# ORIGINAL

| | |
|---|---|
| PRISON LAW OFFICE | McCUTCHEN, DOYLE, BROWN & |
| DONALD SPECTER, #83925 | ENERSEN |
| STEVEN FAMA #99641 | WARREN E. GEORGE, #53588 |
| SARA NORMAN,#189536 | Three Embarcadero Center |
| General Delivery | San Francisco, CA  94111-4066 |
| San Quentin, CA  94964 | Telephone: (415) 393-2000 |
| Telephone: (415) 457-9144 | Facsimile: (415) 393-2286 |
| Facsimile: (415) 457-9151 | |
| | |
| PILLSBURY WINTHROP | McCUTCHEN, DOYLE, BROWN & |
| SHAWN HANSON, #109321 | ENERSEN |
| CAROLINE MITCHELL, #143124 | JOHN MORRISEY, #122194 |
| 50 Fremont Street | 355 South Grand Avenue |
| San Francisco, CA 94105 | Los Angeles, CA 90071 |
| Telephone: (415) 983-1000 | Telephone: (213) 680-6400 |
| Facsimile: (415) 983-1200 | Facsimile: (213) 680-6499 |

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, OTIS SHAW, RAY STODERD, RAYMOND JOHNS, JOSEPH LONG, LESLIE RHOADES, GILBERT AVILES, PAUL DECASAS, STEVEN BAUTISTA, and all others similarly situated, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| GRAY DAVIS, Governor; B. TIMOTHY GAGE, Director, Department of Finance; ROBERT PRESLEY, Secretary, California Youth and Corrections Agency; STEVEN CAMBRA, acting Director, Department of Corrections; SUSANN STEINBERG, M.D., Deputy Director for Health Care Services, DANIEL THOR, M.D., MTA COOPER, T. BUI, M.D., DONALD CALVO, M.D., SHANKAR RAMAN, M.D., BRIAN YEE, M.D., D. SMITH, M.D., M.A. VAN PELT, M.D., BHAVIESH SHAH M.D., ANDREW WONG, M.D., DANIEL | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**C 01   1351**

COMPLAINT

CLASS ACTION

1  FULLER, M.D., MICHAEL SONGER, M.D. )
   M. LEVIN, M.D., JOSEPH SIEGEL,      )
2  M.D., SERGEANT DAVIS, EDGAR         )
   CASTILLO, M.D., K. NGUYEN, M.D.,    )
3  MOHAN SUNDARESON, M.D., DR.         )
   CLINTON, SANDFORD HEPPS, M.D.,      )
4  STEPHEN WYMAN, M.D., L. RICHNAK,    )
   M.D., RICHARD SANDHAM, M.D., and    )
5  C. PARK, DDS.,                      )
                                       )
6      Defendants.                     )
                                       )
7  _____ )

## I.   NATURE OF ACTION

1.   Plaintiffs are nine California state prisoners who have been seriously injured because of defendants' deliberate indifference to their serious medical needs in violation of the cruel and unusual punishment clause of the U.S. Constitution. They bring this civil rights action on behalf of themselves and all other California prisoners because the medical care system operated by the California Department of Corrections (CDC) does not and, with current systems and resources, cannot properly care for and treat the prisoners in its custody.  These unconstitutional conditions have caused widespread harm, including severe and unnecessary pain, injury and death.  Such conditions also have caused prisoners with some disabilities not to have access to prison programs, services and activities in violation of the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act (§ 504).  Because defendants know that plaintiffs and all other prisoners live under conditions creating an unreasonable risk of future harm but have not responded reasonably to this dire situation, they ask the Court to issue an

injuction compelling defendants to immediately furnish them with constitutionally adequate medical care.

## II.   JURISDICTION

2.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.  Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201 and 2202, 29 U.S.C. §794a and 42 U.S.C. §§ 1983 and 12101 et seq.

## III.   VENUE

3.   Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to plaintiffs' claims occurred within the Northern District of California.

## IV.   INTRADISTRICT ASSIGNMENT

4.   Actions giving rise to venue of this case in the Northern District of California occurred in Marin and Monterey Counties.  Accordingly, pursuant to Local Rule 3-2(c), this case arises in the San Francisco Division.

## V.   PARTIES

A.   Plaintiffs

5.   Plaintiff Marciano Plata is a prisoner incarcerated at Salinas Valley State Prison at Soledad, California with very limited ability to communicate in English.  Defendants were deliberately indifferent to his serious medical needs by failing to provide adequate care and treatment for injuries he sustained as a result of several falls.  In November 1997 Plata fell while working in the kitchen at Calipatria State Prison, injuring his

1   right knee, back and head.  He was examined by a Medical

2   Technical Assistant(MTA) who did not provide Plata with any

3   treatment or a referral to a physician.  Plata was forced to walk

4   back to his prison cell without any assistance.  After receiving

5   no response to his requests to be examined at sick call, Plata

6   fell at work again after his right knee buckled and was

7   temporarily unable to move. Plata was taken to the infirmary

8   where X-rays were taken, but no other treatment was provided.

9   Plata continued to be denied medical care by MTAs even though he

10  was experiencing headaches and dizzy spells.  He fell a third

11  time when his right knee buckled at work.  He was lifted into a

12  wheelchair by other inmates and taken to the infirmary where an

13  MTA denied Plata medical care and treatment.  On March 9, 1998

14  Plata was transferred to Salinas Valley State Prison where he had

15  no access to sick call during lockdowns.  Plata finally had an

16  appointment with a physician, but language barriers prevented any

17  meaningful communication.  Without notice or any understanding of

18  why he needed surgery or what was wrong with his knee, Plata was

19  taken to a community hospital for surgery in October 1999.  Upon

20  his discharge from the hospital, Plata was returned to Salinas

21  Valley where he was forced to walk unaided on his surgically

22  repaired knee from the infirmary to his housing unit, causing him

23  severe pain and inflammation of his foot.  After surgery,

24  plaintiff has not received any follow-up care or physical therapy

25  at Salinas Valley.  Plata informed MTA Cooper that he was not

26  receiving any post-operative care and treatment, but no treatment

    was provided.  As the Health Care Manager at Salinas Valley, Dr.

