**ORIGINAL**

1   PRISON LAW OFFICE
    DONALD SPECTER #83925
2   STEVEN FAMA #99641
    SARA NORMAN#189536
3   General Delivery
    San Quentin, CA  94964
4   Telephone: (415) 457-9144
    Facsimile: (415) 457-9151
5

6   PILLSBURY WINTHROP
    SHAWN HANSON #109321
7   CAROLINE MITCHELL #143124
    50 Fremont Street
8   San Francisco, CA 94105
    Telephone: (415) 983-1000
9   Facsimile: (415) 983-1200

10   Attorneys for Plaintiffs

McCUTCHEN, DOYLE, BROWN &
  ENERSEN
WARREN E. GEORGE #53588
Three Embarcadero Center
San Francisco, CA  94111
Telephone: (415) 393-2000
Facsimile: (415) 393-2286

McCUTCHEN, DOYLE, BROWN &
  ENERSEN
JOHN MORRISEY #122194
355 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 680-6400
Facsimile: (213) 680-6499

**FILED**

AUG 2 0 2001

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

11

IN THE UNITED STATES DISTRICT COURT

12

NORTHERN DISTRICT OF CALIFORNIA

13

14   MARCIANO PLATA, OTIS SHAW, RAY
    STODERD, RAYMOND JOHNS, JOSEPH
15   LONG, LESLIE RHOADES, GILBERT
    AVILES, PAUL DECASAS, STEVEN
16   BAUTISTA, CLIFFORD MYELLE and
    all others similarly situated,
17

18         Plaintiffs,

19         v.

20

21   GRAY DAVIS, Governor, B. TIMOTHY
    GAGE, Director, Department of
    Finance, ROBERT PRESLEY,
22   Secretary, California
    Youth and Adult Correctional
23   Agency, CALIFORNIA DEPARTMENT
    OF CORRECTIONS, TERESA ROCHA,
24   acting Director Department of
    Corrections, SUSANN STEINBERG,
25   M.D., Deputy Director  for Health
    Care Services, DANIEL THOR, M.D.,
26   ANGELA COOPER, R.N., ANDREW
    LUCINE, M.D., TAM BUI, M.D., DONALD
27   CALVO, M.D., SHANKAR RAMAN, M.D.,
    BRIAN YEE, M.D., DARRELL SMITH, M.D.,
28   MEREDITH ALDEN VAN PELT, M.D.,

    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )

No. C-01-1351 TEH

**FIRST AMENDED
COMPLAINT
CLASS ACTION**

Amended Complaint
Plata v. Davis No. C-01-1351 TEH

1  BHAVIESH SHAH, M.D., ANDREW          )
   WONG, M.D., DANIEL FULLER, M.D.,     )
2  MICHAEL SONGER, M.D., MARTIN         )
   LEVIN, M.D., JOSEPH SIEGEL, M.D.,    )
3  SERGEANT RANDALL DAVIS, EDGAR        )
   CASTILLO, M.D., K. NGUYEN, M.D.,     )
4  MOHAN SUNDARESON, M.D., DR.          )
   CLINTON, SANFORD HEPPS, M.D.,        )
5  STEPHEN WYMAN, M.D., LOUIS           )
   RICHNAK, M.D., RICHARD SANDHAM,      )
6  M.D., C. PARK, DDS., DR. WILLIAMS,   )
   J. KOFOED, M.D., JOSEPH TOURELLA,    )
7  M.D., MTA MICHAEL FARRINGER,         )
   GLENN A. MUELLER, ROSEANNE          )
8  CAMPBELL, DENEICE MAYLE, and        )
   DOES I - V,                          )
9                                       )
10      Defendants.                     )
                                        )
11 ─────────────────────────────────── )

12

13 **I. NATURE OF ACTION**

14      1.  Plaintiffs are ten California state prisoners who have been seriously injured

15 because of defendants' deliberate indifference to their serious medical needs in violation of

16 the cruel and unusual punishment clause of the Eighth Amendment to the United States

17 Constitution.  They bring this civil rights action on behalf of themselves and all other

18 California prisoners because the medical care system operated by the CALIFORNIA

19 DEPARTMENT OF CORRECTIONS (CDC) does not and, with current systems and

20 resources, cannot properly care for and treat the prisoners in its custody.  These

21 unconstitutional conditions have caused widespread harm, including severe and

22 unnecessary pain, injury and death.  Such conditions also have denied prisoners with some

23 disabilities access to prison programs, services and activities in violation of the Americans

24 with Disabilities Act (ADA) and § 504 of the Rehabilitation Act (§ 504).  Because

25 defendants know that plaintiffs and all other prisoners live under conditions creating an

26 unreasonable risk of future harm but have not responded reasonably to this dire situation,

27

28

Amended Complaint
Plata v. Davis No. C-01-1351 TEH          2

they seek an injunction compelling defendants to immediately furnish them and the class they represent with constitutionally adequate medical care.

2. Plaintiffs Decasas and Stoderd and the subclass they represent are each an "individual with a disability," as that term is defined in § 504, and a "qualified individual with a disability," as that term is defined in the ADA, and have been denied access to the programs, services and activities of the CDC because of defendants' failures to adequately treat and/or monitor their serious medical conditions, in violation of § 504 and the ADA.

## II. JURISDICTION

3. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201 and 2202, 29 U.S.C. §794a and 42 U.S.C. §§ 1983 and 12101 et seq.

## III. VENUE

4. Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to plaintiffs' claims occurred within the Northern District of California.

## IV. INTRADISTRICT ASSIGNMENT

5. Actions giving rise to venue of this case in the Northern District of California occurred in Marin and Monterey Counties. Accordingly, pursuant to Local Rule 3-2(c), this case arises in the San Francisco Division.

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                    3

## V. PARTIES

### A. Plaintiffs

#### (1) *Marciano Plata*

6.   Plaintiff Marciano Plata is a prisoner incarcerated at Salinas Valley State Prison at Soledad, California, with very limited ability to communicate in English.  Defendants were deliberately indifferent to his serious medical needs because they failed to provide adequate care and treatment for injuries he sustained as a result of several falls.

7.   On or around November 28, 1997,  Mr. Plata fell while working in the kitchen at Calipatria State Prison, injuring his right knee, back and head.  Mr. Plata was examined by a Medical Technical Assistant (MTA), defendant DOE I, who did not provide Mr. Plata with any treatment or a referral to a physician.  Upon information and belief, DOE I did not facilitate transport assistance for Mr. Plata and Mr. Plata was forced to walk back to his cell unaided, which resulted in exacerbating the pain from his untreated injuries.

8.   Although following his November 28, 1997 injury Mr. Plata submitted a written request for medical attention, he was not seen by a doctor or any other medical staff member.  On or about December 4, 1997,  Mr. Plata fell at work again after his injured right knee locked and/or buckled.  He further injured his head and back and aggravated his knee injury.  Mr. Plata was temporarily unable to move.  Mr. Plata was taken to the infirmary where x-rays were taken.   Among other things, he was referred to the orthopedist.  Mr. Plata continued to experience knee pain and problems along with headaches and dizzy spells.

9.   On December 17, 1997, Mr. Plata was examined by Charles C. Lai, M.D., an

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                4

orthopedist.  Dr. Lai noted that Mr. Plata had a positive McMurray Sign of the right knee.

A positive McMurray Sign means that there was an occurrence of a cartilage click during

manipulation of the knee, and is indicative of an injury or tear to the meniscus, a shock-

absorbing cartilage in the middle of the knee.   Dr. Lai prescribed Motrin, said that Mr.

Plata should be medically unassigned (i.e., not work) for two weeks, and said that he

would re-examine Mr. Plata in two weeks.

10.  The meniscus injury or tear caused Mr. Plata sharp pain, and other problems,

such as the locking and buckling of the knee.   On December 23, 1997, Mr. Plata went to

the prison medical clinic in an attempt to receive medical treatment for his continuing

knee, head, and back pain.  At the clinic, an MTA, defendant DOE II, denied Mr. Plata

care or treatment, stating that "there's nothing we can do."

11.  On or about December 25, 1997, Mr. Plata was directed by his work

supervisor, correctional officer, defendant DOE III, to report back to work in the prison

kitchen.   Although Mr. Plata informed his supervisor that he was medically unable to

work,  DOE III required plaintiff to work, despite Dr. Lai's December 17, 1997 order that

Mr. Plata not work for two weeks.   After starting work in the kitchen, Mr. Plata suffered a

back spasm and a buckled or locked knee, which caused him to fall.   A wheelchair was

brought and fellow prisoner workers lifted Mr. Plata in the chair.   DOE III transported Mr.

Plata in the wheelchair to the prison medical clinic.   There, defendant DOE I told Mr.

Plata that nothing could be done because the doctor was not in.   Mr. Plata was taken by

wheelchair back to his cell.

12.  On January 14, 1998, Dr. Lai, the orthopedist, again examined Mr. Plata.  This

follow-up exam took place approximately two weeks later than Dr. Lai had ordered. Dr. Lai again noted a positive McMurray sign and further noted that "as a matter of fact" Mr. Plata's right knee pain seemed to be getting worse. The doctor stated that Mr. Plata should have arthroscopic surgery of the right knee.

13. Mr. Plata did not have arthroscopic surgery of the right knee until October 1999, approximately 19 months after the doctor's recommendation.

14. On February 19, 1998, Mr. Plata filed an administrative grievance on CDC form 602, complaining that following each of his three injuries, he did not receive adequate medical treatment and requesting that he be provided appropriate medical care.

15. On March 6, 1998, a consultation with a neurologist was ordered for Mr. Plata based on his complaints of headaches and dizziness.

16. Upon information and belief, as Chief Medical Officer at Calipatria, defendant Martin LEVIN, M.D. had responsibility for supervision and training of the medical staff at Calipatria, including the MTAs. Dr. LEVIN was responsible for establishing policies and procedures to ensure that doctors' orders were ca

17. On March 9, 1998, Mr. Plata was transferred from Calipatria State Prison to Salinas Valley State Prison. The informal level response to the 602 he completed while at Calipatria was completed that same day and stated, "transferred to another facility." Upon information and belief, none of the defendants made any effort to inform officials at Salinas Valley State Prison of the care requested by Mr. Plata in his 602 or took any effort to ensure that his previously untreated medical condition was addressed.

18. On March 10, 1998, Salinas Valley State Prison medical staff member

Houghtalin conducted a review of Mr. Plata's health care records, and noted that Mr. Plata should be seen within 24 hours because of a medical special need related to the order for a neurological consultation.   Mr. Plata was not medically examined within 24 hours.  A psychiatrist did see him on March 12, 1998, but simply reviewed his mental health condition; there was no reference to the need for a neurological and orthopedic examination.

19.  On or about March 18, 1998, Mr. Plata was examined at Salinas Valley State Prison by a medical doctor.  The doctor noted that there had been a recommendation for arthroscopic surgery and ordered an orthopedic consultation.

20.  On June 2, 1998, Mr. Plata was brought to the medical clinic, apparently for a neurological exam.   An unsigned note in Mr. Plata's health record states, "neuro exam deferred today because of the count – will come tomorrow to neuro clinic."  There is no record of any such exam having taken place the next day, or thereafter.

21.  Both before and after June 2, 1998, Mr. Plata requested to see a doctor due to continuing problems with his back and knee.   His requests often did not result in a medical appointment, due to lockdowns at the prison.

22.  On August 19, 1998, Mr. Plata was examined at Salinas Valley by Lilian I. Lustman, M.D.   Dr. Lustman found weakness and atrophy in Mr. Plata's right thigh.  Dr. Lustman failed to note that there had been a previous recommendation for arthroscopic surgery on Mr. Plata's right knee, or that a neurological consultation had not been completed as ordered.  Dr. Lustman ordered an orthopedic consult, an MRI of Mr. Plata's spine, and an x-ray of the knee.

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                    7

23.  On or about November 4, 1998, J.M., Wittenberg, M.D., the Salinas Valley Chief Medical Officer and the warden approved the transport of Mr. Plata on November 6, 1998 for purposes of obtaining an MRI of Mr. Plata's spine.  The MRI was never conducted.

