IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCIANO PLATA, et al.,

    Plaintiffs,

v.

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

NO. C01-1351 TEH

CLASS ACTION

<u>ORDER RE INTERIM REMEDIES RELATING TO CLINICAL STAFFING</u>

    On October 3, 2005, this Court appointed a Correctional Expert to assist the Court in identifying discrete, urgently needed, remedial measures that could be undertaken immediately in the areas of clinical staffing and death reviews, pending the Court's national search for, and appointment of, a Receiver. On November 14, 2005, the Correctional Expert filed a report and recommendations relating to clinical staffing. The parties were then given an opportunity to file written objections. The Court also invited the Coalition of California Department of Corrections and Rehabilitation ("CDCR") Healthcare Unions to file an amicus response.

    As the Court emphasized at the November 28, 2005 hearing on this matter, the Correctional Expert's report powerfully underscores the depth of the crisis in the delivery of health care services in the CDCR – a crisis which is most acute at the leadership and management level. Yet, as was made clear by Defendants' objections to the report, and their stance at the hearing, they *still* fail to grasp the gravity of the crisis. Instead of voicing an aggressive commitment to the recommended reforms, Defendants were content to invoke bureaucratic red tape and "business as usual" procedures as roadblocks to reform. One remarkable symptom of this dysfunction came to light during the hearing when the Court was

informed that neither the Secretary of the CDCR, Rod Hickman, nor its Undersecretary, Jeanne Woodford, were personally involved in responding to the Report, and were not even *aware* of the objections thereto that were being made on their behalf.  The above does not instill confidence in the Court that the CDCR is giving the on-going medical crisis the required attention and priority.  The Court continues to believe in – and indeed rely upon – the Governor's commitment to fix the constitutional violations at issue, a commitment he has repeatedly voiced both publicly and privately to the Court.  It has become increasingly clear, however, that those in his service have not fully understood this message.

The Court will not, however, permit defendants to twiddle their collective thumbs during this interim period. As the Correctional Expert's report makes all too clear, interim measures are imperative to avoid further deterioration of services.  Nor does the fact that the Court has ruled that it will appoint a Receiver relieve defendants of their constitutional obligations.  The CDCR's tepid response to the Report's recommendations, however, plainly highlight the need for the Governor to personally designate an accountable individual who has both the authority and ability to ensure that the recommendations are timely and effectively implemented.

As the Correctional Expert details, the recommendations are the product of intensive and thorough consultation with both the parties, the Coalition of Healthcare Unions, medical experts and others.  They are careful, detailed, well-supported by the record, and designed to positively impact the clinical staffing crisis while avoiding any interference with the kinds of systemic or more far reaching remedies that a Receiver might wish to undertake.  Notably, while Defendants raise (unsubstantiated) reservations about their ability to fully fund certain recommendations or to implement certain recommendations as quickly as recommended, they do not dispute the efficacy of the recommendations to accomplish their objective.

The Court will now turn to certain of the objections or comments raised by Defendants and the Coalition of Healthcare Workers.  No objections were filed by the Plaintiffs.

2

A. Objections Raised by Defendants

    1. Availability of Funding (Objections at 2)

Defendants' contention that they may not have sufficient funds to support the modest recommended recruitment and retention differentials is readily rejected.   Not only have Defendants completely failed to substantiate this contention, particularly in light of the massive vacancies among clinical positions, but it is well established  that lack of funds does not relieve defendants of their duty to protect constitutional rights. *See e.g. Campbell v. McGruder*, 580 F.2d 521, 540 (D.C. Cir. 1978).   Nor do  "business as usual" budget procedures provide Defendants cover in the face of a known crisis.

    2. Annual versus monthly salary calculations  (Objections at 4:10-20 and 5:12-6:3)

Defendants seek clarification as to whether or not the annual differentials shall be considered in calculating the compensation increases.  The annual salary enhancement paid to clinicians working at specific prisons shall not be included in proposed differentials, as set forth in the Expert's report.

    3. Application to headquarters and regional offices  (Objections at 4:21-26)

Defendants seek clarification as to whether the recruitment and retention differentials would apply to physicians assigned to headquarters and regional offices.  The answer is yes.

