IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCIANO PLATA, et al.,

          Plaintiffs,

v.

ARNOLD SCHWARZENEGGER, et al.,

          Defendants.

NO. C01-1351 TEH

ORDER APPOINTING NEW RECEIVER

      On October 3, 2005, this Court issued detailed findings of fact and conclusions of law explaining the Court's June 30, 2005 oral ruling to establish a Receivership to take control of the delivery of medical services to all California state prisoners confined by the California Department of Corrections and Rehabilitation ("CDCR"). The Court concluded that "the California prison medical care system is broken beyond repair," and that an "unconscionable degree of suffering and death is sure to continue if the system is not dramatically overhauled." Oct. 3, 2005 Findings of Fact & Conclusions of Law at 1-2. The Court "impose[d] the drastic but necessary remedy of a Receivership in anticipation that a Receiver [could] reverse the entrenched paralysis and dysfunction and bring the delivery of health care in California prisons up to constitutional standards." *Id.* at 2. The Court further explained that, "[o]nce the system is stabilized and a constitutionally adequate medical system is established, the Court will remove the Receiver and return control to the State." *Id.*

      On February 14, 2006, the Court appointed Robert Sillen "to serve as the Receiver in this case, at the pleasure of the Court, effective Monday, April 17, 2006." Feb. 14, 2006

Order Appointing Receiver at 2. In that appointment order, the Court also set forth the Receiver's duties and powers and provided for the establishment of an advisory board to assist and advise the Court and Receiver. *Id.* at 2-9.

Much progress has been made since the Receivership was established, and the Receiver has successfully recruited and hired a team of correctional and clinical experts to assist him with his remedial obligations. As detailed in the Receiver's bimonthly and, subsequently, quarterly reports to the Court, the Receiver and his staff, including the many CDCR employees who report to the Receiver, have undertaken significant efforts to improve the delivery of medical care to California inmates. For example, vacancy rates among clinical staff in prisons have been dramatically reduced as a result of increased salaries and improved hiring processes. Similarly, many clinically appropriate changes have been made, including the replacement of medical technical assistants with licensed vocational nurses, and several necessary clinical construction projects have been initiated. In its first two years, the Receivership has also resolved the CDCR specialty care contracting crisis, which was preventing inmates from receiving needed care from clinical specialists, and established a successful prison improvement pilot project at San Quentin State Prison. Nonetheless, it is beyond dispute that the system for delivering health care to California's inmate population remains below constitutional standards and continues to be in need of repair – not through any fault of the Receiver or his staff, but, rather, primarily as a result of the extreme dysfunction the Receiver inherited from the State, as well as the numerous problems and obstacles encountered by the Receiver that were not anticipated at the time the Receivership was established.

In addition to being charged with undertaking immediate and short-term measures "designed to improve medical care and begin the process of restructuring and development of a constitutionally adequate medical health care delivery system," the Receiver was also ordered to develop a detailed Plan of Action to complete the development and implementation of such a system. *Id.* at 2-3. The Court originally ordered the Receiver to file his Plan of Action within 180 to 210 days of his appointment, *id.* at 2, but later granted

2

the Receiver's request for an extension of time. On December 19, 2006, the Court granted the Receiver until May 15, 2007, to file his initial Plan of Action with metrics "that are realistic, fully informed, detailed, and effective," with a revised Plan of Action due by November 15, 2007. Dec. 19, 2006 Order at 2, 5. In the same order, the Court granted the Receiver's request to delay appointment of an advisory board until after the filing of the initial Plan of Action. *Id.* at 3-4.

The Receiver timely filed his initial Plan of Action on May 10, 2007. Following the Court's independent review of that plan and consideration of Plaintiffs' responses to the plan, including arguments raised during an August 27, 2007 hearing, the Court found that the initial Plan of Action failed to contain adequate metrics and time lines. The Court ordered that the Receiver include such benchmarks in his revised Plan of Action to be filed in November 2007. Sept. 6, 2007 Order Re (1) Receiver's May 2007 Preliminary Plan of Action, & Mot. for Order Modifying Stip. Inj. & Orders Entered Herein, & (2) Pls.' Mot. for Order Directing Receiver to Comply with April 4, 2003 Order etc. at 3-5. The Court also observed at the August 27, 2007 hearing that it had not furnished the type of hands-on leadership that, in retrospect, it wished it had, and the Court resolved to provide such leadership as this case moved forward.

To that end, the Court appointed Starr Babcock as a Pro Bono Special Assistant to the Court to assist with special projects, including the creation of "an advisory working group to assist the Court with evaluating the Receiver's [revised] Plan of Action . . . and determining how best to assemble the advisory board." Oct. 29, 2007 Order Appointing Pro Bono Special Assistant to the Court at 1. Following the Receiver's timely filing of his revised Plan of Action on November 15, 2007, the Court provided the advisory working group with a copy of the revised plan and convened the group for a one-day meeting on December 8, 2007. The Pro Bono Special Assistant to the Court had numerous individual conversations with advisory working group members both before and after the December 8 meeting.

The Receiver, as well as counsel for Plaintiffs and Defendants, made presentations to and answered questions from the advisory working group at that meeting. The group

3

subsequently reached two main consensus opinions during closed-session discussions. First, the advisory group recommended that a professional planner be hired to assist the Receiver in revising the Plan of Action so that it both complied with the Court's orders and directions and could serve as a useful leadership document that would provide a common vision for all stakeholders. In addition, the working group was unanimous in its recommendation that an advisory board be formed to assist in the planning process and, more broadly, to advise the Court on issues relating to the Receivership's operation and progress towards implementing a prison medical care system that meets constitutional standards. The Court agrees with and adopts both of these recommendations, as ordered below.

