FUTTERMAN & DUPREE LLP
MARTIN H. DODD (104363)
JAMIE L. DUPREE (158105)
160 Sansome Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
martin@dfdlaw.com
jdupree@dfdlaw.com

*Attorneys for Receiver*
J. Clark Kelso

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

MARCIANO PLATA, et al.,

*Plaintiffs*,

v.

ARNOLD SCHWARZENEGGER, et al.,

*Defendants*.

Case No. C01-1351 TEH

**NOTICE OF FILING OF THE RECEIVER'S TURNAROUND PLAN OF ACTION**

PLEASE TAKE NOTICE that the Receiver in *Plata v. Schwarzenegger*, Case No. C01-1351 TEH has filed his Turnaround Plan of Action, attached hereto.

Dated: June 6, 2008

FUTTERMAN & DUPREE LLP

By: /s/
Martin H. Dodd
Attorneys for Receiver J. Clark Kelso

## CERTIFICATE OF SERVICE

The undersigned hereby certifies as follows:

I am an employee of the law firm of Futterman & Dupree LLP, 160 Sansome Street, 17th Floor, San Francisco, CA 94104. I am over the age of 18 and not a party to the within action.

I am readily familiar with the business practice of Futterman & Dupree, LLP for the collection and processing of correspondence.

On June 6, 2008 I served a copy of the following document(s):

**NOTICE OF FILING OF THE RECEIVER'S TURNAROUND PLAN OF ACTION**

by placing true copies thereof enclosed in sealed envelopes, for collection and service pursuant to the ordinary business practice of this office in the manner and/or manners described below to each of the parties herein and addressed as follows:

___ BY HAND DELIVERY: I caused such envelope(s) to be served by hand to the address(es) designated below.

_X_ BY MAIL: I caused such envelope(s) to be deposited in the mail at my business address, addressed to the addressee(s) designated. I am readily familiar with Futterman & Dupree's practice for collection and processing of correspondence and pleadings for mailing. It is deposited with the United States Postal Service on that same day in the ordinary course of business.

___ BY OVERNIGHT COURIER SERVICE: I caused such envelope(s) to be delivered via overnight courier service to the addressee(s) designated.

___ BY FACSIMILE: I caused said document(s) to be transmitted to the telephone number(s) of the addressee(s) designated.

Andrea Lynn Hoch
Legal Affairs Secretary
Office of the Governor
Capitol Building
Sacramento, CA 95814

Robin Dezember, Director (A)
Division of Correctional
Health Care Services
CDCR
P.O. Box 942883
Sacramento, CA 94283-0001

Bruce Slavin
Legal Counsel
CDCR, Legal Division
P.O. Box 942883
Sacramento, CA 94283-0001

Mathew J. Lopes
Pannone, Lopes & Devereaux, LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908

Richard J. Chivaro
John Chen
State Controller
300 Capitol Mall, Suite 518
Sacramento, CA 95814

Molly Arnold
Chief Counsel, Dept. of Finance
State Capitol, Room 1145
Sacramento, CA 95814

Laurie Giberson
Staff Counsel
Department of General Services
707 Third St., 7th Fl., Ste. 7-330
West Sacramento, CA 95605

Matthew Cate
Inspector General
Office of the Inspector General
P.O. Box 348780
Sacramento, CA 95834-8780

Donna Neville
Senior Staff Counsel
Bureau of State Audits
555 Capitol Mall, Suite 300
Sacramento, CA 95814

Warren C. (Curt) Stracener
Paul M. Starkey
Dana Brown
Labor Relations Counsel
Depart. of Personnel Admin. Legal Division
1515 "S" St., North Building, Ste. 400
Sacramento, CA 95814-7243

Al Groh
Executive Director
UAPD
1330 Broadway Blvd., Ste. 730
Oakland, CA 94612

Yvonne Walker
Vice President for Bargaining
SEIU Local 1000
1808 – 4th Street
Sacramento, CA 95814

Pam Manwiller
Director of State Programs
AFSME
555 Capitol Mall, Suite 1225
Sacramento, CA 95814

Richard Tatum
CSSO State President
CSSO
1461 Ullrey Avenue
Escalon, CA 95320

Tim Behrens
President
Association of California State Supervisors
1108 "O" Street
Sacramento, CA 95814

Elise Rose
Counsel
State Personnel Board
801 Capitol Mall
Sacramento, CA 95814

Stuart Drown
Executive Director
Little Hoover Commission
925 L Street, Suite 805
Sacramento, CA 95814

California State Personnel Board
Office of the Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550

____ [State] I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

✓ [Federal] I declare that I am employed in the offices of a member of the State Bar of this Court at whose direction the service was made. I declare under penalty of perjury, under the laws of the united State of America, that the above is true and correct.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 6, 2008, at San Francisco, California.

Lori Dotson

CALIFORNIA
PRISON HEALTH CARE
RECEIVERSHIP CORP.

J. Clark Kelso
Receiver

June 6, 2008

Honorable Thelton E. Henderson
Chambers of Judge Henderson, U.S.D.C.
Northern California District
450 Golden Gate Avenue, 19th Floor
San Francisco, CA 94102

Dear Judge Henderson:

I am pleased to submit to the Court for its approval the Plan of Action required by the Court's Order Appointing Receiver and Order Appointing New Receiver.

Attached is the Turnaround Plan of Action for your review. If you have any questions, you may call me directly at (916) 323-1264.

Sincerely,

J. Clark Kelso
Receiver

Attachment

# Achieving a Constitutional Level of Medical Care in California's Prisons

## The Federal Receiver's Turnaround Plan of Action

**June 6, 2008**

CALIFORNIA
PRISON HEALTH CARE
RECEIVERSHIP CORP.

J. Clark Kelso, Receiver
501 J Street, Suite 100
Sacramento, CA 95814
(916) 323-1923
Clark.Kelso@cdcr.ca.gov
www.cprinc.org

June 6, 2008

The Honorable Thelton E. Henderson
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Henderson:

The February 14, 2006 Order Appointing Receiver ("Order") requires the Receiver to "develop a detailed Plan of Action designed to effectuate the restructuring and development of a constitutionally adequate medical health care delivery system" (Order at 2:19-22). The Court's January 23, 2008, Order Appointing New Receiver further directed that I work with the Pro Bono Special Assistant to the Court and a professional planner to "rework the . . . Plan of Action so that it is a more useful *leadership document*" (page 5, emphasis added).

I am pleased to submit for your consideration my Turnaround Plan of Action for bringing prison medical care services within California's Department of Corrections and Rehabilitation ("CDCR") up to federal constitutional standards. Because this is a turnaround plan designed to correct constitutional deficiencies in California's prison health care system, the plan does *not* contain action items for all components of the prison health care system. For example, the plan does not contain goals focused on treatment of infectious disease, alcohol and drug programs, palliative care, or public health. The Receivership is responsible for maintaining and developing all of these components, and the absence of these components from this plan is not intended to suggest a lack of attention on these elements of a comprehensive health care system. However, in terms of selecting priorities for initial investment of resources, these components are not as critically in need of improvement. Moreover, the improvements provided in the plan will in large part address many needs in these areas.

The Court's opinions in *Plata v. Schwarzenegger* and *Coleman v. Schwarzenegger*, and the orders in *Perez v. Tilton* and *Armstrong v. Schwarzenegger*, document and reflect pervasive, fundamental organizational weaknesses and failures within CDCR that undermine its ability to

provide constitutionally adequate health care services. Having been given control over CDCR's medical program, the Receiver's job is to establish constitutionally adequate prison medical care as quickly as practicable and in a way which will be sustainable after the Receiver winds down operations and the responsibility for prison medical care reverts to the State. The Receiver is also required to coordinate planning and activities with federal judicial oversight of CDCR's mental health, access to Americans with Disabilities Act services, and dental programs.

There is no great mystery about what needs to be done. Constitutionally adequate health care occurs when patient-inmates are given

- timely access to competent medical and clinical personnel who provide effective care informed by accurate patient records and supported by appropriate housing, medical facilities, equipment and processes; and

- timely access to prescribed medications, treatment modalities, specialists and appropriate levels of care.

The elements listed above have not routinely existed within CDCR's medical delivery system. Access has not been timely. The number of medical personnel has been inadequate, and competence has not been assured. Accurate and complete patient records are often not available when needed. Adequate housing for the disabled and aged does not exist. The medical facilities, when they exist at all, are in an abysmal state of disrepair. Basic medical equipment is often not available. Medications and other treatment options are too often not available when needed – to be meaningful, access must be timely. This strategic plan establishes a three- to five-year framework for addressing all of these problems.

Absent these foundational elements, health care within CDCR consists of chaotic, episodic and often untimely encounters between patients and clinicians who, given the lack of reliable patient information and support systems, are placed in a responsive position with no incentives or feedback loops to encourage good medical practices. We need to transform the system to one in which encounters are:

- proactive,
- planned,
- informed,
- patient-centered, and
- professional.

Although it will take years to establish all of the necessary systems throughout the CDCR, we cannot wait years to take some immediate steps to stop the avoidable mortality and morbidity that exists within CDCR's health care system. Accordingly, in addition to building a long-term foundation for health care services, the Receiver must implement some programs immediately to improve care even before the proper foundation has been put in place. Successfully implementing these short-term programs will be challenging precisely because an adequate health care infrastructure – the foundation for quality health care – does not presently exist.

However, even if some of the early actions are not as comprehensively planned or executed as would be desirable if we had the luxury of more time, these early steps will undoubtedly improve CDCR's health care system.

