1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  ROCHELLE C. EAST
   Senior Assistant Attorney General
4  JONATHAN L. WOLFF
   Senior Assistant Attorney General
5  LISA A. TILLMAN – State Bar No. 126424
   Deputy Attorney General
6  KYLE A. LEWIS – State Bar No. 201041
   Deputy Attorney General
7  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
8  Telephone: (415) 703-5708
   Facsimile:  (415) 703-5843
9  lisa.tillman@doj.ca.gov
   kyle.lewis@doj.ca.gov
10
   Attorneys for Defendants
11

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO – 179755
S. ANNE JOHNSON – 197415
SAMANTHA D. TAMA – 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA  94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

12          **UNITED STATES DISTRICT COURT**

13        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

14        **AND THE NORTHERN DISTRICT OF CALIFORNIA**

15  **UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES**

16    **PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE**

17

| | |
|---|---|
| 18  RALPH COLEMAN, et al., | No. 2:90-cv-00520 LKK JFM P |
| 19        Plaintiffs, | **THREE-JUDGE COURT** |
| 20        v. | |
| 21  ARNOLD SCHWARZENEGGER, et al.,<br>        Defendants. | |
| 22  MARCIANO PLATA, et al., | No. C01-1351 TEH |
| 23        Plaintiffs, | **THREE-JUDGE COURT** |
| 24        v. | **DEFENDANTS' JOINT TRIAL BRIEF** |
| 25  ARNOLD SCHWARZENEGGER, et al., | **(Eastern District Local Rule 16-285)** |
| 26        Defendants. | **To:  Three-Judge Panel** |
| 27 | |
| 28 | |

- 1 -

1

**TABLE OF CONTENTS**

2

**Page**

3

I.  INTRODUCTION ...................................................................................................... 1

4

II.  STATEMENT OF FACTS ........................................................................................ 3

5

    A.  Plata v. Schwarzenegger ................................................................................ 3

        1.  Procedural History ................................................................................ 3

6

        2.  Challenges to the Delivery of Medical Care in California's Prisons ................................................................................................... 4

7

        3.  Improvements in the Delivery of Medical Care ................................... 5

8

        4.  Overcrowding Is Not the Primary Cause of Inadequacies In Medical Care ........................................................................................ 6

9

    B.  Coleman v. Schwarzenegger ........................................................................... 7

10

        1.  Procedural History ................................................................................ 7

11

        2.  Defendants Have Established the Components of a Constitutionally Adequate Mental Health Care System ................... 9

12

            a.  The Coleman Court has Already Approved Defendants' Mental Health Care Policies ............................ 9

13

            b.  The Coleman Court Already Approved Defendants' Suicide Prevention Program ............................................... 11

14

            c.  Defendants' Staffing of the Mental Health Care System is Adequate ................................................................. 12

15

            d.  The Coleman Court Already Approved Defendants' Submitted 2007 Plan for Mental Health Care Beds. .......... 13

16

            e.  Record Keeping, Pharmacy, and Information Technology ............................................................................ 14

17

            f.  The Population of CDCR is Not an Element in a Constitutionally Adequate Mental Health Care System ...... 14

18

19

    C.  A Prisoner Release Order Would Adversely Impact Public Safety And Local Criminal Justice Systems ........................................................... 16

20

        1.  Because a Majority of CDCR Inmates Have Committed Serious and/or Violent Crimes, a Court-Ordered Prisoner Release Poses a Serious Risk to the Public and a Burden to the Local Criminal Justice Systems. ............................................... 16

21

22

23

        2.  CDCR's Mentally Ill Population's Care Needs Cannot Be Met by Available Community Resources ............................................. 18

24

    D.  CDCR Is Addressing Overcrowding .............................................................. 18

25

        1.  Measures to Reduce Population and Eliminate Nontraditional Beds ............................................................................ 18

26

            a.  Parole Reform ........................................................................ 18

27

            b.  Rehabilitation ......................................................................... 19

28

            c.  Out of State Transfers ........................................................... 20

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3                                    d.      In-Fill and Re-Entry Beds....................................................20

4                            2.      Declining Prison Population............................................20

III.     LEGAL ISSUES ............................................................................21

5

        A.     Defendants Are Not Deliberately Indifferent To The Health Care
               Needs Of The Plata And Coleman Class Members ................................21
6

        B.     The Receiver Is the Entity Presently Responsible for Medical Care
7              and Key Components of Mental Health Care...........................................22

8       C.     Overcrowding Is Not the Primary Cause Of, Nor Is A Prisoner
               Release Order A Remedy For, The Alleged Constitutionally
9              Inadequate Delivery Of Medical Or Mental Health Care .........................23

10      D.     Plaintiffs' Requested Relief Is Not The Least Intrusive Relief, Is Not
               Narrowly Drawn, And Extends Far Beyond The Plata And Coleman
               Classes ................................................................................................26

11      E.     The Adverse Impact Of The Proposed Release On Public Safety
12             And The Local Criminal Justice Systems Precludes Issuance Of A
               Prisoner Release Order........................................................................27

13  IV.     CONCLUSION ...............................................................................29

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

**Cases**

4

5
Anthony v. Dowdle,
  853 F.2d 741, 743 (9th Cir. 1988) ............................................................................21

6
Coleman v. Wilson,
  912 F. Supp. 1282 (E.D. Cal. 1995) ................................................................7, 8, 26

7
Cruzan v. Dir., Mo. Dep't of Health,
  497 U.S. 261, 285 n.11 (1990) ..................................................................................23

8
Dean v. Coughlin,
  804 F.2d 207 (2d Cir. 1986) ......................................................................................24

9

10
Estelle v. Gamble,
  429 U.S. 97, 104 (1976) .............................................................................................21

11
Farmer v. Brennan,
  511 U.S. 825, 834 (1994) ...........................................................................................21

12
Inmates of Occoquan v. Barry,
  No. 86-2128, 1989 U.S. Dist. LEXIS 7362 (D.D.C. Jan. 20, 1998) ..........................22

13
Preiser v. Rodriguez,
  411 U.S. 475 (1973) ...................................................................................................24

14

15
Roberts v. County of Mahoning,
  No. 4:03-CV-02329-DDD, slip op. at 2 (N.D. Ohio May 25, 2006) ......................22, 23

16
Toguchi v. Chung,
  391 F.3d 1051, 1060-61 (9th Cir. 2004) ...................................................................21

17
Turner v. Safley,
  482 U.S. 78 (1987) .....................................................................................................24

18
United States v. Jackson,
  480 F.3d 1014 (9th Cir. 2007) ...................................................................................24

19

20
Wilson v. Seiter,
  501 U.S. 294, 298 (1991)) .........................................................................................21

**Statutes**

21

18 U.S.C. § 3626(a)(3)(E) ...............................................................................................1

22
U.S.C. § 3626(a)(1)(A) .........................................................................................1, 26, 27

23

**Other Authorities**

24
American Heritage College Dictionary 1106 (4th ed. 2002) ...........................................24

25
Random House Webster's Unabridged Dictionary 1537 (2d ed. 1998) .........................24

26

27

28

DEFENDANTS' RESPONSE TO PLAINTIFFS' NOTICE OF DEPOSITION
OF DR. DAVID THOMA 2:90-CV-00520 LKK JFM P

# I.   INTRODUCTION

The *Plata* and *Coleman* Plaintiffs are improperly seeking a prisoner release order directed not at themselves but at the general prison population.  The pretext of this request is that overcrowding is the "primary cause" of the alleged failures in the delivery of medical and mental health care to them.  The evidence, including the testimony of Plaintiffs' own experts, will show that this claim is false and that Plaintiffs cannot meet the strict legal standards—which are based on principles of federalism, comity, and separation of powers—that are required for this Three-Judge Panel to impose a prisoner release order.

A prisoner release order is an extreme remedy that cannot issue unless it will cure the alleged constitutional violation in question.  Such an order cannot issue unless overcrowding is the "primary cause" of the alleged violation and the violation cannot be fixed any other way.  18 U.S.C. § 3626(a)(3)(E).  Moreover, a prisoner release order cannot issue unless it is narrowly drawn, extends no further than necessary to correct the violation of the plaintiff's right, and is the least intrusive means necessary to correct the violation.  18 U.S.C. § 3626(a)(1)(A).  Last, in determining whether to issue a prisoner release order, the three-judge court must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.  *Id.*  The plaintiff has the burden of proof by clear and convincing evidence.  18 U.S.C. § 3626(a)(3)(E).

