| | |
|---|---|
| PRISON LAW OFFICE<br>DONALD SPECTER, Bar No. 83925<br>STEVEN FAMA, Bar No. 99461<br>SARA NORMAN, Bar No. 189536<br>ALISON HARDY, Bar No. 135966<br>REBEKAH EVENSON, Bar No. 207825<br>1917 Fifth Street<br>Berkeley, CA 94710<br>Telephone: (510) 280-2621 | ROSEN BIEN & GALVAN, LLP<br>MICHAEL W. BIEN, Bar No. 96891<br>JANE E. KAHN, Bar No. 112239<br>AMY WHELAN, Bar No. 215675<br>LISA ELLS, Bar No. 243657<br>MARIA V. MORRIS, Bar No. 223903<br>315 Montgomery Street, 10th Floor<br>San Francisco, CA 94104<br>Telephone: (415) 433-6830 |
| K & L GATES LLP<br>JEFFREY L. BORNSTEIN, Bar No. 99358<br>EDWARD P. SANGSTER, Bar No. 121041<br>RAYMOND E. LOUGHREY, Bar No. 194363<br>55 Second Street, Suite 1700<br>San Francisco, CA 94105-3493<br>Telephone: (415) 882-8200 | BINGHAM, McCUTCHEN, LLP<br>WARREN E. GEORGE, Bar No. 53588<br>Three Embarcadero Center<br>San Francisco, CA 94111<br>Telephone: (415) 393-2000 |
| THE LEGAL AID SOCIETY -<br>EMPLOYMENT LAW CENTER<br>CLAUDIA CENTER, Bar No. 158255<br>600 Harrison Street, Suite 120<br>San Francisco, CA 94107<br>Telephone: (415) 864-8848 | |

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br>    Plaintiffs,<br>vs.<br>ARNOLD SCHWARZENEGGER, et al.,<br>    Defendants | No. Civ S 90-0520 LKK-JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br>    Plaintiffs,<br>vs.<br>ARNOLD SCHWARZENEGGER, et al.,<br>    Defendants | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**PLAINTIFFS' TRIAL BRIEF**<br>**(E.D. Local Rule 16-285)** |

## I.  SCOPE OF PROCEEDINGS

This trial is solely about determining the appropriate remedy for the constitutional violations that the *Plata* and *Coleman* courts have found to exist.  Given this procedural posture, this proceeding does not involve proof of the existence of the constitutional violations, whether the *Plata* and *Coleman* courts have issued prior orders directed at remedying the violations, or whether defendants had a reasonable amount of time to comply with such orders.  Those are all conditions precedent to convening a three judge court.  18 U.S.C. § 3626(a)(3)(A).  The three judge court does not have jurisdiction to make determinations that must be made in the first instance by the presiding court in the underlying matters.  Now that the three judge court has been convened, it would be inappropriate to re-litigate these matters.

At issue in these proceedings are three questions: 1) whether crowding is the primary cause of the constitutional violations; 2) whether "no other relief" will remedy the constitutional violations; and 3) if plaintiffs have established these elements, what is the appropriate scope of the remedy (including giving substantial weight to whether any remedy would adversely impact public safety or the administration of a criminal justice system).  18 U.S.C. §§ 3626(a)(3)(A), (a)(1)(A).

## II.  POINTS OF LAW

The PLRA requires plaintiffs seeking a "prisoner release order" to make two showings.  Plaintiffs must demonstrate by clear and convincing evidence that 1) "crowding is the primary cause" of the constitutional violations (in this case, the rights to constitutionally adequate medical and mental health care), and 2) that "no other relief" will remedy the violations.  18 U.S.C. § 3626(a)(3)(E).  At trial in this matter, plaintiffs will demonstrate that these elements are met through the overwhelming evidence from the *Plata* Receiver and the *Coleman* Special Master, the experts (including defense experts), and voluminous documents created by defendants themselves.  We do not recount the items of proof here, as this matter has been extensively briefed, most recently in plaintiffs' opposition to defendants' motion for summary judgment. (*Plata* Docket No. 1522).

Following a finding that crowding is the primary cause of the violations and that no other relief will remedy the violations, the three judge court's next step will be to fashion a "prisoner release order" to remedy the violations.

