EDMUND G. BROWN JR.
Attorney General of California
ROCHELLE C. EAST
Senior Assistant Attorney General
DANETTE E. VALDEZ
Supervising Deputy Attorney General
ZACKERY P. MORAZZINI
Deputy Attorney General
KENNETH T. ROOST
Deputy Attorney General
WILLIAM C. KWONG, State Bar No. 168010
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5724
  Fax:  (415) 703-5843
  E-mail:  William.Kwong@doj.ca.gov
*Attorneys for State Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **MARCIANO PLATA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ARNOLD SCHWARZENEGGER, et al.,**<br><br>Defendants. | C 01-01351 TEH<br><br>**DEFENDANTS' MOTION:**<br><br>1) **TO REPLACE THE RECEIVER WITH A SPECIAL MASTER AND, DURING THE TRANSITION, TO ESTABLISH A PROCESS TO ENSURE THE RECEIVER'S COMPLIANCE WITH STATE AND FEDERAL LAW; and**<br><br>2) **TO TERMINATE THE RECEIVER'S CONSTRUCTION PLAN**<br><br>Date:          March 9, 2009<br>Time:          10:00 a.m.<br>Courtroom: 12<br>Judge          The Honorable Thelton E. Henderson<br>Action Filed:  April 5, 2001 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

STATEMENT OF THE ISSUES TO BE DECIDED................................................. 3

STATEMENT OF RELEVANT FACTS ................................................................. 3

    I.    THE RECEIVER IS SPENDING VAST SUMS TO DEVELOP THE NATION'S BEST AND MOST EXPENSIVE PRISON HEALTH CARE SYSTEM.. ....................................... 3

    II.    THE RECEIVER'S CONSTRUCTION PLAN GOES FAR BEYOND CURING CONSTITUTIONAL DEFICIENCIES. ................................................................. 7

ARGUMENT ....................................................................................................... 9

    I.    THE PLRA'S LIMITS ON THE COURT'S REMEDIAL AUTHORITY HAVE BEEN IGNORED IN THIS CASE.................................................................................... 9

    II.    THE RECEIVERSHIP SHOULD BE REPLACED WITH A SPECIAL MASTER. ..................... 10

        A.    The PLRA permits the appointment of a special master to monitor constitutional compliance, but not a receiver to take over prison operations with a blank check. ................................................................ 10

        B.    The receiver's pursuit of a state-of-the-art prison health care system violates the PLRA. .................................................................................. 11

        C.    During the requested transition from the receiver to a special master, the court should establish a formal process to allow the state to participate in, review, and object to the receiver's activities. ............... 13

    III.    THE RECEIVER'S CONSTRUCTION PLAN MUST BE TERMINATED BECAUSE IT VIOLATES THE PLRA. ....................................................................................... 14

        A.    The PLRA precludes the court from ordering the construction of prisons. ...................................................................................................... 14

        B.    The receiver's construction plan does not comport with the limited relief authorized under the PLRA. .............................................................. 17

            1.    The Court Has Not Made the Findings Required to Support Ordering the Receiver's Construction Plan................................... 17

            2.    The Construction Plan Does Not Constitute the Minimum Relief Necessary to Cure Any Constitutional Violation. .............. 18

CONCLUSION .................................................................................................. 20

i

Defs.' Mot. to Replace the Receiver with a Special Master & Terminate the Construction Plan    (C 01-01351 TEH)

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Cabazon Band of Mission Indians v. Wilson*
    37 F.3d 430 (9th Cir. 1994).................................................................................. 16

5

6

*Cason v. Seckinger*
    231 F.3d 777 (11th Cir. 2000).......................................................................... 10, 17

7

8

*Castillo v. Cameron County*
    238 F.3d 339 (5th Cir. 2001)............................................................................ 10, 17

9

*Estelle v. Gamble*
    429 U.S. 97 (1976)................................................................................................ 12

10

11

*Farmer v. Brennan*
    511 U.S. 825 (1994).............................................................................................. 12

12

13

*Gilmore v. California*
    220 F.3d 987 (9th Cir. 2000)................................................................. 9, 10, 15, 17

14

*Hoptowit v. Ray*
    682 F.2d 1237 (9th Cir. 1982).............................................................................. 12

15

16

*Jones v. Wittenberg*
    330 F. Supp. 707 (D.C. Ohio 1971) ..................................................................... 15

17

18

*Lewis v. Casey*
    518 U.S. 343 (1996).............................................................................................. 14

19

*Miller v. French*
    530 U.S. 327 (2000)................................................................................... 10, 15, 16

20

21

*Missouri v. Jenkins*
    515 U.S. 70 (1995)................................................................................................ 14

22

23

*Padgett v. Stein*
    406 F. Supp. 287 (D.C. Pa. 1975) ........................................................................ 15

24

*Reece v. Gragg*
    650 F. Supp. 1297 (D. Kan. 1986) ....................................................................... 15

25

26

27

28

ii

# TABLE OF AUTHORITIES
**(continued)**

**Page**

**STATUTES**

United States Code, Title 18

§ 3626 .............................................................................................................. 9, 15

§ 3626(a)(1)(A) ..................................................................................................... 19

§ 3626(a)(1)(A), (a)(1)(C), (f) .............................................................................. 10

§ 3626(a)(1)(c) ................................................................................................. 15, 16

§§ 3626(a), (b), (e) and (f) ..................................................................................... 1

§ 3626(f) .......................................................................................................... 10, 20

§ 3626(f)(6)(c) ...................................................................................................... 10

§ 3626(g)(8) .......................................................................................................... 10

Business and Professions Code

§ 19605.7 .............................................................................................................. 16

§ 19606.5 .............................................................................................................. 16

§ 19606.6 .............................................................................................................. 16

**CONSTITUTIONAL PROVISIONS**

Eighth Amendment ......................................................................................... 3, 12, 18

**COURT RULES**

Federal Rule of Evidence

Rule 201 .................................................................................................................. 5

Federal Rules of Civil Procedure

Rule 53 .................................................................................................................. 10

Rule 60 .................................................................................................................... 1

TO ALL PARTIES AND THEIR COUNSEL:

PLEASE TAKE NOTICE that at 10:00 a.m. on March 9, 2009, or as soon thereafter as the matter may be heard in this Court, Defendants will move this Court pursuant to Rule 60 of the Federal Rules of Civil Procedure and 18 U.S.C §§ 3626(a), (b), (e) and (f) for:

(1) an order ending the Receivership following a period during which the Receiver's control is transitioned back to the State and appointing a Special Master and, during the transition, an order establishing a formal process to ensure that the State has a meaningful opportunity to participate, review, and object to the Receiver's activities and to ensure that the Receiver complies with state and federal law, including the Prison Litigation Reform Act (PLRA); and

(2) an order terminating the Receiver's plans to construct prison healthcare facilities at a cost of approximately $8 billion, as contemplated in Goal 6 of his Turnaround Plan of Action and as proposed more specifically in his Facility Program Statement (collectively, "the Receiver's Construction Plan"), and related expenditures, because the plan fails to comply with the limitations on prospective relief set forth in the PLRA.

