1

2          IN THE UNITED STATES DISTRICT COURTS

3          FOR THE EASTERN DISTRICT OF CALIFORNIA

4          AND THE NORTHERN DISTRICT OF CALIFORNIA

5     UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

6        PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

7

8    RALPH COLEMAN, et al.,

9                        Plaintiffs,

10                  v.                          NO. CIV S-90-0520 LKK JFM P

11   ARNOLD SCHWARZENEGGER,                     **THREE-JUDGE COURT**
     et al.,
12
                         Defendants.
13

14   MARCIANO PLATA, et al.,

15                        Plaintiffs,

16                  v.                          NO. C01-1351 TEH

17   ARNOLD SCHWARZENEGGER,                     **THREE-JUDGE COURT**
     et al.,
18                                              TENTATIVE RULING
                         Defendants.
19

20

21        Having heard the evidence and arguments presented by the parties and intervenors, we

22   will now make a tentative ruling.  Although it will take the Court some time to review all the

23   evidence that has been presented and to issue a final opinion, we have decided to make this

24   tentative ruling in order to give the parties notice of the likely nature of that opinion, and to

25   allow them to plan accordingly.[1]  (The term parties as used throughout shall, where

26   appropriate, include the intervenors.)

27   _____

28        [1] Although we refer to the evidence in the record in this tentative ruling, we continue
     to reserve final rulings on all of the outstanding evidentiary objections.

We tentatively conclude the following:

**1.**     First, plaintiffs have presented overwhelming evidence that crowding is the primary cause of the underlying constitutional violations.  No party contests that California's prisons are overcrowded, however measured, and whether considered in comparison to prisons in other states or jails within this state.  There are simply too many prisoners for the existing capacity.  The Governor, the principal defendant, declared a state of emergency in 2006 because of the "severe overcrowding" in California's prisons, which has caused "substantial risk to the health and safety of the men and women who work inside these prisons and the inmates housed in them."  Pls.' Exh. P-1.  A state appellate court upheld the Governor's proclamation, holding that the evidence supported the existence of conditions of "extreme peril to the safety of persons and property."  *CCPOA v. Schwarzenegger*, 163 Cal. App. 4th 802, 818 (Cal. App. Ct. 2008).  The Governor's declaration of the state of emergency remains in effect to this day.  Moreover, in the underlying cases, the court found that the States have failed to deliver constitutionally adequate mental or physical healthcare.  Those determinations have not been questioned in the courts that made those findings, nor has there been an appeal of those orders.

Under these circumstances, the disagreement between the parties cannot be  whether overcrowding in California's prisons exists or whether that condition constitutes extreme peril to health and safety.  Rather it is whether overcrowding is the "primary cause" of the State's inability to provide constitutionally adequate medical care and mental health care to its prisoners.  We agree with the defendants that "primary cause" means the "chief, principal, or root" cause.  We also agree that the delivery of constitutional medical and mental health care in prisons is a complicated and "polycentric" problem.  As we have stated before, however, we believe that a polycentric problem can have a primary cause – a cause that underlies and affects nearly every dimension of the problem and that in this case must be substantially mitigated before the constitutional failure can be resolved.

Evidence offered at trial was overwhelmingly to the effect that overcrowding is the primary cause of the unconstitutional conditions that have been found to exist in the

2

1   California prisons.  There is, for example, uncontroverted evidence that, because of

2   overcrowding, there are not enough clinical facilities or resources to accommodate inmates

3   with medical or mental health needs at the level of care they require.  There is also

4   uncontroverted evidence that, because of overcrowding, there are not enough clinical or

5   custodial personnel to ensure that inmates with medical or mental health needs are receiving

6   appropriate treatment, are taking the medications that they need to take, are being escorted to

7   their medical appointments in a timely manner, and are having their medical information

8   recorded and filed properly.  Additionally, as the Governor has stated, and as the California

9   appellate court has found, overcrowded conditions – the use of triple bunks in gymnasiums

10  and other areas not intended to be used for housing, for example – have "substantially

11  increased the risk of the transmission of infectious illnesses among inmates and prison staff."

12  *CCPOA*, 163 Cal. App. 4th at 819-20.

13          Almost every expert who testified in the first phase of the trial identified

14  overcrowding as the main cause of the prison system's constitutionally inadequate medical

15  and mental health care and as the problem that must be fixed before constitutionally adequate

16  care can be delivered.  Among the experts was Ms. Jeanne Woodford, the former acting

17  Secretary of the California Department of Corrections and Rehabilitation, who testified that it

18  is impossible to get inmates necessary mental health treatment and health care exams when

19  operating in the overcrowded setting of California's prisons.  Experts with correctional

20  experience in states ranging from Texas and Pennsylvania to Maine and Washington testified

21  to similar effect.  Even defendants' expert, Dr. Ira Packer, agreed that the primary cause of

22  the inadequacy in mental health care is that there are not enough mental health resources for

23  the population. He also concluded in his expert report that crowding is the primary cause of

24  the problems at the reception centers.

