JAMES J. BROSNAHAN (34555)
GEORGE C. HARRIS (111074)
STUART C. PLUNKETT (187971)
EVI SCHUELLER (237886)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
Telephone:  (415) 268-6000
Facsimile: (415) 268-7522
jbrosnahan@mofo.com
gharris@mofo.com
splunkett@mofo.com
eschueller@mofo.com

MARTIN H. DODD (104363)
JAMIE L. DUPREE (158105)
FUTTERMAN & DUPREE LLP
160 Sansome Street, 17th Floor
San Francisco, California 94104
Telephone:  (415) 399-3840
Facsimile:  (415) 399-3838
martin@dfdlaw.com
jdupree@dfdlaw.com

Attorneys for Receiver
J. Clark Kelso

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, et al., | Case No.   C01-1351 TEH |
| Plaintiffs, | |
| v. | **RECEIVER'S OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE THE RECEIVERSHIP AND THE RECEIVER'S CONSTRUCTION PLANS** |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants. | |
| | Date:        March 16, 2009 |
| | Time:        10:00 a.m. |
| | Ctrm.:        12 |
| | Judge:        The Honorable Thelton E. Henderson |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 2

    A.    Inaction by the State Following the 2002 and 2004 Consent Orders Led to a Crisis Requiring the Appointment of a Receiver ................................................. 2

    B.    The Receiver Has Pursued Construction Plans With the Full Knowledge and Endorsement of Defendants ................................................................................ 3

    C.    The Three-Judge Court Impaneled Pursuant to the PLRA Has Found, in a Tentative Ruling, Current and Ongoing Constitutional Violations ........................ 5

ARGUMENT ............................................................................................................................. 6

I.    DEFENDANTS FAIL TO PROVIDE ANY BASIS FOR TERMINATION OF THE RECEIVERSHIP ......................................................................................................... 6

    A.    The PLRA Does Not Prohibit the Appointment of Receivers ................................ 6

        1.    Defendants' New Interpretation of the PLRA Lacks any Basis in the Statute or Case Law ...................................................................... 6

        2.    Construing the PLRA To Forbid the Appointment of a Receiver Would Render the Statute Unconstitutional.................................................. 9

        3.    Defendants Have Expressly Conceded that the PLRA Permits the Appointment of Receivers................................................................... 10

    B.    Defendants Provide No Other Basis for Termination of the Receivership .......... 10

        1.    Subsequent to Filing Their Motion, Defendants Conceded They Do Not Seek Termination of the Receivership So Long as the PLRA Permits Appointment of Receivers ........................................................... 10

        2.    Defendants Failed to Provide Any Evidence that Would Justify Termination of the Receivership ................................................................ 11

            a.    Defendants Do Not Dispute that Unconstitutional Conditions Persist in Prison Healthcare ............................................. 11

            b.    Defendants Have Failed To Establish that the Receivership Is No Longer Necessary, or that Less Intrusive Means Exist To Remedy the Ongoing Constitutional Violations ................................. 13

        3.    Defendants' Accusations Against the Receiver Are False....................... 15

II.    DEFENDANTS FAIL TO PROVIDE ANY BASIS FOR TERMINATION OF THE RECEIVER'S "CONSTRUCTION PLAN"............................................................. 17

    A.    Defendants' Motion Should Be Denied Because the Court Has Not Ordered as Prospective Relief the "Construction Plan" that Defendants Challenge ...................................................................................................................... 17

    B.    To The Extent Defendants Challenge Goal 6 of the TPA, Termination Is Improper Because the TPA Was Adequately Supported By Findings Under the PLRA........................................................................................................................ 18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**
**(continued)**

Page

C.    Nothing Subsequent to the Court's Approval of Goal 6 of the TPA Justifies Its Termination ................................................................................................. 20

    1.    Defendants Have Not Met Their Burden of Demonstrating that Termination of the "Construction Plan" Is Justified ................................. 21

    2.    An Evidentiary Hearing Would Be Needed To Make Any Updated Findings Under the PLRA Regarding the "Construction Plan" ............... 22

D.    The PLRA Does Not Prohibit Orders that Implicate Construction ....................... 23

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page(s)**

*Bell v. Hood*,
   327 U.S. 678 (1946) ................................................................................................. 9, 10

*Benjamin v. Fraser*,
   343 F.3d 35 (2d Cir. 2003) .................................................................................. 7, 8, 15

*Bullcreek v. Nuclear Reg. Comm.*,
   359 F.3d 536 (D.C. Cir. 2004) ..................................................................................... 24

*Cabazon Band of Mission Indians v. Wilson*,
   37 F.3d 430 (9th Cir. 1994) ................................................................................... 23, 24

*Cason v. Seckinger*,
   231 F.3d 777 (11th Cir. 2000) ..................................................................................... 19

*Castillo v. Cameron County*,
   238 F.3d 339 (5th Cir. 2001) ................................................................................. 19, 23

*Crain v. Bordenkircher*,
   376 S.E.2d 140 (W. Va. 1988) ....................................................................................... 6

*Dickerson v. United States*,
   530 U.S. 428 (2000) ...................................................................................................... 25

*Dixon v. Barry*,
   967 F. Supp. 535 (D.D.C. 1997) .................................................................................... 6

*Feliciano v. Rullan*,
   378 F.3d 42 (2004) ............................................................................................. 11, 14, 15

*Feliciano v. Serra*,
   300 F. Supp. 2d 321 (D.P.R. 2004) ................................................................ 11, 14, 15, 20

*Gilmore v. California*,
   220 F.3d 987 (9th Cir. 2000) ................................................................................. passim

*Hadix v. Caruso*,
   2007 U.S. Dist. LEXIS 15605 (W.D. Mich. Mar. 6, 2007) .................................... 24

*Hadix v. Caruso*,
   465 F. Supp. 2d 776 (W.D. Mich. 2006) .................................................................... 12

*Handberry v. Thompson*,
  446 F.3d 335 (2d Cir. 2006) ............................................................... 8

*Inmates of D.C. Jail v. Jackson*,
  158 F.3d 1357 (D.C. Cir. 1998) ......................................................... 8

*Jones v. Wittenberg*,
  330 F. Supp. 707 (N.D. Ohio 1971) ................................................ 24

*Miller v. French*,
  530 U.S. 327 (2000) ......................................................................... 25

*NAACP v. Duval County Sch.*,
  273 F.3d 960 (11th Cir. 2001) ......................................................... 12

*Newman v. State of Alabama*,
  466 F. Supp. 628 (M.D. Ala. 1979) ................................................. 6

*Reece v. Gragg*,
  650 F. Supp. 1297 (D. Kan. 1986) ................................................. 24

*Rissetto v. Plumbers & Steamfitters Local 343*,
  94 F.3d 597 (9th Cir. 1996) ........................................................... 10

*Russell v. Rolfs*,
  893 F.2d 1033 (9th Cir. 1990) ........................................................ 10

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ........................................................................ 6


**STATUTES**

18 U.S.C.
  § 3626(a)(1)(C) ..................................................... 23, 24, 25
  § 3626(a)(3) .................................................................. 9
  § 3626(b)(2) .................................................... 18, 19, 22
  § 3626(b)(3) ........................................................... passim
  § 3626(g)(7) & (9) ................................................. 17, 18
  § 3626(g)(8) .................................................................. 7


**OTHER AUTHORITIES**

Fed. R. Civ. Proc. 53 ............................................................. 7

Fed. R. Civ. Proc. 66 ............................................................. 7

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The motion to terminate demonstrates the same reckless approach that Defendants have employed in recent months in their campaign to reverse years of cooperation and hard work by the Receiver, the parties, and the Court to remedy the crisis in California's prison healthcare system. A motion to terminate remedial measures that were so carefully considered by the Court and agreed upon and consented to by the parties over a period of years — measures that are vital to bringing the prison medical system to minimum constitutional standards — ought to be made with great care. Yet Defendants' motion fails in every respect. It is wrong on the applicable legal standards. It is unclear about what it seeks. It glosses over the facts and levels false accusations at the Receiver. And perhaps most reckless of all, Defendants ask the Court to terminate ongoing remedial measures without submitting even a scrap of evidence suggesting that they have a better solution or an alternative plan of any kind.

