IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCIANO PLATA, et al.,

                Plaintiffs,

      v.

ARNOLD SCHWARZENEGGER, et al.,

                Defendants.

NO. C01-1351 TEH

ORDER DENYING DEFENDANTS' MOTION TO REPLACE RECEIVER WITH SPECIAL MASTER AND TO TERMINATE THE RECEIVER'S CONSTRUCTION PLAN

This matter came before the Court on March 16, 2009, on Defendants' motion (1) to replace the Receiver with a special master and, during the transition, establish a process to ensure the Receiver's compliance with state and federal law and (2) to terminate the Receiver's construction plan.  After carefully considering the parties' and the Receiver's written and oral arguments, the Court agrees with Plaintiffs and Defendants that an evidentiary hearing is unnecessary and, for the reasons set forth below, now DENIES Defendants' motion.

I.      **BACKGROUND**

Plaintiffs filed this lawsuit on April 5, 2001, alleging constitutional violations in the delivery of medical care to inmates confined in California state prisons.[1]  The parties had been in informal negotiations concerning prison medical care since July 1999 and ultimately agreed to a stipulation for injunctive relief, which the Court entered as an order on June 13,

---

[1]This case originally did not include Pelican Bay State Prison, which was under the Court's jurisdiction in a separate action, *Madrid v. Cate*, Case No. C90-3094 TEH. However, on June 6, 2008, the parties stipulated, and the Court ordered, that Pelican Bay State Prison is now included in this case and that prisoners housed at that facility are now included in the Plaintiff class.

2002.  The parties also stipulated to the appointment by the Court of medical and nursing

experts ("Court Experts") to assist with the remedial process.

Under the June 13, 2002 Stipulation for Injunctive Relief, Defendants agreed and

were ordered to implement new policies and procedures on a staggered basis, with seven

prisons to complete implementation in 2003.  In each subsequent year, Defendants were to

complete implementation at five additional prisons, such that statewide implementation was

to be achieved by the end of 2008.[2]  Needless to say, Defendants failed to comply with the

schedule to which they stipulated.  *E.g.,* May 10, 2005 Order to Show Cause ("OSC") at 3

(noting that, as of the date of the order, when implementation should have been complete at

twelve prisons, "not a single prison has successfully completed implementation").

The Court Experts' July 16, 2004 report identified serious deficiencies relating to

physician quality at California's prisons.  Defendants agreed to address these issues in a

stipulation entered as an order of the Court on September 17, 2004 ("Patient Care Order").

> The Patient Care Order required defendants to engage an
> independent entity to (a) evaluate the competency of physicians
> employed by the CDCR [California Department of Corrections
> and Rehabilitation] and (b) provide training to those physicians
> found to be deficient.  It also required defendants to undertake
> certain measures with respect to the treatment of high-risk
> patients, to develop proposals regarding physician and nursing
> classifications and supervision, and to fund and fill Quality
> Management Assistance Teams ("QMAT") and other support
> positions.  Defendants failed to come close to meeting the terms
> of the Patient Care Order, even with generous extensions of time
> from the Court.

Oct. 3, 2005 Findings of Fact & Conclusions of Law Re: Appointment of Receiver

("FF&CL") at 3.

To help facilitate implementation of the stipulated injunctive relief in this case, the

Court also conducted monthly status conferences with the parties and invited them "to

contribute ideas as to possible remedies."  *Id.* at 38.  At those conferences:

---

[2]Thirty-two prisons were covered by the original stipulation.  As noted, Pelican Bay
State Prison was not originally included as part of this lawsuit.

1

2          the Court especially encouraged defendants to consider ways in
           which they could take the actions necessary to solve the medical
3          care problems through measures within their own control,
           including use of the extraordinary powers of the Governor.  The
4          Court went to the length of requesting that defendants present it
           with a series of proposed orders so that the Court could help
5          empower them to overcome some of their bureaucratic hurdles on
           their own.  Defendants did not submit a single proposed order.

6   *Id.* at 38-39 (citation omitted).

7          Ultimately, the Court found itself with no alternative other than to issue an order to

8   show cause as to why Defendants should not be found in civil contempt and why a receiver

9   should not be appointed to manage health care delivery for the CDCR.  May 10, 2005 OSC.

10  "Even following issuance of the OSC – on the brink of possible contempt and the imposition

11  of a Receivership – defendants were able to enact only very limited and piece-meal

12  measures, with no prospect for system-wide reform or restructuring."  Oct. 3, 2005 FF&CL

13  at 39.

14         Beginning on May 31, 2005, and concluding on June 9, 2005, the Court conducted a

15  six-day evidentiary hearing concerning the OSC.  The parties then submitted legal briefs

16  addressing both contempt and whether a receiver should be appointed, and several unions

17  representing state prison medical personnel filed an amicus brief.  Of particular relevance to

18  the motion now pending before the Court, Defendants acknowledged in their brief that this

19  Court has the authority to appoint a receiver:  "Defendants do not dispute that the Court has

20  the power to appoint a receiver, whether 'interim' or 'temporary,' in this matter."  Defs.'

21  June 20, 2005 Response to OSC at 2 (footnote omitted); *see also id.* at 25 ("Defendants do

22  not deny that the Court has the power to appoint a receiver").

23         The Court heard argument on the OSC on June 30, 2005.  "Based on the arguments of

24  counsel, the evidence presented, the full record in this case, and the Court's own observations

25  [on visits to two prisons, accompanied by counsel for the parties], the Court delivered an oral

26  ruling at the conclusion of the hearing that it would take control of the medical delivery

27  system of the CDCR and place it under the auspices of a Receivership."  Oct. 3, 2005

28  FF&CL at 4.  On October 3, 2005, the Court issued its 53-page findings of fact and

                                              3

conclusions of law setting forth the detailed reasoning behind its oral ruling.  Because the Court concluded that a finding of contempt was not a prerequisite to the appointment of a receiver, the Court held the contempt remedy in abeyance.  *Id.* at 50.

