IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCIANO PLATA, et al.,

    Plaintiffs,

v.

EDMUND G. BROWN JR., et al.,

    Defendants.

NO. C01-1351 TEH

ORDER RE: RECEIVERSHIP TRANSITION PLAN AND EXPERT EVALUATIONS

On May 30, 2012, this Court issued an order proposing a plan to transition away from the Receivership toward a monitor or special master, and also to begin expert evaluations to determine when an adequate level of care had been achieved. The Court has considered the parties' responses to the proposed plan, as well as their replies to each other's responses, including Plaintiffs' August 30, 2012 supplemental reply. Plaintiffs moved to strike portions of Defendants' reply as inappropriately presenting new evidence or, alternatively, moved to allow consideration of a sur-reply. The Court grants Plaintiffs' alternative motion and has considered both Defendants' reply in its entirety as well as Plaintiffs' sur-reply. The Court addresses the parties' concerns below before entering its order concerning the Receivership transition and expert evaluations.

## I.     Plaintiffs' Concerns

Plaintiffs suggest two modifications to the Court's order. First, Plaintiffs' counsel request that they be included in the process to determine when tasks should be transitioned from the Receiver to Defendants. The Court agrees to the extent that the Receiver and Defendants should consider Plaintiffs' counsel's views, but it denies the request to the extent that Plaintiffs' counsel seek the ability to prevent the Receiver from implementing a

1  transition schedule to which he and Defendants have agreed. However, as ordered below, the
2  transition shall occur by revocable delegation, and Plaintiffs may file a motion before this
3  Court if the Receiver declines to revoke a delegation of authority as to any particular task for
4  which Plaintiffs believe revocation is warranted.

5  Second, Plaintiffs suggest that an insignificant decrease in OIG scores need not trigger
6  another expert evaluation if the experts have already determined that care at that institution is
7  adequate. The Court agrees and will modify its proposed order to incorporate this
8  suggestion.

## II. Defendants' Concerns

Defendants' primary objection is that they believe the Receivership should end immediately. Defendants accurately quote the Court's original appointment order as providing that:

> The Receivership shall remain in place no longer than the conditions which justify it make necessary, and shall cease as soon as the Court is satisfied, and so finds in consultation with the Receiver, that Defendants have the will, capacity, and leadership to maintain a system of providing constitutionally adequate medical health care services to class members.

Feb. 14, 2006 Order Appointing Receiver at 7. Defendants also accurately report that the Receiver has made much progress on implementing his Court-ordered Turnaround Plan of Action, and that the scores on the Office of Inspector General's ("OIG's") medical inspections have shown improvement. However, evidence of progress made under the direction and control of the Receiver does not constitute evidence of Defendants' own will, capacity, and leadership to maintain a constitutionally adequate system of inmate medical care; indeed, Defendants have not always cooperated with, and have sometimes actively sought to block, the Receiver's efforts. Likewise, while Defendants assert that the 2012 Budget Act signed by the Governor on June 27, 2012, demonstrates their willingness and ability to provide constitutionally adequate care, the Court need look no further than the history of Assembly Bill 900 to understand that passing legislation and implementing

2

legislation are two very different things.[1]  In addition, evidence of increasing OIG scores demonstrates only that the system is improving; the inspection instrument has never been validated as demonstrating constitutional compliance at any particular score level. Defendants argue that "[t]here can be little doubt that a score above 85% on the OIG standards is compliant with minimally adequate constitutional conditions," Defs.' Response at 10, but nothing in the record supports this bald assertion.  As the Court has previously noted, the parties have not agreed on the significance of any particular OIG score, nor does the record contain any evidence correlating OIG scores with constitutionality of care.  Thus, the Court continues to find that court expert evaluations are required to determine whether care is adequate; that the record lacks sufficient evidence to justify ending the Receivership; and that a transition plan that includes revocable delegations of authority is necessary.  The process ordered below will allow Defendants an opportunity to demonstrate that they are able to maintain the reforms achieved by the Receiver, which would in turn, if Defendants are successful, demonstrate that the Receivership is no longer necessary.

Defendants next ask the Court to set a six-month time limit for transitioning medical care back to Defendants, but the Court finds it inappropriate to set calendar-based deadlines for ending the Receivership.  Deciding when the Receivership should transition to a monitor or special master must be based on need and not time.  However, the Court anticipates, based on input from the Receiver, that the first areas will be delegated to Defendants within the next thirty days.

