1  KAMALA D. HARRIS
   Attorney General of the State of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  JAY C. RUSSELL – SBN 122626
   Supervising Deputy Attorney General
4  DEBBIE VOROUS – SBN 166884
   PATRICK McKINNEY – SBN 215228
5  Deputy Attorneys General
   455 Golden Gate Avenue, Suite 11000
6  San Francisco, CA  94102-7004
   Telephone:  (415) 703-3035
7  Facsimile:  (415) 703-5843
   Email:  Patrick.McKinney@doj.ca.gov
8

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER – SBN 39374
PAUL B. MELLO – SBN 179755
WALTER R. SCHNEIDER – SBN 173113
SAMANTHA D. WOLFF – SBN 240280
PAUL B. GRUWELL – SBN 252474
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:   (415) 777-3200
Facsimile:   (415) 541-9366
pmello@hansonbridgett.com

9  Attorneys for Defendants

10

11              UNITED STATES DISTRICT COURT

12             EASTERN DISTRICT OF CALIFORNIA

13         AND THE NORTHERN DISTRICT OF CALIFORNIA

14    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

15      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| 16  RALPH COLEMAN, et. al., | 2:90-cv-00520 LKK JFM P |
| 17              Plaintiffs, | |
| 18         v. | **THREE-JUDGE COURT** |
| 19  EDMUND G. BROWN JR., et al., | |
| 20              Defendants. | |
| 21 | |
| 22  MARCIANO PLATA, et al., | C01-1351 TEH |
|              Plaintiffs, | |
| 23 | **THREE-JUDGE COURT** |
| 24         v. | **DEFENDANTS' RESPONSE TO OCTOBER 11, 2012 ORDER TO DEVELOP PLANS TO ACHIEVE REQUIRED PRISON POPULATION REDUCTION** |
| 25  EDMUND G. BROWN JR., et al., | |
| 26              Defendants. | |
| 27 | |
| 28 | |

# TABLE OF CONTENTS

**Page**

I.   The State Has Already Taken Significant Actions in All Areas This Court Identified as Potential Ways to Safely Reduce the Prison Population...................3

II.  Further Prison Population Reductions to Satisfy the Court's Population Cap Cannot Be Achieved Unless the Court Alters State Law, Dictates the Adoption of Risky Prison Policies, and Orders the Outright Early Release of Inmates Serving Prison Terms For Serious and Violent Felonies.........................6

III. All Potential Options To Further Reduce the Prison Population Are Poor..............8

    A.  Expansion of Credits ...................................................................9

        1.  Minimum Support Facilities ..............................................9

        2.  "Milestone Completion" Credits for Serious and Violent Inmates...................................................................10

        3.  Increased Credit Earning for Violent and "Second Strike" Felons.....................................................................11

    B.  Changes To State Sentencing Laws .........................................11

        1.  Require Prison-Bound Felons with Nine Months or Less to Serve to Remain in County Jail .......................................11

        2.  Change More Felonies to be Served in County Jail.........................12

    C.  Other Potential Options to Decrease Population ........................13

        1.  Expand Fire Camp Eligibility.............................................13

        2.  Expand Work Furlough, Restitution Centers, and Alternative Custody Programs...........................................................14

        3.  Slowed Return of Out-of-State Placements....................................14

        4.  Increase Use of Contract Private Prison and Leased County Jail Space in California ......................................................16

        5.  Court-Ordered Releases of Convicted Felons................................16

IV.  Plaintiffs' Plan Demonstrates that Compliance with the Court's Population Cap Cannot be Achieved Without Court-Ordered Early Releases and the Adoption of Unsound Prison Policies ..........................................................17

    A.  Plaintiffs Advocate for Outright Early Release of Thousands of Murderers and Other Serious and Violent Felons .......................17

    B.  Plaintiffs Advocate for the Outright Release of All Third-Strike Inmates Eligible to Seek Resentencing Under Proposition 36 .................19

C.      Plaintiffs Advocate for the Early Release of Inmates Who Are Not U.S. Citizens ............................................................................................20

D.      Plaintiffs' Retroactive-Credit Proposal Would Threaten Public Safety........21

E.      Plaintiffs' Milestone Credit Proposal Subverts the Program's Purpose ......22

1

# TABLE OF AUTHORITIES

2
**Page**

3

4 **FEDERAL CASES**

5 *Agostini v. Felton*,
     521 U.S. 203, 215 (1997).............................................................................2
6
*Brown v. Plata*,
7      563 U.S. ___, 131 S. Ct. 1910, 1941 (2011).............................................2

8 *California v. U.S. Dept. of Justice*
     114 F.3d 1222, 1226 (D.C. Cir. 1997.....................................................20
9
*Horne v. Flores*,
10      557 U.S. 433 (2009)..................................................................................2

11

12 **STATE CASES**

13 *In re Ballard*,
     115 Cal. App. 3d 647 (1981)................................................................22
14
*In re Lawrence*
15      44 Cal.4th 1181 (Cal. Sup. Ct. 2008) ..................................................17

16 *In re Shaputis*
     44 Cal.4th 1241 (Cal. Sup. Ct. 2008) ..................................................17
17

18 **FEDERAL STATUTES**

19
8 U.S.C.
20      § 1365(a).................................................................................................20

21 18 U.S.C.
     § 3626(a)(1)(A) .......................................................................................2
22
18 U.S.C.
23      § 3626(a)(1)(B) .......................................................................................6

24 Title 15
     sections 3080 and 3081)......................................................................14
25
Title 15,
26      sections 3375.2.....................................................................................13
27

28

1

**STATE STATUTES**

2

California Government Code

3       § 13332.10 ...................................................................................................15

4       § 13332.19 ...................................................................................................15

5       § 14616 ........................................................................................................15

6       § 14660 ........................................................................................................15

7       § 14669 ........................................................................................................15

8       §§ 14825-14828 ...........................................................................................15

9       §§ 14835-14837 ...........................................................................................15

10      § 15853 ........................................................................................................15

11      § 15815 ........................................................................................................15

12      §§ 18500 et seq. .....................................................................................15, 16

13      § 19130 ...................................................................................................15, 16

14      §§ 4530-4535.3 ...........................................................................................15

15      §§ 4525-4529.20 .........................................................................................15

16      §§ 7070-7086 ...............................................................................................15

17      §§ 7105-7118 ...............................................................................................15

18

California Penal Code

19      § 290 ..............................................................................................................   1

20      § 290(e) ..........................................................................................................7

21      § 473 ............................................................................................................13

22      §§ 458 et seq. ..............................................................................................13

23      §§ 484 et seq ...............................................................................................13

24      §667(c)(5) ..................................................................................7, 9, 11, 22

25      §1170(a) .......................................................................................................12

26      §1170(h)(3) ..................................................................................................12

27      § 1170.05 .....................................................................................................14

28

§ 1170.126 ....................................................................................................... 5

§ 1170.126(b) ................................................................................................. 19

§ 1170.126(f) ................................................................................................. 19

§1216 ........................................................................................................ 7, 12

§2901 ................................................................................ 7, 12, 17 19, 20, 21

§2933 ........................................................................................................... 7, 9

§ 2933.05 ......................................................................................................... 22

§2933.05(a) .............................................................................................. 10, 23

§2933.05(e) ......................................................................................... 7, 11, 23

§2933.1 ............................................................................................ 7, 9, 11, 22

§2933.2 ......................................................................................................... 7, 9

§2933.3 ..................................................................................................... 7, 9, 10

§2933.3(a) ....................................................................................................... 10

§ 3000 ............................................................................................................... 22

§ 3041(b) ......................................................................................................... 18

§ 3041.1 ........................................................................................................... 19

§ 3041.2 ........................................................................................................... 19

§ 3041.5 ........................................................................................................... 19

§ 3043 *et seq.* ................................................................................................ 19

§ 3046 ............................................................................................................... 18

§ 6228 ............................................................................................................... 14

§6263 ................................................................................................................ 14

Cal. Code Regulations.

Title 2, §§ 1195-1195.6 ................................................................................ 15

Title 15, article 3.5, § 3042 *et seq.* ............................................................... 7

Title 15, article 3.5, § 3375.2 ......................................................................... 7

Title 15, article 10, § 3379(a)(9) .................................................................. 15

Title. 15, § 2281 .............................................................................................. 18

Title 15, § 2316 ................................................................. 18

Title 15, § 2317 ................................................................. 18

Title 15, § 2402 ................................................................. 18

Title 15, § 2245 ................................................................. 19

Title 15, § 3044(b)(1) ........................................................ 10

Title 15, § 3080 ................................................................. 14

Title 15, § 3081 ................................................................. 14

Title 15, § 3375.2 .............................................................. 13

Cal. Health & Safety Code
§ 11350(a) ......................................................................... 12

§ 11377(a) ......................................................................... 13

Cal. Vehicle Code
§ 10851 .............................................................................. 13

Military and Veterans Code
§§ 999-999.13 .................................................................... 15

Public Contract Code
§§ 20160 *et seq.* ............................................................... 14

§ 10129 .............................................................................. 15

§ 6106 ................................................................................ 15

§ 10140 .............................................................................. 15

§ 10141 .............................................................................. 15

§ 10297 .............................................................................. 15

§ 10314 .............................................................................. 15

§ 10333 .............................................................................. 15

§ 10335 .............................................................................. 15

§ 10346 .............................................................................. 15

§ 10351 .............................................................................. 15

§ 10369 .............................................................................. 15

§§ 10109-10126 .................................................................. 15

§§ 10180-10185 .................................................................. 15

-vi-

1   §§ 10290-10295 .................................................................................. 15

2   §§ 10301-10306 .................................................................................. 15

3   §§ 10340-10345 .................................................................................. 15

4   §§ 10420-10425 .................................................................................. 15

5   §10220 ............................................................................................... 15

6   §10367 ............................................................................................... 15

7

8   **OTHER AUTHORITIES**

9   A.B. 109, 2011-2012 Leg., Reg. Sess.
        (Cal. 2011) ..................................................................................... 4
10
    California State Constitution,
11       Article 1, § 28(a)(5) ....................................................................... 7

12       Article 1, § 28(b) .......................................................................... 19

13       Article 1, § 28(f)(5) ................................................... 7, 16,19, 20, 21

14       Article. 4, § 1 ............................................................................ 6, 9

15       Article 5, § 8(b) .......................................................................... 19

16       Article 7 ..................................................................................... 16

17       Article 18 .................................................................................... 7

18  S.B. 18, 2009-2010 Leg., Reg. Sess.
        (Cal. 2009) ..................................................................................... 5
19
    State Contractors Manual
20       section 3.02.4 ................................................................................ 15

21  Stats. 2009-2010, 3rd Ex. Sess., c. 28 (S.B. 18),
        § 39, eff. Jan. 25, 2010 ................................................................... 22
22
    Stats. 2010, c. 644
23       § 1 (SB 1266) ................................................................................. 14

24

25

26

27

28

-vii-

**INTRODUCTION**

The further prison population reductions that would be needed to satisfy the Court's population cap cannot be achieved unless the Court alters state law, dictates the adoption of risky prison policies, and orders the early release of inmates serving prison terms for serious and violent felonies. The Court itself would need to take these actions because Defendants are barred from adopting new population-reduction measures by state law and the state constitution. Some of these prohibitions can only be changed by a supermajority of the Legislature or by voter initiative. But more importantly, further court-ordered reductions are unnecessary because the underlying constitutional deficiencies in prison medical and mental health care have been remedied. For that reason, Defendants are filing, along with this response, a motion to vacate the population cap.

Significant and lasting improvements have produced the superior and sustainable prison health care system that exists today. In *Plata*, the court-appointed receiver has substantially completed his turn-around plan of action, and is in the process of transitioning control of the medical care system back to the State. After inspecting the delivery of medical care at every prison, the independent state Inspector General has found that the system provides inmates with timely and effective medical care, and that there are no areas of systemic neglect to inmates' serious medical needs. In *Coleman*, nationally recognized experts have found California's prison mental health care system to be among the best in the nation. Contemporaneously with this filing, the State is moving to dismiss the *Coleman* case in its entirety.

Of course, the greatly reduced prison population is part of the reason prison health care has improved so significantly over the past few years. Since 2006, the prison population has dropped by more than 43,000 inmates. Public Safety Realignment has had the biggest and most immediate impact on prison crowding. Since October 2011 when realignment went into effect, the prison population has shrunk by more than 24,000 inmates. This Court imposed the population cap because it found that prison

-1-

1   overcrowding was prohibiting the State from providing constitutionally adequate health

2   care.  But clearly, that is no longer the case.  Because the State is providing effective

3   health care at current population levels, further court-ordered reductions of the prison

4   population are not needed.[1]

5        In addition to being unnecessary, further reductions are unwise, would jeopardize

6   public safety, and would run afoul of numerous state laws.  The State has followed the

7   Court's October 11, 2012 directive to work with Plaintiffs to develop reforms that would

8   safely further reduce the prison population to 137.5% by June or December of 2013.  To

9   that end, state officials have exhaustively reviewed all possible options (including those

10  supported by Plaintiffs) to further reduce the prison population.  Unfortunately, it became

11  evident that the options that remain following realignment are not consistent with sound

12  penological or democratic principles.  In other words, the remaining options are all poor.

13  They are prohibited by numerous state constitutional and statutory provisions, many of

14  which would have to be rewritten.  And even if implemented, they would not yield the

15  amount of further reductions needed to satisfy the Court's population cap.  The Court

16  would have to also order the outright early releases of inmates.

17       Given the compelling evidence of significant changed circumstances, the only

18  rational and legally appropriate decision at this point is to vacate the 2009 population cap

19  order.  Yet, the State recognizes that before the Court had this evidence, it ordered the

20  State to submit measures that would achieve the current population cap.  For the sole

21  _____

22  [1] Also, as explained in the accompanying motion to vacate the population cap, further

23  compliance with the order is not authorized under federal law.  (Defs.' Mot. to Vacate or
    Modify Population Reduction Order, filed Jan. 7, 2013.)  The population cap is only

24  appropriate if needed to remedy an ongoing violation of a federal right.  18 U.S.C. §
    3626(a)(1)(A); *Horne v. Flores*, 557 U.S. 433 (2009); *see also Brown v. Plata*, 563 U.S.

25  ___, 131 S. Ct. 1910, 1941 (2011).  Requiring the State's continued compliance with the
    order violates federal law by extending injunctive relief "further than necessary."  *See* 18

26  U.S.C. § 3626(a)(1)(A).  An injunction must terminate when its continued enforcement is

27  no longer equitable or when the facts supporting it have significantly changed.  *Horne*,
    557 U.S. 433; *Agostini v. Felton*, 521 U.S. 203, 215 (1997).

28

purpose of complying with the Court's directive, the State submits the following options to

satisfy the current population cap.  These are not good or advisable options; they are

simply the least bad of the available options, but are still risky.  The State does not

endorse them and will challenge any order requiring their implementation.  Any further

court-ordered population reductions would threaten public safety and interfere with

California's independent right to determine its own criminal justice laws.

## RESPONSE

**I.     The State Has Already Taken Significant Actions in All Areas This Court
        Identified as Potential Ways to Safely Reduce the Prison Population**

When the Court imposed the population cap in 2009, it found that there were five

types of population-reduction measures that could be implemented without an adverse

impact on public safety or the operation of the criminal justice system.  (Aug. 4, 2009

Order, *Plata v. Brown*, No. 01-1351 TEH (N.D. Cal.), ECF No. 2197, at 137-157.)  In the

Court's October 11, 2012 Order, the Court directed the parties to consider taking action in

these all areas to reduce the prison population.  (Oct. 11, 2012 Order, *Plata v.* Brown,

No. 01-1351 TEH (N.D. Cal.), ECF No. 2485 at ¶ 2.)  As explained below, since 2009, the

State has taken major action in all five of these areas, and has dramatically reduced and

reshaped the prison population as a result.  Following these actions and the resulting

impact they have had on the prison population, any further actions in these areas could

not be implemented without adversely impacting public safety or disrupting the policy

determinations upon which the State's criminal justice system is structured.  (*See infra*,

Sections II, III.)

The options identified in the 2009 population cap order were: (1) expansion of

good time credits; (2) diversion of technical parole violators; (3) diversion of low-risk

offenders with short sentences; (4) expansion of evidence-based rehabilitative

programming in prisons or communities; and (5) sentencing reform and other potential

population-reduction measures.  (Aug. 4, 2009 Order at 137-57.)  These options were

identified by Plaintiffs' experts during the 2008 evidentiary hearing when the prison

-3-

1   population had ballooned to nearly 195% of design capacity.  (CDCR, Monthly Pop. Rpt.,

2   Nov. 30, 2008, available at: http://www.cdcr.ca.gov/Reports_Research/Offender_

3   Information_Services_Branch/ Monthly/TPOP1A/TPOP1Ad0811.pdf.)

4          Since 2009, the State has dramatically reduced the prison population by taking

5   significant steps in all of these areas.  First and foremost, the 2011 Public Safety

6   Realignment addresses four of the options the Court identified in 2009.  *See* A.B. 109,

7   2011-2012 Leg., Reg. Sess. (Cal. 2011).  Realignment is a major sentencing reform that

8   diverts lower level offenders and parole violators to local authorities while dedicating

9   resources for evidence-based community rehabilitative programs.  *See id.*  The

10  Legislature implemented these changes by reforming the State penal code to shift

11  incarceration and post-release responsibilities for non-violent, non-serious, and non-sex-

12  related offenses from the State to the counties.  *Id.*  Under realignment, the State

13  annually appropriates substantial funding to the counties to compensate them for their

14  additional responsibilities.  *See*, *e.g.*, *id.*, Leg. Counsel's Digest, at 7.  Local officials may

15  use this funding for rehabilitative programs that more effectively reintegrate lower level

16  offenders into their communities.  *See* A.B. 109, 2011-2012 Leg., Reg. Sess. (Cal. 2011).

17         The State has also taken action to improve rehabilitative programming in prison.

18  The State's post-realignment prison plan (the Blueprint) funds the expansion and

19  improvement of evidence-based rehabilitative programming.  ("The Future of California

20  Corrections: A Blueprint to Save Billions of Dollars, End Federal Court Oversight, and

21  Improve the Prison System," April 23, 2012, available at: http://www.cdcr.ca.gov/

22  2012plan/docs/plan/complete.pdf, at pp. 21-27 & Appx. B & D.)  Under the Blueprint, the

23  State is increasing the percentage of inmates served in rehabilitative programs to reach

24  the goal of 70%.  (*Id.*)  Reentry hubs are being created to provide services to inmates that

25  will ensure successful reintegration into society.  (*Id.*)  The Blueprint adds academic

26  teachers and vocational instructors, creates programs tailored toward job readiness skills,

27  and establishes career centers.  (*Id.*)  The State is also enhancing substance abuse

28  treatment and is expanding and creating cognitive behavioral therapy programs such as

-4-

1  anger management, criminal thinking, and family relationships.  (*Id.*)  The Blueprint also

2  provides for the development of sex offender treatment and gang prevention programs,

3  as well as enhanced case management to ensure that inmates are properly placed in

4  programs to address their needs.  (*Id.* at 24-25.)

5       Further, in 2009, the Legislature enacted Senate Bill 18, which helped reduce

6  prison crowding in several ways.  S.B. 18, 2009-2010 Leg., Reg. Sess. (Cal. 2009).  First,

7  the law increased credit-earning capacity by providing eligible inmates or parole violators:

8  (1) up to six weeks of credit per year for completion of approved programs; (2) one day of

9  credit for each day served (for parole violators); (3) two days of credit for every one day

10  served once an inmate is endorsed to transfer to a fire camp (rather than providing such

11  credit after the inmate participates in the camp); (4) one day of credit for every day

12  served for all eligible inmates, regardless of wait-list status, whether the inmate is

13  participating in college, or being processed in reception centers, so long as the inmate is

14  discipline-free; and (5) one day of sentence credit for every day served in county jail from

15  the time of sentencing (rather than one day of credit for every two days served in county

16  jail).  *Id.*  Second, Senate Bill 18 (and subsequently enacted Senate Bill 678) provides for

17  community-corrections programs with funding for counties to implement and expand

18  evidence-based programs for felony probationers.  *See id.*  Third, Senate Bill 18

19  authorized CDCR to collaborate with the state court system to establish and expand drug

20  and mental health reentry courts for parolees, with highly-structured rehabilitative

21  treatment in lieu of prison time for parole violations.  *See id.*  Lastly, Senate Bill 18

22  increased the dollar threshold for "wobbler" crimes—i.e., those crimes that are treated as

23  a felony or misdemeanor depending upon the amount stolen. *See id.*  As a result, fewer

24  crimes result in convictions punishable by a state prison term.  *See id.*

25       Finally, in November 2012, California voters passed Proposition 36, which

26  reformed California's "Three Strikes" sentencing law to impose a life sentence only when

27  the third-strike felony conviction is serious or violent.  Cal. Pen. Code § 1170.126.

28  Proposition 36 also authorizes re-sentencing for inmates currently serving a life term for a

-5-

1    third-strike conviction that was not serious or violent, so long as the re-sentencing does

2    not pose an unreasonable risk to public safety.  *Id.*  It is estimated that this re-sentencing

3    will reduce the prison population by 300 inmates by June 2013 or 500 inmates by

4    December 2013.  (Decl. B. Grealish Supp. Defs.' Resp. (Decl. Grealish), ¶ 4.)

5    **II.    Further Prison Population Reductions to Satisfy the Court's Population Cap
           Cannot Be Achieved Unless the Court Alters State Law, Dictates the**

6    **         Adoption of Risky Prison Policies, and Orders the Outright Early Release of
           Inmates Serving Prison Terms For Serious and Violent Felonies**

7

8            As explained in Defendants' concurrently filed Motion to Vacate or Modify

9    Population Reduction Order, there is no longer a need for further reductions to the prison

10   population because the constitutional deficiencies in health care that once existed have

11   been remedied.  (*See* Defs.' Mot. to Vacate or Modify Population Reduction Order, filed

12   Jan. 7, 2013; Defs.' Mot. to Terminate, *Coleman v. Brown,* filed Jan. 7, 2013.)  In addition

13   to being wholly unnecessary, as described below, the further reductions needed to satisfy

14   the current population cap cannot be achieved through sound or safe prison reform

15   measures.  The State believes the Court will recognize that it lacks the authority to order

16   the identified population reduction measures. Therefore, to achieve compliance with the

17   population cap, the Court would still have to resort to ordering the outright early release

18   of prison inmates.  (*See infra*, Section III.)

19           Each of the prison population reduction measures described below would require

20   rewriting or waiving state statutes and constitutional provisions.  This Court, CDCR, and

21   the Governor are each without the power to do so.  State laws may only be modified by

22   the Legislature or California electorate.  Cal. Const. art. 4, § 1.  This Court cannot waive

23   state laws where, as here, there is no ongoing constitutional violation.  18 U.S.C. §

24   3626(a)(1)(B).  Accordingly, the population reduction measures described below cannot

25   be implemented absent legislative or voter approval.

26           The options below would require modifying California Constitutional provisions and

27   numerous other state statutes and regulations.  Any modification to the Constitution

28   requires approval by a supermajority of the Legislature or approval by a majority of

-6-

1    California voters.  Cal. Const. art. 18.

2        Specifically, the measures discussed below would require, at a minimum, the

3   following constitutional provisions and statutory schemes to be waived or substantively

4   changed: California Constitution, article 1, §§ 28(f)(5) ("sentences . . . shall not be

5   substantially diminished by early release policies intended to alleviate overcrowding in

6   custodial facilities") & 28(a)(5) ("the punitive and deterrent effect of custodial sentences

7   imposed by the courts will not be undercut or diminished by the granting of rights and

8   privileges to prisoners that are not required by . . . the United States Constitution or by

9   the laws of this State to be granted to any person incarcerated . . . as a punishment or

10   correction for the commission of a crime"), article 7 (regarding civil service hiring

11   requirements); California Penal Code §§ 290(e) ("A person sentenced pursuant to this

12   section shall not be released on parole prior to serving the minimum term of confinement

13   prescribed by this section"), 667(c)(5) (for second strike inmates, "The total amount of

14   credits awarded . . . shall not exceed one-fifth of the total term of imprisonment

15   imposed[.]")[2], 1216 (requires sheriff to transport any person sentenced to a term in state

16   prison to CDCR custody); 2901 (prohibits CDCR wardens from releasing inmates until

17   their sentences are complete), 2933 (addressing credit earning), 2933.05(e) (eligibility

18   criteria for inmates who may earn credit), 2933.1 (violent offenders "shall accrue no more

19   than 15 percent of worktime credit"), 2933.2 (felons convicted of murder "shall not accrue

20   any credit"); 2933.3 (allows only those inmates who were assigned to or completed

21   training for fire camps to receive 2-for-1 credit), 11191 (requiring written consent by

22   inmate to transfer and requiring consultation with attorney; California Code of Regulations

23   title 15, article 3.5, §§ 3042 *et seq.* (addressing credit earning), and 3375.2 (any inmate

24   with an administrative determinant is ineligible for fire camp placement).  *See* Appendix A

25   for a more comprehensive listing of governing state laws.

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27   [2] Penal Code section 667 was enacted by voter initiative and can only be modified by

28   two-thirds vote of the Legislature or voter approval of another ballot measure.

1    Because this Court and Defendants are without the power to change, waive, or

2  disregard the governing state laws, the available population-reduction measures cannot

3  be legally implemented through this federal court action.

4  **III.    All Potential Options To Further Reduce the Prison Population Are Poor**

5    The potential measures to further reduce the prison population fall into the

6  following categories: increases to inmate credit-earning capacity; further changes to

7  California's sentencing laws; placement of higher risk inmates in fire camps; and

8  expanding contract prison capacity.  The one-page chart attached to the Declaration of

9  Brenda Grealish shows that, if no further actions are taken, the state prison population is

10  projected to fall short of reaching the Court's population cap by about 9,000 inmates (give

11  or take a couple hundred).  (Decl. Grealish, Ex. A.)  The chart also shows that if all of the

12  identified population reduction measures were to be implemented, they would still not

13  produce a large enough population reduction to satisfy the population cap.  (Decl.

14  Grealish, ¶ 11.)  The Court would still need to also order some outright early releases of

15  inmates serving prison terms for serious and violent felonies.

16    As the Court considers the available population-reduction options, as well as

17  whether there is a continuing need for the population cap, the State believes the Court

18  will recognize that not only are the available options risky and unsound, but are beyond

19  the Court's authority to order.  (*See supra,* Section II.)  Accordingly, for every option the

20  Court is without authority to order, a corresponding number of additional early releases

21  would be necessary to satisfy the population cap. Rather than needlessly order the early

22  release of inmates, the State asks the Court to recognize that the cap no longer remains

23  necessary in light of the overwhelming new evidence of constitutional prison health care.

24    Nonetheless, to comply with the Court's order, the State identifies the following

25  potential population-reduction measures, all of which are poor and barred by law.  The

26  following options do not comprise the State's plan because the State has already issued

27  its plan for the future of the State's prison system, the Blueprint.  The State does not

28  endorse the following measures, does not believe they are lawful or necessary, and does

-8-

1  not have the ability to implement them.

2      **A.**    **Expansion of Credits**

3      Numerous statutes define and restrict inmate credit-earning capacity.  For

4  instance, Penal Code section 2933 *et seq.* allows inmates to earn day-for-day credits

5  unless a more specific statute either increases or decreases credit-earning capacity.

6  *See*, *e.g.*, Cal. Pen. Code §§ 2933.1 (credit-earning for violent felons limited to 15%),

7  2933.2 (murderers receive no credit), 2933.2 (felons convicted of murder may not accrue

8  any credit), 2933.3 (inmates assigned to fire camps receive two-for-one credit), 667(c)(5)

9  (second-strike inmates may not receive more than 20% credit).  Defendants have no

10  discretion to deviate from these statutory limitations.  Moreover, the State does not

11  believe that the policy decisions upon which these credit laws are premised should be

12  altered by either executive or court-ordered fiat.  (Decl. Beard Supp. Mot. to Vacate or

13  Modify Population Reduction Order (Decl. Beard), ¶ 25; *see* Cal. Const. art. 4, § 1.)

14  These types of policy decisions can best be weighed and assessed through California's

15  legislative or ballot-measure process.

16      The following expansion-of-credit measures assume immediate application of

17  credits to the current and future inmate populations, following any court-ordered

18  implementation.  These measures do not anticipate retroactive application.

19      **1.**    **Minimum Support Facilities**

20      If inmates housed in minimum custody facilities were to have their credit-earning

21  rate increased to "two-for-one," which is the same level of credit earning for inmates in

22  fire camps, the population could be slightly reduced.  (Decl. Grealish, ¶ 5.)  Defendants

23  do not estimate any population reduction as a result of this measure by June 2013

24  because to do so would require implementation within six months, which is operationally

25  infeasible.  (Decl. K. Allison Supp. Defs.' Resp. to Oct. 11, 2012 Order (Decl. Allison), ¶

26  10.)  Assuming implementation after June 2013, the population could be reduced by 257

27  inmates by December 2013.  (Decl. Grealish, ¶ 5.)

28      To effect these changes, the Court would have to rewrite Penal Code sections

1   2933.3 (to include inmates assigned to minimum support facilities among those who are

2   currently eligible under the law to receive two-for-one credit earning), and 2933.3(a)

3   (inmates convicted of a violent or strike offense are ineligible to receive day-for-day

4   credits and requiring requires day-for-day eligibility in order to receive two-for-one credit

5   earning).  The Court would also have to amend Title 15, section 3044(b)(1), which only

6   permits two-for-one credit earning for inmate-fire camp workers and institutional inmate

7   fire fighters.

8           **2.      "Milestone Completion" Credits for Serious and Violent Inmates**

9           The population could be reduced if "milestone completion" sentencing credits were

10  provided to violent, serious, and second-strike inmates who are currently ineligible to

11  receive such credits, with the credit-earning cap increased from six to eight weeks.

12  (Decl. Grealish, ¶ 6.)  Defendants do not estimate any population reduction under this

13  measure by June 2013 because it could not be implemented within six months.  (Decl.

14  Allison, ¶ 10.)  Assuming implementation after June 2013, the population could be

15  reduced by 554 inmates by December 2013.  (Decl. Grealish, ¶ 6.)

16          Extending these credits to serious and violent inmates would, in turn, effectuate

17  their early release.  This is a risky proposal with serious public safety implications.  (Decl.

18  Beard, ¶ 25.)  As a November 2009 study by the University of California, Irvine, Center

19  for Evidence-Based Planning regarding "Development of the California Static Risk

20  Assessment Instrument" indicated, 69% of moderate-risk offenders and 82% of high-risk

21  offenders are likely to be arrested for a felony within 3 years of their release.  (Turner,

22  Hess, Jennetta, "Development of the California Static Risk Assessment Instrument," The

23  University of California, Irvine, Center for Evidence-Based Planning, November 2009, at

24  22 figure 3.1, courtesy copy attached as Exhibit B to Decl. Grealish.)  The State cannot

25  endorse these credit increases outside of the appropriate legislative or voter-initiative

26  process.  (Decl. Beard, ¶ 25.)

27          To effect these changes, the Court would have to rewrite Penal Code section

28  2933.05(a) to expand the credit-earning cap to eight weeks.  The Court would also have

-10-

to waive Penal Code section 2933.05(e), which bars inmates sentenced under the Three-Strikes law, pursuant to Penal Code section 290 (as a sexual offender), or as a violent offender, from receiving program credits.

### 3. Increased Credit Earning for Violent and "Second Strike" Felons

Population reductions might further result if the credit-earning capacity of inmates convicted of "second-strike" and violent felonies (excluding sex offenders) expanded to 34%. (Decl. Grealish, ¶¶ 7, 8.) Inmates convicted of second-strike and violent felonies are currently capped at 20% and 15%, respectively. Cal. Pen. Code §§ 667(c)(5), 2933.1. This measure could not be implemented before the June 2013 benchmark. (Decl. Allison, ¶ 10.) However, assuming implementation after June 2013, this measure could result in a reduction to the prison population by 387 second-strike felons and 380 violent offenders by December 2013. (Decl. Grealish, ¶¶ 7, 8.)

To effect these changes, the Court would have to rewrite Penal Code sections 2933.1 (violent offenders receive no more than 15% credit earning) and 667(c)(5) (second strike felons receive no more than 20% credit earning).

Defendants do not endorse any expansion of credit earning for these classes of felons. (Decl. Beard, ¶ 25.) The Legislature and voters determined that lower credit earning levels were appropriate for these violent and repeat offenders, and Defendants cannot endorse increasing those earning levels to 34% outside the appropriate state democratic process.

### B. Changes To State Sentencing Laws

#### 1. Require Prison-Bound Felons with Nine Months or Less to Serve to Remain in County Jail

The prison population could be reduced further if convicted felons who have nine months or less time to serve on a sentence, and who are currently housed in county jails, are not transported to state prison to serve their sentence. (Decl. Grealish, ¶ 9.) The county jails would retain them for the duration of their sentences. (*Id.*) Assuming a Court order and implementation after June 2013, the population could be reduced by 439

-11-

1    inmates by December 2013.  (*Id.*)

2        Of course, this option is another poor choice because the counties' incarceration

3    responsibilities were just increased a little over a year ago by realignment.  (Decl. Allison,

4    ¶ 8.)  Counties have been working diligently to successfully manage their increased

5    responsibilities under realignment and to most effectively allocate their realignment

6    funding.  (*Id.*)

7        To effect this change, the Court would need to substantively rewrite—in addition to

8    the laws cited above—Penal Code sections 1170(a) (requiring terms of imprisonment to

9    be served in state prison), 1170(h)(3) (requiring felonies enumerated in this section to be

10   served in state prison), 1216 (requiring Sheriff to deliver to the warden of a CDCR

11   institution any felon sentenced to state prison), and 2901 (requiring CDCR to maintain

12   custody of all inmates until completion of their sentence).

13            **2.     Change More Felonies to be Served in County Jail**

14       The prison population could be reduced further if additional felonies, which are

15   currently punishable by state prison (including drug possession, petty theft, second

16   degree burglary, vehicle theft, and forgery), were instead treated as punishable by

17   incarceration in county jail only.  (Decl. Grealish, ¶ 10.)  Assuming sentencing laws were

18   changed and made effective after June 2013, the population could be reduced by 228

19   inmates by December 2013.  *(Id.*)

20       This is another poor choice because counties are still working to implement their

21   additional responsibilities under realignment.  (Decl. Allison, ¶ 8.)  If any changes are

22   implemented that require county jail incarceration, they should not be imposed by a

23   federal court, but instead considered by the state Legislature, which can address the

24   various stakeholders' concerns and determine whether these changes serve sound

25   public safety and criminal justice objectives.  (Decl. Beard, ¶ 25.)

26        To effect this change, the Court would have to rewrite the following state statutory

27   criminal sentencing laws so that the punishment is changed from incarceration in state

28   prison to incarceration in county jail: Cal. Health & Safety Code § 11350(a): possession

-12-

of a controlled substance, including cocaine; Cal. Health & Safety Code § 11377(a):
possession of a controlled substance, including methamphetamine; Cal. Penal Code §§
484 et seq. (petty theft); Cal. Penal Code §§ 458 et seq. (second degree burglary); Cal.
Veh. Code § 10851 (vehicle theft); and Cal. Penal Code § 473 (forgery).

### C.   Other Potential Options to Decrease Population

Apart from the above measures, the Court could—again, over Defendants'
objections—issue the following orders to divert violent inmates from serving prison
sentences.

### 1.   Expand Fire Camp Eligibility

The prison population could be reduced if the eligibility criteria for inmates
participating in fire camps were expanded to include serious and violent felons.  (Decl.
Allison, ¶ 4.)  The State opposes placing inmates incarcerated for serious or violent
felonies in these minimum-security settings because they have little or no security
presence or measures to prevent escape.  (Decl. M. Stainer Supp. Defs.' Resp. to Oct.
11, 2012 Order (Decl. Stainer), ¶¶ 5-8.)  Should these offenders escape, the risk to the
public would be unacceptable.  (*Id.*)  But if the Court were to force the expansion of
criteria to include these offenders, Defendants estimate it would reduce the prison
population by 500 inmates in June 2013.  (Decl. Allison, ¶ 4.)  This reduction is
temporary, though, due to limited qualified offenders.  (*Id.*)  Over time, inmates who may
otherwise be eligible for fire camps could be released due to other potential population
reduction measures, including enhanced credit earning and milestone completion.  (*Id.*)
As a result, if all the available measures are enacted, the camp expansion of 500 inmates
will no longer exist by December 2013.  (*Id.*)

To effect this change, the Court would have to rewrite Title 15, sections 3375.2
(describing criteria for fire camp eligibility).

/ / /

/ / /

/ / /

-13-

### 2. Expand Work Furlough, Restitution Centers, and Alternative Custody Programs

The prison population could be reduced further if an Alternative Custody Program was created for male inmates, eligibility criteria for restitution centers was expanded to allow the participation by inmates incarcerated for serious or violent felonies, and community-based treatment programs such as work furlough were used to house inmates.  (Decl. Allison, ¶ 5.)  Due to the time needed to locate contractors and enter into contracts, these measures might result in a reduction of 300 inmates by June and 1,000 inmates by December 2013.  (*Id.*)

To effect these changes, the Court would need to rewrite Penal Code section 1170.05, which establishes the Alternative Custody Program for women, so that men too could participate.  This change would run contrary to the Legislature's intent in establishing this program for females only.  *See* Stats. 2010, c. 644 § 1 (SB 1266).  The Court would also have to modify Penal Code sections 6228, regarding eligibility criteria for restitution center participants, 6263, regarding eligibility for work furlough programs; Public Contracting Code sections 20160 *et seq.*; and related Title 15 provisions (including sections 3080 and 3081).

### 3. Slowed Return of Out-of-State Placements

The Blueprint calls for the incremental decrease and elimination of the State's housing of inmates in private contract prisons in other states.  (Blueprint at p. 28.)  As the State previously informed the Court on August 17, 2012, "[t]he Blueprint . . . calls for the return of up to 4,992 inmates housed out-of-state by December 2013 by reducing the capacity of the California Out-of-State Correctional Facility Program."  (Defs.' Response to Aug. 3, 2012 Order at 12:11-13.)  The Brown Administration developed the Blueprint, and the Legislature approved it.  (Decl. Beard, ¶ 20.)  Thus, the Blueprint reflects the State's determination that the time has come to begin the process of reducing and eliminating the out-of-state program.

If compelled by the Court, the return of inmates being housed in private contract

-14-

1   prisons in other states could be slowed.  (Decl. Allison, ¶ 6.)  This measure would have

2   no impact by June 2013, but would keep 3,892 out-of-state inmates who were otherwise

3   expected to return by December 2013 in out-of-state facilities.  (*Id.*)

4        Any such order would necessarily disrupt the sound public and fiscal policy

5   determination that the Legislature made in approving the Blueprint.  (Decl. Beard, ¶ 25.)

6   The Court would need to order waived California Constitution, article VII (civil service

7   hiring requirements); Government Code §§ 4525-4529.20, 4530-4535.3, 7070-7086,

8   7105-7118, 14835-14837; 13332.10, 14660, 14669, 15853 (governing acquisition and

9   leasing of real property); 13332.19, 15815 (governing plans, specifications and

10  procedures for major capital projects); 14616 (governing approval of contracts by the

11  Department of General Services and exemption from and consequences for failure to

12  obtain DGS approval); 14825-14828 (governing advertisement of State contracts); 19130

13  (establishing standards for the use of personal services contracts, and prohibiting

14  contracts that "cause the displacement of civil service employees"); 18500 et seq. (State

15  Civil Service Act); Military and Veterans Code §§ 999-999.13; Penal Code § 11191

16  (requiring inmate's consent to transfer); and Public Contracts Code §§ 6106, 10109-

17  10126, 10129, 10140, 10141, 10180-10185, 10220, 10290-10295, 10297, 10301-10306,

18  10314, 10333, 10335, 10340-10345, 10346 (progress payment limitations), 10351,

19  10367, 10369, and 10420-10425.

20       The Court would also have to order waived California Code of Regulations, title

21  15, article 10, section 3379(a)(9) (eligibility criteria for California Out-of-State Correctional

22  Facility program); title 2, sections 1195-1195.6; (governing competitive and non-

23  competitive bidding, contractor evaluations and notice, contract award and protest

24  procedures); and State Contractors Manual section 3.02.4 (governing multiple contracts

25  with same.)

26  / / /

27  / / /

28  / / /

-15-

**4.    Increase Use of Contract Private Prison and Leased County Jail Space in California**

If more tax dollars were spent on increased use of in-state private prison capacity and leased jail capacity, the prison population could be reduced.  (Decl. Allison, ¶ 7.)  If compelled by the Court, this option could result in a reduction of 1,225 inmates by June 2013.  (*Id.*)  That number would remain constant through December 2013 as 1,225 beds is the maximum number of beds that were available under previous contracts with two facilities.  (*Id.*)

This is another poor option in these difficult fiscal times when limited tax dollars are available for California's schools, social services, and court system.  (*See* Decl. Beard, ¶ 25.)  And spending money for expanded capacity when the prison population is undergoing an historic reduction and the prison health care system has achieved system wide improvements makes no sense.  (*Id.*)  To effect this change, the Court would need to waive Article VII of the state Constitution, and Government Code sections 19130 and 18500 et seq.

**5.    Court-Ordered Releases of Convicted Felons**

Even if the Court were to order each and every one of the above measures, the resulting prison population reductions would still fall short of the Court's 137.5% mandate by 7,143 inmates in June 2013 or by 429 inmates in December 2013.  (Decl. Grealish, ¶ 11; Decl. Allison ¶ 9.)  Accordingly, to bridge these population gaps, if this Court insists that the population cap must still be enforced, the Court will need to order that inmates be released from prison before the completion of their prison terms.  (Decl. Allison ¶ 9.)  In the face of such an order, CDCR would use its best efforts to release inmates based on risk using a risk assessment tool and other screening factors to minimize the impact upon California's citizens.  (*Id.*)  Even using a risk analysis, any such order would unnecessarily risk public safety.  (*Id.*)

California Constitution, article 1, section 28(f)(5) prohibits the early release of felons to alleviate overcrowding.  This Constitutional provision was enacted following

1   voter approval of Proposition 9, thus any modification would require a two-thirds majority

2   vote by the Legislature or voter-approval.  Further, the Court would have to waive Penal

3   Code section 2901, which obligates CDCR to house inmates for their full prison terms.

4   **IV.    Plaintiffs' Plan Demonstrates that Compliance with the Court's Population
         Cap Cannot be Achieved Without Court-Ordered Early Releases and the
5         Adoption of Unsound Prison Policies**

6          Plaintiffs' population-reduction plan amounts to two basic actions: (1) outright early

7   releases of thousands of inmates convicted of murder or other serious felonies; and (2)

8   aggressive, retroactive credit increases for inmates convicted of violent and second-strike

9   felonies.  As discussed below, Plaintiffs' plan confirms that there are no rational prison

10  reforms available that would achieve the population reductions required by the 2009

11  population cap.  As Plaintiffs' plan shows, the Court would also need to order outright

12  early releases to satisfy the existing population cap.  (*See* Decl. Paul Mello Supp. Defs.'

13  Resp. to Oct. 11, 2012 Order (Decl. Mello), ¶ 2 & Ex. A.)

14         **A.     Plaintiffs Advocate for Outright Early Release of Thousands of
                 Murderers and Other Serious and Violent Felons**
15

16         Plaintiffs propose releasing nearly 4,000 life inmates—mostly convicted

17  murderers—who are eligible for parole but have not been found suitable for parole by the

18  state parole board.  (Decl. Mello, ¶ 2 & Ex. A.)  These inmates have all been sentenced

19  to indeterminate life terms that require them to remain in prison until the parole board

20  finds them suitable for parole.  Plaintiffs' proposal asks the Court to simply order the

21  outright early release of these inmates.

22         This proposal calls for the release of murderers and other life inmates who have

23  been found to still be dangerous.  Under Penal Code section 3041, the Board of Parole

24  Hearings schedules life-term inmates for periodic parole hearings once they have

25  completed their base terms.  At these hearings, the Board is required by state law to

26  grant parole if they determine, based on the record, that the inmates are no longer

27  dangerous.  *See, e.g., In re Lawrence* 44 Cal.4th 1181 (Cal. Sup. Ct. 2008); *In re*

28  *Shaputis* 44 Cal.4th 1241 (Cal. Sup. Ct. 2008).  In making these difficult assessments,

-17-

1  the Board conducts a comprehensive review that includes examining the crime, the

2  inmate's psychological risk assessments, current mindset, and information about the

3  inmate's history and behavior both before and during prison.  *See* Cal. Pen. Code §§

4  3041(b), 3046; Cal. Code Regs., tit. 15, §§ 2281, 2316, 2317, 2402.  Plaintiffs' early-

5  release proposal targets life inmates whom the Board has found are still too dangerous to

6  be released back into society.  (*See* Decl. Mello, ¶ 2 & Ex. A; *see also* Cal. Pen. Code §§

7  3041(b), 3046; Cal. Code Regs. tit. 15, §§ 2281, 2316, 2317, 2402.)

8        Determining an inmate's public safety risk requires much more than simply

9  examining the behavior in prison of inmates who have reached their minimum eligible

10  parole date.  *See* Cal. Pen. Code §§ 3041(b), 3046; Cal. Code Regs. tit. 15, §§ 2281,

11  2316, 2317, 2402.  A proposal to release "low risk" life term inmates outside of the

12  Board's exhaustive and well-defined parole suitability processes will compromise public

13  safety.[3]  (*See* Decl. Beard, ¶ 25.)  Further, while CDCR would employ a risk assessment

14  tool to determine an inmate's likelihood of reoffending, that tool does not and cannot

15  determine the severity of what the potential offense could be.  (Decl. Grealish, ¶ 12.)

16  Accordingly, although a low risk inmate may, on a percentage basis, be unlikely to

17  _____

18       [3] Plaintiffs may rely on the November 2009 University of California, Irvine, Center
for Evidence-Based Planning study regarding "Development of the California Static Risk
19  Assessment Instrument" to assert that "low risk" and "moderate risk" offenders are highly
unlikely to be re-arrested or convicted of a violent crime.  The study, however, sets forth
20  statistics of California's inmate population in 2009—before realignment shifted lower-level
offenders out of the prison population.  (Turner, Hess, Jennetta, "Development of the
21  California Static Risk Assessment Instrument," The University of California, Irvine, Center
for Evidence-Based Planning, November 2009, at 4, courtesy copy attached as Exhibit B
22  to Decl. Grealish.)  The pre-realignment population this study references no longer exists.
Moreover, the study finds that 48% of "low risk" offenders are likely to be rearrested for a
23  felony within 3 years of release.  (*Id.* at 22, Figure 3.1.)  The study further found that 11%
percent of these "low risk" offenders are likely to be arrested for a violent felony within 3
24  years.  (*Id.*)  And significantly, 69% of "moderate risk" offenders—who Plaintiffs claim are
highly unlikely to be re-arrested or convicted of a violent crime—are likely to be arrested
25  for a felony within 3 years, with 22% of these arrests for a violent felony.  (*Id.*)  By
contrast, 82% of high-risk offenders are likely to be arrested for a felony within 3 years.
26  (*Id.*)  Thus, while "low risk" offenders are less likely to be arrested when compared to
"high-risk" offenders, it does not mean that "low-risk" offenders are unlikely to reoffend
27  generally.  (*Id.*)  On the contrary, nearly half of "low-risk" offenders, and over two-thirds of
"moderate risk" offenders, are likely to reoffend within three years.  (*Id.*)

28

1   commit a new crime in a year, if he or she does commit a crime, that crime may very well

2   be severe in nature.  (*Id.*)

3          This proposal runs afoul of the California Constitution.  Cal. Const. art. 1, §§ 28(b)

4   (victim rights, including right to be notified prior to scheduled release), 28(f)(5) (sentences

5   shall not be diminished by early release policies so as to alleviate overcrowding).  The

6   California Constitution may only be modified by a two-thirds vote of the Legislature or

7   voter-approval.  Additionally, state statutory provisions prohibit the early release of any

8   prison inmate.  *See, e.g.,* Cal. Pen. Code §§ 2901 (duty of wardens to receive inmates),

9   3041.5 (describing process for parole), 3043 *et seq.* (rights of victims with respect to

10  parole); Cal. Code Regs., tit. 15, § 2245 (prisoner rights at parole hearings). This

11  proposal would also circumvent the Governor's constitutional and statutory authority to

12  review parole decisions of life inmates, and block any parole grant to a convicted

13  murderer who he finds to still be dangerous.  *See* Cal. Const. art. V, § 8(b); Pen. Code §§

14  3041.1 & 3041.2.

15         **B.     Plaintiffs Advocate for the Outright Release of All Third-Strike Inmates**
           **Eligible to Seek Resentencing Under Proposition 36**
16

17         Plaintiffs propose to circumvent the court-resentencing process established by

18  Proposition 36, and just release eligible third-strike candidates outright.  (*See* Decl. Mello,

19  ¶ 2 & Ex. A.)  Plaintiffs' plan assumes that the impact of this expedited release can be

20  achieved by June 27, 2013.

21         But the release of inmates via Proposition 36 is entirely outside Defendants'

22  control.  Petitions to the court for resentencing must be initiated by inmates, not the State.

23  Cal. Pen. Code §1170.126(b).  Once an inmate files his petition, the court that imposed

24  the original sentence holds a hearing to determine if a new sentence should issue.  *Id.* at

25  § 1170.126(f).  Even if the inmate is eligible for resentencing, the court may find that he

26  or she poses an unreasonable public safety risk and deny the petition.  *Id.*  The State has

27  no input as to whether the inmate should be resentenced.  Prop. 36, appr. Nov. 6, 2012,

28  eff. Nov. 7, 2012.  The State's only involvement in this process is to provide records upon

                                                    -19-

1   subpoena.  *Id.*  Thus, the State cannot "expedite" resentencing, as Plaintiffs propose, and

2   certainly cannot ensure that the courts will decide to resentence all of the eligible third-

3   strike petitioners.[4]

4           Plaintiffs' proposal essentially amounts to the State interjecting itself before the

5   state courts can consider resentencing petitions, and just outright releasing all third-strike

6   inmates who are eligible for resentencing consideration.  Of course, the State is barred

7   from release any inmate before the completion of their sentences.  *See*, *e.g.*, Cal. Const.

8   art. 1, § 28(f)(5); Cal. Penal Code § 2901.  So Plaintiffs' early release proposal would

9   have to be court-ordered.

10          **C.      Plaintiffs Advocate for the Early Release of Inmates Who Are Not U.S.
                      Citizens**

11

12          Plaintiffs propose releasing about a thousand inmates who are not citizens of the

13  United States, in the hope that they will be deported.  (Decl. Paul Mello Supp. Defs.'

14  Resp. to Oct. 11, 2012 Order (Decl. Mello), ¶ 2 & Ex. A.)  However, every person who is

15  subject to deportation is not actually deported since the federal government is not

16  required to accept all criminal aliens into federal custody.  8 U.S.C. § 1365(a); *see also*

17  *California v. U.S. Dept. of Justice*, 114 F.3d 1222, 1226 (D.C. Cir. 1997.)  And often times

18  when people are deported from the United States, they return.  *See* U.S. Dep't Homeland

19  Security Annual Report, "Immigration Enforcement Actions: 2011" (Sept. 2012) at 6, table

20  7, http:// http://www.dhs.gov/sites/default/files/publications/immigration-

21  statistics/enforcement_ar_2011.pdf.  (indicating that in fiscal year 2012, Immigration and

22  Customs Enforcement removed 86,405 repeat immigration violators).  The vast majority

23  _____

24          [4] The State recognizes its role in facilitating inmate access to the courts under
        Proposition 36.  Specifically, it has posted information in all prisons with addresses for the
25      courts and county public defenders. (Decl. Allison, ¶ 12.)  The State has provided lists of
        eligible offenders to county public defenders and district attorneys.  (*Id.* ¶ 13.)  CDCR has
26      provided the State Administrative Office of the Courts an estimate of the likely number of
        eligible cases to assist the courts in planning their calendars.  (*Id.* ¶ 14.)  And the State is
27      working closely with the courts, district attorneys, and defense attorneys to expedite the
        production of records that will be used in resentencing hearings.  (*Id.* ¶¶ 15-16.)

28

of illegal immigrants in California's prisons are from Mexico. (Decl. Grealish, Ex. C.)
Given Mexico's proximity to California, it is not uncommon for people who have been
deported to Mexico to return to California. U.S. Dep't Homeland Security Annual Report,
"Immigration Enforcement Actions:2011" (Sept. 2012) at 6, tables 6 & 7,
http://www.dhs.gov/sites/default /files/ publications/immigration-
statistics/enforcement_ar_2011.pdf. Plaintiffs' proposal would cause numerous serious
or violent offenders being released back into California when federal immigration officials
decline to deport them, or when they return to California after having been deported. And
of course, as with Plaintiffs' other early release proposals, the State has no authority to
release these inmates prior to the completion of their prison terms. The Court would
have to order their outright early releases, in contravention of California Constitution,
article 1, section 28(f)(5), which provides that no inmate may be released prior to the
completion of his or her sentence in order to alleviate overcrowding, and Penal Code
section 2901, which prohibits CDCR wardens from releasing inmates until their
sentences are complete.

### D.   Plaintiffs' Retroactive-Credit Proposal Would Threaten Public Safety

Plaintiffs propose that all second-strike and violent offenders be awarded day-for-
day credits *retroactive* to the beginning of their incarceration. (Decl. Mello, ¶ 2 & Ex. A.)
Imposition of retroactive 50% percent time credits for this population will result in the
immediate release of thousands of offenders serving prison terms for second-strike and
violent offenses. (Decl. Allison, ¶ 18.) This is because potentially thousands of these
classes of felons who are currently incarcerated have already served 50% of their
sentence. (*Id.*) Thus, if Plaintiffs' proposal was adopted, these inmates would all be
eligible for immediate release. (*Id.*) Plaintiffs' 50% retroactive credit proposal is
dangerous because it indiscriminately expedites the release of violent and repeat
offenders without regard to their risk assessments or their readiness for release and safe
reintegration back into society. (*Id.*) Moreover, Plaintiffs' proposal subverts the policy
determinations that shape the current state laws that require these more serious felons to

1    serve a greater percentage of their prison terms.  *See*, *e.g.*, Cal. Pen. Code §§ 2933.1,

2    667(c)(5).  Any credit expansion for these more serious offenders should be implemented

3    through a transparent democratic process, not by court order.

4           Plaintiffs' proposed retroactive award of credits would also raise a legal question

5    about whether these newly released felons would have a remaining parole period.  *See*

6    *In re Ballard*, 115 Cal. App. 3d 647 (1981) (excess time spent incarcerated credited

7    against parole term.)  The impact of Plaintiffs' proposal is best illustrated through

8    example.  Assume a second-strike inmate with a 10-year prison sentence who has

9    already served 8 years.  Under current law, that inmate is eligible for 20% credit and

10   would therefore be eligible for release, having served 80% of his 10-year sentence.  *See*

11   Cal. Pen. Code § 667(c)(5).  This inmate would be released with a full three-year parole

12   term.  *See* Cal. Pen. Code § 3000.  If credit earning is increased to 34% for second-strike

13   inmates, this same inmate would have to only serve 6.6 years in custody, and thus would

14   have already served 1.4 years of the three-year parole term.  So, although the inmate

15   would be eligible for immediate release, he would still serve a fully-supervised 1.6-year

16   parole term.  But under Plaintiffs' 50% proposal, it is arguable that the inmate's full

17   incarceration time would have been completed after five years, and he would be

18   discharged from CDCR without any parole supervision or transitional programming.

19          **E.    Plaintiffs' Milestone Credit Proposal Subverts the Program's Purpose**

20          Plaintiffs propose making all inmates who are sentenced to determinate terms

21   eligible to receive an average of six months' worth of program credits annually via the

22   "milestone" program.  Cal. Pen. Code § 2933.05.  Plaintiffs' attempt to expand the

23   program ignores the purpose of the milestone credit program, which is to reward life skills

24   improvements that are meant to help prepare the inmate for life in the community and

25   smooth transition into civil society by acknowledging and encouraging *completion* of

26   programs such as education, substance abuse, or anger management programs.  Stats.

27   2009-2010, 3rd Ex. Sess., c. 28 (S.B. 18), § 39, eff. Jan. 25, 2010.  Plaintiffs seek to have

28   credits applied for mere participation without completion, subverting the program's

-22-

purpose and goals.  Plaintiffs' proposal applies credits haphazardly without regard to an improvement in life skills or impact on the inmates' ability to successfully transition into the community.

To implement this proposal, the Court would have to rewrite Penal Code section 2933.05(a), which currently requires inmates to complete milestone programs in order to receive program credits, whereas Plaintiffs seek to reward credits merely for participation, not completion.  The Court would also have to waive Penal Code section 2933.05(e), which bars inmates sentenced under the Three-Strikes law, pursuant to Penal Code section 290 (as a sexual offender), or as a violent offender, from receiving program credits.

## CONCLUSION

The State has reduced its prison population by more than 43,000 inmates since 2006.  It has also made tremendous improvements to the prison medical and mental health care systems, and eliminated all constitutional systemic deficiencies in the provision of care to inmates.  Given these changes in California prisons, further court-ordered reductions to the prison population are unnecessary, unsafe, and unauthorized under federal law.  Accordingly, rather than force further population reductions, the Court should vacate the population cap and end this three-judge court proceeding.


DATED: January 7, 2013                    HANSON BRIDGETT LLP


By:_____/s/ Paul B. Mello_____
        PAUL B. MELLO
        Attorneys for Defendants

-23-

1

2   DATED: January 7, 2013                    KAMALA D. HARRIS
                                              Attorney General of California
3

4

5                                    By:_____/s/ Jay C. Russell_____
                                          JAY C. RUSSELL
6                                         Deputy Attorney General
                                          Attorneys for Defendants
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-24-