1      IN THE UNITED STATES DISTRICT COURTS

2      FOR THE EASTERN DISTRICT OF CALIFORNIA

3      AND THE NORTHERN DISTRICT OF CALIFORNIA

4   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

5      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

6

7   RALPH COLEMAN, et al.,

8              Plaintiffs,

9        v.                              NO. 2:90-cv-0520 LKK JFM P

10  EDMUND G. BROWN JR., et al.,         **THREE-JUDGE COURT**

11             Defendants.

12  _____

13  MARCIANO PLATA, et al.,              NO. C01-1351 TEH

14             Plaintiffs,               **THREE-JUDGE COURT**

15       v.                              OPINION AND ORDER
                                         REQUIRING DEFENDANTS TO
16  EDMUND G. BROWN JR., et al.,         IMPLEMENT AMENDED PLAN

17             Defendants.

18  _____

19         On April 11, 2013, this Court issued an opinion and order denying defendants' motion

20  to vacate or modify our population reduction order.  Apr. 11, 2013 Op. & Order Denying

21  Defs.' Mot. to Vacate or Modify Population Reduction Order (ECF No. 2590/4541).[1]  In that

22  opinion and order, defendants were required to take all steps necessary to comply with our

23  population reduction order issued on June 30, 2011, in compliance with the Supreme Court's

24  decision of May 23, 2011, which (as amended) requires defendants to reduce the overall

25

26         [1] All filings in this Three-Judge Court are included in the individual docket sheets of
    both *Plata v. Brown*, No. C01-1351 TEH (N.D. Cal.), and *Coleman v. Brown*, No. 90-cv-
27  520-LKK (E.D. Cal.).  In this Opinion, when we cite to such filings, we include the docket
    number in *Plata* first, then *Coleman*.  When we cite to filings in the individual cases, we
28  include the docket number and specify whether the filing is from *Plata* or *Coleman*.

1    prison population to 137.5% design capacity by December 31, 2013 (sometimes referred to

2    as "Order").  To ensure that they did so, this Court ordered defendants to submit a list of all

3    prison population reduction measures identified in this litigation ("List") and a plan for

4    compliance with our Order ("Plan").  Apr. 11, 2013 Order Requiring List of Proposed

5    Population Reduction Measures (ECF No. 2591/4542).  On May 2, 2013, defendants

6    submitted this List and their Plan, although their Plan does not comply with our Order.

7    Defs.' Resp. to Apr. 11, 2013 Order (ECF No. 2609/4572) ("Defs.' Resp.").  On May 15,

8    2013, plaintiffs submitted a responsive filing, in which they requested this Court to issue an

9    order to show cause why defendants should not be held in contempt.  Pls.' Resp. & Req. for

10   Order to Show Cause Regarding Defs.' Resp. to Apr. 11, 2013 Order (ECF No. 2626/4611).

11   On May 29, defendants submitted a reply.  Defs.' Resp. to Pls.' Resp. & Req. for Order to

12   Show Cause Regarding Defs.' Resp. to Apr. 11, 2013 Order (ECF No. 2640/4365).  On

13   June 17, defendants submitted their monthly status report.  Defs.' June 2013 Status Report

14   (ECF No. 2651/4653).

15        Because defendants' Plan does not comply with our Order, this Court hereby orders

16   defendants to implement an additional measure along with its Plan that will bring defendants

17   into compliance: the expansion of good time credits, as set forth in Item 4 of defendants' List

18   submitted on May 2, 2013.  This measure, expanded good time credits, in conjunction with

19   the measures included in the Plan submitted by defendants, will constitute an amended Plan

20   ("Amended Plan") – a plan that will, unlike defendants' Plan, reduce the overall prison

21   population to 137.5% design capacity by December 31, 2013.  Defendants are ordered to take

22   all steps necessary to implement all measures in the Amended Plan, commencing forthwith,

23   notwithstanding any state or local laws or regulations to the contrary. 18 U.S.C.

24   § 3626(a)(1)(B).  All such state and local laws and regulations are hereby waived, effective

25   immediately.

26        This Court desires to continue to afford a reasonable measure of flexibility to

27   defendants, notwithstanding their continued failure to cooperate with this Court.  To this end,

28   this Court offers defendants three ways in which they can amend the Amended Plan.  First,

1   defendants may, if they prefer, revise the expanded good time credit program, so long as

2   defendants' revision results in the release of at least the same number of prisoners as does the

3   expanded measure.  This Court will not specify the changes defendants must make in order

4   to meet this requirement.  Defendants must inform this Court in a timely manner, however,

5   of their decision to make such changes.

6          Second, defendants may at their discretion substitute for prisoners covered by any

7   measure or measures in the Amended Plan an equivalent number of prisoners by using the

8   "system to identify prisoners who are unlikely to reoffend or who might otherwise be

9   candidates for early release" (the "Low Risk List").  *Brown v. Plata*, 131 S. Ct. 1910, 1947

10  (2011).  Although defendants need not obtain prior approval for this substitution, they must

11  inform this Court that they intend to make such substitution.

12         Third, defendants may, with the prior approval of this Court, substitute any measure

13  or measures on the List for any measure or measures in the Amended Plan, as long as the

14  number of prisoners to be substituted equals or exceeds the number of prisoners to be

15  substituted for and defendants provide this court with incontestable evidence that the

16  substitution of prisoners to be released will be completed by December 31, 2013.  The filing

17  or pendency of any such request, or of any appeal from any order of this Court, shall not

18  relieve defendants of their continuing obligation to take forthwith all steps ordered herein or

19  necessary for the purpose of achieving compliance with this Order and the Amended Plan.

20         If for any reason the measures in the Amended Plan will not reach the 137.5%

21  population ceiling by December 31, 2013, defendants shall release the necessary number of

22  prisoners to reach that goal by using the aforementioned Low Risk List, a list that we have

23  previously ordered them to develop, and that they have advised us they can develop in

24  sufficient time to allow its use for purposes of compliance with the Order.

25

26  **I.      PROCEDURAL HISTORY**

27         The history of this litigation is of defendants' repeated failure to take the necessary

28  steps to remedy the constitutional violations in its prison system.  It is defendants'

3

unwillingness to comply with this Court's orders that requires us to order additional relief today and to reiterate the lengthy history of this case, notwithstanding the fact that we set forth much of this history in our April 11, 2013 Opinion & Order.

### A.   The *Plata* and *Coleman* cases

We begin where the Supreme Court began in its June 2011 decision: "This case arises from serious constitutional violations in California's prison system.  The violations have persisted *for years*.  They *remain* uncorrected." *Plata*, 131 S. Ct. at 1922 (emphasis added).  The constitutional violations at issue concern the Eighth Amendment's ban on cruel and unusual punishment and are the subject of two separate class actions.  The first, *Coleman v. Brown*, began in 1990 and concerns California's failure to provide constitutionally adequate mental health care to its mentally ill prison population.  The second, *Plata v. Brown*, began in 2001 and concerns California's failure to provide constitutionally adequate medical health care to its prison population.  In both cases, the district courts found constitutional violations and ordered injunctive relief.[2]

In *Coleman*, defendants proved unable to remedy the constitutional violations despite over a decade of remedial efforts.  The case was initiated in 1990, and – following a trial overseen by Magistrate Judge John Moulds – the *Coleman* court found in 1995 that defendants were violating the Eighth Amendment rights of mentally ill prisoners.  *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995).  Defendants were ordered to remedy the constitutional violations under the supervision of a Special Master.  *Id.* at 1323-24.  One decade later in 2006, however, the Special Master's reports stated that defendants had wholly failed to remedy the constitutional violations.  Worse yet, there was a backward slide in progress, attributable largely to the growing overcrowding problem in the California prison system.

---

[2] We provide here only a brief review of the extensive (and unsuccessful) remedial efforts in both the *Plata* and *Coleman* cases.  For those interested in a detailed summary of these efforts, see our August 4, 2009 Opinion & Order at 10-36 (ECF No. 2197/3641).

1    In *Plata*, defendants' inability to make progress in remedying the constitutional

2  violations resulted in the imposition of a drastic remedy: placing the prison medical care

3  system in a receivership.  The case was initiated in 2001, and defendants agreed to a

4  stipulated injunction in 2002.  Three years passed, however, during which defendants made

5  virtually no progress in implementing the necessary injunctive relief to remedy the

6  underlying constitutional violations.  As the *Plata* court wrote in 2005:

> The prison medical delivery system is in such a blatant state of
> crisis that in recent days defendants have publicly conceded their
> inability to find and implement on their own solutions that will
> meet constitutional standards.  The State's failure has created a
> vacuum of leadership, and utter disarray in the management,
> supervision, and delivery of care in the Department of
> Corrections' medical system.

11  May 10, 2005 OSC, 2005 WL 2932243, at *1-2.  After an extensive fact-finding process, the

12  *Plata* court established the Receivership, concluding that there was "nowhere else to turn."

13  Oct. 3, 2005 FF&CL, 2005 WL 2932253, at *31.  The Receiver was able to implement

14  substantial changes in the prison healthcare system but, ultimately, was unable to remedy the

15  constitutional errors in light of the severe overcrowding in the California prison system.[3]

16    "After years of litigation, it became apparent that a remedy for the constitutional

17  violations would not be effective absent a reduction in the prison system population." *Plata*,

18  131 S. Ct. at 1922.  Congress, however, had restricted the ability of federal courts to enter a

19  population reduction order in the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L.

20  No. 104-134, 110 Stat. 1321 (codified in relevant parts at 18 U.S.C. § 3626); Aug. 4, 2009

21  Op. & Order at 50-51 (ECF No. 2197/3641) (explaining why a population reduction order is

22  a "prisoner release order," as defined by the PLRA, 18 U.S.C. § 3626(g)(4)).  Under the

23  PLRA, a population reduction order can be issued only by a specially convened three-judge

24  court which has made specific findings described in the statute.  18 U.S.C. § 3626(a).

25    In 2006, the plaintiffs in *Coleman* and *Plata* independently filed motions to convene a

26  three-judge court capable of issuing a population reduction order.  Both district courts

27  _____

28  [3] The current Special Master in the *Coleman* case is Matthew A. Lopes, Jr.  The current Receiver in the *Plata* case is J. Clark Kelso.

granted plaintiffs' motions and recommended that the cases be assigned to the same three-judge court "[f]or purposes of judicial economy and avoiding the risk of inconsistent judgments."  July 23, 2007 Order in *Plata*, 2007 WL 2122657, at *6; July 23, 2007 Order in *Coleman*, 2007 WL 2122636, at *8; *see also Plata*, 131 S. Ct. at 1922 ("Because the two cases are interrelated, their limited consolidation for this purpose has a certain utility in avoiding conflicting decrees and aiding judicial consideration and enforcement.").  The Chief Judge of the United States Court of Appeals for the Ninth Circuit agreed and, on July 26, 2007, convened the instant three-judge district court pursuant to 28 U.S.C. § 2284.  The court was composed of the two district judges who had many years of experience with the *Coleman* and *Plata* cases and one circuit judge appointed by the Chief Judge of the Circuit, in accordance with the circuit's regular procedure for the assignment of circuit court judges to special matters (the next judge on the list for such assignments who is available to serve).

### B.    This Court's August 2009 Opinion

In August 2009, after a fourteen-day trial, this Court issued an Opinion & Order designed to remedy the ongoing constitutional violations with respect to both medical and mental health care in the California prison system.  The order directed defendants, including the Governor, then Arnold Schwarzenegger,[4] and the Secretary of the California Department of Rehabilitation and Corrections ("CDCR"), then Matthew Cate,[5] to reduce the institutional prison population to 137.5% design capacity within two years.  This Court made extensive findings, as set forth in our 184-page opinion.  We repeat here only those findings that are necessary or relevant to the determination of the issues before us.

Because the PLRA makes the entry of a prisoner release order the "remedy of last resort," H.R. Rep. No. 104-21, at 25 (1995) (report of the House Committee on the Judiciary on the Violent Criminal Incarceration Act of 1995), we were required to find that "no other relief will remedy the violation of the Federal right." 18 U.S.C. § 3626(a)(3)(E)(ii).

_____

[4] Edmund G. Brown Jr. was elected Governor to succeed Arnold Schwarzenegger on November 2, 2010.

[5] Jeffrey Beard was appointed successor to Matthew Cate on December 27, 2012.

Defendants contended that a prisoner release order was unnecessary because defendants *could* construct new prisons, construct re-entry facilities at existing prisons, or expand medical facilities at existing prisons. Aug. 4, 2009 Op. & Order at 101-08 (ECF No. 2197/3641). We recognized the theoretical possibility of such measures but found them entirely unrealistic. California had thus far failed to fund prison expansion and, in light of its ongoing fiscal crisis, the prospect of any additional funding for prison expansion was "chimerical." *Id.* at 106. We further concluded on the basis of expert testimony that all other remedies suggested by defendants or defendant-intervenors were either insufficient or required some level of prisoner release. *Id.* at 112-118. Accordingly, we concluded that "no relief other than a prisoner release order is capable of remedying the constitutional deficiencies at the heart of these two cases." *Id.* at 119. In short, we would not delay remedying the constitutional violations in the prison system simply because defendants made unrealistic and unfounded assertions regarding alternative remedies to the problem of overcrowding.

This Court gave "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1)(A). In fact, we devoted 10 days out of the 14-day trial to the issue of public safety; we also devoted approximately 25% of our Opinion & Order – 49 out of 184 pages – to it. We heard from the country's leading experts in the field of incarceration and crime, who based their opinions on the experience of various jurisdictions that had successfully reduced prison population without adversely affecting public safety or the operation of the criminal justice system. On the basis of this testimony and many state-commissioned reports that proposed various measures for safely reducing the overcrowding in California's prison system, we identified a variety of measures to reduce prison population without a significant adverse effect on public safety or the criminal justice system's operation: (1) early release through the expansion of good time credits; (2) diversion of technical parole violators; (3) diversion of low-risk offenders with short sentences; (4) expansion of evidence-based rehabilitative programming in prisons or communities; and (5) sentencing reform and other potential population

7

1   reduction measures.  Aug. 4, 2009 Op. & Order at 137-57 (ECF No. 2197/3641).  We did

2   not, however, select specific measures for defendants to implement.  Instead, defendants

3   were ordered to submit a plan for reducing California's prison population to 137.5% design

4   capacity within two years, and we stated that "[a]ny or all of these measures may be included

5   in the state's plan.  Whichever solutions it ultimately chooses, the evidence is clear that the

6   state can comply with our order in a manner that will not adversely affect public safety."  *Id.*

7   at 132.  Indeed, "[t]here was overwhelming agreement among experts for plaintiffs,

8   defendants, and defendant-intervenors that it is 'absolutely' possible to reduce the prison

9   population in California safely and effectively."  *Id.* at 137.  The question of *how* to do it was

10   left to defendants.

11         The most promising measure, it was generally agreed, was early release through the

12   expansion of good time credits.  This measure would in some cases reduce the prison

13   population by allowing prisoners to shorten their lengths of stay in prison by a few months.

14   Plaintiffs' experts – Doctors Austin and Krisberg; Secretaries Woodford, Lehman, and Beard

15   – were unanimous in their agreement that "such moderate reductions in prison sentences do

16   not adversely affect either recidivism rates or the deterrence value of imprisonment."  *Id.* at

17   140.  According to Dr. Austin (who continues to provide expert testimony on behalf of

18   plaintiffs in the present proceedings), criminologists have known "for many, many, many

19   years" that generally "there is no difference in recidivism rates by length of stay" in prison,

20   so reducing the length of stay by a "very moderate period of time" – four to six months –

21   would have no effect on recidivism rates. Tr. at 1387:1-11.  We considered extensive

22   testimony on the question of whether early release through good time credits increases the

23   crime rate, concluding that it does not and that it "affects only the timing and circumstances

24   of the crime, if any, committed by a released inmate."  *Id.* at 143.  Defendants presented only

25   one expert in opposition, Dr. Marquart, but his opposition (if it can be called that) was feeble.

26   Marquart testified that, while he criticized generic early release, he did not in fact oppose

27   good time credit measures.  *Id.* at 139-40.  Further, he agreed that there was no statistically

28   significant relationship between an individual's length of stay in prison and his recidivism

8

rate.  *Id.* at 140-41.  His only criticism – that good time credits expansion might reduce the opportunity for prisoners to complete rehabilitation programming – was, in our final determination, "a note about the factors that should be considered in designing an effective expanded good time credits system. It is entitled to little, if any, weight as an observation about the possible negative effect on public safety of such a system." *Id.* at 141.  Thus, there was essentially agreement among all experts – for plaintiffs and for defendants – that the expansion of good time credits was consistent with public safety.  We concluded as follows: "We credit the opinions of the numerous correctional experts that the expansion of good time credits would not adversely affect but rather would benefit the public safety and the operation of the criminal justice system." *Id.* at 145.

This conclusion was supported by the experience in many jurisdictions that had successfully and safely implemented early release through good time credits.  California was one such jurisdiction.  "Dr. Krisberg reviewed data provided by California and the FBI and concluded that such programs, which were instituted in twenty-one California counties between 1996 [and] 2006, resulted in approximately 1.7 million inmates released by court order but did not result in a higher crime rate." *Id.* at 144.  Washington expanded its good time credits program and Secretary Lehman, the former head of corrections for Washington, testified that "these measures did not have any 'deleterious effect on crime' or public safety." *Id.* at 174.  Dr. Austin – who has thirty years of experience in correctional planning and research and has personally worked with correctional systems in eight states to reduce their prisoner populations – testified that Illinois, Nevada, Maryland, Indiana, and New York all successfully implemented good time credits expansion without adversely affecting public safety. *Id.* at 175.  In New York, in particular, "the prison population decreased due in part to the expansion of programs awarding good time credits, and not only did the crime rate not increase, it 'declined substantially.'" *Id.*  Dr. Marquart attempted to point to Texas as an example of a jurisdiction that unsuccessfully implemented good time credits expansion, but he ultimately presented such equivocal testimony that it was of little use to this Court. *Id.* at 176-77.  We concluded that "the CDCR should implement population reduction measures

1   mirroring those of the jurisdictions that have successfully and safely reduced their inmate

2   populations." *Id.* at 177.

3          Not only did this Court find the expansion of good time credits to be safe, but we

4   found that it had the potential for significant reduction in the prison population.  The state-

5   sponsored CDCR Expert Panel on Adult Offender Recidivism Reduction Programming

6   ("CDCR Expert Panel"),[6] on which we relied heavily, recommended that expansion of good

7   time credits could result in the release of 32,000 prisoners.  *Id.* at 177-81.  Such estimates, in

8   conjunction with our findings regarding other safe and effective population reduction

9   measures, led us to conclude that "the state has available methods by which it could readily

10  reduce the prison population to 137.5% design capacity or less without an adverse impact on

11  public safety or the operation of the criminal justice system."  *Id.* at 181.

12         Defendants were thus ordered to submit a plan for compliance within 45 days of our

13  order.  *Id.* at 183.  They failed to do so, however; instead, they submitted a plan for achieving

14  the 137.5% reduction within five years, not two.  Defs.' Population Reduction Plan (ECF No.

15  2237/3678).  This Court ordered defendants to comply with the terms of the August 2009

16  Order by providing a plan for the reduction of the prison population to 137.5% capacity

17  within two years.  Oct. 21, 2009 Order Rejecting Defs.' Proposed Population Plan (ECF No.

18  2269/3711).  Defendants responded by submitting a plan for compliance within two years in

19  which defendants would reduce the prison population to 167%, 155%, 147%, and 137.5% at

20  six-month benchmarks.  Defs.' Response to Three-Judge Court's Oct. 21, 2009 Order (ECF

21  No. 2274/3726).  On January 12, 2010, this Court issued an order accepting defendants' two-

22  year timeline for compliance.  That is, rather than ordering defendants to implement any

23  specific population reduction measures, we ordered defendants to reduce prison population to

24  167%, 155%, 147%, and 137.5% at six-month benchmarks.  Jan. 12, 2010 Order to Reduce

25

26
_____

27         [6] CDCR Expert Panel, *A Roadmap for Effective Offender Programming in California:*
   *A Report to the California Legislature*, June 2007.  The report is available at
28  http://sentencing.nj.gov/downloads/pdf/articles/2007/July2007/document03.pdf

1  Prison Population at 4 (ECF No. 2287/3767).  This Court stayed the effective date of our

2  order while defendants appealed to the Supreme Court.  *Id.* at 6.

3          **C.**     **The Supreme Court's June 2011 Opinion**

4         In June 2011, the Supreme Court affirmed this Court's order in full.  Again, we repeat

5  here only those portions of the Supreme Court opinion that are relevant to the motions

6  pending before us.

7         The Supreme Court framed the central question before it as whether resolving the

8  ongoing constitutional violations necessitated the entry of a prisoner release order.  The

9  Court fully recognized that the order was "of unprecedented sweep and extent" and that the

10 possible release of 37,000 prisoners was a matter of "undoubted, grave concern."  *Plata*, 131

11 S. Ct. at 1923.  The Court continued:

12
13
14
15
16
17
18
> Yet so too is the continuing injury and harm resulting from these
> serious constitutional violations.  For years the medical and
> mental health care provided by California's prisons has fallen
> short of minimum constitutional requirements and has failed to
> meet prisoners' basic health needs.  Needless suffering and death
> have been the well-documented result.  Over the whole course of
> years during which this litigation has been pending, no other
> remedies have been found to be sufficient.  Efforts to remedy the
> violation have been frustrated by severe overcrowding in
> California's prison system.  Short term gains in the provision of
> care have been eroded by the long-term effects of severe and
> pervasive overcrowding.

19 *Id.*  The Court thus recognized that, at some point when a state actor has proven unwilling or

20 incapable of remedying a constitutional violation, the deprivation of constitutional liberties

21 demands a more forceful solution.  Here, as "overcrowding is the 'primary cause of the

22 violation of a Federal right,' 18 U.S.C. § 3626(a)(3)(E)(i), specifically the severe and

23 unlawful mistreatment of prisoners through grossly inadequate provision of medical and

24 mental health care," that solution was a population reduction order.  *Id.*  The Supreme Court

25 affirmed our order in full, holding "that the court-mandated population limit is necessary to

26 remedy the violation of prisoners' constitutional rights."  *Id.*

27        One of defendants' principal arguments before the Supreme Court was that the Three-

28 Judge Court was prematurely convened, as defendants had been afforded insufficient time to

achieve a solution on their own to the problem of prison overcrowding.  The Supreme Court rejected this argument, stating that defendants had been given "ample time to succeed" in resolving the constitutional violations.  *Id.* at 1930.  At the time that the Three-Judge Court was convened, twelve years had passed since the appointment of the Special Master in *Coleman*, and five years had passed since the stipulated injunction in *Plata*.  The Supreme Court stated that, given defendants' continuing inability to remedy the overcrowding problem during that time, "the District Courts were not required to wait to see whether their more recent efforts would yield equal disappointment."  *Id.* at 1931.  In short, decades of failure by defendants justified the convening of this Three-Judge Court.

Defendants also repeated their challenge that a population reduction order was not required, as the overcrowding problem could be resolved through construction and other efforts.  The Supreme Court flatly rejected each option presented by defendants, affirming our determination that these options were "chimerical," ineffective, or demanded some level of prisoner release.  *Id.* at 1938-39.  When defendants attempted to assert, without evidence, that they could resolve the problem through some combination of these options, the Supreme Court explained why defendants' troubled history in this litigation belied placing any trust in them:

> The State claims that, even if each of these measures were unlikely to remedy the violation, they would succeed in doing so if combined together.  Aside from asserting this proposition, the State offers no reason to believe it is so.  Attempts to remedy the violations in *Plata* have been ongoing for 9 years.  In *Coleman,* remedial efforts have been ongoing for 16.  At one time, it may have been possible to hope that these violations would be cured without a reduction in overcrowding.  A long history of failed remedial orders, together with substantial evidence of overcrowding's deleterious effects on the provision of care, compels a different conclusion today.

*Id.* at 1939.  Again, decades of failure justified rejecting defendants' reassurances that, with more time, they could resolve the problem.

Defendants also insisted that achieving a prison population of 137.5% design capacity would adversely affect public safety.  The Supreme Court recognized that defendants

maintained this belief but found it unpersuasive in light of this Court's explicit factual

findings to the contrary:

> This inquiry necessarily involves difficult predictive judgments regarding the likely effects of court orders.  Although these judgments are normally made by state officials, they necessarily must be made by courts when those courts fashion injunctive relief to remedy serious constitutional violations in the prisons.  These questions are difficult and sensitive, but they are factual questions and should be treated as such.  Courts can, and should, rely on relevant and informed expert testimony when making factual findings.  It was proper for the three-judge court to rely on the testimony of prison officials from California and other States.  Those experts testified on the basis of empirical evidence and extensive experience in the field of prison administration.

*Id.* at 1942.  In other words, defendants' beliefs about public safety are not to be credited

over the contrary findings of this Court, which were supported by extensive expert testimony

and which the Supreme Court affirmed.  In so doing, the Supreme Court specifically

endorsed the good time credits expansion measure:

> The court found that various available methods of reducing overcrowding would have little or no impact on public safety.  Expansion of good-time credits would allow the State to give early release to only those prisoners who pose the least risk of reoffending.

*Id.* at 1943.  The Supreme Court also approvingly discussed the empirical and statistical

evidence from other jurisdictions that had successfully implemented good time credits.  *Id.* at

1942-43 (listing the experience in certain California counties, Washington, etc.).  The

Supreme Court was in clear agreement with this Court that defendants could reduce the

prison population to 137.5% design capacity without adversely affecting public safety,

specifically through the expansion of good time credits.

In its final section, the Supreme Court addressed the issue of timing.  Defendants

objected to the fact that our Order required them to achieve the prison population cap within

two years.  The Supreme Court held that there was nothing problematic about our two-year

time frame, especially as defendants had not raised an objection to the two-year deadline at

trial; nor had they formally requested an extension from the Supreme Court.  *Id.* at 1946.

The Court further observed that, because our Order was stayed during the pendency of the

1  Supreme Court proceedings, defendants "will have already had over two years to begin

2  complying with the order of the three-judge court." *Id.* The Supreme Court stated that, to

3  the extent that additional time was necessary, defendants could seek modification, a request

4  which this Court "must remain open to." *Id.* (We have, in fact, done so, granting defendants

5  a six-month extension, the most that they even suggested might be necessary.) Just as the

6  Supreme Court advised this Court to be open to accommodating defendants' possible need

7  for additional time, it also reminded us of the "the need for a timely and efficacious remedy

8  for the ongoing violation of prisoners' constitutional rights." *Id.* at 1946-47. To the extent

9  that this Court granted defendants an extension, it should be "provided that the State satisfies

10  necessary and appropriate preconditions designed to ensure that measures are taken to

11  implement the plan without undue delay," including "the State's ability to meet interim

12  benchmarks for improvement in provision of medical and mental health care." *Id.* at 1947.

13  The Supreme Court then stated that, while it approved of the fact that our order "left the

14  choice of how best to comply with its population limit to state prison officials," *id.* at 1943,

15  circumstances may call for further relief:

16  > The three-judge court, in its discretion, may also consider whether it is appropriate to order the State to begin without delay
17  > to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release.
18  > Even with an extension of time to construct new facilities and implement other reforms, it may become necessary to release
19  > prisoners to comply with the court's order. To do so safely, the State should devise systems to select those prisoners least likely
20  > to jeopardize public safety. An extension of time may provide the State a greater opportunity to refine and elaborate those
21  > systems.

22  *Id.* at 1947. The Supreme Court concluded its opinion by recognizing that, while

23  modification was certainly permissible, the serious constitutional deprivations in the

24  California prison system must be resolved in a timely fashion:

25  > The medical and mental health care provided by California's prisons falls below the standard of decency that inheres in the
26  > Eighth Amendment. This extensive and ongoing constitutional violation requires a remedy, and a remedy will not be achieved
27  > without a reduction in overcrowding. The relief ordered by the three-judge court is required by the Constitution and was
28  > authorized by Congress in the PLRA.

*Id.* The final words of the Supreme Court's opinion leave no room for ambiguity: "The State shall implement the order without further delay." *Id.*

### D. Three-Judge Court Proceedings since June 2011

Having been affirmed, our Court issued an order setting the following schedule by which defendants were required to reduce the prison population to 137.5% design capacity within two years after the Supreme Court's decision:

> Defendants must reduce the population of California's thirty-three adult prisons as follows:
>
> a.  To no more than 167% of design capacity by December 27, 2011.
>
> b.  To no more than 155% of design capacity by June 27, 2012.
>
> c.  To no more than 147% of design capacity by December 27, 2012.
>
> d.  To no more than 137.5% of design capacity by June 27, 2013.

June 30, 2011 Order Requiring Interim Reports at 1-2 (ECF No. 2374/4032). Defendants informed this Court that they would accomplish the population reduction primarily through Assembly Bill 109, often referred to as "Realignment." Defs.' Resp. to Jan. 12, 2010 Court Order (ECF No. 2365/4016).[7] Realignment would shift responsibility for criminals who commit "non-serious, non-violent, and non-registerable sex crimes" from the state prison system to county jails. This would apply both to incarceration and parole supervision and revocation, and to current and future prisoners convicted of those crimes. Defs.' Resp. to June 30, 2011 Court Order (ECF No. 2387/4043). Realignment became effective in October 2011, and its immediate effects were highly beneficial, as thousands of prisoners either serving prison terms or parole revocation terms for "non-serious, non-violent, and non-registerable sex crimes" were shifted to county jails. Defendants were thus able to comply with the first benchmark, albeit shortly after the deadline. Defs.' Jan. 6, 2012 Status Report

---

[7] California had also enacted Senate Bill 18, which made various minor reforms to its good-time credits, parole policy, community rehabilitation programs, and sentences. Defs.' Resp. to Jan. 12, 2010 Court Order at 4-5 (ECF No. 2365/4016).

1    (ECF No. 2411/4141).  It also appeared that Defendants would easily meet the second

2    benchmark and would likely meet the third.  *Id.*

3         It soon became apparent, however, that Realignment was not sufficient in itself to

4    achieve the 137.5% benchmark by June 2013 or to meet the ultimate population cap at any

5    time thereafter, in the absence of additional actions.  In February 2012, plaintiffs filed a

6    motion requesting this Court to order defendants to demonstrate how they intended to meet

7    the 137.5% figure by June 2013.  Pls.' Mot. for an Order Requiring Defs. to Demonstrate

8    How They Will Achieve the Required Population Reduction by June 2013 (ECF No.

9    2420/4152).  Plaintiffs argued that, based on CDCR's own population projections (as of Fall

10   2011), it was evident that defendants would not achieve a prison population of 137.5% by

11   June 2013.  *Id.* at 2-3.  Defendants responded that, because their Fall 2011 projections

12   predated the implementation of Realignment, they were not reliable.  Defs.' Opp'n to Pls.'

13   Mot. for Increased Reporting in Excess of the Court's June 30, 2011 Order at 2-3 (ECF No.

14   2423/4162).  They stated that the forthcoming Spring 2012 population projections would

15   give a more accurate indication of whether defendants would meet the 137.5% figure by June

16   2013.  *Id.* at 4.  This Court accepted defendants' representations and denied plaintiffs' motion

17   without prejudice to the filing of a new motion after CDCR published the Spring 2012

18   population projections.  Mar. 22, 2012 Order Denying Pls.' Feb. 7, 2012 Mot. (ECF No.

19   2428/4169).

20        In May 2012, plaintiffs renewed their motion.  Pls.' Renewed Mot. for an Order

21   Requiring Defs. to Demonstrate How They Will Achieve the Required Population Reduction

22   by June 2013 (ECF No. 2435/4180).  Plaintiffs correctly observed that, despite defendants'

23   assurances that the Fall 2011 projections were outdated and unreliable, the Spring 2012

24   population projections were not significantly different.  *Id.* at 3-4.  Plaintiffs also pointed to a

25   new public report issued in the intervening months, titled "The Future of California

26   Corrections" (known as "The Blueprint"), in which defendants stated that they would not

27   meet the 137.5% figure by June 2013 and announced their intention to seek modification of

28   this Court's Order.  *See* CDCR, *The Future of California Corrections: A Blueprint to Save*

16

1   *Billions of Dollars, End Federal Court Oversight, and Improve the Prison System*, Apr. 2012

2   ("CDCR Blueprint").[8]  In fact, the Blueprint called for a substantial increase in the California

3   prison population.  Based on this evidence, plaintiffs repeated their request that this Court

4   order defendants to demonstrate how they would comply with this Court's June 30, 2011

5   Order.  Pls.' Renewed Mot. for an Order Requiring Defs. to Demonstrate How They Will

6   Achieve the Required Population Reduction by June 2013 at 5-6 (ECF No. 2435/4180). They

7   further contended that defendants' delaying tactics and "failure to take reasonable steps to

8   avert a violation of this Court's Order would amount to contempt of court."  *Id.* at 6.

9   Defendants' responsive filing, dated May 2012, confirmed their intent not to comply with the

10  Order but instead to seek its modification from 137.5% design capacity to 145% design

11  capacity.  Defs.' Opp'n to Pls.' Renewed Mot. for an Order Requiring Defs. to Demonstrate

12  How They Will Achieve the Required Population Reduction by June 2013 at 2 (ECF No.

13  2442/4191).

14          This Court, being of the opinion that it could not grant plaintiffs' request to order

15  defendants to demonstrate how they would meet the 137.5% goal if defendants actually had a

16  legitimate basis for seeking modification, ordered two rounds of supplemental briefing

17  regarding the basis for defendants' anticipated (but unfiled) motion to modify.  June 7, 2012

18  Order Requiring Further Briefing (ECF No. 2445/4193); Aug. 3, 2012 2d Order Requiring

19  Further Briefing (ECF No. 2460/4220).[9]  Additionally, because defendants[10] had suggested

20  ─────────────

21      [8] The Blueprint represents defendants' current plan for the California prison system.
    It, however, makes no attempt to reduce prison crowding further than Realignment.  To the
    contrary, it calls for the elimination of California's program that houses approximately 9,500

22  prisoners in out-of-state prisons, which – as explained *infra* – will have the result of
    increasing prison crowding substantially.  The Blueprint is therefore in all ways relevant, as

23  it is in effect the updated version of the Realignment, and we use the terms Realignment and
    Blueprint interchangeably.  The Blueprint can be found at

24  http://www.cdcr.ca.gov/2012plan/docs/plan/complete.pdf.

25      [9] Defendants' initial responsive briefing was unclear and did not satisfactorily respond
    to this Court's question as to what the basis for the motion to modify would be.

26  Additionally, their answer raised further factual questions.  For example, defendants assured
    this Court that they would not use modification as a delaying tactic because they would seek

27  modification promptly after the prison population fell to 145%, which they projected would
    happen in December 2012.  Defs.' Resp. to June 7, 2012 Order Requiring Further Briefing at

28  1, 2 (ECF No. 2447/4203).  Their projection, however, appeared to be outdated or simply

that they were not currently on track to reduce prison population to 137.5% design capacity, this Court asked the following:

> [I]f the Court ordered defendants "to begin without delay to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release," *Plata*, 131 S. Ct. at 1947, by what date would they be able to do so and, if implemented, how long would it take before the prison population could be reduced to 137.5%? By what other means could the prison population be reduced to 137.5% by June 27, 2013? Alternatively, what is the earliest time after that date that defendants contend they could comply with that deadline?

*Id.* at 4. This Court further stated that, until such time as we declare otherwise, "defendants shall take all steps necessary to comply with the Court's June 30, 2011 order, including the requirement that the prison population be reduced to 137.5% by June 27, 2013." *Id.*

In their response, defendants stated that they would seek to prove that Eighth Amendment compliance could be achieved with a prison population higher than 137.5% design capacity. Defs.' Resp. to Aug. 3, 2012 2d Order Requiring Further Briefing at 6 (ECF No. 2463/4226). Defendants defiantly refused, however, to answer the set of questions quoted above. Defendants stated, somewhat astonishingly, that our suggestion that we *might* order defendants to develop a system to identify low-risk prisoners, a system that the Supreme Court had suggested we might consider ordering defendants to develop "without delay," "is a prisoner release order that vastly exceeds the scope of any of the Court's prior orders." *Id.* at 11. In tortured logic, defendants suggested that the Supreme Court's statement ("The three-judge court, in its discretion, may also consider whether it is appropriate to order the State to begin without delay to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release.") "did not authorize the early release of prisoners," or even the consideration of that question. *Id.*

---

erroneous. The then-current prison population was higher than defendants estimated, and the rate of prison population decline was already slowing considerably. If defendants failed to take additional measures until after they filed a motion to modify and would not file the motion until the prison population fell to 145%, it was unclear when, if ever, a motion would be filed. Accordingly, this Court ordered a second round of briefing.

[10] Our order was directed at both parties, but the answers we sought were from defendants only.

1   More to the point, our questions were about the timing of the development of such a system,

2   not the actual imposition of it.  Defendants, nevertheless, refused to answer our questions.[11]

3   　　　　We had asked other factual questions, which defendants did answer.  In response to

4   this Court's question whether modification proceedings could commence before the prison

5   population reached 145%, defendants replied that they believed it would be premature to

6   begin modification proceedings before the prison population reached 145%.  Defs.' Resp. to

7   Aug. 3, 2012 2d Order Requiring Further Briefing at 9-10 (ECF No. 2463/4226).  In response

8   to the question whether their population projections were flawed, defendants conceded that

9   point and stated that they believed the prison population would reach 145% design capacity

10  by February or March 2013, at which point they would seek modification.  *Id.* at 10-11.  As

11  of the date of this order, the prison population is at 149.8% design capacity.  CDCR, *Weekly*

12  *Rpt. of Population*, June 12, 2013, *available at*  http://www.cdcr.ca.gov/reports_research/

13  offender_information_services_branch/WeeklyWed/TPOP1A/TPOP1Ad130612.pdf.

14  Plaintiffs again asked this Court to find defendants in contempt, asserting that "[d]efendants

15  have all but stated that they have no intention of complying with this part of the Court's

16  Orders."  Pls.' Request for Disc. & Order to Show Cause Re: Contempt at 1 (ECF No.

17  2467/4230).

18  　　　In September 2012, this Court ruled on plaintiffs' pending motions, including their

19  request that defendants be held in contempt, which we denied without prejudice.  Sept. 7,

20  2012 Order Granting in Part & Denying in Part Pls.' May 9 and Aug. 22, 2012 Mots. (ECF

---

[11] Defendants did appear to state, however, that, if the motion to modify were to be denied, they could comply with our Order with a six-month extension.  *Id.* at 12 ("If the Court for some reason disagrees and insists that the final benchmark cannot be modified, Defendants' only method of achieving the 137.5% target, without the early release of prisoners or further legislative action to shorten prison time, would be to maintain the out-of-state program.  If the Court were to order that the current out-of-state capacity be maintained and waived the associated state laws, the prison population should reach 137.5% by December 31, 2013.").  Defendants offered no explanation, however, why they could not release low-risk prisoners early or obtain any necessary legislative action for other measures identified in our August 2009 Opinion & Order.  As to the out-of-state prisoner program, which had been authorized under an Emergency Proclamation issued by Governor Schwarzenegger but still remained in effect, Governor Brown without prior notice subsequently terminated the Emergency Proclamation while announcing that the overcrowding problem had been solved.

No. 2473/4235).  In the course of ruling on those motions, we commented that the question whether constitutional compliance could be achieved with a prison population higher than 137.5% design capacity "has already been litigated and decided by this Court and affirmed by the Supreme Court, and this Court is not inclined to permit relitigation of the proper population cap at this time." *Id.* at 2-3.  Accordingly, this Court stated that we were "not inclined to entertain a motion to modify the 137.5% population cap based on the factual circumstances identified by defendants." *Id.* at 2.  This Court further stated that it would, "however, entertain a motion to extend the deadline for compliance with the June 30, 2011 order." *Id.* at 3.  We also ordered defendants to answer the questions to which they had failed to respond. *Id.*

Defendants filed a response in which they answered our questions.  Specifically, they stated that they would need six months to develop a system for identifying low-risk offenders for early release.  Defs.' Resp. to Sept. 7, 2012 Order at 5 (ECF No. 2479/4243). Furthermore, defendants advised us that they could comply with our Order with a six-month extension, largely by maintaining the out-of-state program. *Id.* at 6.  It appeared, from the parties' filings, that resolution was not far off:  Even defendants acknowledged that they could comply by December 2013.  The parties disagreed, but perhaps not irreconcilably, over whether defendants could comply by the original date for compliance, June 2013. Accordingly, in October 2012, this Court ordered both parties to meet and confer, to develop, and to submit (preferably jointly) "plans to achieve the required population reduction to 137.5% design capacity by (a) June 27, 2013, and (b) December 27, 2013." Oct. 11, 2012 Order to Develop Plans to Achieve Required Prison Population Reduction at 1 (ECF No. 2485/4251).  The plans were due on January 7, 2013.

On January 7, 2013, both parties filed plans to meet the 137.5% population cap. Defendants suggested in their plan that, although compliance by June 2013 would require the outright release of thousands of prisoners "without a structured program," compliance by December 2013 would require virtually no such release of prisoners.  Defs.' Resp. to Oct. 11, 2012 Order (ECF No. 2511/4284).  Three other more significant events occurred, however,

20

on or around that date, all indicating a troubling change in position on the part of defendants. First, in their monthly status report, defendants stated that despite not being in compliance with this Court's order, they would take no further action to comply with it.[12]  Defs.' Jan. 2013 Status Report at 1 (ECF No. 2518/4292) ("Based on the evidence submitted in support of the State's motions, further population reductions are not needed . . . .").  Second, defendants filed a *motion to vacate or modify* this Court's Order.  Defs.' Mot. to Vacate or Modify Population Reduction Order (ECF No. 2506/4280) ("Three-Judge Motion").  This motion did not await the defendants' reaching a 145% population cap, as they had said they would, *see supra* at n.9, or renew defendants' request to extend the deadline by six months. Rather, defendants requested complete vacatur of this Court's Order.  *Id.* at 3.  On the same day, defendants filed, in the *Coleman* court, a motion to terminate all injunctive relief in that case.  Mot. to Terminate & to Vacate J. & Orders (*Coleman* ECF No. 4275).  Notably, defendants did not file a similar motion in the *Plata* court.  The *Coleman* court denied defendants' motion to terminate.  Apr. 5, 2013 Order Denying Defs.' Mot. to Terminate (*Coleman* ECF No. 4539).  Third, the Governor terminated his emergency powers, while arrogating unto himself the authority to declare, notwithstanding the orders of this Court, that the crisis in the prisons was resolved.  Gov. Edmund G. Brown Jr., *A Proclamation by the Governor of the State of California*, Jan. 8, 2013 ("[P]rison crowding no longer poses safety risks to prison staff or inmates, nor does it inhibit the delivery of timely and effective health care services to inmates.").[13]  This termination eliminated the legal authorization that permitted defendants to form contracts to house approximately 9,500 California prisoners in out-of-state prisons.[14]  As the existing contracts expire, they will not be reauthorized.

---

[12] In defendants' two subsequent status reports, they repeated verbatim the statement from their January report that they would not make any further attempts to comply with the Order.  Defs.' Feb. 2013 Status Report at 1 (ECF No. 2538/4342) ("Based on the evidence submitted in support of the State's motions, further population reductions are not needed."); Defs.' March 2013 Status Report at 1 (ECF No. 2569/4402) (same).

[13] Available at http://gov.ca.gov/news.php?id=17885.

[14] The appropriations for housing California prisoners in out-of-state prisons had already been terminated by the Blueprint.

1   Consequently, the state prison population will increase by approximately 9,500 prisoners

2   over the next several years.  The Governor's declaration that the constitutional crisis in the

3   prisons had ended and that overcrowding no longer posed health risks to prisoners or safety

4   risks to prisoners or staff was contrary to fact and served no legal purpose other than, by

5   terminating his own authority with regard to out-of-state prisoner housing, to make it more

6   difficult for defendants to comply with this Court's orders while publicly proclaiming

7   "Victory," or "Mission Accomplished."

8          On January 29, 2013, this Court stayed its consideration of the Three-Judge Motion.

9   Jan. 29, 2013 Order at 2 (ECF No. 2527/4317).  However, we granted defendants a six-

10  month extension, even though no formal request had been made to this Court.  *Id.* at 2-3.

11  Finally, we once again ordered defendants to comply with our Order.  *Id.* at 2 (ECF No.

12  2527/4317) ("Neither defendants' filings of the papers filed thus far nor any motions,

13  declarations, affidavits, or other papers filed subsequently shall serve as a justification for

14  their failure to file and report or take any other actions required by this Court's Order.").

15         **E.     This Court's April 11, 2013 Opinion & Order Denying Defendants' Three-
           Judge Motion and April 11, 2013 Order Requiring List of Population
16         Reduction Measures**

17         On April 11, 2013, this Court denied defendants' Three-Judge Motion and ordered

18  them to "immediately take all steps necessary" to comply with our Order.  Apr. 11, 2013 Op.

19  & Order at 2 (ECF No. 2590/4541).  This Court explained its rationale for rejecting

20  defendants' modification request in a lengthy 71-page opinion.  We briefly repeat our

21  rationale here, noting one instance in which evidence available subsequent to the filing of our

22  April 11, 2013 Opinion & Order confirms our conclusions.

23  //

24  //

25  //

26  //

27  //

28  //

We denied the Three-Judge Motion (as modified[15]) for three reasons.  First, it was barred by res judicata principles as an improper attempt to relitigate the 137.5% figure, a predictive judgment that this Court had made and that the Supreme Court had specifically affirmed.[16]  Second, defendants presented insufficient evidence to meet their burden under a Rule 60(b)(5) motion, which is to prove a "significant and unanticipated change in factual conditions warranting modification."  *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005) (summarizing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384-86 (1992)).  The Receiver's 23rd Report, which was filed on May 23, 2013, subsequent to our April 11, 2013 Opinion & Order, further supports our conclusion that defendants failed to demonstrate that their various renovation projects, although adding some treatment space, have added *adequate* treatment space to conclude that the overcrowding was no longer the primary cause of the ongoing constitutional violations:

> Sufficient additional space for healthcare has been added by the Receiver only at San Quentin and Avenal, and some additional space and beds for mental healthcare have been added pursuant to court orders in *Coleman*.  As reported below, however, the State has not completed promised improvements and upgrades to healthcare space at the remainder of the prisons, and even though a plan to complete such construction was completed and agreed to four years ago, not a single upgrade project has broken ground and not even a single contract for design services has been entered into.  The completion dates for these projects stretch into 2016 and 2017, far enough into the future that there is no reliable guarantee the projects will ever be undertaken.

---

[15] Defendants' Three-Judge Motion presented two arguments for vacatur: that there are no longer ongoing constitutional violations regarding the failure to provide the requisite level of medical and mental health care and, even if there are, crowding is no longer the primary cause of those constitutional violations.  Defendants later modified the Three-Judge Motion by withdrawing their request for this Court to decide either constitutional question and asked us to answer only the overcrowding question.  Defs.' Resp. to Jan 29, 2013 Order at 4 (ECF No. 2529/4332) ("The issue to be decided by this Court is not constitutional compliance."); Defs.' Reply Br. in Supp. of Three-Judge Mot. at 11 (ECF No. 2543/4345) ("Defendants' motion did not seek a determination of constitutionality.").

[16] To the extent that defendants continue to insist that 137.5% design capacity is too low a figure, we note that the Receiver's 23rd Report calls for the opposite conclusion.  He states that Realignment has transferred a disproportionately younger and thus healthier prison population to county jails.  Receiver's 23rd Report at 32 (ECF No. 2636/4628).  This proposition supports the conclusion that, if anything, the population cap should be lower, as the remaining prison population is less healthy than this Court assumed when it adopted the 137.5% figure in August 2009.

> Simply put, we do not have appropriate and adequate healthcare space at the current population levels.  We need population levels to reduce to 137.5% of design capacity as ordered by the Three Judge Panel, and we need the State to complete its promised construction.

Receiver's 23rd Report at 31 (ECF No. 2636/4628).[17]  Third, in light of defendants' stated intention to increase the state prison population by 9,500 prisoners by eliminating the out-of-state prison program, defendants failed to demonstrate a "durable" solution that would justify this Court exercising its equity power to vacate a prior order.  We denied the Three-Judge Motion and ordered defendants to comply with our Order and reduce the overall prison population to 137.5% design capacity by December 31, 2013.

To ensure that defendants complied, this Court entered a separate order consisting of five parts.  Apr. 11, 2013 Order (ECF No. 2591/4542).  First, we ordered defendants to "submit a list ('List') of all prison population reduction measures identified or discussed as possible remedies in this Court's August 2009 Opinion & Order, in the concurrently filed Opinion & Order, or by plaintiffs or defendants in the course of these proceedings (except for out-of-state prisoner housing . . .).  Defendants shall also include on the List any additional measures that they may presently be considering." *Id.* at 1-2.  Defendants were to list these measures "in the order that defendants would prefer to implement them, without regard to whether in defendants' view they possess the requisite authority to do so," and to provide various additional information for each measure on the List. *Id.* at 2.  For example, we asked for "[d]efendants' best estimate as to the extent to which the measure would, in itself, assist defendants in reducing the prison population to 137.5% design capacity by December 31, 2013, including defendants' best estimate as to the number of prisoners who would be 'released,' *see* 18 U.S.C. § 3626(g)(4), as a result of the measure." *Id.*  These estimates were to include both prospective and retroactive implementation of the measure, where applicable. *Id.*

---

[17] We have received and reviewed Defendants' Response to the Receiver's 23rd Tri-Annual Report (ECF No. 2647/4650).

Second, we ordered defendants to submit "a plan ("Plan") for compliance with the Order:[18]  The Plan was to identify measures from the List that defendants propose to implement, without regard to whether in defendants' view they possess the requisite authority to do so." *Id.* at 3.  Defendants were specifically ordered to explain:

> For the measures included in the List but not in the Plan: defendants' reasons, excluding lack of authority, why they do not propose to implement these measures.  Other reasons that shall be excluded are all reasons that were previously offered at the trial leading to this Court's August 2009 Opinion & Order and rejected in that Opinion & Order.

*Id.* at 3.  If defendants included a measure to slow the return of out-of-state prisoners, they were required to "include an estimate regarding the extent to which this measure would assist defendants in reducing the prison population to 137.5% design capacity by December 31, 2013" and to explain whether any such measure would provide a durable solution.  *Id.* at 4.

Third, we ordered defendants to "use their best efforts to implement the Plan." *Id.* at 4.  For measures for which they possessed the requisite authority, this meant "[d]efendants shall immediately commence taking the steps necessary to implement the measure." *Id.*  For measures for which they lacked such authority, this meant "[d]efendants shall forthwith attempt in good faith to obtain the necessary authorization, approval, or waivers from the Legislature or any relevant administrative body or agency." *Id.*

Fourth, we ordered defendants to update us on their progress towards implementing the Plan in their monthly reports. *Id.*  For measures for which they possess the requisite authority, defendants were to commence taking all necessary steps immediately and, if they failed to do so, explain who is responsible and why.  For measures for which they lacked such authority, we asked for information regarding their progress in acquiring legislative and administrative authorization.

---

[18] "Order" was defined in the April 11, 2013 order the same way as "Order" is defined in this Opinion & Order.  It refers to defendants' obligation to reduce the prison population to 137.5% design capacity by December 31, 2013.

1    Fifth, we ordered defendants "to develop a system to identify prisoners who are

2  unlikely to reoffend or who might otherwise be candidates for early release, to the extent that

3  they have not already done so." *Id.* at 5. "If defendants fail to reduce the prison population

4  to 137.5% design capacity in a timely manner, this system will permit defendants to

5  nevertheless comply with the Order through the release of low-risk prisoners." *Id.*

6  Defendants were ordered to submit the List and Plan within 21 days of our April 11, 2013

7  order.

8

9  **II.    DISCUSSION**

10    Defendants timely submitted the List and a Plan, although – as will be explained in

11  detail *infra* – defendants' Plan does not comply with our Order.  This Court therefore orders

12  defendants to implement the Plan plus an additional population reduction measure as well.

13  This additional measure, in conjunction with the measures included in the Plan submitted by

14  defendants, will constitute the Amended Plan – a plan that will, unlike defendants', reduce

15  the overall prison population to 137.5% design capacity by December 31, 2013.

16    **A.    Defendants' Plan for Non-Compliance**

17    Defendants again directly defied this Court's orders, this time our April 11, 2013

18  order.  By the terms of our April 11, 2013 order, defendants were required to submit a Plan

19  for compliance with our Population Reduction Order as amended, i.e., to reduce the prison

20  population to 137.5% design capacity by December 31, 2013.  Apr. 11, 2013 Order at 3 (ECF

21  No. 2591/4542).  Under Realignment and the Blueprint (which was defendants' earlier

22  "effort" to comply with the Order), the prison system is projected, on December 31, 2013, to

23  contain 9,636 prisoners more than permitted by the Population Reduction Order.  This

24  includes several thousand prisoners who, under the Blueprint, are due to be returned to the

25  state prison system sometime this year.  *Id.*; *see also* CDCR Blueprint at 6-7 & App. G.

26  Consequently, on December 31, 2013, the prison population was projected to be 149.3%

27

28

design capacity rather than 137.5%.[19]  Accordingly, we directed defendants in our April 11, 2013 order to propose a new Plan that would reduce the state prison population by 9,636 more prisoners by December 31, 2013.

It is clear that defendants failed to comply with our April 11, 2013 order, and they have now conceded as much.  Defs.' Resp. to April 11, 2013 Order at 5 n.3, 37 (ECF No. 2609/4572) (acknowledging that its latest Plan will not achieve the 137.5% figure by December 31, 2013).  Defendants, however, understate the extent of their own non-compliance.  Defendants assert that their Plan would achieve a prison population of 140.7% design capacity by December 31, 2013.  In fact, however, at best defendants' latest Plan would result in a prison population of 142.6% design capacity by December 31, 2013, assuming that the out-of-state prisoners are actually not to be returned (despite the Governor's termination of his authority to order them housed outside of California).  In other words, Defendants submitted a Plan that at best would achieve essentially only half of the prisoner reduction required by our April 11, 2013 order.  Demonstrating the discrepancy between defendants' assertions and the reality of their proposed Plan requires some explanation.

Defendants' Plan has five components: (1) expanding the use of fire camps; (2) leasing jail capacity from Los Angeles and Alameda county; (3) expanding good time credits

---

[19] The calculations throughout this Opinion & Order are based on projections for prison population and design capacity that defendants have either reported to us in various filings or stated in published reports (e.g., the Blueprint).  We accept defendants' reported numbers because, not only does this Court have no independent method to determine such figures, but also plaintiffs have not objected to these numbers.  Accordingly, we credit defendants fully with the additional design capacity resulting from construction to be completed between now and December 31, 2013.

We note, however, that defendants' previous estimate for the shortfall between the Blueprint and the 137.5% population figure was 8,790 prisoners.  App. A to Grealish Decl. in Supp. of Defs.' Resp. to Oct. 11, 2012 Order (ECF No. 2512/4285).  Based on defendants' May 2, 2013 filing, it is apparent that the shortfall is now 9,636 prisoners.  Defendants have failed to explain why or how this estimate has changed by almost 1,000 prisoners.  It appears to be attributable to an upward revision in the State's general population projections.  Defendants' Spring 2013 population projections show the prison population to be higher than was expected in the Fall 2012 projections.  Spring 2013 Adult Population Projections at 11, http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/Projections/S13Pub.pdf.

for non-violent offenders prospectively (despite the agreement of all experts that the full expansion of good time credits, retroactively and for all prisoners, was the most promising population reduction measure); (4) expanding some parole categories; and (5) slowing the return of out-of-state prisoners.  Defendants estimate the prisoner reduction from each of these measures as follows:[20]

| Component | Reduction by December 31, 2013 |
|---|---:|
| 1) Fire camps | 1,250 |
| 2) Leasing jail space | 1,600 |
| 3) Good time credits (limited) | 247 |
| 4) Expanding parole | 400 |
| 5) Out-of-state prisoners not to be returned | 3,569 |
| Total achieved by Plan | 7,066 |
| Shortfall relative to 9,636 reduction required by population reduction order | 2,570 |

Thus, if defendants were able to implement all the measures included in its Plan and if these estimates accurately reflected the prisoner population reduction that would be achieved under those measures, defendants would fail to comply with our April 11, 2013 order by a total of 2,570 prisoners – i.e., it would fall 27% short of the 9,636 reduction required by that order. Put another way, it would result in a prison population of 140.7% design capacity on December 31, 2013.

Defendants' estimates, however, include reductions that would not be attainable by December 31, 2013.  Specifically, the second item on defendants' Plan is not attainable by that date because defendants concede that, even with complete authorization, they will need nine months to negotiate the necessary contracts and thus cannot "fully implement this measure" by the end of the year.  Defs.' Resp. to April 11, 2013 Order at 7 (ECF No.

---

[20] Because our April 11, 2013 opinion ordered defendants to ensure that the estimated reductions from the measures in its Plan did not double count the same prisoners, Apr. 11, 2013 Op. & Order at 3 (ECF No. 2591/4542), we assume that the total reduction from the Plan is the simple sum of the individual measures in the Plan.

2609/4572).  In fact, defendants do not assert that by December 31, 2013 their Plan would achieve any specific reduction in the prison population as a result of the reassignment of prisoners to leased jail space.  Consequently, we cannot credit the Plan with the 1,600 prisoner reduction as a result of leasing jail capacity by December 31, 2013.  With this adjustment, defendants' Plan is as follows:

| Component | Reduction by December 31, 2013 |
|---|---|
| 1) Fire camps | 1,250 |
| 2) Leasing jail space (1,600) | 0 |
| 3) Good time credits (limited) | 247 |
| 4) Expanding parole | 400 |
| 5) Out-of-state prisoners not to be returned | 3,569 |
| Total achieved by Plan | 5,466 |
| Shortfall relative to 9,636 reduction required by population reduction order | 4,170 |

Eliminating the effect of the proposed jail leasing measure, defendants' Plan fails to comply with our April 11, 2013 order by a total of 4,170 prisoners – i.e., it falls 43% short of the 9,636 reduction required by that order.  Put another way, defendants' Plan would actually result in a prison population of 142.6% design capacity on December 31, 2013.  In short, defendants' Plan clearly fails to meet the design capacity limit ordered by this Court – and affirmed by the Supreme Court – by a significant amount.

Although defendants' Plan does not come close to meeting the population reduction required by our order, defendants also advise us that this deficient Plan cannot be immediately implemented because all but one of the measures included therein are contrary to state law.  This includes the measure to slow the return of out-of-state prisoners, even though the legal authorization to house these prisoners out of state in the first place was provided by Governor Schwarzenegger's Emergency Proclamation, which Governor Brown terminated earlier this year on the erroneous legal ground that no constitutional violation existed any longer in the California prison system.  In other words, defendants must now

1  seek authorization (from the Legislature, or from this Court in the form of a waiver of state

2  law) for a new measure that is required only because of the Governor's own prior action in

3  terminating his own emergency authority, and his refusal to reinstate this authority.

4  Defendants' June 17, 2013 status report indicates that they have proceeded no further in

5  making the necessary preparations to implement the measures in the Plan other than to draft

6  proposed legislation.[21]  Defs.' June 2013 Status Report (ECF No. 2651/4653).  Moreover,

7  with regard to all measures that require authorization, the leader of the State Senate has

8  declared them DOA, dead on arrival.  Hardy Decl., ¶ 3, Ex. B (ECF No. 2628/4612).  In sum,

9  there is more than merely a substantial numerical deficiency with regard to defendants'

10 Plan.[22]

11      **B.**     **The Need for Further Relief**

12      In responding to defendants' submission of a "Plan" that fails to comply with our

13 Order, we begin again with the Supreme Court's prior decision:

14          If government fails to fulfill its obligation [to provide care
            consistent with the Eighth Amendment], the courts have a
15          responsibility to remedy the resulting Eighth Amendment
            violation.  *See Hutto v. Finney*, 437 U.S. 678, 687, n. 9, 98 S. Ct.
16          2565, 57 L. Ed.2d 522 (1978).  Courts must be sensitive to the
            State's interest in punishment, deterrence, and rehabilitation, as
17          well as the need for deference to experienced and expert prison
            administrators faced with the difficult and dangerous task of
18          housing large numbers of convicted criminals.  *See Bell v.*

19

20      [21] The two exceptions are that they have (a) continued with construction of the
        California Health Care Facility in Stockton and the DeWitt Nelson Correctional Annex in
21      Stockton; and (b) revised the 2013-2014 budget to include appropriations to increase fire
        camp capacity.  Defs.' June 2013 Status Report 1-2 (ECF No. 2651/4653).
22
        [22] There are many other, although more minor, examples of how defendants have
23      failed to follow the clear terms of our April 11, 2013 order.  For example, defendants: failed
        to list the total number of prisoners who would be released as a result of the Plan (violating
24      provision (2)(d) of the order); cited an excluded reason for failing to include various
        measures on the Plan (e.g., cited public safety as reason for not including expansion of good
25      time credits for all prisoners) (violating provision (2)(e) of the order); failed to provide a
        substantive explanation as to how the Plan would provide a durable solution to the problem
26      of overcrowding (violating provision (2)(f) of the order); failed to provide an estimate
        regarding the effect on durability of slowing the return of out-of-state prisoners (violating
27      provision (2)(g) of the order); and failed to use their "best efforts" to implement the Plan.
        Additionally, defendants failed to provide the necessary information in their May monthly
28      report required by provision (4)(b) of our order.

1

2

3

4

> *Wolfish*, 441 U.S. 520, 547-548, 99 S. Ct. 1861, 60 L. Ed.2d 447
> (1979).  Courts nevertheless must not shrink from their obligation
> to "enforce the constitutional rights of all 'persons,' including
> prisoners." *Cruz v. Beto*, 405 U.S. 319, 321, 92 S. Ct. 1079, 31 L.
> Ed. 2d 263 (1972) (per curiam).  Courts may not allow
> constitutional violations to continue simply because a remedy
> would involve intrusion into the realm of prison administration.

5  *Plata*, 131 S. Ct. at 1928-29.  There can be no reasonable dispute that Defendants have failed

6  to meet their obligations.  In August 2009, this Court found that defendants must reduce the

7  prison population to 137.5% design capacity in order to resolve the underlying constitutional

8  violations, and we ordered defendants to do so within two years.  Aug. 4, 2009 Op. & Order

9  at 183 (ECF No. 2197/3641).  In June 2011, the Supreme Court affirmed that determination

10  in full, stating that defendants "shall implement the order without further delay."  *Plata*, 131

11  S. Ct. at 1947.  Defendants have now had almost four years to comply with this Order, and

12  we have afforded them another six months for ease of compliance.  Defendants have not

13  requested a further extension, yet they submitted a Plan that they concede will not achieve

14  the necessary population reduction by December 31, 2013.  Further, there is no indication

15  that the Legislature will enact the necessary authorization for the Plan.  Consequently, in the

16  absence of further action by this Court, defendants have guaranteed what would be the

17  perpetuation of constitutional violations in the California prison system for the indefinite

18  future.  *See* Receiver's 23rd Report at 35 ("Of greatest concern to the Receivership, the State

19  has deliberately planned not to comply with the Three Judge Court's order to reduce

20  population density to 137.5% of design capacity, a decision that directly impacts our ability

21  to deliver a constitutional level of care.") (ECF No. 2636/4628).  This Court cannot permit

22  such a result.  We are compelled to enforce the Federal Constitution and to "enforce the

23  constitutional rights of all 'persons,' including prisoners." *Cruz v. Beto*, 405 U.S. 319, 321

24  (1972) (per curiam).  Here, that means ensuring that defendants implement additional

25  measures to reduce the prison population to 137.5% design capacity by December 31, 2013.

26       Thus far, this Court has taken care to limit the extent to which its orders tell

27  defendants how to administer their prison system.  Defendants, however, have continually

28  responded to this Court's deference with defiance.  Over the course of the last eighteen

31

months, even as we recognized that defendants were not taking the steps necessary to comply with our Order and repeatedly ordered them to come into compliance, this Court has not ordered defendants to take particular steps or implement particular measures. We left such choices to defendants' discretion. Defendants, however, have refused to take the necessary additional steps beyond Realignment and the Blueprint. Despite this deliberate failure to comply with this Court's repeated orders, we have nevertheless recently granted defendants a six month extension, to afford them yet another opportunity to come into compliance. Additionally, when this Court rejected defendants' Three-Judge Motion, we again granted defendants discretion to design a Plan that would comply with our Order, notwithstanding the fact that the Three-Judge Motion was largely duplicative of defendants' prior request that we had previously advised them we were not inclined to grant. We also asked for a List of possible prison population reduction measures based on the expert testimony in the 14-day trial or on any other suggestion they might have, to be listed in defendants' order of preference. Defendants, however, submitted a Plan that clearly violated the terms of our April 11, 2013 order and refused to express any preference among the various other prison population reduction measures that had been suggested by national prison experts and others, including California prison officials. Regretfully, we are compelled to conclude that defendants must mistake the scope of their discretion. We are willing to defer to their choice for *how* to comply with our Order, not *whether* to comply with it.

Defendants have consistently sought to frustrate every attempt by this Court to achieve a resolution to the overcrowding problem. In February 2012, we initially dismissed plaintiffs' request to investigate defendants' ability to comply with the population reduction order because we accepted defendants' assurances that the Fall 2011 population projections were unreliable. Then, the Spring 2012 projections proved to be largely identical. In May 2012, we did not order defendants to present a plan for complying with our Order, because defendants advised us that they would seek to modify our order. After inquiring closely into the basis for defendants' proposed modification, we explained why we were not inclined to grant any such modification. Rather than ordering defendants to submit a plan for

compliance, however, we indicated our receptivity to a six-month extension and ordered

settlement talks, by which we hoped that the parties could agree on a solution that would be

to their mutual satisfaction.  Defendants, however, refused to accede to any solution other

than that of the Blueprint and filed a motion to vacate the population reduction order in its

entirety.  When we rejected this motion, we ordered defendants to submit a Plan for

compliance within 21 days.  Defendants responded in 21 days, but with a Plan for non-

compliance.  In proposing the deficient Plan, the Governor declined to reinstate the

emergency powers that he had recently ended erroneously and that would have enabled him

to implement by far the largest of the proposed population reduction measures, insisting

instead that legislation would be necessary (legislation that would later be declared "dead on

arrival").  Defendants' responses to our questions, as well as their actions, have consistently

been confusing, contradictory, and unhelpful.[23]  Defendants have thus made it clear to this

Court that they will not, on their own, comply with our Order.

　　　　The Receiver has observed the same, if not worse, type of behavior in his own

experience with defendants and their subordinates.  We recite his report at length because it

too demonstrates the need for further action by this Court:

> Over the course of the last two reporting periods, the substance
> and tone of leadership set by State officials has changed from
> acquiescence bordering on support for the Receiver's work, to

---

[23]Two examples come from defendants' May 29, 2013 filing.  First, defendants assert that they have reduced the prison population by "more than 42,000 inmates since 2006." Defs.' Resp. to Pls.' Resp. & Req. for Order to Show Cause Regarding Defs.' Resp. to Apr. 11, 2013 Order at 3 (ECF No. 2640/4365).  They have made similar statements in the past. *See, e.g.*, Defs.' Resp. to Apr. 11, 2013 Order at 39 (ECF No. 2609/4572).  This statistic is misleading, as it includes reductions made between 2006 and 2009, before we issued our initial population reduction order.

Second, defendants claim that they have "taken all of the actions in [their] power" to reach the December 2013 population cap, arguing that they are either without authority to take further measures or that such measures would threaten public safety.  *Id.* at 1. Defendants fail to acknowledge that they could have met the 137.5% cap by increasing capacity – a measure that would have reduced overcrowding without releasing prisoners – or, assuming that their representations concerning their inability to take the necessary actions is correct, they could have requested this court to waive restrictions upon which they now rely. Finally, we question the good faith of their arguments, as in January of this year Governor Brown terminated his own emergency authority with respect to the 9,500 prisoners housed out of state on the purported basis that the crisis in the prisons was over.

> opposition bordering on contempt for the Receiver's work and
> for implementation of court orders, including the orders of the
> Three Judge Court.
>
> . . .
>
> The clear message to the field, from at least early 2012 until the
> present, is that court orders in Coleman and Plata, and orders
> from the Three Judge Court, are to be implemented only to the
> extent that State officials and their legal counsel deem desirable.
> This message of deliberate non-compliance undermines the
> legitimacy and integrity of all court orders in these cases and of
> the Receiver's turnaround plan initiatives.  And when that
> message is reinforced by repeated statements by State leaders that
> reports from the Special Master in *Coleman* are not worth reading
> or following, that too many resources and too much money has
> been spent improving prison healthcare (which ignores the 20%
> reduction in the cost of prison medical care which the
> Receivership has achieved over the last four years), and that the
> State stands ready immediately to take over prison medical care
> from the Receiver notwithstanding the State's shortcomings, the
> result has been to freeze and ossify improvement efforts in the
> field.  Clinicians and healthcare leaders in the field are naturally
> concerned that, when the Receiver leaves, CDCR leadership will
> tend to favor those who have supported the Administration's
> position over the Receiver's position and that hard fought
> changes will be immediately rolled back.
>
> In short, the tone from the top of the Administration that
> improvements in prison healthcare have gone too far and that
> necessary reductions in population density have gone too far
> interferes with our progress towards a final transition of prison
> medical care back to the State.  We have lost at least six to nine
> months of time while the State seeks essentially to relitigate
> claims that it previously lost before the trial courts and the
> Supreme Court of the United States.

Receiver's 23rd Report at 35 (ECF No. 2636/4628).  It is therefore pellucidly clear that if our

Population Reduction Order is to be met, this Court must prescribe the specific actions that

defendants must take in order to come into compliance.  As the Supreme Court stated,

"[c]ourts may not allow constitutional violations to continue simply because a remedy would

involve intrusion into the realm of prison administration."  *Plata*, 131 S. Ct. at 1928-29.  At

this point, this Court's "intrusion" into state affairs is necessitated by defendants' own

intransigence.  Furthermore, the degree of "intrusion" is minimal in this case.  This Court

asked defendants to list the possible prison population reduction measures in the order of

their preference.  Apr. 11, 2013 Order at 1-2 (ECF No. 2591/4542).  Defendants, however,

34

1    chose to submit their List of possible prison population reduction measures "in no particular

2    order of preference."  Defs.' Resp. at 5 (ECF No. 2609/4572).  Because defendants have

3    expressed no preference at all among the measures on the List, they have forfeited any

4    challenge to this Court's selection of the particular measures that we have ordered.

5        Our conclusion that we must order defendants to implement additional population

6    reduction measures is compelled by *Hutto v. Finney*.  In that case, the district court ordered a

7    30-day limit on solitary confinement to remedy ongoing Eighth Amendment violations.  The

8    Supreme Court fully recognized that such a specific remedy was rare, but affirmed.  It did so

9    because the state had repeatedly failed to correct the constitutional violations on its own

10   accord:

> In fashioning a remedy, the District Court had ample authority to
> go beyond earlier orders and to address each element contributing
> to the violation.  The District Court had given the Department
> repeated opportunities to remedy the cruel and unusual conditions
> in the isolation cells. If petitioners had fully complied with the
> court's earlier orders, the present time limit might well have been
> unnecessary.  But taking the long and unhappy history of the
> litigation into account, the court was justified in entering a
> comprehensive order to insure against the risk of inadequate
> compliance.

17   437 U.S. 678, 687 (1978).  Here, too, we face a "long and unhappy history of litigation."

18   The underlying constitutional violations are the subject of cases that date back between

19   twelve and twenty-three years, and this Court's current population reduction order dates back

20   approximately four years.  More important than the length of the litigation, however, has

21   been defendants' conduct throughout.  Defendants have continually equivocated regarding

22   the facts and the law, and have consistently sought to delay the implementation of our Order.

23   At the time of the population reduction order, defendants asked this Court to wait for

24   "chimerical" possibilities.  As the order was appealed to the Supreme Court, defendants

25   insisted that the Three-Judge Court had been convened prematurely and that alternative

26   remedies to a prisoner release order existed.  The Court unhesitatingly rejected these

27   arguments in light of defendants' decade-long failure to remedy the constitutional violations

28   and expressly ordered defendants to "implement the order without further delay."  *Plata*, 131

1   S. Ct. at 1947.  That was hardly what followed.  Within a year of the Supreme Court's

2   decision, even though it was apparent that Realignment and the Blueprint would be

3   insufficient to comply with our Order, defendants refused to take the necessary additional

4   steps to reduce the prison population to 137.5% design capacity.  Rather, they have used this

5   Court's patience and good-faith attempts to achieve a resolution as an excuse for protracting

6   these legal proceedings to a time that could hardly have been imagined when the litigation to

7   constitutionalize California's prison conditions commenced over two decades ago.  This

8   Court has nevertheless afforded defendants "repeated opportunities" to bring its prison

9   system into compliance by issuing multiple orders directing defendants to take all steps

10  necessary to satisfy our Order.  Most recently, after the filing of our April 11, 2013 Opinion

11  & Order, defendants filed a notice of appeal, in which they stated that they would appeal our

12  order in part because we "did not fully or fairly consider the evidence showing that the

13  State's prisoner health care now exceeds constitutionals standards," Defs.' Notice of Appeal

14  to the Supreme Court at 3 (ECF No. 4605/2621) – notwithstanding the fact that defendants

15  expressly withdrew the question of constitutional compliance from this Court's

16  consideration, *see* discussion *supra* at n.15.  Despite all of our efforts, defendants' conduct to

17  date has persuaded this Court that anything short of an order to implement specific

18  population reduction measures would be futile.  Therefore, we issue the order we do today,

19  although we would have greatly preferred that defendants had themselves chosen the means

20  by which California's prison system would be brought into compliance with the Constitution.

21         **C.      This Court's Amended Plan for Compliance**

22         As explained above, the Plan defendants proffered would, if it could overcome the

23  legal obstacles defendants continually foresaw, achieve a prison population reduction of only

24  5,466 prisoners between the date of our latest order in April 2013 and December 31, 2013.

25  This is 4,170 prisoners short of the 9,636 necessary to achieve compliance with the

26  Population Reduction Order by December 31, 2013.  Thus, for the Amended Plan to comply

27  with our Order, defendants must implement an additional measure or measures that will

28  achieve a reduction of another 4,170 prisoners by the end of the year.

1          1.      Expansion of Good Time Credits

2          A single measure is sufficient to remedy the 4,170 prisoner deficiency: the full

3  expansion of good time credits set forth in Item 4 of defendants' List, submitted on May 2,

4  2013.  The Plan defendants propose to implement includes a highly limited version of good

5  time credits that applies prospectively only and applies to a limited number of prisoners.

6  This limited version would result in the reduction of only 247 prisoners by December 31,

7  2013.  Defs.' Resp. at 35 (ECF No. 2609/4572).  If, however, defendants were to implement

8  the full expansion of good time credits set forth in Item 4 of their List – i.e., prospectively

9  and retroactively, for all prisoners – the measure would result in the additional reduction of

10  as many as 5,385 prisoners by December 31, 2013.  This is more than sufficient to remedy

11  the 4,170 prisoner deficit and achieve the reduction in the prison population to 137.5%

12  design capacity by December 31, 2013.

13          Defendants state their reasons for not including the full expansion of good time credits

14  in their Plan as follows: (1) retroactive expansion results in the immediate release of some

15  prisoners, threatening public safety; and (2) expansion of good time credits to prisoners

16  convicted of violent offenses threatens the public safety.  Defs.' Resp. at 35 (ECF No.

17  2609/4572).

18          We reject these arguments because they are contrary to the express factual findings

19  that this Court has already made and that have been affirmed by the Supreme Court.  As

20  explained at length *supra* Section I.B, this Court carefully considered the question of whether

21  the expansion of good time credits was consistent with public safety in our August 2009

22  Opinion & Order.  We heard extensive testimony from the leading experts in the country, all

23  of whom – including the now Secretary of CDCR Dr. Beard – testified that the expansion of

24  good time credits could be implemented safely, both prospectively and retroactively.  Even

25  defendants' expert agreed that there was no statistically significant relationship between early

26  release through good time credits and recidivism.  Furthermore, many jurisdictions

27  (including a number of counties in California) had safely used the expansion of good time

28  credits to reduce their prison populations.  We therefore concluded that the expansion of

1  good time credits is fully consistent with public safety, and the Supreme Court affirmed this

2  determination.

3       That the Supreme Court affirmed our factual findings with respect to good time

4  credits is alone a sufficient basis for ordering defendants to implement their full expansion.

5  As stated above (but worth repeating nevertheless), the Supreme Court has already stated that

6  this Court's factual findings on public safety are to be credited over the contrary views of

7  defendants:

> This [public safety] inquiry necessarily involves difficult
> predictive judgments regarding the likely effects of court orders.
> Although these judgments are normally made by state officials,
> they necessarily must be made by courts when those courts
> fashion injunctive relief to remedy serious constitutional
> violations in the prisons.  These questions are difficult and
> sensitive, but they are factual questions and should be treated as
> such.  Courts can, and should, rely on relevant and informed
> expert testimony when making factual findings.  It was proper for
> the three-judge court to rely on the testimony of prison officials
> from California and other States.  Those experts testified on the
> basis of empirical evidence and extensive experience in the field
> of prison administration.

15  *Plata*, 131 S. Ct. at 1942. We could stop here and order defendants to implement the full

16  expansion of good time credits as set forth in Item 4 of their List.  We nevertheless explain

17  why neither of defendants' arguments casts any doubt on our prior factual findings.

18       Defendants' first argument is that the prospective application of good time credits for

19  prisoners convicted of non-violent offenses is safe but that the retroactive application of these

20  credits to these same prisoners is somehow not safe.  In order to present a sound argument of

21  this sort, defendants must demonstrate that individuals who benefit from retroactive

22  application are more likely to commit crimes or recidivate than those who benefit from

23  prospective application.  They have, however, provided no support for this highly dubious

24  proposition.  Moreover, the evidence before this Court is to the contrary.  The Receiver, for

25  example, has endorsed the retroactivity of good time credits expansion as provided in Item 4

26  on defendant's List submitted on May 2, 2013.  Receiver's 23rd Report at 33 (ECF No.

27  2636/4628) (stating that "expanding credits for minimum custody inmates, expanding

28  milestone credits to include violent and second strikers, increasing credit earning limits on

1    certain inmates" "could be implemented retroactively to the time of sentencing to achieve

2    maximum benefit").  Additionally, the state's own CDCR Expert Panel (*see* discussion *supra*

3    at 10) recommended making the good time credits changes "retroactive" in the interest of

4    achieving a more timely reduction in the prison population.  CDCR Expert Panel, *A*

5    *Roadmap for Effective Offender Programming in California: A Report to the California*

6    *Legislature*, June 2007, at 95.  Presumably, as a report commissioned by the CDCR, no such

7    recommendation would have been made had it been inconsistent with public safety.  As such,

8    to the extent that defendants state their reason for not implementing the retroactive expansion

9    of good time credits as "public safety," this Court rejects that reason as unfounded and

10   contradicted by the evidence.

11         Defendants' next argument – that good time credits should not be afforded to

12   prisoners convicted of violent offenses – fares only slightly better.  Not a single expert we

13   heard drew any distinction between inmates convicted of violent and non-violent crimes for

14   purposes of good time credits.  The CDCR Expert Panel, on which we relied heavily,

15   specifically recommended expanding good time credits for all prisoners, "including all

16   sentenced felons regardless of their offense or strike levels."  CDCR Expert Panel, *A*

17   *Roadmap for Effective Offender Programming in California: A Report to the California*

18   *Legislature*, June 2007, at 92.[24]   That CDCR itself recommended extending good time

19   credits to all prisoners further strongly supports the conclusion that there is no significant risk

20   to public safety.  In sum, defendants' arguments fail to call into question this Court's prior

21   conclusion that the expansion of good time credits – retroactively and for all prisoners –

22   would be fully consistent with public safety.[25]

23

24         [24] The members of the CDCR Expert Panel included various leading experts in crime
      and incarceration, such as Doctors Petersilia, Krisberg, and Austin; current CDCR Secretary
25    Jeffrey Beard; and many other senior officials of correctional programs throughout the
      country.

26

27         [25] In implementing any good time credits program, the CDCR authorities presumably
      have the authority to prescribe regulations that ensure that good time credits may be withheld
      through the application of objective standards when necessary to avoid the premature release
28    of individuals deemed to be particularly serious threats to the public safety.

1     This Court therefore orders defendants to implement the full expansion of good time

2     credits, as set forth in Item 4 of their List submitted on May 2, 2013.  There are, however,

3     modifications that the defendants could make to the good time credits program that would

4     result in the release of the same number of prisoners without releasing prisoners convicted of

5     violent offenses.  As a practical matter, none of these changes would affect the inclusion of

6     retroactivity.  They would only affect aspects such as the amount of good time credit to be

7     received by various categories of offenders, all non-violent, and the amount of credit to be

8     received for the various activities for which good time credit is awarded.  For example,

9     defendants could extend 2-for-1 credit earning to prisoners other than those held in fire

10    camps and minimum custody facilities, increase the available credit ratio for fire camp and

11    minimum custody prisoners to over 2-to-1, increase the credit earning limit for milestone

12    completion credits, or increase the credit earning capacity of non-violent offenders above 34

13    percent.[26]  Plaintiffs' experts and defendants' experts disagree strongly on the changes in

14    prison population that the good time credit measures on Item 4 of defendants' List would

15    produce.  Neither party's figures are satisfactorily allocated between violent and non-violent

16    offenders; however, it seems clear from projections made using the numbers provided that

17    moderate changes to the good time credit program could result in the release of an adequate

18    number of prisoners to meet the December 31, 2013 benchmark of 137.5% without the

19    _____

20        [26]Other states have taken similar measures to expand their good time credit programs
      for non-violent offenders without a subsequent increase in recidivism.  For example, in 2003,
      Washington increased the amount of good time credit available to certain nonviolent drug
21    and property offenders from 33 percent to 50 percent of those offenders' sentences while
      lowering recidivism and crime rates.  *See* Nat'l Conference of State Legislatures, *Cutting*
22    *Corrections Costs: Earned Time Policies for State Prisoners* at 3 (July 2009), *available at*
      http://www.ncsl.org/documents/cj/earned_time_report.pdf.
23        Another example is Indiana, which awards six months to two years of credits to
      prisoners who complete education programs.  In contrast, defendants propose a credit-
24    earning cap of six to eight weeks for similar "milestone completion."  Defs.' Resp. to
      Apr. 11, 2013 Order at 10 (ECF No. 2609/4572).  Dr. James Austin, plaintiffs' primary
25    expert on good time credits, states that if defendants awarded prisoners four to six months of
      milestone completion credit and increased the number of programs available to prisoners to
26    earn such credits, they could reduce the prison population by 7,000 prisoners with no adverse
      impact on public safety.  Austin Decl. ¶¶ 12-15 (ECF No. 2420-1/4152-1). The CDCR's
27    expert panel similarly recommended an average of four months for milestone completion
      credits.  CDCR Expert Panel, *A Roadmap for Effective Offender Programming in California:*
28    *A Report to the California Legislature*, June 2007, at 92.

1   release of violent offenders.  Thus, if defendants prefer to amend the good time credit

2   program and not release violent offenders, this Court offers them that option, provided that

3   their amendments result in the release of at least the same number of prisoners as does the

4   full expansion of good time credits, as outlined in Item 4 on their List.  We leave it to

5   defendants, however, to determine what modifications they wish to make to the expanded

6   good time credit program in order to achieve the result contemplated by Item 4.

7                              2.      List of Low-Risk Prisoners

8              On April 11, 2013, this Court ordered defendants "to develop a system to identify

9   prisoners who are unlikely to reoffend or who might otherwise be candidates for early

10  release."  Apr. 11, 2013 Order at 5 (ECF No. 2591/4542).  We further specified that the

11  system should be designed "such that it will be effective irrespective of defendants' partial or

12  full implementation of some or all measures in the Plan."  *Id.*  This part of our order was

13  based on the Supreme Court's statement that we may "in our discretion" consider whether to

14  order defendants to begin to develop such a system, to be used in the event that it becomes

15  "necessary to release prisoners to comply with the court's order."  *Plata*, 131 S. Ct. at 1947.

16  Under the terms of our April 11, 2013 order, defendants are to report to us on their progress

17  in approximately two months, Apr. 11, 2013 Order at 5 (ECF No. 2591/4542), and Secretary

18  Beard acknowledged in his May 3 press conference that defendants are making some

19  progress in developing a list of low-risk prisoners to release ("the Low-Risk List"), if

20  necessary or desirable, CDCR Press Conference May 3, 2013, *available at*

21  http://www.cdcr.ca.gov/News/3_judge_panel_decision.html.  We now order defendants to

22  use the Low-Risk List to remedy any deficiency in the number of prisoners to be released in

23  order to meet the 137.5% population ceiling by December 31, 2013, if for any reason

24  defendants do not reach that goal under the Amended Plan as implemented.

25            This Court wishes to make it perfectly clear what this means: Defendants have no

26  excuse for failing to meet the 137.5% requirement on December 31, 2013.  No matter what

27  implementation challenges defendants face, no matter what unexpected misfortunes arise,

28  defendants shall reduce the prison population to 137.5% by December 31, 2013, even if that

                                                    41

is achieved solely through the release of prisoners from the Low-Risk List.  This Court
acknowledges that requiring defendants to create such a list may prove unnecessary should
defendants' implementation of the Amended Plan otherwise result in a reduction in the
prison population to 137.5% design capacity by December 31, 2013.  However, in the past,
defendants have repeatedly found new and unexpected ways to frustrate this Court's orders.
Accordingly, the Low-Risk List is intended to obviate any such action.  We repeat,
defendants shall reduce the prison population to 137.5% by December 31, 2013, in the
manner specified in the Amended Plan or through the use of the Low-Risk List, if that proves
necessary or desirable.

### 3.    Reporting

Instead of submitting monthly reports, defendants shall hereafter submit reports every
two weeks that include all of the information that we have previously ordered be given in the
monthly reports as well as the specific steps defendants have taken toward implementing
each measure in the Amended Plan, any proposed substitutions, and the status of the
development of the Low-Risk List.  The first report shall be submitted two weeks from the
date of this Order.  Defendants are to submit a "benchmark" report for December, detailing
defendants' progress in meeting the 137.5% population cap, as set forth in our previous order
explaining the requirements for such reports.  *See* June 30, 2011 Order Requiring Interim
Reports at 1-2 (ECF No. 2374/4032).  This report shall be submitted no later than
December 15, 2013.  Defendants shall include in this report (a) the total number of prisoners
in California institutions as of December 1, 2013, (b) the number of prisoners permitted
under the 137.5% population cap on December 31, 2013, and (c) the number of prisoners, if
any, whom defendants expect to release between December 1, 2013 and December 31, 2013.
Defendant shall include any additional information necessary for this Court to determine how
many prisoners must be released prior to December 31, 2013, and whether defendants plan to
release them through the use of the Low-Risk List or some alternative vehicle, such as the
adoption of another measure or measures contained on the List that defendants submitted on

1    May 2, 2013.  If the latter, there shall be sufficient factual data to prevent this Court to accept

2    or reject the proposal without further inquiry.

3              4.        Waiver of State and Local Laws and Regulations

4              With respect to all measures in the Amended Plan, this Court provides the necessary

5    authorization for defendants to begin implementation immediately.  Under the PLRA, this

6    Court may order "prospective relief that requires or permits a government official to exceed

7    his or her authority under State or local law or otherwise violates State or local law" so long

8    as "(i) Federal law requires such relief to be ordered in violation of State or local law; (ii) the

9    relief is necessary to correct the violation of a Federal right; and (iii) no other relief will

10   correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(B).  All three conditions

11   have been met, as explained in our August 2009 Opinion & Order and our April 11, 2013

12   Opinion & Order.  To reiterate, defendants have advised us that none of the measures in the

13   Amended Plan (except for the expanded use of fire camps) may be implemented without

14   waiving state laws.  The implementation of these measures is required by federal law

15   notwithstanding the violation of state or local laws, and no other relief will correct the

16   violation of plaintiffs' constitutional rights.  Accordingly, defendants and their subordinates

17   are ordered to implement the Amended Plan, or any actions authorized by it, notwithstanding

18   any state or local laws or regulations to the contrary.

19             It appears to us that the simplest, most direct, and most effective remedy is for us to

20   waive, to the extent necessary to implement the Amended Plan, Penal Code Sections 1170,

21   2900, and 2901, and any other local and state laws and regulations requiring that persons

22   convicted of a felony be housed in a state prison until the end of the term of sentence.  We

23   also waive – to the extent necessary to implement the Amended Plan – the State's

24   Administrative Procedure Act and any and all local and state laws and regulations regarding

25   the housing of California prisoners in other states.[27]

26

27        [27] This waiver is limited to the 3,569 out-of-state prisoners that defendants wish not to
      be returned to California as scheduled.  It is not a permanent waiver of all state laws and
28   regulations regarding housing California prisoners in other states.

43

Although we do not believe that further waivers are necessary, the state has advised us of additional laws and regulations that it believes must be waived in order to carry out the Amended Plan.  *See* Defs.' Resp. to Apr. 11, 2013 Order (ECF No. 2609/4572).  We waive these additional laws and regulations, which we list in Appendix A to this Opinion & Order.  To the extent that any other state or local laws or regulations impede the immediate implementation of the Amended Plan, we waive those as well, and direct defendants to provide us with a list of such laws and regulations within 20 days of this Opinion & Order.  Our purpose for waiving these laws and regulations is to enable defendants to implement or commence implementation of all measures in the Amended Plan immediately.  We will therefore not accept as a reason for non-compliance any contention that our Order failed to waive the necessary laws or regulations.  Defendants must act forthwith as if they have full legal authorization to do so.

We recognize that defendants have stated that they are seeking legislative approval of the measures in their Plan and that therefore we should delay our issuance of this order, or more specifically our waiver of contrary state laws and regulations, until such efforts have been exhausted.  However, as of the date of this Order there is nothing to suggest that defendants have made any progress beyond preliminarily drafting proposed legislation, *see* Defs.' June 2013 Status Report at 2 (ECF No. 2651/4653), Toche Decl., ¶ 3 (ECF No. 2652/5655), and it is entirely unrealistic to believe that the drafted legislation, once submitted, will be approved.  Governor Brown has stated that he will prepare the necessary legislation but will not urge its adoption.  The leader of the State Senate has announced that defendants' Plan will be DOA, "dead on arrival." Hardy Decl., ¶ 3, Ex. B (ECF No. 2628/4612).  Much like defendants' argument that a prisoner release order is unnecessary as the Legislature might fund additional construction, any notion that the California Legislature will authorize the measures in the Plan is "chimerical."  The Supreme Court refused to "ignore the political and fiscal reality behind this case," *Plata*, 131 S. Ct. at 1939, and we

1   will follow that lead.[28]  Waiting months for what is unlikely legislative authorization will

2   simply amount to yet another unnecessary delay in the resolution of the ongoing

3   constitutional violations in the California prison system.  This Court will not accept such

4   needless delay.

5       **D.      The Problem of Durability, the Need for Further Information, and the**
           **Retention of Continuing Jurisdiction**

6

7          The Amended Plan that we order defendants to implement today necessarily entails a

8   problem that we cannot resolve at this time.  Simply achieving a prison population at 137.5%

9   design capacity on December 31, 2013, will not cure the constitutional violations if the

10  population increases substantially the next day or over the next few months.  What is

11  necessary is that the prison population remain at or below 137.5% design capacity so that

12  defendants may then remedy (as they are currently unable to do) the underlying

13  constitutional violations.  In other words, what is necessary is a "durable" solution to the

14  problem of overcrowding if the underlying problem of the deprivation of prisoners'

15  constitutional rights is to be resolved.  *Cf. Horne v. Flores*, 557 U.S. 433, 447 (2009).

16         The Amended Plan, which should result in a maximum prison population of 137.5%

17  design capacity on December 31, 2013, will likely not in itself provide a "durable" solution

18  to the problem of overcrowding and therefore of unconstitutional medical and mental health

19  care, for three reasons.  First, the measure that is significantly responsible for reducing the

20  prison population to 137.5% design capacity on December 31, 2013 – the measure to "slow

21  the return of inmates housed in private contract prisons in other states,"  Defs.' Resp. at 33

22  (ECF No. 2609/4572) – appears to be temporary and its effects likely to be counteracted

23  when the prisoners now housed in other states are returned to California in 2014 or later.

24  Second, it appears that the state prison population is growing in excess of defendants'

25

26         [28] The challenger in the next gubernatorial campaign is making the topic of prison
       reform already accomplished, i.e., Realignment, a central component of his platform.  Phil
       Willon, *Abel Maldonado Takes On Jerry Brown, Prison Realignment*, Los Angeles Times,
27     May 25, 2013, http://www.latimes.com/news/local/la-me-maldonado-prisons-
       20130526,0,5415462.story.  This makes it even less likely that Governor Brown will urge the
28     passage of the Plan or that the Legislature will grant its approval.

1   projections.  Third, defendants assume that they will shortly be able to construct minor

2   facilities that will provide additional design capacity, despite the fact that, in the past, the

3   timely building of such construction projects has proven unreliable due to a lack of

4   administrative approvals and legislative appropriations.

5          Our concern regarding durability begins with the Blueprint, in which defendants

6   acknowledge that the prison population as a ratio of design capacity is projected to *increase*

7   progressively from years 2014 through 2016.  *See* CDCR Blueprint at App. G.  Much of this

8   projected increase appears to be attributable to the fact that the Blueprint eliminates funding

9   for defendants' program that housed 9,500 prisoners out-of-state.  *Id.* at 6-7.  Defendants

10  have repeatedly objected to the expense of such a program, which they advised us costs $300

11  million a year.  *See* Defs.' Resp. to Aug. 3, 2012 2d Order Requiring Further Briefing at 12

12  (ECF No. 2463/4226).  Accordingly, defendants' Blueprint eliminated funding for the out-of-

13  state program.  The necessity to house in the California prison system the large number of

14  prisoners who would have been confined in other states over the next two years, but for the

15  termination of the out-of-state prison housing program, will result in a significant increase in

16  the state prison population.  This increase will significantly exceed the additional design

17  capacity that defendants project from the construction of additional prison facilities during

18  that period.

19         Defendants do *not* describe the measure in their Plan regarding slowing the return of

20  prisoners housed out of state as one to "restore the out-of-state prison program."  Rather, they

21  describe the measure as "slow[ing] the returning inmates to California as called for in the

22  Blueprint."  Defs.' Resp. at 33 (ECF No. 2609/4572).  Defendants do not explain what

23  "slowing the return" means with respect to the prisoners due to be returned between now and

24  December 31, or those due to be returned in 2014.  If the planned return this year is slowed

25  down, defendants will likely bring back all the prisoners scheduled to be returned this year

26  and next year during 2014, including the 3,569 due to be returned this year.  If so, the slowed

27  down return does not contribute to a durable solution – quite the contrary.

28

1    In order to assess accurately the full long-run effect of the elimination of the out-of-

2 state prisoner program on the durability of the Amended Plan, we require much more

3 information from defendants.  It appears quite likely, however, that under the Amended Plan

4 the prison population will rise significantly over the next two years, both as an absolute

5 number and as a ratio of design capacity.

6    Furthermore, the California prison population is likely to increase faster than

7 defendants' projections suggest.  We have already noted in this opinion the numerous

8 instances in which defendants have initially reported to us an estimate for the prison

9 population that later proved inaccurate when compared to subsequent reports.  In short,

10 defendants' projections consistently underestimated the state prison population.  There are

11 many possible reasons for this.  One might be that Realignment is having a less significant

12 effect in reducing the population of prisoners than defendants expected it to have.  Another

13 might be that the state of California's general population is growing at a faster rate than

14 defendants anticipated.  Whatever the reasons, the inaccuracy in defendants' prison

15 population projections are reflected in the Amended Plan, because we have relied on

16 defendants' reported numbers in all of our calculations.  Accordingly, if – as is likely – the

17 prison population grows faster than defendants expect, the Amended Plan will fail to

18 maintain the 137.5% design capacity necessary to remedy the constitutional violations.

19    Finally, defendants intend to add design capacity through two major construction

20 projects and various minor upgrades.  Defendants' intention is generally a positive one, and

21 we have credited defendants with the 1,722 beds that they expect to add and thus to increase

22 design capacity this calendar year.  We must recognize, however, the continuing problems

23 with respect to administrative approvals and legislative appropriations that defendants have

24 faced in making progress with their construction projects.  Indeed, as the Receiver recently

25 reported, some of these minor upgrade projects have already been subject to delays in

26 funding and approval. *See* Receiver's 23rd Report at 21 (ECF No. 2636/4628).  It is therefore

27 possible that defendants' anticipated construction plans for 2014 may be similarly delayed,

28 which would certainly exacerbate the durability issues under the Amended Plan.

1    It will be necessary to see how these many factors affect the 137.5% design capacity

2 ratio that is necessary to achieve constitutional compliance.  This Court will retain

3 jurisdiction for at least some reasonable period of time to determine how the Amended Plan

4 and the various factors will affect the prison population and the design capacity ratio.  This

5 Court may have to determine, based on information to be provided by defendants, what

6 additional steps may be necessary to maintain that ratio, and whether defendants have an

7 adequate plan for doing so.  Sometime before the end of the year, defendants shall provide

8 this Court with updated population projections for 2014-2015 under various conditions,

9 including those contemplated in the Blueprint and the Amended Plan, and with whatever

10 other information may be useful to this Court in assessing the conditions inside and outside

11 the state prison system that explain why and how the prison population is changing.  We will

12 inform defendants when this information should be submitted and the precise nature of the

13 information we desire to receive at a later date.

14    **E.    Order**

15    Defendants are hereby ordered to implement the Amended Plan that shall consist of:

16    (a)    the measures proposed in defendants' Plan submitted on May 2, 2013;[29] and

17    (b)    a measure consisting of the expansion of good time credits, prospective and

18         retroactive, set forth in Item 4 of defendants' List submitted on May 2, 2013.

19 If for any reason the implementation of the measures in the Amended Plan does not result in

20 defendants reaching the 137.5% population ceiling by December 31, 2013, defendants shall

21 release enough additional prisoners to do so by using the Low-Risk List.  Defendants are

22 ordered to take all steps necessary to implement the measures in the Amended Plan,

23 commencing forthwith, notwithstanding any state or local laws or regulations to the contrary.

24 18 U.S.C. § 3626(a)(1)(B).  All such state and local laws and regulations are hereby waived,

25 effective immediately.  This includes all laws that defendants identified in their May 2, 2013

26

27    [29] Defendants are not required, however, to implement the "Contingency Measures"
listed in their Plan because, as defendants acknowledge, these measures cannot be
implemented by December 31, 2013.  Defs.' Resp. to Apr. 11, 2013 Order at 33 (ECF No.
28 2609/4572).

filing as impeding the implementation of the measures in the Amended Plan. We list those laws in Appendix A. To the extent that waiver of any laws and regulations other than those listed in Appendix A is necessary to effectuate the Amended Plan, those laws are also waived, and defendants shall provide us with a list of such laws within 20 days of this Order.

Instead of submitting monthly reports, defendants shall hereafter submit reports every two weeks that shall include all the information that we have previously ordered given in the monthly reports as well as the specific steps defendants have taken toward implementing each measure in the Amended Plan, and the status of the development of the Low-Risk List. The first report shall be submitted two weeks from the date of this Order. Defendants shall also submit a benchmark report, as explained *supra* at 43-44, by December 15, 2013.

This Court desires to continue to afford a reasonable measure of flexibility to defendants, notwithstanding their failure to cooperate with this Court or to comply with our orders during the course of these proceedings. Accordingly, defendants may, if they wish, make any or all of three substitutions. First, in place of subsection (b) defendants may, if they prefer, revise the expanded good time credit program such that it does not result in the release of violent offenders, so long as the revision results in the release of at least the same number of prisoners as would the expanded good time credit program. We leave it to defendants to determine the particular modifications they wish to make. Defendants must inform this Court, however, of their decision to make such changes.

Second, defendants may substitute for any group of prisoners who are eligible for release under the Amended Plan a different group consisting of no less than the same number of prisoners pursuant to the Low-Risk List. Any substitution or release of prisoners from the Low-Risk List shall be in the order in which they are listed, individually or by category. Defendants need not obtain prior approval for such a substitution, but they must inform this Court that they intend to make it.

Third, defendants may, with this Court's approval, substitute any group of prisoners from the List (i.e., the list of all population reduction measures identified in this litigation, submitted by defendants on May 2, 2013) for any groups contained in a measure listed in the

1  Amended Plan, should defendants conclude by objective standards that they are no greater

2  risk than the prisoners for whom they are to be substituted.  Defendants must provide this

3  Court with incontestable evidence that the substitution will be completed by December 31,

4  2013.  An example of such a substitution would be the substitution of those "Lifers" who,

5  due to age or infirmity, are adjudged to be "low risk" by CDCR's risk instrument.  *See* Apr.

6  11, 2013 Op. & Order at 67-69 (ECF No. 2590/4541).  Another example is prisoners who

7  have nine months or less to serve of their sentence and, rather than being sent to state prison,

8  could serve the duration of their sentences in county jails.  *See* Aug. 4, 2009 Op. & Order at

9  149-52 (ECF No. 2197/3641).  Or to the extent that defendants are able to reassign prisoners

10  to leased jail space before December 31, 2013, they can substitute members of this group of

11  prisoners for an equal number of prisoners on the Amended Plan.

12      Absent the three categories of substitutions described above, defendants are ordered to

13  implement the Amended Plan as is.  This Court retains jurisdiction over these proceedings

14  pending further order of the Court.

15

16  **III.   CONTEMPT**

17      Plaintiffs have again requested that this Court issue an order to show cause why

18  defendants should not be held in contempt.  Pls.' Resp. & Req. for Order to Show Cause

19  Regarding Defs.' Resp. to Apr. 11, 2013 Order at 2 (ECF No. 2626/4611).  Their request has

20  considerable merit.  We explained at length in our April 11, 2013 Opinion & Order how

21  defendants' conduct between June 2011 and March 2013 has included a series of

22  contumacious actions.  Apr. 11, 2013 Op. & Order at 63-65 (ECF No. 2590/4541).  The most

23  recent, and perhaps clearest, example of such an action is defendants' failure to follow the

24  clear terms of our April 11, 2013 order, requiring them to submit a Plan for compliance with

25  our Order, not a Plan for non-compliance.  This Court would therefore be within its rights to

26  issue an order to show cause and institute contempt proceedings immediately.  Our first

27  priority, however, is to eliminate the deprivation of constitutional liberties in the California

28  prison system.  To do so, we must first ensure a timely reduction in the prison population to

137.5% design capacity by December 31, 2013.  We will therefore **DEFER** ruling on plaintiffs' motion, and defer instituting any contempt proceedings related to defendants' prior acts until after we are able to determine whether defendants will comply with this order, including the filing of bi-weekly reports reflecting the progress defendants have made toward meeting the requirements of the Order issued June 30, 2011.  The Supreme Court has stated that contempt proceedings must be a remedy of last resort.  *Spallone v. United States*, 493 U.S. 265, 276 (1990) (stating that a federal court must "use the least possible power adequate to the end proposed" in exercising its remedial powers (internal citations omitted)).  We leave that problem for another time.  Today, we order defendants to immediately take all steps necessary to implement the measures in the Amended Plan, notwithstanding any state or local laws or regulations to the contrary, and, in any event, to reduce the prison population to 137.5% design capacity by December 31, 2013, through the specific measures contained in that plan, through the release of prisoners from the Low-Risk List, or through the substitution of prisoners due to other measures approved by this Court.  Failure to take such steps or to report on such steps every two weeks shall constitute an act of contempt.

**IT IS SO ORDERED.**

Dated:   06/20/13

STEPHEN REINHARDT
UNITED STATES CIRCUIT JUDGE
NINTH CIRCUIT COURT OF APPEALS

Dated:   06/20/13

LAWRENCE K. KARLTON
SENIOR UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF CALIFORNIA

Dated:   06/20/13

THELTON E. HENDERSON
SENIOR UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF CALIFORNIA

51