United States District Court
For the Northern District of California

1
2
3
4          IN THE UNITED STATES DISTRICT COURT
5          FOR THE NORTHERN DISTRICT OF CALIFORNIA
6
7
8    MARCIANO PLATA, et al.,                    NO. C01-1351 TEH
9                      Plaintiffs,              ORDER GRANTING
                                               PLAINTIFFS' MOTION FOR
10              v.                              RELIEF RE: VALLEY FEVER
                                               AT PLEASANT VALLEY AND
11   EDMUND G. BROWN JR., et al.,               AVENAL STATE PRISONS
12                      Defendants.
13

14          This matter came before the Court on June 17, 2013, on Plaintiffs' motion concerning

15   Valley Fever at Pleasant Valley State Prison ("PVSP") and Avenal State Prison ("ASP").

16   Plaintiffs' original motion requested an order for Defendants to:

17          (1)    expand their exclusionary factors so that no prisoners in
                   the known at-risk groups of African-Americans, people of
18                 Filipino descent, Inuits, persons with diabetes, HIV, or any
                   immunocompromised state are sent to Pleasant Valley and
19                 Avenal, and suspend the transfer of inmates without HIV
                   test results to PVSP and ASP;
20
            (2)    fully implement their exclusion of these same at-risk
21                 groups by ensuring that all such prisoners are transferred
                   from Pleasant Valley and Avenal within 30 days; and
22
            (3)    immediately request a health hazard evaluation and an
23                 epidemiological evaluation at Pleasant Valley and Avenal
                   by the National Institute of Occupational Safety and
24                 Health and the Centers for Disease Control and
                   Prevention.
25

26   Mot. at 10.  Plaintiffs further requested a referral to the existing three-judge court "for an

27   order suspending the transfer of all inmates into Pleasant Valley and Avenal" if these steps

28   were not completed within 30 days.  *Id.*

After Plaintiffs filed their motion, the Court ordered the Receiver to facilitate a meet-and-confer process that included the court experts.  This process did not resolve the motion, but it did lead to the Receiver's promulgation of the following cocci exclusion policy on April 29, as revised on May 1 to include exclusion of inmates diagnosed with diabetes mellitus:

> To reduce the risks associated with cocci disease at PVSP and ASP to a reasonable level, the following inmates shall be excluded from PVSP and ASP (except for those inmates who waive the application of this exclusion policy):
>
> (1)  inmates who, considering all available patient information, are at an increased risk for contracting cocci disease of 50 percent or greater than baseline risk; and
>
> (2)  inmates who, considering all available patient information, would be at a significantly increased risk of morbidity and/or mortality from contracting cocci disease, which includes inmates who are
>
> > a.  medical high-risk;
> > b.  HIV infected;
> > c.  immunocompromised;
> > d.  diagnosed with diabetes mellitus;
> > e.  undergoing immunosuppressive chemotherapy; or,
> > f.  pregnant.

Receiver's Resp. at 2.  The first category would currently include African-American inmates, inmates of "other race" (non-White, non-Latino/Hispanic, and non-African-American), and inmates older than 55 years of age. *Id.* at 5, 10  To date, Defendants have refused to implement this policy.  In their reply, Plaintiffs abandoned their original requests and now only "seek an order compelling defendants to immediately implement [the Receiver's] policy."  Reply at 2.

The Court has carefully considered the parties' arguments, including those raised in Defendants' June 14, 2013 unsolicited response to the Receiver's latest tri-annual report, as well as reports filed by the Receiver and the court experts.  For the reasons set forth below, the Court GRANTS Plaintiffs' motion by ordering Defendants to implement a modified version of the Receiver's exclusion policy within 7 days of the date of this order, with all transfers to be completed within 90 days of the date of this order.

United States District Court

For the Northern District of California

**I.      BACKGROUND**

This motion concerns coccidioidomycosis, commonly referred to as cocci or Valley Fever, "an infectious disease caused by inhalation of a fungus (*Coccidioides*) that lives in the soil of dry, low rainfall areas.  It is spread through spores that become airborne when the dirt they reside in is disturbed by digging, construction, or strong winds.  There is no direct person-to-person transmission of infection."  Court Medial Experts, *Coccidioidomycosis in Cal. State Prisons*, May 23, 2013, at 2 ("Expert Report").

While cocci infection can be asymptomatic, it can also result in serious illness and, in the most extreme cases, death:

> Approximately 60% of individuals who are infected with cocci are asymptomatic.  Patients who develop symptoms commonly present after an incubation period of one to three weeks with flu-like illness with fever, cough, headaches, rash, and muscle aches; these symptoms typically last weeks to months.  In the majority of infections, resolution occurs without antifungal therapy; however, a small proportion of patients fail to recover and develop severe pulmonary or disseminated disease, affecting soft tissues, joints, bones, and the meninges (the membranes surrounding the brain and spinal cord).  Illness may persist for months or longer, and in some cases result in death.

*Id.*; *see also* Galgiani Decl. ¶ 7.[1]  Approximately 10 percent of individuals infected with cocci develop severe disease.  Cal. Correctional Health Care Svcs. ("CCHCS") Public Health & Quality Mgmt. Units, *Coccidioidomycosis in Cal.'s Adult Prisons: 2006-2010*, Apr. 16, 2012, at 2 (Ex. B to Galgiani Decl.) ("Apr. 16, 2012 CCHCS Report").

> Severe disease or dissemination may develop in anyone, but African-Americans, Filipinos, people with weak immune systems, such as those with an organ transplant or who have HIV/AIDS, and those with chronic illnesses such as diabetes and chronic lung disease requiring oxygen, are at increased risk of developing severe disease.  Individuals with a prior history of cocci are immune to subsequent infection; however, currently there is no commercially available test to determine immunity.  In addition, there is no vaccination to protect against cocci infection.

Expert Report at 2.

---

[1]Defendants do not dispute the qualifications of Plaintiffs' expert, Dr. John Galgiani, to opine on cocci-related issues.  Nor, more broadly, do Defendants dispute any of the data included in the Receiver's reports, the court expert report, or Plaintiffs' submissions.

United States District Court
For the Northern District of California

3

Cocci is "endemic (native and common) to certain regions of the Southwestern United States, Mexico, and South and Central America where the climate and soil conditions are conducive to growth of the fungus.  In California, most cases emanate from the southern San Joaquin Valley." *Id.* at 2.  Eight prisons are located in California's hyperendemic region: ASP; PVSP; California Correctional Institution ("CCI"); California State Prison, Corcoran ("COR"); Kern Valley State Prison ("KVSP"); North Kern State Prison ("NKSP"); the Substance Abuse Treatment Facility and State Prison at Corcoran ("SATF"); and Wasco State Prison ("WSP").  Apr. 16, 2012 CCHCS Report at 11.  However, it is not disputed that ASP and PVSP have the most severe cocci problems.  For example, in 2011, 535 of the 640 reported cocci cases within the California Department of Corrections and Rehabilitation ("CDCR") – nearly 85% – occurred at these two prisons alone.  Expert Report at 5.

Defendants first "identified significant increases in the number of inmate-patients presenting with cocci, with deaths attributed to this disease," at PVSP and ASP in 2005 – eight years ago.[2]  Nov. 20, 2007 CDCR/CCHCS memo to institution staff, "Exclusion of Inmate Patients Susceptible to Coccidioidomycosis from Highest Risk (Hyperendemic) Area Institutions," at 1 ("2007 Exclusion Policy") (Ex. A to Toche Decl.).  At the Receiver's request, the California Department of Public Health ("CDPH") conducted an investigation at PVSP.

> CDPH confirmed the outbreak, noting the occurrence of at least 166 cases of cocci at PVSP during 2005, including 29 (18%) who were hospitalized, and four deaths.  The rate of PVSP cocci cases was 38 times the rate of cocci in residents of Coalinga, the city in which PVSP is located, and 600 times the rate of Fresno County.

Apr. 16, 2012 CCHCS Report at 2.  In January 2007, CDPH made final recommendations, "including inmate and staff education, environmental controls, and relocation of the highest risk groups to other prisons."  Expert Report at 3.  CDPH recommended exclusion of high-risk inmates as "the most effective method to decrease risk":

---

[2]The Stainer Declaration incorrectly states that Defendants first "became aware of a[n] increased infection rate of Valley Fever at PVSP and ASP" in 2006.  Stainer Decl. ¶ 4.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

> Previous studies have suggested that the risk for extrapulmonary complications is increased for *persons of African or Filipino descent*, but the risk is even higher for *heavily immunosuppressed patients*. In this investigation, we found an increased risk among persons with chronic medical conditions, especially pulmonary conditions. *Prevention efforts are critical for these higher risk populations and may mitigate the risk, but physical removal of these highest risk groups from highly endemic regions, if possible, would be the most effective method to decrease risk.*

Apr. 16, 2012 CCHCS Report at 7 (listing January 11, 2007 recommendations from CDPH) (emphasis added).

In response to the CDPH's draft report, PVSP "posted laminated signs in all medical clinics, inmate housing units and law libraries" regarding the "signs and symptoms" of cocci on December 5, 2006. Jan. 10, 2007 memo from PVSP Warden to CDCR Associate Director, General Pop. Level III/IV, Division of Adult Institutions, at 1 ("Jan. 10, 2007 PVSP Memo") (Ex. B to Stainer Decl.). PVSP also alerted staff "to signs and symptoms" by providing information in two issues of the "In-Service Training Bulletin." *Id.* In addition, PVSP transferred "inmates that are high risk due to pulmonary conditions and heavily immunosuppressed patients . . . out of the endemic region by September 21, 2006," and ordered that "[f]urther identified patients are to be transferred within 30 days of being identified."[3] *Id.* Notably, although CDPH observed the increased risk for African-Americans and Filipinos, PVSP did not transfer these inmates out. PVSP also failed to implement CDPH's recommendation to increase ground cover throughout prison property, which was demonstrated to be effective at reducing airborne spores by military operations during World War II. Apr. 16, 2012 CCHCS Report at 7. The PVSP Warden described this recommendation as "not feasible" due to an initial cost that "could potentially exceed $750,000, in addition to significant ongoing maintenance costs." Jan. 10, 2007 PVSP Memo at 1-2. "The Warden proposed soil stabilization as an alternative solution; however, neither

---

[3]At oral argument and in the Stainer Declaration, Defendants described the transfer process as complex and burdensome. *E.g.*, Stainer Decl. ¶¶ 11-15. While the Court understands that "the transfer process is not as simple as identifying open beds at other institutions and transferring the at risk inmate into the open bed [because] CDCR must ensure that the open bed meets the inmate's safety, rehabilitative, and health care needs prior to finalizing the transfer," *id.* ¶ 15, the Court also understands from the Receiver that the CDCR routinely transfers hundreds or thousands of inmates on a weekly basis.

measure was implemented at that time."  Expert Report at 3; *see also* Jan. 10, 2007 PVSP

Memo at 2 (recommending "application of a high-grade soil sealant product to control dust

from the predominant wind direction," which was estimated to cost $110,000 per application

and was "expected to have a useful life of five years and requires no ongoing maintenance

other than reapplication").

Following issuance of the CDPH recommendations, the Receiver convened a

committee – consisting of his staff and public health, academic, and clinical cocci experts –

to examine the problem further.  In June 2007, the committee issued a report with 26

recommendations.  Dwight Winslow, *Recommendations for Coccidioidomycosis Mitigation

in Prisons in the Hyperendemic Areas of Cal.*, June 2007 (Ex. D to Specter Decl.).  CDCR

and the Receiver did not adopt all 26 recommendations but did respond by:

> 1. Implementing cocci education programs for inmates and staff at CDCR prisons.
>
> 2. Canceling construction to expand PVSP.
>
> 3. Relocating inmates with medical conditions designated by the multidisciplinary committee as being high-risk for severe cocci from [all eight] institutions in the hyperendemic region.
>
> 4. Supporting the construction of a medical facility with dialysis beds in Stockton for the protection of patients with end-stage renal disease.

Expert Report at 4 (footnotes omitted).  "[R]ecommendations related to environmental

mitigation that had been shown to be effective were judged to be too costly and were not

implemented."  *Id.*  On November 20, 2007, a new cocci exclusion policy was adopted for all

eight prisons in the hyperendemic area[4] and included the following criteria:

> Criteria a.  All identified HIV infected inmate-patients
>
> Criteria b.  History of lymphoma
>
> Criteria c.  Status post solid organ transplant
>
> Criteria d.  Chronic immunosuppressive therapy (e.g., severe rheumatoid arthritis)

---

[4]This policy replaced the exclusion policy adopted on August 3, 2006, which neither party included in the record on this motion.  2007 Exclusion Policy at 1.

1

> Criteria e.  Moderate to severe Chronic Obstructive Pulmonary
> Disease (COPD) requiring ongoing intermittent or continuous
> oxygen therapy

2

3

> Criteria f.  Inmate-patients with cancer on chemotherapy

4   2007 Exclusion Policy at 2.  Inmates who had already been infected with cocci were not

5   covered by this policy.  *Id.* at 1.  The court experts concluded that "implementation of these

6   measures was ineffective in mitigating the coccidioidomycosis crisis."  Expert Report at 4.

7           In December 2008, CDCR's Occupational and Public Health Section requested a

8   health hazard evaluation ("HHE") from the National Institute for Occupational Safety and

9   Health ("NIOSH"), which is part of the federal Centers for Disease Control and Prevention

10  ("CDC"), to examine cocci cases among prison employees – not inmates – at PVSP and

11  ASP.  *Id.*  However, the State unilaterally cancelled the planned site visit by NIOSH, and the

12  agency subsequently closed out the request for an HHE.  As NIOSH explained in a

13  December 2009 letter to CDCR:

14

> We had planned a visit to both PVSP and ASP for May 18-20,
> 2009.  However, our trip was cancelled the week prior at your
> request. . . .

15

16

> Shortly after we made plans for a site visit, a motion was made by
> California's Office of the Governor to have CDCR create an
> advisory group that would decide whether or not pursuing the
> HHE further would be valuable to the State of California.  In June
> 2009, we learned that your Office of Risk Management, which
> had overseen occupational health issues for the prison system,
> was disbanded.  You have since relocated to another position
> within CDCR.  This development along with the lack of support
> from CDCR management precluded moving forward with the
> HHE.  We contacted the union leaders for the local California
> Correctional Peace Officers Associations (CCPOA), who did not
> support efforts to advance the HHE. . . .

17

18

19

20

21

22

23

> Since we do not have the support of either CDCR management or
> the local CCPOA unions, we are closing out your HHE request.

24  Dec. 4, 2009 letter from NIOSH to CDCR at 4 (Ex. E to George Reply Decl.).

25          In 2010, the Receiver refined the 2007 Exclusion Policy as part of the implementation

26  of a medical classification system policy.  A "Valley Fever transfer list" was created to

27  identify "inmates who are at institutions within the Valley Fever hyperendemic area that need

28  to be transferred out.  When an inmate is identified as meeting the medical classification

United States District Court

For the Northern District of California

criteria by his or her physician, he or she is added to the transfer list."[5]  Stainer Decl. ¶ 5.  As of May 6, 2013, "PVSP has three [inmates] on the transfer list and there are no inmates waiting to transfer out of ASP."  *Id.*

In December 2011, soil stabilization was finally implemented on some of the unpaved surfaces at PVSP.  Funding for this work was provided by the Receiver.  Expert Report at 5; *see also* Receiver's 23rd Tri-Annual Report at 30; Hysen Decl. ¶ 3.

In April 2012, the Receiver's Public Health and Quality Management Units released a report that examined cocci between 2006 and 2010.  Among other findings, the report noted that:

- Four institutions – PVSP, ASP, WSP, and NKSP – had cocci rates higher than rates in the counties in which they are located, and none of these institutions "showed a consistent decrease in rates" despite implementation of the measures described above;
- PVSP had a cocci rate that was 52 times higher, and ASP had a cocci rate that was nearly 10 times higher, than the county with the highest rate in California;
- "PVSP had a cocci rate over 400 times the rate of the county in which PVSP is located, and six times the rate of the adjacent mental health facility," Coalinga State Hospital ("CSH");[6]
- For fiscal years 2008-09 and 2009-10, 355 inmates required outside hospitalization because of cocci, at a cost of $23.4 million per year;
- "PVSP and ASP experienced the highest costs for cocci in the system, corroborating the disproportionate burden of disease in these institutions"; and
- From 2006 to 2010, 27 inmates died from cocci.

---

[5]The record does not include a list of the medical classification criteria used to place inmates on the Valley Fever transfer list, but presumably it is similar to the list of criteria contained in the 2007 Exclusion Policy.

[6]One difference between PVSP and CSH "is that CSH has an air-conditioning system that can be shut off to outside air on dusty days, whereas PVSP has a swamp cooler system with 10 air exchanges per hour with outside air.  CDCR did not investigate why PVSP had higher cocci rates than CSH.  However, the Office of Facilities Management subsequently advised that changing the HVAC system at PVSP would be prohibitively expensive."  Expert Report at 6.

Apr. 16, 2012 CCHCS Report at 3-5.  The Receiver also conducted a study of 36 inmate deaths between 2006 and 2011 that were attributable to cocci and found that 97% were in the hyperendemic region, 70% were African-American, and 76% had a comorbid condition (i.e., a serious illness like HIV or diabetes).  Expert Report at 5.

Based on these troubling findings, Plaintiffs' counsel wrote a letter to the CDCR Secretary and Receiver on September 6, 2012, requesting that further measures be taken to address cocci at PVSP "and other prisons with high infection rates."[7]  Sept. 6, 2012 Letter from Donald Specter to Matthew Cate, CDCR Secretary, and Clark Kelso, Receiver, at 2 (Ex. A to Specter Decl.).  The letter led to a September 25, 2012 meeting between Plaintiffs' counsel, CDCR executives, and the Receiver, as well as an agreement "to future meetings to discuss mitigation measures."  Toche Decl. ¶ 5.

On November 14, 2012, the Receiver – following consultation with the court experts – recommended several possible actions that could be undertaken immediately.  "Recommendations for Immediate Response to Coccidioidomycosis in CDCR Prisons" (Ex. C to Specter Decl.).  The recommendations included suspending the transfer to PVSP and ASP of African-Americans; persons with diabetes, HIV, or any other condition that caused them to be in an immunocompromised state; and persons without HIV test results.  *Id.*  The recommendations also included a suggestion to request assistance from NIOSH and CDC to initiate a health hazard evaluation treating the inmates as if they were employees and to examine whether the cocci cases at the two prisons showed any patterns that suggested environmental causes.  *Id.*

On December 3, 2012, CDCR formally requested assistance from CDPH – nearly six years after CDPH made initial findings and recommendations that CDCR did not implement in their entirety.  Toche Decl. ¶ 6.  On December 21, 2012, "CDCR requested that CDPH

---

[7]Plaintiffs' counsel also wrote to the court experts asking them to evaluate cocci-related policies and procedures.  Oct. 4, 2012 letter from Donald Specter to Court Experts (Ex. B to Specter Decl.).  As the Court subsequently clarified, however, "the appointment of the Receiver superseded the provisions of the June 13, 2002 Order Appointing Experts that allowed the parties to request evaluations from the court experts or to request that the experts attend negotiations, mediation sessions, or court hearings."  Mar. 21, 2013 Order at 2.

United States District Court

For the Northern District of California

communicate with [CDC] and [NIOSH] to seek their assessment and recommendations on Valley Fever."[8]  *Id.* ¶ 7.  However, it was not until April 23, 2013, at the request of the Receiver, that CDPH requested immediate assistance from the CDC.  Expert Report at 9. "Within days, CDC and NIOSH staff contacted the Receiver to begin determining what resources would be necessary and available for this analysis."  *Id.*  Defendants' counsel represented at oral argument that these agencies were expected to issue preliminary findings "any day now" and a final study in approximately six months.

Aside from the promulgation of the Receiver's revised cocci exclusion policy, other recent actions include investigation by the Receiver, CDCR, and CDPH into the potential use of a licensed skin test to screen inmates for cocci immunity; this test is expected to gain FDA licensing and be commercially available later this year.  *Id.* at 7-8.  Additionally, "[i]n or around March 2013, CDCR attempted certain mitigation measures at PVSP and ASP, including installing equipment on the doors at all housing units designed to keep out dust and a finer air filter in one housing unit at each institution."  *Id.* at 8; Hysen Decl. ¶¶ 4-6. Following testing of the new air filters in the two units, "in April 2013, CDCR authorized installation of these higher efficiency filters for all remaining housing units at both PVSP and ASP."  Hysen Decl. ¶ 4.  At oral argument, Defendants' counsel represented that such installation had been completed.  CDCR also expanded its education efforts in March 2013 by authorizing "distribution of additional pamphlets and posters to PVSP, ASP, and six other neighboring institutions."  *Id.* ¶ 7; *see also* Stainer Decl. ¶¶ 17-21 (discussing ongoing training and education efforts for both inmates and staff).

CDCR has also agreed to the Receiver's request to transfer out of PVSP and ASP inmates who meet the medical classification policy's definition of "high risk."  Stainer Decl. ¶ 6.  These individuals include those with "end stage liver disease, hypertension with end organ damage, cancer treated with chemotherapy, [and] coronary artery disease with prior

---

[8]The record is not clear as to whether the request for assistance to NIOSH and CDC followed the November 2012 recommendation to consider inmates as if they were employees, or if the request included an evaluation as to employees only.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

infarction." *Id.*  Approximately 600 medically high-risk inmates have been identified, and CDCR expects to complete transfer of these inmates by August 2013.  *Id.* ¶ 10.

However, CDCR has refused to exclude the other inmates covered by the Receiver's policy – most notably, diabetics and African-American and Filipino inmates[9] – even after CDPH provided its formal commentary on April 4, 2013, that "[a] factor that probably contributed to the high rates in [PVSP and ASP] is housing populations of inmates at risk for severe cocci disease, *such as African Americans and persons with diabetes* or other chronic diseases."  Apr. 4, 2013 letter from Dr. Gil Chavez, State Epidemiologist and CDPH Deputy Director of Infectious Diseases, to Martin Hoshino, Acting CDCR Secretary for Operations, at 1 ("Chavez Letter") (Ex. B to Toche Decl.).  CDPH further concluded that:

> *The populations/groups at risk for severe cocci factor can be addressed by reducing the number of inmates belonging to these groups in these prisons.*  The reality that the state prisons are already crowded means that moving all at-risk inmates out of these prisons is difficult and may not be feasible, but some further screening out of some high risk groups is advisable. . . .  *Further analyses of current data will likely show similar findings of these populations/groups at risk for severe disease as documented in past publications, and therefore it is probably of little additional value to carry out further data analyses to identify or clarify risk groups in these prisons at this time. . . .  The populations at risk are well known and listed by the American Thoracic Society*, but choosing only some categories to include in the updated policy will be difficult.  If CDCR wants input into updating this policy, academic cocci experts should be invited.

*Id.* at 2 (emphasis added).[10]

_____

[9]CDCR also objects to the inclusion of pregnancy on the list of exclusions because "[t]he only potential pregnant women at ASP and PVSP are employees, not inmates.  Are you suggesting that all pregnant women in the hyperendemic region should move?  This certainly appears overbroad."  May 8, 2013 letter from Diana Toche, Acting CDCR Undersecretary for Administration and Offender Services to Clark Kelso at 2 ("Toche Letter") (Ex. B to George Reply Decl.).  This objection is absurd.  The policy clearly applies only to inmates, and the pregnancy exclusion will not apply to any inmates as long as PVSP and ASP remain designated as men's prisons.  The Court presumes that pregnancy was included in the policy because it is a recognized risk factor and to prevent Defendants from housing pregnant women at PVSP or ASP if they subsequently convert either institution to a women's prison.

[10]The American Thoracic Society ("ATS") criteria for increased risk include: "Patients with impaired cellular immunity, such as those with solid organ transplants, those with HIV infection, and those with chronic obstructive pulmonary disease, chronic renal failure, congestive heart failure, diabetes; patients receiving TNF inhibitors (medications used in the treatment of arthritis);  Filipino and African-American men; and pregnant women

The court experts filed a timely report after reviewing all of the papers in this case. They concluded that the measures taken to date by the CDCR and the Receiver have been insufficient:

> While CDCR transferred some medically high-risk patients, conducted soil sampling and environmental mitigation measures (in 2011 paid for by the Receiver), educated inmates and staff, distributed dust masks,[FN] installed new door sweeps and higher efficiency air filters, and created a program to measure wind speeds, these efforts have been far from timely, thorough, or effective.
>
> > [FN] Inmates were limited to one N95 mask per month. These masks are intended to be used for no more than 8 hours.

Expert Report at 11-12. They also agreed with Plaintiffs' expert's conclusion that cocci is not always adequately treated:

> [T]he plaintiffs' expert, Dr. John Galgiani, an internationally known cocci expert, stated in his declaration that his review of four deaths related to cocci indicated that medical staff at prisons in the cocci endemic zone are still slow to recognize the early signs of illness, particularly in African-American men, and are slow to begin timely and proper treatment for the disease. We agree. We reviewed health records that raised similar concerns.

*Id.* at 12-13; *see also* Galgiani Decl. ¶¶ 18-19 (concluding that earlier diagnosis and treatment might have prevented death in all four cases). The experts concluded their report with seven recommendations:

> 1. Immediately implement a modified version of the Receiver's May 1, 2013 Cocci Exclusion Policy at PVSP and ASP. We recommend that all populations that meet the American Thoracic Society criteria for increased risk of severe cocci disease, including ethnicities at increased risk for severe disease (e.g., African-Americans, Filipinos), be included in the policy. We also recommend that individuals whose HIV status is unknown (unless they have refused testing after having been specifically counseled about the risk of cocci) need to be transferred.
>
> 2. Institute environmental mitigation strategies known to be effective to reduce exposure to cocci infection at Avenal and Pleasant Valley State Prisons.

in the 2nd or 3rd trimester." Expert Report at 14 n.31 (citing *An Official American Thoracic Society Statement: Treatment of Fungal Infections in Adult Pulmonary and Critical Care Patients.* (May 2010)).

3.   Upon completion of the CDC and NIOSH investigations convene a multidisciplinary working group to develop an action plan to address the recommendations of the reports.

4.   As noted in the June 2007 report recommendations, if measures taken do not reduce cocci rates to near local community rates, close PVSP and ASP. Relocate PVSP and ASP inmates to institutions with rates of cocci equal or less than their local community rates.

5.   Since 50% of deaths as well as 31% of cases that resulted in a hospital stay of 30 days or longer occurred at facilities in the endemic region other than PVSP and ASP, consider extending the exclusion criteria to those prisons with rates of cocci worse than their local community rates.

6.   Provide training to all CDCR medical and nursing staff in recognition, diagnosis and treatment of cocci.

7.   Establish an infectious disease consultative service (via direct physician participation, phone consultation or telemedicine) to assist medical staff in the management of patients with cocci.

Expert Report at 14-15.

## II.   DISCUSSION

### A.   The Requested Relief Is Not a "Prisoner Release Order" Under the PLRA

The Court first addresses Defendants' argument that the Prison Litigation Reform Act ("PLRA") bars this Court from entering an order to implement the Receiver's policy because it is a "prisoner release order" that can only be issued by a three-judge court under 18 U.S.C. § 3626(a)(3)(B). The PLRA defines "prisoner release order" as "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4). Defendants contend that an order to implement the Receiver's policy satisfies this definition because it "directs the release from or nonadmission of prisoners to a prison."

However, at oral argument, Defendants conceded that an order to transfer any single inmate out of a prison to correct the violation of a constitutional right caused by something other than crowding – for example, because transfer was necessary for the inmate to obtain

13

1   appropriate medical care – would not be a "prisoner release order."  Counsel attempted to

2   draw a distinction between transfer of a single inmate and a policy that would result in

3   transfer of a large group of inmates.  However, no such distinction can be drawn for purposes

4   of analysis under the PLRA.  Either a "transfer" is a "release from" a prison or it is not, and

5   Defendants have now conceded that it is not.[11]  Plaintiffs' requested relief – which concerns

6   only transfer and not release – therefore does not require consideration by a three-judge

7   court.

8       Moreover, even absent Defendants' concession, the Court would reject Defendants'

9   arguments based on general principles of statutory construction.  Statutory phrases are not

10  construed in isolation; to the contrary, statutes must be read as a whole.  *U.S. v. Morton*, 467

11  U.S. 822, 828 (1984).  In addition, "where a statute is susceptible of two constructions, by

12  one of which grave and doubtful constitutional questions arise and by the other of which such

13  questions are avoided, our duty is to adopt the latter."  *Gilmore v. California*, 220 F.3d 987,

14  997 (9th Cir. 2000) (quotation marks and citations omitted).  Likewise, "a statute should not

15  be construed to displace courts' traditional equitable powers '[a]bsent the clearest command

16  to the contrary.'"  *Id.* at n.12 (citation omitted).  "Unless a statute in so many words, or by a

17  necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope

18  of that jurisdiction is to be recognized and applied."  *Weinberger v. Romero-Barcelo*, 456

19  U.S. 305, 313 (1982) (quotation marks and citations omitted).

20      Here, looking at the statute as a whole requires reading the definition of "prisoner

21  release order" in conjunction with the requirements for entering one.  One such requirement

22  is that a three-judge court must determine, by clear and convincing evidence, that "crowding

23

24      [11]Indeed, the California Penal Code appears to draw distinctions between a "transfer"
    and a "release."  For example, the Interstate Corrections Compact provides that: "Inmates

25  confined in an institution pursuant to the terms of this compact shall at all times be subject to
    the jurisdiction of the sending state and may at any time be removed therefrom for *transfer* to

26  a prison or other institution within the sending state, for *transfer* to another institution in
    which the sending state may have a contractual or other right to confine inmates, for *release*

27  on probation or parole, for discharge, or for any other purpose permitted by the laws of the
    sending state; provided that the sending state shall continue to be obligated to such payments

28  as may be required pursuant to the terms of any contract entered into under the terms of
    Article III."  Cal. Penal Code § 11189, Art. IV(c) (emphasis added).

United States District Court
For the Northern District of California

is the primary cause of the violation of a Federal right," before it can enter a prisoner release order.  18 U.S.C. § 3626(a)(3)(E)(i).[12]  Consequently, adopting Defendants' interpretation of "prisoner release order" would mean that a court could only order that prisoners be transferred from one prison to another if overcrowding were the primary cause of the violation of those prisoners' rights, and not if any other reason were causing the violation.

Defendants have failed to point to anything in the legislative history that indicates an intent to limit the protection of inmates' constitutional rights in this manner – or, more generally, any concern with transfers of inmates between prisons as opposed to release of inmates from prison.  To the contrary, "[s]ponsors of the PLRA were especially concerned with courts setting 'population caps' and ordering the release of inmates as a sanction for prison administrators' failure to comply with the terms of consent decrees designed to eliminate overcrowding."  *Gilmore*, 220 F.3d at 998 n.14.

More importantly, even if the legislative history did indicate Congressional intent to limit courts' ability to order inmate transfers in the manner suggested by Defendants, this Court would still be barred from adopting Defendants' interpretation.  Although "Congress is free to alter the standard that determines the scope of prospective relief for unconstitutional prison conditions," it can do so only "so long as the restrictions on the remedy do not prevent vindication of the right."  *Id.* at 1002-03.  It is easy to imagine circumstances – not caused by crowding – where a transfer would be necessary to protect inmates' constitutional rights: for example, if specialized medical care were not available at a particular prison, or if one or more inmates were illegally transferred in retaliation for exercising their First Amendment rights.  More starkly, imagine that a prison were so dilapidated that no one could predict when the walls would crumble down, thus putting inmates' lives at serious risk, but that Defendants refused to transfer those inmates despite being aware of that risk, in clear violation of the Eighth Amendment.  In all of these cases, crowding would not be the cause

---

[12]In addition, a prisoner release order can only be entered after "a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order" and "the defendant has had a reasonable amount of time to comply with the previous court orders."  18 U.S.C. § 3626(a)(3)(A)-(B).

United States District Court

For the Northern District of California

(let alone the primary cause) of the constitutional violation, and adopting Defendants'
interpretation of "prisoner release order" would thus prevent any court – single-judge or
three-judge – from entering a transfer order.  A single-judge court would be barred from
entering the order under 18 U.S.C. § 3626(a)(3)(B), which requires prisoner release orders to
be entered by a three-judge court.  A three-judge court would likewise be barred under 18
U.S.C. § 3626(a)(3)(E)(i), which allows entry of a prisoner release order only if "crowding is
the primary cause of the violation of a Federal right."  This would prevent vindication of the
inmates' constitutional rights and would therefore be impermissible.

Defendants' proposed interpretation of "prisoner release order" must therefore be
rejected.  This Court has the authority to order Plaintiffs' requested relief if it finds that doing
so is warranted – the question to which this Court now turns.

### B.      Plaintiffs Are Entitled to Relief

As an initial matter, the Court notes that the procedural posture of this case has
changed since Plaintiffs filed their original motion.  In between the motion's filing and the
date of Plaintiffs' reply brief, the Receiver promulgated a cocci exclusion policy, and
Plaintiffs now request only that the Court order implementation of the Receiver's policy.
Defendants do not argue that the Receiver was acting beyond his authority in promulgating
the policy.  The question before the Court is therefore whether Defendants should be ordered
to follow a policy adopted by the Receiver in the exercise of his authority as head of inmate
medical care.

Neither party briefed the legal standard that should apply in these circumstances.  At
oral argument, Plaintiffs suggested that this question is governed by the Court's September 6,
2007 order, which provided that "the Receiver can adapt, modify, eliminate, or create
[Policies and Procedures] as the Receivership progresses so long as the alternative Policies
and Procedures meet minimum Eighth Amendment standards."  Sept. 6, 2007 Order at 7.
Thus, Plaintiffs argued, any policy adopted by the Receiver should be enforced as long as it
is reasonable and complies with the Eighth Amendment.  Defendants refused to suggest any
general standard but argued that, in this case, the policy would be barred because it is a

United States District Court

For the Northern District of California

1   prisoner release order under the PLRA – an argument the Court rejected above – and would

2   also be subject to strict scrutiny as a race-based classification under *Johnson v. California*,

3   543 U.S. 499 (2005).  On the latter point, Plaintiffs suggested that Defendants would not

4   have standing to raise the issue, but it logically follows from the Court's September 6, 2007

5   order, which bars the Receiver from adopting policies that do not satisfy the Eighth

6   Amendment, that the Court should not enforce a policy if either party demonstrates that the

7   policy violates the Constitution.  In this case, however, Defendants have not suggested, let

8   alone argued, that the policy would fail under strict scrutiny, and the Court therefore does not

9   reach that issue.  Nonetheless, the Court observes that the exclusion policy under

10  consideration is based on risk and not race, and it is therefore distinguishable from the race-

11  based housing policy at issue in *Johnson*.  Given the lack of briefing on this issue, and

12  because Plaintiffs are – as explained below – entitled to relief even under the most

13  burdensome standard, the Court does not now decide what standard generally governs the

14  Court's review of Defendants' objections to any of the Receiver's policies.

15        The most onerous standard would require Plaintiffs to demonstrate that the Receiver's

16  policy must be enforced because failure to do so would result in deliberate indifference under

17  the Eighth Amendment.  A plaintiff is entitled to relief for an Eighth Amendment violation if

18  the defendant "knows that inmates face a substantial risk of serious harm and disregards that

19  risk by failing to take reasonable measures to abate it."  *Farmer v. Brennan*, 511 U.S. 825,

20  847 (1994).  There is no question here that Defendants are aware of the substantial risk of

21  serious harm; indeed, Defendants admit that they "are aware that Valley Fever presents a

22  serious risk to inmate health," Opp'n at 10, and it would be impossible to conclude that a

23  disease that, in its severe form, could lead to death does not present a risk of serious harm.

24  The only question is therefore whether Defendants' current position fails "to take reasonable

25  measures to abate" it.[13]

26        _____

27        [13]Defendants spend much time arguing that their prior responses to the cocci problem
    demonstrate that they are not deliberately indifferent.  However, the relevant question is not
    what Defendants have done in the past; only Defendants' "current attitudes and conduct" are
28  at issue.  *Farmer*, 511 U.S. at 845-46 (quotation marks and citation omitted).  Moreover,
    even if this Court were to consider Defendants' past actions, it would also consider that the

As noted above, Defendants have agreed to transfer out of PVSP and ASP inmates who are classified as high risk under the current medical classification policy, and they have agreed to do so by August 2013. At oral argument, Defendants' counsel stated that such inmates would also not be admitted or transferred into these two prisons, unless Defendants received a contrary recommendation from the CDC or NIOSH. In addition, Defendants have not contested the continued enforcement of the Valley Fever transfer list that existed prior to promulgation of the Receiver's recent policy.[14] The record is not clear on the medical criteria required to be put on this list, but the Court presumes, in the absence of any contrary evidence, that the criteria include at least those that were adopted in 2007 – i.e., inmates with HIV, a history of lymphoma, a history of solid organ transplant, or moderate to severe COPD requiring ongoing intermittent or continuous oxygen therapy; inmates undergoing chronic immunosuppressive therapy (e.g., inmates with severe rheumatoid arthritis); and inmates receiving chemotherapy treatment for cancer. 2007 Exclusion Policy at 2. Thus, Defendants have already agreed to transfer the majority of inmates who are at higher risk of severe cocci disease for medical reasons. The most notable exception is that Defendants have so far refused to exclude inmates who have been diagnosed with diabetes mellitus.[15]

Beyond diabetes, the major increased-risk categories identified by the Receiver that Defendants have refused to exclude are inmates older than 55 years of age and inmates who are non-White and non-Latino/Hispanic. Defendants ask that the Court do nothing at this time for these other groups and simply wait for "experts at the Centers for Disease Control and NIOSH to evaluate these institutions and issue appropriate recommendations." Opp'n at

Receiver was responsible for several of the actions for which Defendants claim credit, and that Defendants, for unexplained reasons, stopped NIOSH's efforts to conduct health evaluations at PVSP and ASP in 2009.

[14]It is not clear whether all inmates on the Valley Transfer list are also classified as high risk under the medical classification policy, but there is likely significant overlap.

[15]Chronic renal failure and congestive heart failure are also not explicitly listed on the currently excluded conditions. *Compare* Expert Report at 4 n.11 (listing groups CDCR agreed to exclude) *with id.* at 14 n.31 (listing risk criteria identified by the American Thoracic Society). However, they may be part of the criteria used to determine whether an inmate is medically high-risk under the classification system.

United States District Court

For the Northern District of California

14-15.  They contend that "until these experts have had the opportunity to properly evaluate the problem, any attempt by Plaintiffs to address this problem through exclusion of entire classes of inmates is simply guesswork without much chance of success."  *Id.* at 14.

The record does not support Defendants' conclusion.  Far from being "simply guesswork," every medical expert who has presented evidence in this case – including the Receiver's medical team; Plaintiffs' expert, Dr. John Galgiani, whom Defendants do not contest is an expert on cocci; the court experts; and the State Epidemiologist, Dr. Gil Chavez – has concluded both that (1) certain groups of individuals, including African-American and Filipino males and persons with diabetes, are subject to higher risk of severe cocci and (2) the only way to reduce that risk is to reduce the number of inmates in these groups who are housed at PVSP and ASP.[16]  The experts also agree that waiting for environmental evaluations by the CDC and NIOSH is likely to take months or years and are likely to lead to "marginal" improvements at best.[17]  CDCR states that it is "currently in the process of

---

[16]*E.g.*, Receiver's 23rd Tri-Annual Report at 29 (noting that "the Receiver employs a team of Public Health experts who have consulted with both the Court's experts and public health experts from the California Department of Public Health"); Galgiani Decl. ¶ 7 ("Persons at increased risk for disseminated disease include African-Americans and Filipinos, those with immunocompromised conditions, and women in the third trimester of pregnancy."); *id.* ¶ 12 (failure to exclude "African-American prisoners . . . along with Filipinos, Inuits, persons with diabetes, HIV, or any immunocompromising condition . . . will keep these groups at risk of severe complication from new Valley Fever infection"); *id.* ¶ 13 ("[A]ll prisoners with chronic medical high risk conditions should be transferred immediately to prisons outside the hyperendemic Valley Fever area because the risk to inmates with these conditions of becoming infected with the form of Valley Fever that leads to serious disseminated disease or death is unacceptably high from a public health standpoint."); Expert Report at 14 (recommending exclusion of "all populations that meet the American Thoracic Society criteria for increased risk of severe cocci disease"); Chavez Letter at 1 ("A factor that probably contributed to the high rates in these prisons is housing populations of inmates at risk for severe cocci disease, such as African Americans and persons with diabetes or other chronic diseases."); *id.* at 2 ("The populations/groups at risk for severe cocci factor can be addressed by reducing the number of inmates belonging to these groups in these prisons. . . . The populations at risk are well known and listed by the American Thoracic Society, but choosing only some categories to include in the updated policy will be difficult.").

[17]*E.g.*, Galgiani Reply Decl. ¶ 4 ("[T]he chance that [environmental abatement] measures would reduce cocci risk is marginal at best, and in any event it would take many years to determine whether such measures have any value."); Chavez Letter at 2 ("Further analyses of current data are probably of little additional value toward updating the screening policy and will take months to carry out.  Environmental issues are difficult to address and will require additional studies and months to years before additional data are available, and the efficacy of any environmental abatement/control effort implemented will be difficult to assess."); Expert Report at 12 (agreeing with Dr. Chavez).

1    identifying and working with nationally-recognized experts on Valley Fever to ensure that

2    any new policies and procedures will be scientifically justified, reasonable and within the

3    national standard of care."  Toche Decl. ¶ 14.  However, they have presented no expert

4    testimony to date, nor have they presented any other reason to doubt the currently undisputed

5    medical opinion presented by the Plaintiffs, the Receiver, the court experts, and the State's

6    own Department of Public Health.

7         Perhaps at one point, Defendants' wait-and-see approach might have been reasonable.

8    Under current conditions, however, they are not.  As the court experts concluded, "[w]hile it

9    is important to involve the public health expertise of the CDC to provide further guidance,

10   given the ongoing morbidity and mortality from cocci, further postponement of previously

11   made public health recommendations shows a callous disregard for patient health and

12   safety."  Expert Report at 12.  An exclusion policy is now the only reasonable response:

13         The most disturbing aspect of defendant's response to plaintiffs'
14    Valley Fever motion is that defendants have known since at least
      2005 that they are dealing with a public health emergency
15    because of the unfortunate regularity with which Valley Fever
      deaths are continuing to occur in these two prisons.  Public health
16    emergencies require immediate action, not waiting for further
      study.  It is deeply troubling to me that CDCR proposes to deal
17    with this public health emergency by relying on measures which
      either have not worked in the past or which are unsubstantiated
18    mitigating strategies.  In my opinion it will take many years to
      determine whether certain environmental abatement measures
19    might lower the incidence of disseminated disease and death
      caused by the existing Valley Fever problem.  From a public
20    health standpoint, that is unacceptable.  It would seem imperative
      that prisoners of high risk for serious complications be transferred
21    and excluded from these two prisons as soon as possible.

22   Galgiani Reply Decl. ¶ 6.  Defendants acknowledge the serious risk of harm presented by

23   cocci.  In light of all of the undisputed medical testimony, waiting for the CDC and NIOSH

24   to complete their reports – which the experts conclude are likely not to be helpful at reducing

25   the risk of harm, especially in the short term – is simply not a "reasonable measure[] to

26   abate" that risk.  *Farmer*, 511 U.S. at 847.  This is even more true where, as here, the

27   recommendation to exclude inmates at higher risk of severe cocci was first specifically made

28   to Defendants over six years ago; recent studies by the Receiver have demonstrated that,

despite education and limited environmental measures, the problem has persisted; and Defendants – for unexplained reasons – four years ago stopped a federal agency from conducting the very study Defendants now say is required before any further action is taken.

Likewise, Defendants' contention that education and training should be increased is a necessary but not sufficient part of the solution. Defendants point to the court experts' and Dr. Galgiani's conclusion that four deaths might have been avoided had medical staff at PVSP and ASP diagnosed cocci and begun treatment at an earlier stage. Expert Report at 12-13; Galgiani Decl. ¶¶ 18-19; Defs.' Resp. to Receiver's 23rd Tri-Annual Report at 15-17. Rather than demonstrating that an exclusion policy is unnecessary, however, "[t]hese cases show that it is critical that CDCR/CCHCS remove inmates at increased risk for severe cocci disease from prisons in the hyperendemic region *and* improve the ability of clinicians to diagnose and treat new and existing cocci infections." Expert Report at 13 (emphasis added). Defendants have presented no evidence that additional training would be a reasonable solution in the absence of an exclusion policy, nor have they demonstrated that, even if training were sufficient, inmates would not continue to face an unreasonable risk of harm pending development and completion of such training.

The only remaining question is whether the Court should order that the Receiver's policy be implemented, or whether a different policy would be more reasonable. The Receiver's promulgated policy is based on statistical analyses of the inmate populations at PVSP and ASP and seeks to exclude all groups of inmates who are at a greater than 50% over baseline risk. This approach raises questions over how baseline and comparison groups should be defined, whether and when the policy would be subject to revisions as data related to cocci cases was updated, and why the exclusionary line should be drawn at 50% versus any other figure.[18] Upon careful consideration, and given Plaintiffs' agreement at oral

_____

[18]The Receiver opted to draw the line at 50% because confidence intervals for categories below 50% ranged from 1.1 to 1.6 or 1.7, meaning that "at the low end of the confidence interval, there is only a 10% increased risk over baseline, which the Receiver concluded is comparatively insignificant, particularly since the upper end of the confidence interval is only slightly above the 50% line. By contrast, the upper end of the confidence intervals for categories above 50% (i.e., African-American, Other race, and Age > 55) are all greater than 2.0 (i.e., double the risk of the baseline)) [sic], and at the lower end of the

**United States District Court**
For the Northern District of California

argument that they would be satisfied with a policy based either on the Receiver's analysis or the more narrow risk factors noted by the American Thoracic Society, the Court agrees with the court experts, who "acknowledge that [the Receiver's] studies provide important information towards better understanding the cocci epidemic at ASP and PVSP" but "believe it is premature to use the findings to modify the list of high-risk populations specified in the nationally accepted, peer-reviewed statement from the ATS."  Expert Report at 14.  It may well be that certain groups – for example, those over the age of 55 – face an increased risk of severe cocci in California's prisons even if they do not face that risk in the general population.  However, the Court cannot say that it would be the least intrusive remedy at this time to broaden the policy beyond nationally recognized standards, particularly since none of the other medical experts who have provided opinions in this case have suggested that older inmates face an increased risk.[19]  Additionally, although Dr. Galgiani stated that he believed African-American, Filipino, and Inuit inmates needed to be excluded from PVSP and ASP, Galgiani Decl. ¶ 12, his declaration supports only the exclusion of African-American and Filipino inmates; Inuits are not mentioned anywhere except in the cited paragraph and in the preceding paragraph, where Dr. Galgiani notes his understanding "that the Receiver's staff has agreed that if the decision is made to exclude African-Americans from these two prisons, Filipinos and Inuits should also be excluded," *id.* ¶ 11.

Basing the exclusion policy on national standards also addresses Defendants' first two of four objections: (1) that the Receiver's policy is ambiguous because it does not come with an "accompanying procedure that would enable staff to consistently implement and apply the same standards to each inmate-patient" and does not define subjective terms like "significantly increased risk of morbidity and/or mortality from contracting cocci," and

---

confidence intervals are 20%, 30% and 50% above the baseline, respectively."  Receiver's Resp. at 10.  The Receiver also concluded that excluding African-American but not Latino/Hispanic inmates was supported by a statistical analysis that "shows that African-Americans, but no other racial group, had a significantly increased risk for disseminated cocci" at PVSP and ASP.  *Id.*

[19]The court experts noted that cocci infection "is more common among older adults, particularly those 60 and older," Expert Report at 2, but did not comment on any increased risk of severe disease.

(2) that the policy excludes all inmates with diabetes, but the Federal Bureau of Prisons only includes inmates who have Type I diabetes.  Toche Letter at 1-2.  The American Thoracic Society criteria include a list of medical conditions and easily identifiable characteristics such as race, and using such criteria as the basis for an exclusion policy should eliminate any confusion over how to apply the policy.  Additionally, the American Thoracic Society does not draw a distinction between Type I and Type II diabetes and has concluded simply that individuals with diabetes – implicitly either Type I or II – are at heightened risk.  Defendants have provided no justification for rejecting the conclusions of the ATS in favor of the policy adopted by the Federal Bureau of Prisons.

Defendants' third objection – that the Receiver's policy does not consider whether inmates have previously had Valley Fever or long-term exposure to it, *id.* at 2 – is the only one that warrants a modification to the policy.[20]  "Individuals with a prior history of cocci are immune to subsequent infection," Expert Report at 2, so any such individuals need not be transferred or excluded from the affected institutions.  However, time spent in the hyperendemic region alone is not a sufficient criteria because "without a skin test, it is impossible to accurately determine if a specific individual has acquired immunity.  For this reason, using time as a criterion for exclusion is not safe."  *Id.* at 12.  If a licensed skin test becomes available, the Receiver should consider using that test as part of the exclusionary criteria.  Until such a test is available, the only individuals who would otherwise be subject to the exclusion policy who should be exempt from transfer or exclusion are those who have previously been diagnosed with cocci.

### III.    CONCLUSION

In short, Defendants acknowledge that cocci presents a serious risk to inmate health, yet they propose to take no further action until receiving final recommendations from the

---

[20]The Court has already explained that Defendants' fourth objection – that the policy is overbroad because it includes pregnancy as a criteria for exclusion even though the two prisons in question only house male inmates, Toche Letter at 2 – is absurd.  Pregnancy is one of the nationally accepted factors for increased risk, and including it in the policy is necessary in case Defendants ever decide to start housing female inmates at PVSP or ASP.

CDC and NIOSH at some unknown time, estimated to be approximately six months away. All medical experts who have presented testimony in this case, including the State's own epidemiologist, agree that this response is insufficient, both because further delay would be unreasonable and because environmental evaluations are unlikely to have any short-term effect, assuming that the agencies' recommendations are even implemented.[21]  The experts further agree that the factors for increased risk of severe cocci are well-known and undisputed, and that screening out high-risk inmates is an appropriate response.  Indeed, Defendants appear to recognize this, as they have agreed to transfer out and exclude inmates who meet certain medical criteria for increased risk.  At the same time, Defendants are unwilling to exclude other inmates whom they know are at an increased risk of severe disease, which may lead to death.  Defendants have therefore clearly demonstrated their unwillingness to respond adequately to the health care needs of California's inmate population, which is particularly ironic given Defendants' insistence in other court filings that they are now providing a constitutional level of care.  In the absence of a court-ordered exclusionary policy, inmates will continue to suffer unnecessary and unreasonable harm, thus presenting the most recent example of how Defendants lack "the will, capacity, and leadership to maintain a system of providing constitutionally adequate medical health care services to class members."  Feb. 14, 2006 Order Appointing Receiver at 7 (setting forth criteria for ending the Receivership).

Accordingly, for the reasons discussed above, the Court hereby GRANTS Plaintiffs' motion for relief by ordering Defendants to adopt a modified version of the Receiver's cocci exclusion policy that reflects Defendants' agreement to transfer all inmates who are classified as "high-risk" under the medical classification system and is consistent with the factors identified by the American Thoracic Society as creating an increased risk of severe cocci.  Inmates who have previously been diagnosed with cocci shall be exempt from exclusion.  The Receiver will modify his exclusion policy consistent with this order, and

---

[21]Given the history of this case, in which recommendations have been repeatedly ignored, this is not a foregone conclusion.

**United States District Court**
For the Northern District of California

1  Defendants shall implement the modified policy, within 7 days of the date of this order.  All

2  inmates covered by the policy shall be transferred out of PVSP and ASP within 90 days of

3  the date of this order.

4       In addition, the Receiver will request the CDC, as part of its evaluation, to examine

5  the data compiled by the Receiver to determine whether the exclusionary list should be

6  expanded to include any other groups, including individuals over the age of 55, or whether

7  any groups covered by the ATS criteria need not be excluded from PVSP and ASP because

8  they are not empirically at increased risk for severe cocci within the CDCR.  The Receiver

9  will have the authority to modify the exclusion policy if the American Thoracic Society

10 changes its criteria for increased risk, if the CDC or NIOSH recommends changes to the

11 policy, or if the Receiver's data demonstrates that a group covered by the ATS standards

12 does not, based on empirical data, face a heightened risk in the CDCR population.  Prior to

13 making any such modifications, the Receiver will first meet and confer with the parties.  The

14 Court will resolve any disputes that cannot be resolved by the meet-and-confer process.

15      Finally, consistent with the court experts' recommendation, IT IS FURTHER

16 ORDERED that all CDCR medical and nursing staff be provided with additional training in

17 the recognition, diagnosis, and treatment of cocci.  The Receiver will immediately consult

18 with the court experts to develop such training and to discuss whether any interim measures

19 are necessary before such training has been completed.  The Receiver will include a

20 discussion of the response to this order in his next tri-annual report.

21      The Court finds that the above relief is "narrowly drawn, extends no further than

22 necessary to correct the violation of the Federal right, and is the least intrusive means

23 necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).

24

25 **IT IS SO ORDERED.**

26

27 Dated:   06/24/13

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

28