UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>    Defendants. | Case No. 01-cv-01351-TEH<br><br>**ORDER MODIFYING RECEIVERSHIP TRANSITION PLAN** |

On September 5, 2012, this Court ordered a plan for transitioning away from the Receivership through the use of revocable delegations of authority by the Receiver to Defendants over particular tasks within the system of inmate medical care. The Court also established a scheme whereby adequacy of care at individual institutions would be determined by a combination of evaluations by the court experts and medical inspections by the Office of the Inspector General ("OIG"). The Court has consulted at length with the Receiver and court experts and now finds it appropriate to modify the September 5, 2012 order as described below.

## I. OIG Inspections and Court Expert Evaluations

Between January and October 2013, the court experts conducted evaluations at ten institutions, none of which was found to be providing adequate medical care. At four institutions, the experts opined that care would be adequate once certain issues were corrected: problems in medical reception, health care staff access to Outpatient Housing Unit ("OHU") patients, and first responder initiation of CPR at San Quentin State Prison; physical plant issues at Sierra Conservation Center; pharmacy services, medication administration, and health care physical plant at California Men's Colony; and physical plant deficiencies, including sanitation and disinfection, at California Correctional Institution. At the remaining six institutions, the experts found care to be inadequate.

The Court suspended the process of court expert evaluations on March 11, 2014. Rather than focusing on evaluating individual prisons, the experts were directed to assist with the correction of systemic issues and to work with the OIG to refine the OIG's inspection instrument.

Over the course of the past year, the OIG has redesigned its medical inspection process by enhancing the quantitative compliance testing and adding a qualitative clinical case review component. The new OIG instrument no longer contains an overall numeric score but does provide an overall assessment rating of proficient, adequate, or inadequate. The OIG conducted several pilot inspections and met with the parties, the Receiver, and the court experts multiple times to refine the inspection process even further. The pilot process included one institution where the OIG and the court experts performed double-blind evaluations. Although the detailed findings of these evaluations were not identical, both groups reached the same conclusion regarding the overall inadequacy of care at the institution.

Despite this congruent finding, the court experts continue to have concerns about the OIG's methodology. For example, they believe that the methodology includes too few clinical charts as part of its qualitative review and also does not allow for flexibility regarding the number of charts reviewed if the reviewing clinicians believe additional chart reviews are warranted. Nonetheless, the experts believe that the OIG methodology is probably sufficient to identify clearly adequate or clearly inadequate care, and they remain open to the possibility that the methodology is sufficient for institutions that fall in between these extremes. Given the OIG's willingness to modify its methodology if needed, the experts supported commencement of the OIG's fourth inspection cycle using the current methodology, and the OIG began its fourth cycle of inspections at the end of January 2015.

The Court does not find it necessary to resolve at this time the experts' concerns regarding the OIG's methodology. However, doing so may become appropriate if the parties, the Receiver, or the court experts disagree with the OIG's determination of

1  adequacy or inadequacy at any particular institution.  The need to further validate the
2  OIG's methodology will depend in part on the intended use of the OIG inspections.  If, for
3  example, the Receiver – or Defendants, following termination of the Receivership –
4  intends to use the OIG inspections as but one means to monitor and evaluate the quality of
5  care, then validation becomes less important.  If, however, the OIG inspections are ever
6  intended to be the sole monitoring tool or determination of adequacy, then validation
7  becomes critical.

## II.   Receiver's Progress and Remaining Work

At the same time that the OIG inspection instrument was being redesigned, the Receiver has continued to develop and refine internal monitoring tools and quality improvement measures.  In addition, he has continued to make progress on addressing systemwide issues, as well as issues involving care at individual prisons, including the implementation of a regional level of leadership to further strengthen the health care management structure and the elimination of definitely or likely preventable deaths in 2013.[1]  Also notable is the Receiver's initiation of a quality improvement program at the headquarters and institution levels that, when fully implemented, will provide a mechanism for self-identifying and correcting errors – a key component of a sustainable system for delivering adequate care.

Despite widespread agreement that the Receiver has made significant progress, however, critical areas of improvement remain.  In the Receiver's recently filed report on the status of California's prison medical care system, he observed four significant gaps: availability and usability of health information, scheduling and access to care, care management, and facilities.  He also noted the challenge of reducing variation in the

---

[1] The Court hopes that this elimination is permanent, but only time will tell.  In any event, the number of definitely or likely preventable deaths has decreased dramatically under the Receivership, and it can no longer be said that "on average, an inmate in one of California's prisons needlessly dies every six to seven days due to constitutional deficiencies in the CDCR's medical delivery system."  Oct. 3, 2005 Findings of Fact & Conclusions of Law re: Appointment of Receiver at 1.

quality of healthcare across all institutions. As the Receiver discussed in his report, he is actively addressing these issues by, among other measures, the implementation of an electronic health record system; the review and revision of nursing policies and procedures, including those governing medication management; and the ongoing Health Care Facilities Improvement Program. Other areas of concern include staffing levels at the California Health Care Facility and the quality of care at in-state contract beds, where the Receiver has identified significant deficiencies. The Receiver is addressing the former by seeking funding for additional staff required to provide adequate care at the institution and by increasing recruitment efforts. He is addressing the latter by working with the California Department of Corrections and Rehabilitation ("CDCR") to develop a sustainable model for delivering adequate care to inmates housed outside the State's thirty-four institutions.

## III. <u>Revocable Delegations of Authority</u>

The Court's September 5, 2012 order established revocable delegations of authority as part of the process of transitioning health care from the Receivership back to CDCR. Since that time, the Receiver has delegated to CDCR authority over (1) prison construction and activation and (2) management of the institution health care access units. These delegations have allowed an opportunity for CDCR to demonstrate, as to these limited areas, its capacity for adequately managing functions related to inmate medical care. To date, the Receiver has not found any cause to revoke these delegations, which is some evidence that Defendants' capacity to maintain a constitutionally adequate system of inmate medical care is increasing. The Court finds that revocable delegations of authority continue to provide an appropriate mechanism for allowing Defendants an opportunity to demonstrate their will, capacity, and leadership to maintain a constitutional system of care while, at the same time, ensuring that the Receiver can step in expeditiously to address any issues if Defendants fail.

## IV. Order

In light of the above, and following careful consideration and discussion with the Receiver and court experts, IT IS HEREBY ORDERED that the following order shall replace the September 5, 2012 plan for court expert evaluations and transitioning away from the Receivership:

1. The court experts shall continue to assist the Receiver as needed on systemwide issues. The court experts shall also assist the Receiver in addressing the quality of care at low-performing institutions, as well as any other areas requested by the Receiver or directed by the Court. Defendants shall continue to pay the experts through the Court registry under the existing procedure.

2. The Receiver and Defendants shall continue to identify and secure appropriate revisions or additions to state law and regulations, as well as to CDCR's Department Operations Manual, that institutionalize the reforms that have been made. These changes should eliminate, as much as possible, the need for any continued or future waivers of state law while this case remains pending.

3. The process of revocable delegations of authority as to headquarters and systemwide functions shall continue. The Receiver shall evaluate on a continuous basis when additional revocable delegations of authority to CDCR are appropriate.

4. After the OIG releases each medical inspection report, the Receiver shall determine whether that institution is suitable for return to CDCR control. In making that determination, the Receiver shall consider the OIG report, as well as data from the Healthcare Services Dashboard and other internal monitoring tools.

   a. If the Receiver determines that an institution is suitable for return to CDCR control, he will execute a revocable delegation of authority to the Secretary of CDCR to take over management of that institution's medical care program. After delegation, the institution's chief executive officer for healthcare will be ultimately accountable to the Secretary of CDCR instead of to the Receiver. The Receiver and the

1   Secretary shall jointly determine how delegation will affect intermediate reporting
2   relationships.

        b.     A revocable delegation will create a rebuttable presumption that care at the institution has reached a level of constitutional adequacy.

        c.     Plaintiffs will maintain the ability to monitor care at the institution, including by conducting monitoring visits and accessing documentary evidence, for a one-year period following delegation. Monitoring by Plaintiffs shall cease after one year unless the Receiver revokes the delegation of authority or Plaintiffs bring a successful motion for revocation.

5. Prior to executing any delegation of authority, the Receiver shall meet and confer with the parties and consult with the court experts.

6. The Receiver shall evaluate regularly, and no less frequently than monthly, whether any delegations should be revoked. Prior to revoking any delegation of authority, the Receiver shall meet and confer with the parties and consult with the court experts.

7. Any party who disagrees with the Receiver's decision to delegate or not delegate, or to revoke or not revoke a previous delegation, may challenge that decision by filing a motion before this Court. The moving party shall bear the burden of proof.

8. While the Receiver will gradually take on more of a monitoring function as additional activities and institutions are delegated back to CDCR, transitioning from the Receivership to a special master or monitor would eliminate the revocability of the delegations. Accordingly, while the Receiver will ultimately become a monitor in function, he will remain a receiver and retain his powers over the inmate medical care system until this case terminates.

9. Once all headquarters functions and institutions have been revocably delegated to CDCR, the Receiver shall file a notice certifying this fact.

10. Within thirty days of the Receiver's certification, Defendants shall file an updated plan for post-Receivership governance. Plaintiffs must file any motion challenging Defendants' plan no later than thirty days after the plan's filing. The Court

6

encourages the parties to begin meeting and conferring on an appropriate plan as soon as possible to avoid unnecessary litigation.

11. If the Receiver leaves all delegations in place without revocation for a one-year period after certifying that all functions and institutions have been delegated, a rebuttable presumption of constitutional adequacy and sustainability will be created. Plaintiffs must file any motion challenging this presumption within 120 days of the expiration of the one-year period. If no such motion is filed, the parties shall promptly file a stipulation and proposed order terminating the Receivership and this case.

The Court finds that this order is narrowly drawn, extends no further than necessary to correct the violation of Plaintiffs' constitutional rights concerning inmate medical care, and is the least intrusive means necessary to correct the violation of those rights.

**IT IS SO ORDERED.**

Dated: 03/10/15

_____
THELTON E. HENDERSON
United States District Judge