XAVIER BECERRA
Attorney General of California
DANIELLE F. O'BANNON
JAY C. RUSSELL
Supervising Deputy Attorneys General
MANEESH SHARMA
Deputy Attorney General, State Bar No. 280084
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5553
  Fax:  (415) 703-1234
  E-mail:  Maneesh.Sharma@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
  425 Market Street, 26th Floor
  San Francisco, California 94105
  Telephone:  (415) 777-3200
  Fax:  (415) 541-9366
E-mail: pmello@hansonbridgett.com
*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
MAE ACKERMAN-BRIMBERG (310948)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **MARCIANO PLATA, et al.,**<br><br>                    Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>                    Defendants. | C 01-01351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:         March 6, 2018<br>Time:        2:00 pm<br>Courtroom:  9, 19th Floor<br>Judge:       The Honorable Jon S. Tigar<br>Action Filed: April 5, 2001 |

**JOINT STATEMENT**

The parties submit the following joint statement in advance of the March 6, 2018 Case Management Conference.

**I.   Issues Raised During December 12, 2018 Case Management Conference.**

   **A.   Custody Presence During Medical Exams.**

As reported in the Receiver's February 1, 2018 Thirty-Seventh Tri-Annual Report, California Department of Corrections and Rehabilitation (CDCR) and California Correctional Health Care Service (CCHCS) developed a draft policy directive outlining the requirements for custody and health care staff to ensure that health care encounters afford both auditory and visual confidentiality consistent with individualized security and safety concerns for patients and health care providers. (ECF No. 3008 at 7.) The draft directive was provided to impacted bargaining units on December 22, 2017 and provided to Plaintiffs' counsel on January 4, 2018. The directive is expected to be finalized and disseminated statewide in March 2018.

Plaintiffs are in the process of reviewing the draft policy, and intend to provide a response to CCHCS shortly.

   **B.   Roof Maintenance.**

Defendants' Position:

The State continues to address roof maintenance through the legislative budgeting process and multi-year strategy to fund necessary repairs. The Governor's 2018 Proposed Budget continues roof funding provided in the 2017 Budget Act, including $60.7 million to replace roofs at the California Substance Abuse Treatment Facility and Salinas Valley State Prison, as well as Ventura Youth Correctional Facility. (Governor's Budget Summary – 2018-19, Infrastructure at 137, available online at http://www.ebudget.ca.gov/2018-19/pdf/BudgetSummary/Infrastructure.pdf.) The Proposed Budget also includes $20 million for mold remediation efforts at various facilities in 2018-2019. (*Id.*) While Defendants will continue to report on this issue for the Court's information, Defendants maintain that the identified roof infrastructure issues are not a constitutional deficiency and the status of repairs should not impact the potential termination of this matter. Defendants are also planning on presenting a briefing to

Plaintiffs on the status of roof repairs, but are still finalizing the scope of the presentation and possible dates.

Plaintiffs' Position:

Plaintiffs have raised serious concerns to both CDCR and the Receiver about roofs in significant need of repair in at least thirteen prisons. During FY 2017-18, CDCR received $35 million to replace the roofs at California Correctional Institution, Pleasant Valley State Prison, and Salinas Valley State Prison. In a letter dated January 25, 2018, CDCR Secretary Kernan reported that construction on the roof at CCI is currently taking place. The Receiver reported that CDCR has requested over $107 million for additional roof repairs, but this request will address the needs at only four of CDCR's 35 prisons: California Substance Abuse Treatment Facility, Salinas Valley State Prison, Calipatria State Prison, and CSP-Corcoran. (ECF No. 3008 at 11.) Even if approved, it is not clear when the construction will begin or conclude. While Secretary Kernan's letter indicated that some additional repairs or replacements are in the construction and design phase, it is unclear whether and how most of these repairs will be funded, when the repairs will begin, and the expected completion dates. Plaintiffs still do not have information about specific plans for roof repairs or replacements at the remaining prisons at which Plaintiffs are aware of significant problems: Avenal State Prison, Central California Women's Facility, California Institution for Men, California Medical Facility, Folsom Women's Facility, and CSP-Sacramento.[1]  As outlined in Plaintiffs' December 6, 2017 letter to CDCR and January 12, 2018 email to the Receiver, the unsafe and dangerous living conditions created by these deficiencies impact patient health and provision of medical care.

---

[1] Plaintiffs learned about CDCR's intention to provide a briefing on roof and infrastructure problems through the process of preparing this Joint Statement and just before the filing deadline. Plaintiffs look forward receiving more information on CDCR's plans as soon as possible.

3

**C.     Reliability of Data from the Electronic Health Record System (EHRS).**

Defendants' Position:

The Receiver's Thirty-Seventh Tri-Annual Report addressed in detail the impacts of EHRS implementation on the data presented in the Receiver's Dashboards. (ECF No. 3008 at 23-26.) While the EHRS and Dashboard are under the Receiver's control, Defendants intend to maintain and expand the data systems in the future and fully support the Receiver's efforts to improve data quality. Defendants also object to Plaintiffs' attempt to stop or slow the pace of delegations as result of this issue. As noted by the Receiver, the data issues appear to be limited to approximately 11 of the Dashboard's 240 measures and sub-measures. And the Receiver relies on over 25 separate sources of information when making delegation decisions, of which the Dashboard is only one source. To the extent Plaintiffs believe that medical executives at individual prisons are unable to relay their concerns about data quality to the Receiver, Defendants' defer to the Receiver for a response.

Plaintiffs' Position:

Plaintiffs appreciate the Receiver's discussion of this topic in the 37th Report, and the described efforts to improve data accuracy and reliability. However, Plaintiffs continue to have concerns about the unreliability of EHRS and Dashboard data currently published by the Receiver, particularly given that the serious problems now under review were identified by Plaintiffs and not any internal quality control process. Plaintiffs are awaiting responses to Non-Paragraph 7 inquiries dated January 31 and February 8, 2018, seeking more information about validation efforts and how performance measures are currently defined and computed in order to understand the scope of the problem. Plaintiffs are concerned that there may be other yet-to-be-discovered problems with Dashboard data. Even if only a small number of measures are affected, as the Receiver states, there are still serious implications for patient care. For example, the measure that led to Plaintiffs' inquiry into the reliability of EHRS data, the "PCP Routine Referrals 14 Days" measure, relates to a critical piece of any medical care delivery system: whether patients are timely seen by a doctor when a nurse has determined that such referral is necessary. CCHCS's validation efforts revealed that some prisons' compliance on this measure

was significantly lower when the data was input properly: for example, California Women's Facility (CCWF), which reported 95% compliance, actually had a 51% compliance rate.

Plaintiffs also have serious concerns about the capacity of medical executives and staff at some of the individual prisons to self-identify, report, and resolve data issues in the future. As the Receiver notes, the problem with data input for the PCP Routine Referrals 14 Days measure was discovered only after Plaintiffs' counsel inquired into discrepancies in the data during a monitoring tour at CCI. Neither CCI staff nor CCHCS staff had identified the problem independently. At other prisons, well-functioning Quality Management (QM) teams and systems have identified numerous problems with EHRS and Dashboard data but have not been able to effect improvements. For example, during recent monitoring tours at San Quentin and R.J. Donovan, Plaintiffs were impressed that medical executives and the QM teams regularly reviewed data, conducted drill downs to better understand flaws and trends, and contacted headquarters to attempt to address problems they found in data input, gathering, and reporting. Beyond the acknowledged deficiencies with 14-day PCP referrals, they identified problems with data concerning the numbers of patients seen by PCPs and RNs, medication management, durable medical equipment (DME) orders, and returns from higher level of care. However, executives at both SQ and RJD reported limited responsiveness and receptivity from CCHCS headquarters to address the problems.

In light of the questionable reliability of at least some critical measures reported in the Dashboard, Plaintiffs requested that the Receiver postpone making decisions about delegations of particular prisons pending resolution of identified problems in the Dashboard data. Plaintiffs understand that the Receiver intends to proceed with the delegation meet and confer process. Plaintiffs would welcome discussion at the Case Management Conference about how the data problems may impact the delegation process.

**D.     Status of Meet-and-Confer on Continued Monitoring of Delegated Institutions.**

The parties have exchanged letters setting out their respective positions on Plaintiff's request to eliminate the one-year deadline for post-delegation tours, which were submitted to the Court on February 1. The parties are open to further meeting and conferring on this issue.

**II.     Durability.**

The parties' August 17, 2017 Joint Case Management Conference Statement identified six issues that the parties agreed must be resolved before the case can end: (1) Health-Care Facility and Statewide Medical Distribution Improvement Programs (HC-FIP); (2) complete implementation of EHRS; (3) revisions to the health care appeals process; (4) policy for custody presence during medical exams; (5) addressing health care delivery issues at contract facilities; and (6) completion of regulations/policies to remove the need for court-ordered waivers.  As addressed at the last Case Management Conference and in the Receiver's recent Tri-Annual Report, implementation of the EHRS and revisions to the health care appeals process have been completed.  Additionally, as noted above, a standard policy for custody presence during medical exams has been drafted.

**A.     HC-FIP.**

Defendants' Position:

The State continues to make progress on the HC-FIP projects, including the recent activation of several subprojects at the California Institution for Men; Deuel Vocational Institution; Pleasant Valley State Prison; California State Prison, Sacramento; and Valley State Prison.  The State has also updated construction completion dates for several projects. Defendants note that patients continue to receive access to care during this construction process and agree with the Court's previous suggestion that as institutions and systemic functions are delegated to the State, it may be appropriate to the dismiss the case with the Court retaining jurisdictions over remaining construction projects.  (ECF No. 2470 at 4 n. 2.)  Further, the 2018-19 Budget includes funding for the HC-FIP projects that were inadvertently omitted from project plans as Plaintiffs describe below.  CDCR has also met with the Department of Finance to

identify projected funding shortfalls that will exceed the amount of funding available for HC-FIP based upon current appropriations. The Department of Finance is considering different options to address this funding shortfall, including legislative language that would increase the funding level appropriated for HC-FIP. It is anticipated that whatever solution is determined by the Administration will be implemented concurrent with the 2018-19 Budget process and be enacted on or before July 1, 2018.

Plaintiffs' demands that the Receiver report on further healthcare construction needs is unnecessary and speculative. Any further healthcare construction will be appropriately evaluated on a case-by-case basis and funded through normal state processes.

Plaintiffs' Position:

Plaintiffs note that due to delays and errors in the construction process, the Receiver has reported that the costs of completing the approved HC-FIP projects will exceed the authorized budget, and CDCR will need to seek additional funding to complete currently approved HC-FIP projects, which will cause further significant delays.  (ECF No. 3008 at 11.)  Delays in completion of HC-FIP have a significant impact on patient safety and care.  For example, the Receiver noted that due to delays in construction of the primary care clinic at California Institution for Women, care has been provided in an inadequate swing space for three years.  The state must develop a plan to obtain additional funding and complete the currently approved projects.

In addition to the projects that are already planned and were included in the initial authorized budget, the Receiver has identified other necessary HC-FIP projects including Medication Preparation Rooms that were inadvertently omitted from the project plans at eight prisons, and construction related to conversion of programs at eight other prisons (for example, clustering of patients in the Enhanced Outpatient Program, and converting Security Housing Units to non-segregating programs).  (ECF No. 2977 at 17.)  The State must develop a plan to fund and build these necessary projects.

Additionally, there may be more health care construction needs that have not yet been identified. For example, the Medical Beds Needs for Incarcerated Women Project, which the Receiver reported began on September 1, 2017, may identify additional HC-FIP needs. (ECF No. 2977 at 12.) Plaintiffs also understand that California Rehabilitation Center (CRC) was not included in any HC-FIP construction plans because CDCR planned to close the facility. It appears, however, that this decision has been reversed, which likely necessitates a further analysis of HC-FIP needs at CRC. Plaintiffs request that the Receiver report on these matters and, if necessary, that the State develop a plan to fund and build any further necessary projects.

Plaintiffs oppose dismissing the case pending remaining construction because problems can arise, and indeed have arisen, after the completion of HC-FIP projects that impact the adequacy of care. For example, on a recent pre-delegation tour at R.J. Donovan, Plaintiffs' counsel learned that despite completion of new medical clinics with four medication distribution windows, only two windows were operational due to staffing inadequacies, leading to excessive wait times for medication. Similarly, during last summer's site visit at California Institution for Men, Plaintiffs' counsel learned that although CIM would soon complete construction of a new medical clinic in Facility A, the high medical risk patient population had more than doubled since the clinic was designed, raising questions as to whether the new clinic was sufficient to address the needs of the patient population, especially because the prison planned to continue using an old medical clinic, which had been deemed inadequate previously. More monitoring is necessary to ensure that there is adequate clinic space to care for the larger high risk population. Plaintiffs believe termination of the case prior to completion of HC-FIP is inappropriate since it would preclude monitoring of implementation and operations of the new construction projects to ensure that they fulfill their planned purposes.

**B.     Addressing Health Care Delivery Issues at Contract Facilities.**

The Receiver continues to conduct audits of in- and out-of-state contract facilities. (*See* ECF No. 3008 at 9.) The parties agree that the Receiver's audits should continue and significant deficiencies should be addressed.

### C. Completion of Regulations and Policies.

CCHCS staff completed review of the currently published Inmate Medical Services Policies and Procedures (IMSP&P) for conversion into regulations. (ECF No. 3008 at 8-9.) The Receiver determined that critical updates to the IMSP&P are necessary before CCHCS seeks a one-time legislative exception from California's Administrative Procedures Act by July 1, 2019. In addition to the formal notification process for revisions, the Receiver agreed to hold quarterly meetings with the parties to identify policies that are being reviewed for revision and address the status of the revisions.

Plaintiffs appreciate the opportunity to receive updates from the Receiver's Office regarding policy revision initiatives, and the opportunity to comment on any revisions that may be proposed. However, Plaintiffs oppose any legislative exception to California's Administrative Procedures Act because it would deprive patients, as well as the public, of the opportunity to review and comment on these important regulations.

### D. Institution and Systemic Delegation Status.

As of February 23, 2018, fifteen institutions have been delegated back to the State and six delegation decisions are pending. The Receiver has scheduled delegation meetings for the remaining fourteen institutions through February 2019.

## III. Plaintiffs' Additional Priority Areas.

In addition to the issues already raised, Plaintiffs provide the following update to the Court about other priority areas:

### A. Hepatitis C and End Stage Liver Disease.

Thousands of people in CDCR custody have Hepatitis C (HCV). Beginning in mid-2017, Plaintiffs sought information from CCHCS about its HCV treatment criteria, noting that the CCHCS Care Guide appeared to authorize treatment for a narrower group of patients than the Medi-Cal criteria. In December 2017, CCHCS revised the Care Guide to expand the treatment criteria. Plaintiffs understand that the new Care Guide provides that all HCV patients are eligible for treatment except those for whom well-established exclusionary criteria apply, but that those eligible are or will be placed into one of three priority groups. On January 8, 2018, Plaintiffs

requested additional information from CCHCS through the Non-Paragraph 7 process about implementation of the new Care Guide, including about how many people will be affected, how priority will be determined and when treatment will be provided. Plaintiffs are still awaiting a response to this query.

Plaintiffs also identified a related problem with monitoring of patients with End Stage Liver Disease (ESLD) for the development of cancer. After reviewing the analysis of CDCR patient deaths, which included 5 possibly preventable liver cancer deaths in 2016, Plaintiffs sought more information through the Non-Paragraph 7 process about efforts to track and monitor patients with ESLD for cancer. Based on the information provided, which showed that approximately 27% of ESLD patients at seven particular prisons were overdue for or had never been screened for cancer, Plaintiffs have requested that CCHCS take prompt action to screen those approximately 200 patients and ensure that all ESLD patients receive timely screening. Plaintiffs are awaiting a response to this query.

**B.     Opioid-Related Overdoses and Deaths.**

The Court Experts recently provided the Receiver with a report regarding opioid overdose deaths among CDCR patients, with recommendations for further action. Plaintiffs understand the Receiver is considering the report. Plaintiffs look forward to an ongoing discussion with Defendants and the Receiver about how best to address this important patient safety and public health matter.

**C.     Medical Staffing.**

Recruitment and retention of qualified medical staff is a critical piece of any durable remedy in this case. Plaintiffs recognize the efforts of CCHCS in recruiting new staff, and appreciate the recent expansion of the telemedicine Primary Care Provider workforce and the decision to retain an outside expert to, among other things, assess the peer review processes, death review processes, and patient safety program. Despite this progress, some prisons are operating with large provider and nursing vacancy rates that have serious consequences for patient care. The Receiver noted in the 37th Report that recent efforts to increase provider salaries by offering a 15% pay differential at hard-to-recruit institutions has not been successful and is not

a sustainable solution. Specifically, the Receiver noted that while the pay differential provided relief at some institutions, the gain was achieved at the expense of other institutions, as 14 physicians transferred from one prison to another to receive the increased pay. (ECF No. 3008 at 15.) Plaintiffs intend to discuss with the Receiver what additional approaches he believes are necessary to remedy this problem. Plaintiffs also note the Receiver's report that the State Department of Finance did not provide the necessary support for his initiative to establish a student loan repayment program for doctors hired by CCHCS. (ECF No. 2008 at 15.)

Dated:  February 23, 2018

Respectfully submitted,

XAVIER BECERRA
Attorney General of California

/s/
DANIELLE F. O'BANNON
*Attorneys for Defendants*

Dated:  February 23, 2018

HANSON BRIDGETT LLP

/s/

PAUL B. MELLO
SAMANTHA D. WOLFF
*Attorneys for Defendants*

Dated:  February 23, 2018

Respectfully submitted,

PRISON LAW OFFICE

/s/

Mae Ackerman-Brimberg
*Attorneys for Plaintiffs*