UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, et al.,<br>    Plaintiffs,<br>v.<br>EDMUND G. BROWN, et al.,<br>    Defendants. | Case No. 01-cv-01351-JST<br><br>**ORDER DENYING PLAINTIFFS' MOTION TO REVERSE DELEGATION OF THE CALIFORNIA CORRECTIONAL CENTER**<br><br>Re: ECF No. 3046 |

Before the Court is Plaintiffs' motion for an order reversing the Receiver's delegation of the California Correctional Center ("CCC"). ECF No. 3046. The Court will deny the motion.

## I. BACKGROUND

The California prison healthcare system was placed into receivership in 2005. Dkt. No. 371. The process of transitioning control of that system back to the California Department of Corrections and Rehabilitation includes revocable delegations of authority by the Receiver. ECF No. 2841 at 5-7. These revocable delegations "provide an appropriate mechanism for allowing Defendants an opportunity to demonstrate their will, capacity, and leadership to maintain a constitutional system of care while, at the same time, ensuring that the Receiver can step in expeditiously to address any issues if Defendants fail." *Id.* at 4.

Delegation of an individual institution creates "a rebuttable presumption that care at the institution has reached a level of constitutional adequacy, subject to the completion of ongoing statewide or institution-specific initiatives to correct systemic deficiencies." ECF No. 2857 at 1. "Prior to executing any delegation of authority, the Receiver shall meet and confer with the parties and consult with the court experts." ECF No. 2841 at 6. After delegating an institution or systemwide process, the Receiver must evaluate, at least monthly, whether that delegation should

be revoked. *Id.* "Prior to revoking any delegation of authority, the Receiver shall meet and confer with the parties and consult with the court experts." *Id.* "Any party who disagrees with the Receiver's decision to delegate or not delegate, or to revoke or not revoke a previous delegation, may challenge that decision by filing a motion before this Court. The moving party shall bear the burden of proof." *Id.*

The Receiver delegated CCC on March 23, 2018. ECF No. 3047-2 at 2. Prior to delegation, the court experts reviewed the health records of fifty-five "medium to high-risk patients [at CCC] with chronic diseases and other serious medical conditions," as well as five mortality reviews. ECF No. 3047-1 at 2-3. They "found care was adequate in 30 (55%) of 55 applicable records." *Id.* at 3. Their February 22, 2018 report concluded by observing:

> Our review showed that newly arriving patients do not have timely access to a medical provider for their serious medical conditions and that patients with poorly controlled chronic diseases are not monitored in accordance with their disease control. Patients are often seen by multiple providers some of whom are unfamiliar with the patient. Physician assistants inappropriately managed poorly controlled diabetics, failing to change baseline medication regimens. This suggests that physician assistants are not being adequately supervised and may reflect lack of adequate physician staffing and leadership. In conclusion, our review showed harm, and ongoing risk of harm to patients with serious medical conditions.

*Id.* at 10.

The Receiver's March 23, 2018 delegation assessment indicates that he considered "information from over 25 different sources," including the court experts' report, the Office of the Inspector General's medical inspection report, tour reports by Plaintiffs' counsel, and various internal reports and metrics. ECF No. 3047-3 at 2. He ultimately determined that "[t]he strong weight of evidence supports a conclusion that the management of CCC should be delegated to the State." *Id.* at 3. The Receiver described several disagreements with the court experts' assessment. For example, he disagreed "that there was a material delay in accessing care" in some of the experts' cited cases, and he observed that other "delays appear to be related to a backlog that developed at CCC in late 2017," which "has been significantly reduced through telemedicine resources." *Id.* at 4. The Receiver also disagreed with the experts' determination that four patients with diabetes were not adequately treated, and he noted that "the dashboard indicates that

2

89% of medium or high-risk patients who had 3 or more encounters with a PCP [primary care provider] over the last six months had no more than 2 different PCPs for those encounters." *Id.* at 5-6. As to the experts' comments regarding physician assistants, the Receiver concluded:

> That speculation is incorrect. Clear internal documentation shows that physician assistants at CCC are being appropriately supervised consistent with California law. ([Plaintiffs' counsel's] letter of February 23, 2018, also asserts that physician assistants were not being adequately supervised and that any such supervision occurred only very recently. This conclusion was based upon a misinterpretation of recent documentation. My review makes it clear that supervision has been appropriate for at least 18-24 months.)

*Id.* at 6.

In response to questions from Plaintiffs' counsel, the Receiver issued a May 30, 2018 addendum to his delegation assessment. ECF No. 3047-4. He explained that, while he did not address all of the individual cases described in the court experts' report, "[i]mplicit in the failure to discuss those cases in detail was a determination that nothing in those cases, or considering them as a group, was an obstacle to delegation." *Id.* at 2. As to supervision of physician assistants, the Receiver observed:

> In response to the speculation expressed in the Court Experts' report that mid-level providers at CCC were not being properly supervised, the assessment indicated that internal documentation showed that mid-level providers were being supervised and monitored. Recent documentation regarding that supervision has already been provided to the parties. During 2017, the Chief P&S documented his supervision of mid-level providers by co-signing or reviewing individual charts within the electronic health record. Counsel will be providing that information to the parties confidentially. It shows 846 instances of co-signature or review during 2017 for four mid-level providers.

*Id.* at 3. And the Receiver noted that, "[a]s of the end of May, it appears CCC is staffed by two telemedicine providers, two onsite mid-levels, and one registry provider. It currently has one provider vacancy." *Id.* The Receiver concluded that neither staff vacancies nor having a chief physician and surgeon who works remotely prevented CCC from "performing very well with its population," as reflected in "CCC's dashboard show[ing] that it has excellent access to care scores across the board, excellent timeliness in the distribution of medications, and excellent population health measures in all categories." *Id.*

3

Plaintiffs' counsel asked the court experts "to state whether they stood by their opinion regarding care as stated in their February 22, 2018 Report in light of the information provided by the Receiver in his 'Assessing Delegation' and 'Addendum' documents." ECF No. 3047 ¶ 6. The court experts responded on June 15, 2018, stating that they "stand by our opinion that there are systemic issues causing harm to CCC patients." ECF No. 3047-5 at 2. They noted that:

> The Receiver's initial delegation assessment concluded that although problems with access to care were real at the time of our report, they had since been resolved. As improvements occurred after completion of our report we are unable to independently assess this information. We are concerned that CCC has not yet had the opportunity to demonstrate that timely access to a medical provider is sustained.

*Id.* They also explained their belief that "ineffective supervision of physician [assistants]" was "the primary reason for inadequate care described in the body of our report." *Id.* at 3. They stated:

> We have reviewed recent memoranda published in February 2018 regarding physician assistant supervision, including a 2/16/18 [memo] from the Chief Physician and Surgeon requesting that physician assistants self-select progress notes to be forwarded for review. This is not consistent with a 2/21/18 [memo] from the CCC Chief Executive Officer that indicates the Supervising Physician and Surgeon shall select cases for review. This raises questions about actual practice.

*Id.* They concluded by expressing their opinion that, "while some improvements may have occurred at CCC, our concerns about systemic issues related to care of chronic disease and hospitalized patients, as well as physician assistant supervision remain unchanged." *Id.*

Plaintiffs now move for revocation of the Receiver's delegation of CCC based on their contention that there has been "inadequate care provided by physician assistants who were ineffectively supervised and there has been insufficient time to assess whether recent changes have remedied the problems." ECF No. 3046 at 9. Defendants oppose the motion, criticizing the court experts' findings and methodology and noting that the current dashboard shows "that CCC is achieving the 'high' goal/ranking with respect to nearly all health care indicators, including scheduling and access to care, medication management, population health management, care management, grievance processing, and the availability of health information." ECF No. 3057 at 5, 19-22; *see also id.* at 23 (noting that 22 out of 27 dashboard scores are in the high range, and the

4

1  same number of scores exceed the statewide average); ECF No. 3058-2 at 2 (April 2018
2  dashboard).

On reply, Plaintiffs do not address these asserted shortcomings in the experts' findings or methodology. Instead, Plaintiffs ask the Court to "direct the experts to prepare and provide a written response, and, if necessary, hear testimony from them" to resolve the disputes over the experts' findings and methodology. ECF No. 3064 at 2. Plaintiffs also emphasize that, in their view, "the adequacy of physician assistant supervision at CCC since February 2018" is the primary issue: "[T]he expert's [sic] findings regarding current practices could substantially narrow the disputed issues underlying this motion. For example, if the experts opine physician assistants are now adequately supervised, the chief remaining dispute would be when, rather than whether, delegation was appropriate." *Id.* at 3.

## II. DISCUSSION

As the party moving to challenge a delegation decision by the Receiver, Plaintiffs bear the burden of proof. ECF No. 2841 at 6. In this case, they rely solely on the court experts' opinions and, in particular, the experts' conclusion that, as of February 22, 2018, supervision of physician assistants was inadequate and that, as of June 15, 2018, the experts "remain[ed] unconvinced . . . that adequate supervision is occurring." ECF No. 3047-5 at 3. The court experts do not refute the Receiver's notation in his addendum that the chief physician and surgeon "documented his supervision of mid-level providers by co-signing or reviewing individual charts" 846 times during 2017, nor do Plaintiffs present any evidence disputing this factual representation. *See* ECF No. 3047-4 at 3. Plaintiffs also do not present any evidence to counter the declarations submitted by Defendants that describe the level of supervision provided to both physician assistants and nurse practitioners at CCC – either to suggest factual disputes in what supervision is actually provided or to suggest that the described supervision is inadequate. *See* ECF No. 3059-4 (declaration of Dr. S. Aref, CCC's chief executive officer); ECF No. 3059-6 (declaration of Dr. K. Ali, CCC's chief physician and surgeon).

Plaintiffs suggest that the Court direct its experts to provide a written response to Defendants' opposition and "to review and report on the adequacy of physician supervision at

5

CCC since February 2018." ECF No. 3064 at 4. While a party is free to make suggestions to the Court as to how to direct its experts, it cannot meet its burden on a contested motion by doing so. Plaintiffs could have performed their own investigations, or hired their own experts, to dispute the conclusions reached by Defendants' experts and the facts presented in Defendants' opposition and the Receiver's delegation documents. Also, if they were able to do so, they could have rebutted Defendants' criticisms on the merits. That they did not leaves this Court with no basis on which to reverse the Receiver's delegation decision.

Defendants' opposition also raises other questions that the Court does not reach, but that might become necessary to resolve if the parties have future disputes in which either party seeks to rely on the court experts' conclusions. For example, Defendants challenge some of the experts' factual findings, the validity of the experts' sampling methodology to draw population-level inferences, and whether objective measures such as the Healthcare Effectiveness Data and Information Set ("HEDIS") guidelines provide a better measure of the quality of care than subjective reviews. ECF No. 3057 at 6-10, 19-22. Other than suggesting that the Court direct the experts to prepare a response, Plaintiffs did not respond to these arguments. ECF No. 3064. The Court does not resolve any of these questions at this time because doing so is unnecessary to decide Plaintiffs' motion.

## CONCLUSION

Plaintiffs' motion to reverse the Receiver's delegation of the California Correctional Center is denied.

**IT IS SO ORDERED.**

Dated: September 6, 2018

_____
JON S. TIGAR
United States District Judge