DONALD SPECTER – 083925
STEVEN FAMA – 099641
ALISON HARDY – 135966
SARA NORMAN – 189536
RITA LOMIO – 254501
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **THREE JUDGE COURT** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |
| MARCIANO PLATA, et al., | Case No. C01-1351 JST |
| Plaintiffs, | **THREE JUDGE COURT** |
| v. | **PLAINTIFFS' NOTICE OF EMERGENCY MOTION AND EMERGENCY MOTION TO MODIFY POPULATION REDUCTION ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| GAVIN NEWSOM, | |
| Defendants. | |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ............................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................... 1

INTRODUCTION ................................................................................................ 1

ARGUMENT ........................................................................................................ 3

I.      PROCEDURAL HISTORY ....................................................................... 3

II.     OVERCROWDING OF MEDICALLY VULNERABLE PEOPLE AND
        THOSE HOUSED IN CONGREGATE LIVING AREAS CAUSES AN
        UNACCEPTABLE RISK OF HARM DURING THE GLOBAL COVID-19
        PANDEMIC ................................................................................................ 5

        A.     COVID-19 Is a Deadly, Easily Transmissible Virus. ..................... 5

        B.     COVID-19 Will Spread Rapidly in the Prison Environment, and
               Incarcerated People Are at Particular Risk Due to Advanced Age,
               Serious Medical Conditions, and Crowded Congregate Living Spaces. ........ 6

        C.     The Most Critical Prevention and Control Strategies—Social
               Distancing and Isolation to Prevent Transmission—Cannot Be
               Implemented in California Prisons Due to Existing Crowding and
               Space Constraints. ...................................................................... 10

        D.     The Impact of CDCR's Response to the Pandemic Will Be Borne by
               Its Most Vulnerable Populations, Such as People with Serious Mental
               Illness. ...................................................................................... 18

        E.     Time Is of the Essence for any Effective Measures to Stem the Rapid
               Spread of COVID-19 to CDCR's Vulnerable Populations. ......................... 20

III.    THIS COURT SHOULD ORDER TARGETED RELIEF TO ADDRESS
        THE UNACCEPTABLE RISK OF HARM TO MEDICALLY
        VULNERABLE POPULATIONS AND PEOPLE HOUSED IN
        OVERCROWDED DORMS WHERE SOCIAL DISTANCING IS
        IMPOSSIBLE .......................................................................................... 21

        A.     The State Cannot "Properly Account for" Medically Vulnerable
               People and Those Housed in Congregate Settings under Its Current
               Population Reduction Measures .................................................... 21

        B.     Relief Should Be Targeted to These Specific Populations ........................... 23

        C.     An Order for Targeted Relief Is Warranted Under Rule 60(b)(5) ............... 24

               1.     The Global Pandemic Constitutes a Changed Circumstance ............ 24

               2.     A Targeted Population Reduction Order Would Directly
                      Address the Needs of the Medically Vulnerable Population and

[3517464.4]

Those Living in Congregate Settings and Would Therefore Be Tailored to the Changed Circumstances ........................................... 26

D.    The Requested Modifications Would Continue to Meet the PLRA's Requirements for a Prisoner Release Order................................. 26

1.    Less Intrusive Orders Have Failed to Remedy the Violation of Class Members' Right to Constitutionally Adequate Health Care. ..................................................................................... 27

2.    The State Has Had More than a Reasonable Amount of Time to Comply. ................................................................................ 28

3.    Clear and Convincing Evidence Shows that Crowding Is the Primary Cause of the Deprivation of Constitutionally Adequate Health Care ................................................................................. 30

4.    Clear and Convincing Evidence Shows that No Other Relief Will Remedy the Violation ............................................................. 32

5.    A Prisoner Release Order Would Be Narrowly Drawn, Would Extend No Further than Necessary, and Would Be the Least Intrusive Means to Correct the Current Constitutional Violations ................................................................................. 33

6.    Public Safety Would Be Served by a Targeted Prisoner Release Order ...................................................................................... 33

CONCLUSION ................................................................................................. 36

[3517464.4]

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Brown v. Plata*,
    563 U.S. 493 (2011) ...................................................................................... passim

*Coleman v. Brown*, 922 F. Supp. 2d 1004 (E.D. Cal., N.D. Cal. Apr. 11, 2013) ............. 4, 5

*Coleman v. Schwarzenegger*,
    922 F. Supp. 2d 882 (E.D. Cal. 2009) ........................................................ 26, 27, 29

*Coleman v. Schwarzenegger/Plata v. Schwarzenegger*,
    922 F.Supp.2d 882 (E.D. Cal., N.D. Cal. Aug. 4, 2009) ......................... 3, 4, 21, 25

*Coleman v. Schwarzenegger/Plata v. Schwarzenegger*,
    Nos. CIV-90-0520 LKK JFM P, C01-1351 TEH, 2010 WL 99000 (E.D. Cal.,
    N.D. Cal., Jan. 12, 2010) ............................................................................................... 4

*N.Y. State Ass'n for Retarded Children, Inc. v. Carey*,
    706 F.2d 956 (C.A.2 1983) (Friendly, J.) ........................................................ 22, 24

*Rufo v. Inmates of Suffolk Cty. Jail*,
    502 U.S. 367 (1992) ....................................................................................................... 24

*Sharp v. Weston*,
    233 F.3d 1166 (9th Cir. 2000) ................................................................................... 24

## <u>STATUTES</u>

18 U.S.C. § 3626 ................................................................................................. 4, 26, 33

Cal. Gov. Code § 8658 ............................................................................................... 24

## <u>RULES</u>

Fed. R. Civ. P. 60 ........................................................................................................ 24

[3517464.4]

**NOTICE OF MOTION AND MOTION**

TO THE PARTIES AND ALL COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT as soon as the matter may be heard[1] before the Honorable Kim McLane Wardlaw, Kimberly J. Mueller, and Jon S. Tigar, the United States District Court Composed of Three Judges Pursuant to 28 U.S.C. § 2284, Plaintiffs move the Court to modify its order requiring the State of California to reduce the prison population to 137.5% of design bed capacity.  Plaintiffs bring this motion under Federal Rule of Civil Procedure 60(b)(5) and the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626.

Given the urgency, Plaintiffs request that the Court set an expedited briefing schedule and review this motion as soon as practicable.  Plaintiffs waive any right to file a reply.

The motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, and the supporting declarations and associated documents, filed herewith.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

California today is under a state of emergency due to the spread of the novel coronavirus and COVID-19, the deadly disease it causes.  Like the rest of the country and the world, the State is bracing for the potentially catastrophic ravages of this pandemic. The Governor has taken significant steps to flatten the curve of new cases before hospitals are overwhelmed and the death toll skyrockets, as it has elsewhere.  Declaration of

---

[1] This Court has previously instructed that "[a]ny other motions contemplated by the parties shall be filed with no hearing date notice on the motion.  The Court will schedule the hearing date and briefing schedule after reviewing the moving papers."  *See* Declaration of Ernest Galvan in Support of Plaintiffs' Emergency Motion, filed herewith, Exh. 1 (Transcript of Proceedings, Sept. 24, 2007, ECF No. 6519-1, at 99:25-100:2).

[3517464.4]

Michael Bien in Support of Plaintiffs' Emergency Motion ("Bien Decl."), filed herewith,
¶ 36, Exh. 22 (Newsom March 19, 2020 Executive Order N-33-20).  The primary
components of the Governor's actions have been to require social distancing to keep
Californians at least six feet apart at all times and to prepare hospitals and health care
workers for the coming surge in cases.  *Id.*

Those steps have not been meaningfully implemented in the California Department
of Corrections and Rehabilitation (CDCR) for one simple reason: the system is far too
crowded.  The prisons house tens of thousands of people in crowded dormitories where
they live, sleep, and bathe within feet—sometimes inches—of each other.  The prisons also
house tens of thousands of the people most vulnerable to death or severe complications
from COVID-19:  the elderly and people with serious underlying medical conditions.
These conditions pose an unacceptable risk of harm for people who live and work in
CDCR as well as to the broader public:  prison walls cannot stop the spread of pandemic
disease.  According to former CDCR Secretary Scott Kernan, California's prisons are "a
tinderbox of potential infection as you go forward, especially if you are just watching
what's going on around the world."  Bien Decl. ¶ 34, Exh. 20 at 2.  Another former
corrections chief from Colorado sounded a similar warning: "I don't think people
understand the gravity of what's going to happen if this runs in a prison.…  You're going
to see devastation that's unbelievable."  Bien Decl. ¶ 57, Exh. 41 at 2.

It has been only 13 years since California prisons were under another state of
emergency: the state had crowded its prison system beyond humane limits, with deadly
results.  On October 4, 2006, Governor Arnold Schwarzenegger proclaimed a State of
Emergency because "the current severe overcrowding in 29 CDCR prisons has caused
substantial risk to the health and safety of … the inmates housed in them …."  Bien Decl.
¶ 44, Exh. 30.  Among other significant harms, the Governor found, overcrowded prisons
place people living in them at "increased, substantial risk for transmission of infectious
illnesses."  *Id.*

The State has since significantly reduced its prison population overall due to orders

[3517464.4]

1   from this Court, but not enough to prevent widespread sickness and death during the

2   pandemic.  It has taken no steps towards a targeted release of the most vulnerable

3   populations.  The *Coleman* class, people with serious mental illness, is uniquely

4   vulnerable, both to the virus and to the increased isolation and reduced treatment and

5   activities of CDCR's pandemic response.  The current emergency is the inevitable result of

6   the State's failure to learn the lessons from the emergency of 2006.  The deadly promise of

7   the prior overcrowding crisis will be realized today unless this Court acts swiftly to require

8   the State to safely reduce the population in crowded congregate living spaces to a level that

9   will permit social distancing and protect the medically vulnerable by releasing or

10  relocating patients who are at low risk of criminal conduct but especially high risk of

11  severe illness or death from COVID-19.

**ARGUMENT**

12

13  **I.    PROCEDURAL HISTORY**

14          On August 4, 2009, after three weeks of testimony and argument, this Court

15  imposed a population reduction order as a remedy for ongoing constitutional violations in

16  the operation of the California state prison system.  *See Coleman v. Schwarzenegger/Plata*

17  *v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. Cal., N.D. Cal. Aug. 4, 2009).  This Court

18  recounted the long history of the *Coleman* case, concluding that "[a]fter fourteen years of

19  remedial efforts under the supervision of a special master and well over seventy orders by

20  the *Coleman* court, the California prison system still cannot provide thousands of mentally

21  ill inmates with constitutionally adequate mental health care."  *Id.* at 898.  Regarding the

22  *Plata* case, this Court detailed the seven years of increasingly intrusive measures,

23  including the imposition of a Federal Receivership, that had failed to address "fundamental

24  constitutional deficiencies."  *Id.* at 897.  The Court concluded that overcrowding was the

25  primary cause of the ongoing Eighth Amendment violations.  *Id.* at 956, 897.

26          Consequently, this Court directed the State to submit a population reduction plan

27  that would reduce the population of CDCR to 137.5% of design capacity within two years.

28  *Id.* at 970.  On January 12, 2010, the Court approved the State's plan, pursuant to which

[3517464.4]

1   CDCR would reach 137.5% of design capacity by January 2012.  *See Coleman v.*
2   *Schwarzenegger/Plata v. Schwarzenegger*, Nos. CIV-90-0520 LKK JFM P, C01-1351
3   TEH, 2010 WL 99000 (E.D. Cal., N.D. Cal., Jan. 12, 2010).

4          On May 23, 2011, the U.S. Supreme Court upheld this Court's population reduction
5   order.  *Brown v. Plata*, 563 U.S. 493 (2011).  The Supreme Court observed the dramatic
6   impact of overcrowding on the living conditions and quality of care in California prisons,
7   and noted the "the severe impact of burgeoning demand on the provision of care" for
8   *Coleman* and *Plata* class members.  *Id.* at 517-18.  In particular, extreme population
9   pressures had led to "unsafe and unsanitary living conditions" in living quarters that were
10  described as "breeding grounds for disease."  *Id.* at 519-20.  The Supreme Court affirmed
11  this Court's finding by clear and convincing evidence that no relief short of a population
12  reduction order would remedy the State's constitutional violations.  *Id.* at 529; *see also* 18
13  U.S.C. § 3626(a)(3)(E)(ii).  In doing so, the Supreme Court acknowledged that this Court's
14  population reduction order might prove insufficient to remedy the constitutional violation,
15  and thus explicitly directed that "the three-judge court must remain open to a showing or
16  demonstration by either party that the injunction should be altered to ensure that the rights
17  and interests of the parties are given all due and necessary protection."  *Brown v. Plata*,
18  563 U.S. at 543.

19         Defendants subsequently returned to this Court, moving to vacate the Population
20  Reduction Order on January 7, 2013.  Plaintiffs filed a cross-motion seeking institution-
21  specific population caps.  This Court denied Defendants' motion, finding the State had
22  failed to achieve a durable remedy to prison crowding.  *Coleman v. Brown*, 922 F. Supp.
23  2d 1004, 1043 (E.D. Cal., N.D. Cal. Apr. 11, 2013).  It also rejected Plaintiffs' motion,
24  finding it premature because, at that point, the Defendants had not yet reached the
25  prescribed population limit.  This Court determined it was "best to wait and reassess the
26  need for institution-specific caps, if they are needed, when defendants reduce the
27  systemwide prison population to 137.5% design capacity, or at some other time deemed
28  appropriate by the Receiver and Special Master."  *Id.* at 1048.

## II. OVERCROWDING OF MEDICALLY VULNERABLE PEOPLE AND THOSE HOUSED IN CONGREGATE LIVING AREAS CAUSES AN UNACCEPTABLE RISK OF HARM DURING THE GLOBAL COVID-19 PANDEMIC

### A. COVID-19 Is a Deadly, Easily Transmissible Virus.

"On March 11, 2020, the World Health Organization announced that the COVID-19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States." Bien Decl. ¶ 40, Exh. 26 (Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak ("National Emergency Proclamation")). As of March 24, 2020, there are 375,498 confirmed cases and 16,362 confirmed deaths worldwide. Bien Decl. ¶ 41, Exh. 27 (WHO, Coronavirus Disease (COVID-19) Outbreak Situation). Those numbers are expected to rise steeply—in fact, exponentially—as testing increases and the virus spreads. President Trump has declared a national emergency. Bien Decl. ¶ 40, Exh. 26 (National Emergency Proclamation). Last week, Governor Newsom projected "that roughly 56 percent of our population—25.5 million people—will be infected with the virus over an eight week period." Bien Decl. ¶ 42, Exh. 28 (March 18, 2020 Newsom Letter to Trump).

There is no vaccine for COVID-19, and there is no cure. Declaration of Marc Stern, M.D. in Support of Plaintiffs' Emergency Motion ("Stern Decl."), filed herewith, ¶ 4. No one has prior immunity. *Id.* It is easily transmissible—spreading "through droplets generated when an infected person coughs or sneezes, or through droplets of saliva or discharge from the nose." *Id.* It is believed "that a significant amount of transmission may be from people who are infected but asymptomatic or pre-symptomatic." *Id.* ¶ 5. Once a person has been exposed to the virus, she may show symptoms within as little as two days, and her condition might "seriously deteriorate in as little as five days (perhaps sooner) after that." *Id.*

The effects of COVID-19 are very serious and can include severe respiratory illness, major organ damage, and, for a significant number of people, death. Stern Decl.

[3517464.4]

¶¶ 6, 7, 13.  The risk of death or serious illness is especially high for vulnerable populations, including people over the age of 50 and people, regardless of age, with "underlying health problems such as—but not limited to—weakened immune systems, hypertension, diabetes, blood, lung, kidney, heart, and liver disease, and possibly pregnancy."  *Id*. ¶ 6. People infected with COVID-19, especially those in vulnerable populations, may require significant medical attention, including ventilator assistance for respiration and intensive care.  *Id*. ¶ 7.

      **B.**      **COVID-19 Will Spread Rapidly in the Prison Environment, and Incarcerated People Are at Particular Risk Due to Advanced Age, Serious Medical Conditions, and Crowded Congregate Living Spaces.**

People in California prisons are at heightened risk of serious illness or death from COVID-19.  Tens of thousands of people—a quarter of the total population of more than 121,000 people—are over the age of 50, a demographic particularly susceptible to the disease.  Bien Decl. ¶ 43, Exh. 29 (CCHCS, Healthcare Services Dashboard at 27-28 ("CCHCS Healthcare Dashboard")); Bien Decl. ¶ 16, Exh. 6 (CDCR, Weekly Report of Population as of Midnight March 18, 2020).  In addition, 14.7% spread across all institutions—or over 17,000 people—have a medical classification of "high risk," which also places them at higher risk of getting very sick or dying from the disease.[2]  *Id.*; Bien Decl. ¶ 43, Exh. 29 (CCHCS Healthcare Dashboard); Bien Decl. ¶ 16, Exh. 6 (CDCR, Weekly Report of Population as of Midnight March 18, 2020).  And tens of thousands more—regardless of age or medical history—are subjected to crowded, cramped, and

---

[2] "**High Risk:**  Chronic care of complicated, unstable, or poorly-controlled common conditions (e.g., asthma with history of intubation for exacerbations, uncompensated end-stage liver disease, hypertension with end-organ damage, diabetes with amputation). Chronic care of complex, unusual, or high risk conditions (e.g., cancer under treatment or metastatic, coronary artery disease with prior infarction. Implanted defibrillator or pacemaker.  High risk medications (e.g., chemotherapy, immune suppressants, Factor 8 or 7, anticoagulants other than aspirin).  Transportation over a several day period would pose a health risk, such as hypercoagulable state.  Case management is required."  Bien Decl. ¶ 45, Exh. 31 (CCHCS, Health Care Department Operations Manual 1.2.14, Appx. 1, § (c)(3)(c)).

[3517464.4]

1  unsanitary conditions in congregate sleeping and living areas, as explained in more detail
2  in the next section.

3    The World Health Organization ("WHO") has recognized that incarcerated people
4  "are likely to be more vulnerable to the coronavirus disease (COVID-19) outbreak than the
5  general population because of the confined conditions in which they live together."  Bien
6  Decl. ¶ 31, Exh. 17 at 1 (WHO Preparedness, prevention and control of COVID-19 in
7  prisons and other places of detention ("WHO Prevention and Control of COVID-19 in
8  Prisons")).  The U.S. Centers for Disease Control and Prevention ("CDC"), in guidance on
9  management of COVID-19 in correctional and detention facilities, has identified that
10  COVID-19 presents a particularly heightened danger in correctional facilities because
11  "incarcerated/detained populations have higher prevalence of infectious and chronic
12  diseases and are in poorer health than the general population, even at younger ages."  Bien
13  Decl. ¶ 21, Exh. 7 at 13 (CDC Interim Guidance on Management of Coronavirus Disease
14  2019 (COVID-19) in Correctional and Detention Facilities ("CDC Interim Guidance")).
15  And, earlier this week, Scott Kernan, who served as the secretary of CDCR from 2015 to
16  2018, called California prisons "a tinderbox of potential infection as you go forward" and
17  even more of a "petri dish" than cruise ships in terms of "the mass of humanity."  Bien
18  Decl. ¶ 34, Exh. 20 at 2 (Kernan: "I'm very concerned about my colleagues and the
19  inmates and their families in jails and prisons across the country.").  It is no surprise, then,
20  that Clark Kelso, the *Plata* Receiver, stated:

> [W]e believe that a significant reduction in population at this
> time will be a clear benefit to us in opening up cells and beds,
> thereby facilitating increased social distancing within the
> prisons and a more flexible management of the remaining
> population to reduce the speed with which covid-19 will spread
> throughout CDCR institutions. From this perspective, I support
> an accelerated release program.

25  Bien Decl. ¶ 56, Exh. 40 at 1.

26    Similarly, Dr. Marc Stern, a physician who formerly served as the Assistant
27  Secretary for Health Care at the Washington State Department of Corrections, observed
28  that the level of crowding in California prisons "is very significant and worrisome from a

[3517464.4]

1    public health standpoint."  Stern Decl. ¶ 12.  Like the *Plata* Receiver, he recommends

2    "immediately downsizing the population of these prisons, with priority given to those at

3    high risk of harm due to their age and health status, and with the goal of allowing social

4    distancing and recommended public health practices in all ongoing activities."  *Id*. ¶ 15.

5    Even with a constitutionally adequate prison healthcare system, incarcerated people in

6    California "would still be at substantial risk of illness and death" because of their

7    congregate living environment.  *Id*. ¶ 19.

8        The disease already has breached the prison walls.  Seven staff members at four

9    different prisons and an incarcerated person at a fifth prison already have tested positive.

10   Bien Decl. ¶ 47, Exh. 33 (CDCR, COVID-19 Preparedness:  March 24, 2020 Update,

11   showing the following affected prisons: California State Prison, Sacramento; California

12   Institution for Men; Folsom State Prison; California Health Care Facility; and California

13   State Prison, Los Angeles County).  "The actual number of infections," of course, "is

14   likely to be higher due to the testing shortage."  Stern Decl. ¶ 3.

15       "The only way to control the virus is to use preventive strategies, including social

16   distancing."  Stern Decl. ¶ 4.  Put simply, limiting person-to-person contact "is critical to

17   saving lives."  *Id*. ¶ 8.  That is why Governor Newsom ordered "all individuals living in

18   the State of California to stay home or at their place of residence" until further notice.

19   Bien Decl. ¶ 36, Exh. 22 (Executive Department State of California, Executive Order N-

20   33-20).  And that is why the U.S. Centers for Disease Control and Prevention ("CDC"), in

21   guidance on management of COVID-19 in correctional and detention facilities, named

22   social distancing as "a cornerstone of reducing transmission of respiratory diseases such as

23   COVID-19."  Bien Decl. ¶ 21, Exh. 7 (CDC Interim Guidance).  The CDC stated that

24   social distancing requires people—including those who are asymptomatic—to remain at

25   least **six feet** from each other at all times.[3]  *Id.*

26

27   [3] The State of California also directs people to maintain six feet between themselves and
people not in their household.  *See* Bien Decl. ¶ 50, Exh. 36 at 8 (California Coronavirus

28

[3517464.4]

Recognizing the critical importance of social distancing and the difficulty of achieving it under existing conditions in correctional and detention facilities, international, state, and local jurisdictions have taken immediate steps to reduce the number of incarcerated people.  Iran, for example, has temporarily released around 85,000 people from its prisons as of March 24, 2020.  *See* Bien Decl. ¶ 22, Exh. 8 (March 18, 2020 Guardian article).  States and counties across the United States have undertaken similar measures.  For example, New Jersey will release up to 1,000 people from its county jails.  *See* Bien Decl. ¶ 23, Exh. 9 (March 24, 2020 U.S. News & World Report article).  Tennessee has similarly released 25 people from its county jails and plans to release dozens more, focusing on those who are particularly vulnerable to spreading the virus.  *See* Bien Decl. ¶ 62, Exh. 46 (March 23, 2020 Nashville Scene article).  Likewise, the Iowa Department of Corrections plans to expedite the release of 700 incarcerated people, and the North Dakota Parole Board has granted early release to 56 of the 60 people who applied for consideration this month.  *See* Bien Decl. ¶ 60, Exh. 44 at 2 (March 25, 2020 Prison Policy Initiative report).  Los Angeles, Denver, and Philadelphia all have instituted policies aimed at reducing jail populations, including reducing or delaying arrests and releasing individuals being held for drug offenses.  *Id.*

In addition to maintaining physical distance, the CDC recommends that correctional facilities increase their disinfecting procedures and reinforce hygiene practices among staff and the incarcerated population.  *See* Bien Decl. ¶ 21, Exh. 7 at 6 (CDC Interim Guidance).  To meet these ends, the CDC stresses the need for adequate supplies of cleaning materials and personal protective equipment (PPE).  *Id.*  For example, correctional facilities should ensure that they have sufficient numbers of soap and sanitizer, respirators, face masks, and gloves, among other equipment to protect against the transmission of the virus.  *Id.*  The

_____

(COVID-19) Response).  Marin County, where San Quentin State Prison is located, similarly defined "Social Distancing Requirements" as including "maintaining at least six-foot social distancing from other individuals."  Bien Decl. ¶ 48, Exh. 34 (Marin County shelter in place order).

[3517464.4]

CDC also recommends that "[f]acilities should make contingency plans for the likely event of PPE shortages during the COVID-19 pandemic." *Id.* at 4. With greater numbers of people who have been infected or exposed to the virus, more protective equipment will be required, increasing the likelihood of a supply shortage.

Once a person in prison has had close contact with an infected person, the CDC recommends that the person be placed in quarantine or medical isolation. *See* Bien Decl. ¶ 21, Exh. 7. "Close contact" occurs when a person directly contacts an infected individual, or when a person has been within six feet of an infected individual for an extended period of time. *Id.* The CDC suggests that an person who has been in close contact should "be quarantined in a single cell with solid walls and a solid door that closes" for a period of 14 days. Similarly, the WHO recommends that correctional facilities identify particular spaces "where suspect cases or confirmed cases not requiring hospitalization can be placed in medical isolation." *See* Bien Decl. ¶ 31, Exh. 17 (WHO Prevention and Control of COVID-19 in Prisons).

**C.    The Most Critical Prevention and Control Strategies—Social Distancing and Isolation to Prevent Transmission—Cannot Be Implemented in California Prisons Due to Existing Crowding and Space Constraints.**

The Receiver appointed by the *Plata* Court to oversee medical care in CDCR (California Correctional Health Care Services, or CCHCS) has developed guidance to manage COVID-19 in CDCR's 35 institutions. Although many aspects of the guidance are well-reasoned, the most critical prevention and control strategies—social distancing and isolation to prevent transmission—simply cannot be implemented in California prisons due to existing overcrowding and space constraints. As a result, COVID-19 will be easily transmissible in the California prison system, and likely will infect a large number of people unless immediate action is taken.

CCHCS's guidance is outlined in two documents: The COVID-19 Interim Guidance for Health Care and Public Health Providers, dated March 2020, and a memo-randum regarding COVID-19 Guidance Regarding Field Operations, dated March 20,

[3517464.4]

2020.  The cornerstone of the guidance—consistent with international, national, and state directives—is social distancing and isolation.  For example, the guidance recognizes that "[s]ocial distancing strategies should be implemented as much as possible for all individuals" and recommends that individuals remain six feet apart and avoid congregating in groups of ten or more.  Bien Decl. ¶ 11, Exh. 2 at 2-3 ("March 20, 2020 Memo").  But because most people in prison live in close quarters with others, both in crowded dorms and multi-person cells, this is simply impossible.

Approximately 46,265 people currently live in dorms in a California prison.  *See* Bien Decl. ¶ 13, Exh. 3 ("Bed Audit").  This is nearly 40% of the entire prison population. Bien Decl. ¶ 16; *see also id.* ¶ 16, Exh. 6 (showing total in-custody population of 123,030 as of March 18, 2020).  Dorm environments, where groups of people are gathered in close proximity to one another, are ripe for outbreak.  The most recent data provided by the State shows that as of March 23, 2020, many dorms were well over capacity.[4]  Indeed, as of March 23, 2020, 37,677 people live in dorms that are at or over 100% design capacity. Bien Decl. ¶ 17 & Exh. 6.  Of those, 78% *(*29,401 people) live in dorms at or over 137.5% design capacity, including 13,458 people living in dorms at or over 175% design capacity. *Id.*  Such conditions are a hotbed for infection, putting the lives of class members, staff, and thereby the outside community, at extreme risk.

Most alarming, 69% of the State's facilities (24 of 35 institutions) have dorms that are overcrowded.  *See* Bien Decl. ¶ 20.  The below photos illustrate conditions in Joshua Hall at the California Institution for Men ("CIM"), which has a design capacity of 80 people and was 161% overcrowded (housing 129 people) as of March 23, 2020. Declaration of Megan Lynch in Support of Plaintiffs' Emergency Motion ("Lynch Decl."),

---

[4] *See, e.g.*, Bien Decl. ¶ 13, Exh. 3 at 7, 4, 40 (Bed Audit showing that dorms at Central California Women's Facility (CCWF) meant to house 128 people often contain over 200 people, dorms at the California Correctional Center (CCC) are often close to 200% capacity, and dorms at the Substance Abuse Treatment Facility and State Prison, Corcoran ("SATF"), meant to house 63 people regularly house over 100 people); Lynch Decl., Exh. D (photograph of CCWF) & Exh. C (photographs of SATF dorms).

[3517464.4]

filed herewith, ¶¶ 4-9, Exh. A; Bien Decl. ¶ 13, Exh. 3 at 11 (Bed Audit).  Joshua Hall houses a wide range of people who are classified as low security risk (Level II), including at least 28 people aged 60-69, 27 people aged 70-79, and seven people aged 80-90.  *See* Bien Decl. ¶ 13, Exh. 3 (Bed Audit); Lynch Decl. ¶¶ 4-9.  People also have a wide range of medical conditions, including diabetes, hypertension, hyperlipidemia, renal masses, atrial fibrillation, chronic kidney disease, chronic obstructive pulmonary disease, hepatitis C, hypothyroidism, hepatic fibrosis, unspecified systolic (congestive) heart failure, and HIV. Lynch Decl. ¶ 9.  People in Joshua Hall are housed closely together both vertically (in bunk beds) and horizontally (with only between 25.5 and 48 inches between bunks). Declaration of Shira Tevah in Support of Plaintiffs' Emergency Motion ("Tevah Decl."), filed herewith, ¶ 5.  People must traverse a narrow walkway between bunk beds each time they want to use the toilet, shower, or sink, as the bathroom is located in the center of a building with four separate wings.  *Id.* ¶ 4.  There is no way, then, that they can maintain a six-foot distance from other people.

[3517464.4]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

CIM, Facility A, Joshua Hall (Lynch Decl., Exh. A)

17
18
19
20
21
22
23
24





25
26

CIM, Facility A, Joshua Hall
(Lynch Decl., Exh. A)

CIM, Facility A, Joshua Hall
(Lynch Decl., Exh. A)

27      Even when dorms are at 100% capacity, social distancing is impossible.  Dorm

28  living requires people to sleep feet (and sometimes inches) from each other, and pass

13

[3517464.4]

through narrow walkways to access bathroom facilities and common areas.  Elm Hall at CIM illustrates these conditions.  Elm Hall houses a wide range of people who are minimum security (Level I), including at least 33 people aged 60-69, and 12 people aged 70-78.  *See* Bien Decl. ¶¶ 13, Exh. 3 at 11 (Bed Audit); Lynch Decl. ¶ 14.  People have a range of medical conditions, including asthma, dyslipidemia, fibrosis of liver, hypertension, seizures, advanced cirrhosis of liver, diabetes, hyperlipidemia, cirrhosis of liver, presence of automatic (implantable) cardiac defibrillator, cardiomyopathy, hypothyroid, disorder of lipoprotein metabolism, presence of coronary angioplasty implant and graft, ventricular fibrillation, unspecified viral hepatitis B without hepatic coma, chronic viral hepatitis C, and liver disease.  Lynch Decl. ¶ 15.  As of March 2, 2020, 27 people used a wheelchair, and seven people were designated as legally blind.  *Id*. ¶ 12.  All 156 beds in Elm Hall were occupied as of March 23, 2020.  Bien Decl. ¶ 13, Exh. 3 at 11 (Bed Audit).  Distance between beds ranges from 30-40 inches, and there is a narrow walkway between beds to get to and from the bathroom.  Lynch Decl. ¶ 26.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



CIM, Facility D, Elm Hall (Lynch Decl., Exh. A)

Such living arrangements undermine and conflict with CCHCS's directive that "[c]ohorting vulnerable patients is not recommended as they are more susceptible to contracting and rapidly spreading the disease to other high-risk patients and are at high risk for developing serious complications or death related to the disease."  March 20, 2020 Memo at 2.

These problems are not unique to CIM.  As of March 23, 2020, J-1 dorm on Facility A at California Medical Facility ("CMF") was at 139% capacity, with 138 people living in a dorm designed to house just 92.  *See* Bien Decl. ¶ 13, Exh. 3 at 15 (Bed Audit).  J-1 houses a wide range of people who are Level II, including at least 35 people aged 60-69, and 12 people aged 70-79.  *See id.*; Lynch Decl. ¶ 20.  People housed there have a number of medical conditions, including diabetes, hyperkalemia, hypertension, hyperlipidemia,

[3517464.4]

atherosclerotic heart disease of native coronary artery without angina pectoris, disorder involving immune mechanism unspecified, and non-rheumatic aortic (valve) stenosis. Lynch Decl. ¶ 21.  As of March 2, 2020, 19 people used a wheelchair.  *Id.* ¶ 18.  The below photo illustrates the crowded conditions in this unit.  Lynch Decl. ¶ 31, Exh. B. Someone formerly incarcerated at CMF, who lived in J-1 and toured that unit again in November 2019, confirmed that it was and remains impossible to maintain a distance of six feet from other people in that unit.  Declaration of Michael Brodheim in Support of Plaintiffs' Emergency Motion ("Brodheim Decl."), filed herewith, ¶ 7.  The only way social distancing would be feasible would be if the bunk beds were moved six feet apart, all double bunks were replaced by single bunks, and people never moved from their beds, including to dress, bathe, use the toilet, or eat.  *Id.*



CMF, J-1 Dorm (Lynch Decl. ¶ 31 Exh. B)

1      Combatting crowded conditions in the dorms is impossible, as there is simply

2 nowhere to move people to allow necessary social distancing.  The State's prison

3 population currently is at 134.4% of design capacity.  *See* Defs.' Mar. 2020 Status Report

4 in Resp. to Feb. 10, 2014 Order, Coleman Doc. No. 6502 at 2 (Mar. 16, 2020).  Every

5 prison save three is over 100% capacity.  *See id.*, Exh. A (Coleman Doc. No. 6502-1).

6 Many institutions greatly surpassed this mark.  *See id.* (showing nearly a quarter of all

7 institutions over 150% capacity, with SATF housing 1,862 more people than its overall

8 design capacity, and Correctional Training Facility housing 1,795 more people than its

9 capacity).

10      For these same reasons, it will be impossible to implement CCHCS's directive to

11 "[p]romptly separate patients who are sick with fever and lower respiratory symptoms

12 from well-patients."  *See* Bien Decl. ¶ 11, Exh. 1 at 16 ("CCHCS Guidance").  CDCR

13 already lacks adequate medical beds; according to the Plata medical experts, "some prisons

14 do not have sufficient number of medical inpatient beds on site" to meet the needs of the

15 population.  *See* Joint Case Management Conference Statement, *Plata* Doc. No. 3163 at 17

16 (Oct. 29, 2019).  CCHCS anticipates that overcrowding will impact the State's

17 management of the virus.  In particular, the guidance states that it may be necessary to

18 cohort ill and healthy patients in the same dorm section and recommends that "[t]ape can

19 be placed on the floor to mark the isolation section with a second line of tape 6 feet away

20 to mark the well-patient section."  Bien Decl. ¶ 11, Exh. 1 at 16.  But, as noted above,

21 social distancing is impossible in these dorm settings, where patients share bathroom

22 facilities and common areas, and custody and healthcare staff must traverse throughout

23 such units to provide meals, medical care, mental health treatment, and security checks.

24      Indeed, the CDC cautions against this very plan, warning that individuals under

25 medical isolation should be housed "[s]eparately, in single cells with solid walls (i.e., not

26 bars) and solid doors that close fully."  *See* Bien Decl. ¶ 21, Exh. 7 (CDC Interim

27 Guidance).  If those settings are not available, the worst case scenario would still be to

28 house people in multi-person cells "with an empty cell between occupied cells" or, in the

[3517464.4]

1    alternative, "[s]afely transfer individual(s) to another facility with available medical

2    isolation capacity."  *Id*.  Again, given current population levels and space constraints, both

3    the primary and alternative plans are not feasible in the California prison system.

4           The CCHCS guidance also directs that patients be isolated in airborne infection

5    isolation rooms ("AIIR") or, alternatively, "a private room with a solid, closed door."  Bien

6    Decl. ¶ 11, Exh. 1 at 10-11, 15.  But the guidance fails to identify whether AIIRs are

7    available at every institution, and many cells throughout the State lack solid doors.

8           Finally, although the CCHCS guidance directs staff to limit their movement

9    "between different parts of the institution to decrease the risk of staff spreading COVID-

10   19," staffing shortages—which existed prior to the pandemic and will be exacerbated as

11   more employees become ill and/or must work remotely—will require staff to move

12   throughout facilities, even if just to provide basic necessities.  *See* Bien Decl. ¶ 11, Exh. 1

13   at 15.  Given the reality of CDCR's dense population, achieving the CCHCS's well-

14   intentioned goal of "keep[ing] patients who are ill or who have been exposed to someone

15   who is ill from mingling with patients from other areas of the prison" is impossible.  *See*

16   *id*. at 17-18.

17           **D.    The Impact of CDCR's Response to the Pandemic Will Be Borne by Its**

18   **Most Vulnerable Populations, Such as People with Serious Mental**
**Illness.**

19           Responding to the pandemic within prison walls will require operational changes

20   that disproportionately disadvantage populations about which this Court has expressed

21   particular concern.  In particular, CDCR's mental health population will suffer greatly due

22   to the measures instituted to address the COVID-19 pandemic, such as restricted access to

23   mental health treatment and expanded use of solitary confinement. The seriousness of the

24   resulting harm underscores the need for urgent action by the Court.

25           Defendants already have substantially curtailed access to mental health care in

26   response to the COVID-19 pandemic, including by closing access to hundreds of licensed

27   inpatient psychiatric hospital beds.  The Department of State Hospitals DSH suspended

28   admissions of *Coleman* patients to its 336 licensed inpatient psychiatric hospital beds in

response to the COVID-19 pandemic.  *See* Bien Decl. ¶ 34; *see also* Bien Decl. ¶ 14,  Exh. 4 at 4 ("COVID-19 Mental Health Plan").  The remaining Psychiatric Inpatient Programs within CDCR prisons are already full, with long waitlists.  *See* Bien Decl. ¶ 15, Exh. 5 (Psychiatric Inpatient Census and Pending List Report).

Indeed, CDCR's planned response to the COVID-19 pandemic will sharply limit its ability to provide mental health treatment to all patients in its custody at the same time that fear and anxiety will increase demand for mental health services.  *See* Bien Decl. ¶ 14, Exh. 4 at 1.  CDCR's plan acknowledges that asymptomatic patients housed in units or facilities that have been placed under quarantine due to risk of exposure will not receive mental health groups at all.  *Id.* at 4.  Given CDCR's dense housing, many or most units will likely experience rolling quarantines that disrupt or cease all group therapy for months.[5]

Moreover, vulnerable populations will suffer most from the isolation associated with social distancing.  Absent a marked reduction in population, the only significant method for social distancing in CDCR will be placing general population prisoners into solitary confinement conditions.  *See* Declaration of Craig Haney in Support of Plaintiffs' Emergency Motion ("Haney Decl."), filed herewith, ¶ 10 ("In penal settings, the social distancing that is now required in response to the COVID-19 Pandemic will most likely take the form of solitary confinement. Indeed, I have seen precisely this form of social distancing utilized as a matter of course in numerous correctional institutions throughout the country, where medical quarantines are conducted … by effective placing prisoners in solitary confinement.").  The scientific literature on the serious harmful effects of solitary

---

[5] *Coleman* class members are disproportionately vulnerable to both contracting and experiencing severe harm from COVID-19.  13,415 of the people housed in CDCR's dorms have serious mental illness.  Bien Decl. ¶ 59 & Exh. 43.  One in four EOP patients currently live in CDCR's overcrowded dormitories, where they are unable to achieve social distancing.  *Compare id.*, *with* Bien Decl. ¶ 46, Exh. 32 (total number of EOP class members in CDCR).  *Coleman* class members are also disproportionately older than other prisoners; approximately 30% of the class is over the age of 50.  Bien Decl. ¶ 55.

[3517464.4]

1    conditions in prison is consistent and alarming.  *See* Haney Decl. ¶ 11.  The *Coleman* court

2    has recognized the particular dangers of solitary confinement to people with serious mental

3    illness.  *See* Apr. 10, 2014 Order, *Coleman* Doc. No. 5131 at 45-46.

4         The stakes could not be higher.  Suicides in the CDCR are at record levels, leading

5    the Secretary to acknowledge in October 2019 that the Department was experiencing an

6    "inmate suicide crisis."  *See* Bien Decl. ¶ 58,  Exh. 42 (Oct. 8, 2019 SF Chronicle article).

7    CDCR's 38 suicides in 2019 marked a tragic record.  The rate of suicide in CDCR prisons

8    in 2019 was 30.3 per 100,000, almost double the average national rate for prisons of 16 per

9    100,000.  Bien Decl. ¶ 53-54 & Exh. 39 at 1 (2019 mid-year CDCR population data); *see*

10   *also* Bien Decl. ¶ 61,  Exh. 45 at p. 10, Table 10 (BJS report).

11        These stark realities underscore to need for urgent action to reduce the prison

12   population.  Only through a targeted population cap can CDCR mitigate the harm

13   associated with its current COVID-19 prevention and mitigation measures.

14        **E.    Time Is of the Essence for any Effective Measures to Stem the Rapid
         Spread of COVID-19 to CDCR's Vulnerable Populations.**

15

16        The State must act now if it is to stop the global COVID-19 pandemic from running

17   rampant in its prison system and striking down the most vulnerable people in its custody.

18   As Rick Raemisch, the former executive director of the Colorado Department of

19   Corrections, recognized:  "These prisons are bacteria factories.  I don't think people

20   understand the gravity of what's going to happen if this runs in a prison, and I believe it's

21   inevitable.  You're going to see devastation that's unbelievable."  Bien Decl. ¶ 57,  Exh. 41

22   at 2 (March 25, 2020 Pew Trusts report).

23        That is why correctional health expert Dr. Marc Stern warns that CDCR must

24              immediately downsiz[e] the population of these prisons, with
                priority given to those at high risk of harm due to their age and
25              health status, and with the goal of allowing social distancing
                and recommended public health practices in all ongoing
26              activities.  **To be effective in reducing the spread of the
                virus, these downsizing measures must occur now.**
27              Currently, the prevalence of the virus in the prisons appears
                low, limited to a few prisons.  This gives the California a
28              critical window of opportunity to contain the virus before it

[3517464.4]

permeates the prison system and becomes completely
unmanageable.

Stern Decl. ¶ 15 (emphasis in original).

The sole measure Defendants have taken to reduce the prison population—the
cessation of intake from the county jails, announced on March 24, 2020, *see* Bien Decl.
¶ 37, Exh. 23—will be inadequate to accomplish what Dr. Stern and CCHCS's own
guidance say is needed.  Through this pause in intake, CDCR's population will decrease by
only a few thousand people a month.  *See* Declaration of Thomas Hoffman in Support of
Plaintiffs' Emergency Motion ("Hoffman Decl."), filed herewith, ¶ 13 n.8 (38,000 people
released in 2018).  This step is welcome but is neither fast nor targeted enough to bring
relief when and where it is needed.  Notably, to date, the State has announced no plans to
modify any dorm housing to allow social distancing or release any medically vulnerable
people.  Without such action, the many people who live and work in California prisons are
at serious risk.

**III.    THIS COURT SHOULD ORDER TARGETED RELIEF TO ADDRESS THE
         UNACCEPTABLE RISK OF HARM TO MEDICALLY VULNERABLE
         POPULATIONS AND PEOPLE HOUSED IN OVERCROWDED DORMS
         WHERE SOCIAL DISTANCING IS IMPOSSIBLE**

**A.    The State Cannot "Properly Account for" Medically Vulnerable People
        and Those Housed in Congregate Settings under Its Current Population
        Reduction Measures**

This Court, anticipating that the remedies ordered in 2009 might require adjustment
over time, "retain[ed] jurisdiction over this matter … to consider any subsequent
modifications made necessary by changed circumstances."  922 F.Supp.2d at 1004.
Specifically, the Court recognized that the overall limit of 137.5% of capacity might prove
inadequate: "Should the state prove unable to provide constitutionally adequate medical
and mental health care after the prison population is reduced to 137.5% design capacity,
plaintiffs may ask this court to impose a lower cap."  *Id.* at 970 (footnote omitted).  The
2009 remedial order, however sweeping, was only the "first stage of the court's attempt to
bring the system into compliance with the Constitution's mandate."  *Id.* at 964.

[3517464.4]

1    The Court's population reduction order was premised on the State's ability to

2  "properly account for" the needs of particularly vulnerable populations, by maintaining

3  them at lower populations as needed.  *Id*. at 970 n.64.  The Court recognized that some

4  segments of the prison population might require more specific relief based on

5  particularized needs:

> We recognize that certain institutions and programs in the
> system require a population far below 137.5% design capacity.
> We trust that any population reduction plan developed by the
> state in response to our opinion and order will properly account
> for the particular limitations and needs of individual
> institutions and programs.

10  *Id*. at 970 n.64.  The Court acknowledged that the cap might need to be more targeted, and

11  should the "single systemwide cap" prove to be "inadequate relief," further action might be

12  needed.  *Id*. at 964.

13    The U.S. Supreme Court also contemplated the possibility that modification of the

14  cap would be warranted and more targeted relief necessary.  The Court explained:

> The three-judge court … retains the authority, and the
> responsibility, to make further amendments to the existing
> order or any modified decree it may enter as warranted by the
> exercise of its sound discretion.  "The power of a court of
> equity to modify a decree of injunctive relief is long-
> established, broad, and flexible." *N.Y. State Ass'n for Retarded
> Children, Inc. v. Carey*, 706 F.2d 956, 967 (C.A.2 1983)
> (Friendly, J.).  A court that invokes equity's power to remedy a
> constitutional violation by an injunction mandating systemic
> changes to an institution has the continuing duty and
> responsibility to assess the efficacy and consequences of its
> order.  *Id.* at 969-71.  Experience may teach the necessity for
> modification or amendment of an earlier decree.  To that end,
> the three-judge court must remain open to a showing or
> demonstration by either party that the injunction should be
> altered to ensure that the rights and interests of the parties are
> given all due and necessary protection.
>
> *   *   *
>
> These [foregoing] observations reflect the fact that the three-
> judge court's order, like all continuing equitable decrees, must
> remain open to appropriate modification.

27  *Brown v. Plata*, 563 U.S. at 542-43, 545.

28    Indeed, in 2013, this Court counseled Plaintiffs to evaluate the necessity of further

[3517464.4]

relief *after* the State had complied with the population cap.  At that time, the Court denied

Plaintiffs' motion for additional relief in the form of institution-specific population caps on

the following grounds: "Because defendants have not yet met the systemwide cap of

137.5%, it is difficult to determine whether that cap provides inadequate relief….

Accordingly, it is best to wait and reassess the need for [additional relief] when defendants

reduce the systemwide prison population to 137.5% design capacity…."  April 11, 2013

Order, *Plata* Doc. 2590 at 61-62.

Now, more than five years after the State reached the numerical target of the overall

population cap, it is indisputable that the cap is inadequate to permit the delivery of

constitutional health care in the current crisis.  It is therefore necessary to impose

population caps specific to the most vulnerable populations.

### B.    Relief Should Be Targeted to These Specific Populations

There is a real and immediate risk that people living in California prisons will die or

suffer serious medical injuries if Defendants do not make swift and targeted reductions to

the prison population.  In order to prevent the rapid spread of COVID-19 and protect

medically vulnerable class members from severe illness or death, the Court should order

Defendants to (1) significantly reduce the population in crowded congregate living spaces

to a level that will permit social distancing, and (2) protect the medically vulnerable by

releasing or relocating class members who are at especially high risk of severe illness from

COVID-19.

To achieve population reductions in congregate living spaces, the Court should

order Defendants to release to parole or post-release community supervision those class

members who (a) are at low risk as determined by CDCR's risk assessment instrument or

are serving a term for a non-violent offense; and (b) are paroling within the year.  Within

this group, people with six months or less to serve and people who are at high risk of

severe illness from COVID-19 should be prioritized.

To protect the medically vulnerable, the Court should order Defendants to release or

relocate class members who are at high risk of severe illness from COVID-19.  According

[3517464.4]

to the Centers for Disease Control and Prevention, high risk individuals include: (a) people aged 65 and over; (b) people with chronic lung disease or moderate to severe asthma; (c) people who have heart conditions; (d) people who are immunocompromised (for example, due to cancer treatment, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, or prolonged use of immune-weakening medications); (e) people with severe obesity; (f) people with uncontrolled diabetes; (g) people with renal failure; (h) people with liver disease; and (i) people who are pregnant.  *See* Bien Decl. ¶ 51, Exh. 37 (CDC statement re: higher risk people). Defendants can be given ample discretion in implementing this order, to release these vulnerable class members to parole or post-release community supervision and/or use the Governor's emergency powers to temporarily relocate them.  *See generally* Bien Decl. 52, Exh. 38 ¶¶ 1-6 (Newsom March 4, 2020 Proclamation of a State of Emergency); Cal. Gov. Code § 8658.

## C.    An Order for Targeted Relief Is Warranted Under Rule 60(b)(5)

Federal Rule of Civil Procedure 60(b)(5) permits a party to move to modify an injunctive order if "applying it prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5); *see N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983).  Under Rule 60(b)(5), the party seeking relief must show that:  (1) modification is warranted due to a significant change in factual or legal circumstances, and (2) "the proposed modification is suitably tailored to the changed circumstance[s]."  *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 393 (1992).

Modification of an existing injunction "must not create or perpetuate a constitutional violation," *Rufo*, 502 U.S. at 391, and the legal standard underlying the original injunction guides the court in molding the modification.  *See generally id.* at 391-3 & nn.12, 13; *Sharp v. Weston*, 233 F.3d 1166, 1170-73 (9th Cir. 2000).

### 1.    The Global Pandemic Constitutes a Changed Circumstance

The degree to which the coronavirus global pandemic has impacted every aspect of life in the United States and around the world cannot be overstated.  At the time of this

1  writing, tens of millions of Americans, and all Californians, have been ordered to shelter in

2  their homes except for essential needs.  *See* Bien Decl. ¶ 50, Exh. 36.  There have been

3  hundreds of thousands of cases and at least 14,000 deaths reported globally.  Stern Decl.

4  ¶ 2.  Health care facilities around the world have experienced or are bracing for an

5  extraordinary influx of patients, as the virus sweeps through populations and strikes the

6  most vulnerable as well as many others.  *See id.* ¶7.

7  CDCR has recognized the magnitude of the crisis: all visiting and all educational,

8  vocational, rehabilitative, religious, and volunteer programs in California prisons have

9  been shut down, and all people entering the prisons are subjected to health screens.  Bien

10 Decl. ¶ 47, Exh. 33.  The Governor has closed CDCR to all intake from county jails.  Bien

11 Decl. ¶ 37, Exh. 23 at ¶ 1 (Executive Order N-36-20, March 24, 2020).

12 At the time of the 2009 order, this Court expressed confidence that the "population

13 reduction plan developed by the state in response to our opinion and order will properly

14 account for the particular limitations and needs of individual … programs."  922 F.Supp.2d

15 at 970 n.64.  The State's planning clearly did not account for an emergency on this level.

16 CDCR is far too crowded for the most basic and essential public health measure in the face

17 of viral epidemic—social distancing—to be practiced in its many dormitory settings.  Stern

18 Decl. ¶ 8, 10-12; Brodheim Decl. ¶¶ 7, 9.  The system is far too crowded to provide

19 minimally adequate health care to the medically vulnerable who will contract COVID-19

20 with severe complications in large numbers.  *See* Stern Decl. ¶¶ 6-7, 9, 17.  The burden of

21 the response to the virus, including severely restricted access to mental health treatment

22 and expanded use of solitary confinement, disproportionately harms the most vulnerable

23 people in the system, such as those with mental illness.  *See supra*, Section II.D.  In short,

24 "incarcerated people in California state prisons are at an extraordinary risk of dying from

25 the COVID-19 virus because the prisons are too crowded."  Stern Decl. ¶ 13 (emphasis in

26 original).  These are significant factual changes warranting modification of this Court's

27 2009 prisoner release order.

28

2.      **A Targeted Population Reduction Order Would Directly Address the Needs of the Medically Vulnerable Population and Those Living in Congregate Settings and Would Therefore Be Tailored to the Changed Circumstances**

The modification sought—an order requiring the State to reduce the prison population by releasing medically vulnerable people and reducing dormitory capacity to a level that will permit social distancing—is directly tailored to the risk of harm to the Plaintiff classes in the current coronavirus pandemic.  The population reduction would allow necessary public health measures to be implemented and bring CDCR's capacity to care for its most vulnerable patients closer to a constitutional level of care.  *See* Stern Decl. ¶¶ 16-17.  The reduction also would allow CDCR to feasibly implement the *Plata* Receiver's own COVID-19 prevention and response guidelines, which are impracticable at current levels of crowding.  *See supra* Section II.C.  A reduced population would also facilitate the delivery of crucial mental health care, which has already been curtailed to a dangerous degree.  *See supra* Section II.D.  Without a targeted reduction, CDCR's overcrowding poses an unreasonable and substantial risk of harm to these populations.

D.      **The Requested Modifications Would Continue to Meet the PLRA's Requirements for a Prisoner Release Order**

Under the PLRA, this Court should consider whether (1) it "has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right," and (2) "the defendant has had a reasonable amount of time to comply with the previous court orders."  18 U.S.C. § 3626(a)(3)(A)(i), (ii).  The Court also must find by clear and convincing evidence that "(i) crowding is the primary cause of the violation of a Federal right; and (ii) no other relief will remedy the violation."  *Id.* § 3626(a)(3)(E).

The history of this case, the nature of the current public health crisis, and expert testimony demonstrate that a targeted release order from this Court is warranted and, indeed, is urgently necessary.  Current conditions satisfy the PLRA's general standards for prospective relief, *see id.* § 3626(a)(1)(A), and the standards for issuing a prisoner release order, *see id.* § 3626(a)(3)(A), (E). Given the circumstances, this Court "is obligated to

[3517464.4]

act." *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 889 (E.D. Cal. 2009).

### 1. Less Intrusive Orders Have Failed to Remedy the Violation of Class Members' Right to Constitutionally Adequate Health Care.

In 2009, this Court ordered Defendants to reduce crowding in the prisons, in part to address the risk posed by the spread of infectious diseases. *See Coleman,* 922 F. Supp. 2d at 888, 931. The present crisis demonstrates that the 2009 order did not extend far enough to address the risk of serious harm to particular populations in CDCR's custody. By failing to limit extreme crowding in congregate living spaces or to impose specific population caps for aging and medically vulnerable populations, this Court's order was insufficient to address the extraordinary and immediate threats to health and well-being that these populations now face.

Both this Court and the Supreme Court cited the spread of infectious disease as a significant danger of prison overcrowding. In affirming this Court's population reduction order, the Supreme Court cited findings that "[o]vercrowding had increased the incidence of infectious disease" in the CDCR, and that crowded living quarters "where large numbers of prisoners may share just a few toilets and showers [were] 'breeding grounds for disease.'" *Plata*, 563 U.S. at 508-09, 519-20. The Supreme Court observed the connection between chronic overcrowding and the spread of infectious illness, noting that "[o]ne officer testified that antibiotic-resistant staph infections spread widely among the prison population and described prisoners 'bleeding, oozing with pus that is soaking through their clothes when they come in to get the wound covered and treated.' Another witness testified that inmates with influenza were sent back from the infirmary due to a lack of beds and that the disease quickly spread to 'more than half' the 340 prisoners in the housing unit …." *Id.* at 520 n.7 (internal citations omitted).

This Court too emphasized the dangerous connection between prison overcrowding and the spread of infectious disease. The Court observed that "crowding generates unsanitary conditions, overwhelms the infrastructure of existing prisons, and increases the risk that infectious diseases will spread." *Coleman*, 922 F. Supp. 2d at 931. In concluding

[3517464.4]

that prison crowding is a primary cause of the unconstitutional denial of adequate health care to CDCR's incarcerated population, this Court cited expert findings that "[u]ntil CDCR reduces its population, it will remain highly vulnerable to outbreaks of communicable diseases, including staph infections, tuberculosis and influenza." *Id.*

More than a decade after the Court's 2009 order, it is evident that the order did not fully remedy the dangers it sought to alleviate. Even after implementation of the population cap, crowding continues to prevent the State from implementing adequate measures to prevent the dangerous spread of infectious illness. Further population reduction measures are necessary—this time targeted directly at CDCR's overcrowded congregate living spaces and medically vulnerable population. *See id.* at 970 (noting that Plaintiffs may seek further relief "[s]hould the state prove unable to provide constitutionally adequate medical and mental health care after the prison population is reduced to 137.5% design capacity"); *see also Brown v. Plata*, 563 U.S. at 542-43, 545 ("The three-judge court … retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion."). The *Plata* Receiver supports a further population reduction in response to the pandemic:

> [W]e believe that a significant reduction in population at this time will be a clear benefit to us in opening up cells and beds, thereby facilitating increased social distancing within the prisons and a more flexible management of the remaining population to reduce the speed with which covid-19 will spread throughout CDCR institutions. From this perspective, I support an accelerated release program.

Bien. Decl. ¶ 56, Exh. 40.

### 2.   The State Has Had More than a Reasonable Amount of Time to Comply.

The State has had more than reasonable opportunity to devise and implement population reduction measures to eliminate the intolerable risk of serious harm or death due to the spread of infectious disease. Reasonableness, for these purposes, "must be assessed in light of the entire history of the court's remedial efforts." *Brown v. Plata*, 563

1  U.S. at 516.

2      Since the 2009 order from this Court, the State has had over a decade to reduce

3  crowding and develop a constitutionally adequate healthcare system that can fulfill the

4  function of protecting against the spread of communicable diseases.  While COVID-19

5  presents unique risks and challenges, the prevention and management of infectious

6  diseases is a well-established function of a prison health care system.  Indeed, serious

7  deficiencies in CDCR's ability to adequately address the risk of communicable disease

8  were one of the problems that led the *Plata* Court to appoint a Receiver.  *See* Findings of

9  Fact and Conclusions of Law Regarding the Appointment of Receiver, *Plata* Dkt. No. 371,

10  Oct. 3, 2005, at 18, 21-22.  Years later, conditions in the prisons still expose prisoners to

11  unacceptable risk of serious harm or death due to infectious disease.  *See* Stern Decl. ¶¶ 8,

12  10-13.

13      The State has had ample time to address these deficiencies.  *Cf. Brown v. Plata*, 563

14  U.S. at 514 (stating that Defendants "were given ample time to succeed" with regard to

15  earlier orders, where Defendants had five years and 12 years to implement changes in the

16  medical and mental health cases, respectively); *Coleman*, 922 F.Supp.2d at 918 (stating, in

17  2009, that Defendants had been given a reasonable amount of time to comply with the

18  District Court's orders).

19      Moreover, the magnitude and urgency of the threat currently facing CDCR's

20  incarcerated population simply does not lend itself to extended timeframes for further

21  remedial efforts.  According to Defendants, seven employees and one incarcerated person

22  have already tested positive for COVID-19 in CDCR.  Bien Decl. ¶ 47, Exh. 33.  "The

23  actual number of infections is likely to be higher due to the testing shortage."  Stern Decl.

24  ¶ 3. Without a swift and targeted reduction in the population, "[t]he conditions in CDCR's

25  prisons will undoubtedly result in the rapid spread of the COVID-19 virus throughout the

26  prisons."  *Id.* ¶ 13.  Defendants are well aware of the crowding in their prisons and the

27  substantial elderly and medically vulnerable populations in their custody.  Their failure to

28  act more quickly to reduce the prison population in light of this unprecedented crisis is

[3517464.4]

1   troubling and constitutes further evidence of the need for urgent action by this Court.

2       **3.   Clear and Convincing Evidence Shows that Crowding Is the
            Primary Cause of the Deprivation of Constitutionally Adequate
3           Health Care**

4           There is no question that overcrowding is the primary reason class members are at

5   heightened risk of a rapid and deadly spread of COVID-19 in California's prisons. The

6   "primary" cause of a constitutional violation, for the purposes of a prisoner release order,

7   is properly construed as "the foremost cause of the violation." *Brown v. Plata*, 563 U.S. at

8   525.

9           COVID-19 is spread between people who are in close contact with one another

10  (within about six feet), through respiratory droplets when an infected person coughs or

11  sneezes. *See* Bien Decl. ¶ 32, Exh. 18 (CDC Guidance); Stern Decl. ¶ 4. There is no

12  vaccine or cure for COVID-19. Stern Decl. ¶ 4. No one has prior immunity. *Id.* The only

13  way to control the virus is to stop it from spreading, primarily through social distancing.

14  *Id.*

15          Social distancing is simply impossible in CDCR's overcrowded congregate living

16  spaces. As Dr. Stern observed:

17              To the extent that incarcerated people are housed in close
                quarters, unable to maintain a six-foot distance from others,
18              and sharing or touching objects used by others, infectious
                diseases that are transmitted via the air or touch (like COVID-
19              19) are more likely to spread, placing people at risk. This is
                especially true when, as in California, the number of
20              incarcerated people is high and when large numbers of people
                are housed in open dormitories rather than one or two-person
21              cells. For these reasons, if—but more likely when—COVID-
                19 is introduced into a prison, the risks of spread is greatly, if
22              not exponentially, increased as already evidenced by spread of
                COVID-19 in two other congregate environments: nursing
23              homes and cruise ships.

24

25  *Id.* ¶ 8; *see also* Brodheim Decl. ¶ 10 ("[M]ost people in the dorms at CMF are still living,

26
    showering, and sleeping within a few feet of each other most if not all of the time . . . .");
27
    *supra* Section II.C.
28

1    Removing and isolating those with active symptoms will not stop the spread of this

2    disease.  First, isolating people who have symptoms of COVID-19 requires dedicated

3    space in the prisons—many of which are still dangerously overcrowded.  *See* Stern Decl.

4    ¶ 11 ("[A] CDCR Institutional Bed Audit dated March 23, 2020 . . . shows that many of

5    the CDCR dormitories are very crowded.  For example, at Avenal State Prison, all people

6    are housed in dormitories designed to house 50-100 people.  Most of those dormitories are

7    currently at 150% capacity.  At the Central California Women's Facility, some of the

8    dormitories are as much as 194% overcrowded."); *see also* Bien Decl. ¶ 13, Exh. 3 ("Bed

9    Audit")  Moreover, it is believed that people can transmit the virus without being

10   symptomatic and, indeed, that a significant amount of transmission may be from people

11   who are infected but asymptomatic or pre-symptomatic.  Stern Decl. ¶ 5.  Without

12   immediately and significantly reducing the population in congregate living spaces,

13   COVID-19 is very likely to spread rapidly throughout the prison system.

14   When it does, medically vulnerable people will get very ill very quickly.  *Id.* ¶ 6-7.

15   "Vulnerable people who are infected by the COVID-19 virus can experience severe

16   respiratory illness, as well as damage to other major organs.  Treatment for serious cases of

17   COVID-19 requires significant advanced support, including ventilator assistance for

18   respiration and intensive care support."  Stern Decl. ¶ 7; *see also id.* ¶ 17.

19   CDCR's inpatient medical beds are already at capacity; indeed, before the COVID-

20   19 outbreak, medical experts in *Plata* raised the concern "that some prisons do not have

21   sufficient number of medical inpatient beds on site" to meet the needs of the prison

22   population.  *See* Joint Case Management Conference Statement, *Plata* Doc. No. 3163 at 17

23   (Oct. 29, 2019).  Thus, it is unlikely that CDCR will be able to treat many of those who fall

24   very ill from COVID-19 within the prison system, and an outbreak of COVID-19 in the

25   prisons will almost certainly put significant additional pressure on community healthcare

26   systems.  Stern Decl. ¶ 7.  If overloaded local health care systems are unable to absorb the

27   outbreak, class members will die unnecessarily without life-saving treatment.  *Id.*

28

1
2

**4.      Clear and Convincing Evidence Shows that No Other Relief Will Remedy the Violation**

3      No relief other than a targeted prisoner release order will protect class members'

4  constitutional rights to adequate health care.  The only way to control the COVID-19 virus

5  and limit its devastating effects is to implement preventive strategies such as social

6  distancing.  Stern Decl. ¶ 4.  The only way to achieve social distancing in the crowded

7  dorms is to significantly reduce the population in those units.  *See id.* ¶ 16.

8      Specific populations (elderly people and those with chronic medical conditions)

9  also face a heightened risk of serious harm or death due to the virus.  Stern Decl. ¶ 17.  The

10  only reasonable way to protect those people from this imminent threat is to remove them

11  from CDCR's crowded prisons—either by releasing them or relocating them in facilities in

12  which they can be safely isolated.  *See id.* ¶ 17. The State has announced that it will close

13  the state prisons to intake for at least 30 days.  *See* Bien Decl. ¶ 37, Exh. 23 (Newsom

14  March 24, 2020 Executive Order N-36-20).  This measure, while welcome, will not

15  address the danger facing people in the prisons right now.  The population reduction

16  associated with closing the prisons to new intakes will occur only gradually over coming

17  months, as people are released.  But, as Dr. Stern explains, **"[t]o be effective in reducing**

18  **the spread of the virus, … downsizing measures must occur now"** in the "critical

19  window of opportunity to contain the virus before it permeates the prison system and

20  becomes completely unmanageable."  Stern Decl. ¶ 15 (emphasis in original).

21      The decision to halt intake does nothing to address crowding in congregate living

22  spaces today or in the next few weeks—when the virus is likely to spread rapidly through

23  the system—and it does not address the particular risks faced by elderly and medically

24  vulnerable people in CDCR custody.  It will not enable CDCR to contain the potential

25  exponential growth of cases and serious complications, of morbidity and mortality.

26  Nothing short of an immediate, targeted population reduction order will protect class

27  members against the grave threat posed by COVID-19.

28

1

2

**5.      A Prisoner Release Order Would Be Narrowly Drawn, Would Extend No Further than Necessary, and Would Be the Least Intrusive Means to Correct the Current Constitutional Violations**

3

4      This Court should issue a prisoner release order directed solely at CDCR's

5  overcrowded congregate living spaces and medically vulnerable population.  Such an order

6  would be narrowly drawn, extend no further than necessary, and be the least intrusive

7  means to avoid risk of catastrophic harm to the incarcerated population.

8      "Narrow tailoring requires a fit between the remedy's ends and the means chosen to

9  accomplish those ends." *Brown v. Plata*, 563 U.S. at 531 (alterations and citation omitted).

10 "The scope of the remedy must be proportional to the scope of the violation, and the order

11 must extend no further than necessary to remedy the violation." *Id.*  Here, a prisoner

12 release order directed at CDCR's overcrowded congregate living spaces and medically

13 vulnerable population would be tailored directly to the constitutional violations at issue.

14 This Court's 2009 order did not limit the State's discretion in any way, allowing it to

15 choose any methods it wished to relieve the unconstitutional conditions.  Unfortunately,

16 the State implemented population reduction in a manner that failed to adequately address

17 the risk posed by COVID-19.

18     In light of this case history, the order sought would be narrowly drawn, extend no

19 further than necessary to remedy the ongoing constitutional violations, and constitute the

20 least intrusive means to that end.  Even with an order directed at CDCR's overcrowded

21 congregate living spaces and medically vulnerable population, the State would retain

22 maximal discretion as to specific methods of implementation.

23     **6.      Public Safety Would Be Served by a Targeted Prisoner Release Order**

24     In considering a population reduction order, the Court must give "substantial

25 weight" to its impact on public safety.  18 U.S.C. § 3626(a)(1)(A).  Far from having an

26 adverse impact, a targeted prisoner release order would significantly enhance public safety

27 in two ways.

28

[3517464.4]

First, without a targeted release, COVID-19 will spread like wildfire in CDCR's crowded prisons, quickly overwhelming hospital capacity and needlessly infecting thousands of staff and incarcerated people.  Stern Decl. ¶¶ 13-17.  This is because social distancing is impossible at many prisons and for the thousands of people living and working in them.  *Id.* ¶ 8; Brodheim Decl. ¶ 11.  Since social distancing is the primary means to slow the spread of the virus, the virus has the capacity to spread uncontained in CDCR absent immediate action.  Stern Dec. ¶¶ 8, 13, 20.

Nearly 200,000 people live or work in CDCR prisons.  *See* Bien Decl. ¶ 16, Exh. 6 (March 18, 2020 CDCR Weekly Offender Report); Bien Decl. ¶ 33, Exh. 19 (Dec. 2019 State Employee Demographics).  Every day, 65,000 staff go home to their families and communities, *see id.,* and every month, several thousand incarcerated people are released after completing their sentences.  Hoffman Decl. ¶ 13 n.8 (over 38,000 people release in 2018); Bien Decl. ¶ 63, Exh. 47 (Jan. 2020 CDCR Offender Data Points Report showing over 35,000 people released from custody in 2018).  The influx to California communities of thousands of people with significant exposure to the virus will spread the damage caused by CDCR overcrowding to all Californians.  Stern Decl. ¶ 16; Haney Decl. ¶ 9 ("prisons have only limited means of protecting incarcerated persons from contact with staff who regularly enter facilities after having been in the outside world.  Staff members are at risk of having contracted COVID-19 and then transmitting it to all those inside the institutions, including staff and incarcerated persons").  The risk to public safety is extreme.

Second, the unchecked spread of COVID-19 within the prisons has serious potential to create panic and chaos that endangers the lives of incarcerated people and staff alike.  In the words of former CDCR Secretary Scott Kernan, "It's a tinderbox of potential infection as you go forward, especially if you are just watching what's going on around the world… I know Italy and Brazil had serious violence and even escapes and murders in the jails as a result of COVID-19."  Bien Decl. ¶ 34, Exh. 20 (March 23, 2020 KQED article).  In addition, increased demands for mental health care caused by fear, stress and anxiety will

[3517464.4]

1    arise at the same time that the delivery of mental health care, access to inpatient

2    hospitalization and suicide prevention measures are being limited.  Deaths by suicide will

3    increase.

4            The risk to public safety from reducing the population is minimal.  The 2009

5    population reduction order resulted in significant decarceration without significant rise in

6    crime.  Hoffman Decl. ¶ 11; Bien Decl. ¶ 35, Exh. 21 (2015 Public Policy Institute of

7    California report).  Older and medically vulnerable people currently in the system pose

8    minimal risk to the public.  Hoffman Decl. ¶ 8.  The same holds true with low security

9    people already fully identified by CDCR's risk tool.  Hoffman Decl. ¶ 10.  CDCR can

10   choose the lowest risk people to release in order to reduce the dorm population to a level

11   that permits appropriate social distancing.  This Court can implement the necessary

12   population reduction in a manner that permits CDCR maximum latitude to select the

13   release criteria.   In the opinion of Thomas Hoffman, an experienced law enforcement

14   leader and former Director of CDCR's Division of Adult Parole Operations, "CDCR can

15   accelerate the reduction the prison population to address the COVID-19 pandemic without

16   an adverse impact on public safety."  Hoffman Decl. ¶ 12.

17           Governor Newsom, the Defendant in this case, has been clear that social distancing

18   must be practiced by all Californians and that hospital facilities must be conserved for a

19   threatened influx of extremely sick patients.  *See* Bien Decl. ¶ 36, Exh. 22 (Newsom

20   March 19, 2020 Executive Order N-33-20).  Thus a targeted release order to enable social

21   distancing where large groups must gather by necessity, and protect the most medically

22   vulnerable by moving them from a place that cannot serve their needs, is necessary to fully

23   implement the Governor's orders for all Californians.

24           In fact, California law calls for just such measures to be taken.  Section 8658 of the

25   California Government Code provides specific direction to CDCR in the case of

26   emergencies like today's pandemic:

27                  In any case in which an emergency endangering the lives of
                    inmates of a state, county, or city penal or correctional
28                  institution has occurred or is imminent, the person in charge of

> the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them. Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section.

Under this law, the State *shall*, when possible, ensure that people held in custody be provided safe harbor as needed to avoid emergency. State law recognizes that the dangers involved in keeping people incarcerated in an emergency might constitute a greater risk to public safety than a carefully calibrated release.

It is true that "[w]henever a court issues an order requiring the State to adjust its incarceration and criminal justice policy, there is a risk that the order will have some adverse impact on public safety in some sectors," but "[t]he PLRA's requirement that a court give 'substantial weight' to public safety does not require the court to certify that its order has no possible adverse impact on the public." *Brown v. Plata*, 563 U.S. at 534. Any amorphous risks associated with a targeted order cannot stand in the way of ensuring that tens of thousands of people receive the minimally adequate care the Constitution mandates.

The PLRA's requirements are satisfied, as are the requirements for modification of the 2009 prisoner release order. This Court should modify the order to target the populations described above.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to issue an order modifying the 2009 population cap and requiring the State to reduce the population in crowded congregate living spaces to a level that will permit social distancing and protect the medically vulnerable by releasing or relocating class members who are at especially high risk of severe illness from COVID-19.

[3517464.4]

1

2   DATED:  March 25, 2020

3

4

5

6

7

8

9   DATED:  March 25, 2020

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

PRISON LAW OFFICE

By:  */s/ Sara Norman*
       Sara Norman
       Alison Hardy
       Margot  Mendelson
       Rita Lomio
       Sophie Hart
Attorneys for *Plata* Plaintiffs

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Michael W. Bien*
       Michael W. Bien
       Ernest Galvan
       Lisa Ells
       Jessica Winter
       Marc J. Shinn-Krantz
       Cara E. Trapani
Attorneys for *Coleman* Plaintiffs

[3517464.4]