DONALD SPECTER – 083925
STEVEN FAMA – 099641
ALISON HARDY – 135966
SARA NORMAN – 189536
RITA LOMIO – 254501
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>GAVIN NEWSOM, et al.,<br><br>   Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**THREE JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>GAVIN NEWSOM,<br><br>   Defendants. | Case No. C01-1351 JST<br><br>**THREE JUDGE COURT**<br><br>**DECLARATION OF THOMAS HOFFMAN IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION** |

Case No. 2:90-CV-00520-KJM-DB

DECLARATION OF THOMAS HOFFMAN IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION

## DECLARATION OF THOMAS HOFFMAN

I, Thomas Hoffman, declare:

1. I am a public safety executive who has been involved in California municipal and State law enforcement and corrections for over 42 years. During my career I served with the City of Inglewood Police Department (1975-1994), the City of West Sacramento Police Department (1994-2004), and as the Director of the California Department of Corrections and Rehabilitation's (CDCR) Division of Adult Parole Operations (DAPO) (2006-2009). Since August 2009 I have worked as a consultant on public safety, corrections, and parole issues.

2. While serving with the City of Inglewood Police Department (1975-1994), I promoted through the ranks from Officer to Captain, working in the areas of Operations, Investigations, Special Operations and Administration. I also served with the City of West Sacramento Police Department (1994-2004) serving as Captain, Deputy Chief of Police and as Interim Chief of Police.

3. In 2006, I was appointed to be the Director of the Division of Adult Parole Operations (DAPO) of the California Department of Corrections and Rehabilitation. DAPO is the arm of CDCR that is responsible for all parole operations. As Director, I was responsible for policy development, administration, and oversight of an organization of 2,400 sworn and 1,800 non-sworn employees charged with the day-to-day supervision of over 135,000 State parolees. During that time, DAPO was responsible for all programming provided to California parolees being released from prison. Furthermore, during my tenure as Director of DAPO, parole supervision became one of the most hotly debated public safety issues of our time. From 2006 to 2009, DAPO initiated the largest expansion in the number, scope and diversity of post-release rehabilitative programs in its history. During that time, DAPO was also responsible for the implementation of Jessica's Law (the highly controversial and complex sex offender management law), the development of a validated risk and needs assessment instrument (COMPAS/CSRA), and the development of the parole violation decision making instrument (PVDMI).

[3516724.1]

4.      During my tenure at DAPO, I also personally directed the Division's strategy for the implementation of the recommendations of the California Expert Panel (2007) and the Rehabilitation Strike Force (2008).  The California Expert Panel was a nationally renowned group of correctional professionals and academics who gathered to conduct an analysis of CDCR policies and practices, and to recommend areas for improvement.  The Rehabilitation Strike Force was tasked with offering recommendations for the resources provided as part of AB 900, which provided funding for additional criminal justice facilities to California communities.  The recommendations identified in these two reports often served as my personal "roadmap" when I considered a specific policy or strategy for implementing organizational change throughout my tenure as Director.

5.      Upon my retirement from CDCR/DAPO in August 2009, I was engaged as a correctional/parole consultant by the Adult Parole Operations division of the Colorado Department of Corrections to facilitate the development of a parole violation decision making instrument.  As was the case in California, this process was undertaken to ensure transparency, equity, and consistency in the remedies imposed by officers and supervisors in response to parole violations or criminal activity by those under their supervision.

6.      Since my retirement from CDCR I have also served as an Executive Fellow with the Police Foundation, headquartered in Washington DC.  The Police Foundation is a national non-profit, bipartisan organization with a commitment to improve American policing.  In this capacity I have served as a primary point of contact for the Foundation's work on the implementation of AB 109 (California's 2011 "realignment" of the criminal justice system), parole reform, sentencing reform, and most recently, the debate about the militarization of the American police.

7.      Since October 2012, I have also served as the Senior Public Safety Advisor for Californians For Safety and Justice (CSJ).  CSJ is a foundation-funded non-profit organization that encourages the development of "smart justice" solutions for local, county and State organizations.  In this capacity, I played a lead role in developing the campaign strategy for outreach and communication with local law enforcement leaders and others in

the successful Proposition 47 campaign in 2014.  I am also working with the Fontana, Santa Barbara and San Luis Obispo Police Departments as they implement enforcement programs designed to improve the resources and services available for their Officers when they interact with mentally ill individuals, disabled veterans and homeless people in their communities.

8.  As noted above, I am familiar with the tools available for addressing the public safety impacts of changes in the way people transition from incarceration to the community.  There is a well-developed body of evidence regarding the risks that persons will re-offend during the first few years of release from prison. The California Department of Corrections and Rehabilitation publishes result recidivism statistics periodically.  The last published set of data is for persons released in fiscal year 2014/2015.[1]  The data follows these people for the three years after their release.  This data shows that persons who are over 60 years old present dramatically lower risks of a new conviction within three years after release compared to other age groups.[2]  This is consistent with the general consensus in the field of correctional risk assessment that people age out of criminal behavior.  A person who engaged in criminal behavior in his twenties is very unlikely to return to such behavior after age 45.  CDCR publishes demographic data showing that as of December 2018, approximately 8.4% of the in custody population, or approximately 10,600 people, were aged 60 or older, and of them approximately 5,000 people were age 65 or over.[3]  The next lower age bracket, 55 to 59 years of age, also a generally low risk age group, numbered over 9,000 people.

---

[1] *See* Recidivism Report for Offenders Released From the California Department of Corrections and Rehabilitation in Fiscal Year 2014-2015 (Recidivism Report), available at, https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/01/Recidivism-Report-for-Offenders-Released-in-Fiscal-Year-2014-15.pdf.

[2] *Id.* at viii, Persons over 60 have a three-year conviction rate of 20.5 percent compared to 59 percent for persons aged 20 to 24.

[3] California Department of Corrections, Offender Data Points: Offender Demographics for the 24-month Period Ending December 2018  (January 2020) (CDCR Demographics) at

9. The recidivism rates for "lifers," persons with indeterminate sentences are extremely low, regardless of age. Of the 688 lifers released in 2014-2015, sixteen individuals (2.3 percent) were convicted of a new crime, the majority of which were misdemeanors.[4]

10. California's tracking of risk assessment scores is also public.[5] CDCR reports that as of the end of 2018, 49.8% of its in custody population, or over 63,000 people, scored at a "Low Risk to Reoffend" on the California State Risk Assessment Score (CSRA).[6]

11. Much work has been done to study the public safety impact of California's post-2009 prison population reduction. Both violent and property crime rates have remained at historic lows during the same period in which the prisoner and parolee population dropped. To the left are two tables from a January 2020 report by the Public Policy Institute of California,[7] one showing the drop in and the prison and parole population, and the other showing the drop in crime rates.




---

page 20, available at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/01/201812_DataPoints.pdf.

[4] Recidivism Report, *supra* note 1, at viii, 19-20.

[5] CDCR Demographics, *supra* note. 3.

[6] *Id.* at 16.

[7] Public Policy Institute of California, "California continues to reshape its criminal justice

12. Based on my experience as a former peace officer, and former parole administrator, as well as my continued work in this field, it is my professional opinion that CDCR can accelerate the reduction the prison population to address the COVID-19 pandemic without an adverse impact on public safety.

13. In addition, it is my professional opinion that if CDCR does not act to prevent uncontrolled spread of COVID-19 inside the prisons, the consequences will be harmful to public safety. Movement of staff in and out of the prisons is necessary to their operation. The worse the infection rate is in the prisons, the more risk that staff will carry the virus out to the public. Similarly, even without any additional measures, there is a steady flow of people paroling and/or being released to Post Release Community Supervision.[8] Controlling the rate of infection inside the prison also prevents released prisoners from bringing the virus outside the prisons.

14. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at Folsom, California this 24th day of March, 2020.

_____
Thomas Hoffman

---

system," January 2020, available at https://www.ppic.org/wp-content/uploads/californias-future-criminal-justice-january-2020.pdf.

[8] See CDCR Demographics, *supra,* note 3, at page 54 (over 38,000 individuals were released from custody in 2018).

12. Based on my experience as a former peace officer, and former parole administrator, as well as my continued work in this field, it is my professional opinion that CDCR can accelerate the reduction the prison population to address the COVID-19 pandemic without an adverse impact on public safety.

13. In addition, it is my professional opinion that if CDCR does not act to prevent uncontrolled spread of COVID-19 inside the prisons, the consequences will be harmful to public safety. Movement of staff in and out of the prisons is necessary to their operation. The worse the infection rate is in the prisons, the more risk that staff will carry the virus out to the public. Similarly, even without any additional measures, there is a steady flow of people paroling and/or being released to Post Release Community Supervision.[8] Controlling the rate of infection inside the prison also prevents released prisoners from bringing the virus outside the prisons.

14. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at Folsom, California this 24th day of March, 2020.

*Thomas Hoffman* (signature)

Thomas Hoffman

---

system," January 2020, available at https://www.ppic.org/wp-content/uploads/californias-future-criminal-justice-january-2020.pdf.

[8] See CDCR Demographics, *supra*, note 3, at page 54 (over 38,000 individuals were released from custody in 2018).

{3516724.1}

5