| | |
|---|---|
| DONALD SPECTER – 083925 | MICHAEL W. BIEN – 096891 |
| STEVEN FAMA – 099641 | ERNEST GALVAN – 196065 |
| ALISON HARDY – 135966 | LISA ELLS – 243657 |
| SARA NORMAN – 189536 | JESSICA WINTER – 294237 |
| RITA LOMIO – 254501 | MARC J. SHINN-KRANTZ – 312968 |
| MARGOT MENDELSON – 268583 | CARA E. TRAPANI – 313411 |
| PRISON LAW OFFICE | ROSEN BIEN |
| 1917 Fifth Street | GALVAN & GRUNFELD LLP |
| Berkeley, California 94710-1916 | 101 Mission Street, Sixth Floor |
| Telephone: (510) 280-2621 | San Francisco, California 94105-1738 |
| | Telephone: (415) 433-6830 |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM, et al.,<br><br>  Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**THREE JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM,<br><br>  Defendants. | Case No. C01-1351 JST<br><br>**THREE JUDGE COURT**<br><br>**DECLARATION OF CRAIG W. HANEY IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION** |

# DECLARATION OF DR. CRAIG W. HANEY, PHD

I, Craig W. Haney, declare as follows:

1. I am a Distinguished Professor of Psychology and UC Presidential Chair at the University of California Santa Cruz in Santa Cruz, California, where I engage in research applying social psychological principles to legal settings including the assessment of the psychological effects of living and working in institutional environments, especially the psychological effects of incarceration. I was a co-founder and co-director of the UC Criminal Justice & Health Consortium – a collaborative effort of researchers, experts and advocates from across the University of California system working to bring evidence-based health and healthcare solutions to criminal justice reform in California and nationwide.

2. I also have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations on jail- and prison-related issues. Those agencies and organizations include the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the United States Department of Justice, the Department of Health and Human Services (HHS), the Department of Homeland Security, and the White House (under both the Clinton and Obama Administrations). In 2012, I testified as an expert witness before the Judiciary Committee of the United States Senate in a hearing that focused on the use and effects of solitary confinement and was appointed as a member of a National Academy of Sciences committee analyzing the causes and consequences of high rates of incarceration in the United States. My research, writing, and testimony have been cited by state courts, including the California Supreme Court, and by Federal District Courts, Circuit Courts of Appeal, and the United States Supreme Court.[1]

3. COVID-19 is a serious, highly contagious disease and has reached pandemic status. At least 375,498 people around the world have received confirmed diagnoses of COVID-19 as of

---

[1] For example, see *Brown v. Plata,* 563 U.S. 493 (2011).

March 24, 2020,[2] including 44,183 people in the United States.[3] At least 16,362 people have died globally as a result of COVID-19 as of March 24, 2020,[4] including 544 in the United States.[5] These numbers are predicted by health officials to increase, perhaps exponentially. For example, the CDC has estimated that as many as 214 million people may eventually be infected in the United States, and that as many as 21 million could require hospitalization.[6]

4. The COVID-19 Pandemic poses such a threat to the public health and safety in the State of California, that on March 4, 2020 Governor Gavin Newsom declared a statewide State of Emergency, and on March 19, 2020, he ordered all California residents to stay home or at their place of residence except to facilitate certain authorized necessary activities.[7] His office has estimated that, in the absence of taking appropriate steps to mitigate the spread of the virus, as many as 56% of all Californians will contract it.[8]

5. COVID-19 is a novel virus. There is no vaccine for COVID-19, and there is no cure for COVID-19. No one has immunity. Currently, the most effective ways to control the virus are to use preventive strategies, including social distancing, in order to maximize our healthcare capacity for a manageable number of patients. Otherwise, healthcare resources will be overwhelmed and the Pandemic will worsen.

---

[2] World Health Organization, *Coronavirus disease (COVID-19) Outbreak*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019

[3] Center for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[4] *Supra,* fn. 2.

[5] *Supra,* fn. 3.

[6] Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths,* N.Y. TIMES (Mar. 18, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html.

[7] Executive Department, State of California, Executive Order N-33-20, https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf

[8] Office of the Governor, "Letter to President Donald Trump" (March 18, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.18.20-Letter-USNS-Mercy-Hospital-Ship.pdf.

6. Social distancing presents serious challenges for everyone in every part of our society, but nowhere more than in penal institutions, where living conditions are unusually sparse and prisoners necessarily live in unescapably close quarters with one another.

7. Moreover, jails and prisons are already extremely stressful environments for the persons confined in them to live.[9] They can be psychologically and medically harmful in their own right, leaving formerly incarcerated persons with higher rates of certain kinds of psychiatric and medical problems.[10] Incarceration leads to higher rates of morbidity (illness rates) and mortality (i.e., it lowers the age at which people die).[11]

8. Prisons lack the operational capacity to address the needs of persons in custody in a crisis of this magnitude. These facilities are ill-equipped to provide incarcerated persons with ready access to cleaning and sanitation supplies, or to assure that staff sanitize all surfaces during the day. Most correctional facilities were already operating at or beyond the limits of their

---

[9] Much of this evidence is summarized in several book-length treatments of the topic. For example, see: Haney, C., Reforming punishment: Psychological limits to the pains of imprisonment. Washington, DC: American Psychological Association (2006); Liebling, A., & Maruna, S. (Eds.), The effects of imprisonment. Cullompton, UK: Willan (2005); and National Research Council (2014). The Growth of Incarceration in the United States: Exploring the Causes and Consequences. Washington, DC: The National Academies Press. In addition, there are numerous empirical studies and published reviews of the available literature. For example, see: Haney, C., Prison effects in the age of mass incarceration. Prison Journal, 92, 1-24 (2012); Johns, D., Confronting the disabling effects of imprisonment: Toward prehabilitation. Social Justice, 45(1), 27-55.

[10] E.g., see: Schnittaker, J. (2014). The psychological dimensions and the social consequences of incarceration. Annals of the American Association of Political and Social Science, 651, 122-138; Turney, K., Wildeman, C., & Schnittker, J., As fathers and felons: Explaining the effects of current and recent incarceration on major depression. Journal of Health and Social Behaviour, 53(4), 465-481 (2012). See, also: Listwan, S., Colvin, M., Hanley, D., & Flannery, D., Victimization, social support, and psychological well-being: A study of recently released prisoners. Criminal Justice and Behavior, 37(10), 1140-1159 (2010).

[11] E.g., see: Binswanger, I., Stern, M., Deyo, R., et al., Release from prison: A high risk of death for former inmates. New England Journal of Medicine, 356, 157-165; Massoglia, M. Incarceration as Exposure: The Prison, Infectious Disease, and Other Stress-Related Illnesses. Journal of Health and Social Behavior, 49(1), 56-71; and Massolglia, M., & Remster, B., Linkages Between Incarceration and Health. Public Health Reports, 134(Supplement 1), 85-145 (2019); and Patterson, E. (2013). The dose-response of time served in prison on mortality: New York state, 1989-2003. American Journal of Public Health, 103(3), 523-528.

capacities to provide mental health or medical care. The demand for such services in this crisis will only grow, and already scarce treatment resources will be stretched even more.

9. In addition, prisons typically provide very limited access to telephonic or other forms of remote visiting. Yet precisely *these* ways of connecting to others will become critically important if contact visiting is limited. Furthermore, prisons have only limited means of protecting incarcerated persons from contact with staff who regularly enter facilities after having been in the outside world. Staff members are at risk of having contracted COVID-19 and then transmitting it to all those inside the institutions, including staff and incarcerated persons.

10. In penal settings, the social distancing that is now required in response the COVID-19 Pandemic will most likely take the form of solitary confinement. Indeed, I have seen precisely this form of social distancing utilized as a matter of course in numerous correctional institutions throughout the country, where medical quarantines are conducted in prison infirmaries or other housing units by effectively placing prisoners in solitary confinement.

11. Yet solitary confinement subjects people to a separate set of very serious harmful effects, ones that significantly undermine their mental and physical well-being. The scientific literature on the harmfulness of solitary confinement in jails and prisons is now widely accepted and the research findings are consistent and alarming.[12] This research has led a number of professional mental and physical health-related, legal, human rights, and even correctional organizations to call for severe limitations on the degree to which solitary confinement is employed—specifically limiting when, for how long, and on whom it can be imposed.[13]

---

[12] These many studies have been carefully reviewed in a number of publications. For example, see: K. Cloyes, D. Lovell, D. Allen & L. Rhodes, Assessment of psychosocial impairment in a supermaximum security unit sample, Criminal Justice and Behavior, 33, 760-781 (2006); S. Grassian, Psychiatric effects of solitary confinement. Washington University Journal of Law & Policy, 22, 325-383 (2006); C. Haney, Restricting the use of solitary confinement. Annual Review of Criminology, 1, 285-310 (2018); C. Haney & M. Lynch, Regulating prisons of the future: The psychological consequences of solitary and supermax confinement. New York Review of Law & Social Change, 23, 477-570 (1997); and P. Smith, The effects of solitary confinement on prison inmates: A brief history and review of the literature, in Michael Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006).

[13] For a list of these organizations and their specific recommendations, see: Haney, C. (2018)

12.     I provided expert testimony to the single judge *Coleman v. Brown* court in 2013 on the threats to life and safety posted by long-term solitary confinement in California's adult prisons.[14]  My testimony was based on many tours of California prisons, extensive in-depth interviews with numerous incarcerated persons and staff, as well as the review of many policies, procedures, and class member records.

13.     After touring nearly all of the Security Housing Units, and other segregated settings in CDCR, I concluded then that the conditions that existed there created very serious risks to the lives and well-being of persons with mental illness.  I further concluded that mentally ill prisoners could not be safely housed in CDCR's segregated units unless they were provided with a minimally adequate treatment program, including at least 10 hours of out of cell time per week in addition to clinically indicated treatment hours.  In addition, I concluded that even with these minimal forms of amelioration, the conditions in CDCR's segregated units still posed a considerable risk of psychological harm. I urged that strict time limits on such confinement be applied.[15]

14.     I am informed that after the 2013 trial, the single-judge *Coleman* court issued on order severely limiting the use of solitary confinement and/or segregated housing, and that the Special Master and the parties worked out new policies and standards for segregated housing that provide for greater access to treatment, out-of-cell time, access to exercise, time limits, and access to entertainment devices such as radios and televisions.[16]

---

Restricting the use of solitary confinement. Annual Review of Criminology, 1, 285-310; Haney, C., Ahalt, C., & Williams, B., et al. (2020). Consensus statement of the Santa Cruz summit on solitary confinement. Northwestern Law Review, in press.

[14] See Expert Declaration of Craig Haney Re CDCR Segregated Housing Units, Coleman Dkt. No. 4581 (filed May 6, 2013), available at http://rbgg.com/wp-content/uploads/Declaration-of-Craig-Haney-re-CDCR-Segregated-Housing-Units-5-6-13.pdf.

[15] Id. at Paragraphs 28 and 29.

[16] See Order of April 10, 2014 *Coleman* Dkt. No. 5131  (available at http://rbgg.com/wp-content/uploads/Coleman-Order-re-Use-of-Force-Disciplinary-Process-and-Improper-Use-of-Segregated-Housing-4-10-14.pdf); Defendants' Plans and Policies, *Coleman* Dkt. No. 5190 (available at https://rbgg.com/wp-content/uploads/Defendants_-Plans-and-Policies-Submitted-in-

15.  Based on my many years of studying correctional systems and practices across the country, and especially in California, I know that ameliorative measures such as increased treatment and out of cell time will be among the first things that are suspended as the prison system diverts staff to address the Pandemic. I am sure that the CDCR will generally limit movement and contact, and shift more housing units to programs that are identical to the solitary confinement/segregation programs that I observed and critiqued throughout the system during my tours in 2013.

16.  It is my opinion, that the result will be needless suffering and loss of life, unless immediate measures are taken to reduce the population of persons with serious mental illness in the CDCR system.

17.  With these things in mind, it is my professional opinion that adult prisons must reduce their populations *urgently* in order to allow the necessary social distancing in response to the COVID-19 Pandemic.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March __, 2020 at Santa Cruz, California.

_____
DR. CRAIG W. HANEY, PHD

---

Response-to-April-10-2014-and-May-13-2014-Orders-Dock.pdf).

[3516273.2] Declaration of Dr. Craig W. Haney, Ph.D.                             6

15. Based on my many years of studying correctional systems and practices across the country, and especially in California, I know that ameliorative measures such as increased treatment and out of cell time will be among the first things that are suspended as the prison system diverts staff to address the Pandemic. I am sure that the CDCR will generally limit movement and contact, and shift more housing units to programs that are identical to the solitary confinement/segregation programs that I observed and critiqued throughout the system during my tours in 2013.

16. It is my opinion, that the result will be needless suffering and loss of life, unless immediate measures are taken to reduce the population of persons with serious mental illness in the CDCR system.

17. With these things in mind, it is my professional opinion that adult prisons must reduce their populations *urgently* in order to allow the necessary social distancing in response to the COVID-19 Pandemic.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 24, 2020 at Santa Cruz, California.

*Craig W. Haney*
DR. CRAIG W. HANEY, PHD

Response-to-April-10-2014-and-May-13-2014-Orders-Dock.pdf).