1  DONALD SPECTER – 083925          MICHAEL W. BIEN – 096891
   STEVEN FAMA – 099641             ERNEST GALVAN – 196065
2  ALISON HARDY – 135966            LISA ELLS – 243657
   SARA NORMAN – 189536             JESSICA WINTER – 294237
3  RITA LOMIO – 254501              MARC J. SHINN-KRANTZ – 312968
   MARGOT MENDELSON – 268583        CARA E. TRAPANI – 313411
4  PRISON LAW OFFICE                ROSEN BIEN
   1917 Fifth Street                GALVAN & GRUNFELD LLP
5  Berkeley, California  94710-1916  101 Mission Street, Sixth Floor
   Telephone:   (510) 280-2621      San Francisco, California  94105-1738
6                                   Telephone:   (415) 433-6830

7  Attorneys for Plaintiffs

8              UNITED STATES DISTRICT COURTS

9            EASTERN DISTRICT OF CALIFORNIA

10        AND NORTHERN DISTRICT OF CALIFORNIA

   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

11    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

12 RALPH COLEMAN, et al.,            Case No. 2:90-CV-00520-KJM-DB

13         Plaintiffs,              **THREE JUDGE COURT**

14     v.

15 GAVIN NEWSOM, et al.,

16         Defendants.

17 MARCIANO PLATA, et al.,          Case No. C01-1351 JST

18         Plaintiffs,              **THREE JUDGE COURT**

19     v.                          **EXHIBITS 17-47 TO
                                    DECLARATION OF MICHAEL W.
20 GAVIN NEWSOM,                    BIEN IN SUPPORT OF PLAINTIFFS'
                                    EMERGENCY MOTION TO MODIFY
21         Defendants.              POPULATION REDUCTION ORDER

22

23

24

25

26

27

28

---

# Exhibit 17



**World Health Organization**

REGIONAL OFFICE FOR **Europe**



Preparedness, prevention
and control of COVID-19
in prisons and other
places of detention

Interim guidance

15 March 2020



# Preparedness, prevention and control of COVID-19 in prisons and other places of detention

Interim guidance

15 March 2020

**This document is based on the latest available evidence on the COVID-19 outbreak as of 15 March 2020. The World Health Organization (WHO) continues to monitor the situation closely for any changes that may affect this interim guidance. Should any factors change, WHO will issue a further update.**

Address requests about publications of the WHO Regional Office for Europe to:

Publications
WHO Regional Office for Europe
UN City, Marmorvej 51
DK-2100 Copenhagen Ø, Denmark

Alternatively, complete an online request form for documentation, health information, or for permission to quote or translate, on the Regional Office website (http://www.euro.who.int/pubrequest).

© **World Health Organization 2020**

All rights reserved. The Regional Office for Europe of the World Health Organization welcomes requests for permission to reproduce or translate its publications, in part or in full.

The designations employed and the presentation of the material in this publication do not imply the expression of any opinion whatsoever on the part of the World Health Organization concerning the legal status of any country, territory, city or area or of its authorities, or concerning the delimitation of its frontiers or boundaries. Dotted lines on maps represent approximate border lines for which there may not yet be full agreement.

The mention of specific companies or of certain manufacturers' products does not imply that they are endorsed or recommended by the World Health Organization in preference to others of a similar nature that are not mentioned. Errors and omissions excepted, the names of proprietary products are distinguished by initial capital letters.

All reasonable precautions have been taken by the World Health Organization to verify the information contained in this publication. However, the published material is being distributed without warranty of any kind, either express or implied. The responsibility for the interpretation and use of the material lies with the reader. In no event shall the World Health Organization be liable for damages arising from its use. The views expressed by authors, editors, or expert groups do not necessarily represent the decisions or the stated policy of the World Health Organization.

# CONTENTS

III

Acknowledgements                                                    iv
Abbreviations                                                       v

1.   Introduction                                                   1

2.   Rationale                                                      2

3.   Planning principles and human rights
     considerations                                                3

4.   Scope and objectives                                          6

5.   Target audience                                               7

6.   General approach                                              8

7.   COVID-19 virus: pathogen characteristics,
     signs and symptoms, transmission                              10
7.1  Pathogen characteristics                                      10
7.2  Signs and symptoms of COVID-19                                10
7.3  Transmission of COVID-19                                      10
7.4  How long can the virus survive on surfaces?                   11

8.   Preparedness, contingency planning
     and level of risk                                             12

9.   Training and education                                        14

10.  Risk communication                                            15

11.  Important definitions: suspect case,
     probable case, confirmed case, contacts,
     case reporting                                                16
11.1 Definition of a suspect case                                  17
11.2 Definition of a probable case                                 17
11.3 Definition of a confirmed case                                17
11.4 Definition of a contact                                       17
11.5 Case reporting                                                18

12.  Prevention measures                                           19
12.1 Personal protection measures                                  19
12.2 Use of masks                                                  19
12.3 Environmental measures                                        20
12.4 Physical distancing measures                                  21
12.5 Considerations for access restriction and
     movement limitations                                          21
12.6 Staff returning to work following travel to
     affected areas or with a history of potential
     exposure                                                      22
12.7 What to do if a member of staff becomes
     unwell and believes they have been exposed
     to COVID-19                                                   22

13.  Assessing suspected cases of COVID-19
     in people in prison/detention                                 24
13.1 Advice on use of PPE and other standard
     precautions for health-care staff and
     custodial staff with patient-facing roles                     24
13.2 Advice for policing, border force and
     immigration enforcement activities                            26

14.  Case management                                               27
14.1 Clinical management of severe acute
     respiratory infection (SARI) when COVID-19
     is suspected                                                  27
14.2 Additional precautions                                        28
14.3 How to undertake environmental cleaning
     following a suspected case in a prison or
     other place of detention                                      28
14.4 Discharge of people from prisons and other
     places of detention                                           28

15.  Information resources                                         29

Annex 1. Environmental cleaning following
a suspected case of COVID-19 in a place of
detention                                                          31

IV

# ACKNOWLEDGEMENTS

The development of this document was coordinated by Carina Ferreira-Borges, Programme Manager, Alcohol, Illicit Drugs and Prison Health, WHO Regional Office for Europe, who was also part of the core group for the development of this publication. The work was developed under the leadership of Dr João Breda, head of the WHO European Office for the Prevention and Control of Noncommunicable Diseases, and in consultation with the Incident Management Team of the WHO Health Emergencies Programme, WHO Regional Office for Europe, and WHO headquarters, Geneva, Switzerland.

Contributions were received from Masoud Dara, Coordinator, Communicable Diseases, Division of Health Emergencies and Communicable Diseases, WHO Regional Office for Europe; Jeffrey Gilbert, IMT_COVID-19, Information Management, WHO, Beijing, China; Filipa Alves da Costa, WHO European Office for the Prevention and Control of Noncommunicable Diseases; Fahmy Hanna, Department of Mental Health and Substance Abuse, WHO headquarters; Kanokporn Kaojaroen, Health and Migration Programme, WHO headquarters; Teresa Zakaria, Elizabeth Armstrong Bancroft, Rudi Coninx, Adelheid Marschang and Maria Van Kerkhove, Health Emergencies Programme, WHO headquarters.

WHO is very grateful to the following experts, who constituted the core group for the development of this publication (in alphabetical order):

- Daniel Lopez-Acuña, Andalusian School of Public Health, Granada, Spain
- Éamonn O'Moore, National Lead for Health and Justice, Public Health England, and Director, UK Collaborating Centre for WHO Health in Prisons Programme
- Lara Tavoschi, Senior researcher in public health, University of Pisa, Italy
- Marc Lehmann, Medical adviser, Ministry of Justice State of Berlin, Berlin, Germany
- Stefan Enggist, Federal Department of Home Affairs, Federal Office of Public Health, Department of Communicable Diseases, Switzerland
- Sunita Sturup-Toft, Public Health Specialist, Public Health England, and UK Collaborating Centre for WHO Health in Prisons Programme.

**WHO is also grateful for the insights and contributions provided by the following reviewers:**

Elena Leclerc, Health Programme Coordinator, Health Care in Detention, Health Unit, Assistance Programme, International Committee of the Red Cross, Geneva, Switzerland

Erika Duffell, Air-Borne, Blood-Borne and Sexually Transmitted Infections, DPR, European Centre for Disease Prevention and Control

Hans Wolff, Service de médecine pénitentiaire, Hôpitaux universitaires de Genève, Switzerland

Fadi Meroueh, Chef de Service Unité Sanitaire CHU de Montpellier, France, Health Without Barriers (HWB) President

Gary Forrest, Chief Executive, Justice Health and Forensic Mental Health Network, Australia

Hanna Hemminki-Salin, Chief Physician of Outpatient Services, Health Services for Prisoners, National Institute for Health and Welfare, Finland

Laurent Getaz, Division of Prison Health, Hôpitaux universitaires de Genève, Switzerland

Michel Westra, Medical adviser, Dienst Justitiële Inrichtinge (Custodial Institutions Agency), Netherlands

Ruggero Giuliani and Roberto Ranieri, Infectious Diseases Service, Penitentiary Health System, San Paolo University Hospital, Milan, Italy

Robert B. Greifinger, Professor of Health and Criminal Justice, John Jay College of Criminal Justice, New York, USA

Robert Charles Paterson, Health Care in Detention, Health Unit, Assistance Programme, International Committee of the Red Cross, Geneva, Switzerland

Roberto Monarca, Infectious Diseases Specialist, Maximum Security Prison of Viterbo, Lead of Territorial Department of Infectious Diseases, Viterbo, Italy

Philipp Meissner, Justice Section, Division for Operations, United Nations Office on Drugs and Crime

Claudia Baroni, Justice Section, Division for Operations, United Nations Office on Drugs and Crime

Sven Pfeiffer, Justice Section, Division for Operations, United Nations Office on Drugs and Crime

Tracey Flanagan, Manager, Justice Health and Forensic Mental Health Network, Australia.

Images were provided by the Ministry of Health of Kyrgyzstan from a simulation exercise and are included with their permission for illustrative purposes only.

This publication was developed with financial assistance from the Finnish Ministry of Social Affairs and Health.

v

## ABBREVIATIONS

| | |
|---|---|
| **ARDS** | acute respiratory distress syndrome |
| **COVID-19** | coronavirus disease 2019 |
| **ECDC** | European Centre for Disease Prevention and Control |
| **HCID** | high-consequence infectious disease |
| **IPC** | infection prevention and control |
| **MERS** | Middle East respiratory syndrome |
| **nCoV** | novel coronavirus |
| **PHE** | Public Health England |
| **PPE** | personal protective equipment |
| **SARI** | severe acute respiratory infection |
| **SARS** | severe acute respiratory syndrome |
| **SARS-CoV-2** | severe acute respiratory syndrome coronavirus 2 |
| **UNODC** | United Nations Office on Drugs and Crime |
| **WHO** | World Health Organization |

PREPAREDNESS, PREVENTION AND CONTROL OF COVID-19
IN PRISONS AND OTHER PLACES OF DETENTION







# 1. INTRODUCTION

People deprived of their liberty, such as people in prisons and other places of detention,[1] are likely to be more vulnerable to the coronavirus disease (COVID-19) outbreak than the general population because of the confined conditions in which they live together for prolonged periods of time. Moreover, experience shows that prisons, jails and similar settings where people are gathered in close proximity may act as a source of infection, amplification and spread of infectious diseases within and beyond prisons. Prison health is therefore widely considered as public health. The response to COVID-19 in prisons and other places of detention is particularly challenging, requiring a whole-of-government and whole-of-society approach, for the following reasons:[2,3]

1. Widespread transmission of an infectious pathogen affecting the community at large poses a threat of introduction of the infectious agent into prisons and other places of detention; the risk of rapidly increasing transmission of the disease within prisons or other places of detention is likely to have an amplifying effect on the epidemic, swiftly multiplying the number of people affected.

2. Efforts to control COVID-19 in the community are likely to fail if strong infection prevention and control (IPC) measures, adequate testing, treatment and care are not carried out in prisons and other places of detention as well.

3. In many countries, responsibility for health-care provision in prisons and other places of detention lies with the Ministry of Justice/Internal Affairs. Even if this responsibility is held by the Ministry of Health, coordination and collaboration between health and justice sectors are paramount if the health of people in prisons and other places of detention and the wider community is to be protected.

4. People in prisons and other places of detention are already deprived of their liberty and may react differently to further restrictive measures imposed upon them.

---

[1]  Places of detention, as defined for the purposes of these guidelines, include prisons, justice-related detention settings and immigration removal centres.
[2]  2019 Novel Coronavirus (2019-nCoV): Strategic Preparedness and Response Plan. Geneva: World Health Organization; 2020 (https://www.who.int/docs/default-source/coronaviruse/srp-04022020.pdf?sfvrsn=7f55ec0_4&download=true).
[3]  Good governance for prison health in the 21st century: a policy brief on the organization of prison health. Copenhagen: WHO Regional Office for Europe/Vienna: United Nations Office on Drugs and Crime; 2013 (http://www.euro.who.int/__data/assets/pdf_file/0017/231506/Good-governance-for-prison-health-in-the-21st-century.pdf).

## 2. RATIONALE

People deprived of their liberty, such as people in prisons, are likely to be more vulnerable to various diseases and conditions. The very fact of being deprived of liberty generally implies that people in prisons and other places of detention live in close proximity with one another, which is likely to result in a heightened risk of person-to-person and droplet transmission of pathogens like COVID-19. In addition to demographic characteristics, people in prisons typically have a greater underlying burden of disease and worse health conditions than the general population, and frequently face greater exposure to risks such as smoking, poor hygiene and weak immune defence due to stress, poor nutrition, or prevalence of coexisting diseases, such as bloodborne viruses, tuberculosis and drug use disorders.

The COVID-19 outbreak, which was first detected in Wuhan, China, in December 2019, has been evolving rapidly. On 30 January 2020, the WHO Director-General declared that the current outbreak constituted a public health emergency of international concern, and on 12 March 2020 the COVID-19 outbreak was declared a pandemic.[4]

In these circumstances, prevention of importation of the virus into prisons and other places of detention is an essential element in avoiding or minimizing the occurrence of infection and of serious outbreaks in these settings and beyond.

Depending on the COVID-19 situation of the specific country, the risk of introducing COVID-19 into prisons and other places of detention may vary. In areas with no local virus circulation, the risk of virus introduction into closed settings may be associated with prison staff or newly admitted individuals who have recently stayed in affected countries or areas or who have been in contact with people returning from affected countries or areas. However, as several countries in Europe are now experiencing widespread sustained community transmission, the risk of transmission has substantially increased.

In all countries, the fundamental approach to be followed is prevention of introduction of the infectious agent into prisons or other places of detention, limiting the spread within the prison, and reducing the possibility of spread from the prison to the outside community. This will be more challenging in countries with more intense transmission.

Prisons and other places of detention are enclosed environments where people (including staff) live in close proximity. Every country has a responsibility to increase their level of preparedness, alert and response to identify, manage and care for new cases of COVID-19. Countries should prepare to respond to different public health scenarios, recognizing that there is no one-size-fits-all approach to managing cases and outbreaks of COVID-19. Four transmission scenarios that could be experienced by countries at the subnational level have been defined for COVID-19, and countries should therefore adjust and tailor their approach to the local context.[5]

---

[4]   WHO Director-General's opening remarks at the mission briefing on COVID-19 (12 March 2020). Geneva: World Health Organization; 2020 (https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-mission-briefing-on-covid-19---12-march-2020).
[5]   Critical preparedness, readiness and response actions for COVID-19: interim guidance (16 March 2020). Geneva: World Health Organization; 2020 (https://www.who.int/publications-detail/critical-preparedness-readiness-and-response-actions-for-covid-19).

# 3. PLANNING PRINCIPLES AND HUMAN RIGHTS CONSIDERATIONS

Contingency planning is essential in ensuring an adequate health response and maintaining secure, safe and humane detention settings. Generally, plans are available for local, short-lived emergency and resilience actions. However, the evolving nature of infectious outbreaks of epidemic or pandemic proportions, locally, nationally and globally, go beyond such plans, having a potential impact on security, the wider judicial system and, in extreme cases, civil order.

In addition, business continuity plans should be in place for ensuring the security and safety functions inherently associated with prisons and other places of detention.

It is of paramount importance to work in partnership across public health agencies, health-care services and places of detention, bringing together community services and prison/detention services.

The human rights framework provides guiding principles in determining the response to the outbreak of COVID-19. The rights of all affected people must be upheld, and all public health measures must be carried out without discrimination of any kind. People in prisons and other places of detention are not only likely to be more vulnerable to infection with COVID-19, they are also especially vulnerable to human rights violations. For this reason, WHO reiterates important principles that must be respected in the response to COVID-19 in prisons and other places of detention, which are firmly grounded in human rights law as well as the international standards and norms in crime prevention and criminal justice:[6]

- The provision of health care for people in prisons and other places of detention is a State responsibility.
- People in prisons and other places of detention should enjoy the same standards of health care that are available in the outside community, without discrimination on the grounds of their legal status.
- Adequate measures should be in place to ensure a gender-responsive approach in addressing the COVID-19 emergency in prisons and other places of detention.
- Prisons and other detention authorities need to ensure that the human rights of those in their custody are respected, that people are not cut off from the outside world, and – most importantly – that they have access to information and adequate healthcare provision.[7]

---

6  Cf. CESCR General Comment No. 14: The Right to the Highest Attainable Standard of Health (Art. 12). Adopted at the Twenty-second Session of the Committee on Economic, Social and Cultural Rights, on 11 August 2000 (Contained in Document E/C.12/2000/4) (https://www.refworld.org/pdfid/4538838d0.pdf); United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules). United Nations General Assembly Resolution A/RES/70/175, adopted 17 December 2015 (https://undocs.org/A/RES/70/175); High Commissioner updates the Human Rights Council on human rights concerns, and progress, across the world. Human Rights Council 43rd Session, Item 2, Geneva, 27 February 2020. United Nations Human Rights Office of the High Commissioner (https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=25621&LangID=E); Advice from the SPT [Subcommittee on Prevention of Torture] to the UK NPM [National Preventive Mechanism] regarding compulsory quarantine for Coronavirus (https://s3-eu-west-2.amazonaws.com/npm-prod-storage-19n0nag2nk8xk/uploads/2020/02/2020.02.25-Annexed-Advice.pdf).
7  Coronavirus: healthcare and human rights of people in prison. London: Penal Reform International; 2020 (https://www.penalreform.org/resource/coronavirus-healthcare-and-human-rights-of-people-in).



4
- Enhanced consideration should be given to resorting to non-custodial measures at all stages of the administration of criminal justice, including at the pre-trial, trial and sentencing as well as post-sentencing stages. Priority should be given to non-custodial measures for alleged offenders and prisoners with low-risk profiles and caring responsibilities, with preference given to pregnant women and women with dependent children.
- Similarly, refined allocation procedures should be considered that would allow prisoners at highest risk to be separated from others in the most effective and least disruptive manner possible and that would permit limited single accommodation to remain available to the most vulnerable.
- Upon admission to prisons and other places of detention, all individuals should be screened for fever and lower respiratory tract symptoms; particular attention should be paid to persons with contagious diseases. If they have symptoms compatible with COVID-19, or if they have a prior COVID-19 diagnosis and are still symptomatic, they should be put into medical isolation until there can be further medical evaluation and testing.



- The psychological and behavioural reactions of prisoners or those detained in other settings are likely to differ from those of people who observe physical distancing in the community; consideration should therefore be given to the increased need for emotional and psychological support, for transparent awareness-raising and information-sharing on the disease, and for assurances that continued contact with family and relatives will be upheld.

- Adequate measures should be in place to prevent stigmatization or marginalization of individuals or groups who are considered to be potential carriers of viruses.

- Any decision to place people in prisons and other places of detention in conditions of medical isolation should always be based on medical necessity as a result of a clinical decision and subject to authorization by law or by the regulation of the competent administrative authority.

- People subjected to isolation for reasons of public health protection, in the context of prisons and other places of detention, should be informed of the reason for being placed in isolation, and given the possibility to have a third party notified.

- Adequate measures should be in place to protect persons in isolation from any form of ill treatment and to facilitate human contact as appropriate and possible in the given circumstances (e.g. by audiovisual means of communication).

- The COVID-19 outbreak must not be used as a justification for undermining adherence to all fundamental safeguards incorporated in the United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules) including, but not limited to, the requirement that restrictions must never amount to torture or other cruel, inhuman or degrading treatment or punishment; the prohibition of prolonged solitary confinement (i.e. in excess of 15 consecutive days); the requirement that clinical decisions may only be taken by health-care professionals and must not be ignored or overruled by non-medical prison staff; and that while the means of family contact may be restricted in exceptional circumstances for a limited time period, it must never be prohibited altogether.[8]

- The COVID-19 outbreak must not be used as a justification for objecting to external inspection of prisons and other places of detention by independent international or national bodies whose mandate is to prevent torture and other cruel, inhuman or degrading treatment or punishment; such bodies include national preventive mechanisms under the Optional Protocol to the Convention against Torture,[9] the Subcommittee on Prevention of Torture and other Cruel, Inhuman or Degrading Treatment or Punishment,[10] and the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment.[11]

- Even in the circumstances of the COVID-19 outbreak, bodies of inspection in the above sense should have access to all people deprived of their liberty in prisons and other places of detention, including to persons in isolation, in accordance with the provisions of the respective body's mandate.

[8]   United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules). United Nations General Assembly Resolution A/RES/70/175, adopted 17 December 2015 (https://undocs.org/A/RES/70/175).

[9]   Optional Protocol to the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment. United Nations General Assembly Resolution A/RES/57/199, adopted 18 December 2002 (https://www.ohchr.org/EN/ProfessionalInterest/Pages/OPCAT.aspx).

[10]  Optional Protocol to the Convention against Torture (OPCAT) Subcommittee on Prevention of Torture. The SPT in Brief (https://www.ohchr.org/EN/HRBodies/OPCAT/Pages/Brief.aspx).

[11]  European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment [website]. Strasbourg: Council of Europe (https://www.coe.int/en/web/cpt).



6

# 4. SCOPE AND OBJECTIVES

## 4.1 Scope

This document is based on the international standards and norms in crime prevention and criminal justice related to prison management and non-custodial measures as well as international guidance on prison health, including the United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules),[8] the United Nations Rules for the Treatment of Women Prisoners and Non-custodial Measures for Women Offenders (the Bangkok Rules),[12] the Standard Minimum Rules for the Administration of Juvenile Justice (the Beijing Rules),[13] the United Nations Standard Minimum Rules for Non-custodial Measures (the Tokyo Rules),[14] and WHO guidance on *Prisons and health* (2014).[15] The document aims to assist countries in developing specific plans and/or consolidating further action for prisons and other places of detention in response to the international COVID-19 outbreak, with consideration of preparedness plans, prevention and control strategies, and contingency plans to interface with the wider health and emergency planning system.

## 4.2 Objectives

1. To guide design and implementation of adequate preparedness plans for prisons and other detention settings to deal with the COVID-19 outbreak situation in such a way as to:
   - → protect the health and well-being of people detained in prisons and other closed settings, those who work there (custodial, health-care and other staff), and people who visit prisons and other places of detention (legal visitors, family and friends of prisoners, etc.);
   - → support the continued safe operation of prisons and other detention settings;
   - → reduce the risk of outbreaks which could place a considerable demand on health-care services in prisons and in the community;
   - → reduce the likelihood that COVID-19 will spread within prisons and other places of detention and from such settings into the community;
   - → ensure the needs of prisons and other detention settings are considered in national and local health and emergency planning.

---

[12] United Nations Rules for the Treatment of Women Prisoners and Non-custodial Measures for Women Offenders. United Nations General Assembly Resolution A/RES/65/229, adopted 21 December 2010 (https://www.unodc.org/documents/justice-and-prison-reform/crimeprevention/UN_Rules_Treatment_Women_Prisoners_Bangkok_Rules.pdf).

[13] Standard Minimum Rules for the Administration of Juvenile Justice. United Nations General Assembly Resolution A/RES/40/33, adopted 29 November 1985 (https://www.ohchr.org/Documents/ProfessionalInterest/beijingrules.pdf).

[14] United Nations Standard Minimum Rules for Non-custodial Measures. United Nations General Assembly Resolution A/RES/45/110, adopted 14 December 1990 (https://www.ohchr.org/Documents/ProfessionalInterest/tokyorules.pdf).

[15] Prisons and health. Copenhagen: WHO Regional Office for Europe; 2014 (http://www.euro.who.int/__data/assets/pdf_file/0009/99018/E90174.pdf).

2. To present effective preventive and response mechanisms for:

→ preventing the introduction of COVID-19 into prisons and other places of detention;
→ preventing the transmission of COVID-19 in prisons and other places of detention;
→ preventing the spread of COVID-19 from prisons and other closed settings to the community.

3. To outline an appropriate approach to dovetailing the prison health system and the national and local health and emergency planning system for:

→ preventive measures, including physical distancing and hand hygiene facilities;
→ disease surveillance;
→ identification and diagnosis, including contact tracing;
→ treatment and/or referral of COVID-19 cases requiring specialized and intensive care;
→ wider system impacts (including impact of other measures on workforce, e.g. need for home isolation, etc.).

# 5. TARGET AUDIENCE

This guidance is intended to assist health-care and custodial staff working in prisons and other places of detention to coordinate public health action in such settings; it provides information on:

- the novel COVID-19 virus;
- how to help prevent spread of COVID-19;[16]
- what to do if a person in prison/other place of detention or a staff member with suspected or confirmed COVID-19 infection is identified;
- what advice to give to people in prison or in another place of detention and their family members, or to staff members, travelling from affected areas within the last 14 days.

The information given here will also be useful for prison authorities, public health authorities and policy-makers, prison governors and managers, health-care professionals working in prison settings, detention centre employees, people in detention, and the social contacts of people in detention.

The following large, institutional, residential establishments are included within the definition of places of detention used in this guidance:

- prisons (public and privately managed)
- immigration detention settings
- the children and young people's detention estate.

---

[16] This applies to respiratory infections that are transmitted mainly via droplets. For aerosol-transmitted diseases such as tuberculosis, refer to: WHO guidelines on tuberculosis infection prevention and control. Geneva: World Health Organization; 2019 (https://www.who.int/tb/publications/2019/guidelines-tuberculosis-infection-prevention-2019/en).

8

# 6. GENERAL APPROACH

Controlling the spread of infection in prisons and other places of detention is essential to preventing outbreaks of COVID-19 in such settings, protecting the health and well-being of all those who live and work in them and those who visit them, and protecting the outside community. Establishing such control is dependent on the coordinated efforts of health-care and custodial staff, working with local and national public health agencies and with justice and interior ministries and their local counterparts, in applying the general approach summarized below.

1. Actions need to be taken to enable and support coordinated, collaborative efforts across organizations to achieve IPC, following national guidance. Such actions should be commensurate with the level of emergency at the time to avoid panic and to ensure implementation of the most appropriate response at the appropriate time.

2. Joint planning
   → Custodial/detention staff should work together with health-care teams in prisons and other places of detention, following existing national protocols and country arrangements, to enable identification of suspected cases among employees and their subsequent management in accordance with national guidelines.
   → Custodial/detention staff should work together with health-care teams in prisons and other places of detention to enable identification of suspected cases among prisoners/detainees, their subsequent isolation in single accommodation and a subsequent clinical assessment.

3. Risk assessment/risk management
   → Screening at point of entry to prison should be available: health-care and public health teams should undertake a risk assessment of all people entering the prison, irrespective of whether or not there are suspected cases in the community; information should be collected on any history of cough and/or shortness of breath, patients' recent travel history and possible contact with confirmed cases in the last 14 days.
   → Persons checked should include prisoners/detainees, visitors and prison staff.
   → Clear messaging is important so that staff with recent travel history or coming from affected areas who develop COVID-19 symptoms can home-isolate and managers can provide a high level of vigilance and support of their staff. Advice to visitors should also be provided well in advance of their attending the prisons/other detention facilities so that those who have to travel are not disadvantaged. Those who are symptomatic should be excluded from visiting.
   → For asymptomatic visitors with recent travel history or coming from affected areas, there should be protocols in place to permit entry (e.g. for legal advisers), but additional measures, such as non-contact visits, should be considered.
   → Decisions to limit or restrict visits need to consider the particular impact on the mental well-being of prisoners and the increased levels of anxiety that separation from children and the outside world may cause.
   → A detailed daily registry of people moving in and out of the prison should be maintained.

→ Prison/detention management should consider implementing measures to limit the mobility of people within the prison/detention system and/or to limit access of non-essential staff and visitors to prisons and other places of detention, depending on the level of risk in the specific country/area. The psychological impact of these measures needs to be considered and mitigated as much as possible, and basic emotional and practical support for affected people in prison should be available.[17]

→ Prison/detention management should increase the level of information on COVID-19 proactively shared with people in detention. Restrictions, including a limitation of visitors, need to be carefully explained in advance and alternative measures to provide contact with family/friends, e.g. phone or Skype calls, should be introduced.

4. Referral system and clinical management

→ In the context of the current COVID-19 outbreak, the containment strategy includes the rapid identification of laboratory-confirmed cases, and their isolation and management either on site or in a medical facility. For contacts of laboratory-confirmed cases, WHO recommends that such persons be quarantined for 14 days from the last time they were exposed to a COVID-19 patient.[18]

→ Health-care teams, using recommended personal protective equipment (PPE) including eye protection (face shield or goggles), gloves, mask and gown, should ensure that appropriate biological samples are taken, on advice from their public health agency, from any suspected cases and sent for analysis to local microbiology services as per local protocols, in a timely manner and in compliance with clinical and information governance procedures. PPE stocks should be maintained and kept secure to ensure their availability under the indicated circumstances.

→ Prison authorities should be informed and made aware of the hospitals to which they can transfer those requiring admission (respiratory support and/or intensive care units). Appropriate actions need to be taken for any confirmed cases, including transfer to specialist facilities for respiratory isolation and treatment, as required; appropriate escorts should be used and advice on safe transfers followed. However, consideration should be given to protocols that can manage the patient on site with clear criteria for transfer to hospital, as unnecessary transport creates risk for both transport staff and the receiving hospital.

→ Environmental and engineering controls intended to reduce the spread of pathogens and contamination of surfaces and inanimate objects should be in place; this should include provision of adequate space between people,[19] adequate air exchange, and routine disinfection of the environment (preferably at least once daily).

→ Consideration should be given to measures such as distributing food in rooms/cells instead of a common canteen; or splitting out-of-cell time, which could be divided by wing/unit to avoid concentration of prisoners/staff even in open spaces. With these caveats, access of prisoners to the open air should be maintained and not fall below a minimum of one hour per day.

5. Prison/detention management and health-care staff should work alongside local public health agencies to implement the IPC recommendations described in this document; at all times, they must balance public health risk against any operational pressures on prisons and other places of detention and the wider secure and detained estate.

---

[17] Psychological first aid: guide for field workers. Geneva: World Health Organization; 2011 (https://www.who.int/mental_health/publications/guide_field_workers/en/).
[18] Considerations for quarantine of individuals in the context of coronavirus disease (COVID-19): interim guidance (29 February 2020). Geneva: World Health Organization; 2020 (https://www.who.int/publications-detail/considerations-for-quarantine-of-individuals-in-the-context-of-containment-for-coronavirus-disease-(covid-19)).
[19] A minimum space of 1 metre is recommended.

# 7. COVID-19 VIRUS: PATHOGEN CHARACTERISTICS, SIGNS AND SYMPTOMS, TRANSMISSION

## 7.1 Pathogen characteristics

Coronaviruses are a large family of viruses found in both animals and humans. Some infect people and are known to cause illnesses ranging from the common cold to more severe diseases, such as severe acute respiratory syndrome (SARS) and Middle East respiratory syndrome (MERS). A novel coronavirus is a new strain of coronavirus that has not previously been identified in humans. The latest novel coronavirus, now called COVID-19 virus, had not been detected before the outbreak reported in Wuhan, China, in December 2019. So far, the main clinical signs and symptoms reported in people during this outbreak include fever, coughing, difficulty in breathing, and chest radiographs showing bilateral lung infiltrates.

Although the current outbreak of COVID-19 is still evolving, infection may present with mild, moderate or severe illness and can be passed from human to human, primarily (as in other respiratory viruses) by droplet spread. While about 80% of cases manifest as a mild illness (i.e. non-pneumonia or mild pneumonia), approximately 20% progress to a more severe illness, with 6% requiring specialist medical care, including mechanical ventilation. Situation reports on the outbreak, updated daily, are available on the WHO website.[20]

Most estimates of the incubation period of COVID-19 range from 1 to 14 days, with a median of 5–6 days.[21] This means that if a person remains well 14 days after exposure (i.e. contact with an infected person), they may not have been infected. However, these estimates may be updated as more data become available.

## 7.2 Signs and symptoms of COVID-19

The most common symptoms of COVID-19 are fever, tiredness and dry cough. Some patients may have aches and pains, nasal congestion, runny nose, sore throat or diarrhoea. These symptoms are usually mild and begin gradually. Some people become infected but do not develop any symptoms and do not feel unwell. Most people (about 80%) recover from the disease without needing special treatment. Around one out of every five people who are infected with COVID-19 becomes seriously ill and develops difficulty breathing. Older people, and those with underlying medical problems such as high blood pressure, heart problems or diabetes, are more likely to develop serious illness. Based on the latest data, about 3–4% of reported cases globally have died, but mortality varies according to location, age and existence of underlying conditions.[22] People with fever, cough and difficulty breathing should seek medical attention.[23]

## 7.3 Transmission of COVID-19

Respiratory secretions, formed as droplets and produced when an infected person coughs, sneezes or talks, contain the virus and are the main means of transmission.

---

[20] Coronavirus disease (COVID-19) situation reports. Geneva: World Health Organization; 2020
(https://www.who.int/emergencies/diseases/novel-coronavirus-2019/situation-reports).

[21] Coronavirus disease 2019 (COVID-19): situation report 30. 19 February 2020. Geneva: World Health Organization; 2020
(https://www.who.int/docs/default-source/coronavirus/situation-reports/20200219-sitrep-30-covid-19.pdf?sfvrsn=3346b04f_2).

[22] WHO Director-General's opening remarks at the media briefing on COVID-19. 3 March 2020. Geneva: World Health Organization; 2020
(https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---3-march-2020).

[23] Q&A on coronaviruses (COVID-19). 23 February 2020. Geneva: World Health Organization; 2020 (https://www.who.int/news-room/q-a-detail/q-a-coronaviruses).



There are two main routes by which people can spread COVID-19:

- infection can be spread to people who are nearby (within 1 metre) by breathing in droplets coughed out or exhaled by a person with the COVID-19 virus; or
- people may become infected by touching contaminated surfaces or objects (fomites) and then touching their eyes, nose or mouth (e.g. a person may touch a doorknob or shake hands and then touch their own face). This is why environmental disinfection is so important.

According to current evidence, transmission may start just before symptoms become visible. However, many people infected with COVID-19 experience only mild symptoms. This is particularly true at the early stages of the disease. It is therefore possible to catch COVID-19 from someone who has, for example, just a mild cough and does not feel ill. WHO is assessing ongoing research on the period of transmission of COVID-19 and will continue to share updated findings.

## 7.4 How long can the virus survive on surfaces?
How long any respiratory virus survives will depend on a number of factors, including:

- the type of surface the virus is on
- whether it is exposed to sunlight
- differences in temperature and humidity
- exposure to cleaning products.

Under most circumstances, the amount of infectious virus on any contaminated surface is likely to have decreased significantly within 48 hours.

Once such viruses are transferred to hands, they survive for very short lengths of time. Regular cleaning of hands and frequently touched hard surfaces with disinfectants will therefore help to reduce the risk of infection.

# 8. PREPAREDNESS, CONTINGENCY PLANNING AND LEVEL OF RISK

To manage a COVID-19 outbreak, there need to be effective planning and robust collaborative arrangements between the sectors (health and justice or interior, as applicable) that have responsibility for the health and well-being of people in prisons and other places of detention. Such collaboration will be critical in ensuring a sustainable health-care delivery system within prisons and places of detention.

Important steps in setting up such collaborative planning include the following:

- Appropriate contingency plans,[24] including checklists,[25] should be established to help prison and detention systems to self-assess and improve their preparedness for responding to COVID-19.
- Close collaboration/direct links with local and national public health authorities and other relevant agencies (e.g. local crisis units, civil protection) should be established; regular contact should be maintained throughout the planning period to share information, risk assessments and plans.
- A comprehensive risk assessment should be undertaken at the beginning of the planning phase and reviewed regularly; it should have input from (or be led by) the public health authority and include an up-to-date evaluation of the epidemiological situation. It is crucial to identify the different levels of risk and what impact they may have on the prison system and other places of detention (e.g. imported cases in the country; local but circumscribed circulation in the country; local circulation, including in the area where the prison institution is located; circulation within the prison system).
- Action plans in a given country/custodial institution should be developed to mitigate all risks identified in the assessment. Some actions will be the responsibility of the national public health authority to deliver; some will be the responsibility of the local health service provider; and prisons and other places of detention will be responsible for others. Each action plan should specify who is responsible for delivering a particular action, the timescale for delivery, and how and by whom delivery will be ensured. Action plans should include:[26]
  - → integration with national emergency planning and response plans for infectious diseases;
  - → command and control arrangements to facilitate rapid communication of information and efficient situation analyses and decision-making;
  - → disease surveillance and detection (for example, who will be screened for COVID-19 symptoms? Will there be an initial screening for symptoms for all on entry (staff/visitors)? How will the disease be diagnosed and confirmed? How will cases and contacts of confirmed cases be managed?);
  - → case management (for example, how will suspected cases of COVID-19 within the detained population be treated? Is there an appropriate place for rapid health assessment and isolation, in the event of detecting a potential COVID-19 case? Can units to house suspected cases or contacts be created? Is there a mechanism for safely transporting ill travellers to designated hospitals, including identification of adequate ambulance services? What response will be available in the event of

---

24  Multi-agency contingency plan for the management of outbreaks of communicable diseases or other health protection incidents in prisons and other places of detention in England. Second edition. London: Public Health England; 2017 (https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/585671/multi_agency_prison_outbreak_plan.pdf).

25  Correctional facilities pandemic influenza planning checklist. Atlanta (GA): Centers for Disease Control and Prevention; 2007 (https://www.cdc.gov/flu/pandemic-resources/pdf/correctionchecklist.pdf).

26  Adapted from: Key planning recommendations for mass gatherings in the context of the current COVID-19 outbreak: interim guidance (14 February 2020). Geneva: World Health Organization; 2020 (https://www.who.int/publications-detail/key-planning-recommendations-for-mass-gatherings-in-the-context-of-the-current-covid-19-outbreak).

a health-care emergency involving people in prisons and other places of detention? Are there standard operating procedures in place for environmental cleaning and disinfection, including for linens and utensils?);

→ staffing contingency planning with a special focus on (a) staff availability and business continuity, including local minimum service (e.g. essential medications, diabetic checks, wound dressings, etc.); and (b) health-care needs and provision – discuss the possibility/feasibility of providing care within prison versus the need to transfer patients to community health-care services for specialized/intensive care, as well as the expected impact on custodial staff contingency planning.

An essential element to be carefully considered in any preparedness plan for respiratory infectious diseases such as COVID-19 is availability and supply of essential supplies, including PPE and products for hand hygiene and environmental sanitation and disinfection. It is therefore recommended that prison governors, in collaboration with health-care professionals in prisons and other places of detention, assess the need for PPE and other essential supplies in order to ensure continuity of provision and immediate availability. It should be noted that, in order to avoid inappropriate use and misuse of PPE,[27] staff and people in prison should be adequately trained (for further information on training, see section 9 below). In some countries, the proportion of the population in detention that meets the criteria for influenza vaccination has been used as a basic proxy measure of the potential demand on health-care services in the case of COVID-19 outbreak in detention settings.

Given the possibility that some common disinfectants, such as those containing alcohol, may be misused, soap and water, together with personal towels, should be considered as a first option for hand hygiene. These should be supplied in rooms/cells night and day. Chlorine-based gels may be used by prison guards and by people in prison or in other places of detention in common spaces and/or if soap and water are not available. In the case of environmental disinfection, however, it is necessary to ensure that chlorine-based products are kept locked up when not being used by service providers.

---

27  Rational use of personal protective equipment for coronavirus disease 2019 (COVID-19): interim guidance (27 February 2020). Geneva: World Health Organization; 2020 (https://apps.who.int/iris/bitstream/handle/10665/331215/WHO-2019-nCov-IPCPPE_use-2020.1-eng.pdf).



**14**

## 9. TRAINING

Training of staff is a key element of any preparedness plan for prisons and other places of detention. Training activities should be appropriately planned and targeted towards custodial and health-care staff operating in prison settings. Such activities should, at a minimum, cover the following areas:

- basic disease knowledge, including pathogen, transmission route, signs and clinical disease progression
- hand hygiene practice and respiratory etiquette
- appropriate use of, and requirements for, PPE
- environmental prevention measures, including cleaning and disinfection.

In response to the COVID-19 outbreak, WHO has developed several resources that may be useful in prisons and other places of detention.

- Online training courses on IPC and clinical management of severe acute respiratory infection (SARI) are available, free of charge, from OpenWHO, WHO's web-based knowledge platform. These basic courses give a general introduction to COVID-19 and emerging respiratory viruses; they are intended for public health professionals, incident managers and personnel working for the United Nations, international organizations and nongovernmental organizations.[28]
- A risk communication package for health-care facilities provides health-care workers and health-care facility management with the information, procedures and tools required to work safely and effectively. The package contains a series of simplified messages and reminders based on WHO's more in-depth technical guidance on IPC in health-care facilities in the context of COVID-19 and can be adapted to local context.[29]
- In addition, there is a range of technical guidance covering many topics, such as case management, operational support and logistics advice on use of masks.[30]

Finally, before embarking on any initiative, it is absolutely essential to engage the prison population in widespread information and awareness-raising activities, so that people in prison/detention and visitors are informed in advance and understand the procedures to be adopted, why they are necessary, and how they are to be carried out. It is especially important that any potential restrictive measures are explained and their temporary nature emphasized.

Regrettably, as a consequence of stigma or fear, some health-care workers responding to COVID-19 in places of detention may experience avoidance by their family or community. This can make an already challenging situation far more difficult. Health-care personnel should be advised to stay connected with loved ones and have access to mental health and psychosocial support.

---

[28] Emerging respiratory viruses, including COVID-19: methods for detection, prevention, response and control [OpenWHO online course]. Geneva: World Health Organization; 2020 (https://openwho.org/courses/introduction-to-ncov).

[29] The COVID-19 risk communication package for healthcare facilities. Manila: WHO Regional Office for the Western Pacific; 2020 (https://iris.wpro.who.int/handle/10665.1/14482).

[30] Country and technical guidance: coronavirus disease (COVID-19) [resource portal]. Geneva: World Health Organization (https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance).

# 10. RISK COMMUNICATION

In an event such as the COVID-19 outbreak, it is crucial that there is good coordination between the teams at national and subnational levels involved in risk communication. Close contacts must be established to ensure rapid clearance of timely and transparent communication messaging and materials in such crisis situations.

Key messages for people in prison and other places of detention, custodial staff, health-care providers and visitors must be coordinated and consistent. To address language barriers, translation or visual material may been needed. Information resources for custodial and health-care staff, visitors, vendors and detained persons, such as short information sheets, flyers, posters, internal videos and any other means of communication, should be developed and placed in prison common areas and in areas designated for legal visits and family visits.

Consideration should be given to how messages about risk can be delivered quickly; this should include:

(1)  an overall assessment of the local risk (community risk and risk within the prison);
(2)  advice on preventive measures, especially hand hygiene practices and respiratory etiquette;
(3)  advice on what measures to adopt if symptoms develop;
(4)  information about disease signs and symptoms, including warning signs of severe disease that require immediate medical attention;
(5)  advice on self-monitoring for symptoms and signs for those travelling from or living in affected areas, including checking their temperature;
(6)  advice about how to access local health care if necessary, including how to do so without creating a risk to health-care workers;
(7)  information that wearing a face mask is recommended for people who have respiratory symptoms (e.g. a cough); it is not recommended for healthy people.[31]

WHO's advice for the public about COVID-19, including information about the myths that surround it, may also be consulted.[32,33]

---

[31]  Advice on the use of masks in the community, during home care and in healthcare settings in the context of the novel coronavirus (2019-nCoV) outbreak. 29 January 2020. Geneva: World Health Organization; 2020 (https://www.who.int/publications-detail/advice-on-the-use-of-masks-in-the-community-during-home-care-and-in-healthcare-settings-in-the-context-of-the-novel-coronavirus-(2019-ncov)-outbreak).

[32]  Coronavirus disease (COVID-19) advice for the public [website/portal]. Geneva: World Health Organization; 2019 (https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public).

[33]  Coronavirus disease (COVID-19) advice for the public: myth busters [website]. Geneva: World Health Organization; 2019 (https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public/myth-busters).



## 11. IMPORTANT DEFINITIONS: SUSPECT CASE, PROBABLE CASE, CONFIRMED CASE, CONTACT, CASE REPORTING

WHO guidance for global surveillance of COVID-19 disease should be consulted for updated definitions. The WHO case definitions given below are based on information available as of 27 February 2020 and are being revised as new information accumulates.[34] Countries may need to adapt these case definitions depending on their own epidemiological situation.

---

[34]  Global surveillance for human infection with coronavirus disease (COVID-19): interim guidance (27 February 2020). Geneva: World Health Organization; 2020 (https://www.who.int/publications-detail/global-surveillance-for-human-infection-with-novel-coronavirus-(2019-ncov)).

## 11.1 Definition of a suspect case

A suspect case is:

(A)   a patient with acute respiratory illness (fever and at least one sign/symptom of respiratory disease, e.g. cough, shortness of breath) AND no other aetiology that fully explains the clinical presentation AND a history of travel to or residence in a country/area or territory reporting local transmission of COVID-19 during the 14 days prior to onset of symptoms;[35] OR

(B)   a patient with any acute respiratory illness AND who has been in contact with a probable or confirmed COVID-19 case (see 11.2 and 11.3 below) in the last 14 days prior to onset of symptoms; OR

(C)   a patient with severe acute respiratory infection (fever and at least one sign/symptom of respiratory disease, e.g. cough, shortness of breath) AND who requires hospitalization AND who has no other aetiology that fully explains the clinical presentation.

If it is determined that there is a suspect case of COVID-19, the local prison outbreak management plan should be activated. The suspect case should be immediately instructed to wear a medical mask and follow respiratory etiquette and hand hygiene practices. IPC measures, such as medical isolation, should be applied.

In this regard, it is recommended that, within each prison and other place of detention, according to the indications of health-care staff on duty and relevant national/international guidelines, a space is identified where suspect cases or confirmed cases not requiring hospitalization can be placed in medical isolation.[34,36] The creation of housing units may also be considered, as not everyone who is a suspect case, a probable case or a contact requires hospitalization.

## 11.2 Definition of a probable case

A probable case is a suspect case for whom testing for COVID-19 is inconclusive (that is, if the result of the test reported by the laboratory is inconclusive).

## 11.3 Definition of a confirmed case

A confirmed case is a patient with laboratory confirmation of COVID-19 infection, irrespective of clinical signs and symptoms. Laboratory confirmation needs to be made according to an appropriate method.[37]

## 11.4 Definition of a contact

A contact is a person who is involved in any of the following:

- providing direct care without proper PPE for a COVID-19 patient;
- staying in the same closed environment (e.g. a detention room) as a COVID-19 patient;
- travelling together in close proximity (within 1 metre) with a COVID-19 patient in any kind of conveyance within a 14-day period after the onset of symptoms in the case under consideration.

---

[35]   For update on latest situation refer to: Coronavirus disease (COVID-19) situation reports. Geneva: World Health Organization; 2020 (https://www.who.int/emergencies/diseases/novel-coronavirus-2019/situation-reports).

[36]   Infection prevention and control during health care when novel coronavirus (nCoV) infection is suspected: interim guidance (25 January 2020). Geneva: World Health Organization; 2020 (https://www.who.int/publications-detail/infection-prevention-and-control-during-health-care-when-novel-coronavirus-(ncov)-infection-is-suspected-20200125).

[37]   Laboratory testing for coronavirus disease 2019 (COVID-19) in suspected human cases: interim guidance (2 March 2020). Geneva: World Health Organization; 2020 (https://www.who.int/publications-detail/laboratory-testing-for-2019-novel-coronavirus-in-suspected-human-cases-20200117).

**18**   Monitoring of contacts of suspect, probable and confirmed cases

- Contacts should be monitored for 14 days from the last unprotected contact.
- External contacts should self-limit travel and movements. In prison settings, monitoring should be done by prison health-care or custodial staff with regular visits to see if symptoms have developed (this is important as people in prison may have a disincentive to admit to developing symptoms as they could be put in isolation).
- Any contact who becomes ill and meets the case definition becomes a suspect case and should be tested.
- Any newly identified probable or confirmed cases should have their own contacts identified and monitored.

Contact tracing should begin immediately after a suspect case has been identified in a prison or detention facility, without waiting for the laboratory result, in order to avoid delays in implementing health measures when necessary. This should be conducted by prison health-care or custodial staff under the supervision of the competent national health authority and according to national preparedness plans. Every effort should be made to minimize exposure of the suspect case to other people and the environment and to separate contacts from others as soon as possible.[38] Contacts outside the prison (visitors, etc.) should be followed up by the health authorities.

## 11.5 Case reporting

COVID-19 has been added to the list of notifiable diseases that doctors have a duty to report to public health authorities. COVID-19 is a high-consequence infectious disease (HCID) with outbreak potential in prisons and other detention settings; possible cases in such settings should therefore be notified straightaway to responsible public health authorities, who will then report to national and international authorities.

---

[38] Operational considerations for managing COVID-19 cases/outbreak on board ships: interim guidance (24 February 2020). Geneva: World Health Organization; 2020 (https://apps.who.int/iris/handle/10665/331164).



# 12. PREVENTION MEASURES

There is currently no vaccine to prevent COVID-19. All staff and people in prisons and other places of detention should have comprehensive awareness of COVID-19 prevention strategies, including adherence to hand hygiene measures, respiratory etiquette (covering coughs and sneezes), physical distancing (maintaining a distance of at least 1 metre from others), being alert to signs and symptoms of COVID-19, staying away from ill people, and (in the case of staff) staying home when ill. Staff should also comply with any screening measures put in place by local authorities.

In alignment with local health authorities, a workplace protocol should be developed to determine how to manage any personnel who meet the definition of a suspected or confirmed COVID-19 case or their contacts.

## 12.1 Personal protection measures

It is recommended that the following general precautions for infectious respiratory diseases are taken to help prevent people (staff, visitors, vendors, detainees, etc. in prisons) from catching and spreading COVID-19:

- hands should be washed often with soap and water and dried with single-use towels; alcohol hand sanitizer containing at least 60% alcohol is also an option if available (for further guidance on hand hygiene, see section 13.1 below);
- physical distancing should be observed;
- a disposable tissue should be used to cover mouth and nose when coughing or sneezing, then thrown in a bin with a lid;
- touching of eyes, nose or mouth should be avoided if hands are not clean.

If possible, wall-mounted liquid soap dispensers, paper towels and foot-operated pedal bins should be made available and accessible in key areas such as toilets, showers, gyms, canteens and other high-traffic communal areas to facilitate regular hand hygiene. Security staff should assess whether such fixtures pose a security and safety risk to people in prisons and places of detention prior to their installation.

## 12.2 Use of masks

It is important to create a general understanding of what measures should be taken by, and on behalf of, each person in prison when infection by COVID-19 is suspected. It is very important to train people in prison as soon as possible to understand general hygiene and ways of transmission and to make it clear that, if masks are to be used, this measure must be combined with hand hygiene and other IPC measures to prevent human-to-human transmission of COVID-19.

Patient use of a medical mask is one of the prevention measures that can be taken to limit spread of certain respiratory diseases, including COVID-19, in affected areas. However, use of a mask alone is insufficient to provide an adequate level of protection and other equally relevant measures should also be adopted.

WHO has developed guidance for home-care and health-care settings on IPC strategies for use when infection with COVID-19 is suspected.[36] WHO has also issued guidance on the use of masks in the community, during home care and in health-care settings in the context of the COVID-19 outbreak.[31]

20

Wearing medical masks when not indicated may incur unnecessary cost, cause procurement burden and create a false sense of security that can lead to neglecting other essential measures such as hand hygiene practices. Furthermore, using a mask incorrectly may hamper its effectiveness in reducing the risk of transmission.[27]

Management of masks

If medical masks are worn, appropriate use and disposal are essential to ensure that they are effective and to avoid any increase in risk of transmission associated with incorrect use and disposal. The following advice on correct use of medical masks is based on standard practice in health-care settings:[31]

- place mask carefully to cover mouth and nose and tie securely to minimize any gaps between face and mask;
- while in use, avoid touching the mask;
- remove the mask by using an appropriate technique (i.e. do not touch the front but remove by the headband from behind);
- after removal or whenever you inadvertently touch a used mask, clean hands by using an alcohol-based hand rub (if available) or soap and water;
- replace masks with a new clean, dry mask as soon as they become damp/humid;
- do not reuse single-use masks;
- discard single-use masks after each use and dispose of them immediately upon removal (consider a central place in the ward/cell block where used masks can be discarded).

Cloth (e.g. cotton or gauze) masks are not recommended under any circumstances.

## 12.3 Environmental measures

Environmental cleaning and disinfection procedures must be followed consistently and correctly. Cleaning with water and household detergents and with disinfectant products that are safe for use in prison settings should be used for general precautionary cleaning.

Cleaning personnel should be made aware of the facts of COVID-19 infection to ensure that they clean environmental surfaces regularly and thoroughly. They should be protected from COVID-19 infection and wear disposable gloves when cleaning or handling surfaces, clothing or linen soiled with body fluids, and should perform hand hygiene before and after removing gloves.

As the COVID-19 virus has the potential to survive in the environment for several days, premises and areas that may have been contaminated should be cleaned and disinfected before they are reused, with regular household detergent followed by disinfectant containing a diluted bleach solution (e.g. one part liquid bleach, at an original concentration of 5.25%, to 49 parts water for a final concentration of about 1000 ppm or 0.1%). For surfaces that do not tolerate bleach, 70% ethanol can be used. If bleach or ethanol cannot be used in the prison for security reasons, ensure that the disinfectant used for cleaning is able to inactivate enveloped viruses. Prison authorities may have to consult disinfectant manufacturers to ensure that their products are active against coronaviruses.

To ensure adequate disinfection, janitorial and housekeeping personnel should take care to first clean surfaces with a mix of soap and water, or a detergent. Then they should apply the disinfectant for the required contact time, as per the manufacturer's recommendations. The disinfectant may be rinsed off with clean water after the contact time has elapsed.

Clothes, bedclothes, bath and hand towels, etc. can be cleaned using regular laundry soap and water or machine-washed at 60–90 °C with common laundry detergent. Waste should be treated as infectious clinical waste and handled according to local regulation. Guidance on environmental cleaning in the context of the COVID-19 outbreak is available from the European Centre for Disease Prevention and Control (ECDC);[39] see also Annex 1 below.

## 12.4 Physical distancing measures

All staff should be alert to the enhanced risk of COVID-19 infection in people in prisons and other places of detention who have a history of potential exposure, having travelled to, transited through or lived in high-risk areas in the last 14 days.

Any detainee who has (a) travelled from or lived in an identified high-risk area,[40] or (b) had contact with a known case of COVID-19, should be placed in quarantine, in single accommodation, for 14 days from the date of travel or last possible day of contact.[18] If it is not possible to house the detainee in medical isolation, then detainees with similar risk factors and exposures may be housed together while they undergo quarantine. The patient should wear a medical face mask while being transferred to an isolation room. During isolation, the isolated person should be under medical observation at least twice a day, including taking body temperature and checking for symptoms of COVID-19 infection.

An assessment of any language or communication issues should be made and access to a language interpretation/translation service must be provided as soon as a possible case enters the facility so that an accurate history can be taken.

## 12.5 Consideration of access restriction and movement limitation

An assessment of each case and setting should be undertaken by prison staff in conjunction with the local public health agency. Advice on the management of staff or people in prison or places of detention will be based on this assessment.

A temporary suspension of on-site prison visits will need to be carefully considered in line with local risk assessments and in collaboration with public health colleagues, and should include measures to mitigate the negative impact such a measure is likely to have on the prison population. The specific and disproportionate impact on different types of prisoners, as well as on children living with their parent in prison, must be considered. Measures to restrict movement of people in and out of the detention setting, including restricting transfers within the prison/detention system and limiting access to non-essential staff and visitors, need to be

---

[39]  Interim guidance for environmental cleaning in non-healthcare facilities exposed to SARS-CoV-2. ECDC technical report. 18 February 2020. Stockholm: European Centre for Disease Prevention and Control; 2020 (https://www.ecdc.europa.eu/sites/default/files/documents/coronavirus-SARS-CoV-2-guidance-environmental-cleaning-non-healthcare-facilities.pdf).

[40]  Situation updates are available at: Coronavirus disease (COVID-19) situation reports. Geneva: World Health Organization; 2020 (https://www.who.int/emergencies/diseases/novel-coronavirus-2019/situation-reports).

considered carefully in line with appropriate risk assessments, as such restrictions will have a wider impact on the functioning of the detention system. Measures that may be considered include, as appropriate, restriction of family visits, reducing visitor numbers and/or duration and frequency of visits, and introduction of video conferencing (e.g. Skype) for family members and representatives of the judicial system, such as legal advisers.

In particular:

- screening may be considered at entrance with self-reporting questionnaire to exclude those with symptoms;
- visitors who feel unwell should stay at home and not attend the establishment;
- staff must stay at home and seek medical attention should they develop any relevant signs and symptoms.

A workplace protocol for how to manage such situations, including a suspected or confirmed COVID-19 case or their contacts, should be in place.

## 12.6 Staff returning to work following travel to affected areas or with a history of potential exposure

Custodial/detention staff working in places of detention should consult occupational health services in their respective organization if they have travelled or live in a high-risk community/area where COVID-19 is spreading; they should also keep up to date on the latest information on the COVID-19 outbreak, available on the WHO website[40] and through the national and local public health authority, to familiarize themselves with any possible restrictions/quarantine periods in place.

Prisons should review their continuity and contingency plans and update them to ensure that they can perform critical functions with reduced numbers of personnel, in a manner that does not have a negative impact on the security of the prison.

## 12.7 What to do if a member of staff becomes unwell and believes they have been exposed to COVID-19

If a member of staff becomes unwell in the prison and has travelled to an affected area or lives in an area where COVID-19 is spreading, they should be removed to a location which is at least 1 metre away from other people. If possible, a room or place where they can be isolated behind a closed door, such as a staff office, should be made available. If it is possible to open a window for ventilation, do so.



Prison health-care professionals (or the individual who is unwell) should call health services or emergency services (if they are seriously ill or their life is at risk) and explain their current clinical symptoms and their epidemiological and travel history (this may not be necessary if the prison is located in affected area). If the person affected is not able for any reason to call a doctor themselves, then another staff member should call on their behalf.

While the unwell individual waits for advice or an ambulance to arrive, they should remain at least 1 metre from other people, and if possible be isolated behind a closed door. They should avoid touching people, surfaces and objects, and they should be provided with a medical mask. If a medical mask is not available, they should be advised to cover their mouth and nose with a disposable tissue when they cough or sneeze, then put the tissue in a bag and throw it in a bin. If they do not have any tissues available, they should cough and sneeze into the crook of their elbow.

If the unwell individual needs to go to the bathroom while waiting for medical assistance, they should use a separate bathroom, if available. This will apply only to the period of time while they wait for transport to hospital. Given the possible risk of environmental contamination, it is important to ensure that the bathroom is properly cleaned and disinfected after the suspected case has used it; the area where they were sitting should also be cleaned and disinfected.



23



# 13. ASSESSING SUSPECTED CASES OF COVID-19 IN PEOPLE IN PRISON/DETENTION

Case identification should be performed in accordance with available national/supranational guidance for primary care and community settings.

Suspected cases among people in prison may be identified by notifications received from custodial/detention staff, other prisoners/detainees, self-referral, and screening at reception, or by other means. For case definitions, see section 11 above.

Depending on the local level of risk, additional procedures to assess new arrivals in prison may be needed. Measures to consider are:

- creating a dedicated screening area at the facility entrance
- establishing a procedure for immediate isolation of suspected cases.

## 13.1 Advice on use of PPE and other standard precautions for health-care staff and custodial staff with patient-facing roles

Health-care professionals in prisons and other detention settings are most likely to work directly with patients with a possible diagnosis of COVID-19, but custodial staff and transport services may also be engaged, especially at initial presentation. This means that all staff (custodial and health-care workers) should be educated about standard precautions such as personal hygiene, basic IPC measures and how to deal with a person suspected of having COVID-19 as safely as possible to prevent the infection from spreading.

IPC management includes wearing the appropriate level of PPE according to risk assessment, and ensuring safe waste management, proper linens, environmental cleaning, and sterilization of patient-care equipment.

### PPE for custodial staff

For activities that involve close contact with a suspected or confirmed case of COVID-19, such as interviewing people at a distance of less than 1 metre, or arrest and restraint, it is advised that the minimum level of PPE that custodial/escort staff should wear is:

- disposable gloves
- medical mask
- if available, a disposable full gown and disposable eye protection (e.g. face shield or goggles).

## PPE for health-care staff

It is advised that the minimum level of PPE for health-care staff required when dealing with a suspected or confirmed COVID-19 case is:

- medical mask
- full gown
- gloves
- eye protection (e.g. single-use goggles or face shield)
- clinical waste bags
- hand hygiene supplies
- general-purpose detergent and disinfectant solutions that are virucidal and have been approved for use by the prison authorities.

Health-care staff should use respirators only for aerosol-generating procedures; for further details on use of respirators, see section 14 below and WHO guidance on PPE use.[27]

For all staff, PPE must be changed after each interaction with a suspected or confirmed case.

## Removal of PPE

PPE should be removed in an order that minimizes the potential for cross-contamination. Before leaving the room where the patient is held, gloves, gown/apron, eye protection and mask should be removed (in that order, where worn) and disposed of as clinical waste. After leaving the area, the face mask can be removed and disposed of as clinical waste in a suitable receptacle.

The correct procedure for removing PPE is as follows:

(1)  peel off gloves and dispose of as clinical waste
(2)  perform hand hygiene, by handwashing or using alcohol gel
(3)  remove apron/gown by folding in on itself and place in clinical waste bin
(4)  remove goggles/face shield only by the headband or sides and dispose of as clinical waste
(5)  remove medical mask from behind and dispose of as clinical waste
(6)  perform hand hygiene.

Further WHO guidance, with illustrations, on putting on and taking off PPE is available online.[41,42]

All used PPE must be disposed of as clinical waste.

---

[41]  How to put on and take off personal protective equipment (PPE) [information sheet]. Geneva: World Health Organization; 2008 (https://www.who.int/csr/resources/publications/PPE_EN_A1sl.pdf).
[42]  Steps to put on personal protective equipment (PPE) [poster]. Geneva: World Health Organization (https://www.who.int/csr/disease/ebola/put_on_ppequipment.pdf).

26

### Hand hygiene

Scrupulous hand hygiene is essential to reduce cross-contamination. It should be noted that:

- hand hygiene involves cleansing hands either with an alcohol-based hand rub or with soap and water;
- alcohol-based hand rubs are preferred if hands are not visibly soiled;
- if an alcohol-based hand rub is used, it should be at least 60% alcohol;
- always wash hands with soap and water when they are visibly soiled.

All staff should apply the "My five moments for hand hygiene" approach to cleaning their hands:

(1) before touching a patient
(2) before any clean or aseptic procedure is performed
(3) after exposure to body fluid
(4) after touching a patient
(5) after touching a patient's surroundings.

More information on how to wash hands properly, in the form of a poster that can be adapted to the prison facility, is available on the WHO website.[43]

## 13.2 Advice for policing, border force and immigration enforcement activities

For police, border force and immigration enforcement officers, there may be situations where an individual who needs to be arrested or is in custody is identified as potentially at risk of COVID-19.[44]

If assistance is needed for an individual who is symptomatic and identified as a possible COVID-19 case, the person should, wherever possible, be placed in a location away from others. If there is no physically separate room, people who are not involved in providing assistance should be asked to stay away from the individual. If barriers or screens are available, they may also be used.

Appropriate IPC measures should be implemented. In activities that involve close contact with a symptomatic person who is suspected of having COVID-19 (such as interviewing at a distance of less than 1 metre, or arrest and restraint), staff should wear:

- disposable gloves
- medical mask
- long-sleeved gown
- eye protection (e.g. face shield or goggles).

---

43  How to handwash? [poster]. Geneva: World Health Organization; 2009 (https://www.who.int/gpsc/5may/How_To_HandWash_Poster.pdf).
44  For further information, see: Guidance for first responders and others in close contact with symptomatic people with potential COVID-19. London: Public Health England; 2020 (https://www.gov.uk/government/publications/novel-coronavirus-2019-ncov-interim-guidance-for-first-responders/interim-guidance-for-first-responders-and-others-in-close-contact-with-symptomatic-people-with-potential-2019-ncov).




# 14. CASE MANAGEMENT

Case management should be performed in accordance with available national/supranational guidance for primary care and community settings.

## 14.1 Clinical management of severe acute respiratory infection (SARI) when COVID-19 is suspected

WHO has issued guidance intended for clinicians involved in the clinical management and care of adult, pregnant and paediatric patients with or at risk of SARI when infection with the COVID-19 virus is suspected.[45] It is not meant to replace clinical judgement or specialist consultation but rather to strengthen clinical management of these patients and to provide up-to-date guidance. Best practices for IPC, triage and optimized supportive care are included.

The WHO guidance is organized in the following sections:

1. Background
2. Screening and triage: early recognition of patients with SARI associated with COVID-19
3. Immediate implementation of appropriate IPC measures
4. Collection of specimens for laboratory diagnosis
5. Management of mild COVID-19: symptomatic treatment and monitoring
6. Management of severe COVID-19: oxygen therapy and monitoring
7. Management of severe COVID-19: treatment of coinfections
8. Management of critical COVID-19: acute respiratory distress syndrome (ARDS)
9. Management of critical illness and COVID-19: prevention of complications
10. Management of critical illness and COVID-19: septic shock
11. Adjunctive therapies for COVID-19: corticosteroids
12. Caring for pregnant women with COVID-19
13. Caring for infants and mothers with COVID-19: IPC and breastfeeding
14. Care for older persons with COVID-19
15. Clinical research and specific anti-COVID-19 treatments.

---

[45] Clinical management of severe acute respiratory infection (SARI) when COVID-19 disease is suspected: interim guidance (13 March 2020). Geneva: World Health Organization; 2020 (https://www.who.int/publications-detail/clinical-management-of-severe-acute-respiratory-infection-when-novel-coronavirus-(ncov)-infection-is-suspected).

## 14.2 Additional precautions

Patients should be placed in adequately ventilated space. If more suspected cases are detected and if individual spaces are not available, patients suspected of being infected with COVID-19 should be grouped together. However, all patients' beds should be placed at least 1 metre apart whether or not they are suspected of having COVID-19 infection.

A team of health-care workers and custodial/detention staff should be designated to care exclusively for suspected or confirmed cases to reduce the risk of transmission.

## 14.3 How to undertake environmental cleaning following a suspected case in a place of detention

Once a suspected case of COVID-19 has been transferred out of the prison or other place of detention to a hospital facility, the room where the patient was placed and the room where the patient was residing should not be used until appropriately decontaminated; the doors should remain shut, with windows open and any air conditioning switched off, until the rooms have been cleaned with detergent and disinfectant that is virucidal and approved for use in the prison setting. Detailed information on cleaning and disinfection is provided on the WHO website [46] and in Annex 1.

Once the cleaning process has been completed, the room can be put back in use immediately. Medical devices and equipment, laundry, food service utensils and medical waste should be managed in accordance with the medical waste policy at the facility.

A disease commodity package for COVID-19 outlines the supplies needed for surveillance, laboratory analysis, clinical management and IPC.[47]

## 14.4 Discharge of people from prisons and other places of detention

If a person who has served their sentence is an active COVID-19 case at the time of their release, or is the contact of a COVID-19 case and still within their 14-day quarantine period, the prison health authorities should ensure that the person discharged has a place to go where they can maintain quarantine, that the local authority is notified that the person has been discharged, and thus that follow-up is transferred from the prison authorities to the local authorities.

If a discharged individual is transferred to a hospital or other medical facility after their prison term is over, but they are still under quarantine/medical care for their COVID-19 infection, the receiving facility should be notified of the person's COVID-19 status (confirmed or suspected) so that it is ready to provide proper isolation.

---

[46] Home care for patients with suspected novel coronavirus (nCoV) infection presenting with mild symptoms and management of contacts: interim guidance (4 February 2020). Geneva: World Health Organization; 2020 (https://www.who.int/publications-detail/home-care-for-patients-with-suspected-novel-coronavirus-(ncov)-infection-presenting-with-mild-symptoms-and-management-of-contacts).

[47] Disease commodity package: novel coronavirus (COVID-19). Geneva: World Health Organization; 2020 (https://www.who.int/emergencies/what-we-do/prevention-readiness/disease-commodity-packages/dcp-ncov.pdf).

# 15. INFORMATION RESOURCES

## WHO general guidance on COVID-19

COVID-19 information portal: https://www.who.int/emergencies/diseases/novel-coronavirus-2019

Daily situation updates on the COVID-19 outbreak
https://www.who.int/emergencies/diseases/novel-coronavirus-2019/situation-reports

## Mental health and social issues

Coping with stress during the COVID-19 outbreak
https://www.who.int/docs/default-source/coronaviruse/coping-with-stress.pdf?sfvrsn=9845bc3a_2

Helping children cope with stress during the COVID-19 outbreak
https://www.who.int/docs/default-source/coronaviruse/helping-children-cope-with-stress-print.pdf?sfvrsn=f3a063ff_2

Mental health considerations for different groups (including health workers) during the COVID-19 outbreak
https://www.who.int/docs/default-source/coronaviruse/mental-health-considerations.pdf?sfvrsn=6d3578af_10

Addressing social stigma associated with COVID-19
https://www.epi-win.com/sites/epiwin/files/content/attachments/2020-02-24/COVID19%20Stigma%20Guide%2024022020_1.pdf

IASC briefing note on mental health and psychosocial support (MHPSS) aspects of COVID-19
https://interagencystandingcommittee.org/iasc-reference-group-mental-health-and-psychosocial-support-emergency-settings/briefing-note-about

## European Centre for Disease Prevention and Control

COVID-19 information portal: https://www.ecdc.europa.eu/en/novel-coronavirus-china

## United Nations Office on Drugs and Crime

Assessing compliance with the Nelson Mandela Rules: a checklist for internal inspection mechanisms (2017)
https://www.unodc.org/documents/justice-and-prison-reform/17-04946_E_ebook_rev.pdf

Handbook on strategies to reduce overcrowding in prisons (2013)
https://www.unodc.org/documents/justice-and-prison-reform/Overcrowding_in_prisons_Ebook.pdf

Policy brief on HIV prevention, treatment and care in prisons and other closed settings (2013)
https://www.unodc.org/documents/hiv-aids/HIV_comprehensive_package_prison_2013_eBook.pdf

Handbook on prisoners with special needs (2009)
https://www.unodc.org/pdf/criminal_justice/Handbook_on_Prisoners_with_Special_Needs.pdf

## Public Health England

Public Health England (PHE) – Public health in prisons and secure settings (collection of resources)
https://www.gov.uk/government/collections/public-health-in-prisons

COVID-19: prisons and other prescribed places of detention
https://www.gov.uk/government/publications/covid-19-prisons-and-other-prescribed-places-of-detention-guidance

30

**Robert Koch Institute**
Information portal (in German)
https://www.rki.de/DE/Home/homepage_node.html

**National Commission on Correctional Health Care**
What you need to know about COVID-19
https://www.ncchc.org/blog/covid-19-coronavirus-what-you-need-to-know-in-corrections

**Penal Reform International**
Briefing note on COVID-19, health care, and the human rights of people in prison
https://www.penalreform.org/resource/coronavirus-healthcare-and-human-rights-of-people-in



# ANNEX 1
# ENVIRONMENTAL CLEANING FOLLOWING A SUSPECTED CASE OF COVID-19 IN A PLACE OF DETENTION*

Infection prevention and control (IPC) measures are essential to reduce the risk of transmission of infection in prisons and other places of detention. Environmental cleaning of health-care rooms, or cells, where a suspected case has been managed is an essential intervention to control infection as well as to enable facilities to be put back into use quickly. Once a possible case has been transferred from the prison or detention setting, the room where the patient was placed should not be used, the room door should remain shut, with windows opened and the air conditioning switched off (if relevant), until it has been cleaned with detergent and disinfectant. Once this process has been completed, the room can be put back in use immediately.

## Preparation
The responsible person undertaking the cleaning with detergent and disinfectant should be familiar with these processes and procedures:

- collect all cleaning equipment and clinical waste bags before entering the room
- dispose of any cloths and mop heads as single-use items
- perform hand hygiene, then put on a disposable plastic apron and gloves.

## On entering the room
- keep the door closed with windows open to improve airflow and ventilation while using detergent and disinfection products
- bag all items that have been used for the care of the patient as clinical waste – for example, contents of the waste bin and any consumables that cannot be cleaned with detergent and disinfectant
- remove any fabric curtains or screens or bed linen and bag as infectious linen
- close any sharps containers, wiping the surfaces with either a combined detergent/disinfectant solution with a virucidal label claim, or a neutral-purpose detergent followed by disinfection with a virucidal product that has been approved for use in the facility.

## Cleaning process
Use disposable cloths/paper roll/disposable mop heads to clean and disinfect all hard surfaces/floor/chairs/door handles/reusable non-invasive care equipment/sanitary fittings in the room, following one of the two options below:

- *either* use a combined detergent/disinfectant solution with a virucidal label claim
- *or* use a neutral-purpose detergent, followed by a virucidal disinfectant approved by the prison authority.

Follow manufacturer's instructions for dilution, application and contact times for all detergents and disinfectants. Any cloths and mop heads used must be disposed of as single-use items.

---

* COVID-19: interim guidance for primary care (updated 25 February 2020). London: Public Health England; 2020
(https://www.gov.uk/government/publications/wn-cov-guidance-for-primary-care/wn-cov-interim-guidance-for-primary-care).

**32**

## Cleaning and disinfection of reusable equipment

- clean and disinfect any reusable non-invasive care equipment, such as blood pressure monitors, digital thermometers and glucometers, that are in the room prior to their removal
- clean all reusable equipment systematically from the top or furthest away point.

## Carpeted flooring and soft furnishings

If carpeted floors/items cannot withstand chlorine-releasing agents, consult the manufacturer's instructions for a suitable alternative to use, following or combined with detergent cleaning.

## On leaving the room

- discard detergent/disinfectant solutions safely at disposal point
- all waste from suspected contaminated areas should be removed from the room and discarded as medical waste as per the facility guideline for medical waste
- clean, dry and store reusable parts of cleaning equipment, such as mop handles
- remove and discard personal protective equipment (PPE) as medical waste
- perform hand hygiene.

## Cleaning of communal areas

If a suspected case spent time in a communal area, then these areas should be cleaned with detergent and disinfectant (as above) as soon as practicably possible, unless there has been a blood/body fluid spill, which should be dealt with immediately. Once cleaning and disinfection have been completed, the area can be put back in use.

## Decontamination of vehicles following a transfer of a possible case

Any vehicle used to transport a possible case should be cleaned and disinfected (using the methods outlined above for environmental cleaning following a possible case) as soon as possible before it is brought back into service.



**The WHO Regional
Office for Europe**

The World Health Organization (WHO) is a specialized
agency of the United Nations created in 1948 with the
primary responsibility for international health matters
and public health. The WHO Regional Office for
Europe is one of six regional offices throughout the
world, each with its own programme geared to the
particular health conditions of the countries it serves.

**Member States**

Albania
Andorra
Armenia
Austria
Azerbaijan
Belarus
Belgium
Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czechia
Denmark
Estonia
Finland
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Israel
Italy
Kazakhstan
Kyrgyzstan
Latvia
Lithuania
Luxembourg
Malta
Monaco
Montenegro
Netherlands
North Macedonia
Norway
Poland
Portugal
Republic of Moldova
Romania
Russian Federation
San Marino
Serbia
Slovakia
Slovenia
Spain
Sweden
Switzerland
Tajikistan
Turkey
Turkmenistan
Ukraine
United Kingdom
Uzbekistan

**World Health Organization
Regional Office for Europe**

UN City, Marmorvej 51, DK-2100 Copenhagen Ø, Denmark
Tel: +45 45 33 70 00   Fax: +45 45 33 70 01
Email: eurocontact@who.int
Website: www.euro.who.int

# Exhibit 18

 Centers for Disease Control and Prevention

# Coronavirus Disease 2019 (COVID-19)

## How to Protect Yourself

 **Older adults and people who have severe underlying medical conditions** like heart or lung disease or diabetes seem to be at higher risk for developing more serious complications from COVID-19 illness. More information on Are you at higher risk for serious illness?

## Know How it Spreads



- There is currently no vaccine to prevent coronavirus disease 2019 (COVID-19).
- **The best way to prevent illness is to avoid being exposed to this virus.**
- The virus is thought to spread mainly from person-to-person.
  - Between people who are in close contact with one another (within about 6 feet).
  - Through respiratory droplets produced when an infected person coughs or sneezes.
- These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs.

## Take steps to protect yourself



### Clean your hands often

- **Wash your hands** often with soap and water for at least 20 seconds especially after you have been in a public place, or after blowing your nose, coughing, or sneezing.
- If soap and water are not readily available, **use a hand sanitizer that contains at least 60% alcohol**. Cover all surfaces of your hands and rub them together until they feel dry.
- **Avoid touching your eyes, nose, and mouth** with unwashed hands.



### Avoid close contact

- **Avoid close contact** with people who are sick
- Put **distance between yourself and other people** if COVID-19 is spreading in your community. This is especially important for people who are at higher risk of getting very sick.

## Take steps to protect others

### Stay home if you're sick

- **Stay home** if you are sick, except to get medical care. Learn what to do if you are sick.

Case 4:01-cv-01351-JST   Document 3221-2   Filed 03/25/20   Page 45 of 249





## Cover coughs and sneezes

- **Cover your mouth and nose** with a tissue when you cough or sneeze or use the inside of your elbow.
- **Throw used tissues** in the trash.
- Immediately **wash your hands** with soap and water for at least 20 seconds. If soap and water are not readily available, clean your hands with a hand sanitizer that contains at least 60% alcohol.



## Wear a facemask if you are sick

- **If you are sick:** You should wear a facemask when you are around other people (e.g., sharing a room or vehicle) and before you enter a healthcare provider's office. If you are not able to wear a facemask (for example, because it causes trouble breathing), then you should do your best to cover your coughs and sneezes, and people who are caring for you should wear a facemask if they enter your room. Learn what to do if you are sick.

- **If you are NOT sick:** You do not need to wear a facemask unless you are caring for someone who is sick (and they are not able to wear a facemask). Facemasks may be in short supply and they should be saved for caregivers.



## Clean and disinfect

- **Clean AND disinfect** frequently touched surfaces **daily**. This includes tables, doorknobs, light switches, countertops, handles, desks, phones, keyboards, toilets, faucets, and sinks.
- **If surfaces are dirty, clean them:** Use detergent or soap and water prior to disinfection.

**To disinfect:**
Most common EPA-registered household disinfectants will work. Use disinfectants appropriate for the surface.

Options include:

- **Diluting your household bleach.**
  To make a bleach solution, mix:
    - 5 tablespoons (1/3rd cup) bleach per gallon of water
      OR
    - 4 teaspoons bleach per quart of water

  Follow manufacturer's instructions for application and proper ventilation. Check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted.
- **Alcohol solutions.**
  Ensure solution has at least 70% alcohol.

- Ensure solution has at least 70% alcohol.
- **Other common EPA-registered household disinfectants.**
  Products with EPA-approved emerging viral pathogens 📄 [7 pages] ↗ claims are expected to be effective against COVID-19 based on data for harder to kill viruses. Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

| More handwashing tips | Hand Hygiene in Healthcare Settings |
|---|---|

## More information

| | |
|---|---|
| Symptoms | Individuals, schools, events, businesses and more |
| What to do if you are sick | Healthcare Professionals |
| If someone in your house gets sick | 6 Steps to Prevent COVID-19 |
| Frequently asked questions | 6 Steps to Prevent COVID-19 (ASL Version) |
| Travelers | |

Page last reviewed: March 18, 2020

# Exhibit 19

## ACTIVE STATE EMPLOYEES BY DEPARTMENT/FACILITY

Data as of: *December 2019*

| DEPARTMENT | FACILITY/BOARD/BUREAU | | FULL TIME | PART TIME |
|---|---|---|---|---|
| AFRO-AMERICAN MUSEUM | AFRO-AMERICAN MUSEUM | | 12 | 0 |
| AGRICULTURAL LABOR REL BOARD | AGRICULTURAL LABOR REL BOARD | | 55 | 0 |
| AIR RESOURCES BOARD | AIR RESOURCES BOARD | | 1483 | 23 |
| ALCOHOLIC BEVERAGE CNTR AP BD | ALCOHOLIC BEVERAGE CNTR AP BD | | 7 | 0 |
| ALCOHOLIC BEVERAGE CONTROL | ALCOHOLIC BEVERAGE CONTROL | | 424 | 5 |
| ARTS COUNCIL | ARTS COUNCIL | | 23 | 2 |
| BALDWIN HILLS CONSERVANCY | BALDWIN HILLS CONSERVANCY | | 5 | 0 |
| BOARD OF EQUALIZATION | BOARD OF EQUALIZATION | | 133 | 0 |
| BOARD OF GOVERNORS CMTY COLLG | BOARD OF GOVERNORS CMTY COLLG | | 132 | 2 |
| BOARD OF OSTEOPATHIC EXAMINER | BOARD OF OSTEOPATHIC EXAMINER | OSTEPATHIC MED BRD OF CA | 13 | 1 |
| BOARD STATE & COMMUNITY CORR | BOARD STATE & COMMUNITY CORR | | 85 | 2 |
| BRD PILOT COMM | BRD PILOT COMM | BAYS SF S. PABLO & SUISUN | 6 | 0 |
| BUS, CONSUMER SVS & HOUSING | BUS, CONSUMER SVS & HOUSING | | 25 | 0 |
| CA COMPLETE COUNT CENSUS 2020 | CA COMPLETE COUNT CENSUS 2020 | | 29 | 0 |
| CA DEPT OF HUMAN RESOURCES | CA DEPT OF HUMAN RESOURCES | | 281 | 3 |
| CA HEALTH BENEFIT EXCHANGE | CA HEALTH BENEFIT EXCHANGE | | 1206 | 6 |
| CA HIGH SPEED RAIL AUTHORITY | CA HIGH SPEED RAIL AUTHORITY | | 200 | 0 |
| CA VICTIM COMPENSATION BRD | CA VICTIM COMPENSATION BRD | | 210 | 5 |
| CA. ALTERNTVE ERGY SR FN AUTH | CA. ALTERNTVE ERGY SR FN AUTH | | 18 | 0 |
| CA. CHILDREN/FAMILIES 1ST COM | CA. CHILDREN/FAMILIES 1ST COM | | 35 | 0 |
| CA. CITIZENS COMP COMMISSION | CA. CITIZENS COMP COMMISSION | | 0 | 0 |
| CA. COASTAL COMMISSION | CA. COASTAL COMMISSION | | 155 | 6 |
| CA. DEBT ADVISORY COMMISSION | CA. DEBT ADVISORY COMMISSION | | 16 | 0 |
| CA. DEBT LIMIT ALLOCATION COM | CA. DEBT LIMIT ALLOCATION COM | | 9 | 0 |
| CA. EARTHQUAKE AUTHORITY | CA. EARTHQUAKE AUTHORITY | | 64 | 1 |
| CA. EDUC FACILITIES AUTHORITY | CA. EDUC FACILITIES AUTHORITY | | 3 | 0 |
| CA. EXPOSITION AND STATE FAIR | CA. EXPOSITION AND STATE FAIR | | 58 | 0 |
| CA. GAMBLING CONTROL COMM | CA. GAMBLING CONTROL COMM | | 32 | 1 |
| CA. HEALTH FACILITIES AUTH | CA. HEALTH FACILITIES AUTH | | 22 | 0 |
| CA. INST FOR REGENERATIVE MED | CA. INST FOR REGENERATIVE MED | | 32 | 2 |
| CA. JUDICIAL CENTER LIBRARY | CA. JUDICIAL CENTER LIBRARY | | 3 | 3 |
| CA. LAW REVISION COMMISSION | CA. LAW REVISION COMMISSION | | 3 | 2 |
| CA. MORTGAGE BOND,TAX CREDIT | CA. MORTGAGE BOND,TAX CREDIT | | 48 | 0 |
| CA. POLLUTN CONTRL FIN AUTH | CA. POLLUTN CONTRL FIN AUTH | | 27 | 0 |
| CA. SCHOOL FINANCE AUTHORITY | CA. SCHOOL FINANCE AUTHORITY | TREASURER | 10 | 0 |
| CA. STATE AUDITOR'S OFFICE | CA. STATE AUDITOR'S OFFICE | | 169 | 3 |
| CA. TAHOE CONSERVANCY | CA. TAHOE CONSERVANCY | | 36 | 3 |
| CA. TRANSPORTATION COMMISSION | CA. TRANSPORTATION COMMISSION | | 27 | 0 |

## ACTIVE STATE EMPLOYEES BY DEPARTMENT/FACILITY

Data as of: *December 2019*

| DEPARTMENT | FACILITY/BOARD/BUREAU | | FULL TIME | PART TIME |
|---|---|---|---|---|
| CALIFORNIA CONSERVATION CORPS | CALIFORNIA CONSERVATION CORPS | | 370 | 1 |
| CALIFORNIA DEPT OF AGING | CALIFORNIA DEPT OF AGING | | 122 | 1 |
| CALIFORNIA HIGHWAY PATROL | CALIFORNIA HIGHWAY PATROL | | 10266 | 32 |
| CALIFORNIA HORSE RACING BOARD | CALIFORNIA HORSE RACING BOARD | | 49 | 2 |
| CALIFORNIA SENIOR LEGISLATURE | CALIFORNIA SENIOR LEGISLATURE | | 1 | 0 |
| CALIFORNIA STATE LIBRARY | CALIFORNIA STATE LIBRARY | | 113 | 0 |
| CALIFORNIA STATE LOTTERY COMM | CALIFORNIA STATE LOTTERY COMM | | 767 | 0 |
| CDCR | CDCR | AVENAL STATE PRISON | 1253 | 5 |
| CDCR | CDCR | AVENAL STATE PRISON - PIA | 52 | 0 |
| CDCR | CDCR | CA CITY CORR FACILITY (IWF) | 5 | 0 |
| CDCR | CDCR | CA CITY CORRECTIONAL FACILITY | 633 | 3 |
| CDCR | CDCR | CA. CITY CORR FACILITY - PIA | 4 | 0 |
| CDCR | CDCR | CA. CORRECTIONAL CENTER | 1064 | 1 |
| CDCR | CDCR | CA. CORRECTIONAL CENTER - PIA | 7 | 0 |
| CDCR | CDCR | CA. CORRECTIONAL INSTITUTION | 1529 | 6 |
| CDCR | CDCR | CA. HEALTH CARE FACILITY | 1313 | 1 |
| CDCR | CDCR | CA. HEALTH CARE FACILITY - PIA | 12 | 0 |
| CDCR | CDCR | CA. INSTITUTION FOR MEN | 1602 | 11 |
| CDCR | CDCR | CA. INSTITUTION FOR MEN - PIA | 44 | 0 |
| CDCR | CDCR | CA. INSTITUTION FOR WOMEN | 1145 | 7 |
| CDCR | CDCR | CA. INSTITUTION FOR WOMEN- PIA | 18 | 0 |
| CDCR | CDCR | CA. MEDICAL FACILITY | 1603 | 13 |
| CDCR | CDCR | CA. MEDICAL FACILITY - PIA | 21 | 0 |
| CDCR | CDCR | CA. MEN'S COLONY | 1681 | 12 |
| CDCR | CDCR | CA. MEN'S COLONY - PIA | 45 | 0 |
| CDCR | CDCR | CA. REHABILITATION CENTER- PIA | 4 | 0 |
| CDCR | CDCR | CA. STATE PRISON - CORCORAN | 1895 | 5 |
| CDCR | CDCR | CA. STATE PRISON - SACRAMENTO | 1610 | 4 |
| CDCR | CDCR | CA. STATE PRISON - SOLANO | 1257 | 3 |
| CDCR | CDCR | CA. STATE PRISON - WASCO | 1475 | 8 |
| CDCR | CDCR | CA. STATE PRISON - WASCO - PIA | 14 | 0 |
| CDCR | CDCR | CA. STATE PRISON-CORCORAN -PIA | 60 | 0 |
| CDCR | CDCR | CALIPATRIA STATE PRISON | 1172 | 6 |
| CDCR | CDCR | CALIPATRIA STATE PRISON - PIA | 9 | 0 |
| CDCR | CDCR | CCHCS-CENTRAL REGION | 100 | 0 |
| CDCR | CDCR | CCHCS-HEADQUARTERS | 1105 | 7 |
| CDCR | CDCR | CCHCS-NORTHERN REGION | 159 | 3 |
| CDCR | CDCR | CCHCS-SOUTHERN REGION | 210 | 2 |

## ACTIVE STATE EMPLOYEES BY DEPARTMENT/FACILITY

Data as of: *December 2019*

| DEPARTMENT | FACILITY/BOARD/BUREAU | | FULL TIME | PART TIME |
|---|---|---|---|---|
| CDCR | CDCR | CDCR-CA MEDICAL FACILITY-PIP | 467 | 0 |
| CDCR | CDCR | CDCR-CHCF-PIP | 712 | 1 |
| CDCR | CDCR | CDCR-SALINAS VALLEY-PIP | 268 | 0 |
| CDCR | CDCR | CDCR/CCHCS CA HEALTH CARE FACI | 1301 | 2 |
| CDCR | CDCR | CENTINELA STATE PRISON | 1175 | 6 |
| CDCR | CDCR | CENTINELA STATE PRISON - PIA | 11 | 0 |
| CDCR | CDCR | CENTRAL CA. WOMENS FACILITY | 1156 | 9 |
| CDCR | CDCR | CENTRAL CA. WOMENS FACILITY-PI | 27 | 0 |
| CDCR | CDCR | CHADERJIAN SCHOOL | 265 | 0 |
| CDCR | CDCR | CHUCKAWALLA VALLEY STATE PRISO | 833 | 6 |
| CDCR | CDCR | CHUCKAWALLA VALY ST PRISON-PIA | 12 | 0 |
| CDCR | CDCR | CORR TRAINING FACILITY - PIA | 28 | 0 |
| CDCR | CDCR | CORR/IND REVOLVING FUND | 298 | 0 |
| CDCR | CDCR | CORR/INMATE WELFARE FUND | 21 | 0 |
| CDCR | CDCR | CORRECTIONAL TRAINING FACILITY | 1335 | 7 |
| CDCR | CDCR | CORRECTIONS/ADMINISTRATION | 3738 | 9 |
| CDCR | CDCR | CSP - LOS ANGELES COUNTY | 1470 | 10 |
| CDCR | CDCR | DELANO II STATE PRISON | 1533 | 1 |
| CDCR | CDCR | DEUEL VOCATIONAL INST - PIA | 18 | 0 |
| CDCR | CDCR | DEUEL VOCATIONAL INSTITUTION | 1029 | 6 |
| CDCR | CDCR | FOLSOM STATE PRISON | 1022 | 3 |
| CDCR | CDCR | FOLSOM STATE PRISON - PIA | 48 | 0 |
| CDCR | CDCR | HIGH DESERT STATE PRISON | 1253 | 3 |
| CDCR | CDCR | HIGH DESERT STATE PRISON - PIA | 9 | 0 |
| CDCR | CDCR | IRONWOOD STATE PRISON | 1045 | 3 |
| CDCR | CDCR | IRONWOOD STATE PRISON - PIA | 6 | 0 |
| CDCR | CDCR | KERN VALLEY STATE PRISON - PIA | 13 | 0 |
| CDCR | CDCR | MULE CREEK STATE PRISON | 1599 | 5 |
| CDCR | CDCR | MULE CREEK STATE PRISON - PIA | 39 | 0 |
| CDCR | CDCR | NORTH KERN STATE PRISON | 1358 | 13 |
| CDCR | CDCR | NORTH KERN STATE PRISON - PIA | 9 | 0 |
| CDCR | CDCR | NORTHERN CA. YOUTH CENTER | 200 | 1 |
| CDCR | CDCR | O. H. CLOSE SCHOOL | 153 | 0 |
| CDCR | CDCR | PAROLE & COMMUNITY SVS DIV | 2175 | 7 |
| CDCR | CDCR | PELICAN BAY STATE PRISON | 1245 | 3 |
| CDCR | CDCR | PELICAN BAY STATE PRISON - PIA | 14 | 0 |
| CDCR | CDCR | PINE GROVE YTH CONS CAMP | 29 | 0 |
| CDCR | CDCR | PLEASANT VALLEY ST PRISON-PIA | 8 | 0 |

## ACTIVE STATE EMPLOYEES BY DEPARTMENT/FACILITY

Data as of: *December 2019*

| DEPARTMENT | FACILITY/BOARD/BUREAU | | FULL TIME | PART TIME |
|---|---|---|---|---|
| CDCR | CDCR | PLEASANT VALLEY STATE PRISON | 1274 | 7 |
| CDCR | CDCR | R J DONOVAN CORR FACILITY | 1805 | 10 |
| CDCR | CDCR | R J DONOVAN CORR FACILITY-PIA | 29 | 0 |
| CDCR | CDCR | REHABILITATION CENTER | 1147 | 7 |
| CDCR | CDCR | RICHARD A MCGEE CORR TR CENTER | 449 | 1 |
| CDCR | CDCR | SALINAS VALLEY ST. PRISON- PIA | 13 | 0 |
| CDCR | CDCR | SALINAS VALLEY STATE PRISON | 1486 | 4 |
| CDCR | CDCR | SAN QUENTIN STATE PRISON | 1712 | 8 |
| CDCR | CDCR | SAN QUENTIN STATE PRISON - PIA | 25 | 0 |
| CDCR | CDCR | SIERRA CONSERVATION CENTER | 1077 | 2 |
| CDCR | CDCR | SIERRA CONSERVATION CENTER-PIA | 11 | 0 |
| CDCR | CDCR | SUBSTANCE ABUSE TREAT FACILITY | 19 | 0 |
| CDCR | CDCR | SUBSTANCE ABUSE TREAT-CORCORAN | 1865 | 9 |
| CDCR | CDCR | VALLEY STATE PRISON | 1066 | 7 |
| CDCR | CDCR | VENTURA SCHOOL FOR GIRLS | 364 | 2 |
| CDCR | CDCR | YOUTH AUTHORITY/ADMINISTRATION | 71 | 1 |
| CITIZENS REDISTRICTING COMM | CITIZENS REDISTRICTING COMM | | 0 | 0 |
| COACHELLA VALLEY MOUNT CONSER | COACHELLA VALLEY MOUNT CONSER | | 4 | 0 |
| COLORADO RIVER BOARD | COLORADO RIVER BOARD | | 9 | 0 |
| COMM ON STATE GOVT ORG & ECON | COMM ON STATE GOVT ORG & ECON | | 4 | 0 |
| COMM ON TEACHER CREDENTIALING | COMM ON TEACHER CREDENTIALING | | 151 | 3 |
| COMM ON THE STATUS OF WOMEN | COMM ON THE STATUS OF WOMEN | COMM ON STATUS OF WOMEN/GIRLS | 5 | 0 |
| COMM ON UNIFORM STATE LAWS | COMM ON UNIFORM STATE LAWS | | 0 | 0 |
| COMMISSION ON AGING | COMMISSION ON AGING | | 2 | 0 |
| COMMISSION ON JUDICAL PERFORM | COMMISSION ON JUDICAL PERFORM | | 19 | 2 |
| COMMISSION ON STATE MANDATES | COMMISSION ON STATE MANDATES | | 10 | 1 |
| COMMUNITY SERVICES/DEVELOPMEN | COMMUNITY SERVICES/DEVELOPMEN | | 101 | 2 |
| CONSERVATION | CONSERVATION | | 562 | 9 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | ACUPUNCTURE BOARD | 11 | 1 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | ADMIN & INFO SVS | 458 | 6 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | ARBITRATION CERT PROG | 8 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | ATHLETIC COMMISSION | 8 | 1 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BARBER & COSMETOLOGY | 68 | 1 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BOARD OF ACCOUNTANCY | 78 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BOARD OF ARCHITECTURAL EXMRS | 26 | 2 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BOARD OF BEHAVIORAL SCIENCES | 52 | 2 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BOARD OF CHIROPRACTIC EXAMRS | 16 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BOARD OF DENTAL EXAMINERS | 61 | 2 |

## ACTIVE STATE EMPLOYEES BY DEPARTMENT/FACILITY

Data as of: *December 2019*

| DEPARTMENT | FACILITY/BOARD/BUREAU | | FULL TIME | PART TIME |
|---|---|---|---|---|
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BOARD OF MEDICAL QUALITY ASSUR | 6 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BOARD OF OCCUPATIONAL THERAPY | 12 | 1 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BOARD OF OPTOMETRY | 13 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BOARD OF PHARMACY | 107 | 1 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BOARD OF REG FOR PROF ENGINRS | 39 | 2 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BOARD OF REGISTERED NURSING | 176 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BOARD OF RESPIRTY CARE E | 16 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BUREAU ELECT & APPLNC REPAIR | 49 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BUREAU MEDICAL MARIJUANA REG | 92 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BUREAU OF AUTOMOTIVE REPAIR | 569 | 3 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | BUREAU OF REAL ESTATE APPRAISR | 25 | 1 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | CEMETERY BUREAU | 21 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | COMMUNICATION & EDUC | 62 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | CONSUMER RELATIONS | 2 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | CONTRACTORS LICENSE BOARD | 386 | 4 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | COURT REPORTERS BOARD | 4 | 1 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | DENTAL HYGIENE COMMITTEE OF CA | 9 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | DIV INVESTIGATION | 209 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | MEDICAL BOARD OF CALIFORNIA | 149 | 4 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | PHYSICAL THERAPY BOARD | 21 | 3 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | PODIATRY EXAMINING COMMITTEE | 5 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | PRIVATE POSTSECONDARY & VOC | 93 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | PROFESSIONAL FIDUCIARIES BUREA | 3 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | PSYCHOLOGY EXAMINING COMMITTEE | 24 | 1 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | SECURITY & INVESTIGATION | 61 | 1 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | SPEECH PATHOLOGY | 11 | 0 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | STRUCTURAL PEST CONTROL BOARD | 26 | 2 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | VETERINARY MEDICAL BD | 16 | 2 |
| CONSUMER AFFAIRS | CONSUMER AFFAIRS | VOCATIONAL NURSE PROG | 63 | 2 |
| COURT OF APPEAL | COURT OF APPEAL | FIFTH APPELLATE DISTRICT | 65 | 0 |
| COURT OF APPEAL | COURT OF APPEAL | FIRST APPELLATE DISTRICT | 94 | 1 |
| COURT OF APPEAL | COURT OF APPEAL | FOURTH APPELLATE DISTRICT | 167 | 2 |
| COURT OF APPEAL | COURT OF APPEAL | SECOND APPELLATE DISTRICT | 218 | 7 |
| COURT OF APPEAL | COURT OF APPEAL | SIXTH APPELLATE DISTRICT | 44 | 0 |
| COURT OF APPEAL | COURT OF APPEAL | THIRD APPELLATE DISTRICT | 77 | 2 |
| DELTA PROTECTION COMMISSION | DELTA PROTECTION COMMISSION | | 8 | 0 |
| DELTA STEWARDSHIP COUNCIL | DELTA STEWARDSHIP COUNCIL | | 62 | 7 |
| DEPARTMENT OF MANAGED CARE | DEPARTMENT OF MANAGED CARE | | 421 | 7 |

## ACTIVE STATE EMPLOYEES BY DEPARTMENT/FACILITY

Data as of: *December 2019*

| DEPARTMENT | FACILITY/BOARD/BUREAU | | FULL TIME | PART TIME |
|---|---|---|---|---|
| DEPARTMENT OF PUBLIC HEALTH | DEPARTMENT OF PUBLIC HEALTH | | 3709 | 90 |
| DEPT OF BUSINESS OVERSIGHT | DEPT OF BUSINESS OVERSIGHT | | 584 | 10 |
| DEPT OF CHILD SUPPORT SERVICE | DEPT OF CHILD SUPPORT SERVICE | | 547 | 3 |
| DEPT OF STATE HOSPITALS | DEPT OF STATE HOSPITALS | | 517 | 6 |
| DEPT OF STATE HOSPITALS | DEPT OF STATE HOSPITALS | ATASCADERO STATE HOSPITAL | 1759 | 70 |
| DEPT OF STATE HOSPITALS | DEPT OF STATE HOSPITALS | COALINGA SECURE TREATMENT FAC | 2076 | 12 |
| DEPT OF STATE HOSPITALS | DEPT OF STATE HOSPITALS | METROPOLITAN STATE HOSPITAL | 1572 | 9 |
| DEPT OF STATE HOSPITALS | DEPT OF STATE HOSPITALS | NAPA STATE HOSPITAL | 2124 | 80 |
| DEPT OF STATE HOSPITALS | DEPT OF STATE HOSPITALS | PATTON STATE HOSPITAL | 2119 | 82 |
| DEPT OF TAX AND FEE ADMIN | DEPT OF TAX AND FEE ADMIN | | 3704 | 33 |
| DEPT OF TECHNOLOGY | DEPT OF TECHNOLOGY | | 855 | 5 |
| DEPT RESOURCES RECYCLE/RECVRY | DEPT RESOURCES RECYCLE/RECVRY | | 662 | 12 |
| DEVELOPMENTAL SERVICES | DEVELOPMENTAL SERVICES | DEVELOPMENTAL SERVICES/ADMIN | 2013 | 18 |
| EDUCATION | EDUCATION | | 1317 | 29 |
| EDUCATION | EDUCATION | DIAGNOSTIC CENTER/CENTRAL CA. | 34 | 0 |
| EDUCATION | EDUCATION | DIAGNOSTIC CENTER/NORTH CA. | 29 | 1 |
| EDUCATION | EDUCATION | DIAGNOSTIC CENTER/SOUTH CA. | 31 | 2 |
| EDUCATION | EDUCATION | SCHOOL FOR THE BLIND | 88 | 20 |
| EDUCATION | EDUCATION | SCHOOL FOR THE DEAF/FREMONT | 311 | 14 |
| EDUCATION | EDUCATION | SCHOOL FOR THE DEAF/RIVERSIDE | 296 | 3 |
| EDUCATION | EDUCATION | SUMMER SCHOOL FOR THE ARTS | 4 | 0 |
| EDUCATION AUDIT APPEALS PANEL | EDUCATION AUDIT APPEALS PANEL | | 3 | 0 |
| EMERGENCY MED SERVS AUTHORITY | EMERGENCY MED SERVS AUTHORITY | | 71 | 1 |
| EMPLOYMENT DEVELOPMENT DEPT | EMPLOYMENT DEVELOPMENT DEPT | | 6523 | 153 |
| EMPLOYMENT DEVELOPMENT DEPT | EMPLOYMENT DEVELOPMENT DEPT | CA. WORKFORCE INVESTMENT BOARD | 31 | 0 |
| EMPLOYMENT DEVELOPMENT DEPT | EMPLOYMENT DEVELOPMENT DEPT | EMPLOYMENT TRAINING PANEL | 91 | 0 |
| EMPLOYMENT DEVELOPMENT DEPT | EMPLOYMENT DEVELOPMENT DEPT | UNEMPLOYMENT INSURANCE APPEAL | 299 | 18 |
| ENVIRNMTL HLTH HAZRD ASSESS | ENVIRNMTL HLTH HAZRD ASSESS | | 130 | 4 |
| FAIR EMPLOYMENT AND HOUSING | FAIR EMPLOYMENT AND HOUSING | | 203 | 2 |
| FAIR POLITICAL PRACTICES COMM | FAIR POLITICAL PRACTICES COMM | | 75 | 2 |
| FINANCE | FINANCE | | 394 | 9 |
| FINANCIAL INFO SYS FOR CA OFF | FINANCIAL INFO SYS FOR CA OFF | | 274 | 0 |
| FISH AND WILDLIFE | FISH AND WILDLIFE | | 2161 | 23 |
| FOOD AND AGRICULTURE | FOOD AND AGRICULTURE | | 1574 | 14 |
| FOOD AND AGRICULTURE | FOOD AND AGRICULTURE | 22ND DIST AGRICULTURAL ASSOC | 158 | 1 |
| FOOD AND AGRICULTURE | FOOD AND AGRICULTURE | 32ND DIST AGRICULTURAL ASSOC | 94 | 0 |
| FORESTRY AND FIRE PROTECTION | FORESTRY AND FIRE PROTECTION | | 78 | 0 |
| FORESTRY AND FIRE PROTECTION | FORESTRY AND FIRE PROTECTION | FORESTRY | 6024 | 18 |

## ACTIVE STATE EMPLOYEES BY DEPARTMENT/FACILITY

Data as of: *December 2019*

| DEPARTMENT | FACILITY/BOARD/BUREAU | | FULL TIME | PART TIME |
|---|---|---|---|---|
| FRANCHISE TAX BOARD | FRANCHISE TAX BOARD | | 5308 | 75 |
| GENERAL SERVICES | GENERAL SERVICES | | 1101 | 7 |
| GENERAL SERVICES | GENERAL SERVICES | BLDG AND PROPERTY MGMT BR | 1476 | 5 |
| GENERAL SERVICES | GENERAL SERVICES | CANNABIS CONTROL APPEALS PANEL | 7 | 0 |
| GENERAL SERVICES | GENERAL SERVICES | OFFICE OF STATE ARCHITECT | 606 | 4 |
| GENERAL SERVICES | GENERAL SERVICES | OFFICE OF STATE PUBLISHING | 249 | 0 |
| GOV OFF BUS & ECONOMIC DEVL | GOV OFF BUS & ECONOMIC DEVL | | 106 | 1 |
| GOVERNMENT OPERATIONS AGENCY | GOVERNMENT OPERATIONS AGENCY | | 15 | 0 |
| GOVERNOR'S OFFICE | GOVERNOR'S OFFICE | | 188 | 3 |
| HABEAS CORPUS RESOURCE CENTER | HABEAS CORPUS RESOURCE CENTER | | 78 | 0 |
| HEALTH AND HUMAN SERVICES AGY | HEALTH AND HUMAN SERVICES AGY | | 56 | 1 |
| HEALTH SERVICES | HEALTH SERVICES | | 3505 | 33 |
| HOUSING AND COMMUNITY DEVELOP | HOUSING AND COMMUNITY DEVELOP | | 617 | 4 |
| HOUSING FINANCE AGENCY | HOUSING FINANCE AGENCY | | 175 | 0 |
| INDUSTRIAL RELATIONS | INDUSTRIAL RELATIONS | | 2497 | 17 |
| INSURANCE | INSURANCE | | 1186 | 7 |
| JUDICIAL COUNCIL | JUDICIAL COUNCIL | | 690 | 11 |
| JUSTICE | JUSTICE | | 4455 | 62 |
| LABOR AND WORKFORCE DEV AGENC | LABOR AND WORKFORCE DEV AGENC | | 14 | 0 |
| LEGISLATIVE COUNSEL BUREAU | LEGISLATIVE COUNSEL BUREAU | | 509 | 12 |
| LEGISLATURE- ASSEMBLY | LEGISLATURE- ASSEMBLY | | 80 | 0 |
| LEGISLATURE- SENATE | LEGISLATURE- SENATE | | 39 | 0 |
| MENTAL HTH SVS OVERS/ACCT COM | MENTAL HTH SVS OVERS/ACCT COM | | 36 | 0 |
| MILITARY DEPARTMENT | MILITARY DEPARTMENT | | 883 | 0 |
| MOTOR VEHICLES | MOTOR VEHICLES | | 8274 | 84 |
| MUSEUM OF SCIENCE & INDUSTRY | MUSEUM OF SCIENCE & INDUSTRY | | 133 | 0 |
| NATIVE AMERICAN HERITAGE COMM | NATIVE AMERICAN HERITAGE COMM | | 8 | 0 |
| OFC OF SECTY ENVIRMTL PROTECT | OFC OF SECTY ENVIRMTL PROTECT | | 72 | 0 |
| OFFICE OF ADMINISTRATIVE LAW | OFFICE OF ADMINISTRATIVE LAW | | 19 | 0 |
| OFFICE OF EMERGENCY SERVICES | OFFICE OF EMERGENCY SERVICES | | 1150 | 2 |
| OFFICE OF INSPECTOR GENERAL | OFFICE OF INSPECTOR GENERAL | | 107 | 1 |
| OFFICE OF LT GOVERNOR | OFFICE OF LT GOVERNOR | | 8 | 0 |
| OFFICE OF STW HLTH PLNG & DEV | OFFICE OF STW HLTH PLNG & DEV | | 410 | 7 |
| OFFICE OF SYSTEMS INTEGRATION | OFFICE OF SYSTEMS INTEGRATION | | 301 | 2 |
| OFFICE OF TAX APPEALS OTA | OFFICE OF TAX APPEALS OTA | | 79 | 0 |
| PARKS AND RECREATION | PARKS AND RECREATION | | 2134 | 16 |
| PEACE OFF STANDARDS & TRAING | PEACE OFF STANDARDS & TRAING | | 115 | 1 |
| PESTICIDE REGULATION | PESTICIDE REGULATION | | 386 | 6 |

## ACTIVE STATE EMPLOYEES BY DEPARTMENT/FACILITY

Data as of: *December 2019*

| DEPARTMENT | FACILITY/BOARD/BUREAU | | FULL TIME | PART TIME |
|---|---|---|---|---|
| PUBLIC EMPL'S RETIREMENT SYS | PUBLIC EMPL'S RETIREMENT SYS | | 2570 | 29 |
| PUBLIC EMPLMT RELATIONS BOARD | PUBLIC EMPLMT RELATIONS BOARD | | 68 | 1 |
| PUBLIC UTILITIES COMMISSION | PUBLIC UTILITIES COMMISSION | | 1191 | 7 |
| REAL ESTATE | REAL ESTATE | | 322 | 1 |
| REHABILITATION | REHABILITATION | | 1685 | 11 |
| RESOURCES AGENCY | RESOURCES AGENCY | | 56 | 0 |
| SACTO-SAN JOAQUIN DELTA CONSV | SACTO-SAN JOAQUIN DELTA CONSV | | 11 | 1 |
| SAN DIEGO RIVER CONSERVANCY | SAN DIEGO RIVER CONSERVANCY | | 3 | 0 |
| SAN FRANCISCO BAY CON&DEV CM | SAN FRANCISCO BAY CON&DEV CM | | 47 | 0 |
| SAN GABRIEL LOW LA RIV/MTN CO | SAN GABRIEL LOW LA RIV/MTN CO | | 6 | 0 |
| SAN JOAQUIN RIVER CONSERVANCY | SAN JOAQUIN RIVER CONSERVANCY | | 3 | 0 |
| SANTA MONICA MTS CONSERVANCY | SANTA MONICA MTS CONSERVANCY | | 3 | 3 |
| SCHOLARSHARE INVESTMENT BOARD | SCHOLARSHARE INVESTMENT BOARD | | 8 | 2 |
| SECRETARY OF STATE'S OFFICE | SECRETARY OF STATE'S OFFICE | | 493 | 5 |
| SEISMIC SAFETY COMMISSION | SEISMIC SAFETY COMMISSION | | 3 | 0 |
| SIERRA NEVADA CONSERVANCY | SIERRA NEVADA CONSERVANCY | | 30 | 0 |
| SOCIAL SERVICES | SOCIAL SERVICES | | 4197 | 167 |
| STATE COASTAL CONSERVANCY | STATE COASTAL CONSERVANCY | | 62 | 1 |
| STATE COMP INSURANCE FUND | STATE COMP INSURANCE FUND | | 4161 | 8 |
| STATE CONTROLLER'S OFFICE | STATE CONTROLLER'S OFFICE | | 1336 | 15 |
| STATE COUNCIL ON DEVL DISABL | STATE COUNCIL ON DEVL DISABL | | 72 | 1 |
| STATE ENERGY RES CONS&DEV COM | STATE ENERGY RES CONS&DEV COM | | 601 | 16 |
| STATE INDEPENDENT LIVING COUN | STATE INDEPENDENT LIVING COUN | | 2 | 0 |
| STATE LANDS COMMISSION | STATE LANDS COMMISSION | | 200 | 4 |
| STATE PERSONNEL BOARD | STATE PERSONNEL BOARD | | 61 | 0 |
| STATE PUBLIC DEFENDER | STATE PUBLIC DEFENDER | | 63 | 3 |
| STATE TEACHERS RETIREMENT SYS | STATE TEACHERS RETIREMENT SYS | | 1169 | 4 |
| STATE TREASURER'S OFFICE | STATE TREASURER'S OFFICE | | 211 | 1 |
| STATE TREASURER'S OFFICE | STATE TREASURER'S OFFICE | CA ABLE ACT BOARD | 3 | 0 |
| STATE TREASURER'S OFFICE | STATE TREASURER'S OFFICE | CSCRSIB | 7 | 0 |
| STATUTORY OFFICERS | STATUTORY OFFICERS | JUDGE'S RETIRE SYSTEM MEMBER | 1189 | 0 |
| STATUTORY OFFICERS | STATUTORY OFFICERS | LEGISLATURE RETIRE SYS MEMBER | 1 | 0 |
| STATUTORY OFFICERS | STATUTORY OFFICERS | PUBLC EMP RETIRE SYSTEM MEMBER | 23 | 0 |
| STUDENT AID COMMISSION | STUDENT AID COMMISSION | | 105 | 2 |
| SUPREME COURT | SUPREME COURT | | 130 | 2 |
| TOXIC SUBSTANCES CONTROL | TOXIC SUBSTANCES CONTROL | | 901 | 15 |
| TRANSPORTATION | TRANSPORTATION | DISTRICT  1 | 596 | 10 |
| TRANSPORTATION | TRANSPORTATION | DISTRICT  2 | 629 | 3 |

## ACTIVE STATE EMPLOYEES BY DEPARTMENT/FACILITY

Data as of: *December 2019*

| DEPARTMENT | FACILITY/BOARD/BUREAU | | FULL TIME | PART TIME |
|---|---|---|---|---|
| TRANSPORTATION | TRANSPORTATION | DISTRICT  3 | 1341 | 10 |
| TRANSPORTATION | TRANSPORTATION | DISTRICT  4 | 2763 | 14 |
| TRANSPORTATION | TRANSPORTATION | DISTRICT  5 | 747 | 8 |
| TRANSPORTATION | TRANSPORTATION | DISTRICT  6 | 1185 | 3 |
| TRANSPORTATION | TRANSPORTATION | DISTRICT  7 | 2562 | 4 |
| TRANSPORTATION | TRANSPORTATION | DISTRICT  8 | 1529 | 3 |
| TRANSPORTATION | TRANSPORTATION | DISTRICT  9 | 291 | 0 |
| TRANSPORTATION | TRANSPORTATION | DISTRICT 10 | 742 | 1 |
| TRANSPORTATION | TRANSPORTATION | DISTRICT 11 | 1108 | 7 |
| TRANSPORTATION | TRANSPORTATION | DISTRICT 12 | 842 | 2 |
| TRANSPORTATION | TRANSPORTATION | EQUIPMENT HEADQUARTERS SHOP | 648 | 0 |
| TRANSPORTATION | TRANSPORTATION | HEADQUARTERS OPERATIONS | 1256 | 12 |
| TRANSPORTATION | TRANSPORTATION | SECRETARY FOR TRANSPORTATION | 50 | 0 |
| TRANSPORTATION | TRANSPORTATION | TRANSPORTATION/ADMINISTRATION | 3366 | 36 |
| VETERANS AFFAIRS | VETERANS AFFAIRS | BARSTOW VETERANS HOME | 188 | 2 |
| VETERANS AFFAIRS | VETERANS AFFAIRS | CHULA VISTA VETERANS HOME | 326 | 14 |
| VETERANS AFFAIRS | VETERANS AFFAIRS | GLAVC | 646 | 23 |
| VETERANS AFFAIRS | VETERANS AFFAIRS | VETERANS AFFAIRS/ADMINISTRATN | 438 | 5 |
| VETERANS AFFAIRS | VETERANS AFFAIRS | VETERANS HOME | 760 | 22 |
| VETERANS AFFAIRS | VETERANS AFFAIRS | VETERANS HOME OF CA, FRESNO | 409 | 5 |
| VETERANS AFFAIRS | VETERANS AFFAIRS | VETERANS HOME OF CA, REDDING | 226 | 11 |
| WATER RESOURCES | WATER RESOURCES | | 3010 | 36 |
| WATER RESOURCES CONTROL BOARD | WATER RESOURCES CONTROL BOARD | | 2046 | 43 |
| WILDLIFE CONSERVATION BOARD | WILDLIFE CONSERVATION BOARD | | 35 | 0 |

**Total Active Employ**

| INTERMITTENT | INDETERMINATE | TOTAL |
|---:|---:|---:|
| 32 | 0 | 44 |
| 8 | 0 | 63 |
| 132 | 0 | 1638 |
| 1 | 0 | 8 |
| 29 | 0 | 458 |
| 17 | 0 | 42 |
| 9 | 0 | 14 |
| 9 | 0 | 142 |
| 22 | 0 | 156 |
| 15 | 0 | 29 |
| 5 | 0 | 92 |
| 0 | 0 | 6 |
| 1 | 0 | 26 |
| 0 | 0 | 29 |
| 33 | 0 | 317 |
| 46 | 0 | 1258 |
| 24 | 0 | 224 |
| 3 | 0 | 218 |
| 2 | 0 | 20 |
| 13 | 0 | 48 |
| 4 | 0 | 4 |
| 52 | 0 | 213 |
| 1 | 0 | 17 |
| 1 | 0 | 10 |
| 2 | 0 | 67 |
| 0 | 0 | 3 |
| 683 | 0 | 741 |
| 4 | 0 | 37 |
| 1 | 0 | 23 |
| 27 | 0 | 61 |
| 1 | 0 | 7 |
| 4 | 0 | 9 |
| 1 | 0 | 49 |
| 4 | 0 | 31 |
| 2 | 0 | 12 |
| 8 | 0 | 180 |
| 6 | 0 | 45 |
| 15 | 0 | 42 |

| INTERMITTENT | INDETERMINATE | TOTAL |
|---|---|---|
| 1425 | 0 | 1796 |
| 18 | 0 | 141 |
| 91 | 0 | 10389 |
| 6 | 6 | 63 |
| 0 | 0 | 1 |
| 4 | 0 | 117 |
| 53 | 0 | 820 |
| 51 | 0 | 1309 |
| 2 | 0 | 54 |
| 0 | 0 | 5 |
| 18 | 0 | 654 |
| 2 | 0 | 6 |
| 38 | 0 | 1103 |
| 1 | 0 | 8 |
| 51 | 0 | 1586 |
| 38 | 0 | 1352 |
| 0 | 0 | 12 |
| 76 | 0 | 1689 |
| 0 | 0 | 44 |
| 32 | 0 | 1184 |
| 0 | 0 | 18 |
| 43 | 0 | 1659 |
| 1 | 0 | 22 |
| 28 | 0 | 1721 |
| 2 | 0 | 47 |
| 0 | 0 | 4 |
| 61 | 0 | 1961 |
| 55 | 0 | 1669 |
| 49 | 0 | 1309 |
| 61 | 0 | 1544 |
| 1 | 0 | 15 |
| 3 | 0 | 63 |
| 45 | 0 | 1223 |
| 1 | 0 | 10 |
| 1 | 0 | 101 |
| 110 | 0 | 1222 |
| 8 | 0 | 170 |
| 2 | 0 | 214 |

| INTERMITTENT | INDETERMINATE | TOTAL |
|---|---|---|
| 19 | 0 | 486 |
| 9 | 0 | 722 |
| 2 | 0 | 270 |
| 3 | 0 | 1306 |
| 41 | 0 | 1222 |
| 2 | 0 | 13 |
| 50 | 0 | 1215 |
| 2 | 0 | 29 |
| 14 | 0 | 279 |
| 38 | 0 | 877 |
| 0 | 0 | 12 |
| 1 | 0 | 29 |
| 41 | 0 | 339 |
| 1 | 0 | 22 |
| 45 | 0 | 1387 |
| 176 | 0 | 3923 |
| 50 | 0 | 1530 |
| 97 | 0 | 1631 |
| 1 | 0 | 19 |
| 15 | 0 | 1050 |
| 37 | 0 | 1062 |
| 9 | 0 | 57 |
| 55 | 0 | 1311 |
| 2 | 0 | 11 |
| 33 | 0 | 1081 |
| 0 | 0 | 6 |
| 1 | 0 | 14 |
| 40 | 0 | 1644 |
| 2 | 0 | 41 |
| 51 | 0 | 1422 |
| 1 | 0 | 10 |
| 10 | 0 | 211 |
| 15 | 0 | 168 |
| 11 | 0 | 2193 |
| 44 | 0 | 1292 |
| 2 | 0 | 16 |
| 6 | 0 | 35 |
| 1 | 0 | 9 |

| INTERMITTENT | INDETERMINATE | TOTAL |
|---|---|---|
| 61 | 0 | 1342 |
| 33 | 0 | 1848 |
| 0 | 0 | 29 |
| 33 | 0 | 1187 |
| 522 | 0 | 972 |
| 1 | 0 | 14 |
| 53 | 0 | 1543 |
| 47 | 0 | 1767 |
| 2 | 0 | 27 |
| 32 | 0 | 1111 |
| 2 | 0 | 13 |
| 1 | 0 | 20 |
| 80 | 0 | 1954 |
| 62 | 0 | 1135 |
| 23 | 0 | 389 |
| 12 | 0 | 84 |
| 18 | 0 | 18 |
| 3 | 0 | 7 |
| 5 | 0 | 14 |
| 2 | 0 | 6 |
| 7 | 0 | 161 |
| 2 | 0 | 7 |
| 7 | 0 | 7 |
| 1 | 0 | 3 |
| 3 | 0 | 24 |
| 3 | 0 | 14 |
| 7 | 0 | 110 |
| 31 | 0 | 602 |
| 9 | 0 | 21 |
| 308 | 0 | 772 |
| 1 | 0 | 9 |
| 66 | 0 | 75 |
| 26 | 0 | 95 |
| 51 | 0 | 129 |
| 14 | 0 | 42 |
| 8 | 0 | 62 |
| 6 | 0 | 22 |
| 32 | 0 | 95 |

| INTERMITTENT | INDETERMINATE | TOTAL |
|---|---|---|
| 11 | 0 | 17 |
| 7 | 0 | 20 |
| 14 | 0 | 27 |
| 14 | 0 | 122 |
| 35 | 0 | 76 |
| 65 | 0 | 241 |
| 9 | 0 | 25 |
| 0 | 0 | 49 |
| 0 | 0 | 92 |
| 3 | 0 | 575 |
| 0 | 0 | 26 |
| 0 | 0 | 21 |
| 2 | 0 | 64 |
| 0 | 0 | 2 |
| 25 | 0 | 415 |
| 4 | 0 | 9 |
| 9 | 0 | 18 |
| 54 | 0 | 263 |
| 25 | 0 | 178 |
| 6 | 0 | 30 |
| 9 | 0 | 14 |
| 8 | 0 | 101 |
| 5 | 0 | 8 |
| 11 | 0 | 36 |
| 23 | 0 | 85 |
| 8 | 0 | 19 |
| 6 | 0 | 34 |
| 19 | 0 | 37 |
| 20 | 0 | 85 |
| 2 | 0 | 67 |
| 0 | 0 | 95 |
| 0 | 0 | 169 |
| 5 | 0 | 230 |
| 1 | 0 | 45 |
| 0 | 0 | 79 |
| 0 | 0 | 8 |
| 2 | 0 | 71 |
| 9 | 0 | 437 |

| INTERMITTENT | INDETERMINATE | TOTAL |
|---:|---:|---:|
| 120 | 0 | 3919 |
| 8 | 0 | 602 |
| 21 | 0 | 571 |
| 47 | 0 | 570 |
| 114 | 0 | 1943 |
| 31 | 0 | 2119 |
| 146 | 0 | 1727 |
| 148 | 0 | 2352 |
| 325 | 0 | 2526 |
| 35 | 0 | 3772 |
| 13 | 0 | 873 |
| 37 | 0 | 711 |
| 177 | 0 | 2208 |
| 74 | 0 | 1420 |
| 1 | 0 | 35 |
| 1 | 0 | 31 |
| 2 | 0 | 35 |
| 41 | 0 | 149 |
| 165 | 0 | 490 |
| 58 | 0 | 357 |
| 0 | 0 | 4 |
| 1 | 0 | 4 |
| 118 | 0 | 190 |
| 316 | 0 | 6992 |
| 25 | 0 | 56 |
| 17 | 0 | 108 |
| 32 | 0 | 349 |
| 48 | 0 | 182 |
| 20 | 0 | 225 |
| 5 | 0 | 82 |
| 11 | 0 | 414 |
| 10 | 0 | 284 |
| 758 | 0 | 2942 |
| 680 | 28 | 2296 |
| 98 | 0 | 257 |
| 10 | 0 | 104 |
| 15 | 0 | 93 |
| 215 | 0 | 6257 |

| INTERMITTENT | INDETERMINATE | TOTAL |
|---:|---:|---:|
| 771 | 0 | 6154 |
| 23 | 0 | 1131 |
| 5 | 0 | 1486 |
| 0 | 0 | 7 |
| 32 | 0 | 642 |
| 18 | 0 | 267 |
| 6 | 0 | 113 |
| 2 | 0 | 17 |
| 4 | 0 | 195 |
| 2 | 0 | 80 |
| 15 | 0 | 72 |
| 82 | 0 | 3620 |
| 19 | 0 | 640 |
| 15 | 0 | 190 |
| 101 | 0 | 2615 |
| 37 | 0 | 1230 |
| 6 | 0 | 707 |
| 319 | 0 | 4836 |
| 2 | 0 | 16 |
| 22 | 0 | 543 |
| 0 | 0 | 80 |
| 0 | 0 | 39 |
| 4 | 0 | 40 |
| 3 | 0 | 886 |
| 1418 | 0 | 9776 |
| 4 | 0 | 137 |
| 1 | 0 | 9 |
| 2 | 0 | 74 |
| 0 | 0 | 19 |
| 77 | 0 | 1229 |
| 4 | 0 | 112 |
| 0 | 0 | 8 |
| 76 | 0 | 493 |
| 25 | 0 | 328 |
| 7 | 0 | 86 |
| 3749 | 0 | 5899 |
| 9 | 0 | 125 |
| 31 | 0 | 423 |

| INTERMITTENT | INDETERMINATE | TOTAL |
|---|---|---|
| 108 | 0 | 2707 |
| 9 | 0 | 78 |
| 67 | 0 | 1265 |
| 3 | 0 | 326 |
| 215 | 0 | 1911 |
| 18 | 0 | 74 |
| 1 | 0 | 13 |
| 1 | 0 | 4 |
| 2 | 0 | 49 |
| 15 | 0 | 21 |
| 1 | 0 | 4 |
| 7 | 0 | 13 |
| 0 | 0 | 10 |
| 14 | 0 | 512 |
| 11 | 0 | 14 |
| 27 | 0 | 57 |
| 192 | 0 | 4556 |
| 9 | 0 | 72 |
| 30 | 0 | 4199 |
| 37 | 0 | 1388 |
| 34 | 0 | 107 |
| 36 | 0 | 653 |
| 16 | 0 | 18 |
| 18 | 0 | 222 |
| 6 | 0 | 67 |
| 4 | 0 | 70 |
| 12 | 3 | 1188 |
| 24 | 0 | 236 |
| 1 | 0 | 4 |
| 0 | 0 | 7 |
| 0 | 0 | 1189 |
| 0 | 0 | 1 |
| 0 | 0 | 23 |
| 17 | 0 | 124 |
| 10 | 0 | 142 |
| 22 | 0 | 938 |
| 56 | 0 | 662 |
| 95 | 0 | 727 |

| INTERMITTENT | INDETERMINATE | TOTAL |
|---:|---:|---:|
| 331 | 0 | 1682 |
| 172 | 0 | 2949 |
| 3 | 0 | 758 |
| 33 | 0 | 1221 |
| 189 | 0 | 2755 |
| 223 | 0 | 1755 |
| 32 | 0 | 323 |
| 65 | 0 | 808 |
| 22 | 0 | 1137 |
| 2 | 0 | 846 |
| 25 | 0 | 673 |
| 53 | 0 | 1321 |
| 2 | 0 | 52 |
| 63 | 0 | 3465 |
| 14 | 17 | 221 |
| 11 | 16 | 367 |
| 7 | 0 | 676 |
| 9 | 8 | 460 |
| 47 | 155 | 984 |
| 20 | 0 | 434 |
| 17 | 0 | 254 |
| 303 | 0 | 3349 |
| 235 | 0 | 2324 |
| 3 | 0 | 38 |

**yee by Facility or Department:**          **232328**

# Exhibit 20

Case 4:01-cv-01351-JST Document 3221-2 Filed 03/25/20 Page 67 of 249



News    Election 2020    Politics    Education    Housing    Immigration

CORONAVIRUS

# California Prisons Are a 'Tinderbox of Potential Infection,' Former CDCR Secretary Warns

 **LISTEN**   3 min

By Sukey Lewis, Marisa Lagos, Julie Small    Mar 23

   



An inmate of a state prison in Los Angeles County tested positive for COVID-19, prison officials announced Sunday, and staff at three other prisons have also been diagnosed with the disease. *(Michal Czerwonka/Getty Images)*

Case 4:01-cv-01351-JST Document 3221-2 Filed 03/25/20 Page 68 of 249

A man held at the California State Prison in Los Angeles County is the first inmate in the state to test positive for COVID-19, according to the California Department of Corrections and Rehabilitation. He was put in isolation on March 19 after telling staff he felt sick.

As of Monday, five correctional officers in three different prisons — California Institution for Men in Chino, Folsom State Prison and California State Prison, Sacramento — have also been diagnosed with the disease caused by the novel coronavirus. An employee at San Quentin State Prison reported on Friday to have tested positive for COVID-19 does not in fact have the disease, prison officials said Saturday.

Scott Kernan, a former secretary of CDCR, is among officials and inmate rights groups expressing concern over a potentially widespread outbreak in the state's prisons and jails.

"You think cruise ships are a petri dish?" Kernan said in an interview Monday. "Prisons are even more so the mass of humanity. So I'm very concerned about my colleagues and the inmates and their families in jails and prisons across the country."

Sponsored

Kernan said state leaders need to look at all options to reduce the prison population to mitigate the worst impacts of an outbreak. The state's prisons are overcrowded, operating at about 130% of capacity, with more than 123,000 people incarcerated across California. An additional 65,000 people work for the state prison system.

However, all Board of Parole Hearings, which generally assess prisoners who are eligible for release, have been suspended for at least a week. In-person visits and nearly all rehabilitative and educational programs have been canceled in an attempt to slow the spread of the virus.

Kernan said the lack of activities and connection is also likely to take a toll on people being held in prison.

"It's a tinderbox of potential infection as you go forward, especially if you are just watching what's going on around the world," he said. "I know Italy and Brazil had serious violence and even escapes and murders in the jails as a result of COVID-19."

CDCR posted a list of precautions the department is implementing, which includes social distancing, a two-week quarantine for all new inmates and immediate isolation for anyone who has a fever, to prevent the spread of the disease.

## MORE CORONAVIRUS COVERAGE



**A Long List for FEMA's 'Coronavirus Rumor Control' Website**



**Senate Nears Deal on $2 Trillion Coronavirus Stimulus Package**



**So Far, Coronavirus Cases Are Manageable, Say Bay Area Hospitals. But It's Still Early**

But the Prison Law Office and a number of other advocacy groups are also pushing for the state to do more to protect the elderly and those with compromised immune systems in prison.

"We've been imploring the state through various channels to do what county jails are doing all over the state, which is reduce the density of the population by releasing people who are low risk," said Don Specter, executive director of the Prison Law Office.

Last week, the Santa Clara County and Alameda County sheriffs both moved to release hundreds of people early from jail. San Francisco courts have ordered dozens of inmates released early. Contra Costa County is also looking at steps to cut down the number of people held in jail.

On Monday, a group of 28 advocacy organizations wrote a letter to California Attorney General Xavier Becerra requesting the state's top cop expand these localized efforts by directing all sheriffs to release people who have six months or less left on their sentences and asking local law enforcement to reduce arrests and bookings.

"Without action, thousands will likely die with the suffering falling disproportionately on low-income families, particularly Black and Latinx families," the letter says.

Gov. Gavin Newsom addressed the calls from advocates in his Monday afternoon briefing.

"I have no interest — and I want to make this crystal clear — in releasing violent criminals from our system. I won't use a crisis as an excuse to create another crisis," he said.

Newsom said he has a task force looking at how to release people incarcerated for non-violent crimes in a "deliberative" way. He warned that the large-scale release of tens of thousands of prisoners called for by advocacy groups could cause a whole new set of problems for emergency medical providers.

"If we start to release prisoners that are not prepared with their parole plans, they may end up out on the streets and sidewalks, in a homeless shelter," Newsom said.

So far, the prison system has not announced any concrete steps to release people. A spokesperson for CDCR declined to answer questions, but said the department has been posting all COVID-19 updates directly on its website.

"We are continuously evaluating and implementing proactive measures to help prevent the spread of COVID-19 and keep our CDCR population and the community-at-large safe," the CDCR website says. "Additional measures will continue to be developed based on the rapidly-evolving situation."



# KQED

**Stay in touch. Sign up for our daily newsletter.**

Enter your email

**Sign Up**

Copyright © 2020 KQED Inc. All Rights Reserved.

3/24/2020
California Prisons Are a Tinderbox of Potential Infection, Former CDCR Secretary Warns | KQED News
Case 4:01-cv-01351-JST Document 3221-2 Filed 03/25/20 Page 71 of 249

Terms of Service   Privacy Policy   Contact Us



KQED

npr   PBS

TV                  News                Donate

Radio               Science             Help Center

Podcasts            Arts & Culture      About

Events                                  Careers

For Educators                           Corporate Sponsorship

                                        Contact Us

Copyright © 2020 KQED Inc. All Rights Reserved.

Terms of Service    Privacy Policy

Contest Rules       FCC Public Files

# Exhibit 21



SIGN UP ✉

SEARCH 🔍

# Realignment, Incarceration, and Crime Trends in California

## Summary

When California's historic public safety realignment was implemented in October 2011, many were concerned about the impact it would have on crime rates. In a 2013 report, we found that realignment did not increase violent crime in its first year, but that it did lead to an increase in auto thefts. In this report, we assess whether these trends continued beyond realignment's first year. We find that both the prison and jail populations increased slightly since 2012, which means that the number of offenders on the street did not rise from the 18,000 during realignment's first year. This is likely to change with the implementation of Proposition 47, which further reduces California's reliance on incarceration. Our analysis of updated state-level crime data from the FBI confirms our previous findings. Violent crime rates remain unaffected by realignment, and although California's property crime rate decreased in 2013, it did not drop more than in comparable states—so the auto theft gap that opened up in 2012 has not closed. Research indicates that further reductions in incarceration may have a greater effect on crime trends; the state needs to implement effective crime prevention strategies—and it can learn about

alternatives to incarceration successfully implemented by the counties as well as other states.

## Realignment Continues to Unfold

California's public safety realignment, prompted by a federal court mandate to reduce overcrowding in its expensive prison system, is in its fourth year of implementation. The reform decreased the state's reliance on incarceration by changing the sentencing of non-serious, non-violent, and non-sexual felonies and modifying the sanctions for parole violators. Importantly, realignment shifted the responsibility for many lower-level offenders from the California Department of Corrections and Rehabilitation (CDCR) to county jail and probation systems.[1]

Realignment reduced the prison population by about 27,000 by September 2012, the first year of the reform. County jail populations increased by only 9,000, which offset roughly one third of the decline in the prison population. The overall reduction in incarceration meant that more former inmates were on the street, which led to concerns about realignment's impact on the long-run decline in state crime rates. Though 2012 crime data revealed increases in both violent and property crime, our 2013 PPIC report showed that these concerns were mostly unwarranted. We found no evidence that the increase in violent crime was greater than increases in appropriate comparison states. Part of the increase in property crime could be attributed to the prison population decline, but that impact was modest and limited to auto thefts.[2]

In this report, we extend our analysis to assess whether these trends continued into the second year of the reform.[3] It is possible that counties refined their strategies and identified more effective crime prevention approaches. It is also possible that the increase in responsibilities and potentially insufficient resources limited the counties' ability to do this.

## Incarceration Trends

We begin by determining whether the substantial decrease in incarceration continued beyond the first year of realignment. Data on incarceration are more recent than crime data (currently limited to 2013 and earlier), so we can examine the prison population through February 2015 and the jail population through June 2014.

THE PRISON POPULATION DID NOT CONTINUE ITS FIRST-YEAR DECLINE

In September 2011, the month before realignment was implemented, California's prison population stood at 160,700, or 431 inmates per

100,000 residents (Figure 1). Three months later it had dropped to 144,000, and by September 2012 it had fallen to 133,400 (355 inmates per 100,000 residents). After that, the population increased slowly until November 2014, when voters passed Proposition 47.[4] After that, the prison population dropped by almost 5,000, to about 131,200 (or 341 inmates per 100,000 residents). This reduction—along with the increased use of in-state contract beds in both public and private facilities and the opening of a new health care facility in Stockton—has reduced overcrowding and brought the prison population into compliance with the federal court–ordered target of 137.5 percent of design capacity. The prison population now stands at 136.1 percent of design capacity, about 1,200 inmates below the mandate, ahead of the February 2016 deadline.[5]



**Figure 1. After a big first-year drop, the prison population stopped declining until Proposition 47 passed**

SOURCE: California Department of Corrections and Rehabilitation, Weekly Population Report, January 2010–February 2015.
NOTE: Total prison population as of the last day of the month.

## COUNTY JAIL POPULATIONS ARE GROWING AT A SLOWER RATE

With the diversion of both newly sentenced lower-level felons and parole violators to county jail, California's average daily jail population (ADP) increased significantly by the end of the first year of realignment (from about 71,800 to 80,900). California's jail incarceration rate increased from about 191 per 100,000 residents before realignment to 214 a year later. Since then the rate has not changed much and now stands around 216. Although the county jail population has continued to rise, it is increasing

at a much slower rate. The monthly average daily population increased by 1,800 in the second year of realignment and by an additional 350 in the first nine months of the third year. In other words, about 80 percent of the post-realignment increase in the jail population took place in the reform's first year.

With a number of jails operating at full capacity and under court ordered population caps, increases in the jail population do not fully indicate realignment's impact on incarceration. Early releases of jail inmates prompted by these population caps (known as capacity-constrained releases) also increased noticeably in the first year of realignment, from a monthly average of about 10,700 the year immediately before realignment to 12,300 during its first year, an increase of roughly 15 percent.[6] Average capacity constrained releases went up in the second year by about 700, and now hover around 13,100.



### Figure 2. Jail populations have increased slowly since the first year of realignment

SOURCE: Board of State and Community Corrections, Jail Profile Survey, January 2010–June 2014.

### THE TOTAL INCARCERATION RATE IS HOLDING STEADY

Overall, the data quite clearly show that realignment's impact on both jail and prison incarceration was concentrated in the first year of implementation. The decline in prison population was not matched by the increase in jail population, so the combined jail and prison incarceration rate dropped from 619 per 100,000 residents to 566. Between September 2012 and June 2014, the combined jail and prison populations have increased at a pace slightly above the overall rate of population

Case 4:01-cv-01351-JST   Document 3221-2   Filed 03/25/20   Page 77 of 249

growth in the state. The total incarceration rate has increased only marginally, by 0.3 percent, to 568 inmates per 100,000 residents.[7] Furthermore, capacity-constrained releases have leveled off.

In sum, the number of offenders not incarcerated as a result of realignment changed very little after the first year of the reform. It will be important to track the impact of Proposition 47—the prison population data reveal a noticeable drop of about 5,000 in the first four months since its passage in November 2014. But so far, to the extent that the overall decline in the incarceration rate was the main determinant behind the 2012 increase in property crime,[8] our analysis suggests no additional impact of realignment on crime in 2013, unless the impact occurred with a delay.

## California's Crime Rates Declined in 2013

The Federal Bureau of Investigation's (FBI) Uniform Crime Report data show that after increasing slightly in 2012, California's violent crime rate dropped by 6.4 percent in 2013, to a 46-year low of 396 per 100,000 residents. As shown in Figure 3, the greatest percentage decrease in 2013 was in the murder rate, which dropped 8 percent—from 5 homicides per 100,000 residents to 4.6. But other violent crime categories also saw declines that ranged from 5.3 percent (rape) to 6.8 percent (aggravated assault).



Figure 3. California saw declines in all violent offense categories in 2013

SOURCE: FBI, Uniform Crime Reports, 2012–13.
NOTE: The percentage changes refer to the 2012–13 change in the crime rate, defined as number of crimes per 100,000 residents. Violent crime includes homicide, rape, robbery, and aggravated assault.

Case 4:01-cv-01351-JST Document 3221-2 Filed 03/25/20 Page 78 of 249

Property crime increased quite noticeably in 2012—by 7.8 percent—but dropped in 2013 by 3.8 percent (Figure 4). The decline was seen in all property crime categories, ranging from a 6.4 percent drop in burglaries to 2.8 percent in motor vehicle thefts. In spite of the drop in motor vehicle thefts from 444 per 100,000 residents to 431, California continues to have the highest auto theft rate in the country.



**Figure 4. Property crime declined by less than violent crime in 2013**

SOURCE: FBI Uniform Crime Reports, 2012–13.

NOTE: The percentage changes refer to the 2012–13 change in the crime rate, defined as number of crimes per 100,000 residents. Property crime includes burglary, motor vehicle theft, and larceny theft (including non-felonious larceny theft).

The encouraging news that crime rates have returned to their long-term declining trend might suggest that the 2012 increase was an anomaly. To better understand the extent to which this is true, we turn to a comparison of California's crime trends to those of other states. If the observed 2012 increase in property crime was truly unrelated to realignment, we might expect California's 2013 decline in crime rates to reduce or erase the gap between California and comparison states estimated in our 2013 report.

HOW DOES CALIFORNIA'S DECLINE COMPARE TO OTHER STATES?

The FBI crime data show that the 2013 drop in violent crime rates in California was somewhat greater than, but roughly in line with, changes in other states. Table 1 shows that the statewide decline in violent crimes was slightly greater than the national average. Eighteen states experienced a greater decrease in the violent crime rate than California's 6.4 percent, and 17 to 26 states experienced greater drops in murder,

rape, robbery, and aggravated assault rates. California's decline in violent crimes is greater than declines in neighboring states but less than what was observed in two other western states, Washington and Montana.

### Table 1. The 2013 drop in California's violent crime rates was comparable to declines in most other states

| | Violent crime | Murder | Rape | Robbery | Aggravated assault |
|---|---|---|---|---|---|
| California | -6.4% | -8.0% | -5.3% | -5.9% | -6.8% |
| Nationwide | -5.1% | -4.3% | -7.0% | -3.5% | -5.6% |
| Number of states with greater decreases | 18 | 21 | 26 | 17 | 20 |
| Other western states | | | | | |
| Arizona | -5.3% | -1.8% | 1.7% | -10.3% | -4.2% |
| Colorado | -5.3% | 17.2% | -4.9% | -8.6% | -4.6% |
| Idaho | -2.4% | -10.5% | -8.7% | -10.5% | -0.4% |
| Montana | -13.7% | -24.1% | -27.4% | 0.0% | -12.3% |
| Nevada | -2.9% | 28.9% | 15.7% | 4.0% | -7.9% |
| New Mexico | 6.6% | 7.1% | 17.6% | -2.0% | 7.2% |
| Oregon | -1.7% | -13.0% | 24.9% | -1.6% | -6.8% |
| Utah | 0.6% | -5.6% | 0.3% | 10.6% | -2.2% |
| Washington | -6.8% | -25.8% | -20.9% | -0.7% | -6.6% |
| Wyoming | -1.8% | 20.8% | -7.5% | 21.7% | -2.7% |

SOURCE: FBI Uniform Crime Reports, 2012–13.
NOTE: The percentage changes refer to the percent change in the number of crimes per 100,000 residents between 2012 and 2013.

Property crime declined less in California than in the U.S. as a whole (Table 2). Thirty-three states saw greater property crime decreases than California. California's property crime rate fell by less than the rates in three western states (Arizona, Idaho, and Wyoming). A handful of western states saw increases in property crime, including Nevada, New Mexico, and Washington.

Overall, the data suggests that the 2013 changes in crime in California do not stand out compared to trends nationwide or in neighboring and other western states.

Case 4:01-cv-01351-JST Document 3221-2 Filed 03/25/20 Page 80 of 249

### Table 2. California's 2013 property crime decrease was less than that of most other states

| | Property crime | Burglary | Larceny theft | Motor vehicle theft |
|---|---|---|---|---|
| California | -3.8% | -6.4% | -3.0% | -2.8% |
| Nationwide | -4.8% | -9.3% | -3.4% | -3.9% |
| Number of states with greater decreases | 33 | 34 | 30 | 26 |
| Other western states | | | | |
| Arizona | -3.9% | -9.3% | -1.5% | -9.2% |
| Colorado | -1.0% | -5.6% | -0.2% | 2.0% |
| Idaho | -6.5% | -9.2% | -6.7% | 10.0% |
| Montana | -1.5% | 2.7% | -3.1% | 7.9% |
| Nevada | 0.8% | 2.9% | 0.4% | -1.5% |
| New Mexico | 2.8% | 0.4% | 3.3% | 8.0% |
| Oregon | -2.1% | -6.5% | -0.8% | -4.6% |
| Utah | -2.4% | 0.2% | -5.1% | 21.8% |
| Washington | 0.6% | -6.0% | 2.2% | 5.4% |
| Wyoming | -4.1% | -9.0% | -3.3% | -2.1% |

SOURCE: FBI Uniform Crime Reports, 2012–13.
NOTE: The percentage changes refer to the percent change in the number of crimes per 100,000 residents between 2012 and 2013.

Simple comparisons between California and other states cannot tell us conclusively whether its trends are truly unique. To determine whether crime trends have been affected by realignment, we identified a combination of states that best represents what California's crime rates would have been had the state not implemented realignment.

REALIGNMENT'S MODEST IMPACT

As we did in our previous report, we use a data driven matching strategy to identify a combination of states with crime trends similar to California's prior to realignment (the so-called synthetic control method).[9] The post-realignment crime trends of this matched group of states best represent what the crime rates would have been in California had the state not implemented realignment.

There is still no evidence that realignment has affected violent crime. Figure 5 shows that California's violent crime rate continues to follow the trend of its comparison states. Post-realignment changes in violent crime in California fluctuate in ways that are similar to the comparison states, and none of the deviations from the trend are statistically significant.[10] We also analyze each of the four violent crime offense trends separately and find that changes in rates of murder, rape, aggravated assault, and

robbery in California do not stand out when compared to changes in other states.[11]



Figure 5. California's violent crime trend continues to match trends in comparison states

SOURCE: Authors' estimates based on annual state level data from the FBI's Uniform Crime Reports, 2000–2013.

NOTE: The matched comparison states (with estimated weights in parentheses) are Florida (0.338), Maryland (0.161), Montana (0.068), New York (0.214), Rhode Island (0.191), and South Carolina (0.029).

Our analysis of property crime trends shows that the gap between California and other states that emerged in 2012 remains unchanged in 2013. Figure 6 shows that California's pre-realignment property crime trend can be closely matched to that of a set of comparison states. The trends start to diverge in 2011, the year in which realignment was implemented; by 2012 there was a noticeable gap. In 2013, California's property crime rate declined, but not at a greater rate than in comparable states. Our analysis of the three property offense categories of burglary, larceny theft, and motor vehicle theft reveals that the post-realignment increase in property crime has been driven by an increase in the auto theft rate.[12]



Figure 6. The property crime rate gap between California and comparison states persisted in 2013

SOURCE: Authors' estimates based on annual state level data from the FBI's Uniform Crime Reports, 2000–2013.

NOTE: The matched comparison states (with estimated weights in parentheses) are Colorado (0.033), Georgia (0.001), Kentucky (0.133), Massachusetts (0.032), Nevada (0.163), Tennessee (0.075), West Virginia (0.041), and Wyoming (0.522).

## Policy Implications

As we have seen, one of realignment's major effects in its first four years has been to decrease California's reliance on incarceration. The state prison population has declined substantially without causing a corresponding one-to-one increase in the county jail population. As of June 2014, the state's incarceration rate had dropped by slightly more than 8 percent, from 622 inmates per 100,000 residents to 570. Importantly, our research shows that this reduction has had a very limited impact on crime. As we reported in our earlier work, and updated here with 2013 crime data, our analyses reveal no evidence that realignment has so far had an impact on violent crime rates. The only effect we can attribute to realignment is a noticeable rise in motor vehicle thefts. Our estimates indicate that realignment increased the auto theft rate by slightly more than 70 per 100,000 residents, an increase of about 17 percent.

From a cost-benefit perspective, incarceration does prevent some crime, but at current rates its effect is very limited.[13] The estimated crime preventive effects remain unchanged from our earlier report: each additional dollar spent on incarceration generates only 23 cents in "crime

Case 4:01-cv-01351-JST   Document 3221-2   Filed 03/25/20   Page 83 of 249

savings." This suggests that the state would benefit from seeking alternative crime preventive strategies. There are many promising approaches—from early childhood programs and targeted interventions for high-risk youth to increased policing and cognitive behavioral therapy. Also promising are alternative systems for managing probationers and parolees—including swift-and-certain yet moderate sanctions that have been implemented by systems such as Hawaii's Opportunity Probation with Enforcement (HOPE).

Arguably, it is more important than ever to identify and implement effective strategies in California. The recently passed Proposition 47, which converted a number of drug and property offenses from felonies to misdemeanors, will further decrease California's reliance on incarceration. At high incarceration rates, reduced reliance on incarceration appears to have a small and very limited effect on crime, but this effect might become larger with further declines.[14] Hence, it is particularly important to redirect incarceration savings to effective crime-preventive strategies, such as those mentioned above. Additionally, realignment's shift of responsibilities from the state to the county level means that a number of strategies have already been implemented—some more successfully than others.[15] More resources should be devoted to identifying effective alternative strategies and determining whether those efforts can be expanded and replicated around the state.

SHARE   |   PRINT   |   DOWNLOAD PDF

## NOTES

1. Realignment shifted responsibility and funding from the state in three main ways. First, lower-level offenders convicted of non-sexual, non-violent, and non-serious (so-called triple-non) crimes and who have no sexual, serious, or violent crimes in their criminal records now serve their sentences under county supervision rather than in state prisons. Second, parole violators who violate the terms of their release but are not convicted of a new felony are no longer sent to state prison but serve short stays in county jails or face other local sanctions. Third, most offenders serving time in state prison for triple-non offenses will now, upon release from prison, be supervised by county probation departments rather than state parole. Realignment also reduced the maximum incarceration period for probation or parole violations from one year to six months.

2. Magnus Lofstrom and Steven Raphael, *Public Safety Realignment and Crime Rates in California*, (PPIC 2013).

3. It is important to note that crime data are currently available only through 2013, which limits our analysis of realignment's potential impact on crime to roughly the first two years (27 months, to be precise) of the reform.

4. Proposition 47 classifies a number of drug and property offenses as misdemeanors instead of felonies or wobblers (wobblers may be charged as misdemeanors or felonies at the discretion of the prosecutor). Moreover, the new law—which went into effect November 5—permits offenders to file for resentencing, meaning that those who are resentenced could be released from jail or prison.

5. California was sued in federal court for providing inadequate mental health care and medical care to its prison inmates. As a result, in 2007 a three-judge panel determined that excessive crowding in the state's prisons prevented improved conditions and ordered the state in 2009 to reduce its institutional population to 137.5 percent of design capacity. The state appealed to the U.S. Supreme Court, which upheld the mandate in May 2011.

6. Given that there are no currently available data on the extent to which capacity-constrained releases shorten sentences, we do not know how many additional offenders are on the street as a result of this increase.

7. As of June 2014, the most recent month for which statewide jail population data is available.

8. Lofstrom and Raphael, *Public Safety Realignment and Crime Rates in California*.

9. For more detail about the application of the synthetic control method in this context, see the Technical Appendix to Lofstrom and Raphael, *Public Safety Realignment and Crime Rates in California*.

10. To test whether the differences between California and the matched comparison states are statistically significant, we re-run the matching process for the other states, generating a set of matched states for each and then comparing the observed post-realignment differences to the pre-realignment-year differences. A ranking of the magnitude of the estimated changes tells us whether California's changes stand out and provides the basis for statistical significance. California's post-realignment change would be statistically significant at the commonly used 5 percent significance level if it ranked first or second. At a 10 percent significance level, the change would need to be ranked fourth or higher. California's post-realignment change in the violent crime rate ranks no higher than 14th when we simulate a policy change in all other states.

11. California's post-realignment change in each of the violent offense category never ranks higher than 10th when we simulate a policy change in all other states.

12. California's post-realignment increase in motor vehicle theft is larger than increases in the other states and subsequently ranks first. The increases in burglaries and larceny thefts never rank higher than 10th and hence are statistically insignificant.

13. Although inherently difficult and controversial, the crime prevention associated with incarceration can be assessed in the context of cost-benefit analysis. Assuming that costs associated with crime can be measured reliably, the costs of crimes avoided due to incarceration—a benefit—can be juxtaposed against the costs of incarceration. Clearly, the costs associated with violent crime are both more controversial and more difficult to ascertain than are the costs associated with property crime. Nonetheless, there is a growing body of research that places a dollar value on the social costs of specific criminal offenses. The general approach is to obtain estimates of so-called willingness-to-pay to reduce the probability of experiencing an undesirable outcome, such as having one's car stolen (this is similar to the approach used to generate estimates of other difficult-to-determine costs such as those associated with pollution). See Paul Heaton, "Hidden in Plain Sight: What Cost-of-Crime Research Can Tell Us about Investing in Police" (RAND 2010) for a summary of the approaches used and societal crime cost estimates based on the relevant literature.

14. See for example Raymond Liedka, Anne Morrison Piehl, and Bert Useem, "The Crime Control Effect of Incarceration: Does Scale Matter?" *Criminology and Public Policy* 5 (2006): 245–75; Paolo Buonanno and Steven Raphael, "Incarceration and Incapacitation: Evidence from the 2006 Italian Collective Pardon," *American Economic Review* 103 (2013): 2437–65; and Lofstrom and Raphael, *Public Safety Realignment and Crime Rates in California*.

15. Jeffrey Lin and Joan Petersilia, *Follow the Money: How California Counties Are Spending Their Public Safety Realignment Funds* (Stanford Criminal Justice Center, 2013); Mia Bird and Ryken Grattet, *Do Local Realignment Policies Affect Recidivism in California?* (PPIC 2014). Some early evidence of a certain degree of success is that in spite of reduced incarceration as a sanction for parole violations (as a result of lower maximum sentence for a parole violation and jail capacity constraints), recidivism rates did not increase in the first year of realignment. In fact, the one-year re-arrest

rate of offenders released from state prison declined by about 2 percentage points compared to pre-realignment releases. See Lofstrom, Raphael, and Grattet, *Is Public Safety Realignment Reducing Recidivism in California?* (PPIC 2014).

^ BACK TO TOP

---

## ACKNOWLEDGMENTS

This report has benefited significantly from comments and suggestions by Mia Bird, Sarah Bohn, Emma Hughes, Mary Severance, Drew Soderborg, and Lynette Ubois.

**MAY 2015**
PRINT
SHARE
DOWNLOAD PDF

## AUTHORS



Magnus Lofstrom
Policy Director and Senior Fellow



Steven Raphael
Adjunct Fellow

## PRESS RELEASE

Realignment Leads to an Increase in Auto Theft But Not in Violent Crime

# Exhibit 22

# EXECUTIVE DEPARTMENT
## STATE OF CALIFORNIA

### EXECUTIVE ORDER N-33-20

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** in a short period of time, COVID-19 has rapidly spread throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials; and

**WHEREAS** for the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8627, and 8665 do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) To preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those at the highest risk and vulnerability, all residents are directed to immediately heed the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19. Those directives are consistent with the March 19, 2020, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, found at: https://covid19.ca.gov/. Those directives follow:

   ORDER OF THE STATE PUBLIC HEALTH OFFICER
   March 19, 2020

   To protect public health, I as State Public Health Officer and Director of the California Department of Public Health order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, I may designate additional sectors as critical in order to protect the health and well-being of all Californians.

   Pursuant to the authority under the Health and Safety Code 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this order is to go into effect immediately and shall stay in effect until further notice.

   The federal government has identified 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or

destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. I order that Californians working in these 16 critical infrastructure sectors may continue their work because of the importance of these sectors to Californians' health and well-being.

This Order is being issued to protect the public health of Californians. The California Department of Public Health looks to establish consistency across the state in order to ensure that we mitigate the impact of COVID-19. Our goal is simple, we want to bend the curve, and disrupt the spread of the virus.

The supply chain must continue, and Californians must have access to such necessities as food, prescriptions, and health care. When people need to leave their homes or places of residence, whether to obtain or perform the functions above, or to otherwise facilitate authorized necessary activities, they should at all times practice social distancing.

2) The healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them.

3) The Office of Emergency Services is directed to take necessary steps to ensure compliance with this Order.

4) This Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 19th day of March 2020.

_____

GAVIN NEWSOM
Governor of California

**ATTEST:**

_____

ALEX PADILLA
Secretary of State



# Exhibit 23

# EXECUTIVE DEPARTMENT
## STATE OF CALIFORNIA

### EXECUTIVE ORDER N-36-20

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the impacts of COVID-19; and

**WHEREAS** despite sustained efforts, COVID-19 continues to spread and is impacting nearly all sectors of California; and

**WHEREAS**, state and local correctional and public safety leaders are building on their longstanding partnership, to protect public health and safety in the context of the COVID-19 crisis; and

**WHEREAS** the California Department of Corrections and Rehabilitation (CDCR) has infectious disease management plans in place to address communicable disease outbreaks such as influenza, measles, mumps, norovirus, and varicella, and CDCR has taken a series of additional proactive steps to reduce the risk of introducing and spreading COVID-19 in CDCR facilities, including:

- educating staff, inmates, and visitors regarding ways they can protect themselves and those around them from COVID-19;

- screening staff before they enter work locations;

- increasing cleaning and sanitation of CDCR facilities and providing staff and inmates with access to additional soap and sanitizing products;

- quarantining inmates arriving from county jails;

- restricting visitors and volunteers, and offering free methods for inmates to communicate with family members, friends, and attorneys;

- limiting inmate transfers including suspending out-of-state parole or inmate transfers to California for 30 days; and

- suspending scheduled in-person parole visits, except when statutorily required, for critical needs, or in emergencies; and

- eliminating parole revocations in many cases; and

**WHEREAS** the Governor's Office of Emergency Services has operated and continues to operate a multi-agency correctional task force to identify additional steps necessary, as this emergency develops, for action to protect health and safety; and

**WHEREAS** many inmates who are confined in state prison are entitled to timely parole hearings under the California Constitution, the Penal Code, and a federal three-judge court order; and

**WHEREAS** COVID-19 and the response thereto have impaired the Board of Parole Hearings' ability to meet the usual statutory and regulatory requirements to timely conduct parole hearings in person; and

**WHEREAS** inmates, inmates' counsel, victims and their representatives, and representatives of the people have the right to be heard at parole hearings, but such hearings must be secure and safe for all participants; and

**WHEREAS** under the provisions of Government Code section 8571, I find that strict compliance with various statutes and regulations specified in this order would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19 pandemic.

**NOW, THEREFORE, I, GAVIN NEWSOM**, Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8627, 8567, and 8571, do hereby issue the following order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1. To protect the health, safety, and welfare of inmates in the custody of CDCR and staff who work in the facilities, I direct the Secretary of CDCR to use his emergency authority under California Penal Code section 2900(b) to suspend intake into state facilities for 30 days by directing that all persons convicted of felonies shall be received, detained, or housed in the jail or other facility currently detaining or housing them for that period. Consistent with California Penal Code section 2900(b), the time during which such person is housed in the jail or other facility shall be computed as part of the term of judgment. I further order the Secretary to suspend intake into Division of Juvenile Justice (DJJ) facilities for 30 days. To the extent that any statutory or other provisions require DJJ to accept new juveniles into its facilities, such provisions are waived or suspended. The Secretary may grant one or more 30-day extensions of the suspension of intake or commitment if suspension continues to be necessary to protect the health, safety, and welfare of inmates and juveniles in CDCR's custody and staff who work in the facilities.

2. The Board of Parole Hearings is directed to develop a process for conducting parole hearings by videoconference and shall confer with stakeholders in developing this process.  The Board of Parole Hearings shall endeavor to make parole hearings conducted via videoconference accessible to all participants specified in the Penal Code and the California Code of Regulations.  This process shall be operational no later than April 13, 2020.

3. To protect the health and welfare of inmates, hearing board officers, inmates' counsel, victims and their representatives, and representatives of the people, the Board of Parole Hearings is directed to cease conducting in-person parole hearings for 60 days and shall postpone any scheduled parole hearings until April 13, 2020, or an earlier date at which it is able to accommodate conducting parole hearings by video conference.  The Secretary may grant one or more 30-day extensions of the prohibition on in-person parole hearings if it continues to be necessary to protect the health, safety, and welfare of inmates in CDCR's custody, staff who work in the facilities, hearing officers, victims and their representatives, and representatives of the people.

4. For the next 60 days, and for the term of any extensions, inmates scheduled for a parole hearing can elect to continue with their timely parole hearing by videoconference, to accept a postponement of their parole hearing, or to waive their hearing.

   a. Any parole hearing postponed under this provision shall be rescheduled for the earliest practicable date.

   b. All rights for all participants delineated by state law will be applied to hearings postponed and rescheduled.

   c. To the extent that an inmate is required to show good cause to waive or postpone his or her hearing under California Code of Regulations, title 15, section 2253, subdivisions (b)(3) and (d)(2), such requirements are suspended for the next 60 days, and for the term of any extensions.

5. For the next 60 days, and for the term of any extensions, to the extent that any law or regulation gives any person the right to be present at a parole hearing, that right is satisfied by the opportunity to appear by videoconference.  Specifically:

   a. For inmates who choose to go forward with their parole hearing by videoconference during the next 60 days, and during the term of any extensions, the inmate's right to be present and to meet with a Board of Parole Hearing's panel under Penal Code sections 3041, subdivision (a)(2), 3041.5, subdivision (a)(2), and California Code of Regulations, title 15, section 2247, is satisfied by appearance through videoconference.

   b. For inmates who choose to go forward with their parole hearing by videoconference during the next 60 days, and during the term of any extensions, Penal Code section 3041.7 and California Code of Regulations, title 15, section 2256, which provide that an inmate has the right to be represented by an attorney at parole hearings, will be satisfied by the attorney appearing by videoconference and by providing for privileged teleconferencing between the inmate and attorney immediately before and during the hearing.  Such inmates will also be provided reasonable time and opportunity for privileged communications by telephone with their retained or appointed counsel prior to the hearing at no charge to either party.

   c. For hearings conducted by videoconference during the next 60 days, and during the term of any extensions, the right of victims, victims' next of kin, members of the victims' family and victims' representatives to be present at a parole hearing will be satisfied by the opportunity to appear by videoconference, teleconference, or by written or electronically recorded statement, consistent with California Constitution, Article I, section 28, subdivision (b)(7), Penal Code section 3043, subdivision (b)(1) and California Code of Regulations, title 15, section 2029, and as provided in Penal Code sections 3043.2 and 3043.25.

    d. For hearings conducted by videoconference during the next 60 days, and during the term of any extensions, Penal Code section 3041.7 providing that the prosecuting attorney may represent the interests of the people at the hearing will be satisfied by the opportunity to appear by videoconference, teleconference, or a written statement.

       **IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

       This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees or any other person.

       **IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 24th day of March 2020.


GAVIN NEWSOM
Governor of California


**ATTEST:**


_____

ALEX PADILLA
Secretary of State



# Exhibit 24























March 13, 2020

Governor Gavin Newsom
1303 10th Street, Suite 1173
Sacramento, CA 95814

Sent via email: governor@governor.ca.gov, gavin.newsom@gov.ca.gov

To the Honorable Gavin Newsom, Governor of the State of California:

We are calling on you to act immediately to protect the lives of the people impacted by the California Department of Corrections and Rehabilitation (CDCR), including people in custody, staff at CDCR, and the family members and communities of staff and those who are incarcerated. At this time, with the coronavirus threatening the health and lives of untold numbers of people under your care and control, a current prison sentence in California could turn into a death sentence for many.

1

Under California Government Code section 8550, the Emergency Services Act, **you have the power to immediately release people from prisons** and thus work to mitigate the spread of this disease. In 2006, Governor Arnold Schwarzenneggar used these powers to immediately reduce prison overcrowding in California[1]. You must now use this same power to save lives.

## COVID-19 in Prison

COVID-19 outbreaks in California prisons and jails will spread "like wildfire" due to close quarters, overpopulation, unsanitary conditions, overcrowding, and staff that come in and out of the prisons every single day.

California prisons are designed for a maximum capacity of 85,000 people but have been over capacity for decades.

- There are currently over 123,000 people held in CDCR custody.

- Though the prison population has begun to decline in California, it still remains 5 times the size it was in 1980, despite the incredible drop in crime rates since the early 1990s.

This overcrowding and unsanitary conditions will contribute to the spread of COVID-19 within California's prison system. Moreover, it threatens the public at large, as thousands of individuals and correctional, medical, and other staff interact with the incarcerated population and return to their communities.

COVID-19 poses the greatest risk of death to the elderly as well as to those who are immunocompromised, suffer from diabetes, chronic obstructive pulmonary disorder and other lung conditions, high blood pressure, and those with cancer. And in California, we have an aging prison population. Even as the state tried to decrease the number of people in prison, the population of people in prison 55 or older increased by 94 percent between 2005 and 2015, and in 2017, one in seven people in a California prison was age 55 or older. People in this age group are at the greatest risk for death from COVID-19 yet pose the least public safety risk to our communities. Thus evidence supports that this cohort of people can be safely released.

Further, overcrowding has led to too few health care professionals working inside the prisons to provide even an adequate level of care. By releasing the elderly and others who present a low public safety risk from the state's prisons, it will reduce overcrowding and free up health care services to begin to properly address the remaining people kept inside the prisons.

To this end, we are calling on you to immediately:

1. **Release all medically fragile adults and adults over the age of 60 to parole supervision.** Jails and prisons house large numbers of people with chronic illnesses

---

[1] *CCPOA v. Schwarzeneggar* (2008) 163 Cal. App. 4th 802 (Governor had power under Emergency Services Act to act to immediately release to private prisons people incarcerated in a state prison).

2

and complex medical needs, who are more vulnerable to becoming seriously ill and requiring more medical care with COVID-19. And the growing number of older adults in prisons are at higher risk for serious complications from a viral infection like COVID-19. Releasing these vulnerable groups from prison and jail will reduce the need to provide complex medical care or transfers to hospitals when staff will be stretched thin. Individuals who do not have families or others that can offer housing should be released to re-entry facilities.

2. **Release all people who have an anticipated release dates in 2020 and 2021 to parole supervision.** People who have been sentenced to determinate sentences and who would be released soon should be released immediately. This will limit overcrowding and free up beds in facilities that will be needed to care for the sick. These people are overwhelmingly in low-level (Levels 1 and 2) security.

3. **Expedite all review processes for people already found suitable for release, lift holds, and expedite the commutation process.** For all people who have been found suitable for parole by the Board of Parole Hearings, we ask that you expedite the review process and release these parole candidates. Similarly, you should lift all current holds by CDCR for anyone who has been resentenced pursuant to Penal Code sections 1170(d)(1) and 1170.95. We ask that your office also direct increased resources to addressing the commutation applications that are currently before you and grant the many worthy applications expeditiously.

4. **Immediately suspend all unnecessary parole meetings.** People deemed "low risk" should not be required to spend hours traveling to and from meetings, often on public transportation, to wait in administrative buildings for brief check-ins with their parole officers. As many people as possible should be allowed to check in by telephone. Further, people on parole who have been under supervision for three years or longer and have not had an arrest within the last 12 months should be discharged from supervision.

5. **Eliminate parole revocations for technical violations.** Parole officers and others should cease seeking warrants for behaviors that would not warrant incarceration for people not on parole. Reducing these unnecessary incarcerations would reduce the risk of transmitting a virus between the facilities -- jails and prisons -- and the community, and vice versa.

6. **Lift all fees for calls to family members.** As CDCR has limited visits to people who are incarcerated, it is critical that these individuals be able to communicate with their family members and loved ones. All phone calls made by those who are incarcerated to their family members and loved ones should be made free during such time as family visits are limited.

7. **Insist that CDCR adequately address how they will care for people who are incarcerated.** In addition to taking steps to immediately address overcrowding, all people who remain in custody should be cared for. We note that in all of the CDCR information released thus far, there is a shocking lack of concrete details given as to the exact steps CDCR is taking to prevent infections, or to care for those who get sick. CDCR has stated that they will use the same protocols they use for other illnesses, which often means widespread lockdowns or isolating people without care. This approach is both cruel and inadequate. At the very minimum, all people who are incarcerated

must have access to soap and running water. Hand sanitizer should be made widely available and possession of hand sanitizer should be allowed. Appropriate medications and treatment should be available to all without cost. People who are sick should be cared for by appropriate medical staff.

Governor, we know how seriously you take your duty to protect the lives of people living and working in California's prisons and the surrounding communities. As you know, the health, well-being and indeed the lives of these people are quite literally in your hands. We urge you to take immediate and decisive action now to save lives. We will support you in taking the bold, but necessary, action now to protect the health of every Californian, including the most vulnerable.

Sincerely,

The Justice Collaborative
Smart Justice California
ACLU California
Color of Change
Californians for Safety and Justice
Immigrant Legal Resource Center
Ella Baker Center for Human Rights
Asian Americans Advancing Justice -Asian
Law Caucus
California Public Defender's Association
Los Angeles County Public Defenders,
AFSCME Local 148

UnCommon Law
San Francisco Rising
Policy Link
Pillars of the Community
Initiate Justice
Californians United for a Responsible
Budget
La Defensa
The Bail Project
Asian Solidarity Collective
Alliance for Boys and Men of Color
California Prison Moratorium Project

cc:     Dr. Nadine Burke Harris, California Surgeon General
        OSGInfo@osg.ca.gov
        Secretary Ralph Diaz, California Department of Corrections and Rehabilitation
        ralph.diaz@cdcr.ca.gov
        Dr. Diana Toche, Undersecretary, Health Care Services, CDCR
        diana.toche@cdcr.ca.gov
        Dr. Joseph Bick, Director, Division of Correctional Health Care Services, CDCR
        joseph.bick@cdcr.ca.gov

4

# Exhibit 25

     

     

    

   

    

      

     



March 18, 2020

Daniel Seeman, Deputy Cabinet Secretary
daniel.seeman@gov.ca.gov

Kelli Evans, Deputy Legal Affairs Secretary
Kelli.Evans@gov.ca.gov

Dear Dan and Kelli,

As a follow-up to our letter to the Governor on Friday, March 13, 2020, we are writing to suggest more specific steps that can be taken to protect the health and well-being of all people in CDCR custody, the staff, and the surrounding communities. As lawyers, advocates, philanthropists, and service providers, we remain ready to assist in the release process, to increase services for those who are released, and to support those who remain in custody.

California's prisons have been overcrowded for decades. We have an aging population incarcerated. In order to address the public health crisis, actions must be taken now to reduce the population. Public health experts are in agreement about this. The New York Board of Corrections made recommendations yesterday that extend much further than what we are recommending. The Los Angeles Times editorial board issued this today, urging all in charge of jails and prisons to act to expedite releases. The time to act is now.

We understand the valid concerns about where people will go and where they will be housed. Respectfully, when faced with loss of life, the primary goal for prisons must be to "flatten the curve" and provide for as much social distancing as possible. **We join public health experts in concluding that the single most effective way -- perhaps the only way -- to achieve risk-mitigating social distancing inside prisons is through accelerated release and other immediate density reduction steps.** That said, your office and local governments are taking extraordinary steps to house the homeless and those who need to be quarantined, including in hotels and motels.  This can also be done for those released from prison.  Existing service providers and philanthropic organizations stand ready to increase staffing and resources to accommodate an influx of community placement needs.

Below, please find more specific recommendations.

### I.    Population Reduction Proposals to Reduce Risk of Transmission and Death Within Facilities

Our shared goals are 1) to protect those at high risk of COVID-19; 2) mitigate the threat of rapid spread that will overwhelm the health care system by reducing the population density within facilities to 100% of capacity; and 3) ensure that those released do not present either a health risk or a public safety risk to the community.  Accordingly we are recommending the following:

### A.   Emergency release based on an individual's COVID-19 risk

- Age: Release to parole/PCRS individuals 60 and older who have five years or less on their sentence and all those 60 and over who have been determined to be low risk by CDCR's  internal evaluation. This internal evaluation may be a "comprehensive risk assessment" that has been done by the Board of Parole Hearings, or any other assessment tool used by CDCR to assess risk, including current classification score or intake assessment.

- Health: Release to parole/PCRS individuals who are immuno-compromised or who are medically vulnerable because of diabetes, heart disease, respiratory condition, or otherwise, who have five years or less on their sentence and all those in this cohort who have been determined to be low risk by any CDCR  internal evaluation, as defined above.

**B. Density reduction measures**

- Accelerate release to parole/PCRS of those already found suitable for parole by the Board of Parole Hearings.

- Release to parole/PCRS all individuals deemed low risk by CDCR's internal evaluation who have 2 years or less remaining on their sentence.

- Issue an emergency order prohibiting new prison admissions for the duration of the crisis.

- Release to parole/PCRS all women serving determinate sentences, which would allow one facility to be repurposed thereby reducing density in other facilities.

- For all individuals found eligible for release under Prop 57 and all those who have been re-sentenced pursuant to Penal Code section 1170.95 (SB 1437), lift all current holds and release forthwith to parole/PCRS.

- Release to parole/PCRS all those for whom staff have already recommended resentencing under 1170(d).

- We ask that your office also direct increased resources to addressing the commutation applications that are currently before you and grant the many worthy applications immediately.

**C. Reduce density in housing units with high COVID-19 risk**

- Reduce density in the most crowded housing units and dormitory-style housing units.

- Reduce density in housing units with a history of quarantine based on previous outbreaks.

**D. Prevent overload of parole/PCRS case loads**

- Review all people who have passed their Presumptive Discharge Date and remove them from parole unless there has been new criminal behavior within the last 12 months.

- Release parole holds on all parolees currently held in County Jails and prohibit additional detention for parole violations.

- End supervision for anyone who has been on PCRS for two years.

- Conduct a review of all persons on life term parole and consider discharge if a person has been on parole for three years and has had no parole violations within the last twelve months.

## II. Suggestions for Reentry and Transitional Houses To Accommodate Released People

Our shared goals are to provide safe standards for releasing people from prison that both protects the person being released and the community into which they are being released from possible infection.

### A. Ways to increase available housing to accommodate releases and reduce overcrowding

- Allow and encourage those with families and loved ones who can house them to return directly to their families, without requiring a stay in transitional housing.

- Use the Governor's emergency powers to house people in available and vacant buildings that have kitchen facilities and other necessary infrastructure such as hotels, motels and college dorms.

- Provide funding opportunities for existing housing providers to expand rapidly, including offering the use of hotels and motels and other buildings and grant emergency funding for hiring staff.

- Provide resources for re-entry service providers who provide mental health, substance abuse, and housing services so that they can safely remain open in order to provide essential services. For those services that are not open for physical visits, provide support and encouragement for utilizing teleservices.

- Enlist philanthropic organizations to assist with funding. (Should you be interested in pursuing this avenue, we can make introductions to our philanthropic funding partners who have indicated a desire and ability to assist.)

- Restrict unreasonable housing bans for people with convictions who are being released from custody, including any restrictions on living with family members in public housing.

### B. Ways to establish safe standards for releasing people from prison

- Provide all people being released from prison and associated staff with protective gear including hand sanitizer, gloves, and sanitizing wipes.

- Issue an activated Lifeline cellphone during release (aka 'Obama Phone'). This will facilitate connecting with parole and probation in ways that minimize contact. Advocates can assist with this.

- Expand the CAL ID program to everyone released so they can file paperwork and photos and get IDs without visiting DMV in person.

- Work to reduce exposure and the possible spread by having people released from facilities where there has been a confirmed case by releasing people into a safe 14-day quarantine. Such facilities may include hotels and motels, as was provided for by passengers disembarking from a ship.

- Increase the Gate Money allocation by 1) not subtracting cost of clothing or transportation and 2) increasing base amount to $1000.

- Minimize in-person contact between released people and parole/probation officers to protect both parties and reduce use of public transportation for office visits. In lieu of in-person parole meetings, use state-issued cell-phones or Zoom/video check in via a computer in the parolee's home/transitional house.

### III. Ways to Ensure Prisoner Physical and Mental Health During the COVID-19 Pandemic

We have shared goals of ensuring that all people are kept safe and healthy, both mentally and physically during this time. To that end, we start by saying that community groups are available to prepare informational resources for distribution, identify specific products, locate vendors to prepare packages, and to assist with delivery and other logistics.

### A. Distribution of information

To promote the safety and mental health of people living inside prisons, increase the flow of information regarding COVID-19 and the state of the pandemic inside the prison, across the country, and around the world:

- Provide key health information addressing the following topics via prison television stations, flyers, wall posters, and local radio stations:

  - Information on COVID-19: what it is, how it is transmitted, symptoms, and risk groups.

  - Practical guidance for minimizing risk, specifically for people who are incarcerated.

  - Instructions on what to do if feeling ill, and what actions will be taken by the institution (including testing; where will people be housed; what access to the outside world will be provided).

- Instruct the medical staff and warden of each facility to share facility-specific updates daily to a designated inmate council comprised of representatives from each unit or cell block,  e.g. Men's Advisory Council, and to permit the inmate representatives to debrief their respective unit or cell block following each daily update.
- This information should also be made available to people with limited or no English (i.e., deliver in multiple languages), or to those who are non-readers, or with disabilities. Advocates from trusted community organizations are available to produce these resources, in order to increase credibility and compliance with outlined recommendations and reporting.

### B.  Distribution of supplies and materials

Given the labor-intensity and potential health risks of operating canteen and distributing supplies, CDCR should permit the distribution of weekly packages containing the following:

- Cleaning supplies (hand sanitizer, gloves, tissues, cleaning fluid and rags)

- Hygiene products (soap, toothpaste, shampoo, feminine hygiene products as appropriate)

- Non-perishable nutritious food (e.g., trail mix, preserved meat, healthy soup packets)

- Writing materials (wireless notebook)

- Reading materials (books or magazines)

### C.  Communication with family and loved ones

It is imperative that inmates have the ability to safely and regularly communicate with family members and loved ones throughout this crisis.  To eliminate the significant health risks associated with the use of shared landline phones and contraband cell phones, distribute basic cell phones to all people who are quarantined and, potentially, to the entire population.  There is currently technology available to prescribe the telephone numbers that a given phone can call. Advocates are ready to assist with this as necessary.

### D.  Policies and procedures inside

We all want to contain the spread of the virus and care for all inside.  To this end we suggest:

- Provide sanitizing wipes at landline phone stations to reduce person-to-person transmission.

- When feasible, provide 30-day supplies of medications to reduce contact and staff workload.

- Provide low density daily access to yard for anyone who is not ill, and instruct everyone to remain six feet apart at all times.

- Provide access to showers at least every 48 hours.

- Conduct regular deep cleaning of showers, i.e. minimum three times daily.

- House those who are deemed medically high risk in single cells only.

- Conduct weekly meetings between prison leadership (including medical staff) and inmate advisory councils to update on developments and discuss logistical challenges. Consider how prisoners might assist with the logistics outlined above and help compensate for potential staffing shortages.

- Provide protective equipment, e.g. gloves and cleaning materials, and training to prisoners and staff who participate in prep or distribution of food or other goods, like laundry and supplies.

We understand the strain and extreme pressure you are operating under in the face of this unprecedented challenge. We stand ready to assist in whatever way we can and appreciate your consideration of these proposals intended to save lives.

Sincerely,

The Justice Collaborative
Smart Justice California
ACLU California
Color of Change
Californians for Safety and Justice
Immigrant Legal Resource Center
Ella Baker Center for Human Rights
Asian Americans Advancing Justice -Asian Law Caucus
California Public Defender's Association
Los Angeles County Public Defenders, AFSCME Local 148
UnCommon Law
San Francisco Rising
Policy Link
Pillars of the Community
Initiate Justice

Californians United for a Responsible Budget
La Defensa
The Bail Project
Asian Solidarity Collective
Alliance for Boys and Men of Color
California Prison Moratorium Project
Legal Services for Prisoners with Children
California Coalition for Women Prisoners
Young Women's Freedom Center
Anti-Recidivism Coalition
California National Organization for Women
The Peace Alliance
Critical Resistance Los Angeles
Critical Resistance Oakland
Arab Resource and Organizing Center
Root and Rebound

| | |
|---|---|
| Paws for Life K9 Rescue | Stronghold |
| Guiding Rage into Power | Bonafide |
| Safe Return | Buddhist Pathways Prison Project, Inc. |
| TheatreWorkers Project | The Ahimsa Collective |
| Transformative In-Prison Workgroup | A Place for Grace |
| The Safer Communities Project | Jail Guitar Doors |

CC:

Dr. Nadine Burke Harris, California Surgeon General
OSGInfo@osg.ca.gov
Secretary Ralph Diaz, California Department of Corrections and Rehabilitation
ralph.diaz@cdcr.ca.gov
Dr. Diana Toche, Undersecretary, Health Care Services, CDCR
diana.toche@cdcr.ca.gov
Dr. Joseph Bick, Director, Division of Correctional Health Care Services, CDCR
joseph.bick@cdcr.ca.gov
Jennifer Shaffer
Jennifer.shaffer@cdcr.ca.gov
J. Clark Kelso, Receiver
ckelso@pacific.edu

# Exhibit 26

3/25/2020     Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak | The White House

Case 4:01-cv-01351-JST Document 3221-2 Filed 03/25/20 Page 109 of 249



# Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak

Issued on: **March 13, 2020**



★ ★ ★

In December 2019, a novel (new) coronavirus known as SARS-CoV-2 ("the virus") was first detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the coronavirus disease COVID-19 that has now spread globally.  The Secretary of Health and Human Services (HHS) declared a public health emergency on January 31, 2020, under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID-19.  I have taken sweeping action to control the spread of the virus in the United States, including by suspending entry of foreign nationals seeking entry who had been physically present within the prior 14 days in certain jurisdictions where COVID-19 outbreaks have occurred, including the People's Republic of China, the Islamic Republic of Iran, and the Schengen Area of Europe.  The Federal Government, along with State and local governments, has taken preventive and proactive measures to slow the spread of the virus and treat those affected, including by instituting Federal quarantines for individuals evacuated from foreign nations, issuing a declaration pursuant to section 319F-3 of the Public Health Service Act (42 U.S.C. 247d-6d), and releasing policies to accelerate the acquisition of personal protective equipment and streamline bringing new diagnostic capabilities to laboratories.  On March 11, 2020, the World Health Organization announced that the COVID-19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States.

The spread of COVID-19 within our Nation's communities threatens to strain our Nation's healthcare systems.  As of March 12, 2020, 1,645 people from 47 States have been infected with the virus that

causes COVID-19.  It is incumbent on hospitals and medical facilities throughout the country to assess their preparedness posture and be prepared to surge capacity and capability.  Additional measures, however, are needed to successfully contain and combat the virus in the United States.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*) and consistent with section 1135 of the Social Security Act (SSA), as amended (42 U.S.C. 1320b-5), do hereby find and proclaim that the COVID-19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020.  Pursuant to this declaration, I direct as follows:

Section 1.  Emergency Authority.  The Secretary of HHS may exercise the authority under section 1135 of the SSA to temporarily waive or modify certain requirements of the Medicare, Medicaid, and State Children's Health Insurance programs and of the Health Insurance Portability and Accountability Act Privacy Rule throughout the duration of the public health emergency declared in response to the COVID-19 outbreak.

Sec. 2.  Certification and Notice.  In exercising this authority, the Secretary of HHS shall provide certification and advance written notice to the Congress as required by section 1135(d) of the SSA (42 U.S.C. 1320b-5(d)).

Sec. 3.  General Provisions.  (a)  Nothing in this proclamation shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this thirteenth day of March, in the year of our Lord two thousand twenty, and of the Independence of the United States of America the two hundred and forty-fourth.

DONALD J. TRUMP

# Exhibit 27



# Coronavirus disease (COVID-19) Pandemic

## Protect yourself

## Country & technical guidance

**COVID-19 Response Fund**

Donate

## Your questions answered

Latest updates - Live press conference (Geneva)

## Travel advice



Live from WHO Headquarters - COVID-19 daily press briefing 23 ...

# Situation reports

# Media resources

# Research and Development

## __WHO Director-General's opening remarks at the media briefing on COVID-19 - 23 March 2020__

23 March 2020 I Speech

# Mythbusters

## __Pass the message: Five steps to kicking out coronavirus__

23 March 2020 I News Release

# EPI-WIN

Infodemic Management

__Read More__

**Rolling updates on coronavirus disease (COVID-19)**

# Coronavirus disease (COVID-19) outbreak situation

**View dashboard →**

**375,498**
**Confirmed cases**

Updated : 24 March 2020, 14:53 GMT-7

**16,362**
**Confirmed deaths**

Updated : 24 March 2020, 14:53 GMT-7

**196**
**Countries, areas or territories with cases**

Updated : 24 March 2020, 14:53 GMT-7



**All videos →**        **Online training →**        **At a glance: What WHO has done**







# What you need to know

# Situation updates

# Donors & Partners

# Research & Development

What is a coronavirus? →

How to protect yourself →

Myth-busters →

Travel advice →

Questions & answers →

Situation reports →
Here you will find the latest situation updates and data regarding the COVID-19 outbreak.

Disease Outbreak News →
Since 21 January 2020,

**See progress of contributions**

**Strategic**

Update on research activities for novel coronavirus →
WHO's R&D Blueprint has been activated to accelerate diagnostics, vaccines and therapeutics for this outbreak.

See all COVID-19 videos →

Training and e-learning →

COVID-19 and noncommunicable diseases →

Disease Outbreak News have been replaced with daily situation reports.

COVID-19 situation dashboard →

Global situation dashboard →

Report of the WHO-China Joint Mission →

COVID-19 situation update for the WHO European Region →

**Preparedness and Response Plan**

**Donor Alert**

February 2020

International Clinical Trials Registry Platform →

COVID-19 outbreak – Emergency Use Listing Procedure (EUL) announcement →

Partners and Networks →

Contingency fund for emergencies →

United Nations website on coronavirus →

# Exhibit 28



OFFICE OF THE GOVERNOR

March 18, 2020

The Honorable Donald J. Trump
White House
1600 Pennsylvania Avenue, NW
Washington, D.C.

Dear Mr. President,

I write to respectfully request you immediately deploy the USNS Mercy Hospital Ship to be stationed at the port of Los Angeles through September 1, 2020, to help decompress our current health care delivery system in Los Angeles region in response to the COVID-19 outbreak.

As you know, California has been disproportionately impacted by repatriation efforts over the last few months. Our state and health care delivery system are significantly impacted by the rapid increase in COVID-19 cases.  In the last 24 hours, we had 126 new COVID-19 cases, a 21 percent increase.  In some parts of our state, our case rate is doubling every four days. Moreover, we have community acquired transmission in 23 counties with an increase of 44 community acquired infections in 24 hours. We project that roughly 56 percent of our population—25.5 million people—will be infected with the virus over an eight week period.

This resource will help decompress the health care delivery system to allow the Los Angeles region to ensure that it has the ability to address critical acute care needs, such as heart attacks and strokes or vehicle accidents, in addition to the rapid rise in COVID-19 cases. The population density in the Los Angeles Region is similar to New York City, will be disproportionately impacted by the number of COVID-19 cases.

I would ask that the US Navy coordinate with my Office of Emergency Services, through the Defense Coordinator Officer to rapidly deploy this asset.

I thank you for your partnership and look forward to our continued discussion.

Sincerely,

Gavin Newsom
Governor

GOVERNOR GAVIN NEWSOM • SACRAMENTO, CA 95814 • (916) 445-2841

# Exhibit 29

# WHAT IS THE HEALTH CARE SERVICES DASHBOARD?

## A MONTHLY REPORT THAT:

✓ Consolidates key performance indicators and other important organization metrics across health care programs and service areas.

✓ Provides information typically monitored by health care organizations, such as patient outcomes, access to care, and utilization and cost.

✓ Helps the organization regularly assess progress in meeting annual performance objectives.

✓ Helps health care executives and managers identify areas that may need improvement.

*Click the icons below for more information:*

**Statewide Dashboard**

*Statewide performance trends*

**Institution Comparison**

*Compare performance for all institutions*

**Glossary**


## INSTITUTION MENU
*Select an institution below for more information:*

| | |
|---|---|
| Avenal State Prison (ASP) | High Desert State Prison (HDSP) |
| California City Correctional Facility (CAC) | Ironwood State Prison (ISP) |
| Calipatria State Prison (CAL) | Kern Valley State Prison (KVSP) |
| California Correctional Center (CCC) | California State Prison, Los Angeles County (LAC) |
| California Correctional Institution (CCI) | Mule Creek State Prison (MCSP) |
| Central California Women's Facility (CCWF) | North Kern State Prison (NKSP) |
| Centinela State Prison (CEN) | Pelican Bay State Prison (PBSP) |
| California Health Care Facility (CHCF) | Pleasant Valley State Prison (PVSP) |
| California Institution for Men (CIM) | R. J. Donovan Correctional Facility (RJD) |
| California Institution for Women (CIW) | California State Prison, Sacramento (SAC) |
| California Men's Colony (CMC) | California Substance Abuse Treatment Facility (SATF) |
| California Medical Facility (CMF) | Sierra Conservation Center (SCC) |
| California State Prison, Corcoran (COR) | California State Prison, Solano (SOL) |
| California Rehabilitation Center (CRC) | San Quentin State Prison (SQ) |
| Correctional Training Facility (CTF) | Salinas Valley State Prison (SVSP) |
| Chuckawalla Valley State Prison (CVSP) | Valley State Prison (VSP) |
| Deuel Vocational Institution (DVI) | Wasco State Prison (WSP) |
| Folsom State Prison (FSP) | |



The Dashboard is intended to support headquarters and institution staff in identifying opportunities for improvement and monitoring progress toward performance objectives. However, there are limitations to the information - California Correctional Health Care Services (CCHCS) has standardized many data collection processes, provided training to promote consistency in data reporting, and invested in information system modifications to improve data quality. However, much of the data featured in the Health Care Services Dashboard is gathered through multiple networked databases or self-reported by institutions, and the data have not been validated or verified. Performance objectives and benchmarks were generated internally for quality improvement purposes and are not necessarily intended to reflect compliance with court mandates or a determination regarding constitutional levels of care.



# DASHBOARD STATEWIDE COMPARISON
## All Institutions
**October 2019**

| Main Menu | Return to Top |

| Other Trends | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ED/Hospital Stay* | 15.8 | 3.7 | 13.8 | 15.5 | 5.7 | 10.4 | 14.9 | 5.1 | 54.2 | 14.7 | 12.1 | 8.4 | 21.6 | 27.6 | 12.2 | 11.6 | 15.7 | 13.2 | 12.1 | 11.8 | 15.0 | 30.0 | 35.5 |
| Specialty Care Referrals* | 70 | 35 | 47 | 70 | 11 | 44 | 72 | 37 | 171 | 107 | 79 | 71 | 175 | 88 | 41 | 70 | 83 | 36 | 34 | 55 | 41 | 56 | 131 |
| Prescriptions Per Inmate | 2.8 | 1.5 | 1.1 | 1.0 | 0.6 | 2.2 | 3.6 | 1.1 | 9.0 | 4.8 | 4.7 | 4.0 | 7.1 | 2.7 | 1.9 | 2.8 | 2.1 | 1.6 | 1.7 | 1.9 | 1.0 | 2.1 | 3.6 |
| Diagnostics Per Inmate | 1.0 | 0.4 | 0.8 | 0.6 | 0.5 | 0.7 | 1.8 | 0.6 | 2.4 | 1.5 | 1.5 | 0.9 | 1.6 | 0.8 | 0.5 | 0.6 | 0.6 | 1.2 | 0.6 | 0.7 | 1.0 | 0.7 | 1.0 |
| Grievances Received* | 25 | 11 | 3 | 4 | 6 | 19 | 32 | 4 | 132 | 19 | 32 | 26 | 62 | 35 | 12 | 14 | 7 | 23 | 9 | 24 | 8 | 31 | 58 |
| Prison Population Capacity | 131% | 137% | - | 147% | 97% | 135% | 141% | 155% | 96% | 124% | 121% | 99% | 110% | 104% | 140% | 158% | 158% | 135% | 135% | 138% | 129% | 146% | 136% |

| Institution & Population Characteristics | SW | ASP | CAC | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | FSP | HDSP | ISP | KVSP | LAC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| High Risk Priority 1 | 5.9% | 0.1% | 0.0% | 0.2% | 0.1% | 1.0% | 5.2% | 0.3% | 43.8% | 19.1% | 8.0% | 7.2% | 25.8% | 2.5% | 0.5% | 2.3% | 0.6% | 1.4% | 2.4% | 0.8% | 0.5% | 1.6% | 9.4% |
| High Risk Priority 2 | 8.8% | 0.6% | 0.1% | 0.6% | 0.5% | 3.5% | 8.7% | 1.1% | 21.0% | 30.9% | 14.1% | 15.9% | 25.3% | 6.7% | 2.0% | 7.0% | 4.2% | 3.9% | 7.9% | 2.3% | 1.7% | 5.5% | 17.8% |
| Medium Risk | 34% | 36% | 12% | 15% | 8% | 52% | 52% | 16% | 26% | 26% | 45% | 38% | 32% | 50% | 50% | 41% | 19% | 32% | 28% | 42% | 12% | 38% | 40% |
| Low Risk | 52% | 64% | 88% | 84% | 92% | 43% | 34% | 83% | 9% | 24% | 33% | 39% | 17% | 41% | 48% | 50% | 77% | 63% | 61% | 55% | 86% | 55% | 33% |
| Mental Health EOP | 5.4% | 0.1% | 0.0% | 0.0% | 0.0% | 0.1% | 3.7% | 0.0% | 19.2% | 1.2% | 3.7% | 13.8% | 19.2% | 12.9% | 0.1% | 0.0% | 0.0% | 0.7% | 0.1% | 0.1% | 0.0% | 3.4% | 15.5% |
| Patients with Disability | 8.9% | 2.7% | 1.2% | 1.0% | 0.8% | 2.7% | 8.0% | 1.7% | 43.0% | 19.3% | 9.4% | 8.9% | 35.8% | 5.4% | 2.2% | 8.5% | 4.5% | 6.9% | 2.4% | 6.7% | 2.5% | 5.4% | 12.0% |
| Inmates 50 Years or Older | 25% | 27% | 10% | 7% | 8% | 21% | 18% | 8% | 57% | 52% | 24% | 38% | 47% | 15% | 19% | 42% | 31% | 15% | 27% | 11% | 10% | 12% | 27% |
| Men and Women Institutions | - | M | M | M | M | M | W | M | M | M | W | M | M | M | M | M | M | M | M | M/W | M | M | M |
| Specialized Health Care Beds | 2,499 | 28 | - | 18 | 19 | 16 | 38 | 13 | 1,474 | 78 | 53 | 87 | 169 | 88 | 10 | 17 | - | 24 | - | 30 | 14 | 22 | 16 |
| Institution Population | 121,732 | 4,020 | 2,346 | 3,435 | 3,770 | 3,768 | 2,881 | 3,604 | 2,849 | 3,837 | 1,712 | 3,836 | 2,609 | 3,270 | 3,500 | 5,256 | 2,760 | 2,346 | 3,389 | 3,219 | 2,864 | 3,606 | 3,166 |

*Rate Per 1,000 Inmates*

*Please direct questions or feedback to QMstaff@cdcr.ca.gov*

Report run: 2/14/2020 2:06:19 PM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions

**October 2019**

| Main Menu | Return to Top |
| --- | --- |

| Other Trends | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| ED/Hospital Stay* | 24.9 | 13.3 | 4.1 | 4.4 | 34.7 | 19.2 | 14.9 | 7.1 | 11.4 | 11.0 | 23.1 | 19.7 | 5.8 |
| Specialty Care Referrals* | 131 | 65 | 48 | 34 | 174 | 22 | 69 | 36 | 73 | 96 | 52 | 76 | 37 |
| Prescriptions Per Inmate | 6.3 | 1.4 | 1.2 | 1.0 | 5.6 | 3.4 | 3.6 | 1.1 | 2.9 | 4.0 | 3.2 | 4.0 | 1.3 |
| Diagnostics Per Inmate | 1.6 | 2.5 | 0.6 | 0.6 | 1.5 | 0.9 | 0.7 | 0.4 | 0.8 | 1.9 | 0.9 | 0.6 | 1.5 |
| Grievances Received* | 42 | 15 | 12 | 5 | 60 | 59 | 30 | 4 | 13 | 20 | 45 | 27 | 20 |
| Prison Population Capacity | 123% | 151% | 111% | 137% | 132% | 118% | 157% | 108% | 175% | 136% | 120% | 145% | 162% |

| Institution & Population Characteristics | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| High Risk Priority 1 | 20.8% | 0.9% | 1.0% | 0.0% | 17.1% | 5.6% | 3.9% | 0.7% | 9.3% | 9.5% | 4.2% | 6.0% | 0.7% |
| High Risk Priority 2 | 24.7% | 2.4% | 3.1% | 0.3% | 20.5% | 16.4% | 7.3% | 1.5% | 14.6% | 17.5% | 8.0% | 10.2% | 1.7% |
| Medium Risk | 37% | 31% | 21% | 27% | 40% | 46% | 53% | 21% | 24% | 33% | 47% | 52% | 35% |
| Low Risk | 17% | 66% | 75% | 73% | 23% | 32% | 36% | 77% | 53% | 40% | 40% | 32% | 62% |
| Mental Health EOP | 15.9% | 1.6% | 0.0% | 0.0% | 19.6% | 32.1% | 10.6% | 0.0% | 0.1% | 5.9% | 9.9% | 11.2% | 1.2% |
| Patients with Disability | 18.3% | 1.9% | 2.2% | 2.0% | 24.5% | 5.1% | 16.4% | 2.0% | 11.9% | 7.9% | 10.6% | 21.2% | 2.3% |
| Inmates 50 Years or Older | 45% | 11% | 12% | 8% | 38% | 15% | 28% | 13% | 34% | 43% | 16% | 48% | 10% |
| Men and Women Institutions | M | M | M | M | M | M | M | M | M | M | M | M | M |
| Specialized Health Care Beds | 10 | 16 | 19 | 15 | 28 | 66 | 38 | 10 | 15 | 10 | 22 | 20 | 16 |
| Institution Population | 4,074 | 4,206 | 2,650 | 3,168 | 3,998 | 2,177 | 5,425 | 4,276 | 4,623 | 4,297 | 2,978 | 2,881 | 4,936 |

*Rate Per 1,000 Inmates*

*Please direct questions or feedback to QMstaff@cdcr.ca.gov*

Report run: 2/14/2020 2:06:19 PM

# Exhibit 30



# PROCLAMATION

10/04/2006

## Prison Overcrowding State of Emergency Proclamation

PROCLAMATION
by the
Governor of the State of California

**WHEREAS,** the California Department of Corrections and Rehabilitation (CDCR) is required by California law to house inmates committed to state prison; and

**WHEREAS,** various trends and factors, including population increases, parole policies, sentencing laws, and recidivism rates have created circumstances in which the CDCR is now required to house a record number of inmates in the CDCR prison system, making the CDCR prison system the largest state correctional system in the United States, with a total inmate population currently at an all-time high of more than 170,000 inmates; and

**WHEREAS,** due to the record number of inmates currently housed in prison in California, all 33 CDCR prisons are now at or above maximum operational capacity, and 29 of the prisons are so overcrowded that the CDCR is required to house more than 15,000 inmates in conditions that pose substantial safety risks, namely, prison areas never designed or intended for inmate housing, including, but not limited to, common areas such as prison gymnasiums, dayrooms, and program rooms, with approximately 1,500 inmates sleeping in triple-bunks; and

**WHEREAS,** the current severe overcrowding in 29 CDCR prisons has caused substantial risk to the health and safety of the men and women who work inside these prisons and the inmates housed in them, because:

With so many inmates housed in large common areas, there is an increased, substantial risk of violence, and greater difficulty controlling large inmate populations.

With large numbers of inmates housed together in triple-bunks, there is an increased, substantial risk for transmission of infectious illnesses.

The triple-bunks and tight quarters create line-of-sight problems for correctional officers by blocking views, creating an increased, substantial security risk.

**WHEREAS,** the current severe overcrowding in these 29 prisons has also overwhelmed the electrical systems and/or wastewater/sewer systems, because those systems are now often required to operate at or above the maximum intended capacity, resulting in an increased, substantial risk to the health and safety of CDCR staff, inmates, and the public, because:

Overloading the prison electrical systems has resulted in power failures and blackouts within the prisons, creating increased security threats. It has also damaged fuses and transformers.

Overloading the prison sewage and wastewater systems has resulted in the discharge of waste beyond treatment capacity, resulting in thousands of gallons of sewage spills and environmental contamination.

And when the prisons "overdischarge" waste, bacteria can contaminate the drinking water supply, putting the public's health at an increased, substantial risk.

**WHEREAS,** overloading the prison sewage and water systems has resulted in increased, substantial risk of damage to state and privately owned property and has resulted in multiple fines, penalties and/or notices of violations to the CDCR related to wastewater/sewer system overloading such as groundwater contamination and environmental pollution; and

**WHEREAS,** overcrowding causes harm to people and property, leads to inmate unrest and misconduct, reduces or eliminates programs, and increases recidivism as shown within this state and in others; and

**WHEREAS,** in addition to all of the above, in the 29 prisons with severe overcrowding, the following circumstances exist:

Avenal State Prison has an operational housing capacity of 5,768 inmates, but it currently houses 7,422 inmates, with 1,654 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 64 incidents of assault/battery by inmates — 31 of them against CDCR staff — along with 15 riots/melees, and 27 weapon confiscations.

The California Correctional Center has an operational housing capacity of 5,724 inmates, but it currently houses 6,174 inmates, with 450 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 128 incidents of assault/battery by inmates — 16 of them against CDCR staff — along with 34 riots/melees, and 21 weapon confiscations.

The California Correctional Institution has an operational housing capacity of 4,931, but it currently houses 5,702 inmates, with 771 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 125 incidents of assault/battery by inmates — 79 of them against CDCR staff — along with 5 riots/melees, and 57 weapon confiscations.

Centinela State Prison has an operational housing capacity of 4,368, but it currently houses 4,956 inmates, with 588 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 141

incidents of assault/battery by inmates — 30 of them against CDCR staff — along with 10 riots/melees, and 151 weapon confiscations.

The California Institution for Men has an operational housing capacity of 5,372, but it currently houses 6,615 inmates, with 1,243 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 170 incidents of assault/battery by inmates — 57 of them against CDCR staff — along with 21 riots/melees, and 47 weapon confiscations.

The California Institution for Women has an operational housing capacity of 2,228, but it currently houses 2,624 inmates, with 396 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 65 incidents of assault/battery by inmates — 26 of them against CDCR staff — and 6 weapon confiscations.

The California Men's Colony has an operational housing capacity of 6,294, but it currently houses 6,574 inmates, with 280 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 151 incidents of assault/battery by inmates — 33 of them against CDCR staff — along with 11 riots/melees, and 29 weapon confiscations.

The California State Prison at Corcoran has an operational housing capacity of 4,954, but it currently houses 5,317 inmates, with 363 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 147 incidents of assault/battery by inmates — 58 of them against CDCR staff — along with 5 riots/melees, and 111 weapon confiscations.

The California Rehabilitation Center has an operational housing capacity of 4,660, but it currently houses 4,856 inmates, with 196 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 65 incidents of assault/battery by inmates — 28 of them against CDCR staff — 9 riots/melees, and 34 weapon confiscations.

The Correctional Training Facility has an operational housing capacity of 6,157, but it currently houses 7,027 inmates, with 870 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 85 incidents of assault/battery by inmates — 26 of them against CDCR staff — along with 9 riots/melees, and 27 weapon confiscations.

Chuckawalla Valley State Prison has an operational housing capacity of 3,443, but it currently houses 4,292 inmates, with 849 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 50 incidents of assault/battery by inmates — 11 of them against CDCR staff — along with 5 riots/melees, and 21 weapon confiscations.

Deuel Vocational Institution has an operational housing capacity of 3,115, but it currently houses 3,911 inmates, with 796 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 114 incidents of assault/battery by inmates — 54 of them against CDCR staff — along with 7 riots/melees, and 37 weapon confiscations.

High Desert State Prison has an operational housing capacity of 4,346, but it currently houses 4,706 inmates, with 360 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 351

incidents of assault/battery by inmates — 44 of them against CDCR staff — along with 6 riots/melees, and 289 weapon confiscations.

Ironwood State Prison has an operational housing capacity of 4,185, but it currently houses 4,665 inmates, with 480 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 96 incidents of assault/battery by inmates — 19 of them against CDCR staff — along with 14 riots/melees, and 52 weapon confiscations.

Kern Valley State Prison has an operational housing capacity of 4,566, but it currently houses 4,686 inmates, with 120 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 146 incidents of assault/battery by inmates — 60 of them against CDCR staff — along with 10 riots/melees, and 46 weapon confiscations.

TheCalifornia State Prison at Los Angeles has an operational housing capacity of 4,230, but it currently houses 4,698 inmates, with 468 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 211 incidents of assault/battery by inmates — 123 of them against CDCR staff — along with 4 riots/melees, and 101 weapon confiscations.

Mule Creek State Prison has an operational housing capacity of 3,197, but it currently houses 3,929 inmates, with 732 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 65 incidents of assault/battery by inmates — 35 of them against CDCR staff — along with 1 riot/melee, and 28 weapon confiscations.

North Kern State Prison has an operational housing capacity of 5,189, but it currently houses 5,365 inmates, with 176 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 135 incidents of assault/battery by inmates — 43 of them against CDCR staff — along with 16 riots/melees, and 70 weapon confiscations.

Pelican Bay State Prison has an operational housing capacity of 3,444, but it currently houses 3,604 inmates, with 160 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 256 incidents of assault/battery by inmates — 88 of them against CDCR staff — along with 9 riots/melees, and 106 weapon confiscations.

Pleasant Valley State Prison has an operational housing capacity of 4,368, but it currently houses 5,112 inmates, with 744 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 205 incidents of assault/battery by inmates — 59 of them against CDCR staff — along with 12 riots/melees, and 26 weapon confiscations.

The Richard J. Donovan Correctional Facility has an operational housing capacity of 4,120, but it currently houses 4,720 inmates, with 600 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 244 incidents of assault/battery by inmates — 118 of them against CDCR staff — along with 11 riots/melees, and 96 weapon confiscations.

The California State Prison at Sacramento has an operational housing capacity of 2,973, but it currently

houses 3,213 inmates, with 240 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 264 incidents of assault/battery by inmates — 159 of them against CDCR staff — along with 5 riots/melees, and 118 weapon confiscations.

The California Substance Abuse Treatment Facility and State Prison at Corcoran has an operational housing capacity of 6,360, but it currently houses 7,593 inmates, with 1,233 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 120 incidents of assault/battery by inmates — 53 of them against CDCR staff — along with 20 riots/melees, and 124 weapon confiscations.

The Sierra Conservation Center has an operational housing capacity of 5,657, but it currently houses 6,107 inmates, with 450 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 61 incidents of assault/battery by inmates — 18 of them against CDCR staff — along with 19 riots/melees, and 50 weapon confiscations.

The California State Prison at Solano has an operational housing capacity of 5,070, but it currently houses 5,858 inmates, with 788 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 60 incidents of assault/battery by inmates — 26 of them against CDCR staff — along with 4 riots/melees, and 114 weapon confiscations.

San Quentin State Prison has an operational housing capacity of 4,933, but it currently houses 5,183 inmates, with 287 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 262 incidents of assault/battery by inmates — 123 of them against CDCR staff — along with 15 riots/melees, and 118 weapon confiscations.

Salinas Valley State Prison has an operational housing capacity of 4,200, but it currently houses 4,680 inmates, with 480 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 181 incidents of assault/battery by inmates — 82 of them against CDCR staff — along with 7 riots/melees, and 91 weapon confiscations.

Valley State Prison for Women has an operational housing capacity of 3,902, but it currently houses 3,958 inmates, with 56 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 125 incidents of assault/battery by inmates — 75 of them against CDCR staff — and 15 weapon confiscations.

Wasco State Prison has an operational housing capacity of 5,838, but it currently houses 6,098 inmates, with 260 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 226 incidents of assault/battery by inmates — 97 of them against CDCR staff — along with 32 riots/melees, and 82 weapon confiscations.

**WHEREAS,** some of these 29 severely overcrowded prisons may even be housing more inmates, because the inmate population continually fluctuates among the CDCR prisons; and

**WHEREAS,** in addition to the 1,671 incidents of violence perpetrated in these 29 severely overcrowded prisons by inmates against CDCR staff last year, and the 2,642 incidents of violence perpetrated in these prisons on inmates by other inmates in the last year, the suicide rate in these 29 prisons is approaching an average of one per

week; and

**WHEREAS,** the federal court in the *Coleman* case found mental-health care in CDCR prisons to be below federal constitutional standards due in part to the lack of appropriate beds and space; and

**WHEREAS,** the use of common areas for inmate housing has severely modified or eliminated certain inmate programs in the 29 prisons with severe overcrowding; and

**WHEREAS,** the severe overcrowding has also substantially limited or restricted inmate movement, causing significantly reduced inmate attendance in academic, vocational, and rehabilitation programs; and

**WHEREAS,** overcrowded prisons in other states have experienced some of the deadliest prison riots in American history, including:

In 1971, the nation's deadliest prison riot occurred in Attica, New York, resulting in the death of 43 people. On the day of this riot, the prison — which was built for 1600 — housed approximately 2,300 inmates.

In 1981, a riot occurred in the New Mexico State Penitentiary. More than 30 inmates were killed, more than 100 people were injured, and 12 officers were taken hostage, some of whom were beaten, sexually assaulted, and/or raped. On the day of this riot, the prison — which was built for 900 — housed approximately 1,136 inmates.

In 1993, a riot occurred in Lucasville, Ohio. One officer was murdered, four officers were seriously injured, and nine inmates were killed. On the day of this riot, the prison — which was built for 1600 — housed approximately 2,300 inmates.

**WHEREAS,** I believe immediate action is necessary to prevent death and harm caused by California's severe prison overcrowding; and

**WHEREAS,** because of the housing shortage in CDCR prisons, the CDCR has current contracts with four California counties to house 2,352 additional state inmates in local adult jails, but this creates the following overcrowding problem in the county jails:

According to a report by the California State Sheriffs' Association in June 2006, adult jails recently averaged a daily population of approximately 80,000 inmates. On a typical day, the county jails lacked space for more than 4,900 inmates across the state.

Based on the same report, 20 of California's 58 counties have court-imposed population caps resulting from litigation brought by or on behalf of inmates in crowded jails and another 12 counties have self-imposed caps.

Most of California's jail population consists of felony inmates, but when county jails are full, someone in custody must be released before a new inmate can be admitted.

The 2006 Sheriffs' Association report states that last year, 233,388 individuals statewide avoided incarceration or were released early into local communities because of the lack of jail space.

**WHEREAS,** overcrowding conditions are projected to get even worse in the coming year, to the point that the CDCR expects to run out of all common area space to house prisoners in mid-2007, and will be unable to receive any new inmates; and

**WHEREAS,** in January 2006, I proposed $6 billion in the Strategic Growth Plan to help manage inmate population at all levels of government by increasing the number of available local jail beds and providing for two new prisons and space for 83,000 prisoners to address California's current and future incarceration needs; and

**WHEREAS,** the California Legislature failed to act upon this proposal; and

**WHEREAS,** in March 2006, a proposal was submitted as part of my 2006-07 budget to enable the CDCR to contract for a total of 8,500 beds in community correctional facilities within the state; and

**WHEREAS,** the California Legislature denied this proposal; and

**WHEREAS,** on June 26, 2006, I issued a proclamation calling the Legislature into special session because I believed urgent action was needed to address this severe problem in California's prisons, and I wanted to give the Legislature a further opportunity to address this crisis; and

**WHEREAS,** the CDCR submitted detailed proposals to the Legislature to address the immediate and longer-term needs of the prison system in an effort resolve the overcrowding crisis; and

**WHEREAS,** the California Legislature failed to adopt the proposals submitted by the CDCR, and also failed to adopt any proposals of its own; and

**WHEREAS,** in response, my office directed the CDCR to conduct a survey of certain inmates in California's general population to determine how many might voluntarily transfer to out-of-state correctional facilities; and

**WHEREAS,** the CDCR reports that more than 19,000 inmates expressed interest in voluntarily transferring to a correctional facility outside of California; and

**WHEREAS,** the overcrowding crisis gets worse with each passing day, creating an emergency in the California prison system.

**NOW, THEREFORE, I, ARNOLD SCHWARZENEGGER,** Governor of the State of California, in light of the aforementioned, find that conditions of extreme peril to the safety of persons and property exist in the 29 CDCR prisons identified above, due to severe overcrowding, and that the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state. Additionally, the counties within the state are harmed by this situation, as the inability to appropriately house inmates directly impacts local jail capacity and the early release of felons. This crisis spans the eastern, western, northern, and southern parts of the state and compromises the public's safety, and I find that local authority is inadequate to cope with the emergency. Accordingly, under the authority of the California Emergency Services Act, set forth at Title 2, Division 1, Chapter 7 of the California Government Code, commencing with section 8550, I hereby proclaim that a State of Emergency exists within the State of California's prison system.

Pursuant to this proclamation:

     I.   The CDCR shall, consistent with state law and as deemed appropriate by the CDCR Secretary for the sole purpose of immediately mitigating the severe overcrowding in these 29 prisons and the resulting impacts within California, immediately contract for out-of-state correctional facilities to effectuate voluntary transfers of California prison inmates to facilities outside of this state for incarceration consisting of constitutionally adequate housing, care, and programming.

     II.   The CDCR Secretary shall, after exhausting all possibilities for voluntary transfers of inmates, and in compliance with the Interstate Corrections Compact and the Western Interstate Corrections Compact, and as he deems necessary and appropriate to mitigate this emergency, effectuate involuntary transfers of California prison inmates, based on criteria set forth below, to institutions in other states and those of the federal government for incarceration consisting of constitutionally adequate housing, care, and programming. In such instance, because strict compliance with California Penal Code sections 11191 and 2911 would prevent, hinder, or delay the mitigation of the severe overcrowding in these prisons, applicable provisions of these statutes are suspended to the extent necessary to enable the CDCR to transfer adult inmates, sentenced under California law, to institutions in other states and those of the federal government without consent. This suspension is limited to the scope and duration of this emergency.

A.   The CDCR Secretary shall prioritize for involuntary transfer the inmates who meet the following criteria:

1.   Inmates who: (a) have been previously deported by the federal government and are criminal aliens subject to immediate deportation; or (b) have committed an aggravated felony as defined by federal statute and are subject to deportation.

2.   Inmates who are paroling outside of California.

3.   Inmates who have limited or no family or supportive ties in California based on visitation records and/or other information deemed relevant and appropriate by the CDCR Secretary.

4.   Inmates who have family or supportive ties in a transfer state.

5.   Other inmates as deemed appropriate by the CDCR Secretary.

B.    No person under commitment to the Division of Juvenile Justice may be considered for such transfer.

     III.    The CDCR Secretary shall, before selecting any inmate for transfer who has individual medical and/or mental-health needs, consult with the court-appointed Receiver of the CDCR medical system and/or the court-assigned Special Master in the *Coleman* mental-health case, depending on the healthcare needs of the inmate, to determine whether a transfer would be appropriate.

     IV.    The CDCR Secretary shall, before effectuating any inmate transfer, carefully and thoroughly evaluate all appropriate factors, including, but not limited to, the cost-effectiveness of any such transfer and whether an inmate selected for transfer has any pending appeals or hearings that may be impacted by such transfer.

     V.    The CDCR shall, as deemed appropriate by the CDCR Secretary, contract for facility space, inmate transportation, inmate screening, the services of qualified personnel, and/or for the supplies, materials, equipment, and other services needed to immediately mitigate the severe overcrowding and the resulting impacts within California. Because strict compliance with the provisions of the Government Code and the Public Contract Code applicable to state contracts would prevent, hinder, or delay the mitigation of the severe overcrowding in these prisons, applicable provisions of these statutes, including, but not limited to, advertising and competitive bidding requirements, are suspended to the extent necessary to enable the CDCR to enter into such contracts as expeditiously as possible. This suspension is limited to the scope and duration of this emergency.

     **I FURTHER DIRECT** that as soon as hereafter possible, this proclamation be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this proclamation.

 **IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 4th day of October 2006.

ARNOLD SCHWARZENEGGER

Governor of California

**ATTEST:**

BRUCE McPHERSON

Secretary of State

# Exhibit 31

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

# Appendix 1

# The Medical Classification Factors

**(a) Level of Care Based on Patient Need**

    **(1)** This Factor rates the medical setting the patient currently needs; the patient may not actually be housed in that setting.  For example, a patient may be currently housed in a Correctional Treatment Center but need only Outpatient Housing Unit level of care.  By collecting this Factor, users of the Medical Classification System can take appropriate actions for bed management.

    **(2) Outpatient (OP):**  No need for a medical setting that provides the patient with daily nursing care.

    **(3) Specialized Outpatient (SOP)**:  A high medical risk outpatient with the potential for clinical deterioration, decompensation, morbidity, or mortality who has long-term care needs.  This patient population needs frequent supportive care management, care coordination, nursing education, nursing interventions, and may need specialized nursing care.  Endorsements shall be made by the Health Care Placement Oversight Program (HCPOP).  All SOP transfer endorsements require a classification committee referral to HCPOP.

    **(4) Outpatient Housing Unit (OHU):**  A housing unit of a city, county, or city and county law enforcement facility established to retain patients who require special housing for security or protection.  Typically, these are patients whose health condition would not normally warrant admission to a licensed heath care facility and for whom housing in the general population may place them at personal or security risk.  Outpatient housing unit residents may receive outpatient health services and assistance with the activities of daily living.  Outpatient housing unit beds are not licensed correctional treatment center beds.

    **(5) Correctional Treatment Center (CTC):**  A health facility with a specified number of beds within a state prison, county jail, or California Division of Juvenile Justice facility designated to provide health care to that portion of the patient population who do not require general acute care level of services but are in need of professionally supervised health care beyond that normally provided in the community on an outpatient basis.

    **(6) Acute Rehabilitation:**  An acute rehabilitation hospital provides intensive physical, occupational, and speech therapy and supportive nursing services to patients recovering from strokes, amputations, severe burns, etc.  This is a community placement.

    **(7) Hospice:**  Services that are designed to provide palliative care, alleviate the physical, emotional, social, and spiritual discomforts of an individual who is experiencing the last phases of life due to the existence of a terminal disease, and to provide supportive care to the primary care giver and the family.  Care may be provided by a skilled or unskilled person under a plan of care developed by a physician or a multidisciplinary team under medical direction.

    **(8) Skilled Nursing Facility:**  A health facility or a distinct part of a hospital which provides continuous skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis.  It provides 24-hour inpatient care and, at a minimum, includes physician, skilled nursing, dietary, and pharmaceutical services as well as an activity program.

**(b) Classification Factors**

These Medical Classification Factors guide the operation of procedures in the Medical Classification System rather than specify any placement eligibility.

    **(1) Temporary Medical Hold:** A Temporary Medical Hold is used when a patient requires medically necessary health care services, and it is medically prudent to provide these services at the institution where the patient is currently housed.  The Medical Classification Chrono (MCC) will be "Temporary."  Examples of patients who should be reviewed for potential medical holds include, but are not limited to the following:

        **(A)** Medical:

            1.  Patients scheduled for major surgery or recovering from major surgery and requiring close post-operative review by the surgical team.

            2.  Patients having chemotherapy or radiation therapy treatment.

            3.  Patients undergoing a diagnostic workup.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

    4.  Patients being fitted for a major prosthetic, requiring temporary prostheses adjustments and frequent visits.

    5.  Patients awaiting major Durable Medical Equipment.

    6.  Patients scheduled for a specialist visit, which cannot easily be duplicated elsewhere (e.g., surgical subspecialties such as retinal surgery, or specialized oncology surgery).

    7.  All urgent Requests for Services or specialty appointments.

    8.  Hemophiliac, Hepatitis C virus, post-transplant, or human immunodeficiency virus/acquired immunodeficiency syndrome patients requiring close management of medication access and continuity.

    9.  Patients in the middle of a speech therapy, occupational therapy, or physical therapy regimen which would be adversely impacted by transfer.

**(B)** Dental:

    1.  Patients for whom an immediate denture was recently inserted.

    2.  Patients at a Program Facility awaiting completion of endodontic treatment.

    3.  Patients awaiting or in the middle of care for jaw fractures.

    4.  Untreated Dental Priority Classification 1A conditions.

**(C)** Mental Health:

    1.  Patients receiving Clozapine.

    2.  Patients awaiting Court or other hearings.

**(D)** Obstetrics and Gynecology:

    1.  Patients with high risk pregnancies, in late second trimester or third trimester.

**(E)** Patients in the middle of a diagnostic workup for cancer or other high risk conditions.

**(F)** Public Health:

    1.  Patients in quarantine or isolation for a variety of conditions including, but not limited to: TB, influenza-like illness, gastroenteritis, sexually transmitted diseases under treatment, source cases until clearance obtained, and contact cases until clearance obtained.

**(2) Temporary Medical Isolation:** Temporary Medical Isolation means the patient may not be endorsed to another institution unless prompted by a Medical Reason for Endorsement. Patients requiring temporary medical isolation shall also have a temporary medical hold entered on the MCC. Medical Isolation may be confinement to quarters or isolation in a medical setting. For example, a patient with Methicillin-Resistant Staphylococcal infection may be placed on Medical Isolation. If that patient should develop a need for dialysis, the patient could be moved for medical reason to an institution with a dialysis program. The type of isolation must be listed in the Comments section. If the patient requires negative pressure respiratory isolation, the Respiratory Isolation Specialized Service factor must be checked as well. Medical Isolation is always temporary. Closure of institutions or housing units for public health issues does not require an MCC.

**(3) Long-Term Stay:** This applies only to Levels of Care other than OP. This factor means that the patient is expected to continue to need at least the indicated Level of Care for the rest of his/her life.

**(4) Override:** Override means that the MCC has been reviewed by a Regional Health Care Executive and permission has been granted to depart from the usual placement requirements for one or more Medical Classification Factors. The patient's actual Medical Classification Factors are still completed according to usual procedure and the specific directions regarding permitted departures are listed in the Comments section.

**(c) Intensity of Services**

The Intensity of Services Medical Classification Factors are a set of scales that indicate the patient's need for medical services and the institution's ability to provide those services.

**(1) Proximity to Consultation** indicates the frequency and intensity of the patient's need for specialty medical services. These services are typically provided in the community by contracted providers. The availability and distance to the services varies by institution. A match between patient need and institution capability reduces risk and cost.

    **(A) No Particular Need** means there is no anticipated need for consultations at the present time.

    **(B) Basic Consultations** are consultative services typically available in a medium-sized community such as general surgery, orthopedics, obstetrics, radiology, ophthalmology, and internal medicine.

      1.  *Infrequent* - There is an anticipated need for fewer than four Basic Consultations per year.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

    2. *Frequent* - There is an anticipated need for more than four Basic Consultations per year.

**(C) Tertiary Consultation** are consultative services typically available in the university or large medical center setting such as oncology, endocrinology, neurology, neurosurgery, radiation therapy, interventional cardiology, nephrology, and cardio-thoracic surgery.

**(D) Community Placement** indicates the patient requires placement into a community hospital or other medical setting on a permanent basis.   The patient should be assigned to an institution that can most efficiently provide the necessary custody services to that outside level of care.

**(2) Functional Capacity**

Functional Capacity is a scale for the patient's ability to be assigned to particular jobs.  That ability affects placement into certain settings.

**(A) Vigorous Activity:**   Qualified for all assignments including food-handling and firefighting.  Able to dig ditches, chop wood, haul water, and wear a respirator.  Good mobility, endurance, and bilateral grip strength.

    1. For California Correctional Health Care Services/California Department of Corrections and Rehabilitation (CDCR) purposes, Chronic Active Hepatitis is defined as patients who are antibody positive, viral load negative, and whose FIB is less than 1.45.

    2. Patients must meet the National Fire Protection Association's (NFPA) standards in order to work as firefighters at fire camps.  Patients who do not meet the NFPA standards for firefighters may still be able to work at fire camps in non-firefighter positions (e.g., cooks, clerks, clerical support, porters, mechanics, and those who support other functions).  Refer to Appendix 3, Institutional Medical Groupings, "Fire Camps Special Skills" section.

    3. Below are the 2013 NFPA standards which disqualify patients from fire camps.  (Note: See NFPA Annex A, Explanatory Material for all asterisked items within this section):

       a. **Head and Neck**
          1) Defect of skull preventing helmet use or leaving underlying brain unprotected from trauma.
          2) Any skull or facial deformity that would not allow for a successful fit test for respirators used by that department.
          3) Any head condition that results in the candidate not being able to safely perform one or more of the essential job tasks.
          4) Any neck condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

       b. **Eyes and Vision**
          1) *Far visual acuity less than 20/40 binocular, corrected with contact lenses or spectacles, or far visual acuity less than 20/100 binocular for wearers of hard contacts or spectacles, uncorrected.
          2) *Color perception - monochromatic vision resulting in inability to use imaging devices such as thermal imaging cameras.
          3) *Monocular vision.
          4) Any eye condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

       c. **Ears and Hearing**
          1) Chronic vertigo or impaired balance as demonstrated by the inability to tandem gait walk.
          2) On audiometric testing, average hearing loss in the unaided better ear greater than 40 decibels (dB) at 500 Hz, 1000 Hz, 2000 Hz, and 3000 Hz when the audiometric device is calibrated to ANSI Z24.5, *Audiometric Device Testing*.
          3) Any ear condition (or hearing impairment) that results in the candidate not being able to safely perform one or more of the essential job tasks.
          4) *Hearing aid or cochlear implant.

       d. **Dental**
          1) Any dental condition that results in inability to safely perform one or more of the essential job tasks.

       e. **Nose, Oropharynx, Trachea, Esophagus, and Larynx**
          1) *Tracheostomy.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

2) *Aphonia.
3) Any nasal, oropharyngeal, tracheal, esophageal, or laryngeal condition that results in inability to safely perform one or more of the essential job tasks including fit testing for respirators such as N-95 for medical response, P-100 for particulates and certain vapors, and SCBA for fire and hazmat operations.

f. **Lungs and Chest Wall**
1) Active hemoptysis.
2) Current empyema.
3) Pulmonary hypertension.
4) Active tuberculosis.
5) *A forced vital capacity (FVC) or forced expiratory volume in 1 second (FEV1) less than 70 percent predicted even independent of disease.
6) *Obstructive lung diseases (e.g., emphysema, chronic bronchitis, asthma) with an absolute FEV1/FVC less than 0.70 and with either the FEV1 below normal or both the FEV1 and the FVC below normal (less than 0.80).
7) *Hypoxemia - oxygen saturation less than 90 percent at rest or exercise desaturation by four percent or to less than 90 percent (exercise testing indicated when resting oxygen is less than 94 percent but greater than 90 percent).
8) *Asthma - reactive airways disease requiring bronchodilator or corticosteroid therapy for two or more consecutive months in the previous two years, unless the candidate can meet the requirement in 6.8.1.1.
9) Any pulmonary condition that results in the candidate not being able to safely perform one or more of the essential job tasks.
10) Lung transplant.

g. **Aerobic Capacity**
1) An aerobic capacity less than 12 metabolic equivalents (METs) (1 MET = 42 mL O2/kg/min).

h. **Heart and Vascular System**
1) *Coronary artery disease, including history of myocardial infarction, angina pectoris, coronary artery bypass surgery, coronary angioplasty, and similar procedures.
2) *Cardiomyopathy or congestive heart failure, including signs or symptoms of compromised left or right ventricular function or rhythm including dyspnea, S3 gallop, peripheral edema, enlarged ventricle, abnormal ejection fraction, and/or inability to increase cardiac output with exercise.
3) *Acute pericarditis, endocarditis, or myocarditis.
4) *Syncope, recurrent.
5) *A medical condition requiring an automatic implantable cardiac defibrillator or history of ventricular tachycardia or ventricular fibrillation due to ischemic or valvular heart disease, or cardiomyopathy.
6) Third-degree atrioventricular block.
7) *Cardiac pacemaker.
8) Hypertrophic cardiomyopathy including idiopathic hypertrophic subaortic stenosis.
9) Any cardiac condition that results in the candidate not being able to safely perform one or more of the essential job tasks.
10) Heart transplant.
11) Hypertension.
12) *Uncontrolled or poorly controlled hypertension.
13) *Hypertension with evidence of end organ damage.
14) *Thoracic or abdominal aortic aneurysm.
15) Carotid artery stenosis or obstruction resulting in greater than or equal to 50 percent reduction in blood flow.
16) *Peripheral vascular disease resulting in symptomatic claudication.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

17) Any other vascular condition that results in the inability to safely perform one or more of the essential job tasks.

i. **Abdominal Organs and Gastrointestinal System**
1) Presence of uncorrected inguinal/femoral hernia regardless of symptoms.
2) Any gastrointestinal condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

j. **Metabolic Syndrome**
1) Metabolic syndrome with aerobic capacity less than 12 METs.

k. **Reproductive System**
1) Any genital condition that results in inability to safely perform one or more of the essential job tasks.

l. **Urinary System**
1) Renal failure or insufficiency requiring continuous ambulatory peritoneal dialysis or hemodialysis.
2) Any urinary condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

m. **Spine and Axial Skeleton**
1) Scoliosis of thoracic or lumbar spine with angle greater than or equal to 40 degrees.
2) History of spinal surgery with rods that are still in place.
3) Any spinal or skeletal condition producing sensory or motor deficit(s) or pain due to radiculopathy or nerve root compression.
4) Any spinal or skeletal condition causing pain that frequently or recurrently requires narcotic analgesic medication.
5) Cervical vertebral fractures with multiple vertebral body compression greater than 25 percent; evidence of posterior element involvement, nerve root damage, disc involvement, dislocation (partial, moderate, severe), abnormal exam, ligament instability, symptomatic, and/or less than six months post injury or less than one year since surgery.
6) Thoracic vertebral fractures with vertebral body compression greater than 50 percent; evidence of posterior element involvement, nerve root damage, disc involvement, dislocation (severe-with or without surgery), abnormal exam, ligament instability, symptomatic, and/or less than six months post injury or less than one year since surgery.
7) Lumbosacral vertebral fractures with vertebral body compression greater than 50 percent; evidence of posterior element involvement, nerve root damage, disc involvement, dislocation (partial, moderate, severe), fragmentation, abnormal exam, ligament instability, symptomatic, and/or less than six months post injury or less than one year since surgery.
8) Any spinal or skeletal condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

n. **Extremities**
1) Joint replacement, unless all the following conditions are met:
   a) Normal range of motion without history of dislocations post-replacement.
   b) Repetitive and prolonged pulling, bending, rotations, kneeling, crawling, and climbing without pain or impairment.
   c) No limiting pain.
   d) Evaluation by an orthopedic specialist who concurs that the candidate can complete all essential job tasks listed in Chapter 5.
2) Amputation or congenital absence of upper-extremity limb (hand or higher).
3) Amputation of either thumb proximal to the mid-proximal phalanx.
4) Amputation or congenital absence of lower-extremity limb (foot or above) unless the candidate meets all of the following conditions:
   a) Stable, unilateral below-the-knee amputation with at least the proximal third of the tibia present for a strong and stable attachment point with the prosthesis.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

b) Fitted with a prosthesis that will tolerate the conditions present in structural firefighting when worn in conjunction with standard firefighting personal protective equipment.
c) At least six months of prosthetic use in a variety of activities with no functional difficulties.
d) Amputee limb healed with no significant inflammation, persistent pain, necrosis, or indications of instability at the amputee limb attachment point.
e) No significant psychosocial issues pertaining to the loss of limb or use of prosthesis.
f) Evaluated by a prosthetist or orthopedic specialist with expertise in the fitting and function of prosthetic limbs who concurs that the candidate can complete all essential job tasks listed in Chapter 5, including wearing personal protective ensembles and self-contained breathing apparatus while climbing ladders, operating from heights, and walking or crawling in the dark along narrow and uneven surfaces that may be wet or icy.
g) Has passed the department's applicant physical ability test as a condition of appointment without accommodations or modification of the protocol.

5) Chronic non-healing or recent bone grafts.
6) History of more than one dislocation of shoulder without surgical repair or with history of recurrent shoulder disorders within the last five years with pain or loss of motion, and with or without radiographic deviations from normal.
7) Any extremity condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

o. **Neurological Disorders**
1) Ataxias of heredo-degenerative type.
2) Cerebral arteriosclerosis as evidenced by a history of transient ischemic attack, reversible ischemic neurological deficit, or ischemic stroke.
3) Hemiparalysis or paralysis of a limb.
4) *Multiple sclerosis with activity or evidence of progression within previous three years.
5) *Myasthenia gravis with activity or evidence of progression within previous three years.
6) Progressive muscular dystrophy or atrophy.
7) Uncorrected cerebral aneurysm.
8) All single unprovoked seizures and epileptic conditions including simple partial, complex partial, generalized, and psychomotor seizure disorders other than as allowed in 6.17.1.1.
9) Dementia (Alzheimer's and other neurodegenerative diseases) with symptomatic loss of function or cognitive impairment (e.g., less than or equal to 28 on Mini-Mental Status Exam).
10) Parkinson's disease and other movement disorders resulting in uncontrolled movements, bradykinesia, or cognitive impairment (e.g., less than or equal to 28 on Mini-Mental Status Exam).
11) Any neurological condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

p. **Skin**
1) Metastatic or locally extensive basal or squamous cell carcinoma or melanoma.
2) Any dermatologic condition that would not allow for a successful fit test for any respirator required by the fire department.
3) Any dermatologic condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

q. **Blood and Blood-Forming Organs**
1) Hemorrhagic states requiring replacement therapy.
2) Sickle cell disease (homozygous).
3) Clotting disorders.
4) Any hematological condition that results in inability to safely perform one or more of the essential job tasks.

r. **Endocrine and Metabolic Disorders**
1) *Type 1 diabetes mellitus, unless a candidate meets all of the following criteria:

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

a) Is maintained by a physician knowledgeable in current management of diabetes mellitus on a basal/bolus (can include subcutaneous insulin infusion pump) regimen using insulin analogs.

b) Has demonstrated over a period of at least six months the motivation and understanding required to closely monitor and control capillary blood glucose levels through nutritional therapy and insulin administration.  Assessment of this shall take into consideration the erratic meal schedules, sleep disruption, and high aerobic and anaerobic workloads intrinsic to firefighting.

c) Has a dilated retinal exam by a qualified ophthalmologist or optometrist that shows no higher grade of diabetic retinopathy than microaneurysms, as indicated on the International Clinical Diabetic Retinopathy Disease Severity Scale.

d) Has normal renal function based on a calculated creatinine clearance greater than 60 mL/min and absence of proteinuria.  (Creatinine clearance can be calculated by use of the Cockroft-Gault or similar formula.  Proteinuria is defined as 24-hour urine excretion of greater than or equal to 300 mg protein or greater than or equal to 300 mg of albumin per gram of creatinine in a random sample.)

e) Has no autonomic or peripheral neuropathy.  (Peripheral neuropathy is determined by diminished ability to feel the vibration of a 128 cps tuning fork or the light touch of a 10-gram monofilament on the dorsum of the great toe proximal to the nail.  Autonomic neuropathy might be determined by evidence of gastroparesis, postural hypotension, or abnormal tests of heart rate variability.)

f) Has normal cardiac function without evidence of myocardial ischemia on cardiac stress testing (to at least 12 MET) by electrocardiogram (ECG) and cardiac imaging.

g) Has a signed statement and medical records from an endocrinologist or a physician with demonstrated knowledge in the current management of diabetes mellitus as well as knowledge of the essential job tasks and hazards of firefighting as described in 5.1.1, allowing the fire department physician to determine whether the candidate meets the following criteria:

   i. Is being successfully maintained on a regimen consistent with 6.20.1(1)(a) and 6.20.1(1)(b).

   ii. Has had hemoglobin A1C measured at least four times a year (intervals of two to three months) over the last 12 months prior to evaluation if the diagnosis of diabetes has been present over one year.  A hemoglobin A1C reading of eight percent or greater shall trigger a medical evaluation to determine if a condition exists in addition to diabetes that is responsible for the hemoglobin A1C not accurately reflecting average glucose levels.  This shall include evidence of a set schedule for blood glucose monitoring and a thorough review of data from such monitoring.

   iii. Does not have an increased risk of hypoglycemia due to alcohol use or other predisposing factors.

   iv. *Has had no episodes of severe hypoglycemia (defined as requiring assistance of another) in the preceding one year, with no more than two episodes of severe hypoglycemia in the preceding three years.

   v. Is certified not to have a medical contraindication to firefighting training and operations.

2) Insulin-requiring Type 2 diabetes mellitus, unless a candidate meets all of the following criteria:

   a) Is maintained by a physician knowledgeable in current management of diabetes mellitus.

   b) Has demonstrated over a period of at least three months the motivation and understanding required to closely monitor and control capillary blood glucose levels through nutritional therapy and insulin administration.  Assessment of this shall take into consideration the erratic meal schedules, sleep disruption, and high aerobic and anaerobic workloads intrinsic to firefighting.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

    c) Has a dilated retinal exam by a qualified ophthalmologist or optometrist that shows no higher grade of diabetic retinopathy than microaneurysms, as indicated on the International Clinical Diabetic Retinopathy Disease Severity Scale.

    d) Has normal renal function based on a calculated creatinine clearance greater than 60 mL/min and absence of proteinuria.  (Creatinine clearance can be calculated by use of the Cockroft-Gault or similar formula.  Proteinuria is defined as 24-hour urine excretion of greater than or equal to 300 mg protein or greater than or equal to 300 mg of albumin per gram of creatinine in a random sample.)

    e) Has no autonomic or peripheral neuropathy.  (Peripheral neuropathy is determined by diminished ability to feel the vibration of a 128 cps tuning fork or the light touch of a 10-gram monofilament on the dorsum of the great toe proximal to the nail.  Autonomic neuropathy can be determined by evidence of gastroparesis, postural hypotension, or abnormal tests of heart rate variability.)

    f) Has normal cardiac function without evidence of myocardial ischemia on cardiac stress testing (to at least 12 METS) by ECG and cardiac imaging.

    g) Has a signed statement and medical records from an endocrinologist or a physician with demonstrated knowledge in the current management of diabetes mellitus as well as knowledge of the essential job tasks and hazards of firefighting as described in 5.1.1, allowing the fire department physician to determine whether the candidate meets the following criteria:

        i. Is maintained on a stable insulin regimen and has demonstrated over a period of at least three months the motivation and understanding required to closely monitor and control capillary blood glucose levels despite varied activity schedules through nutritional therapy and insulin administration.

        ii. Has had hemoglobin A1C measured at least four times a year (intervals of two to three months) over the last 12 months prior to evaluation if the diagnosis of diabetes has been present over one year.  A hemoglobin A1C reading of eight percent or greater shall trigger a medical evaluation to determine if a condition exists in addition to diabetes that is responsible for the hemoglobin A1C not accurately reflecting average glucose levels. This shall include evidence of a set schedule for blood glucose monitoring and a thorough review of data from such monitoring.

        iii. Does not have an increased risk of hypoglycemia due to alcohol use or other predisposing factors.

        iv. *Has had no episodes of severe hypoglycemia (defined as requiring assistance of another) in the preceding one year, with no more than two episodes of severe hypoglycemia in the preceding three years

        v. Is certified not to have a medical contraindication to firefighting training and operations.

    3) Any endocrine or metabolic condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

s. **Systemic Diseases and Miscellaneous Conditions**

    1) Any systemic condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

t. **Tumors and Malignant Diseases**

    1) Malignant disease that is newly diagnosed, untreated, or currently being treated, or under active surveillance due to the increased risk for reoccurrence.

    2) Any tumor or similar condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

u. **Psychiatric Conditions**

    1) Any psychiatric condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

   v.  **Chemicals, Drugs, and Medications**
     1) Those that require chronic or frequent treatment with any of the following medications or classes of medications:
       a) Narcotics, including methadone.
       b) Sedative-hypnotics.
       c) Full-dose or low-dose anticoagulation medications or any drugs that prolong prothrombin time, partial thromboplastin time, or international normalized ratio.
       d) Beta-adrenergic blocking agents at doses that prevent a normal cardiac rate response to exercise, high-dose diuretics, or central acting antihypertensive agents (e.g., clonidine).
       e) *Respiratory medications: inhaled bronchodilators, inhaled corticosteroids, systemic corticosteroids, theophylline, and leukotriene receptor antagonists (e.g., Montelukast).
       f) High-dose corticosteroids for chronic disease.
       g) Anabolic steroids.
       h) Any chemical, drug, or medication that results in the candidate not being able to safely perform one or more of the essential job tasks.
     2) Tobacco use shall be a Category A medical condition (where allowed by law).
     3) Evidence of illegal drug use detected through testing, conducted in accordance with Substance Abuse and Mental Health Service Administration, shall be a Category A medical condition.
     4) Evidence of clinical intoxication or a measured blood alcohol level that exceeds the legal definition of intoxication according to the authority having jurisdiction at the time of medical evaluation shall be a Category A medical condition.
  **(B) Full Duty:** Qualified for all institutional assignments (including food-handling) without restrictions.
  **(C) Limited Duty:** Restrictions on duty assignment, which are listed in the Comments section. For example, no assignment to work where standing for longer than two hours is required. Qualified for food-handling unless specifically noted.
  **(D) Totally Disabled:** Incapable of any duty assignment.
**(3) Medical Risk**
Medical Risk provides a scale of the risk of adverse outcome caused by the patient's medical conditions.
  **(A) Low Risk:** Routine medical conditions, focused on preventative care. Chronic care of common conditions in good control throughout the last year.
  **(B) Medium Risk:** Chronic care of well or moderately-controlled common conditions. Requires time-sensitive laboratory studies.
  **(C) High Risk:** Chronic care of complicated, unstable, or poorly-controlled common conditions (e.g., asthma with history of intubation for exacerbations, uncompensated end-stage liver disease, hypertension with end-organ damage, diabetes with amputation). Chronic care of complex, unusual, or high risk conditions (e.g., cancer under treatment or metastatic, coronary artery disease with prior infarction). Implanted defibrillator or pacemaker. High risk medications (e.g., chemotherapy, immune suppressants, Factor 8 or 7, anticoagulants other than aspirin). Transportation over a several day period would pose a health risk, such as hypercoagulable state. Case management is required.
**(4) Nursing Care Acuity**
Nursing Care Acuity is a scale for the extent, frequency, and complexity of nursing interventions and activities needed.
  **(A) Basic, Uncomplicated Nursing (Population Risk Stratification Level I: Primary Prevention):** Care of largely well population; prevention and wellness; stable, uncomplicated chronic disease; episodic care of acute injury and illness; routine nursing care in primary care clinic; annual or semi-annual patient service plans; Keep on Person Medications available seven days per week or Nurse administered (NA) medications no more frequent than twice daily.
  **(B) Low-Intensity Nursing (Population Risk Stratification Level II: Secondary Prevention):** Care of chronic stable disease; functional limitations compensated by adaptive equipment; patients able to participate in Activities of Daily Living; maintenance of status; prevention of exacerbation; symptom control and management of pain; uncomplicated wound care (time-limited); uncomplicated chemo/radiation therapy;

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

quarterly patient service plans; Unit pill line: Direct Observed Therapy, Nurse Administered Medications, Intramuscular or subcutaneous injections, and Keep on Person Medications.

**(C) Medium-Intensity Nursing (Population Risk Stratification Level III: Tertiary):** Care of complex, stable or at-risk patients; uncomplicated post-surgical care; dementia, quadriplegia, hemiplegia who are able to participate in self-care; uncomplicated wound care; high risk for skin breakdown; Outpatient Housing Unit (OHU) placement; monthly or every two month patient service plans. Case management/care coordination is required.

**(D) High-Intensity or Specialized Nursing (Population Risk Stratification Level IV: Catastrophic/Complex):** Direct, total and/or specialized nursing care of complex, complicated, unstable, or high risk patients; daily nursing plan update; significant dementia, paraplegia, hemiplegia or quadriplegia who are unstable and unable to participate in self-care; complex medication protocols. Care management/care coordination is required. Inpatient level of care.

**(d) Minimum Support Facility Criteria**
To be medically eligible for Minimum Support Facility (MSF) Placement, patients must have a MCC Risk Category designation of Low Risk or meet the Medium Risk criteria for MSF eligibility (see Clinical Risk Definitions on the Lifeline Quality Management Portal). Additionally, patients must also meet all custodial criteria required for MSF placement (i.e., Time in Custody, no S or R Suffix, etc.).

**(e) Specialized Services**
Specialized Services are special programs or patient needs that are provided by certain specified institutions.

**(1) Pregnancy Program:** Medical program for pregnant and post-partum patients.

**(2) Transplant Center:** Medical program at institutions with agreements with a local transplant center. Currently these patients are managed as part of the continuum of care; this factor then flags these patients for purposes of population management and census.

**(3) Hemodialysis:** Medical program for patients requiring hemodialysis. The program may provide dialysis within the institution or by transportation outside the institution.

**(4) Dementia:** Medical program for patients with dementia. Currently these patients are managed as part of the continuum of care; this factor then flags these patients for purposes of population management and census.

**(5) Therapeutic Diet:** Specified therapeutic diets are available to outpatients and in medical settings. Authorized therapeutic diets include:
(A) Gluten-free diet
(B) Hepatic diet
(C) Renal diet
(D) Pre-renal diet

**(6) Respiratory Isolation:** Low-pressure respiratory isolation room is required. These rooms are included in CTCs and used primarily in the care of patients with active tuberculosis.

**(7) Speech/Occupational Therapy:** Speech and occupational therapy services. These are most commonly provided for patients being rehabilitated from strokes who are being cared for in a medical setting.

**(8) Physical Therapy:** Physical therapy services, which can be provided both in medical settings and as outpatients.

**(9) Durable Medical Equipment:** Provisioning and repair of durable medical equipment including wheelchairs, prostheses, portable oxygen concentrators, and continuous positive airway pressure devices which are available both in medical settings and as outpatients.

**(10) Transgender:** Medical program for transgender patients.

**(f) INSTITUTIONAL-ENVIRONMENTAL**
These Classification Factors are related to institutional capabilities or characteristics that are due to the physical location and architectural design.

**(1) Restricted-Altitude:** The patient has a condition that is placed at risk by high altitude (above 3,500 feet) including patients who require supplemental oxygen and patients with sickle-cell disease (sickle-cell trait does not require restriction).

**(2) Restricted-Cocci Areas**
(A) Institutions in Restricted-Cocci Area 1 include: Avenal State Prison, California City Correctional Center, California Correctional Institution, California Men's Colony, California State Prison, Corcoran, California

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

Substance Abuse Treatment Facility and State Prison at Corcoran, Kern Valley State Prison, North Kern State Prison, Pleasant Valley State Prison, Wasco State Prison, and any Community Correctional Facility/Modified Community Correctional Facility that has these institutions as their hub.

1.  Patients who are designated as Restricted-Cocci Area 1 are precluded from endorsement to the institutions listed above.
2.  Patients with Clinical Category 1 or 2, pregnancy, a history of lymphoma, status post solid organ transplant, chronic immunosuppressive therapy, moderate to severe Chronic Obstructive Pulmonary Disease (on intermittent or continuous $O_2$,) or cancer patients on chemotherapy and/or radiation therapy are restricted from placement in Cocci Area 1, unless they have a history of cocci disease.

(B)  Institutions in Restricted-Cocci Area 2: Avenal State Prison, Pleasant Valley State Prison, and any Community Correctional Facility/Modified Community Correctional Facility that has these institutions as their hub.

1.  Patients who are designated as Restricted-Cocci Area 2 are precluded from endorsement to the institutions listed above.
2.  High Medical Risk patients and those who test negative with the cocci skin test, have not been offered the cocci skin test, or have an incomplete skin test (e.g., consented to testing but the test has not yet been completed) are absolutely restricted from Cocci Area 2, unless they have a history of cocci disease; these patients cannot waive the restriction.
3.  Patients with diabetes or who are Filipino or African American are restricted from Cocci Area 2, unless they have a history of cocci disease or test positive with a cocci skin test; these patients may waive the restriction.

**(3) Restricted-No Stairs:**  Patients who require an environment without stairs for their activities of daily living.  This may be due to mobility impairment or to other functional impairments such as heart failure.

**(4) Requires Electrical Access:**  Patients with electrically-operated supportive equipment such as portable oxygen concentrators or continuous positive airway pressure devices that require an electrical outlet within six feet of the head of the bed.

**(5) Requires Adaptive Equipment:**  Patients who require adaptive equipment in their living area such as grab bars in the toilet or shower or trapeze bars over the bed.

**(6) Requires Medical Transport:**  The patient cannot safely be transported using custody staff and a state car, state bus, or state transport van.  For example, a quadriplegic with autonomic instability.

**(7) See 1845 and 7410:**  The patient has medical needs that are specified on a CDCR 1845, Disability Placement Program Verification, and/or a CDCR 7410, Comprehensive Accommodation Chrono.

**(g) COMMENTS**

**(1)** Specified Medical Classification Factors, if present, require supporting details to be written into the "Comments" section of the MCC.  These factors are marked with a superscript "*".

**(2)** Comments that contain protected health information should be entered into the "Confidential Comments" section.

# Exhibit 32

**MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS)**
**MANAGEMENT INFORMATION SUMMARY (MIS) REPORT**

2/18/2020

| Level of Care | Housing Program | MALES | | | FEMALES | | |
|---|---|---|---|---|---|---|---|
| | | Capacity | Census[1] | Awaiting Placement[2] | Capacity | Census[1] | Awaiting Placement[2] |
| **Correctional Clinical Case Management System (CCCMS)** | | **27,000** | **25,182** | | **2,250** | **2,095** | |
| CCCMS | Reception Center (RC) | | 2,312 | | | 247 | |
| | General Population (GP) | | 20,991 | | | 1,724 | |
| | Enhanced Outpatient Program (EOP) | | 83 | | | 0 | |
| | Mental Health Crisis Bed (MHCB) | | 0 | | | 0 | |
| | Psychiatric Inpatient Program (PIP) | | 0 | | | 0 | |
| | Specialized Medical Beds Housing | | 553 | | | 20 | |
| | Administrative Segregation Unit (ASU) | | 229 | | | 65 | |
| | Condemned | | 129 | | | 15 | |
| | Long Term Restricted Housing Unit (LTRH) | 130 | 223 | | | 0 | |
| | Non-Disciplinary Segregation (NDS) | | 0 | | | 0 | |
| | Psychiatric Services Unit (PSU) | | 13 | | | 0 | |
| | Security Housing Unit (SHU) | | 0 | | | 24 | |
| | Short Term Restricted Housing Unit (STRH) | 1,125 | 649 | | | 0 | |
| **Enhanced Outpatient Program (EOP)** | | **7,075** | **6,531** | | **225** | **191** | |
| EOP | Reception Center (RC) | | 166 | | | 1 | |
| | General Population (GP) | | 59 | | | 46 | |
| | Enhanced Outpatient Program (EOP) | 6,318 | 5,491 | | 195 | 121 | |
| | Mental Health Crisis Bed (MHCB) | | 5 | | | 0 | |
| | Psychiatric Inpatient Program (PIP) | | 21 | | | 1 | |
| | Specialized Medical Beds Housing | | 182 | | | 3 | |
| | Administrative Segregation Unit (ASU) | 585 | 383 | 39 | 20 | 15 | 0 |
| | Condemned | | 61 | | | 0 | |
| | Long Term Restricted Housing Unit (LTRH) | | 1 | | | 0 | |
| | Non-Disciplinary Segregation (NDS) | | 0 | | | 0 | |
| | Psychiatric Services Unit (PSU) | 172 | 127 | 15 | 10 | 4 | 0 |
| | Security Housing Unit (SHU) | | 0 | | | 0 | |
| | Short Term Restricted Housing Unit (STRH) | | 35 | | | 0 | |

| Level of Care | Capacity | Census[1] | Awaiting Placement[2] | Capacity | Census[1] | Awaiting Placement[2] |
|---|---|---|---|---|---|---|
| **Mental Health Crisis Bed (MHCB)** | **407** | **293** | **6** | **41** | **30** | **2** |
| **Psychiatric Inpatient Programs:** **Intermediate Care Facility (ICF)** | **1,131** | **1,068** | **113** | | | |
| Low Custody | 390 | 364 | 35 | | | |
| *Atascadero State Hospital (ASH)* | 256 | 244 | 21 | | | |
| *Coalinga State Hospital (CSH)* | 50 | 46 | 6 | | | |
| *California Medical Facility (CMF)* | 84 | 74 | 8 | | | |
| High Custody | 741 | 704 | 78 | | | |
| *California Health Care Facility (CHCF)* | 331 | 324 | 24 | | | |
| *CMF Single Cells* | 94 | 91 | 21 | | | |
| *CMF Multi Cells* | 70 | 57 | 6 | | | |
| *SVPP Single Cells* | 202 | 194 | 19 | | | |
| *Salinas Valley Psychiatric Program (SVPP) Multi Cells* | 44 | 38 | 8 | | | |
| **Acute Psychiatric Program (APP)** | **421** | **390** | **35** | | | |
| ASH | 0 | 0 | 0 | | | |
| CHCF | 203 | 193 | 19 | | | |
| CMF | 218 | 197 | 16 | | | |
| **Psychiatric Inpatient Program (PIP)** | **40** | **29** | **0** | **75** | **46** | **4** |
| California Institution for Women (CIW) | | | | 45 | 34 | 3 |
| Patton State Hospital (PSH) | | | | 30 | 12 | 1 |
| SQ | 30 | 27 | 0 | | | |
| SQ (Non-condemned)[6] | 10 | 2 | 0 | | | |
| **Penal Code 2974s (Parolees)[5]** | | **2** | | | | |
| Metro State Hospital (MSH) | | 0 | | | | |
| Napa State Hospital (NSH) | | 2 | | | | |
| Patton State Hospital (PSH) | | 0 | | | | |
| **TOTALS (excluding Parolees)** | **36,074** | **33,493** | **208** | **2,591** | **2,362** | **6** |

| | Total Capacity | Total Census[1] | Total Awaiting Placement[2] | Total Over Timeframes[3] | CENSUS PERCENTAGES | |
|---|---|---|---|---|---|---|
| | | | | | % MHSDS | % CDCR[4] |
| CCCMS | 29,250 | 27,277 | | | 76.08% | 22.10% |
| EOP | 6,513 | 6,157 | | | 17.17% | 4.99% |
| EOP-ASU/NDS/STRH | 605 | 433 | 39 | 8 | 1.21% | 0.35% |
| EOP-PSU/LTRH/SHU | 182 | 132 | 15 | 0 | 0.37% | 0.11% |
| MHCB | 448 | 323 | 8 | 0 | 0.90% | 0.26% |
| PSYCHIATRIC INPATIENT | 1,667 | 1,533 | 152 | 5 | 4.28% | 1.24% |
| **GRAND TOTAL** | **38,665** | **35,855** | **214** | **13** | **100.00%** | **29.05%** |

[1] Census sources: HCODS for CCCMS, EOP; HEART for MHCB; RIPA reports for ICF, APP, and PIP programs.

[2] Awaiting Placement = The sum of inmates waiting to be placed in a bed at a specific level of care. Those awaiting placement to ICF, APP, and PIP include referrals that have been custodially reviewed by HCPOP and are awaiting bed availability, inpatient program acceptance, or transfer to the inpatient program as of the reporting date (based on the Referrals to Inpatient Programs Application (RIPA)).

[3] Total Over Timeframes = The number of referrals that are beyond Mental Health Program Guide transfer timeframes: EOP-ASU includes cases in non-hubs waiting > 30 days, PSU includes cases with an original CSR endorsement date > 60 days, MHCB includes referrals > 24 hours, Psychiatric Inpatient includes Intermediate referrals > 30 days and Acute referrals > 10 days.

[4] CDCR pop as of 2/12/20 (OISB). Based on Total In-State Institution Population and Out of State (COCF).

[5] Census numbers are tracked and updated by Department of State Hospital (DSH).

[6] SQ for non-condemned has one MHCB placement.

# Exhibit 33

COVID-19 Preparedness

## RECENT UPDATES

March 24, 2020 update

- *As of March 24, 2020, one incarcerated individual at California State Prison-Los Angeles County has tested positive for COVID-19.*

- *As of March 24, 2020, the Agency has received notification that two employees at California State Prison, Sacramento, three employees at California Institution for Men, and one employee at Folsom State Prison have tested positive for COVID-19. An employee at California Health Care Facility has also tested positive but there is no expected staff or inmate exposure from this case. Please see the latest on our COVID-19 Status webpage here (https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/).*

- *California Governor Gavin Newsom today issued an Executive Order with the following directives to CDCR:*
  - *Suspend intake of all incarcerated persons into both adult state prison and Division of Juvenile Justice facilities from the county level for a minimum of 30 days.*

  - *Directed the Board of Parole Hearings (BPH) to develop a process for conducting parole hearings by videoconference for all participants to attend.*

  - *BPH directed to cease conducting in-person parole hearings for 60 days and postpone any scheduled parole hearings until April 13, or earlier if video conferencing capability is made available.*
    - *For the next 60 days, and for the term of any extensions, inmates scheduled for a parole hearing can elect to continue with their timely parole hearing by videoconference, to accept a postponement, or to waive their hearing.*

  - *For more details on the Governor's Executive Order visit the Office of the Governor's website here (https://www.gov.ca.gov/2020/03/24/governor-newsom-issues-executive-order-on-state-prisons-and-juvenile-facilities-in-response-to-the-covid-19-outbreak/).*

- *CDCR has suspended transfers of inmates into the Male Community Reentry Program (https://www.cdcr.ca.gov/rehabilitation/mcrp/) (MCRP), the Custody to Community Transitional Reentry Program (https://www.cdcr.ca.gov/adult-operations/custody-to-community-transitional-reentry-program/) (CCTRP), and the Alternative Custody Program (https://www.cdcr.ca.gov/adult-operations/acp/)(ACP) through April 6,2020. CDCR has taken this step to limit potential exposure of staff to COVID-19 during inmate transfers to the community. Additionally, as part of this program, incarcerated persons remain under the jurisdiction and responsibility of CDCR, to include providing any required medical attention. Releasing incarcerated persons to these programs could potentially expose them to COVID-19 in the community which would require their transfer back to an institution for medical care for non-emergent health care needs, increasing risk for potential exposure within our institutions.*

- *CDCR has also suspended transfers of inmates to the Conservation Camp program until further notice. Inmate transfers previously initiated under the approved guidelines, that are currently on layover, will be moved to their final destination.*

Executives and staff at CDCR and CCHCS are working closely with infectious disease control experts to minimize the impact of COVID-19 on our operations. To ensure CDCR and CCHCS are ready to immediately respond to any COVID-19 related incident, the Agency activated the Department Operations Center (DOC) in order to be fully prepared to respond to any departmental impacts resulting from COVID-19.

CDCR and CCHCS are dedicated to the safety of everyone who lives in, works in, and visits our state prisons. We have longstanding outbreak management plans in place to address communicable disease outbreaks such as influenza, measles, mumps, norovirus, and varicella, as well as preparedness procedures to address a variety of medical emergencies and natural disasters.

We are bolstering our response readiness by taking several proactive steps to educate those who work in, live in, and visit our facilities regarding ways they can protect themselves and those around them from COVID-19.

**BELOW IS AN OVERVIEW OF STEPS WE ARE TAKING REGARDING COVID-19**

### Expanded precautions at institutions and office locations
CDCR and CCHCS have implemented mandatory verbal screening for every person entering any work location, in line with screenings in place at prisons since March 14. Those attempting to enter a state prison or office building at any time are required to verbally respond if they currently have new or worsening symptoms of a respiratory illness. If the individual's response is that they are experiencing symptoms, they will be restricted from entering the site that day.

All CDCR institutions have been instructed to conduct additional deep-cleaning efforts in high-traffic, high-volume areas, including visiting and health care facilities. Additional hand sanitizer dispensing stations are being procured and will be placed inside adult institution entrances and visiting areas.

Staff have been granted permission to carry up to two ounces of personal-use hand sanitizer. The incarcerated population is being provided extra soap when requested and hospital-grade disinfectant that meets Centers for Disease Control and Prevention guidance for COVID-19.

CDCR and CCHCS have suspended tuberculosis (TB) testing clinics for staff at all locations statewide, including institutions, in accordance with recommended limitations on gatherings. Testing will be rescheduled as appropriate.

CDCR and CCHCS have been actively monitoring and assessing institutions to ensure staff have an adequate supply of personal protective equipment to immediately address any potential COVID-19 exposures, and to protect staff and incarcerated people. The workgroup will continue to collaborate and maintain open lines of communication with the Governor's Office of Emergency Services to identify any deficiencies and ensure adequate supplies are available at each institution on an ongoing basis.

## Screening on entry into prisons

All incarcerated persons received into a Reception Center institution are placed into an automatic 14-day quarantine for monitoring. For more on CDCR and CCHCS quarantine protocols, visit our COVID-19 Status (https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/) webpage.

Immediately upon entry, all inmates are screened for symptoms of influenza-like illness (ILI) including COVID-I9. The inmate populations that must be screened include, but are not limited to, those entering via reception centers, receiving and release locations and fire camps, and returning from court, a higher level of care, or an offsite specialty appointment.

The screening shall include asking an individual if they have a cough, fever and/or difficulty breathing, and taking their temperature. Based on the screening questions, temperature reading, and health care staff's clinical judgement, the individual will either be placed in isolation, quarantine or other housing.

## Social distancing

CDCR has implemented several practices to encourage "social distancing," which is a strategy recommended by public health officials to stop the spread of contagious diseases. Social distancing requires the creation of physical space between individuals, minimizing gatherings, and ensuring space between individuals when events or activities cannot be modified, postponed, or canceled. Achieving space between individuals of approximately six feet is advisable.

The incarcerated population has received information about social distancing, and staff and inmates are practicing social distancing strategies where possible, including limiting groups to no more than 10, assigning bunks to provide more space between individuals, rearranging scheduled movements to minimize mixing of people from different housing areas, encouraging social distancing during yard time, and adjusting dining schedules where possible to allow for social distancing and additional cleaning and disinfecting of dining halls between groups.

## Transportation/Receiving and Release protocols

Effective March 24, CDCR will suspend intake of all incarcerated persons into both adult state prison and Division of Juvenile Justice facilities for a minimum of 30 days. California Governor Gavin Newsom issued an Executive Order directing CDCR to suspend intake into state correctional facilities for 30 days. All persons convicted of felonies shall be received, detained, or housed in a jail or other facility currently detaining or housing them for that period. The order allows the CDCR Secretary to grant one or more 30-day extensions if suspension continues to be necessary to protect the health, safety, and welfare of inmates and juveniles in CDCR's custody and staff who work in the facilities.

CDCR has suspended transfers of inmates into the Male Community Reentry Program (https://www.cdcr.ca.gov/rehabilitation/mcrp/)(MCRP), the Custody to Community Transitional Reentry Program (https://www.cdcr.ca.gov/adult-operations/custody-to-community-transitional-reentry-program/) (CCTRP), and the Alternative Custody Program (https://www.cdcr.ca.gov/adult-operations/acp/)(ACP) through April 6,2020. CDCR has taken this step to limit potential exposure of staff to COVID-19 during inmate transfers to the community. Additionally, as part of this program, incarcerated persons remain under the jurisdiction and responsibility of CDCR, to include providing any required medical attention. Releasing incarcerated persons to these programs could potentially expose them to COVID-19 in the community which would require their transfer back to an institution for medical care for non-emergent health care needs, increasing risk for potential exposure within our institutions.

CDCR has also suspended transfers of inmates to the Conservation Camp program until further notice. Inmate transfers previously initiated under the approved guidelines, who are currently on layover, will be moved to their final destination.

Department of State Hospitals and CDCR/CCHCS will not transfer patients between the two mental health treatment agencies for the next 30 days. All appropriate health care services will be provided to the patient by the current housing agency.

CDCR has limited transfers of inmates between CDCR facilities to only the following scenarios: removal to and from restricted housing units; transfer from reception centers after being assessed by medical and other staff; for medical and mental health needs; conservation camps, Male Community Reentry Program, Custody to Community Transitional Reentry Program; Alternative Custody Program; Modified Community Correctional Facilities due to deactivation efforts; and ordered court appearances.

For inmates coming into the CDCR system, or who are being transported in the above scenarios; we are completing a comprehensive health screening and assessment by health care professionals when they are both processed into and out of an institution; including temperature, blood pressure, pulse, and respiration screenings. They are also asked a series of questions about their state of health.

All Interstate Compact Agreement transfers of out-of-state parolees and inmates to California will cease for 30 days.

**Visiting**
CDCR's inmate telephone network provider Global Tel Link (GTL) has offered the adult incarcerated population two days of free phone calls. The first was held March 19, the next will take place from 12 a.m. to 11:59 p.m. Thursday, March 26. The youth within the Division of Juvenile Justice already receive free phone calls. There is no limit on number of calls; however, each institution may limit time to accommodate need.

CDCR's electronic messaging provider JPay is now offering two free stamps per week for all registered users at the five pilot sites that currently have the technology; High Desert State Prison, Kern Valley State Prison, California Institution for Women, Central California Women's Facility, and Substance Abuse Treatment Facility and State Prison, Corcoran. At some of these institutions, only certain yards currently have this technology. Stamps are added to JPay accounts each Friday.

As part of CDCR's COVID-19 prevention efforts, normal visiting at adult and juvenile facilities is canceled statewide until further notice based on California Department of Public Health guidance for mass gatherings. This includes overnight family visits and Division of Juvenile Justice visiting.

Institution executives have been instructed to find opportunities to allow increased phone access for the incarcerated population so they may keep in touch with their support system, while also practicing social distancing and other infectious disease safety protocols.

At this time, legal/attorney visits and hospice visits will be held as scheduled. Marriages will be postponed, those affected are encouraged to work with the institution's Community Resource Manager regarding rescheduling for a later date.

## Rehabilitative programs and volunteers

Non-CDCR/CCHCS/CALPIA staff will not be permitted to enter state prison until further notice. This includes people who enter state prison as volunteers, or to facilitate rehabilitative programs. Paid union representatives, and Inmate Ward Labor (IWL) staff will be permitted. CalVet representatives and contractors who work with institution staff to conduct interviews and provide forensic evaluations for incarcerated veterans to receive federal disability benefits for themselves and their families pursuant to Senate Bill 776 will also be permitted.

No rehabilitative programs, group events, or in-person educational classes will take place until further notice. At this time, all tours and events have been postponed, and no new tours are being scheduled.

## Education

The Office of Correctional Education is working with institution principals, library staff, and teachers to provide in-cell assignments where possible in order for students to continue their studies, legal library access and educational credit-earning opportunities. For those in our incarcerated population who need supplementary academic support, CDCR has encouraged Disability Placement Program, Developmental Disability Program, and Every Student Succeeds Act staff to coordinate with the institution instructor to provide additional assistance to enrolled students where possible.

Standardized testing has stopped until further notice, although we are encouraging education staff to continue to engage their students as much as possible to stay focused on their rehabilitation and positive programming during this time.

Recreation and Law Library Services will continue to be available to the incarcerated population even if physical access is restricted due to safety and security measures.

## Religious programs

CDCR recognizes the importance of religion in the daily life and spiritual growth of incarcerated people. Unfortunately, the department has limited group religious programming for upcoming holidays such as Ramadan, Passover, and Easter. These services will be provided as in-cell services as an alternative. CDCR will provide the appropriate Ramadan and Passover daily meals to allow incarcerated people to observe their religious meal traditions, including appropriately beginning and breaking their Ramadan fast.

Chaplains will conduct individual religious counseling as appropriate while maintaining social distancing, and CDCR is working to provide televised religious services to the population.

## Health care services

The health and safety of our population is of critical importance to CDCR and CCHCS. While our agency is working together to prepare for and respond to COVID-19, we will continue to provide urgent health care services. To reduce risks to both patients and staff, inmate movement will be minimized. In addition, some specialty and routine care may be delayed as a result of both internal redirections and external closures. All cancelled appointments will be rescheduled as soon as safely possible. Health care staff will continue to see and treat patients through the 7362 process and those with flu-like symptoms will be tested for COVID-19 as appropriate.

## Dental care

The California Dental Association recommends that all non-urgent dental care be suspended for the next 14 days. Effective immediately and until further notice, dental treatment shall be limited to Dental Priority Classification (DPC) 1 conditions (urgent care). For more information on what qualifies as urgent care, view HCDOM 3.3.5.4 (https://cchcs.ca.gov/wp-content/uploads/sites/60/HC/HCDOM-ch03-art3.5.4.pdf).

## Specialty care appointments

In order to reduce risks to patients and staff, all non-urgent offsite specialty appointments will be re-scheduled to a later time. Telemedicine appointments will continue at this time.

## Board of Parole Hearings/Parole suitability hearings

All in-person Board of Parole Hearings (BPH) parole suitability hearings are postponed for a minimum of 60 days, with any scheduled parole hearings postponed until at least April 13. BPH is working to develop a process for conducting parole hearings by videoconference for all participants to attend, including incarcerated persons, attorneys, commissioners, and victims/victims next-of-kin. Parole suitability hearings may resume earlier once BPH is able to provide video-conferencing.

## Division of Adult Parole Operations

The Division of Adult Parole Operations (DAPO) is committed to the safety of the community, staff, and those in its care. Given the increased risk associated with the use of mass/public transportation and those under parole supervision deemed a high-risk population (older adults and those with known serious chronic medical conditions), DAPO will make some operational changes to support both staff and the individuals under their care and supervision, including suspending lobby traffic except for initial parole interviews and emergencies, and suspending office visits for those age 65 and older and/or with chronic medical conditions.

All parolees' conditions of parole remain in place, with the exception of the items listed above. DAPO administrators and supervisors will assess all measures being implemented and adjust, modify, or waive required specifications as appropriate. Any questions parolees may have related to COVID-19 prevention efforts should be directed to their Parole Agent. Learn more here (https://www.cdcr.ca.gov/covid19/division-of-adult-parole-operations/).

## Modified Community Correctional Facilities and Community Reentry Programs

CDCR's in-state contract facilities are conducting verbal screenings of staff and participants who enter the facilities. Those attempting to enter one of these facilities are required to verbally respond if they currently have symptoms of a respiratory illness. Visiting has also been halted at these facilities until further notice.

CDCR is committed to continuing education programs and limiting the impact our COVID-19 response has on positive rehabilitative programming for our Community Reentry Programs. Rehabilitative programs at the reentry facilities will continue with modifications made to class sizes to encourage social distancing, with some potential program closures.

At this time, participants are generally restricted from leaving the facilities outside of mandated legal reasons, urgent medical needs, if they are employed in the community, or for critical reentry services related to those within 30-45 days of release.

Participants age 65 or older are only eligible for passes to go out in the community for emergency situations only.

Visiting has been canceled at the Community Prisoner Mother Program (CPMP) in line with recommendations from public health officials and the cessation of visiting at CDCR locations statewide. This includes scheduled off-site visits for children residing at CPMP with their mothers. Family members may continue to drop approved items such as diapers, wipes, baby food and baby snacks (for children under 1), during normal visiting hours even during closure. CPMP staff are diligently working to ensure the mothers' and children's needs are met and supplies are readily available with a surplus where needed. They are working closely with community healthcare providers and medical staff at nearby California Institution for Women to keep all required appointments for mothers and children.

## Population communication

To keep members of our population informed, we have created and distributed fact sheets and posters in both English and Spanish that provide education on COVID-19 and precautions recommended by CDC,

which expand upon those advised during cold and flu season. We have also begun streaming CDC educational videos on the CDCR Division of Rehabilitative Programs inmate television network and the CCHCS inmate health care television network. Learn more here (https://www.cdcr.ca.gov/covid19/population-communications/).

Additionally, we are providing regular department updates regarding COVID-19 response to the Statewide Inmate Family Council and all institutional Inmate Family Councils who serve the family and friends of the incarcerated population to ensure they are aware of the steps the department is taking to protect their loved ones housed in our institutions.

### Peace officer hiring and academies

Written peace officer exams are suspended until April 6, 2020. The health and safety of our staff, cadets, and candidates is a top priority. CDCR is taking all the available precautions to ensure a safe and healthy environment. These precautions include regular office cleanings, hand sanitizer/gloves when applicable, reduced testing and physical fitness group sizes, and social distancing.

The Basic Correctional Officer Academy (BCOA) that is currently underway has been accelerated to allow graduation to move from May 1, 2020, to April 7, 2020. The BCOA scheduled to start Tuesday, March 24, will be postponed for at least 30 days.

### Communication and guidance to staff

We have worked continuously to keep staff informed of the evolving situation, including creating internal and external webpages with health-related information from CDC and California Department of Public Health on how they can protect themselves against COVID-19. We have also provided staff with California Department of Human Resources (CalHR) updates on personnel and work-related questions specific to the COVID-19 issue.

CDCR and CCHCS care for the health and wellness of its workforce and have been working to accommodate those who have been impacted by this evolving situation. We will continue to work diligently with CalHR and labor organizations on how we can best keep our workforce protected and provide for the safety and security of our institutions.

For more employee resources related to COVID-19, see our webpage here: https://www.cdcr.ca.gov/covid19/information/ (https://www.cdcr.ca.gov/covid19/information/).

# Exhibit 34

**ORDER OF THE HEALTH OFFICER
OF THE COUNTY OF MARIN DIRECTING
ALL INDIVIDUALS LIVING IN THE COUNTY TO SHELTER AT THEIR
PLACE OF RESIDENCE EXCEPT THAT THEY MAY LEAVE TO
PROVIDE OR RECEIVE CERTAIN ESSENTIAL SERVICES OR
ENGAGE IN CERTAIN ESSENTIAL ACTIVITIES AND WORK FOR
ESSENTIAL BUSINESSES AND GOVERNMENTAL SERVICES;
EXEMPTING INDIVIDUALS EXPERIENCING HOMELESSNESS FROM
THE SHELTER IN PLACE ORDER BUT URGING THEM TO FIND
SHELTER AND GOVERNMENT AGENCIES TO PROVIDE IT;
DIRECTING ALL BUSINESSES AND GOVERNMENTAL AGENCIES TO
CEASE NON-ESSENTIAL OPERATIONS AT PHYSICAL LOCATIONS IN
THE COUNTY; PROHIBITING ALL NON-ESSENTIAL GATHERINGS
OF ANY NUMBER OF INDIVIDUALS; AND ORDERING CESSATION OF
ALL NON-ESSENTIAL TRAVEL**

**DATE OF ORDER: <u>MARCH 16, 2020</u>**

**Please read this Order carefully.  Violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both.  (California Health and Safety Code § 120295, *et seq.*)**

UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085, AND 120175, THE HEALTH OFFICER OF THE COUNTY OF MARIN ("HEALTH OFFICER") ORDERS:

1.  The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the maximum extent possible.  When people need to leave their places of residence, whether to obtain or perform vital services, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times reasonably possible comply with Social Distancing Requirements as defined in Section 10 below.  All provisions of this Order should be interpreted to effectuate this intent.  Failure to comply with any of the provisions of this Order constitutes an imminent threat to public health.

2.  All individuals currently living within Marin County (the "County") are ordered to shelter at their place of residence.  To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain social distancing of at least six feet from any other person when they are outside their residence.  All persons may leave their residences only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses, all as defined in Section 10.  Individuals experiencing

Order of the County Health Officer of the
County of Marin to Shelter in Place

homelessness are exempt from this Section, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to utilize Social Distancing Requirements in their operation).

3. All businesses with a facility in the County, except Essential Businesses as defined below in Section 10, are required to cease all activities at facilities located within the County except Minimum Basic Operations, as defined in Section 10.  For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).  All Essential Businesses are strongly encouraged to remain open.  To the greatest extent feasible, Essential Businesses shall comply with Social Distancing Requirements as defined in Section 10 below, including, but not limited to, when any customers are standing in line.

4. All public and private gatherings of any number of people occurring outside a household or living unit are prohibited, except for the limited purposes as expressly permitted in Section 10.  Nothing in this Order prohibits the gathering of members of a household or living unit.

5. All travel, including, but not limited to, travel on foot, bicycle, scooter, motorcycle, automobile, or public transit, except Essential Travel and Essential Activities as defined below in Section 10, is prohibited.  People must use public transit only for purposes of performing Essential Activities or to travel to and from work to operate Essential Businesses or maintain Essential Governmental Functions.  People riding on public transit must comply with Social Distancing Requirements as defined in Section 10 below, to the greatest extent feasible.  This Order allows travel into or out of the County to perform Essential Activities, operate Essential Businesses, or maintain Essential Governmental Functions.

6. This Order is issued based on evidence of increasing occurrence of COVID-19 within the County and throughout the Bay Area, scientific evidence and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, and evidence that the age, condition, and health of a significant portion of the population of the County places it at risk for serious health complications, including death, from COVID-19.  Due to the outbreak of the COVID-19 virus in the general public, which is now a pandemic according to the World Health Organization, there is a public health emergency throughout the County.  Making the problem worse, some individuals who contract the COVID-19 virus have no symptoms or have mild symptoms, which means they may not be aware they carry the virus. Because even people without symptoms can transmit the disease, and because evidence shows the disease is easily spread, gatherings can result in preventable transmission of the virus.  The scientific evidence shows that at this stage of the emergency, it is essential to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed.  One proven way to slow the transmission is to limit interactions among people to the greatest extent practicable.  By

Order of the County Health Officer of the
County of Marin to Shelter in Place

reducing the spread of the COVID-19 virus, this Order helps preserve critical and limited healthcare capacity in the County.

7. This Order also is issued in light of the existence of 10 cases of COVID-19 in the County, as well as at least 258 confirmed cases and at least three deaths in the seven Bay Area jurisdictions jointly issuing this Order, as of 5 p.m. on March 15, 2020, including a significant and increasing number of suspected cases of community transmission and likely further significant increases in transmission.  Widespread testing for COVID-19 is not yet available but is expected to increase in the coming days.  This Order is necessary to slow the rate of spread and the Health Officer will re-evaluate it as further data becomes available.

8. This Order is issued in accordance with, and incorporates by reference, the March 4, 2020 Proclamation of a State of Emergency issued by Governor Gavin Newsom, the March 3, 2020 Proclamation by the Assistant Director of Emergency Services Declaring the Existence of a Local Emergency in the County, the March 3, 2020 Declaration of Local Health Emergency Regarding Novel Coronavirus 2019 (COVID-19) issued by the Health Officer, the March 10, 2020 Resolution of the Board of Supervisors of the County of Marin Ratifying and Extending the Declaration of a Local Health Emergency, and the March 10, 2020 Resolution of the Board of Supervisors of the County of Marin Ratifying and Extending the Proclamation of a Local Emergency.

9. This Order comes after the release of substantial guidance from the County Health Officer, the Centers for Disease Control and Prevention, the California Department of Public Health, and other public health officials throughout the United States and around the world, including a variety of prior orders to combat the spread and harms of COVID-19.  The Health Officer will continue to assess the quickly evolving situation and may modify or extend this Order, or issue additional Orders, related to COVID-19.

10. <u>Definitions and Exemptions</u>.

   a. For purposes of this Order, individuals may leave their residence only to perform any of the following "Essential Activities."  But people at high risk of severe illness from COVID-19 and people who are sick are urged to stay in their residence to the extent possible except as necessary to seek medical care.

      i. To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, obtaining medical supplies or medication, visiting a health care professional, or obtaining supplies they need to work from home.

      ii. To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and

Order of the County Health Officer of the
County of Marin to Shelter in Place

poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of residences.

iii. To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements as defined in this Section, such as, by way of example and without limitation, walking, hiking, or running.

iv. To perform work providing essential products and services at an Essential Business or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations.

v. To care for a family member or pet in another household.

b. For purposes of this Order, individuals may leave their residence to work for or obtain services at any "Healthcare Operations" including hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, or any related and/or ancillary healthcare services. "Healthcare Operations" also includes veterinary care and all healthcare services provided to animals. This exemption shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. "Healthcare Operations" does not include fitness and exercise gyms and similar facilities.

c. For purposes of this Order, individuals may leave their residence to provide any services or perform any work necessary to the operations and maintenance of "Essential Infrastructure," including, but not limited to, public works construction, construction of housing (in particular affordable housing or housing for individuals experiencing homelessness), airport operations, water, sewer, gas, electrical, oil refining, roads and highways, public transportation, solid waste collection and removal, internet, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services), provided that they carry out those services or that work in compliance with Social Distancing Requirements as defined this Section, to the extent possible.

d. For purposes of this Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, and law enforcement personnel, and others who need to perform essential services are categorically exempt from this Order. Further, nothing in this Order shall prohibit any individual from performing or accessing "Essential Governmental Functions," as determined by the governmental entity performing those functions. Each governmental entity shall identify and designate appropriate employees or contractors to continue providing and carrying out any Essential Governmental Functions. All Essential Governmental Functions shall be performed in compliance with Social Distancing Requirements as defined in this Section, to the extent possible.

Order of the County Health Officer of the
County of Marin to Shelter in Place
Page 4 of 7

e.  For the purposes of this Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function they perform, or its corporate or entity structure.

f.  For the purposes of this Order, "Essential Businesses" means:
    i.  Healthcare Operations and Essential Infrastructure;
    ii.  Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, and any other household consumer products (such as cleaning and personal care products).  This includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;
    iii.  Food cultivation, including farming, livestock, and fishing;
    iv.  Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;
    v.  Newspapers, television, radio, and other media services;
    vi.  Gas stations and auto-supply, auto-repair, and related facilities;
    vii.  Banks and related financial institutions;
    viii.  Hardware stores;
    ix.  Plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses;
    x.  Businesses providing mailing and shipping services, including post office boxes;
    xi.  Educational institutions—including public and private K-12 schools, colleges, and universities—for purposes of facilitating distance learning or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible;
    xii.  Laundromats, drycleaners, and laundry service providers;
    xiii.  Restaurants and other facilities that prepare and serve food, but only for delivery or carry out.  Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and take-away basis only.  Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;
    xiv.  Businesses that supply products needed for people to work from home;
    xv.  Businesses that supply other essential businesses with the support or supplies necessary to operate;

Order of the County Health Officer of the
County of Marin to Shelter in Place
Page 5 of 7

      xvi.   Businesses that ship or deliver groceries, food, goods or services directly to residences;

     xvii.   Airlines, taxis, and other private transportation providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order;

   xviii.   Home-based care for seniors, adults, or children;

     xix.   Residential facilities and shelters for seniors, adults, and children;

      xx.   Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities;

     xxi.   Childcare facilities providing services that enable employees exempted in this Order to work as permitted.  To the extent possible, childcare facilities must operate under the following mandatory conditions:

        1.  Childcare must be carried out in stable groups of 12 or fewer ("stable" means that the same 12 or fewer children are in the same group each day).

        2.  Children shall not change from one group to another.

        3.  If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix with each other.

        4.  Childcare providers shall remain solely with one group of children.

g.   For the purposes of this Order, "Minimum Basic Operations" include the following, provided that employees comply with Social Distancing Requirements as defined this Section, to the extent possible, while carrying out such operations:

       i.   The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.

      ii.   The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

h.   For the purposes of this Order, "Essential Travel" includes travel for any of the following purposes.  Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section below.

       i.   Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses, or Minimum Basic Operations.

      ii.   Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

     iii.   Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

     iv.   Travel to return to a place of residence from outside the jurisdiction.

      v.   Travel required by law enforcement or court order.

     vi.   Travel required for non-residents to return to their place of residence outside the County.  Individuals are strongly encouraged to verify that

Order of the County Health Officer of the
County of Marin to Shelter in Place

their transportation out of the County remains available and functional prior to commencing such travel.

     i.  For purposes of this Order, residences include hotels, motels, shared rental units and similar facilities.

     j.  For purposes of this Order, "Social Distancing Requirements" includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

11. Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order. The violation of any provision of this Order constitutes an imminent threat to public health.

12. This Order shall become effective at 12:01 a.m. on March 17, 2020 and will continue to be in effect until 11:59 p.m. on April 7, 2020, or until it is extended, rescinded, superseded, or amended in writing by the Health Officer.

13. Copies of this Order shall promptly be: (1) made available at the Bulletin Board adjacent to the entrance to the Chambers of the Board of Supervisors, Room 330, Administration Building, and in the display case in the center arch of the Hall of Justice, Marin County Civic Center, San Rafael, California; (2) posted on the County of Marin website (www.marincounty.org) as well as the County of Marin Department of Health and Human Services website (www.marinhhs.org); and (3) provided to any member of the public requesting a copy of this Order.

14. If any provision of this Order to the application thereof to any person or circumstance is held to be invalid, the reminder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.


**IT IS SO ORDERED:**


_____

Matt Willis, MD, MPH                          Dated: March 16, 2020
Health Officer of the County of Marin


Order of the County Health Officer of the
County of Marin to Shelter in Place

# Exhibit 35

# The Guardian



# 'Everyone will be contaminated': prisons face strict coronavirus controls

**New WHO guidelines are aimed at protecting one of the most vulnerable sectors of society from the spread of Covid-19**

**Coronavirus – latest updates**
**See all our coronavirus coverage**

Global development is supported by

BILL&MELINDA
GATES *foundation* About this content

**Hannah Summers**

Mon 23 Mar 2020 09.35 EDT

Prisons around the world can expect "huge mortality rates" from Covid-19 unless they take immediate action including screening for the disease, the World Health Organization has warned.

All visitors to prisons along with staff and new admissions should be subject to airport-style temperature testing and health assessments at point of entry, the agency has recommended under new guidelines published today.

Case 4:01-cv-01351-JST　Document 3231-2　Filed 03/25/20　Page 165 of 249

The agency warns that any efforts to control Covid-19 in the wider community will fail unless strict measures to stop infection, including adequate testing, are taken in all places of detention.

Dr Hans Kluge, the WHO's regional director in Europe, told the Guardian: "Covid-19 knows no boundaries; this includes transmission between detainees, facility staff, visitors, and undoubtedly extending outward to (re)infect the general public. Only the boldest of actions will slow and stop the spread of disease. We must not leave anyone behind in this fight."

He added: "Prison settings are both a threat for the transmission of infectious diseases, and an opportunity for its prevention and control.

"Having practised as a tuberculosis physician in prison systems, I wholeheartedly urge all governments to heed the guidance we have prepared through a rapid and global consultation process with experts."

There are more than 10 million men, women and children in prisons worldwide and jails are overcrowded in at least 121 countries, according to a 2019 report on global prison trends.

Overcrowding means it is not possible in prisons to respect the guidelines around hand washing with soap, individual towels and social distancing.

Prisons have high rates of disease, substance dependency and mental illness. Communicable diseases are a particular concern with infection rates for tuberculosis, for example, between 10 and 100 times higher than in the community.

John Podmore, former governor at three British prisons and now a professor of applied social sciences at the University of Durham, said: "We are talking about a place where it is easier to come by illicit drugs than toilet roll, where soap is scarce, where towels are changed once a week if you are lucky, maybe once a month."



Cells are sprayed with disinfectant to prevent the spread of the coronavirus in Batam City, Indonesia. Photograph: Agus Bagjana/Opn Images/Barcroft Media via Getty Images

WHO guidelines say limiting access to prisons to non-essential staff and visitors should be considered and everyone should be screened for fever and lower respiratory tract symptoms, irrespective of whether or not there are suspected Covid-19 cases in the community.

Case 4:01-cv-01351-JST Document 3231-2 Filed 03/25/20 Page 166 of 249

"We are talking about a highly vulnerable population in overcrowded conditions and once Covid-19 gets inside prisons, everyone will be contaminated very quickly," said Carina Ferreira-Borges, the WHO's coordinator for prison health.

"There is a risk of a huge mortality rate and unprecedented burden on the national health systems of countries that are already overstretched," she said.

"In a worst-case scenario this is going to be exploding in prisons and then people will want to get out so there will be a security issue. If people start dying what will the response be? Prisons must prepare now to respond to epidemics."

In Italy, the country worst-hit by the pandemic, there was rioting across 27 jails after the authorities placed restrictions on visiting rights to stop coronavirus spreading. It led to 12 deaths, mostly from overdoses on drugs stolen during the disorder.

Last week in Brazil hundreds of prisoners escaped from four semi-open prisons in São Paulo state after visitor restrictions were tightened, and in Iran 85,000 – mainly political – prisoners were released, including the British-Iranian dual national, Nazanin Zaghari-Ratcliffe. Countries including the Philippines, Kuwait, the Netherlands and Israel have placed bans on prison visits.

In England and Wales there have been two confirmed cases of Covid-19 in the 84,000-strong prison population – one prisoner in HMP Manchester, and a prison warden at HMP High Down in Surrey.

Guidelines for prisons issued by the UK government state that symptomatic prisoners should be in isolation for seven days. They also urge that staff, prisoners and visitors are reminded to wash their hands but stop short of recommending screening.

Ferreira-Borges, the WHO's prison expert said: "We are calling for screening for everyone including new prisoners, workers and visitors from lawyers to family members. They should have their temperature checked and answer questions as part of a health assessment."



Prisoners climb a fence in Foggia, Italy, 9 March 2020. Violent protests broke out in 27 Italian prisons against coronavirus restrictions on visiting rights. Photograph: Franco Cautillo/EPA

She said non-custodial measures should be considered at all stages of the criminal justice system.

"Other options should be considered for people with very low risk profiles or caring responsibilities to decrease the numbers of people inside prisons."

Olivia Rope, director of policy at Penal Reform International, agreed: "A big solution for us would be to consider the release of those people who are low-risk offenders and those who are particularly at risk or have underlying health conditions, such as pregnant women."

She praised France's decision to delay or suspend short-term sentences – a move that has seen daily prison admissions decrease from 200 to 30.

Rope also warned against stringent measures leading to human rights abuses.

"Legitimately prisons may want to isolate or quarantine prisoners to stop the spread of disease but it is important for these people to have meaningful contact with family through the phone or internet," she said.

# America faces an epic choice...

... in the coming year, and the results will define the country for a generation. These are perilous times. Over the last three years, much of what the Guardian holds dear has been threatened – democracy, civility, truth. This US administration is establishing new norms of behaviour. Anger and cruelty disfigure public discourse and lying is commonplace. Truth is being chased away. But with your help we can continue to put it center stage.

Rampant disinformation, partisan news sources and social media's tsunami of fake news is no basis on which to inform the American public in 2020. The need for a robust, independent press has never been greater, and with your support we can continue to provide fact-based reporting that offers public scrutiny and oversight. Our journalism is free and open for all, but it's made possible thanks to the support we receive from readers like you across America in all 50 states.

Our journalism relies on our readers' generosity – your financial support has meant we can keep investigating, disentangling and interrogating. It has protected our independence, which has never been so critical. We are so grateful.

We hope you will consider supporting us today. We need your support to keep delivering quality journalism that's open and independent. Every reader contribution, however big or small, is so valuable. **Support the Guardian from as little as $1 - it only takes a minute. Thank you.**

Case 4:01-cv-01351-JST Document 3231-3 Filed 03/25/20 Page 168 of 249

Support The Guardian





Topics
- Global development
- Coronavirus outbreak
- Prisons and probation
- World Health Organization
- Infectious diseases
- Health
- US prisons
- news

# Exhibit 36

## COVID-19



## Order of the State Public Health Officer (Stay Home Except for Essential Needs) (PDF) – March 19, 2020

## Stay Home Except for Essential Needs FAQs – March 20, 2020

## California is issuing daily updates on COVID-19. To see the most recent update, visit the CDPH News Release page.

**En Español:** Para obtener información en español, visite nuestra página del Coronavirus 2019 (COVID-19).

**COVID-19 in California by the Numbers:**

 As of March 23, 2020, 2 p.m. Pacific Daylight Time, there are a total of 2,102 positive cases and 40 deaths (increase ocurred over a period of two days) in California (including one non-California resident).

- 531: Community-acquired cases
- 1,571: Cases acquired through person-to-person transmission, travel (including cruise ship passengers), repatriation, or under investigation.
  - This includes 31 health care workers

**Ages of all confirmed positive cases:**

- Age 0-17: 28 cases

- Age 18-49: 970 cases

- Age 50-64: 493 cases

- Age 65 and older: 449 cases

- Unknown: 162 cases

**Gender of all confirmed positive cases:**

- Female: 843 cases

- Male: 1,081 cases

- Unknown: 178 cases

In order to better focus public health resources on the changing needs of California communities, beginning on March 18, the state is no longer collecting information about California travelers returning from countries that have confirmed COVID-19 outbreaks. Community transmission of COVID-19 has been identified in California since late February, and since early March, most of the confirmed cases in the state were not related to travel outside of the United States.

Twenty-two public health labs in California are testing samples for COVID-19. These labs include the California Department of Public Health's Laboratory in Richmond, Alameda, Contra Costa, Humboldt, Long Beach, Los Angeles, Monterey, Napa-Solano-Yolo-Marin (located in Solano), Orange, Riverside, Sacramento, San Bernardino, San Diego, San Francisco, San Joaquin, San Luis Obispo, San Mateo, Santa Clara, Shasta, Sonoma, Tulare and Ventura County public health laboratories The Richmond Laboratory will provide diagnostic testing within a 48-hour turnaround time. This means California public health officials will get test results sooner, so that patients will get the best care.

## What should you do if you think you're sick?

**Call ahead:** If you are experiencing symptoms of COVID-19 and may have had contact with a person with COVID-19, or recently traveled to countries with apparent community spread, call your health care provider before seeking medical care so that appropriate precautions can be taken.



## What are the symptoms of COVID-19?

Typically, human coronaviruses cause mild-to-moderate respiratory illness. Symptoms are very similar to the flu, including:

- Fever
- Cough
- Shortness of breath

COVID-19 can cause more severe respiratory illness.

## What if I have symptoms?

**Patient:** If a person develops symptoms of COVID-19, including fever, cough or shortness of breath, and has reason to believe they may have been exposed, they should call their health care provider before seeking care. Contacting them in advance will make sure that people can get the care they need without putting others at risk. Please be sure to tell your health care provider about your travel history. You can also take the following precautionary measures: avoid contact with sick individuals, wash hands often with soap and warm water for at least 20 seconds.

**Health Care Provider**: Patients who may have infection with this novel coronavirus should wear a surgical mask and be placed in

an airborne infection isolation room. If an airborne infection isolation room is not available, the patient should be placed in a private room with the door closed. Health care providers should use standard, contact and airborne precautions and use eye protection. Please see "Update and Interim Guidance on Outbreak of 2019 Novel Coronavirus (2019-nCoV) in Wuhan, China" for more information about infection control. The Public Health Department will issue All Facility Letters to regulated healthcare facilities within California with updated information and guidance; these can be found on the AFL webpage.

## How can people protect themselves?

There is currently no vaccine to prevent COVID-19. The best way to prevent illness is to avoid being exposed to this virus. The virus is thought to spread mainly from person-to-person between people who are in close contact with one another (within about 6 feet). This occurs through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs. Older adults and people who have severe underlying chronic medical conditions like heart or lung disease or diabetes seem to be at higher risk for developing more serious complications from COVID-19 illness. Every person has a role to play. So much of protecting yourself and your family comes down to common sense:

- Washing hands with soap and water.
- Clean and disinfect frequently touched surfaces daily. If surfaces are dirty, clean them using detergent or soap and water prior to disinfection.
- Avoiding touching eyes, nose or mouth with unwashed hands.
- Cover your cough or sneeze with a tissue or your elbow.
- Avoiding close contact with people who are sick.
- Staying away from work, school or other people if you become sick with respiratory symptoms like fever and cough.

- Following guidance from public health officials.

Please consult with your health care provider about additional steps you may be able to take to protect yourself.

## Who is at Higher Risk for Serious Illness from COVID-19?

Early information out of China, where COVID-19 first started, shows that some people are at higher risk of getting very sick from this illness. This includes:

- Older adults (65+)
- Individuals with compromised immune systems
- Individuals who have serious chronic medical conditions like:
  - Heart disease
  - Diabetes
  - Lung disease

If you are at higher risk for serious illness from COVID-19 because of your age or health condition, it is important for you to take actions to reduce your risk of getting sick with the disease, including:

- Isolate at home and practice social distancing.
- Wash your hands often with soap and water for at least 20 seconds, especially after blowing your nose, coughing, or sneezing, or having been in a public place.
- Avoiding touching eyes, nose or mouth with unwashed hands.
- Avoid close contact with people who are sick, and stay away from large gatherings and crowds.
- Consider ways of getting food brought to your house through family, social, or commercial networks.

It is also important that you listen to public health officials who may recommend community actions to reduce potential exposure to COVID-19, especially if COVID-19 is spreading in your community.

For more information visit the CDC's website.

## What if I don't have health insurance and I need screening or treatment for COVID-19?

- Check with your local community health center or hospital to see if fees for testing can be waived
- See if you're eligible for Medi-Cal
- See if you're eligible for Covered California

## What is the treatment for COVID-19?

From the international data we have, of those who have tested positive for COVID-19, approximately 80 percent do not exhibit symptoms that would require hospitalization. For patients who are more severely ill, hospitals can provide supportive care. We are continuing to learn more about this novel coronavirus and treatment may change over time.

## How is it decided whether a person with a confirmed case of COVID-19 can self-isolate at home or must be confined to a hospital or elsewhere?

Local health departments are working in partnership with the California Department of Public Health and the CDC, and making determinations on whether a person ill with COVID-19 requires hospitalization or if home isolation is appropriate. That decision may be based on multiple factors including severity of illness, need for testing, and appropriateness of home for isolation purposes.

## What is the difference between COVID-19 and other coronaviruses?

Coronaviruses are a large family of viruses. There are some coronaviruses that commonly circulate in humans. These viruses cause mild to moderate respiratory illness, although rarely they can cause severe disease. COVID-19 is closely related to two other animal coronaviruses that have caused outbreaks in people—the SARS coronavirus and the MERS (middle east respiratory syndrome) coronavirus.

## Is California able to test for COVID-19?

Twenty-two public health labs in California are testing samples for COVID-19. These labs include the California Department of Public Health's Laboratory in Richmond, Alameda, Contra Costa, Humboldt, Long Beach, Los Angeles, Monterey, Napa-Solano-Yolo-Marin

(located in Solano), Orange, Riverside, Sacramento, San Bernardino, San Diego, San Francisco, San Joaquin, San Luis Obispo, San Mateo, Santa Clara, Shasta, Sonoma, Tulare and Ventura County public health laboratoriesThe Richmond Laboratory will provide diagnostic testing within a 48-hour turnaround time. More public health labs will soon be able to test samples for COVID-19. This means California public health officials will get test results sooner, so that patients will get the best care.

If a person develops symptoms of COVID-19 including fever, cough or shortness of breath, and has reason to believe they may have been exposed, they should call their health care provider before seeking care.

## Should public events be cancelled?

To protect public health and slow the rate of transmission of COVID-19, the California Department of Public Health has determined that all non-essential gatherings should be postponed or canceled across the state until further guidance is issued by the California Department of Public Health.  This includes gatherings such as concerts, conferences, sporting events, gyms and theaters.  Bars, night clubs, wineries, breweries and wine tasting rooms should close. Restaurants should be closed for in-restaurant seated dining and should be open only to drive-through or other pick-up/delivery options.  Certain activities are essential to the functioning of our state and must continue.  Hence, this does not apply to essential public transportation, airport travel, shopping at a store, mall, or farmers' market, or charitable food pantries and distributions.

## Is it safe to go to restaurants and bars?

California public health officials have directed bars, night clubs, breweries and wine tasting rooms to close. Restaurants should focus on food delivery and takeout while maximizing social distancing for those who are inside their restaurant.

For more information, see the Food, Beverage and Other Services Guidance (PDF).

**What is Social Distancing?**

Social distancing is a practice recommended by public health officials to stop or slow down the spread of contagious diseases. It requires the creation of physical space between individuals who may spread certain infectious diseases. The key is to minimize the number of gatherings as much as possible and to achieve space between individuals when events or activities cannot be modified, postponed, or canceled. Achieving space between individuals of approximately six feet is advisable. Additionally, there is a particular focus on creating space between individuals who have come together on a one-time or rare basis and who have very different travel patterns such as those coming from multiple countries, states or counties.

For more information, see the Gathering Guidance (PDF).

**Should I wear a mask?**

The California Department of Public Health, along with the CDC, does not recommend that healthy people wear masks at this time. However, masks are recommended to limit the spread of disease for people who are exhibiting respiratory symptoms.

**What should I do if I am unable to work after being exposed to COVID-19?**

Individuals who are unable to work due to having or being exposed to COVID-19 (certified by a medical professional) can file a Disability Insurance (DI) claim.

Disability Insurance provides short-term benefit payments to eligible workers who have full or partial loss of wages due to a non-

work-related illness, injury, or pregnancy. Benefit amounts are approximately 60-70 percent of wages (depending on income) and range from $50 - $1,300 a week.

Californians who are unable to work because they are caring for an ill or quarantined family member with COVID-19 (certified by a medical professional) can file a Paid Family Leave (PFL) claim.

Paid Family Leave provides up to six weeks of benefit payments to eligibile workers who have a full or partial loss of wages because they need time off work to care for a seriously ill family member or to bond with a new child. Benefit amounts are approximately 60-70 percent of wages (depending on income) and range from $50-$1,300 a week.

For more information related to resources for California's Employers and Workers, please visit this Labor and Workforce Development Agency webpage.

## What is the state doing to protect our health?

California has been actively and extensively planning with our local public health and health care delivery systems.

Here are some of the actions California is taking to combat COVID-19:

- California activated the State Operations Center and the Medical and Health Coordination Center to coordinate response efforts across the state.
- California is coordinating with federal and local partners, hospitals and physicians to prepare and respond to COVID-19.
- Governor Newsom signed emergency legislation providing up to $1 billion in funding to help California fight COVID-19.

- California made available some of its emergency planning reserves of 21 million N95 filtering facepiece masks for use in certain health care settings to ease shortages of personal protective equipment.
- The state's public health experts are providing information, guidance documents, and technical support to local health departments, health care facilities, providers, schools, universities, colleges, elder care and congregate living facilities and childcare facilities across California.
- The Governor signed an executive order to ensure vital goods can be delivered to California retailers in a timely manner during the COVID-19 outbreak.
- The Governor issued an executive order to ensure Californians who rely on Medi-Cal, CalFresh, CalWORKS, Cash Assistance for immigrants & in-home supportive services will not lose access due to COVID-19.
- The Governor issued an executive order to ensure schools retain state funding even in the event of a COVID-19 physical closure.
- California obtained approval to provide meal service during school closures to minimize potential exposure to the coronavirus.
- The state directed mass gatherings be postponed or cancelled to slow the spread of the virus.
- The Franchise Tax Board is providing a 90-day extension to file California tax returns for taxpayers affected by the COVID-19 pandemic.
- Caltrans launched a statewide educational campaign on more than 700 electronic highway signs, urging all Californians to be more diligent about containing the spread of the virus.
- The state is allowing local and state legislative bodies to hold meetings via conference calls while still meeting state transparency requirements.
- The California Business, Consumer Services and Housing Agency released guidance for homeless assistance providers in the state.
- California is deploying massive resources to get individuals experiencing homelessness safely into shelter, removing regulatory barriers and securing trailers and hotels to provide immediate housing options for those most at risk.

- The Department of Motor Vehicles is allowing customers to avoid coming into the DMV office for 60 days so that at-risk populations can avoid required visits and practice social distancing.
- California Volunteers created a resource page for how Californians can safely help their communities during COVID-19.
- The Department of Food and Agriculture published a resource page for the agricultural sector.

- The Governor issued an executive order authorizing local governments to halt evictions for renters and homeowners, slows foreclosures, and protects against utility shutoffs for Californians affected by COVID-19.
- The Governor issued an executive order to protect the health and safety of Californians most vulnerable to COVID-19 residing at health care, residential and non-residential facilities licensed by the state.
- The California Department of Public Health is coordinating with federal authorities and local health departments that have implemented screening, monitoring and, in some cases, quarantine of returning travelers.
- In coordination with state and local health departments, California has actively managed suspect and confirmed cases of COVID-19 patients.
- We are supporting hospitals and local public health laboratories in collection and testing for COVID-19.
- 24 million more Californians are now eligible for free medically necessary COVID-19 testing.
- The state is piloting screening and testing sites for high risk individuals in partnership with Verily.

- The state requested a waiver from the federal government to make it easier for California to quickly and effectively provide care to about 13 million Medi-Cal beneficiaries.
- The state issued guidance for vulnerable Californians – older residents (65+) and those with underlying health conditions – to isolate at home.
- The state is providing safe, wrap around services to vulnerable residents who are isolating at home – ramping up existing meal delivery and home visiting services.

- The California Employee Development Department (EDD) is encouraging individuals who are unable to work due to exposure to COVID-19 to file a Disability Insurance claim.
- Californians unable to work because they are caring for an ill or quarantined family member can file a Paid Family Leave claim.
- The Governor removed the waiting period for unemployment and disability insurance for Californians who lose work as a result of the COVID-19 outbreak.
- EDD is encouraging employers who are experiencing a slowdown in their businesses or services as a result of the Coronavirus impact on the economy to apply for an Unemployment Insurance work sharing program.
- The state secured SBA disaster assistance for California small businesses economically impacted by COVID-19.

- California launched a consumer-friendly website and public service announcements to boost COVID-19 awareness.
- The Governor declared a State of Emergency to make additional resources available, formalize emergency actions already underway across multiple state agencies and departments, and help the state prepare for broader spread of COVID-19.
- The Governor issued a stay-at-home order to protect the health and well-being of all Californians and slow the spread of COVID-19.

- The Governor placed the National Guard on alert to support COVID-19 community readiness.

- The state requested federal assistance to supplement California's efforts to prepare for a COVID-19 surge.

- Governor Newsom requested immediate deployment of the USNS Mercy Hospital Ship to the Port of los Angeles to decompress the state's health care delivery system in Los Angeles.

- The California Department of Public Health's state laboratory in Richmond and 21 other public health department laboratories now have tests for the virus that causes COVID-19.

## More Information

**Guidance and Information:** A complete list of guidance is available.

**Public**: For more information on COVID-19, please visit the Centers for Disease Control and Prevention's website.

**Media:** If you are with a media outlet and have questions for the California Department of Public Health, please email CDPHPressOPA@cdph.ca.gov.

**Coronavirus News Releases:** For the latest information on the 2019 Novel Coronavirus (2019-nCoV), please see our News Releases page.

Page Last Updated : March 25, 2020

# Exhibit 37



Centers for Disease
Control and Prevention

## Coronavirus Disease 2019 (COVID-19)

# People who are at higher risk for severe illness

COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, **older adults and people of any age who have serious underlying medical conditions** might be at higher risk for severe illness from COVID-19.



Based upon available information to date, those at high-risk for severe illness from COVID-19 include:

- People aged 65 years and older
- People who live in a nursing home or long-term care facility
- Other high-risk conditions could include:
    - People with chronic lung disease or moderate to severe asthma
    - People who have serious heart conditions
    - People who are immunocompromised including cancer treatment
    - People of any age with severe obesity (body mass index [BMI] >40) or certain underlying medical conditions, particularly if not well controlled, such as those with diabetes, renal failure, or liver disease might also be at risk
- People who are pregnant should be monitored since they are known to be at risk with severe viral illness, however, to date data on COVID-19 has not shown increased risk

Many conditions can cause a person to be immunocompromised, including cancer treatment, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications

Page last reviewed: March 22, 2020

# Exhibit 38

# Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19

Published: Mar 04, 2020

*Emergency proclamation builds on work already underway across state government to protect public health and safety*

*Proclamation includes increased protections against price gouging, offers more assistance to local governments and allows health care workers to come from out of state*

*All levels of state government are being deployed to tackle this evolving situation*

SACRAMENTO – As part of the state's response to address the global COVID-19 outbreak, Governor Gavin Newsom today declared a State of Emergency to make additional resources available, formalize emergency actions already underway across multiple state agencies and departments, and help the state prepare for broader spread of COVID-19. The proclamation comes as the number of positive California cases rises and following one official COVID-19 death.

Today's proclamation builds on work already underway by the California Department of Public Health, California Health and Human Services Agency, Governor's Office of Emergency Services and other agencies which have been on the front lines of the state's response to COVID-19 since January.

"The State of California is deploying every level of government to help identify cases and slow the spread of this coronavirus," said Governor Newsom. "This emergency proclamation will help the state further prepare our communities and our health care system in the event it spreads more broadly."

The emergency proclamation includes provisions that protect consumers against price gouging, allow for health care workers to come from out of state to assist at health care facilities, and give health care facilities the flexibility to plan and adapt to accommodate incoming patients.

Yesterday, Governor Newsom announced the release of millions of N95 masks to address shortages caused by COVID-19. Today's action also follows the announcement earlier this week that the state has secured the capacity to test thousands of specimens from the federal Centers for Disease Control and Prevention to expedite testing.

For the latest on the state's COVID-19 preparedness and response, visit cdph.ca.gov.

A copy of today's emergency proclamation can be found here.

###

# Exhibit 39

California Department of Corrections and Rehabilitation
Division of Correctional Policy Research and Internal Oversight
Office of Research
July 1, 2019

Monthly Report of Population
As of Midnight June 30, 2019

---

Total CDCR Population

---

| Population | Felon/ Other | Change Since Last Month | Change Since Last Year | Design Capacity | Percent Occupied | Staffed Capacity |
|---|---|---|---|---|---|---|
| A. Total In-Custody/CRPP Supervision | 125,472 | -359 | -3,945 | | | |
| I.  In-State | 125,472 | +13 | -1,100 | | | |
| (Men, Subtotal) | 119,781 | +42 | -885 | | | |
| (Women, Subtotal) | 5,691 | -29 | -215 | | | |
| 1. Institution/Camps | 117,682 | +95 | -1,183 | 89,763 | 131.1 | 125,575 |
| Institutions | 114,831 | +448 | -432 | 85,083 | 135.0 | 121,331 |
| Camps(CCC, CIW, and SCC) | 2,851 | -353 | -751 | 4,680 | 60.9 | 4,244 |
| 2. In-State Contract Beds | 6,405 | -82 | +108 | | | |
| Private Community Correctional Facilities | 1,939 | -45 | -66 | | | |
| Public Community Correctional Facilities | 1,761 | -11 | -16 | | | |
| Community Prisoner Mother Program | 22 | 0 | 0 | | | |
| California City Correctional Facility | 2,441 | -8 | +219 | | | |
| Female Community ReEntry Facility, McFarland | 242 | -18 | -29 | | | |
| 3. Department of State Hospitals | 190 | +4 | -42 | | | |
| 4. CRPP Supervision | 1,195 | -4 | +17 | | | |
| Alternative Custody Program | 160 | +3 | +2 | | | |
| Custody to Community Treatment Reentry Program | 383 | -2 | +3 | | | |
| Male Community Reentry Program | 628 | -5 | +17 | | | |
| Medical Parole | 24 | 0 | -5 | | | |
| B. Parole | 50,822 | +754 | +3,452 | | | |
| Community Supervision | 48,950 | +759 | +3,544 | | | |
| Interstate Cooperative Case | 1,872 | -5 | -92 | | | |
| C. Non-CDCR Jurisdiction | 1,083 | +10 | +72 | | | |
| Other State/Federal Institutions | 323 | +2 | -6 | | | |
| Out of State Parole | 717 | +11 | +99 | | | |
| Out of State Parolee at Large | 13 | -1 | -1 | | | |
| DJJ-W&IC 1731.5(c) Institutions | 30 | -2 | -20 | | | |
| D. Other Populations | 6,247 | -90 | +468 | | | |
| Temporary Release to Court and Hospital | 1,536 | +9 | +263 | | | |
| Escaped | 199 | 0 | +2 | | | |
| Parolee at Large | 4,512 | -99 | +203 | | | |
| Total CDCR Population | 183,624 | +315 | +47 | | | |

---

This report contains the latest available reliable population figures from SOMS.  They have been carefully
audited, but are preliminary, and therefore subject to revision.

California Department of Corrections and Rehabilitation
Division of Correctional Policy Research and Internal Oversight
Office of Research
July 1, 2019

Monthly Report of Population
As of Midnight June 30, 2019

---

Monthly Institution Population Detail

---

| Institutions | Felon/ Other | Design Capacity | Percent Occupied | Staffed Capacity |
|---|---|---|---|---|
| **Male Institutions** | | | | |
| Avenal State Prison (ASP) | 3,744 | 2,920 | 128.2 | 4,370 |
| Calipatria State Prison (CAL) | 3,493 | 2,308 | 151.3 | 3,333 |
| California Correctional Center (CCC) | 3,853 | 3,883 | 99.2 | 4,762 |
| California Correctional Institution (CCI) | 3,739 | 2,783 | 134.4 | 4,120 |
| Centinela State Prison (CEN) | 3,515 | 2,308 | 152.3 | 3,333 |
| California Health Care Facility - Stockton (CHCF) | 2,704 | 2,951 | 91.6 | 2,951 |
| California Institution for Men (CIM) | 3,665 | 2,976 | 123.2 | 4,186 |
| California Men's Colony (CMC) | 3,540 | 3,838 | 92.2 | 4,398 |
| California Medical Facility (CMF) | 2,539 | 2,361 | 107.5 | 2,847 |
| California State Prison, Corcoran (COR) | 3,179 | 3,116 | 102.0 | 4,270 |
| California Rehabilitation Center (CRC) | 2,933 | 2,491 | 117.7 | 3,210 |
| Correctional Training Facility (CTF) | 5,492 | 3,312 | 165.8 | 4,887 |
| Chuckawalla Valley State Prison (CVSP) | 2,741 | 1,738 | 157.7 | 2,478 |
| Deuel Vocational Institution (DVI) | 2,249 | 1,681 | 133.8 | 2,353 |
| Folsom State Prison (FOL) | 2,995 | 2,066 | 145.0 | 2,895 |
| High Desert State Prison (HDSP) | 3,127 | 2,324 | 134.6 | 3,361 |
| Ironwood State Prison (ISP) | 2,693 | 2,200 | 122.4 | 3,200 |
| Kern Valley State Prison (KVSP) | 3,604 | 2,448 | 147.2 | 3,522 |
| California State Prison, Los Angeles County (LAC) | 3,207 | 2,300 | 139.4 | 3,300 |
| Mule Creek State Prison (MCSP) | 4,035 | 3,284 | 122.9 | 4,009 |
| North Kern State Prison (NKSP) | 4,246 | 2,694 | 157.6 | 3,911 |
| Pelican Bay State Prison (PBSP) | 2,663 | 2,380 | 111.9 | 3,250 |
| Pleasant Valley State Prison (PVSP) | 3,416 | 2,308 | 148.0 | 3,333 |
| RJ Donovan Correctional Facility (RJD) | 3,980 | 2,992 | 133.0 | 3,942 |
| California State Prison, Sacramento (SAC) | 2,112 | 1,828 | 115.5 | 2,449 |
| California Substance Abuse Treatment Facility (SATF) | 5,454 | 3,424 | 159.3 | 5,111 |
| Sierra Conservation Center (SCC) | 3,918 | 3,936 | 99.5 | 4,570 |
| California State Prison, Solano (SOL) | 4,533 | 2,610 | 173.7 | 3,882 |
| San Quentin State Prison (SQ) | 4,243 | 3,082 | 137.7 | 3,984 |
| Salinas Valley State Prison (SVSP) | 3,148 | 2,452 | 128.4 | 3,409 |
| Valley State Prison (VSP) | 2,885 | 1,980 | 145.7 | 2,954 |
| Wasco State Prison (WSP) | 5,023 | 2,984 | 168.3 | 4,351 |
| **Male Total** | 112,668 | 85,958 | 131.1 | 116,931 |
| **Female Institutions** | | | | |
| Central California Women's Facility (CCWF) | 2,781 | 2,004 | 138.8 | 2,964 |
| California Institution for Women (CIW) | 1,798 | 1,398 | 128.6 | 1,877 |
| Folsom State Prison (FOL) | 434 | 403 | 107.7 | 530 |
| San Quentin State Prison (SQ) | 1 | 3,082 | 0.0 | 3,273 |
| **Female Total** | 5,014 | 3,805 | 131.8 | 8,644 |
| **Institution Total** | 117,682 | 89,763 | 131.1 | 125,575 |

California Department of Corrections and Rehabilitation
Division of Correctional Policy Research and Internal Oversight
Office of Research
July 1, 2019

Monthly Report of Population
As of Midnight June 30, 2019

---

Notes

---

- Felon/Other counts are felons, county contract boarders, federal boarders, state boarders, safekeepers, county diagnostic cases, Department of Mental Health boarders, and Division of Juvenile Justice boarders.

- Interstate Cooperative Cases are parolees from other states being supervised in California.

- Non-CDCR Jurisdiction are California cases being confined in or paroled to other states or jurisdictions.

- Welfare and Institution Code (W&IC) 1731.5(c) covers persons under the age of 21 who were committed to CDCR, had their sentence amended, and were incarcerated at the Division of Juvenile Justice for housing and program participation.

- Other Population includes inmates temporarily out-to-court, inmates in hospitals, escapees, and parolees at large.

# Exhibit 40

| | |
|---|---|
| **From:** | Clark Kelso <ckelso@███████> |
| **Sent:** | Monday, March 23, 2020 12:40 PM |
| **To:** | Diaz, Ralph M.@CDCR; Neill, Jennifer@CDCR; Donald Specter; Barrow, Roscoe; Richard Kirkland; Tharratt, Steven@CDCR |
| **Subject:** | My Current Thoughts on Population Reduction |

Good afternoon.

Over the last week or so, Dr. Tharratt and I have been weighing the pros and cons of different types of inmate releases and have been in separate conversations with the Secretary and Don Specter, among others. I wanted to share with you my current assessment.

First, from a perspective focused only upon the population health of patients in CDCR's custody (my slice of the world), we believe that a significant reduction in population at this time will be a clear benefit to us in opening up cells and beds, thereby facilitating increased social distancing within the prisons and a more flexible management of the remaining population to reduce the speed with which covid-19 will spread throughout CDCR institutions. From this perspective, I support an accelerated release program.

Second, from a broader public health perspective (which includes thinking about what happens to patients after release and what the impact may be on fighting the virus in communities into which the patients are released), I believe the issues are more complicated and nuanced, and there are some negatives both with respect to the individual healthcare of patients post-release (particularly given the stress on the free world health care system right now) and to population healthcare in the community (particularly focused on fighting the spread of covid-19). To the extent we can focus population reduction on those inmates who, as part of their release planning, appear to have relatively stable family and housing arrangements, a release will reduce CDCR's risks without exposing those inmates to substantially increased risks and without exposing their home communities to increase covid-19 risks. For inmates whose release planning indicate a lack of family and home placement, an early release is unlikely to improve the inmates' environment from a healthcare perspective and may increase the covid-19 risk in the community of release.

Based on these considerations, I favor an immediate, substantial reduction in CDCR's population that focuses on inmates who are likely to have families and homes to return to as part of their pre-release planning.

As you all know, these are fast moving times, so the views expressed above may be altered as new information develops (e.g., whether any of our institutions becomes a hot spot for covid-19). But at the moment, these are my thoughts and recommendations.

Thanks.

Clark Kelso


Sent from Mail for Windows 10

1

# Exhibit 41

**Stateline**

# 'Prisons Are Bacteria Factories'; Elderly Most at Risk

**STATELINE ARTICLE**    March 25, 2020    By: David Montgomery    Topics: Health & Justice    Read time: 5 min



A prisoner in his 70s takes stock of his day in a small cubicle that serves at his home in the geriatric dormitory at the Estelle prison unit at Huntsville, Texas. The sparse furnishings consist of his bunk and a small utility table cluttered with items such as a clock radio, a bottle of hot sauce and a Max Brand Western checked out from the prison library.

Courtesy of the Texas Department of Criminal Justice

*Editor's note: This story was updated March 25 to include information about a Texas inmate who tested positive for COVID-19.*

**Read *Stateline* coverage of the latest state action on coronavirus.**

HUNTSVILLE, Texas — Here in the Estelle prison unit, most of the male inmates in the geriatric dormitory first ran afoul of the law years or even decades ago, convicted of crimes ranging from murder and sex offenses to forgery and repeat DWIs.

Today, any outward hint of menace has evaporated. White-haired, frail and often tethered to canes or wheelchairs, they live in small rectangular cubicles and while away the days in unwavering sameness.

As the coronavirus pandemic sweeps the globe, prisoner advocates are warning of the potential for a disastrous outbreak among inmates. The elderly are most vulnerable, and the

U.S. inmate population is aging. Jails and prisons, crowded places where social distancing is nearly impossible, are breeding grounds for contagious disease.

"These prisons are bacteria factories," said Rick Raemisch, a consultant and former executive director at the Colorado Department of Corrections. "I don't think people understand the gravity of what's going to happen if this runs in a prison, and I believe it's inevitable.

"You're going to see devastation that's unbelievable."

New York inmates tested positive at Rikers Island and at a regional detention center in Brooklyn. The Texas Department of Criminal Justice reported its first two positive cases of COVID-19 this week: an inmate and an employee. A 37-year-old inmate has been medically isolated, and other inmates and staff who may have had contact with him are now being medically restricted. The contract employee was ordered to self-quarantine. The employee had contact with other prison workers and inmates, but so far none of them has developed symptoms.

While state prisons have resisted calls to release inmates, several large county and municipal jurisdictions have freed hundreds of jail inmates deemed low-risk, including seniors and those in poor health.

New Jersey plans to release as many as a thousand people from its county jails, including inmates jailed for probation violations and those sentenced for low-level offenses. Democratic Mayor Bill de Blasio said Monday that New York City may release more than 200 inmates, according to news reports. Los Angeles County and Ohio's Cuyahoga County also have released prisoners.

Prisoner advocacy groups in more than a half-dozen states, including Texas, New York, Illinois, Pennsylvania, Indiana and Michigan, have called on governors to release state prisoners, especially elderly inmates, through compassionate release or medical furlough.

---

**RELATED**

| | |
|---|---|
| Topics | Health, Justice |
| Places | United States, New York, Texas |

**EXPLORE MORE FROM STATELINE**

explore by place ▾

explore by topic ▾

States Take On Coronavirus Threat

*Last update: 3/25/20 at 11 a.m. EDT*



About Tableau

Undo

The Texas Criminal Justice Coalition, in a letter to Republican Gov. Greg Abbott, warned that people in prisons and jails are "particularly vulnerable to the disease" and, among other things, urged the governor's office to identify the sick and elderly who are eligible for parole and "review their cases for immediate release."

In New York, an organization led by a former inmate who was released two years ago after 38 years in prison is joining with other groups to demand that Democratic New York Gov. Andrew Cuomo and lawmakers grant clemency to "vulnerable" people in prison, including the old and sick.

"If it hits state prison, it's going to hit hard," said Jose Saldana, director of the Release Aging People in Prison Campaign. During his nearly four decades in state and federal prisons for bank robbery and attempted murder of a police officer, Saldana earned a college degree and became a role model of rehabilitation. Now 68, he has become a national campaigner for the release of elderly prisoners.

"This is very personal for me," Saldana said. "You don't just leave men you spend years in prison with and go on … as if they were never part of your life."

U.S. prisons aren't alone in wrestling with the issue, or in facing potential unrest. Earlier this month, Iran released some 54,000 prisoners. In Colombia, 23 prisoners died this past weekend in a riot over coronavirus fears.

State prison systems so far have sidestepped requests to release inmates. Instead, they are disinfecting more frequently and tightening screening at prison entrances, among other measures.

The Texas prison system, in compliance with emergency orders from Abbott, has barred visitation but is giving inmates greater access to their families by extending telephone privileges.

The prison system is emphasizing hand-washing and doing what it can to promote social distancing despite the obvious limitations in a prison environment, said Jeremy Desel, spokesman for the Texas Department of Criminal Justice.

"We're doing everything we can in our power to socially distance folks as much as possible by slowing down offender movements and various other techniques," he said, "but given the circumstances there will be times when there will be more people in one place than anybody would like."

Other measures include screening arriving employees and county jail transfers, sanitizing buses and restraints between each use, and disinfecting offices and prison units several times a day. Staff members also are working remotely whenever possible. Under an order from the governor, Texas prisons have waived the copayment that is usually charged to inmates for medical visits.

Still, at least some advocates say those measures aren't enough.

Casey Phillips, head of Texas Prisons Air-Conditioning Advocates, is married to Justin Phillips, who is four years into a 10-year drug sentence. "He's terrified," she said, adding that her husband has asthma, blood pressure problems and a kidney disease, and fears that COVID-19 will take root and spread in the Texas prison system. "He's afraid it's going to kill him."

But David Mains, president and chairman of Texas CURE, the state's oldest inmate rights organization, said he's had largely reassuring conversations with four male prisoners and the relative of a female inmate. "Everybody I've talked to there was in good spirits," he said, saying the inmates described the prison operations as "running as normal."

Long before the emergence of the coronavirus, prison officials and state lawmakers across the country were concerned about elderly prisoners.

Patrick O'Daniel, chairman of the Texas Board of Criminal Justice, told board members in late February that the number of Texas inmates 55 or older is growing by nearly a thousand a year and has doubled over the past decade.

The aging baby boomers now comprise nearly 15% of the more than 140,200 men and women in Texas prisons. Nationwide, nearly 12% of inmates in state and federal prisons are older than 55.

Case 4:01-cv-01351-JST Document 3221-2 Filed 03/25/20 Page 198 of 249

Like their counterparts on the outside, elderly prisoners make up the lion's share of health care costs, putting intense pressure on government budgets. Over a 10-year period ending in 2019, health care costs for the elderly in Texas prisons increased from $51.8 million to $114.7 million, encompassing often complicated and costly treatments for illnesses such as cancer, diabetes, kidney disease, hepatitis and a whole host of other aging-related ailments.

In fiscal 2019, the average annual hospitalization cost for an elderly inmate was $5,900, compared to $1,000 for an inmate under 55, according to the Texas Department of Criminal Justice.

Many inmates entered prison unhealthy to begin with, weakened by drug use, poor nutrition, irregular sleep patterns and other examples of hard living. Consequently, prison experts peg 55 as the starting point for old age in prison and generally rank prisoners as being 10 years older physically than residents on the outside.

"Unfortunately, a lot of our patients have not had great health care coming into prison," said Dr. Owen J. Murray, the prison system's vice president for offender health services, who oversees health care for 80% of the state's inmate population. "And this isn't unique to Texas. The same thing is going on in every state."

Prisons built to house young and middle-age lawbreakers continue to be retooled to accommodate prisoners who are no longer physically able to climb onto a top bunk or can't make the long trek down a prison corridor without a walker, cane or wheelchair. Many are bedridden or suffer from dementia.

William Mays, a 60-year-old former investor who ended a five-year prison sentence for securities fraud in October, recalls watching older inmates trying to make their way through daily prison life. "They're not as mobile as they used to be," he said. "This is like going to boot camp at 60."

---

‹  Coronavirus and the States: Governors Keep Away Vacationers; Some States Bar Abortions as 'Nonessential'

---

## About Stateline

Stateline provides daily reporting and analysis on trends in state policy.

About Stateline →

## Media Contact

**Jeremy Ratner**

Director, Communications

202.540.6507

✉

SIGN UP

Sign up for our daily update—original reporting on state policy, plus the day's five top reads from around the Web.

Email address    SUBMIT

# Exhibit 42

## San Francisco Chronicle

NEXT STORY ›

LOCAL // CRIME

# California prisons head acknowledges 'inmate suicide crisis' after reports

**Jason Fagone** and **Megan Cassidy**

Oct. 8, 2019 | Updated: Oct. 8, 2019 6:17 p.m.



Local   Coronavirus   Election   Sporting Green   Food   Biz+Tech   Culture Desk   Datebook   US & World



FILE - In this Feb. 26, 2013, file photo, inmates walk through the exercise yard at California State Prison Sacramento, near Folsom, Calif. California arrest rates have dropped nearly 60 percent since 1989, yet blacks are three times more likely to be arrested than whites, according to a report released by the Public Institute of California, Monday Dec. 3,

The number of inmates killing themselves in California prisons is "far too high," the state admitted in a new report on the worsening suicide problem in California's correctional system.

Case 4:01-cv-01351-JST Document 3221-2 Filed 03/25/20 Page 201 of 249

## San Francisco Chronicle                              NEXT STORY ›

last year with 26.3 suicides per 100,000 prisoners — substantially higher than the suicide rate in other large prison systems across the country. A total of 34 California inmates killed themselves last year in a system with about 129,000 prisoners overall.

Ralph Diaz, the state's top prison official, acknowledged in an interview Monday that California has "an inmate suicide crisis."

"Staff do care, and staff are trying to work to try and get ahead of these suicides — try to figure out why they're occurring," said Diaz, secretary of the California Department of Corrections and Rehabilitation.

## Related Stories



LOCAL

BY JASON FAGONE AND MEGAN CASSIDY

**Suicides in California prisons**

CRIME

BY MEGAN CASSIDY

**Condemned inmate's death in**

LOCAL

BY ERIN

**Famil**

Local    Coronavirus    Election    Sporting Green    Food    Biz+Tech    Culture Desk    Datebook    US & World

Suicides in California prisons haven't been this frequent since 1990, when the state first began tracking the deaths. Previously, the department had only released data stretching back to 2006.

This month's report — mandated by a 2018 state law — is the first of its kind, and it forces prison officials to share information about the suicide problem and explain how they are trying to fix it.

**San Francisco Chronicle**

NEXT STORY ›

whatsoever and mental health services were available only at a handful of institutions."

In 1995, a federal court decided that poor mental care in California prisons endangered inmates and violated their constitutional rights. The court stepped in and forced changes, and since the 1990s, corrections officials say, the state has spent tens of millions of dollars creating "a robust suicide prevention program" and "a comprehensive system of quality mental health care for inmates that few other state correctional systems can boast of."

The federal case — now known as Coleman vs. Newsom — remains active and the court regularly dispatches psychiatric expert Lindsay Hayes to inspect state prisons, analyze their suicide-prevention programs and make recommendations. Diaz told The Chronicle that many of California's estimated 38,000 inmates who participate in mental health programs are being successfully treated.

Yet federal judges, state politicians and experts in the Coleman case have long disagreed, sounding the alarm about the elevated suicide rate, documenting staff's repeated failures in following their own suicide-prevention policies and questioning the commitment of prison leaders to make meaningful progress.

Last November, after performing his latest audit of state prisons, Hayes wrote that while the California system was making "continued progress at varied speeds" in fixing its approach to suicide prevention, "certain problematic practices continued to fester."

Local    Coronavirus    Election    Sporting Green    Food    Biz+Tech    Culture Desk    Datebook    US & World

Mueller, wrote that the state was delaying important fixes ordered by the court.

"While some progress is being made," she wrote, "a substantial amount of work remains, and implementation is dragging out and taking too long."

The state's new report emphasizes that suicide is rising in the general United States population — the national rate climbed by a third between 1999 and 2017 — and that many prison systems, from federal to state to local, are struggling to stop inmates from killing themselves. Last year in Texas, for example, 40 inmates killed themselves in state prisons, the highest number in 20 years, according to the Houston Chronicle.

Case 4:01-cv-01351-JST Document 3221-2 Filed 03/25/20 Page 203 of 249

## San Francisco Chronicle

NEXT STORY >

Michael Bien, an attorney who represents a class of 30,000 state prisoners with mental illness, said the state's new report gives a "misleading or deceptive picture" of the suicide problem, exaggerating the state's progress and minimizing its failures.

"It's still a system in crisis, and my clients are still very much at risk," Bien said.

The report glosses over California's record on inmate suicides and how it compares poorly to other large prison systems. The 2018 rate of 26.3 suicides per 100,000 inmates is higher than the last recorded national average for state prisons (20 suicides) and the federal rate (about 15). Although the federal prison system is larger than California's, only half as many people killed themselves in federal prisons between 2001 and 2014, according to the Bureau of Justice Statistics. The federal system counted 222 inmate suicides in that period, while California had 448.

"The State of California has consistently led the nation in the number of suicide deaths in its prisons by a large margin," a court-appointed psychiatrist in the Coleman case wrote in 2013.

Coleman psychiatrists have discovered numerous lapses in mental care and suicide-prevention practices by California prison staff, contributing to "either foreseeable or preventable" inmate deaths.

The state report also does not mention the ongoing shortfall of psychiatrists to treat mentally ill prisoners. The system has only 72% of the psychiatrists it needs, according to the state's own tally.

"Staffing is one of our top priorities," Diaz said, "but we're operating against the background where there's an acute nationwide shortage of psychiatrists. And it is getting worse every year."

*Jason Fagone and Megan Cassidy are San Francisco Chronicle staff writers. Email: jason.fagone@sfchronicle.com, megan.cassidy@sfchronicle.com Twitter: @jfagone, @meganrcassidy*

3/25/2020                   California prisons head acknowledges inmate smuggled LSD, fentanyl reports - San Francisco Chron...

Case 4:01-cv-01351-JST   Document 3221-2   Filed 03/25/20   Page 204 of 249

**NEXT STORY ›**

Enter your email                                    **SIGN UP**

By subscribing, you agree to our *Terms of use* and acknowledge that your information will be used as described in our *Privacy Policy*.

# San Francisco Chronicle

   

TOP ⌃

## ABOUT

Our Company                                    Interest Based Ads

Newspaper Delivery Safety Procedures           Terms of Use

Privacy Notice                                 Careers

Your California Privacy Rights                 Advertising

## NEWSROOM

Ethics Policy                                  Anonymous Sources Policy

Correction Policy                              Endorsement Process

Visual Ethics Guidelines                       News Tips

## CONTACT

Customer Service                               Newsroom Contacts

FAQ

## CCPA

Do Not Sell My Info

## SERVICES

Subscriber Services                            Membership

e-edition                                      Store

App                                            Subscription Offers

Archives                                       sfgate.com

**HEARST** *newspapers*
©2020 Hearst

# Exhibit 43

### Division of Adult Institutions Department of Corrections & Rehabilitation
### Classification Services Unit State of California
### Population Management March 2020
### TABLE ONE
### NUMBER OF MALE OFFENDERS IN THE ADULT INSTITUTION POPULATION
### BY INMATE SCORE, HOUSING LEVEL AND MENTAL HEALTH CODE
### AS OF MARCH 11, 2020

| | | MENTAL HEALTH CODE | | | | TOTAL |
|---|---|---|---|---|---|---|
| | | CCCMS | EOP | Non-MHSDS | OTHER | |
| Inmate Score Level | Housing Level | | | | | |
| Level I | I | 1,248 | 1 | 6,224 | 1 | 7,474 |
| | II | 386 | 345 | 1,472 | 2 | 2,205 |
| | III | 14 | 4 | 209 | . | 227 |
| | IV | 4 | 10 | 107 | . | 121 |
| | Temp | . | . | 2 | 1 | 3 |
| | TOTAL | 1,652 | 360 | 8,014 | 4 | 10,030 |
| Level II | Housing Level | | | | | |
| | I | 48 | . | 3,001 | . | 3,049 |
| | II | 8,908 | 2,286 | 25,512 | 11 | 36,717 |
| | III | 1,081 | 187 | 3,156 | 1 | 4,425 |
| | IV | 19 | 5 | 157 | . | 181 |
| | Temp | 2 | . | . | . | 2 |
| | TOTAL | 10,058 | 2,478 | 31,826 | 12 | 44,374 |
| Level III | Housing Level | | | | | |
| | I | . | . | 16 | . | 16 |
| | II | 139 | 42 | 445 | . | 626 |
| | III | 3,310 | 839 | 11,764 | 9 | 15,922 |
| | IV | 184 | 49 | 624 | . | 857 |
| | Temp | 1 | . | . | . | 1 |
| | TOTAL | 3,634 | 930 | 12,849 | 9 | 17,422 |
| Level IV | Housing Level | | | | | |
| | II | 4 | 8 | 2 | . | 14 |
| | III | 648 | 199 | 2,142 | 2 | 2,991 |
| | IV | 4,986 | 1,635 | 13,873 | 14 | 20,508 |
| | Temp | 2 | . | 4 | 1 | 7 |

| | | | | | |
|---|---|---|---|---|---|
| **TOTAL** | 5,640 | 1,842 | 16,021 | 17 | 23,520 |
| **TOTAL** | 20,984 | 5,610 | 68,710 | 42 | 95,346 |

EXCLUDES NA LEVEL BEDS, COCF, MCCF, AND CAC.
PROGRAMRESEARCH.ROUTINE.TAB_M_Institution.sas

### Division of Adult Institutions Department of Corrections & Rehabilitation
### Classification Services Unit State of California
### Population Management March 2020
### TABLE ONEA
### NUMBER OF MALE OFFENDERS IN THE ADULT INSTITUTION POPULATION
### IN NA LEVEL HOUSING BY PROGRAM AND MENTAL HEALTH CODE
### AS OF MARCH 11, 2020

| | MENTAL HEALTH CODE | | | | TOTAL |
|---|---|---|---|---|---|
| | CCCMS | EOP | Non-MHSDS | OTHER | |
| PROGRAM | | | | | |
| ACU | . | 4 | . | 392 | 396 |
| ASU | 214 | 386 | 2,144 | 16 | 2,760 |
| CTC | 215 | 94 | 258 | 7 | 574 |
| DPU | 6 | . | 34 | . | 40 |
| DR | 131 | 58 | 447 | . | 636 |
| FV | 7 | 2 | 45 | . | 54 |
| HSP | 5 | . | 12 | . | 17 |
| ICF | . | 5 | . | 758 | 763 |
| LRH | 229 | . | . | 1 | 230 |
| MCB | 7 | 9 | . | 287 | 303 |
| OHU | 317 | 88 | 419 | 2 | 826 |
| PHU | 4 | . | 3 | . | 7 |
| PIP | . | . | . | 27 | 27 |
| PSU | 6 | 125 | . | 2 | 133 |
| RC | 2,205 | 176 | 6,612 | . | 8,993 |
| RGP | 18 | . | 58 | . | 76 |
| SHU | . | . | 334 | . | 334 |
| SRH | 669 | 36 | 267 | 1 | 973 |
| THU | 3 | . | 12 | . | 15 |
| TOTAL | 4,036 | 983 | 10,645 | 1,493 | 17,157 |

EXCLUDES COCF, MCCF AND CAC INSTITUTIONS
PROGRAMRESEARCH.ROUTINE.TAB_M_INSTITUTION.sas

# Exhibit 44

# Responses to the COVID-19 pandemic

Last update: March 25, 2020

Prisons and jails are amplifiers of infectious diseases such as COVID-19, because the conditions that can keep diseases from spreading - such as social distancing - are nearly impossible to achieve in correctional facilities. So what should criminal justice agencies be doing to protect public health?

On this page, we're tracking examples of state and local agencies taking meaningful steps to slow the spread of COVID-19. (So far, however, no state or municipality has implemented all of our five key policy ideas, nor met the demands issued by various organizations nationwide.)

Can't find what you're looking for here? See our list of other webpages aggregating information about the criminal justice system and COVID-19.

## Releasing people from jails and prisons

We already know that jails and prisons house large numbers of people with chronic diseases and complex medical needs who are more vulnerable to COVID-19, and one of the best ways to protect these people is to reduce overcrowding in correctional facilities. Some jails are already making these changes:

- District attorneys in San Francisco, California and Boulder, Colorado have taken steps to release people held pretrial, with limited time left on their sentence, and charged with non-violent offenses. (March 11 and March 16)
- Ohio courts in Cuyahoga County and Hamilton County have begun to issue court orders and conduct special hearings to increase the number of people released from local jails. On a single day, judges released 38 people from the Cuyahoga County Jail, and they hope to release at least 200 more people charged with low-level, non-violent crimes. (March 14 and March 16)
- The Los Angeles County Sheriff's Department has reduced their jail population by 6% in the past month to mitigate the risk of virus transmission in crowded jails. To reduce the jail population by over 1,000 people, the Sheriff reports releasing people with less than 30 days left on their sentences and the Department is considering releasing pregnant women and older adults at high risk. (March 20)
- In Travis County, Texas, judges have begun to release more people from local jails on personal bonds (about 50% more often than usual), focusing on preventing people with health issues who are charged with non-violent offenses from going into the jail system. (March 16)
- Court orders in Spokane, Washington and in three counties in Alabama have authorized the release of people being held pretrial and some people serving sentences

for "low-level" misdemeanor offenses. (March 17 and March 18)

- In Hillsborough County, Florida, over 160 people were released following authorization via administrative order for people accused of ordinance violations, misdemeanors, traffic offenses, and third degree felonies. (March 19)
- In Arizona, the Coconino County court system and jail have released around 50 people who were held in the county jail on non-violent charges. (March 20)
- New Jersey Chief Justice Stuart Rabner signed an order calling for the temporary release of 1,000 people from jails(almost a tenth of the entire state's county jail population) across the state of New Jersey who are serving county jail sentences for probation violations, municipal court convictions, "low-level indictable crimes," and "disorderly persons offenses. (March 23)

Prisons have not been as quick to change policies and arrange for releases. But state prisons are filled with people with preexisting medical conditions that put them a heightened risk for complications from this virus. So far, we are aware of only a handful of state corrections departments taking steps to reduce the prison population in the face of the pandemic:

- The North Dakota parole board granted early release dates to 56 people (out of 60 people who applied for consideration) held in state prison with expected release dates later in March and early April. (March 21)
- The director of the Iowa Department of Corrections reported the planned, expedited release of about 700 incarcerated people who have been determined eligible for release by the Iowa Board of Parole. (March 23)
- In Illinois, the governor signed an executive order that eases the restrictions on early prison releases for "good behavior" by waiving the required 14-day notification to the State Attorney's office. The executive order explicitly states that this is an effort to reduce the prison population, which is particularly vulnerable to the COVID-19 outbreak. (March 23)

## Reducing jail admissions

Lowering jail admissions reduces "jail churn" — the rapid movement of people in and out of jails — and will allow the facility's total population to drop very quickly.

- In Bexar County, Texas, Sheriff Javier Salazar released a COVID-19 mitigation plan that includes encouraging the use of cite and release and "filing non-violent offenses at large," rather than locking more people up during this pandemic. (March 14)
- Baltimore, Maryland State's Attorney Marilyn Mosby will dismiss pending criminal charges against anyone arrested for drug offenses, trespassing, and minor traffic offenses, among other nonviolent offenses. (March 18)
- District attorneys in Brooklyn, New York and Philadelphia, Pennsylvania, have taken steps to reduce jail admissions by releasing people charged with non-violent offenses and not actively prosecuting low-level, non-violent offenses. (March 17 and March 18)
- Police departments in Los Angeles County, California, Denver, Colorado, and Philadelphia, Pennsylvania are reducing arrests by using cite and release practices,

delaying arrests, and issuing summons. In Los Angeles County, the number of arrests has decreased from an average of 300 per day to about 60 per day. (March 16 and March 17)

- The state of Maine vacated all outstanding bench warrants (for over 12,000 people) for unpaid court fines and fees and for failure to appear for hearings in an effort to reduce jail admissions. (March 17)
- U.S. Immigration and Customs Enforcement (ICE) notified Congress that they will halt arrests except for those deemed "mission critical" to "maintain public safety and national security." In the statement, ICE also stated that they would avoid arrests near necessary healthcare services like hospitals, doctor's offices, and clinics, "except in the most extraordinary of circumstances." (March 18)
- In response to the Oklahoma Department of Corrections' decision not to admit any new people to state prisons, Tulsa and Oklahoma counties are trying to keep their jail population down by not arresting people for misdemeanor offenses and warrants, and by releasing 130 people this past week through accelerated bond reviews and plea agreements. (March 22)

## Reducing incarceration and unnecessary face-to-face contact for people on parole and probation

Limiting unnecessary check-ins and visits to offices for people on parole, probation, or on registries will reduce the risk of viral transmission. We don't (yet) know of many recent reforms in this area, but there is an important letter from current and former probation and parole executives saying what must be done to promote social distancing and continuing to support people under supervision.

- The California Department of Adult Parole Operations has reduced the number of required check-ins to protect staff and the supervised population by suspending office visits for people 65 and older, and those with chronic medical conditions. (March 17)
- The Rhode Island Department of Corrections announced that probation and parole offices will not hold in-person check-ins and that individual parole or probation officers will provide instructions to people on parole and probation about maintaining appropriate remote communication. (March 18)
- The Arkansas Department of Corrections Division of Community Corrections has suspended supervision fees for the month of April 2020 and suspended face-to-face office visits. (March 20)

## Eliminating medical co-pays

In most states, incarcerated people are expected to pay $2-$5 co-pays for physician visits, medications, and testing. Because incarcerated people typically earn 14 to 63 cents per hour, these charges are the equivalent of charging a free-world worker $200 or $500 for a medical visit. The result is to discourage medical treatment and to put public health at risk. In 2019,

some states recognized the harm and eliminated these co-pays. We're tracking how states are responding to the COVID-19 pandemic:

| States that do not charge co-pays | States that have suspended all co-pays for incarcerated people in response to the COVID-19 pandemic | States that have suspended all co-pays for respiratory, flu-related, or COVID-19 symptoms | States that have not made any changes in co-pay policy in regardings to COVID-19 pandemic | States that have not replied to our survey and are presumably still using co-pays to discourage medical treatment |
|---|---|---|---|---|
| California<br>District of Columbia<br>Illinois<br>Missouri<br>Montana<br>Nebraska<br>New Mexico<br>New York<br>Oregon<br>Vermont<br>Virginia<br>Wyoming | Alabama<br>Arkansas<br>Connecticut<br>Massachusetts<br>Minnesota<br>Idaho<br>Louisiana<br>Tennessee<br>West Virginia | Alaska<br>Arizona<br>Colorado<br>Florida<br>Georgia<br>Indiana<br>Iowa<br>Kentucky<br>Maine<br>Michigan<br>Mississippi<br>New Hampshire<br>North Carolina<br>North Dakota<br>Ohio<br>Washington<br>Pennsylvania<br>South Carolina<br>South Dakota<br>Texas<br>Wisconsin | Kansas<br>Nevada<br>Hawaii | Delaware<br>Maryland<br>New Jersey<br>Oklahoma<br>Rhode Island<br>Utah |

*Table created March 13, 2020 and last updated: March 24, 2020. We welcome updates from states that have revised their policies. States can contact us at virusresponse@prisonpolicy.org.*

## Reducing the cost of phone and video calls

Most federal prisons, state prisons and many local jails have decided to drastically reduce or completely eliminate friends and family visitation so as to reduce the risk of COVID-19 exposure in facilities. In normal times, we would point to the significant evidence that sustained meaningful contact with family and friends benefits incarcerated people in the long run, including reducing recidivism. But it is even more important, in this time of crisis, for incarcerated people to know that their loved ones are safe and vice versa. While many facilities have suspended in-person visitation, only a few have made an effort to supplement

this loss by waiving fees for phone calls and video communication. Here is one notable example:

- Shelby County, Tennessee suspended jail visitations, but to maintain these vital connections between families, they are waiving fees for all phone calls and video communication. (March 12)

Other jurisdictions have implemented cost reductions that - while better than nothing - still severely restrict contact between incarcerated people and their loved ones:

- The Utah Department of Corrections is giving people in prison 10 free phone calls per week, with each call limited to 15 minutes. (Calls that go beyond the 15-minute limit will incur charges.)
- Prisons in Connecticut, Delaware, Florida, Vermont, and Pennsylvania are offering residents even smaller numbers of free calls per week. The same is true for jails in Middlesex County, Massachusetts; Harris County, Texas; and Montgomery County, Ohio.


## Other resources

With thousands of jurisdictions making ongoing policy changes, and local advocacy groups across the country issuing new demands, it's impossible to track all ongoing developments in one place. If you didn't find what you were looking for here, try these other pages:

- The Justice Collaborative COVID-19 Response and Resource page offers resource lists, fact sheets, example demand letters, and tracks active demand campaigns throughout the U.S.
- Professor Sharon Dolovich at the UCLA School of Law has shared a growing comprehensive spreadsheet including results from a state-by-state survey of changes in visitor policies, requests for population reduction, and actions taken to reduce the incarcerated population.
- The Justice Management Institute has catalogued updates on criminal justice system responses to COVID-19 at the state and local levels, including changes being made by jails systems, law enforcement agencies, probation and parole systems, prosecutors, and public defenders.
- The Appeal is tracking demands and local and state government responses to the COVID-19 pandemic. This information is organized both geographically and chronologically and includes policies regarding the justice system, elections, healthcare and insurance, and paid sick leave.
- Professor Aaron Littman at the UCLA School of Law has compiled a spreadsheet to help readers understand which local officials have the power to release people from jails. The information in the spreadsheet is state-specific.
- The Marshall Project is tracking articles from across the web on the risks of coronavirus across the U.S. justice system.

**Help us update this page**

If you know of notable reforms that should be listed here, please let us know at virusresponse@prisonpolicy.org. We won't list everything, but we appreciate what you can send us.

# Exhibit 45

**U.S. Department of Justice**

*Bureau of Justice Statistics*

February 2020, NCJ 251920

# Mortality in State and Federal Prisons, 2001-2016 – Statistical Tables

E. Ann Carson, Ph.D., *BJS Statistician*
Mary P. Cowhig, *former BJS Statistician*

In 2016, a total of 4,117 state and federal prisoners died in publicly or privately operated prisons. The number of deaths in state prisons rose 1.3% from 2015 to 2016 (from 3,682 to 3,729), while the number of deaths in federal prisons fell 15% (from 455 to 388). This marked the first decrease in deaths in federal prisons since 2012.

While the total number of state prisoners dropped 5% from 2006 to 2016, the number of deaths in state prisons rose 15% over that same period. Each year from 2001 to 2016, an average of 88% of deaths in state prisons were due to natural causes, ranging from 89% in 2001 to 86% in 2016. Over that same span, an average of 11% of deaths in state prisons were due to unnatural causes (suicide, drug or alcohol intoxication, accidental causes, or homicide), ranging from 9% in 2001 and 2008 to 13% in 2016.

Mortality rates, or the annual number of deaths per 100,000 prisoners, dropped from 2001 to 2016 for all four age groups of state prisoners



**FIGURE 1**
**Mortality rate per 100,000 state and federal prisoners, 2001-2016**

Note: Based on the annual number of deaths and the one-day custody population on December 31. See appendix table 9 for rates.
[a]Includes deaths in private state facilities.
[b]Excludes deaths in private federal facilities.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001-2016; and Federal Bureau of Prisons, 2001-2016.

## Highlights

- From 2015 to 2016, deaths in state prisons increased from 296 to 303 deaths per 100,000 state prisoners.

- From 2015 to 2016, deaths in federal prisons decreased for the first time since 2012, from 283 to 252 deaths per 100,000 federal prisoners.

- Illness-related deaths made up 86% of deaths in state prisons in 2016, with more than half of those being due to cancer (30% of all deaths) or heart disease (28%).

- Homicide deaths, which include deaths due to injuries sustained before imprisonment, accounted for 2.5% of deaths in state prisons and 3.6% of deaths in federal prisons in 2016.

- More than half of all deaths in state prisons in 2016 (55%) were of white prisoners, who made up less than one-third (31%) of the state prison population.

- From 2001 to 2016, mortality rates dropped for all four age groups of state prisoners age 25 or older; however, the portion of prisoners age 55 or older tripled, and they have the highest mortality rates.



age 25 or older (25-34, 35-44, 45-54, and 55 or older). However, the portion of state prisoners who were age 55 or older roughly tripled from 2001 to 2016 (from 4% to 12%), and that subpopulation had the highest mortality rate (more than three times as high as any other age group in each year).

Suicides represented an average of 6% of deaths in state prisons from 2001 to 2016, ranging from 5.5% to 7.1% per year (6.8% in 2016).

Findings in this report are from the Mortality in Correctional Institutions (MCI) data collection (formerly the Deaths in Custody Reporting Program),

developed by the Bureau of Justice Statistics (BJS). The MCI is the only national statistical collection that obtains comprehensive information about deaths among prisoners and jail inmates in the custody of adult correctional facilities. This report reviews deaths in state and federal prisons from 2001 to 2016. Until 2015, BJS received aggregated mortality data from the Federal Bureau of Prisons (BOP). In 2015, BJS began receiving individual-level data on deaths from the BOP.

Data on mortality in local jails can be found in *Mortality in Local Jails, 2000-2016 – Statistical Tables* (NCJ 251921, BJS, February 2020).

## Other key findings

- A total of 59,036 prisoners died in state and federal prisons from 2001 to 2016, with about 90% of the deaths occurring in state prisons (53,051) and 10% occurring in federal prisons (5,985) **(table 1)**.

- A total of 255 state prisoners committed suicide in 2016, marking a 16-year peak in the number of suicides **(table 2)**.

- From 2015 to 2016, suicides increased from 5.9% to 6.8% of all deaths in state prisons, down from 7.1% in 2014 **(table 3)**.

- In 2016, 96% of those who died in state prisons were male (3,586) and 4% were female (143) **(tables 6 and 7)**.

- The annual average rate of suicides from 2001 to 2016 was 17 deaths per 100,000 male state prisoners and 13 deaths per 100,000 female state prisoners **(table 10)**.

- On average from 2001 to 2016, male state prisoners died from cancer, heart disease, or liver disease at about twice the rate of females **(table 10)**.

- From 2001 to 2016, eight states (Texas, California, Florida, Pennsylvania, New York, Michigan, Ohio, and Georgia) accounted for more than half of all deaths in state prisons (27,204 of 53,051), with Texas (6,628) and California (5,796) accounting for 23% of all deaths **(table 13)**.

## List of tables

**TABLE 1.** State and federal prisoner deaths, by cause of death, 2001-2016

**TABLE 2.** Number of state and federal prisoner deaths, by cause of death, 2001 and 2006-2016

**TABLE 3.** Percent of state prisoner deaths, by cause of death, 2001 and 2006-2016

**TABLE 4.** Mortality rate per 100,000 state prisoners, by cause of death, 2001 and 2006-2016

**TABLE 5.** Mortality rate per 100,000 federal prisoners, by cause of death, 2001 and 2006-2016

**TABLE 6.** Number of state prisoner deaths, by decedent characteristics, 2001 and 2006-2016

**TABLE 7.** Percent of state prisoner deaths, by decedent characteristics, 2001 and 2006-2016

**TABLE 8.** Mortality rate per 100,000 state prisoners within each demographic group, by decedent characteristics, 2001 and 2006-2016

**TABLE 9.** Number of deaths in state prisons, by cause of death and decedent characteristics, 2001-2016

**TABLE 10.** Average annual mortality rate per 100,000 state prisoners within each demographic group, by cause of death and decedent characteristics, 2001-2016

**TABLE 11.** Number of prisoner deaths in state and federal facilities, 2001 and 2006-2016

**TABLE 12.** Mortality rate per 100,000 state and federal prisoners, 2001 and 2006-2016

**TABLE 13.** Number of prisoner deaths in state and federal facilities, by cause of death, 2001-2016

**TABLE 14.** Average annual mortality rate per 100,000 state and federal prisoners, by cause of death, 2001-2016

## List of figures

**FIGURE 1.** Mortality rate per 100,000 state and federal prisoners, 2001-2016

*Continued on next page*

# List of appendix tables

**APPENDIX TABLE 1.** Estimated number of state and federal prisoners in custody, by prisoner characteristics, 2001 and 2006-2016

**APPENDIX TABLE 2.** Illness mortality rate per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)

**APPENDIX TABLE 3.** Cancer mortality rate per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)

**APPENDIX TABLE 4.** Heart-disease mortality rate per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)

**APPENDIX TABLE 5.** Liver-disease mortality rate per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)

**APPENDIX TABLE 6.** Respiratory-disease mortality rate per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)

**APPENDIX TABLE 7.** Mortality rate due to all other illnesses per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)

**APPENDIX TABLE 8.** Rate of unnatural deaths per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)

**APPENDIX TABLE 9.** Rates for figure 1: Mortality rate per 100,000 state and federal prisoners, 2001-2016

**TABLE 1**
**State and federal prisoner deaths, by cause of death, 2001-2016**

| Cause of death | State prisoners[a] | | | Federal prisoners[b] | | |
|---|---|---|---|---|---|---|
| | Number of deaths | Percent of deaths | Mortality rate per 100,000 | Number of deaths | Percent of deaths | Mortality rate per 100,000 |
| All causes | 53,051 | 100% | 262 | 5,985 | 100% | 230 |
| Illness | 46,824 | 88.3% | 231 | 5,441 | 90.9% | 209 |
|   Cancer | 14,525 | 27.4 | 72 | ... | ... | ... |
|   Heart disease | 13,695 | 25.8 | 68 | ... | ... | ... |
|   Liver disease | 4,940 | 9.3 | 24 | ... | ... | ... |
|   Respiratory disease | 3,315 | 6.2 | 16 | ... | ... | ... |
|   AIDS-related[c] | 1,873 | 3.5 | 9 | 161 | 2.7 | 6 |
|   All other illnesses[d] | 8,476 | 16.0 | 42 | ... | ... | ... |
| Suicide | 3,300 | 6.2% | 16 | 260 | 4.3% | 10 |
| Drug/alcohol intoxication | 781 | 1.5% | 4 | ... | ... | ... |
| Accident[e] | 530 | 1.0% | 3 | 81 | 1.4% | 3 |
| Homicide[f] | 1,024 | 1.9% | 5 | 160 | 2.7% | 6 |
| Other causes | 345 | 0.7% | 2 | 0 | 0.0% | 0 |
| Missing/unknown | 247 | 0.5% | 1 | 43 | 0.7% | 2 |

Note: Data may have been revised from previously published statistics. Details may not sum to totals due to rounding. Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). See *Methodology*.
...Not available.
[a]Includes deaths in private state facilities.
[b]Data on cause of death for federal prisoners were not available for all causes. Excludes deaths in private federal facilities.
[c]Includes persons who died of illness and were identified as HIV-positive or having AIDS at the time of death.
[d]Includes other specified illnesses (such as cerebrovascular disease, influenza, and other non-leading natural causes of death) and unspecified illnesses.
[e]Includes deaths by intoxication among federal prisoners.
[f]Includes homicides committed by other prisoners, incidental to the use of force by staff, and resulting from injuries sustained prior to incarceration.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001-2016; and Federal Bureau of Prisons, 2001-2016.

**TABLE 2**
**Number of state and federal prisoner deaths, by cause of death, 2001 and 2006-2016**

| Cause of death | 2001 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 3,170 | 3,561 | 3,757 | 3,851 | 3,793 | 3,620 | 3,738 | 3,707 | 3,879 | 3,927 | 4,137 | 4,117 |
| Federal[a] | 301 | 328 | 368 | 399 | 376 | 387 | 387 | 350 | 400 | 444 | 455 | 388 |
| State[b] | 2,869 | 3,233 | 3,389 | 3,452 | 3,417 | 3,233 | 3,351 | 3,357 | 3,479 | 3,483 | 3,682 | 3,729 |
|   Illness | 2,567 | 2,830 | 2,980 | 3,036 | 3,029 | 2,869 | 2,980 | 2,959 | 3,082 | 3,031 | 3,225 | 3,191 |
|     Cancer | 691 | 806 | 772 | 907 | 978 | 927 | 1,028 | 1,024 | 1,066 | 1,046 | 1,122 | 1,128 |
|     Heart disease | 743 | 854 | 840 | 845 | 848 | 830 | 854 | 804 | 897 | 890 | 985 | 1,025 |
|     Liver disease | 307 | 303 | 316 | 318 | 332 | 288 | 339 | 304 | 355 | 313 | 301 | 260 |
|     Respiratory disease | 147 | 193 | 207 | 251 | 200 | 211 | 205 | 223 | 198 | 238 | 242 | 222 |
|     AIDS-related[c] | 275 | 132 | 120 | 99 | 98 | 73 | 57 | 74 | 52 | 64 | 45 | 31 |
|     All other illnesses[d] | 404 | 542 | 725 | 616 | 573 | 540 | 497 | 530 | 514 | 480 | 530 | 525 |
|   Suicide | 168 | 219 | 215 | 197 | 202 | 215 | 185 | 205 | 192 | 249 | 219 | 255 |
|   Drug/alcohol intoxication | 35 | 56 | 41 | 58 | 50 | 40 | 58 | 33 | 56 | 50 | 81 | 104 |
|   Accident | 22 | 32 | 28 | 26 | 32 | 32 | 38 | 50 | 34 | 39 | 39 | 41 |
|   Homicide[e] | 39 | 55 | 57 | 40 | 54 | 70 | 70 | 85 | 90 | 83 | 84 | 95 |
|   Other causes | 0 | 41 | 16 | 95 | 16 | 4 | 11 | 14 | 18 | 10 | 20 | 22 |
|   Missing/unknown | 38 | 0 | 52 | 0 | 34 | 3 | 9 | 11 | 7 | 21 | 14 | 21 |

Note: Data may have been revised from previously published statistics. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). See *Methodology*. For data from 2002 to 2006, see the *Mortality in Correctional Institutions* page on the BJS website.
[a]Until 2015, federal deaths were submitted as an aggregate count by the Federal Bureau of Prisons. Excludes deaths in private federal facilities.
[b]Includes deaths in private state facilities.
[c]Includes persons who died of illness and were identified as HIV-positive or having AIDS at the time of death.
[d]Includes other specified illnesses (such as cerebrovascular disease, influenza, and other non-leading natural causes of death) and unspecified illnesses.
[e]Includes homicides committed by other prisoners, incidental to the use of force by staff, and resulting from injuries sustained prior to incarceration.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001 and 2006-2016; and Federal Bureau of Prisons, 2001 and 2006-2016.

**TABLE 3**

**Percent of state prisoner deaths, by cause of death, 2001 and 2006-2016**

| Cause of death | 2001 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All causes | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Illness | 89.5% | 87.5% | 87.9% | 87.9% | 88.6% | 88.7% | 88.9% | 88.1% | 88.6% | 87.0% | 87.6% | 85.6% |
| Cancer | 24.1 | 24.9 | 22.8 | 26.3 | 28.6 | 28.7 | 30.7 | 30.5 | 30.6 | 30.0 | 30.5 | 30.2 |
| Heart disease | 25.9 | 26.4 | 24.8 | 24.5 | 24.8 | 25.7 | 25.5 | 23.9 | 25.8 | 25.6 | 26.8 | 27.5 |
| Liver disease | 10.7 | 9.4 | 9.3 | 9.2 | 9.7 | 8.9 | 10.1 | 9.1 | 10.2 | 9.0 | 8.2 | 7.0 |
| Respiratory disease | 5.1 | 6.0 | 6.1 | 7.3 | 5.9 | 6.5 | 6.1 | 6.6 | 5.7 | 6.8 | 6.6 | 6.0 |
| AIDS-related[a] | 9.6 | 4.1 | 3.5 | 2.9 | 2.9 | 2.3 | 1.7 | 2.2 | 1.5 | 1.8 | 1.2 | 0.8 |
| All other illnesses[b] | 14.1 | 16.8 | 21.4 | 17.8 | 16.8 | 16.7 | 14.8 | 15.8 | 14.8 | 13.8 | 14.4 | 14.1 |
| Suicide | 5.9% | 6.8% | 6.3% | 5.7% | 5.9% | 6.7% | 5.5% | 6.1% | 5.5% | 7.1% | 5.9% | 6.8% |
| Drug/alcohol intoxication | 1.2% | 1.7% | 1.2% | 1.7% | 1.5% | 1.2% | 1.7% | 1.0% | 1.6% | 1.4% | 2.2% | 2.8% |
| Accident | 0.8% | 1.0% | 0.8% | 0.8% | 0.9% | 1.0% | 1.1% | 1.5% | 1.0% | 1.1% | 1.1% | 1.1% |
| Homicide[c] | 1.4% | 1.7% | 1.7% | 1.2% | 1.6% | 2.2% | 2.1% | 2.5% | 2.6% | 2.4% | 2.3% | 2.5% |
| Other causes | 0.0% | 1.3% | 0.5% | 2.8% | 0.5% | 0.1% | 0.3% | 0.4% | 0.5% | 0.3% | 0.5% | 0.6% |
| Missing/unknown | 1.3% | 0.0% | 1.5% | 0.0% | 0.0% | 0.1% | 0.3% | 0.3% | 0.2% | 0.6% | 0.4% | 0.6% |

Note: Data may have been revised from previously published statistics. Details may not sum to totals due to rounding. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). See *Methodology*. Includes deaths in private state facilities. For data from 2002 to 2006, see the *Mortality in Correctional Institutions* page on the BJS website.
[a]Includes persons who died of illness and were identified as HIV-positive or having AIDS at the time of death.
[b]Includes other specified illnesses (such as cerebrovascular disease, influenza, and other non-leading natural causes of death) and unspecified illnesses.
[c]Includes homicides committed by other prisoners, incidental to the use of force by staff, and resulting from injuries sustained prior to incarceration.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001 and 2006-2016.

**TABLE 4**

**Mortality rate per 100,000 state prisoners, by cause of death, 2001 and 2006-2016**

| Cause of death | 2001 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All causes | 242 | 249 | 258 | 261 | 259 | 246 | 260 | 265 | 274 | 274 | 296 | 303 |
| Illness | 217 | 218 | 226 | 229 | 230 | 218 | 231 | 234 | 243 | 239 | 259 | 260 |
| Cancer | 58 | 62 | 59 | 68 | 74 | 71 | 80 | 81 | 84 | 82 | 90 | 92 |
| Heart disease | 63 | 66 | 64 | 64 | 64 | 63 | 66 | 63 | 71 | 70 | 79 | 83 |
| Liver disease | 26 | 23 | 24 | 24 | 25 | 22 | 26 | 24 | 28 | 25 | 24 | 21 |
| Respiratory disease | 12 | 15 | 16 | 19 | 15 | 16 | 16 | 18 | 16 | 19 | 19 | 18 |
| AIDS-related[a] | 23 | 10 | 9 | 7 | 7 | 6 | 4 | 6 | 4 | 5 | 4 | 3 |
| All other illnesses[b] | 34 | 42 | 55 | 47 | 43 | 41 | 39 | 42 | 40 | 38 | 43 | 43 |
| Suicide | 14 | 17 | 16 | 15 | 15 | 16 | 14 | 16 | 15 | 20 | 18 | 21 |
| Drug/alcohol intoxication | 3 | 4 | 3 | 4 | 4 | 3 | 4 | 3 | 4 | 4 | 7 | 8 |
| Accident | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 4 | 3 | 3 | 3 | 3 |
| Homicide[c] | 3 | 4 | 4 | 3 | 4 | 5 | 5 | 7 | 7 | 7 | 7 | 8 |
| Other causes | 0 | 3 | 1 | 7 | 1 | <1 ! | 1 ! | 1 | 1 | 1 ! | 2 | 2 |
| Missing/unknown | 3 | 0 | 4 | 0 | 3 | <1 ! | 1 ! | 1 ! | 1 ! | 2 | 1 | 2 |

Note: Data may have been revised from previously published statistics. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. See *Methodology*. Includes deaths in private state facilities. For data from 2002 to 2006, see the *Mortality in Correctional Institutions* page on the BJS website.
! Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.
[a]Includes persons who died of illness and were identified as HIV-positive or having AIDS at the time of death.
[b]Includes other specified illnesses (such as cerebrovascular disease, influenza, and other non-leading natural causes of death) and unspecified illnesses.
[c]Includes homicides committed by other prisoners, incidental to the use of force by staff, and resulting from injuries sustained prior to incarceration.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001 and 2006-2016; National Prisoner Statistics, 2001 and 2006-2016.

**TABLE 5**
**Mortality rate per 100,000 federal prisoners, by cause of death, 2001 and 2006-2016**

| Cause of death | 2001 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All causes | 220 | 328 | 222 | 241 | 220 | 224 | 220 | 198 | 230 | 262 | 283 | 252 |
| Illness | 196 | 294 | 195 | 217 | 198 | 203 | 204 | 182 | 213 | 238 | 249 | 220 |
| AIDS-related[a] | 16 | 12 | 6 ! | 8 | 4 ! | 4 ! | 2 ! | 3 ! | 2 ! | 0 | 1 ! | 1 ! |
| Suicide | 13 | 12 | 11 | 13 | 12 | 6 ! | 10 | 11 | 8 | 14 | 12 | 12 |
| Accident[b] | 4 ! | 2 ! | 0 | 4 ! | 3 ! | 1 ! | 1 ! | 2 ! | 2 ! | 1 ! | 10 | 9 |
| Homicide | 6 ! | 8 ! | 7 | 8 | 4 ! | 10 | 5 ! | 3 ! | 7 | 8 | 10 | 9 |
| Other/unknown | 0 | 0 | 9 | 1 ! | 4 ! | 3 ! | 1 ! | 1 ! | 1 ! | 0 | 2 ! | 2 ! |

Note: Until 2015, federal deaths were submitted as aggregate counts by the Federal Bureau of Prisons, with limited details regarding cause of death. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. Excludes deaths in private federal facilities. For data from 2002 to 2006, see the *Mortality in Correctional Institutions* page on the BJS website.
! Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.
[a]Includes persons who died of illness and were identified as HIV-positive or having AIDS at the time of death.
[b]Includes deaths due to drug or alcohol intoxication.
Source: Bureau of Justice Statistics, Federal Bureau of Prisons, 2001 and 2006-2016; and National Prisoner Statistics, 2001 and 2006-2016.

**TABLE 6**
**Number of state prisoner deaths, by decedent characteristics, 2001 and 2006-2016**

| Characteristic | 2001 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 2,869 | 3,233 | 3,389 | 3,452 | 3,417 | 3,233 | 3,351 | 3,357 | 3,479 | 3,483 | 3,682 | 3,729 |
| **Sex** | | | | | | | | | | | | |
| Male | 2,769 | 3,103 | 3,252 | 3,289 | 3,267 | 3,116 | 3,208 | 3,244 | 3,338 | 3,329 | 3,533 | 3,586 |
| Female | 100 | 130 | 137 | 163 | 150 | 117 | 143 | 113 | 141 | 154 | 149 | 143 |
| **Race/ethnicity** | | | | | | | | | | | | |
| White[a] | 1,340 | 1,627 | 1,719 | 1,822 | 1,774 | 1,680 | 1,912 | 1,789 | 1,902 | 1,920 | 2,040 | 2,063 |
| Black[a] | 1,161 | 1,148 | 1,225 | 1,157 | 1,199 | 1,121 | 1,037 | 1,113 | 1,104 | 1,108 | 1,189 | 1,200 |
| Hispanic | 322 | 404 | 383 | 400 | 372 | 359 | 329 | 379 | 402 | 368 | 367 | 383 |
| Other[a,b] | 41 | 50 | 54 | 73 | 58 | 61 | 61 | 70 | 70 | 87 | 84 | 80 |
| **Age** | | | | | | | | | | | | |
| 17 or younger | 2 | 1 | 1 | 3 | 0 | 3 | 2 | 0 | 0 | 2 | 0 | 1 |
| 18-24 | 86 | 60 | 68 | 67 | 69 | 69 | 50 | 69 | 69 | 56 | 68 | 72 |
| 25-34 | 256 | 250 | 226 | 222 | 210 | 217 | 200 | 190 | 221 | 221 | 226 | 244 |
| 35-44 | 656 | 561 | 513 | 468 | 467 | 382 | 397 | 360 | 335 | 335 | 341 | 380 |
| 45-54 | 893 | 1,061 | 1,031 | 1,063 | 1,039 | 956 | 930 | 876 | 861 | 821 | 795 | 721 |
| 55 or older | 972 | 1,300 | 1,550 | 1,629 | 1,631 | 1,606 | 1,771 | 1,862 | 1,993 | 2,048 | 2,251 | 2,297 |

Note: Data may have been revised from previously published statistics. Details may not sum to totals due to missing data. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). Includes deaths in private state facilities. For data from 2002 to 2006, see the *Mortality in Correctional Institutions* page on the BJS website.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001 and 2006-2016.

**TABLE 7**
**Percent of state prisoner deaths, by decedent characteristics, 2001 and 2006-2016**

| Characteristic | 2001 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Sex** | | | | | | | | | | | | |
| Male | 96.5% | 96.0% | 96.0% | 95.3% | 95.6% | 96.4% | 95.7% | 96.6% | 95.9% | 95.6% | 96.0% | 96.2% |
| Female | 3.5 | 4.0 | 4.0 | 4.7 | 4.4 | 3.6 | 4.3 | 3.4 | 4.1 | 4.4 | 4.0 | 3.8 |
| **Race/ethnicity** | | | | | | | | | | | | |
| White[a] | 46.7% | 50.4% | 50.7% | 52.8% | 51.9% | 52.0% | 57.1% | 53.3% | 54.7% | 55.1% | 55.4% | 55.3% |
| Black[a] | 40.5 | 35.6 | 36.1 | 33.5 | 35.1 | 34.7 | 30.9 | 33.2 | 31.7 | 31.8 | 32.3 | 32.2 |
| Hispanic | 11.2 | 12.5 | 11.3 | 11.6 | 10.9 | 11.1 | 9.8 | 11.3 | 11.6 | 10.6 | 10.0 | 10.3 |
| Other[a,b] | 1.4 | 1.5 | 1.6 | 2.1 | 1.7 | 1.9 | 1.8 | 2.1 | 2.0 | 2.5 | 2.3 | 2.1 |
| **Age** | | | | | | | | | | | | |
| 17 or younger | 0.1% | <0.1% | <0.1% | 0.1% | 0.0% | 0.1% | 0.1% | 0.0% | 0.0% | 0.1% | 0.0% | <0.1% |
| 18-24 | 3.0 | 1.9 | 2.0 | 1.9 | 2.0 | 2.1 | 1.5 | 2.1 | 2.0 | 1.6 | 1.8 | 1.9 |
| 25-34 | 8.9 | 7.7 | 6.7 | 6.4 | 6.2 | 6.7 | 6.0 | 5.7 | 6.4 | 6.4 | 6.1 | 6.5 |
| 35-44 | 22.9 | 17.4 | 15.1 | 13.6 | 13.7 | 11.8 | 11.8 | 10.7 | 9.6 | 9.6 | 9.3 | 10.2 |
| 45-54 | 31.1 | 32.8 | 30.4 | 30.8 | 30.4 | 29.6 | 27.8 | 26.1 | 24.7 | 23.6 | 21.6 | 19.3 |
| 55 or older | 33.9 | 40.2 | 45.7 | 47.2 | 47.7 | 49.7 | 52.9 | 55.5 | 57.3 | 58.8 | 61.1 | 61.6 |

Note: Data may have been revised from previously published statistics. Details may not sum to totals due to missing data. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). Includes deaths in private state facilities. For data from 2002 to 2006, see the *Mortality in Correctional Institutions* page on the BJS website.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001 and 2006-2016.

**TABLE 8**
**Mortality rate per 100,000 state prisoners within each demographic group, by decedent characteristics, 2001 and 2006-2016**

| Characteristic | 2001 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 242 | 244 | 258 | 261 | 259 | 246 | 260 | 265 | 274 | 274 | 296 | 303 |
| **Sex** | | | | | | | | | | | | |
| Male | 250 | 251 | 266 | 267 | 266 | 255 | 267 | 275 | 283 | 282 | 306 | 315 |
| Female | 131 | 151 | 146 | 173 | 163 | 128 | 160 | 131 | 159 | 171 | 167 | 161 |
| **Race/ethnicity** | | | | | | | | | | | | |
| White[a] | 345 | 323 | 389 | 413 | 412 | 396 | 461 | 439 | 468 | 473 | 515 | 535 |
| Black[a] | 234 | 219 | 244 | 230 | 243 | 233 | 222 | 245 | 246 | 254 | 282 | 293 |
| Hispanic | 139 | 200 | 138 | 147 | 134 | 129 | 121 | 145 | 153 | 141 | 142 | 144 |
| Other[a,b] | 59 | 151 | 57 | 67 | 49 | 47 | 45 | 49 | 45 | 53 | 50 | 48 |
| **Age** | | | | | | | | | | | | |
| 17 or younger | 68! | 33! | 41! | 115! | 0 | 140! | 111! | 0 | 0 | 206! | 0 | 120! |
| 18-24 | 39 | 29 | 35 | 34 | 35 | 35 | 26 | 38 | 40 | 35 | 47 | 53 |
| 25-34 | 64 | 62 | 52 | 51 | 48 | 50 | 47 | 46 | 53 | 53 | 55 | 61 |
| 35-44 | 181 | 182 | 140 | 131 | 136 | 114 | 123 | 113 | 105 | 104 | 106 | 118 |
| 45-54 | 584 | 554 | 444 | 442 | 427 | 389 | 384 | 368 | 364 | 349 | 347 | 321 |
| 55 or older | 2,032 | 2,004 | 1,927 | 1,859 | 1,737 | 1,580 | 1,632 | 1,615 | 1,619 | 1,563 | 1,619 | 1,578 |

Note: Data may have been revised from previously published statistics. Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. See *Methodology*. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). Includes deaths in private state facilities. For data from 2002 to 2006, see the *Mortality in Correctional Institutions* page on the BJS website.
! Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001 and 2006-2016; National Prisoner Statistics, 2001 and 2006-2016; Survey of Inmates in State Correctional Facilities, 2004; and Survey of Prison Inmates, 2016.

**TABLE 9**
**Number of deaths in state prisons, by cause of death and decedent characteristics, 2001-2016**

| Characteristic | All causes[a] | Cancer | Heart disease | Liver disease | Respiratory disease | AIDS-related[b] | All other illnesses[c] | Suicide | Drug/alcohol intoxication | Accident | Homicide[d] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 53,051 | 14,525 | 13,695 | 4,940 | 3,315 | 1,873 | 8,476 | 3,300 | 781 | 530 | 1,024 |
| **Sex** | | | | | | | | | | | |
| Male | 50,885 | 13,976 | 13,235 | 4,768 | 3,149 | 1,779 | 8,017 | 3,120 | 747 | 513 | 1,017 |
| Female | 2,165 | 549 | 460 | 172 | 166 | 94 | 459 | 180 | 34 | 17 | 7 |
| **Race/ethnicity** | | | | | | | | | | | |
| White[e] | 27,748 | 7,988 | 7,300 | 2,746 | 1,886 | 417 | 3,980 | 1,951 | 436 | 299 | 462 |
| Black[e] | 18,454 | 5,069 | 5,113 | 1,113 | 1,073 | 1,240 | 3,268 | 672 | 148 | 149 | 359 |
| Hispanic | 5,764 | 1,220 | 1,065 | 949 | 306 | 196 | 1,063 | 522 | 161 | 67 | 172 |
| Other[e,f] | 997 | 224 | 203 | 123 | 45 | 19 | 150 | 142 | 36 | 14 | 29 |
| **Age** | | | | | | | | | | | |
| 17 or younger | 21 | 3 | 2 | 1 | 1 | 0 | 1 | 11 | 0 | 1 | 1 |
| 18-24 | 1,081 | 66 | 132 | 13 | 62 | 19 | 133 | 425 | 53 | 38 | 121 |
| 25-34 | 3,706 | 341 | 626 | 81 | 190 | 238 | 493 | 1,059 | 212 | 95 | 283 |
| 35-44 | 7,740 | 1,294 | 1,800 | 602 | 367 | 734 | 1,229 | 930 | 265 | 131 | 276 |
| 45-54 | 14,907 | 4,097 | 3,505 | 2,234 | 715 | 639 | 2,464 | 607 | 184 | 115 | 200 |
| 55 or older | 25,568 | 8,719 | 7,626 | 2,006 | 1,979 | 243 | 4,153 | 266 | 67 | 149 | 141 |

Note: Data may have been revised from previously published statistics. Details may not sum to totals due to missing data. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). See *Methodology*. Includes deaths in private state facilities. There were 88 prisoners whose race/ethnicity was unknown, 28 whose age was unknown, and 1 whose sex was unknown.

[a]Includes other causes not specified and missing and unknown causes.

[b]Includes persons who died of illness and were identified as HIV-positive or having AIDS at the time of death.

[c]Includes other specified illnesses (such as cerebrovascular disease, influenza, and other non-leading natural causes of death) and unspecified illnesses.

[d]Includes homicides committed by other prisoners, incidental to the use of force by staff, and resulting from injuries sustained prior to incarceration.

[e]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).

[f]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.

Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001-2016.

**TABLE 10**
**Average annual mortality rate per 100,000 state prisoners within each demographic group, by cause of death and decedent characteristics, 2001-2016**

| Characteristic | All causes[a] | Cancer | Heart disease | Liver disease | Respiratory disease | AIDS-related[b] | All other illnesses[c] | Suicide | Drug/alcohol intoxication | Accident | Homicide[d] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 262 | 72 | 68 | 24 | 16 | 9 | 42 | 16 | 4 | 3 | 5 |
| **Sex** | | | | | | | | | | | |
| Male | 270 | 74 | 70 | 25 | 17 | 9 | 43 | 17 | 4 | 3 | 5 |
| Female | 154 | 39 | 33 | 12 | 12 | 7 | 33 | 13 | 2 | 1 | <1 ! |
| **Race/ethnicity** | | | | | | | | | | | |
| White[e] | 416 | 120 | 109 | 41 | 28 | 6 | 60 | 29 | 7 | 4 | 7 |
| Black[e] | 243 | 67 | 67 | 15 | 14 | 16 | 43 | 9 | 2 | 2 | 5 |
| Hispanic | 138 | 29 | 25 | 23 | 7 | 5 | 25 | 12 | 4 | 2 | 4 |
| Other[e,f] | 54 | 12 | 11 | 7 | 2 | 1 | 8 | 8 | 2 | 1 | 2 |
| **Age** | | | | | | | | | | | |
| 17 or younger | 66 | 9 ! | 6 ! | 3 ! | 3 ! | 0 | 3 ! | 35 ! | 0 | 3 ! | 3 ! |
| 18-24 | 36 | 2 | 4 | <1 | 2 | 1 | 4 | 14 | 2 | 1 | 4 |
| 25-34 | 55 | 5 | 9 | 1 | 3 | 4 | 7 | 16 | 3 | 1 | 4 |
| 35-44 | 140 | 23 | 33 | 11 | 7 | 13 | 22 | 17 | 5 | 2 | 5 |
| 45-54 | 429 | 118 | 101 | 64 | 21 | 18 | 71 | 17 | 5 | 3 | 6 |
| 55 or older | 1,722 | 587 | 514 | 135 | 133 | 16 | 280 | 18 | 5 | 10 | 9 |

Note: Data may have been revised from previously published statistics. Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). See *Methodology*. Includes deaths in private state facilities.

! Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.

[a]Includes other causes not specified and missing and unknown causes.

[b]Includes persons who died of illness and were identified as HIV-positive or having AIDS at the time of death.

[c]Includes other specified illnesses (such as cerebrovascular disease, influenza, and other non-leading natural causes of death) and unspecified illnesses.

[d]Includes homicides committed by other prisoners, incidental to the use of force by staff, and resulting from injuries sustained prior to incarceration.

[e]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).

[f]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.

Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001-2016; National Inmate Survey, 2007-2009, 2011, and 2012; National Prisoner Statistics, 2001-2016; Survey of Inmates in State Correctional Facilities, 2004; and Survey of Prison Inmates, 2016.

## TABLE 11
### Number of prisoner deaths in state and federal facilities, 2001 and 2006-2016

| State/Federal | 2001 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Federal[a] | 301 | 328 | 368 | 399 | 376 | 387 | 387 | 350 | 400 | 444 | 455 | 388 |
| State[b] | 2,869 | 3,233 | 3,389 | 3,452 | 3,417 | 3,233 | 3,351 | 3,357 | 3,479 | 3,483 | 3,682 | 3,729 |
| Alabama | 87 | 61 | 54 | 75 | 80 | 66 | 104 | 86 | 107 | 102 | 112 | 118 |
| Alaska[c] | 8 | 6 | 10 | 14 | 7 | 13 | 12 | 11 | 8 | 12 | 15 | 10 |
| Arizona | 64 | 72 | 61 | 77 | 85 | 85 | 86 | 87 | 95 | 99 | 105 | 126 |
| Arkansas | 42 | 37 | 46 | 41 | 50 | 54 | 50 | 43 | 56 | 57 | 54 | 71 |
| California | 287 | 424 | 395 | 371 | 395 | 414 | 388 | 368 | 366 | 317 | 353 | 334 |
| Colorado | 42 | 31 | 42 | 38 | 49 | 48 | 37 | 48 | 40 | 35 | 51 | 57 |
| Connecticut[d] | 30 | 25 | 27 | 32 | 29 | 21 | 19 | 24 | 20 | 24 | 23 | 17 |
| Delaware[d] | 16 | 13 | 15 | 15 | 12 | 23 | 15 | 10 | 14 | 18 | 17 | 14 |
| Florida | 182 | 261 | 249 | 291 | 278 | 275 | 297 | 324 | 305 | 346 | 354 | 356 |
| Georgia | 93 | 103 | 143 | 128 | 125 | 112 | 121 | 103 | 122 | 120 | 130 | 132 |
| Hawaii[d] | 7 | 5 | 13 | 14 | 11 | 12 | 6 | 12 | 14 | 8 | 4 | 9 |
| Idaho | 17 | 18 | 14 | 18 | 13 | 13 | 13 | 9 | 10 | 23 | 18 | 16 |
| Illinois | 86 | 94 | 104 | 71 | 75 | 94 | 97 | 85 | 78 | 88 | 120 | 90 |
| Indiana | 46 | 70 | 54 | 70 | 91 | 69 | 74 | 59 | 66 | 70 | 85 | 70 |
| Iowa | 9 | 12 | 17 | 21 | 14 | 13 | 12 | 20 | 16 | 15 | 19 | 29 |
| Kansas | 21 | 16 | 20 | 24 | 20 | 22 | 25 | 17 | 28 | 21 | 25 | 35 |
| Kentucky | 36 | 46 | 46 | 68 | 57 | 42 | 60 | 55 | 40 | 44 | 60 | 42 |
| Louisiana | 71 | 72 | 82 | 117 | 108 | 100 | 108 | 116 | 118 | 118 | 113 | 123 |
| Maine | 6 | 6 | 1 | 2 | 4 | 3 | 5 | 2 | 3 | 7 | 5 | 5 |
| Maryland | 70 | 61 | 57 | 69 | 56 | 40 | 41 | 46 | 58 | 43 | 62 | 49 |
| Massachusetts | 29 | 39 | 39 | 29 | 29 | 39 | 33 | 42 | 39 | 45 | 34 | 34 |
| Michigan | 114 | 138 | 117 | 99 | 148 | 93 | 119 | 124 | 124 | 121 | 118 | 106 |
| Minnesota | 13 | 9 | 13 | 17 | 12 | 16 | 19 | 14 | 20 | 14 | 11 | 18 |
| Mississippi | 36 | 58 | 77 | 54 | 52 | 52 | 47 | 41 | 68 | 50 | 45 | 65 |
| Missouri | 57 | 66 | 78 | 87 | 81 | 88 | 74 | 71 | 92 | 97 | 106 | 99 |
| Montana | 6 | 5 | 5 | 9 | 3 | 2 | 6 | 11 | 7 | 19 | 13 | 16 |
| Nebraska | 7 | 8 | 12 | 6 | 11 | 12 | 17 | 11 | 16 | 13 | 17 | 9 |
| Nevada | 27 | 23 | 39 | 35 | 35 | 41 | 34 | 37 | 35 | 44 | 47 | 43 |
| New Hampshire | 2 | 6 | 6 | 5 | 9 | 4 | 10 | 5 | 8 | 5 | 8 | 9 |
| New Jersey | 69 | 70 | 60 | 66 | 58 | 56 | 66 | 48 | 46 | 50 | 52 | 49 |
| New Mexico | 11 | 13 | 22 | 29 | 21 | 16 | 16 | 14 | 17 | 24 | 19 | 16 |
| New York | 175 | 131 | 148 | 133 | 142 | 124 | 117 | 115 | 142 | 123 | 115 | 147 |
| North Carolina | 66 | 90 | 99 | 117 | 86 | 87 | 71 | 79 | 81 | 94 | 90 | 127 |
| North Dakota | 3 | 1 | 0 | 0 | 0 | 1 | 1 | 3 | 1 | 0 | 0 | 4 |
| Ohio | 115 | 106 | 123 | 101 | 120 | 116 | 111 | 126 | 124 | 111 | 138 | 133 |
| Oklahoma | 51 | 80 | 98 | 88 | 79 | 60 | 85 | 79 | 87 | 107 | 107 | 93 |
| Oregon | 24 | 40 | 36 | 31 | 34 | 39 | 40 | 26 | 30 | 31 | 37 | 47 |
| Pennsylvania | 122 | 124 | 150 | 145 | 165 | 141 | 157 | 157 | 157 | 145 | 167 | 171 |
| Rhode Island[d] | 3 | 8 | 9 | 6 | 7 | 7 | 10 | 6 | 4 | 7 | 5 | 2 |
| South Carolina | 69 | 65 | 72 | 83 | 49 | 70 | 55 | 58 | 66 | 66 | 76 | 79 |
| South Dakota | 4 | 4 | 8 | 6 | 4 | 8 | 11 | 9 | 6 | 7 | 7 | 5 |
| Tennessee | 51 | 84 | 73 | 74 | 69 | 74 | 59 | 84 | 82 | 83 | 94 | 102 |
| Texas | 408 | 443 | 435 | 469 | 426 | 375 | 417 | 462 | 438 | 409 | 418 | 403 |
| Utah | 5 | 7 | 7 | 11 | 17 | 13 | 12 | 15 | 23 | 23 | 16 | 21 |
| Vermont[d] | 3 | 7 | 1 | 3 | 3 | 5 | 0 | 2 | 8 | 6 | 4 | 7 |
| Virginia | 71 | 78 | 103 | 86 | 87 | 93 | 99 | 86 | 82 | 90 | 90 | 90 |

*Continued on next page*

**TABLE 11 (continued)**
**Number of prisoner deaths in state and federal facilities, 2001 and 2006-2016**

| State/Federal | 2001 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Washington | 29 | 36 | 39 | 35 | 44 | 35 | 21 | 33 | 39 | 38 | 42 | 28 |
| West Virginia | 17 | 13 | 19 | 19 | 18 | 20 | 23 | 24 | 26 | 24 | 28 | 26 |
| Wisconsin | 48 | 45 | 43 | 44 | 42 | 25 | 48 | 46 | 43 | 58 | 46 | 66 |
| Wyoming | 5 | 3 | 8 | 9 | 7 | 2 | 3 | 4 | 4 | 12 | 7 | 11 |

Note: Data may have been revised from previously published statistics. Details may not sum to totals due to missing data. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). For data from 2002 to 2006, see the *Mortality in Correctional Institutions* page on the BJS website.

[a]Excludes deaths in private federal facilities.

[b]Includes deaths in private state facilities. Includes nine prisoner deaths reported by the District of Columbia in 2001. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the Federal Bureau of Prisons.

[c]Prisons and jails form one integrated system. Counts include deaths only in state-operated prisons and jails and exclude deaths in 14 locally operated jails.

[d]Prisons and jails form one integrated system. Data include total jail and prison population.

Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001 and 2006-2016; and Federal Bureau of Prisons, 2001 and 2006-2016.

**TABLE 12**
**Mortality rate per 100,000 state and federal prisoners, 2001 and 2006-2016**

| State/Federal | 2001 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Federal**[a] | 220 | 201 | 222 | 241 | 220 | 224 | 220 | 198 | 230 | 262 | 283 | 252 |
| **State**[b] | 242 | 249 | 258 | 261 | 259 | 246 | 260 | 265 | 274 | 274 | 296 | 303 |
| Alabama | 352 | 253 | 214 | 296 | 294 | 241 | 388 | 321 | 399 | 390 | 444 | 497 |
| Alaska[c] | 175! | 119! | 194! | 280 | 128! | 242 | 193 | 174! | 157! | 190 | 286 | 228! |
| Arizona | 231 | 201 | 162 | 195 | 210 | 212 | 215 | 217 | 232 | 235 | 249 | 298 |
| Arkansas | 366 | 288 | 347 | 312 | 375 | 380 | 355 | 306 | 392 | 374 | 342 | 448 |
| California | 183 | 246 | 230 | 217 | 234 | 254 | 263 | 277 | 272 | 236 | 276 | 258 |
| Colorado | 243 | 141 | 185 | 164 | 216 | 211 | 169 | 236 | 198 | 171 | 256 | 293 |
| Connecticut[d] | 171 | 132 | 139 | 161 | 153 | 113 | 106 | 140 | 115 | 143 | 144 | 113 |
| Delaware[d] | 234 | 185 | 211 | 216 | 182 | 361 | 229 | 149! | 206 | 267 | 264 | 221 |
| Florida | 251 | 289 | 262 | 291 | 274 | 269 | 294 | 325 | 302 | 343 | 356 | 363 |
| Georgia | 202 | 195 | 264 | 243 | 233 | 212 | 229 | 187 | 227 | 228 | 250 | 247 |
| Hawaii[d] | 137! | 91! | 238 | 257 | 227! | 227 | 110! | 227 | 271 | 148! | 74! | 174! |
| Idaho | 323 | 270 | 198 | 256 | 181 | 180 | 174 | 117! | 139! | 307 | 249 | 222 |
| Illinois | 194 | 208 | 230 | 156 | 166 | 194 | 200 | 172 | 160 | 182 | 260 | 206 |
| Indiana | 234 | 281 | 215 | 265 | 340 | 253 | 270 | 210 | 232 | 215 | 320 | 278 |
| Iowa | 113! | 136 | 196 | 241 | 157 | 137 | 132 | 229 | 184 | 170 | 214 | 320 |
| Kansas | 245 | 181 | 229 | 281 | 231 | 243 | 268 | 179 | 291 | 220 | 262 | 363 |
| Kentucky | 336 | 295 | 299 | 446 | 380 | 290 | 429 | 423 | 329 | 363 | 502 | 354 |
| Louisiana[e] | 361 | 346 | 401 | 561 | 543 | 526 | 573 | 624 | 628 | 631 | 613 | 817 |
| Maine | 358! | 288! | 47! | 98! | 193! | 154! | 253! | 101! | 145! | 318! | 228! | 212! |
| Maryland | 295 | 269 | 246 | 298 | 254 | 175 | 178 | 211 | 267 | 202 | 296 | 242 |
| Massachusetts | 284 | 362 | 352 | 260 | 260 | 349 | 288 | 377 | 367 | 431 | 358 | 376 |
| Michigan | 233 | 268 | 233 | 203 | 325 | 211 | 277 | 284 | 284 | 279 | 277 | 258 |
| Minnesota | 203 | 102! | 141 | 188 | 126 | 170 | 204 | 149 | 213 | 146 | 115! | 189 |
| Mississippi | 238 | 354 | 441 | 302 | 302 | 316 | 305 | 260 | 436 | 383 | 322 | 474 |
| Missouri | 199 | 219 | 262 | 289 | 265 | 288 | 239 | 228 | 292 | 304 | 328 | 305 |
| Montana | 215! | 170! | 172! | 309! | 97! | 64! | 192! | 355! | 224! | 609 | 409 | 500 |
| Nebraska | 179! | 182! | 273 | 134! | 245! | 260 | 365 | 233! | 319 | 249 | 331 | 174! |
| Nevada | 274 | 180 | 293 | 272 | 278 | 336 | 280 | 294 | 274 | 347 | 355 | 309 |
| New Hampshire | 83! | 224! | 217! | 175! | 309! | 153! | 413! | 195! | 305! | 184! | 301! | 346! |
| New Jersey | 265 | 274 | 237 | 266 | 241 | 229 | 279 | 208 | 207 | 234 | 256 | 252 |
| New Mexico | 194! | 196 | 342 | 459 | 319 | 240 | 239 | 211 | 251 | 345 | 267 | 229 |
| New York | 259 | 206 | 236 | 221 | 243 | 220 | 212 | 213 | 266 | 235 | 223 | 290 |

*Continued on next page*

**TABLE 12 (continued)**
**Mortality rate per 100,000 state and federal prisoners, 2001 and 2006-2016**

| State/Federal | 2001 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| North Carolina | 205 | 239 | 259 | 293 | 214 | 215 | 179 | 211 | 218 | 252 | 244 | 353 |
| North Dakota | 276 ! | 75 ! | 0 | 0 | 0 | 71 ! | 72 ! | 212 ! | 63 ! | 0 | 0 | 244 ! |
| Ohio | 256 | 219 | 247 | 198 | 236 | 224 | 218 | 248 | 240 | 215 | 264 | 255 |
| Oklahoma | 235 | 350 | 412 | 372 | 328 | 248 | 358 | 324 | 343 | 404 | 392 | 353 |
| Oregon | 219 | 303 | 269 | 229 | 248 | 281 | 291 | 184 | 205 | 214 | 252 | 322 |
| Pennsylvania | 324 | 282 | 329 | 298 | 327 | 293 | 316 | 313 | 314 | 295 | 342 | 354 |
| Rhode Island[d] | 89 ! | 215 ! | 240 ! | 160 ! | 205 ! | 222 ! | 330 ! | 197 ! | 126 ! | 223 ! | 168 ! | 69 ! |
| South Carolina | 318 | 283 | 305 | 350 | 207 | 304 | 246 | 265 | 306 | 315 | 372 | 388 |
| South Dakota | 143 ! | 121 ! | 244 ! | 179 ! | 118 ! | 236 ! | 309 ! | 250 ! | 166 ! | 200 ! | 198 ! | 133 ! |
| Tennessee | 292 | 435 | 379 | 382 | 346 | 369 | 298 | 424 | 395 | 399 | 475 | 474 |
| Texas | 275 | 279 | 274 | 295 | 269 | 234 | 261 | 298 | 282 | 265 | 274 | 266 |
| Utah | 121 ! | 139 ! | 136 ! | 214 ! | 324 | 239 | 227 | 283 | 427 | 433 | 331 | 466 |
| Vermont[d] | 214 ! | 316 ! | 47 ! | 142 ! | 135 ! | 241 ! | 0 | 98 ! | 385 ! | 303 ! | 229 ! | 403 ! |
| Virginia | 226 | 253 | 312 | 264 | 281 | 291 | 324 | 289 | 273 | 300 | 296 | 301 |
| Washington | 190 | 214 | 231 | 204 | 255 | 206 | 123 | 195 | 220 | 221 | 244 | 163 |
| West Virginia | 500 | 298 | 387 | 388 | 356 | 394 | 447 | 450 | 456 | 409 | 473 | 441 |
| Wisconsin | 231 | 199 | 188 | 197 | 189 | 113 | 214 | 205 | 192 | 257 | 201 | 285 |
| Wyoming | 336 ! | 147 ! | 415 ! | 528 ! | 402 ! | 96 ! | 139 ! | 183 ! | 175 ! | 507 | 292 ! | 468 ! |

Note: Data may have been revised from previously published statistics. Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. See *Methodology*. Mortality rates are not adjusted for demographic differences among states. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). For data from 2002 to 2006, see the *Mortality in Correctional Institutions* page on the BJS website.
! Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.
[a]Excludes deaths in private federal facilities.
[b]Includes deaths in private state facilities. Includes nine prisoner deaths reported by the District of Columbia in 2001. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the Federal Bureau of Prisons.
[c]Prisons and jails form one integrated system. Counts include deaths only in state-operated prisons and jails and exclude deaths in 14 locally operated jails.
[d]Prisons and jails form one integrated system. Data include total jail and prison population.
[e]In 2016, Louisiana held 57.8% of its prison population in local jails. Since the calculation of mortality rates is based on the custody populations, which exclude prisoners held in local jails, the mortality rates for Louisiana prisoners will be high, because the prisoners held in jails are generally healthier according to the Louisiana Department of Corrections.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001 and 2006-2016, and National Prisoner Statistics, 2001 and 2006-2016; and Federal Bureau of Prisons, 2001 and 2006-2016.

**TABLE 13**
**Number of prisoner deaths in state and federal facilities, by cause of death, 2001-2016**

| State/Federal | All causes[a] | Cancer | Heart disease | Liver disease | Respiratory disease | AIDS-related[b] | All other illnesses[c] | Suicide | Drug/alcohol intoxication | Accident | Homicide[d] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Illness | | | | | | | |
| **Federal[e]** | 5,985 | ... | ... | ... | ... | 161 | 5,280 | 260 | ... | 81 | 160 |
| **State[f]** | 53,051 | 14,525 | 13,695 | 4,940 | 3,315 | 1,873 | 8,476 | 3,300 | 781 | 530 | 1,024 |
| Alabama | 1,360 | 364 | 326 | 129 | 97 | 37 | 262 | 30 | 4 | 17 | 32 |
| Alaska[g] | 156 | 23 | 38 | 17 | 2 | 1 | 23 | 27 | 10 | 8 | 4 |
| Arizona | 1,343 | 352 | 308 | 178 | 80 | 32 | 182 | 102 | 50 | 12 | 36 |
| Arkansas | 743 | 204 | 260 | 57 | 39 | 25 | 85 | 42 | 2 | 12 | 13 |
| California | 5,796 | 1,418 | 986 | 601 | 414 | 115 | 1,207 | 496 | 238 | 44 | 233 |
| Colorado | 709 | 147 | 134 | 121 | 52 | 1 | 125 | 62 | 27 | 14 | 26 |
| Connecticut[h] | 430 | 56 | 104 | 64 | 25 | 11 | 89 | 66 | 3 | 6 | 6 |
| Delaware[h] | 248 | 57 | 60 | 24 | 13 | 20 | 30 | 29 | 4 | 0 | 2 |
| Florida | 4,392 | 1,347 | 928 | 366 | 299 | 295 | 813 | 135 | 23 | 51 | 98 |
| Georgia | 1,872 | 481 | 627 | 110 | 153 | 78 | 233 | 87 | 3 | 15 | 59 |
| Hawaii[h] | 152 | 41 | 26 | 17 | 7 | 4 | 21 | 25 | 4 | 0 | 5 |
| Idaho | 228 | 56 | 60 | 22 | 12 | 3 | 31 | 29 | 4 | 5 | 3 |
| Illinois | 1,403 | 437 | 399 | 73 | 73 | 64 | 188 | 123 | 11 | 13 | 16 |

*Continued on next page*

**TABLE 13 (continued)**
**Number of prisoner deaths in state and federal facilities, by cause of death, 2001-2016**

| State/Federal | All causes[a] | Illness | | | | | | Suicide | Drug/alcohol intoxication | Accident | Homicide[d] |
| | | Cancer | Heart disease | Liver disease | Respiratory disease | AIDS-related[b] | All other illnesses[c] | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Indiana | 1,030 | 274 | 273 | 94 | 65 | 22 | 152 | 68 | 35 | 15 | 26 |
| Iowa | 255 | 90 | 54 | 15 | 24 | 5 | 32 | 27 | 2 | 1 | 2 |
| Kansas | 377 | 118 | 95 | 44 | 22 | 2 | 54 | 24 | 6 | 8 | 3 |
| Kentucky | 767 | 242 | 237 | 62 | 43 | 28 | 123 | 18 | 2 | 4 | 4 |
| Louisiana | 1,577 | 491 | 461 | 127 | 67 | 104 | 205 | 35 | 2 | 14 | 7 |
| Maine | 62 | 15 | 17 | 6 | 5 | 1 | 7 | 4 | 2 | 0 | 4 |
| Maryland | 925 | 196 | 227 | 76 | 37 | 102 | 106 | 68 | 54 | 7 | 43 |
| Massachusetts | 543 | 140 | 146 | 57 | 27 | 10 | 82 | 50 | 10 | 8 | 3 |
| Michigan | 1,939 | 662 | 594 | 157 | 106 | 39 | 182 | 118 | 24 | 24 | 18 |
| Minnesota | 223 | 65 | 45 | 32 | 10 | 1 | 41 | 23 | 4 | 1 | 1 |
| Mississippi | 848 | 218 | 326 | 43 | 45 | 24 | 104 | 37 | 3 | 9 | 18 |
| Missouri | 1,271 | 382 | 357 | 141 | 66 | 25 | 195 | 62 | 10 | 7 | 23 |
| Montana | 143 | 38 | 27 | 21 | 8 | 2 | 24 | 17 | 3 | 1 | 2 |
| Nebraska | 169 | 35 | 39 | 24 | 8 | 4 | 18 | 16 | 4 | 3 | 3 |
| Nevada | 548 | 116 | 128 | 37 | 16 | 9 | 127 | 34 | 6 | 3 | 9 |
| New Hampshire | 106 | 39 | 23 | 11 | 3 | 3 | 11 | 12 | 4 | 0 | 0 |
| New Jersey | 914 | 217 | 282 | 58 | 52 | 83 | 124 | 50 | 14 | 10 | 12 |
| New Mexico | 278 | 71 | 54 | 52 | 17 | 3 | 36 | 25 | 7 | 1 | 11 |
| New York | 2,318 | 666 | 617 | 186 | 100 | 217 | 212 | 204 | 38 | 26 | 25 |
| North Carolina | 1,383 | 457 | 362 | 120 | 95 | 69 | 188 | 47 | 4 | 21 | 15 |
| North Dakota | 18 | 5 | 4 | 2 | 0 | 0 | 3 | 3 | 1 | 0 | 0 |
| Ohio | 1,875 | 627 | 537 | 108 | 133 | 31 | 275 | 107 | 16 | 8 | 26 |
| Oklahoma | 1,276 | 318 | 330 | 142 | 79 | 30 | 170 | 75 | 29 | 27 | 54 |
| Oregon | 544 | 172 | 112 | 84 | 25 | 7 | 75 | 34 | 13 | 7 | 9 |
| Pennsylvania | 2,384 | 667 | 681 | 225 | 141 | 34 | 455 | 121 | 15 | 14 | 17 |
| Rhode Island[h] | 99 | 18 | 25 | 2 | 4 | 5 | 8 | 21 | 5 | 3 | 1 |
| South Carolina | 1,041 | 226 | 394 | 69 | 49 | 36 | 170 | 51 | 8 | 4 | 32 |
| South Dakota | 110 | 21 | 30 | 16 | 11 | 1 | 9 | 15 | 1 | 3 | 3 |
| Tennessee | 1,234 | 329 | 373 | 130 | 66 | 40 | 175 | 50 | 21 | 11 | 29 |
| Texas | 6,628 | 1,603 | 1,683 | 705 | 520 | 166 | 1,364 | 417 | 20 | 66 | 60 |
| Utah | 208 | 42 | 47 | 18 | 8 | 0 | 39 | 34 | 3 | 3 | 8 |
| Vermont[h] | 63 | 11 | 16 | 10 | 1 | 3 | 10 | 9 | 3 | 0 | 0 |
| Virginia | 1,387 | 472 | 374 | 140 | 69 | 53 | 183 | 48 | 12 | 5 | 11 |
| Washington | 561 | 158 | 136 | 66 | 43 | 9 | 87 | 38 | 4 | 10 | 7 |
| West Virginia | 303 | 87 | 110 | 22 | 15 | 6 | 49 | 6 | 1 | 2 | 4 |
| Wisconsin | 713 | 239 | 190 | 45 | 60 | 11 | 77 | 73 | 8 | 5 | 1 |
| Wyoming | 90 | 15 | 31 | 13 | 8 | 1 | 13 | 6 | 2 | 1 | 0 |

Note: Data may have been revised from previously published statistics. Details may not sum to totals due to missing data. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). See *Methodology*.

...Not available.

[a]Includes other causes not specified and missing and unknown causes.

[b]Includes persons who died of illness and were identified as HIV-positive or having AIDS at the time of death.

[c]Includes other specified illnesses (such as cerebrovascular disease, influenza, and other non-leading natural causes of death) and unspecified illnesses. Includes natural and illness-related federal prisoner deaths for which the Federal Bureau of Prisons could not provide details.

[d]Includes homicides committed by other prisoners, incidental to the use of force by staff, and resulting from injuries sustained prior to incarceration.

[e]Excludes deaths in private federal facilities.

[f]Includes deaths in private state facilities. Includes nine prisoner deaths reported by the District of Columbia in 2001. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the Federal Bureau of Prisons.

[g]Prisons and jails form one integrated system. Counts include deaths only in state-operated prisons and jails and exclude deaths in 14 locally operated jails.

[h]Prisons and jails form one integrated system. Data include total jail and prison population.

Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001-2016; and Federal Bureau of Prisons, 2001-2016.

## TABLE 14
**Average annual mortality rate per 100,000 state and federal prisoners, by cause of death, 2001-2016**

| State/Federal | All causes[a] | Cancer | Heart disease | Liver disease | Respiratory disease | AIDS-related[b] | All other illnesses[c] | Suicide | Drug/alcohol intoxication | Accident | Homicide[d] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Federal[e] | 230 | .. | .. | .. | .. | 6 | 203 | 10 | .. | 3 | 6 |
| State[f] | 262 | 72 | 68 | 24 | 16 | 9 | 42 | 16 | 4 | 3 | 5 |
| Alabama | 330 | 88 | 79 | 31 | 24 | 9 | 64 | 7 | 1! | 4 | 8 |
| Alaska[g] | 190 | 28 | 46 | 21 | 2! | 1! | 28 | 33 | 12! | 10! | 5! |
| Arizona | 226 | 59 | 52 | 30 | 13 | 5 | 31 | 17 | 8 | 2 | 6 |
| Arkansas | 343 | 94 | 120 | 26 | 18 | 12 | 39 | 19 | 1! | 6 | 6 |
| California | 235 | 58 | 40 | 24 | 17 | 5 | 49 | 20 | 10 | 2 | 9 |
| Colorado | 214 | 44 | 40 | 36 | 16 | <1! | 38 | 19 | 8 | 4 | 8 |
| Connecticut[h] | 150 | 20 | 36 | 22 | 9 | 4! | 31 | 23 | 1! | 2! | 2! |
| Delaware[h] | 231 | 53 | 56 | 22 | 12 | 19 | 28 | 27 | 4! | 0 | 2! |
| Florida | 296 | 91 | 62 | 25 | 20 | 20 | 55 | 9 | 2 | 3 | 7 |
| Georgia | 227 | 58 | 76 | 13 | 19 | 9 | 28 | 11 | <1! | 2 | 7 |
| Hawaii[h] | 178 | 48 | 30 | 20 | 8! | 5! | 25 | 29 | 5! | 1! | 6! |
| Idaho | 211 | 52 | 56 | 20 | 11 | 3! | 29 | 27 | 4! | 5! | 3! |
| Illinois | 191 | 60 | 54 | 10 | 10 | 9 | 26 | 17 | 1! | 2 | 2 |
| Indiana | 255 | 68 | 67 | 23 | 16 | 5 | 38 | 17 | 9 | 4 | 6 |
| Iowa | 182 | 64 | 39 | 11 | 17 | 4! | 23 | 19 | 1! | 1! | 1! |
| Kansas | 259 | 81 | 65 | 30 | 15 | 1! | 37 | 16 | 4! | 5! | 2! |
| Kentucky | 360 | 114 | 111 | 29 | 20 | 13 | 58 | 8 | 1! | 2! | 2! |
| Louisiana[i] | 513 | 160 | 150 | 41 | 22 | 34 | 67 | 11 | 1! | 5 | 2! |
| Maine | 190 | 46 | 52 | 18! | 15! | 3! | 21! | 12! | 6! | 0 | 12! |
| Maryland | 257 | 54 | 63 | 21 | 10 | 28 | 29 | 19 | 15 | 2! | 12 |
| Massachusetts | 324 | 84 | 87 | 34 | 16 | 6! | 49 | 30 | 6! | 5! | 2! |
| Michigan | 260 | 89 | 80 | 21 | 14 | 5 | 24 | 16 | 3 | 3 | 2 |
| Minnesota | 159 | 46 | 32 | 23 | 7! | 1! | 29 | 16 | 3! | 1! | 1! |
| Mississippi | 337 | 87 | 129 | 17 | 18 | 10 | 41 | 15 | 1! | 4! | 7 |
| Missouri | 259 | 78 | 73 | 29 | 13 | 5 | 40 | 13 | 2! | 1! | 5 |
| Montana | 297 | 79 | 56 | 44 | 17! | 4! | 50 | 35 | 6! | 2! | 4! |
| Nebraska | 232 | 48 | 54 | 33 | 11! | 5! | 25 | 22 | 5! | 4! | 4! |
| Nevada | 282 | 60 | 66 | 19 | 8 | 5! | 65 | 17 | 3! | 2! | 5! |
| New Hampshire | 255 | 94 | 55 | 26! | 7! | 7! | 26! | 29 | 10! | 0 | 0 |
| New Jersey | 238 | 57 | 74 | 15 | 14 | 22 | 32 | 13 | 4 | 3! | 3 |
| New Mexico | 266 | 68 | 52 | 50 | 16 | 3! | 34 | 24 | 7! | 1! | 11! |
| New York | 245 | 70 | 65 | 20 | 11 | 23 | 22 | 22 | 4 | 3 | 3 |
| North Carolina | 234 | 77 | 61 | 20 | 16 | 12 | 32 | 8 | 1! | 4 | 3 |
| North Dakota | 81 | 23! | 18! | 9! | 0 | 0 | 14! | 14! | 5! | 0 | 0 |
| Ohio | 239 | 80 | 68 | 14 | 17 | 4 | 35 | 14 | 2 | 1! | 3 |
| Oklahoma | 332 | 83 | 86 | 37 | 21 | 8 | 44 | 20 | 8 | 7 | 14 |
| Oregon | 254 | 80 | 52 | 39 | 12 | 3! | 35 | 16 | 6 | 3! | 4! |
| Pennsylvania | 325 | 91 | 93 | 31 | 19 | 5 | 62 | 16 | 2 | 2 | 2 |
| Rhode Island[h] | 187 | 34 | 47 | 4! | 8! | 9! | 15! | 40 | 9! | 6! | 2! |
| South Carolina | 292 | 63 | 110 | 19 | 14 | 10 | 48 | 14 | 2! | 1! | 9 |
| South Dakota | 206 | 39 | 56 | 30 | 21! | 2! | 17! | 28 | 2! | 6! | 6! |
| Tennessee | 393 | 105 | 119 | 41 | 21 | 13 | 56 | 16 | 7 | 4! | 9 |
| Texas | 266 | 64 | 68 | 28 | 21 | 7 | 55 | 17 | 1 | 3 | 2 |
| Utah | 262 | 53 | 59 | 23 | 10! | 0 | 49 | 43 | 4! | 4! | 10! |
| Vermont[h] | 205 | 36! | 52 | 33! | 3! | 10! | 33! | 29! | 10! | 0 | 0 |
| Virginia | 280 | 95 | 76 | 28 | 14 | 11 | 37 | 10 | 2 | 1! | 2! |

*Continued on next page*

**TABLE 14 (continued)**
**Average annual mortality rate per 100,000 state and federal prisoners, by cause of death, 2001-2016**

| State/Federal | All causes[a] | Cancer | Heart disease | Liver disease | Respiratory disease | AIDS-related[b] | All other illnesses[c] | Suicide | Drug/alcohol intoxication | Accident | Homicide[d] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Washington | 208 | 59 | 50 | 24 | 16 | 3 ! | 32 | 14 | 1 ! | 4 ! | 3 ! |
| West Virginia | 394 | 113 | 143 | 29 | 19 | 8 ! | 64 | 8 ! | 1 ! | 3 ! | 5 ! |
| Wisconsin | 200 | 67 | 53 | 13 | 17 | 3 ! | 22 | 20 | 2 ! | 1 ! | <1 ! |
| Wyoming | 282 | 47 | 97 | 41 | 25 ! | 3 ! | 41 | 19 ! | 6 ! | 3 ! | 0 |

Note: Data may have been revised from previously published statistics. Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. Mortality rates are not adjusted for demographic differences among states. Details may not sum to totals due to missing data. Excludes executions. For execution data, see *Capital Punishment, 2016 – Statistical Brief* (NCJ 251430, BJS, April 2018). See *Methodology*.

...Not available.

! Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.

[a]Includes other causes not specified and missing and unknown causes.

[b]Includes persons who died of illness and were identified as HIV-positive or having AIDS at the time of death.

[c]Includes other specified illnesses (such as cerebrovascular disease, influenza, and other non-leading natural causes of death) and unspecified illnesses. Includes natural and illness-related federal prisoner deaths for which the Federal Bureau of Prisons could not provide details.

[d]Includes homicides committed by other prisoners, incidental to the use of force by staff, and resulting from injuries sustained prior to incarceration.

[e]Excludes deaths in private federal facilities.

[f]Includes deaths in private state facilities. Includes nine prisoner deaths reported by the District of Columbia in 2001. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the Federal Bureau of Prisons.

[g]Prisons and jails form one integrated system. Counts include deaths only in state-operated prisons and jails and exclude deaths in 14 locally operated jails.

[h]Prisons and jails form one integrated system. Data include total jail and prison population.

[i]In 2016, Louisiana held 57.8% of its prison population in local jails. Since the calculation of mortality rates is based on the custody populations, which exclude prisoners held in local jails, the mortality rates for Louisiana prisoners will be high, because the prisoners held in jails are generally healthier according to the Louisiana Department of Corrections.

Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001-2016, and National Prisoner Statistics, 2001-2016; and Federal Bureau of Prisons, 2001-2016.

# Methodology

### Data collection coverage

The Mortality in Correctional Institutions (MCI), formerly the Deaths in Custody Reporting Program (DCRP), is an annual Bureau of Justice Statistics (BJS) data collection. The MCI obtains national-, state-, and incident-level data on persons who died while in the physical custody of the 50 state departments of corrections (DOCs) or of the approximately 2,800 local jail jurisdictions with adult populations nationwide. This methodology pertains to the prison portion of the MCI collection only. See *Mortality in Local Jails, 2000-2016 – Statistical Tables* (NCJ 251921, BJS, February 2020) for the methodology on deaths in local jails.

The DCRP began in 2000 in response to the Death in Custody Reporting Act of 2000 (P.L. 106-297) and was the only national statistical collection providing comprehensive information about deaths in adult correctional facilities. Starting in 2001, BJS has annually collected data directly from state prison systems, maintaining a 100% response rate. BJS uses these data to track national trends in the number and causes or manners of deaths occurring in state prisons. Until 2015, the Federal Bureau of Prisons (BOP) submitted aggregate counts of the number of male and female deaths to BJS, by cause of death. The BOP started reporting decedent-level data to BJS in 2015, including individual demographic and criminal-justice characteristics. In 2017, BJS changed the name from the DCRP to MCI to more accurately describe the data collection.

Mortality data measured by the MCI include the location and type of facility where the prisoner died, decedent characteristics (sex, race or ethnicity, and age), admission date, conviction status, and admission offense. The MCI also collects data on the circumstances surrounding the death (the cause, time, and location of death), whether an autopsy was conducted, and the availability of autopsy results to the respondent. Data on executions are excluded from this report but are accessible on the BJS website.[1] Statistics for 2001 to 2016 presented in this report are current as of October 30, 2019.

For more information on mortality in correctional settings, see—

- *Assessing Inmate Cause of Death: Deaths in Custody Reporting Program and National Death Index* (NCJ 249568, BJS, April 2016)

- *Mortality in Local Jails, 2000-2014 – Statistical Tables* (NCJ 250169, BJS, December 2016)

- *Mortality in State Prisons, 2001-2014 – Statistical Tables* (NCJ 250150, BJS, December 2016)

- *Suicide and Homicide in State Prisons and Local Jails* (NCJ 210036, BJS, August 2005).

The MCI instruments for collecting data from state prisons are administered annually to state DOCs. Respondents provide an aggregate count of the number of deaths that occurred during the referenced calendar year (NPS-4) and provide forms describing individual deaths (NPS-4A). The prison survey instruments are available on the BJS website. Respondents can submit individual records on decedents at any time during a collection cycle through a BJS web-based collection system. The BOP submits federal prison data directly to BJS.

### Determining eligibility for reporting to the Mortality in Correctional Institutions

In the MCI, custody refers to the physical holding of a person in a facility or to the period during which a correctional authority maintains a chain of custody over a prisoner. For instance, if a prison transports an ill prisoner to a hospital for medical services and that prisoner dies while in the chain of custody of the prison, then that death is counted as a death in custody. A death that occurs when a prisoner is not in the custody of a correctional authority is considered beyond the scope of the MCI. Deaths were considered out-of-scope for prisoners who were on escape status or under the supervision of community corrections, such as on probation, parole, or home-electronic monitoring. For state prisons responding to the survey, prisoners in physical custody include those held in any private prison facility under contract to the responding states' DOCs or in any of their state-operated facilities, such as halfway houses, prison camps or farms, training or treatment centers, and prison hospitals. BOP data submitted to the MCI exclude deaths of federal prisoners that occurred in privately operated facilities.

State and federal prison officials were asked to exclude deaths of prisoners serving sentences in the custody of local jails while under the jurisdiction of the state or federal DOCs. The MCI obtains information about such deaths through the jail reports.

---

[1]See *Capital Punishment, 2017: Selected Findings* (NCJ 253060, BJS, July 2019).

## Identifying and excluding duplicate records

Duplicate and out-of-scope records are excluded from analysis in this report. Duplicate death records may occur in the MCI due to overlapping correctional populations or overlapping duties within correctional facilities. For example, a state prison system may report the death of a prisoner who was transferred to a local jail while serving a prison sentence. This death would be counted by the local jail that had custody of the prisoner at the time of death. The duplicate record from the prison would be deleted.

To identify duplicate records, BJS reconciles the aggregate summary counts of deaths that occurred during a calendar year with the number of individual records of death that were obtained from a reporting prison system. When discrepancies are identified, reporting prison systems are contacted for clarification.

## Information on cause of death

MCI respondents are instructed to report on the cause of death as determined by autopsy or another official medical investigation. For this collection, deaths due to intoxication, accidents, suicides, and homicides are considered discrete causes of death. Although the manner and cause of death are distinct from one another, no such distinction is made in the MCI. When reporting a death due to illness, accident, suicide, intoxication, or homicide, BJS requests that respondents describe the events surrounding these deaths. Clinical-data specialists convert text entries that describe illness-related deaths into standard medical codes from the World Health Organization's International Statistical Classification of Diseases and Related Health Problems, Tenth Revision (ICD-10).

Homicides include all types of intentional homicide and involuntary manslaughter as determined by a medical examiner or pathologist at autopsy. Homicide counts include legal-intervention homicides committed while the prisoner was trying to escape. Homicides also encompass cases that are ruled a homicide at autopsy when events that led to the death occurred prior to incarceration, such as a prisoner who was shot outside of custody and who later died from complications of the gunshot wound while in custody.

## Other BJS sources of correctional mortality data

BJS collects other data reported to the MCI on prisoner mortality. These other collections include—

- Capital Punishment, which provides data on legal executions. Additional details on executions are available on the BJS website.

- the National Prisoner Statistics (NPS) program, which collects counts of deaths by cause of death, including deaths due to execution; illness; AIDS and AIDS-related causes, such as HIV; suicide; accident; or homicide. Detailed counts by cause of death were discontinued in 2007. The NPS currently collects a total count of deaths as a type of release from prison. After 2006, the BOP submitted counts of deaths by cause of death to the DCRP but discontinued submitting counts to the NPS. Additional details on the NPS are available on the BJS website.

## Reported statistics

Mortality data in this report include the number of deaths and mortality rates by year, the cause of death, selected descriptive characteristics, and the state where the death occurred.

Mortality rates are calculated per 100,000 prisoners, with the denominators providing estimates of the number of person-years of exposure in custody in institutional corrections. The mortality rate for state or federal prisoners is calculated as the number of deaths per year divided by the December 31 population of state or federal prisoners in custody, with the resulting quotient multiplied by 100,000. The population of state prisoners used in rate calculations includes prisoners held in privately operated facilities, while the population in federal prisons does not. To improve comparability between years, this report includes mortality rates of state prisons that were re-estimated for prior years using updated year-end custody populations, including privately operated facilities.

Data on the source of the denominator allow annual mortality rates to be calculated separately by group or characteristic. The National Center for Health Statistics (NCHS) calculates crude mortality rates as the number of events for a period (such as one year), divided by the population estimate at the midpoint of the period. For statistics on mortality in the general population, the NCHS uses the midyear population as an approximation of the average population that is exposed to risk of death during any given year.[2]

---

[2]See Siegel, J. S., & Swanson, D. A. (Eds.). (2004). *The methods and materials of demography* (2nd ed., p. 269). San Diego, CA: Elsevier Academic Press.

The crude mortality rates that are reported in the MCI annual statistical tables use a year-end, rather than midyear, population for the denominator. The composition of the general population (sex, race or ethnicity, and age) differs from the population in state and federal prisons, which in turn differs from the population in local jails.

### Estimating population characteristics of prisoners to calculate mortality rates by demographic subgroups

Age and sex distributions of the state prison population are estimated using the NPS and National Corrections Reporting Program (NCRP) collections. Rates for race or ethnicity are also derived from these collections, and they have been updated from previous years and will not match previously reported rates. Race or ethnicity reported in the NPS and NCRP come from administrative records of prisoners and may not reflect self-reporting by prisoners. Distributions of race or ethnicity were adjusted to reflect statistics that were reported in BJS's prisoner surveys. Previously, distributions of race or ethnicity were derived from BJS's 2004 Survey of Inmates in State and Federal Correctional Facilities. In 2017, BJS updated estimates of prisoners' race or ethnicity using new data from the 2016 Survey of Prison Inmates. Annual distributions of race or ethnicity were weighted by the number of years from the most recent prisoner survey (2004 or 2016). For complete details on the methodology used to estimate distributions of race or ethnicity, see *Prisoners in 2016* (NCJ 251149, BJS, January 2018).

### Rolling averages

Rolling averages were computed to examine trends for certain causes of death in prisons while smoothing short-term fluctuations. Data were divided into 10 overlapping 3-year periods spanning 12 years. The rolling averages in this report describe some changes in cause-specific mortality rates over time, such as whether the overall rise in the mortality rate for cancer was steady, or the increase in unnatural deaths was recent. Rolling averages were not computed for all causes of death in custody due to small cell-sizes.

### Interpreting rates among small populations

MCI data on deaths in state prisons are not subject to sampling error because the data represent a full enumeration of deaths. However, according to Brillinger and NCHS, mortality data from a complete enumeration may be subject to random error because "the number of deaths that actually occurred may be considered as one of a large series of possible results that could have arisen under the same set of circumstances."[3,4] The random variation can be large when the number of deaths is small. Therefore, caution is warranted when interpreting statistics that are based on small numbers of deaths.

Continuing to use the NCHS and Brillinger methods, BJS quantified random variation by assuming that the appropriate underlying probability distribution for the number of deaths was a Poisson distribution. This provided a simple and reasonable approach for estimating variances in mortality statistics when the probability of dying is low. Variances were calculated based on the assumption of a Poisson process. From these variances, estimates of relative random error were calculated. These estimates are comparable to the relative standard error because the relative random error is the ratio of random error derived from the Poisson variance to the number of deaths. Following NCHS practice, when the relative random error exceeded 30%, estimated mortality rates were flagged with an "!" symbol to show the instability of the rate. (Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.)

---

[3]See Brillinger, D. R. (1986). The natural variability of vital rates and associated statistics. *Biometrics, 42*(4), 693-734.

[4]See Xu, J., Kochanek, K. D., Murphy, S. L., & Tejada-Vera, B. (2010). *Deaths: Final data for 2007* (National Vital Statistics Reports, Vol. 58, No. 19). Hyattsville, MD: National Center for Health Statistics. Retrieved from https://www.cdc.gov/nchs/data/nvsr/nvsr58/nvsr58_19.pdf

**APPENDIX TABLE 1**
**Estimated number of state and federal prisoners in custody, by prisoner characteristics, 2001 and 2006-2016**

| Characteristic | Custody population, 2001-2016 | 2001 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | 22,869,200 | 1,322,600 | 1,460,300 | 1,482,100 | 1,489,800 | 1,490,600 | 1,487,500 | 1,466,400 | 1,443,500 | 1,444,100 | 1,439,200 | 1,405,800 | 1,382,900 |
| **Federal**[a] | 2,600,100 | 137,100 | 163,100 | 166,000 | 165,300 | 171,000 | 173,100 | 176,200 | 176,500 | 173,800 | 169,500 | 160,700 | 154,200 |
| **State**[b] | 20,269,100 | 1,185,500 | 1,297,200 | 1,316,100 | 1,324,500 | 1,319,600 | 1,314,400 | 1,290,200 | 1,267,000 | 1,270,300 | 1,269,700 | 1,245,100 | 1,228,700 |
| Sex | | | | | | | | | | | | | |
| Male | 18,860,000 | 1,109,400 | 1,205,100 | 1,222,500 | 1,230,600 | 1,227,500 | 1,222,900 | 1,201,100 | 1,180,600 | 1,181,500 | 1,179,400 | 1,156,000 | 1,139,900 |
| Female | 1,409,100 | 76,100 | 92,200 | 93,600 | 93,900 | 92,100 | 91,500 | 89,100 | 86,400 | 88,800 | 90,300 | 89,100 | 88,800 |
| Race/ethnicity | | | | | | | | | | | | | |
| White[c] | 6,670,600 | 387,900 | 475,000 | 441,600 | 441,100 | 430,400 | 424,700 | 414,600 | 407,800 | 406,100 | 406,300 | 396,100 | 385,400 |
| Black[c] | 7,584,200 | 495,400 | 523,300 | 502,700 | 502,800 | 493,200 | 481,800 | 467,900 | 454,600 | 448,200 | 437,000 | 421,000 | 409,600 |
| Hispanic | 4,179,400 | 232,200 | 189,900 | 277,200 | 272,400 | 277,400 | 278,600 | 270,900 | 260,900 | 262,100 | 261,800 | 258,300 | 266,100 |
| Other[c,d] | 1,834,900 | 70,000 | 33,700 | 94,600 | 108,300 | 118,600 | 129,300 | 136,800 | 143,700 | 153,900 | 164,700 | 169,600 | 167,600 |
| Age | | | | | | | | | | | | | |
| 17 or younger | 31,600 | 2,900 | 2,800 | 2,400 | 2,600 | 2,500 | 2,100 | 1,800 | 1,400 | 1,100 | 1,000 | 900 | 800 |
| 18-24 | 3,030,100 | 218,000 | 227,500 | 196,700 | 197,900 | 198,700 | 196,000 | 189,100 | 180,400 | 173,700 | 161,300 | 145,500 | 134,800 |
| 25-34 | 6,712,900 | 401,700 | 429,500 | 437,700 | 439,200 | 437,300 | 434,800 | 424,400 | 413,800 | 415,300 | 417,700 | 407,700 | 400,000 |
| 35-44 | 5,534,900 | 362,000 | 384,500 | 366,600 | 356,600 | 343,700 | 334,200 | 324,100 | 318,200 | 320,500 | 323,700 | 322,500 | 322,600 |
| 45-54 | 3,475,200 | 153,000 | 185,600 | 232,200 | 240,600 | 243,500 | 245,600 | 242,300 | 238,000 | 236,500 | 235,000 | 229,400 | 224,900 |
| 55 or older | 1,484,400 | 47,800 | 60,400 | 80,400 | 87,600 | 93,900 | 101,700 | 108,500 | 115,300 | 123,100 | 131,100 | 139,100 | 145,600 |

Note: Data rounded to the nearest 100. Data may have been revised from previously published statistics. State data include prisoners in the custody of state correctional facilities, including private prison facilities. Federal data include prisoners in the custody of federal prisons, excluding private federal facilities. All populations are based on a custody count as of December 31.
[a]Excludes prisoners in private federal facilities.
[b]Includes prisoners in private state facilities.
[c]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[d]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001-2016, National Prisoner Statistics, 2001-2016, Survey of Inmates in State and Federal Correctional Facilities, 2004, and Survey of Prison Inmates, 2016; and Federal Bureau of Prisons, 2001-2016.

**APPENDIX TABLE 2**
**Illness mortality rate per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)**

| Characteristic | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 223 | 225 | 228 | 226 | 226 | 227 | 236 | 238 | 247 | 252 |
| **Sex** | | | | | | | | | | |
| Male | 230 | 231 | 235 | 232 | 233 | 235 | 243 | 246 | 255 | 261 |
| Female | 133 | 136 | 144 | 137 | 132 | 122 | 132 | 133 | 143 | 142 |
| **Race/ethnicity** | | | | | | | | | | |
| White[a] | 325 | 337 | 353 | 357 | 372 | 381 | 403 | 404 | 425 | 439 |
| Black[a] | 217 | 213 | 218 | 216 | 215 | 213 | 217 | 225 | 236 | 248 |
| Hispanic | 115 | 122 | 119 | 115 | 107 | 110 | 116 | 120 | 120 | 115 |
| Other[a,b] | 48 | 49 | 46 | 42 | 35 | 36 | 36 | 39 | 38 | 37 |
| **Age** | | | | | | | | | | |
| 17 or younger | 14 ! | 27 ! | 13 ! | 41 ! | 47 ! | 56 ! | 23 ! | 29 ! | 33 ! | 73 ! |
| 18-24 | 13 | 14 | 15 | 15 | 14 | 14 | 15 | 15 | 16 | 14 |
| 25-34 | 32 | 29 | 26 | 25 | 25 | 24 | 24 | 23 | 24 | 24 |
| 35-44 | 120 | 110 | 107 | 99 | 94 | 86 | 81 | 75 | 71 | 70 |
| 45-54 | 435 | 416 | 397 | 382 | 364 | 346 | 338 | 324 | 315 | 298 |
| 55 or older | 1,791 | 1,777 | 1,765 | 1,658 | 1,598 | 1,558 | 1,567 | 1,538 | 1,544 | 1,528 |

Note: Based on 3-year rolling averages. Labels show the most recent year only (for example, 2005-07 is shown as 2007). Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. See *Methodology*. Includes deaths in private state facilities.
! Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2007-2016; National Prisoner Statistics, 2007-2016; Survey of Inmates in State Correctional Facilities, 2004; and Survey of Prison Inmates, 2016.

**APPENDIX TABLE 3**
**Cancer mortality rate per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)**

| Characteristic | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 62 | 63 | 67 | 71 | 75 | 77 | 81 | 82 | 85 | 88 |
| **Sex** | | | | | | | | | | |
| Male | 64 | 65 | 70 | 73 | 77 | 79 | 84 | 85 | 88 | 91 |
| Female | 31 | 33 | 35 | 40 | 48 | 44 | 45 | 43 | 51 | 53 |
| **Race/ethnicity** | | | | | | | | | | |
| White[a] | 97 | 103 | 114 | 119 | 130 | 134 | 146 | 144 | 149 | 154 |
| Black[a] | 58 | 58 | 62 | 66 | 68 | 71 | 75 | 79 | 83 | 89 |
| Hispanic | 23 | 24 | 23 | 28 | 30 | 31 | 32 | 34 | 36 | 38 |
| Other[a,b] | 15 | 15 | 13 | 15 | 11 | 12 | 11 | 11 | 11 | 10 |
| **Age** | | | | | | | | | | |
| 17 or younger | 0 | 14 ! | 13 ! | 14 ! | 16 ! | 19 ! | 23 ! | 0 | 0 | 37 ! |
| 18-24 | 2 ! | 1 ! | 2 ! | 3 | 4 | 4 | 3 | 2 | 2 ! | 2 ! |
| 25-34 | 5 | 4 | 4 | 4 | 5 | 5 | 6 | 5 | 6 | 6 |
| 35-44 | 22 | 22 | 20 | 22 | 21 | 21 | 22 | 22 | 21 | 19 |
| 45-54 | 119 | 113 | 115 | 117 | 118 | 113 | 116 | 114 | 113 | 104 |
| 55 or older | 580 | 577 | 592 | 584 | 584 | 573 | 572 | 552 | 549 | 556 |

Note: Based on 3-year rolling averages. Labels show the most recent year only (for example, 2005-07 is shown as 2007). Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. See *Methodology*. Includes deaths in private state facilities.
! Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2007-2016; National Prisoner Statistics, 2007-2016; Survey of Inmates in State Correctional Facilities, 2004; and Survey of Prison Inmates, 2016.

**APPENDIX TABLE 4**
**Heart-disease mortality rate per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)**

| Characteristic | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 65 | 64 | 64 | 64 | 65 | 64 | 67 | 68 | 73 | 77 |
| **Sex** | | | | | | | | | | |
| Male | 68 | 67 | 66 | 66 | 67 | 67 | 69 | 71 | 76 | 81 |
| Female | 32 | 33 | 36 | 30 | 29 | 27 | 31 | 31 | 35 | 37 |
| **Race/ethnicity** | | | | | | | | | | |
| White[a] | 98 | 99 | 99 | 101 | 107 | 107 | 114 | 116 | 126 | 136 |
| Black[a] | 65 | 62 | 63 | 64 | 65 | 66 | 67 | 69 | 76 | 82 |
| Hispanic | 27 | 30 | 29 | 28 | 25 | 23 | 24 | 23 | 25 | 25 |
| Other[a,b] | 12 | 12 | 12 | 9 | 7 | 9 | 11 | 13 | 12 | 11 |
| **Age** | | | | | | | | | | |
| 17 or younger | 0 | 0 | 0 | 14! | 16! | 19! | 0 | 29! | 33! | 37! |
| 18-24 | 5 | 4 | 4 | 4 | 4 | 3 | 5 | 5 | 7 | 5 |
| 25-34 | 10 | 8 | 8 | 8 | 8 | 7 | 7 | 8 | 9 | 10 |
| 35-44 | 34 | 31 | 31 | 32 | 33 | 30 | 28 | 25 | 23 | 24 |
| 45-54 | 112 | 106 | 98 | 94 | 90 | 86 | 82 | 79 | 81 | 82 |
| 55 or older | 572 | 550 | 525 | 487 | 468 | 448 | 455 | 448 | 466 | 470 |

Note: Based on 3-year rolling averages. Labels show the most recent year only (for example, 2005-07 is shown as 2007). Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. See *Methodology*. Includes deaths in private state facilities.
! Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2007-2016; National Prisoner Statistics, 2007-2016; Survey of Inmates in State Correctional Facilities, 2004; and Survey of Prison Inmates, 2016.

**APPENDIX TABLE 5**
**Liver-disease mortality rate per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)**

| Characteristic | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 24 | 24 | 24 | 24 | 24 | 24 | 26 | 26 | 26 | 23 |
| **Sex** | | | | | | | | | | |
| Male | 25 | 25 | 25 | 25 | 26 | 25 | 27 | 26 | 26 | 24 |
| Female | 12 | 10 | 10 | 10 | 9 | 9 | 13 | 14 | 16 | 13 |
| **Race/ethnicity** | | | | | | | | | | |
| White[a] | 37 | 37 | 40 | 42 | 44 | 44 | 47 | 46 | 46 | 44 |
| Black[a] | 15 | 14 | 14 | 14 | 15 | 14 | 15 | 14 | 15 | 14 |
| Hispanic | 25 | 25 | 24 | 21 | 19 | 20 | 23 | 25 | 25 | 19 |
| Other[a,b] | 10 | 8 | 8 | 5 | 5 | 5 | 6 | 5 | 5 | 5 |
| **Age** | | | | | | | | | | |
| 17 or younger | 0 | 0 | 0 | 14! | 16! | 19! | 0 | 0 | 0 | 0 |
| 18-24 | 1! | 1! | 1! | 1! | 1! | <1! | <1! | 1! | 1! | 1! |
| 25-34 | 1 | 1! | 1 | 1 | 1 | 1 | 1! | 1 | 1! | 1! |
| 35-44 | 11 | 11 | 11 | 9 | 10 | 7 | 7 | 5 | 5 | 5 |
| 45-54 | 75 | 69 | 67 | 63 | 58 | 53 | 54 | 50 | 47 | 41 |
| 55 or older | 137 | 136 | 136 | 129 | 137 | 139 | 156 | 150 | 146 | 125 |

Note: Based on 3-year rolling averages. Labels show the most recent year only (for example, 2005-07 is shown as 2007). Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. See *Methodology*. Includes deaths in private state facilities.
! Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2007-2016; National Prisoner Statistics, 2007-2016; Survey of Inmates in State Correctional Facilities, 2004; and Survey of Prison Inmates, 2016.

**APPENDIX TABLE 6**
**Respiratory-disease mortality rate per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)**

| Characteristic | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 16 | 17 | 17 | 17 | 16 | 17 | 16 | 17 | 18 | 19 |
| **Sex** | | | | | | | | | | |
| Male | 16 | 17 | 17 | 17 | 16 | 17 | 17 | 18 | 19 | 19 |
| Female | 15 | 16 | 14 | 12 | 10 | 7 | 10 | 9 | 10 | 11 |
| **Race/ethnicity** | | | | | | | | | | |
| White[a] | 25 | 28 | 28 | 28 | 29 | 31 | 32 | 32 | 34 | 36 |
| Black[a] | 15 | 14 | 14 | 15 | 13 | 13 | 12 | 14 | 15 | 16 |
| Hispanic | 7 | 8 | 8 | 9 | 7 | 7 | 7 | 8 | 8 | 9 |
| Other[a,b] | 1 ! | 1 ! | 1 ! | 1 ! | 1 ! | 2 ! | 3 | 3 | 3 | 3 |
| **Age** | | | | | | | | | | |
| 17 or younger | 14 ! | 14 ! | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18-24 | 2 | 3 | 2 | 2 | 1 ! | 2 ! | 2 ! | 2 ! | 2 ! | 1 ! |
| 25-34 | 3 | 3 | 3 | 3 | 2 | 3 | 3 | 3 | 2 | 2 |
| 35-44 | 9 | 8 | 8 | 7 | 6 | 5 | 4 | 4 | 4 | 4 |
| 45-54 | 22 | 23 | 21 | 21 | 20 | 19 | 18 | 16 | 16 | 16 |
| 55 or older | 144 | 143 | 140 | 137 | 121 | 127 | 120 | 125 | 126 | 126 |

Note: Based on 3-year rolling averages. Labels show the most recent year only (for example, 2005-07 is shown as 2007). Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. See *Methodology*. Includes deaths in private state facilities.
! Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2007-2016; National Prisoner Statistics, 2007-2016; Survey of Inmates in State Correctional Facilities, 2004; and Survey of Prison Inmates, 2016.

**APPENDIX TABLE 7**
**Mortality rate due to all other illnesses per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)**

| Characteristic | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 45 | 48 | 48 | 44 | 41 | 40 | 40 | 40 | 40 | 41 |
| **Sex** | | | | | | | | | | |
| Male | 46 | 49 | 49 | 44 | 42 | 41 | 41 | 41 | 41 | 42 |
| Female | 34 | 36 | 39 | 39 | 32 | 31 | 30 | 32 | 29 | 26 |
| **Race/ethnicity** | | | | | | | | | | |
| White[a] | 61 | 65 | 67 | 61 | 59 | 60 | 61 | 61 | 65 | 66 |
| Black[a] | 46 | 48 | 50 | 45 | 43 | 41 | 40 | 40 | 40 | 41 |
| Hispanic | 28 | 32 | 30 | 27 | 24 | 26 | 27 | 28 | 25 | 24 |
| Other[a,b] | 9 | 12 | 12 | 10 | 9 | 7 | 6 | 6 | 6 | 8 |
| **Age** | | | | | | | | | | |
| 17 or younger | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18-24 | 4 | 4 | 5 | 4 | 4 | 5 | 4 | 4 | 4 | 4 |
| 25-34 | 9 | 9 | 9 | 7 | 7 | 6 | 6 | 5 | 5 | 5 |
| 35-44 | 29 | 28 | 28 | 22 | 19 | 17 | 16 | 14 | 14 | 14 |
| 45-54 | 85 | 84 | 78 | 72 | 65 | 64 | 58 | 55 | 50 | 47 |
| 55 or older | 338 | 350 | 352 | 303 | 274 | 255 | 250 | 246 | 245 | 240 |

Note: Excludes cancer; heart, liver, and respiratory diseases; and AIDS-related illnesses. Based on 3-year rolling averages. Labels show the most recent year only (for example, 2005-07 is shown as 2007). Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. See *Methodology*. Includes deaths in private state facilities.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2007-2016; National Prisoner Statistics, 2007-2016; Survey of Inmates in State Correctional Facilities, 2004; and Survey of Prison Inmates, 2016.

**APPENDIX TABLE 8**
**Rate of unnatural deaths per 100,000 state prisoners within each demographic group, by decedent characteristics, 2007-2016 (3-year rolling averages)**

| Characteristic | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 27 | 26 | 25 | 26 | 27 | 28 | 29 | 31 | 32 | 36 |
| **Sex** | | | | | | | | | | |
| Male | 28 | 27 | 26 | 26 | 27 | 29 | 29 | 31 | 33 | 37 |
| Female | 14 | 15 | 15 | 16 | 18 | 18 | 17 | 20 | 22 | 23 |
| **Race/ethnicity** | | | | | | | | | | |
| White[a] | 43 | 43 | 44 | 44 | 47 | 49 | 50 | 53 | 57 | 63 |
| Black[a] | 16 | 15 | 15 | 16 | 16 | 18 | 18 | 20 | 22 | 26 |
| Hispanic | 23 | 21 | 19 | 20 | 20 | 21 | 23 | 25 | 25 | 26 |
| Other[a,b] | 14 | 13 | 10 | 11 | 11 | 11 | 10 | 10 | 11 | 12 |
| **Age** | | | | | | | | | | |
| 17 or younger | 29 ! | 41 ! | 40 ! | 41 ! | 31 ! | 38 ! | 23 ! | 29 ! | 33 ! | 37 ! |
| 18-24 | 21 | 18 | 19 | 19 | 18 | 19 | 19 | 22 | 24 | 30 |
| 25-34 | 23 | 23 | 22 | 23 | 23 | 23 | 24 | 26 | 29 | 30 |
| 35-44 | 29 | 27 | 26 | 26 | 29 | 30 | 31 | 30 | 33 | 38 |
| 45-54 | 32 | 30 | 30 | 30 | 32 | 33 | 32 | 35 | 36 | 39 |
| 55 or older | 38 | 40 | 36 | 38 | 39 | 46 | 46 | 51 | 46 | 47 |

Note: Unnatural deaths include deaths caused by suicide, accident, homicide, and drug or alcohol intoxication. Based on 3-year rolling averages. Labels show the most recent year only (for example, 2005-07 is shown as 2007). Mortality rates are based on the annual number of deaths and a one-day custody population on December 31. See *Methodology*. Includes deaths in private state facilities.
! Interpret with caution. Estimate is based on 10 or fewer cases, or coefficient of variation is greater than 50%.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes Asians, Native Hawaiians, Other Pacific Islanders, American Indians, Alaska Natives, or persons of two or more races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2007-2016; National Prisoner Statistics, 2007-2016; Survey of Inmates in State Correctional Facilities, 2004; and Survey of Prison Inmates, 2016.

**APPENDIX TABLE 9**
**Rates for figure 1: Mortality rate per 100,000 state and federal prisoners, 2001-2016**

| State/Federal | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Federal[a] | 220 | 232 | 227 | 208 | 244 | 201 | 222 | 241 | 220 | 224 | 220 | 198 | 230 | 262 | 283 | 252 |
| State[b] | 242 | 244 | 257 | 252 | 253 | 249 | 258 | 261 | 259 | 246 | 260 | 265 | 274 | 274 | 296 | 303 |

Note: Based on the annual number of deaths and the one-day custody population on December 31.
[a]Excludes deaths in private federal facilities.
[b]Includes deaths in private state facilities.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001-2016; and Federal Bureau of Prisons, 2001-2016.



The Bureau of Justice Statistics of the U.S. Department of Justice is the principal federal agency responsible for measuring crime, criminal victimization, criminal offenders, victims of crime, correlates of crime, and the operation of criminal and civil justice systems at the federal, state, tribal, and local levels. BJS collects, analyzes, and disseminates reliable statistics on crime and justice systems in the United States, supports improvements to state and local criminal justice information systems, and participates with national and international organizations to develop and recommend national standards for justice statistics. Jeffrey H. Anderson is the director.

This report was written by Mary P. Cowhig and E. Ann Carson. Scott Ginder and Amy Couzens of RTI International conducted statistical analyses. Jennifer Bronson, E. Ann Carson, and Stephanie Mueller verified the report.

Eric Hendrixson and Jill Thomas edited the report. Morgan Young produced the report.

February 2020, NCJ 251920





NCJ 251920

**Office of Justice Programs**
**Building Solutions • Supporting Communities • Advancing Justice**
**www.ojp.gov**

# Exhibit 46



# 25 People Released From Davidson County Jail in Anti-Outbreak Effort

Nashville's district attorney and public defender have agreements to release dozens more

BY STEVEN HALE — MAR 23, 2020 3 PM

A Nashville judge signed off on agreements to release 25 people from jail Monday, beginning the process of a system-wide effort to reduce the jail population in the face of the coronavirus pandemic.

Over the weekend, Davidson County District Attorney Glenn Funk and Metro Public Defender Martesha Johnson came to agreements on as many as 80 people for whom they would seek an early release. They were working from a list of 264 jailed individuals identified by Davidson County Sheriff Daron Hall as particularly vulnerable to the spreading illness.

People in jails and prisons face unique risks in the current crisis. They live in close quarters and are often denied the sort of hygienic and sanitary options that most Americans are turning to now.

"If an outbreak happens in the jail, it's gonna be devastating to some people in there," Johnson told the *Scene* on Friday. "They can't do social distancing."

Even in the best-case scenario, a jail is ripe for an outbreak of infectious disease. In Tennessee, the situation is made worse by county jails that are chronically overcrowded.

As of late last week, no one in Davidson County's jails or in Tennessee's prisons had been tested for the virus. Inmates in other county facilities have reportedly been tested but were found to not have the virus.

Funk tells the *Scene* that of the 25 people released from Davidson County custody on Monday, two of them had holds from other counties, meaning they'll have to be transported to jails in those locations. The rest, he says, had their sentences suspended and will be placed on probation.

Funk says the court will take up more cases on Wednesday and that the day in between is to allow the public defender's office to talk to clients and explain the restrictions that would be placed on them if they are released.

---

💬 **JOIN THE CONVERSATION!**

This site requires you to **login** or **register** to post a comment.

No comments have been added yet. Want to start the conversation?

# RELATED



**PITH IN THE WIND**
**Criminal Justice Orgs Ask Tennessee Supreme Court to Free Prisoners**

---



**PITH IN THE WIND**
**Gov. Lee Encourages Longer School Closures**

---

Case 4:01-cv-01351-JST   Document 3221-2   Filed 03/25/20   Page 245 of 249



**PITH IN THE WIND**

## Governor Adds New Structure to COVID-19 Response

# Exhibit 47



California Department of Corrections and Rehabilitation

# OFFENDER DATA POINTS

OFFENDER DEMOGRAPHICS FOR THE 24-MONTH PERIOD ENDING DECEMBER 2018

**Division of Correctional Policy Research and Internal Oversight**

OFFICE OF RESEARCH | PUBLISHED JANUARY 2020



# Offender Demographics

The Mission of the California Department of Corrections and Rehabilitation's Office of Research:
"To inform public policy by analyzing correctional trends, developing population projections,
guiding research projects and publishing Department reports."

Ralph Diaz, Secretary
Jeff Macomber, Undersecretary
Guillermo Viera Rosa, Director
Julie Basco, Deputy Director
Chris Chambers, Associate Director
Amber Lozano, Chief

 

Produced by:

Ashley Gabbard, Staff Services Manager II
Krista Christian, Research Data Specialist II
Shelley Buttler, Research Data Specialist I
John Yessen, Research Data Specialist I
Michael Keeling, Research Data Analyst II
Yvonne Lawrence, Research Data Analyst II

You can request reports by visiting the California Department of Corrections and Rehabilitation's Office of Research
Website: https://www.cdcr.ca.gov/research/

Data Sources:

Adult data is from the Offender Based Information System and Strategic Offender Management System
Mental Health data is from the Strategic Offender Management System and Health Care Placement Oversight Program
Youth data is from the Offender Based Information Tracking System

This report would not have been possible without the generous support of others. Specifically, we would like to thank
Chanya Bruno, David Campbell, Kendra Jensen, Miguel Lizarde, and Sam Mooc from the Office of Research for providing
their assistance in the production of this Offender Data Points report.

**Offender Demographics**

**Table 4.3:  Releases from State Prison by Type**

| Releases from State Prison | 01/01/2017 to 12/31/2017 Total | 01/01/2017 to 12/31/2017 Rate | 01/01/2018 to 12/31/2018 Total | 01/01/2018 to 12/31/2018 Rate | 12 Month Change |
|---|---|---|---|---|---|
| Releases to Parole[1] | 18,200 | 49.3% | 19,048 | 49.6% | + 4.7% |
| Releases to Post Release Community Supervision[2] | 17,422 | 47.2% | 18,058 | 47.0% | + 3.7% |
| Death | 394 | 1.1% | 467 | 1.2% | + 18.5% |
| Other Releases and Discharges[3] | 887 | 2.4% | 831 | 2.2% | - 6.3% |
| Full Pardon | 1 | 0.0% | 0 | 0.0% | - 100.0% |
| Total Releases | 36,904 | 100.0% | 38,404 | 100.0% | + 4.1% |

[1] Offenders with a current serious or violent offense, third strikers, lifers, high risk sex registrants as defined by California Department of Corrections and Rehabilitation, sexually violent predators, and mentally disordered offenders are released to state parole.

[2] Offenders with current non violent, non serious offenses, and non high risk sex registrants are released to Post Release Community Supervision.

[3] Some examples of the "Other Releases or Discharges" category include discharges of county contract boarders, discharges from sentence, and releases after erroneous admission.

**Figure 4.3:  Graph of Releases from State Prison by Type**

