XAVIER BECERRA
Attorney General of the State of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON C. MCCLAIN
ADRIANO HRVATIN
Supervising Deputy Attorneys General
NASSTARAN RUHPARWAR - 263293
ELISE OWENS THORN - 145931
TYLER V. HEATH - 271478
KYLE A. LEWIS - 201041
LUCAS HENNES - 278361
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone:  (415) 703-5500
Facsimile:  (415) 703-5843
Email:   Nasstaran.Ruhparwar@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
KAYLEN KADOTANI - 294114
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:     (415) 777-3200
Facsimile:     (415) 541-9366
pmello@hansonbridgett.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et. al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. 2:90-cv-00520-KJM-DB<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. C01-1351 JST<br><br>**THREE-JUDGE COURT**<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION TO MODIFY POPULATION REDUCTION ORDER**<br><br>Date:     April 2, 2020<br>Time:     1:15 p.m. |

Case Nos. 2:90-cv-00520-KJM-DB, C01-1351 JST
DEFS.' OPP'N TO PLTFS.' EMERGENCY MOT. TO MODIFY POPULATION REDUCTION ORDER

16431778.2

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................... 1

I.      PROCEDURAL HISTORY ........................................................................................... 3

II.     THE COURT MUST GIVE DEFERENCE TO THE EXECUTIVE BRANCH
        AND STATE PRISON OFFICIALS IN THEIR RESPONSE TO THE COVID-19
        PANDEMIC. ................................................................................................................... 5

III.    PLAINTIFFS DO NOT MEET THEIR BURDEN FOR A PRISONER RELEASE
        ORDER UNDER THE PLRA .......................................................................................... 10

        A.      Plaintiffs Do Not Allege—and Cannot Establish—that Defendants are
                Deliberately Indifferent to the Risk Posed by COVID-19. .................................... 11

                1.      *Defendants Concede COVID-19 Presents An Objectively Serious
                        Risk of Harm.* ........................................................................................ 12

                2.      *Defendants Are Taking Drastic, Reasonable Action To Address The
                        Pandemic.* ............................................................................................. 12

        B.      Plaintiffs' Motion Further Fails The PLRA's Needs-Narrowness-
                Intrusiveness Test. ................................................................................................. 20

        C.      This Court Must Give Substantial Consideration To The Adverse Impact A
                Release Order Would Have On Public Safety, Including Hospitals And
                Community Health Systems That Are Already Over-Stressed By COVID-
                19. ........................................................................................................................... 22

                1.      *Plaintiffs Ignore The Risk And Burden To Public Safety That A
                        Release Order Would Have On Communities Amidst The COVID-19
                        Pandemic.* ............................................................................................. 22

                2.      *Early Release Without Sufficient Prerelease Planning Could
                        Jeopardize Public Safety And Inmates' Success Upon Release.* .......... 24

                3.      *Plaintiffs And Their Expert Improperly Assess Risk To Public Safety.* ... 27

        D.      Neither the *Plata* Nor The *Coleman* Court Has Issued An Order For Less
                Intrusive Relief That Has Failed To Remedy The Deprivation Of Plaintiffs'
                Right At Issue: To Be Free From A Heightened Risk Of Contracting
                COVID-19. ............................................................................................................... 28

IV.     PLAINTIFFS' MOTION PRESENTS A REQUEST FOR A NEW PRISONER
        RELEASE ORDER, NOT MODIFICATION UNDER RULE 60(B)(5). ......................... 30

CONCLUSION ...................................................................................................................... 33

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Brown v. Plata,*
    563 U.S. 493 (2011) ........................................................................................ 4, 5, 11, 22

5

6

*Coleman v. Newsom,*
    No. 2:90-cv-0520 KJM DB ..........................................................................................*passim*

7

*Coleman v. Schwarzenegger,*
    No. CIV S-90-0520 LKK JFM, 2007 WL 2122G36 (E.D. Cal. July 23, 2007) ...................... 3

8

9

*Coleman v. Schwarzenegger/Plata v. Schwarzenegger,*
    922 F. Supp. 2d 882 (E.D. Cal., N.D. Cal. Aug. 4, 2009) .................................................. 3, 4

10

11

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ............................................................................... 11, 12, 19

12

*Gates v. Rowland,*
    39 F.3d 1439 (9th Cir. 1994) ............................................................................. 6

13

14

*Griffin v. Gomez,*
    741 F.3d 10 (9th Cir. 2014) .............................................................................. 6

15

*Helling v. McKinney,*
    509 U.S. 25 (1993) ............................................................................................ 12

16

17

*Loving v. United States,*
    517 U.S. 748 (1996) .......................................................................................... 9

18

19

*Michenfelder v. Sumner,*
    860 F.2d 328 (9th Cir. 1988) ........................................................................... 6

20

21

*N.Y. State Ass'n for Retarded Children, Inc. v. Carey,*
    706 F.2d 956 (2d Cir. 1983) ........................................................................... 32

22

*O'Lone v. Estate of Shabazz,*
    482 U.S. 342 (1987) .......................................................................................... 6

23

24

*Plata v. Newsom,*
    No. 01-cv-1351-JST (N.D. Cal.) ..............................................................*passim*

25

26

*Plata v. Schwarzenegger,*
    No. CO1-1351 TEH, 2007 WL 2122657 (N.D. Cal. July 23, 2007) ........................ 3

27

28

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOT. TO MODIFY POPULATION REDUCTION ORDER

*Procunier v. Martinez*,
  416 U.S. 396 (1974) [overruled on other grounds in *Thornburgh v. Abbott*, 490
  U.S. 401 (1989)] ............................................................................................................... 6

*Rufo v. Inmates of Suffolk Cty. Jail*,
  502 U.S. 367 (1992) ......................................................................................................... 32

*Sandin v. Conner*,
  515 U.S. 472 (1995) ........................................................................................................... 6

*Sharp v. Weston*,
  233 F.3d 1166 (9th Cir. 2000) ......................................................................................... 32

*Spain v. Procunier*,
  600 F.2d 189 (9th Cir. 1979) ........................................................................................... 12

*Turner v. Safley*,
  482 U.S. 78 (1987) .............................................................................................................. 6

*U.S. v. United Shoe Machinery Corp.*,
  391 U.S. 244 (1968) ..................................................................................................... 32, 33

*Wilson v. Seiter*,
  501 U.S. 294 (1991) ........................................................................................................... 11

**Statutes**

18 U.S.C.
  § 3626(a)(1)(A) ......................................................................................................... *passim*
  § 3626(a)(2) ....................................................................................................................... 22
  § 3626(a)(3) ......................................................................................................................... 3
  § 3626(a)(3)(A) ..................................................................................................... 28, 29, 30
  § 3626(a)(3)(A)(i) .............................................................................................................. 31
  § 3626(a)(3)(B)-(C) ........................................................................................................... 30
  § 3626(a)(3)(E) ............................................................................................................. 4, 30

Cal. Gov't Code
  § 8571 ................................................................................................................................... 7
  § 8627 ................................................................................................................................... 7
  § 8658 ........................................................................................................................... *passim*

Cal. Penal Code
  § 290 ................................................................................................................................... 13
  § 667.5(c) ........................................................................................................................... 13

Prison Litigation Reform Act .............................................................................................. *passim*

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOT. TO MODIFY POPULATION REDUCTION ORDER

16431778.2

**Other Authorities**

Executive Order
    N-33-20 ........................................................................................................................ 8
    N-36-20 .................................................................................................................... 8, 13

Fed. R. Civ. P. 60(b)(5) ...................................................................................... 30, 31, 32, 33

# INTRODUCTION

These are unprecedented times.  While Californians are sheltering in place in response to a pandemic caused by the novel coronavirus, COVID-19, our elected officials, public officials, and public agencies simultaneously grapple with how to effectively confront the extraordinary challenges imposed on us all as a result of this pandemic.  California is not alone.  Indeed, leaders around the world struggle to address this crisis and slow the spread of this pandemic.

Defendants share many of the concerns expressed in Plaintiffs' Emergency Motion to Modify Population Reduction Order (Motion) relating to the potential impact COVID-19 could have on the California Department of Corrections and Rehabilitation's (CDCR) inmates, staff, and volunteers.  It is for this reason that the State of California has taken the following extraordinary and unprecedented protective measures (among many others described in greater detail, *infra*, and in the declarations filed in support of Defendants' Opposition to Plaintiffs' Motion) designed to slow the spread of COVID-19 and protect the health and well-being of those who live and work in CDCR's 35 adult institutions:

- CDCR has temporarily suspended all intake from county jails, which, absent any other measures, would result in a net population reduction of about 3,000 inmates in 30 days due to normal attrition;

- CDCR will transition to parole up to approximately 3,500 non-violent male and female inmates who are within 60 days of their release date, within the next several weeks;

- Approximately 480-530 inmates living in dorms will be transferred to other prisons with unoccupied buildings or space available; and

- CDCR has temporarily suspended all visitation by the public, while providing for alternative free methods for inmates to maintain contact with their friends and loved ones.

In short, Defendants have already taken immediate, bold, and appropriate steps in response to this rapidly evolving crisis, and they are planning to take additional actions to expand their capacity with an intent to do more.

The threat from the COVID-19 pandemic is constantly shifting, and with each passing day, government officials are tasked with addressing this dangerous moving target.  In times like these,

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOT. TO MODIFY POPULATION REDUCTION ORDER

16431778.2

1   our system of government is designed to rely on the sound judgment of our elected leaders and

2   their expert staff and advisors to address these complicated issues in a manner that takes all

3   relevant factors into consideration and balances the needs of our state with the limitations imposed

4   on nearly every sector of society by this crippling pandemic.  Indeed, separation of powers

5   principles demand that we afford elected officials and their experts this deference, especially in

6   response to an unprecedented and far-reaching global pandemic.

7          During these troubling times, adherence to the rule of law is critical.  In this instance,

8   Plaintiffs simply do not meet the high standards for a prisoner release order as set forth in the

9   Prison Litigation Reform Act (PLRA) and this Court therefore cannot grant the requested relief.

10  First, Plaintiffs have not demonstrated that Defendants are deliberately indifferent to the severe

11  risk of harm posed to CDCR's inmates by COVID-19.  In fact, all evidence demonstrates that the

12  opposite is true.  Second, the relief sought by Plaintiffs in the form of a prisoner release order is

13  not the most narrow and least intrusive measure of relief that may be employed to achieve the true

14  relief Plaintiffs request: physical distancing among CDCR's inmate population.  Third, the impact

15  on already strained communities from a court-ordered mass release, which Plaintiffs demand be

16  conducted in short order without sufficient time for prerelease planning, cannot be understated or

17  ignored.  Community hospitals, social services and safety nets and other infrastructure are highly

18  stressed, struggling mightily to address the current needs of the community.  As the *Plata*

19  Receiver has observed, a mass release could further add to the strain the free world health care

20  system is under right now.  Finally, the *Plata* and *Coleman* Courts have not issued prior orders for

21  less intrusive relief that are designed to address the Plaintiff classes' risk of harm as a result of the

22  COVID-19 pandemic.

23         While Plaintiffs are not entitled to the relief they request as a matter of law, the record

24  demonstrates that Defendants are working tirelessly to address the COVID-19 pandemic and its

25  attendant risks to CDCR's inmates, staff, and volunteers, including through the implementation of

26  a well-designed plan to transition thousands of inmates to parole.  California's already swift and

27  unprecedented response to the crisis obviates the need for the further judicial intervention into and

28  micromanagement of the state's prison system requested by Plaintiffs.

# ARGUMENT

## I.    PROCEDURAL HISTORY

On November 13, 2006, Plaintiffs in *Plata* and *Coleman* simultaneously filed separate motions to convene a three-judge court, seeking "prisoner release order[s]" pursuant to 18 U.S.C. § 3626(a)(3).  Those separately-filed motions to convene asked the *Plata* and *Coleman* Courts to evaluate, among other things, whether overcrowding was the primary cause of the unconstitutional delivery of medical and mental health care in CDCR's prisons.  ECF 561/2036.[1]  Over the State's objections, the *Plata* and *Coleman* courts held a joint hearing on June 27, 2007, to determine whether to refer each case to a three-judge court.  ECF 735/2298.

On July 23, 2007, the *Plata* and *Coleman* courts granted Plaintiffs' motions to convene. *See Plata v. Schwarzenegger*, No. CO1-1351 TEH, 2007 WL 2122657 (N.D. Cal. July 23, 2007); *Coleman v. Schwarzenegger*, No. CIV S-90-0520 LKK JFM, 2007 WL 2122G36 (E.D. Cal. July 23, 2007).  Those referral orders made clear that the instant three-judge court was convened to adjudicate whether the PLRA standards were met and specifically whether Plaintiffs could show that crowding was the primary cause of the ongoing unconstitutional delivery of health care services to the prisoner classes.  ECF No. 780/2320.  Plaintiffs' motions to convene, and the referral orders, did not request the Ninth Circuit to empanel a three-judge court to evaluate whether population density itself increases the risk of harm from exposure to a transmittable disease or virus.  *See id*.

The Ninth Circuit empaneled this three-judge court on July 26, 2007.  ECF No. 784/2328. Trial commenced on November 18, 2008 and continued intermittently throughout December 2008 and February 2009.  Following trial, on August 4, 2009, the three-judge court found that crowding was the "primary cause" of the alleged Eighth Amendment violations and that no other relief would remedy those violations.  *Coleman v. Schwarzenegger/Plata v. Schwarzenegger*, 922 F.

---

[1] Defendants adopt this Court's method of citation and all ECF filings referenced in this brief refer to the individual docket sheets of both *Plata v. Newsom*, No. 01-cv-1351-JST (N.D. Cal.), and *Coleman v. Newsom*, No. 2:90-cv-0520 KJM DB P (E.D. Cal.).  The citations reference the docket number of *Plata* first, then *Coleman*.

Supp. 2d 882 (E.D. Cal., N.D. Cal. Aug. 4, 2009).  The order mandated that the State cap its

system-wide prison population at 137.5% of the institutions' total "design capacity" within two

years.  *Id*. at 962, 970.  The required reduction equated to 46,000 inmates.  *Id*. at 994.

The three-judge court's order required the State to submit, within 45 days, a plan for

meeting the 137.5% cap within two years.  *Id*. at 1003-1004.  The State submitted a plan on

September 18, 2009, and a revised plan on November 12, 2009, to satisfy the 137.5% cap within

two years.  ECF No. 2274/3726.  On January 12, 2010, the three-judge court approved the revised

plan.  ECF No. 2287/3767.

The Supreme Court affirmed the three-judge court's prisoner release order, the imposition

of the 137.5% cap, and the two-year period for implementing the cap.  *Brown v. Plata*, 563 U.S.

493, 529-544 (2011).  In doing so, the Supreme Court recognized that "[a]s the State implements

the order of the three-judge court, time and experience may reveal targeted and effective remedies

that will end the constitutional violations even without a significant decrease in the general prison

population."  *Id*. at 533 (emphasis added).  The Supreme Court stated that "[t]he State will be free

to move the three-judge court for modification of its order on that basis, and these motions would

be entitled to serious consideration."  *Id*.

The Supreme Court acknowledged that in issuing the existing prisoner release order, the

three-judge court was required to balance the PLRA's narrow tailoring requirements against the

requirement that it give substantial weight to public safety and the operation of the criminal justice

system.  *Brown*, 563 U.S. at 534-538; *see also* 18 U.S.C. § 3626(a)(1)(A), (a)(3)(E).  The Supreme

Court also emphasized that the three-judge court "retains the authority, and the responsibility, to

make further amendments to the existing order."  *Brown*, 563 U.S. at 542.  It explained that

"[e]xperience may teach the necessity for modification or amendment" and "the three-judge court

must remain open to a showing or demonstration ... that the injunction should be altered to ensure

that the rights and interests of the parties are given all due and necessary protection."  *Id*. at 542-

543 ("the three-judge court must give due deference to informed opinions as to what public safety

requires").  The Supreme Court further made clear the need for the three-judge court to attend to

changed circumstances that would warrant eliminating or modifying the 137.5% cap: "As the State

1   makes further progress, the three-judge court should evaluate whether its order remains

2   appropriate.  If significant progress is made toward remedying the underlying constitutional

3   violations, that progress may demonstrate that further population reductions are not necessary or

4   are less urgent than previously believed." *Id*. at 544.  It ordered that the three-judge court "should

5   give any such requests [for modification] serious consideration," and the prisoner release order

6   "must remain open to appropriate modification." *Id*.

7           Following issuance of the Supreme Court's order, on September 16, 2013, the State filed a

8   request for extension of time to allow it to reach the 137.5% cap.  ECF No. 2713/4809.  On

9   February 10, 2014, the three-judge court issued its Order Granting in Part and Denying in Part

10  Defendants' Request for Extension of December 31, 2013.  ECF 2766/5060.  Pursuant to that

11  order, the State was given until February 28, 2016 to reduce California's prison population to

12  137.5% of design capacity.  *Id*.  The State met that benchmark early in February 2015 and has

13  remained below the cap since that time.  *See* ECF No. 2838/5278.  As of March 25, 2020, the last

14  day that CDCR publicly reported its population on its website, 114,167 inmates were housed in

15  the State's 35 adult institution, equating to approximately 134.2% of design capacity.

16  (Declaration of Ralph Diaz Supp. Defs.' Opp'n to Pltfs.' Emergency Motion to Modify Population

17  Reduction Order (Diaz Decl.) ¶ 4.)  Inmates are no longer housed in out-of-state prisons.  *See* ECF

18  No. 3138/6220.  With the freezing of admissions to the system and Secretary Diaz invoking his

19  statutory authority to accelerate release for non-violent male and female inmates who are within

20  60 days of their release date, this number will continue to drop.  (*Id*.)

21  **II.    THE COURT MUST GIVE DEFERENCE TO THE EXECUTIVE BRANCH AND**
22  **STATE PRISON OFFICIALS IN THEIR RESPONSE TO THE COVID-19**
    **PANDEMIC.**

23          The separation of powers is one of the core principles upon which our federal and state

24  governments are built.  This constitutional construct mandates that the three branches of

25  government–executive, legislative, and judicial–remain separate and not otherwise infringe upon

26  the authority of one another.  As it relates to prisons, the Supreme Court has aptly observed that

27  "'courts are ill equipped to deal with the increasingly urgent problems of prison administration

28  and reform,'" recognizing that "running a prison is an inordinately difficult undertaking that

requires expertise, planning, and the commitment of resources, all of which are peculiarly *within the province of the legislative and executive branches of government*." *Turner v. Safley*, 482 U.S. 78, 84-85 (1987) (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974) [overruled on other grounds in *Thornburgh v. Abbott*, 490 U.S. 401 (1989)]) (emphasis added). Critically, the Supreme Court has held that "[p]rison administration is, moreover, a task that has been committed to the responsibility of those branches, and *separation of powers concerns counsel a policy of judicial restraint.* Where a state penal system is involved, federal courts have, as we indicated in *Martinez*, additional reason to accord deference to the appropriate prison authorities." *Turner*, 482 U.S. at 85. These separation of powers interests are particularly salient when the executive branch is responding in real time to a global pandemic with no precedent.

The above separation of powers and deference concepts have been relied upon in a wide range of matters involving prison administration and reform. *See, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) (examining extent of inmates' free exercise of religion and deference given to prison officials); *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988) (upholding prison's policies concerning strip searches and use of tasers); *Gates v. Rowland*, 39 F.3d 1439, 1448 (9th Cir. 1994) (prison policy preventing HIV-positive inmates from holding food service jobs was properly within prison authorities' discretion); *Griffin v. Gomez*, 741 F.3d 10 (9th Cir. 2014) (holding district court improperly impeded state prison management by ordering release of inmate from administrative segregation unit during standard evaluation of his gang status); *see also, Sandin v. Conner*, 515 U.S. 472, 482-83 (1995) (observing that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment [in a prison]"). In short, the same longstanding and foundational principles must not be set aside in connection with Plaintiffs' emergency motion.

Moreover, Plaintiffs' emergency motion threatens to undermine the unique design of California's system of government in responding to public health emergencies at a moment of extreme peril. Through the California Emergency Services Act, the Legislature has centralized authority to respond to state emergencies within the Governor and Governor's Office of Emergency Services. In emergencies like the present one, the Governor has "complete authority

1  over all agencies of the state government … and all police power vested in the state," Cal. Gov.

2  Code § 8627, and exercises emergency authority to "suspend any statute prescribing the procedure

3  for conduct of state business, or the orders, rules, or regulations of any state agency." *Id.* at §

4  8571.  CDCR additionally has (and is exercising) authority to remove and even release to parole or

5  Post Release Community Supervision (PRCS) inmates from correctional institutions in response to

6  emergencies endangering the lives of inmates. *Id.* at § 8658.

7        Here, Governor Newsom and CDCR should be afforded deference in their handling of the

8  COVID-19 virus and in formulating appropriate precautionary and protective measures for

9  California that properly consider all relevant factors.  Governor Newsom and CDCR are uniquely

10 qualified to handle these issues by virtue of the special powers entrusted to them within

11 California's system of government and their superior knowledge of both CDCR's and the State's

12 resources, needs, limitations, and capabilities.  This unique qualification is further underscored by

13 the fact that these variables are evolving every day due to the uncertainties and complexities

14 presented by the COVID-19 virus.  Furthermore, as discussed below, the State should also be

15 given deference in this situation because it has already demonstrated swift and aggressive actions

16 in response to COVID-19, and is currently working on additional unprecedented protective and

17 preventative measures to address the health and safety of CDCR inmates, staff, and our

18 communities.  In these circumstances, the federal judicial intervention and micromanagement

19 called for by Plaintiffs early on in this months-long crisis will significantly interfere with the

20 State's efforts to ensure that California is prepared and well-situated to withstand the months of

21 turbulence that likely lie ahead.

22       To date, the Newsom Administration has issued some of the most aggressive and swift

23 protective measures in the nation in an attempt to control the spread of COVID-19.  For example,

24 California was the first to issue a statewide "stay-at-home" mandate on March 19, 2020.[2]  (Defs.'

25 _____

26 [2] California has also enacted dozens of other proactive and protective measures in response to
   COVID-19, a summary of which is listed on the State's website, here:
27 https://www.gov.ca.gov/california-takes-action-to-combat-covid-19/.  The Governor has likewise
   issued numerous Executive Orders in direct response to combating COVID-19 and protecting
28 (footnote continued)

1  Request for Judicial Notice (RJN), Ex. A [Executive Order N-33-20].)  Further, and relevant here,

2  on March 24, 2020, Governor Newsom issued an executive order that directly addressed CDCR's

3  COVID-19 response.  *See* Executive Order N-36-20 (RJN, Ex. B [Executive Order N-36-20).

4  Critically, this order suspended the intake of new inmates into CDCR facilities for 30 days subject

5  to further 30-day extensions as needed in order "to protect the health, safety, and welfare" of

6  CDCR inmates and staff.  The effect of this order not only reduces the risk of transmission to the

7  current CDCR populations, but also has the effect of reducing the system's population by several

8  thousand for each month the suspension is in effect.  (Diaz Decl. ¶ 4.)

9  Significantly, and further to these efforts, Secretary Diaz has and will exercise his

10  independent authority under California Government Code § 8658 to direct to parole or PRCS

11  inmates for whom CDCR staff have determined that public safety risk does not preclude release.

12  (Diaz Decl. ¶ 5.)  Inmates with 60 days or less remaining on their sentence (as of March 30, 2020)

13  who are not serving a current term for a violent felony, or for a domestic violence offense, and are

14  not required to register as a sex offender will have their release to parole or PRCS accelerated

15  under Secretary Diaz's direction.  (*Id.*)

16  Additionally, CDCR has implemented numerous other proactive and preventative

17  measures to reduce the risk of COVID-19 in its facilities.  For example, CDCR has already

18  implemented: mandatory health screening before entering CDCR facilities; additional deep-

19  cleaning efforts; increased the supply of disinfectants, soap, hand sanitizer, and personal protective

20  equipment; limitations and suspensions of inmate transfers; quarantine protocols; all normal

21  visiting at CDCR facilities has been canceled until further notice, while telephone and electronic

22  messaging access has been increased, including opportunities for free use of each; providing

23  regular and open communication from CDCR officials and resources regarding COVID-19

24  precautions; among many others.  (A full list of CDCR's regular updates and expanded

25  precautions in light of COVID-19 can be found here: https://www.cdcr.ca.gov/covid19/; *see also*

26

27  _____

28  California residents.  *See* https://www.gov.ca.gov/category/executive-orders/.

1   the Declaration of Director Connie Gipson In Support of Defendants' Opposition to Plaintiffs'

2   Emergency Motion to Modify Population Reduction Order (Gipson Decl.), filed herewith.)

3          Thus, in light of these significant efforts, any perceived concerns of long delays or an

4   "indefinite[]" waiting period before the court is able to rule on this Motion are completely

5   unfounded and overblown.  *See* Pltfs.' Opp. to Defs.' Req. to Modify Briefing Schedule and

6   Hearing Date at 2:14-18 (ECF No. 3230/6545).  Moreover, the fact that the Governor and

7   Secretary Diaz have already taken significant and aggressive steps in response to COVID-19,

8   including the speed with which such decisions have been made, is further evidence that this

9   administration takes these issues extremely seriously.  The health and safety of CDCR inmates and

10  staff is no different.  Thus, the State should be given the opportunity to address these important

11  issues without federal judicial intervention.

12         As discussed below, releasing inmates is not a simple proposition.  There are numerous

13  important variables and considerations involved that directly relate to and impact not only the

14  health and safety of inmates, but in this case the entire State's ability to respond to and withstand

15  the COVID-19 pandemic.  For example, the large-scale inmate release called for by Plaintiffs has

16  direct implications for how the State is addressing the homeless population's vulnerability to

17  COVID-19.  Governor Newsom and CDCR have superior knowledge of these evolving and

18  complex variables, unique powers to address them, and are by far in the best position to determine

19  how California will meet this moment during these uncertain times.  Without first at least giving

20  the State the opportunity to perform these essential and important functions, it would contravene

21  fundamental principles underlying our system of government for the federal judiciary to directly

22  inject itself into California's emergency response and override the State's considered judgment.

23  *Cf. Loving v. United States*, 517 U.S. 748, 757 (1996) ("the separation-of-powers doctrine requires

24  that a branch not impair another in the performance of its constitutional duties.")

25  / / /

26  / / /

27  / / /

28  / / /

### III.   PLAINTIFFS DO NOT MEET THEIR BURDEN FOR A PRISONER RELEASE ORDER UNDER THE PLRA.

Plaintiffs focus significant attention on the dangers associated with COVID-19, including its highly contagious and potentially fatal nature and the increased risk of harm it presents for particularly vulnerable populations.  (Plaintiffs' Emergency Motion to Modify Population Reduction Order (Pltfs. Mot.) at 5-10.)  Defendants do not dispute the serious public health risk posed by COVID-19, including the risk of severe illness, widespread transmission, the debilitating burden placed on public health and healthcare systems, the enormous strain on other critical infrastructure such as emergency medical services, first responders and law enforcement, and elevated rates of hospitalizations and death.  (Bick Decl., ¶ 11.)  But Plaintiffs give short shrift to the actual standards applicable to their request under the PLRA, which must instruct this Court's decision.

As an initial matter, Plaintiffs assert that "[t]here is no question that overcrowding is the primary reason class members are at heightened risk of a rapidly and deadly spread of COVID-19," but they do not actually provide any analysis in support of this allegedly irrefutable conclusion.  (Pltfs. Mot. at 30:4-5.)  This is especially true given that CDCR has fully complied with the previous population-cap order for the past five years, which in this Court's judgment set an appropriate limitation on CDCR's inmate population.  *See* ECF No. 2838/5278.  The existence of a constitutional violation is therefore not a foregone conclusion, and the PLRA mandates that Plaintiffs establish a violation before prospective relief may issue.  18 U.S.C. § 3626(a)(1)(A). Plaintiffs have not done so here, nor can they, as explained below.[3]

---

[3] Nor may Plaintiffs rely on this Court's prior determination of unconstitutionality from a decade ago, however, because unlike Plaintiffs' prior prisoner release order request, which was premised on overcrowding as the primary cause of the unconstitutional delivery of medical and mental health care, they now seek a prisoner release order due to the "'substantial risk of illness and death' because of their congregate living environment" in the midst of the COVID-19 crisis. (Pltfs.' Mot. at 8:5-7.)  These are fundamentally different requests.  Further to this point, Plaintiffs actually infer that their requested release order is not related to the delivery of medical care, stating that a prisoner release order is necessary now, "[e]ven with a constitutionally adequate prison healthcare system…."  (*Id.* at 8:5.)  This admission demonstrates that the gravamen of (footnote continued)

Further, Plaintiffs overlook less-intrusive alternatives to a release order that can similarly achieve the goal of physical distancing.  Plaintiffs also disregard the risk to public safety that a release order would impose, including the risk and burden to already-stressed community resources and medical infrastructure.  And finally, Plaintiffs fail to identify *any* orders by either the *Plata* or *Coleman* Courts designed to address any alleged deliberate indifference to the COVID-19 crisis.  For all of these reasons, Plaintiffs' motion must be denied.

> **A.    Plaintiffs Do Not Allege—and Cannot Establish—that Defendants are Deliberately Indifferent to the Risk Posed by COVID-19.**

Courts may only order prospective relief consistent with the PLRA when "necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1)(A).  In order to establish a violation of Plaintiffs' Federal rights, Plaintiffs must demonstrate that Defendants have acted with deliberate indifference toward those rights.  Plaintiffs provide no analysis on this point and merely offer the conclusion that "[t]here is no question that overcrowding is the primary reason class members are at heightened risk of a rapidly and deadly spread of COVID-19 in California's prisons."  (Pltfs. Mot. at 30:4-5.)  Plaintiffs' conclusory assertions are insufficient.

To be entitled to relief, Plaintiffs must first demonstrate that prison administrators and state actors are acting with deliberate indifference to the Federal right at issue.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  A showing of deliberate indifference requires demonstration of two requirements.  First, "the deprivation alleged must be, objectively, 'sufficiently serious.'"  *Farmer*, 511 U.S. at 834 (citations omitted).  Plaintiffs must also demonstrate a second, subjective component, that Defendants are acting with a "'sufficiently culpable state of mind.'"  *Farmer*, 511 U.S. at 834 (*quoting Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  Defendants do not dispute the

---

Plaintiffs' motion is the need for an adequate response to the COVID-19 crisis, not the delivery of medical care.  Moreover, "the propriety of the relief ordered here cannot be assessed without ascertaining the nature and scope of any ongoing constitutional violations.  Proof of past violations will not do; nor is it sufficient simply to establish that *some* violations continue."  *Brown v. Plata*, 563 U.S. at 567 (Alito, J., dissenting).

Case Nos. 2:90-cv-00520-KJM-DB, C01-1351 JST

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOT. TO MODIFY POPULATION REDUCTION ORDER

16431778.2

1  former, but Plaintiffs have not – and cannot – establish the latter.

**1.**    ***Defendants Concede COVID-19 Presents An Objectively Serious Risk of Harm.***

Where, as here, the claim is based on Defendants' failure to prevent harm, Plaintiffs must show under the first prong of the analysis that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Defendants do not dispute the risk of harm that COVID-19 poses to inmates, as well as the community at large. Nor do Defendants dispute that those who are incarcerated may be at a higher risk for contracting COVID-19 given the circumstances of incarceration, including closer living quarters. Defendants therefore concede that the first prong of the deliberate indifference inquiry is satisfied, as COVID-19 objectively poses a serious risk of harm.

**2.**    ***Defendants Are Taking Drastic, Reasonable Action To Address The Pandemic.***

Under the second, subjective prong, Plaintiffs must also show that prison officials knew of and disregarded "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. This standard affords "due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer*, 511 U.S. at 845 (*quoting Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979)). Prison officials must act to "'ensure reasonable safety.'" *Farmer*, 511 U.S. at 844 (*quoting Helling v. McKinney*, 509 U.S. 25, 33 (1993)). Where prison officials act reasonably, they do not violate the Eighth Amendment's Cruel and Unusual Punishment Clause. *Farmer*, 511 U.S. at 845.

The COVID-19 pandemic presents a serious and unprecedented risk to public health, and while the world grapples with the spread of this pandemic, the State of California has led the way in taking aggressive action to confront this crisis. As set forth below and in the accompanying declarations in support of Defendants' Opposition, Defendants have taken, and are in the process of taking, a number of extraordinary steps to slow, and hopefully minimize, the spread of COVID-

16431778.2
DEFS.' OPP'N TO PLTFS.' EMERGENCY MOT. TO MODIFY POPULATION REDUCTION ORDER

19 within CDCR's 35 institutions, including:

- Governor Newsom issued Executive Order N-36-20 on March 24, 2020, suspending intake of all incarcerated persons into state facilities for 30 days. (Diaz Decl. ¶ 4; Gipson Decl. ¶ 11(b); RJN, Ex. A.) The Executive Order also grants Secretary Diaz the authority to extend the suspension of new-inmate intake for an additional 30-day period if "necessary to protect the health, safety, and welfare of inmates and juveniles" and staff who work in CDCR's facilities. (Diaz Decl. ¶ 4.)

- Secretary Diaz has and will exercise his independent authority under Government Code § 8658 to direct the release of inmates for whom CDCR staff have determined that public safety risk does not preclude release, based on the following protocols:

  o Accelerate the date of release to parole, Post-Release Community Supervision, or direct discharge of nonviolent inmates who meet all of the following requirements: (i) have 60 days or less remaining on their sentences (as of March 30, 2020); (ii) are not serving a current term of incarceration for a violent felony offense as defined by Penal Code § 667.5(c); (iii) are not required to register under Penal Code § 290; and (iv) are not serving a current term of incarceration for a domestic violence offense.

  o Inmates approved for release under these protocols will have an appropriate release and transition plan and will be served with reporting instructions and conditions of release before their release. (Diaz Decl. ¶ 5.)

- To achieve greater physical distancing in dorms, asymptomatic inmates who are housed in the following dorms will be transferred to other prisons that have unoccupied buildings or space available: (i) Chuckawalla Valley State Prison will move 100-150 inmates next door to Ironwood State Prison, Facility A, Building 5; and (ii) Substance Abuse Treatment Facility and California Rehabilitation Center will each relocate 192 inmates (for a total of 384 inmates) to California State

Prison-Corcoran, Building 4B.  (Gipson Decl. ¶ 11(h).)

- Defendants have also suspended visits by the public until further notice based on California Department of Public Health guidance for mass gatherings.  (Gipson Decl. ¶ 11(a).)  In addition, CDCR has limited all non-essential or emergency transportations between CDCR facilities and suspended large-scale construction projects located within the secure perimeter of CDCR facilities.  (*Id.*)  Also, all tours and events have been postponed, and no new tours are being scheduled.  (*Id.*)  Further, Defendants have suspended the transfer of out-of-state parolees and inmates into California under interstate compact agreements for 30 days, concluding the end of April 2020, and will revisit before expiration to determine if an extension is warranted.  (Gipson Decl. ¶ 11(c).)

- On March 14, 2020, CDCR began requiring all individuals entering CDCR state prisons and community correctional facilities to undergo a verbal symptom screening for COVID-19 and Influenza-Like-Illness (ILI) symptoms.  Beginning March 27, 2020, CDCR required all such individuals to also undergo a touch-free infrared temperature screening.  (Gipson Decl. ¶ 11(d); Bick Decl. ¶ 7.)  Screeners are offered surgical masks, eye protection, and hand sanitizer.  Individuals who respond "yes" to any COVID-19 or ILI questions or have a temperate measured equal or greater than 100.0 Fahrenheit will be denied entry into in the institution.  Individuals who respond "no" to any of the COVID-19 or ILI questions but have observed symptoms shall have further triage with a nurse.  Based on the clinical judgement of the nurse, the employee may be denied entry into the CDCR correctional facility, and given a recommendation to follow up with their personal medical provider.  (Gipson Decl. ¶ 11(d).)

- In addition, CDCR and CCHCS continue to follow their robust screening practices anytime an inmate enters or exits a state prison.  All inmates received into a Reception Center institution before the close of intake were placed into an automatic 14-day quarantine for monitoring.  The same applies today to inmates

16431778.2

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOT. TO MODIFY POPULATION REDUCTION ORDER

1   who return from offsite medical or court appointments.  Inmates' vitals, including

2   temperature, are taken the day before an inmate leaves the prison for any reason,

3   including court appearances and institution transfers.  At the same time, the inmates

4   are asked a series of questions about their state of health, and any concerns are

5   addressed through the triage process.  The same readings and questions are

6   performed immediately upon arrival at the institution.  (Gipson Decl. ¶ 11(e).)

7   • CDCR began requiring, as of March 28, 2020, all inmates and staff who leave the

8   institutions for offsite medical appointment to wear surgical masks.  (Gipson Decl.

9   ¶ 11(f).)

10   • CDCR has issued information about physical distancing to inmates and staff.  Staff

11   and inmates are practicing physical distancing strategies where possible, including

12   limiting groups to no more than 10, assigning bunks to provide more space between

13   individuals, rearranging scheduled movements to minimize mixing of people from

14   different housing areas, encouraging physical distance during yard time, and

15   adjusting dining schedules where possible to allow for physical distancing and

16   additional cleaning and disinfecting of dining halls between groups.  All in-service

17   trainings for staff are postponed until July 2020.  No rehabilitative programs, group

18   events, or in-person educational classes will take place until further notice.

19   Chaplains will conduct individual religious counseling as appropriate while

20   maintaining physical distancing, and CDCR is working to provide televised

21   religious services to the population.  Contract staff not affiliated with inmate

22   programming will only be permitted to enter an institution on a case-by-case basis

23   at the direction of institution leadership.  (Gipson Dec. ¶ 11(g).)

24   • CDCR developed a COVID-19 Mental Health Delivery Care Guidance

25   Memorandum (Plan) and is providing patients in the Mental Health Services

26   Delivery System (MHSDS) with mental health services during the COVID-19

27   crisis consistent with that Plan, and will continue to do so.  (Decl. Michael Golding

28   Supp. Defs.' Opp'n to Pltfs.' Motion (Decl. Golding) ¶ 2.)  Under the Plan,

MHSDS patients will continue to receive mental health treatment, including Correctional Clinical Case Management System, Enhanced Outpatient Program, Mental Health Crisis Bed, Acute Psychiatric Program, and Intermediate Care Facility, as well as patients in segregated housing units.  While some of the group treatment and other mental health treatment and services may be scaled back or stopped altogether as part of the COVID-19 Mental Health Plan, the Statewide Mental Health Program will continue to provide individual clinical appointments, emergency mental health treatment, and Interdisciplinary Treatment Team meetings as permitted based on staffing or other health concerns.  The mental health programs at individual institutions are also taking many of the following steps to ensure that MHSDS patients are followed by their clinicians and receive urgent or emergent mental health treatment.  In addition to continuing the provision of mental health services for the MHSDS patients, CDCR is continuing to apply suicide prevention measures to the entire inmate population.  (*Id.* at ¶¶ 3-5.)

- On March 20, 2020, the Coleman court convened a task force comprised of the CDCR, the federal special master in *Coleman v. Newsom* overseeing CDCR's mental health care system, and Plaintiffs' attorneys, the purpose of which is to address and mitigate the impacts of COVID-19 at CDCR, especially among seriously mentally ill inmates, and this federal-state task force has been meeting regularly and keeping Judge Mueller updated.  (*Coleman* ECF No. 6513.)

- CDCR has created and distributed fact sheets and posters in both English and Spanish that provide education on COVID-19 and precautions recommended by CDC.  CDCR has also begun streaming CDC educational videos on the CDCR Division of Rehabilitative Programs inmate television network and the CCHCS inmate health care television network.  (Gipson Decl. ¶ 11(h).)

- All inmates are being provided extra soap when requested and hospital-grade disinfectant that meets Centers for Disease Control and Prevention guidance for COVID-19.  (Gipson Decl. ¶ 11(l).)

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOT. TO MODIFY POPULATION REDUCTION ORDER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- Staff members have been granted permission to carry up to two ounces of personal-use hand sanitizer.  (Gipson Decl. ¶ 11(m).)  Hand sanitizer dispensing stations have been placed in the corridors of all clinic areas for inmate and staff use.  (*Id.* at ¶ 11(n).)  Additional hand sanitizer dispensing stations are being procured and placed inside adult institution entrances.  (*Id.*)  In addition, dispensing stations will also be placed in all dining halls and dayrooms in all housing units.  (*Id.*)  Additional hand sanitizer dispensing stations are being procured and placed inside adult institution entrances and visiting areas.  (*Id.*)  Further, on March 26, 2020, CALPIA was licensed by the California Department of Public Health to begin producing hand sanitizer at its chemical enterprise in California State Prison, Los Angeles County.  CALPIA shipped its first delivery of 3,852 bottles (1,000 gallons) to 28 CDCR locations.  (Diaz Decl. Ex. A.)

- All institutions have been instructed to conduct additional deep-cleaning efforts in high-traffic, high-volume areas, including visiting and health care facilities.  In addition, all Wardens were reminded last week to ensure that: (i) cleaning supplies are available to inmates in all dayrooms and inmate phone areas, (ii) all counter tops in the dining halls and canteen windows are being cleaned regularly, and (iii) the dining halls are cleaned in between each feeding.  Additional cleaning efforts have also, for example, been implemented at the dorm at Joshua Hall at CIM.  The dorms are cleaned at 8:00 am and 12:00 pm each day.  All doors handles are sprayed with bleach every 30 minutes.  In addition, the inmates are being instructed to stay six feet apart and are given extra soap and hand sanitizer.  (Gipson Decl. ¶ 11(o).)

- CDCR and CCHCS have collaboratively established additional precautions based on recommendations by CDPH and CDC for units with vulnerable populations and infirmaries, including additional disinfection efforts and even smaller groups for dining and out-of-cell time.  (Gipson Decl. ¶ 11(p).)

- CDCR and CCHCS have longstanding outbreak management plans in place to

16431778.2

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOT. TO MODIFY POPULATION REDUCTION ORDER

address communicable disease outbreaks such as influenza, measles, mumps, norovirus, and varicella, as well as preparedness procedures to address a variety of medical emergencies and natural disasters.  CDCR and CCHCS are using these procedures as a model to respond to any COVID-19 outbreak.  (Gipson Decl. ¶ 14.)

- If, at any point, it is determined there is a potential exposure to COVID-19 among the incarcerated population, CDCR will restrict movement at the institution while a contact investigation is initiated and quarantine those deemed at-risk for an observation period.  (Gipson Decl. ¶ 15.)

- To standardize the diagnosis and treatment of COVID-19 among CDCR's inmate population, CCHCS issued interim guidance for its clinicians in March 2020. (Bick Decl. ¶ 9, Ex. A.)  An inmate-patient with suspected or confirmed COVID-19 will be placed on medical hold, a contact investigation initiated, and all inmates housed in the same unit, and any other identified close contacts, will be placed on a medical hold as part of quarantine measures.  These inmate-patients will be regularly assessed and monitored by institution medical staff, and these patients' movements will be limited to decrease the risk of spreading COVID-19 to other parts of a facility.  CCHCS's interim guidance further describes the necessary steps and decision points for providers concerning appropriate isolation, surveillance, and release from isolation measures.  These informed disease control efforts are based on recommendations from the CDC and California Department of Public Health.  (Bick Decl. ¶ 10.)

- Asymptomatic inmate-patients with contacts to a COVID-19 case will be quarantined.[4]  For example, as of March 30, 2020, approximately 535 asymptomatic inmates at California State Prison, Los Angeles County and the

---

[4] Quarantine does not include restricting the patient to their own cell for the duration without opportunity for exercise or yard time.  Quarantined patients may have yard time as a group but are instructed not to mix with patients not in quarantine.  (Gipson Decl. ¶ 17, fn. 1.)

California Institution for Men, who have been in contact with the four inmates who

have tested positive for COVID-19, have been quarantined within their housing

units.  While on quarantine status, inmates are assessed daily by health care staff

for symptoms.  The quarantine period is for 14 days, and if inmates remain

asymptomatic, they will be released from quarantine.  Inmate-patients in

quarantine, and staff transporting quarantined patients, are instructed to wear

personal protective equipment.  The quarantine units will be assessed continuously

by health care staff in order to immediately identify any new inmate-patients with

symptoms.  If a symptomatic inmate-patient is identified, he or she will be

evaluated by a health care provider as soon as possible.  If one or more inmate-

patients in quarantine develop symptoms consistent with COVID-19, the ill inmate-

patients will be isolated from the well quarantined inmate-patients.  (Gipson Decl. ¶

17.)

The steps taken by the State, particularly in the context of the magnitude of this

unprecedented crisis, demonstrate that Defendants' efforts in responding to this crisis are

abundantly "reasonable."  Plaintiffs even acknowledge that "CDCR has recognized the magnitude

of the crisis" in enacting measures in response to the COVID-19 pandemic.  (Pltfs. Mot. at 25:7.)

So, too, does former Secretary of CDCR Scott Kernan, who stated at his deposition last week that

"logistically the department has taken a number of steps to try to mitigate that [risk]; the screening

of staff coming into the facility, the taking of temperatures, and questioning.  It seems like a

reasonable step to me.  The closing of programs, the closing of visiting[;] all of those things that

the department has done seem to me to be reasonable steps to try to mitigate the problem."  (Wolff

Decl., Ex. A [Kernan Depo.] at 35:11-19.)  And where prison officials act reasonably in

confronting a substantial risk to inmate health or safety, they cannot be found liable under the

Eighth Amendment.  *Farmer*, 511 U.S. at 845.  Absent a Constitutional violation, this Court may

not order prospective relief.  18 U.S.C. § 3626(a)(1)(A).

/ / /

/ / /

**B.**     **Plaintiffs' Motion Further Fails The PLRA's Needs-Narrowness-Intrusiveness Test.**

The PLRA mandates that prospective relief must be narrowly drawn, extend no further than necessary, and be the least intrusive means of addressing the violation of the Federal right. 18 U.S.C. § 3626(a)(1)(A).  Plaintiffs' requested relief—in the form of an order requiring Defendants to release "those class members who (a) are at low risk as determined by CDCR's risk assessment instrument or are serving a term for a non-violent offense; and (b) are paroling within the year," with special priority given to those with six months or less to serve and those with high risk of severe illness—extends further than necessary and is not the least intrusive means of addressing the purported violation of Plaintiffs' rights.

Public health experts agree that the spread of COVID-19 is best addressed through physical distancing and heightened cleanliness—including through thorough and frequent hand washing and regularly cleaning and disinfecting frequently touched surfaces.  (Bick Decl. ¶ 5.) While Plaintiffs acknowledge that "[t]he only way to control the virus is to use preventive strategies, including social distancing," Plaintiffs conclude that physical distancing and other prevention strategies may only be achieved through use of solitary confinement or a "marked reduction in population."  (Pltfs. Mot. at 19:14-16.)  Despite Plaintiffs' contentions that the relief they seek is targeted and the least intrusive relief available, less intrusive alternatives to a "marked reduction in the population" exist, and are presently being implemented by Defendants to achieve greater physical distancing.

To that end, and as stated above, CDCR has stopped accepting new inmates from other jurisdictions, including from counties.  (Diaz Decl. ¶ 4.)  In a typical month, CDCR accepts approximately 3,000 new inmates into custody while 3,000 inmates leave CDCR custody due to normal attrition.  (*Id.*)  Further, and perhaps most significantly, as a result of Secretary Diaz's exercise of his authority under Government Code § 8658, CDCR intends to transition to parole and PRCS nearly all non-violent, non-sex offenders from its custody who would have otherwise paroled in the next 60 days.  (Diaz Decl. ¶ 5.)  Specifically, CDCR will be transitioning the following non-violent offenders to parole and PRCS:

1        • 1,751 inmates who are within 30 days of their release date

2        • 1,745 inmates who are within 60 days of their release date

3   These releases, totaling 3,496 inmates, are scheduled to begin as soon as practicable.  (Diaz Decl.

4   ¶ 7.)  *Plata* and *Coleman* class members who meet the-above described criteria will be included

5   among those inmates released.  (Diaz Decl. ¶ 5.)  The scale of these measures is unprecedented,

6   not only in California but nationally.

7        Additionally, while Plaintiffs' Motion focuses almost exclusively on population reduction,

8   Defendants' more tailored approach achieves much of the same end—greater physical distancing

9   among inmates—by, where possible to do safely and conveniently, removing inmates from

10  crowded conditions and more evenly spreading them throughout CDCR's 35 institutions, in

11  compliance with California Government Code § 8658.  For example, as it pertains to achieving

12  greater physical distancing in dorms, asymptomatic inmates who are housed in the following

13  dorms will be transferred to other prisons that have unoccupied buildings or space available: (i)

14  Chuckawalla Valley State Prison will move 100-150 inmates to Ironwood State Prison, Facility A,

15  Building 5; (ii) Substance Abuse Treatment Facility will relocate 192 inmates to California State

16  Prison, Corcoran, Building 4B; and (iii) California Rehabilitation Center will relocate 192 inmates

17  to California State Prison, Corcoran, Building 4B.  (Gipson Decl. ¶ 11(h).)  In total, 484-534

18  inmates will be moved out of dorms to facilitate greater physical distancing.  (*Id.*)

19        CDCR continues to consider every reasonable measure necessary to respond to this crisis.

20  (Diaz Decl. ¶ 9.)

21        Again, these measures achieve the same results Plaintiffs seek—greater physical

22  distancing—without the need for more intrusive relief.  In fact, when asked at his deposition

23  whether there are alternatives to releasing inmates from dorms that could nonetheless protect

24  inmates from the threat of COVID-19, former CDCR Secretary Scott Kernan stated:

25              I think there's probably a number of them, but one could be
                spreading the bunks out in a particular dorm by reducing some of
26              the population.  For example, if you had a hundred bed dorm today
                and you could move 50 inmates out and spread the inmates out in
27              that dorm, I think that would be a step.

28              You could empty out housing units and move inmates as necessary

1      that are sick and get them out of the population.  I think there's a
2      variety of things that you potentially could do.  And I suspect,
    although I don't have direct knowledge, that the department is trying
3      to do that.

4  (Wolff Decl. Ex. A [Kernan Depo.] at 64:17-65:3.)  Where, as here, less intrusive means exist to

5  "correct the harm" at issue, a prisoner release order may not issue.  18 U.S.C. § 3626(a)(2).

6      **C.**    **This Court Must Give Substantial Consideration To The Adverse Impact A Release Order Would Have On Public Safety, Including Hospitals And Community Health Systems That Are Already Over-Stressed By COVID-19.**

8      The PLRA mandates that this Court give "substantial weight" to any adverse impact on

9  public safety or the operation of a criminal justice system.  18 U.S.C. § 3626(a)(2).  The Supreme

10  Court in *Brown v. Plata* recognized that questions pertaining to public safety impact "are difficult

11  and sensitive, but they are factual questions and should be treated as such.  Courts can, and should,

12  rely on relevant and informed expert testimony when making factual findings."  563 U.S. at 535.

13  Plaintiffs rely solely on the Declaration of Thomas Hoffman in support of their assertion that

14  CDCR can achieve a "marked reduction" in the prison population without a significant rise in

15  crime by focusing on the release of older and "medically vulnerable" inmates and "low security"

16  inmates already identified by one of the static risk assessment tools that CDCR uses.  (Pltfs.' Mot.

17  at 35:4-16.)  But Hoffman's analysis is overly-simplistic and incomplete, and the cohort he

18  identifies is not as low-risk or appropriate for release as Plaintiffs and Hoffman suggest.  Further,

19  Plaintiffs ignore another *type* of harm to public safety that would result from their requested relief,

20  *e.g.*, harm to public health and community health systems.  This type of harm must be given

21  significant consideration in light of the unique challenges posed by the COVID-19 pandemic, and

22  particularly because of the risk of harm Plaintiffs are seeking to remedy by way of their Motion.

23      **1.**    ***Plaintiffs Ignore The Risk And Burden To Public Safety That A Release Order Would Have On Communities Amidst The COVID-19 Pandemic.***

25      Plaintiffs state that "[h]ealth care facilities around the world have experienced or are

26  bracing for an extraordinary influx of patients, as the virus sweeps through populations and strikes

27  the most vulnerable as well as many others."  (Pltfs. Mot. at 25:4-6.)  Plaintiffs further

28  acknowledge that community resources (including emergency room beds, general hospital beds,

1    and ICU beds) are "scarce" and that COVID-19 is "straining the health care systems around the

2    world." (*Id.* at 5:18-20, 1:16-17.)  At the same time, Plaintiffs ask this Court to prioritize for early

3    release the elderly and those with underlying health conditions because they "are at the highest

4    risk of severe complications from COVID-19." (Decl. Marc Stern Supp. Pltfs.' Emergency Mot.

5    (Stern Decl.) at 5:12-14.)  Yet, Plaintiffs fail to address the fact that the release of these at-risk

6    individuals is very likely to cause harm to public safety by straining the already-taxed local health

7    care systems.

8         Indeed, in the course of prerelease planning, it is far more difficult for the Division of

9    Adult Parole Operations (Parole Operations) to arrange for needed services and housing for

10   offenders who require a higher level of services because of chronic health problems or serious

11   mental health issues.  (Declaration of Jeffrey Green Supp. Defs.' Opp'n to Pltfs.' Emergency

12   Motion to Modify Population Reduction Order (Decl. Green) at ¶ 27.)  Finding available skilled

13   nursing facilities or facilities that provide high levels of mental health care is especially difficult,

14   and sometimes impossible.  (*Id.*)  Consequently, these types of offenders occasionally end up in

15   hospital emergency rooms.  (*Id.*)

16        The *Plata* Receiver, Clark Kelso, recently opined on this very issue, recognizing that "the

17   issues are more complicated and nuanced, and there are some negatives both with respect to the

18   individual healthcare of patients post-release (particularly given the stress on the free world health

19   care system right now) and to population healthcare in the community (particularly focused on

20   fighting the spread of covid-19)." (Decl. Michael Bien Supp. Pltfs.' Mot., Ex. 40.)

21        Mr. Kelso's concerns are well-founded.  A 2018 study by Brie Williams and others

22   confirmed that emergency department patients with "criminal justice contact" in California made

23   up a higher proportion of frequent emergency department users and were at higher risk of an

24   emergency department visit resulting in hospitalization compared with patients with no criminal

25   justice contact.  (Wolff Decl., Ex. B.)  The study found that "[m]any challenges are encountered

26   when accessing healthcare postrelease, including lack of insurance and medication supplies, high

27   costs of care, long wait times for appointments and difficulties navigating siloed medical,

28   behavioral health and social services." (*Id.* at 2.)  These challenges "likely contribute to high rates

-23-     Case Nos. 2:90-cv-00520-KJM-DB, C01-1351 JST

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOT. TO MODIFY POPULATION REDUCTION ORDER

1  of emergency department (ED) utilisation" postrelease.  (*Id.*)

2      As the COVID-19 pandemic significantly exacerbates these very challenges, emergency

3  departments are particularly ill-equipped to handle any further increase in utilization.  Plaintiffs do

4  not account for this serious risk to public safety.  As former CDCR Secretary Scott Kernan stated

5  at his recent deposition in this matter, "I don't think that we should be letting out people with high

6  risk that are going to exacerbate the problem in the community."  (Wolff Decl., Ex. A [Kernan

7  Depo.] at 68:23-25.)

8          **2.    *Early Release Without Sufficient Prerelease Planning Could Jeopardize
           Public Safety And Inmates' Success Upon Release.***

9

10     Plaintiffs cite to the opinion of Thomas Hoffman in support of their claim that the public

11 safety risk from their population reduction proposal is "minimal."  (Pltfs.' Mot. at 35:4-16.)

12 Hoffman opines "it is my professional opinion that CDCR can accelerate the reduction [of] the

13 prison population to address the COVID-19 pandemic without an adverse impact on public

14 safety."  (Decl. Thomas Hoffman Supp. Pltfs.' Emergency Mot. (Hoffman Decl.) ¶ 10.)  But

15 Hoffman provides no analysis in support of this conclusion and completely ignores the myriad

16 steps involved in the prerelease planning process, which begin some nine months before an inmate

17 is released, and are designed to ensure that inmates can successfully transition to life in the

18 community.

19     Prerelease planning begins approximately 270 days before an inmate's scheduled release

20 when Parole Operations begins to conduct one or more risk assessments, including the California

21 Static Risk Assessment, the STATIC 99R risk assessment, and the Female Sex Offender Risk

22 Assessment.  (Green Decl. ¶ 4.)  The California Static Risk Assessment is an automated static risk-

23 assessment tool that identifies the static risk of reoffending within three years.  (*Id.* at ¶ 5.)  It was

24 designed to automatically determine a risk-assessment score based on static data points, such as

25 age, gender, and criminal misdemeanor and felony convictions, contained in criminal-history data

26 compiled by the California Department of Justice.  (*Id.*)  The STATIC 99R risk assessment is used

27 to score the potential risk a male sex offender might pose to the community after release while the

28 Female Sex Offender Risk Assessment is used to score the potential risk that a female sex

1   offender might pose to the community after release.  (*Id.* at ¶¶ 6-7.)  These various risk

2   assessments are necessary and important because they identify offenders who might pose a greater

3   risk to the community upon release, and they help determine the level of supervision required for

4   each offender.  (*Id.* at ¶ 8.)

5          From between about 180-210 days before an offender's release, Parole Operations begins

6   working on the Correctional Offender Management Profiling for Alternative Sanctions

7   assessment, which is a re-entry needs-assessment tool that focuses on predictors known to affect

8   recidivism and identifies an offender's criminogenic needs (or characteristics that relate to his or

9   her likelihood to reoffend).  (Green Decl. ¶ 9.)  This assessment enables the parole agent to

10  develop recommendations for an offender's programming.  (*Id.*)  It is an important part of the

11  process because if criminogenic needs are appropriately addressed, the offender's chances of

12  success on parole are improved.  (*Id.*)

13         During this same timeframe, Parole Operations also begins to conduct a Release Program

14  Study.  (Green Decl. at ¶ 13.)  When completed, this study contains a summary of information

15  concerning the offender's residence, employment, supervision designation.  (*Id.*)  The study also

16  contains important information about other case factors, including gang status, the county of last

17  residence, the county of commitment, medical information, reporting instructions, and any request

18  to have supervision transferred.  (*Id.*)

19         From about 105 to 120 days before an offender's release, Case Records staff perform a

20  comprehensive audit of the inmate's file to confirm that critical case factors are appropriately

21  noted and accounted for in the file.  (Decl. Heidi Dixon Supp. Defs.' Opp'n to Pltfs.' Mot. (Dixon

22  Decl.) ¶ 5.)  Accurate and complete case-factor data is important because parole agents and

23  probation officers who are responsible for supervising individuals released from prison rely

24  heavily on the information contained in the offender's file to determine an adequate and

25  appropriate level of supervision and criminogenic needs.  (*Id.*)  The audits also serve to confirm

26  that release dates were calculated based on correct conviction offenses and sentencing

27  information.  (*Id.* at ¶ 6.)  The audit process has prevented violent and dangerous offenders, who

28  would pose a threat to the public if released early, from being mistakenly released early based on

1   inaccurate conviction and sentencing information in their files.  (*Id.*)  Timely completion of this

2   prerelease process is therefore critical to ensuring public safety.  (*Id.* at ¶ 9.)

3   About 90-120 days before offenders are released, Parole Operations' Transitional Case

4   Management Program provides prerelease benefit assistance to all eligible inmates releasing to

5   parole or county probation.  (Green Decl. ¶ 16.)  The benefit workers review institutional and

6   medical files, interview inmates, and screen them for eligibility for Social Security benefits, state-

7   sponsored Medi-Cal, and Veteran's benefits, and submit applications for those who qualify.  (*Id.*

8   at ¶ 17.)  As a further part of this process, 30 days before release, staff conduct an exit interview

9   with the offender to provide an update on this process.  (*Id.* at ¶ 19.)  This part of the prerelease

10  process is important because it provides offenders with much needed benefits upon their release

11  and avoids a delay in the provision of those benefits.  (*Id.* at ¶ 20.)  This, in turn, helps improve

12  their post-release stability, prevents indigence and homelessness, and improves their opportunity

13  for successful reintegration. (*Id.*)

14  From between about 30-90 days before an offender's release, Parole Operations begins the

15  Direct Placement process.  (Green Decl. ¶ 25.)  Direct Placement is a program for referring

16  offenders to community services providers, such as substance abuse treatment, outpatient

17  treatment, recovery housing, and other important services.  (*Id.*)  Although recommendations are

18  made up to 90 days before release, most placements are not actually accepted in the community

19  until offenders are within 30 days of release due to limited capacity.  (*Id.*)  Direct Placement is

20  important because it ensures a continuum of care from custody to the community, and also

21  frequently includes a transportation component so that offenders can get to the programs and

22  services that they need.  (*Id.* at ¶ 26.)  If Parole Operations were unable to provide Direct

23  Placement services for offenders who have been released, some of them could end up homeless

24  and without services that they desperately need.  (*Id.*)

25  Numerous other services and processes occur during this 30-to-90-day timeframe,

26  including prerelease video conferencing between the inmate and his or her supervising probation

27  officer (for inmates released to county supervision), service of reporting instructions and

28  notification of parole or probation conditions, and assistance obtaining a California Identification

1   Card if eligible.  (Green Decl. ¶¶ 29-36.)  These steps are critical to relieving anxiety, setting

2   expectations, and supporting access to federal and state benefits.  (*Id.*)

3        These steps are all critical to ensuring an inmate's best chances for success in the

4   community upon release.  (Green Decl. ¶ 3.)  But an immediate release of a large number of

5   inmates would make it difficult for Parole Operations to conduct any type of extensive prerelease

6   planning.  (*Id.* at ¶ 39.)  At his deposition, former Secretary Kernan shared these concerns, stating

7   that "[n]obody wants to put a high risk inmate[] that hasn't had appropriate preparole planning out

8   on the street and flood our healthcare system and create more of a problem."  (Wolff Decl., Ex. A

9   [Kernan Depo.] at 66:20-23.)  Plaintiffs, and Hoffman, ignore these critical considerations.

10              **3.      *Plaintiffs And Their Expert Improperly Assess Risk To Public Safety.***

11       In support of their assertion that "low security people already fully identified by CDCR's

12   risk tool" would "pose a minimal risk to the public," Plaintiffs rely upon the declaration of Mr.

13   Hoffman in which he asserts that 49.8% of California's inmates scored at a "Low Risk to

14   Reoffend" on the California Static Risk Assessment tool.  (Pltfs.' Mot. at 35:7-9; Hoffman Decl. ¶

15   10.)  Mr. Hoffman and Plaintiffs' conclusion is wrong and seems to be based on a fundamental

16   misunderstanding of the tool, its purpose, and its limitations.  (Green Decl. ¶ 48.)

17       The California Static Risk Assessment tool predicts the likelihood that an offender released

18   on parole will reoffend, *and be arrested and convicted of the new offense*, within three years.

19   (Green Decl. ¶ 49.)  The tool does not predict how dangerous an inmate is to public safety.  (*Id.*)

20   A low-risk score does not mean an offender would pose no risk to public safety.  (*Id.*)  In fact, as

21   CDCR's most recently published recidivism data shows, 21.4% of released offenders with a low-

22   risk score were convicted of reoffending within three years.  (*Id.*)  And, of course, that data does

23   not include offenders who were not identified or convicted after committing their new crimes.

24   (*Id.*)  If this statistic were to hold true, then one out of every five so-called low-risk inmates

25   released would reoffend and be convicted.  (*Id.*)  And many more might reoffend and never be

26   caught.

27       Parole Operations uses risk assessment tools to determine criminogenic needs for inmates

28   who will be released on parole, and to determine appropriate levels of supervision for those

**DEFS.' OPP'N TO PLTFS.' EMERGENCY MOT. TO MODIFY POPULATION REDUCTION ORDER**

1   parolees, not as a tool to determine whether large numbers of inmates can be released from prison

2   early with no risk to the public.  (Green Decl. ¶ 50.)  For Parole Operations, a low score on the

3   California Static Risk Assessment tool is one indicator that suggests a parolee might require a

4   lower level of supervision while on parole.  (*Id.*)  A low score on that tool, however, does not

5   mean that the parolee poses no risk to the public.  In fact, if such a so-called low-risk parolee also

6   received a high score on the Static 99R assessment tool—as many sex offenders do—the opposite

7   would likely be true.  (*Id.*)  Similarly, an inmate could have a low score on the California Static

8   Risk Assessment tool even though he may have been convicted of recent rule serious violations

9   for battery or involvement in gang activity while in prison.  (*Id.*)

10         Parole Operations uses multiple risk assessment tools that are based on both static and

11   dynamic risk factors to assess offenders.  (Decl. Green ¶ 51.)  It is insufficient to rely on a single

12   assessment tool to predict a parolee's risk of reoffending or risk to public safety, particularly if

13   that tool relied solely on static risk factors, as the California Static Risk Assessment tool does.

14   (*Id.*)  And, in the opinion of Parole Operations' acting Director, it would be foolish and dangerous

15   to rely solely on such a tool to decide that large numbers of inmates could be released early from

16   prison without posing a risk to the public.  (*Id.*)

17         **D.     Neither the *Plata* Nor The *Coleman* Court Has Issued An Order For Less
                Intrusive Relief That Has Failed To Remedy The Deprivation Of Plaintiffs'**
18              **Right At Issue: To Be Free From A Heightened Risk Of Contracting COVID-**
                **19.**
19

20         The PLRA mandates that "no court shall enter a prisoner release order unless" orders for

21   less intrusive relief have failed to remedy "the deprivation of *the Federal right sought to be*

22   *remedied* through the prisoner release order," and the defendant has been given sufficient time to

23   comply with the previous orders.  18 U.S.C. § 3626(a)(3)(A) (emphasis added).  Here, through

24   their requested prisoner release order, Plaintiffs seek to remedy the "especially high risk of severe

25   illness or death from COVID-19" caused by living in "crowded congregate living spaces."  (Pltfs.

26   Mot. at 3:8-11.)  Yet, no prior order in either underlying case has required Defendants to take

27   affirmative steps to mitigate inmates' risk of contracting COVID-19.  Because Plaintiffs fail to

28   meet this important statutory requirement, their claim fails.

-28-        Case Nos. 2:90-cv-00520-KJM-DB, C01-1351 JST

In an effort to satisfy their obligation under 18 U.S.C. § 3626(a)(3)(A), Plaintiffs assert that "[m]ore than a decade after the Court's 2009 order, it is evident that the order did not fully remedy the dangers it sought to alleviate." (Pltfs. Mot. at 28:5-6.) But this Court's prior prisoner release order does not satisfy the PLRA's requirement under (a)(3)(A) because the prior order was not intended to remedy the Federal right that Plaintiffs seek to address here in their current Motion. As explained in footnote 3, *supra*, Plaintiffs' initial prisoner release motion was premised on their assertion that overcrowding was the primary cause of the unconstitutional delivery of medical and mental health care. By comparison, Plaintiffs do not now assert that medical and mental health care is unconstitutional; rather, Plaintiffs seek a prisoner release order due to the "'substantial risk of illness and death' because of their congregate living environment" during the COVID-19 crisis. (Pltfs. Mot. at 8:5-7.) These are fundamentally different requests that are based on different sets of facts and circumstances. Indeed, Plaintiffs state that a prisoner release order is necessary now, "[e]ven with a constitutionally adequate prison healthcare system…." (*Id*. at 8:5.) Nor can this Court's initial prisoner release order reasonably be construed as an order for "less intrusive" relief, since the PLRA anticipates such "less intrusive" orders stop short of requiring a prisoner reduction. *See* ECF No. 2287/3767; *see* 18 U.S.C. § 3626(a)(3)(A) (requiring less intrusive relief before a court may enter a prisoner release order).

Moreover, Plaintiffs obscure the PLRA's requirement under (a)(3)(A)(ii), which mandates that "the defendant has had a reasonable amount of time to comply with the previous court orders," in an attempt to demonstrate their compliance with this statutory prerequisite. Plaintiffs argue that "[t]he State has had more than reasonable opportunity to devise and implement population reduction measures to eliminate the intolerable risk of serious harm or death due to the spread of infectious disease." (Pltfs. Mot. at 28:24-27.) But this Court's January 12, 2010 Order to Reduce Prison Population *did not* direct Defendants to "devise and implement population reduction measures to eliminate the intolerable risk of serious harm or death due to the spread of infectious disease," as Plaintiffs suggest. Rather, the Court's January 12, 2010 Order set six-month benchmarks for population reductions, culminating in an ultimate reduction to 137.5% of design capacity. ECF No. 2287/3767. Plaintiffs cannot reasonably dispute that Defendants are in

-29-   Case Nos. 2:90-cv-00520-KJM-DB, C01-1351 JST
DEFS.' OPP'N TO PLTFS.' EMERGENCY MOT. TO MODIFY POPULATION REDUCTION ORDER

16431778.2

1  compliance with this Order and have been for five years; indeed, Plaintiffs acknowledge that the

2  State's current population is 134.4% of design capacity.  (Pltfs. Mot. at 17:2-3.)

3       Plaintiffs further argue that Defendants' "failure to act more quickly to reduce the prison

4  population in light of this unprecedented crisis is troubling and constitutes further evidence of the

5  need for urgent action by this Court" in support of their claimed compliance with subsection

6  (a)(3)(A).  (Pltfs. Mot. at 29:27-30:1.)  But this, too, is not the standard under the PLRA, nor does

7  the Court's January 12, 2010 Order obligate Defendants to "act more quickly" in response to an

8  "unprecedented crisis" that would occur ten years later.

9       Finally, to the extent this Court construes the *Coleman* Court's requiring Defendants to

10  convene a task force on the topic of COVID-19 (ECF No. 6513), there is no indication (and

11  Plaintiffs do not allege) that Defendants have in some way failed to comply with that order, or that

12  it has been ineffective.

13       Thus, having failed to identify a prior order for less intrusive relief with which Defendants

14  have failed to comply, Plaintiffs are not entitled to a prisoner release order under the PLRA.

15  **IV.    PLAINTIFFS' MOTION PRESENTS A REQUEST FOR A NEW PRISONER
16         RELEASE ORDER, NOT MODIFICATION UNDER RULE 60(B)(5).**

17       The first step in obtaining a prisoner release order is an initial request in the district court

18  for referral to a three-judge court.  18 U.S.C. § 3626(a)(3)(B)-(C).  And in order to make such a

19  referral, the court must find that a prior court order for less intrusive relief has failed to remedy a

20  deprivation of a particular federal right *and* the defendant has had a reasonable amount of time to

21  comply with previous court orders.  18 U.S.C. § 3626(a)(3)(A).  A three-judge court shall then

22  only enter a prisoner release order if it finds by clear and convincing evidence that "crowding is

23  the primary source of the violation of a Federal right; and . . . no other relief will remedy the

24  violation of the Federal right."  *Id.*, § 3626(a)(3)(E).

25       Here, Plaintiffs' Motion is procedurally improper because they have erroneously presented

26  the Motion as a modification of this Court's prior population reduction order pursuant to Federal

27

28

1   Rule of Civil Procedure 60(b)(5),[5] rather than following the required procedural steps for

2   empaneling a new three-judge court.  Plaintiffs' instant Motion arises from a different purported

3   Constitutional violation than that presented in their 2006 motion, and as such, required separate

4   District Court referrals.  *See* 18 U.S.C. §§ 3626(a)(1)(A) (limiting prospective relief to "no further

5   than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs");

6   3626(a)(3)(A)(i) (limiting issuance of a prisoner release order until "less intrusive relief has failed

7   to remedy the deprivation of the Federal right sought to be remedied through the prisoner release

8   order").

9          Specifically, *Plata* Plaintiffs' 2006 motion requested referral to a three-judge court because

10  "[i]nadequate medical care is among the unconstitutional conditions caused by overcrowding" and

11  "until there is action to reduce overcrowding, the medical care provided to California inmates will

12  not, and indeed cannot, be raised to a constitutional level."  ECF No. 561 at 9:8-12.  Similarly,

13  *Coleman* Plaintiffs' 2006 motion requested referral to a three-judge court because

14  "[o]vercrowding directly impacts the fundamental constitutional right of the plaintiff class to

15  receive adequate mental health treatment."  ECF No. 2041 at 9:16-17.  The underlying *Plata* and

16  *Coleman* Courts each issued findings that prior less intrusive orders had issued, and those orders

17  failed to remedy the State's inability to deliver constitutionally adequate medical and mental

18  health care to inmates.  ECF No. 780/2320.  In deciding to convene this panel in 2007, the district

19  courts also found that the State had a reasonable amount of time to comply with previous court

20  orders aimed at CDCR's development of a constitutionally adequate health care delivery system.

21  *Id.*  Neither the *Plata* nor the *Coleman* Court was asked to consider whether population density

22  was the primary cause of an increased risk of harm from exposure to a transmittable disease or

23  virus.  These are separate issues and must be treated as such under the applicable statutory scheme.

24  *See* 18 U.S.C. §§ 3626(a)(1)(A) & (a)(3)(A)(i).  Because Plaintiffs' instant Motion seeks a

25

26  _____

[5] Plaintiffs argue that relief is warranted under the following provision of FRCP 60(b)(5): "[o]n

27  motion and just terms, the court may relieve a party or its legal representative from a final

judgment, order, or proceeding [if] … applying it prospectively is no longer equitable."

28

1  prisoner release order for reasons *other* than those set forth in their initial motions requesting to

2  convene a three-judge panel, under the statutory scheme, Plaintiffs' Motion requires a new request

3  to empanel a new three-judge court.

4        Plaintiffs' request for modification based on changed circumstances under Federal Rule of

5  Civil Procedure 60(b)(5) is therefore procedurally improper.  The requested "modification" does

6  not seek to alter the underlying prisoner reduction order based on some changed circumstance that

7  has frustrated or prevented its performance, like in the cases cited by Plaintiffs.[6]  To the contrary,

8  Plaintiffs seek to "modify" the underlying prisoner reduction order based on a completely new

9  theory of liability, which was not part of the prior order.  In essence, Plaintiffs seek to bypass the

10  procedural requirements to obtain a new prisoner reduction order.

11        To further illustrate this distinction, in *U.S. v. United Shoe Machinery Corp.*, 391 U.S. 244,

12  246 (1968), a prior district court entered a decree that imposed a variety of restrictions on

13  defendant shoe machinery manufacturer in order to eliminate its unlawful market domination, in

14  violation of federal antitrust laws.  The decree also required the parties to submit a report 10 years

15  later as to its effect "in establishing workable competition," and permitted the parties to apply for

16  modification.  *Id.* at 246.  The Government sought such modification, arguing that the defendant

17  continued to dominate the market despite the court's prior restrictions.  *Id.* at 247.  In reversing the

18  district court's order denying modification, the Supreme Court reasoned that the *purpose* of the

19  underlying decree was to "eliminate this unlawful market domination" and explicitly invited the

20  parties to petition for modification after 10 years, if that purpose had or had not been achieved,

21

22  [6] Plaintiffs cite the following cases, none of which support the expansive scope of relief sought in

23  the instant Motion: *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367 (1992) (defendant county jail
    sought relief under Rule 60(b) of prior consent decree providing for construction of new jail where

24  said construction was delayed and inmate population outpaced earlier projections); *N.Y. State
    Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956 (2d Cir. 1983) (defendant institution

25  sought modification of prior consent judgment's limitation on the permissible number of resident
    beds based on several unexpected obstacles); *Sharp v. Weston*, 233 F.3d 1166 (9th Cir. 2000)

26  (defendant state facility sought dissolution of prior injunction requiring facility to bring treatment

27  program into compliance with constitutional requirements on grounds that it had complied with
    the terms of the injunction).

28

1    and therefore the Government was entitled to seek a more restrictive measure. *Id.* at 249-50.

2         Plaintiffs here, unlike the Government in *United Shoe*, are not seeking to modify an

3    underlying order because its original purpose had not been achieved; instead, Plaintiffs essentially

4    seek a brand new order under the guise of a Rule 60(b) motion for modification to circumvent the

5    PLRA's requirements.  This is an impermissible shortcut that is not supported by law.  Under the

6    relevant statutory framework, the prisoner reduction order sought here requires a new three-judge

7    court and a separate finding of liability by clear and convincing evidence.

8         For this additional reason, Plaintiffs' Motion should be denied.

9                                    **CONCLUSION**

10        Defendants share Plaintiffs' concerns relative to the COVID-19 pandemic and the risk it

11   poses to the inmates and staff who live and work inside the State's 35 institutions.  That is why

12   California is taking aggressive and unprecedented steps to confront this crisis, including

13   suspending intake from county jails for 30 to 60 days and transitioning nearly 3,500 non-violent

14   inmates to parole and PRCS within the next few weeks, together freeing-up space for nearly 6,500

15   inmates total over the next several weeks.  The State has also taken meaningful steps to allow for

16   more physical distancing in dorm settings and has implemented enhanced medical screenings for

17   those entering CDCR's prisons.  Through these measures—and others which have already been

18   implemented or may be implemented in the coming days as the need arises and in response to the

19   constantly evolving threat presented by COVID-19—the State is "reasonably" acting to ensure the

20   safety and security of all who live and work within the State's institutions.  Plaintiffs are therefore

21   not entitled to a prisoner release order under these circumstances, and indeed have not met their

22   burden under the PLRA.  This Court must not accept Plaintiffs' invitation to substitute its

23   judgment for that of a co-equal branch, which is far better positioned to respond to this

24   unprecedented emergency.

25        In light of these measures, no order from the 3JP is required at this time.  This Court must

26   afford state officials broad discretion and flexibility to address this ever-evolving crisis.  And, if

27   additional population reduction is necessary, state officials should be allowed to implement such

28   measures in a way that balances the needs of CDCR's inmates and staff with the realities of a

16431778.2

public health crisis that extends beyond the prisons' walls and into communities where medical and mental health systems are stretched to their limits.

This motion must be denied.

DATED:  March 31, 2020                    HANSON BRIDGETT LLP


                                  By: /s/ Samantha D. Wolff
                                      PAUL B. MELLO
                                      SAMANTHA D. WOLFF
                                      KAYLEN KADOTANI
                                      Attorneys for Defendants

DATED:  March 31, 2020                    XAVIER BECERRA
                                          Attorney General of California


                                  By:  /s/ Damon McClain
                                       DAMON MCCLAIN
                                       Supervising Deputy Attorney General
                                       NASSTARAN RUHPARWAR
                                       Deputy Attorney General
                                       Attorneys for Defendants