XAVIER BECERRA
Attorney General of the State of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON C. MCCLAIN
ADRIANO HRVATIN
Supervising Deputy Attorneys General
NASSTARAN RUHPARWAR - 263293
ELISE OWENS THORN - 145931
TYLER V. HEATH - 271478
KYLE A. LEWIS - 201041
LUCAS HENNES - 278361
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone:  (415) 703-5500
Facsimile:  (415) 703-5843
Email:  Nasstaran.Ruhparwar@doj.ca.gov

Hanson Bridgett LLP
PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
 425 Market Street, 26th Floor
 San Francisco, California 94105
 Telephone:  (415) 777-3200
 Fax:  (415) 541-9366
 E-mail: pmello@hansonbridgett.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB<br><br>**THREE-JUDGE COURT** |
| **MARCIANO PLATA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | C01-1351 JST<br><br>**THREE-JUDGE COURT**<br><br>**DECLARATION OF JEFFREY GREEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION TO MODIFY POPULATION REDUCTION ORDER** |

I, J. Green, declare:

1. I have been employed by the California Department of Corrections and Rehabilitation (CDCR) for over twenty-four years. From 1996 through 2000, I worked for CDCR as a Recreational Therapist, Correctional Officer, and Correctional Counselor I. Since November 2000, I have worked in the Division of Adult Parole Operations in various capacities, including Parole Agent, Parole Administrator, Associate Director, Chief Deputy Regional Administrator, Deputy Director, and Director. I have been the acting Director of the Division of Adult Parole Operations since June 2019. Based on my many years of experience in the Division of Parole Operations, I have a thorough understanding of, and ready access to information about, its mission and processes.

2. I am competent to testify to the matters set forth in this declaration and, if called upon by this Court, would do so. I submit this declaration in support of Defendants' opposition to Plaintiffs' emergency motion to reduce the inmate population because of the COVID-19 pandemic.

**THE DIVISION OF ADULT PAROLE OPERATIONS' PRERELEASE PROCESSES**

3. The Division of Adult Parole Operations (Parole Operations) has a robust and complex prerelease process designed to help ensure that inmates can successfully transition to life in the community. An immense amount of work goes into the preparations for each offender's release. These prerelease processes are important because they greatly decrease the likelihood that offenders will violate parole or reoffend, determine appropriate levels of supervision, increase an offender's chances of success on parole, connect offenders with needed services and housing, and promote public safety. I have serious concerns about the prospect of a Court order that would require the immediate release of a large number of inmates, especially if the Court ordered the release of inmates for whom Parole Operations has not completed the prerelease planning process. Some of the important steps of the prerelease process, and the timeframes involved in completing them, are described below.

1

Decl. J. Green Supp. Defs.' Opp'n Pls.'Emergency Mot. Modify Population Reduction Order
Case Nos. 2:90-cv-00520 KJM-DB & C01-1351 JST

**Risk Assessments**

4. Beginning about 270 days before an offender's scheduled release, Parole Operations begins to conduct one or more risk assessments, including the California Static Risk Assessment, the STATIC 99R risk assessment, and the Female Sex Offender Risk Assessment.

5. The California Static Risk Assessment is an automated static risk-assessment tool that identifies the static risk of reoffending within three years. It was designed to automatically determine a risk-assessment score based on static data points, such as age, gender, and criminal misdemeanor and felony convictions, contained in criminal-history data compiled by the California Department of Justice. The risk assessment scores for the overwhelming majority of offenders have been automatically calculated before the prerelease planning process even begins. But sometimes offenders' scores could not be automatically calculated based solely on Department of Justice data because there exist of out-of-state convictions that must be accounted for, hybrid rap sheets that must be interpreted, or inaccurate information in various offender databases that must be corrected before the assessment can be completed.

6. The STATIC 99R risk assessment is used to score the potential risk a male sex offender might pose to the community after release. Offenders who score a 3 or less on this assessment are supervised by county probation departments after they are released. Offenders who score of 4 or above are supervised by Parole Operations. The commitment offense, however, may override the assessment score. For example, if the offense was serious or violent, then Parole Operations would supervise the offender regardless of the score. Staff spend up to about one and a half hours to complete this assessment.

7. The Female Sex Offender Risk Assessment is used to score the potential risk that a female sex offender might pose to the community after release. Staff spend up to about one and a half hours to complete this assessment.

8. These various risk assessments are necessary and important because they identify offenders who might pose a greater risk to the community upon release, and they help determine the level of supervision required for each offender.

**Criminogenic Needs Assessment**

9. From between about 180-210 days before an offender's release, Parole Operations begins working on the Correctional Offender Management Profiling for Alternative Sanctions assessment, which is a re-entry needs-assessment tool that focuses on predictors known to affect recidivism and identifies an offender's criminogenic needs. This assessment enables the parole agent to develop recommendations for an offender's programming. It is an important part of the process because if criminogenic needs are appropriately addressed, the offender's chances of success on parole are improved and the risk that the offender will reoffend is decreased.

10. Parole Operations only completes this assessment for offenders being released to Parole Operations' supervision (roughly half of released offenders). County probation departments use their own assessment tools to assess offenders who will be released to their supervision.

11. As part of this assessment, staff also prepare a prerelease case plan for each offender who will be supervised by Parole Operations. Each unique case plan provides the offender with community resources to address each criminogenic need. For example, if an offender had a substance-abuse problem, the plan might direct the offender to a substance-use-disorder-treatment program three times per week and call for random anti-narcotic testing. The preparation of case plans is important because offenders and their supervisors can use the case plans as a road map for success on parole.

12. Staff spend up to about an hour and a half to complete each offender's combined assessment and case plan.

**Release Program Study**

13. From between about 180-210 days before an offender's release, Parole Operations begins to conduct a Release Program Study. When completed, this study contains a summary of information concerning the offender's residence, employment, supervision designation. The study also contains important information about other case factors, including gang status, the county of last residence, the county of commitment, medical information, reporting instructions, and any request to have supervision transferred.

14. The release program study is important because it summarizes important information critical to postrelease supervision of the offender, identifies the county where the offender will be released, and provides the offender with instructions for reporting to the parole or probation office.

15. Staff are provided about one hour to complete this study.

**Transitional Case Management Program**

16. Parole Operations' Transitional Case Management Program provides prerelease benefit assistance to all eligible inmates releasing to parole or county probation. Under this program, about 90-120 days before offenders are released, benefit workers begin providing benefit-application assistance to all eligible offenders.

17. The benefit workers review institutional and medical files, interview inmates, and screen them for eligibility for Social Security benefits, state-sponsored Medi-Cal, and Veteran's benefits, and submit applications for those who qualify.

18. As a part of this process, benefit workers cross reference lists of inmates who will be released in the next 120 days with the Veteran's Re-Entry Search Services secure website to identify inmates who may be entitled to benefits upon release. They then help eligible offenders to apply for those benefits.

19. As a further part of this process, 30 days before release, staff continue to complete and submit applications for benefits as needed and conduct an exit interview with the offender to provide an application-status update and an outcome letter that provides the addresses of the Medi-Cal and Social Security Administration offices closest to the area where the offender will reside.

20. This part of the prerelease process is important because it provides offenders with much needed benefits upon their release and avoids a delay in the provision of those benefits. This, in turn, helps improve their post-release stability, prevents indigence and homelessness, and improves their opportunity for successful reintegration.

**Out-of-State Transfers**

21.  Some offenders request that their supervision be transferred out of state so that they can reside with their families.  Living with family members can be beneficial for offenders because it may provide them with more support, a stable residence, and better chances at stable employment.  About 90-120 days before an offender's release, Parole Operations begins to process any request for an offender's supervision to be transferred to another state.  Parole Operations only performs this function for the offenders it will supervise upon release (roughly half of released offenders).  County probation departments process these types of requests for offenders who will be released to county supervision.

22.  Under the current state of emergency, California and other states have suspended interstate transfers of offenders, including the transfer of parolees' supervision to other states.  But staff will continue to complete the transfer-related work so that once the suspension is lifted, the work to facilitate transfers will already be complete.  The fact that transfers are currently suspended, will likely increase the workload related to the Direct Placement process (discussed below), because more offenders will need housing and services in California.

23.  The processing of out-of-state transfers is important because these transfers often facilitate a smooth transition from custody to the community, and they lessen the likelihood that offenders will become homeless.  Starting this process early is critical to ensure that the transfer is approved before the offender is paroled, which could cause a parolee to become homeless pending approval.

24.  Staff spend up to about an hour to complete out-of-state-transfer paperwork.

**Direct Placement**

25.  From between about 30-90 days before an offender's release, Parole Operations begins the Direct Placement process.  Direct Placement is a program for referring offenders to community services providers, such as substance abuse treatment, outpatient treatment, recovery housing, and other important services.  Although recommendations are made up to 90 days before release, most placements are not actually accepted in the community until offenders are within 30 days of release due to limited capacity.  CDCR funds these services through its Division of

5

Decl. J. Green Supp. Defs.' Opp'n Pls.'Emergency Mot. Modify Population Reduction Order
Case Nos. 2:90-cv-00520 KJM-DB & C01-1351 JST

Rehabilitation Programs. Under this program offenders are referred to these services before they are released. Parole Operations only provides these referrals for offenders that it will supervise upon release (roughly half of released offenders). County probation departments handle referrals for offenders who they will supervise upon release.

26. Direct Placement is important because it ensures a continuum of care from custody to the community, and also frequently includes a transportation component so that offenders can get to the programs and services that they need. If Parole Operations were unable to provide Direct Placement services for offenders who have been released, some of them could end up homeless and without services that they desperately need.

27. It is far more difficult to arrange for needed services and housing for offenders who require a higher level of services because of chronic health problems or serious mental health issues. And finding available skilled nursing facilities or facilities that provide high levels of mental health care is especially difficult, and sometimes impossible. Consequently, these types of offenders occasionally end up in hospital emergency rooms.

28. Staff spend up to about three hours to interview offenders about their needs and to complete the Direct Placement process.

**Prerelease Video Conferencing**

29. From between about 30-90 days before an offender's release, Parole Operations arranges a prerelease video conference between the offender and the supervising probation officer for inmates released to county supervision. Parole Operations will arrange the conference if it is requested by the probation department. During the conference the probation officer may conduct risk and needs assessments and discuss issues related to the offender's release, reporting instructions, conditions of release, available community programs, housing, or any other subject that may assist the offender during the transition to the community.

30. Prerelease video conferences are an important part of the prerelease process because they give offenders an opportunity to ask questions about their release and transitions, and relieve prerelease anxiety. It also ensures that offenders are aware of their probation officers' expectations upon their release, and helps to increase their chances of success.

31. Staff spend up to about an hour to arrange and provide the prerelease video conference.

**Reporting Instructions and Notice of Parole Conditions**

32. From between about 30-90 days before an offender's release, Parole Operations serves the offender the reporting instructions and notice of any conditions of parole or probation. As part of this process, a Parole Service Associate explains the conditions of parole and has the offender sign documents acknowledging that the offender understands the parole conditions.

33. This is an important step of the prerelease process because it ensures that the offender is aware of expectations and prohibitions during the transfer to the community. And it helps to improve an offender's postrelease success.

34. Staff spend up to about an hour to complete this step of the process.

**California Identification Cards**

35. The Department screens offenders in advance of their release to determine their eligibility for a California Identification Card, submits applications to the Department of Motor Vehicles, and ultimately arranges for eligible offenders to receive a card upon their release.

36. Obtaining California Identification Cards for offenders is important because it enables them to access federal and state benefits without the stigma of an inmate identification card.

**POSTRELEASE SUPERVISION**

37. The passage of Assembly Bill 109 in 2011 shifted the postrelease supervision responsibility for many inmates released from prison to county probation departments. But the Division of Adult Parole Operations remained responsible for the postrelease supervision of a specified group of inmates—e.g., inmates convicted of serious felonies, violent felonies, and sex offences.

38. Since 2011, roughly half of offenders released from CDCR's prisons were in the groups of persons whose postrelease community supervision was handled by county probation departments. And the Division of Adult Parole Operations handled the postrelease supervision for the remainder—roughly half—of offenders released from prison.

39. In light of the COVID-19 pandemic and the Governor's shelter-in-place order, Parole Operations must carefully balance public safety and the need to provide offender supervision, re-entry services, and assistance with the public health measures ordered by the Governor, the safety of Parole Operations staff, and the health of the community. Balancing these competing interests has been difficult, and I am concerned that a Court order directing the immediate release of a large number of inmates could make it even more difficult, especially if Parole Operations has not completed prerelease planning for them.

40. The COVID-19 pandemic and public-health measures currently in place have severely impacted Parole Operations' ability to conduct its usual business. And the same must be true for county probation departments that are responsible for supervising about half of released offenders. For example, Parole Operations' parole offices are only maintaining minimum staffing levels during this phase of the COVID-19 crisis to comply with physical distancing and the shelter-in-place order. Supervisors and parole agents are working remotely whenever possible. Most offenders' required parole-office visits have been suspended, with the exception of emergencies, statutory requirements, and critical needs. Contacts with offenders are to be made telephonically in lieu of the usual fact-to-face contacts. The usual steps of taking offender photos and conducting initial interviews are to be rescheduled during the current shelter-in-place order.

**AVAILABILITY OF SERVICES AND HOUSING DURING THE PANDEMIC**

41. The Division of Rehabilitative Programs within CDCR has oversight of most community-based parolee program contracts. These parolee contracts are 6-12 month service-based criminogenic treatment contracts that may come with a recovery-housing component. Services can range from outpatient services with no housing component to non-clinical detoxification services. CDCR has both direct contracts for services, and contracts with vendors that provide regionalized coverage. The regionalized vendors subcontract for services in local communities. These contracts are mainly focused on substance use and other criminogenic treatment deliverables, and are not qualified to take mental health patients who are not stabilized or who need a high level of medical care (e.g., skilled nursing).

42. Community-based parolee programs are often critical to the success of the newly released offenders. They provide a stable place to live while parolees address various community-based needs, including substance-use-disorder treatment, anger management treatment, and domestic violence treatment. These programs also reconnect parolees to local health care, provide functional supports necessary for reintegration, assist parolees in gaining employment, and connect parolees with permanent supportive housing.

43. In my experience, the community-based contracts serve about 4,000 to 4,500 parolees at any one time. And about half of these contracts include a housing-related component. In light of the COVID-19 crisis, it is important to note that the housing provided under these contracts is comprised of group-living arrangements, including shared bedrooms, bathrooms, and common spaces throughout the homes.

44. Because these programs are costly, CDCR has traditionally provided them to moderate to high-risk, and moderate to high-need, parolees. Doing so mitigates public safety risks and improves the chances of success for these parolees.

45. The Division of Rehabilitative Programs uses all available funding for these community contracts, and these programs are almost always filled to capacity. Consequently, it often takes time to arrange new placements. The COVID-19 pandemic has exacerbated this situation because many providers have employees who are attempting to telework or are not working due to the crisis. Providers have begun expressing concerns about taking on additional placements and causing a risk of exposure to other participants who are sheltering in place and practicing social distancing. Treatment groups in licensed facilities and outpatient services have either been minimized to avoid exposure risk, or have been cancelled for the time being.

46. I am, of course, aware that parolees are able to live with family members, but from my many years of Parole Operations experience, I also know that this may involve a parolee sleeping on a couch in a crowded home with multiple extended family members living in small quarters. COVID-19 has likely exacerbated living situations for many families because of school closures and shelter-in-place orders. I have additional concerns that the economic impact of the crisis on the families of parolees may make it difficult, if not impossible, for them to offer much

support or a home to live in, which could lead to the worst-case situation of a parolee becoming homeless.

47.  Under these circumstances, a large influx of probationers or parolees in need of housing and services, without appropriate coordination and prerelease planning, could overtax local community resources and cause an adverse impact on their ability to assist parolees with reintegration.

**THOMAS HOFFMAN'S DECLARATION**

48.  I have reviewed Thomas Hoffman's declaration, which was filed in support of Plaintiffs' motion. And in particular, I reviewed paragraph 10, in which he asserts that 49.8% of California's inmates scored at a "Low Risk to Reoffend" on the California Static Risk Assessment tool. I also reviewed page 35 of Plaintiffs' motion where they cite to the Hoffman declaration to support their conclusion that all inmates who have a low score on the California Static Risk Assessment tool could be released with minimal risk to the public. That conclusion is incorrect and seems to be based on a misunderstanding of the tool, its purpose, and its limitations.

49.  Plaintiffs' conclusion indicates they have a fundamental misunderstanding about what the California Static Risk Assessment does. The tool predicts the likelihood that an offender released on parole will reoffend, *and be arrested and convicted of the new offense*, within three years.[1] The tool does not predict how dangerous an inmate is to public safety. I have confirmed with CDCR's Office of Research that 61% of the offenders with a low-risk score have a current violent commitment offense, and 91% of the offenders with a low-risk score have a current violent and/or serious commitment offense. Therefore, a low-risk score does not mean an offender would pose no risk to public safety. In fact, as CDCR's most recently published recidivism report shows, 21.4% of released offenders with a low-risk score were convicted of reoffending within three years.[2] And, of course, that data does not include offenders who were not identified after committing their new crimes or who were not convicted for some other

---

[1] *See* https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/01/Recidivism-Report-for-Offenders-Released-in-Fiscal-Year-2014-15.pdf at p. 30.
[2] *See Id.* at pp. 30-31 (table 13 & Figure 9).

reason. If this statistic were to hold true for the 63,000 inmates referenced in Hoffman's declaration, we would expect that 13,482 of those offenders would reoffend and be convicted within three years of release. And many more might reoffend and never be caught or convicted.

50.  Parole Operations uses risk assessment tools to determine criminogenic needs for inmates who will be released on parole, and to determine appropriate levels of supervision for those parolees, not as a tool to determine whether large numbers of inmates can be released from prison early with no risk to the public. For Parole Operations, a low score on the California Static Risk Assessment tool is one indicator that suggests a parolee might require a lower level of supervision while on parole. A low score on that tool, however, does not mean that the parolee poses no risk to the public. In fact, if such a parolee received a high score on the Static 99R assessment tool—a tool used to assess sex offenders—the opposite would likely be true. I have confirmed with CDCR's Office of Research that numerous inmates with low to moderate scores on the California Static Risk Assessment have high scores on the Static 99R. Similarly, inmates could have a low score on the California Static Risk Assessment tool even though they may have been convicted of recent rule violations for battery or involvement in gang activity while in prison. That is because the assessment does not account for in-prison conduct unless it results in a criminal conviction.

/ / /

/ / /

/ / /

51. As discussed above, Parole Operations uses multiple risk assessment tools that are based on both static and dynamic risk factors to assess offenders. Based on my extensive experience in the parole supervision field, I believe it would be naive to rely on a single assessment tool to predict a parolee's risk to public safety, especially a tool that relied solely on static risk factors. And it would be foolish and dangerous to rely solely on such a tool to decide that large numbers of inmates could be released early from prison without posing a risk to the public.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on March 31, 2020, at Sacramento, California.

/s/ *Jeffrey Green*
_____
Jeffrey Green, Director (A), Division of Adult Parole Operations
California Department of Corrections and Rehabilitation
(*Original signature retained by counsel*)