1  DONALD SPECTER – 083925           MICHAEL W. BIEN – 096891
   STEVEN FAMA – 099641              ERNEST GALVAN – 196065
2  ALISON HARDY – 135966             LISA ELLS – 243657
   SARA NORMAN – 189536              JESSICA WINTER – 294237
3  RITA LOMIO – 254501               MARC J. SHINN-KRANTZ – 312968
   MARGOT MENDELSON – 268583         CARA E. TRAPANI – 313411
4  PRISON LAW OFFICE                 ROSEN BIEN
   1917 Fifth Street                 GALVAN & GRUNFELD LLP
5  Berkeley, California  94710-1916  101 Mission Street, Sixth Floor
6  Telephone:   (510) 280-2621       San Francisco, California  94105-1738
                                     Telephone:   (415) 433-6830
7
   Attorneys for Plaintiffs

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **THREE JUDGE COURT** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |
| MARCIANO PLATA, et al., | Case No. C01-1351 JST |
| Plaintiffs, | **THREE JUDGE COURT** |
| v. | |
| GAVIN NEWSOM, | **PLAINTIFFS' REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION** |
| Defendants. | |

**INTRODUCTION**

The parties do not dispute the relevant facts: (1) the COVID-19 pandemic poses a serious risk of harm to plaintiffs; (2) the best way to prevent the spread of the virus is social distancing; (3) conditions in the prisons currently do not allow for requisite social distancing; and (4) as a result, people must be released or relocated to reduce population density. The only question, then, is whether the modest steps proposed by the State are reasonable in light of the extreme risk faced by the Plaintiff class. They are not.

The State recognizes that the pandemic is "dangerous," "crippling," and "unprecedented," and brings us to a "moment of extreme peril." Defs.' Opp. to Pls.' Emergency Mot. ("Opp.") at 6-7, 11. The State concedes that Plaintiffs, like those "in nursing homes," "are at a higher risk for contracting the virus" due to "closer living quarters," Declaration of Joseph Bick ("Bick Decl.") ¶ 6; *see* Opp. at 17, and that the virus poses a "risk of severe illness" and "elevated rates of hospitalizations and death," Bick Decl. ¶ 17 &. ¶¶ 3, 11; *see also* Opp. at 15. CDCR already has "shortages of masks, gloves, gowns, and faceshields, which endangers staff and patients." Declaration of Michael Golding ("Golding Decl.") ¶ 6.

The State also agrees that "the spread of COVID-19 is best addressed through physical distancing," Opp. at 25; *see* Declaration of Ralph Diaz ("Diaz Decl.") ¶ 1; Declaration of Connie Gipson ("Gipson Decl.") ¶ 4; Bick Decl. ¶ 7, and that release of people is necessary because "an emergency endangering the lives of inmates . . . has occurred or is imminent," Cal. Gov't Code § 8658; Diaz Decl. ¶¶ 1, 5.

The State's proposed steps—temporarily pausing intake from county jails, expediting the release of 3,496 people who were scheduled to be released in the next 60 days, and relocating at most 534 people from three dorms—are important but not sufficient. Over 46,000 people in CDCR custody live in dorms, and most are in dorms at over 100% of design capacity. Declaration of Michael Bien ISO Pls.' Emergency Mot. ("Bien Decl.") ¶ 17 & Ex. 3 (3221/6529). The State does not (because it cannot) suggest that a modest, one-time reduction in the overall population and transfer of people from three dorms (where overcrowding will lower only to 179%, 161%, and

151%, respectively) will achieve necessary social distancing.  The most the State will say is that its approach will allow "greater physical distancing," will "remov[e] inmates from crowded conditions" where "convenient[]," and that staff and incarcerated people are "practicing physical distancing strategies" and "adjusting dining schedules" "where possible."  Opp. at 20, 25-26.  That is not enough.

This is not the time for half-measures or incremental steps.  In the seven days since Plaintiffs filed this motion, the number of confirmed infections of staff more than tripled, the number of confirmed infections of people in the Plaintiff class increased eightfold, and the number of affected institutions more than doubled.  Bien Decl. ¶ 47 & Ex. 33 at 149; Declaration of Donald Specter ISO Pls.' Reply Br. ("Specter Decl.") ¶ 4 & Exs. C & D.

Because the State's proposed plan falls far short of the relief required to prevent disaster, this Court must intervene to ensure complete, effective action is taken without further delay. Plaintiffs' proposed remedies – the reduction of population density in crowded dorms to allow social distancing and release or relocation of medically vulnerable patients – are narrowly tailored to address the current crisis and, far from "micromanaging" the State's efforts (Opp. at 12), provide the State flexibility in what measures to implement so long as they achieve social distancing.  Such measures can be implemented safely and must be implemented expeditiously.

I. **Plaintiffs Are Entitled to Relief Under the PLRA.**

   A. **Preventing and Responding to Infectious Disease Is a Core Component of a Constitutionally Adequate Health Care System and of the *Plata* Case.**

Fundamentally misunderstanding the history of this case and the nature of the relief Plaintiffs seek, the State argues that Plaintiffs must file a new lawsuit alleging deliberate indifference to COVID-19 and requesting that a new three-judge panel be convened.  Opp. at 15-16, 33-39.  The State argues that the matter falls outside the scope of the *Plata* and *Coleman* cases because "the gravamen of Plaintiffs' motion is the need for an adequate response to the COVID-19 crisis, not the delivery of medical care."  *Id.* at 16 n.3.

Preventing the spread of a dangerous, contagious illness is plainly a requirement of an

adequate medical care system. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (Eighth Amendment requires a remedy for conditions that allow the spread of "infectious maladies such as hepatitis and venereal disease" (citation omitted)). Indeed, the State's failure to adequately control infectious illness has long been a concern *in this case*. *See Brown v. Plata*, 563 U.S. 493, 508-09, 519-20 (2011) (noting that "[o]vercrowding had increased the incidence of infectious disease" in CDCR, and crowded living quarters "where large numbers of prisoners may share just a few toilets and showers [were] 'breeding grounds for disease'"); *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 931 (E.D. Cal., N.D. Cal. 2009) ("[C]rowding generates unsanitary conditions, overwhelms the infrastructure of existing prisons, and increases the risk that infectious diseases will spread."); Findings of Fact and Conclusions of Law Regarding the Appointment of Receiver, *Plata* Dkt. No. 371, Oct. 3, 2005, at 18, 21-22 (identifying deficiencies in CDCR's ability to address communicable diseases and noting that infectious disease outbreaks in the prisons have "the potential to affect other prisoners, the staff and the local community").

And Plaintiffs need not re-prove the long-standing constitutional violations each time they seek relief for the State's failure to provide constitutionally adequate health care. Opp. at 15-16. This Court retains "broad" and "flexible" authority to modify its prior order "as warranted by the exercise of its sound discretion." *Plata*, 563 U.S. at 542-43 (citations omitted). Indeed, this Court has a "continuing duty . . . to assess the efficacy and consequences of its order" and to modify the order to "ensure that the rights and interests of the parties are given all due and necessary protection." *Id.* The Court is not required to make new findings of constitutional violations before exercising this power. *See Parsons v. Ryan,* 912 F.3d 486, 501 (9th Cir. 2018) ("Nor do we accept Defendants' suggestion that the district court was required to make *new* findings of a constitutional violation before entering the [additional remedial order]."); *Armstrong*, 768 F.3d at 986-87 (upholding modification of injunction because "[t]he ongoing, intractable nature of this litigation affords the district court considerable discretion in fashioning relief").[1]

---

[1] For the same reasons, it is plainly erroneous to claim that in a case of this duration, complexity, and scope the Court has not issued orders for less intrusive relief. Opp. at 28. The *Plata* Court

Here, Plaintiffs seek the precise relief contemplated by this Court over a decade ago when it directed Plaintiffs to seek further relief "[s]hould the state prove unable to provide constitutionally adequate medical and mental health care after the prison population is reduced to 137.5% design capacity."  922 F. Supp. 2d at 970 (footnote omitted).  It is well established that "social distancing . . . directives are the community standard healthcare recommendations" for COVID-19.  *See* Stern Supp. Decl., ¶ 9 & Ex. A at 1.  Due to ongoing overcrowding, the State cannot implement this directive—a failure that places class members at unacceptable risk of serious harm.  *See* Stern Decl. at ¶ 8; Specter Decl. ¶ 2 & Ex. A at 26, 29-30, 77.

### 1. Defendants Are Deliberately Indifferent to the Threat of Serious Harm or Death from the COVID-19 Pandemic.

While it is unnecessary to establish the constitutional violation anew, Defendants' conduct with respect to the COVID-19 pandemic clearly violates the Eighth Amendment.  "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  Failure to prevent the spread of a contagious illness constitutes deliberate indifference to a serious medical need, as the State concedes.  Opp. at 12; *see Helling*, 509 U.S. at 33 (officials may not be "deliberately indifferent to the exposure of inmates to a serious, communicable disease."); *Hutto v. Finney*, 437 U.S. 678, 682 (1978) (finding constitutional violation where incarcerated people were placed in conditions where infectious diseases could spread easily).

The State agrees that "the spread of COVID-19 is best addressed through physical distancing" and concedes that prison conditions, "including closer living quarters," place Plaintiffs at a higher risk for contracting COVID-19.  Opp. at 17, 20.  The State does not dispute that more than 46,000 people in CDCR live in dorms where people sleep well under six feet apart.  *See* Bien Decl. ¶ 16 & Ex 3.  And the State is well aware that those incarcerated in CDCR are at heightened risk of falling severely ill due to COVID-19: according to a recent analysis done by the Receiver's

---

has issued dozens of orders aimed at the establishment of a constitutionally adequate health care system.  *See Plata*, 563 U.S. at 514-16.  The State's suggestion that the Court lacks jurisdiction because of the absence of prior court orders specifically addressing COVID 19 strains credulity.

office, 45,110 people incarcerated in CDCR (37%) are at risk of "adverse COVID-19 outcomes" due to age or pre-existing health conditions.  *See* Specter Decl. ¶ 3 & Ex. B.

But the State's proposed measures—expediting the release of 3,496 people and moving at most 534 people from three dorms—fail to affect more than a sliver of the overall dorm population.  For example, one of the so-called "extraordinary" protective measures is the proposed transfer of "[a]pproximately 480-530 inmates living in dorms . . . to other prisons with unoccupied buildings of space available."  Opp. at 6.  Specifically, the State asserts that it will move 100-150 people from Chuckawalla Valley State Prison to Ironwood State Prison, and 192 people each from Substance Abuse Treatment Facility and California Rehabilitation Center to California State Prison-Corcoran.  Opp. at 18-19.  These transfers amount to just 5.5% of the population in those dorms.[2]

The State also proposes expediting the release of 3,496 people who were scheduled to be released in the next 60 days.  Opp. at 18; Diaz Decl. ¶ 7.  But this will decrease the dorm population, at most, by 7.6%.  *See* Bien Decl. ¶ 16 & Ex. 3.  Similarly, the effect of State's decision to close intake to the prisons will incur only over time and without the necessary immediacy.  Its impact also will be generally limited to the Reception Centers in the CDCR.

These modest decreases, while welcome, will not address overcrowding and will not facilitate appropriate social distancing in the dorms.[3]  Put simply, ongoing overcrowding constitutes "a condition of confinement that is sure or very likely to cause serious illness."

---

[2] The State's proposal to move 150 people out of CVSP would reduce overcrowding in CVSP's dorms only from 170% to 161% of design capacity.  *See* Bien Decl. ¶ 13 & Ex. 3 at 21. Defendants' proposal to move 192 people out of SATF's dorms would impact just 7% of SATF's total dorm population and would reduce overcrowding in SATF's dorms only from 162% to 151% design capacity.  *See id.* at 40-41. Finally, the proposal to move 192 people out of CRC's total dorm population of 4,012 people would reduce overcrowding in those dorms from 187% to 179% design capacity.  *See id.* at 19.

[3] The State further asserts that people housed in Joshua Hall at the California Institution for Men are being instructed to stay six feet apart and are given extra soap and hand sanitizer."  Opp. at 22. But the State fails to mention that, as of March 23, 2020, Joshua Hall housed 129 people despite having a design capacity of 80 beds, for an overcrowding rate of 161%, with beds only 25-48 inches apart.  Tevah Decl. ¶ 5; Bien Decl. ¶ 13, Ex. 3 at 11.  The State never explains how social distancing is feasible in such an environment. Notably, 11 staff and one incarcerated person at CIM already have tested positive for COVID-19.  Specter Decl. ¶¶ 4-5, Exs. C & D.

*Helling*, 509 U.S. at 33.  Failure to address that grave risk amounts to deliberate indifference.

### B. Plaintiffs' Proposed Remedy is Narrowly Tailored and Extends No Further than Necessary

Plaintiffs' proposed remedy is simple.  The State must immediately reduce its population to permit social distancing in the prisons.  In so doing, the State must address the vulnerabilities of people who are most at risk of becoming severely ill or dying because of COVID-19.  The State argues that the remedy Plaintiffs seek is not sufficiently tailored and "overlook[s] less-intrusive alternatives to a release order that can similarly achieve the goal of physical distancing." Opp. at 16.  But the State fails to present any evidence that its "more tailored approach" would "achieve[] much of the same end." *Id.* at 26.  The State does not explain how social distancing could be achieved by the minimal population releases and transfers it proposes.

Courts have rejected challenges to the scope of relief sought by Plaintiffs where, as here, the State fails to present "realistic alternatives" to the remedy sought.  *See Plata*, 563 U.S. at 533-34 (explaining State's failure to propose "any realistic alternative" to population reduction "creates a certain and unacceptable risk of continuing violations of the rights of sick and mentally ill prisoners, with the result that many more will die or needlessly suffer," and that "[t]he Constitution does not permit this wrong"); *Armstrong v. Brown*, 768 F.3d 975, 986-87 (9th Cir. 2014) (where State fails to present "any realistic alternative" that will cure violation, State cannot complain that court order is overly intrusive under PLRA).  The State's failure to present a realistic alternative in the prisons underscores the need for relief.

### C. Public Safety Considerations Favor Targeted Releases to Curb the Rampant Spread of COVID-19 in CDCR

#### 1. The Adverse Effect on the Public Health System Will Be Far Worse Without a Swift Population Reduction

The State's primary public safety argument is that releasing medically at-risk patients from prison will tax local health care systems because those people will seek emergency health care and utilize other community resources.  Opp. at 27-29.  The State's estimation of this impact is overblown, but even if it was not "[t]his risk pales in comparison to the risk that groups of

medically at-risk people living in crowded congregate housing will become seriously ill with the virus." Stern Supp. Decl. ¶¶ 3-7.  Rapid transmission of COVID-19 in California's congested prisons is "inevitable" and when that happens, the level of care infected patients will require – all of which will be provided by hospitals outside CDCR – will "far exceed the level of care Defendants expect them to require if they are released" now, before they contract COVID-19.  *Id*. ¶ 4.  Their critical needs will quickly and completely overwhelm the community hospitals tasked with their care, which will then "lack the space, staff and equipment to serve the larger community."  *Id*. ¶ 5.  This dire prediction is not hypothetical, but in fact already has occurred in an Illinois prison.  *Id*. ¶ 6.  Preventing the spread of COVID-19 within California's prison walls by releasing people, including those who are medically at-risk, will allow both those released and those who remain incarcerated to socially distance and practice appropriate hygiene.  *Id*. ¶ 10.  As former CDCR Secretary Kernan testified, these basic prevention practices are simply impossible in the "tinderbox" that is California's overcrowded prison system right now.  Specter Decl. ¶ 2 & Ex. A at 26, 29-30, 77.

The State relies heavily on statements from the *Plata* Receiver and a study conducted by one of the consultants to the Receiver, Dr. Brie Williams, in support of their public health argument.  Opp. at 28-29.  But the State's analysis of Dr. Williams's study is flawed; both the Receiver and Dr. Williams favor decreasing population density to reduce the risk of COVID-19 spread in CDCR.  *See* Stern Supp. Decl. ¶¶ 8-9 & Ex. A; Bien Decl. ¶ 56 & Ex. 40.

In short, the State gets the calculation of risk to public health exactly backwards.  *See* Stern Supp. Decl. ¶ 10.  As the State agrees, people are more likely to be infected with COVID-19 in prison than in the community.  *See* Bick Decl. ¶ 6. The real risk here is that COVID-19 will quickly run rampant in CDCR, causing many thousands of people to become critically ill, and those people will then require intensive, resource-consuming health care in community hospitals that already are on the verge of being overwhelmed.  Only by reducing the prison population to the point where effective preventative measures can actually be employed to slow transmission can this catastrophic outcome be mitigated.  Anything less will result in a public health nightmare.

### 2. The State Has Both the Expertise and the Tools to Reduce the Prison Population with Minimal Effect on Public Safety

The State asserts that it cannot safely release people early from CDCR in order to curb COVID-19's spread because doing so would prevent appropriate prerelease planning and cause increased crime. *See* Opp. at 29-33. Those claims fall short. On the prerelease planning point, the State relies entirely on the testimony of Jeffrey Green, the acting Director of DAPO, who goes to great lengths to recite the steps of DAPO's nine-month prerelease planning process. Notably, Mr. Green never claims that this standard, leisurely process cannot be expedited in the face of the greatest public health emergency of this generation. Indeed, even using Mr. Green's own estimates, it is clear that the numerous prerelease planning steps currently spread over 270 days can be accomplished in a matter of hours. Hoffman Supp. Decl. ¶¶ 6-15; *see* Green Decl. ¶¶ 4-40.

The State stresses the burden of accelerated releases on DAPO prerelease and supervisory resources. Opp. at 32. But, as former CDCR Secretary Kernan testified, the State already releases 38,000 people per year, some of who have insufficient or indeed no parole plans whatsoever, even if they have contagious diseases. Specter Decl. ¶ 2 & Ex. A at 37-38, 92. And DAPO has many options available to it to use its resources more efficiently. Hoffman Supp. Decl. ¶¶ 16-22. Finally, of course, the State's claim that its prerelease planning process is "crucial to ensuring an inmate's best chances for success in the community upon release" is a hollow promise if the people undergoing that process die in prison of COVID-19 awaiting release, which is likely absent an order reducing CDCR's population density. *See* Opp. at 32; *see also* Stern Decl. ¶¶ 7-8; Bick Decl. ¶¶ 6, 11 (recognizing that COVID-19 poses elevated risk of death that is heightened in prison setting); Specter Decl. ¶ 2 & Ex. A at 27 (Kernan testimony that risk of significant health concerns, including death, is heightened in prison).

The State's second argument, which predicts increased crime, echoes the dire forecasts that greeted this Court's 2009 population order. The State does not contest the fact that California was able to dramatically reduce its prison and parole populations while maintaining historically low crime rates using the exact same types of evidence-based tools and data Mr. Hoffman testifies are

available to safely implement the remedy here.  *See* Hoffman Decl. ¶¶ 3-4, 8-11; *see also* Hoffman Supp. Decl. ¶¶ 3-5.  Indeed, the risk to public safety is even lower now than it was at the time of this Court's 2009 order.  *See* Austin Decl. ¶¶ 11-25.

The State zeros in on one paragraph in Mr. Hoffman's declaration concerning the State's risk assessment tool, the CSRA, asserting that Mr. Hoffman must misunderstand the tool even though it was developed under his direction.  *See* Opp. at 27-28; *see also* Hoffman Supp. Decl. ¶¶ 2-5.  But it is the State who misconstrues Mr. Hoffman's testimony.  Mr. Hoffman does not claim that the State should simply release the roughly 50% of incarcerated people who score low risk on CSRA, or that the CSRA is a perfect predictor of future crime.  *See* Hoffman Supp. Decl. ¶ 3.  Both Mr. Hoffman and Mr. Green agree that risk assessment is a valuable component of pre-release decision-making, including what levels of supervision the person will require upon release.  *Id*. ¶¶ 4-5; Green Decl. ¶¶ 4-8.  The State's investment in such tools must be leveraged now to address this crisis, consistent with former CDCR Secretary Kernan's testimony that expedited releases are reasonable and indeed necessary given the extreme danger posed by COVID-19.  Specter Decl. ¶ 2 & Ex. A at 34-35, 38.  And the evidence shows that can be safely done, as it has before.  *See* Austin Decl. ¶¶ 11-25.

The gravamen of the State's argument is that releasing some people a few months early as an emergency measure to stave off the spread of COVID-19 will increase crime.  The State points to no competent evidence that contradicts this Court's well-supported finding that "moderate reductions in prison sentences do not adversely affect either recidivism rates or the deterrence value of imprisonment," because "[t]here is no statistically significant relationship between an individual's length of stay in prison and his recidivism rate."  *Coleman*, 922 F. Supp. 2d at 976-97; *see also* Austin Decl. ¶¶ 11-25.  Nor would expediting releases cause new crime, because "the likelihood that a person who is released a few months before his original release date will reoffend is the same as if he were released on his original release date."  *Id.* at 977.  That is sufficient to satisfy the PLRA's public safety inquiry, which "does not require the court to certify that its order has no possible adverse impact on the public."  *Plata*, 563 U.S. at 534.

## II. The Court Must Act to Enforce the Constitutional Rights of People in State Prisons

The State exhorts the Court to refrain from ordering relief to protect the 122,000 people in CDCR custody out of deference to prison authorities. Opp. at 10-14. While courts must give some deference to prison administrators, the Supreme Court has counseled in this very case that where a "government fails to fulfill its obligation [to provide adequate health care], the courts have a responsibility to remedy the resulting Eighth Amendment violation." *Plata*, 563 U.S. at 511. Thus, while courts should be sensitive to principles of federalism, "[c]ourts nevertheless must not shirk from their obligation to enforce the constitutional rights of all persons, including prisoners," and "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.*

If the State does not significantly reduce the crowding, COVID-19 will rapidly spread through the California prisons, placing the people who live and work inside them at substantial risk of injury and death, in addition to endangering the community at large. *See* Stern Decl. ¶¶ 8-9, 12-13; Stern Supp. Decl., ¶¶ 3-6, 9 & Ex. A. The State's failure to take swift action to prevent this crisis therefore warrants judicial intervention.

## CONCLUSION

Plaintiffs respectfully request this Court grant their emergency motion.

Respectfully submitted,

DATED: April 1, 2020                    PRISON LAW OFFICE

By:  */s/ Margot Mendelson*
     Margot Mendelson
     Donald Specter
     Alison Hardy
     Sara Norman
     Rita Lomio
     Sophie Hart
     Patrick Booth
Attorneys for *Plata* Plaintiffs

| | | |
|---|---|---|
| DATED: April 1, 2020 | | ROSEN BIEN GALVAN & GRUNFELD LLP |
| | By: | */s/ Michael W. Bien* |
| | | Michael W. Bien |
| | | Ernest Galvan |
| | | Lisa Ells |
| | | Jessica Winter |
| | | Marc J. Shinn-Krantz |
| | | Cara E. Trapani |
| | Attorneys for *Coleman* Plaintiffs | |

11
PLAINTIFFS' REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION