DONALD SPECTER – 083925
STEVEN FAMA – 099641
ALISON HARDY – 135966
SARA NORMAN – 189536
RITA LOMIO – 254501
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURTS
EASTERN DISTRICT OF CALIFORNIA
AND NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM, et al.,<br><br>    Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**THREE JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM,<br><br>    Defendants. | Case No. C01-1351 JST<br><br>**THREE JUDGE COURT**<br><br>**SUPPLEMENTAL DECLARATION OF MARC STERN, M.D. IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION** |

DECLARATION OF MARC STERN, M.D.

I, Marc Stern, declare as follows:

1. My qualifications are set forth in my previous declaration in this action, filed on March 25, 2020. (Docket No. 3219-4.)

2. Defendants have stated that the release of medically at-risk patients from prison "is very likely to cause harm to public safety by straining the already taxed local health care systems." Def's Opp'n to Pltfs' Emergency Mot. To Modify Population Reduction Order at p. 23.

3. According to Defendants, the risk of releasing medically at-risk people from prison is that when they return to their communities, they may seek health care from their local emergency department and hospital and access other community resources.

4. This risk pales in comparison to the risk that groups of medically at-risk people living in crowded congregate housing will become seriously ill with the virus. The level of crowding in the California state prisons makes rapid transmission inevitable once the virus enters the facility. When people who are already medically at-risk contract the virus, they are at heightened risk of severe disease and are much more likely to access the community health care system. The level of care they will require at that point will far exceed the level of care Defendants expect them to require if they are released free of COVID-19.

5. If and when the virus becomes prevalent in the prisons, the rural or semi-rural community hospitals that serve the prisons will quickly become overwhelmed with a high concentration of very sick and possibly dying people who require intensive care. Inundated with very ill patients from the prisons, the hospitals will lack the space, staff and equipment to serve the larger community.

6. This is not an abstract hypothetical. In Illinois, according to a news report, 14 incarcerated people from the Stateville Correctional Center required hospitalization, dozens of inmates and staff have been isolated with coronavirus symptoms, and one inmate

has died from the virus.  The National Guard was called in today to assist overwhelmed local hospitals.

7. I agree with Defendants that for those individuals who are so fragile as to require continuing care in a community skilled-nursing or assisted living facility, they might not benefit from release if they were placed in a community facility crowded to similar degree as the prison.  However, based on my knowledge of the health status of individuals in prison, the vast majority of medically at-risk individuals would not require such continuing care.

8. The Defendants' assertion that released individuals would burden emergency departments and hospitals in the community is based on a 2018 study of criminal justice involved individuals by Dr. Brie Williams and others. Their reliance on this study suffers from two important limitations. First, the study was conducted in 2014. It is unreasonable to assume that the use of hospital resources by criminal justice involved individuals for non-COVID-19 problems now would be similar to the use of those resources during normal times. Second, the researchers did not distinguish between individuals who were criminal justice involved due to involvement with jails vs. prisons. If a large part of the individuals they followed were, in fact, people who had recently released from jail – something that is very possible – then any inferences drawn from that study have little or no relevance to the issue at hand.

9. In any case, Dr. Brie Williams strongly favors decreasing population density in prisons to reduce risk of COVID-19 spread in the Department of Corrections, including by accelerating release of people 50 years of age or older within two years of their release date, and the seriously ill.  See "COVID-19 in Correctional Setting: Immediate Population Reduction Recommendations," March 30, 2020, attached as Exhibit A.

10. Releasing incarcerated individuals, including those who are medically at-risk, will permit them to self-isolate and maintain a sanitary environment outside of a congregate setting.  By practicing social distancing in their community, they will greatly reduce the risk of contracting the virus.  The health of the community is far better served

by ensuring that people who are especially vulnerable to the virus are able to socially distance and practice proper hygiene.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day in April, 2020 in Tumwater, Washington.

_____
Dr. Marc Stern

# Exhibit A



COVID-19 in Correctional Settings:

Immediate Population Reduction Recommendations

*March 30, 2020*
*Please visit https://amend.us/covid for additional information and to*
*ensure that you are referencing our most up-to-date recommendations.*

Amend at UCSF is a health-focused correctional culture change program led by experts in medicine (geriatrics, infectious diseases, family medicine), public health, and correctional health and policy.

As we confront a rapidly worsening COVID-19 epidemic, **reducing population density inside correctional facilities is an urgent first-line public health measure.** Failure to reduce populations smartly and safely will significantly increase the likelihood of disease transmission in these uniquely vulnerable settings.[1] This document provides recommended immediate **first steps** towards purposeful and public health-oriented population reduction at Departments of Corrections with the goal of optimizing the health and safety of patients and staff.

### The Public Health Rationale for Population Reduction

1. **Medical vulnerability**. Correctional populations are enriched with medically vulnerable patients (people of older age or with chronic medical conditions) who have the highest risk of serious illness when infected with COVID-19. This risk is compounded by limited space and few private rooms with solid doors, **making effective social distancing and compliance with "shelter-in-place" guidance virtually impossible in U.S. jails and prisons, most of which are operating at or above capacity.** In a growing number of U.S. jurisdictions, social distancing and/or "shelter-in-place" directives are the community standard healthcare recommendations. In the context of a highly transmissible infectious disease like COVID-19, it can be argued that correctional systems have a constitutional obligation to provide these same public health protections to their residents.

2. **Prisons are not isolated from local communities.** Hundreds of thousands of correctional officers and correctional healthcare workers enter these facilities every day, returning to their families and their communities at the end of each shift. The risk of transmission between correctional settings and surrounding communities is particularly elevated because COVID-19 is highly transmissible, including by asymptomatic carriers. **Decreasing population density inside U.S. jails and prisons will reduce COVID-19 transmission risk inside these facilities *and* in local communities.**

---

[1] For more on the unique challenges to slowing the spread of coronavirus faced by U.S. correctional systems, see Amend's guidance on *COVID-19 in Correctional Settings: Unique Challenges and Proposed Responses* at http://amend.us/covid.



https://amend.us/covid

3. **Jails and prisons have far less medical treatment capacity than community hospitals**. Correctional healthcare systems are designed to treat relatively mild types of respiratory problems for a limited number of people. This means that **a surge in incarcerated people with serious respiratory illness is likely to impose an unmanageable burden on community hospitals**, particularly in rural areas where many U.S. prisons are located.

### The Immediate Public Health Goal of Population Reduction

The immediate public health goals of population reduction are to enable social distancing and to free up beds in every correctional facility so that *medical* isolation and quarantine wings can be created for patients diagnosed or awaiting laboratory results for COVID-19 infection. As population reduction results in increased bed space, medical isolation and quarantine units should be developed using as little population movement within the facility as possible since every new contact carries with it the potential to transmit the infection.

### Immediate Steps to Take to Reduce Risk of COVID-19 Spread in Departments of Corrections

1. **Close Intake immediately.** Since it will be impossible to adequately assess recent exposures for most new admissions, any newly admitted residents should immediately enter quarantine. However, if prison intake units continue to function at their usual pace, the need to quarantine new admissions would impose considerable and *avoidable* strain on valuable resources (including areas to use for quarantine). Thus, all new admissions into U.S. prisons should be immediately suspended until medical leadership has developed an effective containment strategy for the facility, and no new infections have been recorded for 14 days. All new admissions into U.S. jails should be similarly suspended except in cases of a serious, credible threat to public safety.

2. **Decrease population density using a purposeful strategy focusing on the following high medical risk populations:**
   - **Persons 50 years of age or older within 2 years of a parole or release date.** Accelerate release for all those in age brackets known to be disproportionately vulnerable to serious illness following COVID-19 diagnosis who are scheduled to return to the community, have a home to go to, and are eligible for Medicaid or VA health benefits.[2] Increase discharge/reentry planning staff to support housing, health insurance enrollment, and medical care planning for this group.
   - **People of any age who have already completed compassionate release or medical parole request paperwork and have a housing and medical plan in place.** Prioritize seriously ill incarcerated patients for immediate release to free up medical beds in prisons, lower the likelihood of COVID-19 mortality inside these facilities, and allow correctional healthcare staff to focus attention on COVID-19 patients. In some states, Governors can take immediate action for these patients using commutation or reprieve (temporary sentence suspension) powers.
   - **All who have been successful at pardon or parole hearings but remain incarcerated pending administrative processes** (e.g. approval of housing plans already assessed by a parole board).

---

[2] Older age, stable housing, and access to health care are all associated with a low likelihood of recidivism. This accelerated release proposal aims to reduce the likelihood of COVID-19 exposure for correctional staff and lower the public health risks associated with a surge of patients in need of critical care via urgent transfer from prisons to community hospitals.



https://amend.us/covid

> Individuals of all ages who meet this criterion should be released to impove outcomes for those who remain incarcerated. Particular priority should be given to those with a chronic health condition (e.g. diabetes) that increases the risk of serious illness from COVID-19.

3. **Document the medical / public health rationale for each release** to ensure decision-making is well supported by relevant medical guidance, responsive to the urgent call to action necessitated by the rapidly worsening COVID-19 pandemic, and transparent. A template for documenting essential medical / public health release information is provided in an *Appendix* to this guidance.

**While undertaking medically-informed, decisive action to decrease prison populations may seem to some like an overreaction to the COVID-19 crisis, it is a critical public health intervention that will save the lives of incarcerated people, correctional staff, and people living in surrounding communities.**

---

*Amend COVID-19 Guidance & Tools developed by:*
  Brie Williams, MD, MS
  Cyrus Ahalt, MPP
  David Sears, MD
  Leah Rorvig, MD, MPH
  David Cloud, JD, MPH

Copyright © 2020 Amend at UCSF. All Rights Reserved.

Amend at UCSF fundamentally transforms culture inside prisons and jails to reduce their debilitating health effects. We provide a multi-year immersive program drawing on public health-oriented correctional practices from Norway and elsewhere to inspire changes in correctional cultures and create environments that can improve the health of people living and working in American correctional facilities.

*Amend is currently focused on providing resources, expertise, and support to correctional systems confronting the global COVID-19 pandemic.*

*For more information:*
  https://amend.us

  Daryl Norcott, Director of Communication
    Daryl.Norcott@ucsf.edu



https://amend.us/covid

*Appendix.* Documenting the Medical / Public Health Rationale for Accelerated Release to Mitigate Exposure and Adverse Health Consequences Associated with COVID-19

The following guidance is adapted from best practices developed by correctional healthcare providers writing narrative letters of support for patients being considered for compassionate release. Such letters are not typically required for compassionate release hearings but are employed by experienced correctional clinicians with the goal of providing decision-makers with (1) a clear understanding of the medical rationale for release, and (2) an explanation of why the correctional setting and/or the correctional healthcare delivery system is insufficient to deliver a community standard of care in the case. Regardless of the applicant's outcome, these letters are placed in the patient's file.

*\*\*Editable versions of the following template and sample letters can be found at https://amend.us/covid*

<span style="color:red">Effective letters documenting decision-making in COVID-19 accelerated release cases should include:</span>

1. A list of the patient's medical conditions using lay terminology as much as possible.

2. A comment on the patient's general health and prognosis, including:
   - Any health conditions undermining their ability to meet the demands of daily prison life
   - Any demographic or chronic health condition(s) making them vulnerable to serious illness and/or a higher likelihood of ICU need or death from COVID-19, including the following (listed in descending order of risk severity based on knowledge as of the date this document was created):
     - Age 60-69, 70-79, or age 80 or older
     - Cardiovascular disease
     - COPD
     - Cerebrovascular disease, hypertension, diabetes
     - Other major medical conditions s*uch as asthma, chronic kidney disease, cancer, HIV/AIDS, etc*

3. A comment on relevant critical care capacity, including:
   - A "boilerplate" description of the facility's critical care capacity
   - A "boilerplate" description of critical care capacity at the area hospital(s) where the facility transfers patients (include any important information about COVID-19 prevalence and/or critical care burden in those communities surrounding area hospitals)
   - An estimate of how patient's release will free up healthcare staff resources

4. A comment on how exposure to COVID-19 for this patient is likely to be reduced outside prison and/or how their treatment for COVID-19 will differ in the community.

5. A short example describing how the patient's health condition affects their ability to perform basic tasks in prison, increases their medical or social vulnerability inside, or how their ongoing incarceration increases their health risk and/or health-related suffering

4

https://amend.us/covid

**\*\*An editable version of this 2-pg letter template can be found at <https://amend.us/covid>**

*Template:* COVID-19 Accelerated Release Letter [*fill-in / check box where indicated*]

**The following letter documents the medical rationale for recommending this patient's immediate release in response to the risks posed by the ongoing COVID-19 pandemic.** A copy has been forwarded to the appropriate authority and is included in the patient's medical record.

**Based on current knowledge, AGE is the greatest risk factor for ICU need and mortality from COVID-19.** *[Patient name]* is a *[age]*-year-old who falls into the following high-risk category [*choose one*]:

    ☐ Age 60 – 69
    ☐ Age 70-79
    ☐ Age 80 years or older\*\*

*\*\*As currently understood, age 80 years or older confers the greatest risk of ICU need or death among all known risk factors. Being age 60 - 79 also substantially increases risks (risk increasing as age increases). Risks may also be elevated for those age 50-59.*

**Based on current knowledge, the following comorbid conditions substantially increase risks for ICU need and mortality.** This patient has the following high-risk comborbid conditions:

    ☐ Cardiovascular disease\*\*
    ☐ COPD\*\*
    ☐ Diabetes
    ☐ Hypertension
    ☐ Cerebrovascular disease

Other major medical conditions that likely increase risk of serious illness, hospitalization, and/or mortality in the event of COVID-19 infection: [*list other major medical conditions such as asthma, chronic kidney disease, cancer, HIV/AIDS, etc.*]

_____

*\*\*As currently understood, cardiovascular disease and COPD confer the greatest risk among comorbid conditions. Many other comorbid conditions, particularly those listed here, also increase risk of hospitalization, ICU need, and/or death.*

**This patient has / has not** *[circle one]* **been hospitalized in the past year for:**

_____

5



https://amend.us/covid

**Due to his/her poor health, this patient requires the following:**
    wheelchair
    walker
    supplemental oxygen
    assistance with basic functions, such as bathing, dressing, feeding, transferring, and/or toileting
    other: *list any other special needs the patient may have*

_____

**In his/her current health status, this patient requires significant medical resources, including:**
    medical appointments weekly / monthly / every 2 months *[circle one]*
    frequent adjustment of medications and/or laboratory evaluation (e.g. at least once a month)
    frequent specialty care (e.g. at least every two months)

**Given the above health factors, this patient poses a high risk of of critical care need and mortality if s/he contracts COVID-19.** Our facility has _____ *[enter brief description of number of medical beds at your facility, if any]*. If s/he were living in the community, this patient would be able to shelter-in-place and practice appropriate social distancing, which would significantly decrease his/her risk of contracting COVID-19. Such social distancing is not feasible in our institution.

Of note, the nearest community hospital has _____ *[fill in number if known; can also write "<5" or "<10" if only an approximate number is known]* ICU beds.

*[If patient has changed his/her behavior in any way out of fear of COVID-19, enter a narrative description here.]*

Managing this patient's health requires significant medical resources from correctional and community healthcare staff. Upon this patient's release from custody, these critical resources could be reallocated to care for the expected surge in patients affected by COVID-19.

**For these reasons, the healthcare team strongly recommends this patient's immediate release, pending an appropriate housing and medical discharge plan.**

**An editable version of this sample letter can be found at [https://amend.us/covid](https://amend.us/covid)*

*Sample*: COVID-19 Accelerated Release Letter

*Mr. A is a 54-year-old man with severely reduced heart function resulting from multiple heart attacks in the past. His heart is extremely weak and he uses oxygen. He also has diabetes. He has been hospitalized in the past 6 months for heart failure. He spends most of his time in bed or in a wheelchair due to shortness of breath and fatigue, and he uses a walker. He is short of breath even when at rest.*

*Mr. A's overall medical vulnerability and his medical conditions mean he is at extremely high risk of critical care need and mortality if he contracts COVID-19. Studies have shown that cardiac disease alone and diabetes alone each carry a four-fold increased risk of death or ICU admission from COVID-19 and we estimate Mr. A's risk to be substantially higher given that he carries both of these diagnoses and his heart failure is particularly advanced.*

*Of note: our facility has 4 medical beds for patients in need of critical, all of which are currently occupied. The community hospital in our county has only 4 ICU beds and cases of COVID-19 have been identified in our surrounding communities.*

*Mr. A poses a high risk of requiring a medical bed or transfer to outside medical care even if he does not contract COVID-19. In his current stable status, Mr. A requires a weekly clinic appointment, close monitoring of his weight, frequent adjustment of medications, and twice monthly labs. Managing Mr. A's health requires significant medical resources from the correctional and community healthcare staff. These critical resources could be reallocated to the expected surge in COVID-19 cases upon Mr. A's release from custody.*

*Mr. A has expressed fear and increased anxiety related to a possible COVID-19 infection to his healthcare providers and appears to have changed his behavior, refusing to come out of his cell for recreation or day room and missing pill call while increasing the frequency of sick calls. These behavioral changes both elevate his risk of worsening health and/or death and increase healthcare staff time spent caring for Mr. A.*

*For these reasons, the healthcare team strongly recommends Mr. A's immediate release, pending an appropriate housing and medical discharge plan.*