**Pages 1 - 56**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

Before The Honorable Kim McLane Wardlaw, Judge;

the Honorable Kimberly J. Mueller, Judge;

and the Honorable Jon S. Tigar, Judge

RALPH COLEMAN, ET. AL., )
)
Plaintiffs, )
)
VS. ) **NO. CV 90-00520-KJM-DB**
)
GAVIN NEWSOM, ET AL., )
)
Defendants. )
)

MARCIANO PLATA, ET AL., )
)
Plaintiffs, )
)
VS. ) **NO. CV 01-01351-JST**
)
GAVIN NEWSOM, ET AL., )
)
Defendants. )
)

Oakland, California
Thursday, April 2, 2020

**TRANSCRIPT OF TELEPHONIC PROCEEDINGS**

**BEFORE THE THREE-JUDGE COURT**

(Appearances provided on the following pages)

Reported By: Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
Official Reporter

APPEARANCES OF PEOPLE WHO CHECKED IN PRIOR TO THE COMMENCEMENT OF THE PROCCEDINGS:

For Plaintiffs:

PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA 94710
**BY: DONALD H. SPECTER, ESQUIRE**
**SARA L. NORMAN, ESQUIRE**
**ALISON HARDY, ESQUIRE**
**SOPHIE J. HART, ESQUIRE**
**CORENE KENDRICK, ESQUIRE**

ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street - 6th Floor
San Francisco, CA 94105
**BY: MICHAEL W. BIEN, ESQUIRE**
**LISA A. ELLS, ESQUIRE**
**CARA E. TRAPANI, ESQUIRE**
**MARC J. SHINN-KRANTZ, ESQUIRE**
**MARGOT MENDELSON, ESQUIRE**

For Defendants:

HANSON BRIDGETT LLP
425 Market Street - 26th Floor
San Francisco, CA 94105
**BY: PAUL B. MELLO, ESQUIRE**
**SAMANTHA WOLFF, ESQUIRE**

DEPARTMENT OF JUSTICE
Office of the Attorney General
455 Golden Gate Avenue - Suite 11000
San Francisco, CA 94102
**BY: KYLE A. LEWIS**
**DAMON G. MCCLAIN**
**NASSTARAN RUHPARWAR**
**DEPUTY ATTORNEYS GENERAL**

For the Proposed Interventors:

PAVONE & FONNER, LLP
501 West Broadway - Suite 800
San Diego, CA 92101
**BY: BENJAMIN L. PAVONE, ESQUIRE**

APPEARANCES CONTINUED:

Also Present:

**CLARK KELSO, PLATA RECEIVER**
**MATTHEW LOPES, COLEMAN SPECIAL MASTER**
**RICHARD KIRKLAND, CHIEF DEPUTY RECEIVER/CALIFORNIA PRISON HEALTHCARE**
**VINCENT CULLEN, DIRECTOR, CORRECTIONS SERVICES AT CALIFORNIA CORRECTIONAL**

**Thursday - April 3, 2020** **1:17 p.m.**

**P R O C E E D I N G S**

**---000---**

**THE CLERK:** Your Honors, now calling Civil Matters 90-520, Ralph Coleman, et al., vs. Gavin Newsom, et al., and Case No. 01-1351, Marciano Plata vs. Gavin Newsom, et al.

If counsel could please identify themselves for the record, starting with plaintiffs in Coleman.

**JUDGE WARDLAW:** Yes. Courtroom Deputy Lee, this is Judge Wardlaw. I would like to do, instead of having all counsel identify themselves since you have sent me a list of who actually will be speaking -- I would like to do a roll call of the people who are speaking. And I would like to also note for the record that all counsel who have checked in with the courtroom deputy will be shown on the record as entering appearances.

And we will -- I first just want to say that this is the time for argument on Plaintiffs' Emergency Motion to Modify Population Reduction Order in Light of COVID-19 Pandemic. As defendants said, these are unprecedented times, and we appreciate that it's very difficult to hold a hearing on these important issues and grave issues by telephone.

So we appreciate your being mindful of these difficulties. Mute your phones if you're on a speaker. I'm hearing a little background noise. And be mindful that we need to have a clear

record as we proceed.

I'm going to start by doing a roll call of the attorneys who have indicated that they plan to argue.

For plaintiffs, Sarah Norman?

**MS. NORMAN:** Yes, Your Honor.

**JUDGE WARDLAW:** Michael Bien?

**MR. BIEN:** Yes, Your Honor.

**JUDGE WARDLAW:** Damon McClain?

**MR. McCLAIN:** Yes, Your Honor.

**MR. SPECTER:** Your Honor, it's Donald Specter for the plaintiffs.

**JUDGE WARDLAW:** Okay. You are not listed as arguing, but I will put you down.

**MR. SPECTER:** Thank you.

**JUDGE WARDLAW:** And Kyle Lewis for the plaintiffs?

**MR. LEWIS:** Your Honor, Kyle Lewis for defendants. You may have your lists a bit crossed. Damon McClain also appears for defendants.

**JUDGE WARDLAW:** All right. So --

**JUDGE TIGAR:** Judge Wardlaw, this is Judge Tigar. Because I'm hosting the line, so to speak, I had the line open fairly early, and I believe I can identify for Your Honor the persons who will be arguing.

**JUDGE WARDLAW:** That would be very helpful.

**JUDGE TIGAR:** Mr. Bien, Ms. Norman, and Ms. Specter

have checked in as arguing for the plaintiffs and all of them have already answered to Your Honor's roll call.

Arguing for the defendants, I believe, today are Paul Mello, potentially Mr. Lewis, potentially Mr. McClain, and I apologize, Ms. Wolff. I don't know if you're in that category or not. And those are what's in my notes.

**MS. WOLFF:** Good afternoon, Your Honor. This is Samantha Wolff. I do not intend to argue today. Thank you.

**JUDGE TIGAR:** Thank you, Ms. Wolff.

Is Mr. Mello on the line?

**MR. MELLO:** I am, Your Honor.

**JUDGE TIGAR:** Mr. Lewis, you're on the line?

**MR. LEWIS:** Yes, Your Honor.

**JUDGE TIGAR:** And, Mr. McClain, you are as well; correct?

**MR. McCLAIN:** That is correct.

**JUDGE TIGAR:** For the defendants, have I now identified all the persons who may be arguing on their behalf this afternoon?

**MR. MELLO:** This is Mr. Mello. You have, Your Honor.

**JUDGE TIGAR:** Thank you.

Thank you, Judge Wardlaw.

**JUDGE WARDLAW:** Thank you very much, Judge Tigar.

Counsel, as you begin -- as you argue, we will -- if you plan to turn it over to the next counsel, please indicate who

you are turning over the argument to or who is responding to our questions.

Also, please remember to pause after your sentences or points as members of the Three-Judge Panel may have pertinent questions as the argument proceeds.

And so counsel for the plaintiffs may proceed.

**MR. SPECTER:** Thank you, Your Honor. This is Donald Specter arguing for the plaintiffs from the Prison Law Office.

Just to give the Court a sense of how we're going to divide up the argument, I'm going to give a very brief opening statement. Then I'm going to turn the argument over to Sara Norman, also from the Prison Law Office. Michael Bien will be available to answer questions about the *Coleman* population specifically and the remedies.

And so with your permission, I will start.

**JUDGE WARDLAW:** You may proceed.

**MR. SPECTER:** Thank you.

For three decades, the people who live in California's overcrowded prisons have come before the two respective district courts to preserve their health, their well-being, and in many cases, their lives.

For three decades, the two respective district courts have taken whatever judicial action has been necessary and appropriate to ensure, to the extent permitted by the Constitution and other laws, that those in state custody

receive minimally-adequate healthcare designed to minimize the risk of serious harm.

In *Plata*, for example, Judge Henderson appointed a Receiver because he found, among other things, that individuals in California's prisons were dying of neglect or malpractice at a rate of one person every ten days, and more recently, Judge Tigar is presiding over a program designed to reduce the number of deaths from drug overdoses.

Similarly, Judge Karlton and, more recently, Judge Mueller, have issued innumerable orders intended to ensure that patients with acute psychosis receive inpatient care and to prevent people with serious mental illness from killing themselves.

Eleven years ago, this Three-Judge Court held that prison overcrowding was the primary cause of continuing violations of the Eighth Amendment's cruel and unusual punishment clause in order that the prison population be reduced to 137.5 percent of design capacity.

In doing so, this Court and the Supreme Court recognized that circumstances change and emphasized that the Court retain jurisdiction to respond to these changes.

It is an understatement to say that today's circumstances have changed dramatically. Indeed, it is difficult to describe the kind of situation without sounding hyperbolic. The healthcare remains inadequate and unconstitutional in many

respects, and the prison system remains overcrowded at a level slightly under the Court-ordered population cap, but the risk of harm and death to everyone who lives and works in our prisons and to the community at large has increased exponentially due to the COVID-19 pandemic.

The risk of harm and death is so serious because the virus is transmitted so easily, and it is killing people in staggering numbers. On top of that, many people, such as those who are older and with certain conditions or diseases, are particularly vulnerable as they live in today's prisons.

To prevent transmission and to save lives, the Governor has ordered all of us to shelter in place and to practice social distancing, which means staying six feet away from other people.

There is no dispute that that is not possible today in our state prisons. It is not possible because our prisons remain very overcrowded. The pictures of the prison dormitories in the record are perhaps the best evidence of how impossible and how dangerous the situation is. What may not be apparent from the pictures is that many of the individuals in these pictures are at high risk because of their age or illness.

We are not saying that in the face of this emergency defendants are doing nothing. As they point out in their brief, in the declarations that they filed, they and the Receiver are doing a number of things, but as Ms. Norman will

explain in detail shortly, they are not reducing the population in a way that is commensurate with the speed with which the virus spreads, the extent of the need for social distancing, and the number of people who are particularly vulnerable.

As we pointed out in our reply brief, there is no dispute among the public health and correctional experts about the immediate need for strong and swift measures. And as Drs. Stern and Austin testify in their respective rebuttal -- reply declarations, reducing the population is consistent with public safety.

When we filed this motion last week, there was one known case of an infected prisoner and seven infected staff at four other prisons. Today there are eight confirmed cases of incarcerated individuals in three prisons and twenty-four staff in nine prisons. These numbers are expected to grow exponentially.

There is a very small window of time in which to flatten the curve. As former Secretary Kernan stated in his recent deposition, there is a need for, quote, immediate and bold action.

The sad history of the last 30 years of litigation against the CDCR is a pattern of resistance to the bold and immediate measures that have been needed to safeguard the well-being of people in their custody; instead, there has been a pattern of deliberate indifference that is evident here today in the

minimal and untimely efforts to reduce the density of the prison population and remove those who are most at risk.

Because of these facts and on behalf of the men and women in California's prisons, we turn again to this Three-Judge Court for relief.

This time the risk is greater and more direct than it was 11 years ago, and the risk to public safety is less than it was at that time.

As Mr. Kernan testified, the conditions in the prisons are a tinderbox, and they will remain a tinderbox unless this Court acts. There is a desperate need to reduce the prison population because the level of overcrowding in our prisons is literally a matter of life and death.

Thank you very much.

I now turn the argument over to Ms. Norman.

**JUDGE MUELLER:** Judge Wardlaw, this is Judge Mueller. I have a threshold question I believe Mr. Specter may be the one to address. May I ask that now?

**JUDGE WARDLAW:** Of course.

**JUDGE MUELLER:** Mr. Specter, can you clarify, is plaintiffs' motion properly construed as a motion for modification of the original population reduction order setting 137.5 percent of design capacity as the target, and if so, are plaintiffs suggesting a new percentage target based on physical-distancing guidance?

**MR. SPECTER:** The answer to the first part of your question is an unequivocal "yes" and the second part of your question is it could be a percentage or it could be an absolute number. We are not at present in a position to offer a specific number at this time, but we are, in our motion, offering a method by which the State could reduce the population and minimize the risk.

**JUDGE WARDLAW:** Counsel, I would ask a follow-up to that. This is Judge Wardlaw.

Isn't it a fact, however, that defendants are in compliance with the original injunction issued by the Three-Judge Panel and affirmed by the Supreme Court?

**MR. SPECTER:** Yes, Your Honor. But the Supreme Court -- well, when the Three-Judge Court imposed this specific population cap based on 137.5 percent of capacity, it recognized that it was doing so -- that that number may be subject to change based on changed circumstances, and our position is the circumstances have changed, even though defendants are in compliance with that number.

I think it was a Three-Judge -- the prior Three-Judge Court's position that they couldn't tell exactly how the reduction in population would work out and whether there was a need for further population reductions or vice versa at the time they issued their order.

But I turn the rest of the argument over to Ms. Norman

for -- if the Court --

**JUDGE TIGAR:** Judge Wardlaw, this is Judge Tigar. Perhaps I could ask also a follow-up question.

**JUDGE WARDLAW:** Yes.

**JUDGE TIGAR:** Mr. Specter, if the case is not viewed as a modification of the Three-Judge Court's existing order, is there any way that we could conclude that the requirements of Section 3626 have been satisfied? And I'm happy to be more specific.

**MR. SPECTER:** Yes. Thank you, Judge.

**JUDGE TIGAR:** Well, for example, that statute requires that before this Court do anything, there has to have been an order for less-intrusive relief that failed to remedy the deprivation of a federal right, the defendant had a reasonable amount of time to comply with that order, etc. There are many, many requirements in that section which enables this Court to act in the first place.

And I'm just wondering, for example, if this motion is not viewed as a modification of the Three-Judge Court's original order, what order is it that you contend the defendants were not in compliance with or that they've had enough time to comply with?

**MS. NORMAN:** Well, Your Honor --

**MR. SPECTER:** Go ahead, Sara.

**MS. NORMAN:** This is Sara Norman from the Prison Law

Office. If I may be heard on this point?

**JUDGE TIGAR:** Sure.

**MS. NORMAN:** Thank you, Judge Tigar.

Your Honor, our position is that it's this Court's very population modification order that has today proven insufficient to bring medical care/mental healthcare up to minimum constitutional standards.

And this Court in 2013, actually, the Three-Judge Court or the prior institution of the Three-Judge Court, in rejecting plaintiffs' motion for individual prison population caps determined that -- and I'll quote from the Court's opinion -- "it's best to wait and reassess the need for institution-specific caps, if they are needed" --

**THE COURT REPORTER:** I'm sorry, counsel. Can you repeat that?

**JUDGE WARDLAW:** Ms. Norman, this is Judge Wardlaw. Would you please just slow down a bit, especially when you're reading.

**MS. NORMAN:** Absolutely. I apologize.

So this Three-Judge Court determined -- and I quote -- "that it was best to wait and reassess the need for institution-specific cap, if they are needed, when defendants reduced the system-wide prison population to 137.5 percent design capacity," and I end the quote.

So this current motion is to modify the 2009 order for

system-wide population caps that has proven inadequate to ensure that minimal constitutional care can be provided in the current pandemic.

**JUDGE TIGAR:** Yes. Ms. Norman, my question was not to the point of asking you about the merits of that request. I was following up on Judge Mueller's question, and that is, her question really was are you -- is this -- do you view this as a modification of that prior order?

My question is if for some reason this Court were to conclude that we can't categorize this motion as a modification of the Court's -- Three-Judge Court's earlier order, is there any way that we could grant relief under 3626? And I don't want to belabor the point just because our time is so limited.

I just want to ask one more question on a separate point, and that is Mr. Specter said a moment ago that the risk to public safety is lower now than it was 11 years ago. I'm not aware in the record of what the basis for that statement is, and perhaps you can tell me in a moment.

But my question is -- but my question is given that the plaintiffs have conceded that they don't know how many inmates we would need to release in order to attain six-foot social or physical distancing, how can this Court do its job of evaluating the impact on public safety to the release of that number of inmates since we don't even know anything about the characteristics of that group? That's my question.

**MS. NORMAN:** Thank you, Your Honor. This is Sara Norman.

So there were a number of issues there, and let me start with the public safety one.

There is not a definite number at this point that we can offer the Court, in part because of the exigencies of the current situation.

We do offer the Court, however, a means to get there, and we ask that the Court order defendants to immediately begin to plan to determine how many people they can house safely in the current dorm by going in, measuring and figuring out how many people they can house in each of the dorms six feet apart so that nobody is closer than six feet in all directions. They can come up with that number, we think, very quickly, and then we will know how many people need to be moved, need to be shifted.

It is within defendants' power to do this in a variety of ways. They could activate unused gyms. They could seek other unused buildings in the system. They could look for unused buildings outside the system to shift the population to. They could also do releases.

So it's very difficult to determine exactly what the number is right now, but we believe the defendants could do it quickly, and we believe that it is well within this Court's power to order them to do so.

Now, the public-safety question, if I can get to your specific point, we believe that it is clear from the record, from the history since this Court's 2009 order drastically reducing the prison population -- it is clear that a very large number, an ample number of people could be carefully and with a reasonable process -- could be quickly released from prison without a significant negative impact on public safety.

So the declarations from Mr. Austin, who was previously called upon as an expert before this Court, as well as from Mr. Hoffman, who also testified in the Three-Judge proceedings in the 2008 trial, demonstrate that there are very large populations of people who could be released with very low, if any, impact on public safety. For example, people over 65. There is well over 5,000 people over 65 in the prison system that are at extremely high risk from serious injury or death from COVID-19. They are at extremely low risk to reoffend in the community. That is not contested. Neither of those points is contested. That's a very large group of people who could be released fairly quickly. And I could go on and identify other groups of people.

We think that the Court could make a determination that, consistent with public safety, enough people could be released to allow for social distancing in the dorms and to reduce the burden on healthcare staff, both inside and outside of prison, should the pandemic weep through as it is well able to do and

as it might be doing already.

We also think there are other means available to defendants to do so, to reduce the population in adequate numbers without necessarily releasing them.

I hope that answers your question.

**JUDGE TIGAR:** Thank you.

**JUDGE MUELLER:** This is Judge Mueller. A follow-up to clarify.

Is the focus -- it's not at this point, in your view, Ms. Norman, statewide but institution by institution?

**MS. NORMAN:** Our understanding from the CDCR's website, last check about 15 minutes ago, is that one-third of the prisons are now impacted. So when we filed this motion, it was just a few prisons with either staff or people living in the prisons tested positive. It is now up to one-third just in the days since we filed our motion.

So it is -- it is systemic, and this is based on a couple hundred tests. We have no idea how many people actually have it inside the prison, but the uncontested testimony from both sides is that prisons are particular hotbeds and particularly dangerous places for the very good spread of the virus.

**JUDGE TIGAR:** Ms. Norman -- I'm sorry. Go ahead.

**JUDGE WARDLAW:** I'm sorry. If you want to go ahead, that's fine.

**JUDGE TIGAR:** Ms. Norman, this is Judge Tigar.

Does the Eighth Amendment require six-foot physical distancing in every jail or prison in the United States, and do we need to hold that it does in order to grant your motion?

**MS. NORMAN:** The Eighth Amendment requires minimally-adequate medical care, and it is our position that minimally-adequate care cannot be provided under the current circumstances without the social distancing that all experts -- that pretty much everybody in the world agrees is necessary to stem the tide of the virus.

**JUDGE TIGAR:** That sounds like a "yes."

**MS. NORMAN:** So under the current circumstances -- under the current circumstances --

**THE COURT REPORTER:** I'm sorry, counsel. I can't understand you.

There is background noise going on, Your Honor.

**JUDGE TIGAR:** This is Judge Tigar.

I said something earlier. It is simply not possible for the Three-Judge Court to do its work if persons other than the counsel who are addressing the Court have not muted their lines, and so I would appreciate everyone's doing that. Thank you.

I apologize, Ms. Norman. Go ahead.

**MS. NORMAN:** Thank you, Your Honor.

So that was a "yes."

**JUDGE TIGAR:** Thank you.

**JUDGE WARDLAW:** Counsel, so procedurally, although you haven't actually articulated this in your papers, you might be asking for a reconsideration of the Three-Judge Court order in 2013 where we denied your motion to impose institution-specific caps?

**MS. NORMAN:** I'm sorry, Your Honor. I concede that issue. We are not doing so, no. I was simply --

**JUDGE WARDLAW:** You are not doing that?

**MS. NORMAN:** No, we are not. No, we're not. We're not looking for institution-specific caps in this case, in this current motion.

**JUDGE WARDLAW:** All right. You can continue.

**MS. NORMAN:** Thank you.

If there are no further questions at this point, I can continue with the general presentation.

**JUDGE WARDLAW:** Yes. You may proceed.

**MS. NORMAN:** Thank you very much.

So as we have been discussing, the Court today is presented with a remarkable degree of consensus in that every healthcare expert and prison administrator quoted by either party says the same thing: That California's prison population must be reduced in order to prevent a massive spread of the virus, both behind bars and spilling over to the community at large and accompanying severe illness and death. They say that the population must come down for two reasons. First, to allow

for social distancing that is the cornerstone of any effort to slow the pandemic, and, second, to reduce the burden on healthcare professionals in order to save lives.

The experts and administrators who say this include Ralph Diaz, who runs the California prison system; the Receiver, who runs medical care in the California prisons for Judge Tigar; Dr. Marc Stern in support of plaintiffs' motion; and Dr. Joe Bick in opposition; Dr. Brie Williams quoted by both parties; Rick Raemisch, an amicus who ran both the Colorado and the Wisconsin prison system. They all agree that these two goals, social distancing and reducing the burden on healthcare professionals, are essential to accomplish inside the prisons to prevent a wildfire pandemic.

These two goals also underlie the Governor's State of Emergency Declaration for all California. The State of Emergency Declaration requiring social distancing does not say for all Californians except for people in prison.

So everyone agrees that population reduction is necessary in the current pandemic. Everyone. Both parties. That would seem to make this Court's job easier. But the problem that the Court must resolve today, as Mr. Specter alluded to, is a significant gap between what defendants say needs to happen and what they're willing to do to get there. The State's remedies fall far short of accomplishing the end that we all know is necessary.

So here are the uncontested facts: 46,000 people live in dorms in California prisons. More than 29,000 of them live in dorms that are at or over 137.5 percent of capacity. Over 13,000 of them live in dorms that are at or over 175 percent of capacity. Many sleep in double bunks and many sleep in beds that are set less than three feet apart from each other, and you can see that in the pictures filed with our brief.

These are not contested numbers, and this is a portrait of drastic overcrowding.

So physical distancing is impossible for tens of thousands of people in California prisons. Physical distancing is necessary because we don't know who has the virus. Many carriers are asymptomatic or show no symptoms in early infectious stages. These are also not contested facts.

In addition, according to the Receiver, approximately 5,600 people in California prisons are 65 or older. It is uncontested that people over 65 are at tremendous risk from serious complications or death from COVID-19. Also uncontested that they have a very low recidivism rate.

Also according to the Receiver, 45,000 people in California prisons have at least one significant risk factor that makes them medically vulnerable to serious complications or death with COVID-19.

Further, it's uncontested that some prisons already don't have enough medical inpatient beds. A serious outbreak of

COVID-19 cases will quickly overwhelm prison hospitals and spill out to the community hospitals with potentially dire effects for people in those communities.

The uncontested facts lead to two conclusions: First, that overcrowding makes physical distancing impossible; and, second, that physical distancing is a necessary public health measure to prevent severe illness and death; in other words, essential to a minimally-adequate healthcare system. Thus, overcrowding is the primary cause of defendants' failure to provide constitutional care to the plaintiffs in this case.

Defendants' remedy is to reduce the population by 3,500 people over the next several weeks, to close the prisons to new people so that the population will slowly reduce by attrition, to move about 500 people from dorms to other housing. They also offer numerous practices inside the prisons like increased cleaning supplies, reduced movement, and telling people to stay six feet apart when they can. These are welcome steps, but they hardly make a dent in the problem given the uncontested numbers that I just cited.

There are no reliefs for the elderly or medically vulnerable. There is no relief for tens of thousands who remain in overcrowded dorms. There is injury and despair for people living with drastically-limited mental health services.

How will someone in Elm Hall at the California Institution for Men, elderly, in a wheelchair, with multiple health

concerns stay six feet away from the elderly sick person in the next bed 30 inches from him? Or in Joshua Hall with someone in the bunk directly above him?

At the California Institution for Men, eleven staff and one incarcerated person have already tested positive for the virus.

Defendants never say that it's beyond their capabilities to reduce the prison population to allow for physical distancing in all of the dorms, and they never say that it would increase crime if they did so. They never say that they can't release or relocate elderly and medically-vulnerable people to get them out of the way of the impending prison pandemic. They say it would be difficult or undesirable but never that it's beyond their capabilities.

We have a window of opportunity to flatten the curve, but it's closing. Rikers Island went from one case to several hundred in the space of two weeks. The number of confirmed cases in California prisons, as we discussed previously, jumped from one incarcerated person to eight, from seven staff to twenty-five in the days since we filed our motion, and one-third of the prisons are now impacted.

The end goal is undisputed. The means are available. The defendants will never get there without an order from this Court.

Thank you.

**JUDGE TIGAR:** Judge Wardlaw, may I ask a follow-up question?

**JUDGE WARDLAW:** Yes, Judge Tigar. Please.

Everybody, please mute their phones again because we keep getting some background noise.

**JUDGE TIGAR:** Ms. Norman, I'm sorry to keep coming back to this question.

I have in mind the Supreme Court's decision in *Brown vs. Plata* where Justice Kennedy said that, "When a court is imposing a population limit, this means the court must set the limit at the highest population consistent with an efficacious remedy. The court must also order the population reduction achieved in the shortest period of time reasonably consistent with public safety."

My question for you is I understand that under the circumstances, the plaintiffs have not had the time to do a lot of discovery or gather the evidence that they might in a proceeding with a longer limit. I get that.

But my question is are you saying that it is the defendants' burden, essentially, on a prisoner-by-prisoner basis to demonstrate that there would be a risk to public safety, or how else am I to answer the question that is posed by that quote from *Brown vs. Plata*?

**MS. NORMAN:** Judge Tigar, I would say two things. One is that the Court can order defendants to determine the number

that they can accommodate in the dorms, and they can do that very quickly, so we would have a number. And that is based on social distancing in the dorms. All beds six feet apart. No bunk beds overhead. That's a straightforward number to determine.

In terms of the public safety, we believe that the Court has before it clear expert opinions that it would be safe to reduce enough people -- to reduce the population by enough people in order to achieve that physical distancing.

**JUDGE TIGAR:** How can we reach that conclusion if we don't know what that number is? For example, you've averred a couple of times to statements in the record about inmates who are 65 years or older. Is it the plaintiffs' position that right now the Three-Judge Court has enough information to release everybody in state prison at that age or older?

**MS. NORMAN:** Yes, Your Honor. I believe the Court does have enough information in the record.

We have the information in the record about the profoundly-overcrowded dorms and the distance between the beds in them. We know that tens of thousands of people are in that position, and we know -- we know that the current remedies that the defendants propose, the 3500 population reduction, would not be enough to provide relief for the people in the dorms.

So if the Court ordered the release, for example, of people 65 and older who have a place to go, that would add

several thousand to the remedy. We believe that it would be clear that that would not be enough to achieve the goal of physical distancing of six feet in all the dorms, but it would be far closer to it.

**JUDGE TIGAR:** Thank you.

**JUDGE MUELLER:** Judge Wardlaw, this is Judge Mueller. I have a follow-up question when you call on me.

**JUDGE WARDLAW:** Yes. Go ahead, Judge Mueller.

**JUDGE MUELLER:** Ms. Norman, are you suggesting a multistep process where the matter would come back to this Court? So, for example, the current remedy sought is release of those 65 and older with solid release plans and a directive to the defendants to conduct the measurements you've alluded to, identify all available spaces, and then submit that to this Court for further consideration?

**MS. NORMAN:** Your Honor, I'm proposing exactly such a process, and I would actually throw in a few other things as well.

The Court, in order to begin this process to -- to be able to issue a final ruling with the level of specificity that Judge Tigar points out is required by the *Brown vs. Plata* opinion, by the PLRA, we propose that the Court order the defendants to come up with a number based on how many people can be housed safely in the dorms with physical distancing.

At the same time, we propose that the Receiver be directed

to come up with a list of medically-vulnerable people and a number of those medically-vulnerable people who would need to be released in order to make the burden on healthcare staff in the prisons and in the outlying communities tolerable with an acceptable level, given the various models that can be used to predict how many people will need hospitalization.

The Receiver has tremendous resources for data collection, and it already has gathered quite a bit of data about medically-vulnerable people, about the elderly, and about their corresponding rank on the risk assessment instrument.

So this data is available, and the Receiver could be directed to develop lists of people who might be appropriate for release under those circumstances.

At the same time --

**JUDGE MUELLER:** What's the time frame that you are currently -- I know you had wanted the Court to order a plan by the -- by April 1st. What is your current request, just so it's clear, in terms of the release of those over 65 and completion of a plan?

**MS. NORMAN:** Our request is that defendants be required to produce the facts that the Court needs to help make its final determination and the planning by Monday.

**JUDGE MUELLER:** All right. Thank you.

**JUDGE TIGAR:** Let me just --

**JUDGE WARDLAW:** Counsel - go on, Judge Tigar.

**JUDGE TIGAR:** This time, Judge, I think it's your turn to go first.

**JUDGE WARDLAW:** Okay. Thank you.

I guess what I'm seeing that I have, in my review of the past history of this case, looked at is Judge Henderson's ruling in the *Valley Fever* case where it went to him as the one judge in *Plata* to -- and requests with a few things that we're talking about right now, instrumental things that were assured of release that might end up alleviating the Eighth Amendment violation that he found in that case.

My question is shouldn't you have gone to Judge Tigar in the *Plata* case and asked for some of these less-intrusive measures first instead of coming to the Three-Judge Court?

**MS. NORMAN:** There are two answers to that, Your Honor.

First is that we believe that some releases -- a population reduction will be necessary in order to achieve the goal of social distancing, and, in fact, the State of California believes that population reduction is necessary in order to achieve social distancing. They've already started to do it, as Mr. Diaz testified to this Court and as is set forth in their brief. We just know that it's not enough. So the first answer to your question is that we believe that some releases are necessary.

There was no reason then to go -- it didn't -- especially

given the exigencies of the circumstances, it made no sense to go before Judge Tigar in the *Plata* case when we believed that releases would be an end result of what was needed for relief in case.

However, if the State could prove us wrong, we think that they have the potential to be able to do that and to show by Monday that they have a plan using the Governor's emergency powers, which they described in their brief, to find places to transfer people to.

So there are all kinds of work that was done in order to find a place for people coming off of the cruise ships, finding things like unused hospitals or military bases or developmental centers in the community. If the State of California could use its emergency powers to find a place to relocate people, then it's possible that that would not be a release of prisoners but a relocation of them.

(Unidentified voice interruption)

**JUDGE WARDLAW:** Someone is talking -- someone or someones are talking over Ms. Norman, and it's making it very difficult to hear. I don't know -- if we could identify those people, I would insist that they get off the line.

Ms. Norman, you are over your 30 minutes, and I am just wondering if you want to sum up at this point.

**MS. NORMAN:** Thank you, Your Honor.

At this point, I would simply say that it is within the

Court's power to close the gap between what defendants have already started to do, what they are willing to do, and what everyone agrees must happen.

I urge you to take advantage of this moment in time to close the gap, to order the State to enforce the Governor's order for social distancing within the prison, as well as without.

Thank you.

**JUDGE WARDLAW:** Thank you, counsel.

We will now hear from the government.

**MR. MELLO:** Good afternoon, Your Honor. This is Paul Mello from Hanson Bridgett on behalf of the State.

Let me start by saying that the defendants appreciate the import of this moment, of this worldwide pandemic. This is a moment unlike any of us have seen in our lifetime and a moment we hope that none of our children, grandchildren will ever experience again.

Our elected leaders, public health experts, and governmental officials and their staffs and their experts are governing in the midst of the COVID-19 pandemic when information and strategy are constantly changing. These leaders, public health professionals, and experts need to be permitted to address in realtime this dangerous moving target.

I will get to some of the questions that your Court -- that this Court has asked of plaintiffs' counsel and where the

Court seems to be, for good reason, focusing on the legal standards that are before it and the high hurdles that are required by the Prison Litigation Reform Act.

But I intend to continue my opening statement. I do not intend to turn it over to Mr. McClain or Mr. Lewis unless there is, one, a *Coleman*-specific question that I might not be able to answer, or if we're going to touch upon the evidentiary issues, which it doesn't sound like we will, Your Honors. So that's, in short, how we intend to proceed.

So sort of back to my opening statement.

I think it is clear by the actions to date that the defendants care deeply about the person working and residing in a California prison system and the persons in the community in this unprecedented moment.

The Governor activated the State's Operations Center with respect to COVID-19 on March 2nd. The Secretary established the Department Operations Center on March 15th. That operations center is co-chaired by the Director of Adult Institutions, Ms. Gipson, who Your Honor saw a declaration from, as well as Dr. Steven Tharratt. Dr. Tharratt is, for lack of a better term, the head physician at CCHCS. He reports directly to the *Plata* Receiver, Mr. Kelso.

To be clear, defendants share many of the concerns that plaintiffs raised in their emergency motion. It's for that reason that they have acted with such bold and urgent but

considered -- in such a considered matter.

We do not believe that plaintiffs have satisfied the Prison-Litigation-Reform-Act-type standards. We do not believe, as this Court delved into earlier, that this is the proper court for this particular motion, which apparently is not a modification, but maybe we can come back to that.

But I think it's important to start with the concept that under the Prison Litigation Reform Act and under its strictures, this Court cannot issue any order for which it -- it is not proven that defendants were acting to deprive one of their constitutional rights. And so that's where we get to our deliberate-indifference argument and that's where we get to our separation-of-powers argument.

So let's explore all of the efforts that the State has taken in realtime to address this pandemic.

CDCR, as was indicated, will expedite the transition to parole for eligible inmates who have 60 days or less to serve on their current sentences, as long as those current offenses are not violent crimes, domestic violence offenses, or the persons are not registered sex offenders.

I believe at one point during questioning from the Court, Ms. Norman indicated that everyone over 65 years of age should be released under the unclear, inchoate prisoner release order that they are seeking here. We don't believe that is appropriate. We don't believe that is a method that should be

followed here.

But let's talk again about what we know. First of all --

**JUDGE MUELLER:** Excuse me, Judge Wardlaw. This is Judge Mueller, and I have a question.

**JUDGE WARDLAW:** Please, go ahead.

**JUDGE MUELLER:** Mr. Mello, let's assume for sake of argument the Panel accepts everything in the record memorializing what the State has done, which is, I believe, undisputed and not insignificant. But isn't it also the case, looking at everything the State has provided to this Court, that the State is not representing to the Court that its current plans can achieve six feet of physical distancing throughout the prison system? Dr. Bick strongly supports that distancing. Everyone acknowledges, without a comprehensive testing program, that the distancing is the method available currently to minimize the spread of the virus.

Ms. Gipson indicates that the goal is distancing to the maximum feasible. That does not represent that the State can achieve, with its current plans, complete distancing.

So am I reading the record incorrectly? Is the State telling us it can achieve systemwide distancing, and if so, by when?

**MR. MELLO:** So I think what the record indicates, Your Honor, is that they have taken bold and immediate steps to reduce population density; that those steps have already begun

through the -- I'm being informal -- through the closing of the front door, through the temporary suspension of admissions, and as well as the -- the actions taken by the Secretary pursuant to his government code section authority.

And I think what the State is saying is that in realtime with our experts and our infectious disease experts, we are trying to increase social distancing, and we should be afforded the opportunity granted to us to attempt to increase social distancing.

If the Court reads what's in -- the record before this Court is that this step occurred, and they continued to evaluate and make steps to increase social distancing; for example, those steps that occurred with respect to the dorms. But what the record is not clear as, because as we live in this incredibly fast-paced, changing time -- what's clear is what we provided to the Court in our brief at noon on Tuesday or maybe 12:15 -- we're sorry, Your Honor -- is that they are taking steps, and at that snapshot in time, that's where we are. But by reducing the population, by decreasing the numbers of individuals coming into the system, we now are able to activate other habitable locations in the system and potentially outside of the system.

And the irony is not lost on me here. We can move people into gyms. We can move people into dorm rooms. We can move people into vacant facilities. We should be afforded the

opportunity to do those things with our experts without -- and respectfully without intervention of this Court, especially when plaintiffs have failed to demonstrate that they have satisfied the requirements of the PLRA.

I feel like in these times, that we can't lose track of the fact that the rule of law matters and the statutory strictures matter and our constitutional requirements of separation of powers matter. It's very significant for us to have a system by which Secretary Kernan or the Governor -- pardon me -- Secretary Diaz or the Governor or their experts are running back to -- wow.

(Music playing over the telephone line.)

**JUDGE WARDLAW:** This is Judge Wardlaw. What is going on here?

**MR. MELLO:** Somebody put us on hold, Your Honor.

**JUDGE WARDLAW:** Can the courtroom deputy determine the identity of any people who are acting disrespectfully to the Court in the proceeding?

**THE CLERK:** Your Honor, I'm sorry. I --

**JUDGE TIGAR:** Judge Wardlaw, this is Judge Tigar.

That's okay, Ms. Lee. I can handle this.

Judge Wardlaw, this is Judge Tigar. Ms. Lee is my courtroom deputy, and everyone is using an AT&T conference line that my court has assigned to me for matters like this.

Neither Ms. Lee nor I, unfortunately, have any way of

identifying the offending parties when these things happen, and I apologize for that.

**JUDGE WARDLAW:** All right. That's obviously not your fault. As I said at the beginning, that's one of the obstacles that we are facing in even holding this hearing during these times, but I would just admonish people, the 130-plus sum that are on this line, to be considerate of the proceedings and hang up if you have to -- if you feel that it's urgent to be doing something else.

All right. Mr. Mello --

**JUDGE TIGAR:** Judge Wardlaw, this is Judge Tigar again. Perhaps I could take advantage of the interruption to ask counsel a question.

Mr. Mello, I thought that my colleague, Judge Mueller, asked you an excellent and important question, but I don't think you've answered it.

Her question was, as I understood it, does the State contend that using its process that it's announced, it will get the six-feet social distancing -- that's a yes-or-no question -- and relatedly I would ask you, does the State agree with the plaintiffs' contention, yes or no, that six-foot social distancing is constitutionally required?

**MR. MELLO:** So I'll start with the second one.

I don't believe that the State is agreeing that six-foot social distancing is constitutionally required in a

correctional setting, and I think again it ignores the fact that they must, as a prerequisite, prove that this is the right court and that -- that we've been deliberately indifferent to the unprecedented situation that is the COVID-19 crisis.

Now with respect to your first question, is the State arguing that we can provide six-feet social distancing? Is that the question, Your Honor?

**JUDGE TIGAR:** Yes. I think I just --

**MR. MELLO:** With the --

**JUDGE TIGAR:** I beg your pardon. I think I'm just restating my colleague's question. As I understand it, the question is, is the State contending that using the procedures it has already outlined, it will achieve six-foot social distancing within the prison?

**MR. MELLO:** So I know you want a "yes" or "no," Your Honor, and it's not because I went to law school and I feel incapable of saying "yes" or "no." I would say "yes" if I knew the answer, but I think the facts are not developed. We just implemented these measures in real breakneck time, and so we don't know --

**JUDGE TIGAR:** "I don't know" --

**MR. MELLO:** -- if we can get to -- I'm sorry. I'm sorry, Your Honor.

**JUDGE TIGAR:** "I don't know" is a perfectly acceptable third answer.

So the answer is that the State doesn't know whether it will achieve that goal. That's fine.

Let me ask you a related question, which is the State has announced it's going to release inmates early who are within 60 days already of a release date, and I understand there's going to be a limiting factor there, which is the parties seem to agree that several hours per inmate are required of work before that can happen; but, anyway, this is what the State has announced.

My question is why within 60 days of release? Why not, for example, inmates who are within 180 days of release as to whom it would seem to me all of the public safety considerations, as well as the medical considerations, are the same? Why not choose a horizon that is much further out?

**MR. MELLO:** So, first of all, I think you are referring, Your Honor, to Mr. Hoffman's supplemental declaration where he concedes that prerelease planning is absolutely necessary to protect public safety. And I want to back up a little bit because I think this issue of public safety, while not a red herring, is being slightly misconstrued by opposing counsel.

When we're talking about public safety, we are not talking about increased crime rates which may occur. The reason we focused on Mr. Hoffman's language in his original declaration with respect to the numbers of persons who fall within Category

1 or the low-risk category on the CFRA was to describe why that was shortsighted.

What we are talking about here with respect to public safety is the real risk to the public of a mass release without prerelease plans, sufficient prerelease plans. So Mr. Hoffman's supplemental declaration says that it would take three to six hours per inmate who are within a short period of time before -- he's not saying people who are 180 days out. He's not saying people who are 270 days out. He's not saying people who are 120 days out. He is saying people that are close to the end of their term, it would take three to six hours of planning.

So, first of all, if they're farther away from their term, up to the 180 days in your hypothetical, we don't know because he hasn't been deposed, but based upon his declaration to date, Mr. Hoffman would undoubtedly say that it would take more than three to six hours per individual, and our own testifying witness, Mr. Green, would say that it would take far more than that, and he would say that it would take far more than that, Your Honor, under normal time where it's already difficult to provide that transitional housing, where it's already difficult to match up inmates to services in the community like medical care if they have chronic care, like substance abuse treatment if they are in the middle of their substance abuse programming, if they have serious mentally ill -- serious mental illness so

that they can ensure that they have access to medications and services when they are in the community. So that's one part of it, the risk to those individuals.

But also the risk to the public at large. Yes, for crime, but that's not where we're going, and I don't want it to act like that. That's a scare tactic. We are not trying to say that.

What we are trying to say is "the risk is," and what Dr. Brie Williams said in her study was that those individuals accessed emergency rooms in public health centers more than regular members of the community, and that happens when we're not in the middle of a world pandemic, when we're not at a place where individuals are overloaded at our emergency rooms and hospitals in the community. So they're missing that point.

And this Court -- and, again --

**JUDGE MUELLER:** Excuse me. I have a question on that, on hospital beds, Judge Wardlaw.

**JUDGE WARDLAW:** Yes.

**JUDGE MUELLER:** Mr. Mello, does the -- is there any place in the record that the Court can find the CDCR's projections on the number of its contracted community hospital beds that will be needed for the prison population, because currently, as I understand it, the CDCR has arrangements, and as inmates become infected and exhibit serious symptoms, they will be transferred to community hospitals. What are the

protections about those hospital-bed needs compared to what's available?

**MR. MELLO:** And so to answer your question, that information is not in the record, and I think that that question could be answered, but that is not in the record, Your Honor, and so --I mean, that's your answer. I don't want to say "yes" or "no." It's just not in the record. I think that's correct.

**JUDGE MUELLER:** All right. I appreciate that.

A related question on this issue of low risk to reoffend, help me understand if I'm reading the record correctly. I think the plaintiffs present evidence -- and this is referencing Hoffman -- that 63,000 inmates currently housed in the prisons score at low risk to reoffend. The defendants dispute that figure in part, but I point to 13,500 that might reoffend.

Is it fair to infer that there is substantial agreement that there are 50,000 inmates in the prisons who are at low risk to reoffend, using the available risk assessment tools?

**MR. MELLO:** No -- so they are -- it is undisputed that pursuant to the CSRA, the Static Risk Assessment Tool, that 13,000 of those 63,000 would commit a new felony and be convicted within three years. That is undisputed.

However, with -- and, again, I feel like -- and I don't -- I don't mean to be disrespectful, so I'm not trying to, but I

think we're missing the point. It goes beyond the fact that there is some risk of increased crime because those 13,000 individuals -- there is many other tools that the CDCR uses before releasing individuals. It's not just that Static Risk Assessment Tool, for example.

**JUDGE WARDLAW:** Counsel --

**MR. MELLO:** I'm sorry?

**JUDGE WARDLAW:** -- this is Judge Wardlaw. I just want to interject at this point that in this time of emergency, why would it -- is it appropriate or reasonable to adhere to all the procedures that you do at a time of non-emergency?

**MR. MELLO:** So I think everybody was -- is acting with due haste, Your Honor.

But just by way of background, nobody -- no system in the country has taken the steps that CDCR has taken to address this pandemic. No system in the country has gone as far as we have gone, so I think we can't lose track of that.

And then with respect -- so we are acting in due haste -- I'm sorry?

(Unidentified voice interruption)

**JUDGE WARDLAW:** That was not the Court. That was someone on the telephone call but not the Court.

**MR. MELLO:** Okay. Okay.

So I think that can't be lost.

Also this Court is required by the Prison Litigation

Reform Act and required by the decision in *Plata* to give substantial weight to the adverse impact on public safety and the criminal justice system, and that adverse impact must also include to our hospitals and ER rooms.

But then back to your point regarding --

**JUDGE WARDLAW:** Counsel, this is the Court. This is Judge Wardlaw again.

Just because I don't -- I haven't been involved in this case as long as my colleagues, but just one thing that I don't quite thoroughly follow is that -- my understanding is that to the extent that inmates contract the disease, that has an incredible effect on your -- the prison guards, the staff, their families, their communities, in addition to the fact that regardless of whether they're in prison or out of prison, they will still end up impacting the local hospitals and health centers as it becomes such a large number that -- that it -- that they require the local community health and medical support. I don't -- I don't know exactly where the substantial weight weighs, if you take all of that into consideration.

**MR. MELLO:** I'm sorry. The question, Your Honor? I'm sorry?

**JUDGE WARDLAW:** Yes. I want you to comment on that. How do you weigh all of these other factors?

**MR. MELLO:** So what we're saying is it has to be weighed. It has to be weighed. And it has to be weighed

through the filter of, though, again, it's unclear what plaintiffs are asking for and that gets to the need's narrowness requirements of the PLRA also failing to be met here by way of this motion.

But it absolutely doesn't consider a patient coming out of the system and going to it. That is vastly different than a max increase of persons going out and a group of individuals who access emergency rooms at higher levels than other individuals. The evidence on that is also undisputed. And so it absolutely adversely impacts the public safety and those facilities.

I would like, if I may, to get back to some of the questions that the Court asked to opposing counsel, if I may.

**JUDGE WARDLAW:** All right. You may.

**MR. MELLO:** Okay. So I think -- I think that -- whether it was Judge Tigar -- I believe it was Judge Tigar -- indicated -- the question was, I guess, what the modification -- or whether they needed to essentially comply with 3626, and I believe that they do. They do. We have been in compliance. Plaintiffs admit this is not really a modification; that this is a motion that seeks social distancing.

The PLRA makes absolutely clear that before a Three-Judge Court can consider granting a prisoner release order, there must be evidence of prior less intrusive orders for which

defendants had a sufficient amount of time to comply with and they failed to do so.

The record is undisputed here that there has not been a prior less intrusive order that the defendants have had sufficient time to comply with.

**JUDGE TIGAR:** Mr. Mello, this is Judge Tigar.

The *Brown vs. Plata* decision -- excuse me -- in the *Brown vs. Plata* decision, Justice Kennedy says quite clearly that both the State and the plaintiffs could return to the court and seek a modification, and he contemplates, certainly in that opinion, circumstances in which there has not been an additional prior violation.

So my question would be given that we know that -- that it's permissible in some circumstances for plaintiffs or the State to return and seek modification, why isn't this one of those circumstances?

**MR. MELLO:** I think it is -- thank you, Your Honor. I think it is because this is a new circumstance. This is a new request for relief, and no prior orders have been sought to address the issue.

Plaintiffs, in response to questioning, I believe from you, Your Honor, said that the prior prisoner release order is the order that they failed to comply with. That is a circular argument. That is not an order of less intrusive relief. It has to be something short of a prisoner release order.

And because there has not been any order directed at by either the *Plata* or the *Coleman* courts to address this crisis, which is different, then we believe they have not complied with the Three-Judge Panel.

But I believe also, Your Honor, under questioning from Judge Mueller or Wardlaw or maybe even you, when they start describing this process by which the Court will order defendants to -- to basically prove plaintiffs' case, to provide information so that the Court then can provide some sort of advisory opinion, that seems both counterproductive and contrary to separation of -- separation of powers principles, as well as the strictures of the Prison Litigation Reform Act. They never answered that question, and I don't believe they satisfied those requirements.

**JUDGE TIGAR:** Thank you.

**JUDGE MUELLER:** This is Judge Mueller. I have a follow-up question for Mr. Mello.

**JUDGE WARDLAW:** Go ahead.

**JUDGE MUELLER:** I hear what you're saying. Let's just assume for sake of argument the Court is prepared to reach plaintiffs' request for relief as described by Ms. Norman -- clarified by Ms. Norman. Again, from the record, can the Court tell, in terms of the relief that is planned as described by Secretary Diaz, what percentage of that population is the elderly and medically vulnerable? Is that information in the

record?

**MR. MELLO:** Is the information in the record? I mean, the information in the record is that persons who are within 60 days of their -- so I guess the answer is I don't believe so. The record demonstrates that persons within 60 days of their release date will be transitioned to parole or post-release community supervision and that persons who fall within the *Plata* class or the *Coleman* class who meet those criteria and the filters that we've described -- not violent offenders, not domestic violent offenders, current-term registrant -- they will be eligible. But I don't believe the record indicates those over 65. I don't believe it does, Your Honor.

**JUDGE MUELLER:** All right.

And then secondly -- and just so I'm clear, the defendants are not taking any position about what percentage the design capacity would allow achieving six-foot distancing; correct?

**MR. MELLO:** Defendants are not respectfully doing plaintiffs' work in articulating what a prisoner release order should look like. What defendants are doing is they're saying that we are acting swiftly. We continue to evaluate these issues with experts. We are in a better position to respond to this pandemic, which changes by the moment, and that it would be counterproductive and violate principles of separation of powers and the strictures of the PLRA for this Court to order the defendants to do what they're doing, which is trying to

solve this crisis.

**JUDGE MUELLER:** All right. Final question for me, I believe: Do you have a response to Ms. Norman's calling out the possibility of relocation, not just within existing prison institutions but to other secure locations in the community, including possibly abandoned detention facilities and including possibly with the support of the National Guard?

**MR. MELLO:** Okay. So I don't believe that she said secured facilities. But if you look at -- so a very incredible source of information is the CDCR website, and the CDCR website has a COVID-19 page, and on that page, it has their plans, etc. It is very transparent. CDCR has been transparent as to what they are doing, and I encourage the Court to look at those public forms of information.

But in describing what they were doing and how they were intending to increase physical distancing, they described the fact that everything is on the table with respect to empty facilities, with respect to private facilities, with respect to NCCF, that they are considering all of those things, and they should be afforded the deference to quickly evaluate and take action without judicial oversight.

**JUDGE WARDLAW:** Counsel, this is Judge Wardlaw. I just want to clarify.

You made the argument in the opposition that you concede an -- on an Eighth Amendment violation, you concede that it's a

substantial risk of serious harm, but you asserted that there is no Eighth Amendment violation because you are taking reasonable measures to evade it from the *Farmer* case, the two prongs; right? Is that your position in your opposition?

**MR. MELLO:** Our position is that we do not dispute that -- that COVID-19 presents a substantial risk of harm. It is our position that we are taking beyond a reasonable -- we are taking extraordinary steps to address it, and there is no evidence that we have been indifferent, subjectively indifferent, to those efforts to that, Your Honor.

**JUDGE WARDLAW:** But my question is in listening to your last bit of argument, it sounded like you were saying "we're trying to do things, we are thinking about things to do, do *Turner vs. Safely* deference to what we are doing," and that to me sounds like, well, maybe you really haven't taken all of the reasonable measures that you could take.

**MR. MELLO:** So, Your Honor --

(Unidentified voice interruption)

**JUDGE WARDLAW:** I know. I heard someone talking, too.

So your last bit of argument, you know, that you want *Turner vs. Safely* deference as you're thinking about these issues and taking steps, that suggests to me that maybe you haven't really taken all reasonable steps that you could take and -- but maybe, you know, that could be -- that could be the answer. That could be all right. It's a perfectly acceptable

answer at this point in time. I just want you to clarify which it is.

**MR. MELLO:** So, Your Honor, I am not saying -- I'm not saying that we haven't done what we believe is reasonable. What -- so to the extent I said that, I misspoke, and I thank you for giving me the opportunity to restate it.

What I am saying is we have taken bold and reasonable steps, deliberative steps, to address this. And -- and that we will continue to evaluate, as everybody is with this COVID-19 crisis -- we will continue to evaluate the circumstances.

Honestly, I believe Secretary Diaz would say and the Governor would say that we are going to continue to act to protect the inmates and workers of CDCR, and we are going to continue to act to try to flatten the curve, as we apparently have. We are going to continue to try to do that. If that means we have to revisit issues, yes. But we believe we have taken reasonable, bold actions to date, and that we, therefore, have not been subjective -- the subjective prong of the deliberate indifference test has been met. That's what I am saying. If I said otherwise, I apologize, Your Honor, because that was not my intent.

**JUDGE WARDLAW:** Thank you, counsel. You have now exceeded your 30 minutes.

Let me ask my colleagues if they have any additional questions for you?

**JUDGE MUELLER:** Thank you, Judge Wardlaw. I have one final question, after all, for Mr. Mello.

Mr. Mello, just so I'm clear, you are not disputing that contemporary standards of decency requires six feet of distancing now, are you?

**MR. MELLO:** I thought the question was whether we thought that less than six feet constituted a violation of the Eighth Amendment, and I answered that question that we do not.

**JUDGE MUELLER:** All right. Well, I just have to -- I asked that question, so I think I'm hearing you decline to respond to that, but that's all right.

So I'm done.

**JUDGE TIGAR:** Thank you, Judge Wardlaw. This is Judge Tigar. I don't have any further questions for counsel. Thank you.

**JUDGE WARDLAW:** All right. Thank you very much, Mr. Mello.

Further argument, Ms. Norman? Did you have -- ouch. Sorry. Paper cut.

Mr. Specter, do you have a couple minutes of rebuttal?

**MS. NORMAN:** Yes, Your Honor. This is Sara Norman.

I believe I have a few points I would like to rebut, and then I will turn it over to my colleagues to close out the rebuttal.

I wanted to start by hearkening back to the original point

that Mr. Specter made that I think Mr. Mello has muddied up a bit.

The prevention of contagious illness is a fundamental aspect of medical care systems in prisons. It's been a part of the *Plata* case from the very beginning. It was a very significant part of the order appointing a Receiver that Judge Henderson issued about 15 years ago, and it was also part of the findings of this Court in 2009. The prevention of contagious illness was part of the Governor's State of Emergency Declaration that started the whole process with the Three-Judge Court back at that time. It's an essential aspect of medical care systems.

Prior orders of the *Plata* court and of this Court have not proven capable of providing constitutionally minimally adequate care to our clients, to the *Plata* plaintiffs and the *Coleman* plaintiffs in the current pandemic, so those orders have failed. The State's remedies are utterly inadequate, given the vast numbers of people in overcrowded dorms and the small numbers that they're talking about adjusting. So I wanted to clarify that about prior orders.

The other point I wanted to clarify is about the risk to public safety should people go out -- should people who are sick be released or have medical conditions be released and then have to make use of their community hospitals for emergency services. Well, those community hospitals are

already serving the prison population. When people in prison need emergency care, they're sent to outside community hospitals. It's no different whether they are in prison or out of prison, except for two factors.

If they're in prison and they go to an emergency room, they are accompanied by several custody officers who come with them and are with them at all times.

Further, if they're in prison now, they're far more likely to get COVID-19 and become deathly ill than if they were outside of prison, and we believe that that is uncontested.

To the risk to public safety, to the community hospitals, it's far greater, as Dr. Stern says in his rebuttal declaration, than it would be if these people were released to the outside community where they have a fighting chance of avoiding the virus and not burdening the community healthcare.

I'm going to pass it over to Mr. Bien to continue.

**JUDGE WARDLAW:** All right. Thank you.

(Unidentified voice interruption)

**MR. BIEN:** This is Michael Bien.

**JUDGE WARDLAW:** There are some people speaking in the background. Whoever is speaking, please stop.

Thank you.

Mr. Bien.

**MR. BIEN:** I would just like to add in terms of the remedy, if -- as Ms. Norman pointed out, if the Court orders

defendants to come up rapidly with a plan, their plan should also include considering using their powers such as were used by Secretary Diaz yesterday under the Government Code 8658 to transfer inmates from danger in a prison to a safe place. It's a temporary transfer. They could transfer them to other places where there could be security. They would avoid the release problem, the prerelease planning, and this is an emergency -- temporary emergency measures.

Secretary Diaz and Receiver Kelso identified the power under California law to do this. They should report back to the Court what they've done to investigate how many prisoners could be moved to places in an emergency basis, and that wouldn't be a complete release from custody. At the end of the emergency, if it was appropriate, the defendants could bring these people back.

This is an emergency, and we need every possible measure to be considered by the State, and they should -- they should definitely report back about have they investigated vacant buildings owned by the State, have they investigated the power that the Governor has himself asserted under one of his emergency measures issued on March 12th to commandeer property as necessary for -- to fight the COVID-19 to house people who are exposed to COVID-19.

Thank you.

**JUDGE WARDLAW:** All right. Thank you very much,

counsel.

This oral argument session will be adjourned, and I just want to thank all of you for your excellent arguments today. I very much appreciate it.

Judge Tigar, Judge Mueller, do you have something else to say?

**JUDGE TIGAR:** Judge Wardlaw, I would also like to extend my thanks to all the counsel, not just for the excellence of their arguments but for everybody's patience and forbearance while we did this by telephone, and having said that, I have nothing else to add. Thank you.

**JUDGE WARDLAW:** Thank you.

**JUDGE MUELLER:** I have nothing else either.

Thank you, Judge Wardlaw, for your excellent presiding under the circumstances.

**JUDGE WARDLAW:** I tried.

Thank you very much, counsel. This Court will be adjourned for today.

(Proceedings adjourned at 2:42 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, April 3, 2020

Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter