PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND**

| | |
|---|---|
| MARCIANO PLATA, et al., *Plaintiffs*, v. GAVIN NEWSOM, et al., *Defendants*. | Case No. 01-1351 JST **PLAINTIFFS' EMERGENCY MOTION REGARDING PREVENTION AND MANAGEMENT OF COVID-19** |

**NOTICE OF MOTION AND MOTION**

TO THE PARTIES AND ALL COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT as soon as the matter may be heard before the Honorable Jon S. Tigar, Plaintiffs will move the Court for an order directing Defendants and Receiver to develop a plan to manage and prevent the further spread of COVID-19 in California state prisons.

Given the urgency, Plaintiffs request that the Court set an expedited briefing schedule and review this motion as soon as practicable.  Plaintiffs waive any right to file a reply.  The motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Plaintiffs' Emergency Motion to Modify Population Reduction Order (ECF No. 3219) and Reply (ECF No. 3248), and all declarations and evidence filed in support of the previous Motion and Reply, and in support of this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The COVID-19 pandemic poses an enormous and unprecedented risk of harm to the people living in California's significantly overcrowded prisons, where tens of thousands in the Plaintiff class are crowded into dorms and where many are elderly and/or chronically ill and thus particularly at risk of severe illness and death from COVID-19.  To date, Defendants' response to the pandemic has been insufficient to protect the lives of the over 114,000 people housed in the prisons.  Plaintiffs seek an order from this Court requiring further action to address this unprecedented health crisis.

On April 4, 2020, the Three-Judge Court empaneled jointly in this case and in *Coleman v. Newsom*, 90-cv-0520 (E.D. Cal.), denied Plaintiffs' Emergency Motion to Modify Population Reduction Order, holding that the Motion was not properly before them.  The Three-Judge Court did so "without prejudice to Plaintiffs' seeking relief" before this Court, noted "the undisputed risk of further contagion in a carceral environment," and advised that "Plaintiffs may go before a single judge to press their claim that Defendants' response to the COVID-19 pandemic is constitutionally inadequate."  ECF No. 3261 at 2 and 12 (footnote omitted).  Accordingly, Plaintiffs now seek an order from this Court to reduce population levels to safe and sustainable levels in light of the COVID-19 pandemic.

### II. FACTS

Plaintiffs incorporate by reference the facts set forth in their Emergency Motion and Reply before the Three-Judge Court.  ECF Nos. 3219, 3248.  The number of staff and incarcerated people testing positive for the disease continues to climb.  As of 3:25 p.m. on April 8, 2020, Defendants report that at least 25 members of the Plaintiff class and 62 prison staff are infected with the virus.  Declaration of Patrick Booth, filed herewith, ¶ 2 ("Booth Decl.").  Fifteen of the state's 35 prisons now are affected.  *Id*., Exhs. A, B.  Those numbers, of course, are likely to be lower than the actual number of infections.  ECF 3219-4 at ¶ 3.  Less than 0.4% of the incarcerated population has been tested to date, and the data regarding infected staff is self-

reported.  Booth Decl. ¶ 14.  If experience in other jurisdictions is any indication, those numbers will increase dramatically absent appropriate action.[1]

In the meantime, people at high risk of getting very sick or dying from COVID-19 continue to be crowded in dorms.  As of April 7, 2020, most dorms remain dangerously overcrowded.  Booth Decl. ¶¶ 5, 7, Exh. C.  Consider the California Institution for Men ("CIM"), where 18 staff and 14 incarcerated people now have tested positive.  *Id.*, Exhs. A, B.  Plaintiffs previously introduced photographs of conditions in Joshua Hall, which has a design capacity of 80 people and was 161% overcrowded (housing 129 people) as of March 23, 2020, with people sleeping sometimes as close as 26 inches apart.  ECF 3219 at 15-17.  As of April 7, 2020, the population there has decreased by only **one** person.  Booth Decl. ¶ 5, Exh. C at 18

On April 3, 2020, the California Correctional Health Care Services ("CCHCS") issued additional interim guidance related to COVID-19.  Booth Decl. ¶ 8, Exh. D.  The updated guidance notes that "[t]he virus is highly transmissible, even when only having mild symptoms," "[t]ransmission from asymptomatic individuals has been demonstrated and may be responsible for 6-13% of COVID-19 cases," and "airborne transmission (virus suspended in air or carried by dust that may be transported further than 6 feet from the infectious individual) is a possible mode of transmission."  *Id.* at 14-15.

### III. DEFENDANTS' RESPONSE TO THE COVID-19 PANDEMIC IS CONSTITUTIONALLY INADEQUATE.

Prison officials may not be deliberately indifferent "to a substantial risk of serious harm to" the people in their custody.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  As the Three-Judge Court recognized, "the Eighth Amendment requires Defendants to take adequate steps to

---

[1] *See* Booth Decl. ¶ 12, Exh. F (April 6, 2020 "Opening Statement" from The Marshall Project) (reporting that at least 200 prisoners in Michigan have COVID-19, there are almost 300 confirmed cases in Cook County Jail in Illinois, "[t]here is a growing outbreak in the jail in Washington, D.C.," an outbreak at a federal prison in Connecticut "also is spreading," and "[a]t least 650 staff and prisoners have now tested positive" at Rikers Island).  Indeed, Cook County Jail—with 238 incarcerated people and 115 staff members testing positive—"has emerged as the largest-known source of U.S. virus infections, according to data compiled by The Times."  Booth Decl., Exh. I (April 8, 2020 New York Times Article).

curb the spread of disease within the prison system." ECF No. 3261 at 8; *see Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("correctional officials have an affirmative obligation to protect inmates from infectious disease."); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (second-hand smoke); *Clark v. Taylor*, 710 F.2d 4, 14 (1st Cir. 1983) (carcinogens); *Powers v. Snyder*, 484 F.3d 929, 931 (7th Cir. 2007) (hepatitis); *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (asbestos).

"Defendants themselves acknowledge that the virus presents a 'substantial risk of serious harm' and that the Eighth Amendment therefore requires them to take reasonable measures to abate that risk." ECF No. 3261 at 9 (citations omitted). The only question before this Court, then, is whether Defendants have taken reasonable steps to mitigate this threat. They have not.

Prison officials must implement reasonable measures to ensure that people in their custody are safely housed and are not unnecessarily exposed to infectious diseases. When they fail to do so, courts will intervene to ensure appropriate housing. *See, e.g., Hutto v. Finney*, 437 U.S. 678, 682-87 (1978) (affirming limits on placements in crowded punitive segregation); *Gates v. Collier*, 501 F.2d 1291, 1300, 1303 (5th Cir. 1974) (holding that plaintiffs were entitled to relief where prison officials allowed inmates with serious contagious diseases in general population); *Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 944 and n.88, 959 (N.D. Cal. 2015) (granting preliminary injunction requiring plan to address prevention and control of tuberculosis, including related to placement in medical isolation).

Indeed, this Court already has intervened to enforce plaintiffs' right to be housed without unreasonable risk to their health. Seven years ago, when Defendants failed to safely house people who were most at risk of contracting severe coccidioidomycosis (Valley Fever), this Court required Defendants to exclude certain class members from certain prisons. *See* ECF No. 2661, *Plata v. Brown*, No. CO1-1351-TEH, 2013 WL 3200587, at *14 (N.D. Cal. June 24, 2013). In concluding Defendants' proposed Valley Fever plan was inadequate with respect to certain vulnerable populations, this Court noted both those persons' particular vulnerability due to age, underlying medical condition(s), and/or race, as well as the heightened exposure they faced at

certain prisons. *See id.* at *2, *13.

In the face of the COVID-19 pandemic, Defendants again have failed to take appropriate steps to ensure the safe housing of vulnerable class members who are at high risk, based on age or underlying medical conditions, of getting very sick or dying. This time, their failure imperils not only the people incarcerated in the prisons, but also the staff and people living in communities surrounding the prison, as explained below. Unless Defendants initiate dramatic housing changes, the impact of COVID-19 on the prison system will be two-fold. First, many people, and particularly the elderly and those who are medically compromised, will become infected in the overcrowded prisons. Second, a substantial number of people will become so sick that they will require hospitalization and community health care infrastructure will be overwhelmed. *See Madrid v. Gomez*, 889 F. Supp. 1146, 1257 (N.D. Cal. 1995) ("The prison may refer inmates to outside facilities for treatment; however, if defendants choose to refer inmates outside the prison, they must provide 'reasonably speedy access' to these other facilities.").

### A. Defendants Have Failed to Remedy Dangerously Crowded Dorms.

According to a recent analysis by the Receiver's office, 45,110 people in California prisons (37% of the total population) are at risk of "adverse COVID-19 outcomes" due to age or pre-existing health conditions. Specter Decl., Exh. B (ECF 3249 at 17). These medically vulnerable individuals remain at substantial risk of "severe respiratory illness, as well as damage to other major organs, and death" once the virus spreads throughout the prison system. Stern Decl. ¶ 5.

As the Three-Judge Court recognized, "the only way to stop its spread is through preventive measures—principal among them maintaining physical distancing sufficient to hinder airborne person-to-person transmission." ECF 3261 at 8. Indeed, every correctional and public health official testifying in this case agrees that physical distancing in the prison system is imperative to prevent the rapid spread of COVID-19, a disease for which there is no vaccine or cure, and which is easily transmissible. *See* ECF 3219-4 ¶ 8; ECF 3243-3 ¶¶ 3, 6-8; ECF 3241 ¶ 1; ECF 3240 ¶¶ 4, 11; ECF 3225-1 ¶¶ 19, 26. The U.S. Centers for Disease Control and Prevention ("CDC"), in guidance on management of COVID-19 in correctional facilities, named

social distancing as "a cornerstone of reducing transmission of respiratory diseases such as COVID-19." ECF 3221 ¶ 21, ECF 3221-1 Exh. 7 (CDC Interim Guidance).

But many in the Plaintiff class "are housed in close quarters, unable to maintain a six-foot distance from others, and sharing or touching objects used by others."[2] ECF No. 3219-4 ¶ 8. More than half of these institutions are over 130% design capacity. Stern Decl. ¶ 6. "Infectious diseases that are transmitted via the air or touch (like COVID-19) are more likely to spread" under these conditions. ECF No. 3219-4 ¶ 8. Joshua Hall at the California Institution for Men is illustrative. This dorm is at 160% design capacity. Booth Decl. ¶ 6, Exh. C at 18. Based on the most recent information available to Plaintiffs, approximately 75% of the people on Facility A at CIM are medically high risk, and 67% in Joshua Hall have physical disabilities. Booth Decl. ¶ 15-16; Lynch Decl. ¶ 4. Defendants' plan to limit the spread of COVID-19 in Joshua Hall has been to implement "[a]dditional cleaning efforts," including cleaning the dorms twice a day and regularly sanitizing the door handles. ECF No. 3235 at 22. Additionally, "inmates are being instructed to stay six feet apart," *id.*—something that is impossible to do because the beds are only between two and four feet apart. ECF No. 3219-3 at ¶ 5. That simply is inadequate.

The steps that Defendants have proposed to date—temporarily pausing intake from county jails, expediting the release of people who were scheduled to be released in the next 60 days, and relocating fewer than 600 people from a few dorms at three prisons to cells—do not adequately

---

[2] Courts across the country have ordered relief when conditions in detention facilities did not allow for safe distancing. *See, e.g.*, *Castillo v. Barr*, CV2000605TJHAFMX, 2020 WL 1502864, at *5-*6 (C.D. Cal. Mar. 27, 2020) (granting temporary restraining order for release of detainees at Adelanto, California detention center in part because conditions of confinement took away ability to socially distance); *Basank v. Decker*, No. 20-cv-2518, 2020 WL 1481503, at *5-*6 (S.D.N.Y. Mar. 26, 2020) (granting temporary restraining order for release of detainees in part because "Respondents could not represent that the detention facilities were in a position to allow inmates to remain six feet apart from one another, as recommended by the Centers for Disease Control and Prevention"); *United States v. Davis*, No. 20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant because "[s]ocial distancing in a pretrial facility is nearly impossible for anyone who enters its doors, especially detainees"); *United States v. Colvin*, No.3:19cr179 (JBA), 2020 WL 1613943, at *4-*6 (D. Conn. Apr. 2, 2020) (noting defendant's multiple health conditions, including diabetes, and that "she is unable to practice effective social distancing and hygiene to minimize her risk of exposure" as reasons justifying her immediate release).

address the magnitude of the problem and the needs of medically vulnerable class members. None of these transfers or releases target those who are medically vulnerable, and even Defendants do not claim that these steps will render crowded conditions in dorms throughout the state safe. *See* Bien Decl. ¶ 17 & Exh. 3 (ECF 3221 & 3221-1); Diaz Decl. ¶¶ 4-5 (ECF 3241). Even with these modest reductions, adequate physical distancing will remain impossible in the dorms, leaving thousands of medically vulnerable people in settings where they are at high risk of contracting, and spreading, COVID-19.

### B. Defendants' Failure to Initiate Appropriate Relief Will Overwhelm Community Resources

The failure to address the needs of medically vulnerable people in the dorms will stress community health resources. "An outbreak of COVID-19 in any prison where community health resources are already stressed by COVID-19 will put significant pressure on or exceed the capacity of local health infrastructure. To the extent that the health care infrastructure is overloaded, incarcerated people and local people from the community will die unnecessarily because necessary respirators and hospital facilities are unavailable." Stern Decl. ¶ 11.

Put differently, Defendants will not be able to treat those who fall severely ill from COVID-19 within the prison system. Defendants already have "shortages of masks, gloves, gowns, and faceshields, which endangers staff and patients." Golding Decl. ¶ 6 (ECF 3238). And the effects of COVID-19 are very serious, and include "respiratory illness, as well as damage to other major organs." Stern Decl. ¶¶ 6-7 (ECF 3219-4). "Treatment for serious cases of COVID-19 requires significant advanced support, including ventilator assistance for respiration and intensive care support." *Id.* ¶ 7; *see also id.* ¶ 17.

Thus, Defendants will have no choice but to turn to community health care systems to treat its most acutely ill patients. Stern Decl. ¶ 7 (ECF 3219-4); Supp. Stern Decl. ¶ 4 (ECF 3251). But these "rural or semirural community hospitals that serve the prisons will quickly become overwhelmed with a high concentration of very sick and possibly dying people who require intensive care." Supp. Stern Decl. ¶¶ 5-6 (ECF 3251); *see also id.*, Exh. A ("[A] surge in incarcerated people with serious respiratory illness is likely to impose an unmanageable burden on

community hospitals, particularly in rural areas where many U.S. prisons are located."). Without access to necessary medical treatment, class members "will die unnecessarily." *See* Stern Decl. ¶ 7 (ECF 3219-4).

Indeed, in Illinois, a news report stated that "[t]he National Guard was called in . . . to assist overwhelmed local hospitals" after "14 incarcerated people from the Stateville Correctional Center required hospitalization, dozens of inmates and staff [were] isolated with coronavirus symptoms, and one inmate . . . died from the virus." Supp. Stern Decl. ¶ 6 (ECF 3251). Only then did the Governor of Illinois significantly expand the availability and length of medical furloughs, noting that "the Illinois Department of Corrections (IDOC) currently has a population of more than 36,000 male and female inmates in 28 facilities, the vast majority of whom, because of their close proximity and contact with each other in housing units and dining halls, are especially vulnerable to contracting and spreading COVID-19."[3] Booth Decl. ¶ 13, Exh. G (April 6, 2020 Executive Order in Response to COVID-19).

Defendants cannot wait for disaster to strike or the numbers to climb higher. Their failure to take appropriate remedial steps constitutes deliberate indifference to the profound risk of harm to medically vulnerable people in their custody. Defendants must take immediate and complete steps now to ensure that people are safely housed so that the disease does not continue its spread throughout the prison system, attack the most vulnerable, and overrun prison and community health care infrastructure. *See Helling*, 509 U.S. at 33 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").

---

[3] California, of course, is not alone in dealing with the COVID-19 pandemic in its prison system. The problem in the California, however, is particularly acute due to the severe overcrowding in its prisons, a problem not shared by many of the other larger jurisdictions. Booth Decl. ¶¶ 8-10, Exh. E. In addition, California's prison health care system already has been found to violate the Eighth Amendment, and currently 16 of the 35 state prisons have failed to provide adequate health care such that the Receiver can delegate the management of their health care back to the State. *See* Receiver's Forty-Third Tri-Annual Report, ECF No. 3182, at 7 (Jan. 15, 2020).

## IV. REQUESTED RELIEF

### A. This Court Should Order the Defendants to Reduce Population Density to Mitigate the Spread of COVID-19.

Plaintiffs seek an order directing that the population density in the California prison system be reduced so that (1) class members at high risk of serious illness or death from COVID-19 due to their age and/or underlying health conditions are safely housed, and (2) the system can respond to those who become sick and require hospitalization without overloading community health care systems. The order should direct Defendants to assess the continued need to reduce population density as the virus impacts each prison's health care and custody work forces.

Defendants must engage in an iterative review of high risk patients, their eligibility for release, and safe housing options, including within the prison system and through home confinement, electronic monitoring, and medical furlough. *See* Cal. Govt. Code § 8658 (CDCR Secretary has emergency power to release people whose lives are in danger to a "safe and convenient place"); Cal. Pen. Code § 2690 (CDCR Secretary has authority to order temporary removal from prison). More specifically, Defendants should adopt the following mitigation measures, based on the present state of knowledge about COVID-19, as set forth in the concurrently filed declaration of Dr. Marc Stern.

(1) Identification of those people who are at the highest risk for severe complications from the virus. Stern Decl. ¶ 13.

(2) Immediate steps to ensure that such high-risk individuals are safety situated, either by releasing them, or ensuring that they are safely housed where they can best practice physical distancing. *Id.*

(3) Immediate steps to downsize the population to the lowest number possible at each prison by release or transfer to a safe alternative. Priority should be given to releasing high-risk individuals and those in crowded dormitories. This process will create space to deal with the need for isolation and quarantine, and allow greater opportunities for physical distancing to slow the spread of the virus. *Id.* ¶ 14.

(4) Immediate planning to address foreseeable changes in conditions, including a

reduction in workforce (custody and healthcare staff) as workers respond to their personal needs (self-quarantine or isolation, care for ill relatives, staying at home with school-age children). Such planning may require further population downsizing. *Id.* ¶ 16.

Defendants, however, retain discretion to develop and implement a plan to achieve the necessary population density reduction, so long as it is effective. *People of the State of New York ex rel. Stoughton v. Brann*, No. 451078/2020, 2020 WL 1679209, at *4 (N.Y. Sup. Ct. Apr. 6, 2020) ("Reasonable care to mitigate must include an effort to employ an *effective* ameliorative measure.").

As the Three-Judge Court observed, this Court's 2013 Valley Fever Order offers a roadmap to navigate the situation at hand. ECF No. 3261 at 9-10 (citations omitted). There, this Court directed Defendants to plan "to transfer all inmates who are classified as 'high risk' under the medical classification system" out of Pleasant Valley State Prison and Avenal State Prison within 90 days, and to exclude the transfer of high risk patients into those two prisons. ECF No. 2661 at 24-25. Here, Plaintiffs are asking that the Court order Defendants to reduce population density within California prisons, including through, where appropriate, transfers to appropriate areas in existing prisons or other locations while remaining in CDCR custody, to allow adequate hygiene and distancing practices to be observed and necessary medical care to be provided.

In the Valley Fever Order, this Court also recognized that the Receivers' plan to respond to Valley Fever would necessitate ongoing modifications to policy if new community standards for treatment and prevention of Valley Fever evolved, as Plaintiffs' proposed remedy similarly envisions. Thus, the Valley Fever Order directed the Receiver to consult with the Centers for Disease Control and Prevention to determine whether the exclusionary criteria of who is "high risk" may need to be modified. *Id.* at 25. The Court should order Defendants to do the same here.

**B.   The Requested Relief Satisfies the Requirements of the Prison Litigation Reform Act.**

The requested order would be narrowly drawn, extend no further than necessary, and be the least intrusive means to avoid risk of catastrophic harm to the Plaintiff class. "Narrow

tailoring requires a fit between the remedy's ends and the means chosen to accomplish those ends." *Brown v. Plata*, 563 U.S. 493, 531 (2011) (alterations and citation omitted). "The scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation." *Id.* Here, an order reducing population density in the prison system would be tailored directly to the constitutional violations at issue.

In light of the case history, the order sought would be narrowly drawn, extend no further than necessary to remedy ongoing constitutional violations, and constitute the least intrusive means to that end. The State would retain maximal discretion as to specific methods of implementation. *Plata*, 563 U.S. at 533 ("While the order does in some respects shape or control the State's authority in the realm of prison administration, it does so in a manner that leaves much to the State's discretion.").

Finally, this Court has authority to order a reduction in population density. In 2013, this Court determined that an order to transfer a group of people out of a prison where they were at undue risk of serious harm was not a "prisoner release order" under the Prison Litigation Reform Act. ECF No. 2661 at 14 ("Either a 'transfer' is a 'release from' a prison or it is not, and Defendants have now conceded that it is not"). Under the "law of the case" doctrine, this prior determination controls. *See Nordstrom v. Ryan*, 856 F.3d 1265, 1269–70 (9th Cir. 2017) (holding that "[b]ecause this case returns our court in virtually the same procedural posture . . . the prior determination that Nordstrom had standing is both the law of the case and binding precedent we must follow" and noting that any exceptions to the law of the case doctrine are rare) (citations omitted).

///
///
///

|   |   |   |
|---|---|---|
| 1 |   | Respectfully submitted, |
| 2 | DATED:  April 8, 2020 | PRISON LAW OFFICE |
| 3 |   | By: /s/ Alison Hardy |
|   |   | Donald Specter |
| 4 |   | Alison Hardy |
|   |   | Rita Lomio |
| 5 |   | Sara Norman |
|   |   | Corene Kendrick |
| 6 |   | Sophie Hart |
|   |   | Patrick Booth |
| 7 |   |   |
| 8 |   | *Attorneys for Plaintiffs* |

-11-    Case No. 01-1351 JST
PLAINTIFFS' EMERGENCY MOTION RE: PREVENTION AND MANAGEMENT OF COVID-19