XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN - SBN 209508
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR - 263293
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF -  240280
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

Attorneys for Defendants

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:    April 10, 2020<br>Time:    1:30 p.m.<br>Crtrm.:  6, 2nd Floor<br>Judge:  Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the April 9, 2019 Case Management Conference.

## I.  PLAINTIFFS' STATEMENT

The COVID-19 pandemic has tremendously affected CDCR operations, including medical care.  The Receiver and his CCHCS staff have issued clinical and public health protocols for use in the prisons.  Plaintiffs believe CCHCS' clinical and public health guidance, including regarding testing, treatment, and public health measures to slow the spread of coronavirus, are largely consistent with national Centers for Disease Control and Prevention (CDC) and California Department of Public Health guidelines.  However, Plaintiffs do not believe CDCR can implement the most critical prevention and control strategies—social distancing and isolation to prevent transmission—given current population levels.  Plaintiffs have therefore filed an emergency motion before this Court, based on the unacceptable risk of harm COVID-19 poses to the many medically vulnerable people incarcerated in CDCR.

*Changes to Medical Services*:  CCHCS and CDCR on March 20, 2020 issued a joint memorandum regarding public health and medical care delivery processes in the prisons during the pandemic.  The memorandum calls for cancelling or postponing all non-essential medical appointments including those off-site, and limiting face-to-face encounters and movement related to medical care, while stating that emergency services, absolutely necessary care, and administration of medication should continue.  In essence, many CCHCS policy requirements have been suspended, with patient care cancelled or postponed, with direction provided that truly necessary care continue.

*Changes to Plaintiffs' Monitoring*:  The Receiver also modified processes related to Plaintiffs' monitoring.  On March 16, 2020, site visits to the prisons were suspended through April in *Plata*, as well as in the *Coleman* and *Armstrong* cases.  The Receiver also asked that Plaintiffs' queries regarding individual patients be limited to truly urgent matters, and subsequently said responses to such memos will be delayed and the monthly

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

phone calls regarding individual patients will not be held.  Further, the Receiver stated that responses to Plaintiffs' queries regarding state-wide and certain other issues may be delayed or suspended.

The Receiver made these changes to medical care delivery processes and Plaintiffs' monitoring to limit the spread of the virus and to permit medical staff to give maximum attention to the pandemic and affected patients.  Given the current extraordinary circumstances, Plaintiffs agree with these actions, and believe it appropriate to give wide berth to the Receiver in these matters.

That said, we also believe we must continue to monitor medical care provided to class members, as well as CCHCS' and CDCR's response to the pandemic.  With regard to individual medical concerns, we continue to have access to the Electronic Health Records System, and have clarified that our concerns will be promptly provided to the relevant prison so that local medical staff can consider the matter, even if a response is delayed. We also believe the Receiver will consider permitting certain suspended monitoring activities if warranted by the circumstances.

With regard to COVID-19, CCHCS has established a public "Population COVID-19 Tracking" website, which provides what Plaintiffs' understand is nearly real-time data regarding the number of patients tested, the results, as well as the number of patients recovered and who have died, both statewide and by prison.[1]  The Receiver has also provided access to a COVID-19 patient registry that CCHCS customized for our use, which lists all patients who have tested positive.  The Receiver and his staff have also answered most questions Plaintiffs have asked about patients and care related to the pandemic.  We are very grateful for these resources and actions.

---

[1].    The website is available here: https://www.cdcr.ca.gov/covid19/population-status-tracking/. As of April 10, 2020 at 0800 hours, a total of 483 COVID-19 tests had been done, with a total of 34 positive results, 296 negative, one inconclusive, and 152 pending. Of the positive results, 19 were at the California Institution of Men, 12 at California State Prison – Los Angeles County, and one each at North Kern State Prison, Substance Abuse Treatment Facility and State Prison, Corcoran, and California Institution for Women.

Plaintiffs request to discuss the following issues at the Case Management

Conference, and to receive any appropriate responses from the Receiver and Defendants:

- <u>Response to two substantial outbreaks of COVID-19:</u>  Plaintiffs' review of patient medical records indicates that substantial clusters or outbreaks of COVID-19 took place or are on-going at California State Prison – Los Angeles County, Facility D, Building 2 (a cell-block, in which 12 residents have tested positive as of April 9, 2020), and California Institution for Men, Facility D Alder Hall (a dorm, in which at least 11 and possibly more residents have tested positive as of April 9, 2020, with most or all of CIM's 19 total positive patients having resided in Facility D).   Is this accurate?  If so, has there been a focused Public Health response, aside from the quarantining and surveillance of the populations?[2]  Have any lessons or best practices been identified that could be used if similar clusters or outbreaks occur elsewhere?

- <u>COVID-19 testing</u>:  Are there problems currently or anticipated with the availability of COVID-19 test supplies at any of the prisons?  Is there any update regarding obtaining rapid COVID-19 test capability?

- <u>Availability of Personal Protective Equipment</u>.  Are there problems currently or anticipated with the availability of Personal Protective Equipment for CCHCS and CDCR staff who provide care to, escort, or transport those patients who may or do have COVID-19?

- <u>Conditions of medical isolation:</u>  CCHCS currently places all persons suspected pending test results for or diagnosed with COVID-19 on "medical isolation," and Plaintiffs' understand current practice is to place such patients in a single cell that

---

[2] . On April 9, 2020, CCHCS indicated, if Plaintiffs understood correctly, that COVID-19 tests had earlier this week been offered to all residents of Facility D, Building 2 at California State Prison – Los Angeles County, and that approximately 100 such tests had been done.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

is, to use prison lingo, "capped," meaning out-of-cell time is extremely limited if provided at all.[3]   Medical isolation under current practices has lasted three weeks and apparently could last longer.  CCHCS has not yet provided statewide directives or guidance so that these patients get out-of-cell time, including for showers, day-room, and yard, and have access to canteen, personal property including entertainment appliances, and phone calls in a manner and amounts at least equal to what would be received if not on isolation.  Doing this is necessary so ill patients are treated decently and to minimize disincentives to report symptoms by patients not on isolation.  CCHCS has indicated it will consider such matters.  Will it issue such directives or guidance, and will CDCR provide medical isolation patients with rights and privileges offered to those who are not on isolation?  If so, when?

- Cell front health care rounds:  Pursuant to an April 7, 2020 CDCR memo, all prisons must until at least April 22nd conduct "health care . . . rounds" cell front, including apparently nurse assessments done in response to health care service requests (7362s, aka sick call) and perhaps primary care provider appointments as well.  What appointments or encounters are being done cell front, and which are not?  With regard to appointments done cell front, what directions have been given with regard to the taking of patients' vital signs?  An April 8th nurse note for one patient stated that the nurse was "unable" to obtain vitals because of the COVID-19 and quarantine cell front encounter.  If vital signs are not required, Plaintiffs would be concerned, given the importance of fever as a marker for COVID-19, and more generally because of the importance of vital signs for adequate patient assessments.

- Availability of masks:  The CDC has recommended that all people wear cloth face coverings (masks) in public settings where other social distancing measures are

---

[3] . CCHCS Guidelines call for medical isolation patients to be assessed at their cell twice daily by a nurse.  The guidelines also permit, if necessary, for COVID-19 positive patients to be cohorted two to a cell, or for groups of such patients to be cohorted in a dorm, including dorms also housing non-infected persons.

difficult to maintain, to reduce the risk of infection to others.  An April 6, 2020 joint CDCR-CCHCS memorandum stated (underlining added):

> CALPIA has started manufacturing two-ply, cotton, reusable barrier masks that we will start distributing to our population in quarantine settings this week.  Distribution of the masks will begin for inmates in quarantine and medically fragile inmates.  As CALPIA continues to expand the production of these masks, we will also make them available to the general population and staff who do not have access to face coverings as a precautionary measure as supply allows. <u>CALPIA is making 800 masks per day between two locations and will continue to ramp up to full production to meet the expected needs</u>.

On April 8, 2020 CALPIA stated it was making 10,000 masks per day.[4]  Clarity regarding actual availability of masks in the prisons would be appreciated. Also, will CDCR and CCHCS and require masks be worn by incarcerated people and staff?

- <u>CCHCS plans related to potential medical staffing shortages</u>:  CCHCS states it has "examined and prioritized key work functions for medical, allied health and nursing functions as well as developed plans for external health care providers to augment . . . staff if critical staffing issues emerge."   Plaintiffs have asked if CCHCS can promptly inform us if and when a prison has "critical staffing issues" necessitating focus primarily or solely on "key work functions."

- <u>CCHCS plans related to potential hospital unavailability</u>.  CCHCS has said it has discussed mitigation strategies if its patients cannot be provided care at rural health care facilities because those facilities are full or cannot accept further patients, and has said that initial management will be to distribute patients to regions with care capacity.  Plaintiffs have asked for more information regarding these strategies.

---

[4] . See https://www.calpia.ca.gov/news/articles/media-release-calpia-begins-cloth-face-mask-production-for-cdcr-staff-and-offenders-in- response-to-covid-19-pandemic/ .

## II.   DEFENDANTS' STATEMENT

Due to time constraints and for the sake of efficiency, Defendants limit this statement to providing the information the Court and Plaintiffs requested during the April 6, 2020 status conference.

### A.   CCHCS has produced the requested information about medically high-risk patient-population

On April 8, 2020, CCHCS produced an excel spreadsheet with a compilation of various data points pertaining to over 50,000 medically high-risk patients in CDCR's institutions.  On April 9, 2020, CCHCS set up a conference call to discuss the content of the spreadsheet.  Plaintiffs requested that CCHCS provide a few data points that were missing from the spreadsheet.

### B.   How long would it take for CDCR to complete the process to provide early release to inmates currently scheduled for release in the next 180 days?

#### 1.   Another large expedited release of inmates to the communities at this time would present significant public safety and public health challenges.

Before addressing the question of how long it would take to complete the process for releasing inmates currently scheduled for release in the next 180 days, the prudence of releasing another large group of offenders to the communities must be considered.  Even if it were possible to immediately process for release all inmates in this proposed cohort, CDCR officials believe that it is simply not feasible to responsibly release an additional large group of inmates early at this time because of the potential lack of community resources necessary for assisting them.

Offender supervision, whether conducted by the counties or the Division of Adult Parole Operations (DAPO), is not limited to simply monitoring offenders.  To the contrary, it involves providing and coordinating numerous services, transportation, transitional housing, and programs essential to the health, safety, and success of released offenders. Thus, Plaintiffs' suggestion that currently supervised offenders should simply be discharged from parole or probation to make room for new early releases is not reasonable

because many of these offenders are still in need of the services and supervision that they receive.  In fact, there are already frequently used mechanisms for discharging offenders early from parole and probation supervision once those offenders are stable and doing well in their communities.

Furthermore, it is important to note that the recidivism rate of 21% for offenders who received the lowest score on the California Static Risk Assessment is only achieved because newly released offenders typically receive a variety of essential services, including transportation, transitional housing, programs, and supervision provided by either DAPO or the counties.  It would be unreasonable to assume that there would be no impact on public safety if CDCR were to provide early release to a large cohort of inmates without providing them with critical services, housing, and supervision.  Plaintiffs are requesting that many of their clients be set up for failure.

Some counties have informed DAPO that they are stretched extremely thin by the current early releases that are underway.  Approximately sixty percent of the cohort of offenders currently being released early will be supervised by the counties, and there are already reports of problems with providing these early releases with the services they need. For example, there have been reports that some of the current early-release cohort did not acquire California Identification Cards before their releases, which made them ineligible for transitional housing and will make it difficult to access other services and benefits.

It is also important to consider that county probation departments are responsible for supervising numerous individuals in addition to those offenders released from CDCR.  In fact, the counties currently supervise approximately 350,000 adult individuals.  Moreover, county probation-department workloads have significantly increased recently as a result of releases of pretrial detainees and county jail inmates over concerns about COVID-19, and because CDCR is no longer accepting new inmates from the counties.

If CDCR releases thousands of additional offenders at one time to county supervision, it will likely deplete most available county resources for providing housing

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

and other critical support services.  Similarly, by the time the current expedited releases are complete, CDCR expects that available community housing and services provided by contractors for inmates supervised by DAPO will also be nearly exhausted.  The availability of these community resources is not something that CDCR or the counties control.  Most transitional housing resources, and the wrap-around services that are sometimes included with them, are provided through community contractors.

In response to COVID-19 and the shelter-in-place order, the contractors that provide transitional housing and related wrap-around services are, understandably, limiting the services they normally supply, not expanding them.  Consequently, the current cohort of expedited releases are putting a strain on these programs and services.  In light of these facts, immediately providing expedited release to another large group of inmates could risk leaving some with little supervision, little or no assistance with housing, and few or no supportive community services.

Housing is a significant issue for many released offenders.  In fact, based on the Correctional Offender Management Profiling for Alternative Sanctions assessment, which is a re-entry needs-assessment tool that focuses on predictors known to affect recidivism, DAPO officials estimate that approximately thirty percent of released offenders would probably become homeless if they were not provided housing, and upwards of forty to fifty percent of all released offenders are likely to experience residency instability during their supervision.[5]  Some offenders do become homeless while on parole.  CDCR's Division of Rehabilitative Programs is currently extending the provision of housing to some parolees beyond normal timeframes in an effort to prevent those individuals from becoming homeless during the COVID-19 epidemic.  These critical extensions have further limited the availability of community housing and programs for offenders who have not yet been released.  COVID-19 has also complicated the reentry process because it has made it more

---

[5] Residential instability could be caused by a variety of issues, such as unstable living arrangements with others or an inability to consistently pay rent.

difficult to find parolees employment and permanent housing.  It would undermine public safety and public health to release large numbers of offenders to the community without providing them housing, assisting them in obtaining a stable source of income, and providing other critical services that they need, especially in the midst of a pandemic.

Even if CDCR staff were able to provide assistance finding employment or other benefits, the Department of Motor Vehicles and Social Security Offices are closed to the public due to COVID-19, and some important services are not available online.  If offenders are not able to obtain ID cards and social security cards before release, they cannot simply go to an office in the community.  Parolees often rely on libraries for internet access to online services, but libraries are also currently closed.  As a consequence, even if they were somehow able to find potential employment during this period of high unemployment, they may not have the documents necessary to complete the hiring process.

Because of the state's efforts to address the risks to California's homeless population posed by COVID-19, the needs of the homeless are competing for many of the same resources that newly released offenders need.  The most recent published data (2018) from the U.S. Department of Housing and Urban Development estimated that California's homeless population is over 150,000, and even this estimate is considered by many experts to substantially underestimate the true number of homeless individuals in the state.  The State is gravely concerned about COVID-19's impact on that vulnerable population, which is why Governor Newsom issued Executive Order N-32-20 on March 18, 2020, and directed $150 million in emergency COVID-19 funding for local jurisdictions to expand shelter and housing for the homeless, and to expand isolation and quarantine capacity for homeless individuals who contract COVID-19.  This has put a tremendous strain on these already scarce housing resources—the same resources that many released offenders will need.

In light of these issues, CDCR does not believe that additional inmate releases are

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

appropriate at this time.  Nor does CDCR believe additional releases are currently warranted in light of the constellation of steps that CDCR has already taken, and the additional measures that CDCR will take in the coming weeks, to prevent the spread of COVID-19 and to protect vulnerable inmates.

### 2.    CDCR cannot quickly process a 180-day cohort of inmates.

CDCR was able to quickly complete required pre-release processes for the 60-day cohort of offenders because the vast majority of pre-release planning for those inmates had already been completed.  Nonetheless, it has required, and continues to require, extraordinary efforts to move toward completion of the early releases, and some steps still were not completed in time for all offenders (e.g., California Identification Cards).

A significant obstacle to CDCR's ability to quickly complete all pre-release processes for a 180-day cohort of offenders is the inability to assign additional staff to perform the work.  There are three primary groups of staff who perform pre-release processes.  They are the (1) Case Records staff; (2) DAPO staff; and (3) the Transitional Case Management Program staff, who are comprised of UC San Diego contract workers. All three groups are spread across the state and work in the different prisons, and the impact of the COVID-19 crisis on the prisons has affected the ability of all three groups to complete their work quickly and efficiently because of restricted movement within the prisons and quarantines.

DAPO and Case Records staff have been working overtime to complete the current early releases and are stretched thin.  It is also important to note that in addition to working on the early releases, over the next two months, DAPO and Case Records must continue to process thousands of inmates being released in accordance with their regularly scheduled release dates.  The workload on those cases is now behind schedule because staff have temporarily stopped working on them in order to complete the early releases.  It will take continuing extraordinary efforts for them get regularly scheduled releases back on track.

Similar to how offices and businesses outside prison walls have been impacted,

CDCR staffing has been compromised at many levels as a result of the COVID-19 crisis and statewide shelter-in-place orders.  The current circumstances prevent CDCR from redirecting staff to work on pre-release processes.  But even if CDCR could redirect staff to work on pre-release processes carried out by Case Records and DAPO, redirected staff would need to be trained to perform the highly specialized work for which Case Records and DAPO staff are responsible.

CDCR estimates that if it extended the current 60-day cohort of planned releases to include inmates scheduled for release up to 180 days out, and applied the same exclusionary criteria,[6] then approximately 5,500 additional inmates would be released early to parole or community supervision.

Under the expedited process that Case Records staff have been using to prepare early releases, they spend approximately three to five hours per inmate on pre-release work.  Thus, if the advanced releases were expanded to a 180-day cohort, CDCR estimates that the Case Records workload for those additional releases would total from about 16,500 to 27,500 hours for a staff of about 862 individuals.[7]

On average, DAPO staff spend about 8.5 hours of work for males and 8.75 hours of work for females to complete pre-release planning, and there is little flexibility in the time it takes to complete that work for each offender.  Thus, if the early releases were expanded to a 180-day cohort, CDCR estimates that the DAPO workload for those additional releases would total about 46,750 hours for a staff of about 85 individuals.

On average, the Transitional Case Management Program staff spend about 10 hours total per offender to prepare Social Security and Medi-Cal applications.  Thus, if the early

---

[6] (1) Nonviolent inmates who are not serving a current term of incarceration for a violent felony offense as defined by Penal Code § 667.5(c); (2) inmates who are not required to register under Penal Code § 290; and (3) inmates who are not serving a current term of incarceration for a domestic violence offense (Penal Code § 273.5).

[7] Some pre-release work has been completed for at least some portion of the 180-day cohort by Case Records, DAPO, and the Transitional Case Management Program, but only a case-by-case assessment could determine precisely how much work remains to be completed for the entire group.

releases were expanded to a 180-day cohort, CDCR estimates that the additional work load would total about 55,000 hours for a staff comprised of about 77 individuals.  For offenders who are veterans, benefits staff would also need to spend an additional hour preparing veterans' benefits applications, and for HIV positive offenders, staff would need spend an additional hour preparing a Communicable Infectious Disease plan so that the offenders receive continuity of care once released.

The timing for some steps in DAPO's pre-release process are out of CDCR's control.  For example, the Social Security Administration and Medi-Cal will not accept applications for inmates until they are within 90 days of their release dates, and the Veterans' Administration will not accept applications until inmates are within 120 days of their release dates.  Once these benefit applications have been submitted, the processing of the applications is completely in the hands of those agencies.  Similarly, CDCR has little control over the time it takes to connect offenders to community services, programs, and housing, especially given that these resources are becoming increasingly scarce due to the COVID-19 crisis and the thousands of inmates that CDCR has already released early.

Even if it were possible to accelerate the completion of pre-release processes to allow for a modest number of additional early releases from the proposed 180-day cohort, CDCR does not believe that the current circumstances warrant additional early releases at this time.  CDCR will, however, continue to assess the situation as it evolves, and take any additional steps that are necessary.

/ / /

/ / /

/ / /

1

**C.    Other requests**

2       After the April 6, 2020 status conference, Plaintiffs' counsel sent an email asking

3   for the names, CDCR numbers, and locations of (1) all individuals who have been

4   recommended for recall of sentence under Penal Code section 1170(d), and (2) all

5   individuals who have been found suitable for parole but are still awaiting release.  CDCR

6   is in the process of obtaining information responsive to this question and will keep

7   Plaintiffs' counsel informed about the progress.

8

9   DATED:  April 10, 2019                    XAVIER BECERRA
                                              Attorney General of California
10

11

12                                  By:      _____*/s/ Damon McClain*_____
                                             DAMON MCCLAIN
13                                           Supervising Deputy Attorney General
                                             NASSTARAN RUHPARWAR
14                                           Deputy Attorney General
                                             Attorneys for Defendants
15

16

17  DATED:  April 10, 2019                    HANSON BRIDGETT LLP

18

19                                  By:      _____*/s/ Paul Mello*_____
                                             PAUL B. MELLO
20                                           SAMANTHA D. WOLFF
                                             Attorneys for Defendants
21

22

23  DATED:  April 10, 2019                    PRISON LAW OFFICE

24

25                                  By:      _____*/s/ Steven Fama*_____
                                             STEVEN FAMA
26                                           Attorneys for Plaintiffs

27

28

                                    -14-                          Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT