XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON G. MCCLAIN
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR - 263293
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Email:  Nasstaran.Ruhparwar@doj.ca.gov

Attorneys for Defendants

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
KAYLEN KADOTANI - 294114
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:     (415) 777--3200
Facsimile:     (415) 541-9366
pmello@hansonbridgett.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

MARCIANO PLATA, et al.,

        Plaintiffs,

    v.

GAVIN NEWSOM, et al.,

        Defendants.

CASE NO. 01-1351 JST

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION REGARDING PREVENTION AND MANAGEMENT OF COVID-19**

Date:     April 16, 2020
Time:     2:00 P.M.

# TABLE OF CONTENTS

**Page**

INTRODUCTION..................................................................................................................1

ARGUMENT .......................................................................................................................3

I.      ABRIDGED PROCEDURAL HISTORY ..........................................................3

II.     THIS COURT LACKS AUTHORITY UNDER THE PRISON LITIGATION
        REFORM ACT TO GRANT PLAINTIFFS' REQUESTED RELIEF.................4

III.    DEFENDANTS HAVE IMPLEMENTED REASONABLE AND AGGRESSIVE
        MEASURES IN RESPONSE TO COVID-19 AND ARE THEREFORE NOT
        DELIBERATELY INDIFFERENT..................................................................7

IV.     PLAINTIFFS' FORM OF REQUESTED RELIEF IS UNSAFE. ....................13

        A.      The Release And Transfer Of Medically High-Risk Inmates Places Their
                Health At Unnecessary Risk. .................................................. 13

        B.      A Further Release Would Leave Inmates Ill-Prepared To Transition To
                Society And Leave Them At Risk. ............................................ 15

CONCLUSION..................................................................................................................16

16465050.3

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Cases**

4

*In re: Abbott,*
   No. 20-50264, 2020 WL 1685929 (5th Cir. April 7, 2020) ..................................................12

5

6

*Basank v. Decker,*
   No. 20-cv-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ...........................................14

7

*Brown v. Plata,*
   563 U.S. 493 (2011) ..................................................................................................... 3, 4, 5, 9

8

9

*Castillo v. Barr,*
   CV2000605TJHAFMX, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020) ..............................14

10

11

*Coleman v. Schwarzenegger/Plata v. Schwarzenegger,*
   922 F. Supp. 2d 882 (E.D. Cal., N.D. Cal. Aug. 4, 2009) ..............................................3, 11

12

*Farmer v. Brennan,* 511 U.S. 825 (1994) .............................................................................12

13

*Helling v. McKinney,*
   509 U.S. 25 (1993) ..............................................................................................................12

14

15

*Jacobson v. Commonwealth of Massachusetts,*
   197 U.S. 11 (1905) ..............................................................................................................12

16

17

*Lil' Man in the Boat, Inc. v. City and County of San Francisco,*
   2018 WL 4207620 (N.D. Cal. Sep. 4, 2018) .......................................................................6

18

*Locket v. U.S. Dept. of Labor,*
   867 F.2d 513 (9th Cir. 1989) ................................................................................................6

19

20

*Milgard Tempering, Inc. v. Selas Corp. of Am.,*
   902 F.2d 703 (9th Cir. 1990) ................................................................................................6

21

22

*Turner v. Safley,*
   482 U.S. 78 (1987) ..............................................................................................................12

23

*U.S. v. Cote,*
   51 F.3d 178 (9th Cir. 1995) ..................................................................................................6

24

25

*U.S. v. Houser,*
   804 F.2d 565 (9th Cir. 1986) ................................................................................................6

26

27

*U.S. v. Colvin,*
   No. 3:19cr179 (JBA), 2020 WL 1613943 (D. Conn. Apr. 2, 2020) ...................................14

28

-ii-

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION

*U.S. v. Davis*,
   No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) ..................................................14

**Statutes**

18 U.S.C.
   § 3626(a)(1)(A) .................................................................................................................13
   § 3626(a)(2).........................................................................................................................5
   § 3626(a)(3)................................................................................................................3, 4, 6
   § 3626(a)(3)(A)....................................................................................................................5
   § 3626(a)(3)(B).................................................................................................................4, 5
   § 3626(B) .............................................................................................................................5

Case No. 01-1351 JST

16465050.3

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION

# INTRODUCTION

Defendants have worked tirelessly in close coordination with the longtime federal Receiver who oversees healthcare in the California Department of Corrections and Rehabilitation's (CDCR) 35 institutions to prevent and slow the spread of COVID-19. CDCR has quickly implemented extensive, thoughtful, and unprecedented measures in response to a rapidly-fluctuating and novel pandemic, including nearly all of the Centers for Disease Control and Prevention's (CDC) recommended measures for correctional facilities, many of which were implemented before the CDC's recommendations were even released.

Nonetheless, Plaintiffs yet again ignore well-established principles of law, attempt to interfere with state officials and experts' sound discretion, and attempt to side-step procedural safeguards in their haste to compel the State to further reduce its prison population in response to the COVID-19 pandemic. Both the Prison Litigation Reform Act ("PLRA") and the three-judge court's recent Order Denying Plaintiffs' Emergency Motion to Modify Population Reduction Order make clear that before a prisoner release order may be issued, Plaintiffs must first seek an interim order from this single-judge court requiring Defendants "to take steps short of release necessary to remedy that violation," and Defendants must be afforded a sufficient opportunity to comply with that order. ECF 3261 at 13:1-2. Only after that less-intrusive relief proves inadequate may Plaintiffs then request that a three-judge court be convened to make the ultimate determination of whether a prisoner release order is appropriate under the circumstances. Rather than follow those mandatory steps, Plaintiffs instead ask this court to usurp the authority of the three-judge court and issue an order "to reduce population levels to safe and sustainable levels in light of the COVID-19 pandemic." (Pltfs.' Emergency Motion Regarding Prevention and Management of COVID-19 ("Motion") at 1:17-18.) This court lacks the authority to grant this form of relief and Plaintiffs' motion must be denied on this basis alone.

Even if Plaintiffs had complied with the PLRA's jurisdictional prerequisites and this court had the authority to issue a prisoner release order, Plaintiffs nonetheless would not be entitled to the relief they request because they have not shown, and cannot show, that Defendants are acting with deliberate indifference in response to the COVID-19 pandemic. To the contrary, Defendants

have taken swift, decisive, and unprecedented action in response to this novel global pandemic. In just the thirteen days since Defendants filed their Opposition to Plaintiffs' Emergency Motion to Modify Population Reduction Order, Defendants have taken the following *additional* steps (described in detail, *infra*) in response to this constantly evolving pandemic:

- Under the authority granted by the Governor's March 24, 2020 executive order, Secretary Diaz is extending the suspension of new-inmate intake for an additional 30 days, resulting in an additional approximately 2,500-3,000 fewer inmates entering the prison system;

- Defendants have transferred approximately 630 inmates out of dorms and into vacant, low-population density housing and anticipate transferring another approximately 640 inmates in the coming days in coordination with the Receiver;

- Defendants have released approximately 3,418 inmates from custody to date as a result of the Secretary's directive to transition certain inmates to early parole;

- Defendants implemented a mandatory 14-day modified program across all institutions to further restrict physical contact and ensure more frequent cleaning and disinfection practices;

- Defendants have been working closely and cooperatively with the Receiver and his staff to assess the feasibility of creating 8-person housing cohorts for inmates housed in dorm settings; and

- Defendants have implemented virtually every applicable CDC guideline for correctional facilities in collaboration with the Receiver.

Finally, the relief Plaintiffs request is unsafe. At a time when all California residents have been ordered to shelter in place, Plaintiffs would have this court order the transfer or release of tens of thousands of medically high-risk individuals around the state. This is an irresponsible request that would not only place these inmates at even higher risk of contracting the novel virus and not getting the care they need, but also directly undercut the comprehensive strategy that Defendants and the Receiver have adopted to reduce the spread of COVID-19 within CDCR.

16465050.3

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION

1    Moreover, immediately providing early release to a large group of medically high-risk inmates

2    could risk leaving many with no valid identification documents, few employment prospects, little

3    supervision, little or no assistance without housing, few or no supportive community services, and

4    reduced access to needed healthcare services.

5         Plaintiffs' requested relief is procedurally improper, unnecessary, and unsafe, and must be

6    denied.

7                                **ARGUMENT**

8    **I.     ABRIDGED PROCEDURAL HISTORY**

9         On November 13, 2006, Plaintiffs in *Plata* and *Coleman* simultaneously requested to

10   convene a three-judge court under 18 U.S.C. § 3626(a)(3) to consider whether overcrowding was

11   the primary cause of the unconstitutional delivery of medical and mental health care in CDCR's

12   prisons.  ECF 561.  The *Plata* and *Coleman* courts granted Plaintiffs' motions to convene on July

13   23, 2007.  ECF 780.  On August 4, 2009, following trial, the three-judge court found that

14   crowding was the "primary cause" of the alleged Eighth Amendment violations and that no other

15   relief would remedy those violations.  *Coleman v. Schwarzenegger/Plata v. Schwarzenegger*, 922

16   F. Supp. 2d 882 (E.D. Cal., N.D. Cal. Aug. 4, 2009).  The order capped the State's prison

17   population at 137.5% of design capacity and gave the State two years to reach that benchmark.

18   ECF 962.  The Supreme Court affirmed the three-judge court's prisoner release order, the

19   imposition of the 137.5% cap, and the two-year period for implementing the cap.  *Brown v. Plata*,

20   563 U.S. 493, 529-544 (2011).  The State subsequently requested an extension of time to meet the

21   final benchmark and ultimately reduced its population below the cap in February 2015.  ECF

22   2766, 2838.  The State has remained below the cap since that time, over five years ago.

23        On March 25, 2020, Plaintiffs filed an Emergency Motion to Modify Population Reduction

24   Order ("Motion to Modify") in the three-judge court matter, seeking a further prisoner reduction to

25   prevent the risk of severe illness or death from COVID-19.  ECF 3219.  In denying without

26   prejudice Plaintiffs' Motion to Modify, the three-judge court explained that the motion was not

27   properly before the court because "the impetus for the release order Plaintiffs seek is different

28   from the overarching structural violations underlying the 2009 population reduction order."  ECF

16465050.3
DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION

3261 at 8:14-15. The three-judge court properly noted that the prior prisoner reduction order "was never intended to prepare Defendants to confront this unprecedented pandemic." *Id.* at 9:14. The three-judge court instructed that "if [Plaintiffs] believe that [Defendants'] response [to COVID-19] violates Plaintiffs' right to adequate medical care, they may seek relief before the individual *Plata* court." *Id.* at 12:25-26. The three-judge court further explained that "[i]f a single-judge court finds a constitutional violation, it may order Defendants to take steps short of release necessary to remedy that violation. And if that less intrusive relief proves inadequate, Plaintiffs may request, or the district court may order sua sponte, the convening of a three-judge court to determine whether a release order is appropriate." *Id.* at 12:28-13:4.

Four days later, Plaintiffs filed this instant Motion "seek[ing] an order from this Court to reduce population levels to safe and sustainable levels in light of the COVID-19 pandemic." (Motion at 1:16-18.)

## II.     THIS COURT LACKS AUTHORITY UNDER THE PRISON LITIGATION REFORM ACT TO GRANT PLAINTIFFS' REQUESTED RELIEF.

In enacting the PLRA, Congress established the procedural framework all litigants must follow in seeking a prisoner release order. Those steps are clear and mandatory. As the *Plata/Coleman* three-judge court recently observed, it may only consider whether a prisoner release order is appropriate after a single-judge court finds a constitutional violation, issues an order to address that violation short of a release order, and affords Defendants adequate time to comply with that order. ECF 3261 at 6:23-7:1, 12:28-13:4; 18 U.S.C. § 3626(a)(3). Only after those steps have been taken may Plaintiffs then request that a three-judge court be convened to determine whether a prisoner release order is appropriate. ECF 3261 at 13:2-4; 18 U.S.C. § 3626(a)(3)(B). Disregarding this mandatory process, Plaintiffs seek a prisoner release order from this single-judge court instead. Plaintiffs' attempt to circumvent the PLRA is particularly egregious and perplexing given the three-judge court's clear instruction on this subject just barely one week ago. ECF 3261 at 12:20-13:4

Through their motion, Plaintiffs request an order requiring Defendants "to downsize the population to the lowest number possible at each prison by release or transfer to a safer

1   alternative." (Motion at 8:23-24.)   No such release or transfer order may issue unless each of the

2   PLRA's prerequisites are satisfied, and even then, only a three-judge court possesses the authority

3   to issue such an order.  18 U.S.C. §§ 3626(a)(3)(A), (B).  Here, no prior order has been issued by

4   this court requiring Defendants to take action in response to the COVID-19 pandemic.  ECF 3261

5   at 7:5-8 ("Plaintiffs likely cannot satisfy the prior order requirement at this point because there

6   have not yet been any orders requiring Defendants to take measures short of release to address the

7   threat of the virus; nor have Defendants had a reasonable time in which to comply.").  And

8   certainly, this court alone cannot require Defendants to release or transfer inmates outside of

9   CDCR's custody.  18 U.S.C. § 3626(a)(3)(B); *Brown v. Plata*, 563 U.S. 493, 527 ("requiring out-

10  of-state transfers itself qualifies as a population limit under the PLRA … The same is true of

11  transfers to county facilities.  Transfers provide a means to reduce the prison population in

12  compliance with the three-judge court's order.  They are not a less restrictive alternative to that

13  order.").  This court therefore lacks jurisdiction to consider Plaintiffs' request for inmate transfers

14  or early releases.

15          Further, even if this court could issue an order to release or transfer inmates outside of the

16  system, Plaintiffs barely try to explain why such an order would meet the PLRA's additional

17  needs-narrowness-intrusiveness requirements.  18 U.S.C. § 3626(a)(2).  Plaintiffs must show that

18  the relief they seek is "narrowly drawn, extend[s] no further than necessary to correct the harm the

19  court finds requires preliminary relief, and [is] the least intrusive means to correct that harm."  *Id.*

20  Plaintiffs fail to address this standard, merely stating in conclusory fashion that "an order reducing

21  population density in the prison system would be tailored directly to the constitutional violations

22  at issue" and that "[i]n light of the case history, the order sought would be narrowly drawn, extend

23  no further than necessary to remedy ongoing constitutional violations, and constitute the least

24  intrusive means to that end." (Motion at 10:4-7.)  Plaintiffs offer no analysis here and fail to

25  address the myriad measures Defendants and the Receiver have taken in response to the COVID-

26  19 pandemic or offer any explanation as to why these measures fall short of constitutional

27  compliance.

28          Plaintiffs also appear to suggest that the PLRA is not implicated by their request at all, and

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION

cite to this court's 2013 Valley Fever order, calling it "law of the case." (Motion at 10:12-21.) The "law of the case" doctrine is "a judicial invention designed to aid in the efficient operation of court affairs." *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990) (citing *Locket v. U.S. Dept. of Labor*, 867 F.2d 513, 518 (9th Cir. 1989)). Under this discretionary doctrine, "a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case." *Id.*; see also, *U.S. v. Houser*, 804 F.2d 565, 567 (9th Cir. 1986) ("in order to maintain consistency during the course of a single lawsuit, reconsideration of legal questions previously decided should be avoided."). Critically, the "law of the case" doctrine only applies to issues actually considered and decided by the first court. *U.S. v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995) ("Although the doctrine applies to a court's 'explicit decisions as well as those issues decided by necessary implication,' [citation], it 'clearly does not extend to issues [the first] court did not address.''); see also, *Lil' Man in the Boat, Inc. v. City and County of San Francisco*, 2018 WL 4207620, at *3 (N.D. Cal. Sep. 4, 2018) (holding law of the case doctrine did not bar defendant's motion for judgment on the pleadings since the arguments raised were "not the same issues considered and decided by the Court" in the defendant's prior motion to dismiss.) This court's 2013 Valley Fever order did not pertain to the issues currently before this court, and is therefore inapplicable here for two reasons.

First, this court determined that the PLRA was not implicated by its Valley Fever decision because "Plaintiffs' requested relief … concerns only [intra-system] transfer and not release [and] therefore does not require consideration by a three-judge court." ECF 2661 at 14:5-7. Indeed, as a result of the Valley Fever order, Defendants were ordered to transfer certain inmates from Pleasant Valley and Avenal State Prisons *to other CDCR institutions. Id.* at 25:1-3. No inmates were ordered released or transferred outside of CDCR custody as a result of the Valley Fever order. *Id.* By contrast, here Plaintiffs are requesting an order for Defendants to "downsize the population" through release, which is strictly governed by the PLRA. *See* 18 U.S.C. § 3626(a)(3); Motion at 8:9-11, 19-24.

Second, Plaintiffs did not assert that crowding was the primary cause of the constitutional violation in the Valley Fever litigation, and therefore, the court determined that the PLRA did not

1   apply.  ECF 2661 at 14:20-16:11.  Here, however, Plaintiffs argue that it is because of

2   overcrowding that they face an unconstitutional risk of harm. (*See*, *e.g.*, Motion at 1:5-6, 2:3-4,

3   4:7-9.)  Thus, this court's prior determination pertaining to Valley Fever has no bearing on

4   Plaintiffs' requested relief currently pending before this court.

5         Finally, to the extent Plaintiffs request that this court issue an order requiring the Receiver,

6   "with the full cooperation of Defendants, [to] exercise his authority and develop a plan to

7   minimize the spread of the COVID-19 virus," such a request is moot.  (*See* Proposed Order

8   Granting Plaintiffs' Emergency Motion Regarding Prevention and Management of COVID-19,

9   ECF 3266-4 at 1:24-26.)  The Receiver's April 10 and April 12, 2020 memoranda, discussed more

10   fully below, set forth a plan to further "mitigate the risks associated with transmission of the

11   COVID-19 coronavirus."  (Declaration of Secretary Ralph Diaz ("Decl. Diaz"), Exs. M & N;

12   Declaration of Joseph Bick, M.D. ("Decl. Bick"), Exs. A & B.)  Defendants have been working

13   closely and cooperatively with the Receiver in addressing this pandemic and will continue to do

14   so. (Decl. Diaz ¶¶ 4, 20.)  Indeed, Secretary Diaz intends to comply with the April 10 and 12

15   directives, and has already been collaborating with the Receiver on how to implement this plan.

16   (*Id*. at ¶ 20.)  No order should issue requiring Defendants to do that which they are already doing,

17   particularly when a prior court order already mandates their cooperation.  ECF 473 (Order

18   Appointing Receiver) at 8:9-13.

19         Plaintiffs may not circumvent the PLRA in their attempt to reduce the State's prison

20   population particularly given the aggressive, effective, and narrowly-tailored actions Defendants

21   and the Receiver are taking in response to this novel pandemic, described further below.

22   Plaintiffs' Motion must therefore be denied.

23
24
**III.    DEFENDANTS HAVE IMPLEMENTED REASONABLE AND AGGRESSIVE MEASURES IN RESPONSE TO COVID-19 AND ARE THEREFORE NOT DELIBERATELY INDIFFERENT.**

25         While Plaintiffs make references to "safe housing" and "adequate physical distancing" in

26   their brief, the true relief they seek is a prisoner release order. (Motion at 4:3, 6:5; Proposed Order

27   (ECF 3266-4) at 2:11-15.)  This form of relief is premised upon Plaintiffs' belief that no other

28   measure or combination of measures can adequately address the COVID-19 pandemic.  Plaintiffs'

1   myopic focus on population reduction as a panacea for preventing the spread of COVID-19 is

2   misguided and shortsighted. While physical distancing is certainly one effective precaution,

3   population reduction is not the only means of achieving physical distancing. Moreover, the

4   Centers for Disease Control and Prevention (CDC) has recommended numerous other measures,

5   including reinforced hygiene practices, intensifying cleaning and disinfection efforts, screening of

6   new intakes, visitors and staff, medical isolation and care of inmates with symptoms, and—

7   directly contrary to Plaintiffs' position—*"restricting movement in and out of the facility."*

8   (Declaration of Samantha Wolff Supp. Defs.' Opposition to Pltfs.' Emergency Motion Re:

9   Prevention and Management of COVID-19 ("Decl. Wolff"), Ex. A at 5, emphasis added.) In

10  coordination with the Receiver and his team, Defendants have complied with nearly every single

11  CDC recommendation. (Decl. Diaz ¶ 3 & Ex. A.) There can be no finding of deliberate

12  indifference in this context.

13          In addition to the significant and unprecedented measures initially taken by the State in

14  response to the COVID-19 pandemic, which were previously described in Defendants' Opposition

15  to Plaintiffs' Emergency Motion to Modify Population Reduction Order and are incorporated

16  herein (ECF 3235), Defendants continue to devise and implement further strategies as the

17  pandemic evolves to ensure the health and safety of inmates and staff, including the following:

18      • Governor Newsom issued Executive Order N-36-20 on March 24, 2020,

19          suspending intake of all incarcerated persons into state facilities for 30 days. Under

20          the authority granted to him by the executive order, Secretary Diaz is extending the

21          suspension of new-inmate intake for an additional 30-day period. (Decl. Diaz ¶ 6.)

22      • As of April 11, 2020, CDCR had transferred over 630 inmates out of dorms and

23          into vacant low-population density housing. (Decl. Gipson ¶ 6.) The transfer of

24          approximately 640 additional inmates should be completed by Thursday, April 16.

25          (Decl. Gipson ¶ 7.) CDCR will coordinate these remaining transfers with the

26          Receiver in accordance with his April 10, 2020 memorandum. (*Id.* at ¶ 4(e).)

27      • Inmate transfers have been sharply reduced to only allow essential movement in

28          and out of the institutions. This has occurred with coordination between the

Division of Adult Institutions, the Statewide Mental Health Program, and California Correctional Health Care Services. Any transfers that are required are conducted in a manner that maintains social distancing for both staff and inmates. (Decl. Gipson ¶ 4(d).)

- On April 7, 2020, the Director of the Division of Adult Institutions, Connie Gipson, issued a memorandum detailing a mandatory 14-day modified program across all institutions. Effective April 8, 2020:
  - o All institutions must ensure that movement is conducted via escort with increased social distancing where possible, and without comingling inmates from different housing units;
  - o Inmates will be fed in cells or in the dining all, one housing unit at a time with inmates practicing social distancing and tables disinfected between each use;
  - o Showers must be disinfected between each use;
  - o Wardens must work with CEOs to establish a process for medication distribution, including either within each housing unit or on the yard if controlled feeding in the dining halls is permitted;
  - o Reducing the number of inmates allowed in dayrooms, and possibly curtailing dayroom use entirely if the institution is unable to maintain social distancing numbers to also accommodate showers and phone use;
  - o Only one housing unit or dorm may participate in recreation at a time;
  - o Phones must be disinfected between each use;
  - o Religious programs must be conducted cell front or materials delivered directly to the inmates in their housing unit, dorm, or cell; and
  - o Consider placement of six-food markers on the ground as reminders for inmates and staff to maintain social distancing.

(Decl. Gipson ¶ 4(b) & Ex. B.)

- On April 10, 2020, the *Plata* Receiver, Mr. Kelso, issued "CCHCS Guidelines for

Achieving and Maintaining Social Distancing in California Prisons" ("Guidelines"), recommending that CDCR implement the following measures to further mitigate the risks of COVID-19:

- o CDCR should not authorize or undertake any further movement of inmates between institutions to achieve necessary social distancing without prior approval and consultation with CCHCS because such "[i]nter-institution moves risk carrying the virus from one institution to another."

- o CDCR should create 8-person housing cohorts for inmates housed in dorm settings, with each cohort separate from the others by a distance of at least six feet in all directions.

- o Transfers out of the dorms for purposes of achieving social distancing require coordination with CCHCS to ensure that "such movement does not cause, contribute to or exacerbate the potential spread of the disease."

(Decl. Diaz ¶ 20 & Ex. M.) Defendants intend to comply with the Receiver's well-reasoned guidance. (*Id*. at ¶ 20.)

- On April 12, 2020, the Receiver issued a supplemental memorandum clarifying that his April 10, 2020 memorandum is not intended to affect any inter-institution transfers that are to address either medical, mental health, or dental treatment needs that are not available at the sending institution, such as to provide a higher level of care or to reduce or prevent morbidity or mortality, or a safety or security issue that cannot be managed by the sending institution. (Decl. Diaz ¶ 21 & Ex. N.)

- Consistent with the Receiver's guidance, CDCR is currently assessing whether there is additional space within the institutions that may be used to house inmates, such as gymnasiums. Those spaces must first be approved by the State Fire Marshal to be used as housing. Further, cots must be purchased and the staffing needs for each location must be assessed so that the Division of Adult Institutions can ensure that safety and security will be maintained and that inmates' essential needs can be met. At this time, nineteen potential sites have been identified and

-10-

about 600 cots have already been procured.  To date, the State Fire Marshal has approved occupancy for twelve gymnasiums and two visiting rooms located at Mule Creek State Prison, Central California Women's Facility, Pleasant Valley State Prison, Salinas Valley State Prison, San Quentin State Prison, California State Prison – Solano, and California State Prison – Los Angeles County.  CDCR is continuing to determine how these spaces might be used to improve physical distancing.  (Decl. Gipson ¶ 4(f).)

- The Receiver's April 10 memorandum also suggested creating eight-person housing cohorts in dorms to achieve greater social distancing.  CDCR is evaluating the feasibility of eight-person pods in the dorms.  As the Receiver's memorandum noted, these "social-distancing cohorts" would be analogous to family units in communities.  (Decl. Gipson, ¶ 9.)

- All early transitions to parole or Post Release Community Supervision for certain specified inmates within 60 days of their release date will be completed by April 13, 2020.  (Decl. Gipson, ¶ 4(a).)  As of the end of the day on April 12, 2020, a total of 3,418 inmates have been released pursuant to the Secretary's directive.  (*Id*.)

Plaintiffs' assertion that Defendants have deliberately ignored the risk this virus poses to their health and safety simply cannot be reconciled with the constellation of measures that CDCR and CCHCS have taken to mitigate the impact of COVID-19 in the prisons.[1]  The measures taken by Defendants to date in response to this novel threat have been decisive, aggressive, and thoughtful.  These measures are consistent with CDC recommendations and in many instances

---

[1] In addition to those measures described above and in the supporting declarations of Secretary Diaz, Director Gipson, and Dr. Bick filed herewith, numerous high-level CDCR staff have also collectively dedicated hundreds of hours of time in 11 COVID task force meetings to date that have been convened by the *Coleman* Special Master and have included Plaintiffs.  (Decl. Diaz ¶ 8.)  Numerous additional sub-group meetings have occurred on this topic as well with the involvement of high-level CDCR staff.

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION

1   were already underway when the CDC issued its Interim Guidance on Management of

2   Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities on March 23,

3   2020. (Decl. Diaz ¶ 3 & Ex. A.) As CDC recommendations and the Receiver's Guidelines

4   demonstrate, population reduction is not the only method to achieve physical distancing. Indeed,

5   Defendants are converting alternative space in gymnasiums into temporary housing to provide

6   additional space in dorms, and are considering converting other areas as well. (Decl. Gipson ¶

7   4(f).) Further, CDCR is evaluating the feasibility of creating social-distancing cohorts in the

8   dorms that would each be separated from other pods. (Decl. Gipson ¶ 9.) As the Receiver's

9   memorandum noted, these "social-distancing cohorts" would be analogous to family units in

10  communities. (*Id.*) These measures comply with CDC guidance, which also recognizes that

11  "[n]ot all strategies will be feasible in all facilities" and accordingly, "[s]trategies will need to be

12  tailored to the individual space in the facility and the needs of the population and staff." (Decl.

13  Wolff, Ex. A at 11.) And while Plaintiffs might prefer mass early release to these measures, the

14  Court should give deference to the path that the State's officials and experts have chosen because

15  "running a prison is an inordinately difficult undertaking that requires expertise, planning, and the

16  commitment of resources, all of which are peculiarly *within the province of the legislature and*

17  *executive branches of government.*" *Turner v. Safley*, 482 U.S. 78, 84-85 (1987), emphasis added.

18      Defendants continue to work tirelessly and collaboratively with the Receiver and CCHCS

19  to identify and implement all feasible strategies to slow the spread of COVID-19. (Decl. Diaz ¶¶

20  4, 20.) That Defendants, through their coordination with the Receiver and CCHCS, have

21  implemented nearly all CDC recommendations demonstrates that they have acted to "'ensure

22  reasonable safety.'" *Farmer v. Brennan*, 511 U.S. 825, 844 (1994) (*quoting Helling v. McKinney*,

23  509 U.S. 25, 33 (1993)); *see also* Decl. Diaz ¶ 3 & Ex. A. Defendants are entitled to deference

24  and neither this court nor Plaintiffs may substitute their judgment for that of state experts and

25  officials. *Id.*; *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 30 (1905) ("It is no part

26  of the function of a court or a jury to determine which one of two modes was likely to be the most

27  effective for the protection of the public against disease"). Indeed, courts lack "judicial power to

28  second-guess the state's policy choices in crafting emergency public health measures." *In re:*

16465050.3

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION

*Abbott*, No. 20-50264, 2020 WL 1685929, *12 (5th Cir. April 7, 2020).  Plaintiffs' attempts to interfere with Defendants' efforts, to repeatedly resort to wasteful litigation tactics during this time of crisis, and to substitute their judgment for that of the State's experts and officials, has only served to distract officials from doing the important work required to protect inmates and staff.

## IV.    PLAINTIFFS' FORM OF REQUESTED RELIEF IS UNSAFE.

The PLRA mandates that courts give "substantial weight to any adverse impact on public safety" in deciding whether to issue prospective relief.  18 U.S.C. § 3626(a)(1)(A).  One such consideration must include whether Plaintiffs' form of requested relief would unnecessarily expose inmates to the very harm the parties seek to avoid.  *See id.* at § 3626(a)(1)(A) (relief must be the "least intrusive means necessary to correct the violation of the Federal Right").  Here, because Plaintiffs' requested relief in the form of transfers and releases of inmates (including those who are medically high-risk) would enhance their risk of contracting the virus.  (*See* Decl. Bick, ¶ 7 & Ex. A.) Further, aside from these medical risks, such a large early release would leave these parolees without access to the numerous critical resources and services new parolees need to be successful upon release, including housing, proper identification, benefits and medical care. (*See* ECF 3269 at 7-11.)  Plaintiffs' requested relief must be denied.

### A.    The Release And Transfer Of Medically High-Risk Inmates Places Their Health At Unnecessary Risk.

Plaintiffs' medical expert, Dr. Stern, makes only three recommendations to "mitigate the impact of this pandemic in the prisons," each of which advocates for the release of inmates: (1) release high-risk inmates or "ensure that they are safely situated,"; (2) make "immediate and concerned efforts to downsize the population to the lowest number possible at each prison"; and (2) "begin planning now to downsize further as conditions change." (Decl. Stern, ECF 3266-1, at 5:5-7, 10-11, 18.)  These recommendations focus solely on population reductions, fail to acknowledge less-intrusive alternatives promoted by public health experts and officials, and ignore

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION

1    serious concerns relating to the movement of at-risk individuals.[2]

2    　Indeed, Dr. Stern's recommendations and Plaintiffs' requested relief directly contradict

3    serious warnings issued by the CDC and the Receiver, among others, that transfers and movement

4    create significant risk of exposure and should be avoided.  (Decl. Wolff, Ex. A at 9; Decl. Diaz ¶¶

5    20, 21 & Exs. M & N.)  The CDC recommends "restricting movement in and out of the facility"

6    as a means of managing confirmed and suspected COVID-19 cases inside the facility and

7    preventing further transmission.  (Decl. Wolff, Ex. A at 5.)  The Receiver acknowledges this very

8    real risk in his Guidelines, stating that "CDCR should not authorize or undertake any further

9    movements of inmates between institutions to achieve necessary social distancing" without prior

10   approval and consultation with CCHCS because such moves "risk carrying the virus from one

11   situation to another." (Decl. Diaz, Ex. M at 1.)  Similarly, Dr. Bick, CDCR's Director of Health

12   Care Services, agrees "that patient transfer should be limited to either that which is essential to

13   address significant mental health or medical emergencies, or movement of patients from dorms to

14   single or double occupancy housing for improved physical distancing.  (Bick Decl., ¶ 8.)  Subject

16   [2] Plaintiffs assert that "[c]ourts across the country have ordered relief when conditions in detention
17   facilities did not allow for safe distancing," and cite a number of cases in support of this
     proposition.  (Motion at 5, fn. 2.)  Notably, all but one case cited by Plaintiffs order the release of
18   *pre-trial* detainees, which involves a different framework and standard for courts to consider in
     granting a release. *See Castillo v. Barr*, CV2000605TJHAFMX, 2020 WL 1502864, at *5 (C.D.
19   Cal. Mar. 27, 2020); *Basank v. Decker*, No. 20-cv-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26,
     2020); *U.S. v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020).  These factors
20   include: the risk of harm due to COVID-19, "further complicated by the fact that pretrial detention
     facilities see a daily flow of people entering and leaving the facility who could be carrying the
21   virus by asymptomatic" (*Davis* at *7); the detention facility's ability to protect detainees; the
     seriousness of the charges; the criminal history; the danger to the community if released; a civil
22   immigration detainee's entitlement to more considerate treatment; and the detainee's risk of re-
     offending and/or fleeing.  Thus, the facility's ability to allow for physical distancing is just one of
23   many factors that courts consider.  Plaintiffs' citation to *U.S. v. Colvin* is similarly unavailing
24   where a diabetic inmate was granted compassionate release. No. 3:19cr179 (JBA), 2020 WL
     1613943 (D. Conn. Apr. 2, 2020).  There, the inmate had had two weeks left on her sentence for a
25   non-violent offense (mail fraud), would be home-confined for seven months, had a medical care
     team in the community managing her diabetes, and otherwise presented no danger. *Id.*  Indeed,
26   had this inmate been confined to CDCR's custody, she would have been included among those
     transitioned to early parole in accordance with Secretary Diaz's directive.  (*See* Decl. Diaz, ECF
27   3241 at ¶ 5.)

28

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION

1   to these very limited exceptions (including to address significant mental health or medical

2   emergencies), the risks associated with inmate transfers during this pandemic "must be avoided to

3   ensure the health and safety of our inmate-patients, staff and the community." (*Id.* at Exs. A at 1

4   & B.) Yet, neither Plaintiffs nor Dr. Stern make any allowance for this very real risk.

5           Plaintiffs also argue that inmates should be released because the "rural or semirural

6   community hospitals that serve the prisons will quickly become overwhelmed with a high

7   concentration of very sick and possibly dying people who require intensive care." (Supp. Stern

8   Decl. ¶ 5-6 (ECF 3251); Motion at 6:23-26.) Plaintiffs contend that "[w]ithout access to necessary

9   medical treatment, class members 'will die unnecessarily.'" (Motion at 7:1-2, quoting Stern Decl.

10   ¶ 7 (ECF 3219-4).) However, CDCR and CCHCS have access to hospitals around the State and

11   can transport inmate-patients to those hospitals by any means necessary, including by ambulance

12   or helicopter. (Decl. Diaz ¶ 22; Decl. Bick ¶ 10.) CDCR would employ all necessary means to

13   ensure inmate-patient health, including transferring inmate-patients in need of hospitalization who

14   are located in rural or semi-rural areas. (Decl. Diaz ¶ 22; Decl. Bick ¶ 10.)

15        **B.**     **A Further Release Would Leave Inmates Ill-Prepared To Transition To Society And Leave Them At Risk.**

16

17           Before an inmate is released to parole or community supervision, CDCR's Division of

18   Adult Parole Operations (DAPO) staff work to coordinate and connect inmates with the numerous

19   services, transportation, transitional housing, and programs that are essential to the health, safety,

20   and success of released offenders. (ECF 3269 at 7:23-26.) This planning process starts 180 days

21   prior to release, when inmates are screened for eligibility for Social Security benefits, state-

22   sponsored Medi-Cal, and Veteran's benefits, among other services and benefits. (Declaration of

23   Jeffrey Green In Support of Defendants' Opposition to Plaintiffs' Emergency Motion to Modify

24   Population Reduction Order ("Decl. Green") ECF 3239 at ¶ 17.) DAPO staff conduct this

25   screening and submit applications for those who qualify. (*Id.*) DAPO staff also assist eligible

26   inmates to complete an application for a California Identification Card, which enables parolees to

27   access federal and state benefits without the stigma of an inmate identification card. (*Id.* at ¶¶ 35-

28   36.) DAPO staff also work to connect parolees with substance abuse services, medical care, and

16465050.3

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION

1  housing, if needed. (*Id.* at ¶¶ 41, 42.) These services are limited and it takes time to arrange

2  placements and eligibility. (*Id.* at ¶ 45.) This prerelease process is important because it provides

3  offenders with much needed benefits upon their release and avoids a delay in the provision of

4  those benefits. (*Id.* at ¶ 20.) This, in turn, helps improve their post-release stability, prevents

5  indigence and homelessness, and improves their opportunity for successful reintegration. (*Id.*)

6      Approximately sixty percent of the cohort of offenders currently being transitioned to early

7  parole and community supervision will be supervised by the counties, and there are already reports

8  of problems with providing these early releasees with the services they need. (ECF 3269 at 8:14-

9  16.) For example, there have been reports that some of the current early-release cohort did not

10  acquire California Identification Cards before their releases, which made them ineligible for

11  transitional housing and will make it difficult to access other services and benefits. (*Id.* at 8:17-

12  19.) If CDCR releases thousands of additional offenders at one time to county supervision, as

13  Plaintiffs request, it will likely deplete most available county resources for providing housing and

14  other critical support services. Similarly, by the time the current expedited releases are complete,

15  CDCR expects that available community housing and services provided by contractors for inmates

16  supervised by DAPO will also be nearly exhausted. The availability of these community

17  resources is not something that CDCR or the counties control. Most transitional housing

18  resources, and the wrap-around services that are sometimes included with them, are provided

19  through community contractors. (*Id.* at 8:26-9:6.)

20      In light of these facts, immediately providing expedited release to another large group of

21  inmates could risk leaving many with little or no assistance with housing and few or no supportive

22  community services.

## CONCLUSION

24      The *Plata/Coleman* three-judge court provided Plaintiffs with clear instructions and

25  guidance to seek an order in this court requiring Defendants "to take steps short of release" if

26  Plaintiffs believe Defendants' COVID-19 response violates their right to adequate medical care.

27  Rather than follow this roadmap and its attendant PLRA prerequisites, Plaintiffs now request the

28  ultimate relief—a prisoner release order—from this single-judge court. The PLRA prohibits the

16465050.3

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION

1   type of relief Plaintiffs seek by way of their Motion.  Further, even if Plaintiffs' request were not

2   jurisdictionally flawed, Defendants' response to the COVID-19 pandemic has been decisive,

3   thorough, unprecedented, and effective.  Plaintiffs have not, and cannot, establish deliberate

4   indifference under these circumstances.  Finally, the relief Plaintiffs seek is irresponsible and

5   dangerous, and conflicts with the recommendations of numerous public health officials and

6   experts, including the CDC and the Receiver.  For these reasons, Defendants respectfully request

7   that this court deny Plaintiffs' Motion.

8   DATED:  April 13, 2020                          HANSON BRIDGETT LLP

9

10                                                  By:        /s/ Samantha D. Wolff

11                                                       PAUL B. MELLO
                                                         SAMANTHA D. WOLFF
12                                                       KAYLEN KADOTANI
                                                         Attorneys for Defendants
13

14  DATED:  April 13, 2020                          XAVIER BECERRA
                                                    Attorney General of California
15

16                                                  By:        /s/ Damon McClain

17                                                       DAMON MCCLAIN
                                                         Supervising Deputy Attorney General
18                                                       NASSTARAN RUHPARWAR
                                                         Deputy Attorney General
19                                                       Attorneys for Defendants

20

21

22

23

24

25

26

27

28

DEFS.' OPP'N TO PLTFS.' EMERGENCY MOTION