PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>    *Defendants*. | Case No. 01-1351 JST<br><br>**PLAINTIFFS' REPLY RE EMERGENCY MOTION REGARDING PREVENTION AND MANAGEMENT OF COVID-19** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................................ 1

I.  THE REQUESTED RELIEF IS CONSISTENT WITH THE PRISON
    LITIGATION REFORM ACT ........................................................................................... 2

    A.  The Relief Meets the Needs-Narrowness-Intrusive Test. ...................................... 2

    B.  The Requested Relief is Not a Prisoner Release Order. ........................................ 3

II. DEFENDANTS' COVID-19 RESPONSE IS NOT ADEQUATE ........................................... 4

    A.  Defendants Fail to Establish that They Have Implemented Adequate
        Measures in Response to COVID-19 ................................................................... 4

    B.  Defendants Do Not Have a Plan to Limit Physical Distancing. ............................ 4

III. DEFENDANTS HAVE NUMEROUS OPTIONS FOR SAFELY
     REDUCING POPULATION DENSITY AND REHOUSING THE
     MEDICALLY VULNERABLE. ........................................................................................ 7

    A.  Early Releases Can Be Done Safely ..................................................................... 9

    B.  Pre-Release Planning Can Be Streamlined ......................................................... 10

    C.  Defendants Can Temporarily Relocate People to Off-Site Facilities ............. 11

CONCLUSION ............................................................................................................................. 13

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Armstrong v. Schwarzenegger*,
    622 F.3d 1058 (9th Cir. 2010) .................................................................................................. 3

*Brown v. Plata*,
    563 U.S. 493 (2011) .................................................................................................................. 3

*Pierce v. Cty. of Orange*,
    761 F. Supp. 2d 915 (C.D. Cal. 2011) ...................................................................................... 3

*Reaves v. Dep't of Correction*,
    404 F. Supp. 3d 520 (D. Mass. 2019) ....................................................................................... 3

**CONSTITUTIONS**

Cal. Const. Art. V, § 8(a) ................................................................................................................ 11

**STATUTES**

18 U.S.C § 3626 ............................................................................................................................... 2

Cal. Govt. Code § 8658 ............................................................................................................ 3, 11

Cal. Pen. Code § 2690 ..................................................................................................................... 3

## INTRODUCTION

In denying Plaintiffs' emergency motion before the Three Judge Panel the Court stated, "Thus far, the only way to stop [the] spread [of Covid-19] is through preventive measures—principal among them maintaining physical distancing sufficient to hinder airborne person-to-person transmission." Order Denying Motion, Doc. 3261 at 8. Referring to Defendants' obligation to protect the people living in California prisons, the Court urged Defendants "to leave no stone unturned." *Id.*, at 13. Defendants' Opposition to the motion before this Court demonstrates that they have failed to heed that direction. Even at this late date they have not taken reasonable steps to minimize the serious risk of transmission of COVID-19 by creating sufficient space to maintain physical distancing for the general prison population or even for those who are most vulnerable to serious illness or death from this deadly virus.

California's Attorney General has personally recognized the grave threat that correctional facilities pose to those who are detained in a letter to the Department of Homeland Security calling for "urgent action" to prevent "countless deaths." He urged the Department "to decrease the detainee population as much as possible … [because COVID-19] will not only harm civil immigration detainees, but will overwhelm community hospitals to which those detainees will necessarily be transferred for treatment." Supplemental Declaration of Patrick Booth, Exh. I.

Defendants fail to show the same sense of urgency here. Defendants say that they are "working" with the Receiver to "assess the feasibility" of creating 8-person housing cohorts. There is no plan for establishing those cohorts, nor is there a plan to protect the vulnerable due to age or medical condition. Defendants have thus far moved only a small fraction of people out of overcrowded dormitories. And while they claim to be investigating whether gymnasiums can house people, they conspicuously fail to mention how many people those gyms will hold and who will be transferred.

In light of these continuing failures and the fact that there is now an exponential

increase in the number of people (both staff and those incarcerated) who have tested positive, Plaintiffs seek a simple and narrow remedy—an order from this Court requiring Defendants to immediately develop and implement an adequate plan to maintain "physical distancing sufficient to hinder airborne person-to-person transmission" and to do so consistent with the vulnerability of many of the patients and the CDC guidelines.

To oppose this motion, Defendants rely on the tired strategy of creating a straw man to knock down. In this case, the straw man they knock down is a prisoner release order. Plaintiffs do not seek an order from this Court seeking the release of anyone, much less the release of thousands at a time. Rather, they present credible evidence that there are practical and safe alternatives for Defendants to use in developing an effective plan in the event that adequate physical distancing cannot be provided in CDCR's overcrowded 35 prisons.

The global threat posed by this pandemic is unprecedented in modern times. The measures taken by local, state and federal agencies to prevent transmission through shelter-in-place orders also are unprecedented, as is the effect on the entire economy. Those measures, however, do not protect people in the custody of CDCR. In this emergency the minimal steps taken to date by CDCR to prevent transmission are simply not a reasonable response to the magnitude of the crisis. The Court must intervene to force Defendants to turn over every stone to prevent further transmission of COVID-19 in our state prisons.

## I. THE REQUESTED RELIEF IS CONSISTENT WITH THE PRISON LITIGATION REFORM ACT

### A. The Relief Meets the Needs-Narrowness-Intrusive Test.

Plaintiffs have requested that the Court order Defendants to immediately develop and implement a plan to achieve sufficient physical distancing in CDCR's overcrowded dorms, and to ensure that medically vulnerable people will be safely housed. ECF 3266-4; *see also* ECF 3266 at 9-10. This requested relief is narrowly drawn, no broader than necessary, and the least intrusive means to correct the violations. 18 U.S.C § 3626(a)(1). It is "proportional to the scope of the violation"—indeed, it is directly targeted to halt the

rapid spread of this virus in the dorms and to protect those most at risk of falling severely ill or dying if they contract COVID-19.  *See Brown v. Plata*, 563 U.S. 493, 531 (2011).  And, it grants Defendants maximal discretion to choose the "the means … to accomplish those ends."  *See id.*  "Allowing defendants to develop policies and procedures to meet [their legal] requirements is precisely the type of process that the Supreme Court has indicated is appropriate for devising a suitable remedial plan in a prison litigation case." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1071 (9th Cir. 2010); *see also Pierce v. Cty. of Orange*, 761 F. Supp. 2d 915, 954 (C.D. Cal. 2011) (explaining that "the least intrusive means to compel the County to remedy the [deficiencies identified in the case] is to allow the County to draft a proposed plan").

**B.     The Requested Relief is Not a Prisoner Release Order.**

Contrary to Defendants' assertions, ECF 3273 at 4-7, the PLRA does not prohibit this Court from ordering Defendants to develop a plan to meet physical distancing requirements and safely house the medically vulnerable people in its custody.  Plaintiffs have requested only that the Court order Defendants to develop a plan to achieve these goals.  *See* ECF 3266-4; *see also* ECF 3266 at 9-10.  Defendants would have complete discretion in developing this plan.

As described in Plaintiffs' motion, Defendants may be able to achieve these goals by moving people to appropriate areas within the prisons.  ECF 3266 at 9; ECF 2661 at *13-14 (transfer order is not a release order).  Or, if existing spaces within the prisons are insufficient, Defendants could exercise their emergency powers to move people to "other locations *while remaining in CDCR custody*."  ECF 3266 at 9 (emphasis added).  For example, CDCR might choose to house people in other secure facilities, or to transfer people to temporary home confinement, either of which could be done while keeping people in CDCR custody.  *See* Cal. Govt. Code § 8658; Cal. Pen. Code § 2690; *see, e.g.*, *Reaves v. Dep't of Correction*, 404 F. Supp. 3d 520, 522 (D. Mass. 2019) (finding that order to transfer plaintiff to hospital was not a release order under the PLRA because "this

Court did not release Mr. Reaves from incarceration, it transferred him").

## II.     DEFENDANTS' COVID-19 RESPONSE IS NOT ADEQUATE

There is no dispute that "the Eighth Amendment requires Defendants to take adequate steps to curb the spread of disease within the prison system." ECF 3261, at 8. The sole issue in dispute is whether Defendants' response to the COVID-19 pandemic is reasonable. It is not, as set forth below.

### A.     Defendants Fail to Establish that They Have Implemented Adequate Measures in Response to COVID-19

Defendants claim that they have implemented reasonable and aggressive measures in response to COVID-19.  ECF 3273 at 7-11.  Referring to the U.S. Centers for Disease Control and Prevention's (CDC) *Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities*, Defendants assert that they have complied with "nearly every single CDC recommendation" regarding the management of COVID-19 in correctional facilities.  ECF 3273 at 8.

In support of this broad contention, they cite Secretary Ralph Diaz's declaration and a table he states was prepared by the Receiver that Secretary Diaz testifies "accurately reflects all measures that CDCR and CCHCS have taken to date in response to COVID-19, and demonstrates that CDCR and CCHCS have complied with almost all of the CDC's numerous suggested guidelines for correctional facilities." ECF 3274, ¶ 3 and 3274-1 (Exh. A).  The table, however, is hearsay offered to prove the truth of the matter asserted. Defendants offer no hearsay exception, thus the table is not admissible.  FRE 802. Defendants have enacted some measures to address the epidemic, but they have failed to demonstrate that they have followed nearly all of the CDC's recommendations.

### B.     Defendants Do Not Have a Plan to Limit Physical Distancing.

Even if Secretary Diaz's assertions are correct, and Defendants have complied with almost all of the CDC recommendations, Defendants' management plan has a gaping and obvious hole: the lack of a plan to facilitate physical distancing.   This, despite the fact that

the *CDC Interim Guidance* describes distancing as a "cornerstone of reducing" COVID-19.  ECF 3221-1 at 110.  And in the absence of a plan to facilitate distancing, tens of thousands of people remain housed in CDCR's crowded dormitories, sleeping in bunk beds and, in some cases, within three feet of each other.  Without this critical cornerstone, defendants' plan is plainly insufficient.

Plaintiffs acknowledge that the Defendants have taken some steps to reduce population density in some of the prisons.  As Plaintiffs demonstrated in the Emergency Motion, Defendants have failed to establish, however, that the limited steps they have taken to permit adequate physical distancing can be practiced in the dormitories under current conditions or that they have ensured that those particularly vulnerable to complications from COVID-19 have been removed from dangerous living situations.  ECF 3266, pp. 4-6.

As indicated above, the Receiver has very recently recommended to the Defendants that they create eight-person housing cohorts for people housed in dorm settings, with "each cohort… separated from the others by a distance of at least six feet in all directions," to achieve necessary social distancing.  ECF 3274 at 5, and ECF 3276-6.   Defendants indicate that they are "evaluating the feasibility of creating social distancing cohorts in the dorms that would each be separated from other pods." ECF 3273 at 12.  They further state that they are in the process of converting gymnasium space into alternative temporary housing, and "considering converting other areas as well." *Id.*  They have not, however, taken significant action to relieve the crowding in the dormitories, nor have they identified any measures to ensure that at least those people most at risk of serious complications from COVID-19 are safely housed.

Without an effective distancing plan in place, the number of COVID-19 cases among incarcerated people and CDCR staff has increased dramatically, even since Plaintiffs filed the first emergency motion.  Three weeks ago, just one incarcerated person had tested positive for COVID-19 in all 35 state prisons, at California State Prison, Los

Angeles (LAC), and seven staff members at four prisons reported positive tests. ECF 3221, at ¶ 47, & 3221-2 at 149. Since then, the number of infected incarcerated people has risen to 57, with 78 staff now reporting they have the virus. *See,* https://www.cdcr.ca.gov/covid19/population-status-tracking/ and https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/. (Both last accessed April 14, 2020.)

Significantly, the largest outbreak is centered in several dormitories at the California Institution for Men (CIM), where 38 incarcerated people have tested positive.[1] *Id.* Review of the housing for these people shows that at least 33 of them lived in dormitories on CIM's Facility D immediately prior to testing positive. Declaration of Steven Fama, filed herewith, at 2.

- Twenty-two people were housed in a single dormitory, Alder Hall;
- Six people were housed in Spruce Hall;
- Five people were housed in Cedar Hall.

*Id.* at 2. As of April 7, 2020, all three of these housing units remained at over 100% capacity. *Id.* at ¶¶ 5-7. And although Defendants did transfer approximately 638 people from dorms last week in order to create space and allow for distancing, none of those transfers involved CIM's crowded dormitories. ECF 3275, at 5. Additional transfers are scheduled for this week – but again, these do not impact CIM, where many of the dorms are at over 100% of capacity, and some are at over 160%. *See* Fama Decl, ¶ 8, Exh. C at 18-19.

Defendants' measures to prevent the spread of the virus are not effective, and there are reasonable steps they could take to further protect Plaintiffs, as set forth below.

---

[1] In addition to CIM, the outbreak at LAC has also grown, with 15 incarcerated people testing positive, and eleven staff. *Id.*

1  III.  **DEFENDANTS HAVE NUMEROUS OPTIONS FOR SAFELY REDUCING POPULATION DENSITY AND REHOUSING THE MEDICALLY VULNERABLE.**

Defendants assert that Plaintiffs seek relief that is unsafe.  Again, they are wrong.  Prison and jail systems around the country and, indeed, the world have been facing decisions about how to protect the health of the incarcerated people, staff and the public during this pandemic.  Many leaders have recognized that, in this emergency, strong action is required and that, in light of the pandemic, reducing density in prisons is vital for public health.

One of those leaders is Defendants' own counsel, California Attorney General Xavier Becerra, who wrote, in a letter to the Acting Secretary of Homeland Security, that "[s]ignificant steps are needed to avoid COVID-19-related catastrophe in our immigration detention facilities and their surrounding communities."  Suppl. Booth Decl., Exh. I.  The conditions he described in California immigration detention facilities mirror those in California prisons:  physical plants that "do not allow for social distancing"; "crowded dorms with up to 99 other people, with no physical partitions" (far fewer than many dorms in CDCR); "dining halls built for 50 or more people, at communal tables"; and too-few medical isolation rooms, resulting in the need to "deal[] with outbreaks by cohorting an entire 64-person housing unit."  Id. at 1, 2, 3 (parenthetical omitted); compare with ECF 3266-3 ¶ 5 & Exh. C (128 people in CIM dorm); ECF 3266-3, Exh. D at 25 (CCHCS cohorting guidance).

The dire consequences that will flow from the conditions in immigration detention facilities will flow from the same conditions in state prison: "countless unnecessary deaths," "increase[ed] … risk of infection to the public at large and overwhelming local health care providers," "community health resources being less available for community members," "a shortage of medical equipment," and limited ability for medical staff in the prisons to treat people with chronic illness "due to potential significant diversion of healthcare staff and resources to treat COVID-19 patients."  See Suppl. Booth Decl., Ex. I

7   Case No. 01-1351 JST
PLAINTIFFS' REPLY RE EMERGENCY MOTION REGARDING PREVENTION AND MANAGEMENT OF COVID-19

at 1, 2, 3-4.

And the "urgent action" the Attorney General demands of the Department of Homeland Security is the same that should be applied to the state prison system: "maximum use of supervised release options" and immediate reduction of the incarcerated population, "prioritizing those that are in fragile health."  Suppl. Booth Decl., Ex. I at 2, 4; see also id. at 4 ("Unless DHS takes immediate steps to reduce the population of detainees …, detainees, detention facility staff, and members of the neighboring communities will face increased risk of death").

Nowhere in the Attorney General's letter does he say, as he does in the present case (*see* Opp. at 14), that a reduction in the population is unsafe for medical reasons.  That is not surprising since the evidence Defendants rely on here consists of the declaration of Dr. Bick, who parrots the Receiver's position that inter-institution and intra-institution transfers should occur only for health related emergencies.  ECF 3278. at ¶ 7.  At this point, there can be no question that the risk of infection is much higher in Defendants' crowded dormitories than in the free community.

Plaintiffs described many measures correctional systems have taken to reduce population density in the first Emergency Motion, including the temporary release of 85,000 people from Iran's prisons and policies initiated in major U.S. cities from delaying arrests to releasing people held for drug offenses.  ECF 3219 at 13.  Since then, many more systems have acted decisively to develop and implement effective steps to reduce virus transmission in their facilities.  For example, U.S. Attorney General William Barr directed the U.S. Department of Justice to prioritize home confinement over imprisonment, noting that "some at-risk inmates … might be safer serving their sentences in home confinement rather than BOP facilities." Supp. Decl. of Patrick Booth, ¶¶ 3-4, Exh. A.  The Governor of Colorado signed an executive order suspending caps on earned credits, thereby expediting releases.  *Id.*, at ¶¶ 5-6, Exh. B.  The Governor of Kentucky commuted the prison sentences of people in prison "identified as at higher risk for severe illness or death due to

their medical conditions per guidelines" issued by the CDC and plans to commute the sentences of people with six months or less on their sentences. *Id.* at ¶¶ 7-9, Exh. C. In Illinois, the Governor significantly expanded the availability and length of medical furloughs, explaining that the "vast majority" of 36,000 people in custody "because of their close proximity and contact with each other in housing units and dining halls, are especially vulnerable to contracting and spreading COVID-19." *Id.* at ¶¶ 12, ECF 3266-3 at 176. The Governor of Pennsylvania ordered the expedited release of people within nine months of their release dates, as well as medically vulnerable people. *Id.* at ¶¶ 13-14, Exh. F. And here in California, the Judicial Council approved an emergency rule that sets bail statewide at $0 for misdemeanors and lower-level felonies in order to limit the jail populations in the state. *Id.*, ¶ 15, Exh. G.

### A. Early Releases Can Be Done Safely

In developing their plan, Defendants may choose the option of releasing some people from prison, and this can be done safely. Defendants have already released 3,500 people who were within 60 days of their release date in the space of a few weeks. They do not contend or offer evidence that people within 180 days of release would be less of a risk to recidivate. Their only argument is that this group may have "little or no assistance with housing and few or no supportive community services." ECF 3273 at 20. But 70% of this population has a place to go on parole, and 50-60% has stable housing. *See* Supplemental Declaration of Thomas Hoffman, ("Hoffman Decl."), filed herewith, ¶ 9. Defendants do not explain why these people cannot be promptly and safely released.

Using data provided by Defendants, Plaintiffs' expert identified 3,182 people who (1) are at high risk of complications or death from COVID-19, (2) have low or moderate risk of recidivism, (3) are within six months of release. Declaration of James Austin, Ph.D. ("Austin Decl.") ¶ 13. Of these 3,182 people, a subgroup of 1,520 people have been classified by Defendants as having low levels of housing instability. *Id.* ¶ 20. They could target this group for release. *Id*. ¶¶ 12-28.

Defendants assert that people are safer in the prisons because if they get seriously ill, they can be flown to hospitals around the State. A review of the data demonstrates the opposite – it is the prison environment that places people at risk. A large proportion of people within 180 days of release who are low or moderate risk to reoffend and over 50 years old live in dormitories. Austin Decl. ¶ 15 and Table 1. The "high proportion housed in dorms speaks to 1) their low security levels which reflects good prison conduct and 2) their risk of COVID-19 infection due to an inability to maintain social distancing." *Id.*, see also ECF 3219-4 at ¶ 9. The people who would be safest to release also stand the most to gain from being removed from the congregate living environment.

Pregnant women are another high-risk group who may be safely released: they are vulnerable to COVID-19 complications, and 11 of the 33 pregnant women in CDCR custody have release dates in 2020 and are low or moderate risk to reoffend. Austin Decl. ¶ 11. In Dr. Austin's opinion, these women could and should be safely released from prison now. *Id.*

### B. Pre-Release Planning Can Be Streamlined

Defendants argue that large numbers cannot be released quickly because each person must undergo a lengthy pre-release planning process by the Division of Adult Parole Operations ("DAPO"). *See* ECF 3273 at 15-16 and ECF 3269 at 7-13. There is no reason the process cannot be significantly shortened during the current state of emergency; indeed, Defendants' argument "assumes that CDCR and DAPO must complete every step of the pre-release process thoroughly and perfectly, something it has never done up to until now. […] To my knowledge, the pre-release process has never been so perfect in the past, and it is not realistic or prudent to expect perfection during this emergency. […] Rather than pointing to the ideal pre-release and supervision processes as an obstacle, CDCR and DAPO should be changing the process to fit the emergency." Hoffman Decl. ¶¶ 10, 13, 14; *see also* Plfs' Reply Brief Before Three-Judge Panel, ECF 3248 at 9-10, and declarations cited therein.

10  Case No. 01-1351 JST
PLAINTIFFS' REPLY RE EMERGENCY MOTION REGARDING PREVENTION AND MANAGEMENT OF COVID-19

Mr. Hoffman notes that many of the steps in the pre-release process "can be addressed later when the crisis is abated." Hoffman Decl. ¶ 15. He also describes the simple steps that DAPO and county probation departments could take to manage any uptick in recently-released parolees. *Id*. ¶¶ 16-18.

### C.    Defendants Can Temporarily Relocate People to Off-Site Facilities

Defendants offer no evidence that the temporary relocation of class members to off-site facilities is impractical. There are numerous options available to the State to transfer people to other locations in order to allow for physical distancing to lower the risk of deadly disease transmission.[2] For example, in *Coleman v. Newsom*, Defendants reported a plan to move 46 women to McFarland Female Community Reentry Facility and an unspecified number of men to another outside facility with which CDCR already has a contract. *See* Declaration of Michael Bien in Support of Plaintiffs' Emergency Motion at ¶ 4.). Moreover, Defendants have the power to temporarily transfer medically vulnerable people to safe locations where the risk of contracting COVID-19 is substantially reduced pursuant to the Governor's power to grant a reprieve from sentence under Article V, Section 8(a) of the California Constitution Cal. Const. Art. V, § 8(a) and. California Government Code § 8658:

> In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them.

Defendants have already invoked § 8658 as authority for their limited releases.[3]

---

[2] Plaintiffs' counsel have repeatedly—to no avail—encouraged Defendants to identify facilities outside of the CDCR prison system to safely house class members and reduce the density of overcrowded prisons. Bien Decl., ¶¶ 5-6, Exhs. 2 and 3.

[3] In addition, Sections 62010.3.1 and 62010.3.2 of CDCR's Department Operations Manual ("DOM") authorizes Headquarters staff, Wardens, Chief Deputy Wardens to "sign orders for removal of inmates in time of specified disasters and/or temporary community release." *See* https://www.cdcr.ca.gov/regulations/wp-content/uploads/sites/171/2019/07/Ch_6_2019_DOM.pdf (last visited Apr. 8, 2020).

1    Such transfers can be made, for example to some of the hotels or other facilities that
2 the Governor has commandeered for this emergency.  Bien Decl. ¶ 2 & Exh. 1.  Since the
3 population of the prisons will be reduced, correctional officer positions could be redirected
4 to these facilities.  Should more custody staff be needed, Governor Newsom could activate
5 the California National Guard to assist, pursuant to recent federal action authorizing the
6 National Guard to support California's response efforts to COVID-19, with the federal
7 government covering the full costs of eligible activities. *Id.* at ¶ ¶ 7-8 & Exh. 5.

8    The State knows how to do this.  For example, in February, the State engaged in a
9 search for available vacant spaces appropriate to house vulnerable persons who may have
10 been exposed to or contracted COVID-19 on cruise ships.  According to a declaration filed
11 in federal court by Dr. Mark Ghaly, the Secretary of California's Health and Human
12 Services Agency, on February 23, 2020, his agency considered several facilities around the
13 state including "Sonoma Developmental Center, Army National Guard Camp Roberts and
14 closed youth correctional facilities." *See* Bien Decl. ¶ 8 & Exh. 5. "Any facility selected
15 needed to meet the very strict CDC sheltering criteria, which includes individual rooms
16 and bathrooms for each patient." *Id*. at Exh. 12.  The location ultimately identified for use
17 was the Fairview Development Center in Orange County that was very recently closed by
18 the State, "with the last patient moving out on February 24, 2020." *Id*.  Fairview
19 Developmental Center has housed more than 900 patients and was licensed as a hospital
20 and skilled nursing facility, operated by the State for decades for people with profound
21 developmental disabilities. Bien Decl. ¶ 8 (citing https://www.dds.ca.gov/services/state-
22 facilities/fairview-dc/).  There are many other available State or federally-owned properties
23 in California, including other sparsely occupied and decommissioned Developmental
24 Centers, closed Department of Juvenile Justice facilities, hospitals, and closed military
25 bases.  *Id*. at ¶¶ 11-14.

26    Defendants have not indicated why they cannot release to parole and electronic
27 ankle monitoring the low-risk prisoners who have been working every day in the

28

12                                           Case No. 01-1351 JST
PLAINTIFFS' REPLY RE EMERGENCY MOTION REGARDING PREVENTION AND MANAGEMENT OF COVID-19

community while living in CDCR's Male Community Reentry Program (with six locations across the state), Custody to Community Transitional Reentry Program (409 available beds), Alternative Custody Program, and Conservation Camp program, in order to then free up those bed spaces for people from the 35 prisons. *Id.* at ¶ 9, *see also* CDCR, Male Community Reentry Program, available at https://www.cdcr.ca.gov/rehabilitation/mcrp/ (last accessed April 14, 2020); CDCR, Custody to Community Transition Reentry Program at https://www.cdcr.ca.gov/adult-operations/custody-to-community-transitional-reentry-program/ (last accessed April 14, 2020); CDCR, List of Conservation Camps, at https://www.cdcr.ca.gov/facility-locator/conservation-camps/camps/ (last accessed April 14, 2020).

Defendants also have contracts with multiple Modified Community Correctional Facilities (MCCFs), including but not limited to: Golden State MCCF (700 beds), Desert View MCCF (700 beds), Shafter MCCF (640 beds), Taft MCCF (600 beds), Delano MCCF (578 beds), and McFarland Female MCCF (300 beds). Bien Decl. ¶ 10. Again, Defendants' opposition brief is silent as to what—if any—efforts they have made to optimize their use of these beds.

## CONCLUSION

For the reasons stated above, Plaintiffs ask that this Court order Defendants to immediately develop and implement a plan to reduce the density in the 35 state prisons, and to ensure that medically vulnerable patients are safely housed.

DATED: April 14, 2020

Respectfully submitted,

PRISON LAW OFFICE

By: */s/ Alison Hardy*
    Donald Specter
    Steve Fama
    Alison Hardy
    Sara Norman
    Corene Kendrick
    Sophie Hart
    Patrick Booth

Attorneys for Plaintiffs