PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>GAVIN NEWSOM., et al.,<br><br>    *Defendants*. | Case No. C01-1351 JST<br><br>**DECLARATION OF JAMES AUSTIN, PH.D., IN SUPPORT OF PLAINTIFFS' REPLY** |

1

DECLARATION OF JAMES AUSTIN, PH.D.

I, James Austin, declare as follows:

1. I am the Senior Policy Analyst for the JFA Institute, a nationally-recognized criminal justice and corrections research organization. I have the personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently testify. I make this declaration in support of Plaintiffs' reply brief on their emergency motion, and to supplement the Declaration I submitted to the Three-Judge Panel on April 1, 2020. ECF 3250.

2. As noted in my previous declaration, I have implemented inmate classification and risk assessment systems for juvenile adult custody in more than thirty local and state correctional systems. I have implemented parole guidelines and related risk assessment systems in a number of states and local jurisdictions, including most recently in Maryland, Texas, Arkansas, Kentucky, Illinois, South Carolina, Charleston, S.C., and New Orleans, LA. I have assisted a number of states and local jail systems in identifying policies and procedures that have resulted in a safe reduction in their prison and jail systems.

3. In 2006, I was appointed to the Expert Panel on Adult Offender and Recidivism Reduction Programming for the California Department of Corrections and Rehabilitation (CDCR). I correctly argued that the CDCR prison population could be safely reduced from 170,000 incarcerated people in 2007, to 120,000, without increasing crime rates.

4. I was the primary author for the National Institute of Corrections (NIC) manuscript on Objective Prison and Jail Classification Systems, which provides details on the same types of classification systems employed by CDCR.

5. I submit this declaration in support of Plaintiffs' Reply, and to respond to assertions by Defendants regarding whether segments of the current CDCR population can be safely reduced for the purpose of lowering the risk of infection from the COVID-19 virus for

incarcerated people and staff.

6. I reviewed a spreadsheet that Defendants provided to Plaintiffs' counsel on April 8, 2020. This spreadsheet listed all people incarcerated in CDCR custody (1) who have medical classifications as High Risk 1, High Risk 2, or Pregnant, (2) those who are currently assigned to the Mental Health Delivery System and or (3) who have been admitted to the Mental Health Delivery System in the past year. For each person Plaintiffs' counsel requested the following information:

- Name
- CDCR Number
- Location (Prison, Building, and whether in a Dorm or Cell)
- Gender
- Age
- Race and Ethnicity
- Classification Score
- California Static Risk Assessment (CSRA) score
- COMPAS score
- Disability Placement Program (DPP) Codes, if any
- Developmental Disability Program (DDP) Codes, if any
- Current Mental Health Designation
- Admitted/been in MHDS in past year
- Medical Risk Level (High Risk 1, High Risk 2, or Pregnant)
- Underlying Health Conditions that lead to High Risk 1 or High Risk 2 score
- Security Level
- Commitment offense category
- Offense group
- Sex registrant
- Date of commitment to CDCR
- Sentence Length
- Projected release date
- Most Early Parole Date (MEPD) for people with sentences of life with the possibility of parole
- Controlling county

7. It's important to understand that the CSRA (California Static Risk Assessment) was developed by the University of California-Irvine, Center for Evidenced-Based Corrections to

allow the CDCR to obtain a risk assessment for all newly admitted prisoners.[1] As such, it uses 20 items, of which 18 items reflect the current offense and prior record. The other two factors are gender and current age. The term "static" is relevant as the only variable that changes over time is the inmate's age. Thus this instrument does not take into account the prisoner's participation in risk reduction programs and good conduct – all of which serve to reduce recidivism rates. For these reasons the estimates of the prisoners who are "low" and "moderate" risk are conservative estimates.

8. The COMPAS risk assessment instrument is used to assess a person's need for support services upon release from CDCR custody. The spreadsheet includes the prisoners' COMPAS factors. These include: Substance Abuse, Criminal Thinking, Social Isolation, Criminal Personality, Anger, Educational Problems, Employment Problems, Criminal Peers, Criminal Opportunity, Leisure and Recreation, Financial, and Residential Instability.

9. For those prisoners with a determinate sentence, COMPAS is administered toward the end of prisoner's prison term (180 – 210 days prior to release). It's important to note that such a needs assessment is most relevant to prisoners scoring at the high or moderate risk levels to determine which criminogenic risk factors need to be addressed prior to release or after release to parole supervision. Prisoners scoring low risk do not need to have such an assessment made given the fact they are already low risk to recidivate.

10. This spreadsheet listed 50,572 people. At my direction, Corene Kendrick, an attorney at the Prison Law Office, extracted certain subpopulations of prisoners to create worksheets for me to analyze. I also conducted my own statistical analysis to verify Ms. Kendrick's analysis. I describe each subgroup of population, and my opinion regarding their risk

---

[1] https://ucicorrections.seweb.uci.edu/files/2013/12/Development-of-the-CSRA-Recidivism-Risk-Prediction-in-the-CDCR.pdf

4

DECLARATION OF JAMES AUSTIN, PH.D.
CASE NO. C01-1351 JST

to recidivate in the following paragraphs. In addition, CDCR publishes recidivism statistics periodically; the last published set of data is for persons released in Fiscal Year 2014-15.[2] The data follows these people for the three years after their release, in other words, through FY 2017-18. I will reference CDCR's data throughout my declaration.

**Pregnant Prisoners**

11. As noted by medical experts, pregnant women are considered a population vulnerable to COVID-19. *See* ECF 3219-4 ¶ 6; ECF 3266-1 ¶ 4. Of the 50,572 people in the CDCR data file, there were 33 pregnant women currently in custody. Eighteen (18) of them have release dates between now and December 11, 2020, and eleven of those 18 have Low or Moderate CSRA scores. In my opinion, these women could be safely released from prison now. CDCR's data show that the three year conviction rate of released women of all ages is 34%, which is 13 points lower than for released men.[3]

**Prisoners With Determinate Sentences and Planned Release Dates Before October 31, 2020**

12. Next, Ms. Kendrick extracted from the CDCR spreadsheet all persons with determinate sentences who had a projected Earliest Possible Release Date (EPRD) between April 10, 2020, and October 31, 2020 or six months from April 8, 2020. I then requested Ms. Kendrick to only include prisoners who had a CSRA score of Low or Moderate risk. At my direction, she excluded all persons with release dates before October 31, 2020 who did not have a CSRA score listed, or scores of High Violence, High Drug, or High Property risk.[4]

---

[2] *See* Recidivism Report for Offenders Released From the California Department of Corrections and Rehabilitation in Fiscal Year 2014-2015 (Recidivism Report), available at, https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/01/Recidivism-Report-for-Offenders-Released-in-Fiscal-Year-2014-15.pdf.

[3] Recidivism Report, viii.

[4] While I purposely limited my analysis of this group to people with low or moderate CSRA scores with release dates in the next six months, CDCR's own data show that for *all* of California's released prisoners, only 7% are subsequently convicted of a violent crime after release. Recidivism Report, Page 10.

13. Based on the above criteria there are **3,182 people scheduled for release in the next six months who CDCR has assessed as a low or moderate risk to recidivate, who have a Medical Level 1 or 2 Condition, are currently assigned to one of the CDCR Mental Health Program Services and/or had previously been assigned to such a program in the past year.**

14. Of this group, 1,802 (or 57%) have a CSRA score of Low Risk, and 1,379 (or 43%) have a CSRA score of Moderate Risk.  The gender breakdown is 437 women (14%) and 2,745 men (86%).

15. Their age ranges are as follows.  As detailed in Table 1, many of the people over age 50 with release dates in the next six months are currently housed in dormitories. The high proportion housed in dorms speaks to 1) their low security levels which reflects good prison conduct and 2) their risk of COVID19 infection due to an inability to maintain social distancing:

Table 1.  Age and Location of Determinate Sentenced Prisoners Within 6 Months of Release, With Current or Past Medical and Mental Health Care

| Current Age | # of Prisoners | # In Dorms | % in Dorms |
| --- | --- | --- | --- |
| 80-89 | 13 | 10 | 77% |
| 70-79 | 85 | 58 | 68% |
| 65-69 | 110 | 84 | 76% |
| 60-64 | 189 | 131 | 69% |
| 50-59 | 643 | 420 | 65% |
| 40-49 | 735 | 454 | 62% |
| 30-39 | 962 | 511 | 53% |
| 19-29 | 444 | 223 | 50% |
| Totals | 3,181 | 1,891 | 59% |

16. In terms of medical and mental health care, the vast majority of these people either are in Medical Care Level 1 or 2 (856 people), are currently receiving mental health care services (2,227 people) and/or were previously assigned to some form of mental health care in

6

the past 12 months (2,782 people).

17. To date these people have served an average of 39 months to date not including an estimated 3-6 months in local jails prior to being transferred to the CDCR (the median time served to date in CDCR is 15 months). Their average sentence length is 70 months with a median sentence of 48 months. Thus the average projected reduction of 3 months (ranges from a few days to 6 months) which is a small percent of the time these people have been incarcerated in either the jail and/or state prison for their current offense(s).

18. It is a well-established fact that reducing the expected length of stay (or LOS) by this amount of time (an average of 3 months) will have no impact on the recidivism rates of these people or the state's already low crime rate which has continued to decline as state prison, jail, probation and parole populations have declined since 2007.[5]

**Table 2. Key Medical and Mental Health Flags of Determinate Sentenced Prisoners Within Six Months of Release, With Current or Past Medical and Mental Health Care**

| Attribute | Prisoners |
|---|---|
| Total CDCR Population | 120,135 |
| Determinate Sentenced Prisoners, within 6 months of release, Not High Risk, Who Meet Medical and Mental Health Criteria | 3,181 |
|   Medical 1 | 278 |
|   Medical 2 | 578 |
|   Total Currently in MH | 2,227 |
|     Acute | 22 |
|     CCCMS | 1,844 |
|     EOP | 332 |
|     EOP Mod | 23 |
|     ICF | 66 |
|     MHCB | 10 |
| In MH Past Year | 2,782 |

---

[5] Rhodes, William, Gerald G. Gaes, Ryan Kling, and Christopher Cutler. August 2018. Relationship between Prison Length of Stay and Recidivism: A Study Using Regression Discontinuity and Instrumental Variables With Multiple Break Points, *Criminology and Public Policy. 17(3):731-770*. Bartos, Bradley J. and Charis Kubrin. August 2018. Can We Downsize Our Prisons and jails Without Compromising Public Safety?: Findings form California Prop 47. *Criminology and Public Policy. 17(3):693-716.*

19. Further, because a high proportion of these people are rated as "low" risk to recidivate there is no need to require any special services. It is also a well-accepted fact that providing unneeded services and levels of supervision to low risk prisoners only serves to *increase* rather than *decrease* recidivism rates.[6] Thus for many of this group there is no need for the CDCR or local probation departments to provide any specialized assistance other than verification of a residence.

20. The COMPAS scores also show that a large number of this group (879 prisoners) are classified as low risk to recidivate, and have "low residential instability." This means that they should not have any significant issues maintaining a stable residence once released. There were 641 additional people who had "low residential instability" and are classified as moderate risk to recidivate. Finally, there are another 468 people in this cohort of 3,182 people for whom there is no COMPAS assessment. This is problematic, as my understanding is that the COMPAS test is administered between 180 and 210 days prior to release. CDCR should immediately perform the COMPAS analysis on the low/moderate risk to recidivate people for whom there is no information regarding their residential stability. CDCR should prioritize for expedited release the 1,520 low/moderate risk to recidivate people with low residential instability.

21. The number of these people who would be released under current CDCR practices and policies are as follows:

- From April 11-30, 2020: **309**
- May 2020: **382**
- June 2020: **515**
- July 2020: **491**
- August 2020: **480**
- September 2020: **502**
- October 2020: **499**

---

[6] Andrews, D. A., James Bonta, *The Psychology of Criminal Conduct, Fifth Edition* Elsevier (2010), p. 48.

22. CDCR's own data show that persons who are over 60 years old present dramatically lower risks of a new conviction within three years after release, compared to other age groups.[7] This is consistent with the general consensus in the field of correctional risk assessment that people age out of criminal behavior. A person who engaged in criminal behavior in his twenties is very unlikely to return to such behavior after age 45.

23. The CDCR argues that many of these candidates have been convicted of crimes against people and on that basis alone should not be granted a modest early release date. It is acknowledged that most of these people have been convicted of violent crimes but it is also true that they have served substantially longer prison terms for such convictions (Table 3).

**Table 3. Sentence Length, Time Served and Time Left to Serve of Determinate Sentenced Prisoners Within 6 months of Release, With Current or Past Medical and Mental Health Care**

| Primary Offense | Prisoner | Average Sentence (months) | Average Time Served (days) | Average Time Left |
|---|---|---|---|---|
| Person Crimes | 2,009 | 81 mos. | 1,484 days | 101 days |
| Drug | 207 | 54 | 655 | 113 |
| Property | 443 | 54 | 731 | 110 |
| Other | 517 | 45 | 527 | 111 |
| Total | 3,181 | 70 | 1,170 | 105 |

24. Further, California prisoners convicted of violent crimes who have longer lengths of stay have significantly lower rates of recidivism than other prisoners largely because they are older, which lowers their risk of recidivism.[8]

25. The CDCR's own publication on recidivism shows an inverse relationship

---

[7] Recidivism report at viii, Persons over 60 have a three-year conviction rate of 20.5% compared to 59% for persons ages 20 to 24.
[8] Recidivism Report, Table 20, p. 44.

between the severity of the sentencing offense and recidivism rates.[9] Specifically, prisoners with a conviction for violent crimes have reconviction rates that are about half the rates of the prisoners convicted of non-violent crimes.[10] For these reasons excluding prisoners convicted of violent crimes would only serve to worsen public safety rather than enhance it.

26. Of the 3,182 people, I also sorted by their controlling county, which normally is the county to which they will return upon release. As shown below, with the exception of six counties the number of accelerated releases is 100 or less.

- Alameda – 56
- Amador – 6
- Butte – 34
- Calaveras – 4
- Colusa – 3
- Contra Costa – 42
- Del Norte – 6
- El Dorado – 19
- Fresno – 128
- Glenn – 2
- Humboldt – 8
- Imperial – 11
- Inyo – 1
- Kern – 109
- Kings – 31
- Lake – 17
- Lassen – 2
- Los Angeles – 974
- Madera -19
- Marin – 10
- Mendocino – 8
- Merced – 35
- Modoc – 2
- Mono – 1
- Monterey – 35
- Napa – 13
- Nevada – 6
- Orange – 117
- Placer – 23

---

[9] Recidivism Report. Figure 12, p. 23
[10] Recidivism Report. Figure 12, p. 23.

DECLARATION OF JAMES AUSTIN, PH.D.
CASE NO. C01-1351 JST

- Plumas – 5
- Riverside – 249
- Sacramento – 168
- San Benito – 7
- San Bernardino -217
- San Diego – 297
- San Francisco – 21
- San Joaquin – 48
- San Luis Obispo – 29
- San Mateo – 31
- Santa Barbara – 34
- Santa Clara – 65
- Santa Cruz – 13
- Shasta – 22
- Sierra – 1
- Siskiyou – 9
- Solano – 20
- Sonoma – 21
- Stanislaus – 47
- Sutter – 13
- Tehama – 24
- Tulare – 40
- Tuolumne – 8
- Unknown – 1
- Ventura – 44
- Yolo – 10
- Yuba – 15

27.  As Thomas Hoffman noted in his supplemental declaration submitted to the Three Judge Panel, CDCR can and should shift the workloads of Division of Adult Parole Operations (DAPO) employees, discharge some of the existing parole population, in order to focus upon the newly released people.  ECF 3252 at ¶¶ 16-19, 21-22.  Many of the people in this group will be discharged to county supervision, not DAPO supervision.[11]  Mr. Hoffman also described how county probation departments, which supervise many of the people released from CDCR to

---

[11] *See* Recidivism Report at 45 ("Post Release Community Supervision [PRCS] is a form of supervision provided to an offender who has been released from a CDCR institution to the jurisdiction of a county agent, pursuant to the Post Release Community Supervision Act of 2011. Prior to Public Safety Realignment, almost all offenders released from CDCR were placed on state parole supervision after their release. After Public Safety Realignment, most non-serious, non-violent, and non-sex registrant offenders are release[d] to PRCS.")

11

DECLARATION OF JAMES AUSTIN, PH.D.
CASE NO. C01-1351 JST

1  county supervision, can shift their caseloads to accommodate an increase in newly-released

2  people. *Id*. at ¶ 20.  I agree with Mr. Hoffman's opinions about how DAPO and the counties can

3  accommodate these persons.

4      28.    Further, it should be noted that the state probation and parole populations have

5  declined significantly with the passage of Props 47 and 57. Specifically the adult parole

6  population has declined from 95,000 in 2010 to about 51,000 as of April 2020.  The county

7  felony probation population has also declined from 255,000 in 2010 to 167,000 in 2019.[12]

### Parole-Eligible Lifers

9      29.    Next, I asked Ms. Kendrick to extract from CDCR's spreadsheet a list of all

10  people with sentences of life with the possibility of parole, with parole dates in the past, thus

11  indicating that they are parole-eligible.  The recidivism rate for these "lifers," is extremely low,

12  regardless of age.  Of the 688 lifers released in 2014-15, only 16 of them (2.3%) were convicted

13  of a new crime in the subsequent three years, the majority of which were misdemeanors.[13]

14      30.    There were 3,981 parole-eligible lifers in CDCR's spreadsheet.  I then excluded

15  people with CSRA scores of High Violent (8 people), High Property (9 people), High Drug (2

16  people), or a blank entry for the CSRA score (25 people), to come up with **3,936 parole-eligible**

17  **lifers that CDCR has concluded have a low or moderate risk of recidivism, and have**

18  **medical or mental conditions (current or past 12 months)**.

19      31.    As compared to the determinate sentenced population discussed earlier, this

20  population is considerably older, lower risk to recidivate, have much higher medical care and

21  mental health needs. Of these 3,936 people, 3,846 of them have Low Risk CSRA scores and 90

22  have Moderate Risk CSRA scores.  There are 173 women (4.3%) and 3,736 men (95.7%) in the

---

[12] https://openjustice.doj.ca.gov/exploration/crime-statistics/adult-probation-caseload-actions

[13] Recidivism Report at viii, 19-20.

12

DECLARATION OF JAMES AUSTIN, PH.D.
CASE NO. C01-1351 JST

Low/Moderate subgroup.

32. The amount of time that this group has served to date is much longer than the determinate sentenced population (an average of 10,407 days or 29 years). On average they have served 5,032 days (13.7 years) passed their legal parole eligibility date.

33. The age range of this subgroup of parole-eligible lifers is from 23 to 92 years old, and average age is 59 which is also much longer than the determinate sentenced population (average age of 43 years).

34. A large percentage of these inmates are currently assigned to dorms which again reflects 1) their low security levels which reflects good prison conduct and 2) their risk of COVID19 infection due to an inability to maintain social distancing. (Table 4.)

**Table 4. Age and Location of Parole Eligible Prisoners With Current or Past Medical and Mental Health Care**

| Current Age | Prisoners | In Dorms | % in Dorms |
|---|---|---|---|
| 80 plus | 70 | 36 | 51% |
| 70-79 | 550 | 307 | 56% |
| 65-69 | 686 | 314 | 46% |
| 60-64 | 653 | 247 | 38% |
| 50-59 | 684 | 242 | 35% |
| 40-49 | 644 | 185 | 29% |
| 30-39 | 113 | 39 | 35% |
| Under 30 | 4 | 2 | 50% |
| Totals | 3,404 | 1372 | 40% |

35. As noted above, the older population is at a significant lower risk of recidivism.

36. Given their sentence of life with the possibility of parole, it is not surprising that most of these people were convicted of Murder 1st Degree (1,276 prisoners) and Murder 2nd (1,565 prisoners). But a sizeable number are instead sentenced for property, drug, and other crimes (155 prisoners). Further, the courts also sentenced them so they could be considered for parole and as noted above most if these people are many years past their parole eligibility date.

And as, noted above there is an inverse relationship between the severity of the commitment offense and the probability of recidivism.

37. In terms of their current and past medical and mental health status within the CDCR, the vast majority of this population has such a history. *See* Table 5:

**Table 5. Key Medical and Mental Health Flags of Parole Eligible Inmates**

| Attribute | Prisoners |
|---|---|
| Total CDCR Population | 120,135 |
| Parole Eligible Prisoners, Not High Risk, Who Meet Medical and Mental Health Criteria | 3,936 |
|   Medical 1 | 1,344 |
|   Medical 2 | 1,282 |
|   Total Currently in MH | 2,130 |
|     Acute | 18 |
|     CCCMS | 1,469 |
|     EOP | 492 |
|     EOP Mod | 73 |
|     ICF | 76 |
|     MHCB | 2 |
| In MH Past Year | 2,341 |

38. Similar to the group of low/moderate risk people with release dates in the next six months, I analyzed the low/moderate risk parole-eligible people by county of commitment. As these persons have life sentences, they will have to be supervised by DAPO. But as I noted above, I agree with Mr. Hoffman's assessment of how DAPO could shift resources and caseloads to accommodate additionally released people.

- Alameda – 172
- Amador – 2
- Butte – 21
- Calaveras – 1
- Colusa – 1
- Contra Costa – 69
- Del Norte – 2
- El Dorado – 19
- Fresno – 126
- Glenn – 7
- Humboldt – 20

- Imperial – 19
- Inyo – 3
- Kern – 94
- Kings – 19
- Lake – 7
- Lassen – 2
- Los Angeles – 1,403
- Madera – 12
- Marin – 19
- Mariposa – 5
- Mendocino – 12
- Merced – 17
- Mono – 1
- Monterey – 47
- Napa – 8
- Nevada – 8
- Orange – 187
- "Other County" – 6
- Placer – 22
- Plumas – 2
- Riverside – 165
- Sacramento – 170
- San Bernardino – 188
- San Diego – 304
- San Francisco – 107
- San Joaquin – 84
- San Luis Obispo – 24
- San Mateo – 58
- Santa Barbara – 34
- Santa Clara – 166
- Santa Cruz – 17
- Shasta – 28
- Siskiyou – 8
- Solano – 34
- Sonoma – 27
- Stanislaus – 46
- Sutter – 13
- Tehama – 10
- Trinity – 1
- Tulare – 38
- Tuolumne – 4
- Unknown – 1
- Ventura – 49
- Yolo – 16
- Yuba – 9

15

DECLARATION OF JAMES AUSTIN, PH.D.
CASE NO. C01-1351 JST

39. Like the determinate sentenced prisoners, a large percentage of this group (1,965 prisoners) are classified as low risk to recidivate and have "low residential instability". This means that they should not have any significant issues maintaining a stable residence once released.

40. In summary, there is a considerable number of people in the current CDCR prison system who have served substantial periods of time in prison, with significant medical and mental health conditions who could be safely and immediately released to the community. Many of these prisoners pose a significantly lower risk to public safety than many prisoners now being released under current CDCR practices and state law. Moderately reducing their projected lengths of stay would not change their risk or recidivism or negatively impact California's low crime rate. When distributed across the various counties over a reasonable but short time frame, the numbers of additional cases will not negatively impact the DAPO or County Probation Departments' populations, which have declined significantly since the implementation of Props 47 and 57, or their capacity to manage these accelerated releases. Rather, there would be a slight surge in the total number of CDCR releases (currently about 35,000 per year), but thereafter the number of total releases would return to the current rate.

41. The fears raised by the Defendants that releasing these people who have already spent many months and years incarcerated is "unsafe" are similar to the ones raised prior to *Plata* decision in 2011 and are similarly false.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of April, 2020 in Camden, South Carolina.

*/s/ James Austin, Ph.D.*
JAMES AUSTIN, PH.D.