XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN - SBN 209508
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR - 263293
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF -  240280
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

Attorneys for Defendants

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>        Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:    April 20, 2020<br>Time:   2:00 p.m.<br>Crtrm.: 6, 2nd Floor<br>Judge:  Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the April 20, 2019 Case Management Conference.

## I. PLAINTIFFS' STATEMENT

As of 8:00 a.m. this morning, 121 patients statewide have tested positive for COVID-19: 60 at the California Institution for Men (CIM) (all from Facility D, we believe), 55 at California State Prison – Los Angeles County (LAC) (all from Facility D, almost or perhaps all from a single housing unit in that Facility, we believe), two at Centinela State Prison, and one each at the California Institution for Women, California Men's Colony, North Kern State Prison, and the Substance Abuse Treatment Facility and State Prison. There has been one patient death from COVID-19, on April 19, 2020.

### A. Defendants' plan to implement the Receiver's directive to facilitate distancing.

Plaintiffs seek further information regarding Defendants' intent to implement the Receiver's April 10, 2020 Directive (Receiver's Directive) (ECF 3273-2) to create in the prison dormitories eight-person housing cohorts, each separated by a distance of at least six feet in all directions. Defendants before this Court last week unequivocally indicated that they would implement this Directive, "and explained that they have already moved some individuals from dormitory housing into gymnasiums to increase physical distancing in the dorms." Order, ECF 3291 at 11. They further stated that the aspiration was to complete the process in the following week.

That same day, in response to Judge Mueller's Order requiring Defendants to submit a strategic plan for achieving compliance with the U.S. Centers for Disease Control and Prevention (CDC) *Interim Guidance on Management of Coronavirus Disease (2019) (COVID-19) in Correctional and Detention Facilities* ("CDC Guidance"), the CDCR filed a COVID-19 Plan that is inconclusive as to whether they will implement the Receiver's Directive. That Plan states "CDCR, in conjunction with the Plata Receiver, will assess the population in the dorms and determine *what additional steps need to be taken, if any*" after completing already-scheduled transfers. CDCR COVID Plan at 6, *Coleman v. Newsom*, Case No. 2:90-CV-00520-KJM-DB, ECF No. 6616 at 11 ("Strategic Plan") (emphasis added).

In light of these inconsistent positions, Plaintiffs seek the following information from Defendants:

First, do Defendants intend to comply with the Receiver's Directive to create housing cohorts?

Second, if Defendants intend to comply with the Receiver's Directive, Plaintiffs request that Defendants provide the "activation schedule" that Defendants' counsel referenced during the April 16, 2020 motion hearing. That schedule should include an explanation of the methodology Defendants intend to use to house people at high risk due to COVID-19. Plaintiffs request that this schedule include all of the dormitories, including any existing or established in re-purposed space (e.g., gyms) in each of the 35 facilities and indicate whether each dormitory has been or will be reorganized to incorporate the eight-person cohort plan, with six-foot separation, and the final date by which Defendants intend to complete this transition for each dormitory.

Third, Defendants must provide photos or video-recorded site visits of each of the newly configured dormitories, in which staff measure the distances between cohorts, and document access to programs, bathrooms and showers, medical/mental health services, and meals.

Finally, if Defendants do not intend to fully implement the Receiver's Directive, Plaintiffs request that Defendants provide details on their alternative plan to effect physical distancing in the prison dormitories.

**B.      People at higher risk for severe illness or death from COVID-19.**

In their Strategic Plan, Defendants stated that they do not intend to target COVID-related efforts to any particular population, including the medically vulnerable: "There are currently no plans to target specific portions of the population, such as *Coleman* class members or high risk inmates, for special movement or housing, except as detailed [elsewhere in the Plan] regarding the provision of Mental Health care." Strategic Plan at 4 (*Coleman* ECF 6616 at 9). Defendants' filings in this Court likewise do not indicate any plan to specially-house the medically vulnerable.

Plaintiffs remain concerned by Defendants' decision to not target any COVID-19 efforts to the medically vulnerable people in their custody. The Receiver's office has recognized the

importance of taking steps to protect these patients. In its April 3 *COVID-19: Interim Guidance for Health Care and Public Health Providers*, CCHCS instructed that prisons may consider placing these vulnerable patients on a "protective shelter in place":

> During the COVID-19 pandemic, CCHCS institutions may implement additional measures to protect vulnerable patients who are at increased risk for severe COVID-19 disease (e.g., single-cell or protected housing area, limited movement, separate dining and yard time, and telemedicine services). Patients in protective shelter in place should be educated regarding their risk and how to protect themselves, early symptom recognition and request for medical attention, and the availability of testing for COVID-19.

*See* April 3 Guidance at 18 (ECF 3274-6 at 19).

Defendants apparently have not adopted this recommendation. On April 8, CCHCS and Defendants provided Plaintiffs a spreadsheet of patients considered more vulnerable to COVID-19 complications. The spreadsheet showed that many of these individuals remained housed in crowded dorms. For example, CIM's Alder Hall housed 71 people who were classified as "high risk" medical, over the age of 50, and/or had conditions that made them vulnerable to severe illness from COVID-19. Alder Hall is the locus of a COVID-19 outbreak: at least 22 people were housed there prior to testing positive for COVID-19. ECF 3284-2 ¶ 5. Tragically, one CIM patient has recently died from COVID-19 complications, s*ee* Cal. Dep't of Corr. & Rehab., *California Institution for Men Inmate Dies from Complications Related to COVID-19* (April 19, 2020), https://www.cdcr.ca.gov/news/2020/04/19/california-institution-for-men-inmate-dies-from-complications-related-to-covid-19/, and medical records indicate he had been housed in Alder Hall. In addition, those records indicate the patient had risk factors, including age and underlying medical conditions, which made him especially vulnerable to COVID-19.

According to the April 7, 2020 Bed Audit, Alder Hall was at 112% capacity (ECF 3284-2 at 27), with 112 people in a space designed for 100 beds. Thus, sixty-three percent (63%) of the 112 people in this dorm were considered vulnerable to COVID-19 complications. As of April 8, there were also 71 medically vulnerable people (70% of that dorm's population) in Cedar Hall,

where at least 5 people were housed prior to testing positive for COVID-19 (ECF 3284-2 ¶ 7).[1] And, there were 83 medically vulnerable people (74% of that dorm's population) in Spruce Hall, where at least 6 people have tested positive for COVID-19 (ECF 3284-2 ¶ 6).

CIM is not the only prison in the state housing medically vulnerable people in crowded dormitories. For example, data provided by the Receiver indicates that California Medical Facility has five dorms that house 92, 84, 70, 70, and 61 people designated "high risk medical" in dorms that are, respectively, 129%, 134%, 142%, 116%, and 114% of design capacity. And, at California State Prison Solano, a dorm houses 57 such people in a dorm at 162% of design capacity. Valley State Prison houses 63 and 71 people in dorms who have at least one COVID-19 risk factor; these housing units are up to 133% of design capacity. Similarly, at the Substance Abuse and Treatment Facility there are 47 and 46 people housed in dorms who have at least one COVID-19 risk factor; those units are up to 141% of design capacity.

These figures demonstrate that Defendants have knowingly housed medically vulnerable people in a situation that puts them at a serious risk of harm and in one recent case, death. As stated above, Defendants have no plan to specially protect these individuals through physical distancing in their housing units. In monitoring Defendants' response to COVID-19 the Court should direct that those at medically high risk be housed in a manner that protects them from infection to the fullest extent possible.

### C. Medical care related to COVID-19.

The changes to medical services, and Plaintiffs' monitoring, caused by the COVID-19 pandemic, described in the April 13, 2020 Case Management Conference Statement, continue. On April 14th, the Receiver's Chief Medical Executive and Chief of Corrections Services held an hour-long phone conference to answer questions Plaintiffs' regarding COVID-19. Defendants counsel participated in the conference. Plaintiffs have asked for a similar session this week to address questions and concerns that remain unresolved. The Receiver has not yet replied whether

---

[1] Plaintiffs understand that the Cedar Hall dorm has since been converted to a kind of infection control unit for patients who have tested positive for COVID-19.

a conference will be scheduled.  Among the questions and concerns Plaintiffs hope to discuss with Receiver are:

 a. Medical Isolation

  i. Criteria for release from medical isolation:  CCHCS said its "priority" last week was reconsideration of the criteria for when COVID-19 patients would be considered recovered and thus can be released from medical isolation.  Currently, no CDCR COVID-19 patient has been determined to be recovered and released from isolation; one patient has been on isolation for 30 days and others have been on that status for approximately three weeks.

  ii. Outdoor time for those on medical isolation: None of the dozen patients on medical isolation at LAC and CIM were offered outdoor time, CCHCS said last week, even though it also said there was no medical or public health reason they could not be, so long as they did not mix with those not on medical isolation.  CCHCS guidance to the prisons is currently silent regarding outdoor time for those on medical isolation, even though it has specifically said those on quarantine can be provided outdoor exercise so long as they do not mix with others.  CCHCS said it would pass along Plaintiffs' request that the prisons be told that medical isolation patients can be offered outdoor time to those currently revising the directives and guidance given to the prisons.

  iii. Question about cell-housing of medical isolation patient at LAC: A class member reported that although he did not have COVID-19 he was double-celled with a person who was positive for the virus.  Plaintiffs have asked CCHCS for information to determine if the class member's report is correct.

 b. Testing

  i. Availability of tests and timely test results: CCHCS said last week its

        supply of test kits was fairly stable.  It reported 1400 COVID-19 test kits statewide, roughly distributed equally among the prisons except for re-allocations made to CIM and LAC given the outbreaks at those prisons. CCHCS said it had not heard of any problems in obtaining tests in the near future.  CCHCS said the test results turn-around time was 48-72 hours, except at Pelican Bay State Prison (PBSP), where it was taking six days (currently, seven PBSP patients have been tested).

    ii. Rapid tests: CCHCS said it expected to hear last week whether it would obtain rapid COVID-19 testing developed and being sold by Abbott Labs.

    iii. Surveillance testing of non-symptomatic persons:  CCHCS sometime in the last two weeks, apparently in partnership with an outside entity, offered COVID-19 testing to non-symptomatic people housed in LAC's D-2, the locus of a large outbreak.  As a result, more than 20 persons have been diagnosed with COVID-19.  CCHCS has said it will attempt similar surveillance testing at CIM, given the large outbreak at that prison's Facility D.

c. Personal Protective Equipment for staff

    i. CCHCS said last week that its supplies of masks for healthcare and other staff was stabilizing.  It stated it had received approximately 10,000 N95 or Nk95 masks, and some of those had been distributed to CIM and LAC. CCHCS said it did have issues with gowns, but did not provide further information.

d. Cloth face barriers for incarcerated persons and staff

    i. On April 16, 2020, CDCR and CCHCS executives issued a memo stating that incarcerated persons and staff are required to wear a cloth face barrier "once a supply of two (2) face barriers/masks per correctional staff and inmate/patient has been delivered to the institution."  CDCR last week

                stated that it is manufacturing 20,000 cloth face coverings per day for use by incarcerated persons and staff. However, it is not known when each prison will receive the supply necessary to trigger the requirement that cloth face barriers be worn.

    e. Availability of community hospital beds for COVID-19 patients in need of inpatient or other advanced care including ICU placement

        i. CCHCS last week said it has not had and does not anticipate problems with hospital admissions in the Los Angeles area. There may be concerns if patients need hospitalization in areas referred to as "medical deserts." For example, the hospital in Crescent City, California, which is the nearest one to PBSP, has only eight ICU beds.

## II.  DEFENDANTS' STATEMENT

Defendants' statement describes the additional measures CDCR has taken since the filing of Defendants' opposition to Plaintiffs' emergency motion on April 13, 2020 (ECF No. 3272 et seq.). In particular, this statement discusses the steps CDCR has taken in response to the Receiver's directives from April 10 and April 12, 2020, to mitigate the risks of COVID-19 in CDCR's institutions, including the creation of eight-person cohorts for inmates housed in dorm settings.

First, however, Defendants must raise a concern about the potential for orders related to CDCR's response to the COVID-19 pandemic issued in *Coleman v. Newsom*, No. 2:90-cv-0520 KJM DB (E.D. Cal.) to conflict with orders issued about that subject in *Plata*. While the *Coleman* case focuses on a particular subset of correctional health care— mental health care—the potential for conflicting orders related to correctional health care more generally is emerging. For example, in its recent ruling denying Plaintiffs' emergency motion, this Court concluded that it could not order the injunctive relief requested by Plaintiffs—which included a request for an order requiring CDCR to develop and implement a plan to minimize the spread of the COVID-19 virus to the incarcerated

population in California's state prisons—because Defendants have not been deliberately indifferent. (ECF No. 3291.) By contrast, on April 10, the *Coleman* Court, after acknowledging the same robust response to the COVID-19 crisis that this Court considered, concluded that CDCR's efforts were insufficient,[2] and ordered the following:

> Good cause appearing, defendants will be directed to file, not later than 5 p.m. on Thursday, April 16, 2020, a strategic plan for achieving compliance with the U.S. Centers for Disease Control and Prevention (CDC) Interim Guidance on Management of Coronavirus Disease (2019) (COVID-19) in Correctional and Detention Facilities (CDC Guidance), to the maximum extent defendants currently maintain is possible.

(*Coleman,* ECF No. 6600 at 1-2; *see also* ECF No. 6622 at 1-2.) It is difficult to reconcile these two orders. And the situation becomes more ambiguous upon considering the fact that many of the CDC recommendations concern subjects that fall directly under the Receiver's responsibility.

As this Court is aware, on February 14, 2006, it issued an order appointing the Receiver, which divested the Secretary of CDCR from control of the medical delivery system and placed the day-to-day management of it in the control of the Receiver. (ECF No. 473 at 4.) Under that order, the Receiver shall "exercise all powers vested by law in the Secretary of CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical health care system." (*Id.*) And although some institutions' medical delivery has been delegated back to CDCR, the Receiver retains control of the administrative functions of CDCR's medical services. Thus, CDCR cannot enter into agreements about how to provide medical care to "high risk" patients or on how to provide physical-distancing measures for medical purposes without the approval of the Receiver.

On April 16, Defendants complied with the *Coleman* Court's order, which required them to file a plan with the Court. The strategic plan filed in *Coleman* sets forth a

---

[2] The *Coleman* Court did not, however, explicitly find that CDCR's response to the pandemic constituted deliberate indifference under the Eighth Amendment or otherwise violated the Constitution.

comprehensive summary of the measures that have already been presented to this Court, plus additional actions CDCR has taken regarding the provision of mental health care to address the needs of patients with mental illnesses. (*Coleman,* ECF No. 6616.) However, upon "initial review," the *Coleman* Court found the plan (not limited to the mental health components)—which was developed in close cooperation with the Receiver—to be problematic. (*Coleman,* ECF No. 6622 at 2 (noting that the Court's review "suggest[ed] an absence of specific goals and objectives and no identification of the expected duration of the plan or aspects thereof").)

The *Coleman* Court has allowed for additional briefing regarding the plan before it takes the plan under formal review. (*Id.* at 2.) It is unclear what additional orders the *Coleman* Court will make concerning CDCR's response to the pandemic. To support CDCR's preference for a holistic approach to addressing inmates' health needs and to mitigate the potential for conflicting orders, Defendants request that this Court and the *Coleman* Court address this issue through the Court's normal coordination mechanism.

While there is no doubt that the *Coleman* Court's jurisdiction fully encompasses CDCR's continuing provision of adequate mental health care in its institutions, Defendants believe that the determination of the adequacy of CDCR's measures to mitigate the medical risks of COVID-19 in its institutions falls squarely in the purview of this Court. In its April 10 order, the *Coleman* Court acknowledged that coordination between the two cases is desirable, and going forward, Defendants are optimistic that coordination can prevent the issuance of any conflicting orders.

### A. CDCR Has Taken Significant Additional Steps to Improve Physical Distancing in its Institutions.

Defendants have rapidly begun to implement the Receiver's April 10 plan to improve physical distancing in the dorms by transferring numerous inmates out of dorms and into other locations, including celled housing and gyms. Although additional transfers are still needed, CDCR anticipates that by activating gymnasiums for occupation, and by

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

fully utilizing vacant cells in various locations, it will be able to fully implement the eight-person cohorts contemplated in the Receiver's plan.

### 1. Dorm transfers have commenced.

Officials at all prisons with dorms have been directed to determine the reductions in their dorm populations that will be required to create the eight-person cohorts described in the Receiver's plan, and CDCR has moved quickly to conduct the required transfers.  In their opposition to Plaintiffs' emergency motion, Defendants described an initial phase of inmate transfers from dorms to improve physical distancing, which included the following transfers:

- 361 inmates from California Rehabilitation Center to CSP Corcoran; and
- 300 inmates from Chuckawalla Valley State Prison to Ironwood State Prison;
- 226 inmates from CSP Solano to Deuel Vocational Institution;
- 143 inmates from Sierra Conservation Center to camps;
- 100 inmates from Substance Abuse Treatment Facility to CSP Corcoran;
- 57 inmates from Chuckawalla Valley State Prison to CSP Corcoran;
- 52 inmates from California Correctional Center to camps;
- 43 inmates from Folsom State Prison B Facility to Female Community Reentry Facility.

The last of these transfers were completed last week, and the total number of inmates transferred in this first phase was about 1,282.

To create the space in the dorms required to implement the Receiver's plan for eight-person cohorts, however, additional transfers from some of the dorms are required.  On April 17, 2020, CDCR presented to the Receiver an initial proposal to comply with the Receiver's plan.  The Receiver sought additional information and CDCR therefore submitted a modified proposal to the Receiver for approval this morning—April 20, 2020. That modified proposal includes following additional dorm transfers:

- 175 inmates from Substance Abuse Treatment Facility to CSP Corcoran;

- 76 inmates from Substance Abuse Treatment Facility to California City Correctional Facility;
- 133 inmates from Correctional Training Facility to CSP Corcoran;
- 180 inmates from Chuckawalla Valley State Prison to Ironwood State Prison;
- 95 inmates from San Quentin to CSP Corcoran;
- 76 inmates from California Rehabilitation Center to CSP Corcoran;
- 57 inmates from CSP Solano to California City Correctional Facility;
- 19 inmates from CSP Solano to Deuel Vocational Institute;
- 50 inmates from Central California Women's Facility to Female Community Reentry Facility; and
- 38 inmates from Correctional Institution for Women to Female Community Reentry Facility.

If the Receiver approves these transfers on April 20, then CDCR should be able to complete them within about two weeks. CDCR anticipates that once these transfers are completed, nearly all dorms should have sufficient space to implement eight-person cohorts in accordance with the Receiver's plan. But it is possible that as CDCR works through this process it will identify a few remaining transfers that might be needed to fully implement eight-person cohorts in every dorm, in which case CDCR will promptly seek the Receiver's approval and conduct any such transfers as soon as possible.

**2.  CDCR has begun to activate gyms for housing as needed.**

At this time, nineteen potential gymnasium sites have been identified. The State Fire Marshal, whose inspections are still underway, has approved occupancy at twelve gyms. The activation of gyms also requires that cots and lockers be moved into those locations for the inmates who will be housed there. CDCR has already acquired 600 cots and has ordered an additional 500 cots. And CDCR is in the process of surveying its need for additional lockers.

CDCR has already activated some approved gyms. To date, 108 inmates have been

moved into gyms at San Quentin, and 21 inmates have been moved into a gym at California Institution for Men (that number will likely be increased to 50 inmates this week).  CDCR anticipates that two gyms at CSP Solano will be activated this week and that 128 inmates will be housed in them.  CDCR has the ability and resources to activate more gyms, and will continue to do so as the need arises.

### 3. Appropriate physical distancing is being achieved in the dorms.

All institutions with dorms have been directed to determine how their dorms can be arranged to comply with the Receiver's eight-person-cohort plan, and to the extent their dorm populations allow it, those prisons have been directed to begin implementing the cohort plan.  A number of dorm locations have already completed implementing eight-person cohorts.  And rather than use the cohort model, a number of dorm locations were able to separate all inmates by at least six feet.

CDCR is in the process of surveying these efforts and has compiled some rough numbers concerning dorm areas that have achieved appropriate physical distancing. CDCR offers the following rough numbers to demonstrate that the process of ensuring appropriate physical distancing in the dorms is well underway.  When considering these numbers, it is important to note that the dorm locations vary greatly from institution to institution.  Some dorm areas house as few as ten inmates and others house well over 200 inmates.  To date, it appears that about 135 dorm areas have implemented eight-person cohorts and about 67 dorm areas have been able to separate all inmates by at least six feet. Additionally, CDCR anticipates that over the next week an additional 88 dorm areas will be able to implement eight-person cohorts, and eight additional dorm areas will be able to separate all inmates by at least six feet.  CDCR anticipates that within about the next three weeks, the remaining dorm areas (approximately 55) will achieve either eight-person cohorts or six-foot distancing for all inmates.

### B. Steps Taken at California Institution for Men and CSP Los Angeles County to contain the spread of COVID-19

#### 1. Status of positive COVID-19 cases and hospitalizations among the inmate population

As of April 18, 2020, at 5:30 p.m., a total of 115 inmates at CDCR's 35 institutions have tested positive for COVID-19. Out of those 110 inmates, 59 are housed at California Institution for Men (CIM) and 50 are housed at CSP Los Angeles County (LAC).[3] At CIM, the majority of the inmates who tested positive were previously housed in Dorm D10. The other inmates who tested positive were also housed in Facility D dorms. Similarly, all inmates who tested positive at LAC were housed in Facility D at that institution before testing positive.

As of April 19, 2020, seven inmates from CIM and one inmate from LAC were hospitalized for COVID-19-related symptoms.

#### 2. CIM's and LAC's continuing efforts to contain the spread of COVID-19

As described in prior briefings relating to Plaintiffs' emergency motions filed in the Three-Judge Panel and this case, to contain the spread of COVID-19, CDCR has been isolating inmates with COVID-19-related symptoms and quarantining inmates who have had contact with a COVID-19-positive individual.

##### a. Measures taken by CIM to contain the spread of COVID-19

In addition to the previously described measures, CIM has had a thorough and detailed plan in place to contain the spread of COVID-19 since the early stages of the COVID-19 pandemic. For example, during the second week in March, CIM's healthcare and custody leadership started mapping out a plan to ensure that CIM would have sufficient supplies and buildings available to house quarantined or isolated inmates. In addition, as soon as the first staff members and inmates tested positive, CIM immediately began its contact tracing investigations and placed inmates who had contact with COVID-

---

[3] In addition, as of April 18, 2020, two inmates at CEN, one inmate at CIW, one inmate at CMC, one inmate at NKSP, and one inmate at SATF have tested positive.

19 cases into quarantine.  Further, after receiving the first positive test from an inmate, CIM set up an outdoor tent clinic where patients with COVID-19-related symptoms could be evaluated without risking exposure to inmates receiving treatment for other issues.

In addition, CIM set up an Incident Command Post, which was staffed seven days a week, to monitor patient information, supplies, and staff resources to consistently manage the effects of the ongoing pandemic.  As part of the Incident Command Post, CIM conducts a daily call (except for weekends and holidays) with various healthcare and custody staff, including the Warden, the Associate Warden for health care, the Chief Executive Officer, the Chief Medical Executive, the Chief Nurse Executive, and various captains to discuss COVID-19-related topics.

All CIM inmates who display COVID-19-related symptoms are tested for COVID-19 and housed individually in cells while awaiting their test results.  If the tests return positive, the inmates are sent to a dorm where they will be housed with other inmates who tested positive.  If the test results are negative, the inmates do not go straight back into their old housing units.  Instead, as a matter of precaution, they are housed in a separate unit together with other inmates who tested negative and are monitored for COVID-19-related symptoms for 14 days before they return to their housing units.

Inmates who have had contact with a person infected with COVID-19 are quarantined and monitored together in dorms.  As of April 18, 2020, approximately 1,200 inmates at CIM are quarantined.  Nurses and physicians perform surveillance screenings of all inmates in isolation or on quarantine for COVID-19-related symptoms at least twice per day.

With respect to face coverings, all CIM inmates who are isolated or quarantined have received at least three cloth masks.  Inmates who tested positive are required to wear cloth masks at all times.  Healthcare staff who evaluate inmates are required to wear a cap, a face shield, and a N95 mask.  Inmates are required to wear their cloth masks during those evaluations. Custody staff who walk around the institution are also required to wear

surgical or cloth masks.  (For further details about face coverings, Defendants refer to heading D., *infra.*)

### b. Measures taken at LAC to contain the spread of COVID-19

Similar to CIM, LAC reacted quickly after the first inmate in Facility D tested positive for COVID-19.  Custody and health care immediately isolated the inmate and began working together to establish protocols and methods to keep all inmates and staff safe.  Further, LAC has set up an incident command center and reduced the staff footprint by increasing telework options with alternating onsite and telework schedules for primary care providers.

Staff members at LAC conduct additional rounds to ensure the safety and well-being of inmates who are placed on modified program.  Inmates with complaints of cough, fever or shortness of breath are tested for COVID-19.  In addition, inmates with respiratory symptoms or complaints such as sore throat, runny nose, sneezing, loss of smell, feeling feverish, or chest congestion are considered for COVID-19 testing as well.  Staff members conduct additional rounds to ensure the safety and well-being of inmates on modified program.  Further, cloth masks have been provided to all inmates at LAC and LAC is in the process of providing cloth masks to all staff members.

Also, to determine the prevalence and the manner of the spread of COVID-19 at LAC's housing unit D2 (where the majority of the inmates who tested positive were located previously), the prison commenced surveillance testing of all quarantined inmates who were asymptomatic last week.  According to California Correctional Health Care Services, as of April 18, out of 51 inmates who were tested, 21 were positive, 18 were negative, and 12 results were pending.  An additional 47 inmates still need to be tested.

### 3. Passing of released CIM inmate at a congregate living facility in Los Angeles County

On April 11, 2020, a 63-year old inmate who was released on parole (not an early release) from CIM on April 3, 2020, to a congregate living center in Los Angeles County, was found dead at the living center.  Prior to his release, the inmate was quarantined

because he had been in contact with a COVID-19 positive person. According to the California Correctional Health Care Services, the inmate did not have any symptoms upon release, and the Los Angeles County Public Health Department was notified of the inmate's release and of his quarantine status. He died at the living center of apparent respiratory failure and his post-mortem testing was positive for COVID-19. Los Angeles County is performing a contact investigation at the living center. The inmate had other serious medical conditions at the time of his death.

### 4. Passing of a current CIM inmate

On April 19, 2020, a 60-year old inmate from CIM passed away from what appear to be complications related to COVID-19. The exact cause of death has not yet been determined. The inmate was at an outside community hospital at the time of his death. He was sent to the hospital on April 16, 2020, from CIM's quarantined D10 dorm after he became hypoxemic with a fever.

### C. Updates on CALPIA's production and supply of hand sanitizer and masks, and new face covering policies

The California Prison Industry Authority (CALPIA) plans to ship 11,880 bottles of hand sanitizer next week. Starting in May, CALPIA plans to produce 50,000 32-ounce bottles of hand sanitizer per month, which will be shipped on a weekly basis.

In addition, CALPIA continues to produce 22,000 washable cloth barrier masks per day. The cloth masks are being distributed to all institutions for inmate and staff use. On April 10, 2020, CDCR issued a memorandum to notify all institutions that the cloth masks will be issued to all inmates, starting with three cloth masks per inmate for immediate distribution, with a later distribution of two additional cloth masks per inmate. The memorandum also noted that each facility needed to prepare for an increased demand for laundry services in light of the need to wash the masks regularly.

On April 15, 2020, California Correctional Health Care Services issued a memorandum that provided guidance on the use of the cloth masks. The memorandum

clarified that the cloth masks are not intended for direct patient-care scenarios. The memorandum advised that staff members who are working or performing duties on institutional grounds shall (at a minimum) wear a cloth face covering. It also stated that inmates shall use a cloth face covering within the institution during the following activities: any situation that requires movement outside of cell or while in a dorm setting; during interactions with other inmates (ex: yard time, canteen, dayroom); movement to and from health care appointments; and movement to and from medication administration areas. These requirements are effective as soon as each institution receives a supply of two face barriers/masks for each correctional staff member and each inmate.

DATED: April 20, 2020                         XAVIER BECERRA
                                              Attorney General of California



                                              By:      */s/ Damon McClain*
                                                   DAMON MCCLAIN
                                                   Supervising Deputy Attorney General
                                                   NASSTARAN RUHPARWAR
                                                   Deputy Attorney General
                                                   Attorneys for Defendants


DATED: April 20, 2020                         HANSON BRIDGETT LLP



                                              By:      */s/ Paul Mello*
                                                   PAUL B. MELLO
                                                   SAMANTHA D. WOLFF
                                                   Attorneys for Defendants

| | | |
|---|---|---|
| DATED:  April 20, 2020 | | PRISON LAW OFFICE |
| | By: | _/s/ Steven Fama_ |
| | | STEVEN FAMA |
| | | Attorneys for Plaintiffs |

CA2001CS0001
42157844.docx