| | |
|---|---|
| XAVIER BECERRA | PRISON LAW OFFICE |
| Attorney General of California | DONALD SPECTER (83925) |
| DAMON MCCLAIN (209508) | STEVEN FAMA (99641) |
| Supervising Deputy Attorney General | ALISON HARDY (135966) |
| NASSTARAN RUHPARWAR (263293) | SARA NORMAN (189536) |
| Deputy Attorney General | RANA ANABTAWI (267073) |
| 455 Golden Gate Avenue, Suite 11000 | SOPHIE HART (321663) |
| San Francisco, CA 94102-7004 | 1917 Fifth Street |
| Telephone: (415) 703-5500 | Berkeley, California 94710 |
| Facsimile: (415) 703-3035 | Telephone: (510) 280-2621 |
| Damon.McClain@doj.ca.gov | Fax: (510) 280-2704 |
| | dspecter@prisonlaw.com |

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:   (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., | CASE NO. 01-1351 JST |
| Plaintiffs, | **JOINT CASE MANAGEMENT CONFERENCE STATEMENT** |
| v. | Date: April 29, 2020 |
| GAVIN NEWSOM, et al., | Time: 2:00 p.m. |
| Defendants. | Crtrm.: 6, 2nd Floor |
| | Judge: Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the April 29, 2020 Case Management Conference.

**Plaintiffs' Statement**

As of just before 8:00 a.m. this morning, 194 patients statewide have tested positive for COVID-19: 99 at the California Institution for Men (CIM), 87 at California State Prison – Los Angeles County (LAC), three at California Men's Colony, two at Centinela State Prison, and one each at the California Institution for Women, North Kern State Prison, and the Substance Abuse Treatment Facility and State Prison. Most of CIM's confirmed cases have resided at Facility D, but some patients recently diagnosed appear to have resided at Facility C, located approximately a mile away, which possibly represents a new cluster of cases. All of LAC's patients have resided at that prison's Facility D; there currently are four separate units there with multiple patients. There has been one death, and currently 13 patients statewide, including 10 from CIM, are at outside hospitals.

### A. Defendants' implementation of the Receiver's directive to facilitate distancing in CDCR dorms and other congregate living settings.

On April 10, 2020, Receiver Clark Kelso directed CDCR to facilitate distancing in dorm settings by "creating 8-person housing cohorts. Each cohort is to be separated from the others by a distance of at least six feet in all directions." ECF No. 3274, ¶ 20, and 3276-6 at 2. Defendants developed a plan to implement the directive and submitted it to the Receiver on April 17, 2020. ECF No. 3294 at 11. After the Receiver requested additional information, Defendants submitted a modified proposal on April 20 (*id.*), and Defendants represented that the Receiver approved the plan at the Case Management Conference that same day.

Plaintiffs have indicated that, if properly executed, the Receiver's directive might be sufficient to permit class members to maintain adequate physical distancing from each other during the COVID-19 pandemic. ECF 3291 at 11. Thus, to monitor and assess the new program, Plaintiffs requested the activation schedule for the plan and the final date by which Defendants intended to complete the transition for each dormitory. We further

requested photos or video-recorded site visits of each of the newly configured dormitories showing staff measuring the distance between cohorts and documenting class members' access to programs, bathrooms and showers, medical/mental health services and meals. We also scheduled a phone conference with the Receiver's representatives.

As explained below, now that details of the dorm cohort project are known, it is clear that the Defendants' and Receiver's current cohorting plan is poorly conceived and will not result in the physical distancing necessary to protect medically vulnerable people living in the dorms and will fail to significantly slow the spread of the virus. Quite simply, the new housing design fails to protect *Plata* class members from a very significant risk of harm from COVID-19.

Accordingly, Plaintiffs hereby request that the Receiver exercise his authority to develop and implement necessary restrictions to ensure that people housed in state prisons are not exposed to an unreasonable risk of harm, consistent with the sound principles of public health and evidence-based medicine. The Receiver's authority to enforce such a plan derives from the February 14, 2006 Order Appointing the Receiver stating that he shall "exercise all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation and financing of the California prison medical health care system." Order at 4 (Dkt. No. 473). Additionally, this Court recognized the Receiver's power to impose housing restrictions related to health care risk in the Valley Fever Exclusion Order. ECF No. 2661 at 24. Alternatively, Plaintiffs request that the Court direct the Receiver to so exercise his authority.

1.  Defendants' plan

On April 20, Defendants provided Plaintiffs a 45-page "Dorm Social Distancing" document that purported to list the dorms in the 35 state prisons. This document included the "Temporary COVID Capacity" for each dorm, whether it would be reconfigured into cohorts, and when that would happen. After Plaintiffs pointed out that a number of dorms, including those housing some of the most vulnerable patients, appeared to be not included,

Defendants produced a revised document, asserting that the omissions had been inadvertent.

The original document also stated that certain dorms at CIM, housing some of the highest percentages of medically vulnerable patients in CDCR, would <u>not</u> be included in the cohorting plan. When asked why they did not intend to create cohorts in the dorms on CIM's Facility A, Defendants responded:

> Inmates on Facility A are 80-90% high risk population, elderly (65 or older), multiple comorbidity and at the advice of Medical we do not want to move these patients at all but rather "shelter in place". As of April 22, 2020, new direction has been received from CCHCS to create social distancing with these dorms. CIM is developing their plan.

Plaintiffs have asked Defendants for information about this "new direction" received from CCHCS regarding social distancing in these dorms.[1] We have not yet received that information, nor have we received information regarding when this will be done.

        2.    Defendants' cohorting plan is not implemented in a way that facilitates physical distancing

"Cohorting to contain infectious disease outbreak is long-practiced, evidence-based, and a hallmark of [Centers for Disease Control and Prevention] infection control guidelines for residential settings." Brie Williams, Cyrus Ahalt, David Sears, & Stefano M. Bertozzi, *Limiting COVID-19 Transmission and Mitigating the Adverse Consequences of a COVID-19 Outbreak in Correctional Settings: RELEASE · COHORT · TEST* at 3 (Apr. 26, 2020), https://amend.us/wp-content/uploads/2020/04/Cohorting-Guidance.Amend_.UCB_.pdf. It is "the community standard for reducing risk of transmission in most U.S. jurisdictions." *Id.*

However, Defendants' implementation of the Receiver's dorm social distancing

---

[1] Plaintiffs first asked the Receiver about the advice "Medical" had given to CDCR, and what "new direction" was then provided. The Receiver's attorney replied that "[t]he intent was to provide clarification to the operationalization of the 'shelter in place' concept" but otherwise did not provide specific information about what was said, and when. The attorney instead stated the Receiver "defers to CDCR regarding its choice of words . . . ." This lack of clarity hampers Plaintiffs' understanding and our ability to monitor.

directive does not protect the people who live and work in the prisons from a serious risk of harm, and essentially only results in "cohorting" during sleeping hours. It fails to incorporate critical components of a cohorting practice, and leaves patients—including those most vulnerable to severe illness and death—at substantial risk of being infected with COVID-19. On April 23rd, Connie Gipson, speaking on behalf of the Defendants, advised Plaintiffs that Defendants' "cohorting" of people refers only to bed placements. People in each cohort will move freely within the dorms, using the same day room, toilets, sinks, showers and other common areas as those in other, supposedly separate, cohorts. There do not appear to be set times for each cohort to separately use these shared facilities. In essence, their "cohorting" is solely for their sleeping hours. Moreover, the staff assigned to these cohorted dorms are not assigned to follow certain cohorts, but are instead interacting with all people in the dorm. The free movement of staff and incarcerated people within the dorms means that, once it is introduced into a living space, the virus will continue to spread.

Plaintiffs have discussed Defendants' plan with nationally recognized correctional health expert Marc Stern. He asserts that having people sleep six feet from each other will have little impact on the spread of the virus in a congregate living facility if, when not sleeping, the people are sharing common areas such as benches, tables, bathrooms and showers, and are standing in close proximity to each other while in line for medications or health care.

According to Dr. Stern and UCSF, using cohorts as a strategy for reducing the spread of the virus requires that other essential elements be implemented:

- "Cohorts should be separated from each other by as much space as recent studies suggest is needed to minimize the spread of infection, this should be updated as new information becomes available." *Id.* Absolute social distancing between cohorts must be maintained.

- All shared-use spaces must be thoroughly clean and disinfected between cohorts. Ideally, the cohorts should use separate bathrooms. *Id.*

- Specific security staff should be assigned to each cohort. *Id.*

-5-     Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

Defendants' plan does not contain any of these features in policy or practice. Therefore, Plaintiffs request that the Receiver work closely with CDCR to ensure that the cohorting plan is implemented in a way that will achieve the goal that it was designed for—a reduction in the transmission of the virus.

### B.  Medical care and other matters related to COVID-19.

The changes to CCHCS medical care and to Plaintiffs' monitoring caused by the COVID-19 pandemic continue, as described in the April 13, 2020 Case Management Conference Statement. Plaintiffs continue to monitor medical and public health efforts related to COVID-19 in the state prisons.

As part of Plaintiffs' monitoring, the Receiver and his staff have informally and helpfully responded to questions and concerns related to COVID-19 medical and public health concerns. Also helpful have been the recent weekly phone conferences with CCHCS's Chief Medical Executive; last week, CDCR executives were available as well, which was appreciated given that certain aspects of COVID-19 care directly involve custody staff. This week's call is scheduled for April 30, 2020. Among the key questions and concerns Plaintiffs hope to discuss are:

#### 1. Housing of Patients during Medical Isolation

CCHCS during last week's call acknowledged that at LAC Facility D, in a case identified and brought to their attention by Plaintiffs, a patient without symptoms was housed in a cell with a patient who was placed on medical isolation for having symptoms of, then testing positive for, COVID-19. The first patient then developed symptoms and tested positive. CCHCS indicated that custody staff made the housing decision. In response to this disturbing case, a CDCR headquarters executive said that a LAC associate warden had been given verbal instruction regarding the housing of medical isolation and healthy patients.

This CCHCS/CDCR response is inadequate. CCHCS's clinical guidelines for its health care providers mandate that healthy patients not be housed with those suspected of

or diagnosed with COVID-19. However, that mandate is not particularly prominent in those guidelines. More important, the mandate, to Plaintiffs' knowledge, is not set forth in any directive to custody staff, who make cell-housing decisions. Plaintiffs have asked CCHCS and CDCR to issue a joint statewide memo to all Wardens regarding not housing apparently healthy people with those awaiting test results, or who have tested positive for, COVID-19. In this way, these requirements regarding the housing of medical isolation patients will be clearly stated for all, particularly custody staff, to know, and staff can be more readily held accountable if the mandates are not followed. This is necessary to minimize recurrences of the very unfortunate LAC double-celling described above.

Other questions and concerns to be discussed include the availability and use of COVID-19 testing, including rapid testing, public health lessons from the current CIM and LAC outbreaks, the availability of personal protective equipment, and cohorting approximately 70 COVID-19 patients in a single dorm at CIM, Facility D.

**DEFENDANTS' STATEMENT**

Defendants' statement describes the additional measures CDCR has taken since the last case management conference on April 20, 2020. In addition, Defendants' statement provides a summary of additional information and documents they have produced to Plaintiffs since the last conference.

### A. CDCR Has Taken Additional Steps to Improve Physical Distancing in Its Institutions.

As set forth below, Defendants have continued implementing measures and inmate transfers to achieve physical distancing and eight-person cohorts in CDCR's dorms. These additional efforts will nearly complete the eight-person-cohort plan that the Receiver approved.

///

///

### 1. The second round of dorm transfers are almost complete.

CDCR has continued the transfer of inmates housed in dorms to achieve greater physical distancing.  As of April 29, 2020, dorm transfers out of the below two facilities remain outstanding:

- 50 inmates from the Substance Abuse Treatment Facility are scheduled to be transferred to CSP-Corcoran on April 29, 2020;
- The transfer of approximately 143 inmates out of Facility A-dorm at the California Institution for Men has not occurred due to CCHCS's instructions to not transfer any inmates out of that dorm; and

### 2. California Institution for Men (CIM) set up six tents to house 60 inmates on D-yard.

To create further space in its dorms, CIM set up six tents on D-yard that now house a total of 60 inmates (ten inmates per tent).  The tents are climate controlled with air-conditioning and heat.  In addition, CIM set up nine portable toilets, sixteen sinks, and eleven portable showers for the inmates' use.  Tents are being used because transfers into or out of CIM are prohibited at this time.

### 3. Appropriate physical distancing is being achieved in the dorms.

To date, about 280 dorm areas (increased from 135 since April 20, 2020) have implemented eight-person cohorts and about 72 dorm areas (increased from 67 since April 20, 2020) have been able to separate all inmates by at least six feet.  Further, CDCR anticipates that over the next week an additional eleven dorm areas will implement eight-person cohorts.  CDCR anticipates that within about the next two weeks, the remaining dorm areas (approximately eleven) will achieve either eight-person cohorts or six-foot distancing for all inmates.

### B. Miscellaneous Other Updates

In collaboration with the Governor's Office of Emergency Services and Project Hope, CDCR has started to work on a project that will coordinate the provision of hotel

rooms for inmates who are released on parole if the inmates were in quarantine or in isolation before their release and do not have a place to go to complete their period of quarantine or isolation. In addition, CDCR's Division of Adult Parole Operations is securing housing for inmates released to parole.

Also, on April 11, 2020, CCHCS issued a memorandum notifying CCHCS and CDCR staff that they may be eligible for the COVID-19 Healthcare Worker Hotel Program. The program provides accommodations to healthcare workers and other state employees who must self-isolate or quarantine. Through this program, these workers can keep their families safe and free from risk of possible infection.

### C. Information and Documents CDCR produced to Plaintiffs since April 20, 2020

On April 23, 2020, the Receiver coordinated a call to discuss questions raised by the Prison Law Office during the last case management conference. During the call, Connie Gipson, the Director of CDCR's Division of Adult Institutions, answered questions about the eight-person cohorts and the status of dorm transfers. Following the call, CDCR provided information and documents that the Prison Law Office requested, including information on how many inmates are housed in congregate living units at CHCF's Facility C, and information about CIM's quarantined inmates' access to showers, yard, and telephones. The Prison Law Office promptly sent various follow-up questions and requests (including an email with approximately twelve requests), which Defendants will respond in the near future.

In addition, on April 20, 2020 and April 24, 2020, CDCR produced a number of documents that the Prison Law Office requested during the last case management conference. Those documents include, but are not limited to, various documents pertaining to the transfer of inmates out of dorms, a memorandum that sets forth the criteria CDCR used to identify which inmates would be transferred out of the dorms, a diagram pertaining to social distancing in dorms, documents pertaining to the set-up and

status of the creation of eight-person cohorts in CDCR's statewide institutions, and photos and diagrams that depict the set-up of the eight-person cohorts in dorms at ten facilities. CDCR has also facilitated calls for the Prison Law Office to speak with their clients at CIM for the last two weeks.

DATED:  April 29, 2020            PRISON LAW OFFICE


By:      */s/ Alison Hardy*
         ALISON HARDY
         Attorney for Plaintiffs


DATED:  April 29, 2020            XAVIER BECERRA
                                  Attorney General of California



By:      */s/ Damon McClain*
         DAMON MCCLAIN
         Supervising Deputy Attorney General
         NASSTARAN RUHPARWAR
         Deputy Attorney General
         Attorneys for Defendants

DATED:  April 29, 2020            HANSON BRIDGETT LLP



By:      */s/ Paul Mello*
         PAUL B. MELLO
         SAMANTHA D. WOLFF
         Attorneys for Defendants