PAGES 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE JON S. TIGAR, JUDGE**

| | |
|---|---|
| MARCIANO PLATA, ET AL., PLAINTIFFS, | NO. C-01-1351 JST |
| VS. | WEDNESDAY, APRIL 29, 2020 |
| GAVIN NEWSOME, ET AL., DEFENDANTS. | OAKLAND, CALIFORNIA<br>FURTHER CASE MANAGEMENT CONFERENCE |

**REPORTER'S TRANSCRIPT OF TELEPHONIC PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFFS:**
PRISON LAW OFFICE
1917 FIFTH STREET
BERKELEY, CALIFORNIA 94710
BY: DONALD H. SPECTER, ESQUIRE
STEVEN FAMA, ESQUIRE
ALISON HARDY, ESQUIRE

**FOR DEFENDANTS:**
HANSON, BRIDGETT LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
BY: PAUL B. MELLO, ESQUIRE
SAMANTHA WOLFF, ESQUIRE

(APPEARANCES CONTINUED)

**REPORTED BY:**
DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
OFFICIAL COURT REPORTER

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

**FOR DEFENDANTS:** DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
455 GOLDEN GATE AVENUE, STE. 11000
SAN FRANCISCO, CALIFORNIA 94102
BY: DAMON G. MCCLAIN, DEPUTY A.G.

**FOR INTERVENOR CCPOA:** MESSING ADAM & JASMINE, LLP
235 MONTGOMERY STREET, STE. 828
SAN FRANCISCO, CALIFORNIA 94104
BY: GREGG M. ADAM, ESQUIRE

CALIFORNIA CORRECTIONAL PEACE OFFICERS ASSOCIATION
755 RIVERPOINT DRIVE STE. 200
SACRAMENTO, CALIFORNIA 95605
BY: DAVID A. SANDERS, ESQUIRE

**FOR RECEIVER CLARK KELSO:** FUTTERMAN DUPREE DODD CROLEY MAIER
601 MONTGOMERY STREET, STE. 333
SAN FRANCISCO, CALIFORNIA 94111
BY: MARTIN H. DODD, ESQUIRE

**ALSO PRESENT:** CLARK KELSO, RECEIVER

WEDNESDAY, APRIL 29, 2020 2:00 P.M.

T E L E P H O N I C P R O C E E D I N G S

OOO

**THE COURT:** MS. LEE, THIS IS JUDGE TIGAR. I'M HAPPY TO PROCEED WHENEVER YOU'RE READY IF THE PARTIES ARE READY.

**THE CLERK:** YES, SIR.

YOUR HONOR, NOW CALLING CIVIL MATTER 01-1351 MARCIANO PLATA, ET AL. V. GAVIN NEWSOM, ET AL.

IF COUNSEL COULD PLEASE IDENTIFY THEMSELVES FOR THE RECORD, STARTING WITH PLAINTIFFS' COUNSEL.

**MR. SPECTER:** THANK YOU. GOOD AFTERNOON. THIS IS DON SPECTER FROM THE PRISON LAW OFFICE FOR THE PLAINTIFFS.

**MR. FAMA:** STEVEN FAMA ALSO FOR THE PLAINTIFFS.

**MS. HARDY:** ALISON HARDY ALSO FOR THE PLAINTIFFS.

**MR. MELLO:** GOOD AFTERNOON. THIS IS PAUL MELLO OF HANSON, BRIDGETT ON BEHALF OF DEFENDANTS.

**MS. WOLFF:** GOOD AFTERNOON, YOUR HONOR. THIS IS SAMANTHA WOLFF ALSO FROM HANSON, BRIDGETT FOR DEFENDANTS.

**MR. MCCLAIN:** GOOD AFTERNOON. THIS IS DAMON MCCLAIN WITH THE ATTORNEY GENERAL'S OFFICE FOR THE DEFENDANTS.

**MR. DODD:** GOOD AFTERNOON, YOUR HONOR. THIS IS MARTIN DODD FOR THE RECEIVER.

**MR. KELSO:** GOOD AFTERNOON. THIS IS THE RECEIVER.

**MR. SANDERS:** GOOD AFTERNOON, YOUR HONOR. THIS IS DAVID SANDERS FOR CCPOA, INTERVENOR.

**MR. ADAM:** AND GREG ADAM ALSO ON FOR CCPOA, YOUR HONOR. THANK YOU.

**THE COURT:** ALL RIGHT. VERY GOOD. EVERYONE WHO SHOWS UP AS A GUEST ON THE ZOOM PARTICIPANT PANEL HAS NOW STATED THEIR APPEARANCE, SO I THINK WE ARE READY TO GO.

JUST A COUPLE OF PRELIMINARY COMMENTS, AND THEN I HAVE SOME QUESTIONS FOR THE STATE, AND THEN I WILL HEAR FROM THE PARTIES.

THE PRELIMINARY COMMENT IS, I STILL THINK -- OR I THINK IT IS STILL APPROPRIATE TO HAVE THESE CONFERENCES ON A WEEKLY BASIS, IN PART TO MAKE SURE THAT THE INFORMATION FLOW BETWEEN THE PARTIES CONTINUES TO BE GOOD AND IN PART SO I CAN RECEIVE THE INFORMATION. I GET VERY USEFUL, VALUABLE INFORMATION FROM THE CASE MANAGEMENT STATEMENTS. SO JUST KEEPING ME UPDATED IS ANOTHER FUNCTION OF THESE CONFERENCES.

BUT, HAVING SAID THAT, WHEN THE INFORMATION FLOW IS GOOD, THEN NOT ALL OF THESE CASE MANAGEMENT CONFERENCES ARE GOING TO BE LENGTHY. SO I JUST WANTED TO START BY ACKNOWLEDGING THAT.

IT DOES SEEM FROM THE STATEMENT THAT THE INFORMATION EXCHANGE AT THE MOMENT IS GOING WELL AND THERE WAS SOME INFORMATION IN THIS STATEMENT THAT IT WAS USEFUL FOR ME TO GET.

THE QUESTIONS I HAVE FOR THE STATE REVOLVE AROUND WHAT I WOULD DESCRIBE AS SOME GAPS IN THE STATE'S RESPONSE TO QUESTIONS RAISED BY THE PLAINTIFFS IN THE PLAINTIFFS' PORTION

OF THE STATEMENT AND TO QUESTIONS THAT ARISE NATURALLY FROM THE EXISTENCE OF THOSE GAPS.

FOR EXAMPLE, THE PLAINTIFFS POINT OUT -- AND I HAD NOT EITHER FOCUSED ON THIS OR REALIZED IT -- I THINK I REALLY HAD NOT GIVEN IT THOUGHT -- THEY POINT OUT THAT WHILE THE BEDS OF COHORT NUMBERS WITHIN A DORMITORY SETTING ARE INTENDED TO BE, AND FOR THE MOST PART ARE AND SHORTLY WILL ENTIRELY BE, HOPEFULLY, 6 FEET APART, THAT INMATES WITHIN THOSE DORMITORIES MIGHT NOT BE SOCIALLY DISTANCED WHEN THEY ARE NOT SLEEPING. IN OTHER WORDS, THAT THE 6-FOOT DISTANCING POLICY THAT WE HAVE BEEN DISCUSSING MIGHT PERTAIN ONLY TO THE PLACEMENT OF INMATE BEDS IN THE DORMITORY SETTING.

NOW, THAT -- I WAS JUST SURPRISED THAT THERE WASN'T SOME KIND OF RESPONSE ON THAT QUESTION FROM THE STATE, AND I'LL GET TO THAT IN JUST A SECOND. I NOTE, LOOKING BACK AT THE OPPOSITION THAT THE DEFENDANTS FILED TO THE PLAINTIFFS' MOTION FOR EMERGENCY RELEASE, THAT -- AND THEY MIGHT BE ACCURATELY QUOTING MR. KELSO'S GUIDELINES OR THEY ARE SUMMARIZING, I AM NOT SURE, BUT ON PAGE 10, WHICH IS ECF PAGE 14, THEY SAY, EITHER SUMMARIZING OR QUOTING FROM THOSE GUIDELINES, "CDCR SHOULD CREATE EIGHT-PERSON HOUSING COHORTS FOR INMATES HOUSED IN DORM SETTINGS WITH EACH COHORT SEPARATE FROM THE OTHERS BY A DISTANCE OF AT LEAST 6 FEET IN ALL DIRECTIONS."

THAT'S JUST WHAT IT SAYS. AND MAYBE -- I THINK THAT EXPLANATION MIGHT HAVE BEEN IMPROVED BY ADDITIONAL DETAIL THAT

MADE IT CLEAR THAT, ASSUMING THIS IS CORRECT, THAT CDCR WAS GOING TO BE ATTEMPTING TO ACHIEVE THAT DISTANCING ONLY WITH REGARD TO THE PLACEMENT OF INMATE BEDS.

SIMILARLY, ON THE FOLLOWING PAGE OF THE SAME BRIEF, THERE IS -- IT'S RECITED THERE, AND THEN THERE'S A CITE TO THE DECLARATION OF CONNIE GIBSON, WHO IS THE DIRECTOR OF ADULT FACILITIES FOR CDCR, "THE RECEIVER'S APRIL 10 MEMORANDUM ALSO SUGGESTED CREATING EIGHT-PERSON HOUSING COHORTS IN DORMS TO ACHIEVE GREATER SOCIAL DISTANCING. CDCR IS EVALUATING THE FEASIBILITY OF EIGHT-PERSON PODS IN THE DORMS. AS THE RECEIVER'S MEMORANDUM NOTED, THESE SOCIAL DISTANCING COHORTS WOULD BE ANALOGOUS TO FAMILY UNITS IN COMMUNITIES."

WELL, WITHOUT BELABORING THE POINT, I WILL SAY THAT I THINK FAMILY UNITS CALLS TO ONE'S MIND A CERTAIN PICTURE ABOUT HOW MUCH DISTANCE WOULD BE CREATED BETWEEN INMATES WHILE THEY ARE THERE, AND NOT SOLELY WHEN THEY'RE SLEEPING.

NOW, I'M NOT -- I'M NOT CRITICIZING THE STATE FOR THE WAY IT WROTE ITS BRIEF. THAT'S -- THAT IS SOMETHING THAT HAPPENED IN THE PAST AND THIS ISSUE HADN'T COME UP. WHAT I'M SAYING IS, THAT I THINK WHEN THE PLAINTIFFS RAISED THIS ISSUE IN THE CASE MANAGEMENT STATEMENT, IT WASN'T UNREASONABLE FOR THEM TO SAY -- TO ASK FOR MORE INFORMATION ABOUT THAT TOPIC.

I ALSO WANT TO BE CLEAR THAT I'M, BY RAISING THIS, I AM NOT EXPLICITLY OR IMPLICITLY HOLDING ANYTHING. I'M NOT DRAWING ANY LEGAL CONCLUSION ABOUT THIS TOPIC. I'M NOT

HOLDING AT A PARTICULAR DISTANCE BETWEEN INMATES IS REQUIRED. I'M NOT, AT THIS POINT, MAKING ANY CRITICISM OF ANY EFFORTS. I'M JUST SAYING THAT I THINK THAT I NEED MORE INFORMATION ABOUT WHAT IS GOING ON IN THE PRISONS THAN I HAVE, AND SO I HAVE THE FOLLOWING QUESTIONS:

MR. MELLO, TO THE EXTENT YOU KNOW THE ANSWERS TO ANY OF THESE QUESTIONS NOW, I WOULD LIKE TO GET THE INFORMATION NOW. IF YOU DON'T KNOW, YOU SHOULD SAY THAT, AND THEN WE'LL FIGURE OUT WHEN I CAN GET THE INFORMATION.

FIRST, I WOULD LIKE TO KNOW -- I THINK I HAVE PRETTY GOOD INFORMATION FROM THE STATEMENT ABOUT WHAT THE PLACEMENT OF BEDS IS AND HOW MANY DORMS CDCR HAS BEEN ABLE TO ACHIEVE, MR. KELSO'S GUIDELINES, AND WHEN THE REMAINING DORMITORIES WILL COME INTO COMPLIANCE WITH THE GUIDELINES. I HAVE THAT.

BUT I WOULD LIKE TO KNOW WHAT DISTANCE -- WHAT WE KNOW, IF ANYTHING, ABOUT THE EXTENT OF DISTANCING OR LACK OF DISTANCING AMONG DORMITORY RESIDENTS WHEN THEY ARE AWAKE. AND IF THAT IS DIFFERENT IN DIFFERENT PARTS OF THE HOUSING, I WOULD LIKE TO KNOW THAT.

IF INMATES ARE USING A DAY ROOM, FOR EXAMPLE, AND THAT IS A CHALLENGING ENVIRONMENT -- I'M NOT SAYING THAT THERE ARE ANY PROBLEMS IN THE DAY ROOM -- BUT IF -- IF THE CHALLENGES ARE DIFFERENT THERE THAN THEY ARE WHILE COHORTS FROM THE DORMITORY ARE GOING INTO THE DINING HALL, I JUST NEED TO KNOW THAT. I WOULD LIKE TO HAVE A PICTURE OF WHAT THE SOCIAL DISTANCING

PICTURE IS FOR DORMITORY-HOUSED INMATES WHEN THEY ARE NOT SLEEPING.

ALSO, WHAT -- I GUESS PART AND PARCEL OF THAT IS NOT JUST WHAT IS HAPPENING WITH THE INMATES, BUT ALSO WHAT STEPS IS CDCR TAKING TO ACHIEVE SOCIAL DISTANCING FOR THOSE INMATES?

I NOTE THAT MS. GIBSON WROTE A MEMORANDUM ON APRIL 7, 2020, AND I DON'T HONESTLY KNOW, THIS MAY HAVE BEEN ATTACHED TO SOMEONE'S BRIEF. I RECEIVE THESE MATERIALS IN MY CAPACITY AS THE JUDGE ON THIS CASE, AND I AM IN ONGOING COMMUNICATION WITH THE RECEIVER'S OFFICE AND THAT SORT OF THING. SO I THINK YOU PROBABLY ALL HAVE THIS MEMORANDUM. I AM JUST NOT ABLE TO PROVIDE A CITATION TO IT ON THE DOCKET.

BUT IT IS DATED APRIL 7, 2020, AND IT IS ENTITLED "REVISED COVID-19 MANDATORY 14-DAY MODIFIED PROGRAM." AND ONE OF THE THINGS THAT MS. GIBSON SAYS IN THE MEMORANDUM IS THAT, EFFECTIVE WEDNESDAY, APRIL 8, 2020, ALL INSTITUTIONS WILL IMPLEMENT A MANDATORY 14-DAY MODIFIED PROGRAM. NOW, PARENTHETICALLY, THE 14 DAYS HAS EXPIRED SO I DON'T KNOW WHETHER THIS PROGRAM IS STILL IN EFFECT.

BUT AT THE TOP OF PAGE 2 OF HER MEMORANDUM SHE SAYS, RECREATION: ONE HOUSING UNIT/DORM AT A TIME. OBVIOUSLY, WITHIN THE SAME DORMITORY, IF EVERYONE IS DOING RECREATION AT THE SAME TIME, WE ARE NOT ACHIEVING SOCIAL DISTANCING.

AND ON THAT POINT, JUST TO REITERATE, I'M NOT STATING AT THIS TIME WHAT THE REQUIREMENT IS. I'M JUST NOTING THAT

EVERYBODY IN THIS CASE HAS ACKNOWLEDGED THE DESIRABILITY OF ACHIEVING 6-FOOT DISTANCING WHERE IT'S FEASIBLE. OBVIOUSLY THE CENTERS FOR DISEASE CONTROL HAVE SAID IN THEIR GUIDANCE ON JAILS AND PRISONS, THAT 6-FOOT DISTANCING MIGHT NOT ALWAYS BE POSSIBLE.

I'M NOT DRAWING ANY CONCLUSIONS ON THAT TOPIC RIGHT NOW. BUT I THINK, IF WE ARE GOING TO ASK OURSELVES HOW WELL WE ARE DOING, IF WE ALL AGREE THAT 6 FEET DISTANCING IS THE GOAL, IS THE GOLD STANDARD TO BE ACHIEVED, THEN WE NEED TO KNOW HOW CLOSE TO THAT GOAL WE ARE GETTING, AND ASSURE OURSELVES THAT WE ARE TAKING THE STEPS WE CAN TAKE TO GET THERE. AND THEN WE CAN LOOK AT THE DELTA, IF THERE IS ONE, AND MAKE WHATEVER DETERMINATIONS WE NEED TO MAKE. WE ARE NOT AT THAT POINT YET, BUT WE NEED THE INFORMATION THAT WOULD ALLOW US TO GET TO THAT POINT.

AND THEN ON THE SAME TOPIC, AND THAT IS, THIS IS SOMETHING THAT THE PLAINTIFFS RAISE IN THEIR JOINT CASE MANAGEMENT STATEMENT, MY LAST QUESTION IS, WHAT STEPS, IF ANY, IS CDCR TAKING TO LIMIT THE NUMBER OF STAFF, MEDICAL AND CUSTODIAL ASSIGNED ON A COHORT BASIS OR A UNIT BASIS OR WHATEVER THE APPROPRIATE BASIS IS? AND THAT QUESTION GOES TO THE HEALTH OF STAFF JUST AS MUCH AS IT DOES TO THE HEALTH OF THE INMATES.

MY QUESTION MAY NOT BE CLEAR. SO LET ME TRY TO REFRAME IT.

WE KNOW THAT THE GUIDANCE THAT'S OUT THERE SAYS, IF YOU

CAN, YOU WANT THE SAME STAFF INTERACTING WITH THE SAME INMATES TO THE GREATEST EXTENT POSSIBLE WHILE THE COVID-19 OR CORONAVIRUS PANDEMIC IS OCCURRING. BECAUSE THE MORE YOU REDUCE THE NUMBER OF PEOPLE ANY PERSON INTERACTS WITH, THE MORE YOU'RE REDUCING THE RISK OF THOSE PERSONS IN THE TRANSMISSION OF THE VIRUS.

AND, AGAIN, JUST LIKE 6-FOOT SOCIAL DISTANCING, I RECOGNIZE THAT, FOR A VARIETY OF REASONS, YOU'RE NOT GOING TO PROBABLY JUST HAVE ONE CUSTODY STAFF FOR THE SAME PERSON FOR EVERY, YOU KNOW, INMATE ALL THE TIME. YOU ARE NOT GOING TO HAVE MAYBE THE SAME NURSE OR THE SAME INMATE ALL THE TIME. BUT THE QUESTION -- THAT'S NOT THE QUESTION. THE QUESTION IS, WHERE ARE WE ON THAT AND WHAT STEPS HAVE WE TAKEN TO GET -- UNLESS THERE'S A DISAGREEMENT ON THAT AS A GOAL, WHAT STEPS ARE WE TAKING TO ACHIEVE THAT GOAL?

SO, MR. MELLO, THESE ARE SOME QUESTIONS THAT I THOUGHT AROSE NATURALLY FROM THE CASE MANAGEMENT CONFERENCE, AND LET ME TURN THE MICROPHONE OVER TO YOU.

**MR. MELLO:** GOOD AFTERNOON, YOUR HONOR. PAUL MELLO OF HANSON BRIDGETT FOR DEFENDANTS.

BY WAY OF BACKGROUND, I JUST WANT TO MAKE SURE THE COURT UNDERSTANDS HOW THESE CASE MANAGEMENT CONFERENCE STATEMENTS ARE PREPARED.

SO THE PARTIES SHARE, EXCHANGE THEIR PORTIONS OF THE STATEMENT AT, I BELIEVE, AT AROUND 8:00 A.M. ON THE DAY OF THE

HEARING. SO WE DIDN'T SEE THEIR QUESTIONS, WHICH NATURALLY LEAD TO YOUR VERY GOOD QUESTIONS, UNTIL 8:00 A.M. THIS MORNING. AND SO THAT'S ONE OF THE REASONS WE MAY NOT HAVE RESPONDED TO THOSE QUESTIONS. SO, THAT'S NUMBER ONE.

AND THEN WITH RESPECT TO YOUR THREE QUESTIONS, BECAUSE I DON'T WANT TO GET IN FRONT OF MY CLIENTS ON THIS AND MAKE SURE THAT WE'RE COMMUNICATING WELL WITH THE RECEIVER, ESPECIALLY ON QUESTION NUMBER THREE, I WOULD PREFER TO RESPOND TO THOSE QUESTIONS IN WRITING SO THAT WE CAN PROVIDE COMPLETE INFORMATION TO THE COURT.

I THINK THERE ARE SOME INFORMATIONAL PIECES THAT ARE WORTH NOTING, WHICH IS, IN TERMS OF -- WELL, AGAIN, I DON'T WANT TO SPEAK WHEN I KNOW AN ANECDOTE ABOUT A PARTICULAR INSTITUTION OR PARTICULAR YARD WHEN WE CAN PROVIDE A MORE COMPLETE ANSWER TO THESE THREE FAIR QUESTIONS, YOUR HONOR.

**THE COURT:** OKAY. THAT'S REASONABLE. I ASKED -- I MEAN THE QUESTIONS THAT I ASKED WOULD REQUIRE THE PERSON ANSWERING THEM TO HAVE A FAIR AMOUNT OF SUBSTANTIVE INFORMATION AT HIS OR HER FINGERTIPS.

I WOULD LIKE CDCR TO FILE A DOCUMENT FRIDAY -- BY FRIDAY AT 5:00 THAT ANSWERS THOSE QUESTIONS TO THE EXTENT POSSIBLE WITHIN THE KNOWLEDGE OF CDCR. AND I KNOW YOU WILL MAKE EVERY EFFORT TO HAVE THAT INFORMATION BE AS COMPLETE AS IT CAN, BUT WHATEVER THE STATE OF THE INFORMATION IS, IT NEEDS TO BE FILED BY FRIDAY AT 5:00. IF YOU ACQUIRE MORE INFORMATION LATER ON

THESE TOPICS, THEN THAT CAN BE PROVIDED LATER.

I WOULD LIKE A CHANCE TO JUST READ THAT STUFF OVER THE WEEKEND AND JUST KIND OF SEE WHERE WE ARE.

**MR. MELLO:** WILL DO, YOUR HONOR.

**THE COURT:** ANYWAY, THOSE ARE THE QUESTIONS I HAD FOR THE PARTIES.

MR. SPECTER, WOULD YOU LIKE TO MAKE ANY COMMENTS DURING THIS CASE MANAGEMENT CONFERENCE?

**MR. SPECTER:** THANK YOU, YOUR HONOR.

THE -- JUST FOR A LITTLE BACKGROUND INFORMATION, THE MATERIAL INFORMATION THAT WE SUBMITTED IN THE JOINT CASE MANAGEMENT CONFERENCE STATEMENT WAS BASED ON PHONE CALLS WITH MR. MELLO, OTHER COUNSEL, THE RECEIVER'S OFFICE, AND MS. GIBSON.

SO WE -- I HOPE THERE'S NO DISAGREEMENT ABOUT THOSE FACTS BECAUSE THOSE WERE TAKEN FROM THE INFORMATION WE LEARNED FROM HER AND THE RECEIVER'S OFFICE. AND THERE WAS NO DISPUTE ON THESE. AND I THINK IT WAS STATED EXPLICITLY ON EITHER THIS CALL OR A CALL WE HAD IN THE *COLEMAN* CASE WHICH ACKNOWLEDGED THAT THE SEPARATION WAS ONLY FOR SLEEPING.

SO THAT'S WHY WE BROUGHT THIS MATTER TO YOUR ATTENTION. THE WAY IN WHICH THE RECEIVER'S PLAN HAS BEEN IMPLEMENTED BY THE CDCR IS NOT PRODUCTIVE, TO SAY THE LEAST. AND WE ALSO THINK THAT REGARDLESS OF THE INFORMATION THAT THE STATE IS GOING TO PROVIDE TO YOU ON FRIDAY BY 5:00 O'CLOCK, THAT THE

RECEIVER'S OFFICE SHOULD TAKE AN ACTIVE ROLE IN SUPERVISING OR AT LEAST HAVING SOME OVERSIGHT AUTHORITY OVER WHAT IS ACTUALLY HAPPENING IN THE... IN THE HOUSING UNITS THEMSELVES.

AS YOU PROBABLY KNOW, THIS PLAN WAS APPROVED BY MR. KELSO. WE HAVE NEVER SEEN EXACTLY WHAT THE PLAN WAS THAT WAS APPROVED BY MR. KELSO, BUT WHATEVER IT WAS, I'M NOT SURE THAT HE UNDERSTOOD THAT IT WAS GOING TO BE IMPLEMENTED IN THIS WAY. BUT IN ANY EVENT, IT SEEMS LIKE ONE THING THAT REALLY NEEDS TO HAPPEN IS THAT PUBLIC HEALTH -- DECISIONS ABOUT HOUSING SHOULD BE MADE ON A PUBLIC HEALTH BASIS RATHER THAN ON A PURELY CUSTODIAL BASIS LIKE THE CDCR IS DOING NOW.

SO I THINK THAT OVERSIGHT OR INVOLVEMENT IN THE PROCESS IS CRITICAL, ESPECIALLY SINCE THE NUMBERS, ESPECIALLY AT CIM, OF PEOPLE WHO ARE POSITIVE AND THE NUMBERS OF PEOPLE WHO ARE GOING TO THE HOSPITAL ARE RISING EVERY SINGLE DAY.

**THE COURT:** MR. SPECTER, WHEN YOU SAY THAT YOU THINK HOUSING -- YOU WANT HOUSING DECISIONS TO BE MADE ON A PUBLIC HEALTH BASIS, WHAT SPECIFICALLY ARE YOU REFERRING TO?

BECAUSE OBVIOUSLY THE DECISION TO IMPLEMENT DISTANCING WITHIN THE DORMS WAS MADE ON A PUBLIC HEALTH BASIS. YOU MUST BE REFERRING TO OTHER HOUSING DECISIONS. WHAT ARE THEY?

**MR. SPECTER:** WELL, ALL OF THE DECISIONS THAT YOU JUST TALKED ABOUT WITH MR. MELLO AND IN YOUR INTRODUCTORY STATEMENT.

I THINK I OVERSTATED SOMETHING. WHAT I BELIEVE THESE

HOUSING DECISIONS AND THE PROGRAM THAT THE PRISONERS ARE ACTUALLY USING AND HOW MUCH THEY MIX SHOULD BE MADE ON A DUAL BASIS, A CUSTODY BASIS AND A PUBLIC HEALTH BASIS. THEY SHOULD BE JOINT DECISIONS.

BUT THE RECEIVER'S OFFICE, IN MY OPINION, IS RESPONSIBLE FOR ENSURING THAT THE PHYSICAL DISTANCING REQUIREMENTS THAT THE CDCR IS USING TO HOUSE PEOPLE ARE, IN A PRACTICAL WAY, GOING TO REDUCE THE RISK OF TRANSMISSION, WHICH WE DON'T THINK IS HAPPENING AT THIS POINT BECAUSE OF ALL THE FACTORS YOU'VE IDENTIFIED AND WE IDENTIFIED IN OUR STATEMENT.

**THE COURT:** OKAY. THANK YOU.

ANYTHING -- ARE THERE -- I DIDN'T SEE IN THE STATEMENT, OTHER THAN THESE ISSUES, ANYTHING THAT REQUIRED DISCUSSION AT THE CONFERENCE, ALTHOUGH I WAS GLAD TO GET THE INFORMATION.

IS THERE ANYTHING FROM YOUR POINT OF VIEW THAT SHOULD BE DISCUSSED -- ANYTHING ELSE FROM YOUR POINT OF VIEW THAT SHOULD BE DISCUSSED?

**MR. SPECTER:** YES. I WILL TURN IT OVER TO MR. FAMA. I THINK WHILE THERE HAS BEEN A FAIR AMOUNT OF INFORMATION TRANSFERRED FROM THEM TO US, I THINK WE ARE STILL HAVING A LITTLE PROBLEM IN TERMS OF FIGURING OUT WHO IS RESPONSIBLE FOR WHAT INFORMATION. SOMETIMES WE WILL ASK THE RECEIVER ABOUT SOME ISSUE, SUCH AS THESE, AND HE OR HIS LAWYER, NOT MR. DODD, BUT MR. BARROW (PHONETIC), TELLS US TO TALK TO THE CDCR.

SO WE'RE A LITTLE CONFUSED ABOUT THE LINES OF AUTHORITY,

AND MR. FAMA CAN FILL YOU IN ON THE DETAILS.

**THE COURT:** OKAY. MR. FAMA?

**MR. FAMA:** STEVEN FAMA, YOUR HONOR. GOOD AFTERNOON AGAIN.

MR. SPECTER WAS REFERENCING THE CIRCUMSTANCES THAT WERE LAID OUT IN A LITTLE BIT OF DETAIL IN FOOTNOTE 1 OF OUR PORTION OF THE STATEMENT. IT'S A CIRCUMSTANCE WHERE UNFORTUNATELY WE ARE SORT OF LEFT WITHOUT ANY CLEAR NOTION OF WHAT ADVICE OR DIRECTION, OR IF -- OR REALLY WHAT ADVICE AND DIRECTION THAT WAS PROVIDED.

AND IT DOES HAVE TO DO WITH THE DORM SOCIAL DISTANCING MATTER, SO THAT'S ALREADY BEEN DISCUSSED IN PART, BUT THAT IS THE CONCERN. AND IT IS -- WAS UNUSUAL IN THAT WE HAVE HAD, CONTINUE TO HAVE THE INFORMAL AND NOW THE KINDLY ARRANGED SCHEDULED WEEKLY PHONE CALLS, BUT THE EXAMPLE THERE DISCUSSED IN FOOTNOTE 1 IS, IN OUR VIEW, UNFORTUNATE AND LEAVES US PUZZLED AS TO WHAT HAS HAPPENED AND WHAT WE SHOULD BE LOOKING FOR.

**THE COURT:** WELL, LET ME SAY, I READ FOOTNOTE 1. AND I DON'T -- I'M NOT PERSUADED YET THAT THERE IS ANY KIND OF INAPPROPRIATE WALL BEING PUT UP, OR MISDIRECTION, OR ANYTHING LIKE THAT.

WE HAVE VERY DIFFICULT ISSUES THAT ARE CONSTANTLY IN FLUX, THAT REQUIRE NEW DECISIONS EVERY DAY, THAT REQUIRE REAL-TIME INTERACTION BETWEEN CDCR AND THE RECEIVER'S OFFICE. AND

WITHIN CDCR, BRANCHES AND DIVISIONS AND THINGS AT A RATE THAT IS MUCH, MUCH FASTER THAN WHAT IS REQUIRED UNDER ORDINARY CIRCUMSTANCES. AND THE PEOPLE WHO ARE RESPONSIBLE FOR MAKING THOSE DECISIONS ARE ENTITLED TO MAINTAIN THEIR INDIVIDUAL AUTHORITY.

AND I DON'T -- I SAY THAT WITHOUT GETTING INTO THE SPECIFICS OF ANY QUESTION THAT YOU'VE ASKED WHERE YOU HAVE BEEN GIVEN THIS KIND OF ANSWER, BUT WHEN I READ -- AND I ASSUME FOR THE SAKE OF ARGUMENT THAT YOUR QUOTATION THERE IN FOOTNOTE 1 ABOUT WHAT THE RECEIVER'S ATTORNEY TOLD YOU IS ACCURATE. AND YOU'RE RIGHT, IT'S NOT VERY CLEAR. AND IT LOOKS LIKE MAYBE THAT PERSON WAS TRYING TO BUY TIME, OR I DON'T KNOW.

BUT MY POINT IS, IF YOU ASK FOR INFORMATION AND YOU DIDN'T GET THE INFORMATION, THAT'S WHAT I WANT TO KNOW ABOUT. THE FACT THAT YOU MAY HAVE HAD TO GO TO ONE PLACE TO GET IT, YOU KNOW, I DON'T KNOW.

**MR. KELSO:** YOUR HONOR, THIS IS THE RECEIVER. IF I MIGHT RESPOND VERY BRIEFLY.

**THE COURT:** SURE.

**MR. KELSO:** ASSUMING WHAT WE ARE TALKING ABOUT HERE IS THE ISSUE OF ONE OF THE DORMS AT CIM WHERE THERE WAS A QUESTION ABOUT WHAT DID IT MEAN TO SHELTER IN PLACE, I BELIEVE THE PROBLEM IS, AND I BELIEVE WE WILL BE ANSWERING -- PROVIDING A FURTHER ANSWER TO MR. FAMA THROUGH COUNSEL -- SO

I'M GETTING AHEAD OF MY COUNSEL, WHICH IS ALWAYS A PROBLEM.

I BELIEVE THE ANSWER IS GOING TO BE THAT MEDICAL, MY STAFF, ME, WE DON'T KNOW WHERE THAT DIRECTION CAME FROM, OR THAT INTERPRETATION. WE DON'T THINK IT WAS LEADERSHIP AT MEDICAL HEADQUARTERS.

IT'S POSSIBLE THAT CUSTODY CORRECTLY BELIEVES THAT THEY GOT THAT DIRECTION OR GOT THAT INFORMATION FROM QUOTE "MEDICAL." IT MAY HAVE COME FROM THE INSTITUTION. BUT THIS IS A SITUATION WHERE, AS IS NOT UNCOMMON, WHEN DIFFERENT PARTIES ARE TRYING TO DIRECT COMMUNICATIONS SEVERAL WEEKS AGO IN THE MIDDLE OF SOMETHING AS COMPLEX AS THIS, THERE MAY SIMPLY BE A DIFFERENCE OF OPINION AS TO WHAT HAPPENED. I DON'T THINK THERE'S ANY EFFORT HERE TO HIDE ANYTHING.

WE SIMPLY, IN OUR RESPONSES -- THE QUESTION BEING WHO TOLD SOMEBODY THAT, WE DIDN'T KNOW. MAYBE IT WOULD HAVE BEEN CLEARER FOR US TO SAY, WE DON'T KNOW.

**THE COURT:** MR. KELSO, IS IT THE CASE -- IT SAYS IN THE INDENTED PORTION OF THE TEXT TO WHICH FOOTNOTE 1 PERTAINS, AND I'M QUOTING: "AS OF APRIL 22, 2020, NEW DIRECTION HAS BEEN RECEIVED FROM CCHCS TO CREATE SOCIAL DISTANCING WITH THESE DORMS."

IS THAT SENTENCE ACCURATE?

**MR. KELSO:** I'M SORRY, YOUR HONOR. I WAS TRYING TO CATCH UP TO WHERE YOU WERE. YOU ARE IN FOOTNOTE --

**THE COURT:** I WAS READING TOO QUICKLY.

I'M ON PAGE 4 OF THE STATEMENT.

**MR. KELSO:** YES.

**THE COURT:** IN WHAT PEOPLE WHO READ LAW REVIEWS WOULD CALL, TEXT AT NOTE 1, IN OTHER WORDS --

**MR. KELSO:** I'M AT FOOTNOTE 1.

**THE COURT:** -- TO WHICH NOTE 1 PERTAINS. SO UP IN THE BODY OF --

**MR. KELSO:** I GOT IT. I WAS IN NOTE 1. I APOLOGIZE.

**THE COURT:** THERE'S AN INDENTED TEXT THERE.

**MR. KELSO:** YES.

**THE COURT:** AND WITHIN THAT PARAGRAPH, BEGINNING ON THE THIRD LINE, APPEARS THE SENTENCE, "AS OF APRIL 22, 2020, NEW DIRECTION HAS BEEN RECEIVED FROM CCHCS TO CREATE SOCIAL DISTANCING WITH THESE DORMS."

MY QUESTION FOR YOU IS, IS THAT SENTENCE ACCURATE?

**MR. KELSO:** THIS IS EXACTLY THE PRECISE CHALLENGE, YOUR HONOR.

I THINK FROM THE PERSPECTIVE OF CCHCS, WE DID NOT GIVE NEW DIRECTION. WE SIMPLY CLARIFIED WHAT WE THOUGHT THE PRIOR DIRECTION HAD BEEN.

**THE COURT:** GOT IT.

**MR. KELSO:** IT MAY WELL BE THAT THE DEFENDANTS FROM DAI'S PERSPECTIVE, THIS WAS NEW DIRECTION BECAUSE THEY HAD APPARENTLY INTERPRETED THIS DIFFERENTLY.

SO, YOU KNOW, THIS IS ONE OF THOSE THINGS WHERE PROBABLY

IF ALL THE LAWYERS WEREN'T INVOLVED, WE COULD RESOLVE THIS A LITTLE MORE QUICKLY.

**THE COURT:** LET ME --

(SIMULTANEOUS COLLOQUY.)

**MR. KELSO:** FROM MY PERSPECTIVE, THERE WAS NOT NEW DIRECTION.

**THE COURT:** SO LET'S DISPENSE WITH NEW DIRECTION BECAUSE THAT SEEMS TO BE A SPEED BUMP TO EVERYONE'S MUTUAL UNDERSTANDING.

MY MORE BASIC QUESTION IS, IS IT THE CASE THAT RATHER THAN... RATHER THAN THE SUGGESTION THAT NOBODY MOVE, IN FACT, WITHIN THOSE DORMS, IT IS CCHCS'S INTENT TO CREATE SOCIAL DISTANCING?

**MR. KELSO:** YEAH. I THINK THE DIFFERENCE, YOUR HONOR, WAS PREVIOUSLY IT APPEARS THAT DAI TOOK THE POSITION OR BELIEVED THAT OUR POSITION WAS THERE SHOULD BE NO MOVEMENT OUT OF THAT DORM FOR ANY REASON AT ALL.

AND THE CLARIFICATION THAT OCCURRED WAS THAT, NO, IT WOULD BE PERMISSIBLE TO MOVE PEOPLE FOR PURPOSES OF CREATING SOCIAL DISTANCING.

**THE COURT:** YEAH. OKAY. GOOD.

OKAY. MR. FAMA, I WAS ABOUT TO SAY I INTERRUPTED YOU, BUT I THINK MR. KELSO WANTED TO RESPOND, AND THEN I WENT OFF ON A TERROR WITH MR. KELSO. LET ME RETURN THE MICROPHONE TO YOU.

**MR. FAMA:** THANK YOU, YOUR HONOR. STEVEN FAMA

SPEAKING.

YOUR COMMENTS, YOUR HONOR, VERY HELPFUL. MR. KELSO'S COMMENTS VERY HELPFUL. APPRECIATE THE TIME TAKEN.

THIS IS, OF COURSE, AN -- IT'S MORE THAN A CUL-DE-SAC BECAUSE THESE PARTICULAR DORMS AT CIM ARE, FOR THE REASONS THAT ARE CLEAR FROM THE STATEMENT, I THINK, VERY IMPORTANT GIVEN THE MEDICAL VULNERABILITY OF THE PATIENTS.

BUT THE POINT HERE IS THAT THIS SITS WITH -- IS NESTED -- IT'S NOW, I THINK, MOSTLY RESOLVED, AND IT'S NESTED WITHIN THE MUCH MORE IMPORTANT ISSUE THAT WAS EARLIER DISCUSSED IN THIS STATUS CONFERENCE, THE QUESTION OF WHAT KIND OF SOCIAL DISTANCING IS, IN FACT, GOING TO BE ACHIEVED IN THESE, AS WELL AS ALL THE OTHER DORMS.

SO THANK YOU AGAIN, YOUR HONOR.

**THE COURT:** OKAY. THANKS.

MR. MELLO, IS THERE ANYTHING ELSE THAT THE DEFENDANTS WANTED TO DISCUSS TODAY?

**MR. MELLO:** I MEAN, AGAIN, PAUL MELLO FOR DEFENDANTS.

THERE'S A LOT TO UNPACK THAT WAS SAID BY PLAINTIFFS' COUNSEL. SO I AM DEFINITELY NOT ONE TO WANT TO OVERSTATE THE FACTS, AND I AM NOT GOING TO, HOWEVER, AGREE THAT ANY STATEMENTS ARE UNDISPUTED OR UNTRUE, BUT THAT IS COUNTERPRODUCTIVE HERE.

I THINK WITH RESPECT TO THE LAST ISSUE YOUR HONOR WAS DISCUSSING WITH MR. KELSO IS, IT MAY HAVE JUST BEEN A

MISUNDERSTANDING. TO THE EXTENT IT WAS A MISUNDERSTANDING AND INDIVIDUALS CAN MOVE OUT OF THOSE DORMS AT CIM TO LOCATIONS AT CIM, IT IS CRYSTAL CLEAR AND THAT IS BEING WORKED UPON. SO THAT'S CLEAR.

AND, AGAIN, I THINK THAT THERE ARE MANY QUESTIONS. I DON'T THINK WE SHOULD ASSUME THESE STATEMENTS IN THE CASE MANAGEMENT CONFERENCE STATEMENT ARE NECESSARILY ACCURATE OR COMPLETE WITH RESPECT TO WHAT THE UNDERLYING FACTS ARE, AND THAT'S WHY I AM THANKFUL TO THE COURT THAT WE GET TO PROVIDE THOSE ANSWERS IN WRITING ON FRIDAY.

THANK YOU.

**THE COURT:** OKAY. WELL, THIS MIGHT GO THEN -- THIS MIGHT GO INTO THE QUICKER RATHER THAN LONGER BUCKET.

DOES ANYBODY DISAGREE -- NEVER MIND. I WANT TO HAVE THESE WEEKLY, FOR NOW ANYWAY. SO I AM GOING TO WITHDRAW THE QUESTION I ALMOST ASKED.

LET'S SET OUR NEXT CASE MANAGEMENT CONFERENCE ON MAY 6TH, SAME TIME, 2:00 P.M.

AND LET ME ASK THE PARTIES, 10:00 A.M. THE SAME DAY; IS THAT STILL WORKABLE FOR THE PARTIES?

MR. SPECTER?

**MR. SPECTER:** YES, YOUR HONOR.

**THE COURT:** MR. MELLO?

**MR. MELLO:** YES, YOUR HONOR.

**THE COURT:** VERY GOOD. THAT WILL BE THE COURT'S

ORDER. THANK YOU ALL.

**MR. SPECTER:** THANK YOU, YOUR HONOR.

**MS. HARDY:** THANK YOU.

**MS. WOLFF:** THANK YOU.

(PROCEEDINGS CONCLUDED AT 2:35 P.M.)

**CERTIFICATE OF REPORTER**

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

THURSDAY, APRIL 30, 2020