**Pages 1 - 31**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

MARCIANO PLATA, ET AL., )
)
Plaintiffs, )
)
VS. ) **NO. CV 01-01351-JST**
)
GAVIN NEWSOM, ET AL., )
)
Defendants. )
)

Oakland, California
Wednesday, May 6, 2020

**TRANSCRIPT OF PROCEEDINGS**
**CASE MANAGEMENT CONFERENCE HELD VIA ZOOM**

**APPEARANCES**:

For Plaintiffs:
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA 94710
**BY: DONALD H. SPECTER, ESQUIRE**
**ALISON HARDY, ESQUIRE**
**STEVEN FAMA, ESQUIRE**

For Defendants:
HANSON BRIDGETT LLP
425 Market Street - 26th Floor
San Francisco, CA 94105
**BY: PAUL B. MELLO, ESQUIRE**
**SAMANTHA D. WOLFF, ESQUIRE**

OFFICE OF THE ATTORNEY GENERAL
455 Golden Gate Avenue - Suite 11000
San Francisco, CA 94102
**BY: DAMON MCCLAIN**
**DEPUTY ATTORNEY GENERAL**

Reported By: Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
Official Reporter

APPEARANCES CONTINUED:

For the Receiver J. Clark Kelso:
FUTTERMAN DUPREE DODD CROLEY MAIER LLP
601 Montgomery Street - Suite 333
San Francisco, CA 94111
**BY: MARTIN H. DODD, ESQUIRE**

For California Correctional Peace Officers Association:
MESSING ADAM & JASMINE
980 9th Street, No. 380
Sacramento, CA 95814
**BY: GREGG ADAM, ESQUIRE**

CCPOA
755 Riverpoint Drive - No. 200
West Sacramento, CA 95605
**BY: DAVID A. SANDERS, ESQUIRE**

Also Present: **J. CLARK KELSO, RECEIVER**

**Wednesday - May 6, 2020** **2:00 p.m.**

**P R O C E E D I N G S**

---000---

**THE CLERK:** Now calling civil matter 01-1351, Marciano Plata, et al. vs. Gavin Newsom, et al.

If counsel could please identify themselves for the record, starting with plaintiffs' counsel.

**MR. SPECTER:** Good afternoon. This is Donald Specter for the plaintiffs.

**MR. FAMA:** Good after --

**MS. HARDY:** Good afternoon --

**MR. FAMA:** Excuse me, Ms. Hardy. Please.

**MS. HARDY:** Good afternoon. This is Alison Hardy for the plaintiffs.

**MR. FAMA:** Good afternoon. Steve Fama for the plaintiffs.

**MR. MELLO:** Good afternoon. Paul Mello of Hanson Bridgett on behalf of defendants.

**MS. WOLFF:** Good afternoon, Your Honor. Samantha Wolff from Hanson Bridgett on behalf of defendants.

**MR. McCLAIN:** Good afternoon. This is Damon McClain on behalf of defendants.

**MR. DODD:** Good afternoon, Your Honor. This is Martin Dodd on behalf of the Receiver.

**MR. KELSO:** Good afternoon. This is Clark Kelso, the

Receiver.

**MR. SANDERS:** Good afternoon. It's David Sanders on behalf of intervenors.

**MR. ADAM:** And Gregg Adam, also on behalf of CCPOA.

**THE COURT:** Very good. This is Judge Tigar. I think we have heard from everybody. As we've discussed before, CCPOA is not formally an intervenor in this case, but we welcome the participation of their counsel on an amicus basis.

So, Gentlemen, if you -- it will be my practice as I go along usually to call on the plaintiffs or the defendants and not to call on you directly, but if something arises and you'd like to contribute, please just let me know that.

**MR. ADAM:** Thank you, Your Honor.

**THE COURT:** Okay. Well, there is some -- there is some -- first of all, I hope everybody is safe and healthy. I have been remiss in not starting our prior conferences that way.

We are having these regular conferences because we are in the midst of a pandemic, and as far as I know, everybody who has been participating in these calls has remained healthy during that time, and my fingers are crossed for all of you that that continues to be the case.

We've got some kind of, what I would call, work-in-progress issues in the Joint Case Management Conference Statement. I want to turn to those in just a second.

I want to make a housekeeping announcement. I do think it continues to be helpful to have these conferences on a, more or less, weekly basis. My feeling about that has not changed.

I'm getting a little tired in my court practice of doing everything by telephone or by microphone only, so starting with next week's conference, we're going to move to video link, still using Zoom but with a video capability, so just bear that in mind. Make sure that you have the technology available, and, you know, if you've been doing these things with a Jimi Hendrix poster or something behind you, think about your background or whatever people do on Zoom.

Anyway, before I get to the -- before I get to the substantive issues, the kind of work-in-progress issues in the Joint Case Management Conference Statement, there is something that I want to address in the defendants' portion of that statement.

I note that defendants raise the question of the Receiver's jurisdiction as it relates to certain issues that have recently been discussed in the *Coleman* case. I don't have any authority over the *Coleman* case or, for that matter, what Mr. Specter says to that court, although I do wonder why he or members of his law firm would appear in that court as representatives of the *Plata* case.

I thought a brief statement this afternoon might be helpful in clarifying this Court's position regarding the

Receiver's authority.

The Receiver was appointed on February 14, 2006. The order appointing him divested the Secretary of CDCR from control of the state prison medical delivery system and placed the day-to-day management of that system under the Receiver's sole control.

Pursuant to that order, the Receiver shall, quote, exercise all powers vested by law in the Secretary of CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical healthcare system, close quote.

Of course, the *Plata* and *Coleman* courts need to coordinate on issues related to mental health, and that's happening. That coordination is the subject of both formal orders and an ongoing, robust coordination process.

But I agree with the defendants that the three issues identified by the parties -- which is to say, number one, the use of cohorts in dormitories; number two, testing; and, number three, the housing of high-risk individuals -- are medical issues that are solely within the Receiver's jurisdiction.

That's all I intend to say on that issue today. I don't intend to hold a hearing on these issues right now or to take further comment from the parties beyond what was included in the Joint Case Management Statement.

I was asked at a prior hearing whether I'm in touch with

Judge Mueller, and I am, and I don't have anything further to say on that subject right now.

I will, however, now turn to the other issues that I saw raised in the Joint Case Management Statement, and I thought I would start with this issue of monitoring. And "monitoring" -- that word encompasses a couple of different things. One of them is to what extent is CDCR actually complying with its own guidelines that it has established about cohorting, which is a question I think I would have had based on the defendants' response to my April 29, 2020, questions that the defendants filed on May 1, but that issue is also something that the plaintiffs raise in their portion of the Joint Case Management Statement.

And obviously policies are one thing. They're incredibly important in general in this case and in specific with regard to COVID, and then the question of the extent of compliance with the policies is always a separate issue.

So let me ask first if there is any update on that issue, and I'll ask both parties in the case.

Mr. Specter, any update here?

**MR. SPECTER:** Your Honor, I think Ms. Hardy is going to address that issue. Thank you.

**THE COURT:** Very good.

Ms. Hardy.

**MS. HARDY:** Good afternoon, Your Honor.

The information that we have most recently from the defendants is from April the 29th or April the 30th, and it leaves the door wide open as to whether or not the defendants have actually complied with what they said they were going to comply with in terms of cohorting and spacing. That's the information we have.

The photographs that we have received for ten prisons are very inconclusive about whether the spacing is actually happening.

**THE COURT:** Okay. And so you're sort of in the same place that's reflected in the Joint Case Management Statement.

**MS. HARDY:** We are, yes.

**THE COURT:** Okay.

Mr. Mello or Ms. Wolff, anything further you want to say before I weigh in?

**MR. MELLO:** This is Mr. Mello.

No, Your Honor, other than what's in our statement. That's the current information.

**THE COURT:** So I said there was -- there were a couple of different pieces of monitoring, and maybe I should just jump to the second one and then come back to this.

The second one is, whether or not we have COVID, just on an ongoing basis, the Prison Law Office, in the ordinary course of things, has the ability to go into the individual institutions, and they do that for the purpose of monitoring

compliance with things, asking open-ended questions of inmates, etc., and I am anxious for that to resume just as soon as it would be safe for everybody to do that, and I've asked Mr. Kelso just to let the Prison Law Office know as soon as possible when they can go into the facilities to resume monitoring. So I have that in mind.

And so I also have in mind that this current situation, which I'd like to work on, is both a second best and also temporary.

So I think what I would say is I want to -- I think I can -- we can start in general by acknowledging that the plaintiffs' desire to monitor compliance with these policies is reasonable and even, I would sort of say, ordinary course, so then the question becomes what is it that exactly they need to do their monitoring and what is it possible for the defendants reasonably to provide, and I think right now for me, at least -- and you can correct me in a moment if I'm wrong -- the issue is just at a little bit too high a level of generality for me to weigh in.

The plaintiffs have said essentially "we want everything" or -- and I don't mean that in a disparaging way, but "we want everything we can get our hands on," and the defendants are saying "we're doing the best we can, and we'll get you more when it's available," and it's hard for me to facilitate a conversation between the parties or adjudicate at that level.

And my suggestion would be that the parties have an additional round of meeting and conferring before we meet again next week in which the plaintiffs are as specific as they can be about what they need and the defendants are as specific as they can be, not just about what they can provide, but when it can be provided, and then maybe I would be in a position to provide more input.

Ms. Hardy, do you want to respond to that?

**MS. HARDY:** Your Honor, we, as plaintiffs' counsel, have been getting together as a team to try to iron out what it is that we want, and I -- we welcome the opportunity to develop that further and meet with the defendants in short order.

**THE COURT:** Are you able -- you know, I, as the parties know, go two or three times a year into the prisons, and I'm with you. You would accompany me. And I'm able to see the very good relationship that the Prison Law Office attorneys have with inmates, and I'm wondering, are you in -- I don't want you to violate any attorney-client or anything, but are you able to maintain telephone contact now with inmates at any of the institutions?

**MS. HARDY:** Well, we have been, and the defendants have been helpful in that regard. And I will pass off to Steve Fama, who has been doing the bulk of our phone conversations, if you'd like more information about that.

**THE COURT:** Only what you would like to provide, but I

think it might be useful background for me in terms of information that's available to you, so if Mr. Fama wants to talk about that, I'd be glad to listen.

**MR. FAMA:** Steve Fama, Your Honor. I would like to say just a few things, if I could.

The --

**THE COURT:** Sure.

**MR. FAMA:** What we have done is -- is limited, very limited, I would say. Is that based upon correspondence that we've received, have requested and have so far held -- I think it's about a dozen or a little more phone calls with individuals at two prisons, a total of about a dozen. The two prisons -- I don't think the defendants know -- it's the California Institution for Men and the California State Prison Los Angeles County.

My impression is that these calls, to be held confidentially, as they must be, are not easy to be arranged within the prisons themselves, and -- and unlike a site visit where one can quickly get information from one class member and then move on to another, it's a far more structured and, thus, time-consuming process, and so -- yet useful information has been obtained. But, again, it's a very limited number compared to what can be encountered -- the people that one can talk with when on site.

I will also share -- and defendants know because we've

asked them, and they are in the process of providing us the rosters of the names and numbers of the incarcerated people who sit on the 35 prisons' -- they're usually called Inmate Advisory Councils, and --

**THE COURT:** Oh, yes. I'm very familiar with Inmate Advisory Councils, and once I became aware of the existence of those councils, I made it a point of always speaking to them when I do a facility visit.

**MR. FAMA:** Right. And so you can well -- I don't have to tell you what we're thinking of hoping to do; on the other hand, it's not yet clear whether we can talk to the even executive bodies of each respective IAC, as they're called, as groups, given social-distancing needs and the sizes of conference rooms and the availability of speaker phones.

So, again, it could be a very time-consuming process, but -- so it's -- it's certainly not a substitute at all for being there or -- and probably not even a substitute for if -- doing something like a Zoom visit to the prisons. How that could be technological -- technically arranged, I don't know, Your Honor, but all I can say is that we have had phone calls. Other co-counsel have had phone calls with others, but it is -- it does take time, and it's not nearly as efficient as a site visit.

**THE COURT:** Now that we're all in the world of telephone and so forth and video, I can appreciate that.

I don't mean to put you or your office on the spot, but if it were deemed safe by CDCR and if they -- and they might put conditions on it like they might ask, you know, the lawyers to be tested or I don't know what the other conditions might be, are you or members of your office interested in resuming in-facility visits?

**MR. FAMA:** Of course. I'm speaking for -- this is Steve Fama. I'm speaking for myself.

Yes, of course, we are. You know, you had an assumption in there. I currently am respecting the local public health officials' directives, but, yes.

**THE COURT:** Okay.

**MR. FAMA:** We would like to go. And we're thinking of other options, too, like can there be a phone that can be passed among people while they're in their cells, things like that.

**THE COURT:** Yes. Although the notion of having a physical object that someone has held up to his face being passed to somebody else so he can hold the object up to his face gives me some pause.

**MR. FAMA:** Right.

**THE COURT:** But I take your broader point, which is that you're thinking creatively about how you can continue to get information from individual members of the class given the restrictions that are in place.

Okay. Mr. Mello or Ms. Wolff, is there anything further you want to say on that subject?

**MR. MELLO:** Your Honor, we think it's very reasonable to meet and confer with plaintiffs' counsel, as you suggested earlier.

On the subject of the Prison Law Office returning and conducting in-person visits, obviously that's a larger discussion that I believe the Receiver, as well as CDCR, might have concerns.

**THE COURT:** Yeah.

**MR. MELLO:** But with that, I don't think I need to belabor the point.

**THE COURT:** I know that I require lawyers not to raise in front of me something that they haven't addressed first with the other side outside of court, and I violated the corollary of that rule by lobbing into your laps the idea of when can we get the plaintiffs' lawyers back into the prison, so I understand that you're hearing that for the first time, and I'm not directing anybody to do anything. It's just that I suspected correctly that they would be interested in doing that, so I'm just hoping that we can all keep our eye on that.

Then the next issue on my list is plaintiffs stating that they want to ensure that the State has the ability to maintain the integrity of the cohorting system once intake resumes, and I don't know that the parties have a current dispute about

that. I gathered that that was sort of -- that that was mostly for my information, but maybe I should ask the plaintiffs -- let me finish the thought. That that was for my information in the sense that as we are monitoring compliance going forward, wanting to make sure that we don't give up whatever gains we made from cohorting when CDCR begins again to receive additional inmates.

Mr. Specter, is there more that you wanted to say about that?

**MR. SPECTER:** No. It was, of course, for your information, Your Honor, but also we think there needs to be a -- a discussion between the parties about how that's going to occur and, you know, some sort of a plan if they do open the prison to intake, how that is going to be effectuated so that -- exactly what you said, that they don't lose the gain -- whatever gains they've made to this point.

**THE COURT:** Okay. Well, it sounds like that's a subject of information exchange and discussion between the parties already.

Mr. Mello, is there anything further that you wanted to say about that?

**MR. MELLO:** No, Your Honor.

**THE COURT:** Okay.

The last topic on my list is "work group." That's the phrase the plaintiffs used in the Case Management Statement.

They suggested that a work group be convened. I didn't see a response on that subject from the defendants.

I have to say as I sit here, I'm not sure I see the need for a work group. I, of course, agree that the plaintiffs need to have avenues to express their ideas, to express their concerns, and to get information about what's happening, but I think that's already occurring, and where there are sticking points or bumps in the road, I'm finding out about those in these Case Management Conferences, and I think I've been able to address them.

One thing that happens with work groups is that it's an additional layer of meetings for everybody where they're not actually doing the work; they're having a meeting about the work. And then, of course, this is an adversarial process. The work groups occur in the context of litigation, so then the lawyers have to have pre-meetings before they go to the meeting so they'll be ready for the meeting. And it strikes me as a high cost of time, and just thinking about it, the benefit for that cost seems to me not to be worth it, but that's not a firm conclusion. I'm happy to hear more from the parties.

Do the defendants want to respond to the suggestion, Mr. Mello?

**MR. MELLO:** I -- I -- you took the words right out of my mouth, Your Honor. We agree that it's already happening, that there's avenues for information exchange, and that it's

both distracting, and Your Honor is right, there are pre-meetings, and we're distracting people from their --

**THE COURT:** I would say --

**MR. MELLO:** -- time and effort.

**THE COURT:** I'm sorry.

**MR. MELLO:** I apologize.

**THE COURT:** No. I thought you were done. I didn't mean to talk over you.

**MR. MELLO:** Nothing more, Your Honor.

**THE COURT:** I will say that I don't -- I -- I didn't trans -- I didn't transpose this portion of the statement into my notes, but my recollection is that the work group was intended to be related to the development of standards for things like cohorting, and on that point I would say I personally am hungry and I assume the defendants are also hungry for any third-party expert information about that, and I -- my staff gives me anything they can get their hands on that might relate to that. In fact, I haven't read it yet, but I know that today, for example, the Centers for Disease Control and Prevention issued a Morbidity and Mortality Weekly Report on COVID-19 in correctional and detention facilities.

Now, there is always some risk when a judge says, "hey, what about this piece of paper" that I haven't read because then it may turn out that there's some can of worms that gets opened that's contained in the information in that piece of

paper, but I don't really care about that. It's whatever the CDC is saying. And so whatever that is, we should all be aware of that.

And my point, which I'm making in a slightly long-winded way, is that of course if the plaintiffs have information from expert sources on public health or prison health, I'm assuming the defendants would like to be made aware of them and I probably also would, but those are my tentative thoughts.

I may be -- maybe there is something about the idea I'm missing or there's more the plaintiffs want to say.

Mr. Specter, do you want to address that topic?

**MR. SPECTER:** Yes. I will just say a word, and then I'll pass it on to Ms. Hardy.

But these -- the information sharing is not a two-way street. There's -- it's not a discussion between the parties of what should be done, how are you going to monitor things, that kind of thing. It's very much a one-way street of they are providing some information, but there's no opportunity for us to have any meaningful input into this process, so it's -- while we appreciate getting the information, it's a very frustrating exercise at this point because we find out only after something's been decided what the decision has been.

So I'll pass it on to Ms. Hardy at this point.

**THE COURT:** Ms. Hardy.

**MS. HARDY:** Your Honor, seeking a work-group solution

is based on our very deep concern that defendants seem to have a very limited view of what can be done in a cohorting program.

We believe that there are a lot more options than defendants have considered, and in their statement, they state that the -- that the plaintiffs have not requested and probably do not want the clients to be restricted to sitting only on their beds during all waking hours.

That's certainly not what we want, but we believe that it's not an A or B situation. And because they have not thought about those other options, we think that it makes sense to get together and share what other options there might be, and it would be helpful to include people who are bona fide experts in public health areas, like Dr. Brie Williams, who has written about cohorting and has -- has some authority in the area.

I think that you're right, it would be very helpful to have public health people weighing in with the parties so that we can find a middle ground that ensures that people are safely housed and -- and that they are not unduly restricted to sitting only on their beds for the next six months or however long we have to socially distance.

**THE COURT:** I see. And when you say that there isn't a forum for the plaintiffs to make suggestions to the defendants, what has happened -- I'm assuming that you've made such suggestions. When you have done that, what happened?

**MR. SPECTER:** They evaporate into thin air or we get writing -- a letter back from the defendants, from their lawyers, which is not that informative. So, in our view, there is really --

**THE COURT:** Hold on a second. It's not informative to get a letter back from a lawyer? Aren't you the one who sends the letter?

**MR. SPECTER:** Yes, Your Honor.

**THE COURT:** Aren't you a lawyer? I mean, I don't mean to -- anyway...

**MR. SPECTER:** Yeah. I mean, it's -- it's the same thing as getting a response to an interrogatory. They're drafted with, you know -- let me just put it this way. There is really no substitute for talking directly to the correctional officials with the lawyers in the room about some of these issues. That's -- that's basically the bottom line.

**THE COURT:** Okay. Well, I think these are good -- these are good comments. I think Mr. Mello sort of adopted my comments so I don't have anything more from the defendants on that.

I think maybe I -- I would like the opportunity to talk to the Receiver offline and not have that conversation here in the middle of a public hearing.

I will say that I don't -- I don't know that there is a pat answer to the question what should the State do when it

gets a letter from a lawyer in a case in which there have already been two emergency motions on the subject that is also the subject of the letter, and so there's -- I don't know that there's going to be a way of removing the kind of litigation tinge that you're talking about. I don't in any way dispute that informal discussion is helpful. It's just that these things kind of exist side by side.

**MR. SPECTER:** Well, they -- I'm sorry, Your Honor.

**THE COURT:** No. Go ahead.

**MR. SPECTER:** One thing we could do is just agree that the discussions -- you know, whatever is said in these meetings won't we raised in the context of litigation. We do that quite often in these type of cases where there's a litigation side and there's also a negotiation side.

**THE COURT:** Yeah. Okay. Well, there are two -- of course you're free to -- of course you're free to seek a variety of kinds of conversation with the defendants or, for that matter, the Receiver. It's a separate question from whether I would order a particular structure of conversation to take place, so let me -- but let me think about that.

**MR. SPECTER:** Thank you, Your Honor.

**THE COURT:** Mr. Specter, other -- these are the issues that I pulled out from the Case Management Conference Statement. Are there other issues that you were hoping to discuss today or other members of your office were hoping to

discuss?

**MR. SPECTER:** Yeah. I think Ms. Hardy has got at least one other subject that she wants to raise. Thank you.

**THE COURT:** Very good.

Ms. Hardy.

**MS. HARDY:** I believe that what Mr. Specter is alluding to is we do remain concerned about the housing of the medically-vulnerable people in the prison, and so far we have not seen any aspect of the defendants' plans that address that specifically, and that is another issue that we would hope to weave into the work group should that come to pass.

**THE COURT:** And is that concern limited to the medically vulnerable in the dorms, or does it extend beyond that?

**MS. HARDY:** It is primarily focused on the folks who are living in the dormitories. You know, there may be certain people who are so medically fragile that they ought not to have a cellmate in a two-person cell, but I think that's a very small number. I think it is primarily a concern about dorm living.

**THE COURT:** And what is it in particular that you want the defendants to do that they aren't doing?

**MS. HARDY:** Well, so far we've not seen any indication that as they are doing cohorting and housing people in the dorms and the gyms and tents, that they are assessing whether

the person ought not to be in a congregate living situation at all given that their medical condition renders them to be extremely vulnerable to complications if they contract COVID-19.

**THE COURT:** And in that instance, if the defendants were to make that determination, what would you want them to do as it regards that individual prisoner?

**MS. HARDY:** We would like a medical decision to be made by a medical professional about whether that person can be safely continued to be housed in a dormitory or ought to be housed in a cell with a closed door.

**MR. SPECTER:** And, Your Honor, this is one of those issues that we have raised repeatedly which has gone nowhere for the last couple of months.

**THE COURT:** I see. All right.

**MR. SPECTER:** We haven't even gotten a response, so...

**MR. MELLO:** Your Honor, this is Mr. Mello. May I be heard?

**THE COURT:** Please.

**MR. MELLO:** So this is a Case Management Conference, so I -- I typically try not to argue, and so I'm going to do my best not to do that.

They again -- plaintiffs' counsel again seems to be touching on medical issues where the authority lies with the Receiver.

I am not aware of suggestions not being responded to. That is not my style and defense counsel's style, not to respond to questions, so I'm a little bit uncertain as to that.

With respect to the question of one-way sharing of information, information going one direction, there is a level of irony to that since we are the ones who receive requests for information and are required to respond to those requests. They are not usually coming from the other side.

So we are -- absolutely believe that a work group is unnecessary, that those actions are already occurring, that information sharing is happening, and we remain committed to providing and trying to limit the spread and protect the -- the inmate patients and the workers at CDCR, and we will continue to do that, Your Honor.

Thank you.

**THE COURT:** I don't -- well, I don't know what the answer is with regard to individual inmates. I used the word "prisoner" a second ago, which I try not to use. I don't know what the answer is with regard to individual inmates or medically vulnerable.

The issue is not, I don't think, raised in the Case Management Statement outside of the -- outside of the sentence about forming a work group, and so it's not something I've given a great deal of thought to. So I don't know that I have anything more to say today on that issue.

The request that Ms. Hardy makes is a fairly specific one, and perhaps I could just say that if there's not been an answer to that request in writing, that the defendants could provide one to the plaintiffs by the end of the week; otherwise, I don't have the training or the factual background to say much beyond what's already been said.

**MR. MELLO:** Your Honor, Mr. Mello speaking. May I be heard?

**THE COURT:** Sure.

**MR. MELLO:** If there is such a request, can -- so that we make sure we're all on the same page, can it either be restated or can it be put in writing if we are to respond by 5:00 p.m. on Friday?

**THE COURT:** I think putting it -- let me just say it, and then if I have done justice to it, then that will be sufficient. And if I haven't done justice, then I'll have the plaintiffs put it in writing outside of this call.

But as I understand Ms. Hardy's request, it is that when there is a medically-vulnerable inmate -- and that term may require some definition in a moment -- but when there is a medically-vulnerable inmate who is housed in a dormitory setting, making an inmate-by-inmate determination as to whether it would be healthier for that inmate to be housed in a cell with a closed door instead of in a dormitory.

Ms. Hardy, how did I do?

**MS. HARDY:** I think that's accurate, Your Honor. Or an alternative way would be to say whether because that inmate has certain medical conditions, that inmate ought to be housed in a cell with a solid door in order to avoid -- to mitigate the risk of transmission of COVID-19.

**THE COURT:** Ms. Hardy, how many such inmates are there?

**MS. HARDY:** I believe that Mr. Fama has that information. We have gathered that data, and I don't have it at my fingertips, but I believe Mr. Fama might.

**THE COURT:** Mr. Fama, how many people fit in this category?

**MR. FAMA:** Steven Fama, Your Honor.

I'm sorry. I do not have that number. I'm sorry. I just don't have that.

**THE COURT:** All right. Let me ask -- so we actually don't have any idea how big the "ask" is.

Let me ask a couple more questions.

Is this a determination that the plaintiffs want to be made after an individual medical examination of each inmate, after a review of an Excel spreadsheet that lists only the conditions that make that inmate a, you know, in quotes "vulnerable inmate," or after a physician review of all of that inmate's medical records, or something else? What do you contemplate?

**MS. HARDY:** Your Honor, I would leave that to the physicians to determine what is necessary to make that determination about whether or not the person requires additional housing protections. I believe that the physicians are in the best position to determine whether that can be determined based on file review, a spreadsheet that shows who is high risk, or an actual examination.

**THE COURT:** I see.

Well, I think this is turning out to be more complicated than I thought, and so I don't think I'll set a hard deadline.

What I would say to the plaintiffs is put this request by itself in writing as a freestanding request and send it to the defendants, and if they don't get back to you or they get back to you in a way that you think is inadequate, then that can be something we talk about next week.

**MR. SPECTER:** Well -- Your Honor, this is Don Specter.

Would it be okay if we include the Receiver in that correspondence because, as you noted earlier, he's the one responsible for medical-care decisions?

**THE COURT:** I'm actually making no order about this.

**MR. SPECTER:** Oh, okay.

**THE COURT:** So you can do as you like. I know --

**MR. SPECTER:** Okay.

**THE COURT:** I know the Prison Law Office is already in -- it has already a weekly phone call with the Receiver, and

it is my belief and understanding that, Mr. Specter, you and Mr. Kelso talk sometimes outside of that, and so you can -- you can attempt to get more information about this as you think appropriate.

**MR. SPECTER:** Perfect. Thank you, Your Honor.

**THE COURT:** And just as I'm -- just as I'm not -- I'm not ordering either side to do anything. I think you can continue to develop this. It doesn't -- it sounds like -- it doesn't sound specific enough yet to me.

Okay. Well, Mr. Specter said, Ms. Hardy, that you had at least one issue, so maybe there's another one.

**MS. HARDY:** No, Your Honor. I am not aware of another issue that I might have, although Mr. Specter might have a different opinion.

**THE COURT:** Mr. Specter, has Ms. Hardy let you down in some way?

**MR. SPECTER:** No, Your Honor. I would never say that, but she hasn't in this instance either.

**THE COURT:** Very good.

**MR. SPECTER:** Thank you.

**THE COURT:** Mr. Mello, are there any issues that the defendants were hoping to address today that we have not discussed?

**MR. MELLO:** No, Your Honor. Just a question. Since appearing in court has been very different, are we wearing

suits and ties next week for our video appearance?

**THE COURT:** You know, I have never made any -- that's not true. I was about to say I have never made any order of anybody about what to wear in court. In my very first year as a judge in the state court in Alameda County, I had a misdemeanor pretrial calendar. It was an enormous calendar every day, and I didn't actually look at what people were wearing usually. It was too busy, and I didn't care very much. But a district attorney -- an assistant district attorney got very upset because a defendant was wearing a very profane T-shirt, and I made him go out into the lobby and then into the restroom and turn his T-shirt inside out and come back in, and we finished.

I doubt very much that anybody in this case will need that kind of guidance, so I'm not going to order anybody to do anything.

I personally will be wearing a necktie and a robe because that's what feels like court to me.

**MR. MELLO:** Understood, Your Honor.

**THE COURT:** Anything further from the defendants, Mr. Mello?

**MR. MELLO:** No, Your Honor.

**THE COURT:** Mr. Kelso, I don't know if there is anything you -- I'm not calling on you or asking you to address any particular topic, but is there anything that you wanted to

add to today's proceeding?

**MR. KELSO:** This is Clark Kelso.

No, thank you, Your Honor.

**THE COURT:** Okay. Very good.

Next week I can't do it Wednesday afternoon because I have a hearing that I can't move that I scheduled the same time as we are doing our call today. My suggestion would be that we have our next Case Management Conference at 10:00 a.m. on Thursday the 14th.

Is that date convenient for everybody? Mr. Specter?

**MR. SPECTER:** Yes, Your Honor.

**THE COURT:** Mr. Mello?

**MR. MELLO:** Your Honor, I'm looking at my calendar, but whatever it is, it can move.

Yes, Your Honor.

**THE COURT:** Okay. Very good.

Mr. Kelso, is that date convenient for you?

**MR. KELSO:** This is Clark Kelso.

Yes, it is.

**THE COURT:** And hold on just a moment. One of my screens closed. There we go.

Mr. Adam?

**MR. ADAM:** Yes, Your Honor. There is a lot of gaps in my dance card at the moment. That will work fine.

**THE COURT:** Very good.

We will set this for Thursday at 10:00 a.m. Let's have a Case Management Conference Statement in by 4:00 p.m. on the 13th. I know the parties put these together at the last moment so that the information can be as current as possible. To the extent that you are able to do some meeting and conferring, that's always helpful to making it a joint statement.

And as I said before, we will be proceeding by video. We will provide you with the video link information when we have it.

I think that concludes our hearing for today. Thank you all very much.

(Proceedings adjourned at 2:45 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Thursday, May 7, 2020

Pamela Batalo Hebel

Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter