XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., <br><br>  Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br>  Defendants. | CASE NO. 01-1351 JST <br><br> **JOINT CASE MANAGEMENT CONFERENCE STATEMENT** <br><br> Date:  May 14, 2020 <br> Time:  10:00 a.m. <br> Crtrm.: 6, 2nd Floor <br> Judge:  Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the May 14, 2020 Case Management Conference. The parties exchanged their respective sections at approximately 2:10 p.m. today.

## I. PLAINTIFFS' STATEMENT

As of just before 2:00 p.m. on Wednesday, May 13, 2020, 535 patients statewide had been confirmed to have COVID-19 via testing.[1] These include 397 at the California Institution for Men (CIM), an increase of approximately 150 from a week ago and 300 from two weeks ago. There have also been 116 cases at California State Prison – Los Angeles County, 11 at California Men's Colony, seven at the California Institution for Women, two at Centinela State Prison, and one each at North Kern State Prison and the Substance Abuse Treatment Facility and State Prison. Nearly 90 cases at these prisons are considered resolved. Twenty-seven patients, including 25 from CIM, are currently in an outside hospital due to complications from their condition.

There were an additional four deaths from COVID-19 in the last week, bringing the total to five. All deaths have been of patients from CIM who had serious medical conditions that made them especially vulnerable to the disease. Four were housed in large dorms when infected. One of those, a 65-year-old man, was scheduled to parole in just a few months. Before being diagnosed he twice implored medical staff in writing to help him get an early release due to myriad conditions, including severe breathing problems, which made him especially susceptible to severe consequences from COVID-19. To prevent more unnecessary deaths the Receiver and/or the Defendants must expedite review and release or transfer of the medically vulnerable. Both the Receiver and Defendants have authority to do so under Cal. Government Code section 8658, and the Receiver has the authority under the Order of Reference to house individuals in medically appropriate

---

[1]. This number, and the others reported here, derive from the CDCR/CCHCS "Population COVID-19 Tracking" website, and include active in custody, released while active, resolved, and deceased patients.

settings.

The seriousness of the situation at CIM cannot be overstated.  In addition to the deaths and the total number of confirmed cases, outbreaks have now been identified in <u>all</u> four CIM facilities, and some housing units have deeply concerning percentages of confirmed patients: in CIM-A's Mariposa Hall dorm, whose residents are nearly all medical high risk, 79 of 124 patients tested were confirmed to have COVID-19.  As of last week, nearly 2,000 people at CIM were reportedly quarantined, and the Receiver's office now says all high risk medical patients at the prison will be offered COVID-19 testing this week.  The widespread outbreaks have caused CIM to temporarily use six tents for housing (with porta-potties and portable sinks located near the tents) and eight tents for medical care.  Further, due to large numbers of staff and other workers being out sick, the prison is serving many people on many days cold box lunches in lieu of the hot breakfast and dinner typically provided.

The inability to contain the virus at CIM demonstrates the need for immediate and effective action, such as strengthening dorm cohorting efforts, the need for the removal of the medically vulnerable from congregate housing areas, and delay in re-opening of CDCR reception center intake and consequent re-starting of inter-prison transfers.

**A.      Defendants and the Receiver must identify and appropriately house people at risk of severe illness or death from COVID-19.**

COVID-19 is particularly dangerous for people who are elderly and those who are immunocompromised or have certain health conditions.  According to the U.S. Centers for Disease Control and Prevention (CDC), those conditions include chronic lung disease, serious heart conditions, diabetes, chronic kidney disease requiring dialysis and liver disease, severe obesity and conditions that make one immunocompromised.  Many people with these conditions are currently housed in crowded congregate living areas in CDCR, where they are at heightened risk of contracting the virus.  As noted above, five people, all with known medical conditions predisposing them to COVID complications, have died at

CIM since April 16th of COVID-related causes. More will almost certainly die if they remain in the dorms where physical distancing is difficult.

Defendants have, to date, offered no strategy for identifying and safely housing people who, because of age or underlying medical conditions, are particularly vulnerable to severe illness or death if they contract COVID-19.

Following last week's Case Management Conference, at the Court's suggestion, Plaintiffs on May 7, 2020, renewed our request for a housing plan for the medically vulnerable. Plaintiffs had made similar requests on at least four occasions without success. Plaintiffs initially requested a plan over a month ago, in a letter from Don Specter to Ralph Diaz and Clark Kelso, but received no substantive response. Plaintiffs then filed two emergency motions, both of which included a request for a plan. ECF Nos. 3219 at 27, 3219-6 at 2-3, 3266 at 9, 3266-4 at 2. Defendants' responses to both motions cited COVID-related measures they had undertaken, but none of the measures listed addressed Plaintiffs' request for a housing plan. ECF No. 3235 at 18-24 and ECF No. 3277 at 12-15. Plaintiffs also raised this issue in a prior CMC statement. ECF No. 3294 at 3-4. Citing CCHCS's April 3 *COVID-19: Interim Guidance for Health Care and Public Health Providers*, Plaintiffs urged Defendants to develop a plan, noting that the Receiver has advised Defendants they may place vulnerable people in special housing. *See* April 3 Guidance at 18 (ECF 3274-6 at 19). Defendants did not respond.

To date, Plaintiffs have received no substantive response to the May 7 letter. To address the needs of the medically vulnerable a plan must include:

1. The identification of people who, because of their age or medical condition, are at higher risk for severe illness if they contract COVID-19. We understand CCHCS has already completed this step: on March 30, CCHCS identified all people in custody with at least one of the risk factors listed above. *See* ECF 3249 ¶ 3 & Exh. B.

2. Beginning with those housed in congregate living spaces (dormitories, tents,

gyms), medical staff should evaluate whether these individuals are housed appropriately, taking into account the severity of their conditions and medical needs.  We believe this could be done by medical staff at the particular institution where the person is housed, but that CCHCS should issue guidance for this process.

3.  A process by which CDCR re-houses those identified by medical staff as requiring safer housing.

**B.  Defendants' Dorm Social Distancing plan remains inadequate because newly-issued "guidelines" for minimizing risk during waking hours are too vague and there remains no plan to minimize the risk of harm to medically vulnerable patients.**

Defendants' Dorm Social Distancing plan, involving the creation of eight-person cohorts of bunks (with each cohort separated by at least six feet) or six feet of separation between all bunks in all congregate living areas, <u>might</u> be adequate if  Defendants (1) complete all dorm rearrangements and transfers to other congregate living areas such that all complies with the Receiver's directive and their own guidance regarding bed and sleeping positions; (2) adequately protect those in the dorms during waking hours; and (3) adequately address the heightened risk to the medically vulnerable.

With regard to completing dorm rearrangements and transfers, Defendants this week provided an unsigned document asserting that the necessary cohorts or bunk separation in congregate living areas had been "established" at most prisons, but which also indicates the task remains unfinished at a half-dozen prisons and certain community-based facilities.  Plaintiffs have asked Defendants about these matters.  Plaintiffs will also need to monitor what has been done (see discussion below).

With regard to protecting those in the dorms during waking hours, we have repeatedly stated that the eight-person cohorting scheme as currently implemented leaves *Plata* class members at a serious risk of harm and does little to mitigate their exposure to

COVID-19 if it enters their congregate living space, because the plan only separates cohorts or people when asleep. ECF No. 3304 at 3 and ECF No. 3316 at 4-6. As indicated in the last Joint Case Management Conference Statement, at that time, Defendants considered it up to each individual class member to "practice physical distancing and to take other precautions" to keep him or herself safe – thus assuming that every member of the eight-person cohort would be doing the same. ECF No. 3314 at 3.

Defendants this week provided a May 11, 2020 memorandum issued by CDCR's Division of Adult Institutions Director Connie Gipson, titled "*Guidance* for Daily Program Regarding Social Distancing for Cell or Alternative/dorm style Housing of Eight Person Cohorts" (emphasis added). This memo was issued without input from Plaintiffs. The May 11th memo does not adequately address the risk of harm during waking hours to those in congregate living areas.

Abandoning their previous position that the eight-person cohorts were for "sleeping hours" only, Defendants' May 11th memo purports to extend the cohesiveness of each cohort to waking hours and activities. But it fails on many levels. First, and most fundamentally, this memorandum for the most part merely provides the prisons with suggested goals that are entirely discretionary. The memo leaves each institution independently "responsible for their daily operations [while] taking the . . . information [included in the memo] into consideration." Further, the guidelines provided are vague. For example, they encourage social distancing rather than require prisons to establish clear schedules that allow each cohort access to various programs and services at particular times.

More fundamentally, Defendants' May 11th memo advises the prisons to keep each eight-person cohort together for activities only "when feasible." Given the risk of harm posed by COVID-19, excusing action simply because it is not easy or convenient is inadequate. The memo similarly encourages institutions to "consider" options such as canteen and package delivery if social distancing is not able to be achieved. Again,

Defendants give each institution broad discretion, and affirmative action is not required.

Also, with regard to cleaning – a key matter since individuals in congregate living areas share, among other things, toilets and sinks regardless of how cohorted – the May 11th memo incorporates an April 8, 2020, memorandum titled "COVID-related Cleaning Protocols for Institutions," which requires that porters clean communal areas twice per watch, *i.e.*, every four hours on average. Such minimal cleaning is entirely inadequate for the toilets and sinks used by people from multiple cohorts throughout the day. It is further inadequate if, as the memo suggests, each eight-person cohort showers separately. For instance, many dorms at Avenal State Prison have a "temporary COVID capacity" of 192 individuals in cohorts of eight. This results in 24 cohorts, 10 of which would presumptively need to access the shower any given day to allow for three showers per week. The memo provides no instruction on how the common areas will be cleaned or who will clean them after each eight-person cohort's use.

In addition to all the above, Defendants' May 11th memo does not contain any binding standards or a method for ensuring accountability.

Plaintiffs have requested a meet and confer to review our concerns with Defendants but have not yet received a response.

**Plaintiffs' Monitoring Needs**

With regard to whether Defendants have arranged cohorts, bunks, and sleeping arrangements in accord with the Receiver's directives and CDCR guidance, Plaintiffs have not received sufficient information to evaluate CDCR's progress remotely. On April 20th, we requested that Defendants "provide photos or video-recorded site visits of each of the newly configured dormitories, in which staff measure the distances between cohorts, and document access to programs, bathrooms and showers, medical/mental health services, and meals." ECF 3294 at 3. Defendants' response thus far has been limited and unsatisfactory. On April 24, we received a collection of photographs and diagrams of dormitories at 10 prisons. On May 7th, we received a collection of diagrams and photos for 20 additional

prisons. We have not received any documents for four prisons.[2] And, the production for many prisons has been incomplete: for example, CIM has 16 dorms, but we only received photos/diagrams apparently corresponding to three of those dorms. Similarly, SATF has dorms on A, B, F, and G yards, but we only received photos/diagrams for the dorms on F and G yards. For CMC, which has 31 dorms, we received only a diagram of what appears to be the second floor of the hospital building, and one photo.

Moreover, the documents produced do not permit us to adequately evaluate CDCR's implementation of the physical distancing plan. Some diagrams reflect measurements between bunks, but many do not. It is also unclear from many diagrams whether people are assigned to both top and bottom bunks, and, in some instances, whether a full wall or a half-wall (a "pony wall") is being used to separate bunks or cohorts.

We also have no way to determine whether the diagrams reflect what is actually happening on the ground. We received a very limited number of photos. Some appear to be of just a few beds within a larger housing unit, so we are unable to confirm, for example, that bunks are empty as indicated in the diagram. Many photos are also not labeled with a particular dorm name/number. Only three photos include a tape measure stretched between bunks, but the numbers on the tape measure are illegible.

As discussed at the May 6th Case Management Conference, we have been unable to conduct site visits to assess conditions regarding cohorting (or for efforts related to the new May 11th memo) in person. On May 7th, CCHCS stated during a conference call that, from a public health perspective, Plaintiffs' counsel could be allowed to visit the prisons in person. However, we believe that in-person tours are not appropriate at this time. We are bound by the shelter in place orders in Bay Area counties through June 1, and are also concerned about whether physical distancing can be practiced while traveling, and introducing multiple people into the prisons during our visits. Thus, on May 9th, we wrote

---

[2]. The California Training Facility, Chuckawalla Valley State Prison, North Kern State Prison, and Valley State Prison.

Defendants to request virtual site visits (via Zoom, FaceTime, etc.) of the key dormitories and temporary housing spaces, beginning with CIM. We indicated we may request in-person visits of other dormitories in June or thereafter, based on the available facts and public health recommendations.

In the early afternoon on May 13th, shortly before this Statement was filed, Defendants replied that they are evaluating their technological capabilities to determine how to best facilitate the requested inspections, and suggesting a phone conference this week to discuss logistics (we will schedule such a call). Defendants also said they will make every effort to prioritize Plaintiffs' virtual inspection of CIM the week of May 18th. We appreciate defendants' response, and hope such an inspection takes place.

### C. Potential resumption of Reception Center intake and inter-prison transfers, and the need for vastly expanded COVID-19 testing

On or about March 24, 2020, Secretary Diaz closed CDCR to intake for 30 days, pursuant to authority granted him by the Governor's Executive Order N-36-20 of that date. On April 24, Secretary Diaz extended that closure until May 25. The Secretary retains the authority to extend the period for another 30 or more days but has apparently decided not to do so: Defendants have informed Plaintiffs that they plan to reopen intake to new admissions on May 26, 2020.

The resumption of intake without any additional releases will have two effects: first, an immediate rise in CDCR's population from the two-month backlog, and second, an increase in movement of people throughout the system, as the current Reception Center population is transferred to other prisons and new people arrive from county jails to the Reception Centers.

Plaintiffs believe that the rise in population and increase in movement will significantly and unacceptably elevate the risk of transmission of COVID-19. The rise in population will mean more overcrowding and consequent difficulties with packed dorms and overflowing common areas. The implementation of cohorts in the dorms is already

troubled, as discussed above, and it is unclear how CDCR will accommodate potentially thousands more people. There must be a detailed plan to do so, with metrics that assess how many people can be allowed into the system, and a plan to cease intake as needed if further serious outbreaks occur.

The increase in movement is also dangerous. The Receiver has stated, and Plaintiffs agree, that the cessation of transfers system-wide has been a significant factor in the apparent lack of significant disease outbreaks at many prisons. Once people living and working in the prisons start transferring among them, the potential for more serious outbreaks increases substantially.

The Receiver and his team have stated that a large expansion of CDCR's testing capabilities is necessary to safely increase population and transfers. People must be tested on arrival, in order to determine what risk they pose to those living and working in the Reception Centers; they must be tested after Reception Center processing and before they leave, to determine what risk they pose to people at the prisons where they will live; and the prisons that accept this new population must have widespread testing done to determine if there are currently outbreaks that will place the new arrivals (and current residents) at risk of harm. The Receiver has sought to increase testing capacity by 10,000 per month. This additional testing capability must be secured and it must be demonstrated that it provides adequate oversight before a resumption of movement can occur without placing the Plaintiff class at an unacceptable risk of harm.

In sum, any increase in movement or population must come only when the system is prepared to manage the additional risk involved. On May 8th, Plaintiffs requested to meet and confer with Defendants about these concerns. On May 13th, we were informed that we will be allowed to express our "collective thoughts" about the process to Defendants on May 15 and are allowed to ask questions so long as they are submitted in advance.

16541200.2                                      -10-                      Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

### D. Medical care and other matters related to COVID-19.

The weekly phone conference with the Receiver and CCHCS's Chief Medical Executive is scheduled for tomorrow (Thursday, May 14th) in the afternoon, and Plaintiffs have provided questions and concerns in advance. In addition to the matters related to the issues discussed above, we have asked to discuss COVID-19 testing developments and plans.

## II. DEFENDANTS' STATEMENT

Defendants' statement describes additional COVID-19 related measures CDCR has taken since the last case management conference on May 6, 2020. In addition, Defendants' statement provides a summary of additional information and documents they have produced to Plaintiffs since the last conference.

### A. CDCR issued additional written guidance to all institutions reiterating social distancing expectations pertaining to the eight-person cohorts.

On May 11, 2020, CDCR issued a memorandum titled "COVID-19 guidance for daily program regarding social distancing for cell or alternative/dorm style housing of eight person cohorts." The memorandum set forth CDCR's expectations that each institution must consider as they develop their daily operational programs during this unprecedented pandemic. A copy of the memorandum was produced to Plaintiffs' counsel on May 12, 2020. Specifically with respect to facilitating social distancing for eight-person cohorts, the memorandum states that "[m]ovement for all dorm/gym housing with eight-person pods should be cohorted as much as feasibly possible; in such fashion as to not mix inmates with other cohorted groups, as well as not mixing inmates from different housing units." With respect to feeding, the memorandum provides that "cohorted inmates that are housed in the same cohort should walk together to the dining halls, maintaining social distancing." With respect to ducats and shower and restroom use, the memorandum provides that "when required to ducat in groups, ducat through housing cohorted inmates as much as possible," and that "[c]ohorts may shower together, when feasible. Daily, staff will remind and educate the inmate population to maintain social distancing standards and

disinfect between each us." For dayrooms and recreation, the memorandum provides that "[r]educed numbers [of inmates in dayrooms] to allow for increased social distancing may result in no dayroom activities" and that yard time should be scheduled in a way to allow "[o]ne housing unit/dorm at a time and in such fashion as to not mix inmates from one housing unit with another housing unit or one exposed or infected group with another." It also provides that "[i]nmates housed in cohorted groups should go to yard together." Lastly, the memorandum provides that for the duration of the COVID-19 altered program, verbal announcements shall be made several times a day through the public address system to remind inmates to maintain at least six feet of social distancing and to wear masks.

### B.   CIM set up eight tents to provide more space for medical services

On or around May 9, 2020, CIM set up eight tents (*i.e.,* two tents on Facility A-yard, one tent on Facility C-yard, and five tents on Facility D-yard) for additional space to provide medical services to inmates. The purpose of these tents is to provide for greater social distancing for both inmates and staff during medical encounters.

### C.   Information and Documents CDCR has produced to Plaintiffs since May 6, 2020

On May 7 and May 8, 2020, CDCR produced various additional photos, floor plans, and diagrams pertaining to dorms at approximately 20 institutions. In addition, CDCR has completed its production of rosters with names of members of the Inmate Advisory Councils from all 35 institutions. Further, on May 7, 2020, CDCR provided answers to various questions raised by Plaintiffs' counsel about changes in food services and kitchen staff at CIM and LAC housing assignments. Also, on May 12, 2020, CDCR produced various documents pertaining to the status of inmate transfers, a memorandum pertaining to the availability of cloth barrier masks and hand sanitizer, and the above-referenced May 11, 2020 memorandum titled "COVID-19 guidance for daily program regarding social distancing for cell or alternative/dorm style housing of eight person cohorts."

Since May 8, 2020, Plaintiffs' counsel has sent three separate requests to Defendants,

asking them to coordinate the following three separate meetings/calls with CDCR staff this week: (i) a call to discuss various issues that may arise from Plaintiffs' perspective as a result of the decision to resume intake of inmates from county jails (which is currently scheduled to commence on May 26, 2020), (ii) a call with Connie Gipson, the Director of CDCR's Division of Adult Institutions, to discuss unspecified questions about the above-referenced May 11, 2020 COVID-19 guidance memorandum, and (iii) a call to discuss Plaintiffs' request to schedule virtual tours of all dorms and temporary housing spaces at CDCR's institutions, starting with a virtual tour of CIM this Friday, May 15, 2020.

Regarding Plaintiffs' request for a virtual tour, Plaintiffs' counsel suggested that a very small group (*e.g.,* two people) facilitate the virtual tour by carrying a phone, laptop, or tablet through each housing unit, and also requested that staff conducting the tour be available to answer questions about the physical-distancing plan in the housing unit. Plaintiffs' counsel further requested that these individuals have a measuring tape and camera to take measurements and photographs during the virtual tour upon Plaintiffs' counsel's request.  Defendants are currently working with CIM to determine whether the requested tour can be facilitated from a technical perspective and will further discuss the request with Plaintiffs' counsel once this assessment is complete.  Further, Defendants believe that the Receiver should be consulted regarding any requests to conduct virtual tours of prisons.

With respect to Plaintiffs' requests for multiple calls with CDCR staff, Defendants acknowledge and respect Plaintiffs' right to obtain information from Defendants.  And Defendants are in the process of coordinating a call with Plaintiffs' counsel for later this week or early next week to give them an opportunity to share their collective thoughts and concerns about resuming intake of inmates from county jails.  But the sheer number of repeated, and at times duplicative[3], requests to make CDCR staff available for in-person

---

[3] Counsel for the plaintiffs in the *Armstrong* class action, which includes the Prison Law Office, sent a very similar request for another virtual tour of CIM.

(or telephonic) questioning at short notice cannot be accommodated without diverting the staff members' time and attention from other crucial COVID-19 related tasks.  Therefore, in lieu of two of the calls Plaintiffs' counsel requested this week, Defendants have asked Plaintiffs to submit any questions they have in writing and Defendants will provide written answers to their questions in a timely manner.  And if Plaintiffs have any concerns, thoughts, or proposals about ongoing COVID-19 related topics, Defendants request that they submit them in writing for Defendants' consideration.

DATED:  May 13, 2020                          PRISON LAW OFFICE


By:     */s/ Steven Fama*
STEVEN FAMA
Attorney for Plaintiffs


DATED:  May 13, 2020                          XAVIER BECERRA
                                              Attorney General of California


By:     */s/ Damon McClain*
DAMON MCCLAIN
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR
Deputy Attorney General
Attorneys for Defendants


DATED:  May 13, 2020                          HANSON BRIDGETT LLP


By:     */s/ Paul Mello*
PAUL B. MELLO
SAMANTHA D. WOLFF
Attorneys for Defendants

-14-                                          Case No. 01-1351 JST

16541200.2   JOINT CASE MANAGEMENT CONFERENCE STATEMENT