| | |
|---|---|
| XAVIER BECERRA<br>Attorney General of California<br>DAMON MCCLAIN (209508)<br>Supervising Deputy Attorney General<br>NASSTARAN RUHPARWAR (263293)<br>Deputy Attorney General<br>455 Golden Gate Avenue, Suite 11000<br>San Francisco, CA  94102-7004<br>Telephone: (415) 703-5500<br>Facsimile: (415) 703-3035<br>Damon.McClain@doj.ca.gov<br><br>HANSON BRIDGETT LLP<br>PAUL B. MELLO (179755)<br>SAMANTHA D. WOLFF (240280)<br>425 Market Street, 26th Floor<br>San Francisco, California 94105<br>Telephone:    (415) 777-3200<br>Facsimile:    (415) 541-9366<br>pmello@hansonbridgett.com<br><br>*Attorneys for Defendants* | PRISON LAW OFFICE<br>DONALD SPECTER (83925)<br>STEVEN FAMA (99641)<br>ALISON HARDY (135966)<br>SARA NORMAN (189536)<br>RANA ANABTAWI (267073)<br>SOPHIE HART (321663)<br>1917 Fifth Street<br>Berkeley, California 94710<br>Telephone:  (510) 280-2621<br>Fax: (510) 280-2704<br>dspecter@prisonlaw.com<br><br>*Attorneys for Plaintiffs* |

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>GAVIN NEWSOM, et al.,<br><br>       Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:     May 21, 2020<br>Time:    10:00 a.m.<br>Crtrm.:  6, 2nd Floor<br>Judge:   Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the May 21, 2020 Case Management Conference. The parties exchanged their respective sections at approximately 2:00 p.m. today.

## I. PLAINTIFFS' STATEMENT

As of just before 2:00 p.m. on Wednesday, May 20, 2020, 910 patients statewide had been confirmed to have COVID-19 via testing.[1] These include 599 at the California Institution for Men (CIM), an increase of approximately 200 from a week ago and 500 from three weeks ago. 449 of CIM's cases are currently considered active at the prison. There have also been 127 cases at California State Prison – Los Angeles County; 39 of those are considered active.[2] 226 cases statewide are considered resolved.

Since last week's Conference, new outbreaks have occurred at three prisons. California Institution for Women (CIW) now has had 108 confirmed cases, an increase of almost 100 from a week ago. That prison houses approximately 1,500, approximately 22% of whom (more than 300) are designated medical high risk; there are also eight who are pregnant. Chuckawalla Valley State Prison (CVSP), an all-dorm institution which houses approximately 2,300 people, has 36 cases. Avenal State Prison, which houses approximately 4,170 people (all but about 100 in dorms) has 25 cases.

There was an additional death of a COVID-19 patient this past week, bringing the total to six. All deaths have been of patients from CIM who had serious medical conditions or other factors, such as age, that made them especially vulnerable to the disease. Currently, 32 patients, including 27 from CIM, are at outside hospitals due to COVID-19 complications. We anticipate an increase in community hospitalizations given the increasing number of COVID-19 confirmed cases statewide.

---

[1] This number, and the others reported here, derive from the CDCR/CCHCS "Population COVID-19 Tracking" website, and include active in custody (638), released while active (10), resolved (226), and deceased (six) patients.

[2] In addition, as reported previously, California Men's Colony has had 11 cases, Centinela State Prison has had two, and North Kern State Prison and the Substance Abuse Treatment Facility and State Prison at Corcoran have had one case each.

Over the last approximately 10 days, the number of COVID-19 tests done statewide more than doubled, and now totals 7,192. More than 3,100 of that total have been done at CIM, where nearly the entire population has been tested. CCHCS last week indicated it was considering a similar mass testing at CIW. Plaintiffs believe such testing, as well as surveillance testing, is necessary to prevent or reduce the risk of widespread outbreaks and adequately protect the medically vulnerable. In this regard, Plaintiffs have been told that CCHCS has been promised 18,000 COVID-19 tests per month on an ongoing basis.

### A. Defendants and the Receiver denied Plaintiffs' request for a plan to house people at risk of severe illness or death from COVID-19.

Plaintiffs requested several times that Defendants and the Receiver develop a plan to ensure that people who are medically vulnerable to complications and death from COVID-19 are safely housed during the pandemic. We made this request because COVID-19 is particularly dangerous for people who are elderly and those who are immunocompromised or have certain health conditions, and because many such people are currently housed in crowded congregate living areas in CDCR, where they are at heightened risk of contracting the virus. As stated above, six people, all with known medical conditions predisposing them to COVID complications, have died since April 16th of COVID-related causes. We believe most or all were living in dorms when they developed symptoms of the virus. In addition, of the 30 active COVID patients currently in an outside hospital, 26 have at least one identified risk factor and half have more than two identified risk factors based upon data in the CCHCS COVID registry.

After direction from this Court, Defendants responded to Plaintiffs' letter on May 15, denying the request for a plan. Defendants stated, and Plaintiffs agree, that CCHCS has identified people who have at least one risk factor for severe disease if they contract the virus. However, they refuse to perform a housing assessment for these people, stating that they and the Receiver believe medical staff already have mechanisms for assessing whether people are "housed in an environment that is conducive to the receipt of ongoing,

adequate treatment." They claim that "a mass movement" of people to different housing "between institutions" is potentially dangerous.

These reasons are faulty. First, Defendants state that they are considering moving some high risk patients out of CIM because of the COVID-19 outbreak at that facility. Although that indefinite commitment comes late, it is welcome and should be expanded to other prisons, especially those such as CHCF and CMF which have scores of potentially vulnerable patients in congregate living areas.

Second, we understand that Defendants and CCHCS have procured a reliable monthly supply of 18,000 COVID-19 tests. In Coleman proceedings, Defendants have described a transfer process in which people will be tested for the virus upon arrival at Reception Centers and again prior to transfer, and then will be housed in quarantine for 14 days upon arrival at their destination prison. Presumably a similar process can be applied to the medically vulnerable requiring transfer to safer housing.

Defendants also assume that this would require mass movement of high risk patients. However, all patients categorized as "high risk" are not necessarily at the same level of risk. For example, patients with well-controlled diabetes are probably at less risk than other high risk patients. An individualized assessment will allow Defendants to avoid a mass transfer by prioritizing patients whose conditions pose the greatest risk. Moreover, because many prisons have both dormitories and celled housing, presumably some "rehousing" will involve moving people from a dorm to celled housing at the same prison, avoiding the need for a transfer to a different prison.

The CDCR tracking website shows that while the curve for California and the United States is flattening, the curve for confirmed cases in prison is rising at a much higher rate. (https://www.cdcr.ca.gov/covid19/population-status-tracking/ at p. 4.) Therefore, in the near term there will probably be more outbreaks at other prisons. Under these critical circumstances, additional precautions related to the housing of medically vulnerable patients should be taken immediately. If adequate space is not available in the

state prison system, state officials should explore other safe alternatives, especially for individuals who pose a low risk to public safety.

### B. Defendants' plan to reopen intake and inter-prison transfers

Defendants plan to reopen CDCR prisons to county jail intake on May 26. In order to create space in the Reception Centers, Defendants have lifted the ban on nonessential prison-to-prison transfers to move people starting this week from those prisons to other institutions. The parties met and conferred on May 15 regarding Plaintiffs' questions about the process, submitted in advance.

After a productive conversation, Plaintiffs requested a copy of any written documents generated that provide direction to headquarters staff and institutions regarding intake and transfers.

Plaintiffs also provided in writing on May 18 a written statement of our position. In short, Plaintiffs believe that adequately protecting class members from a substantial risk of serious harm requires that these transfers and intake should not begin until CDCR safely completes pending transfers for necessary medical care (including, for example, inpatient placements and removal from the cocci endemic zone),[3] mental health care, and ADA accessible housing. Further, Plaintiffs believe that intake should not resume until it is established that there is adequate space to safely house the additional people, based on a determination of the population capacity of each prison (taking into account the needs of medically vulnerable patients, the availability of PPE, the availability of space for medical isolation and quarantine, physical distancing, etc.) and then should only proceed at a speed that allows time to adjust to new outbreaks and space limitations. The process should be governed by standards and criteria for determining how many people can be transferred

---

[3] There currently are nearly 200 people who have medical conditions or other factors that per CCHCS policy require they be promptly moved from the cocci region because of increased risk of severe complications if infected. More than 100 of those were identified as needing to be transferred more than 60 days ago; almost 70 of those are at Avenal State Prison or Pleasant Valley State Prison, which together constitute a hyper-endemic cocci zone.

into and out of each institution, as well as when prisons should be closed to accepting new people (as CIM, CIW, and Lancaster currently are).  Further, Plaintiffs believe that CDCR and CCHCS should establish standards and criteria for determining when the increased movement and the increased population have increased risk of transmission to an unacceptable level, and steps to take to reduce that risk, including slowing or stopping intake.  Finally, the measures described by CCHCS and CDCR for COVID-screening, quarantines and related processes should be set forth in policy and procedure; and the same should occur with regard to medical protocols developed for all other inter-prison transfers.

### C. Defendants' Dorm Social Distancing plan remains inadequate because their "guidelines" for minimizing risk during waking hours are too vague and there is no plan to minimize the risk of harm to medically vulnerable patients.

Plaintiffs remain concerned about the memorandum provided by the Division of Adult Institutions (DAI) on May 11, 2020, titled "Guidelines for Daily Program Regarding Social Distancing for Cell or Alternative/dorm style Housing of Eight Person Cohorts," which purports to provide guidelines to the institutions on how to appropriately and safely cohort each eight-person group to prevent the spread of COVID-19.  As detailed in the last Joint Case Management Statement, the memorandum provides prisons with suggested goals that are discretionary and vague. ECF No. 3322 at 6.  Little direction is given regarding cleaning and disinfecting requirements, and no monitoring or accountability procedures are put into place.  ECF NO. 3322 at 7.  On Tuesday, May 12, Plaintiffs requested a meeting with Defendants to discuss the memorandum, at which time Plaintiffs were invited to submit questions in writing.  Shortly after the last Case Management Conference, on May 14, 2020, Plaintiffs again wrote to Defendants and elaborated on our concerns with the May 11, 2020, DAI memorandum, laid out some potential solutions to the identified deficiencies, and reiterated our request for a meeting with Ms. Gipson and key DAI staff.  At this time, no such meeting has been set and we have received no substantive response.

### D. Plaintiffs' monitoring

Plaintiffs have not received sufficient information to evaluate CDCR's implementation of the Receiver's dorm cohorting directive and DAI's Guidelines regarding social distancing in the dorms. As previously explained, the photos and diagrams provided by Defendants of the dorms do not provide an adequate basis to assess matters. The information received from class member letters and phone calls as well as the CCHCS report on certain social distancing practices at certain prisons,[4] are helpful but not adequate to provide a complete picture that would allow Plaintiffs to determine the adequacy of CDCR's implementation.

On May 9, we requested virtual site visits (via Zoom, FaceTime, etc.) of the key dormitories and temporary housing spaces, beginning with CIM. We discussed this request with Defendants' counsel on May 15. On May 19, we were informed that Defendants would conduct a test run virtual visit at CIM on Wednesday, May 20, and that – if it worked as a technical matter -- they envisioned Plaintiffs' tour of CIM would occur on Friday, May 22. However, Defendants have not confirmed whether they will permit Plaintiffs to ask questions of staff during the virtual site visit, which may be a problem. Nevertheless, we appreciate these efforts and will report on further developments next week.

### E. Receiver has authority in housing matters

At the last Case Management Conference, this Court posed questions to both parties about the Receiver's authority to order housing changes for incarcerated people.

#### 1. Does the Receiver have the power to order CDCR to place people in medically appropriate environments under CDCR's control?

Yes. The Defendants conceded this point at the Case Management Conference of May 14, 2020. *See also* Order Granting Plaintiffs' Motion for Relief Re: Valley Fever at

---

[4] The CCHCS report did not review whether dorm bunk or bed arrangements were consistent with the Receiver's directives, and did not involve visits or review at the many prisons in which people are mostly housed in cells.

Pleasant Valley and Avenal State Prisons, June 24, 2013, ECF No. 2661 at 24-25 (CDCR required to comply with Receiver's housing policy based on medical necessity); Health Care Department Operations Manual, found at https://cchcs.ca.gov/policies/, at 1.2.14 (Receiver has authority to determine certain housing placements based on medical need.).

### 2. Does the Receiver have the power to order CDCR to acquire additional space to house patients out of medical necessity?

Yes. The Receiver "shall exercise all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical health system." Order Appointing Receiver, ECF No. 473, Feb. 14, 2006, at 4. That includes "the power to acquire . . . and lease property . . . as necessary to carry out his duties." *Id.*

Further, the Receiver has the power, in an emergency, to find alternate safe locations for people in CDCR custody. Section 8658 of the Government Code grants "the person in charge" of a "a state, county, or city penal or correctional institution" in a life-threatening emergency the power to "remove [people living in the institution] to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them." The "person in charge" of CDCR for these purposes, with the power to effect such removal or release during in the current medical emergency, is both the Secretary and the Receiver. *See* Memorandum: Updated Message to Employees Regarding the Department's Response to COVID-19, April 1, 2020, from Secretary Ralph Diaz and Receiver J. Clark Kelso, found at https://www.cdcr.ca.gov/covid19/memos-guidelines-messaging ("We have . . . jointly determined that, pursuant to Government Code Section 8658, an emergency has occurred endangering the lives of inmates and staff through all institutions of CDCR" that makes it "necessary to accelerate the release of certain nonviolent inmates.").

### F. Medical care and other matters related to COVID-19.

The weekly phone conference with the Receiver and CCHCS's Chief Medical

Executive is scheduled for Thursday, May 21, and Plaintiffs have provided questions and concerns in advance. In addition to matters related to the issues discussed above, we have asked to discuss the adequacy of hospital beds for COVID patients at CIW, CIM and CVSP, given that Riverside and San Bernardino Counties have high rates of COVID infection, and about measures to prevent virus transmission for those patients who require regular treatment at community hospitals or other off-site medical facilities.

## II. DEFENDANTS' STATEMENT

Defendants' statement addresses the questions this Court raised during the May 14 case management conference. In addition, Defendants' statement provides a summary of additional information and documents they have produced to Plaintiffs since the last conference.

Defendants also remain concerned with Plaintiffs' efforts in the *Coleman* litigation, which have the effect of muddying the waters dividing the *Plata* and *Coleman* matters. Most recently, on Monday, May 18, counsel in *Coleman*, Michael Bien, requested that the Special Master devote time on the task force meeting agenda to specifically consider "transfers of medically vulnerable" inmates. Mr. Specter and Mr. Fama were copied on this request and ultimately participated during the discussion of this agenda item during the *Coleman* task force meeting.

Mr. Bien's request was made following *Plata* Defendants' and CCHCS' joint response to *Plata* Plaintiffs' May 7 letter regarding the transfer of medically high-risk inmates. In their joint response, CDCR and CCHCS stated that:

(1) CCHCS has already identified inmates with at least one risk factor for severe illness if they contract the disease;

(2) CCHCS does not believe that additional analysis of risk on an individual basis is necessary because medical staff already have policies and procedures in place for assessing whether medically high-risk inmates are housed in an appropriate environment and if a high-risk patient living in "non-standard" housing (e.g., gyms or tents) cannot be treated

adequately for any reason, alternative placement for that patient may be appropriate; and

(3) CCHCS believes that mass movement of high-risk inmates between institutions without outbreaks is ill-advised and potentially dangerous since movement itself carries significant risk of spreading transmission of the disease between institutions. This initial response utilizes the well-accepted public health concepts of sheltering-in-place within the institution, quarantine and isolation. But the risks associated with transfer may be less than the risk of sheltering in place where the virus is present throughout housing units and high risk inmates test negative. CDCR will work with CCHCS to facilitate the safe transfer of high risk inmates if deemed appropriate by CCHCS and will consult with the Office of the Special Master if such transfers would impact *Coleman* class members.

**A.     Response to the Court's question about releases**

CDCR does not currently plan on conducting additional accelerated inmate releases. CDCR, however, has determined that it will postpone intake of inmates from the counties for an additional 30 days, with the exception of the intake of approximately 200 inmates over the next month. This limited intake of about 200 inmates will allow CDCR to test its new intake processes, including intake COVID-19 testing, and establish best practices of how to safely and efficiently expand intake. CDCR's decision to postpone intake for an additional 30 days will result in a further reduction of the prison population over the next month by approximately 1700 inmates. By way of reminder, intake was initially suspended by the Governor's March 24, 2020 Executive Order, and since that time, CDCR's adult population has decreased by approximately 5,317 inmates (as of May 13, 2020).

CDCR does not currently plan to conduct additional early inmate releases because it believes that it has taken and continues to take sufficient appropriate steps to improve the safety of inmates and staff in its prisons through social distancing, screening, enhanced cleaning and sanitation, staff and inmate education, and increased testing. CDCR will continue to monitor the evolving nature of this crisis and conditions in its institutions, and

will respond to future developments as appropriate.  Additional accelerated inmate releases are one of many options that CDCR will continue to consider as it continues to manage and mitigate during the pandemic.

### B. Response to the Court's concerns about testing

Before attempting to respond to the Court's general questions about testing in California, Defendants are pleased to report that CCHCS has secured, through Health Net Federal Services (CDCR's health care services provider), COVID-19 testing services sufficient to cover the tests that the Receiver has determined are necessary.

Earlier this week, the Receiver revised the estimated monthly number of tests needed from approximately 17,840 tests per month to about 20,440 tests per month.  This total assumes the need for 7,000 tests per month for the intake process, which has now been largely postponed for another 30 days.

Quest Diagnostics has informed Health Net Federal Services that it can provide up to 20,440 tests for inmates on a monthly basis.  It is anticipated that this level of testing will cover CDCR's ongoing testing needs for inmates already in CDCR's custody in addition to the additional testing required to safely intake new inmates when the intake process resumes.  The first deliveries of tests under this new arrangement with Quest Diagnostics are expected to occur at some institutions this week.  And CDCR is also receiving additional tests from Thermo Fisher and the Office of Emergency Services.  As a result of these new resources and arrangements, there should be adequate testing for the foreseeable future.  Defendants hope this development addresses the Court's main concern about the current availability of COVID-19 tests for inmates.

To try to obtain information responsive to the Court's general questions about testing in California, Defendants' counsel reached out to California's Department of Public Health and California's COVID-19 Testing Task Force, which has been operating since early April 2020.  The Testing Task Force is a public-private collaboration working group with stakeholders across the state.  It was created to quickly and significantly boost

California's testing capacity.  The Testing Task Force's priority is to ensure that California's labs have enough capacity and supplies to administer a significantly greater number of tests statewide.  To achieve this objective, the Testing Task Force works to ensure that approximately 300 testing laboratories in California—comprised of academic, commercial, hospital, and public health laboratories—have the necessary supplies to satisfy California's testing needs.  The Testing Task Force also closely monitors the number of tests completed in California.

The Department of Public Health and the Testing Task Force do not control who utilizes each lab's testing capacity.  Instead, the Testing Task Force attempts to ensure that all of the labs in California have the resources needed to satisfy the demand for testing, wherever that demand comes from.  The efforts of the Testing Task Force appear to be paying off because the Department of Public Health reports that the availability of testing in California has been steadily improving, and the rate of testing has been significantly increasing.

Likewise, the rate of testing in CDCR's institutions has been increasing.  On April 1, only 266 tests had been completed on inmates.  By May 1, 1,469 inmate tests had been completed.  And by May 20, 7,088 inmate tests had been completed.  Based on the newly acquired access to additional testing resources, Defendants expect the rate of inmate testing to continue to increase at a quick pace.  Further, each new admission through intake will be tested upon entry and again prior to leaving the Reception Center after being endorsed for transfer.

The Department of Public Health advised that the Testing Task Force does not acquire and stockpile tests or other testing supplies, nor does it control who can request testing services from the hundreds of labs in California.  The Department of Public Health does, however, closely track the number of tests that have been completed in California, and as of May 19, it reported that 1,339,316 tests have been completed.

The Department of Public Health was not able to provide Defendants a response to

the Court's question about the number of tests the Department of Public Health is expecting to receive under contracts and when those tests will be received due to the nature of the State's test-related contracting.  The Department of Public Health and the testing task force have attempted to identify the types of testing-related resources labs need that are scarce and difficult for the labs to obtain, including, for example, serology tests, M2000 test kits, swabs, and cartridges, among other types of testing resources and equipment.  The Testing Task Force then attempts to secure contracts for those scarce resources to make them available to labs in California.  For example, if the Testing Task Force were to secure a contract with Abbott for 250,000 test kits, then a participating lab in California would be able to directly order some of those test kits from Abbott as the need for them arose at that particular lab.  And other labs could do the same until the tests acquired through that contract were exhausted.

The testing landscape in California is complex and defies simple explanation.  The above is a general overview of the steps California has been taking to increase testing across the state.  If the Court would like a more detailed explanation of any aspect of testing in California, Defendants will endeavor to provide it.

**C.     Summary of cleaning protocols at CDCR's 35 institutions**

During the last case management conference, this Court raised various questions about the cleaning schedule and protocols for the communal areas at CDCR's institutions. In response, CDCR posed the below questions to each institution and gathered answers from all 35 institutions.  Each institution has the right to outline and manage its own protocols and procedures as appropriate for each housing unit or living area.  Therefore, the cleaning protocols vary from institution to institution and, in some cases, within different areas of the same institution.  The below responses reflect Defendants' best effort to summarize all the information CDCR received in response to the survey questions issued to the institutions.  CDCR is reviewing the information that was provided to determine if any additional guidance or directives about cleaning schedules and methods

need to be provided to the field.  Due to time constraints, Defendants' counsel was not able to follow-up with each institution to fill in gaps in the collected information and to confirm whether certain protocols are in place.  Defendants will report additional information to the Court on this topic in the next Joint Case Management Conference Statement.

It is also worth noting that CCHCS' Correctional Service Team summarized its observations following its visit to 21 institutions to inspect conditions in the dorms and other areas.  The Chief Counsel for CCHCS produced that summary to counsel for the parties on May 18, 2020 and the summary touches upon many subjects relevant here, including cleaning, use of masks, and the observance of physical distancing at the surveyed institutions.

**1.   How often are showers being cleaned?  (Dorms and cells)**

Depending on the institution and various locations within each institution, on average, showers are either being cleaned after every use, every 2-3 hours, and/or two to four times per shift during second and third watch (*i.e.,* between 6:00 am and 10:00 pm), plus additional cleanings after the last use.  In some institutions, inmates also have the option to clean the showers themselves prior to using them.

CDCR is evaluating how cleaning and monitoring is conducted and reported and plans to issue further guidance regarding compliance with cleaning and social distancing mandates and guidance.

**2.   How are communal toilets and sinks being cleaned? (Dorms, dayroom, yard)[5]**

Depending on the institution and various locations within each institution, communal toilets and sinks are cleaned after each use, every hour or every two to four hours, three times a day, two to three times per third and second watch (and sometimes one more time at the end of each shift), or up to nine times per day.

---

[5] Due to the wording of this question, some institutions did not provide information about how often the toilets and sinks are being cleaned.  Defendants' counsel will follow-up with the institutions on this.

### 3. How many people use the showers before they get disinfected?

Some institutions indicated that the showers are disinfected after each use. At other institutions, the number of uses between cleaning ranged from two to 83 at one housing unit (although the vast majority of the numbers are in the one digit or lower two-digit range).

### 4. Who is doing the disinfecting for showers/ toilets/sinks? If it's the inmates themselves, which inmates, the ones who just used the bathroom or workers?

In almost all institutions and areas, inmates (*i.e.,* inmate workers/porters, CALPIA workers, or inmate volunteers) handle the cleaning and disinfecting of communal showers, toilets, and sinks. On very few occasions, CDCR staff members perform the cleaning. In addition, in a lot of institutions, inmates who used the communal showers, toilets, and sinks, also have supplies available to clean and disinfect the areas themselves.

### 5. What protective gear, if any, are the inmates provided and required to wear while cleaning?

Almost all institutions provide gloves and face masks (such as cloth barrier masks or KN95 masks) to inmate workers. Some also provide eye protection (such as goggles or eye shields). At the Outpatient Housing Unit of the Correctional Training Facility, inmate workers are also provided isolation gowns and shoe covers. A couple of institutions also offer rubber boots to the workers.

### 6. What cleaning supplies are made available?

Among other supplies, all institutions make Cell Block 64 available to clean the communal areas. Cell Block 64 is a powerful, hospital grade, neutral pH disinfectant for use on floors, walls, medical surfaces, and all other surfaces not harmed by water. Some institutions also listed SaniGuard (surface spray sanitizer that kills 99.99% of germs, bacteria, and viruses on contact), Break Out, and bleach.

### D. The Receiver's Authority to Acquire Physical Space

At the May 14, 2020 case status conference, this Court asked the parties if the Receiver, acting in his official capacity, has the power to acquire additional space if he

deems it necessary in order to provide adequate medical care. The February 14, 2006 Order Appointing Receiver is clear on this subject. It states: "[t]he Receiver shall have the power to acquire, dispose of, modernize, repair, and lease property, equipment, and other tangible goods as necessary to carry out his duties under this Order …." ECF 473 at 4:23-25. Thus, to the extent the Receiver deems it necessary to ensure the constitutional provision of medical care to inmates within CDCR's custody and control, he may acquire or lease property.[6]

However, the Order Appointing Receiver also obligates the Receiver to "make all reasonable efforts to exercise his powers, as described in this Order, in a manner consistent with California state laws, regulations, and contracts, including labor contracts." *Id.* at 5:2-4. The Receiver may seek a waiver of such laws from this Court but only in the event compliance with such laws would prevent the Receiver from implementing a constitutionally adequate medical care system or from otherwise carrying out his duties. Therefore, if the Receiver were to determine that his acquisition of property was necessary to ensure the delivery of constitutionally adequate medical care, he would be obligated to comply with (or seek a waiver of) a number of state laws, including (but not limited to) the following:

- Public Contract Code sections 6106, 10109-10126, 10129, 10140, 10141, 10180-10185, 10220, 10290-10295, 10297, 10301-10306, 10333, 10335, 10351, 10367, 10369, 10420-10425 (pertaining to the state contracting process).
- Cal. Public Contracts Code §§ 10365.5, 10371; SCM § 3.02.4 (governing restrictions on and approval for multiple contracts with same contractor.
- Cal. Const., art. VII: Civil service hiring requirements.

---

[6] In making this observation, Defendants do not waive any potential arguments they may have should this Court order the Receiver to acquire property, including, but not limited to, under the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1)(C).

- Cal. Gov't Code §§ 4525-4529.20, 4530-4535.3, 7070-7086, 7105-7118, 14835-14837.
- Cal. Gov't Code §§ 13332.10, 14660, 14669, 15853 (governing acquisition and leasing of real property).
- Cal. Gov't Code §§ 13332.19, 15815 (governing plans, specifications and procedures for major capital projects).
- Cal. Gov't Code §§ 14616 (governing approval of contracts by the Department of General Services (DGS) and exemption from and consequences for failure to obtain DGS approval).
- Cal. Penal Code § 11191 (requiring written consent by inmate to transfer & requiring consultation with attorney).
- Cal. Gov't Code §§ 14825-14828 (governing advertisement of state contracts).

CDCR must also comply with State budgeting processes and obtain funding before it could acquire or lease additional space.

Finally, it bears noting that the State is projecting a $54.3 billion deficit due to the COVID-19 crisis. The State anticipates that it will take years to recover from this historic shortfall. Without federal assistance, the Legislature will need to consider additional, significant cuts, including to the public schools and universities that educate our children and prepare them to succeed in our society; medical care, dental care, and mental health care for the state's most vulnerable residents; programs for housing older adults, especially those at risk of homelessness; environmental protection and natural resource management; and the reduction of the pay of State employees by 10%. The State's current and historic budget crisis must be considered when evaluating the State's and the Receiver's evolving response to the COVID-19 pandemic and their collective efforts to protect inmates, staff, and volunteers at CDCR's adult institutions.

### E. Consideration of Alternative Housing Space

During the last Case Status Conference, this Court raised the issue of alternative housing for inmates. CDCR has informally considered unconventional inmate housing options outside of institution grounds since the onset of the COVID-19 pandemic. But the lack of necessary infrastructure at these non-institutional settings – including lack of onsite healthcare clinics and access to healthcare services, insufficient security, inability to provide food in mass quantities three times per day – as well as additional issues such as collective bargaining unit problems, make these alternatives impractical. For these reasons, CDCR has focused its efforts on converting unused space within CDCR institutions where food, healthcare, staffing, and a secure perimeter already exist. CDCR, however, continues to evaluate and consider alternative spaces within which to house inmates safely on an ongoing basis.

### F. CDCR's and CCHCS's Successful Measures to Address the COVID-19 Pandemic

To date, the confirmed COVID-19 cases among inmates are limited to six out of 35 of CDCR's institutions. Also, a comparison between the rate of COVID-19 testing of CDCR inmates and the testing rate pertaining to tests performed on California and U.S. residents, respectively, shows that the testing rate of CDCR inmates is about twice as high as the testing rates of California and the U.S.: to date, 60.8 of every 1,000 inmates have been tested for COVID-19 in CDCR's institutions. In California, 27 of every 1,000 residents have been tested. Nationwide, 30.4 out of 1,000 residents have been tested.

Additionally, at Pelican Bay State Prison, inmates in the Crafts for Community program crocheted over 50 colorful and whimsical masks in a week-and-a-half to be distributed to the community. They hope to make hundreds more. The goal of this program is to teach problem solving, promote patience, and foster a sense of self-worth.

### G. Information CDCR Has Produced to Plaintiffs Since May 14, 2020

On May 14, Defendants produced further floor plans and photos of the dorms at the

Correctional Training Facility, Chuckawalla Valley State Prison, North Kern State Prison, and Valley State Prison.  On May 15, CDCR and CCHCS sent their joint response to PLO's May 7 letter about housing of medically vulnerable inmate-patients to Plaintiffs' counsel.  On May 18, Defendants produced a map and photos of the medical triage tents that were set up at the California Institution for Men.  On May 19, Defendants provided responses to PLO's follow-up questions about a document pertaining to the status of social distancing in CDCR's dorms as well as an updated status summary.  The same day, Defendants also produced a poster that lists the updated screening criteria for staff who enter CDCR's institutions, and CDCR and CCHCS provided answers to Plaintiffs' questions about the processes for critical inmate workers at the California State Prison – Los Angeles County via the non-paragraph 7 process.  Lastly, Defendants intend to respond in writing on May 20 to Plaintiffs' counsel's May 18 letter in which Plaintiffs provide their suggestions regarding intake.

     Regarding Plaintiffs' request for a virtual tour at the California Institution for Men, the parties met and conferred on the topic on May 15 and discussed which areas Plaintiffs' counsel would like to tour.  A test run is planned at CIM on May 20 to determine whether the tour can be facilitated from a technical perspective.  Subject to confirmation from Plaintiffs' counsel and to the parties' agreement on the agenda of the tour, the virtual tour is likely to occur on Friday, May 22.

DATED:  May 20, 2020                       PRISON LAW OFFICE

By:    */s/ Steven Fama*
       STEVEN FAMA
       Attorney for Plaintiffs

| | | |
|---|---|---|
| DATED: May 20, 2020 | | XAVIER BECERRA<br>Attorney General of California |
| | By: | ___/s/ Damon McClain___<br>DAMON MCCLAIN<br>Supervising Deputy Attorney General<br>NASSTARAN RUHPARWAR<br>Deputy Attorney General<br>Attorneys for Defendants |
| DATED: May 20, 2020 | | HANSON BRIDGETT LLP |
| | By: | ___/s/ Samantha Wolff___<br>PAUL B. MELLO<br>SAMANTHA D. WOLFF<br>Attorneys for Defendants |