XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:   (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　　Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:　　May 28, 2020<br>Time:　　10:00 a.m.<br>Crtrm.:　 6, 2nd Floor<br>Judge:　 Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the May 28, 2020 Case Management Conference. The parties exchanged their respective sections at approximately 2:00 p.m. today.

## I. PLAINTIFFS' STATEMENT

### A. CDCR Must Transfer Vulnerable Patients from Dormitories to Cells

The public health recommendations for preventing transmission of the virus that causes COVID-19 are well known and undisputed. Dr. Arthur Reingold, Division Head of Epidemiology and Biostatistics at the University of California, Berkeley, School of Public Health, explains that "SARS-CoV-2 is readily spread through respiratory transmission. All people are susceptible to and capable of getting COVID-19 because of the ease with which it spreads. The virus is spread through droplet transmission; that is, when an infected individual speaks, coughs, sneezes, and the like, they expel droplets which can transmit the virus to others in their proximity." Reingold Decl. at ¶ 8. It is estimated that one infected person infects two to eight other individuals and some "superspreaders" cause widespread infection. *Id.*

Because there is no vaccine, the current recommendations for avoiding infection include isolation, social distancing, frequent handwashing, wearing masks, and disinfecting surfaces. *Id.* at ¶ 9. "[C]rowded indoor rooms, such as dormitories, with poor ventilation, are prime environments for the spread of SARS-CoV-2 infection. Prolonged confinement in such spaces dramatically increases the transmission of SARS-CoV-2 infection and it is particularly important that people at high risk of serious injury from SARS-CoV-2 not be exposed to those environments." *Id.* at ¶ 19.

Seven out of the nine deaths in CDCR thus far have come from people who were housed in dormitories at CIM. In light of the risk of further deaths and serious harm, "prison cells rather than dormitories should be used to house patients who are at medically high risk, even in prisons where there is not yet an outbreak." *Id.* at ¶ 20. Since CDCR's current and past measures have failed to stem outbreaks and stop the spread, it is

imperative that vulnerable patients receive additional protection immediately. *Id.* at ¶¶ 17, 23. Therefore, Defendants must be directed to work with the Receiver to identify the vulnerable patients who are most at risk, test them for COVID-19, and transfer those in dormitories to cells with other people who have tested negative. Defendants have indicated that they are transferring approximately 700 people high risk people from the CIM dorms to 15 other prisons. This assessment and transfer process must be extended system-wide.

### B. Population Reduction Measures

According to Defendants, "CDCR does not currently plan to conduct additional early inmate releases because it believes that it has taken and continues to take sufficient appropriate steps to improve the safety of inmates and staff in its prisons through social distancing, screening, enhanced cleaning and sanitation, staff and inmate education, and increased testing." Joint Case Management Conference Statement, ECF No. 3328, May 20, 2020, at 10. However, as the Receiver informed the Court at the May 21 Case Management Conference, the population reduction measures that CDCR undertook in the early days of the pandemic had a significant positive impact on State's ability to contain the deadly spread of the virus in the prisons. See also Reingold Decl. at ¶ 24. Defendants are therefore rejecting measures they can take – and have taken in the past – to save lives.

In fact, the State is already planning significant additional population reductions in the coming years, including the closure of at least one prison. See Governor's Revised Budget Summary 2020-21, found at http://www.ebudget.ca.gov/budget/2020-21MR/#/BudgetSummary, at 83.

In this state of emergency, where CDCR prisons continue to experience severe outbreaks and patients continue to die, the State refuses either to repeat measures already proven successful or to speed up measures already planned over the course of the next year. The refusal is baffling, and profoundly dangerous to members of the Plaintiff class.

### C. Dorm Social Distancing "Guidelines" Remain Inadequate and Offer No Distancing Requirements Beyond "Sleeping Hours"

As Plaintiffs explained in the last two Joint Case Management Statements, the Division of Adult Institutions' (DAI) social distancing/cohorting "guidelines" dated May 11, 2020, are discretionary and vague, and thus inadequate. ECF No. 3322 at 6 and ECF No. 3328 at 6. These guidelines contain no mandates that cohorts remain distanced from each other, very little direction regarding cleaning and disinfecting requirements, and no monitoring or accountability procedures. ECF NO. 3322 at 7.

On May 14, 2020, Plaintiffs detailed our concerns to Defendants, offered measures that could be implemented to improve the plan, and requested to meet and confer. Plaintiffs recommended, for example, that Defendants establish clear mandates – rather than suggested practices – for certain activities. While some aspects of the CDCR's directives could be discretionary and prison-based (such as whether canteen is delivered or picked up at a specific time by each eight-person cohort), other aspects should be direct requirements (such as a mandate that each eight-person cohort shower and use common areas together with cleanings between uses). Plaintiffs suggested that each prison be tasked with designing its own schedule for common area uses with the goal of keeping each eight-person cohort together throughout the day. Plaintiffs further recommended that there be very clear, specific, and rigorous cleaning and disinfecting requirements put into place. Lastly, Plaintiffs asked that there be a process for monitoring and accountability to ensure that all prisons are complying with the social distancing and cleaning/disinfecting requirements set forth by DAI.

In response, Defendants issued a written response on May 22, 2020, rejecting most of Plaintiffs' suggestions and ignoring the meet and confer request. With regard to mandates for keeping each eight-person cohort together during waking hours, Defendants wrote "[a]fter talking to Wardens and Associate Directors, such an approach would be very difficult to manage and elicit negative reactions from inmates. Inmates may want to talk with a friend who lives across the building and use this time to chat with them during

dayroom." Regarding shower access, Defendants indicate that it is important "to allow the inmates to use the showers when they desire to do so."

Defendants' approach critically undermines the effectiveness of cohorting as a measure to mitigate spread of the virus. To make a difference in viral transmission rates, "[c]ohorts should be separated from each other by as much space as recent studies suggest is needed to minimize the spread of infection, this should be updated as new information becomes available." Brie Williams, Cyrus Ahalt, David Sears, & Stefano M. Bertozzi, *Limiting COVID-19 Transmission and Mitigating the Adverse Consequences of a COVID-19 Outbreak in Correctional Settings: RELEASE · COHORT · TEST* at 3 (Apr. 26, 2020), https://amend.us/wp-content/uploads/2020/04/Cohorting-Guidance.Amend_.UCB_.pdf. There must be "absolute social distancing between cohorts," including for activities such as "shower, pill call, [and] canteen," and when people are "sleeping, eating, and waiting or recreating." *Id*. at 2-4. Permitting members of different cohorts to intermingle (closer than six feet) facilitates spread of the virus.

As a result of this pandemic and for the safety of all, every facet of society is functioning under extreme and mandatory restrictions in an attempt to slow viral spread. Prisons are no different. As the experience outside of prison has shown, if restrictions on intermingling of cohorts are not clear and firmly reinforced, this public health measure will fail. If there are too many cohorts to effectively enact this measure, Defendants should undertake the population reduction measures they have already used to reduce the populations enough to make it work.

With regard to cleaning and disinfecting, Defendants stated CDCR plans to issue a memorandum by May 27, 2020, mandating that all showers, toilets and bathroom sinks be cleaned and disinfected after each use by inmate workers or staff. If or when the memorandum is issued, Plaintiffs will review, to determine exact mandates and operational plans. We remain concerned about the cleaning and disinfecting of other common areas such as dayrooms and shared equipment such as telephones.

Lastly, regarding the lack of monitoring and accountability requirements, Defendants stated that "[a]ll institutions already hav[e] a monitoring and accountability system in place. All facility captains are required to monitor their respective facilities to ensure that the COVID-19 related measures are being complied with." Plaintiffs believe that the monitoring and accountability measures in place thus far are insufficient. One of the only clear system-wide mandates put out by Defendants is the eight-bed cohorting scheme, and despite the representation to Plaintiffs on May 18, 2020 that the cohorting in the CIM Facility A non-quarantined dorms had been "established," the CIM virtual tour on May 22, 2020 demonstrated otherwise (see section D, below, for details). Defendants must develop reliable and comprehensive monitoring and accountability protocols to ensure that measures enacted to curb viral spread are scrupulously followed.

### D. California Institution for Men Virtual Site Visit

On May 22, CDCR facilitated a video-audio "virtual site visit" that permitted Plaintiffs, via Skype, to view certain dorms in California Institution for Men (CIM) Facilities A and D. In CIM-A, we observed a dorm called Otay Hall. On May 18, 2020, Defendants represented that social cohorting had been implemented there. *See* "Dorm Social Distancing" memorandum, May 15, 2020 (eight person pods, or all bunks separated by at least six feet, "established" at Otay Hall). Unfortunately, this was not true; cohorts were clearly not separated by six feet in all directions, as directed by the Receiver in his memorandum of April 10, 2020.[1] More unfortunately, we saw the same noncompliant bunk arrangement in a second dorm (Cleveland Hall), and a CIM Associate Warden stated

---

[1] At CIM-A Otay Hall, essentially every cohort was well within six feet of another cohort, and some were well within six feet of two cohorts. More specifically, and to use geometric terms, while there was six feet between cohorts on the x-axis, there was definitely not such distance between cohorts on the y-axis. Stated another way, when one looked down a row of bunks making up one cohort, there was not six feet of distance between that cohort and the next on the left or right, or, for some cohorts, both the left and right.

1 a third dorm was the same. We were not able to see CIM-A's other five dorms, because
2 they housed people on medical quarantine or isolation, and thus were declared off limits by
3 CDCR; we believe those five dorms are arranged the same as the other three at CIM-A.[2]

Here is a photo of one of the CIM-A dorms, taken during the virtual site visit, which illustrates the lack of six feet of separation between double-bunks situated across a narrow aisle; each dorm has four such rows:



---

[2] During the May 22 virtual site visit, we also observed a few CIM Facility D dorms. Unfortunately, that part of the visit was not successful because of connectivity problems: the video and audio was very choppy, and at times blurry. Plaintiffs could not determine whether the cohort arrangements in those dorms fully comported with the Receiver's directive. Because of these problems, Plaintiffs, at Defendants' suggestion, will on May 29 conduct an in-person site visit at California Medical Facility. Virtual visits may be appropriate there or at other prisons in the future.

During the virtual visit, Defendants' counsel agreed there was not six feet of separation between the cohorts in all directions.  In response to Plaintiffs' subsequent query, Defendants on May 26 wrote that CIM over the past weekend had worked to reconfigure its bunks to provide for "greater social distancing" and "appropriate spacing" and was exploring whether a barrier could be erected within the dorms to provide separation between certain cohorts.  Defendants stated further information would be relayed once learned.  It's not clear whether the reconfiguring of the dorms has resulted or will result in six feet of distance in all directions between each eight-person cohort.  Plaintiffs have asked for and Defendants have agreed to another video virtual visit at CIM next week.

More generally, Plaintiffs are very concerned that this problem was not identified and (we hope) corrected until Plaintiffs' counsel conducted a site visit.  That Defendants could not do this themselves at CIM, the locus of a massive COVD-19 outbreak in which many have died, including some from these dorms, demonstrates the need for strict accountability measures.

### E. The Receiver Should Require CDCR to Test Staff for COVID-19

As the Receiver explained at the May 21 Case Management Conference, the most significant vector for spreading COVID-19 in the prisons now is the staff.   Accordingly, at the site of the largest CDCR outbreak to date, the Receiver plans to test all staff at CIM. Plaintiffs have suggested to the Receiver that the staff members at California Medical Facility at Vacaville (CMF) and California Health Care Facility (CHCF) be tested next. The Receiver indicated that he would consider testing staff at prisons that develop new positive cases among the incarcerated people.

Plaintiffs believe that staff should be tested at every prison regardless of whether there is an identified positive case.  The measures that Defendants have used to stop the spread of the virus so far, including screening employees and temporarily suspending movement of incarcerated people, have failed to keep the virus at bay, and there are now

significant outbreaks at five prisons. Defendants and the Receiver can and should do more.

Testing staff at the prisons would be consistent with the California Department of Public Health (CDPH) Guidelines published for skilled nursing facilities, which recommend doing baseline testing of all residents and staff at facilities that do not currently have a confirmed COVID case. *See* May 22, 2020 Memorandum from Deputy Director Heidi Steinecker to Skilled Nursing Facilities, at https://www.cdph.ca.gov/Programs/CHCQ/LCP/Pages/AFL-20-53.aspx

Plaintiffs request that at this upcoming Case Management Conference the Receiver and/or CDCR indicate whether or not testing will commence at CMF and CHCF and whether there is a plan for testing staff at other prisons.

### F. Medical Care and Other Matters Related to COVID-19

The weekly phone conference with the Receiver and CCHCS's Chief Medical Executive is scheduled for Thursday, May 28, and Plaintiffs have provided questions and concerns in advance. In addition to the issues discussed above, we have asked to discuss the need for more specific CCHCS directives, operations, and monitoring regarding what happens when confirmed or suspected (i.e., nose-swabbed but awaiting test results) COVID-19 patients are housed in the same dorm building as patients who are not so confirmed or suspected. A CIM-A Inmate Advisory Committee (IAC) Executive Member stated that until early last week, he and many others who had tested negative for COVID-19 were housed for approximately two weeks in the same dorm with dozens confirmed to have COVID-19. The individuals from the two groups not only interacted in the dorm's bathroom, but also the confirmed patients, multiple times per day, walked through the section of non-COVID patients to get to and return from medical assessments, and also lined up in the non-COVID patients' section, right in front of those patients bunks, to receive their breakfast and dinner meals, and to get medication. The IAC Member also said some confirmed patients did not wear face masks when in in the non-COVID patients'

section. All this indicates a risk of infection to others, due to housing arrangements and operations. At Chuckawalla Valley State Prison, multiple IAC members last week stated that patients who were believed to have or had been tested for COVID-19 were moved before their test results were reported to locations with patients who had not been tested or suspected of having COVID, risking infection to the latter group. Some of those who were moved did have positive test results and were subsequently returned to their former housing for isolation.

## II. DEFENDANTS' STATEMENT

Defendants address the questions this Court raised during the May 21, 2020 Case Management Conference and provide a summary of additional information, including documents they have produced to Plaintiffs since the last conference.

### A. Institution Inspections

#### 1. Touring By Secretary Diaz

From May 20 through May 22, 2020, Secretary Diaz toured the following seven institutions: California State Prison, Los Angeles County (LAC), California City Correctional Facility (Cal City), California Institution for Men (CIM), California Institution for Women (CIW), California Rehabilitation Center (CRC), Wasco State Prison (Wasco), and North Kern State Prison (North Kern). Six of those seven institutions were provided approximately thirty minutes' notice in advance of the Secretary's arrival. Only CIM was provided more advance notice of the Secretary's visit and inspection so as to ensure that his visit would not negatively impact prison operations given the current restrictions in place due to the COVID-19 outbreak at the institution. The Secretary conducted these inspections in order to personally observe the efforts by the institutions and staff to address the unprecedented challenges presented by this pandemic and to observe the institutions' COVID-19 practices. The Secretary spent time with the wardens, executives, nurses, and chief executive officers. He also spoke with inmates and staff and conveyed his support in these difficult times. During his visits at Wasco and North Kern,

in addition to observing their COVID-19 practices, the Secretary spoke with the wardens, classification staff, and chief executive officers regarding county intake, including how the 30-day reception process will work as those institutions are opened up to limited intake this week.

The Secretary was generally pleased with what he observed during his unannounced inspections but recognizes that CDCR must continue to evaluate and improve its response to the COVID-19 pandemic. The Secretary observed that both inmates and staff are overwhelmingly in compliance with mandates to wear masks at all times and to maintain social distancing. Secretary Diaz observed the dorms at CIM and determined that additional spacing was needed between cohorts, particularly within A-Facility (described in greater detail below). Following his visits, the Secretary noted and discussed with the Receiver CIM's need to transfer inmates who have recovered from COVID-19 or tested negative as a protective measure. When done safely, such transfers will help facilitate many goals, including enhancing social distancing, protecting medically vulnerable patients, and facilitating the provision of mental health care and other treatment, programs, and services. To that end, CCHCS has identified nearly 700 COVID negative, medically high risk inmates to move out of CIM. CDCR's Division of Adult Institutions is facilitating the transfers.

### 2. Touring By Plaintiffs' Counsel

During the last Case Management Conference, the parties indicated that Plaintiffs would be conducting a virtual inspection at California Institute for Men (CIM) the following day, Friday, May 22. The virtual inspection went forward as planned, albeit with some technological glitches and challenges. The inspection was conducted via two associate wardens at CIM, one of whom held a device that enabled the parties to observe the inspection via Skype. He simultaneously narrated the inspection via headset and microphone and answered questions from Plaintiffs' counsel during the hours-long tour. The other associate warden carried a camera with which to take photographs at Plaintiffs'

request, as well as an approximately six-foot-long pole that was used to measure bunk spacing throughout the tour, as requested by Plaintiffs.

The tour commenced in dorms located within A-Facility. At the outset, it became clear that certain cohorts were not afforded six feet of spacing in every direction (it appeared, however, that all cohorts were spaced six feet apart in at least several directions). After touring three dorms within A-Facility, the tour then proceeded to D-Facility. The parties encountered technical issues during much of the tour of D-Facility, which made it difficult to ascertain the set-up of the cohorts in those dorms.

Since Friday, CIM has worked to reconfigure bunks throughout all dorms in the institution to ensure six feet of social distancing *in all directions*. The dorms in A-Facility were prioritized, however, the set-up in those dorms is especially challenging in that a "pony wall" (an approximately four-foot-high wall) separates one row of bunk beds from another but fails to provide an adequate barrier for the inmates assigned to the top bunks on either side of the pony wall (who are in separate cohorts). CDCR's Associate Director of Reception Centers traveled to CIM on Tuesday, May 26 to inspect the reconfigurations and work with CIM to come up with options to create a more formidable barrier between inmates on either side of pony walls. Facility Operations is looking into purchasing a lexan-type material to cover the wall and create a taller barrier. CDCR anticipates this will be accomplished by June 5, provided the necessary material is available without delay. Defendants are in the process of scheduling a return virtual site inspection for Plaintiffs' counsel to occur next week.

Additionally, and based upon the Secretary's tour, as well as CCHCS's tour reported in last week's case management conference statement, it appears that other institutions are not facing the same difficulties that CIM has in establishing and maintaining the cohort physical distancing requirements. CIM's challenges have been compounded by the fact that no transfers have been permitted out of CIM since the pandemic began due to the outbreak onsite. As discussed above, transfers will now begin.

Moreover, Director Gipson, Deputy Directors, and Associate Directors from CDCR's Division of Adult Institutions are conducting tours to verify compliance at other institutions.

Plaintiffs' next tour is scheduled at California Medical Facility (CMF) on Friday, May 29. This tour will occur in person.

### B.  Increased COVID-19 Testing

As Defendants anticipated in their last status report to the Court, there has been a significant increase in the level of testing throughout the prisons since last week. As of May 1, only 1,469 COVID-19 tests had been performed on inmates statewide. As of May 27, the number of completed inmate tests has jumped to 11,808, a rate approximately three times the testing rate of California and the United States in general. Defendants anticipate that the level of testing will continue to quickly rise. And, as discussed more fully below, staff testing is also increasing.

### C.  Efforts To Ensure The Safety Of Medically High Risk Inmates at CIM

Although the Receiver has not drafted formal written guidelines and procedures concerning high-risk[3] inmates during the pandemic, the following describes Defendants' understanding of the Receiver's strategy for protecting high-risk inmates during the

---

[3]  The CCHCS Health Care Department Operations Manual at Chapter 1, Article 2, section 1.2.14 sets forth the medical classification system, including the medical factors that are considered in making patient placement decisions. The policy also defines "high risk" to include: (1) the chronic care of complicated, unstable, or poorly-controlled common conditions (e.g., asthma with history of intubation for exacerbations, uncompensated end-stage liver disease, hypertension with end-organ damage, diabetes with amputation); (2) the chronic care of complex, unusual, or high risk conditions (e.g., cancer under treatment or metastatic, coronary artery disease with prior infarction); (3) implanted defibrillator or pacemaker; (4) high risk medications; and (5) transportation over a several day period would pose a health risk, such as hypercoagulable state. Those risk categories, which were established pre-pandemic. As Defendants understand it, inmates who are particularly at risk of a bad outcome if they contract COVID-19 are: (1) over age 65, (2) obese, and (3) suffer a kidney insufficiency.

COVID-19 pandemic:

- High-risk inmates are to be sheltered in place so long as they are in COVID-free facilities within a particular institution;
- If a facility housing high-risk inmates has an outbreak of COVID-19, high-risk inmates who are COVID negative should be moved to a facility that is COVID-free within the same institution;
- If it is determined that the risk to shelter in place for COVID-negative high-risk inmates is greater than transferring patients due to the prevalence of COVID within the institution, negative high-risk inmates should be considered for transfer to another institution.

Defendants' understanding is that this strategy is based in large part on the concept that unnecessary transfers of inmates increase the risk of spreading COVID-19 throughout the system, and that there are additional considerations, such as maintaining continuity of care, and ordinary risks associated with moving vulnerable populations that weigh against unnecessarily transferring high-risk inmates. Furthermore, as testing throughout the prison system increases, it should become easier to mitigate the risk of high-risk inmates by confirming that they are housed in COVID-free facilities or units.

Because COVID-19 has spread to every housing unit within CIM, the Receiver, in consultation with the Secretary, has directed that high-risk inmates at CIM who test negative for COVID-19 be transferred to facilities in institutions that remain COVID-free. As noted above, the Secretary's visit to CIM last week confirmed the need for such transfers. The Receiver has notified CDCR that 691 high-risk inmates at CIM tested negative for COVID-19 and should be transferred out of CIM. CDCR immediately began the process of evaluating this group of inmates to determine where they could be transferred based on their case factors. CDCR anticipates that the transfer of this group of inmates will begin by the end of this week.

Under the Receiver's policy, other high-risk inmates throughout the system will

continue to shelter in place unless the facilities where they are housed have outbreaks of COVID-19. In those cases, the evaluation of potential moves will be analyzed pursuant to the strategies outlined above.

### D.     Efforts To Limit The Spread Of COVID-19 Via Staff

CDCR continues to screen staff every day before they enter the prisons, all staff are required to wear cloth masks at a minimum in the prisons, and all staff have been ordered to maintain physical distancing to the extent possible as they perform their duties in the prisons. Staff may also be required to don an N95 mask, face shield, gloves and/or additional PPE depending on assignment and duties.

CDCR recognizes that staff are potential vectors for the introduction of COVID-19 into CDCR's prisons, and CDCR has been working with the California Department of Public Health, and in some cases with local county health departments, on plans and strategies for staff testing. Earlier this month, 250 staff were tested at California Men's Colony and 150 staff were tested at California Institution for Women. Beginning this week, COVID-19 testing of all staff at CIM and Avenal State Prison will commence. CDCR will continue to work with State and local public health professionals on staff-testing strategies in the coming days and weeks to further mitigate the risk of spread of COVID-19 in CDCR's institutions.

Under normal operating procedures, custody staff are assigned to a particular primary post where they work for five days each week. CDCR is making efforts to ensure that primary-post positions are permanently filled, which should limit the number of different staff who are working in various housing units. But in such a large and complex system, it is impossible to completely and permanently limit the staff who work in various locations throughout the prisons.

### E.     CDCR's Efforts Regarding Cleaning

CDCR plans to issue a supplemental memorandum to the prisons regarding cleaning and physical distancing. The purpose of the memorandum is to provide

clarification concerning cleaning requirements and to require institutions to provide confirmation that they are complying with required cleaning and physical distancing rules.

The supplemental memorandum will require that captains and managers conduct weekly inspections and complete check lists confirming compliance with rules for social distancing, mask wearing, dorm-cohort separation, and increased cleaning and disinfecting. The memorandum also provides an example of an appropriate shower cleaning schedule.[4]

The memorandum will require the use of cleaning logs to document the cleaning of showers, toilets, and sinks between use periods, and will require the use of gloves and masks by the inmate porters who perform the cleaning. The memorandum will direct the wardens at each institution to provide the logs to CDCR headquarters so that associate directors can confirm compliance.

### F. Early Releases

While CDCR is not currently planning to grant early release to additional inmates, the State and CDCR continue to meaningfully evaluate this and other options on a daily basis and will continue to provide updates in future filings. It is important to note that, at the same time, institutional population has continued to decline. As reported last week, CDCR has decided to maintain the closure of intake for an additional 30 days with the exception of a very limited number of individuals from four counties. CDCR also continues to release on parole or post release community supervision approximately 3,000 inmates each month. CDCR will continue to evaluate the situation and will consider all options for mitigating risk and increasing physical distancing.

As noted above, the resumption of transfers from CIM and other facilities will

---

[4] Last week, Defendants reported that the showers at one institution were cleaned after 83 uses. Upon further inquiry, Defendants learned that the institution misunderstood the survey question and provided the number of inmates living in a particular dorm rather than answering the question pertaining to their cleaning schedule.

1 enable CDCR to more flexibly use its facilities to reduce density and expand social
2 distancing.  CDCR will, as it always does, look to vacant, usable space to house inmates as
3 additional transfers are completed later this week and next, including the first internal
4 movement out of CIM since the outbreak began, as well as approximately 1,500 other
5 internal transfers scheduled for next week (which include mental health patients, transfers
6 out of reception centers, and transfers out of segregated housing).

7 Of course, early releases and internal transfers are only one factor to employ to
8 reduce the spread of the virus, and CDCR is working with its internal team and CCHCS's
9 public health experts to evaluate all available options on an ongoing basis.  Further, as
10 stated below, CDCR is also vetting public health experts and will explore additional
11 options with the expert once retained.

**G.     Road Map to Reopening Operations**

On May 22, 2020, CCHCS issued a memorandum to all wardens and chief executive officers jointly signed by Connie Gipson, Director of the Division of Adult Institutions, Dr. Joseph Bick, Director of the Division of Health Care Services, and Dr. Steven Tharratt, Director of Health Care Operations and Statewide Chief Medical Executive at CCHCS, entitled "COVID 19 Pandemic – Road Map to Reopening Operations."  The memorandum outlines Phase 2 Operations within CDCR/CCHCS, including permissible activities and strategies to continue to mitigate and prevent the spread of the virus, including modified reception center intake, screening, housing, testing, social distancing and separation of populations.  The memorandum also attaches a "Covid Screening and Testing Matrix for Patient Movement," which provides clear direction to institutions regarding the testing and housing of inmates under particular movement scenarios.  For instance, the matrix indicates that patients who are transferring from a county jail into a CDCR Reception Center must be placed in quarantine and cohorted for 14 calendar days and offered testing.  Inmates who screen positive must not be transferred; asymptomatic inmates who refuse testing must be placed in Orientation Status for 14

calendar days and reoffered testing at the new institution.  Inmates who are a returning from hospitalization of 24 hours or longer or an emergency department visit must be placed in quarantine for 14 calendar days and offered testing.

The memorandum further mandates that the following categories of inmates must be tested: (1) all patients entering CDCR from county jail must be offered testing within 24 hours of arrival; (2) all patients transferring to another CDCR institution or camp; (3) all patients returning from an outside healthcare facility shall be offered testing within 24 hours of their return; (4) all patients returning from an out-to-court appearance that included at least one night away shall be offered testing within 24 hours of their return; and (5) all patients to be released back into the community.

The memorandum also explains when patients who have been previously diagnosed with COVID-19 can be released from isolation, and further reiterates when cloth face coverings must be worn by staff and inmates.  The memorandum also states that "basic public health and environmental hygiene efforts must continue indefinitely," including hand washing, use of personal protective equipment, and disinfection of all shared and frequently used surfaces.

### H.   Update Regarding Expert Retention

Defendants investigated several candidates and are in the process of vetting a public health medical expert for retention in this matter following this Court's suggestion at the last case management conference.  However, Defendants continue to work in collaboration with the Receiver and his public health experts to address this crisis.

-18-    Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

DATED: May 27, 2020                           PRISON LAW OFFICE


                                              By:      */s/ Alison Hardy*
                                                    ALISON HARDY
                                                    Attorney for Plaintiffs


DATED: May 27, 2020                           XAVIER BECERRA
                                              Attorney General of California


                                              By:      */s/ Damon McClain*
                                                    DAMON MCCLAIN
                                                    Supervising Deputy Attorney General
                                                    NASSTARAN RUHPARWAR
                                                    Deputy Attorney General
                                                    Attorneys for Defendants


DATED: May 27, 2020                           HANSON BRIDGETT LLP


                                              By:      */s/ Samantha Wolff*
                                                    PAUL B. MELLO
                                                    SAMANTHA D. WOLFF
                                                    Attorneys for Defendants

-19-                                          Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT