XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON G. MCCLAIN
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR - 263293
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Email:  Nasstaran.Ruhparwar@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF -  240280
KAYLEN KADOTANI - 294114
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777--3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

Attorneys for Defendants

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI
(267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>        Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:    June 19, 2020<br>Time:    3:00 p.m.<br>Crtrm.: 6, 2nd Floor<br>Judge:  Hon. Jon S. Tigar |

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16632948.3

The parties submit the following joint statement in advance of the June 19, 2020 Case Management Conference (CMC).

Since the last CMC, the parties have met and conferred on a number of occasions regarding multiple topics relating to Defendants' response to the COVID-19 pandemic, including: staff testing, resumption of intake, measures to decrease population density, intra-prison transfers of medically high-risk incarcerated people from dorms to cells, transfer protocols, and further efforts to achieve physical distancing and compliance with safety precautions and mandates.  The outcome of the parties' discussions, and their positions on the topics, are relayed below.

# I.      EFFORTS TO DECREASE POPULATION DENSITY

Before discussing the plan to further reduce the prison population, Defendants note that in three months, from March 19 to June 17, CDCR's institution population has decreased by 7,914 people, while CDCR's in-custody population has decreased by 8,372 people[1].  These decreases are largely the result of measures implemented by CDCR to reduce the prison population in response to the pandemic.  They have assisted CDCR in mitigating and managing the spread of the virus.

In addition to these population reduction measures, as Defendants explained last week, CDCR is in the process of implementing a new community supervision plan to further safely reduce the prison population under California Government Code section 8658.  Under the plan, incarcerated people who are within 180 days of their release date will be supervised in the community if they meet the following criteria:

- They are not serving a current term of incarceration for a violent felony offense as defined by California Penal Code section 667.5(c);

---

[1] CDCR's "institution population" refers to people housed within CDCR's 35 adult institutions. CDCR's "in-custody population" refers to people housed outside of the institutions, including, for instance, in camps, another state, Bureau of Prisons, out to court, in transit, or in the Male Community Reentry Program.

- They are not serving a current term of incarceration for a serious felony offense as defined by California Penal Code section 1192.7(c);

- They are not required to register under California Penal Code section 290;

- They are not serving a current term of incarceration for a domestic violence offense;

- They do not have a California Static Risk Assessment score indicating a high risk for violence; and

- They have a post-release housing plan.

Under CDCR's plan, released offenders will be supervised in the community until the individuals reach their natural release date.  At that time, the individuals will either transition to county supervision or state parole, whichever is consistent with the commitment offense.

**Plaintiffs' Position:**

Plaintiffs welcome this population reduction measure because it may provide a limited amount of additional space that is necessary to protect people in prison from the virus and its related disease.  The actual effect on the prison population is unknown because of the uncertainty surrounding the resumption of intake and the number of people who will be actually released or removed from prison.  Plaintiffs understand Defendants estimate approximately 530 people will be released early on parole each month, in addition to the roughly 3,000 who are released normally on parole.  Even if these projections are understood correctly and actually happen, the population will not decrease by an additional 530 because other people will be received by CDCR through intake.  Currently, CDCR is accepting a maximum of 200 people for the month of June but no decision has been made for July. Assuming the intake number does not increase, the population will drop by an additional approximately 330 people each month.  In six months the total additional population reduction will be about 2,000.  If the level of intake is increased, the expected population drop will be commensurately less.

More importantly, the Community Supervision Program does not directly address

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  the plight of those most in need of relief.  The program does not release to community

2  supervision those at the highest risk of serious injury and death and at the lowest risk to

3  public safety.

4          While we very much appreciate the Secretary's action in reducing the population,

5  Plaintiffs believe that further reductions are necessary and should be targeted at those most

6  at risk.  Because those released early generally will be people convicted of lower level

7  offenses who are housed in dormitories and thus their release will not increase the number

8  of cells available for medically vulnerable people currently housed in dormitories.  The

9  prisons will remain seriously overcrowded and unable to provide the social distancing that

10  is necessary to reduce the risk of infection to an acceptable level.

11          **Defendants' Position:**

12          CDCR has begun the process of reviewing the inmate population to identify inmates

13  who might potentially meet all of these criteria, and anticipates that the first inmates

14  released to community supervision under this plan will occur on July 1, 2020.  Based on

15  the information reviewed so far, CDCR has identified a group of approximately 3,500

16  inmates who might satisfy the criteria for release in July, but CDCR has not yet determined

17  which individuals in this group satisfy all of the criteria.  Thus, in the first month of

18  community supervision under this new plan, it is not expected that the total releases will

19  exceed 3,500 inmates, and the total number could be less depending on the number of

20  candidates who satisfy all of the criteria.  Determining whether every eligible candidate

21  has a post-release housing plan is one of the more challenging and time-consuming criteria

22  to confirm.

23          Whatever the total number of releases in July will be, CDCR currently anticipates

24  that community supervision under the new plan will continue on a rolling basis beyond

25  July, and that on a weekly basis, CDCR will identify a new group of inmates who are

26  newly within 180 days of release, and who will become potentially eligible for community

27  supervision.

28  / / /

16632948.3

## II.     TESTING STAFF FOR COVID-19

On June 16, 2020, CDCR produced its comprehensive COVID-19 staff-testing plan, which is attached as **Exhibit A** to this statement.  As discussed during last week's Case Management Conference and stated in the parties' June 9, 2020 Case Management Conference Statement, the plan sets out three different protocols for staff testing at: (1) California Health Care Facility (CHCF), California Medical Facility (CMF), and Central California Women's Facility (CCWF); (2) all other prisons without COVID-19 cases; and (3) all other prisons with active COVID-19 cases.

For the first group of institutions (CHCF, CMF, and CCWF), the plan requires those institutions to adopt the California Department of Public Health's (CDPH) recommendations for staff testing at skilled nursing facilities (SNF), which is an aggressive testing protocol.  (Exhibit A at 1; *see* Memorandum from Deputy Director Heidi Steinecker to Skilled Nursing Facilities (May 22, 2020), available at: https://www.cdph.ca.gov/Programs/CHCQ/LCP/Pages/AFL-20-53.aspx.)  The CDPH SNF Guidance calls for universal baseline testing of all staff, followed by regular surveillance testing of 25% of staff each week, such that 100% of staff are re-tested every month.  *Id*. The CDPH SNF Guidance also calls for testing all staff and serial re-testing every seven days thereafter until no new cases are identified in two sequential rounds of testing, after one (or more) individuals (resident or staff) tests positive for COVID-19.  *Id*.

With respect to prisons with no recent COVID-19 cases, the plan requires surveillance testing of 10% of all staff every 14 days, such that all staff will be tested in five months.  The plan also calls for monthly testing of staff regularly assigned to transport duty, guarding duty at a community hospital, or culinary areas.  Finally, the plan calls for testing of staff pursuant to the CDPH SNF Guidance if they are regularly assigned to inpatient medical or mental health beds. .  (*Id*.)

Finally, at institutions where there have been recent COVID-19 cases, the plan calls for serial retesting of staff every 14 days until no new cases have been identified in two sequential rounds of testing.  This testing may be limited to the yard where the incarcerated

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16632948.3

person who has tested positive is housed or the staff person who has tested positive is assigned.  (*Id*. at 4.)

Plaintiffs submitted a number of follow-up questions about the staff-testing plan on June 17, 2020, which Defendants will endeavor to answer.

**Plaintiffs' Position:**

Plaintiffs strongly support the decision to begin regular, organized testing of staff, and believe this testing should begin as soon as possible.  In general, Plaintiffs agree with the testing protocols proposed for CMF, CCWF, and CHCF, and for the staff regularly assigned to the inpatient medical and mental health units.  We have some questions and concerns about the protocols proposed for the remaining prisons, which we provided to Defendants on Wednesday afternoon.  Among others, these include the following observations and questions:

- Plaintiffs have asked whether staff will be obligated to report positive test results if they are tested privately.  As we understand it, this is not currently required.

- For prisons with COVID-19 cases, the plan calls for serial retesting of all staff, but indicates that "[i]t is not necessary to test staff across multiple yards as long as staff are not moving among buildings to provide services." Plaintiffs do not agree with this carve-out.  Even if staff do not work on the same yard, they are likely to interact with each other during shift change and outside of work, as many staff members live and recreate in the same communities.  We believe all staff should be re-tested whenever there is a new COVID-19 case at a prison.

- The plan calls for more frequent testing of staff "regularly assigned" to inpatient medical or mental health beds, transport duty, guarding duty at a community hospital, and culinary areas.  However, the plan does not define "regularly assigned."  Plaintiffs believe these provisions should apply to all staff members who actually work in these areas, and have asked whether

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16632948.3

there are any restrictions on staff covering/swapping these shifts.

- The plan defines staff as those "who interact with inmates." Plaintiffs believe this definition is too narrow. Staff who are not in direct contact with incarcerated people may be in contact with staff who are, and thus could still introduce and spread the virus.

- The plan only calls for surveillance testing of 10% of the staff each month at prisons without COVID-19 cases. When asked for the factual basis or reasoning for testing 10% Defendants refused to respond.

- The plan only calls for testing transportation staff once per month, while CCHCS states that incarcerated persons should be tested within 7 days of transfer. Since the virus does not distinguish between those who live and work in the prisons, the testing regimen should be the same for both.

**Defendants' Position:**

On an emergency basis, CDCR has already entered into a contract with a lab to provide the staff testing for California Medical Facility, California Health Care Facility, and Central California Women's Facility, and testing under that contract should commence this week. CDCR is working on the completion of expedited emergency contracts that will cover the remainder of the testing called for by the testing plan, and that process is nearly complete. CDCR anticipates that testing under those contracts will commence next week.

In the meantime, and in response to the Court's directive, from June 11 through June 15, 2020, CDCR tested 1,668 staff (94.9% of staff) at San Quentin and 1,872 staff (92.6% of staff) at California State Prison – Corcoran.[2] The June 11, 2020 testing at San Quentin and Corcoran was focused on the custody and healthcare staff who may have come into contact with the CIM inmate-transferees.

/ / /

---

[2] Not all staff were tested at these facilities for a number of reasons, including employees out on sick leave, disability leave, parental leave, vacation, and remote assignment.

16632948.3

III.     **TRANSFERS**

    A.     **The Transfer Of Medically High-Risk Individuals From Dorms To Cells**

**Plaintiffs' Position:**

    The parties and the Receiver have agreed in principle on a plan to move as many medically vulnerable patients living in dorms to cells as possible, based on the Receiver's determination that celled housing presents a significantly lower risk of contracting COVID-19 than dorm housing.  That agreement is as follows:

> CCHCS will immediately identify all patients who are 65 and over and living in a dorm.  CCHCS will share that information with DAI and with healthcare at the institutions.  The healthcare staff at institutions with these patients will discuss with each of these patients the risks and benefits of staying in the dormitory or transferring to a cell either at that institution or another institution.  These discussions with patients will occur in reverse chronological order so that the oldest patients are selected first.  CCHCS will inform DAI of all the patients who consent to be transferred.  DAI will endeavor to transfer these patients to a cell at the existing institution or another institution.  Patients will not be transferred to another institution until the Receiver approves the transfers.

    In order to evaluate how to operationalize this agreement, Defendants have provided Plaintiffs' counsel with a recent Institutional Bed Report and have agreed to provide a list of available cells.  In addition, the parties and the Receiver met by conference call on June 16 to discuss several operational issues, including the process for identifying eligible patients, the classification process and the procedure for providing information to the patients about the risks and benefits of moving from their existing housing to cells in other parts of the prison or, if applicable, to another prison.  The parties also discussed the need to address mental health and other disability accommodations when making placement decisions.  The parties expect these discussions to continue until these issues are resolved.

**Defendants' Position:**

    On June 16, 2020, the Receiver, Plaintiffs, and Defendants reached agreement in principle regarding the intra-prison transfer of medically high-risk individuals from dorms to cells.  Under the terms of this agreement, CCHCS will immediately begin the process of

identifying all patients age 65 and over who are presently living in a dorm setting. CCHCS will prioritize patients who are at highest risk for a bad outcome if they were to contract COVID-19, including in reverse chronological order by age.  CCHCS will then share that list with DAI and with healthcare at the institutions.  The healthcare staff at the institutions where these patients are located will then discuss with the patients the risks and benefits of transferring from the dormitory setting into a cell at that same institution. CCHCS will inform DAI of the patients who consent to be transferred.  DAI will then endeavor to transfer these patients who consent to be transferred in the order they appear on the list.

The parties and CCHCS participated in a telephonic meet-and-confer discussion on June 16, 2020, to further discuss the details of this agreement.  DAI indicated it is in the process of analyzing the availability of cell beds at each institution where dorms are located.  This is not an easy process because certain cell beds, while not occupied, must remain vacant for a number of reasons, and are thus not "available" for purposes of these transfers.  For instance, while cells may typically accommodate two beds (and thus, two inmates), a number of cells are occupied by inmates who have been classified as "single-cell status," meaning, for security reasons, they may not share a cell.  Additionally, other cells have been "deactivated" due to their condition or some other physical limitation and thus are no longer inhabitable.  Other cell beds are considered "not in service" because they are temporarily uninhabitable and undergoing maintenance or renovation.  Further, cells housing units should not be crowded up to 200% capacity because it would make appropriate physical distancing in those units and facilities difficult or impossible in common areas.  This, in turn, would likely have an adverse impact on programming, the ability to provide an appropriate amount of treatment space and medical care, and normal functioning and services in these units.  A certain number of cells must also remain available for medical isolation.  It is also likely that many of the inmates who will be considered for transfer from dorms to cells will require lower bunks due to health care factors, further limiting the availability of appropriate cell beds.  DAI anticipates that it

1    will complete its analysis of available cell beds by June 24, 2020.

2          Once DAI completes the process of identifying available cell beds and CCHCS has

3    compiled its list of medically high-risk inmates who consent to transfer from dorm to cell,

4    DAI will then review CCHCS' list to determine where inmates may be placed.  This

5    process will take into consideration an inmate's compatibility with a potential cellmate,

6    enemy list, case factors, security level, and health care factors.  Additionally, if an inmate

7    has to move to another yard within an institution, the Unit Classification Committee must

8    meet to consider the transfer and identify any issues with respect to potential enemy

9    concerns or security concerns, for instance.

10          **B.     Educating Medically Vulnerable Individuals in Dorms About Transfers**

11          After asking for and receiving input from Plaintiffs, CCHCS circulated a one-page

12   information sheet they intend to provide patients whom they offer a transfer from a dorm

13   to a cell, plus a Refusal Form that patients would sign if they decline the offered transfer.

14   When Plaintiffs suggested an addition to the information sheet that would more directly

15   quantify the risk of being infected with COVID-19 in a dorm compared to celled housing,

16   CCHCS explained among other things that additional information would be provided to

17   patients by medical staff when a possible transfer is discussed, and that medical staff

18   would use a script prepared for that purpose.  Plaintiffs have asked to see a copy of that

19   script, and CCHCS stated that it would be provided when done.  CCHCS also said patients

20   would not be counseled and asked to make a decision about a dorm to cell move unless

21   and until a specific location for the move could be specified.

22          **Plaintiffs' Position:**

23          The education of medically vulnerable patients regarding the risks if infected with

24   COVID-19 is crucial for individuals to make an informed decision regarding whether to

25   move from a dorm to a cell.  Although the information sheet is mostly well done, Plaintiffs

26   cannot say whether the education to be provided is adequate until we consider the script to

27   be used by medical staff when counseling patients.  Plaintiffs agree that patients should not

28

16632948.3
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  be asked to decide whether to move from a dorm until a cell at a specific location is

2  offered.

3  **C.     The CIM Transfers and Updated Transfer Protocols**

4  **Plaintiffs' Position:**

5       At the time of the late May transfers of hundreds of medically vulnerable patients

6  from the California Institution for Men (CIM) to San Quentin and Corcoran State Prison –

7  done to try to remove those patients from the massive COVID-19 outbreak at CIM –

8  CCHCS protocols, issued on May 22, provided that patients must test negative for

9  COVID-19 before transfer, but did not specify a pre-transfer time frame for that test.  Nor

10  were CIM staff specially told by Headquarters any time frame for testing these particular

11  patients before the transfers, which were ordered by Headquarters.  Nor were any

12  directives given regarding testing after Plaintiffs' May 22nd email raising concerns about

13  CIM housing practices possibly exposing patients who previously tested negative,

14  including those up for transfer, to the virus.  It also appears that CDCR staff who drive the

15  buses and provide security may not have been tested prior to transfer, increasing the risk of

16  transmission.

17       Patients were transferred from CIM at the end of May based on negative COVID-19

18  negative tests done in the middle or near the start of the month.  Some of those tested

19  positive for COVID-19 shortly after arrival at San Quentin and Corcoran, meaning they

20  were likely positive at the time they were transferred.  Others transferred to San Quentin

21  on the same bus as those patients subsequently tested positive for the virus.   One of them

22  is hospitalized, in an ICU and on a ventilator.

23       It is deeply unfortunate that transfers done to keep people safe have resulted in

24  some becoming positive, and have introduced the virus to a prison – San Quentin – where

25  previously there were no confirmed cases.  Although it cannot be said for certain that

26  negative tests done closer in time to the transfer date would have prevented what has now

27  occurred,  it was a poor decision to not require such tests to incarcerated people and staff,

28  given public health principles and common sense, and the alert about CIM housing

1  practices we sent to CCHCS on May 22.  CCHCS's current comprehensive reconsideration

2  of its testing and transfer protocols is clearly necessary.

3  The more general lessons are also clear.  CCHCS must specify timeframes for

4  testing, transfers, the staff who should be tested and all related matters involving patient

5  safety.[3]  Similarly, CCHCS must mandate action, including regarding the timing of tests,

6  so that the message is clear and staff can be held fully accountable for noncompliance.  In

7  this regard, the use of discretionary language, such as the "may" and "should not" in the

8  June 2 and June 5 policy statements regarding testing, cannot continue.  The new policy,

9  strategy, or protocol must use unambiguous language.

10  Plaintiffs have asked to review the new testing and transfer policy or protocol in

11  advance of implementation later this month, so that if necessary we can comment on it, as

12  has been the standard practice for years with dozens of other policy changes.  Such

13  reviews, which we will do on an expedited basis if so asked, have previously resulted in

14  changes that reduce the risk of harm to patients.  CCHCS has not indicated whether it will

15  share the new testing and transfer policy or protocol in advance.  Plaintiffs ask that the

16  Court direct the Receiver to do so.

17  Finally, and fundamentally, the Receiver must prohibit all inter-prison transfers

18  except those necessary for healthcare reasons or other emergencies until the new testing

19  and transfer policy or protocol is fully implemented, piloted in a substantial way, and

20  deemed adequate.  In addition to the CIM to San Quentin transfers, Plaintiffs this week

21  discovered that people on or about June 8th were moved from San Quentin for purely

22  custody reasons and that one of those persons – who had tested negative six days before

23  transfer, subsequently tested positive for COVID-19 at the new prison.  When asked about

24  this, CCHCS stated the patient is believed to have infected a nurse and two officers at the

25

26  [3] On June 17, 2020, CCHCS informed Plaintiffs that last week, it provided CDCR with
27  recommendations to reduce the risk of COVID-19 transmission during bus transports, including
limits on bus capacity, but did not know whether CDCR would adopt them.

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16632948.3

new prison.  In addition, CCHCS stated this week that an officer who drove patients to California Medical Facility in Vacaville tested positive for COVID-19, and those who were in the bus may have been infected.  As noted above, the Receiver, for public health reasons, should prohibit all except essential transfers until it is clear that the revised testing and transfer policy or protocol is adequate.

**Defendants' Position:**

As reported in the May 27, 2020 Joint Case Management Conference Statement, on May 22, 2020, CCHCS issued a memorandum to all wardens and chief executive officers jointly signed by Connie Gipson, Director of the Division of Adult Institutions, Dr. Joseph Bick, Director of the Division of Health Care Services, and Dr. Steven Tharratt, Director of Health Care Operations and Statewide Chief Medical Executive at CCHCS, entitled "COVID 19 Pandemic – Road Map to Reopening Operations."  Attached to that memorandum was a "Covid Screening and Testing Matrix for Patient Movement," which set forth direction to institutions regarding the testing and housing of inmates under particular movement scenarios.  That memorandum did not provide specific time frames for the testing of inmates prior to inter-prison transfers, for instance, in circumstances like the transfers from CIM to San Quentin and Corcoran, that were discussed during the June 9, 2020 Case Management Conference.  As a result of the lessons learned from the CIM transfers (which are described more fully below), all inmates: (1) must be administered a COVID-19 test no more than seven days before transfer and; (2) must receive a negative test result before transfer.  This modification to the transfer protocol was memorialized in an email from CCHCS's Vince Cullen to all Chief Executive Officers on June 5, 2020.  A copy of this email is attached as **Exhibit B.**

As it pertains to the CIM transfers, on May 23, 2020, CCHCS provided the Division of Adult Institutions (DAI) with a list of 691 inmates at CIM who were deemed "medically high risk" and who had tested negative for COVID-19.  CCHCS directed DAI to transfer the listed inmates out of CIM.  DAI immediately started the classification process required to transfer the inmates to San Quentin and Corcoran.  DAI kept CCHCS apprised of the

1   anticipated schedule for transferring the inmates, and CCHCS did not object to that

2   schedule.  CCHCS did not notify DAI that a retest would be necessary of the inmates

3   before they were transferred, nor had CCHCS issued a general directive concerning the

4   timing of COVID-19 tests in relation to inmate transfers.  On May 28—four business days

5   after CCHCS sent the transfer list to DAI—the transfers commenced.  CCHCS suspended

6   the transfers on June 4, 2020, when it was discovered that some of the transferred inmates

7   tested positive for COVID-19 after they arrived at San Quentin and Corcoran.   On June 5,

8   2020, CCHCS issued a new "testing and transfer strategy" dictating that "a patient should

9   not transfer if the date of their NEGATIVE test is past 7 days on the date of transfer.  This

10  means 7 days from the date the test was administered."  There have been no additional

11  transfers from CIM since CCHCS suspended transfers on June 4.

12  **IV.    RESUMPTION OF INTAKE**

13          As reported in the parties' June 8, 2020 Joint Case Management Conference

14  Statement, CDCR has maintained the closure of county jail intake, with the exception of

15  the intake of approximately 50 county jail inmates per week, for a total of 200 inmates.

16  Four counties (Los Angeles, San Bernardino, Fresno, and San Diego) are permitted to send

17  inmates to CDCR according to a set schedule.[4]  Due to the number of positive COVID-19

18  cases in Los Angeles County jails, CDCR temporarily suspended the intake of inmates

19  from Los Angeles County jails on June 5, 2020 and replaced that intake with inmates from

20  Kern County.  After receiving assurances from Los Angeles County that it is testing and

21  screening its inmates prior to transfer, CDCR will resume limited intake from Los Angeles

22  County on June 24, 2020.  CDCR will continue to limit county jail intake to 50 county jail

23  inmates total per week from these same four counties through July 3, 2020.  The parties

24  discussed intake at the meet and confer on June 16, 2020 and with CCHCS on the June 17,

25  2020 informational call.

26  _____

27  [4] Should any of these four counties be unable to fulfill their quota, two other counties – Orange
    County and Kern County – may send people to complete the quota.

28

16632948.3

CCHCS has made recommendations to DAI regarding intake, including (a) providing a list of current outbreaks in county jails based on data from the Department of Public Health with a recommendation that people not be received from counties where there are outbreaks; (b) the suggestion that DAI accept on a preferential basis those people in the county jails who have recovered from the virus; and (c) recommendations about transportation procedures, such as having bus passengers masked and keeping windows open.  CCHCS noted on the June 17 call that it has become apparent that custody staff in the Reception Centers will need additional protective equipment (N95 respirators).

**Plaintiffs' Position:**

Plaintiffs maintain their position that intake should be suspended until CDCR completes the process of moving medically vulnerable people to cells, until transfers can be accomplished safely, and until the population decreases to the point that social distancing can be safely practiced.  Plaintiffs continue to be concerned about intake from counties with active outbreaks, including Los Angeles and San Bernardino.

**Defendants' Position**:

In the interim, CDCR is continuing to evaluate when and how it will resume more normalized county intake.  It will update the Court and the parties on its future intake plans when additional information becomes available.

**V.    STRATEGIES TO CREATE AND ENCOURAGE SOCIAL DISTANCING FOR INDIVIDUALS LIVING IN CELLS AND DORMS**

With respect to incarcerated persons, on Wednesday, June 10, 2020, plaintiffs provided Director Gipson a list of suggestions for creating and encouraging healthy behavior in cells and dorms, including social distancing.  Plaintiffs' suggestions included: (1) talking to incarcerated people, including by consulting the Inmate Advisory Councils, conducting (distanced) town hall style meetings, and using the closed circuit television to solicit their input on these issues; (2) empowering incarcerated people to respectfully remind staff to wear their masks; (3) providing "substantial value" benefits to mark measurable compliance success, including  include tablets, magazines/books,  additional

16632948.3

free phone calls, and (properly distanced) group celebrations, (4) consulting with Department of Juvenile Justice officials regarding their incentive programs, and (5) consulting with CDCR staff, including staff who work in the Developmentally Disabled Program.

During the parties' telephonic meet-and-confer discussion on June 16, 2020, Director Gipson stated that she had communicated with the wardens regarding Plaintiffs' proposals and soliciting best practices.  She noted numerous incentives that were under discussion.

With respect to staff, on June 11, 2020, Secretary Diaz and the Receiver jointly issued a memorandum to all custody and health care staff reminding them to adhere to cleaning and disinfection protocols, wash hands frequently, answer daily screening questions, physically distance at all times possible, and wear cloth or other approved face barrier coverings at all times (with limited exceptions).  The memorandum indicates that failure to wear an appropriate face barrier covering "may result in progressive discipline." This disciplinary process is overseen by the Office of the Inspector General and discipline can range from training to counseling to dismissal according to a disciplinary matrix.  A copy of this June 11, 2020 Memorandum is attached as **Exhibit C.**

During the first half of June, the Corrections Services staff of CCHCS conducted site visits at each of the 35 state prisons to assess compliance with social distancing guidelines, including whether staff and incarcerated people are wearing masks.  According to the schedule of visits, all should have been completed by June 17, and the report should be completed on June 19, 2020.

**Plaintiffs' Statement:**

Plaintiffs welcome these efforts.  We have requested the memo that Director Gipson sent to the Wardens, and will continue to monitor Defendants efforts to promote compliance with distancing guidance.

**Defendants' Statement:**

DAI continues to work with each institution to ensure that physical distancing,

16632948.3
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1 | cleaning, and other measures are appropriately implemented to ensure the health and
2 | wellbeing of both inmates and staff at each institution.  However, a one-size-fits-all
3 | approach to cleaning schedules and physical distancing is not appropriate for every
4 | housing unit at every institution.  Each housing unit is different and therefore, it is best left
5 | to the discretion of the wardens to determine how to implement CDCR directives
6 | pertaining to cleaning and physical distancing.

7 |       Director Gipson is also in the process of working with the wardens at each
8 | institution to encourage them to implement incentives for inmates who comply with
9 | cohorting principles and mask-wearing directives.  Wardens have been very receptive to
10 | this directive and are in the process of meeting with Inmate Advisory Committees and
11 | health care staff to brainstorm potential incentives and are also in the process of
12 | considering suggested incentives provided by Plaintiffs' counsel.

14 | DATED:  June 18, 2020               HANSON BRIDGETT LLP

16 |                   By:      */s/ Samantha Wolff*
17 |                   PAUL B. MELLO
                  SAMANTHA D. WOLFF
18 |                   KAYLEN KADOTANI
19 |                   Attorneys for Defendants

21 | DATED:  June 18, 2020               XAVIER BECERRA
                  Attorney General of California

23 |                  By: */s/ Damon McClain*
24 |                   DAMON MCCLAIN
                  Supervising Deputy Attorney General
25 |                   NASSTARAN RUHPARWAR
26 |                   Deputy Attorney General
                  Attorneys for Defendants

1   DATED:  June 18. 2020                    PRISON LAW OFFICE

2

3                                   By:  */s/ Alison Hardy*
                                         ALISON HARDY
4                                        Attorney for Plaintiffs

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16632948.3