XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

MARCIANO PLATA, et al.,

    Plaintiffs,

    v.

GAVIN NEWSOM, et al.,

    Defendants.

CASE NO. 01-1351 JST

**JOINT CASE MANAGEMENT
CONFERENCE STATEMENT**

Date:    July 2, 2020
Time:    3 p.m.
Crtrm.: 6, 2nd Floor
Judge:  Hon. Jon S. Tigar

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

The parties submit the following joint statement in advance of the July 2, 2020 Case Management Conference.

**I. Population Reduction**

*Plaintiffs' Position*:  As the Court catalogued in its recent Order to Show Cause, the virus is spreading throughout the state and there have been serious outbreaks at several prisons, most notably and recently at San Quentin.  ECF No. 3366 at 3.  As of today, only 11 prisons have not had an incarcerated person test positive for COVID-19.  CDCR, *Population COVID-19 Tracking*, https://www.cdcr.ca.gov/covid19/population-status-tracking (last visited July 1, 2020).  Those include two with extremely vulnerable populations, California Medical Facility (CMF) and California Health Care Facility (CHCF), and one, Folsom State Prison, with the same five-tiered open cell door construction as San Quentin.

In response to the outbreak at San Quentin, a team of UCSF and UC public health experts evaluated the conditions at that prison and found that "profoundly inadequate resources" prevented prison officials from stopping the outbreak from becoming a local epidemic in the prison and surrounding communities.  Williams & Bertozzi, Urgent Memo COVID-19 Outbreak: San Quentin Prison, June 13, 2020.  In addition, "San Quentin's antiquated facilities and severe overcrowding places the prison at high risk of significant COVID-19 related morbidity and mortality unless the population is quickly reduced by 50% or more. . . ."  *Id*.  Providing appropriate housing for hundreds of individuals to prevent infection by separating people who test positive from those who test negative is impossible because there is no available space at the prison, and transfers to other prisons have been halted.  The tents that are being erected have the capacity to house only 60-100 persons.

The UCSF/UC team believes that its recommendations are applicable to all California prisons.  *Id*.  To date, CMF, CHCF and Folsom have been fortunate not to have a detected a confirmed case of COVID-19 among the incarcerated population, despite staff

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  at those facilities testing positive.  But, as the Court noted, this virus spreads quickly.  ECF

2  No. 3366 at 3.  And the prediction made months ago by former CDCR Secretary Scott

3  Kernan that our prisons are "tinderboxes" tragically has come true.  ECF No. 3221-2 at 68;

4  ECF No. 3249 at 5:22-25-6:1.

5         Given the absence of any completely reliable method of preventing the virus from

6  spreading, there is every reason to believe that infections will occur at these prisons as

7  well.  Before that happens, it is critical and potentially life-saving for urgent measures to

8  be taken at these prisons to prevent another "local epidemic" that will overwhelm the

9  prisons and the communities in which they are situated.  Similar action must also be taken

10  at other prisons where deadly outbreaks have continued for months and it is clear that

11  appropriate housing cannot be provided to all (see for example the discussion below

12  regarding the California Institution for Men).

13         In addition to other measures that are being taken, CDCR must expand its

14  Community Release Program to include those individuals living in these prisons who are

15  at high risk of serious complications and death from the virus and low risk to public

16  safety.[1]  Based on the most recent data that Plaintiffs have, there are approximately 1343,

17  1812, and 352 individuals categorized as high risk medical[2] at CMF, CHCF and Folsom,

18  respectively.  Of those, 978, 1380, and 256 are a low risk to public safety if released.

19         The time for action is now, not after the next outbreak occurs.  The Court's

20  observation that "every day counts" could not be more true.  ECF No. 3366 at 3.

21  _____

22  [1] On or about June 30, 2020, CDCR's revised or clarified its program such that, apparently,
   people will not simply be removed but actually released from prison and formally placed
23  on parole or county supervised probation.  If so, those released would be eligible for public
   benefits, including Medi-Cal, which may not have been the case if they were simply
24  removed from prison.  It is not clear how many people are being released in the first week
   of the program.
25
26  [2] The category "high risk medical" is not identical to the category of people who are
   believed by the Centers for Disease Control and Prevention (CDC) to be at high risk for
27  serious complications or death from COVID-19, but Plaintiffs do not currently have the
   data showing both CDC high-risk and public safety low-risk factors.
28

*Defendants' Position*:  CDCR's new plan to reduce the population by providing offenders release to supervision in the community is underway.  The counties where these releases will occur, and the county probation departments that will be responsible for supervising these individuals, are a crucial component of the release plan.  CDCR's county partners are working on verifying the inmate's release plans, which is a required component of eligibility, and will be essential for the success of these individuals during their post-release community supervision.  It is possible that a small number of releases might occur over the next week, but it will likely be another 10-12 days before meaningful numbers of releases occur.

The new release plan is not comprised of a single release cohort.  Instead, once releases under the new plan have commenced, they will continue indefinitely on a rolling basis until the COVID crisis abates.

## II. Intake

*Plaintiffs' Position*:  On June 29, 2020, we were informed by the Receiver that intake has been closed.  We strongly support this decision.  We continue to believe that intake should be suspended until CDCR completes the process of moving medically vulnerable people to cells, transfers can be accomplished safely, and the population decreases to the point that social distancing can be safely practiced and prisons have sufficient space to use for isolation and quarantine in the event of an outbreak.

*Defendants' Position*:  CDCR was previously conducting a limited intake from the county jails of about 50 inmates per week.  But as of June 29, in cooperation with the Receiver, CDCR closed all intake from the counties until at least July 27.

## III. Transfers

*Plaintiffs' Position*:  CCHCS continues to work on revisions to its COVID-19 testing and transfers protocol or policy, undertaken after the transfer of patients from California Institution for Men to San Quentin apparently resulted in the start of what has now become a mega-outbreak.  CCHCS has reported that these revisions are part of a

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

broader review and revision of all COVID-19 testing policies. A date for completion of the revision is not yet known.  CCHCS has also reported that, since June 19, 2020, there have been no inter-prison transfers except for those necessary for essential healthcare or other emergencies.  CCHCS earlier this week it said it did not know how many such transfers took place last week (June 21 – 27).

Revision of the testing and transfers policy remains necessary, and the prohibition on transfers except when necessary for essential healthcare or other emergencies must continue until the revised policy is completed, piloted, and fully implemented.  Since the most recent Case Management Conference, persons transferred on June 8, 2020, from San Quentin, who had tested negative for COVID-19 six days before being moved, apparently were not quarantined upon arrival to the California Correctional Center (CCC) in Susanville, but placed in a dorm and mixed freely with large numbers of people on the yard.[3]  The patients were not re-tested again for COVID-19 until June 18, 2020, after Plaintiffs asked if such had been done, and they were confirmed to have COVID-19.  This policy failure resulted in another major outbreak, with 215 confirmed cases at the prison (see further discussion of CCC below).

*Defendants' Position*:  Under the Receiver's instructions, inter-prison transfers remain suspended, with the exception of essential movement of inmates.  Approved essential movements, include, but are not limited to: inmate transfers to outside medical facilities for emergent and specialty services that cannot be safely deferred; admissions to and discharges from the Correctional Treatment Center, Outpatient Housing Unit, and hospice; movement between general population housing and restricted housing; selected movements of mental health patients; and Disability Placement Programs/ Developmental Disability Program movements from a non-designated institution to a designated

---

[3]     Plaintiffs both last week and this week asked CCHCS to confirm that the three patients transferred were not kept apart from others in the ten days after they arrived at CCC.  On June 30, 2020, we were told that the CCC's Healthcare Chief Executive Officer had not yet provided a response to Headquarters.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

institution to prevent morbidity/mortality.  Defendants can provide a complete list of approved essential movement upon request.

## IV.  Safely Housing Medically Vulnerable People

On June 24, CDCR provided an analysis of CDCR's cell capacity, which was prepared by CDCR's Division of Adult Institutions in consultation with CCHCS, plus a report that set forth the number of empty cell beds at the respective institutions and the number of medically high-risk incarcerated patients at each listed institution.

*Plaintiffs' Position*:  People with medical conditions or who are of an age that make them at risk for severe complications if infected with COVID-19 remain in CDCR's crowded dorms throughout the state where, the Receiver has determined, they are at significantly higher risk of contracting the disease than they would be if housed in cells. Although the parties reported in the last Case Management Conference Statement having reached an agreement in principle on a plan to move as many medically vulnerable patients from dorms to cells as possible and to prioritize moving the most elderly, this plan has not been implemented.

The Receiver has determined that transfers between prisons are too dangerous at this time, so any movement from dorms to cells can happen only at prisons that have both dorms and cells.  Thus, CDCR provided Plaintiffs an analysis of cell beds available in prisons that have both cell and dorm living.  The data produced demonstrates that the movement of vulnerable medical patients from dorms to cells within their current prison as a means of protecting the medically vulnerable will be of limited or even very limited effectiveness because the system is too overcrowded.  First, there are not enough available beds in cells in many prisons with the most vulnerable patients.  For instance, according to the data produced by Defendants, there are currently 666 high risk medical patients at California Health Care Facility (CHCF) who are residing in dorms, of whom 414 have a COVID-weighted score of over 4. Even assuming that these patients could be housed in any available cell – which is not the case given program restrictions (discussed below) –

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

Defendants report only 203 beds that are empty and available. This leaves over half the patients with COVID-weighted scores over 4 in their current dorm arrangements. Similarly, with 1054 high risk patients, of whom 540 have a COVID-weighted score over 4, Mule Creek State Prison has only 454 cells available.  California Rehabilitation Center (CRC) currently has an outbreak, with 103 active cases.  That prison has 578 high risk patients, of whom 39 have a COVID-weighted score of over 4, yet there are no cells at that prison.

Even in a scenario where there are "enough" cell beds empty and available to accommodate vulnerable patients living in the dorms, many, if not most, of these cell moves would not be feasible.  According to the Defendants, "while it may appear that there are abundant cells available for housing medically high-risk dorm inmate-patients, it is important to note that many of the identified empty cell beds are not appropriate for particular inmates for various reasons."  For instance, among the "empty" cell beds identified for CMF, the list includes ICF, CTC, and MCB, which are specialized mental health beds likely not appropriate for long term use by medically vulnerable patients.  At all of the prisons, it is likely that at least half, and probably much more than half, of the available cell beds are upper bunks, and thus cannot be assigned to people with certain mobility impairments.  Finally, at prisons like R.J. Donovan, where most of the available cells are either on a Sensitive Needs Yard or an Administrative Segregation Unit, patients will have a huge disincentive to accepting the cell move.  Defendants lack sufficient space to place medically vulnerable people in safe and appropriate housing during this pandemic.

*Defendants' Position*:  Defendants are in the process of confirming the accuracy of the numbers reported by Plaintiffs above.  CDCR's Division of Adult Institutions is ready to facilitate moves of medically high-risk patients from dorms to cells within the same institution once CCHCS has provided DAI with a list of patients who, after patient education has been provided to them, have agreed to move from their current dorm to a cell.

## V. COVID-19 Testing

### a.   Staff Testing

*Plaintiffs' Position*:  As noted in this Court's June 28, 2020 Order to Show Cause re: Baseline Staff Testing for COVID-19, CDCR's plan for staff testing does not call for baseline testing of all staff.  ECF No. 3366 at 2.  In their June 30, 2020 response to the Order, Defendants state that CDCR has "decided to change course and now plans to conduct baseline staff testing at each institution" and plans to complete doing so by July 16, 2020.  ECF No. 3368 at 3.  We agree baseline testing of all staff must be done as soon as possible.

As to the remainder of CDCR's plan—which outlines what testing will be done in response to an outbreak, and the parameters for surveillance testing of staff—we continue to have significant concerns.  We have consulted with Professor Adam Lauring, M.D., Ph.D., a board-certified medical doctor in Infectious Diseases,[4] and reviewed existing public health guidance for COVID-19 testing in congregate settings, including guidance issued by the Centers for Disease Control and Prevention (CDC) for nursing homes and homeless shelters, and guidance issued by the California Department of Public Health (CDPH) for skilled nursing facilities.  CDCR's plan departs from these guidelines in significant, concerning ways.

Symptomatic Testing:  CDCR's plan does not call for testing symptomatic staff.  It states that "[a]ll staff should be screened for fever, respiratory symptoms, or other symptoms before entering any institution each day," and "[p]ersonnel who develop fever, respiratory symptoms, or other symptoms should be instructed not to report to work."  ECF No. 3356-1 at 3.  Staff who have symptoms must be tested so appropriate outbreak testing and contact tracing can be done at the prison.

Outbreak Investigations:  The testing proposed in the event of an outbreak is too

---

[4]    Dr. Lauring's biography and qualifications are available here: https://medicine.umich.edu/dept/microbiology-immunology/adam-lauring-md-phd.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

limited.  Regarding the scope, all staff should be retested when there is a new outbreak at a prison.  This is consistent with recommendations from the CDC for nursing homes, as well as the recommendations from the CDPH for skilled nursing facilities.  Instead, CDCR's plan calls for limiting outbreak testing to a particular yard where the staff person worked or incarcerated person lived.  *See* ECF No. 3356-1 at 5.  But, as this Court stated in the June 28 Order to Show Cause, "although the Receiver has recommended consideration of staff cohorting so that staff interact only with limited groups of inmates, no such cohorting has been implemented."  ECF No. 3366, n.2.  And, as explained in our portion of the last CMC Statement, even if staff do not work on the same yard, they are likely to interact with each other during shift change, in carpools, and outside of work, as many staff members live and recreate in the same communities.  ECF No. 3355 at 6.

Regarding the frequency of testing during an outbreak, CDCR's plan calls for testing to be done every 14 days during an outbreak.  ECF No. 3356-1 at 5.  This is significantly less frequent than what is recommended for other congregate living environments.  During an outbreak, the CDC recommends retesting nursing home staff every 3 to 7 days, and homeless shelter staff every 7 days.  The CDPH likewise recommends retesting skilled nursing facility staff every 7 days.  Given how quickly the virus can spread in an outbreak, including through asymptomatic people, we believe CDCR should adopt a similar standard.

Surveillance Testing:  Plaintiffs believe the proposed surveillance testing for most prisons—10% every 14 days—is insufficient.  Public health guidelines for skilled nursing facilities and nursing homes call for surveillance testing of all staff either weekly or monthly.  We are unaware of any public health guidance endorsing a lower standard for long-term congregate living environments.  During our meet-and-confer with Defendants on June 5, we asked the public health department official how 10% every 14 days was selected for surveillance, but counsel for Defendants would not allow any response.  We later asked this question again in writing.  In response, Defendants stated only that:

"CDCR determined the frequency/scope of surveillance staff testing through consultation with the California Department of Public Health, which recommended the adopted testing frequency."  We do not know what the reasoning was for this decision, but, given Defendants' reluctance to respond, we are skeptical that it was based on public health guidelines.

Regarding the medically vulnerable, CDCR's current plan calls for monthly surveillance testing of staff regularly assigned to outpatient medical or mental health housing units, and staff working at California Medical Facility (CMF), Central California Women's Facility (CCWF), and California Health Care Facility (CHCF).  ECF No. 3356-1 at 1.  We believe heightened surveillance testing of staff should also be done at other prisons with large populations of medically vulnerable and elderly people, including San Quentin (SQ), the California Institution for Men (CIM), Mule Creek State Prison (MCSP), and Richard J. Donovan Correctional Facility (RJD).  According to the May 2020 Dashboard, SQ had 1,196 patients classified as high risk for medical care purposes; CIM had 1,554; MCSP had 1,863; and RJD had 1,426.

Regarding staff working in high risk environments, CDCR's plan calls for monthly testing of staff regularly assigned to transport duty, or as guards for patients in the hospital. ECF No. 3356-1 at 2-3.  Given the risks that these officers will contract COVID-19 during transport or at the hospital, we believe they should be tested more frequently—at least once a week.  We also believe these testing requirements should apply to any staff member who works such a shift, not just those who are "regularly assigned" to do so.

Finally, regarding staff living in communities with high rates of COVID transmission, CDCR's plan states that the "State may adjust the scope and frequency of staff testing based on community spread data and prevalence of the virus in the community."  ECF No. 3356-1 at 3.  However, on June 27, 2020, in response to Plaintiffs' question, Defendants said no adjustments were currently planned for any prison under this provision.  We are concerned by this response: as of today, 49 of the 58 California counties

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

reported more than 25 new cases per 100,000 residents in the prior 14 days.  *See Tracking the Coronavirus in California*, L.A. Times, https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak (last visited July 1, 2020).  Numerous prisons are located in counties reporting some of the highest rates for new cases, including Imperial County (CAL, CEN), Lassen County (CCC, HDSP), Los Angeles County (LAC), and Kings County (ASP, COR, SATF).  *Id.*

We requested to meet and confer with Defendants regarding their plan for staff testing before the last Case Management Conference, but received no response.  After the Case Management Conference, on June 23, 2020, we renewed our request for a meet and confer, and asked that it be scheduled in advance of the filing of this Statement.  On June 29, 2020, Defendants responded, and informed us that they could not meet until July 1 at 3:30.  We therefore anticipate we will have met before this Case Management Conference and may have further updates for the Court.

*Defendants' Position*:  The California Department of Public Health (CDPH) has indicated it will be providing additional guidance for CDCR's staff testing plan, and CDCR looks forward to receiving CDPH's recommendations.  Even though a state-wide staff-testing plan has not yet been finalized, CDCR has conducted testing of numerous staff throughout the system, and CDCR will move forward with baseline testing at all prisons while the details of the staff-testing plan are worked out in cooperation with CDPH.  To date, the following staff testing has occurred:

- 1,603 staff tested at California Institution for Men in May and June;
- 1,725 staff tested at San Quentin in mid-June and retesting of all San Quentin staff is scheduled to begin June 30, 2020;
- 1,949 staff tested at Corcoran in mid-June;
- 286 staff tested at California Institution for Women on June 8, 2020;
- 380 staff tested at California Men's Colony on June 11, 2020;
- 1,164 staff tested at Avenal State Prison in late May and serial testing at

Avenal commenced on June 23, 2020;

- 1,939 staff tested at California Medical Facility from June 24-30, 2020;
- 2,959 staff tested at California Health Care Facility from June 24-30, 2020;
- 1,018 staff tested at Central California Women's Facility from June 26-30, 2020; and
- 1,142 staff tested at California State Prison, Solano from June 26-30, 2020.

Furthermore, testing of all staff at California Correctional Center is scheduled to commence on July 1, 2020, and serial testing at that institution is scheduled to begin on July 15, 2020.  Finally, testing of all staff at High Desert State Prison is scheduled to commence on July 1, 2020.  In the meantime, CDCR is working on finalizing contracts for baseline testing of all staff at the outstanding prisons, and anticipates that all baseline testing should be completed by July 16, 2020.

CDCR's Office of Labor Relations has not yet engaged in formal negotiations with the California Correctional Peace Officers' Association (CCPOA) on staff testing, but has been in contact with CCPOA officials regarding that issue.  On June 30, 2020, CCPOA filed a status report regarding staff testing in which it identified "five components" that would increase the efficiency and effectiveness of COVID-19 testing.  The first component was to conduct testing at the place of employment.  It is already CDCR's practice to conduct COVID-19 staff testing at the institutions where the employees work.  For example, the baseline staff testing that CDCR will be completing at all institutions will take place at those institutions.

Likewise, CDCR's staff-testing practices already satisfy the second, third, and fifth components identified in CCPOA's filing, which include testing staff when they are on duty, conducting the testing at no cost to the staff members, and safe guarding staff members' personal medical information.

Finally, CDCR's policies concerning COVID-19 positive staff largely satisfy the CCPOA's fourth component, which suggests that COVID-19 positive staff should be

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

placed on paid administrative leave.  Under CDCR's policy:

- If an employee tests positive for COVID-19 they are placed on paid administrative time off for up to 14 days;

- If an employee reports to work and does not pass the COVID-19 screening they are sent home and placed on paid administrative time off for that day (any time thereafter would be supplemented by their existing leave credits or would be considered unpaid leave);

- If an employee stays home sick and uses accrued leave time, and then later has a positive result for COVID-19, the leave time will be restored and the absence will be considered paid administrative time off for up to 14 days; and

- For a COVID-19 positive absence exceeding 14 days, the employee may use existing leave credits, apply for leave credits through the Catastrophic Bank Time, or apply for nonindustrial disability insurance and state disability insurance.  After that, the employee may apply for emergency administrative time off.

### b.      Testing of Incarcerated People

*Plaintiffs' Position*:  As of July 1, every prison has had at least one incarcerated person and/or staff person test positive.  *See* CDCR, *CDCR/CCHCS COVID-19 Employee Status*, https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status (last updated June 30, 2020); CDCR, *Population COVID-19 Tracking*, https://www.cdcr.ca.gov/covid19/population-status-tracking (last visited July 1, 2020). However, as far as Plaintiffs are aware, baseline testing of the entire incarcerated population had only been done at five prisons: CIM, CIW, ASP, CVSP, and SQ.  Plaintiffs believe universal baseline testing of the incarcerated population should be done at all remaining institutions as soon as possible, so CCHCS and CDCR can identify and isolate any positive cases immediately.

More broadly, Plaintiffs understand other COVID-19 testing protocols for the

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

incarcerated population are being revised, which we believe is past due.  We have made clear that many testing guidelines must be made mandatory.  For example, in a unit, facility, or prison that has experienced an outbreak, serial re-testing of all who initially tested negative "shall" be done every week or two weeks until no positive cases are identified.

**VI.  Prison-Specific Updates**

    **a.  San Quentin (SQ)**

*Plaintiffs' Position*:  San Quentin is the most recent prison to experience a mega-outbreak, one that as of the end of June resulted in 30 people hospitalized including 16 in intensive care units.  CCHCS says it anticipates that at the outbreak's peak 80 to 100 patients may require hospitalization.  Meanwhile, at the prison, nursing and custody staff shortages have been so severe that earlier this week medical staff from other Northern California prisons were called in and arrangements for other suppliers of staff are being explored, and the Office of Emergency Services has established a command post to address the disaster.  Of greatest concern is that San Quentin is running out of space to adequately separate patients confirmed to have COVID-19, those who may be infected, and those who are neither infected nor suspected of being so.  According to CCHCS, temporary tents are being brought in, but at most will house only 100 people, while "hundreds" need to be separated.  According to the Receiver, conversations continue with the State regarding the need to reduce the population at San Quentin.  To Plaintiffs, such action is imperative and very overdue.

*Defendants' Position*:  CDCR has continued to grapple with the outbreak at San Quentin, and is taking measures to address the situation there.  Efforts are continuously underway to quarantine exposed inmates and to isolate inmates with COVID-19.  Six tents have been erected at San Quentin that can provide additional housing for approximately 60 inmates or alternative medical treatment space.  In addition, the Fire Marshal evaluated and approved the chapel as additional housing space or alternative medical treatment

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  space.  And a field hospital will be erected on the grounds at San Quentin to provide

2  additional treatment space.

3      CDCR has identified 14 medically high-risk inmates that might be released from

4  San Quentin if their COVID-19 tests come back negative and if it can be verified that they

5  have a residence where they can stay upon release.  Other institutions are sending staff to

6  assist at San Quentin and a command center has been established to coordinate the

7  response to the outbreak.

8      Unfortunately, one of CDCR's planned measures—the transfer of a group of

9  medically high-risk inmates to another prison—had to be cancelled at the last minute when

10  two members of the group were found to be positive for COVID-19.  But, in coordination

11  with California Correctional Health Care Services, CDCR is considering transferring up to

12  300 inmates who have recovered from COVID-19 from San Quentin to other prisons to

13  reduce the population at San Quentin.

14      **b.  California Institution for Men (CIM)**

15      *Plaintiffs' Position*:  The mega-outbreak at the California Institution for Men

16  (CIM), which has resulted in 16 deaths, continues three months after its start, even as other

17  prisons which experienced their first cases at the same time have returned to normal

18  operations.  In the last approximately two weeks, more than 60 new COVID-19 cases have

19  been identified, about half of which are age 65 or older and thus particularly at risk of

20  severe complications, and there remain more than 500 active cases.  As in earlier months,

21  CIM continues to lack adequate space to separate those who are diagnosed with, suspected

22  of having, and who have tested negative for COVID-19.  A group of more than 20 patients

23  newly diagnosed with COVID-19 in the last approximately ten days remain in the same

24  dorm as patients who have tested negative because the prison has no appropriate housing

25  available for either group.  It is imperative that the State reduce the population at CIM so

26  the outbreak can be safely managed.  Also, and just as problematic, CIM has not and

27  according to CCHCS has no plans to re-test every week or two those who have tested

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

negative, so as to more promptly determine who is infectious and thus isolate them, even though CCHCS guidance says that should be done and CDCR's staff testing plan calls for CIM staff to be re-tested every two weeks.  It is imperative that serial re-testing begin immediately.

*Defendants' Position*:  Following the last case management conference statement, further improvements were made to CIM's Facility A and Facility D dorms, with the following results:  On June 17, 2020, CIM completed the configuration of all 8-person cohorts in all Facility D dorms, and marked the boundaries of the cohorts with tape on the floor.  With respect to CIM's Facility A dorms, CIM completed marking the floor boundaries with tape for all 8-person cohorts on June 17, 2020.  On June 9, CIM completed the installation of Lexan barriers to separate cohorts in the dorms A1, A2, and A3.  On June 14, CIM completed the installation of the Lexan barrier in dorm A4.  CIM received additional Lexan barriers on June 22, 2020.  On June 23, 2020, CIM resumed the installations of the Lexan barriers in dorms A6, A7, and A8.  The installations of Lexan barriers in all Facility A dorms were completed on June 28, 2020.

### c.  California Correctional Center (CCC)

*Plaintiffs' Position*:  As explained above, poor policy and poor decisions after the transfer of patients from San Quentin has resulted in a major COVID-19 outbreak at California Correctional Center (CCC), centered in a number of dorms that are pipelines to and from some of CDCR's fire camps, where incarcerated workers are deployed.  Many incarcerated people deeply value the camp experience, and those workers are essential to the State's wildfire control efforts, performing hard and essential labor for two dollars a day (plus one dollar per hour when fighting a fire), thus saving the state a reported $100 million dollars a year.  Because the outbreak at CCC, a camp hub, imperils the State's fire-fighting capabilities, or threatens to make that far more expensive if non-incarcerated workers had to be hired, extraordinary measures were immediately undertaken, including the special hiring of nurses, to test and monitor those at the prison and the seven camps to

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

which people had been transferred.  In addition, all staff will be tested and then serially re-tested.  Plaintiffs laud these efforts on behalf of the health of the people at CCC and the camps.  However, we deplore the fact that similar efforts, including serial re-testing of patients who have tested negative, have not been undertaken at CIM or at the other prisons that have had mega-outbreaks and deaths.

## VII.   Other Mitigation Efforts

*Plaintiffs' Position*:  We appreciate the updates provided below, and intend to discuss these matters with Defendants during the July 1, 3:30 PM meeting.

### a.  Discipline of CDCR and CCHCS Staff for Failure to Wear Masks

*Defendants' Position*:  Staff members who do not comply with the mask wearing expectations set forth in CDCR and CCHCS's June 11, 2020 memorandum will be subject to progressive discipline as outlined in the Department Operations Manual, Chapter 3, Article 22, Employee Discipline policy (unless the staff member at issue has a medical condition that precludes the wearing of facial coverings).  The progressive discipline generally consists of four steps:  (1) a documented verbal warning, (2) Employee Counseling Record, which is defined as a "written record of counseling, documented on a CDCR Form 1123, between a supervisor and subordinate which provides formal instruction about laws, rules, policies and employer expectations," (3) Letter of Instruction (LOI), which is defined as a "written document, which outlines requirements for an employee to advance his/her job performance or conduct to an acceptable level," and (4) adverse action, which is defined as a "documented action, which is punitive in nature and is intended to correct misconduct or poor performance or which terminates employment." And adverse action can include suspension, loss of pay, and termination, or rejection during probation, dependent on the employee's tenure.

As of June 26, disciplinary actions had been taken against approximately twenty CDCR staff members at five institutions for failure to comply with the mask wearing directive.  Fourteen of the disciplinary actions consisted of LOIs, three consisted of

Employee Counseling records, one of them led to on-the-job-training pursuant to CDC form 844, and two of them led to the issuance of a CDCR From 989 request for internal affairs investigation, which is the first step to be completed prior to issuing an adverse action.  Based on information received from CCHCS, as of June 29, disciplinary actions for failure to wear masks or failure to wear a mask correctly had been taken against approximately five CCHCS staff members at four institutions.  Four of the disciplinary actions consisted of Employee Counseling Records. For one of them, the Office of Internal Affairs approved a direct adverse action without the need of an investigation.

CDCR and CCHCS are working on a memorandum to institution management that reiterates that it is vital that staff adherence to the June 11 directives to protect the health of the staff, their families, the inmate population, and the public, that managers must be vigilant in the enforcement of the face covering expectations, and that managers are expected to utilize the progressive discipline process against staff members who fail to comply with them. Additionally, on June 26, 2020, CDCR and CCHCS issued a memorandum to all staff outlining the use of face coverings in headquarters and regional offices. Non-institutional staff must wear face coverings during the following situations: when interacting in person with any member of the public; working in any space visited by members of the public regardless of whether anyone else is present; in common areas such as hallways, stairways, elevators, and parking facilities; or in any room or enclosed area where other people are present, when unable to physically distance.

**b.  Provision of Surgical Masks for Incarcerated Workers**

*Defendants' Position*:  On June 24, CDCR issued a directive to the Wardens and Chief Executive Officers at all institutions that, effective immediately, all culinary inmate workers, laundry inmate workers, ADA inmate workers, and inmate porters must be issued surgical masks to be changed out and disposed of as they become soiled, and that should not be used longer that the duration of one shift.

**c.  Efforts to Incentivize Social Distancing and Mask Wearing**

*Defendants' Position*:  The Division of Adult Institutions has instructed the Wardens at all institutions to conduct meetings with the Inmate Advisory Councils to discuss ideas to incentivize social distancing and mask wearing among inmates.  Director Gipson is in the process of reviewing the corresponding Inmate Advisory Council minutes to develop ideas.  Director Gipson is also considering the ideas for incentives presented by Plaintiffs' counsel.  In addition, the Division of Adult Institutions has reinstated food sales at various prisons, which allow inmates to purchase meals, such as pizza, from selected local restaurants, which will be either be delivered to the institutions or distributed at the institutions via food trucks.  Further, Director Gipson plans to issue a memorandum to increase the number of quarterly packages inmates can receive.  Quarterly packages contain merchandise from authorized private vendors that can be purchased by inmates for themselves or by inmates' family members.  Director Gipson is also looking into options to increase the opportunities for inmates to make phone calls.  For example, at some institutions, some phones were taken out of service to facilitate social distancing.  DAI is looking into options to reinstate the phones by setting up physical barriers around each phone.

Lastly, CDCR made the following video in which inmates serving on the Inmate Advisory Councils at several CDCR prisons share their reasons for wearing cloth facial barrier masks:  https://www.cdcr.ca.gov/insidecdcr/2020/06/08/in-this-together-insights-best-practices-for-wearing-masks/.  This video is being played on the DRP-TV station at all institutions with access by all inmates.

**VIII.   Site Visits and Document Production**

    **a.  Plaintiffs' Site Visits**

On June 24, CDCR facilitated a virtual tour of the Substance Abuse Treatment Facility.  On June 25, CDCR facilitated a virtual tour of the California State Prison, Solano.  CDCR is in the process of coordinating a virtual tour at the California Men's Colony for July 7.

### b.  Information CDCR Has Produced to Plaintiffs Since June 19

On June 19, CDCR provided answers to Plaintiffs' questions about COVID-19 measures taken at the California Institution for Women.  On June 22, CDCR produced a copy of CDCR's memorandum titled COVID-19 Mandatory 14-Day Modified Program (2) (dated June 19, 2020).  On June 24, CDCR provided a description of the status of changes that were made to the dorms in Facilities A and B at the California Institution for Men since the virtual tour on May 22.  The same day, CDCR provided an analysis of CDCR's cell capacity prepared by CDCR's Division of Adult Institutions in consultation with CCHCS, plus a report that set forth the number of empty cell beds at the respective institutions and the number of medically high-risk incarcerated patients at each listed institution.  On June 27, CDCR provided answers to Plaintiff's questions about CDCR's staff testing plan.  On June 30, CDCR produced diagrams of San Quentin's Facility H-dorms to Plaintiffs.  Lastly, since the last case management conference, CDCR produced approximately 385 PDFs containing copies of the weekly captain's checklists that all CDCR institutions need to prepare in response CDCR's May 27, which requires that captains and area managers complete checklists on a weekly basis confirming that the areas they manage are compliant with previous directives concerning cloth face masks, social distancing, cleaning schedules, display of COVID-19 posters, and availability of hand sanitizer and disinfectants.

DATED:  July 1, 2020                    PRISON LAW OFFICE


By:       /s/
          SOPHIE HART
          Attorney for Plaintiffs

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

DATED:  July 1, 2020

XAVIER BECERRA
Attorney General of California


By: _____/s/_____
DAMON MCCLAIN
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR
Deputy Attorney General
Attorneys for Defendants


DATED:  July 1, 2020

HANSON BRIDGETT LLP


By: _____/s/_____
PAUL B. MELLO
SAMANTHA D. WOLFF
Attorneys for Defendants

JOINT CASE MANAGEMENT CONFERENCE STATEMENT