PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM, et al.,<br><br>  Defendants. | CASE NO. 01-1351 JST<br><br>**PLAINTIFFS' SUPPLEMENTAL CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:   July 2, 2020<br>Time:   3 p.m.<br>Crtrm.: 6, 2nd Floor<br>Judge:  Hon. Jon S. Tigar |

Plaintiffs submit the following supplemental statement in advance of the July 2, 2020 Case Management Conference, to report on the status of our discussions with Defendants regarding staff testing and other issues related to the COVID-19 pandemic.

In compliance with this Court's order, ECF No. 3353, Defendants produced CDCR's staff testing plan to Plaintiffs on June 16.  On June 17, Plaintiffs sent Defendants a list of questions and concerns regarding the plan, and requested to schedule a call with

Defendants before the Case Management Conference on June 19.  Plaintiffs did not receive a response, though in the Case Management Conference Statement, Defendants indicated they would endeavor to respond to our comments.  ECF No. 3356 at 6.

On June 23, Plaintiffs again wrote to Defendants, requesting a response to our June 17 questions regarding the staff testing plan by June 25, and to schedule a meet and confer the following Monday (June 29) regarding the staff testing plan and other pending issues, including the San Quentin outbreak and the movement of medically vulnerable people from dorms to cells.

We again did not receive a response to our request for a meeting.  On June 25, Defendants informed us that they hoped to send us responses to our June 17 comments on the staff testing plan the following day.  On June 26, we again emailed Defendants, asking for a response to our request for a meet and confer.  We did not receive a response.

Instead, on June 27, Defendants provided written answers to our June 17 comments on the staff testing plan.  For the most part, the written answers were limited and unhelpful.  For example, we asked how the frequency and scope of the surveillance testing for most prisons—10% of staff every 14 days—had been determined.  Defendants stated that "CDCR determined the frequency/scope of surveillance staff testing through consultation with the California Department of Public Health, which recommended the adopted testing frequency."  Similarly, in response to our concerns about the scope of testing done during an outbreak, the written response stated that "[t]his testing strategy was developed in consultation with the California Department of Public Health, which recommended this approach."

On June 28, this Court issued an Order to Show Cause Regarding Baseline Staff Testing for COVID-19.  *See* ECF No. 3366.  In the Order, this Court noted that it "anticipates that the parties intend to report on the results of their further meeting and conferring about Defendants' comprehensive testing plan" in the July 1 Case Management Conference Statement.  *Id*. at 3.

On the evening of June 29, Defendants responded to our pending requests for a meet and confer, stating that they could meet with us regarding the staff testing plan on July 1 or 2, at a time yet to be determined. On June 30, Defendants said the meet and confer could be scheduled for July 1 at 3:30 PM. We sent Defendants a proposed agenda the morning of July 1, including detailed comments on the staff testing plan, many of which mirrored the comments we had sent on June 17 and/or included in our previous Case Management Conference Statements. *See* ECF No. 3345 at 4-6; ECF No. 3356 at 6-7. Specifically, we sent the following comments:

I. Symptomatic testing
   a. The plan does not appear to call for testing staff who are symptomatic (though it calls for screening staff daily for symptoms). We believe symptomatic staff must be tested, so the prison can do appropriate contact tracing/outbreak investigations if the staff member tests positive.
II. Outbreak investigations
   a. The plan calls for testing staff every 14 days once a new COVID-19 case is found. Plaintiffs have concerns about both the frequency and scope of this proposed testing.
      i. Scope: The plan states that this testing can be limited to the particular yard where the incarcerated person lives or staff member works who initially tested positive. As Judge Tigar noted in his recent OSC, staff are generally not cohorted to work on a particular yard. CDCR should expand this provision to call for all staff to be tested.
      ii. Frequency: We're concerned about the frequency – every 14 days – all public health recommendations we've seen for congregate living environments suggest retesting at shorter intervals (CDC: 3 to 7 days for nursing homes; CDC: 7 days for homeless shelters; CDPH: 7 days for SNFs). CDCR should adopt a similar standard.

III. Surveillance testing

    a. The plan calls for testing 10% of staff every 14 days.  This is substantially less than what's recommended for other congregate living environments (CDC: every 7 days for nursing homes; CDPH: every month for SNFs).  CDCR should adopt a similar standard.

    b. The plan states that the "State may adjust the scope and frequency of staff testing based on community spread data and prevalence of the virus in the community."  However, on June 27, 2020, in response to Plaintiffs' question, Defendants said no adjustments were currently planned for any prison under this provision.  We are concerned by this response: as of today, 49 of the 58 California counties reported more than 25 new cases per 100,000 residents in the prior 14 days.  *See Tracking the Coronavirus in California*, L.A. Times, https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak (last visited July 1, 2020).  Numerous prisons are located in Counties reporting some of the highest rates for new cases, including Imperial County (CAL, CEN), Lassen County (CCC, HDSP), Los Angeles County (LAC), and Kings County (ASP, COR, SATF).

        i. What specific metric will CDCR/CDPH use to determine when it is necessary to conduct more frequent/widespread surveillance testing at a prison due to community spread?

    c. The plan calls for monthly surveillance testing of staff regularly assigned to outpatient medical or mental health housing units, and staff working at California Medical Facility (CMF), Central California Women's Facility (CCWF), and California Health Care Facility (CHCF).  We believe heightened surveillance testing of staff should also be done at other prisons with large populations of medically vulnerable and elderly people, including San Quentin (SQ), California Institution for Men (CIM), Mule Creek State

|   |   |   |
|---|---|---|
| | | Prison (MCSP), and Richard J. Donovan Correctional Facility (RJD). According to the May 2020 Dashboard, SQ had 1,196 patients classified as "high risk" for medical care purposes; CIM had 1,554; MCSP had 1,863; and RJD had 1,426. |
| | d. | The plan calls for monthly testing of staff regularly assigned to transport duty, or as guards for patients in the hospital.  Given the risks that these officers will contract COVID-19 during transport or at the hospital, they should be tested more frequently—at least once a week.  These testing requirements should apply to any staff member who works such a shift, not just those who are "regularly assigned" to do so. (This question applies to CCWF, CHCF, and CMF as well.) |
| IV. | | Monitoring:  How will this be tracked and reported? We ask that CDCR report no later than the 10th of the month following the end of the previous month regarding whether all elements of the Staff Testing plan were complied with at all prisons, and provide data that verifies such compliance.  (This applies to CCWF, CHCF, and CMF as well.) |

We also included in our agenda the other topics we had requested to meet and confer about in our June 23 and June 26 emails.  Defendants responded that they would only be prepared to discuss the staff testing plan.

Unfortunately, during the meet and confer, Defendants were largely unable to respond to our positions, either to agree or disagree.  Again, for nearly every point we raised, we were told only that the Department of Public Health had recommended the specific metric, or would make a decision on a particular matter, and nobody on the call could explain the reasoning or factual basis for the provisions in Defendants' own plan.  We therefore asked whether we could set up a meeting between our public health expert and the Department of Public Health, and Defendants' counsel indicated they would look into whether that could be done.  We appreciate Defendants' willingness to consider this,

but are concerned about further delay.  We believe CDCR's staff testing plan needs to be strengthened and implemented as soon as possible.

As the Receiver, this Court, and the parties have all recognized, staff are now the main vector for spreading COVID-19 in the state prisons.  *See* ECF No. 3345 at 3; ECF No. 3366 at 1.  While we are glad Defendants have agreed to conduct baseline testing in response to this Court's June 28 Order to Show Cause, CDCR's plan for testing staff—including at prisons with current, major outbreaks—remains unfinished and has significant gaps.  For example, Defendants' policy provides that any staff member with certain COVID-19 related symptoms should not report to work.  But, there is no requirement that the symptomatic employee be tested for COVID-19, either by CDCR or their private physician, so that CDCR can perform appropriate contact tracing.  No one on the call could explain the rationale for not requiring the testing of symptomatic staff members or agree to change the policy.

We are also concerned, more broadly, with Defendants' unwillingness to engage with us in a meaningful way to discuss their response to COVID-19, including what they are doing to respond to urgent situations, like the outbreak at San Quentin.  We have been able to conduct weekly phone calls with the Receiver's office regarding his team's response to the crisis, but in those calls we are told, reasonably, that our comments or questions on specific topics should be directed to CDCR, not CCHCS.  When we have succeeded in scheduling a meeting with CDCR, these meet and confer sessions have been neither efficient nor productive.  The reluctance of Defendants to engage with us substantively on these topics has slowed progress on mitigating the dangers of COVID-19.

DATED: July 2, 2020                    PRISON LAW OFFICE


                                       By:    /s/
                                           Sophie Hart
                                           Attorney for Plaintiffs