UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM, et al.,<br><br>    Defendants. | Case No. 01-cv-01351-JST<br><br>**ORDER SETTING JULY 6, 2020<br>CASE MANAGEMENT CONFERENCE** |

  California's state prison system continues to be in the grip of the COVID-19 pandemic. According to the most recently available data, there are 5,335 confirmed inmate COVID-19 cases in the state prison system, of which 2,444 are active, and 949 reported cases of staff infection as of July 3, 2020. Twenty-five inmates and two staff members are known to have died from the disease. Although our knowledge of COVID-19 is still developing, we know that it has caused and will continue to cause a significant number of deaths, and that it disproportionately kills the elderly and the medically vulnerable. We also know that the virus has affected every one of California's 35 adult prison facilities, although there has not yet been a positive inmate test result at each institution.

  Three days ago, at the July 2, 2020 case management conference, the Court expressed its view that Defendants must urgently release a significant number of elderly or otherwise medically vulnerable inmates to avoid the unnecessary spread of, and deaths from, COVID-19 among both inmates and staff alike. Without such releases, it appears that prisons will not have the empty cells and empty beds necessary to quarantine and isolate inmates. Also, when the number of infections within a single institution grows too high, medical staff can become overwhelmed and unable to provide adequate care. Large outbreaks also threaten surrounding communities.

The Court also provided several composite examples of inmates for whom COVID-19 poses particularly high risks of severe disease and death, who have had exemplary records while in prison, and who in many cases had already spent decades in confinement. These examples were drawn from the population at California Medical Facility ("CMF"), which the Court visited on June 29 and which, at the time, had no positive inmate test results. The Court expressed particular concerns about CMF because it houses some of the most medically vulnerable people in Defendants' custody. But CMF is not the only facility at risk, and the Court expressed its view that the virus would inevitably invade every institution.

Less than one day after the case management conference, CMF reported its first positive test result among its inmate population. Fortunately, for now that has been the institution's only positive inmate test result. In addition, it appears that staff are doing everything they can to control the spread of the disease. The Court is pleased, for example, that leadership has restricted custody and healthcare staff who work in the affected unit from working in other areas of CMF or at any other prison. But the situation is not static, and if staff are unable to control the spread of COVID-19 at CMF, multiple deaths are a certainty – a fact made obvious by the recent outbreak at San Quentin, which the Court describes in more detail below.

To address the increasing urgency of this matter, the Court now sets an emergency case management conference on July 6, 2020, at 3:00 p.m. Zoom access credentials will be provided separately.

At that conference, the parties shall be prepared to discuss what next steps they believe this Court should take. The Court anticipates that the discussion will include whether the parties believe that referring this matter to a three-judge court to consider whether to enter a prisoner release order is appropriate and, if so, what predicate steps, if any, are necessary before doing so. For example, does the Court first need to make a finding that Defendants are now being deliberately indifferent in violation of the Eighth Amendment and, if so, what proceedings, if any, are required before the Court can determine whether to make that finding? In addition, the Court might ask the Receiver to report on whether he believes that any more can be done to help prevent the spread of disease, or to adequately quarantine, isolate, and treat inmates who test positive,

2

particularly at CMF, and whether those measures can be accomplished without a further significant reduction in population density.

On the Eighth Amendment question, the Court previously found that Defendants' actions, as of two-and-a-half months ago, were not deliberately indifferent: "Although it is undisputed that the risks of COVID-19 are substantial, and the Court believes that Defendants have the ability to take additional steps to decrease the risk of spreading the disease, Plaintiffs have not demonstrated that Defendants' response at this time is constitutionally deficient." *Plata v. Newsom*, No. 01-cv-01351-JST, ___ F. Supp. 3d ___, 2020 WL 1908776, at *11 (N.D. Cal. Apr. 17, 2020). But the Court also explained that "this does not preclude a finding of deliberate indifference at a later time." *Id.* at *9.

That time may now have arrived. The Court notes, for example, that it previously commended the state for "produc[ing] a comprehensive, manipulable spreadsheet containing detailed information" on thousands of inmates "who have medical classifications as High Risk 1, High Risk 2, or Pregnant," among other conditions; for taking a variety of steps within its institutions to sanitize its physical spaces and promote physical distancing; and for releasing a certain number of inmates. *Id.* at *7 (internal quotation marks omitted); *see also id.* at *4-5. It was reasonable to conclude then that those measures, along with others that Defendants had taken, were not inadequate. But since then, the disease has spread out of control at more than one institution, and the risks to elderly and medically vulnerable inmates are markedly more clear. On April 17, 2020, the day the Court's prior order issued, there had not been a single COVID-19 fatality in the state prison system. The first one occurred two days later, and as of today, there have been 25.

San Quentin provides a signal example of what can happen when an outbreak overwhelms an institution. Over 1,400 San Quentin inmates, and over 150 staff members, have now tested positive for COVID-19. The number of inmate infections is undoubtedly even higher because hundreds of inmates have refused to be tested. Three COVID-19 deaths have been confirmed, a number that will surely rise given the number of inmates who continue to be transferred to outside hospitals for treatment and placed in intensive care units for treatment. San Quentin appears to

3

have lacked sufficient facilities to quarantine and isolate inmates, as well as adequate staff to respond to the resulting rapid spread of disease. And the outbreak at San Quentin has also helped COVID-19 spread more widely in surrounding communities.

Defendants must say what they believe is required to protect California's prisons, their staff and inmates, and their surrounding communities during this pandemic. If Defendants believe that a significant release of prisoners is unnecessary because, despite their experience at San Quentin, they have the ability to adequately respond to outbreaks at every other institution in a manner that comports with medical and public health guidance, they should say so – and place that guidance on the record. Perhaps Defendants can make such a showing. However, the Court is currently unaware of any public health expertise that would counsel against further reductions in population density as a necessary response to the pandemic, even after crediting all the measures that Defendants have already taken. If Defendants believe that this is not a relevant consideration for the Court, or that the law does not require them to follow what appears to be uncontroverted public health guidance, they should explain why not. The Court does not expect answers to these questions at tomorrow's case management conference; instead, it offers them as examples of questions that it believes further litigation is likely to raise.

The Court is prepared to proceed down the litigation path if necessary, and the parties should assume that the Court would proceed on the fastest practicable timeline. But even on that schedule, it would take at least several weeks to reach the point where this Court or a three-judge court, if one were convened, could determine whether Defendants should be required to release inmates. During that time, the harm inflicted by COVID-19 will only grow. In addition to valuable time lost, litigation would be a significant and costly distraction for operational staff and leadership, all of whom now work around the clock to protect their patients and have no time to spare. Defendants, on the other hand, have the power to take action now, without waiting for a court to decide whether they are legally required to do so.

Unless and until the matter is litigated, the Court expresses no opinion on whether Plaintiffs are entitled to a prisoner release order or any other relief under the law. What is undisputed in the record to date, however, is that without significant reductions in population

4

1  density that are tied to the needs of specific institutions to manage potential outbreaks of

2  COVID-19, Defendants' failure to act will cause an inevitable and unnecessary loss of life – not

3  just in California's incarcerated population, but also among CDCR staff and those beyond

4  institutional walls who interact with staff or their households on a daily basis.

5      Tomorrow, the parties should each present a plan for addressing these issues, after having

6  met and conferred in good faith. The Court will then take the matter under submission and

7  determine how best to proceed.

8      **IT IS SO ORDERED.**

9  Dated: July 5, 2020



JON S. TIGAR
United States District Judge