XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>    Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:    July 16, 2020<br>Time:    10:00 a.m.<br>Crtrm.:  6, 2nd Floor<br>Judge:   Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the July 16, 2020 Case Management Conference.

## I. POPULATION REDUCTION

### A. Releases

*Defendants' Update:*  After reducing its prison population by about 10,000 inmates since mid-March 2020, CDCR announced additional plans for early releases on July 10, 2020, estimating that implementation of new measures will allow CDCR to release up to 8,000 inmates by the end of August 2020.  These new measures fall into four categories, described below.

#### 1. 180-Day Releases.

To be eligible for release in this cohort, incarcerated persons must:

- have 180 days or less to serve on their sentence,
- not currently be serving time for domestic violence-related crimes or certain violent crimes,
- have no current or prior sentences that require them to register as a sex offender under Penal Code section 290, and
- not have an assessment score that indicates a high risk for violence.

This statewide cohort is currently being screened and released on a rolling basis to continuously create more space in all institutions throughout the pandemic, and will continue to be screened until CDCR determines such releases are no longer necessary. CDCR estimates 4,800 people could be released by the end of July 2020.

#### 2. One-Year Releases.

To be eligible for release, incarcerated persons must:

- have 365 days or less to serve on their sentence;
- not currently be serving time for domestic violence-related crimes or certain violent crimes;
- have no current or prior sentences that require them to register as a sex

offender under Penal Code section 290;

- not have an assessment score that indicates a high risk for violence; and
- be housed at one of the following institutions, which were selected based on several factors, including, but not limited to, the size of the population of high-risk inmates and the physical plant layout: San Quentin State Prison (SQ), Central California Women's Facility (CCWF), California Health Care Facility (CHCS), California Institution for Men (CIM), California Institution for Women (CIW), California Medical Facility (CMF), Folsom State Prison (FOL), and Richard J. Donovan Correctional Facility (RJD).

Inmates at age thirty or over who meet eligibility criteria are immediately eligible for release. Those who meet these criteria and are age twenty-nine or under will be reviewed on a case-by-case basis for release. CDCR will consider medical risk, case factors, and time served, among other factors, in determining whether to expedite release for those identified in this cohort. This cohort will continue to be screened on a rolling basis until CDCR determines such releases are no longer necessary.

### 3.   Positive Programming Credits.

To recognize the impact on access to programs and credit earning during the COVID-19 pandemic, CDCR is awarding a one-time Positive Programming Credit (PPC) to all eligible incarcerated people.

This credit of twelve weeks will be awarded not only to help offset credits not earned due to program suspensions, but also to recognize the burden incarcerated people have shouldered through these unprecedented times. CDCR estimates that nearly 108,000 people will be eligible for PPC. Further, CDCR estimates the population will reduce by approximately 2,100 by the end of August 2020 as a result of the application of this credit.

To be eligible to receive this credit, an incarcerated individual must:

- be currently incarcerated at one of the thirty-five adult institutions, community correctional facilities, fire camps, Male Community Reentry

Program, Community Prisoner Mother Program, Custody to Community Transitional Program, Alternative Custody Program, or a state hospital;

- not be condemned to death or serving life without the possibility of parole, as these inmates are not eligible for credit earning; and

- have no serious rules violations between March 1 and July 5, 2020, including no Division "A" through "F" offenses, for example, murder, rape, battery, assault, arson, escape, possession or distribution of contraband, possession of a cellphone, or gang activity.

On July 9, Secretary Diaz wrote a letter to all incarcerated people notifying them about the foregoing positive programming credit earning-program.  The letter can be found on CDCR's website at https://www.cdcr.ca.gov/covid19/letter-to-all-incarcerated-people/.

### 4.   High-Risk Medical Individuals.

Individuals deemed "high risk" are considered to be at greater risk for morbidity and mortality should they contract COVID-19.  They include people age sixty-five and over who have chronic conditions, or those with respiratory illnesses like asthma or chronic obstructive pulmonary disease (COPD).  The estimated number of releases in this cohort is currently being calculated.

To be eligible for release, incarcerated persons must:

- be deemed high risk for COVID-19 complications by CCHCS, indicated by a COVID weighted score of four or higher, noting that individuals ages sixty-five and over are automatically awarded four points, and individuals ages sixty-four and younger with a COVID weighted score of four or higher also qualify;

- not be condemned to death or serving life without the possibility of parole;

- have an assessment indicating a low risk for violence; and

- not be a high-risk sex offender, meaning a convicted sex offender who is

required to register pursuant to Penal Code Section 290, and has been identified to pose a higher risk to commit a new sex offense in the community, as determined using a standard risk assessment tools for sex offenders.

*Plaintiffs' Position*:  Plaintiffs continue to believe that significant population reductions are necessary to protect those incarcerated in CDCR from another uncontrolled COVID-19 outbreak.  In that regard, we welcome the State's July 10 announcement,[1] described above, of the one-time 12-week credit award for many incarcerated people, and the three programs that will consider some for early release.  However, the State's actions only require a release of relatively few from the 35 adult prisons in the next two months, and it is not known if or how many others will be actually released by then or afterwards, particularly among those who are medically vulnerable to COVID-19 complications. Unless and until sizable numbers of people are released, especially the medically vulnerable, the State's new initiatives will have very little meaningful impact now or in the near future on reducing sickness and death, or maximizing space in the prisons.

The one-time 12-week credit award is the only one of the State's recently announced actions certain to result in people being released.  That said, the State's estimate that about 2,100 will be released early because of this award between now and September overstates the impact on the 35 state prisons.  That is because the 2,100 estimate includes what Plaintiffs believe are hundreds of people who are not in the 35 prisons but in camps, community facilities, and state hospitals, who also are getting the credits.[2]  The credit

---

[1]     *See* CDCR, *CDCR Announces Additional Actions to Reduce Population and Maximize Space Systemwide to Address COVID-19* (July 10, 2020), https://www.cdcr.ca.gov/news/2020/07/10/cdcr-announces-additional-actions-to-reduce-population-and-maximize-space-systemwide-to-address-covid-19/.

[2]     On Monday, July 13, 2020, we asked Defendants how many of the approximately 2,100 early releases between July and September from the one-time 12-week credit award would be of those in the 35 prisons, and how many would be of those receiving credits in all other facilities.  On July 14, Defendants replied that they did not have that information.

award is deserved by those not confined in the 35 prisons, but their release does not reduce crowding or create space in those prisons.  Further, even assuming all 2,100 releases will be from the 35 adult prisons, it would represent a paltry 2% decrease of those prisons' current approximately 104,000 total population.   This will not create sufficient space in a system that remains overcrowded—as of June 10, according to Defendants, the prisons remain at 125.7% of design capacity.  ECF 3354 at 2.

None of the three other programs announced by the State—the 180-day, One-year (for certain prisons), and Medical Risk programs, respectively—actually require that anyone be released at any time.[3]  In other words, the programs do not provide that anyone shall be released.  Instead, the programs provide that CDCR will consider release for some who meet specified criteria.  Yet even the timing of this consideration is unclear: the programs do not require an eligible person be considered at any particular time, or even the consideration of any particular number of eligible people during any particular period of time.[4]  Because the State failed to do anything other than to say it will consider release for some when it chooses to do so, at this point it can only be said that it is not known if these programs will result in enough releases to substantially reduce sickness, death, and crowding in the prisons, including for the benefit of the medically vulnerable.[5]

---

[3]     The State, below, reports that two of these programs will require releases.  As we read it, the announcement does not mandate releases under those programs.  As we explain below, full monitoring will determine how many people are actually released.

[4]     Relatedly, the programs do not provide a means for an incarcerated person who believes they are eligible to learn whether they are, and if so, whether they are being or when they will be considered for release, or whether they have been considered and denied.  This is at the least very unfortunate.  For most, when they might or will be released is the central concern of imprisonment.  This is especially true during the COVID-19 pandemic.  In our view, knowledge of this fact, as well as respect for the individual's basic dignity, should compel the State to tell people that they will be or are being considered, and the determination that is reached.

[5]     CDCR's "one-year" early release consideration program by its terms is limited to patients at eight prisons which, to quote the announcement, "house large populations of high-risk patients."  We agree with the focus on high-risk patients, and on July 14 asked

Given the importance of population reduction in reducing the risk of COVID-19 in the adult prisons, Defendants must provide frequent, timely, and complete information and data about its new programs and their impact, including the number of actually released. On July 14, we asked Defendants to provide a report, every two weeks, with the following information:

(1)   the number of incarcerated people at the 35 adult institutions who have been released early during the relevant time period as a result of the one-time 12-week credit award;

(2)   the number of incarcerated people at the 35 adult institutions who have been released early during the relevant time period as a result of each of the three programs announced on July 10, 2020 ("180-day release," "One-year release," and "High-Risk Medical");

(3)   the number of incarcerated people at the 35 adult institutions for whom a decision on early release was made pursuant to each of the three programs announced on July 10, 2020; and

(4)   the number of such determinations granting or providing for release pursuant to each of the three programs announced on July 10, 2020.

We asked to receive the first such report by July 31 for the period ending July 25, the second report by August 14 for the period ending August 8, etc.  On July 14, Defendants replied that it is not yet known what information about these release programs can be provided, including whether the data we requested will be provided.  Defendants further stated that a report of some kind will be provided on July 31, and that they are "open to hearing [our] comments" regarding it.  Defendants also did not say how

CDCR to add seven other prisons to the program, each of which houses a greater percentage of high-risk patients than at least one and in some cases several of the prisons included in the program.  On July 14, Defendants replied that they will consider whether to add more prisons to the list, and that the prisons they chose to include were based on physical layout as well as high-risk medical percentages.  We will follow-up with Defendants regarding this matter.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16704056.2

1  frequently subsequent reports would be provided.

2       The importance of reducing the prison population to decrease the risk of illness and

3  death caused by COVID-19, especially to the medically vulnerable, cannot be over-stated.

4  As such, Defendants efforts to reduce the population via its newly announced programs

5  must be fully transparent so that adequate monitoring can occur.  The number of people

6  considered and released from the prisons under each part of the program are critical to

7  assessing whether each discrete program has been effective to reduce the population and

8  the risk of harm from COVID-19.  Defendants' promise to provide an unspecified report

9  on July 31 and then hear comments, when we have already stated what exactly is needed,

10  inspires little confidence that the information necessary for adequate monitoring will be

11  received then or thereafter.  The Court, which has rightly emphasized the necessity of

12  population reduction measures, should order Defendants to report the data every two

13  weeks, as set forth above.

14       *Defendants' Position*:  First, with respect to Plaintiffs' reference to the percentage

15  of inmate population at CDCR's prison as of June 10, the number of inmates at CDCR's

16  prisons has decreased since June 10 by 2,240 (or 2.6%) to a total of 104,725

17  inmates/123.1% of design capacity.[6]

18       More importantly, CDCR's additional plans for early releases constitute yet another

19  new, bold, and unprecedented move that has not been replicated in any other jurisdiction.

20  Also, the new plans have only been in place for five days.  Therefore, it is premature for

21  Plaintiffs or anyone to make any predictions about the exact numbers of the upcoming

22  releases.  Similarly, it is premature to make any assumptions about the impact of the

23  upcoming releases on CDCR's COVID 19 efforts and draw the conclusion that the planned

24  releases will not be sufficient to mitigate the risks of COVID-19 at CDCR's prisons.

25  However, it bears noting that Plaintiffs' statement that none of the three programs

26

27

28
[6] *See* CDCR's July 8, 2020 weekly population report, available on CDCR's website at
https://www.cdcr.ca.gov/research/population-reports-2/.

16704056.2
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

announced by the State actually require releases is inaccurate.  Both the 180-day and One-Year programs provide for releases assuming incarcerated persons meet the stated eligibility criteria.  CDCR remains committed to expeditiously execute on the new release plans it has put in place and will keep the Court and Plaintiffs appraised of any updates.

### B.    Other Population Reduction Efforts

*Plaintiffs' Position*:  We are aware of the long-standing medical parole and compassionate release laws and processes mentioned by Defendants below, but have no information regarding early releases of those in hospice or who are pregnant.  We believe the number of people released early as a result of the programs described below is very small, but support all such efforts.

*Defendants' Position*:  Between July 1 and today, the inmate population was reduced by 1,901 people, accomplished through a combination of natural attrition and early releases.   In addition to the efforts discussed above, Defendants continue to evaluate inmates who may be appropriate for early release pursuant to medical parole or compassionate release or due to their hospice or pregnancy status.

## II.   INTAKE

Defendants have, in cooperation with the Receiver, closed all intake from the counties until July 27.

*Plaintiffs' Position*:  As indicated in previous statements, we believe that intake must remain suspended until (1) CDCR initiates and completes the process of moving medically vulnerable people to cells, (2) transfers can be accomplished safely, and (3) the population decreases to the point that social distancing can be safely practiced and prisons have sufficient space to use for isolation and quarantine in the event of an outbreak.

*Defendants' Position*:  CDCR will evaluate whether to continue the suspension of intake by the end of July. CDCR will work with its healthcare and county partners to develop safe practices before resuming intake.

-9-                                          Case No. 01-1351 JST

### III.    TRANSFERS

*Plaintiffs' Position*:  CCHCS continues to work on a revised patient testing and transfer protocol, necessary after transfers in late May and June resulted in the spread of COVID-19 and mega-outbreaks at San Quentin and the California Correctional Center. CCHCS has reported that a version of the new protocol will be shared for review by Plaintiffs this week.  The new protocol is needed not just because of the problems mentioned above, but because essential and emergent transfers continue, numbering according to CCHCS nearly 450 in the three weeks prior to July 12.

### IV.    SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE

*Plaintiffs' Position*:  Individuals at risk of severe complications or death if infected with COVID-19 remain housed in crowded CDCR dorms throughout the state.  As reported in prior Case Management Conference Statements, the parties previously reached an agreement, in principle, on a plan to move as many medically vulnerable patients from dorms to cells as possible (within their current facility) and to prioritize moving the most elderly.  However, this plan still has still not come to fruition.

On July 6, 2020, CCHCS prepared a document titled "Dorm to Cell Movement," that outlined the initial plan to begin such moves.  Based upon the document, such movements would take place in a phased approach, beginning with four institutions (CMC, CTF, SATF, SOL).  A conference call with the Wardens and CEOs explaining the process was to take place last week, and, based on bed availability, a list of patients to be offered moves would be provided to the institution, to begin PCP consults offering them.  If no custody concerns arose, those who agreed to the moves would be rehoused in a cell.  Those individuals whose move raised custody concerns would be seen in Committee.

Unfortunately, no such moves have occurred.  Based on information received from CCHCS on July 14, 2020, the plan to conduct these dorm to cell moves has been suspended while CDCR and CCHCS work to ensure adequate bed availability on each yard for isolation/quarantine purposes.  Plaintiffs agree that creating adequate quarantine and isolation space is critical, but remain concerned about the significant number of

16704056.2

medically vulnerable patients still residing in overcrowded dorms.  Defendants need to develop plans to ensure that there is sufficient space to place medically vulnerable people in safe and appropriate housing during this pandemic.

*Defendants' Position*:  As reported in the last case management conference statement, CDCR's Division of Adult Institutions was ready to facilitate moves of medically high-risk patients from dorms to cells within the same institution once CCHCS provided DAI with a list of patients who, after patient education has been provided to them, have agreed to move from their current dorm to a cell. Per the Receiver's instructions, however, the move of medically high-risk patients from dorms to cells within the same institution has been placed on hold.   Defendants remain committed to working with the Receiver to facilitate these moves or any other moves to safely house medically high-risk inmates if such moves have been recommended and approved by the appropriate experts.  Because moving inmates bears risks, Defendants emphasize that any plans to move inmates (no matter if it is the movement of medically high-risk inmates or other inmates to create space to house high-risk inmates) should be carefully developed in collaboration with and executed under the supervision of appropriate health experts.

## V.   COVID-19 TESTING

### A.   Staff Testing

*Plaintiffs' Position*:  During the last Case Management Conference, the Court ordered Defendants to provide to Plaintiffs a revised draft of the staff testing policy no later than July 16, 2020.  As of the time of this filing, Plaintiffs have not yet received the revised policy. We will review the new policy and, if necessary, provide further comments to Defendants once we receive these revisions.  With regard to the staff testing data presented by Defendants below, we observe that the percentage tested at each institution remains unavailable, and CDCR is unable to say when that fundamental measure will be presented.

*Defendants' Position*:  CDCR's plan to conduct baseline staff testing across all of the

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

institutions is well underway and will be completed soon.  A first round of baseline testing has been completed at most institutions and some initial and follow-up testing at a number of institutions will be completed by July 19, 2020.  The table below sets forth the dates of completed and pending staff testing at each institution and the number of staff tested to the extent that data is available.  As reflected in the table, multiple rounds of staff testing have occurred at some institutions.[7]

Because of the short time within which CDCR has conducted a massive amount of baseline staff testing, CDCR has not yet had a chance to reconcile all of the data it has collected, and is currently unable to present it all in a tidy format.  But CDCR is working to develop a standardized format for regularly reporting staff-testing data.

Because staff are comprised of different groups (e.g., custody staff, medical staff, Prison Industry Authority staff), it is not easy to provide a percentage of staff tested at each institution.  Additionally, the method by which CDCR could potentially calculate percentages might be misleading because it would be based on authorized positions.  Thus, vacancy rates at each institution would skew the result of the calculation.  Further complicating the task is the fact that while some staff are considered to be employed by a particular institution, they work remotely.  And during any round of testing, some staff will not end up being tested because they are on vacation or some other type of leave, on temporary assignments at other locations, or temporarily working remotely.  There have also been some staff refusals to test.[8]  Regardless, CDCR will endeavor to develop a standardized format for reporting staff-testing data that will include the percentage of staff tested at each prison.

| PRISON | DATES OF TESTING | NUMBER OF STAFF TESTED |
|---|---|---|
| Avenal State Prison | May 27-29, 2020 | 1,168 |

[7] The table represents a snapshot in time.  Completed tests are not counted until the results are received, and new results are provided by the labs every day.

[8] On July 13, CDCR issued a memorandum to all staff setting forth expectations regarding staff testing and advising that an employee who refuses to test will face progressive discipline, up to and including termination.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

| | | |
|---|---|---|
| | June 1-2, 2020<br>June 23-26, 2020<br>June 29 | |
| California City Correctional Facility | July 9-10, 2020 | 510<br>Additional Pending Results |
| California Correctional Center | July 1-2, 2020<br>July 16-18, 2020 | 662<br>Additional Pending Tests |
| California Correctional Institution | July 2-3, 2020<br>July 15-17, 2020 | 1,136<br>Additional Pending Tests |
| California Health Care Facility | June 24-26, 2020<br>June 29-July 3, 2020 | 3,480 |
| California Institution for Men | May 26-27, 2020<br>June 1-3, 2020<br>June 8-10, 2020 | 1,603 |
| California Institution for Women | May 15, 2020<br>June 8-9, 2020<br>July 13-15, 2020 | 1,029<br>Additional Pending Results |
| California Men's Colony | July 6-7, 2020 | 1,389 |
| California Medical Facility | June 24-July 3, 2020<br>July 6-7, 2020 | 2,188 |
| California Rehabilitation Center | June 25-26, 2020<br>June 30, 2020<br>July 10, 2020 | 850 |
| California State Prison, Corcoran | June 11-15, 2020<br>June 30-July 3, 2020<br>July 6-7, 2020 | 1,964 |
| California State Prison, Los Angeles County | July 8-10, 2020 | 1,275 |
| California State Prison, Sacramento | July 8-10, 2020 | 1,335 |
| California State Prison, Solano | June 26-July 3, 2020<br>July 6-7, 2020 | 1,248 |
| Substance Abuse Treatment Facility | July 9-11, 2020 | 1,453 |
| Calipatria State Prison | July 15-17, 2020 | 195<br>Additional Pending Results |
| California State Prison, Centinela | July 2-3, 2020<br>July 17-19, 2020 | 799<br>Additional Pending Tests |
| Central California Women's Facility | June 26, 2020 | 1,230 |

16704056.2

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

| | June 29-July 3, 2020<br>July 6-7, 2020 | |
| Chuckawalla Valley State Prison | July 2-3, 2020<br>July 17-19, 2020 | 551<br>Additional Pending Tests |
| Correctional Training Facility | July 9-11, 2020 | 1,140 |
| Deuel Vocational Institution | July 13-15, 2020 | 933<br>Additional Pending Results |
| Folsom State Prison | July 8-9, 2020 | 1,183 |
| High Desert State Prison | July 1-2, 2020<br>July 16-18, 2020 | 910<br>Additional Pending Tests |
| Ironwood State Prison | July 2-3, 2020<br>July 17-19, 2020 | 609<br>Additional Pending Tests |
| Kern Valley State Prison | July 6-7, 2020 | 1,271 |
| Mule Creek State Prison | July 13-15, 2020 | 1,368<br>Additional Pending Results |
| North Kern State Prison | July 6-7, 2020 | 1,061 |
| Pelican Bay State Prison | July 13-15, 2020 | 1,095<br>Additional Pending Results |
| Pleasant Valley State Prison | July 9-11, 2020 | 1,024<br>Additional Pending Results |
| Richard J. Donovan Correctional Facility | July 15-17, 2020 | 374<br>Additional Pending Tests |
| Salinas Valley State Prison | July 9-11, 2020 | 1,503 |
| San Quentin State Prison | June 11-15, 2020<br>June 24-25, 2020<br>June 30-July 3, 2020<br>July 6-7, 2020 | 1,724 |
| Sierra Conservation Center | July 13-15, 2020 | 794<br>Additional Pending Results |
| Valley State Prison | July 13-15, 2020 | 923<br>Additional Pending Results |
| Wasco State Prison | July 6-7, 2020 | 1,136 |

CDCR continues to consider Plaintiffs' comments and concerns about the staff testing plan and has provided them to the California Department of Public Health (CDPH) for consideration. CDCR also intends to have its public health expert evaluate the plan and

16704056.2

Plaintiffs' concerns.  CDCR expects to receive additional input from CDPH regarding the staff-testing plan.  CDCR will provide the current iteration of the plan to Plaintiffs by July 16.  But as Defendants have repeatedly advised, the plan will be subject to change based on new information and public health expertise.

### B.    Testing of Incarcerated People

*Plaintiffs' Position*:  CCHCS reports that it continues to plan for deployment sometime this month of rapid COVID-19 testing capabilities at the prisons, and states that such machines will be run 24 hours a day.  It is not clear whether or to what degree rapid testing will supplant the format currently used.  The current test format, according to CCHCS, is subject to increased delays in reporting results from its prime vendor laboratory.

A major problem has arisen with respect to monitoring re-testing of patients, including of the kind the Court was told at the last Case Management Conference would be undertaken at the California Institution for Men, and which CCHCS says will happen weekly for all at San Quentin who previously tested negative (and which it said should occur at other prisons that have or are experiencing major outbreaks).  Currently, while those in charge say such re-testing should be done, there is no data available within CCHCS or that can be made available to us that demonstrates whether or to what degree such re-testing is actually being done.  In this regard, the CCHCS "Population COVID-19 Tracking" website reports only patients' initial tests.

Re-testing is critical to reducing the spread of the virus, and when hundreds or thousands of patients require such tests, CCHCS needs an accurate and timely systemic process to determine if required tests have been timely done.  It is not clear from our discussions that it will be able to do so.  We understand it is a complex matter, given the variety of platforms and vendors now sometimes used for COVID testing, but we believe it is essential that this information be collected and tracked.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16704056.2

## VI.   PRISON-SPECIFIC UPDATES

### A.    San Quentin (SQ)

*Plaintiffs' Position*:  San Quentin is a disaster, given the number of patients infected, the number who so far have died, the current number hospitalized (56 as of Monday evening, according to CCHCS, including 20 in ICUs, eight of those intubated), the establishment of a large "Alternate Care Site," a kind of skilled nursing facility, equipped and staffed by a contractor at presumably enormous cost to the State, the need to re-direct sizable numbers of staff from other prisons, the hiring of other temporary staff, and the profound disruption to prison operations including incarcerated people being unable to get outdoors for exercise or even make phone calls.

Plaintiffs again observe that in mid-June public health experts called for at least a 50% reduction in capacity at the prison so that the outbreak could be adequately managed. *See* Williams & Bertozzi, *Urgent Memo COVID-19 Outbreak: San Quentin Prison* (June 13, 2020) at 3.  "It is a frightening public health reality," the experts' report warned, "that in a matter of days there may be no cells to isolate a potentially infectious COVID-19 patient."  *Id.*  Unfortunately, this came to pass: patients with active COVID-19 at San Quentin, who present a risk of infecting others, continue to be housed in the same facilities with others known to be negative (including, in at least one instance, a positive and negative patient housed in the same cell).  Resolving this problem, CDCR now says, requires activation of what its managers refer to as "temporary structures" to house certain patients (which will be in addition to the tents currently being used for temporary housing), then a series of transfers of patients between buildings, all to happen at some unknown future date.  Plaintiffs ask the Court to discuss with Defendants, who are responsible for these "temporary structures" and transfers, the specific timeline for getting this necessary work done, and exploring whether an order is necessary to facilitate its prompt completion.

Despite the State's response to the disaster, it has not successfully contained the virus.  Unfortunately, new positive cases continue to be identified throughout the prison.  On July 14, CCHCS reported the first positive COVID-19 patients in H-Unit, in which

16704056.2

1    approximately 400 people are housed in the only dorms (there are five) at San Quentin,

2    and which until then had been the only part of the prison with no confirmed COVID-19

3    cases.  CCHCS says that all in the unit will now be re-tested.

4        Further, Plaintiffs have serious questions whether the State's response could be

5    replicated if a similar disaster occurred at a more remotely located prison, where hospital

6    beds and medical staffing resources are limited in comparison to the Bay Area, or if a

7    similar outbreak occurred now at another prison, particularly one nearby from which staff

8    have been redirected to San Quentin.

9        Finally with regard to San Quentin, on the evening of July 8, 2020, CDCR and

10   CCHCS published a joint update stating that all staff entering the prison are being provided

11   N95 masks that are mandated to be worn when working at the prison.  On July 9, we asked

12   if incarcerated people are being provided N95 masks as well.  On July 14, CDCR stated

13   that it was determined that N95 masks were necessary at a prison with a COVID-19

14   outbreak of the scope that has occurred at San Quentin, and reported that those who reside

15   at the prison would be provided N95 masks beginning on that date.  We appreciate this

16   action, but regret that in this regard the safety of incarcerated people appears to have been

17   at best an after-thought.

18       *Defendants' Position*: CDCR has taken a number of steps to address the outbreak at

19   San Quentin and is actively working with CCHCS to implement additional measures.  At

20   present, 533 previously COVID-19 positive inmates have "resolved," 1,454 inmates

21   remain actively COVID-19 positive, and of those, 410 cases are new within the last 7 days.

22   San Quentin's gym (which currently houses 91 inmates) remains free of any COVID-19

23   cases, and staff who work there are cohorted and not permitted to work elsewhere in the

24   prison to ensure there is no cross-contamination.

25       Currently, all staff entering the prison must wear an N95 mask while performing

26   duties on institution grounds.  On July 14, 2020, inmates were also offered N95 masks.  It

27   will be optional for inmates to wear an N95 mask; inmates who choose not to wear one

28

1  must instead wear a cloth face covering.

2      Additionally, nine tents have been installed, each with a maximum capacity of 10

3  patients.  CDCR is exploring larger temporary structures in lieu of these tents to provide

4  additional capacity and is working with the State Fire Marshal at present to explore this

5  option.  CDCR has also modified San Quentin's Prison Industry Authority's on-site

6  furniture facility, transforming into a 220-bed alternative care site to treat COVID-19

7  positive patients at the institution and reduce the impact to outside health care facilities.

8  Forty-six symptomatic, medically low-risk, COVID-19-positive inmate patients are

9  presently housed in the alternative care site, which is akin to a skilled nursing level of care

10  and is staffed with doctors, registered nurses, and custody staff.

11      Additionally, San Quentin's population has been reduced by 659 inmates from

12  March through July 8, 2020.  This reduction is attributable to the suspension of intake from

13  county jails, natural releases, and expedited releases from the institution.  All inmates

14  being released from San Quentin are offered placement into Project Hope[9] in the

15  community, which provides hotel rooms at no cost to those needing to quarantine or isolate

16  in the community upon release.  All inmates released from San Quentin are provided

17  COVID-19 educational information and cloth face coverings.

18      Further, on June 8, CDCR suspended the transfer of any inmates into or out of San

19  Quentin except for emergencies.  San Quentin implemented modified programming such

20  that dining and showers are provided in staggered schedules to allow for physical

21  distancing and proper disinfection between each use.  Cleaning supplies and personal

22  protective equipment are provided to inmates on a weekly basis; additional hand sanitizer

23  refills are available upon request.  Staff must disinfect their equipment prior to coming on

24  shift and during the day if contact occurs with positive or symptomatic inmate patients.

25      Tens of thousands of additional pieces of personal protective equipment have been

26

27  [9] Project Hope is a partnership between CDCR, the California Office of Emergency Services
   (CalOES) and Federal Emergency Management Agency. Transportation to Project Hope-

28  accommodations is provided by CDCR.

16704056.2

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

sent to San Quentin and distributed to inmates and staff.  Strict guidelines have been implemented which mandate the use of PPE while on institution grounds.  All inmates have been provided five reusable cloth barrier masks to be used whenever moving around the institution.  Staff must wear a facial barrier at all times or are provided the specific PPE that is required based upon their assigned work location.  Surgical masks are provided to incarcerated critical workers.

A unified incident command center has been established at San Quentin to coordinate custody and medical response to COVID-19 cases.  The team is comprised of medical, custody, emergency management and infectious disease experts from CDCR, CCHCS, the California Governor's Office of Emergency Services (Cal OES), Emergency Medical Services Authority (EMSA), CDPH, and Division of Occupational Safety and Health.  Cal OES has established an Incident Management Assistance Team (IMAT) at San Quentin to support healthcare and medical response and coordinate operational logistics at the facility among local, state and federal agencies.  And an ambulance strike team from EMSA has been established at San Quentin to facilitate the rapid transfer of patients to outside healthcare settings when needed.

Additional custody and health care staff have been redirected to San Quentin from nearby institutions to ensure continuity of operations.  Specifically, more than 130 correctional officers and 20 sergeants from other institutions are being redirected to San Quentin.  More than 40 nursing staff from CCHCS have been redirected from other institutions and headquarters.  These staffing assignments are for a 30-day term, with lodging provided by the State.

CDCR has also increased testing at San Quentin for both inmates and staff.  Inmates are tested every 7 days at San Quentin (with some inmates already having been tested three times).  San Quentin is working with an epidemiologist and with their doctors to ensure that they are implementing the best testing strategy.

Defendants continue to explore and consider all possible means of ensuring the

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16704056.2

safety of the inmates and staff who live and work within the facility.

**B.    California Healthcare Facility (CHCF)**

*Plaintiffs' Position*:  As the Court is aware, CHCF reported its first COVID-confirmed patients in the last few days.  One patient is from a Facility D Correctional Treatment Center building, another from a Facility C Outpatient Housing Unit building, and the third is from the Facility E Enhanced Outpatient Program.  Given the enormous percentages of medical high-risk patients at the prison, including large numbers at risk of complications from COVID-19—more than 1600 patients, according to data provided by CCHCS in June—we fervently hope that the medical isolation of the COVID-positive patients, and quarantining of others, works to stop the spread of the virus.

Widespread COVID-19 infections at CHCF could represent a worst-case scenario within CDCR.  As one example of the challenges at CHCF, one of the current active COVID-19 patients has end stage renal disease and receives dialysis three times a week.  Before COVID-19 was diagnosed, the patient's dialysis took place at CHCF along with many of what we understand are more than 100 other dialysis patients at the prison, in a room in which the patients receiving the service spend hours in at a time.  Now, according to CCHCS, the patient is receiving dialysis at a local hospital, in an isolation dialysis room.  The hospital, we are told, has two such rooms, apparently the only ones available in the area.  Should a large number of CHCF patients become infected with COVID-19, the challenges of continuing life-sustaining dialysis would seemingly be daunting.

Because these developments so recently took place, we have not been able to learn what steps have been taken, or whether additional resources or actions are necessary to reduce the risk of disease transmission.  We ask the Court to have the Receiver and Defendants report at the Case Management Conference on the situation at CHCF, including the need for additional resources and actions.

*Defendants' Position*:  Currently three COVID-19 positive inmates reside at CHCF.  CHCF closed to movement on July 9, 2020 until further notice.  On July 9, 2020, Warden

16704056.2

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

Burton and CEO Dr. Aref from CHCF issued a memorandum to Associate Director Tammy Foss and Eureka Daye, Region I Executive Health Care/Director of Women's Health at CCHCS regarding CHCF's COVID-19 mitigation strategy.  The memorandum details all efforts being undertaken by the institution to mitigate the spread of COVID-19, including directives to staff and inmates, indicates that the institution established an ICP effective July 6, 2020, and describes physical distancing measures and use of PPE.

Staff have also been reminded to wear masks and practice hygiene.  Leadership at CHCF has also stress the importance of testing to staff.  Further, staff are being cohorted together in groups to reduce the risk of cross-contamination.  Finally, CHCF has cleared out an entire unit to make space for isolation or quarantine needs, and the CEO at CHCF, Dr. Aref, has been working with the Warden to free-up cell space in the event additional space is needed in the future to quarantine affected inmates.

## C.    California Medical Facility (CMF)

*Plaintiffs' Position*:  We understand from the medical record that the one patient whose COVID-19 test at CMF was initially reported as "detected" was re-analyzed by the lab, which then reported it had made an error and the actual result of the test was "not detected."  We further understand that a subsequent re-test of the patient again yielded a "not detected" result.

*Defendants' Position*:  An inmate at CMF tested positive for COVID-19 on July 3, 2020.  By July 4, the prison's Institution Command Post had been activated and 12 tents, accommodating up to 120 inmates, were approved by July 6.  Since that time, it has been determined that the inmate's test was a false positive, and currently no COVID-19 positive inmates reside at CMF.  Nonetheless, the tents remain onsite and are being used to house inmates to increase the space for physical distancing in the housing units.  Currently, 25 inmates are housed in CMF's tents.

## VII.   CDCR's Further COVID-19 Mitigation Efforts

### A.   Establishment of Incident Command Posts

*Plaintiffs' Position*:  Plaintiffs support the creation of incident command post (ICPs) at each prison, as described below.  As the situation at San Quentin makes clear, prison leadership cannot wait until they are in the midst of an outbreak to develop a response plan and put together a response team.  *See* Williams & Bertozzi, *Urgent Memo COVID-19 Outbreak: San Quentin Prison* (June 13, 2020) at 1-3 (noting that "the over-reliance on local existing medical and correctional leadership to develop an outbreak response plan means that these leaders are tasked with making multiple acute decisions on a daily basis without enough people on the ground to operationalize a centralized game plan or long term strategy" and recommending the urgent creation of a COVID-Outbreak Emergency Response Team).  While we support the creation of these teams, we believe their ability to develop and implement adequate, life-saving outbreak response plans will hinge upon CDCR's commitment to create sufficient quarantine and isolation space at each prison.

*Defendants' Position*:  On July 2, 2020, Secretary Ralph Diaz directed each CDCR institution to set up an incident command post (ICP) to coordinate COVID-19 response and planning efforts.  This directive applied even to institutions that had not experienced any outbreaks.  At a minimum, ICPs are staffed with co-incident commanders from CCHCS and CDCR's Division of Adult Institutions (DAI), as well as designated staff to lead planning, operations, logistics, finance operations, and public information.  Staffing varies by institution based on factors like size, layout, space, and outbreak status.

Generally, ICPs coordinate custody and medical responses to COVID-19 cases; collect, manage, and report COVID-19-related data; manage COVID-19 tests and testing data; track and allocate testing equipment and PPE inventory; create and update assessments and plans related to COVID-19 and mitigation efforts; and maintain communication with local health departments and healthcare providers.  Additionally, ICPs work in conjunction with internal departments and external stakeholders and agencies to meet the institution's ongoing needs while also taking proactive measures.  Specific

16704056.2

functions, day-to-day operations, and collaborations vary by institution based on the institution's individual needs.  For example, see section IV.A. above regarding San Quentin's unified command center and current COVID-19 response efforts.  Additionally, as part of their proactive outbreak-management efforts, ICPs will run drills to assess COVID-19 preparedness in the event of an outbreak.

As of July 7, 2020, all CDCR institutions have active ICPs, report updates to CDCR headquarters daily and provide other information as needed.  For example, last week, each ICP was directed to collect data related to each institution's housing capacity, occupied and unoccupied beds, and beds needed in the event of a COVID-19 outbreak, and report this data to the Receiver's office to assist the Receiver's office in its analysis of this issue.

## B.    Inmate Porter Training

*Plaintiffs' Position*:  Plaintiffs support all efforts to provide training and adequate equipment to incarcerated person workers.  In April, we raised concerns about unsafe practices by apparently unsupervised or inadequately trained housing unit porters and volunteer incarcerated person workers at California State Prison, Los Angeles County.

*Defendants' Position*: On June 25, the California Prison Industry Authority (CALPIA) issued a memorandum about a COVID-19 training for all CDCR inmate porters at all institutions.  The training includes, but is not limited to, personal hygiene and hand washing, safe work practices, chemical mixing and COVID-19, personal protective equipment, and COVID-19 on surfaces and cleaning after suspected/confirmed COVID-19 (CDC recommendations).

## VIII. SITE VISITS AND DOCUMENT PRODUCTION

### A.    Plaintiffs' Site Visits

On July 7, CDCR facilitated a virtual tour of the California Men's Colony.

### B.    Information CDCR Has Produced to Plaintiffs Since July 2

On July 2, CDCR provided answers to Plaintiffs' follow-up questions from the virtual prison tour at the California State Prison, Solano, which took place on June 25.  On

July 3, CDCR provided answers to Plaintiffs' questions about the use of cots in the dayrooms at the California Health Care Facility.  The same day, CDCR produced CDCR's July 1 memorandum, which sets forth the processes for the increase of quarterly packages the incarcerated population can receive and that Defendants reported on in the last case management conference statement.  On July 10, CDCR produced the results of a statewide survey to Plaintiffs that sets forth which institutions have pony walls in their dorms.  On July 14, CDCR provided answers to Plaintiffs' questions about the early releases described in section I.A. above.  Lastly, since the last case management conference, CDCR produced approximately 213 PDFs containing copies of the weekly captain's checklists that all CDCR institutions need to prepare in response CDCR's May 27, which requires that captains and area managers to complete checklists on a weekly basis confirming that the areas they manage are compliant with previous directives concerning cloth face masks, social distancing, cleaning schedules, display of COVID-19 posters, and availability of hand sanitizer and disinfectants.

DATED:  July 15, 2020                              PRISON LAW OFFICE


By:        /s/
                 STEVEN FAMA
                 SOPHIE HART
                 Attorney for Plaintiffs

16704056.2
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

DATED:  July 15, 2020                    XAVIER BECERRA
                                         Attorney General of California


                                    By:    /s/ Nasstaran Ruhparwar
                                         DAMON MCCLAIN
                                         Supervising Deputy Attorney General
                                         NASSTARAN RUHPARWAR
                                         Deputy Attorney General
                                         Attorneys for Defendants


DATED:  July 15, 2020                    HANSON BRIDGETT LLP


                                    By:    /s/ Paul Mello
                                         PAUL B. MELLO
                                         SAMANTHA D. WOLFF
                                         Attorneys for Defendants

16704056.2

JOINT CASE MANAGEMENT CONFERENCE STATEMENT