PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| MARCIANO PLATA, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> GAVIN NEWSOM., et al., <br><br> *Defendants*. | Case No. C01-1351 JST <br><br> **PLAINTIFFS' BRIEF IN SUPPORT OF PROPOSED ORDER ON ISOLATION AND QUARANTINE SPACE** |

In its July 7, 2020, Order Re: Isolation and Quarantine Space, the Court announced its intention to issue an order requiring Defendants to set aside sufficient space "to allow [each] institution to follow public health guidance on isolating and quarantining patients in the event of a COVID-19 outbreak." ECF No. 3381 at 1.  The Court ordered the parties and the Receiver to meet and confer about the elements of any such order.  *Id.*  As stated previously, *see* ECF No. 3385, the parties have met with the Receiver and each other to discuss the methodology for determining the need and location for the necessary space in the event of an outbreak.  As a result of those meetings

1

and his own analysis, the Receiver issued a document entitled "COVID-19 Space Needs for Prevention, Isolation and Quarantine." A copy of this document is attached to the Declaration of Adam Lauring, filed herewith (Lauring Decl.), as Exhibit C (Receiver's Guidance).

The parties have met and conferred over a proposed order, as directed by the Court, but have been unable to come to an agreement. Accordingly, Plaintiffs hereby submit the attached proposed order for the Court's consideration.

### A.     Receiver's Guidance

The Receiver's "summary of principles and strategies" carefully defines the people who must be placed in medical isolation or quarantine in order to prevent isolated occurrences of the disease from becoming significant outbreaks. The document also delineates the separation requirements for those groups. These definitions and separation requirements are well grounded in scientific consensus. Lauring Decl., ¶ 10.

The document then sets forth the space requirements to allow for effective implementation of medical isolation and quarantine in an outbreak:

> each facility in each prison shall identify space that will allow for rapid isolation and quarantine of impacted patients. Each facility shall identify its largest congregate living space. Each facility shall maintain empty beds equivalent to the capacity of its largest congregate living space or 20% of the current population of the facility, whichever is larger.

Receiver's Guidance at 3. The Receiver noted during the meet and confer sessions that there is no body of scientifically validated evidence that could be used to develop a formula for the amount of space in a correctional institution necessary to minimize the risk of an outbreak. As the Receiver explained in his statement:

> The methodology for determining the number of empty beds, including the 20% adjustment noted at the end of this document, was based upon our experience during the pandemic with outbreaks of different sizes. We have experienced four large outbreaks (total positives greater than 500), six medium-sized outbreaks (total positives greater than 100 and less than 500), and fourteen small outbreaks (total positives between 1 and 99). The goal of this analysis and its associated methodology is to ensure to the extent reasonably feasible that each institution has enough beds to handle the beginning phases of an outbreak in order to significantly reduce the risk of it blossoming into a medium-sized or large outbreak.

Receiver's Guidance at 1.

The strategy outlined by the Receiver is consistent with the advice provided to the Court by AMEND and the Berkeley School of Public Health in their "Urgent Memo" of June 13, 2020, regarding the COVID-19 outbreak at San Quentin State Prison.  This document, authored by an eminent group that includes two members of the Court's Advisory Board, found that "a massive outbreak at San Quentin will significantly overwhelm the availability of [San Quentin's limited] Medical Isolation cells, and there will quickly be nowhere for infectious cases to be moved."  Lauring Decl., Exh. C, at 5. The memo recommends taking drastic measures to create medical isolation space and develop alternate quarantine sites in order to meet the anticipated need for empty beds to perform the essential action of separating the sick patients from the healthy ones. *Id.* The Receiver's strategies, building on the experience gained at tragic cost from the San Quentin outbreak, seek to establish that isolation and quarantine space *in advance*, in every prison, in order to prevent further unacceptable loss of life.

In addition, Dr. Adam Lauring, a noted expert in infectious disease and COVID-19 prevention, agrees with the Receiver's approach and adds that the lack of current scientific consensus should not prevent action based on the experience to date with the

virus in the CDCR.  Lauring Decl., ¶¶ 7-9.

The Receiver's approach, grounded in his own experience and consistent with the opinions of national experts, represents the best thinking available on this matter.  It strikes a balance between two important considerations: on one hand, the urgent need to prevent further disastrous outbreaks and reduce the current, unacceptable risk of harm to all people housed in CDCR institutions, and on the other hand, the need to ground any remedial actions in experience, careful analysis, and expert advice.

**B.     Plaintiffs' proposed order**

Plaintiffs have incorporated the Receiver's analysis and proposed methodology into their proposed order.  The order requires Defendants to speedily implement the Receiver's strategies in order to reduce the unacceptable risk of harm inherent in current conditions.  Plaintiff class members in prisons throughout the state live in fear of an outbreak.  Too often those fears have been realized, with deadly cost: the COVID-19 mortality rate at San Quentin, at approximately 300 per 100,000, is nearly 17 times the COVID-19 mortality rate in the state as a whole.[1]  The uncontested expert opinions before the Court warn that the lack of space for medical isolation and quarantine will result in serious illness and many additional deaths unless the Court requires Defendants to act.

Plaintiffs' proposed order includes a provision, however, that allows for

---

[1] *See* https://www.cdc.gov/covid-data-tracker/index.html#cases (last viewed July 15, 2020) (California mortality rate is 17.8 per 100,000); https://www.cdcr.ca.gov/covid19/population-status-tracking/ (last viewed July 15, 2020) (10 COVID-19 deaths at San Quentin); https://www.cdcr.ca.gov/research/population-reports-2/ (last viewed July 15, 2020) (as of July 8, San Quentin population was 3,392).  The COVID-19 mortality rate at San Quentin is thus 295 per 100,000.

adjustment based on factors identified by Defendants during the meet and confer process, such as alternative housing that might be available at the facility, the physical structure of the prison, characteristics of the population at the prison and transfers to other prisons once a transfer protocol is approved.  It also allows for adjustments based on the necessity to accessibly house plaintiff class members with disabilities and other factors that limit housing flexibility.  It therefore allows for – requires – narrow tailoring to meet the needs and limitations of the individual prisons.

   Plaintiffs respectfully request that the Court issue the attached order.

               Respectfully submitted,

DATED:  July 15, 2020     PRISON LAW OFFICE

               By: *Sara Norman*
                  Donald Specter
                  Steven Fama
                  Alison Hardy
                  Sara Norman
                  Rana Anabtawi
                  Sophie Hart

               Attorneys for Plaintiffs