PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>GAVIN NEWSOM., et al.,<br><br>*Defendants*. | Case No. C01-1351 JST<br><br>**[PROPOSED] ORDER ON ISOLATION AND QUARANTINE SPACE** |

The Court finds that in light of recent events, especially at San Quentin, it is imperative for Defendants to have sufficient physical space in each prison to reduce the risk of serious harm and death from COVID-19.  At the present time, neither party has developed a plan to ensure that there is adequate physical space to keep the incarcerated population reasonably safe from the virus.  Accordingly, the Receiver was asked to develop principles that would for the first time in this litigation quantify the space needs of the CDCR in light of toll that COVID-19 has taken on the prison population.

1

Pursuant to that request, the Receiver drafted a statement "of principles and strategies that guide how the department should manage physical space and prison populations in order to both prevent the introduction of COVID-19 into the prison and to contain the spread of COVID-19 infection once introduced. A fundamental underlying tenet of this proposal is that each institution must have adequate space to allow for the housing, feeding, and programing of all inmates under its care."  Kelso, COVID-19 Space Needs for Prevention, Isolation and Quarantine, July 11, 2020, at 1.

Based on his experience with the tragic toll that the virus has taken to the present day and his firsthand experience managing the pandemic response in institutions that have had outbreaks, the Receiver has developed a methodology for determining the space needs of each institution.  Specifically, the Receiver states,

> The methodology for determining the number of empty beds . . . was based upon our experience during the pandemic with outbreaks of different sizes. We have experienced four large outbreaks (total positives greater than 500), six medium-sized outbreaks (total positives greater than 100 and less than 500), and fourteen small outbreaks (total positives between 1 and 99). The goal of this analysis and its associated methodology is to ensure to the extent reasonably feasible that each institution has enough beds to handle the beginning phases of an outbreak in order to significantly reduce the risk of it blossoming into a medium-sized or large outbreak.

*Id.*

The Court finds that at this time there is no disagreement among public health experts that separating individuals through the use of quarantine and isolation is essential to managing an outbreak.  The Receiver's methodology applies the distancing principle to the prison environment in a sound and sensible manner and should be implemented. No party has put forth a competing proposal despite several months of litigation.  As the

Court has already ruled, in this situation "every day counts."  Order to Show Cause re Baseline Staff Testing for COVID-19, ECF No. 3366, June 28, 2020, at 3.  Therefore, the Court will order Defendants to implement the guidelines set forth in Receiver's statement as set forth below.  As experience with the virus and advances in treatment and prevention occur, modifications of the methodology should be considered.  Accordingly,

IT IS HEREBY ORDERED that:

(1) Defendants, their agents and employees (collectively "Defendants") shall identify within 10 days in each facility in each prison space that will allow for rapid isolation and quarantine of impacted patients. Each facility shall also identify its largest congregate living space.

(2) Defendants shall take immediate steps to ensure that each facility shall maintain empty beds equivalent to the capacity of its largest congregate living space or 20% of the current population of the facility, whichever is larger.  Priority shall be given to those prisons where the population is at highest risk, as determined by the Receiver.

(3) Defendants shall within fifteen days run "table-top" exercises at each facility to determine whether the space needs at each facility should be adjusted.

(4) The Receiver shall consider on an expedited basis, with input from counsel, any request by either party to modify the number of empty beds as set forth above based on the results of the "table-top exercise," the architecture of the prison, the classification factors, the availability of alternative housing arrangements, the healthcare needs of the population, accommodations necessary for people with disabilities or any other factors that are relevant to determining the minimum space requirements necessary to ensure reasonable safety.

(5) The Receiver shall continually evaluate the methodology set forth in his statement in light of experience as well as advances in medical science in treatment and prevention.  If the Receiver determines that the methodology should be adjusted he shall consult with the parties to determine whether an agreement can be reached.  If so, the parties shall file a stipulation modifying this order.  If not, the Receiver shall so inform the Court that the parties have been unable to agree.

The Court finds that this Order is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

IT IS SO ORDERED.

Dated: July __, 2020                              _____

                                         THE HONORABLE JON S. TIGAR
                                         U.S. DISTRICT COURT JUDGE