XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON G. MCCLAIN - 209508
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR - 263293
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Email:  Nasstaran.Ruhparwar@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF -  240280
KAYLEN KADOTANI - 294114
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:      (415) 777--3200
Facsimile:       (415) 541-9366
pmello@hansonbridgett.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. 01-1351 JST<br><br>**DEFENDANTS' RESPONSE TO ORDER RE: QUARANTINE AND ISOLATION SPACE; PROPOSED ORDER**<br><br>Judge:   Hon. Jon S. Tigar |

## INTRODUCTION

Defendants' respectfully submit this response to the Court's July 7, 2020 order regarding quarantine and isolation cells.  The Receiver only provided the final proposed methodology to determine reserved bed needs and the data concerning the numbers of beds that must be kept in reserve for isolation and quarantine purposes under his proposed methodology on Monday, July 13, at about 8:30 p.m.  It is not surprising that the Receiver was unable to provide this information the previous week because the issue and task at hand are complex and not suitable for a rushed process.  Undoubtedly, the process and the Receiver's final product would have benefited

significantly if more time had been permitted. Because this process has been rushed, Defendants and their public health expert have not had sufficient time to fully evaluate the appropriateness of the Receiver's proposed methodology or assess its likely impact on the institutions and prison operations. But even a cursory review of the Receiver's methodology and calculations for each institution raises a number of significant issues. Below, based on an initial review of the Receiver's documents, Defendants have identified a number of issues and concerns regarding the Receiver's methodology.

Defendants' recent decisions and actions to release significant numbers of additional inmates address the concerns underlying the Court's July 7 order in a much more meaningful way than could this response or any expert declaration. As the Court stated last week, the release of more inmates from the institutions "would make all of this less necessary, maybe even unnecessary." (ECF No. 3387; Hr'g Tr. 40:10-12, July 7, 2020.) And releasing additional inmates under new and modified criteria is precisely what CDCR has decided to do, as described in more detail below. In sum, on top of the reduction in the population by approximately 10,000 inmates that has already occurred since the COVID-19 pandemic hit California, CDCR will reduce its population by about 8,000 inmates before the end of August, and releases under these measures will continue on a rolling basis as long as is necessary.

In light of this new significant effort to further reduce the inmate population, and the need for more time to develop a better method for determining the extent to which institutions need additional reserved space, Defendants submit a proposed order that directs the parties and the Receiver to continue to meet and confer regarding this subject and to try to reach agreement within two weeks. If the parties are unable to do so, and if the Court still believes an order might be necessary despite the numerous planned releases and other remedial measures Defendants have taken, the Court should request that the parties submit additional briefing and evidence on the subject and consider whether an order can or should be made.

In the meantime, the additional time will allow the Receiver, the parties, and their public health experts to further vet the Receiver's proposed methodology and to devise possible alternative approaches that would be better tailored to address each of the institutions. Additional

time would also allow all stakeholders to observe how the newly planned releases will improve physical distancing and possibly affect the analysis for determining space needs.

**I.    CDCR WILL RELEASE ABOUT 8,000 INMATES BEFORE THE END OF AUGUST AND HAS TAKEN OTHER STEPS TO ENSURE ADEQUATE SPACE IN THE EVENT OF OUTBREAKS.**

Even before the new rounds of releases described below began, CDCR's previous decompression efforts in response to the pandemic have reduced its prison population by about 10,000 inmates since mid-March 2020.  (Decl. Diaz ¶ 2.)  CDCR now plans to build on its previous efforts.  As the Court requested, CDCR has expanded the scope of the 180-day inmate cohort and has implemented additional measures to increase the number of inmates who will be released in the coming weeks.  (*Id.*)  Indeed, these releases are already underway, and their impact on the institutions should be seen beginning this week.

CDCR modified the criteria for its plan to release inmates who are scheduled for release within 180 days (180 Day Plan).  (*Id.* ¶ 3.)  Under the modified criteria, more inmates will be released and the releases will happen quicker.  (*Id.*)  With the modifications, approximately 4,800 inmates will be released under the 180 Day Plan by the end of July 2020.  (*Id.*)  And inmates will thereafter continue to be released under the 180 Day Plan on a rolling basis until the plan is no longer necessary.  (*Id.*)

CDCR is also implementing a new plan to release certain inmates who are within one year of their release dates (One Year Plan).  (*Id.* ¶ 4.)  The One Year Plan focusses on eight specific prisons that were selected based on several factors, including, but not limited to, the size of the population of high-risk inmates and the physical plant layout: San Quentin, Central California Women's Facility, California Health Care Facility, California Institution for Men, California Institution for Women, California Medical Facility, Folsom State Prison, and Richard J. Donovan Correctional Facility.  (*Id.*)  Under the One Year Plan, about 700 inmates age thirty or over will become immediately eligible for release and should be released before the end of July 2020, and about 300 additional inmates who are under age 30 will be considered for release on a case-by-case basis.  (*Id.*)  The One Year Plan will also continue on a rolling basis until it is no longer necessary.  (*Id.*)

CDCR will also implement a new plan to award twelve weeks of positive programming credits to all inmates except inmates who are serving a life sentence without the possibility of parole, inmates who are condemned to death, and inmates who received a serious rules violation between March 1 and July 5, 2020 (Credit Plan). (*Id.* ¶ 5.) CDCR estimates that about 108,000 inmates will be awarded the credits and that the Credit Plan will result in approximately 2,100 additional releases between July and the end of August 2020. (*Id.*) And the impact of the Credit Plan will continue indefinitely because it will advance the release dates or parole-consideration dates for every inmate who is awarded the credits. (*Id.*)

CDCR has also established criteria for releasing medically high-risk inmates who will be evaluated for release on a case-by-case basis (High Risk Medical Plan). (*Id.* ¶ 6.) Because of the nature of the High Risk Medical Plan, CDCR is currently unable to estimate the number of releases that will result from its implementation. (*Id.*)

Additionally, CDCR is reviewing potential release protocols for incarcerated persons who are in hospice or pregnant because they are considered at high risk for COVID-19 complications. (*Id.* ¶ 7.) And CDCR will be expediting the release of incarcerated persons who have been found suitable for parole by the Board of Parole Hearings, but who have not yet been released from prison. (*Id.*)

Like the Court, CDCR is concerned about the institutions' preparedness for significant outbreaks. (*Id.* ¶ 8.) That is why on July 2, 2020, CDCR ordered the activation of Incident Command Posts at each institution. (*Id.* ¶ 8, Ex. A.) The purpose of that order was to enhance each institution's ability to mitigate, prepare for, respond to, and recover from a COVID-19 outbreak in accordance with the Department All-Hazards Emergency Operations Plan. (*Id.*) All CDCR institutions have now activated an Incident Command Post in response to the pandemic and have submitted strategic plans for dealing with outbreaks. (*Id.*)

The objectives of the Incident Command Posts include, among many other things, the following:

- Identifying logistical needs and resource deployments;

- Identifying potential challenges in responding to outbreaks;

- Conducting advance planning;

- Managing COVID-19 testing; and

- Identifying new or potential COVID-19 cases.  (*Id.* ¶ 9.)

One of the objectives of the Incident Command Posts will be to assess and identify the need for quarantine and isolation space in the institutions. (*Id.* ¶ 10.) CDCR has already taken some steps to ensure additional space is readily available if it is needed, such as securing a contract with a vendor that can erect fully functional tents to provide additional housing or treatment spaces within 72 hours. (*Id.*) CDCR has also obtained advanced approval from the State Fire Marshal to convert gymnasiums into housing spaces in a number of institutions, and has already outfitted some gymnasiums with beds and lockers so that they can be used for housing at a moment's notice. (*Id.*)

In light of the new significant efforts to reduce the population, it does not make sense to rush the imposition of orders mandating the implementation of reserved spaces at every institution based on an unvetted and overly simplistic methodology to address a highly complex issue.  As the party responsible for running California's prison system, Defendants cannot simply rubber-stamp the Receiver's one-size-fits-all approach for identifying reserve-bed needs, and neither should the Court.

Furthermore, although Defendants want to implement a reasonable plan to ensure adequate isolation and quarantine space in the institutions, Defendants object to the issuance of any order mandating that this be done.  The Court cannot reasonably conclude that CDCR is deliberately indifferent or has otherwise ignored a threat to the health and safety of inmates, a prerequisite for issuing injunctive relief under the Prison Litigation Reform Act (PLRA).  18 U.S.C. § 3626(a)(1). Nor can the Court reasonably conclude that an order mandating the reservation of space under the Receiver's methodology satisfies the PLRA's needs-narrowness-intrusiveness requirements.  *Id*. As the Court itself recognized last week, such an order might not be necessary if CDCR were to release more inmates, which is exactly what CDCR is now doing.

## II. DEFENDANTS AND THEIR EXPERTS HAVE NOT HAD SUFFICIENT TIME TO EVALUATE THE RECEIVER'S PROPOSED DIRECTIVES.

On Tuesday, July 7, the Court issued its order regarding quarantine and isolation beds, which seemed to assume that the Receiver's production of a draft plan for determining the need for isolation and quarantine beds was imminent and that the parties would have the remainder of the week to evaluate the plan and its impact on the institutions before submitting their court ordered responses on Monday, July 13.[1]  (ECF No. 3381 at 1.)  But this did not happen.  Instead, the Receiver produced a three-page draft document on Wednesday, July 8, that the parties had a number of questions about and that Defendants were not able to fully comprehend.  (Decl. McClain ¶ 2, Ex. A.)  The only guidance the draft document provided regarding the number of beds that should be reserved for quarantine and isolation—found in the very last paragraph of the document—was especially challenging to understand.  (*Id.* Ex. A at 3.)  The draft document did not specify the number of beds that should be reserved at any institution.  (*Id.* Ex. A.)

The Receiver's office advised that it would provide additional information on Thursday, July 9, and proposed a meeting with the parties on July 9 to discuss the draft document.  (Decl. McClain ¶ 3.)  On July 9, the Receiver's office provided a new document to the parties that purported to demonstrate how the Receiver's proposed methodology would be used to determine how many reserved quarantine and isolation beds would be needed at each institution.  (*Id.* ¶ 3, Ex. B.)  The document addressed a single prison—California Correctional Institution—but the parties were advised during the meeting that the numbers used for the example were likely incorrect.  (*Id.*)  No explanation was provided regarding a public-health basis for the methodology that the Receiver selected.  (*Id.*)

During the July 9 meeting, the Receiver acknowledged that the methodology document needed revision and clarification and advised that a new draft might be provided by July 10.

---

[1] The report of a COVID-19 positive inmate at the Correctional Medical Facility seemed to be a primary reason for the urgency and rushed process contemplated by the Court.  Thus, it is significant that it was later determined that the report regarding the inmate at the California Medical Facility was the result of a false positive COVID-19 test.

(Decl. McClain ¶ 4.) The Receiver also indicated that a document—similar to the one prepared for California Correctional Institution—would be prepared for each of the other institutions so that the parties could see the number of isolation and quarantine beds that should be held in reserve at each prison under the Receiver's proposed methodology. (*Id.*) Neither the revised methodology nor the documents showing the amount of reserved space needed at the institutions were provided to the parties on July 10. (*Id.*)

On Saturday, July 11, the Receiver sent the parties a revised methodology document and calculations for all 35 institutions. (Decl. McClain ¶ 5, Exs. C-D.) The parties then conferred and agreed to seek an extension of time to Wednesday to either file a stipulated order or competing orders if no agreement is reached. (*Id.*) Defendants believed it was important to seek more time to try to understand the documents, which were confusing, and to ask for additional clarification from the Receiver. (*Id.*) The parties asked the Receiver for another meeting on Monday, July 13, to further discuss those subjects. (*Id.*)

During the Monday, July 13 conference call, the Receiver acknowledged that the document describing the methodology for determining space needs required further revisions, in part because the methodology document still did not comport with the method that was actually used for the Receiver's calculations of needed reserved space at the institutions. (Decl. McClain ¶ 6.) The Receiver sent the parties a new revised methodology document on Monday night, July 13. (*Id.* Ex. E.)

Although Defendants and their public health expert have had time to conduct a preliminary review of the Receiver's documents—a review that has revealed a number of potential problems with the Receiver's methodology—they have not had enough time to fully evaluate the Receiver's methodology or to devise ways to improve it. (Decl. McClain ¶ 7.) There simply has not been sufficient time since Monday night, when the final draft of the Receiver's proposed methodology was provided, for Defendants or their public health experts to fully evaluate the Receiver's documents. (*Id.*) Nor have they had enough time to fully assess the impact on the institutions and prison operations if the Court were to order that the Receiver's plan to be implemented. (*Id.*) Nor have Defendants or their expert had sufficient time to determine and

demonstrate possible alternatives to the Receiver's proposal that might be superior, better tailored to each institution's needs, and less intrusive. (*Id.*)

Defendants recognize the importance and urgency of ensuring adequate space is available at each institution for responding to an outbreak, but strongly believe that a more nuanced approach should be developed with more input from the parties and public health experts. Because this is an important issue, the Receiver and the parties should not be forced to rush the completion and implementation of measures that have not been thoroughly evaluated and discussed. Nor should the Court be in a rush to order such measures.

### III. THERE ARE PROBLEMS WITH THE RECEIVER'S PROPOSED METHODOLOGY FOR DETERMINING SPACE-RESERVATION NEEDS AT THE INSTITUTIONS.

Defendants appreciate the Receiver's efforts to develop an approach for determining the need to reserve quarantine and isolation spaces within the institutions, and those efforts have helped advance the discussion on this subject among the parties and stakeholders. But the Receiver's planned methodology is far from fully developed. It would be inappropriate for the Court to issue an order mandating that CDCR implement it.

The Receiver's own statements about the proposed methodology make clear that it is not fully developed. His attorney's cover email from July 13 states: "We reiterate that this is not a formal policy or procedure document and reflects current thinking. It is, therefore, subject to modification or reconsideration as and if circumstances warrant." (Decl. McClain Ex. E.) And the most current draft of the Receiver's methodology document itself states:

> A number of caveats apply to use of this document:
> 1) This product was intended to guide the decision of how many beds are needed to house the residents of an institution, and not to determine where they will go or whether they need to be released.
> 2) Use of the word "shall" does not result in this document being directive. It is not directive and does not constitute policy or procedure.
> 3) Realities on the ground might require exceptions to the points noted in these documents.

(*Id.* Ex. F at 1.) These statements do not support the notion that the Receiver's methodology

should be mandated by a Court order. And "realities on the ground" should be considered and addressed before the Court considers mandating the Receiver's proposal by Court order.

The newest draft of the portion of the Receiver's proposed methodology that addresses the formula for calculating the reserved space needed at each institution in case of an outbreak states:

> To plan for the possibility of a large-scale outbreak of COVID-19, each facility in each prison shall identify space that will allow for rapid isolation and quarantine of impacted patients. Each facility shall identify its largest congregate living space. Each facility shall maintain empty beds equivalent to the capacity of its largest congregate living space or 20% of the current population of the facility, whichever is larger.

(Decl. McClain Ex. F at 3.) On Monday, the Receiver's staff advised that there are no public-health guidelines describing this proposed methodology for determining space needs and that the Receiver did not obtain input from his own public health experts in developing the methodology. (*Id.* ¶ 8.) The Receiver's staff further advised that they are aware of no other prison system that uses this methodology for determining reserved space needs, and in fact, are aware of no other prison system that is addressing this issue as proactively as CDCR. (*Id.* ¶ 9.)

The Receiver's staff acknowledged that their assessment of space needs is based solely on a simple formula, and that in arriving at the calculated space needs for each institution, no consideration was given to the unique layout of each institution, the specific population in each institution (e.g., the medical acuity or average age of the population at each institution), or the number of patients in each institution who have already contracted and recovered from COVID-19. (*Id.* ¶ 10.) Nor did the Receiver adjust the calculations of needed space at any institution based on the availability of alternative spaces for housing patients, such as gyms, tents, and other buildings that could be readily converted into housing. (*Id.*) In developing the methodology, the Receiver did not consider the possibility of housing recovered COVID-19 patients with COVID-19 positive patients. (*Id.* ¶ 11.) Nor did the Receiver consider the possibility of moving recovered patients into denser housing arrangements to create more space for isolation and quarantine patients in other locations. (*Id.*) The Receiver's staff also acknowledged that if a safe transfer protocol is developed, the ability to transfer patients to locations with more space would change the space needs at institutions. (*Id.*) And the Receiver's staff advised that the documents provided

to the parties are subject to change and that some "table-top test runs" should be conducted at some institutions to figure out if the proposed methodology actually works. (*Id.* ¶ 12.)

Given the exceedingly short period in which the Receiver attempted to devise and apply the proposed methodology to 35 institutions, it is understandable that he was unable to evaluate or work through these important considerations, unable to obtain expert public health input on the subject, and unable to present a fully formed and well-vetted plan to the parties. There simply was not enough time for the Receiver to do these critical things. Defendants themselves have barely had time to consider these various factors and are still in the process of working with their public health expert on this complex issue.

As discussed above, Defendants have not been deliberately indifferent to the health risks associated with this worldwide pandemic. But even if that PLRA prerequisite could somehow be satisfied, in light of the early stage of this process and the ongoing development of an approach to determining quarantine and isolation space needs at the institutions, it cannot be demonstrated at this time that the current iteration of the Receiver's methodology is either narrowly tailored or the least intrusive option, and the Court should not order that it be implemented.

## CONCLUSION

In light of CDCR's extraordinary efforts to continue reducing the inmate population throughout the institutions, the Court should not make orders concerning the number of beds that should be held in reserve at each prison for quarantine and isolation during an outbreak. Furthermore, Defendants have simply not had sufficient time to fully evaluate the Receiver's plan, which in its current iteration was only provided on July 13. And finally, it would be premature for the Court to order the implementation of Receiver's methodology at this time because it is not yet fully developed and vetted by the parties and stakeholders. Accordingly, Defendants respectfully request that the Court adopt their order, which would direct the parties and the Receiver to continue to meet and confer regarding this subject and to try to reach agreement within two weeks. If the parties were unable to do so, and if the Court still believed an order might be necessary despite the numerous planned releases and other measures that CDCR has taken to prepare its

institutions for outbreaks, the Court could request that the parties submit additional briefing and evidence on the subject, and consider whether an order can or should be made.

DATED: July 15, 2020                     HANSON BRIDGETT LLP

By: _____/s/ Paul B. Mello_____
PAUL B. MELLO
SAMANTHA D. WOLFF
KAYLEN KADOTANI
Attorneys for Defendants

DATED: July 15, 2020                     XAVIER BECERRA
Attorney General of California

By: _____/s/ Damon McClain_____
DAMON MCCLAIN
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR
Deputy Attorney General
Attorneys for Defendants