PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| MARCIANO PLATA, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> GAVIN NEWSOM., et al., <br><br> *Defendants*. | Case No. 4:01-cv-1351 JST <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANTS' PROPOSED ORDER ON ISOLATION AND QUARANTINE SPACE** |

On July 7, 2020, the Court ordered the parties and the Receiver to meet and confer regarding isolation and quarantine space.  ECF No. 3381.  The parties and the Receiver did so on the same date.  ECF No. 3385.  Early the following morning, the Receiver provided the parties with his written guidelines about how quarantine and isolation should be accomplished.  The parties and the Receiver subsequently met several times, with the Receiver producing updated drafts of substantially the same plan, with revisions and clarifications based on input from the parties. *See* Declaration of Damon McClain, July 15, 2020, ECF No. 3392-2, at Exhs. A, C.

1

Now, nearly two weeks later, Defendants say they have not had enough time to consult experts and understand the Receiver's plan; they ask for two more weeks to meet and confer, followed by additional briefing.  ECF No. 3392 at 2.  Under some circumstances, two weeks is not a long delay; during a deadly pandemic, a two-week delay means death and grave illness.  In the 12 days since the Receiver provided his first draft, nine more people in CDCR custody have died of COVID-19 and approximately 1,000 new cases have been reported.  *See* https://www.cdcr.ca.gov/covid19/population-status-tracking.  There has also been a new positive case at the California Medical Facility in Vacaville and two additional cases at the California Health Care Facility in Stockton.  *Id*.

Defendants have had far more than two weeks already to formulate strategies to ensure adequate quarantine and medical isolation space.  From the earliest days of this pandemic, public health experts have emphasized the need to do so.  *See, e.g.,* Centers for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correction and Detention Facilities, March 23, 2020, ECF No. 3221-1 at Exh. 7 (correctional facilities should "[e]nsure that physical locations (dedicated housing areas and bathrooms) have been identified to isolate confirmed COVID-19 cases and individuals displaying COVID-19 symptoms, and to quarantine known close contacts of cases.  (Medical isolation and quarantine locations should be separate). The plan should include contingencies for multiple locations if numerous cases and/or contacts are  identified and require medical isolation or quarantine simultaneously").  Defendants cannot now seek to delay this process even further by

2

claiming lack of time to consider the Receiver's strategy and any alternatives.

Given the exigent circumstances, the Court should require speedy action to ameliorate the substantial risk of serious harm endured on a daily basis by the people living in CDCR prisons.  Plaintiffs' proposed order constitutes a common-sense approach to ensure that each prison yard will have adequate quarantine and isolation space to avert widespread outbreaks.  It incorporates the standards set by the Receiver, based on the expertise and sobering experience of his medical and public health professionals, who have managed multiple outbreaks over the last four months -- some successfully and some with tragic loss of life.  It is narrowly tailored to allow for adjustments based on factors the State has identified that alter the space needs of a facility due to the individual characteristics of the built environment and the people who live there.

The Receiver's guidelines that serve as the basis for Plaintiffs' proposed order are not particularly complex.  He defines the groups who must be separated from each other in order to prevent small outbreaks from flaring into the kinds of large-scale deadly events already seen at multiple prisons, most notably CIM and San Quentin.  He estimates the set-aside needed to give each prison, and every facility within each prison, the flexibility to respond and keep people safe.  He has already begun the process of working with each prison to see what space would be made available under these standards.

The implementation of the guidelines, on the other hand, is a complex and difficult undertaking.  It will take time, which is why Defendants and the Receiver must start now to make the essential, individualized determinations to protect each yard in each prison.

In their explanation of their proposed order, Defendants do not provide evidence or reasoned arguments that the Receiver's guidance is unworkable, unreasonable, or unconstitutional. Instead, they argue that they need more time (a) to consult with experts, (b) "to fully evaluate the appropriateness of the Receiver's proposed methodology," and (c) to "assess its likely impact on the institutions and prison operations."[1] ECF No. 3392 at 2. These arguments neither justify the delay Defendants seek nor call into question the reasonableness of the Receiver's approach and its implementation in Plaintiffs' proposed order.

In the days since the Receiver provided his first draft, Plaintiffs have spoken repeatedly to a highly qualified national expert in the matter, who offered his opinion and analysis. *See* Declaration of Adam Lauring, July 13, 2020, ECF No. 3391-1. Defendants' argument that they were unable to do the same lacks credibility.

There has likewise been sufficient time to assess "the appropriateness of the Receiver's proposed methodology." Multiple sessions with the Receiver and his staff have given Plaintiffs a sufficient understanding of his plans and reasoning. As stated above, these are not complex and the circumstances do not allow for endless meet and confers once the essential concepts are clear.

The impact of the Receiver's guidance as to how space in each prison yard should be set aside for medical isolation and quarantine is indeed complex, as Defendants

---

[1] Defendants assert that the Receiver's final proposed methodology was only provided at 8:30 p.m. on July 13, two days before the parties' proposed orders were due. While technically correct, this complaint is disingenuous: the Receiver provided the parties with the first draft, which is substantially similar to the final product, the morning of July 8, the day following the Court's order.

maintain. However, that is a matter of implementation, not of concept. Given the immediate necessity to provide adequate isolation and quarantine space on every prison yard, it is appropriate first to establish a valid methodology to determine a starting point for each yard and subsequently to work through the individual implementation concerns, as Plaintiffs' proposed order provides. Action need not wait for every detail to be hammered out and every exception to be fully identified. Plaintiffs' proposed order identified a process to identify an initial number in each yard, followed by a period of adjustment to ensure that that number is feasible and adequate. The adjustment factors include all the measures Defendants identify in their brief as "problems with the Receiver's proposed methodology." ECF No. 3392 at 8-10.

In addition to arguing for more time, Defendants spend much of their brief describing measures they have already taken to reduce the prison population in order to stem the spread of the pandemic behind bars. ECF No. 3392 at 3-5. Plaintiffs agree fully with Defendants' premise – that more space is essential in this effort – and laud these efforts. Defendants' efforts to reduce the population and to identify space at individual prisons for isolation and quarantine will make compliance with an order to provide such space that much more manageable. But there can be no doubt that such an order is necessary. Defendants have failed to present any clear plan to ensure that their efforts are strategic and calculated to provide adequate tools to stem an outbreak. As with their proposed staff testing plan, they have provided no reasoning to indicate that the measures they list will be enough. The lack of reasoned justification suggests that they are doing what is possible instead of asking what is necessary.

Defendants assert, without much argument, that the proposed order is not warranted because there is no constitutional violation and that it would not comply with standards of the Prison Litigation Reform Act that any relief be narrowly drawn, extend no further than necessary, and be the least intrusive means to correct the constitutional violation.  ECF No. 3392 at 5.  They are wrong.  As a preliminary matter, the Court found a constitutional violation many years ago and need not determine deliberate indifference again.  *See* Stipulation for Injunctive Relief and Order, June 13, 2002, ECF No. 68 at ¶ 29 and Order at p. 18; *see also* Findings of Fact and Conclusions of Law Re Appointment of Receiver, October 3, 2005, ECF No. 371.  As the Court in *Coleman v. Newsom* has held,

> once an Eighth Amendment violation is found and injunctive relief ordered, the focus shifts to remediation of the serious deprivations that formed the objective component of the identified Eighth Amendment violation. *See Coleman v. Brown*, 938 F.Supp.2d [955,] 988 [(E.D. Cal. 2013)]. Remediation can be accomplished by compliance with targeted orders for relief or by establishing that the "violation has been remedied in another way." *Id*.  To the extent the subjective component of an Eighth Amendment violation remains a relevant inquiry, it is coextensive with proof of ongoing objectively unconstitutional conditions.

*Coleman v. Brown*, 28 F. Supp. 3d 1068, 1077 (E.D. Cal. 2014); *see also Coleman v. Brown*, 756 Fed. Appx. 677, 678–79 (9th Cir. 2018) (unpublished) (district court is entitled to rely on its previous rulings of deliberative indifference and "the persistence of objectively unconstitutional conditions satisfies the subjective 'deliberate indifference' inquiry").

Even if a new finding of deliberate indifference is necessary, the uncontested facts clearly establish the requisite elements.  Deliberate indifference is found if prison

officials "know[] that inmates face a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it." *Id*. at 834, 847.  It has been clear for over a month that isolation and quarantine space adequate to stave off the multiple massive virus outbreaks already experienced is lacking in CDCR.  *See, e.g.,* AMEND and the Berkeley School of Public Health, "Urgent Memo," June 13, 2020, ECF No. 3391-1 at Exh. B.  By failing to promptly assess and make available the isolation and quarantine space necessary to prevent further deadly outbreaks, Defendants demonstrate deliberate indifference.  The current review of housing space for isolation and quarantine has taken place only under threat of Court intervention; Defendants have demonstrated no strategic or planning capabilities to address this matter without such a threat.

Moreover, the proposed remedy meets the PLRA standards.  "Narrow tailoring requires a fit between the remedy's ends and the means chosen to accomplish those ends." *Brown v. Plata*, 563 U.S. 493, 531 (2011) (alterations and citation omitted). "The scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation." *Id*.  In this case, Plaintiffs' proposed order relies on the Court-appointed Receiver's assessment of a starting point for determining the space needed in each prison, and then requires an adjustment process to ensure that the end result is tailored to the built environment of that individual facility and the characteristics of the population, using factors supplied by Defendants themselves.

Inevitably, cases of COVID-19 will appear in prisons over the next months and years, despite all efforts at disinfection and screening.  Once the virus appears, according

to the emerging consensus among public health researchers, nothing is more important than space: people must have space to be apart from each other, suspected cases must not mix with confirmed cases, and neither must mix with people who are not infected. Declaration of Adam Lauring, July 15, 2020, ECF No. 3391-1 at ¶ 5.  Without that separation, the massive outbreaks at CIM, San Quentin, and elsewhere will repeat across CDCR prisons.  The time to prepare isolation and quarantine space is now, to avert the otherwise inevitable death and suffering in the prisons.

                                        Respectfully submitted,

DATED:  July 20, 2020          PRISON LAW OFFICE

                                        By:  *Sara Norman*
                                              Donald Specter
                                              Steven Fama
                                              Alison Hardy
                                              Sara Norman
                                              Rana Anabtawi
                                              Sophie Hart

                                        Attorneys for Plaintiffs