XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON G. MCCLAIN
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR - 263293
Deputy Attorney General
IRAM HASAN - 320802
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Email: Nasstaran.Ruhparwar@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
KAYLEN KADOTANI - 294114
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777--3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., <br><br>     Plaintiffs, <br><br>     v. <br><br>GAVIN NEWSOM, et al., <br><br>     Defendants. | CASE NO. 01-1351 JST <br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' PROPOSED ORDER REGARDING QUARANTINE AND ISOLATION** |

Case No. 01-1351 JST

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................................1

BACKGROUND ..............................................................................................................................2

ARGUMENT ...................................................................................................................................3

    I.    Plaintiffs' Proposal Is Not Narrowly Tailored And Ignores Less-Intrusive Mitigation Measures That Have Been—And Are Being—Implemented By CDCR And CCHCS. ................................................................................................3

    II.   Defendants' Proposal Constitutes A Viable, Less-Intrusive Alternative. ...................7

    III.  An Order Requiring Implementation Of Plaintiffs' Proposed Order Would Run Afoul Of The Prison Litigation Reform Act. ......................................................10

CONCLUSION ..............................................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Plata*,
    563 U.S. 493 (2011) .................................................................................................. 10

*Turner v. Safley*,
    482 U.S. 78 (1987) ..................................................................................................... 7

**Statutes**

18 U.S.C.
    § 3626(a) ................................................................................................................... 10
    § 3626(a)(3)(B) ......................................................................................................... 11

Prison Litigation Reform Act ................................................................................................ 2

**Other Authorities**

*CDCR COVID-19 Preparedness*, Population COVID-19 Tracking,
    https://www.cdcr.ca.gov/covid19/population-status-tracking/ (last visited July
    20, 2020) ..................................................................................................................... 4

# INTRODUCTION

In response to the rapidly evolving COVID-19 pandemic, this Court issued an order directing the parties and the Receiver to meet and confer on a potential order which would require Defendants to "set aside sufficient space at each institution to allow the institution to follow public health guidance on isolating and quarantining patients in the event of a COVID-19 outbreak." Dock. No. 3381 at 1:14-16. The Court "strongly encourage[d] the involvement of medical and public health experts during this process." *Id.* at 1:18-19. In response, the Receiver devised a formula to apply at each of CDCR's 35 unique institutions to calculate the number of beds that must be vacant for use as quarantine and isolation space in the event of an outbreak. But the Receiver cautioned that "[r]ealities on the ground might require exceptions" to his proposed methodology. Dock. No. 3391-1 at 1. Plaintiffs now ask this Court to order Defendants to implement this rigid methodology despite the fact that, as the Receiver acknowledges, it is not based upon public health guidance and does not consider the unique physical layout of each institution, the type of population housed at each institution (including medical acuity or average age of the incarcerated population), or the number of "resolved" patients at each institution. This methodology also fails to account for less intrusive alternatives, including structures that are available for alternative housing space, such as tents, gyms, and other onsite buildings that can be converted into temporary housing. Significantly, the methodology also fails to consider mitigation measures—including mandatory mask wearing, enhanced use of staff and patient testing, contact tracing, quarantine and isolation policies, limitations on transfers, establishment of incident command posts and, among other things, modifications to existing air recirculation systems—that did not exist before recent outbreaks.[1]

Defendants submit an alternate proposal for this Court's consideration that accounts for each of their 35 institutions' varying needs, geography, and populations. Specifically, Defendants

---

[1] All four prior large outbreaks occurred before extensive staff testing was implemented, and at least one outbreak started before the testing of incarcerated people commenced or mask wearing became mandatory. Another of the large outbreaks occurred because of an inadequate transfer protocol which is unlikely to be repeated by CCHCS and CDCR.

propose that each institution set aside a minimum of 100 empty beds for quarantine or isolation—in addition to any celled rooms with solid doors that are already appropriate for isolation or quarantine, should the occupant need it—which will equate to at least one empty housing unit at most institutions.

Unlike Plaintiffs' proposal, Defendants' plan is based on the premise that mitigation measures that were implemented as a result of these large outbreaks will continue to be utilized and improved upon, including staff and incarcerated person testing, contact tracing, mask wearing, and restriction of movement.  It does not assume that improved mitigation measures, described above, will be abandoned or forgotten by CCHCS and CDCR and that prior mistakes from earlier outbreaks will be repeated.  Because extensive corrective measures have been taken, past outbreaks, while informative, do not provide the best assumptions for properly planning for future outbreaks.  Defendants' proposal is therefore the least-restrictive alternative and provides a reasonable, narrowly-tailored approach to mitigating the spread of COVID-19, consistent with the Prison Litigation Reform Act (PLRA).

For these reasons, this Court should adopt Defendants' proposal.

## BACKGROUND

On July 7, 2020, the Court issued its order regarding quarantine and isolation beds.  The Receiver's office provided a draft plan to the parties on July 8, and a revised document on July 9. (Decl. Samantha Wolff Supp. Defs.' Opp'n to Pltfs.' Proposed Order re Quarantine and Isolation (Decl. Wolff), ¶ 2.)  The parties met with the Receiver on July 9 to discuss the revised draft document, and during that meeting, the Receiver acknowledged the methodology document needed further revision and clarification.  (*Id.* at ¶ 3.)  A revised draft was then provided to the parties on July 11.  (*Id.*)  Another meet-and-confer discussion between the parties and the Receiver occurred on July 13, and the parties submitted the respective proposed orders to the Court on July 15.  (*Id.*)

Following the July 16 Case Management Conference, and at this Court's urging, the parties met and conferred again on July 18.  (*Id.* at ¶ 4.)  During that discussion, Defendants presented the general concept of their new proposal.  (*Id.*)  The parties discussed the proposal in

-2-                                    Case No. 01-1351 JST
16711621.2     DEFS.' OPP'N TO PLTFS.' PROPOSED ORDER RE: QUARANTINE AND ISOLATION

broad terms and Plaintiffs asked important questions about the development of this proposal and its possible implementation. (*Id.*) Defendants indicated they would endeavor to provide additional information to Plaintiffs as it became available. (*Id.*) Subsequently, on July 19, 2020 at 7:02 p.m., Defendants shared their revised proposed order with Plaintiffs' counsel and the Receiver. (*Id.*)

**ARGUMENT**

**I.   Plaintiffs' Proposal Is Not Narrowly Tailored And Ignores Less-Intrusive Mitigation Measures That Have Been—And Are Being—Implemented By CDCR And CCHCS.**

It is undisputed that in a congregate living environment, it is critical to have space available for both quarantine and isolation in the event of a COVID-19 outbreak. (Decl. Anne Spaulding, M.D., PhD., Supp. Defs.' Opp'n (Decl. Spaulding), ¶ 10; Decl. Adam Lauring, M.D., PhD., Supp. Pltfs.' Prop. Order, ECF 3391-1 at ¶ 9.) Rather, the parties' disagreement stems from precisely how much space must be set aside to help mitigate any future COVID-19 outbreaks within CDCR's institutions. Plaintiffs contend that, based upon the Receiver's experience in dealing with four large-scale outbreaks at California Institution for Men (CIM), Chuckawalla Valley State Prison (CVSP), Avenal State Prison (ASP), and California State Prison - San Quentin (San Quentin), their proposal to require the State to vacate approximately 20 percent of bed space at each prison is the most reasonable approach. But this proposal suffers from several flaws, including failing to account for lessons learned and mitigation measures implemented as a result of each of these outbreaks, the unique physical characteristics of each institution, and the disparate demographics of each institution's population. This proposal also ignores that several potential outbreaks were successfully contained with far less isolation and quarantine space than that proposed by Plaintiffs under their current plan.[2]

Plaintiffs' proposal labors under the assumption that mistakes *will* be repeated, and that mitigation measures will be ignored. For instance, the outbreak at California Institution for Men

---

[2] For instance, under Plaintiffs' 20 percent proposal, COR would need to vacate an additional 679 beds. Corcoran's outbreak peaked at about 153 cases and Corcoran was able to successfully mitigate the spread of COVID-19 without the additional beds called for under Plaintiffs' proposal.

started before extensive staff or incarcerated person testing had commenced, and even before certain basic measures, such as mandatory mask wearing, had been implemented in the prisons. And the outbreak at San Quentin appears to have been caused by an unfortunate decision to transfer incarcerated persons—before an adequate transfer protocol had been implemented—from a prison with a large active outbreak to a prison that previously had no known cases of COVID-19.  CDCR and CCHCS have implemented specific mitigation measures as a result of lessons learned following these and other outbreaks.  For example, inter-institution transfers have largely stopped (save for emergent situations) and, in particular, institutions with three or more COVID-19-positive incarcerated persons are closed to transfers.  (Decl. Ralph Diaz Supp. Defs.' Opp'n to Pltfs.' Prop. Order (Decl. Diaz), ¶ 3.)  CDCR also has issued numerous directives to staff and incarcerated persons alike setting forth strict expectations with respect to mask wearing, personal hygiene, and facility cleanliness.  Additionally, CDCR has recently completed statewide baseline COVID-19 testing of all staff and will continue to test staff according to its current staff testing plan.  Incarcerated persons are also tested far more frequently than was the case when the outbreak at CIM first started.  *CDCR COVID-19 Preparedness*, Population COVID-19 Tracking, https://www.cdcr.ca.gov/covid19/population-status-tracking/ (last visited July 20, 2020) (CDCR Population Tracker).  But because Plaintiffs' proposal is based upon the circumstances that existed before these and other mitigation measures were implemented, it presumes that future outbreaks will occur on the same scale without any accounting for lessons learned and mitigation strategies implemented.

Plaintiffs' proposal also fails to account for the unique physical layout of each institution.  It requires a 20 percent vacancy rate regardless of whether the housing unit consists of cells or dorms, the latter of which are considered higher risk for the spread of COVID-19.  Indeed, Plaintiffs have previously asserted that "dorms are plainly the locus of the largest, most widespread, and serious outbreaks."  Dock. No. 3345 at 8:12-13.  And yet, their proposal makes no distinction in this regard and would require the same amount of space regardless of dorm or celled housing.

Further, Plaintiffs' proposal fails to consider that individual layouts contain the spread of

COVID-19 differently: among institutions with celled housing, those institutions with a "270 design" have generally been more successful in controlling the spread of COVID-19 than those institutions with an open-tiered design. For example, incarcerated persons were transferred from CIM to both San Quentin and California State Prison, Corcoran, at the same time. *See* Dock. No. 3356 at 14:4-7 ("On May 28 … the transfers [from CIM to San Quentin and Corcoran] commenced. CCHCS suspended the transfers on June 4, 2020, when it was discovered that some of the transferred inmates tested positive for COVID-19 after they arrived at San Quentin and Corcoran.") COVID-19 positive incarcerated persons were inadvertently and unfortunately included among those transferred. While those transfers resulted in a large-scale outbreak at San Quentin, with 1,111 "resolved" patients and 922 active patients as of July 20, 2020, by comparison, 151 patients at Corcoran are "resolved" and only 11 are considered active. (CDCR Population Tracker.) This disparity in infection rates is likely attributed to the physical layout of each institution, even though those transferred were housed in cells at both receiving institutions. San Quentin's housing units consist of open-bar cells along five open tiers, where COVID-19 positive (and quarantine suspected positive) incarcerated persons were initially isolated and quarantined. (Decl. Diaz, ¶ 2.) By contrast, COVID-19 positive (and suspected positive) incarcerated persons at Corcoran were housed in cells with a solid door, and in housing units with a "270 design" (no open tiers). (*Id.*) Plaintiffs' proposal makes no accommodation for these factors.

Additionally, persons who have already contracted and recovered from COVID-19 are very unlikely to contract the disease again for a period of at least months and possibly longer. (Decl. Spaulding, ¶ 13.) At present, there are approximately 4,615 incarcerated persons within CDCR's custody who have recovered from COVID-19, including nearly 1,000 recovered incarcerated persons at San Quentin, CVSP, ASP, and CIM each. (CDCR Population Tracker.) Plaintiffs' proposal, however, does not account for the number of recovered incarcerated persons at these and other institutions, even though these numbers would reduce the number of beds that would need to be left vacant at any one time for quarantine and isolation. (*See* Decl. Spaulding, ¶ 13.)

     Nor does Plaintiffs' proposal account for additional measures that can be implemented to improve air circulation, and thus mitigate the need to appropriate additional open beds. For instance, California State Prison, Lancaster (LAC), was able to avoid a large-scale outbreak in part because of its ability to change the air handler dampers from air recirculating in the housing units to 100 percent outside air intake and exhaust. (Decl. Gipson, ¶ 2.) As of July 20, 2020, LAC had 127 resolved cases and only five active cases. (CDCR Population Tracker.)

     Finally, on July 14, 2020, the CDC issued its "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities." (CDCR Population Tracker.) This guidance revises prior guidance on this same topic and further indicates that "[r]ecommendations may need to be revised as more information becomes available." Specifically, as is relevant here, the July 14 Interim Guidance recommends that facilities "[u]se one large space for cohorted medical isolation rather than several smaller spaces. This practice will conserve PPE and reduce the chance of cross-contamination across different parts of the facility." Plaintiffs' proposal does not account for the fact that COVID-19 positive patients should be housed together *without* a need for physical distancing, a practice which is sure to reduce the amount of necessary space. (*See* Decl. Spaulding, ¶ 16.) Indeed, while the Receiver's "COVID-19 Space Needs for Prevention, Isolation, and Quarantine" proposal acknowledges that "[m]ultiple confirmed COVID-19 positive cases can be housed together," the 20 percent vacancy rate included in Plaintiffs' Proposed Order makes no accommodation for this fact. As a result, Plaintiffs' proposal requires the setting aside of an excessive number of beds, particularly in light of the fact that it is unclear whether the 20 percent rate applies to dorms, cells, or both. *See* Dock. No. 3391-1 at 2.

     Plaintiffs' failure to account for these factors in their Proposed Order has led to a plan that is overly broad and not focused on the individualized needs of each institution. While their proposal would allow the parties to request that the Receiver modify the number of empty beds required, it begins with the premise that an unnecessarily large number of beds must be set aside, and fails to provide Defendants with either the deference they are owed as prison administrators or the flexibility to immediately adjust to changing circumstances or guidance without first having to

seek approval and engage in a meet-and-confer effort. *Turner v. Safley*, 482 U.S. 78, 85 (1987) ("Where a state penal system is involved, federal courts have, as we indicated in *Martinez*, additional reason to accord deference to the appropriate prison authorities"); *see* Dock. No. 3391-2 at 3. Nor does Plaintiffs' Proposed Order afford the Defendants any recourse should the Receiver reject their request to modify the vacancy rate at any institution. *See id.* (only permitting the parties to inform the Court of any disagreements as to adjustments to the methodology). In short, this proposal does not reflect the realities of the COVID-19 virus, including lessons learned to date in responding to outbreaks and policies implemented following these outbreaks, and does not afford Defendants the critical flexibility they need to adjust in real time to scientific advances that are occurring on a near daily basis. Plaintiffs' proposal must be rejected for these reasons.

## II.     Defendants' Proposal Constitutes A Viable, Less-Intrusive Alternative.

Unlike Plaintiffs' proposal, Defendants' proposal would afford prison administrators significantly more flexibility in allocating necessary space for quarantine and isolation in the event of an outbreak. Defendants' proposal also recognizes that lessons have been learned from prior large-scale outbreaks. And Defendants' proposal is more likely to *prevent* future outbreaks insofar as it would not require unnecessary inter-institution transfers and consolidation of certain populations that would be required under Plaintiffs' plan. As more is learned about this virus on a near-daily basis, it is critical that Defendants be afforded flexibility to adjust in real time to scientific advances. Defendants' proposal does just that and is more narrowly-tailored to address the concern at issue here: prevention of future large-scale outbreaks.

Under Defendants' proposal, the State would be required to leave vacant a reasonable number of beds to address an outbreak—including at least one housing unit at a majority of institutions (with a minimum of 100 beds). Unlike Plaintiffs' proposal, Defendants' proposal affords greater flexibility insofar as it permits Defendants to allocate additional space by *either* reserving additional housing unit beds *or* activating nontraditional beds, such as gymnasiums, installation of tents, or converting space like chapels and PIA facilities. *See* Defs.' Proposed Order, filed herewith, at 2. This approach allows the State to balance the need to have readily available quarantine and isolation space with the equally critical need to afford physical distancing

in the facilities. Indeed, space that Plaintiffs propose remain vacant in the event of a *future* outbreak may be better used now to spread out the current population or to house medically high-risk incarcerated person in order to *prevent* an outbreak from occurring in the first instance. (Decl. Spaulding, ¶ 14.) In this regard, it is unlikely that Defendants would be able to accommodate Plaintiffs' 20 percent vacancy proposal without paring back physical distancing mandates in dorms. (Decl. Diaz, ¶ 7.)

Further, while either party may request modification of the set-aside space via the Receiver (as is true under Plaintiffs' plan as well), Defendants' proposal enables the parties to seek the Court's assistance in the event they disagree with the Receiver's determination. This proposal also empowers Defendants to determine the initial amount of reserved space that they believe is necessary, taking into account critical factors such as the physical layout of each institution, medical acuity of each institution's incarcerated population, and number of resolved patients, in the first instance.

Additionally, implementation of Defendants' plan is safer and carries significantly less risk of unintentionally spurring further outbreaks. Whereas Plaintiffs' proposal would require inter-system transfers in order to set aside the required amount of space (or further ordered prisoner releases in violation of the PLRA as discussed below), Defendants' proposal could be implemented *without any further transfers.* (Decl. Diaz, ¶ 8.) As this Court and the parties are painfully aware, transfers create a significant risk of transmission of the virus and must be avoided to the extent possible.

Finally, in developing their proposal, Defendants considered how the addition of the space they currently propose would have impacted prior outbreaks. Defendants surveyed a number of institutions that have addressed COVID-19 outbreaks to date and learned that while some institutions believe that a vacant housing unit would have been sufficient (or indeed, was sufficient) in managing the outbreak, others reported that alternative measures (such as the speed with which they received test results, increased cleaning efforts, and improved outside air filtration) were more impactful in mitigating the spread of COVID-19. And one institution, CRC, indicated that it would have needed supplemental space in addition to a vacant housing unit, but its

buildings are smaller (approximately 40-50 beds each) and therefore under CDCR's proposed plan, at least two and possibly three of the dorms would have been set aside for a minimum of 100 beds.  (Decl. Gipson, ¶ 3.)  Specifically, CIW, LAC, COR, CRC and CCC reported as follows:

- CIW had a vacant building prior to its outbreak and never exceeded its isolation unit capacity due to mass testing and isolation of incarcerated persons within hours of receiving positive test results.
- LAC reported that a vacant building "might" have helped but that the biggest factor in controlling the spread of COVID-19 was the institution's ability to change the air handler dampers from air recirculating in the housing units to 100 percent outside air intake and exhaust.  Increased cleaning efforts in the housing unit and on the yard also played a tremendous role in controlling the spread of the virus.
- COR responded that a vacant building would have further mitigated the spread of COVID-19.  However, at the time of the outbreak, current guidance required single-celling of COVID-19 positive incarcerated persons (contrary to recent CDC guidance which now encourages cohorting COVID-19 positive patients together).
- CRC reported that one vacant building would not have been sufficient to manage the number of COVID-19 positive patients.  Indeed, CRC created a vacant dorm for this purpose but delays in receiving test results appear to have complicated efforts to mitigate the spread of the virus.
- CCC reported that due to enhanced testing of the inmate population and the various custody levels at the institution, it was impossible to house all positive COVID-19 patients in one building.  Instead, CCC designated isolation and quarantine dorms or cells at each facility (with the exception of CCC's MSF).

(Decl. Gipson, ¶ 2.)

As these findings indicate, each prison's experience dealing with a potential outbreak varied significantly, and not simply based upon the availability of space for quarantine and isolation.  Myriad other factors contributed, including ventilation, the speed within which test results were received, availability of alternate housing, and cleaning efforts in housing units and

on the yards. (*Id.*) Of Course, CDCR has the ability to provide supplemental space in prisons that do not already have extra space in the housing units via gymnasiums, tents, and other alternative housing spaces if needed. (Decl. Diaz, ¶ 5.) And CDCR's proposed order requires CDCR to assess whether additional supplemental space might be necessary at some locations, and if so, to determine how it will be provided in the event of an outbreak. Accordingly, an approach that solely focuses on across-the-board application of a formula does not reflect the lessons learned from prior outbreaks and, as explained below, is not narrowly tailored to the goal of preventing future outbreaks.

### III. An Order Requiring Implementation Of Plaintiffs' Proposed Order Would Run Afoul Of The Prison Litigation Reform Act.

Prospective relief with respect to prison conditions cannot issue unless it is narrowly drawn, extends no further than necessary to correct the constitutional violation at issue, and is the least intrusive means necessary to correct the violation. 18 U.S.C. § 3626(a); *Brown v. Plata*, 563 U.S. 493, 530 (2011). Plaintiffs' proposal here, which would require the State to leave vacant at least 20 percent of all beds at each institution, does not meet this standard. As explained above, and in the accompanying declarations of Secretary Diaz, Director Gipson, and Dr. Spaulding, Plaintiffs' proposal does not consider the unique physical layout of each institution, the varying demographics of each institution's population (including age, medical acuity, and COVID risk factors), the percentage of incarcerated persons who previously tested positive for COVID-19 and have since recovered, or other mitigation efforts. Plaintiffs' one-size-fits-all approach simply does not provide the State with sufficient flexibility to account for these unique characteristics.

Less intrusive alternatives to this proposal exist. Defendants' proposal would enable CDCR to determine which housing unit(s) and how many housing unit(s) are necessary to accommodate a possible outbreak (but requiring a minimum of 100 beds), recognizing that no two institutions are alike and some will require more space than others. For instance, it is unlikely that 20 percent of the beds at San Quentin will need to be made vacant in order to prevent a future outbreak at San Quentin considering the number of inmates who will already have had COVID-19. As of July 19, 2020, 1,070 inmates at San Quentin had already "resolved" while another 961

1  cases remained active.  (CDCR Population Tracker.)  Once the outbreak is fully contained at San
2  Quentin, it is likely that nearly two-thirds of the population will have recovered from COVID-19
3  and will be less-likely to contract it again in the following three months and possibly longer.  (*See*
4  Decl. Spaulding, ¶ 13; CDCR Population Tracker.)  Thus, a proposal that would allow San
5  Quentin to set aside a sufficient number of beds to accommodate potential illness that could arise
6  among the remaining one-third of the population, in combination with other measure like early
7  testing, would be less restrictive and more narrowly-tailored than a proposal that makes no
8  accommodation for these unique circumstances.

9  Moreover, Defendants' proposal recognizes that the State can act quickly to increase
10  capacity beyond that which is accounted for in the prisons' design capacity, including by
11  converting various facilities (such as gymnasiums, chapels, and Prison Industries Authority
12  manufacturing areas) and through the use of temporary structures such as tents.  In fact, the State
13  secured a contract with a vendor that can erect tents within 72 hours to provide additional housing
14  or treatment spaces at any institution.  (Decl. Diaz Supp. Defs.' Response to Order Re: Quarantine
15  and Isolation Space, Dock. No. 3392-1, ¶ 10.)  CDCR has also obtained advance State Fire
16  Marshal approval to convert gymnasiums in a number of institutions into housing spaces, and has
17  already outfitted some gymnasiums with beds and lockers so that they can be used for housing at a
18  moment's notice.  (*Id.*)  Plaintiffs' proposal makes no mention of these temporary structures,
19  which have proven effective in quarantining and isolating incarcerated persons.  (Decl. Diaz, ¶ 5.)

20  Finally, even if Plaintiffs' proposal satisfied the PLRA's needs-narrowness-intrusiveness
21  requirements (which it does not), this Court nonetheless lacks the authority to order the State to
22  implement it because it would have the "purpose or effect of reducing or limiting the prison
23  population." 18 U.S.C. § 3626(a)(3)(B).  Such an order constitutes a prisoner release order, which
24  may only be issued by a three-judge court. *See id.*; *see also* ECF 3291 at 15:22-27.  Indeed,
25  Defendants are unable to implement Plaintiffs' proposal at current population levels absent
26  additional releases.  (Decl. Diaz, ¶ 6.)  Conversely, Defendants' proposal would not force the State
27  to conduct additional early releases.  (*Id.*)  Accordingly, Defendants may not be ordered to
28  implement Plaintiffs' proposal, which would limit the State's adult institution population and

require the release of a significant number of incarcerated persons.

## CONCLUSION

As the parties, the Receiver, and this Court grapple with how best to prevent future outbreaks, we should not assume that the same mistakes will be repeated, or that present mitigation efforts will be ignored or ineffective.  We must also ensure that significant flexibility is afforded to CDCR and CCHCS to manage this pandemic in real time, in response to ever-changing scientific developments and corresponding public health guidance.  Defendants' proposal does just this, and is therefore the most narrowly tailored, least intrusive proposal to manage the spread of COVID-19, consistent with the PLRA's directives in this regard.

DATED:  July 20, 2020                           HANSON BRIDGETT LLP

                                                By:     */s/ Samantha Wolff*
                                                        PAUL B. MELLO
                                                        SAMANTHA D. WOLFF
                                                        KAYLEN KADOTANI
                                                        Attorneys for Defendants

DATED:  July 20, 2020                           XAVIER BECERRA
                                                Attorney General of California

                                                By:     */s/ Damon McClain*
                                                        DAMON MCCLAIN
                                                        Supervising Deputy Attorney General
                                                        NASSTARAN RUHPARWAR
                                                        Deputy Attorney General
                                                        Attorneys for Defendants