XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON G. MCCLAIN - 209508
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR - 263293
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Email: Nasstaran.Ruhparwar@doj.ca.gov
Attorneys for Defendants

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
KAYLEN KADOTANI - 294114
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:   (415) 777--3200
Facsimile:   (415) 541-9366
pmello@hansonbridgett.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. 01-1351 JST<br><br>**DECLARATION OF RALPH DIAZ IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED ORDER RE: QUARANTINE AND ISOLATION SPACE**<br><br>Judge: Hon. Jon S. Tigar |

I, Ralph Diaz, declare:

1.     I am the Secretary of the California Department of Corrections and Rehabilitation (CDCR). I was appointed by Governor Gavin Newsom as CDCR's Secretary on March 27, 2019. Before my appointment as Secretary, I served in several positions at CDCR's headquarters, including Undersecretary of Operations, Deputy Director of Facility Operations, and Associate Director of High Security Institutions. And before I worked at CDCR's headquarters, I served as a prison Warden, Correctional Counselor Supervisor, and Correctional Counselor, after starting my career as a Correctional Officer in 1991. I submit this declaration to support Defendants' response to Plaintiffs' proposed order regarding quarantine and isolation space.

2. Around the end of May and beginning of June 2020, incarcerated persons were transferred from California Institution for Men (CIM)—where a large outbreak of COVID-19 was underway—to the State prisons at San Quentin and Corcoran. Even though the transferees had previously tested negative for COVID-19, some of the transferees tested positive for COVID-19 after they had arrived at San Quentin and Corcoran. While those transfers resulted in a large-scale outbreak at San Quentin—with 1,111 "resolved" patients and 922 active patients as of July 20, 2020—by comparison, 151 patients at Corcoran are "resolved" and only 11 are currently considered active. The units at San Quentin where these transferees were housed consist of open-bar cells along five open tiers. At Corcoran, the transferees were housed in a "270 design" building with solid cell doors.

3. CDCR and CCHCS have implemented specific mitigation measures as a result of lessons learned following these and other outbreaks. For example, inter-institution transfers have largely ceased (save for emergent situations), and in particular, an institution with three or more COVID-19-positive incarcerated persons is closed to transfers. CDCR has also issued numerous directives to staff and incarcerated persons alike, setting forth strict expectations with respect to mask wearing, personal hygiene, and facility cleanliness.

4. Additionally, CDCR has recently completed statewide baseline COVID-19 testing of all staff and will continue to test staff according to its current staff testing plan. Incarcerated persons are also tested far more frequently than was the case when the outbreak at CIM first started. And CCHCS's data on testing of the prison population indicates that over 58,000 incarcerated persons have now been tested.

5. When outbreaks have caused a shortage of regular housing for either isolation or quarantine space, CDCR has effectively used alternative spaces to provide both housing and treatment space during outbreaks, including gymnasiums, chapels, Prison Industry Authority buildings, and tents.

6. It is unlikely that the Receiver's plan for reserving quarantine and isolation space for outbreaks could be implemented without forcing CDCR to release a substantial number of people in addition to the currently planned releases in order to maintain social distancing in the

remaining housing units. Conversely, CDCR should not need to release more people than it already plans to release in order to implement its proposal to set aside a housing unit in each prison, or at a minimum 100 beds, which could be supplemented with additional alternative housing in the event of an outbreak.

7. It is important to recognize that closing even a single housing unit in many of the prisons will result in higher population densities in the remaining units that continue to house incarcerated persons. Under the Receiver's plan, that compaction would be more extreme, making it more difficult, if not impossible, to allow for the physical distancing which has currently been achieved in housing units.

8. Similarly, if the Receiver's plan for creating reserved quarantine and isolation space were implemented, CDCR would likely have no choice but to transfer numerous incarcerated persons between prisons, assuming transfers were permitted by the Receiver. But CDCR's proposal for reserving space would require no or few transfers.

I declare under penalty of perjury that I have read this document, and its contents are true and correct to the best of my knowledge. Executed on July 20, 2020, in Sacramento, California.

*RALPH DIAZ*