XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
IRAM HASAN (320802)
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:   (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:     July 28, 2020<br>Time:    10:00 a.m.<br>Crtrm.:   6, 2nd Floor<br>Judge:   Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the July 28, 2020 Case Management Conference.

**I.   POPULATION REDUCTION**

**A.   Status**

*Plaintiffs' Position*:  Substantially less crowded prisons are necessary to reduce sickness and death from COVID-19, and reduction of population is one way to do that. Preliminarily, the reduction in CDCR's population since March is to a large degree a result of the closure of county jail intake, which we understand typically results in two to three thousand additional people arriving to CDCR prisons each month.  Any re-opening of intake (see discussion below) will directly impact the number of incarcerated people and thus crowding in CDCR.

The State's early release initiatives are a necessary step to reduce sickness and death from COVID-19, including by reducing crowding in the prisons.  However, as Plaintiffs previously described, it is not clear how many releases will be expedited via the three programs announced July 10th, or the degree to which such releases will impact crowding in the prisons.

CDCR last week said that a recent point-in-time calculation showed that, applying all exclusionary factors in the July 10th programs, 4,800 were eligible for release under the 180 days or less to serve program, 700 under the 365-days or less to serve program, and 6,500 were eligible under the high risk for sickness or death from COVID-19 program. Even in the unlikely event that all eligible are released, this would result in a reduction of approximately 340 people per prison; on average, each prison incarcerates almost 2,900 people.  This is not a substantial reduction, especially given that public health experts recently recommended that San Quentin's population be halved to reduce the risk from COVID-19, the Receiver recommended setting aside 20% of the beds in each prison for quarantine and isolation purposes, and the medically vulnerable need to be offered moves from dorms to cells.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16728938.1

Plaintiffs have asked the State and Receiver's office to make changes to increase the number of people eligible for release under the July 10th programs.  First, we have asked the State to expand the number of prisons in which people are eligible for early release consideration under the 365-days or less to serve program.  That program is currently limited to nine specified prisons, based on the size of the population of medical high-risk people and the physical plant layout.  We have pointed out that other prisons have very similar percentages of high-risk patients and physical plant layout.

Second, we have asked CCHCS to update its list of COVID-19 risk factors, which currently do not include additional or revised risk factors announced in June and July by the Centers for Disease Control and Prevention ("CDC").  As we understand it, the CCHCS COVID-19 risk factors are used to determine who is at high risk for sickness or death from COVID-19 and thus eligible to be considered for release under the July 10th program.  Using the current CDC-listed risk factors should increase the number of medically vulnerable people who can be released.  This is important because in addition to reducing crowding, harm from COVID-19 can be lessened by removing from prison those who are medically vulnerable to sickness and death from the disease.

*Defendants' Position*:  From July 1 through July 26, 2020, a total of 2,345 incarcerated persons have been released from custody early as a result of the COVID-19 early release programs initiated by Defendants.  An additional 1,869 incarcerated persons were released during this same time period in accordance with their natural release date.  Thus, a total of 4,214 incarcerated persons were released from CDCR institutions and camps from July 1 through July 26, 2020.

**B.      Population reduction reports and parties' meet and confer efforts regarding same**

The parties have met and conferred twice, as well as exchanged substantive emails, regarding the data to be provided to Plaintiffs regarding the number of people released pursuant to the July 10th programs and the impact of those releases on population and

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

crowding in the prisons.  Plaintiffs streamlined their request for information.  CDCR is working to develop a report that will show, among other things, the number of people released at each prison and statewide under programs announced on July 10th for some with (1) 180 days or less to serve, (2) 365 days or less to serve, or (3) deemed to be at high risk for complications if infected with COVID-19.  CDCR expects to share this report on Friday, July 31.  CDCR provided a report on population by facility on July 24, and agreed to provide it on a monthly basis.  Also on July 24, Plaintiffs requested a bed audit dated July 22 or July 24 to be close in time to the population reports sent on July 24, and that a bed audit be provided monthly.  The parties will report further on this matter at the next Case Management Conference.

## II.   INTAKE

On July 23, CDCR announced it would extend the suspension of county jail intake until August 9, 2020.

*Plaintiffs' Position*:  Plaintiffs continue to believe the prisons should remain closed to intake until CDCR can safely transfer people between prisons, has set aside sufficient space for quarantine and isolation at each prison, and can safely house all patients at risk of severe complications or death from COVID-19.

*Defendants' Position*:  CDCR suspended county intake from March 24, 2020 to May 25, 2020.  Beginning the week of May 25, CDCR resumed limited intake of only 50 incarcerated persons per week from only four counties.  On June 29, in cooperation with the Receiver, CDCR closed all intake from the counties and that closure will be continued until at least August 9.  CDCR will continue to work with its healthcare and county partners to develop safe practices before resuming intake.

## III.   SETTING ASIDE SPACE FOR QUARANTINE AND ISOLATION AND COURT ORDER REGARDING SAME (ECF NO. 3401)

On July 22, the Court issued an order directing Defendants to set aside space for quarantine and isolation purposes at each prison.  *See* ECF No. 3401.

*Plaintiffs' Position*:  As directed by the Court, on July 25 Defendants provided Plaintiffs a list of which housing units would be set aside for quarantine and isolation purposes at 31 of the 35 state prisons.  On July 27, Defendants provided a revised list for these 31 prisons.  We are reviewing the information provided.  We understand that the Receiver's office is in the process of setting up a meeting with the parties' public health experts regarding these plans, and that Plaintiffs' expert, Dr. Adam Lauring, will participate in this discussion.

*Defendants' Position*:  On July 22, 2020, this Court issued its Order to Set Aside Isolation and Quarantine Space.  Dock. No. 3401.  That order requires CDCR to "disclose to Plaintiffs and the Receiver which housing unit of at least 100 beds will be vacated at 30 or more institutions, and what space will be reserved at the remaining institutions to allow a minimum of 100 beds for use in the event of an outbreak at those institutions."  *Id.* at 3:23-26.  The order also requires CDCR to "make such disclosures for as many institutions as practicable within three days of this order."  *Id.* at 3:26-27.

Even prior to the issuance of the July 22 Order, CDCR and its partners at CCHCS began evaluating space at the prisons and identifying possible housing units and/or alternative space for quarantine and isolation purposes.  And, on Saturday July 25, as required by the Court's order, CDCR informed Plaintiffs and the Receiver that it had identified housing units of at least 100 beds that would be vacated and reserved for quarantine and isolation space at 31 institutions.  On July 27, CDCR circulated a corrected version of the document that was provided on July 25.  (*See* Emails and attachments from Paul Mello dated July 25 and July 27, which are attached as **Exh. A**.)  CDCR will also comply with the Court's requirement that it issue disclosures for the remaining institutions by August 5, and will vacate or reserve space at each institution with fourteen days of the applicable disclosure.  Dock. No. 3401 at 3:28-4:5.

CDCR looks forward to working with CCHCS, Plaintiffs' counsel, and the various public health experts as they work towards complying with the other provisions of the

16728938.1

1 Court's July 22 Order.   Defendants' expert Dr. Spaulding intends to participate in the
2 above referenced meeting with the Receiver and the parties' respective experts as well.

3 **IV.   TESTING AND TRANSFER PROTOCOLS**

4 　　CCHCS recently provided a detailed, eight-page "COVID movement matrix"
5 setting forth new testing, quarantine, and isolation protocols applicable to eighteen
6 different types of transfers.  The matrix also includes limits on transfers, and mandates
7 related to the housing of patients in quarantine or on medical isolation, designed to reduce
8 the risk of COVID-19 infection.  CCHCS asked the parties to provide comments by July
9 30.

10 **V.   SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE**

11 　　*Plaintiffs' Position:*  Thousands of people at risk of severe complications or death if
12 infected with COVID-19 remain housed in crowded dormitories in CDCR.  Previously, the
13 parties reported that a program to offer medically vulnerable people moves from dorms to
14 cells was on hold while CCHCS and CDCR identified and vacated appropriate space at
15 each prison for quarantine and isolation.  We understand the Receiver has since directed
16 his staff to prioritize implementation of this Court's recent order on quarantine and
17 isolation, but to also prioritize moving high-risk COVID-19 patients out of dorms, as a
18 secondary goal.  Plaintiffs continue to believe CDCR must have sufficient space to both
19 safely house medically vulnerable people and maintain dedicated quarantine and isolation
20 units for use in the event of an outbreak.  We hope CDCR will, in cooperation with the
21 Receiver's office, quickly identify and vacate all necessary quarantine and isolation space
22 at each prison, and that the program to offer moves from dorms to cells can be
23 implemented as expeditiously as possible.

24 　　*Defendants' Position*:  Defendants remain committed to working with the Receiver
25 to facilitate moves of medically high-risk patients from dorms to cells or any other moves
26 to safely house medically high-risk patients if such moves have been recommended and
27 approved by the appropriate public health and corrections experts.

28

16728938.1
Case No. 01-1351 JST

# VI.   COVID-19 TESTING

## A.   Staff Testing

During the last Case Management Conference, the Court ordered the parties to meet and confer regarding CDCR's plan to test staff for COVID-19.  The Court directed Plaintiffs to file a motion by July 24 if the parties' disputes had not been resolved through the meet-and-confer process.  *See* Civil Minutes (July 16, 2020), ECF No. 3393 at 2.  On July 23, the parties engaged in a meet and confer call to discuss Plaintiffs' feedback and various questions about CDCR's staff testing plan.  Dr. J. Watt, Chief of the California Department of Public Health's Division of Communicable Disease Control, participated in the call and answered Plaintiffs' questions from a public health perspective.  After the call, the parties exchanged emails about whether their respective positions as to certain portions of the staff testing plans have changed as a result of the meet and confer call.  The parties were able to reach a consensus on some of the points that Plaintiffs raised and, on July 24, Plaintiffs filed a motion for an order modifying CDCR's COVID-19 staff testing plan on the remaining points of contention.

*Plaintiffs' Position*:  As described above, Plaintiffs filed a motion on July 24, seeking an order from the Court directing CDCR to modify its COVID-19 staff testing plan.  *See* ECF No. 3402.  On July 26, Defendants provided for the first time data showing the percentage of prison staff that has received baseline testing, which Defendants discuss below.  According to this data, a statewide average of 90% has received baseline testing.  Sixteen prisons have averages below that, including a dozen in which approximately 20% or more of staff were not tested.  *See* Exhibit B attached hereto.  This data is concerning, as it suggests that hundreds of staff, any one of whom could cause an outbreak in a prison, have not been tested.

Defendants assert this could be due to staff being out on long term sick leave, pre-approved time off, or family and medical leave, as well as a delay in receiving test results.  But, there is no way to determine whether and to what extent that is true from the data

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16728938.1

1    reported.  CDCR must reliably track and report whether each staff member actually

2    coming to work has received baseline testing and, if applicable, timely re-testing.  CDCR

3    also must report the number of staff who are not available due to the reasons they state.

4         Defendants report that CDCR has implemented or is considering measures to

5    increase participation, including expanding the dates/times when testing is conducted.

6    Plaintiffs also understand that on July 13, CDCR and CCHCS issued a memo stating that

7    "[s]hould an employee refuse to test they will face progressive discipline up to and

8    including termination."  Plaintiffs are reviewing the data produced on July 26 and

9    considering whether and what additional measures might be necessary to protect

10   incarcerated people when staff refuse testing.

11        *Defendants' Position*:  Defendants intend to continue to meet and confer with

12   Plaintiffs regarding their remaining concerns and will respond to Plaintiffs' motion

13   accordingly.

14        With respect to the status of CDCR's baseline testing, CDCR completed the first

15   round of baseline testing at all institutions on July 17, 2020.  Per the Court's request,

16   attached as **Exhibit B** is an updated table that contains information about CDCR's baseline

17   staff testing, including the percent[1] of staff members who have been tested at each

18   institution during baseline testing.

19        As shown in Exhibit B, as of July 22, 2020, there were six institutions (*i.e.,*

20   California Correctional Center, California Correctional Institution, California State Prison

---

22   [1] As Defendants explained in the last case management conference statement (ECF No.
23   3389) and the footnotes in Exhibits B and C, there are various factors that might skew the
     accuracy of the percentage of staff that has been tested.  Nevertheless, CDCR has
24   exercised its utmost due diligence to provide the most accurate percentages that were
     reasonably possible.  Also, the tables in Exhibits B and C only represent a snapshot in time
25   on July 22.  Completed tests are not counted until the results are received, and new results
     are provided by the labs every day.  Further, the total number of individuals tested also
26   include contractors and non-staff, such as registry providers.  Therefore, in some instances,
     the percentage of tested employees may exceed 100%.  Lastly, the format of the tables in
27   Exhibits A and B are only temporary.  The format of future information about staff testing
     may differ from the format used in Exhibits B and C.

28

-8-                                              Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

- Centinela, Chuckawalla Valley State Prison, High Desert State Prison, and Ironwood State Prison) at which baseline testing was only completed for 72% of the staff or less. CDCR's Director of the Division of Administrative Services reached out to these six institutions to evaluate what circumstances might have led to the lower percentages and learned that baseline testing at these six institutions was performed shortly before the July 4 holiday weekend, *i.e.,* on two days sometime between July 1 and July 3.  Therefore, it is likely that a large number of staff were on vacation for the holiday weekend and therefore missed the baseline testing.  In addition, the lower percentages could have also been attributable to the facts that some institutions have experienced a recent increase in retirements, and a large number of staff members have been out on long term sick leave, pre-approved time off, or family and medical leave.  However, as explained below, CDCR is taking steps to ensure that all staff are in compliance.

The first round of serial testing commenced on or around July 15, 2020.  As shown in the table attached hereto as **Exhibit C**, the percentage of staff who completed serial testing at five of the six institutions increased by 5-10 percent over the baseline testing numbers at those institutions.  Unfortunately, the data that is currently available to CDCR does not enable to CDCR to readily determine whether staff members who were not tested during baseline testing have now been tested during the first round of serial testing.  A manual comparison of staff names would have to be conducted in order to determine this information.  CDCR is therefore working on a technical solution that will enable CDCR to identify which individuals have been tested.  Once that is accomplished, the institutions will reach out to the respective employees to remind them to get tested.

Lastly, CDCR is monitoring staff testing compliance percentages and has implemented (and is continuously evaluating) measures to increase participation.  The additional measures that have been implemented or are being evaluated include, but are not limited to, performing the current and upcoming serial tests on three days at each facility (instead of only two days), performing the tests Monday through Friday (rather than over

the weekend), increasing the hours the vendor is onsite to perform the tests, assigning a staff member to call all on-duty staff to ensure they have completed testing, and displaying posters at the front gate and all entrances to remind staff of the testing dates and times. Also, on July 13, CDCR and CCHCS issued a joint memorandum that states that "[s]hould an employee refuse to test they will face progressive discipline up to and including termination. However, if a staff person has a medical condition or any other reason that precludes them from COVID-19 testing, they should contact their Return to Work Coordinator."

### B.   Testing Incarcerated People

*Plaintiffs' Position*:  The reported number of patients tested (currently approximately 65,000 statewide) continues to increase, which is laudable.  Re-tests of patients, however, are not currently reported, according to what CCHCS's Statewide Director of Healthcare Operations stated in late June.  The number is important to determine if sufficient test supplies are or will be available, and to monitor, along with other data, whether directives to, for example, test all previously negative-for-COVID patients weekly at San Quentin, or serially re-test all such patients at CIM, actually are done.  We continue to discuss these reporting and monitoring imperatives with CCHCS, which we believe is considering them.

## VII.   UNIFIED COMMAND POSTS

*Plaintiffs' Position*:  Unified Commands, which among other things provide skills and resources from the Office of Emergency Services, should be used whenever necessary to adequately respond to a COVID-19 outbreak in a prison.  A Unified Command was necessary at San Quentin.  It appears the same should have occurred during the outbreaks at CIM, and perhaps ASP and CVSP as well.

*Defendants' Position*:  At the July 16, 2020 case management conference, the Court asked Defendants to explain the trigger for activating unified commands and to describe plans to set up unified commands and activate assistance from other State agencies at each

1  institution.  (Case Mgmt. Conf. Tr. at 33, July 18, 2020.)

2      **Background Information and Triggers.[2]**

3       The standard basic structure for emergency management system, used at both

4  federal and local levels,[3] takes the form of Incident Command Systems (ICSs) at the field

5  level.[4]  An ICS is a nationally-used, standardized, on-scene emergency management

6  structure for running an emergency response in a particular place, and which is staffed and

7  resourced according to the needs and complexity of the emergency.[5]  ICSs can be activated

8  in response to unplanned incidents like air crashes or explosions, planned events like large

9  sporting events or marches, and disasters like earthquakes or wildfires.[6]  ICSs are designed

10  to provide a comprehensive response to emergencies; accordingly, their functions include

11  management, operations, planning and intelligence, logistics, and finance and

12  administration.[7]  ICSs must establish communication with the local government, with the

13  understanding that each jurisdiction has different resources available.[8]  Often, ICS field

14  response units are linked primarily to the Department Operations Center (DOC) with

15  jurisdictional responsibility for the particular emergency.[9]  One or more incident

16  _____

17  [2] In response to comments made by the Receiver during the last case management
18  conference, Defendants requested information from the Receiver's office pertaining to
   regulations governing the establishment of Unified Commands.  That information was not
19  available as of the date of this filing.
   [3] *See*, e.g., *An Introduction to the Incident Command System, ICS 100* (2018), available at
20  https://training.fema.gov/emiweb/is/is100c/student%20manual/is0100c_sm.pdf and *Law*
   *Enforcement Guide for Emergency Operations* (2019), available at
21  https://www.caloes.ca.gov/LawEnforcementSite/Documents/Red%20Book%20ADA%20
22  Compliant.pdf.
   [4] *Law Enforcement Guide for Emergency Operations* (2019) at 9, available at
23  https://www.caloes.ca.gov/LawEnforcementSite/Documents/Red%20Book%20ADA%20
24  Compliant.pdf.
   [5] *Id*. at 124.
25  [6] *Id*. at 17.
   [7] *Id*. at 12.
26  [8] *Id*. at 10.
27  [9] *Id*. at 10.

28

16728938.1

commanders manage the ICS and are tasked with, among other duties, setting up an Incident Command Post (ICP)—the field location at which the primary incident command function is performed, and which serves as the central point of collaboration, communication, and receipt and dissemination of information.[10]  And, as noted below, ICPs at each institution have been instructed to reach out the local public health department to establish communication.  Because of the flexibility ICSs allow, emergency responses can be built to fit a specific incident utilizing the various organizational components as needed, within the general framework of the ICS.[11]

Incidents requiring action from multiple agencies with concurrent jurisdiction are managed under a Unified Command.[12]  Typically, two or more incident commanders manage a Unified Command.  For example, three incident commanders manage San Quentin's Unified Command—one each from the Governor's Office of Emergency Services (Cal OES), CCHCS, and CDCR.

Cal OES recommends that Unified Commands be established to respond to aircraft crashes in particular, and allows jurisdictions to determine whether a Unified Command is required to respond to threatened acts of terrorism, bomb threats, a weapons of mass destruction attack, post-blast event, or a hazardous materials release.[13]  Separate from the ICS, public health officials at the state and local levels are authorized to impose quarantine and isolation to assist in the control of communicable disease.[14]  Some factors to consider when establishing a Unified Command include the particular jurisdiction's policy, objectives of a Unified Command, entities represented in the Unified Command, needed and available resources, and the operational plan.[15]

_____

[10] *Id*. at 26, 124.
[11] *Id*. at 18.
[12] *Id*. at 131.
[13] *Id*. at 91, 92, 96.
[14] *Id*. at 102.
[15] *Incident Command Systems 300 – Lesson 4: Unified Command*,

16728938.1

**CDCR's Efforts.**

CDCR activated its Department Operations Center (DOC) on March 15, 2020 in response to the COVID-19 pandemic and tasked it with, among other duties, overseeing ICPs at individual institutions.[16]  On July 2, 2020, CDCR issued a directive to all CDCR institutions requiring the activation of ICPs.  As reported in the July 16, 2020 case management conference statement, all CDCR institutions have active ICPs as of July 7, 2020.  (ECF no. 3389 at 23.)  On July 12, 2020, each ICP was directed to establish communication with their local public health departments in the event activation of a Unified Command is necessary.

Because of the flexibility an ICS allows, each institution may determine its needs based on its unique circumstances, including whether there is an outbreak, and if so, the magnitude.  For example, if an institution has few positive cases, it likely does not require Cal OES, CDPH or OSHA onsite to effectively implement its response, particularly at a time when the resources of those other agencies are in such high demand.  Even larger scale outbreaks can be contained without the initiation of a Unified Command.  For instance, LAC, CMC, and Corcoran were each able to address the potential threat of a COVID-19 outbreak without initiating Unified Commands.

The Secretary and the Receiver participate in the daily statewide Unified Coordination Group (UCG) telephone call.  This is a multi-agency coordination that works to establish priorities, allocate resources, resolve policy issues, and provide strategic guidance.  CDCR continues to consider all available resources in determining how best to respond to a potential outbreak and will consider the need for Unified Commands on an ad

---

https://www.usda.gov/sites/default/files/documents/ICS300Lesson04.pdf (last visited July 24, 2020.)

[16] *Department Operations Center Activation*, https://www.cdcr.ca.gov/covid19/department-operation-center-activation/#:~:text=Department%20Operations%20Center%20Activation%20Updated%203%2F16%2F2020%20At%201,prepared%20to%20go%20into%20full%20operation%20as%20needed. (updated March 16, 2020.)

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16728938.1

hoc basis.

**VIII. PRISON-SPECIFIC UPDATES**

    **A.**    **San Quentin (SQ)**

    *Plaintiffs' Position*: Thankfully, the number of newly identified infections has dropped at the prison, although that in part might be because approximately 60% of the people incarcerated there when the outbreak began have already tested positive.[17] Still, as of July 27, 19 people from San Quentin had died from COVID-19 related conditions, the same number as have died at the California Institution for Men. As of July 23, 45 San Quentin patients were hospitalized, including 14 in Intensive Care Units, and approximately 40, with some on supplemental oxygen, were housed in the "high risk" section of the temporary Alternate Care Site at the prison.

    While the prison remains on a modified program, referred to more colloquially as a lockdown, late last week outdoor exercise – denied to all for a month or more – began to be offered to some, according to the July 24 CDCR daily COVID-19 update; the apparent intention is to make it available to others but not all in the near future. The lack of outdoor exercise for all was extraordinary, as CCHCS guidelines call for such opportunities even for those on medical isolation. Counsel for the *Coleman* plaintiff class had raised concern about the denial of outdoor exercise, which adversely impacted many patients' mental health. We understand that on July 20, CCHCS's Director of Health Care Services provided clear direction that outdoor exercise be provided even while virus control efforts are being undertaken.

    Also, according to a CDCR daily COVID update, a prison-wide, one-time, four-day deep cleaning was begun at San Quentin last week, performed by a contractor. It

---

[17]    When San Quentin's index patient was tested on May 31, 3,626 were housed at prison; as of July 26, 2,150 patients have tested positive. The percentage of infected incarcerated people rises to 67% if the approximately 425 housed in H-Unit, a separate facility located outside the main walls of the prison, and which apparently has had only two positive cases, are excluded from the population total.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16728938.1

1 reportedly involved disinfection of all hard surfaces, electrostatic spraying of unoccupied

2 cells, and removal and proper disposal of soiled linens and bio-hazard material.  San

3 Quentin's Warden also reported last week that N95 masks continued to be provided to

4 incarcerated people, including when showers are offered every three days.  These and

5 other COVID-19 precautions undertaken at San Quentin should be done at other prisons,

6 and we intend to discuss this with CCHCS and CDCR.[18]

7    *Defendants' Position*:  In response to the outbreak at San Quentin, 33 percent of the

8 incarcerated person population has been tested in the last two weeks, amounting to 1,153

9 patients as of July 27, 2020.  That equates to testing 899.9 patients per 1,000 people at San

10 Quentin; by comparison, California's statewide cumulative testing rate is 178.4 per 1,000

11 people.  The number of COVID-19 active patients has trended down since July 7, 2020

12 and, as of July 27, 2020, there were 1,551 resolved patients and 537 active patients in

13 custody.  Of those, 90 patients were newly diagnosed within the last two weeks.

14    **B.    California Healthcare Facility (CHCF)**

15    *Plaintiffs' Position*:  There have been no other COVID-19 confirmed patients at the

16 prison beyond the three discussed in the last Case Management Conference Statement.  We

17 continue to hope that the medical isolation of these COVID-positive patients, the

18 quarantining of others, and other measures such as staff testing, works to stop the spread of

19 the virus at CHCF.

20    *Defendants' Position*:  Since the last case management conference statement, the

21 number of active COVID-19 cases among the incarcerated population remains at three,

22 with zero new cases in the last two weeks.  Further, in addition to the measures described

23 in the last case management conference statement, CHCF has taken additional steps to

24 mitigate the risks and spread of COVID-19 at CHCF, including, but not limited to:

---

26 [18]    We intend to do the same with regard to the conclusions and recommendations of
27 the 50-page Amend / Berkeley Public Health July 20, 2020 report (provided to us on July
23), "Evaluation of the April-May 2020 COVID-19 Outbreak at California Men's
28 Colony."

Case No. 01-1351 JST

16728938.1    JOINT CASE MANAGEMENT CONFERENCE STATEMENT

Displaying posters about the requirements of Personal Protective Equipment (PPE) in all housing units; CHCF staff attending the daily statewide Incident Commander Post conference calls with CDCR's Department Operations Center to stay appraised of COVID-19 trends and challenges; daily accounting for all COVID-19 related supplies in order to ensure staff and incarcerated people have the necessary safety materials for daily use; daily accounting of COVID-19 test kits to ensure consistent availability; CHCF's Correctional Counselor staff communicated with Los Angeles Probation, the Monterey County Probation, the Tehama County Probation, and the Fresno County Probation about transportation precautions for the release of incarcerated people; CHCF's Community Resource Manager communicated with the San Joaquin County Public Health, the El Concilio of San Joaquin County, the San Joaquin County WorkNet, the San Joaquin County Salvation Army, the Fathers and Families of San Joaquin County, and the San Joaquin County Delta College about COVID-19 testing at CHCF, number of positive incarcerated people, and safety precautions imposed to keep staff and incarcerated people safe; and CHCF's Chief Medical Executive and Chief Nurse Executive had a telephone conference with San Joaquin County General Hospital to discuss medical advice for CHCF's incarcerated population.

C.    **California Medical Facility (CMF)**

*Plaintiffs' Position*:  Unfortunately, three patients have now tested positive at CMF. Reportedly, two of the newly-diagnosed patients lived in 5-person dorms before being moved to medical isolation.

*Defendants' Position*:  On July 16, 2020, one incarcerated person tested positive for COVID-19.  On July 22, 2020, two more incarcerated people tested positive for COVID-19.  As a result of these three positive incarcerated people and a few staff members who tested positive for COVID-19, as of July 23, 2020, CMF has twelve housing units with a total of 605 incarcerated people on medical quarantine.  All movement within the institution is structured in a way that incarcerated people from different housing units do

not mix with other housing units.  Incarcerated people have access to showers on a rotating schedule.  Access to dayrooms has been modified to allow for physical distancing. Incarcerated persons from Unit IV, the Enhanced Outpatient Program, and the main yard have access to yards based on a schedule to facilitate social distancing.  Incarcerated persons from the Psychiatric Inpatient Program have normal access to yard and custody staff monitors the yard to ensure that physical distancing is maintained during yard time. Chaplains conduct rounds in housing units to perform religious services.  Access to the law library is facilitated via a paging system.  Lastly, CMF provides a hot morning meal and a sack lunch followed by a hot evening meal.  Incarcerated people in Facility C and D-dorms are provided meals as usual, but separated by cohorts.  All other incarcerated people are being provided their meals in their cells.

Tents remain onsite and are being used to house incarcerated people to increase the space for physical distancing in housing units and dorms.  Currently, a total of 95 people are housed in CMF's tents.

**IX.  MEET AND CONFERS BETWEEN PARTIES AND DOCUMENT PRODUCTION SINCE JULY 16**

On July 20, CDCR produced CDCR's July 2 revised memorandum, which sets forth the processes for the increase of quarterly packages for the incarcerated population.  On July 21, in preparation for a meet and confer call with Plaintiffs' counsel, CDCR produced a document titled COVID daily release numbers through July 13 to Plaintiffs.  On July 22 and July 24, the parties met and conferred on what kind of reports CDCR can produce that set forth how many incarcerated people have been released pursuant to CDCR's expedited release plans and what the timeline for such reports would be.  On July 22, in preparation for a call with San Quentin State Prison's Warden Broomfield and Chief Executive Officer (CEO) Cryer, CDCR produced a copy of San Quentin's July 22 Program Status Report, a July 22 memorandum titled Resumption of Inmate Phone Usage in COVID-19 Outbreak Areas, and two lists with the names of patients who were housed at San Quentin's

1    alternative care site at that time.  The same day, CDCR facilitated a call during for
2    Plaintiffs' counsel with San Quentin during which San Quentin's Warden and CEO
3    answered various questions from Plaintiffs' counsel about (i) exercise opportunities,
4    showers, phone calls, and food service and certain medical care matters at the prison, (ii)
5    the provision of N95 masks to the incarcerated population, (iii) the current process for non-
6    COVID-19 related lab work, (iv) the process for documentation of care at San Quentin's
7    alternative care sites, (v) the use of any temporary tents for medical services, (vi) the
8    current status of medical department staffing, including the use of registry, staff diverted
9    from other locations, and volunteer staff, (vii) the current and near future strategies and
10   locations for housing active, suspected, and resolved COVID-19 patients, and (viii) the
11   process for re-testing incarcerated people who previously tested negative for COVID-19.

12
13
14   DATED:  July 27, 2020                              PRISON LAW OFFICE
15
16                                      By:        /s/
17                                           STEVEN FAMA
18                                           SOPHIE HART
                                             Attorney for Plaintiffs
19
20
21
22
23
24
25
26
27
28

16728938.1
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED:  July 27, 2020

XAVIER BECERRA
Attorney General of California


By:   _____/s/_____
DAMON MCCLAIN
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR
Deputy Attorney General
Attorneys for Defendants


DATED:  July 27, 2020

HANSON BRIDGETT LLP


By:   _____/s/_____
PAUL B. MELLO
SAMANTHA D. WOLFF
Attorneys for Defendants

-19-

Case No. 01-1351 JST

16728938.1