XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
IRAM HASAN - 320802
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:    August 12, 2020<br>Time:    10:00 a.m.<br>Crtrm.:  6, 2nd Floor<br>Judge:   Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the August 12, 2020 Case Management Conference.

# I.   POPULATION REDUCTION

## A.   Status

*Plaintiffs' Position*:  Even with recent developments, some of which are in our view positive and are discussed below, the basic paradigm and thus our main concern remain the same: substantially less crowded prisons are necessary to reduce sickness and death from COVID-19, and reduction of population is one way to do that, particularly if such action focuses on those at increased risk of severe complications or death if infected.  The degree to which the State's recent actions will ultimately  lower density in the prisons appears very limited, both because the number of those eligible to be released is small compared to the current population, and so much depends on intake remaining closed or severely limited.  Further, it's not clear whether or when a significant number of people who are particularly at-risk will be released.

Following at least a year of essentially stable counts, the population of CDCR's 35 adult prisons since mid-March[1] has decreased from 114,328 to 98,009 as of August 5, 2020.  Fundamentally, this decrease has come about because the number of people leaving CDCR prisons has been greater than the number of people arriving to them.  In this regard, intake from county jails, which we understand previously added three or four thousand to CDCR's population each month, has been substantially limited or closed for much of this period.  As a result, many people remain incarcerated in county jails, awaiting transfer to CDCR.  At the same time, many people – the exact number not known but typically involving three to four thousand people each month – have left prison because they served the term prescribed by law: a "natural" release to use CDCR's preferred term.[2]  In sum, most of the population decrease over the last approximately four months has resulted from

---

[1] The CDCR's first Covid-19 patient tested positive on March 23, 2020.
[2] CDCR reports that there were 3,690 of these natural releases between July 1 and August 5, 2020.

16576559.1

actions unrelated to early release programs.  If intake (discussed below) is re-opened, further reductions may be limited or completely offset.

CDCR's early release programs have, however, helped.  In April, the CDCR Secretary invoked emergency authority granted by state statute to advance by up to 60 days the release date of approximately 3,500 people.  That was laudable, but only a one-time effort, and because all were scheduled to be released in any event by early June its impact on crowding is now moot.

In July, a one-time award by the Secretary of 12 weeks of time credit resulted in what CDCR says is approximately 2,100 statewide having their release date advanced to a date before the end of last month.  That too was laudable, but the impact on crowding in the 35 prisons was more limited than indicated by the number of people whose release date was advanced, because the credit award applied to all, including what we believe were hundreds in camps and community facilities.

Also in July, CDCR began early release consideration for three groups of incarcerated people: some within 180 days of release, others within 365 days of release at certain prisons, and those, no matter where incarcerated, determined to be at high risk for complications from COVID-19 if infected.  CDCR reports as of August 5, 2020, 4,352 people were released early via the 180-day program.  That total, while substantial, includes those released from camps and community-based facilities as well as from the prisons; the number from just the prisons was not reported.  Even if all were from prisons, the average number released amounts to only approximately 120 people per institution, which on average each house approximately 2,850.  Further, the total released so far comprises approximately 90% of the people that CDCR said were initially eligible for release under the 180-day program.  As such, further releases under this program will be relatively far fewer in number, as they will primarily be people who as the calendar turns newly reach the 180-day to release window.

CDCR also reports that as of August 5, 163 people have been released early via the

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16576559.1

365-day program, which applies to only eight prisons CDCR selected, it said, because of the percentage of patients designated as medical high risk and the physical plant lay-out of each.  In mid-July, we requested that CDCR add other prisons to the program because they were very similar to those included in it.  On July 29, we renewed our request, providing additional information regarding the similarities between prisons included in the program and those that were not.  On August 8, Defendants stated that CDCR added four prisons to the 365-day early release program; there are now 12 prisons where that program is in place.[3]   This is a positive development.  However, even with the new prisons, the impact of this program on crowding reduction will be minimal, because CDCR has previously indicated that the number eligible for release amounts to on average fewer than 100 out of the 2,200 or more (in some cases upwards of 3,000 or even almost 4,000) incarcerated at each prison.

CDCR also reports that approximately 6,200 people, including approximately 3,900 serving life sentences, currently meet all criteria for consideration for release under the program for those at high risk of severe complications or death if infected with COVID-19. CDCR also reports that the Board of Parole Hearings (BPH) will prepare a summary of each case that will be considered by CDCR and others when making a release decision. However, CDCR further reports that as of August 5, only 8 people have been released under the medical high risk program.  That's a start, and of great importance to those no longer confined, since the prisons can have astronomical infectivity rates.[4]  However, it's

---

[3] California Men's Colony (CMC), California State Prison – Los Angeles County (LAC), Mule Creek State Prison (MCSP), and California State Prison – Solano (SOL) were added to the program, joining the initially announced Central California Women's Facility (CCWF), California Health Care Facility (CHCF), California Institution for Men (CIM), California Institution for Women (CIW), California Medical Facility (CMF), Folsom State Prison (FOL), Richard J. Donovan Correctional Facility (RJD), and San Quentin State Prison (SQ).

[4] For example, at Avenal State Prison in May, more 90% of those in a particular housing unit were infected and at Chuckawalla Valley State Prison, approximately 75% of an entire

16576559.1

1  clear, and a deep concern, that the review process established will require what will likely

2  be months before all eligible are considered.[5]

3        Meanwhile, in response to our request, CCHCS last week said it will revise its list

4  of risk factors for severe complications from COVID-19.  This is an appreciated and

5  necessary step, which we hope will bring CCHCS' recognized risk factors in accord with

6  the Centers for Disease Control's,  Also, as mentioned last month, updating risk factors

7  may result in additional people being eligible for early release consideration due to being

8  at higher risk of serious complications if infected.  Finally, we have asked CCHCS to use

9  its updated COVID-19 risk factors as the basis of a statewide education initiative, as we

10  believe knowledge of the conditions now known to create increased risk will promote

11  greater diligence regarding precautions to reduce virus transmission.

12        *Defendants' Position*:  Since the last case management conference, 1,872

13  incarcerated people were released from CDCR institutions and camps as a result of the

14  COVID-19 early-release programs announced by Defendants on July 10, 2020.  Through

15  August 9, 2020, 4,421 incarcerated people were released from CDCR institutions and

16  camps as a result of the COVID-19 early-release programs announced by Defendants on

17  July 10, 2020.  An additional 4,265 people were released during this same period in

18  accordance with their natural release dates.  In total, 8,686 incarcerated persons were

19  released from CDCR institutions and camps from July 1, 2020, through August 9, 2020.

20  17,832 people have been released from CDCR institutions and camps since the beginning

21  of March 2020.  Significantly, and in large part because of Defendants' COVID-19-

22  mitigation efforts, CDCR's population in its institutions and camps is below 100,000 for

23  the first time in three decades as of July 30, 2020.  The last time the population was below

24

25  facility tested positive.  To date, approximately 66% of those incarcerated in the part of
   San Quentin have been infected.

26  [5] Plaintiffs asked for but CDCR has not provided the number of case summaries BPH has
   completed among the approximately 6,500 it will do, and when those remaining will be

27  done.  Plaintiffs have no information regarding how many people of the 6500 have been

28  considered for release to date.

100,000 was in 1990, when California's overall population was almost 10 million less than it is today.

For the Court's information, the cumulative early-release data by cohort from July 1 through August 5, 2020 is as follows:

- 4,352 people have been released in the 180-day early-release cohort;
- 128 people age 30 and over have been released in the 365-day early-release cohort;
- 35 people under age 30 have been released in the 365-day early-release cohort;
- 8 people have been released in the medically high-risk early-release cohort.

Additionally, as part of continued efforts to ensure the safety of CDCR's incarcerated population, Defendants expanded the scope of its one-year early-release cohort. On July 10, 2020, Defendants announced that incarcerated people with 365 days or less to serve on their sentences and who reside in institutions housing large populations of medically high-risk patients are eligible for-early release consideration, subject to certain conditions. The original list included the following eight institutions: San Quentin State Prison (SQ), Central California Women's Facility (CCWF), California Health Care Facility (CHCF), California Institution for Men (CIM), California Institution for Women (CIW), California Medical Facility (CMF), Folsom State Prison (FOL), and Richard J. Donovan Correctional Facility (RJD). On August 7, 2020, Defendants added Mule Creek State Prison (MCSP); California State Prison, Los Angeles County (LAC); California State Prison, Solano (SOL); and California Men's Colony (CMC) to this list. With these additions, incarcerated people from a total of twelve institutions are eligible for early-release consideration in the one-year early-release cohort announced on July 10, 2020. At this time, it is expected CDCR will pause the 365-day releases on September 30; however, CDCR's response to COVID-19 remains flexible based on guidance from public health experts. CDCR will re-evaluate the pause closer to September 30 again. The rolling releases of those in the 180-day cohort and the review of the High-Risk Medical cohort will continue.

16576559.1

**B.    Population reduction reports and parties' meet and confer efforts regarding same**

On July 31 and August 7, respectively, the parties met and conferred regarding Defendants' population reduction efforts.  During the first meet and confer on July 31, Defendants made an employee from CDCR's case records department available to answer Plaintiffs' questions about the reports. Prior to each meet and confer, Defendants produced several iterations of its population-reduction reports, including, but not limited to, those showing early and natural releases by county and by early-release cohort.  Attached as **Exhibit A** are true and correct copies of the reports that Defendants produced to Plaintiffs on July 31.  CDCR's counsel explained to Plaintiffs' counsel that the reports that were provided might not be 100% accurate due to ongoing data entry processes.  Attached as **Exhibit B** are true and correct copies of the reports that Defendants produced to Plaintiffs on August 7.  Per Plaintiffs' request, Defendants will continue to provide the foregoing reports to Plaintiffs, first on a bi-weekly, then on a monthly basis.  In addition, on July 30, Defendants produced two copies of institution bed audits, dated July 9 and July 29, to Plaintiffs.

*Plaintiffs' Position*:  We remain optimistic that an agreement can be reached regarding what data will be provided, and when, regarding population reduction efforts. The final table in each of the data sheets provided by Defendants in recent weeks (see Exhibits A and B hereto) provide one set of key data we initially requested: the cumulative statewide total releases under each of the three early release programs announced on July 10th.  CDCR says it is working on also providing that information by prison as well.  We have asked the initially this information be provided every two weeks, with the expectation that after a short period monthly production would suffice.  We also believe CDCR is working on providing monthly data showing population totals in each prison's Facility, so that we can monitor reductions across the prisons' sub-units.  CDCR has also kindly agreed to provide a "Bed Audit" each month, which should permit, if necessary, monitoring of population levels in each prison's housing unit.

Last week we requested additional information and periodic data regarding the program to consider early release for those most at risk of severe complications or death from COVID-19, which currently number approximately 6,500. We asked for additional information after CDCR staff during a meet and confer said, as we understood it, that the BPH has been tasked with preparing an individual summary for each eligible patient, and after seeing that the numbers of such patients released in the first few weeks of the program was very small, especially when compared to the thousands released under the 180-day program. Thus, we asked CDCR to confirm that BPH would prepare summaries on each patient, to provide the number of such summaries completed, and the projected dates for when it would complete the first 100, 500, 1,000, 3,000, and then all remaining summaries. We further asked that CDCR, when it provides the number considered but not released. This basic information is necessary for minimal transparency and adequate monitoring of this early release program which of three announced July 10 is *by far* the most important in terms of potential reduction of harm, since it focuses exclusively on those most at risk.

*Defendants' Position*: As set forth above, as of the filing of this statement, Defendants have provided some of the early-release data Plaintiffs had initially requested, including an explanation of how many patients have been released under each of the early release measures.

In addition to the data that Defendants have already provided, Plaintiffs had also asked Defendants in their initial request to provide a breakdown of the early-release cohort-information (1) on an institution-by-institution basis, and (2) for each reporting period. Defendants continue to work on a solution to provide the requested breakdowns.

Plaintiffs now want more information and in recent requests have expanded the scope of their original requests to include the following additional information: (1) confirmation that approximately 6,200 people have been identified as meeting criteria for early release consideration in the medically high-risk category; (2) confirmation that the

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16576559.1

Board of Parole Hearings (BPH) is preparing a summary of each person which CDCR/executive branch will review; (3) the number of individual summaries BPH has completed and forwarded; (4) the dates by which BPH plans to complete the first 100, 500, 1000, 3000, and then all ~6,200 individual summaries; and (5) each time CDCR reports the number of medically high-risk people released, CDCR should also report the number reviewed and not released as a result of the review.  Defendants are currently considering these additional requests.

## II.   INTAKE

On August 6, 2020, CDCR announced it would extend the suspension of county jail intake until August 23, 2020.

*Plaintiffs' Position*:  As explained further below, the Receiver and Defendants have not yet finalized the COVID-19 Screening and Testing Matrix that will govern how people can safely move from county jails to state prisons, as well as between prisons, and between prisons and hospitals.  Plaintiffs continue to believe the prisons should remain closed to intake until CDCR can safely transfer people between prisons and jails, has set aside sufficient space for quarantine and isolation at each prison, and can safely house all patients at risk of severe complications or death from COVID-19.

*Defendants' Position*:  On June 29, in cooperation with the Receiver, CDCR closed all intake from the counties and CDCR has still not set a date to resume intake.  CDCR will continue to work with its healthcare and county partners to develop safe practices before resuming intake.

At the last case management conference, the Court asked whether CDCR could require the counties to test inmates before transferring them to CDCR's custody. Defendants did not find any statutory authority directly addressing this question or expressly granting CDCR that authority.  Consequently, it is unclear whether the law would allow the Secretary to require such testing.  California Code of Regulations, title 15, section 3075, concerns the delivery of inmates from the counties and requires the provision

of confidential medical and mental health documents indicating that the inmate is medically capable for transport.  Cal. Code Regs., tit. 15, § 3075.  But it is not clear that the language of section 3075 would permit CDCR to require the counties to conduct pretransfer COVID-19 testing.

Penal Code section 5058 generally provides that the director may prescribe and amend rules and regulations for the administration of the prisons, and Penal Code section 5058.3 allows the director to adopt such regulations on an emergency basis, subject to processes required by the Government Code.  Cal. Pen. Code §§ 5058, 5058.3.  Whether these statutes would allow the Secretary adopt a regulation requiring counties to test inmates before transfer to CDCR remains an open question.

Regardless of what might be permissible under the law, once intake resumes, CDCR prefers and intends to work cooperatively with its county partners to ensure the safe transfer of inmates from the counties in a manner that comports with any guidance from the Receiver concerning intake, testing, and transfers.

## III. SETTING ASIDE SPACE FOR QUARANTINE AND ISOLATION AND COURT ORDER REGARDING SAME (ECF NO. 3401)

### A. Summary of CDCR's disclosures to date

On July 25, 2020, Defendants disclosed to the Receiver and Plaintiffs the housing units in each of 31 prisons that would be reserved for isolation and quarantine space in the event of an outbreak.  On August 5, 2020, Defendants disclosed the spaces that would be reserved at the four remaining prisons for isolation and quarantine space in the event of an outbreak.  On August 8, Defendants confirmed that the reserved spaces in the 31 prisons had been vacated for use as quarantine and isolation space, with the exception of the reserved housing unit at Richard J. Donovan (RJD), which still housed 17 persons who required lower bunks, and for whom RJD was having difficulty locating appropriate beds for transfer.  Defendants informed Plaintiffs and the Receiver that RJD was still working to rehouse those 17 individuals in appropriate housing.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16576559.1

1    *Plaintiffs' Position*:  Plaintiffs have nothing to add to the above statement.

2    *Defendants' Position*:  Defendants made extraordinary efforts to comply with the

3    Court's deadlines to identify and vacate housing units for isolation and quarantine space

4    and continues to work diligently to complete that process.  Although there is now

5    substantial space in various places across the system, current restrictions on inter-prison

6    transfers have greatly hindered CDCR's ability to create and vacate needed space at certain

7    prisons.  The Receiver has indicated that new transfer protocols will soon be completed.

8    Once implemented, those protocols should assist CDCR in making the transfers necessary

9    to complete the process of reserving appropriate isolation and quarantine spaces across the

10   system.

11   **B.    Report on meet and confers between parties, Receiver, and experts**

12   On July 31 and August 4, 2020, officials from California Correctional Health Care

13   Services (CCHCS), public health experts from the Court's advisory panel, public health

14   experts for the parties, and CDCR officials met to discuss the need for isolation and

15   quarantine space in the prisons.  In an effort to include multiple perspectives and to address

16   serious concerns as early in the process as possible, CDCR (Connie Gipson) and CCHCS

17   (Vince Cullen) hosted a marathon conference call on August 7 to review and discuss the

18   designations at 21 prisons with the respective Wardens and health care Chief Executive

19   Officers.  *Plata* Plaintiffs participated on the call along with *Coleman*, *Armstrong*, and

20   *Clark* plaintiffs, the *Coleman* Deputy Special Master, the *Armstrong* Court Expert, and

21   members of the Court's Advisory Board.  A follow-up call, set for August 12, will address

22   most of the remaining prisons.

23   *Plaintiffs' Position*:   On the above referenced call on August 7 call, the participants

24   identified potential problems and provided suggestions to ensure that the designated

25   housing is adequate for quarantine and isolation purposes as well as safe and accessible to

26   incarcerated people.  Notably, the call represented an open and non-defensive approach

27   that sought to bring all interested parties together to raise concerns and suggest practical

28

16576559.1
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  solutions.

2      Several areas of general consensus emerged:

3   • Dorm housing should not be used for quarantine purposes, but may be used for

4     isolation.

5   • Generally, people in inpatient health care beds (CTC, MHCB, PIP) will quarantine

6     and isolate in place, unless they are in dorms.

7   • California Rehabilitation Center, Chuckawalla Valley State Prison, Folsom State

8     Prison, Correctional Health Care Facility, and San Quentin State Prison present

9     unique problems, and call for unique solutions, due to their physical plant and

10    populations.

11  • Several plans were clearly inadequate (California Medical Facility, Avenal), and

12    revised designations will be forthcoming.

13  • The designated space at most prisons did not provide adequate accessible

14    quarantine and isolation space for people with disabilities impacting placement.

15      The call also highlighted several points of confusion and diverging interpretations

16  of what is needed:

17  • The data provided should include the number of COVID-naïve people (those who

18    have no known exposure to the virus) at the two housing units containing the

19    largest populations of that group (instead of the number of COVID-naïve people in

20    the two largest congregate housing units at the prison).  The same is true for people

21    in need of accessible housing features.  The purpose of this data to is identify the

22    largest number of isolation/quarantine beds that might be needed if the virus were

23    to strike two living units at the prison.

24  • There is not yet consensus on whether people in the Enhanced Outpatient Program

25    will have separate quarantine areas (they will not be separated for isolation

26    purposes).

27

28

16576559.1     JOINT CASE MANAGEMENT CONFERENCE STATEMENT

- It was not specified which of the designated spaces was meant for isolation and which for quarantine.  Without clear designations, it is not clear whether there is enough space for either status for people who use wheelchairs, for example.  It also might not be possible to determine whether the prison will have enough celled housing for quarantine purposes.

- There was confusion surrounding the definition of "quarantine" as it relates to the prison setting. There are no written policies to direct when people who qualify for quarantine status will be moved to a designated quarantine unit and when they will quarantine in place.  Does it make a difference if the housing unit is dorms or cells?  Does it make a difference if people are placed on quarantine as new arrivals versus exposure in their housing unit?  Without clear standards as to when patients with suspected exposure will be moved, it is not clear if the space set aside is adequate in total number and also in terms of accessible housing.

- Under what circumstances is it acceptable to mix people on quarantine and isolation status in the same housing unit?  Can they be in cells side by side?  What restrictions should be placed on staff who interact with people of different status in the same unit?  How would common areas, including showers, be managed?

- Plaintiffs expressed concern when the designated space was on a Sensitive Needs Yard (SNY) and would require people in general population to be moved there for isolation or quarantine, or when the designated space is in a GP housing unit and would require people from an SNY to be placed there.  Plaintiffs believe that many people could refuse testing or bed transfers based on fear, particularly among vulnerable populations such as people with mental illness or intellectual disabilities.  Widespread refusals could endanger essential public health measures in the event of a major outbreak.  Plaintiffs took the position that it is appropriate to prepare for this risk by designating space on both types of facilities, as High Desert

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16576559.1

State Prison indicated it has already done, because quarantine and isolation spaces should be effectively available on short notice in the event of a major outbreak.

*Defendants' Position*:  Defendants are working in good faith with the Receiver, Plaintiffs, and the public health experts to determine appropriate isolation and quarantine space needs for the prisons.  The process of vacating the reserved spaces has proven challenging, but great progress has been made.  In fact, many prisons are already using their reserved housing units for isolation and quarantine purposes, and many others have already vacated their identified housing units, which are now standing by in case of an outbreak.  The meeting on August 7 was productive and useful because it identified a number of challenges that need to be addressed to create appropriate reserved spaces across the system.

## IV.  SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE

*Plaintiffs' Position*:  As reported in previous CMC statements, people at risk of severe complications or death if infected with COVID-19 remain housed in crowded dormitories in CDCR.  At the July 28 Case Management Conference, the Court inquired about the status of Defendants' efforts to reduce the risk of harm to this population by offering them housing in cells.  Specifically, the Court focused on the possibility and advisability of expediting the process of offering celled housing to those who, based upon their high COVID risk factor scores, may be at greatest risk of harm if they contract the virus.  ECF 3411 at 19-21.

According to the Receiver,  "there is some sense in saying people who have COVID Risk Factors that are above some number . . .  are at a greater risk than just people who are over 65."  *Id.* at 20:12-15.  He went on to state that he would "get some advice from [his] medical and public health people about is this something that we can help CDCR do in terms of moving those people or prioritizing them for release."  *Id.* at 20:16-19.  The Receiver suggested to the Court that the Parties and the Receiver should continue their "ongoing conversations" on the issue, and report back to the Court in the next CMC

Statement. *Id.* at 21:1-4.  The Parties concurred.  *Id.* at 21.

On July 29, Plaintiffs sent a follow-up email to the Receiver and Defendants, urging an expedited process for rehousing the most vulnerable in cells, and attaching a spreadsheet, based on data provided to Plaintiffs in June, showing that there were just 60 people who had a weighted COVID risk score of 11 or higher, who were at that point housed in dorms.  The Receiver responded that he had already directed his staff to prepare a list in reverse order from 15 to 10, expected to receive it within a day, and would then take "the next steps."

On August 6, CCHCS again reported that the program to offer medically vulnerable people moves from dorms to cells remains on hold while CCHCS and CDCR continue to identify and vacate appropriate space at each prison for quarantine and isolation.   Now that the Defendants have identified and begun to vacate the isolation and quarantine units at most prisons, we urge the Receiver and Defendants to expedite movement of the most medically vulnerable to safer housing.

*Defendants' Position*:  Defendants remain committed to working with the Receiver to facilitate moves of medically high-risk patients from dorms to cells or any other moves to safely house medically high-risk patients if such moves have been recommended and approved by the appropriate public health and corrections experts.

## V.    TESTING AND TRANSFER PROTOCOLS

The parties on July 30 provided CCHCS comments to its draft "COVID movement matrix," which details requirements for testing and quarantine for various types of transfers, and mandates for other related matters.  CCHCS states it hopes to finalize and implement the new requirements late this week.

## VI.   COVID-19 TESTING

### A.    Staff Testing

*Plaintiffs' Position*:  The Court will hear arguments on August 12 regarding Plaintiffs motion for an order directing CDCR to modify its COVID-19 staff testing plan.

1   ECF 3402.

2        Once the contours of the Defendants' staff testing plan are finalized, Plaintiffs will

3   request from Defendants a plan for the collection and periodic reporting of data regarding

4   staff testing at each prison, including the percentages of staff tested when such is required.

5        *Defendants' Position*:  Serial re-testing of staff is ongoing and is currently

6   scheduled to take place in August at all 35 institutions.  As stated during the last case

7   management conference, CDCR is diligently working on an IT solution to establish a

8   program that will enable CDCR to electronically capture the number and percentages of

9   staff members that have been tested at any given date and to identify the names of staff

10  members who have (or have not been) tested.  CDCR's efforts in this respect are ongoing.

11  Subject to any unforeseen events, CDCR is hopeful to have the IT solution in place

12  towards the end of the week of August 17.

13       In the meantime, CDCR, CCHCS, and all institutions continue their efforts to

14  maximize staff participation in the testing process.  On July 31, CDCR and CCHCS issued

15  a joint memorandum to all Wardens and Chief Executive Officers to reiterate the

16  expectations outlined in their prior July 13 memorandum that set forth that employees who

17  refuse to get tested will face progressive discipline up to and including termination (unless

18  they have a medical condition or any other reason that precludes them from COVID-19

19  testing).  The July 31 memorandum outlines the various steps and stages of the disciplinary

20  process.  Defendants produced a copy of the July 31 memorandum to Plaintiffs.

21       Further, where possible and appropriate, CDCR increased the number of days on

22  which staff testing will be performed at certain institutions.  For example, at Avenal State

23  Prison, staff testing is currently scheduled twice in August on five consecutive days (*i.e.,*

24  from August 3-7 and then again from August 17-21).  Also, one of the three vendors who

25  is performing the staff testing now offers oral swab testing in addition to the nasal swab

26  testing.

27       CDCR's additional measures to maximize staff participation include, but are not

28

16576559.1

limited to[6]:  Sending reminders about the upcoming staff testing to all staff members via email; issuing memos from the Warden to staff members emphasizing the expectation that staff must participate in the testing for COVID-19; contacting staff supervisors via telephone to ensure that the staff members in their respective areas are reporting to the testing site; calls by supervisors to staff to remind them to get tested; performing mandatory training on staff testing; providing a list of staff members who failed to get tested to managers so they can follow-up with the staff members; and making announcements several times per day via the intercom system to remind staff to get tested. Lastly, CDCR posted answers to frequently asked questions about the staff testing procedures on its website at https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-staff-testing-faqs/.

### B.    Testing Incarcerated Population

*Plaintiffs' Position*:  We have three concerns related to patient testing.  First, CCHCS in June stated that it would revise its patient testing guidance or protocols, a project we hoped would address unfortunate non-mandatory language in current guidelines regarding, for example, serial re-testing of those in facilities or prisons with massive outbreaks, or of those who due to essential work have frequent contact with staff or other incarcerated people.  However, when asked late last week, CCHCS indicated no such project was underway.  We will further discuss this matter with CCHCS and the Receiver.

Second, we further discussed with CCHCS the reporting on patient re-tests.  We confirmed the data on the CCHCS COVID-19 Tracking website does not fully include re-tests, and thus the total number tests done is not reported.[7]  We believe that data is

---

[6] This summarizes the outcome of the survey answers from various institutions.  Not all institutions perform all of the listed measures.

[7] On the website, the "Cumulative Tested" count only includes each patient's first test. The "Patients Tested in Last 14 Days" data, reported for each prison in the "Institution View" tab, includes both patients who were initially and were re-tested during that period.

1 important so that the full scope of COVID testing efforts, and the need for supplies and

2 staff to administer tests, can be known.  Late Sunday night, CCHCS provided a page of

3 what appears to be carefully compiled data regarding testing, apparently including re-tests.

4 We will review and ask further questions if necessary.

5        Finally, we remain concerned about the monitoring of serial re-testing when such is

6 required, as at San Quentin, where those who have previously tested negative are supposed

7 to be re-tested at least once per week.  According to CCHCS, there currently is no ability

8 to report the percentage of required re-tests actually done during a particular week, other

9 than by reviewing a list of hundreds of patients the week <u>after</u> that in which the re-tests

10 were supposed to be done, then counting the number timely done.  Knowing the

11 percentage of required re-tests done is fundamental to assessing the success of such efforts

12 and to determine if there are opportunities for improvement.  We plan to further discuss

13 this matter with CCHCS and the Receiver.

14 **VII.  TRANSMISSION RISK REDUCTION MEASURES**

15        *Plaintiffs' Position*:  We have recently asked defendants about three matters related

16 to reducing the risk of COVID-19 transmission.  First, Defendants recently reported (ECF

17 3397 at 6:2-5) that LAC stated that its ability to avoid a large scale outbreak in March and

18 April was in part due to changing housing unit ventilation system air dampers so that air

19 was not recirculated.  We then asked, among other things, whether other prisons could do

20 the same, and if so, have or would they do so.  The response received late last week, while

21 detailed in some respects, did not reference specific prisons by name.  We will follow up

22 with Defendants, including regarding what is known with regard to the ventilation system

23 in the old cellblocks at San Quentin.  We will also ask about air filtration in housing units.[8]

24        We also asked Defendants to provide N95 masks to all at any prison or facility that

25 _____

26 [8]  With regard to COVID-19 and building ventilation and air filtration, see

27 https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html
[recommending among other things opening air dampers to reduce or eliminate

28 recirculation and improving central air filtration].

experiences a large COVID-19 outbreak, given that such masks were and continue to be provided to all at San Quentin.  In response, Defendants late last week stated that CDCR does not currently provide N95 masks to all at prisons with large outbreaks, that it has provided such masks to positive patients at Avenal State Prison, provides them to all workers (including incarcerated workers) at prisons with COVID-19 outbreaks, and that KN95 masks may be substituted for N95 masks provided to incarcerated people (but not to staff).  We remain concerned that CDCR will not do at other prisons with large outbreaks what has been done at San Quentin regarding N95 masks.  We will discuss this matter with a public health expert.

Finally, we asked Defendants if the one-time four-day deep cleaning effort at San Quentin would be done at other prisons with large COVID-19 outbreaks.  Defendants replied that CDCR has nothing in writing yet, that it relies on incarcerated people to clean, and that it plans to establish a statewide contract for one-time deep cleanings on an as-needed basis. This latter statement is encouraging news, and we will follow-up with Defendants.

*Defendants' Position*:  As stated below under XI.C., N95 masks are now also provided to all staff and patients in Buildings Two and Three at Folsom State Prison.

## VIII. PATIENT EDUCATION

*Plaintiffs' Position*:  Last week we asked CCHCS provide statewide written notification and education requirements for patients who test positive for COVID-19.  We also asked that CCHCS undertake or direct a statewide education campaign regarding the infectiousness of those who tested positive for the disease and have been clinically determined to be "resolved."  We raised these concerns after reviewing scores of patient records and receiving reports from patients indicating they received little information after testing positive about what would happen including when they might be, or what it would

1  mean to be considered resolved.[9]

2       With regard to notification and education after positive results are received, our

3  review of medical records of patients who recently tested positive at 11 different prisons

4  show wide variations in practice.  One prison appears to not provide written notification to

5  patients at all, even though CCHCS policy requires notification to patients whenever any

6  lab result is received.  Another provides notification that results have been received but

7  does not state the result or even what test was done.  While the others provide written

8  notification of the positive COVID result, the amount of education provided varies widely,

9  from a single sentence that simply repeats basic precautions (stay six feet away from

10  people, wear a mask, and wash hands) to seven sentences that, we believe very helpfully,

11  include symptoms the patient should watch for.  A few provide such education and also

12  inform patients of the general length of time (14 to 21 days) they will be on medical

13  isolation.  Puzzlingly, CCHCS has initially indicated it does not intend to standardize

14  written notification and education requirements for patients who test positive, indicating

15  that it believes nurses who see these patients daily will provide needed information.

16  However, there is no requirement that nurses do that, or guidance regarding what patients

17  should be told.  We plan to further discuss this issue with CCHCS and the Receiver.

18       In response to our request that positive patients and all others be provided

19  standardized information regarding whether a person who is clinically resolved remains

20  infectious, CCHCS provided a short paragraph on the issue written by a group of San

21  Quentin clinicians for health newsletter to be distributed at the prison.  The paragraph

22  includes the key information that a COVID patient determined to be resolved by a clinician

23  cannot infect others.  CCHCS says it will share the newsletter with other prisons and

24  "encourage them to consider" modifying it for their populations.  This approach is not

---

26  [9]  A recent Los Angeles Times article also reported confusion among some incarcerated
27  people about the infectiousness of COVID-19 patients whose have been determined to be
    clinically resolved.  See https://www.latimes.com/california/story/2020-07-30/an-inmate-
28  tested-positive-for-covid-19-prison-staff-housed-him-with-uninfected-inmates-he-say.

adequate.  Medical headquarters should mandate education on this matter.  Further, it must mandate notification to individual patients when a medical staff determine their COVID-19 is resolved, so that they know they are no longer a risk to infect others.  We plan to further discuss this issue with CCHCS and the Receiver.

## IX.   PRISON-SPECIFIC UPDATES

### A.   San Quentin

*Plaintiffs' Position*:   The health care disaster at San Quentin continues to unfold, with the death toll currently at 25 incarcerated people, and at least one staff member.  As of Monday, August 10, there were 15 people receiving care at outside hospitals, the highest number among the prisons.

The presence of the virus has had a dramatic impact on the living conditions for people living in San Quentin.  Among other things, opportunities for outdoor exercise have been sharply curtailed.  Hundreds of people living at San Quentin were confined to their cells and deprived of exercise outdoors for more than two months.  While people with resolved cases, and those who have tested negative, are now permitted some exercise, those who have active cases are not.  Even for those who do receive exercise, some receive very limited periods, amounting to approximately three or, for others, five and one-half hours per week.[10]

*Defendants' Position*:  Defendants recognize the importance of exercise and out of cell-time for the incarcerated population and continue to provide and evaluate opportunities to provide exercise and out of cell time in a safe manner.

### B.   California Men's Colony (CMC) and Mule Creek State Prison (MCSP)

*Plaintiffs' Position*:  CMC is experiencing a surge of cases, registering 106 new cases in the last two weeks, of which the first two cases were identified by pre-parole

---

[10] As a point of reference, people confined in CDCR's most restrictive setting, the maximum security, minimum privilege Security Housing Unit, are generally offered ten hours a week of outdoor exercise.

-21-

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16576559.1

release testing of asymptomatic patients.  MCSP is experiencing its first outbreak, with 38 cases in the last two weeks.  These outbreaks are of particular concern because the large percentages of medical "high risk" and who are age 50 or older at each prison.  At CMC, about 25% of the approximately 3,500 people at the prison are considered medical "high risk", and about 40% are age 50 or older; at MCSP, about 46% of the approximately 3,800 people at the prison are considered "high risk" medical, and about 45% are age 50 or older.[11] This means that many at these prisons will be at higher risk of complications and death if infected with the virus.

*Defendants' Position*:  As of August 9, CMC has a total of 101 active COVID-19 cases.  CMC has taken numerous steps to prevent and mitigate the risk and spread of COVID-19, including:

- Immediately initiating contact with the San Luis Obispo Public Health Agency when an incarcerated person or staff member is identified as COVID-19 positive;
- Conducting a minimum of weekly, or more frequent., conference calls with the San Luis Obispo Public Health Agency;
- Providing staff training by the San Luis Obispo Public Health Agency for staff members who had or have contact with COVID-19 positive incarcerated persons;
- Maintaining continuous contact with local stakeholders, including outside hospitals and San Luis Obispo County Sheriff's Department;
- Identifying and placing incarcerated people in designated housing for medical orientation status, quarantine, or isolation;

---

[11] For reference, at California Institution for Men (CIM), about 50% of the approximately 3,500 at the prison as of the end of March were medical "high risk" and approximately the same percentage were age 50 or older; at San Quentin, about 32% of the approximately 3,500 at the prison as of the end of May (when its outbreak began) were medical "high risk" and approximately 50% were age 50 or older.

16576559.1

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

- Implementing the Institutional Command Post and communicating with institutional and statewide stakeholders on a daily basis;

- Conducting daily meetings of the management team began to discuss inmate and staff COVID-19 positives as well as any modifications which may need to be made to CMC's current program modifications;

- Conducting meetings between executive staff and the Inmate's Advisory Council from all yards to update and share COVID-19 related information;

- Petitioning for and receiving masks for the incarcerated population and staff two weeks prior to the originally scheduled delivery date;

- Continuing to be proactive in providing additional instruction and cleaning supplies to inmates regarding cleaning their individual and common areas;

- Reducing the number of incarcerated people who are released to the recreation yard at a time;

- Restricting the ability of incarcerated people to interact with people from different facilities;

- Restricting inmate workers to critical workers only, and to limiting the work of critical workers to their respective yards;

- Reducing the numbers of incarcerated people in dining halls; and

- Modifying mental health and medical appointments to coincide with recreation-yard rotation so that only incarcerated people within the same housing unit attend appointments at the same time.

Defendants received Plaintiffs' above position about MCSP on the day of this filing and are therefore not able to provide a written position about MCSP. But Defendants will do their best to present their position orally during the case management conference, if needed.

## C.    Avenal State Prison (ASP)

*Plaintiffs' Position*:  After apparently gaining control over a large outbreak in June

1  involving over 800 patients, ASP is now experiencing a new surge in cases. The prison

2  went from 18 active cases in the middle of July to almost 450 by the end of the month.

3  According to the Receiver's staff, the latest surge stemmed from exposure to staff.

4      *Defendants' Position*:  As of August 9, ASP has a total of 360 active COVID-19

5  cases.  ASP has taken numerous steps to prevent and mitigate the risk and spread of

6  COVID-19 at ASP, including, but not limited to:

7          • Collaborating with outside stakeholders on ASPs process to contain the

8            spread of COVID-19 (such as the Kings County Public Health Department,

9            the California Department of Public Health, and county law enforcement

10            agencies);

11          • Activating an Institutional Incident Command Post/Emergency Operations

12            Center on May 18, 2020;

13          • Identifying and placing incarcerated people in designated housing for

14            quarantine or isolation purposes;

15          • Conducting weekly leadership meetings;

16          • Establishing a pilot Peer COVID Educator program that the incarcerated

17            population can volunteer for;

18          • Issuing modified yard schedules to ensure social distancing (*i.e.,* one housing

19            unit per yard, with disinfecting common areas and equipment);

20          • Extending meal times with social distancing to reduce crowding and allow

21            for thoroughly disinfecting solid surfaces, including but not limited to tables

22            chairs, railings, and door knobs in between housing units;

23          • Installing barriers for inmate phones;

24          • Limiting the number of approved critical workers;

25          • Issuing posters and handouts to educate the incarcerated population and staff

26            on how to prevent the spread of COVID-19;

27          • Hosting regular town hall meetings with the inmate population and custody

28

-24-

Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16576559.1

and healthcare administration representatives;

- Conducting meetings between the Inmate Advisory Council from all facilities and custody and healthcare administration representatives; and

- Showing various educational videos about the risks of COVID-19 on institutional TV channels to educate the incarcerated population

**D.   Folsom State Prison (FSP)**

*Plaintiffs' Position*:  Of Folsom's 23 current (as of August 10) active COVID-19 cases, 22 of have been diagnosed in the last two weeks, qualifying as a large outbreak. This is a concern because many people at Folsom live in housing units similar to those at San Quentin, where there are no solid doors on the cells, and hundreds thus share a single airspace which facilitates rapid spread of the virus.

*Defendants' Position*:  FSP identified two new COVID-19 cases after testing two symptomatic patients in Building Two.  A third positive case was found in an asymptomatic cellmate of one of the symptomatic positives cases.  Building Three was recently quarantined and completed mass testing, which was done in response to a possible contact with a PIA worker who tested positive.  The mass testing in Building Three did not reveal any positive cases.

FSP's immediate measures to mitigate the risk and spread of COVID-19 include, but are not limited to:

- Conduct rapid testing on all patients and staff in Building Two, followed by routine polymerase chain reaction (PCR) testing of all staff and patients;

- Complete contact tracing for the three positive inmates, quarantine and test all incarcerated people identified as close contacts, and test all staff members identified as close contacts;

- Conduct twice daily symptom screening on all patients in Building Two;

- Distribute N95 respirators to all staff and patients in building two and three. Building two staff and patients will be encouraged to wear them routinely,

16576559.1

building three staff and patients will be encouraged to wear them as they

pass through building two;

- Begin cell feeding of all patients in Building Two; and

- FSP set up 4 ten-man tents that they use for isolation purposes.  Five

  additional ten-man tents and one 90-man tent will be set up today.

### E.    Other Prisons

*Plaintiffs' Position*:  xxx.

*Defendants' Position*:  As of August 9, Chuckawalla State Prison, which previously had a total number of 1,054 confirmed COVID-19 cases among its incarcerated population, now has zero active cases.   As of the same date, the number of active COVID-19 cases at San Quentin decreased to 166.

In addition to all the above referenced measures, all of CDCR's institutions continue to take numerous steps to prevent or mitigate the spread and risks of COVID-19. Lastly, CDCR's Secretary and other agency heads, the California Governor's Officer of Emergency Services, members of the Governor's Office's executive staff, and others have daily cross-agency calls each morning (Monday through Friday) to discuss the State's overarching efforts to address the COVID-19 pandemic and to request assistance, if needed.

### X.    MEET AND CONFERS BETWEEN PARTIES AND DOCUMENT PRODUCTION SINCE JULY 27

In addition to the above referenced meet and confer efforts and documents produced by Defendants to Plaintiffs, on July 30, Defendants provided answers to Plaintiffs' questions about outdoor exercise opportunities for resolved COVID-19-patients and complaints about clogged showers at San Quentin.  On August 6, CDCR answered various questions from Plaintiffs about the calculation of the earliest possible release date of an incarcerated person at San Quentin.  Per Plaintiffs' request, Defendants will stop producing the weekly captain's checklists to Plaintiffs on a regular basis and will only provide them

1  if and when Plaintiffs ask for copies.  Plaintiffs also asked Defendants to notify them if and

2  when the preparation of the captain's checklists will be discontinued.

3

4

5  DATED:  August 11, 2020                    PRISON LAW OFFICE

6

7                                             By: _____/s/_____

8                                                 STEVEN FAMA
                                                  ALISON HARDY
9                                                 Attorney for Plaintiffs

10

11  DATED:  August 11, 2020                    XAVIER BECERRA
                                               Attorney General of California
12

13

14                                             By: _____/s/ Nasstaran Ruhparwar_____

15                                                 DAMON MCCLAIN
                                                  Supervising Deputy Attorney General
16                                                 NASSTARAN RUHPARWAR
                                                  Deputy Attorney General
17                                                 Attorneys for Defendants

18

19  DATED:  August 11, 2020                    HANSON BRIDGETT LLP

20

21

22                                             By: _____/s/ Paul B. Mello_____

23                                                 PAUL B. MELLO
                                                  SAMANTHA D. WOLFF
24                                                 Attorneys for Defendants

25

26

27

28

16576559.1
JOINT CASE MANAGEMENT CONFERENCE STATEMENT