XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
IRAM HASAN (320802)
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., | CASE NO. 01-1351 JST |
| Plaintiffs, | **JOINT CASE MANAGEMENT CONFERENCE STATEMENT** |
| v. | Date:    August 21, 2020 |
| GAVIN NEWSOM, et al., | Time:    2 p.m. |
| Defendants. | Crtrm.:  6, 2nd Floor |
| | Judge:   Hon. Jon S. Tigar |

1     The parties submit the following joint statement in advance of the August 21, 2020

2   Case Management Conference.

3   **I.    POPULATION REDUCTION**

4        **A.    Status**

5        *Plaintiffs' Position*:  Substantially less crowded prisons are necessary to reduce

6   sickness and death from COVID-19.  Reduction of population is one way to do that,

7   particularly if such action focuses on those at increased risk of severe complications or

8   death if infected.  The degree to which the State will ultimately lower density in the

9   prisons appears very limited, both because the number of those eligible to be released is

10  small compared to the current population, and so much depends on intake remaining

11  closed or severely limited.[1]  Further, it's not clear whether or when a significant number of

12  people who are particularly at-risk will be released from prison.

13       The number of early releases under the medical high-risk program remains

14  shockingly low, weeks after the program began.  As of August 12, CDCR said that only 14

15  of what it says are approximately 6,200 eligible[2] had been released under that program.[3]

16  In response to the Court's August 12th verbal order, CDCR below states that they have

17  completed written summaries for just over ten percent of those eligible. They do not say

18  when the remainder will be completed or when determinations will be made on all that

_____

19

20  [1]     *See* ECF No. 3417 at 2-4 for a more detailed statement regarding the impact of
21  population reduction on prison crowding.

22  [2]     The number eligible is based on a two-part process.  First, CCHCS determines those
    who at increased risk, which it currently defines as those with a COVID Weight Risk
23  Factor Score of four or higher.  CDCR then applies a set of custody or public safety factors
    based on sentence or criminal risk assessment, which exclude some.  *See* ECF No. 3389 at
24  4-5.

25  [3]     Defendants below, for the first time, say that other high-risk people have been
26  released under the two other release programs.  We are supportive of these releases, but
    remain concerned that the release program focused on those at highest risk of harm from
27  infection is rolling out so slowly.

28

16799779.2

have been completed.  The process of release consideration for those serving indeterminate terms, which CDCR has previously said amounts to approximately 3,900 of the 6,200 eligible, is unclear.  Based on the data presented by Defendants below, if the current rate of releases continues, fewer than 15% of those considered for release will leave prison under this program.

As reported earlier this month, CCHCS per our July request will update its COVID-19 risk factors so that they will be in accord with those listed by the Centers for Disease Control.  This will revise the COVID Weighted Risk Factor formula, used to determine those most at risk for severe complications from the disease.  Since the Weighted Risk Factor score is used to determine which patients are medically eligible for early release consideration (see fn. 2), we believe updating the risk factors will increase the number of people so eligible.  CCHCS has said that the updated risk factors and Revised Risk Factor scores will be implemented by the end of this month.

*Defendants' Position*:  18,352 incarcerated people were released from CDCR institutions and camps since the beginning of March 2020 through August 12, 2020, and CDCR's total population is currently approximately 96,000.  From July 1, 2020 through August 18, 2020, 5,035 people were released as a result of the COVID-19 early-release programs Defendants announced on July 10, 2020, and, 4,704 were released in accordance with their natural release date.  Since the last case management statement was filed on August 11, 2020, 490 people were released under the early-release program.

Additionally, Defendants report on the first four items listed in the previous case management conference statement starting on page 8, line 25, as ordered by the Court in the August 12, 2020 case management conference.  Defendants can confirm that the Receiver initially identified approximately 6,200 people who met criteria for early release consideration in the medically high-risk category at that time.  A number of those people have since been released, and CDCR is in the process of considering determinately sentenced people for early release.

The Board of Parole Hearings (BPH) is currently preparing individual summaries for each determinately sentenced, medically high-risk person eligible for early-release consideration in this cohort.  Each of these summaries is forwarded to the Secretary of CDCR for individual review.  Notably, not all high-risk people are released through the high-risk medical early-release cohort.  For example, medically high-risk persons who are eligible for release as part of the 180-day early-release cohort are released under that program.  Therefore, the number of medically high-risk early releases is greater than the number identified has having been released through the high-risk medical early-release cohort.  From July 1, 2020 through August 13, 2020, 130 medically high-risk people have been released through CDCR's early-release programs, including 95 through the 180-day cohort, 16 through the 365-day over 30 cohort, 14 through the high-risk medical cohort, and 5people people who are medically compromised or fragile and who do not meet the criteria for early-release consideration in the 180-day and one-year early-release cohort.

To date, BPH has completed approximately 700 individual summaries for determinately sentenced people.  Those who are determined to present an unreasonable risk to public safety are removed from consideration, and the remaining summaries are then sent to the Secretary for review.  The Secretary has reviewed 210 case summaries to date, of which 28 were approved for release and 182 were not approved.  The Secretary currently has 511 remaining cases to be reviewed.  Additional cases will likely be forwarded to the Secretary for review in the near future.  But again, some of the 6,200 will not require individual summaries if they will be or are released through a different early release measure.  Defendants are currently considering how to address indeterminately sentenced people in the high-risk medical cohort.

**B.   Population reduction reports and parties' meet and confer efforts regarding same**

Plaintiffs and Defendants have maintained open communication regarding population reduction information and data, as availability of information permitted.  The

parties continue to communicate regarding the status of requested information, and Defendants endeavor to be transparent about the release process.

To date, Plaintiffs have requested various forms of population data from Defendants.  Defendants have agreed to provide the requested data to Plaintiffs, and will continue to do so on either on a biweekly or monthly basis, depending on the type of data.  This includes (1) a table tracking early-release numbers per early-release cohort, per institution, including statewide totals.  To create this table, defense counsel personally worked with CDCR's Office of Research to design this table, an up-to-date copy of which is attached as **Exhibit A**.  This will be provided to Plaintiffs on a biweekly basis.  Defendants will also provide Plaintiffs with (2) a table showing both early releases and natural releases from institutions and camps since July 1, 2020 on a biweekly basis; (3) a report showing total populations for each institution, including a population breakdown by each facility near the end of each month; and (4) a bed audit at the end of each month.  Defendants have provided these four items to Plaintiffs at least once to date.  Additionally, since the last case management conference, Plaintiffs have requested a report with a list of people released due to a high-risk medical condition, with the list showing, in chronological order, the date of release, the person's name and number, and the institution from which the person was released.  Defendants have committed to providing this report to Plaintiffs, and anticipate it will be available by the end of next week.  Plaintiffs have requested an updated list be provided once a month.  Defendants are exploring whether and how this can be done, and will respond to Plaintiffs accordingly.

The parties are working together to come up with solutions to two remaining requests.  First, Plaintiffs have asked for a monthly update on the number of written reviews the BPH has completed for those in the medical high-risk cohort, starting at the end of September and then in at the end of each subsequent month.  As mentioned above, approximately 700 have been completed and forwarded to the Secretary, 210 of which have already been reviewed.  Defendants agree to provide Plaintiffs with an update once

16799779.2

the form of the update is finalized.  Second, Plaintiffs, in response to the information

learned when Defendants' draft of this Statement was received on August 19, requested on

August 20 that Defendants report at least once a month the number of high-risk medical

people released in the 180-day and 365-day cohorts.  Defendants are working with the

appropriate CDCR staff departments to come up with a solution to this request.

Since the last case management conference, Plaintiffs made additional requests

regarding the status of people who are released through the "high-risk medical" program.

These requests include the type of supervision people are placed on; CDCR's obligations

to provide food, shelter, and healthcare; the conditions of released imposed; and notice and

opportunity to be heard if being returned to custody.  Defendants have provided an answer,

explaining that the usual parole or community supervision conditions and processes apply.

Plaintiffs appreciate the clarification.

## II.  TESTING AND TRANSFER PROTOCOLS

On August 19, 2020, CCHCS released its revised "COVID movement Matrix,"

setting forth protocols for testing and transfer of incarcerated persons (including intra- and

inter-institution transfers).

*Plaintiffs' Position*:  In the wake of the devastating tragedy at San Quentin that has

so far claimed 26 lives, CCHCS has been developing a transfer and movement protocol to

reduce the risk of harm to incarcerated people, staff and the community.  On July 22,

CCHCS provided the parties with a draft protocol titled "COVID-19 Screening and

Testing Matrix for Patient Movement" to limit transfers between prisons, require testing

and quarantines for necessary transfers, and provide guidance on related matters.  The

parties submitted responsive comments.   Plaintiffs received no response to our submitted

comments.

On August 19, CCHCS provided the parties with a substantially revised Screening

and Testing Matrix that incorporates some of Plaintiffs' recommendations and also

includes some measures that were not part of the original draft and, so far as we were

aware, were not under consideration. Those new measures include a requirement that people be quarantined in single cells or cohorts of ten or fewer prior to transfer, that people in transit, both incarcerated and staff, wear N95 masks, and that rapid tests be used prior to some transfers. As the revised Matrix was not identified as a draft or final version, we inquired whether the document had been sent as a draft, for which comments were invited, or as the final version. On August 20, CCHCS advised that the August 19 is the final version "although conceivably there could be amendments to it in the future."

Plaintiffs will review the matrix with our public health expert. After doing so, we will promptly submit questions and concerns about some of the new provisions. The San Quentin disaster dictates that this protocol and its implementation be scrutinized with extraordinary care. Plaintiffs believe that this protocol should not be implemented until Plaintiffs have had an opportunity to address our concerns with CCHCS.

*Defendants' Position*: Defendants will work with CCHCS to ensure compliance with the matrix.

## III.  INTAKE

*Plaintiffs' Position*: On August 18, the Receiver advised the parties that he and Secretary Diaz have been considering re-opening the Reception Centers to permit intake from county jails, and that CCHCS may recommend and CDCR may start re-opening in a few days, as early as Monday, August 24. He further stated any re-opening will proceed "very slowly" and that he envisions a weekly or bi-weekly cap on admissions. According to Mr. Kelso, the final decision would be made regarding intake only after the COVID-19 Screening and Testing Matrix protocol was finalized and released.

As indicated above, Plaintiffs received a substantially revised Screening and Testing Matrix protocol on August 19 and, on August 20, were advised that it is the final version. Plaintiffs learned that Defendants intend to re-open intake next week upon receiving Defendants' draft portion of this statement on August 19.

Plaintiffs strongly oppose the re-opening at this time. Intake should not re-start

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

until a number of issues are satisfactorily resolved.  First, Defendants must comply with this Court's July 22, 2020 Order to identify and set aside sufficient space for COVID-19 isolation and quarantine.  (Dkt. 3401.)  As discussed in Part IV.A, below, the Public Health Work Group released its report on August 18, finding that the CDCR's initial identification of isolation and quarantine beds has a deficit of well over 1000 single cells needed statewide for an adequate COVID response.  Second, as discussed in Part V, below, a plan to rehouse/offer rehousing for people who are medically vulnerable and are currently housed in dorms has not been finalized.  Indeed, they have not even started to move from dorms the handful of people whom all agree are likely to be at the very highest risk of complications from COVID infection.  Finally, CCHCS's recently-revised Matrix for transfers has not yet been implemented and thus it is not known if it will result in a safer means to move people during the pandemic.  We believe the Matrix should first be piloted with necessary intra-system transfers to determine whether it is workable and efficacious, before opening the gates to additional people.  Until data from a pilot period has been collected and analyzed, and the impact of adding more people to the system has been considered in light of that data, the Defendants should not reopen intake.  Plaintiffs made this request to Defendants and the Receiver on August 19.

*Defendants' Position*:  CDCR, in cooperation with the Receiver, plans to resume intake the week of August 24, 2020.  During that week, CDCR will accept 50 incarcerated persons into the reception center at North Kern State Prison and 50 into the reception center at Wasco State Prison.  CDCR and CCHCS will monitor the process to make sure it follows the protocols in the transfer matrix.

## IV.   SETTING ASIDE SPACE FOR QUARANTINE AND ISOLATION AND COURT ORDER REGARDING SAME (ECF NO. 3401)

### A.   Summary of CDCR's disclosures to date

On July 25, 2020, Defendants disclosed to the Receiver and Plaintiffs the housing units in each of 31 prisons that would be reserved for isolation and quarantine space in the

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

event of an outbreak.  On August 5, 2020, Defendants disclosed the spaces that would be reserved at the four remaining prisons for isolation and quarantine space in the event of an outbreak.  On August 8, Defendants confirmed that the reserved spaces in the 31 prisons had been vacated for use as quarantine and isolation space, with the exception of the reserved housing unit at Richard J. Donovan (RJD), which still housed 17 persons who required lower bunks, and for whom RJD was having difficulty locating appropriate beds for transfer.  RJD has now moved those 17 individuals out of the reserved space, which is now solely dedicated for isolation and quarantine purposes.  CDCR has now also confirmed to Plaintiffs that the identified reserved spaces for the four remaining prisons—Folsom State Prison, San Quentin, Sierra Conservation Center, and CHCF—are ready for occupancy in the event of an outbreak with the exception of two tents at CHCF.  The installation of the two tents at CHCF will be completed on Friday, August 21.

*Plaintiffs' Position*:  Since the last Case Management Conference, the parties have completed the process of reviewing and providing feedback on most individual institution's preliminary set-aside space for isolation and quarantine, along with representatives from the Public Health Workgroup, the *Armstrong* plaintiffs and Court Expert, and the *Coleman* plaintiffs and Special Master's office.

On August 18, the Public Health Workgroup issued recommendations regarding additional space needs.  Those recommendations state generally that patients with confirmed cases (isolation) can be housed in dorms or in cells with barred or porous doors but must not "share air space with any of the other groups."  Patients with suspected cases or who have been exposed (quarantine) "should be housed in the equivalent of single cells with solid doors."  Others "should be housed in sparsely populated spaces that allow for as much physical distancing as possible and in the smallest cohorts as possible."  Staff should be assigned "in cohorts that do not mix."

The Workgroup stated that people in isolation and quarantine could be housed in the same housing unit so long as "[t]he space is single cells with solid doors and all public

health measures are enforced along with the de-densification that has already occurred." For institutional space, the Workgroup stated that prisons should set aside space that is the equivalent of the combined current occupancy in each of the two largest congregate housing units.  By that calculation, CDCR's initial designations had a shortfall of 499 beds at eight institutions (excluding three prisons – San Quentin, Folsom, and the California Rehabilitation Center – where the unique housing configurations will require unique solutions).  However, if the quarantine space must be single-celled, as the Workgroup's recommendations indicate, the shortfall becomes 1364 beds at 13 prisons (with the same three excluded).  The Workgroup further noted, without taking a position on, many additional concerns raised by Plaintiffs and others about the adequacy of CDCR's designated space, including accessibility for people with disabilities.[4]

Defendants' assessments of whether additional space is required to be set aside at each prison, taking into account public health considerations, was due August 19.  *See* ECF No. 3401 ¶ 3.  As of the writing of this section, no assessments have been provided to Plaintiffs.  Plaintiffs believe that the next step in this process, pursuant to the Court's Order of July 22, is for Plaintiffs to evaluate Defendants' assessments once received and determine whether to request that the Receiver consider a modification at any of the prisons.  *See id.* ¶ 6.

Because the review process is still unfolding, Plaintiffs will not, with one exception, reiterate here their concerns set forth in the last Case Management Conference statement about CDCR's initial designations.  These concerns for the most part remain, although

---

[4]     On August 19, the *Armstrong* Court Expert filed a report in that case regarding whether the quarantine and isolation space identified by CDCR was adequate and appropriate to house people with disabilities in the *Armstrong* class.  The Expert identified insufficient bed space at 16 prisons.   Some of the deficits, he noted, are "extreme," with set-aside space that is inaccessible to wheelchair-users despite substantial populations that require such housing, or with a deficit of over 100 lower bunk/tier beds.  The Expert recommended that the *Armstrong* Court order CDCR to designate adequate space to correct these deficiencies within 21 days.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  some have been partially allayed by the Public Health Workgroup's directions.

2  Because of its urgent nature, Plaintiffs raise here one of their concerns about the

3  adequacy of Defendants' actions to properly implement isolation in prisons with outbreaks.

4  It is essential to set aside adequate isolation space, but that measure is meaningless unless

5  the space is actually used, consistent with clear policy directives.  Plaintiffs have

6  consistently urged CDCR and CCHCS to adopt clear guidelines to instruct the prisons as to

7  how to use their isolation and quarantine space.  *See, e.g*., Joint Case Management

8  Conference Statement (August 11, 2020), ECF No. 3417 at 13.  As recently as August 18,

9  during one of our periodic informational calls regarding COVID-19 issues with CCHCS,

10  Plaintiffs reiterated this request and were told that it was not necessary.

11  However, on the same call, CCHCS confirmed that last week during the current

12  outbreak at CMC, some patients known to have tested positive for the virus were not

13  moved from their dorm housing to the designated or any other isolation space.  As a result,

14  they remained in the dorm along with patients who had not yet tested positive, resulting in

15  a serious but completely avoidable risk of harm to those people.  This potentially dire

16  problem was identified, not by staff at the prison or by CCHCS, but by Plaintiffs, in an

17  email on August 14.  CCHCS assured Plaintiffs on the August 18 call that measures had

18  subsequently been taken to address such problems in the future.  Plaintiffs believe that

19  without clear direction to the prisons as to how to make use of their isolation space, and

20  measures to review and monitor the implementation of these steps, such problems will

21  continue.

22  Similarly, on the August 7 calls with individual prisons, it emerged that some were

23  not currently using their designated isolation space to house confirmed COVID-19 patients

24  because they read the Court's order to require that space to be held vacant.  Even after that

25  problem was discovered, it recurred on the August 12 call: Sierra Conservation Center was

26  housing confirmed cases in its administrative segregation unit along with people who were

27  not confirmed.  It appeared that CDCR had not reached out to the prisons immediately

28

after this problem emerged to ensure that it was corrected.  Plaintiffs remain concerned that even with isolation space pre-designated for use in the event of an outbreak, it will not properly be used without clear guidelines and direction to the prisons.

*Defendants' Position*:  CDCR has worked diligently to identify and prepare reserved isolation and quarantine spaces for occupancy in case of outbreaks.  At the overwhelming majority of prisons the first phase of this effort is complete, and those prisons either have vacated their identified spaces, which are now standing by in case of an outbreak, or they are already using their reserved spaces in response to outbreaks.  But CDCR has determined that its original plans for reserved space at California Medical Facility, Chuckawalla Valley State Prison, and Avenal State Prison require significant revision, and transfers may be necessary to create appropriate spaces for isolation and quarantine at Avenal and Chuckawalla Valley.  As set forth above, on August 19, 2020, CCHCS released its revised "COVID Movement Matrix," setting forth protocols for testing and transfer of incarcerated persons (including intra- and inter-institution transfers). CDCR is hopeful that implementation of the matrix will permit Avenal and Chuckawalla Valley to open up additional space for isolation and quarantine.

**B.     Report on meet and confers between parties, Receiver, and experts**

On July 31 and August 4, 2020, officials from California Correctional Health Care Services (CCHCS), public health experts from the Court's advisory panel, public health experts for the parties, and CDCR officials met to discuss the need for isolation and quarantine space in the prisons.  As reported last week, CDCR (Connie Gipson) and CCHCS (Vince Cullen) hosted a lengthy conference call on August 7 to review and discuss the designations at 21 prisons with the respective wardens and health care chief executive officers.  *Plata* Plaintiffs participated on the call along with *Coleman*, *Armstrong*, and *Clark* plaintiffs, the *Coleman* Deputy Special Master, the *Armstrong* Court Expert, and members of the Court's Advisory Board.  On August 12, a second meeting was held with most of the same attendees to address eleven additional prisons.  CCHCS

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16799779.2

staff have indicated that the three outstanding prisons that were not discussed at either meeting—San Quentin, Folsom, and California Rehabilitation Center—will require special consideration and unique plans for providing appropriate quarantine and isolation spaces because of the physical layouts of those institutions.

*Plaintiffs' Position*:  Plaintiffs will continue to work with Defendants and the Receiver to ensure that adequate spaces for isolation and quarantine are identified at each prison.

*Defendants' Position*:  While special plans for creating appropriate isolation and quarantine spaces at San Quentin, Folsom, and California Rehabilitation Center need to be more fully developed, each of those prisons have already identified and reserved significant space for isolation and quarantine until those plans are finalized.

## IV.   SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE

*Plaintiffs' Position:*  As reported in previous CMC statements, people at risk of severe complications or death if infected with COVID-19 remain housed in crowded dormitories in CDCR. The Receiver has agreed that people who may be at the greatest risk of harm, based on their elevated weighted COVID risk scores, should be prioritized for possible transfer from their dorms to a cell at their current prison.  On August 18, CCHCS provided Plaintiffs with a list of 67 people with a weighted COVID-19 risk score of 11 or higher who are currently housed in dormitories at ten prisons.  Of those, 30 are at either CMF or CHCF, where CCHCS anticipates rehousing from dormitories to cells may not be possible.  CCHCS reported on August 18 that they anticipate being able to start offering celled housing to the remaining 37 people in the next week.

Plaintiffs appreciate that there is apparently finally some movement toward rehousing those most vulnerable to complications if they contract the virus.  Nevertheless, this is merely one step in a long process that should unfold at all prisons that currently house hundreds or possibly thousands of medically vulnerable in dorms around the state. At this point, so far as Plaintiffs are aware, Defendants and CCHCS have no current plan

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16799779.2

1  to address this bigger issue.

2  *Defendants' Position*:  Defendants remain committed to working with the Receiver

3  to facilitate moves of medically high-risk patients from dorms to cells, or any other moves,

4  to safely house medically high-risk patients, if such moves have been recommended and

5  approved by the appropriate public health and corrections experts and outlined in the

6  Receiver's movement matrix.

7  **V.   COVID-19 TESTING**

8         **A.   Staff  Screening and Testing**

9               **i.   OIG Report**

10  *Plaintiffs' Position*:  In April 2020, the Speaker of the California Assembly

11  requested that the Office of the Inspector General (OIG) assess the policies, guidance, and

12  directives CDCR has implemented in response to the COVID-19 pandemic.  *See* Office of

13  the Inspector General, *COVID-19 Review Series, Part One: Inconsistent Screening*

14  *Practices May Have Increased the Risk of COVID-19 Within California's Prison System* at

15  1 (August 2020), available at: https://www.oig.ca.gov/wp-content/uploads/2020/08/OIG-

16  COVID-19-Review-Series-Part-1-Screening.pdf.  Specifically, the Speaker requested an

17  analysis of three issues: 1) CDCR's screening process for individuals entering a prison, 2)

18  CDCR's distribution of personal protective equipment to staff and incarcerated persons,

19  and 3) how CDCR treats incarcerated persons who are suspected to have either contracted

20  or been exposed to COVID-19.  *Id*.  On August 17, the OIG released its first report,

21  focusing on CDCR's screening process.

22         The OIG concluded that CDCR's screening directives were "vague" and "resulted

23  in inconsistent implementation among the prisons, which left some staff and visitors

24  entering prisons unscreened."  *Id*.  Indeed, while visiting the prisons to conduct these

25  reviews, OIG staff themselves were not screened at 38 of their 212 prison visits (18

26  percent).  *See id.* at 20.  Some CDCR staff also reported to the OIG that they had not

27  consistently been screened during the pandemic.  *Id* at 23.  Troublingly, of the seven

28

prisons surveyed, San Quentin reported the most significant lapses in screening. *Id* at 24. The OIG also noted that staff who were responsible for screening reported that their thermometers did not always work properly, were not always accurate, and, in some cases, lacked battery power. *Id.* at 25-30. Those staff member also reported that they had not been properly trained to carry out their screening duties; this was corroborated by their training records. *Id.* at 26.

Plaintiffs are deeply troubled by this report. We agree with the OIG's conclusion that CDCR headquarters must immediately provide additional guidance to prisons to improve the consistency and effectiveness of the screening process. *See id.* at 31.

*Defendants' Position*: Page 31 of the OIG's report lists four recommendations for steps to be taken to ensure that institutions properly screen all staff and visitors. CDCR recognizes that the establishment of effective screening procedures is imperative to prevent and slow the spread of COVID-19 among staff, inmates, and the public. CDCR continues to work closely with infectious disease control experts to ensure appropriate measures are put into place and is in the process of reviewing the OIG's recommendations listed as numbers 1 and 4 to determine any measures that need to be implemented. Defendants understand that CCHCS will review the OIG's recommendations listed as numbers 2 and 3 to determine any next steps.

Defendants note that the department has provided better communication and training for screeners for consistency and accuracy of anyone entering institutions, and that new thermometers have been procured throughout the past few months.

### ii.      CDCR Staff Testing Plan

On August 17, CDCR produced the August 12 iteration of its staff testing plan to Plaintiffs and filed the plan with the Court (ECF No. 3424).

*Plaintiffs' Position*: On July 24, Plaintiffs filed a motion seeking an order directing Defendants to modify CDCR's COVID-19 staff testing plan. *See* ECF No. 3402. Specifically, Plaintiffs' motion sought (1) a modification of the plan for outbreak response

1   testing, to require serial retesting of all staff, not only staff assigned to a particular yard;

2   and (2) a comprehensive plan for staff with symptoms of COVID-19, including testing of

3   staff whose symptoms are discovered while at work, and a plan to track and require

4   reporting from staff who report symptoms from home.  *See id.*; *see also* ECF No. 3402-3

5   (Plaintiffs' Proposed Order).

6        On August 17, Defendants filed a revised staff testing plan with this Court.  *See*

7   ECF No. 3424-1.  Regarding staff with COVID-19 symptoms, the plan appears largely

8   unchanged.  The previous iteration of the plan stated that staff with symptoms "shall be

9   directed to obtain a medical evaluation to determine whether he or she should be tested for

10  COVID-19."  *See* ECF No. 3402-2 at 17.  The revised version now states that such staff

11  members "should be immediately isolated and referred for medical evaluation to determine

12  whether they should be tested for COVID-19."  ECF No. 3424-1 at 2.  There is still no

13  requirement that the employee report their results to CDCR, nor is there a plan for what to

14  do if a symptomatic employee who is "referred for medical evaluation" declines to obtain a

15  medical evaluation, or is simply unable to get a test in the community.

16       Regarding outbreak response testing, the new plan states:

17
18      As soon as possible, after one (1) COVID-19 positive individual(s) (inmate
        or staff) is identified in an institution, contact tracing should be initiated and
19      serial retesting of all exposed persons should be performed every 7 days until
        no new cases are identified in two (2) sequential rounds of testing.

20      If three (3) or more COVID-19 positive individuals are identified serial
21      retesting of all staff should be performed every 7 days until no new cases are
        identified in two (2) sequential rounds of testing. Once laboratory capacity
22      allows, and within 12 weeks from this guidance (dependent on laboratory
        capacity), the facility should ensure that the turnaround time between each
23      specimen collection and receipt of the testing result for that specimen is 48
        hours or less. The institution may then resume their regular surveillance
24      testing schedule as outlined above. CDCR expects to be able to implement
25      serial testing at applicable institutions as soon as baseline testing is initiated.

26      *Id.* at 4.  It thus appears that, under the new plan, response testing will no longer be
27  limited to a particular yard.  Indeed, the revisions deleted the provisions stating that "initial

28

16799779.2

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

testing can be limited to the yard where the positive inmate is housed or staff is assigned" and that "[i]t is not necessary to test staff across multiple yards as long as staff are not moving among buildings to provide services."  *See* ECF No. 3402-2 at 18-19.  However, the plan still states that "[i]f there are positive cases across multiple yards at any given institution, all staff across all yards should be tested every 7 days until no new cases are identified in two sequential rounds of testing."  ECF No. 3424-1 at 4.  This suggests a different retesting plan could apply if positive cases are clustered on a single yard. Plaintiffs have asked for clarification from Defendants.

Once Defendants' staff testing plan is finalized, Plaintiffs will request from Defendants the collection and periodic reporting of data regarding staff testing at each prison.

*Defendants' Position*:  Defendants are in the process of gathering the answers to Plaintiffs' requests for clarification about the August 12 iteration of the staff testing plan.

Serial re-testing of staff is still ongoing.  CDCR is in the process of finalizing an IT solution that will enable CDCR to create reports on the number and percentages of staff members that have been tested at any given date.  CDCR has an IT solution in place, but it is currently still being tested to ensure accuracy and completeness.  Once the IT solution has been finalized (which is expected to occur next week), CDCR expects to be able to provide reports that set forth numbers and percentages.

CDCR is still working on an IT solution that will enable CDCR to identify the names of staff members who have (or have not been) tested.  CDCR asked both the vendors and the institutions to continue working closely together to get an accurate account of the number of staff being tested and subsequent results.  Once the vendor has completed the current round of re-testing, the vendor provides a report that includes the list of staff members who have (and have not) been tested to the institution and to CDCR's headquarters.  The information is then electronically transferred into a system (BIS EHS). All staff members who were not tested will be contacted by the institution to be tested in

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

the next round of serial testing (unless the staff member is on a 100% telework assignment or long-term sick leave).  As mentioned in the prior case management conference statements, employees who refuse to get tested will face progressive discipline up to and including termination (unless they have a medical condition or any other reason that precludes them from COVID-19 testing).

Lastly, CCHCS will take over the entire staff testing-process from CDCR.  CCHCS will implement the August 12 iteration of the staff-testing plan and assign CCHCS nurses on-site at each institution to oversee the testing of staff members.

## B.    Testing Incarcerated Population

*Plaintiffs' Position*:  We further discussed with CCHCS our concern that certain matters of unquestioned necessity in its COVID-19 patient testing protocols or guidance, such as those relating to serial re-testing of patients known to be negative at prisons or on yards with outbreaks, or relating to incarcerated persons assigned to jobs that require frequent contact with staff or incarcerated people, are phrased in discretionary not mandatory language.  Given the risk of harm posed by COVID-19, the medical headquarters should not merely recommend but provide specific prescriptive instructions on key matters.  Mandatory language – "shall" instead of "should," for example, is necessary so that directives are clear and staff can be held accountable if necessary actions are not done.[5]  We believe CCHCS's Director of Health Care now better understands our views, and will consider them.

On a separate issue, we were told that a technological solution will hopefully be available by the end of this month that will permit, as we understand it, clinicians to check

_____

[5]     A similar concern regarding the absence of specific headquarters directives is discussed in Part IV, above, with regard to the failure last week to remove known COVID-19 patients from a dorm in which those not known to be positive were also residing.  A similar concern is also addressed in Part VII, below, regarding whether CCHCS will mandate or recommend standardized written notification to patients who test positive for COVID-19.

if ordered serial re-testing has been done.  We further discussed with CCHCS our view that a prison should be able to publically report, or at least share with Plaintiffs, the percentage of ordered serial re-tests that were completed.  For example, those at San Quentin who are known to have tested negative for COVID-19 are supposed to receive a weekly re-test, and it is important to know, for public health and monitoring purposes, whether that was done for, again for example, 60% or 95% of those patients.

## VI.   PATIENT EDUCATION

*Plaintiffs' Position*:  Plaintiffs earlier this month asked CCHCS to standardize statewide the written notice given to patients by medical staff when positive COVID-19 lab results are received, and to include specific educational information in that notice, based on experience that practices varied widely in the prisons.  See ECF No. 3417 at 19-20.  This week, CCHCS's Director of Health Care Services reported that he had reviewed various templates for such notices used in the prisons, and also talked to patients who, he reported, evinced a wide variety of understanding regarding their condition.  The Director said his decision regarding this matter would be informed by his review and patient interviews; he also asked Plaintiffs to provide a suggested template.  Not yet known is whether CCHCS will mandate use of a standardized notification and education template for COVID-19 positive patients at all prisons, or simply provide it to prisons who can decide to use it or not.  We believe a mandate is necessary so that practices are uniform and will continue to discuss with CCHCS.

We believe our companion request, for a standardized written notification and education to patients when a primary care provider or public health nurse clinically "resolves" their COVID-19 infection (meaning they are no longer considered infectious to others), remains under consideration.  Such notification and education is necessary because of confusion among patients and others on this matter, and because the method used at San Quentin to educate people – a paragraph in a multi-page hard copy newsletter jointly written by custody and medical staff and distributed to thousands – does not target the

16799779.2
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

patients most impacted (those who should be told they are "resolved") and is not realistically possible at other prisons.  We will follow up on this matter with CCHCS.

CCHCS this week also said that once it completes the updating of its list of COVID-19 risk factors, it will initiate a patient education campaign.

*Defendants' Position*:  Defendants agree that a consistent message to all incarcerated persons regarding COVID-19, including a template explanation regarding test results and education to encourage testing, would be beneficial not only to all incarcerated persons, but to staff, volunteers, and visitors as well.  Dr. Bick has indicated that he is currently in the process of gathering information to learn what information is currently distributed to the incarcerated population and will then prepare recommendations.  While CDCR has, and continues to, provide educational materials to the patient population concerning COVID-19, including information concerning the virus and mitigation measures that the incarcerated population should take to prevent the spread of the virus, Defendants look forward to working with CCHCS in expanding educational materials.

## VII.   PRISON UPDATES

### A.   Folsom State Prison

*Defendants' Position:* At the last case management conference, this Court requested updated information regarding the COVID-19 outbreak and response measures at Folsom State Prison.  There are currently 224 positive COVID-19 cases at Folsom.  More than 1,600 incarcerated persons have been tested since August 12.  In the last 14 days, 63% of the population has been tested.  Close contact tracing is being conducted.  On August 18, 2020, Folsom completed the installation of a large tent with a 90-bed capacity to house COVID-19 patients and Folsom is in the process of moving individuals into the tent.  This space is in addition to the 286 beds that are available and in use for quarantine and isolation purposes**,** which include main yard tents, Facility A cells, Facility B dorm pods, and MSF dorm beds.  Additional space remains available at Folsom's Visiting building and will be considered for housing should the need arise.

16799779.2

## IX.   OTHER UPDATES

*Defendants' Position*:  On August 13, CDCR published an article on its website to acknowledge the hard work and crucial role of public health nurses and CDCR's institutions during the pandemic.  The article can be found at https://www.cdcr.ca.gov/insidecdcr/2020/08/13/public-health-nurses-play-vital-role-inside-californias-prisons-during-covid-19/.

As a further update regarding CDCR's Project Hope program, which is a voluntary initiative to provide accommodations to incarcerated persons who need to quarantine or isolate upon release from prison, more than 600 people released from prison during the pandemic have been provided with free hotel accommodations to date.  Safe transportation and meal service has also been provided to these individuals.

DATED:  August 20, 2020                    PRISON LAW OFFICE



By:      */s/ Alison Hardy*
     STEVEN FAMA
     ALISON HARDY
     SARA NORMAN
     SOPHIE HART
     Attorney for Plaintiffs



DATED:  August 20, 2020                    XAVIER BECERRA
     Attorney General of California



By:      */s/ Damon McClain*
     DAMON MCCLAIN
     Supervising Deputy Attorney General
     NASSTARAN RUHPARWAR
     Deputy Attorney General
     Attorneys for Defendants

16799779.2
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

DATED:  August 20, 2020                    HANSON BRIDGETT LLP


By:      */s/ Samantha Wolff*
_____
         PAUL B. MELLO
         SAMANTHA D. WOLFF
         Attorneys for Defendants

16799779.2

JOINT CASE MANAGEMENT CONFERENCE STATEMENT