1 | XAVIER BECERRA
Attorney General of California
2 | MONICA N. ANDERSON
Senior Assistant Attorney General
3 | DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
4 | NASSTARAN RUHPARWAR (263293)
IRAM HASAN (320802)
5 | RYAN GILLE (262105)
Deputy Attorneys General
6 | 455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
7 | Telephone: (415) 703-5500
Facsimile: (415) 703-58443
8 | Email:  Nasstaran.Ruhparwar@doj.ca.gov

9 | HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
10 | SAMANTHA D. WOLFF -  240280
KAYLEN KADOTANI - 294114
11 | 425 Market Street, 26th Floor
San Francisco, California 94105
12 | Telephone:    (415) 777--3200
Facsimile:     (415) 541-9366
13 | pmello@hansonbridgett.com

14 | *Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

15

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>             Plaintiffs,<br><br>      v.<br><br>GAVIN NEWSOM, et al.,<br><br>             Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Judge:    Hon. Jon S. Tigar<br>Date:      September 1, 2020<br>Time:      10:00 a.m.<br>Crtrm.:    6, 2nd Floor |

16827595.1
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1    The parties submit the following joint statement in advance of the September 1, 2020 Case

2  Management Conference.

3  **I.      POPULATION REDUCTION**

4       **A.      Status**

5       *Plaintiffs' Position:* Plaintiffs continue to believe that a significant reduction in population

6  is necessary to reduce sickness and death from COVID-19.  The degree to which the State will

7  ultimately lower density in the prisons appears very limited, both because the number of those

8  eligible to be released is small compared to the current population, and so much depends on intake

9  remaining closed or severely limited.[1]  Further, it's not clear whether or when a significant number

10  of people who are particularly at-risk will be released from prison, although it is increasingly

11  apparent that only a relatively small number will be released.

12       CDCR last month said that approximately 6,200 people are eligible for consideration of

13  release under the high risk medical release program, of which roughly 3,900 are serving

14  indeterminate terms.  Defendants report below that currently only determinately sentenced people

15  are being considered under this program.  Of the approximately 2,900 in that Group, Defendants

16  say that approximately 1,100 have been considered, with 41 approved for release (other

17  documents provided by Defendants shows that as of August 26 only 16 have been actually

18  released).[2]  This approval rate of less than four percent, should it continue, would mean fewer than

19  120 among the nearly 3,000 determinately sentenced people eligible for consideration under the

20  high risk medical program will be released.  While we hope to be proved wrong, it appears that for

21  most this particular ballyhooed release program will not reduce their risk from COVID-19.

22       On August 20, CDCR indicated it did not have a plan for considering release of the

23  approximately 3,900 indeterminately sentenced people eligible for release via the high risk

24

25  [1]    *See* ECF No. 3417 at 2-4 for a more detailed statement regarding the impact of population
26  reduction on prison crowding.

27  [2]    Defendants append redacted versions of four individual summaries as Exhibit A.  Although
28  requested, Defendants did not provide these summaries to us until just before this Statement was
   filed.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

medical program.  *See* ECF No. 3427 at 4:22-23.  On August 24, we asked CDCR for its plan to consider early release for this group.  No plan was provided.  Defendants below say they are evaluating how to consider release for this group.  Unfortunately, the lack of any process for this group almost two months after the program was announced suggests eligible people may never be considered for release at all, or perhaps only in the context of a formal parole suitability hearing, which even if specially scheduled will, as we understand it, take approximately six months to calendar.   We hope to be proven wrong on this as well.  But for the moment, the high risk medical early release program provides no chance of reducing the risk from COVID-19 for the nearly 4,000 people serving indeterminate sentences who CDCR says are eligible for release consideration.

CCHCS on August 28 said that its revised COVID-19 risk factors, updated to be consistent with those listed by the Centers for Disease Control and Prevention, as well as revised individual patient Weighted COVID Risk Scores, would be implemented on August 31.  We appreciate that this necessary updating, which we requested on July 20, has been completed.  We expect the revision will result in additional patients being eligible for early release consideration, given that whether a person is considered at high risk for COVID-related complications is based on their Weighted COVID Risk Score, as calculated by CCHCS.  We will follow up with CCHCS and CDCR regarding this matter.

*Defendants' Position:* 19,827 incarcerated people were released from CDCR institutions and camps since the beginning of March 2020 through August 26, 2020, and CDCR's total population remains below 100,000.  From July 1, 2020 through August 28, 2020, 5,952 people were released as a result of the COVID-19 early-release programs Defendants announced on July 10, 2020, and, 6,676 were released in accordance with their natural release date.  These figures represent an additional 917 releases under the early-release program since the Defendants' reporting in the August 20, 2020 case management conference statement.

At the August 21, 2020 case management conference, the Court ordered Defendants to provide a specific deadline by which they expect to complete reviewing the individual files of incarcerated people eligible for early-release consideration in the high-risk medical early-release

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

program CDCR announced on July 10, 2020.  CDCR anticipates completing its review of files for determinately sentenced people by October 1, 2020.  Defendants are currently considering how to evaluate indeterminately sentenced people eligible for early release consideration in the high-risk medical cohort.  Defendants note that, as CDCR undergoes its transition in leadership, it will continue to evaluate how indeterminately-sentenced individuals should be considered for release.  Defendants will provide an update regarding its consideration of indeterminately-sentenced individuals in the next Case Management Conference statement.  In the meantime, those incarcerated persons who are approved for release as part of this medically high-risk early-release program will continue to be processed for release.

Additionally, the Court ordered Defendants to indicate by what metrics it is prioritizing this review.  (Tr. 9:14-17.)  The Secretary considers each person's COVID-19 weighted risk score, current commitment offense, criminal history, length of time served and left to serve, in-custody behavior, in-custody programming, and risk to public safety among other factors.  The Secretary prioritized the review of determinately sentenced people.  Within this group, the Secretary prioritized review by COVID-19 weighted risk score, moving from high COVID-19 weighted risk score to low.  When the outbreak at Folsom State Prison began, the Secretary adjusted the review process to prioritize review of all eligible determinately sentenced people housed at Folsom State Prison.  Once these reviews were completed, the Secretary resumed individual reviews by COVID-19 weighted risks core.  As of August 29, 2020, the Board of Parole Hearings completed 1,540 individual summaries for medically high-risk people eligible for early-release consideration, and the Secretary completed review of 1,073 individual summaries and approved 41 for early release.

Additionally, at the August 21, 2020 case management conference, the Court suggested that Defendants provide either a redacted version of an individual summary the Secretary reviewed, or a hypothetical summary to provide the public with a better understanding of the "challenges of weighing the need to protect an individual inmate's health and the public safety challenges that are out there."  (Tr. 12:3-14.)  Defendants continue to believe that it is important for all stakeholders to understand their efforts to reduce the spread of and harm from COVID-19

16827595.1

1   while simultaneously ensuring public safety.  To this end, Defendants attach as **Exhibit A**

2   redacted summaries of four incarcerated persons who were considered for early release.  Two

3   resulted in approval for early release, while the other two did not.

4        As reported in the previous case management conference statement, not all medically high-

5   risk people are released through this particular cohort, because if some medically high-risk people

6   are also eligible for release under other early-release categories that do not require individual

7   review by the Secretary.  For example, individuals may be released through the 180-day early-

8   release cohort if they satisfy the release criteria.  Individual summaries are not prepared for people

9   who are released in this manner.  From July 1, 2020, through August 31, 2020, 137 medically

10  high-risk people have been released through CDCR's early-release programs, including 101

11  through the 180-day cohort, 20 through the 365-day cohort, and 16 through the high-risk medical

12  cohort.  In other words, more medically high-risk people have been released early than just those

13  through the high-risk medical early-release cohort.  Additionally, the Secretary approved a one-

14  time release of 14 medically high-risk individuals from San Quentin State prison early in the

15  pandemic.  Several additional medically high-risk individuals who did not qualify for the July 10

16  early-release program, including gravely ill incarcerated persons, were approved for early release.

17        **B.    Population Reduction Reports and Parties' Meet and Confer Efforts
            Regarding Same.**

18

19        Since the August 21, 2020 case management conference, Defendants started regular

20  production of the reports listed in ECF No. 3427 at 5:6-14 to Plaintiffs, including (1) a report

21  showing early-release numbers per early-release cohort, per institution, including statewide totals,

22  which will be produced every two weeks; (2) a report showing both early releases and natural

23  releases from institutions and camps since July 1, 2020, which will be produced every two weeks;

24  (3) a report showing total populations for each institution, including a population breakdown by

25  each facility, which will be produced once a month; and (4) a bed audit, which will be produced

26  once a month.  Additionally, once a month, Defendants will provide Plaintiffs with the name,

27  number, institution, and release status of those approved by the Secretary for release under the

28  high-risk medical early-release program announced on July 10.  For those already released, the

1   release date will be provided.  Also once a month, Defendants will provide Plaintiffs with the

2   number of people who were eligible for early-release consideration in the high-risk medical early-

3   release program, and were instead released through the 180-day or 365-day programs announced

4   on July 10.  Defendants will report in case management statements the number of individual

5   summaries the Board of Parole Hearings has completed for people eligible for early-release

6   consideration in the high-risk medical early-release program announced on July 10, the number

7   the CDCR Secretary has reviewed, and the number approved for release.  In the future, if case

8   management statements are filed less than once per month, the parties will further discuss

9   production of this data.

10  **II.      TESTING AND TRANSFER PROTOCOLS**

11          On August 19, 2020, CCHCS released its revised "COVID movement Matrix," setting

12  forth protocols for testing and transfer of incarcerated persons (including intra- and inter-

13  institution transfers).

14          *Plaintiffs' Position:*  Movement poses an enormous risk of introducing and spreading the

15  virus between prisons, including via infections among those transported together.  We continue to

16  believe that no large-scale movements should be done until CDCR and CCHCS have determined

17  that the new movement matrix is safe, effective, and carefully adhered to at all prisons.

18          Since the last Case Management Conference, we have reviewed the new movement matrix

19  with our public health expert and, on August 25, provided written questions to CCHCS.  Among

20  other issues, we noted that at prisons where cell-based housing is not available, the matrix allows

21  for pre- and post- transfer quarantine to occur in cohorts in a dorm.  The matrix, however, is

22  unclear on whether and how the transfer cohorts will be separated from other cohorts in the dorm.

23  Despite implementation of the Receiver's April 10 directive on cohorting in the dorms, *see* ECF

24  No. 3276-6, there have been significant outbreaks of COVID-19 in numerous dorms, where the

25  virus appears to have quickly spread between cohorts.[3]  We therefore believe additional separation

26  _____

27  [3]       For example, there have been 1,916 confirmed cases at Avenal State Prison, which houses

28

16827595.1

1   is necessary for transfer cohorts.  The matrix is also unclear as to what happens when some people

2   test negative in a cohort, but others test positive—those who test positive will be placed in

3   isolation, but the matrix does not say whether those who test negative, but who have clearly been

4   exposed, will be permitted to transfer (if in pre-transfer quarantine) or be released from quarantine

5   (if in post-transfer quarantine), or whether additional precautions will be taken.  We discussed

6   some of our questions with CCHCS on a call on August 31 at 10:30 AM. We understand CCHCS

7   will consider our suggestions when drafting the next iteration of the matrix.

8          Separately, we also believe CCHCS and CDCR must aggressively monitor implementation

9   of this new matrix.  Transfers of patients not tested within appropriate timeframes have spread the

10  virus between prisons with disastrous results—including a devastating outbreak at San Quentin

11  State Prison (SQ) and a massive outbreak at California Correctional Center (CCC).  The new

12  transfer policy is lengthy and complex: it is 9 pages long, and provides separate testing,

13  quarantining, and PPE procedures for 17 different types of movements (*e.g*., from a reception

14  center to a prison, from one prison to another for specialized medical bed placement, and

15  admission to the department of state hospitals from CDCR).  CCHCS has reported that the policy

16  was sent to all prisons, and that on August 21, CCHCS held an hour-long phone conference with

17  the prisons' leadership to explain and answer questions about the matrix.  Because of the

18  complexity of this policy, the fact that many different staff members will need to understand and

19  follow it, and the incredible importance of ensuring movement is done as safely as possible, we

20  have suggested that CCHCS take further action to ensure the matrix is well understood and strictly

21  adhered to at all prisons.  Specifically, we suggested CCHCS develop and require use of a

22  checklist verifying that necessary safety measures were followed at the sending and receiving

23  prisons for each type of transfer.  We raised these concerns with CCHCS on a phone call on

24  August 26, and were told CCHCS will consider our recommendations.

25

26  _____

27  approximately 3700 people in dormitories, and 1,054 confirmed cases at Chuckawalla Valley State
    Prison, which houses approximately 2800 people in dormitories.  *See* CDCR, *Population COVID-*

28  *19 Tracking*, https://www.cdcr.ca.gov/covid19/population-status-tracking/ (last accessed August
    31, 2020).

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   *Defendants' Position:* The movement matrix went into effect on August 21, 2020, upon its

2   release to the field.  A statewide conference call between DAI, CCHCS and leadership teams at all

3   institutions was held to discuss the movement matrix, including a detailed discussion of each

4   section of the matrix.  The statewide call also included a question-and-answer session.  As

5   explained during that call, movement will be limited and controlled and must be pre-approved by

6   CDCR headquarters, which is working in collaboration with CCHCS (including Mr. Cullen and

7   Dr. Bick).

8   **III.    INTAKE**

9   *Plaintiffs' Position:* Defendants have re-opened intake as of August 28, reportedly

10  accepting 50 people from each of two counties—Kings and San Joaquin—at the North Kern and

11  Wasco Reception Centers.

12      On August 28, the parties met and conferred about Defendants' and the Receiver's intake

13  plans.  Plaintiffs have opposed re-opening of intake from county jails until (a) adequate space has

14  been set aside for quarantine and isolation; (b) particularly vulnerable people have been moved

15  from dorms to cells; and (c) the newly revised transfer matrix has been piloted with high-priority

16  intra-system transfers (moving people to accessible housing, moving people out of segregation

17  who have long completed their terms, etc.) to determine whether it can be done safely.

18      At the meet and confer, Defendants explained that they established the current intake

19  number of 100 per week based on how many people they believe they can properly monitor and

20  manage, in keeping with their requirements: for example, that all people transported from the

21  county jails test negative for the virus within seven days before the transfer; that the test results be

22  relayed to the Reception Center in advance of the transfer; that staff and incarcerated people wear

23  N95 masks during transport; and that people received in CDCR be tested, quarantined for 14 days,

24  and tested at the end of the quarantine period.  Plaintiffs were assured that there is no current plan

25  to expand intake beyond the current low numbers or to move the people arriving from county jails

26  to other prisons, outside of the vacant housing units at North Kern and Wasco where they will be

27  quarantined and then housed.  Approximately an hour before this statement was filed, through

28  edits to the statement, Plaintiffs discovered intake will be doubled this week.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

1  Plaintiffs were also told that essential intra-system transfers continue to take place under

2  careful scrutiny by CCHCS, now using the protocols in the updated transfer matrix.  Plaintiffs

3  continue to believe CCHCS and CDCR must ensure that the new protocols can be followed

4  appropriately and effectively before newly arrived people from the county jails are moved out of

5  the Reception Centers.  Defendants also explained that they have chosen to prioritize intake from

6  those counties where people with state sentences face significantly crowded conditions.  Plaintiffs

7  recognize the importance of and agree with this approach.

8  The parties also discussed the order by the Michigan Governor to condition state prison

9  transfers on local jail efforts to combat the coronavirus.  The Receiver suggested that the Michigan

10  approach is neither warranted under the circumstances nor legally appropriate; Defendants did not

11  assert a position.  At the last Case Management Conference, the Court directed the parties to

12  weigh in as to the advisability of a similar order in the present case.  Plaintiffs support such an

13  order.  Defendants have already imposed some obligations on the counties in order to reopen

14  intake: testing, mask-wearing, and a ban on confirmed cases.  Plaintiffs believe that further efforts

15  along the lines of those included in Governor Whitmer's order, to ensure that the counties are

16  taking reasonable steps in accordance with generally accepted national standards to stem the

17  spread of the virus in their facilities, are appropriate to minimize the risk to those being

18  transported to and initially incarcerated in the Reception Centers.  It is Plaintiffs' view that the

19  Court has the power to order Defendants to expand their requirements in this way.  Plaintiffs

20  request the opportunity to brief this matter once Defendants make their position known, should

21  they disagree.

22  Plaintiffs appreciate the additional information about intake processes supplied by CDCR

23  and CCHCS and the prompt scheduling of a meet and confer regarding their approach and plans.

24  Plaintiffs continue to have questions and concerns about how CDCR and CCHCS will determine

25  when and whether intake should be increased, decreased, suspended, or restarted.  Plaintiffs also

26  note that North Kern and Wasco State Prisons are currently experiencing COVID-19 outbreaks.

27  At North Kern, the number of positive cases more than doubled on August 27th, and now numbers

28  32.  At Wasco, there have been more than 60 new cases in the last 14 days.  We will continue to

-8-                              Case No. 01-1351 JST

16827595.1

1    engage in discussions of this matter with CDCR and CCHCS as appropriate.

2         *Defendants' Position:* CDCR resumed intake the week of August 24, and accepted a total

3    of 100 inmates into custody.  Fifty inmates from San Joaquin County and Kings County each were

4    successfully transferred to the reception centers at Wasco State Prison and North Kern State

5    Prison.  CDCR expects to receive another 200 incarcerated persons total from the following three

6    counties the week of August 31: San Bernardino, Kern, and Santa Cruz.[4]  This limited intake

7    allows CDCR and CCHCS to test its processes, mitigate risk and ensure that intake can be done

8    safely in compliance with the movement matrix.  Limited intake will allow for modification of

9    intake processes, if necessary.  CDCR will decide whether to increase, decrease, or suspend intake

10   in accordance with health care and public health guidance.

11        In advance of the resumption of intake, CDCR and CCHCS leaders worked closely with

12   the California State Sheriff's Association and prioritized intake from counties that have the

13   greatest need to create space in their facilities, with the understanding that the resumption of intake

14   must be done in a controlled and limited manner.  CDCR and CCHCS worked closely with the

15   California Department of Public Health to set parameters for counties to follow in advance of any

16   transfer of incarcerated persons from jail to CDCR custody.  In advance of transfer, counties must:

17   (1) ensure negative COVID-19 test results are received within 7 days of transfer[5]; (2) use N-95

18   mask for all incarcerated persons and transportation staff during transport; (3) conduct symptom

19   screening within 24 hours of transfer; and (4) provide a manifest of people transferring to the

20   reception center Classification and Parole Representative in advance.  Counties have agreed to

21   comply with this protocol.

22        Upon arrival at a CDCR reception center, county transferees will again undergo COVID-

23   19 symptom screening and testing in accordance with the movement matrix.  All new arrivals are

24   quarantined in single cells for 14 days following arrival in designated quarantine housing.  While

25

---

26   [4]    To date, the following counties have been approved for intake: San Joaquin, Kings, San
     Bernardino, Kern, and Santa Cruz.
27   [5]    Test results must be provided to health care staff at the reception center prior to transfer.
     Individuals who refuse to test will not be transferred.  The 7 day period may be subject to change
28   based upon, amongst other things, average statewide test turnaround times.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

1   in quarantine, new arrivals are screened daily for COVID-19 symptoms.  Tests are administered

2   within 24 hours of arrival, again on day 7, and again prior to release from quarantine (but no

3   sooner than day 12).  Arrivals are then released from quarantine after 14 days if they are

4   asymptomatic and test negative for COVID-19.  New arrivals who refuse testing must remain in

5   pre-transfer quarantine for at least 21 days and receive daily symptom screening.  Their

6   disposition is then determined in consultation with the Chief Medical Executive in accordance

7   with the movement matrix.

8           Specific to the resumption of intake the week of August 24, CDCR and CCHCS jointly led

9   a telephone call with the wardens and Chief Executive Officers at both North Kern State Prison

10  and Wasco State Prison to walk through the entire process from the time the bus arrives through

11  the housing of new county transferees.  CCHCS also dispatched an Associate Warden to both

12  institutions to confirm that they were prepared to resume intake in accordance with the mandates

13  of the movement matrix.  CCHCS and CDCR were confident that both institutions were prepared

14  and knowledgeable of the process before intake resumed.

15          Finally, Defendants do not believe an order requiring CDCR to suspend intake from

16  counties that do not comply with certain COVID-19 protocols, like the Executive Order signed by

17  Michigan Governor Gretchen Whitmer on August 15, 2020, is necessary or appropriate in

18  California.  By way of comparison, Michigan's current rate of reported cases of Coronavirus is

19  1,423 per 10,000 prisoners, whereas California's is 926 per 10,000 prisoners; Michigan's deaths

20  due to Coronavirus is 19 per 10,000 prisoners, while California's is 5 per 10,000 prisoners.[6]

21  California's county jails have already agreed to the parameters discussed above, and CDCR is

22  strictly adhering to the movement matrix.  To the best of Defendants' knowledge, no other

23  jurisdiction in this country has implemented the robust procedures set forth in the movement

24  matrix developed by CCHCS.  These steps will ensure the safety of incarcerated persons in CDCR

25  custody, new arrivals, and staff.

26

27  _____

28  [6] Information available at The Marshall Project: https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

## IV.    QUARANTINE AND ISOLATION

### A.    Set Aside Space

The Court's July 22 Order to Set Aside Isolation and Quarantine Space required CDCR to quickly identify and disclose (by August 5) and vacate or reserve (within 2 weeks of identifying such space) at least 100 beds for quarantine and isolation purposes at each prison.  *See* ECF No. 3401 at 3-4, ¶¶ 1-2.  CDCR completed this process for 30 prisons on August 8, and for the remaining 5 prisons on or before August 27.

The Court's July 22 order also required CDCR to assess whether additional space is required at each prison, and to include the Receiver and the parties' health experts in this process. *See* ECF No. 3401 at 4, ¶ 3.  This process was to be completed by August 19.  *See id.*  On August 18, the Public Health Workgroup (comprised of Plaintiffs' Expert, Defendants' Expert, and CCHCS experts) issued guidance regarding quarantine and isolation space at each prison to both parties.  Based on this guidance, CCHCS's Quality Management team also on that date recommended specific numbers of beds to reserve for quarantine and isolation purposes at each prison.  On August 27, CDCR provided Plaintiffs with a document outlining how much space CDCR has proposed to dedicate to isolation and quarantine at 31 prisons, and whether all such space had been vacated.  According to this document, 15 prisons have identified but still need to vacate additional space for quarantine and isolation purposes.  Finally, CDCR provided isolation and quarantine plans for the remaining four prisons—California Health Care Facility (CHCF), Folsom State Prison (FSP), San Quentin State Prison (SQ), and California Rehabilitation Center (CRC)—to Plaintiffs on August 29, but reported that CDCR continues to look at ways to address the unique space needs at these four prisons.

*Plaintiffs' Position*:  Plaintiffs are reviewing CDCR's August 27 and 29 proposed set asides for each prison. We intend to promptly raise our concerns about particular prisons with Defendants and the Receiver, request a meet and confer to discuss these concerns, and, if necessary, submit a joint letter brief to the Court to resolve any disputes, pursuant to the process described in the Court's July 22 Order at Paragraph 6.  *See* ECF No. 3401 at 4, ¶ 6.

Plaintiffs further note that the *Armstrong* Court Expert has concluded that CDCR's set-

-11-                                   Case No. 01-1351 JST

16827595.1

1    asides are insufficient for people with significant disabilities at 16 prisons.  *See* Report and

2    Recommendations Regarding Housing of *Armstrong* Class Members During the COVID-19

3    Pandemic, *Armstrong v. Newsom*, No. CV 94-2307 CW (N.D. Cal. August 19, 2020), ECF No.

4    3048.  The Expert described some of the deficits as "extreme," with set-aside space that is

5    inaccessible to, among others, those who use wheelchairs despite sizeable populations that require

6    such housing.  *See id.* at 17.

7            *Defendants' Position*:  On August 18, 2020, CCHCS Quality Management issued

8    recommended quarantine and isolation space reserves for the prisons based on the methodology

9    devised by the Public Health Workgroup.  At the August 21 case management conference, the

10   Court ordered CDCR to provide its proposed isolation and quarantine space for each prison in

11   response to the CCHCS recommendations.  CDCR has now provided that response to Plaintiffs

12   and the Receiver and identified what space it can reserve for isolation and quarantine purposes at

13   each of the prisons.

14           CDCR has worked hard to address the recommendations for isolation and quarantine space

15   and has identified and reserved vast quantities of space across the system for this purpose.  As

16   identified in CDCR's response to the recommendations, the quarantine and isolation space already

17   reserved at seventeen prisons[7] meets or exceeds the recommended space reserves.[8]  For an

18   additional eight prisons,[9] CDCR has identified space that will meet or exceed the

19

20   ───────────────────────

21   [7]      The seventeen prisons are California City Correctional Facility, California Correctional
         Center, Central California Women's Facility, California Institution for Women, California Men's
22   Colony, California State Prison—Corcoran, Correctional Training Facility, Deuel Vocational
         Institution, Ironwood State Prison, Mule Creek State Prison, North Kern State Prison, Pelican Bay
23   State Prison, Pleasant Valley State Prison, R.J. Donovan, California State Prison—Sacramento,
         Salinas Valley State Prison, and Valley State Prison.

24   [8]      For one additional prison—Substance Abuse Treatment Facility—the space CDCR
         reserved exceeded the number of beds originally recommended by CCHCS.  But CCHCS has now
25   advised that it miscalculated the number of recommended beds, and that it will recommend that
         more beds be set aside than CDCR has currently reserved.

26   [9]      The eight prisons are Calipatria State Prison, California State Prison—Centinela,
27   California Institution for Men, Chuckawalla Valley State Prison, High Desert State Prison, Kern
         Valley State Prison, Sierra Conservation Center, and Wasco State Prison.

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

1  recommendations, but CDCR will need to conduct some inmate transfers to free up some of the

2  identified space at these eight prisons.  CDCR intends to work with the Receiver to safely conduct

3  those transfers, but it will take time to safely complete them.

4        For an additional five prisons,[10] even after needed transfers are completed, the space

5  CDCR can currently set aside has fewer than the recommended number of single-cell beds.  Three

6  of the prisons in this group are only slightly under the recommended number of beds (short by

7  eleven beds or less).  CDCR will continue to consider ways to improve its ability to respond to an

8  outbreak at these prisons, and if possible, increase the amount of reserved space.

9        Meeting the recommendation for the last four outstanding prisons—San Quentin, Folsom,

10  California Rehabilitation Center, and California Health Care Facility—is not currently feasible.

11  For these prisons, CDCR has identified the space that it can currently reserve, which is

12  substantially less than the recommendation.  CDCR has developed plans to augment the reserved

13  spaces in the event of an outbreak at these prisons by installing tents and converting other spaces

14  within the prisons into isolation and quarantine spaces.  And CDCR intends to continue

15  developing special plans for these four prisons.

16        Because transfers are required to vacate some of the identified isolation and quarantine

17  spaces, CDCR will be unable to fully comply with the Courts directive that all identified space be

18  ready for occupancy by September 2, 2020.  CDCR intends to work with the Receiver to safely

19  accomplish the transfers, but that process has not yet begun.  Consequently, CDCR does not yet

20  know how long it will take, but CDCR should be able to report more on timing by the next case

21  management conference.

22        Defendants look forward to working with Plaintiffs and CCHCS to ensure adequate space

23  for quarantine and isolation is reserved at all institutions.

24        **B.        Policies and Practices**

25        *Plaintiffs' Position*:  We believe the identification of adequate isolation and quarantine

26  _____

27  [10]     The five prisons are Avenal State Prison, California Correctional Institution, California
28  Medical Facility, California State Prison—Los Angeles County, and California State Prison—
    Solano.

16827595.1

1    space is critical, but further guidance to the prisons is necessary so that patients are timely and

2    appropriately isolated or quarantined in the designated space or elsewhere.  Custody and medical

3    officials have made housing decisions during the pandemic that put patients at risk or caused

4    harm.  For example, in April at the California State Prison, Los Angeles County (LAC), a patient

5    known to have COVID-19 was housed with another person not known to have the condition, with

6    the latter then becoming infected.  *See* ECF No. 3304 at 6-7.   At San Quentin in early June, staff

7    reportedly disregarded clear directives from public health officials to quarantine people transferred

8    from the California Institution for Men (CIM) apart from others, allowing the virus to spread.  *See*

9    Megan Cassidy, *San Quentin officials ignored coronavirus guidance from top Marin County*

10    *health officer, letter says*, San Francisco Chronicle (Aug. 11, 2020),

11    https://www.sfchronicle.com/crime/article/San-Quentin-officials-ignored-coronavirus-

12    15476647.php.  In early July, we reported a group of more than 20 patients at CIM who were

13    newly diagnosed with COVID-19 remained in the same dorm as patients who had tested negative.

14    *See* ECF No. 3370 at 15.  And in the last CMC Statement, we reported that we had recently

15    identified and raised with CCHCS a failure to timely move COVID-confirmed patients from a

16    dormitory at California Men's Colony to the designated isolation celled unit at that prison.  *See*

17    ECF No. 3427 at 11.

18          Since the last Case Management Conference, we have also recently identified and reported

19    to CCHCS and CDCR related concerns at the Substance Abuse Treatment Facility and State

20    Prison, Corcoran (SATF), Correctional Training Facility (CTF), and LAC.  Specifically, we

21    discovered patients on quarantine status at SATF were being housed together in a gym, rather than

22    in the designated, celled housing unit for quarantine and isolation.  We also discovered that

23    COVID-confirmed patients at SATF and CTF had been moved to or remained in housing units

24    other than the units identified by CDCR for quarantine and isolation purposes.  Plaintiffs have

25    asked whether those buildings also house people who are not confirmed or suspected to have

26    COVID-19.  We have not yet received a written response to our inquiries, but during a phone call

27    on August 31, CCHCS reported that at CTF, while positive patients did not share a cell or dorm

28    with those not confirmed to have COVID-19, some were in buildings that housed both confirmed

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   and non-confirmed patients, and that direction had been given to the prison to address this.

2   Finally, we reported that at LAC, a confirmed COVID-positive patient in administrative

3   segregation had not been moved to that prison's quarantine and isolation unit, even though doing

4   so would not seem to pose any security risk (because the prison has a celled isolation unit).[11]

5           First, CCHCS and CDCR should issue a clear policy explaining when a patient must be

6   moved to the designated quarantine and isolation space, and when it is permitted for the patient to

7   isolate or quarantine in place or in some other building.  CCHCS's current policies on this topic

8   are unclear.  On August 28, CCHCS explained that its current policies for quarantine and isolation

9   can be found in the definitions section of the August 19 Screening and Testing Matrix for Patient

10  Movement.  Regarding isolation, that document provides that "[c]onfirmed positive patients shall

11  not be housed in the same unit with those who are not known to have COVID-19," but that

12  patients can be housed in the same building with non-infected patients "[i]f there are no other

13  options."  In Plaintiffs view, this is not sufficiently clear: does "no other options" mean that the

14  isolation and quarantine unit is full?  Or that the isolation unit is a dormitory, and for security

15  reasons the person cannot be housed in a dormitory?  Should someone in an inpatient medical or

16  mental health bed be moved to a quarantine or isolation unit?  If not, how will those patients

17  access showers and yard without potentially exposing other non-positive patients who share the

18  same facilities?  Plaintiffs believe the policy must be clarified to address these scenarios.

19          Second, we believe CCHCS and CDCR should draft a procedure that clearly lays out what

20  steps will be taken, and by whom, when a patient is confirmed to be COVID-19 positive, or needs

21  to be quarantined due to the risk of exposure.  We believe such a procedure should outline the

22  steps both custody and medical staff must take related to the timeliness and appropriateness of

23  housing moves, as well as assigning a point-person who is ultimately responsible for monitoring

24  that all patients are housed appropriately and that there remain sufficient available isolation and

25  _____

26  [11]    We are able to monitor where patients confirmed to have COVID-19 are housed by
    regularly checking the COVID-19 Registry.  However, we are not able to monitor where patients
27  who are on quarantine status are housed, as these patients are not reported in the Registry.  We
    have recently asked CCHCS and CDCR to produce weekly a list of patients on quarantine status
28  and in isolation, with their housing locations.  We are awaiting a response to this request.

16827595.1

1  quarantine beds at the prison.  This person should be required to report and elevate (to Regional or

2  Headquarters staff) any concerns with the available isolation and quarantine space, as well as

3  instances where a person could not be appropriately housed.

4        Plaintiffs wrote to CCHCS and CDCR, outlining our concerns and requests, on August 25.

5  We have not yet received a written response, though on an informational call with CCHCS on

6  August 28, CCHCS leadership indicated they did not feel any additional policies or procedures

7  were necessary at this time.  However, on August 31, CCHCS mentioned that CEOs from prisons

8  with outbreaks will now be required to complete daily reports that will be forwarded to

9  Headquarters, based on a template that has not yet been finalized.  CCHCS has said they will share

10  the template with Plaintiffs once completed.  We continue to believe the policies and procedures

11  described above are needed.

12        *Defendants' Position*:  All prisons have been advised that they must use the reserved

13  isolation and quarantine space to isolate COVID-19 positive inmates and to quarantine inmates

14  who may have been exposed.  All prisons with current outbreaks were directed to confirm their

15  use of the designated spaces by Monday, August 31.

16  **V.    SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE**

17        *Plaintiffs' Position:*  As previously reported, the Receiver has agreed that people who may

18  be at the greatest risk of harm, based on their elevated weighted COVID-19 risk scores, should be

19  prioritized for possible transfer from their dorms to a cell at their current prison.  On August 18,

20  CCHCS provided Plaintiffs with a list of 67 people with a weighted COVID-19 risk score of 11 or

21  higher who are currently housed in dormitories at ten prisons.  Of those, 30 were at either

22  California Medical Facility (CMF) or at California Health Care Facility (CHCF), where CCHCS

23  anticipates rehousing from dormitories to cells may not be possible.  On August 28, CCHCS

24  reported that it had initiated the process of offering moves from dormitories to cells to the

25  remaining 37 patients.  CCHCS reported that it set a "soft deadline" of September 4 for a report

26  from the prisons offering such moves, and that it would share the results with the parties once this

27  initial project was completed.  CCHCS reported that it will assess the next group of possible

28  patients after that, and after its internal revision of the COVID-19 risk score has been

-16-                                    Case No. 01-1351 JST

16827595.1

1  implemented, as this will likely change some patients' scores (discussed above and expected to be
2  completed by August 31).

3      Plaintiffs are glad to hear this initial project is underway.  We hope that it will be quickly
4  expanded to all patients who are at risk of severe complication or death if they contract COVID-
5  19.

6      *Defendants' Position:* Defendants remain committed to working with the Receiver to
7  facilitate moves of medically high-risk patients from dorms to cells, or any other moves, to safely
8  house medically high-risk patients when such moves are recommended and approved by the
9  appropriate public health and corrections experts.  Working in close coordination with the
10 Receiver's Office, CDCR hopes to commence the rehousing of medically high-risk people this
11 week.  These moves will be for people who agree to be relocated and where cell beds are
12 available.  Defendants expect to further report on the success of these moves at the next case
13 management conference.

14 **VI.    COVID-19 TESTING**

15     **A.    Staff Screening**

16     *Plaintiffs' Position:*  As described in the last Joint Case Management Conference
17 Statement, the Office of the Inspector General recently reported significant problems with
18 CDCR's COVID-19 screening process for individuals entering a prison. *See* ECF No. 3427 at 14-
19 15; Office of the Inspector General, *COVID-19 Review Series, Part One: Inconsistent Screening*
20 *Practices May Have Increased the Risk of COVID-19 Within California's Prison System* (August
21 2020), available at: https://www.oig.ca.gov/wp-content/uploads/2020/08/OIG-COVID-19-
22 Review-Series-Part-1-Screening.pdf.  The OIG recommended that CCHCS/CDCR provide more
23 specific screening instructions to the prisons, and develop a plan to monitor compliance with such
24 screening procedures on an ongoing basis.  *See* OIG Report at 31.

25     On August 25, Plaintiffs emailed CDCR and CCHCS, asking what steps would be taken to
26 respond to the issues identified in the OIG's report.  On August 26, CCHCS reported that it was
27 developing procedures to standardize the screening process at all prisons.  Plaintiffs have asked to
28 review those procedures once drafted.  We have also asked whether the new standardized

1  procedures will include instructions to the prisons on expectations for monitoring, as

2  recommended by the OIG.

3      *Defendants' Position:* Plaintiffs sent an email with their above-referenced questions to

4  CCHCS and CDCR yesterday (Sunday, August 30, 2020).  CDCR will work with CCHCS to

5  provide a response.

6      **B.**    **Staff Testing**

7      At the last Case Management Conference, Defendants reported that CCHCS would take

8  over the staff testing project from CDCR.  *See* ECF No. 3427 at 18.  The Court asked the Receiver

9  to inform the parties the following week whether any improvements would be made to the August

10  12 iteration of CDCR's staff testing plan.  *See* ECF No. 3432 at 45:14-19.

11      *Plaintiffs' Position:* On August 26, CCHCS reported to the parties that it is still reviewing

12  the August 12 plan to determine whether any changes are necessary.  CCHCS also reported that a

13  number of preliminary steps must be completed before CCHCS staff can begin testing employees,

14  including: finding a vendor to process the employee tests, obtaining funding for and hiring staff at

15  each prison to conduct necessary contact tracing, and developing a system to track and report

16  employee test results.  The time-frame for this work is not certain.  Regarding staffing, CCHCS

17  reported that it intended to hire an employee health nurse for every prison, with assigned contact

18  tracers.  CCHCS further reported such staff would be hired at five prisons this week (the week of

19  August 31, 2020), and at the remaining 30 prisons by September 30, 2020.

20      CCHCS's taking over the staff testing program could be a step forward, and we support the

21  hiring of additional medical staff at each prison to conduct necessary contact tracing.  However,

22  our concerns about the sufficiency of the August 12 iteration of the staff testing plan persist.  We

23  are eager to hear whether CCHCS will make any changes to the plan drafted by CDCR.  We also

24  are concerned about the as yet uncertain time-frame for CCHCS to fully assume operational

25  authority for the program, including reporting.

26      *Defendants' Position:* CDCR will continue to work closely with CCHCS to continue the

27  current staff testing procedures and to ensure a smooth and easy transition of the staff testing-

28  responsibilities to CCHCS.  CDCR also remains committed to continuing to work with CCHCS to

-18-                Case No. 01-1351 JST