XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
IRAM HASAN (320802)
RYAN GILLE (262105)
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Email:   Nasstaran.Ruhparwar@doj.ca.gov

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax:  (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF -  240280
KAYLEN KADOTANI - 294114
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:     (415) 777--3200
Facsimile:     (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br> Defendants. | CASE NO. 01-1351 JST <br><br> **JOINT CASE MANAGEMENT CONFERENCE STATEMENT** <br><br> Judge:  Hon. Jon S. Tigar <br> Date:     September 1, 2020 <br> Time:     10:00 a.m. <br> Crtrm.:   6, 2nd Floor |

The parties submit the following joint statement in advance of the September 1, 2020 Case Management Conference.

## I.      POPULATION REDUCTION

### A.      Status

*Plaintiffs' Position:* Plaintiffs continue to believe that a significant reduction in population is necessary to reduce sickness and death from COVID-19.  The degree to which the State will ultimately lower density in the prisons appears very limited, both because the number of those eligible to be released is small compared to the current population, and so much depends on intake remaining closed or severely limited.[1]  Further, it's not clear whether or when a significant number of people who are particularly at-risk will be released from prison, although it is increasingly apparent that only a relatively small number will be released.

CDCR last month said that approximately 6,200 people are eligible for consideration of release under the high risk medical release program, of which roughly 3,900 are serving indeterminate terms.  Defendants report below that currently only determinately sentenced people are being considered under this program.  Of the approximately 2,900 in that Group, Defendants say that approximately 1,100 have been considered, with 41 approved for release (other documents provided by Defendants shows that as of August 26 only 16 have been actually released).[2]  This approval rate of less than four percent, should it continue, would mean fewer than 120 among the nearly 3,000 determinately sentenced people eligible for consideration under the high risk medical program will be released.  While we hope to be proved wrong, it appears that for most this particular ballyhooed release program will not reduce their risk from COVID-19.

On August 20, CDCR indicated it did not have a plan for considering release of the approximately 3,900 indeterminately sentenced people eligible for release via the high risk

---

[1]      *See* ECF No. 3417 at 2-4 for a more detailed statement regarding the impact of population reduction on prison crowding.

[2]      Defendants append redacted versions of four individual summaries as Exhibit A.  Although requested, Defendants did not provide these summaries to us until just before this Statement was filed.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

medical program.  *See* ECF No. 3427 at 4:22-23.  On August 24, we asked CDCR for its plan to consider early release for this group.  No plan was provided.  Defendants below say they are evaluating how to consider release for this group.  Unfortunately, the lack of any process for this group almost two months after the program was announced suggests eligible people may never be considered for release at all, or perhaps only in the context of a formal parole suitability hearing, which even if specially scheduled will, as we understand it, take approximately six months to calendar.   We hope to be proven wrong on this as well.  But for the moment, the high risk medical early release program provides no chance of reducing the risk from COVID-19 for the nearly 4,000 people serving indeterminate sentences who CDCR says are eligible for release consideration.

CCHCS on August 28 said that its revised COVID-19 risk factors, updated to be consistent with those listed by the Centers for Disease Control and Prevention, as well as revised individual patient Weighted COVID Risk Scores, would be implemented on August 31.  We appreciate that this necessary updating, which we requested on July 20, has been completed.  We expect the revision will result in additional patients being eligible for early release consideration, given that whether a person is considered at high risk for COVID-related complications is based on their Weighted COVID Risk Score, as calculated by CCHCS.  We will follow up with CCHCS and CDCR regarding this matter.

*Defendants' Position:* 19,827 incarcerated people were released from CDCR institutions and camps since the beginning of March 2020 through August 26, 2020, and CDCR's total population remains below 100,000.  From July 1, 2020 through August 28, 2020, 5,952 people were released as a result of the COVID-19 early-release programs Defendants announced on July 10, 2020, and, 6,676 were released in accordance with their natural release date.  These figures represent an additional 917 releases under the early-release program since the Defendants' reporting in the August 20, 2020 case management conference statement.

At the August 21, 2020 case management conference, the Court ordered Defendants to provide a specific deadline by which they expect to complete reviewing the individual files of incarcerated people eligible for early-release consideration in the high-risk medical early-release

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

program CDCR announced on July 10, 2020.  CDCR anticipates completing its review of files for determinately sentenced people by October 1, 2020.  Defendants are currently considering how to evaluate indeterminately sentenced people eligible for early release consideration in the high-risk medical cohort.  Defendants note that, as CDCR undergoes its transition in leadership, it will continue to evaluate how indeterminately-sentenced individuals should be considered for release. Defendants will provide an update regarding its consideration of indeterminately-sentenced individuals in the next Case Management Conference statement.  In the meantime, those incarcerated persons who are approved for release as part of this medically high-risk early-release program will continue to be processed for release.

Additionally, the Court ordered Defendants to indicate by what metrics it is prioritizing this review.  (Tr. 9:14-17.)  The Secretary considers each person's COVID-19 weighted risk score, current commitment offense, criminal history, length of time served and left to serve, in-custody behavior, in-custody programming, and risk to public safety among other factors.  The Secretary prioritized the review of determinately sentenced people.  Within this group, the Secretary prioritized review by COVID-19 weighted risk score, moving from high COVID-19 weighted risk score to low.  When the outbreak at Folsom State Prison began, the Secretary adjusted the review process to prioritize review of all eligible determinately sentenced people housed at Folsom State Prison.  Once these reviews were completed, the Secretary resumed individual reviews by COVID-19 weighted risks core.  As of August 29, 2020, the Board of Parole Hearings completed 1,540 individual summaries for medically high-risk people eligible for early-release consideration, and the Secretary completed review of 1,073 individual summaries and approved 41 for early release.

Additionally, at the August 21, 2020 case management conference, the Court suggested that Defendants provide either a redacted version of an individual summary the Secretary reviewed, or a hypothetical summary to provide the public with a better understanding of the "challenges of weighing the need to protect an individual inmate's health and the public safety challenges that are out there."  (Tr. 12:3-14.)  Defendants continue to believe that it is important for all stakeholders to understand their efforts to reduce the spread of and harm from COVID-19

while simultaneously ensuring public safety.  To this end, Defendants attach as **Exhibit A** redacted summaries of four incarcerated persons who were considered for early release.  Two resulted in approval for early release, while the other two did not.

As reported in the previous case management conference statement, not all medically high-risk people are released through this particular cohort, because if some medically high-risk people are also eligible for release under other early-release categories that do not require individual review by the Secretary.  For example, individuals may be released through the 180-day early-release cohort if they satisfy the release criteria.  Individual summaries are not prepared for people who are released in this manner.  From July 1, 2020, through August 31, 2020, 137 medically high-risk people have been released through CDCR's early-release programs, including 101 through the 180-day cohort, 20 through the 365-day cohort, and 16 through the high-risk medical cohort.  In other words, more medically high-risk people have been released early than just those through the high-risk medical early-release cohort.  Additionally, the Secretary approved a one-time release of 14 medically high-risk individuals from San Quentin State prison early in the pandemic.  Several additional medically high-risk individuals who did not qualify for the July 10 early-release program, including gravely ill incarcerated persons, were approved for early release.

**B.      Population Reduction Reports and Parties' Meet and Confer Efforts Regarding Same.**

Since the August 21, 2020 case management conference, Defendants started regular production of the reports listed in ECF No. 3427 at 5:6-14 to Plaintiffs, including (1) a report showing early-release numbers per early-release cohort, per institution, including statewide totals, which will be produced every two weeks; (2) a report showing both early releases and natural releases from institutions and camps since July 1, 2020, which will be produced every two weeks; (3) a report showing total populations for each institution, including a population breakdown by each facility, which will be produced once a month; and (4) a bed audit, which will be produced once a month.  Additionally, once a month, Defendants will provide Plaintiffs with the name, number, institution, and release status of those approved by the Secretary for release under the high-risk medical early-release program announced on July 10.  For those already released, the

16827595.1

1   release date will be provided.  Also once a month, Defendants will provide Plaintiffs with the

2   number of people who were eligible for early-release consideration in the high-risk medical early-

3   release program, and were instead released through the 180-day or 365-day programs announced

4   on July 10.  Defendants will report in case management statements the number of individual

5   summaries the Board of Parole Hearings has completed for people eligible for early-release

6   consideration in the high-risk medical early-release program announced on July 10, the number

7   the CDCR Secretary has reviewed, and the number approved for release.  In the future, if case

8   management statements are filed less than once per month, the parties will further discuss

9   production of this data.

10  **II.      TESTING AND TRANSFER PROTOCOLS**

11         On August 19, 2020, CCHCS released its revised "COVID movement Matrix," setting

12  forth protocols for testing and transfer of incarcerated persons (including intra- and inter-

13  institution transfers).

14         *Plaintiffs' Position:*  Movement poses an enormous risk of introducing and spreading the

15  virus between prisons, including via infections among those transported together.  We continue to

16  believe that no large-scale movements should be done until CDCR and CCHCS have determined

17  that the new movement matrix is safe, effective, and carefully adhered to at all prisons.

18         Since the last Case Management Conference, we have reviewed the new movement matrix

19  with our public health expert and, on August 25, provided written questions to CCHCS.  Among

20  other issues, we noted that at prisons where cell-based housing is not available, the matrix allows

21  for pre- and post- transfer quarantine to occur in cohorts in a dorm.  The matrix, however, is

22  unclear on whether and how the transfer cohorts will be separated from other cohorts in the dorm.

23  Despite implementation of the Receiver's April 10 directive on cohorting in the dorms, *see* ECF

24  No. 3276-6, there have been significant outbreaks of COVID-19 in numerous dorms, where the

25  virus appears to have quickly spread between cohorts.[3]  We therefore believe additional separation

26  _____

27  [3]      For example, there have been 1,916 confirmed cases at Avenal State Prison, which houses

28

16827595.1

1   is necessary for transfer cohorts.  The matrix is also unclear as to what happens when some people

2   test negative in a cohort, but others test positive—those who test positive will be placed in

3   isolation, but the matrix does not say whether those who test negative, but who have clearly been

4   exposed, will be permitted to transfer (if in pre-transfer quarantine) or be released from quarantine

5   (if in post-transfer quarantine), or whether additional precautions will be taken.  We discussed

6   some of our questions with CCHCS on a call on August 31 at 10:30 AM. We understand CCHCS

7   will consider our suggestions when drafting the next iteration of the matrix.

8           Separately, we also believe CCHCS and CDCR must aggressively monitor implementation

9   of this new matrix.  Transfers of patients not tested within appropriate timeframes have spread the

10  virus between prisons with disastrous results—including a devastating outbreak at San Quentin

11  State Prison (SQ) and a massive outbreak at California Correctional Center (CCC).  The new

12  transfer policy is lengthy and complex: it is 9 pages long, and provides separate testing,

13  quarantining, and PPE procedures for 17 different types of movements (*e.g.*, from a reception

14  center to a prison, from one prison to another for specialized medical bed placement, and

15  admission to the department of state hospitals from CDCR).  CCHCS has reported that the policy

16  was sent to all prisons, and that on August 21, CCHCS held an hour-long phone conference with

17  the prisons' leadership to explain and answer questions about the matrix.  Because of the

18  complexity of this policy, the fact that many different staff members will need to understand and

19  follow it, and the incredible importance of ensuring movement is done as safely as possible, we

20  have suggested that CCHCS take further action to ensure the matrix is well understood and strictly

21  adhered to at all prisons.  Specifically, we suggested CCHCS develop and require use of a

22  checklist verifying that necessary safety measures were followed at the sending and receiving

23  prisons for each type of transfer.  We raised these concerns with CCHCS on a phone call on

24  August 26, and were told CCHCS will consider our recommendations.

25

26  _____

27  approximately 3700 people in dormitories, and 1,054 confirmed cases at Chuckawalla Valley State
    Prison, which houses approximately 2800 people in dormitories.  *See* CDCR, *Population COVID-*

28  *19 Tracking*, https://www.cdcr.ca.gov/covid19/population-status-tracking/ (last accessed August
    31, 2020).

1   *Defendants' Position:* The movement matrix went into effect on August 21, 2020, upon its

2   release to the field.  A statewide conference call between DAI, CCHCS and leadership teams at all

3   institutions was held to discuss the movement matrix, including a detailed discussion of each

4   section of the matrix.  The statewide call also included a question-and-answer session.  As

5   explained during that call, movement will be limited and controlled and must be pre-approved by

6   CDCR headquarters, which is working in collaboration with CCHCS (including Mr. Cullen and

7   Dr. Bick).

8   **III.     INTAKE**

9   *Plaintiffs' Position:* Defendants have re-opened intake as of August 28, reportedly

10   accepting 50 people from each of two counties—Kings and San Joaquin—at the North Kern and

11   Wasco Reception Centers.

12   On August 28, the parties met and conferred about Defendants' and the Receiver's intake

13   plans.  Plaintiffs have opposed re-opening of intake from county jails until (a) adequate space has

14   been set aside for quarantine and isolation; (b) particularly vulnerable people have been moved

15   from dorms to cells; and (c) the newly revised transfer matrix has been piloted with high-priority

16   intra-system transfers (moving people to accessible housing, moving people out of segregation

17   who have long completed their terms, etc.) to determine whether it can be done safely.

18   At the meet and confer, Defendants explained that they established the current intake

19   number of 100 per week based on how many people they believe they can properly monitor and

20   manage, in keeping with their requirements: for example, that all people transported from the

21   county jails test negative for the virus within seven days before the transfer; that the test results be

22   relayed to the Reception Center in advance of the transfer; that staff and incarcerated people wear

23   N95 masks during transport; and that people received in CDCR be tested, quarantined for 14 days,

24   and tested at the end of the quarantine period.  Plaintiffs were assured that there is no current plan

25   to expand intake beyond the current low numbers or to move the people arriving from county jails

26   to other prisons, outside of the vacant housing units at North Kern and Wasco where they will be

27   quarantined and then housed.  Approximately an hour before this statement was filed, through

28   edits to the statement, Plaintiffs discovered intake will be doubled this week.

16827595.1

1  Plaintiffs were also told that essential intra-system transfers continue to take place under

2  careful scrutiny by CCHCS, now using the protocols in the updated transfer matrix.  Plaintiffs

3  continue to believe CCHCS and CDCR must ensure that the new protocols can be followed

4  appropriately and effectively before newly arrived people from the county jails are moved out of

5  the Reception Centers.  Defendants also explained that they have chosen to prioritize intake from

6  those counties where people with state sentences face significantly crowded conditions.  Plaintiffs

7  recognize the importance of and agree with this approach.

8  The parties also discussed the order by the Michigan Governor to condition state prison

9  transfers on local jail efforts to combat the coronavirus.  The Receiver suggested that the Michigan

10  approach is neither warranted under the circumstances nor legally appropriate; Defendants did not

11  assert a position.  At the last Case Management Conference, the Court directed the parties to

12  weigh in as to the advisability of a similar order in the present case.  Plaintiffs support such an

13  order.  Defendants have already imposed some obligations on the counties in order to reopen

14  intake: testing, mask-wearing, and a ban on confirmed cases.  Plaintiffs believe that further efforts

15  along the lines of those included in Governor Whitmer's order, to ensure that the counties are

16  taking reasonable steps in accordance with generally accepted national standards to stem the

17  spread of the virus in their facilities, are appropriate to minimize the risk to those being

18  transported to and initially incarcerated in the Reception Centers.  It is Plaintiffs' view that the

19  Court has the power to order Defendants to expand their requirements in this way.  Plaintiffs

20  request the opportunity to brief this matter once Defendants make their position known, should

21  they disagree.

22  Plaintiffs appreciate the additional information about intake processes supplied by CDCR

23  and CCHCS and the prompt scheduling of a meet and confer regarding their approach and plans.

24  Plaintiffs continue to have questions and concerns about how CDCR and CCHCS will determine

25  when and whether intake should be increased, decreased, suspended, or restarted.  Plaintiffs also

26  note that North Kern and Wasco State Prisons are currently experiencing COVID-19 outbreaks.

27  At North Kern, the number of positive cases more than doubled on August 27th, and now numbers

28  32.  At Wasco, there have been more than 60 new cases in the last 14 days.  We will continue to

-9-

Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   engage in discussions of this matter with CDCR and CCHCS as appropriate.

2       *Defendants' Position:* CDCR resumed intake the week of August 24, and accepted a total

3   of 100 inmates into custody.  Fifty inmates from San Joaquin County and Kings County each were

4   successfully transferred to the reception centers at Wasco State Prison and North Kern State

5   Prison.  CDCR expects to receive another 200 incarcerated persons total from the following three

6   counties the week of August 31: San Bernardino, Kern, and Santa Cruz.[4]  This limited intake

7   allows CDCR and CCHCS to test its processes, mitigate risk and ensure that intake can be done

8   safely in compliance with the movement matrix.  Limited intake will allow for modification of

9   intake processes, if necessary.  CDCR will decide whether to increase, decrease, or suspend intake

10  in accordance with health care and public health guidance.

11      In advance of the resumption of intake, CDCR and CCHCS leaders worked closely with

12  the California State Sheriff's Association and prioritized intake from counties that have the

13  greatest need to create space in their facilities, with the understanding that the resumption of intake

14  must be done in a controlled and limited manner.  CDCR and CCHCS worked closely with the

15  California Department of Public Health to set parameters for counties to follow in advance of any

16  transfer of incarcerated persons from jail to CDCR custody.  In advance of transfer, counties must:

17  (1) ensure negative COVID-19 test results are received within 7 days of transfer[5]; (2) use N-95

18  mask for all incarcerated persons and transportation staff during transport; (3) conduct symptom

19  screening within 24 hours of transfer; and (4) provide a manifest of people transferring to the

20  reception center Classification and Parole Representative in advance.  Counties have agreed to

21  comply with this protocol.

22      Upon arrival at a CDCR reception center, county transferees will again undergo COVID-

23  19 symptom screening and testing in accordance with the movement matrix.  All new arrivals are

24  quarantined in single cells for 14 days following arrival in designated quarantine housing.  While

25

26  [4]     To date, the following counties have been approved for intake: San Joaquin, Kings, San
        Bernardino, Kern, and Santa Cruz.
27  [5]     Test results must be provided to health care staff at the reception center prior to transfer.
28  Individuals who refuse to test will not be transferred.  The 7 day period may be subject to change
        based upon, amongst other things, average statewide test turnaround times.

-10-                                                  Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  in quarantine, new arrivals are screened daily for COVID-19 symptoms.  Tests are administered

2  within 24 hours of arrival, again on day 7, and again prior to release from quarantine (but no

3  sooner than day 12).  Arrivals are then released from quarantine after 14 days if they are

4  asymptomatic and test negative for COVID-19.  New arrivals who refuse testing must remain in

5  pre-transfer quarantine for at least 21 days and receive daily symptom screening.  Their

6  disposition is then determined in consultation with the Chief Medical Executive in accordance

7  with the movement matrix.

8         Specific to the resumption of intake the week of August 24, CDCR and CCHCS jointly led

9  a telephone call with the wardens and Chief Executive Officers at both North Kern State Prison

10 and Wasco State Prison to walk through the entire process from the time the bus arrives through

11 the housing of new county transferees.  CCHCS also dispatched an Associate Warden to both

12 institutions to confirm that they were prepared to resume intake in accordance with the mandates

13 of the movement matrix.  CCHCS and CDCR were confident that both institutions were prepared

14 and knowledgeable of the process before intake resumed.

15        Finally, Defendants do not believe an order requiring CDCR to suspend intake from

16 counties that do not comply with certain COVID-19 protocols, like the Executive Order signed by

17 Michigan Governor Gretchen Whitmer on August 15, 2020, is necessary or appropriate in

18 California.  By way of comparison, Michigan's current rate of reported cases of Coronavirus is

19 1,423 per 10,000 prisoners, whereas California's is 926 per 10,000 prisoners; Michigan's deaths

20 due to Coronavirus is 19 per 10,000 prisoners, while California's is 5 per 10,000 prisoners.[6]

21 California's county jails have already agreed to the parameters discussed above, and CDCR is

22 strictly adhering to the movement matrix.  To the best of Defendants' knowledge, no other

23 jurisdiction in this country has implemented the robust procedures set forth in the movement

24 matrix developed by CCHCS.  These steps will ensure the safety of incarcerated persons in CDCR

25 custody, new arrivals, and staff.

26

27 _____

28 [6] Information available at The Marshall Project: https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons.

-11-                                Case No. 01-1351 JST

16827595.1

1    **IV.    QUARANTINE AND ISOLATION**

2         **A.    Set Aside Space**

3         The Court's July 22 Order to Set Aside Isolation and Quarantine Space required CDCR to

4    quickly identify and disclose (by August 5) and vacate or reserve (within 2 weeks of identifying

5    such space) at least 100 beds for quarantine and isolation purposes at each prison. *See* ECF No.

6    3401 at 3-4, ¶¶ 1-2. CDCR completed this process for 30 prisons on August 8, and for the

7    remaining 5 prisons on or before August 27.

8         The Court's July 22 order also required CDCR to assess whether additional space is

9    required at each prison, and to include the Receiver and the parties' health experts in this process.

10   *See* ECF No. 3401 at 4, ¶ 3. This process was to be completed by August 19. *See id.* On August

11   18, the Public Health Workgroup (comprised of Plaintiffs' Expert, Defendants' Expert, and

12   CCHCS experts) issued guidance regarding quarantine and isolation space at each prison to both

13   parties. Based on this guidance, CCHCS's Quality Management team also on that date

14   recommended specific numbers of beds to reserve for quarantine and isolation purposes at each

15   prison. On August 27, CDCR provided Plaintiffs with a document outlining how much space

16   CDCR has proposed to dedicate to isolation and quarantine at 31 prisons, and whether all such

17   space had been vacated. According to this document, 15 prisons have identified but still need to

18   vacate additional space for quarantine and isolation purposes. Finally, CDCR provided isolation

19   and quarantine plans for the remaining four prisons—California Health Care Facility (CHCF),

20   Folsom State Prison (FSP), San Quentin State Prison (SQ), and California Rehabilitation Center

21   (CRC)—to Plaintiffs on August 29, but reported that CDCR continues to look at ways to address

22   the unique space needs at these four prisons.

23        *Plaintiffs' Position*: Plaintiffs are reviewing CDCR's August 27 and 29 proposed set

24   asides for each prison. We intend to promptly raise our concerns about particular prisons with

25   Defendants and the Receiver, request a meet and confer to discuss these concerns, and, if

26   necessary, submit a joint letter brief to the Court to resolve any disputes, pursuant to the process

27   described in the Court's July 22 Order at Paragraph 6. *See* ECF No. 3401 at 4, ¶ 6.

28        Plaintiffs further note that the *Armstrong* Court Expert has concluded that CDCR's set-

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

1  asides are insufficient for people with significant disabilities at 16 prisons.  *See* Report and

2  Recommendations Regarding Housing of *Armstrong* Class Members During the COVID-19

3  Pandemic, *Armstrong v. Newsom*, No. CV 94-2307 CW (N.D. Cal. August 19, 2020), ECF No.

4  3048.  The Expert described some of the deficits as "extreme," with set-aside space that is

5  inaccessible to, among others, those who use wheelchairs despite sizeable populations that require

6  such housing.  *See id.* at 17.

7       *Defendants' Position*:  On August 18, 2020, CCHCS Quality Management issued

8  recommended quarantine and isolation space reserves for the prisons based on the methodology

9  devised by the Public Health Workgroup.  At the August 21 case management conference, the

10 Court ordered CDCR to provide its proposed isolation and quarantine space for each prison in

11 response to the CCHCS recommendations.  CDCR has now provided that response to Plaintiffs

12 and the Receiver and identified what space it can reserve for isolation and quarantine purposes at

13 each of the prisons.

14       CDCR has worked hard to address the recommendations for isolation and quarantine space

15 and has identified and reserved vast quantities of space across the system for this purpose.  As

16 identified in CDCR's response to the recommendations, the quarantine and isolation space already

17 reserved at seventeen prisons[7] meets or exceeds the recommended space reserves.[8]  For an

18 additional eight prisons,[9] CDCR has identified space that will meet or exceed the

19

20

_____

21 [7]     The seventeen prisons are California City Correctional Facility, California Correctional Center, Central California Women's Facility, California Institution for Women, California Men's

22 Colony, California State Prison—Corcoran, Correctional Training Facility, Deuel Vocational Institution, Ironwood State Prison, Mule Creek State Prison, North Kern State Prison, Pelican Bay

23 State Prison, Pleasant Valley State Prison, R.J. Donovan, California State Prison—Sacramento, Salinas Valley State Prison, and Valley State Prison.

24 [8]     For one additional prison—Substance Abuse Treatment Facility—the space CDCR reserved exceeded the number of beds originally recommended by CCHCS.  But CCHCS has now

25 advised that it miscalculated the number of recommended beds, and that it will recommend that more beds be set aside than CDCR has currently reserved.

26 [9]     The eight prisons are Calipatria State Prison, California State Prison—Centinela,

27 California Institution for Men, Chuckawalla Valley State Prison, High Desert State Prison, Kern Valley State Prison, Sierra Conservation Center, and Wasco State Prison.

28

16827595.1

1    recommendations, but CDCR will need to conduct some inmate transfers to free up some of the

2    identified space at these eight prisons.  CDCR intends to work with the Receiver to safely conduct

3    those transfers, but it will take time to safely complete them.

4         For an additional five prisons,[10] even after needed transfers are completed, the space

5    CDCR can currently set aside has fewer than the recommended number of single-cell beds.  Three

6    of the prisons in this group are only slightly under the recommended number of beds (short by

7    eleven beds or less).  CDCR will continue to consider ways to improve its ability to respond to an

8    outbreak at these prisons, and if possible, increase the amount of reserved space.

9         Meeting the recommendation for the last four outstanding prisons—San Quentin, Folsom,

10   California Rehabilitation Center, and California Health Care Facility—is not currently feasible.

11   For these prisons, CDCR has identified the space that it can currently reserve, which is

12   substantially less than the recommendation.  CDCR has developed plans to augment the reserved

13   spaces in the event of an outbreak at these prisons by installing tents and converting other spaces

14   within the prisons into isolation and quarantine spaces.  And CDCR intends to continue

15   developing special plans for these four prisons.

16        Because transfers are required to vacate some of the identified isolation and quarantine

17   spaces, CDCR will be unable to fully comply with the Courts directive that all identified space be

18   ready for occupancy by September 2, 2020.  CDCR intends to work with the Receiver to safely

19   accomplish the transfers, but that process has not yet begun.  Consequently, CDCR does not yet

20   know how long it will take, but CDCR should be able to report more on timing by the next case

21   management conference.

22        Defendants look forward to working with Plaintiffs and CCHCS to ensure adequate space

23   for quarantine and isolation is reserved at all institutions.

24   **B.    Policies and Practices**

25   *Plaintiffs' Position*:  We believe the identification of adequate isolation and quarantine

26

27   [10]    The five prisons are Avenal State Prison, California Correctional Institution, California
28   Medical Facility, California State Prison—Los Angeles County, and California State Prison—
     Solano.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

space is critical, but further guidance to the prisons is necessary so that patients are timely and appropriately isolated or quarantined in the designated space or elsewhere.  Custody and medical officials have made housing decisions during the pandemic that put patients at risk or caused harm.  For example, in April at the California State Prison, Los Angeles County (LAC), a patient known to have COVID-19 was housed with another person not known to have the condition, with the latter then becoming infected.  *See* ECF No. 3304 at 6-7.   At San Quentin in early June, staff reportedly disregarded clear directives from public health officials to quarantine people transferred from the California Institution for Men (CIM) apart from others, allowing the virus to spread.  *See* Megan Cassidy, *San Quentin officials ignored coronavirus guidance from top Marin County health officer, letter says*, San Francisco Chronicle (Aug. 11, 2020), https://www.sfchronicle.com/crime/article/San-Quentin-officials-ignored-coronavirus-15476647.php.  In early July, we reported a group of more than 20 patients at CIM who were newly diagnosed with COVID-19 remained in the same dorm as patients who had tested negative. *See* ECF No. 3370 at 15.  And in the last CMC Statement, we reported that we had recently identified and raised with CCHCS a failure to timely move COVID-confirmed patients from a dormitory at California Men's Colony to the designated isolation celled unit at that prison.  *See* ECF No. 3427 at 11.

Since the last Case Management Conference, we have also recently identified and reported to CCHCS and CDCR related concerns at the Substance Abuse Treatment Facility and State Prison, Corcoran (SATF), Correctional Training Facility (CTF), and LAC.  Specifically, we discovered patients on quarantine status at SATF were being housed together in a gym, rather than in the designated, celled housing unit for quarantine and isolation.  We also discovered that COVID-confirmed patients at SATF and CTF had been moved to or remained in housing units other than the units identified by CDCR for quarantine and isolation purposes.  Plaintiffs have asked whether those buildings also house people who are not confirmed or suspected to have COVID-19.  We have not yet received a written response to our inquiries, but during a phone call on August 31, CCHCS reported that at CTF, while positive patients did not share a cell or dorm with those not confirmed to have COVID-19, some were in buildings that housed both confirmed

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

1  and non-confirmed patients, and that direction had been given to the prison to address this.

2  Finally, we reported that at LAC, a confirmed COVID-positive patient in administrative

3  segregation had not been moved to that prison's quarantine and isolation unit, even though doing

4  so would not seem to pose any security risk (because the prison has a celled isolation unit).[11]

5  First, CCHCS and CDCR should issue a clear policy explaining when a patient must be

6  moved to the designated quarantine and isolation space, and when it is permitted for the patient to

7  isolate or quarantine in place or in some other building.  CCHCS's current policies on this topic

8  are unclear.  On August 28, CCHCS explained that its current policies for quarantine and isolation

9  can be found in the definitions section of the August 19 Screening and Testing Matrix for Patient

10  Movement.  Regarding isolation, that document provides that "[c]onfirmed positive patients shall

11  not be housed in the same unit with those who are not known to have COVID-19," but that

12  patients can be housed in the same building with non-infected patients "[i]f there are no other

13  options."  In Plaintiffs view, this is not sufficiently clear: does "no other options" mean that the

14  isolation and quarantine unit is full?  Or that the isolation unit is a dormitory, and for security

15  reasons the person cannot be housed in a dormitory?  Should someone in an inpatient medical or

16  mental health bed be moved to a quarantine or isolation unit?  If not, how will those patients

17  access showers and yard without potentially exposing other non-positive patients who share the

18  same facilities?  Plaintiffs believe the policy must be clarified to address these scenarios.

19  Second, we believe CCHCS and CDCR should draft a procedure that clearly lays out what

20  steps will be taken, and by whom, when a patient is confirmed to be COVID-19 positive, or needs

21  to be quarantined due to the risk of exposure.  We believe such a procedure should outline the

22  steps both custody and medical staff must take related to the timeliness and appropriateness of

23  housing moves, as well as assigning a point-person who is ultimately responsible for monitoring

24  that all patients are housed appropriately and that there remain sufficient available isolation and

---

26  [11]    We are able to monitor where patients confirmed to have COVID-19 are housed by
27  regularly checking the COVID-19 Registry.  However, we are not able to monitor where patients
    who are on quarantine status are housed, as these patients are not reported in the Registry.  We
    have recently asked CCHCS and CDCR to produce weekly a list of patients on quarantine status
28  and in isolation, with their housing locations.  We are awaiting a response to this request.

-16-                                          Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

quarantine beds at the prison.  This person should be required to report and elevate (to Regional or Headquarters staff) any concerns with the available isolation and quarantine space, as well as instances where a person could not be appropriately housed.

Plaintiffs wrote to CCHCS and CDCR, outlining our concerns and requests, on August 25. We have not yet received a written response, though on an informational call with CCHCS on August 28, CCHCS leadership indicated they did not feel any additional policies or procedures were necessary at this time.  However, on August 31, CCHCS mentioned that CEOs from prisons with outbreaks will now be required to complete daily reports that will be forwarded to Headquarters, based on a template that has not yet been finalized.  CCHCS has said they will share the template with Plaintiffs once completed.  We continue to believe the policies and procedures described above are needed.

*Defendants' Position*:  All prisons have been advised that they must use the reserved isolation and quarantine space to isolate COVID-19 positive inmates and to quarantine inmates who may have been exposed.  All prisons with current outbreaks were directed to confirm their use of the designated spaces by Monday, August 31.

## V.     SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE

*Plaintiffs' Position:*  As previously reported, the Receiver has agreed that people who may be at the greatest risk of harm, based on their elevated weighted COVID-19 risk scores, should be prioritized for possible transfer from their dorms to a cell at their current prison.  On August 18, CCHCS provided Plaintiffs with a list of 67 people with a weighted COVID-19 risk score of 11 or higher who are currently housed in dormitories at ten prisons.  Of those, 30 were at either California Medical Facility (CMF) or at California Health Care Facility (CHCF), where CCHCS anticipates rehousing from dormitories to cells may not be possible.  On August 28, CCHCS reported that it had initiated the process of offering moves from dormitories to cells to the remaining 37 patients.  CCHCS reported that it set a "soft deadline" of September 4 for a report from the prisons offering such moves, and that it would share the results with the parties once this initial project was completed.  CCHCS reported that it will assess the next group of possible patients after that, and after its internal revision of the COVID-19 risk score has been

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

1  implemented, as this will likely change some patients' scores (discussed above and expected to be

2  completed by August 31).

3      Plaintiffs are glad to hear this initial project is underway.  We hope that it will be quickly

4  expanded to all patients who are at risk of severe complication or death if they contract COVID-

5  19.

6      *Defendants' Position:* Defendants remain committed to working with the Receiver to

7  facilitate moves of medically high-risk patients from dorms to cells, or any other moves, to safely

8  house medically high-risk patients when such moves are recommended and approved by the

9  appropriate public health and corrections experts.  Working in close coordination with the

10  Receiver's Office, CDCR hopes to commence the rehousing of medically high-risk people this

11  week.  These moves will be for people who agree to be relocated and where cell beds are

12  available.  Defendants expect to further report on the success of these moves at the next case

13  management conference.

14  **VI.   COVID-19 TESTING**

15      **A.   Staff Screening**

16      *Plaintiffs' Position:*  As described in the last Joint Case Management Conference

17  Statement, the Office of the Inspector General recently reported significant problems with

18  CDCR's COVID-19 screening process for individuals entering a prison. *See* ECF No. 3427 at 14-

19  15; Office of the Inspector General, *COVID-19 Review Series, Part One: Inconsistent Screening*

20  *Practices May Have Increased the Risk of COVID-19 Within California's Prison System* (August

21  2020), available at: https://www.oig.ca.gov/wp-content/uploads/2020/08/OIG-COVID-19-

22  Review-Series-Part-1-Screening.pdf.  The OIG recommended that CCHCS/CDCR provide more

23  specific screening instructions to the prisons, and develop a plan to monitor compliance with such

24  screening procedures on an ongoing basis.  *See* OIG Report at 31.

25      On August 25, Plaintiffs emailed CDCR and CCHCS, asking what steps would be taken to

26  respond to the issues identified in the OIG's report.  On August 26, CCHCS reported that it was

27  developing procedures to standardize the screening process at all prisons.  Plaintiffs have asked to

28  review those procedures once drafted.  We have also asked whether the new standardized

16827595.1

procedures will include instructions to the prisons on expectations for monitoring, as recommended by the OIG.

*Defendants' Position:* Plaintiffs sent an email with their above-referenced questions to CCHCS and CDCR yesterday (Sunday, August 30, 2020).  CDCR will work with CCHCS to provide a response.

**B.     Staff Testing**

At the last Case Management Conference, Defendants reported that CCHCS would take over the staff testing project from CDCR.  *See* ECF No. 3427 at 18.  The Court asked the Receiver to inform the parties the following week whether any improvements would be made to the August 12 iteration of CDCR's staff testing plan.  *See* ECF No. 3432 at 45:14-19.

*Plaintiffs' Position:* On August 26, CCHCS reported to the parties that it is still reviewing the August 12 plan to determine whether any changes are necessary.  CCHCS also reported that a number of preliminary steps must be completed before CCHCS staff can begin testing employees, including: finding a vendor to process the employee tests, obtaining funding for and hiring staff at each prison to conduct necessary contact tracing, and developing a system to track and report employee test results.  The time-frame for this work is not certain.  Regarding staffing, CCHCS reported that it intended to hire an employee health nurse for every prison, with assigned contact tracers.  CCHCS further reported such staff would be hired at five prisons this week (the week of August 31, 2020), and at the remaining 30 prisons by September 30, 2020.

CCHCS's taking over the staff testing program could be a step forward, and we support the hiring of additional medical staff at each prison to conduct necessary contact tracing.  However, our concerns about the sufficiency of the August 12 iteration of the staff testing plan persist.  We are eager to hear whether CCHCS will make any changes to the plan drafted by CDCR.  We also are concerned about the as yet uncertain time-frame for CCHCS to fully assume operational authority for the program, including reporting.

*Defendants' Position:* CDCR will continue to work closely with CCHCS to continue the current staff testing procedures and to ensure a smooth and easy transition of the staff testing-responsibilities to CCHCS.  CDCR also remains committed to continuing to work with CCHCS to

-19-

1  answer any questions Plaintiffs might have about the status of and processes for staff testing until

2  the transition to CCHCS has been completed.

3        **C.**      **Incarcerated Population Testing**

4        *Plaintiffs' Position:* CCHCS reports that it has been meeting and considering revisions to

5  its patient COVID-19 testing guidelines and policies.  It is not known whether or to what extent

6  CCHCS agrees with Plaintiffs' request that certain testing matters be mandated, such as serial re-

7  testing during an outbreak, or the testing of incarcerated workers who have frequent interaction

8  with staff or other incarcerated people.  CCHCS said it will share revisions with us before they are

9  finalized, which we appreciate, and that the policy will probably be revised repeatedly in the

10  future, which we understand.  That said, no time-frame for an initial revision was provided.

11        CCHCS also said it continues to work on a method to determine and, presumably, report

12  on the degree to which ordered serial re-testing of patients is done.  It was indicated that such

13  reporting would not be available soon, but that additional information may be available this week.

14  We appreciate that work on this continues, and note that now that CCCHS is assuming

15  responsibility for staff testing (see above), it will similarly need to provide reports on compliance

16  with staff re-testing mandates at, for example, the prisons where all staff must be re-tested at least

17  once per month.

18  **VII.**    **NOTIFYING PATIENTS OF COVID-19 LAB RESULTS**

19        *Plaintiffs' Position:* CCHCS reports that it continues to consider and work on what we

20  continue to request be a mandated template for prisons to use to notify patients of COVID-19 lab

21  results.  We have asked this notification also include educational information related to symptoms,

22  medical isolation, and other key matters, including what happens when the infection is considered

23  "resolved."  We provided CCHCS with a template.  CCHCS said it continues to gather best

24  practices from the prisons, and that there are technical and work-flow issues being considered, as

25  currently notifications of lab results to patients must be individually generated by a Primary Care

26  Provider (PCP).  CCHCS says it has no timeframe for resolution of this matter.  This remains a

27  significant concern.  Last week, we provided CCHCS notifications sent by PCPs at two prisons

28  that confusingly told patients that lab results were "essentially within normal limits" and that

16827595.1

COVID-19 had been detected.  Neither notification provided educational information about COVID-19.

*Defendants' Position:* Defendants understand that CCHCS is in the process of reviewing communications sent by various institutions to patients in conjunction with test results and identifying best practices.  CCHCS plans to disseminate exemplars of communications to incarcerated persons informing them of their test results to the Chief Medical Executives in the coming weeks and suggest they share the exemplars with providers.  Simultaneously, CCHCS is evaluating whether they can write code that would issue a template letter to patients once their results are entered into the system.  This process is anticipated to take several weeks.

## VIII.   PRISON UPDATES

*Plaintiffs' Position*:  We have asked CDCR or CCHCS about several matters related to COVID-19 at particular prisons.  On August 21, we asked CDCR if a report that a housing unit ventilation system had been turned off at San Quentin was correct, and whether it had requested or received an evaluation of whether the unusual ventilation system used in many of the prison's housing units, in which air from the building as whole is drawn into the cells, plays any role in transmission of the virus that causes COVID-19.  On August 22, we asked CDCR about reports that at Kern Valley State Prison people on quarantine were not provided yard or dayroom, and were denied access to forms used to request medical services and present medical grievances.  Also on that date, we asked CDCR about reports from CHCF that some quarantined patients there were not offered outdoor exercise or dayroom.  On August 24, we asked CDCR about numerous reports that in recent months some correctional officers at California State Prison – Los Angeles County did not wear or properly wear face masks, including during the twice-daily delivery of food trays to cell fronts.  On August 27, we asked CCHCS about documentation by nurses in July purporting to show that a patient, after meticulously documented "effective communication," refused to be assessed for COVID-19 symptoms, then refused to sign a form acknowledging that the assessments had been refused (the patient in fact was at an outside hospital on the dates for which the nurses documented these events).  We have received a response to the last of these inquiries, which raises additional questions, and are awaiting responses to the others.

16827595.1

IX.     **OTHER UPDATES**

*Plaintiffs' Position*:  On August 13, we asked CCCHS to provide the number of CDCR incarcerated people currently receiving Medication Assisted Treatment (MAT) for substance use disorder, the number newly started on such treatment in June and July, and whether there is a Dashboard we can access that would provide such information on an on-going basis.  We also noted a huge increase in the number of addiction medicine appointments reported in recent months and the substantial backlog of such appointments that nevertheless exists, and asked for information about the pending appointments and plans to address the backlog.

We also on August 13 asked CCHCS about the sharp decrease in new HCV treatment starts in recent months, from between 600 to 700 statewide in January, February, and March, respectively, to an average of approximately 275 per month in April, May, and June, with substantial decreases seen even at prisons without COVID-19 outbreaks.  We noted that during this same period, the number needing HCV treatment has risen since March, in all risk groups.

On August 25, we asked CCHCS about the status of a revised mortality review policy, and regarding certain current practices which raise concerns about the adequacy of current reviews. We are awaiting responses to these queries.

*Defendants' Position*:

A.      **Secretary Diaz's Retirement**

As announced on August 28, 2020, Secretary Diaz will be retiring effective October 1, 2020, after almost three decades of service to the people of California.  Governor Newsom announced that Kathleen Allison will be named Secretary of CDCR upon Secretary Diaz's retirement.  Ms. Allison is currently serving as Undersecretary of Operations and began her career at CDCR as a medical technical assistant in 1987 and is a registered nurse.  Further details can be found at: https://www.cdcr.ca.gov/insidecdcr/2020/08/28/governor-newsom-announces-cdcr-secretary-retirement-names-new-secretary/.

B.      **Public-Private Partnership to Support Reentry**

The State of California has established a public-private partnership with nonprofit organizations and philanthropies to support the reentry of incarcerated people who have been and

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

1  will be released from CDCR's institutions since July 1, 2020.  The partnership is called

2  "Returning Home Well" and provides essential services, such as housing, health care, treatment,

3  transportation, direct assistance, and employment support.  The State of California has made an

4  initial commitment of $15 million, which will be matched by philanthropic contributions for a

5  total goal of $30 million.  The resources are going to organizations providing transportation home

6  from prison, quarantine housing, emergency supportive housing, residential treatment, access to

7  health care, employment services, direct assistance, and more.

8      **C.      Requests for Information**

9          Finally, since the last case management conference on August 21, Plaintiffs have sent

10  approximately twelve separate requests for information.  Defendants are in the process of

11  providing responses to same.

12  **X.    SCHEDULING REQUEST**

13          Until circumstances regarding COVID-19 in the prisons indicate otherwise, the parties

14  jointly request that the Court generally schedule Case Management Conferences every other

15  Friday, with Case Management Conference statements due on Thursday before the conference

16  date.  This modification to the frequency of hearings, from approximately every 10 days to every

17  14 days, should permit the parties to meet and confer more effectively, perhaps make more

18  progress on issues between Conferences, and better enable the parties to obtain current

19  information for the statement without the added challenge of obtaining such information over the

20  weekend for Monday filings.

21

22  DATED:  August 31, 2020                    HANSON BRIDGETT LLP

23

24                                          By:  */s/ Samantha Wolff*
                                                ─────────────────────────
25                                               PAUL B. MELLO
                                                 SAMANTHA D. WOLFF
26                                               KAYLEN KADOTANI
                                                 Attorneys for Defendants
27

28  DATED:  August 31, 2020                    XAVIER BECERRA
                                                 Attorney General of California

                                                -23-                    Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16827595.1

1

2
                      By:  */s/ Damon McClain*

3
                           DAMON MCCLAIN
                           Supervising Deputy Attorney General

4
                           NASSTARAN RUHPARWAR
                           Deputy Attorney General

5
                           Attorneys for Defendants

6

7
DATED:  August 31, 2020           PRISON LAW OFFICE

8

9

10
                      By:  */s/ Sophie Hart*

11
                           STEVEN FAMA
                           ALISON HARDY

12
                           SARA NORMAN
                           SOPHIE HART

13
                           Attorney for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16827595.1
JOINT CASE MANAGEMENT CONFERENCE STATEMENT