XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
RYAN GILLE (262105)
IRAM HASAN (320802)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>            Plaintiffs,<br><br>      v.<br><br>GAVIN NEWSOM, et al.,<br><br>            Defendants. | CASE NO. 01-1351 JST<br><br>**CORRECTED JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:    September 17, 2020<br>Time:   10:00 a.m.<br>Crtrm.: 6, 2nd Floor<br>Judge:  Hon. Jon S. Tigar |

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

The parties submit the following corrected joint statement in advance of the September 17, 2020 Case Management Conference (the correction is at page 2, line 22: the number "4," has been corrected to "42").

## I.   POPULATION REDUCTION

*Plaintiffs' Position*:  Population reduction remains necessary to minimize the risk of harm from COVID-19, particularly among those at increased risk of harm if infected.  As previously explained (see ECF No. 3417 at 2:14 – 3:2), the overall CDCR population reduction since March, while certainly helped by early release programs, has primarily resulted from natural releases and the suspension and limitation of intake.  In this regard, and predictably, it appears the overall population decline in CDCR has slowed since intake was re-opened late last month.  For example, CDCR's August 19 report showed a drop of 785 people in the prisons compared to the prior week, while the September 9 report showed a drop of only 253.[1]  If and when intake increases, CDCR's total population is likely to increase as well.  This is especially so since the number and rate of early releases is also dropping dramatically.  In the month after the July 10 programs were announced, 4,421 people were released early.  See ECF No. 3417.  In the more than one month since then, fewer than half that number have been released, with most of those releases having occurred weeks ago: per Defendants' report below, there were only 336 early releases in the three weeks since the last Case Management Conference Statement was filed.

Further, Defendants' data below shows only a relatively small number of those at increased risk of harm if infected with COVID-19 have been released early.  Within the July 10-announced program specifically designed for such people, only 42 have been

---

[1] .  Compare CDCR Weekly Report of Population, August 19, 2020 [at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/08/Tpop1d200819.pdf] with CDCR Weekly Report of Population, September 9, 2020 [at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/09/Tpop1d200909.pdf].

1   approved for release, less than four percent of those that have been considered.  Even

2   counting medical high risk patients released under the other July 10 programs, a total of

3   only 163 such people have been released, an average of approximately five people per

4   prison, a very disappointing number given the 6,200 who defendants said were eligible

5   overall.  Unfortunately, despite 60 deaths and almost five hundred hospitalizations caused

6   by COVID-19, it does not appear the State fully considers these releases an emergency,

7   despite invoking state law grounded on the fact that it is.

8       Defendants below for the first time describe the process being used to consider

9   release under the high risk medical program for those with indeterminate sentences.  The

10   process includes previously undisclosed exclusionary factors such as a person having a

11   parole consideration hearing scheduled, and an added requirement of gubernatorial review.

12   Defendants previously stated that there were 3,900 people with indeterminate sentences

13   eligible for release consideration.  Perhaps tellingly, Defendants do not now say how many

14   remained eligible after its new exclusionary criteria were applied.

15       Defendants also do not discuss whether CCHCS's recent updating of its COVID

16   risk factors and thus the Weighted COVID Risk Scores assigned to thousands of patients

17   has increased the number of people eligible for release consideration under the high risk

18   medical program.[2]  On September 14, we asked CDCR for this information, after learning

19   from CCHCS that CDCR has had available to it since September 1 a list of incarcerated

20   persons with their updated Weighted COVID Risk Scores.  People newly eligible for early

21   release consideration due to a revised Risk Score must be considered by the Secretary.

22       *Defendants' Position*:  From March 2020 through September 9, 2020, 20,515

23   incarcerated people were released from CDCR institutions and camps.  CDCR's total

24   population remains below 100,000.  From July 1 through September 15, 5,668 people were

25   released from institutions and camps as a result of the COVID-19 early-release programs

26

27   ───────────────

[2] Those with such a CCHCS Weighted COVID Risk Score of four or more are medically eligible
for early release consideration under the CDCR's high risk medical program.

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16869130.1

Defendants announced on July 10.  This represents 336[3] more early releases than those reported in the August 31 case management conference statement.  Between July 1 and September 12, 6,628 additional people were released in accordance with their natural release date.

In the August 31 case management conference statement, Defendants reported that CDCR anticipates completing its review of determinately sentenced people eligible for early-release consideration in the high-risk medical early-release program by October 1. (ECF No. 3436 at 4.)  Defendants also reported the factors and priority of factors considered for each person reviewed.  (*Id.*)  This included a real-time reprioritization of medically high-risk people housed at Folsom State Prison when the COVID-19 outbreak was discovered at that institution.  (*Id.*)  And to illustrate the process, Defendants provided redacted copies of four actual individual files the Secretary reviewed.  (*Id.* at 5, Ex. A.)  Of the four, two were approved for early release and two were not.[4]  As of September 15, 2020 the Secretary has completed review of 1,198 individual summaries.  This figure is inclusive of both determinately and indeterminately sentenced people deemed eligible for consideration.  The Secretary has approved 42 determinately sentenced people for early release.  In addition to the 42 determinately sentenced people approved for release, the Secretary intends to refer 7 cases of indeterminately sentenced people to the Governor with the recommendation that the Governor grant them clemency.  83 medically high-risk summaries are pending the Secretary's review, and CDCR is preparing an additional 112 summaries for the Secretary's review.

---

[3] In their usual reporting of early and natural release figures in the August 31 case management conference statement, Defendants mistakenly reported cumulative data that included releases from institutions, camps, and other locations, instead of just institutions and camps.  Accordingly, the reported 5,952 early and 6,676 natural releases between July 1 and August 28 reflected releases from more locations than just CDCR institutions and camps.  The numbers of early and natural releases from only institutions and camps during this period were 5,332 and 5,203, respectively. (ECF No. 3436 at 3:21-23.)  Based on these figures, the August 31 statement reported 297 more early releases from institutions and camps than those reported in the August 20 statement, and not 917 as previously reported.  (*See id.* at 3:24.)

[4] *See* ECF No. 3436 at 3:26-5:3 for a more detailed discussion of CDCR's process for considering determinately sentenced medically high-risk people for release through the high-risk medical early-release cohort announced on July 10.

1    The process for reviewing indeterminately sentenced people eligible for early-

2 release consideration in the high-risk medical early-release program announced on July 10

3 involves a few more steps.  Like with eligible determinately sentenced people, CDCR first

4 conducts an initial review of indeterminately sentenced people.  People who do not have a

5 current valid risk assessment, or who have a valid risk assessment indicating a moderate or

6 high risk for future violence were removed from further consideration for early release.  In

7 addition, people who the Board of Parole Hearings (BPH) found to pose a current,

8 unreasonable risk to public safety at their last parole hearing were removed from further

9 consideration for early release in this program.  Finally, those who are already scheduled

10 for a parole hearing will not be released through this program because, among other

11 considerations, district attorneys and victims have been notified of the hearings and

12 attorneys have been assigned to incarcerated people.

13    Following this initial review, the BPH prepares profiles for remaining eligible

14 indeterminately sentenced people.  These profiles are similar to those prepared for eligible

15 determinately sentenced people.  (*See* ECF No. 3436, Ex. A for examples of actual

16 profiles.)  The Secretary reviews each profile.  Finally, the Secretary will forward the cases

17 he recommends for early release to Governor Newsom.  Like its review of determinately

18 sentenced people, CDCR anticipates completion of its review of indeterminately sentenced

19 people by October 1, 2020.

20    As reported in previous case management conference statements, not all medically

21 high-risk people are released through the high-risk medical early-release program

22 announced on July 10.  If a medically high-risk person qualifies for release through other

23 early-release programs that do not require individual review by the Secretary, the release

24 occurs in that manner.  For example, determinately sentenced medically high-risk

25 individuals who also qualify for the 180-day early-release program are released in this

26 manner.  If deemed eligible for release in this manner, the BPH does not prepare profiles

27 for these individuals and the Secretary does not review profiles for these individuals prior

28

1    to release.  From July 1 through September 9, 2020, 163 medically high-risk people have

2    been released through CDCR's early-release programs, including 107 through the 180-day

3    cohort, 24 through the 365-day over 30 cohort, and 32 through the high-risk medical

4    cohort.  In other words, more medically high-risk people have been released early than just

5    those through the high-risk medical early-release cohort.  The Secretary also approved a

6    one-time release of 14 medically high-risk individuals from San Quentin State prison early

7    in the pandemic.  Several additional medically high-risk individuals who did not qualify

8    for the COVID-19 early-release program announced on July 10, including gravely ill

9    incarcerated persons, were approved for early release.  Medically high-risk people eligible

10   for early-release consideration can also be released in accordance with their natural release

11   date if that date arises before the early-release determination.[5]

12          Regardless of the process, each early release evaluation involves a delicate balance of

13   many factors weighing both in favor of and against early release, including the individual

14   circumstances of each incarcerated person reviewed and the risk that release would pose to

15   public safety.  The ongoing public health crisis has given rise to a number of

16   considerations that weigh in favor of early release that did not exist before, but it did not

17   eliminate the need to balance these factors with the risk to public safety.  CDCR's

18   discretionary COVID-19 early-release program alone has resulted in nearly 6,000 early

19   releases since July when the program was first announced.

---

[5] In addition to CDCR's discretionary COVID-19 early-release program, incarcerated people may be eligible for release through other avenues.  For example, eligible people may be relocated to a skilled nursing facility or other appropriate medical facility to receive a heightened level of care through the expanded medical parole program.  This process involves, among other steps, requesting an eligibility review by the individual's primary care physician.  For more information regarding the expanded medical parole process, *see* https://www.cdcr.ca.gov/bph/mph-overview/. Individuals may also apply for compassionate release through Penal Code section 1170(e) if, among other factors, the person is terminally ill with an incurable condition caused by an illness or disease that could lead to death within twelve months.  This law was recently modified to increase the timeframe from six to twelve months.  Additionally, Penal Code section 1170(d) allows for resentencing of eligible people upon recommendation of the Secretary.  Individuals may also apply to the Governor for a commutation of sentence.  For more information about commutations, *see* https://www.gov.ca.gov/commutations/.  This list is not exhaustive; its purpose is to illustrate that early releases may be achieved through several avenues other than the Secretary's discretionary review of medically high-risk individuals.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

## II.    TESTING AND TRANSFER PROTOCOLS

*Plaintiffs' Position*:  CCHCS's August 19 "Movement Matrix" continues to be a source of concern, given that inter-prison transfers are necessary[6] but must be done as safely as possible given that transfers in June resulted in the COVID-19 disaster at San Quentin, a massive outbreak at California Correctional Center, and smaller outbreaks at other prisons.

The Movement Matrix is very complex, imposing varying quarantine and testing requirements at sending and receiving prisons depending on which of approximately 15 types of transfers or movements is being undertaken.  To ensure compliance, we proposed and provided CCHCS with examples of checklists to be completed at the prisons, based on the type of transfer: at the sending prison, staff would complete it and thus ensure that all requirements for transfer were done, before the incarcerated person was placed on the transportation bus; at the receiving institution, staff would complete a checklist before the person was released from quarantine.  Plaintiffs have attached a sample checklist as Exhibit A.

CCHCS says a checklist is problematic, and that it is developing a "Transfer Registry" that addresses "many" of the items covered in our checklists.  This Registry is described as providing a performance metric for each week's transfers.  We look forward to receiving more details, which could happen very soon as CCHCS indicated it is a top priority and may be done this week.  However, we are concerned the Registry may provide only a retrospective view of what was and wasn't done and thus show, for example, that during a previous week which patients were and were not transferred with a timely COVID-19 test.  If this is right, it would be problematic because some patients would have been transferred without the mandated test being done, putting others at risk.  We thus continue to believe that staff completing checklists that show compliance before a person

---

[6]    For example, a few weeks ago CDCR said that more than 2,000 people were overdue for release from restricted (aka maximum custody, minimum privilege) housing units.  Our understanding is such releases which could happen only via an inter-prison transfers.

1    is permitted in a transportation vehicle would best serve to minimize the risk of movement

2    that is inconsistent with the Matrix requirements.

3          We also discussed with CCHCS our concern regarding how staff would know

4    exactly which type of transfer or movement a patient is undergoing, and how the type of

5    transfer would be posted in patients' medical records.  Given the varying testing and

6    quarantine requirements in the Matrix, knowing the type of transfer is key.  CCHCS says

7    that because transfers are approved 18 days in advance of the week of transfer there will be

8    time to notify staff.  However, quarantine in many cases begins at least 14 days before

9    transfer.  And, the fact that there is time to notify staff does not tell us how that will be

10   done or how the information about the type of transfer will be conveyed.  We will continue

11   to ask about this matter.

12         CCHCS also says it shares our concern about the need to document the type of

13   transfer, is looking into how to best accomplish that, and suggests that the medical record

14   is not suitable because only healthcare staff have access to those records.  That's true, but

15   we do, and we want it there so that we can, for any transferred patient, quickly ascertain

16   the type of transfer that was done and thus be able to check if testing and quarantine

17   required for that type of transfer was actually done.  We suggested the registered nurses

18   who are already required to enter documentation in the health record at the sending

19   institution just before a person is transported, and at the sending institution promptly after

20   arrival post-transfer, can easily enter the information.  We will continue to ask about this

21   matter.

22         We also last week raised concerns with CCHCS regarding whether patients

23   previously infected with COVID-19 and now resolved – whom the Matrix explicitly

24   exempts from all testing requirements for a period of 12 weeks from the date of infection –

25   are required to undergo quarantine pre- and post-transfer (the Matrix does not address the

26   issue).  CCHCS says the question is complex, and is currently being discussed with

27   experts.  We will continue to ask about this matter.

28

*Defendants' Position*:  The movement matrix went into effect on August 21, 2020. DAI, CCHCS, and leadership teams at all institutions held a statewide conference call to conduct a detailed discussion of each section of the movement matrix.  The statewide call also included a question-and-answer session.  As explained during that call, movement will be limited and controlled, and must be pre-approved by CDCR headquarters, which is working in collaboration with CCHCS (including Mr. Cullen and Dr. Bick).  More meetings, conference calls, and training sessions are planned to help staff understand and implement the movement matrix.  Additionally, safety protocols now require county staff and inmates arriving to CDCR on intake buses to wear N95 masks.

## III.  INTAKE

*Plaintiffs' Position*:  Plaintiffs continue to oppose re-opening intake from county jails until (a) adequate space has been set aside for quarantine and isolation; (b) particularly vulnerable people have been moved from dorms to cells; and (c) the transfer matrix's effectiveness has been evaluated, based upon intra-system transfers.

Nevertheless, Defendants have re-opened intake.  According to Defendants, CDCR planned to receive a total of 500 people from county jails in various counties during the three weeks since August 24, and would evaluate the intake plan "on a week-by-week basis."  On September 10, the Receiver advised Plaintiffs that, while all of the people transferred had tested negative for COVID-19 within a few days prior to their transfers, a total of 10 people from San Bernardino County tested positive upon arrival at North Kern State Prison reception center.  On September 10, Defendants advised Plaintiffs that intake would pause "for CDCR and CCHCS to assess the process and ensure sufficient space is maintained at the two reception centers."  Plaintiffs will request further information regarding CCHCS's and CDCR's assessments.  Additionally, Defendants have agreed to share with Plaintiffs each week the intake plan for the following week; we anticipate receiving the plan for the week of September 21 later this week.

The parties have met and conferred about the mechanics of the intake process, and

16869130.1

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1    Defendants have responded to a series of questions and provided relevant documents.

2    Defendants posted a notice on their website entitled "Resumption of County Intake," that,

3    among other things, sets forth the criteria CDCR uses to prioritize the counties from which

4    they will accept transfers, requires the timely testing of all people transferred (except those

5    with resolved COVID cases), and requires that all staff and incarcerated people wear N95

6    masks during transfer. According to Defendants, CDCR staff checks whether the people

7    arriving from the counties have the appropriate mask, and they will consider asking

8    people, when they arrive at the reception centers, whether they wore their masks since

9    leaving the jail.  Plaintiffs requested information about whether CCHCS or CDCR had

10   provided any guidance to counties about how people are transported from the counties to

11   the reception centers, including whether and how people are physically distanced on the

12   bus or vehicle conveying them.  The Receiver and CDCR's Connie Gipson stated that they

13   would work together to develop and provide guidance to the counties on this matter, and

14   would provide this to Plaintiffs in the near future.

15          *Defendants' Position*:  During the week of September 6, 2020, CDCR accepted a

16   total of 135 incarcerated persons from county jails as follows:

17

| Number of Incarcerated Persons | Sending County | Receiving Institution |
|---|---|---|
| 50 | Contra Costa | Wasco State Prison |
| 85 | Riverside | North Kern State Prison |

22          CDCR has paused all intake the week of September 13 to assess the flow of intake,

23   the space at the North Kern and Wasco Reception Centers that remains available, the

24   processes that the counties and CDCR have followed to date with respect to intake, and the

25   efficacy of the procedures that are currently in place for county intake, among other

26   factors.

27          CDCR continues to work collaboratively with the counties ensure compliance with

28   all transfer matrix requirements.  For instance, the Receiving and Release Sergeants at

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

Wasco and North Kern verify what type of mask both incarcerated persons and staff wore at the time they disembarked from the transfer busses and will follow up with the counties if necessary to ensure that all transferees and staff wear N95 masks at all times during transfer.

CDCR expects to adopt a schedule for intake that will include some limited number of weeks for intake followed by one or two weeks of no intake, repeated for the foreseeable future.  For instance, 3 weeks of intake, followed by a 1 or 2 week pause, then 3 weeks of intake.

CDCR continues to work with the California Sheriff's Association to permit intake from the counties with the greatest need, determined based on a number of factors, including population density, proximity to reception center, and impact from the wildfires.

CDCR and CCHCS met and conferred with the PLO on the topic of intake on September 10, 2020.  The PLO suggested that CDCR staff inquire with the arriving county transferees whether they have worn a mask the entire trip.  The PLO also inquired whether CDCR will require the counties to ensure physical distancing during transport.  Because there is currently no public health guidance on this topic, CCHCS is in the process of evaluating best practices and will make a recommendation to CDCR in the near future, which CDCR will then pass along to the counties as another requirement for intake.

**IV.   SETTING ASIDE SPACE FOR QUARANTINE AND ISOLATION AND COURT ORDER REGARDING SAME (ECF NOS. 3401 AND 3442)**

*Plaintiffs' Position*:

**A.     Set Aside of Quarantine and Isolation Space**

This Court ordered Defendants to identify space at every prison where people may be housed for quarantine or isolation, in the event of an outbreak, and to vacate that space. ECF No. 3401 at 3-4.  Additionally, the Court ordered the parties and the Receiver to monitor the space reserves, to determine whether they should be modified at a particular prison.  *Id*. at 4.

Defendants have provided a series of space designations, most recently on

1  September 10, specifying for each prison what beds have been or will be vacated to house

2  people on isolation or quarantine.  Plaintiffs have identified several concerns about the

3  designations, including that Defendants have failed to identify whether beds have been set

4  aside for the purpose of quarantine or for isolation and that, at a few prisons, the number of

5  beds allocated appear to be clearly inadequate.  Plaintiffs will this week request the

6  Receiver consider whether bed reserve levels at particular prisons should be modified, and

7  will continue to meet and confer on this issue.

8      In response to the Defendants' application for an extension to comply with this

9  Court's order to vacate the designated space, this Court ordered the parties to meet and

10  confer regarding an expedited timeline for preparing all identified space for occupancy.

11  ECF No. 3442 at 2.  The parties were not able to reach an agreement on this matter.

12          **B.        Development of Policies related to Quarantine and Isolation.**

13      Plaintiffs have asked the Receiver to develop two policies related to quarantine and

14  isolation, and also asked about the directives that have been given regarding those matters.

15  First, we asked that guidance be provided regarding when people should be

16  quarantined/isolated in a space other than the spaces set aside for that purpose.  Plaintiffs

17  have identified numerous instances where people have been quarantined in their assigned

18  housing unit, including in dormitories, after an exposure, or placed on medical isolation in

19  administrative segregation after testing positive, instead of moving to the designated space.

20      CCHCS leadership has strongly affirmed that people are to be quarantined or

21  isolated in the spaces designated for those purposes.  Nevertheless, the Receiver has

22  rejected our request for a policy about when such space need not be used, stating that it is

23  not necessary because "not all situations can be appropriately captured by increasingly

24  specific rules… and there are times when informed and expert judgment and discretion are

25  the most appropriate approach."   Plaintiffs remain highly concerned that, unless there are

26  clear policies directing prison staff regarding when and how to use the isolation and

27  quarantine beds held in reserve, staff may make housing decisions that may not be

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16869130.1

consistent with public health considerations.  Further, if prisons can, for any reason whatsoever, not use designated beds to quarantine and isolate people exposed or diagnosed with COVID-19, it will be all but impossible to assess whether adequate space has been set aside to safely respond to outbreaks at a particular prison.

If there is no policy governing when the set-aside space is used, Plaintiffs urge the Receiver to require that the prisons report every instance when they house a person in quarantine or isolation in a place other than a designated bed, and the reason why that is done.

Plaintiffs have also requested that CCHCS and CDCR develop procedures and time-frames for placing patients in isolation or quarantine, once positive test results are received, or information is received regarding an exposure. The Receiver suggested that such a policy is not necessary because "existing policy calls for immediately masking and promptly isolating cases."  We explained that because test results are received 24/7, people are not always moved promptly, and we have cited examples of cases where necessary movement was delayed.  This is not surprising in a system where the staff members who receive test results (i.e., medical staff) are not involved with physically moving the person to isolation.  Given the risk of transmission to others and the examples of delays that we have cited, we believe it makes sense to operationalize this process with a standard procedure.  The Receiver maintains that the examples Plaintiffs have cited are isolated exceptions, and states that he will "explore with staff whether further operational direction should be given."

On September 9, we asked CCHCS why its directives regarding quarantine permit cohorts of people who have been exposed to COVID-19 when the Public Health Workgroup stated that such people should be quarantined "in the equivalent of single cells with solid doors."  It is deeply concerning that the Workgroup's recommendation is not being followed.  CCHCS stated it would try to respond this week.

1

### C.  Monitoring Use of Quarantine and Isolation Space

Plaintiffs must be able to adequately monitor the use of quarantine and isolation space, including to ensure that incarcerated people are not placed at risk of harm and so that we can determine whether to request that further space be set aside.  CCHCS provided Plaintiffs with a draft template that prisons will use on a daily basis to report on matters related to the Movement Matrix and the use of quarantine and isolation.  We have concerns regarding the adequacy of the information the template calls for,   and will provide CCHCS with comments on the draft shortly.

CCHCS has offered to provide completed copies of these daily reports once they are in use at the prisons "as part of a routine document production."  To adequately monitor, plaintiffs will need to receive reports on virtually a real time basis.   We have also requested regular production of other data regarding medical isolation and the two types of quarantine.  We will continue to discuss this matter with CCHCS.

*Defendants' Position*:  CDCR has diligently continued to increase the amount of reserved isolation and quarantine space at its prisons.  Attached as Exhibit B is a table showing the large quantities of reserved space across the system, and identifying spaces that must still be vacated before they are ready for quarantine or isolation occupancy.

In August 2020, CDCR identified and reserved a minimum of 100 beds at each prison for isolation and quarantine.  In late August, after considering recommendations from the public-health working group, CDCR identified additional spaces at the prisons that it would reserve for isolation and quarantine.

On September 2, 2020, Defendants filed a request for additional time to prepare the additional identified spaces at thirteen prisons for occupancy.  On September 10, the Court partially granted that request and directed the parties to meet and confer with the Receiver to identify an expedited timeline to complete the transfers that are necessary to prepare the identified quarantine and isolation spaces.  (ECF No. 3442.)

The parties had an initial meeting with the Receiver on September 10 and a follow-

16869130.1

1    up meeting on September 15.  By September 15, CDCR had already managed to prepare

2    the isolation and quarantine spaces at eight of the thirteen outstanding prisons.  Thus,

3    additional work to complete the preparation of identified quarantine and isolation space is

4    now only necessary at five prisons.  The last column of Exhibit B identifies the spaces that

5    must still be vacated before they can be used for quarantine or isolation.  Defendants

6    informed Plaintiffs that CDCR was working to expedite the remaining transfers as much as

7    is possible without compromising the appropriate placement of the transferees, and without

8    jeopardizing the health and safety of inmates and staff.  Defendants advised Plaintiffs that

9    CDCR believed it could complete the remaining transfers during the following dates:

10                 • Avenal State Prison – September 18-22;

11                 • Chuckawalla Valley State Prison – September 24-28;

12                 • Valley State Prison – September 24-28;

13                 • California State Prison, Los Angeles County – October 9-13; and

14                 • California Medical Facility – October 9-13.

15            Plaintiffs proposed that if tents were available at the five prisons until transfers are

16   complete, then they would agree to Defendants' proposed timelines.  Otherwise, Plaintiffs

17   proposed allowing the Receiver to submit his proposed timeline for the transfers.  In light

18   of the short period before transfers are complete, the fact that tents can be quickly installed

19   within 72 hours if they are needed, and the fact that the five prisons are not currently in

20   need of tents, it would not make sense for CDCR to install tents at the five prisons now,

21   and Defendants did not agree to Plaintiffs' tent proposal.  Because Plaintiffs were not

22   satisfied with Defendants' proposed timeline for the remaining transfers, no agreement was

23   reached.

24            On September 16, the Receiver filed a proposed timeline for completion of transfers

25   that comports with Defendants' proposed timeline for the five remaining prisons.  (ECF

26   No. 3447.)  Defendants agree with and support the Receiver's filing.

27            Defendants likewise agree that the Receiver should be permitted to continue to

28

assess the effectiveness of the existing policies on quarantine and isolation before deciding whether more specific or restrictive policies should be implemented.

## V.   SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE

*Plaintiffs' Position:*  The parties and the Receiver agree that people who maybe at the greatest risk of harm, based on their elevated weighted COVID-19 risk scores, should be prioritized for possible transfer from their dorms to a cell.  CCHCS then determined that such transfers should, at least initially, only occur within (not between) prisons.  CCHCS in the last few weeks began by identifying 36 people for possible transfer based on what it called "super high" Weighted COVID Risk Scores.  Of those, we were told that 19 could not be transferred because there was no accessible celled housing available.  Of the remaining 17 people, CCHCS reported that five elected to move into celled housing, and have been moved.  CCHCS indicates that they are working on developing a larger list of eligible people to provide to prisons.

Plaintiffs support continuing the project to offer celled housing to the most medically vulnerable currently in dorms.  However, the fact that CDCR was unable to accommodate more than half of the people who were deemed appropriate for celled housing based upon their super high Weighted COVID Risk Score suggests that the prisons remain overcrowded, and raises concerns that this process will largely become a fruitless exercise of identifying more people who cannot be appropriately housed.

*Defendants' Position*:  Defendants remain committed to working with the Receiver to facilitate movements of medically high-risk patients from dorms to cells, or any other movements, to safely house medically high-risk patients when such movement is recommended and approved by the appropriate public health and corrections experts.  Currently, CDCR and CCHCS are focusing on additional moves of patients that have a COVID-19 risk score of 11 or higher.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

## VI.   COVID-19 TESTING

### A.   Staff Testing

*Plaintiffs' Position*:  In August, CCHCS took over from CDCR the authority for staff COVID-19 testing, and said it would review the protocols, staffing, and reporting mechanisms established by CDCR.  Our understanding is that the protocols, staffing, and reporting that CDCR had in place continue, except as described at pilot institutions below.

On September 14, CCHCS distributed its draft "Employee Testing Guidance," and asked for any input by September 21.  We are reviewing the draft with the help of a public health expert.

CCHCS last week said that decisions regarding staffing for and report processes for the Employee Testing program are still in development.  It said that pilot programs for staffing are rolling out now at four prisons.  With regard to reporting, CCHCS indicated that it was working towards a statewide registry.  It also said that results, and thus presumably compliance percentages, are under the current CDCR program compiled locally.  The Receiver in response to our request said we would be provided data regarding the percentage of staff tested during August at the three prisons that, because of patient acuity, are required to test all staff at least once per month, but that it was not known when that information would be provided.[7]

*Defendants' Position*:  On September 14, the Receiver's Office shared the employee testing guidance with the parties and requested comments, if any, by September 21.  CDCR continues working closely with CCHCS to maintain the current staff testing procedures and to ensure a smooth and easy transition of the staff testing-responsibilities to CCHCS.  CDCR also remains committed to continuing to work with CCHCS to answer any questions Plaintiffs might have about the status of and processes for staff testing until the transition to CCHCS has been completed.

---

[7] The three prisons are Central California Women's Facility, California Health Care Facility, and California Medical Facility.

16869130.1       JOINT CASE MANAGEMENT CONFERENCE STATEMENT

### B.    Testing Incarcerated Population

*Plaintiffs' Position*:

#### 1.    Patient Testing Policies

After our initial requests in June, CCHCS said it would review its patient COVID-19 testing policy as part of its review of testing protocols applicable to transfers.  Our understanding is that during that review CCHCS would consider our concerns that key matters, such as serial retesting requirements during an outbreak, and the testing of incarcerated people who have frequent interaction with staff due to job assignments, are set forth using discretionary not mandatory language.  In late August, CCHCS said it had been meeting to consider revisions to its patient testing guidelines, and that any revisions would be shared with us.  On September 11, it said there was no further update.  We will continue to ask about this matter.

#### 2.    Reports and Monitoring of Serial Retesting

CCHCS also said that it had paused work on developing metrics and reports regarding patient COVID-19 retesting to focus on developing metrics and reports related to the requirements of its testing and transfer protocols.  It could not say when patient testing and re-testing metrics and reports would re-start.  We believe it is essential that CCHCS, as we believe it is doing for its Employee Testing program, develop a reliable and accurate means to report on percentages of patients re-tested when such is ordered as part of a public health response to an outbreak.  We will continue to ask about this matter.

#### 3.    Notification to Patients of Test Results

With regard to notification to patients of COVID-19 test results, CCHCS last week said it had developed a standardized results letter template for use with the electronic medical record; as described, the template for patients with positive results provides education on COVID-19, next steps (isolation) and the recovery period.   However, CCHCS said a key committee at its Headquarters "may not" approve use of the template because providing test results in writing may in its view violate patient privacy.  We of

course understand protected health information, but are puzzled because such notification both with regard to COVID-19 and many other test results, has been done at many prisons for years.  Also, the alternative – a notice that simply says a result has been received and an appointment with a primary care provider (PCP) will be scheduled to discuss it – has proven unworkable for the last six months because very few medical appointments take place during a COVID-19 outbreak and in any event very few people diagnosed with COVID-19 are seen by a PCP during while infected.  We will continue to ask about this matter.  CCHCS also says it has created an educational hand-out for patients who have recovered.

## VII.  PRISON-SPECIFIC UPDATES

*Plaintiffs' Position*:  Two recent changes have limited Plaintiffs' efforts to monitor developments related to COVID-19 at individual prisons.  First, CCHCS and the Receiver have decided that phone calls with individual prison staff, which we had requested sparingly, should not occur.[8]  Instead, CCHCS has asked that we talk with Regional-level Chief Executive Officers about prison-specific matters.  The first such phone call is scheduled for September 18.  It is not clear how frequently such calls will be permitted, and we are not certain whether talking with people who are not at the prison will be adequate.

CCHCS has also recently taken over from CDCR the responsibility of responding to all written queries regarding prison-specific COVID-related matters.  This unfortunately appears to have resulted in delays in receiving information, compared to when CDCR provided the information.  If this continues, we will discuss the matter with CCHCS and the Receiver.

Among the questions and issues we have presented are:

- What are the sources of the current large outbreaks at Folsom and Avenal

---

[8]   In recent weeks, vital information regarding prisons experiencing outbreaks has been learned via phone calls with local prison staff that Plaintiffs' counsel requested under the *Armstrong* and *Clark* class actions.

1    state prisons?

2    • What are the plans for testing and serial re-testing at those two prisons?

3    • At the current outbreak at the Substance Abuse and Treatment Facility at

4       Corcoran, why some people are being quarantined in dorms, in units that

5       have not been designated for quarantine, rather than the designated celled

6       unit, and whether they will be moved to cells.

7    • Was a patient at RJ Donovan Prison with suspected COVID symptoms

8       double-celled after an order for isolation placement, and does RJD, CCHCS

9       or CDCR have a policy regarding the housing of suspected COVID patients?

10   **VIII. UPDATES ON MEDICAL CARE MATTERS NOT DIRECTLY RELATED TO**
      **COVID-19**

11

12       *Plaintiffs' Position*:  On August 13, we asked CCCHS to provide the number of

13   CDCR incarcerated people currently receiving Medication Assisted Treatment (MAT) for

14   substance use disorder, the number newly started on such treatment in June and July, and

15   whether there is a Dashboard we can access that would provide such information on an

16   ongoing basis.  We also noted a huge increase in the number of addiction medicine

17   appointments reported in recent months and the substantial backlog of such appointments

18   that nevertheless exists, and asked for information about the pending appointments and

19   plans to address the backlog.

20       We also on August 13 asked CCHCS about the sharp decrease in new HCV

21   treatment starts in recent months, from between 600 to 700 statewide in January, February,

22   and March, respectively, to an average of approximately 275 per month in April, May, and

23   June, with substantial decreases seen even at prisons without COVID-19 outbreaks.  We

24   noted that during this same period, the number needing HCV treatment has risen since

25   March, in all risk groups.

26       No response has been received to these queries.  In response to our September 15

27   follow-up regarding these matters, CCHCS on that date apologized for the delay, said there

28

was ongoing internal discussion about the issues, and that it anticipated sending a response next week.  We very much look forward to receiving that.  CCHCS and CDCR, to their credit, issued a memorandum in March explicitly stating that the substance use disorder treatment program, including MAT, would continue during the pandemic. Our perception is that while many have started MAT since then, many others await the necessary tele-medicine addiction medicine appointment necessary to begin treatment.

On August 25, we asked CCHCS about the status of a revised mortality review policy, and regarding certain current practices that raise concerns about the adequacy of current reviews.  On September 2, CCHCS advised that the policy revision – which has been pending for nearly two years – remains under review including because of issues raised in recent court coordination meetings, and that a response to the concerns about the adequacy of certain reviews was forthcoming.

## IX.   NON-HEALTHCARE ITEMS THAT MAY BE OF INTEREST

*Defendants' Position:*

### A.   Legislation Impacting CDCR Fire Crews

On September 11, 2020, Governor Newsom signed into law Assembly Bill 2147, which will allow formerly incarcerated, nonviolent offenders who joined fire crews while incarcerated to petition to have their records expunged and parole time waived.  This is significant because it will allow these offenders to pursue careers as firefighters and first responders once released.  Prior to AB2147, emergency service agencies were required by law to deny certification to anyone convicted of two or more felonies, on parole, or who committed a felony within the last decade.

### B.   OIG Report on Transgender Incarcerated Persons

As part of CDCR's commitment to address the safety concerns of the incarcerated transgender, intersex, and non-binary community, beginning in 2019, CDCR initiated a multi-disciplinary workgroup to evaluate CDCR policies for housing and searching incarcerated people. The Office of the Inspector General (OIG) was one attendee in a guest

1  list of internal and external stakeholders who held several meetings with incarcerated

2  members of the transgender, non-binary and intersex communities, as well as members of

3  the cisgender community, and conducted an in-person survey last fall to learn what is most

4  important and to hear directly from the people the policy changes would impact.

5       The survey was created to voluntarily solicit anonymous opinions from incarcerated

6  people who identify as transgender, non-binary, or intersex.  Those participating in the

7  survey also had the opportunity to speak with CDCR staff and advocates in the workgroup

8  to share their candid experiences.  Following the results of the statewide survey, the OIG

9  issued its report summarizing the steps CDCR has taken to pro-actively learn about the

10  concerns and issues impacting this community, titled "*The California Department of*

11  *Corrections and Rehabilitation Has Taken Thoughtful and Important Steps to Address the*

12  *Difficult Conditions of Confinement for Incarcerated Transgender, Nonbinary, and*

13  *Intersex Individuals*."[9]

14       CDCR has proactively implemented several policies, practices and procedures for

15  the screening, housing, searching and treatment of incarcerated transgender, intersex, non-

16  binary, and gender non-conforming people.  This includes allowing access to clothing and

17  personal care items consistent with their gender identity and setting clear expectations that

18  staff address them consistent with their gender identity, to include the use of correct

19  pronouns and honorifics.  CDCR also developed and implemented specialized training to

20  ensure staff members are aware of laws and departmental policies and to give them the

21  knowledge and tools to respectfully interact with the incarcerated transgender community.

22       Adopting this spirit of understanding, inclusion, and change of culture that CDCR is

23  implementing is a challenging, but necessary endeavor, and CDCR has engaged the

24  expertise of advocacy groups including the SB 132 coalition and the Prison Law Office to

25  solicit feedback on the new training, policies, and survey.

26

27

28

---

[9] The report can be found at https://www.oig.ca.gov/wp-content/uploads/2020/09/Special-Review-Incarcerated-Transgender-Nonbinary-Intersex-Individuals.pdf.

16869130.1     JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  DATED:  September 16, 2020                    PRISON LAW OFFICE

2

3                                                By:      /s/
4                                                   STEVEN FAMA
                                                   ALISON HARDY
5                                                  SARA NORMAN
                                                   SOPHIE HART
6                                                  Attorney for Plaintiffs

7

8
   DATED:  September 16, 2020                    XAVIER BECERRA
9                                                Attorney General of California

10

11

12                                               By:      /s/
                                                   DAMON MCCLAIN
13                                                 Supervising Deputy Attorney General
                                                   NASSTARAN RUHPARWAR
14                                                 RYAN GILLE
                                                   Deputy Attorneys General
15                                                 Attorneys for Defendants

16

17
   DATED:  September 16, 2020                    HANSON BRIDGETT LLP
18

19

20                                               By:      /s/
                                                   PAUL B. MELLO
21                                                 SAMANTHA D. WOLFF
                                                   Attorneys for Defendants
22

23

24

25

26

27

28

16869130.1
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

# EXHIBIT

# A

**Regular (not Reception Center and not health care) prison transfers – Sending prison**

Name: _____

CDCR Number: _____

Prison: _____

Date and time of Transfer: _____

Was person quarantined for at least 15 days in cell based housing or in cohort of no more than 10 in a dorm or small tent solely dedicated to the cohorts who will depart on the same day?     YES     NO

If in a cohort, did anyone in the cohort test positive during quarantine period, including on test done within 72 hours of transfers?          YES              NO

Are there documented daily symptom checks for COVID-19 during quarantine?

        YES     NO
Were all symptoms checks negative? YES     NO

Was person swabbed for COVID 19 within the 72 hours before getting on bus?

        YES     NO

Date and Time of test: _____

Was test negative?   YES          NO

Does person have N95 mask when getting on bus?    YES    NO

If person refused the test, did person quarantine for 21 days, have daily symptoms checks which were all negative, and was release from quarantine approved by CME and public health?   YES      NO


Name and Title of Staff completing above: _____

Signature: _____

Date: _____

**Regular (not Reception Center and not health care) prison transfers – Receiving prison**

Name: _____

CDCR Number: _____

Prison: _____

Date of arrival: _____

**<u>To be completed upon arrival</u>:**

Did person have N95 mask?   YES      NO

Was person screened for COVID-19 symptoms upon arrival?    YES        NO

Name and Title of Staff completing above: _____

Signature: _____

Date: _____

**<u>To be completed before release from quarantine</u>:**

Was person quarantined in cell housing or in a cohort of no more than 10?   YES     NO

If in a cohort, was person only with people who arrived on same date from same place?  YES        NO

If in a cohort, did anyone in the cohort test positive on any of the three required tests?  YES        NO

Did person have symptom checks documented upon arrival and every day in quarantine, and were all checks negative?    YES        NO

Did person have COVID-19 test on Day 12 of quarantine?  YES      NO
          Date of test: _____

Was the COVID-19 test negative?    YES        NO

If person refused the test, did person quarantine for 21 days, have daily symptoms checks which were all negative, and was release from quarantine approved by CME and public health?  YES        NO

Name and Title of Staff completing above: _____

Signature: _____

Date: _____

# EXHIBIT B

| Institution | Location and type of reserved space | Number of Beds | Spaces that Must Still Be Vacated |
|---|---|---|---|
| ASP | Facility A, Housing Unit 120 (191 dorm beds); Facility A, Housing Unit 140 (200 cell beds) | CCHCS QM Recommendation - 248 beds<br><br>**Reserved Space**<br>Dorm Beds - 191<br>Cell Beds - 200 double celled or 100 single celled | HU 140 must be vacated |
| CAC | Facility A, Building 2, A and B Pod - (168 cell beds) | CCHCS QM Recommendation - 4 beds<br><br>**Reserved Space**<br>Cell Beds - 168 double celled or 84 single celled | n/a |
| CAL | Facility A, Building 5 (200 cell beds); Facility B, Building 5 (200 cell beds) | CCHCS QM Recommendation - 180 beds<br><br>**Reserved Space**<br>Cell Beds - 400 double celled or 200 single celled | n/a |
| CCC | Facility C, Building 3 (200 cell beds) | CCHCS QM Recommendation - 48 beds<br><br>**Reserved Space**<br>Cell Beds - 200 double celled or 100 single celled | n/a |
| CCI | Facility A, Housing Unit 8 (124 cell beds); Facility C Housing, Unit 1 (200 cell beds); Facility E, Davis Hall (94 dorm beds); Facility D, Housing Unit 9 (48 cell beds); Facility D Gym (60 beds) | CCHCS QM Recommendation - 235 beds<br><br>**Reserved Space**<br>Dorm/Gym Beds - 154<br>Cell Beds - 248 double celled or 124 single celled | n/a |

| Institution | Location and type of reserved space | Number of Beds | Spaces that Must Still Be Vacated |
|---|---|---|---|
| CCWF | Facility A, Building 503 (200 cell beds) | CCHCS QM Recommendation - 16 beds<br><br>**Reserved Space**<br>Cell Beds - 200 double celled or 100 single celled | n/a |
| CEN | Facility A, Building 5 (200 cell beds); Facility D, Building 5 (200 cell beds) | CCHCS QM Recommendation - 193 beds<br><br>**Reserved Space**<br>Cell Beds - 400 double celled or 200 single celled | n/a |
| CHCF | Facility E, Main Yard Tents (100 beds); Facilities A, B, C and D Negative Pressure Rooms (92 NPR beds) | CCHCS QM Recommendation - 277 beds<br><br>**Reserved Space**<br>Negative Pressure Room Beds - 92<br>Tent Beds - 100 | n/a |
| CIM | Facility B, Birch Hall(102 single cell beds); Facility C, Del Norte (200 cell beds) | CCHCS QM Recommendation - 188 beds<br><br>**Reserved Space**<br>Cell Beds - 200 double celled or 100 single celled<br>Single Cell Beds - 102 | n/a |
| CIW | Housing Unit A RCU (220 cell beds) | CCHCS QM Recommendation - 4 beds<br><br>**Reserved Space**<br>Cell Beds - 220 double celled or 110 single celled | n/a |

| Institution | Location and type of reserved space | Number of Beds | Spaces that Must Still Be Vacated |
|---|---|---|---|
| CMC | Facility C, Building 5 (300 single cell beds) | CCHCS QM Recommendation - 143 beds<br><br>**Reserved Space**<br>Single Cell Beds - 300 | n/a |
| CMF | S-3 Housing Unit (18 cell beds);<br>W-1 Housing Unit (41 cell beds);<br>W-3 Housing Unit (42 cell beds);<br>H-1 Housing Unit (21 cell beds, 26 dorm beds);<br>I-1 Housing Unit (10 dorm beds, 36 cell beds) | CCHCS QM Recommendation - 162 beds<br><br>**Reserved Space**<br>Single Cell Beds - 158<br>Dorm Beds - 36 | Housing Units H-1 and I-1 must be vacated |
| COR | Facility 3B, Building 02 (200 cell beds) | CCHCS QM Recommendation - 46 beds<br><br>**Reserved Space**<br>Cell Beds - 200 double celled or 100 single celled | n/a |
| CRC | Facility D, Dorm 410 (78 dorm beds);<br>Facility D, Dorm 311 (77 dorm beds);<br>Facility D, Gym (78 beds) | CCHCS QM Recommendation - 187 beds<br><br>**Reserved Space**<br>Dorm Beds - 155<br>Gym Beds - 78 | n/a |
| CTF | Central Facility, Y wing (258 cell beds) | CCHCS QM Recommendation - 127 beds<br><br>**Reserved Space**<br>Cell Beds - 258 double celled or 129 single celled | n/a |

| Institution | Location and type of reserved space | Number of Beds | Spaces that Must Still Be Vacated |
|---|---|---|---|
| CVSP | Facility D, Building 11 (192 dorm beds); Facility A, Building 3 (200 cell beds) | CCHCS QM Recommendation - 91 beds<br><br>**Reserved Space**<br>Cell Beds - 200 double celled or 100 single celled<br>Dorm Beds - 192 | Facility A, Building 3 must be vacated |
| DVI | Facility A, G-wing (264 cell beds) | CCHCS QM Recommendation - 66 beds<br><br>**Reserved Space**<br>Cell Beds - 264 double or 132 single | n/a |
| FOL | Facility A, Unit IV, Tier 2, A & B side cells (88 cell beds); Facility B, FWF A Dorm Pods 3/4 (126 dorm beds); MSF Dorm 500/600 (32 dorm beds) | CCHCS QM Recommendation - 1,380 beds<br><br>**Reserved Space**<br>Cell Beds - 88 double celled or 44 single celled<br>Dorm Beds - 158 | n/a |
| HDSP | Facility C, Building 1 (128 cell beds); Facility A, Building 4 (200 cell beds) | CCHCS QM Recommendation - 71 beds<br><br>**Reserved Space**<br>Cell Beds - 328 double celled or 164 single celled | n/a |
| ISP | Facility C, Building 1 (200 cell beds) | CCHCS QM Recommendation - 63 beds<br><br>**Reserved Space**<br>Cell Beds - 200 double celled or 100 single celled | n/a |

| Institution | Location and type of reserved space | Number of Beds | Spaces that Must Still Be Vacated |
|---|---|---|---|
| KVSP | Facility D, Building 6 (128 cell beds); Facility A, Building 1, Section B (20 cell beds) | CCHCS QM Recommendation - 66 beds<br><br>**Reserved Space**<br>Cell Beds - 148 double celled or 74 single celled | n/a |
| LAC | Facility C, Building 5 (200 cell beds); Facility B, Building 2 (200 cell beds); Facility B Gym (24 beds) | CCHCS QM Recommendation - 210 beds<br><br>**Reserved Space**<br>Cell Beds - 400 double celled or 200 single celled<br>Gym Beds - 24 | Facility B, Building 2 must be vacated |
| MCSP | Facility A, Building 2 (200 cell beds) | CCHCS QM Recommendation - 29 beds<br><br>**Reserved Space**<br>Cell Beds - 200 double celled or 100 single celled | n/a |
| NKSP | Facility D, Building 3 (198 cell beds) | CCHCS QM Recommendation - 78 beds<br><br>**Reserved Space**<br>Cell Beds - 198 double celled or 99 single celled | n/a |
| PBSP | Facility A, Building 1 (128 cell beds) | CCHCS QM Recommendation - 49 beds<br><br>**Reserved Space**<br>Cell Beds - 128 double celled or 64 single celled | n/a |
| PVSP | Facility D-5 Building (200 cell beds) | CCHCS QM Recommendation - 78 beds<br><br>**Reserved Space**<br>Cell Beds - 200 double celled or 100 single celled | n/a |

| Institution | Location and type of reserved space | Number of Beds | Spaces that Must Still Be Vacated |
|---|---|---|---|
| RJD | Facility D, Housing Unit 20 (200 cell beds) | CCHCS QM Recommendation - 39 beds<br><br>**Reserved Space**<br>Cell Beds - 200 double celled or 100 single celled | n/a |
| SAC | Facility A, Building 2 (20 cell beds);<br>Facility B, Building 1 (48 cell beds);<br>Facility C, Building 8 (128 cell beds) | CCHCS QM Recommendation - 11 beds<br><br>**Reserved Space**<br>Cell Beds - 196 double celled or 98 single celled | n/a |
| SATF | Facility E, Building 2 (200 cell beds);<br>Facility C, Building 4 sec. B and C (88 cell beds);<br>Facility C Building 3 (128 cell beds); Facility F,<br>Housing Unit F1, A-section - 11 pods (88 beds) | CCHCS QM Recommendation - 260 beds<br><br>**Reserved Space**<br>Cell Beds - 416 double celled or 208 single celled<br>Dorm - 88 beds (11 pods) | n/a |
| SCC | Facility C, Building 3 (200 cell beds); Facility C gym (100 beds) | CCHCS QM Recommendation - 63 beds<br><br>**Reserved Space**<br>Cell Beds - 200 double celled or 100 single celled<br>Gym Beds - 100 | n/a |
| SOL | Facility B, Building 7 (200 cell beds);<br>Facility B, Building 9 (200 cell beds);<br>Facility B Gym (64 beds) | CCHCS QM Recommendation - 211 beds<br><br>**Reserved Space**<br>Cell Beds - 400 double celled or 200 single celled<br>Gym Beds - 64 | n/a |

| Institution | Location and type of reserved space | Number of Beds | Spaces that Must Still Be Vacated |
|---|---|---|---|
| SQ | Gym (108 beds) | CCHCS QM Recommendation - 1,550 beds<br><br>**Reserved Space**<br>Gym Beds - 108 | n/a |
| SVSP | Facility C, Building 7 (182 cell beds);<br>Facility D, Building 6, Section B (40 cell beds) | CCHCS QM Recommendation - 78 beds<br><br>**Reserved Space**<br>Cell Beds - 222 double celled or 111 single celled | n/a |
| VSP | Facility A, Building 4 (88 cell beds);<br>Facility A, Building 3 (199 cell beds) | CCHCS QM Recommendation - 16 beds<br><br>**Reserved Space**<br>Cell Beds - 287 double celled or 143 single celled | Facility A, Building 3 must be vacated |
| WSP | Facility B, Building 1 (200 cell beds);<br>Facility B, Buildings 5 (200 cell beds) | CCHCS QM Recommendation - 152 beds<br><br>**Reserved Space**<br>Cell Beds - 400 double celled or 200 single celled | n/a |