XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
RYAN GILLE (262105)
IRAM HASAN (320802)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:   (415) 777-3200
Facsimile:   (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>GAVIN NEWSOM, et al.,<br><br>   Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:   October 7, 2020<br>Time:   10:00 a.m.<br>Crtrm.: 6, 2nd Floor<br>Judge:  Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the October 7, 2020 Case Management Conference.

## I. POPULATION REDUCTION

*Plaintiffs' Position*: Population reduction remains necessary to minimize the risk of harm from COVID-19, particularly among those at increased risk of harm if infected.  As previously explained (see ECF No. 3417 at 2:14-3:2), the overall CDCR population reduction since March, while certainly helped by early release programs, has primarily resulted from natural releases and the suspension and limitation of intake.  As intake increases, CDCR's total population is likely to increase as well.[1]

This is especially so since the number and rate of early releases is dropping dramatically.  As of August 5, approximately four weeks after the July 10 programs were announced, approximately 4,420 people had been released early from the prisons and camps.  *See* ECF No. 3417 at 1:14-4:19.  In contrast, in the subsequent eight weeks (i.e., as of September 30, the most recent date Defendants have formally provided data to Plaintiffs about population reduction efforts), 1,544 were released early.[2]  And, as Defendants state below, both the July 10 program that considered early release for certain people at certain prisons if within 365 days of release, and the program to consider early release for those considered at high risk for medical harm, are essentially over.  As such, the number of early releases will continue to dwindle.

Further, Defendants' final data confirms the program to consider release of those at increased risk of harm if infected with COVID-19 resulted in release for only a very small number of those eligible.  Within that program, Defendants report below that of the 6,599

---

[1]     CDCR last week reported that nearly 8,000 people in county jails are awaiting transport to its reception centers.

[2]     Defendants below state that as of September 30 there were a total of 5,964 early releases under the July 10 programs.

16869130.1

they say were eligible, only 1,335 were actually considered.[3]  Of the 1,335 considered, only 45 were approved for release, with an additional 12 recommended to the Governor for clemency.  Thus, even if all are released, the program will have resulted in release of less than one percent of those eligible, and only approximately four percent of those actually considered.

In addition, on September 25, Defendants informed Plaintiffs that although CCHCS on September 1 revised its COVID-19 risk factors, thus presumably increasing the number of people with a Weighted COVID Risk Score of four or higher – the threshold for considering a person for early release under the medical risk program – CDCR would not determine who these people are or consider them for early release.  As was coldly stated, with no explanation, "there are no plans to revise the original group."  This is deeply disappointing, and clear evidence that the early release program for those most at risk was a one-time gesture, rather than a sustained action to reduce the risk to those most susceptible to severe consequences from COVID-19.

Finally, even with the release programs, thousands remain in common air space congregate setting housing units which are especially susceptible to massive COVID-19 outbreaks.  As further discussed below, the six CDCR prisons with the largest number of total confirmed COVID-19 cases—all of which have had more than 1,000 such cases, with one of those having almost 3,000—all primarily have common air space congregate setting housing units.  *See* Section IV.A.

*Defendants' Position*:  Since the start of the COVID-19 public health crisis, 22,714

---

[3]   Defendants list several reasons why people were not considered, but do not provide the number of people excluded due to each listed reason.  It appears many of the listed reasons for why people were not considered, especially regarding those with indeterminate sentences, are factors added after the original criteria were announced.  Defendants also say that some who could have been considered under the medical high risk program were released under the 180 and 365-day programs, but do not provide a count; as of late August, there were only 120 such releases.

16869130.1

incarcerated people were released from CDCR institutions and camps as of September 30, 2020.[4]  CDCR experienced a 19.35% decrease in population during this time period.[5] Between July 1 and September 30, 5,964 people were released from institutions and camps as a result of the COVID-19 early-release programs Defendants announced on July 10.[6] This represents 296 more early releases than those reported in the September 16 case management conference statement.  (ECF No. 3449 at 3:24-4:1.)  An additional 7,852 people were released in accordance with their natural release date during this time period. CDCR's total population remains below 100,000.

Consistent with the timeline reported in previous case management conference statements, on September 30, CDCR completed its review of 6,599 people[7] who were identified as being eligible for early-release consideration in the COVID-19 high-risk medical early release program announced on July 10.[8]  Of these, approximately 2,444 were serving determinate sentences.  The Secretary reviewed a total of 1,284 individual

---

[4]    This figure is calculated by taking the difference between the total population in institutions and camps on February 26, 2020 and September 30, 2020.  Weekly population reports can be found at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2020/.

[5]    *See* previous footnote.

[6]    *See* ECF No. 3389 at 2:4-5:4 and https://www.cdcr.ca.gov/covid19/expedited-releases/ for details regarding CDCR's COVID-19 early-release program announced on July 10, 2020.

[7]    The court-appointed federal Receiver, who oversees healthcare in the state's prisons, identified approximately 6,500 incarcerated people as being medically high-risk for COVID-19.  These people were identified as being eligible for individual early-release consideration, and not part of the rolling releases.  *See* https://www.cdcr.ca.gov/covid19/frequently-asked-questions-expedited-releases/.

[8]    *See* ECF No. 3436 at 3:26-5:3 for a detailed discussion of CDCR's process for evaluating individual, determinately sentenced, medically high-risk people for early release through the high-risk medical program announced on July 10, including factors considered.  Exhibit A of the same filing includes examples of actual individual files reviewed by the Secretary.  *See also* ECF No. 3449 at 5:1-19 for a detailed discussion of the State's process for evaluating indeterminately sentenced, medically high-risk people for early release on an individual basis through the high-risk medical early-release cohort announced on July 10.

16869130.1

summaries for determinately sentenced people, approved 45 for release, and did not

approve 1,239.  The remaining 1,160 did not receive individual reviews for one of the

following reasons: they were released through either the 180-day or 365-day early-release

program, their earliest possible release date was within 30 days, they were no longer

considered high-risk as a result of a change in their COVID-19 risk score, they were

released in accordance with their natural parole or discharge date, or were assessed to have

a high risk of committing future violence.

Of the total 6,599 medically high-risk people eligible for early-release consideration

in the COVID-19 high-risk medical program, 4,155 were serving indeterminate sentences.

As reported in the previous case management conference statement, the process of

reviewing indeterminately sentenced people deemed eligible for early-release

consideration involved a few more steps than that of eligible determinately sentenced

people.  (ECF No. 3449 at 5:1-4.)  Like determinately sentenced people, indeterminately

sentenced people received an initial review before receiving further consideration from the

Secretary—a process approved by the Secretary.  As a result of this initial review, 4,104

did not receive further consideration from the Secretary because they did not have a valid

risk assessment on which CDCR could preliminarily assess whether the individuals could

safely be released,[9] had a valid risk assessment indicating a moderate or high risk for

future violence, were found to pose a current and unreasonable risk to public safety at their

last parole hearing, were already scheduled for parole hearings,[10] or were released in

---

[9]      These risk assessments are done in the normal course of business for
indeterminately sentenced people in conjunction with a parole consideration hearing.  A
forensic psychologist performs these risk assessments.  The psychologist reviews each
person's file, conducts a detailed interview of each person, usually about two hours each,
and drafts a report.  By its nature, the process cannot be completed quickly.

[10]      When a parole hearing is scheduled, relevant stakeholders including victims or
families of victims and local district attorneys are informed of the hearing, and attorneys
are assigned to incarcerated people.  CDCR determined that these processes should move
forward because they provide an opportunity for release and maintain consistency in the

16869130.1

1  accordance with their natural release date.  (ECF No. 3449 at 5:4-12.)

2  Following this initial review, 51 individual summaries were prepared for

3  indeterminately sentenced people deemed eligible for further early-release consideration.

4  After reviewing each of these summaries, the Secretary referred 12 cases of

5  indeterminately sentenced people to the Governor with the recommendation that the

6  Governor grant them clemency, and did not refer 39 people for early release.[11]  As of

7  September 30, CDCR completed the review of medically high-risk people eligible for

8  early-release consideration through the COVID-19 high-risk medical program.  CDCR

9  currently does not have plans to expand the original list of approximately 6,500.  The

10  releases of approved people will continue to be processed until they are complete.

11  Additionally, as reported in the July 15 case management conference statement and

12  CDCR's July 10 press release, early releases through the 365-day COVID-19 early-release

13  cohort were expected to "be screened on a rolling basis until CDCR determines such

14  releases are no longer necessary."  (ECF No. 3389 at 3:14-15 and

15  https://www.cdcr.ca.gov/covid19/expedited-releases/.)  The institutions from which

16  eligible people were screened for release originally included San Quentin State Prison

17  (SQ), Central California Women's Facility (CCWF), California Health Care Facility

18  (CHCS), California Institution for Men (CIM), California Institution for Women (CIW),

19  California Medical Facility (CMF), Folsom State Prison (FOL), and Richard J. Donovan

20  Correctional Facility (RJD).  (ECF No. 3389 at 3:5-9.)  On August 7, CDCR added Mule

21  Creek State Prison (MCSP); California State Prison, Los Angeles County (LAC);

22  California State Prison, Solano (SOL); and California Men's Colony (CMC) to this list.

23  (ECF No. 3417 at 6:18-20.)  In the August 11 case management conference statement,

24  Defendants announced that these releases were expected to conclude on September 30,

25  _____

26  process.  Moreover, full parole considerations are preferred to early-release reviews.

27  [11]  As reported in the previous case management conference statement, after selecting
eligible candidates, the Secretary forwards cases recommended for early-release to

28  Governor Newsom.  (ECF No. 3449 at 5:16-17.)

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

2020.  (*Id*. at 6:22-25.)  As an update, Defendants report that the final cohort within the 365-day COVID-19 early-release program has been identified and will be evaluated for early release eligibility.  This early-release program will be suspended once these releases have been completed.[12]  For the time being, the rolling early releases of eligible people—including medically high-risk people—will continue through the 180-day COVID-19 early-release program.

CDCR continues to give special consideration to medically high-risk people whose cases may warrant early release.  (*See, e.g.,* ECF No. 3449 at 5:20-6:11, ECF No. 3436 at 5:4-16, and ECF No. 3427 at 4:4-13.)  As with every release, each early-release evaluation involves a delicate balance of many factors weighing both in favor of and against early release, including the individual circumstances of each incarcerated person reviewed and the risk that release would pose to public safety.  The ongoing public health crisis has given rise to a number of considerations that weigh in favor of early release that did not exist before, but it did not eliminate the need to balance these factors with the risk to public safety.

CDCR, in its discretion, implemented the early-release programs described above as an added safety measure at a time when more comprehensive COVID-19-related policies were still being developed.  Since then, CDCR adopted significant safety measures to reduce the spread of COVID-19, including, as described in sections below, a drastic reduction in intake from county jails, setting aside designated quarantine and isolation space, and implementing enhanced policies regarding personal protective equipment, movement of incarcerated people, and COVID-19 testing of staff and incarcerated people.  CDCR continues to evaluate, improve, and supplement these policies in close coordination with the Receiver.

CDCR continues to consider and implement additional measures to keep its

---

[12]  Plaintiffs monitor early releases in each of the COVID-19 early-release programs announced on July 10 through data Defendants produce to them twice per month.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   population safe during the COVID-19 public health crisis.  For example, CDCR previously

2   awarded twelve weeks of positive programming credit to eligible incarcerated people to

3   help mitigate the impact on access to programs and credit earnings due to COVID-19.[13]

4   To ensure all eligible people receive these credits, on October 1, CDCR starting working

5   with each county jail in which incarcerated people await transfers to CDCR institutions to

6   identify people eligible to receive the twelve-week credit, and to award the credit.  In

7   instances where the twelve-week credit is applied and makes a person eligible for

8   immediate release, CDCR will provide a release memorandum to the county jail with

9   instructions for the person to report to the nearest parole office for post-release assignment.

10      **II.        TESTING AND TRANSFER PROTOCOLS**

11      *Plaintiffs' Position*:  Large numbers of patients are now transferring between

12   prisons, with testing and quarantining to reduce the risk of COVID-19 transmission

13   governed by CCHCS's August 19 "Movement Matrix."  CDCR reports there were 126

14   such transfers between September 14 and 20, and 748 between September 21 and 27.

15      CCHCS has rejected our suggestion that staff complete a checklist before patients

16   get on a transportation vehicle so as to minimize the risk that a person is moved without

17   the necessary quarantine period and a timely negative test.  Instead, CCHCS is working on

18   what it terms a "Transfer Registry" that apparently will include information for each

19   transferred patient regarding quarantine and COVID-19 test dates and results.  While this

20   will be useful, it is unclear when this registry will be fully operational.  We believe interim

21   measures are needed now so that medical staff checks that Movement Matrix requirements

22   have been met before each person is moved.

23      In that regard, we most recently suggested that each prison's receiving and release

24   nurses check for quarantine and timely testing information before a transfer.  Those nurses

25   have long been required to, among other things, interview each patient before a transfer,

26

27   [13]   *See* ECF 3389 at 3:16-4:11 and https://www.cdcr.ca.gov/covid19/expedited-

28   releases/ for eligibility criteria.

-8-                                                     Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   verify required medications and medical equipment is on hand, and ensure that all contents

2   of what's called the "transfer envelope" are present (see Health Care Department

3   Operations Manual 3.1.9 at 5 [https://cchcs.ca.gov/wp-

4   content/uploads/sites/60/HC/HCDOM-ch03-art1.9.pdf]).  CCHCS apparently will not do

5   this.  Given the tragic disaster at San Quentin caused by transfers to that prison of patients

6   with active COVID-19, CCHCS must use all available safeguards to minimize the risk of

7   such harm occurring again.

8       *Defendants' Position*:  The current iteration of the movement matrix went into effect

9   on August 21, 2020.  DAI, CCHCS, and leadership teams at all institutions held a

10  statewide conference call to conduct a detailed discussion of each section of the movement

11  matrix.  The statewide call also included a question-and-answer session.  As explained

12  during that call, movement will be limited and controlled, and must be pre-approved by

13  CDCR headquarters, which is working in collaboration with CCHCS (including Mr.

14  Cullen and Dr. Bick).  More meetings, conference calls, and training sessions are planned

15  to help staff understand and implement the movement matrix.  Additionally, there is

16  continued enforcement of the safety protocols requiring all county staff and incarcerated

17  people arriving to CDCR on intake buses to wear N95 masks.  In fact, as discussed below,

18  CDCR refused to accept inmates from an intake bus that was not in compliance with this

19  safety measure.  Also, Plaintiffs raised the issue of patients who were formerly infected

20  with COVID-19 and now resolved being excluded from further testing.  During a call with

21  Plaintiffs on September 25, 2020, CCHCS clarified that these people are not excluded

22  from testing, but are instead included in the groups of people who are randomly tested at

23  each prison.  Finally, Plaintiffs request that a paper checklist be completed and passed

24  through multiple staff members with each transfer.  Instead, CCHCS will use a registry to

25  track all transfer information.  This registry will be easily accessible, updateable, and will

26  contain comprehensive information.

27  //

28

16869130.1

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

### III. INTAKE

*Plaintiffs' Position*:  Plaintiffs continue to maintain that intake should be closed until all prisons have set aside adequate space for quarantine and isolation, and Defendants have evaluated the efficacy of the Movement Matrix.  Nevertheless, CDCR resumed intake six weeks ago, on a limited basis.  The Parties met and conferred on September 29 to review that process and consider lessons learned.

Currently, CDCR has three reception centers, at Wasco State Prison, North Kern State Prison (NKSP), and Central California Women's Facility (CCWF).  At the September 29 meet and confer, CDCR's Director of the Division of Adult Institutions, Connie Gipson, explained that she meets weekly with the leaders at those prisons to review the process for the previous week, to evaluate the amount of space available at each prison, and to consider each Reception Center's capacity to admit people the following week.  Each week, this group determines how much space is available, what the processing capacity is, and how many people should be admitted for the following week.  Defendants indicated that they decide how many people can be admitted the following week based on the actual number of beds currently open at each Reception Center.  For the week of October 5th, Defendants announced on Thursday October 1st that NKSP, Wasco, and CCWF would accept a total of 240 people from three counties.  Defendants report that there are currently approximately 7900 men and women in county jails awaiting transfer to CDCR.

*Defendants' Position*:  During the week of September 20, 2020, CDCR accepted a total of 143 incarcerated persons from county jails as follows:

| Number of Incarcerated Persons | Sending County | Receiving Institution |
|---|---|---|
| 143 | Orange | NKSP |

CDCR accepted a total of 232 incarcerated persons from the following county jails during

the week of September 27, 2020:

| Number of Incarcerated Persons | Sending County | Receiving Institution |
|---|---|---|
| 30 | Los Angeles | CCWF |
| 64 | Los Angeles | Wasco State Prison |
| 138 | San Diego | North Kern State Prison |

CDCR has authorized intake from the following county jails during the week of October 4, 2020:

| Number of Incarcerated Persons | Sending County | Receiving Institution |
|---|---|---|
| 30 | Riverside | CCWF |
| 120 | Stanislaus | Wasco State Prison |
| 90 | San Diego | North Kern State Prison |

CDCR continues to work collaboratively with the counties to ensure compliance with all transfer matrix requirements. For instance, the Receiving and Release Sergeants at Wasco and North Kern verify what type of mask both incarcerated persons and staff wore at the time they disembarked from the transfer busses and question individuals regarding their wearing of masks during transport in order to ensure that all transferees and staff wear N95 masks at all times during transfer. This process is working. One county sent, on three different days, three separate busloads of incarcerated persons to North Kern the week of September 20, 2020. Two of the buses arrived with staff and riders properly wearing N95 masks and were processed at the reception center. Incarcerated persons on the third bus, however, were transported to North Kern in regular cloth masks, and the Release Sergeant and Warden refused to receive the incarcerated persons for intake and instructed the bus to return them to the county.

As reported in the last joint CMC statement, CDCR will continue to work with the California Sheriffs' Association to permit intake from the counties with the greatest need,

determined based on a number of factors, including population density, proximity to reception centers, and impact from the wildfires.

CDCR and CCHCS met and conferred with the PLO on the topic of intake on September 29, 2020.

**IV.   SETTING ASIDE SPACE FOR QUARANTINE AND ISOLATION AND COURT ORDER REGARDING SAME (ECF NOS. 3401)**

*Plaintiffs' Position*:

**A.   Set Aside of Quarantine and Isolation Space**

This Court previously ordered Defendants to identify and vacate COVID-19 quarantine and isolation space at every prison, to be used in the event of an outbreak.  ECF No. 3401 at 3-4.  Additionally, the Court ordered the parties and the Receiver to monitor the space reserves, and determine whether the space identified by CDCR was sufficient, or whether they should be modified at particular prisons.  *Id.* at 4-5.

On September 16, pursuant to the process laid out in the Court's order, Plaintiffs requested that the Receiver consider whether the bed reserve levels at particular prisons should be modified.  Among other concerns, we raised the issue that some prisons had failed to designate appropriate spaces for quarantine.  In their recommendations for setting aside appropriate isolation and quarantine space at each prison, the Public Health Workgroup stated that people exposed to COVID-19 "must be separated from each other in single cells with solid doors," to stop the virus from spreading among those in quarantine.  Yet some prisons have not designated enough or, in some cases, *any* cells with solid doors (or the equivalent of such) for quarantine.  Thus, as of October 2, approximately 2,300 people exposed to COVID-19 remained quarantined in large dorms or tiered cell blocks with non-solid doors, including approximately 800 in dorms at Avenal State Prison, 750 in dorms at California Rehabilitation Center, 350 in dorms at California Institution for Men, and 450 in tiered cell blocks at Folsom State Prison.

We also requested modifications where a prison had not designated separate

isolation and quarantine space for people classified as general population and as sensitive needs.  We believe actual or serious threats of harm will be suffered by many of those classified as sensitive needs if housed in the same unit as those who are not.  Further, many classified as general population may refuse to house with those who are classified as sensitive needs.  Thus, if the two populations are not housed separately, CDCR and CCHCS face a very real possibility that large numbers of people will refuse to be tested and/or refuse to be moved to the designated isolation and quarantine space, seriously hampering the prison's ability to control the spread of the virus.  Some prisons have appropriately recognized this risk and designated separate spaces for each group; we requested the remaining prisons housing both populations do the same.

We also raised the concern that many prisons had only identified one building for both quarantine and isolation purposes, and requested that each of these prisons either (a) identify at least one additional quarantine and isolation building or (b) explain how quarantine and isolation patients would be housed safely in the single building and provide a plan for how the groups will be kept separate, including for purposes of access to yard, dayroom, showers, and phones, and receiving medications and meals.[14]

The Receiver has yet to respond to our September 16 request for modifications.

On Friday, October 2, the *Coleman* Special Master, *Armstrong* Court Expert, and *Plata* Receiver requested a meeting with counsel for Plaintiffs and Defendants in each case to discuss quarantine and isolation issues, recognizing that there may be overlap between all three cases in this conversation.  The meeting took place Monday, October 5. The parties discussed the allocation of quarantine space in the prisons that have limited cell space, but came to no agreements about how to address the shortfall of adequate and available space at certain prisons.

It is undisputed that the CDCR's COVID-19 statistics show assignment to a

---

[14]    We also raised a number of specific concerns and questions about plans for particular prisons.

dormitory or housing unit with shared air space exposes people to serious harm and the risk of harm from COVID-19.  Six prisons have had outbreaks that have resulted in more than 1000 people becoming infected with COVID-19:

- Avenal State Prison (ASP) – 2838 people;
- San Quentin State Prison (SQ) – 2239 people;
- California Rehabilitation Center (CRC) – 1486 people;
- Chuckawalla Valley State Prison (CVSP) – 1392 people;
- California Institution for Men (CIM) – 1349 people; and
- Folsom State Prison (FSP) – 1316 people.

Tragically, 63 of the 69 incarcerated people who have died from COVID-19 in CDCR were incarcerated in these six prisons.  Each of those prisons houses large numbers of people in dormitories or tiered cell blocks with non-solid doors.  Although the Public Health Experts and all parties agree that quarantine should take place in a single cell, behind a solid door, none of the six prisons has enough available celled housing with solid doors to adequately quarantine people during an outbreak.  Not surprisingly, at many of these prisons, the outbreaks continue: in the past two weeks, 539 new confirmed cases have been identified at CRC, 311 at ASP, and 163 at FSP.  Essentially, the dorms are on fire, and the Defendants have no plan to evacuate the people who remain in the fire's path.

**B.     Development of Policies Related to Quarantine and Isolation**

As reported at the last Case Management Conference, Plaintiffs have asked the Receiver to consider developing two policies related to quarantine and isolation.  First, we asked that guidance be provided regarding when people should be quarantined or isolated in a space other than the spaces set aside for that purpose.  Second, we have asked that CCHCS and CDCR develop procedures and time-frames for placing patients in isolation or quarantine, once positive test results are received, or information is received regarding an exposure.  *See* ECF No. 3448 at 12-13.

On September 29, we requested an update on these two requests.  The Receiver

1  suggested that this may be discussed during the October 5 meeting on quarantine and

2  isolation with the *Coleman* and *Armstrong* representatives, but the issue was not discussed.

3  We will follow up with CCHCS about these requests.

4      **C.      Monitoring Use of Quarantine and Isolation Space**

5          Plaintiffs must be able to adequately monitor the use of quarantine and isolation

6  space, including to ensure that incarcerated people are not placed at risk of harm and so

7  that we can determine whether to request that further space be set aside.  CCHCS has

8  developed a template—called an Outbreak Management Tool—that prisons will use on a

9  daily basis to report on matters related to COVID-19, including information on numbers

10  and housing locations of patients in quarantine and isolation.  We sent CCHCS comments

11  on a draft version of the template, and were told on October 2 that CCHCS is in the

12  process of automating the tool, and that completed copies of these daily reports will be

13  provided to Plaintiffs once they are in use at the prisons.

14          *Defendants' Position*:  CDCR has already set aside vast quantities of isolation and

15  quarantine space and has continued to increase the amount of reserved space at its prisons.

16  As discussed in the last case-management statement, CDCR requested additional time to

17  prepare identified quarantine and isolation space at five prisons to allow time for the safe

18  transfer of inmates to other locations.  The Court granted the requested extensions to

19  complete the transfers and prepare the isolation and quarantine spaces.  (ECF No. 3455.)

20  CDCR has made every effort to expedite this project.  As of the filing of this statement, the

21  identified spaces at three of the five remaining prisons—Avenal State Prison, Chuckawalla

22  Valley State Prison, and California Medical Facility—are vacated and prepared for

23  occupancy.  Only two outstanding prisons must still be completed—California State

24  Prison-Los Angeles County and Valley State Prison.

25          Plaintiffs have submitted a number of concerns about current isolation and

26  quarantine reserves to the Receiver and the parties await the Receiver's response.

27  Defendants anticipate that the Receiver and the parties will continue to meet and confer

28

16869130.1

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

about those issues and others related to quarantine and isolation space.  In fact, the
Receiver's office arranged a meeting on Monday, October 5, for the parties in Plata,
Coleman, and Armstrong to further discuss isolation and quarantine issues with the
Receiver, the Coleman Special Master, and the Armstrong Court Expert.

## V.   SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE

*Plaintiffs' Position*:  CDCR continues to house thousands of people who, based on
age and/or their medical condition, are particularly vulnerable to severe illness or death
from COVID-19 in large congregate living areas.

CDCR has agreed to work with CCHCS to offer those who are medically high risk
and living in dorms to move to celled housing, at prisons with available cells.  CDCR and
CCHCS have been offering these moves in stages, starting with those at highest risk.  They
reported last week that they identified a group of 267 people who, based upon their high
risk status, could qualify to transfer from their dorm to celled housing.  Of that group,
however, they did not offer moves to those housed at the California Medical Facility,
because that prison needed all the cells it had available to set aside space for quarantine
and isolation.  They also did not offer moves to patients in dorms at the California Health
Care Facility, Valley State Prison, or Central California Women's Facility, because those
prisons lacked enough celled housing to offer safer housing to those in dorms.  This left a
total of 123 people in the group who were offered celled housing.

In the last Joint Case Management Conference Statement, we highlighted that, of
the 36 people that Defendants initially identified as having "super high" weighted COVID
risk scores, 19 could not be offered celled housing because there were no appropriate and
accessible cells available at their prisons.  We raised the concern that CDCR's inability to
accommodate more than half of the people deemed appropriate for celled housing suggests
that the prisons remain overcrowded.  This week, Defendants once again report that they
are not able to offer celled housing to many medically vulnerable people because they lack
the space to do so.  Overcrowding remains a serious problem in CDCR when medically

appropriate housing is not available to people who are at serious risk of harm.

According to Defendants, of the 123 who were offered celled housing, 19 people accepted, and 104 decided to remain in their dorm.  Although a relatively small number of people accepted the offer to move, those who did move have taken an important step towards reducing their risk of harm, and thus we support the continuation of this process to the extent that there are additional people in dorms who might benefit from a transfer to a cell with a solid door to reduce their risk of harm from COVID-19.  We also intend to check with at least some of those who are said to have refused a move to determine if adequate education was provided.  Finally, Plaintiffs will continue to confer with public health experts to identify further measures that may be employed to protect medically vulnerable people who remain in CDCR's dorms.

*Defendants' Position*:  Defendants remain committed to working with the Receiver to facilitate movements of medically high-risk patients from dorms to cells, or any other movements, to safely house medically high-risk patients when such movement is recommended and approved by the appropriate public health and corrections experts.

## VI. COVID-19 TESTING

### A. Staff Screening and Testing

*Plaintiffs' Position*:  CCHCS took over authority for staff COVID-19 testing in August, and on September 14, distributed its draft "Employee Testing Guidance" to the parties.  Plaintiffs provided comments to CCHCS on September 23.  On October 2, CCHCS said it had reviewed our comments and would be providing responses, as well as a revised version of the Testing Guidance, the following week.  CCHCS also reported that they are in the process of hiring additional nursing staff at each prison to carry out the testing and tracing required by the plan, and that it anticipated the plan would be implemented at all prisons within the next couple of months.  Finally, CCHCS is working to transfer all of the employee testing data from CDCR to CCHCS, and anticipates being able to create and produce regular reports on employee testing.  CCHCS explained the

16869130.1

1 reports for September would be available this week, and Plaintiffs have requested to

2 receive copies for certain prisons once available.  We appreciate the steps CCHCS is

3 taking to implement an effective staff testing program, but regret that such necessary

4 action was not taken by CDCR or CCHCS sooner.

5       Regarding the screening of staff at entrances, as described in prior Joint Case

6 Management Conference Statements, the Office of the Inspector General in August

7 reported significant problems with CDCR's COVID-19 screening process for individuals

8 entering a prison.  *See* ECF No. 3427 at 14-15; ECF No. 3436 at 18-19; Office of the

9 Inspector General, *COVID-19 Review Series, Part One: Inconsistent Screening Practices*

10 *May Have Increased the Risk of COVID-19 Within California's Prison System* (August

11 2020), available at: https://www.oig.ca.gov/wp-content/uploads/2020/08/OIG-COVID-19-

12 Review-Series-Part-1-Screening.pdf.  We requested CCHCS and CDCR inform us of the

13 steps they would take to respond to the issues identified in the OIG's report.  On

14 September 25, CCHCS explained it would issue a memorandum standardizing entrance

15 screening procedures at all prisons, and provided a draft to the parties.  Plaintiffs provided

16 written comments to CCHCS on September 28.  On October 2, CCHCS said it had

17 reviewed our comments and would be issuing the final memorandum this week.

18       *Defendants' Position*:  On September 14, the Receiver's Office shared the employee

19 testing guidance with the parties and requested comments, if any, by September 21.

20 CDCR continues working closely with CCHCS to maintain the current staff testing

21 procedures and to ensure a smooth and easy transition of the staff testing responsibilities to

22 CCHCS.  CDCR also remains committed to continuing to work with CCHCS to answer

23 any questions Plaintiffs might have about the status of and processes for staff testing until

24 the transition to CCHCS has been completed.

25 **B.    Testing Incarcerated Population**

26 *Plaintiffs' Position*:

27

28

16869130.1

1

### 1. Patient Testing Policies

After our initial requests in June, CCHCS said it would review its patient COVID-19 testing policy as part of its review of testing protocols applicable to transfers.  We understood CCHCS would consider our concern that on key matters, such as serial retesting requirements during an outbreak, and the testing of incarcerated people who have frequent interaction with staff due to job assignments, the current guidance uses discretionary not mandatory language.  In late August, CCHCS said it had been meeting to consider revisions to its patient testing guidelines, and that any revisions would be shared with us.  On September 11, it said there was no further update.  On October 2, it made clear that no revisions are forthcoming, and that it believed that closer monitoring and more frequent reporting of testing strategies at the prison would be as effective as new mandates.  We do not believe that policy mandates and more rigorous reporting and monitoring are mutually exclusive.  We further believe the if mandates were in place, the months-long failure to implement serial re-testing at California Institution for Men, discussed below at Part VII, would have been addressed long ago.

### 2. Reports and Monitoring of Serial Retesting

CCHCS says that due to other priorities, including the Transfer Registry that will support the Movement Matrix, it has not yet re-started work on developing metrics and reports regarding patient COVID-19 retesting.  We believe it is essential that CCHCS, as we understand it is doing for its Employee Testing program, develop a reliable and accurate means to report on percentages of patients re-tested when such is ordered as part of a public health response to an outbreak.  We will continue to ask about this matter.

### 3. Notification to Patients of Test Results

CCHCS on October 2 confirmed that it had developed and said it will implement standardized templates notifying patients of and educating them on test results, and is now working on automating the patient notifications for use with the Electronic Health Record System.  CCHCS said it would begin using them "soon."  Although we have not yet seen

16869130.1

1   the templates to be used, we very much appreciate that CCHCS, after its early August

2   rebuffing of the idea of standardized language, will use templates, especially since health

3   records continue to show disparate, sometimes confusing, and, with regard to education,

4   mostly inadequate notifications to patients.  We also very much appreciate the Receiver on

5   September 1 identified this as a very high priority.  We hope the matter is fully resolved by

6   the next Case Management Conference.

7   **VII.  PRISON-SPECIFIC UPDATES**

8       *Plaintiffs' Position*:  Preliminarily, weekly phone calls with CCHCS's four

9   Regional Healthcare Chief Executive Officers (CEOs) regarding COVID-19 outbreak

10   management at the prisons have begun (three have been held, and the next is scheduled for

11   October 9).  These calls are monitored by senior CCHCS executives.  The calls have been

12   very useful, including because they permit us to learn important details about what is or is

13   not being done in the prisons, and in certain cases result in the focusing of attention on

14   matters of concern.

15       For example, on October 2, we discussed the lack of a strategy of serial re-testing of

16   previously negative-for-COVID patients at California Institution for Men (CIM).  The lack

17   of such testing, which Plaintiffs first asked to be done in June, was deeply concerning

18   given the continuing massive outbreak at the prison, the huge number of high acuity

19   patients it houses, the 23 COVID-related deaths among the population, and the fact that

20   serial re-testing has been done for months or weeks at other prisons, including San Quentin

21   and Folsom.  We heard no adequate explanation for why CIM was not doing serial re-

22   testing, but also received the firm impression that CCHCS executives would promptly fix

23   this very unfortunate problem.[15]

24

25   _____

26   [15]    The CCHCS executives included a registered nurse with extensive correctional

27   health care executive experience, both in and out of CDCR, who last week began in a
newly created job position, a primary duty of which is the supervising of the Regional

28   Healthcare CEOs.

16869130.1

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

VIII. **UPDATES ON MEDICAL CARE MATTERS NOT DIRECTLY RELATED TO COVID-19**

*Plaintiffs' Position*:  On August 13, more than seven weeks ago, we asked CCCHS about matters related to Medication Assisted Treatment (MAT) for substance use disorder, including the substantial backlog of patient appointments.  A response was provided on October 5.  It indicated, consistent with the Receiver's October 1 report to Court (*see* ECF No. 3417 at 11-12) that while approximately 4,700 are receiving MAT, more than 6,000 are awaiting the necessary addiction medicine appointment to be considered for such an order.  The response also indicated that more than 80% of those appointments are overdue.

A letter received last week from a patient at California State Prison, Los Angeles County, the underlying facts of which we verified in his medical records, illustrates the depth of and risks caused by the huge backlog of MAT appointments, and CCHCS's unfortunate responses to patients regarding it.  On April 7, the patient was seen by a substance use disorder social worker, who determined he was at high risk due to opioid addiction and ordered an addiction medicine specialist appointment within 14 days.  Nearly six months later, the patient has not been seen and no appointment is yet scheduled, despite him telling medical staff in writing in May that his addiction had reached an emergency level, and despite a formal grievance in which he stated, in June, that his addiction was escalating.  In response to his grievance, CCHCS Headquarters last month informed him there would be "no intervention" because an appointment had been ordered.[16]

In response to our question regarding how the current addiction medicine initial appointment backlog will be addressed, CCHCS on October 5 said that in June primary care providers at four of the 35 prisons were trained to care for patients already on MAT, and that 26 additional staff, of an unspecified classification, will be trained by November, which will "provide further access to those waiting to see an Addiction Medicine provider."  CCHCS did not provide information that the staff to be newly trained will be

---

[16]     On October 5 we asked CCHCS about this particular patient's situation.

1  sufficient to reduce the backlog.

2       On another topic, CCHCS last week finally issued for review and comment by

3  Plaintiffs and others its revised mortality review policy, which has been pending for nearly

4  two years.  Once formally adopted, we believe the next major step, after mortality reviews

5  are done for a period of time, is an evaluation by either the Court experts or an independent

6  outside entity to determine if the new revised process, in combination with other CCHCS

7  quality improvement mechanisms, adequately works to timely identify and remedy

8  identified problems that create substantial risks of harm to patients.

9  **IX.   OTHER UPDATES** [17]

10       *Plaintiffs' Position*:  Plaintiffs welcome the State's announcement that DVI will

11  close in September 2021.

12       *Defendants' Position:* On Friday, September 25, 2020, CDCR announced its

13  decision to close California's sixth oldest prison, Deuel Vocational Institution (DVI) which

14  is located in Tracy.  DVI's closure is part of the state's multi-year budget plan.  The

15  incarcerated population at DVI will be transferred to other institutions based on their

16  housing, custody, and rehabilitative needs.  In addition, their rehabilitative, educational,

17  and self-help program credits will transfer with them.  It is anticipated that DVI will be

18  fully deactivated by September 30, 2021.

19

20

21

22

23

24

25

26

27  [17]   At Plaintiffs' request Defendants will no longer include information previously
reported under the heading "Non-Healthcare Items that May Be of Interest."

28

16869130.1   JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1    DATED:  October 6, 2020                    PRISON LAW OFFICE

2

3                                                By:      /s/ Steven Fama

4                                                     STEVEN FAMA
                                                     ALISON HARDY
5                                                    SOPHIE HART
                                                     Attorneys for Plaintiffs
6

7

8    DATED:  October 6, 2020                    XAVIER BECERRA
                                                Attorney General of California
9

10

11                                               By:      /s/ Ryan Gille
                                                     DAMON MCCLAIN
12                                                   Supervising Deputy Attorney General
                                                     RYAN GILLE
13                                                   IRAM HASAN
                                                     Deputy Attorneys General
14                                                   Attorneys for Defendants
15

16

17   DATED:  October 6, 2020                    HANSON BRIDGETT LLP

18

19                                               By:      /s/ Paul B. Mello

20                                                   PAUL B. MELLO
                                                     SAMANTHA D. WOLFF
21                                                   Attorneys for Defendants

22

23

24

25

26

27

28

16869130.1    JOINT CASE MANAGEMENT CONFERENCE STATEMENT