XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
JOHN WALTERS (216427)
RYAN GILLE (262105)
IRAM HASAN (320802)
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Email:   Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF -  240280
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777--3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>        Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Judge:   Hon. Jon S. Tigar<br>Date:    October 21, 2020<br>Time:    10:00 a.m.<br>Crtrm.:  6, 2nd Floor |

16964008.3

The parties submit the following joint statement in advance of the October 21, 2020 Case Management Conference.

# I.  POPULATION REDUCTION

## A.  Status

*Plaintiffs' Position:* Today, the California Court of Appeal ruled that the state's failure to provide adequate space to allow for distancing for people housed in San Quentin State Prison during the pandemic violated the Eighth Amendment.  The Court ordered that the state expedite the removal from that prison, by means of release or transfer to another prison, the number of people necessary to reduce the population to no more than 1,775 (i.e., 50% of the June 2020 population).  *See,* In re Von Staich, No. A160122 (Cal. Ct. App. Oct. 20, 2020) attached as Exh. 1.

Population reduction remains necessary to minimize the risk of harm from COVID-19, particularly among those at increased risk of harm if infected.  As Defendants acknowledge below, reduced population contributes to fewer infections.

As previously explained (see ECF No. 3417 at 2:14-3:2), the overall CDCR population reduction since March, while certainly helped by early release programs, has primarily resulted from natural releases and the suspension and limitation of intake.  As intake increases, CDCR's total population is likely to increase as well.[1]

The vast majority of early releases under the three programs CDCR announced in July took place in that month and early August.  Since the October 6 Statement, in which CDCR announced the end of two of the three July programs, only 221 early releases have taken place.

Following the October 7 Case Management Conference, we asked Defendants to

---

[1]    CDCR recently stated that nearly 8,000 people in county jails are awaiting transport to its reception centers. As reported in Part III, below, more than 600 people are being received this week from county jails.  If intake continues at such levels, it will soon enough off-set much of any continuing reduction achieved from natural and early releases.

16964008.3
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

have the new CDCR Secretary consider early release of people newly determined to have a Weighted COVID Risk Score qualifying them under the now-ended July Program that focuses on those at highest risk of severe complications if infected with COVID-19. Defendants have not substantively responded to this request, but the clear implication from their report below is that they will not do so, at least at present.

*Defendants' Position:* Since the start of the COVID-19 public health crisis, 23,131 incarcerated people were released from CDCR institutions and camps as of October 14, 2020.[2]  CDCR experienced a population decrease of about 19.7% during this period. Between July 1 and October 14, 6,185 people were released from institutions and camps as a result of the COVID-19 early-release programs Defendants announced on July 10.[3]  This represents 221 additional early releases since the October 6 case management conference statement.[4]  An additional 8,498 people were released in accordance with their natural release date during this period.  As of October 14, CDCR's institutions and camps have a population of 94,211.[5]

Responding to Plaintiffs' comment regarding the rate of population reduction above, Defendants note that CDCR started decreasing its population in late March.  CDCR's population decreased by approximately 4,000 between mid-March and mid-April, over 5,000 more between mid-April and July, nearly 6,000 more in July, and over 5,000 more in August.  To provide a visual of the rate of CDCR's population decrease this year, Defendants include the below graph.  The population data in this graph is sourced from

---

[2]   This figure is calculated by taking the difference between the total population in institutions and camps on February 26, 2020 and October 14, 2020.  Weekly population reports can be found at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2020/.

[3]   *See* ECF No. 3389 at 2:4-5:4 and https://www.cdcr.ca.gov/covid19/expedited-releases/ for details regarding CDCR's COVID-19 early-release program announced on July 10, 2020.

[4]   *See* ECF No. 3460 at 4:3-4.

[5] See October 14, 2020 weekly population report at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/10/Tpop1d201014.pdf.

---

16964008.3

CDCR's weekly population reports from January 1 through October 14, 2020.



CDCR continues to process early releases on a rolling basis through the 180-day early-release program announced on July 10. CDCR implemented its discretionary early-release program as an added safety measure at a time when more comprehensive COVID-19-related policies were still being developed. Since then, CDCR has adopted additional significant safety measures to reduce the spread of COVID-19, including, as described in sections below, a drastic reduction in intake from county jails, comprehensive testing, quarantine, isolation, and movement protocols, policies regarding personal protective equipment, and plans for COVID-19 testing of staff and incarcerated people.

Because of the effectiveness of these policies, which CDCR continues to evaluate, improve, and update in close coordination with the Receiver, positivity rates and COVID-19-related complications and deaths have recently trended downwards. As of October 20, fewer than 500 incarcerated people statewide—or less than 1% of CDCR's current

population—are COVID-19-positive.[6]  This is the lowest positivity rate CDCR has experienced since May.  The below graph is a screenshot from page 4 of CDCR's Population COVID-19 Tracker taken on October 19, showing the number of positive COVID-19 cases among CDCR's incarcerated population between March 10 and October 19.



**ACTIVE CASES IN CUSTODY CURVE**

*Patients who released while active, resolved, or died are not included in graph above.
Active case count by date may be delayed 2-3 days while awaiting test results.

Early releases of medically high-risk people continue through the 180-day early-release program, which has accounted for the vast majority of all early releases since CDCR's COVID-19 early-release programs were announced on July 10.  And, as set forth in section V below, the Receiver has indicated that new recommendations related to medically high-risk people are forthcoming.[7]  In this context, CDCR continues to evaluate the need to resume the high-risk medical early-release program in addition to its other ongoing COVID-19 mitigation efforts.[8]

---

[6]   *See* CDCR's Population COVID-19 Tracking tool at https://www.cdcr.ca.gov/covid19/population-status-tracking/ (last visited on October 20, 2020).

[7]   On October 14, the Receiver circulated a draft document to the parties titled "Report on Risks of COVID to High-Risk Patients."  The current iteration of the report includes updates to recommended policies related to incarcerated people at a higher risk of experiencing complications if they contract COVID-19.  The Receiver is accepting comments to this report until October 20.

[8]   In the October 6 joint case management conference statement, Defendants reported that the high-risk medical early-release program, originally announced on July 10, had been (footnote continued)

1   CDCR continues to work with county jails to apply 12 weeks of positive

2   programming credits to eligible people awaiting transfers to CDCR institutions.  This

3   includes identifying people eligible to receive these credits, calculating updated release

4   dates following the application of credits, and providing release instructions for people

5   who are released early as a result of the application of these credits.[9]  As of October 9,

6   2020, CDCR had issued 965 release memoranda for persons incarcerated in county jails

7   and awaiting transfer to CDCR.

8   ## II.   TESTING AND TRANSFER PROTOCOLS

9   *Plaintiffs' Position:*  CDCR continues to transfer large numbers of patients between

10   prisons, with testing and quarantining to reduce the risk of COVID-19 transmission

11   governed by CCHCS's August 19 "Movement Matrix."  CDCR reports there were 514

12   such transfers between September 28 and October 4, and 370 between October 5 and 11.

13   According to CCHCS, there have been "no COVID transmission events . . . among

14   patients subjected to the movement matrix process."

15   Medical staff, before a patient is transferred between prisons, should check that a

16   timely COVID test and other requirements of the Movement Matrix have been met.  As

17   noted previously, CCHCS rejected our suggestion that staff complete a checklist before

18   patients get on a transportation vehicle to minimize the risk that a person is moved without

19   the necessary quarantine period and a timely negative test.  However, at the October 7

20   Case Management Conference, the Receiver explained that medical staff do use a checklist

21   when people are transferred, and some prisons had modified it to include Matrix-related

22   requirements.  We then asked that the modified checklist be used at all prisons.  CCHCS

23   on October 16 denied our request.  Instead, it stated that its "Nursing Program is cross

24   _____

25   suspended after the original list of people had been evaluated for early-release eligibility.
26   *See* ECF No. 3460 at 6:6-10.
      [9]   *See* ECF No. 3460 at 8:1-9 for further explanation of this positive programming credit
27   initiative.

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

referencing [the] current EHRS documentation 'pre-screening form' and will modify accordingly to ensure that the transfer matrix requirements are met."  Plaintiffs have requested further information about this process.

In addition, to track transfers, CCHCS has developed a "Transfer Registry." Defendants indicate below that CCHCS implemented the Registry on October 6, and that it is easily accessible to staff.   In response to questions we asked last week, CCHCS on October 16 said that on October 12 one session of training had been done with field staff about how the Registry works and that based on feedback received additional training will be developed by the end of this month.  It is not clear to Plaintiffs the degree to which the Registry is fully operational, given that training is still being developed.

We also last week asked CCHCS about obtaining access to the Registry.  Our question was not answered.  We believe access to the Registry is necessary to adequately monitor compliance with the Movement Matrix.

*Defendants' Position:*   Since the current iteration of the movement matrix went into effect on August 21, 2020, DAI, CCHCS, and leadership teams at all institutions have held meetings, conference calls, and training sessions to help staff understand and implement the matrix.  As directed by the matrix, movement is limited and controlled, and must be pre-approved by CDCR headquarters, which is working in collaboration with CCHCS (including Mr. Cullen and Dr. Bick).  Additionally, there is continued enforcement of the safety protocols requiring all county staff and incarcerated people arriving to CDCR on intake buses to wear N95 masks.  Further, CDCR and CCHCS continue to utilize measures to track patient information for transfers.  Staff at each prison have procedures and processes in place to follow the requirements of the matrix.  Further, on October 6, 2020, CCHCS implemented an online registry to track all transfer information for incarcerated people.  The registry is easily accessible, updateable, and contains comprehensive information that allows staff to review medical and other important data before, during, and after transfers.  Finally, the prisons continue to offer comprehensive COVID-19 testing for incarcerated people, and the specific protocols for

each prison are outlined for Plaintiffs during routine calls with CCHCS staff.

## III.    INTAKE

*Plaintiffs' Position:* Plaintiffs remain concerned about the admission of additional people to CDCR prisons at this time.  In compliance with Court's July 22 Order, the parties and the Receiver continue to meet and confer to ensure the space allocated for quarantine and isolation at each prison is adequate to respond to a COVID outbreak. Moreover, as set forth in § V., the Receiver recently issued a draft report urging Defendants to offer celled housing to all those considered medically vulnerable to COVID-19 who now live in dorms.  Admitting additional people to the CDCR population before the quarantine and isolation allocation is finalized and these potential transfers are addressed could put pressure on already stressed quarantine space and result in further spread of the virus.

Defendants reopened intake to their facilities on August 24, admitting a total of 100 people the first week and 200 the following week.  This "limited intake" would, according to Defendants, allow CDCR and CCHCS to test their processes, mitigate risk and ensure safety.  *See* ECF No. 3436 at 10.  Two weeks later, Defendants wrote, "CDCR expects to adopt a schedule for intake that will include some limited number of weeks for intake followed by one or two weeks of no intake, repeated for the foreseeable future.  For instance, 3 weeks of intake, followed by a 1 or 2 week pause, then 3 weeks of intake." ECF No. 3449 at 11.  However, Defendants have seemingly abandoned their measured approach to intake.  Since September 20, Defendants have admitted between approximately 143 to 360 people each week.  *See* ECF No. 3460 at 10-11.  For the current week, Defendants say they plan to admit 610 people.

*Defendants' Position:* CDCR accepted 215 incarcerated persons into custody via county jail intake the week of October 4, and 322 incarcerated persons the week of October 11, as follows:

| Week of: | Number of Incarcerated Persons | Sending County | Receiving Institution |
| --- | --- | --- | --- |

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

| October 4 | 132 | Stanislaus | WSP |
|---|---|---|---|
| October 4 | 83 | San Diego | NKSP |
| **Total Week of October 4:** | 215 | | |
| October 11 | 25 | Shasta | NKSP |
| October 11 | 145 | Orange | NKSP |
| October 11 | 123 | Kern | WSP |
| October 11 | 10 | Kings | CCWF |
| October 11 | 6 | Stanislaus | CCWF |
| October 11 | 12 | Kern | CCWF |
| **Total Week of October 11:** | 322 | | |

Each week, CDCR headquarters meets with leadership from NKSP, WSP, and CCWF, as well as CCHCS, to determine whether the institutions should permit intake the following week, and if so, how much space is available such that social distancing of newly arriving incarcerated persons can safely be accomplished during the initial quarantine period.  For the week of October 18, CDCR has authorized intake as follows:

| Number of Incarcerated Persons | Sending County | Receiving Institution |
|---|---|---|
| 30 | Humboldt | NKSP |
| 30 | Shasta | NKSP |
| 100 | Butte | NKSP |
| 10 | Plumas | NKSP |
| 10 | Modoc | NKSP |
| 50 | Napa | NKSP |
| 40 | Contra Costa | NKSP |
| 50 | Sutter | NKSP |
| 90 | Los Angeles | WSP |

16964008.3

| 160 | San Bernardino | WSP |
|---|---|---|
| 40 | Orange | CCWF |
| **Total Week of October 18:** | 610 | |

As Defendants have reported in previous Case Management Statements, CDCR is working tirelessly to ensure that sending counties are complying with all intake protocols, including testing of incarcerated persons in advance of transport and wearing of N95 masks by both incarcerated persons and transportation staff at all times during transport. CDCR requires strict compliance with its protocol. By way of example, a bus arrived at CCWF during the week of October 4, but the sending county had failed to provide CCWF with COVID-19 test results in advance of arrival for three incarcerated persons. Additionally, upon inspection of the bus at the vehicle sallyport, CCWF medical staff observed that the neither the sending county's transportation staff nor any of the incarcerated persons being transported were wearing N95 masks. Accordingly, the bus was not allowed to enter CCWF and the incarcerated persons were returned to the sending county.

CDCR also coordinates intake with the sending counties to ensure that it is spread across multiple days within the week to better enable staff at the receiving institution to ensure social distancing during the intake process.

CDCR remains in communication each week with the California State Sheriffs' Association to determine which counties have the greatest need and are able to comply with CDCR's strict transfer protocol.

## IV.    QUARANTINE AND ISOLATION

*Plaintiffs' Position*:

### A.    Set Aside of Quarantine and Isolation Space

Defendants have identified COVID-19 quarantine and isolation space at every prison to be used in the event of an outbreak, as ordered by this Court on July 22.   ECF

No. 3401 at 3-4.  Based upon information we received from Defendants on October 16, it appears that this space has been vacated, in compliance with the Court's orders on July 22 and September 22.  ECF Nos. 3401 at 3-4 and 3460 at 2.  On September 16, Plaintiffs requested modifications to that set-aside space, as allowed by the Court's order.  *Id.*  On October 15, CCHCS responded.

Plaintiffs' first ground for requesting modifications was that many of the quarantine set-asides are dorms or tiered cell blocks without solid doors -- exactly the sort of congregate living environments, with shared airspaces, that have allowed rapid and uncontrolled spread of the virus in the prisons.  The Public Health Workgroup recognized that people exposed to the virus "must be separated from each other in single cells with solid doors."  Several thousand people incarcerated in CDCR are presently quarantined in dorms or cells with barred or perforated doors, in direct contradiction to that guidance.

The response from CCHCS recognized these concerns but did not provide a clear response to how patients in prisons without solid-door celled quarantine space would be protected from an unreasonable risk of harm.

Plaintiffs' second ground for requesting modification was a concern that general population patients might refuse to move to isolation or quarantine space located on a sensitive needs yard, and vice versa, due to fears that they might experience violent reprisals from other incarcerated people as a result.  People could refuse tests for the same reason.  Multiple refusals could create a public health problem.  CCHCS responded that isolation and quarantine space was akin to Administrative Segregation, where general population and sensitive needs populations are mixed.  Finally, CCHCS provided specific responses to our institution-specific concerns and noted that, subsequent to Plaintiffs' September 16 letter, CDCR set aside additional beds for isolation and quarantine at some prisons.  We then asked and received from CDCR a current draft of all set aside space.  Plaintiffs will review the additional space and CCHCS's responses to determine whether we think our concerns have been adequately addressed.

**B.     Development of Policies Related to Quarantine and Isolation**

-10-                                Case No. 01-1351 JST

16964008.3

1    As reported in the last two Case Management Conferences, Plaintiffs have asked

2 the Receiver to consider developing two policies related to quarantine and isolation: (a)

3 guidance regarding when people should be quarantined or isolated in a space other than the

4 set-aside space, and (b) procedures and time-frames for placing patients in isolation or

5 quarantine once positive test results are received or information is received regarding an

6 exposure.  *See* ECF No. 3448 at 12-13; ECF No. 3460 at 14.

7    Although CCHCS has provided responses to the above requests, plaintiffs are

8 pursuing clarification.

9    We have also asked CCHCS to issue a directive to ensure that those placed in

10 isolation due to symptoms who are pending a COVID-19 test results are kept separate from

11 those who are lab-confirmed to have COVID-19.  CCCHS on October 16 responded that

12 this message has been provided to the field in regularly scheduled phone conferences, and

13 will be addressed in the next iteration of the Movement Matrix.

14    **C.    Monitoring Use of Quarantine and Isolation Space**

15    Plaintiffs must be able to adequately monitor the use of quarantine and isolation

16 space, including to ensure that incarcerated people are not placed at risk of harm and so

17 that we can determine whether to request that further space be set aside.  CCHCS has

18 developed a template—called an Outbreak Management Tool—that prisons will use on a

19 daily basis to report on matters related to COVID-19, including information on numbers

20 and housing locations of patients in quarantine and isolation.  We sent CCHCS comments

21 on a draft version of the template, and were told on October 2 that CCHCS is in the

22 process of automating the tool, and that completed copies of these daily reports will be

23 provided to Plaintiffs once they are in use at the prisons.  On October 16, CCHCS said that

24 work on a partially automated Tool was expected to be completed last week, would then be

25 distributed to the prisons for feedback, and that it anticipated a partially automated version

26 would be available by the end of this month.

27    While providing the above information, CCHCS did not last week respond to our

28 question regarding when we will be provided access to the Outbreak Management Tool as

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

completed by the various prisons.  We understand, including because weeks ago CCHCS provided us a copy of one, that the prisons are currently completing and forwarding the tool to regional and central office managers.  Given that earlier this month CCHCS said we would be provided copies, it is not clear why we are not regularly receiving them.   We believe access to this information is necessary for adequate monitoring and would significantly improve our understanding of outbreak response.

*Defendants' Position*:  CDCR has completed its effort to set aside vast quantities of previously identified isolation and quarantine space at the prisons.  As discussed at the last case-management conference, only one prison—California State Prison, Los Angeles County (LAC)—still needed to vacate its identified isolation and quarantine space.  LAC completed that process on October 9, 2020, and all identified quarantine and isolation space is now either ready for occupancy or is already being used for quarantine or isolation.

Plaintiffs submitted a number of concerns about current isolation and quarantine reserves to the Receiver in September and the Receiver responded to those concerns on October 15, 2020.  Additionally, the Receiver's office arranged a meeting on October 5 for the parties in *Plata*, *Coleman*, and *Armstrong* to further discuss isolation and quarantine issues with the Receiver, the *Coleman* Special Master, and the *Armstrong* Court Expert. The Receiver held a follow-up to that meeting on October 15, 2020.  The focus of the October 15 meeting was ensuring that appropriate isolation and quarantine space would be available for enhanced-outpatient *Coleman* class members.  Significant progress toward achieving that goal was made at the October 15 meeting, and the Receiver scheduled another follow-up meeting on October 27, 2020, to allow the parties to further discuss quarantine and isolation.

## V.   SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE

*Plaintiffs' Position:*  CDCR continues to house people in large congregate living

areas, including thousands who, based on age and/or their medical condition, are particularly vulnerable to severe illness or death from COVID-19.[10]  In these dorms and open-cell-front living units, large numbers of people share airspace, including sleeping areas, bathrooms, and showers.  The U.S. Centers for Disease Control and Prevention ("CDC") recently confirmed that COVID-19 can be spread by aerosolization, and the number and rate of infections in CDCR in the first seven months of the pandemic show that the virus spreads rapidly when introduced into dorms and open-cell-front housing. Because the risk of infection is so much greater in these environments, they are particularly dangerous for medically vulnerable people, placing them at heightened risk of severe illness or death.

In an effort to address this situation, the Receiver on October 14 circulated a Draft Report entitled, "Report on Risks of COVID to High-Risk Patients."[11]  Recognizing the high risks of morbidity and mortality for people with COVID-19 risk-factors,  he recommends that "CDCR extend an offer to the over 8,200 patients with COVID-19 risk scores of 3 and above who are currently housed in dorms or open-cell-front housing the opportunity to transfer into closed-front cells either at their existing institution or at another institution."  Having consulted with our public health expert, Dr. Adam Lauring, Plaintiffs endorse this recommendation, and are continuing to discuss whether the CDCR should do more than extend an offer to those at high medical risk for COVID-19.

To date large percentages of medically vulnerable patients have declined offers to move from dorms to cells.  Last week we mailed a questionnaire to each of these patients, in the hope of better understanding why they did not want to move and whether there are circumstances under which they would.

_____

[10]  As noted in the previous Joint Case Management Conference Statement, celled housing has already been offered to a small number of medically vulnerable people in dorms, and the acceptance rate has been low.

[11]  The parties have been invited to submit comments on the report by Tuesday, October 20.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

*Defendants' Position:*   The Receiver has provided the parties with a draft report that proposes that CDCR should offer over 8,000 HRM patients living in dorms the opportunity to move into a single cell.  The Report is still awaiting further comments and the Defendants remain committed to working with the Receiver to facilitate movements of medically high-risk patients from dorms to cells, or any other movements, to safely house medically high-risk patients when such movement is recommended and approved by the appropriate public health and corrections experts.

Defendants note that Plaintiffs have raised issues in this section that appear to be directed to the Receiver's office and CCHCS.  Defendants will not attempt to respond on their behalf, but remain committed to working with them in addressing Plaintiffs' concerns.

## VI.   COVID-19 TESTING

### A.   Staff Testing

*Plaintiffs' Position:* As reported in prior Joint Case Management Conference Statements, the Office of the Inspector General (OIG) in August reported significant problems with the entrance screening practices in CDCR.  *See* ECF No. 3427 at 14-15; ECF No. 3436 at 18-19; ECF No. 3460 at 18; Office of the Inspector General, *COVID-19 Review Series, Part One: Inconsistent Screening Practices May Have Increased the Risk of COVID-19 Within California's Prison System* (August 2020), https://www.oig.ca.gov/wp-content/uploads/2020/08/OIG-COVID-19-Review-Series-Part-1-Screening.pdf.  On October 8, CCHCS issued a memorandum to standardize the entrance screening practices at all prisons.  The memorandum directs each prison to identify and submit a screening location for approval, provide training for employees conducting the screening, and regularly audit and report on compliance with screening procedures.  We hope this will result in reliable, consistent screenings of all staff entering the prisons.

Regarding staff testing, CCHCS took over authority for staff testing in August, and on September 14, distributed its draft "Employee Testing Guidance" to the parties.  Plaintiffs provided comments to CCHCS on September 23.  On October 2, CCHCS said it

-14-                        Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

had reviewed our comments and would be providing responses, as well as a revised version of the Testing Guidance, the following week.  On October 16, in response to our query, CCHCS stated it was still finalizing the revised Testing Guidance.  CCHCS also reported it was finalizing an Employee Testing Budget Proposal, so that nursing staff could be hired to conduct onsite testing seven days a week.  CCHCS reported that, currently, employee testing is still conducted by vendors, and is only done five days a week.  CCHCS stated they anticipated nursing staff would be conducting employee testing by December 2020.  As we have previously stated, we appreciate the steps CCHCS is taking to implement an effective staff testing program, but, seven months into the pandemic, regret that such necessary action was not taken by CDCR or CCHCS sooner.

Finally, in response to our request for reports on the staff testing completed in August and September at CHCF, CMF, and CCWF, CCHCS on October 16 stated that reports for staff testing are still being developed, and that no reports have been finalized. We acknowledge the difficulty of developing a comprehensive reporting system, but are eager to receive these reports, as we currently have no way to monitor whether and when employees have been re-tested.

*Defendants' Position:*  On September 14, the Receiver's Office shared the employee testing guidance with the parties and requested comments, if any, by September 21.  CDCR continues working closely with CCHCS to maintain the current staff testing procedures and to ensure a smooth and easy transition of the staff testing-responsibilities to CCHCS.  CDCR also remains committed to continuing to work with CCHCS to answer any questions Plaintiffs might have about the status of and processes for staff testing until the transition to CCHCS has been completed.

**B.   Incarcerated Population Testing**

*Plaintiffs' Position:*

**1.   Patient Testing Policies**

The Receiver at the October 7 Case Management  Conference said, as we understood it, that CCHCS would revise its patient testing policies so that serial retesting

was mandated in certain circumstances.  We hope to soon see this and other revisions.

Another issue has recently arisen related to CCHCS's increasing reliance on a particular Point of Care (POC, sometimes referred to as a rapid) antigen test.  As we understand it, this test is FDA-approved for use on symptomatic patients, but is widely used, including by CCHCS, for those without symptoms.  Earlier this month, five patients without symptoms at the California Medical Facility (CMF) were declared to have COVID-19 and placed in isolation due to positive POC tests.  However, and fortunately, CMF doctors ordered retests using the more traditional lab testing, and determined the earlier results were false positives: none of the patients in fact were infected.  We believe CCHCS practices vary statewide as to whether POC positive results are confirmed by subsequent lab tests, and that without confirming lab tests, placing patients into medical isolation with others who are in fact infected is dangerous.  Under current CCHCS policy, people in isolation can be grouped and housed together.  We asked CCHCS to implement a mandate requiring lab retests of POC positive patients, and that such patients not be mixed with others in isolation until confirming lab results are received.  On October 16, CCHCS said it uses the POC tests consistent with Centers for Disease Control and Prevention and California Department of Public Health guidelines, but that as it "gain[s] more experience" it "may modify" its approach.

### 2.    Reports and Monitoring of Serial Retesting

CCHCS reports that work has been done on developing an automated reporting and monitoring process regarding whether ordered serial retesting of patients is actually done, but that further work has been deferred pending completion and release of the Transfer Registry.  We continue to hope that this can be completed soon.

### 3.    Notification to Patients of Test Results

CCHCS on October 16 said initial testing of automated test result processes, using standardized templates, has been completed and approved by its leadership, and the processes are now undergoing final testing.  It also provided copies of the standardized templates, which are very well done  We have asked that the notification template for

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

1  positive patients be modified to, among other things, explain that nurses will check blood

2  oxygen levels, given the central importance of that check in the monitoring of COVID-19

3  patients.

4      *Defendants' Position:* Defendants note that Plaintiffs have raised issues in this

5  section that appear to be directed to the Receiver's office and CCHCS.  Defendants will

6  not attempt to respond on their behalf, but remain committed to working with them in

7  addressing Plaintiffs' concerns.

8  **VII.   Prison-Specific Updates**

9      *Plaintiffs' Position:*

10      We continue to have a weekly conference regarding prison-specific COVID-related

11  matters with the CCHCS Regional Medical Chief Executive Officers (CEOs) and the

12  Deputy Director who supervises them.  We have been able to raise concerns that have

13  resulted in what we consider major improvements in COVID risk reduction measures and

14  conditions for patients, highlight other concerns, and learn of initiatives undertaken at

15  particular prisons.

16      For example, we believe the weekly conferences resulted in programs to serially

17  test every week never-positive patients at the California Rehabilitation Center (CRC) and

18  California Institution for Men (CIM), prisons where, despite large numbers of COVID

19  infections for months, comprehensive retesting such as is being done at San Quentin and

20  Folsom had not been instituted.  At CIM, we learned that to implement serial testing,

21  CCHCS in the last two weeks arranged for approximately 20 additional nurses, a laudable

22  effort.  The weekly conferences also resulted in patients on medical isolation and

23  quarantine being offered some outdoor exercise at Salinas Valley State Prison, where some

24  had been locked in their cells for weeks, even though other prisons, including the

25  Correctional Training Facility located almost literally across the street, routinely provided

26  outdoor exercise opportunities to those on isolation and quarantine.

27      Our questions at the conferences also revealed that at CIM, nearly 50 people who

28  medical staff determined had been exposed to COVID-19 were quarantined together in a

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

gym, even though single cells with solid doors—which CCHCS mandates be used if available—were available.  Further, the patients quarantined together came from four different housing units; the Regional CEO was not able to explain how this was consistent with the CCHCS mandates that if people are quarantined together they must have the same date and type of exposure.  Subsequently, a number of people in the gym tested positive.

Similarly, we were able to confirm that at CRC this past summer people were quarantined in a particular dorm for months, with people from another dorm, with seemingly different exposure dates or sources, brought into same dorm.  For weeks, new infections were repeatedly identified, with only four people remaining uninfected at the end of the quarantine period.  The dorm acted as an incubator for COVID-19, and this unfortunate experience shows again why quarantine in single cells with solid cells must be done.[12]

Finally, we have learned via the conferences that a decision is expected shortly on whether to enter into a contract to study and test the ventilation systems in San Quentin's five-tier East, South, and West Block ventilation systems, as those systems relate to possible transmission of the virus that causes COVID-19.  This is important because those units have peculiar ventilation, in which air in the building is drawn into each cell, a concern given that it is now recognized that the virus is in the air.   We appreciate CCHCS's and CDCR's undertaking of this initiative.

*Defendants' Position:*  Defendants note that Plaintiffs have raised issues in this section that appear to be directed to the Receiver's office and CCHCS.  Defendants will not attempt to respond on their behalf, but remain committed to working with them in addressing Plaintiffs' concerns.

---

[12]      CRC has less than a handful of cells.  CCHCS and CDCR have within the last two weeks installed tents at the prison, in which they intend to house, in cohorts of four or five, those who are at high risk of severe complications if infected with COVID-19 who are not yet infected.  In that way, they hope to limit the spread of COVID-19 among those patients.  Still, single cell quarantining cannot occur.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

## VIII.   Updates on Medical Care Matters Not Directly Related to COVID-19

*Plaintiffs' Position:*   We previously reported, and discussed at the October 7 Case Management Conference, that there are now approximately 4,700 patients who are ordered and receiving Medication Assisted Treatment (MAT) for a substance use disorder, and more than 6,000 patients awaiting the necessary addiction medicine physician appointment to be considered for such an order, with more than 80% of those appointments overdue. Many of those appointments are several months overdue.

On October 12 we asked CCHCS to begin providing us monthly data on overdue addiction medicine physician appointments. CCHCS on October 16 said it would do so starting at the end of November. We appreciate that this will be done.

Also on October 12 we asked CCHCS to take immediate action to increase the number of Addiction Medicine physician appointments currently provided, so that the backlog can be substantially reduced as soon as possible. Our concern about the backlog was heightened by our review of the records of a CCHCS patient who recently died. In May, the patient twice submitted written requests for care, describing his problems with heroin and asking for MAT so he could he could get help to "sober up."  That same month, a primary care visit documented that he used heroin daily. On June 9, the patient was seen by a Licensed Clinical Social Worker, who determined he was at "high risk" for matters related to opioid use and ordered an Addiction Medicine physician appointment within 14 days. On June 11, that appointment was scheduled for June 25; however, it was then successively rescheduled to July 16, August 6, and then November 26. The records do not appear to include a reason why the appointment was repeatedly rescheduled; we believe it was due to the backlog.

On October 2, the patient was found unresponsive in his cell. Narcan was given with minimal improvement, apparently, and he was emergently transported to a local hospital. The hospital record reports that "a needle was found next to him" when found unresponsive in his cell, and state that patient had a "possible overdose" or "opioid overdose." The next day, the patient died.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

1    *Defendants' Position:*  Defendants note that Plaintiffs have raised issues in this

2    section that appear to be directed to the Receiver's office and CCHCS.  Defendants will

3    not attempt to respond on their behalf, but remain committed to working with them in

4    addressing Plaintiffs' concerns.

5    DATED:  October 20, 2020                     HANSON BRIDGETT LLP

6

7

8                                        By:   */s/ Samantha Wolff*
                                               PAUL B. MELLO
9                                              SAMANTHA D. WOLFF
                                               Attorneys for Defendants
10

11   DATED:  October 20, 2020                     XAVIER BECERRA
                                                  Attorney General of California
12

13

14                                       By:   */s/ Damon McClain*
                                               DAMON MCCLAIN
15                                             Supervising Deputy Attorney General
                                               JOHN WALTERS
                                               RYAN GILLE
16                                             IRAM HASAN
                                               Deputy Attorney General
17                                             Attorneys for Defendants

18

19   DATED:  October 20, 2020                     PRISON LAW OFFICE

20

21

22                                       By:   */s/ Alison Hardy*
                                               STEVEN FAMA
23                                             ALISON HARDY
                                               SARA NORMAN
24                                             SOPHIE HART
                                               Attorneys for Plaintiffs
25

26

27

28