XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
JOHN WALTERS (216427)
RYAN GILLE (262105)
IRAM HASAN (320802)
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Email:  Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF -  240280
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777--3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Judge:   Hon. Jon S. Tigar<br>Date:    November 5, 2020<br>Time:    1:30 p.m.<br>Crtrm.:  6, 2nd Floor |

16964008.3

The parties submit the following joint statement in advance of the November 5, 2020 Case Management Conference.

## I.     POPULATION REDUCTION

*Plaintiffs' Position:*  Further population reductions are necessary to minimize the risk of harm from COVID-19, particularly at prisons with primarily open-air, congregate living spaces, and among those at increased risk of harm if infected.  As Defendants have acknowledged, reduced population contributes to fewer infections and deaths.  *See* ECF No. 3469 at 3-4.

Unfortunately, as previously explained (*see* ECF No. 3417 at 2:14-3:2), the overall CDCR population reduction since March, while certainly helped by early release programs, has primarily resulted from natural releases and the suspension and limitation of intake.[1]  Defendants have now stopped two of the three population reduction programs announced in July.  As intake increases, and the number of early releases dwindles, CDCR's total population will increase.

Indeed, CDCR's population is already beginning to increase: the population totals for CDCR's Prisons and Camps on October 21 and 28 were, respectively, 7 and 75 people greater than the week before.[2]  Significantly, these week-to-week net increases were the first reported since the initial CDCR COVID-19 patient was diagnosed in late March.[3]

---

[1]     The subsidiary role of early releases in population reduction is further illustrated by Defendants' recently provided data.  They report that between July 1 and October 14, approximately 6,200 were released early, while a far greater number -- approximately 8,500 -- were released via their natural release date (ECF No. 3469 at 2:9-13), and at the same time, intake was prohibited until late August and since then has been, until the last three weeks, greatly limited.

[2]     *See* "Institutions/Camps" totals (subpart A.I.1) at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/10/Tpop1d201021.pdf [October 21] and https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/10/Tpop1d201028.pdf [October 28].

[3]     *See* "Institutions/Camps" totals (subpart A.I.1) in 2020 Weekly Total Population

16964008.3

Given the large number of people in county jail awaiting transport to CDCR,[4] this dangerous increasing of population will likely continue unless the State re-starts early release programs.

We continue to be extremely disappointed that the State ended the early release program focused on those most vulnerable to severe complications or death if infected by COVID-19, and that so very few – less than 50 out of almost 6,600 eligible[5] – were released by that program when it was in effect.  We are similarly disappointed the State excluded people from its COVID-19 high risk early release consideration if medical conditions changed such that they were no longer considered high risk, but refused to include people newly determined to be high risk based on pre-existing medical conditions that public health officials in July announced were serious risk factors for hospitalization or death from COVID-19.  We are finally disappointed that the State has not released anyone from San Quentin since the October 20 state appellate decision requiring that prion's population to be substantially reduced due to the risk of harm from COVID-19.

Our disappointment with the State's very limited releases of those most at risk is deepened given what appears to be the inevitable next wave of COVID-19 infections.  The

---

Reports at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2020/.

[4]    CDCR on September 29 stated that nearly 8,000 people in county jails were awaiting transport to its reception centers (see ECF No. 3460 at 10:8-20), and surely many additional people were sentenced to state prison in the counties since then.  For the most recent three weeks, *i.e.*, those starting October 19, October 26, and November 2, CDCR told us that it authorized intake of, respectively, 610, 428, and 680 people.

[5]    *See* ECF No. 3460 at 4:9-6:6 (Defendants report that of 6,599 eligible for early release consideration under COVID-19 high-risk program, 45 determinately sentenced people were approved for release, and 12 indeterminately sentenced people were referred to the Governor for executive clemency consideration).  We are not aware of the Governor granting any person in prison clemency since these referrals were made.  Even if all referred were released, the main point would remain: surpassingly few of those most at risk of harm from COVID-19 were released by the State's program specifically enacted to release those people.

16964008.3

1   Governor warned of this next wave a month ago.[6]  The United States as a whole is
2   experiencing record-breaking numbers of infections, with no state reporting decreased
3   numbers of infections.[7]  California, as of the end of October, had an almost 20 percent
4   increase in infections over the previous week.[8]

5       *Defendants' Position*: As of October 28, 2020, CDCR has experienced a population
6   reduction of 23,049, representing a nearly 20 percent decrease in the size of the population,
7   since the start of the COVID-19 public health crisis.[9]  Between July 1 and October 28,
8   2020, 6,391 people were released from institutions and camps as a result of the COVID-19
9   early-release programs Defendants announced on July 10.[10]  This represents 206 more
10  early releases than those reported in the October 20 case management statement.[11]  An
11  additional 9,089 were released in accordance with their natural release dates during this

12

---

13  [6]     *See* Amy Graff, SFGATE, *Newsom warns second COVID-19 wave in other*
14  *countries could hit California* (Oct. 5, 2020),
15  https://www.sfgate.com/news/editorspicks/article/COVID-19-coronavirus-second-wave-California-fall-15623027.php.
16  [7]     *See* New York Times, *The U.S. breaks its record, tallying over 99,000 new cases in*
17  *a day* (Oct. 31, 2020), https://www.nytimes.com/live/2020/10/30/world/covid-19-coronavirus-updates#the-us-breaks-its-record-tallying-over-99000-new-cases-in-a-day
18  (reporting that "nearly two dozen states are reporting their worst weeks for new cases —
    and none are recording improvements").
19  [8]     *See* California Department of Public Health, COVID-19 Cases, California Cases, at
20  https://public.tableau.com/views/COVID-19CasesDashboard_15931020425010/Cases?%3Aembed=y&%3AshowVizHome=no (last
21  accessed Oct. 31, 2020) (showing as of October 31 an 18.4% "Weekly % Change" aka
22  "Week-Over-Week % Change of New Cases").
    [9]     This figure is calculated by taking the difference between the total population in
23  institutions and camps on February 26, 2020 and October 14, 2020.  Weekly population
24  reports can be found at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2020/.
25  [10]    *See* ECF No. 3389 at 2:4-5:4 and https://www.cdcr.ca.gov/covid19/expedited-releases/ for details regarding CDCR's COVID-19 early-release program announced on
26  July 10, 2020.
27  [11]    *See* ECF No. 3469 at 3:9-3:12.

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

period.  As of October 28, CDCR's institutions and camps have a population of 94,293, CDCR's lowest population in three decades.[12] https://word-edit.officeapps.live.com/we/wordeditorframe.aspx?ui=en-US&rs=en-US&hid=vCe5%2Bp3Mrkefw96kzKDndA.0&wopisrc=https%3A%2F%2Fwopi.onedrive.com%2Fwopi%2Ffiles%2FEFAD5F4D2302DFAD!1633&wde=docx&sc=host%3D%26qt%3DFolders&mscc=1&wdp=2&uih=OneDrive&jsapi=1&jsapiver=v2&corrid=de8d08f3-df71-4e33-908c-37031bfc25a6&usid=de8d08f3-df71-4e33-908c-37031bfc25a6&newsession=1&sftc=1&wdorigin=Unknown&instantedit=1&wopicomplete=1&wdredirectionreason=Unified_SingleFlush - _ftn1https://word-edit.officeapps.live.com/we/wordeditorframe.aspx?ui=en-US&rs=en-US&hid=vCe5%2Bp3Mrkefw96kzKDndA.0&wopisrc=https%3A%2F%2Fwopi.onedrive.com%2Fwopi%2Ffiles%2FEFAD5F4D2302DFAD!1633&wde=docx&sc=host%3D%26qt%3DFolders&mscc=1&wdp=2&uih=OneDrive&jsapi=1&jsapiver=v2&corrid=de8d08f3-df71-4e33-908c-37031bfc25a6&usid=de8d08f3-df71-4e33-908c-37031bfc25a6&newsession=1&sftc=1&wdorigin=Unknown&instantedit=1&wopicomplete=1&wdredirectionreason=Unified_SingleFlush - _ftn2https://word-edit.officeapps.live.com/we/wordeditorframe.aspx?ui=en-US&rs=en-US&hid=vCe5%2Bp3Mrkefw96kzKDndA.0&wopisrc=https%3A%2F%2Fwopi.onedrive.com%2Fwopi%2Ffiles%2FEFAD5F4D2302DFAD!1633&wde=docx&sc=host%3D%26qt%3DFolders&mscc=1&wdp=2&uih=OneDrive&jsapi=1&jsapiver=v2&corrid=de8d08f3-df71-4e33-908c-37031bfc25a6&usid=de8d08f3-df71-4e33-908c-37031bfc25a6&newsession=1&sftc=1&wdorigin=Unknown&instantedit=1&wopicomplete=1&wdredirectionreason=Unified_SingleFlush - _ftn3https://word-edit.officeapps.live.com/we/wordeditorframe.aspx?ui=en-US&rs=en-US&hid=vCe5%2Bp3Mrkefw96kzKDndA.0&wopisrc=https%3A%2F%2Fwopi.onedrive.com%2

---

[12]   *See* October 28, 2020 population report at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/10/Tpop1d201028.pdf.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

Fwopi%2Ffiles%2FEFAD5F4D2302DFAD!1633&wde=docx&sc=host%3D%26qt%3DFolders&mscc=1&wdp=2&uih=OneDrive&jsapi=1&jsapiver=v2&corrid=de8d08f3-df71-4e33-908c-37031bfc25a6&usid=de8d08f3-df71-4e33-908c-37031bfc25a6&newsession=1&sftc=1&wdorigin=Unknown&instantedit=1&wopicomplete=1&wdredirectionreason=Unified_SingleFlush - _ftn4

CDCR continues to process early releases on a rolling basis through the 180-day early-release program announced on July 10, which has accounted for the vast majority of all early releases since then.  This discretionary early-release program was implemented as an added safety measure at a time when more comprehensive COVID-19 related policies were still being developed.  Since then, CDCR adopted additional significant safety measures to reduce the spread of COVID-19, including, as described below, a drastic reduction in intake from county jails, comprehensive testing, quarantine, isolation, and movement protocols, policies regarding personal protective equipment, and plans for COVID-19 testing of staff and incarcerated persons.  CDCR continues to evaluate, improve, and update these policies in close coordination with the Receiver.

CDCR has regularly provided early-release data to Plaintiffs' counsel and the public after announcing the July 10 programs.  The data shows that CDCR's early-release programs are not merely subsidiary: between July 1 and October 28, 2020, early releases accounted for over 41 percent of all releases from CDCR's institutions and camps during that period.[13]  Defendants have also been transparent about the fact that the early releases are one of many safety measures CDCR implemented in response to COVID-19, and note that Plaintiffs' list of disappointments (*see supra* pp. 2-3) lacks recognition of the logistics of release and post-release processes and the impact on public safety.

---

[13]     As reported above and according to data compiled by CDCR's Office of Research, 6,391 people were released from CDCR's institutions and camps through its COVID-19 early-release programs between July 1 and October 28.  9,089 additional people were released in accordance with their natural release dates.  A total of 15,480 people were released during this period.

16964008.3

1    Plaintiffs' counsel receives several updates regarding intake and its mechanics each

2  week through email and phone conferences, and they are aware of the planning, testing,

3  quarantine, isolation, communication, and movement protocols involved in the intake

4  process.  Plaintiffs continue to disapprove of CDCR's efforts to provide relief to

5  overpopulated county jails by restarting intake, but fail to acknowledge the impact on jails,

6  courts, and local communities CDCR's intake policies have.  At the October 21, 2020 case

7  management conference, Plaintiffs' counsel had no response when the Court attempted to

8  seek clarity on their conflicting positions on this issue (Tr. at 13:11-12), and appear to

9  offer no further clarity on their position in this statement.

10    Additionally, Plaintiffs' commentary on the State's compliance with court

11  directives in *In re Ivan Von Staich*, No. A160122, 2020 WL 6144780 (Cal. Ct. App. Oct.

12  20, 2020) is unhelpful and inappropriate.  *In re Von Staich* is a separate, state court matter

13  that currently remains pending.  Defendants will not substantively comment on that

14  litigation here except to note that, on its own motion, the California Supreme Court opened

15  a case for appeal of this matter and extended its time for ordering review to and including

16  February 17, 2020.  Thus, the *In re Von Staich* order does not become enforceable until

17  either the court denies a petition for review or the period expires for California Supreme

18  Court review (on February 17, 2020), whichever occurs first.

19    Plaintiffs' counsel continue to omit mention of safety measures that have been

20  created, executed, and improved over the past eight months or the beneficial impact they

21  have had.  Indeed, Plaintiffs have actively contributed to the development of safety

22  protocols implemented by the Receiver and monitored CDCR's compliance with these

23  protocols, many of which are mentioned on page four above and in sections below.  These

24  include, but are not limited to, aggressive testing strategies in each of CDCR's 35

25  institutions, contact tracing conducted by healthcare staff, quarantine and isolation

26  protocols that surpass some Centers for Disease Control recommendations, a movement

27  matrix that controls all movement of incarcerated people across the state, staff testing,

28  protective-equipment guidance, and an ongoing collaboration between CDCR and the

counties regarding compliance with these standards in advance of intake.

Finally, Plaintiffs comment on the current size of CDCR's population.  Although CDCR's population has increased by 82 people in the past two weeks since the last case management conference, it has reduced by nearly 20 percent since the beginning of March and still remains the lowest it has been in three decades.

## II.    TESTING AND TRANSFER PROTOCOLS

*Plaintiffs' Position:*  CDCR continues to transfer large numbers of patients between prisons.  Over the last several weeks, there have been on average approximately 500 such transfers per week.  Testing and quarantining of those transferred, to reduce the risk of COVID-19 transmission, remain governed by CCHCS's August 19 "Movement Matrix."

We are not able at present to adequately monitor compliance with the Movement Matrix's testing and quarantine requirements.  The best we can do is spot check individual patient records, and it is not possible to gain a systemic view of compliance doing that given the large numbers of people transferred.  We also ask CCHCS regularly if it is aware of any COVID-19 transmission events associated with transfers; it says it is not aware of any such events.  And while CCHCS says it believes prison staff are complying with the Matrix requirements, we believe it necessary—again remembering the San Quentin disaster resulting from transfers of positive patients into that prison, and the failure to properly quarantine them once they arrived—that objective information document compliance.

In this regard, CCHCS says its Transfer Registry, which we are told will comprehensively display compliance with Movement Matrix requirements for each transferred person, will be made available to us when "fully operational" or "completed." As of October 30, no date for this could be provided by CCHCS.  We are not able to square this information with previous reports that the Transfer Registry had been implemented.

CCHCS also previously stated that it would modify an existing form in its Electronic Health Records System (EHRS) so that nurses before a transfer can document

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

that they checked that Movement Matrix requirements had been followed at the sending prison.  On October 30, CCHCS said it wanted to complete work on this project and implement the revised form as soon as possible, but could not provide a date by which that would happen.

*Defendants' Position*:  Since the current iteration of the movement matrix went into effect on August 21, 2020, DAI, CCHCS, and leadership teams at all institutions have held meetings, conference calls, and training sessions to help staff understand and implement the matrix.  As directed by the matrix, movement is limited and controlled, and must be pre-approved by CDCR headquarters, which is working in collaboration with CCHCS (including Mr. Cullen and Dr. Bick).  Additionally, there is continued enforcement of the safety protocols requiring all county staff and incarcerated people arriving at CDCR on intake buses to wear N95 masks.  Further, CDCR and CCHCS continue to utilize measures to track patient information for transfers.  Staff at each prison have procedures and processes in place to follow the requirements of the matrix.  Further, on October 6, 2020, CCHCS implemented an online registry to track all transfer information for incarcerated persons.  The registry is easily accessible, updateable, and contains comprehensive information that allows staff to review medical and other important data before, during, and after transfers.  Finally, the prisons continue to offer comprehensive COVID-19 testing for incarcerated people, and the specific protocols for each prison are outlined for Plaintiffs during routine calls with CCHCS staff.

III.   INTAKE

*Plaintiffs' Position*: CDCR doubled intake this week: from 338 the week of October 25, to 680 the week of November 1.  As noted above, the State has at the same time ended two of the three early release programs announced in July.  If the State continues intake at this pace, without conducting additional early releases, the population reduction achieved in recent months will be slowly reversed.

*Defendants' Position*:  CDCR accepted 445 incarcerated persons into custody from county jail intake the week of October 18, and 338 incarcerated persons the week of

October 25, as follows:

| Week of: | Number of Incarcerated Persons | Sending County | Receiving Institution |
|---|---|---|---|
| October 18 | 26 | Humboldt | NKSP |
| October 18 | 28 | Shasta | NKSP |
| October 18 | 41 | Butte | NKSP |
| October 18 | 10 | Plumas | NKSP |
| October 18 | 5 | Modoc | NKSP |
| October 18 | 30 | Napa | NKSP |
| October 18 | 22 | Contra Costa | NKSP |
| October 18 | 40 | Sutter | NKSP |
| October 18 | 74 | Los Angeles | WSP |
| October 18 | 130 | San Bernardino | WSP |
| October 18 | 39 | Orange | CCWF |
| **Total Week of October 18:** | 445 | | |
| October 25 | 44 | El Dorado | NKSP |
| October 25 | 23 | Shasta | NKSP |
| October 25 | 15 | Colusa | NKSP |
| October 25 | 32 | Yuba | NKSP |
| October 25 | 105 | Tulare | WSP |
| October 25 | 52 | San Luis Obispo | WSP |
| October 25 | 35 | Los Angeles | CCWF |
| October 25 | 10 | Kings | NKSP |
| **Total Week of October 25:** | 338 | | |

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

Each week, CDCR headquarters staff meet with leadership at the three reception centers (NKSP, WSP, and CCWF) and CCHCS to evaluate current available space, determine whether the institutions should permit intake the following week, and if so, how much space is available to accommodate social distancing of newly arriving incarcerated persons during the initial quarantine period.

For the week of November 1, CDCR has authorized intake as follows:

| Number of Incarcerated Persons | Sending County | Receiving Institution |
|---|---|---|
| 100 | San Joaquin | NKSP |
| 50 | Madera | NKSP |
| 40 | Mendocino | NKSP |
| 100 | Riverside | NKSP |
| 50 | Sacramento | NKSP |
| 25 | Sacramento | WSP |
| 100 | Fresno | WSP |
| 100 | Merced | WSP |
| 50 | Sonoma | WSP |
| 25 | Sacramento | WSP |
| 40 | San Diego | CCWF |
| **Total Week of November 1:** | 680 | |

As Defendants have reported in previous Case Management Statements, CDCR is working tirelessly to ensure that sending counties are complying with all intake protocols, including testing of incarcerated persons in advance of transport and wearing of N95 masks by both incarcerated persons and transportation staff at all times during transport. CDCR requires strict compliance with its protocol and has refused buses at intake on this basis, two of which were refused this week.

CDCR also coordinates intake with the sending counties to ensure that it is spread

across multiple days within the week to better enable staff at the receiving institution to ensure social distancing during the intake process.

CDCR remains in communication each week with the California State Sheriffs' Association to determine which counties have the greatest need and are able to comply with CDCR's strict transfer protocol, and establishes priority for intake accordingly.

## IV.   QUARANTINE AND ISOLATION

*Plaintiffs' Position*:

### A.   Set Aside of Quarantine and Isolation Space

Plaintiffs continue to contest the adequacy of the quarantine and isolation space identified by Defendants at each prison in response to the Court order of July 22, ECF No. 3401 at 3-4.  We raised our concerns with CCHCS on September 16, as described in several past Joint Case Management Conference Statements, based on (a) the plan to use congregate living environments with shared airspace for quarantine purposes, when experience has proven that such environments serve as incubators for uncontrolled viral spread, and (b) the plan to move patients to housing environments that many consider will render them susceptible to attack from other incarcerated people.

On October 27, we asked the Receiver to consider an additional question: whether the set-aside spaces at each prison include provisions for people who are about to be transferred or have been recently transferred (known as precautionary quarantine).  This question has gained urgency as inter-prison transfers have steadily increased, averaging approximately 500 per week in recent weeks, and intake has climbed as well, with a planned 680 to enter CDCR from county jails the week of November 2.

CCHCS's own COVID-19 Screening and Testing Matrix for Patient Movement of August 19, 2020, requires people to be placed in precautionary quarantine pre- and post-transfer in celled housing (except for those prisons that have no cells).   Each prison "shall maintain sufficient quarantine space to accommodate its historical average volume of transfers."  (Definitions at 2.b.ii.)  Plaintiffs asked whether such quarantine space has been set aside in accordance with this directive, and if so, whether it is considered included in

1   the set-aside space for outbreaks.

2   **B.     Development of Policies Related to Quarantine and Isolation**

3   As reported at prior Case Management Conferences, Plaintiffs have asked the

4   Receiver to consider developing three policies related to quarantine and isolation: (a)

5   guidance regarding when people should be quarantined or isolated in a space other than the

6   set-aside space, (b) procedures and time-frames for placing patients in isolation or

7   quarantine once positive test results are received or information is received regarding an

8   exposure, and (c) a directive to ensure that those placed in isolation due to symptoms who

9   are pending a COVID-19 test results are kept separate from those who are lab-confirmed to

10  have COVID-19.  *See* ECF No. 3469 at 12.  On October 30, CCHCS updated its policy

11  regarding the preferential use of set aside space for isolation and quarantine, and stated that

12  isolation of positive patients should happen immediately.  No specific procedures for

13  ensuring that were mandated.  CCHCS on October 30 said that is developing a report that

14  will measure compliance with key quarantine and isolation requirements.  We hope this

15  includes timeliness of placement.  CCHCS also says that directives regarding separate

16  isolation placement for symptomatic patients who are pending test results have been

17  provided verbally to the prisons, and will be included in the next revision of the isolation

18  guidelines set forth in the Movement Matrix.

19  **C.     Monitoring Use of Quarantine and Isolation Space**

20  CCHCS provided us with the Outbreak Management Tool (OMT) for 10 prisons, as

21  requested, and late last week provided access to a portal at which it says all prisons' OMTs

22  will be accessible.  We have engaged in productive discussions with CCHCS regarding

23  best practices and our suggestions for OMT improvements.  In our view, the OMTs should

24  permit managers and executives to determine whether fundamental CCHCS public health

25  directives regarding medical isolation and quarantine are being followed at the prisons, and

26

27

28

16964008.3

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  provide information from which we can monitor such compliance.[14]  We have at CCHCS's

2  invitation suggested revisions to the OMTs so they might better present this key

3  information.

4      *Defendants' Position*:  As discussed in the last joint statement, CDCR has

5  completed its initial effort to set aside large amounts of previously identified isolation and

6  quarantine space at the prisons.  CDCR has continued to work with Plaintiffs, the

7  Receiver, the *Coleman* Special Master, and the *Armstrong* Court Expert to ensure that

8  appropriate isolation and quarantine space is reserved for class members of all three class

9  actions and to modify reserved spaces and plans for quarantine and isolation as needed

10  across the system.

11      On October 27, 2020, representatives from all three class actions met again to

12  discuss isolation and quarantine space needs, with a focus on the needs of *Coleman*

13  enhanced-outpatient class members.  The *Plata* Receiver and the *Coleman* Special Master

14  requested another follow-up meeting to take place on November 10.  Similar efforts are

15  underway through the *Armstrong* case to ensure that the potential needs of *Armstrong* class

16  members are adequately covered.

17  **V.      SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE**

18      *Plaintiffs' Position*:  People who live in open airspace congregate living areas in

19  CDCR prisons are at higher risk of contracting COVID-19 than those housed in cells, and

20  thousands of people living in those spaces currently are at heightened risk of severe illness

21  or death from the virus, due to their age and/or medical condition.  Since we filed our last

22  Statement, the Receiver finalized his report entitled "Transferring COVID-19 High-Risk

23

24  _____

25  [14]      CCHCS's public health directives are set forth in its web-based COVID-19 "Interim

26  Guidance" (https://cchcs.ca.gov/covid-19-interim-guidance/), including in particular the
   "Definitions" section at the end of Appendix 13, the "COVID-19 Screening and Testing

27  Matrix for Patient Movement" (revised August 19, 2020, and also known as the Movement
   Matrix).

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

Patients to Safer Housing" in which he addresses concerns about the medically vulnerable in open airspace living units.  The Safer Housing Report recommends that CDCR "extend an offer to the over 8,200 patients with COVID-19 risk scores of 3 and above the opportunity to transfer into closed-front cells either at their existing institution or at another institution."

Plaintiffs support this recommendation, and Defendants have not objected to it.  *See* ECF No. 3475 at 21.  Indeed, Defendants have repeatedly affirmed that they are "committed to working with the Receiver to facilitate movements of medically high-risk patients from dorms to cells" to ensure safe housing "when such movement is recommended and approved by the appropriate public health and corrections experts." ECF No. 3469 at 15; *see also* ECF No. 3460 at 17, ECF No. 3448 at 16.

Unfortunately, progress towards implementing this recommendation has been limited.  During our meeting with the Receiver's staff and Defendants on October 22, Mr. Kelso stated that his staff and Defendants would form a Working Group to plan for and to implement offering celled housing to medically vulnerable people, consistent with his Report.  He indicated that this process would be undertaken "quickly," and that he was identifying CDCR custody and mental health staff to participate in this process.  However, Plaintiffs learned on October 30 that the Working Group has not yet been formed. According to Vince Cullen, Director of Health Care Operations and Corrections Services, CCHCS is still assessing all prisons to ensure they have accurate information about the living spaces available.  He reported that this process will not take months, but will also "not be ready next week."

Providing safer housing to those who are at highest risk of serious illness or death if they contract COVID-19 must be a priority, and the Plaintiffs urge Defendants and the Receiver to expedite this process.  There will be, as the parties and the Court have recognized, challenges to implementation that include, but are not limited to, a reluctance on the part of many who have earned the right to live in less restrictive dorm housing to

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   move to a more restrictive cell.[15]  Plaintiffs believe that there may be ways to incentivize

2   movement to safer housing, and will welcome the opportunity to work with the Receiver

3   and Defendants to develop and deploy strategies to make safer housing appealing to those

4   who would benefit most from a move.  As noted above, the next wave of infections is

5   building now, and expediting the process is critical.

6       *Defendants' Position*:  The Receiver has provided the parties with a final report on

7   October 21, 2020 that proposes that CDCR should offer over 8,000 high risk medical

8   patients living in dorms the opportunity to move into a single cell.  The Defendants remain

9   committed to working with the Receiver to facilitate movements of medically high-risk

10  patients from dorms to cells, or any other movements, to safely house medically high-risk

11  patients when such movement is recommended and approved by the appropriate public

12  health and corrections experts.

13  **VI.    COVID-19 TESTING**

14      *Plaintiffs' Position*:

15      **A.    Staff Testing**

16      As previously reported, CCHCS took over authority for the staff testing program in

17  August.  On October 30, CCHCS distributed a revised "Employee Testing Guidance" to

18  the parties.  We are reviewing the revised Guidance and will send any concerns to

19  CCHCS.  Preliminarily, the revised Guidance appears to have increased the frequency of

20  testing for employees at CHCF, CMF, and CCWF, and in medical inpatient units, from

21  monthly to at least every two weeks (and weekly during an outbreak).  It also increases the

22  frequency of testing for transportation and hospital custody staff, from monthly to weekly,

23  which we support.  We are reviewing whether the revised Guidance's testing requirements

24  are adequate for staff who work at jobs areas, such as kitchens and factories, that require

25  

26  _____

27  [15]     As noted in our previous Case Management Conference Statement, Plaintiffs have
    distributed over 120 surveys to people who have been offered, and have declined, transfer
28  to a cell, based on their elevated COVID risk factors.  We have started to receive responses
    and are in the process of reviewing and compiling that information.

-15-                                Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1 high levels of contact with incarcerated people and have been the source of a number of
2 major outbreaks.

3       Regarding staffing for this program, CCHCS reports that as of October 5, it had
4 assigned employee health RNs to each prison to conduct contact tracing onsite (this was
5 previously done at Headquarters).  CCHCS also reports that it will hire nurses to conduct
6 the testing at each prison, and has stated it plans to have these nurses in place by the end of
7 December.  In the meantime, vendors continue to conduct employee testing.

8       Regarding Plaintiffs' monitoring, we still do not have access to employee testing
9 data.  The last update we received was in the July 27 Joint Case Management Conference
10 Statement.  *See* ECF No. 3405 at 8-10.  CCHCS has said it is working on a reporting
11 system for this data, and that reports for three prisons where some of the most vulnerable
12 patients are incarcerated—CHCF, CMF, and CCWF—would be sent to us this week.

13       We support these developments and appreciate the steps CCHCS has taken to
14 improve the staff testing program.  But, seven months into this pandemic, we are
15 disappointed that a comprehensive staff testing plan has yet to be fully implemented.  Most
16 significantly, CCHCS has reported that testing employees with symptoms of COVID-19—
17 something we have been requesting since July, *see* ECF No. 3370, including in our motion,
18 *see* ECF No. 3402 at 4-6—will not happen until CCHCS nurses are hired and trained to
19 conduct onsite testing, which it estimates will not be completed until the end of December.

20       **B.     Incarcerated Population Testing**

21             **1.     Patient Testing Policies**

22       We have since June asked CCHCS to revise certain COVID-19 clinical guidelines
23 regarding patient testing so that instead of language indicating a discretionary suggestion
24 (e.g., "should"), words (e.g., "shall") be used that denote a directive mandate.  We
25 specifically were concerned about provisions related to serial re-testing of those
26 quarantined who initially tested negative, and regular testing of those who work in areas
27 with high levels of contact with staff or other incarcerated people.

28

16964008.3

With regard to serial re-testing, it appears the requested change will be made.[16]
With regard to testing of essential workers who have high levels of contact with staff and
others, no changes were made to the clinical guidelines, and there continues to be no
mandated testing of these people despite multiple major COVID-19 outbreaks being
directly attributable to such contact.  On October 30, we again raised these concerns in
relation to the most recent such outbreak, involving kitchen and factory workers at the
California State Prison and Substance Abuse Treatment Facility (SATF).  According to
CCHCS, these workers were infected by staff and then seeded infections in multiple
housing units, with approximately 400 people testing positive over the last 14 days.  We
believe CCHCS must require that prisons at specified intervals test workers who have high
levels of contact with staff.  On October 30, the Receiver said the issue would be
considered.

### 2.   Notification to Patients of Test Results

In early July we first raised concerns about inadequate patient notification and
education regarding COVID-19 test results.  CCHCS continues to work on implementing
standardized templates that will notify patients of negative, inconclusive, or negative
COVID-19 test results, and provide educational information.  On October 30, CCHCS
indicated it hoped to implement use of these templates by Thanksgiving.  Meanwhile, and
unfortunately, late, limited, and otherwise inadequate written notification of and education
regarding test results continues.

*Defendants' Position:* Defendants note that Plaintiffs have raised issues in this
section that appear to be directed to the Receiver's office and CCHCS.  Defendants will
not attempt to respond on their behalf, but remain committed to working with them in

---

[16]     On November 2, CCHCS's Chief Counsel wrote, as we understand it, that
discretionary language ("should") would be replaced with mandatory language ("shall") in
the Interim Guidance's "Testing for COVID-19 and Other Respiratory Pathogens"
provision that currently reads "[s]erial retesting of housing unit inmates and others who are
at potential exposure risk, who are quarantined, and initially test negative should be
performed every 3-7 days until no new cases are identified."

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

1  addressing Plaintiffs' concerns.

2  **VII.    OIG Report on the Use of Face Coverings in CDCR**

3         *Plaintiffs' Position*:  On October 26, the Office of the Inspector General (OIG)

4  released its second report in its review of CDCR's response to the COVID-19 pandemic.

5  *See* Office of the Inspector General, *COVID-19 Review Series, Part Two: The California*

6  *Department of Corrections and Rehabilitation Distributed and Mandated the Use of*

7  *Personal Protective Equipment and Cloth Face Coverings; However, Its Lax Enforcement*

8  *Led to Inadequate Adherence to Basic Safety Protocols* (Oct. 2020), available at:

9  https://www.oig.ca.gov/wp-content/uploads/2020/10/OIG-COVID-19-Review-Series-Part-

10  2-%E2%80%93-Face-Coverings-and-PPE.pdf.  This report reviews CDCR's distribution

11  and use of personal protective equipment (PPE).  The OIG found that, although CDCR had

12  provided PPE and communicated face covering and physical distancing requirements to

13  staff and incarcerated persons, in practice, both frequently failed to adhere to mask-

14  wearing requirements.  *Id*. at 2.  OIG staff directly observed this during their monitoring

15  visits, *id.* at 22-30, and significant noncompliance was also reported by prison staff

16  surveyed by the OIG, *id*. at 31.

17         Most troubling, the OIG concluded that the failure to follow face covering and

18  physical distancing requirements "was likely caused at least in part by the department's

19  supervisors' and managers' lax enforcement of the requirements."  *Id*. at 2.  The OIG noted

20  that CDCR has referred only 7 employees (out of more than 63,000) for formal

21  investigation or punitive actions for misconduct relating to face covering and physical

22  distancing requirements since February 1, 2020.  *Id.* at 2-3, 35.  Even lower levels of

23  progressive discipline were infrequent:  "A sample of five prisons that employ a total of

24  10,382 staff showed that from February 1, 2020, to September 2, 2020, prison supervisors

25  and managers had taken just 29 disciplinary actions—in a period spanning seven months—

26  for noncompliance with the department's face covering or physical distancing

27  requirements."  *Id.* at 20-21.  Of those 29, "almost all the actions taken were the lowest

28  levels of the progressive discipline process: namely, verbal warnings and instances of

16964008.3

written counseling." *Id*. at 34.  California Institution for Men, with 1,413 COVID-confirmed cases and 27 COVID-related deaths among the incarcerated population, "provided no documentation of any disciplinary actions." *Id.* at 2, 34.  San Quentin, with 2,240 COVID-confirmed cases and 28 COVID-related deaths, "provided documentation of just one action." *Id*. at 2, 34-35.

The OIG also faulted CDCR and CCHCS for loosening face covering requirements in June 2020.  *Id*. at 3, 36.  Two memos released in June allowed staff and incarcerated persons to remove their face coverings when they were outside and able to maintain a distance of at least six feet from other individuals.  *Id*. at 36-37.

Plaintiffs were deeply troubled by this report.  In response to the OIG's recommendations, on October 27, CDCR and CCHCS issued a memorandum requiring staff to wear face coverings "at all times," with two exceptions: (1) when a staff member is alone in a hard-walled office, tower, or control booth, and (2) when a staff members is in the performance of their duties and is actively responding to an incident.  In the latter incident, the staff member is permitted to remove their face covering while jogging/running to respond to an incident.  The memorandum also provides that "corrective action shall be taken" whenever managers or supervisors observe noncompliance, and that managers and supervisors "shall document" the noncompliance in a tracking log.  Finally, the memo calls for unannounced compliance visits to each prison.

We support these efforts, but remain concerned, as self-monitoring of compliance with the face covering and physical distancing policies has proven to be extremely difficult.  We have previously sent reports to CDCR and CCHCS of staff not adhering to these policies; each time, we have been told that CDCR or CCHCS conducted audits and found no or limited issues.  We believe that the OIG should conduct another review of CDCR's compliance with the mandatory mask requirement in the near future, given the likelihood of another wave of COVID-19 infections hitting the prisons in the near future. The Inspector General has informed us that upon request from the Court he would conduct a follow-up review in a few months in order to determine whether there is increased

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   compliance by staff with the mask wearing requirements.

2   *Defendants' Position*:  On October 26, 2020, the OIG released a report focused on

3   CDCR's distribution of personal protective equipment (PPE) to its staff and incarcerated

4   persons during the COVID 19 pandemic. The report states that OIG monitored CDCR

5   institutions between May 19, 2020 and July 29, 2020 and that it conducted state-wide staff

6   surveys.

7      The report found that, despite early shortages, CDCR was generally able to procure

8   and maintain PPE supplies.  Indeed, by April 9, CDCR delivered more than half of the

9   752,000 cloth face coverings it had purchased to its institutions.  However, the report

10  further found that CDCR's enforcement of face covering and social distancing guidelines

11  was too lax and that not enough disciplinary action was employed, resulting in

12  noncompliance by staff and incarcerated persons.

13     On October 27, CDCR issued a memorandum updating the requirements regarding

14  the use of facial coverings and physical distancing, including strict enforcement protocols

15  and regular unannounced compliance audits to each institution.  The memorandum

16  reminds "[a]ll departmental supervisors and managers [that they] are responsible for

17  ensuring subordinate staff consistently wear approved face coverings correctly and practice

18  physical distancing," and that failure to do so will result in corrective action.  This

19  memorandum is attached as **Exhibit A**.  Further, on October 28, CCHCS issued an

20  amended memorandum outlining enhanced entrance screening procedures that detail the

21  screening process, screener training, guidance for employees who are sick or denied

22  entrance to an institution, and regular submission of a proof of practice report to ensure

23  compliance with screening procedures, attached as **Exhibit B**.

24     In addition, Regional Healthcare Executives conducted random, surprise spot

25  checks at several institutions the week of November 2.  Progressive discipline was initiated

26  for instances of noncompliance, in accordance with CDCR's October 27 memorandum.

27  Further, Secretary Allison and Mr. Kelso are jointly hosting a call with all wardens, CEOs,

28  and their management teams on Friday, November 6 to further reiterate the importance of

1   the mask wearing mandate and related discipline for noncompliance.  Secretary Allison

2   and Mr. Kelso are also in the process of creating a video with additional speakers which

3   will stress the importance of mask wearing to staff.  Thus, while CDCR is disappointed

4   and concerned by the OIG's findings based upon monitoring that occurred before the end

5   of July, it is taking every effort to ensure staff compliance with mask-wearing mandates

6   and enhance policies to further safeguard the institution population as well as staff against

7   the spread of COVID-19.

8   **VIII.   Prison-Specific Updates**

9       *Plaintiffs' Position:*  We continue to have weekly conferences with Regional Health

10  Care Chief Executive Officers (CEOs) and their supervisor regarding COVID-related

11  matters at individual prisons.  We very much appreciate these discussions, including

12  because we learn of positive initiatives, raise concerns about problems, and suggest

13  opportunities for improvement.

14      Based on information received at the October 16 conference with the CEOs, we on

15  October 20 reported to the Court that CIM would begin serial weekly testing of never-

16  positive patients, as is being done at San Quentin, and the California Rehabilitation Center

17  (CRC).  *See* ECF No. 3469 at 17:16-22.  We also reported that CIM had arranged for

18  approximately 20 additional nurses, to implement such testing.  *Id*.

19      On October 23, the Regional CEO said serial retesting did <u>not</u> start at CIM and that

20  20 additional nurses were <u>not</u> obtained there; CCHCS then said it would review the matter.

21  On October 30, it was again stated that serial retesting of never-positive patients prison-

22  wide, is not occurring at CIM, could not occur until additional nurses were hired, and that

23  an experienced physician had been sent to the prison to determine those staffing needs.

24      That incorrect information was provided about serial weekly testing at CIM is

25  unfortunate.  That such retesting has not started is unacceptable.  Serial retesting of never-

26  positive patients occurs at San Quentin, CRC, and, we believe, Avenal.  The COVID-19

27  outbreak at CIM is about to enter its eighth month.  Almost 1,500 at the prison have been

28  infected with the virus, resulting in 161 hospitalized (the largest such total among CDCR

-21-                                              Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

prisons) and 27 deaths (sadly, the second highest among the state prisons).  CIM has a very large number of medically vulnerable patients: only the California Health Care Facility (CHCF) and the California Medical Facility (CMF) have greater percentages of high risk medical patients.[17]  CIM's number of medically vulnerable patients, and the continuing consequences from COVID-19 suffered by those at the prison (the two most recent deaths occurred in the last week), require that weekly retesting of never-positive patients start immediately.[18]

*Defendants' Position:*  Defendants note that Plaintiffs have raised issues in this section that appear to be directed to the Receiver's office and CCHCS.  Defendants will not attempt to respond on their behalf, but remain committed to working with them in addressing Plaintiffs' concerns.

## IX.   Updates on Medical Care Matters Not Directly Related to COVID-19

*Plaintiffs' Position:*  A conference with CCHCS has been scheduled for November 6 to discuss in more detail what is being done about the thousands of delayed (many for months) Addiction Medicine physician appointments for patients with substance use disorders referred for Medication Assisted Treatment (MAT).  *See* ECF No. 3469 at 19. We appreciate the opportunity to further discuss this important issue.  In the last two weeks we have for the first time learned, via CCHCS responses to queries about particular patients, that a part of the problem is that some Addiction Medicine physicians, both at a local prison and headquarters, have reached their current patient load limit set by federal licensing requirements and thus cannot prescribe MAT for additional patients.

---

[17]     The most recent data provided by CCHCS, dated August 2020, shows that 65% of CHCF's population is designated medical high risk.  At CMF and CIM, respectively, 53.9% and 49.6% of the population is so designated.  Because CIM houses more people than CMF, the number of medical high risk patients housed there is greater than at CMF.
[18]     We support the serial retesting program at CRC, but it is puzzling that CCHCS does it there but not at CIM.  CCHCS data shows that only 4.6% of CRC's population is designated medical high risk, 23 patients have been hospitalized due to COVID-19 and, fortunately, none have died.

1      *Defendants' Position:*  Defendants note that Plaintiffs have raised issues in this

2   section that appear to be directed to the Receiver's office and CCHCS.  Defendants will

3   not attempt to respond on their behalf, but remain committed to working with them in

4   addressing Plaintiffs' concerns.

5   DATED:  November 4, 2020               HANSON BRIDGETT LLP

6

7

8                                         By:  */s/ Paul B. Mello*
                                               PAUL B. MELLO
9                                              SAMANTHA D. WOLFF
                                               Attorneys for Defendants
10

11   DATED:  November 4, 2020              XAVIER BECERRA
                                               Attorney General of California
12

13

14                                        By:  */s/ Ryan Gille*
                                               DAMON MCCLAIN
15                                             Supervising Deputy Attorney General
                                               RYAN GILLE
16                                             IRAM HASAN
                                               Deputy Attorney General
17                                             Attorneys for Defendants

18   DATED:  November 4, 2020              PRISON LAW OFFICE

19

20

21                                        By:  */s/ Steven Fama*
                                               STEVEN FAMA
22                                             ALISON HARDY
                                               SARA NORMAN
23                                             SOPHIE HART
                                               Attorneys for Plaintiffs
24

25

26

27

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT