XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
RYAN GILLE (262105)
IRAM HASAN (320802)
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Email:  Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF -  240280
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777--3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., | CASE NO. 01-1351 JST |
| Plaintiffs, | **AMENDED JOINT CASE MANAGEMENT CONFERENCE STATEMENT** |
| v. | |
| GAVIN NEWSOM, et al., | Judge:   Hon. Jon S. Tigar |
| Defendants. | Date:    November 19, 2020<br>Time:    10:00 a.m.<br>Crtrm.:  6, 2nd Floor |

Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

The parties submit the following joint statement in advance of the November 19, 2020 Case Management Conference.

## I.      POPULATION REDUCTION

*Plaintiffs' Position:*  Further population reductions are necessary to minimize the risk of harm from COVID-19, particularly at prisons with primarily open-air, congregate living spaces, and among those at increased risk of harm if infected.  As Defendants have acknowledged, reduced population contributes to fewer infections and deaths.  *See* ECF No. 3469 at 3-4.

Unfortunately, as previously explained (*see* ECF No. 3417 at 2:14-3:2), the overall CDCR population reduction since March, while certainly helped by early release programs, has primarily resulted from natural releases and the suspension and limitation of intake.[1]  With Defendants' stopping of two of the three population reduction programs announced in July, the number of early releases has slowed considerably.  Per data provided by CDCR, 437 people were released early between October 5 and November 4.  That number, while important, is nowhere near the 4,421 released early between July 10 and August 9, the first month after the State announced its early release programs.  See ECF 3417 at 5:14-17.  As the number of early releases dwindles, and intake increases,[2] CDCR's total Prison and Camps population has essentially plateaued, and may slowly

---

[1]      Defendants' reported data shows the subsidiary role of early releases in population reduction. See ECF No. 3477 at 5:17-20 (indicating that between July and nearly the end of October, 59% of releases were natural and 41% via early-release programs).   During almost all of this period, reception center intake was suspended or greatly limited.

[2]      CDCR on September 29 stated that nearly 8,000 people in county jails were awaiting transport to its reception centers (*see* ECF No. 3460 at 10:8-20); on November 5 we asked CDCR to update that total, and are awaiting a response.  For the most recent five weeks, *i.e.*, those starting October 19 and 26 and November 2, 9, and 16, CDCR told us that it authorized intake of, respectively, 610, 428, 680, 671, and 469 people.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   increase.[3]  This is unfortunate given continuing large COVID-19 outbreaks in the prisons,

2   including one in the last three weeks resulting in an alarmingly large number of people

3   being hospitalized (see section VIII, infra).

4        A positive - though at present very small - step towards further population reduction

5   was taken on November 10 by Governor Newsom, who granted a "medical reprieve of

6   sentence" to four people incarcerated in CDCR, based on the risk of harm to them if

7   infected with COVID-19.  See https://www.gov.ca.gov/wp-

8   content/uploads/2020/11/November-2020-Clemency-Certificates-Signed.pdf (the last four

9   actions, at pages 49-52 of that PDF).  These reprieves make the four eligible to continue

10  serving their sentence temporarily in what the Governor termed "an appropriate alternative

11  placement in the community placement."  *Id*.  On November 12 we asked defendants about

12  the reprieves, including what type of community placement will be required and who will

13  be responsible for health care.  Medical reprieves of the same or a similar kind, if they

14  reduce the risk of harm to those now in prison, should be granted to many more people.

15      *Defendants' Position*: As of November 11, 2020, CDCR has experienced a

16  population reduction of 23,002, representing a nearly 20 percent decrease in the size of the

17  population, since the start of the COVID-19 public health crisis.[4]  Between July 1 and

18  November 11, 2020, 6,598 people were released from institutions and camps as a result of

---

[3]    CDCR reports, published weekly, show an average of 94,249 people in its prisons and camps during each of the most recent five weeks, with marginal variations below and above that number.  *See* "Institutions/Camps" totals (subpart A.I.1) in 2020 Weekly Total Population Reports at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2020/.  The most recent report shows a total prisons and camps population of 94,340.  *See* "Institutions/Camps" totals (subpart A.I.1) https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/11/Tpop1d201111.pdf (November 11, 2020).

[4]    This figure is calculated by taking the difference between the total population in institutions and camps on February 26, 2020 and November 11, 2020.  Weekly population reports can be found at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2/.

16964008.3

the COVID-19 early-release programs Defendants announced on July 10.[5]  This represents 207 more early releases than those reported in the November 4 case management statement.[6]  An additional 9,646 were released in accordance with their natural release dates during this period.  As of November 11, CDCR's institutions and camps have a combined population of 94,340 and its institutions have a population of 92,605..[7]  CDCR's institutions and camps have experienced an increase of 122 over the past month and an overall decrease of nearly 20 percent since the beginning of March.

CDCR continues to process early releases on a rolling basis through the 180-day early-release program announced on July 10, which has accounted for the vast majority of all early releases since then.  This discretionary early-release program was implemented as an added safety measure at a time when more comprehensive COVID-19 related policies were still being developed.  Since then, CDCR adopted additional significant safety measures to reduce the spread of COVID-19, including, as described below, a reduction in intake from county jails, comprehensive testing, quarantine, isolation, and movement protocols, policies regarding personal protective equipment, and plans for COVID-19 testing of staff and incarcerated persons.

Additional measures include, but are not limited to, aggressive testing strategies in each of CDCR's 35 institutions, contact tracing conducted by healthcare staff, quarantine and isolation protocols that surpass some Centers for Disease Control recommendations, a movement matrix that controls all movement of incarcerated people across the state, staff testing, protective equipment guidance, an ongoing collaboration between CDCR and the counties regarding compliance with these standards in advance of intake, and measures to

---

[5]     *See* ECF No. 3389 at 2:4-5:4 and https://www.cdcr.ca.gov/covid19/expedited-releases/ for details regarding CDCR's COVID-19 early-release program announced on July 10, 2020.

[6]     *See* ECF No. 3477 at 4:7-9.

[7]     *See* November 11, 2020 population report at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/11/Tpop1d201111.pdf.

increase compliance with PPE policies.  Plaintiffs have actively contributed to the development of safety protocols implemented by the Receiver and monitored CDCR's compliance with these protocols, many of which are mentioned above and in sections below.  CDCR continues to evaluate, improve, and update these policies in close coordination with the Receiver.

Additionally, and by way of update, CDCR filed its Petition for Review with the California Supreme Court in *In re Von Staich* on November 16, 2020.  As Defendants previously reported to this Court, the California Supreme Court extended its time for ordering review to and including February 17, 2020.

## II.        TESTING AND TRANSFER PROTOCOLS

*Plaintiffs' Position:*  CDCR continues to transfer large numbers of patients between prisons.  Over the last several weeks, there have been on average approximately 500 such transfers per week.  Testing and quarantining of those transferred, to reduce the risk of COVID-19 transmission, remain governed by CCHCS's August 19 "Movement Matrix."

We still are not able at present to adequately monitor compliance with the Movement Matrix's testing and quarantine requirements.  The best we can do is spot check individual patient records, and it is not possible to gain a systemic view of compliance doing that given the large numbers of people transferred.  We also ask CCHCS regularly if it is aware of any COVID-19 transmission events associated with transfers; it says it is not aware of any such events.  And while CCHCS says it believes prison staff are largely complying with the Matrix requirements, we believe it necessary—again remembering the San Quentin disaster resulting from transfers of positive patients into that prison, and the failure to properly quarantine them once they arrived—that objective information document compliance.

CCHCS last week provided us access to its newly developed Transfer Registries,[8]

---

[8]        There are two Registries: "Pre-Transfer" and "Post-Transfer."  Information
(footnote continued)

1   which as designed display much information regarding compliance with Movement Matrix

2   requirements for each transferred person.  Clearly, much work and technical expertise in

3   CCHCS's quality management division was necessary to build these tools.  However,

4   when it provided access to the Registries, CCHCS said "there should be no expectation

5   whatsoever of accuracy in the data contained in this tool at this time" and subsequently

6   implied it will be months before it will certify the Registries' data as accurate.  Until that

7   happens, the Registries have little if any value in terms of monitoring compliance.  We

8   have also determined, via communications with CCHCS, that the Registries, once the data

9   is determined to be accurate, can be used to determine the statewide compliance rate for

10  timely pre-transfer COVID-19 tests, which we believe is a key requirement given that

11  untimely pre-transfer tests were the primary cause of the disastrous COVID outbreak at

12  San Quentin.[9]

13          CCHCS also previously stated that it would modify an existing form in its

14  Electronic Health Records System (EHRS) so that nurses can verify before a patient

15  transfers that the Movement Matrix requirements were followed by the sending prison.  On

16  November 12, CCHCS staff explained that further changes were being made and indicated

17  that the form could start to be used in December.

18          CCHCS on November 12 also said that work on a revised Movement Matrix

19  continues.  We were told that one change will be to require quarantining of transferring

20  resolved COVID-19 patients who are within 84 days of initial infection.  Currently, those

21  patients, unlike all others who transfer, are not required to quarantine because medical

22  doctors and public health officials say they are not infectious to others.  Hundreds of

23  resolved COVID patients have been and presumably will continue to be transferred

24  _____

25  concerning those who transfer can appear on both, depending on the nature of the transfer.

[9]      The Registries do not report this compliance rate directly, because, as CCHCS
26  explains, they are operational tools not a program intended to report performance metrics.
    CCHCS says it is working on performance metrics for all Matrix requirements, but did not
27  indicate when such will be in place.

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

between prisons.  As such, the new quarantine requirement will increase the demand for set-aside beds at each prison for quarantine purposes.  We believe these set-asides, when established, were done without factoring in the demand for pre- and post-transfer quarantine housing; the new directive requiring even more to quarantine when transferring will further reduce the availability of these beds for outbreaks (please see related discussion in Part IV, infra).

*Defendants' Position*:  Since the current iteration of the movement matrix went into effect on August 21, 2020, DAI, CCHCS, and leadership teams at all institutions have held meetings, conference calls, and training sessions to help staff understand and implement the matrix.  As directed by the matrix, movement is limited and controlled, and must be pre-approved by CDCR headquarters, which is working in collaboration with CCHCS (including Mr. Cullen and Dr. Bick).  Additionally, there is continued enforcement of the safety protocols requiring all county staff and incarcerated people arriving at CDCR on intake buses to wear N95 masks.  Further, CDCR and CCHCS continue to utilize measures to track patient information for transfers.  Staff at each prison have procedures and processes in place to follow the requirements of the matrix.  Further, on October 6, 2020, CCHCS implemented an online registry to track all transfer information for incarcerated persons.  The registry is easily accessible, updateable, and contains comprehensive information that allows staff to review medical and other important data before, during, and after transfers.  Finally, the prisons continue to offer comprehensive COVID-19 testing for incarcerated people, and the specific protocols for each prison are outlined for Plaintiffs during routine calls with CCHCS staff.

## III.   INTAKE

*Plaintiffs' Position*: As set forth below, CDCR is now admitting hundreds of additional incarcerated people from county jails each week.  Absent additional population reduction measures, it appears that the population will remain static or start to increase.

*Defendants' Position*:  CDCR accepted 505 incarcerated persons into custody from county jail intake the week of November 2, and 527 incarcerated persons the week of

16964008.3

November 9, as follows:

| Week of: | Number of Incarcerated Persons | Sending County | Receiving Institution |
|---|---|---|---|
| November 2 | 67 | San Joaquin | NKSP |
| November 2 | 36 | Madera | NKSP |
| November 2 | 38 | Mendocino | NKSP |
| November 2 | 98 | Riverside | NKSP |
| November 2 | 38 | Sacramento | NKSP |
| November 2 | 79 | Fresno | WSP |
| November 2 | 74 | Merced | WSP |
| November 2 | 32 | Sonoma | WSP |
| November 2 | 16 | Sacramento | WSP |
| November 2 | 27 | San Diego | CCWF |
| **Total Week of November 1:** | 505 | | |
| November 9 | 16 | Butte | NKSP |
| November 9 | 78 | San Bernardino | NKSP |
| November 9 | 24 | Shasta | NKSP |
| November 9 | 78 | Los Angeles | NKSP |
| November 9 | 61 | Riverside | NKSP |
| November 9 | 2 | Placer | NKSP |
| November 9 | 91 | Orange | WSP |
| November 9 | 86 | Kings | WSP |
| November 9 | 86 | Kern | WSP |
| November 9 | Canceled | San Bernardino | CCWF |
| November 9 | 5 | Madera | CCWF |
| **Total Week of November 8:** | 527 | | |

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

Each week, CDCR headquarters staff meet with leadership at the three reception centers (NKSP, WSP, and CCWF) and CCHCS to evaluate current available space, determine whether the institutions should permit intake the following week, and if so, how much space is available to accommodate social distancing of newly arriving incarcerated persons during the initial quarantine period.

For the week of November 15, CDCR has authorized intake as follows:

| Number of Incarcerated Persons | Sending County | Receiving Institution |
| --- | --- | --- |
| 70 | Stanislaus | NKSP |
| 23 | Nevada | NKSP |
| 16 | Siskiyou | NKSP |
| 50 | Solano | NKSP |
| 90 | Sacramento | WSP |
| 90 | Santa Barbara | WSP |
| 90 | Monterey | WSP |
| 40 | Riverside | CCWF |
| **Total Week of November 15:** | 469 | |

As Defendants have reported in previous Case Management Statements, CDCR is working tirelessly to ensure that sending counties are complying with all intake protocols, including testing of incarcerated persons in advance of transport and wearing of N95 masks by both incarcerated persons and transportation staff at all times during transport. CDCR requires strict compliance with its protocol and has refused buses at intake on this basis.

CDCR also coordinates intake with the sending counties to ensure that it is spread across multiple days within the week to better enable staff at the receiving institution to ensure social distancing during the intake process.  The reception centers will also now cap the number of incarcerated persons that may be received each day at 100 to ensure

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

1  appropriate social distancing and adequate resources.

2      CDCR remains in communication each week with the California State Sheriffs'

3  Association to determine which counties have the greatest need and are able to comply

4  with CDCR's strict transfer protocol, and establishes priority for intake accordingly.

5  **IV.     QUARANTINE AND ISOLATION**

6      *Plaintiffs' Position*:

7      **A.     Set Aside of Quarantine and Isolation Space**

8      It is clear from bitter experience over the last eight months that COVID-19 spreads

9  like wildfire in large CDCR dormitories.  Two months ago, Plaintiffs challenged

10  Defendants' choice of quarantine and isolation set-aside space at many prisons primarily

11  because of the reliance on large dormitories to quarantine potentially infected patients.

12      We have had no response from CCHCS aside from a rejection of our position that

13  was subsequently withdrawn.  In that time, major outbreaks have continued at Avenal

14  State Prison, California Rehabilitation Center, and Chuckawalla Valley State Prison.

15      It has been nearly three weeks since we raised another concern that appears to

16  render Defendants' set-aside space utterly inadequate: CCHCS's policy requires that each

17  prison "maintain sufficient quarantine space to accommodate its historical average volume

18  of transfers" for pre- and post-transfer precautionary quarantine.  CDCR, however,

19  designated set-aside space based solely on what was needed for outbreak prevention.

20  Given the significant increase in transfers around the system, much of this housing is now

21  taken up for precautionary quarantine, rendering it unavailable in case of an outbreak, in

22  apparent contradiction to this Court's order of July 22.  ECF No. 3401 at 3-4.  We have

23  had no response from CCHCS.

24      Plaintiffs can no longer wait, and are preparing to move the Court to enforce its

25  Order to Set Aside Isolation and Quarantine Space, ECF No. 3401, pursuant to the

26  processes set forth in that Order.

27      **B.     Development of Policies and Procedures on Quarantine and Isolation**

28      As noted in multiple Joint Case Management Conference Statements, Plaintiffs

16964008.3

1  have for several months requested that the Receiver, in conjunction with CDCR, draft a

2  procedure that clearly lays out what steps should be taken when a patient is confirmed or

3  suspected to be COVID-positive.  We asked that the procedure mandate the steps that

4  should be taken to ensure that patients are moved into the appropriate housing on a timely

5  basis, including the assignment of a point-person who is ultimately responsible for the

6  patient bed moves and for daily monitoring of each patient's housing assignment.   We

7  were informed that such a policy was not needed as CDCR and CCHCS already had

8  adequate processes in place.

9         Our initial request was grounded on a series of concerning housing moves we

10  identified, including the failure to move COVID positive patients from a dorm at

11  California Men's Colony into the designated isolation housing for over 24 hours in mid-

12  August.  Unfortunately, we continue to identify such cases: through the review of the

13  COVID registry and corresponding medical chart, we identified a patient in an eight-

14  person dorm at Valley State Prison whose positive COVID results were reviewed at the

15  prison the morning of November 12 but, 24 hours later, remained in his dorm with other

16  patients not known to be positive.  We asked that his case be reviewed for potential

17  movement on the morning of November 13; later that afternoon, his medical chart

18  reflected that he was moved to designated isolation housing.

19         Relatedly, we have learned that while some prisons require those in dorms who

20  have been exposed to COVID to move to single cell housing, others either do not believe it

21  universally necessary to even offer such housing to those exposed in dorms, or if offered

22  consider a move voluntary.  Basic public health principles suggest that a person exposed to

23  COVID housed in a congregate setting should be removed due to the risk of infecting

24  others, and that if multiple people in a congregate setting have been exposed all should be

25  separated, given that not all initially exposed may have been infected but if any were they

26  could subsequently infect those who weren't.

27          CDCR and CCHCS processes still leave gaps that demonstrate the need for

28  additional clear direction to the field.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

### C.   Monitoring Use of Quarantine and Isolation Space

Plaintiffs continue to have access to CCHCS's Outbreak Management Tools (OMTs), used by prisons that have a current COVID outbreak (defined by CCHCS for this purpose as 10 or more active cases).  The OMTs provide information regarding isolation housing of those with active COVID, including where such patients are housed.  However, most prison's OMTs do not include specific housing information for those who are quarantined (e.g., what housing units are being used, whether people are single celled behind solid doors, and, if not, why such cells are not available), and even if such information were included, prisons that have no outbreak, but quarantine  large numbers of people, are not required to provide OMTs.  We had hoped the OMTs would include this information, and be provided for all prisons, so that we could efficiently monitor whether CCHCS's fundamental public health directives regarding quarantine are being followed. That the OMTs do not always include this essential information about quarantine housing, and that OMTs are not required unless there is an outbreak, even if hundreds are quarantined, also raises the question of how CCHCS regional and headquarters managers monitor whether fundamental directives regarding quarantines are being followed. We will continue to discuss these concerns with CCHCS.

*Defendants' Position*:  CDCR has completed its initial effort to set aside large amounts of previously identified isolation and quarantine space at the prisons.  CDCR has continued to work with Plaintiffs, the Receiver, the *Coleman* Special Master, and the *Armstrong* Court Expert to ensure that appropriate isolation and quarantine space is reserved for class members of all three class actions and to modify reserved spaces and plans for quarantine and isolation as needed across the system.

On November 10, 2020, representatives from all three class actions met again to discuss isolation and quarantine space needs for *Coleman* enhanced-outpatient class members.  The parties reached a number of agreements that will be memorialized in a stipulation to be filed in *Coleman.*  The parties in *Armstrong* continue to meet and confer to address concerns about quarantine and isolation space for *Armstrong* class members.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

1   Defendants note that Plaintiffs have raised issues in this section that appear to

2   concern outstanding requests to the Receiver's office and CCHCS.  Defendants will not

3   attempt to respond on their behalf, but remain committed to working with them in

4   addressing Plaintiffs' concerns.

5   **V.      SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE**

6   *Plaintiffs' Position*:  Living in open air congregate living spaces places people at

7   higher risk for contracting COVID-19.  In an effort to protect those most vulnerable to

8   death or severe disease from the virus, the Receiver four weeks ago released his report

9   entitled "Transferring COVID-19 High-Risk Patients to Safer Housing." There, he

10  recommended that CDCR "extend an offer to the over 8,200 patients with COVID-19 risk

11  scores of 3 and above the opportunity to transfer" from open air congregate living units to

12  closed front celled housing, to reduce their risks of contracting the disease.

13  During our regular phone conference with the Receiver and members of his staff, on

14  November 13, Mr. Kelso advised us that his goal is to start offering people celled housing

15  in early December.  Dr. Joseph Bick, Director, Health Care Services, told us the program

16  will initially focus on offering housing to those with a Weighted COVID-19 Risk Score of

17  greater than six, before widening to the pool of people with Risk Scores of three or higher.

18  According to Vince Cullen, Director of Health Care Operations and Corrections Services,

19  they will start offering celled housing to people who are living at six prisons with large

20  open airspace congregate living units: Avenal State Prison, California Institution for Men

21  (Yards A and D), California Rehabilitation Center, Chuckawalla Valley State Prison,

22  Folsom State Prison and San Quentin State Prison.

23  As the parties and the Court have recognized and discussed, people who have

24  earned the right to live in less restrictive dorm housing are likely to resist moving to more

25  restrictive celled housing.  Indeed, when CCHCS recently offered celled housing to a small

26  cohort of people considered medically vulnerable, 85% declined the offer.  In order to gain

27  insight into the issues involved and possible solutions, Plaintiffs distributed over 120

28  surveys to people who were offered and declined transfer to a cell.  We summarized and

16964008.3
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

analyzed the 58 responses we received, and provided the results along with recommendations to the Receiver and Defendants on November 13.

Not surprisingly, many people reported they declined the move because they perceived the quality of life in the dorms, where they have greater access to showers, telephones and yard time, to be distinctly better than life in cells. They also reported that they were comfortable and felt safe with the people that they lived with. In addition to the showers/telephones/yard time restrictions, they described life on Level III yards as more difficult because staff tend to be more hostile, cells tend to be older with poor ventilation, yard politics can be unpredictable and dangerous, and the yards are subject to more frequent lockdowns.

Other significant disincentives included fears and concerns about the loss of their jobs/pay numbers and opportunity to work, lost property, delayed parole hearings, and moves away from family. Some people indicated that they would consider a move from their dorm if they were guaranteed a single cell, but were not willing to move into a small cell with another person, and particularly not a stranger. Others indicated that they were not willing to consider moving without receiving information about the housing they would move to, particularly if the move required going to a different prison.

Based upon the survey results, we made the following recommendations to the Receiver and Defendants:

1. Create new Level II yards on what are now Level III or IV facilities, with real Level II programming, yard and day room access – in short, Level II culture.

2. For those people who want a single cell – provide it. This is particularly important for people who use CPAPs, but have had them confiscated, and people who are immunocompromised due to treatment for cancer and other serious conditions.

3. Provide people with as much information as possible about the specific prison, facility, and yard to which they would be transferred.

4. If a person is willing to transfer to a cell and have a cellie, allow him to choose his cellie before the transfer, or at least identify a compatible cellie at the new facility.

5.  Allow people to take all of their property with them to the celled facility, including property that may exceed the normal volume limits and including perishable canteen items.  Additionally, staff should ensure that property is transported with the person to new facility, and distributed within three days of arrival.

6.  Coordinate with BPH to ensure that lifers who have upcoming hearing dates do not have their hearings delayed and communicate this assurance to lifers being offered a move.  (Given the use of remote video hearings in the coming months, this ask should be easier to satisfy.)

7.  For people who have jobs, guarantee that they will continue to receive their pay following their transfer, and make every effort to ensure that they are provided a job at the celled facility.

8.  Provide focused education to people who have already had COVID, so that they understand they may not have extended immunity to COVID, and thus could benefit from celled housing.

9.  Prioritize movement for those people who are in the largest shared airspace settings, as people in the smaller infill dorms may have a greater ability to control their exposure.

10.  For people with family or others who visit, work with them to identify a celled facility that is reasonably close to them so their loved ones can visit once visiting resumes.  For those who have family who live far away but might visit if they were closer, try to accommodate a move closer to them.

We have not yet had an opportunity to discuss these findings with the Receiver and the Defendants.

*Defendants' Position*:  The Receiver has provided the parties with a report proposing that CDCR offer over 8,000 high risk medical patients living in dorms the opportunity to move into a single cell.  The Defendants remain committed to working with the Receiver to facilitate movements of medically high-risk patients from dorms to cells, or any other movements, to safely house medically high-risk patients when such movement is recommended and approved by the appropriate public health and corrections experts.

///

///

1  **VI.    COVID-19 TESTING**

2      *Plaintiffs' Position*:

3      **A.    Staff Testing**

4      On October 30, CCHCS distributed its revised "Employee Testing Guidance" to the

5  parties.  We reviewed the Guidance with our public health expert, provided written

6  comments, and discussed the Guidance with CCHCS on November 13.  In general, we

7  support many of the changes made.  CCHCS increased the frequency of surveillance

8  testing at CHCF, CMF, and CCWF, in medical inpatient units, and of transportation and

9  hospital custody staff.  The Guidance also now calls for contact tracing and serial retesting

10  of exposed staff whenever a positive case is identified.

11      We have asked that CCHCS increase the frequency of surveillance testing for staff

12  who work at jobs in areas that require high levels of contact with incarcerated people, such

13  as kitchens and factories. CCHCS has said that multiple outbreaks (including at Avenal

14  State Prison, California Institution for Men, California Institution for Women, Correctional

15  Training Facility, and Substance Abuse Treatment Facility) are believed to have been

16  started in such job sites, with staff infecting incarcerated workers who then spread the

17  virus to others in their housing units.  CCHCS said it will consider this request.

18      All employee testing is still done by vendors.  CCHCS continues to anticipate hiring

19  nurses to conduct testing after-hours and at the entrances to the prisons by the end of

20  December.  Staff who are symptomatic will not be tested until these nurses are in place.

21      Unfortunately, we still have no access to employee testing data, and thus no way to

22  monitor compliance with the Employee Testing Guidance.  CCHCS has since August said

23  it is working on a reporting system for this data.  On November 13, CCHCS reported that

24  work continues, and that it hoped to provide reports to us this week, or early next week.

25      **B.    Incarcerated Population Testing**

26      On November 13, CCHCS said that revisions to its Interim Guidance regarding

27

28

16964008.3

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1    serial testing were imminent, to make clear that such testing was mandatory in certain

2    circumstances.[10]

3         On that same date, CCHCS acknowledged our concern that its guidance currently

4    only suggests regular testing of incarcerated people who have high levels of contact with

5    staff and others, as in kitchens and Prison Industry Authority factories, and said it may

6    "evolve" to a mandate.  However, the Receiver, then indicated such a change would be

7    more immediately considered, as would the question of which prison job sites should be

8    operating.  Required regular testing of incarcerated workers in kitchens and factories –

9    along with increased testing of staff who work in those facilities – is necessary given

10   multiple major COVID-19 outbreaks are directly attributable to such sites and these

11   workers often live in multiple buildings across the facility.

12        On November 16, CCHCS revised its Interim Guidance to require a confirmed PCR

13   test for incarcerated people who test positive COVID-19 via a point-of-care antigen test,

14   and to require single cell isolation housing for such people until a PCR test confirms the

15   antigen test result.[11]  These important and necessary changes will better safeguard patient

16   safety and public health, especially given the increased use of antigen tests in the prisons,

17   and are responsive to concerns about those test that we raised last month with CCHCS (see

18   ECF No. 3469 at 16:2-18).

19             **1.    Notification to Patients of Test Results**

20        In early July we first raised concerns about inadequate patient notification and

21   education regarding COVID-19 test results.  CCHCS continues to work on implementing

22   _____

23   [10]    On November 2, CCHCS's Chief Counsel wrote, as we understand it, that
24   discretionary language ("should") would be replaced with mandatory language ("shall") in
     the Interim Guidance's "Testing for COVID-19 and Other Respiratory Pathogens"
25   provision that currently reads "[s]erial retesting of housing unit inmates and others who are
     at potential exposure risk, who are quarantined, and initially test negative <u>should</u> be
26   performed every 3-7 days until no new cases are identified."
27   [11] .    See "Record of Changes" and "Testing" sections at https://cchcs.ca.gov/covid-19-
     interim-guidance/ .

28

standardized templates that will notify patients of negative, inconclusive, or negative COVID-19 test results, and provide educational information.  CCHCS indicates use of the new templates will begin this month.  We hope that happens, as the need for prompt notification and better education regarding test results remains great.

*Defendants' Position:* Defendants note that Plaintiffs have raised issues in this section that appear to be directed to the Receiver's office and CCHCS.  Defendants will not attempt to respond on their behalf, but remain committed to working with them in addressing Plaintiffs' concerns.

## VII.   OIG Report on the Use of Face Coverings in CDCR

*Plaintiffs' Position*:  As reported in the last Case Management Conference Statement, the Office of the Inspector General (OIG) recently released a report reviewing CDCR's distribution and use of personal protective equipment (PPE) during the COVID-19 pandemic.  *See* Office of the Inspector General, *COVID-19 Review Series, Part Two: The California Department of Corrections and Rehabilitation Distributed and Mandated the Use of Personal Protective Equipment and Cloth Face Coverings; However, Its Lax Enforcement Led to Inadequate Adherence to Basic Safety Protocols* (Oct. 2020), https://www.oig.ca.gov/wp-content/uploads/2020/10/OIG-COVID-19-Review-Series-Part-2-%E2%80%93-Face-Coverings-and-PPE.pdf. The OIG found that, although CDCR had provided PPE and communicated face covering and physical distancing requirements to staff and incarcerated persons, in practice, both frequently failed to adhere to mask-wearing requirements.  *Id.* at 2.  OIG staff directly observed this during their monitoring visits, *id.* at 22-30, and significant noncompliance was also reported by prison staff surveyed by the OIG, *id.* at 31.

Defendants report below that since April 15, action has been taken on 493 CDCR employees related to non-compliance with mask-wearing and social distancing requirements.  That number amounts to less than one percent of the Department's more than 63,000 staff members, nowhere near sufficient given the OIG's report that staff frequently failed to observe those mandates.  *See id.* at 3.

16964008.3

1   During the last Case Management Conference, the Court issued a tentative order

2   directing Defendants to submit to Plaintiffs and the Receiver biweekly reports of staff

3   noncompliance with face covering and physical distancing requirements.  The Court

4   directed the parties to confer and submit a proposed order.  In Plaintiffs' view, the parties

5   have reached agreement on the form and content of the reports.  However, we disagree as

6   to whether the reports may be publicly shared or filed with the Court.  At the last Case

7   Management Conference, the Court directed that the reports be regularly produced to

8   Plaintiffs' counsel and the Receiver's office, but not publicly filed with the Court.  We

9   have since agreed, at Defendants' request, that employees' names will be omitted from the

10  reports.  Because the reports will not identify individual employees, we believe they can

11  appropriately be publicly filed and shared.  Plaintiffs would appreciate further direction

12  from the Court on this issue.  We have attached the draft proposed order, with the

13  contested language highlighted in yellow, to this Statement.  *See* Exh. A.

14  The Court also invited the OIG to conduct further random audits of CDCR's

15  compliance with the mandatory mask requirement.  In response, the OIG has developed a

16  plan to conduct random audits at all 35 state prisons during the period from December 7,

17  2020 through March 7, 2021.  *See*, "Face Covering and Physical Distancing Follow-up

18  Monitoring Plan," attached as Exh. B.  Counsel for the OIG has advised that Inspector

19  General Roy Wesley will appear at the Case Management Conference to answer any

20  questions the Court may have.

21  On November 13, CCHCS said that CDCR will provide standardized face coverings

22  (the kind "your dentist wears") to all staff, which will be required to use them.  CCHCS

23  says the face coverings are considered more effective than cloth, and foresees that a

24  uniform covering will allow more efficient enforcement of the mask-wearing requirement.

25  *Defendants' Position*:  Following the OIG's report on CDCR's deficient compliance

26  with face covering and physical distancing requirements, Regional Healthcare Executives

27  and Assistant Directors conducted random, surprise spot checks at 16 institutions the week

28  of November 2.  Progressive discipline was initiated for instances of noncompliance.  To

16964008.3

date, approximately 493 employees across all institutions have received discipline (ranging from a verbal warning to adverse action) since CDCR mandated mask wearing and social distancing for staff on April 15, 2020 and June 11, 2020, respectively. .

Additionally, at the last Case Management Conference, this Court invited the OIG to conduct follow-up monitoring at all 35 prisons.  Consistent with this request, between December 7, 2020 and March 7, 2021, the OIG will conduct unannounced visits to observe and report on the department's efforts to ensure its staff and incarcerated population comply with face covering and physical distancing requirements.  These inspections will also include review of video footage from select prisons and CDCR's noncompliance tracking logs and documentation of related progressive discipline actions.  Beginning in January 2021, OIG will provide monthly reports summarizing its monitoring activities to the court and all parties.  The OIG's proposed audit plan is attached as **Exhibit B.**

Finally, CDCR's Director of Adult Institutions, Connie Gipson, personally toured four prisons in the last two weeks: Deuel Vocational Institute (DVI), California Institution for Men (CIM), California Institution for Women (CIW), and Pelican Bay State Prison (PBSP).  Director Gipson observed that, with the exception of two incarcerated people at CIW, all staff and incarcerated people at these institutions were in compliance with mask-wearing and physical-distancing requirements.

Defendants have been engaged in discussions with Plaintiffs regarding the proposed order and content of the biweekly reports regarding noncompliance with face covering and physical distancing requirements.  Defendants believed those discussions were not yet concluded; however, first learned that Plaintiffs are requesting this Court's "direction" twenty minutes prior to the filing deadline of this Case Management Conference statement.  Defendants believe it would have been more appropriate for the parties to continue their discussions, rather than requesting Court intervention, moments prior to the filing deadline.

## VIII.   Prison-Specific Updates

*Plaintiffs' Position:*  We continue to have weekly conferences with CCHCS Regional Health Care Chief Executive Officers (CEOs) and their supervisor regarding COVID-related matters at individual prisons.  We very much appreciate these discussions,

1   including because we learn of positive initiatives, raise concerns about problems, and

2   suggest opportunities for improvement.

3        Of note, on November 13 we were told that serial re-testing of COVID-19

4   susceptible patients had finally begun at the California Institution for Men, with 18 nurses

5   added to assist with that work.  We were also told that serial re-testing of COVID-19

6   susceptible patients has begun at Chuckawalla Valley State Prison (CVSP), with 18 nurses

7   added there for that purpose.

8        Also notable is a very concerning development at CVSP, now unfortunately

9   experiencing its second large COVID-19 outbreak in the last two months, following the

10  mega-outbreak there from mid-May to the end of July.  As background, CVSP has had

11  nearly 1,800 total COVID-19 cases, third highest among CDCR prisons.  Its population in

12  mid-May was approximately 2,300, and it is currently approximately 1,900.[12]  All are

13  housed in large dorms except for those in a building with 100 cells (currently used for

14  COVID quarantine) and a few placed in smaller-sized congregate settings in temporarily

15  converted space.

16       As of early last week, 24 patients from CVSP required hospitalization for COVID-

17  19 symptoms, almost ten percent of the prison's total active cases at that time.  According

18  to CCHCS, the average CDCR hospitalization rate among COVID-19 patients is about

19  three percent.  On November 9, we asked CCHCS about this markedly increased rate of

20  hospitalizations at CVSP, a prison which has a relatively small number of medically

21  vulnerable patients.[13]  On November 13, CCHCS said it believed that CVSP was sending

---

[12]   *See* 2020 Weekly Total Population Reports at
https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2020/.  The
reduction of approximately 400 in population equates to about works out to
[13]   The most recent CCHCS data shows that 7.5% at CVSP, or approximately 140
people, are designated medical high risk.  In contrast, many CDCR prisons have several
hundred such patients, and a few have more than 1,000, comprising 50% or more of their
populations.  *See* ECF No. 3477 at 22, fn. 17.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

patients to hospitals in accord with established guidelines and that on November 12 it held a conference call regarding the significantly higher hospitalization rate at the prison during which no cause for the large number of hospitalizations was identified.  CCHCS also said it is partnering with the California Department of Public Health to do genomic analysis of the virus of infected patients to determine if that yields any information about what is causing the greatly increased morbidity among patients at the prison.

Finally, and unfortunately, Avenal State Prison has been reported to have "the nation's largest known coronavirus cluster of any kind, with at least 3,314 infected inmates and correctional officers over the course of the pandemic . . . ."  See "What Places Are Hardest Hit by the Coronavirus?  It Depends on the Measure," *The New York Times*, November 12, 2020, available at:  https://www.nytimes.com/2020/11/12/us/coronavirus-crisis-united-states.html [accessed November 16, 2020].  According to the report, "more than 85%" of those incarcerated at the prison have tested positive.  *Id.*

*Defendants' Position:* Defendants note that Plaintiffs have raised issues in this section that appear to be directed to the Receiver's office and CCHCS.  Defendants will not attempt to respond on their behalf, but remain committed to working with them in addressing Plaintiffs' concerns.  [

**IX.   Updates on Medical Care Matters Not Directly Related to COVID-19**

*Plaintiffs' Position:* CCHCS on November 6 provided an overview of its efforts to reduce the thousands of delayed (many for months) Addiction Medicine physician appointments for patients with substance use disorders referred for Medication Assisted Treatment (MAT).  *See* ECF No. 3469 at 19.  Given the current inability of some providers to see additional substance use disorder patients given limits resulting from licensing and clinical requirements, CCHCS in the short term will increase the caseloads of local prison doctors who are trained to and can see more patients, by limiting those doctors' other, non-addiction related, clinical duties.  Those other clinical duties will be covered, to the extent necessary, by hiring additional primary care providers.  As we understand it, supplemental funding is being sought to do this.  More long term, CCHCS will train all local prison

16964008.3

1  doctors, most of whom are licensed to provide MAT, to actually do so, thus increasing the

2  number of providers who can treat substance abuse disorders.  However, this latter effort is

3  currently subject to apparently challenging labor negotiations.  This initiative, as we

4  understand it, may also require additional funds.

5      These plans seem sound.  However, CCHCS was unable to say how many

6  additional patients will be seen, and when, or how much the backlog of delayed

7  appointments will or might be reduced by any particular date.  Starting November 30, we

8  will begin receiving monthly data that we hope will allow us to track substance abuse

9  treatment and appointment backlog numbers.  We continue to strongly support the

10 substance use disorder program, which we believe has saved and will save many lives, and

11 again express appreciation for all, including the Governor, who undertook to implement it.

12     *Defendants' Position:* Defendants note that Plaintiffs have raised issues in this

13 section that appear to be directed to the Receiver's office and CCHCS.  Defendants will

14 not attempt to respond on their behalf, but remain committed to working with them in

15 addressing Plaintiffs' concerns.

16 DATED:  November 18, 2020          HANSON BRIDGETT LLP

17

18

19                                    By: _____
                                          PAUL B. MELLO
20                                        SAMANTHA D. WOLFF
                                          Attorneys for Defendants
21

22 DATED:  November 18, 2020          XAVIER BECERRA
                                       Attorney General of California
23

24

25                                    By: _____
                                          DAMON MCCLAIN
26                                        Supervising Deputy Attorney General
                                          RYAN GILLE
27                                        IRAM HASAN
                                          Deputy Attorney General
28                                        Attorneys for Defendants

1

2  DATED:  November 18, 2020                    PRISON LAW OFFICE

3

4
                                        By: _____
5
                                            STEVEN FAMA
6                                           ALISON HARDY
                                            SARA NORMAN
7                                           SOPHIE HART
                                            Attorneys for Plaintiffs
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16964008.3
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

EXHIBIT A

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., | CASE No. 01-1351 JST |
| Plaintiffs, | **[PROPOSED] ORDER REGARDING STAFF COMPLIANCE WITH FACE COVERING AND PHYSICAL DISTANCING REQUIREMENTS** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

[PROPOSED] ORDER REGARDING STAFF COMPLIANCE WITH FACE COVERING AND PHYSICAL
DISTANCING REQUIREMENTS

17014802.1

On October 26, 2020, California's Office of the Inspector General (OIG) released a report reviewing CDCR's distribution and use of personal protective equipment (PPE) during the COVID-19 pandemic.  *See* Office of the Inspector General, *COVID-19 Review Series, Part Two: The California Department of Corrections and Rehabilitation Distributed and Mandated the Use of Personal Protective Equipment and Cloth Face Coverings; However, Its Lax Enforcement Led to Inadequate Adherence to Basic Safety Protocols* (Oct. 2020), https://www.oig.ca.gov/wp-content/uploads/2020/10/OIG-COVID-19-Review-Series-Part-2-%E2%80%93-Face-Coverings-and-PPE.pdf.  The OIG found that, although CDCR had provided PPE and communicated face covering and physical distancing requirements to staff, in practice staff frequently failed to adhere to both requirements during the period monitored (May 19, 2020 and July 29, 2020).  *Id*. at 2.  The OIG directly observed staff's failure to follow face covering requirements during their monitoring visits.  *Id.* at 2, 22-30.  The OIG also surveyed more than 12,000 staff members; 31% reported they had observed staff or incarcerated persons failing to properly wear face coverings.  *Id*. at 2, 31.  The OIG concluded that the failure to follow these requirements "was likely caused at least in part by the department's supervisors' and managers' lax enforcement of the requirements."  *Id*. at 2.  The OIG observed that CDCR had referred only seven employees (out of more than 63,000) for formal investigation or punitive actions for misconduct relating to face covering or physical distancing requirements since February 1, 2020.  *Id.* at 2-3, 35.

The Court discussed the OIG's report with the parties at a Case Management Conference on November 5, 2020.  During the Conference, the Court issued a tentative order from the bench, directing Defendants to <mark>confidentially</mark> submit to Plaintiffs and the Receiver biweekly reports of staff noncompliance with face covering and physical distancing requirements.  There were no objections to the Court's tentative order.  The Court therefore issues the following order:

    1.    Defendants shall <mark>confidentially</mark> produce to Plaintiffs and the Receiver

[PROPOSED] ORDER REGARDING STAFF COMPLIANCE WITH FACE COVERING AND PHYSICAL DISTANCING REQUIREMENTS

biweekly (every two weeks) reports regarding staff noncompliance with face covering and physical distancing requirements as outlined in CDCR's October 27, 2020 Memorandum for each of the 35 prisons.  At a minimum, each report shall include: (a) the classification of each staff person who failed to comply with CDCR's October 27, 2020 Memorandum regarding face covering and physical distancing requirements, including whether it is a repeat offense; (b) the institution and unit where the violation occurred; (c) a summary of the specific violation, including date; and (d) a summary of the action taken, if any, by CDCR in response to the violation as of the date of the production of the report.

     2.    For the purposes of this order, "staff" refers to all non-incarcerated persons working in the prisons (including all healthcare, custody, non-uniformed workers, contract, and CDCR or CCHCS headquarters or regional staff when on site at an institution).

IT IS SO ORDERED.


Dated: November __, 2020

                            _____
THE HONORABLE JON S. TIGAR
UNITED STATES DISTRICT COURT
JUDGE


*Approved as to form*:

Dated:  November __, 2020         XAVIER BECERRA
                            Attorney General of California



                            _____
DAMON MCCLAIN
Supervising Deputy Attorney General
RYAN GILLE
IRAM HASAN
Deputy Attorney General
Attorneys for Defendants

[PROPOSED] ORDER REGARDING STAFF COMPLIANCE WITH FACE COVERING AND PHYSICAL DISTANCING REQUIREMENTS

Dated:  November __, 2020                HANSON BRIDGETT LLP


_____
PAUL B. MELLO
SAMANTHA D. WOLFF
Attorneys for Defendants

[PROPOSED] ORDER REGARDING STAFF COMPLIANCE WITH FACE COVERING AND PHYSICAL
DISTANCING REQUIREMENTS

EXHIBIT B

STATE *of* CALIFORNIA

# OIG | OFFICE *of the* INSPECTOR GENERAL

*Roy W. Wesley, Inspector General*
*Bryan B. Beyer, Chief Deputy Inspector General*

Independent Prison Oversight

*Regional Offices*

*Sacramento*
*Bakersfield*
*Rancho Cucamonga*

### Face Covering and Physical Distancing Follow-up Monitoring Plan

In October 2020, the Office of the Inspector General (the OIG) issued a public report regarding the California Department of Corrections and Rehabilitation's (the department) compliance with face covering and physical distancing requirements for staff and incarcerated persons.[1] The report identified frequent noncompliance by both staff and incarcerated persons, revealed lax enforcement efforts by departmental supervisors and managers, and questioned the prudence of loosening of face covering requirements in June 2020. In response to the report, Federal District Court Judge Jon S. Tigar invited the OIG to conduct follow-up monitoring at the department's prisons to observe and report whether staff and incarcerated persons have come into compliance with the department's current requirements. The OIG proposes to perform the monitoring activities described below in response to the court's invitation:

OIG staff in our three regional offices will observe and report on the department's efforts to ensure its staff and incarcerated population comply with face covering and physical distancing requirements at the department's 35 prisons. For the period beginning December 7, 2020 through March 7, 2021, OIG staff will conduct the following ongoing monitoring activities to review the extent of statewide compliance with the department's directives:

- The OIG will conduct unannounced visits to the department's 35 prisons (approximately 17 per month). During these visits, OIG staff will visit multiple locations throughout the prisons to observe and record their observations of face covering and physical distancing compliance by department staff and incarcerated persons. To maintain consistency, the OIG will develop and utilize a standard monitoring tool to record its staffs' observations during each visit.
- The OIG will also record face covering and physical distancing noncompliance observed by OIG staff during their routine monitoring activities.

---

[1] The OIG's report can be found at https://www.oig.ca.gov/wp-content/uploads/2020/10/OIG-COVID-19-Review-Series-Part-2-%E2%80%93-Face-Coverings-and-PPE.pdf



OIG Follow-up Monitoring Plan
November 16, 2020
Page 2

- The OIG will review video footage from select prisons to determine the extent to which prison staff and incarcerated persons complied with face covering and physical distancing requirements.
- The OIG will obtain and review the department's noncompliance tracking logs as well as documentation of progressive discipline actions related to face covering or physical distancing noncompliance taken by prison supervisors and managers.

Beginning in January 2021, the OIG will provide the court, and all parties, monthly reports summarizing the results of our monitoring activities. Although the OIG plans to continue the above monitoring activities until March 7, 2021, it may need to re-evaluate its approach and the need for continued monitoring based on conditions observed during the monitoring time frame.