XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
RYAN GILLE (262105)
IRAM HASAN (320802)
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Email:  Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF -  240280
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777--3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>            Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>            Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Judge:   Hon. Jon S. Tigar<br>Date:    December 10, 2020<br>Time:    10:00 a.m.<br>Crtrm.:  6, 2nd Floor |

The parties submit the following joint statement in advance of the December 10, 2020 Case Management Conference.

## I.      POPULATION REDUCTION

*Plaintiffs' Position:* As California experiences its most extensive surge of the pandemic, it is clear that further population reductions in CDCR are necessary to minimize the risk of harm from COVID-19, particularly at prisons with primarily open-air, congregate living spaces, and among those at increased risk of harm if infected. Defendants have acknowledged that reduced population contributes to fewer infections and deaths (*see* ECF No. 3469 at 3-4) and last week Secretary Allison reaffirmed that CDCR prisons' "large population and physical layout make us particularly susceptible to the spread of COVID-19."[1]  With active cases at every prison, including 13 prisons with at least 100 active cases, and the Receiver's new mandate that those placed on quarantine be housed in solid-door cells (*see* Section III.A., *infra*), there is now an even more heightened imperative to reduce crowding so that people are not put at risk.  We call on the Governor and CDCR to do so.

As previously reported (*see* ECF No. 3487 at 1:17-2:1), the prison and camp population has essentially plateaued, with natural releases along with those under the one continuing early release program – for certain people within 180 days of release – balanced against new arrivals from the county jail.[2]  While intake from the county jails has been temporarily suspended, CDCR reports that as of November 23, 2020 nearly 8,000 people in the jails are pending transfer to its prisons.  At the same time, the number of early

---

[1]      "Important COVID-19 message from Secretary Allison," December 4, 2020, available at https://www.cdcr.ca.gov/insidecdcr/2020/12/04/important-covid-19-message-from-secretary-allison/ (last accessed December 4, 2020).

[2]      The most recent available CDCR data shows that on December 2, 2020, the Institution and Camps population was 93,962.  *See* Weekly Report of Population, https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/12/Tpop1d201202.pdf.  As previously reported, that population for several weeks had averaged approximately 94,250.  *See* ECF No. 3487 at 2, n. 3.  On November 11, 2020, it was 94,340.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

1  releases continues to be scant compared to the first month of the programs begun in July,

2  when nearly 4,500 were provided release (*see* ECF No. 3417 at 5:14-17).  In contrast,

3  CDCR data shows that in the four weeks from October 21 to November 18, 2020, only 382

4  people were released early.

5      Unfortunately, even as the number of COVID-19 infections in the prisons has surged

6  to the highest levels ever, CDCR and the Governor have only very recently – informing us

7  only on the date of this filing, after not mentioning it at all when drafts were exchanged on

8  December 7 – begun further population reduction efforts, even though they have always

9  had clear authority to do so.  There have been no further medical reprieves of sentence

10  since the four granted a month ago (*see* ECF No. 3487 at 2:4-14).[3]  Now, as Defendants

11  report below, they are again considering release for some who are the most medically

12  vulnerable.  This appears to be  a version of the program stopped at the end of September

13  after a paltry percentage of those eligible were considered, and a miniscule 1% of those

14  eligible – approximately 50 of 6,600 people – were released (*see* ECF No. 3460 at 2:20-

15  3:5).   With regard to these new reviews, the number of people eligible, and when such

16  reviews will be completed, are not stated.  While these new reviews are welcome, this key

17  information is necessary to fully understand its possible impact.[4]

18      We also appreciate that, as Defendants also state below, a relatively small number of

19  people have been released who were serving determinate terms consecutive to lengthy

20  indeterminate terms for which they had previously been found suitable for release.  We

21  believe CDCR's actions in these cases result from our advocacy regarding an elderly and

22  medically vulnerable person who had served a lengthy indeterminate term for which he

---

[3]     On November 11, we asked about the conditions attached to the reprieves, including what type of community placement will be required and who will be responsible for health care for those released.  Defendants provided responses in their final revisions to this Statement, which we appreciate.

[4]     Also, that some or even all approved for release may or will be referred to a superior court for resentencing, instead of being immediately released under the CDCR Secretary's emergency authority, is concerning, as such judicial review can take weeks.

was found suitable for and approved for parole approximately two years ago, and was now serving a determinate term for two in-prison drug offenses which occurred approximately 15 and 25 years ago, respectively.

Despite these new actions, Defendants have not re-started the early release program, also ended in September, for certain people within a year of release at certain prisons. CDCR also has not granted incarcerated people additional "Positive Programming Credits," as it did in early July when it rightfully recognized that the pandemic limits the ability to earn sentence-reducing time credits, despite announcing a mandatory 14-day further restriction on programming on November 25.  The Governor and Secretary must take all these and other actions now, to further reduce crowding so as to reduce the spread of the virus, and thus sickness and death, in the prisons.

*Defendants' Position*:  As of December 2, 2020, CDCR has experienced a population reduction of 23,380, representing a nearly 20 percent decrease in the size of the population, since the start of the COVID-19 public health crisis.[5]  Between July 1 and December 2, 2020, 6,842 people were released from institutions and camps through the COVID-19 early-release programs Defendants announced on July 10.[6]  This represents 244 more early releases than those reported in the November 18 case management statement.[7]  An additional 10,606 were released in accordance with their natural release dates during this period.  As of December 2, CDCR's institutions have a population of

---

[5]     This figure is calculated by taking the difference between the total population in institutions and camps on February 26, 2020 and December 2, 2020.  Weekly population reports can be found at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2/.

[6]     *See* ECF No. 3389 at 2:4-5:4 and https://www.cdcr.ca.gov/covid19/expedited-releases/ for details regarding CDCR's COVID-19 early-release program announced on July 10, 2020.

[7]     *See* ECF No. 3487 at 3:17-4:1.

16964008.3

92,259,[8] representing a decrease of 346 since Defendants' last reporting on November 18[9] and an overall decrease of nearly 20 percent since the beginning of March.https://word-edit.officeapps.live.com/we/wordeditorframe.aspx?ui=en-US&rs=en-US&hid=vCe5%2Bp3Mrkefw96kzKDndA.0&wopisrc=https%3A%2F%2Fwopi.onedrive.com%2Fwopi%2Ffiles%2FEFAD5F4D2302DFAD!1633&wde=docx&sc=host%3D%26qt%3DFolders&mscc=1&wdp=2&uih=OneDrive&jsapi=1&jsapiver=v2&corrid=de8d08f3-df71-4e33-908c-37031bfc25a6&usid=de8d08f3-df71-4e33-908c-37031bfc25a6&newsession=1&sftc=1&wdorigin=Unknown&instantedit=1&wopicomplete=1&wdredirectionreason=Unified_SingleFlush - _ftn1https://word-edit.officeapps.live.com/we/wordeditorframe.aspx?ui=en-US&rs=en-US&hid=vCe5%2Bp3Mrkefw96kzKDndA.0&wopisrc=https%3A%2F%2Fwopi.onedrive.com%2Fwopi%2Ffiles%2FEFAD5F4D2302DFAD!1633&wde=docx&sc=host%3D%26qt%3DFolders&mscc=1&wdp=2&uih=OneDrive&jsapi=1&jsapiver=v2&corrid=de8d08f3-df71-4e33-908c-37031bfc25a6&usid=de8d08f3-df71-4e33-908c-37031bfc25a6&newsession=1&sftc=1&wdorigin=Unknown&instantedit=1&wopicomplete=1&wdredirectionreason=Unified_SingleFlush - _ftn2https://word-edit.officeapps.live.com/we/wordeditorframe.aspx?ui=en-US&rs=en-US&hid=vCe5%2Bp3Mrkefw96kzKDndA.0&wopisrc=https%3A%2F%2Fwopi.onedrive.com%2Fwopi%2Ffiles%2FEFAD5F4D2302DFAD!1633&wde=docx&sc=host%3D%26qt%3DFolders&mscc=1&wdp=2&uih=OneDrive&jsapi=1&jsapiver=v2&corrid=de8d08f3-df71-4e33-908c-37031bfc25a6&usid=de8d08f3-df71-4e33-908c-37031bfc25a6&newsession=1&sftc=1&wdorigin=Unknown&instantedit=1&wopicomplete=1&wdredirectionreason=Unified_SingleFlush - _ftn3https://word-edit.officeapps.live.com/we/wordeditorframe.aspx?ui=en-US&rs=en-

---

[8]     *See* December 2, 2020 population report at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/12/Tpop1d201202.pdf.

[9]     *See* ECF No. 3487 at 4:4-5.

US&hid=vCe5%2Bp3Mrkefw96kzKDndA.0&wopisrc=https%3A%2F%2Fwopi.onedrive.com%2Fwopi%2Ffiles%2FEFAD5F4D2302DFAD!1633&wde=docx&sc=host%3D%26qt%3DFolders&mscc=1&wdp=2&uih=OneDrive&jsapi=1&jsapiver=v2&corrid=de8d08f3-df71-4e33-908c-37031bfc25a6&usid=de8d08f3-df71-4e33-908c-37031bfc25a6&newsession=1&sftc=1&wdorigin=Unknown&instantedit=1&wopicomplete=1&wdredirectionreason=Unified_SingleFlush - _ftn4

CDCR is conducting individual reviews of medically high-risk patients to determine their eligibility to be released early.  Eligible patients are those with COVID-19 weighted risk scores of three or more, and who have either served the base term of their sentence or are within one year of release.  Determinately sentenced patients who have the highest risk for morbidity or mortality should they contract COVID-19—those with COVID-19-weighted risk scores of six or more—and who are not required to register as a sex offender under Penal Code section 290 are being reviewed first.  Among these people, those who pose a low risk for violent recidivism will be approved for release or referred to the courts for expedited consideration for recall of sentence and resentencing, depending on how much time remains on their sentences.  A number of these individuals have been incarcerated for a period of time that has exceeded their base term.  Their sentences carry enhancements that were previously mandatory, but are now at a judge's discretion after the passage of Senate Bill 1393, which became effective on January 1, 2018.  Therefore, the Secretary is asking the courts to review certain high-risk medical cases for possible recall and resentencing under Penal Code section 1170, subdivision (d)(1).

The Secretary also individually reviewed 24 indeterminately sentenced people who were granted parole for their commitment offenses, but remained in prison serving separate terms for offenses committed while in prison.  The Secretary approved 19 people for release and they have all been released.

Finally, responding to Plaintiffs' footnote 3, Housing varies depending on individual.  Some people will be placed with family or friends, and others at community housing.  Medical will be provided through Medi-Cal.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

In addition, the Secretary individually reviewed 24 people who had finished serving indeterminate sentences (had final parole grant) but remained in prison serving a separate term for an in-prison crime.  She approve 19 people for release and they have all been released.

CDCR continues to process early releases on a rolling basis through the 180-day early-release program announced on July 10, which has accounted for the vast majority of early releases since then.  This discretionary early-release program was implemented as an added safety measure at a time when more comprehensive COVID-19 related policies were still being developed.  Since then, CDCR adopted additional significant safety measures to reduce the spread of COVID-19, including, as described below, a reduction in intake from county jails, comprehensive testing, quarantine, isolation, and movement protocols, policies regarding personal protective equipment, and plans for COVID-19 testing of staff and incarcerated persons.

Additional measures include, but are not limited to, aggressive testing strategies in each of CDCR's 35 institutions, contact tracing conducted by healthcare staff, quarantine and isolation protocols that go beyond what the Centers for Disease Control has recommended, a movement matrix that requires compliance with stringent safety protocols when moving incarcerated people, staff testing, protective equipment, ongoing collaborations with counties regarding compliance movement matrix protocols in advance of intake, and measures to increase compliance with PPE policies.  Plaintiffs have actively contributed to the development of safety protocols implemented by the Receiver and monitored CDCR's compliance with these protocols, many of which are mentioned above and in sections below.  CDCR continues to evaluate, improve, and update these policies in close coordination with the Receiver.

## II.    INTAKE

*Plaintiffs' Position*:  Particularly in light of the significant increase of COVID-19 in the community, we support the decision to suspend intake at least until December 13.

*Defendants' Position*:  CDCR accepted 355 incarcerated persons into custody from

county jail intake during the week of November 16, 2020, as follows:

| Week of: | Number of Incarcerated Persons | Sending County | Receiving Institution |
|---|---|---|---|
| November 16 | CANCELED | Stanislaus | NKSP |
| November 16 | 12 | Nevada | NKSP |
| November 16 | 12 | Siskiyou | NKSP |
| November 16 | 29 | Solano | NKSP |
| November 16 | 89 | Santa Barbara | WSP |
| November 16 | 89 | Monterey | WSP |
| November 16 | 86 | Sacramento | WSP |
| November 16 | 38 | Riverside | CCWF |
| **Total Week of November 16:** | 355 | | |

Intake was paused at North Kern State Prison the week of November 23, 2020, though 162 incarcerated persons were accepted that week into Wasco State Prison and Central California Women's Facility, as follows:

| November 23 | 89 | San Joaquin | WSP |
|---|---|---|---|
| November 23 | 28 | Sonoma | WSP |
| November 23 | 10 | San Benito | WSP |
| November 23 | 16 | Del Norte | WSP |
| November 23 | 19 | Los Angeles | CCWF |
| **Total Week of November 23:** | 162 | | |

In response to the increase of COVID-19 cases in the community and consistent with public health and health care guidance, CDCR suspended intake from county jails effective November 26, 2020, through at least December 13, 2020.  CDCR will continue to evaluate when, and to what extent and under what conditions, it is safe to resume intake from county jails.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

III.    **QUARANTINE AND ISOLATION**

*Plaintiffs' Position*:

A.      **Set Aside of Quarantine and Isolation Space**

The parties will file a joint brief regarding the adequacy of the set-aside spaces on December 9.  Plaintiffs, in challenging Defendants' practice of quarantining people exposed to the virus in shared air spaces, provided their draft expert declaration to Defendants on November 30, their draft proposed order on December 2, and their draft brief on December 3.  Plaintiffs have made themselves available to Defendants to answer questions, and have done so fully on two occasions in the week of November 30.

On December 4, the Receiver issued a new policy regarding quarantine, stating that "post-exposure quarantine in shared airspace housing more than 2 persons fails to adequately achieve the intended goals of a COVID-19 post-exposure quarantine to facilitate the prompt identification of new cases and to help limit the spread of COVID-19 to new, uninfected people. The first choice for post-exposure quarantine housing should be solid-door cells occupied by only one person. Quarantine cohorting as defined in the Interim Guidance is to be used with no more than 2 persons per shared airspace housing." The Receiver further noted that there are five prisons – Avenal State Prison, California Rehabilitation Center, Chuckawalla Valley State Prison, Folsom State Prison, and San Quentin State Prison – where "the available facilities are insufficient" to comply with these standards.  He directed that "[a]ll efforts should be made" at those prisons "to find quarantine alternatives that satisfy the purposes of a post-exposure quarantine as set forth above."

Plaintiffs have also challenged Defendants' failure to set aside precautionary quarantine space as required by the Receiver in the August 19 Movement Matrix. Defendants have not provided a clear policy on precautionary quarantine set-aside space.

B.      **Development of Policies and Procedures on Quarantine and Isolation**

As noted in multiple Joint Case Management Conference Statements, Plaintiffs have for several months requested that the Receiver, in conjunction with CDCR, draft a

procedure that clearly lays out what steps should be taken when a patient is confirmed or suspected to be COVID-positive.  Our request was grounded on a series of concerning housing moves we identified at multiple prisons, where there appeared to be significant delays in moving COVID-positive patients to isolation or COVID-exposed patients to quarantine.  We asked that the Receiver mandate the steps that should be taken to ensure that patients are moved into the appropriate housing on a timely basis, including the assignment of a point-person who is ultimately responsible for the patient bed moves and for daily monitoring of each patient's housing assignment.

In response to our concerns, on December 4, CCHCS reported it had recently put in place an automatic notification system, which sends an email to a designated group of staff at each prison within one hour of a positive test result being received.  CCHCS reported it is working on shortening that timeframe.  CCHCS also reported it has now assigned staff at each institution to verify that patients have been timely and appropriately moved. Finally, CCHCS said it is working on a dashboard to measure timeliness of moves at each prison.  We support these steps and believe they are necessary to ensure patients are being appropriately isolated and quarantined, which is essential to prevent the spread of the virus.

### C.    Monitoring Use of Quarantine and Isolation Space

Plaintiffs' primary way to monitor use of quarantine and isolation spaces at the prisons is through CCHCS's Outbreak Management Tools (OMTs).  Prisons with active COVID-19 outbreaks (defined by CCHCS for this purpose as 10 or more active cases) have been directed to upload OMTs daily; prisons without outbreaks have been directed to upload OMTs weekly.  The OMTs provide information regarding isolation housing of those with active COVID, including where such patients are housed.  However, most prison's OMTs do not include specific housing information for those who are quarantined (*e.g.*, what housing units are being used, whether people are in cells behind solid doors, and, if not, why such cells are not available).  We have asked that the OMTs be modified to include this essential information about quarantine housing, so that we and CCHCS

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16964008.3

1  regional and headquarters managers can effectively monitor whether people are being

2  safely quarantined.  On December 4, CCHCS said it would consider our request.

3  *Defendants' Position*:  CDCR has completed its efforts to set aside large amounts of

4  previously identified isolation and quarantine space at the prisons.  CDCR has continued to

5  work with Plaintiffs, the Receiver, the *Coleman* Special Master, and the *Armstrong* Court

6  Expert to ensure that appropriate isolation and quarantine space is reserved for class

7  members of all three class actions and to modify reserved spaces and plans for quarantine

8  and isolation as needed across the system.

9  The parties have met and conferred about Plaintiffs' motion regarding quarantine

10 and isolation space.  Specifically, the parties had a preliminary discussion regarding

11 Plaintiffs' position on December 1, 2020, though Plaintiffs were unclear as to the relief

12 they would be seeking as of that time.  Subsequently, on Thursday, December 3, 2020,

13 Plaintiffs provided a draft of their portion of the joint brief and further clarified their

14 position and requested relief that same day via videoconference.  Their position, as

15 Defendants understand it, is that inmates in quarantine must be housed in a single-cell with

16 a solid door or else Defendants will be in violation of the Eighth Amendment, regardless of

17 Defendants' compliance with the Court's July 2020 Order, and with the public health

18 guidance regarding appropriate quarantine practices of the Receiver, Center for Disease

19 Control, and California Department of Public Health.

20 On December 3, 2020, the Receiver sent the parties a table that describes the places

21 where currently quarantined patients are being housed, and, on December 4, 2020, the

22 Receiver issued new guidance regarding housing options for patients being quarantined.

23 Defendants are still evaluating these documents and look forward to discussing them with

24 the Receiver.

25 Defendants provided Plaintiffs with a document on December 4, 2020, setting forth

26 their preliminary responses in bullet-point format to both Plaintiffs' motion and to the

27 declaration of Dr. Lauring.  Defendants also inquired whether Plaintiffs' position had

28 changed in light of the Receiver's statement on quarantine (issued December 4, 2020),

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   including whether they believed that the parties would benefit from postponing the hearing

2   on Plaintiffs' quarantine motion so the parties could further discuss the Receiver's

3   December 4th guidance.

4        Also on December 4, 2020, Defendants produced to Plaintiffs a new chart that sets

5   forth the spaces that have been reserved under the Court's July 2020 order for quarantine

6   and isolation and further describes substantial additional space at many prisons that is

7   currently available for quarantine or isolation if needed.

8        On the evening of December 7, 2020, after Defendants provided Plaintiffs with their

9   brief and supporting declarations, Plaintiffs informed Defendants that their position had

10  changed in light of the Receiver's December 4th  guidance.  Now their position is that

11  double celling is reasonable for post-exposure quarantine, in contrast to their original

12  position that quarantine following an exposure in anything short of a single cell with a

13  solid door violates the Eighth Amendment.

14       Defendants believe that Plaintiffs' motion is premature and fails to satisfy requisite

15  legal standards.  We have suggested instead that the parties meet and confer with input

16  from the Receiver to further explore the issues Plaintiffs have raised and the specific relief

17  they request to determine whether there may be an informal way to resolve their concerns.

18  **IV.    SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE**

19       *Plaintiffs' Position*:  Living in open air congregate living spaces places people at

20  high risk for contracting COVID-19.  In an effort to reduce the risk of harm to those people

21  most vulnerable to severe harm or death from the virus, the Receiver recommended on

22  October 21, 2020 that those with higher COVID Weighted Risk scores who are currently

23  in congregate housing be offered transfers to closed-front celled housing.  During our

24  weekly conferences with CCHCS Regional Health Care Chief Executive Officers (CEOs)

25  and their supervisor and Defendants, and periodic conferences with the Receiver and his

26  staff, we have since then continued to discuss how this directive will be implemented.  As

27  explained below, we very recently learned of a significant change in approach:  the

28  rehousing program is likely to be mandatory for people identified as high risk at certain

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

prisons, rather than voluntary.[10]

We discussed the program with Defendants and the Receiver's staff on December 3 and 4.  We were told the program will initially focus on offering housing to those with a Weighted COVID-19 Risk Score of greater than six, before widening to the pool of people with Risk Scores of three or higher, and that the program is rolling out first at San Quentin State Prison (SQ), and will then begin at Avenal State Prison (ASP), Chuckawalla Valley State Prison (CVSP), and California Rehabilitation Center (CRC).  In an effort to effectively monitor this process, we have requested, but not yet received, an updated list of all people with a risk score of three or higher, and an updated list of all celled housing available statewide to accommodate the moves from dorms to celled housing.

On December 3, we were told that people would first be offered a voluntary move, but if people declined the voluntary move, they may be compelled to move.  The following day, Tammy Foss, Director, Corrections Services, confirmed that the moves would be mandatory, and explained that the process would be streamlined: all people with a COVID Weighted Risk Score of three or higher at the four prisons (SQ, ASP, CVSP and CRC) will be scheduled for a classification hearing to prepare for transfer to a facility where they will be housed in a cell.

*Defendants' Position*:  The Receiver has provided the parties with a report proposing that CDCR offer over 8,000 high risk medical patients living in dorms the opportunity to move into a single cell.  On December 3, 2020, Plaintiffs, CDCR, and CCHCS met to discuss the movement of medically high-risk patients from dorms to cells including a discussion of Plaintiffs' recommendations following a survey of incarcerated

---

[10]      As indicated in our last CMC statement, recognizing that many people living in dorms were reluctant to transfer from dorms to cells, we conducted a survey of people who had been offered but refused housing in cells based on health concerns.  We collated the findings, drafted recommendations for strategies to increase participation, and presented them to Defendants.  Defendants have declined to implement most of the suggestions that we offered.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  people.  CCHCS has identified 83 medically high-risk patients at San Quentin (which

2  includes incarcerated persons on death row) with a COVID risk score of 6 and above.  Of

3  those, ten have agreed to move.  The remaining medically high-risk patients will meet with

4  the Unit Classification Committee to discuss appropriate housing alternatives, and will be

5  moved.  Movement for these 83 incarcerated persons will ultimately not be voluntary.

6        During this meeting, Plaintiffs inquired whether CCHCS and CDCR should

7  prioritize movement of medically high-risk patients at other institutions ahead of San

8  Quentin.  However, as was explained during the meeting, now is the best time to move

9  medically high-risk inmate patients while there is no COVID-19 outbreak at San Quentin

10  and these patients can therefore be transferred safely.

11        On December 4, 2020, CCHCS informed the parties that going forward, the moves

12  of medically high-risk patients will be more streamlined to avoid delays in moves.  The

13  Unit Classification Committee will no longer be preceded by an offer to move voluntarily.

14  Instead, healthcare staff will now participate in the Unit Classification Committee and

15  provide patient education.

16        The Defendants remain committed to working with the Receiver to facilitate

17  movements of medically high-risk patients from dorms to cells, or any other movements,

18  to safely house medically high-risk patients when such movement is recommended and

19  approved by the appropriate public health and corrections experts.

20  **V.      TESTING AND TRANSFER PROTOCOLS**

21        *Plaintiffs' Position:* Transfers between prisons continue, although in reduced

22  number recently, presumably due to substantial COVID-19 outbreaks at more than 20

23  prisons.  Testing and quarantining of those transferred, to reduce the risk of COVID-19

24  transmission, remain governed by CCHCS's August 19 "Movement Matrix."  The disaster

25  at San Quentin earlier this year, resulting from the failure to timely test people for COVID-

26  19 before they were transferred from the California Institution for Men, and the failure to

27  adequately quarantine those people after they arrived at the prison, requires full

28  compliance with risk-prevention requirements to minimize the chance of COVID-19

spread when people are moved.  CCHCS last week again said it is aware of no cases of COVID transmission resulting from people transferred pursuant to Matrix requirements.

Monitoring compliance with the Movement Matrix's testing and quarantine requirements remains a challenge.  Unfortunately, CCHCS has reaffirmed that the Transfer Registries, which show whether Matrix requirements have been met for each person transferred, do not yet display reliable data.  More positively, CCHCS reports that it has implemented a modified form in its Electronic Health Records System (EHRS), so that nurses can verify in writing that Movement Matrix requirements were followed by the sending prison before a person transfers.

CCHCS has also circulated a draft revised Movement Matrix, which we have commented upon.  The biggest proposed change, which we believe after consultation with a public health expert is reasonable, is the elimination of pre-transfer quarantine in favor of a double-testing requirement before transfer along with post-transfer quarantine and testing.

*Defendants' Position*:  Since the current iteration of the movement matrix went into effect on August 21, 2020, DAI, CCHCS, and leadership teams at all institutions have held meetings, conference calls, and training sessions to help staff understand and implement the matrix.  As directed by the matrix, movement is limited and controlled, and must be pre-approved by CDCR headquarters, which is working in collaboration with CCHCS (including Ms. Foss and Dr. Bick).  Additionally, there is continued enforcement of the safety protocols requiring all county staff and incarcerated people arriving at CDCR on intake buses to wear N95 masks during transport.  Further, CDCR and CCHCS continue to utilize measures to track patient information for transfers.  Staff at each prison have procedures and processes in place to follow the requirements of the matrix.  Further, on October 6, 2020, CCHCS implemented an online registry to track all transfer information for incarcerated persons.  The registry is easily accessible, updateable, and contains comprehensive information that allows staff to review medical and other important data before, during, and after transfers.  Finally, the prisons continue to offer comprehensive

16964008.3

1   COVID-19 testing for incarcerated people, and the specific protocols for each prison are

2   outlined for Plaintiffs during routine calls with CCHCS staff.

## VI.   COVID-19 TESTING

### A.   Incarcerated Population Testing

*Plaintiffs' Position:* CCHCS has revised its guidance to mandate serial retesting in

certain circumstances, and weekly testing of certain incarcerated person workers, including

those who work in kitchens.[11]  An automated system to track whether such ordered testing

is actually done remains under development.  That said, substantial COVID-19 testing is

occurring.  Several prisons have recently added nurses to support increased testing, and a

number of prisons test never-infected patients weekly.  Such has been done at San Quentin

since late June, with some patients now having been tested two dozen times.

CCHCS reports it very recently automated the ordering of COVID-19 tests, and

finally implemented templates by which doctors' notifications to patients of test results are

accompanied by essential educational information (however, we do not know how

frequently these templates are actually being used).  It also reports having done just over

500,000 COVID-19 tests statewide since the pandemic began.  These robust testing

strategies and efforts must continue, and be coupled with effective quarantining and other

risk reduction practices including population reduction, to minimize the spread of the

virus.

### B.   Staff Testing

*Plaintiffs' Position*:  Staff testing continues under CCHCS's October 30 "Employee

Testing Guidance," and continues to be carried out by vendors. On December 4, CCHCS

reported that is has begun hiring nurses to conduct testing after-hours and at the entrances

---

[11]     Periodic testing of those who work in Prison Industry Authority (PIA) factories, which we understand have been the locus of multiple outbreaks, remains discretionary. We recently received from CDCR a list of currently operational PIA facilities, and will further discuss with CCHCS the need for mandated periodic testing of incarcerated people who work at them.

-15-                                    Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  to the prisons; it anticipates all such nurses will be hired by the beginning of January.
2  Hiring of these nurses is critical, as staff who are symptomatic will not be tested until these
3  nurses are in place.

4      As reported in the last Joint Case Management Conference Statement, we
5  previously requested CCHCS revise the Guidance to provide for more frequent
6  surveillance testing for staff whose jobs require high levels of contact with incarcerated
7  people, such as those working in kitchens and factories.  On December 4, CCHCS said it
8  will mandate weekly testing for this group in the next version of the Guidance, which is
9  currently being updated.  We appreciate this step and all CCHCS's work to develop a
10 COVID-19 testing policy for staff.

11     Unfortunately, we still have no access to employee testing data,[12] and thus no way
12 to monitor compliance with the Testing Guidance—including whether staff have refused to
13 be tested.  Regarding refusals, we recently asked CCHCS about staff refusing to test at the
14 Substance Abuse Treatment Facility (SATF), after hearing concerns from patients at that
15 prison.  SATF has recently experienced a devastating outbreak: on November 25, at what
16 we hope was the height of the outbreak, there were 1200 active cases among the
17 incarcerated population and hundreds more on quarantine for exposure to the virus.  Six
18 people incarcerated at SATF have died due to complications with COVID-19 in the past
19 three weeks, and the prison currently has more than 200 staff with active, confirmed cases
20 of COVID-19.

21     Despite the magnitude of this outbreak, we learned from CCHCS on December 4
22 that 52 staff members at SATF had recently refused to be tested for COVID-19.  CCHCS
23 reported that these staff members had received Letters of Instruction (LOIs), which we
24 understand is a first step in the progressive discipline process.  CCHCS also reported that

---

26,27  [12]  On December 4, CCHCS reported that the staff testing reports were being validated, and it anticipated providing reports to Plaintiffs soon.  However, as of this filing, we have not received any reports.

16964008.3

1   these staff members were permitted to continue working, even though they could be

2   infected and transmitting the virus.  We have asked CCHCS and CDCR whether these 52

3   staff members work in jobs that require contact with the incarcerated population, and if so,

4   whether they can be reassigned to an administrative role until they agree to test or are

5   placed on administrative leave.  We have also asked whether any of the 52 have refused to

6   test more than once.  Finally, we have asked how many staff have refused to be tested at

7   the 34 other prisons in the past two weeks, and whether CDCR/CCHCS can produce bi-

8   weekly reports of refusals, as is done for noncompliance with face covering and physical

9   distancing policies.

10          *Defendants' Position:* Defendants note that Plaintiffs have raised issues in this

11  section that appear to be directed to the Receiver's office and CCHCS.  Defendants will

12  not attempt to respond on their behalf, but remain committed to working with them in

13  addressing Plaintiffs' concerns.

14  **VII.    Staff Compliance with Face Covering and Physical Distancing Requirements**

15          *Plaintiffs' Position*:  On December 4, Defendants produced to Plaintiffs the first set

16  of biweekly reports of staff noncompliance with face covering and physical distancing

17  requirements, as directed by the Court.  *See* ECF No. 3492.  These report document 521

18  incidents of noncompliance among custody staff and 210 incidents among medical staff.[13]

19  Almost all of the noncompliance reported was for failing to follow mask wearing

20  requirements, and, particularly for custody staff, the vast majority of the corrective action

21  taken was in the form of verbal counseling.

22          We appreciate CDCR's and CCHCS's efforts to address this problem, but are

23  extremely disappointed that eight months into this pandemic, compliance with mask-

_____

25  [13]      Defendants provided two reports: one from CDCR, primarily reporting

26  noncompliance among custody staff, and one from CCHCS, reporting noncompliance
    among medical and mental health staff.  CCHCS's report included incidents between

27  10/27/2020 and 12/2/2020.  The vast majority of incidents reported in CDCR's report also

28  occurred between those dates, though several prisons included reports from earlier on in
    the pandemic.

wearing—a fundamental public health measure necessary to prevent the spread of the virus—is still a significant problem at some prisons.  In particular, we are concerned to see so many reported incidents of noncompliance at prisons with active COVID-19 outbreaks, including 32 incidents among custody staff and 17 incidents among medical and mental health staff in recent weeks at SATF, while that prison was in the midst of a very serious outbreak.  It is equally disconcerting to see, via the reports, that statewide dozens of nurses and at least six primary care providers received progressive discipline due to violating face-covering mandates.

Also of note, on December 2 we sent CDCR and CCHCS a copy of a log or letter written by a named resident of San Quentin's all-dorm H-Unit (which primarily houses people who have not been infected with COVID-19) providing the dates and times of 20 instances between November 18 and 29 when staff – more than two dozen are named – did not comply with face-covering requirements, including for an entire shift within a housing unit.  We asked that immediate action be taken on those named and described as violating the face-covering mandate and that action be taken to end what, based on the numerous instances of non-compliance described, appears to be a pervasive disregard of face-covering mandates by some at San Quentin.  We are awaiting a response.

We continue to believe that an outside agency should monitor staff's compliance with mask-wearing policies in CDCR.  As discussed at the last Case Management Conference, the Office of the Inspector General plans to conduct random audits of CDCR's compliance with the mandatory mask requirement at all 35 state prisons between December 7, 2020 and March 7, 2021.  We understand the Inspector General will periodically update the Court and the parties throughout this audit period; we have not yet received the first update.

*Defendants' Position*: CDCR has determined that light-weight, polypropylene procedure masks, sometimes referred to as surgical masks, are a more effective facial covering for preventing the spread of COVID-19, thereby protecting both staff and inmates.  Effective November 23, 2020, all employees, contractors, and visitors working,

visiting or performing duties at a CDCR institution, indoors and outdoors, are required to wear a procedure mask at all times.   Exceptions to the wearing of masks are made for the following situations:

       1) eating or drinking, if a minimum of six feet of physical distance is maintained from all other individuals;

       2) When alone in an office with the door closed;

       3) When alone in a tower or enclosed control booth with no other individuals present.

       Employees and contract workers are provided two procedure masks per shift, per day, upon entry to an institution.  Visitors will also be provided two procedure masks upon entry to the institution or facility and as needed throughout the day.  Staffing working a double shift will be provided additional masks for the next shift.  Procedure masks will be provided at the screening point (e.g., entrance gate or first pedestrian entrance).  If staff, contractors, or visitors arrive without a mask, they will be required to put on a procedure mask prior to screening.

       Defendants have also prepared and provided Plaintiffs with mask compliance logs on December 4, 2020.  As Plaintiffs note, the vast majority of corrective active action taken was verbal counseling, however, the vast majority of instances of noncompliance were a first offense.  For those instances of noncompliance that were a repeat offense, nearly all offending CDCR staff members received progressive discipline.

       Defendants remain committed to enforcing mask wearing and social distancing statewide.  Further, Defendants issued a memorandum updating and clarifying expectations for staff mask usage and physical distancing in a December 4, 2020 directive. Staff are required to review and acknowledge the directive via CDCR's training portal. Supervisors are notified of any staff who have failed to review and acknowledge the directive.  A copy of that directive is attached as Exhibit A.

## VIII.   Prison-Specific Updates

       *Plaintiffs' Position:* We continue to have weekly conferences with CCHCS

Regional Health Care Chief Executive Officers (CEOs) and their supervisor regarding COVID-related matters at individual prisons.  In recent weeks, we have asked whether air-handler units (AHUs) in cell blocks at certain prisons are a concern with respect to the spread of the virus.  This concern has heightened with a significant outbreak at High Desert State Prison (High Desert).  After the outbreak at that prison began last month, CCHCS in response to our query said that housing unit ventilation was a concern for viral spread, due to air being recirculated in housing units especially during cold weather (High Desert is located in Susanville, where the average low temperature in November and December is below freezing).  CCHCS said an environmental survey was being done at the prison.  That survey, provided last weekend, reported that in all High Desert housing units during cold weather months, heating and ventilation is done via 100% recirculated air, and for many buildings, that air recirculates not only within buildings (including between otherwise separate sections) but also between housing units including across separate facilities.  We are seeking further information about the role of the ventilation system in High Desert's outbreak, and whether this is a concern at other prisons.  On December 9, CDCR said the information about High Desert was incorrect, and provided further details about ventilation at the prison.  We are reviewing and will follow up with CDCR and experts as necessary.

*Defendants' Position:* Starting November 26, 2020, Defendants implemented a 14-day modified programming schedule.  A copy of that directive as attached as Exhibit A.  Also, in response to the State's Stay-at-Home Order, Defendants implemented a directive instructing that the minimum number of staff are onsite to perform in-person, essential functions, and that staff that can telework to the maximum extent possible.  A copy of that directive as attached as Exhibit C.

## IX.   Vaccines

*Plaintiffs' Position:*  CCHCS reports it has worked for months to prepare for and obtain COVID-19 vaccines, and has been aggressively advocating for its patients' needs.  The Receiver says these efforts were in part responsible for the State's inclusion of

1  "correctional facility hospitals" and "[s]killed nursing facilities, assisted living facilities,

2  and similar settings for older and medically vulnerable" people in "Tier One" of

3  California's vaccine distribution plan, and "correctional facility clinics" in "Tier Two" of

4  its vaccine distribution plan.  *See* https://covid19.ca.gov/vaccines (last accessed Dec. 6,

5  2020).

6  　　　　More practically, CCHCS says it expects delivery in the very near future at

7  essentially every prison of freezers capable of sub-zero storage, necessary for at least one

8  of the COVID-19 vaccines.  The Receiver reports that CCHCS has been told it should plan

9  on offering its first doses of vaccines to patients the second week of January.  CCHCS

10  could not say how much vaccine they will receive initially or subsequently, in part because

11  they say conversations with and decisions by the California Department of Public Health

12  and its control agency (and Governor's office) are still occurring.  But CCHCS says that,

13  consistent with the state as a whole, its initial and perhaps subsequent supplies may or will

14  be limited,[14] so it is establishing vaccination priorities, focusing first on patients who have

15  not been infected and are the most medically vulnerable.[15]

16  　　　　We highly commend the Receiver's and CCHCS's efforts, and share the hope that

17  vaccines may eventually substantially reduce the harm caused by the pandemic in the

18  prisons.[16]  However, that the number of vaccine doses to be received, and when they will

19  ──────────────

20  [14]　The Centers for Disease Control will allocate vaccine supplies to the fifty states.
21  [15]　This approach to prioritization is in accord with our general views.  Still, we have
asked for written specifics from CCHCS so that the plan's details can be considered.
22  [16]　Information about vaccine efficacy and adverse effects is not yet fully known,
23  including because the elderly and medically vulnerable were not included in trials.  *See*
"The Exclusion of Older Persons From Vaccine and Treatment Trials for Coronavirus
24  Disease 2019—Missing the Target," *JAMA Internal Medicine*, September 28, 2020,
25  available at https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2771091.  It
also is not yet known how long any immunity produced by a vaccine will last.  In any
26  event, we understand it may take months for broad societal (and thus CDCR-wide) benefits
27  to occur even if vaccines are safe, effective, and widely received.  Thus, all current risk
reduction measures must continue, and be improved as necessary.

28

be received, are not known creates concern, as it raises the possibility that allocations will not be commensurate with the clear, present, and continuing danger from COVID-19 faced by those in prison.  CDCR houses approximately 55,000 people who have at least one risk factor for severe complications if infected with the virus, and more than 15,000 whose age or medical conditions make them highly vulnerable to severe complications.  Almost all are housed in congregate or other settings in which substantial, massive, or mega-outbreaks are occurring, have occurred, or could.[17]  Social distancing and attendant safeguards are to say the least very difficult in prison.  CDCR to date has been unable to adequately quarantine large numbers of those exposed to the virus, and information now suggests the possibility the some housing unit ventilation systems serve to spread the virus.  With 93 dead, approximately 700 hospitalized, and more than 25,000 infected so far – along with a massive disruption in programs and the stopping of in-person visiting – the people incarcerated in CDCR have suffered inordinately from COVID-19, and continue to face an extreme risk of harm from the virus.  Offering vaccinations to the medically vulnerable in prison should be given the highest priority.

*Defendants' Position:* Defendants note that Plaintiffs have raised issues in this section that appear to be directed to the Receiver's office and CCHCS.  Defendants will not attempt to respond on their behalf, but remain committed to working with them in addressing Plaintiffs' concerns.

## X.    Other COVID-19 Related Matters

*Defendants' Position:*  On December 4, 2020, Secretary Allison issued an important COVID-19 message regarding Governor Newsom's December 3, 2020 stay at home order. In pertinent part, Secretary Allison advised staff that procedure masks are required and

---

[17]    With regard to potential catastrophes, we note that to date only a relatively small number of COVID-19 infections have been reported at the California Health Care Facility, California Medical Facility, and Richard J. Donovan Correctional Facility, which each have percentages and  numbers of medically vulnerable patients in their populations similar to or greater than at San Quentin (28 deaths, 149 hospitalizations due to COVID-19) and California Institution for Men (27 deaths, 179 hospitalizations).

-22-                             Case No. 01-1351 JST

provided at all institutions, and cloth masks are required at all other work sites.  She reminded staff that she expects staff to wear their mask properly to protect themselves and those around them.  Secretary Allison also informed staff that supervisors and executives are performing spot checks throughout the institutions and work sites to ensure compliance, and that those who are not following directions will face disciplinary action.  Secretary Allison's full message is available at:

https://www.cdcr.ca.gov/insidecdcr/2020/12/04/important-covid-19-message-from-secretary-allison/.

## XI.    Updates on Medical Care Matters Not Directly Related to COVID-19

*Plaintiffs' Position:* CCHCS on November 30 provided the first of what will be monthly reports on Medication Assisted Treatment (MAT) and pending appointments for substance use disorder patients.  The data shows 6,541 current active MAT patients, with 6,843 other patients pending an initial appointment with a licensed provider, 6,242 of which are overdue.  Although we asked for it, CCHCS did not provide data as to the how long appointments are overdue.  We believe based on individual case reviews that thousands have been pending for months.  The substance use disorder and MAT programs are necessary and save lives, and the current efforts to reduce the massive appointment backlog, previously described (*see* ECF No. 3487 at 21:19-22:4), are necessary.  CCHCS's future monthly reports will show whether these efforts are adequate to substantially reduce the backlog.

*Defendants' Position:* CDCR circulated a new video regarding its Integrated Substance Use Disorder Treatment Ambassador Program.  A link to the video is: https://vimeo.com/485633742.

16964008.3

1    DATED:  December 9, 2020              HANSON BRIDGETT LLP

2

3

4                                    By:  */s/ Paul Mello*
                                         PAUL B. MELLO
5                                        SAMANTHA D. WOLFF
                                         Attorneys for Defendants
6

7    DATED:  December 9, 2020              XAVIER BECERRA
                                          Attorney General of California
8

9

10                                   By:  */s/ Ryan Gille*
                                         DAMON MCCLAIN
                                         Supervising Deputy Attorney General
11                                       RYAN GILLE
                                         IRAM HASAN
12                                       Deputy Attorney General
                                         Attorneys for Defendants
13

14

15   DATED:  December 9, 2020              PRISON LAW OFFICE

16

17                                   By:  */s/ Sophie Hart*
                                         STEVEN FAMA
18                                       ALISON HARDY
19                                       SARA NORMAN
                                         SOPHIE HART
20                                       Attorneys for Plaintiffs

21

22

23

24

25

26

27

28

16964008.3    JOINT CASE MANAGEMENT CONFERENCE STATEMENT