XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
RYAN GILLE (262105)
IRAM HASAN (320802)
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Email:   Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF -  240280
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777--3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., | CASE NO. 01-1351 JST |
| Plaintiffs, | **JOINT BRIEF ON QUARANTINE** |
| v. | Judge:   Hon. Jon S. Tigar |
| GAVIN NEWSOM, et al., | Date:    December 23, 2020<br>Time:    10:00 a.m.<br>Crtrm.:  6, 2nd Floor |
| Defendants. | |

Pursuant to the Scheduling Order of November 20, 2020, ECF No. 3493, the parties hereby submit their joint brief.

**AREAS OF EXPERT AGREEMENT**

The parties and their experts agree to the following:

From an infection control perspective, the ideal space for quarantine of a potentially exposed patient is in a single cell behind a solid door.

Precautionary quarantine, not following exposure, may be done in cohorts in shared air spaces.

People are considered far less susceptible to being re-infected with COVID-19 in the three months after they contract and recover from it.  CDCR and CCHCS should take this into consideration in their efforts to safely house people.

**AREAS OF EXPERT DISAGREEMENT**

The parties' experts disagree on to what extent, if at all, it is acceptable under public health guidance to quarantine cohorts in shared air spaces.  In this section, the parties will directly and succinctly state their positions on this area of dispute.  In the sections that follow, each party will outline its overall position regarding Plaintiffs' request for Court intervention.

*Plaintiffs' position:*

According to Plaintiffs' expert Dr. Adam Lauring, "it is not safe to quarantine people in dormitories or celled housing with open bars or porous doors."  Declaration of Adam Lauring, filed herewith, ¶ 6.  This opinion is shared by AMEND and the Berkeley School of Public Health authors of the evaluation of the outbreak at California Men's Colony, who opine that "[n]o one in a dormitory environment can quarantine properly."  Lauring Decl., Exh C at 37.

The Centers for Disease Control and Prevention (CDC) confirms that "[c]ohorting multiple quarantined close contacts could transmit SARS-CoV-2 from those who are infected to those who are uninfected" and concludes that "cohorting individuals with suspected COVID-19 is not recommended due to high risk of transmission from infected

to uninfected individuals."  Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, posting date October 7, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited December 9).  However, the CDC factors in feasibility in some correctional settings, and directs that "[c]ohorting should only be practiced if there are no other available options" and corrections officials must "**make every possible effort to individually quarantine close contacts of individuals with confirmed or suspected COVID-19**."  *Id.*  (emphasis in original).

The Receiver, while recognizing the risk of transmission from quarantining cohorts in shared air space and the necessity for significantly limiting that risk, has determined that double-celling in solid-door cells is also acceptable.  His position is that "post-exposure quarantine in shared airspace housing more than 2 persons fails to adequately achieve the intended goals of a COVID-19 post-exposure quarantine to facilitate the prompt identification of new cases and to help limit the spread of COVID-19 to new, uninfected people."  Declaration of Rana Anabtawi in Support of Plaintiffs' Position, filed herewith, Exh. A (Receiver's Statement on Quarantine, December 4, 2020).  He has therefore directed that quarantine for exposed people will no longer be allowed in cohorts of more than two people (in other words, double-celling), and directing that "[a]ll efforts should be made" at those prisons with relatively few cells "to find quarantine alternatives that satisfy the purposes of a post-exposure quarantine" that would "help limit the spread of COVID-19 to new, uninfected people."  *Id.*

Plaintiffs, having carefully considered the Receiver's and CDC's guidance, have agreed to a compromise of our initial position that quarantining must take place in single cells with solid doors.  We are willing to accept double celling (cohorts of two) in solid-door cells in order to further the aim of keeping as many people as possible as safe as possible.  Our position is therefore that only single- or double-celling in solid-door cells is acceptable housing for exposure quarantine, and that CDCR can achieve that end by making "every possible effort" to do so.

*Defendants' position:*

### 1. The Purpose of Public Health Guidance is to Achieve the Safest Possible Conditions in the Context of What is Available.

Dr. Lauring opines that quarantine in anything other than a single cell with a solid door is not possible: "use of living units with common air space to quarantine people with known exposure to the virus is effectively not quarantine at all." Decl. Lauring at ¶ 13. He further believes that "there are no mitigating steps that would reduce the risk of placing people in these common air living units for quarantine purposes, so that it would more closely approximate the risk of quarantine in living units with solid-door cells." *Id*. at ¶ 14.

Defendants' expert disagrees with Dr. Lauring's opinions. Risk mitigation is a cornerstone of public health. Decl. Spaulding ¶ 18. The purpose of public health guidance is to provide strategies for preventing the spread of COVID-19 and the harm it can cause, taking into consideration the unique needs of different populations. *Id*. at ¶ 8. The CDC recognizes this and provides separate sets of guidelines for populations like correctional systems, whose needs and circumstances vary from those of the general public. From a public health perspective, Dr. Lauring's opinion that quarantining a cohort of incarcerated people in an open-air space is like not quarantining at all is absurd. Quarantining such a cohort prevents them from potentially exposing all other areas and housing units of the prison to the virus. *Id*. ¶ 19.

Dr. Lauring does not cite or discuss the Centers for Disease Controls (CDC) guidelines—the preeminent national source of public health guidance—including guidelines that are specifically applicable to correctional facilities, at all, except to say that the CDC acknowledges that COVID-19 is transmitted through aerosolized droplets. *Id*. at ¶ 18. Instead, he cites to reports prepared in response to specific situations in CDCR institutions, and a study conducted in Connecticut jails and prisons that does not discuss whether any efforts to reduce the spread of infection were in effect at the time of the study, or the degree to which the surge examined occurred in jails versus prisons. *Id*. at 5; Decl.

17118624.1

Spaulding ¶ 17.

Dr. Spaulding's opinions are grounded in the CDC guidelines for correctional and detention facilities, which state "cohorting individuals with suspected COVID-19 is not recommended due to high risk of transmission from infected to uninfected individuals."[1] The CDC immediately follows this statement with a reference to guidelines for quarantine in correctional settings "for specific details about ways to implement cohorting as a *harm reduction strategy* to minimize the risk of disease spread and adverse health outcomes."[2] (Emphasis added.)  The guidelines further state that "guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions."[3]  Thus, as the CDC acknowledges, the best possible option is not always available, so "it is critical for public health experts to identify other, next-best strategies to mitigate the risk of infection.  Decl. Spaulding ¶ 18. Dr. Lauring ignores this reality.

The purpose of public health guidance is to achieve the safest possible conditions in the context of what is available, not an unachievable ideal.  Decl. Spaulding at ¶ 48.  To allow institutions to identify appropriate areas for quarantine, the CDC provides a list of options available for quarantining patients in correctional settings in order of preference, stating "[i]f the ideal choice does not exist in a facility, use the next best alternative as a harm reduction approach."[4]  If single cells with solid doors are not available, the CDC

---

[1] Centers for Disease Control and Prevention, *Guidance for Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (Updated Dec. 3, 2020).
[2] *Id.*
[3] Centers for Disease Control and Prevention, *Coronavirus Disease: Guidance for Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#QuarantineCloseContacts (Updated Dec. 3, 2020).
[4] *Id.*

JOINT BRIEF ON QUARANTINE

17118624.1

guidelines recommend options ranging from quarantining separately in single cells without solid doors to quarantining in various group settings with at least six feet of space around each individual.[5]  The CDC guidelines propose an option of quarantining an entire housing unit in place if the entire unit has been exposed and other better options are not available.[6] As indicated by the order of preference, quarantining people in small cohorts is more ideal than in large groups.  Decl. Spaulding at ¶ 20.

Per the CDC guidelines, it is appropriate for correctional systems in general to consider and implement the safest quarantine options available and feasible in a particular setting.  *Id.*  And while post-exposure quarantine in cohorts is not ideal from an infection control standpoint, quarantining in small groups is less of a risk to those in quarantine than quarantining in large groups.  *Id.*   When people must be quarantined in cohorts in shared air spaces because single cells with solid doors are not available, institutions can make them safer by implementing a multipronged application of evidence-based strategies to reduce harm, like those outlined in a Morbidity and Mortality Weekly Report of the CDC published on December 4, 2020.  *Id.* at ¶ 24.  The report concludes that a multipronged approach to implementing all evidence-based strategies to reduce COVID-19 transmission is essential.[7]  *Id.*

_____

[5] In order of preference, recommendations for quarantine space include (1) single cells with solid walls and doors; (2) single cells with solid walls but without solid doors; (3) a cohort in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least six feet of space around each person; (4) same as (3), but without a solid door; (5) a cohort in single cells without solid walls or doors, preferably with an empty cell between occupied cells to create at least six feet of space between people; (6) a cohort in multi-person cells without solid walls or solid doors, preferably with an empty cell between occupied cell and at least six feet of space between each person; (7) a cohort in the individuals' regularly assigned housing unit but with no movement outside the unit and at least six feet of space between people; (8) quarantining an entire housing unit that has been exposed in place; and (9) safely transfer to another institution with capacity to quarantine in one of the previous arrangements.  *Id.*

[6]  *Id.*

[7] Margaret A. Honein, et al., *Summary of Guidance for Public Health Strategies to Address*

JOINT BRIEF ON QUARANTINE

The strategies include universal face mask use; maintaining physical distance and limiting in-person contacts; avoiding nonessential indoor spaces and crowded outdoor spaces; increasing testing to rapidly identify and isolate positive cases; promptly identifying, quarantining, and testing close contacts of persons with known COVID-19; safeguarding people with a higher risk of comorbidity or mortality from COVID-19; providing essential workers with personal protective equipment and safe work practices; postponing travel; increasing indoor air ventilation; enhancing hand hygiene and environmental disinfection; and achieving widespread availability of effective COVID-19 vaccines.[8]

Dr. Spaulding disagrees with Dr. Lauring's position that quarantining in anything short of a single cell with a solid door cannot be done safely, and opines that "institutions can implement multiple evidence-based strategies to reduce potential harm." Decl. Spaulding ¶¶ 7, 24. Dr. Lauring makes no mention of these critical harm-reduction strategies.

Dr. Lauring states, "'[n]o one in a dormitory environment can quarantine properly'. . . This is not a contested opinion; all experts I've read or spoken with have come to the same conclusion[.]" Decl. Lauring ¶¶ 6-7 & Ex. C at 37. But Dr. Lauring does not define "properly" or cite to the expert opinions he relies on. This statement is ambiguous. To the extent it means that post-exposure quarantine in prisons is not possible, or that the risk in those settings cannot be mitigated, Dr. Spaulding disagrees. Decl. Spaulding ¶ 7.

## 2. Susceptibility to COVID-19.

Dr. Lauring opines that "[i]f you quarantine [exposed people] together in shared air space, the risk level for all rises to the highest risk level among them; everyone will be at the same risk as the person who was most exposed." Decl. Lauring at ¶ 11. But as

---

*High Levels of Community Transmission of SARS-CoV-2 and Related Deaths*, vol. 69, Centers for Disease Control and Prevention Morbidity and Mortality Weekly Report 1 (Dec. 4, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6949e2-H.pdf.
[8] *Id.*

JOINT BRIEF ON QUARANTINE

17118624.1

1   Defendants' expert, Dr. Spaulding, observes, aside from proximity to and duration of

2   exposure, the factors affecting the risk of acquisition of infection—as opposed to risk of

3   dire outcomes—have not been elucidated.  Decl. Spaulding ¶ 22.  Moreover, as discussed

4   above, Defendants' expert opines that multipronged evidence-based strategies can be used

5   to reduce harm when two or more people must share airspace during quarantine.  *Id*. at ¶¶

6   24, 48.

7        Plaintiffs state in their motion that they "amended [their] position to incorporate

8   double-celling for exposure quarantine, in recognition of the reasonableness of the

9   Receiver's approach" in the Receiver's December 4, 2020 Statement on Quarantine.  But

10  because this means quarantining two people in a shared-airspace in prisons, Plaintiffs'

11  position does not appear to be consistent with Dr. Lauring's.

12        **3.    Household Versus Correctional Setting.**

13        Dr. Lauring suggests that quarantine in shared-air living spaces is acceptable in a

14  household, where "there are no other options but to continue to interact with them even in

15  quarantine."  Decl. Lauring ¶ 15.  Dr. Lauring states that people in households "have the

16  option to try to separate internally, to use separate rooms and airspaces, keep windows

17  open, and take other measures to reduce interaction and common airspace."  *Id*.  According

18  to Dr. Lauring, "People in prison have no such options."  *Id*.

19        Dr. Lauring makes a false distinction between homes and prisons.  First, the

20  statement that people have no choice but to interact in household is also true of prisons.

21  And in the same way that households can decrease the risk of spreading infection at home,

22  prisons can decrease the risk of spreading infection by socially distancing individuals in

23  the shared airspace by moving beds farther apart, providing personal protective equipment,

24  and encouraging minimal interaction.  In other words, use a multipronged evidence-based

25  approach to reducing harm.  Decl. Spaulding ¶ 24. Dr. Spaulding disagrees with Dr.

26  Lauring's statement that "[p]eople in prisons have no such options."

27        Dr. Lauring states that "[i]t would be possible to reduce the enhanced risk of

28  quarantining in such settings by reducing the number of people who are housed in the

-8-                              Case No. 01-1351 JST

JOINT BRIEF ON QUARANTINE

shared airspace."  Decl. Lauring ¶ 15.  Dr. Spaulding agrees with this statement, assuming it extends to the prison setting.  Decl. Spaulding at ¶ 24.

### 4. When Shared Airspaces Can Be Used for Quarantine.

Dr. Lauring states that the use of shared-air living spaces could be explored "only for people who have already had COVID-19."  Decl. Lauring ¶ 19.  Defendants' expert, Dr. Spaulding, opines that quarantining in shared-air living spaces—when better options are not available—is a strategy that can mitigate harm for all incarcerated people, not just people who have had COVID-19.  Decl. Spaulding ¶¶ 19-21.  CDC guidance for correctional facilities supports Dr. Spaulding's opinion, and recommends various options for use of shared air living spaces for quarantine where single cells with solid doors are unavailable.  (*See* fn. 5.)

## PLAINTIFFS' POSITION

### I. Introduction

California prisons have endured multiple alarming outbreaks of COVID-19 over the last nine months.  More than 90 people have died and nearly 700 have been hospitalized, many of whom are likely to have serious long-term health consequences.  While a vaccine is on the horizon, the danger has never been greater, with case counts surging in California and around the country and at the highest levels yet seen in CDCR.

Tragically, one of the most critical tools to stem outbreaks – quarantining people who have been exposed to the virus – has been employed inadequately and inappropriately in California prisons.  Defendants routinely place people with known exposure to COVID-19 on quarantine status in housing units that have shared air space, such as dormitories or cells with barred or porous doors.  This practice occurs both in the Court-ordered set-aside space for quarantine, which in some prisons includes shared air locations, and also in housing units that are "quarantined in place," where Defendants choose to quarantine an entire shared-air-space living unit without moving the residents.  Dormitories and housing units with porous-door cells are essentially incubators of infection; the use of such space

JOINT BRIEF ON QUARANTINE

1   for quarantine places the residents at substantially higher risk of contracting COVID-19

2   than if they were housed in solid-door cells.  CDCR's failure to take steps to avoid and

3   prevent such placements thus constitutes deliberate indifference to the health care needs of

4   its patients, particularly when solid-door celled housing is available at the same prison.

5   Unless CDCR is required to expand the quarantine set-aside space at individual prisons to

6   include adequate numbers of solid-door cells, its quarantine practices will continue to

7   violate the Eighth Amendment.

8        Since commencement of briefing in this matter, the Receiver has issued clear

9   direction that "post-exposure quarantine in shared airspace housing more than 2 persons

10   fails to adequately achieve the intended goals of a COVID-19 post-exposure quarantine to

11   facilitate the prompt identification of new cases and to help limit the spread of COVID-19

12   to new, uninfected people."  Declaration of Rana Anabtawi in Support of Plaintiffs'

13   Position, filed herewith, Exh. A (Receiver's Statement on Quarantine, December 4, 2020).

14   Accordingly, he directed that quarantine for exposed people will no longer be allowed in

15   cohorts of more than two people (in other words, double-celling), and directing that "[a]ll

16   efforts should be made" at those prisons with relatively few cells "to find quarantine

17   alternatives that satisfy the purposes of a post-exposure quarantine" that would "help limit

18   the spread of COVID-19 to new, uninfected people." *Id.*

19        In response to this direction, Plaintiffs have amended our position to incorporate

20   double-celling for exposure quarantine, in recognition of the reasonableness of the

21   Receiver's approach.[9]  Defendants have not yet indicated how the Receiver's statement

22   impacts their position.  The parties will continue to discuss and attempt to find common

23   ground in the two weeks remaining before the hearing in this matter.

24        Plaintiffs seek Court intervention on an additional concern: Defendants have not

25

26   _____

27   [9] Cellmates are likely to have spent several days in close proximity to one another prior to
     the discovery of the exposure to an infected person, given the unavoidable lag in test
28   results and contact tracing.  Their risk is thus closer to equivalent by the time the exposure
     is discovered.

JOINT BRIEF ON QUARANTINE

1 adjusted quarantine reserves at individual prisons to provide additional space to separate

2 newly arrived residents from the rest of the population (precautionary quarantine).  This

3 failure violates the Receiver's clear direction.  Unless CDCR is required to set aside space

4 for such quarantine, the growing population in the system and the large number of inter-

5 prison transfers will inevitably lead to crowding and encroach on the space already set

6 aside at the direction of the Court to combat outbreaks.  By failing to follow the Receiver's

7 instructions, Defendants impermissibly endanger the *Plata* plaintiff class.

8      Plaintiffs seek an order requiring Defendants to follow the Receiver's directive to

9 use only solid-door single or double cells for quarantine and to follow the Receiver's

10 directive to set aside space for precautionary quarantine.  The space designated at each

11 prison for quarantine and isolation must be adjusted accordingly, and Defendants must

12 urgently find alternate solutions at those prisons with very few or no cells currently

13 available.

14 **II.      Procedural background**

15      On July 22, 2020, following a series of disastrous and deadly outbreaks in the

16 prisons, the Court ordered CDCR to set aside at least 100 quarantine and isolation beds at

17 each prison and then to

18      assess whether additional space is required at the institution for isolation
    and quarantine purposes and, if so, whether that space will be obtained by
19      vacating additional housing units or through other means.  The Receiver
    and the parties' health experts, as well as institution leadership, shall be
20      included in these discussions.  Assessments shall be guided by health
    considerations, without regard to whether sufficient space can be reserved
21      at the institution without a further reduction in population.
22

23 Order to Set Aside Isolation and Quarantine Space, July 22, 2020, ECF No. 3401 at 4.

24 Following this order, the Receiver convened a Public Health Workgroup to provide

25 guidance regarding the number of beds to set aside at each prison.  The Workgroup

26 accepted the Receiver's proposal to set aside a number equivalent to the populations in the

27 two largest congregate living spaces of each prison, because those are the likeliest settings

28 for the quick spread of the virus.  Declaration of Adam Lauring, M.D., in Support of

17118624.1
JOINT BRIEF ON QUARANTINE

1   Plaintiffs' Position on Quarantine in Housing Units with Shared Air Space, filed herewith,

2   Exh. D (Order to Set Aside Isolation and Quarantine Space: Public Health Workgroup

3   Recommendations, August 17, 2020) at 2.  The Workgroup did not require CDCR to

4   designate which set-aside beds would be used for quarantine and which for isolation, but

5   noted that most would be used for quarantine, which "should be configured as equivalent

6   to *single cells with solid doors*."  *Id.* at 1, 2 (emphasis in original).

7        The Workgroup did allow for "minimal exceptions" to the single-cell solid-door

8   rule: San Quentin and Folsom State Prisons, which have enormous congregate living areas,

9   and the California Rehabilitation Center (CRC), which has no cells.  *Id.* at 1, 3.  These

10  prisons required "unique solutions."  *Id.*

11       The Workgroup noted that "if the [quarantine] space is single cells with solid doors

12  and all public health measures are enforced along with the de-densification that has already

13  occurred, the proposed space plan, though imperfect, is a reasoned and supportable

14  approach that protects residents and staff."  *Id.* at 2.

15       After the Workgroup issued its guidance, the parties and the Receiver met to discuss

16  the set-asides for each prison, along with representatives from the *Coleman* Special

17  Master, the *Armstrong* Court Expert, and counsel for those cases.  Plaintiffs raised multiple

18  concerns and objections.  Following the discussions, CDCR established and vacated its

19  chosen set-aside space at each prison, pursuant to the Court's order.  Some of Plaintiffs'

20  objections remained, including the inadequacy of quarantine space.

21       The July 22 Order required the Receiver to "continually monitor whether isolation

22  and quarantine space reserves are appropriate in light of changing circumstances" and

23  allowed either party to request modifications.  ECF No. 3401 at 4.  If the parties are unable

24  to reach agreement, they may present the dispute in a joint brief to the Court.  *Id.*  Plaintiffs

25  formally registered objections on September 16 (used of shared air space for quarantine)

26  and October 27 (failure to set aside space for precautionary quarantine).  Anabtawi Decl.,

27  Exhs. B and C.

28       Since sending formal objections on September 16, Plaintiffs have continued to raise

17118624.1
JOINT BRIEF ON QUARANTINE

concerns about Defendants' use of quarantine space.  For example, during a call with CCHCS and Defendants on October 2, 2020, Plaintiffs asked CCHCS executives about the use of set-aside space at the California Institution for Men (CIM), which was experiencing an outbreak.  Anabtawi Decl. ¶ 5.  Despite having a significant number of vacant cells, CIM continued to house quarantined patients in congregate living spaces.  *Id.*  During that call, a CCHCS executive noted Plaintiffs' persistent line of questioning over whether institutions use available single cells for quarantine purposes, and noted that that area would be explored in subsequent weeks.  *Id.*  On October 9, 2020, during a call with CCHCS and Defendants, Plaintiffs asked why 38 patients housed in a dorm on quarantine status at the Correctional Training Facility (CTF) were not moved to available cells in the designated set-aside space.  *Id.* ¶ 6.  On October 16, 2020, during a call with CCHCS and Defendants, Plaintiffs asked why patients at the California Men's Colony (CMC) and the California Correctional Institution (CCI) were quarantined in dorms despite a significant number of vacant cells in the designated set-aside spaces at both prisons.  *Id.* ¶ 7.

> Plaintiffs have also raised these concerns in Court filings, noting questions about
>
> the current outbreak at the Substance Abuse and Treatment Facility at Corcoran, why some people are being quarantined in dorms, in units that have not been designated for quarantine, rather than the designated celled unit, and whether they will be moved to cells.

Corrected Joint Case Management Conference Statement, Sept. 16, 2020, ECF No. 3449 at 20.  Similarly, we informed Defendants and the Court that

> at CIM, nearly 50 people who medical staff determined had been exposed to COVID-19 were quarantined together in a gym, even though single cells with solid doors—which CCHCS mandates be used if available—were available. . . .  Subsequently, a number of people in the gym tested positive.

Joint Case Management Conference Statement, Oct. 20, 2020, ECF No. 3469 at 17-18.

> Defendants never commented on these concerns and gave no indication that they would provide any additional quarantine space as a result until December 4, Anabtawi Decl. ¶ 8, after Plaintiffs had already provided a draft expert declaration, proposed order, and brief in the matter and five days before the parties' joint brief was due.

-13-

JOINT BRIEF ON QUARANTINE

Case No. 01-1351 JST

Also on December 4, the Receiver issued a new policy regarding quarantine, stating that "post-exposure quarantine in shared airspace housing more than 2 persons fails to adequately achieve the intended goals of a COVID-19 post-exposure quarantine to facilitate the prompt identification of new cases and to help limit the spread of COVID-19 to new, uninfected people. The first choice for post-exposure quarantine housing should be solid-door cells occupied by only one person. Quarantine cohorting as defined in the Interim Guidance is to be used with no more than 2 persons per shared airspace housing." Anabtawi Decl., Exh. A.  The Receiver further noted that there are five prisons -- Avenal State Prison, California Rehabilitation Center, Chuckawalla Valley State Prison, Folsom State Prison, and San Quentin State Prison -- where "the available facilities are insufficient" to comply with these standards.  *Id.*  He directed that "[a]ll efforts should be made" at those prisons "to find quarantine alternatives that satisfy the purposes of a post-exposure quarantine as set forth above."  *Id.*

## III.   Quarantine of people with known exposure in living units with shared air space constitutes deliberate indifference

### A.   Prison officials have an affirmative duty to protect residents from known harm from infectious disease

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citation omitted); *see Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir. 2014).  Failure to prevent the spread of a contagious illness constitutes deliberate indifference to a serious medical need.  *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (officials may not be "deliberately indifferent to the exposure of inmates to a serious, communicable disease"); *Hutto v. Finney*, 437 U.S. 678, 682 (1978) (housing incarcerated people where infectious diseases could spread easily violates 8th Amendment); *Gates v. Collier*, 501 F.2d 1291, 1300, 1303 (5th Cir. 1974) (plaintiffs entitled to relief where state allowed "inmates with serious contagious diseases . . . to mingle with the general prison population").

The State must also take action to prevent harm: the Three-Judge Court in this

JOINT BRIEF ON QUARANTINE

17118624.1

1   matter recognized that "the Eighth Amendment requires Defendants to take adequate steps

2   to curb the spread of disease within the prison system."  Order Denying Plaintiffs'

3   Emergency Motion to Modify Population Reduction Order, April 4, 2020, ECF No. 3261

4   at 8; *see Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("correctional officials have an

5   affirmative obligation to protect inmates from infectious disease").  In particular, prison

6   officials must implement reasonable measures to ensure that people in their custody are

7   safely housed and are not unnecessarily exposed to infectious diseases.  When they fail to

8   do so, courts will intervene to ensure appropriate housing.  *See, e.g., Hutto*, 437 U.S. at

9   682-87 (affirming limits on placements in crowded punitive segregation); *Gates*, 501 F.2d

10  at 1300, 1303 (plaintiffs entitled to relief where state allowed "inmates with serious

11  contagious diseases . . . to mingle with the general prison population"); *Hernandez v. Cty.*

12  *of Monterey*, 110 F. Supp. 3d 929, 944 & n.88, 959 (N.D. Cal. 2015) (granting preliminary

13  injunction requiring plan to address prevention and control of tuberculosis, including

14  placement in medical isolation).

### B.   It is impossible to effectively quarantine people exposed to COVID-19 in shared air living spaces

17      The purpose of quarantine is to prevent the exposed person who may be infected

18  from transmitting the virus to others.  *See* Lauring Decl. ¶ 11.  That cannot be done in a

19  dormitory or cells without solid doors, where everyone shares the same air.  As Dr.

20  Lauring explains, "transmission through the air is one of the primary means by which

21  people contract COVID-19. . . . The shared air in dormitories or cells with barred or porous

22  doors allows for ready transmission of the virus."  *Id.* ¶ 8; *see also id.,* Exh. A at 7

23  (Receiver's Report on Transferring COVID-19 High-Risk Patients to Safer Housing)

24  ("Dorms and open-cell-front housing are more dangerous than closed-door cells because,

25  as very recently confirmed by the CDC, transmission of COVID-19 occurs both through

26  droplets and through aerosolization").

27      CDCR's own experience with outbreaks demonstrates that the virus spreads rapidly

28  among residents in dorms and shared air living spaces.  According to the Receiver,

17118624.1

"[e]ighty-one percent (81%) of the 69 deaths [of CDCR residents] acquired COVID-19 while living in a dorm or open-cell-front housing unit."[10]  Lauring Decl., Exh. A at 6.  The Receiver also found that "the six largest outbreaks in CDCR institutions – outbreaks resulting in more than 1,000 confirmed COVID-19 patients – have all been in institutions that predominately house patients in common airspace, dorm and open-cell-front housing units."[11]  *Id*.  One example illustrates the widespread problem: Dorm 106 at CRC was placed on quarantine on June 24, 2020, and remained on quarantine until September 23, 2020, due to frequent new infections among those who resided in the unit.  Anabtawi Decl., Exh. D at 1.  Each time a patient tested positive, the clock for the unit's 14-day quarantine was reset.  *Id.* at 1-2.  Ultimately, the virus spread throughout the dorm and, at the end of the quarantine three months later, 65 of 69 patients who resided in that unit had been infected with COVID-19.  *Id.* at 1-2.[12]

Other experts reviewing COVID-19 outbreaks in jails and prisons have reached the

---

[10] Plaintiffs' review of the information available to us suggests that this percentage has not substantially changed in the weeks since this report: of the subsequent 24 deaths, 15 people were housed in dorms when infected, eight in solid-door cells, and one unknown.

[11] Since the Receiver's report was issued, a massive outbreak of more than 2,600 cases at the Substance Abuse Treatment Facility and State Prison at Corcoran (SATF), in both dorms and solid-door celled housing, has become the second largest in the system to date.

[12] Perplexingly, Defendants use CRC as an example of their ability to effectively manage an outbreak.  A more complete picture is that CRC experienced a lengthy and significant outbreak that developed over six months, resulting in far more than half of its population infected with COVID-19.  Anabtawi Decl. ¶ 9.  CRC has a population of approximately 2100 patients and has had over 1600 active cases.  *Id.*  CRC has been fortunate to have experienced no COVID-19 related deaths, but this good fortune can likely be attributed to the very low medically high risk population housed within the facility, rather than the management of the outbreak.  *Id.* ¶ 10.  Based on recent data, only 102 of the over 2200 patients residing at CRC had a COVID-weighted risk score of over 4.  *Id.*  These are among the patients who were offered tented housing in an attempt to limit their exposure to COVID in a large dorm setting, but such offers did not begin until mid to late October 2020, months after the virus had already run rampant throughout the facility and infected over half the resident population, and at which point the spread of the infection within the institution was already waning.  *Id.* ¶ 11.

Case No. 01-1351 JST
JOINT BRIEF ON QUARANTINE

17118624.1

same conclusion: the virus spreads with dangerous speed in open air housing units.  In a recent correspondence published in the New England Journal of Medicine, the authors noted that they had tested 10,304 people in the Connecticut prison system and found that people in dorms were 35 times more likely to be infected with the SARS-CoV-2 virus than people in cells.  Lauring Decl., Exh. B (New England Journal of Medicine, Risk Factors for SARS-CoV-2 in a Statewide Correctional System, November 24, 2020) at 1.  In a study by AMEND and the Berkeley School of Public Health of the outbreak at California Men's Colony (CMC), experts noted that "[d]ue to incarcerated persons living in close, prolonged proximity and the close physical distance of dormitory pods, CMC's West dorms are primed for super-spreader events."  Lauring Decl., Exh. C at 37.

There have been serious outbreaks in celled environments, notably at High Desert and Pleasant Valley State Prisons.  This does not contradict the fundamental truth that cells are safer than dorms.  As Dr. Lauring explains, "[b]y far the largest outbreaks have been in shared air spaces"; the outbreak in solid-door cell environments "would have been far worse in dorms or cells with barred or porous doors."  Lauring Decl. ¶ 10.   Put simply, "[t]he fact that this virus possesses tenacity that is very difficult to counter even under suitable conditions does not let [Defendants] off the hook from knowingly placing people in harm's way."  *Id.*

There can be no serious dispute that placement of anyone in a dorm increases their risk of catching COVID-19.  But placement of groups of people, all of whom have known risk of exposure to the virus, *together* in dorms or porous door cells and thus exposing them to others with high risk of infection is far more serious.  Because these units function like incubators for the virus, "[i]f you quarantine them together in shared air space, the risk level for all rises to the highest risk level among them; everyone will be at the same risk as the person who was most exposed."  *Id.* ¶ 11.  An example illustrates this point: if 10 people are exposed to the virus, "[i]t is likely that not all of those people will actually wind up being infected" because of "[t]he numerous variations in how different exposed people have interacted with the infected person – the frequency of interaction and proximity to

JOINT BRIEF ON QUARANTINE

each other, the airflow at the time, whether the infected person coughs or sneezes or laughs or speaks loudly during the interaction." *Id.* ¶ 12.  Out of the 10 people exposed, "maybe two or three . . . will become infected, and the other seven or eight will be lucky.  If you quarantine each person in a single cell after exposure, you have only two or three secondary cases.  However, if you quarantine them together, the lucky ones will continue to be exposed -- to the secondary cases, now -- over the ensuing 14 days. So, you have actually increased their total exposure to COVID-19 positive people and increased their risk for contracting the disease." *Id.*  Thus, "[t]he use of living units with common air space to quarantine people with known exposure to the virus is effectively not quarantine at all." *Id.* ¶ 13.

The Centers for Disease Control and Prevention (CDC) come to the same conclusion: "cohorting individuals with suspected COVID-19 is not recommended due to high risk of transmission from infected to uninfected individuals."  Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, posting date October 7, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited December 9, 2020) ("CDC Guidance").  Thus, "**[f]acilities should make every possible effort to individually quarantine close contacts of individuals with confirmed or suspected COVID-19**" and "[c]ohorting should only be practiced if there are no other available options." *Id.*

It is no surprise that the Receiver, Plaintiffs' expert, the Public Health Workgroup, and the experts at AMEND and the Berkeley School of Public Health all have reached the same conclusion: people exposed to COVID-19 cannot be effectively quarantined in dormitories or shared air space housing units.[13]  *See* Anabtawi Decl., Exh. A (Receiver

---

[13] Defendants cast doubt on Dr. Lauring's credentials as an expert in this area, criticizing him for lack of correctional experience, and fault him for failing to state how to prioritize safe housing among at-risk populations.  But they do not contradict any of his scientific

JOINT BRIEF ON QUARANTINE

1  directs that only single or double celled housing is permissible for quarantine for known

2  exposure); Lauring Decl. ¶ 6 ("My review of the literature, conversations with public

3  health and correctional experts, and knowledge of outbreaks in CDCR all strongly support

4  the conclusion that it is not safe to quarantine people in dormitories or celled housing with

5  open bars or porous doors"); *id.*, Exh. C. at 37 (AMEND/Berkeley School of Public

6  Health, Evaluation of CMC Outbreak) ("[n]o one in a dormitory environment can

7  quarantine properly"); *id.*, Exh. D at 2 (Workgroup Recommendations) ("[i]ndividuals

8  who have been exposed should be quarantined in the equivalent of single cells with solid

9  doors").

10      **C.    Defendants knowingly place people in living units with shared air space
              for quarantine**

11

12      Despite the clear direction from the Public Health Workgroup and the Receiver,

13  CDCR continues to quarantine large numbers of people in shared air living spaces, both in

14  designated set-aside units and through quarantine in place.

15      In some prisons, CDCR uses shared air living spaces for quarantine despite the fact

16  that there are multiple living units of solid-door cells that are available or could be made

17  available.  In some of these instances, Defendants have misused the reserve space by using

18  solid-door cells for isolation of confirmed cases and dorms for quarantine.  (Isolation may

19  be done in shared air spaces because people with confirmed infections do not present a

20  medical risk of harm to other infected people.)  For example, at CIM, Plaintiffs discovered

21  that people were quarantined in dorms and a gym despite cells being available in the

22  designated set-aside space; at the California Men's Colony, patients were quarantined in

23

   _____

24

25  opinions or credentials for assessing risk and protective factors for this pandemic, and the
   fact remains that his conclusions find strong support in the CDC's guidance, the Receiver's

26  statement, the Public Health Workgroup, and the experts from AMEND and U.C.
   Berkeley, including members of this Court's Advisory Panel.  It is Defendants' expert

27  whose opinion -- that Defendants can place people at risk of harm without fully making

28  use of all other options available to them to prevent it – is out of line with the national
   leaders in this field.

                                                          -19-                        Case No. 01-1351 JST

JOINT BRIEF ON QUARANTINE

1   dorms while many cells were available in the designated set-aside space.  Anabtawi Decl.

2   ¶¶ 5, 7.  Plaintiffs have been raising concerns with CCHCS and Defendants over the use of

3   dorms for quarantine at prisons with available solid-door cells for more than two months,

4   including regarding CIM (October 2), CTF (October 9), and CMC and CCI (October 16).

5   Anabtawi Decl. ¶¶ 5-7.   Plaintiffs have also included some of these concerns in the Joint

6   Case Management Conference Statements filed with the Court, regarding quarantines at

7   SATF (ECF No. 3449 at 20) and at CIM (ECF No. 3469 at 17-18).

8        Defendants confirm that they have used "[q]uarantine cohorts" instead of the set-

9   aside space for quarantine in "some instances" and admit that "it is possible that less than

10  optimal decisions [on quarantine housing] have been made in some circumstances."

11  Declaration of Connie Gipson in Support of Defendants' Opposition ¶ 20.

12       The problem continues: it appears from the information available to Plaintiffs that

13  Valley State Prison, California Institution for Men, Mule Creek State Prison, California

14  State Prison at Solano, Central California Women's Facility, California Men's Colony,

15  Avenal State Prison, R.J. Donovan State Prison, and SATF have in recent weeks used

16  dorm housing for quarantine despite available solid-door cells at the same prison.[14]

17  Anabtawi Decl. ¶¶ 2-4.  All of these recent examples appear to be quarantine in place.

18       In some prisons, CDCR has designated shared air living spaces as part of its Court-

19  ordered reserves for quarantine and isolation purposes, along with celled housing.  *Id*.,

20  Exh. E.  At CRC, CDCR has designated *only* shared air living spaces.  *Id.*  Plaintiffs have

21  objected to these designations for months: on September 16, Plaintiffs informed

22

23  _____

24  [14] Plaintiffs determined this information from reviewing the Outbreak Management Tools,
    only recently made available to us, as well as CDCR's bed audit (to determine which
25  locations are celled housing and which are dorms).  Anabtawi Decl. ¶ 2.  The information
    needed to identify these problems has always been available to Defendants.  Defendants'
26  complaint that Plaintiffs have failed to bring this problem to their attention previously is
    therefore perplexing.  Plaintiffs first raised it formally September 16 and have consistently
27  since then maintained the position that quarantine in shared air space locations is wrong,
28  giving Defendants numerous examples along the way.  *Id.* ¶¶ 2-8, 15 and Exhs. B & D.

1  Defendants and CCHCS that "[s]ome prisons have not designated appropriate space,"

2  including CRC, which "has not designated any cells with solid doors for quarantine,

3  because there is no celled housing at the prison." *Id.*, Exh. B.  Plaintiffs further noted that

4  at other prisons "celled housing is designated for the reserve space, but the doors are

5  perforated and thus allow for the flow of air outside of the cell, such as the celled housing

6  at San Quentin, Chuckawalla Valley, and Pelican Bay," and argued that a "solution must

7  be found to allow safe quarantine consistent with the Public Health Workgroup's

8  guidance." *Id.*

9  Defendants have failed to take steps available to them to avert unsafe quarantine

10  housing and prevent known risk of harm.  They have not used reserve or other solid-door

11  cells to their fullest capacity, as discussed above.  Nor have they taken other available

12  steps such as a targeted reduction of the population density at these prisons to significantly

13  reduce the need for quarantine and increase the ability to accomplish it safely, whether

14  through attrition[15] or targeted transfers or the population reduction measures at their

15  disposal.[16]  Instead, they have chosen to keep the populations at these prisons too high to

16  allow for safe quarantine practices.  They have failed to restrict the populations at these

17  prisons to only people who have already had COVID-19 to provide a possibly significantly

18  reduced risk of infection and outbreaks.  With very limited exceptions, they have not

19  activated unused space to serve as isolation or quarantine space, as suggested in the

20  AMEND and UC Berkeley School of Public Health report on San Quentin.  Anabtawi

21  Decl., Exh. G (Urgent Memo – COVID-19 Outbreak: San Quentin Prison, June 13, 2020)

22  at 5-6.

23

24  ───────────────────

25  [15] Defendants did restrict some transfers into these prisons, but only for people at high risk from complications from COVID-19.  Anabtawi Decl., Exh. F.  There is no restriction on

26  transferring others into these prisons in their place.

27  [16] Defendants have chosen to release only a very few of the elderly people who are high risk for COVID complications and low risk to public safety that their various population

28  reduction measures would allow, as noted in multiple Joint Case Management Conference Statements.  *See, e.g.,* ECF No. 3460 at 2-3; ECF No. 3477 at 3.

-21-                         Case No. 01-1351 JST

JOINT BRIEF ON QUARANTINE

1    In all of these situations, Defendants have made clear and knowing choices to

2  quarantine people in housing that places them at substantial risk of serious harm.

3    The Public Health Workgroup found that "if the [quarantine] space is single cells

4  with solid doors and all public health measures are enforced along with the de-

5  densification that has already occurred, the proposed space plan, though imperfect, is a

6  reasoned and supportable approach that protects residents and staff."  Lauring Decl., Exh.

7  D, at 2.  But the quarantine space is too often *not* single cells with solid doors; as a result,

8  the space plan is unreasonable, unsupportable, and fails to protect residents and staff.

9     **D.    Defendants violate the Eighth Amendment by placing people exposed to
10          COVID-19 together in shared air living spaces**

11    Defendants place residents exposed to COVID-19 on living units with shared air

12  space.  This practice knowingly subjects them to substantial risk of serious harm.  As set

13  forth in the previous section, Defendants have failed to take available steps to avoid these

14  dangers – in some cases, even quarantining people in dorms when there are solid-door

15  cells they could have made available at the same prison.  They thus demonstrate deliberate

16  indifference to the serious health care needs of the plaintiff class in violation of the Eighth

17  Amendment.  *See Farmer,* 511 U.S. at 828 (a "prison official's 'deliberate indifference' to

18  a substantial risk of serious harm to an inmate violates the Eighth Amendment") (citation

19  omitted).

20    Defendants argue that their actions do not constitute deliberate indifference because

21  their actions are reasonable.  Significantly, they do not deny that they knowingly place

22  people at a substantial risk of harm when they place them in shared air spaces for

23  quarantine with other exposed people.  It is unreasonable to knowingly expose people to

24  enhanced risk of harm without making use of means at their disposal to avert that harm.

25    Defendants also argue that they are not deliberately indifferent because they are

26  taking reasonable steps to stem outbreaks and protect people from transmission by other

27  means.  But the other steps Defendants have taken during the pandemic, while necessary

28  and important, do not eliminate the substantial risk of serious harm to the Plaintiff class

-22-

Case No. 01-1351 JST

17118624.1

1  members who have been exposed to the virus and are then placed in shared air space with

2  other exposed people, thus facing a higher risk of contracting COVID-19.  Mask-wearing

3  is essential, as are the significant efforts Defendants have expended on testing, hygiene,

4  and movement restrictions and precautions during the pandemic.  (Notably, many of these

5  efforts were not fully implemented until the Court ordered, the Receiver directed, or

6  Plaintiffs insisted on them.)  But those efforts do not absolve Defendants of their

7  responsibility to provide safe housing for people who have been exposed.

8         After listing at length the steps they have taken to address the pandemic in other

9  ways, Defendants profess helplessness in the face of the need to find safe quarantine space

10  for the people in their custody.  They argue that it is unreasonable to be required to safely

11  house people, apparently no matter the heightened risk they would otherwise face, because

12  of "the reality of incarceration that there simply are not enough single cells with solid

13  doors at all institutions."  The fundamental flaw in their argument is that the national

14  standards they themselves cite require far more than this passive approach.  Defendants

15  quote the CDC guidelines, but ignore the section that requires them to "**make every**

16  **possible effort to individually quarantine close contacts of individuals with confirmed**

17  **or suspected COVID-19**."  CDC Guidance (emphasis in original).  The CDC confirms

18  that "[c]ohorting multiple quarantined close contacts could transmit SARS-CoV-2 from

19  those who are infected to those who are uninfected" – indeed, that there is a "high risk" of

20  such transmission -- and instructs that "[c]ohorting should only be practiced if there are no

21  other available options."  *Id.*

22         Defendants have other available options.  Most prisons have both dormitories and

23  solid-door celled housing.  They can use the solid-door celled housing at their disposal,

24  something that they fail to do all too often, as noted in the prior section.  There are

25  additional tools at their disposal to plan for adequate safe quarantine space, as listed in the

26  previous section: proper use of the celled set-aside space they already have; reduction of

27  population density at prisons with inadequate celled housing through attrition, targeted

28  transfers, or available population reduction measures; restriction of dorm populations to

-23-                          Case No. 01-1351 JST

JOINT BRIEF ON QUARANTINE

1   people who have already had COVID-19; activation of unused space.  They have not made

2   "every possible effort" to ensure adequate celled quarantine space, as required by the

3   CDC.

4          Echoing the CDC's Guidance, the Receiver recently gave clear direction that people

5   with known exposure should be quarantined "with no more than 2 persons per shared

6   airspace housing."  Anabtawi Decl., Exh. A.  He acknowledged that at some prisons, "the

7   available facilities are insufficient" to accomplish that end, but did not allow Defendants to

8   simply throw up their hands.  Instead, he required that "[a]ll efforts should be made at

9   these institutions to find quarantine alternatives that satisfy the purposes of a post-exposure

10  quarantine as set forth above." *Id.*

11         Defendants' argument thus ignores the clear and unambiguous direction from

12  undeniable national leaders at the intersection of corrections and public health.  Defendants

13  cannot credibly hold that it is unreasonable to be required to follow the CDC's and the

14  Receiver's guidance.  *See Hernandez v. Cty. of Monterey,* 110 F. Supp. 3d 929, 959 (N.D.

15  Cal. 2015) ("known noncompliance with generally accepted guidelines for inmate health

16  strongly indicates deliberate indifference to a substantial risk of serious harm").

17  **IV.    Precautionary quarantine**

18         The Receiver, in the COVID-19 Screening and Testing Matrix for Patient

19  Movement, August 19, 2020 (Movement Matrix), required CDCR to set aside enough

20  precautionary quarantine space at each prison to accommodate its historical average of

21  transfers.[17]  Anabtawi Decl, Exh. H.  Plaintiffs asked for the set-aside space to be modified

22  and expanded for this purpose nearly six weeks ago and received no answer.  *Id.*, Exh. C.

23  Defendants have never produced a designation of precautionary quarantine space at any

24  prison. *Id. ¶* 14.

25

26  _____

27  [17] The Movement Matrix requires precautionary quarantine for people who arrive at the
    Reception Centers and who transfer between prisons and other facilities in order to curb

28  spread of the virus.  The Receiver issued a draft revised Matrix on November 24 that also
    requires post-transfer precautionary quarantine in the same amount. Anabtawi Decl. ¶ 19.

JOINT BRIEF ON QUARANTINE

The Public Health Workgroup developed a methodology for determining how many beds should be set aside for quarantine and isolation based on outbreak prevention. They did not consider precautionary quarantine, likely because there was minimal movement in the system at that time. Transfers now happen in far greater numbers. These changed circumstances necessitate set-aside space dedicated for this purpose.

It is essential to consider precautionary quarantine space along with quarantine space for people with known viral exposure because the precautionary quarantines take up set-aside space, making it unavailable in event of an outbreak. That could render the space inadequate to comply with the Court's order. Defendants admit that they do not know if this is happening. Gipson Decl. ¶ 19.

Defendants argue that the number of cells required for this purpose is small, and they might be able to fill the need with current space. *Id.* Compliance with Plaintiffs' proposed order should thus be well within their reach. Moreover, since people placed in precautionary quarantine are not known to have been exposed to the virus, they do not present an enhanced risk of transmission to each other and may be housed in congregate settings in small cohorts. Lauring Decl. ¶ 20.

## V. The Court should order Defendants to quarantine people with known exposure only in solid-door cells or the equivalent and to set aside adequate space for precautionary quarantine

Defendants' quarantine practices thus violate the Eighth Amendment rights of Plaintiff class members. The Court should order CDCR to cease placing its residents at known risk of harm. As the Supreme Court directed in this case, where a "government fails to fulfill [its] obligation [to provide adequate health care], the courts have a responsibility to remedy the resulting Eighth Amendment violation." *Brown v. Plata*, 563 U.S. 493, 511 (2011). Thus, while courts should be sensitive to principles of federalism, "[c]ourts nevertheless must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners," and "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison

1    administration." *Id*.

2        Defendants protest that the task of quarantining in solid-door cells is unreasonable

3    while at the same time acknowledging that most people are already single or double celled

4    for exposure quarantine and that there is ample capacity available in CDCR's prisons.  See

5    Spaulding Decl. ¶ 23 and Exh. B (a snapshot of recent quarantines by the Receiver shows

6    that 77% are single- or double-celled); Gipson Decl. ¶ 6 ("CDCR has reduced its

7    population by over 23,000 [people] since the beginning of the pandemic").  Further, they

8    assert that (following several disastrous experiences in which they spread the virus from

9    prison to prison), they can now safely transfer people within the system.  Gipson Decl. ¶ 7.

10   Why, then, is it unreasonable to require them to be more creative in using the available

11   space and in making space available in order to safely house people who have been

12   exposed to the virus?

13       Defendants' final argument is that a hearing on this matter is premature because the

14   Receiver's direction in this area was issued on December 4 and they have not yet decided

15   what to do about it.  But they have long known of this problem and have demonstrated

16   their reluctance to act without Court intervention: despite Plaintiffs' longstanding objection

17   that the allocated quarantine space is inadequate, they identified additional quarantine

18   space only after Plaintiffs asked for a hearing date.  Anabtawi Decl. ¶ 8.  The Receiver's

19   direction is clear and unambiguous: it does not need interpretation, only a plan for

20   implementation.  Plaintiffs' proposed order provides such a plan.  In the two weeks

21   remaining before the hearing, Plaintiffs will continue to meet and confer with Defendants

22   and the Receiver and, as appropriate, the public health experts, on how it can be

23   accomplished.

24       The coronavirus pandemic has brought tremendous difficulties to prison systems

25   around the world, and California is no exception.  Finding solid-door cells or the

26   equivalent for quarantine space will be difficult in some prisons.  But the means to make it

27   possible are well within Defendants' reach.  As described in Section III.C, above, they

28   have repeatedly failed to use the available celled housing effectively, have failed to reduce

-26-                          Case No. 01-1351 JST

JOINT BRIEF ON QUARANTINE

17118624.1

1   population density at the prisons with little or no celled housing, and have chosen to

2   release only a very few of the elderly people who are high risk for COVID complications

3   and low risk to public safety.[18]  A significantly reduced population density at all the

4   prisons, but particularly those with few to no cells, would make the work of quarantining

5   exposed cases far easier.  The Public Health Workgroup instructed Defendants to

6   quarantine people in solid-door cells and to find unique solutions at the prisons without

7   adequate celled space nearly four months ago and the evidence demonstrates that that they

8   have failed to do so in a meaningful way.

9        For the above reasons, Plaintiffs respectfully request the Court grant the relief in the

10   proposed order filed herewith.

11

12   **DEFENDANTS' POSITION**

13                              **INTRODUCTION**

14        Plaintiffs are again asserting that Defendants' response to the COVID-19 pandemic

15   is deliberately indifferent, and now ask this Court for an order requiring Defendants to

16   comply with guidance issued by the Receiver not less than three business days ago.

17   Simply the temporal nature of their requested relief alone is unreasonable.  If that were not

18   enough to justify the denial of this motion, Plaintiffs' legally and factually flawed claim of

19   deliberate indifference does not square with the incredible and tireless efforts of CDCR,

20   California Correctional Health Care Services (CCHCS) and their staff to combat the spread

21   of the virus and to treat the patients who have contracted it.  CDCR and CCHCS have

22   significantly reduced the patient population, periodically frozen intake of new patients

23   from the counties, reserved large quantities of space for isolation and quarantine, made

24   efforts to remove high-risk-medical inmates to safer environments, developed a corrections

25   industry leading transfer matrix, updated that transfer matrix based upon experience and

26   _____

27   [18] Plaintiffs do not seek a population reduction order.  The remedy should recognize,
     however, that it is within the authority of the Defendants to reduce their population as one
28   option to facilitate compliance.

                                                    -27-                Case No. 01-1351 JST
JOINT BRIEF ON QUARANTINE

17118624.1

1  evolving public health guidance, developed surge plans for prisons with challenging

2  facilities, and implemented a constellation of additional measures to combat the spread of

3  the virus and prevent or reduce bad outcomes.  Moreover, CDCR has demonstrated time

4  after time that it is willing to diligently work with Plaintiffs and the Receiver to address

5  changes in public health guidance, issues raised by Plaintiffs, and to improve its efforts to

6  keep incarcerated persons and staff safe.  These facts collectively demonstrate that

7  Defendants are not deliberately indifferent.

8          Because the entire country is in the grip of this devastating pandemic and its current

9  crippling surge of cases and deaths, Defendants understand Plaintiffs' urgency in seeking

10  relief.  But in their haste to present these challenging and complex issues to the Court, they

11  did not allow sufficient time for Defendants and the Receiver to assess them or to

12  determine how and whether they can be addressed.  For example, Plaintiffs committed to

13  bringing this motion before considering the fact that CDCR has significant additional

14  space suitable for quarantine and isolation far beyond the already-reserved quarantine and

15  isolation spaces.  An accurate compilation of that data was only completed and produced

16  to Plaintiffs on December 4, though Plaintiffs were advised on December 2 of the likely

17  availability of this space.  Decl. Ryan Gille Supp. Defs.' Opp'n to Pltfs.' Mot. re

18  Quarantine and Isolation Space ("Gille Dec.") ¶ 2.  Consequently, the parties and the

19  Receiver have yet to meet to discuss how this additional space might be used to address the

20  issues Plaintiffs raise here.  Nor have they discussed the potential impact of recent updated

21  guidance from the Centers for Disease Control and Prevention may have on current

22  isolation and quarantine policies and protocols, which include the transfer matrix.  And

23  based on their conduct since the onset of the pandemic, it is apparent that the Receiver and

24  Defendants are fully dedicated to the many measures already implemented to protect

25  patients.

26          Despite Defendants' and the Receiver's efforts to date, and willingness to discuss

27  further modifications and improvements related to quarantine, Plaintiffs ask this Court to

28  set an impossibly high standard—one which most, if not all, jails and prisons in this

17118624.1

country cannot meet, and one which is not mandated by the Eighth Amendment.  This Court may not grant the dramatic and unprecedented relief Plaintiffs seek because Defendants have not been deliberately indifferent to the COVID-19 pandemic, and further, Plaintiffs' requested relief is not narrowly drawn or the least intrusive means necessary to correct the harm.

## PROCEDURAL AND FACTUAL BACKGROUND

In a July 22, 2020 order, the Court adopted CDCR's interim proposal for quarantine and isolation space, which required that spaces with at least 100 beds would be set aside at each prison for isolation and quarantine purposes.  ECF No. 3401 at 4.  The Court further ordered that the Receiver, the parties' experts, and institution leadership work together to help CDCR determine whether additional space should be reserved for isolation and quarantine at each prison based on health considerations.  *Id.*

The parties' experts, advisory board members, and the Receiver's public health experts at CCHCS (the "Public Health Workgroup") met several times in late July and early August to develop a methodology for determining the amount of space that should be reserved for quarantine and isolation at each prison.  Declaration of Connie Gipson Supp. Defs.' Opp'n Re Quarantine Motion ("Decl. Gipson") Ex. D at 1.  The Receiver arranged for the parties—including counsel representing the plaintiffs in the *Armstrong* and *Coleman* class actions—and members of the Public Health Work Group to meet on August 7 and 12 to further discuss the reserves that should be set aside at each prison.  *Id.*

On August 18, 2020, CCHCS issued a document explaining the methodology for determining appropriate isolation and quarantine reserves developed by the Public Health Work Group, which was based on the number of inmates living in each prison's largest congregate living space.  *Id.* at 2.  Congregate living spaces include dorms and housing units with cells that have barred or porous doors.  *Id.*  The document's attachments provided specific recommendations for reserves at each prison.  *Id.*

CCHCS's recommendation document included several significant observations.  First, it noted that "[g]iven the recommendations and application of the method, it appears

-29-

JOINT BRIEF ON QUARANTINE

Case No. 01-1351 JST

that nearly all institutions already had reserved or vacated enough suitable bed space for isolation and quarantine." *Id.*  Second, it noted that unique solutions would be required for San Quentin, Folsom, and California Rehabilitation Center because of their designs and lack of sufficient cells with solid doors.  *Id.* at 3.  Third, it noted that San Quentin needed less reserve space than the formal recommendation indicated because of the large number of patients at that prison who had already contracted COVID-19.[19]  *Id.* at 2.  And fourth, it observed that "many institutions have excess capacity, beyond what was identified for purpose of Judge Tigar's order, and could quickly identify additional buildings for use as quarantine and/or isolation space."  *Id.* at 3.

From July through September 2020, CDCR took on the massive task of vacating and preparing the spaces it identified for isolation and quarantine in every prison.  Decl. Gipson ¶¶ 13-14.  This undertaking presented numerous logistical challenges, including the transfer of hundreds of inmates to other housing units and prisons and ensuring that reserved spaces were appropriate for *Armstrong* and *Coleman* class members.  *Id.*  CDCR continued to work on a number of these challenges through October and November 2020.  *Id*.

At many of the prisons, the reserved quarantine and isolation space exceeds the amount of space recommended by CCHCS and the public health workgroup, and some prisons exceeded the recommendations by a large quantity (e.g., California City Correctional Facility, California Institution for Women, and California State Prison-Sacramento).  Decl. Gipson ¶¶ 15-16 , Ex. E.  CDCR's reserved space has capacity to house approximately 7,809 patients in cells if they are mostly double celled, and up to about 4,228 patients if they are single celled.  *Id.*  CDCR has also formally reserved about 1,195 beds that are in congregate living spaces, such as dorms, tents, gyms, and other converted spaces for isolation and quarantine.  *Id.*

---

[19] This same consideration should apply to other prisons that have large numbers of patients who have recovered from COVID-19.

JOINT BRIEF ON QUARANTINE

17118624.1

1   Furthermore, because of CDCR's reduced population, a number of prisons currently

2   have abundant additional space available—beyond the reserved space—that could be used

3   for quarantine and isolation if needed.  *Id.* ¶ 17.  In total, the additional cell space is

4   sufficient to house about 2,620 patients if they are mostly double celled, and about 1,347

5   patients if they are single celled.  *Id.*  And there are about 1,999 additional beds in

6   congregate settings that are also currently available for quarantine or isolation use.  *Id.*

**ARGUMENT**

7

8   **I.     Plaintiffs Have Not Established Defendants' Deliberate Indifference to the COVID-19 Pandemic.**

9

10   To be entitled to injunctive relief, Plaintiffs must first establish an Eighth

11   Amendment violation.  Here, Plaintiffs have not, and cannot, demonstrate that Defendants

12   have been deliberately indifferent to the COVID-19 pandemic in light of the myriad

13   measures Defendants and the Receiver have put in place to attempt to mitigate the spread

14   of the virus.

15   In order to establish a violation of their Federal rights, Plaintiffs must prove that

16   Defendants have acted with deliberate indifference toward those rights.  *Farmer v.*

17   *Brennan*, 511 U.S. 825, 828 (1994).  A deliberate indifference finding requires Plaintiffs to

18   show that the deprivation of their rights is "objectively, 'sufficiently serious,'" and further,

19   that Defendants are acting with a "'sufficiently culpable state of mind.'"  *Farmer*, 511 U.S.

20   at 834 (*quoting Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  As Defendants have indicated

21   in response to Plaintiffs' previous challenges to Defendants' response to the COVID-19

22   pandemic, COVID-19 objectively poses a risk of harm to incarcerated persons, and those

23   who are incarcerated may be at a higher risk for contracting COVID-19 given the

24   circumstances of incarceration, including the congregate living environment inherent in

25   carceral settings.  *See* ECF Nos. 3235 at 17 ("Defendants do not dispute the risk of harm

26   that COVID-19 poses to inmates, as well as the community at large"), 3291 at 5:5-13

27   ("Defendants do not attempt to relitigate the issue here, and the Court finds that this

28   element has been established").

1    However, Plaintiffs have not previously established, and cannot now establish the

2    second prong of the deliberate indifference inquiry.  Since the onset of the pandemic,

3    Defendants have taken immediate, far reaching, and reasonable action in response to the

4    pandemic, and thus are not disregarding the serious risk of harm posed by COVID-19.

5    **A.    Defendants Have Taken Significant and Unprecedented Steps to Respond to the COVID-19 Pandemic.**

6

7    Under the second, subjective prong, Plaintiffs must show that prison officials knew

8    of and disregarded "an excessive risk to inmate health or safety; the official must both be

9    aware of facts from which the inference could be drawn that a substantial risk of serious

10   harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  The state of

11   mind required for deliberate indifference equates to the *mens rea* element for criminal

12   recklessness.  *Farmer*, 511 U.S. at 839-840.  For that reason, courts must "focus[ ] on what

13   a defendant's mental attitude actually was (or is), rather than what it should have been (or

14   should be)."  *Id.* at 839.  This approach is required, according to the Supreme Court,

15   because the "Eighth Amendment does not outlaw cruel and unusual 'conditions'; it

16   outlaws cruel and unusual 'punishments.'"  *Id.* at 838.  Thus, prison officials who

17   understand a substantial risk to inmate health or safety may be found free from liability if

18   they respond reasonably to the risk "even if the harm ultimately was not averted."  *Id.* at

19   844.

20   This standard affords "due regard for prison officials' unenviable task of keeping

21   dangerous men in safe custody under humane conditions."  *Farmer*, 511 U.S. at 845

22   (*quoting Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979)).  This standard is also

23   exacting, and the Court has rejected attempts to dilute it.  *See Estelle v. Gamble*, 429 U.S.

24   97, 106-108 (1976) ("insufficient treatment, malpractice, or negligence does not amount to

25   a constitutional violation); *Wilson v. Seiter*, 501 U.S. 294, 305 (1991) (mere negligence

26   does not meet the deliberate indifference standard); *Baze v. Rees*, 553 U.S. 35 (2008) (risk

27   of negligence does not establish a cognizable Eighth Amendment claim).

28   Here, Plaintiffs cannot establish that Defendants have disregarded an excessive risk

-32-

to their health.  To the contrary, Defendants have taken immediate, decisive, and significant steps to mitigate the spread of COVID-19 within CDCR.  Defendants' efforts in this regard are extensive, and just as our understanding of the pandemic has evolved, so too has CDCR's response.[20]  For example, in March and early April 2020, which was only a short period after the beginning of the pandemic, CDCR had already implemented the following measures:

- CCHCS and CDCR established a multi-disciplinary team, chaired by a public health physician, to take all feasible steps to prevent a COVID-19 outbreak in CDCR's institutions and to develop a thorough and solid response action plan for dealing with outbreaks;

- CDCR activated the Department Operations Center (DOC)—a centrally-located command center where CDCR and CCHCS experts monitor information, prepare for known and unknown events, and exchange information centrally in order to make decisions and provide guidance quickly in the event of outbreaks;

- CDCR developed Pandemic Operational Guidelines;

- CDCR suspended public visiting in the prisons;

- CDCR suspended intake from the county jails (intake has since resumed on a limited and intermittent basis, but it is currently suspended);

- CDCR implemented symptom screening for individuals entering the prisons;

- CDCR initiated efforts to educate staff and inmates about the need for

---

[20]Accurate descriptions of many of CDCR and CCHCS's efforts to address the pandemic in the prisons can be found on CDCR's website at:
https://www.cdcr.ca.gov/covid19/covid-19-response-efforts/;
https://www.cdcr.ca.gov/covid19/san-quentin-state-prison-response/; and
https://www.cdcr.ca.gov/covid19/memos-guidelines-messaging/.  Decl. Gipson ¶ 5.

17118624.1

taking precautions such as physical distancing and hygiene;

- CDCR initiated efforts to reduce the populations in dorms by transferring significant numbers of inmates out of dorms to other housing throughout the system;

- CDCR implemented enhanced cleaning efforts throughout the prisons and widely distributed hand soap and hand sanitizer dispensers;

- CDCR implemented quarantines for exposed patients;

- CDCR implemented an expedited release plan to quickly reduce the system's population by nearly 3,500 inmates;

- CDCR implemented a modified program to manage and restrict inmate movement throughout the system and to provide guidance on physical distancing and efforts to cohort inmates in their housing units;

- CDCR placed physical-distancing markings throughout the prisons to encourage physical distancing;

- CDCR developed plans to convert certain areas in prisons, such as gyms, chapels and visiting areas, into additional housing for the purpose of allowing greater physical distancing in housing units;

- The California Prison Industry Authority initiated efforts to manufacture cloth face masks and hand sanitizer for inmates and staff throughout the system;

- CDCR created physical-distancing cohorts within dorm settings; and

- CDCR placed restrictions on inmate transfers and implemented requirements to obtain approval for transfers from the Health Care Placement Oversight Program and the CCHCS's public health team.

Decl. Gipson ¶¶ 3-4; *see also* ECF Nos. 3240 and 3275 (Director Gipson's previous declarations, provide more detail concerning these early efforts).

This Court has previously determined that Defendants' initial response to the pandemic, which included these (and other) measures, to be Constitutionally adequate.

1  ECF No. 3291 at 17:19-22.  Since those early days of the pandemic, CDCR and CCHCS

2  have worked tirelessly to further address and mitigate the impact of the pandemic on the

3  prison system.[21]  For example, beginning in July 2020, CDCR implemented several

4  measures to expedite the release of additional inmates to further reduce the prison

5  population.  Decl. Gipson ¶ 6.  Those measures resulted in the early release of an

6  additional 7,060 inmates from the 35 institutions and camps (including California City

7  Correctional Facility) during the period from July 1 through December 3, 2020.  *Id.*

8  Combined with the previous early release efforts, natural releases, and restrictions on

9  intake from the counties, CDCR reduced its population by over 23,000 inmates since the

10 beginning of the pandemic.[22]  *Id.*

11          To ensure that transfers of inmates between institutions are conducted safely,

12 CCHCS developed the Movement Matrix.  Decl. Gipson ¶ 7, Ex. A.  By carefully

13 complying with the requirements of the Movement Matrix, CDCR has been able to safely

14 transfer inmates throughout the system for a number of important reasons, including

15 moving medically high-risk patients into safer settings and reducing the population in

16 particular housing units to provide for greater social distancing.  *Id.*  CDCR takes the

17 Movement Matrix requirements seriously, and has turned away intake buses from counties

18 that have not complied with transfer requirements.  *Id.*

19          Additionally, CCHCS conducts a robust COVID-19 surveillance-testing program

20 for CDCR staff and incarcerated persons.  Decl. Gipson ¶ 8.  In addition to sending tests to

21 _____

22 [21] Beginning in April 2020, the Court began holding frequent case management
conferences to discuss CDCR's efforts to respond to the pandemic.  For each of those

23 conferences, the parties submitted joint statements describing evolving issues related to the
pandemic and detailing CDCR's evolving efforts to respond to it.  Those joint statements

24 provide an overview of CDCR's monumental efforts to respond to the pandemic.  *See* ECF

25 Nos. 3269, 3294, 3304, 3316, 3322, 3332, 3345, 3356, 3367, 3370, 3371, 3389, 3405,
3417, 3427, 3435, 3436, 3448, 3449, 3460, 3469, 3477, 3486, and 3487.

26 [22] The press release concerning the early-release measures implemented in July 2020

27 provides additional details and can be found at:
https://www.cdcr.ca.gov/news/2020/07/10/cdcr-announces-additional-actions-to-reduce-

28 population-and-maximize-space-systemwide-to-address-covid-19/.

JOINT BRIEF ON QUARANTINE

17118624.1

1    labs for results, every prison now also has the ability to conduct point-of-care tests that

2    usually provide results in about fifteen minutes.  *Id.*  Furthermore, wastewater monitoring

3    has been initiated at two prisons and might be expanded to others to assess its feasibility

4    and effectiveness for early detection of outbreaks.  *Id.*

5          CDCR and CCHCS are also collaborating on an effort to move medically high-risk

6    patients out of dorms and into cells.  Decl. Gipson ¶ 10.  On October 21, 2020, the

7    Receiver issued a memorandum entitled "Transferring COVID-19 High-Risk Patients to

8    Safer Housing," which requires CDCR to offer each person with a COVID-weighted risk

9    score of three or higher a single cell with a solid door.  *Id.*  The Receiver has also restricted

10    the transfer of medially high-risk patients to a specific group of prisons that do not have

11    the ability to house them in cells with solid doors.  *Id.*  As a result of these decisions,

12    CDCR is now prioritizing movement of medically high-risk patients who have not

13    contracted COVID-19 in the last three months from congregate living spaces to cells with

14    solid doors.  *Id.*  And CDCR and CCHCS are working on a process for mandating the

15    transfer of patients who do not voluntarily move to cells.  *Id.*  The implementation of the

16    plan to move medically high-risk patients has already commenced at San Quentin, and

17    plans for three other institutions are being developed.  *Id.*

18          As discussed above, since April 2020, CDCR has been providing cloth face masks

19    to incarcerated persons and staff and providing guidance and directives on mask use.  Decl.

20    Gipson ¶ 11.  CDCR currently requires mask wearing in the prisons and provides all staff

21    with surgical face masks.  *Id.*  As an additional mitigation effort during serious outbreaks

22    at particular prisons, CDCR has issued N95 masks to all incarcerated persons and staff to

23    help stop the virus's spread.  *Id.*  To date, this type of prison-wide N95 measure has been

24    implemented at Folsom State Prison, San Quentin State Prison, and Avenal State Prison.

25    *Id.*  And at other prisons experiencing outbreaks, CDCR has required the use of N95 masks

26    by staff and incarcerated persons who work or reside in the areas experiencing the

27    outbreaks.  *Id.*

28          CDCR has also implemented other measures to protect incarcerated persons at

JOINT BRIEF ON QUARANTINE

17118624.1

1  prisons experiencing serious outbreaks, such as transferring medically high-risk patients

2  out of dorms and into cells, and the implementation of increased testing rates of patients

3  and staff.  Decl. Gipson ¶ 12.  And as discussed in more detail above, CDCR has set aside

4  vast quantities of isolation and quarantine space throughout the prison system.  *Id.* ¶¶ 13-

5  17, Ex. E.  This massive undertaking has reserved spaces throughout the prison system that

6  provide thousands of beds for quarantine and isolation use in the event of outbreaks.  *Id.*

7  Because some prisons were unable to reserve the recommended space for isolation

8  and quarantine, and because their facility design is likely to present challenges in the event

9  of an outbreak, they have developed plans for how to deal with a surge of COVID-19

10  cases.  Decl. Gipson ¶ 18.  San Quentin, Folsom, California Rehabilitation Center,

11  California Health Care Facility, and Avenal State Prison have developed such plans, which

12  are based on experience gained during past serious outbreaks, such as the outbreak at San

13  Quentin.  *Id.*

14  CDCR also makes a concerted effort to learn from past outbreaks how to better

15  respond to new outbreaks.  Decl. Gipson ¶ 22.  For instance, CDCR immediately took a

16  number of steps at the beginning of an outbreak at Folsom in August 2020 that were based

17  on lessons learned from San Quentin, which resulted in a far better outcome.  *Id.*  Those

18  steps included the early installation of tents to provide additional capacity for quarantine,

19  isolation, and medical treatment, the preparation of Folsom's limited cell capacity to help

20  manage the outbreak, the movement of medically high-risk patients to cells, close

21  monitoring of staffing needs and the implementation of plans to ensure sufficient staffing

22  for the duration of the outbreak, the implementation of a mandatory prison-wide N95 mask

23  policy for staff and inmates, and greatly increased testing rates.  *Id.*  Through all of these

24  efforts, CDCR was able to prevent an outcome similar to the outbreak at San Quentin,

25  even though Folsom and San Quentin faced many of the same challenges based on their

26  age and design.  *Id.*

27  Similarly, through lessons learned from past outbreaks, CDCR was able to

28  effectively manage an outbreak that occurred at California Rehabilitation Center (CRC).

JOINT BRIEF ON QUARANTINE

17118624.1

Decl. Gipson ¶ 23.  Despite a dearth of cells for quarantining patients, CRC was able to control a large outbreak and prevent the loss of life from COVID-19.  *Id.*  The reduction in CRC's population allowed it to utilize several large dorms for quarantine space, and CRC's installation of climate controlled tents increased housing capacity.  *Id.* Furthermore, CRC installed additional climate controlled tents for the specific purpose of housing medically high-risk patients away from the general population, and CRC assigned dedicated staff to essentially cohort with those high-risk patients during the outbreak to further limit their potential exposure to the virus.  *Id.*  The medically high-risk areas contained full services, including bathrooms and showers, dedicated to those patients so they would not comingle with the general population.  *Id.*  The tents were designed to house ten people, but only four medically high-risk people were assigned to each tent, which allowed for greater physical distancing.  *Id.*

Despite these significant and successful mitigation efforts, Plaintiffs state that they are "perplex[ed]" by Defendants' use of CRC as an example of CDCR's ability to effectively manage an outbreak, and instead suggest the outcome of the outbreak at CRC was the result of "good fortune" that is "likely attributed to the very low medically high risk population housed within the facility, rather than the management of the outbreak." Pltfs.' Mot. at 16, fn. 12.  Plaintiffs cite to the declaration of one of their own attorneys for this determination, and notably, not to the opinion of any public health expert.  Moreover, Plaintiffs fail to recall that the primary goal of managing the pandemic has always been to flatten the curve so that healthcare professionals and resources are not overwhelmed, and so the sick can be properly treated.  Spaulding Dec. ¶ 8.  From that perspective, CRC's management of its outbreak was successful.  At its peak, CRC never exceeded 550 active cases.[23]  CRC isolated the medically vulnerable and kept them safe.  In the end, no lives were lost.  And they did this all without any cells.  Decl. Gipson ¶ 23.

---

[23] Statistics pertaining to the impact of COVID-19 at CRC are available at https://www.cdcr.ca.gov/covid19/population-status-tracking/

JOINT BRIEF ON QUARANTINE

17118624.1

1    Finally, CCHCS and CDCR are actively communicating with the California

2  Department of Public Health to ensure that inmates and staff are provided the opportunity

3  to be vaccinated in accordance with public health guidelines for vaccine distribution.

4  Decl. Gipson ¶ 24.

5    As these efforts reflect, CDCR has worked tirelessly and dedicated significant

6  resources to responding to the pandemic in California's prisons.  Plaintiffs' accusations of

7  deliberate indifference to the risks presented by COVID-19 are simply inconsistent with

8  and unsupported by this record.

9    **B.    Defendants' Quarantine Efforts Comport with Public Health Guidance and Cannot be Said to Violate the Constitution.**

10

11    Plaintiffs assert that the failure to quarantine incarcerated persons in anything other

12  than a cell with a solid door constitutes an Eighth Amendment violation.  Plaintiffs state

13  that they have "amended" their position, and now find double-celling for quarantine

14  purposes acceptable "in recognition of the reasonableness of the Receiver's approach,"

15  contrary to their own expert's opinion.  Pltfs.' Mot. at 8; Decl. Lauring, ¶ 15 (stating "the

16  risk is significant for … cellmates of people who are double-celled in quarantine").

17  Although Plaintiffs acknowledge the correct legal standard and admit that "prison officials

18  must implement reasonable measures to ensure that people in their custody are safely

19  housed and are not unnecessarily exposed to infectious diseases," Plaintiffs disregard the

20  "reasonableness" standard and request an order from this Court that would far exceed that

21  which is mandated by the Constitution.  *See* Pltfs.' Mot. at 15:5-7.  In making this

22  aggressive and unprecedented request, Plaintiffs rely on the opinion of Dr. Adam Lauring,

23  a physician who is board certified in infectious diseases, but who lacks public health or

24  correctional expertise.[24]  *See* Defs.' Objections to the Lauring Decl.; Gille Dec. ¶ 7 & Ex.

25  _____

26  [24] In response, Plaintiffs state that Defendants "do not contradict any of [Lauring's]

27  scientific opinions or credentials for assessing risk and protective factors for this pandemic…."  Pltfs.' Mot. at 18, fn. 13.  But Defendants do disagree with his opinion, and

28

C.  Indeed, Dr. Lauring admitted while testifying in a different case in a Michigan District Court earlier this year that he *does not* specialize in healthcare in jails or prisons.  Gille Dec. ¶ 7 & Ex. C at 78:18-20.  While Defendants do not dispute Dr. Lauring's uncontroversial assertions that "transmission through the air is one of the primary means by which people contract COVID-19," and that the ***best*** way to minimize the spread of COVID-19 is to quarantine exposed persons in single cells with solid doors, Dr. Lauring fails to acknowledge the reality of incarceration that space is limited in all correctional systems.  *See* Lauring Decl. ¶ 8.  This is not surprising, given Dr. Lauring has never been to a jail or prison.  Gille Dec. ¶ 7 & Ex. C at 83:8-10.

But public health experts and prison administrators do not have the luxury of operating in the best of environments or considering only the most ideal public health response.  Rather, in the reality in which they operate, they have the unenviable task of determining acceptable alternatives, and ensuring that reasonable steps are taken to ensure the safety and wellbeing of incarcerated persons under difficult circumstances.  Indeed, the cornerstone of public health is risk mitigation and management.  (Decl. Spaulding, ¶ 18.)  Dr. Lauring's opinion is therefore of little value, not simply because he does not have the education, training, or experience to opine upon best practices for disease mitigation in a carceral setting from a public health standpoint, but because he offers no practical alternatives or solutions.  (*See* Defs.' Obj. to Decl. Lauring.)  Because Defendants have responded reasonably under the circumstances, and have acted consistent with public health guidance from the Centers for Disease Control and Prevention (CDC), and because Plaintiffs offer no viable alternatives (despite carrying the burden to do so), Defendants may not be found deliberately indifferent.

### 1.  The Vast Majority of Persons Incarcerated by CDCR Who Must Undergo Quarantine Are Housed Alone or With One Cellmate in Cells with Solid Doors.

---

in this regard, it bears noting that the Eighth Amendment does not allow a deliberate indifference finding based merely on a difference of medical opinion about appropriate treatment.  *Estelle v. Gamble*, 429 U.S. 97, 107 (1976).

JOINT BRIEF ON QUARANTINE

17118624.1

1    A recent table of data provided by the Receiver presents a breakdown of the

2    locations where currently quarantining patients are housed in CDCR's prisons.  Decl.

3    Spaulding Ex. B.  Consistent with the CDC guideline preferences for quarantine, the table

4    indicates that over three- quarters (77%) of the quarantining patients are either celled alone

5    (33%) or with only one cellmate (44%).  Decl. Spaulding ¶ 22, Ex. B.  Another 12% are

6    housed in cohorts of ten or fewer patients, and 11% are housed in larger cohorts.  *Id.*  This

7    data demonstrates that CDCR prioritizes placing quarantining patients in cells with solid

8    doors consistent with CDC guidelines.  *Id.*  Although Plaintiffs contend these efforts are

9    insufficient, as explained below, Defendants' quarantine practices are consistent with the

10    Constitution.

11    **2.   It Is Not an Eighth Amendment Violation to Quarantine
             Incarcerated Persons in Space Other Than Cells with Solid Doors.**

12

13    Plaintiffs ask this Court to extend the reach of the deliberate indifference standard

14    to subsume reasonable governmental action.  Rather than require Defendants to act

15    reasonably, Plaintiffs seek to require Defendants to do what is best without regard to

16    resources and institutional constraints.  They also ask this Court to ignore the myriad

17    measures Defendants have put in place to mitigate the spread of COVID-19, to the

18    exclusion of the one measure they deem superior.  But this is not the law, and Defendants

19    are not required to adopt what Plaintiffs believe to be the superior solution, particularly

20    without any consideration of what is reasonable under the circumstances.

21    There can be no finding of an Eighth Amendment violation where prison officials

22    respond reasonably to address medical concerns, even if the harm is not ultimately averted.

23    *Farmer*, 511 U.S. at 844.  To find otherwise would require this Court to conclude that

24    Defendants have acted with a "sufficiently culpable state of mind" of "criminal

25    recklessness."  *Id.*  Such a finding cannot reasonably be made under the set of facts before

26    this Court.  Even if Defendants' response is "imperfect[, t]hat is not enough to establish

27    deliberate indifference."  *Cameron v. Bouchard*, 815 Fed. Appx. 978, 986 (6th Cir. 2020).

28    Here, Defendants have made significant and reasonable efforts to quarantine

-41-                                Case No. 01-1351 JST

JOINT BRIEF ON QUARANTINE

incarcerated persons who have been exposed to the virus in single or double cells with solid doors.  Spaulding Ex. B.  Those efforts have been effective, as over three quarters of the quarantined population is currently housed in such a setting.  *Id.*  There are, however, a handful of institutions where it simply is not feasible to quarantine all exposed incarcerated persons in single cells with solid doors.  Decl. Gipson Ex. D at 3.  The Public Health Workgroup acknowledged this reality when it described single cell, solid door quarantine space as "ideal," but conceded that "[t]here are multiple institutions where the recommendations of the CCHCS and public health experts is difficult, if not impossible." *Id.*  For those institutions, the workgroup suggested implementation of "a unique strategy on quarantining patients."  *Id.*  Defendants have implemented unique and reasonable strategies at these institutions, and Plaintiffs do not proffer *any* alternatives.  Decl. Gipson ¶¶ 18, 22-23; Decl. Spaulding, ¶¶ 12; *see* Pltfs.' Prop. Order at ¶ 5.

Further, Plaintiffs' argument selectively cites CDC guidance on this topic, and Dr. Lauring's declaration ignores this guidance altogether.  Plaintiffs are correct to note that the CDC advises jails and prisons to make every effort to individually quarantine persons with suspected COVID-19.  However, Plaintiffs neglect to mention that the CDC also acknowledges that "the next best alternative" to the "ideal choice" of single cells with solid walls should be used "as a harm reduction approach" when single cells with solid walls are unavailable.  (CDC Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities, Dec. 3, 2020, available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("CDC Interim Guidance".)  In fact, the CDC provides the following seven alternatives for housing multiple quarantined individuals, *in order of preference*:

- Separately, in single cells with solid walls but without solid doors
- As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions
- As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a

JOINT BRIEF ON QUARANTINE

17118624.1

solid door

- As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals

- As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing to maintain at least 6 feet of space between individuals housed in the same cell

- As a cohort, in individuals' regularly assigned housing unit but with no movement outside the unit (if an entire housing unit has been exposed – referred to as "quarantine in place"). Employ social distancing strategies related to housing to maintain at least 6 feet of space between individuals

- Safely transfer to another facility with capacity to quarantine in one of the above arrangements, though transfer should be avoided due to the potential to introduce infection to another facility

Decl. Spaulding ¶ 19, n.13.  It bears noting that even the CDC's "next best alternative"—housing patients separately in cells without solid doors—is unacceptable to Plaintiffs, and that each of these options would violate the Constitution, according to Plaintiffs.  But as explained above, Defendants' reasonable efforts to quarantine individuals under challenging circumstances comport with this guidance.  Decl. Spaulding ¶ 22, Ex. B. Moreover, the Eighth Amendment does not mandate "the best possible solution[;] [r]ather, the question is whether Defendants' actions to date are reasonable."  Order Denying Pltfs.' Emergency Mot. Re: Prevention and Management of COVID-19, ECF No. 3291, at 13:24-14:1.  Plaintiffs' advocacy of a "best possible solution" standard is misplaced, and they have failed to prove Defendants' actions to date are unreasonable.

But rather than acknowledge these reasonable, CDC-sanctioned alternatives, Plaintiffs claim that Defendants have "profess[ed] helplessness" at the need to find safe quarantine space.  Pltfs.' Mot. at 23:9.  Nothing could be further from the truth. Defendants have gone to extensive lengths to identify safe housing, and indeed, 77% of CDCR's quarantined population is housed alone or with only one other cellmate in a cell with solid doors.  Decl. Spaulding, Ex. B.  Defendants have also converted unused or

-43-                          Case No. 01-1351 JST

JOINT BRIEF ON QUARANTINE

alternative space like gyms and factories, transferred incarcerated persons as appropriate to increase social distancing, installed climate-controlled tents, and, when necessary, housed incarcerated persons in cohorts.  Decl. Gipson ¶¶ 4, 15, 23.  These efforts are consistent with CDC guidance, which instructs correctional facilities to "use the next best alternative as a harm reduction approach."  (CDC Interim Guidance.)

Moreover, Defendants are entitled to deference here, where Defendants have acted reasonably and consistent with public health guidance.  Neither this Court nor Plaintiffs may substitute their judgment for that of state experts and officials.  *Farmer*, 511 U.S. at 844; *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 30 (1905) ("It is no part of the function of a court or jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease").  Courts lack "judicial power to second-guess the state's policy choices in crafting emergency public health measures."  *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020), *citing Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 27-28 (1905).  Plaintiffs ignore the realities of this legal maxim and its impact on their position here.  But because Plaintiffs may not substitute their judgment for that of prison administrators and State officials, and because the law does not require Defendants to adopt the superlative means to address the risk of harm at issue, Plaintiffs' motion must be denied consistent with long established Eighth Amendment jurisprudence.  *Farmer*, 511 U.S. at 844.

### C.  Plaintiffs' Claim that Reserved Quarantine Space Is Not Being Appropriately Used Is Incomplete and Premature.

Plaintiffs allege that reserved quarantine space is not being appropriately used by some institutions.  But the data recently produced by the Receiver suggests that the reserved space is used much of the time during outbreaks.  Decl. Spaulding Ex. B.  To the extent there are instances where this space is not being properly used for quarantine, the parties should work together with the Receiver, who has now issued new guidance on quarantine housing, to determine whether correct decisions are being made on the use of reserved quarantine space.

JOINT BRIEF ON QUARANTINE

The management of outbreaks in prison settings is extremely complex, and there may be practical reasons why officials at outbreak institutions have decided to quarantine incarcerated persons in cohorts despite available reserved quarantine space.  Decl. Gipson ¶ 20.  Those reasons are likely not readily apparent to those who are not on the ground at that facility during the outbreak.  *Id.*  On the other hand, it is possible that different decisions could have been made in some circumstances.  *Id.*  Regardless, and in light of the additional space Defendants have recently identified, Defendants intend to ensure that all available single and double cells with solid doors are utilized first, and that cohorting in groups of three or more persons occur as a secondary option.  Decl. Gipson, ¶ 20.  Defendants are aware, however, that Plaintiffs have submitted an inquiry to the Receiver about quarantines at a number of prisons related to this issue, and the results of that inquiry, once obtained, should help determine to what extent there is a problem that needs to be addressed.  This issue clearly warrants further investigation and Defendants welcome the opportunity to work with the Receiver and Plaintiffs in that regard.  But it is premature for Plaintiffs to seek relief for an issue that has not been fully investigated or validated.

D.     **Plaintiffs' Claim that Reserved Quarantine Space Has Been Improperly Used for Precautionary Quarantines is Premature and Unsubstantiated.**

Plaintiffs' motion complains that reserved isolation and quarantine space is sometimes improperly used for precautionary quarantines associated with inmate transfers.  Defendants have not yet fully investigated whether or to what extent this is happening, but even if the claim were true, it would not cause much of an impact on availability of quarantine space during outbreaks, and would not amount to a constitutional violation.

When there is an outbreak of three or more patients at a prison, that prison closes to transfers, with the possible exception of intake from reception centers.  Decl. Gipson ¶ 19.  This means that most transfers to or from that prison cease once there are three positive cases of COVID-19.  *Id.*  This likely greatly reduces the need for precautionary quarantine space at institutions experiencing outbreaks.  *Id.*  Furthermore, as discussed above, most prisons have already reserved more quarantine and isolation space than the public-health

-45-                          Case No. 01-1351 JST

JOINT BRIEF ON QUARANTINE

1   workgroup recommended, and many prisons have abundant additional space beyond the

2   reserved space.  *Id.* ¶¶ 15-17, Ex. E.

3          Additionally, anticipated modifications to the precautionary quarantine protocols

4   that are reflected in the new draft Movement Matrix should further mitigate any issue in

5   this area, if one exists, because there will be fewer precautionary quarantines taking place.

6   Decl. Gipson, ¶ 19, Ex. B.  Regardless, because this issue has only recently been raised by

7   Plaintiffs, Defendants have not yet had the opportunity to coordinate with the Receiver and

8   investigate this issue to determine whether the limited transfers that can occur at a closed

9   prison have impacted the ability to quarantine exposed inmates in reserved areas.  As such,

10  Plaintiffs' motion on this subject is premature.

11  **II.     Plaintiffs' Requested Relief Does Not Meet the Prison Litigation Reform Act's
            Needs-Narrowness-Intrusiveness High Standard.**

12

13         To be entitled to the injunctive relief Plaintiffs seek here, in addition to proving

14  deliberate indifference, they must also comply with the Prison Litigation Reform Act

15  (PLRA).  18 U.S.C. § 3626(a)(1)(A).  The PLRA mandates that courts may not "grant or

16  approve any prospective relief unless the court finds that such relief is narrowly drawn,

17  extends no further than necessary to correct the violation of the Federal right, and is the

18  least intrusive means necessary to correct the violation of the Federal right."  *Id.*

19  Plaintiffs' requested relief—in the form of an order requiring Defendants to "use only

20  solid-door cells to quarantine people for known exposure to the virus in all prisons except

21  the five noted below"—fails to comply with this strict standard and, instead, extends far

22  broader than necessary to address the narrow risk of harm Plaintiffs allege.  Pltfs.' Prop.

23  Order, ¶ 1.

24         Plaintiffs contend that incarcerated persons who have been exposed to a COVID-19

25  positive individual must only be quarantined alone or with one other cellmate in a cell with

26  a solid door.  Plaintiffs assert that Defendants' inability to do so in all instances of

27  exposure equates to a Constitutional violation.  However, Plaintiffs ignore that 77% of all

28  incarcerated persons currently undergoing quarantine are indeed housed in single or double

                                                    -46-                    Case No. 01-1351 JST

JOINT BRIEF ON QUARANTINE

1   cells with solid doors.  Decl. Spaulding Ex. B.  Similarly, Plaintiffs ignore that at least 12

2   institutions currently have *zero* incarcerated persons who are quarantined with more than

3   one other person.  *Id.*  Indeed, the Public Health Workgroup noted that "it appears that

4   nearly all institutions already had reserved or vacated enough suitable bed space for

5   isolation and quarantine."  Decl. Gipson Ex. D at 2.  Thus, the relief Plaintiffs seek here is

6   inapplicable to these institutions, which may not be subjected to prospective relief under

7   the PLRA given these factual realities.

8       Even for those institutions that do utilize shared airspace for quarantine, not all

9   institutions are alike.  Institutions that lack single cells with solid doors, like California

10  Rehabilitation Center, have implemented additional measures to control outbreaks and

11  prevent the loss of life from COVID-19.  Decl. Gipson ¶ 23.  But Plaintiffs do not

12  comment on the effectiveness of these measures, including whether the use of similar

13  measures at other institutions is an acceptable alternative.  Plaintiffs' one-size-fits-all

14  approach to require all institutions to adopt the same form of relief thus runs afoul of the

15  PLRA, which instead calls for a more narrowly tailored approach.  18 U.S.C. §

16  3626(a)(1)(A).

17      Additionally, Plaintiffs fail to specify the relief they propose for those institutions

18  that lack sufficient single cells with solid doors.  For instance, San Quentin State Prison

19  and Folsom State Prison lack an adequate number of single cells with solid doors.  For

20  these institutions and others that are similarly situated, Plaintiffs ask this Court to require

21  Defendants to "place [people in need of quarantine] in cells with solid doors or use another

22  alternative that will provide equivalent safety."  Pltfs.' Prop. Order, ¶ 5.  Plaintiffs do not

23  specify what such an alternative would consist of.  Elsewhere, in Plaintiffs' Motion,

24  Plaintiffs further elucidate their request as it relates to these institutions lacking in

25  sufficient (or any) single cells with solid doors: order population reductions.  Pltfs.' Mot. at

26  27:3-5 ("A significantly reduced population density at all the prisons, but particularly those

27  with few to no cells, would make the work of quarantining exposed cases far easier.").  But

28  as Plaintiffs are aware, this Court lacks jurisdiction to order CDCR to reduce its

-47-                        Case No. 01-1351 JST

JOINT BRIEF ON QUARANTINE

population; even the targeted reduction envisioned by Plaintiffs may only be considered by a three-judge court.  18 U.S.C. § 3626(a)(3)(B).  And to the extent Plaintiffs seek to place limits on the number of incarcerated persons who may be housed at those institutions, that too would violate the PLRA's requirement that a prisoner release order only be considered by a three-judge court.  *Id.* at §(g)(4) ("the term 'prisoner release order' includes any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison").

Because Plaintiffs' relief sought does not square with CDCR's current reality, which is that each institution requires a different approach to setting aside and utilizing quarantine and isolation space, they are not entitled to such relief under the PLRA.

### III.    Plaintiffs' Motion is Premature.

On December 4, 2020, the Receiver issued new recommendations concerning housing options for patients under quarantine.  Gille Dec. ¶ 21.  Defendants are in the process of evaluating this new recommendation and have not yet had the opportunity to discuss it either with the Receiver or Plaintiffs' counsel, or determine the extent to which this guidance will impact Plaintiffs' instant motion, or Defendants' current practices.  *Id.*

Also on December 4, 2020, Defendants produced to Plaintiffs a chart setting forth the spaces that have been reserved under the Court's July 2020 order for quarantine and isolation and further describes substantial additional space at many prisons that is currently available and could potentially be used for quarantine or isolation if needed.  Gille Dec. ¶ 3; Decl. Gipson Ex. E.  The parties have not yet discussed this information, including the extent to which this additional space impacts Plaintiffs' motion.  *Id.*

After the close of business on December 7, 2020, and after Defendants had provided Plaintiffs with their draft opposition and supporting declarations earlier that day, Plaintiffs informed Defendants that they were modifying their position, and now believe double celling for purposes of quarantine is reasonable.  Gille Dec. ¶ 5.  Defendants then had to wait until 4:30 p.m. on December 8 to receive Plaintiffs' revised briefing, which

JOINT BRIEF ON QUARANTINE

1    included eight additional pages of argument from the version initially sent.  *Id.* ¶ 6.  In the

2    span of one week, Plaintiffs' motion morphed from a "very straightforward, simple

3    argument" requiring "about ten pages," to a 23-page brief that has shifted the relief sought

4    at least twice.  ECF No. 3495-2 at 2; Gille Dec. ¶ 5.

5        In light of the rapidly evolving nature of Plaintiffs' position with respect to

6    quarantine, as well as Defendants' and CCHCS's response to the pandemic, including the

7    new information produced by the Receiver and Defendants last week, Plaintiffs' motion is

8    premature.  If any order issues in response to this motion, it should direct the parties to

9    further meet and confer about the subjects raised in Plaintiffs motion to determine whether

10   the parties can informally resolve Plaintiffs' concerns.

11                              **CONCLUSION**

12       Since the onset of the pandemic, CDCR and its partners at CCHCS have worked

13   tirelessly to mitigate the risks associated with COVID-19 and to protect the incarcerated

14   and the staff who work in the system.  Approaches have evolved as more is learned about

15   this dreaded disease and public health guidance has changed.  CDCR has strived to comply

16   with evolving CDC guidelines.  CDCR and CCHCS have also capitalized on lessons

17   learned as they react in real time to this crisis.  Plaintiffs' motion and the relief they request

18   ignores these facts, CDC's Interim Guidance, the law, and the realities of correctional

19   systems.  Plaintiffs' motion must fail because it is abundantly clear that CDCR has not

20   been deliberately indifferent to this public health emergency generally and quarantine

21   specifically, and the Court cannot grant the unprecedented and broad relief Plaintiffs seek.

22

23

24

25

26

27

28

JOINT BRIEF ON QUARANTINE

1   DATED:  December 9, 2020          HANSON BRIDGETT LLP

2

3
                                      By:  */s/ Samantha Wolff*
4                                          PAUL B. MELLO
5                                          SAMANTHA D. WOLFF
                                           Attorneys for Defendants
6

7   DATED:  December 9, 2020          XAVIER BECERRA
                                      Attorney General of California
8

9

10                                    By:  */s/ Damon McClain*
                                           DAMON MCCLAIN
11                                         Supervising Deputy Attorney General
                                           RYAN GILLE
12                                         IRAM HASAN
                                           Deputy Attorneys General
13                                         Attorneys for Defendants

14

15

16  DATED:  December 9, 2020          PRISON LAW OFFICE

17

18
                                      By:  */s/ Sara Norman*
19                                         DONALD SPECTER
20                                         STEVEN FAMA
                                           ALISON HARDY
21                                         SARA NORMAN
                                           SOPHIE HART
22                                         Attorneys for Plaintiffs

23

24

25

26

27

28

17118624.1   JOINT BRIEF ON QUARANTINE