XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN - 209508
Supervising Deputy Attorney General
RYAN GILLE - 262105
IRAM HASAN - 320802
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
LAUREL O'CONNOR - 305478
DAVID CASARRUBIAS - 321994
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER - 83925
STEVEN FAMA - 99641
ALISON HARDY - 135966
SARA NORMAN - 189536
RANA ANABTAWI - 267073
SOPHIE HART - 321663
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

MARCIANO PLATA, et al.,

    Plaintiffs,

      v.

GAVIN NEWSOM, et al.,

    Defendants.

CASE NO. 01-1351 JST

**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**

Judge:  Hon. Jon S. Tigar
Date:   December 23, 2020
Time:  10:00 a.m.
Crtrm.: 6, 2nd Floor

17144259.2

The parties submit the following joint statement in advance of the December 23, 2020 Case Management Conference.

*Plaintiffs' Preliminary Statement*: Given the gravity of the current state of the pandemic in CDCR prisons, we believe it necessary to set forth certain key facts in this Statement.  There are currently a heretofore unprecedented number of COVID-19 cases in the prisons, including in particular among incarcerated people.  Approximately 10,300 are infected, more than three times as many as the previous peak in late July.  There are substantial or massive outbreaks at more than two dozen prisons including, sadly, a number that house large numbers of medically vulnerable people.  The latter include the California Health Care Facility, California Medical Facility, Mule Creek State Prison, Richard J. Donovan State Prison, and California State Prison Los Angeles County, five of the six CDCR prisons that house the largest numbers of medically vulnerable patients, and which collectively house nearly 10,000 with risk factors making them especially susceptible to severe complications if diagnosed with COVID-19.  The number of COVID-related incarcerated people deaths now exceeds 100, and the total hospitalized since March now approaches 1,000, with the highest number ever – more than 100 as of late last week – currently hospitalized.

More hopefully, most of the prisons ravaged by the virus earlier this year, including California Institution for Men, San Quentin, Chuckawalla Valley State Prison, and Avenal State Prison, have not experienced new waves of infections of the same magnitude. However, it is not known how long the immunity apparently conferred by those previous disasters will last.  Also, and most hopefully of all, vaccinations against COVID-19 have started for some incarcerated people and staff (see Part IX, below).  The Governor must exercise strong leadership to get the vaccine to all in the prisons urgently.

*Defendants' Preliminary Statement:* Just as the State and this Country are in the grips of another severe COVID-19 outbreak, so too is CDCR.  Despite the myriad protective measures put in place by CDCR and CCHCS, CDCR is not immune to the spread of the virus.  CDCR continues to tighten restrictions and movement in an effort to

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17144259.2

slow the spread of the virus, including closing all institutions to intake from county jails since November 26 and placing all institutions on modified program through December 30, which limits the movement of staff and incarcerated persons within and between institutions.  And critically, California has prioritized CDCR's healthcare workers, staff and residents at skilled-nursing facilities (including those within CDCR institutions), and correctional staff at certain facilities who regularly work with patients for receipt of the COVID-19 vaccine.  Vaccinations are being administered as of the date of this filing (December 22, 2020).

# I.    POPULATION REDUCTION

*Plaintiffs' Position:*  Further urgent population reductions are necessary to minimize the risk of and harm from COVID-19.  Defendants have acknowledged that reduced population contributes to fewer infections and deaths (*see* ECF No. 3469 at 3-4), and earlier this month Secretary Allison reaffirmed that CDCR prisons' "large population and physical layout make us particularly susceptible to the spread of COVID-19."[1]  With more than 10,000 infected, significant outbreaks at two dozen prisons, and the timing and other information about vaccinations still uncertain (see Part IX, below), there is an urgent need to reduce crowding.  We call on the Governor and CDCR to do so.

The prison and camp population continues at around 93,000.[2]  We appreciate that this total is approximately 24,000 fewer than in mid-March,[3] when the first incarcerated person in CDCR was diagnosed with COVID-19.  We further recognize that

---

[1]     *See* "Important COVID-19 message from Secretary Allison," Dec. 4, 2020, available at https://www.cdcr.ca.gov/insidecdcr/2020/12/04/important-covid-19-message-from-secretary-allison (last accessed Dec. 21, 2020).
[2]     *See* CDCR Weekly Report of Population, Dec. 16, 2020, at Part A.I.1 (Institution/Camps), available at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/12/Tpop1d201216.pdf  (last accessed Dec. 21, 2020).
[3]     *See and compare* CDCR Weekly Report of Population, March 18, 2020, at Part AI.1 (Institution/Camp), available at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/03/Tpop1d200318.pdf (last accessed Dec. 21,2020).

17144259.2

approximately 10,500 of that reduction has resulted from early releases, including the program begun in July, which still continues, for some within 180 days of release.[4]  The remainder of the reduction has resulted from natural releases and the suspending of or great limitations on intake from the county jails, where we understand more than 8,000 are incarcerated and currently awaiting transfer to CDCR.

But as the number and size of outbreaks continue to grow, it is clear that more must be done.  CDCR appears to have recognized this earlier this month when it said it would conduct individual reviews of certain medically vulnerable incarcerated people who they might release, presumably under the Secretary's emergency authority, or refer back to a superior court for resentencing, stating that they would begin with the most medically vulnerable among the eligible.  *See* ECF No. 3501 at 5:7-21.  Defendants below state that as of December 18 there were 1,690 people who met the criteria for review under this recently announced program, and that the Secretary had reviewed 181 people, approved four for release, and referred 75 to the courts for resentencing consideration.  We appreciate this program, and the Secretary should make completing the reviews a top priority.  However, it appears that urgent releases will be approved only for a very few, that others will be released, if at all, only after adversarial court proceedings that may or are likely to take substantial time, and, most important, the total number ultimately released will be a fraction of the number eligible.[5]

Defendants below also repeat the information stated in the previous Case Management Statement (*see* ECF No. 3501 at 5:22-25 and 6:6:1-4) that the Secretary reviewed 24 people who were serving determinate terms after having been granted parole

---

[4]      This 180 day release program has resulted in about 400 early releases per month, per data provided by CDCR; however, information provided by Defendants below, that since December 2, 140 people have been released per this program, suggests this number may be diminishing.

[5]      The early release program focused on the medically vulnerable that CDCR announced in July ultimately resulted in the release of only approximately 50 out of nearly 6,600 eligible persons.  *See* ECF No. 3477 at 2:4-7.

on indeterminate terms, and approved 19 for release.  They add that she is also reviewing 22 other indeterminately sentenced people who have been granted parole but have not reached their release date.  These reviews are appreciated but will not result in significant population reduction.

On December 18, Secretary Allison indicated to the *Coleman* court during a status conference that she would in the near future implement changes to CDCR's credit earning rules that will result in certain sub-groups of the incarcerated receiving additional time credits as they serve their terms.  We welcome such changes but unless implemented immediately and applied fully retroactively, such would result only in incremental advances to release dates, with any substantial reduction to the current population only happening well in the future.  Again, reduction in population is necessary now.

We believe the Governor should grant additional medical reprieves of sentences, including of those indeterminately sentenced, of the kind done for a handful of people last month.  *See* ECF No. 3487 at 2:4-14.  The Secretary should also re-start the program for early release for some with a year or less to serve that was done between July and September at a sub-set of prisons, except it should now apply to all given the pervasive outbreaks which put all incarcerated at risk.  Further, the Secretary should grant incarcerated people "Positive Programming Credits" (PPCs) as CDCR did in early July, approximately four months after the pandemic began, when it rightfully recognized that because of program restrictions imposed to limit the virus' spread people were unable to earn sentence-reducing time credits as they previously could.  Granting additional PPC now would be fair, and result in relatively quick population reduction.  The Governor and Secretary must take all these and other actions now, to further reduce crowding so as to reduce the spread of the virus, and thus sickness and death, in the prisons.

*Defendants' Position:* CDCR's population has decreased by 24,330, or over 20

17144259.2

percent, since the start of the COVID-19 public health crisis.[6]  Between July 1 and December 16, 2020, 6,982 people were released from institutions and camps through the COVID-19 early-release programs Defendants announced on July 10.[7]  This represents 140 more early releases than those reported in the December 2 case management statement.[8]  An additional 11,249 were released in accordance with their natural release dates during this period.  As of December 16, CDCR's institutions have a population of 91,458.[9]

In addition to CDCR's COVID-19 early release programs and mitigation measures described in sections below, the Secretary is releasing medically high-risk people early on a discretionary basis.  The Secretary is considering those with COVID-19 weighted risk scores of three or more, and who have either served the base term of their sentence or are within one year of release.  The Secretary is first considering determinately-sentenced people who have the highest risk for morbidity or mortality should they contract COVID-19—those with COVID-19 weighted risk scores of six or more—and who are not required to register as a sex offender under Penal Code section 290.  Among these people, those who pose a low risk for violent recidivism will either be approved for release per the Secretary's discretionary authority, or referred to the courts for expedited consideration for resentencing under Penal Code section 1170, subdivision (d)(1), depending on how much time remains on their sentence(s)—this is evaluated on a case-by-case basis.  Those being considered include people who have served their base term, but whose sentence(s) carry

---

[6]     This figure is calculated by taking the difference between the total population in institutions and camps on February 26, 2020 and December 16, 2020.  Weekly population reports can be found at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2/.

[7]     *See* ECF No. 3389 at 2:4-5:4 and https://www.cdcr.ca.gov/covid19/expedited-releases/ for details regarding CDCR's COVID-19 early-release program announced on July 10, 2020.

[8]     *See* ECF No. 3501 at 4:14-16.

[9]     *See* December 16, 2020 population report at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/12/Tpop1d201216.pdf.

enhancements that were previously mandatory, and are now at a judge's discretion after the passage of Senate Bill 1393, which became effective on January 1, 2018.   As of December 18, 2020, there are 1,690 people who meet the criteria for review.  The Secretary has reviewed 181 people, approved 4 for release, and referred 75 to the courts for consideration under section 1170(d)(1).

The Secretary also considered indeterminately sentenced people who were granted parole for their commitment offense(s), but remained in prison serving separate terms for offense(s) committed while in prison.  CDCR identified 24 incarcerated people in this category.  The Secretary reviewed all 24 and approved 19 of these people for early release, and they have all been released.

In addition, the Secretary is individually reviewing indeterminately sentenced people who have been granted parole but remain in prison because they have not yet reached their minimum eligible parole date or youth offender parole date.  She has approved 4 for release and is continuing to review the remaining 22 individuals in this group.

CDCR continues to process early releases on a rolling basis through the 180-day early-release program announced on July 10, which has accounted for the vast majority of early releases since then.

II.    **INTAKE**

*Plaintiffs' Position:*  Particularly in light of the significant increase of COVID-19 in the community, we support the decision to suspend intake.

*Defendants' Position:* Intake into CDCR from county jails was paused effective November 26, 2020, in accordance with public health guidance, due to the rise in the number of COVID-19 cases in the community.  CDCR continues to evaluate whether and when it will be safe to reopen to intake from county jails.  However, because of the current status of the pandemic, intake will remain closed through at least January 3, 2021.

III.    **QUARANTINE AND ISOLATION**

*Plaintiffs' Position:*  The parties filed a joint brief regarding the adequacy of the set-

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17144259.2

aside spaces on December 9; a hearing is scheduled for December 23.  On December 18, the Receiver issued an addendum to his December 4 Statement on Quarantine.  *See* ECF No. 3503 at 8-9.  The addendum provides: "At institutions experiencing a massive outbreak (defined as an outbreak where the number of COVID positive patients exceeds 200 or the number of patients who should be quarantined exceeds the total number of beds set aside at that institution for quarantine), decisions about post-exposure quarantine practices and housing shall be committed to the discretion of the warden and CEO or their designees at the institution in consultation with CDCR and CCHCS regional and headquarters staff."  The parties met with the Receiver on December 22 to discuss the parties' dispute and the Receiver's December 18 addendum.

*Defendants' Position:* CDCR has set aside large amounts of previously identified isolation and quarantine space at the prisons.  CDCR has continued to work with Plaintiffs, the Receiver, the *Coleman* Special Master, and the *Armstrong* Court Expert to ensure that appropriate isolation and quarantine space is reserved for class members of all three class actions and to modify reserved spaces and plans for quarantine and isolation as needed across the system.

The parties have met and conferred about Plaintiffs' motion regarding quarantine and isolation space.  As of December 7, 2020, Plaintiffs' position was that double celling (in solid-door cells) is reasonable for post-exposure quarantine, in contrast to their original position that quarantine following an exposure in anything short of a single cell with a solid door violates the Eighth Amendment.  The motion is scheduled to be heard concurrently with this case management conference.

On December 3, 2020, the Receiver sent the parties a table that describes the places where currently quarantined patients are being housed, and, on December 4, the Receiver issued new guidance regarding housing options for patients being quarantined.  Also on December 4, Defendants provided Plaintiffs with a document identifying space at each institution in addition to the space already set aside for quarantine and isolation.  Since then, CDCR has been meeting with the Receiver's Office to discuss how to operationalize

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17144259.2

the new guidance.

On December 18, 2020, the Receiver's Office issued an addendum to its December 4 statement ("December 18 Addendum"). The December 18 Addendum observed that "it has become apparent during our daily management calls with institutions that the attempts to comply with [the Receiver's] December 4 quarantine statement at institutions now experiencing widespread outbreaks may be causing more harm than good." Further, the December 18 Addendum explained that transfers to comply with post-exposure quarantine protocol creates a "'churning' of patients that may contribute to the spread of COVID-19 throughout the institution which is contrary to the very purposes for quarantining." The December 18 Addendum therefore commits decisions about post-exposure quarantine practices and housing to the discretion of the wardens and CEOs or their designees, in consultation with CDCR and CCHCS regional and headquarters staff, at institutions experiencing massive outbreaks. The Receiver defines "massive outbreaks" as those where the number of COVID-19-positive patients exceeds 200, or the number of patients who should be quarantined exceeds the total number of beds set aside for quarantine. CDCR will continue to work closely with the Receiver's Office to implement quarantine and isolation procedures in accordance with public health guidelines.

Defendants' counsel reached out to Plaintiffs' counsel on December 19 to inquire the extent to which the Receiver's December 18 Addendum impacted their position with respect to quarantine, if at all, and whether it was premature to have this matter heard by this Court while the issue remains in flux. The Receiver and the parties met and conferred on December 22, 2020 regarding the Receiver's most-recent guidance on quarantine and isolation. During the discussion, the Receiver explained that the impetus for his updated guidance came from Drs. Bertozzi and Williams following a recent onsite inspection at the Substance Abuse Treatment Facility, and their concern that transfers to quarantine and isolation space were possibly contributing to the further spread of the virus. Moreover, the Receiver explained that incarcerated persons are refusing to move in increasing numbers. The Receiver also indicated that his guidance is still in the process of being developed; for

instance, with respect to the steps institutions must take once they fall below the 200-COVID-positive-patient threshold following an outbreak. At the conclusion of the discussion, Defendants asked Plaintiffs if they intended to proceed with their motion, or if they would agree to take it off calendar while the guidance is further developed and in light of CDCR's continued willingness to work collaboratively with the Receiver. Plaintiffs indicated they would not withdraw their motion. Finally, during that call, Plaintiffs raised a new request that CDCR reserve congregate housing at each prison specifically for isolation.

Defendants continue to believe that Plaintiffs' motion is premature and fails to satisfy requisite legal standards.

## IV. SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE

*Plaintiffs' Position:* As reported in prior Joint Case Management Conference Statements, the Receiver, CCHCS, and CDCR previously agreed to offer – then decided to mandate – transfers from common air-space housing to solid-door cell housing for the people most medically vulnerable to COVID-19 complications. However, the situation in the prisons has changed radically since the Receiver issued his October 21 report recommending that those most medically vulnerable to COVID-19 complications be offered moves to closed-front celled housing. On October 21, there were, according to the CDCR COVID-19 Tracker, fewer than 500 people with the active infections in the system. Today, there are more than 10,000, and more than half of the 35 prisons are experiencing massive outbreaks, while the prisons from which transfers were to be made initially are not. These circumstances raise obvious concerns about moving people between prisons at the present time.

On December 11, we asked if the locations and extent (or lack thereof) of outbreaks had been considered in the then-current transfer plan, and whether those circumstances were a possible reason to pause the plan. Early last week, about two dozen people were transferred from San Quentin pursuant to the plan. On December 17, CDCR informed us the plan has been suspended indefinitely. We believe this was a prudent decision.

*Defendants' Position*:  CDCR has been working closely with CCHCS to provide safer housing to medically-high risk individuals in certain prisons by relocating those individuals from open dorm or open cell settings to housing with solid doors.  To that end, on December 14, 2020, 26 individuals were moved from San Quentin State Prison (San Quentin) to California State Prison, Corcoran (Corcoran).  Those who have not been infected with COVID-19 before were prioritized for these moves.  Those individuals who were moved had a COVID risk score of six or greater, and also tested negative for COVID-19 twice before transfer.  All individuals were also screened for symptoms the day of the transfer.  These individuals are subject to quarantine at Corcoran for fourteen days and will again be tested before they are released from quarantine.

Although CDCR had planned to move all individuals housed at San Quentin with a COVID-19 risk score of three or greater by January 29, 2021, given the current surge in COVID-19 cases, these transfers will be temporarily suspended.  CDCR determined in consultation with CCHCS that it is safer to suspend these transfers until the current outbreak is contained.  Defendants understand from Plaintiffs that they are supportive of this decision.

## V.    TESTING AND TRANSFER PROTOCOLS

*Plaintiffs' Position:*  Transfers between prisons continue, although in greatly reduced numbers in recent weeks, presumably due to substantial COVID-19 outbreaks statewide.  Testing and quarantining of those transferred, to reduce the risk of COVID-19 transmission, mostly remain governed by CCHCS's August 19 "Movement Matrix," although CCHCS appears to have stopped pre-transfer quarantine for some.  CCHCS in late November circulated a draft revised Movement Matrix, which we and others provided comments on during the second week of December.  On December 18, CCHCS said its review is on-going.

*Defendants' Position:*  On November 25, 2020, the Receiver issued a draft revised version of the CDCR/CCHCS COVID-19 Screening and Testing Matrix for Patient Movement, and requested comments by December 7.  The revised Matrix includes several

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  significant updates to the August 19 version, including an increase in the number of people

2  that can share the same airspace for precautionary transfer quarantine.  The Receiver's

3  Office met and conferred with the parties in the *Plata* and *Coleman* class actions regarding

4  their comments to the Matrix on December 9.  The Receiver's Office indicated that the

5  comments would be addressed and a revised version of the Matrix would be distributed.

6  CDCR will continue working closely with the Receiver's Office to implement the

7  protocols set forth in the revised Matrix.

8  Since the current iteration of the movement matrix went into effect on August 21,

9  2020, DAI, CCHCS, and leadership teams at all institutions have held meetings,

10  conference calls, and training sessions to help staff understand and implement the matrix.

11  As directed by the matrix, movement is limited and controlled, and must be pre-approved

12  by CDCR headquarters, which works in collaboration with CCHCS (including Ms. Foss

13  and Dr. Bick).  Additionally, there is continued enforcement of the safety protocols

14  requiring all county staff and incarcerated people arriving at CDCR on intake buses to

15  wear N95 masks during transport.

16  Further, CDCR and CCHCS continue to utilize measures to track patient

17  information for transfers.  Staff at each prison have procedures and processes in place to

18  follow the requirements of the matrix.  On October 6, 2020, CCHCS implemented an

19  online registry to track all transfer information for incarcerated persons.  The registry

20  allows staff to review and update medical and other important data before, during, and

21  after transfers.  Finally, the prisons continue to offer comprehensive COVID-19 testing for

22  incarcerated people, and the specific protocols for each prison are outlined for Plaintiffs

23  during routine calls with CCHCS staff.

24  **VI.   STAFF SCREENING AND TESTING**

25  *Plaintiffs' Position:*  Staff testing continues under CCHCS's October 30 "Employee

26  Testing Guidance," which revised earlier guidance in place when CCHCS took over the

27  staff testing program in late August.  Unfortunately, Plaintiffs still have not received

28  employee testing data, although we have been requesting this data since early September.

17144259.2
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

We have been told CCHCS is creating reports, but they are not yet available.  Without these reports, we are unable to monitor compliance with the Testing Guidance.

As reported in the last Joint Case Management Conference Statement, we previously asked CDCR and CCHCS a series of questions regarding 52 staff members at SATF who apparently refused to be tested for COVID-19.  We have since been told that these staff members had returned from time off and failed to test the week they returned to work.  CCHCS reports that all have since been tested.  We do not know how many of this group, if any, tested positive.

At the last Case Management Conference, the Court asked the parties to provide more information about what happens, and what should happen, when a staff person refuses to be tested for COVID-19.  CDCR's previous policy, contained in a July 31, 2020 memo, outlines a progressive discipline process for refusals to test.  First, a Letter of Instruction (LOI) is issued.  Then, if the employee still refuses to be tested, fails to be tested by the specified due date on the LOI, or fails to provide substantiation that they have attempted to schedule a test but were unable to do so within the identified timeframe, further disciplinary action is initiated.

However, in response to our query, on December 17, CCHCS explained that CCHCS/CDCR was in the process of drafting a new policy, and provided a draft memorandum.  On December 22, Defendants provided a copy of the finalized memorandum.  The memorandum states that employees who refuse to comply with mandatory testing will immediately be sent home, without pay, until they comply with testing.  They will also be issued an LOI, and continued refusals will be addressed with progressive discipline.  We support this change in policy.

In response to our request for data regarding staff testing refusals, CCHCS and CDCR on December 17 produced reports of all corrective action taken between July 14 and December 16 regarding employees' failures to test.  From these reports, it appears a

17144259.2

significant number of LOIs have been issued to staff for failing to test at some prisons.[10] The vast majority were issued to custody staff. For custody staff, only the total number of actions taken was reported. It is difficult to determine the scope of this problem without more information (*e.g.*, how many were for repeat failures to test, and when the failures to test occurred). CCHCS and CDCR have now agreed to provide Plaintiffs with biweekly reports of staff refusals to test and corrective action taken, as is currently done for noncompliance with face covering and physical distancing policies. To adequately monitor this issue, we believe we will also need to receive staff testing data for each prison, including the percentages of staff tested when such is required. As described above, we have been requesting this data for almost four months, but have not received it.

*Defendants' Position:* CDCR coordinated with the Receiver's Office to prepare a Memorandum on Employee Accountability for COVID-19 testing. *See* **Exhibit A**. The Memorandum dictates that any employee who refuses to comply with mandatory COVID-19 testing shall not be permitted to enter the institution or facility and shall be placed on approved dock (without pay) until they comply with mandatory testing. Unwillingness to comply with mandatory staff testing shall be interpreted as a refusal. Concurrently, employees who refuse to comply with mandatory employee COVID-19 testing and who are not actively engaged in a request for reasonable or religious accommodation shall also be subject to progressive discipline for their refusal to submit to the mandatory testing.[11]

On December 17, 2020, the Receiver's Office responded to Plaintiffs' inquiry

---

[10]     In all, more than 1,000 LOIs were issued; significant numbers were reported at California Health Care Facility (263), Central California Women's Facility (130), California Correctional Institution (79), California State Prison, Corcoran (68), Correctional Training Facility (73), High Desert State Prison (56), Mule Creek State Prison (69), Pelican Bay State Prison (60), and California State Prison, Sacramento (51).

[11]     At the last Case Management Conference, this Court asked Defendants what options are available to respond to staff members who refuse to test and whether any labor agreements impede CDCR's response. As is made clear in the Memorandum on Employee Accountability for COVID-19 testing, suspension without pay is the action that will be taken in response to an employee who refuses testing. No labor agreements prohibit this response.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17144259.2

regarding an initial report of apparent staff testing refusals at the Substance Abuse Treatment Facility (SATF).  *See* ECF No. 3501 at 16:21-18:6.  After review, the Receiver's Office determined that SATF and California State Prison, Corcoran had issued letters of instruction to staff who returned from time off and did not test the week they returned to work.  There were no actual refusals to test; rather, the letters of instruction were intended to be "reminders" to staff to test during the next available testing cycle.  The Receiver's Office further reported that all staff have been tested and continue to be tested weekly unless they have had a positive test in the last 90 days.

## VII.   STAFF COMPLIANCE WITH FACE COVERING AND PHYSICAL DISTANCING REQUIREMENTS

*Plaintiffs' Position:*  On December 18, Defendants produced to Plaintiffs the second set of biweekly reports of staff noncompliance with face covering and physical distancing requirements, as directed by the Court.  *See* ECF No. 3492.  As with the previous set of reports, CDCR and CCHCS produced separate logs, for custody and healthcare staff.  The logs were missing some information required by the Court's order; for example, some prisons did not indicate whether the violations were "repeat offenses," and several did not indicate where the violations occurred.  The report provided by CDCR for custody staff was also difficult to interpret, as it appeared to contain conflicting information.  For example, a table apparently summarizing noncompliance at each prison reported 32 "non-compliant staff current week" at Avenal State Prison, but the log provided for Avenal included only 8 entries.  Similarly, the table reported 69 staff members non-compliant for the current week at North Kern State Prison, but only 10 incidents were included in the log.  We have requested clarification from CDCR and CCHCS.  Nevertheless, it is apparent from these logs that noncompliance continues, including 140 incidents among medical staff between December 3 and December 15.

Based on reports we receive from those incarcerated in CDCR, this appears to be only a subset of actual violations.  On December 2, we forwarded a log kept by a San Quentin resident detailing 20 instances of staff not wearing face-coverings at the prison,

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17144259.2

asking that action be taken against the staff identified therein.  On December 11, CDCR counsel replied, including a letter from the San Quentin Warden stating that the allegations will be investigated via the prison's "inquiry process and that any discrepancies identified will be addressed via . . . progressive discipline . . . ."   The letter also stated, "CDCR does not provide citizens with information relative to the outcome of any inquiry regarding staff members."  This statement is concerning because it is incorrect,[12] and because we believe transparency is necessary here, given the risks that result from non-compliance with face-covering mandates.

On December 18, we forwarded to CDCR a log compiled by a California State Prison – Los Angeles County (LAC) resident between early November and early December.  The compiler notes "a general uptick" in compliance with face-covering requirements by November 21, and identifies numerous staff who comply with the mandates, but also identifies many who still do not, including repeated instances of staff refusing to provide a food tray to him when reminded of the face covering requirement.

As discussed in prior Case Management Conferences, the Office of the Inspector General will conduct random audits of CDCR's compliance with the mandatory mask requirement at all 35 state prisons between December 7, 2020 and March 7, 2021.  We understand the Inspector General will periodically update the Court and the parties throughout this audit period; we have not yet received the first update.

*Defendants' Position:* As of November 23, 2020, all employees, contractors, and

---

[12]     CDCR's Department Operations Manual, section 31140.4.10, specifically requires the Warden, as a Hiring Authority, to "Notify[] each complainant, including citizen, inmate, or employee complainants, in writing, of the finding on the original complaint within thirty (30) days of the determination of the disposition of the investigation regarding the original complaint."  This rule further explains that the complainant is to be notified "whether the original complaint is sustained, not sustained, exonerated, or unfounded."  This rule was adopted during the remedial phase of *Madrid v. Gomez*, N.D. Cal. Civ. S-90-3094 TEH, the landmark class action regarding Pelican Bay State Prison, so as to foster accountability and transparency when staff misconduct is alleged.  That a Warden, presumably with the guidance of his lawyers, apparently wishes to disregard or is unfamiliar with this important remedial provision is unfortunate.

visitors working, visiting or performing duties at a CDCR institution, indoors and outdoors, were required to wear a procedure mask at all times, with only limited exceptions.  Employees and contract workers are provided two procedure masks per shift, per day, upon entry to an institution.  Visitors will also be provided two procedure masks upon entry to the institution or facility and as needed throughout the day.  Staff working a double shift will be provided additional masks for the next shift.  Procedure masks will be provided at the screening point (e.g., entrance gate or first pedestrian entrance).  If staff, contractors, or visitors arrive without a mask, they will be required to put on a procedure mask prior to screening.

Defendants issued a memorandum updating and clarifying expectations for staff mask usage and physical distancing in a December 4, 2020 directive.  Staff are required to review and acknowledge the directive via CDCR's training portal.  A copy of that directive was attached as Exhibit A to the December 9, 2020 case management conference statement (ECF No. 3501).

Defendants prepared and provided Plaintiffs with mask compliance logs on December 18, 2020, and are in the process of reviewing and responding to Plaintiffs' counsel's questions regarding same.  Defendants are also in the process of investigating allegations of mask non-compliance by staff at CSP-Lancaster, which were brought to Defendants' attention by Plaintiffs' counsel last week.  With respect to Plaintiffs' comments pertaining to the allegations of mask non-compliance by staff at San Quentin, Plaintiffs have not previously voiced their dissatisfaction with the Warden's response, however, it bears noting here that the complaining party is not entitled to the details of the outcome of an investigation into allegations of employee misconduct.

Defendants remain committed to enforcing mask wearing and social distancing statewide, and take allegations of non-compliance very seriously.

## VIII.  PRISON-SPECIFIC UPDATES

*Plaintiffs' Position:*  At the Receiver's request, made because of the work required given the massive outbreaks at many prisons, we did not meet last week with the Regional

Healthcare Chief Executive Officers regarding prison-specific COVID-related issues. Based on our reviews of the prisons' daily Outbreak Management Tool reports, we did send concerns about approximately a dozen prisons, focused on housing of positive and exposed patients together, and quarantining patients in congregate settings.  At LAC, for example, people known to have COVID-19 were housed with those not known to have it in approximately a dozen housing units, and at Richard J. Donovan State Prison, such mixed housing continued in multiple housing units a week after the outbreak began.

CDCR last week also provided information relevant to housing unit ventilation, including a report on San Quentin's cellblocks.[13]  That report, while concluding that there were "relatively strong dilution ventilation effects under test conditions," also said that "[i]nter-cell airflow patterns" were not tested "due to facility access constraints."  Given that incarcerated people were effectively locked in their cells for weeks during the COVID-19 outbreak in the prison, the absence of inter-cell airflow analysis unfortunately renders the more general conclusion meaningless.  The report also strongly encouraged CDCR during an outbreak to "maintain the same crew from day to day in the infected block to achieve proper isolation."  CDCR has never been able to do that, unfortunately.

CDCR also provided a statewide memorandum, dated December 18, 2020, requiring all prison to try to use MERV-13 filters on housing unit Air Handling Units (AHUs), instead of the commonly used MERV-8.  According to the memorandum, using the MERV-13 will "reduce airborne transmission of COVID-19."  However, the memorandum makes clear that AHUs may not be able to adequately operate with MERV-13 or any other filter besides the MERV-8, in which case the latter can continue to be used. We will follow up with CDCR as to the actual use of the MERV-13 in each prison, and consult with an expert as necessary.

---

[13]    CDCR has informed us that, as we requested, a similar repot will be done at High Desert State Prison, with the contractor expected to begin sometime in January.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17144259.2

The memorandum also stated that "another component of reducing COVID-19 transmission is ventilation with outside air."  It stated it is "critical to maximize the outside air intake and minimize recirculated air volume during winter months when the AHU is used for heating."  This directive, however, does not appear particularly helpful given that, per information provided by CDCR on December 9, AHUs even in summer months use only a small percentage of outside air – approximately 20% to 25%, depending on the type of housing unit – and use an even smaller percentage – approximately 10% to 15% – in winter months when there is below freezing weather, as otherwise the AHUs become inoperable.  People who live and work in CDCR housing units must breathe largely recirculated air, and even more of such at many prisons in winter months.

## IX.   VACCINES

*Plaintiffs' Position:*  The State including defendant Governor Newsom should urgently prioritize the distribution of available vaccine to those who reside and work in CDCR prisons.  We believe the Governor's office is the ultimate decision-maker regarding vaccine prioritizations.  California's prisons are incubators of infection, and have been the loci of the largest reported outbreaks – in prison or out – in the nation.[14]  Too many people, held in congregate settings in which preventing the spread of the virus is extremely difficult, have been infected, hospitalized, and died.  According to the most recent CCHCS data, the rate per 1,000 of confirmed COVID-19 cases among the CDCR population – 354.7 – is *seven times higher* than that rate (47.7) in California as a whole.[15]  Sadly, catastrophic outbreaks continue.  The massive, months-long disruption in programs and stopping of in-person visiting have also placed an enormous burden on the mental health and well-being of those incarcerated in CDCR.  Vaccinations can protect all incarcerated

---

[14]   *See* ECF No. 3487 at 21:7-13, citing the November 12 *New York Times* report that Avenal State Prison is the site of United States' largest outbreak.  Since that report was published, the total number of infections at Avenal has, unfortunately, been nearly matched by those at the Substance Abuse Treatment Facility and State Prison.

[15]   *See* CDCR Patients: COVID Trends, available at https://www.cdcr.ca.gov/covid19/population-status-tracking/ (last accessed Dec. 22, 2020)

in the prisons, including, according to CCHCS on December 18, nearly 17,000 people age 65 or older or who have medical conditions which cause them to have Weighted COVID Risk Score of three or above, thus indicating an especially heightened risk of severe complications if infected.  All who reside and work in the prisons should be promptly offered vaccination.

California Department of Public Health (CDPH) guidelines on who should be offered vaccine first (in "Phase 1a") include those who work and live in "skilled nursing facilities, assisted living facilities, and similar long term care settings for older or medically vulnerable individuals." *See* "CDPH Allocation Guidelines for COVID-19 Vaccine During Phase 1A: Recommendations," Dec. 5, 2020, available at https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CDPH-Allocation-Guidelines-for-COVID-19-Vaccine-During-Phase-1A-Recommendations.aspx (last accessed Dec. 21, 2020).  Prisons, in our view, are "similar long term care settings" with regard to older or medically vulnerable individuals.  To the extent vaccine supplies are limited, CDPH says that Tier 1should include nursing, long-term care, or other long-term settings for older and medically people as well as "correctional facility hospitals," with Tier 2 including "correctional facility clinics."  *Id.*  These guidelines fully support that all who work and reside in CDCR prisons should be among the first to be offered vaccine.  We believe the Defendant Governor, given his responsibility for prison operations, should state that all possible actions to ensure that will be taken, and then act accordingly, including if necessary activating the Office of Emergency Services so that all necessary resources are available to support the offering of vaccinations for all in the prisons.

On December 18, CCHCS stated that its goal is to offer vaccinations to all CDCR residents and staff.[16]  It further said that its plans for vaccination are still in draft, and will

---

[16]     We asked CCHCS whether 160,000 staff and incarcerated people was a fair round number for the total to be offered vaccinations.  Our question was not directly answered.  The total seems relevant in that if that number, or one in the same general ballpark, is

17144259.2

1   depend greatly upon how many doses are received and what restrictions are placed upon

2   distribution by the CDPH and the federal government.  The current plan, CCHCS stated, is

3   for the first allotment to be provided to all staff and residents at the skilled nursing

4   facilities (CHCF, CMF, and the CCWF-SNF), with the remainder of the doses to be

5   allotted to high risk individuals at other prisons.[17]  We agree with this initial prioritization

6   among incarcerated persons, and the vaccination of staff, both because it is consistent with

7   CDPH guidelines and because staff are the primary vector for incarcerated person

8   infections which then result in outbreaks.[18]

9          On December 18, CCHCS said that while the final number was still in flux, it

10   expected 20-25,000 doses of vaccine this month (December), and indicated that when it

11   receives that supply it expects to begin vaccinations consistent with its initial priorities,

12   described above.  On December 22, we were told that vaccinations had begun at California

13   Health Care Facility, with a total of more than 100 patients and staff having been

14   vaccinated.  The Receiver has explained that the exact number of doses to be received, and

15   when, is not certain, and that such details are entirely out of CCHCS' control.  CCHCS

16   also said the number to be received in January is not yet known, but that each initial dose

17   received is tied to a guaranteed second shipment (presumably because the currently

18   available vaccines require two doses for every person, spaced three or four weeks apart).

19   We again highly commend the Receiver, CCHCS executives, and staff for their work to

20

21   _____

22   correct, it would be a very small fraction of the approximately 25 million adults in
    California, which in turn suggests that as vaccines are received state officials could provide

23   CCHCS with doses sufficient for it to reach its goal relatively quickly.

24   [17]     It is not clear whether those who have been previously infected with COVID-19
    will be included in these initial vaccination efforts.

25   [18]     The federal Equal Employment Opportunity Commission has recently said that

26   employers can mandate vaccinations.  *See* Vimal Patel, "Employers Can Require Workers
    to Get Covid-19 Vaccine, U.S. Says," *The New York Times*, Dec. 18, 2020, available at

27   https://www.nytimes.com/2020/12/18/us/eeoc-employers-coronavirus-mandate.html (last
    accessed Dec. 19, 2020).

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   obtain vaccine.[19]

2       As stated above, we believe the Governor's office is the ultimate decision-maker

3   regarding how and when prisons will be prioritized for vaccines.  The astronomical rate of

4   infection in the prisons as compared to the community plus the current outbreaks that have

5   engulfed many of the prisons make it incumbent upon the State generally and the Governor

6   specifically to ensure that they lives of thousands of individuals living and working in the

7   prisons are promptly protected via the vaccine.  The State should be directed to report on

8   this issue to Plaintiffs and the Court within the next 7 days.

9       CCHCS on December 18 also indicated that educational materials for patients

10  regarding vaccines had not yet been completed, and that it will share them "when they are

11  ready to go."  We intend to monitor vaccination efforts, including via data and information

12  from CCHCS, which we believe should be provided weekly, and information from class

13  members in the prisons.

14      *Defendants' Position:* CDCR is working closely with CCHCS and their public

15  health partners on a distribution plan for the COVID-19 vaccine to both staff and

16  incarcerated persons.  The plan will comport with federal, state, and health care guidelines

17  for distribution prioritization, and will aim to target frontline workers and medically high-

18  risk patients initially.

19      CDCR currently anticipates receiving both the Moderna and Pfizer vaccines, though

20

21  _____

22  [19]     Information about vaccine efficacy and adverse effects is not yet fully known,
    including because the elderly and medically vulnerable were not included in trials.  *See*
23  "The Exclusion of Older Persons From Vaccine and Treatment Trials for Coronavirus
    Disease 2019—Missing the Target," *JAMA Internal Medicine*, Sept. 28, 2020, available at
24  https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2771091.  It also is not
    yet known how long any immunity produced by a vaccine will last.  In any event, and
25  especially if sufficient doses are not promptly received, it may take months for broad
    benefits to occur even if vaccines are safe, effective, long-lasting, and widely received.
26  Thus, all current CDCR risk reduction measures must continue, and be improved as
    necessary.
27

28

1  information is likely to change as the process is quickly unfolding and being developed in

2  consultation with CCHCS and the California Department of Public Health.  CDCR

3  received its first doses of the Pfizer vaccine on December 21, and began vaccinations on

4  December 22.  Healthcare workers and long-term residential home residents and staff will

5  be the first recipients of the vaccine.  This category of persons includes incarcerated

6  persons and staff at CHCF, CMF, and CCWF who have not already contracted COVID-19.

7  In addition, healthcare staff throughout CDCR will be among the first "tier" of individuals

8  to receive the vaccine, and within that tier, healthcare staff who are at the highest risk and

9  those with the highest risk of exposure will be prioritized.  Custody staff who regularly

10  work with patients will be included among this tier.  Notably, California is among only a

11  handful of states prioritizing certain incarcerated persons in the first phase of vaccinations.

12

13  DATED:  December 22, 2020                    HANSON BRIDGETT LLP

14

15

16                                              By:  */s/ Samantha Wolff*
                                                     PAUL B. MELLO
17                                                   SAMANTHA D. WOLFF
                                                     LAUREL O'CONNOR
18                                                   DAVID C. CASARRUBIAS
                                                     Attorneys for Defendants
19

20  DATED:  December 22, 2020                    XAVIER BECERRA
                                                 Attorney General of California
21

22

23                                              By:  */s/ Damon McClain*
                                                     DAMON MCCLAIN
24                                                   Supervising Deputy Attorney General
                                                     RYAN GILLE
25                                                   IRAM HASAN
                                                     Deputy Attorneys General
26                                                   Attorneys for Defendants
27

28

DATED:  December 22, 2020                    PRISON LAW OFFICE


By:  */s/ Sophie Hart*
     _____
     STEVEN FAMA
     ALISON HARDY
     SARA NORMAN
     SOPHIE HART
     Attorneys for Plaintiffs

17144259.2

JOINT CASE MANAGEMENT CONFERENCE STATEMENT