XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN - 209508
Supervising Deputy Attorney General
RYAN GILLE - 262105
IRAM HASAN - 320802
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
LAUREL O'CONNOR - 305478
DAVID CASARRUBIAS - 321994
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER - 83925
STEVEN FAMA - 99641
ALISON HARDY - 135966
SARA NORMAN - 189536
RANA ANABTAWI - 267073
SOPHIE HART - 321663
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Judge:  Hon. Jon S. Tigar<br>Date:   January 14, 2021<br>Time:   10:00 a.m.<br>Crtrm.: 6, 2nd Floor |

1

2    The parties submit the following joint statement in advance of the January 14, 2021

3    Case Management Conference.

4    *Defendants' Preliminary Statement:* As the second and third COVID-19 surges

5    continue nationwide among the general population, cases within CDCR continue to decline

6    from its apex on December 20, 2020 of 10,721 active cases of COVID-19 among the

7    incarcerated population, to 4,956 active in-custody cases as of the date of this filing.

8    During that same time, CDCR and CCHCS have diligently worked to immunize healthcare

9    workers, staff and residents at skilled-nursing facilities (including those within CDCR

10   institutions), and correctional staff at certain facilities who work closely with patients.  As

11   discussed in greater detail below, as of January 13, 2021, 2,945 incarcerated patients have

12   been offered the COVID-19 vaccination, with approximately 90% of those patients

13   accepting the vaccine.  Significant progress has been made to mitigate against the spread

14   of COVID-19 within CDCR's skilled nursing facilities, specifically.  At CHCF, 54% of

15   patients have been vaccinated and approximately 77% of all patients have either been

16   vaccinated or were previously infected with COVID-19.  At CMF, 54% of patients have

17   been vaccinated and approximately 84% of all patients have either been vaccinated or were

18   previously infected with COVID-19.  With respect to employees at those institutions, at

19   CHCF, approximately 61% of staff have either been vaccinated or previously infected with

20   COVID-19, and at CMF, 63% of staff have either been vaccinated or previously infected

21   with COVID-19.

22   Among staff, 18,539 employees have been vaccinated, amounting to 30% of all

23   CDCR and CCHCS employees statewide.

24   These extensive efforts are ongoing and CDCR and CCHCS will move into Phase

25   1b of the vaccine distribution – to the entire incarcerated population – as soon as possible,

26   and hopefully as early as next week.

27   / / /

28   / / /

# I.     VACCINES

*Plaintiffs' Position:*  Vaccination against COVID-19, especially for those at heightened risk of serious complications or death if infected, is essential, and could be done quickly by the Receiver and CCHCS if the Governor and state officials authorized and provided a minimal amount of vaccine now.  Vaccinating this group will prevent a highly vulnerable population from developing disease and ultimately reduce significantly the number of individuals needing community hospital beds.

People incarcerated in CDCR are extremely vulnerable to infection.  They are housed in congregate settings in which key COVID risk reduction measures are at best difficult and at times impossible.  Thousands are housed in common air space settings, including many who are vulnerable to severe illness or death if they contract COVID-19.  Copious amounts of outside air in many housing units is all but impossible, given the lack of open windows and ventilation limitations, meaning virus can circulate in the air (see below).  Sadly, almost 45,000 have been diagnosed with COVID-19 already, including more than 75% (or even greater percentages) of the total population in many housing units, facilities, yards, and even prisons.  CDCR prisons are the sites of the largest outbreaks in the country, and the rate of infection among the incarcerated is seven times higher than in the community at large.  *See* ECF 3520 at 19:15-20.  Large numbers of those infected have developed serious complications, including approximately 1,200 who have been hospitalized.  Most tragically, 164 people have died.  Approximately one-third of those deaths have occurred in the last approximately 30 days, and as of January 11, 114 were hospitalized, which further underscores the urgent need to vaccinate those at heightened risk.

According to CCHCS last week, approximately 9,000 people in CDCR are at heightened risk of serious complications or death if infected by the coronavirus.  These people have a Weighted COVID Risk Score of three or higher, have not had COVID-19 within the last 90 days, and have not yet been vaccinated.  CCHCS stated that if they were authorized and supplied sufficient vaccine doses, they could offer vaccinations to all 9,000

within a week.[1]

However, CCHCS cannot vaccinate the 9,000 most at risk because Governor Newsom and state officials have not provided authorization and vaccine supplies to do so. The State's failure to do so, knowing as it must the harm suffered and the risk to others, is extremely concerning.  As of January 11, the California Department of Public Health reports it has shipped nearly 2.5 million doses of vaccine.[2]  *Less than four-tenths of one percent* of that is needed for the first dose for those currently at highest risk of harm in CDCR.  The State should immediately authorize and provide these vaccine doses.

CCHCS has so far shown that it can administer the vaccine more efficiently than the community as a whole.  Statewide, as of the end of last week, only approximately 32% of vaccine doses had been administered.[3]  In contrast, CCHCS had received approximately 35,000 initial dose allocations (for both patients and staff), and as of near the end of last week (January 7) had administered about 50% of them, and told us on January 8 it

---

[1]     To be clear, those with a Weighted COVID Risk Score of three or above are not the only patients at risk of serious complications or death.  Approximately 25% of those currently hospitalized due to COVID-19 are patients that have either no risk factors or a Risk Score of 1 or 2, and such patients make up approximately that same percentage of the most recent 50 reported COVID-related deaths.  All in CDCR need vaccination, but we agree CCHCS should prioritize those with a Weight COVID Risk Score of three or above, as the evidence shows the risk of harm is much greater for that group.  In addition to such patients comprising approximately 75% of COVID-related current hospitalizations and recent deaths, data from CCHCS provided in mid-October shows that those with a Weighted COVID Risk Score of three or above had a COVID case fatality rate *forty times* higher than those who did not.

[2]     *See* Cal. Dep't of Pub. Health, *COVID-19 Vaccine Doses Shipped* (Jan. 12, 2021), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/VaccineDoses.aspx.

[3]     *See* Catherine Ho, *Here's California's plan to speed up coronavirus vaccinations. Will it be enough?*, San Francisco Chronicle (Jan. 9, 2021), https://www.sfchronicle.com/bayarea/article/Here-s-California-s-plan-to-speed-up-15857102.php.

17201748.1

1    expected to administer almost all of the rest by the end of the current week.  This includes
2    offering vaccination to all patients who have not had COVID-19 in the last 90 days at the
3    California Health Care Facility, California Medical Facility, and in two medical units at
4    the Central California Women's Facility, a total of approximately 4,200 people.  As of
5    January 7, 2,350 of those had been offered vaccine, and 2,105 accepted, meaning the
6    refusal rate was only approximately 10%.[4]

7         The patients vaccinated so far by CCHCS fall within Phase 1A of California's
8    vaccination plan, which includes those in correctional facility hospitals.  *See* Cal. Dep't of
9    Pub. Health, *CDPH Allocation Guidelines for COVID-19 Vaccine During Phase 1A:*
10   *Recommendations* (Dec. 5, 2020),
11   https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CDPH-Allocation-
12   Guidelines-for-COVID-19-Vaccine-During-Phase-1A-Recommendations.aspx .  All others
13   in CDCR, including the 9,000 at heightened risk of harm that should be vaccinated now,
14   are covered by California's Phase IB, which includes in its Tier One those age 75 and
15   above, and in Tier Two those age 65 or above as well as all in "congregate settings with
16   outbreak risk," specifically referencing the "incarcerated."  *See Vaccines*, California All
17   https://covid19.ca.gov/vaccines (last updated Jan. 8, 2021).

18        CCHCS says it is prohibited from vaccinating those in Phase 1B, and thus the 9,000
19   at heightened risk they want to vaccinate, until the California Department of Public Health
20   – an agency under the direct control of Defendant Governor Newsom – authorizes it and
21   provides vaccine.  CCHCS says it has provided data to those state officials, and told them
22   that it wants to start by vaccinating those who are most at risk for serious complications
23   and death if infected.  The State must authorize and provide vaccine for these most-at-risk
24   people immediately, and then promptly do the same for all others in CDCR.

25
26   _____
27   [4]    The other vaccine doses have been administered to staff, including frontline
     healthcare personnel and correctional officers, who have patient contact or are necessary
28   for prison operations.  CCHCS says it is considering whether to mandate vaccinations for
     staff.

17201748.1

1  Shortly before this Statement was finalized for filing, Defendants informed us that

2  "CDCR and CCHCS will move into Phase 1b of the vaccine distribution – to the entire

3  incarcerated population – as soon as possible, and hopefully as early as next week."   That

4  must happen, so that all, including the thousands at highest risk of serious illness and

5  death, and thousands at risk of being quarantined in shared air spaces, can be vaccinated

6  immediately.

7  *Defendants' Position:*  CDCR is working closely with CCHCS and their public

8  health partners to distribute the COVID-19 vaccine to both staff and incarcerated persons

9  as efficiently and expeditiously as possible, and consistent with constantly evolving public

10  health guidance.  CDCR and CCHCS's distribution of the vaccine comports with federal

11  and state public health guidelines for distribution prioritization.  The State's prioritization,

12  formalized in the California Department of Public Health's Allocation Guidelines,[5] was

13  developed by the Drafting Guidelines Workgroup with input from the Community Vaccine

14  Advisory Committee and was consistent with the Centers for Disease Control and

15  Prevention's guidance on this topic at the time it was issued.[6]  The CDC recently issued

16  new guidance on January 11, 2021, recommending that staff and incarcerated persons be

17  vaccinated at the same time because of their shared increased risk of disease.  The

18  California Department of Public Health issued further guidance on the evening of January

19  12, 2021, advising that providers may offer doses promptly to people in lower priority

20  groups when demand subsides in the current groups or doses are about to expire.

21  CDCR is currently in the first phase of inoculation, Phase 1a.  Healthcare personnel

22  and frontline workers who are at risk of exposure to COVID-19 because of their role in

23  _____

24  [5]  CDPH Allocation Guidelines for COVID-19 Vaccine During Phase 1A:

25  Recommendations available at:

26  https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CDPH-Allocation-Guidelines-for-COVID-19-Vaccine-During-Phase-1A-Recommendations.aspx

27  [6]  CDC recommendations available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations.html.

28

17201748.1

direct health care or long-term care settings, as well as incarcerated residents of long-term care facilities were prioritized for receipt of the initial doses of the vaccine.  As of January 13, 2021, 18,539 CDCR and CCHCS employees (or 30% of employees) have been vaccinated statewide.  It is CDCR and CCHCS's goal to vaccinate at least 100 additional employees daily at each of CDCR's 35 institutions by January 15th, resulting in 30,000 employees being vaccinated by the end of January.[7]

Additionally, as of January 13, 2021, 2,945 patients have been offered the vaccine, and approximately 90% of those patients have accepted the vaccination (2,410).[8]  Further, CDCR and CCHCS have developed COVID vaccine registries, which are updated daily to track the vaccination status of both staff and patient vaccinations.

Consistent with the California Department of Public Health and the CDC's very recently revised guidance regarding vaccine distribution, to maximize vaccine administration and reduce the potential for wastage, CCHCS advised on the evening of January 12, 2021, that incarcerated persons may be considered for inoculation if doses of the vaccine remain available at the conclusion of a staff vaccination clinic and those doses would otherwise expire.  A joint meeting between CDCR and CCHCS is scheduled to occur on January 14 to further coordinate the distribution of vaccines in light of the

---

[7]     During the first several weeks of the vaccine distribution, COVID-19-naïve employees were prioritized for vaccination.  Currently, the vaccination is available to all employees, including those who have resolved a prior COVID-19 infection.

[8]     These numbers include 1,275 patients at CHCF (in addition to 164 refusals), 55 patients at CCWF (in addition to 6 refusals), 1,073 patients at CMF (in addition to 331 refusals), 2 patients at DVI (0 refusals), 1 patient each at Folsom State Prison and Avenal State Prison (0 refusals), and 3 Sacramento Control Office Unit (SACCO) patients (in addition to 1 refusal).  A SACCO incarcerated person is someone who was sentenced to serve a prison term in California but is serving a concurrent or consecutive term in a facility in another jurisdiction, or an incarcerated person who served time in a county jail, was sentenced to serve a prison term in California, and was released before being transferred to CDCR custody.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

1  constantly evolving guidance.

2  CDCR, CCHCS, the California Department of Public Health, and the Governor's

3  Office had previously prioritized all incarcerated persons in the second phase, Phase 1b,

4  starting with medically high-risk incarcerated persons.  CDCR will commence Phase 1b as

5  soon as possible, and hopefully as early as next week.  In short, Plaintiffs' call upon the

6  State to "immediately authorize" that the vaccine be provided to persons in Phase 1b

7  would not materially advance or modify the State's current schedule.[9]

8  Finally, in an effort to vaccinate as many staff and patients as possible, as efficiently

9  as possible, pursuant to the Governor's Executive Order N-39-20, the Director of the

10  California Department of Consumer Affairs waived certain restrictions on dentists to

11  enable them to administer COVID-19 vaccines statewide, including within CDCR

12  institutions.  CDCR's dentists began administering COVID-19 vaccinations on January 6,

13  2021.

14  **II.    POPULATION REDUCTION**

15  *Plaintiffs' Position:*  Further urgent population reductions are necessary to minimize

16  the risk of and harm from COVID-19, as massive outbreaks continue and vaccine

17  availability, as discussed above, remains uncertain.  Defendants have acknowledged that

18  reduced population contributes to fewer infections and deaths (*see* ECF No. 3469 at 3-4),

19  and last month Secretary Allison reaffirmed that CDCR prisons' "large population and

20

21

22  [9]    It also bears clarification that the State does not have 2.1 million doses of the
23  vaccine waiting around for distribution, as Plaintiffs seem to suggest.  The overwhelming
   majority of vaccines received from the federal government flow directly to the counties
24  and do not physically pass through the State's custody or control.  The State receives a
   small number of doses for certain eligible populations under the State's care.  The number
25  of doses that are received by both the State and the counties is dependent upon the amount
   of vaccine available from the federal government each week and the eligible population in
26  the Phase/tier as the entities use up their allotments.

27

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

physical layout make us particularly susceptible to the spread of COVID-19."[10]

The prison and camp population is currently approximately 92,000.[11]  We appreciate that this total is approximately 25,000 fewer than in mid-March,[12] when the first incarcerated person in CDCR was diagnosed with COVID-19.  We further recognize that approximately 11,000 of that reduction has resulted from early releases, including the program begun in July, which still continues, for some within 180 days of release.[13]  The remainder of the reduction has resulted from natural releases and the suspending of or great limitations on intake from the county jails, where we understand more than 8,000 are incarcerated and currently awaiting transfer to CDCR.

But given the current number and size of outbreaks, and recent spike in COVID-related deaths, it is clear that more must be done.  CDCR appears to have recognized that last month when it told this Court it would conduct individual reviews of certain medically vulnerable incarcerated people who they might release, presumably under the Secretary's emergency authority, or refer back to a superior court for resentencing, stating that they would begin with the most medically vulnerable among the eligible.  *See* ECF No. 3501 at 5:7-21.  But only 1,690 people are eligible for those reviews (*see* ECF No. 3520 at 7:3),

---

[10]     *See* Cal. Dep't of Corr. & Rehab., *Important COVID-19 message from Secretary Allison* (Dec. 4, 2020), https://www.cdcr.ca.gov/insidecdcr/2020/12/04/important-covid-19-message-from-secretary-allison.

[11]     *See* CDCR Weekly Report of Population (Jan. 6, 2021) at Part A.I.1 (Institution/Camps), https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2021/01/Tpop1d210106.pdf.

[12]     *See and compare* CDCR Weekly Report of Population (March 18, 2020) at Part AI.1 (Institution/Camp), https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/03/Tpop1d200318.pdf.

[13]     This 180 day release program has resulted in about 400 early releases per month, per data provided by CDCR; however, information provided by Defendants below, that since December 2, 140 people have been released per this program, suggests this number may be diminishing.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

and as reported by Defendants below, only 15 have been approved for released.

The Court on December 23, 2020 detailed why the State needed to urgently review others, including the indeterminately sentenced, for release.  A week later, it was reported that Governor Newsom said he was reviewing individuals incarcerated in CDCR for release on a weekly basis.  *See* Abené Clayton, *'People are terrified': a coronavirus surge across California's prisons renews calls for releases*, The Guardian (Dec. 29, 2020), https://www.theguardian.com/us-news/2020/dec/29/california-coronavirus-cases-prison-system.  On December 30, we asked Defendants for information about these reviews.[14]  Defendants below indicate there is no new program; rather, the Governor continues the work, that has always been done, of reviewing the cases of those granted release by the parole board.

As previously discussed, Secretary Allison last month indicated she would in the near future implement changes to CDCR's credit earning rules that will result in certain sub-groups of the incarcerated receiving additional time credits as they serve their terms. *See* ECF No. 3520 at 5:5-8.  We agree that should be done, but repeat that unless implemented immediately and applied fully retroactively, will result only in incremental advances to release dates, with any substantial reduction to the current population only happening well in the future.  Again, reduction in population is necessary now.

The Governor should grant additional medical reprieves of sentences, including of those indeterminately sentenced, of the kind done for a handful of people in November 2020.  *See* ECF No. 3487 at 2:4-14.  The Secretary should also re-start the program for early release for some with a year or less to serve that was done between July and September at a sub-set of prisons, except it should now apply to all given the pervasive outbreaks which put all incarcerated at risk.  Further, the Secretary should grant

---

[14]     Among other things, we asked for the criteria for being eligible for review, how many and which people have been, are being, and will be brought to the Governor for review, the number of reviews completed, the number that resulted in a decision to release, the number actually released, and the timeframe within which the reviews will be done.

Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

incarcerated people "Positive Programming Credits" (PPCs) as CDCR did in early July, approximately four months after the pandemic began, when it rightfully recognized that because of program restrictions imposed to limit the virus' spread people were unable to earn sentence-reducing time credits as they previously could. Granting additional PPC now would be fair, and result in relatively quick population reduction. The Governor and Secretary must take all these and other actions now, to further reduce crowding so as to reduce the spread of the virus, and thus sickness and death, in the prisons.

*Defendants' Position:* CDCR's population has decreased by 23,950—or over 20 percent—since the start of the COVID-19 public health crisis.[15] Between July 1, 2020 and January 7, 2021, 7,953 people were released from institutions and camps through the COVID-19 early-release programs Defendants announced on July 10.[16] This represents 140 more early releases than those reported in the December 23 case management statement.[17] An additional 11,927 were released in accordance with their natural release dates during this period. As of January 7, 2021, CDCR's institutions house approximately 90,313 persons.[18]

In addition to CDCR's COVID-19 early release programs and mitigation measures described in sections below, the Secretary is releasing medically high-risk individuals early on a discretionary basis. The Secretary is considering those with COVID-19 weighted risk

---

[15]    This figure is calculated by taking the difference between the total population in institutions and camps on February 26, 2020 and January 6, 2021. Weekly population reports can be found at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2/.

[16]    *See* ECF No. 3389 at 2:4-5:4 and https://www.cdcr.ca.gov/covid19/expedited-releases/ for details regarding CDCR's COVID-19 early-release program announced on July 10, 2020.

[17]    *See* ECF No. 3501 at 4:14-16.

[18]    *See* December 16, 2020 population report at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/12/Tpop1d201216.pdf.

scores of three or more, and who have either served the base term of their sentence or are within one year of release.  The Secretary first considered determinately-sentenced people who have the highest risk for morbidity or mortality should they contract COVID-19—those with COVID-19 weighted risk scores of six or more—and who are not required to register as a sex offender under Penal Code section 290.  Those who pose a low risk for violent recidivism will either be approved for release per the Secretary's discretionary authority, or referred to the courts for expedited consideration for resentencing under Penal Code section 1170, subdivision (d)(1), depending on how much time remains on their sentence(s).  Those being considered include people who have served their base term, but whose sentence(s) carry enhancements that were previously mandatory, but are now discretionary after the passage of Senate Bill 1393, which became effective on January 1, 2018.  As of January 8, 2021, there are 1,690 people who meet this initial criteria for review.  Of those, 553 persons made the next level of screening and were then individually reviewed by the Secretary.  Of the 553 who were reviewed, 15 were approved for release and 152 were referred to the courts for consideration under Penal Code section 1170(d)(1).

As previously reported, the Secretary also considered indeterminately sentenced persons who were granted parole for their commitment offense(s), but remain incarcerated serving separate terms for offense(s) committed while in prison.  CDCR identified 24 such incarcerated persons within this category.  The Secretary reviewed all 24 and approved 19 of these individuals for early release, and they have all been released.

In addition, the Secretary is individually reviewing indeterminately sentenced individuals who have been granted parole but remain in prison because they have not yet reached their minimum eligible parole date or youth offender parole date.  Secretary Allison has approved four individuals for release and is continuing to review the remaining twenty-two individuals in this group.

CDCR continues to process early releases on a rolling basis through the 180-day early-release program announced on July 10, which has accounted for the vast majority of early releases since then.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

1    Finally, in response to Plaintiffs' statement above regarding reports that Governor

2  Newsom is reviewing individuals incarcerated in CDCR for release on a weekly basis,

3  each week the Governor reviews the parole grants of long-term incarcerated persons who

4  have granted parole.  These reviews include expedited consideration whenever possible.

5  **III.    INTAKE**

6    *Plaintiffs' Position:*  After pausing intake from county jails for six weeks,

7  Defendants have started receiving new people at Wasco State Prison and North Kern State

8  Prison the week of January 11, and will start receiving people at Central California

9  Women's Facility during the week of January 18, 2021.  In light of the continuing surge of

10  cases throughout California, and the significant outbreaks at all three CDCR Reception

11  Centers currently, Plaintiffs believe that CDCR should suspend intake, at least until all

12  incarcerated people at high risk for complications from COVID infection are vaccinated.

13    *Defendants' Position:*  Intake into CDCR from county jails was paused effective

14  November 26, 2020, in accordance with public health guidance, due to the rise in the

15  number of COVID-19 cases in the community.  CDCR resumed intake the week of

16  January 11, 2021 and will accept 104 incarcerated persons from San Joaquin and Amador

17  Counties into custody at North Kern State Prison, and 76 incarcerated persons from

18  Orange and Los Angeles Counties into custody at Wasco State Prison.  CCWF remains

19  closed to intake until the week of January 18, 2021 to ensure that adequate bed space is

20  available in the event it becomes necessary for quarantine of its existing population.

21    Additionally, for the week of January 18, CDCR will plan to accept 80 incarcerated

22  persons from county jails into North Kern State prison, 75 incarcerated persons into Wasco

23  State Prison, and 20 into CCWF.

24  **IV.    QUARANTINE AND ISOLATION**

25    *Plaintiffs' Position:*  We respond to the Court's December 23 Order re Quarantine

26  Space (ECF No. 3523) in Part XIII, below.

27    As mentioned in the late December Case Management Conference Statement (*see*

28  ECF. No. 3520 at 18:4-7), we recently raised concerns to CCHCS and CDCR about

17201748.1    JOINT CASE MANAGEMENT CONFERENCE STATEMENT

positive COVID-19 patients being co-located in cell-housing units at the California State Prison – Los Angeles County (LAC) and Richard J. Donovan Correctional Facility (RJD) with those not known to have the disease, in contravention of the Receiver's directives saying such should not occur.  We also raised concerns about staff in those units permitting those who were positive to mix with those not known to be, including during phone access periods and when people picked up food trays, a practice which creates a serious risk of further infections.  We relayed these same concerns early this year after receiving information that co-locating and mixing within housing units at the two prisons continued. Counsel in the *Armstrong* case had also done the same.

On January 8, CCHCS and CDCR confirmed that co-locating positive patients with those not known to be positive had occurred for weeks in housing units at LAC and RJD, and continued at RJD.  It was explained that the co-locating was a result of a number of factors, including a shortage of custody staff at LAC (meaning that in the prison's view cell changes were not feasible as staff to supervise the moves were not available), some patients' refusal to move, and, at RJD, in effect being overwhelmed by the size of the COVID outbreak during the first weeks of December.  We are also aware of significant co-locating of positive patients with others in cell-housing units at High Desert State Prison, Pleasant Valley State Prison, and Kern Valley State Prison.

We strongly agree with the Receiver's directive that COVID-positive patients must not be co-located in any housing unit with those not known to be positive.  But given the repeated examples of that not happening, we have suggested harm reduction measures when that co-location occurs.  Specifically, we have asked that CCHCS and CDCR issue written directives and guidance, for use by housing unit officers, regarding who, by reference to COVID-status, can and cannot be allowed to mix during common out-of-cell housing unit activities, including showers, phone access, medication lines, and food service.  On January 8, CCHCS said it would consider adding provisions to its COVID "Interim Guidance," and CDCR indicated it would consider whether such could be done using a variant of the long-standing "Program Status Report," a daily document that among

17201748.1
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

other things tells staff which groups of people can and cannot for custody-based reasons be mixed when the usual prison program is modified.  Such written directives and guidance is urgently necessary both to reduce the risk of additional infections and so that there is a clear basis to hold accountable officers who permit mixing of patients who for public health reasons must be kept apart.

In addition to the problem of co-locating COVID-positive patients with those who are not in the same housing units, we learned of and presented to CCHCS this week allegations that at LAC and RJD in December, patients who tested negative for COVID were kept in their cell with cell mates who tested positive, despite requests to be quarantined elsewhere.

*Defendants' Position:*  CDCR has set aside large amounts of previously identified isolation and quarantine space at the prisons.  CDCR has continued to work with Plaintiffs, the Receiver, the *Coleman* Special Master, and the *Armstrong* Court Expert to ensure that appropriate isolation and quarantine space is reserved for class members of all three class actions and to modify reserved spaces and plans for quarantine and isolation as needed across the system.

CDCR continues to work in close collaboration with CCHCS to appropriately house quarantined and isolated incarcerated persons.  However, a growing number of incarcerated persons refuse to relocate or transfer to such housing.  For these incarcerated persons, CDCR and CCHCS continue to work together to educate and encourage their compliance with quarantine and isolation measures, including movement.  While CDCR will not forcefully extract individuals who refuse to relocate, institutions have begun issuing Rules Violation Reports.

As it relates to Plaintiffs' specific concerns described above, the primary reason COVID-19 positive inmate-patients are comingled with those who are not known to be positive is due to incarcerated persons refusing to move.  CDCR does not believe that cell extractions are appropriate, and instead, as indicated above, attempts to educate inmate-patients in an effort to encourage volunteer movement.  Daily multi-disciplinary check-ins

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

1   are occurring with these inmate-patients to further encourage them to move to the

2   designated housing.  Additionally, while CSP-Los Angeles County was heavily impacted

3   by staff vacancies between December 14 and 31, 2020, the institution was provided

4   available staffing resources from both neighboring institutions (CCI and CAC), as well as

5   resources from CDCR's statewide transportation unit.

6       Similarly, at both RJD and Pleasant Valley, inmate-patients continue to refuse to

7   move to isolation, resulting in the co-locating of patients.  Medical staff provide patient

8   education and refusals are documented, but inmate-patients are not forcefully extracted

9   from their cells.  And at High Desert, CDCR initiated a conference call with Plaintiffs'

10  counsel in December to solicit their assistance in convincing their clients to relocate to the

11  appropriate quarantine or isolation housing.

12      Further discussion on Quarantine and Isolation appears in Part XIII, below.

13  **V.    SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE**

14      *Plaintiffs' Position:*  As reported in the last Joint Case Management Conference

15  Statement, CDCR and CCHCS suspended the plan to mandate transfers from common air-

16  space housing to solid-door cell housing for the people most medically vulnerable to

17  COVID-19 complications.  Plaintiffs supported this decision in light of the rapid spread of

18  the virus in CDCR prisons during November and December and concerns that movement

19  within and between prisons could exacerbate the spread.

20      Dr. Joseph Bick informed us on January 8 that CCHCS currently has no plans to

21  restart moving medically vulnerable people from one prison to another in order to place

22  them in celled housing.  As the outbreaks unfortunately continue statewide, we support

23  extending the suspension of the rehousing plan.

24      *Defendants' Position*:  CDCR has been working closely with CCHCS to provide

25  safer housing to medically-high risk individuals in certain prisons by relocating those

26  individuals from dorm or open-cell settings to cells with solid doors.  On December 14,

27  2020, 26 individuals were moved from San Quentin State Prison (San Quentin) to

28  California State Prison, Corcoran (Corcoran).  Although CDCR had planned to move all

-16-                                    Case No. 01-1351 JST

1  individuals housed at San Quentin with a COVID-19 risk score of three or greater by

2  January 29, 2021, given the current surge in COVID-19 cases, these transfers have been

3  suspended until CCHCS deems it safe to resume these transfers.

4  **VI.    TESTING AND TRANSFER PROTOCOLS**

5        *Plaintiffs' Position:*  Transfers between prisons continue, although in greatly

6  reduced numbers in recent weeks, presumably due to substantial COVID-19 outbreaks

7  statewide.  Testing and quarantining of those transferred to reduce the risk of COVID-19

8  transmission have been governed by CCHCS's August 19 "Movement Matrix," although

9  CCHCS appears to have stopped pre-transfer quarantine for some.  CCHCS on January 8

10  said it was unaware of any cases of COVID transmission attributable to any transfers done

11  pursuant to the current Matrix.

12        CCHCS in late November circulated a draft revised Movement Matrix, which we

13  and others provided comments on during the second week of December.  On January 12,

14  CCHCS issued a final version of the revised Matrix, and CDCR and CCHCS jointly

15  announced it supersedes all previous versions and is effective immediately.  We are

16  reviewing the revisions and will send any concerns to CCHCS and CDCR.

17        *Defendants' Position:*  On November 25, 2020, the Receiver issued a draft revised

18  version of the CDCR/CCHCS COVID-19 Screening and Testing Matrix for Patient

19  Movement, and requested comments by December 7.  The revised Matrix includes several

20  significant updates to the August 19 version, including an increase in the number of people

21  who may share the same airspace for precautionary transfer quarantine.  The Receiver's

22  Office met and conferred with the parties in the *Plata* and *Coleman* class actions regarding

23  their comments to the Matrix on December 9.  The Receiver's Office indicated that the

24  comments would be addressed and a revised version of the Matrix would be distributed.

25        On the afternoon of January 12, 2021, the Receiver's Office sent an updated version

26  of the movement matrix that previously went into effect on August 21, 2020.  Of note, the

27  revised matrix now states that inmates who were previously infected with COVID and who

28  are considered resolved will not be required to re-test or be quarantined for movement

17201748.1
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

purposes for 90 days from the date of first symptoms or first positive test, whichever came first.  The revised matrix also clarifies that for movement within the same institution, "inmates who are symptomatic and/or test positive shall not be transferred and shall be isolated as per interim guidance."  The revised matrix also now includes the Receiver's prior guidance from December 4 and 18, 2020 pertaining to quarantine and isolation space, among other changes.  A copy of the revised matrix is attached as **Exhibit 1.**  A joint meeting between CDCR and CCHCS is scheduled to occur on January 14 to coordinate implementation of the revised matrix and to ensure consistency in implementation.

Further, CDCR and CCHCS continue to utilize measures to track patient information for transfers.  Staff at each prison have procedures and processes in place to follow the requirements of the matrix.  On October 6, 2020, CCHCS implemented an online registry to track all transfer information for incarcerated persons.  The registry allows staff to review and update medical and other important data before, during, and after transfers.  Finally, the prisons continue to offer comprehensive COVID-19 testing for incarcerated people, and the specific protocols for each prison are outlined for Plaintiffs during routine calls with CCHCS staff.  CDCR will continue working closely with the Receiver's Office to implement the protocols set forth in the revised Matrix.

## VII.   STAFF SCREENING AND TESTING

*Plaintiffs' Position:* Staff remain the most significant vector for introducing COVID-19 into the state prison system.  As of January 12, more than 2,500 staff were out with active cases of COVID-19, and nearly 14,000 had contracted COVID-19 since March. *See* Cal. Dep't of Corr. & Rehab., *CDCR/CCHCS COVID-19 Employee Status*, https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status (last updated Jan. 12, 2021). And while CCHCS and CDCR have begun offering vaccines to staff, it is not yet known whether vaccination prevents transmission.  Frequent and rigorous testing thus remains essential to preventing the introduction and spread of COVID-19 in the prisons.

The Receiver continues to oversee the COVID-19 staff testing program.  On December 4, CCHCS reported that, due to the number of outbreaks among patients and

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

staff, every prison was testing all staff weekly.  On January 8, CCHCS reported that eight

prisons had increased the frequency of staff testing to twice a week, given the number of

positive cases at those prisons.[19]  We asked whether CCHCS had considered conducting

daily antigen testing in combination with weekly PCR testing, given the current rates of

COVID-19 infections in California, and noted that the Department of State Hospitals has

recently adopted this strategy.  *See* Cal. Dep't of State Hospitals, *COVID-19 Transmission-*

*Based Precautions and Testing*, https://www.dsh.ca.gov/COVID-

19/docs/TransmissionBasedPrecautions_and_Testing.pdf (last updated Dec. 31, 2020).

CCHCS said they were considering this strategy, but that it would require significant

nursing staff resources, which is currently a challenge.

Regarding staffing for the testing program, testing continues to be largely carried

out by vendors, who conduct testing during regular business hours.  On January 8, CCHCS

reported the vendors had the capacity to conduct twice-weekly testing of all staff at the

eight prisons where CCHCS had determined more frequent testing was needed.  As

previously reported, CCHCS planned to hire nurses to supplement the testing carried out

by vendors (specifically, to test staff at the entrances to prisons and test staff after-hours)

by the end of December.  However, on January 8, CCHCS reported they had so far hired

only 29 of the 70 nurses required, and that they now anticipate these positions will be filled

by the end of March.

Regarding monitoring compliance with the staff testing policies, on December 31,

CCHCS provided Plaintiffs a report reflecting the percentage of staff tested at each prison

in recent weeks.  Unfortunately, the data had not yet been validated so is of limited use.

The data provided showed that, across all 35 prisons, only 77% of staff were tested (or

were exempt because they tested positive within the previous 90 days) during the weeks of

---

[19]     Those eight prisons are California Rehabilitation Center, California Correctional
Institution, High Desert State Prison, Salinas Valley State Prison, California Men's
Colony, California State Prison, Los Angeles County, and Richard J. Donovan
Correctional Facility.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

December 6 and December 13, and only 68.3% were tested the week of December 20. However, CCHCS said this data does not account for staff who did not test because they were out sick or on vacation, and that adjusting for these absences could have a significant impact on the compliance rates reported. CCHCS said that it is currently addressing this issue through the data validation process. On January 8, CCHCS said that all prisons had submitted their validated data to headquarters, but they did not know when the validated data would be incorporated into a report and made available to Plaintiffs. Also on January 8, we asked whether such reports with validated staff testing data could be provided on a biweekly basis. CCHCS stated they would provide a response to these questions this week.

As described below, CCHCS and CDCR also recently provided the third set of biweekly reports of staff noncompliance with face covering and physical distancing requirements, which for the first time also included documentation of noncompliance with testing requirements. The logs document discipline taken for twelve staff members who failed to comply with mandatory testing policies in December at Mule Creek State Prison, two at the Substance Abuse Treatment Facility, and one at California Medical Facility. As stated previously, we believe that to adequately monitor compliance with the testing policies, we need both the logs reporting individual refusals to test (and corrective action taken) and reliable staff testing data for each prison.

*Defendants' Position:* CDCR continues to coordinate with the Receiver's Office and enforce the Memorandum on Employee Accountability for COVID-19 testing, which dictates that any employee who refuses to comply with mandatory COVID-19 testing shall not be permitted to enter the institution or facility and shall be placed on approved dock (without pay) until they comply with mandatory testing. Unwillingness to comply with mandatory staff testing shall be interpreted as a refusal. Concurrently, employees who refuse to comply with mandatory employee COVID-19 testing and who are not actively engaged in a request for reasonable accommodation shall also be subject to progressive discipline for their refusal to submit to the mandatory testing.

1    Further, beginning the week of January 4, 2021, staff at California State Prison,

2  Lancaster, and California City Correctional Facility were first offered saliva testing as a

3  new option.  CDCR anticipates that the saliva test will be available at all institutions by the

4  end of January 2021.

5  **VIII.  STAFF COMPLIANCE WITH FACE COVERING AND PHYSICAL**

6  **DISTANCING REQUIREMENTS**

7    *Plaintiffs' Position:*  On December 31 and January 8, Defendants produced to

8  Plaintiffs the third set of biweekly reports of staff noncompliance with face covering and

9  physical distancing requirements, as directed by the Court. [20]  *See* ECF No. 3492.  As with

10  the previous set of reports, CDCR and CCHCS produced separate logs, for custody and

11  healthcare staff.  No logs for custody staff were provided for four prisons; Defendants'

12  counsel stated these prisons had no incidents to report.[21]  Again, it is apparent from these

13  logs that noncompliance with face covering and physical distancing policies continues: the

14  logs document 50 incidents of noncompliance among medical staff and approximately 100

15  incidents among custody staff between December 16 and December 29.  The majority of

16  corrective action reported was in the form of verbal counseling.

17    We continue to believe Defendants should use also positive reinforcement and

18  education to increase compliance.  At the previous Case Management Conference, we

19  raised the possibility of CDCR having Captains compare and in essence compete with each

20  other regarding face-covering compliance in their facilities, and having CDCR supervisors

21  ask incarcerated people about staff noncompliance.  Defendants on January 12 said the

22  idea of having Captains compete remains under consideration.  With regard to asking

23  incarcerated people, Defendants on January 12 said they believed the most effective

24

25

26  [20]    The report Defendants initially provided on December 31 omitted CDCR's logs for
several prisons.  Defendants produced a revised report with those logs on January 8.

27

28  [21]    These prisons include Central California Women's Facility, California State Prison,
Centinela, California State Prison, Solano, and Valley State Prison.

-21-                                      Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

approach is to have Captains "talk with the population as they tour regarding all things related to COVID compliance and ask if the incarcerated persons have concerns." Defendants further asserted that this is already being done, and is the better approach because it does not make people uncomfortable.  We disagree.  As we explained in an email on January 13, we believe Captains should directly ask about staff face-covering compliance, and so too should Lieutenants and Sergeants.  Having leadership directly ask about face coverings will help CDCR get more accurate information about compliance.  It will also send a clear message to all staff and the incarcerated population that these policies are to be taken seriously.

In recent weeks, and as previously reported, we have sent CDCR detailed reports from incarcerated people regarding lack of compliance by staff with face-covering compliance at certain facilities at San Quentin and LAC.  CDCR has said that it would review and investigate the San Quentin report, and we have asked for those results.   We have not received a substantive response regarding the LAC report.

*Defendants' Position:*  Defendants remain committed to enforcing mask wearing and social distancing statewide, and take allegations of non-compliance very seriously. As of November 23, 2020, all employees, contractors, and visitors working or performing duties at a CDCR institution, whether indoors and outdoors, must wear a procedure mask at all times, with only limited exceptions.  Employees and contract workers are provided two procedure masks per shift, per day, upon entry to an institution.  Visitors are also provided two procedure masks upon entry to the institution or facility and as needed throughout the day.  Staff working a double shift will be provided additional masks for the next shift.  Procedure masks are provided at the screening point (e.g., entrance gate or first pedestrian entrance).  If staff, contractors, or visitors arrive without a mask, they will be required to put on a procedure mask prior to screening.

Defendants issued a memorandum updating and clarifying expectations for staff mask usage and physical distancing in a December 4, 2020 directive.  Staff are required to review and acknowledge the directive via CDCR's training portal.  A copy of that directive

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  was attached as Exhibit A to the December 9, 2020 case management conference statement

2  (ECF No. 3501).

3          Defendants prepared and provided Plaintiffs with mask compliance logs on

4  December 31, 2020, and on January 12, 2021, CCHCS responded to a number of

5  Plaintiffs' counsel's questions pertaining to the logs.   Finally, at the last Case

6  Management Conference, this Court encouraged the parties to consider Plaintiffs'

7  suggestions to further incentivize mask wearing: (1) have CDCR supervisors speak with

8  incarcerated persons to inquire whether compliance with mask wearing is a problem in

9  their housing unit and to encourage them to report noncompliance; and (2) ask CDCR

10 captains to report compliance ratings to each other to create competition.  Regarding

11 Plaintiffs' first suggestion, CDCR believes it would be preferable for captains to speak

12 with the population as they tour regarding all matters related to COVID-19 compliance,

13 including adequacy of cleaning supplies, gloves, and how the population and staff are

14 doing with mask wearing and physical distancing, including whether the population has

15 any concerns.  It is already CDCR's expectation that captains are speaking with staff and

16 incarcerated persons during their tours, and this approach would not put the incarcerated

17 population in an uncomfortable position.  Regarding Plaintiffs' second suggestion, CDCR

18 is currently considering whether and how to create competition among captains and yards

19 to increase compliance.

20 **IX.    OFFICE OF THE INSPECTOR GENERAL AUDIT REPORT**

21         The parties received the Office of the Inspector General's first audit report

22 concerning CDCR's compliance with face covering and physical distancing requirements

23 on January 13, 2021 (the date of this filing).  The parties have not had an opportunity to

24 review the report prior to the filing of this statement.  The report is attached as **Exhibit 2**.

25 **X.     VENTILATION**

26         *Plaintiffs' Position:*  Adequate housing unit ventilation is a necessary component of

27 COVID-19 risk reduction in prisons.  We have raised questions and concerns about

28 ventilation for months, including after CDCR in July asserted that a prison avoided a large-

scale outbreak last spring in part by adjusting housing unit Air Handling Units (AHUs) so that only outside air was used.  *See* ECF No. 3397 at 6:2-5.

The use of outside air is a key ventilation risk reduction measure, as CDCR again recently recognized.  *See* ECF No. 3520 at 19:1-2.  On January 13, as this Statement was being finalized, CCHCS and CDCR provided information in which they suggested our previously stated facts regarding the limited amount of outside air used in prisons' AHUs was incorrect, implying (contrary to what had been previously indicated) that it only concerned a single prison, and in winter.  They unfortunately did not provide a comprehensive statement of outside air use at all prisons in all seasons.  We will ask for it, but continue to believe, based on information previously provided by CDCR, that housing unit ventilation in winter months at many prisons uses only 20% to 25% outside air, and an even smaller percentage when temperatures are below freezing.

As also previously reported (*see* ECF No. 3520 at 18:17-22), CDCR also issued a statewide memorandum, dated December 18, 2020, requiring all prison to try to use MERV-13 filters on housing unit AHUs instead of the commonly used MERV-8. According to the memorandum, using the MERV-13 will "reduce airborne transmission of COVID-19."  However, the memorandum makes clear that AHUs may not be able to adequately operate with MERV-13 or any other filter besides the MERV-8, in which case the latter can continue to be used.  On December 30, 2020, we asked CDCR to provide information as to each prison's efforts to upgrade its housing unit AHUs' MERV filters. On January 13, CDCR and CCHCS responded that even before the December 18 memo, seven prisons either partly or entirely used filters with an efficiency rating greater than MERV-8.  They further explained that it would take all other prisons between 30 and 120 days to obtain MERV-13 filters.  This timeframe suggests standard procurement have been used, despite the need to reduce airborne transmission of COVID-19.

We also on December 30 asked CDCR whether it would seek a report on "[i]nter-cell airflow patterns" at San Quentin, which a recently received report on that prison's cellblock ventilation specifically said was not analyzed (*see* ECF No. 3250 at 18:8-16).

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  On January 13, CCHCS and CDCR said they are still considering the underlying report.

2  *Defendants' Position:*   On January 13, 2021, CDCR provided Plaintiffs with

3  additional information in response to their inquiries pertaining to air filtration.  As noted in

4  the response, Plaintiffs' assertion that Air Handling Units (AHUs) in CDCR housing units

5  use only approximately 20-25% outside air during summer months, and only 10-15%

6  outside air in winter months is incorrect as that data only pertains to the design parameters

7  of the AHUs at High Desert State Prison during heating operations only, and does not

8  address the design parameters of AHUs at other CDCR prisons.  The response also

9  indicated that at least 7 prisons already utilized filters with an efficiency rating higher than

10 MERV-8 prior to issuance of the December 18, 2020 memorandum.  The first installation

11 of MERV-13 filters to test whether sufficient airflow quantity can be maintained with the

12 higher efficiency filter should occur in early February 2021.

13 **XI.   PRISON-SPECIFIC UPDATES**

14 *Plaintiffs' Position:*  Two patient deaths last week at RJD raised serious questions

15 about whether ordered COVID-19 tests were being done.

16    On January 7, a 51 year old patient from RJD died at an outside hospital from what

17 appears to be COVID pneumonia.  He had a serious underlying medical conditions known

18 to create a heightened risk of harm from COVID, a serious mental health condition, and

19 was severely developmentally disabled.  Prison medical doctors ordered COVID tests for

20 the patient on December 11, December 18, and December 28, but none were ever done.

21 On January 5, medical staff saw him emergently for shortness of breath, oxygen saturation

22 in the low 40s, and sent him to an outside hospital, where he died two days later.

23    We immediately asked CCHCS about the death, and asked whether RJD has or had

24 a problem completing orders for COVID testing.  On the morning of January 8, CCHCS

25 told us there was no problem with COVID testing at the prison.

26    Later on January 8, we were notified of the COVID-caused death of a 63 year old

27 from RJD who died that same day.  Medical records show the patient had multiple medical

28 conditions known to create a heightened risk of harm from COVID, and a serious mental

health condition that resulted in a current determination of grave disability.   On December 11 and then again on December 28, prison medical doctors had ordered that the patient be tested for COVID (with swabs to be done on December 14 and December 29) but neither was done.  On January 5, medical staff responded emergently to the patient for shortness of breath; oxygen saturation was measured at 74%.  The patient was sent to an outside hospital and died there three days later.

We then reviewed medical records for about two dozen patients, and CCHCS Dashboard information for RJD, all of which appeared to show that the prison had many, perhaps hundreds of orders for COVID testing in December that had apparently not been done, timely or otherwise.  On January 10, we informed CCHCS of our concerns and, given the two patient deaths, asked them to urgently review whether there was a problem with ordered COVID tests not being done at RJD.

*Defendants' Position:*  Defendants understand that CCHCS is in the process of reviewing Plaintiffs' concerns.

Video visitation was fully implemented at all 35 CDCR institutions by the end of 2020, and will be extended to conservation camps by early 2021.  A more detailed article describing video visitation and its impact on the incarcerated population and their families is available at https://www.cdcr.ca.gov/insidecdcr/2020/12/30/cdcr-video-visits-reconnect-families/.

## XII.   MEDICAL CARE MATTERS NOT RELATED TO COVID-19

*Plaintiffs' Position:*  On December 18, 2020, Judge Mueller at a *Coleman* status conference *sua sponte* extensively discussed a CDCR review of a recent suicide at the California Health Care Facility (CHCF).  We subsequently received a copy of the CDCR review.  In addition to identifying more than two dozen problems related to mental health care, the review determined there was incomplete emergency response documentation by medical staff, nursing staff failed to document required patient checks, and that it took staff eight minutes to activate 911 after the person was found unresponsive in his cell with a state-issued t-shirt wrapped around his neck (Judge Mueller mentioned this latter fact when

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

1  discussing the matter).

2      That these types of emergency medical response problems continue at CHCF is

3  extremely troubling.  Two and one-half years ago, in August 2018, we wrote the Receiver

4  about both CHCF emergency response nursing documentation problems, and undue delays

5  in activating 911 in what we called an extraordinarily large number of cases.  At least

6  partly in response to this report as well as similar concerns we reported at other prisons,

7  CCHCS in 2019 launched an extensive re-tooling of its medical emergency response

8  procedures and practices, particularly as done by nurses, and CHCF staff received special

9  training on this in July 2019.  For the same problems to now recur is concerning including

10  because -- especially considering the other problems identified in the suicided review -- it

11  indicates that staff acted as if the deceased deserved less care than would be accorded to a

12  non-incarcerated person.

13      We believe CCHCS's and CDCR's mild response when staff delay activating 911 is

14  a major cause of the continuing problems.  In August 2018, we informed the Receiver that

15  when the problem was identified the response was to train staff.  But training seems to

16  miss the mark when such staff has already been trained on the policy, and regardless of

17  that the need to call 911 in emergency circumstances is known by just about every person

18  above age ten, and probably many younger than that as well.

19      *Defendants' Position:*  The emergency response to the suicide referenced in

20  Plaintiffs' section above is still under review by institution leadership.  As such, any

21  further discussion would be premature and incomplete.

22  **XIII.   RESPONSE TO COURT'S DECEMBER 23, 2020 ORDER**

23      *Defendants' Position:*  At Plaintiffs' request, Defendants provided a detailed bullet-

24  point outline of their responses to the Court's questions from the December 23, 2020 order

25  to Plaintiffs' counsel on the morning of Saturday, January 9.  Plaintiffs responded stating

26  that they needed Defendants' full responses to provide their comments to the Court's

27  questions.  Defendants provided Plaintiffs with a copy of their full responses on Monday,

28  January 11 when the parties exchanged portions of the joint CMC statement.  Plaintiffs

17201748.1

1   also requested a copy of Defendants' supporting declaration, which Defendants provided

2   the following morning.  Plaintiffs did not provide their responses to the Court's questions

3   to Defendants in advance of the joint filing.  Defendants are therefore unable to address or

4   respond to any of the points raised in Plaintiffs' responses to these questions, though

5   Defendants will attempt to be prepared to do so during tomorrow's hearing.

6
7   **A.  The extent to which each institution has set aside enough cells with solid doors to comply with the Receiver's December 4, 2020 and December 18, 2020 guidance.**

8   *Defendants' Position:*  CDCR has made substantial progress to enable all prisons,

9   including those with challenging designs, to appropriately quarantine and isolate inmates.

10  All but a handful[22] of CDCR's prisons have reserved a substantial number of cells that

11  give them the ability to comply with the Receiver's guidance provided on December 4 and

12  18, 2020, and CDCR is endeavoring to follow that guidance despite numerous challenges.

13          From July through September 2020, CDCR vacated and prepared a significant

14  amount of space across the prison system that it reserved for isolation and quarantine under

15  the Public Health Workgroup's guidance.  Decl. Gipson Supp. Defs.' Opp'n ¶¶ 13-14;

16  ECF No. 3508.  In addition to that reserved space, CDCR made extensive efforts to

17  identify other spaces that could potentially be used for isolation and quarantine at the

18  prisons beginning last summer and continuing to the present.  Decl. Gipson Supp. Defs.'

19  Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶ 2.  Some of those spaces were

20  comprised of additional cell and dorm housing that was vacated so that it could be

21  available and ready for use if needed during an outbreak.  *Id.*  And some of those

22  additional spaces were comprised of alternative spaces that had to be prepared and

23  approved for occupancy, such as gyms, chapels, and tents.  *Id.*  Through its many efforts,

24  CDCR has identified abundant additional space for quarantine and isolation at many

25  prisons.  *Id.* at ¶ 3.  Much of the available space—both the originally reserved quarantine

26  _____

27  [22] As discussed in more detail below, San Quentin, Folsom, California Rehabilitation

28  Center, and California Health Care Facility were unable to substantially satisfy the Public Health Workgroup's recommendation for reserved quarantine and isolation space.

spaces and additional identified spaces—was presented to the Court with Defendants'

opposition to Plaintiffs' motion.  *See* Decl. Gipson Supp. Defs.' Opp'n, Ex. E; ECF No.

3508-5; Decl. Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶ 3.

The Receiver's guidance from December 4 and 18 recommends that patients

exposed to COVID-19 should be quarantined in a cell with no more than two inmates per

cell.  Decl. Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶ 4,

Ex. F.  But the guidance provides that if an outbreak exceeds 200 positive cases or if the

reserved quarantine cells are full, then "decisions about post-exposure quarantine practices

and housing shall be committed to the discretion of the warden and CEO or their designees

at the institution in consultation with CDCR and CCHCS regional and headquarters staff."

*Id.*  The Receiver's guidance from December 4 and December 18 does not specify an

amount of reserved space for any particular prison, but it does seem to require that each

prison have a substantial number of cells reserved for quarantine purposes.  *Id.*  Thus, each

of the prisons that has substantial reserved cells—or that has additional cells that were later

vacated and prepared for quarantine use—has capacity to comply with the Receiver's

December 4 guidance until those cells are all occupied.  In the event that reserved

quarantine cells are all occupied by quarantining patients, those prisons can still follow the

Receiver's guidance by then having their medical CEOs and Wardens consult with

CCHCS and CDCR headquarters about how to handle any additional patients who need to

be quarantined.

As reflected in the table that Defendants produced with their opposition to

Plaintiffs' motion, 31 prisons have substantial quarantine-cell reserves, and each of them

therefore has the ability to implement the Receiver's guidance.  Decl. Gipson Supp. Defs.'

Opp'n, Ex. E; ECF No. 3508-5.  But as the Receiver's guidance recognized, "the high

frequency and number of transfers increases patient COVID-19 fatigue which is resulting

in a substantial increase in refusals, both refusals to transfer and refusals of COVID-19

testing."  Decl. Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶

4, Ex. F.  Consequently, without resorting to forced cell extractions and forced moves,

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   CDCR cannot follow the Receiver's guidance in every instance.  *Id.* at ¶ 5.

2        A case-by-case analysis of the circumstances at each prison is required to determine

3   what compliance with the Receiver's guidance looks like as far as numbers of inmates

4   quarantined in cells is concerned, and Defendants provide the following three examples to

5   illustrate:

6   •   For California State Prison-Corcoran, the Public Health Workgroup

7        recommended that 40 beds be reserved.  Decl. Gipson Supp. Defs.' Opp'n, Ex.

8        E; ECF No. 3508-5.  Corcoran exceeded that recommendation and reserved

9        100 cells.  *Id.*  Corcoran later identified an additional 252 cells that may be

10       used for isolation or quarantine purposes during outbreaks.  *Id.*  Thus, under

11       the Receiver's recent guidance, Corcoran could potentially place 352 post-

12       exposure patients in a cell by themselves, or those same cells could

13       accommodate up to 704 quarantined patients if double-celled.  To the extent

14       Corcoran's available quarantine cells are all occupied by patients on

15       quarantine, Corcoran can still comply with the Receiver's guidance by having

16       its medical CEO and Warden consult with CCHCS and CDCR headquarters

17       on how best to quarantine additional patients.

18   •   For Avenal State Prison, the Public Health Workgroup recommended that 248

19       beds be reserved for quarantine and isolation purposes.  *Id.*  Avenal was able

20       to reserve 100 cells and 192 dorm beds in response to that recommendation.

21       *Id.*  Avenal's reserved cells can quarantine up to 200 patients under the

22       Receiver's recent guidance.  Although Avenal was not able to reserve 248 cell

23       beds as recommended, it supplemented its cell space with 192 reserved dorm

24       beds.  *Id.*  Furthermore, the Receiver's August guidance indicated that if a

25       large portion of the population had already been infected by COVID-19, then

26       less quarantine space is needed than was recommended by the Public Health

27       Workgroup.  Decl. Gipson Supp. Defs.' Opp'n, Ex. D at 1-2; ECF No. 3508-4

28       (CCHCS's guidance explained that a large number of resolved patients within

17201748.1

a prison expands options for cohorting patients, and that San Quentin likely
needed less than the recommended space reserves due to the fact that a
significant portion of its population had already been infected with COVID-
19).  This is an important consideration for Avenal, where 2,997 patients have
contracted the virus, and Avenal's current population is about 3,327.  Decl.
Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶ __.
To the extent Avenal's available quarantine cells are all occupied by patients
on quarantine, Avenal can still comply with the Receiver's guidance by
having its medical CEO and Warden consult with CCHCS and CDCR
headquarters on how best to quarantine additional patients.

- The Public Health Workgroup recommended that California Correctional
  Institution (CCI) reserve 235 beds for quarantine and isolation.  Decl. Gipson
  Supp. Defs.' Opp'n, Ex. E; ECF No. 3508-5.  In response, CCI was able to
  reserve 124 cells and 154 dorm beds for isolation and quarantine.  Decl.
  Gipson Supp. Defs.' Opp'n, Ex. E; ECF No. 3508-5.  Under the Receiver's
  recent guidance, CCI can quarantine up to 248 patients in its reserved cells,
  which would satisfy the Public Health Workgroup recommendation.  And to
  the extent that CCI's available quarantine cells are all occupied by patients on
  quarantine, CCI can still comply with the Receiver's guidance by having its
  medical CEO and Warden consult with CCHCS and CDCR headquarters on
  how best to quarantine additional patients.

Only four prisons either have no quarantine cells or only a small fraction of the
number recommended by the Public Health Workgroup.  They are San Quentin (63 cells),
Folsom (99 cells), California Health Care Facility (92 negative pressure rooms/cells), and
California Rehabilitation Center (no quarantine cells).[23]  Decl. Gipson Supp. Defs.' Opp'n,

---

[23]   The Receiver's December 4 guidance suggested that two additional prisons—

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

1   Ex. E; ECF No. 3508-5; Decl. Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.'

2   Quarantine Mot. ¶ 3.

3      **B.   What efforts have Defendants made "to find quarantine alternatives that satisfy the purposes of a post-exposure quarantine," at the seven institutions identified by the Receiver as lacking sufficient facilities or having a medical mission (ECF No. 3503 at 8.)**

4

5

6   *Defendants' Position:* CDCR has made great efforts to enable all prisons, including

7   those with challenging designs, to appropriately quarantine and isolate inmates.  Decl.

8   Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶ 6.  Since last

9   summer, CDCR has endeavored to identify alternative spaces that can be used for

10  quarantine or isolation in the event of a large outbreak.  *Id.*  Many prisons have not only

11  identified alternative spaces, but have also already obtained fire marshal approval and

12  acquired bedding and storage units for the spaces to prepare them for occupancy.  *Id.*

13  Some of these spaces, including gyms, visiting areas, and chapels, are set forth in the table

14  of isolation and quarantine space that Defendants presented with their opposition to

15  Plaintiffs' motion.  Decl. Gipson Supp. Defs.' Opp'n, Ex. E; ECF No. 3508-5.  Other

16  spaces not reflected in that document have also been identified and set aside at various

17  prisons.  Decl. Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶

18  6, Ex. G.  Also, CCHCS has indicated that it is in the process of undertaking a survey of all

19  prisons to determine whether there is any additional space that can be used for isolation

20  and quarantine.  *Id.*

21      Additional information regarding the efforts of the seven specific prisons about

22  which the Court inquired is provided below.

23

24  ───────────────

25  Avenal State Prison and Chuckawalla Valley State Prison—lack sufficient facilities to comply with the new guidance.  Decl. Gipson Supp. Defs.' Suppl. Br. Ex. F.  That was

26  before the Receiver issued the supplemental guidance on December 18.  As discussed below, with the addition of the December 18 guidance, Avenal and Chuckawalla have

27  sufficient facilities, especially in consideration of the large portion of their populations that have already been infected with COVID-19, and additional identified space at each

28  institution.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1
      1.      **Avenal State Prison**

2
     The Public Health Workgroup recommended that Avenal reserve 248 beds for

3
quarantine and isolation purposes.  Decl. Gipson Supp. Defs.' Opp'n, Ex. E; ECF No.

4
3508-5.  Avenal State Prison has reserved 100 cells for quarantine, which could be used to

5
quarantine up to 200 patients under the Receiver's guidance.  *Id.*  In addition, Avenal has

6
reserved dorm space sufficient to house 192 patients.  *Id.*  In May 2020, Avenal obtained

7
fire marshal approval to use gyms in Facilities A and B as quarantine and isolation

8
housing, and in July 2020, Avenal obtained fire marshal approval for gyms in Facilities C,

9
D, and E.  Decl. Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶

10
7.  Later, however, an issue was discovered with the Facility E gym fire panel.  *Id.*  This

11
will require that Avenal develop and obtain approval from the fire marshal for a fire-watch

12
process for that gym if Avenal needs to use it again.  *Id.*  These gyms, which can each

13
house at least 50 patients, were fully prepared for occupancy with the installation of

14
bedding and storage units, and were occupied during Avenal's outbreaks.  *Id.*

15
     Last summer, Avenal also obtained fire marshal approval to use three cells in

16
Building 390A for quarantine or isolation, and Avenal obtained preapproval from the fire

17
marshal to use visiting areas in Facilities A, B, C, E, and F in late October and early

18
November 2020.  *Id.*  If the visiting areas are ever needed, they will be set up to house

19
patients and final approval from the fire marshal will be obtained.  *Id.*  Each of the visiting

20
areas can house about 32 patients.  *Id.*

21
     Like all of the prisons, Avenal has the ability to quickly install tents to provide

22
additional housing if a large outbreak should occur.  *Id.*  A tent contractor has already

23
visited Avenal's grounds to identify locations where tents will be installed, if needed,

24
which should expedite the installation process.  *Id.*  The installation of tents can usually be

25
accomplished within 72 hours.  *Id.*

26
     It is noteworthy that Avenal had several large outbreaks from May through October

27
2020.  *Id.* at ¶ 8.  As of January 12, CCHCS's patient tracker indicates that 3,001 patients

28
at Avenal have been infected with COVID-19, and Avenal's current population is about

3,327.[24]  *Id.*  As CCHCS noted in its August 2020 recommendations concerning quarantine space, less space is required if a large portion of the population has already been infected by COVID-19.  Decl. Gipson Supp. Defs.' Opp'n, Ex. D at 1-2; ECF No. 3508-4.  During the recent surge of cases throughout the prison system (and the United States) that began in November, Avenal has not had another large outbreak, which suggests that CCHCS's guidance was correct.  *Id.*  In light of these facts and developments, Avenal has sufficient quarantine space.

### 2.    Chuckawalla Valley State Prison

The Public Health Workgroup recommended that Chuckawalla Valley State Prison reserve 91 beds for quarantine and isolation purposes.  Decl. Gipson Supp. Defs.' Opp'n, Ex. E; ECF No. 3508-5.  Chuckawalla reserved 100 cells that can be used to accommodate up to 200 patients on quarantine under the Receiver's guidance.  *Id.*  Chuckawalla also reserved 192 beds in dorm settings for quarantine and isolation use.  *Id.*

Like all prisons, Chuckawalla has reviewed its facilities to identify additional space that can potentially be used for isolation or quarantine in the event of a large outbreak and obtained fire marshal approval to use the spaces.  Decl. Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶ 9.  Chuckawalla has already obtained fire marshal approval to use the chapels and education rooms in Facilities A, B, C, and D.  *Id.*  In combination, those spaces accommodate up to 168 patients.  *Id.*  Chuckawalla also vacated offices in a decommissioned part of the Central Infirmary and turned the offices back into rooms for isolation or quarantine in the event of an outbreak.  *Id.*  Each of the twelve rooms can now house up to two inmates if needed.  *Id.*

Additionally, Chuckawalla can easily and quickly add additional space for quarantine and isolation in the event of a large outbreak by installing tents.  *Id.*  A tent contractor has already reviewed the grounds at Chuckawalla and identified areas for tent

---

[24] Even though many cases of COVID-19 in the prisons resolved as early as May 2020, CCHCS has advised that, to date, there are no confirmed cases of reinfection among the patient population in any prison.  Decl. Gipson Supp. Defs.' Suppl. Br. ¶ 8.

1   installation so that the installation process can be expedited if the tents are ever needed.  *Id.*

2       Chuckawalla has previously had several large outbreaks; in total, 1,742 patients at

3   Chuckawalla have been infected with the virus since May 2020.  *Id.* at ¶ 10.  Chuckawalla's

4   current population is about 1,845.  *Id.*  As CCHCS guidance indicates, less reserved space

5   is needed for quarantine and isolation when a large portion of the population at a prison

6   has already been infected.  Decl. Gipson Supp. Defs.' Opp'n, Ex. D at 2; ECF No. 3508-4.

7   Chuckawalla has not had another large outbreak despite the recent surge in cases across the

8   system and nation.  Decl. Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.'

9   Quarantine Mot. ¶ 10.  Based on these developments and facts, Chuckawalla has sufficient

10  quarantine space.

11                  **3.      California Medical Facility**

12      The Receiver's guidance leaves decisions about post-exposure quarantine housing

13  at California Medical Facility (CMF) to the discretion of the medical leadership in

14  recognition of its materially different mission.  Decl. Gipson Supp. Defs.' Responses Ct.'s

15  Questions re Pls.' Quarantine Mot. Ex. F.  The Public Health Workgroup recommended

16  that CMF reserve 162 beds for quarantine and isolation.  Decl. Gipson Supp. Defs.' Opp'n,

17  Ex. E; ECF No. 3508-5.  CMF was able to move inmates in various locations throughout

18  the prison so that it could reserve 158 cells and 36 dorm beds for quarantine and isolation.

19  *Id.*  The reduction in CMF's population has allowed it to recently set aside and use

20  additional space for isolation and quarantine, including the following: Unit H2 (21 cells

21  and five 8-person dorms); U-Wing (110 cells); D-Dorm (150 dorm beds); and an area in

22  CMF's Psychiatric Inpatient Unit (64 cells).  Decl. Gipson Supp. Defs.' Responses Ct.'s

23  Questions re Pls.' Quarantine Mot. ¶ 11.  Further, to create additional space for isolation or

24  quarantine purposes, CMF has currently installed six tents with a total capacity of 100

25  patients.  *Id.*

26

27

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

1        Currently, vaccinations are underway at CMF, and as of January 12, 1073[25] patients

2  and 1029 staff had received their first dose of the COVID-19 vaccine.  *Id.* at ¶ 12.  As of

3  January 12, about 583 patients at CMF had been infected with the virus, and nearly all of

4  those infections occurred within the past 90 days.  *Id.*  As of January 12, the population at

5  CMF was about 1,998, thus a significant portion of CMF's population has now either had

6  one dose of the vaccine or already been infected with the virus.  *Id.*  In light of these facts

7  and recent developments, CMF has sufficient quarantine space.

8                          **4.**      **California Health Care Facility**

9        The Receiver's guidance also leaves decisions about post-exposure quarantine

10  housing at California Health Care Facility (CHCF) to the discretion of the medical

11  leadership in recognition of its medical mission and unique operations.  Decl. Gipson

12  Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. Ex. F.  The Public Health

13  Workgroup recommended that CHCF reserve 277 beds for quarantine and isolation.  Decl.

14  Gipson Supp. Defs.' Opp'n, Ex. E; ECF No. 3508-5.  CHCF was able to reserve 92

15  negative pressure rooms and 100 tent beds for quarantine and isolation purposes.  *Id.*  And

16  CHCF has the ability to install additional tents if needed.  Decl. Gipson Supp. Defs.'

17  Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶ 13.

18        Furthermore, numerous inmates and staff are currently being vaccinated at CHCF

19  and vaccinations are ongoing.  *Id.* at ¶ 14.  As of January 12, about 1,275[26] patients and

20  1,499 staff had received their first dose of vaccine, and 33 patients and 235 staff had

21  received two doses of vaccine.  *Id.*  As of January 12, about 554 patients at CHCF had

22  been infected with the virus, and the overwhelming majority of those infections occurred

23  within the past 90 days.  *Id.*  As of January 12, the population at CHCF was about 2,389.

24  *Id.*  Thus, a significant portion of CHCF's population has either had at least one dose of the

25

26  _____

27  [25] An additional 331 patients were offered the vaccine but refused it.

28  [26] An additional 164 patients were offered the vaccine but refused it.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

1    vaccine or already been infected.  In light of these facts and recent developments, CHCF

2    has sufficient quarantine space.

3               **5.    Folsom State Prison**

4               CCHCS acknowledged that Folsom State Prison was one of the locations where

5    setting aside quarantine and isolation space would be a challenge because of Folsom's

6    design.  Decl. Gipson Supp. Defs.' Opp'n, Ex. D at 2; ECF No. 3508-4.  The Public Health

7    Workgroup recommended that Folsom reserve 1,380 beds for quarantine and isolation.

8    Decl. Gipson Supp. Defs.' Opp'n, Ex. E; ECF No. 3508-5.  Folsom was initially able to

9    reserve 44 cells and 28 dorm beds for quarantine and isolation.  *Id.*  Later, Folsom was able

10   to set aside an additional 55 cells and 302 dorm beds for quarantine or isolation.  *Id.*

11   Folsom has also obtained fire marshal approval to use its visiting area as an alternative

12   housing space, and during the large outbreak from August through October 2020, Folsom

13   housed 70 patients in the visiting area.  Decl. Gipson Supp. Defs.' Responses Ct.'s

14   Questions re Pls.' Quarantine Mot. ¶ 15.  Folsom could prepare the visiting area again for

15   occupancy in about 24 hours.  *Id.*  Additionally, Folsom has the ability to install tents to

16   supplement its quarantine and isolation space.  *Id.*  During the large outbreak at Folsom

17   last summer, Folsom was able to quickly install multiple tents with capacity to house up to

18   180 patients.  *Id.*

19              As a result of Folsom's large outbreak, 1,338 patients were infected with the virus.

20   *Id.* at ¶ 16.  As of January 6, Folsom's population was about 2,054.  *Id.*  Thus, a substantial

21   portion of Folsom's population has already been infected with the virus.  *Id.*  Despite the

22   recent surge in cases across the system, there are currently no active cases of the virus in

23   Folsom's population.  *Id.*  As CCHCS's guidance indicates, the fact that a significant

24   portion of the population was already infected with the virus reduces the need for

25   quarantine and isolation space.  Decl. Gipson Supp. Defs.' Opp'n, Ex. D at 1-2; ECF No.

26   3508-4.  Based on these facts and developments, Folsom has sufficient isolation and

27   quarantine space.

28              **6.    San Quentin State Prison**

-37-                              Case No. 01-1351 JST

CCHCS acknowledged that San Quentin was one of the locations where setting aside quarantine and isolation space would be a challenge because of its design.  Decl. Gipson Supp. Defs.' Opp'n, Ex. D at 2; ECF No. 3508-4.  The Public Health Workgroup recommended that San Quentin reserve 1,550 beds for quarantine and isolation.  Decl. Gipson Supp. Defs.' Opp'n, Ex. E; ECF No. 3508-5.  San Quentin was able to reserve 108 gym beds, and has since set aside 63 additional cells in the Adjustment Center.  *Id.*  San Quentin also has the ability to quickly activate 69 beds in its three chapels.  Decl. Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶ 17.  San Quentin can also use its Prison Industry Authority building for additional space as it did during the large outbreak last summer, and San Quentin has experience quickly installing tents that can provide an additional 90 beds if necessary.  *Id.*

According to CCHCS's patient tracker San Quentin's outbreaks have resulted in 2,151 infected patients.  *Id.* at 18.  As of January 6, San Quentin's population was about 2,652.  *Id.*  Thus, a substantial portion of San Quentin's population has already been infected with the virus.  As CCHCS's guidance indicates, the fact that a significant portion of San Quentin's population was already infected with the virus reduces the need for quarantine and isolation space.  Decl. Gipson Supp. Defs.' Opp'n, Ex. D at 1-2; ECF No. 3508-4.  Despite the recent surge in cases across the system, there are currently only three active cases of the virus in San Quentin's population.  Decl. Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶ 18.  Based on these facts and developments, San Quentin has sufficient isolation and quarantine space.

### 7.    California Rehabilitation Center

The Public Health Workgroup recommended that California Rehabilitation Center (CRC) reserve 187 beds for quarantine and isolation.  Decl. Gipson Supp. Defs.' Opp'n, Ex. E; ECF No. 3508-5.  CRC was able to reserve 155 dorm beds and was later able to set aside an additional 344 dorm beds.  *Id.*  CRC has also set aside its family visiting buildings, which provide 12 additional beds.  Decl. Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶ 19.

1   Like all of the prisons, CRC has the ability to rapidly install tents if it needs more

2   space.  *Id.*  During its previous large outbreak, CRC installed 30 twelve-person tents to

3   provide extra housing capacity and safe locations for medically high-risk inmates.  *Id.*

4   Since the beginning of the pandemic, about 1,866 patients at CRC have been

5   infected with the virus, and CRC's current population is about 2,047.  *Id.* at ¶ 20.  Thus, a

6   significant portion of CRC's population has already contracted the virus.  Based on these

7   facts and developments, CRC has sufficient isolation and quarantine space.

8   **C.   If Plaintiffs contend that the efforts identified in Paragraph 2 are**
   **insufficient, the basis for that contention and what more Plaintiffs**

9   **propose should be done.**

10   *Plaintiffs' Position*:  The efforts identified in Paragraph 2 are insufficient.  They

11   consist primarily of (a) identification of additional quarantine and isolation space,

12   overwhelmingly in congregate living settings (such as dorms, gym, and tents) that present

13   high risk of transmission for people on quarantine; (b) reliance on the immunity derived

14   from large numbers of people who have recovered from COVID-19 in some CDCR

15   prisons; (c) phone calls with CCHCS to determine how to handle outbreaks that have

16   grown out of control; and (d) vaccination at three prisons.  While Plaintiffs welcome the

17   vaccinations and the small number of additional cells identified for quarantine and

18   isolation at some prisons, these efforts do not go nearly far enough.

19   There are 16 CDCR prisons where a large proportion of the population lives in

20   dorms, pods, cells with perforated doors, or other common airspace: Avenal State Prison,

21   California Correctional Center (CCC), California Medical Facility (CMF), California

22   Rehabilitation Center (CRC), California State Prison-Los Angeles County (Lancaster),

23   California State Prison-Solano, Calipatria State Prison, Central California Women's

24   Facility (CCWF), Correctional Health Care Facility (CHCF), Folsom State Prison,

25   Chuckawalla Valley State Prison (CVSP), Mule Creek State Prison, Richard J. Donovan

26   Correctional Facility (RJD) (Facility E only), San Quentin State Prison, Sierra

27   Conservation Center (SCC), and Valley State Prison (VSP).  All of these prisons are

28

17201748.1

profoundly dangerous places to live during the pandemic.[27]  *See* Joint Brief on Quarantine, ECF No. 3502, at 17 (people in prison dorms are 35 times more likely to contract COVID-19 than if they lived in cells).  Defendants have consistently refused to take the most effective step to protect the people in these prisons from severe illness or death: population reduction sufficient to allow for social distancing and cell-based quarantine.  *Id.* at 21 and n.16.

Defendants' decision not to reduce the population meaningfully has led inevitably to massive outbreaks because social distancing, generally recognized as an essential means to reduce transmission, is impossible, and because once people are exposed to the virus, they are all too often quarantined in dorms or other shared airspace that serve as incubators and not barriers to transmission.  *Id.* at 14-22.  Given this dire situation, the only routes to having adequate quarantine space in the 16 prisons identified above are (a) to wait for a massive outbreak that provides the survivors with some immunity to reinfection and the few remaining COVID-naïve people[28] with adequate access to the small number of solid-

---

[27]     The 19 other CDCR prisons, all of which have significant quantities of solid-door celled housing, are also dangerous places to live during the pandemic, but they do not have the significant risk factor at issue in this motion: they have adequate celled housing to provide quarantine without resort to shared airspace.

[28]     Plaintiffs use the term "COVID-naïve" to mean people who have not previously tested positive for COVID-19 and are therefore vulnerable to infection.  In focusing on this group, we might be undercounting the people who are susceptible to infection, because it is not currently known how long immunity lasts for those who recover from the virus.  It is generally accepted that people within 90 days of infection have substantial immunity, but no data-based consensus has emerged on how much or how long immunity lasts after that point.  The most cautious approach would be to consider all people in CDCR whose COVID-19 infections resolved more than 90 days ago as susceptible to reinfection and therefore to include them with the COVID-naïve group for these calculations.  Plaintiffs choose not to do so at this point for two reasons: first, we do not have data regarding that group, and second, we concur with CCHCS that although we cannot be sure that this population cannot be reinfected after 90 days, the experience so far in CDCR, with tens of thousands of cases and no proven cases of reinfection, indicates that any reinfection in upcoming months will likely be extremely rare.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

door cells available for quarantine, or (b) vaccinate the population.  The former has happened at Avenal, with 330 remaining COVID-naïve people and 200 solid-door cell placements, and CVSP, with 103 COVID-naïve people and 200 solid-door cell placements. The latter option has been employed at two prisons to date,[29] CMF and CHCF.  It must also be immediately undertaken at the remaining prisons.

Plaintiffs contend that Defendants' efforts are inadequate at the 12 prisons with substantial COVID-naïve populations, inadequate solid-door cell space for quarantine, and no current plan for vaccination:

**Calipatria** has 600 double-cell beds set aside with a COVID-naïve population of approximately 1985 living in shared air space[30] (perforated cell doors).

**CCC** has 200 double-cell beds set aside with a COVID-naïve population of approximately 642 living in shared air space.

**CCWF** has 200 double-cell beds set aside with a COVID-naïve population of approximately 1181 living in shared air space.

**CRC** has no cells set aside with a COVID-naïve population of approximately 121 living in shared air space.

**Folsom** has 99 cells set aside with a COVID-naïve population of approximately 702 living in shared air space.

**Lancaster** has 400 double-cell beds set aside with a COVID-naïve population of approximately 1254 living in shared air space (perforated cell doors).

**Mule Creek** has 200 double-cell beds set aside with a COVID-naïve population of

---

[29]     People at CCWF are also being vaccinated, but only in the two relatively small long-term care facilities at the prison in accordance with Phase 1A of the state's vaccination plan, and not the entire population.

[30]     We estimate the COVID-naïve population housed in shared air space by taking the percentage of all people at the prison housed in shared air space and applying that percentage to the total number of COVID-naïve people at the prison.

17201748.1

1    approximately 842 living in shared air space.

2    **RJD** has 200 double-cell beds set aside with a COVID-naïve population of 554

3    approximately living in shared air space.

4    **San Quentin** has 63 cells set aside with a COVID-naïve population of

5    approximately 412 living in shared air space.

6    **SCC** has 200 double-cell beds set aside with a COVID-naïve population of

7    approximately 1302 living in shared air space.

8    **Solano** has 400 double-cell beds set aside with a COVID-naïve population of

9    approximately 983 living in shared air space.

10   **VSP** has 287 double-cell beds set aside with a COVID-naïve population of

11   approximately 1093 living in shared air space.

12   People at these prisons are exposed to an unacceptable risk of harm and cannot be kept

13   safe because there are too many people for the available celled housing in the event of an

14   outbreak.  Declaration of Adam Lauring, ECF No. 3504, at ¶ 6.  Vaccination is the only

15   acceptable path to safety.

16   In the weeks since briefing was completed in this matter, COVID-19 cases continue

17   to grow and overwhelm community hospitals and a new, vastly more transmissible variant

18   has been detected in the state.  Plaintiffs no longer believe that the Receiver's

19   supplemental guidance of December 18 will have a meaningful impact on the outbreaks in

20   California prisons.  There are four reasons for this change in our position.  First, CDCR

21   has been unable to determine, as a practical matter, how much is enough space to set aside

22   under this direction.  Second, the revision is tautological: it directs each prison to set aside

23   enough quarantine space unless there isn't enough quarantine space, in which case the

24   prison should do the best it can with the space it has available.  It is difficult *not* to meet

25   this standard in an outbreak, no matter the number of cells set aside, so long as the prison

26   first fills up its quarantine cells.  Third, Defendants cannot even meet this standard, as they

27   persist in quarantining people in congregate spaces even where there are available solid-

28   door cells.  Joint Brief at 19-20.  This failure continues to the present.  For example, on

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

December 16, 2020, and again on January 5, 2021, Plaintiffs asked why patients quarantined in congregate living space at VSP had not been moved into available celled housing.  On January 5, 2021, VSP had only 104 active COVID-19 cases and close to 250 vacant solid-door cell placements set aside for quarantine; under the Receiver's amended guidance, Defendants were required to move quarantined patients into the available cells. They did not do so; according to the CCHCS Regional Healthcare Executive, prison officials decided to quarantine people in their eight-person dorms in clear contradiction to the Receiver's direction.

The most important reason the Receiver's guidance is inadequate, however, is that it is grounded in the assumption that CDCR and the Governor can only do the best with what they have and make informed decisions in an impossible situation.  That might be appropriate advice under normal circumstances but nothing about the pandemic is normal.

Given the inadequacy of CDCR's efforts to date, it is essential that the Court order the only remaining solution with any hope to save lives: vaccination.  CDCR's incomplete or delayed efforts have failed to stop the virus from raging through the prison system. There is no reason to believe that will change with the measures they have proposed.  The only alternative is to vaccinate the population immediately.

**D.**   **Whether Defendants refuse to comply or, despite their best efforts, cannot comply with any parts of the Receiver's current guidance, or any modifications to that guidance that might occur between now and the filing of the parties' January 13, 2021 case management statement.**

*Defendants' Position*:  Defendants do not refuse to comply with the Receiver's guidance and Defendants believe that substantial compliance with the guidance is achievable.  Decl. Gipson Supp. Defs.' Responses Ct.'s Questions re Pls.' Quarantine Mot. ¶ 21.  Defendants intend to continue to make all reasonable efforts to follow the guidance. *Id.*  There have been instances where the new guidance has not been implemented correctly, and CDCR is working closely with CCHCS to quickly correct those mistakes and ensure that they are not repeated.  *Id.*  There have also been numerous instances where prisons have been unable to fully implement the new guidance because patients refuse to

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

move from their cells or refuse to be tested. *Id.*  CDCR is working with CCHCS and is making every effort to educate such patients and convince them to protect themselves and others by moving to appropriate quarantine or isolation space. *Id.*

Since the Receiver issued his new guidance on December 4, 2020, CDCR has taken a number of steps to begin implementing the guidance. *Id.* at ¶ 22.  Some of the more significant steps include the following:

- December 15, 2020—Meeting between the Division of Adult Institutions and CCHCS to clarify the Receiver's new guidance;

- December 18, 2020—Communication from Director Gipson to the prisons concerning the Receiver's supplemental guidance regarding quarantine;

- December 31, 2020—Meeting between CCHCS, the Division of Adult Institutions, and other officials regarding the implementation of the guidance;

- January 4, 2021—Meeting between Director Gipson and the Associate Directors in the Division of Adult Institutions regarding increasing efforts to ensure prisons are following the new quarantine guidance from the Receiver; and

- January 7, 2021—Meeting between CCHCS, the Division of Adult Institutions, the prisons' Chief Medical Executives, and the Regional Health Care Managers concerning the appropriate implementation of the Receiver's new guidance. *Id.*

These meetings ensure constant communication between and among CDCR and CCHCS headquarters and onsite leadership, and provide a productive and efficient forum to coordinate directives and discuss concerns, challenges, and areas of uncertainty. *Id.* at ¶ 23.  CDCR and CCHCS continue to ensure open lines of communication as institutions work to implement the Receiver's guidance and refine their response to a constantly evolving pandemic..

E.     **The extent to which changes in science, public health guidance,**

17201748.1

1

**recommendations from the Receiver, or the state of the pandemic have changed the relief Plaintiffs seek.**

2

3     *Plaintiffs' Position*:  The disastrous nature of the cascading outbreaks in CDCR, the

crisis of availability of hospital beds in the Central Valley and Southern California, and the

4     slow progress of vaccination in the state have changed the relief Plaintiffs seek.

5

6     There has never been a more dangerous time for this pandemic: a new, more

infectious strain of coronavirus has started to spread in California at the same time as case

7     counts, infection rates, and the death toll set and break daily records and ICU beds are at

8     zero capacity in many of the counties where prisons are located.  But it is a hopeful time as

9     well: health care workers and nursing home residents are being vaccinated every day by

10    the thousands.

11

12    But although California has received over three million vaccine doses, the State has

vaccinated just over 800,000.  *See* https://www.bloomberg.com/graphics/covid-vaccine-

13    tracker-global-distribution/;

14    https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/VaccineDoses.aspx.   In

15    recognition of the slow roll-out, state guidelines were recently relaxed to allow vaccination

16    of people in Phase 1B (including all incarcerated people) as long as vaccines have been

17    made available to people in Phase 1A (including health care workers and residents of long-

18    term care facilities).  *See* https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-

19    19/Vaccine-Prioritization.aspx.  Specifically, "[a]fter focused and appropriate efforts to

20    reach the prioritized groups, vaccine providers may offer doses to people in lower priority

21    groups when. . . [d]emand subsides in the current groups."

22    https://covid19.ca.gov/vaccines/.  The Governor today announced that people 65 and older

23    should start to be vaccinated as well.  https://www.msn.com/en-us/news/us/california-

24    allows-everyone-65-and-older-to-get-covid-19-vaccine/ar-BB1cJ6Kj.  People who are 65

25    and older are in the State's Phase 1B Tier Two along with all incarcerated people.

26    https://covid19.ca.gov/vaccines/

27    The State's decision is consistent with the current thinking from national experts:

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

1  according to the CDC's vaccination guidelines, "[i]t is not necessary to vaccinate all

2  individuals in one phase before initiating the next phase; phases may overlap," and

3  "[d]ecisions about transitioning to subsequent phases should depend on supply, demand,

4  equitable vaccine distribution, and local, state, or territorial context."

5  https://www.cdc.gov/vaccines/covid-19/phased-implementation.html.  Dr. Jerome Adams,

6  the Surgeon General, has called for an immediate and significant expansion in vaccine

7  administration: "Your headline today really should be, 'Surgeon General tells states and

8  governors to move quickly to other priority groups' . . . . If the demand isn't there in 1a, go

9  to 1b and continue on down."  https://www.nytimes.com/2021/01/05/ world/the-us-

10  surgeon-general-warns-not-to-let-priority-guidelines-slow-down-vaccinations.html.

11  Indeed, the federal government on January 12 "instructed states . . . to immediately begin

12  vaccinating every American 65 and older, as well as tens of millions of adults with medical

13  conditions that put them at higher risk of dying from coronavirus infection," threatening

14  that if they did not use the doses they have received quickly, they would lose them.

15  https://www.nytimes.com/2021/01/12/us/politics/vaccine-

16  states.html?action=click&module=Top%20Stories&pgtype=Homepage.

17      CDCR and CCHCS will shortly complete offering the vaccine to all people

18  incarcerated in CMF, CHCF, and the skilled nursing facility and transitional care unit at

19  CCWF, and to all staff, under Phase 1A of the State's vaccination plan.  Plaintiffs have

20  welcomed this accomplishment and expressed deep gratitude to the leaders who have made

21  it happen.  CDCR and CCHCS also plan to start vaccinating the rest of the population,

22  based on COVID risk score, in Phase 1B of the State's plan; that process has not yet

23  started and the timeframe for starting and completing the process is currently unknown.

24  But the State still has ample unused doses of the vaccine and has been directed to expand

25  the pool of people to be vaccinated to the next tier.  Based on current direction from both

26  CPDH and national experts, and given the extreme danger to people in CDCR facilities

27  that Defendants have proven unable to mitigate, vaccination of all of the remaining people

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17201748.1

1    in CDCR custody is an urgent necessity.[31]

2            Accordingly, the Court should order (a) Defendants and CCHCS to immediately

3    begin to offer the vaccine to all people incarcerated in CDCR based on CCHCS's

4    prioritization plan; (b) the Governor to provide adequate doses for these vaccinations; and

5    (c) that people who are COVID-naïve and unvaccinated shall be quarantined only in solid-

6    door cells as of February 1, 2021.

7

8    DATED:  January 13, 2021                    HANSON BRIDGETT LLP

9

10

11                                    By:   /s/ Paul B. Mello
                                            PAUL B. MELLO
12                                          SAMANTHA D. WOLFF
                                            LAUREL O'CONNOR
13                                          DAVID C. CASARRUBIAS
                                            Attorneys for Defendants
14

15   DATED:  January 13, 2021                    XAVIER BECERRA
                                                 Attorney General of California
16

17

18                                    By:   /s/ Ryan Gille
                                            DAMON MCCLAIN
19                                          Supervising Deputy Attorney General
                                            RYAN GILLE
20                                          IRAM HASAN
                                            Deputy Attorneys General
21                                          Attorneys for Defendants

22

23

24

25   _____

26   [31]    Plaintiffs seek this relief for all people in CDCR custody and not just the 12 prisons
     because inter-prison transfers, which could resume in large numbers at any time, can
27   quickly reduce the efficacy of any prison-specific relief.  Plaintiffs continue to support
     CCHCS's plan to prioritize those at higher risk from serious complications or death from
28   COVID.

                                            -47-                      Case No. 01-1351 JST
     JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  DATED:  January 13, 2021                    PRISON LAW OFFICE

2

3

4                                        By:  */s/ Steven Fama*
                                             STEVEN FAMA
5                                            ALISON HARDY
                                             SARA NORMAN
6                                            SOPHIE HART
                                             Attorneys for Plaintiffs
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17201748.1