XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN - 209508
Supervising Deputy Attorney General
RYAN GILLE - 262105
IRAM HASAN - 320802
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
LAUREL O'CONNOR - 305478
DAVID CASARRUBIAS - 321994
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER - 83925
STEVEN FAMA - 99641
ALISON HARDY - 135966
SARA NORMAN - 189536
RANA ANABTAWI - 267073
SOPHIE HART - 321663
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

MARCIANO PLATA, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

CASE NO. 01-1351 JST

**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**

Judge: Hon. Jon S. Tigar
Date: January 28, 2021
Time: 10:00 a.m.
Crtrm.: 6, 2nd Floor



17223262.1

The parties submit the following joint statement in advance of the January 28, 2021 Case Management Conference.

## I. VACCINES

The State's program to vaccinate people in CDCR custody is moving ahead. The time frames the Receiver described to the Court remain generally within reach. Specifically, vaccination of the population in medical beds at CMF, CHCF, and CCWF who have not had COVID-19 has been completed; vaccination of people 65 and older who have not had the disease is proceeding with the expectation that it will be concluded by the time of the Case Management Conference; vaccination of people with COVID-weighted risk scores of three and above who have not had the disease is also expected to be completed in approximately a week from the time of this filing. The Receiver has indicated that vaccination of the remaining population who have not had COVID-19 will occur as previously described to the Court. Vaccination will then be offered to those who have had COVID-19.

*Plaintiffs' Position:* Preliminary numbers on the acceptance rate among incarcerated people are very positive, as Defendants report below. CCHCS reports a coordinated approach to people who refuse the preliminary vaccine offer, with medical and mental health and custody team members providing additional education, and they report some success with those efforts. Plaintiffs applaud these efforts. For our part, we include, with every letter we send to a person in CDCR, the excellent educational materials developed by AMEND/UCSF with input and collaboration from a wide range of organizations, many led by incarcerated or formerly incarcerated people (see https://amend.us/covidvaccinefaq/). We also stand ready to provide whatever additional help we can to further these efforts.

CCHCS says it continues to consider the question of whether staff vaccination should be mandated. As of January 21, CCHCS reported that 35% of the approximately 53,000 staff who work at the prisons had received at least one dose of vaccine, and approximately 20% have had the disease.

*Defendants' Position:* CDCR continues to work closely with CCHCS and their public health partners to distribute the COVID-19 vaccine to both staff and incarcerated persons as efficiently and expeditiously as possible, and consistent with constantly evolving public health guidance. CDCR and CCHCS's distribution of the vaccine comports with federal and state public health guidelines for distribution prioritization. The State's prioritization, formalized in the California Department of Public Health's Allocation Guidelines,[1] was developed by the Drafting Guidelines Workgroup with input from the Community Vaccine Advisory Committee and was consistent with the Centers for Disease Control and Prevention's guidance on this topic at the time it was issued.[2] The California Department of Public Health issued further guidance on the evening of January 12, 2021, advising that providers may offer doses promptly to people in lower priority groups when demand subsides in the current groups or doses are about to expire.

Healthcare personnel and frontline workers who are at risk of exposure to COVID-19 because of their role in direct health care or long-term care settings, as well as incarcerated residents of long-term care facilities and medically high-risk incarcerated people were prioritized for receipt of the initial doses of the vaccine. As of January 25, 2021, 22,068 CDCR and CCHCS employees (or approximately 35% of employees) have been given the first dose of the COVID-19 vaccine. Of these, 2,289 staff have received both doses of the COVID-19 vaccine. Since the last case management conference, CCHCS has moved from a first-come-first-served system to an appointment system for providing vaccines to employees. Employees will still be required to wear PPE and physically distance even with the vaccination.

---

1 CDPH Allocation Guidelines for COVID-19 Vaccine During Phase 1A: Recommendations available at: https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CDPH-Allocation-Guidelines-for-COVID-19-Vaccine-During-Phase-1A-Recommendations.aspx

2 CDC recommendations available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations.html.

COVID-19 naïve patients at skilled nursing facilities (including, all patients at CMF and CHCF, and certain units within CCWF) were initially prioritized to receive the vaccine. All patients at skilled nursing facilities have been offered the vaccine. The following additional groups are being prioritized in this order: COVID-19 naïve patients age 65 or higher at all CDCR institutions, COVID-19 naïve patients who have a weighted risk score of 6 or greater, and COVID-19 naïve patients with a weighted risk score of 3 or greater. When vaccination of these groups is completed, the remaining COVID-19 naïve CDCR population will then be offered the vaccine.

As of January 25, 2021, 8,349 incarcerated persons have been offered the vaccine. Approximately 84% of those patients accepted the first dose of the vaccine and approximately 99% accepted the second dose. Of those offered, COVID-19 naïve patients aged 65 or older accepted dose 1 of the vaccine at a rate of over 90% and dose 2 at a rate of over 99%; COVID-19 naïve patients with a COVID-19 weighted risk score of 6 or higher accepted dose 1 of the vaccine at a rate of over 90% and dose 2 at a rate of over 99%; and COVID-19 naïve patients with a COVID-19 weighted risk score of 3 or higher accepted dose 1 of the vaccine at a rate of approximately 86% and dose 2 at a rate of over 99%.

To keep the staff and patient populations informed and to continue to encourage acceptance of the COVID-19 vaccine, CDCR and CCHCS release educational materials on a regular basis. Dr. Heidi Bauer from CCHCS's Public Health Branch answered frequently asked questions about the COVID-19 vaccine by video during the week of January 18, 2021. Answers to frequently asked questions were also posted online at https://cchcs.ca.gov/covid19-vaccine/. Additionally, during the week of January 11, 2021, CDCR and CCHCS shared the story of a Psychiatric Technician at California Medical Facility who battled COVID-19, and during the week of January 18, shared the story of the Chief of the Office of the Ombudsman and her family's fight with COVID-19. The video for the latter is available at https://www.youtube.com/watch?v=wWP6F9U0ynQ&feature=youtu.be.

A Vaccination Planning and Implementation Committee meets daily to monitor vaccine clinic operations and ensure safe and efficient vaccine delivery to staff and patients.

## II. POPULATION REDUCTION

*Plaintiffs' Position:* Further urgent population reductions are necessary to minimize the risk of and harm from COVID-19, as outbreaks continue and much of the population has not been vaccinated. Defendants have acknowledged that reduced population contributes to fewer infections and deaths (*see* ECF No. 3469 at 3-4), and last month Secretary Allison reaffirmed that CDCR prisons' "large population and physical layout make us particularly susceptible to the spread of COVID-19."[3]

The prison and camp population is currently approximately 91,300.[4] We appreciate that this total is approximately 26,000 fewer than in mid-March,[5] when the first incarcerated person in CDCR was diagnosed with COVID-19. We further recognize that approximately 11,000 of that reduction has resulted from early releases, including the program begun in July, which still continues, for some within 180 days of release.[6] The

---

[3] *See* Cal. Dep't of Corr. & Rehab., *Important COVID-19 message from Secretary Allison* (Dec. 4, 2020), https://www.cdcr.ca.gov/insidecdcr/2020/12/04/important-covid-19-message-from-secretary-allison.

[4] *See* CDCR Weekly Report of Population (Jan. 20, 2021) at Part A.I.1 (Institution/Camps), https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2021/01/Tpop1d210120.pdf (accessed Jan. 22, 2021).

[5] *See and compare* CDCR Weekly Report of Population (Mar. 18, 2020) at Part AI.1 (Institution/Camp), https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/03/Tpop1d200318.pdf (accessed Jan. 22, 2021).

[6] Between December 3, 2020 and January 13, 2021 – the most recent six week period for which data has been provided by CDCR – the 180 day release program resulted in 362 early releases. That is a small number relative to the more than 1,700 "natural releases" that, according to CDCR data, happened during that same time period.

remainder of the reduction, including much of that seen over the last two months, has resulted from natural releases and the suspending of or great limitations on intake from the county jails, where we understand approximately 9,000 are incarcerated and currently awaiting transfer to CDCR. With CDCR now re-opening intake,[7] the prison population is expected to increase over time absent further population reduction efforts.

Given the continuing risk of infection and thus morbidity and mortality from COVID-19 in prisons, more must be done. CDCR reports its program, begun in December, to review certain medically vulnerable incarcerated people for release or referral back to superior court for resentencing (*see* ECF No. 3501 at 5:7-21) has been completed. It has had only a minor impact on population. Only 1,690 people were deemed eligible for these reviews (*see* ECF No. 3520 at 7:3), and as reported by Defendants, only 15 were approved for release. Another 153 have been referred for resentencing, according to Defendants. Although eventually they may be released, the overall population reduction resulting from this program will remain minimal.

As previously discussed, Secretary Allison in December 2020 indicated she would in the near future implement changes to CDCR's credit earning rules that will result in certain sub-groups of the incarcerated receiving additional time credits as they serve their terms. *See* ECF No. 3520 at 5:5-8. Unfortunately, there appears to have been no further action with regard to this. Even if there was, unless implemented immediately and applied fully retroactively, it will result only in incremental advances to release dates, with any substantial reduction to the current population only happening well in the future. Again, reduction in population is necessary now.

The Governor should grant additional medical reprieves of sentences, including of those indeterminately sentenced, as very few have been granted. *See* ECF No. 3487 at 2:4-14. The Secretary should also re-start the program for early release for some with a year or

---

[7] CDCR says that it planned to receive a total of 175 people from county jails the week of January 18, 2021, and 370 during the week of January 25, 2021.

less to serve that was done between July and September at a sub-set of prisons, except it should now apply to all given the pervasive outbreaks which put all incarcerated at risk. Further, the Secretary should grant incarcerated people "Positive Programming Credits" (PPCs) as CDCR did in early July, approximately four months after the pandemic began, when it rightfully recognized that because of program restrictions imposed to limit the virus' spread people were unable to earn sentence-reducing time credits as they previously could. Granting additional PPC now would be fair, and result in relatively quick population reduction. The Governor and Secretary must take all these and other actions now, to further reduce crowding so as to reduce the spread of the virus, and thus sickness and death, in the prisons.

*Defendants' Position:* CDCR's population has decreased by 25,989—or over 22 percent—since the start of the COVID-19 public health crisis.[8] Between July 1, 2020 and January 20, 2021, 7,252[9] people were released from institutions and camps through the COVID-19 early-release programs Defendants announced on July 10, 2020.[10] This represents 80 more early releases than those reported in the January 13, 2021 case management statement.[11] As reported in previous statements, the previous Secretary

---

[8] This figure is calculated by taking the difference between the total population in institutions and camps on February 26, 2020 and January 20, 2021. Weekly population reports can be found at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2/.

[9] In the case management conference statement filed on January 13, 2021, this number was mistakenly reported as 7,953. ECF No. 3530 at 11:9-11. The correct number of early releases from CDCR's institutions and camps between July 1, 2020, and January 6, 2021, is 7,172.

[10] *See* ECF No. 3389 at 2:4-5:4 and https://www.cdcr.ca.gov/covid19/expedited-releases/ for details regarding CDCR's COVID-19 early-release program announced on July 10, 2020.

[11] *See* footnote 9.

released 6 additional medically high-risk individuals who did qualify for relief through the July 10 program. And before the July 10 program went into effect, the previous Secretary approved a one-time release of 14 medically high-risk individuals form San Quentin State Prison early in the COVID-19 pandemic. An additional 12,630 were released in accordance with their natural release dates during this period. As of January 20, 2021, CDCR's institutions house approximately 89,933 persons.[12]

In addition to CDCR's COVID-19 early release programs and mitigation measures, the Secretary completed her review of eligible medically high-risk people for expedited consideration for resentencing under Penal Code section 1170, subdivision (d)(1)). Those being considered include people who have served their base term, but whose sentence(s) carry enhancements that were previously mandatory, but are now discretionary after the passage of Senate Bill 1393, which became effective on January 1, 2018. As of January 25, 2021, 15 were released and an additional 153 were referred to the courts for consideration under Penal Code section 1170(d)(1).

The Secretary individually reviewed indeterminately-sentenced individuals who have been granted parole but remain in prison because they have not yet reached their minimum eligible parole date or youth offender parole date. Secretary Allison approved 17 individuals for release within this group.

CDCR continues to process early releases on a rolling basis through the 180-day early-release program announced on July 10, which has accounted for the vast majority of early releases since then.

The additional early-release programs referenced by Plaintiffs above are discretionary in nature and were initially implemented based upon the Secretary's authority under California Government Code § 8658 in response to the pandemic. Since the last Case Management Conference, the Governor has granted medical reprieves of

---

[12] *See* January 20, 2021 population report at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2021/01/Tpop1d210120.pdf.

sentences to six additional individuals deemed by the Receiver to be at high risk for potential complications from COVID-19. These individuals range in age from 69 to 85 years old. CDCR is not currently planning to re-start the early release program for persons with a year or less to serve or providing across-the-board Positive Programming Credits at this time, but may reconsider in the future.

It bears noting that incarcerated patients' COVID weighted risk score is only one of many factors considered by CDCR in determining whether early release is appropriate, including, among others, risk to public safety, victim's rights, risk of recidivism, and time served. Further, incarcerated persons who may be *eligible* for parole may nonetheless be determined not to be *suitable* for parole due to the unreasonable risk of current danger they pose, as determined by a panel of Board of Parole Hearings commissioners and deputy commissioners.

## III. QUARANTINE AND ISOLATION

*Plaintiffs' Position:* Plaintiffs' motion remains pending before the Court. We believe that Court intervention remains necessary and ask that the Court issue the proposed order, as revised on January 13 (ECF No. 3531).

Plaintiffs do not doubt Defendants' desire to vaccinate people in their custody, but we do doubt the ability of CDCR and CCHCS to act on that desire without commitment of the necessary supplies from Defendant Governor Newsom. Although Defendants and the Receiver report encouraging numbers and predicted timelines, the Court's engagement, involvement, and potential action in this area has had an effect on their ability to follow through and meet those timelines. Vaccination is the only judicial remedy that can have a meaningful impact on the dangerous quarantine practices in CDCR. Accordingly, Defendants should be required to quarantine people as safely as possible, including the use of cells with solid doors for all who have not had COVID-19 and have not been vaccinated by a date certain. The Court's intervention in this area will save lives.

Defendants discuss below the widespread practice at RJD and LAC to co-locate in the same housing units patients who test positive, as well as those on quarantine, with

others not on medical isolation or quarantine. Defendants admit a part of the reason this happened is "staffing challenges." They did not have enough staff at the prisons to timely complete these essential moves. Second, as the Court has previously stated, the prisons have insufficient space to house people in accord with public health directives. Defendants below claim "RJD had abundant isolation space," but the daily Outbreak Management Tools from early December to approximately mid-January, when infection numbers dropped to relatively low levels, repeatedly and consistently stated, for numerous housing units, that "confirmed positive patients will be moved . . . as beds become available." In other words, overcrowding placed patients at serious risk of harm.

Defendants' assertion that most of these housing failures are a result of patient refusals to move rings hollow. Their data in this area is suspect for several reasons. For one thing, the claimed refusals are apparently undocumented, so there is no mechanism to ensure they are accurate. We suspect that some are not: we have heard from people at RJD and LAC who say they wanted to move, but were refused. And we have previously documented the gravely disturbing practice of staff at another prison (CSP-Sacramento) falsifying refusal forms for medical appointments for which the patients were never notified.

To the extent patients actually do refuse to move, Plaintiffs believe, based on numerous client contacts, that they are motivated by distrust of Defendants' competence and good faith in managing the pandemic. There is a widespread attitude of doubt that moving to another unit will do anything other than deprive patients of their jobs, property, and program, since patients have seen and heard about widespread and apparently unchecked spread, botched transfers, and staff – the primary vectors of introduction of the virus into the prisons – with incomplete adherence to masking requirements.

*Defendants' Position:* Defendants have continued to make efforts to ensure that prisons comply with the Receiver's isolation and quarantine guidance provided on December 4 and 18, 2020, by closely monitoring the prisons use of reserved quarantine space. When it has been discovered that the guidance has not been correctly followed at a

particular prison, CDCR headquarters has issued strenuous corrective instructions.

At the last case management conference the Court asked for more information concerning reasons patients who tested positive at R.J. Donovan (RJD) and California State Prison, Los Angeles County (LAC) during the outbreaks in December were not moved to isolation. The outbreaks at these two prisons were large and struck rapidly. During outbreaks like these, the circumstances are constantly evolving and officials often find themselves tasked with making the best possible decision under rapidly changing and complex circumstances. Patient moves to isolation or quarantine spaces take time to complete. When it is determined within a very short period that large numbers of patients must all be immediately moved to isolation or quarantine (for instance, when results from mass testing pour in), the sheer volume of necessary moves can cause delays. Staffing challenges caused by the outbreak add to the difficulty of quickly moving patients. But the primary challenge officials faced at LAC and RJD were patient refusals to move.

Although the Receiver's guidance on isolation and quarantine might appear simple on paper, during large, quickly spreading, and rapidly evolving outbreaks, it cannot be overstated how complex and difficult it is to comply with that guidance. For example, in LAC's B3 housing unit, it became clear as test results were received in early December that large numbers of patients in that unit had contracted the virus. LAC officials made a decision to convert B3 into an isolation unit and to remove patients who were not known to be positive. In an effort to quickly remove those patients without delay, many patients whose test results had not yet been received were moved out of the unit to quarantine spaces. As test results continued to come in, it was discovered that many patients who were moved out of B3 were actually positive and had to be moved back into the unit for isolation.

By mid-December, virtually all patients in LAC's Facilities B and C who should have been moved to isolation (approximately 342 patients) were refusing to move to isolation. And patients who should have moved to quarantine spaces were also refusing to move. The patients in these Facilities were unified in their decision to refuse to move.

The constant shuffling of patients from one place to another throughout the prison gave many patients the impression that the moves were causing the virus to spread faster and worsening LAC's outbreak, which, in turn, lead to even more patient refusals to move to isolation or quarantine.

At RJD, patient refusals to move were also the primary reason patients who should have moved to isolation did not move. During the period from December 14 through January 4, officials at RJD had to contend with well over 400 patient refusals to move to isolation or quarantine. RJD had abundant isolation space, much of which was never used during its large outbreak because patients simply refused to move to those isolation spaces.

## IV. STAFF SCREENING AND TESTING

*Plaintiffs' Position:* Staff remain the most significant vector for introducing COVID-19 into the state prison system. As of January 25, nearly 15,000 staff members had contracted COVID-19 since March, and more than 1,700 were out that day with an active case of COVID-19. *See* Cal. Dep't of Corr. & Rehab., *CDCR/CCHCS COVID-19 Employee Status*, https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status (last updated Jan. 25, 2021). And while CCHCS and CDCR have begun offering vaccines to staff, approximately 45% of the 53,000 staff working in the prisons have not had the disease and have not yet received a vaccine. Moreover, it is not yet known whether vaccination prevents transmission. Frequent and rigorous staff testing thus remains essential to preventing the introduction and spread of COVID-19 in the prisons.

CDCR and CCHCS currently lack a reliable system to ensure each day that staff at the prisons have complied with mandatory testing. As Defendants have described in recent Joint Case Management Conference Statements, on December 21, CDCR and CCHCS issued a joint memo stating that "any employee who refuses to comply with mandatory COVID-19 testing shall not be permitted to enter the institution or facility and shall be placed on approved dock (without pay) until they comply with mandatory testing." ECF No. 3530 at 20 (January 13 Joint CMC Statement); ECF No. 3510 at 14 (December 22 Joint CMC Statement); *see also* ECF No. 3520-1 (copy of December 21 memorandum).

After this memorandum was released, we asked how prison staff were tracking compliance with the testing guidelines, to ensure employees were being appropriately excluded from work if they had not tested. On January 21, we received a description of the process used at eight prisons: weekly, prison staff review a list of employees who tested the week before, compare it to a list of employees who worked that week, and investigate those employees who appear to have worked but were not tested. Employees who are identified through this process are not immediately placed on leave; instead, they are directed to get tested and are only placed on leave if they then refuse to test.

This process will not ensure that employees showing up to work each day have been tested in accordance with the guidelines, as required by the December 21 CDCR/CCHCS Memorandum. This process will only identify noncompliant staff the week after they have worked, perhaps for many days, without having been tested. This system also will not identify whether particular employees were tested every 7 days, as required by the testing guidance, but only whether employees were tested at some point the week they worked. From the examples provided, it appears an employee could test on a Monday one week and a Friday the next week (11 days apart) and still be considered in compliance with the requirement to test every 7 days.

On January 22, we sent these concerns to CCHCS and CDCR, and suggested that CCHCS and CDCR also require staff provide proof of compliance with testing policies (e.g., proof they were tested within the previous 7 days) during the entrance screening process. We met on January 25 to discuss the issue. We suggested that CCHCS and CDCR consider (1) asking employees whether they have been tested within the required timeframe during entrance screening and (2) producing a list each day of all employees who have been tested during the previous 7 days and cross-referencing that list during entrance screening to ensure staff have been tested in accordance with policy. CCHCS and CDCR said they are continuing to consider and discuss the issue this week.

CCHCS and CDCR also recently provided the fourth set of biweekly reports of staff noncompliance with face covering, physical distancing, and testing requirements. It is

apparent from these logs that failures to test continue at some prisons. CDCR documented staff refusals to test in December and January at Central California Women's Facility (29 refusals); Mule Creek State Prison (12 refusals); High Desert State Prison (9 refusals); California State Prison, Corcoran (7 refusals); Substance Abuse Treatment Facility (7 refusals); Avenal State Prison (6 refusals); San Quentin State Prison (5 refusals); California Institution for Men (4 refusals); Richard J. Donovan Correctional Facility (4 refusals); North Kern State Prison (3 refusals); Chuckawalla Valley State Prison (3 refusals); California Institution for Women (2 refusals); Valley State Prison (2 refusals); and Sierra Conservation Center (1 refusal). We do not have access to reliable testing data to determine whether there have been any additional refusals that were not documented in these logs. As described in previous Case Management Conference Statements, we have been requesting employee testing data for many months. The initial data we received in late December reflected low compliance percentages with mandatory weekly testing, but we were told this data did not account for staff who did not test because they were out sick or on vacation. *See* ECF No. 3530 at 19-20. We have been told CCHCS and CDCR are still reviewing and validating this data.

*Defendants' Position:* CDCR continues to coordinate with the Receiver's Office and enforce the Memorandum on Employee Accountability for COVID-19 testing, which dictates that any employee who refuses to comply with mandatory COVID-19 testing shall not be permitted to enter the institution or facility and shall be placed on approved dock (without pay) until they comply with mandatory testing. Unwillingness to comply with mandatory staff testing shall be interpreted as a refusal. Concurrently, employees who refuse to comply with mandatory employee COVID-19 testing and who are not actively engaged in a request for reasonable accommodation shall also be subject to progressive discipline for their refusal to submit to the mandatory testing. Additionally, the Receiver's Office circulated an updated draft of its Employee Testing Guidance to the parties on January 21, 2021, and requested feedback before the draft is finalized.

On January 25, 2021, the Receiver's Office and CDCR met with Plaintiffs' counsel

to answer their questions regarding the updated draft of the staff testing plan, which is in the process of being revised. Plaintiffs also proposed changes to the current system of monitoring staff compliance with the plan. The Receiver's Office indicated they will consider the feasibility of Plaintiffs' suggestions and respond to Plaintiffs with their findings. CDCR will continue to support CCHCS's efforts, particularly with respect to staff testing.

Additionally, with respect to staff compliance with mask-wearing and physical distancing, CDCR will continue to progressively discipline employees who fail to properly wear a mask and/or physically distance from others appropriately. CDCR will also continue to report to Plaintiffs' counsel and the Court on a bi-weekly basis regarding employees who fail to comply with Department requirements in this regard.

DATED: January 26, 2021

HANSON BRIDGETT LLP

By: */s/ Samantha Wolff*
PAUL B. MELLO
SAMANTHA D. WOLFF
LAUREL O'CONNOR
DAVID C. CASARRUBIAS
Attorneys for Defendants

DATED: January 26, 2021

XAVIER BECERRA
Attorney General of California

By: */s/ Damon McClain*
DAMON MCCLAIN
Supervising Deputy Attorney General
RYAN GILLE
IRAM HASAN
Deputy Attorneys General
Attorneys for Defendants

DATED: January 26, 2021 PRISON LAW OFFICE

By: */s/ Steven Fama*
STEVEN FAMA
ALISON HARDY
SARA NORMAN
SOPHIE HART
Attorneys for Plaintiffs