XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN - 209508
Supervising Deputy Attorney General
RYAN GILLE - 262105
IRAM HASAN - 320802
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
LAUREL O'CONNOR - 305478
DAVID CASARRUBIAS - 321994
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER - 83925
STEVEN FAMA - 99641
ALISON HARDY - 135966
SARA NORMAN - 189536
RANA ANABTAWI - 267073
SOPHIE HART - 321663
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br> Defendants. | CASE NO. 01-1351 JST <br><br> **JOINT CASE MANAGEMENT CONFERENCE STATEMENT** <br><br> Judge: Hon. Jon S. Tigar <br> Date: February 16, 2021 <br> Time: 10:00 a.m. <br> Crtrm.: 6, 2nd Floor |

The parties submit the following joint statement in advance of the February 16, 2021 Case Management Conference.

## I. VACCINES

As of February 8, 2021, 76% of all incarcerated people within CDCR have either received at least one dose of the vaccine or have had COVID-19. Thirty-eight percent of all incarcerated people have been offered at least one dose of the vaccine, and 68% of all people offered have accepted the vaccine (amounting to 26% of the incarcerated population having been vaccinated). Of those offered, medically high-risk patients accepted the vaccine as follows: COVID-19 naïve patients aged 65 or older accepted the vaccine at a rate of 90%; COVID-19 naïve patients with a COVID-19 weighted risk score of 6 or higher accepted the vaccine at a rate of 91%; and COVID-19 naïve patients with a COVID-19 weighted risk score of 3 or higher accepted dose 1 of the vaccine at a rate of 83%. And as of February 8, 2021, 39% of staff who work in CDCR's institutions have been given at least one dose of the COVID-19 vaccine. Sixty-one percent of all staff have either been vaccinated or have had COVID-19. Employees are still required to wear PPE and physically distance even with the vaccination.

*Plaintiffs' Position:* The vaccination numbers as reported by Defendants and CCHCS are indeed impressive, and very welcome. However, it is imperative that the amount of vaccine supplied by the State be consistent with the Receiver's ability to administer vaccines to the staff and the incarcerated population. Plaintiffs are concerned that the State's new vaccine guidelines -- which eliminate any mention of incarcerated people, who had previously been listed in Phase 1B -- will drastically reduce the amount of vaccines available to CCHCS.[1]

---

[1] *See* Cal. Dep't of Pub. Health, *Updated COVID-19 Vaccine Allocation Guidelines* (Feb. 4, 2021), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/VaccineAllocationGuidelines.aspx.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.5

As of this writing, California has already administered nearly five million vaccine doses.[2] The state prison population, with 25,659 doses administered, accounts for one half of one percent of that total. Put another way, there are approximately 30.4 million Californians eligible to be vaccinated (18 and older),[3] of which 25.4 million have not yet received a shot. The remaining approximately 70,000 people in CDCR who require vaccination[4] is less than one third of one percent (.28%) of that total. It thus requires only a tiny fraction of the State's vaccine allocation to ensure the safety of this extraordinarily vulnerable population. Unlike other groups, people living inside prisons cannot effectively practice physical distancing to minimize the risk of infection, and many prisons lack essential space to quarantine people safely consistent with public health standards.

Plaintiffs seek Court intervention to ensure a stable supply of vaccine consistent with ability of CCHCS to administer the shots in a timely manner. Data from CCHCS indicates that they administered approximately 14,000 vaccine doses to the incarcerated population between February 1 and February 8. Accordingly, we seek an order requiring Defendants to supply that amount per week until CDCR's incarcerated population has been vaccinated. Given the known profound risk of harm from quarantine in shared air space, and the clear risk of quarantine in unventilated celled housing units as noted in the

_____

[2] *See* https://covid19.ca.gov/vaccines/#California-vaccines-dashboard (last viewed Feb. 10, 2021).

[3] *See* https://censusreporter.org/profiles/04000US06-california (last viewed Feb. 10, 2021).

[4] Defendants' statement below that "nearly three-quarters of the incarcerated population have protection against COVID-19 as a result of either receiving the vaccine or recovering from the virus" is misleading; that calculation includes thousands who had COVID-19 more than 90 days ago and are thus no longer considered immune from reinfection.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

Ventilation section of this Statement, vaccination is the only remedy that can be effective.[5]

*Defendants' Position:*

CDCR continues to work closely with CCHCS and their public health partners to distribute the COVID-19 vaccine to both staff and incarcerated persons as efficiently and expeditiously as possible, and consistent with public health guidance. COVID-19 naïve patients at skilled nursing facilities (including, all patients at CMF and CHCF, and certain units within CCWF) were initially prioritized to receive the vaccine. All patients at skilled nursing facilities have been offered the vaccine. The following additional groups of COVID-19-naïve patients are being prioritized in this order: patients age 65 or older at all CDCR institutions; patients with a COVID-19 weighted risk score of 6 or greater; patients with a weighted risk score of 3 or greater; certain psychiatric patients and patients who require a higher level of care; and incarcerated people with jobs. When vaccination of these groups is completed, the remaining COVID-19 naïve CDCR population will be offered the vaccine.

A Vaccination Planning and Implementation Committee continues to meet daily to monitor vaccine clinic operations, discuss vaccine priorities, and ensure safe and efficient vaccine delivery to staff and patients.

The Receiver's Office reported to the parties on February 9 that a group of experts convened last week to discuss the topic of mandating COVID-19 vaccines for CDCR employees, and that the State will not mandate vaccines for its staff at this time. The decision regarding whether to mandate current COVID-19 vaccines involves complex and novel issues that the State is still researching and considering. A mandatory vaccine policy would require carefully thought-out workplace policies that cannot be developed in a rush,

[5] A federal judge in the District of Oregon recently ordered the state to offer the COVID-19 vaccine to every person incarcerated in the state's prison system "as if they had been included in Phase 1A, Group 2, of Oregon's Vaccination Plan" – that is, at the same time staff were offered the vaccine. *See Maney v. Brown*, No. 6:20-CV-00570-SB, 2021 WL 354384, at *17 (D. Or. Feb. 2, 2021).

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.5

and there are concerns that mandating the vaccine at this time could create staff shortages. The State may reevaluate its position as it continues to monitor developments in the law and workplace policies, the availability of the vaccine, and the outcome of ongoing scientific studies regarding how effectively the vaccine reduces not just viral infection, but viral transmission. As the CDC has acknowledged, "[w]hile mRNA COVID-19 vaccines have demonstrated high efficacy at preventing severe and symptomatic COVID-19, there is currently limited information on how much the vaccines might reduce transmission and how long protection lasts." Available at https://www.cdc.gov/vaccines/covid-19/info-by-product/clinical-considerations.html. The State's position of focusing on voluntary vaccination in light of limited vaccine supplies, collaboration with employee representatives to educate staff and promote uptake, and monitoring with basic safety requirements is in line with national trends: based on news reports, state prison systems across the country currently do not require their employees to accept the COVID-19 vaccine.

Consistent with Centers for Disease Control and Prevention guidelines, CDCR continues to require staff to wear masks, practice social distancing, and participate in regular COVID-19 testing as frequently as twice per week. As reported previously and below, the State takes disciplinary action in instances of noncompliance. To keep the staff and patient populations informed and to continue to encourage acceptance of the COVID-19 vaccine, the State continues to focus on educating its staff and incarcerated population on the benefits of taking the vaccine to encourage higher acceptance rates. For example, CDCR and CCHCS release educational materials on a regular basis. In addition to the resources reported in the previous case management conference statement, CDCR and CCHCS continue to create and circulate educational videos to CDCR's staff and incarcerated population. For example, a video of a formerly incarcerated person can be viewed at https://vimeo.com/505411415/2900157a35, and Dr. Heidi Bauer, the head of CCHCS's Public Health division, answered frequently asked questions about the vaccine in a video

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

that can be viewed here https://vimeo.com/499825217/e0d6b1df08.[6]

Plaintiffs' request above for an order requiring a steady supply of 14,000 COVID-19 vaccine doses per week is neither necessary nor appropriate. Plaintiffs do not assert that there is currently an insufficient supply of the vaccine flowing to the institutions, and therefore fail to demonstrate any need to support their request. Indeed, Plaintiffs have commended the State's vaccination efforts to date. And in a February 9, 2021 conference call with the parties, the Receiver's Office confirmed that incarcerated people continue to be included among vaccine priority groups. Moreover, Plaintiffs' request—which has not been briefed—ignores the fact that COVID-19 vaccines are a scarce resource nationwide and the State receives an unpredictable supply from the federal government.

Further, Plaintiffs' failure to distinguish California's vaccine distribution plan from *Maney v. Brown*, No. 6:20-CV-00570-SB, 2021 WL 354384, at *17 (D. Or. Feb. 2, 2021), as mentioned in footnote 4, is misleading. While California has prioritized medically vulnerable incarcerated people in its initial distribution of vaccines, Oregon had completely excluded incarcerated people from its initial distribution of vaccines. In *Maney*, the court ordered the State of Oregon to include incarcerated people in the same vaccine priority group as prison employees—which Oregon had identified as Group 2 in Phase 1A before the court made its decision—in part because incarcerated people and prison staff have a "'shared increased risk of disease.'" *Maney*, 2021 WL 354384 at *1, 13-14, quoting Centers for Disease Control and Prevention guidelines. In contrast, the State of California prioritized vaccine distribution to prison staff and incarcerated people at the same time. Additionally, the *Maney* court acknowledged that "[t]he question of which groups of Oregonians should receive priority is best left to policymakers." *Id*. at *1. But here, Plaintiffs appear to ask the Court to take on the role of policymaker by ordering the State to vaccinate its incarcerated population, regardless of the priority group they fall into.

---

[6] Other educational videos can be viewed at CDCR's YouTube channel, https://www.youtube.com/user/CACorrections/videos.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.5

As described above, and as Plaintiffs acknowledge, Defendants and CCHCS have made good progress with vaccine distribution to the incarcerated population. Currently, nearly three-quarters of the incarcerated population have protection against COVID-19 as a result of either receiving the vaccine or recovering from the virus, and the majority of medically high-risk incarcerated people, including those who are 65 or older, have been vaccinated. The State is committed to vaccinating the remaining population as quickly as possible, consistent with public health guidelines, and based on supplies received from the federal government.

## II. POPULATION REDUCTION

*Plaintiffs' Position:* "If the coronavirus were designing its ideal home," the Receiver told a California Assembly subcommittee earlier this week, "it would build a prison."[7] He also bluntly stated, "Unfortunately we know we can never stop the movement and spread of this virus, no matter how hard we try."[8] Similarly, CDCR Secretary Allison also recently acknowledged that CDCR prisons' "large population and physical layout make us particularly susceptible to the spread of COVID-19."[9] These truths, learned and re-learned at great cost, show precisely why urgent population reductions are necessary to minimize the risks and harm from COVID-19 to those incarcerated in CDCR.[10]

---

[7] *See* Assembly Budget Subcommittee No. 5 on Public Safety, Monday, February 8 2021, available at https://www.assembly.ca.gov/media/budget-subcommittee-5-public-safety-20210208/video [at 1:38:25 et seq.].

[8] *Id.*

[9] *See* Cal. Dep't of Corr. & Rehab., *Important COVID-19 message from Secretary Allison* (Dec. 4, 2020), https://www.cdcr.ca.gov/insidecdcr/2020/12/04/important-covid-19-message-from-secretary-allison.

[10] As of February 10, there were 91,073 people in CDCR's prisons and camps. *See* CDCR Weekly Report of Population (February 10. 2021) at Part A.I.1 (Institution/Camp), https://www.cdcr.ca.gov/research/wp-

172766690.5

This Court has repeatedly called for CDCR to release more of the medically vulnerable, particularly the elderly, to reinstate the program permitting release of some with less than a year left to serve, and to grant additional "Positive Programming Credits" given the efforts of the incarcerated to limit viral spread over the last several months and the fact that limitations on the availability of milestone and achievement credits have resulted in people serving more time than they would have but for the pandemic. At the last Case Management, the Court noted that Defendants in their Statement had not provided reasoning for or an explanation of why these suggestions, which we have repeatedly made as well, have not been undertaken.

Defendants below again have no explanation for why they are not granting additional medical reprieves or early releases of those most at risk of harm and death from COVID-19. Nor do they directly explain why additional Positive Programming Credits (PPCs), similar to the 12 weeks granted to many in July, are not being granted. Defendants say the pandemic "has not affected the awarding of good conduct credits to eligible people." But this misses the mark. We believe the pandemic has reduced opportunities to earn, and thus the awarding of, Milestone Completion, Rehabilitation Achievement, and Educational Merit Credits, available to many in addition to good conduct credits. In this way, it appears the pandemic has resulted in people serving longer terms.[11]

*Defendants' Position:* CDCR's population has decreased by 26,269—or over

_____

content/uploads/sites/174/2021/02/Tpop1d210203.pdf. As we have previously explained, this total represents a reduction of approximately 26,000 from mid-March 2020, but it results primarily from natural releases and the slowing or closing of intake. With regard to intake, CDCR Secretary Kathy Allison reported last week that 10,700 people are in county jails pending transport to CDCR.

[11] On February 12, we requested data regarding Milestone Completion, Rehabilitation Achievement, and Educational Merit Credits granted in 2019 and 2020.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.5

22%—since the start of the COVID-19 public health crisis.[12]  Between July 1, 2020 and February 10, 2021, 7,574 people were released from institutions and camps through the COVID-19 early-release programs Defendants announced on July 10, 2020.[13]  This represents 322 more early releases than those reported in the January 26, 2021 case management conference statement.[14]  An additional 13,481 people were released in accordance with their natural release dates.  CDCR's institutions currently house approximately 89,663 people.[15]

CDCR implemented a number of early-release programs based on the Secretary's authority under California Government Code § 8658 in response to the COVID-19 pandemic, several of which were announced on July 10, 2020.  CDCR continues to process early releases on a rolling basis through the 180-day early-release program announced on July 10, which has accounted for the vast majority of early releases since then.  Additionally, the Governor has granted medical reprieves of sentences to 10 people deemed by the Receiver to be at high risk for potential complications from COVID-19, and continues to review potential cases.  These individuals range in age from 69 to 85 years old.  And as previously reported, CDCR's Secretary has released medically high-risk people based on discretionary individual reviews, and has referred incarcerated people to

---

[12]    This figure is calculated by taking the difference between the total population in institutions and camps on February 26, 2020 and February 10, 2021.  Weekly population reports can be found at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2/.

[13]    *See* ECF No. 3389 at 2:4-5:4 and https://www.cdcr.ca.gov/covid19/expedited-releases/ for details regarding CDCR's COVID-19 early-release program announced on July 10, 2020.

[14]    *See* ECF No. 3539 at 7:12-14.

[15]    *See* February 10, 2021 population report at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2021/02/Tpop1d210210.pdf.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.5

the courts for possible reconsideration of their sentences under Penal Code section 1170(d)(1).

CDCR previously awarded 12 weeks of positive programming credits to eligible incarcerated people under California Code of Regulations, Title 15, section 3043.6 to recognize the incarcerated population's efforts, and the impact on their ability to earn program credits during COVID-19.[16] Later, CDCR expanded this program to include people in county jails awaiting transfer to a CDCR institution. CDCR is not currently planning to award more credits under section 3043.6 at this time, but may reconsider in the future. The pandemic has not affected the awarding of good conduct credits to eligible people under section 3043.2. Incarcerated people not sentenced to death or a term of life without the possibility of parole earn good conduct credit in the following manner: people serving a determinate or indeterminate term for a violent felony earn one day of credit for every four days of incarceration, unless eligible for greater credit; people serving a sentence under the Three Strikes Law, Penal Code section 1170.12(c), or Penal Code section 667(c) or (e) earn one day of credit for every two days of incarceration, unless eligible for greater credit; and others earn one day of credit for every day of incarceration. Cal. Code. Regs. tit. 15, § 3043.2.

Incarcerated patients' COVID weighted risk score is only one of many factors considered by CDCR in determining whether early release is appropriate, including, among others, risk to public safety, victim's rights, risk of recidivism, and time served. Further, incarcerated persons who may be *eligible* for parole may nonetheless be determined not to be *suitable* for parole due to the unreasonable risk of current danger they pose, as determined by a panel of Board of Parole Hearings commissioners and deputy commissioners.

## III. QUARANTINE AND ISOLATION

---

[16] *See* letter to all incarcerated people at https://www.cdcr.ca.gov/covid19/letter-to-all-incarcerated-people/.

172766690.5

*Plaintiffs' Position:* Plaintiffs' motion remains pending before the Court. Plaintiffs seek a ruling on the matter for the reasons set forth in the above section on vaccination.

<u>Strategies to Encourage Moves to Quarantine and Isolation Housing</u>

At the last CMC, Plaintiffs raised the concern that medical orders for movement to isolation or quarantine housing were, in a significant number of cases, not carried out. CDCR and CCHCS attributed the failure to move to a number of factors, including that some incarcerated people had refused, choosing instead to remain in their cell or dorm despite the potential health risks to themselves and others in the unit. The Court directed Plaintiffs to identify potential strategies to address this issue, and rank them based on the expense involved and likely efficacy. ECF No. 3545 at 27-28.

Shortly after the hearing, we provided Defendants with a list of five measures they could adopt to encourage compliance with the isolation/quarantine orders, ranked based on our estimate of the relative costs. After conducting phone interviews with 57 incarcerated people who were identified as recently refusing moves at California State Prison–Los Angeles County, Calipatria State Prison, R.J. Donovan State Prison (RJD), and Pleasant Valley State Prison,[17] we provided a revised list of four measures to Defendants, ranked based on expense and efficacy. The measures we proposed, in the order endorsed by our clients, are:

1.     Arrange for an extra video visit with loved ones.

2.     If the person has a job and pay number, continue to pay the person for their work during the time they are under quarantine and/or isolation, even though they will likely be unable to work.

3.     Commit to making every effort to return each person their original housing, whenever possible, if that is what they want.

4.     Compensate people for the risk and inconvenience of moving. Provide each

---

[17]    We appreciate Defendants' help in arranging for these confidential phone calls with the class members with very short notice.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

person who voluntarily moves with $25 credit at canteen.

We added the video visit option after our phone calls with class members, at their suggestion. A number of class members explained that, having endured many months without seeing their loved ones, the prospect of video contact would be a strong incentive to comply with the public health orders. Plaintiffs are pleased to learn today that Defendants plan to issue a memo shortly setting forth the incentives that CDCR is willing to offer, including the option of an additional video visit if available, to those who comply with the health-based housing orders. Plaintiffs will follow up with Defendants to determine the availability of video visits at the 35 state prisons.

While discussing our proposed strategies with the class members, we identified other factors that impact movement. At RJD, people told us staff had indicated that the moves were optional, and that if they signed off on a 128-A (a refusal chrono), they could remain. Others at that prison said that when they were told they had to move, they packed their cells and waited but staff never returned. And while the December Outbreak Management Tools reported that hundreds of patients had refused to move during the outbreak at Pleasant Valley, when we asked for a list of patients who had refused to move at this prison, Defendants provided us with the names of only 5 patients.

People at Pleasant Valley, Calipatria, and RJD also told us they refused moves because the quarantine units were located on Sensitive Needs Yards, and they did not believe they would be safe moving there from a General Population Yard. Three people at RJD refused having heard that the gym conditions for the isolation unit were crowded, and they would have to go outside to use the porta-potties and portable showers.

Many of those who refused at Lancaster expressed concern that the moves were proposed too late, after the virus had taken hold in housing units and thus they served no point. Some believed that the prison was spreading the virus by moving people in and out of different housing units, a concern also expressed by the members of the Court's Advisory Board in December that prompted the Receiver's decision to suspend required moves to quarantine units in favor of quarantining in place. In this context, we were

troubled to learn that, of the 17 Lancaster residents we spoke to, 11 reported that they were given Rules Violation Reports (RVRs) for refusing to move, including an 85-year-old man who reported he was confused about whether the moves were optional, and a man who said he returned from the hospital after being treated for COVID pneumonia for four days and felt too weak to pack his cell and move. RVRs can (and we understand did here) result in the loss of time credits, and are considered during parole hearings.

Based on our survey, it became apparent that the strategy of offering compensatory measures to those who agree to leave their housing for a quarantine or isolation unit will likely induce some to comply. Better compliance could also be obtained by better oversight from managers to ensure that communication with the incarcerated population is clear and accurate and that refusals are genuine. Another crucial measure, which Plaintiffs have maintained from the beginning of the quarantine/isolation set-aside process, is to designate separate space for people who are on Sensitive Needs and General Population Yards. Indeed, in our September 16 request for modification of the set-aside spaces, we stated that "there should be separate isolation and quarantine space for each classification," and that at the prisons where this hadn't been done, "CDCR and CCHCS face a very real possibility that large numbers of people will refuse to be tested and/or refuse to be moved to the designated isolation and quarantine space." *See* ECF No. 3503 at 11. Prisons that have not yet designated separate isolation and quarantine space for people on Sensitive Needs and General Population Yards must do so immediately.

Finally, it was clear from these interviews, as well as from countless letters and interviews in the years prior to the pandemic, that a substantial population of incarcerated people in California deeply mistrust the custody and medical leadership in the prisons, and may not agree to the moves under any conditions. We cannot stress enough the importance of ameliorating this mistrust in order to achieve a healthy, functioning health care system. This problem cannot be solved during the pandemic, but its impact on CDCR's and CCHCS's efforts to control the spread of the virus is a clear indication that it must be solved if CDCR is to achieve its goals in providing constitutional care.

*Defendants' Position:* Defendants have continued to make efforts to ensure that prisons comply with the Receiver's isolation and quarantine guidance provided on December 4 and 18, 2020, by closely monitoring the prisons use of reserved quarantine space. When it has been discovered that the guidance has not been correctly followed at a particular prison, CDCR headquarters has issued strenuous corrective instructions.

In the last Case Management Conference Statement, Plaintiffs called into question the accuracy of Defendants' statements that patients at RJD and LAC were not housed in the appropriate quarantine or isolation housing because they had refused to move. *See* Jan. 28, 2021 CMC Statement at 10:10-11 ("Defendants' assertion that most of these housing failures are a result of patient refusals to move rings hollow."), ECF No. 3539. Since that time, on February 2, 2021, Defendants provided Plaintiffs' counsel with the names of hundreds of patients at Pleasant Valley State Prison, Calipatria State Prison, RJD, and LAC who refused medically-directed moves to quarantine or isolation cells. Defendants also set up calls for multiple Prison Law Office attorneys to conduct simultaneous interviews of these patients, based on a list of approximately 100 patients provided by Plaintiffs' counsel.

Additionally, CCHCS recently conducted a special review of the patients who refused to participate in COVID-19 testing and bed moves at California Correctional Institution (CCI). The review concluded that patients were refusing to test because of a concern they would have to move cells or lose their cellmate; patients also stated they were tired of having their program (and job assignments) disrupted when they are placed on quarantine (even if they test negative). Additionally, the patients believe that the spread of COVID-19 is caused by the moving of patients into set aside space, rather than keeping them isolated in place. In short, the review concluded that "[t]he quarantine process is what is driving the refusals …."

Following the last case management conference, Plaintiffs' counsel provided Defendants with a list of five proposals to encourage incarcerated persons to comply with medical directives to move to quarantine or isolation space. Several of these proposals had

previously been discussed between the parties in the context of incentivizing medically high-risk patients to move to celled housing at different institutions. Defendants have agreed to implement several of the Plaintiffs' proposals, with modifications. To that end, Defendants will issue a memorandum by the end of this week describing the following incentives:

- For persons who moved for placement in quarantine or isolation housing, if the person has a job, with or without pay number, every effort will be made to retain the person in their assignment. If this is not possible (for instance, the person is relocated to a different yard, it was an essential job and workers were needed to fill that position), once released from quarantine or isolation housing, the person will be placed at the top of the wait list and will be assigned appropriately. This will only apply if the person remains at the same institution.

- Persons will be allowed to bring all of their property to the isolation or quarantine housing.

- CDCR will commit to making every effort to return each person to their original housing, whenever possible, if that is what the person wants.

- Persons who comply with directions for placement in quarantine or isolation housing, upon release from such housing, will be afforded one additional video visiting session, based on availability.

Finally, after again revising the relief they request, Plaintiffs ask the Court to rule on their quarantine and isolation motion. But in light of the fact that 76% of CDCR's incarcerated population has now either contracted COVID-19 or received at least one dose of the vaccine, the Receiver has indicated that his office is considering a "re-set" of current quarantine guidelines which set forth the amount of space that each prison must set aside for quarantine and isolation. With this development, it would be inappropriate for the Court to rule on Plaintiffs' quarantine and isolation motion at this time. Moreover,

17276690.5

Plaintiffs' requested relief has changed several times over the course of the months since their motion was first filed. If Plaintiffs want an order granting the relief they now apparently seek, which differs significantly from the relief initially requested, they must be required to file a motion seeking it, and Defendants should be afforded the opportunity to formally respond to Plaintiffs' new request through motion practice.

## IV. STAFF SCREENING AND TESTING

*Plaintiffs' Position:* Staff testing remains a critical component of preventing the introduction and spread of COVID-19 in the prisons. Unfortunately, failures to comply with testing continue. On February 9, CCHCS reported that 64 CDCR staff members had been placed on leave without pay for failure to comply with the testing policies since December 21. And, in the biweekly noncompliance logs we regularly receive from CCHCS and CDCR, CDCR documented 46 staff refusals to test during the month of January.

As reported at the last Case Management Conference, Plaintiffs previously raised the concern that CDCR and CCHCS lack a process to timely identify staff who have failed to comply with mandatory COVID-19 testing. Currently, prison staff review a list of employees who tested the week before, compare it to a list of employees who worked that week, and investigate those employees who appear to have worked but were not tested. Although CDCR and CCHCS issued a joint memorandum on December 21 stating that "any employee who refuses to comply with mandatory COVID-19 testing shall not be permitted to enter the institution or facility and shall be placed on approved dock (without pay) until they comply with mandatory testing," ECF No. 3530 at 20 (January 13 Joint CMC Statement); ECF No. 3510 at 14 (December 22 Joint CMC Statement); ECF No. 3520-1 (December 21 memorandum), employees who are identified through this process are not immediately placed on leave. Instead, they are directed to report for testing within a specific timeframe and are only placed on leave if they again fail to test when directed to do so.

This process will not ensure that employees showing up to work each day have been

tested in accordance with the Employee Testing Guidance. Rather, this process will identify noncompliant staff only the week after they have worked, perhaps for many days, without having been tested. Even then, employees are only directed to be tested, and are permitted to continue working unless they again fail to report for testing. This process also will not identify whether particular employees were tested every 7 days, as is required by the testing guidance, but only whether employees were tested at some point during the week they worked.

On January 25, we met with CCHCS and CDCR to discuss these concerns. We suggested that CCHCS and CDCR monitor compliance with testing policies during the entrance screening process, for example, by (1) asking employees whether they have been tested within the required timeframe during entrance screening and (2) producing a list each day of all employees who have been tested during the previous 7 days and cross-referencing that list during entrance screening to ensure staff have been tested. On February 12, CCHCS reported that they would revise their system: by March 15, they will ask staff whether they had complied with the 7-day testing requirement during the entrance screening process, and if staff have not complied, they will be immediately tested onsite. We support this change.

Unfortunately, during our call with CCHCS on February 12, we learned of another serious gap in the staff testing program: staff who call in sick or whose symptoms are discovered during entrance screening are sent home for the day, but are not required to be tested for COVID-19 or isolate at home for any period of time before returning to work. That is, staff who are sick with symptoms of COVID-19 can simply return to work the following day, if they are no longer symptomatic. We raised this issue in our July 2020 motion regarding the staff testing program, *see* ECF Nos. 3402 at 4-6 (Plaintiffs' Motion); 3402-1 at ¶ 7 (Declaration of Adam Lauring); 3402-3 at ¶ 1 (Proposed Order), and were told the problem would be solved by hiring nurses to provide COVID-19 testing to symptomatic staff. During a call with CCHCS on November 13, we were also told that,

until CCHCS could hire enough nurses to conduct this testing, symptomatic employees who did not get tested would be required to self-isolate at home for ten days before returning to work.  Unfortunately, in a call with CCHCS on February 12, we were told otherwise: staff reporting symptoms of COVID-19 were not, and never had been, required to isolate at home.  We are deeply concerned by the failure to implement such a policy, which we have been calling for since July.  CCHCS and CDCR must immediately implement a policy requiring staff who are symptomatic to either (1) provide proof of a negative COVID-19 test result or (2) self-isolate at home and not report to work until (a) it has been at least 10 days since symptoms first appeared, (b) it has been at least 24 hours with no fever without fever-reducing medication, and (c) other symptoms of COVID-19 are improving.  *See* CDC, *Isolate if You Are Sick*, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/isolation.html (last updated Jan. 7, 2021); *see also* ECF No. 3402-1 at ¶ 7 (Lauring Decl.).

Finally, regarding the production of staff testing data, CCHCS on February 9 stated that staff testing reports had been completed for the month of January and would be provided to Plaintiffs that day.  We have not yet received these reports.  On February 12, CCHCS informed us that the reports would be sent to us by February 16 (the date of this Case Management Conference).

*Defendants' Position:*  While currently all health care staff are in compliance with this mandate, 64 custodial staff are on leave without pay due to their failure to abide by CDCR's testing requirements.  CDCR is supportive of the Receiver's efforts to ensure compliance with staff testing requirements and is working closely with CCHCS to improve custodial compliance.  For instance, CDCR is currently in the final stages of preparing a survey to be sent to all CDCR custodial staff asking what challenges staff face in terms of testing, social distancing, and mask wearing, and what reasons staff may have for failing to comply with these COVID-19 protections.  The survey also seeks suggestions on how CDCR could help improve compliance.  Additionally, CCHCS, which oversees staff testing and screening for CDCR employees, is evaluating its current guidelines and

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.5

processes to determine the feasibility of changes that may identify and resolve instances of noncompliance faster.  CDCR will implement and comply with any updated policies and work with CCHCS to seek solutions to improve compliance.

## V.     VENTILATION

*Plaintiffs' Position*:  We believe housing unit ventilation is a significant vector in the spread of coronavirus, particularly in cold weather months when air handling units largely use recirculated as opposed to fresh air.  We have previously asked CDCR about housing unit filters, and were told a multi-month project is underway to determine if the prisons can install and use filters that may decrease circulation of aerosolized microbes associated with coronavirus.  In December, the Receiver reported that he had requested public health experts review the ventilation systems at several prisons and provide recommendations.  We welcome this review.  Particularly in light of the substantial outbreaks that occurred in some celled housing units this winter, we believe it is critical that the prisons' ventilation systems be assessed.  The CDCR this week said it has received the experts' report pertaining to housing unit ventilation at the California State Prison and Substance Abuse Treatment Facility (SATF).  We have asked for a copy of this report.

*Defendants' Position*:

CDCR provided direction to prisons on December 18, 2020 to increase the filter efficiency within housing unit air handling units (AHUs), preferably to a MERV-13 efficiency level, as long as the air volume of the AHU was not decreased by more than 10 percent from its current volume.  Prior to this date, two prisons (Avenal State Prison and Pleasant Valley State Prison) already utilized MERV-13 filters in their housing unit AHUs.  An additional 40 housing units at five other prisons (including the California Health Care Facility) also utilized MERV-13 filters in their housing unit AHUs.  MERV-13 filters have recently been installed in housing unit AHUs at two additional prisons (Chuckawalla Valley State Prison and R.J. Donovan Correctional Facility).  These filters will continue to be installed at other prisons as the filters are from vendors.

The MERV-13 filter is intended to minimize COVID-19 spread within housing

17276690.5

units where the AHUs recirculate air from within the housing units during months with colder outside air temperatures. CDCR notes, however, that the AHUs at many prisons already operate on 100% outside air supply and do not recirculate air from within the housing units back through the air handling unit. In addition, some ventilation systems are not configured to recirculate interior air, and other locations depend upon windows for ventilation, so these locations also operate on 100% outside air. Eight prisons report that they are operating their housing units entirely on 100% outside air (California Institution for Men, California Institution for Women, California Men's Colony, California Medical Facility, Ironwood State Prison, California State Prison – Los Angeles County, California State Prison Solano and San Quentin State Prison). Additionally, the large majority (between 79 percent and 95 percent) of housing units at California Rehabilitation Center, Correctional Training Facility, Deuel Vocational Institution and Folsom State Prison utilize 100 percent outside air, as do 19 housing units at California State Prison Sacramento, Mule Creek State Prison, and Substance Abuse Treatment Facility.

## VI. OIG REPORT REGARDING THE MAY 2020 TRANSFER OF PATIENTS FROM CALIFORNIA INSTITUTION FOR MEN TO SAN QUENTIN STATE PRISON

*Plaintiffs' Position*: The Office of the Inspector General (OIG) recently released its third report in its review of CDCR's response to the COVID-19 pandemic, focusing on the May 2020 transfer of high risk medical patients from CIM to San Quentin. *See* Office of the Inspector General, *California Correctional Health Care Services and the California Department of Corrections and Rehabilitation Caused a Public Health Disaster at San Quentin State Prison When They Transferred Medically Vulnerable Incarcerated Persons From the California Institution for Men Without Taking Proper Safeguards* (February 2021), https://www.oig.ca.gov/wp-content/uploads/2021/02/OIG-COVID-19-Review-Series-Part-3-%E2%80%93-Transfer-of-Patients-from-CIM.pdf. The OIG found that the efforts by CCHCS and CDCR to prepare for and execute the transfers were "deeply flawed." As has been previously reported to this Court, the OIG found the vast majority of those transferred had not been recently tested for COVID-19. *See* ECF No. 3345 at 9. The

OIG reviewed and cited email conversations indicating that a CIM health care executive and multiple CCHCS and departmental executives were aware of the outdated nature of the tests before the transfers occurred.  The OIG also reported that they did not believe the department had provided them all pertinent emails related to the transfer.  Finally regarding the preparation efforts for the transfers, the OIG discovered that prison health care staff conducted screenings too early to determine whether those transferring had symptoms of COVID-19 when they boarded the buses.  Separately, the OIG also found problems with how the transfers were handled at San Quentin: the prison was unable to properly quarantine and isolate those exposed to or infected with COVID-19, and allowed staff to work throughout the prison during shifts or on different days, which the OIG found "likely caused the virus to spread to multiple areas of the prison."

Plaintiffs are deeply concerned about the findings in this report.  We have already had a productive conversation with CCHCS leadership on the topic and plan to engage with CDCR leadership as well, to determine whether additional measures are necessary to minimize the risk of recurrence of such a disastrous event.

*Defendants' Position*:  The Office of the Inspector General published a report on February 1, 2021 focusing on the decision to transfer 189 medically vulnerable incarcerated persons from the California Institution for Men (CIM) to California State Prison, Corcoran (Corcoran), and San Quentin.  The Inspector General concluded that the efforts by CCHCS and CDCR to prepare for and execute the transfer were deeply flawed and risked the health and lives of thousands of incarcerated persons and staff members.  Importantly, the Receiver explained in recent testimony before the Legislature:

> Public health agencies back in May [2020] believed COVID spread by droplets, not aerosolization.  That evolving knowledge is important because assuming droplet-only transmission, the space at San Quentin would have been an appropriate place for quarantine, and to test the patients arriving from CIM.  Based on what was known at the time, we believed San Quentin was a safer place than CIM for these inmates.  As we have learned, and was ultimately confirmed by the Centers for Disease Control and Prevention in October of

last year, COVID does spread by aerosolization, and so a move to San Quentin failed . . . Ultimately, we have learned from the San Quentin outbreak. And as the OIG report indicates, we subsequently made a substantial number of improvements in our policies and procedures related to managing outbreaks and moving patients, so that a San Quentin type failure has not happened again.

*Update on COVID-19 Mitigation Efforts in CDCR: Assembly Budget Subcommittee No. 5 on Public Safety* (Feb. 8, 2021) (statement of Clark Kelso, Federal Receiver), at 1:36:42 - 1:38:19, https://www.assembly.ca.gov/media/budget-subcommittee-5-public-safety-20210208/video.

Ultimately, the Inspector General acknowledged that following the transfers from CIM to Corcoran and San Quentin, CDCR made efforts to identify and designate sufficient space at each institution to follow public health guidance on isolating and quarantining patients in the event of a future COVID-19 outbreak. The IG recognized the following actions taken in the ensuing months: (1) CDCR and CCHCS have continued issuing updated guidance addressing the process for transferring incarcerated persons between prisons; (2) CDCR and CCHCS announced requirements effective June 10, 2020, directing that any incarcerated person scheduled to transfer to another prison be required to test negative for COVID-19 within seven days of transfer and that if more than seven days had elapsed since the date of the test, the incarcerated person would need to be retested before the transfer could take place; (3) on July 31, 2020, CDCR submitted maps of 31 institutions in which space had been set aside for isolation and quarantine; and, (4) on August 19, 2020, and then again on January 12, 2021, CDCR and CCHCS issued updated requirements placing more stringent timelines on COVID-19 transfer screening, testing, retesting, quarantine, and isolation. All of these actions were taken by CDCR, in consultation with experts and CCHCS's review, before the Inspector General published his report. Yet, the Inspector General's report did not evaluate CDCR's updated plans and related actions since the San Quentin outbreak.

Since this transfer took place, the Receiver and the State have described to this

Court and Plaintiffs the myriad efforts to minimize the risk of recurrence of a similar transfer, and these efforts continue to evolve. CDCR has been following CCHCS's revised guidance for movement and transfers since it was first finalized in August 2020. This guidance was recently revised a third time consistent with evolving public health guidelines and based on lessons learned from months of execution of previous versions the guidance.

In a conference call with the parties on January 21, 2021, the Receiver's Office stated that it was unaware of any COVID-19 transmissions based on transfers done in accordance with the movement matrix. In a conference call with the parties on February 9, 2021, the Receiver's Office expressed its confidence that staff involved in executing these moves are following the protocols in place. Defendants remain committed to working closely with the Receiver's Office to ensure the safety of its incarcerated population.

## VII. OIG REPORT REGARDING FACE COVERING AND PHYSICAL DISTANCING FOLLOW-UP MONITORING

On February 12, 2021, the parties received the OIG's report on Face Covering and Physical Distancing Follow-Up Monitoring. The parties are in the process of reviewing this report. The report is attached as **Exhibit A** at the OIG's request.

DATED: February 12, 2021 HANSON BRIDGETT LLP

By: */s/ Samantha Wolff*
PAUL B. MELLO
SAMANTHA D. WOLFF
LAUREL O'CONNOR
DAVID C. CASARRUBIAS
Attorneys for Defendants

17276690.5

1   DATED:  February 12, 2021                    XAVIER BECERRA
2                                                Attorney General of California

3

4                                        By:   /s/ Damon McClain
5                                              DAMON MCCLAIN
                                               Supervising Deputy Attorney General
6                                              RYAN GILLE
                                               IRAM HASAN
7                                              Deputy Attorneys General
8                                              Attorneys for Defendants

9

10  DATED:  February 12, 2021                    PRISON LAW OFFICE

11

12

13                                       By:   /s/ Sophie Hart
                                               STEVEN FAMA
14                                             ALISON HARDY
                                               SARA NORMAN
15                                             SOPHIE HART
16                                             Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT