XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN - 209508
Supervising Deputy Attorney General
RYAN GILLE - 262105
IRAM HASAN - 320802
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
LAUREL O'CONNOR - 305478
DAVID CASARRUBIAS - 321994
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER - 83925
STEVEN FAMA - 99641
ALISON HARDY - 135966
SARA NORMAN - 189536
RANA ANABTAWI - 267073
SOPHIE HART - 321663
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Judge: Hon. Jon S. Tigar<br>Date: March 4, 2021<br>Time: 10:00 a.m.<br>Crtrm.: 6, 2nd Floor |

The parties submit the following joint statement in advance of the March 4, 2021 Case Management Conference.

# I. VACCINES

As of February 25, 2021, 78% of all incarcerated people in CDCR institutions have either received at least one dose of the vaccine or have had COVID-19. Sixty-two percent of all incarcerated people have been offered at least one dose of the vaccine, and 65% of all people offered have accepted the vaccine. Forty percent of the incarcerated population has received at least one dose of the vaccine. Of those offered, medically high-risk patients accepted the vaccine as follows: COVID-19 naïve patients aged 65 or older accepted the vaccine at a rate of 87%; COVID-19 naïve patients with a COVID-19 weighted risk score of 6 or higher accepted the vaccine at a rate of 88%; and COVID-19 naïve patients with a COVID-19 weighted risk score of 3 or higher accepted dose 1 of the vaccine at a rate of 81%. And as of February 25, 2021, 41% of staff who work in CDCR's institutions have been given at least one dose of the COVID-19 vaccine. Employees and incarcerated people are still required to wear PPE and practice physical distancing even after receiving the vaccine.

*Plaintiffs' Position:* We continue to be pleased with the pace of vaccination of people incarcerated in California's prisons, and believe it is appropriate given the very serious danger faced by incarcerated people in this pandemic. We are grateful for the open communication from CCHCS and fully support their prioritization of vulnerable populations. Given this ongoing progress, and in anticipation of the Receiver's updated guidance on the use of quarantine (see Section III, below), we ask that the Court defer ruling on the pending motion regarding quarantine space, in which Plaintiffs sought vaccination as relief.

We anticipate that once the initial vaccination process is largely complete, the energy and attention of many of us will turn to education and encouragement of those who were initially hesitant to accept vaccination, especially at prisons and specific prison yards where the refusal rates are consistently high. We look forward to working collaboratively

with Defendants and CCHCS toward that end.

Regarding staff vaccinations, we remain concerned by the low numbers of staff who have agreed to get vaccinated, which has the potential to interfere significantly with the re-opening of the programs and services that our clients require. We are eager to hear what CDCR and CCHCS plan to do to address this issue.

*Defendants' Position:* As Plaintiffs acknowledge, Defendants and CCHCS have made good progress with vaccine distribution to the incarcerated population. Currently, 78% of the incarcerated population has protection against COVID-19 as a result of either receiving the vaccine or recovering from the virus, and the majority of medically high-risk incarcerated people, including those who are 65 or older, have been vaccinated. The State is committed to vaccinating the remaining population as quickly as possible, consistent with public health guidelines, and based on supplies received from the federal government. To assist with vaccination efforts, CDCR's statewide Dental Director, Dr. Rosenberg, was instrumental in obtaining approval for California dentists to administer vaccines, in addition to doctors and other healthcare staff authorized to vaccinate patients. Dr. Rosenberg's discussion of these efforts can be viewed at https://www.cdcr.ca.gov/insidecdcr/2021/02/18/cdcr-dentists-join-covid-19-vaccination-efforts/. Consistent with Centers for Disease Control and Prevention guidelines, CDCR continues to require staff and incarcerated people to wear masks, practice social distancing, and participate in regular COVID-19 testing as frequently as twice per week, regardless of whether they have been vaccinated.

To keep the staff and patient populations informed and to continue to encourage acceptance of the COVID-19 vaccine, the State continues to focus on educating its staff and incarcerated population on the benefits of taking the vaccine to encourage higher acceptance rates. Among other educational efforts, incarcerated people receive one-on-one counseling from medical professionals. Staff and incarcerated people can request the vaccine later if they do not accept it when first offered.

//

## II. POPULATION REDUCTION

*Plaintiffs' Position:* Population reduction remains necessary. CDCR's prisons are still the ideal home for the coronavirus, and stopping its spread has proven to be almost impossible. Experts say a fourth wave of infections, fueled by variants, resulting in a staggering additional death toll, is possible.[1] Staff, the primary vector for patient infections, will continue to put patients at risk by bringing infections into the facilities, particularly given the low percentage who have accepted the vaccine to date, and because the impact of immunity from vaccines and previous infection is not yet known.

Especially concerning is CDCR's failure to grant additional credits to incarcerated people despite the fact that tens of thousands of people are serving more time due to modified programs and quarantines that greatly limit opportunities to earn Milestone, Educational Merit, and Rehabilitation Achievement Credits. To quantify the additional time served, we on February 12 asked Defendants to provide the total amount of such credit granted in 2019 and 2020. On February 19, we asked for this data again after Defendants appeared to provide the number of people who received credits, but not the amount of credits granted. We have not yet received a response to our February 19 inquiry; on March 1, Defendants said they intend to respond by close of business on March 3.[2]

---

[1] *See* Karen Weintraub, *'It's like we're trying our best to help the virus': A fourth wave is looming if US fails to contain COVID-19 variants, experts say*, USA Today, (Feb. 16, 2021), https://www.usatoday.com/story/news/health/2021/02/16/covid-19-us-fourth-wave-variants-coronavirus/4460958001/.

[2] Below, Defendants state that the report they provided "shows the number of credits earned in each category of credits." We emailed Defendants after receiving this Statement today to seek clarification. Defendants responded that the report we received shows the number of credits earned, but that each credit type may be valued differently (in other words, may result in a different number of days being awarded). We believe there has been a miscommunication: we wanted to know the total number of days granted under these programs in 2019 and in 2020, so that we can compare the amount of time awarded in

-4-                                              Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT
17276690.4

*Defendants' Position:* CDCR's population has decreased by 26,032, or over 22% since the start of the COVID-19 public health crisis.[3] Between July 1, 2020 and February 24, 2021, 7,724 people were released from institutions and camps through the COVID-19 early-release programs Defendants announced on July 10, 2020.[4] This represents 150 more early releases than those reported in the case management conference statement filed on February 12, 2021.[5] An additional 14,018 people were released in accordance with their natural release dates. CDCR's institutions currently house 89,947 people.[6]

Incarcerated people continue to be released through the 180-day early-release program announced on July 10, 2020. Defendants implemented these early release programs in response to the COVID-19 pandemic at a time when other protections were still being developed in accordance with public health guidelines that were changing rapidly. Even with existing protections, described in this and previous statements, Defendants and CCHCS continue to improve and add to their COVID-19 safety measures as the science develops. Foremost in CDCR's priorities is to keep its incarcerated and staff population safe.

Defendants continue to receive and respond to Plaintiffs' regular requests for

---

those two years. We have asked CDCR to provide this information.

[3] This figure is calculated by taking the difference between the total population in institutions and camps on February 26, 2020 and February 24, 2021. Weekly population reports can be found at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2/.

[4] *See* ECF No. 3389 at 2:4-5:4 and https://www.cdcr.ca.gov/covid19/expedited-releases/ for details regarding CDCR's COVID-19 early-release program announced on July 10, 2020.

[5] *See* ECF No. 3548 at 9:1-3.

[6] *See* February 24, 2021 population report at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2021/02/Tpop1d210224.pdf.

information. On February 12, 2021, Plaintiffs requested "the total, respectively, of Milestone Completion, Rehabilitation Achievement, and Educational Merit Credits granted in 2019, and the totals granted in 2020[.]" On February 18, CDCR provided Plaintiffs with a document titled "Credit Awards Earned by Credit Type and Month Earned Between January 1, 2019 and December 31, 2019." This document shows the number of credits earned in each category of credits, including the Milestone Completion, Rehabilitation Achievement, and Educational Merit Credits Plaintiffs requested. On February 19, Plaintiffs responded that this was not the information they requested, and that instead they request "the total number of credits granted." In response to Plaintiffs' footnote 2, Defendants agree that there has been a miscommunication. Defendants are evaluating Plaintiffs' clarified request, will work with Plaintiffs to the extent any further clarification is needed, and will provide Plaintiffs with a response.

### III. QUARANTINE AND ISOLATION

*Plaintiffs' Position:* We understand that the Receiver has planned for several weeks to issue updated guidance on use of quarantine set-aside space and solid-door cells. We eagerly await this updated guidance, which we believe is urgent, given the very high numbers of people who remain on quarantine in CDCR. According to CCHCS, more than 9,000 people remained on quarantine as of February 25, despite active case numbers of fewer than 500.

While we fully support the use of safe quarantine space for those exposed to the coronavirus and for precautionary placements following transfer in accordance with public health guidelines, we also recognize that placement in quarantine imposes serious restrictions on movement and programming that can be very difficult for patients to tolerate, especially over long periods. We are concerned that some institutions may be over-using quarantine. We were glad to hear that CCHCS custody staff are undertaking a prison-by-prison review of the use of quarantine status and the set-aside space. We look forward to hearing the results of that review. Similarly, we welcome the news, heard on February 25, that CCHCS will review the use of 30-day, as opposed to the standard 14-

day, quarantine orders; we agree that 30-day orders should be used rarely if ever outside of very serious outbreaks.

In coming days, as movement through transfers and intake continues to increase in CDCR, we will seek information regarding the use of precautionary quarantine space, used to house people during post-transfer quarantines. We believe that CCHCS's review of the use of quarantine space will help to determine whether the current set-aside space is adequate for this purpose.

To the extent that bed moves for quarantine and isolation remain necessary at some prisons, we have encouraged Defendants to use positive measures to promote compliance. As discussed in the previous CMC Statement, we suggested several measures, including the offer of an additional video visiting session with loved ones for those who comply with bed moves. As a result, Defendants issued a memo on February 12 directing the prisons to offer, among other things, an additional video visit to people after quarantine or isolation "based on availability." ECF No. 3584 at 15. Unfortunately, preliminary information provided by Defendants strongly suggests that at virtually every prison, there is no availability for additional visits, as there appear to be far more requests for video visits in any given time period than there are actual visiting slots. At California Rehabilitation Center, for example, during the period from February 5-15, 386 people requested video visits, but just 47 were completed in that time, and at Wasco State Prison, 202 people requested the visits during that period, and only 26 were completed. We are concerned that the offer of an additional video visit for those who comply in good faith with the bed move order may be illusory. We have asked for additional information and will report to the Court when we receive a further response.

Below, Defendants suggest that the initial data that they provided us regarding the number of people who requested video visits and the number of visits actually completed may be misleading because some people who requested the visits were not eligible, and others may not have completed the application correctly. Additionally, there have apparently been technical challenges and space limitations that have limited the number of

17276690.4  JOINT CASE MANAGEMENT CONFERENCE STATEMENT

successful video visits, and Defendants report they are working to address them. Once we receive the additional information we requested about the calls and the number of visiting slots available, we intend to meet and confer with Defendants to review access to the video visiting program, and the viability of offering an extra video visiting session to people who comply with orders to move for quarantine or isolation.

Plaintiffs remain concerned about the use of punitive measures against people who have refused to comply with health-related bed moves. The concerns are especially compelling when patients received inadequate education and inconsistent messaging regarding the necessity to move for isolation or quarantine, or raised reasonable safety concerns about moving between SNYs and GP yards. *See* ECF No. 3548 at 12-13. On February 11, we requested that Defendants provide a list of all people who had been issued a Rules Violation Report (RVR) in the prior 90 days for failure to comply with a COVID-related housing move, and to dismiss those RVRs. We have not yet received a substantive response to that request, but Defendants report below that they issued 83 RVRs to people at California State Prison, Los Angeles County (LAC) during that period. They also state that no RVRs were issued at RJ Donovan, Pleasant Valley State Prison, or Calipatria State Prison. Defendants are silent as to whether RVRs were issued at any other prison for failure to comply with quarantine or isolation bed move orders. Plaintiffs await the list of the 83 people who received RVRs, as well as any other people who received RVRs for resisting bed moves at any other prison, and a response to our request that the RVRs be voided.

As Defendants write below, on February 24, the CDCR issued a memo "to standardize a process to address inmates who refuse to comply with direction to move" to housing as recommended by health care staff based on COVID-19 protocols. That memo directs health care staff to explain the medical reasons for the move to ensure the person understands them. If the person still refuses to move, the refusal shall be documented by a counseling chrono and recorded on a Non-compliance Tracking Log. Finally, it states that "progressive discipline will be in accordance with" California regulations for disciplinary

-8- Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

methods. After receiving this new directive, we have requested that Defendants also provide information on whether people who received RVRs in the last 90 days for bed move refusals were first provided 128Bs demonstrating that they had been counseled about the bed moves. Depending upon the response, we may report further to the Court.

*Defendants' Position:* Defendants continue making efforts to ensure that prisons comply with the Receiver's isolation and quarantine guidance provided on December 4 and 18, 2020, by closely monitoring the prisons' use of reserved quarantine space.

Additionally, the parties are awaiting CCHCS' anticipated "reset" of the Quarantine and Isolation set-aside space. The reset is being considered based on the progress made in vaccinating COVID-naive incarcerated persons, coupled with the number of incarcerated persons who developed immunity after recovering from COVID.

CDCR issued guidance on discipline for incarcerated persons who refuse to relocate for quarantine or isolation purposes. (See February 24, 2021 Memorandum attached as Exhibit A.) The guidance directs staff to document the refusal on a General Chrono (CDCR Form 128b) and scan it into the Electronic Records Managements System. The incarcerated person will then be subject to progressive discipline in accordance with Section 3312 of Title 15 of the California Code of Regulations.

There has been some discipline in the institutions identified by Plaintiffs for incarcerated persons' refusals to move to quarantine or isolation. In LAC, over 500 inmates refused to move from December 1, 2020, through March 1, 2021, and 83 were issued RVRs for refusing to move. At CAL, informational chronos were issued in some cases for failure to accept housing, but no RVRs were issued. At RJD no inmate was issued progressive discipline for refusing to move into designated spaces. Finally, at PVSP inmates who refused to move were issued 128B chronos, but they were not issued RVRs.

Further, contrary to Plaintiffs' claims that the staff provided inadequate education and inconsistent messaging, institutions statewide made considerable efforts to educate incarcerated persons before any discipline was issued. Specifically, officials met directly

with incarcerated persons who refused to move to educate them on the reasons why moving to quarantine or isolation was medically necessary for everyone's safety. In some instances, medical staff met on a daily basis with incarcerated persons who refused to move in an effort to encourage them to re-house for the safety of the entire population and to assist the institution in complying with public-health guidance.

CDCR continues to work on improving video visiting for the incarcerated population, and video visits are being offered as an incentive for inmates to cooperate with quarantine and isolation moves. CDCR is currently in the second phase of implementing the Visitation Scheduling Application (VSA) system, which allows approved visitors to schedule their own video visits. Defendants are hopeful that this new process will enable the completion of more visits. This week twelve institutions will be utilizing the VSA. All other institutions will continue utilizing the email process to request a video visit.

CDCR provided Plaintiffs with a link on CDCR Visitor's website that provides a step-by-step process on how to schedule video visits using the VSA and using email. Sunday morning, CDCR updated the initial message that visitors receive when requesting their visit that more clearly differentiates a requested visit versus a scheduled visit.

A number of requested visits have not gone forward because one of the following factors or steps was not satisfied or completed:

- The person requesting the video visit must be an approved visitor;
- The approved visitor must include all required information in their request and that information must be correct;
- The approved visitor must email the correct institution (it has been reported that visitors have sometimes sent video-visiting requests to the wrong institution);
- The incarcerated individual must not have had a video visit within the past 30 days.

Furthermore, institutions have varying numbers of video-visiting stations because of their different layouts, which effects their ability to complete requested video visits. There are institutions that have ten stations per facility, and others that have only four because of

-10- Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.4

space limitations. Additionally, available bandwidth affects the number of visits that can occur at the same time. When piloting the program, five institutions utilized 50 stations all at once, which exceeded the available bandwidth and caused connection failures, freezing, and lagging at all stations, and sometimes caused an immediate and complete shutdown. As CDCR works to address these issues, more video visits will be successfully completed.

In response to concerns regarding the discrepancy between the number of visits requested, versus those completed, it appears this is due to the way the data was collected. If the visitor who has requested an appointment for video visitation via email did not include all of the required information, or emailed the wrong institution, that request is counted in the data, regardless of whether the person requesting the visit is eligible. Therefore, the number does not reflect the difference between eligible visitors and eligible incarcerated persons, but also the requests from ineligible visitors, visitors providing incomplete information, and request to the wrong institutions. In order to minimize the ineligible requests, CDCR provides updated information on-line at https://www.cdcr.ca.gov/visitors/.

## IV. STAFF SCREENING AND TESTING

*Plaintiffs' Position:* Staff testing remains a critical component of preventing the introduction and spread of COVID-19 in the prisons. As reported in prior Case Management Conferences, Plaintiffs previously raised the concern that CDCR and CCHCS lacked a process to timely identify staff who have failed to comply with mandatory COVID-19 testing. *See* ECF No. 3548 at 16. Although CDCR and CCHCS issued a joint memorandum on December 21 stating that "any employee who refuses to comply with mandatory COVID-19 testing shall not be permitted to enter the institution or facility and shall be placed on approved dock (without pay) until they comply with mandatory testing," ECF No. 3520-1 (December 21 memorandum), they lacked a mechanism to meaningfully enforce this policy. We also raised the concern that staff who call in sick or whose symptoms are discovered during entrance screening are sent home for the day, but are not required to be tested for COVID-19 or isolate at home for any period

-11- Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.4

of time before returning to work. *See* ECF No. 2548 at 17-18.

CCHCS has made substantial progress in addressing these issues since the last Case Management Conference. On February 22, CCHCS reported that by March 1, all staff will be asked whether they have been tested within the prison's current required timeframe (for most prisons, this is currently within the previous seven days) during the entrance screening process. If staff report that they have not been tested, they will be immediately tested onsite via a rapid test. Similarly, in addition to asking about current symptoms of COVID-19 during entrance screening, screeners will ask each employee whether they have experienced such symptoms within the previous 10 days. If the employee reports current or recent symptoms, they will immediately be tested onsite via a rapid test.

We appreciate these changes and believe they will improve compliance with the testing policies. We are concerned, however, that this process relies entirely on staff self-reporting compliance with the testing policies during entrance screening. We have suggested CCHCS also develop systems to independently verify compliance. For example, to ensure compliance with routine testing, CCHCS could (1) require staff to provide proof that they were tested, or (2) produce daily lists of all employees who were tested within the past 7 days and cross-reference that list during entrance screening. CCHCS has said they are working to address this concern.

Finally, regarding reporting, we recently received reports of staff testing completed in January and the first two weeks of February. Like the report we received in December, *see* ECF No. 3530 at 19-20, the reports showed significant noncompliance with the testing policies. According to the data provided, 4,000 to 6,000 staff members who apparently should have been tested were not tested each week. In other words, only approximately 75% to 80% of staff who should have been tested were tested each week. However, also like the report we received in December, CCHCS has said that there are significant problems with the data that at least partially account for the low compliance ratings. Given these ongoing problems with developing an accurate reporting system for staff testing, we believe the additional measures described above are critical to ensure staff are being tested

as required.

*Defendants' Position:* CCHCS, which oversees staff testing and screening for CDCR employees, is evaluating its current guidelines and processes to determine the feasibility of changes that may identify and resolve instances of noncompliance faster. For example, effective March 1, 2021, CCHCS and CDCR issued revised guidance to all CCHCS and CDCR staff outlining updated institution entrance screening procedures. A copy of this guidance is attached as Exhibit B. When entering an institution, each person must submit to a series of questions and have their temperature taken. In addition to the questions already asked of those entering CDCR's institutions, the screening process will now include questions asking each person entering CDCR's institutions if they have been tested within the last seven days. If they have not, if they appear to have COVID-19 symptoms, or if they have a temperature of 100.4 degrees or more, they will immediately receive a rapid test. Staff who have tested within the past seven days will be asked if they have experienced any symptoms of COVID-19 in the past ten days or if they have been in close contact with someone with lab-confirmed COVID-19 or COVID-19-like symptoms without appropriate personal protective equipment. If they have, they will similarly receive a rapid test. Even if a person receives a negative COVID-19 test, they may be sent home if the nurse administering the test observes symptoms or makes a clinical judgment that it is appropriate to send that person home. People who receive a positive test or have symptoms will be denied entrance to the institutions for ten days.

Entrance screening staff, who must receive training for the position, will be provided with the screening decision tree on page five of Exhibit B to assist with this process and promote consistent entrance screening. Each of CDCR's institutions is equipped with rapid COVID-19 test machines. CCHCS is also in the process of obtaining a rapid test called BinaxNOW, which does not require a machine and can be administered more easily onsite at the institutions. CDCR will implement and comply with any updated policies and work with CCHCS to seek solutions to improve compliance.

CDCR and CCHCS continue to test their employees one to two times per week as

one of their precautionary efforts to detect and respond to instances of COVID-19 early. And CCHCS continues to review and improve its methods for tracking compliance data. Plaintiffs receive reports on progress in this and other topics related to the State's COVID-19 response at least once a week. Among a myriad of Plaintiffs' inquiries that CDCR and CCHCS respond to on an almost daily basis, on February 25, 2021, CCHCS staff provided Plaintiffs with a detailed description of their internal data tracking and affirmation process as it relates to staff testing data, and the status of their investigation into possible discrepancies in data. CCHCS staff informed Plaintiffs that they are analyzing the data to determine how many of the 4,000-6,000 staff members who appear to have not received a COVID-19 test each week in January are reflected in this category due to data-related issues. For example, CCHCS staff are working to differentiate active staff from staff not physically onsite at the institution at the time testing occurred, or staff who recently recovered from COVID-19, who may be among the numbers of staff who appear, on paper, to have not received a COVID-19 test as scheduled. Defendants and CCHCS are hopeful that the results of this investigation will provide further clarity to the data being collected and reported.

Defendants are committed to working with their healthcare partners at CCHCS to implement and improve programs designed to ensure the safest possible conditions in CDCR's institutions.

## V. FACE COVERINGS AT CALIFORNIA STATE PRISON, SOLANO

*Plaintiffs' Position*: We appreciate many of the efforts described by Defendants below regarding face-coverings at Solano. However, Defendants describe an asymmetrical approach with regard to staff versus residents' noncompliance that is deeply concerning. Defendants say that "employees, contractors, and visitors" who fail to comply with mask-wearing protocols are "subject to progressive discipline." The many logs produced by Defendants regarding staff compliance with face-coverings show that almost all who fail to comply with face-covering mandates, both at Solano and statewide, receive verbal counseling or a letter of instruction. These are forms of corrective action as opposed to

formal adverse action. We do not argue with the prioritization of lower levels of coercive action.

In contrast, Defendants report that staff at Solano "have been directed to issue rules violation reports to residents who refuse to comply with current mask-wearing mandates." The immediate issuance of RVRs is punitive and will result in people serving more time, because RVRs can result in loss of time credits or, for those serving an indeterminate term, can be used by the parole board to support a finding that a person is unsuitable for release. As is the practice for responding to staff noncompliance, CDCR should first provide verbal counseling and written warnings (128-B informational or general chronos) and then begin the progressive discipline process. On March 2, we requested that Defendants provide copies of all RVRs issued in the past 90 days for failure to comply with mask-wearing mandates, so that we can assess whether RVRs are being issued in appropriate circumstances.

More broadly, we continue to believe CDCR should focus on educating and encouraging compliance, not just punishing noncompliance. In this regard, we support the newsletter and meeting with the Men's Advisory Council described below. CDCR should continue to develop creative methods to encourage and incentivize compliance with mask wearing mandates. *See, e.g.*, ECF No. 3356 at 15-16 (June 18, 2020 Joint Case Management Conference Statement) (recommending CDCR encourage compliance with social distancing requirements by "talking to incarcerated people, including by consulting the Inmate Advisory Councils, conducting (distanced) town hall style meetings, and using the closed circuit television to solicit their input on these issues" and "providing 'substantial value' benefits to mark measurable compliance success, including . . . tablets, magazines/books, additional free phone calls, and (properly distanced) group celebrations").

*Defendants' Position*: CDCR continues to reinforce its state-wide mandate that all staff wear face masks in compliance with prior directives. At the last case management conference, the Court inquired about the CSP-Solano's efforts to improve mask

-15- Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

compliance. Following the OIG visit, Solano issued a directive on February 8, 2021, reiterating that employees, contractors, and visitors must comply with mask-wearing protocols, or be subject to progressive discipline. On January 20, 2021, a memorandum titled, "Clarification for Offenders Wearing Facial Coverings" was released to incarcerated persons. This directive reiterated expectations and illustrated the proper way to wear masks. Additionally, it reiterated that incarcerated persons who fail to adhere to these mandates will be disciplined and restricted to their housing units until they comply. The Food Services Department, which was one of the problematic areas cited by the OIG, provided additional training on mask requirements to staff on January 14, 2021, and January 20, 2021. Additionally, the Food Services Department placed posters throughout the kitchen to remind incarcerated persons and staff of how to appropriately wear masks.

Solano included COVID-19 education topics in its February 2021 edition of the Solano Chronicle, which is written by incarcerated persons for the residents at Solano. This edition provided information related to stopping the spread of COVID-19 along with information regarding the COVID-19 vaccines.

Solano Managers and Supervisors have personally met with the Men's Advisory Council to educate them on the importance of correct mask wearing and have walked the yards to talk with and educate the residents and provide them an opportunity to ask questions. Staff have been directed to issue rules violation reports to residents who refuse to comply with current mask-wearing mandates.

## VI. INTAKE

*Plaintiffs' Position*: After pausing intake from county jails for six weeks, CDCR started receiving new people the week of January 11. For the past month, CDCR has received approximately 500 new people each week. On February 8, CDCR Secretary Kathy Allison reported that 10,700 people were incarcerated in county jails pending transport to CDCR.

As discussed at the last Case Management Conference, on February 15, the Receiver paused the large scale movements out of the Reception Centers that would be

necessary to make additional space available to expand intake. Since then, CCHCS has approved the transfer of recently COVID-19 resolved patients (diagnosed not more than 80 days ago) from the Reception Centers to other prisons. CCHCS issued a policy outlining testing and other safety precautions for these transfers on February 19.

We believe that CCHCS's decision to limit movement out of Reception Centers to recently resolved patients is sensible, and that continued intake should be contingent upon (1) CDCR's ability to safely make space available in the Reception Centers, pursuant to CCHCS's guidance, and (2) CCHCS's receipt of sufficient doses of the vaccine to continue vaccinations at the current pace, including for new intake.

*Defendants' Position*: CDCR continues to perform intake on a limited basis. Incarcerated persons who meet the intake criteria are housed in reception centers, but they are not currently being transferred to mainline institutions. Presently, there is no requirement that persons accepted from the counties be vaccinated before transfer to CDCR. But CCHCS and CDCR monitor whether new residents have received the vaccine and if so, how many doses. CDCR completes the vaccination of new patients in accordance with public health guidelines and based on their eligibility in appropriate priority groups.

CDCR accepted 435 incarcerated persons for intake from county jails for the week of February 22, 2021. For the Week of March 1, 2021, CDCR has authorized intake of 555 incarcerated persons from county jails.

DATED: March 2, 2021                     HANSON BRIDGETT LLP

By: */s/ Samantha Wolff*
PAUL B. MELLO
SAMANTHA D. WOLFF
LAUREL O'CONNOR
DAVID C. CASARRUBIAS
Attorneys for Defendants

-17-    Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.4

| | | |
|---|---|---|
| 1 | DATED: March 2, 2021 | XAVIER BECERRA |
| 2 | | Attorney General of California |
| 3 | | |
| 4 | | By: */s/ Damon McClain* |
| 5 | | DAMON MCCLAIN |
| | | Supervising Deputy Attorney General |
| 6 | | RYAN GILLE |
| 7 | | IRAM HASAN |
| | | Deputy Attorneys General |
| 8 | | Attorneys for Defendants |
| 9 | | |
| 10 | DATED: March 2, 2021 | PRISON LAW OFFICE |
| 11 | | |
| 12 | | |
| 13 | | By: */s/ Sophie Hart* |
| | | STEVEN FAMA |
| 14 | | ALISON HARDY |
| 15 | | SARA NORMAN |
| | | SOPHIE HART |
| 16 | | Attorneys for Plaintiffs |