MATTHEW RODRIQUEZ
Acting Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN - 209508
Supervising Deputy Attorney General
RYAN GILLE - 262105
IRAM HASAN - 320802
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
LAUREL O'CONNOR - 305478
DAVID CASARRUBIAS - 321994
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER - 83925
STEVEN FAMA - 99641
ALISON HARDY - 135966
SARA NORMAN - 189536
RANA ANABTAWI - 267073
SOPHIE HART - 321663
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| **MARCIANO PLATA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Judge:   Hon. Jon S. Tigar<br>Date:    March 26, 2021<br>Time:    2:30 p.m.<br>Crtrm.:  6, 2nd Floor |

The parties submit the following joint statement in advance of the March 26, 2021 Case Management Conference.

*Plaintiffs' Introduction*:  It's very good news that the number of active COVID-19 cases among incarcerated people has dropped to such a low level.  It's also good that Defendants, as they state below, are working to ensure that programming for incarcerated people returns to what it was before March 2020.  But it is far too early to declare the pandemic over in California's prisons and resume the delegation process, as Defendants below suggest should happen very soon.  CCHCS has made significant, encouraging progress in vaccinating those who are incarcerated and who work in CDCR prisons, but that work is far from complete.  For example, Defendants state below the Avenal State Prison has reached more than 90% immunity, but only about 30% of the incarcerated population at Avenal has received one or more doses of the vaccine.  Most are unvaccinated and contracted COVID-19 during the massive outbreaks at that prison in the summer and fall of 2020, and are thus susceptible to reinfection.

We believe that CCHCS's primary tasks at present are, in addition to caring for current and ongoing COVID cases, to complete offering vaccination to all in CDCR, fully vaccinate those who want it, then address the high refusal rates among patients at some prisons and housing units within prisons and among certain staff classifications statewide.

Once vaccination is substantially complete, CCHCS should focus on what we believe are substantial backlogs in specialty services, including possibly unidentified needs for such services, and restarting its primary care clinical services.  In this regard, we note -- and this comes as no surprise -- that the monthly Dashboards show very poor compliance with medical service requirements in general and especially with those for specialty appointments.  We understand the reasons for the backlogs and hope compliance can rapidly improve, but we expect the process to require significant time and resources.  We also expect that CCHCS and CDCR will focus more attention on certain statewide medical service issues, including problems with emergency response care, the substantial backlog

17375197.1

of health care incident report reviews (the first step in patient safety improvement efforts, including root cause analyses), and expanding substance abuse treatment.

*Defendants' Introduction*:  For more than a year, Defendants, their partners at CCHCS, and public health experts have worked tirelessly to address the ever-moving target that is COVID-19.  As this Court acknowledged at the last case management conference, because of Defendants' and CCHCS's actions during the course of the pandemic, infections have declined significantly (currently down from over 10,000 to only 40 active cases) and "we're entitled to feel good about the progress that has been made." (Case Mgmt. Conf. Tr., 5:22-24, Mar. 4, 2021.)  As discussed in greater detail in the Vaccination section, CCHCS recently noted that CDCR has been one of the most proactive correctional organizations in the world in recognizing the public health imperative to vaccinate those who live and work in correctional facilities.  As a result, there is increasing optimism about the ability to resume programing and in-person visiting.

As of March 22, 2021, 47% of the incarcerated population has been vaccinated with at least one dose of a COVID-19 vaccine, and 78% have some form of immunity to the virus (either through vaccination or having previously contracted the virus).  Some institutions have levels of immunity through vaccinations and prior infections that exceed 90% of the population, including Avenal State Prison, California Men's Colony, California Rehabilitation Center, Correctional Training Facility, Chuckawalla Valley State Prison, Mule Creek State Prison, and Valley State Prison.  Furthermore, 42% of staff have received at least one dose of vaccine.  These successes in the vaccination rollout far exceed those achieved by other states and even most nations.  In light of these significant gains, CDCR will be demobilizing the Department Operations Center (DOC), which was originally established on March 15, 2020.  It will transition to a COVID-19 Support Team, which will be comprised of one liaison each from CDCR, CCHCS, and support staff.

Defendants are taking steps to ensure that life for incarcerated persons returns to what it was before March 2020, and Defendants are pleased that the Court is

contemplating resuming its onsite visits because onsite tours will more fully demonstrate their many successes and ongoing efforts to address and mitigate risks associated with COVID-19.  In light of these achievements, and cognizant of the fact that all must remain vigilant in the fight against COVID-19, Defendants are hopeful that the parties can intensify their focus on the delivery of constitutionally adequate medical care on a system-wide basis.

Since the last Case Management Conference held before the COVID-19 pandemic, on November 5, 2019, the Office of the Inspector General has issued five Cycle 6 reports, finding the delivery of medical care "Adequate" at Wasco State Prison, CSP-Solano, Valley State Prison, California Rehabilitation Center, and CSP-Los Angeles County.  Only one of these institutions has been delegated, and it is Defendants' expectation that the delegation review process will resume in the very near future so that this case can continue on its previous trajectory toward resolution.

## I.    VACCINES

As of March 22, 2021, 71% percent of all incarcerated people have been offered at least one dose of the vaccine, and 67% of all people offered have accepted the vaccine. This amounts to 45% percent of the incarcerated population having received at least one dose of the vaccine.  Vaccination rates of medically high-risk incarcerated people are as follows: 99% of all COVID-19 naïve patients aged 65 or older have been offered the vaccine, and they accepted at a rate of 90%; 99% of all COVID-19 naïve patients with a COVID-19 weighted risk score of 6 or higher have been offered the vaccine, and they accepted at a rate of 91%; and 98% of COVID-19 naïve patients with a COVID-19 weighted risk score of 3 or higher have been offered the vaccine, and they accepted at a rate of 83%.  Additionally, as of March 22, 2021, 42% of staff who work in CDCR's institutions have been given at least one dose of the COVID-19 vaccine.  Employees and incarcerated people are still required to wear personal protective equipment and practice physical distancing even after receiving the vaccine.

*Plaintiffs' Position:*  We are pleased with the overall progress with vaccinations, which are necessary to minimize the risk of harm in the dangerous congregate settings of CDCR prisons.  CCHCS in the last three weeks provided second doses to an impressive number of patients, although limited vaccine supplies greatly reduced the number of patients who could be offered a first dose, compared to previous weeks.  CCHCS reports that a substantially larger vaccine allocation was received this week, and greatly increased numbers of first dose offers are thus expected.  We believe this larger allocation will result in offers of vaccine to essentially all of the approximately 2,000 COVID-susceptible patients who are age 65 and older or medically high risk, who had not yet been offered vaccine as of March 20.  We raised concerns about these patients last week, and very much appreciate that on March 20 CCHCS asked each prison to consider those patients' vaccination needs, then reported on March 22 that approximately 300 of them had been offered a first dose in the previous two days.[1]

*Defendants' Position:*  As Plaintiffs acknowledge, Defendants and CCHCS have made good progress with vaccine distribution to the incarcerated population.  Currently, 78% of the incarcerated population has protection against COVID-19 as a result of either receiving the vaccine or recovering from the virus, and nearly all medically high-risk incarcerated people, including those who are 65 or older, have been vaccinated.[2]  The State is committed to vaccinating the remaining population as quickly as possible, consistent with public health guidelines, and based on supplies received from the federal government.

To keep the staff and patient populations informed and to continue to encourage

---

[1]     We do not agree with Defendants' assertion below that those who have recovered from the virus have "protection against COVID-19."  CCHCS says that those who are recovered and more than 90 days from their initial infection date are "COVID susceptible." It requires that such patients be tested for COVID-19, to quarantine if exposed to an active case, and be medically isolated if they test positive.  CCHCS is vaccinating these patients against COVID-19, in accord with public health guidelines.

[2]     Plaintiffs added their footnote 1 above approximately thirty minutes before the deadline to file this statement.  Defendants are unable to draft a response at this time, but can respond at the case management conference or at a later date.

17375197.1

acceptance of the COVID-19 vaccine, the State remains focused on educating its staff and incarcerated population on the benefits of taking the vaccine.  Among other educational efforts, incarcerated people receive one-on-one counseling from medical professionals if they do not initially accept the vaccine, and medical staff specially meet with medically high-risk COVID-19-naïve patients who refuse the vaccine.  Staff and incarcerated people can request the vaccine later if they do not accept it when first offered.  According to the Receiver's Office, there is no correlation between the rate at which staff accept the vaccine and the rate at which incarcerated people accept the vaccine; therefore, whether or not staff are willing to accept the vaccine does not affect incarcerated people's willingness to accept the vaccine.  Currently there are no plans to mandate vaccinations at this time.  Consistent with Centers for Disease Control and Prevention guidelines, CDCR continues to require staff and incarcerated people to wear masks, practice social distancing, and participate in regular COVID-19 testing as frequently as twice per week, regardless of whether they have been vaccinated.

As reported by the Receiver's Office, few if any correctional systems in the world have been more proactive in recognizing the public health imperative to vaccinate those who live and work in correctional facilities.  By doing so, the State has been able to prevent unnecessary illness and death both within CDCR's institutions and beyond in the outside community.  When the State first started its vaccination efforts in late December, CDCR had over 10,000 active COVID-19 cases among its staff and patients.  With the active support of the administration, the tireless efforts of CCHCS and CDCR's vaccine working group, and the relentless work of staff in the institutions, nearly half of CDCR's incarcerated population and staff have received at least one dose of COVID-19 vaccine. The results, as reported by the Receiver's Office, could not be clearer.  CDCR's institutions have had only 33 new COVID-19 cases over the past two weeks—the lowest number since April 2020—and 23 institutions have had zero new cases over the past two weeks.  According to the Receiver's Office, COVID-19 infection rates among staff have

17375197.1

also dramatically decreased.  CCHCS staff continue to improve public data on the website to ensure accurate reporting of staff cases.  CCHCS plans to take advantage of these low numbers by redoubling its efforts to vaccinate those who have not yet been offered the vaccine and also those who have moved past their initial vaccine hesitancy.  The Receiver's Office is optimistic that, in the coming months, programming will increase and in-person visits will resume, taking into consideration necessary safety precautions.

## II.  POPULATION REDUCTION

*Plaintiffs' Position:*  Unfortunately, CDCR's population is increasing.  Having re-opened intake from the county jails, the institution and camp population has increased by more than 600 since February 3, per the Department's Weekly Total Population Reports.[3]

Population reduction remains necessary.  CDCR's prisons are still the ideal home for the coronavirus, and stopping its spread has proven to be almost impossible.  The current decrease in active cases and continuing vaccination efforts do not guarantee that there will be no further outbreaks.  The full impact of immunity from vaccines and previous infection is not yet known, including because of possible virus variants, and because infections can occur, and have already occurred, among those fully vaccinated.  Staff, the primary vector for patient infections, will continue to put patients at risk by bringing infections into the facilities.  Housing unit ventilation, especially in cold weather months, appears to spread the virus, even between solid door cells (see Section VI, below).  More generally, public health experts warn of a possible fourth surge of infections.[4]

We appreciate that CDCR continues its program providing for early release for some with less than 180 days to serve.  This appears to benefit about 350 people per month.  We believe that CDCR should reinstitute the program, implemented for

---

[3]     *See* Cal. Dep't of Corr. & Rehab., *2021 Weekly Total Population Reports*, https://www.cdcr.ca.gov/research/2021-weekly-total-population-reports/.

[4]     *See* Annie Vainshtein & Matthias Gafni, *Why another COVID surge could hit the Bay Area in the months ahead*, San Francisco Chronicle (March 11, 2021), https://www.sfchronicle.com/local/article/san-francisco-Bay-Area-fourth-COVID-surge-spring-16016459.php.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   approximately three months in mid-2020, that allowed early release for some with less
2   than one year left to serve.

3       We also appreciate that the Governor earlier this month granted medical reprieves
4   to 11 persons determined to have a heightened risk from COVID-19.  This action
5   recognizes the continuing risk of harm to incarcerated people.  We believe reprieves
6   should be granted to many others.

7       With regard to sentence-reducing credits, we appreciate, as Defendants explain
8   below, that those who have taken self-study education classes during the pandemic are
9   taking or may soon be able to take classroom-based tests that CDCR expects will result in
10  significant milestone and education credit awards.  We plan to ask Defendants about these
11  credit awards.

12      Finally, we appreciate that CDCR, as Defendants also report below, plans to revise
13  its rules to increase credit-earning opportunities for some people.  This revision was first
14  announced by CDCR Secretary Allison to the *Coleman* court in December.  It should be
15  implemented promptly, not sometime this summer, as Defendants state below is their
16  current "hope."  Because it will be (absent special action by the Secretary only)
17  prospective only, this revision will not immediately result in a material reduction in the
18  overall population, but may do so in the long term; we plan to ask Defendants about this
19  once final revisions are announced.

20      *Defendants' Position:*   CDCR's population has decreased by 25,761, or about 22%
21  since the start of the COVID-19 public health crisis.[5]  Between July 1, 2020 and March 17,
22  2021, 7,952 people were released from institutions and camps through the COVID-19
23  early-release programs Defendants announced on July 10, 2020.[6]  This represents 228

---

24  [5]     This figure is calculated by taking the difference between the total population in
25  institutions and camps on February 26, 2020 and March 17, 2021.  Weekly population
26  reports can be found at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2/.

27  [6]     *See* ECF No. 3389 at 2:4-5:4 and https://www.cdcr.ca.gov/covid19/expedited-
28

1   more early releases than those reported in the case management conference statement filed

2   on March 2, 2021.[7]  An additional 14,799 people were released in accordance with their

3   natural release dates.  CDCR's institutions currently house 90,064 people.[8]  The slight

4   increase in population since Defendants' last reporting results from increased intake from

5   county jails.  Weekly intake only occurs after approval by CDCR, healthcare staff, and the

6   Receiver's office after assessing the receiving institutions' capacity to safely receive and

7   quarantine people from county jails.  Intake is done in accordance with the Movement

8   Matrix, which requires stringent movement protocols, including COVID-19 testing,

9   quarantine, and personal-protective-equipment practices.

10          Incarcerated people continue to be released through the 180-day early-release

11   program announced on July 10, 2020.  Defendants implemented this and other early-

12   release programs in response to the COVID-19 pandemic at a time when other protections

13   were still being developed in accordance with public health guidelines that were changing

14   rapidly.  The current status of the pandemic within CDCR's institutions, however, has

15   changed dramatically since the time the early release program and positive programming

16   credits (PPC) were implemented – including the fact that 58% of the COVID-naïve

17   incarcerated population is currently vaccinated and there are only 39 active cases of

18   COVID-19 within the institutions.  As a result, the Secretary is not contemplating

19   exercising her discretion to award further PPCs at this time.

20          Per the Court's order, a CDCR official[9] will attend the March 26, 2021 case

21   ─────────────────────

22   releases/ for details regarding CDCR's COVID-19 early-release program announced on
     July 10, 2020.

23

24   [7]     *See* ECF No. 3558 at 5:2-4.

25   [8]     *See* March 17, 2021 population report a https://www.cdcr.ca.gov/research/wp-
     content/uploads/sites/174/2021/03/Tpop1d210317.pdf.

26

27   [9]     Charles Callahan, Deputy Director of Facility Support, will be appearing as
     CDCR's representative in accordance with the Court's Order to discuss CDCR's current

28

management conference to answer the Court's questions related to population reduction. Secretary Allison, CDCR's General Counsel, and counsel for the parties participated in an *in camera* session with the Court on March 19, 2021, in which the Secretary provided information about credit awards to incarcerated people.

As previously reported, CDCR awarded 12 weeks of positive programming credits to 83,347 eligible incarcerated people in 2020 to offset the impact of COVID-19 on people's ability to earn credits through regular programming.  The impact of the 2020 credit award was significant: the incarcerated population earned a total of 4,428,779 days of credits in 2019, and 8,649,378 days in 2020.  The 2020 positive programming credit award resulted in more than twice as many credits being awarded to the incarcerated population than in the previous year, even though the incarcerated population was 22% smaller at the end of 2020 than it was in 2019.  This data is reflected in the document attached as Exhibit A.  Although CDCR does not contemplate awarding another round of positive programming credits at this time, it is increasing good time credit earning rates for certain people, including people serving sentences for violent offenses, and people serving sentences for nonviolent offenses with second- and third-strike enhancements.  CDCR expects this increase will have a significant impact on the incarcerated population's ability to earn credits, and hopes to implement the new credit-earning policy by this summer. Additionally, due to reduced movement and programming in accordance with COVID-19 safety measures, incarcerated people have been completing coursework for milestone and education programs on their own time, outside a classroom setting.  When classes resume, incarcerated people may submit their completed work and take tests to earn credits. Testing is already underway at institutions where programming has resumed.  CDCR

policy on awarding credits to incarcerated persons.  He will also be available to answer any additional questions the Court may have regarding information that has not already been provided in the current statement, earlier Case Management Conferences, or the *in camera* meeting.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17375197.1

1  expects this will result in significant milestone and education credit awards.

2  **III.   QUARANTINE AND ISOLATION**

3  *Plaintiffs' Position:* As reported in the last Case Management Conference

4  Statement, CCHCS administrators recently undertook a prison-by-prison review of the use

5  of quarantine status and the set-aside space.  The review documented a significant decrease

6  in the number of people on quarantine: as of March 18, CCHCS reported 5,097 on

7  quarantine, of which about 2,000 were on quarantine due to exposure to COVID-19.

8  *Compare* ECF No. 3558 at 6 (March 2, 2021 Joint Case Management Conference

9  Statement) ("more than 9,000 people remained on quarantine as of February 25, despite

10  active case numbers of fewer than 500").  We are glad to see a decrease in the number of

11  patients on quarantine due to possible exposure to COVID-19, and believe it is appropriate

12  given the significant decrease in active cases among the incarcerated population. [10]

13  A large number of those on quarantine as of March 18 were in precautionary, post-

14  transfer quarantine (3,032 out of 5,097).  This includes new arrivals from county jails and

15  transfers from reception centers to other prisons, among others.  The issue of providing

16  appropriate quarantine space for these transfers is discussed further in Section V, below.

17  As explained in previous Case Management Conference Statements, Plaintiffs

18  remain concerned about the use of punitive measures against people who refuse to comply

19  with health-related bed moves and, in particular, the issuance of Rules Violation Reports

20

---

21  [10]     We note here that the number of active cases reported on the CDCR Population
22  COVID-19 Tracking website does not include patients who are "re-positive," a term used
    for those who test positive after an initial infection is deemed resolved.  CCHCS says a
23  "re-positive" may not be a "re-infection," even though some test positive months after the
    initial infection and after repeatedly testing negative in the interim.  Although not counted
24  as active cases, "re-positive" patients and their close contacts are housed exactly as if they
    were active cases: the positive-testing patient is placed on medical isolation for at least 14
25  days and all contacts, including at times entire large dorms, are placed are placed on
    quarantine and subjected to testing for the same period.  CCHCS reports there are currently
26  288 "re-positive" patients and that it is considering how to determine if these patients are
    in fact re-infected.
27

28

(RVRs) to people who refused such moves during the surge several months ago.
Defendants have acknowledged that they issued RVRs to 83 people at one prison for
refusing these moves during this period, while at three other prisons, people who refused
instead received counseling chronos.  The one prison's heavy-handed response raises
concerns about fairness and equity.  ECF No. 3558.  Some we spoke with who had
received RVRs raised plausible concerns about significant safety risks if they were to
comply with the orders, some raised legitimate concerns that further movement would
cause wider spread of the virus, while others described receiving inconsistent messages
regarding the necessity for the moves.

On February 11, we requested a list of all people who were issued an RVR in the
previous 90 days for failure to comply with a COVID-related housing move, and for the
dismissal of those RVRs.  After we made this request, Defendants issued a February 24
memo "to standardize a process to address inmates who refuse to comply with direction to
move" to housing as recommended by health care staff based on COVID-19 protocols, to
document noncompliance with a counseling chrono, and, if necessary, to use "progressive
discipline . . . in accordance with" California regulations for disciplinary methods.  On
February 26, after receiving this new directive, we requested that Defendants also provide
information on whether people who had received RVRs during the relevant period for bed
move refusals were first provided 128Bs (general chronos) demonstrating that they had
been counseled about the bed moves.

Defendants responded on March 22 that "it is not CDCR's position to rescind RVRs
for refusing a housing move," and they do not have "an automated report to reference"
who received a 128-B before receiving an RVR for refusing these moves.  It thus appears
that Defendants cannot show they issued chronos to people before issuing RVRs, in accord
with the February 24 memo.

Defendants also stated they could not provide a list of people who received an RVR
for refusing moves that were related to quarantine or isolation orders.  They provided

17375197.1

instead a list of all people who received an RVR for "refusing to accept assigned housing-delaying a Peace Officer" regardless of the purpose for the move during the relevant period.  We pointed out that Defendants had previously identified 83 people at California State Prison, Los Angeles County who received RVRs for refusing health-related moves, and had asserted that no one at three other prisons received RVRs related to such moves.  ECF No. 3558.  We asked why CDCR could not do a similar assessment at the remaining prisons, and asked for copies of all RVRs and adjudications for those who received them for refusing a health care related move.

Late on March 23, Defendants refused to provide the RVRs, asserting that the request is unreasonable and is "far afield from the confines of this case."  We disagree.  Class members have reported that some have been punished for resisting possibly ill-conceived health-related movement orders because they feared for their health and safety.  As class counsel, we have a duty to investigate this issue, and we intend to continue our efforts.  As Defendants have declined to provide us with critical information, we will assess our options to obtain the necessary information and will update the Court as appropriate.

We also continue to urge Defendants to use positive incentives to encourage compliance with health-related housing moves.  Defendants stated on March 10 that they had offered 533 extra video visits to people at eight prisons, but none of the visits had actually been completed as of March 5.  We asked clarifying questions on March 11, and have not received a substantive response.

*Defendants' Position:*  As reported in the prior statement, Defendants continue making efforts to ensure that prisons comply with the Receiver's isolation and quarantine guidance provided on December 4 and 18, 2020, by closely monitoring the prisons' use of reserved quarantine space.  Additionally, Defendants are awaiting CCHCS's anticipated "reset" of the Quarantine and Isolation set-aside space.  The reset is being considered based on the progress made in vaccinating COVID-naive incarcerated persons, the number

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  of incarcerated persons who have recovered from COVID, and the low rates of infection

2  throughout the system.

3       CDCR is also in the process of upgrading its video conferencing platform in

4  response to incarcerated persons selling their visits and visits not being scheduled because

5  the visitor was not pre-approved.  A statewide call is being scheduled for this week to

6  discuss the logistics finalizing how to implement the new video visiting system, and part of

7  the discussion will be how prisons should inform incarcerated persons how to schedule

8  visits.

9       Meanwhile, because of the significant reductions in active COVID cases, CDCR is

10  working with CCHCS to restart in-person visits on a limited basis starting April 10,

11  2021[11].  The visiting protocols will incorporate measures to prevent COVID transmission,

12  including temperature and symptom screenings, COVID-19 testing, physical distancing,

13  required face coverings, limitations on the number of visitors at a given time, and

14  limitations on the duration of visits.

15       Plaintiffs requested data on the number of incarcerated persons who received RVRs

16  for failure to accept housing assignment related to a healthcare-related bed moves.  CDCR

17  is able to retrieve the list of incarcerated persons that received RVRs for failure to accept

18  housing assignments, but it is not able to readily separate that data into categories of

19  discipline related to healthcare-related moves versus refusals for a reason unrelated to

20  COVID.  As COVID-positive numbers continue to rapidly decline, the need to rehouse

21  inmates for quarantine or isolation purposes should also decline, reducing the instances

22  where an RVR might be issued.  In the meantime, the statewide memorandum issued on

23  February 24, 2021, is still in effect and provides uniform guidance for progressive

24  discipline at all institutions.

25

26

27  [11]  https://www.cdcr.ca.gov/news/2021/03/23/california-department-of-corrections-

28  and-rehabilitation-to-begin-phased-reopening-of-in-person-visiting-on-april-10-2021/

17375197.1

## IV.   STAFF SCREENING AND TESTING

*Plaintiffs' Position:*  Staff testing remains a critical component of preventing the introduction and spread of COVID-19 in the prisons.

As reported in the last Case Management Conference Statement, CCHCS recently announced a significant improvement to the staff testing program: beginning March 1, all staff are asked during the entrance screening process whether they have been tested within the prison's current required timeframe, and whether they have experienced symptoms of COVID-19 within the previous 10 days.  If the employee reports that they have not been tested within the required timeframe, or reports current or recent symptoms of COVID-19, they are immediately tested onsite via a rapid test.  We appreciate these efforts and hope they will both improve compliance with staff testing requirements and reduce the risk of viral infections among residents and other staff.[12]

We remain concerned, however, that this process relies entirely on staff self-reporting compliance with the testing policies during entrance screening.  We previously raised this concern, and suggested CCHCS also develop systems to independently verify compliance.  On March 17, we requested an update on this request.  We have not yet received a response.

*Defendants' Position:*  Defendants continue to enforce the heightened entrance screening protocols developed in coordination with the Receiver's Office and CCHCS, which oversee COVID-19 testing and screening for CDCR employees.  These protocols are described in detail in the case management conference statement filed on March 2, 2021.  (*See* ECF No. 3358 at 13-14.)  Defendants are committed to working with their healthcare partners to ensure the safety of all those inside CDCR's institutions with these stringent screening protocols and other safety measures.

## V.   INTAKE

*Plaintiffs' Position*:  CDCR reopened intake from county jails on a limited basis ten

---

[12]   We do not know to what degree this has improved compliance as we have not yet received staff testing data for March.

17375197.1

weeks ago.  In recent weeks, CDCR has authorized specified counties to send between 470 and 590 people per week to the Reception Centers at North Kern State Prison, Wasco State Prison, and Central California Women's Facility.

In order to make space for the people arriving from the counties, Defendants had to transfer large numbers of people from the Reception Centers to other prisons.  On March 3, the Receiver provided Plaintiffs with a plan for these transfers that CCHCS indicated would be implemented to reduce the risk of COVID spread.  We provided comments on the plan on March 9.  We did not receive a response.  This week, we received information from CDCR that appeared to indicate transfers had been done that were inconsistent with the March 3 plan.  We wrote to CCHCS to inquire about these transfers.  On March 24, CCHCS informed us that a different plan had been implemented on March 11, and sent the new plan, along with a revised list of post-transfer quarantine spaces at each prison, and responses to our comments on the previous plan.  We are reviewing these documents and will raise questions and concerns with the Receiver and Defendants.

Regarding the quarantining of new arrivals from the county jails in the Reception Centers, we recently learned that, in mid-February, CCWF began using eight-person dormitories to house people arriving from the county jails.  We raised concerns about this practice, noting that the Movement Matrix provides that quarantines should be completed in a single cell, and cohorting can only be done if "essential," with cohorts that are "as small as possible (2-4 persons)."  We were informed CCWF was housing no more than four people in each dormitory.  However, on March 12, after reviewing the records of a recent arrival who tested positive for COVID-19 and appeared to have had seven dorm-mates while on quarantine, we raised the concern that the cohorting was not happening as directed.  On March 19, CDCR confirmed that while the directive to cohort all new intake in groups of four or fewer had been given, it had not been followed at CCWF.  CDCR stated that CCWF re-housed the approximately 100 people still on intake quarantine into cohorts of four or fewer on March 12, and that the population report would be reviewed

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17375197.1

daily to ensure this directive is adhered to for future intake.  We appreciate Defendants' candor and quick response to address these concerns, including in particular the plan to monitor this issue to ensure new arrivals to CCWF are appropriately housed.  We are concerned, however, that neither CDCR nor CCHCS were aware of this problem before we brought it to their attention.

*Defendants' Position*: CDCR continues to perform intake on a limited basis. Incarcerated persons who meet the intake criteria are housed in reception centers and are only moved to receiving institutions with CCHCS oversight and approval.  Presently, there is no requirement that persons accepted from the counties be vaccinated before transfer to CDCR.  But CCHCS and CDCR monitor whether new residents have received the vaccine, and if so, how many doses.  CDCR completes the vaccination of new patients in accordance with public health guidelines and based on their eligibility in appropriate priority groups.

CDCR accepted 476 incarcerated persons from county jails for the week of March 8, 2021, and 425 for the week of March 15, 2021.  For the Week of March 22, 2021, CDCR has authorized intake of 590 incarcerated persons from county jails, and 580 for the week of March 29, 2021.

## VI.   VENTILATION

*Plaintiffs' Position*:  On March 7, a multidisciplinary team of experts from AMEND at UC San Francisco and UC Berkeley Schools of Public Health and Public Policy gave a presentation to the parties regarding ventilation and COVID-19 spread in housing units at the Substance Abuse Treatment Facility and State Prison at Corcoran (SATF).  The presentation was based on a December 2020 site visit to the prison.

The experts found that COVID-19 spread last fall through all types of SATF housing units, whether large dorms, buildings with smaller (six to eight person) dorms, or those in which one or two people were housed in cells with solid doors.  Statewide, it was determined that the large outbreaks late last year mostly occurred not in dorms or

17375197.1

cellblocks with barred doors, as in the earlier part of the year, but in units with solid door cells.  The experts said this shift may have been due to the use of recirculated heated air in the units during cooler weather.  The experts further described "critical" space and staffing shortages during its outbreak and noted that the prison's ventilation system may have been designed for the stated capacity, not the actual current population.  Among other things, the experts said SATF's outbreak likely resulted from movement of patients in isolation or quarantine, and "some combination of poor air exchange, recirculation, and unbalanced ventilation/pressurization" in those systems, and shared staff between units with active cases and those which had none.

With regard to ventilation, the experts reported that its tests of four SATF housing units showed air exchange rates far below those recommended by the World Health Organization (WHO) for reduction of aerosol transmission of virus.  The experts also found that the prison used air filters of a lower grade than recommended by the Centers for Disease Control for viral capture, and that the ventilation system was poorly functioning, thus promoting virus spread.  In short, the experts' findings showed that SATF cellblocks, even with solid doors, functioned as de facto dorms with regard to aerosol virus spread.

The experts said that to meet WHO minimum standards for containing airborne infection, housing density must be substantially reduced in all SATF buildings.  Each SATF large dorm, which can house approximately 50 people each, should house only three.  Its small dorms, which house six people each, and its solid-door cells, which currently mostly house two people each, should each house only one person.

The experts recommended, among other things, population reduction, the urgent hiring of a HVAC specialist to re-evaluate and re-balance SATF's ventilation system, implementation of COVID-19 tests with a turnaround time of less than 24 hours, and the development and implementation of plans for stable cohorts of residents, custody, and healthcare staff.

17375197.1

We understand that the Receiver will both take and recommend action in response to the experts' report, including determining whether experts should review other prisons' housing unit ventilation systems.  We believe this should occur.  We also believe CDCR should immediately hire a HVAC specialist at SATF, as recommended by the experts.

*Defendants' Position*:  Recognizing that ventilation plays a role in the health of CDCR's incarcerated and staff populations, CDCR has continued to monitor and evaluate housing unit ventilation consistent with internal guidance regarding maintenance and repair of heating, ventilation, and air conditioning (HVAC) units, and indoor ventilation during COVID-19.  Since December, four institutions (Chuckawalla Valley State Prison (CVSP), High Desert State Prison (HDSP), North Kern State Prison (NKSP) and the Richard J. Donovan Correctional Facility (RJD) have installed MERV-13 filters in their housing unit air handling units.  Even though the nationwide high demand for MERV-13 filters is delaying delivery and installation at other institutions, many have installed partial shipments of MERV-11 and MERV-13 filters to increase filter efficiency.  MERV 13 filters are more efficient at filtering out small particles and contaminants than the current MERV 8 and 10 filters that are used at most institutions.  Because certain facilities at certain institutions utilize only outside air and not HVAC systems or recirculated air, they do not require filter upgrades, but airflow will continue to be monitored in these areas.  Additionally, some institutions have increased the percentage of outside air as they were directed to do in December 2020.

On February 26, 2021, the Director of CDCR's Division of Facility Planning, Construction, and Management convened a ventilation workgroup with the Receiver's Office, CCHCS, and CDCR's Division of Adult Institutions to create a collaborative channel of communication on the topic of ventilation.  Currently, the Director's staff is examining ventilation systems in areas used for quarantine and isolation and creating diagrams of the airflow in these areas.  These diagrams will be provided to CCHCS and CDCR's Division of Adult Institutions so that they may collaboratively evaluate the

1    airflow in these spaces and draw appropriate conclusions.

2           Separately, CDCR is undertaking a system-wide inspection and evaluation of

3    ventilation systems in CDCR's institutions, focusing on whether the airflow is working the

4    way it is supposed to.  The inspection will be performed by CDCR Plant Operations

5    professionals and will include visual inspections of air handling units, ducts and grills, and

6    will measure air flow at multiple locations within the ventilation system.  Inspections will

7    be done in accordance with best practices set forth by the Centers for Disease Control and

8    Prevention and the American Society of Heating, Refrigerating and Air-Conditioning

9    Engineers.  CDCR expects to complete these inspections in May 2021.  Their findings will

10   be used to identify and prioritize ventilation system repairs to identify any additional steps

11   that can be taken to minimize COVID-19 transmission using the design operation of

12   existing ventilation systems.

13          Plaintiffs accurately summarize part of the presentation AMEND gave on their

14   investigation of SATF's ventilation system.  In addition to their recommendations to

15   decarcerate, evaluate SATF's ventilation system, and reduce COVID-19 test result

16   turnaround times, AMEND also recommended improving outbreak and emergency

17   planning and response efforts; developing communication plans that include medical staff,

18   custody staff, and residents; and promoting a culture that encourages learning,

19   participation in public health measures, and health and wellness.  As reported in numerous

20   prior statements, CDCR has worked hand in hand with the Receiver's Office and CCHCS

21   to respond to the COVID-19 pandemic, and has made efforts to implement each of the

22   Receiver's COVID-19 safety protocols.  CDCR implemented robust emergency response

23   plans by creating incident command posts at each institution, which served as

24   communication centers for COVID-19 mitigation and response efforts on a day to day

25   basis, were staffed by both custody and healthcare staff at each institution, and sometimes

26   solicited the aid of outside agencies.  CDCR continues to find ways to promote the health

27   and wellness of its incarcerated population by making efforts to provide as much outdoor

28

time as is safely possible, implementing video visits, and providing education regarding the benefits of following COVID-19 measures, among many other measures.

The AMEND team's conclusions regarding how COVID-19 *may* have been transmitted in housing units at SATF were based on a number of hypothetical scenarios. When asked if it is possible to measure the movement or presence of virus particles in a ventilation system, the AMEND team responded that they are not aware of any methods being used widely to date, but that it is usually done through gas tracer studies. They added that there are methods to measure aerosolized particles the same size of a virus, which could be used. These methods were not used as part of AMEND's investigation of SATF's ventilation system. And notably, the investigation in December 2020 was done during a nationwide surge in COVID-19 cases, which has since subsided.

CDCR appreciates the efforts of public health experts to assist with its COVID-19 response efforts. As described above and in previous statements, CDCR is committed to keeping its residents safe. To that end, its work to evaluate and improve its ventilation systems, where needed, is already underway. Defendants look forward to their continued collaboration with the Receiver's Office, CCHCS, and public health experts to achieve the shared goal of keeping CDCR's incarcerated and staff populations safe.

**VII.  OIG REPORT REGARDING FACE COVERING AND PHYSICAL DISTANCING MONITORING**

The parties received the Office of Inspector General's report on Face Covering and Physical Distancing Follow-Up monitoring at about 12:30 p.m. on March 24, 2021. The parties are in the process of reviewing this report. It is attached as Exhibit B at the OIG's request.

DATED:  March 24, 2021                    HANSON BRIDGETT LLP


                                    By:   */s/ Paul B. Mello*
                                          PAUL B. MELLO
                                          SAMANTHA D. WOLFF
                                          LAUREL O'CONNOR
                                          DAVID C. CASARRUBIAS
                                          Attorneys for Defendants

DATED:  March 24, 2021                    MATTHEW RODRIQUEZ
                                          Acting Attorney General of California



                                    By:   */s/ Ryan Gille*
                                          DAMON MCCLAIN
                                          Supervising Deputy Attorney General
                                          RYAN GILLE
                                          IRAM HASAN
                                          Deputy Attorneys General
                                          Attorneys for Defendants


DATED:  March 24, 2021                    PRISON LAW OFFICE



                                    By:   */s/ Steven Fama*
                                          STEVEN FAMA
                                          ALISON HARDY
                                          SARA NORMAN
                                          SOPHIE HART
                                          Attorneys for Plaintiffs