ROB BONTA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN - 209508
Supervising Deputy Attorney General
RYAN GILLE - 262105
IRAM HASAN - 320802
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
LAUREL O'CONNOR - 305478
DAVID CASARRUBIAS - 321994
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER - 83925
STEVEN FAMA - 99641
ALISON HARDY - 135966
SARA NORMAN - 189536
RANA ANABTAWI - 267073
SOPHIE HART - 321663
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br> Defendants. | CASE NO. 01-1351 JST <br><br> **JOINT CASE MANAGEMENT CONFERENCE STATEMENT** <br><br> Judge: Hon. Jon S. Tigar <br> Date: April 29, 2021 <br> Time: 9:00 a.m. <br> Crtrm.: 6, 2nd Floor |

17276690.4

The parties submit the following joint statement in advance of the April 29, 2021 Case Management Conference.

*Plaintiffs' Introduction*:  Plaintiffs are encouraged that COVID-19 cases statewide have remained low since the last Case Management Conference.  We are also eager for medical services and prison programs to resume in a safe manner, and for our focus to return to ensuring constitutionally adequate medical care.  We believe the biggest hurdle to achieving these goals is the low rate of vaccination among CDCR and CCHCS staff.

*Defendants' Introduction*:  Defendants continue taking steps to ensure that life for incarcerated persons returns to what it was before March 2020.  As of the time of this filing there are only 13 active COVID-19 cases statewide.  CDCR and CCHCS continue to vaccinate incarcerated persons and staff with impressive speed and success: over half of all incarcerated persons (58.2% as of April 25, 2021) are *fully* vaccinated (with another 11.3% partially vaccinated).[1]  CDCR and CCHCS are also developing and implementing strategies to increase vaccine acceptance rates among incarcerated persons and staff.  As Defendants continue to effectively mitigate the introduction and spread of COVID-19 within the facilities, Defendants are optimistic that the parties can return their focus to the more general delivery of constitutionally adequate medical care on a system-wide basis.

## I.    VACCINES

As of April 23, 2021, 97% of all incarcerated people have been offered at least one dose of the vaccine, [2] and 71% of those offered have accepted the vaccine.  This amounts to 70% percent of the incarcerated population having received at least one dose of the vaccine.  Vaccination rates of medically high-risk incarcerated people are as follows: 99% of all COVID-19-naïve patients aged 65 or older have been offered the vaccine, and they accepted at a rate of 90%; 99% of all COVID-19-naïve patients with a COVID-19

---

[1]    *See* https://www.cdcr.ca.gov/covid19/population-status-tracking/.

[2]    According to the Receiver's office, most of those who have not been offered the vaccine have either been out–to-court or have not yet completed the 14-day quarantine period required after arriving in CDCR's reception centers.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.4

weighted risk score of 6 or higher have been offered the vaccine, and they accepted at a rate of 91%; and 99% of COVID-19-naïve patients with a COVID-19 weighted risk score of 3 or higher have been offered the vaccine, and they accepted at a rate of 84%. Additionally, as of April 23, 2021, at least 44% of staff who work in CDCR's institutions have been given at least one dose of the COVID-19 vaccine. Employees and incarcerated people are still required to wear personal protective equipment and practice physical distancing even after receiving the vaccine.

*Plaintiffs' Position:*

Patients

We continue to be pleased with CCHCS's efforts to offer COVID-19 vaccination to incarcerated people. CCHCS data as of April 26 shows that 97% of the approximately 95,600 people in CDCR custody have been offered a vaccine.[3] It also shows that 60% of the population is fully vaccinated, and another 10% have received one dose of a two-dose regimen, so will be fully vaccinated within 30 days. The reported vaccination rates among residents most at risk of serious complications if infected with COVID-19 are even more encouraging. For example, nearly 90% of those age 65 or older are or very soon will be fully vaccinated, according to the data.

The data also shows that approximately 30% of the CDCR population has so far refused vaccine.[4] Approximately one-third of those persons, or approximately 10% the overall population, are resolved COVID patients, and thus have some natural immunity against reinfection. We appreciate that CCHCS has re-offered, and continues to re-offer, vaccine to those who have hesitated or refused to be vaccinated. We are hopeful that

---

[3] Most of those who have not been offered vaccine are out-to-court and thus not available, or have not completed the 14 day quarantine period for Reception Center new arrivals that is required before vaccine can be offered.

[4] At 10 of the 35 prisons, the refusal rate is approximately 40% or higher, with the highest such rate being 49%. There are a few "yards" at some of those prisons in which the refusal rate is greater than 50%.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.4

lessons learned from the prison with the lowest refusal rate among incarceration people (Correctional Training Facility, at which only 9% have refused), which CCHCS has shared with the other prisons, will result in increased vaccinations elsewhere, particularly at those prisons where nearly 40% or more of the population declined vaccine. In another effort to increase vaccination rates, CCHCS this week is conducting "town halls" with incarcerated persons at California State Prison, Los Angeles County (LAC). We support all these efforts, and appreciate that CCHCS invited us to participate in the LAC town halls.

Vaccinations have clearly had a very positive impact on the number of COVID cases in the prisons, and the number who suffer serious complications or die. So too has the decrease in COVID-19 in California generally,[5] and the continuing virus-reduction measures such as resident and staff testing, the use of quarantine and isolation, and the wearing of face-coverings. Due to these factors, the number of reported active COVID cases has steadily decreased in recent months, particularly in March and April.[6] The number of COVID-related hospitalizations and deaths also have dropped substantially. As of April 22, CCHCS said no patients were in acute care hospitals for COVID-related conditions.[7] There were four COVID-related deaths in March, and one so far in April (all

---

[5] CCHCS says that significant outbreaks in the prisons have all occurred when there have been significant numbers of cases in the surrounding communities. Currently, California has the lowest COVID case rate in the continental USA. *See* https://www.sfgate.com/bayarea/article/2021-04-California-CDC-data-lowest-case-rate-US-16120284.php.

[6] CCHCS says that two dozen patients have been diagnosed with COVID-19 after being fully vaccinated, that four of those were hospitalized, and none have died. Active cases currently do not include those who test positive again after having already had, and recovered from, COVID. CCHCS says there have been approximately 370 such patients since the pandemic began, and that none of those patients have died.

[7] CCHCS reports four patients are in sub-acute long term care facilities due to COVID-related conditions. We believe these patients were diagnosed with COVID-19 before the vaccine became available.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.4

were unfortunately unvaccinated at the time of their initial diagnosis), compared to approximately 50 deaths each this past December and January.

Staff

The lower rates of COVID-19 vaccination among staff remain a great concern. Staff are vectors of infection, and community (aka herd) immunity in a prison must account for them, not just residents. A Centers for Disease Control and Prevention study has recently shown that a single unvaccinated staff member can infect many in a congregate living setting, even where most residents are vaccinated, and that those infections can cause death, including among the vaccinated.[8] In addition, staff infections dramatically and negatively impact prison programming, including medical services. For example, at Richard J. Donovan last week, the prison was placed on a COVID "Tier One" program, the most restrictive available, because more than three staff members were reported to have tested positive for COVID (there have been no positive cases among residents for weeks). As a result, per the prison's own report, all incarcerated persons' outdoor exercise time was limited, cell feeding was required, and healthcare appointments were limited. Similarly, at California State Prison -- Sacramento, four staff members testing positive resulted in over 650 incarcerated people being put on quarantine status and having their access to healthcare and programming disrupted as a result.

Based on April 22 statewide data, CCHCS reports that even though vaccination has been available to all CDCR staff for months, only 40% of staff are fully vaccinated and another 4% have received one dose. At five prisons, less than 30% of staff have received a dose of vaccine.[9] There is no prison at which 60% or more of staff have received

---

[8] Roni Caryn Rabin, "An unvaccinated worker set off an outbreak at a U.S. nursing home where most residents were immunized," New York Times, April 21, 2021, at https://www.nytimes.com/2021/04/21/health/vaccine-nursing-homes-infections.html.

[9] These prisons, and the percentages of staff who have received at least one dose of vaccine, are California Correctional Center (29%), California Correctional Institution

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

vaccine.[10]

CCHCS says that some staff may prefer being vaccinated by their own or another community provider, and that more staff may become vaccinated now that all in California are eligible to receive vaccine. It also says it is considering whether people who are fully vaccinated can be safely exempted from routine surveillance testing, which might be an incentive for additional staff to receive the vaccination. It also said last week it would appreciate further support from employee bargaining units to encourage vaccination.

Finally, CCHCS last week said it continues to discuss whether COVID-19 vaccinations should be mandated for staff. In that regard, California's public universities will require students, faculty, and staff on its campuses to be vaccinated this fall.[11] We believe that the time has come for the Receiver and CDCR to protect the interests of the incarcerated population, their employees and the community by requiring that all staff be vaccinated.

*Defendants' Position:* The COVID-19 vaccine is now available to every person age 16 and older nationwide. Defendants and CCHCS have worked tirelessly with the state to ensure sufficient vaccine allocation to provide each person in CDCR's institutions the opportunity to get vaccinated against COVID-19. Defendants and CCHCS remain committed to vaccinating CDCR's incarcerated population and staff as quickly as possible consistent with public health guidelines and based on supplies received from the federal government, and Defendants are redoubling their efforts to encourage people who initially

---

(29%), High Desert State Prison (20%), Pelican Bay State Prison (25%), and Pleasant Valley State Prison (29%).

[10]   The Correctional Training Facility, where 59% of staff having received a dose of vaccine, has the highest rate, per CCHCS data.

[11]   *See* Jocelyn Gecker, "California's public universities to require COVID-19 vaccine," Associated Press, April 21, 2-21, available at https://apnews.com/article/us-news-health-education-california-coronavirus-vaccine-28a4729ef178edad794d4362c5f2482a

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

declined the vaccine to consider accepting it. In the meantime CCHCS and CDCR are taking precautionary measures to ensure their safety. For example, the following changes are contemplated in a forthcoming revised version of the movement matrix, which governs all movement of CDCR's incarcerated population: precautionary post-transfer quarantine of incarcerated people who have not yet been vaccinated must be done in cells with solid doors, and incarcerated people with COVID-19 risk scores of three or more cannot be transferred to certain institutions. CCHCS and CDCR are also analyzing efforts made at institutions with the highest vaccine acceptance rates to identify additional strategies for increasing vaccine acceptance. The Correctional Training Facility, which has the highest acceptance rate among patients, described its efforts to CDCR and CCHCS officials to assist them in identifying effective strategies.

The parties agree that impressive progress has been made towards the goal of vaccinating as many people who live and work in CDCR institutions as possible—CDCR and CCHCS are nearing 100,000 individuals vaccinated. When the State first started its vaccination efforts in late December, CDCR had over 10,000 active COVID-19 cases among its staff and patients. That number has now fallen to 13. As a result, programming has increased and in-person visits have resumed with necessary safety precautions.

To increase staff participation in its COVID-19 vaccine program, CCHCS is formulating plans to increase access to the vaccine and decrease the time staff must currently wait to receive the vaccine. To this end, open vaccine clinics will be held at each institution for a minimum of five days during the month of May. These clinics will cover all shifts and will be open to all staff. CCHCS will then end its current practice of offering staff vaccine appointments through email, and is considering the appropriate frequency of vaccine clinics at each institution after May. The plan includes heavy advertisement of these clinics to ensure that staff are aware of them and to encourage staff participation. Defendants are hopeful this new plan will make vaccines more easily accessible and increase acceptance rates among staff.

On April 16, 2021, CDCR and CCHCS issued a memorandum to all staff informing

them of a supplemental-paid-sick-leave program consistent with California Labor Code Sections 248.2 and 248.3. The program applies retroactively to January 1, 2021, and permits staff to take time off to receive the COVID-19 vaccine. Under the program, staff can also receive paid sick leave if they experience symptoms after receiving the vaccine or if they need to quarantine, isolate, or receive medical treatment in connection with COVID-19 symptoms. Significantly, under this program, full time employees may receive up to 80 hours of leave at their regular rate of pay. This leave is in addition to any other paid leave to which employees may be entitled. Defendants are hopeful that this program, along with the other measures, will encourage more institution-based employees to accept the vaccine.

Additionally, on April 21, 2021, CCPOA, CCHCS, and CDCR announced the creation of a COVID Mitigation Advocate Program. The program requires each institution to form a COVID Mitigation Team to "provide ongoing education to staff, at the peer level, on the importance of COVID compliance, the latest CDCR and CCHCS COVID-19 policies, the importance of mask-wearing and physical distancing, precautions that should be taken outside of work, testing, and the vaccination program." The COVID Mitigation Teams will be comprised of an unlimited number of staff volunteers who will be trained on COVID education, death rates, mask compliance, vaccination information, best practices, innovation strategies, and the various communication methods available.

As noted above, at least 44% of CDCR and CCHCS employees who work in the prisons have received at least one dose of a COVID-19 vaccine. CCHCS believes a number of staff may be receiving the vaccine outside CDCR now that it is available to the general population. On April 23, CCHCS informed the parties that it is working with the California Department of Public Health to identify additional staff who have been vaccinated outside CDCR and will update its data accordingly.

The State continues to educate staff and patient populations on the benefits of the COVID-19 vaccine to encourage its continued acceptance. Staff and incarcerated people can still request the vaccine even if they initially opted not to accept it. Consistent with

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

Centers for Disease Control and Prevention guidelines, CDCR continues to require staff and incarcerated people to wear masks, practice social distancing, and participate in regular COVID-19 testing as frequently as twice per week, regardless of their vaccination status.

Regardless of vaccine acceptance rates, CDCR takes compliance with COVID-19 safety protocols seriously. CDCR has been monitoring staff and incarcerated people's compliance with face covering and physical distancing protocols since June 2020, and has been recording instances of staff discipline for noncompliance with these protocols since December 2020. CDCR provided this data to Plaintiffs' counsel. CDCR also assists the Office of the Inspector General in gathering data for its face covering and physical distancing compliance reports, the first of which was issued in October 2020. CDCR and CCHCS continue to reiterate compliance expectations to all staff. And CDCR remains committed to working in partnership with the Receiver's office and CCHCS to achieve their shared goal of keeping each person in and around CDCR's institutions safe.

## II.    POPULATION REDUCTION

*Plaintiffs' Position:* CDCR's total in-custody population as of April 21 was approximately 95,600, substantially lower than the approximately 123,000 in mid-March, 2020.[12] That said, the current total represents an increase of more than 1,000 since mid-February of this year, and there are approximately 10,000 people in county jails who are sentenced and pending transportation to CDCR.

Limiting population remains crucial, even though active cases of COVID-19 infection among CDCR residents have thankfully dwindled in recent weeks. First,

---

[12]    *Compare* Cal. Dep't of Corr. & Rehab., *Weekly Report of Population, April 21, 2021*, available at *https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2021/04/Tpop1d210421.pdf* with *Weekly Report of Population, March 18, 2020*, available at *https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/03/Tpop1d200318.pdf* .

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.4

according to April 21 CCHCS data, thousands of beds must continue to be set aside (and left empty), so that they can be used to house the thousands of people who continue to be quarantined either due to exposure to a confirmed COVID-19 patient (typically a staff member currently) or for precautionary purposes, as is done for all who transfer between prisons.[13]  For this reason alone, and especially given the increasing in-custody population, CDCR must at the least continue its early release program for some who are within 180 days of release.  (CDCR's most recently provided data shows that between March 11 and April 14, 461 people left prison early under this program.)

Further serious COVID-19 outbreaks also remain possible in CDCR.  Tens of thousands of incarcerated people and prison staff are unvaccinated.  Further, it is not known how long vaccine or previous infection-conferred protection from serious COVID-19 complications lasts, or when booster shots, if necessary, will be available.  Finally, those who are unvaccinated, both in and out of prison, may harbor coronavirus infections that could transform into more dangerous and more contagious variants, which could break through existing vaccinations.[14]

Given that further outbreaks are possible and that the prisons are the ideal environment for the virus to spread, Defendants must have a plan to promptly reduce the prison population should there be another spike in COVID-19 infections and COVID-

---

[13]    This precautionary quarantine is part of the Movement Matrix measure which minimize the risk of COVID-19 spreading from one prison to another due to incarcerated person movement, and thus reduce the risk of another disaster of the kind that occurred at San Quentin in late spring and early summer 2020.

[14]    *See* Sheryl Gay Stolberg and Annie Karni, "Nation Faces 'Hand-to-Hand Combat' to Get Reluctant Americans Vaccinated," *New York Times*, April 21, 2021 ("The fear is that even as some regions like New England race toward broad immunity, others will harbor coronavirus infections that could transform into more dangerous and more contagious variants, which could break through existing vaccinations"), available at https://www.nytimes.com/2021/04/21/us/politics/coronavirus-vaccine-rates.html.

17276690.4

related serious complications and deaths.

*Defendants' Position:* As Plaintiffs note, CDCR's population is 22% lower now than it was at the beginning of the pandemic in mid-March 2020. Additionally, CDCR's institutions are currently occupied at 106.8% of design capacity.[15] CDCR continues to release incarcerated people through the 180-day early-release program announced on July 10, 2020. This program has resulted in 8,086 early releases as of April 22, 2021.

As discussed in previous statements, CDCR implemented several population reduction measures early in the pandemic at a time when other protections were still being developed in accordance with public health guidelines that were changing rapidly. *See, e.g.* ECF No. 3558 at 5. These measures have resulted in 8,423 early releases since July 2020. Now that more is known about the virus, population reduction is no longer the only safety measure available. As Dr. Spaulding opined, institutions can implement multiple evidence-based strategies to reduce potential harm. Decl. A. Spaulding, MD, MPH, Supp. Defs.' Position on Quarantine and Isolation Space, ECF No. 3505 at 11-20. In the past nine months, among many other measures, CDCR and the Receiver's office identified and set aside space devoted to quarantine and isolation, developed and implemented a movement matrix that sets forth strict testing and quarantine protocols, made face coverings and physical distancing mandatory, and implemented strict and frequent testing protocols for the early detection of COVID-19. Defendants have detailed their robust response to the COVID-19 pandemic in filings submitted to the Court over the past nine months, and continue to report updates to this end in case management conference statements. *See, e.g.,* Joint Brief on Quarantine, ECF No. 3502 at 33-39 and Decl. C. Gipson Supp. Defs.' Opp'n to Pl.' Position on Quarantine in Housing Units with Shared Air Space, ECF No. 3508.

Ultimately, Defendants recognize that population reduction is one component of a

---

[15] *See* CDCR's Weekly Report of Population as of April 21, 2021 at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2021/04/Tpop1d210421.pdf.

17276690.4

multi-pronged approach to a novel and complex public health emergency. And CDCR and CCHCS's efforts have been fruitful, as the greatly reduced number of active COVID-19 cases among CDCR's incarcerated population demonstrates. Nonetheless, CDCR and CCHCS continue to improve and supplement existing safety measures so that staff are prepared to respond to future outbreaks.

## III.    QUARANTINE AND ISOLATION

*Plaintiffs' Position:*  As case counts sink and transfers rise, CCHCS has modified the set-aside space at each prison based on the significantly reduced need for isolation of positive cases and quarantine of suspected cases, and the significantly enhanced need for post-transfer precautionary quarantine. *See* Order to Set Aside Quarantine and Isolation Space, July 22, 2020, ECF No. 3401 at 4 ("The Receiver will continually monitor whether isolation and quarantine space reserves are appropriate in light of changing circumstances. He will advise the parties if he believes reserve levels should be modified at a particular institution"). These modifications were accompanied by two crucial measures: if an outbreak occurs, movement into the affected prison will be immediately modified to allow adequate quarantine space; and CCHCS will continue to monitor the use of this space and weigh its adequacy. Given the accompanying measures, Plaintiffs support this effort and will continue to review the data and raise any concerns with CCHCS and, if necessary, the Court.

CCHCS administrator Tammy Foss continues to report on her prison-by-prison review of the use of quarantine status and the set-aside space, documenting decreasing use of quarantine for exposure (approximately 1,000 as of the last report) and increasing use of precautionary quarantine (more than 4,000 as of the last report).

As more quarantine space is used for post-transfer precautionary quarantine, it remains vital for institutions to properly utilize quarantine space without combining multiple post-transfer cohorts in one shared air space. On April 1, 2021, Plaintiffs raised concerns about multiple post-transfer quarantine cohorts being housed together in a dorm space at CCC. Plaintiffs had also raised concerns about multiple cohorts being housed

17276690.4

together in a dorm with shared air space at CRC.  On April 9, 2021, CDCR and CCHCS issued a revised Screening and Testing Matrix for Patient Movement, and on April 16, 2021, CDCR and CCHCS responded to Plaintiffs' query, acknowledging that at some institutions, there were discrepancies in the interpretation of the quarantine requirements for pre- and post-transfer, but that clarification and further training were given to the institutions to ensure cross-contamination errors do not occur in the future.  We appreciate Defendants' candor and the steps they have taken to ensure that post-transfer quarantine housing is conducted safely going forward.  We are concerned, however, that once again neither CDCR nor CCHCS appear to have been aware of these problems before we brought them to their attention.  Plaintiffs are particularly concerned that there may be a pattern of errors in post-transfer quarantine housing given the issues we previously raised with such housing at CCWF, as discussed in the last case management conference statement.

*Defendants' Position:* As reported in the prior statement, Defendants are working to ensure that institutions comply with the Receiver's isolation and quarantine guidance provided on December 4 and 18, 2020, by closely monitoring their use of reserved quarantine space.  Due to a successful COVID-19 vaccination program, a rigorous testing and transfer policy,[16] stringent policies regarding physical distancing and personal protective equipment, and aggressive COVID-19 surveillance testing and contract tracing, CDCR has experienced a significant and sustained decline in the number of active COVID-19 cases among incarcerated persons.  This has resulted in the overwhelming majority of the reserved quarantine spaces, including large numbers of cells with solid doors, sitting empty.

CDCR recently prepared an updated "Roadmap to Reopening" (Roadmap), attached here as **Exhibit A**, which sets forth CDCR and CCHCS's approach to reopen statewide

---

[16]    Significantly, according to CCHCS, CDCR has not encountered a single positive COVID case vis-à-vis inter-facility transfers as a result of these protocols.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

operations consistent with public health guidance.  As CDCR follows its Roadmap and resumes more normal programming, there is an urgent need for celled housing in which post-transfer precautionary quarantine and testing can be safely conducted.  CCHCS and CDCR have worked together to identify portions of reserved quarantine space at particular institutions that can be used for post-transfer quarantine.  In the meantime, aggressive COVID mitigation strategies, such as ongoing surveillance testing, will continue.  If surveillance testing detects an outbreak at an institution, movement will be immediately modified so that adequate quarantine space is available for exposed patients.  CCHCS will continue to monitor the use of all reserved quarantine space on a regular basis and make adjustments as necessary.

## IV.  HOUSING UNIT VENTILATION

*Plaintiffs' Position*: On March 24, Defendants described various measures underway or planned to evaluate and improve housing unit ventilation with regard to minimizing COVID-19 transmission.  See ECF No. 3566 at 19:5-20:12.  On April 14, we requested certain information and a meeting regarding these efforts.  Specifically, we asked for an update regarding installation of MERV-13 filters in CDCR housing units' air handling units, including a list that shows, for each prison and its housing units, the number or grade of MERV filter currently being used in the air handling units, and, if MERV-13 is not being used, why such is not being used and whether an upgrade to 13 is planned (and if so, when).  We also asked for an update on the work of the "ventilation workgroup."  Finally, we asked for an update on the system-wide inspection and evaluation of each prison's ventilation systems being done by CDCR Plant Operations staff,  a copy of any completed inspection report, and the schedule for completing any that remain pending.   We asked for all information by April 22.  On April 21, defendants stated that information was still being gathered, and that they would not be able to provide it by our requested date.  We believe housing unit ventilation continues to be an important concern.

*Defendants' Position*:  Defendants received Plaintiffs' request and are compiling

relevant information.  Defendants will respond to Plaintiffs' request when the data is available.

**V.      RESUMPTION OF SERVICES**

*Plaintiffs' Position*:

<u>Medical Clinics</u>

As a result of the pandemic, medical clinic operations have been significantly impacted.  While medication distribution has continued, and nurses typically have seen patients who submit requests for care, many of those appointments take place not in clinics but housing units.  Medical providers (e.g., doctors), have been seeing some patients, but not nearly as many as previously; many appointments are deferred, or conducted by reviewing the patient's records, and many take place in locations other than a clinic.  We believe there is a large unmet need for face-to-face medical provider services, and the need for such services could be greater still given recent information that some who have had COVID-19 require greater amounts of medical services even months after infection.[17]  In this regard, on April 1, we asked CCHCS for information about the status of any Care Guide or other approach to identifying and caring for long-haul COVID patients.  On April 27, CCHCS responded, saying among other things that its providers received training on long-haul COVID by an outside specialist, and that while there are currently no specific national guidelines for the screening or management of patients following COVID-19 infection as it relates to post-acute sequela, providers are aware of the need to manage these patients.

CCHCS says it has been working with CDCR on re-opening its clinics.  It says identifying acceptable space is a challenge, in that some clinics had operated in cramped quarters.  The timeframe for reopening clinics, according to CCHCS, is the coming

---

[17]    *See* Pam Belluck, "Patients With Long Covid Face Lingering Worrisome Health Risks, Study Finds," *New York Times*, April 22, 2021, available at https://www.nytimes.com/2021/04/22/health/covid-patients-health-risks-long-term.html?searchResultPosition=27.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.4

months. We will discuss this further with CCHCS, especially since late last week a "Roadmap to Reopening" was provided. While we are still reviewing that document, it appears once the least restrictive Phase is reached upon there being no COVID outbreak for 28 days, resumption of clinic operations lies almost entirely in the discretion of local prison officials, with no provision for formal assessment by regional or headquarters managers. It also appears that no direction or guidance is provided regarding seemingly fundamental operations questions, such as how patient holding tanks and waiting areas in clinics should be used if social distancing remains required.

Specialty Services

Many necessary and ordered specialty services have been delayed during the pandemic. Consistent with this fact, the CCHCS Dashboard shows red zone compliance percentages for high, medium, and routine specialty services, with overall statewide percentages averaging approximately 50% to 60%. CCHCS acknowledges that there is a backlog, said it is working on it, and will provide data quantifying the backlog for various specialty services. In addition to backlogged ordered services, we believe there are many patients for whom providers have deferred ordering routine specialty services during the pandemic. For example, the Roadmap to Reopening provided late last week implies that services related to cancer screening may not have been ordered at points during the pandemic.

Emergency Response Improvement Project

Approximately two years ago, CCHCS undertook a necessary project to improve emergency response medical care and documentation. The project involves revised policies and procedures, and a plan to provide new equipment and extensive training to nursing and other staff at each prison. The schedule called for most prisons to receive the training, and then implement the new policies and procedures, by the end of 2020.

Unfortunately, the pandemic interrupted the training and implementation schedule, such that staff at 15 prisons have not received training, according to CCHCS. In addition, CCHCS also recently said that of the 20 prisons that received training, only one completed

necessary implementation and certification requirements. CCHCS plans to re-start this improvement project. To that end, it told us last week it intends to do what is needed to finish implementation at the 19 prisons that have received training, and has scheduled training to begin between May and September at five of fifteen prisons that still need it. The schedule for the remaining prisons, per CCHCS, is to be determined. As such, a final completion date for this necessary project is not yet known, but given implementation and certification requirements it is likely to be late 2022 at the earliest.

Integrated Substance Use Disorder Treatment (ISUDT)

As designed, the CCHCS / CDCR ISUDT consists of medication assisted treatment (MAT) as necessary, individual and group counseling and therapy, and clustering patients in particular housing units so as to create therapeutic communities. To its credit, CCHCS when the pandemic began explicitly directed that MAT continue and that patients continue to be evaluated and placed in the program if appropriate.

We reported in late 2020 that there was a massive backlog of patients pending an initial addiction medicine appointment, which is necessary to begin MAT. See ECF No. 3487 at 21:19-22:4, and ECF 3501 at 23:10-20. Since then, we are pleased to report that CCHCS data shows that the number of backlogged appointments, while still large, has slowly but steadily decreased. Specifically, as of March 23, the most recent date for which CCHCS has provided data, the number of overdue initial addiction medicine appointments has been reduced by more than 2,000 compared to late November. Relatedly, since then the number of people receiving MAT has increased by almost 3,000, and now totals more than 9,200. Given that MAT is life-saving and life-changing for many, we very much appreciate the work that has been done in this area by many at CCHCS and CDCR, and that such work will continue until the current backlog of approximately 4,000 patients is eliminated.

The pandemic unfortunately has for the time being stopped the group therapy and

clustered-housing elements of the ISUDT program.[18]  CCHCS said last week that in-person counseling groups will begin again, although dates for that were not available, and that it hopes that clustered-housing can be done as well.

Programming and Visitation

Plaintiffs recognize the importance of access to programming for incarcerated people, both in terms of general wellbeing and in terms of the ability to earn credits towards diminution of sentence.  Plaintiffs also recognize the critical importance of access to visitation by family members and loved ones.  We are encouraged that Defendants have begun to allow in-person visits.  On April 22, Defendants in the Coleman case provided a revised "Roadmap to Reopening;" we are reviewing this document.  Of course, the resumption of both programming and visitation must be done thoughtfully and carefully, with an awareness that this pandemic is not yet over, and that many staff and patients remain unvaccinated while also recognizing that these critical services are essential to the well-being of our clients. We will continue to review Defendants' plans and progress and provide feedback as necessary.

*Defendants' Position*:

Healthcare Services for the Incarcerated Population

CDCR continues to partner with the Receiver's office and CCHCS to safely return healthcare services to their pre-pandemic frequency, particularly now as COVID-19 cases remain low.

Programming and Visitation

CDCR's institutions have begun resuming programming while keeping safety protocols in place, and continue to work towards their goal of returning to pre-pandemic programming.  CDCR expects programming, credit-earning opportunities like testing, and resulting credit awards to continue to increase as COVID-19 cases remain at their lowest

---

[18]    According to CCHCS, about one-third of ISUDT patients are receiving written materials, and a similar percentage receive one-to-one encounters with mental health clinicians, about their addiction.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

17276690.4

level since the beginning of the pandemic, the number of fully vaccinated incarcerated people increases, and CCHCS authorizes greater flexibility in movement and housing.

Starting in November 2020, CDCR offered video visits to the incarcerated population while in-person visits were paused for over a year during the COVID-19 pandemic. Defendants are cognizant of the impact this pause has had on the incarcerated population and their loved ones, and are pleased to report that in-person visits resumed on April 10, 2021, as planned.[19] In an effort to protect each person visiting, residing, and working in its institutions, CDCR has implemented strict safety protocols for visitors including, but not limited to, the following requirements:

- visitors must provide proof of a negative COVID-19 test no longer than 72 hours before the visit or receive a negative rapid test at the institution from healthcare staff onsite;
- incarcerated persons are rapid tested within 48 hours of their scheduled visits;
- symptom and temperature screenings are mandatory for all visits;
- procedure masks will be provided to each person in the visiting areas;
- visits are currently limited to one adult visitor per incarcerated person for one hour;
- visitors must maintain a minimum of 6 feet of separation, and physical contact is limited to a brief hug at the beginning and end of the visit.

CDCR will continue to offer video visits in addition to in-person visits, and hopes this development will increase morale in the institutions.

## VI. OIG REPORTS REGARDING FACE COVERING AND PHYSICAL DISTANCING MONITORING

The parties received the Office of Inspector General's report on Face Covering and

---

[19] All but two institutions resumed in-person visits on April 10, 2021: Calipatria State Prison resumed in-person visits on April 16, 2021, and the California Institution for Women will resume in-person visits on May 2, 2021. Resumption of visitation at these two institutions was delayed due to COVID-19.

Physical Distancing Follow-Up Monitoring and Updated Face Covering and Physical

Distancing Follow-up Monitoring Plan at about 10:30 a.m. on April 27, 2021. The parties

are in the process of reviewing these documents. They are attached as **Exhibits B** and **C**,

respectively, at the OIG's request.


DATED: April 27, 2021                    HANSON BRIDGETT LLP


                                 By:  */s/ Paul B. Mello*
                                     PAUL B. MELLO
                                     SAMANTHA D. WOLFF
                                     LAUREL O'CONNOR
                                     DAVID C. CASARRUBIAS
                                     Attorneys for Defendants

DATED: April 27, 2021                    ROB BONTA
                                     Attorney General of California


                                 By:  */s/ Damon McClain*
                                     DAMON MCCLAIN
                                     Supervising Deputy Attorney General
                                     RYAN GILLE
                                     IRAM HASAN
                                     Deputy Attorneys General
                                     Attorneys for Defendants

DATED:  April 27, 2021                    PRISON LAW OFFICE


                                    By:   /s/ Steven Fama
                                          STEVEN FAMA
                                          ALISON HARDY
                                          SARA NORMAN
                                          SOPHIE HART
                                          RANA ANABTAWI
                                          Attorneys for Plaintiffs