JAMIE L. DUPREE (SBN: 158105)
jdupree@fddcm.com
JAIME G. TOUCHSTONE (SBN: 233187)
jtouchstone@fddcm.com
FUTTERMAN DUPREE DODD CROLEY MAIER LLP
601 Montgomery Street, Suite 333
San Francisco, California 94111
Telephone: (415) 399-3840
Facsimile: (415) 399-3838

BRAD D. BRIAN (State Bar No. 79001)
brad.brian@mto.com
KATHERINE M. FORSTER (State Bar No. 217609)
katherine.forster@mto.com
JACOB S. KREILKAMP (State Bar No. 248210)
jacob.kreilkamp@mto.com
ROBERT E. BOWEN (State Bar. No. 335932)
robert.bowen@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Receiver
J. Clark Kelso

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. 4:01-cv-01351-JST<br><br>**NOTICE OF FILING OF REPORT OF J. CLARK KELSO, RECEIVER; DECLARATIONS OF DR. JOSEPH BICK, DR. TARA VIJAYAN, AND MS. TAMMATHA FOSS** |

TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Receiver J. Clark Kelso has filed herewith his Report regarding a mandatory COVID-19 vaccination policy for the California Department of Corrections and Rehabilitation in the instant matter.  As reflected in the Report, the Receiver recommends that access by workers to CDCR institutions be limited to those workers who establish proof of vaccination (or have established a religious or medical exemption to vaccination).  The Receiver further recommends that incarcerated persons who desire to work outside of the institution (e.g., fire camps) or to have in-person visitation must be vaccinated (or establish a religious or medical exemption).  The Receiver respectfully requests that the Court issue an order to show cause why the Court should not order CDCR and CCHCS to implement this recommendation.

In support of the Report, the Receiver has filed herewith the Declarations of Dr. Joseph Bick, Dr. Tara Vijayan, and Ms. Tammatha Foss.


DATED: August 4, 2021                      MUNGER, TOLLES & OLSON LLP


                                           By: _____
                                                BRAD D. BRIAN
                                              Attorneys for Receiver J. Clark Kelso

Munger, Tolles & Olson LLP | 350 South Grand Avenue | Los Angeles, CA 90071
Tel: (213) 683-9100 | www.mto.com



# Report of J. Clark Kelso, Receiver

## Regarding a Mandatory COVID-19 Vaccination Policy for California Department of Corrections and Rehabilitation Personnel Working within Institutions and for Incarcerated Persons with Outside Contacts

August 4, 2021



# Table of Contents

**I.      The ability of COVID-19 to cause great harm – including death – to those incarcerated in CDCR institutions is beyond dispute.** ........................................................................... 3

**II.     Institutional staff are a primary vector for introducing COVID-19 to prisons.** .................... 5

**III.    Once introduced, COVID-19 spreads rapidly in prisons.** ........................................................ 8

   **A.      Means of Transmission in Prisons** ................................................................................. 9

      1.    *Close Contact Transmission* ....................................................................... 10

      2.    *Fomite Transmission* ................................................................................. 13

   **B.      Facility Design** ............................................................................................................ 13

   **C.      Other Factors** ............................................................................................................. 14

**IV.    Once infected, incarcerated persons with COVID-19 have worse health outcomes than the population at large.** ................................................................................................................ 14

**V.     COVID-19 outbreaks exacerbate the healthcare delivery inadequacies that the core mission of the Receivership addresses.** ................................................................................... 16

**VI.    The Delta variant will continue to cause additional outbreaks.** ..................................... 17

**VII.   Vaccination at very high levels is the only effective measure for preventing outbreaks.** 19

**VIII.  The vaccination rate for CDCR staff is too low, and it is now evident that voluntary means of encouraging vaccination will not raise rates to acceptable levels.** ............................ 21

**IX.    A mandatory vaccination policy is necessary and reasonable considering historical precedent, the widespread adoption of similar policies, and the public health necessity for doing so.** ....................................................................................................................................... 22

**X.     The Receiver has determined that a mandatory vaccination policy for workers entering CDCR institutions and incarcerated persons who choose to work outside of an institution or accept in-person visitation is supported by the best medical science and respectfully requests that the Court issue an order to show cause why CDCR and CCHCS should not be ordered to implement such a policy.** ....................................................................................................... 24



This report sets forth (a) the public health basis for adopting a mandatory COVID-19 vaccination policy, with medical and religious exemptions, for staff working in or entering California Department of Corrections and Rehabilitation (CDCR) institutions; and (b) the Receiver's recommendation of such a policy as a matter of public health necessity as to workers who enter institutions and as to incarcerated persons who accept employment outside CDCR institutions or receive in-person visits.

The Receiver believes, based on the advice of medical and public health professionals, including Dr. Joseph Bick, Director of Healthcare Services, California Correctional Health Care Services (CCHCS), that given the rapid and ongoing spread of the Delta variant in California, mandatory COVID-19 vaccination for institutional staff is necessary to provide adequate health protection for incarcerated persons.  Once COVID-19 infection has been introduced into a prison, it is virtually impossible to contain, and staff are indisputably a primary vector for introducing into the prison the infection now spreading rapidly in the larger community. Therefore, the only method to ensure adequate protection and care for incarcerated persons is vaccination of all persons who can bring infections into the prison.  The Receiver also accepts the view of medical and public health professionals that such a policy protects the health of staff and the surrounding communities.

The arrival of the Delta variant poses enormous risks to incarcerated persons and staff and to the ability of the medical system to care for patients.  The best available medical science shows that in populations—particularly in congregate settings—with significant unvaccinated populations, the Delta variant *will* cause new outbreaks, increased hospitalizations, and deaths. Efforts short of a mandatory vaccination requirement have not raised the vaccination rate sufficiently to prevent these consequences.

A mandatory vaccination policy is medically necessary for those individuals who regularly go in and out of CDCR facilities—or receive visitors to those facilities—and so cannot be effectively quarantined with each visit.  That group includes institutional staff and other CDCR employees who enter institutions, and incarcerated persons who choose to work outside an institution or receive in-person visitation.  Given the medical case for mandatory vaccination in the circumstances, the Receiver respectfully recommends that the Court issue an order to show cause why it should not order CDCR and CCHCS to implement such a policy.

**I.      The ability of COVID-19 to cause great harm – including death – to those incarcerated in CDCR institutions is beyond dispute.**



The global COVID-19[1] pandemic has resulted in more than 198 million cases and 4.2 million deaths as of July 2021.[2]  Because of unavoidable aspects of prison life, infection rates in California prisons – and in prisons around the world – are dramatically higher than in the free population.  In CDCR facilities, 49,580 incarcerated people – 50% of all persons incarcerated by CDCR – have had a confirmed case of COVID-19.[3]  To date, 232 incarcerated people have died of COVID-19.[4]  By contrast, statewide in California there have been 3.87 million confirmed cases, about 9.5% of the state population, and at least 64,085 deaths.[5]  Incarcerated persons are five times as likely to be infected in outbreaks and nearly three times more likely to die.

COVID-19 can cause pneumonia and other severe respiratory symptoms, major organ damage, strokes, blood clots, multisystem inflammatory syndrome, sepsis, and death.[6]  Patients who survive COVID-19 often suffer long-term effects including fever, chest pains, shortness of breath, diarrhea, vomiting, sudden onset diabetes and hypertension, mood disorders, and

---

[1] Coronavirus disease 2019 (COVID-19) is the disease caused by the coronavirus severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).  For ease and clarity, this report will use "COVID-19" throughout to refer both to the virus and the disease it causes.

[2] Johns Hopkins University of Medicine, Coronavirus Resource Center, COVID-19 Dashboard, https://coronavirus.jhu.edu/map.html (accessed Aug. 2, 2021).

[3] California Department of Corrections and Rehabilitation, Population COVID-19 Tracking, https://www.cdcr.ca.gov/covid19/population-status-tracking/ (accessed Aug. 2, 2021).

[4] *Id*.

[5] State of California, Tracking COVID-19 in California, https://covid19.ca.gov/state-dashboard/ (accessed Aug. 2, 2021).

[6] Vijayan Decl. ¶ 4; Mayo Clinic, *COVID-19 (coronavirus): Long-term effects*, https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351.  *See also* Sapna Bamrah Morris, et al., *Case Series of Multisystem Inflammatory Syndrome in Adults Associated with SARS-CoV-2 Infection – United Kingdom and United States, March-August 2020*, 69 MMWR 1450 (Oct. 9, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6940e1.htm; Myoung-Hwa Lee, et al., *Microvascular Injury in the Brains of Patients with COVID-19*, 384 New Eng. J. Med. 481 (Feb. 4, 2021), https://www.nejm.org/doi/10.1056/NEJMc2033369; Alexander E. Merkler, et al., *Risk of Ischemic Stroke in Patients With Coronavirus Disease 2019 (COVID-19) vs Patients With Influenza*, 77 JAMA Neurology 1366 (July 2, 2020), https://jamanetwork.com/ journals/jamaneurology/fullarticle/2768098; Tahmineh Mokhtari, et al., *COVID-19 and multiorgan failure: A narrative review on potential mechanisms*, J. Mol. Histol. (Oct. 4, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7533045/#; Charles Ochieng' Olwal, et al., *Parallels in Sepsis and COVID-19 Conditions: Implications for Managing Severe COVID-19*, 12 Front. Immunol. (Feb. 3, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7886971/.



nervous system disorders.[7]  Such long-term symptoms are sometimes experienced by patients who had mild COVID-19 symptoms and the impact may be life-long.[8]  Approximately one-third of those with severe cases of COVID-19 develop PTSD.[9]  Providing adequate care for COVID-19 patients and their long-term conditions presents insuperable challenges for a medical care system already overburdened.

## II.   Institutional staff are a primary vector for introducing COVID-19 to prisons.

Institutional staff are primary vectors for introducing COVID-19 into CDCR facilities.  This is not a criticism, it is simply a fact: "[e]ven when residents rarely leave, these facilities are highly connected to communities through workers and guests."[10]  All of CDCR's institutional staff members live outside the prison and regularly come into contact with friends, family, and local service providers in the surrounding community.  They bring the risk of these contacts back with them to CDCR institutions.  It cannot be otherwise unless staff effectively become prisoners themselves, taking up residence in the prisons and never traveling beyond the walls for the duration of the pandemic.

Incarcerated persons transferred to a new facility may be tested and quarantined with others who arrived on the same day, limiting the risk that any incarcerated persons who are transferred will introduce COVID-19 into the institution at large.  But institutional staff come and go from the institution daily and cannot be quarantined with every entrance.  When infections rise in the community, visits can be curtailed and limited.  Staff ingress, by contrast, is essential to prison operations.

---

[7] Angelo Carfi, et al., *Persistent Symptoms in Patients After Acute COVID-19*, 6 JAMA 603 (July 9, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768351.  *See also* Vijayan Decl. ¶ 4.

[8] Ani Nalbandian, et al., *Post-acute COVID-19 syndrome*, 27 Nature Med. 601 (March 22, 2021), https://www.nature.com/articles/s41591-021-01283-z; Thomas M. Drake, et al., *Characterisation of in-hospital complications associated with COVID-19 using the ISARIC WHO Clinical Characterisation Protocol UK: a prospective, multicentre cohort study*, 398 The Lancet 223 (July 17, 2021), https://www.thelancet.com/action/showPdf?pii=S0140-6736%2821%2900799-6.

[9] Delfina Janiri, et al., *Posttraumatic Stress Disorder in Patients After Severe COVID-19 Infection*, 78 JAMA Psychiatry 567 (February 18, 2021), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/2776722.

[10] Elizabeth C. Lee, et al., *The engines of SARS-CoV-2 spread*, 370 Science 406 (Oct. 23, 2020), https://science.sciencemag.org/content/370/6515/406 (emphasis added) (identifying prisons and other congregate facilities as particularly vulnerable to COVID).



While staff members are tested, testing is universally recognized as a far imperfect substitute for vaccination.  Staff may be infected between tests.  And even when tested, COVID-19 is often not detectible by test in its early incubation period.

The factually obvious and inevitable role of staff in bringing infections from the larger community into the prisons has been borne out by the now-long record of COVID-19 in CDCR facilities.[11]  Half of all outbreaks in May, June, and July have been confirmed to have originated with staff.[12]  Analysis of the remaining outbreaks during that time is ongoing—genomic sequencing takes weeks or months—and those outbreaks, too, may eventually be traced back to staff.[13]

Because of their job responsibilities, institutional staff infected with COVID-19 are virtually certain to come into contact with incarcerated persons and other corrections officers who will, in turn, come into contact with incarcerated persons.  Corrections officers have frequent close contact with incarcerated persons, typically working their entire shifts in the spaces in which incarcerated persons live.  They have many responsibilities that place them in close contact with incarcerated persons each day, including supervising incarcerated persons as they get their meals and their mail, performing pat-downs for contraband when entering and exiting the yard each day, and handcuffing and escorting incarcerated persons throughout the institution.[14]  Corrections officers often move between various parts of a facility over the course of a day based on the needs of the institution, and frequently work overtime in areas of the institution to which they are not permanently assigned.  Infected officers are not only likely to infect incarcerated persons, the spread is unlikely to be contained to one part of the facility.[15]

Frequent testing is insufficient to prevent institutional staff who are unaware that they have COVID-19 from spreading the virus.  Under the State Public Health Officer Order of July 26, 2021, unvaccinated corrections officers must be tested for COVID-19 once each week.[16]  CDCR has indicated that although the COVID-19 safety measures adopted by the State require only weekly testing, it will test unvaccinated employees twice per week.[17]  Tests can detect a positive case only where a certain viral load is present, so a recently infected individual may not

---

[11] Bick Decl. ¶¶ 15-17.

[12] Bick Dec. ¶ 17.

[13] Bick Decl. ¶ 17, Ex. A at 3-4.

[14] Foss Decl. ¶ 3.

[15] Foss Decl. ¶ 4; Vijayan Decl. ¶ 16.

[16] California Department of Public Health, *State Public Health Officer Order of July 26, 2021*, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Unvaccinated-Workers-In-High-Risk-Settings.aspx#.YQAuOFRMEO4.mailto.

[17] *See* ECF No. 3623 at 7.



test positive for several days after exposure.[18]  Results of COVID-19 tests are also typically available only after a wait of a day or longer.[19]  An infected staff member might work two or three days before being tested; a newly infected staff member may test negative, continue working and reach a viral load sufficient to transmit the virus before being tested again and finally receiving a positive test result.

Because as much as 40 percent of transmission is pre-symptomatic,[20] individuals who receive false negative test results or who test too early may be unaware they are contagious throughout this period.  As a result, the twice-per-week testing regimen does not effectively prevent asymptomatic staff from introducing COVID-19 to CDCR institutions.  Indeed, even daily testing would not do so.  Testing is an essential component of any plan, but it is not a substitute for vaccination.

The widely recognized link between community outbreaks of COVID-19 and outbreaks in nearby prisons through institutional staff is why the Federal Bureau of Prisons ("BOP") recommended early in the pandemic that staff vaccination be prioritized when the supply of vaccines was limited:

> Vaccinating correctional staff will serve to decrease the possible introduction of SARS-CoV-2 into institutions and thus protect inmates.  In the context of limited quantities of vaccine, the BOP recommends offering vaccination *to staff first <u>as the best way</u> to achieve the greatest public health benefit* to inmates, staff, and communities.[21]

---

[18] Bick Decl. ¶ 20; Lauren M. Kucirka, et al., *Variation in False-Negative Rate of Reverse Transcriptase Polymerase Chain Reaction-Based SARS-CoV-2 Tests by Time Since Exposure*, 20 Ann. Intern. Med. 1495 (May 13, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7240870/#.

[19] Bick Decl. ¶ 20.

[20] Xi He, et al., *Temporal dynamics in viral shedding and transmissibility of COVID-19*, Nature Med. (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5; Xiang Ren, et al., *Evidence for pre-symptomatic transmission of coronavirus disease 2019 (COVID-19) in China*, 15 Influenza Other Respi. Viruses 19 (January 2021), https://onlinelibrary.wiley.com/doi/full/10.1111/irv.12787.  *See also* Vijayan Decl. ¶ 7.

[21] Federal Bureau of Prisons, *COVID-19 Vaccine Guidance: Federal Bureau of Prisons Clinical Guidance* 5 (January 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf (emphasis added).



The Receiver and the CDCR medical experts agree: Vaccination of staff is _the best way_ to achieve the greatest health benefits for incarcerated persons. There is no other equally effective method.

### III.   Once introduced, COVID-19 spreads rapidly in prisons.

Studies have repeatedly found that COVID-19 spreads far more rapidly inside jails and prisons than in other environments.  The central metric for understanding the spread of COVID-19 is the reproduction rate ("R")—the number of people each infected person, on average, infects over the course of their illness.  An R below 1, "subcritical transmission," indicates that each infected person infects less than one other person in turn, on average.[22]  If R remains below 1 for a sustained period of time, the disease will disappear.[23]  By contrast, when R is above 1, we have "supercritical transmission," and the outbreak will grow.[24]

A project by prominent medical and public health experts to model the reproduction rate of COVID-19 across California estimates that at no time in the pandemic has California's state-wide R exceeded 1.5.  Each infected person, on average, infects 1.5 others.  The study also estimates that the R has not exceeded 1.5 in any of the six Bay Area counties, nor in Los Angeles or Orange counties, until the arrival of the Delta variant in July 2021.[25]

The transmission rate in prisons is far higher.  One modeling study found that, even before the Delta variant, the R of COVID-19 in a large, urban jail in the United States is approximately 8.44.[26]  Each infected person infects 8 others.  In other words, the reproduction rate in a prison would be expected to be more than 5 times the highest reproduction rate experienced in California and its major metropolitan counties.

The consequence of this greatly elevated rate is inevitable: it produced a staggeringly high incidence of COVID-19 in CDCR facilities and in other jails and prisons.  Since the beginning of the pandemic, there have been more than 200 outbreaks of COVID-19 in California jails and

---

[22] Lee Worden, et al., _Estimation of COVID-19 transmission rates in California and the U.S. with reporting delays_ (May 14, 2020), https://www.medrxiv.org/content/10.1101/2020.05.14.20101162v1.full.pdf.

[23] _Id_.

[24] _Id_.

[25] Lee Worden, et al., _COVID-19 R estimation for California_, https://ca-covid-r.info/ (visited Aug. 2, 2021) (providing updated data to the study at n.22).

[26] Lisa B. Puglisi, et al., _Estimation of COVID-19 basic reproduction ratio in a large urban jail in the United States_, 53 Ann. Epidemiol. 103 (Jan. 2021), https://www.sciencedirect.com/science/article/abs/pii/S1047279720303471?via%3Dihub.



prisons.[27]  A study of federal and state prisons in the United States concluded that the mean daily case growth rate was 8.3% per day in prisons as compared to 3.4% in the country as a whole, and that the fatality rate, adjusted for age, was 3 times higher for incarcerated individuals than the population at large.[28]  Another study estimated an age- and sex- adjusted COVID-19 mortality rate for incarcerated persons 2.95 times that of the US population at large.[29]  This result has been confirmed in detailed regional studies.[30]

COVID-19 spreads so rapidly in prisons because of the design of facilities, the manner in which they must be operated, population density, and the transmission characteristics of the virus.  COVID-19 may be transmitted by close contact with an infected individual or by contact with a surface which contains live virus, each of which is difficult to prevent in prisons.  The Director of the California Department of Public Health is in agreement, noting that jails and prisons are "residential facilities where the residents have little ability to control the persons with whom they interact. There is frequent exposure to staff and other residents."[31] Institutions were designed long ago with the goal of building a safe security environment in which incarcerated persons could be housed in a cost-effective manner.  One aspect of this design is extreme population density.  These facilities were not designed to prevent the transmission of COVID-19, and while CDCR and CCHCS have made substantial efforts to limit transmission where possible, experience shows that it is not possible to change many aspects of institutions that cause a high COVID-19 transmission rate.  Improvements on this front are vital, but infection rates will remain high, and the benefits of improvements pale in comparison to the benefits of vaccination.

### A.    Means of Transmission in Prisons

---

[27] California Department of Public Health, *supra* note 16.

[28] Brendan Saloner, et al., *COVID-19 Cases and Deaths in Federal and State Prisons*, 324(6) JAMA 602 (July 8, 2020),
https://jamanetwork.com/journals/jama/fullarticle/2768249?resultClick=1.

[29] Brendan Saloner, et al*., COVID-19 Cases and Deaths in Federal and State Prisons* [published online ahead of print, 2020 Jul 8] 324 *JAMA* 2020, 602–603. doi:10.1001/jama.2020.12528 (as of June 6, 2020), https://pubmed.ncbi.nlm.nih.gov/32639537/.

[30] Monik C. Jimenez, et al., *Epidemiology of COVID-19 Among Incarcerated Individuals and Staff in Massachusetts Jails and Prisons*, JAMA Netw. Open. (August 21, 2020), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2769617?resultClick=1 (documenting in Massachusetts state jails and prisons Massachusetts state prisons an infection rate 2.91 times higher than the state average and 4.80 times the national average).

[31] California Department of Public Health, *supra* note 16.



COVID-19 is transmitted by inhalation of aerosolized particles; deposition of the virus directly on exposed mucus membranes; and fomite transmission, by touching an object on which the virus has been left by someone shedding virus.[32]  The greater the amount of virus to which an individual is exposed, and the more prolonged the exposure, the greater the likelihood that the individual will contract COVID-19.[33]  Prison conditions put people in sustained close contact, causing exposure to a greater amount of virus for far longer periods of time, and thus a greater likelihood of contraction.[34]

1.    *Close Contact Transmission*

COVID-19 spreads much more in congregate facilities such as prisons because "those who live in congregate residences such as prisons, worker dormitories, and long-term care facilities have intense, long-duration, close contact. . . . The confluence of these factors can lead to high infection rates in outbreaks (attack rate); for example, 66% of residents were infected in a homeless shelter, 62% in a nursing home, and 80% in a prison dormitory."[35]  The CDC defines close contact as a cumulative fifteen minutes within six feet of an infected individual over a 24 hour period.[36]  In congregate facilities in which people remain in the same spaces with each other for many hours, such contact is inevitable and far more common than in the general population.[37]  Incarcerated persons share spaces with one another throughout the day: common areas, gyms and recreational spaces, bathrooms, showers, and cafeterias are all typically communal.[38]  Sleeping quarters are typically communal as well.[39]

While communal spaces make social distancing challenging under any circumstances, the crowded nature of CDCR institutions leaves insufficient space to make distancing possible.

---

[32] Centers for Disease Control and Prevention, SARS-CoV-2 Transmission (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html.

[33] Bick Decl. ¶ 22.

[34] *Id*.

[35] Elizabeth C. Lee, et al., *The engines of SARS-CoV-2 spread*, 370 Science 406 (Oct. 23, 2020), https://science.sciencemag.org/content/370/6515/406.

[36] Centers for Disease Control and Prevention, Case Investigation & Contract Tracing Guidance, Appendices (updated July 9, 2021), https://www.cdc.gov/coronavirus/2019-ncov/php/contact-tracing/contact-tracing-plan/appendix.html.

[37] Bick Decl. ¶¶ 22-23; Vijayan Decl. ¶¶ 9-11, 14.

[38] Foss Decl. ¶ 7.

[39] Foss Decl. ¶ 5.



CDCR's population is currently at 109.3% of its design capacity.[40]  These design capacities, even when not exceeded, did not anticipate the need to maintain six feet of distance from others at all times.  As a result, the bedrooms, common areas, cafeterias, bathrooms, and other spaces incarcerated persons share are too crowded to allow for consistent social distancing.[41]

Prison operations require people from throughout the prison to come into contact with each other, making it difficult to isolate an outbreak to only one housing unit or yard.  For example, prisons often share a single cafeteria.[42]  And each individual in a prison, even in quarantine, must be visited by a corrections officer on rounds every day.[43]  People from different housing units come in close contact with each other in medication distribution, dining areas, the laundry, telephones, transportation, and in performing work assignments throughout the prison.[44]  It is typical for an incarcerated person to be required to come into contact with others throughout the prison multiple times per day.

Masking is also less effective in congregate facilities because incarcerated persons and staff cannot wear a mask at all times.  The chance of transmitting the virus is increased by removing a mask, including when that person is eating or sleeping, yet those are necessary exceptions to masking requirements.[45]  In CDCR institutions, incarcerated persons are indoors and in close proximity to others while they are eating or sleeping.[46]

While sleeping arrangements vary across CDCR facilities, the most common arrangement is for incarcerated persons to sleep in bunk beds placed within a few feet of each other.[47]  This arrangement can allow for transmission between incarcerated persons sharing a bunk bed, and between neighboring beds, particularly because people do not wear masks while sleeping and the very long exposure period of several hours allows for transmission of a large amount of virus.[48]  Although individual or small group cells are an improvement over these dormitory conditions, those cells often have one wall that is open with bars or other

---

[40] California Department of Corrections and Rehabilitation, Three-Judge Court Monthly Update (June 15, 2021), https://www.cdcr.ca.gov/3-judge-court-update/.

[41] Foss Decl. ¶¶ 5, 7, 8, 9, 10.

[42] Foss Decl. ¶ 8; Bick Decl. ¶ 21.

[43] Foss Decl. ¶ 3.

[44] Foss Decl. ¶ 10.

[45] Bick Decl. ¶¶ 25-26.

[46] Foss Decl. ¶¶ 5, 8.

[47] Foss Dec. ¶ 5.

[48] Vijayan Decl. ¶ 15; CDCR CCHCS Memorandum, *Recommended COVID-19 Personal Protective Equipment and Physical Distancing Requirements for Staff and Inmate-Patients Update* (May 10, 2021), ECF No. 3592-1 Ex. A. at 3-4.



perforations rather than a solid door, and are in close proximity to one another,[49] still permitting transmission.

Many individuals sleeping in a single room would be dangerous even with single beds rather than bunk beds and even with six feet between each bed.[50]  For example, medical and public health experts from UC Berkeley and UCSF visited the Substance Abuse Treatment Facility and State Prison at Corcoran (SATF) and concluded that, in order to minimize COVID-19 risk, dorms with a <u>capacity of fifty people</u> should house <u>only three people</u>, and that small dorms with a capacity of six people and cells with capacity of two people should both house only a single person.[51]  A prison system operating at 109% of design capacity simply cannot meet these idealized conditions.

Thus, CDCR institutions, by their design, current population, and operation, pose a great and ineliminable risk of COVID-19 transmission by close contact, even where rules regarding masking and social distancing are enforced.

Even where greater social distancing is possible, airborne transmission is also a substantial risk in indoor conditions.  Indoor conditions, including air conditioning, fans, and heating systems, facilitate transmission by carrying droplets further than six feet – up to 19 to 26 feet away.[52]  Particularly in spaces where ventilation uses recycled air with insufficient filtering, these droplets build up over time.  The virus can survive for approximately three hours in such droplets suspended in the air.  These conditions, in which a person infected with COVID-19 may remain in a single space for a long period of time, make congregate living dangerous even where individuals are further than six feet apart.[53]

---

[49] Foss Decl. ¶ 6; Bick Decl. ¶ 27.

[50] Vijayan Decl. ¶ 15.

[51] ECF No. 3566 at 17-21.  *See also* ECF No. 3579 at 14-15; ECF No. 3592 at 14-17.

[52] Vijayan Decl. ¶¶ 9-11; Lydia Bourouiba, Images in Clinical Medicine: *A Sneeze*, 375 New Eng. J. Med. e15 (Aug. 25, 2016), https://www.nejm.org/doi/full/10.1056/nejmicm1501197; Francis W. Moses, et al., *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020*, 26 Emerging Infectious Diseases 2298 (Sept. 2020), https://doi.org/10.3201/eid2609.201749; M. Saiful Islam, et al., *Current knowledge of COVID-19 and infection prevention and control strategies in healthcare settings: A global analysis*, 41 Infection Control & Hospital Epidemiology 1196, 1196–1206 (Oct. 2020), https://doi.org/10.1017/ice.2020.237.

[53] Center for Disease Control and Prevention, *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission* (Oct. 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html.  *See also* Neeltje van Doremalen, et al., *Aerosol and Surface Stability of*



Indeed, ventilation which uses recirculated air and insufficient filters may spread the virus even to people housed in single-person cells with solid doors.[54]  Efforts to install filters to mitigate this condition are ongoing, but are in any event only a small step toward reducing the high risks of infection through repeated and continuous exposure in congregate conditions.[55] Poor circulation is also exacerbated by the lack of openable windows, often making it impossible to comply with CDC guidance that windows be opened to allow air circulation after an infection has been present in a building.[56]

2.    *Fomite Transmission*

In congregate spaces such as prisons, fomite transmission is also a much greater risk because many people are in regular contact with the same objects and surfaces.  Incarcerated persons share the same tables, chairs, bathroom facilities, and phones, among other items – items used not merely by one or two family members, but by many incarcerated persons.[57]  The length of time the virus can survive in a droplet on a surface depends upon the surface material; however, COVID-19 can survive as long as two to three days on plastic or stainless steel.[58]  Without nearly constant cleaning, COVID-19 may be transmitted in prisons by contact with surfaces in communal spaces.

**B.    Facility Design**

As noted above, the spaces in which incarcerated persons live are generally too densely populated to allow for social distancing, and inadequate ventilation in CDCR institutions can exacerbate this difficulty.

---

*SARS-CoV-2 as Compared with SARS-CoV-1,* 382 New Eng. J. Med. 1564 (Mar. 17, 2020), https://www.nejm.org/doi/10.1056/nejmc2004973.

[54] ECF No. 3566 at 17-21.  *See also* ECF No. 3579 at 14-15; ECF No. 3592 at 14-17.

[55]  Moreover, while a substantial number of housing units at eleven prisons utilize a MERV-13 filter, eighteen institutions have yet to make this change, with fifteen planning to do so by October.  ECF No. 3605 at 10-11.

[56] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, at (Jul. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[57] Foss Decl. ¶ 11.

[58] Centers for Disease Control and Prevention, *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments* (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html#ref10.



Facilities limitations also make effective quarantining difficult.  For those under quarantine in prisons, the CDC recommends that "[i]deally, each quarantined individual should be housed in a single cell with solid walls and a solid door that closes."[59]  Throughout the pandemic, CDCR has not had enough solid-door cells at many institutions to follow this guidance.[60]

### C.    Other Factors

Quarantining in CDCR facilities has also been complicated by some incarcerated persons refusing to leave their cell or dorm despite qualifying for quarantining.[61]  While the reasons for such refusal vary, interviews conducted by the *Plata* Plaintiffs suggest that some reasons include fear of social isolation, loss of pay from work, loss of their previous housing and the community networks they have built there, the location of quarantine facilities in a Sensitive Needs Yard where they did not believe they would be safe, and mistrust of custody and medical leadership.[62]  CDCR has taken steps to identify and address these issues, including adopting many of the *Plata* Plaintiffs' proposals to ameliorate refusals.  But the persistent problem illustrates the complexity of preventing the spread of infection within the prison environment.

* * *

In sum, prison systems, even those that take important mitigation measures such as masking and social distancing, are not designed and operated to prevent the transmission of a highly contagious virus and cannot be redesigned to do so effectively in the near term.  The conditions of confinement and the manner in which prisons are operated deprive incarcerated people of the same opportunities to protect themselves through social distancing and limiting contact that are available to the public at large.  Limiting the introduction of COVID-19 into prisons is critical to protecting the health of incarcerated people.

## IV.   Once infected, incarcerated persons with COVID-19 have worse health outcomes than the population at large.

Studies of health outcomes for incarcerated persons with COVID-19 in prison systems confirm that incarcerated persons have worse health outcomes on average than the population

---

[59] Bick Decl. ¶ 27; Center for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (June 9, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[60] ECF No. 3502 at 2-7.  *See also* Foss Decl. ¶¶ 5, 6.

[61] ECF No. 3545 at 27-28.

[62] ECF No. 3548 at 11-15.



as a whole.  One study of patients in Michigan found that this was true even when incarcerated persons were treated in hospitals.[63]  The study found incarcerated persons were more likely to be admitted to the intensive care unit (26.9% vs. 18.7%), require respirators (24.1% vs. 9.9%), and require intubation (25.0% vs. 15.2%).[64]  Incarcerated persons were also more likely to die in the hospital (29.6% vs. 20.1%) and more likely to die after 30 days (34.3% vs. 24.6%).[65]

Incarcerated persons experience worse health outcomes in part because they have risk factors for COVID-19 at a disproportionate rate compared to the general public.  Incarcerated persons have high rates of chronic illnesses including diabetes, heart disease, chronic lung disease, and immunosuppressive illnesses, as well as other risk factors owing to poor access to medical care prior to incarceration or a history of alcohol or drug abuse.[66]  For these reasons, incarcerated persons are often considered effectively ten years older, physiologically, than their chronological age,[67] and they experience worse health outcomes accordingly.[68]  The more of these risk factors an individual has, the greater the medical care challenges and the greater the risk of a poor health outcome.[69]

Prison conditions also increase the difficulty of securing good patient outcomes.  Patients experiencing severe symptoms may need treatment in community medical facilities, such as an area hospital.  But many prisons are located in rural areas with poor access to

---

[63] Ahmed M. Altibi, et al., *Characteristics and comparative clinical outcomes of prisoner versus non-prisoner populations hospitalized with COVID-19*, Scientific Reports (March 22, 2021), https://www.nature.com/articles/s41598-021-85916-w.

[64] *Id*.

[65] *Id*.

[66] Jennifer Bronson, et al., *Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates, 2007-2009*, U.S. Department of Justice, Bureau of Justice Statistics (updated Aug. 10, 2020), https://bjs.ojp.gov/content/pub/pdf/dudaspji0709.pdf (approximately 58% of convicted persons incarcerated in state prisons meet DSM IV criteria for substance use dependence or abuse).

[67] Brie A. Williams, et al., *Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care*, 102 Am. J. Pub. Health 1475 (Aug. 2012) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/.

[68] Ingrid A. Binswanger, et al., *Health Disparities and the Criminal Justice System: An Agenda for Further Research and Action*, 89 J. Urban Health 98 (Feb. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3284594/.

[69] Wei-jie Guan, et al*., Comorbidity and its impact on 1590 patients with COVID-19 in China: a nationwide analysis*, 55 Eur. Respir. J. (May 14, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7098485/.



community healthcare, and transportation to a far-away hospital may be necessary.[70]  Delays in accessing care for serious COVID-19 cases may be critical.[71]

**V.      COVID-19 outbreaks exacerbate the healthcare delivery inadequacies that the core mission of the Receivership addresses.**

The experience of the pandemic to date has demonstrated beyond dispute the obvious fact that COVID-19 diverts scarce healthcare resources from managing chronic health conditions.[72]  CCHCS continues to take precautions against a renewed spread of an even worse variant that will again prevent routine care.[73]  When an outbreak is ongoing in an institution, non-essential medical services are postponed.  Only after 14 days without a new infection in that institution can medium priority healthcare services like preventative care and screenings resume.[74]  Routine clinical operations are suspended until 28 days without a new infection.[75]

Even when there is no recent outbreak in an institution, prevention protocols interfere with the provision of adequate medical services.  The risk of COVID-19 requires social distancing in medical clinic waiting areas and the cleaning of holding cells and exam rooms between each appointment, limiting the number of appointments per day.[76]  As a result of COVID-19, between January 31, 2020, and March 15, 2021, the backlog of overdue primary care appointments grew from 2,700 to 6,600.[77]

The risk to healthcare providers of contracting COVID-19 at work, the need for the use of excessive overtime, and the stress of providing care in institutions with extraordinarily high

---

[70] Bick Decl. ¶ 6.

[71] Jenna S. Silverstein, et al., *Acute Respiratory Decompensation Requiring Intubation in Pregnant Women with SARS-CoV-2 (COVID-19)*, 10 Am. J. Perinatology Rep. e169 (June 4, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7272216/; Matthew E. Hartman, et al., *COVID-19 Respiratory Failure: Targeting Inflammation on VV-ECMO Support*, 66 ASAIO Journal 603 (June 2020), https://journals.lww.com/asaiojournal/fulltext/2020/06000/covid_19_respiratory_failure__targeting.4.aspx.

[72] Bick Decl. ¶ 7.

[73] California Department of Corrections and Rehabilitation, Roadmap to Reopening (April 20, 2021), https://www.cdcr.ca.gov/covid19/reopening/roadmap/.

[74] *Id*.

[75] *Id*.

[76] ECF No. 3592 at 17.

[77] *Id*.



COVID-19 caseloads have also made it more difficult to staff healthcare units fully, as the difficult working conditions have reduced the size of the workforce.[78]

## VI.    The Delta variant will continue to cause additional outbreaks.

The risk now is grave.  We cannot afford to be lulled by the decline in infections in CDCR, which mirrored the fall in rates in the larger community.  That fall in rates is, unfortunately, already a thing of the past.  That fire may be dying, but a new one is starting: As Dr. Tomás J. Aragón, Director of the California Department of Public Health, now reports, "California is currently experiencing the <u>fastest increase</u> in COVID-19 cases <u>during the entire pandemic</u>."[79]  As rates rise rapidly, more institutional staff will come to work with COVID-19, unaware they are ill, introducing COVID-19 into CDCR institutions.[80]  Indeed, case rates among staff members have increased by more than 500% in recent weeks.[81]

This is not a mere repetition of the early days of the pandemic.  This new wave threatens to be worse.  The Delta variant is twice as transmissible as the original Wuhan strain.[82]  The natural immunity provided by having previously been infected with COVID-19 may not provide robust protection against the Delta variant, both because natural immunity wanes over time, possibly within months,[83] and because the immunity provided by earlier variants may not provide the same level of immunity to the Delta variant.[84]  Each of these factors may allow individuals who have previously contracted COVID-19 to be re-infected with the Delta variant.

---

[78] Bick Decl. ¶ 12.

[79] California Department of Public Health (July 26, 2021), *supra* note 16.

[80] Bick Decl. ¶¶ 14-18, 20, 30.

[81] Bick Decl. ¶ 30.

[82] Vijayan Decl. ¶ 12; Scientific Pandemic Influenza Group on Modeling, Operational sub-group (SPI-M-O), *Consensus Statement on COVID-19* (June 2, 2021), https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/993321/S1267_SPI-M-O_Consensus_Statement.pdf.

[83] Bick Decl. ¶ 31; Jeffrey Seow, et al., *Longitudinal observation and decline of neutralizing antibody responses in the three months following SARS-CoV-2 infection in humans*, 5 Nature Microbiology 1598 (Oct. 26, 2020), https://www.nature.com/articles/s41564-020-00813-8.

[84] Bick Decl. ¶ 31; Emanuele Andreano & Rino Rappuoli, *SARS-CoV-2 escaped natural immunity, raising questions about vaccines and therapies*, 27 Nature Med. 759 (May 10, 2021), https://www.nature.com/articles/s41591-021-01347-0.



Research results are mixed, but early evidence suggests that health outcomes for those infected with the Delta variant may be worse than for those infected with previous variants, causing hospitalization and death in a greater proportion of cases.[85]

The Delta variant is now the predominant strain of COVID-19 in California, accounting for 82.8% of tested samples in July 2021.[86]  Case counts across the state are climbing rapidly. The reproduction rate is the highest it has been in the course of the pandemic.  Five counties currently have an R at or above 1.50.[87]  This is consistent with past waves, where the reproduction rate was a leading indicator that cases would surge.  Positive COVID-19 tests of staff and incarcerated persons in CDCR in July reflect a similarly high percentage of Delta variant infections.[88]

Recognizing the building third wave, public health agencies are now taking action to slow the growth rate of new COVID-19 infections.  Two weeks ago, on July 15, 2021, Los Angeles County announced that masks would again be required in indoor public spaces, regardless of vaccination status.[89]  The State of California announced on July 26, 2021, that all state employees and employees in certain high-risk environments must provide proof of vaccination or submit to weekly or bi-weekly testing for COVID-19.[90]  Following the many hospital systems adopting a mandatory vaccination policy, the Department of Veterans Affairs mandated vaccination for all health care personnel working in or visiting Veterans Health Administration facilities.[91]

---

[85] Aziz Sheikh, *SARS-CoV-2 Delta VOC in Scotland: demographics, risk of hospital admission, and vaccine effectiveness*, The Lancet (June 14, 2021),
https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)01358-1/fulltext.
[86] California Department of Public Health, Tracking Variants (updated July 22, 2021),
https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/COVID-Variants.aspx.
[87] Lee Worden, et al., *supra* note 25 (providing updated data to the study at note 22).
[88] Bick Decl. ¶ 30.
[89] Luke Money & Rong-Gong Lin II, *L.A. County will require masks indoors amid alarming rise in coronavirus cases*, L.A. Times (July 15, 2021), https://www.latimes.com/california/story/2021-07-15/l-a-county-will-require-masks-indoors-amid-covid-19-surge.
[90] California Department of Public Health, *supra* note 16.
[91] U.S. Department of Veterans Affairs, Office of Public and Intergovernmental Affairs, *VA mandates COVID-19 vaccines among its medical employees including VHA facilities staff* (July 26, 2021), https://www.va.gov/opa/pressrel/pressrelease.cfm?id=5696.



Recent large-scale outbreaks demonstrate the risk COVID-19 still presents to prisons.  A recent outbreak in Solano sickened 93 incarcerated persons and spread to two of four yards.[92]  The vaccination rate for corrections officers at Solano is only 46%.[93]

The virus will continue to mutate, likely generating more transmissible varieties.[94]  Variants of Concern (VOC's), such as the Delta variant, have been <u>confirmed</u> to increase transmissibility or virulence, or to decrease the effectiveness of disease prevention measures and treatments.[95]  The World Health Organization is also currently tracking four variants currently designated as Variants of Interest (VOI) – variants with genetic changes believed to affect characteristics like transmissibility and disease severity with significant community transmission.[96]  Among those Variants of Interest—which may become confirmed Variants of Concern—is the Lambda variant, which may already be driving higher infection rates in South America, and has spread rapidly to other countries, including the United States.[97]

Absent very high levels of vaccination, the Delta variant and other future variants will become more common in California, and there almost certainly will be additional large-scale outbreaks in CDCR facilities.[98]  The responsibility to act includes the responsibility to act before it is too late.  Now is the time to take decisive steps to minimize this risk.

## VII.   Vaccination at very high levels is the only effective measure for preventing outbreaks.

The higher reproduction rate from both the Delta variant and the great risk of spread in prison conditions necessitates a resolute effort to block the transmission of the disease into the prison environment.[99]  Popular belief notwithstanding, there is no known percentage for achieving so-called "herd immunity" either in the larger community or in prisons.  The best way

---

[92] Bick Decl., Ex. A at 3.

[93] Bick Decl., Ex B.

[94] Bick Decl. ¶ 33.

[95] World Health Organization, Tracking SARS-CoV-2 variants (accessed Aug. 3, 2021), https://www.who.int/en/activities/tracking-SARS-CoV-2-variants/.

[96] *Id*.

[97] Clive Cookson & Gideon Long, *Lambda Covid variant's 'unusual' mutations puzzle scientists*, Financial Times (July 2, 2021), https://www.ft.com/content/b3ea5177-9312-418b-acb7-af16a3bdcd22; Robert Downen, *Houston Methodist Hospital records first lambda variant as COVID cases double since July 1*, Houston Chronicle (July 19, 2021), https://www.houstonchronicle.com/news/houston-texas/houston/article/Houston-Methodist-Hospital-records-first-lambda-16325190.php.

[98] Bick Decl. ¶¶ 32-33.

[99] Christie Aschwanden, *The false promise of herd immunity for COVID-19*, Nature (October 21, 2020), https://www.nature.com/articles/d41586-020-02948-4.

Page 20



to protect the health of incarcerated individuals and staff is to achieve as high a level of vaccination as possible.[100]

The Delta variant is well-controlled by existing vaccines.[101]  Researchers in Britain have found two doses of the Pfizer vaccine 88% effective against symptomatic disease from the Delta variant.[102]  Other studies have replicated this result.  A Scottish study found 79% efficacy against symptomatic disease,[103] and a Canadian study found 87% efficacy against symptomatic disease.[104]  One study found a more significant decrease in efficacy at preventing symptomatic disease, down to 64%, but that study nevertheless confirmed that the vaccine is 94% effective at preventing hospitalization and death.[105]  Some range in studies of efficacy is ordinary and the research overall strongly supports the efficacy of the vaccines at preventing transmission.

Vaccination is far more effective than other measures like masking and social distancing.[106]  Even if it were possible in prisons to apply all other methods to reduce transmission, these methods are less effective than vaccination.  Social distancing cannot be effectively imposed in current present conditions, but even if it could, it is far less effective in spreading infection than vaccination.  Remaining at six feet of distance from others provides some protection against contracting COVID-19, but, particularly in indoor environments, the virus can travel up to 19 to 26 feet away and remain alive in droplets in the air for as much as three hours.[107]  It has been a challenge to implement masking requirements.  As the Office of

---

[100] Bick Decl. ¶¶ 34-37; Vijayan Decl. ¶¶ 17-19.

[101] Bick Decl. ¶¶ 34-35; Vijayan Decl. ¶¶ 18-19.

[102] Jamie Lopez Bernal, et al., *Effectiveness of COVID-19 vaccines against the B.1.617.2 (Delta) Variant*, New Eng. J. Med. (July 21, 2021), https://www.nejm.org/doi/full/10.1056/NEJMoa2108891.

[103] Aziz Sheikh, et al., *SARS-CoV-2 Delta VOC in Scotland: demographics, risk of hospital admission, and vaccine effectiveness* (June 14, 2021), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)01358-1/fulltext.

[104] Sharifa Nasreen, et al., *Effectiveness of COVID-19 vaccines against variants of concern, Canada* (July 3, 2021), https://www.medrxiv.org/content/10.1101/2021.06.28.21259420v1.

[105] Dov Lieber, *Pfizer Vaccine Less Effective Against Delta Infections but Prevents Sever Illness, Israeli Data Show*, Wall Street J. (July 6, 2021), https://www.wsj.com/articles/pfizers-covid-19-vaccine-is-less-effective-against-delta-variant-israeli-data-show-11625572796.

[106] Bick Decl. ¶ 34.

[107] Lydia Bourouiba, Ph.D., Images in Clinical Medicine: *A Sneeze*, 375 New Eng. J. Med. e15 (Aug. 25, 2016), https://www.nejm.org/doi/full/10.1056/nejmicm1501197; Francis W. Moses, et al., *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020*, Emerg. Infect. Dis. (Sept. 2020), https://doi.org/10.3201/eid2609.201749; M. Saiful Islam, et al., *Current knowledge of COVID-19 and infection prevention and control strategies in*



MUNGER TOLLES & OLSON LLP

the Inspector General's report made clear, masks are not consistently correctly used by incarcerated persons or staff at CDCR institutions.[108] But even when correctly used, "medical masks (surgical masks and even N95 masks) [are] not able to completely block the transmission of virus droplets/aerosols . . . ."[109] As the Director of the California Department of Public Health has noted, "[v]accination against COVID-19 is the most effective means of preventing infection with the COVID-19 virus, and subsequent transmission and outbreaks."[110]

Voluntary efforts have not produced acceptable results, and continuation with a voluntary approach that yields such results must be acknowledged for what it has proven to be – an unacceptable half-way measure. As a result of voluntary programs, only 53% of all staff and only 42% of custodial staff have received at least one dose of the vaccines.[111]

## VIII. The vaccination rate for CDCR staff is too low, and it is now evident that voluntary means of encouraging vaccination will not raise rates to acceptable levels.

The vaccination rate for institutional staff is far too low to safeguard the health of CCHCS's patients. Only 40% of corrections officers statewide are fully vaccinated.[112] The proportion is alarmingly lower in some institutions. For example, at High Desert State Prison,

---

*healthcare settings: A global analysis*, 41 Infection Control & Hospital Epidemiology 1196, 1196-1206 (Oct. 2020), https://doi.org/10.1017/ice.2020.237.

[108] Office of the Inspector General, COVID-19 Review Series Part Two (October 2020), https://www.oig.ca.gov/wp-content/uploads/2020/10/OIG-COVID-19-Review-Series-Part-2-%E2%80%93-Face-Coverings-and-PPE.pdf ("[O]ur staff observed that staff and incarcerated persons frequently failed to adhere to those basic safety protocols. . . . The frequent noncompliance by staff and incarcerated persons was likely caused at least in part by the department's supervisors' and managers' lack of enforcement of the requirements. . . . [W]e found that prison management statewide only referred seven of the department's more than 63,000 employees for formal investigations or punitive actions for misconduct related to face covering or physical distancing requirements.").

[109] Hiroshi Ueki, et al., *Effectiveness of Face Masks in Preventing Airborne Transmission of SARCoV-2*, 5 mSphere (Oct. 28, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7580955/.

[110] California Department of Public Health, *supra* note 15.

[111] Bick Decl. ¶ 37, Ex. B. The statistics show that virtually all staff who get the first dose get the second. For that reason, unless otherwise indicated, the figures for staff vaccination are for those who have received "at least one dose"; the percentage that have received two doses is slightly less.

[112] *Id*.

Page 22



just 16% of all corrections officers are fully vaccinated.[113]  In six other institutions the complete vaccination rate for corrections officers is at or below 30%.[114]  Healthcare staff are fully vaccinated at higher rates, 72% statewide, but that higher rate is still insufficient to provide protection against large outbreaks.[115]

Vaccination rates remain unacceptably low despite widely advertised vaccine clinics for all staff during all shifts, at all facilities in May; offers of up to 80 hours of supplemental paid sick leave; and peer education through the COVID Mitigation Action Program.[116]  Recent progress has dwindled.  In the four weeks between June 30, 2021, and July 29, 2021, the percentage of staff fully vaccinated and the percentage receiving only one dose each increased by just one percent.[117]

The Receiver is committed to continuing all efforts to increase staff vaccination rates and welcomes all efforts by the State and CCPOA to do the same.[118]  Recent experience provides no basis for believing those efforts will find significant success.  With rapidly rising case rates, there is no time to delay implementing a policy that will be effective: a mandatory vaccination requirement for staff coming into contact with incarcerated persons.

## IX.    A mandatory vaccination policy is necessary and reasonable considering historical precedent, the widespread adoption of similar policies, and the public health necessity for doing so.

Because voluntary efforts to raise the vaccination rate to safe levels have proven insufficient, requiring vaccination of institutional staff is the only path likely to provide adequate protection for incarcerated persons.  CDCR would not be the first congregate facility to require vaccination for staff against COVID-19.  As detailed below, countless other congregate facilities have already chosen to mandate vaccination for staff.  Prior to the COVID-19 pandemic, requiring vaccination for other diseases was commonplace.  A majority of

---

[113] *Id*.

[114] *Id*.

[115] *Id*.

[116] ECF No. 3579 (Apr. 27, 2021) at 7-9.

[117] Bick Decl. ¶ 37; ECF No. 3623 at 6.

[118] Mandatory individual vaccine counseling, scheduled to begin on August 4, 2021, is one such program, as is continuing to pursue peer education through the COVID Mitigation Action Program.  Implementing statewide programs of this magnitude takes time, such that any success will take time to manifest.  With rapidly rising infection rates, these efforts must proceed alongside implementation of a mandatory program so that their combined impact is not felt only after the next wave has come and gone.

Page 23



hospital systems require that staff be vaccinated for the seasonal influenza.[119]  Schools and colleges have long required documentation of vaccination for diseases like meningitis.[120]

Mandatory vaccination policies, particularly in congregate settings, are being widely adopted with strong support from the public health community.  The American Medical Association and eighty-eight other medical associations have announced their support for mandatory vaccination policies for health care workers.[121]  Numerous hospitals have adopted just such a mandatory policy;[122] as have many universities, another type of congregate facility;[123] and the City San Francisco also will require employees in hospitals, nursing homes, and jails, all congregate facilities, whether employed by the city and county or not, to be vaccinated.[124]

---

[119] M. Todd Greene, et al., *Changes in Influenza Vaccination Requirements for Health Care Personnel in US Hospitals*, 1 JAMA Network Open e180143 (June 1, 2018), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2682876 (finding that 61.4% of hospitals surveyed had such a requirement).

[120] *See e.g.*, University of California Immunization Requirements & Recommendations (Sept. 25, 2017), https://healthcenter.ucsc.edu/forms/immunization_requirements.pdf.

[121] Ezekiel J. Emanuel, *Joint Statement in Support of COVID-19 Vaccine Mandates for All Workers in Health and Long-Term Care* (July 26, 2021), http://www.ezekielemanuel.com/writing/all-articles/2021/07/26/joint-statement-in-support-of-covid-19-vaccine-mandates-for-all-workers-in-health-and-long-term-care.  *See also* Dan Diamond, *Coalition says healthcare workers should be required to get coronavirus vaccine*, Washington Post (July 13, 2021), https://www.washingtonpost.com/health/2021/07/13/vaccine-mandates-health-care-workers/ (reporting that the Society for Healthcare Epidemiology of America, the Infectious Diseases Society of America, and five other public health organizations recently recommend mandatory vaccination for healthcare facilities).

[122] Kelly Gooch and Hannah Mitchell, *Hospitals, health systems mandating vaccines for workers*, Becker's Hospital Review (updated July 15, 2021), https://www.beckershospitalreview.com/workforce/hospitals-health-systems-mandating-vaccines-for-workersjune17.html (listing thirty-two hospital systems which have announced such policies).

[123] Andy Thomason & Brian O'Leary, *Here's a List of Colleges That Will Require Students or Employees to Be Vaccinated Against Covid-19*, Chronicle of Higher Education (July 15, 2021), https://www.chronicle.com/blogs/live-coronavirus-updates/heres-a-list-of-colleges-that-will-require-students-to-be-vaccinated-against-covid-19.

[124] Rong-Gong II, *San Francisco to require staff in hospitals, jails and nursing homes to get COVID-19 vaccine* (June 15, 2021), https://www.latimes.com/california/story/2021-06-15/san-



Every prior measure to limit the spread of COVID-19 in CDCR institutions has been mandatory.  Employees have not had the choice of whether to wear a mask, social distance, or take weekly COVID-19 tests.[125]  Each is a mandatory requirement of employment.  Requiring vaccination, which is far more effective, is consistent with prior actions taken during the COVID-19 pandemic.

Waiting until COVID-19 case counts are higher to mandate vaccination will ensure that protection against COVID-19 is effective only after the next wave has come and gone.  The CDC recommends that patients receive the second dose of the Pfizer vaccine three weeks after the first dose, and the second dose of the Moderna vaccine four weeks after the first dose.[126]  After the second dose, it takes another two weeks for a patient to receive full benefits of vaccination.[127]  Individuals will therefore not be fully vaccinated until at least five to six weeks after their first dose.  Any mandatory vaccination program would have to provide a significant amount of additional time for patients to comply.  California's two previous waves of COVID-19 infection lasted approximately three months each.[128]  Delaying a mandatory vaccination policy until the next wave is upon us will not produce results until it is too late and the worst of the wave is over.

With the rate of vaccination unacceptably low, the voluntary means of raising it ineffective and insufficient, and an urgent need to increase the vaccination rate in the face of the Delta variant, a mandatory vaccination policy is urgently required.

**X.     The Receiver has determined that a mandatory vaccination policy for workers entering CDCR institutions and incarcerated persons who choose to work outside of an institution or accept in-person visitation is supported by the best medical science and**

---

francisco-to-require-covid-19-vaccine-for-some-workers?utm_campaign=KHN%3A%20First%20Edition&utm_medium=email&_hsmi=134144726&_hsenc=p2ANqtz-8bEAEUkoHWLC3nfpBI87MguaZQD639q2x_j9_tg1ak_D90-hw1ZiZKcY2XCioY_gGyG3o5QbhsvT8UikNz-YU5DuTwCr6lUcRl5U3E2BWasQ4UqSI&utm_content=134144726&utm_source=hs_email.

[125] California Department of Corrections and Rehabilitation, COVID-19 Response Efforts (accessed July 29, 2021), https://www.cdcr.ca.gov/covid19/covid-19-response-efforts/.

[126] Centers for Disease Control and Prevention, COVID-19 Vaccines That Require 2 Shots (updated June 3, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/second-shot.html.

[127] *Id*.

[128] State of California, Tracking COVID-19 in California (updated July 15, 2021), https://covid19.ca.gov/state-dashboard/ (showing a spike in infections from mid-June to late-August 2020 and from early-November 2020 to mid-February 2021).



**respectfully requests that the Court issue an order to show cause why CDCR and CCHCS should not be ordered to implement such a policy.**

Staff and incarcerated persons with contact with the community outside of CDCR institutions cannot be effectively quarantined with each contact and so are most likely to introduce COVID-19 into CDCR institutions.  As discussed above, this has been confirmed by more than a year of experience of COVID-19 in CDCR institutions and other jails and prisons.  It is particularly critical that those at high risk of being vectors for infection are fully vaccinated to minimize the chance that COVID-19 will be introduced to an institution.

Pursuant to the State Public Health Officer Order of July 26, 2021, all CDCR institutions must verify the vaccine status of all workers.  As the Receiver said at the July 29, 2021 Case Management Conference, in addition to this requirement, and the other requirements imposed by that Order, the Receiver recommends that access by workers to CDCR institutions be limited to those workers who establish proof of vaccination (or who have established a religious or medical exemption to vaccination).[129]  The Receiver further recommends that incarcerated persons who desire to work outside of the institution (e.g., fire camps) or to have in-person visitation must be vaccinated (or establish a religious or medical exemption).  The Receiver has determined that the best available medical science supports this recommendation.

The Receiver respectfully requests that the Court issue an order to show cause why the Court should not order CDCR and CCHCS to implement this recommendation.

---

[129] *See* 42 U.S.C. § 2000e-2; 42 U.S.C. § 12112.