1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7    MARCIANO PLATA, et al.,                Case No. 01-cv-01351-JST
8               Plaintiffs,
9         v.                                **ORDER RE: MANDATORY**
                                            **VACCINATIONS**
10   GAVIN NEWSOM, et al.,
                                            Re: ECF No. 3647
11              Defendants.
12
13        Since the COVID-19 pandemic began, over 50,000 incarcerated persons in California's

14   state prisons have been infected by the SARS-CoV-2 virus.  At least 240 have died from the

15   disease, many more have been hospitalized, and some of those who have survived continue to

16   suffer long-term effects.  Defendants have undertaken significant measures to combat the virus,

17   including the provision of masks, physical distancing, disinfection, testing, quarantine and

18   isolation protocols, restrictions on transfers, reducing the population, and making vaccines

19   available to both incarcerated persons and staff on a voluntary basis.  But the virus continues to

20   infect the prison population, including incarcerated persons who have accepted the vaccine – one

21   of whom recently died from the disease – and outbreaks create significant risks of harm beyond

22   the risk of infection.  Once the virus enters a facility, it is very difficult to contain, and the

23   dominant route by which it enters a prison is through infected staff.

24        Facing these facts, the Receiver has recommended, based on his review of the medical and

25   public health science, that a mandatory COVID-19 vaccination policy be implemented for workers

26   entering CDCR institutions and incarcerated persons who choose to work outside of an institution

27   or accept in-person visitation.  Now before the Court is an order to show cause as to why the

28   Receiver's recommendations should not be adopted.  ECF No. 3647.

The question of mandatory vaccines is complex. In this case, however, the relevant facts are undisputed. No one challenges the serious risks that COVID-19 poses to incarcerated persons. No one disputes that it is difficult to control the virus once it has been introduced into a prison setting. No one contests that staff are the primary vector for introduction. And no one argues that testing, even if done on a daily basis, is an adequate proxy for vaccination to reduce the risk of introduction. While Defendants point to the minority of incarcerated persons who have not yet accepted the vaccine and argue that the best way to protect such individuals is for them to become vaccinated, no one disputes that the risks to the incarcerated population extend to the vaccinated as well as the unvaccinated. All agree that a mandatory staff vaccination policy would lower the risk of preventable death and serious medical consequences among incarcerated persons. And no one has identified any remedy that will produce anything close to the same benefit.

Framed in terms of the Eighth Amendment, under which this case arises, Defendants are aware of a substantial risk of serious harm to incarcerated persons, and, although they have taken many commendable steps during the course of this pandemic, they have nonetheless failed to reasonably abate that risk because they refuse to do what the undisputed evidence requires. Accordingly, the Court will grant the Receiver's request for an order to implement his recommended vaccine mandates.

## I.    BACKGROUND

Since 2005, the California prison medical care system has been under receivership. COVID-19 is a medical issue that falls within the Receiver's authority, and the Receiver has appropriately taken a leadership role in guiding Defendants' pandemic response. Until the dispute over mandatory vaccination, Defendants have followed the Receiver's recommendations. For example, early in the pandemic, Defendants agreed to implement the Receiver's cohorting guidelines for achieving and maintaining social distancing. Defendants have also implemented many other measures in conjunction with the Receiver or, where appropriate, exercising their own authority. These measures include several early release programs designed to reduce population density, temporary suspension of both intake and visitation, masking and distancing requirements, advanced cleaning protocols, efforts to improve ventilation, and the development of a centralized

1    command center and multi-disciplinary teams to oversee response efforts to outbreaks.

2         This is not the first time that this Court, or a companion court, has considered whether to

3    order Defendants to take particular measures in response to the COVID-19 pandemic.  Shortly

4    after the pandemic began, Plaintiffs asked the three-judge court convened in this case and

5    *Coleman v. Newsom*, Case No. 2:90-cv-0520 KJM DB (E.D. Cal.), to order a further population

6    reduction in light of the dangers posed by COVID-19.  ECF No. 3219.  That court concluded that

7    Plaintiffs' request was not properly before the three-judge court and denied Plaintiffs' motion.

8    *Coleman v. Newsom*, 455 F. Supp. 3d 926 (E.D. Cal./N.D. Cal. 2020).  Days after the three-judge

9    court denied relief, Plaintiffs moved this Court for:

> an order directing that the population density in the California prison
> system be reduced so that (1) class members at high risk of serious
> illness or death from COVID-19 due to their age and/or underlying
> health conditions are safely housed, and (2) the system can respond
> to those who become sick and require hospitalization without
> overloading community health care systems.

14   ECF No. 3266 at 9.  On April 17, 2020, the Court denied Plaintiffs' motion after considering

15   Defendants' early response to the pandemic and concluding that Plaintiffs had not demonstrated

16   an Eighth Amendment violation.  *Plata v. Newsom*, 445 F. Supp. 3d 557, 561-69 (N.D. Cal. 2020).

17   The Court also determined that portions of Plaintiffs' relief could only be ordered by a three-judge

18   court.  *Id.* at 569-71.

19        Beginning in April 2020, the Court has conducted regular case management conferences –

20   starting approximately weekly, then biweekly, and then monthly – focused almost exclusively on

21   pandemic management and attended by the parties as well as the California Correctional Peace

22   Officers Association ("CCPOA").  Defendants have continued to cooperate with the Receiver,

23   including by implementing a movement transfer matrix to reduce the risk of transmission caused

24   by movement of incarcerated persons into or within the system, and revising that matrix based on

25   updated information regarding how the virus spreads.  Defendants have also complied with orders

26   of this Court.  *E.g.*, ECF No. 3353 (regarding staff testing); ECF No. 3455 (setting deadlines to set

27   aside isolation and quarantine space).

28        Once vaccines became available, Defendants supported efforts to provide the vaccine to

United States District Court
Northern District of California

3

both staff and incarcerated persons – including before many jurisdictions were prioritizing incarcerated persons to receive vaccines. Nearly every incarcerated person has now been offered the vaccine, and those who have not have either been away from the institutions for court proceedings or have newly entered the system. Most recently, Defendants have offered third doses of the vaccine to immunocompromised incarcerated persons in accordance with updated health guidance. Defendants have also been offering the vaccine to staff on-site and have undertaken multiple efforts to encourage both staff and incarcerated persons to be vaccinated. Approximately 75% of both incarcerated persons and health care staff, and approximately 42% of custody staff, have been fully vaccinated to date. Notwithstanding concerted efforts by the Receiver, Defendants, the CCPOA, and many other persons and groups, the overall staff vaccination rate is approximately 55% statewide, with rates in the 30% range at several institutions and a correctional staff rate as low as 18% at one institution.

In February 2021, the Receiver convened a group of experts and decided not to recommend a staff vaccine mandate at that time. However, mandatory vaccination continued to be a topic of conversation, including at the Court's case management conferences. At the July 29, 2021 case management conference, the Receiver reported his conclusion that "all of our efforts to date have been insufficient to achieve the very high rate of staff vaccination that is necessary to further significantly reduce the risk that COVID will be introduced into our prisons," in part due to the threat posed by the more infectious Delta variant. ECF No. 3641 at 18-19. The Receiver recommended "that access by workers to CDCR institutions be limited to those workers who establish proof of vaccination or a religious or medical exemption to vaccination," and that "incarcerated persons who desire to work outside of the institution, for example, fire camps, or to have in-person visitation must be vaccinated or establish a religious or medical exemption." *Id.* at 21. He noted that his discussions with counsel indicated likely opposition to his recommendations, and the Court discussed with the parties and CCPOA a process to resolve the issue.

On August 4, the Receiver filed a report setting forth the public health basis for his recommendations, ECF No. 3638, and the Court subsequently issued an order to show cause as to

1    why it should not order that those recommendations be implemented, ECF No. 3647.  The matter

2    was fully briefed by the parties, the Receiver, and potential intervenor CCPOA,[1] and the Court

3    accepted amicus briefs from the Service Employees International Union, Local 1000 ("SEIU") and

4    a group of mental health professionals.  The Court heard argument on September 24, 2021.

5           Separate from the Receiver's and the Court's consideration of a mandatory vaccination

6    policy, the California Department of Public Health ("CDPH") issued several related orders.  First,

7    on July 26, CDPH issued an order requiring full vaccination or testing, either weekly or twice

8    weekly, of staff who work in hospitals, skilled nursing facilities, other health care settings, and

9    high-risk congregate settings, including correctional facilities and homeless centers.  CDPH,

10   *Order of the State Public Health Officer re: Health Care Worker Protections in High-Risk*

11   *Settings* (July 26, 2021), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-

12   of-the-State-Public-Health-Officer-Unvaccinated-Workers-In-High-Risk-Settings.aspx.  Under

13   this order, CDCR staff must either be fully vaccinated or tested at least once weekly.  *Id.*

14   Individuals are considered fully vaccinated "two weeks or more after they have received the

15   second dose in a 2-dose series (Pfizer-BioNTech or Moderna or vaccine authorized by the World

16   Health Organization), or two weeks or more after they have received a single-dose vaccine

17   (Johnson and Johnson [J&J]/Janssen)."  *Id.*

18          CDPH issued another order on August 5 that eliminated the option of testing for workers in

19   certain healthcare settings.  ECF No. 3663-1 at 260-63.  CDPH concluded that, "[a]s we respond

20   to the dramatic increase in cases, all health care workers must be vaccinated to reduce the chance

21   of transmission to vulnerable populations."  *Id.* at 261.  The order requires all workers who

22   "provide services or work in" a specified list of health care facilities to "have their first dose of a

23   one-dose regimen or their second dose of a two-dose regimen by September 30, 2021."  *Id.*  The

24   order defined "worker" as including "all paid and unpaid individuals who work in indoor settings

25   where (1) care is provided to patients, or (2) patients have access for any purpose," and

26   specifically included "security" personnel.  *Id.* at 262.  CDPH clarified the following day that the

27   _____

28   [1] CCPOA's motion to intervene, ECF No. 3665, is noticed for hearing in October and remains
     pending.

United States District Court
Northern District of California

5

1    order did not apply to healthcare settings within correctional facilities and that further guidance

2    would be forthcoming.

3           On August 19, CDPH issued its further guidance in an order that requires the following

4    persons to "have their first dose of a one-dose regimen or their second dose of a two-dose regimen

5    by October 14, 2021": "All paid and unpaid individuals who are regularly assigned to provide

6    health care or health care services to inmates, prisoners, or detainees," and "[a]ll paid and unpaid

7    individuals who are regularly assigned to work within hospitals, skilled nursing facilities,

8    intermediate care facilities, or the equivalent that are integrated into the correctional facility or

9    detention center in areas where health care is provided."  ECF No. 3663-1 at 270-71.  The latter

10   group "includes workers providing health care to inmates, prisoners, and detainees, as well as

11   persons not directly involved in delivering health care, but who could be exposed to infectious

12   agents that can be transmitted in the health care setting."  *Id.* at 271.

13          Defendants are implementing the August 19 CDPH order by requiring the following

14   individuals to be vaccinated: "all staff at California Health Care Facility (CHCF), California

15   Medical Facility (CMF), and the Skilled Nursing Facility at Central California Women's Facility

16   (CCWF)," and all workers "regularly assigned to work" in certain healthcare areas systemwide,

17   including clinic treatment areas, Correctional Treatment Centers and other licensed beds, hospice

18   beds, and dialysis units.  ECF No. 3662-3 at 2-3.  The vaccine requirement does "not apply to non-

19   regularly assigned staff, such as relief staff, voluntary overtime, mandatory overtime, swaps, or

20   those who do not work in the area regularly, such as staff making pick-ups or deliveries,

21   conducting maintenance repairs, conducting tours, etc.  Additionally, this will not apply to any

22   staff responding to emergencies."  *Id.* at 3.  "[W]orkers in correctional settings who are not fully

23   vaccinated or who cannot show proof of vaccination [must] submit to twice-weekly testing,"

24   which exceeds the requirement in the July 26 CDPH order that such workers be tested weekly.

25   ECF No. 3662 ¶ 18.

26   **II.    LEGAL STANDARD**

27          The Prison Litigation Reform Act ("PLRA") allows prospective relief only if it "extend[s]

28   no further than necessary to correct the violation of the Federal right of a particular plaintiff or

*United States District Court*
*Northern District of California*

plaintiffs."  18 U.S.C. § 3626(a)(1)(A).  The federal right at issue in this case is whether

Defendants' response to the threat posed by COVID-19 violates the Eighth Amendment.  The

parties and CCPOA agree on the relevant legal standard.  As the Court previously explained:

> To establish an Eighth Amendment violation "based on a failure to prevent harm, the inmate must [first] show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The Court need not analyze this issue in detail because Defendants have already stated before the Three-Judge Court that they "do not dispute the risk of harm that COVID-19 poses to inmates, as well as the community at large.  Nor do Defendants dispute that those who are incarcerated may be at a higher risk for contracting COVID-19 given the circumstances of incarceration, including closer living quarters." ECF No. 3235 at 17.  Defendants do not attempt to relitigate the issue here, and the Court finds that this element has been established.[2]
>
> The Court therefore turns to the second prong of the Eighth Amendment analysis: whether Plaintiffs have demonstrated that Defendants "have a 'sufficiently culpable state of mind,'" which in this case requires "'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297, 302-03 (1991)).  Under this standard, a prison official must "know[] that inmates face a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it." *Id.* at 847.  "A prison official's duty under the Eighth Amendment is to ensure reasonable safety," and "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 844-45 (internal quotation marks and citations omitted).  There is no Eighth Amendment violation, for example, where prison officials "did not know of the underlying facts indicating a sufficiently substantial danger and . . . were therefore unaware of a danger," or where "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844.  Likewise, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*  In determining whether officials have been deliberately indifferent, courts must give "due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions,'" *id.* at 845 (quoting *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979)), and "consider arguments regarding the realities of prison administration," *Helling v. McKinney*, 509 U.S. 25, 37 (1993).

*Plata*, 445 F. Supp. 3d at 562 (footnote added).

    If the Court finds the violation of a federal right, it may not, under the PLRA, "grant or

_____

[2] Defendants continue to acknowledge that "the COVID-19 pandemic presents a substantial risk of serious harm." ECF No. 3660 at 9.

approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).  "Narrow tailoring requires a fit between the remedy's ends and the means chosen to accomplish those ends. The scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation."  *Brown v. Plata*, 563 U.S. 493, 531 (2011) (quotation marks, alterations, and citations omitted).  "But the precedents do not suggest that a narrow and otherwise proper remedy for a constitutional violation is invalid simply because it will have collateral effects."  *Id.*  Instead, the PLRA's restrictions on injunctive relief mean "only that the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court."  *Id.*

## III.   DISCUSSION

There has been no objection to the Receiver's recommendation "that incarcerated persons who desire to work outside of the institution (e.g., fire camps) or to have in-person visitation must be vaccinated (or establish a religious or medical exemption)."  ECF No. 3638 at 27. Accordingly, the Court focuses below on the contested recommendation "that access by workers to CDCR institutions be limited to those workers who establish proof of vaccination (or who have established a religious or medical exemption to vaccination)."  *Id.*  In particular, the Court examines whether ordering implementation of the Receiver's recommendation is necessary, and is the least restrictive means, to remedy a violation of Plaintiffs' Eighth Amendment rights.

### A.   Deliberate Indifference

Defendants first argue that a finding of deliberate indifference is precluded by the fact that a portion of the incarcerated population has refused to accept the vaccine they have been offered. However, the cases they rely on are cases seeking individual injunctive relief, rather than the type of systemic relief sought here.[3]  *See Pride v. Correa*, 719 F.3d 1130, 1137 (9th Cir. 2013)

---

[3] *Davis v. Allison*, on which Defendants seek to rely for its conclusion that the plaintiff was unlikely to succeed on the merits of his COVID-related deliberate indifference claim, is distinguishable for the same reason.  No. 1:21-cv-00494-HBK, 2021 WL 3761216 (E.D. Cal. Aug. 25, 2021), *report and recommendation adopted*, 2021 WL 4262400 (E.D. Cal. Sept. 20,

("Individual claims for injunctive relief related to medical treatment are discrete from the claims for systemic reform addressed in *Plata*."). More significantly, Defendants fail to consider that it is not only the unvaccinated population that is at substantial risk of serious harm from COVID-19, and that such risk would be present even if the entire incarcerated population were vaccinated. The unrebutted evidence[4] is that, "although vaccination greatly reduces the risk of harm, the Delta variant presents a substantial risk of serious harm even to fully vaccinated patients." ECF No. 3652 ¶ 5. This is because "some fully vaccinated individuals will contract COVID-19. When a fully-vaccinated patient becomes infected this is referred to as a 'breakthrough' infection. Although the exact rate of breakthrough infections is not yet clear, the Delta variant causes breakthrough infections significantly more often than prior COVID-19 variants." *Id.* ¶ 3. The most recent data in the record is that:

> Through September 1, 2021, 385 fully vaccinated patients in CDCR custody have suffered COVID-19 breakthrough infections, and 94 of those patients had a COVID risk score of 3 or higher, indicating a high risk of severe disease. One patient who CCHCS [California Correctional Health Care Services] believes was fully vaccinated has died of COVID-19. Other patients with breakthrough infections have also experienced serious symptoms and there are early indications that some may have long-term symptoms.

ECF No. 3670-1 ¶ 9 (footnotes omitted). Long-term effects of COVID-19 can include "fever, chest pains, shortness of breath, diarrhea, vomiting, sudden onset diabetes and hypertension, mood

---

2021) (denying motion for preliminary injunction). In addition, *Davis* is not persuasive because the plaintiff did not raise the issues that are currently before this Court. Instead, Davis more narrowly complained about circumstances in which incarcerated persons are released from quarantine housing and the lack of adequate cleaning supplies. *Id.* at *1. The court determined that "[t]he only disputed fact on this record concerns the inmates' respective access to cleaning supplies for their respective cells," but that the record demonstrated that "inmates *do* have access to cleaning supplies" and that Davis did not "allege that he asked for cleaning supplies for his cell and was denied any supplies." *Id.* at *6 (emphasis in original). The court also noted that Davis had chosen to receive the vaccine and concluded that his "claims of threatened harm are speculative at best." *Id.* at *4. In this case, however, the Receiver and Plaintiffs have presented evidence – unrebutted by Defendants – that the harms faced by vaccinated incarcerated persons are substantial and not speculative, as explained in more detail below.

[4] Aside from the Declaration of James Watt, discussed further below, no medical or public health evidence was submitted in opposition to the Receiver's recommendations. Indeed, Defendants explicitly stated that they "agree with the public health findings regarding the COVID-19 vaccine cited in the Receiver's report." ECF No. 3660 at 24.

1    disorders, and nervous system disorders.  Such long-term symptoms are sometimes experienced

2    by patients who had mild COVID-19 symptoms and the impact may be life-long."  ECF No. 3638

3    at 6-7 (footnotes omitted).  Moreover, although much of the recent focus has been on the Delta

4    variant, which "is more than twice as transmissible as the Wuhan strain," the risk is not limited to

5    that variant; instead, "[t]he virus is likely to continue to mutate, potentially creating even more

6    transmissible strains than Delta."  ECF No. 3638-1 ¶¶ 29, 33.

7            In addition, COVID-19 outbreaks pose other serious risks to incarcerated persons beyond

8    the direct impacts of COVID-19 infection.  For example, during an outbreak, "non-essential

9    medical services are postponed.  Only after 14 days without a new infection in that institution can

10   medium priority healthcare services like preventative care and screenings resume.  Routine

11   clinical operations are suspended until 28 days without a new infection."  ECF No. 3638 at 18

12   (footnotes omitted).  "An outbreak is defined as three or more related COVID-19 incarcerated

13   person cases within a facility, as determined by a contact investigation, in the past 14 days."  ECF

14   No. 3673-1 ¶ 15.  "During outbreaks, a large number of people are on quarantine due to exposure.

15   When quarantined for exposure, incarcerated persons experience restricted movement and

16   therefore have limited access to routine healthcare and screenings because they cannot go to the

17   clinic."  ECF No. 3652 ¶ 7.  And for those incarcerated persons who are able to attend clinic

18   because they are not themselves on quarantine, appointment availability is limited because

19   quarantines "divert clinical staff resources to performing mass testing, medication administration,

20   and rounds on COVID-19 patients rather than providing routine medical care."  *Id.*  Delays in

21   clinical care are also caused by the "large number of staff in quarantine" – approximately 5,500 in

22   total over the past year – either because they have themselves contracted COVID-19 or because

23   they "are identified as close contacts of an infected individual."  *Id.* ¶ 9.  The pandemic has led to

24   significant increases in backlog appointments for both primary and specialty care, and the increase

25   in cases due to the Delta variant is expected to lead to further delays.  *Id.* ¶¶ 10-11.  As of July

26   2021, there were approximately 5,000 backlogged primary care appointments and 8,000

27   backlogged specialty appointments.  *Id.* at 31, 33.  Although mental health care is the subject of

28   the *Coleman* case, the Court notes the undisputed evidence that outbreaks cause "a significant

United States District Court
Northern District of California

10

impediment to the delivery of group therapy" and "complicate the movement of patients for higher level mental health care." ECF No. 3638-1 ¶¶ 9-10; *see also* ECF No. 3658 (brief of amici mental health professionals). In short, "[a]dditional program modifications and the renewed diversion of healthcare resources to address COVID-19 cases from Delta variant outbreaks put patients at a substantial risk of serious harm." ECF No. 3652 ¶ 8.

Defendants also argue that the Court cannot find them deliberately indifferent in light of their multi-faceted response to the COVID-19 pandemic and the Court's April 2020 determination that Defendants were not deliberately indifferent at that time. This argument is unpersuasive. Deliberate indifference "should be determined in light of the prison authorities' *current* attitudes and conduct." *Helling*, 509 U.S. at 36 (emphasis added). While the Court concluded seventeen months ago that Defendants' initial response to the pandemic was not deliberately indifferent, it cannot reach that same conclusion based on the current record. In its prior ruling, the Court explained:

> No bright line divides a reasonable response from one that is deliberately indifferent in violation of the Eighth Amendment. In this case, however, the Court concludes without difficulty that Defendants' response has been reasonable. Plaintiffs identify other steps Defendants might take to provide for greater physical distancing, but they cite no authority for the proposition that Defendants' failure to consider or adopt these potential alternatives constitutes deliberate indifference within the meaning of the Eighth Amendment.

*Plata*, 445 F. Supp. 3d at 568. The Court reached this conclusion in part because Defendants had already implemented measures to increase physical distancing; Plaintiffs failed to articulate any "standard by which to determine how much physical distance is required to ensure reasonable safety"; Defendants had recently agreed to comply with a cohorting directive from the Receiver designed to increase physical distancing; and "Plaintiffs [did] not argue that housing in compliance with the Receiver's directive would be constitutionally inadequate." *Id.* at 564-68 (quotation marks and citation omitted). As discussed below, such considerations are not present here. At the time of the Court's prior ruling, no vaccine was available. A finding that Defendants were not deliberately indifferent based on a toolbox without a vaccine has little relevance when the same toolbox now includes a vaccine that everyone agrees is one of the most important tools,

United States District Court
Northern District of California

if not the most important one, in the fight against COVID-19.

Defendants do not dispute any of the relevant facts, nor do they present any evidence suggesting it would be reasonable not to adopt the Receiver's recommendations.  The closest they come is the declaration of Dr. James Watt, a CDPH official, who states that other "measures, when considered in conjunction with the relatively high rate of vaccination among the incarcerated population, will significantly mitigate the spread of the virus," and that "[t]he best way for patients in correctional settings to reduce their risk of severe illness – regardless of location – would be to get vaccinated."[5]  ECF No. 3661 ¶¶ 17, 18.  But Watt stops short of saying that vaccination, even when in combination with other measures, offers incarcerated persons sufficient protection from COVID-19.  Nor could such a conclusion be reconciled with the uncontested evidence regarding the dangers COVID-19 presents to vaccinated incarcerated persons.  Likewise, even if other measures "significantly mitigate" the spread of the virus, Watt does not say that they are sufficient to protect Plaintiffs from those harms.  Defendants have pointed to no measure or combination of measures that offers the incarcerated population the same level of protection as the vaccine mandates recommended by the Receiver.  They do not refute the studies cited by the Receiver that conclude that "COVID-19 spreads far more rapidly inside jails and prisons than in other environments," in part because individuals who live in congregate settings like prisons "have intense, long-duration, close contact."  ECF No. 3638 at 10-16.  Nor do Defendants dispute the Receiver's conclusion that "[l]imiting the introduction of COVID-19 into prisons is critical to protecting the health of incarcerated people" because:

> prison systems, even those that take important mitigation measures such as masking and social distancing, are not designed and operated to prevent the transmission of a highly contagious virus and cannot be redesigned to do so effectively in the near term.  The conditions of confinement and the manner in which the prisons are operated deprive incarcerated people of the same opportunities to protect themselves through social distancing and limiting contact that are available to the public at large.

---

[5] Defendants also attempt to rely on the December 9, 2020 declaration of Dr. Anne Spaulding. ECF No. 3505.  However, Spaulding was opining on Defendants' efforts at that time, prior to the availability of a vaccine, and Defendants have not offered her opinion on the reasonableness of Defendants' efforts under current circumstances.

United States District Court
Northern District of California

1    *Id.* at 16.

2         It is also uncontested that "[i]nstitutional staff are primary vectors for introducing

3    COVID-19 into CDCR facilities," *id.* at 7, and that "[i]nstitutions with low staff vaccination rates

4    experience larger and more frequent COVID-19 outbreaks," ECF No. 3652 ¶ 9.  For example, half

5    of the 14 outbreaks between May and July 2021 have been traced to staff, and that number could

6    still grow because analysis of the remaining outbreaks is ongoing.  ECF No. 3638-1 ¶ 17 & at

7    9-12.  Between July 31 and September 10, 2021, a staggering 48 outbreaks "have been traced back

8    to institutional staff."  ECF No. 3670-1 ¶ 6.  The record does not include the number of outbreaks

9    overall that occurred during this latter period, but the number of outbreaks traced back to staff

10   alone, over a shorter period of time, indicates that the introduction of the virus into CDCR

11   institutions by staff is increasing.  By contrast, "[i]ncarcerated persons who neither work outside

12   of CDCR institutions nor participate in in-person visitation do not present a significant risk of

13   introducing SARS-CoV-2 into CDCR institutions."  ECF No. 3638-1 ¶ 13.  "Because COVID-19

14   spreads so easily within prisons and is so disruptive to prison operations once outbreaks begin, it is

15   particularly important that all people going between the community and institutions without

16   quarantining are fully vaccinated to prevent the introduction of COVID-19 to institutions."  ECF

17   No. 3670-1 ¶ 4.  Defendants themselves acknowledge that "[v]accination in the largest possible

18   numbers, including all incarcerated people, is clearly one of the best available protections against

19   COVID-19."  ECF No. 3660 at 25.

20        Defendants also do not contest the Receiver's analysis regarding the insufficiency of

21   testing as an alternative to vaccination:

22        Frequent testing is insufficient to prevent institutional staff who are
          unaware that they have COVID-19 from spreading the virus. . . .
23        CDCR has indicated that . . . it will test unvaccinated employees twice
          per week.  Tests can detect a positive case only where a certain viral
24        load is present, so a recently infected individual may not test positive
          for several days after exposure.  Results of COVID-19 tests are also
25        typically available only after a wait of a day or longer.  An infected
          staff member might work two or three days before being tested; a
26        newly infected staff member may test negative, continue working and
          reach a viral load sufficient to transmit the virus before being tested
27        again and finally receiving a positive test result.

28

13

> Because as much as 40 percent of transmission is pre-symptomatic, individuals who receive false negative test results or who test too early may be unaware they are contagious throughout this period. As a result, the twice-per-week testing regimen does not effectively prevent asymptomatic staff from introducing COVID-19 to CDCR institutions. Indeed, even daily testing would not do so. Testing is an essential component of any plan, but it is not a substitute for vaccination.

ECF No. 3638 at 8-9 (footnotes omitted). "CDCR staff are vaccinated at far too low a rate to reduce the risk of mass outbreaks in CDCR institutions." ECF No. 3638-1 ¶ 37.

Even in light of all of the above, Defendants argue that their implementation plan for the July 26 and August 19 CDPH orders is sufficient.[6] The uncontradicted public health record before the Court says otherwise. Defendants' plan mandates vaccination at only two institutions in their entirety, and only for staff who are regularly assigned to work in certain designated healthcare settings at the remaining institutions. This partial vaccination requirement is an unreasonable attempt to address the risk of harm to Plaintiffs for several reasons. First, the incarcerated population is not at risk only, and may not even be at the highest risk, in areas that Defendants have designated as healthcare settings. For example, Defendants do not dispute that incarcerated persons do not wear masks when eating or sleeping, and that this increases the chance of transmission.[7] ECF No. 3638 at 13-14. Nor do Defendants dispute the myriad ways in which incarcerated persons come into close contact with staff outside of healthcare settings. *E.g.*, ECF No. 3638-2 ¶ 3 ("Corrections officers have frequent, daily, close contact with incarcerated persons."); ECF No. 3663-2 ¶¶ 12-16 (describing close contact between staff and incarcerated persons with physical disabilities); ECF No. 3663-3 ¶¶ 5-6 (describing close contact between staff

---

[6] Defendants raise this argument in the context of narrow tailoring, but the issue is properly considered as part of the deliberate indifference analysis because it goes towards the reasonableness of Defendants' response to the risk of harm to Plaintiffs.

[7] Defendants present evidence that there are fewer occupied beds in dormitories now than there were at the beginning of the pandemic. ECF No. 3673-1 ¶ 12. While this might increase the distance between incarcerated persons while they are sleeping, it does not remove the danger of transmission "because the air in any given room is shared with each individual in that room and the length of exposure is so long." ECF No. 3638-3 ¶ 15. Public health experts have concluded, without rebuttal, that "to minimize COVID-19 risk, dorms with a capacity of fifty people should house only three people, and that small dorms with the capacity of six people and cells with capacity of two people should both house only a single person." ECF No. 3638 at 14 (emphasis omitted). Defendants do not contend that they have reduced capacity to such levels.

and incarcerated persons with developmental disabilities).  Even healthcare itself can be provided outside designated healthcare settings; for example, during quarantines, "[u]rgent care is provided to patients in their cells or dormitories."  ECF No. 3652 ¶ 7.  Put most simply, "[i]ncarcerated persons spend the vast majority of their time outside of healthcare settings, where staff with whom they come into contact are vaccinated at much lower rates."  ECF No. 3670-1 ¶ 5.  Given recent outbreaks, there is no doubt that the limited vaccine requirements adopted by Defendants are insufficient "to ensure reasonable safety."  *Farmer*, 511 U.S. at 844 (quotation marks and citation omitted).  Of the 48 outbreaks traceable to staff since July 31, only 14, or 29%, were "traced back to a person that the August 19 CDPH order would require to be vaccinated."  ECF No. 3670-1 ¶ 6.

Second, and relatedly, requiring vaccination only for workers assigned to designated healthcare settings does not protect vulnerable persons who do not reside in those settings. Defendants acknowledge that patients with COVID-19 risk scores greater than 3 are classified as "medically high-risk."[8]  ECF No. 3662 ¶ 5.  Throughout the prison system, 17,886 patients have such a score.  ECF No. 3670-1 ¶ 8.  Of those, "15,246 (85%) live in a space not covered by the August 19 CDPH order," and another "313 live in a medical facility located within an institution that is not fully covered by the order.  The August 19 CDPH order does not provide significant protection from outbreaks for either of these two groups," which constitute the overwhelmingly majority of high-risk patients housed in CDCR institutions.  *Id.*  These patients are housed throughout all of CDCR's adult institutions.  ECF No. 3674-1 ¶ 2.  In response to the Court's request for information regarding "whether there is any reason for concluding that these individuals are at lower risk than the high-risk individuals housed in the covered institutions or areas," ECF No. 3653 at 3, Defendants offered only that such persons "are likely to have widely variable levels of risk, depending on the institution and the location within the institution of an

---

[8] "The COVID Weighted Risk Score Factors and their weights in parentheses include: Age 65+ (4), Advanced Liver Disease (2), Persistent Asthma (1), High Risk Cancer (2), Chronic Kidney Disease (CKD) (1), Stage 5 CKD or receiving dialysis (1), Chronic Lung Disease (including Cystic Fibrosis, Pneumoconiosis, or Pulmonary Fibrosis) (1), COPD (2), Diabetes (1), High Risk Diabetes (1), Heart Disease (1), High Risk Heart Disease (1), Hemoglobin Disorder (1), HIV/AIDS (1), Poorly Controlled HIV/AIDS (1), Hypertension (1), Immunocompromised (2), Neurologic Conditions (1), Obesity (1), Other High Risk Chronic Conditions (1), and Pregnancy (1)."  ECF No. 3663-1 at 42.

exposure." ECF No. 3661 ¶ 18. The Court cannot conclude from that submission that at-risk patients who reside outside of designated healthcare areas are any less vulnerable than those individuals who live in designated healthcare areas. Defendants also assert that the August 19 order "targets employees who work closely with *particularly* vulnerable patients," ECF No. 3660 at 21 (emphasis in original), but they fail to explain why those patients merit protection only while present in a designated healthcare setting.

Third, transmission of the virus cannot be controlled by requiring vaccination only for staff in limited areas of an institution. Defendants do not dispute that "[p]rison operations require people from throughout the prison to come into contact with each other, making it difficult to isolate an outbreak to only one housing unit or yard." ECF No. 3638 at 13. "Medical facilities and yards often share facilities with the entire institution, such as cafeterias, yards, and programming spaces," which means that incarcerated persons who reside in those areas "have contact with staff and incarcerated persons from other yards." ECF No. 3670-2 ¶ 5. As a consequence, the same person can cause multiple areas to be placed in quarantine, as happened recently when a single staff member exposed four housing units to the virus. ECF No. 3674-1 at 90.

Fourth and finally, even if Defendants had presented evidence that only healthcare areas need be covered by a vaccine requirement, the limitation to only workers who are regularly assigned to such areas would render the requirement ineffective. Defendants have themselves characterized "the flexibility to send custody staff to locations where they are needed, which can change from day to day due to staff illness, leave, emergencies, changes in programming, staffing shortages, promotions, and transfers, among other reasons" as necessary and "even more essential during the current pandemic." ECF No. 3314 at 5-6. "Every day, across all CDCR institutions, there are hundreds of employees working in areas to which they are not regularly assigned," including "relief officers with no permanent post who fill different vacancies from day to day," and "[s]taff are often temporarily assigned to medical facilities." ECF No. 3670-2 ¶¶ 2-3. "Officers working their ordinary shifts are often reassigned to cover higher-need vacant positions. For example, a gym officer may be reassigned for the day to guard a clinic in order to keep the

16

1    clinic operating." ECF No. 3638-2 ¶ 4.  Thus, workers who are not subject to Defendants' current

2    vaccination requirement regularly work in designated healthcare settings despite not being

3    regularly assigned to those areas.  In other words, Defendants plan to regularly send unvaccinated

4    staff into areas they concede are in need of greater protection.  For all of the above reasons,

5    Defendants' implementation of the August 19 CDPH order does not constitute a reasonable

6    response to Plaintiffs' risk of harm.

7         The August 5 CDPH order that applies to non-correctional healthcare settings underscores

8    the unreasonableness of Defendants' position.  One of the purposes of that order was "to protect

9    particularly vulnerable populations."  ECF No. 3663-1 at 260.  It applied to hospitals, skilled

10   nursing facilities, and other healthcare facilities because those facilities were determined to be

11   "particularly high-risk settings where COVID-19 outbreaks can have severe consequences for

12   vulnerable populations including hospitalization, severe illness, and death."  *Id.*  These settings

13   were also described as "shar[ing] several features.  There is frequent exposure to staff and highly

14   vulnerable patients, including elderly, chronically ill, critically ill, medically fragile, and disabled

15   patients.  In many of these settings, the patients are at high risk of severe COVID-19 disease due

16   to underlying health conditions, advanced age, or both."  *Id.*

17        These same descriptors concededly apply to California's prisons as a whole, and not only

18   to designated healthcare facilities within those prisons.  *See, e.g.*, ECF No. 3638 at 16-18 (noting

19   that incarcerated persons infected with COVID-19 "have worse health outcomes on average than

20   the population as whole," "in part because they have risk factors for COVID-19 at a

21   disproportionate rate compared to the general public" and "are often considered effectively ten

22   years older, physiologically, than their chronological age").  In fact, the July 26 CDPH order

23   described correctional facilities as "residential facilities where the residents have little ability to

24   control the persons with whom they interact.  There is frequent exposure to staff and other

25   residents.  In many of these settings, the residents are at high risk of severe COVID-19 disease due

26   to underlying health conditions, advanced age, or both."  https://www.cdph.ca.gov/Programs/

27   CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Unvaccinated-Workers-

28   In-High-Risk-Settings.aspx.  Moreover, one basis for the August 5 order was that "[r]ecent

United States District Court
Northern District of California

17

outbreaks in health care settings have frequently been traced to unvaccinated staff members," which led CDPH to concluded that "all health care workers must be vaccinated to reduce the chance of transmission to vulnerable populations."  ECF No. 3663-1 at 261.  As discussed above, recent outbreaks in prisons – not only in designated healthcare areas within prisons – have also been traced to staff.  Defendants do not explain why it would be reasonable to refuse a similar vaccination requirement to reduce the chance of transmission to the vulnerable population that resides in CDCR's facilities.

Defendants assert that "CDCR has made every effort to implement COVID-19 safety measures based on the latest public health guidance and available resources."  ECF No. 3673 at 4.  However, to the extent that assertion might have been true before, it is no longer supported by the record.  Neither Defendants nor CCPOA disputes that COVID-19 continues to pose a substantial risk of serious harm – including death – to incarcerated persons, regardless of their vaccination status; that, even with mitigation measures in place, the virus spreads quickly in a prison setting; that limiting the introduction of the virus is therefore critical to protecting the health of incarcerated persons; that staff are the primary vector of introducing the virus into a prison; or that testing is ineffective at controlling that vector.  In the absence of any evidence suggesting that Defendants' existing mitigation measures reasonably address this risk, the issue is not whether mandatory vaccines are merely a further step Defendants could take, but whether it would be unreasonable not to take it.  *See Plata*, 445 F. Supp. 3d at 568 ("[T]he question before the Court is not what it thinks is the best possible solution.  Rather, the question is whether Defendants' actions to date are reasonable.").  Defendants have disregarded a substantial risk of serious harm "by failing to take reasonable measures to abate it" and are therefore violating Plaintiffs' Eighth Amendment rights.[9]  *Farmer*, 511 U.S. at 847.

---

[9] Defendants state that they "are not aware of any other prison system in the country that has been as innovative or proactive in responding to the COVID-19 pandemic and protecting the health and safety of inmates during these unprecedented times."  ECF No. 3660 at 17.  While that may be true in some respects, Defendants are not leaders on the question of protecting incarcerated persons against the introduction of the virus by staff, whom Defendants concede are the primary sources of exposure.  Unlike California, multiple other jurisdictions – including the Federal Bureau of Prisons; the states of Oregon, Washington, Colorado, Illinois and Massachusetts; and several counties within California, including Orange, San Francisco, Los Angeles, Contra Costa,

United States District Court
Northern District of California

**B.      Narrow Tailoring**

Having found an Eighth Amendment violation, the Court now considers whether the Receiver's recommendations present a narrowly tailored remedy.  Defendants and CCPOA make several arguments as to why they do not, all of which are unavailing.

First, Defendants suggest that a mandatory staff vaccination policy is not narrowly tailored because the best protection for incarcerated persons would come from a mandatory vaccination policy for incarcerated persons.  CCPOA also raises this argument, but with respect to deliberate indifference rather than narrow tailoring.  No one has disputed that getting vaccinated provides one of the most effective protections against COVID-19.  However, neither the Receiver nor any party has recommended that vaccination be required for all incarcerated persons, and so that question is not before the Court.  More importantly, as discussed above, Defendants and CCPOA do not contest the continued risk of harm to *vaccinated* incarcerated persons, nor do they present any evidence that it would be reasonable not to address the introduction of the virus into the prisons.  A policy directed towards vaccination of the incarcerated population, aside from those persons covered by the Receiver's uncontested recommendation regarding persons who work outside the institution or receive in-person visitation, would not address these issues and therefore would provide no remedy for the identified harm.  Nonetheless, because no one disputes the effectiveness of vaccination as a protective measure, the Court directs the Receiver to consider additional efforts to increase the vaccination rate among the incarcerated population, including whether a mandatory vaccination policy should be implemented.

Second, Defendants and CCPOA argue that Defendants' implementation of the August 19 CDPH order is a lesser intrusive remedy.  For the reasons already discussed, that plan is too limited to reasonably address the substantial risks faced by Plaintiffs.  By Defendants' own admission, the CDPH order was not intended to address the risk of introduction of the virus by staff into the institutions or even to protect the incarcerated population in anything other than healthcare settings.  Instead, the order was intended "to protect particularly vulnerable populations

and Santa Clara – have adopted mandatory vaccination requirements applicable to correctional staff.  ECF No. 3663-1 at 362-431; ECF No. 3674-1 at 256-60.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   receiving care in health care settings, and ensure a sufficient, consistent supply of workers in high-

2   risk health care settings."  ECF No. 3661 ¶ 12.  Thus, although the CDPH order is more narrow

3   and would be less intrusive than the Receiver's recommendation, it was not intended to and does

4   not reasonably abate the risk of serious harm to Plaintiffs.

5          Third, Defendants and CCPOA argue that existing efforts to increase vaccination among

6   staff are sufficient.  However, these efforts "have had minimal success, with the rate of

7   vaccination increasing by just 1% in July (from 52% to 53%) and 2% in August 2021 (from 53%

8   to 55%)."  ECF No. 3670-1 ¶ 11.  Included as part of the August efforts "was a program of

9   mandatory one-on-one vaccine counseling" through which "5,135 staff members attended a

10  counseling appointment" but only 262 – approximately 5% – agreed to be vaccinated, with 4,385

11  signing "a formal declination, refusing to become vaccinated."  *Id.*  That program "has been halted

12  to redirect resources to complying with the August 19 CDPH order."  *Id.*  Neither Defendants nor

13  CCPOA offer any evidence suggesting that further voluntary efforts will be any more successful,

14  nor do they contest that "CDCR staff are vaccinated at far too low a rate to reduce the risk of mass

15  outbreaks in CDCR institutions."  ECF No. 3638-1 ¶ 37.

16         In short, none of the alternatives suggested by Defendants or CCPOA would correct the

17  violation of Plaintiffs' Eighth Amendment rights identified in this order, and the Court concludes

18  that the Receiver's recommendation "is narrowly drawn, extends no further than necessary to

19  correct the violation of the Federal right, and is the least intrusive means necessary to correct the

20  violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).

21         **C.      Other Considerations**

22         Three other considerations warrant discussion.  First, Plaintiffs argued in their initial

23  response that workers who are unvaccinated due to their religious beliefs should not be allowed to

24  enter the prisons.  They do not raise this argument in their reply brief, and it is not clear whether

25  they continue to request this relief.  In any event, the request is premature, as the manner in which

26  a vaccine mandate might be implemented has not yet been determined – and is something that the

27  Court leaves to the discretion of the Receiver and Defendants in the first instance.  Nor does

28  Plaintiffs' brief discussion of the issue establish that the requested relief is proper under the PLRA.

United States District Court
Northern District of California

Second, CCPOA asserts that "state unions are entitled to negotiate over the impacts of the CDCR's decision to implement mandatory vaccinations pursuant to the Ralph C. Dills Act, Cal. Gov't Code §§ 3512, et seq." ECF No. 3664 at 12 n.9. Similarly, SEIU argues that "the State . . . has the obligation to negotiate with SEIU over aspects of [a mandatory vaccination] policy that impact matters within the scope of representation before the policy is actually implemented." ECF No. 3656 at 6 (emphasis omitted). Again, the Court leaves the details of implementation to the Receiver and Defendants in the first instance. The Court also notes that CCPOA is already meeting and conferring with CDCR regarding implementation of the August 19 CDPH order, which was issued without prior collective bargaining, and CCPOA does not contend that this timing violates any provision of state law. ECF No. 3669 at 10. If the Receiver or Defendants believe they cannot comply with the Court's order without a waiver of state law, they shall file a motion seeking such a waiver that explains why it is permissible under 18 U.S.C. § 3626(a)(1)(B).

Third, although Plaintiffs suggest that the Court "set a date for full compliance" that is "soon," ECF No. 3674 at 19, the record contains no information on which the Court could base a reasonable compliance deadline, and the Receiver does not request one. Accordingly, the Court does not set a compliance deadline in this order and instead orders the Receiver and Defendants to submit an implementation plan that includes such a deadline.

## CONCLUSION

For the foregoing reasons, Defendants and the Receiver shall implement the Receiver's recommendations that (1) access by workers to CDCR institutions be limited to those workers who establish proof of full COVID-19 vaccination or have established a religious or medical exemption to vaccination and (2) incarcerated persons who desire to work outside of the institution or to have in-person visitation must be fully vaccinated against COVID-19 or establish a religious or medical exemption.[10]

Defendants and the Receiver shall submit an implementation plan, including a deadline by which all covered persons must be vaccinated, within 14 days of the date of this order.

---

[10] Defendants' evidentiary objections to photographs submitted with the Hart Declaration and to one paragraph of the Norman Declaration are overruled. ECF Nos. 3671, 3672.

Additionally, the Receiver shall consider efforts to increase the vaccination rate among the incarcerated population, including whether a mandatory vaccination policy should be implemented.

**IT IS SO ORDERED.**

Dated:  September 27, 2021



JON S. TIGAR
United States District Judge

United States District Court
Northern District of California