28

Complaint
Plata v. Davis,

1 | Thor failed to adequately supervise and train staff and put in
2 | place procedures so that Plata would receive medically
3 | appropriate care.  As the Chief Medical Officer at Calipatria,
4 | Dr. Levin failed to adequately supervise and train staff and put
5 | in place procedures so that Plata would receive medically
6 | appropriate care.

7 |     6.   Plaintiff Otis Shaw is a 52 year old prisoner at San
8 | Quentin suffering from end stage renal disease who has kidney
9 | dialysis three times a week.  After receiving an operation to
10 | insert a synthetic graft into his arm to facilitate dialysis, he
11 | was returned to the prison infirmary for post-operative care.
12 | Two weeks later, Dr. T. Bui explicitly noted that his wound was
13 | still oozing, but made no attempt to determine why, and ordered
14 | that Shaw be moved.  Shaw was placed in an unsanitary cell and
15 | did not receive further nursing care for the wound.  Shaw had to
16 | clean the wound and change the bandages himself, which he could
17 | not adequately do because the wound's location on his upper arm
18 | made it impossible for him to use both hands.  Ten days later,
19 | the still-oozing wound became infected, requiring him to be
20 | hospitalized for two weeks.  As the Health Care Manager at San
21 | Quentin, Dr. Calvo failed to adequately supervise and train staff
22 | and put in place procedures so that Shaw would receive medically
23 | appropriate care.

24 |     7.   Plaintiff Raymond Stoderd is a prisoner at California
25 | State Prison - Corcoran who suffers from AIDS and chronic pain
26 | syndrome.  Stoderd experienced deliberate indifference to his
  | serious medical needs because prison officials treated his pain
28 |

1   with methadone and then abruptly discontinued that treatment at

2   least eight times, causing him to suffer withdrawal, an extremely

3   painful condition which involves uncontrolled shaking, vomiting,

4   insomnia, headaches, dizziness, hot flashes, sweats, chills and

5   loss of appetite.  Dr. Shankar Raman ordered abrupt

6   discontinuation of Stoderd's methadone prescription several times

7   despite knowing of both the risk of withdrawal symptoms and that

8   Stoderd had previously suffered severe withdrawal symptoms.

9   Through letters from Stoderd's counsel Dr. Brian Yee was made

10  aware of the repeated abrupt discontinuations of Stoderd's

11  methadone prescription.  As the Health Care Manager at Corcoran

12  Dr. Yee failed to adequately supervise and train staff and put in

13  place procedures so that Stoderd would receive medically

14  appropriate care.

15      8.   Plaintiff Raymond Johns is a 76 year old condemned

16  prisoner at San Quentin.  He is blind in his left eye and going

17  blind in his right eye due to cataracts.  He has experienced

18  deliberate indifference to his serious medical needs because Dr.

19  D. Smith, a contract ophthalmogist, hired by San Quentin, ordered

20  that surgery to remove Johns's cataracts not be performed until

21  the vision in his right eye is also compromised, and Dr. Donald

22  Calvo, the Health Care Manager at San Quentin, personally

23  approved this decision.  Dr. M.A. Van Pelt denied Johns's

24  administrative appeal requesting the operation.  Dr. Calvo is the

25  Health Care Manager at San Quentin and as such is responsible for

26  developing and implementing the policy preventing Johns from

    receiving adequate care.  Dr. Calvo also failed to adequately

28

Complaint
Plata v. Davis

1   supervise and train staff and put in place procedures so that

2   Johns would receive medically appropriate care.

3      9.   Plaintiff Joseph Long is a 24 year old paraplegic who

4   is a prisoner at Salinas Valley State Prison.   Due to

5   unreasonable delays in assessing and treating chronic bladder

6   infections, he experienced unnecessary pain from urinary tract

7   infections that also led to urinary incontinence. Dr. Bhaviesh

8   Shah assessed that Long had a urinary tract infection, but did

9   not ensure that Long was seen by a urologist during the almost

10   five months that he was incarcerated at Wasco State Prison

11   Reception Center.   Dr. Andrew Wong prescribed antibiotics to

12   treat Long's infections but did not refer him to a urologist,

13   despite persistent signs of infection and despite the fact that

14   he was initially referred to a urologist in June 2000 and that he

15   was never seen by one.   Dr. Daniel Fuller reviewed his case in

16   response to a letter from Long's counsel but did not ensure that

17   Long was seen by a urologist.   Dr. Daniel Thor was made aware of

18   Long's medical condition in late January 2001 based on a letter

19   from Long's counsel.   As the Chief Medical Officer at Salinas

20   Valley State Prison Dr. Thor failed to ensure that Long receive

21   adequate treatment and failed to adequately supervise and train

22   staff and put in place procedures so that Long would receive

23   medically appropriate care.   As the Health Care Manager at Wasco

24   State Prison, Dr. Michael Songer failed to adequately supervise

25   and train staff and put in place procedures so that Long would

26   receive medically appropriate care.

28

1      10.   Plaintiff Leslie Rhoades is a prisoner at Calipatria

2   State Prison.  Mr. Rhoades has suffered from severe pain in his

3   left hip since a car accident which occurred shortly before being

4   arrested on October 7, 1996.  This condition has made it

5   extremely difficult for him to walk.  Mr. Rhoades began his

6   prison term on October 8, 1997.  In December 1997, an x-ray was

7   taken which was negative as to damage to the hip bone.  But the

8   hip was still found on examination to be subluxating, meaning it

9   was popping in and out of the hip socket.  On July 9, 1998, a CDC

10  orthopedist, Dr. David Smith, stated that Mr. Rhoades' hip was

11  dislocated, with the hip visibly popping in and out of the

12  socket.  Dr. Smith determined that Mr. Rhoades required a

13  stabilization procedure or possibly a total hip replacement.  Dr.

14  Smith then began requesting on a nearly monthly basis beginning

15  in July 1998 that an MRI scan be conducted to determine the

16  appropriate course of treatment.  Dr. Smith also continually

17  requested that Mr. Rhoades be transferred to a CDC hospital

18  facility for treatment.

19     11.   While the MRI for Mr. Rhoades was eventually approved

20  in December 1998, a December 21, 1999 "MRI was cancelled as per

21  Watch Commander secondary to custody concerns during

22  transportation."  According to Dr. M. Levin, the MRI was not done

23  at that time because the only experienced transportation team at

24  the prison was unavailable that day.  No MRI was scheduled during

25  the next six months.  Finally, on June 25, 1999, Rhoades was

26  taken for an MRI.  However, one of the guards accompanying Mr.

     Rhoades walked too close to the MRI machine and had his weapons

28

1  sucked into the MRI's magnet, breaking the machine and preventing

2  the MRI from being done.  Rhoades did not have an MRI scan until

3  July 16, 1999, despite continuing requests from Dr. Smith, and

4  only after his attorney made an appeal to the Chief Medical

5  Officer and his attorney met with Rhoades at Calipatria.

6       12.  No appointment was set up to present and discuss the

7  MRI results with Rhoades until October 7, 1999.  Mr. Rhoades was

8  then informed that the MRI confirmed what the December 1997 x-ray

9  had already found, that the hip bone was not damaged.  However,

10 Mr. Rhoades's left hip continued to pop in and out and cause

11 severe pain.  In addition, the right hip had begun to do the same

12 thing.  Mr. Rhoades was told by Dr. Smith that he did not know

13 what was causing the hip to subluxate, but further x-rays would

14 be taken.  The Chief Medical Officer, Dr. M. Levin, wrote to

15 Rhoades's attorney on November 1, 1999 and stated that x-rays

16 would be taken on November 4, 1999 showing "subluxation views" of

17 the hips.  Dr. Levin stated that the doctor must do the

18 manipulation of the hips to show the subluxations.  He stated

19 that "this is not an x-ray procedure that can just be done simply

20 by the technician."  However, these x-rays were taken without any

21 assistance by a physician.  The technician was not able to take

22 an x-ray of Rhoades's hips in the subluxated position due to the

23 fixed position of the x-ray machine.  However, upon review of the

24 x-rays that were taken, Dr. Smith determined that the hips were

25 no longer subluxating.

26      13.  In December 1999 Rhoades was transferred to CIM to

   obtain a second opinion by another orthopedist.  He was seen by

28

1   Dr. Pospisic who recommended that surgery be performed to repair

2   the hip condition and that Rhoades be given a wheelchair so that

3   he would not have to walk.  Rhoades used the wheelchair for the

4   remainder of his time at CIM.  In January 2000 Rhoades was

5   examined by a consulting doctor at Riverside General Hospital who

6   said that surgery would not help repair the condition, but

7   recommended an MRI for assistance in assessment of the condition.

8   The MRI was done two months later in March 2000.  Dr. Joseph

9   Siegel then reported to Rhoades's counsel that the working

10  diagnosis was atrophy of the left gluteus minimus muscle.  In

11  June 2000 Rhoades was examined by another Riverside General

12  Hospital consulting doctor who agreed that surgery would not be

13  helpful, but that Rhoades should have physical therapy in order

14  to determine which muscles were damaged.

15      14.  Rhoades was transferred back to Calipatria State

16  Prison in October 2000.  Upon his arrival at Calipatria Sergeant

17  Davis forced Rhoades to walk from the reception area to his

18  housing unit, a distance of over 1000 yards, even though Davis

19  was notified by the MTA and by Rhoades that he had not walked for

20  over nine months, and even though Davis was told by the MTA that

21  a wheelchair was available in the central health clinic for

22  Rhoades to use.  Rhoades was handcuffed and, using a cane for

23  assistance, took ten to fifteen minutes to walk from the

24  reception area to his housing unit.  The next morning his left

25  hip, leg and foot were swollen and he was unable to get out of

26  bed to go to meals for the next two days.  It took over a month

    for Rhoades's medical records to be forwarded from CIM to

28

1  Calipatria, further delaying steps towards diagnosing and

2  treating his condition.  The recommendations by the Riverside

3  General Hospital doctors and by Dr. David Smith, the Calipatria

4  orthopedist, to have Rhoades undergo physical therapy in order to

5  assess the damage to his hip muscles was not acted upon until

6  January 2001 when Rhoades filed a Reasonable Modification or

7  Accommodation Request.  Dr. Levin, the Calipatria Chief Medical

8  Officer approved transfer to a medical facility where Rhoades

9  could obtain physical therapy, and he is awaiting such a

10  transfer.  He continues to suffer acute pain in his hips, back

11  and legs and is suffering detrimental effects of taking

12  painkillers for several years.  As the Chief Medical Officer at

13  Calipatria, Dr. Levin failed to adequately supervise and train

14  staff and put in place procedures so that Rhoades would receive

15  medically appropriate care.  As the Chief Medical Officer at

16  California Institution for Men, Dr. Stephen Wyman failed to

17  adequately supervise and train staff and put in place procedures

18  so that Rhoades would receive medically appropriate care.

19       15.  Plaintiff Gilbert Aviles is a prisoner at the

20  Substance Abuse Treatment Facility (SATF) who transferred from

21  Wasco State Prison Reception Center on June 18, 1999.  He is a

22  paraplegic who requires the use of a catheter to relieve his

23  bladder, either an in-dwelling "foley" (which remains in the body

24  for extended periods) or single use type.  From the beginning of

25  his incarceration in October 1998 through August 1999, at both

26  Waco and SATF, he used an in-dwelling foley catheter.  During

27  this time period, physician orders in Mr. Aviles's medical

28

1   records stated that his catheter was to be changed every 14 days.
2   However, at both Wasco and SATF his catheter was in fact not
3   changed for periods of two months or more, causing him to suffer
4   severe urinary tract infections which required at least two
5   hospitalizations.  Further, the catheters provided at Wasco were
6   past their expiration dates.  For example, Mr. Aviles was
7   provided with a catheter at Wasco on or about June 4, 1999 that
8   had an expiration date of February 1999.  When the catheter
9   balloon broke upon insertion, another catheter was provided with
10  an expiration date of March 1995.  This catheter was left in for
11  two months until Mr. Aviles was hospitalized on or around August
12  3-6, 1999 with a urinary tract infection.  Mr. Aviles has become
13  increasingly resistant to antibiotics due to the frequent
14  infections.  While ill from the urinary tract infections, Mr.
15  Aviles was unable to eat many meals, or to take part in social or
16  recreational programs, including daily yard time.  It was not
17  until Mr. Aviles's attorney visited SATF and wrote letters to
18  Health Care Manager Edgar Castillo that Mr. Aviles started to
19  receive an adequate supply of in-and-out catheters in August 1999
20  and was able to avoid further infections.  As the Health Care
21  Manager at Wasco, Dr. Michael Songer failed to adequately
22  supervise and train staff and put in place procedures so that
23  Aviles would receive medically appropriate supplies in a timely
24  manner.  As the Health Care Manager at SATF, Dr. Castillo failed
25  to adequately supervise and train staff and put in place
26  procedures so that Aviles would receive medically appropriate
     supplies in a timely manner.
28

Complaint
Plata v. Davis
                              11

16. Plaintiff Paul Decasas is a 34-year-old prisoner housed at SATF. He has a serious seizure disorder. He was being treated as an inpatient through medication at the California Institution for Men Hospital. Dr. Mohan Sundareson and Dr. Clinton signed discharge orders allowing Decasas to be transferred from CIM to SATF even though his seizures had not been brought under control. Upon discharge he was transferred to SATF, a prison with no inpatient hospital, to participate in a civil addict drug treatment program; he cannot be released from prison until he satisfactorily completes this program. Once at SATF his condition was not monitored properly by Dr. K. Nguyen, his treating physician, he did not always receive his prescribed medications, and as a result he continued to experience frequent seizures. During one seizure, Decasas used a bite stick to protect his tongue and shattered it. A nurse refused to replace the bite stick, although he was at risk for having seizures at any time. Decasas's seizures continued until his counsel's intervention precipitated a change in his medication. As a result of the CDC's inadequate medical care, Mr. Decasas was denied access to the benefits of the substance abuse program for several months. As the Health Care Manager at SATF Dr. Edgar Castillo failed to ensure that Decasas receive adequate treatment and failed to adequately supervise and train staff and put in place procedures so that Decasas would receive medically appropriate care. As the Health Care Manager and Chief Medical Officer at CIM, Dr. Hepps failed to ensure that Decasas receive adequate treatment and failed to adequately supervise and train

1  staff and put in place procedures so that Decasas would receive

2  medically appropriate care.

3      17.  Plaintiff Steven Bautista is a prisoner at California

4  State Prison - Sacramento.  While he was incarcerated at High

5  Desert State Prison he began suffering a priaprism, which is a

6  persistent penile erection, on January 29, 1999 as a result of

7  taking Trazodone (Desyrel)which was prescribed by Dr. Richnak, a

8  psychiatrist employed by the prison, for major depression.  Dr.

9  Richnak prescribed this medication without informing Bautista of

10  the possible side effects, which include priaprism.  Bautista's

11  condition was brought to the attention of Dr. Sandham on January

12  30.  Dr. Sandham failed to adequately treat Bautista's medical

13  condition.  Dr. Sandham noted that the priaprism had started 23

14  hours earlier and believed that it was a side-effect of the

15  antidepressant Trazodone, which Bautista had been taking for one

16  and a half months.  Dr. Sandham ordered that Bautista discontinue

17  taking the Trazodone, that he apply ice packs to his genital

18  area, and that he take Motrin.  Dr. Sandham told Bautista that he

19  would see him the next day; however, he did not evaluate

20  Bautista's condition again until two days later.  On February 1,

21  Dr. Sandham issued an order for application of ice to the genital

22  area for twenty minutes and again the next morning, as well as

23  Roboxin and that Bautista be cell fed.  On February 2, Bautista

24  was seen by Dr. Sandham in the prison emergency room.  The doctor

25  noted that the priaprism had started 96 hours earlier.  He

26  prescribed Terbutaline but this did not reverse the priaprism.

    He then spoke to a consulting urologist who recommended

28

1 | pseudoephedrine, but this medication was also ineffective.
2 | Bautista was admitted to the prison infirmary.  The next morning,
3 | on February 3, Bautista was transferred to the consulting
4 | urologist's office.  The urologist worked with the patient most
5 | of the day in his office with various therapies but to no avail.
6 | The inmate was subsequently hospitalized later the same day but
7 | surgery was not performed until the morning of February 4, 1999.
8 | Mr. Bautista was left with permanent impotence and disfigurement,
9 | resulting in exacerbation of his depressive state.  He continues
10 | to suffer serious urological problems including pain and
11 | difficulty urinating.  The medical care provided to Mr. Bautista
12 | was inadequate as acute priaprism is a urological emergency
13 | requiring prompt intervention so as to prevent the possibility of
14 | impotence.  There was an inexcusable delay in accessing the
15 | proper urological care from the onset of the priaprism on January
16 | 29, 1999 until February 3, 1999 which was on the sixth day of the
17 | acute condition. As the Health Care Manager at High Desert, Dr.
18 | Park failed to adequately supervise and train staff and put in
19 | place procedures so that Bautista would receive medically
20 | appropriate care.
21 |     B.  <u>Defendants</u>
22 |     18.  Defendant Gray Davis is the Governor of the State of
23 | California and the Chief Executive of the state government.  He
24 | is sued herein in his official capacity.  As Governor he is
25 | obligated under state law to supervise the official conduct of
26 | all executive and ministerial officers and to see that all
     | offices are filled and their duties lawfully performed.
28 |

1  Defendant Davis has control over the monies allocated to the CDC

2  by submitting a budget and by exercising his authority to veto or

3  sign legislation appropriating funds.  Defendant Davis has the

4  authority to appoint and remove the subordinate defendants named

5  herein.  Defendant Davis retains the ultimate state authority

6  over the care and treatment of the plaintiff class.

7      19.  Defendant B. Timothy Gage is the Director of the

8  Department of Finance and is sued in that capacity.  Mr. Gage

9  supervises the Department of Finance, which is responsible for

10  approving the CDC budget requests, including budget items for

11  provision of medical care.

12      20.  Defendant Robert Presley is Secretary of the Youth and

13  Adult Corrections Agency of the state of California and is sued

14  herein in this capacity.  The Youth and Adult Corrections Agency

15  supervises the operation of the CDC.

16      21.  Defendant Steven Cambra is the acting Director of the

17  CDC and is sued herein in that capacity.  The CDC is responsible

18  for the operation of the California state prison system,

19  including the provision of constitutionally adequate medical

20  care.  As Director, Defendant Cambra is responsible for the

21  operation of all the prison facilities, including decisions

22  concerning staff deployment and training that directly affect

23  plaintiffs' abilities to obtain adequate medical care.

24      22.  Defendant Susann Steinberg, M.D. is the Deputy

25  Director for Health Care Services for the CDC and is sued in that

26  capacity.  As Deputy Director, Dr. Steinberg is responsible for

28

Complaint
Plata v. Davis.

15

supervising the provision of medical care for all prisoners
within the custody of the department.

23.  Defendant Daniel Thor, M.D., was at all relevant times
the Health Care Manager at Salinas Valley State Prison and is
sued in his individual capacity.  As Health Care Manager, Dr.
Thor is responsible for supervising the provision of adequate
medical care for prisoners at Salinas Valley.

24.  Defendant MTA Cooper was at all relevant times an MTA
at Salinas Valley and is sued in his individual capacity.

25. Defendant T. Bui, M.D., was at all relevant times a
physician employed at San Quentin State Prison and is sued in his
individual capacity.

26.  Defendant Donald Calvo, M.D., was at all relevant
times the Health Care Manager at San Quentin State Prison and is
sued in his individual capacity.  As Health Care Manager, Dr.
Calvo was responsible for supervising the provision of adequate
medical care for prisoners at San Quentin.

27.  Defendant M. Levin, M.D., was at all relevant times
the Health Care Manager at Calipatria State Prison and is sued in
his individual capacity.  As Health Care Manager, Dr. Levin was
responsible for supervising the provision of adequate medical
care for prisoners at Calipatria.

28.  Defendant Shankar Raman, M.D., was at all relevant
times a physician employed at California State Prison - Corcoran
and is sued in his individual capacity.

29.  Defendant Brian Yee, M.D., was at all relevant times
the Health Care Manager at California State Prison - Corcoran and

1    is sued in his individual capacity.  As Health Care Manager, Dr.

2    Yee was responsible for supervising the provision of adequate

3    medical care for prisoners at Corcoran.

4          30.   Defendant D. Smith, M.D., was at all relevant times a

5    contract ophthalmologist hired by San Quentin State Prison and is

6    sued herein in his individual capacity.

7          31.   Defendant M.A. Van Pelt, M.D., was at all relevant

8    times a physician at San Quentin State Prison and is sued herein

9    in his individual capacity.

10         32.   Defendant Bhaviesh Shah, M.D., was at all relevant

11    times a physician employed at Wasco State Prison and is sued in

12    his individual capacity.

13         33.   Defendant Andrew Wong, M.D., was at all relevant times

14    a physician employed at Wasco State Prison and is sued in his

15    individual capacity.

16         34.   Defendant Daniel Fuller, M.D.,was at all relevant

17    times a physician employed at Salinas Valley State Prison and is

18    sued in his individual capacity.

19         35.   Defendant Michael Songer, M.D., was at all relevant

20    times the Health Care Manager at Wasco State Prison and is sued

21    in his individual capacity.  As Health Care Manager, Dr. Songer

22    was responsible for supervising the provision of adequate medical

23    care for prisoners at Wasco.

24         36.   Defendant Stephen Wyman, M.D., was at all relevant

25    times the Health Care Manager and Chief Medical Officer at

26    California Institution for Men and is sued in his individual

      capacity.  As Health Care Manager and Chief Medical Officer, Dr.

28

1  Wyman was responsible for supervising the provision of adequate

2  medical care for prisoners at Wasco.

3       37.  Defendant Joseph Siegel, M.D., was at all relevant

4  times a physician employed at California Institution for Men and

5  is sued in his individual capacity.

6       38.  Defendant Sergeant Davis was at all relevant times a

7  sergeant at Calipatria State Prison and is sued in his individual

8  capacity.

9       39.  Defendant Edgar Castillo, M.D., was at all relevant

10  times the Health Care Manager at SATF and is sued in his

11  individual capacity.  As Health Care Manager, Dr. Castillo was

12  responsible for supervising the provision of adequate medical

13  care for prisoners at SATF.

14       40.  Defendant K. Nguyen, M.D., was at all relevant times a

15  physician employed at SATF and is sued in his individual

16  capacity.

17       41.  Defendant Sanford Hepps, M.D., was at all times

18  relevant to plaintiff Decasas's claims the Health Care Manager

19  and Chief Medical Officer at the California Institution for Men

20  and is sued in his individual capacity.  As Health Care Manager,

21  Dr. Hepps was responsible for supervising the provision of

22  adequate medical care for prisoners at CIM.

23       42.  Defendant Mohan Sundareson, M.D., was at all relevant

24  times a physician employed at CIM and is sued in his individual

25  capacity.

26

28

43.   Defendant Dr. Clinton, M.D., was at all relevant times a physician employed at CIM and is sued in his individual capacity.

44.   Defendant L. Richnak, M.D., was at all relevant times a psychiatrist employed at High Desert State Prison and is sued in his individual capacity.

45.   Defendant Richard Sandham, M.D., was at all relevant times a physician employed at High Desert State Prison and is sued in his individual capacity.

46.   Defendant C. Park, DDS, was at all relevant times  the Health Care Manager at High Desert State Prison and is sued in his individual capacity.  As Health Care Manager, Dr. Park was responsible for supervising the provision of adequate medical care for prisoners at High Desert.

## VI. CLASS ACTION ALLEGATIONS

47.   The named plaintiffs bring this action on their own behalf and, pursuant to Rules 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a class of all prisoners who are now, or will in the future be, under the custody of the CDC but excluding any prisoners confined at Pelican Bay State Prison.

(a)   Thousands of prisoners in CDC custody suffer from serious medical conditions.  All prisoners are at risk of developing a serious medical condition while in prison and thousands need care and treatment to prevent serious medical conditions.  All prisoners are entirely dependent on defendants

Complaint
Plata v. Davis

19

1  for the provision of medical treatment.   The size of the class is
2  so numerous that joinder of all members is impracticable.

3        (b)   The conditions, practices and omissions that form
4  the basis of this complaint are common to all members of the
5  class and the relief sought will apply to all of them.

6        (c)   The claims of the named plaintiffs are typical of
7  the claims of the class.

8        (d)   The prosecution of separate actions by individual
9  members of the class would create a risk of inconsistent and
10  varying adjudications which would establish incompatible
11  standards of conduct for the defendants.

12        (e)   The prosecution of separate actions by individual
13  members of the class would create a risk of adjudications with
14  respect to individual members which would, as a practical matter,
15  substantially impair the ability of other members to protect
16  their interests.

17        (f)   Defendants have acted or refused to act on grounds
18  generally applicable to the class, making appropriate injunctive
19  and declaratory relief with respect to the class and subclass as
20  a whole.

21        (g)   There are questions of law and fact common to the
22  members of the class, including defendants' violations of the
23  Eighth and Fourteenth Amendments to the United States
24  Constitution, the ADA and § 504.

25        (h)   The named plaintiffs are capable, through counsel,
26  of fairly and adequately representing the class and protecting
   its interests.

28

Complaint
Plata v. Davis
20

1    **VII.   STATEMENT OF CLASS CLAIMS**

2         48.   The medical care provided by defendants in each of its

3    prison is woefully inadequate and violates the constitutional

4    rights of the named plaintiffs and the plaintiff class under the

5    Eighth and Fourteenth Amendments of the United States

6    Constitution to be free from cruel and unusual punishment.   There

7    are a multitude of problems with the delivery of medical care to

8    plaintiffs and the plaintiff class, including but not limited to,

9    the following:

10        a.   MTAs are inadequately trained to perform their

11   duties and have conflicting custodial responsibilities.   MTAs are

12   the "gatekeepers" for plaintiffs' access to any medical care.

13   Prisoners who wish to be seen by a doctor must first submit a

14   request to an MTA.   The first person who responds to a prisoner

15   with an acute medical incident often is an MTA.   MTAs are often

16   called upon to make initial medical diagnoses of prisoner medical

17   conditions.   Many MTAs, however, have inadequate medical

18   training.   MTAs therefore may not, and have not in the past,

19   recognized the symptoms a patient displays until that condition

20   has become so acute as to be life threatening.   MTAs are peace

21   officers and are expected to perform custodial functions which

22   interfere with their ability to provide adequate medical care.

23        b.   There are insufficient numbers of qualified

24   medical staff, including physicians, nurses and MTAs.

25        c.   There is a lack of training and supervision of all

26   medical personnel.

28

d.   Prisoners' medical records often are disorganized and incomplete.

e.   There is a lack of adequate medical screening of incoming prisoners.

f.   There are lengthy delays in accessing care, including delays to see a primary physician, to obtain a referral to see a specialist, to see a specialist after obtaining the referral, to obtain medical testing and to obtain treatment. These delays are compounded when inmates are transferred to new institutions, often causing further delays in the provision of medical care.

g.   There are frequent failures to provide prisoners with access to care altogether.  Often, medical staff do not take sufficient steps necessary to make diagnoses.  There are often failures to provide treatment when a diagnosis or symptom is discovered.  Medical staff do not provide care because they do not use interpretative services to communicate with prisoners who speak languages other than English.

h.   Laboratory and other medical tests are frequently delayed, never done or not reported.

i.   There is poor emergency response caused by lack of expertise of MTAs and custody concerns.

j.   Correctional officers frequently interfere with the provision of medical care.

k.   There is a lack of quality control procedures, including lack of physician peer review, quality assurance and

1  death reviews.   Even if deficiencies are identified, there is

2  inadequate follow-up to prevent future problems.

3        l.   There is a lack of established protocols for

4  dealing with chronic illnesses such as diabetes, heart disease

5  and HIV.   The care of HIV+ inmates is particularly inadequate.

6  Problems include, but are not limited to, (i) frequent failure to

7  instruct and assist inmates in following the strict regimen

8  needed to take their drug combinations successfully, (ii)

9  irregular, untimely, and sometimes incorrect administration of

10  medications, and (iii) failure to adequately monitor and treat

11  secondary infections.

12        m.   Defendants are unable to recruit sufficient,

13  competent medical staff and to retain those staff who are hired.

14        n.   Necessary medical care is often denied based

15  solely on an inmate's expected release date, even when this date

16  is over one year away.

17        o.   Defendants lack sufficient knowledge about the

18  medical care system to properly monitor and improve the delivery

19  of medical care.

20        49.   The CDC receives federal financial assistance as that

21  term is used in 29 U.S.C. § 794(b)(1)(A).

22        50.   By denying plaintiffs and the plaintiff class adequate

23  medical care plaintiffs are not able to participate and are

24  therefore denied meaningful access to programs, services and

25  activities that they are otherwise qualified to participate in

26  and benefit from, thereby subjecting them to discrimination based

27  on their disabilities.

28

1                           **CLAIMS FOR RELIEF**

2                                  I.

3 (All Plaintiffs v. Davis, Cage, Presley, Cambra & Steinberg)

4                           (§ 1983)

5     51. The conduct described herein has been and continues to

6 be performed by defendants and their agents or employees in their

7 official capacities and is the proximate cause of the named

8 plaintiffs' and the plaintiff class' ongoing deprivation of

9 rights secured by the United States Constitution under the Eighth

10 and Fourteenth Amendments.

11     52. The constitutional deprivations described herein are

12 the proximate result of the official policies, customs and

13 pervasive practices of defendants. Defendants have been and are

14 aware of all of the deprivations complained of herein, and have

15 condoned or been deliberately indifferent to such conduct.

16                                II.

17 (All Plaintiffs v. Davis, Cage, Presley, Cambra & Steinberg)

18     53. As a result of defendants' policies and practices

19 which result in inadequate medical care, plaintiff Decasas and

20 other members of the class with disabilities other than mobility,

21 sight, hearing, learning and developmental disabilities have been

22 excluded from the substance abuse programs, education, vocation,

23 work furlough and work credit, recreation, dining hall and other

24 meals, yard time, visiting, classification, discipline,

25 telephone, emergency and other programs and services for which

26 they are otherwise qualified that defendants offer to individuals

28

1  under their custody and control, thereby subjecting them to

2  discrimination in violation of the ADA and § 504.

3                           III.

4                (Plata v. Thor, Cooper, & Levin)

5                          (§ 1983)

6      54.  Defendants Thor, Cooper, and Levin were deliberately

7  indifferent to plaintiff Plata's medical needs and have violated

8  plaintiff Plata's right to be free from cruel and unusual

9  punishment under the Eighth Amendment to the U.S. Constitution.

10 Defendants acted under color of state law and knew or should have

11 known that their conduct or omissions created an unreasonable

12 risk of harm to Plata.  As a direct and foreseeable result of

13 these defendants' violations of plaintiff's constitutional

14 rights, plaintiff has suffered and will continue to suffer

15 physical injuries to his knee, leg, foot, back and head that have

16 also caused pain and suffering, emotional distress and other

17 injuries.  Defendant Cooper's acts were willful, intentional,

18 wanton and in conscious disregard of plaintiff's rights.

19                           IV.

20                (Shaw v. Bui & Calvo)

21                          (§ 1983)

22     55.  Defendants Bui and Calvo were deliberately indifferent

23 to plaintiff Shaw's medical needs and have violated plaintiff

24 Shaw's right to be free from cruel and unusual punishment under

25 the Eighth Amendment to the U.S. Constitution.  Defendants acted

26 under color of state law and knew or should have known that their

27 conduct or omissions created an unreasonable risk of harm to

28

1   Shaw.  As a direct and foreseeable result of these defendants'

2   violations of plaintiff's constitutional rights, plaintiff has

3   suffered physical injuries to his arm and a resulting

4   debilitating infection; defendants have also caused pain and

5   suffering, emotional distress and other injuries by failing to

6   provide medically appropriate treatment.  Defendant Bui's acts

7   were willful, intentional, wanton and in conscious disregard of

8   plaintiff's rights.

9                                   V.

10                         (Stoderd v. Raman & Yee)

11                                (§1983)

12       56.  Defendants Raman and Yee have been deliberately

13   indifferent to plaintiff Stoderd's medical needs and have

14   violated plaintiff Stoderd's right to be free from cruel and

15   unusual punishment under the Eighth Amendment to the U.S.

16   Constitution.  These defendants acted under color of state law

17   and knew or should have known that their conduct or omissions

18   created an unreasonable risk of harm to Stoderd.  As a direct and

19   foreseeable result of these defendants' violations of plaintiff's

20   constitutional rights, plaintiff has suffered pain and suffering,

21   emotional distress and other injuries from their discontinuation

22   of his pain medications.  Defendants' acts were willful,

23   intentional, wanton and in conscious disregard of plaintiff's

24   rights.

25   ///

26   ///

     ///

28

        Complaint
     Plata v. Davis

                                    26

VI.

(Johns v. Smith, Calvo, & Van Pelt)

(§1983)

57.  Defendants Smith, Calvo, & Van Pelt have been deliberately indifferent to plaintiff Johns's medical needs and have violated plaintiff Johns's right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution.  These defendants acted under color of state law and knew or should have known that their conduct or omissions created an unreasonable risk of harm to Johns.  As a direct and foreseeable result of these defendants' violations of plaintiff's constitutional rights, plaintiff has suffered and will continue to suffer pain and suffering, emotional distress and other injuries from their refusal to correct his correctable eye condition until he goes completely blind.  Defendants' acts were willful, intentional, wanton and in conscious disregard of plaintiff's rights.

VII.

(Long v. Shah, Wong, Fuller, Songer, & Thor)

(§1983)

58.  Defendants Shah, Wong, Fuller, Songer, and Thor have been deliberately indifferent to plaintiff Long's medical needs and have violated plaintiff Long's right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution.  These defendants acted under color of state law and knew or should have known that their conduct or omissions created an unreasonable risk of harm to Long.  As a direct and

1  foreseeable result of these defendants' violations of plaintiff's

2  constitutional rights, plaintiff has suffered and will continue

3  to suffer permanent injury of incontinence as well as pain and

4  suffering, emotional distress and other injuries from their

5  failure to provide timely and appropriate treatment and

6  specialist referrals.  Defendants Shah, Wong, Fuller, and Thor's

7  acts were willful, intentional, wanton and in conscious disregard

8  of plaintiff's rights.

9                              VIII.

10              (Rhoades v. Levin, Davis, & Wyman)

11                            (§1983)

12       59.  Defendants Levin, Davis, and Wyman have been

13  deliberately indifferent to plaintiff Rhoades's medical needs and

14  have violated plaintiff Rhoades's right to be free from cruel and

15  unusual punishment under the Eighth Amendment to the U.S.

16  Constitution.  These defendants acted under color of state law

17  and knew or should have known that their conduct or omissions

18  created an unreasonable risk of harm to Rhoades.  As a direct and

19  foreseeable result of these defendants' violations of plaintiff's

20  constitutional rights, plaintiff has suffered and will continue

21  to suffer permanent injury to his hip as well as pain and

22  suffering, emotional distress and other injuries from their

23  failure to provide timely and appropriate treatment and

24  specialist referrals.  Defendants Levin and Davis's acts were

25  willful, intentional, wanton and in conscious disregard of

26  plaintiff's rights.

    ///

28

IX.

(Aviles v. Songer & Castillo)

(§1983)

60.  Defendants Songer and Castillo have been deliberately indifferent to plaintiff Aviles's medical needs and have violated plaintiff Aviles's right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution. These defendants acted under color of state law and knew or should have known that their conduct or omissions created an unreasonable risk of harm to Aviles.  As a direct and foreseeable result of these defendants' violations of plaintiff's constitutional rights, plaintiff has suffered and will continue to suffer permanent injury as well as pain and suffering, emotional distress and other injuries from their failure to provide timely and appropriate treatment and supplies.

X.

(Decasas v. Nguyen, Castillo, Sundareson, Clinton & Hepps)

(§1983)

61.  Defendants Nguyen, Castillo, Sundareson, Clinton and Hepps have been deliberately indifferent to plaintiff Decasas's medical needs and have violated plaintiff Decasas's right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution.  These defendants acted under color of state law and knew or should have known that their conduct or omissions created an unreasonable risk of harm to Decasas.  As a direct and foreseeable result of these defendants' violations of plaintiff's constitutional rights, plaintiff has suffered and

1   will continue to suffer permanent injury as well as pain and

2   suffering, emotional distress and other injuries from their

3   failure to provide timely and appropriate treatment.  Defendants

4   Nguyen, Sundareson, and Clinton's acts were willful, intentional,

5   wanton and in conscious disregard of plaintiff's rights.

6                                   XI.

7                   (Bautista v. Richnak, Sandham & Park)

8                               (§1983)

9        62.  Defendants Richnak, Sandham, & Park have been

10  deliberately indifferent to plaintiff Bautista's medical needs

11  and have violated plaintiff Bautista's right to be free from

12  cruel and unusual punishment under the Eighth Amendment to the

13  U.S. Constitution.  These defendants acted under color of state

14  law and knew or should have known that their conduct or omissions

15  created an unreasonable risk of harm to Bautista.  As a direct

16  and foreseeable result of these defendants' violations of

17  plaintiff's constitutional rights, plaintiff has suffered and

18  will continue to suffer permanent impotence and disfigurement

19  that has also caused pain and suffering, emotional distress and

20  other injuries.  Defendants Richnak and Sandham's acts were

21  willful, intentional, wanton and in conscious disregard of

22  plaintiff's rights.

23  ///

24  ///

25  ///

26  ///

27  ///

28

Complaint
Plata v. Davis

30

1 | **VIII.   PRAYER FOR RELIEF**

2     WHEREFORE, the named plaintiffs and the class they represent

3 request that this Court grant them the following relief:

4         (a)   Declare the suit is maintainable as a class action

5 pursuant to Federal Rule of Civil Procedure 23(b)(1) and

6 23(b)(2);

7         (b)   Adjudge and declare that the acts, omissions,

8 policies, and conditions described above are in violation of the

9 Eighth and Fourteenth Amendments, which grant constitutional

10 protection to the plaintiffs and the class they represent;

11         (c)   Adjudge and declare that the acts, omissions,

12 policies, and conditions described above are in violation of the

13 ADA and § 504;

14         (d)   Preliminarily and permanently enjoin defendants,

15 their agents, employees and all persons acting in concert with

16 them, from subjecting the named plaintiffs and the class they

17 represent to the unconstitutional and unlawful acts, omissions,

18 policies, and conditions described above;

19         (e)   Award only the named plaintiffs monetary damages,

20 compensatory and punitive, in an amount to be determined at

21 trial;

22         (f)   Award plaintiffs the costs of this suit, and

23 reasonable attorneys' fees and litigation expenses pursuant to 42

24 U.S.C. § 1988, 29 U.S.C. § 794a(b), and 42 U.S.C. § 12205;

25         (g)   Retain jurisdiction of this case until defendants

26 have fully complied with the orders of this Court, and there is a

28

Complaint
Plata v. Davis

1 │ reasonable assurance that defendants will continue to comply in

2 │ the future absent continuing jurisdiction; and

3 │         (h)   Award such other and further relief as the Court

4 │ deems just and proper.

5 │     Dated: April 4, 2001

6 │                              Respectfully submitted,

7 │

8 │

9 │                              DONALD SPECTER
                                 Attorney for Plaintiffs

10 │

11 │

12 │

13 │

14 │

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

28 │

        Complaint
Plata v. Davis