24.  On December 30, 1998, Dr. Lustman and defendant Andrew LUCINE, M.D., the Salinas Valley Chief Medical Officer, again approved Mr. Plata's transport on January 8, 1999 for an MRI of his spine.  This transport and procedure did not take place.  On January 11, 1999, Dr. Lustman and Dr. LUCINE yet again approved Mr. Plata's transport on January 15, 1999 for an MRI of his spine. This transport and procedure did not take place.  Warden Deneice MAYLE at Salinas Valley was responsible for ensuring that prisoners were transported to medical appointments in a timely manner, and on information and belief failed to develop and implement adequate policies and procedures to ensure that such transportation occurred.

25.  On January 22, 1999, Mr. Plata went, on an emergency basis, to the medical clinic at Salinas Valley State Prison because he was suffering severe headaches and ringing in his head . Defendant DOE IV, an MTA acting, on information and belief, without proper clinical supervision, determined that Mr. Plata should be followed up on the regular medical line.

26.  On January 24, 1999, Mr. Plata again went, with assistance and on an emergency basis, to the medical clinic at Salinas Valley State Prison medical clinic, this time because his knee was very painful and his lower back hurt.  An MTA noted that Mr. Plata's right knee was "very tender to touch" and swollen.  The MTA stated that Mr. Plata

would see a doctor on January 25, 1999.

27. On January 25, 1999, Dr. Lustman saw Mr. Plata. Dr. Lustman could not conduct an examination, assessment, or provide treatment, because Mr. Plata's health care records were not available. Dr. Lustman ordered that Mr. Plata be brought back to the clinic for an examination, with his records, on January 27, 1999.

28. Mr. Plata was not brought back to the clinic for an examination on January 27, and was not seen by any doctor until May 1999.

29. On February 16, 1999, Mr. Plata was transported to the hospital at Corcoran State Prison where at CT Scan of his lumbar spine was performed. On information and belief, no doctor had ordered such a procedure. Thomas W. Maclennan, M.D., who analyzed the CT Scan, concluded that an MRI should be considered to exclude left-side disc herniation, if indicated clinically. After Dr. Maclennan's conclusions were provided in writing, Dr. Embree, who, on information and belief, never examined Mr. Plata determined that an MRI was not clinically indicated. Dr. Embree was unaware of or ignored the order and repeated approvals that had been obtained for an MRI by Salinas Valley doctors, and grossly failed to properly document his conclusion.

30. On or about March 30, 1999, Dr. Lustman and defendant Dr. LUCINE approved an orthopedic consultation on April 9, 1999 for Mr. Plata. This consultation did not take place.

31. On May 10, 1999, Mr. Plata was seen by an orthopedist, who saw him in response to the order for such an examination that a doctor had made approximately 14 months before, on March 18, 1998. The orthopedist recommended arthroscopic surgery

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                    9

1  for Mr. Plata's right knee, the same recommendation that had been made sixteen months

2  earlier in January 1998.

3

4      32.  On August 2, 1999, Mr. Plata was again seen by the orthopedist, this time in

5  response to the order for such an examination that Dr. Lustman had made approximately

6  one year before, on August 19, 1998.   The orthopedist repeated his recommendation for

7  arthroscopic surgery.

8

9      33.  Upon information and belief, in October 1999, a medical doctor, defendant

10  DOE V, authorized Mr. Plata's transfer to a community hospital for surgery without

11  informing Mr. Plata of the medical condition that necessitated the surgery and without

12  providing him with notice of the surgery.  On October 6, 1999, Donald Pompan, M.D.,

13  performed surgery on Mr. Plata for repair of his right knee medial meniscus tear with

14  pathological medial plica.  Mr. Plata was discharged from the community hospital the same

15  day his surgery was performed and was returned to the infirmary at Salinas Valley State

16  Prison.  The personnel at Salinas Valley required Mr. Plata to walk on his surgically

17  repaired knee from the infirmary to the housing unit, causing him severe pain and swelling.

18

19      34.  Dr. Pompan had ordered that he see Mr. Plata one week after the surgery.

20  Upon information and belief, this never took place; there is no documentation in the health

21  care record indicating that it did.   On October 19, 1999, defendant Dr. LUCINE wrote that

22  Mr. Plata was to be seen by the orthopedist and indicated that treatment was appropriate

23  until the next exam.  No additional exam took place by the orthopedist.

24

25      35.  Mr. Plata requested medical care for the swelling in his knee and received

26  none.  Mr. Plata received no post-surgery follow-up care from the orthopedist or physical

therapy from medical or other staff at Salinas Valley.   On approximately February 22, 2000, Mr. Plata informed defendant nurse Angela COOPER that he was not receiving any post-operative care and treatment and that he was in pain.  Nurse COOPER did not provide post-operative care.  Upon information and belief, she also failed to report the lack of post-operative care to an appropriate physician or to take any other steps to ensure that Mr. Plata received post-operative care.

36.   On March 2, 2000, a doctor examined Mr. Plata and ordered that he be seen by Dr. Pompan, the orthopedist.

37.   On May 31, 2000, Mr. Plata again saw a doctor, but because the doctor could not speak Spanish and a translator was not available a full assessment could not be done.

38. .On June 2, 2000, Mr. Plata was seen again by the doctor who saw him on May 31.   The doctor among other things ordered that Mr. Plata's right knee be x-rayed and that he see the orthopedist for follow-up.  Mr. Plata had not seen the orthopedist since the October 1999 surgery.   The x-ray was done on June 14, 2000, but no orthopedic exam was conducted.

39.   On January 19, 2000, Mr. Plata filed a 602 regarding the September and October appointments.  Mr. Plata also complained of the failure of the prison medical staff to provide post-operative care for his knee.  This 602 was initially screened out (e.g., rejected) because there was no informal level response.  An undated informal level response signed by Dr. Paul Pavlovic, M.D., stated "you will be ducated soon for M.D. line."  Mr. Plata received a copy of this appeal from the Inmate Appeals office which only stated the date on which it was received at the First Level.   Mr. Plata appealed this

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                    11

response to the Director's Level and received a response stating that the form must first be completed through the Second Level. Mr. Plata has no recourse now to exhaust the administrative remedies on either 602 he filed.

40. Mr. Plata was seen by a physical therapist for his knee on or about May 1, 2001, only after defendant Daniel THOR, M.D., in March 2001 had conducted a special review of Mr. Plata's file based on his knowledge that counsel was coming to visit Mr. Plata, and after the filing of the original complaint in this action on April 5, 2001. Mr. Plata continues to suffer from serious headaches, and problems with his knee and back.

41. Defendants Dr. THOR and Dr. LUCINE were or are the Health Care Managers or Acting Health Care Managers at Salinas Valley at all times relevant to Mr. Plata's allegations. These doctors were or are responsible for supervising and training the medical staff at Salinas Valley, including the MTAs. Upon information and belief, these doctors knew that Mr. Plata, a patient needing orthopedic consult, surgery and follow-up, was not receiving timely and adequate medical care. These doctors were responsible for the inadequate policies and procedures that led to inadequate medical care for Mr. Plata and other prisoners. Upon information and belief, defendants THOR and LUCINE knew that these inadequate policies and procedures would cause injury to Mr. Plata. These defendants failed to provide the necessary oversight to prisoners being returned after same-day surgical procedures at community hospitals to ensure that the prisoners did not suffer further injury. These defendants did not ensure that there were adequate procedures for post-operative care for Mr. Plata and others like him at Salinas Valley.

(2) *Otis Shaw*

42.  Plaintiff Otis Shaw is a 52-year-old prisoner at the California Medical Facility in Vacaville.  Mr. Shaw suffers from end stage renal disease and requires kidney dialysis three times a week.  Previously, Mr. Shaw was incarcerated at San Quentin.  On or about April 12, 2000, he was sent to Novato Community Hospital where he received an operation to insert a synthetic graft into his arm to facilitate dialysis.  He was returned to the prison infirmary at San Quentin for post-operative care.  Two weeks later, on April 28, 2000, defendant Dr. Tam BUI explicitly noted that Mr. Shaw's wound was still oozing.  Dr. BUI made no effort to determine why, and ordered that Shaw be moved out of the in-patient unit of the infirmary.  Dr. BUI did not direct that any other medical personnel at San Quentin provide care to Mr. Shaw's arm.  Mr. Shaw was placed in an unsanitary cell in another part of the infirmary.

43.  Mr. Shaw filed a 602 in April 2000 regarding his transfer from the San Quentin infirmary while his surgical wound was still draining, complaining about the fact that he was not receiving assistance in cleaning and dressing the wound.  The appeal was answered on June 13, 2000, and states "the department shall only provide medical services which 'are based on medical necessity . . . determined by the attending physician to be reasonable.' Title 15 §3350 (a)(10).  Accordingly, housing moves are also accomplished."

44.  Mr. Shaw received no further nursing care for his wound.  Mr. Shaw was forced to attempt to clean the wound and change the bandages himself.  Because of the wound's location on his upper arm, it was impossible for him to use both hands to do this task.  As a result, he was not able to change the dressings competently.  Defendant Dr. BUI did not examine Mr. Shaw after discharging him from the in-patient unit of the infirmary.

Dr. BUI looked through the small window of the unsanitary cell door once during the time that Mr. Shaw was housed in that cell. Ten days after Dr. BUI ordered Mr. Shaw transferred to the unsanitary cell, the still-oozing wound became more seriously infected. On May 8, 2000, the infection resulted in Mr. Shaw's transfer to Novato Community Hospital for two weeks, until May 25, 2000. The oozing of the wound and the onset of serious infection risked rendering the graft unusable.

45. Upon information and belief, as Health Care Manager at San Quentin, defendant Dr. Donald CALVO knew that there was inadequate post-surgical care for Mr. Shaw and/or others like him and that the absence of this care injured prisoners. Dr. CALVO failed to adequately supervise and train staff and failed to put in place procedures to ensure that Mr. Shaw and others like him would receive medically appropriate care. Upon information and belief, Dr. CALVO knew that this failure did and would result in injury to prisoners.

46. After filing of the complaint in this case, Mr. Shaw was subjected to adverse action by defendants. On April 25, 2001, Mr. Shaw was placed in Administrative Segregation at San Quentin on the basis of information that prison officials had possessed for seven years stating that Mr. Shaw was an associate of the Black Guerrilla Family gang. Prior to the filing of this complaint, and despite defendants' knowledge of Mr. Shaw's association, Mr. Shaw had not been sent to Administrative Segregation because of this affiliation from the time he was incarcerated for his most recent offense (beginning April 7, 2000) until the time this lawsuit was filed. Instead, the Classification Services Representative had rejected Mr. Shaw's placement in segregation on the basis of this

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                14

information and he had been housed in the general population at San Quentin throughout his current commitment, without incident.  Despite the defendants' knowledge of his association, Mr. Shaw also had been housed in the general population for a prior commitment at two other institutions from May 5, 1994 until he was paroled on February 25, 1995.

47.  Upon information and belief, defendants' action to place Mr. Shaw in Administrative Segregation on the basis of his long-known association is pretextual and intended to punish him for participating in this lawsuit.  Upon information and belief, these actions were taken in retaliation for the filing of this lawsuit.  This action adversely affected Mr. Shaw's medical treatment.  On Thursday May 3, 2001, Mr. Shaw missed his scheduled dialysis treatment because his Administrative Segregation custody status required an escort and there was no available custody staff to escort him.  Failure to undergo dialysis adversely affects Mr. Shaw's health.

(3) *Raymond Stoderd*

48. Plaintiff Raymond Stoderd is a prisoner at California State Prison-Corcoran who suffers from AIDS and chronic pain syndrome, which is treated with methadone.  Mr. Stoderd experienced deliberate indifference to his serious medical needs because prison officials abruptly discontinued that treatment at least eight times, leaving him in severe pain, and causing him to suffer withdrawal, an extremely painful condition which involves uncontrolled shaking, vomiting, insomnia, headaches, dizziness, hot flashes, sweats, chills and loss of appetite.  These side effects of abrupt withdrawal from methadone are well known in the medical community and were known to the medical personnel at Corcoran.

49.  Mr. Stoderd was first diagnosed with neuropathy, a painful condition which causes damage to the peripheral nerves, in February 1998, while at Corcoran.  Methadone was prescribed by Corcoran medical staff.  The prescription was written for 30 days and had to be renewed after each 30-day period.  One prescription expired on or about August 12, 1998.  Mr. Stoderd did not receive a renewal until September 2 and consequently went through withdrawal.

50.  The symptoms caused by withdrawal significantly affected Mr. Stoderd's daily living activities.  Until Mr. Stoderd suffered the first withdrawal due to the abrupt discontinuation of methadone he had a prison job.  As a result of the withdrawal, however, he was unable to perform his job adequately, he received poor work performance reports and he was subsequently deemed unable to work.  Prior to the first withdrawal episode Mr. Stoderd played sports in the prison yard; this was impossible for him to do during and after the first withdrawal episode.  During one episode he had to terminate a visit with his wife and children because he was nauseated and vomiting, suffering extreme pain and was unable to sit up.  He was forced to give up his position as Executive Chairman of the Men's Advisory Council (MAC) and as a MAC representative because he was consistently unable to attend meetings or to move around enough to communicate with other prisoners.  Mr. Stoderd was not able to walk to the chow hall to eat and instead had to rely on meals being delivered to his cell.  During a later episode Mr. Stoderd was unable to eat or sleep or go to the yard.

51.  Mr. Stoderd filed several 602s regarding the inappropriate and repeated discontinuation of his prescribed methadone, and did not receive responses to most of

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                        16

1    them. The intermittent nature of the discontinuations precluded Mr. Stoderd from

2    appealing his complaint to the Director's Level. After filing one 602, dated October 7,

3    1998, his methadone prescription was reinstated and it was therefore unnecessary to appeal

4    the 602 to the next level. However, the prescription was later discontinued again, but by

5    then it was too late to appeal the previously filed 602.

6    

7        52. Defendant Dr. Shankar RAMAN ordered abrupt discontinuation of Mr.

8    Stoderd's methadone prescription several times despite knowing both the risk of

9    withdrawal symptoms and that Mr. Stoderd had previously suffered severe withdrawal

10   symptoms. Mr. Stoderd filed another 602, dated June 22, 1999, in which he complained of

11   one of Dr. RAMAN's orders to discontinue the methadone prescription. Dr. RAMAN, in

12   

13   the response to the 602 dated July 22, 1999, confirmed his decision to order abrupt

14   discontinuation of the methadone. Mr. Stoderd requested a Second Level Review, stating

15   that since the discontinuation order, on May 28, 1999, he had suffered three painful

16   

17   withdrawal episodes and his health had deteriorated further. By the time he reached the

18   Director's Level he had been prescribed a suitable pain medication by another doctor. Dr.

19   RAMAN refused to renew the prescription, however, forcing Mr. Stoderd to seek out the

20   

21   other doctor in order to continue to receive the medications that he needed. Mr. Stoderd

22   therefore requested assignment to a different doctor. Mr. Stoderd has no recourse now to

23   exhaust the administrative remedies on either 602 he filed.

24   

25       53. Through letters from Mr. Stoderd's counsel to defendant Dr. Brian YEE, the

26   Health Care Manager at Corcoran, Dr. YEE was made aware of the repeated abrupt

27   discontinuations of Mr. Stoderd's methadone prescription, but did nothing. As the Health

28   

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                    17

Care Manager at Corcoran, Dr. YEE failed to adequately supervise and train staff and put in place procedures so that Mr. Stoderd and others similarly situated would receive medically appropriate care. Defendant Dr. YEE specifically failed to stop defendant Dr. RAMAN's practice of suddenly and repeatedly discontinuing methadone treatment for Stoderd.

54. Mr. Stoderd suffers continuing effects of the repeated methadone discontinuations and resulting withdrawal episodes. He has AIDS, a disease which attacks the immune system. Any physical stress negatively affects the immune system's ability to ward off opportunistic infections. His overall health is worse now than before suffering the withdrawal episodes. In addition, he is unable to sit for long periods and is not able to engage in any physically challenging activities.

(4) *Raymond Johns*

55. Plaintiff Raymond Johns is a 76 year-old condemned prisoner at San Quentin. He is blind in his left eye and partially blind in his right eye due to cataracts. He has experienced deliberate indifference to his serious medical needs because of delays in obtaining care, and because prison doctors refused to order or undertake corrective surgery to remove the cataracts until Mr. Johns loses vision in both eyes.

56. On August 13, 1999, a San Quentin medical doctor referred Mr. Johns for an exam by an eye specialist, based on the doctor's suspicion that Mr. Johns had a cataract.

57. On February 17, 2000, more than six months after the referral was made, Mr. Johns was seen by an eye specialist. The specialist, defendant Darrell SMITH, M.D., noted Mr. Johns' complaint of blinding headaches while reading, diagnosed a left eye

cataract, prescribed an eye patch as needed for headaches, and ordered a follow-up visit in one year.

58. Mr. Johns, however, continued to suffer due to the cataract, and he again requested to be seen by a doctor. On June 26, 2000, Mr. Johns was seen at sick call based on his complaint of double vision. San Quentin medical staff concluded that his eyes should be re-checked by a specialist.

59. Mr. Johns was not seen by the specialist as recommended. After several weeks of waiting, and because he continued to suffer from the cataract, Mr. Johns again asked to see a doctor about his condition. On August 11, 2000, he was seen by another prison doctor, who noted Mr. Johns' complaint of continuing problems, including poor vision and headaches. The doctor again referred Mr. Johns to the eye clinic for a specialist exam.

60. Mr. Johns was not seen by the specialist in the San Quentin eye clinic until October 26, 2000, four months after the referral in June and ten weeks after the August referral. During the October 26, 2000 exam, defendant Dr. SMITH, an ophthalmologist hired by San Quentin, told Mr. Johns that corrective surgery would not be performed until Mr. Johns was blind in both eyes, and that even then only one eye would be corrected. Dr. SMITH wrote in Mr. Johns' health care record that Mr. Johns should be seen again in a year and further wrote "[left eye] cataract surgery in future."

61. On September 20, 2000, Mr. Johns filed an administrative appeal seeking corrective surgery to restore his eyesight. On November 11, 2000, Mr. Johns filed another such appeal. As the informal response a prison staff member wrote, "Sick call doctor cannot force eye specialist to give surgery which he feels isn't warranted." Mr. Johns then

submitted the appeal to the first level.  On or about December 20, 2000, defendant

Meredith Alden VAN PELT, M.D., responded to the appeal by stating, "Inmate refused to

be interviewed on December 20, 2000.  I personally discussed findings with Dr. D. SMITH

ophalmological (sic) consultant plus reviewed his findings outlined in the chart.  Dr.

SMITH's decision stands – no surgery on your left cataract until vision is compromised in

your rt. eye.  This decision is compatible with Title 15."   Mr. Johns, however, never

refused to be interviewed.   On information and belief, Mr. Johns's housing unit was on

lockdown at that time.

      62.  Mr. Johns subsequently resubmitted the appeal to the second level of review.

In February 2001, defendant Dr. CALVO responded by stating that the appeal had been

cancelled because Mr. Johns had refused to be interviewed during the first level review

process.  Dr. CALVO, as Health Care Manager at San Quentin, is responsible for

developing and implementing the policy preventing Johns from receiving adequate care.

      63.  On or about February 16, 2001, after receiving the second level response, Mr.

Johns appealed to the third or Director's Level or review.  On or about May 25, 2001, Mr.

Johns received a letter from the Chief of Inmate Appeals instructing him that his appeal

must be completed through the Second Level before it could be processed at the Director's

Level.  However, because the appeal had been cancelled at the second level based on the

erroneous assertion that Mr. Johns had refused to participate in an interview regarding the

appeal, Mr. Johns could not obtain a second level response.  On or about May 28, 2001,

Johns wrote to the Inmate Appeals Coordinator at San Quentin asking for instruction on

how to proceed with his appeal.  On or about June 5, 2001, the San Quentin inmate appeals

office wrote, "[t]he appeal you have attached was addressed at the 2nd level if you are dissatisfied then forward to 3rd level." On or about June 25, 2001, Mr. Johns wrote to the Inmate Appeals Coordinator at San Quentin requesting that his appeal be forwarded to the next level. On or about June 28, 2001, the appeal was returned to Mr. Johns with the comment that failure to cooperate cancels the appeal.

64. On or about June 7, 2001, following the filing of the initial complaint in this action, Mr. Johns was informed by a doctor in the eye clinic that surgery was appropriate for his right eye, but that it was too expensive to also operate on the right eye. The doctor also told Johns that the operation still had to be approved by the medical authorization review process at the prison.

(5) *Joseph Long*

65. Plaintiff Joseph Long is a 24-year-old paraplegic who is a prisoner at Pleasant Valley State Prison. Due to unreasonable delays by defendants in assessing and treating a bladder stone and chronic bladder infections, he experienced unnecessary pain from urinary tract infections that also led to urinary incontinence. In June 2000, while Mr. Long was incarcerated at Wasco State Prison Reception Center, defendant Dr. Bhaviesh SHAH assessed Mr. Long and referred him to a urologist due to his history of bladder stones. Neither Dr. SHAH, nor any other medical personnel at Wasco State Prison took any further steps to ensure that Mr. Long was actually seen by a urologist for the four months he was incarcerated at that facility. During this time, Mr. Long suffered from pain from his bladder stone and urinary tract infections. Despite his complaints about these problems and about the ineffectiveness of the antibiotics given to him, he never was examined by a

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                    21

specialist.  Between June and December 2000 Long filed a 602 to which he never received

a response.  Long filed a second 602 on December 16, 2000, requesting that he be seen by

a urologist immediately for evaluation of his chronic infections and for surgery to remove

the bladder stones.

66.  Mr. Long was transferred from Wasco to Salinas Valley State Prison on

October 27, 2000, where he continued to have urinary tract and bladder infections and to

complain about the debilitating pain of the infections and his need for further medical

attention.  Defendant Dr. Andrew WONG prescribed antibiotics to treat Mr. Long's

infections but did not refer him to a urologist.  Dr. WONG pursued this course of treatment

despite the fact that Mr. Long exhibited persistent signs of infection and that Mr. Long

complained of acute pain and had a history and symptoms of bladder stones.

67.  Mr. Long filed a third 602 on or about January 16, 2001.  Defendant Dr.

Daniel FULLER reviewed Mr. Long's case in response to a January 29, 2001 letter from

Long's counsel.  He stated that tests did not indicate the presence of bladder stones, but

ordered further tests.  He failed to ensure that Mr. Long was examined by a specialist.

68.  Mr. Long did not receive an examination by a urologist until April 11, 2001.

On that date he underwent surgery at the Corcoran State Prison Acute Care Hospital.  The

surgeon, Dr. Dwivedi, removed a large bladder stone and expressed his opinion to Mr.

Long that if Mr. Long was not paralyzed from the waist down he would have been unable

to withstand the pain caused by such a large stone.  After a week in the Corcoran hospital,

Mr. Long was transferred to Salinas Valley State Prison, and then on May 9 to Pleasant

Valley State Prison.  Mr. Long informed the doctor on his yard at Pleasant Valley upon

1    arrival that he had undergone bladder stone surgery and was scheduled for a follow-up

2
3    examination. He was scheduled to have a follow-up examination with the surgeon on May

4    16, but this examination did not take place until May 30.

5        69. As the Health Care Manager at Wasco State Prison during the time period

6    relevant to Mr. Long's claims, defendant Dr. Michael SONGER failed to adequately

7
8    supervise and train staff and to put in place procedures so that Mr. Long would receive

9    medically appropriate care. Upon information and belief, Dr. SONGER knew that the

10   system in place at Wasco was failing to ensure that prisoners referred to specialists were

11
12   seeing specialists on a timely basis and that this failure was injuring prisoners.

13       70. Defendant Dr. Daniel THOR had personal knowledge of Mr. Long's medical

14   condition. As the Chief Medical Officer at Salinas Valley State Prison, Dr. THOR failed

15   to ensure that Mr. Long and others similarly situated received adequate treatment. Dr.

16
17   THOR failed to adequately supervise and train staff and to put in place procedures so that

18   Mr. Long would receive medically appropriate care. Upon information and belief, Dr.

19   THOR knew or should have known that the system in place at Wasco was failing to ensure

20
21   that prisoners who required specialized treatment and follow-up care were receiving the

22   required medical attention on a timely basis and that this failure was injuring prisoners.

23       71. The First Level response to the 602s that Mr. Long filed on or about December

24   16, 2000, was received by Mr. Long on or about June 15, 2001. It approved a referral to

25   an outside urologist on a "non-emergent basis," and stated that it would occur within the

26
27   next 60 days. The response ignored the fact that Mr. Long had received the surgery in the

28   six months it took to answer the 602. Mr. Long never received a response to the 602 he

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                23

1  filed on January 16, 2001.

2       (6) *Leslie Rhoades*

3

4       72.  Plaintiff Leslie Rhoades is a prisoner at the California Medical Facility.  Mr.

5  Rhoades has suffered from severe pain in his left hip since a car accident, which occurred

6  in 1996.  This condition has made it extremely difficult for him to walk.  In December

7
8  1997, while Mr. Rhoades was incarcerated at Calipatria State Prison, an x-ray was taken

9  which was negative as to damage to the hip bone.  But on examination the hip was still

10  found to be subluxating.  Additionally, Mr. Rhoades was experiencing swelling and pain in

11
12  his hip and lower back.  At the time of his initial x-ray and examination, Mr. Rhoades was

13  not receiving treatment or medication for his pain.

14       73.  Mr. Rhoades filed a 602 on January 14, 1998, regarding swelling around his

15  hip and lower back and requesting medications for the pain and to bring down the swelling.

16
17  Mr. Rhoades also requested transfer to a medical facility.  The informal response stated

18  that he was scheduled to see the doctor who would evaluate his requests.  Mr. Rhoades

19  filed another 602 on April 1, 1998, again asking for consideration of his request to be

20  transferred to a medical facility due to the pain and swelling in his hips and lower back.

21
22  The request was denied at the informal level due to a lack of documentation from the Chief

23  Medical Officer.  Mr. Rhoades was not informed how he could get such documentation.

24  He filed another 602 on May 4, 1998, requesting an orthopedic evaluation, medication for

25  his swollen hip and transfer to a medical facility.

26
27       74.  On July 9, 1998, a CDC orthopedist, Dr. David Smith, wrote that Mr.

28  Rhoades' hip was dislocated, with the hip visibly popping in and out of the socket.  Dr.

Smith determined that Mr. Rhoades required a stabilization procedure or possibly a total hip replacement. Dr. Smith then began requesting on a nearly monthly basis that an MRI scan be conducted to determine the appropriate course of treatment. Dr. Smith also continually requested that Rhoades be transferred to a CDC hospital facility for treatment.

75. On August 5, 1998, Mr. Rhoades filed a 602 regarding the delay in receiving the chrono recommending a transfer to the California Medical Facility. The informal level response granted the request and stated that he would receive the chrono in approximately seven to ten days. On October 16, 1998, Mr. Rhoades filed a 602 complaining of pain in his hip and a lack of meaningful medical attention and requesting that recommended diagnostic tests be performed in order to allow his transfer to a medical facility. The appeal was screened out as a duplicate appeal to his appeal filed on May 4, 1998. The First Level response to that appeal, dated November 9, 1998, stated that the tests were pending approval and scheduling.

76. While the MRI for Mr. Rhoades was eventually approved in December 1998, a December 21, 1998 appointment was cancelled by the Watch Commander because the regular transportation team was busy. Defendant Dr. Martin LEVIN failed to ensure that the MRI was rescheduled during the next six months.

77. Mr. Rhoades filed a 602 on March 26, 1999, requesting a transfer to a medical facility in order to have his medical needs met. It was screened out at the first level as a duplicate appeal.

78. Finally, on June 25, 1999, Mr. Rhoades was taken for an MRI. However, one of the guards accompanying Mr. Rhoades walked too close to the MRI machine and had

his weapons sucked into the MRI's magnet, breaking the machine and preventing the MRI examination.

79.    Mr. Rhoades filed a 602 on July 7, 1999, complaining of deliberate indifference in the CDC medical care system. The appeal was screened out at the First Level as an abuse of the appeal procedure. Mr. Rhoades did not have an MRI scan until July 16, 1999, despite continuing requests from Dr. Smith, and only after his attorney met with Mr. Rhoades at Calipatria and made a request, dated June 10, 1999, to the Chief Medical Officer.

80.    On August 9, 1999, Mr. Rhoades filed a 602 requesting information about the July x-rays and MRI scans. The First Level response stated that the appeal was granted and that copies of the test reports had been requested and that he would have a follow-up evaluation with Dr. Smith on September 9, 1999. Mr. Rhoades filed another 602 on August 23, 1999, requesting that constitutional violations within the CDC medical care system be remedied and, specifically, that procedures be implemented in order to prevent delays in access to medical care. The appeal was screened out at the First Level as a duplicate appeal.

81.    Defendant Dr. LEVIN did not ensure that the MRI results were discussed with Mr. Rhoades in a timely manner. No appointment was set up to present and discuss the MRI results with him until October 7, 1999. Mr. Rhoades was then informed that the MRI confirmed what the December 1997 x-ray had already found, that the hip bone was not damaged. However, Mr. Rhoades' left hip continued to pop in and out and cause severe pain. In addition, the right hip had begun to do the same thing.

82. Mr. Rhoades was told by Dr. Smith that he did not know what was causing the hip to subluxate, but further x-rays would be taken. Defendant Dr. LEVIN told Mr. Rhoades that x-rays would be taken on November 4, 1999, showing "subluxation views" of the hips. Dr. LEVIN stated that the doctor must do the manipulation of the hips to show the subluxations. He stated that "this is not an x-ray procedure that can just be done simply by the technician." Despite Dr. LEVIN's knowledge that a physician needed to perform the x-ray procedure in order to obtain meaningful views, he did not ensure that this took place. The x-rays were taken without any assistance by a physician. The technician was not able to take an x-ray of Rhoades' hips in the subluxated position due to the fixed position of the x-ray machine. Despite the fact that the x-rays were not appropriate for diagnosing subluxation, upon review of the x-rays that were taken, Dr. Smith concluded that the hips were no longer subluxating.

83. In December 1999, Rhoades was transferred to CIM to obtain a second opinion by another orthopedist. He was seen by Dr. Pospisic who recommended that surgery be performed to repair the hip condition and that Mr. Rhoades be given a wheelchair so that he would not have to walk. Mr. Rhoades used the wheelchair for the remainder of his time at CIM. In January 2000, Mr. Rhoades was examined by a consulting doctor at Riverside General Hospital who said that surgery would not help repair the condition, but recommended an MRI for assistance in assessment of the condition. The MRI was done two months later in March 2000. Defendant Dr. Joseph SIEGEL, acting Chief Medical Officer at CIM, then reported that the working diagnosis was atrophy of the left gluteus minimus muscle. In June 2000, Mr. Rhoades was examined by another Riverside General

1    Hospital consulting doctor who agreed that surgery would not be helpful, but that Mr.

2

3    Rhoades should have physical therapy in order to determine which muscles were damaged.

4        84. Mr. Rhoades was transferred back to Calipatria State Prison in October 2000.

5    Upon his arrival at Calipatria no medical guidelines were in place to make sure that Mr.

6

7    Rhoades was not forced to undertake activity inconsistent with his medical condition.

8    Instead, defendant Sergeant Randall DAVIS forced Mr. Rhoades to walk from the

9    reception area to his housing unit, a distance of over 100 yards. This was allowed to

10    happen even though Sergeant DAVIS was notified by the MTA and by Mr. Rhoades that

11

12    he had not walked for over nine months, and even though a wheelchair was available in the

13    central health clinic for Mr. Rhoades to use. With no effective intervention by the medical

14    staff, Mr. Rhoades was handcuffed and, using a cane for assistance walked from the

15    reception area to his housing unit. The next morning his left hip, leg and foot were

16

17    swollen and he was unable to get out of bed to go to meals for the next two days.

18        85. When Mr. Rhoades was transferred to Calipatria, it took over a month for Mr.

19    Rhoades' medical records to be forwarded from CIM to Calipatria. During this time

20

21    period, no progress was made in diagnosing and treating his condition and Mr. Rhoades

22    continued to experience severe pain.

23        86. Although the Riverside General Hospital doctors and Dr. David Smith, the

24    Calipatria orthopedist, recommended that Mr. Rhoades undergo physical therapy in order

25

26    to assess and to treat the damage to his hip muscles, Mr. Rhoades was housed at Calipatria,

27    a prison without a physical therapy program. Defendant Dr. LEVIN approved transfer to a

28    medical facility where Mr. Rhoades could obtain physical therapy.

87. As the Chief Medical Officer at Calipatria, defendant Dr. Martin LEVIN failed to adequately supervise and train staff and failed to put in place procedures so that Mr. Rhoades would receive medically appropriate care. Mr. Rhoades's condition was specifically known to Dr. LEVIN and Dr. LEVIN failed to take action to address Mr. Rhoades's medical condition with appropriate diagnosis and treatment. Upon information and belief, Dr. LEVIN knew that the failure to provide appropriate medical care to Mr. Rhoades caused his condition to deteriorate and forced him to suffer significant pain.

88. Mr. Rhoades was transferred to the California Medical Facility on May 2, 2001, arriving on May 11. As of June 24, 2001, Mr. Rhoades had not been seen by any physician about his hip and lower back problems.

89. As the acting Chief Medical Officer at California Institution for Men, defendant Dr. Stephen WYMAN failed to adequately supervise and train staff and put in place procedures so that Rhoades would receive medically appropriate care.

(7) *Gilbert Aviles*

90. Plaintiff Gilbert Aviles is a prisoner at the Substance Abuse Treatment Facility (SATF) who transferred from Wasco State Prison Reception Center to SATF on June 18, 1999. He is a paraplegic who requires the use of a catheter to relieve his bladder, either an in-dwelling "foley" (which remains in the body for extended periods) or single use type. From the beginning of his incarceration in October 1998 through August 1999, at both Wasco and SATF, he used an in-dwelling foley catheter. During this time period, physician orders in Mr. Aviles's medical records stated that his catheter was to be changed every 14 days. However, at both Wasco and SATF his catheter was in fact not changed for

1   periods of two months or more, causing him to suffer severe urinary tract infections which

2

3   required at least two hospitalizations. Further, some of the catheters provided at Wasco

4   were past their expiration dates. For example, Mr. Aviles was provided with a catheter at

5   Wasco on or about June 4, 1999 that had an expiration date of February 1999. When the

6

7   catheter balloon broke upon insertion, another catheter was provided by a nurse at Wasco

8   with an expiration date of March 1995. This catheter was left in for two months until Mr.

9   Aviles was hospitalized on or around August 3-6, 1999 with a urinary tract infection.

10      91. Mr. Aviles has become increasingly resistant to antibiotics due to the frequent

11

12   bladder and urinary tract infections. While ill from the urinary tract infections, Mr. Aviles

13   was unable to eat many meals, or to take part in social or recreational programs, including

14   daily yard time.

15      92. As the Health Care Managers at Wasco and SATF, defendant Dr. Michael

16

17   SONGER and defendant Dr. Edgar CASTILLO failed adequately to supervise and to train

18   staff. They also failed to put in place procedures so that Mr. Aviles would receive

19   medically appropriate supplies in a timely manner. Drs. SONGER and CASTILLO were

20

21   responsible for appropriately managing medical supplies and should have ensured that

22   catheters were not being supplied to prisoners, including Mr. Aviles, in a manner

23   inconsistent with their intended use. The failure of Dr. SONGER and Dr. CASTILLO to

24   provide new catheters to prisoners requiring them on a timely basis has resulted in

25   infection and injury to prisoners, including Mr. Aviles.

26

27      93. Since the filing of the *Plata* complaint on April 5, 2001, Mr. Aviles has been

28   subject to adverse actions by defendants. On or about April 20, 2001, Mr. Aviles was

transferred from SATF to CMF after plaintiffs' counsel had repeatedly requested that he be evaluated to determine if an impending transfer from an accessible cell to a gymnasium was appropriate. However, upon his arrival at CMF, Mr. Aviles was informed that CMF staff did not have any information about why he was sent there. While at CMF, Mr. Aviles's ability to function in a gym setting was not evaluated and he was transferred back to SATF during the week of May 28.

94. Upon return to SATF Mr. Aviles was placed immediately in a triple bunk in the gym, which was inaccessible to him, and as a result he spent the night in his wheelchair. He was then transferred to a cell not accessible for wheelchair users in violation of CDC policy, where he spent several days. In order to maneuver his wheelchair so that he could access the toilet Mr. Aviles had to wait until his cell door was opened by SATF custodial staff. He was subsequently required to sign a chrono stating that it was acceptable to him to be housed in an inaccessible cell temporarily. He was told that if he did not sign the chrono he would be placed in Administrative Segregation. Mr. Aviles is currently housed in the gym at SATF, despite the fact that his ability to function there has not been adequately evaluated and that Mr. Aviles has repeatedly raised concerns that gym housing is inaccessible to him. Upon information and belief, these actions were taken in retaliation for the filing of this lawsuit.

95. At Wasco, Mr. Aviles filed a 602 on February 23, 1999, complaining that MTAs at Wasco had refused to change his catheter. He stated that in four months at Wasco, his internal catheter was changed only once after he had been hospitalized for a urinary tract infection. Mr. Aviles did not receive a response on the informal level, and he

1    failed to receive a response to the appeal he filed on March 28, 1999 at the first formal

2    level.

3

4        96. Mr. Aviles wrote to Wasco Warden Candelaria on June 28, 1999, complaining

5    of inadequate medical care by Wasco staff and stating, among other things, that Wasco

6    medical staff had failed to provide him with all the catheters ordered by the doctors at San

7    Joaquin Community Hospital. He also informed the Warden that he had filed several 602s

8

9    without receiving a response, and that he could not pursue those administrative remedies

10   due to his illness and hospitalization.

11       97. On July 21, 1999, Mr. Aviles filled out a sick call slip, stating that he had been

12

13   using his current catheter for over two months and he had not been given the type of

14   catheters ordered by the doctor at SATF. Mr. Aviles did not receive a response to this

15   request for assistance, and filed a 602 on the same issue. He did not receive a response to

16   this 602.

17

18       98. Mr. Aviles filed another 602 on September 16, 1999 at SATF, complaining that

19   he had not been given replacement catheters in a timely manner, and that he had been

20   given catheters after the expiration dates had passed. Mr. Aviles stated that these catheters

21

22   had caused bladder infections and hospitalization.

23       (8) *Paul Decasas*

24       99. Plaintiff Paul Decasas is a 34 year-old former prisoner who on or about July

25

26   18, 2001 was paroled from SATF. During the term on which he paroled, Mr. Decasas had

27   been previously housed at CIM and the California Rehabilitation Center. Mr. Decasas has

28   a serious seizure disorder.

100.  While at CIM from approximately October 5, 2000 through approximately January 10, 2001, Mr. Decasas was housed in the prison's infirmary because of his seizure disorder, specifically for adjustment of his anti-seizure medications.  Although his seizure disorder had not been brought under control, defendant Dr. Mohan SUNDARESON and defendant Dr. CLINTON, who treated Mr. Decasas in the prison infirmary, allowed and/or permitted Mr. Decasas to be transferred to SATF, even though that facility does not have an inpatient facility.  Neither Dr. SUNDARESON nor Dr. CLINTON wrote a discharge summary when Mr. Decasas was discharged from the CIM hospital, so there was no summary setting forth the admitting diagnosis or course of treatment, and additional treatment needs.  Included among these factors were the necessity of orders or suggestions by the two doctors for certain medications to be in liquid form and that Mr. Decasas be examined by a neurologist.  These actions were deliberately indifferent to Mr. Decasas's serious medical condition and caused him to suffer harm.

101.  As Health Care Manager at CIM, defendant Dr. Sanford HEPPS, failed to ensure that Mr. Decasas receive adequate treatment and failed to adequately supervise and train staff and put in place procedures so that Mr. Decasas would receive medically appropriate care.

102.  Mr. Decasas was transferred to SATF to participate in a civil addict drug treatment program; his release from prison was tied to his completion of this program. After his transfer to SATF on or about January 10, 2001, Mr. Decasas began to experience frequent seizures.  He experienced seizures documented by SATF medical staff on January 18, January 25, February 1, February 6, February 9, February 13, February 15,

February 18, February 19, February 24, March 22, March 29, April 2, April 17, April 19, May 7, May 9, May 10, and May 15. His condition was not properly monitored or treated by defendant Dr. K. NGUYEN, his treating physician at SATF, and he frequently was not given his prescribed medications; as a result, he continued to experience seizures. As a result of inadequate medical care, Mr. Decasas was denied access to the benefits of the treatment program.

103. Mr. Decasas uses a bite stick to protect his tongue during seizures. During one seizure, Mr. Decasas shattered his bite stick. A nurse refused to replace the bite stick, although Mr. Decasas was at risk for having seizures at any time.

104. As Health Care Manager at SATF, defendant Dr. Edgar CASTILLO failed to ensure that Mr. Decasas receive adequate treatment and failed to adequately supervise and train staff and put in place procedures so that Mr. Decasas would receive medically appropriate care.

105. Since the filing of the original complaint on April 5, 2001, Mr. Decasas has been subject to improper actions by defendants. During a medical appointment on or about May 10, 2001, defendant Dr. NGUYEN, Mr. Decasas's treating physician, asked Mr. Decasas why Mr. Decasas was suing him. On or about June 12, 2001, Dr. NGUYEN asked Mr. Decasas to sign a release in order to obtain confidential medical files from non-Department of Corrections facilities so that the doctor could investigate a suspicion that Mr. Decasas's seizures were based on a mental health problem. Dr. NGUYEN had never asked Mr. Decasas to sign such a form in the five months he had been at SATF, nor had any of the doctors who treated him at the hospital at CIM. Upon information and belief,

the actions described in this paragraph were taken in retaliation for the filing of this lawsuit.

(9) *Steven Bautista*

106.   Plaintiff Steven Bautista is a prisoner at California State Prison – Lancaster. At about 12:00 noon on January 29, 1999, while incarcerated at High Desert State Prison, Mr. Bautista developed a priapism, a painful, persistent, and abnormal penile erection, unaccompanied by sexual desire or excitation.  The priapism was the result of Mr. Bautista taking Trazodone (also known as Desyrel) which, on December 16, 1999, had been prescribed for treatment of major depression by defendant Dr. Louis RICHNAK, a psychiatrist employed by the prison.  Dr. RICHNAK prescribed this medication without informing Mr. Bautista of the possible side effects, which include priapism, and did not obtain Mr. Bautista's informed consent for the medication.

107.   On the morning of January 30, 1999, with the painful priapism persisting, Mr. Bautista sought medical attention, and at approximately 10:30 a.m. he was brought to the prison's infirmary.  Since it was a Saturday, no doctors were present at the prison.  While Mr. Bautista was at the infirmary, MTA Wyman spoke by phone with defendant Richard SANDHAM, M.D. regarding Mr. Bautista's condition.  Dr. SANDHAM was told that the priapism had lasted for approximately 23 hours at that point.

108.   Defendant Dr. SANDHAM failed to adequately treat Bautista's medical condition.  Dr. SANDHAM failed to personally examine Mr. Bautista on January 30. Despite the lengthy duration of the priapism to that point, Dr. SANDHAM only directed that Mr. Bautista stop taking the Trazadone, apply ice packs to his genital area and take

Motrin. At 11:00 a.m. Mr. Bautista was returned to his cell, having been told that he would be seen by Dr. SANDHAM the next day.

109. However, defendant Dr. SANDHAM did not see or evaluate Mr. Bautista on Sunday, January 31, 1999. Mr. Bautista continued to suffer from the priapism.

110. On Monday, February 1, 1999, defendant Dr. SANDHAM saw Mr. Bautista. However, Dr. SANDHAM failed to document Mr. Bautista's subjective complaint, or his own objective observations, assessment, or plan. Instead, he merely issued orders for application of ice to the genital area for twenty minutes, to be repeated the next morning, and for Robaxin, a medication commonly prescribed in an attempt to relieve muscular-skeletal discomfort. He also ordered that Mr. Bautista be cell fed.

111. At about 3:00 p.m. on Tuesday, February 2, 1999, Mr. Bautista was again brought to the prison emergency room. Mr. Bautista was suffering terrible pain. Defendant Dr. SANDHAM noted that the priapism had started 96 hours earlier. He prescribed Terbutaline, but this did not reverse the priapism. Dr. SANDHAM then spoke to Gordon L. Nitz, M.D., a consulting urologist who recommended pseudoephedrine, which was given by means of Sudafed; this medication was also ineffective. Mr. Bautista was admitted to the prison infirmary.

112. The next day, February 3, 1999, Bautista was finally transported to the office of Dr. Nitz, the urologist. Dr. Nitz tried various therapies to relieve the priapism, including multiple puncture wounds and direct injection of epinephrine into the penis, but was not successful in relieving the condition. Dr. Nitz informed Mr. Bautista that he would probably not get erections again following reduction of the priapism because of the length

of time the condition had persisted. Dr. Nitz also indicated to Mr. Bautista that he (the doctor) did not understand why defendant Dr. SANDHAM had not adequately reacted to what Dr. Nitz termed an emergency problem as soon as Mr. Bautista had made Dr. SANDHAM aware of the priapism.

113. Later on February 3, 1999, Mr. Bautista was admitted to a hospital. On February 4, 1999, surgery was performed by Dr. Nitz to relieve the priapism. Bautista was left with permanent impotence and disfigurement, resulting in exacerbation of his depressive state. He continues to suffer serious urological problems including pain and difficulty urinating.

114. Defendant Dr. SANDHAM provided inadequate medical care to Bautista because acute priapism is a urological emergency requiring prompt intervention so as to prevent the possibility of impotence. Dr. SANDHAM's failure to personally examine Mr. Bautista until approximately 48 hours after first becoming aware of the emergency condition was an inexcusable delay, as was the doctor's failure to consult with a urologist until approximately 96 hours after the priapism began. These failures, upon information and belief, allowed Mr. Bautista's condition to deteriorate in such a way that it resulted in permanent damage that he would not have suffered had he received prompt attention.

115. Mr. Bautista filed a 602 regarding this matter on or about February 16, 1999, but never received a response. Mr. Bautista has no further recourse through administrative remedies.

116. As the Health Care Manager at High Desert State Prison, defendant Dr. PARK did not adequately supervise and train staff. He also failed to put in place

procedures so that Mr. Bautista would receive medically appropriate care. Upon information and belief, Dr. PARK was responsible for ensuring that all medical personnel at High Desert advise prisoners of the potential side-effects of drugs. Upon information and belief Dr. PARK knew that a failure to implement a disclosure requirement could result in prisoners suffering unexpected and debilitating side-effects from drugs prescribed to them. Upon information and belief, Dr. PARK also bears responsibility for policies on when outside specialists must be contacted to intervene in emergency conditions, including policies that would have ensured that Mr. Bautista promptly saw a urologist after onset of his priapism.

117. Since the filing of the *Plata* complaint defendants have had at least one improper discussion with Mr. Bautista regarding his involvement in the lawsuit. On April 18, 2001, less than two weeks after *Plata* was filed, Mr. Bautista had a classification committee hearing at California State Prison - Sacramento regarding his need for continued administrative segregation placement due to protective custody concerns. Several prison officials were present at the hearing. During the hearing Chief Deputy Warden Rosario reviewed Mr. Bautista's Central file and asked him if he was filing a lawsuit against the Department of Corrections and Mr. Bautista replied affirmatively. Captain Vance asked what lawsuit Mr. Bautista was involved in; Chief Deputy Warden Rosario replied that it was *Plata v. Davis*. Captain Vance had not heard of *Plata* and asked what lawsuit it was. Chief Deputy Warden Rosario then told him that it was the "black blanket that fell upon the CDC medical." Chief Deputy Warden Rosario then asked Mr. Bautista what had happened to him. Mr. Bautista responded that he had suffered a side effect from a

psychiatric medication and had undergone two operations as a result. Chief Deputy Warden Rosario then proceeded to discuss Mr. Bautista's safety concerns. Upon information and belief, the comments to Mr. Bautista were intended to intimidate him.

(10) *Clifford Myelle*

118. Plaintiff Clifford Myelle is incarcerated at Folsom State Prison. He suffers from degenerative disc disease, a very painful condition which was originally diagnosed in October 1991 and that began causing, during the summer of 1998, increasingly severe pain, numbness in his legs, and urinary retention problems. Mr. Myelle has suffered excessive delays in having his condition diagnosed and treated.

119. On August 31, 1998, while incarcerated at California State Prison - Solano (Solano), Dr. Neely examined Myelle and ordered that he receive an urgent orthopedic consult. However, an urgent consult did not take place; an orthopedist did not see Myelle until October 3, 1998, more than a month after the referral.

120. On October 3, 1998, Myelle was seen by defendant John KOFOED, M.D., an orthopedist. Dr. KOFOED ordered X-rays and an MRI. The X-rays were performed on October 9. The MRI was not done until December 4, 1998; it showed degenerative disc disease and two areas of disc protrusion, one of which impacted nerve roots.

121. On February 5, 1999, Mr. Myelle filed a 602 appeal requesting an appointment with defendant Dr. KOFOED in order to discuss the results of the MRI.

122. On February 20, 1999 defendant Dr. KOFOED re-examined Myelle. Dr. KOFOED referred Myelle to a neuro-orthopedic specialist for a surgical evaluation. On or about March 17, 1999, the Solano prison medical authorization review committee

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                    39

approved Dr. KOFOED's request that Mr. Myelle be evaluated by a neurosurgeon.

123. Mr. Myelle, however, was not evaluated by a neurosurgeon until September 18, 2000, more than 18 months after the exam was ordered and approved.

124. On April 24, 1999, Mr. Myelle filed an administrative appeal with prison officials requesting confirmation that an appointment had been made with the neuro-orthopedic specialist. On May 1, 1999, Mr. Myelle was again seen by defendant KOFOED who did not explain to Myelle why he had not been seen by the specialist. Dr. KOFOED made a second referral and ordered that the evaluation be done within the next 30 days. This second referral was approved by the Solano medical authorization review committee, but defendant Dr. Donald CALVO ordered that the consultation be scheduled at a later date.

125. On July 6, 1999, the Solano utilization review nurse rescheduled Mr. Myelle to be seen by the neurosurgeon on August 18, 1999. However, on August 8, the utilization nurse was informed that the neurosurgeon who was to evaluate Mr. Myelle was no longer treating state prisoners and that as a result the August 18 appointment was cancelled. The nurse left a message with defendant Dr. KOFOED, asking him to decide what to do next.

126. On July 18, 1999, Mr. Myelle filed an administrative appeal requesting that he be seen by a neurosurgeon for an evaluation. The informal level response, dated July 23, stated that an appointment had been made for the third week of August. He did not further pursue the appeal because prison officials stated that he would be seen by the doctor.

127. On August 23, 1999, Mr. Myelle filed another administrative appeal, again

requesting confirmation of an appointment with the specialist. On September 2, 1999, Mr. Myelle received a response, dated September 2, stating that the outside neurosurgeon with whom the appointment had been made was no longer seeing CDC patients and that he would instead be scheduled again to see defendant Dr. KOFOED. He did not appeal this response.

128. On September 25, 1999, Mr. Myelle was again seen by defendant Dr. KOFOED, who told Mr. Myelle that he would be seen by a specialist soon. Dr. KOFOED ordered that Mr. Myelle see a specialist "ASAP". On October 6, 1999, the Solano utilization review process approved this consultation.

129. On November 5, 1999, Mr. Myelle was seen by Dr. Low, a non-specialist medical doctor employed by contract at the medical clinic at Solano. Mr. Myelle was scheduled to see Dr. Low for a medical problem unrelated to his disc disease. Dr. Low's documentation of the visit states that Mr. Myelle complained of his lower back condition and of difficulties voiding and evacuating. The doctor further noted that Mr. Myelle was "awaiting neurosurgical eval[uation]." The doctor's notes make no mention of any discussion of any transfer to another prison.

130. On November 5, 1999, Solano Utilization Nurse Killian wrote a note in Mr. Myelle's health care record. The note states that (1) there is a two month backlog for neurosurgeon consultations, (2) Mr. Myelle is pending transfer to California State Prison – Folsom (Folsom) on November 8, 1999, and (3) the clinic doctor (Dr. Low) discussed the case with her and advised her of Mr. Myelle's desire to transfer and to not have a medical hold placed which would prohibit the transfer pending completion of medical care. Based

1   on this information, Nurse Killian postponed the neurosurgeon consultation.

2       131.  On November 6, 1999, Mr. Myelle was again seen by defendant Dr.

3
4   KOFOED.  Dr. KOFOED emphatically stated that Mr. Myelle should have been seen by

5   the specialist by that point because of the severity of the condition and symptoms.  After

6   Mr. Myelle informed Dr. KOFOED that prison officials intended to transfer him (Myelle)

7
8   from Solano, Dr. KOFOED recommended a "medical hold," an order that Mr. Myelle not

9   be transferred until he had been seen by the specialist.  The Solano Chief Physician and

10  Surgeon approved the order on November 8, 1999.    Upon information and belief, as Chief

11
12  Medical Officer at Solano, Camille Williams, M.D., had responsibility for supervision and

13  training of the medical staff at Solano.

14      132.  On December 14, 1999, without having seen the neurosurgeon and despite the

15  doctors' orders for a medical hold, Mr. Myelle was transferred from Solano to Folsom

16
17  State Prison (Folsom).

18      133.  Since his initial diagnosis Mr. Myelle's medical condition has progressively

19  deteriorated, including increasing difficulty urinating and painful bowel movements.

20  Myelle suffers from severe pain, including in his feet and legs when walking or climbing

21
22  stairs, and bladder problems.

23      134.  On January 12, 2000, Mr. Myelle told defendant Dr. Joseph TOURELLA of

24  his continuing problems, including slow or obstructed voiding of urine.  On January 19,

25  2000, an unidentified medical staff member noted in Myelle's medical file that a

26
27  neurological consult had been approved but could not take place because the most recent

28  MRI report had been done eighteen months earlier.  Dr. TOURELLA submitted a request

for another MRI. On March 13, 2000, Mr. Myelle again told Dr. TOURELLA of his problems voiding urine.

135. On May 5, 2000, an MRI was performed on Mr. Myelle. It again showed disc disease with disc protrusion resulting in contact with and/or displacement of nerve roots.

136. On July 12, 2000, Mr. Myelle was taken to a neurosurgeon's office in Modesto, but upon arrival was informed by clinic staff that a Folsom staff member had cancelled the appointment on July 11 because no transport team was available to bring him to the appointment. According to a note in the health care record, the appointment was cancelled because "custody" arrived with Mr. Myelle at the neurologist's office over an hour late. Plaintiff is informed and believes and therefore alleges that defendant MTA Michael FARRINGER was responsible for scheduling medical appointments with outside specialists and did not ensure that Mr. Myelle's appointment with the Modesto doctor was completed.

137. On July 27, 2000, Mr. Myelle had a surgical consultation appointment but did not receive a ducat (inmate pass) to go to the appointment and therefore could not see the specialist. On August 16, 2000, Mr. Myelle was seen by Dr. McArthur who told plaintiff that he had been scheduled for a consultation that day or the next day but the appointment was cancelled due to an institution lockdown, although other inmates were transported to medical appointments that day. Mr. Myelle again saw Dr. McArthur, on September 1, 2000, who informed him that a surgical consultation appointment had been made but that custody had denied approval to transport plaintiff to the appointment.

1

2    138.   On September 18, 2000, Mr. Myelle was finally examined by a

3    neurosurgeon.  A doctor had first ordered this consult approximately 18 months earlier.

4    Approximately 14 months before the consult, a doctor had ordered that it take place within

5    30 days.  And approximately one year before the appointment, a doctor had ordered that it

6    take place "ASAP".

7    139.   At the September 18, 2000 examination, Louis R. Nelson, M.D., the

8    neurosurgeon, ordered that Mr. Myelle have a discogram and post CT scan (additional

9

10   diagnostic tests), and said he would see Mr. Myelle again after that.  The discogram was

11   not performed until January 17, 2001.

12   140.   On September 19, 2000, Mr. Myelle filed a 602 complaining that several

13   appointments had been made with the outside neurosurgeon but that he had not been

14   transported to them, and requesting information about the process of issuing ducats to

15

16   inmates to notify them of outside medical appointments.  The undated informal level

17   response stated that because Mr. Myelle is a lifer he is not given a ducat until the last

18   minute, and that "if CDC has the transport CO's available they will make a good effort to

19   get you to your appointment."  He did not appeal this response.

20

21   141.   On February 7, 2001, Mr. Myelle filed another administrative appeal,

22   requesting prompt medical attention to treat his back condition.  He appealed to the Second

23   Level and the response stated that he was seen by Dr. Nelson, neurosurgeon, and that

24   follow-up treatment would be determined once results of that visit were received.  Mr.

25   Myelle appealed to the Director's Level on June 7, 2001, and that response is pending.

26

27   142.   On May 9, 2001, Mr. Myelle had a follow-up appointment with the

28

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                    44

neurosurgeon during which the surgeon discussed the discogram results and recommended spinal disc fusion surgery. On June 8, 2001, Mr. Myelle was informed that the prison had not yet received the recommendation from the neurosurgeon. Mr. Myelle continues to suffer pain and other problems.

143. As the wardens at Folsom State Prison during the period when Mr. Myelle has been incarcerated at that institution, defendant Glenn MUELLER and defendant Roseanne Mueller failed to adequately supervise and train custody staff and to implement procedures so that Mr. Myelle would be properly and timely scheduled for and transported to outside medical appointments in order to receive appropriate medical care.

144. Defendants DOE VI and Dr. Sandra Hand were or are the Health Care Managers or Acting Health Care Managers at Folsom State Prison at all times relevant to Mr. Myelle's allegations. These doctors were or are responsible for supervising and training the medical staff at Folsom. Upon information and belief, these doctors knew that Mr. Myelle was not receiving timely and adequate medical care. These doctors were responsible for the inadequate policies and procedures that led to inadequate medical care for Mr. Myelle and other prisoners. Upon information and belief, defendants DOE VI and HAND knew that these inadequate policies and procedures would cause injury to Mr. Myelle.

B. Defendants

145. Defendant Gray DAVIS is the Governor of the State of California and the Chief Executive of the state government. He is sued herein in his official capacity. As Governor he is obligated under state law to supervise the official conduct of all executive

and ministerial officers and to see that all offices are filled and their duties lawfully performed. DAVIS has control over the monies allocated to the CDC by submitting a budget and by exercising his authority to veto or sign legislation appropriating funds. DAVIS has the authority to appoint and remove the subordinate defendants named herein. Defendant DAVIS retains the ultimate state authority over the care and treatment of the plaintiff class.

146. Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS operates the correctional facilities that are the subject of the claims against it for violation of the Americans with Disabilities Act and section 504 of the Rehabilitation Act. The CALIFORNIA DEPARTMENT OF CORRECTIONS has the responsibility to take action to remedy the violations of the Americans with Disabilities Act and section 504 of the Rehabilitation Act, but has not done so.

147. Defendant B. Timothy GAGE is the Director of the Department of Finance and is sued in that capacity. Mr. GAGE supervises the Department of Finance, which is responsible for approving the CDC budget requests, including budget items for provision of medical care.

148. Defendant Robert PRESLEY is Secretary of the Youth and Adult Correctional Agency of the state of California and is sued herein in this capacity. The Youth and Adult Correctional Agency supervises the operation of the CDC.

149. Defendant Teresa ROCHA is the acting Director of the CDC and is sued herein in that capacity. The CDC is responsible for the operation of the California state prison system, including the provision of constitutionally adequate medical care. As

1  Director, Defendant ROCHA is responsible for the operation of all the prison facilities,

2  including decisions concerning staff deployment and training that directly affect plaintiffs'

3

4  abilities to obtain adequate medical care.

5     150.  Defendant Susann STEINBERG, M.D. is the Deputy Director of the Health

6  Care Services Division of the CDC and is sued in that capacity.  As Deputy Director, Dr.

7  STEINBERG is responsible for supervising the provision of medical care for all prisoners

8

9  within the custody of the department.

10    151.  Defendant Daniel THOR, M.D., was at all relevant times the Health Care

11  Manager at Salinas Valley State Prison and is sued in his individual capacity.  As Health

12

13  Care Manager, Dr. THOR is responsible for supervising the provision of adequate medical

14  care for prisoners at Salinas Valley.

15    152.  Defendant Angela COOPER was at all relevant times a nurse at Salinas

16  Valley and is sued in her individual capacity.

17

18    153.  Defendant Andrew LUCINE was at all relevant times the Health Care

19  Manager at Salinas Valley and is sued in his individual capacity.  As Health Care Manager,

20  Dr. LUCINE was responsible for supervising the provision of adequate medical care for

21

22  prisoners at Salinas Valley.

23    154.  Defendant Deneice MAYLE was at relevant times the warden at Salinas

24  Valley State Prison and is sued in her official capacity.  As the warden at Salinas Valley,

25  MAYLE failed to adequately supervise and train custody staff and put in place procedures

26

27  so that plaintiff Plata was able to receive medically appropriate care.

28    155.  Defendant Tam BUI, M.D., was at all relevant times a physician employed at

San Quentin State Prison and is sued in his individual capacity.

156.  Defendant Donald CALVO, M.D., was at all relevant times the Health Care Manager at San Quentin and Solano and is sued in his individual capacity.  As Health Care Manager, Dr. CALVO was responsible for supervising the provision of adequate medical care for prisoners at San Quentin and Solano.

157.  Defendant Martin LEVIN, M.D., was at all relevant times the Health Care Manager at Calipatria State Prison and is sued in his individual capacity.  As Health Care Manager, Dr. LEVIN was responsible for supervising the provision of adequate medical care for prisoners at Calipatria.

158.  Defendant Shankar RAMAN, M.D., was at all relevant times a physician employed at California State Prison - Corcoran and is sued in his individual capacity.

159.  Defendant Brian YEE, M.D., was at all relevant times the Health Care Manager at California State Prison - Corcoran and is sued in his individual capacity.  As Health Care Manager, Dr. YEE was responsible for supervising the provision of adequate medical care for prisoners at Corcoran.

160.  Defendant Darrell SMITH, M.D., was at all relevant times a contract ophthalmologist hired by San Quentin State Prison and is sued herein in his individual capacity.

161.  Defendant Meredith Alden VAN PELT, M.D., was at all relevant times a physician at San Quentin State Prison and is sued herein in her individual capacity.

162.  Defendant Bhaviesh SHAH, M.D., was at all relevant times a physician employed at Wasco State Prison and is sued herein in his individual capacity.

163.  Defendant Andrew WONG, M.D., was at all relevant times a physician employed at Salinas Valley State Prison and is sued herein in his individual capacity.

164.  Defendant Daniel FULLER, M.D.,was at all relevant times a physician employed at Salinas Valley State Prison and is sued herein in his individual capacity.

165.  Defendant Michael SONGER, M.D., was at all relevant times the Health Care Manager at Wasco State Prison and is sued herein in his individual capacity.  As Health Care Manager, Dr. SONGER was responsible for supervising the provision of adequate medical care for prisoners at Wasco.

166.  Defendant Stephen WYMAN, M.D., was at all relevant times the Health Care Manager and Chief Medical Officer at California Institution for Men and is sued in his individual capacity.  As Health Care Manager and Chief Medical Officer, Dr. WYMAN was responsible for supervising the provision of adequate medical care for prisoners at CIM.

167.  Defendant Joseph SIEGEL, M.D., was at all relevant times a physician employed at California Institution for Men and is sued in his individual capacity.

168.  Defendant Sergeant Randall DAVIS was at all relevant times a sergeant at Calipatria State Prison and is sued in his individual capacity.

169.  Defendant Edgar CASTILLO, M.D., was at all relevant times the Health Care Manager at SATF and is sued herein in his individual capacity.  As Health Care Manager, Dr. CASTILLO was responsible for supervising the provision of adequate medical care for prisoners at SATF.

170.  Defendant K. NGUYEN, M.D., was at all relevant times a physician

employed at SATF and is sued herein in his individual capacity.

171. Defendant Sanford HEPPS, M.D., was at all times relevant to plaintiff Decasas's claims the Health Care Manager and Chief Medical Officer at the California Institution for Men and is sued in his individual capacity. As Health Care Manager, Dr. HEPPS was responsible for supervising the provision of adequate medical care for prisoners at CIM.

172. Defendant Mohan SUNDARESON, M.D., was at all relevant times a physician employed at CIM and is sued in his individual capacity.

173. Defendant Dr. CLINTON, M.D., was at all relevant times a physician employed at CIM and is sued herein in his individual capacity.

174. Defendant Louis RICHNAK, M.D., was at all relevant times a psychiatrist employed at High Desert State Prison and is sued in his individual capacity.

175. Defendant Richard SANDHAM, M.D., was at all relevant times a physician employed at High Desert State Prison and is sued herein in his individual capacity.

176. Defendant C. PARK, DDS, was at all relevant times the Health Care Manager at High Desert State Prison and is sued in his individual capacity. As Health Care Manager, Dr. PARK was responsible for supervising the provision of adequate medical care for prisoners at High Desert.

177. Defendant Dr. Camille WILLIAMS, was at all times relevant to plaintiff Myelle's claim the Chief Medical Officer of California State Prison - Solano and is sued in her individual capacity. As the Chief Medical Officer at Solano, Dr. WILLIAMS failed to adequately supervise and train staff and put in place procedures so that plaintiff Myelle

1  would receive medically appropriate care.

2      178.  Defendant J. KOFOED, M.D., was at all relevant times employed as an

3  attending orthopedist at California State Prison - Solano and is sued in his individual

4

5  capacity.

6      179.  Defendant Joseph TOURELLA, M.D., was at all relevant times employed as

7  a staff physician at Folsom State Prison and is sued in his individual capacity.

8

9      180.  Defendant MTA Michael FARRINGER was at all relevant times employed as

10  a medical technical assistant at Folsom State Prison and was responsible for scheduling

11  medical appointments at outside facilities.  He is sued in his individual capacity.

12

13      181.  Defendant Glenn A. MUELLER was at relevant times the warden of Folsom

14  State Prison and is sued in his individual capacity.  As the warden at Folsom, MUELLER

15  failed to adequately supervise and train custody staff and put in place procedures so that

16  plaintiff Myelle was able to receive medically appropriate care.

17

18      182.  Defendant Roseanne CAMPBELL was at relevant times the warden of

19  Folsom State Prison and is sued in her individual capacity.  As the warden at Folsom,

20  CAMPBELL failed to adequately supervise and train custody staff and put in place

21  procedures so that plaintiff Myelle was able to receive medically appropriate care.

22

23      183.  Defendant Sandra HAND, M.D. was at all times relevant to plaintiff Myelle's

24  claim the Health Care Manager of Folsom State Prison and is sued in her individual

25  capacity. As the Health Care Manager at Folsom, Dr. HAND failed to adequately supervise

26  and train staff and put in place procedures so that plaintiff Myelle would receive medically

27  appropriate care.

28

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                    51

184. Defendant DOE I was at all relevant times employed as a medical technical assistant at Calipatria State Prison and is sued in his individual capacity.

185. Defendant DOE II was at all relevant times employed as a medical technical assistant at Calipatria State Prison and is sued in his individual capacity.

186. Defendant DOE III was at all relevant times employed as a correctional officer at Calipatria State Prison and is sued in his individual capacity.

187. Defendant DOE IV was at all relevant times employed as a medical technical assistant at Salinas Valley State Prison and is sued in his individual capacity.

188. Defendant DOE V was at all relevant times employed as a physician at Salinas Valley State Prison and is sued in his individual capacity.

189. Defendant DOE VI was at all relevant times employed as the Health Care Manager at Folsom State Prison and is sued in his individual capacity. As the Health Care Manager at Folsom, DOE VI failed to adequately supervise and train staff and put in place procedures so that plaintiff Myelle would receive medically appropriate care.


## VI. CLASS ACTION ALLEGATIONS

190. The named plaintiffs bring this action on their own behalf and, pursuant to Rules 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a class of all prisoners who are now, or will in the future be, under the custody of the CDC but excluding any prisoners confined at Pelican Bay State Prison.

(a)      Thousands of prisoners in CDC custody suffer from serious medical conditions. All prisoners are at risk of developing a serious medical condition while in

prison and thousands need care and treatment to prevent serious medical conditions. All prisoners are entirely dependent on defendants for the provision of medical treatment. The size of the class is so numerous that joinder of all members is impracticable.

(b)     The conditions, practices and omissions that form the basis of this complaint are common to all members of the class and the relief sought will apply to all of them.

(c)     The claims of the named plaintiffs are typical of the claims of the class.

(d)     The prosecution of separate actions by individual members of the class would create a risk of inconsistent and varying adjudications which would establish incompatible standards of conduct for the defendants.

(e)     The prosecution of separate actions by individual members of the class would create a risk of adjudications with respect to individual members which would, as a practical matter, substantially impair the ability of other members to protect their interests.

(f)     Defendants have acted or refused to act on grounds generally applicable to the class, making appropriate injunctive and declaratory relief with respect to the class and subclass as a whole.

(g)     There are questions of law and fact common to the members of the class, including defendants' violations of the Eighth and Fourteenth Amendments to the United States Constitution.

(h)     The named plaintiffs are capable, through counsel, of fairly and

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                    53

adequately representing the class and protecting its interests.

191. (a)   Paul Decasas and Raymond Stoderd and other similarly situated plaintiffs meet the requirements for certification as subclass pursuant to Fed. R. Civ. P. Rule 23 (c)(4).  The subclass consists of all prisoners with disabilities, except those prisoners with mobility, hearing, sight, learning and developmental disabilities.

(b) Upon information and belief, thousands of prisoners in CDC custody have disabilities and are denied access to CDC programs, services and activities due to inadequate medical care.  All prisoners are entirely dependent on defendants for the provision of medical treatment.  The size of the class is so numerous that joinder of all members is impracticable.

(c)   The conditions, practices and omissions that form the basis of this complaint are common to all members of the subclass and the relief sought will apply to all of them.

(d)   The claims of Decasas and Stoderd are typical of the claims of the entire subclass.

(e)   The prosecution of separate actions by individual members of the subclass would create a risk of inconsistent and varying adjudications which would establish incompatible standards of conduct for the defendants.

(f)   The prosecution of separate actions by individual members of the subclass would create a risk of adjudications with respect to individual members which would, as a practical matter, substantially impair the ability of other members to protect their interests.

(g)    Defendants have acted or refused to act on grounds generally applicable to the subclass, making appropriate injunctive and declaratory relief with respect to the class and subclass as a whole.

(h)    There are questions of law and fact common to the members of the subclass, including defendants' violations of the ADA and § 504.

(i)    Decasas and Stoderd are capable, through counsel, of fairly and adequately representing the subclass and protecting its interests because they are prisoners confined within the CALIFORNIA DEPARTMENT OF CORRECTIONS who have been discriminated against on the basis of their disabilities, through failure to provide adequate medical care, and who are at risk of having future serious medical needs.

## VII. STATEMENT OF CLASS CLAIMS

192.    The medical care provided by defendants in each of California's prisons is woefully inadequate and violates the constitutional rights of the named plaintiffs and the plaintiff class under the Eighth and Fourteenth Amendments of the United States Constitution to be free from cruel and unusual punishment. There are a multitude of problems with the delivery of medical care to plaintiffs and the plaintiff class, including but not limited to, the following:

a.    MTAs are inadequately trained to perform their duties and have conflicting custodial responsibilities. MTAs are the "gatekeepers" for plaintiffs' access to any medical care. Prisoners who wish to be seen by a doctor must first submit a request to an MTA. The first person who responds to a prisoner with an acute medical incident often

is an MTA. MTAs are often called upon to make initial medical diagnoses of prisoner medical conditions. Many MTAs, however, have inadequate medical training. MTAs therefore may not, and have not in the past, recognized the symptoms a patient displays until that condition has become so acute as to be life threatening. MTAs are peace officers and are expected to perform custodial functions which interfere with their ability to provide adequate medical care.

        b.      There are insufficient numbers of qualified medical staff, including physicians, nurses and MTAs.

        c.      There is a lack of training and supervision of all medical personnel.

        d.      Prisoners' medical records often are disorganized and incomplete. These records often do not accompany prisoners when they are transferred to other prisons.

        e.      There is a lack of adequate medical screening of incoming prisoners.

        f.      There are lengthy delays in accessing care, including delays to see a primary physician, to obtain a referral to see a specialist, to be transported to a specialist for examination after obtaining the referral, to obtain medical testing and to obtain treatment. These delays are compounded when inmates are transferred to new institutions, often causing further delays in the provision of medical care.

        g.      There are frequent failures to provide prisoners with access to care altogether. Often, medical staff do not take sufficient steps necessary to make diagnoses. There are often failures to provide treatment when a diagnosis or symptom is discovered. Medical staff do not provide care because they do not use interpretative services to communicate with prisoners who speak languages other than English.

h.    Laboratory and other medical tests are frequently delayed, never done or not reported.

i.    There is untimely response to emergencies.

j.    Correctional officers frequently interfere with the provision of medical care.

k.    There is a lack of quality control procedures, including lack of physician peer review, quality assurance and death reviews.  Even if deficiencies are identified, there is inadequate follow-up to prevent future problems.

l.    There is a lack of established protocols for dealing with chronic illnesses such as diabetes, heart disease, hepatitis and HIV.  The care of HIV+ inmates is particularly inadequate.  Problems include, but are not limited to, (i) frequent failure to instruct and assist inmates in following the strict regimen needed to take their drug combinations successfully, (ii) irregular, untimely, and sometimes incorrect administration of medications, and (iii) failure to adequately monitor and treat secondary infections.

m.    Prisoners are not informed of potential side effects of prescribed medications and of the actions they should take if side effects occur.

n.    Defendants are unable to recruit sufficient, competent medical staff and to retain those staff who are hired.

o.    Necessary medical care is often denied based solely on an inmate's expected release date, even when this date is over one year away.

p.    Defendants lack sufficient knowledge about the medical care system to properly monitor and improve the delivery of medical care.

q.    The administrative grievance system often does not provide timely or adequate responses to complaints about medical care, and at times is not available to prisoners seeking to grieve a medical care issue.

193.  The CDC receives federal financial assistance as that term is used in § 504 [29 U.S.C. § 794 (b)(1)(A)].

194.  All of the operations of the CALIFORNIA DEPARTMENT OF CORRECTIONS constitute a program, service or activity as those terms are used by § 504 [29 U.S.C. § 794.] and by the ADA.

195.  By failing to provide adequate medical care to plaintiffs Decasas and Stoderd and the plaintiff subclass they represent defendants are preventing plaintiffs from participating in and are therefore denying meaningful access to programs, services and activities that plaintiffs are otherwise qualified to participate in and benefit from, thereby subjecting them to discrimination based on their disabilities.

196.  Defendants ROCHA and STEINBERG, through their counsel, executed an agreement during settlement negotiations explicitly waiving their right to require plaintiffs to exhaust available administrative remedies before bringing an action for injunctive relief. Defendants DAVIS, GAGE and PRESLEY do not have any administrative remedies that are available for plaintiffs to exhaust.

## CLAIMS FOR RELIEF

### I.

(All Plaintiffs and the plaintiff class v. Davis, Gage, Presley, Rocha & Steinberg)

(§ 1983)

197.  The conduct described herein has been and continues to be performed by defendants and their agents or employees in their official capacities and is the proximate cause of the named plaintiffs' and the plaintiff class's ongoing deprivation of rights secured by the United States Constitution under the Eighth and Fourteenth Amendments.

198.  The constitutional deprivations described herein are the proximate result of the official policies, customs and pervasive practices of defendants.  Defendants PRESLEY, ROCHA and STEINBERG have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

199.  Upon information and belief, defendants DAVIS and GAGE have been and are aware of the deprivations complained of herein and have been deliberately indifferent to such conduct.  Defendants DAVIS and GAGE failed to provide necessary additional funding to remedy deficiencies in the CALIFORNIA DEPARTMENT OF CORRECTIONS's medical care system.

200.  Plaintiffs are entitled to reasonable attorneys' fees, litigation expenses and costs for maintaining this claim pursuant to 42 U.S.C. § 1988.

## II.

(Plaintiffs Decasas and Stoderd and subclass v. California Department of Corrections, Davis, Gage, Presley, Rocha & Steinberg)

(ADA and § 504)

201.  The actions of defendants, as set forth in this Complaint, constitute a violation of the rights under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of plaintiffs Decasas and Stoderd and the subclass they represent.

202.  Plaintiffs Decasas and Stoderd and the subclass they represent are qualified individuals with disabilities as defined in the ADA and qualify as individuals with disabilities as defined in Section 504.

203.  As a result of defendants' policies and practices which result in inadequate medical care, plaintiffs Decasas and Stoderd and other members of the subclass with disabilities have been excluded from the substance abuse programs, education, vocation, work furlough and work credit, recreation, dining hall and other meals, yard time, visiting, classification, discipline, telephone, emergency procedures and other programs and services for which they are otherwise qualified that defendants provide to individuals under their custody and control, thereby subjecting them to discrimination in violation of the ADA and § 504.

### III.

(Plata v. Thor, Cooper, Levin, Lucine, Mayle & DOES I-V)

(§ 1983)

204.  Defendants THOR, COOPER, LEVIN, LUCINE, MAYLE and DOES I-V were deliberately indifferent to plaintiff Plata's medical needs and have violated plaintiff Plata's right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution.  Defendants acted under color of state law and knew and should have known that their conduct or omissions created an unreasonable risk of harm to Plata. As a direct and foreseeable result of these defendants' violations of plaintiff's constitutional rights, plaintiff has suffered and will continue to suffer physical injuries to his knee, leg, foot, back and head that have also caused pain and suffering, emotional

distress and other injuries. Defendant Cooper's acts were willful, intentional, wanton and in conscious disregard of plaintiff's rights.

IV.

(Shaw v. Bui & Calvo)

(§ 1983)

205. Defendants BUI and CALVO were deliberately indifferent to plaintiff Shaw's medical needs and have violated plaintiff Shaw's right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution. Defendants acted under color of state law and knew and should have known that their conduct or omissions created an unreasonable risk of harm to Shaw. As a direct and foreseeable result of these defendants' violations of plaintiff's constitutional rights, plaintiff has suffered physical injuries to his arm and a resulting debilitating infection; defendants have also caused pain and suffering, emotional distress and other injuries by failing to provide medically appropriate treatment. Defendant BUI's acts were willful, intentional, wanton and in conscious disregard of plaintiff's rights.

V.

(Stoderd v. Raman & Yee)

(§1983)

206. Defendants RAMAN and YEE have been deliberately indifferent to plaintiff Stoderd's medical needs and have violated plaintiff Stoderd's right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution. These defendants acted under color of state law and knew and should have known that their

conduct or omissions created an unreasonable risk of harm to Stoderd. As a direct and foreseeable result of these defendants' violations of plaintiff's constitutional rights, plaintiff has suffered pain and suffering, emotional distress and other injuries from their discontinuation of his pain medications. Defendants' acts were willful, intentional, wanton and in conscious disregard of plaintiff's rights.

## VI.

### (Johns v. Smith, Calvo, & Van Pelt)

### (§1983)

207. Defendants SMITH, CALVO and VAN PELT have been deliberately indifferent to plaintiff Johns's medical needs and have violated plaintiff Johns's right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution. These defendants acted under color of state law and knew and should have known that their conduct or omissions created an unreasonable risk of harm to Johns. As a direct and foreseeable result of these defendants' violations of plaintiff's constitutional rights, plaintiff has suffered and will continue to suffer pain and suffering, emotional distress and other injuries from their refusal to correct his correctable eye condition until he goes completely blind. Defendants' acts were willful, intentional, wanton and in conscious disregard of plaintiff's rights.

## VII.

### (Long v. Shah, Wong, Fuller, Songer, & Thor)

### (§1983)

208. Defendants SHAH, WONG, FULLER, SONGER and THOR have been

1   deliberately indifferent to plaintiff Long's medical needs and have violated plaintiff Long's

2
3   right to be free from cruel and unusual punishment under the Eighth Amendment to the

4   U.S. Constitution.  These defendants acted under color of state law and knew and should

5   have known that their conduct or omissions created an unreasonable risk of harm to Long.

6
7   As a direct and foreseeable result of these defendants' violations of plaintiff's

8   constitutional rights, plaintiff has suffered and will continue to suffer permanent injury of

9   incontinence as well as pain and suffering, emotional distress and other injuries from their

10  failure to provide timely and appropriate treatment and specialist referrals.  Defendants

11
12  SHAH, WONG, FULLER, and THOR's acts were willful, intentional, wanton and in

13  conscious disregard of plaintiff's rights.

14                                          **VIII.**

15                      (Rhoades v. Levin, Davis, Siegel & Wyman)

16
17                                        (§1983)

18       209.  Defendants LEVIN, DAVIS, SIEGEL and WYMAN have been deliberately

19  indifferent to plaintiff Rhoades's medical needs and have violated plaintiff Rhoades's right

20
21  to be free from cruel and unusual punishment under the Eighth Amendment to the U.S.

22  Constitution.  These defendants acted under color of state law and knew and should have

23  known that their conduct or omissions created an unreasonable risk of harm to Rhoades.

24  As a direct and foreseeable result of these defendants' violations of plaintiff's

25
26  constitutional rights, plaintiff has suffered and will continue to suffer permanent injury to

27  his hip as well as pain and suffering, emotional distress and other injuries from their failure

28  to provide timely and appropriate treatment and specialist referrals.  Defendants LEVIN

of harm to Decasas. As a direct and foreseeable result of these defendants' violations of plaintiff's constitutional rights, plaintiff has suffered and will continue to suffer permanent injury as well as pain and suffering, emotional distress and other injuries from their failure to provide timely and appropriate treatment. Defendants NGUYEN, SUNDARESON, and CLINTON's acts were willful, intentional, wanton and in conscious disregard of plaintiff's rights.

**XI.**

(Bautista v. Richnak, Sandham & Park)

(§1983)

212. Defendants RICHNAK, SANDHAM, and PARK have been deliberately indifferent to plaintiff Bautista's medical needs and have violated plaintiff Bautista's right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution. These defendants acted under color of state law and knew and should have known that their conduct or omissions created an unreasonable risk of harm to Bautista. As a direct and foreseeable result of these defendants' violations of plaintiff's constitutional rights, plaintiff has suffered and will continue to suffer permanent impotence and disfigurement that has also caused pain and suffering, emotional distress and other injuries. Defendants RICHNAK and SANDHAM's acts were willful, intentional, wanton and in conscious disregard of plaintiff's rights.

**XII.**

(Myelle v. Williams, Kofoed, Tourella, Farringer, Campbell, Calvo, Mueller, Hand and Doe VI)

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                    65

1    described above are in violation of the ADA and § 504;

2          (d)    Preliminarily and permanently enjoin defendants DAVIS, GAGE,
3
4    PRESLEY, ROCHA and STEINBERG, their agents, employees and all persons acting in
5    concert with them, from subjecting the named plaintiffs and the class they represent to the
6    unconstitutional and unlawful acts, omissions, policies, and conditions described above;

7          (e)    Award only the named plaintiffs monetary damages, compensatory
8
9    and punitive, in an amount to be determined at trial;

10         (f)    Award plaintiffs the costs of this suit, and reasonable attorneys' fees
11
12   and litigation expenses pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 794a(b), and 42 U.S.C.
13   § 12205;

14         (g)    Retain jurisdiction of this case until defendants have fully complied
15   with the orders of this Court, and there is a reasonable assurance that defendants will
16   continue to comply in the future absent continuing jurisdiction; and
17
18         (h)    Award such other and further relief as the Court deems just and
19   proper.

20         Dated: August 20, 2001
21
22                                        Respectfully submitted,
23
24
25                                        DONALD SPECTER
26                                        Attorney for Plaintiffs
27
28

Amended Complaint
Plata v. Davis No. C-01-1351 TEH                67

## DECLARATION OF SERVICE BY MAIL

Case Name:      Plata v. Davis      No. USDC C-01-1351 TEH

I am employed in the County of Marin, California.  I am over the age of 18 years and not a party to the within entitled cause:  my business address is Prison Law Office, General Delivery, San Quentin, California 94964.

On August 20, 2001, I served the attached

**FIRST AMENDED COMPLAINT CLASS ACTION**

in said cause, placing, or causing to be placed, a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid in the United States Mail at San Rafael, California, addressed as follows:

John Appelbaum, DAG
Office of the Attorney General
PO Box 944255
Sacramento, CA 94244-2550

Attorney for Defendants

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed at San Rafael, California onAugust 20, 2001.


_____
Carole Lamanna