    4. Completion of QICM program as predicate (Objections at 4:28- 5:1)

Defendants suggest deferring the payment of recruitment and retention differentials recommended by the Correctional Expert to certain physicians employed by the CDCR until after those physicians complete the QICM process.  Given the adversarial manner in which  the QICM program was implemented, the Court concludes that Defendants' suggestion

would have an adverse impact on morale which would not be offset by any significant benefit. Accordingly, the Court's declines to modify this aspect of the recommendations.

### 5. Acting capacity (Objections at 5:2-11)

Defendants suggest substituting the language proposed by the Correctional Expert, concerning compensation for clinicians serving as supervisors/managers in an "acting" capacity, with language that more closely mirrors the terminology utilized in their collective bargaining agreements. At the November 28, 2005 hearing, the Coalition of Healthcare Unions stated that they did not object to Defendants' proposed language. Accordingly, the order relating to this subject will be modified as recommended by Defendants.

### 6. Streamlining clinical hiring (Objections at 6:4-12)

Defendants have offered no compelling justification or documentation as to why they require 30 *business* days to hire a clinician and instead rely on their "limited resources." The Court is convinced that this objection is more of a reflection of Defendants' instinctive "can't do" attitude (which has plagued them throughout this case), than what can actually be accomplished with initiative and additional effort. This objection is rejected.

### 7. Primary Care physician's assistant duty statement (Objections at 6:12-19)

Given that the Department of Personnel Administration has informed defendants that a physician's assistants classification will be established by December 6, 2005, there is no basis for this objection.

### 8. Modifying vacant physician and surgeon positions to permit hiring of mid-level practitioners (Objections at 6:20-7:9)

Defendants suggest an alternative process but do not dispute the objective underlying the recommendation. The Court concludes, however, that the proposed alternative process is

4

potentially cumbersome and may result in unnecessary bureaucratic delays. Nor have they adequately documented why it is genuinely necessary. Further, the process recommended in the report has been used successfully at Pelican Bay State Prison for several years. Accordingly, the Court does not accept this objection.

9. Orientation Program (Objections at 7:10-19)

Defendants do not dispute the need for an orientation program but contend that 30 *business* days are needed to comply, again citing "limited resources.". At the hearing, Defendants could not explain, however, why they could not utilize the orientation program that is already in place at Pelican Bay State Prison, and in fact did not appear to be familiar with the program. Nor have Defendants otherwise justified the need for 30 business day to implement this recommendation. Again, Defendants' objection appears to be based more on bureaucratic inertia than necessity.

B. Objections raised by Coalition of Healthcare Unions

The Court notes that some of the Coalitions of Healthcare Union's responses simply involve comments or pertain to matters that go beyond the scope of the report and are best left to the Receiver. The Court addresses, however, the following two items.

1. Compensation for Board-Eligible Currently Employed Physicians (Objections at 2:11-3:8).

As discussed at the November 28, 2005 hearing, the Coalition of Healthcare Unions will identify and convey to the Correctional Expert any specific instances of concern.

2. Compensation for Specialist Physicians (Objections at 3:9-14)

The Court clarifies that the recommendation includes all CDCR physicians.

5

In light of all of the above, the entire record herein, and good cause appearing, it is HEREBY ORDERED as follows:

1. The recommendations set forth in the Correctional Expert's November 14, 2005 report are adopted as set forth below:

2. <u>Recruitment and Retention Differentials</u>

Defendants shall implement the following recruitment and retention differentials[1] pursuant to the schedule set forth below:

**(a) Physicians:**

Defendants SHALL**:**

(1) Continue in full force and effect all existing CDCR physician recruitment and retention differentials.[2]

(2) Hire Physician and Surgeon applicants who are Board certified or eligible in internal medicine or family practice at the top step of Physician and Surgeon salary range D, plus the existing $200 month recruitment and retention differential, plus an additional recruitment and retention differential of 10%. The 10% differential shall be calculated as

---

[1] As the Correctional Expert points out in his Report, the salary differentials described herein address only the current crisis. Therefore, recruitment and retention differentials are being utilized rather than modifications to base salary. This approach permits the CDCR and its bargaining units the option of negotiating permanent salaries in the context of the normal management/labor bargaining process. The Receiver will also have the option of modifying the differentials to respond to future circumstances or to make other structural changes as may be appropriate.

[2] At present, all CDCR physicians receive a monthly recruitment and retention differential of $200. In addition, certain prison specific recruitment and retention differentials are provided based on geographical considerations.

6

10% of the sum of (a) the top step of salary range D *plus* (b) the existing $200 recruitment and retention differential to ensure a starting monthly salary of no less than $12,519.10.

(3) Provide an additional 10% monthly recruitment and retention differential, calculated as set forth in paragraph 2, to all presently employed CDCR Physicians and Surgeons (regardless of whether the physician is Board certified or eligible or not).

(4) Provide Chief Physicians and Surgeons with the 10% recruitment and retention differential as set forth in paragraph 3.  In addition, provide Chief Physicians and Surgeons with a clinical supervisory recruitment and retention differential so that their monthly salary is no less than 7% above the revised top salary for CDCR Physicians and Surgeons (for example, 1.07 X $12,519.10 = $13,395.40). [3]  Apply this supervisory differential to physicians who are filling an established, open Chief Physician and Surgeon position and who are identified as being in an Out-of-Class Assignment consistent with their MOU or rule/regulation.

(5) Provide Chief Medical Officers with the 10% recruitment and retention differential as set forth in paragraph 3.  In addition, provide Chief Medical Officers with a management recruitment and retention differential so that their monthly salary is no less than 12% above the revised top salary for CDCR Physicians and Surgeons (for example, 1.12 X $12,519.10 = $14,021.40).[4]  Apply this supervisory differential to physicians who are filling an established, open Chief Medical Officer position and who are identified as being in an Out-of-Class Assignment consistent with their MOU or rule/regulation.

---

[3] Some Chief Physicians and Surgeons may receive a slightly higher level of total compensation due to local prison specific recruitment and retention differentials.

[4] Some Chief Medical Officers may receive a slightly higher level of total compensation due to local prison specific recruitment and retention differentials.

7

(6) Increase the current recruitment and retention differential for physicians filling Chief Deputy Clinical Services positions to ensure annual compensation of no less than $185,000.00.

(7) Establish the above referenced physician recruitment and retention differentials effective December 1, 2005. Provide the differential in the paychecks issued to physicians no later than February 2006.

(8) Modify all written and digital recruitment documents to reflect the additional differentials no later than December 19, 2005.

**(b) Mid-Level Providers:**

Defendants SHALL:

(1) Continue in full force and effect all existing CDCR nurse practitioner recruitment and retention differentials.

(2) Hire nurse practitioner applicants at the top step of Nurse Practitioner salary range B, plus an additional recruitment and retention differential of $1750.00 per month.

(3) Provide a monthly recruitment and retention differential of $1750.00 per month to all presently employed nurse practitioners.[5]

(4) Establish the above referenced mid-level recruitment and retention differentials effective December 1, 2005. Provide the differential in the paychecks issued to nurse practitioners no later than February 2006.

(5) Modify all written and digital recruitment documents to reflect the additional differentials no later than December 19, 2005.

---

[5] A $1500.00 per month differential for Pelican Bay State Prison nurse practitioners has been established through a *Madrid* order entitled "Order re Special Master's Final Report and Recommendations re Family Nurse Practitioners" filed September 13, 2005. Therefore, an additional $250.00 per month shall be added as a differential to the salaries of Pelican Bay nurse practitioners.

8

**(c) Registered Nurses:**[6]

Defendants SHALL:

(1)  Continue in full force and effect all existing CDCR registered nurse recruitment and retention differentials.[7]

(2)   Hire registered nurse applicants at the top step of salary range B, plus all existing recruitment and retention differentials applicable to the institution of hire, plus an additional recruitment and retention differential of 18%.  The 18% differential shall be calculated as 18% of the sum of the top of salary range B plus the existing recruitment and retention differentials.

(3)  Provide an additional 18% monthly recruitment and retention differential, calculated as set forth in paragraph 2, to all presently employed CDCR registered nurses.

(4)  Provide SRN IIs with the 18% recruitment and retention differential set forth in paragraph 3.  In addition, provide SRN IIs with a clinical supervisory recruitment and retention differential so that their monthly salary is no less than 7% above the revised top salary for a CDCR registered nurse (for example, no less than 1.07 X $6,635.10 = $7,099.60 plus applicable existing recruitment and retention differentials).  Apply this supervisory differential to nurses who are filling an established, open SRN II position, and who are

---

[6] The recruitment and retention differentials for CDCR nurses shall extend to all CDCR registered nurse related categories of clinicians employed by the CDCR, including but not limited to Nurse Instructors, Utilization Management Nurse, Nurse Anesthesiologists, Public Health Nurses, Nurse Consultants, Registered Nurses, Nurse Consultant Program Review, and Surgical Nurse.  This differential does *not* extend to Medical Technical Assistants, even when the Medical Technical Assistant has a registered nurse license.

[7] At present, there is a $200.00 per month registered nurse recruitment and retention differential for all CDCR nurses, and a number of additional prison specific differentials which range from $200.00 to $400.00.

9

identified as being in an Out-of-Class Assignment consistent with their MOU or rule/regulation.[8]

(5) Provide SRN IIIs with the 18% recruitment and retention differential set forth in paragraph 3. In addition, provide SRN IIIs with a management recruitment and retention differential so that their monthly salary is no less than 12% above the revised top salary for a CDCR registered nurse (for example, no less than 1.12 X $6,635.10 = $7,431.30 plus applicable existing recruitment and retention differentials). Apply this supervisory differential to nurses who are filling an established, open SRN III position, and who are identified as being in an Out-of-Class Assignment consistent with their MOU or rule/regulation.

(6) Apply a recruitment and retention differential for registered nurses filling the Regional Nursing Director positions to ensure an annual compensation of no less than $98,000.00

(7) Establish the above referenced registered nurse recruitment and retention differentials effective December 1, 2005. Provide the differential in the paychecks issued to registered nurses no later than February 2006.

(8) Modify all written and digital recruitment documents to reflect the additional differentials no later than December 19, 2005.

3. Procedures for Hiring of Clinical Staff

Defendants SHALL:

a. Establish and implement by December 15, 2005 a program to evaluate the application/examination, clear the existing List, verify the credentials, and establish security clearance for physician, mid-level practitioner, and registered nurse job applicants within 5 business days from the date of receipt of an applicant's written job application. Establish and

---

[8] The supervisory differential for SRN IIs, as set forth in paragraph (4) shall also apply to any remaining SRN I supervisors.

10

implement by December 15, 2005 a monitoring program to ensure that the 5 day standard is met for at least 90% of all applicants.

b. Establish and implement by December 15, 2005 a program to interview, evaluate, and render a "hire" or "no-hire" decision to applicants for physician, mid-level provider, and registered nurse positions a within 10 business days from the date of receipt of an applicant's written job application. Establish and implement by December 15, 2005 a monitoring program to ensure that the 10 day standard is met for at least 90% of all applicants.

4. Program for Hiring and Retaining Mid-Level Practitioners

Defendants SHALL:

a. Establish and implement a model statewide primary care nurse practitioner duty statement for use in all CDCR institutions within 10 business days of the date of this Order. If defendants fail to comply with this recommendation within the 10 business days, the preparation of the duty statement shall default to the Court Experts.

b. Establish and implement a model statewide primary care physician's assistant duty statement for use in all CDCR institutions within 10 business days of the date of this Order. If defendants fail to comply with this recommendation within the 10 business days, the preparation of the duty statement shall default to the Court Experts.

c. Establish and implement policies and procedures concerning physician supervision of CDCR nurse practitioners and physician assistants by CDCR Physicians and Surgeons within 10 business days of the date of this Order. If defendants fail to comply with this recommendation within the 10 business days, the preparation of this supervision policy shall default to the Court Experts.

d. Establish and implement a CDCR Physician's Assistant salary scale consistent with that of Nurse Practitioners within 10 business days of the date of this Order. If defendants

11

fail to comply with this recommendation within 10 business days, the preparation of the physicians assistant salary scale shall default to the Court Experts.

  e. Modify, within 10 business days, every vacant position for Physician and Surgeon positions to allow for the hiring of either a Physician and Surgeon, Nurse Practitioner, or Physician's Assistant to fill the vacant position.

  f. Commence advertising and begin hiring mid-level practitioners within 20 business days of the date of this Order.

  5. <u>Program to Protect Recently Hired CDCR Physicians.</u>

Defendants SHALL:

  a. Establish and implement, within 10 business days of the date of this Order, a policy requiring that recently hired physicians (full-time State hire or contractor) be supervised by the Regional Medical Director when the new physician is placed into a CDCR institution where the Chief Medical Officer and Chief Physician and Surgeon positions are vacant. If defendants fail to comply with this recommendation within the 10 business days, the preparation of this policy shall default to the Court Experts.

  b. Establish and implement, within 15 business days of the date of this Order, an adequate orientation program for new State and contract physicians, mid-level practitioners, and registered nurses. If defendants fail to comply with this recommendation within the 15 business days, the preparation of the orientation program shall default to the Court Experts. Defendants are advised to involve the Coalition of Healthcare Unions in this process.

  c. Establish and implement a program, within 30 business days of the date of this Order, to hire physicians, mid-level practitioners, and registered nurses on a regional basis, allowing for placement at prisons with the most need.

6. Contract Personnel

Defendants SHALL:

a. Modify existing contracts with the Colonial Medical Group ("CMG") and Newport Oncology and Healthcare, Inc. ("NOAH") within 10 business days of the date of this Order in a manner that provides an hourly rate of compensation adequate to attract physicians and mid-level providers who meet CDCR standards.[9]

b. Ensure that CMG and NOAH are reimbursed for all appropriately billed services within 30 days of receipt of billing.

c. Verify the credentials and licensure of contract physicians and mid-level providers on a provisional basis within two business days of presentation by CMG and NOAH. Complete the final verification of credentials and licensure within 5 business days of presentation by CMG and NOAH.

d. Verify the security clearance of contract physicians and mid-level providers on a provisional basis within two business days of presentation by CMG/MHA/Staff Care. Complete the final verification of security clearance within 5 business days of presentation.

e. Complete the hiring interview and make a provisional decision to hire or reject for 90% of all physicians and mid-level providers submitted for contract hire by CMG and NOAH within 4 business days of the submission.

f. Establish and implement an orientation program for contract physicians and mid-level providers within 15 business days of the date of this Order.. If defendants fail to comply with this recommendation within the 15 business days, the preparation of this policy shall default to the Court Experts.

---

[9] The Court notes that nothing in this Order limits the CDCR's ability to enter into other contracts with other vendors for clinical services. Nor does it limit either the CDCR's or CMG's and NOAH's ability to terminate any contract if any party fails to perform as required.

13

g. Counsel for the parties shall meet and confer, and within 20 business days of the date of this Order, file a stipulation, reviewed in advance by the Court Experts, establishing an adequate program to monitor the prisoner health services provided by CMG/MHA/Staff Care.

7. <u>Accountability for Implementation of this Order</u>

For the reasons discussed above, as well as those set forth in the Correctional Expert's Report, the Court does not have confidence that the orders set forth above will be timely or effectively implemented unless the Governor of California – a named defendant in this case – personally designates a qualified individual who has the authority to implement the recommendations and is accountable for such implementation.

Accordingly, Defendant Governor Arnold Schwarzenegger shall, within 5 business days of the date of this Order, designate an individual who (a) has the authority and qualifications to implement the recommendations set forth in this report within the time parameters established by the Court, and (b) is accountable for implementation of such recommendations to the Governor, the CDCR, and this Court. Counsel for defendants shall simultaneously file a declaration identifying the designated individual and attesting to the Governor's compliance with this paragraph of this Order.

It is further ordered that the designated individual shall meet with the Correctional Expert, the Medical Experts, and counsel as soon as practical in order to develop a plan to monitor compliance with this Order, and the Correctional Expert shall file a proposed monitoring plan with the Court no later than December 15, 2005. It is further ordered that the designated individual shall file, no later than December 15, 2005, an initial status report with the Court describing the status of each item requiring action in this Order.

8. <u>On-site inspections</u>

The Court's Correctional Expert shall direct the Court's medical experts to conduct on-site inspections during January and February 2006 of those prisons which the parties agree are in the greatest need with respect to clinical staffing[10], and thereafter prepare and file status reports by no later than March 1, 2006, as to the delivery of health care services at those institutions.

The Court finds that the above remedies are narrowly drawn to remedy the constitutional violations at issue, extend no further than necessary to correct a current and ongoing violation of a federal right, and are the least intrusive means necessary to correct these violations.  The Court also is amply satisfied that this relief will impose no unnecessary burden on defendants and will have no adverse impact on either the safety of the public or the operation of the criminal justice system.

**IT IS SO ORDERED.**

Dated: 12/1/05

　　　　　　　　　　　　　　　　　　　THELTON E. HENDERSON
　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

---

[10] The parties concur that the following prisons have the greatest need for increased levels of clinical staffing (as of the date of the Correctional Expert's Report):  Pleasant Valley State Prison, High Desert State Prison, Corcoran State Prison, Substance Abuse Treatment Center and State Prison, Valley State Prison for Women, Avenal State Prison, San Quentin, and the California Institute for Men.