The Receivership has reached a critical juncture at which it must now move from a primarily investigative and evaluative phase, during which the Receivership analyzed the current system to determine what reforms were necessary and worked to create the infrastructure required to effectuate such reforms, into an implementation phase, during which the Receivership must translate the conceptualized reforms into reality. Throughout its existence, the Receivership has developed and put into practice critical short-term measures, and such measures must continue to be adopted to address issues requiring urgent attention. However, the Receivership's focus can and must now shift towards long-term reform that will achieve the implementation of a sustainable, constitutionally adequate system of delivering medical care to Plaintiffs – and, not inconsequentially, a system that must ultimately be transitioned back to the State of California's control. Put another way, the Receivership's overarching goal should be working itself out of existence once delivery of medical care to California's inmates has been brought up to constitutional standards.

After careful reflection and deliberation, the Court has concluded that such work would best be accomplished by appointing a new Receiver who brings a different set of strengths appropriate to guiding the Receivership through its second phase. While the current Receiver has successfully used his unique skills and bold, creative leadership style to investigate, confront, and break down many of the barriers that existed at the inception of the Receivership, the second phase of the Receivership demands a substantially different set of

4

administrative skills and style of collaborative leadership. The Receivership must continue to maintain its independence as an arm of the federal courts established to take over state operations, but it also must work more closely at this stage with all stakeholders, including State officials, to ensure that the system developed and implemented by the Receivership can be transferred back to the State in a reasonable time frame. Such collaboration appears to be more important now than ever, given the current budget crisis faced by the State of California.

Accordingly, with good cause appearing, IT IS HEREBY ORDERED that:

1. The Court's appointment of Robert Sillen as the Receiver in this case is hereby terminated, and all prior authority vested by the Court in Mr. Sillen is hereby revoked, effective immediately.

2. J. Clark Kelso is appointed to serve as the Receiver in this case, at the pleasure of the Court, effective immediately. All powers, privileges, and responsibilities of the Receiver, as set forth in the Court's February 14, 2006 Order Appointing Receiver, shall continue in full effect, except as modified by subsequent orders of this Court. A short biography of Mr. Kelso is attached to this order.

3. The Pro Bono Special Assistant to the Court shall assist the Receiver in reworking the November 15, 2007 Plan of Action so that it is a more useful leadership document. The Receiver and Pro Bono Special Assistant shall consider how best to choose and use the services of a professional planner to assist in this process, the costs of which shall be borne by Defendants as part of the Receivership's budget.

4. The Court will shortly be appointing an advisory board to assist and advise the Court and the Receiver as this case moves forward. All costs associated with the appointment and service of the advisory board shall be borne by Defendants as part of the Receivership's budget. Although the Court is cognizant of not making the advisory board so large as to be unhelpful and inefficient, the Court may expand the advisory board beyond the five individuals provided for by the February 14, 2006 Order Appointing Receiver to ensure that medical, correctional, and any other areas of necessary expertise are adequately

represented.  The Pro Bono Special Assistant to the Court shall continue to assist the Court in assembling and staffing the advisory board, in consultation with the Receiver.  Details of the advisory board will be announced by subsequent order of the Court.

**IT IS SO ORDERED.**

Dated:   01/23/08

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

# J. Clark Kelso

## Biographical Information

J. Clark Kelso is a Professor of Law and, for the last twelve years, has been the Director of the Capital Center for Government Law and Policy at the University of the Pacific McGeorge School of Law in Sacramento, California. He comes to the California Prison Health Care Receivership with over fifteen years of experience in a wide variety of positions in all three branches of state government. Throughout this service, he has successfully improved state programs and operations while developing a well-known reputation for independence, integrity, and collaborative leadership.

In the 1990s, Kelso worked with the California Judicial Council and Administrative Office of the Courts on a number of task forces and commissions. This work, particularly his efforts in support of unification of the state's trial courts, led to his receipt of the 1998 Bernard E. Witkin Amicus Curiae Award, the highest honor given to an individual other than a member of the judiciary for outstanding contributions to California's courts.

In July 2000, Kelso was selected by then Attorney General Bill Lockyer and Governor Gray Davis as the interim replacement for outgoing Insurance Commissioner Chuck Quackenbush, who abruptly resigned amid allegations of corruption. Kelso's leadership quickly restored public trust to the Department of Insurance.

In June 2002, Governor Davis appointed Kelso to serve as the State's Chief Information Officer and charged him with restoring the state's crumbling information technology program. After Governor Davis's recall, Governor Arnold Schwarzenegger retained Kelso in the State CIO position. Focusing on the disciplines of strategic planning, collaborative execution, and workforce development, Kelso turned the state's information technology ("IT") program around, in two years moving the state from 47th to 12th in Brown University's annual e-government report. In his State CIO role, Kelso also supported the development of state policies encouraging health information technologies and data sharing to improve quality, transparency, and accountability in public and private health care delivery systems. In recognition of his accomplishments, he received a "Top 25 Award for 2004 Doers, Dreamers and Drivers" from Government Technology and was named by Computerworld to their list of "Premier 100 IT Leaders for 2007."

A 1983 graduate of the Columbia University School of Law, Professor Kelso clerked for Judge Anthony M. Kennedy on the United States Court of Appeals for the Ninth Circuit. Kelso joined the faculty at Pacific McGeorge in 1986 after practicing law briefly in the New York offices of Kaye, Scholer, Fierman, Hays & Handler. A registered Republican, Kelso is married to Kari Kelso, Ph.D., and they have two daughters.