We have adopted six goals to focus our efforts. These goals, and their associated objectives and action items, summarize the steps necessary for CDCR's health care program to rise to constitutionally acceptable and sustainable levels. The goals are as follows:

1. Ensure Timely Access to Health Care Services

2. Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services

3. Recruit, Train and Retain a Professional Quality Medical Workforce

4. Implement a Quality Assurance and Continuous Improvement Program

5. Establish Medical Support Infrastructure

6. Provide for Necessary Clinical, Administrative and Housing Facilities

There has already been significant progress on some of these goals (comprehensive status reports appear in the quarterly reports which the Receiver files with the Court, reports that are on the Receiver's website at www.cprinc.org). For example, the recruitment of registered nurses has dramatically improved as a result of increasing compensation to market levels and vastly improved recruitment practices. Similar success is just now being seen in the recruitment of physicians. Substantial work has been completed at several prisons to improve conditions. Overall, however, we are at early stages in fully implementing our goals.

The total costs for implementing this plan are substantial (see Appendix A). Bringing prison medical care up to constitutional standards will require a significant investment of resources, both one-time capital expenses and an increase in ongoing operational expenses. This is not a good time to be putting additional demands on the state's budget. But there simply is no choice. The State of California has a constitutional obligation to improve its prison medical care system, and I am convinced the only way to satisfy that obligation is by making substantial investments today that will make up for 30 years of systematic under-investment in prison health care.

The Court's Order calls for periodic reports to the Court concerning our remedial progress (Order at 3:15-22). In addition to our Quarterly Reports, to keep the Court and public informed of our progress, and to hold ourselves accountable for our progress, we will add a "Progress Report" to the CPR website. The "Progress Report" will show how far along we are with each of our goals and objectives (a timeline and list of proposed metrics appears in Appendix A). It will be updated monthly.

We are setting an aggressive time table for achieving our goals. The cooperation and support of the Governor and Legislature, as well as of a multitude of state and local agencies, will be required over the next several years. The Governor has personally committed to me his full support, and I am confident that I can work with legislative leaders to support our efforts.

I look forward to working with you, Judge Reinhardt, Judge Karlton, Judge White, and Judge Wilken as we endeavor to resolve California's prison health care crisis.

Sincerely,

J. Clark Kelso

Cc: The Honorable Stephen Reinhardt
The Honorable Lawrence K. Karlton
The Honorable Jeffrey S. White
The Honorable Claudia Wilken

# Table of Contents

**Vision**......1

**Mission**......2

**Strategic Goals**......4

**Appendix A. Estimated Costs, Metrics & Timeline**......30

# Summary of Goals and Objectives

**Goal 1. Ensure Timely Access to Health Care Services**

- 1.1. Screening and Assessment Processes
- 1.2. Access Staffing and Processes
- 1.3. Scheduling and Patient-Inmate Tracking System
- 1.4. Standardized Utilization Management System

**Goal 2. Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services**

- 2.1. Primary Care
- 2.2. Chronic Care
- 2.3. Emergency Response
- 2.4. Specialty Care and Hospitalization

**Goal 3. Recruit, Train and Retain a Professional Quality Medical Care Workforce**

- 3.1. Physicians and Nurses
- 3.2. Clinic Leadership and Management Structure
- 3.3. Professional Training Program

**Goal 4. Implement a Quality Assurance and Continuous Improvement Program**

- 4.1. Clinical Quality Measurement and Evaluation Program
- 4.2. Quality Improvement Programs
- 4.3. Medical Peer Review and Discipline Process
- 4.4. Medical Oversight Unit
- 4.5. Health Care Appeals Process
- 4.6. Out-of-State, Community Correctional Facilities and Re-entry Oversight

**Goal 5. Establish Medical Support Infrastructure**

- 5.1. Pharmacy
- 5.2. Medical Records
- 5.3. Radiology and Laboratory
- 5.4. Clinical Information Systems
- 5.5. Telemedicine

**Goal 6. Provide for Necessary Clinical, Administrative and Housing Facilities**

- 6.1. Upgrade Administrative and Clinical Facilities
- 6.2. Expand Administrative, Clinical, and House Facilities
- 6.3. Finish Construction at San Quentin State Prison

# Vision

As soon as practicable, provide constitutionally adequate medical care to patient-inmates of the California Department of Corrections and Rehabilitation (CDCR) within a delivery system the State can successfully manage and sustain.

A receivership is an extraordinary judicial remedy employed by a federal court only as a last resort when all other attempts to secure compliance with court orders have proven futile. Because it is such an extraordinary remedy, and because federal courts are instructed to employ only as much equitable power as is necessary to cure a constitutional violation, it is incumbent upon the Receiver in this case to move with all possible speed to establish a constitutionally adequate prison medical care system. This is the Receiver's primary order of business.

For the Court's orders to be efficacious, the medical care system established by the Receiver must be sustainable long after federal court supervision has ceased. It is not enough to simply bring CDCR's health care system up to constitutional minimums. The system created must be one that the State itself will be able to maintain long into the future. As the Court stated in its October 3, 2005 Findings of Fact and Conclusions of Law Re Appointment of Receiver ("Findings"), the purpose of the Receivership is to bring the delivery of health care in California prisons up to constitutional standards and return a stabilized health care system back to the State (Findings at 2:8-13). Therefore, sustainability of the system under State management and control must be considered by the Receiver as we formulate our plans for building the foundation.

The vision statement strongly reflects the litigation context that led to the Receivership's creation and that influences the Receivership's planning, operations and termination. The vision statement speaks in terms of constitutional standards for health care, and it recognizes the boundaries of federal equitable relief. It is a vision grounded in a legal context.

# Mission

> Reduce avoidable morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and integrate the delivery of medical care with mental health, dental and disability programs.

As noted above, our vision statement is grounded in the legal context giving rise to the Receivership. Our day-to-day mission is of a very different quality. It is health care oriented and patient centric in its perspective. The mission explains and restates in more concrete terms, and from a health care perspective, what overall organizational and systemic changes the Receiver must achieve to fulfill the vision.

In many respects, the mission is a simple one: Reduce avoidable deaths and illness by giving patient-inmates:

- timely access to competent medical and clinical personnel who provide effective care informed by accurate patient records and supported by appropriate housing, medical facilities, equipment and processes; and

- timely access to prescribed medications, treatment modalities, specialists and appropriate levels of care.

Accomplishing the mission is a huge challenge only because of the current chaotic state of CDCR's medical delivery system. Timely access is not assured. The number of medical personnel has been inadequate, and competence has not been assured. Accurate and complete patient records are often not available when needed. Adequate housing for the disabled and aged does not exist. The medical facilities, when they exist at all, are in an abysmal state of disrepair. Basic medical equipment is often not available or used. Medications and other treatment options are too often not available when needed. Custody resources needed to facilitate access to care and provide the security necessary to deliver health care safely in a prison setting are inadequate, lacking both the personnel and structure to ensure timely access to health care services. Indeed, it is a misnomer to call the existing chaos a "medical delivery system" – it is more an act of desperation than a system.

This is not intended to be a criticism of the hard work done on a daily basis by thousands of health care professionals within CDCR. The truth is that these professionals are struggling to provide care in a chaotic environment where treatment encounters are largely episodic, accurate

patient information is often not available and follow-up care cannot be taken for granted. Adequate medical care requires much more than individual effort – it requires organizational leadership, effective management, coordinated planning, and execution by health care and custody teams, all of which has been lacking. More than anything else, this plan establishes a roadmap to bring order to CDCR's medical program:

*moving from* – chaotic care that is largely episodic, and consists of often untimely and uninformed encounters between patients and clinicians;

*moving to* – a system of proactive, planned, informed, patient-centered, and professional care.

# Strategic Goals

As noted above, our mission is a simple one: Reduce avoidable deaths and illness by giving patient-inmates

- timely access to competent medical and clinical personnel who provide effective care informed by accurate patient records and supported by appropriate housing, medical facilities, equipment and processes; and

- timely access to prescribed medications, treatment modalities, specialists and appropriate levels of care.

To fulfill this mission, our strategic goals focus on the following:

1. Ensure Timely Access to Care,
2. Improve the Medical Program,
3. Strengthen the Health Care Workforce,
4. Implement Quality Assurance and Continuous Improvement,
5. Establish Medical Support Infrastructure, and
6. Provide Health Care and Health Care-Related Facilities.

These goals encompass key aspects of CDCR's health care delivery system. We are coordinating our planning and implementation with CDCR's mental, dental and health care accessibility programs, and as we move increasingly from planning into execution, we should see improvements in CDCR's overall health care program.

A brief word about implementation strategy is warranted here. As reflected in this strategic plan, the Receiver is undertaking an extraordinarily broad organizational change effort within CDCR's health care program. We are touching, changing and improving virtually every element of that program – and in many areas, creating capacity that does not exist at all today. In these circumstances, a proven change methodology is essential. We have adopted, and will continue to follow, the organizational change strategies suggested by the Institute of Medicine (*Crossing the Quality Chasm, A New Health System for the 21st Century*, Washington D.C., National Academy Press, 2001), strategies the Institute considers essential to safe, effective and efficient health care:

1. Redesign of care processes based on best practices.
2. Information technologies for clinical information and decision support.
3. Knowledge and skills management.
4. Development of effective teams.
5. Coordination of care across patient conditions, services and settings over time.
6. Incorporation of performance and outcome measurements for improvement and accountability.

# Goal 1. Ensure Timely Access to Health Care Services

Health care services are meaningful only if patient-inmates have timely access to appropriate services. The initial assessment of health care needs occurs during the process of reception and intake (where inmates first enter the CDCR system). The Receiver will redesign and standardize this initial assessment process. Once within the CDCR system, access to health care will be improved by creating health care access units to facilitate patient-inmate movement to on-site clinics and to off-site care, and the Receiver will work with CDCR to speed the delivery of an inmate scheduling and tracking system so that the health care system can properly locate patient-inmates.

## Objective 1.1. Redesign and Standardize Screening and Assessment Processes at Reception/Receiving and Release

Intake screening and assessment is done inconsistently throughout the system. Medication mishaps at reception alone are responsible for significant morbidity and mortality. Efforts at some reception centers (e.g., San Quentin) have led to streamlined integration of medical, mental health, and dental screening with more appropriate use of resources and improved quality of care. Even at San Quentin, however, workflows will need to change in response to changes in the pharmacy and laboratory processes as well as improved computer systems. There is a pressing need to redesign and standardize reception center processes and ensure statewide implementation. This standardization must be done prior to implementation of electronic record systems. It will serve as a first step toward appropriate identification and assessment of high-risk patients, development of utilization/case management systems, and facilitation of electronic quality monitoring.

***Action 1.1.1. By January 2009, develop standardized reception screening processes and begin pilot implementation***

***Action 1.1.2. By January 2010, implement new processes at each of the major reception center prisons***

## Objective 1.2. Establish Staffing and Processes for Ensuring Health Care Access at Each Institution

Health care services are meaningful only if patient-inmates have timely access to those services. In a correctional setting, issues of access are inextricably intertwined with control and supervision of inmate movement by custody staff. System-wide, CDCR lacks the custody staff and organizational structure and processes to ensure that patient-inmates are reliably escorted and/or transported to medical appointments. As a result, patient-inmates are often denied timely access to health care services, substantially increasing the risk that patient-inmates' health will further deteriorate and increasing the overall costs of providing health care services.

To ensure timely access, CDCR will establish dedicated health care access custody teams – to be known as "Health Care Access Units" – at each institution whose primary mission will be to ensure access to health care, both in-prison and out-of-prison, consistent with professional standards of custody management.

***Action 1.2.1. By January 2009, the Receiver will have concluded preliminary assessments of custody operations and their influence on health care access at each of CDCR's institutions and will recommend additional staffing, along with recommended changes to already established custody posts, to ensure all patient-inmates have improved access to health care at each institution***

The Receiver has already concluded preliminary assessments at over two-thirds of CDCR's institutions. The institutions are working closely with the Receiver and are embracing the concept of Health Care Access Units in response to the Receiver's recommendations. We expect the preliminary staffing review relating to health care access operations inside all the institutions to be completed by January 2009.

***Action 1.2.2 By July 2011, the Receiver will have fully implemented Health Care Access Units and developed health care access processes at all CDCR institutions***

Ensuring access requires more than just staffing Health Care Access Units. Currently there are no standard policies, processes or procedures for how those units would actually ensure that a patient-inmate gets timely access to health care. In the corrections context, those policies and procedures must be developed to ensure that transport is accomplished in a safe and efficient manner. In addition, we must develop standards and processes for measuring our performance on access to care.

The Receiver will develop policies and measurement approaches that are appropriate to the type of institution and access that is needed. For example, access procedures will certainly differ depending upon whether the need for access arises in a reception context or involves sick call, chronic care, specialty care, infirmary care or acute care.

The staffing, organizational structure and operational policies and procedures for Health Care Access Units will be fully developed and implemented at all CDCR institutions by July 2011, contingent upon recruiting and training sufficient numbers of correctional officers to fill the new health care access posts.

## Objective 1.3. Establish Health Care Scheduling and Patient-Inmate Tracking System

The Health Care Access Units created pursuant to Objective 1.2 will be most effective when there is a health care scheduling and patient-inmate tracking system. Currently there is no system in place that efficiently and effectively is able to schedule medical appointments and track the location of patient-inmates as a medical appointment approaches. The result is an enormous waste of precious clinical treatment slots as large numbers of appointments are missed, either because conflicts develop on the calendar or, more frequently, because the patient-inmate is moved without timely notification to the health care provider. The Receiver needs to implement

a health care scheduling system encompassing medical, mental and dental which is linked with a patient-inmate tracking system.

***Action 1.3.1. Work with CDCR to accelerate the development of the Strategic Offender Management System with a scheduling and inmate tracking system as one of its first deliverables***

The Legislature has already approved and provided funding for CDCR to develop the Strategic Offender Management System ("SOMS"). SOMS will provide an automated system to replace manual paper files and improve and standardize population management practices statewide. It will also consolidate the functionality of multiple existing inmate and parole automated systems into a single integrated solution with an enterprise database. CDCR is nearing completion of the work to release an RFP.

The SOMS project includes an adult offender tracking system which, with appropriate modifications, could satisfy the Receiver's needs for a healthcare tracking and scheduling system. Recently, the Receiver and CDCR agreed to explore whether, with the Receiver's assistance, CDCR could deliver the inmate scheduling and tracking system on a significantly accelerated time table. This approach will avoid the expense and added complexity of having the Receivership acquire a separate scheduling and tracking system.

## Objective 1.4. Establish A Standardized Utilization Management System

Utilization management (UM) aims to ensure appropriate access to specialty services, infirmary beds, and hospitalization. The Receiver's centralized utilization management system will provide interdisciplinary, criteria-based decision-making based on patients' illness and needs, supported by information technology and a data analysis unit. As part of this development effort, the Receiver will accelerate current efforts to ensure that patients have appropriate access to needed care. The first step will be to undertake statewide medical bed sweeps to identify those patients who have needs that cannot readily be met in their current location. We anticipate discovering a large population of patients who have long-term care needs, and to provide a destination for those patients pending construction of the permanent long-term chronic care facilities described in Goal 6, we will increase long-term care capacity at an existing facility.

***Action 1.4.1. By January 2009, open long-term care units at one facility as a pilot project to assist in developing plans for other long-term chronic care facilities***

Initiate a long-term chronic care pilot at California Medical Facility by converting one Outpatient Housing Unit to a Correctional Treatment Center and by converting two General Population Units to Outpatient Housing Units.

***Action 1.4.2. By October 2010, establish a centralized Utilization Management System***

The Utilization Management System will facilitate interdisciplinary, criteria-based decision-making based on patients' illness and needs, supported by information technology and a data analysis unit.

## Goal 2. Establish A Prison Medical Program Addressing The Full Continuum of Health Care Services

The following is a simplified schematic of the prison medical care system:




Considerable work remains to be done in each of these domains as well as in others not shown, e.g., receiving and release, each of the clinical disciplines, and the custody, information technology, and other support functions discussed elsewhere in this document. Goal 2 addresses primary care, chronic care, specialty and hospital care, and emergency response.

### Objective 2.1. Redesign and Standardize Access and Medical Processes for Primary Care

In the prison system, access to primary care is generally through a "sick call" process. While the sick call process would appear to be more straightforward than reception, it too is plagued by inconsistent local processes involving too many forms, handoffs, and opportunities for error. Nurses and physicians often make decisions about patients without access to critical information and past assessments and depend upon a downstream paper referral system for tests and follow-up, a system that is inefficient and treacherous. Nursing protocols have lacked appropriate review, revision, oversight and support. Harmful delays and disruptions in care often involve errors in the sick call and follow-up process. The lack of any effective electronic scheduling and tracking system makes it easy to "lose" patients and makes it difficult to measure compliance with access-to-care standards. These system problems make it virtually impossible to provide proactive, planned care to our patients.

***Action 2.1.1. By July 2009, complete the redesign of sick call processes, forms, and staffing models***

***Action 2.1.2. By July 2010, implement the new system in all institutions***

## <u>Objective 2.2.</u> Improve Chronic Care System to Support Proactive, Planned Care

A review of all inmate deaths during 2006 revealed that 17% of those deaths (66 out of 381) were preventable or possibly preventable if proper medical care had been provided. Of those 66 deaths, 18 (27%) were preventable, and 48 (73%) were possibly preventable.

The leading cause of preventable deaths during 2006 and 2007 were chronic conditions. In 2006 the leading cause was asthma, typically an acute asthma attack that was not properly treated (6 of 18 or 33%). The annual rate of death from asthma in California's prisons in 2006 (35 per million) was 250% higher than the annual rate of death from asthma in the general population (14 per million).

The significantly higher rate of death from asthma in California's prisons is attributable to basic failures across the spectrum of chronic care, including failure of clinicians to follow published guidelines and standards of care, failure of RNs to triage sick asthmatics to an MD, failure to ensure timely follow-up, a failure to appreciate the volatility of symptoms, failure to ensure timely follow-up, non-existent tracking systems, and a broken emergency response system.

The Receiver has taken steps to educate all clinicians and custody personnel regarding the seriousness of access to care for patient-inmates who are suffering from asthma. These include death reviews, action against 62 practitioners, establishing statewide clinical leadership, and new tools such as asthma medication guidelines.

These focused steps appear to have dramatically improved the problem of avoidable deaths from asthma. According to preliminary analysis of deaths during 2007, there was only one possibly preventable death from asthma. However, the problem of improving chronic care plainly remains since the leading cause of preventable and possibly preventable deaths in 2007 is another chronic condition, cardiovascular disease.

### *Action 2.2.1. By April 2009, complete a comprehensive, one-year Chronic Care Initiative to assess and remediate systemic weaknesses in how chronic care is delivered*

A variety of systemic access-to-chronic-care failures contributed to the high number of preventable deaths from asthma. In February 2008, the Receiver approved an initiative to assess failures in chronic care and implement a program of remediation to address conditions such as: cardiovascular disease, diabetes, immune system impairment (including HIV), liver disease, and asthma. The remediation program will develop improved systems for managing chronic illness, including use of team-based rather than physician-centric approaches, care coordination across settings, performance measurement, and information technology.

## Objective 2.3. Improve Emergency Response to Reduce Avoidable Morbidity and Mortality

Each institution within CDCR has developed its own internal medical emergency response system, and many of these systems do not meet community standards. As a result, CDCR facilities are not uniformly prepared to handle basic medical emergencies resulting in failures of care, delayed transport and poor outcomes for inmates and staff.

The basic elements of an emergency response system include:

- Planning and policy development,
- Training in emergency response, and
- Acquisition and placement of appropriate emergency response equipment.

### *Action 2.3.1. Immediately finalize, adopt and communicate an Emergency Medical Response System policy to all institutions*

The Receiver's team has completed work on a new Emergency Medical Response System policy. The policy clearly specifies the roles of the first responder, health care staff and custody personnel in reacting to an emergency medical situation.

Within 60 days, that policy will be adopted, and the substance of the policy will be communicated to all health care and custody staff to improve access to appropriate care in emergency situations.

### *Action 2.3.2. By July 2009, develop and implement certification standards for all clinical staff and training programs for all clinical and custody staff*

Adoption of policy, the focus of Action 2.4.1, is only the first step in establishing a robust emergency response system. For the policy to be effective, all clinical staff must receive appropriate training in basic emergency response skills. The Receiver's team will develop and implement certification standards for emergency response including a requirement that all medical personnel be certified in CPR, one of the key components of effective emergency response.

### *Action 2.3.3. By January 2009, inventory, assess and standardize equipment to support emergency medical response*

The final element in effective emergency medical response is the ready availability of appropriate emergency medical equipment. This type of equipment is not uniformly available at CDCR institutions. By July 2008, we will have completed an inventory and assessment of EMR equipment within CDCR. By January 2009, we will have acquired standard EMR equipment for all CDCR institutions.

## <u>Objective 2.4.</u> Improve the Provision of Specialty Care and Hospitalization to Reduce Avoidable Morbidity and Mortality

Specialty care and hospitalization of patient-inmates is generally provided by contract with specialty care and/or hospital providers. Access is through transport to out-of-prison specialty care providers and hospitals, or by utilizing telemedicine technologies. Objective 2.4 focuses on the policy and contract aspects of providing specialty and hospital care. Access by transport is the subject of Goal 1.3, and access by telemedicine is encompassed within Objective 5.5.

***Action 2.4.1. By June 2009, establish standard utilization management and care management processes and policies applicable to referrals to specialty care and hospitals***

CDCR does not have standardized processes or policies for referral of patient-inmates to specialty care providers or hospitals. The result is inconsistent access to specialty care and hospitals that varies from institution to institution.

The Receiver's clinical leadership will develop standardized processes and policies for specialty care and hospital utilization.

***Action 2.4.2. By July 2009, establish on a statewide basis approved contracts with specialty care providers and hospitals***

Contracts to provide specialty care and hospitalization services have generally been negotiated on an institution-by-institution basis. The result has been inconsistent and weak procurement practices and results, and a failure to benefit from the full range of specialty service and hospital providers that are available on a statewide basis.

The Receivership will establish a specialty care and hospital provider contracting program at a statewide level. This will result in more cost-effective contracts with specialty care and hospital providers, as well as improved access to these services at CDCR facilities.

***Action 2.4.3. By July 2009, ensure specialty care and hospital providers' invoices are processed in a timely manner***

CDCR does not have a history of paying invoices in a timely manner. The cost of not being a good purchaser who timely pays for services rendered includes providers simply refusing to do business with CDCR. Although these problems with individual specialty providers or hospitals usually get resolved, the inconvenience, administrative cost and delays interfere with CDCR's ability to secure timely, cost-effective specialty care and hospital services.

By July 2009, payment of specialty care and hospital provider invoices will be made on a timely basis 98% of the time.

# Goal 3. Recruit, Train and Retain a Professional Quality Medical Care Workforce

CDCR has had great difficulty recruiting, training and retaining a professional quality medical care workforce. The quality of care directly suffers. The Receiver will pursue three broad initiatives to improve the quantity and quality of health care workers:

- Recruiting of physicians, nurses and other clinicians with a goal of filling 90% of established positions,
- Establishing a professional training program, and,
- Creating and staffing a health care leadership and management structure.

## <u>Objective 3.1.</u> Recruit Physicians and Nurses to Fill Ninety Percent of Established Positions

### *Action 3.1.1. By January 2009, fill 90% of nursing positions*

Medical care in the prison system is primarily mediated by the nursing staff. Faced with a severe shortage of qualified nurses, during 2007, the Receiver converted the existing peace officer Medical Technical Assistants ("MTAs") to Licensed Vocational Nurses ("LVNs") and embarked upon an aggressive recruitment campaign to fill those positions. As of February 2008, the vacancy rate for LVNs is approximately 29%. A stipulation between the State and the Receiver was entered into in January 2008 that allows for the hiring of LVNs at various rates within the salary range based on each LVN's work experience. This change should assist in bringing the LVN vacancy rate down considerably in the coming months. Our target is a 10% vacancy rate by January 2009.

### *Action 3.1.2. By January 2009, fill 90% of physician positions*

The severe shortage of competent medical personnel within CDCR extends to the ranks of its primary care physicians. While increasing physician compensation in 2007 has resulted in some improvement in CDCR's ability to attract doctors, more needs to be done to reach the target of having 90% of physician positions filled by January 2009.

The Receiver has recently given the green light to a substantial recruitment effort focused on attracting quality physicians to CDCR. Results from the effort should be apparent in the fourth quarter of 2008. Recruiting and retaining physicians in certain parts of the State – such as certain areas of the central valley – will remain as challenging for CDCR as it currently is for private sector health care providers. As noted elsewhere in this plan, the Receiver intends to expand the utilization of telemedicine technologies to partially compensate for some of the recruitment challenges we are sure to face.

## <u>Objective 3.2</u> Establish Clinical Leadership and Management Structure

***Action 3.2.1. By January 2009, establish and staff new executive leadership positions***

The Receiver has worked with the State Personnel Board to establish appropriate classifications, first for Nurse Executives, then for Physician Executives. In coordination with the Department of Personnel Administration, the Receiver recently engaged CPS Human Resources Services to conduct a compensation survey to assist the Receiver in determining appropriate compensation levels for these positions. The Receiver will meet with DPA and other departments in the Executive Branch that employ nurses and physicians to ensure that the Receiver's approach to these classifications is coordinated with those other departments. The Receiver intends to fill 90% of the Nurse Executive positions by January of 2009. The Receiver has also worked with the Special Master in *Coleman*, and the Court Representatives in *Perez* and *Armstrong* to create a Chief Executive Officer (CEO) pilot program. Health care services at each of the three pilot institutions will be administered by a single CEO responsible for directing the entire health care program at the institution, including medical, pharmacy, nursing, mental health and dental services.

***Action 3.2.2. By January 2009, establish and staff regional leadership structure***

The Receiver will analyze options for allocation of functions and responsibilities at three levels: statewide, regionally and at the institution. It is important to identify those functions that can most efficiently and effectively be performed by centralizing them statewide. Likewise, coordination at the regional level is essential, particularly as the Receivership is initiating fundamental change throughout the system.

## <u>Objective 3.3.</u> Establish Professional Training Programs for Clinicians

***Action 3.3.1. By January 2009, establish statewide organizational orientation for all new health care hires and institution-specific clinical orientation through a nursing preceptor or proctoring program***

CDCR has no consistent orientation program or practice for its new health care employees, and none of its individual facilities has a formalized preceptor or proctoring program. These are basic elements in establishing a culture of organizational quality in a health care program. In most health care settings, employees receive an introduction to the organization through a standardized orientation process starting on day one of employment. The best practice is to follow the organizational orientation with a comprehensive preceptor or proctoring program (i.e., a "clinical orientation") for clinical staff.

The Receiver has piloted the content and format for orientation at three CDCR institutions. Based on participants' feedback and lessons learned, the Receiver will roll out new orientation programs to all institutions within a given region (i.e., Northern, Central and Southern). This regional orientation approach allows us to include all 33 CDCR institutions in the new orientation program by January 2009.

Beyond lacking orientation, CDCR clinicians have been working with little professional support in remarkably dispiriting environments. Prisons are a vital part of the health care safety net, along with public hospitals, community clinics, and the Veterans Health Administration, and the Receiver has had success in recruiting clinical change agents into CDCR. To retain these clinicians and to sustain improvements in quality, however, it is critical to establish professional expectations and support. The Receiver has established new programs for nurses, mid-level providers, and physicians and has begun to deploy web-based decision support at the point of care.

***Action 3.3.2. By January 2009, win accreditation for CDCR as a CME provider recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education***

The new Continuing Medical Education Committee has been charged with infusing adult education principles and evaluation throughout the system. The Receiver is also creating formal leadership programs for deployment this year.

# Goal 4. Implement Quality Improvement Programs

As noted above, the Institute of Medicine identified one of its six essential strategies for health care transformation as "the incorporation of performance and outcome measurements for improvement and accountability." These measurements become the basis for a continuous quality improvement program throughout the prison health care system. Development of this program requires not only new policies and procedures, but a fundamental culture change and the development of skills for clinicians, clinical units, institutions and the entire system to self-assess and self-correct.

## Objective 4.1. Establish Clinical Quality Measurement and Evaluation Program

Sustaining a program of organizational improvement is possible only if organizational outcomes are routinely measured, evaluated and analyzed.Then, steps must be taken to adjust organizational resources, processes and practices to improve those outcomes. There must be "feedback loops" that encourage best practices and a culture of accountability that discourages noncompliant behavior. . Currently in CDCR, timely, accurate data about outcomes is virtually non-existent and there is no quality management infrastructure in place.

***Action 4.1.1. By July 2011, establish sustainable quality measurement, evaluation and patient safety programs***

The Receiver is now recruiting leadership for a new Quality and Safety Branch which will support performance measurement, quality improvement and patient safety initiatives in service of accountability and effectiveness. This group will be responsible for developing the metrics by which performance will be assessed.

Quality measurement and evaluation depend upon access to timely, accurate and relevant data. Today, the infrastructure for collecting that data simply does not exist within CDCR. As various statewide information systems are developed, we will increasingly be able to report on relevant outcome measures.

The ultimate goal, which may not be achieved for three years, is to develop balanced scorecards showing each institution's disease burden, utilization, staffing, access-to-care measures, clinical quality indicators and financial performance.

***Action 4.1.2. By July 2009, work with the Office of Inspector General to establish an audit program focused on compliance with Plata requirements***

Working with the Receiver, Prison Law Office and the State's representatives, the Office of the Inspector General has begun to establish an audit process of clinical performance in CDCR facilities. The process will be piloted in five facilities during the first six months of 2008. The results of the pilot will be used to improve the process. With the consent of the Court, the inspection program will then be rolled out to all CDCR facilities.

## Objective 4.2. Establish a Quality Improvement Program

Quality improvement is a hallmark of a well-run health care system. Using information from measurement and evaluation systems (see Objective 4.1 above), as well as self-assessment and other sources of ideas for improvement, the health care system works on a continuous basis to improve both its efficiency and its outcomes. Improvements in clinical processes will also require updating of clinical policies and procedures.

***Action 4.2.1. By September 2009, train and deploy a cadre of quality improvement advisors to develop model quality improvement programs at selected institutions.***

***Action 4.2.2. By September 2009, establish a Policy Unit responsible for overseeing review, revision, posting and distribution of current policies and procedures.***

As noted above, the ability to incorporate improvements into policies and procedures is key to standardizing those improvements within an institution, and support the system's ability to implement those improvements, with adjustments as necessary, at other institutions.

***Action 4.2.3. By January 2010, implement process improvement programs at all institutions involving trained clinical champions and supported by regional and statewide quality advisors***

To build a culture of continuous quality improvement requires not only systems and procedures, but also training and development of clinical and support staff. By January 2010, the Receiver will have in place the leadership structure, including clinical champions at the institutional level and quality advisors at the regional and statewide level, and will have developed the capability and commitment of staff to implement a system-wide quality improvement program.

## Objective 4.3. Establish Medical Peer Review and Discipline Process to Ensure Quality of Care

Peer review is the gold standard when it comes to maintaining and improving the performance of health care professionals and the quality of care. Peer review is a process whereby medical professionals evaluate the performance of other professionals in a health care organization and provide remediation or, in the most extreme cases, limit or terminate privileges to practice within the organization.

***Action 4.3.1. By July 2008, working with the State Personnel Board and other departments that provide direct medical services, establish an effective Peer Review and Discipline Process to improve the quality of care***

CDCR has not had an effective peer review and discipline program. As a result, there has been little professional pressure or support to improve quality of care. Incompetent practitioners have been allowed to remain paid state employees even after the CDCR has removed their privileges to practice within the system.

Because peer review processes can lead to the suspension of privileges, and the conduct giving rise to peer review can at times overlap with conduct that would support disciplinary action, the Receiver will work with the State Personnel Board to establish a peer review process that serves the dual goals of improving quality of care by having professionals review each other's practice and ensuring that the processes of peer review, if it leads to a suspension or termination of privileges or to adverse discipline, are conducted fairly and consistently with State law. The Receiver will coordinate this program with other departments that provide direct medical services.

Working with the State Personnel Board, the Receiver intends to establish a peer review and discipline program on a statewide basis by July 1, 2008.

## Objective 4.4. Establish Medical Oversight Unit to Control and Monitor Medical Employee Investigations

Preliminary work has already begun on a pilot of the Medical Oversight Unit. An Investigation and Discipline Coordinator currently monitors all healthcare investigative and disciplinary activity. A statewide tracking system for health care-related investigations of misconduct by health care and correctional staff has been implemented. Institutions are required to provide a monthly Investigation and Discipline Audit Report on all cases involving medical employees.

### *Action 4.4.1. By January 2009, fully staff and complete the implementation of a Medical Oversight Unit to control and monitor medical employee investigations*

Physicians and nurses will be trained to do investigations. The Medical Oversight Unit will be led by a Chief Medical Officer working with a lead nurse and reporting to the Clinical Operations Branch Chief, who reports directly to the Receiver's Chief Medical Officer. The lead clinicians of the Medical Oversight Unit will be responsible for leading Central Intake Unit discussions involving clinical incidents. Representatives from the Office of Internal Affairs and the Employment Advocacy Prosecution Team will participate in those weekly discussions. The Office of the Inspector General's Bureau of Independent Review has agreed to conduct independent oversight of the new units. The Medical Oversight Unit commenced operation in January 2008.

Goals of the Medical Oversight Unit include:

- Improving patient safety by identifying and addressing misconduct among staff in the CDCR medical care system;
- Reducing the potential of lawsuits by addressing misconduct in a thorough, timely and judicious manner;
- Increasing the success of appropriate employee discipline, reducing the number of overall appeals, enhancing settlement prospects and reducing civil litigation.

## Objective 4.5. Establish a Health Care Appeals Process, Correspondence Control and Habeas Corpus Petitions Initiative

Disputes can arise in individual cases whether or not there has actually been appropriate and adequate access to care. As a result, health care organizations have processes to resolve patient complaints regarding access to care.

In CDCR, patient-inmates concerned about their access to or the quality of medical care may file an appeal pursuant to Title 15 of the California Code of Regulations and/or file petitions for a writ of habeas corpus. However, CDCR lacks a coordinated system for tracking and responding to complaints about access to care. Absent such a system, complaints about access are at risk of being misplaced or mishandled.

***Action 4.5.1. By July 2008, centralize management over all health care patient-inmate appeals, correspondence and habeas corpus petitions***

The first step in improving health care appeals is to consolidate the management of all appeals, correspondence and health care-related habeas corpus petitions. Consolidation has the greatest potential to quickly improve how disputes about health care access are resolved.

By July 2008, we will have consolidated all patient-inmate health care inquiry functions (including controlled correspondence, correspondence addressed to the Receiver, Prison Law Office inquiries, Inmate Health Inquiry Hotline calls, Health Care Appeals and Petitions for Writs of Habeas Corpus) into one unit and established more consistent, comprehensive and timely inquiry response systems.

***Action 4.5.2. By August 2008, a task force of stakeholders will have concluded a system-wide analysis of the statewide appeals process and will recommend improvements to the Receiver***

To improve the consolidated system, we have established a task force of stakeholders (including clinical staff, counsel and correctional staff) to conduct a system-wide analysis of the current statewide appeals process. The task force is in the process of conducting an analysis of the current system to determine best practices and make recommendations to the Receiver for further improvements. Certain remedial programs (e.g., the transfer of Third Level Appeals from custody analysts to health care analysts) are being implemented at this time.

The Task Force's report to the Receiver is due by August 2008.

## Objective 4.6. Establish Out-of-State, Community Correctional Facilities and Re-entry Facility Oversight Program

Thousands of CDCR prisoners are now being housed in out-of-state, community correctional or re-entry facilities that are not subject to CDCR's day-to-day control and management. The health care of these prisoners remains a subject of concern to the Receiver.

***Action 4.6.1. By July 2008, establish administrative unit responsible for oversight of medical care given to patient-inmates housed in out-of-stat, community correctional or re-entry facilities***

The Receiver will establish an administrative unit with responsibility for conducting medical oversight of entities that, by contract with CDCR, house and care for CDCR inmates. Oversight includes establishing clinical standards and health care staffing standards for out-of-state community correctional and re-entry facilities, managing contract modifications with these entities to ensure compliance with remedial orders of the federal courts, and establishing and implementing an inspection protocol and schedule. The oversight program has been established and will be fully operational by July 2008.

# Goal 5. Establish Medical Support Infrastructure

The Receiver's primary attention in its first eighteen months has been to plan and begin implementing the core elements of a medical program, which have included improving the quantity and quality of medical and clinical personnel within the system and improving access to care. As plans for those elements have materialized, it is now time to turn more attention to planning and activities to improve the secondary services that surround and support health care delivery systems. These secondary services include such things as:

- Pharmacy,
- Medical Records,
- Radiology Services,
- Laboratory Services, and,
- Telemedicine.

## Objective 5.1. Establish a Comprehensive, Safe and Efficient Pharmacy Program

There has been no effective management of CDCR's pharmacy program. The predictable result has been a huge waste of public funds which cuts into expenditures for other important aspects of CDCR's health care system. Ineffective acquisition practices have resulted in the State overpaying for pharmaceuticals, and the failure to establish an approved formulary – a critical first step in creating a program of managed care – has resulted in some of the most expensive drugs being prescribed when less expensive, but equally efficacious, alternatives are available.

The Receiver has contracted with a nationally-known provider of pharmacy services, Maxor National Pharmacy Services Corporation, to assist in establishing a comprehensive, modern pharmacy program throughout CDCR. There are three key elements to the program:

- Establishing a drug formulary to standardize and improve quality of care at reduced cost;
- Improving and standardizing pharmacy policies, practices and support at each institution; and,
- Establishing a central-fill pharmacy to manage inventory.

At the same time the system is experiencing increased access to care and a resulting higher demand for pharmaceuticals, with proper management of the elements above (i.e., more cost-effective acquisition of drugs, and system-wide cooperation and implementation of the drug formulary), the pharmacy program is expected to achieve significant cost avoidance in pharmaceutical expenditures. Expenditures are estimated to be $33 million lower in 2008 than what costs would have been if the prior trends had been allowed to continue without change.

***Action 5.1.1. Continue developing the drug formulary for the most commonly prescribed medications***

One of the cornerstones of managing costs in a managed care system is utilization of a drug formulary to guide physicians in selecting prescriptions. The Receiver has reconstituted a revitalized CDCR Pharmacy and Therapeutics Committee ("P&T Committee") that meets monthly to review policies and procedures.

Among other things, the P&T Committee has begun to develop and adopt a standardized CDCR Formulary. The P&T Committee has developed disease medication management guidelines for the following common conditions:

- Hypertension and Hypertension Urgency
- Asthma (acute and chronic)
- Diabetes (type 1 and type 2)
- Hyperlipidemia
- HIV
- Seizure (acute and chronic)
- Hepatitis C (currently pending final approval)
- Gastroesophageal Reflux Disease (GERD) / Peptic Ulcer Disease (PUD)
- Schizophrenia (acute and chronic)
- Chronic Obstructive Pulmonary Disease (COPD)

As a result of the initial implementation of this program, non-formulary costs per member per month have declined in the last half of 2007 from $29.01 to $14.66, while formulary costs per member per month have increased only slightly from $73.64 to $74.75 (while costs for prescription drugs nationally rose 4.2% in 2007).

The P&T Committee will continue to conduct therapeutic category reviews as part of the formulary program. The savings from this active management will be substantial. For example, when data on drug utilization was collected and presented, the P&T Committee immediately noticed that almost 70% of total statin purchases were for Lipitor (atorvastatin). The P&T Committee decided in June 2007 to adopt simvastatin (generic Zocor) for the CDCR drug formulary. Utilization of Lipitor dropped dramatically over the course of the next several months, while utilization of simvastatin rose. This single decision has resulted in a cost avoidance of more than $400,000 per month.

A clinical pharmacy service to assist health care providers with formulary compliance, appropriate medication management and patient intervention has been developed and is being extended to facilities statewide.

***Action 5.1.2. By June 2009, improve pharmacy policies and practices at each institution and complete the rollout of the GuardianRx system***

Working closely with Maxor, the Receiver has taken a number of quick steps to improve the operations of institution-based pharmacies. The Receiver will continue these system-wide program improvements.

Fully staffing the pharmacy function has been a top priority. The Receiver has approved 10 new pharmacist and 3 new technician positions. The number of registry pharmacists-in-charge has been reduced from 10 to 6, and one site with no pharmacist-in-charge has been staffed. In addition, personnel training and competency programs have been established to ensure compliance with revised policies and practices.

Pharmacists and pharmacies do not work in isolation from the professionals who direct patient care. To ensure coordination, the Receiver has established Pharmacy Nursing Liaison staff to work with nursing leadership on medication management processes. This has resulted in improved communication and coordination with nursing staff.

Maxor has started employing a pharmacy services "drop-in" operations team to provide immediate, intensive attention to facilities experiencing significant pharmacy system issues. To date, the drop-in teams have assisted 17 of the 33 prison facilities.

Finally, Maxor has now successfully rolled out the GuardianRx system as an interim operating system in four prisons. By the end of 2008, GuardianRx will be functional in 26 prisons and in all facilities by June of 2009. Its statewide implementation will provide a strong basis for improving pharmacy performance, enforcing policies and standards, such as the formulary, managing pharmaceutical inventory and collecting reliable utilization data.

*Action 5.1.3. By February 2009, establish a central-fill pharmacy*

Building a central-fill pharmacy from which nearly all drugs will be acquired will substantially improve CDCR's ability to control and cost-effectively manage its drug inventory and utilization. The Receiver is working with CDCR and the Department of General Services on the development of sites for the proposed centralized pharmacy facility. Maxor continues to develop the minimum specifications required and through the services of DGS space planning and design teams, will work with property owners to develop a build-out plan.

We expect the central-fill pharmacy to be operational by February 2009.

## Objective 5.2. Establish Standardized Health Records Practice

CDCR lacks a uniform, standardized health information system and lacks functional centralized oversight or management of health care recordkeeping. The Receiver is seeking external assistance to establish an effective management system that ensures standardized health records practice in the California prison system.

*Action 5.2.1. By February 2009, create a roadmap for achieving an effective management system that ensures standardized health records practice in all institutions*

CDCR is in the initial planning stages for system-wide computerized patient information systems for all inmates. If these systems are to be implemented in a timely and efficient fashion, paper-based health records processes and clinical documentation at all CDCR facilities will first need to be standardized and streamlined.

## Objective 5.3. Establish Effective Radiology and Laboratory Services

Last year, the Receiver engaged consultants to assess CDCR's medical records, radiology and laboratory programs and to make recommendations for improvements. The report on laboratory services is due to be received by mid-2008. The work on medical records is scheduled to begin Spring 2008. The report on radiology services is due to be received by July 2008. After reviewing these reports, the Receiver will decide upon a strategy to improve radiology and laboratory services.

***Action 5.3.1. By August 2008, decide upon strategy to improve medical records, radiology and laboratory services after receiving recommendations from consultants***

## Objective 5.4. Establish Clinical Information Systems

CDCR's information technology systems are a shambles, although there is real hope for the future. Until fiscal year 2007-2008, there had been no strategic investment in CDCR's information systems for decades. As a result, CDCR did not have a statewide network, its desktop systems and applications were not connected, and many of the critical applications were nearing or already past their life expectancy. Last year, CDCR presented to the Legislature, and the Legislature funded, a portfolio of information technology projects that promises to bring CDCR's information systems into the 21st century. The Receiver is closely coordinating his activities with the development of these systems, many of which are of critical importance to the delivery of health care.

***Action 5.4.1. By July 2009, establish a clinical data repository available to all institutions as the foundation for all other health information technology systems***

Because the Receivership had already been created, CDCR did not propose to the Legislature last year any core medical information technologies. The most important medical system is a clinical data repository which will serve as the primary database for CDCR's health care system. It will be through the data repository that patient-inmate health records can be established, radiology and laboratory results can be communicated, and the initial steps towards building a digital health care system can be taken.

The Receivership is nearing completion of its statewide network infrastructure. We are also nearing the award of a contract for an integrator to assist in implementing the medical data repository. We expect the repository to be functioning by no later than July 2009.

## Objective 5.5. Expand and Improve Telemedicine Capabilities

Telemedicine is being used very effectively by prison health care systems around the country. CDCR is lagging far behind as a result of the absence of strong leadership to nurture the program as well as insufficient telemedicine infrastructure to support a significantly expanded telemedicine program.

***Action 5.5.1. By September 2008, secure strong leadership for the telemedicine program to expand the use of telemedicine and upgrade CDCR's telemedicine technology infrastructure***

The Receiver will put in place strong leadership within the telemedicine program with a direction to upgrade CDCR's telemedicine technologies, assess and expand staffing as appropriate and engage with the University of California system and others to establish a vastly expanded telemedicine program.

# Goal 6. Provide for Necessary Clinical, Administrative and Housing Facilities

The facilities available for providing health care services within CDCR are woefully inadequate. Through years of neglect, the facilities have long since passed the time when modest investments could remedy the problem. We are dealing not with deferred maintenance, but with some facilities that are literally falling apart. In addition, investments in health care facilities have significantly lagged behind growing inmate populations, so much so that available clinical space is less than half of what is necessary for daily operations.

The only cost-effective remedy is to improve and/or build new administrative and clinical facilities at each of CDCR's 33 prison locations to provide local health care services. These facilities will generally include clinical treatment space, medical administration space, medical storage space and other medical support spaces such as pharmacy, medical records and medical laboratories.

In addition to these local facilities, CDCR needs to establish seven regional long-term care centers at existing CDCR institutions with administrative, clinical and housing facilities to serve up to 6% of CDCR's inmate population who have long-term medical and/or mental health needs. Approximately three-quarters of the housing at these centers will consist of open dormitory quality housing for patient-inmates with functional impairments or chronic conditions requiring ready access to health care services.

## Objective 6.1. Upgrade administrative and clinical facilities at each of CDCR's 33 prison locations to provide patient-inmates with appropriate access to care

Each of California's prisons needs improved clinical space and clinical support space. The Receiver's "Construction Upgrade Program" involves undertaking assessments and planning at each institution, followed by construction according to plans.

***Action 6.1.1. By January 2010, complete assessment and planning for upgraded administrative and clinical facilities at each of CDCR's 33 institutions***

Assessments and preliminary planning has already occurred at the following institutions:

- Avenal State Prison
- Correctional Training Facility
- California Rehabilitation Center
- Mule Creek State Prison

By August 2008, assessments and preliminary planning will have been completed at the following institutions:

- California Institution for Men
- California Institution for Women
- Folsom State Prison
- California State Prison, Sacramento

- Richard J. Donovan Correctional Facility
- California Conservation Center
- High Desert State Prison

By March 2009, assessments and preliminary planning will have been completed at the following institutions:

- Deuel Vocational Institution
- Sierra Conservation Center
- California Correctional Institution
- California State Prison, Los Angeles County
- Wasco State Prison – Reception Center
- California Men's Colony
- Salinas Valley State Prison
- Pleasant Valley State Prison

By January 2010, assessments and preliminary planning will have been completed at the following institutions:

- Chuckawalla Valley State Prison
- Ironwood State Prison
- California State Prison, Solano
- Calipatria State Prison
- Centinela State Prison
- California Substance Abuse Treatment Facility and State Prison at Corcoran
- California State Prison, Corcoran
- Valley State Prison for Women
- Central California Women's Facility
- North Kern State Prison
- Kern Valley State Prison
- California Medical Facility
- Pelican Bay State Prison

The Receiver will closely coordinate its Upgrade Program with CDCR's construction team.

***Action 6.1.2. By January 2012, complete construction of upgraded administrative and clinical facilities at each of CDCR's 33 institutions***

As plans are completed and funding is made available, upgrade construction projects will be authorized by the Receiver. For each project, there will be additional detailed construction planning that will be undertaken and additional pre-construction activities cleared. We anticipate that once each prison upgrade project has been approved by the Receiver, it will take another 18 to 24 months to complete the construction.

In light of the phased assessments and planning described in Action 6.1.1, construction at multiple facilities around the State should commence no later than September 2008. By the July 2009, we should have construction activities taking place in a dozen or more prisons, and this level of construction will continue until the Construction Upgrade Program is complete, which we are targeting for January 2012.

## Objective 6.2. Expand administrative, clinical and housing facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs

As a core component of the plan to bring the level of prison health care services up to constitutional standards as quickly as practicable, the Receiver will supervise the creation of expanded prison health facilities and housing for approximately 6% of CDCR's existing inmate population (i.e., approximately 10,000 inmates) whose medical and/or mental condition requires separate housing to facilitate appropriate, cost-effective access to necessary health care services.

CDCR does not have adequate clinical, administrative and housing facilities to support constitutionally adequate health care. Reports by ABT Associates Inc. and Lumetra on chronic and long-term care needs in California's prisons and by Navigant Consulting on mental health needs demonstrate the inadequacy of current facilities and document the need for expanded facilities to serve both present and future populations. Based on these reports, the Receiver will supervise construction of facilities at existing institutions to serve 10,000 inmates with medical and/or mental health needs.

Approximately half of the housing and facilities will be for medical services, of which approximately three-quarters will consist of open-space dormitories for "specialized general population" patients who have functional impairments and chronic conditions requiring ready access to health care services (e.g., advanced chronic obstructive lung disease, or wheel chair bound patients with spinal chord injuries). Approximately eighteen percent will consist of assisted-living-quality housing for "low acuity" patients who have nursing needs (e.g., wheel chair with wounds that need routine dressing, or stroke patients who need help dressing), and less than ten percent will consist of nursing-home-quality housing for "high acuity" patients (e.g., patients with complicated wounds that need nursing attention daily, pre/post transplant, patients undergoing chemotherapy, and patients who are completely bed bound).

The other half of the housing and facilities will be for mental health services. Approximately seventy percent of this housing will consist of open-space dormitories for an "enhanced outpatient program," eighteen percent will be for high-custody enhanced outpatients, and less than fifteen fourteen percent will be for a mix of mental health crisis beds, acute beds, an intermediate care facility and a high-custody intermediate care facility.

The Receiver intends to supervise construction on up to seven sites at existing CDCR institutions, each site supporting medical and mental health services for up to 1,500 inmates. Two of the facilities will be specially designed to serve the unique health needs of CDCR's female population. Because existing facilities are operating well beyond their design capacity for all systems, the new facilities will be designed to be self-sufficient, full-service institutions for both infrastructure and support service facilities such as food service, laundry and central plant.

The initial planning focus has been almost exclusively on the facilities themselves. Planning for the operation of these long-term, chronic care facilities is just now getting underway. We expect to present to the Administration and the Legislature preliminary estimates of operational costs in time for initial consideration for the 2009-2010 fiscal year.

We will complete this objective by July 2013.

*Action 6.2.1. Complete pre-planning activities on all sites as quickly as possible*

In order to complete the construction as quickly as practicable, a great deal of the planning for all of the sites will be front-loaded and done in parallel. For each of the sites, the following pre-construction planning activities must be completed:

1. Site assessment and selection.
2. CEQA review and evaluation.
3. Infrastructure review and development of remediation plans.
4. Facility planning.
5. Program delivery.
6. Obtaining funding.
7. Development of Program Management Plan.

*Action 6.2.2. By February 2009, begin construction at first site*

The key to hitting our 2013 target date for completing this objective is the commencement of construction at the first site no later than February 2009, with construction completed at that site no later than February 2011.

Since it is unknown which sites will pose what obstacles, and how quickly those obstacles can be overcome, we are pursuing preliminary planning on all sites. Whichever site is first ready for the commencement of construction will be where we begin.

*Action 6.2.3. By July 2013, complete execution of phased construction program*

Construction contracts will be awarded for the project at the first site in January 2009, followed by projects No. 2 and No. 3 which will roll out in three-month increments, with contract awards by April 2009 and July 2009. Because of concerns for construction industry capacity for projects of this size, the remaining four projects will roll out in six-month increments, with the seventh project awarded by July 2011 and completed by July 2013.

## Objective 6.3. Complete Construction at San Quentin State Prison

There are a number of essential construction projects already underway at San Quentin State Prison, including establishing new, improved sick call units in facility rotundas, building a temporary medical building to provide needed clinical offices and space, constructing a medical supply warehouse, and constructing the San Quentin Central Health Services Facility, a state-of-the-art correctional health care center.

*Action 6.3.1. By December 2008, complete all construction except for the Central Health Services Facility*

A substantial amount of the San Quentin improvements has already been completed, including replacing parking spaces, relocation of the "walk alone" exercise yards, renovating

the Trauma Treatment Area, limited upgrades to certain clinics, a minor remodel of the medical records unit and receiving and release areas, and addition of a triple-wide relocatable trailer to provide office space for medical care delivery personnel.

Other construction activities will be complete by December of 2008, including construction of new personnel offices and a medical supply warehouse, expansion of clinical sick call units and the addition of a primary care / specialty medical services modular.

***Action 6.3.2. By April 2010, complete construction of the Central Health Services Facility***

Demolition of existing buildings is well under way, and construction of the Central Health Services Facility is expected to begin in April 2008. The building will be ready for occupancy by April 2010.

# Appendix A
# Estimated Costs, Metrics and Timeline

The Strategic Plan contains six major goals:

1. Ensure Timely Access to Care;
2. Improve the Medical Program;
3. Strengthen the Health Care Workforce;
4. Implement Quality Assurance and Continuous Improvement;
5. Establish Medical Support Infrastructure; and,
6. Build Health Care and Health Care-Related Facilities.

The one-time capital cost for the Healthcare Improvement and Healthcare Facility Expansion projects is estimated to be $7 billion. These projects will be funded through lease revenue bonds over a 25 year period. The debt service for these bonds will begin in Fiscal Year 2010-11 and will reach the full annual amortized payment of $585 million by Fiscal Year 2013-14.

The one-time support costs for the plan are approximately $253 million over a three-year period. Of this amount, $24 million is already included in the $1.84 billion medical budget for Fiscal Year 2008-09. This leaves only $229 million in additional one-time funding that will need to be requested at this time.

The total ongoing costs for the plan are approximately $287 million. Of this amount, $248 million is already included in the $1.84 billion medical budget for Fiscal Year 2008-09. This leaves only $39 million in additional funding that will need to be requested at this time.

There remains only one significant gap in our cost estimates. We have not yet estimated costs for operating the long-term, chronic care facilities. The operational planning for those facilities is just now getting underway, and until that planning is much further along, attempting to estimate operational costs is not feasible. Given the size of the facilities, we can expect the annual operational costs to be substantial, but until the detailed planning has been done, it simply is not possible to give a credible estimate of these costs.

We are including in the tables which follow our preliminary set of metrics by which to measure our progress. For each objective and action, we will establish and report "project" metrics (e.g., schedule, scope and cost). For some actions, we already are ready to report more substantive metrics that assist in assessing the performance or value of the program in achieving fundamental organizational goals (e.g., vacancy and retention rates for recruitment objectives). We will continue developing these substantive metrics as appropriate information on program performance becomes more readily available.

# Estimated Costs, Metrics and Timeline

| | | Bonded Capital | One-Time | Annual On-Going | Metric | 2008 | | | 2009 | | | | 2010 | | | | 2011 | | | | 2012 | | | | 2013 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 |
| Vision | **Constitutional Prison Health Care** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Mission | **Reduce Avoidable Morbidity & Mortality** | | | | Mortality Reports | | | | | | | | | | | | | | | | | | | | | | |
| | TOTAL ESTIMATED COSTS | $7,070,000,000 | $253,647,579 | $287,533,391 | | | | | | | | | | | | | | | | | | | | | | | |
| GOAL 1 | TIMELY ACCESS TO CARE | | $20,000,000 | $235,479,425 | | | | | | | | | | | | | | | | | | | | | | | |
| Obj. 1.1 | **Assessment at Reception and Release** | | | $353,612 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 1.1.1 | Standardize Screening and Assessment | | | | Planning | | | | | | | | | | | | | | | | | | | | | | |
| Act 1.1.2 | Implement at Major Reception Centers | | | | % Rolled Out | | | | | | | | | | | | | | | | | | | | | | |
| Obj. 1.2 | **Staffing & Processes for Health Access** | | | $230,415,000 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 1.2.1 | Preliminary Assessment for Access Teams | | | | % Appts Missed | | | | | | | | | | | | | | | | | | | | | | |
| Act 1.2.2 | Fully Implement Health Care Access Teams | | | | % Appts Missed | | | | | | | | | | | | | | | | | | | | | | |
| Obj. 1.3 | **Scheduling and Tracking System** | | $20,000,000 | | | | | | | | | | | | | | | | | | | | | | | | |
| Act 1.3.1 | Strategic Offender Management System | | | | IT Project | | | | | | | | | | | | | | | | | | | | | | |
| Obj. 1.4 | **Standardized Utilization Management** | | | $4,710,813 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 1.4.1 | Pilot Long-Term Care Unit | | | | Organizational | | | | | | | | | | | | | | | | | | | | | | |
| Act 1.4.2 | Centralized Utilization Management System | | | | % Completed | | | | | | | | | | | | | | | | | | | | | | |
| GOAL 2 | **MEDICAL PROGRAM** | | | $2,388,635 | | | | | | | | | | | | | | | | | | | | | | | |
| Obj. 2.1 | **Access and Processes for Primary Care** | | | $469,943 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 2.1.1 | Redesign sick call | | | | Planning | | | | | | | | | | | | | | | | | | | | | | |
| Act 2.1.2 | Implement new sick call system statewide | | | | % Rolled Out | | | | | | | | | | | | | | | | | | | | | | |
| Obj. 2.2 | **Chronic Care** | | | $717,674 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 2.2.1 | Chronic Care Initiative | | | | Quality Assess | | | | | | | | | | | | | | | | | | | | | | |
| Obj. 2.3 | **Emergency Medical Response System** | | | $1,201,018 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 2.3.1 | Emergency Medical Response Policy | | | | Policy Adoption | | | | | | | | | | | | | | | | | | | | | | |
| Act 2.3.2 | Certification and Training | | | | % Cert & Trained | | | | | | | | | | | | | | | | | | | | | | |
| Act 2.3.3 | Standardize Emergency Equipment | | | | % Completed | | | | | | | | | | | | | | | | | | | | | | |
| Obj. 2.4 | **Specialty Care and Hospitalization** | | | [Costs in 1.4] | | | | | | | | | | | | | | | | | | | | | | | |
| Act 2.4.1 | Utilization and Care Management Policies | | | | % Complete | | | | | | | | | | | | | | | | | | | | | | |
| Act 2.4.2 | Statewide Specialty Care Contracts | | | | % Complete | | | | | | | | | | | | | | | | | | | | | | |
| Act 2.4.3 | Specialty Care Invoice Payments | | | | % On Time | | | | | | | | | | | | | | | | | | | | | | |

| | | Bonded Capital | One-Time | Annual On-Going | Metric | 2008 | | | 2009 | | | | 2010 | | | | 2011 | | | | 2012 | | | | 2013 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 |
| **GOAL 3** | **RECRUIT, TRAIN & RETAIN MEDICAL WORKFORCE** | | | **$30,278,290** | | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 3.1** | **Recruit Physicians and Nurses** | | | $5,441,811 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 3.1.1 | Nursing Positions | | | | Vacancy/Retention | | | | | | | | | | | | | | | | | | | | | | |
| Act 3.1.2 | Physician Positions | | | | Vacancy/Retention | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 3.2** | **Clinical Leadership and Management** | | | $296,236 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 3.2.1 | Executive Leadership Positions | | | | Vacancy/Retention | | | | | | | | | | | | | | | | | | | | | | |
| Act 3.2.2 | Regional Leadership Positions | | | | Vacancy/Retention | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 3.3** | **Professional Training for Clinicians** | | | $24,540,243 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 3.3.1 | Orientation and Preceptor / Proctoring | | | | % Participation | | | | | | | | | | | | | | | | | | | | | | |
| Act 3.3.2 | CME Accreditation | | | | Completed | | | | | | | | | | | | | | | | | | | | | | |
| **GOAL 4** | **QUALITY IMPROVEMENT PROGRAMS** | | | **$10,986,617** | | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 4.1** | **Clinical Quality Measurement & Evaluation** | | | $1,346,602 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 4.1.1 | Quality Measurement & Evaluation System | | | | Planning | | | | | | | | | | | | | | | | | | | | | | |
| Act 4.1.2 | OIG Audit Program | | | | "Report Card" | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 4.2** | **Quality Improvement Program** | | | $2,379,673 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 4.2.1 | Model Quality Improvement Program | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Act 4.2.2 | Establish Policy Unit | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Act 4.2.3 | Statewide Process Improvement Programs | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 4.3** | **Medical Peer Review Process** | | | $210,752 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 4.3.1 | Establish Peer Review Process with SPB | | | | Organizational | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 4.4** | **Medical Oversight Unit** | | | $3,644,894 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 4.4.1 | Staff and Establish Medical Oversight Unit | | | | Organizational | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 4.5** | **Health Care Appeals** | | | $1,704,000 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 4.5.1 | Centralize Appeals, Correspondence, Habeas | | | | Workload / Backlog | | | | | | | | | | | | | | | | | | | | | | |
| Act 4.5.2 | Health Care Appeals Task Force & Report | | | | Planning | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 4.6** | **Out-of-State & Other Facilities** | | | $1,700,696 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 4.6.1 | Administrative Unit for Oversight | | | | Organizational | | | | | | | | | | | | | | | | | | | | | | |

| | | Bonded Capital | One-Time | Annual On-Going | Metric | 2008 | | | 2009 | | | | 2010 | | | | 2011 | | | | 2012 | | | | 2013 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 |
| **GOAL 5** | **MEDICAL SUPPORT INFRASTRUCTURE** | | **$133,647,579** | **$8,400,424** | | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 5.1** | **Pharmacy Program** | | $6,605,000 | $3,561,000 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 5.1.1 | Drug Formulary | | | | % Utilization | | | | | | | | | | | | | | | | | | | | | | |
| Act 5.1.2 | Pharmacy Policies and Practices | | | | % Complete | | | | | | | | | | | | | | | | | | | | | | |
| Act 5.1.3 | Central-Fill Pharmacy | | | | Construction Proj | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 5.2** | **Health Records** | | **$3,752,688** | | | | | | | | | | | | | | | | | | | | | | | | |
| Act 5.2.1 | Standardize Health Records Practice | | | | % Complete | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 5.3** | **Radiology and Laboratory Services** | | **$100,610,000** | **$880,000** | | | | | | | | | | | | | | | | | | | | | | | |
| **Act 5.3.1** | **Establish Strategy for Improvements** | | | | **Planning** | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 5.4** | **Clinical Information Systems** | | **$17,679,891** | **$2,559,424** | | | | | | | | | | | | | | | | | | | | | | | |
| Act 5.4.1 | Medical Data Repository | | | | IT Project | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 5.5** | **Telemedicine** | | $5,000,000 | $1,400,000 | | | | | | | | | | | | | | | | | | | | | | | |
| Act 5.5.1 | Secure Telemedicine Leadership | | | | Planning | | | | | | | | | | | | | | | | | | | | | | |
| **GOAL 6** | **CLINICAL, ADMINISTRATIVE & HOUSING** | **$7,070,000,000** | **$100,000,000** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 6.1** | **Upgrade Program** | $900,000,000 | $100,000,000 | | | | | | | | | | | | | | | | | | | | | | | | |
| Act 6.1.1 | Assessment & Planning at 33 Institutions | | | | % Complete | | | | | | | | | | | | | | | | | | | | | | |
| Act 6.1.2 | Upgraded Administrative & Clinical Facilities | | | | Construction Proj. | | | | | | | | | | | | | | | | | | | | | | |
| **Obj. 6.2** | **Expansion Program** | $6,000,000,000 | | | | | | | | | | | | | | | | | | | | | | | | | |
| Act 6.2.1 | Pre-Planning on All Sites | | | | % Complete | | | | | | | | | | | | | | | | | | | | | | |
| Act 6.2.2 | Construction at First Site | | | | Construction Proj. | | | | | | | | | | | | | | | | | | | | | | |
| Act 6.2.3 | Phased Construction Program | | | | Construction Proj. | | - | | | | | | | | | | | | | | | | | | | | |
| **Obj. 6.3** | **San Quentin Construction** | $170,000,000 | | | | | | | | | | | | | | | | | | | | | | | | | |
| Act 6.3.1 | All Construction But Central Health Services | | | | Construction Proj. | | | | | | | | | | | | | | | | | | | | | | |
| Act 6.3.2 | Central Health Services | | | | Construction Proj. | | | | | | | | | | | | | | | | | | | | | | |