The alleged constitutional violations at issue here relate to the delivery of medical and mental health care in California's prisons, not overcrowding, housing, or other environmental conditions affecting the general population.  Defendants are not deliberately indifferent to the medical needs of the *Plata* class members, who are those inmates with "serious medical needs," or to the mental health needs of the *Coleman* class members, who are those inmates with "serious mental disorders."  Further, Plaintiffs cannot meet their elevated burden here because overcrowding is not the "primary cause" of the alleged constitutional deficiencies in the delivery of medical and

mental health care; a prisoner release order will not remedy the alleged constitutional violations; and other relief will—such as the continued efforts of the *Plata* Receiver to improve the delivery of medical care and of the California Department of Corrections and Rehabilitation (CDCR) to improve the delivery of mental health care, under the direction of the *Coleman* Special Master.

Additionally, the alternate remedies to the alleged deficiencies in medical and mental health care which are in place are less intrusive means to continue to improve medical and mental health care.  A prisoner release order is not.  Neither is the prisoner release order Plaintiffs seek narrowly drawn, extending no further than necessary. Indeed, *Plata* Plaintiffs do not connect, much less limit, their requested relief to the *Plata* class or the delivery of medical care.  The *Coleman* Plaintiffs similarly refuse to limit the requested relief to *Coleman* class members, rejecting a prisoner release order "directed solely at the *Coleman* class" that does not address "overcrowding in general."

Both *Plata* and *Coleman* Plaintiffs seek an immediate release of 15,000 prisoners for the purpose of eliminating non-traditional beds, i.e., beds located in areas not intended for housing.  There is no nexus to improving the delivery of medical or mental health care.  The *Plata* Plaintiffs also seek a reduction of the prison population to design capacity, which would cut the prison population almost in half.  Based on August 2008 population numbers, *Plata* Plaintiffs seek to reduce the prison population by over 76,000 inmates.  Such a drastic reduction is severely intrusive and has no relationship to meeting the medical care needs of the *Plata* class.  The grossly overbroad nature of Plaintiffs' requested relief underscores the reality that Plaintiffs are improperly using this Three-Judge Panel proceeding not to address medical and mental health care and to obtain relief for the *Plata* and *Coleman* class members, but to improperly address general conditions caused by overcrowding, regarding which no prior relief has been sought and no prior order has ever issued.

Further, the adverse impact of the proposed release on public safety and the local criminal justice systems precludes issuance of the requested relief.  The facts are that

1   California is by far the most populous State and its large prison population results from

2   the enforcement of its laws and the incarceration of convicted felons at a relatively

3   ordinary rate.  The growth in California's prison population in the past 10 years is due

4   almost exclusively to an increase in inmates convicted of crimes against persons.

5   Moreover, sufficient community services do not exist to meet the behavioral health

6   needs of former inmates, and without appropriate services, inmates with behavioral

7   health needs are more likely to commit crimes.  Those inmates would place an additional

8   burden on the already strained County criminal justice systems, over thirty of which have

9   population control measures in place.  It would be unwise and unsafe to reduce

10  California's prison population through immediate release and a court-imposed population

11  cap.

12          Last, independent of issues regarding delivery of medical and mental health care,

13  CDCR is taking steps to appropriately address overcrowding and has reduced its non-

14  traditional beds and the number of prisoners housed in California prisons.  A court-

15  ordered prisoner release to address overcrowding is neither necessary nor appropriate.

16          As the evidence will show, under the strict legal requirements for issuance of a

17  prisoner release order under the Prisoner Litigation Reform Act, Plaintiffs' request for a

18  prisoner release order should be denied.

19                          **II.      STATEMENT OF FACTS**

20  **A.      *Plata v. Schwarzenegger***

21          **1.**   Procedural History

22          The *Plata* class action case challenges the medical care delivery system of the

23  CDCR.  The Amended Complaint, filed on August 20, 2001, alleges that the medical

24  care delivery system operated by the CDCR does not, and with their current systems

25  and resources cannot, properly care for and treat the prisoners in its custody.  (Defs.'

26  Trial Ex. 1059.)  The parties negotiated a settlement of the litigation which is

27  encompassed in the Stipulation and Order for Injunctive Relief which was approved by

28  the Court on June 13, 2002.  The Stipulation defines the Plaintiff class as "California

1   state prisoners who have serious medical needs."  (Defs.' Trial Ex. 1060.)  Following

2   entry of the Stipulation, the parties entered into a remedial phase and roll-out plan to

3   correct the alleged constitutional violations.  Three years later, the Court ordered the

4   appointment of a Receiver to take control of CDCR's medical care system.

5          On November 13, 2006, Plaintiffs filed their motion to convene a three-judge

6   panel.  Over Defendants' objections, on July 23, 2007, the Court granted Plaintiffs'

7   motion to convene this Three-Judge Panel.

8          In response to Defendants' interrogatories regarding the scope of the prisoner

9   release order sought, *Plata* Plaintiffs explained that they are seeking:

10
11          A PRISONER RELEASE ORDER that would require that
            Defendants develop a plan (within 30 days of the date of
12          such an order) to immediately reduce the population by
            15,000 prisoners so that no prisoners are housed in what are
13          commonly referred to as "ugly" or "bad" beds, i.e., those in
            gymnasiums, dayrooms, triple-bunks, and other locations not
14          intended for housing, and to reduce the prison population in
            each CDCR prison to each facilities' design capacity over a
15          three year period, with most of the reduction in the first two
            years.
16

17   (Defs.' Trial Ex. 1319, 4:15-20.)  *Plata* Plaintiffs further explained that to calculate the

18   overall number of prisoners who need to be released, one subtracts the "the cumulative

19   design capacity of all CDCR prisons from the entire prison population."  (*Id.* at 11:21-23.)

20   Based on the prison population numbers as of August 27, 2008, that would be a

21   reduction of 76,524 inmates, i.e., 156,352 - 79,828.  (Defs.' Trial Ex. 1063.)

22          **2.**   Challenges to the Delivery of Medical Care in California's Prisons

23          In ordering the appointment of the *Plata* Receiver, the *Plata* Court itself

24   acknowledged that the problem with the delivery of constitutionally adequate medical

25   care in California's prisons is a polycentric problem, involving an historical lack of

26   leadership, planning, and vision by the State's highest officials during a period of

27   exponential growth of the prison population.  (Defs.' Trial Ex. 1063 at 38:1-18, 43:11-15.)

28          According to Plaintiffs' own correctional medical expert, Ronald Shansky, M.D.,

- 4 -

1    and the Receiver, there are multiple, interrelated components of a constitutionally

2    adequate correctional healthcare system, including staffing, environment,

3    documentation, tracking, movement of patients, system of self-monitoring, sufficient

4    custody staff, sufficient community resources, and credentialing.  (Shansky Dep., Vol. I,

5    7:24-9:13 (attached to Mello Decl. Supp. Defs.' Mots. Dismiss, Summ J.); Defs.' Trial Ex.

6    1133 at 4.)

7         According to Dr. Shansky, it is very difficult to rank these interrelated components

8    in terms of importance and very hard to single out a most important component, but one

9    of the most important factors to remedy CDCR's failed medical care delivery system is

10   changing the culture.  (Shansky Dep., Vol. I, 12:17-13:7, 160:19-161:2.)  The Receiver

11   has also identified cultural change as an important aspect of improving delivery of health

12   care.  (Defs.' Trial Ex. 1133 at 13, 15.)  According to Defendants' correctional medical

13   expert, David Thomas, M.D., J.D., delivery of adequate health care in a correctional

14   environment is dependent more on a culture that fosters the delivery of health care than

15   any other single factor.  (Defs.' Trial Ex. 1015 at 10-11.)  It is particularly important that

16   the health care mission be separate and independent from the custodial function.  (*Id.* at

17   12.)

18        Despite the challenges to delivery of medical care in California's prisons, over the

19   entire five year period from 2001 to 2005, California's average annual death rate from

20   illness for prisoners was 26% lower than that of all other States.  (Defs.' Trial Ex. 1012,

21   Attachment 1, Note 2.)

22        **3.**    Improvements in the Delivery of Medical Care

23        That there have been improvements in the delivery of medical care in California's

24   prisons since the appointment of the *Plata* Receiver is unquestionable.  Some of these

25   improvements are mentioned here.  In Fiscal Year 2005-2006, when the Receiver was

26   appointed, California spent $1.252 billion on its prison health care system.  In Fiscal

27   Year 2008-2009, California anticipates spending $2.193 billion.  The amount of money

28   spent on each prisoner for healthcare per year has increased from $7,601 to $13,887 in

1   this time frame, representing an 81% increase in per inmate expenditure in the last three

2   years.  (Trial Affidavit of Todd Jerue ¶¶ 7, 9.)  CDCR's physician staffing has increased

3   dramatically, and is within 5% of the Receiver's goal to fill 90% of physician positions.

4   (Defs.' Trial Ex. 1100 at 29.)  Similarly, staffing of registered nurses has increased and is

5   now within 2% of the Receiver's statewide goal to fill 90% of nursing positions.  (*Id.* at

6   25.)  A quality-based program to administer healthcare credentialing and privileging has

7   been established.  (*Id.* at 37.)  A Professional Practice Executive Committee has been

8   established to review allegations of clinical misconduct.  (Defs.' Trial Ex. 1098 at 32.)

9       In addition, San Quentin's intake system was re-designed in 2006-2007, and it

10  now provides integrated medical, dental, and mental-health screening on the day of

11  each new inmate's arrival.  (*Id.* at 7.)  This pilot program reduced sick calls, emergency

12  encounters, and hospitalizations, and is being rolled out throughout the State.  (Defs.'

13  Trial Ex. 1099 at 4.)

14      Emergency Medical Response System procedures (based on American Heart

15  Association and California Emergency Services Authority System standards) have been

16  developed to standardize medical emergency response in every prison facility.  (Defs.'

17  Trial Ex. 1098 at 8-9.)  These procedures have been piloted at several facilities.  (Defs.'

18  Trial Ex. 1100 at 18.)  An Emergency Response Review Committee has been developed

19  to ensure institutions review medical emergency response on a regular basis.  (Defs.'

20  Trial Ex. 1098 at 9.)

21      A clinical data repository to store patient-inmate health information in a

22  standardized manner, and make this information available to providers at the point-of-

23  care, is being created.  (Defs.' Trial Ex. 1100 at 57.)

24      Most importantly, deaths are down nearly 30% since 2006.  (Defs.' Trial Ex. 1208

25  at 3; *see also* Defs.' Trial Ex. 1058.)

26      **4.**   Overcrowding Is Not the Primary Cause of Inadequacies In Medical Care

27      Plaintiffs' expert, Dr. Shansky, testified that simply reducing the prison population

28  will not by itself cure the problems with specialty medical care.  (Shansky Dep., Vol. 1,

1   132:6-9.)  Dr. Shansky also believes that a prisoner reduction will only impact the volume

2   of the use of a paper-based medical scheduling system, not solve the problems caused

3   by such a system.  (*Id.* at 139:24-140:9.)  Nor does Dr. Shansky believe that a reduction

4   in the prisoner population would result in an effective computer network, which is

5   essential to providing adequate medical care.  (*Id.* at 134:18-135:8.)  Dr. Shansky also

6   believes that an adjustment of the medical classification system is a possible solution to

7   the staffing issues at some of the remotely located prisons, such as California State

8   Prison, Avenal State Prison, or High Desert State Prison.  (*Id.* at 112:20-113:25.)

9        Dr. Shansky testified that, in his opinion, it is not impossible for the CDCR and the

10   Receiver to ever provide constitutionally adequate medical care to 172,000-plus inmates

11   and that "one could provide constitutional care" to that number of prisoners.  (*Id.* at

12   144:3-12)  According to Dr. Shansky, overcrowding is not the underlying cause of

13   inadequate medical care, but only an "external pressure."  (Specter Decl. re Submission

14   of Pls.' Expert Report to Ex. 12; 9/10/08 Shansky Second Suppl. Report at ¶ 11.)

15   Importantly, Dr. Shansky believes that a decrease in the prisoner population of up to

16   40,000 inmates by itself would not result in a constitutionally adequate medical care

17   delivery system.  (Shansky Dep., Vol. 1, 61:14-24.)

18   **B.   *Coleman v. Schwarzenegger***

19        **1.**   Procedural History

20        This action began in 1990, and became a class action soon thereafter.  The court

21   certified the class as all inmates "with serious mental disorders" confined within CDCR.

22   *Coleman v. Wilson*, 912 F. Supp. 1282, 1293 (E.D. Cal. 1995).  In 1995, the court

23   granted injunctive relief and appointed a special master to oversee the development of a

24   constitutionally adequate mental health care system.

25        At trial, the *Coleman* court declared Defendants' mental health care system must

26   contain the following elements for constitutional adequacy: (1) a systematic program for

27   screening and evaluating inmates to identify those in need of mental health care; (2) a

28   treatment program that involves more than segregation and close supervision of

1   mentally ill inmates; (3) employment of a sufficient number of trained mental health

2   professionals; (4) maintenance of accurate, complete and confidential mental health

3   treatment records; (5) administration of psychotropic medication only with appropriate

4   supervision and periodic evaluation; and (6) a basic program to identify, treat, and

5   supervise inmates at risk for suicide.  *Id.* at 1298 n.10.  None of these elements bears

6   any relation to the size of the CDCR population.

7        During the remedial phase, the *Coleman* court issued a variety of orders, often

8   directing Defendants to submit plans showing the development of core areas of the

9   mental health care system.  None of those orders directed Defendants to address the

10  inmate population of the entire CDCR system.  Rather, the orders have consistently

11  focused upon the development of the integral components of a constitutionally adequate

12  mental health care system: sufficient and qualified mental health care staff, appropriate

13  policies and procedures for mental health care, accurate record and data management,

14  and sufficient licensed and unlicensed beds for mental health patients.

15       On November 13, 2006, as in the *Plata* action, Plaintiffs moved to convene a

16  three-judge panel.  Over Defendants' objections, the court granted Plaintiffs' motion to

17  convene a three-judge panel.

18       In response to Defendants' interrogatories regarding the scope of the prisoner

19  release order sought, *Coleman* Plaintiffs rejected "a prisoner release order that is

20  directed solely at the *Coleman* class" and insist that it must "address overcrowding in

21  general."  (Defs.' Trial Ex. 1320 at 5:2-4.)  In addition, the *Coleman* Plaintiffs explained:

22  "There should also be an immediate reduction of approximately 15,000 prisoners so that

23  no prisoners are housed in what are commonly referred to as "ugly" or "bad" beds, i.e.,

24  those in gymnasiums, dayrooms, triple-bunks, and other locations not intended for

25  housing."  (*Id.* at 11:4-7.)

26  ///

27  ///

28  ///

- 8 -

**2.**      <u>Defendants Have Established the Components of a Constitutionally Adequate Mental Health Care System.</u>

During the past 13 years, Defendants have created a mental health system in conformance with the elements set forth by the trial court in 1995.  Further, systemic mechanisms are in place to ensure the elements of a constitutionally adequate mental health care system – such as sufficient and appropriate beds, staff, medication management, record keeping, and suicide prevention measures – are met.

a.      **The *Coleman* Court has Already Approved Defendants' Mental Health Care Policies.**

The first element of a constitutionally adequate mental health care system, uniform policies for the identification and care of mentally ill inmates, was established as early as 1997 and finally obtained court approval in 2006.  (Trial Affidavit Robin Dezember ¶¶ 15-17.)  In March 2006, the *Coleman* Court approved the Revised Program Guide, a revision of the 1997 Program Guide borne through a lengthy negotiation process with Plaintiffs' counsel and the *Coleman* Special Master.  (*Id.*)

The Revised Program Guide provides for several levels of mental health care, ranging from outpatient to inpatient care:

(1)      Correctional Clinical Case Management System (CCCMS): Inmates receiving this level of care are able to function well in the General Population with some mental health treatment.  These inmate-patients are provided individual therapy at least once every 90 days, medication management by a psychiatrist at least once every 90 days, and group therapy as indicated by the inmate-patient's treatment plan.

(2)      Enhanced Outpatient Program (EOP): Inmates receiving this level of care are segregated from the General Population in yards dedicated to these inmates because they require significant services to function well.  These inmate-patients are provided weekly contact with a primary clinician, medication management by a psychiatrist at least once every 30 days, and structured treatment activities 10 hours per

- 9 -

week.

(3)     Psychiatric Services Unit (PSU): The purpose of the PSU is to assure the effective delivery of EOP services to inmates who have been diagnosed as having a serious mental disorder and are serving a security housing unit term.

(4)     Mental Health Crisis Beds: Inmates receive this level of care because of a short-term need for intensive mental health care services, generally not to exceed 10 days.  This level of care provided 24-hour inpatient care, evaluation, and treatment for inmate-patients who require mental health services to prevent danger to themselves or others, or who have mental conditions which cause grave disability.

(5)     Inpatient Non-Acute Intermediate Care Facility (ICF): Inmates receive this level of care because of a longer-term need for intensive mental health care services delivered by the Department of Mental Health (DMH).

(6)     Day Treatment Program: This program with 44 beds is operated by the DMH at the California Medical Facility.  It is designed for patients needed transitional outpatient care, essentially a step down from Intermediate to Enhanced Outpatient Program level of care.

(7)     Inpatient Acute Care:  The Department of Mental Health delivers this 24-hour inpatient care in licensed facilities.  Inmates who require mental health treatment to prevent danger to themselves or others, or who have mental conditions which cause grave disability (such as an inability to use food, clothing, or shelter in appropriate ways) receive individual and group therapy as well as medication management by a psychiatrist.  (Trial Affidavit of Robin Dezember ¶ 20.)

The 2006 Program Guide also contains standardized mental health forms for screening and referring patients to appropriate levels of care.  (*Id.* ¶ 21.)  This reliable and standard set of policies and procedures governing mental health service delivery has been disseminated to and implemented by CDCR and DMH clinicians.  (*Id.*)  Training for clinical practitioners has occurred and will continue to occur regularly, especially with the adoption of any significant policy or procedure.  (*Id.*)  The *Coleman*

1   Special Master himself declared, as of this past year, that "several CDCR institutions

2   were substantially compliant" with the Program Guide and court-ordered standards.

3   (Defs.' Trial Ex. 1112 at 6.)

4               b.      **The *Coleman* Court Already Approved Defendants' Suicide
                        Prevention Program.**

5

6               Defendants have also satisfied the second element of a constitutionally compliant

7   system, a suicide prevention program.  Indeed, the trial court in 1994 stated Defendants'

8   "have designed an adequate suicide prevention program and have taken many of the

9   steps necessary to implement that program."  (Defs.' Trial Ex. 1273 at 71:3-5, 75:1-6.)

10  The trial court stated Defendants' needed to fully deploy the program.  (*Id.* at 75:1-6)

11              Defendants have not only fully deployed the program, they have expanded the

12  suicide prevention program to consist of a multi-faceted and multi-disciplinary approach

13  to preventing suicides, with mental health clinicians, correctional officers, and facility

14  management personnel now involved at the headquarters and field levels.  (Trial

15  Affidavit Robin Dezember ¶ 31.)  Mental health clinicians are provided with specific

16  direction on suicide prevention.  An entire chapter of the 2006 Revised Program Guide is

17  dedicated to delineating the identification of inmates at risk for suicide (whether already

18  a patient within the Mental Health Services Delivery System or not) and the treatment of

19  such inmates.  (*Id.* ¶¶ 32-26.)  The Revised Program Guide provides a clear set of

20  guidelines for screening inmates for the risk of suicide, with a uniform questionnaire used

21  at reception centers and before placement into an administrative segregation unit.  (*Id.*)

22              Additional measures undertaken by CDCR to prevent suicides includes

23  correctional officers' participation in observing inmates and CDCR's retrofitting certain

24  physical features of the institutions to reduce the likelihood of suicides.  (Trial Affidavit

25  Robin Dezember ¶¶ 37-41.)  These interdisciplinary efforts are largely encapsulated in

26  Defendants' plan to reduce suicides, a plan approved by the *Coleman* court last year.

27  (Defs.' Trial Exs. 1141 & 1268.)  These multidisciplinary efforts are far beyond the

28  program of suicide prevention already approved by the trial court in 1994.  Defendants

- 11 -

1   have met the element of suicide prevention for a constitutionally adequate mental health

2   care system.

3           c.      **Defendants' Staffing of the Mental Health Care System is
                    Adequate.**

4

5           The mental health care system now reflects the number of mental health care

6   positions and range of mental health care professionals ordered by the *Coleman* court in

7   2006 as necessary to implement the court-approved Revised Program Guide.  (Trial

8   Affidavit Robin Dezember ¶¶ 53-54; *see also Coleman* Court Order, 7/28/06, amended

9   8/1/06.)  The broad array of mental health clinicians staffing the mental health services

10  delivery system to identify and treat mentally ill inmates include psychiatrists,

11  psychologists, psychiatric social workers, nurses, occupational therapists, and

12  recreational therapists.  (*Id.* ¶ 48.)  The growth in the mental health clinical staffing,

13  particularly in the core areas of psychiatrists, psychologists, and social workers, from the

14  start of this case in 1994 to today is significant: in July 1994, CDCR had approximately

15  314 such clinical positions statewide; in June 2008, CDCR had approximately 2,396

16  such clinical positions statewide.  (*Id.* ¶ 48; s*ee* Defs.' Trial Exs. 1235 & 1269.)  The

17  vacancy rate has declined to below 20%.  (Trial Affidavit Robin Dezember ¶ 59.)

18  Clinicians' pay has been increased to ensure the recruitment and retention of competent

19  staff.  (*Id.* ¶ 56.)  A methodology for determining the need for additional mental health

20  care positions is now in place to avoid any future shortfalls in staffing.  (*Id.* at ¶ 65.)

21          This increase in funded mental health clinician positions is matched by a

22  centralized system of oversight of the care rendered.  (*Id.* ¶ 66.)  The quality of mental

23  health clinicians has not been sacrificed in increasing the quantity of clinicians.  (*Id.* ¶

24  64.)  For example, CDCR initiated and completed a program to evaluate the competency

25  of those psychiatrists that were neither board certified nor board eligible.  (Defs.' Trial Ex.

26  1289.)

27          Certain staffing vacancies, particularly at institutions in remote locations, are often

28  filled by contractors.  The use of such contractors is appropriate in private sector

- 12 -

1    institutions and meets the minimal standards of care under the Eighth Amendment.

2    Further, Defendants' use of contractors shows that care, even at a higher cost, is being

3    provided to inmates.  Because the mental health care system now has in place the

4    mechanisms to ensure adequate staffing by qualified mental health clinicians,

5    Defendants have met the third element of a constitutionally adequate mental health care

6    system.

7              d.    **The *Coleman* Court Already Approved Defendants' Submitted
                     2007 Plan for Mental Health Care Beds.**
8

9          In October 2007, the *Coleman* court approved the adequacy of Defendants'

10   August 2007 mental health bed plan to increase the number of mental health beds for

11   the care of mentally ill inmates in the next five years.  (Defs.' Trial Ex. 1038.)  This

12   August 2007 mental health bed plan, combined with the present system of designated

13   mental health care beds for *Coleman* class members, satisfies the fourth element of a

14   constitutionally adequate mental health care system.

15         Defendants' mental health care system is decentralized; every institution has

16   mental health care beds for at least short-term care pending transfer to an institution with

17   the mental health care bed appropriate for the patient's long-term needs.  Bolstered by a

18   validated population forecast methodology, Defendants have now planned for the mental

19   health bed needs of the *Coleman* caseload for the next five years.  (Trial Affidavit Robin

20   Dezember ¶¶ 82-85.)  The Defendants' August 2007 plan presents an expansion of the

21   number of mental health beds: 7,400 residential mental health beds (Enhanced

22   Outpatient Program, mental health crisis bed, acute inpatient and intermediate inpatient

23   care).  (Defs.' Trial Exs. 1139 & 1298.)  This plan presents a new mode of delivery of

24   care: consolidated health care centers offering a broad range of mental and medical

25   care at specific sites throughout the State.  (*Id.*)  This creation of additional beds to meet

26   the present and forecasted needs of the *Coleman* class satisfy the fourth element of a

27   constitutionally compliant system.

28   ///

DEFS.' TRIAL BRIEF (CASE NOS. 90-00520 AND 01-1351)                          1663221.1

1

e.      **Record Keeping, Pharmacy, and Information Technology**

2          Defendants have maintained patient records and provided medication to patients

3   with regularity, despite 'low-technology' infrastructure supporting those efforts.  Under

4   the Coordinated Courts' recent order, the *Plata* Receiver is charged with the

5   development of the information technology and pharmacy systems so integral to the care

6   of medical and mental health patients.  (Defs.' Trial Ex. 1299.)  The *Plata* Receiver plans

7   to unveil a new information system that should become operational over the next 18-24

8   months.  (Trial Affidavit Robin Dezember ¶¶ 91.)  The system will provide comprehensive

9   data to inform all aspects of mental health care and management.  (*Id.*)  A majority of

10  *Coleman* class members are reliant on timely and appropriate medication for their

11  mental illnesses.  CDCR Mental Health anticipates the Receiver's efforts to improve

12  pharmacy will serve to improve the medication management of *Coleman* class members.

13  (*Id.* ¶ 92.)  Defendants anticipate this cooperative relationship with the Receiver on

14  information technology and pharmacy issues will enable a finding of compliance on

15  those elements of an adequate mental health care system.  (*Id.* ¶ 93.)

16

f.      **The Population of CDCR is Not an Element in a Constitutionally
                Adequate Mental Health Care System.**

17

18         The *Coleman* court has never found that the overall number of CDCR inmates

19  was an element in a constitutionally adequate mental healthcare system.  Rather, the

20  trial court, by and through its own orders and the reports of its Special Master, has stated

21  the primary case of alleged (remaining, if any) inadequacies in the mental health care

22  system is management of the specific resources needed by mentally ill inmates, not the

23  number of inmates within CDCR.  Mentally ill inmates need specific types of beds, such

24  as licensed mental health crisis beds and licensed inpatient hospital beds, and specific

25  types of staff, such as licensed psychiatrists, psychologists and other clinicians.  A

26  reduction in the overall population of the CDCR will not create these needed resources.

27         After a decade of monitoring the development of the mental health care system,

28  the *Coleman* Special Master was asked if there was any relationship between the overall

DEFS.' TRIAL BRIEF (CASE NOS. 90-00520 AND 01-1351)                          1663221.1

1   population of CDCR and the availability of the resources needed to provide adequate

2   mental health care to *Coleman* patients.  He responded in the negative.  A reduction in

3   the overall inmate population would not enable any increase in this specialized clinical

4   staffing and licensed beds necessary to serve the needs of the mental health caseload.

5   (Defs.' Trial Ex. 1192.)  Even if the overall population were reduced by 100,000 inmates,

6   that reduction would not permit the 'freeing up' of mental health clinicians, because

7   those clinicians "cannot be spread out evenly over the Mental Health Care Services

8   Delivery System because staffing ratios are much more intensive in inpatient setting

9   (intermediate care, acute care, and mental health crisis beds), as opposed to outpatient

10  care (Enhanced Outpatient Program and Correctional Clinical Case Management

11  System)."  (*Id.* at 15.)  Likewise, even a release of 100,000 inmates "would likely leave

12  the defendants with a largely unmitigated need to provide intensive mental health

13  services to program populations."  (*Id.*)  Even if a prisoner reduction permitted the

14  "freeing up" of various beds, those beds built in prisons designed in the 1980s are not

15  transferable for use as licensed mental health care beds, particularly in prisons that

16  already lack adequate clinical treatment and office space.  (*Id.* at 4-6, 15-16.)

17         These observations are consistent with the former Special Master's observations

18  in over twenty monitoring reports since his appointment in 1995 in which overcrowding

19  was never identified as the primary cause of alleged deficiencies in the mental health

20  care system and never the source of any recommendations to the *Coleman* court for any

21  orders on population control.  (Defs.' Trial Ex. 1108, Compendium of Monitoring Reports

22  Summaries and Recommendations.)  The Special Master discussed the need for mental

23  health care beds in his September 2007 report on Defendants' August 2007 bed plan.

24  (Defs.' Trial Exs. 1139 & 1298.)  He noted that since 2006, Defendants submitted plans

25  to the *Coleman* court for the construction of mental health beds to meet the treatment

26  needs of mentally ill inmates.  (Defs.' Trial Ex. 1298 at 1, 4-8.)

27         The *Coleman* Special Master further observed that these bed plans have been

28  challenged by "at least a half dozen changes and obstacles," such as (a) the long-

- 15 -

DEFS.' TRIAL BRIEF (CASE NOS. 90-00520 AND 01-1351)                                    1663221.1

1    standing paucity of headquarters personnel trained and able to develop mental health

2    beds; (b) the need for coordination with the Receiver; (c) the "Right Prison, Right

3    Mission" project; (d) the "rapid and continuous turnover in CDCR leadership;" (e) the

4    discordance among separate executive departments (alleviated in part by the Governor's

5    own intervention); (f) a shortage of DMH inpatient beds; (g) the very need to craft and

6    implement interim solutions to bed needs in the midst of intricate long-term planning; and

7    (h) vacancy rates among mental health clinicians.  (*Id.* at 1-3.)  Only one factor was "the

8    unanticipated surge in overall population."  (*Id.*)

9        Finally, the *Coleman* Special Master observed the trial court's lack of approval for

10   Defendants' submitted bed plans stymied their "pursuit of the funding necessary for

11   construction of the treatment beds scheduled to be housed in the Department's

12   consolidated care centers, without which it cannot hope to meet the level of care

13   required by the Eighth Amendment and the orders of the Court."  (*Id.* at 12-13.)  That

14   approval has now been provided.  (Defs.' Trial Exs. 1038 & 1139.)

15   **C.    A Prisoner Release Order Would Adversely Impact Public Safety And Local**
16   **Criminal Justice Systems.**

17        **1.    Because a Majority of CDCR Inmates Have Committed Serious and/or**
18        **Violent Crimes, a Court-Ordered Prisoner Release Poses a Serious Risk to**
             **the Public and a Burden to the Local Criminal Justice Systems.**

19        As of June 30, 2008, 52.6% (89,921) of the CDCR institutional population were

20   convicted for crimes against persons; 20% (34,275) were convicted for property crimes;

21   19.3% (32,933) are prison for drug crimes, and 8.1% (13,940) are prison for other

22   crimes.  (Trial Affidavit of Matthew Cate ¶¶ 16-17.)

23        The largest group of offenders was inmates convicted of 1st and 2nd Degree

24   Murder, at 13.8% (23,525) of the population.  When combined with Manslaughter (1.9%)

25   and Vehicular Manslaughter (0.4%), Homicide convictions make up 16.1% (27,466) of

26   the population.  The second largest group of offenders was inmates convicted of

27   Robbery, at 11.9% (20,285) of the population.  Together, these offense groups account

28   for 28% (47,751) of all inmates.  The third largest group of offenders was inmates

1    convicted of 1st and 2nd Degree Burglary, at 8.0% (13,685) of the population.

2    Accordingly, Homicide, Robbery, and Burglary convictions account for over one-third

3    (61,436) of all inmates.  In addition, 13.4% (22,886) of inmates meet the Sex

4    Registration Requirement.  Assault with a Deadly Weapon accounts for 7.0% (11,954) of

5    inmates.  (*Id.*; Defs.' Trial Ex. 1255, Tables 2, 9.)  Thus, combined, Homicide, Robbery,

6    Burglary, Assault with a Deadly Weapon, and Registration Sex Offenses account for

7    56.3% (96,276) of all inmates.

8            Further, crimes against persons were the single most significant source of the

9    increase in the prison population between 1997 and 2007.  The number of inmates in

10   prison for crimes against persons increased from 65,028 in 1997 to 88,612 in 2007, a

11   total increase of 23,854.  In sharp contrast, the number of inmates in prison for drug

12   offenses decreased from 41,459 in 1997 to 33,738 in 2007.  Because the number of

13   inmates incarcerated for drug offenses declined in that 10-year period, the growth in the

14   inmates incarcerated for crimes against persons accounts for more than 100 percent of

15   the total increase in the prison population from 1997 to 2007.  (*Id.* ¶ 18.)

16           The probability of being sentenced to prison for a felony conviction in California is

17   lower than the average nationwide percentage.  For the period from 2001 through 2006,

18   fewer than 1 in 5 felony convictions resulted in a prison sentence in California.  During

19   the same period, by far the most common disposition of convicted felons was probation

20   with jail.  Also, during that same period, sentencing to prison decreased from 21.5% to

21   18.8% for drug offense convictions, while sentencing to probation increased from 18.1%

22   to 34.2%.  (*Id.* ¶¶ 23-24.)

23           Since California is the most populous state, simply enforcing the law and

24   incarcerating convicted felons at a relatively ordinary rate for the United States results in

25   a high number of prisoners.  (*Id.* ¶ 26.)  A court-approved prisoner release, particularly in

26   light of the absence of sufficient services in the community to serve inmates, would have

27   serious adverse consequences for public safety and local criminal justice systems, which

28   are already overloaded.  (*See* Defs.' Trial Exs. 1002-24 & 1025-26.)

**2.** CDCR's Mentally Ill Population's Care Needs Cannot Be Met by Available Community Resources.

The *Coleman* class contains mentally ill inmates who, even at the lowest level of care, require ongoing medication management and supportive therapy for their mental illness. The impact on the mentally ill inmates themselves and the communities in general cannot be discounted. As more fully discussed by Defendants' expert Gale Bataille, local communities do not have resources available to serve this fragile population upon release. (Defs.' Trial Ex. 1025, Preliminary Expert Report Bataille, pp. 18- 21.) Indeed, even the Parole Outpatient Clinics lack sufficient resources to meet the mental health needs of such a large group of mentally ill inmates. (Trial Affidavit of Tom Hoffman ¶¶ 28-32.) Those mentally ill inmates who do not receive necessary medication and supportive counseling will likely recidivate and will likely be preyed upon by others. (Defs.' Trial Ex. 1025, Preliminary Expert Report Bataille, at 18- 21.) They will experience decompensation in their mental illness. (*Id.* at 20.) Those mentally ill inmates who also suffer from substance abuse issues will likely recidivate and decompensate at higher levels. (*Id.*) Clearly, the communities will suffer and the inmates with mental illness will suffer by this proposed and drastic remedy of a court-ordered prisoner release.

**D. CDCR Is Addressing Overcrowding.**

**1.** Measures to Reduce Population and Eliminate Nontraditional Beds

CDCR has already eliminated more than 5,000 non-traditional beds, with the goal of eliminating all nontraditional beds. It plans to address the size of the California inmate population through a combination of programs such as reduced recidivism through parole reform; rehabilitation reform efforts; out-of-state transfers; and construction of in-fill and re-entry beds, authorized by AB 900. (Cate Trial Affidavit ¶ 33.)

a. **Parole Reform**

The Division of Adult Parole Operations has made recent improvements that will greatly enhance the efficiency and effectiveness of parole supervision within the State

1   and reduce the number of parolees returning to California prisons.  CDCR is

2   implementing parole accountability efforts that are intended to provide more consistent

3   revocation decisions, alternative sanction programs, diversion to parole programs based

4   upon parolees' individual risk and needs factors, and more consistent decisions

5   regarding parolee discharges.  Through more consistent parole discharge decisions,

6   CDCR saw an increase of 6,560 additional discharges from May 2007 through the end

7   of April 2008, compared to the previous twelve month period.  This increase has had a

8   direct impact on reducing the prison population through fewer parolees being returned to

9   prison for technical violations.  (Trial Affidavit of Thomas Hoffman ¶ 7.)

10         In addition, CDCR now has access to 1,800 In-custody Drug Treatment Program

11   beds (up from 500 in 2007/08) statewide that provide alternative sanctions for parolees

12   who violate their parole conditions due to drug or alcohol dependency and/or who need

13   treatment to control their substance abuse.  (*Id.* ¶ 20.)  Parolees can receive care in

14   either local community correctional environments or community-based residential

15   treatment programs, rather than in state prison facilities.  (*Id.*)  Parole violators can also

16   be assigned to Day Reporting Centers as an alternative sanction.  CDCR currently has

17   700 available spaces in Day Reporting Centers, an increase from 300 in 2006.  (*Id.* ¶

18   21.)

19               b.    **Rehabilitation**

20         The Adult Programs Rehabilitative Programming Reform Work Project Plan is

21   designed to reduce the rate of recidivism in two respects: (1) by ensuring that each

22   individual offender's criminogenic needs are being met to ensure success upon release,

23   and (2) by identifying high-risk offenders such that resources may be properly allocated

24   and focused on these individuals who require a greater level of supervision during

25   incarceration and while on parole.  (Trial Affidavit of Kathy Jett ¶ 6.)  The Plan provides

26   steps from intake to parole including (1) a risk and needs assessment and a secondary

27   assessment; (2) a case management plan; (3) delivery of programs; (4) measurement of

28   individual progress; (5) preparation for reentry; (6) reintegration in communities and

1   follow-up; and (7) evaluation of program fidelity.  (*Id.* ¶ 12.)  The anticipated reduction in

2   recidivism in turn will free up much needed space in reception centers and throughout

3   CDCR.  (*Id.* ¶ 8.)

4        CDCR also has a Drug Treatment Furlough program that allows inmates to serve

5   the last 120 days of their prison term in a community-based drug treatment program.

6   The Drug Treatment Furlough program has funding for 500 beds at any given time.

7   CDCR is reaching full capacity for these beds.   (*Id.* ¶ 32.)

8               c.     **Out of State Transfers**

9        As of August 29, 2008, approximately 4,852 inmates were placed in out-of-state

10   institutions.  CDCR currently plans to place up to a total of 8,000 inmates out-of-state

11   and will seek funding to transfer more than 8,000 inmates out-of-state, if necessary.

12   (Cate Trial Affidavit ¶ 47.)

13               d.     **In-Fill and Re-Entry Beds**

14        As soon as funding is available, CDCR plans to move forward with constructing

15   4,800 additional in-fill beds in existing facilities and 2,000 new beds in re-entry facilities.

16   (Trial Affidavit of Deborah Hysen ¶¶ 18,19.)

17        **2.**   Declining Prison Population

18        The overall population has trended downward.  From October 2006 to August

19   2008, there was a decrease in the absolute number of inmates under CDCR's

20   jurisdiction.  At its peak in October 2006, the total inmate population under CDCR's

21   jurisdiction was 173,357, which declined to 172,057 as of August 27, 2008.  In addition,

22   from October 2006 to August 2008, the number of inmates housed in-state at all of

23   CDCR's facilities (prisons, camps, and community correctional facilities) declined—from

24   173,357 in October 2006 to 167,269 as of August 2008.  Moreover, from October 2006

25   to August 2008, the in-state prison population declined—from 162,735 in October 2006

26   to 156,352 in August 2008.  (Trial Affidavit of Scott Kernan ¶ 13.)

27        As the in-state prison population has decreased, nontraditional beds have

28   reduced in number.  As of August 2008, there were 14,197 (13,465 male and 732

DEFS.' TRIAL BRIEF (CASE NOS. 90-00520 AND 01-1351)                          1663221.1

1   female) non-traditional beds being utilized.  This represents a total reduction of 5,386

2   non-traditional beds throughout the system since the all-time high of 19,618 was

3   reached in August 2007.  (*Id.* ¶ 14.)

4                                    **III.       LEGAL ISSUES**

5   **A.       Defendants Are Not Deliberately Indifferent To The Health Care Needs Of
            The *Plata* And *Coleman* Class Members.**
6

7            In order to establish an Eighth Amendment claim arising out of inadequate

8   medical care, a prisoner must prove "deliberate indifference to serious medical needs."

9   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  This standard includes both subjective and

10  objective components.  First, the alleged deprivation must be, in objective terms,

11  "sufficiently serious."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v.*

12  *Seiter*, 501 U.S. 294, 298 (1991)).  Second, the prison official must act with a "sufficiently

13  culpable state of mind," which entails more than mere negligence, but less than conduct

14  undertaken for the very purpose of causing harm.  *Id.* at 837.  A prison official does not

15  act in a deliberately indifferent manner unless the official "knows of and disregards an

16  excessive risk to inmate health or safety."  *Id.*

17           The first prong requires that the deprivation of medical care must produce a

18  substantial risk of serious harm.  *See id.* at 828.  The alleged deliberate indifference

19  must rise to the level of "unnecessary and wanton infliction of pain."  *Estelle*, 429 U.S. at

20  104.  The second prong requires that the culpable state of mind required is more than

21  mere "indifference."  *See Farmer*, 511 U.S. at 835.  Allegations of negligence, gross

22  negligence, and ordinary recklessness all lack sufficient deliberateness to be the basis

23  for a claim under the Eighth Amendment.  *Id.* at 835-37; *Toguchi v. Chung*, 391 F.3d

24  1051, 1060-61 (9th Cir. 2004).  Neither an inadvertent failure to provide adequate

25  medical care, nor a physician's negligence "in diagnosing or treating a medical condition

26  . . . state a valid claim of medical mistreatment under the Eighth Amendment."  *Anthony*

27  *v. Dowdle*, 853 F.2d 741, 743 (9th Cir. 1988) (citing Estelle).  In essence, "subjective

28  recklessness," as used in the criminal law, is the appropriate test for "deliberate

                                            - 21 -

1   indifference." *Farmer*, 511 U.S. at 837.

2          As discussed in detail above and in the trial affidavits of Defendants' witnesses,

3   Defendants are not acting with criminal recklessness to Plaintiffs' medical and mental

4   health care needs.  In *Plata*, since 2001, the medical care system is greatly improved

5   due to both Defendants' and the Receiver's actions.  And in *Coleman*, the essential

6   elements of a constitutionally adequate mental health care system as set forth by the

7   *Coleman* court are sufficiently established such that this Three-Judge Panel should find

8   the predicate for proceeding -- a finding of failure to comply with the injunction to create

9   a constitutionally adequate system -- does not exist.

10         Defendants have also invested in the provision of mental and medical health care

11  to inmates.  In the last three years, spending on prison health has almost doubled.   In

12  Fiscal Year 2005-2006, California spent $1.252 billion on its prison health care system,

13  while in Fiscal Year 2008-2009, California anticipates spending $2.193 billion.  The

14  amount of money spent on each prisoner for healthcare per year has increased from

15  $7,601 to $13,887 in this time frame.  This investment has yielded substantial

16  improvements in the delivery of medical and mental health care.

17         The deliberate indifference that underlies an Eighth Amendment violation does

18  not exist here, and a prisoner release order should not issue.

19  **B.     The Receiver Is the Entity Presently Responsible for Medical Care and Key
           Components of Mental Health Care.**
20

21         The judicial decisions interpreting the PLRA have addressed defendants who

22  have both custody over the inmates and control over the infrastructure.  In *Roberts v.*

23  *County of Mahoning*,No. 4:03-CV-02329-DDD, slip op. at 2 (N.D. Ohio May 25, 2006),

24  the court intervened with a prisoner release mechanism when a stipulated population

25  cap could not be implemented.  In the case of *Inmates of Occoquan v. Barry*, No. 86-

26  2128, 1989 U.S. Dist. LEXIS 7362 (D.D.C. Jan. 20, 1998) the court responded to

27  plaintiffs' claim that prison overcrowding in and of itself violated the inmates' Eighth

28  Amendment rights.  There was no question in these decisions that the same entity

1   responsible for ensuring constitutionally compliant conditions within the penal system

2   had custody over the   prisoners within the system.

3          The shifting of authority away from CDCR and to the Receiver compels a finding

4   that Defendants can no longer be considered responsible for the development of

5   constitutionally compliant medical and mental health services delivery systems.

6   Because the Receiver is the entity responsible for key components of the medical and

7   mental health care services delivery system, such as contracting functions, information

8   technology, and pharmacy, this Court should find the Receiver's role supersedes any

9   issue of Defendants' alleged noncompliance with court orders to deliver constitutionally

10  adequate medical and mental health care.

11  **C.    Overcrowding Is Not the Primary Cause Of, Nor Is A Prisoner Release Order
           A Remedy For, The Alleged Constitutionally Inadequate Delivery Of Medical
12         Or Mental Health Care.**

13         To obtain a prisoner release order, Plaintiffs have the burden to prove by clear

14  and convincing evidence that "crowding is the primary cause of the violation of a Federal

15  right" *and* that "no other relief will remedy the violation of the Federal right."  18 U.S.C. §

16  3626(a)(3)(E); *Roberts v. Mahoning County*, 495 F. Supp. 2d 713 (N.D. Ohio 2006);

17  *Plata v. Schwarzenegger*, 2007 U.S. Dist. LEXIS 56031 *19 (N.D. Cal. July 23, 2007).

18  "Clear and convincing" evidence is an exacting standard "which produces in the mind of

19  the trier of fact a firm belief or conviction as to the truth of the allegations sought to be

20  established, evidence so clear, direct and weighty and convincing as to enable the fact

21  finder to come to a clear conviction, without hesitancy, of the truth of the precise facts in

22  issue." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 285 n.11 (1990) (internal

23  quotations and citations omitted).

24         Here, the PLRA prohibits a prisoner release order unless Plaintiffs prove by

25  "evidence so clear, direct, weighty, and convincing" that the Court may "come to a clear

26  conviction, without hesitancy," that crowding is the primary cause of the alleged

27  inadequacies in the delivery of medical and mental health care in California's prisons.

28  The PLRA does not define "primary," and thus the Court must look to the ordinary

1   meaning of this term.  *See United States v. Jackson*, 480 F.3d 1014, 1022 (9th Cir.

2   2007).  "Primary" commonly means "first or highest in rank or importance; chief;

3   principal."  *Random House Webster's Unabridged Dictionary* 1537 (2d ed. 1998); accord

4   *American Heritage College Dictionary* 1106 (4th ed. 2002) ("First or highest in rank,

5   quality, or importance; principal.").

6          The term "the primary cause" must also be read in conjunction with the second,

7   related requirement that "no other relief will remedy the violation of the Federal right."  In

8   other words, crowding must be so central to the condition complained of that a prisoner

9   release order is the only remedy for the problem.  The two requirements read together

10  reveal a meaning of "primary" consistent with the common definition, i.e., for a prisoner

11  release order to issue, crowding must be the most important, or principal, cause of the

12  violation.  This definition is consistent with the legislative intent of the PLRA.

13         Further, the U.S. Supreme Court has repeatedly instructed federal courts not to

14  become unduly enmeshed in running prisons.  *Turner v. Safley*, 482 U.S. 78, 84-85

15  (1987).  The rationale behind this policy is that the "internal problems of state prisons

16  involve issues so peculiarly within state authority and expertise, the States have an

17  important interest in not being bypassed in the correction of those problems."  *Preiser v.*

18  *Rodriguez*, 411 U.S. 475, 491-92 (1973).  "The strong considerations of comity that

19  require giving a state court system that has convicted a defendant the first opportunity to

20  correct its own errors thus also require giving the States the first opportunity to correct

21  the errors made in the internal administration of their prisons."  *Id.*  Thus, a remedial court

22  order must balance the court's obligation to eliminate a constitutional violation with the

23  state's right to administer its own prisons, with the state continuing to have the

24  responsibility for implementing a plan to operate its prison in a constitutional manner.

25  *Dean v. Coughlin*, 804 F.2d 207, 214 (2d Cir. 1986) (agreeing that relief was necessary,

26  but nonetheless vacating injunction imposing comprehensive dental care plan on the

27  state's prison system as a departure from the concepts of comity and federalism).  The

28  Supreme Court's directives mandate that California be given a chance to address

1   overcrowding before a court issues a prisoner release order.[1]

2           Moreover, as demonstrated above, overcrowding is not the primary cause of the

3   unconstitutional delivery of medical or mental health care in California's prisons.  Indeed,

4   other less-intrusive measures will remedy the alleged constitutional inadequacies in the

5   delivery of medical and mental health care, but a prisoner release order will not.  The

6   *Plata* and *Coleman* Courts have provided other relief to address the problems with

7   medical and mental health care[2]—specifically, the appointment of the Receiver over the

8   medical care system and particular mental health care components (information

9   technology, pharmacy, bed construction), and the Special Master in connection with the

10  mental health care system—and that relief is working.  It is indisputable the Receiver has

11  made improvements in the delivery of medical care, including responsiveness to inmate

12  appeals, timeliness of appointments, improved pharmacy and drug formulary, and

13  increased staffing with board certified and board eligible physicians.

14          Similarly, as discussed in detail above, the improvements in the mental health

15  care system are dramatic.  Moreover because mentally ill inmates are often housed

16  apart from the general population of CDCR inmates, Plaintiffs cannot show the mentally

17  ill are impacted by the overall census of CDCR.  The policy requiring segregated housing

18  of mentally ill patients receiving Enhanced Outpatient Patient care or higher levels of

19  (inpatient) care means such patients are not housed within triple-bunked gymnasiums or

20  dayrooms.  (Trial Affidavit Robin Dezember ¶¶ 76.)  Likewise, those mentally ill inmates

21  requiring inpatient care within a mental health crisis bed, an acute bed or an

22  intermediate care bed are in mental health units separated from the general population

23  of inmates and, due to licensure requirements, immune from the triple-bunking seen in

24  gymnasiums and dayrooms.  (*Id.* ¶ 77.)  While mentally ill inmates at the lowest level of

25  [1] Indeed, as explained in Defendants' Motions for Dismissal or, Alternatively, Summary
26  Judgment or Summary Adjudication, a three-judge panel proceeding should never have
    been convened in the first place because neither the *Plata* nor *Coleman* Court has
27  issued a prior order directed at overcrowding or general conditions caused by
    overcrowding.
28  [2] As distinguished from prior relief directed at overcrowding or general conditions caused
    by overcrowding, which has never been ordered.

1    outpatient care, Correctional Clinical Case Management Services, are permitted to be

2    housed in general population areas, the data shows that the majority, some 80 percent,

3    of these patients are in traditional housing and not in "non-traditional settings" of

4    dayrooms and  gymnasiums.  (*Id.* ¶ 78; Defs.' Trial Ex. 1252.)  As a result, Plaintiffs will

5    not be able to show by clear and convincing evidence that overcrowding is the primary

6    cause of alleged unconstitutional mental health care.

7         There is therefore no direct nexus between meeting the treatment needs of the

8    *Plata* and *Coleman* populations and capping the overall population of CDCR.  Although

9    a reduction in prison overcrowding may improve the overall prison environment, the

10   provision of constitutional medical and mental health care requires improvements

11   specifically related to the delivery of medical and mental health care—not population

12   control measures.  Indeed, not only *will* other measures solve the problems in the

13   delivery of medical and mental health care, other measures are *necessary* to solve the

14   problems.

15        In sum, Plaintiffs will not be able to prove by clear and convincing evidence that

16   overcrowding is the primary cause of the alleged unconstitutional provision of medical

17   and mental health care.

18   **D.    Plaintiffs' Requested Relief Is Not The Least Intrusive Relief, Is Not Narrowly
             Drawn, And Extends Far Beyond The *Plata* And *Coleman* Classes.**
19

20        A prisoner release order cannot issue unless it is narrowly drawn, extends no

21   further than necessary to correct the violation of the plaintiff's right, and is the least

22   intrusive means necessary to correct the violation.  18 U.S.C. § 3626(a)(1)(A).

23        As discussed above, Plaintiffs' request for a population cap would not remedy

24   medical or mental health care, which is accomplished by, among other things, creating

25   leadership, hiring and retaining qualified staff, appropriate office and treatment space,

26   and creating a useable records system.  Instead, Plaintiffs simply seek to reduce the

27   overall prison population with a prisoner release order directed at the entire prison

28   population, rather than the members of the *Plata* and *Coleman* classes.  Indeed,

- 26 -

1   Plaintiffs do not address the demographic, offense, or risk profiles of the *Plata* or

2   *Coleman* class members, nor assess the possibility of a safe reduction of their

3   populations.  Plaintiffs' evidence and requested relief are directed at the general

4   California prison population.  But such a reduction will not remedy the alleged clinical

5   problems in the delivery of medical and mental health care that exist for the *Plata* and

6   *Coleman* class members.

7        It is the continued efforts of the *Plata* Receiver to improve the delivery of medical

8   care and of the CDCR to improve the delivery of mental health care, under the direction

9   of the *Coleman* Special Master, that will remedy the alleged problems with medical and

10  mental health care.  And these existing remedies which are in place are the least

11  intrusive means to continue to improve medical and mental health care.  Plaintiffs cannot

12  be permitted to bootstrap an overcrowding class action and relief through the *Plata* and

13  *Coleman* cases.[3]

14       In addition, a court-ordered prisoner release to address overcrowding is neither

15  necessary nor appropriate because CDCR is taking steps to safely address

16  overcrowding and has reduced its prison population, such as transferring inmates out-of-

17  state, instituting parole reform and rehabilitative programming to reduce recidivism, and

18  planning the construction of new beds.

19  **E.    The Adverse Impact Of The Proposed Release On Public Safety And The**
20  **       Local Criminal Justice Systems Precludes Issuance Of A Prisoner Release**
        **       Order.**

21       In determining whether to issue a prisoner release order, a three-judge court must

22  give substantial weight to any adverse impact on public safety or the operation of a

23  criminal justice system caused by the relief.  18 U.S.C. § 3626(a)(1)(A).

24       California is the most populous State in the United States with several million

25  _____

26  [3] In fact, as explained in Defendants' Motions for Dismissal or, Alternatively, Summary
    Judgment or Summary Adjudication, the *Plata* and *Coleman* class representatives do not
27  have standing to seek a prisoner release order directed at the general prison population
    because they represent only the interests of prisoners with "serious medical needs" and
    "serious mental disorders," and this Court does not have jurisdiction to issue the relief
28  sought.

DEFS.' TRIAL BRIEF (CASE NOS. 90-00520 AND 01-1351)                                    1663221.1

more residents than the next most populous State, Texas.  Its large prison population is

a function of enforcement of its laws and incarceration of convicted felons at a relatively

normal rate for the United States.  The majority of its prisoners have been incarcerated

for crimes against persons and other serious crimes—such as homicide, robbery,

burglary, assault with a deadly weapon, and registration sex offenses.  The absolute

number of inmates incarcerated for drug crimes has declined over the past 10 years.

Inmates convicted of felony crimes against persons account for the increase in the

prison population in the past 10 years.

According to correctional expert James Marquart, Ph.D., diversion of even select

groups of inmates without proper community support systems and supervision will lead

to additional recidivism.  From an offender's perspective, the re-entry process or

"returning home" is not an easy transition, and staying out of prison is difficult.

"Successful" re-entry is dependent upon, among other things, securing employment,

obtaining proper medical and mental health care, securing housing, securing substance

abuse programming, obtaining/maintaining family support, obtaining community support,

and experiencing a positive period of parole supervision.  If parolees are not assisted in

securing such resources upon their release their chances of success are dismal.  A

blanket release order will severely strain county level mental health departments, county

alcohol and drug treatment programs, and housing.  It will also foster additional

competition for jobs in local communities, as well as strain local criminal justice systems,

especially county jails.

As Dr. Marquart explains, the Texas experience in the 1980s is instructive—a

legislatively implemented population cap on the State prisons resulted in overcrowding

at county jails and coincided with an upsurge in crime.  The additional arrests led to

additional convictions and prison commitments—all fueling the demand on prison bed

space leading to a cycle of releases and returns.

In California, over 30 of California's counties are under a court-imposed

population cap or have adopted population control measures, resulting in the early

DEFS.' TRIAL BRIEF (CASE NOS. 90-00520 AND 01-1351)                    1663221.1

1   release of prisoners due to lack of adequate housing capacity.   The existing criminal

2   justice infrastructure is not adequate to handle the existing demands and must be built

3   up before caps or releases are instituted.

4       In addition, according to community mental health services expert Gale Bataille,

5   MSW, California's county-based public mental health system does not currently have the

6   financial, resource or workforce capacity to significantly increase the availability of

7   services to seriously mentally ill parolees within the next several years.

8       According to Dr. Marquart, a prisoner release order by itself ignores the gaps in

9   programming and assistance needed to improve the success chances of parolees upon

10   re-entry to the community. As such, a prison release order will not accomplish long-term

11   reductions in the prison population and the supposed benefits of such reductions as any

12   "slack" created will likely be quickly filled with returns to CDCR institutions.

13                            **IV.   CONCLUSION**

14   Plaintiffs want this Three-Judge Panel to order the release tens of thousands of State

15   prisoners into the local communities in California.  The law proscribes such an order

16   under these circumstances.  Indeed, the *Plata* and *Coleman* Plaintiffs are not even

17   seeking relief directed at themselves—inmates with serious medical needs and serious

18   mental disorders.  Instead, they want a release directed at the general prison population.

19   Such a release will not fix the alleged problems with medical and mental health care, and

20   no lawsuit even exists challenging, much less establishing, constitutional violations in

21   connection with general prison conditions related to overcrowding.  Moreover, the

22   prisoner release Plaintiffs seek would threaten public safety and overburden already

23   strained local criminal justice systems.  The safe and lawful response is to deny

24   Plaintiffs' request for a prisoner release order and allow the *Plata* Receiver and the

25   ///

26   ///

27   ///

28   ///

1   CDCR to continue to make the clinical and other improvements necessary to adequately

2   meet the constitutionally minimum needs of the *Plata* and *Coleman* class members.

3   DATED:  November 3, 2008                    HANSON BRIDGETT LLP

4

5                                              By: /s/ Paul B. Mello
                                               _____
6                                              PAUL B. MELLO
                                               Attorneys for Defendants
7                                              Arnold Schwarzenegger, et al.

8   DATED:  November 3, 2008                    EDMUND G. BROWN JR.
                                               Attorney General of the State of California
9

10                                             By: /s/ Lisa Tillman
                                               _____
11                                             LISA TILLMAN
                                               Deputy Attorney General
12                                             Attorneys for Defendants
                                               Arnold Schwarzenegger, et al.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28