The PLRA requires the court to take several factors into consideration in crafting the remedy. 18 U.S.C. §3626(a)(1)(A).  First, the relief must be "narrowly drawn," "extend[] no further than necessary to correct" the constitutional violations, and be "the least intrusive means necessary to correct the violation of the Federal right." *Id.*  Second, the court crafting the relief "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

### III.  RELIEF SOUGHT

The remedy plaintiffs seek is a court order that (1) requires defendants to reduce the population of CDCR institutions to 130% of the design capacity over a 2-year period; and (2) orders defendants to develop a population reduction plan within 30 days of the court's order to achieve that population level. The Population reduction plan should include the following:

1. Defendants should develop the population reduction plan in consultation with the parties.
2. The population reduction plan should include a plan for establishing, within 6 months of the court's order, maximum population levels for each CDCR institution such that the overall population across all CDCR institutions will not exceed 130% of design capacity at the end of the 2-year implementation period.
3. The population reduction plan should establish 6-month benchmarks for achieving progress toward reducing the prison population to 130% of design capacity over the two-year implementation period.
4. The population reduction plan should be designed to minimize any adverse impacts on public safety or the operation of a criminal justice system
5. The population reduction plan should not discriminate against mentally ill inmates.  The population reduction plan should include targeted policies and programs directed to the risks and needs of *Coleman* class members with special needs who may require additional services and programs to be successfully diverted from incarceration or to reenter their communities on parole.
6. If the parties are unable to reach an agreement on the population reduction plan, the court should hold a hearing to rule on any objections.

This remedy meets the constitutional and statutory mandates because it provides defendants themselves the opportunity to craft the relief. And as we discuss further below, the evidence will show that defendants can reduce their prison population without any adverse impact on public safety or criminal justice system operations.

## IV.  SAFE REDUCTION OF PRISON POPULATION

While plaintiffs propose that defendants be provided the first opportunity to craft a plan for reducing the prison population, plaintiffs' experts have demonstrated that it is possible to do so in a way that is responsible, gradual, and will improve public safety and have no adverse impact on the administration of a criminal justice system. Expert Reports of Dr. James Austin dated September 25, 2008 ("Austin 9/25/08 Report"), August 27, 2008 ("Austin 8/27/08 Report"), and August 15, 2008 ("Austin 8/15/08 Report"); Expert Report of Dr. Barry Krisberg ("Krisberg Report"); Expert Report of Dr. James Gilligan, M.D. ("Gilligan Report"); Expert Report of Joseph Lehman; Supplemental Expert Report of Jeanne Woodford dated August 15, 2008.[1]

Defendants' and defendant-intervenors' primary contention is that a plan that simply "opens the prison doors" and releases tens of thousands of inmate at once would be overwhelming and irresponsible. But there is no need for the population be reduced in such an abrupt and careless way.

Instead, plaintiffs' experts will demonstrate that defendants can safely reduce their prison population by 1) diverting from prison those parolees who are returned to prison for a short term because they violated technical parole rules; 2) diverting from prison certain low-risk offenders, and 3) reducing length of stay in prison by a few months by increasing "good time" credits for good behavior and/or participation in rehabilitative programs. Austin 8/15/08 Report at 20-35. These methods of reducing the prison population would only impact prisoners *who were about to be released*. In other words, defendants can reduce the prison population solely by diverting or shortening the length of stay for prisoners whom defendants would otherwise release shortly under current circumstances.

All of the methods for reducing the prison population that are described in Dr. Austin's report are also measures recommended by CDCR's own hand-picked "Expert Panel." Austin 8/15/08 Report at 21. Moreover, each of these methods has been proven to have no impact on recidivism. Reducing length of

---

[1] Copies of all expert reports cited herein were filed with the court on October 30, 2008.

Plaintiffs' Trial Brief
Case Nos. 90-00520; 01-1351                                3

1  stay in prison has no impact on recidivism rates, and persons who are diverted away from prison do not
2  have higher recidivism rates than persons who are incarcerated. Austin 8/15/08 Report at 26-28;
3  Krisberg Report at 4-11.

4  Furthermore, each of these population reduction methods has been *implemented successfully in*
5  *other jurisdictions*. They have been effective in reducing the prison population without having any
6  impact on crime rates. Krisberg Report at 4-18; Austin 8/15/08 Report at 11-20. Dr. Barry Krisberg
7  surveyed early release programs in Canada, nine states (including some of the largest states), and
8  numerous jurisdictions within California. Every jurisdiction studied implemented early release programs
9  and experienced no increase in recidivism or crime rates – indeed, both recidivism rates and crime rates
10 *declined* in some of the jurisdictions. Krisberg Report at 4-11.

11 Defendants and intervenors do not contest these facts, but they argue (incorrectly) that reducing
12 the prison population would increase crime rates because California has a high recidivism rate, and so a
13 large number of prisoners who are released will commit new crimes. But no additional crimes would be
14 committed as a result of a responsible population reduction. Austin Report 8/15/08 Report at 36-45;
15 Austin 8/27/08 Report at 1-5. California releases about 140,000 prisoners every year. Defendants can
16 reduce their prison population without releasing anyone who would not otherwise be released within a
17 few months. And it is uncontested that diversion programs and short reductions in length of time served
18 have no impact on recidivism. Thus, the likelihood of parolees committing crime remains the same
19 whether they are released as expected, or a few months earlier than expected. Reducing the prison
20 population will not result in any additional crimes. At most, it might affect the timing or circumstances
21 of crimes that are statistically likely to occur under the current system. But reducing the prison
22 population will not change the likelihood that any individual will be a victim of a crime.

23 Defendants and certain intervenors also vastly overstate the proportion of crime committed by
24 parolees. There is no data demonstrating the numbers of crimes committed by parolees (and no party
25 purports to present such data). However, there is data regarding the numbers of parolees who are
26 arrested, and the proportion of all arrests that are arrests of parolees. That data shows that parolees make
27 up less than 5% of all arrests. Austin 9/25/08 Report at 2. (Contrary to popular belief, only a tiny
28 fraction of offenders are "career criminals;" most commit very few offenses. *Id.* at 1-2.) Thus, if all new

parolees have the same arrest rate as the current parolees, a small, short-term increase in the overall number of parolees will not have any noticeable impact on arrests. Austin 8/15/08 Report at 36-44.

Because there will not be a measurable impact on crime or arrests, there will be no impact on the administration of local criminal justice systems. Certain intervenor-defendants express concern that reducing the prison population will overwhelm local police, prosecutors or courts. But that would only occur if there were an increase in crime. If crime rates remain the same, these impacts will not occur.

Defendants make inflammatory arguments about releasing mentally ill inmates. But mental illness by itself is not a significant predictor of violent recidivism. Gilligan Report at 18-26, ¶¶34-49. And in any event, mentally ill inmates are released every day under the current system, and there is no reason to suspect their recidivism rates would be different if they were diverted or released several months earlier. Moreover, under the current system, mentally ill prisoners are regularly "churned" through short-term incarcerations, which exacerbates mental illness. Gilligan Report at 6, ¶16(a). Diversion programs (which reduce the prison population) also reduce churning, and could therefore improve outcomes for mentally ill prisoners. Interrupting this destructive cycle of churning would not just be good for parolees, it is also essential for improving public safety, as recognized by defendants' own trial witnesses. *See* Trial Affidavit of Thomas Hoffman (*Coleman* Docket No. 3148) ¶ 6.

Several of the intervenors have taken the position that any adverse impacts from a prison population reduction could be mitigated by funding rehabilitative programs at the local level. They complain (and defendants echo this complaint) that currently there are insufficient resources in the communities to address the needs of parolees – too few programs providing job placement, housing, drug and alcohol addition treatment, mental health treatment, etc. According to both groups, the lack of such programs endangers public safety. But it is the state's responsibility to provide funding for such programs, and it is the state's failure to do so that has caused this dearth of programs. To the extent that the intervenors control the availability of funding as legislators, or its allocation as county officials, they share the responsibility for any dearth of programs. CDCR currently releases more than a hundred and thirty thousand people every year, including individuals who are drug addicted, mentally ill, or have

other needs, despite this dearth of resources.[2]  The Governor, as well as numerous other public officials, has proclaimed that protecting public safety is of paramount importance to the state.  Either the Governor does not believe that the rehabilitative programs actually protect the public safety, or he does not think that it is important.  Either way, it is a policy decision that the state has made, and that reflects the current state of affairs.

While creating and funding rehabilitative programs would *improve* outcomes, reducing the prison population without such programs in place will not *worsen* public safety.  It will merely perpetuate the status quo.

Nonetheless, reducing the prison population could generate a billion dollars in savings, which could be applied to create the needed programs both within prisons and in the communities.  For every reduction of ten thousand prisoners, the state will save more than $200,000,000.  Austin 9/25/08 Report at 3.  Defendants and intervenors can craft a population reduction plan that redirects these savings toward funding the programs that defendants and intervenors claim are necessary in order to protect the public from parolees.  Defendants' own hand-picked expert panel has provided them with a roadmap of programs and policies that could receive such diverted funding.  Austin 8/15/08 Report at 21.  Defendants' own experts have presented additional program alternatives that could receive such support if the funds were freed up by a reduction in the prison population.  *See* Declaration of Paul Mello Regarding Submission of Defendants' Expert Reports (*Coleman* Docket No. 3139), Exhibit A, Preliminary Report of Gale Bataille, MSW at 16-18, Exhibit B, Rebuttal Report of Gale Bataille at 10-11.

//
//
//
//
//

---

[2] No one argues that the necessary resources exist *inside* the prisons.  Indeed, the mental health care in prisons is unconstitutional, and the evidence will show that CDCR has no ability to provide the right rehabilitative programs to the right prisoners.

Thus, while plaintiffs will demonstrate that defendants can reduce the prison population without any impact on crime rates or the administration of a criminal justice system, plaintiffs will also show that if defendants devote the money they save to creating recidivism-reducing programs, a population reduction order could *improve* public safety and the administration of criminal justice systems throughout the state.

DATED: November 5, 2008

Respectfully submitted,

By: */s/ Rebekah Evenson*

Rebekah Evenson
Prison Law Office
Attorney for Plaintiffs in
*Plata v. Schwarzenegger*
and
*Coleman v. Schwarzenegger*