**INTRODUCTION**

Defendants bring this motion to end the Receivership and replace it with a Special Master, and to terminate the Receiver's proposed Construction Plan.  The Receivership must end because 1) the PLRA permits the appointment of a Special Master but not a Receiver; and 2) the Receiver is violating the PLRA by pursuing the wrong goal (creating an extravagant prison health care system instead of one that simply satisfies the Constitution) and doing it in an improper manner (failing to proceed in the least intrusive means possible).  Defendants seek to terminate the Receiver's proposed $8 billion Construction Plan because it also violates the PLRA, which bars federal courts from ordering  prison construction and from imposing remedies that, like the Construction Plan, exceed the minimum necessary to cure the federal violation.

Rather than ensuring, in the least intrusive manner, that Defendants are no longer deliberately indifferent to prisoners' serious medical needs, the Receiver is spending exorbitant sums to create a medical care system that exceeds industry standards and provides more than medical care.  Since the inception of the Receivership, California has nearly doubled its spending

1

1   on inmate health care: from $1.252 billion, or $7,601 per inmate, in fiscal year 2005-2006, to

2   $2.249 billion, or approximately $13,778 per inmate, in fiscal year 2007-2008. The State's 2008-

3   2009 inmate health care budget is $2.193 billion, or $13,887 per inmate. In addition to this direct

4   inmate health care spending, California has spent over $74 million to date on the Receiver's

5   operations to fund the Receiver's administrative functions. The Receiver's excess does not end

6   with his inmate health care spending and administrative costs, though. It extends to the size,

7   design, services and cost of his proposed new health care facilities. In the Receiver's own words,

8   his Construction Plan calls for the building of seven new facilities with space that would equal

9   "70 Wal-Marts." Those facilities—ostensibly designed purely for medical care—feature yoga

10  rooms, regulation-sized basketball courts with electronic bingo boards and bleachers, and

11  landscaped courtyards for reflection and meditation. They also provide visiting areas, academic

12  education and administration, libraries, business services, executive conference facilities, food

13  services and laundry services. If financing costs are included in the price tag, the cost of the $8

14  billion Construction Plan balloons to $16 billion. Estimated annual operating costs of these seven

15  new facilities will be approximately $230,000 per inmate annually.

16      The Receivership is unaccountable and has entirely displaced all state control over the

17  prison health care system, with no end in sight, and the time has come to replace the Receiver

18  with a Special Master to evaluate Defendants' current state of compliance with federal law. At

19  the very least, during the transition, a formal process should be established to ensure that the State

20  has a meaningful opportunity to participate in, review, and object to the Receiver's activities. In

21  addition, the Receiver's massive Construction Plan should be terminated. This relief is required

22  to satisfy Congress's goals in enacting the PLRA to prevent judicial micromanagement of state

23  prison systems and to restore control to elected and appointed state officials who are accountable

24  to taxpayers.

25      In bringing this motion, Defendants are mindful that the Receivership was established to

26  resolve constitutional deficiencies that the Court determined were not being effectively remedied

27  by the State. Defendants were hopeful that a Receivership might provide an effective mechanism

28  to bring about constructive and necessary reform. And by many measures, the Receivership has

2

Defs.' Mot. to Replace the Receiver with a Special Master & Terminate the Construction Plan   (C 01-01351 TEH)

1   helped:  in the last three years, significant improvements in prison health care have been

2   achieved.  But in implementing these improvements, the Receiver failed to focus on the proper

3   goal (ensuring that Defendants are no longer deliberately indifferent) or to do so in the proper

4   manner (by the least intrusive means).  Instead, the Receiver ignored these limits, and spent and

5   continues to spend massive sums in an unaccountable manner to create one of the most expensive

6   prison health care systems in the nation.  The Receiver's utopian system must now end.  Time has

7   come for the authority over prison health care to transition back to the State.

8   **STATEMENT OF THE ISSUES TO BE DECIDED**

9       1.   Whether the Receivership should be ended because the PLRA contemplates

10  only the appointment of a Special Master, and the Receivership in this case has ignored the limits

11  on its authority by implementing reforms that extend further than necessary, are not narrowly

12  tailored, and are not the least intrusive means of correcting violations of federal rights.

13      2.   Whether an order should be entered providing for a process during the

14  transition to ensure that the State has a meaningful opportunity to participate, review, and object

15  to the Receiver's activities and to ensure the Receiver's actions and proposed actions comply with

16  state and federal law, including the PLRA.

17      3.   Whether the Receiver's Construction Plan, and related expenditures, should be

18  terminated because it fails to comply with the limitations on prospective relief set forth in the

19  PLRA.

20  **STATEMENT OF RELEVANT FACTS**

21  **I.   THE RECEIVER IS SPENDING VAST SUMS TO DEVELOP THE NATION'S BEST AND
22  MOST EXPENSIVE PRISON HEALTH CARE SYSTEM.**

23      The Court established the Receivership to help Defendants provide "only the minimum

24  level of medical care required under the Eighth Amendment."  (Stipulation for Injunctive Relief

25  3.)  Among the Court's findings leading to the Receivership are that the CDCR lacked an

26  adequate system for screening prisoners' health care needs; failed to provide access to general,

27  specialty, and emergency care; failed to provide sufficient and competent medical staff; and

28  lacked an organized, standardized, accurate, and thorough medical record keeping system.  (*See*

3

Court's Findings of Fact re Appointment of Receiver 5-27.)  The totality of these findings delineates the scope of the Receiver's charge.

The first Receiver was appointed almost three years ago, in February 2006.  The Court vested the Receiver with all of the CDCR Secretary's powers over prison medical care, and directed the Receiver to develop a sustainable system that provides constitutionally adequate medical care.  (*See* Order Appointing Receiver 1-2, 4.)  The Court replaced the first Receiver with the current Receiver, Clark Kelso, in January 2008, and, together with the federal district court judges overseeing litigation pending against the State regarding dental care, mental health care, and the Americans with Disabilities Act, gave the Receiver authority to coordinate the construction of new prison health care facilities to provide medical, dental and mental health care.

California has since spent a staggering amount of money improving its prison health care system.  (*See* Receiver's Seventh Quarterly Report 7; Ninth Quarterly Report 25, 29, noting improved health care screening to identify inmate medical needs and better access to quality general and specialty care to treat those needs.)  In fact, the State increased spending on inmate health care from $1.252 billion, or $7,601 per inmate, in fiscal year 2005-2006, to $2.249 billion, or approximately $13,778 per inmate, in fiscal year 2007-2008, an 81% increase.  (Trial Affidavit of Todd Jerue 4 (from Three-Judge Court).)  By comparison, Florida expects to spend $4,330 per inmate on health care in 2008-2009; the Federal Government spent $4,413 per inmate in 2007; and New York expects to spend $5,813 per inmate in 2008-2009.  (Decl. Jarvis Supp. Defs.' Mot. Replace Receiver with Special Master & Terminate Construction Plan (Jarvis Decl.) 2-3.)  And a single person outside of the prison system in California paid an average of $4,482 in 2007 for healthcare coverage.  Diana Diamond, *California Health Care Insurance Costs Escalating*, Healthcare Journal of Northern California, available at http://healthcarejournalnorcal.com/news/2008/03/california_health_care_insuran.shtml (last accessed Jan. 27, 2009).

In addition to the State's over $2 billion current annual spending on inmate health care, the State and its taxpayers have spent in excess of $74 million to date to fund the Receiver's efforts to develop a prison health care model based not on the constitutional minimum criteria but instead

4

1   on "long term compassionate relationships between patients and their clinicians."   (Decl. Hill

2   Supp. Receiver's Supplemental Application No. 8 for Order Waiving State Contracting Statutes,

3   Regulations and Procedures (Hill Decl.) 2.)  The Receiver's expenses amounted to over $51

4   million in 2007-2008.  (Decl. Kwong Supp. Defs.' Mot. Replace Receiver with Special Master &

5   Terminate Construction Plan (Kwong Decl.), Ex. A.)  Expenses for the first two months of the

6   current fiscal year total over $11 million.  (*See* Receiver's Ninth Quarterly Report, Exs. 24 and

7   25.)

8         Salaries and other compensation for the Receiver and his staff accounted for over $13

9   million of the Receiver's expenses through August 2008.  (Kwong Decl. Ex. A.)  The first

10  Receiver, Robert Sillen, was paid a total of $775,790 from April 2006 through June 2007.

11  Matthew L. Cate, *California Prison Health Care Receivership - Review of Disbursements April*

12  *2006 through June 2007*, Office of the Inspector General, 11.  His Chief of Staff, John Hagar,

13  was paid $605,526, at $250 per hour, for the same period.  (*Id.* at 13.)  Defendants are unaware of

14  Mr. Hagar's current compensation but understand that his $250 hourly rate remains unchanged.

15  The current Receiver, Clark Kelso, receives a salary of $224,000.  Tim Reiterman, *Ex-Prison*

16  *Healthcare Receiver's Staff Was Well Paid*, L.A. Times, accessible at

17  http://articles.latimes.com/2008/feb/28/local/me-prisons28 (last accessed January 27, 2009).

18        The Receiver's staff, which operates in effect as a separate, independent state agency,

19  includes planners, architects, engineers, and support personnel, as well as correctional and clinical

20  professionals, advisers, and lawyers.  (Receiver's Facility Program Statement – Third Draft (FPS

21  Third Draft), at Introduction 3-6 (under Federal Rule of Evidence 201, this Court can take judicial

22  notice of the Receiver's documents, which are available at http://www.cprinc.org).)  This staff

23  also includes a large team that would run the Receiver's proposed new health care facilities,

24  duplicating major administrative functions handled currently within the CDCR.  In addition to the

25  Receiver's independent staff, the Receiver controls over 12,000 CDCR medical and

26  administrative personnel.   (Decl. Kernan Supp. Defs.' Mot. Replace Receiver with Special

27  Master & Terminate Construction Plan (Kernan Decl.) 7-8.)

28

5

Defs.' Mot. to Replace the Receiver with a Special Master & Terminate the Construction Plan   (C 01-01351 TEH)

1    The Receiver's organizational and reporting structure deprives the CDCR Secretary of

2    control over the CDCR staff and access to essential information about the current status of the

3    State's prison health care system.  Even worse, the Receiver has flatly refused to provide relevant

4    information when asked for it.  For example, the Receiver rejected Defendants' informal request

5    for information surrounding inmate deaths that the Receiver contends were "preventable" or

6    "possibly preventable."  (Decl. Gilevich Supp. Defs.' Mot. Replace Receiver with Special Master

7    & Terminate Construction Plan (Gilevich Decl.) 2.)  Needless to say, this information is critical in

8    evaluating whether progress is being made.  Without specific information, Defendants are left to

9    simply assume that substantial progress is being made based on other reports of "dramatic

10   decreases" in inmate deaths.  (*See*, *e.g.*, Hill Decl. 2.)

11   The Receiver's excessive control extends to inmate custody.   He has precluded the CDCR

12   from transferring inmates to out-of-state prisons by requiring, yet refusing to provide, pre-transfer

13   health care screenings.  (*See* Kernan Decl. 3.)  He also has begun (1) monitoring the delivery of

14   health care provided to California inmates already transferred to out-of-state prisons; (2) requiring

15   expensive changes to that health care; (3) threatening to return those inmates transferred out of

16   state, based on his independent determination, in the absence of any judicial finding, that the out-

17   of-state health care is constitutionally infirm; and (4) indicating that he will monitor private in-

18   state prisons housing California inmates.  (*Id.* at 5.)

19   In addition to this overbroad control and profligate spending, the Receiver has ignored the

20   State's escalating $40 billion budget deficit and continues to develop state-of-the-art health care

21   plans with complete disregard for their cost.  (Decl. Hysen Supp. Defs.' Mot. Replace Receiver

22   with Special Master & Terminate Construction Plan (Hysen Decl.) 5.)  That disregard is

23   evidenced by his remark that the State's financial situation is "unfortunate," but irrelevant.  (*See*

24   Receiver's Mot. to Hold Defs. in Contempt and to Compel Funding 18.)

25

26   **II.    THE RECEIVER'S CONSTRUCTION PLAN GOES FAR BEYOND CURING
     CONSTITUTIONAL DEFICIENCIES.**

27   The Receiver plans to spend $8 billion to construct seven new prison facilities to house

28   10,000 health care beds ("the Receiver's Health Care Expansion Program") and to construct and

6

1   renovate space at all 33 existing prisons ("the Receiver's Health Care Facility Improvement

2   Program").  (Hysen Decl. 2-4.)  Construction of the new facilities will result in 7 million square

3   feet of new medical facilities – the equivalent of 70 Wal-Mart stores.  (Receiver's Mot. to Hold

4   Defs. in Contempt and to Compel Funding 10.)  The CDCR estimates that financing will bring

5   the cost of the Receiver's planned construction to $14 billion, and that operating costs for the new

6   facilities will add $2.3 billion per year.  (Hysen Decl. 4.)  The CDCR can only estimate those

7   operating costs because the Receiver has not provided an operating budget.  (*Id.*)

8          The Receiver has produced multiple versions of the 600+ page Facility Program Statement

9   that defines the scope of his Construction Plan.  He issued the Second Draft of the Statement in

10  July 2008 and continues to rely on that Second Draft to support his motion to compel Defendants

11  to fund his Construction Plan.  He published a Third Draft in November 2008, but has refused

12  Defendants' request to identify any differences in the Second and Third Drafts.  At least some

13  differences between the two seem to be merely semantic.  The Second Draft's yoga room, for

14  example, appears in the Third Draft as an exercise room "programmed for other therapeutic

15  activities to promote wellness."

16         The Facility Program Statement is another illustration of the Receiver's mistaken view of

17  his mission.  It demonstrates plainly that his Plan extends far beyond satisfying the constitutional

18  requirement that the State not act with deliberate indifference to inmates' serious medical needs:

19  "[E]very aspect of the delivery of health and mental health services [must] take into account the

20  objective of returning the inmate to a condition that prepares him or her to return to general

21  custody or to be released to the community."  (FPS Third Draft, at Facility Development 1.)  It

22  goes on to say that the "overarching value that has defined every effort to define constitutional

23  minimum levels of care has been:  the [proposed new facility] is a health care facility that cares

24  for prisoners as patients and not a prison that cares for health care needs as inmates."  *Id.*

25         To further the Receiver's vision that inmates should be treated more as patients rather than

26  prisoners, the proposed design requires particular scale, materials, and color, and the use of trees

27  and other landscaped areas, to minimize the "institution-like" appearance of the facilities.  (*See*

28  FPS Third Draft, at Facility Development 2-3.)  It requires that, "in the place of sterile prison

7

1   corridors of barren large scale 'yards', both staff and patient [ ] experience landscaped courtyards

2   and places of rest and respite between buildings."  The design's recreational and therapeutic

3   requirements include exercise/workout rooms and space for yoga, horticulture, music therapy,

4   board games, and stress reduction; a gymnasium; handball courts; and a regular-size basketball

5   court equipped with an electronic bingo-type board and bleacher seating.  (*See* FPS Third Draft,

6   at Functional Narrative 154-55.)

7        In addition to exceeding the constitutional standard, the design's departure from an

8   "institution-like" appearance to achieve the Receiver's "health-focused mission" presents clear

9   security risks.  It allows for and promotes freedom of movement in an open, "mall-based"

10  environment with unlocked rooms, doors made of wood, open-dorm settings and common areas.

11  This type of open setting is simply not appropriate in a prison due to the very nature of the inmate

12  population, which includes violent offenders who pose serious safety risks.  (Hysen Decl. 6.)

13  Inmates should be suitably housed for their security classification, including placement in secured

14  cells.  (*Id.*)  In addition, the design's secure perimeter remains in the background with a relatively

15  unobtrusive entry to minimize its intrusiveness into the community.  But a visibly secure

16  perimeter operates as the primary physical barrier between the inmate population and the

17  community and is a critical component of prison security.  (*See id.*)

18       The Facility Program Statement also requires many facilities and services that not only lack

19  a connection to constitutional standards, but also duplicate facilities and services that already

20  exist.  (Hysen Decl. 7.)  These include general visiting areas; operational, administrative and

21  education administration; academic, therapeutic and vocational education; religious programs;

22  general and legal libraries; business services; executive conference facilities; food services;

23  "healthy choice" canteen services; staff dining; and laundry services.  (*See* FPS – Third Draft, at

24  Facility Development 2-7, Functional Narrative 18-22, 147, 158, 161, 171, 179 and 202-203.)

25       The Receiver's Construction Plan is exorbitant in cost, exceeds any remedy necessary to

26  cure constitutional deficiencies, poses significant security risks, and includes programs and

27  services that duplicate those already provided by the CDCR.   It accordingly should be

28  terminated.

8

1

**ARGUMENT**

2    **I.     THE PLRA'S LIMITS ON THE COURT'S REMEDIAL AUTHORITY HAVE BEEN**

3            **IGNORED IN THIS CASE.**

4            The PLRA restricts the ability of federal courts to order prospective relief in prison

5    condition cases, such as this one. *See* 18 U.S.C. § 3626.  In passing the PLRA, Congress

6    recognized that the complexities of operating prisons are not readily susceptible to resolution by

7    court decree, but require deference to the expertise of prison administrators.  *See Gilmore v.*

8    *California*, 220 F.3d 987, 991, 996-97 (9th Cir. 2000) (quoting *Procunier v. Martinez*, 416 U.S.

9    396, 404-05 (1974)).  It accordingly enacted the PLRA to limit federal court oversight and

10   micromanagement of state prisons, to preclude federal courts from imposing remedies intended to

11   effect an overall modernization of local prison systems or to provide an overall improvement in

12   prison conditions, and to restore control over those prisons to the states.  *Gilmore*, 220 F.3d at

13   997, n.11 (quoting H.R. Rep. No. 104-21, at 24 n. 2 (1995)); *id.* at 996 (PLRA sponsors decried

14   "overzealous Federal courts . . . micromanaging our Nation's prisons," and "judicial orders

15   entered under Federal law [which] have effectively turned control of the prison system away from

16   elected officials accountable to the taxpayer, and over to the courts." (quotation marks omitted)).

17   The PLRA reflects this intent by limiting prospective relief to the minimum necessary to correct

18   violations of federal rights and by requiring that such prospective relief give substantial weight to

19   any adverse impact on public safety or criminal justice caused by such remedies.  *Gilmore*, 220

20   F.3d at 997.

21           The PLRA restricts judicial authority in three ways relevant to this motion:  (1) it limits

22   federal courts' authority to appoint any person to exercise the quasi-judicial powers of the court

23   during the remedial phase of litigation; (2) it prohibits federal courts from ordering the

24   construction of prisons; and (3) it limits federal courts' authority to grant prospective relief to

25   only that which is narrowly drawn, extends no further than necessary and is the least intrusive

26   means necessary to correct the violation of a federal right.  18 U.S.C. § 3626(a)(1)(A), (a)(1)(C),

27   (f); *see Miller v. French*, 530 U.S. 327, 333 (2000).  In addition, it requires that, before ordering

28   prospective relief, courts make "[p]articularized findings, analysis, and explanations . . . as to the

9

1    application of each criteria to each requirement" imposed by its provisions.  *Cason v. Seckinger*,

2    231 F.3d 777, 785 (11th Cir. 2000); *see also Castillo v. Cameron County*, 238 F.3d 339, 354 (5th

3    Cir. 2001).  These mandatory findings must be made based on the current record, and cannot be

4    based on prior findings.  *See Gilmore*, 220 F.3d at 1010; *Cason*, 231 F.3d at 784-85.  These limits

5    have not been observed in this case.

6    **II.    THE RECEIVERSHIP SHOULD BE REPLACED WITH A SPECIAL MASTER.**

7        **A.    The PLRA Permits the Appointment of a Special Master to Monitor
              Constitutional Compliance, but Not a Receiver to Take Over Prison
8             Operations with a Blank Check.**

9        The PLRA limits federal courts' authority to appoint any person to exercise the quasi-

10   judicial powers of the court during the remedial phase of litigation.  18 U.S.C. § 3626(f).  It

11   allows for the appointment of only a special master with specific, limited powers.  *Id.*  Congress

12   defined the term "special master" as "any person appointed by a Federal court pursuant to Rule

13   53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to

14   exercise the powers of a master, regardless of the title or description given by the court."  18

15   U.S.C. § 3626(g)(8).  The PLRA limits a special master's powers to conducting hearings,

16   preparing proposed findings of fact, and simply assisting in the development of remedial plan.  18

17   U.S.C. § 3626(f)(6)(c).  These limited powers apply even if the person appointed by and relied

18   upon to monitor or review compliance with court-ordered relief is titled or described by the court

19   as a receiver.  H.R. Rep. No. 21, 104th Cong., 1st Sess. (1995), WL 56410, at *28 ("limitation . . .

20   on . . . use of masters is intended to apply to anyone relied on by the court to make factual

21   findings or to monitor or review compliance with, enforcement of, or implementation of a consent

22   decree or of court-ordered relief").

23       Rather than appointing a special master in this case, the Court created the Receivership,

24   which completely removed control over inmate medical care from the State and placed it in the

25   hands of an unelected and unaccountable person.  That transfer of absolute authority contravenes

26   the letter and intent of the PLRA, as well as principles of federalism and separation of powers.

27   The Receiver was given the power to "control, oversee, supervise, and direct all administrative,

28   personnel, financial, accounting, contractual, legal, and other operational functions of the medical

1   delivery component of the CDCR." (*See* Order Appointing Receiver 2.)  And he was given

2   "independence as an arm of the federal courts," so that he and his staff have the status of officers

3   and agents of, and are vested with the same immunities as, this Court.  (Order Appointing New

4   Receiver 5-6.)

5        The Receiver has exercised this broad authority in direct conflict with the PLRA's

6   limitations.  He has resisted fiscal and other accountability, even while California faces an

7   unprecedented and potentially catastrophic $40 billion deficit.  (Hysen Decl. 5.)  He has withheld

8   critical information from Defendants, such as information supporting his findings that certain

9   inmate deaths were "preventable" or "possibly preventable."  (Gilevich Decl. 2.)  He refused to

10  make available for public scrutiny the Second Draft of his Facility Program Statement, until it

11  became expeditious for him to do so for his own purposes.  (*See* Receiver's Opp'n Defs.' Admin.

12  Mot. Lift Confidentiality Designation on Receiver's Facility Program Statement, Second Draft;

13  *but see* Facility Program Statement, Second Draft (publicly available at http://www.cprinc.org).)

14  And he has pursued a state-of-the-art medical care model and extravagant $8 billion prison

15  construction plan that lack any nexus to the constitutional standard of providing medical care free

16  from deliberate indifference, and that do not represent the minimum relief necessary to cure any

17  such deficiency.

18       The Court's broad grant, and the Receiver's even broader exercise of power conflicts with

19  the limited authority of special masters under the PLRA to conduct hearings, make findings of

20  fact and assist in developing remedial plans, and accordingly should end.

21       **B.    The Receiver's Pursuit of a State-of-the-Art Prison Health Care System**
22  **            Violates the PLRA.**

23       The Receivership should be ended because the Receiver has grossly exceeded the limits of

24  his lawful charge:  to ensure only that Defendants are not deliberately indifferent to inmates'

25  medical care and to do so in as minimally intrusive a manner as possible.  The Constitution does

26  not require that the State provide exceptional medical care.  Rather, the Eighth Amendment's ban

27  on cruel and unusual punishment requires that prison officials not act with "deliberate

28  indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Prison

11

1    officials do not act with deliberate indifference unless they both know of and disregard an

2    excessive risk to inmate health.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  Deliberate

3    indifference thus includes an objective and a subjective component.  Objectively, the alleged

4    deprivation of care must be "sufficiently serious" and rise to the level of an "unnecessary and

5    wanton infliction of pain."  *Id.*; *Estelle*, 429 U.S. at 104.  Subjectively, prison officials must act

6    with a "sufficiently culpable state of mind," knowing that an inmate faces a substantial risk of

7    serious harm, yet disregarding that risk "by failing to take reasonable measures to abate it."

8    *Farmer*, 511 U.S. at 847.

9        The Eighth Amendment thus does not require the most-desirable level, nor even a high

10   professional standard, of care.  *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).  Neither a

11   lack of ordinary due care, negligence, malpractice, gross medical malpractice, nor even civil

12   recklessness (failure to act in the face of an unjustifiably high risk of harm that is so obvious that

13   it should be known) constitutes an Eighth Amendment violation.  *Farmer*, 511 U.S. at 835.

14   Nothing less than recklessness in the criminal sense—disregard of a risk of which one is actually

15   aware—establishes such a violation.  *Id.* at 839.  Accordingly, where officials demonstrate

16   reasonable efforts to abate problems, they have not acted with a "sufficiently culpable state of

17   mind."  *Id.* at 837, 847.

18       Accordingly, the question here is whether California prison officials have made reasonable

19   efforts to abate the identified constitutional deficiencies.  (*See* Court's Findings of Fact re

20   Appointment of Receiver 5-27.)  Defendants have made not only reasonable, but extensive,

21   efforts to abate these problems.  Rather than blindly assuming, as the Receiver seems to, that the

22   Defendants continue to act with deliberate indifference, the Court should carefully evaluate and

23   measure the state of Defendants' compliance in accordance with the PLRA's standards.  Such an

24   evaluation will demonstrate that the Defendants have cooperated with the Receiver and have

25   approached prison medical care deficiencies with concern, as is evidenced by the State's

26   substantial increase in inmate health care spending and the dramatic reduction, by the Receiver's

27   own account, of preventable inmate deaths.  (Hill Decl. 2.)

28

12

Not only is the Receiver's lawful goal only to ensure that Defendants are no longer deliberately indifferent to inmates' serious medical needs, but he must also achieve this goal in the least intrusive means possible.  On their face, the Receiver's extravagant health care model and Construction Plan, and his large staff and $74 million in administrative expenses, are manifestly not the least intrusive means to satisfy constitutional requirements.  On the contrary, they amount to a full-scale takeover of the State's prison health care delivery system for the indefinite future at escalating and indefinite costs that far exceed what is necessary to cure any specific violations.  The return of control of the prison health care system to the State and appointment of a special master to conduct hearings, make findings of fact and assist in developing remedial plans represents a far less intrusive remedy than the Receivership.  The appointment of a special master is expressly authorized under the PLRA, and would strike a proper balance between the Court's need to monitor compliance with its orders and assist in the development of remedial plans necessary to cure any remaining violations, without improperly intruding on the State's sovereignty.

C.  **During the Requested Transition from the Receiver to a Special Master, the Court Should Establish a Formal Process to Allow the State to Participate in, Review, and Object to the Receiver's Activities.**

Defendants believe that the law requires that authority over the prison health system be transitioned back to the State, and furthermore request that a formal process be established to allow the State to participate in, review, and object to the Receiver's activities, and to otherwise ensure that his remedies comport with the PLRA.  Defendants propose a process that substantially conforms to the one set forth in Defendants' Proposed Order, filed concurrently.

Although the Receiver has invited some participation from Defendants in the development of his plans, he has made it abundantly clear that he does so only on his terms and will not alter his course even in the face of the State's reasonable objections.  Rather than re-evaluating his $8 billion Construction Plan in response to Defendants' legitimate concerns about the Plan's scope in light of California's $40 billion budget deficit, the Receiver responded by seeking to hold the Defendants in contempt.  In addition, he continues to monitor and require expensive changes to medical care provided by out-of-state prison facilities housing California inmates, in the absence

13

1   of any judicial finding that any of those facilities provides constitutionally inadequate medical

2   care.  Furthermore, the Receiver refused to provide Defendants with information regarding

3   "preventable" and "possibly preventable" inmate deaths that this Court has identified as critical in

4   determining Defendants' constitutional compliance.  (Gilevich Decl. 2.)

5          Principles of federalism require the Court to institute a process for Defendants to review the

6   Receiver's plans.  These principles limit courts' equity powers and require this Court to exercise

7   great restraint before intruding into the proper sphere of the State.  *Missouri v. Jenkins*, 515 U.S.

8   70, 131 (1995).  When federalism is accorded its proper respect, "Article III cannot be understood

9   to authorize the Federal Judiciary to take control of core state institutions like prisons . . . and

10  assume responsibility for making the difficult policy judgments that state officials are both

11  constitutionally entitled and uniquely qualified to make."  *Lewis v. Casey*, 518 U.S. 343, 385

12  (1996) (Thomas, J., concurring).  Here, the Receiver has usurped the State's authority over its

13  own policy and budgetary decisions regarding prison medical care and prison construction.

14         In sum, the PLRA and principles of comity, federalism, and separation of powers require a

15  process by which the Receiver must provide the State with information (including objective

16  benchmarks and outcome measures) sufficient for the State to evaluate any proposed plan, its

17  scope and costs.  The process must include an opportunity for the State to have meaningful input

18  into and to challenge, before the Court, the Receiver's plans and funding requests.  A transparent

19  and comprehensive process that includes these important features will allow the Receiver, the

20  Court and the parties to arrive at remedies that are authorized under the PLRA and conducive to

21  the ultimate transition of authority back to the State.

22  **III.   THE RECEIVER'S CONSTRUCTION PLAN MUST BE TERMINATED BECAUSE IT
         VIOLATES THE PLRA.**

23

24         **A.     The PLRA Precludes the Court from Ordering the Construction of Prisons.**

25         The PLRA prohibits courts from ordering the construction of prisons:  "Nothing in this

26  section shall be construed to authorize the courts, in exercising their remedial powers, to order the

27  construction of prisons . . . ."  18 U.S.C. § 3626(a)(1)(c).  Notwithstanding this restriction, the

28  Receiver has sought a court order to compel Defendants to fund the construction of extravagant

14

1   new prison facilities at a staggering cost to California taxpayers.  The Receiver contends that the

2   PLRA does not prohibit a court from ordering prison construction where necessary to correct

3   violations of federal law, but provides only that nothing in section 3626 shall be construed to

4   authorize such construction.  (Receiver's Reply re Mot. Hold Defs. in Contempt and to Compel

5   Funding 16.)  This argument must fail because it ignores Congress's intent to curb federal courts'

6   equitable discretion to end judicial micromanagement of prisons and restore control to the states.

7   *Gilmore*, 220 F.3d at 999.  It also must fail because it lacks the support of any independent

8   authority allowing the Court to order prison construction.  18 U.S.C. § 3626(a)(1)(c).

9        To begin with, it is doubtful that federal courts had equitable authority to order prison

10   construction even before the PLRA was passed.  Prior to the PLRA's enactment, many federal

11   courts noted that their power did not extend to ordering prison construction to remedy

12   constitutional violations.  *See Reece v. Gragg*, 650 F. Supp. 1297, 1306 (D. Kan. 1986) ("Even if

13   this Court could order a new jail built, it would not do so.  A decision such as that is a decision to

14   be made by the political process, not by judicial fiat."); *Padgett v. Stein*, 406 F. Supp. 287, 303

15   (D.C. Pa. 1975) ("this court lacks the power to order public funds expended to build a new

16   prison"); *Jones v. Wittenberg*, 330 F. Supp. 707, 712 (D.C. Ohio 1971) (holding that the court has

17   no power to require the public to fund new jails).

18        But even if federal courts once had the power to order prison construction, that power was

19   curtailed by the passage of the PLRA.  The Supreme Court confirmed in *Miller v. French*, 530

20   U.S. 327, 340-41 (2000), that Congress intended to limit sharply the scope of federal courts'

21   equitable authority in ordering prospective relief.  At issue in *Miller* was section 3626(e)(2),

22   which provides that "[a]ny motion to modify or terminate prospective relief made under

23   subsection (b) shall operate as a stay," such that while a motion to terminate prospective relief is

24   pending, the relief at issue is stayed.  The Supreme Court rejected the Government's argument

25   that the district court retained traditional equitable authority to stay the operation of the PLRA's

26   stay.  In doing so, the Court concluded that, given Congress's intent to curb the equitable

27   discretion of the district courts, it would have been anomalous for Congress to have left section

28   3626(e)(2) vulnerable to that very same discretion.  *Miller*, 530 U.S. at 340-41.

15

Defs.' Mot. to Replace the Receiver with a Special Master & Terminate the Construction Plan   (C 01-01351 TEH)

1  In enacting section 3626(a)(1)(C), Congress intended to restrict the scope of district courts'

2  equitable powers to order the construction of prisons. Subsection (a)(1)(C) expressly references

3  courts' remedial powers, indicating that Congress fully intended to limit courts' equitable

4  authority in ordering prospective relief. Moreover, as in *Miller*, Congress's intent to restrict

5  federal courts from using their equitable powers to order the construction of prisons is evident

6  from the PLRA's statutory scheme. It would be nonsensical for Congress to prohibit the

7  construction of prisons under the PLRA and provide limitations on other prospective relief in

8  subsection (a)(1)(A)-(B), but to nevertheless contemplate that district courts could use their

9  inherent equitable authority to circumvent these limitations.

10  Finally, Defendants note that this Court has previously relied on *Cabazon Band of Mission*

11  *Indians v. Wilson*, 37 F.3d 430 (9th Cir. 1994), for the proposition that the PLRA, while not

12  providing the Court with authority to order prison construction, does not itself prohibit the Court

13  from ordering prison construction. (*See* Order Denying Stay 11). Such a reading of *Cabazon* is

14  misplaced.

15  In *Cabazon*, the issue was whether a state had the power to levy a tax on activities

16  occurring on an Indian reservation. *Cabazon*, 37 F.3d at 432. But there, the general power of

17  states to levy taxes was well-established, separate and apart from the federal Indian Gaming

18  Regulatory Act. Indeed, California law expressly authorized the state to impose the tax at issue

19  through Business and Professions Code §§ 19605.7, 19606.5, 19606.6. *Id.* Thus, the court

20  simply interpreted the federal Indian Gaming Regulatory Act as not revoking a state's well-

21  established (and statutorily authorized) power to impose taxes where there was no evidence of

22  Congressional intent to the contrary.

23  Here, in stark contrast to *Cabazon*, there is no express state or federal statutory authority

24  empowering the federal courts to order the construction of prisons. Indeed, as discussed above,

25  there appears to be a notable absence of such authority. Through Section 3626(a)(1)(C),

26  Congress was clear that such judicial authority was prohibited by the PLRA. Thus, no such

27  authority exists.

28

**B.    The Receiver's Construction Plan Does Not Comport with the Limited Relief Authorized under the PLRA.**

**1.    The Court Has Not Made the Findings Required to Support Ordering the Receiver's Construction Plan.**

Even if the PLRA were interpreted not to preclude courts from ordering prison construction, this Court lacks the authority to order the Receiver's proposed Construction Plan because the Court has failed to make, and, as argued below, cannot make, the required findings that the Construction Plan complies with the limited relief authorized under the PLRA.  Although this Court has contended that it made the required PLRA findings by repeatedly stating that the Receiver's generally stated Turnaround Plan of Action is necessary to remedy constitutional violations in this case, the PLRA requires more.  (Order Denying Defs.' Mot. Stay Oct. 27, 2008 Order 12.)  Conclusory statements that the PLRA's requirements are met are insufficient.  "Particularized findings, analysis, and explanations should be made as to the application of each criteria to each requirement" imposed by the PLRA, and those findings must be made based on the current record, and cannot be based on prior findings.  *See Cason v. Seckinger*, 231 F.3d 777, 785 (11th Cir. 2000); *Castillo v. Cameron County*, 238 F.3d 339, 354 (5th Cir. 2001); *Gilmore*, 220 F.3d at 1010.

In its order approving the general goals stated in the Receiver's Turnaround Plan of Action, the Court stated only that it "finds the plan's six strategic goals to be necessary to bring California's medical health care system up to constitutional standards, and the Court is satisfied that the objectives and action items identified in the plan will help the Receivership achieve those six goals."  (*See* Order Approving Receiver's Turnaround Plan of Action 3-4.)  The Court did not find that the construction goals outlined in the Turnaround Plan of Action are narrowly drawn (nor could they be given that that they were just general goals), or that they extend no further than necessary, or that they are the least intrusive means of remedying an existing constitutional violation.  Indeed, the Court's statements fail to identify any nexus between the construction goals and any specific, existing violation.  The Court's statements are plainly too conclusory and unsubstantiated to meet the PLRA's fact-finding standards to ensure that the prospective relief embodied in the construction goals complies with PLRA limits.

17

1    Moreover, the Court's statements addressed only the Receiver's Turnaround Plan of Action

2    and did not consider the Receiver's subsequently produced 600+ page Facility Program

3    Statement.  Goal 6 in the Turnaround Plan of Action identified only a general need to provide

4    clinical, administrative, and housing facilities.  The comprehensive details in the Facility Program

5    Statement, though, demonstrate that the Receiver designed the proposed new prison facilities to

6    improve overall living conditions within the prison facilities rather than cure any specific,

7    existing Eighth Amendment violations.  Because the Court has never made any findings

8    regarding specific remedies outlined in the Facility Program Statement, the Receiver's

9    Construction Plan must be terminated.

10          **2.     The Construction Plan Does Not Constitute the Minimum Relief
                     Necessary to Cure Any Constitutional Violation.**
11

12    It takes no more than a cursory review of the Receiver's Construction Plan to conclude that

13    it fails to satisfy the PLRA's limits.  The Receiver plans to spend $8 billion to construct 7 million

14    square feet of new medical facilities—the equivalent of 70 Wal-Mart stores—to house 10,000

15    health care beds, and to construct and renovate space at all 33 existing prisons.  (Receiver's Mot.

16    to Hold Defs. in Contempt and to Compel Funding 10.)  Financing could bring the total cost of

17    construction to $16 billion, and operating costs could add up to $2.3 billion, or $230,000 per

18    inmate, annually.  (Hysen Decl. 4.)

19    These staggering construction and operating costs constitute only one measure of the Plan's

20    gross excess.  The Plan's design philosophy stands as another:  "[E]very aspect of the delivery of

21    health and mental health services [must] take into account the objective of returning the inmate to

22    a condition that prepares him or her to return to general custody or to be released to the

23    community."  (FPS Third Draft, at Facility Development 1.)  The Facility Program Statement's

24    interpretation of the applicable constitutional standard represents yet another:  the "overarching

25    value that has defined every effort to define constitutional minimum levels of care has been:  the

26    [proposed new facility] is a health care facility that cares for prisoners as patients and not a prison

27    that cares for health care needs as inmates."  *Id.*

28

Defs.' Mot. to Replace the Receiver with a Special Master & Terminate the Construction Plan    (C 01-01351 TEH)

1     Thus, far from being limited to the minimum relief necessary to cure any constitutional

2   violation, the Receiver's Construction Plan seeks overall improvements in prison living

3   conditions and lacks a nexus to curing any specific violations.  The plan requires specific scale,

4   materials, and color, and the use of landscaping, to minimize the institution-like appearance of the

5   new facilities.  It mandates landscaped courtyards and places of rest and respite between buildings

6   for staff and inmates.  It includes yoga rooms and space for horticulture, music therapy, board

7   games, and stress reduction; gymnasiums, handball courts, and basketball courts.  It also

8   duplicates and expands non-medical facilities and services already provided by the CDCR in its

9   existing facilities, such as general visiting areas; operational, administrative and education

10   administration; academic and vocational education; religious programs; general and legal

11   libraries; business services; executive conference facilities; food services; "healthy choice"

12   canteen services; staff dining; and laundry services.  (*See* FPS – Third Draft, at Facility

13   Development 2-7, Functional Narrative 18-22, 147, 158, 161, 171, 179 and 202-203.)  As such, it

14   goes further than necessary, is not narrowly drawn, and is not the least intrusive means available

15   to correct existing constitutional violations.  18 U.S.C. § 3626(a)(1)(A).

16     In addition, the design's departure from an "institution-like" appearance to achieve the

17   Receiver's "health-focused mission" presents clear security risks.  Freedom of movement in the

18   open, "mall-based" environment, with its unlocked rooms, wood doors, and open-dorm settings

19   and common areas is inappropriate in a prison housing violent offenders who pose serious safety

20   risks.  (Hysen Decl. 6.)  Inmates should be placed in housing suitable for their security

21   classification, including cells, in accordance with department regulations.  (*Id.*)  The design's

22   secure perimeter, which should operate as the primary physical barrier between inmates and the

23   community, but instead has a relatively unobtrusive entry designed to minimize its intrusiveness

24   into the community, likewise poses real security risks.  (*See id.*)  The PLRA's requirement that

25   substantial weight be given to these security risks also mandates the Plan's termination.  18

26   U.S.C. § 3626(a)(1)(A).

27

28

**CONCLUSION**

Based on the legal and factual analysis above, Defendants request that this Court end the Receivership following a transition period during which the Receiver's duties are returned to the State.  Defendants request that a structured review-and-approval process be established to ensure that all of the Receiver's actions strictly comply with state and federal law, including the PLRA, during the transition period.  Defendants further request that a special master be appointed under 18 U.S.C § 3626(f).  Finally, Defendants request that the Receiver's Construction Plan, as detailed in his Turnaround Plan of Action and Facility Program Statements, be terminated.

Dated:  January 28, 2009                                      Respectfully Submitted,

                                                             EDMUND G. BROWN JR.
                                                             Attorney General of California



                                                             /s/ Rochelle C. East
                                                             ROCHELLE C. EAST
                                                             Senior Assistant Attorney General
                                                             *Attorneys for Defendants*

CA2001CS0001
20176243.docx

Defs.' Mot. to Replace the Receiver with a Special Master & Terminate the Construction Plan    (C 01-01351 TEH)