25          The defendants argue that the work of the Receiver and the Special Master has

26  significantly improved the conditions in the prisons, and that with more time the Receiver

27  and California Department of Corrections and Rehabilitation (sometimes referred to as

28  CDCR), as monitored by the Special Master, can remedy the constitutional violations

1   without decreasing the prison population.  Although we agree that the Receiver and the
2   Special Master have succeeded in improving some of the conditions in the prisons, no party
3   has argued before the *Plata* or the *Coleman* courts that the unconstitutional conditions have
4   abated.  The Special Master stated that although much has been achieved in the past eleven
5   years, "many of these achievements have succumbed to the inexorably rising tide of
6   population."  Pls.' Exh. P-35.  The Receiver stated in a letter to the Governor and legislators
7   dated July 24, 2006, that "[i]t will not be possible to raise access to, and quality of, medical
8   care to constitutional levels with overpopulation at its current levels."  Pls.' Exh. P-55.  In
9   addition, of course, the Receiver's ability to help ameliorate the overcrowding is currently
10  seriously threatened by the defendants' actions to cut off his funding and terminate the
11  receivership.

12  **2.**      Second, the evidence is compelling that there is no relief other than a prisoner release
13  order that will remedy the unconstitutional prison conditions.  As defined in the PLRA, other
14  "relief" refers only to relief other than a prisoner release order "that may be granted or
15  approved by the court."  18 U.S.C. § 3626(g)(9).  We would be remiss, however, if we did
16  not take note at the outset of this section that California, like most other states, is in the
17  throes of an unprecedented economic crisis and that the budgetary implications are of the
18  most serious order.  There are simply no additional funds that are currently being made
19  available by the State to deal with the critical problem created by prison overcrowding.

20          The two cases underlying this three-judge proceedings have been in the federal courts
21  for a very long time: *Coleman* has been in its remedial stage since 1995, and *Plata*, since
22  2002.  The respective district courts have entered a number of orders short of a prisoner
23  release order aimed at remedying the constitutional violations.  In *Coleman*, the court has
24  entered at least 77 substantive orders to defendants since 1996, including the order
25  appointing the Special Master.  Order, *Coleman v. Schwarzenegger*, 2007 WL 2122636, *2
26  (E.D. Cal. July 23, 2007).  In *Plata*, the defendants' failure to bring the prison system into
27  constitutional compliance, despite reasonable opportunity to do so, compelled the court to
28  appoint a Receiver.  *See* Findings of Fact and Conclusions of Law Re Appointment of

4

1    Receiver, *Plata v. Schwarzenegger*, 2005 WL 2932253, *27 (N.D. Cal. Oct. 3, 2005).  In

2    granting the motion to convene this panel, both courts concluded that these orders for "less

3    intrusive relief" had failed to remedy the unconstitutional conditions.

4         The defendants argue that the Receivership and the Special Master's monitoring

5    efforts constitute other "relief" short of a prisoner release order that could remedy the

6    constitutional violations.  But the defendants have opposed the Receiver's work in *Plata* and

7    are seeking the dissolution of the Receivership.  They have also been unable to bring their

8    mental health care delivery system into constitutional compliance at any point in the past

9    fourteen years.  Moreover, as stated in the defendants' motion before the *Plata* court,

10   "California faces an unprecedented and potentially catastrophic $40 billion deficit."  Defs.'

11   Motion 1) To Replace Receiver with a Special Master, and 2) To Terminate the Receiver's

12   Construction Plan at 11, Jan. 28, 2009 (Docket # 2039).   Even if it were possible for the

13   construction and renovation projects to proceed despite this deficit, they would take many

14   years to complete.  As the *Coleman* and *Plata* plaintiffs have been denied their constitutional

15   rights for fourteen and seven years, respectively, the plaintiffs cannot be compelled to await

16   the outcome of the efforts of the Receiver, the Special Master, and/or the State for an

17   indeterminable additional number of years.

18        Given that the *Coleman* and *Plata* courts have entered a number of remedial orders,

19   we are at a loss to imagine what "other relief" short of a prisoner release order a court could

20   grant.  A "prisoner release order" is defined broadly in the PLRA as "any order . . . that has

21   the purpose *or effect* of reducing or limiting the prison population, or that directs the release

22   from or nonadmission of prisoners to a prison."  18 U.S.C. §3626(g)(4) (emphasis added).

23   Many of the forms of relief that defendants and intervenors suggest, like parole reform, good

24   time credits, and evidence-based programming intended to reduce recidivism, are designed to

25   "reduc[e] the prison population" and thus fall under the PLRA's definition of a "prisoner

26   release order."  Others, like the implementation of the construction program contemplated by

27   AB900, may not be within the court's general powers under the PLRA.  Other forms of relief

28   suggested by various participants are without adequate evidentiary support or appear

5

infeasible as well as incapable of curing the violations presently existing in the California prison system. We therefore tentatively conclude that there is no relief other than a prisoner release order that can remedy the constitutionally inadequate medical and mental health care in California's prisons.

**3.**      When Congress enacted the PLRA, it contemplated that the federal courts would impose prisoner release orders only in limited circumstances. Congress, however, did not prohibit such orders, recognizing that they would, in some cases, be the appropriate and indeed the only available remedy for unconscionable and unconstitutional conditions in the nation's prisons. Given the clear and convincing evidence presented here that crowding is the primary cause of the constitutional violations and that no other relief will remedy those violations, we tentatively conclude that the PLRA gives us the authority to issue a "prisoner release order" to reduce the overcrowding in California's prisons.

The more difficult question, in the Court's view, is the maximum level of crowding at which the State could provide constitutionally adequate care. The evidence presented provides a range of asserted operational capacities for California's prisons. We heard testimony from law enforcement intervenors that their jails begin to experience problems when the population is over 100% of design capacity. We received evidence that the Independent Review Panel chaired by former Governor Deukmejian recommended 145% of design capacity as the outside limit for California prisons generally, although that number assumed an end to the use of all non-traditional beds in programming spaces and did not specifically address services for the mentally and physically ill. We received evidence that AB 900 Facility Strike Team leader Deborah Hysen recommended that the population in any new facilities constructed under AB 900 be limited to 130% of design capacity. Plaintiffs' experts generally agreed with that number as appropriate for California prisons in general. We also heard from Dr. Pablo Stewart, a mental health expert, that some specialized clinical programs should operate at or below 100% of design capacity. In contrast, as of August 2008, California's prisons were operating at close to 200% of design capacity.

//

6

1      Although the evidence may be less than perfectly clear, it appears to the Court that in

2  order to alleviate the constitutional violations California's inmate population must be reduced

3  to at most 120% to 145% of design capacity, with some institutions or clinical programs at or

4  below 100%. We caution the parties, however, that these are not firm figures and that the

5  Court reserves the right – until its final ruling – to determine that a higher or lower figure is

6  appropriate in general or in particular types of facilities.

7  **4.**      The PLRA directs the Court to give "substantial weight" to any "adverse impact on

8  public safety or the operation of a criminal justice system," before issuing a prisoner release

9  order. The parties and the Court have therefore dedicated a significant portion of the trial to

10  this issue. It appears to us tentatively that on the basis of the evidence, a prison cap at 120%

11  to 145% of capacity, with some institutions or clinical programs at or below 100%, could be

12  achieved without an adverse effect on public safety. Dr. James Austin, for example, testified

13  that such a population reduction could be implemented without adversely affecting public

14  safety by adopting a combination of parole reform, diversion of low risk prisoners with short

15  sentences, and good time credits. Other evidence introduced at trial also supported the view

16  that earned credits and parole reform would have little effect on public safety, and that

17  earned credits may even improve safety by encouraging prisoners to participate in

18  rehabilitation programs. Evidence-based rehabilitative programming could also benefit

19  public safety by reducing recidivism. But such programming cannot be delivered given the

20  present state of overcrowding.

21      Many of these reform measures are also supported by the State and by state officials

22  with a commitment to ensuring public safety. The report of CDCR's Expert Panel on Adult

23  Offender Recidivism Reduction Programming recommended a combination of earned credits

24  and parole reform that would reduce the prison population by about 40,000 prisoners. The

25  Governor supported a similar set of reform measures in his 2008-2009 and 2009-2010

26  proposed budgets, and the legislature passed a bill containing similar measures in

27  //

28  //

1    December of 2008.[2]  We cannot believe that such support would exist if the adoption of such

2    measures would adversely affect public safety.  We thus infer from the universal official

3    support for these measures that they are not likely to result in adverse public safety

4    consequences.

5            The counties argue that they do not have enough funding to provide released prisoners

6    with appropriate programming for reentry into the community.  This, however, appears to be

7    an existing problem regardless of whether the prisoners are released under the current regime

8    or pursuant to the reform measures.  More important, the Expert Panel found that, if CDCR

9    were to adopt the recommended combination of earned credits and parole reform, it could

10   save $803 to $906 million annually.  These savings could be diverted from the current prison

11   budget to fund community based programming, which would allow the communities to

12   continue and expand the programs that they have described to the Court.  We also note, for

13   the benefit of the defendants, that, according to the Expert Panel's recommendation, even if a

14   portion of the savings from population reduction is diverted to new investments in

15   community and prison programming, California could still save between $561 and $684

16   million a year.  It appears from these figures that the State could easily fully fund all the

17   community rehabilitative and other programs that would implement the recommendations of

18   its own experts without expending any funds other than those regularly provided in the

19   prisons budget.

20           We emphasize that a "prisoner release order" is a broad term that is not limited to the

21   generic "early release" program that many witnesses for the defendants and defendant-

22   intervenors oppose.  A prison cap of 120% or 145% of design capacity (or somewhere in

23   between) could be achieved through reform measures that would not adversely affect public

24   safety, and might well have a positive effect.  This is particularly true considering that

25   //

26   _____

27       [2]These documents have been presented to the Court as part of Plaintiffs' January 23,
     2009 Request for Judicial Notice.  The Court does not now rule on Plaintiffs' request.
28   However, we note that we will consider any legislative enactments or proposals by the
     Governor as relevant evidence in these proceedings.

1   California's overcrowded prison system is itself, as the Governor as well as experts who have

2   testified before the Court have recognized, a public safety hazard.

3   **5.**      Under the PLRA, any prisoner release order that we issue will be narrowly drawn,

4   extend no further than necessary to correct the violation of constitutional rights, and be the

5   least intrusive means necessary to correct the violation of those rights.  For this reason, it is

6   our present intention to adopt an order requiring the State to develop a plan to reduce the

7   prison population to 120% or 145% of the prison's design capacity (or somewhere in

8   between) within a period of two or three years.  The State has a number of options, including

9   reform of the earned credit and parole systems, that would serve to reduce the population of

10  the prison to whatever percentage is ultimately determined to be appropriate without

11  adversely affecting public safety.  It could also use the savings that will result from the

12  implementation of a population cap to provide for any increased burdens on the counties.  In

13  fact, a roadmap for this type of comprehensive plan has already been laid out by CDCR's

14  Expert Panel.  This would, of course, not in any way preclude the State from constructing

15  more facilities in the future so that its prisons could hold more inmates.  We tentatively

16  conclude, given the evidence presented to this Court, that an order imposing a cap on the

17  prison population and requiring the State to adopt a course of action to reduce overcrowding

18  is warranted, and that it is authorized under the PLRA.

19          The Court may hold a final hearing prior to issuing its final order.  It will in any event

20  ask the parties and intervenors to submit written proposals setting forth the specific

21  percentages and dates that they believe should be incorporated into the order regarding the

22  ultimate population cap and compliance date, as well as any interim percentages and dates

23  they believe the Court should include in the order.  The State will also be asked to specify at

24  that time, or before, the measures it intends to adopt to ensure compliance in a manner that

25  will best accomplish the objectives of the order, including ensuring public safety.  Comments

26  by the plaintiffs and intervenors as to these measures are invited.

27          Prior to the issuance of a final order the State and the plaintiffs, as well as any

28  intervenors who choose to participate, are encouraged to engage in discussions regarding

9

1    joint recommendations with respect to all or any of the above matters as well as with respect

2    to a settlement of all or any part of the dispute at issue in this proceeding.  In any event, the

3    State is directed to consult with the plaintiffs and the intervenors as to any proposed course

4    of action that would serve to reduce the prison population.  The Court will accept reports by

5    the participants regarding any settlement that the plaintiffs are prepared to enter into with the

6    defendants as well as with any intervenors who elect to join such settlement.

7          The parties and intervenors individually are each requested to advise the Court within

8    10 days of this tentative ruling whether they would like the assistance of a court-appointed

9    settlement referee to aid in their discussions and, if so, whether they would have any

10   objection to the appointment of the prior settlement referees Justice Elwood Lui and Justice

11   Peter Siggins for that purpose.

12

13   **IT IS SO ORDERED.**

14

15   Dated:   02/09/09                          _____/s/_____
                                               STEPHEN REINHARDT
16                                             UNITED STATES CIRCUIT JUDGE
                                               NINTH CIRCUIT COURT OF APPEALS
17

18

19   Dated:   02/09/09                          _____
                                               LAWRENCE K. KARLTON
20                                             SENIOR UNITED STATES DISTRICT JUDGE
                                               EASTERN DISTRICT OF CALIFORNIA
21

22

23   Dated:   02/09/09                          _____
                                               THELTON E. HENDERSON
24                                             SENIOR UNITED STATES DISTRICT JUDGE
                                               NORTHERN DISTRICT OF CALIFORNIA
25

26

27

28

                                               10