Defendants' motion raises two questions: (1) whether the Court should terminate the Receivership and, if not, (2) whether the Court should terminate the Receiver's "construction plan." The motion should be denied with respect to both questions.

Termination of Receivership. The motion makes a host of allegations against the Receivership based on inaccurate and misleading submissions, which the Receiver corrects in the submissions filed with this opposition. But those allegations are irrelevant to the termination motion because, as counsel confirmed after filing the motion, Defendants rely on just one argument for terminating the Receivership and replacing it with a special master: that the Prison Litigation Reform Act ("PLRA") prohibits the appointment of receivers. This legal argument is meritless. Federal courts have the inherent equitable power to appoint receivers, and under controlling Ninth Circuit authority, federal courts retain "*all* of [their] traditional equitable powers not expressly revoked" by the PLRA. *Gilmore v. California*, 220 F.3d 987, 1000 (9th Cir. 2000) (emphasis added). The PLRA does not expressly or even impliedly revoke the Court's power to appoint a receiver. Presumably because the law is so clear on this point, Defendants previously represented to the Court that they "*do not dispute* that the Court has the power to appoint a receiver . . . ." (Dkt. 328 at 2 (emphasis added).)

Termination of Construction Plan.  Defendants' motion to terminate the Receiver's construction plan should be denied because the Court has never ordered as prospective relief the "construction plan" that Defendants challenge.  Defendants' motion is directed at certain details of construction planning documents, but the Receiver has never recommended any of these plans for final approval by the Court.  The Receiver only recently, following a public comment period, filed a report with the Court on options for long-term care bed construction.  There is no basis in the PLRA for termination of prospective relief that has not been ordered by the Court.

To the extent Defendants' motion may be read as a challenge to the construction goal set forth in the Turnaround Plan of Action ("TPA"), the motion fails because the Court's June 2008 approval of the TPA was fully supported by the record.  Defendants come nowhere near meeting their burden of showing that the TPA's construction goal violates the PLRA.  Instead, Defendants haphazardly criticize various design components in the plans, but fail to acknowledge that most of these components were included *at the request of State officials*.  In any event, if the Court is to reach the issue of whether currently proposed construction plans pursuant to the TPA comply with the PLRA requirements for prospective relief, the Receiver believes the Court should make the specific findings required by the PLRA following an evidentiary hearing.

## FACTUAL BACKGROUND

### A.   Inaction by the State Following the 2002 and 2004 Consent Orders Led to a Crisis Requiring the Appointment of a Receiver

Despite consent orders entered by the Court in 2002 and 2004, prison medical care in California had deteriorated by 2005 to the point where the Court issued an order to show cause why a Receiver should not be appointed.  (Dkt. 294 at 1.)  After six days of evidentiary hearings, the Court found that "the California prison medical care system is broken beyond repair" and noted that "it is an uncontested fact that, on average, an inmate in one of California's prisons needlessly dies every six to seven days due to constitutional deficiencies in the CDCR's medical delivery system."  (Dkt. 371 at 1.)  The Court found that appointment of a Receiver was necessary to "reverse the entrenched paralysis and dysfunction and bring the delivery of health care in California prisons up to constitutional standards."  (*Id.* at 2.)

1   The Court considered all possible alternatives to the appointment of a Receiver and

2   concluded that

> the relevant factors and considerations weigh heavily in favor of the
> imposition of a Receivership in this case.  While this is a step that no court
> takes lightly, the Court concludes that the record in this case compels this
> result and offers no realistic alternative.  The Court further finds that the
> establishment of a Receivership, along with those actions necessary to
> effectuate its establishment, are narrowly drawn to remedy the
> constitutional violations at issue, extend no further than necessary to
> correct a current and ongoing violation of a federal right, and are the least
> intrusive means necessary to correct these violations.

(Dkt. 371 at 49.)  The Court entered the Order Appointing Receiver ("OAR") on February 14,

2006, without objection or appeal by Defendants.  (Dkt. 473.)

**B.    The Receiver Has Pursued Construction Plans With the Full
Knowledge and Endorsement of Defendants**

Numerous reports and unopposed motions document the history of the Receiver's efforts

to construct necessary facilities, all of which has been done with the participation and support of

the State.  In September 2006, the Receiver filed his Second Bi-Monthly Report, as required by

the OAR, notifying the Court of meetings he had held with State officials to discuss the need for

"up to 5,000 beds of dedicated medical facilities to be operational within the next three-to-five

years."  (Dkt. 547 at 4, 49-50; *see also* Dkt. 581 at 27-31; Dkt. 618 at 19-21; Dkt. 866 at 77-81.)[1]

In January 2007, the Receiver issued a Request for Qualifications detailing the Receiver's capital

improvement plans.  (Dkt. 1774 at Ex. A.)  The Receiver also initiated bi-weekly meetings with

representatives from the State to discuss the construction of up to seven medical facilities, each

accommodating approximately 1,500 beds.  (*Id*.)  On April 17, 2007, the Receiver applied for a

waiver of state law in which he outlined his plan for construction of healthcare facilities.  (Dkt.

639.)  Defendants filed a statement of non-opposition.  (Dkt. 653.)  In granting the application,

the Court noted that it was "undisputed that the projects described in the Receiver's Application

---

[1] The Receiver's detailed reports have also provided extensive information related to various
analyses of California prison healthcare costs, including an accounting for the Receiver's
expenditures.  (*See, e.g.*, Dkt. 581 at 38-40; Dkt. 547 at 4-6, 23; Dkt. 618 at 68; Dkt. 866 at 86;
Dkt. 1136 at 51-52.)

1   are integral to developing the different facets of a constitutionally adequate medical health care

2   system . . . ." (Dkt. 700 at 3, 11.)

3          On May 10, 2007, the Receiver filed a preliminary Plan of Action ("POA") describing

4   "plans for fast-tracking construction of up to 5,000 new medical beds and 5,000 new mental

5   health beds." (Dkt. 658 at 39.) In response, Defendants stated that they "support[ed] the

6   Receiver's Plan of Action to deliver medical care in California's prisons" and "remain[ed]

7   committed to working with the Receiver and to helping him implement the Plan of Action."

8   (Dkt. 740 at 2.) On November 15, 2007, the Receiver filed a second draft of the POA, which

9   detailed the Receiver's construction plans and included voluminous supporting documentation.

10  (Dkts. 929-949) Defendants again made no objections. On March 11, 2008, the Receiver

11  released a draft TPA for public comment. (*See* Dkt. 1245 at 2.) The draft plan included

12  improvement to existing health care facilities and expansion for up to 10,000 new medical and

13  mental health beds. After receiving public comment and input from the Court's advisory working

14  group and all stakeholders — including Defendants — the Receiver filed a final TPA on June 6,

15  2008. (*Id.* at 2-3; Dkt. 1229.) The TPA outlines six "Goals and Objectives." (Dkt. 1229.) "Goal

16  6" is to "Provide for Necessary Clinical, Administrative and Housing Facilities," including the

17  upgrades and expansion "to serve up to 10,000 patient-inmates with medical and/or mental health

18  needs." (*Id.* at 25-28.)

19         On June 16, 2008, the Court approved the TPA "as a reasonable and necessary strategy to

20  address the constitutional deficiencies in California's prison health care system." (Dkt. 1245 at

21  1.) It noted that the TPA "does not present a complete vision of how to operate California's

22  entire correctional health care system" but "[i]nstead, . . . as it should — focuses more narrowly

23  on bringing the delivery of health care in California's prisons up to constitutional standards." (*Id.*

24  at 3.) The Court also found that "the plan's six strategic goals [are] necessary to bring

25  California's medical health care system up to constitutional standards." (*Id.*) Defendants did not

26  object to, or appeal from, the order approving the TPA.[2]

27  _____

    [2] On June 16, 2008, the Receiver filed a sixth supplemental application for waiver of state law

28  "necessary for the design, construction and related project delivery services for the Receiver's

                                                                        (Footnote continues on next page.)

Subsequent to the approval of the TPA, the Receiver has continued to develop detailed proposals to implement Goal 6. On November 18, 2008, the Receiver made public a draft Facility Program Statement regarding the 10,000 bed project. On February 6, 2009, following a public comment period, the Receiver submitted a "Report on Options for Long-Term Care Bed Construction," which presents three alternative construction plans. (Dkt. 2065.) The Receiver recommended that the "parties be provided an opportunity to respond to this options report and that the State defendants inform the court concerning other construction options which they believe may be appropriate." (*Id*. at 15.)

**C.      The Three-Judge Court Impaneled Pursuant to the PLRA Has Found, in a Tentative Ruling, Current and Ongoing Constitutional Violations**

On February 9, 2009, following a lengthy trial, a three-judge panel constituted pursuant to the PLRA issued a tentative ruling holding that the evidence offered at trial demonstrated overwhelmingly that overcrowding is the primary cause (but by no means the only cause) of the State's continuing inability to provide constitutionally adequate medical care to its prisoners. (Dkt. 2066 at 2.) The three-judge panel found, among other things, that there was uncontroverted evidence that currently there are not enough clinical facilities or resources to accommodate inmates with medical or mental health needs at the level of care they require, and that the State has been unable to bring its mental health care delivery system into constitutional compliance at any point in the past fourteen years. (*Id.* at 3, 5.) The severity of the ongoing constitutional violations led the panel to conclude that the drastic remedy of a prison release order is necessary to provide immediate relief to the Plaintiffs in this action and in *Coleman*. (*Id.* at 2-9).

---

(Footnote continued from previous page.)

project to construct facilities to house and treat 10,000 inmates . . . ." (Dkt. 1243 at 1.) The Court set a briefing schedule, with objections to the application due on June 30, 2008. (Dkt. 1293 at 1.) Defendants again made no objections. (*Id.*) In granting the application, the Court found that "the identified activities relating to the 10,000 Bed Program are critical to establishing a constitutional system of medical care delivery in California's prisons." (*Id.* at 2.)

**ARGUMENT**

## I.  DEFENDANTS FAIL TO PROVIDE ANY BASIS FOR TERMINATION OF THE RECEIVERSHIP

### A.  The PLRA Does Not Prohibit the Appointment of Receivers

Defendants argue that the PLRA "limits federal courts' authority to appoint any person to exercise the quasi-judicial powers of the court during the remedial phase of litigation"; courts can appoint only special masters and cannot appoint receivers.  (Defendants' Motion to Terminate the Receivership and the Receiver's Construction Plan ("Mot.") at 10.)  This argument is not based on any supporting authority and contradicts Defendants' prior arguments to the Court.

### 1.  Defendants' New Interpretation of the PLRA Lacks any Basis in the Statute or Case Law

In support of their assertion that the Court lacks authority to appoint a receiver, Defendants cite only the PLRA's provisions governing special masters and legislative history from an earlier statute that was never enacted.  Defendants do not cite a single case to support their novel argument, because no such case exists.  Rather, the plain language of the PLRA, and controlling Ninth Circuit caselaw construing the statute, make clear that the PLRA does not strip federal courts of their inherent authority to appoint receivers.

Defendants do not dispute that federal courts have equitable authority to appoint receivers. Indeed, federal courts have appointed receivers "to coerce public officials to comply with legal mandates in a number of factual settings, including public schools, housing, highways, nursing homes, and prisons."  *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997); *see also Newman v. State of Alabama*, 466 F. Supp. 628, 636 (M.D. Ala. 1979) (imposing receivership on state prison system); *Crain v. Bordenkircher*, 376 S.E.2d 140, 143 (W. Va. 1988) (court "has authority to place the [West Virginia] penitentiary in receivership and appoint a receiver for the purpose of constructing a new facility").  Defendants argue instead that the PLRA strips federal courts of this inherent authority.  However, "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Accordingly, the Ninth Circuit has held under the PLRA that federal courts retain "***all*** of [their]

1    traditional equitable powers not expressly revoked." *Gilmore v. California*, 220 F.3d 987, 1000

2    (9th Cir. 2000) (emphasis added).  Nothing in the text or structure of the PLRA expressly, or by

3    "necessary and inescapable inference," revokes the authority of federal courts to appoint a receiver.

4              Defendants point to the provisions of the PLRA that place certain limits on the powers of

5    "special masters" appointed in prison conditions cases, apparently arguing that because the PLRA

6    *discusses* "special masters," it necessarily follows that courts are prohibited from appointing a

7    receiver or any officer other than a "special master."  (Mot. at 10 (citing 18 U.S.C. § 3626(f)).)

8    But Defendants fail to cite any case to support this novel proposition, which would have the effect

9    of severely restricting the court's equity jurisdiction.  Nothing in the PLRA or its legislative

10   history demonstrates congressional intent to divest the federal courts of their inherent equitable

11   power to appoint a receiver to remedy constitutional violations.  It is simply not a "necessary and

12   inescapable" inference from the special master provision that courts can appoint only special

13   masters.  If Congress had intended that result, it could have easily said so in the statute.

14             The PLRA's limitations on special masters by their terms do not apply to the Receiver in

15   this case.  The PLRA defines "special master" as "any person appointed by a Federal court

16   pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of

17   the court *to exercise the powers of a master*, regardless of the title or description given by the

18   court."  18 U.S.C. § 3626(g)(8) (emphasis added).  Here, the Receiver was not appointed "to

19   exercise the powers of a master," which typically include convening hearings, ruling on the

20   admissibility of evidence, and making factual findings that are automatically binding unless

21   established to be clearly erroneous.  *See Benjamin v. Fraser*, 343 F.3d 35, 45-47 (2d Cir. 2003)

22   (holding that court-appointed monitor was not "special master" within meaning of PLRA because

23   monitor did not perform functions of a master); Fed. R. Civ. Proc. 53 (describing functions of

24   special masters); Fed. R. Civ. Proc. 66 (appointment of receiver).  Indeed, in its Findings of Fact

25   and Conclusions of Law, this Court expressly considered appointing a person to exercise the

26   powers of a special master but concluded that a person exercising those powers would not be able

27   to remedy the constitutional violations at issue.  (Dkt. 371 at 41.)

28

1    Defendants' only other authority is a House report that they cite for the proposition that

2  the PLRA's limitations on the powers of special masters "apply even if the person appointed . . .

3  is titled or described by the court as a receiver." (Mot. at 10 (citing H.R. Rep. No. 21 (1995)).)

4  But the report concerns a *predecessor bill to the PLRA (the "STOP" Act) that was never enacted*

5  and differed in material respects from the PLRA.  Although the legislative history of STOP

6  remains relevant with respect to those portions of STOP that were ultimately enacted in the

7  PLRA, the STOP provision to which the cited House report refers in the excerpt cited by

8  Defendants was amended in material respects in the PLRA.  As the Second Circuit explained with

9  respect to an analogous argument by the government in *Benjamin*:

10        If enacted, STOP would have done precisely what the City argues the
          PLRA does:  bar the use of monitors in prison conditions litigation.  But,
11        in light of STOP's express prohibition of the use of monitors, to draw the
          conclusion that the PLRA meant silently to prohibit their use would show
12        infidelity to what we know of Congress's intentions. . . .  Congress's
          contemplation of STOP indicates its awareness of the distinction between
13        quasi-judicial court agents appointed to undertake the activities of a
          master, as generally outlined in Rule 53, and monitors employed by courts
14        to assist in compliance with remedial orders.

15  *Benjamin*, 343 F.3d at 46-47 (internal emphasis and citations omitted).  Similarly here, the STOP

16  House report undermines Defendants' argument.  It shows that Congress was aware that courts

17  might appoint judicial officers other than special masters, but chose in enacting the PLRA not to

18  limit courts' authority to do so.

19    No court has held that the PLRA prohibits the appointment of judicial officers other than

20  special masters.  The Second Circuit has twice held to the contrary that the PLRA leaves intact

21  the federal courts' authority to appoint judicial agents other than special masters in prison

22  conditions cases.  *See Benjamin,* 343 F.3d at 46-47 (holding that PLRA's restrictions on special

23  masters do not apply to court-appointed monitor); *Handberry v. Thompson*, 446 F.3d 335, 352

24  (2d Cir. 2006) (same); *see also Inmates of D.C. Jail v. Jackson*, 158 F.3d 1357, 1359 (D.C. Cir.

25  1998) (noting that in addition to court-appointed special master monitoring compliance with

26  existing orders, D.C. jail's medical and mental health services remained under control of court-

27  appointed *receiver* as of 1998, several years after passage of PLRA).

28

In sum, there is no support in the case law, the plain language of the PLRA, or its legislative history, for Defendants' argument that the PLRA strips federal courts of their inherent equitable power to enforce their own orders by appointing a receiver.

### 2. Construing the PLRA To Forbid the Appointment of a Receiver Would Render the Statute Unconstitutional

Defendants' construction of the PLRA should also be rejected because it violates the "cardinal principle" that courts have a duty to avoid construing a statute in such a way as to (i) raise "doubtful constitutional questions" or (ii) "displace courts' traditional equitable powers." *Gilmore*, 220 F.3d at 997-98 & n.12 (internal quotations and citation omitted).  Defendants' interpretation would do both.  The Ninth Circuit has held that Congress is free to alter the permissible scope of prospective relief for unconstitutional prison conditions only "so long as the restrictions on the remedy do not prevent vindication of the right."  *Id.* at 1002-03.  Stripping courts of their traditional authority in equity to appoint a receiver — irrespective of whether that remedy is necessary to correct a proven constitutional violation — would violate that principle and overstep the bounds of Congress's authority.  *See id.* at 1002-03, 1006 n.23 ("Congress clearly cannot define a constitutional right out of existence by preventing courts from crafting an effective remedy.").

When drafting the PLRA, Congress clearly understood this limitation.  For example, the PLRA addresses the ability of federal courts to order the release of prisoners (*see id.* at 998 n.14), and yet the PLRA does not categorically prohibit prisoner release orders.  Instead, it merely places certain limits on the circumstances in which such an order can be issued.  *See* 18 U.S.C. § 3626(a)(3).  Similarly, the PLRA places certain limitations on the circumstances under which a receiver can be appointed, in the form of the general limitations on prospective relief contained in subsection 3626(a), but does not categorically prohibit such an appointment.

The Court should avoid construing the PLRA in a way that would strip federal courts of their traditional equitable power to appoint receivers and thus render the statute unconstitutional. *Cf. Bell v. Hood*, 327 U.S. 678, 684 (1946) ("where legal rights have been invaded, and a federal

statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done").

### 3. Defendants Have Expressly Conceded that the PLRA Permits the Appointment of Receivers

In their response to the Court's 2005 order to show cause why a receiver should not be appointed, Defendants did not oppose the appointment of a receiver. (*See* Dkt. 328.) Instead, Defendants argued only that the Court should not hold them in contempt and that the remedy of a receivership should be used as a last resort. In making these arguments, Defendants stated that they "***do not dispute*** *that the Court has the power to appoint a receiver . . . .*" (*Id.* at 2 (emphasis added).) Later in the same brief, Defendants reiterated that they "***do not deny*** *that the Court has the power to appoint a receiver.*" (*Id.* at 25 (emphasis added).)

The doctrine of judicial estoppel "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996). That is exactly what Defendants have done here. They originally avoided a finding of contempt by arguing that the Court could impose a receivership without first finding contempt; but now that they seek to remove the Receiver, Defendants have taken the contrary position and argued that the Court never had the power to appoint a receiver. *See id.* at 604-05 (judicial estoppel applies to inconsistent positions taken in the same litigation, as well as in separate proceedings). The doctrine of judicial estoppel is intended to prevent litigants like Defendants from interfering with "the orderly administration of justice" by "playing fast and loose with the courts." *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990). Defendants are thus precluded from arguing that the PLRA prohibits appointment of receivers.

### B. Defendants Provide No Other Basis for Termination of the Receivership

#### 1. Subsequent to Filing Their Motion, Defendants Conceded They Do Not Seek Termination of the Receivership So Long as the PLRA Permits Appointment of Receivers

After filing the motion to terminate, counsel for Defendants conceded that the only ground on which Defendants seek termination of the Receivership is the argument that the PLRA does

not permit appointment of receivers.  (Declaration of Stuart C. Plunkett in support of Receiver's Opp. to Mot. to Terminate ("Plunkett Decl.") ¶ 2.)  Counsel for Defendants confirmed that, if the Court finds that the PLRA permits appointment of Receivers, Defendants do not seek termination of the Receivership.  (*Id.*)  Counsel for Defendants, however, refused to sign a stipulation to that effect.  (*Id.*)

As demonstrated above, Defendants' interpretation of the PLRA is meritless and cannot serve as a basis for termination.  Thus, with respect to the challenge to the Receivership, the Court's inquiry should end.  However, in light of the many accusations leveled in the motion and counsel's refusal to sign a stipulation, the following sections explain why the motion falls far short of justifying termination of the Receivership under the PLRA's termination provisions.

### 2.   Defendants Failed to Provide Any Evidence that Would Justify Termination of the Receivership

Under the PLRA, prospective relief "shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3).  The burden of proof to terminate prospective relief under the PLRA is on the party seeking termination.  *Gilmore*, 220 F.3d at 1008; *see also Feliciano v. Serra*, 300 F. Supp. 2d 321, 337 (2004) (refusing to accept Defendants' conclusory assertions in support of their motion to terminate and chastising them for failing to conduct discovery prior to moving to terminate).  To have met this burden here, Defendants needed to show that the Receivership is (1) no longer necessary to correct ongoing constitutional violations, (2) not narrowly drawn, or (3) not the least intrusive means available to remedy the constitutional violations.  *See Feliciano v. Rullan*, 378 F.3d 42, 52-56 (D.P.R. 2004).  Nothing in Defendants' submission comes close to satisfying their burden.

### a.   Defendants Do Not Dispute that Unconstitutional Conditions Persist in Prison Healthcare

Defendants do not dispute that there are current and ongoing constitutional violations in the prison healthcare system.  *See Gilmore*, 220 F.3d at 1008 (court must find that

1    unconstitutional conditions are ongoing).  They present no evidence that the massive and

2    systematic constitutional violations this Court found in 2005 have been remedied.  (*See, e.g.*,

3    (Dkt. 294 at 2 ("Defendants themselves have conceded that a significant number of prisoners

4    have died as a direct result of this lack of care . . . ."); Dkt. 371 at 1("it is an uncontested fact that,

5    on average, an inmate in one of California's prisons needlessly dies every six to seven days due to

6    constitutional deficiencies in the CDCR's medical delivery system").)  Where previous violations

7    have been found, as here, there is a presumption of continuing injury.  *Hadix v. Caruso*, 465 F.

8    Supp. 2d 776, 798 (W.D. Mich. 2006) (citing *Thompson v. City of Los Angeles*, 885 F.2d 1439,

9    1449 (9th Cir. 1989)); *see also NAACP v. Duval County Sch.*, 273 F.3d 960, 988-89 (11th Cir.

10   2001)).

11   Defendants do not, and cannot, show that California prison healthcare is now

12   constitutional.  Indeed, after an extensive trial, the three-judge panel concluded, among other

13   things, that the State continues to be unable to provide constitutionally adequate medical care to

14   its prisoners.  (*Id.* at 2.)  The panel noted that the Governor's 2006 declaration of a state of

15   emergency due to "severe overcrowding" is still in effect, and that a California appellate court

16   had recently upheld the Governor's emergency proclamation, which declared that existing prison

17   conditions cause "extreme peril to the safety of persons and property."  (*Id.* (citing *CCPOA v.

18   Schwarzenegger*, 163 Cal. App. 4th 802, 818 (2008)).)

19   Defendants also do not dispute that the "Death reviews" for 2007 show 3 preventable

20   deaths, 65 possibly preventable deaths, and at least 292 extreme departures from the standard of

21   care.  (Declaration of Terry Hill, M.D. in Support of Receiver's Opposition to Motion to

22   Terminate ("Hill Decl.") ¶¶ 20-28 & Ex. H.)  A preventable or possibly preventable death thus

23   occurred every 5.4 days.[3]

24

25

26

27   _____

[3] The Court took possibly preventable deaths into account in its original findings leading to the
OAR.  (Dkt. 371 at 11-12.)

28

b.   **Defendants Have Failed To Establish that the Receivership Is No Longer Necessary, or that Less Intrusive Means Exist To Remedy the Ongoing Constitutional Violations**

Defendants argue that "the time has come to replace the Receiver with a Special Master to evaluate Defendants' current state of compliance with federal law" (Mot. at 2), but they provide no evidence that a special master is a more appropriate remedy.  Defendants cite nothing to contradict this Court's earlier finding that, "given defendants' professed inability to take adequate measures to cure the constitutional violations even with the extraordinary guidance of the Court Experts and the mandates of the Court's orders, [the appointment of a Special Master] would be an exercise in futility."  (Dkt. 371 at 41.)

Defendants do not present any evidence that the circumstances the Court described at length before appointing the Receiver have changed with respect to the State's inability to fix the ongoing constitutional violations.  In its May 2005 order, for example, the Court noted that Defendants had informed the Court that it was an "impossible task" for them to come up with a plan to meet their deadlines and obligations.  (Dkt. 294 at 7.)  The Court also noted that Defendants had stated that "areas such as budget, personnel, contracts, procurement, information systems, *physical plant, and space issues* [] continue to pose fundamental barriers to compliance."  (*Id*. at 7 (emphasis added).)  The Court stated that "defendants' representatives ha[d] publicly acknowledged that defendants are unable to correct the problem on their own, and that unconstitutional conditions will remain until an outside entity is hired to take over."  (*Id*. at 8.)  Similarly, in its October 2005 findings, the Court held that "the CDCR leadership simply has been — and presently is — incapable of successfully implementing systemic change or completing even minimal goals toward the design and implementation of a functional medical delivery system."  (Dkt. 371 at 7.)  Defendants make no showing that circumstances have changed such that Defendants can now remedy the constitutional violations described without the aid of the Receiver.

The *Feliciano* case in the First Circuit is instructive.  As here, the *Feliciano* court addressed egregious constitutional violations in the delivery of prison medical care and "abject failure" by the relevant governmental institutions, over a long period of time, to remedy the

1   violations. *Feliciano*, 378 F.3d at 55. Faced with those circumstances, the district court held, and

2   the First Circuit agreed, that the government defendants' history of failure and noncompliance

3   with court orders were "relevant . . . in determining the necessary scope of an effective remedy."

4   *Feliciano*, 300 F. Supp. 2d at 332; *see also Feliciano*, 378 F.3d at 55 ("[A] record of abject failure

5   matters in the narrowness-need-intrusiveness inquiry."). In light of the State's prior history of

6   failure and noncompliance, the State was required to come forward with evidence to support its

7   contention that it is now capable of managing the prison healthcare system in the absence of the

8   court-ordered prospective relief. But the State has failed to do so.

9       Defendants argue that the time has come for "return of control of the prison health care

10  system to the State" (Mot. at 13), but offer zero evidence to establish that the State currently is

11  capable of delivering constitutionally adequate healthcare. *See Feliciano*, 300 F. Supp. 2d at 337

12  (noting that Defendants made only conclusory assertions in motion to terminate). Instead,

13  Defendants repeatedly and inconsistently describe the Receiver's costs and his staff's salaries,

14  implying that the cost of the Receivership alone is enough to warrant its termination. (Mot. at 4-

15  5; Declaration of John Hagar in Support of Opp. to Mot. to Terminate ("Hagar Decl.") ¶¶ 20-24,

16  37-40; Declaration of Richard Kirkland in Support of Opp. to Mot. to Terminate ("Kirkland

17  Decl.") ¶¶ 14-27.) A motion to terminate Court-ordered prospective relief under the PLRA

18  requires far more. The Receiver's costs must be evaluated in the context of the enormity of

19  California's prison system. As Defendants admit, CDCR's healthcare budget is over $2 billion a

20  year. (Hagar Decl. ¶ 40.) It is hardly surprising that the Receiver, charged with "addressing the

21  crisis in the delivery of health care in the CDCR," would have substantial expenses. (Dkt. 371 at

22  45.)

23      Furthermore, Defendants' agreement to the appointment of the Receiver in the first place

24  weighs in favor of finding that the remedy was appropriate under the PLRA. *See Feliciano*, 300

25  F. Supp. 2d at 334 ("The very fact that the defendants chose to join the plaintiffs in selecting this

26  remedy would seem to mean — and must be taken to mean — that they understood it to be

27  precisely tailored to the needs of the occasion, that it is narrowly drawn and least intrusive — in

28  fact not intrusive at all."). Defendants have repeatedly consented to and supported the Receiver

1   and his plans.  As the First Circuit noted in upholding the denial of a motion to terminate the

2   drastic remedy of privatizing healthcare in the entire Puerto Rico prison system:

3   > [A] great deal of time, effort, and money has been spent in constructing
>   facilities, procuring equipment, creating programs and building a more
4   > responsive infrastructure. . . . The district court has cultivated this tree
>   patiently and at great expense, and it would be rash for us to insist that it
5   > be uprooted just when it shows promise of bearing fruit.

6   *Feliciano*, 378 F.3d at 55-56.  The same could be said here.[4]

7           This Court and the parties, after extensive proceedings over many years, determined that a

8   Receivership was necessary, narrowly tailored, and the least intrusive means of remedying

9   massive and systemic constitutional violations.  Defendants have presented no evidence, just bare

10  rhetoric, to support their assertion that the Receivership should be terminated.

11                 **3.        Defendants' Accusations Against the Receiver Are False**

12          Defendants repeatedly assert that the Receiver has refused to provide information to the

13  State.  (Mot. at 6 ("Even worse, the Receiver has flatly refused to provide relevant information

14  when asked for it."); Mot. at 11 ("He has withheld critical information from Defendants . . . .");

15  Mot. at 14 (the "Receiver refused to provide Defendants with information").)  But the only

16  example Defendants cite — refusing to give "information surrounding inmate deaths that the

17  Receiver contends were 'preventable' or 'possibly preventable'" — is false.  The declaration

18  Defendants submit does ***not*** say the Receiver refused to provide "information surrounding inmate

19  deaths"; it says only that ***patient names*** were not disclosed.  (*See* Gilevich Declaration in Support

20  of Motion to Terminate ("Gilevich Decl.") ¶ 3 (stating that Mr. Gilevich contacted Jared

21  Goldman to request "inmate names").)  And even that does not tell the whole story.

22  Mr. Goldman did not provide the names due to privacy concerns under federal law, and Mr.

23  Gilevich was unable to justify his request.  (Declaration of Jared Goldman in Support of Opp. to

24

25  ---
    [4] The *Feliciano* court also emphasized that a remedy may extend beyond the constitutional
    minimum but still satisfy the PLRA's need-narrowness-intrusiveness requirement.  *Feliciano*, 300
26  F. Supp. 2d at 332.  Indeed, "a federal court may order relief that the Constitution would not of its
    own force initially require if such relief is necessary to remedy the constitutional violation. . . ."
27  *Id.* at 332 (quoting *Toussaint v. McCarthy*, 801 F.2d 1080, 1086-87 (9th Cir. 1986)); *see also*
    *Benjamin v. Fraser*, 343 F.3d 35, 53-54 (2nd Cir. 2003) ("a remedy may require more than the
    bare minimum the Constitution would permit and yet still be necessary and narrowly drawn").
28

Mot. to Terminate ¶¶ 2, 3.)  Moreover, Mr. Gilevich fails to mention in his declaration that the
Receiver regularly provides him with medical and death information that he requests, and
provides the State with extensive documentation of the Receiver's activities and Death Reviews.
(Declaration of Theresa Kimura-Yip in Support of Opp. to Mot. to Terminate ("Kimura-Yip
Decl.") ¶¶ 3-7; Hill Decl. ¶¶ 32-37.)

Defendants also argue that they have not been given adequate opportunity to participate,
review, and object to the Receiver's activities.  (Mot. at 13-14.)  This assertion is patently false.
Defendants have been informed of, and given every opportunity to participate in, review, and
object to all of the Receiver's activities and plans.  (Hagar Decl. ¶¶ 28, 30, 31, 33-36; Kirkland
Decl. ¶¶ 4-10, 16, 17, 23, 24-26; Declaration of Steven Cambra in Support of Opp. to Mot. to
Terminate ("Cambra Decl.") ¶¶ 3-6; Kimura-Yip Decl. ¶¶ 3-7.)  The OAR instituted a "formal
process," such as the one Defendants request now, which has been followed throughout the
history of the Receivership.  (Dkt. 473 at 2-5.)  The Receiver has, for example, fully complied
with his obligation to file detailed reports of his activities multiple times a year on a schedule
agreed to by Defendants.  (*Id*. at 3; *see also* Dkts. 524, 547, 581, 618, 723, 866, 1136, 1248, 1472,
2011-2018.)  The Receiver has submitted multiple successful applications for waivers of state law
detailing his progress.  (*See, e.g.*, Dkts. 543, 627, 636, 639, 645, 959, 981, 1153, 1240, 1243.)
Defendants have always had the opportunity to respond or object to those applications.  The
Receiver has also filed or otherwise released multiple extensive and detailed drafts of his plans,
including his construction efforts, since May 2007.  When Plaintiffs objected to those drafts for a
lack of the type of benchmarks or metrics that Defendants claim are lacking now, the Court
required the Receiver to comply with Plaintiffs' requests.  (Dkt. 826 at 5.)  Defendants, though
present at those hearings and in receipt of the Receiver's plans, never made similar objections.
Further, this Court has convened an advisory group and held hearings on the Receiver's plans
throughout this process.  Defendants have been present at and participated in those hearings, as
well as countless other meetings held with the Receiver's staff in order to develop and explain his
activities and plans.  (*See* Dkt. 1774 at ¶¶ 5, 18, Ex. C; Hagar Decl. ¶¶ 31; Kirkland Decl. ¶¶ 4-7;
Cambra Decl. ¶¶ 3-6; Kimura-Yip Decl. ¶¶ 6, 7.)

1    Finally, Defendants misrepresent the Receiver's actions with respect to inmates who have

2    been transferred to out-of-state prisons.  (Mot. at 6.)  Defendants fail to note that the Receiver's

3    responsibilities with respect to those inmates stem from express mandates in the Governor's

4    Prison Overcrowding State of Emergency Proclamation dated October 4, 2006, and by contracts

5    agreed to by CDCR officials.  (Hagar Decl. ¶¶ 2-8.)  Defendants also fail to acknowledge that the

6    Receiver's more recent monitoring activities criticized by Defendants began as a result of

7    remedial plans agreed to and formulated by CDCR officials.  (*Id.* ¶¶ 9-18.)

8    ## II.   DEFENDANTS FAIL TO PROVIDE ANY BASIS FOR TERMINATION OF THE RECEIVER'S "CONSTRUCTION PLAN"

9

10   ### A.   Defendants' Motion Should Be Denied Because the Court Has Not Ordered as Prospective Relief the "Construction Plan" that Defendants Challenge

11

12   Defendants' motion should be denied because it seeks to terminate a "construction plan"

13   that the Court has not approved as prospective relief.  Defendants seek an order from the Court

14   "terminating the Receiver's plans to construct prison healthcare facilities . . . as contemplated in

     Goal 6 of [the TPA] *and as proposed more specifically in his Facility Program Statement*," which

15   Defendants refer to "collectively" as "the Receiver's Construction Plan."  (Mot. at 1 (emphasis

16   added).)  The Court, however, has never considered or approved the Receiver's drafts of the

17   Facility Program Statement.  The "construction plan" Defendants seek to terminate is, therefore, a

18   plan that has never been considered or approved by the Court, much less ordered as "prospective

19   relief" within the meaning of the PLRA.  *See* 18 U.S.C. § 3626(g)(7) & (9) (prospective relief is

20   any "relief other than compensatory monetary damages" that is "*granted or approved* by the

21   court") (emphasis added).

22   Indeed, the Receiver has not even recommended or asked for final approval of the

23   construction plan that Defendants seek to terminate.  After the period for public comment on the

24   Facility Program Statement expired, the Receiver issued, on February 6, 2009, "The Receiver's

25   Report on Options for Long-Term Care Bed Construction," which presents three alternative

26   construction plans:  (1) 5,000 beds at three facilities for treatment of long-term medical patients

27   that would address the constitutional requirements of the *Plata* class at an estimated cost of $2.5

28

1    billion; (2) 7,500 beds at five facilities that would include the 5,000 beds for long-term medical

2    patients and also address the needs of 2,500 out-patient mental health, *Coleman* class members at

3    a cost of approximately $4.3 billion; and (3) 10,000 beds at seven facilities that would resolve the

4    long-term care needs of the *Coleman* and *Armstrong* classes as well as the *Plata* class at a cost of

5    approximately $6.0 billion.  In the report, the Receiver recommended "that the parties be

6    provided an opportunity to respond to [the] options report and that the State defendants inform the

7    court concerning other construction options which they believe may be appropriate."  (Dkt. 2065

8    at 15.)

9          The Receiver anticipates that there will be further proceedings, and that the Court will

10   make findings and give approval to a final construction plan only after those proceedings have

11   been completed.  Indeed, the Receiver is obligated to seek further approval before beginning

12   construction.  (*See* Dkt. 1243 at 1 (submitting application for state law waivers "with the

13   understanding that the Receiver will submit a further application prior to commencing any actual

14   construction").)  Defendants' motion to terminate is, therefore, premature and without foundation

15   in the statute.  It challenges a "construction plan" that has not been "granted or approved by the

16   court," 18 U.S.C. § 3626(g)(7) & (9), and which is still under active consideration by the Court.

17          **B.    To The Extent Defendants Challenge Goal 6 of the TPA, Termination
               Is Improper Because the TPA Was Adequately Supported By Findings
18             Under the PLRA**

19          The TPA, including Goal 6 related to construction, was approved by an order of the Court

20   on June 16, 2008 — less than a year ago.  Thus, assuming for the sake of argument that the TPA

21   or Goal 6 constitutes separate "prospective relief" within the meaning of the PLRA,[5] this portion

22   of the motion to terminate is governed by 18 U.S.C. § 3626(b)(2), which provides the standard for

23   termination of prospective relief that was entered within two years of the motion to terminate.

24   Under that section, Goal 6 of the TPA may be terminated only if it was "approved or granted in

25   the absence of a finding by the court that the relief is narrowly drawn, extends no further than

26

27   _____

     [5] The Receiver does not concede that the TPA or any portion of it constitutes "prospective relief"
     that is subject to the termination and stay provisions of the PLRA.

28

1    necessary to correct the violation of the Federal right, and is the least intrusive means necessary to

2    correct the violation of the Federal right."  18 U.S.C. § 3626(b)(2).

3         The Court made those findings, and they are supported by the record.  In the order

4    approving the TPA, the Court stated:  "the plan — as it should — focuses more narrowly on

5    bringing the delivery of health care in California's prisons up to constitutional standards."  (Dkt.

6    1245 at 3.)  The Court also held that "the plan's six strategic goals" are "necessary to bring

7    California's medical health care system up to constitutional standards."  (*Id.* at 3-4.)  In its

8    October 27, 2008 order requiring the Defendants to fund the TPA, the Court reiterated that it has

9    made the appropriate PLRA findings, stating that the Court has "determined . . . that the

10   implementation of the TPA is necessary to bring the prison healthcare system to constitutional

11   standards."  (Dkt. 1610 at ¶ 10.)

12        Defendants contend that the PLRA requires more detailed findings than those made by the

13   Court when approving the TPA.  (Mot. at 17.)  But Defendants apply the wrong legal standard.

14   They cite *Cason v. Seckinger*, 231 F.3d 777 (11th Cir. 2000), and *Castillo v. Cameron County*,

15   238 F.3d 339 (5th Cir. 2001) — cases that were governed by section 3626(b)(3), ***not*** by

16   3626(b)(2).  *See Cason*, 231 F.3d at 785 (stating that particularized findings are required by

17   section 3626(b)(3)); *Castillo*, 238 F.3d at 354 (same).  Here, section 3626(b)(2) is controlling

18   because the TPA was entered less than two years ago, and the Ninth Circuit has held that this

19   provision does ***not*** require "explicit findings"; rather, section 3626(b)(2) is satisfied "so long as

20   the record, the court's decision ordering prospective relief, and relevant caselaw fairly disclose

21   that the relief actually meets the . . . narrow tailoring standard."  *Gilmore*, 220 F.3d at 1008 n.25.

22        The Court's approval of Goal 6 in the TPA was clearly supported by the record in June

23   2008.  The adequacy of the Court's findings must be assessed in light of what the Court actually

24   approved.  Rather than approve specific construction plans, the Court approved as one of the six

25   goals of the TPA the expansion of administrative, clinical, and housing facilities for "up to 10,000

26   inmates" at "up to seven facilities."  (Dkt. 1229 at 27.)  In making its findings, the Court stated:

27         In approving the Receiver's turnaround plan of action, the Court
           emphasizes that, as with any such plan, this plan must remain a living
28         document.  Indeed, as the Court ordered when it originally appointed a

Receiver, the Receiver must update or modify the plan of action "as necessary throughout the Receivership."

(Dkt. 1245 at 4.)  The record that supports this goal includes the Receiver's findings in the TPA, which are themselves supported by the substantial work of experts and consultants.  (*See* Dkt. 1229 at 27-28.)  The Court also relied on "comments from the public and all stakeholders, including counsel for both Plaintiffs and Defendants." (Dkt. 1245 at 3.)  That Defendants participated in the Court's adoption of the TPA and never objected to or appealed from its order approving the TPA further supports the Court's order.  *See, e.g.*, *Feliciano*, 300 F. Supp. 2d at 334 (defendants' participation in selection of particular form of relief "must be taken to mean . . . that they understood it to be precisely tailored to the needs of the occasion, [and] that it is narrowly drawn and least intrusive").

Defendants fault the Court for failing to make findings regarding the construction plans outlined in the Facility Program Statement.  (Mot. at 18.)  This criticism is misplaced given that the Court has never considered or approved any draft of the Facility Program Statement, which is not final and is currently under reconsideration after the expiration of the public comment period.

Nor did the Court consider or approve any detailed or final construction plans when it approved the TPA.  It did find that Goal 6 — "Providing for Necessary Clinical, Administrative and Housing Facilities" — was necessary along with the other five TPA goals to bring California's prison health care into constitutional compliance and that the TPA was an appropriate "plan of action for moving this case forward." (Dkt. 1245 at 4.)  Consistent with the Court's direction that the TPA should be "a living document" subject to updating and modifications, the Receiver has now updated his plans and proposed three construction options for consideration by the parties and final approval by the Court.

**C.    Nothing Subsequent to the Court's Approval of Goal 6 of the TPA Justifies Its Termination**

Even if the Court were to hold that the order approving Goal 6 of the TPA was not supported by sufficient findings under the PLRA and that current construction plans pursuant to the TPA are "prospective relief" within the meaning of the statute, that relief must not be terminated if "the court makes written findings based on the record that prospective relief remains

1   necessary to correct a current and ongoing violation of the Federal right, extends no further than

2   necessary to correct the violation of the Federal right, and that the prospective relief is narrowly

3   drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3).

4   Defendants have the burden of proving this test is not met. *Gilmore*, 220 F.3d at 1008.

5                      **1.     Defendants Have Not Met Their Burden of Demonstrating that
                               Termination of the "Construction Plan" Is Justified**

6

7          Defendants contend it takes no more than a "cursory review" of the Receiver's

8   construction plans to conclude they violate the PLRA, and it is clear from the page and a half of

9   Defendants' brief devoted to this issue that Defendants themselves have done no more than that.

10  (Mot. at 18-19.) Based on the Facilities Program Statement, the Defendants recite the projected

11  costs of the Receiver's plans, but make no effort to show that the costs themselves demonstrate

12  that the proposed construction is not necessary or narrowly tailored in light of the constitutional

13  deficiencies in the California prison medical care system.

14         Defendants then pluck from draft planning documents various design elements that they

15  contend prove that the overall plans violate the PLRA. (Mot. at 19.) But many of these examples

16  are from plans that have since been revised, and Defendants fail to note that other design elements

17  were included in the plans *at the request of CDCR officials and healthcare professionals*.

18  (Kirkland Decl. ¶¶ 11-13; Hagar Decl. ¶ 32; Cambra Decl. ¶¶ 22, 23.) Indeed, nearly all of the

19  examples touted by Defendants as demonstrating that the constructions plans exceed

20  constitutional minimums pertain only to the 5,000 mental health beds that were added *at the*

21  *State's request* to comply with orders in the *Coleman* class action. (*Id.*)[6]

22         Moreover, not only are the passages Defendants repeat throughout their motion a very

23  minor part of the Receiver's lengthy and detailed plans, those plans are also a work in progress

24  subject to further evaluation by the parties and the Court. As Defendants themselves have

25  acknowledged, the Court approved the TPA with the understanding that the details of the plan

26  would remain the subject of further proceedings. (Dkt. 1245 at 4.) As discussed above, the

---

27  [6] Defendants also claim that the new facilities would present "clear security risks" because of
    their "open setting." (Mot. at 8.) Defendants are wrong on this point. (Cambra Decl. ¶¶ 7-19,
28  21.)

1   Receiver has recently filed a "Report on Options for Long-Term Care Bed Construction," which

2   proposes three construction options.  (Dkt. 2065.)  Given the State's withdrawal of support for

3   construction of mental health beds that were included at the State's request to meet the needs of

4   *Coleman* class members, the Receiver has proposed a 5,000 bed option that would address only

5   the need for treatment of long-term medical patients in the *Plata* class.  (*Id*. at 12.)

6          Finally, Defendants argue that the Receiver's plans would create staffing and other

7   miscellaneous redundancies.  (Mot. at 8.)  This argument ignores the fact that the Receiver's

8   plans call for *separate* medical facilities on existing CDCR property.  (*See* Kirkland Decl. ¶ 14,

9   15; Hagar Decl. ¶ 39; Cambra Decl. ¶ 20.)  As Defendants know, after extensive studies

10  conducted with Defendants' knowledge and participation, the Receiver determined that the most

11  cost-effective and least intrusive means for providing constitutional medical care to California's

12  severely ill and disabled inmates would be to build separate medical facilities on existing prison

13  property.  (Hagar Decl. ¶¶ 29-31; Dkt. 1774 at ¶¶ 5-6.)  Not only should such inmates be housed

14  separately from the general population for compelling medical reasons, adding the number of

15  medical beds required by California's prisons into existing prison buildings would be virtually

16  impossible due to the current state of the buildings' infrastructure and overcrowding.  (*Id*.; *see*

17  *also* Hill Decl. ¶¶ 3-6, 9, 13.)

18         In sum, Defendants have presented insufficient evidence to show that the Receiver's

19  construction plans violate the PLRA.

20                  **2.      An Evidentiary Hearing Would Be Needed To Make Any**
                            **Updated Findings Under the PLRA Regarding the**
21                          **"Construction Plan"**

22         It is clear that the Court's original order approving Goal 6 of the TPA complied with

23  section 3626(b)(2) of the PLRA, and it is also clear that Defendants have failed to meet their

24  burden of demonstrating that the construction plans should be terminated for any other reason.

25  However, if the Court decides to evaluate the Receiver's construction plans in light of current

26  circumstances, then it must make the "written findings" required by section 3626(b)(3) of the

27  PLRA.  In that event, the Receiver believes that an evidentiary hearing should be held so that the

28  Receiver and the parties can present evidence and argument on whether the construction plans

OPPOSITION TO MOTION TO TERMINATE
CASE NO. C01-1351 TEH                                                                                22
sf-2640796

1   remain "necessary to correct a current and ongoing violation," extend "no further than necessary

2   to correct the violation of the Federal right," and are "narrowly drawn and the least intrusive

3   means to correct the violation."  *See* 18 U.S.C. § 3626(b)(3); *see also Gilmore*, 220 F.3d at 1010

4   (remanding with instructions to district court to conduct evidentiary hearing); *Castillo*, 238 F.3d

5   at 355 (same).  If undertaken, that hearing process should address the Receiver's updated plans,

6   including the three construction options now proposed by the Receiver.

### D.      The PLRA Does Not Prohibit Orders that Implicate Construction

8          As the Court held in denying Defendants' motion to stay contempt proceedings pending

9   appeal, the PLRA does not categorically prohibit courts from ordering prison construction

10  projects where such projects are necessary to correct the violation of a federal right.  (Dkt. 1778 at

11  10-11.)  The statute provides:

12          *Nothing in this section shall be construed* to authorize the courts, in
            exercising their remedial powers, to order the construction of prisons or
13          the raising of taxes, or to repeal or detract from otherwise applicable
            limitations on the remedial powers of the courts.
14
15  18 U.S.C. § 3626(a)(1)(C) (emphasis added).  Nothing in the plain language of this statute

16  prohibits courts from ordering prison construction where necessary to correct violations of federal

17  law; rather, it merely provides that nothing in section 3626 shall be construed to *authorize* such

18  construction.  Had Congress intended the PLRA to "expressly prohibit" construction of prisons, it

19  would have included prohibitory language — "the court shall not order the construction of

20  prisons" — as it did in section 3626(a)(1)(B) ("The court shall not order any prospective relief

21  that requires or permits a government official to exceed his or her authority under State or local

22  law … unless [certain conditions are satisfied].").

23          Defendants' contrary interpretation is flawed, among other reasons, because it "equates

24  the failure to confer authority . . . with a prohibition [of such authority]," a statutory construction

25  expressly rejected by the Ninth Circuit.  *Cabazon Band of Mission Indians v. Wilson*, 37 F.3d

26  430, 433 (9th Cir. 1994).  In *Cabazon*, the plaintiffs argued that a provision in the federal Indian

27  Gaming Regulatory Act, stating that "nothing in this section shall be interpreted as conferring

28  upon a State . . . authority to impose any tax . . . upon an Indian tribe," constituted an "express[]

1   prohibit[ion]" of taxation on Indian tribes. *Id.* at 432-33. The court rejected this argument,

2   holding that a statutory provision disclaiming a grant of authority does not constitute an express

3   prohibition of such authority. *Id.* Applying the same analysis here defeats Defendants'

4   unsupported assertion that section 3626(a)(1)(C) "expressly prohibits" courts from ordering

5   prison construction projects. *See also Bullcreek v. Nuclear Reg. Comm.*, 359 F.3d 536, 542 (D.C.

6   Cir. 2004) (similar statutory provision "contain[ed] no prohibitory language" and thus left

7   untouched any independent source of authority).

8        Defendants try to distinguish *Cabazon* by arguing that the court there interpreted the

9   statute at issue as not revoking a state's well-established power "where there was no evidence of

10  Congressional intent to the contrary." (Mot. at 16.) In the portion of the *Cabazon* decision

11  addressing the construction of the statute at issue, however, the court had no need to address, and

12  did not address, congressional intent because it held that the statutory language — "nothing in

13  this section shall be construed as authorizing" — unambiguously did not constitute a prohibition.

14  *Cabazon*, 37 F.3d at 433. This holding of *Cabazon* applies with equal force here, where

15  Defendants are trying to read into the very same statutory language an "express prohibition" that

16  simply does not exist.[7]

17       Defendants' interpretation of section 3626(a)(1)(C) also violates the "cardinal principle"

18  that courts have a duty to avoid construing a statute in such a way as to (i) raise "doubtful

19  constitutional questions," or (ii) "displace courts' traditional equitable powers." *Gilmore*, 220

20  F.3d at 997-98 & n.12 (internal quotations and citation omitted). Defendants' interpretation

21  would do both. The Ninth Circuit has held that Congress is free to alter the permissible scope of

22

23  ─────────────

    [7] Defendants also cite three cases for the proposition that courts have recognized their inability to
24  order prison construction. (Mot. at 15 (citing *Jones v. Wittenberg*, 330 F. Supp. 707 (N.D. Ohio
    1971); *Padgett v. Stein*, 406 F. Supp. 287 (M.D. Pa. 1975); *Reece v. Gragg*, 650 F. Supp. 1297
25  (D. Kan. 1986)).) None of these cases hold that courts lack the equitable authority to issue
    remedial orders requiring prison construction where necessary to cure constitutional violations.
    Rather, they hold only that courts are limited in their ability to specify funding or impose taxes
26  for construction. Indeed, the court in *Jones* expressly recognized that courts may order
    improvements in or construction of prison medical facilities when necessary to correct
27  constitutional violations. *See Jones*, 330 F. Supp. at 718; *see also Hadix v. Caruso*, 2007 U.S.
    Dist. LEXIS 15605, *4 (W.D. Mich. Mar. 6, 2007) (noting that consent decree required the
    construction of a healthcare facility).

28

1   prospective relief for unconstitutional prison conditions only "so long as the restrictions on the

2   remedy do not prevent vindication of the right." *Id.* at 1002-03.  Stripping courts of their

3   authority to order "construction of prisons" — irrespective of whether that remedy is necessary to

4   correct a proven constitutional violation — would violate that principle and overstep the bounds

5   of Congress' authority.  *Cf. Dickerson v. United States*, 530 U.S. 428, 437 (2000) (Congress

6   cannot overrule prophylactic remedy designed by courts to prevent violation of constitutional

7   rights).

8           Finally, the cases Defendants cite in support of their interpretation of section

9   3626(a)(1)(C) do not help them.  The Ninth Circuit's observation in *Gilmore* that section 3626(a)

10  "operates . . . to restrict the equity jurisdiction of federal courts" was in reference to the

11  provisions of section 3626(a) that prevent courts from ordering states to "do more than the

12  constitutional minimum."  *Gilmore,* 220 F.3d at 998-99.  Under Defendants' construction, the

13  PLRA would bar courts from ordering prison construction even where such construction would

14  be required to meet (not exceed) the constitutional minimum.  The Supreme Court's decision in

15  *Miller v. French*, 530 U.S. 327 (2000), is similarly inapposite.  In *Miller*, the Court rejected an

16  interpretation of a separate provision of the PLRA that would have "subvert[ed] the plain

17  meaning of the statute, making its mandatory language merely permissive."  *Miller*, 530 U.S. at

18  337.  Here, it is *Defendants'* interpretation of section 3626(a)(1)(C) that would "subvert the plain

19  meaning of the statute" by transforming language that merely disclaims any grant of authority

20  into a prohibition of such authority, despite the absence of any prohibitory language.

21                                   **CONCLUSION**

22          For all of these reasons, the Court should deny Defendants' motion to terminate the

23  Receivership and should deny the motion to terminate the construction plans.

24  Dated:  February 23, 2009              MORRISON & FOERSTER LLP

25

26                                 By:   / s /  James J. Brosnahan
                                         James J. Brosnahan

27                                     Attorneys for Receiver
                                       J. CLARK KELSO

28