The Court initially appointed Robert Sillen as Receiver on February 14, 2006, with an effective date of April 17, 2006.  On January 23, 2008, the Court appointed J. Clark Kelso as Mr. Sillen's replacement, effective immediately.  Throughout both Receivers' tenures, the Receivership has put into place significant changes and issued regular reports documenting its progress.  Defendants themselves acknowledge that the Receivership has made improvements to the manner in which medical care is delivered to the Plaintiff class.  Nonetheless, much work remains to be done, as evidenced by the Receiver's most recent report, the tenth tri-annual report filed on January 20, 2009, as well as the evidence submitted by Plaintiffs and the Receiver in response to Defendants' instant motion – evidence left unrebutted by Defendants' reply papers.

The Receiver's intention to oversee construction of separate facilities to house inmates with serious medical needs has been evident since at least the filing of the Receiver's second bi-monthly report on September 19, 2006.[3]  Periodic updates have been provided in the Receiver's subsequent reports, and the Receiver's office has been in regular contact with representatives from the State concerning construction issues for several years.

The construction proposals have also been included in the Receiver's plans of action filed with the Court, beginning with his preliminary plan of action, filed on May 10, 2007, and culminating in his Turnaround Plan of Action, filed on June 6, 2008.  In its order approving the Turnaround Plan, the Court described the extent of the Receivership's consultation with the parties and the public before the Receiver presented a final draft plan for the Court's approval.  June 16, 2008 Order at 1-3.  As the Court has repeatedly noted, Defendants have been involved with construction planning from the outset and, despite having multiple opportunities to file formal objections with the Receiver and the Court, have

---

[3]During the Receivership's initial phases, the Receiver filed bi-monthly reports.  The reporting frequency was subsequently changed to quarterly, and it is now tri-annually.

failed to do so.  Defendants make much of their argument that the Receiver's plans indicated that any construction would be funded through lease revenue bonds, and that such bonds require the approval of the Legislature; however, the evidence demonstrates that lease revenue bonds need not require legislative approval.

It was not until the late summer of 2008 that Defendants began objecting to the Receiver's construction plans.  On August 13, 2008, the Receiver filed a motion seeking a contempt finding against Defendants Governor Arnold Schwarzenegger and Controller John Chiang for their failure to make funding available for the Receiver's capital projects.  As an intermediate step short of contempt, this Court entered an order on October 27, 2008, for Defendants to transfer to the Receivership $250 million in unencumbered funds appropriated to the CDCR by Assembly Bill 900 ("AB 900").  The Court ordered Defendants to effectuate the transfer by November 5, 2008, or be prepared to show cause on November 12, 2008, as to why contempt should not be entered for failure to comply with the Court's order.

On October 31, 2008, Defendants filed an appeal of the October 27, 2008 Order and concurrently filed a motion to stay the order pending appeal.  This Court temporarily stayed the order until November 7, 2008, to allow time for briefing and hearing on the motion to stay.  On November 7, 2008, the Court held oral argument on the motion to stay and subsequently issued an order denying the motion.  Later that same day, the United States Court of Appeals for the Ninth Circuit entered an order granting a similar motion to stay brought by Defendants before that court.  The Ninth Circuit set an expedited briefing schedule and heard argument on Defendants' appeal on February 12, 2009.  The appeal remains pending as of the date of the issuance of this order.

Throughout the construction planning process, the Receiver has made clear that construction of separate facilities will proceed in phases; that the need for additional facilities will be re-evaluated prior to beginning each phase; and that the Receiver will seek approval from this Court prior to beginning construction in any phase.  For instance, in Goal 6 of the Turnaround Plan of Action, the Receiver stated his intent "to supervise construction on *up to* seven sites at existing CDCR institutions, each site supporting medical and mental health

services for *up to* 1,500 inmates." June 6, 2008 Turnaround Plan of Action at 27 (emphasis added). In addition, the Receiver has recognized that the outcome of the three-judge court proceedings concerning prison overcrowding – in which the court has already issued a tentative ruling indicating that it will, absent a settlement, enter a population reduction order – will need to be considered. Most recently, on February 6, 2009, the Receiver filed with the Court a report on options for long-term care bed construction that sets forth three construction options ranging from 5,000 to 10,000 inmate beds and indicates that other options may also exist. *E.g.,* Feb. 6, 2009 Report at 12 ("There are at least three construction options."). In that report, the Receiver explained the extent of his interactions with Defendants and other State officials on construction. The report concluded by recommending "that the parties be provided an opportunity to respond to this options report and that the State defendants inform the courts [in this case and three other prison cases involving mental health care, dental care, and inmates with disabilities] concerning other construction options which they believe may be appropriate." *Id.* at 15. The Receiver's options report, as well as the Receiver's suggestion that responses from the parties would be useful, remains under consideration by this Court at this time.

Defendants filed their instant motion to replace the Receiver with a special master and to terminate the Receiver's construction plan on January 28, 2009. Defendants' moving papers contended that, as a legal matter, both the Receivership and its construction plans were prohibited by the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, and also appeared to raise factual attacks against both the Receivership and its construction plans. Plaintiffs and the Receiver filed briefs opposing the motion, and the Receiver also filed an administrative motion requesting an order setting a date for an evidentiary hearing and allowing limited discovery. In its order denying the Receiver's request, the Court noted that Defendants' counsel reportedly stated that Defendants did not seek to terminate the Receivership if the Court determined that the PLRA allowed appointment of receivers. The Court ordered Defendants to verify or dispute the accuracy of that statement in their reply papers. *See* Mar. 4, 2009 Order at 2. In their reply brief, Defendants admitted that

6

1   Defendants' counsel's statements were accurately reported, but they added that, "to the

2   extent the statement made by Defendants' counsel is inconsistent with the written briefs

3   submitted by Defendants, the written briefs more accurately convey the position of

4   Defendants in this matter."  Reply at 1.  *Id.*  Counsel are advised that this Court fully expects

5   all counsel's oral and written representations, as well as the briefs they prepare on behalf of

6   their clients, to represent their clients' positions.

7           After reviewing the parties' and the Receiver's written and oral arguments, the Court

8   agrees with Plaintiffs and Defendants that an evidentiary hearing is not necessary to resolve

9   Defendants' motion.  Notably, the Receiver did not renew his request for an evidentiary

10  hearing following receipt of Defendants' reply papers.  For the reasons discussed below, the

11  Court DENIES both Defendants' motion to terminate the Receivership and replace it with a

12  special mastership and their motion to terminate the Receiver's construction plans.

13

14  **II.      DISCUSSION**

15          **A.      <u>Motion to Terminate Receivership and Replace with Special Mastership</u>**

16                  **1. Whether the PLRA Permits Appointment of a Receiver**

17          Defendants first argue that this Court must terminate the Receivership, and replace the

18  Receiver with a special master, because the PLRA bars federal courts from appointing

19  receivers in cases involving prison conditions.  Under the PLRA, "the court may appoint a

20  special master who shall be disinterested and objective and who will give due regard to the

21  public safety, to conduct hearings on the record and prepare proposed findings of fact."

22  18 U.S.C. § 3626(f)(1)(A).  A special master appointed under this provision "may be

23  authorized by a court to conduct hearings and prepare proposed findings of fact, which shall

24  be made on the record," "shall not make any findings or communications ex parte," and

25  "may be authorized by a court to assist in the development of remedial plans."  18 U.S.C.

26  § 3626(f)(6)(A)-(C).  The statute defines "special master" as "any person appointed by a

27  Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any

28  inherent power of the court to exercise the powers of a master, regardless of the title or

7

1   description given by the court." 18 U.S.C. § 3626(g)(8).  Defendants acknowledge that pre-

2   PLRA case law permitted appointment of receivers in prison litigation, *see, e.g., Shaw v.*

3   *Allen*, 771 F. Supp. 760 (S.D. W. Va. 1990); *Newman v. Alabama*, 466 F. Supp. 628 (M.D.

4   Ala. 1979), but they contend that the provisions in the PLRA governing the appointment of a

5   special master render such cases invalid.

6        As an initial matter, Defendants have never before contested this Court's authority to

7   appoint a receiver.  In fact, to the contrary, when responding to the Court's order to show

8   cause as to why a receiver should not be appointed, Defendants explicitly stated that they did

9   not dispute the Court's authority to do so.  Defs.' June 20, 2005 Response to OSC at 2, 25.

10  In their reply papers to the instant motion, however, Defendants argue that they are not

11  bound by their earlier positions because a court's authority to appoint a receiver is a

12  jurisdictional issue that can never be waived.  This Court need not decide whether

13  Defendants' jurisdictional argument is correct because, for the reasons discussed below, it

14  finds Defendants' current position to be unsupported by the law.

15       First, Defendants make no argument that the Receiver operates as a special master

16  under the PLRA; that is, Defendants do not contend that the Court appointed the Receiver

17  under Federal Rule of Civil Procedure 53 or to exercise the powers of a master.  *See* 18

18  U.S.C. § 3626(g)(8) (defining "special master").  As Defendants recognize, this Court

19  appointed the Receiver "to control, oversee, supervise, and direct all administrative,

20  personnel, financial, accounting, contractual, legal, and other operational functions of the

21  medical delivery component of the CDCR."  Feb. 14, 2006 Order at 2.  Elsewhere in the

22  Order Appointing Receiver, this Court explained that "[t]he Receiver shall exercise all

23  powers vested by law in the Secretary of the CDCR as they relate to the administration,

24  control, management, operation, and financing of the California prison medical health care

25  system.  The Secretary's exercise of the above powers is suspended for the duration of the

26  Receivership."  *Id.* at 4.  Thus, the powers and duties of the Receiver extend far beyond the

27  powers of a special master.  Indeed, Defendants must acknowledge this point, else there

28  would be no reason for them to draw a contrast between a special master and the Receiver,

1  *see, e.g.,* Mot. at 10 ("Rather than appointing a special master in this case, the Court created

2  the Receivership. . . ."), or to seek replacement of the Receiver by a special master.

3      Defendants argue that the PLRA bars this Court from appointing a receiver because

4  the statute refers explicitly to special masters but not receivers.  For support, they rely on

5  Congressional history, including a statement that, "[t]he limitation in this provision on the

6  selection and use of masters is intended to apply to anyone relied on by the court to make

7  factual findings or to monitor or review compliance with, enforcement of, or implementation

8  of a consent decree or of court-ordered relief in a prison conditions suit."  H.R. Rep. No.

9  104-21, at 28 (1995) (available at 1995 WL 56410).  Similarly, they cite a statement in the

10  legislative history that, "[t]his provision applies even if the agent of the court is titled or

11  described by the court not as a special master but as a receiver, master, master hearing

12  officer, monitor, human rights committee, ombudsman, or consultant."  *Id.*

13      However, as Defendants acknowledged in their reply (but not in their moving papers),

14  the cited legislative history related not to the PLRA, but to a predecessor bill that was never

15  enacted.  Moreover, the provision discussed in the legislative history cited by Defendants

16  was dramatically different from the provision ultimately enacted in the PLRA.  The earlier

17  provision that formed the basis for the commentary relied on by Defendants read as follows:

18      In any civil action in a Federal court with respect to prison
       conditions, any special master or monitor shall be a United States
19      magistrate and shall make proposed findings on the record on
       complicated factual issues submitted to that special master or
20      monitor by the court, but shall have no other function.  The
       parties may not by consent extend the function of a special master
21      beyond that permitted under this subsection.

22  *Id.* at 6.  The enacted version differs in several material respects.  For instance, it refers only

23  to special masters and not monitors; does not require that only a United States magistrate can

24  be appointed as a special master; and does not provide that a special master shall have no

25  other function than those listed.  *Compare supra with* 18 U.S.C. § 3626(f).  The limitations in

26  the earlier, non-enacted version therefore should not be read into the PLRA.  *I.N.S. v.*

27  *Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction

28  are more compelling than the proposition that Congress does not intend *sub silentio* to enact

1   statutory language that it has earlier discarded in favor of other language." (citations

2   omitted)); *Russello v. United States*, 464 U.S. 16, 23-24 (1983) ("Where Congress includes

3   limiting language in an earlier version of a bill but deletes it prior to enactment, it may be

4   presumed that the limitation was not intended.").

5        Also weighing against Defendants' interpretation of the PLRA are the well-

6   established principles that (1) "where a statute is susceptible of two constructions, by one of

7   which grave and doubtful constitutional questions arise and by the other of which such

8   questions are avoided, our duty is to adopt the latter," and (2) "a statute should not be

9   construed to displace courts' traditional equitable powers '[a]bsent the clearest command to

10  the contrary.'" *Gilmore v. California*, 220 F.3d 987, 997 & n.12 (9th Cir. 2000) (citations

11  omitted).  Regarding the first principle, "Congress is free to alter the standard that determines

12  the scope of prospective relief for unconstitutional prison conditions," but it can do so only

13  "so long as the restrictions on the remedy do not prevent vindication of the right." *Id.* at

14  1002-03.  In this case, the Court appointed a receiver only after it found that no other relief

15  could remedy the constitutional violations at issue.  Construing the PLRA to prevent this

16  Court from appointing a receiver would therefore raise a serious question as to whether

17  Congress over-stepped its authority by preventing vindication of Plaintiffs' constitutional

18  rights.

19       Regarding the second principle, Defendants do not dispute that federal courts had the

20  equitable power to appoint a receivership in cases involving prison conditions prior to

21  enactment of the PLRA.  Because the PLRA does not provide "the clearest command" that it

22  was intended to displace this power, the statute should not be so construed.  Notwithstanding

23  Defendants' assertions to the contrary, a statute's silence on an issue, such as the

24  appointment of a receiver, does not constitute repeal of pre-existing equitable powers.  As the

25  Supreme Court has held, "[u]nless a statute in so many words, or by a necessary and

26  inescapable inference, restricts the court's jurisdiction in equity, the full scope of that

27  jurisdiction is to be recognized and applied." *Weinberger v. Romero-Barcelo*, 456 U.S. 305,

28  313 (1982) (citations omitted).  That standard is not satisfied here, and the Court therefore

1  concludes that the PLRA's inclusion of provisions governing special masters does not

2  constitute a prohibition on the appointment of other officers or agents, including receivers.

3  ## 2.   Defendants' Remaining Arguments

4  Defendants' remaining arguments as to why the Receivership should be terminated

5  are not entirely clear, but none of the arguments that the Court discerns from Defendants'

6  briefs is persuasive.  First, Defendants' papers could be read as arguing that this Court never

7  made any findings that a receivership was a narrowly drawn or the least intrusive remedy.

8  This argument is without merit.  Under the PLRA, a "court shall not grant or approve any

9  prospective relief unless the court finds that such relief is narrowly drawn, extends no further

10  than necessary to correct the violation of the Federal right, and is the least intrusive means

11  necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).  The

12  Court's October 3, 2005 decision indicated that perhaps a lesser standard applied in the

13  context of health-related conditions, but the Court did not decide that issue because it made

14  detailed findings that a receivership satisfied the "needs-narrowness-intrusiveness" standard

15  under the PLRA.  *Id.* at 37-42; *see also id.* at 45 (observing that the Court could have

16  appointed a receiver to displace the State officials in charge of the CDCR instead of just

17  taking over the functions relating to medical care); *id.* at 47 (noting that the Court neither

18  sought nor relished a receivership but found that it was "simply at the end of the road with

19  nowhere else to turn"); *id.* at 49 (explaining that the Court found that there was "no realistic

20  alternative" to a receivership and "that the establishment of a Receivership, along with those

21  actions necessary to effectuate its establishment, are narrowly drawn to remedy the

22  constitutional violations at issue, extend no further than necessary to correct a current and

23  ongoing violation of a federal right, and are the least intrusive means necessary to correct

24  these violations.").  Thus, any assertions by Defendants that the Court failed to make the

25  necessary findings for prospective relief under the PLRA when it created the Receivership

26  are unfounded.

27  Defendants' motion also appears to argue that the Receivership must be terminated

28  because it is expensive, has failed to provide information regarding inmate deaths, and is

11

engaging in conduct that extends beyond the requirements of constitutional medical care.  On

this last issue, Defendants provided only two concrete examples: the Receiver's involvement

in the out-of-state inmate transfer program and the Receiver's proposal to construct seven

new health care facilities to house California inmates.  However, Defendants offered no

rebuttal to the evidence submitted by the Receiver justifying the Receivership's involvement

with inmates who have been transferred to out-of-state facilities.[4]  Moreover, although

objections that any actions by the Receivership extend beyond constitutional requirements or

are not the least intrusive means to ensure constitutional compliance may be grounds for

narrowing or eliminating those aspects of the Receivership, they are not bases for terminating

the Receivership in its entirety.  Indeed, Defendants have cited no authority to support that

proposition.  The same holds true for allegations that some of the Receivership's expenses

may be unnecessary or that the Receivership needs to be more transparent.

As the Court explained when it found a receivership to be necessary:

> It bears emphasizing that establishment of the Receivership, while absolutely necessary, is intended as a temporary, not permanent, measure.  The Court looks forward to the day, hopefully sooner rather than later, when responsible officials of the State will assume their legal obligations to run the CDCR in a manner that provides constitutionally adequate health care to all prisoners.  As the Supreme Court has instructed, "[a] receivership is only a means to reach some legitimate end sought through the exercise of the power of a court of equity.  It is not an end in itself."  [*Gordon v. Washington*, 295 U.S. 30, 37 (1935)].  Once the Court is confident that defendants have the capacity and will to provide such care, the Court will relinquish control from the Receiver back to the State.

Oct. 3, 2005 FF&CL at 50.  Similarly, in the February 14, 2006 Order Appointing Receiver,

the Court ordered that:

> The Receivership shall remain in place no longer than the conditions which justify it make necessary, and shall cease as soon as the Court is satisfied, and so finds in consultation with the Receiver, that Defendants have the will, capacity, and leadership to maintain a system of providing constitutionally adequate medical health care services to class members.

---

[4]The Court addresses challenges to the construction program in more detail below.

12

Feb. 14, 2006 Order at 7.  Based on the entire record in this case, the Court is far from confident that Defendants have the will, capacity, or leadership to provide constitutionally adequate medical care in the absence of a receivership, and Defendants have presented no evidence to the contrary.  Nor have Defendants offered any rebuttal to the evidence presented by Plaintiffs and the Receiver in their opposition papers concerning the ongoing nature of the constitutional violations.

Defendants' counsel repeatedly emphasized at oral argument that the State has committed large financial resources to fund prison health care, and counsel also argued that the Receivership has now put into place foundational elements that cannot be eliminated. However, Defendants have presented no evidence that increased funding alone will result in constitutionally adequate health care, that their support for improvements in prison medical care would continue if this Court were to eliminate the Receivership, or that the reforms already put into place by the Receivership would not be allowed to backslide.  To the extent that some of the conditions noted in the Court's October 3, 2005 decision have improved, the Court attributes the vast majority of, if not all, such improvements to the existence of the Receivership.  The Court has no confidence that such improvements would continue, or even be maintained, in the absence of the Receivership.

Put simply, Defendants have failed to present any factual basis for concluding that they could and would remedy the constitutional violations at issue in this case if the Court terminated the Receivership.  Neither have they presented any factual basis for concluding that the far more limited powers of a special master would provide sufficient judicial oversight at this time.  Consequently, Defendants have failed to meet their burden on this motion.  *See Gilmore*, 220 F.3d at 1007 (holding that the burden of proof is on the party seeking to terminate prospective relief).

As to Defendants' statements about the Receivership's expenses and alleged lack of transparency and cooperation, the Receiver filed substantial declarations with his opposition disputing Defendants' allegations.  Those declarations indicate that, contrary to Defendants' initial assertions, the Receivership has been transparent, has extensively involved Defendants

in the Receivership's activities, has shown no attempts to avoid accountability, and does not contain unnecessary administrative teams that duplicate the work of existing divisions of the CDCR.  Revealingly, Defendants filed not a single response to contest any of the Receiver's evidence.  The Court does not address all of the evidence in this order, but it does make two observations.  First, the only specific example of a lack of transparency identified by Defendants concerned the provision of information concerning inmate deaths.  Gilevich Decl. ¶ 3.  Those concerns appear to be unfounded based on the uncontested evidence presented by the Receiver.  *See, e.g.,* Goldman Decl. ¶¶ 2-3 (explaining reason for not providing inmates' names and indicating willingness to respond to further explanation for request, which Defendants' counsel, Mr. Gilevich, did not provide); Kimura-Yip Decl. ¶¶ 3-4 (stating that she received frequent requests for information from Mr. Gilevich and is "not aware of any occasion on which Mr. Gilevich's information requests have been denied or otherwise unsatisfactorily fulfilled").  Additionally, while the costs of the Receivership are undoubtedly significant, providing adequate prison medical care in the largest prison system in the United States is costly, and it is even more costly when the Receivership must make up for the years of neglect by the State that gave rise to this Court's appointing a receiver.[5]  For example, the separate administrative teams created by the Receivership are necessary because of the CDCR's prior abject failure to perform such functions adequately as to issues

---

[5]The Court described some of the deplorable conditions concerning inmate medical care in its findings of fact concerning the appointment of a receiver.  *See* Oct. 3, 2005 FF&CL at 5-25.  Substantial evidence supports those findings.  For example, following a February 2005 visit to San Quentin State Prison, which was to have completed implementation of the stipulated injunctive relief in this case by 2004, the Court's nursing experts observed that clinics in housing areas were sometimes "nothing more than an office used by correctional officers" and "lacked basic medical equipment and supplies."  Apr. 9, 2005 Nursing Experts' Report on San Quentin at 2.  The "most disturbing" conditions were in one unit where "[t]he area used for nursing triage is a small room at the end of the tier that the nurse accesses by walking through a gate and into the men's showers. . . .  Because of a clogged shower drain, standing water was present outside the clinic door.  Inside, the room was filthy.  The furniture was old and in disrepair.  There was no examination table, medical equipment or supplies, or handwashing facilities.  According to staff, equipment (otoscope [an instrument used to examine the ear]) requested for this area had been denied.  As well, there was no telephone or computer access.  Prior to this room being used, a broom closet on the fourth tier was used for nurse triage.  These conditions are deplorable and have no resemblance to a medical setting whatsoever."  *Id.* at 2-3.

related to prison medical care, and Defendants have made no showing, or even contention, that the administrative divisions of the CDCR are now willing and capable to perform these functions adequately.

While Defendants' assertions regarding costs and transparency are not grounds for terminating the Receivership – and, in light of Defendants' failure to submit any evidence to rebut the evidence presented by the Receiver on these issues, appear to have been abandoned in any event – the Court nonetheless takes this opportunity to reiterate its commitment to ensuring that a constitutional system of delivering medical care to California's inmates is developed and implemented timely, in an efficient and cost-effective manner, and in the least intrusive means possible.  As the remedy imposed by the Court to achieve that goal, the Receivership must share the same commitment.  The Court further reiterates that the Receivership is not an unaccountable entity operating in secret.  To the extent that Plaintiffs or Defendants believe the Receivership is not providing them with necessary information, they are directed first to submit a written request to the Receivership and then to meet and confer with the Receivership to attempt to resolve those differences.  If the parties and the Receivership are unable to resolve their differences independently, they shall mediate their dispute with the assistance of Mr. Starr Babcock, the Pro Bono Special Assistant to the Court.  Disputes of this nature should be brought to the Court for resolution only if such good-faith efforts to resolve the disputes informally are unsuccessful.

### B.    Motion to Terminate Receiver's Construction Plan

#### 1.    Whether the Court Has Jurisdiction to Consider This Motion

The second portion of Defendants' motion seeks to terminate the Receiver's "construction plan."  Mot. at 14.  Plaintiffs argue that the Court lacks jurisdiction to consider this portion of Defendants' motion based on Defendants' appeal of the Court's October 27, 2008 order to transfer $250 million in unencumbered AB 900 funds to the Receiver.  The Court rejects Plaintiffs' argument and agrees with Defendants and the Receiver that it retains jurisdiction to consider this issue.

15

It is well-settled that the filing of a notice of appeal "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam). However, this Court has already determined that Defendants' appeal did not divest the Court of jurisdiction because Defendants attempted to appeal a non-appealable order, which does not deprive the district court of jurisdiction. Nov. 7, 2008 Order at 3-6; *see Ruby v. Sec'y of U.S. Navy*, 365 F.2d 385, 389 (9th Cir. 1966) ("Where the deficiency in a notice of appeal, by reason of . . . reference to a non-appealable order, is clear to the district court, it may disregard the purported notice of appeal and proceed with the case, knowing that it has not been deprived of jurisdiction.")

Even if the Ninth Circuit ultimately concludes that it does have jurisdiction to hear Defendants' appeal, "an appeal from an interlocutory order does not divest the trial court of jurisdiction to continue with other phases of the case." *Plotkin v. Pac. Tel. & Tel. Co.*, 688 F.2d 1291, 1293 (9th Cir. 1982). In addition, the Ninth Circuit has held that:

> in the kinds of cases where the court supervises a continuing course of conduct and where as new facts develop additional supervisory action by the court is required, an appeal from the supervisory order does not divest the district court of jurisdiction to continue its supervision, even though in the course of that supervision the court acts upon or modifies the order from which the appeal is taken.

*Hoffman v. Beer Drivers & Salesmen's Local No. 888*, 536 F.2d 1268, 1276 (9th Cir. 1976). Thus, this Court would retain jurisdiction to consider Defendants' motion even if Defendants' appeal of the order to pay $250 million were procedurally proper.

## 2. Description of the Court's Orders Regarding Construction

Before reaching the merits of Defendants' motion, the Court first discusses the scope of its prior orders on construction to clarify what construction plans have actually been ordered. On June 16, 2008, this Court entered an order approving the Receiver's Turnaround Plan, filed on June 6, 2008. Goal 6 of that plan is to "provide for necessary clinical, administrative and housing facilities." Turnaround Plan at 25. Included in Goal 6 are objectives to "upgrade administrative and clinical facilities at each of CDCR's 33 prison

1    locations to provide patient-inmates with appropriate access to care" and to "expand

2    administrative, clinical and housing facilities to serve up to 10,000 patient-inmates with

3    medical and/or mental health needs." *Id.* at 25-28.[6]  When the Court approved the

4    Turnaround Plan, it found "the plan's six strategic goals to be necessary to bring California's

5    medical health care system up to constitutional standards," and that "the objective and action

6    items identified in the plan will help the Receivership achieve those six goals." June 16,

7    2008 Order at 3-4.  The Court further "emphasize[d] that, as with any such plan, this plan

8    must remain a living document," and that the Turnaround Plan "was never intended to be a

9    detailed set of policies and procedures to govern the day-to-day practices of health care

10   delivery within the CDCR.  To the contrary, the plan should be a higher-level view of the

11   Receivership and its goals that also provides a mechanism – in this case, specific action items

12   with deadlines – for measuring the Receivership's progress towards achieving its goals." *Id.*

13   at 4.

14          Thus, the Court has never intended for the Turnaround Plan to be viewed as the final

15   word on what remedies are necessary, narrowly drawn, and least intrusive in this case, or

16   when those remedies must be implemented.  For example, the Turnaround Plan calls for the

17   construction of seven new facilities by July 2013.  Turnaround Plan at 28.  However, as the

18   Court has observed, "both the Receiver and this Court have emphasized the phased approach

19   of the Receiver's construction program, as well as the Receiver's intention to evaluate the

20   contemporaneous need for each phase prior to beginning work on that phase."  Nov. 7, 2008

21   Order at 15 n.6.  Similarly, as noted in the Receiver's most recent tri-annual report, planning

22   for upgrades at existing facilities has been delayed pending coordination with other class

23   actions involving mental health and dental care, and the deadlines contained in the

24   Turnaround Plan will need to be revised accordingly. Jan. 20, 2009 Tenth Tri-Annual Report

25   at 92-94.

26

27          [6]Goal 6 also includes completion of construction projects related to health care needs
     at San Quentin State Prison.  Defendants have never objected to those projects, which, in
28   fact, have already been funded and are well under way.

17

1    In short, in case it is not already clear, the Court now clarifies that its approval of the

2    Turnaround Plan, and in particular Goal 6 of that plan, was not an order authorizing that any

3    specific construction projects shall proceed.  Instead, it authorized the Receiver to undertake

4    planning for necessary facilities to ensure that California inmates are provided with

5    constitutionally adequate medical care.  The Receiver is not authorized to begin any actual

6    construction without other orders from this Court.

7    Three such orders approving actual construction projects have issued.  First, on

8    June 4, 2007, this Court granted the Receiver's master application for a waiver of state

9    contracting law.  Among the projects included in the Receiver's application were

10   construction upgrade projects at San Quentin State Prison and a project to supplement

11   existing medical facility space with temporary modular buildings where needed, beginning

12   with a pilot project at Avenal State Prison.  Receiver's Apr. 17, 2007 Master Contracting

13   Waiver Appl. at 18-21.  The projects also included project management and preliminary

14   planning for construction of separate health care facilities.  *Id.* at 16-18.  Plaintiffs and

15   Defendants filed statements of non-opposition to this application, and it was "undisputed that

16   the projects described in the Receiver's Application are integral to developing the facets of a

17   constitutionally adequate medical health care system within the [CDCR]."  June 4, 2007

18   Order at 3.  Not only did Defendants not object to the substance of the Receiver's proposed

19   projects; they also agreed that state contracting law would prevent timely implementation of

20   the necessary projects and suggested that the Receiver obtain a waiver of state law from this

21   Court.  *Id.* at 3-4.  No party "offered any alternative to the requested waiver to achieve a

22   constitutional remedy in this instance."  *Id.* at 4.

23   Second, on December 20, 2007, this Court granted the Receiver's unopposed third

24   supplemental application for a waiver of state contracting law.  This application concerned

25   construction projects related to the improvement of health care facilities at Avenal State

26   Prison.  In its order granting the Receiver's application, the Court noted its agreement "that

27   the identified projects at Avenal State Prison are critical to establishing a constitutional

28   system of medical delivery in California's prisons, and that failure to obtain a waiver of state

18

law would prevent the Receiver from achieving that goal in a timely fashion." Dec. 20, 2007
Order at 2. The Court further noted that "no party has identified any alternatives to the
requested waiver that would achieve a constitutional remedy in this instance." *Id.*

Third, the Court granted a similar request for waiver of state law, the Receiver's
unopposed fifth supplemental application, on July 1, 2008. The fifth application concerned
projects related to the improvement of health care facilities at Correctional Training Facility,
Soledad ("CTF"), Mule Creek State Prison ("MCSP"), and California Rehabilitation Center,
Norco ("CRC"). Again, the Court found "that the identified projects at CTF, MCSP, and
CRC are critical to establishing a constitutional system of medical care delivery in
California's prisons," "that failure to obtain a waiver of state law would prevent the Receiver
from achieving that goal in a timely fashion," and that "no party has identified any
alternatives to the requested waiver that would achieve a constitutional remedy in this
instance." July 1, 2008 Order at 2.

In addition to the above orders approving specific construction projects, the Court
approved the Receiver's sixth supplemental application for waiver of state contracting law on
July 2, 2008. This application concerned "design and construction planning for the
Receiver's project ('10,000 Bed Program') to construct facilities to house and treat
approximately 10,000 inmates whose medical and/or mental health conditions require
separate housing to facilitate appropriate access to necessary health care services." July 2,
2008 Order at 1. Neither Plaintiffs nor Defendants opposed this application or identified any
alternatives to the requested waiver that would achieve a constitutional remedy. Upon
reviewing the Receiver's application and the record in this case, the Court again found that
the design and planning activities that were the subject of the Receiver's application were
"critical to establishing a constitutional system of medical care delivery in California's
prisons, and that failure to obtain a waiver of state law would prevent the Receiver from
achieving that goal in a timely fashion." *Id.* at 2.

//

//

3.      **Whether Renovations at Existing Prisons and Planning for Construction of Separate Facilities Should Be Terminated**

What Defendants seek to terminate by their motion is not entirely clear, but Defendants do not appear to be arguing that any of the ongoing renovation projects at existing prisons should be terminated.  Nonetheless, out of an abundance of caution, and for the reasons discussed below, the Court denies Defendants' motion to the extent Defendants seek to terminate the renovation projects in progress at the four facilities discussed above. The Court also denies the motion to the extent Defendants seek to terminate planning for separate facilities to house inmates with serious medical and/or mental health needs. Defendants have never asserted – not even in their papers on this motion to terminate relief – that capital improvements of medical facilities do not need to be undertaken at existing prisons, nor have they ever argued that no separate health-care facilities need to be built.

Because the orders approving the renovation projects and planning for construction of separate facilities were entered by the Court within the past two years, Defendants' motion to terminate is governed by 18 U.S.C. § 3626(b)(2).  *Compare* 18 U.S.C. § 3626(b)(1)(A)(i) (providing that a party may bring a motion to terminate prospective relief "2 years after the date the court granted or approved the prospective relief") *with* 18 U.S.C. § 3626(b)(2) (providing for immediate termination of prospective relief under certain circumstances). Under that provision, immediate termination is proper "if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(b)(2).

Defendants have failed to persuade the Court that this standard for immediate termination is satisfied by the record in this case.  While Defendants correctly observe that the Court never explicitly stated that the remedies at issue are narrowly drawn, extend no further than necessary, and are the least intrusive means necessary to correct the constitutional violations at issue here, such conclusions are inescapable from the Court's orders granting the Receiver's applications for waivers of state law.  As noted above, the

1   Court found that the renovation projects and construction planning were critical to curing the

2   constitutional violations, and that failure to waive state law such that those projects could

3   proceed would prevent elimination of the constitutional violations in a timely manner.

4   Moreover, the Court observed that no party presented any alternatives to the Receiver's

5   proposed projects that would remedy the constitutional violations in a timely manner.  These

6   findings demonstrate that the approved relief satisfied the "needs-narrowness-intrusiveness"

7   requirements of the PLRA when entered.  This is particularly true where, as here, Defendants

8   did not object to any of the relief at issue:  "The very fact that the defendants chose to join

9   the plaintiffs in selecting this remedy would seem to mean – and must be taken to mean –

10  that they understood it to be precisely tailored to the needs of the occasion, that is narrowly

11  drawn and least intrusive."  *Morales Feliciano v. Calderon Serra*, 300 F. Supp. 2d 321, 334

12  (D.P.R. 2004), *aff'd*, *Morales Feliciano v. Rullán*, 378 F.3d 42 (1st Cir. 2004).  Defendants

13  have cited no authority that any more detailed findings are required to avoid immediate

14  termination of relief in cases such as this one, where Defendants did not – and still do not –

15  contest any of the facts presented by the Receiver or assert that any other relief would

16  remedy the violation of Plaintiffs' constitutional right to adequate medical care.

17
18
                 **4.      Whether the Contents of the Receiver's Facility Program Statement
                          Should Be Terminated**

19          While Defendants do not specifically contest any aspects of the renovation projects at

20  existing prisons or the need for planning for separate facilities, they do assert several

21  examples of alleged excess in the second and third drafts of the Receiver's Facility Program

22  Statement.[7]  To the extent that Defendants seek to terminate any proposals included in the

23  Receiver's second draft Facility Program Statement, that document has been superseded and

24  is no longer active even as a draft proposal.  To the extent that Defendants seek to terminate

25  any proposals included in the Receiver's third draft Facility Program Statement or actual

26
27          [7]Defendants failed to respond to evidence that CDCR and Department of Mental
28  Health officials requested that the Receiver's draft Facility Program Statements include many
    of the elements to which Defendants now object.

21

1 construction of any separate facility to provide medical care to California's inmate

2 population, Defendants' motion is premature.  The Court has not authorized construction of

3 any separate facilities that are the subject of the Receiver's third draft Facility Program

4 Statement, nor has the Receiver presented the Facility Program Statement or any other draft

5 plans for construction of separate facilities to this Court for approval.  In addition, on

6 February 6, 2009, the Receiver filed a report on options for long-term care bed construction,

7 indicating that the scope of any construction remains under consideration and in flux.  Thus,

8 to the extent that Defendants seek to terminate construction of separate facilities to provide

9 medical care to Plaintiffs, there simply is nothing for this Court to terminate.  The Court will

10 conduct further proceedings, including evidentiary hearings as necessary, before any

11 construction of separate facilities is authorized.

12 **5.      Whether Construction Orders are Permissible under the PLRA**

13 Finally, Defendants contend that any order to construct separate facilities would run

14 afoul of 18 U.S.C. § 3626(a)(1)(C), which provides that, "Nothing in this section shall be

15 construed to authorize the courts, in exercising their remedial powers, to order the

16 construction of prisons or the raising of taxes, or to repeal or detract from otherwise

17 applicable limitations on the remedial powers of the courts."  Resolving that issue on this

18 motion is unnecessary because the Court has not ordered construction of prisons; it has

19 authorized only renovations of health-care facilities at existing prisons and the planning for

20 construction of new facilities.  As noted above, Defendants have objected to neither of these

21 activities as necessary to remedying the constitutional violations at issue in this case.

22 During the further proceedings contemplated by the Court regarding any final proposal by

23 the Receiver to construct new facilities, the Court can determine the meaning of

24 § 3626(a)(1)(C) as necessary.[8]

25 //

26 //

27 _____

28 [8]It is possible that such resolution will be unnecessary if the Ninth Circuit resolves the issue on Defendants' pending appeal.

22

## III.   CONCLUSION

With good cause appearing for all of the reasons discussed above, the Court DENIES Defendants' motion to replace the Receiver with a special master and to terminate the Receiver's construction plans.  As Defendants have previously acknowledged, this Court has the authority, even after enactment of the PLRA, to appoint a receiver in cases involving prison conditions.  In addition, Defendants have failed to persuade the Court that any more narrowly drawn or less intrusive remedy, such as the appointment of a special master, would be sufficient to remedy the constitutional violations at issue in this case.  On the record of this case, and in the complete absence of any evidence to the contrary, the Court concludes that the Receivership remains necessary to correct the constitutional violations at issue, and that it is narrowly drawn, extends no further than necessary, and is the least intrusive remedy that will vindicate Plaintiffs' constitutional rights.

Defendants have also failed to meet their burden to the extent they seek to terminate the ongoing construction projects to renovate clinical space at four existing prisons or the planning process for constructing separate medical facilities.  Indeed, it appears that Defendants only seek to terminate actual construction of separate medical facilities based on the designs included in the Receiver's third draft Facility Program Statement.  As discussed in this order, however, any such motion is premature.  Neither the Facility Program Statement nor any final construction plans for separate facilities have been presented to this Court for approval, and the Court will conduct further proceedings, including evidentiary hearings as necessary, before approving any plans for construction.  Defendants can, at that time, object to any elements that the Receiver proposes to include in the facilities but that Defendants contend are unnecessary, not the least intrusive remedy, or not narrowly drawn to establish a constitutionally adequate system of delivering medical care to Plaintiffs.

//

//

//

//

1    The development of such a system – no more, and no less – is the focus of the Court's

2    oversight of this case and must also continue to be the focus of the Receivership.  The Court

3    remains committed to ensuring that the Receivership is neither excessive nor wasteful,[9] and

4    the Court again reiterates that the Receivership is not and was never intended to be a

5    permanent solution.  Instead, the Receivership "shall cease as soon as the Court is satisfied,

6    and so finds in consultation with the Receiver, that Defendants have the will, capacity, and

7    leadership to maintain a system of providing constitutionally adequate medical health care

8    services to class members."  Feb. 14, 2006 Order at 7.

9

10   **IT IS SO ORDERED.**

11

12   Dated:   03/24/09

                                            THELTON E. HENDERSON, JUDGE
13                                          UNITED STATES DISTRICT COURT

14

15

16

17

18

19

20

21

22

23

24

---

25   [9]To that end, for example, the Court ordered the Receiver to work with the Office of
     the Inspector General ("OIG") "to ensure the transparency and accountability of budget
26   operations."  Feb. 14, 2006 Order at 3.  Pursuant to that order, the OIG conducts periodic
     reviews of the Receivership's expenditures and, following those reviews, issues public
27   reports that include any identified instances of fraud, waste, or abuse.  The Receivership has
     also demonstrated its own initiative to identify and eliminate waste by inviting a fiscal
28   review by the State Controller's Office and three separate investigations by the California
     State Auditor.