Finally, Defendants raise several concerns about the proposed expert evaluations. Defendants first argue that the experts need not evaluate every institution, and that the experts can determine whether the inmate medical care system is adequate by analyzing eight

---

[1] *See, e.g., Coleman v. Schwarzenegger*, 2009 WL 2430820, at *64-66 (Aug. 4, 2009) (three-judge court opinion and order discussing AB 900 delays, noting, for example, that "AB 900 construction has already been delayed for more than two years due to the absence of funding.  At the start of trial not a single facility had been constructed under AB 900.  As far as we are aware, it remains the case today, eight months later, that there is no funding for AB 900 and no ground has been broken on the AB 900-authorized re-entry facilities." (citations omitted)).

3

to twelve institutions. In response, Plaintiffs correctly observe that the parties' original stipulation contemplates evaluations of each institution as the least intrusive manner of determining compliance. June 13, 2002 Stip. & Order for Injunctive Relief ¶¶ 19-23, 31. The parties further agreed that the stipulated relief "satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A)," *id.* ¶ 29, the portion of the Prison Litigation Reform Act that requires a court to find that prospective relief "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right," 18 U.S.C. § 3626(a)(1)(A). While the Court terminated the specific provisions of the original stipulation and order defining how substantial compliance would be measured, Sept. 6, 2007 Order at 16-17 (vacating paragraphs 5 and 19-23), the Court did not vacate the termination provision, which provides that Defendants may move to "dismiss the case on the ground that *each institution subject to this stipulation has been found to be in substantial compliance*." June 13, 2002 Stip. & Order ¶ 31 (emphasis added). That the experts did not look at every institution before testifying in the receivership proceedings does not alter this fact. Moreover, whether a receivership is necessary is a different question from whether Plaintiffs are receiving constitutionally adequate care throughout the California prison system. Unless and until the Court approves a stipulation or grants a motion modifying the above termination provision, every institution must be found to be in substantial compliance before this case can end.[2]

Second, Defendants suggest that the experts begin work immediately and need not wait for the results of a third-round OIG score or for an institution to achieve an overall OIG

---

[2] This does not mean that the case will end as soon as all institutions have been found to be in substantial compliance. To the contrary, the parties' intent appears to have been for each institution to be in substantial compliance for at least one year. *See* June 13, 2002 Stip. & Order ¶ 23 ("If the experts find substantial compliance, the experts shall return a year later, or as soon thereafter as possible, to determine whether the institution has maintained substantial compliance."). In addition, the Receiver's court-ordered Turnaround Plan of Action provides additional items that may need to be completed prior to termination of this case. However, the Court notes that, pursuant to the parties' stipulation, the court in *Perez v. Cate*, Case No. C05-5241 JSW (N.D. Cal.), recently dismissed that case following successful dental audits at each institution but retained jurisdiction over outstanding construction items. A similar model may be appropriate when this case reaches a similar stage.

4

score over 85%.  Notwithstanding that some institutions have already achieved third-round OIG scores over 85% and work could therefore begin immediately under this standard, the Court will modify its proposed order to allow the Receiver and court experts additional flexibility in scheduling evaluations.

Third, Defendants ask the Court to prohibit the experts from engaging in ex parte communications.  However, the parties agreed, and the Court ordered, that "[t]he experts shall be available to meet with the plaintiffs or defendants separately or jointly as the occasion may warrant."  June 13, 2002 Order Appointing Experts ¶ 7.  If Defendants want to modify that order, they must bring an appropriate motion establishing good cause to set aside the parties' prior agreement.

Fourth, Defendants request that the experts be asked to evaluate whether care is constitutionally adequate.  Plaintiffs correctly observe in response that the experts have clinical but not legal expertise.  However, the parties intended for their original stipulation to provide the minimum level of care that is constitutionally adequate, June 13, 2002 Stip. & Order ¶ 4, and they therefore agreed that any institution found by the experts to be in substantial compliance would be providing minimally constitutionally adequate care.  Consequently, although the Court will not ask the experts to evaluate the constitutionality of care directly, the experts' conclusions will nonetheless from a basis for addressing that issue.

Fifth, Defendants raise concerns about the impact of a finding by the experts that an institution is providing adequate care.  They object that Plaintiffs need not have access to documentary evidence because the OIG inspection reports and the Receiver's regular reports, including the dashboard, will be continued, and they also argue that a decline in an institution's OIG score should not automatically trigger a new evaluation.  The Court agrees with the latter suggestion and will modify the proposed order to allow additional discretion in conducting re-evaluations.  The Court denies the prior suggestion based on its understanding that the Receiver's reporting does not cover every aspect of care that may be relevant to substantial compliance.  However, it will modify the proposed order to limit Plaintiffs' access to documents to one year after an institution is found to be in substantial compliance.

5

Such an order is consistent with the parties' expectation that an institution should remain in compliance for at least one year. *See id.* ¶ 23.

## II. Order

Having addressed the parties' responses to the Court's proposed plan, the Court now enters the following order. The Court finds that the order below is narrowly drawn, extends no further than necessary to correct the violation of Plaintiffs' constitutional rights concerning inmate medical care, and is the least intrusive means necessary to correct the violation of those rights.

### A. Receivership Transition

With good cause appearing, the following is HEREBY ORDERED regarding the transition away from the Receivership toward a monitor or special master:

1. To provide Defendants with an opportunity to demonstrate their ability to maintain a constitutionally adequate system of inmate medical care, and in accord with the Court's prior orders, "the ultimate transfer of power back to the State [from the Receivership] will be transitional," and the Receiver must "attempt to engage Defendants in assuming responsibility over portions of the system that are within Defendants' demonstrated ability to perform." Feb. 14, 2006 Order Appointing Receiver at 7-8. To accomplish the transfer of responsibility while also ensuring appropriate Court oversight, the Receiver shall enter into revocable delegations of authority – a practice that has already been used once and to which no party has objected.

   a. The Receiver shall meet and confer with the parties to determine when Defendants shall assume responsibility for particular tasks. If Defendants and the Receiver cannot agree on the timing of a particular delegation of authority after considering their respective positions and that of Plaintiffs' counsel, then they shall work with the Court-appointed Special Assistant to attempt to reach agreement. The Special Assistant shall notify the Court if he is unable to mediate any particular dispute.

6

b. The Receiver shall not revoke any delegation of authority until after meeting and conferring with the parties. Any party who disagrees with the Receiver's decision on revocation may challenge that decision by filing a motion before this Court. The moving party shall bear the burden of persuasion.

2. The parties, the Receiver, and the Court must have sufficient time to evaluate whether Defendants have successfully managed all delegated tasks. Consequently, the Receivership will not end until after a reasonable period of time following the final revocable delegation of authority. The Receiver shall meet and confer with the parties, and shall also seek input from the court experts, regarding how long a period of evaluation is necessary and the evaluation criteria that should be used. The parties have already agreed that the transition from the Receivership to a special master or monitor shall not be tied to any particular set of OIG scores or findings by the court experts on the adequacy of care, and they have further agreed that the Court may transition away from the Receivership even if it has not been established that care throughout the system is constitutionally adequate.

3. The parties and Receiver agree that all outstanding items in the Receiver's Turnaround Plan of Action ("Plan") remain necessary. However, it is not clear that the Receivership must exist until the Plan is completed, and the Court may transition from the Receivership to a special master or monitor prior to the Plan's full completion if Defendants are able to demonstrate both (1) the ability to maintain a system that provides care as good as or better than that being provided under the Receivership and (2) that any outstanding Plan items, including construction of the California Health Care Facility, renovations of the DeWitt Correctional Facility, and completion of the Health Care Facility Improvement Program, will not be jeopardized if the Receivership were to end.

4. The Receiver and Defendants shall continue to identify and secure appropriate revisions or additions to state law and regulations, as well as to CDCR's Department Operations Manual, that institutionalize changes made during the Receivership and eliminate, to the extent possible, the need for any waivers of state law following the termination of the Receivership.

5.  Pursuant to the parties' and the Receiver's agreement, the Court modifies the February 14, 2006 Order Appointing Receiver to require Defendants, rather than the Receiver, to submit a plan for post-Receivership governance.  The Court construes Exhibit 4 to the Declaration of Martin Hoshino filed on May 7, 2012, as Defendants' proposed plan but finds consideration of that plan to be premature.  The Court reserves for subsequent proceedings questions related to post-Receivership governance and Court supervision.

### B. Expert Evaluations

The Court will not require substantial compliance at individual institutions before transitioning from the Receivership to a monitor or special master.  Nonetheless, the Court finds good cause to enter orders at this time concerning expert evaluations of individual institutions because Defendants and the Receiver have expressed their opinion that at least some institutions may now be providing adequate care.  In the original stipulation and order for injunctive relief, the parties agreed that an institution would be in substantial compliance if it both achieved a score of at least 75% on an audit instrument and received a favorable expert evaluation.  June 13, 2002 Stip. & Order ¶ 22.  The parties further agreed on the stipulation's intent "to require defendants to provide only the minimum level of medical care required under the Eighth Amendment," *id.* ¶ 4, thus agreeing that any institution found to be in substantial compliance would necessarily be providing constitutionally adequate care.  Using the parties' agreements as an initial framework, the Court now HEREBY ORDERS the following:

1.  With input from the parties, the Receiver shall work with the court experts to establish a schedule for evaluating each institution.[3]  As was the case before the Receivership, the experts shall be paid by Defendants through the Court's registry, and Defendants shall promptly deposit additional funds with the Court when ordered to do so.  The procedure for payment and objections set forth in the September 16, 2002 stipulation and

---

[3] After the Receivership has transitioned to a monitor or special master, the monitor or special master shall fulfill all roles of the Receiver with respect to the evaluation process. These responsibilities shall not be subject to the delegation process described above.

8

order shall remain in effect, except that the new hourly rates will be as follows: $275.00 for Joe Goldenson, M.D., and Michael Puisis, D.O., and $200.00 for Madeleine LaMarre, F.N.P.-B.C., with compensation for travel time paid at half of these hourly rates.

2. The experts shall complete a written evaluation of any institution that receives an overall third-round OIG score of 85% or higher as soon as feasible, and no later than six months after the publication of the OIG report awarding that score. Evaluations may, at the Receiver's and experts' discretion, also be scheduled at institutions that have received overall OIG scores of between 75% and 85% in any round of the OIG inspections.

3. Unless the parties reach an alternate agreement or file a successful motion to modify, an institution shall be deemed to be in substantial compliance, and therefore constitutionally adequate, if it receives an overall OIG score of at least 75% and an evaluation from at least two of the three court experts that the institution is providing adequate care. Among other factors, the experts must consider whether any pattern or practice exists at the institution, or systemwide, that presents a serious risk of harm to inmates that is not being adequately addressed. The experts shall also make themselves available to discuss with the parties any other criteria that the parties believe must be examined to determine whether an institution is in substantial compliance.

4. Plaintiffs' monitoring visits shall cease after an institution has been found to be in substantial compliance. Visits may resume if an institution is subsequently found to be out of substantial compliance, but such visits shall be limited only to the areas of non-compliance.

5. Plaintiffs shall maintain access to documentary evidence for one year following a finding that an institution has been found in substantial compliance. This period shall reset if an institution is subsequently found to be out of substantial compliance, but only for those areas found to be non-compliant.

6. The court experts shall not re-evaluate any institution that has been found to be in substantial compliance unless (a) all parties agree or (b) the Receiver and court experts find that good cause exists for re-evaluation. Good cause shall include, but not be limited to, new evidence of a pattern and practice at the institution that is likely to present a serious risk of

9

harm to inmates, a decrease in the institution's overall OIG score to below 75%, or a decrease in the institution's overall OIG score of more than 10%. The parties may present a request for re-evaluation to the Receiver and court experts if they believe good cause exists, and the Receiver and court experts shall meet and confer with the parties prior to conducting any re-evaluation. Any party who disagrees with the determination by the Receiver and court experts on whether to schedule a re-evaluation may file a motion requesting relief from this Court.

7. The court experts shall notify the Court if, at any time, they develop confidence that any particular overall OIG score or set of sub-scores is sufficient to establish the adequacy of care without a subjective evaluation. They shall also notify the Court if, at any time, they conclude that they need not examine every institution individually to determine that the overall system is adequate.

8. The court experts and the Receiver, in consultation with the parties, shall consider whether appointment of additional experts or hiring of other clinical personnel is necessary or desirable. Any proposed additional experts or personnel, along with proposed hourly rates, shall be presented to the Court for approval, preferably by stipulation. All such individuals shall follow the methodology adopted by the three original court experts when conducting their evaluations.

**IT IS SO ORDERED.**

Dated:   09/05/12

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT