Rob Bonta
Attorney General of California
Monica N. Anderson
Senior Assistant Attorney General
Damon G. McClain
Supervising Deputy Attorney General
Iram Hasan
Deputy Attorney General
State Bar No. 320802
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3793
  Fax:  (415) 703-5480
  E-mail:  Iram.Hasan@doj.ca.gov

*Attorneys for Defendants*

Hanson Bridgett LLP
Paul B. Mello - 179755
Samantha D. Wolff – 240280
Laurel O'Connor – 305478
David Casarrubias – 321994
  425 Market Street, 26th Floor
  San Francisco, CA 94015
  Telephone: (415) 777-3200
  Facsimile: (415) 541-9366
  E-mail: pmello@hansonbridgett.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **MARCIANO PLATA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 01-cv-01351-JST<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO STAY ORDER RE MANDATORY VACCINATIONS (ECF NO. 3684) PENDING APPEAL**<br><br>Date:          December 9, 2021<br>Time:          2:00 p.m.<br>Courtroom:   6, 2nd Floor<br>Judge:         The Honorable Jon S. Tigar<br>Action Filed:  April 5, 2001 |

# TABLE OF CONTENTS

**Page**

Introduction ......................................................................................................... 1

Updated Factual Background .............................................................................. 3

Relevant Procedural Background ........................................................................ 4

Argument ............................................................................................................. 5

    I.      Defendants Are Likely to Succeed on the Merits of Their Appeal. ..................... 5

        A.     Defendants Are Likely to Succeed on the Merits of the Eighth
             Amendment Question.......................................................................... 5

            1.     The Court Incorrectly Framed the Eighth Amendment
                   Question and Heightened the Standard Defendants Must
                   Satisfy. ...................................................................................... 6

            2.     The Court Disregarded Defendants' Numerous Ongoing
                   Mitigation Efforts to Reduce the Risk of COVID-19................... 10

            3.     The Court's Ruling Disregarded Analogous Cases
                   Defendants Cited and Misinterpreted the Scope of
                   Defendants' Safety Measures..................................................... 13

            4.     The Court's Unreasonableness Finding Disregards the
                   Success of Defendants' Efforts. .................................................. 15

        B.     The Court Erred in Finding That the Receiver's Proposed
              Mandatory Vaccination Policy Does Not Satisfy the PLRA's
              Needs, Narrowness, Intrusiveness Requirement...................................... 16

    II.     Defendants Face Irreparable Harm........................................................ 19

    III.    The Balance of Equities Tips in Favor of a Stay................................................ 23

Conclusion.......................................................................................................... 25

i

Defs.' Mot. Stay Order Re Mandatory Vaccinations Pending Appeal (01-cv-01351-JST)

1

# TABLE OF AUTHORITIES

2

**Page**

3

4

CASES

5

*Abbassi v. INS*
6      143 F.3d 513 (9th Cir.1998) ................................................................................. 6

7    *Bell v. Wolfish*
       441 U.S. 548 (1979) ............................................................................................ 9
8
     *Brown v. Plata*
9      563 U.S. 493 (2011) ..................................................................................... 13, 17

10   *Davis v. Allison*
       No. 1:21-cv-00494-HBK, 2021 U.S. Dist. WL 178740 (E.D. Cal. Sep. 18,
11     2021) ................................................................................................................. 14

12   *Davis v. Allison*
13     No. 1:21-cv-00494-HBK, 2021 WL 3761216 (E.D. Cal. Aug. 25, 2021) .................... 13, 14

14   *Estelle v. Gamble*
       429 U.S. 97 (1976) ......................................................................................... 6, 13
15
     *Farmer v. Brennan*
16     511 U.S. 825 (1994) ............................................................................. 6, 7, 10, 12

17   *Fraihat v. U.S. Immigration and Customs Enforcement*
18     20-55634, 2021 WL 4890884 (9th Cir. Oct. 20, 2021) ................................. *passim*

19   *Golden Gate Rest. Ass'n v. City of San Francisco*
       512 F.3d 1112 (9th Cir. 2008) ............................................................................ 5
20
     *Helling v. McKinney*
21     509 U.S. 25 (1993) ............................................................................................ 14

22   *Hilton v. Braunskill*
23     481 U.S. 770 (1987) ......................................................................................... 5, 6

24   *Hollingsworth v. Perry*
       558 U.S. 183 (2010) .......................................................................................... 6
25
     *Leiva-Perez v. Holder*
26     640 F.3d 962 (9th Cir. 2011) ............................................................................. 5, 6

27   *Nken v. Holder*
28     556 U.S. 418 (2009) ........................................................................................ 23

# TABLE OF AUTHORITIES
**(continued)**

**Page**

*Pell v. Procunier*
417 U.S. 817 (1974)..........................................................................................9

*Pride v. Correa*
719 F.3d 1130 (9th Cir. 2013) .......................................................................13

*Tyler v. Murphy*
135 F.3d 594 (8th Cir. 1998) .........................................................................16

*Wilson v. Seiter*
501 U.S. 294 (1991).......................................................................................14

*Woodford v. Ngo*
548 U.S. 81 (2006).........................................................................................19

*Zatko v. Rowland*
835 F. Supp. 1174 (N.D. Cal. 1993) .............................................................13

**STATUTES**

United States Code, Title 18
§ 3626(a)(1)(A)..............................................................................................16

**COURT RULES**

Federal Rules of Civil Procedure
Rule 62(d)........................................................................................................5

**OTHER AUTHORITIES**

Cal. Corr. Health Care Services, *COVID-19 Screening and Testing Matrix for Patient Movement*, https://cchcs.ca.gov/wp-content/uploads/sites/60/COVID19/Appendix13-PatientMovement.pdf .............................12

Cal. Dep't. Corr. & Rehabilitation, *Updates*, https://www.cdcr.ca.gov/covid19/updates/ ........................................................................11

iii

Defs.' Mot. Stay Order Re Mandatory Vaccinations Pending Appeal (01-cv-01351-JST)

**INTRODUCTION**

California has led the nation in responding to the COVID-19 pandemic.  To this day, the State's efforts to vaccinate all residents, implement stringent safety measures, and take calibrated, but aggressive evidence-based actions to stem the spread of COVID-19 are a model for other jurisdictions.  With respect to the state prison system, Defendants have led the nation in implementing strict masking and social distancing protocols, significantly decreasing the prison population, and prioritizing the early vaccination of incarcerated people with the most effective COVID-19 vaccines in the world.  Unlike other state prison systems that de-prioritized their incarcerated population for vaccination when vaccines were scarce, Defendants started these efforts at the earliest possible time after the vaccine became available and continue to encourage those who initially refused the vaccine to accept it.  Nonetheless, even after Defendants successfully vaccinated three-quarters of the incarcerated population (the percentage who have accepted at least one dose now stands at seventy-nine percent), offered virtually every incarcerated person vaccines, and went beyond most other states in mandating that workers in correctional healthcare settings be vaccinated, this Court determined on September 27, 2021, that Defendants are "deliberately indifferent" to the risks posed to inmates by COVID-19.  Further, the Court issued an unprecedented order mandating that Defendants vaccinate all correctional workers (subject to medical and religious exemptions).  Underscoring the unprecedented nature of this order, no other prison system in the country is subject to such an order, and no federal court has issued a similar order, before or since.

The Court's September 27 vaccine-mandate order far exceeds the Court's authority under the Prison Litigation Reform Act (PLRA).  Furthermore, this unprecedented intrusion into state operations and responsibilities is likely to irreparably harm the administration of the state prison system.  As evidenced by the substantial level of staff resistance to the California Department of Public Health's (CDPH) order mandating vaccination for a limited portion of workers in the prisons (including a lawsuit filed in state court by correctional officers' labor representative, in which CDPH and California Department of Corrections and Rehabilitation (CDCR) successfully

1   defended a preliminary injunction just last week), noncompliance with the court-ordered

2   statewide vaccination mandate is unfortunately inevitable.  And while the CDCR and California

3   Correctional Health Care Services (CCHCS) both have contracts with outside healthcare service

4   providers to fill vacancies in healthcare positions that may arise because of people deciding to

5   quit or retire rather than comply with a vaccine mandate, there are no similar contracts for

6   correctional officers.  Resulting shortages of correctional officers and other classifications of

7   prison workers that are likely to occur under the system-wide September 27 order will hurt

8   CDCR's ability to ensure safety and security in its prisons.  The order is also likely to prove

9   harmful to class members because some prisons will likely need to reduce programming so that

10   the limited remaining staff can focus on providing essential and constitutionally mandated

11   services.

12       These irreparable harms cannot be justified by current circumstances or the record.  The

13   current status of active cases and serious illness among class members shows that Defendants,

14   through their successful vaccine programs and myriad other measures to prevent the spread of

15   COVID-19, and through their efforts to provide the best possible treatments for patients who

16   contract it, have already greatly reduced the risks to class members.  The level of active cases in

17   the prisons has remained relatively low since March 2021, recently hovering around 200 active

18   cases as compared to about 10,600 active cases in December 2020.  And the number of serious

19   COVID-19 related illnesses that require hospitalization have remained especially low.  Out of

20   about 99,000 class members, three are currently hospitalized because of a COVID-19 related

21   illness, as compared to 143 in January 2021.  Out of the State's thirty-four operating prisons,

22   eighteen prisons currently have no active cases.  And thanks to policies already in place, the

23   proportion of prison staff with at least one dose of vaccine is consistently increasing, jumping

24   from fifty-three percent to sixty-two percent just since August 9, 2021.  In other words,

25   Defendants' current efforts to prevent the spread and reduce the risks of serious illness have been

26   working, and the court-ordered vaccine mandate is neither necessary nor proper at this time under

27   the law.  Under these facts and a fair balancing of the various interests and rights at stake, the

28   Court should stay the vaccine-mandate order pending appeal.

2

Defs.' Mot. Stay Order Re Mandatory Vaccinations Pending Appeal (01-cv-01351-JST)

## UPDATED FACTUAL BACKGROUND

COVID-19 vaccines first became available in December 2020.  Since that time, and without a court order mandating that they do so, Defendants have vaccinated over 78,000 class members and over 34,000 prison staff.  (Decl. Toche Supp. Mot. Stay Defs.' Mot. Stay Mandatory Vaccine Order (Decl. Toche Supp. Stay) ¶ 3.)  Since the Court issued the August 9, 2021 order to show cause, staff vaccinations have continued.  In fact, well over 10,000 doses of vaccine were administered to prison staff from August 9 through October 21.  (*Id.*)  The number of staff who have received at least one dose of vaccine increased from about fifty-three percent on August 6, 2021, to about sixty-two percent on October 15, 2021.  (*Id.*)  Broken down by classification, healthcare staff who are fully vaccinated increased from seventy-two percent on August 6, 2021, to eighty-two percent on October 14, 2021; custody staff who are fully vaccinated increased from forty-one percent on August 6, 2021, to fifty-one percent on October 14, 2021; and administrative, maintenance, and operations staff who are fully vaccinated increased from sixty-one percent on August 6, 2021, to sixty-seven percent on October 14, 2021.  (*Id.*)

The full vaccination rate for the incarcerated population has also risen to about seventy-seven percent as of October 15, 2021, compared to approximately seventy-six percent when the Court issued the order to show cause on August 9.  (*Id.* ¶ 5.)  And consistent with the most current public health guidance, CCHCS issued a policy on August 20, 2021 regarding third booster doses of vaccine—shortly after the Centers for Disease Control and Prevention released its recommendation for administering booster shots—and promptly started offering booster shots to eligible immunocompromised patients and staff.  (*Id.*)  Over 700 eligible immunocompromised patients had accepted a booster shot when Defendants filed their response to the Court's order to show cause on August 30.  (*Id.*)  Since then, CCHCS has expanded booster-shot-eligibility criteria to include all non-immunocompromised patients who have received two doses of the Pfizer vaccine.  (*Id.*)  As of October 15, 5,540 currently eligible patients have been offered a booster shot, and 4,996 have accepted it.  (*Id.*)  CCHCS continues to offer booster shots to currently eligible patients. (*Id.*)

1    To reduce the risk of serious illness and hospitalizations, CCHCS has also provided

2    infected patients with the newest and most effective therapies where indicated.  (*Id.* ¶ 6.)  For

3    example, as of October 14, 2021, CCHCS had administered monoclonal antibody treatments to

4    483 patients.  (*Id.* ¶ 7.)

5    Defendants' vaccination programs and other efforts have greatly reduced the risks of

6    infection among class members and as a result, the rates of serious illness are low.  (*Id.* ¶ 6.)  As

7    of October 24, 2021, out of a prison population of about 99,300, CCHCS reported three patient

8    hospitalizations and about 187 active cases, and that number has hovered around 200 active

9    COVID-19 cases for the past week.  (*Id.*)  Active-infection rates have remained relatively low

10   since March 2021.  (*Id.*)  By contrast, when vaccines first became available in December 2020,

11   there were over 10,000 active cases in the incarcerated population and there were 143 patient

12   hospitalizations.  Since that time, CCHCS's efforts to vaccinate class members and staff,

13   combined with myriad other safety measures, have greatly reduced the number of active cases

14   and kept the rate of infection relatively low for months.  (*Id.*)

15                        **RELEVANT PROCEDURAL BACKGROUND**

16   On August 4, 2021, the Receiver filed a recommendation that (1) access by workers to

17   CDCR institutions be limited to those workers who establish proof of full COVID-19 vaccination

18   or establish a religious or medical exemption to vaccination, and (2) incarcerated persons who

19   desire to work outside of the institution or to have in-person visitation must be fully vaccinated

20   against COVID-19 or establish a religious or medical exemption.  (ECF No. 3638.)  On August 9,

21   2021, the Court issued an order to show cause why it should not order Defendants to implement

22   the Receiver's recommendation and ordered briefing by the parties.  (ECF No. 3647.)

23   Defendants, Plaintiffs, and intervener California Correctional Peace Officers Association filed

24   responsive briefs on August 30, 2021 (ECF Nos.  3660, 3663, 3664) and reply briefs on

25   September 10, 2021 (ECF Nos. 3673, 3674, 3669.)  The Receiver also filed a reply brief on

26   September 10, 2021.  (ECF No. 3670.)

27   The Court heard oral argument regarding the order to show cause on September 24, 2021,

28   and filed an order on September 27, 2021, requiring Defendants to implement the Receiver's

4

1    recommendation and to work with the Receiver to submit an implementation plan within fourteen

2    days.  (ECF No. 3684.)  On October 12, Defendants and the Receiver submitted an

3    implementation plan to comply with the Court's order, but Defendants specifically noted that they

4    did not agree with the timeline presented in the plan, "continue[d] to have serious reservations

5    about implementing the Receiver's broad mandatory vaccine recommendation due to the impact

6    of implementing this plan on staffing and operations statewide," and were also considering filing

7    a motion to stay implementation of the September 27 order.  (ECF No. 3694 at 2, 5.)

8                                          **ARGUMENT**

9           This Court is authorized under Federal Rule of Civil Procedure 62 to stay its vaccine-

10   mandate order to ensure that Defendants' rights are secured pending appeal.  Fed. R. Civ. P.

11   62(d).  In considering motions for stays pending appeal, the Ninth Circuit has adopted the factors

12   enumerated in *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987): "(1) whether the stay applicant has

13   made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

14   irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the

15   other parties interested in the proceeding; and (4) where the public interest lies."  *Golden Gate*

16   *Rest. Ass'n v. City of San Francisco*, 512 F.3d 1112, 1115 (9th Cir. 2008) (quoting *Hilton*, 481

17   U.S. at 776) (internal quotations omitted).

18          This Court analyzes the first two factors on a "'sliding scale in which the required degree of

19   irreparable harm increases as the probability of success decreases.'"  *Golden Gate*, 512 F.3d at

20   1116.  A party may also establish the first two *Hilton* factors by showing (1) that there are serious

21   legal questions regarding the merits, and (2) the balance of hardships tips sharply in the moving

22   party's favor.  *Id.* at 1115–16.

23

24   I.     **DEFENDANTS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR APPEAL.**

25          A.     **Defendants Are Likely to Succeed on the Merits of the Eighth Amendment**
                   **Question.**

26          For the purposes of a stay motion, the success-on-the-merits standard requires a "reasonable

27   probability" of success, a "fair prospect" of success, a showing of a "substantial case on the

28   merits," or a showing that "serious legal questions are raised."  *Leiva-Perez v. Holder*, 640 F.3d

                                                    5

1   962, 967-68 (9th Cir. 2011) (quoting *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010); *Hilton*,

2   481 U.S. at 778; and *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir.1998).  Each of these

3   formulations of the standard is interchangeable.  (*Id.*)

4        Defendants satisfy this standard because they have more than shown that they have a "fair

5   prospect" of success on appeal and that they have raised "serious legal questions."  *Leiva-Perez*,

6   640 F.3d at 967-98 (citations omitted).  Despite acknowledging Defendants' robust, multilayered

7   efforts to protect the incarcerated population in its September 27, 2021 order (*see* ECF No. 3684

8   at 2:21-3:1, 3:22-4:9), the Court's ruling largely did not factor those efforts into the analysis that

9   followed.  And the Ninth Circuit's recent decision in *Fraihat v. U.S. Immigration and Customs*

10  *Enforcement*, 20-55634, 2021 WL 4890884, at *1 (9th Cir. Oct. 20, 2021), helps to highlight the

11  defects in the Court's Eighth Amendment analysis.

12
13            **1.  The Court Incorrectly Framed the Eighth Amendment Question and**
                    **Heightened the Standard Defendants Must Satisfy.**

14       Under the subjective prong of the deliberate indifference analysis, prison officials must

15  know of and disregard "an excessive risk to inmate health or safety" for the court to find a

16  violation of a federal right.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The state of mind

17  required for deliberate indifference equates to the *mens rea* element for criminal recklessness.  *Id.*

18  at 839-40.  Accordingly, courts must "focus[] on what a defendant's mental attitude actually was

19  (or is), rather than what it should have been (or should be)."  *Id.* at 839.  This standard is exacting,

20  and courts have rejected attempts to dilute it.  *See Estelle v. Gamble*, 429 U.S. 97, 106-08 (1976)

21  ("insufficient treatment, malpractice, or negligence does not amount to a constitutional

22  violation.").  When officials respond reasonably to a risk of harm, there is no Eighth Amendment

23  violation even if the harm is not averted.  *Farmer*, 511 U.S. at 844.

24       The Court failed to correctly apply this well-established standard.  According to the Court,

25  "the issue is not whether mandatory vaccinations are merely a further step Defendants could take,

26  but whether it would be unreasonable not to take it."  (ECF No. 3684 at 18:17-18.)  But by

27  focusing solely on Defendants' decision *not* to implement the Receiver's recommended

28  vaccination policy—which the Court appears to think is the best policy choice—instead of

6

Defs.' Mot. Stay Order Re Mandatory Vaccinations Pending Appeal (01-cv-01351-JST)

1    determining whether all the measures Defendants *are* implementing (including CCHCS's own

2    vaccination policies)—ensure "reasonable safety" of the incarcerated population under the Eighth

3    Amendment, the Court improperly heightened the standard Defendants must meet to satisfy the

4    Eighth Amendment.  *Farmer*, 511 U.S. at 844.  Focusing only on the potential benefits of

5    mandatory vaccinations for staff and some inmates, the Court simply disregarded all of the

6    mitigation measures that Defendants implemented earlier in the pandemic and continue to

7    implement today, and therefore failed to assess the evidence of Defendants' actual mental

8    attitudes, as required by *Farmer*.  These measures include taking aggressive steps to vaccinate the

9    incarcerated population and staff starting as early as vaccines became available in December 2020

10   (Decl. Toche Supp. Defs.' Response to Order to Show Cause, ECF No. 3662 at ¶ 8), offering

11   incentives to increase acceptance among both the incarcerated population and staff (ECF No.

12   3660 at 17-18), offering booster shots in accordance with recent public health guidance (Decl.

13   Toche Supp. Defs.' Response to Order to Show Cause, ECF No. 3662 at ¶ 3), requiring all

14   correctional staff to verify that they are vaccinated or submit to bi-weekly testing consistent with

15   CDPH's July 26 public health order, and implementing a vaccine mandate for staff assigned to

16   licensed health care settings within correctional institutions pursuant to CDPH's August 19, 2021

17   order (ECF Nos. 3657, 3657-1).

18        The Eighth Amendment requires prison officials to *reasonably* abate the risk, not to

19   completely eliminate it.  *Farmer*, 511 U.S. at 844.  Defendants have more than adequately

20   demonstrated reasonable efforts to abate the risk of COVID-19, and these efforts are ongoing and

21   evolving.

22        The Ninth Circuit reiterated the correct deliberate-indifference standard in *Fraihat*, 20-

23   55634, 2021 WL 4890884, at *1, in an opinion published this month.  *Fraihat* was brought by

24   detainees in the custody of the United States Immigration and Customs Enforcement (ICE), and

25   asserted deliberate indifference to the risks of COVID-19 in ICE's detention facilities.  After the

26   district court found that the plaintiffs had shown a likelihood of success on the merits and issued a

27   preliminary injunction covering all ICE detention facilities, ICE appealed the district court's

28   ruling.  The Ninth Circuit, after exhaustively assessing *all* of ICE's many efforts to respond to the

7

1  risks from the virus, concluded that the district court had not correctly applied the deliberate

2  indifference standard.  *Id.* at *5-*12, *19-*25.

3       In reaching that conclusion, the Court made several points that are instructive here.  First, a

4  finding of deliberate-indifference must satisfy the "formidable" reckless-disregard standard.  *Id.*

5  at *19.  That standard reflects "the core principle, grounded in the separation of powers, that far-

6  reaching intrusion in matters initially committed to a coordinate Branch requires a

7  commensurately high showing sufficient to warrant such a significant exercise of judicial power."

8  *Id.* at *4.  Here, that high standard would require a finding that Defendants, despite all of their

9  efforts throughout the pandemic, including their extensive vaccination of class members and

10  prison staff, have acted with reckless disregard to the safety of class members.

11       Although it was far from a complete list, the Court recognized, that the record demonstrates

12  Defendants implemented the following measures and programs during the course of the pandemic

13  to reduce the risk of harm: (1) significant population reduction measures; (2) temporary

14  suspensions of county intake; (3) temporary suspensions of visiting; (4) masking mandates; (5)

15  distancing mandates; (6) enhanced cleaning protocols; (7) quarantine and isolation protocols; (8)

16  measures to assess and improve ventilation systems; (9) specialized teams and command centers

17  to manage outbreak-response efforts; (10) patient screening, testing, and movement protocols;

18  (11) staff testing mandates; (12) patient and staff vaccination programs; and (13) incentive

19  measures to increase vaccination rates.  (ECF No. 3684 at 1-3.)  The Court further found that

20  Defendants supported efforts to offer vaccines to class members before many jurisdictions

21  followed suit.  (*Id.* at 4.)  This record simply does not support a ruling that Defendants acted with

22  reckless disregard toward the risks of COVID-19 to the incarcerated population.

23       Second, *Fraihat* correctly recognized that the "constitutional line" cannot be drawn based

24  on "a court's idea of how best to operate a detention facility."  20-55634, 2021 WL 4890884, at

25  *24.  With that principle in mind, *Fraihat* concluded that, regardless of whether the district court

26  considered ICE's own policy "as strong, fair, needing improvement, or something else, it simply

27  cannot be described . . . as a reckless disregard of the very health risks it forthrightly identified

28  and directly sought to mitigate."  *Id.* at *21.  This is precisely the sort of policy second-guessing

8

Defs.' Mot. Stay Order Re Mandatory Vaccinations Pending Appeal (01-cv-01351-JST)

1   the Court engaged in with this ruling.  Among myriad other COVID-19 prevention measures,

2   Defendants implemented vaccination policies that have resulted in tens of thousands of class

3   member and staff vaccinations throughout a large and complex prison system.  Yet the Court did

4   not frame the issue as whether, despite implementing these extensive prevention and vaccination

5   policies, Defendants acted with reckless disregard to the safety of class members.  Instead, the

6   Court evaluated whether Defendants' vaccination policy "neede[ed] improvement," *id.,* and

7   concluded that Defendants are deliberately indifferent because their existing vaccination policies

8   could have gone further.  But as *Fraihat* explained, the fact that a court might believe that a

9   policy could have been stronger or that a modified policy could have done a better job of

10  mitigating risks does not convert a party's conduct into deliberate indifference.  *Id.*

11      Third, *Fraihat* reiterated that the deliberate indifference standard is informed by important

12  principles of deference to the political branches of government in cases concerning detention and

13  correctional facilities, especially when facing "a public health crisis unlike any that we have

14  encountered in our time."  *Fraihat* at *21; *see also Bell v. Wolfish,* 441 U.S. 548, 520, 531 (1979)

15  ("[T]he operation of our correctional facilities is peculiarly the province of the Legislature and

16  Executive Branches of our Government, not the Judicial," and "'courts are ill equipped to deal

17  with the increasingly urgent problems of prison administration,' . . . it would 'not [be] wise for

18  [it] to second-guess the expert administrators on matters on which they are better informed.'"

19  (quoting *Pell v. Procunier*, 417 U.S. 817 (1974))).  "When combined with the exigencies of a

20  global pandemic, these core principles, grounded in the Constitution's separation of powers, must

21  in this context necessarily inform the deliberate indifference standard and the scope of appropriate

22  injunctive relief."  *Fraihat* at *25.

23      The Ninth Circuit was particularly troubled by the fact that as "ICE was in the middle of

24  confronting an unprecedented and evolving public health problem, it found its nationwide policies

25  almost immediately subject to judicial revision."  *Fraihat* at *4.  This is precisely Defendants'

26  predicament.  In the middle of combatting a pandemic with evolving measures and policies,

27  including evolving policies on vaccinations, the Court's ruling usurped the political branch's

28  ability to make its own informed decisions on how to proceed, including the best way to keep

9

1    inmates safe from COVID-19, while also maintaining security within the prisons and ensuring

2    inmate access to medical and mental health care services and educational and rehabilitative

3    programming.  As *Fraihat* stated, the deliberate-indifference standard recognizes that the

4    executive "must have some discretion in addressing a complex problem like the one before us."

5    *Id.* at 24.

6         The Court's application of incorrect legal standards raises a substantial case for relief on the

7    merits on appeal.

8         **2.    The Court Disregarded Defendants' Numerous Ongoing Mitigation
              Efforts to Reduce the Risk of COVID-19.**

9

10        The Court summarized a number of the safety measures Defendants implemented during

11   the course of the pandemic at the beginning of its order where it found that Defendants

12   implemented several early release programs (resulting in the early release of approximately

13   11,655 inmates since the start of the pandemic), a temporary suspension of county jail intake and

14   visitation, masking and distancing requirements, advanced cleaning protocols, ventilation

15   improvement efforts, centralized command centers and multidisciplinary teams to oversee

16   response efforts to outbreaks, movement protocols to reduce the risk of virus transmission, staff

17   testing procedures, quarantine and isolation procedures, programs to vaccinate all staff and

18   incarcerated people, incentive measures to increase vaccine acceptance, and the provision of

19   additional vaccine doses for immunocompromised incarcerated people in accordance with

20   updated public health guidance.  (*See* ECF No. 3684 at 2:21-3:1, 3:22-4:9.)

21        But the Court then stated that it was unpersuaded by past efforts because under the

22   deliberate-indifference standard, it need only consider Defendants' current attitude and conduct.

23   (*Id.* at 11.)  The Court's reasoning misses the fact that many of these efforts are ongoing, and

24   therefore do reflect Defendants' current attitudes and current conduct.  Had the Court considered

25   Defendants' numerous efforts to reduce the risks of COVID-19 that are ongoing, it could not have

26   found a violation given the Eighth Amendment's exacting standards: to violate the Eighth

27   Amendment, prison officials must know of a substantial risk of serious harm to an incarcerated

28   person's health or safety, and disregard it.  *Farmer*, 511 U.S. at 837.

That the Court ignored Defendants' extensive and ongoing COVID-19 prevention policies is illustrated by the Court's assertion that Defendants did not "present any evidence that it would be reasonable not to address the introduction of the virus into the prisons." (ECF No. 3684 at 19:12-13.) This statement seems to assume that Defendants are currently making no efforts to address the introduction of the virus into the prisons, which is incorrect. Defendants *are* addressing the introduction of the virus into the prisons through a multilayered approach, because no single measure is enough to combat the risks of COVID-19. (ECF No. 3660 at 11:10-16.) For example, Defendants require workers entering the prisons to present proof of vaccination. (*Id*. at 16:18-20.) Workers who cannot show proof of vaccination must be tested for COVID-19 twice per week. (*Id*.) And regardless of vaccination status, each person entering the prisons must wear a procedure, N95, or KN95 mask at all times. (Decl. Toche Sup. Defs' Response to Order to Show Cause at ¶ 18, ECF No. 3662 at 7:5-10.) Additionally, Defendants' stringent movement protocols, which include testing and quarantining incarcerated people arriving from county jails, are also designed to prevent the introduction of COVID-19 into the prisons. (ECF No. 3660 at 8:23, 8:26, 9:24-10:6.)[1] CDCR and CCHCS's implementation of the CDPH's vaccine-mandate requirements for healthcare settings and ongoing efforts to increase staff-vaccination rates generally should also have been considered, along with the recent implementation of a booster vaccine policy for eligible patients. Any conclusion that Defendants have not exhibited *current conduct* taking aggressive action to prevent the introduction of the virus into the prisons cannot be reconciled with these facts.

Furthermore, the measure of Defendants' current attitudes and conduct should not be limited to their efforts to prevent the introduction of the virus. Thus, the Court should also have considered that if the virus does enter a prison, Defendants' policies require that the affected prison activate an incident command post staffed by both healthcare and custody staff to coordinate and manage all operational activities related to outbreak response efforts designed to mitigate the risk. (*Id*. at 10:25-27.) These efforts include the implementation of quarantine and

---

[1] *See* ECF Nos. 3660, 3662, and 3673-1 for more information regarding CDCR's COVID-19 response efforts to date. *See also* Cal. Dep't. Corr. & Rehabilitation, *Updates*, https://www.cdcr.ca.gov/covid19/updates/ (last visited Oct. 21, 2021).

1    isolation procedures and testing of incarcerated people and staff at a higher frequency until the

2    outbreak abates.  (*Id.* at 15:7-9.)  Prisons experiencing outbreaks also do not accept intake and,

3    with very limited exception, do not transfer incarcerated people to other locations until the

4    outbreak has resolved.  (*See, e.g., id.* at 8:15, 10:15-16; *see also* Cal. Corr. Health Care Services,

5    *COVID-19 Screening and Testing Matrix for Patient Movement*, https://cchcs.ca.gov/wp-

6    content/uploads/sites/60/COVID19/Appendix13-PatientMovement.pdf (last updated Sept. 22,

7    2021.)  Heightened cleaning procedures continue at the same time.  (ECF No. 3660 at 8:21-22.)

8           The Court erred in concluding that Defendants' multilayered response to the pandemic,

9    which includes robust vaccination programs, is deliberately indifferent.  (ECF No. 3684 at 11:9-

10   10.)  Indeed, although Defendants implemented many of these measures before vaccines became

11   available, these measures are continuing because they help limit the introduction of COVID-19

12   into CDCR's prisons and help abate the risk of COVID-19 if it is introduced into a prison.  These

13   measures are relevant to an analysis of Defendants' *current* attitudes and conduct because these

14   efforts are currently ongoing.  The Eighth Amendment demands *reasonableness* in the face of a

15   substantial risk of serious harm, not a complete elimination of the risk.  *See Farmer*, 511 U.S. at

16   822-23.  And here, Defendants' proactive approach to outbreak prevention and management is

17   reasonable.  But even if complete elimination of the risk were the correct standard, no record

18   evidence supports the conclusion that the remedy the Court ordered would actually effectuate that

19   goal.

20          The Court further rejected Defendants' argument regarding unvaccinated incarcerated

21   people, concluding that it "fail[s] to consider that it is not only the unvaccinated population that is

22   at substantial risk of serious harm from COVID-19, and that such risk would be present even if

23   the entire incarcerated population were vaccinated."  (ECF No. 3684 at 9:2-4.)  But the record

24   makes clear that Defendants take risks to the vaccinated population extremely seriously.  As

25   discussed above and in Defendants' response to the Court's order to show cause (*see* ECF No.

26   3660 at 7:25-11:9, 17:6-18:11), Defendants continue to implement numerous safety measures

27   applicable to the vaccinated and unvaccinated alike, in addition to ongoing efforts to increase

28   class member vaccinations.  (*Id.*)  Because Defendants implement safety measures to address the

                                                      12

1  risk of COVID-19 to both vaccinated and unvaccinated incarcerated people, the Court erred in

2  finding that they disregard the risk the virus poses to vaccinated people.

3

### 3. The Court's Ruling Disregarded Analogous Cases Defendants Cited and Misinterpreted the Scope of Defendants' Safety Measures.

4

5  Defendants supported their position regarding the Court's order to show cause with recently

6  decided cases that analyzed prison officials' COVID-19 response efforts and compliance with the

7  Eighth Amendment.  (ECF No. 3660 at 5:3-15; ECF No. 3673 at 6:8-7:3.)  For example,

8  Defendants argued that unvaccinated people are most vulnerable to the harmful effects of

9  COVID-19, and prison officials do not violate the Eighth Amendment if incarcerated people

10  refuse to accept the vaccine.  *See, e.g., Zatko v. Rowland*, 835 F. Supp. 1174, 1178 (N.D. Cal.

11  1993) (incarcerated person's refusal to accept medical care did not amount to a denial or delay of

12  medical care or harm by prison officials) (citing *Estelle*, 429 U.S. at 104-05 (1977)).  The Court,

13  however, dismissed these cases with a cursory citation to *Pride v. Correa*, 719 F.3d 1130, 1132

14  (9th Cir. 2013), finding that the cases Defendants relied on sought "individual injunctive relief,

15  rather than the type of systemic relief sought here."  (ECF No. 3684 at 8:24-9:2.)

16  But in *Pride*, the Ninth Circuit drew the distinction between individual and systemic claims

17  to reject prison officials' argument that relief for the plaintiff's individual medical claim was

18  already being provided in the *Plata* class action.  719 F.3d at 1132.  The Ninth Circuit reversed

19  the district court's dismissal of the plaintiff's individual claim, holding that "*Plata* does not bar

20  the prisoner's claim for injunctive relief."  *Id.* at 1137.  The Ninth Circuit reasoned that because

21  the plaintiff's "claim for injunctive relief concerns only his individual medical care, his claim is

22  not already encompassed in the *Plata* litigation, which seeks systemic reform of medical care in

23  California prisons."  *Id.  Pride* neither finds nor suggests that analyses in individual cases are

24  irrelevant to issues in matters seeking "systemic relief."  Accordingly, the Court erred in

25  disregarding most of the cases Defendants cited on this issue.

26  Defendants also cited a recent decision in an Eighth Amendment case brought by an

27  individual incarcerated person, in which the Eastern District held the plaintiff was unlikely to

28  succeed on the merits of his Eighth Amendment claim.  *Davis v. Allison*, No. 1:21-cv-00494-

13

1    HBK, 2021 WL 3761216 at *6 (E.D. Cal. Aug. 25, 2021), *report and recommendation adopted*,

2    2021 WL 4262400 (E.D. Cal. Sept. 20, 2021) (denying motion for preliminary injunction) (citing

3    *Helling v. McKinney*, 509 U.S. 25, 32 (1993) and *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).  The

4    Court rejected this case as unpersuasive because Defendants did not rebut the Receiver's and

5    Plaintiffs' evidence "that the harms faced by vaccinated incarcerated persons are substantial and

6    not speculative," whereas in *Davis*, the Eastern District found that the harm the plaintiff alleged

7    was speculative at best.  ECF No. 3684 at 8-9 n.3.  However, the Court overlooked the Eastern

8    District's analysis of CDCR's pandemic response efforts, which formed the basis of its

9    conclusion that the plaintiff failed to satisfy the subjective prong of the deliberate indifference

10   standard regarding "whether three COVID-19 protocols in place at Pleasant Valley subject

11   Plaintiff to unconstitutional conditions of confinement under the Eighth Amendment."  *See Davis*,

12   2021 WL 3761216 at *4.

13        The Eastern District's analysis included consideration of a number of CDCR's pandemic

14   response efforts, including social distancing, mask-wearing, the availability of N95 masks and

15   cleaning supplies, COVID-19 testing, and quarantine and isolation protocols that include

16   immediately rehousing incarcerated people who test positive and medical checks of incarcerated

17   people in quarantine and isolation.  *Id.* at *5-6.  The Eastern District further noted that "other

18   federal courts have found similar measures by correctional officials in comparable circumstances

19   to be reasonable and not violative of the Eighth Amendment."  *Id.* at *6 (citations omitted).

20   Taking into consideration the additional fact that the plaintiff "received the [COVID-19] vaccine

21   as requested[,]" the Eastern District concluded "[t]he protocols challenged by Plaintiff fall far

22   short of denying him his basic human needs."  *Id.*

23        Despite much discussion regarding the objective prong of the deliberate indifference

24   standard and whether COVID-19 creates the substantial risk of serious harm—a fact Defendants

25   have never disputed, in this litigation or throughout the pandemic—that is not the dispositive

26   issue.  In this matter, the subjective prong is dispositive: that is, whether Defendants *reasonably*

27   address the risk presented by COVID-19.  The Eastern District's analysis, published in August

28   2021 in the midst of the parties' briefing in response to the Court's order to show cause, is clearly

14

Defs.' Mot. Stay Order Re Mandatory Vaccinations Pending Appeal (01-cv-01351-JST)

1   applicable to the issue of whether Defendants' pandemic response efforts violate the Eighth

2   Amendment and should not have been disregarded.

3       Accordingly, a substantial case on the merits exists, warranting a stay of the Court's

4   September 27, 2021 order.

5       **4.  The Court's Unreasonableness Finding Disregards the Success of
            Defendants' Efforts.**

6

7       The Court also supported its deliberate indifference by arguing that the scope of the

8   California Department of Public Health's (CDPH) August 19 public health order, which

9   mandated vaccination for certain healthcare workers in correctional settings, was inadequate.  The

10  Court analyzed public health science and the logic of CDPH's policy decision, and found that

11  "[g]iven recent outbreaks, there is no doubt that the limited vaccine requirements adopted by

12  Defendants are insufficient 'to ensure reasonable safety.'"  (ECF No. 3684 at 15:5-7.)  The Court

13  erred in reaching this conclusion for two reasons.

14      First, the Court's order does not acknowledge the drastic reduction in COVID-19 cases

15  since Defendants introduced vaccines into their arsenal of mitigation measures.  In assessing the

16  risk CDCR's incarcerated population faces from the virus, the Court examined the number of

17  outbreaks in the months preceding its order (*id*. at 13:4-8), but it considered neither the magnitude

18  nor the outcomes of those outbreaks, and did not differentiate the magnitude or outcomes of

19  outbreaks that occurred before CCHCS successfully vaccinated upwards of seventy-nine percent

20  of the incarcerated population with at least one dose of vaccine.  This data was included in

21  Defendants' briefing: the number of COVID-19 cases among CDCR's incarcerated population

22  peaked at 10,617 on December 22, 2020, when vaccines first became available, and declined to

23  101 positive cases by September 9, 2021, when approximately seventy-nine percent of the

24  incarcerated population was at least partially vaccinated.  (*See* Declaration of Connie Gipson,

25  ECF No 3673-1 at 2, ¶ 3; Decl. Toche Supp. Mot. Stay ¶ 6.)  Additionally, as of October 24,

26  2021, three out of approximately 99,300 incarcerated people were hospitalized for COVID-19-

27  related reasons, compared to 143 hospitalizations on January 5, 2021.  (Decl. Toche Supp. Mot.

28  Stay ¶ 6.)

1  Second, contrary to the Court's finding that "[n]either Defendants nor CCPOA offer any

2  evidence suggesting that further voluntary efforts will be any more successful," (ECF No. 3684 at

3  20:12-13), Defendants submitted evidence that staff vaccine acceptance rates increased by five

4  percent during months when incentives were offered (ECF No. 3660 at 18:14-20).  On this basis,

5  Defendants urged the Court to allow recently introduced policies, including public health orders

6  designed, in part, to increase staff vaccination rates, to be fully implemented.  (*Id.* at 17:8-9,

7  17:14-22, 18:26-24:2.)  And as Defendants predicted, staff vaccination rates have continued to

8  rise.  Well over 10,000 doses of vaccine were administered to prison staff after the Court issued

9  the order to show cause on August 9 through October 21, 2021.  (Decl. Toche Supp. Mot. Stay ¶

10  3.)  The number of staff who have received at least one dose of vaccine increased from about

11  fifty-three percent on August 6, 2021, to about sixty-three percent by October 14, 2021.  (*Id.*)

12  And the vaccination rates among custody staff have increased from about forty-one percent to

13  fifty-one percent in the same period.  (*Id.*)

14  Additionally, the number of positive COVID-19 cases across CDCR's institutions has

15  remained relatively low in recent months.  As of October 25, CCHCS reported 187 active cases

16  among CDCR's population of approximately 99,300, and cases have recently hovered around

17  200.  (Decl. Toch Supp. Mot. Stay ¶ 6)

18  Accordingly, the Court erred in concluding that Defendants are deliberately indifferent by

19  failing to consider Defendants' success in mitigating the risks and increasing vaccinations

20  through their current efforts and policies.

21  **B.  The Court Erred in Finding That the Receiver's Proposed Mandatory Vaccination Policy Does Not Satisfy the PLRA's Needs, Narrowness,**
22  **Intrusiveness Requirement.**

23  A Court may not grant prospective relief under the Prison Litigation Reform Act (PLRA)

24  unless that "relief is narrowly drawn, extends no further than necessary to correct the violation of

25  the Federal right, and is the least intrusive means necessary to correct the violation of the Federal

26  right."  18 U.S.C. ¶ 3626(a)(1)(A).  The Court lacks the authority to order prospective relief

27  because, as discussed above, Defendants' response to the COVID-19 pandemic does not violate

28  the Eighth Amendment. *See Tyler v. Murphy*, 135 F.3d 594, 596 (8th Cir. 1998) ("The PLRA

16

1    limits remedies to those necessary to remedy the proven violation of federal rights") (quotation

2    marks and citations omitted).  But even if there were a violation, the Court erred in finding that

3    the Receiver's proposal satisfied the PLRA's restrictions on prospective relief.

4         The goal of the Receiver's policy is to ensure the safety of the incarcerated population, and

5    the Receiver's own data demonstrates that *being* vaccinated is the single safest way to protect

6    one's self from a serious COVID-19 infection.  (ECF No. 3638 at 5, 22.)  Because "narrow

7    tailoring requires a fit between the [remedy's] ends and the means chosen to accomplish those

8    ends," a more narrowly tailored solution would be to vaccinate all class members before

9    evaluating the necessity for a vaccine mandate addressing everyone else.  *Brown v. Plata*, 563

10   U.S. 493, 531 (2011) (quotation marks and citations omitted).

11        The Court dismissed Defendants' argument that vaccinating the roughly 20,000

12   unvaccinated class members is a far more narrowly tailored plan than mandating vaccination for

13   virtually all CDCR prison workers instead, stating that "neither the Receiver nor any party has

14   recommended that vaccination be required for all incarcerated persons, and so that question is not

15   before the Court."  (ECF No. 3684 at 19:9-11.)  This was clear error because the availability of

16   that option is indisputably relevant to whether the Receiver's recommendation meets the PLRA's

17   standards, regardless of whether any party formally recommended it.

18        However, now the Receiver *has* indicated an intention to mandate vaccination for all class

19   members.  The very last sentence of the Court's vaccine-mandate order requested that the

20   Receiver "consider efforts to increase the vaccination rate among the incarcerated population,

21   including whether a mandatory vaccine policy should be implemented."  And at the October 14,

22   2021 intervention hearing, the Receiver's counsel stated: "Your Honor, you asked the receiver to

23   consider efforts to increase the vaccination rate among the incarcerated population.  We are

24   considering that, and we are developing a plan that we think effectively will read that all

25   incarcerated persons becoming vaccinated, subject to religious and -- and medical exemptions.

26   That plan is still in development, but we will submit a plan to the court."  Tr. Intervention Hr'g,

27   15-16, Oct. 14, 2021.  This demonstrates that the Receiver is working on a more narrowly tailored

28

1    plan that should be implemented and evaluated before the Court requires the extreme measure of

2    mandatory vaccinations for all prison staff.

3         The Court also found flaw in Defendants' argument because they "do not contest the

4    continued risk of harm to *vaccinated* incarcerated persons," but omitted evidence in the record of

5    Defendants' extensive efforts to reduce the risk posed by COVID-19 to those vaccinated people.

6    (*Id*. at 19:11-12.)  As noted above, this argument is based on an assumption, which is flatly

7    contradicted by the record, that vaccinated incarcerated persons can be completely protected from

8    COVID-19—using the Court's own logic that vaccinated persons may still contract COVID-19,

9    the risk of exposure remains even if every worker were vaccinated because they likewise can still

10   contract and transmit the disease (as can workers granted exemptions under the Receiver's

11   recommendation).  Moreover, the Court did not reach the ultimate conclusion clearly supported

12   by the record that no safety measure will protect unvaccinated incarcerated people as well as if

13   they themselves are vaccinated—not even the Receiver's proposal to require the vaccination of

14   those who work near them (while allowing exemptions for religious beliefs and medical reasons).

15   Indeed, the Court overlooked Defendants' argument that, unlike school-age children under age 12

16   who are ineligible for vaccination based on their age, no class member is age-barred from

17   receiving the vaccine.  (ECF No. 3660 at 14-15.)

18        Additionally, the Court conceded that CDPH's August 19, 2021 public health order

19   requiring certain healthcare staff to be vaccinated "is more narrow and would be less intrusive

20   than the Receiver's recommendation," but nonetheless rejected it because it "was not intended to

21   address the risk of introduction of the virus by staff into the institutions or even to protect the

22   incarcerated population in anything other than healthcare settings."  (ECF No. 3684 at 20:2-4,

23   20:24-26.)  As discussed above, that plan had not been fully implemented at the time the Court

24   ruled, and the Court simply speculated that it would not adequately protect Plaintiffs.  Indeed,

25   contrary to the Court's conclusion that no "evidence suggest[ed] that further voluntary efforts will

26   be any more successful" (*id*. at 20:12-13), staff vaccination rates have increased from fifty-three

27   to sixty-three percent since the Court issued its order to show cause, and COVID-19 infection

28

1   rates among the incarcerated population remain exponentially lower than in December 2020 when

2   vaccines first became available.  (Decl. Toche Supp. Defs.' Mot. Stay at ¶¶ 3-6.)

3       The Court erred in selectively applying evidence in the record to conclude that "none of the

4   alternatives suggested by Defendants . . . would correct the violation of Plaintiffs' Eighth

5   Amendment rights identified in this order," and that the Receiver's recommendation complies

6   with the PLRA's restrictions on prospective relief.  Defendants are likely to succeed on the merits

7   of their appeal for the reasons discussed above.

8   **II.   DEFENDANTS FACE IRREPARABLE HARM.**

9       It is "difficult to imagine an activity in which a State has a stronger interest, or one that is

10  more intricately bound up with state laws, regulations, and procedures, than the administration of

11  its prisons."  *Woodford v. Ngo*, 548 U.S. 81, 94 (2006).  The Court's unprecedented vaccine-

12  mandate order irreparably injures Defendants by interfering with the operations and

13  responsibilities of the State.  And by interfering with the State's ability to properly staff and run

14  its prison system, the vaccine-mandate order threatens to significantly impede the State's ability

15  to fulfill its responsibilities under state and federal law.  This unprecedented intrusion into state

16  policymaking, outside the confines of the PLRA, alone suffices to establish irreparable harm.

17      Recent experience at two of CDCR's prisons—California Medical Facility (CMF) in

18  Vacaville and California Health Care Facility (CHCF) in Stockton—also confirm Defendants'

19  concerns about the irreparable operational harms that the requirement to vaccinate all correctional

20  officers with no testing option will likely cause.  (Decl. Gipson Supp. Defs.' Motion Stay ¶ 8.)

21  As medical prisons, CMF and CHCF are subject to the order issued by CDPH in August 2021

22  mandating that all staff at CMF and CHCF, including all correctional officers, be vaccinated by

23  October 14, 2021.  (*Id.*)  As of October 25, 2021—eleven days past the deadline for mandatory

24  compliance with CDPH's order—78 (8.26%) of CHCF correctional officers, and 72 (10.14%) of

25  CMF correctional officers had neither complied by taking the vaccine nor sought a medical or

26  religious exemption.  (*Id.*)  The high levels of noncompliance indicate that substantial numbers of

27  officers are refusing to comply with the CDPH order.  (*Id.*)  The staggering number of religious

28  accommodation requests that CDCR has received from across the state's prisons in response to

19

Defs.' Mot. Stay Order Re Mandatory Vaccinations Pending Appeal (01-cv-01351-JST)

1    the CDPH order further indicate that staff resistance to the vaccine-mandate order will be

2    substantial.  (*Id.* ¶ 11.)  As of October 15, 2021, CDCR has received 1,738 religious

3    accommodation requests in response to the CDPH order across multiple classifications of prison

4    workers.  (*Id.*)  About 1,160 of those requests are from essential custody staff, including

5    correctional captains, lieutenants, sergeants, officers and counselors.  (*Id.*)

6          Moreover, unions representing correctional officers and other staff at affected institutions

7    have vigorously pushed back on the CDPH vaccinate mandate for healthcare settings at every

8    step.  (Decl. Gipson Supp. Defs.' Motion Stay ¶ 9; Decl. Toche Supp. Mot. Stay ¶ 9.)  The

9    California Correctional Peace Officers Association has sued CDCR and CDPH in Kern County to

10   block the implementation of the CDPH order; the American Federation of State, County, and

11   Municipal Employees has issued a letter to CDCR and CCHCS on behalf of psychiatric

12   technicians who work in CDCR's prisons, demanding that CDCR and CCHCS cease and desist

13   from enforcing the CDPH order; and the Service Employees International Union has filed an

14   unfair labor practice charge with California's Public Employment Relations Board against CDCR

15   and CCHCS for implementing the CDPH order.  (*Id.*)

16         There is no reason to think that resistance at CMF and CHCF is not an accurate barometer

17   for what will happen when all correctional officers at all prisons are required to accept the

18   vaccine as a condition of employment under the vaccine-mandate order.  (Decl. Gipson Supp.

19   Mot. Stay ¶ 12.)  Indeed, these recent developments confirm the operational concerns of CDCR

20   leadership about implementing a vaccine mandate for all correctional workers at this time (*Id.* ¶¶

21   8-16.)  And if correctional officers at other institutions exhibit similar rates of noncompliance

22   when the vaccine-mandate order is implemented, and are therefore not permitted to enter the

23   prisons as the vaccine-mandate order requires, CDCR's prisons are likely to experience a

24   substantial increase in staff vacancy rates.[2]  (*Id.* 12.)   Increased officer vacancy rates, in turn,

25   will likely result in the following significant, irreparable impacts:

26   _____
          [2] Events in another West Coast jurisdiction also forecast that California's prisons will
27   likely experience a significant adverse impact on staffing if the vaccine-mandate order is not
     stayed.  (Decl. Gipson Supp. Mot. Stay ¶ 10; Request Judicial Notice, Ex. A.)  The Seattle Times
28   reported on October 19, 2021, that as a consequence of Washington's vaccine mandate for state

- Extremely high correctional officer vacancy rates create challenges for prisons to maintain safety, security, and order, and the risk of security breaches and violence rises.  (*Id.* ¶ 7.) Correctional officers—who are sworn peace officers—are responsible for maintaining safety, security, and order in the prisons, among many other important duties.  (*Id.* ¶ 3.) There are currently about 28,248 correction officers working in CDCR's prisons.  (*Id.*) Sufficient officer staffing levels are required to maintain safety, security, and order throughout the prisons.  (*Id.*)  Without sufficient numbers of correctional officers, prisons cannot operate safely.  (*Id.*) This is because there may be insufficient staff on hand to adequately respond to serious security breaches and to maintain order.  (*Id.* ¶¶ 3, 7.) Violent security breaches can lead to physical injuries to incarcerated people and staff, and result in workers compensation claims and lawsuits.  (*Id.* ¶ 7.)

- Essential prison operations are supported by not only correctional officers but also noncustodial workers throughout the prisons, such as culinary staff, electricians, plumbers, carpenters, maintenance mechanics, warehouse workers, and administrative staff.  (*Id.* ¶ 5.) There are currently about 8,558 noncustodial workers throughout CDCR's prisons who support the basic functions of each prison.  (*Id.*)  If CMF and CHCF's noncompliance rates are consistent across other classifications of workers besides correctional officers, the detrimental impact on administration and operations could be serious.  (*Id.* ¶ 12.)  If culinary positions are insufficiently staffed, it becomes challenging to provide meals to the prison population.  (*Id.*)  If electrician, plumber, and maintenance mechanic positions are insufficiently staffed, work orders for various critical repairs throughout the prisons cannot be timely completed.  (*Id.*)  And if there are insufficient administrative personnel, important administrative functions that keep the prisons running cannot be timely carried out.   (*Id.*)

- High correctional officer vacancies can also have severe impacts on prison operations, requiring reductions in programming for the incarcerated population, including recreation,

workers, the Department of Corrections lost about 4.5 percent of its prison staff.  (*Id.*)  Although the article stated that a spokesperson for the department asserted that Washington's prisons were still sufficiently staffed to operate, if CDCR were to lose 4.5 percent of its prison staff across the state, the impact on prison operations would be severe in some places, and normal operations would not be possible in all of CDCR's prisons.  (*Id.*)

21

day room, rehabilitation, education, and work programs, and even the curtailment of basic services, such as phone calls and daily showers for the incarcerated population.  (*Id.* ¶ 6.) Limiting or suspending these programs allows the prison to redirect correctional officers to help ensure the delivery of essential services, such as medical care and meals for the incarcerated population.  (*Id.*)  If the number of vacancies rises to the level suggested by the preliminary data and widespread resistance to the vaccine mandate orders experienced to date and discussed above, all programming may need to be suspended, and the incarcerated population might be required to remain in cells or dorms for extended periods.  (*Id.*)

- Situations where correctional officer vacancies become extremely high require officers to work extensive overtime and place a great deal of stress on officers, leading to officer fatigue, burn out, and injuries.  (*Id.* ¶ 6.)  As a result, more officers request extended periods of leave, which can further exacerbate staffing challenges.  (*Id.*)

- If the vaccine-mandate order is implemented, there is a serious risk that a substantial number of highly experienced and skilled correctional officers who are currently eligible for retirement benefits will simply choose to retire rather than be vaccinated.  (*Id.* ¶ 13.) Approximately 1,898 correctional officers have been employed for over twenty years and are over age 50.  (*Id.*)  This means that they could retire at any time.  (*Id.*)  CDCR normally relies heavily on incoming cadets to help fill positions of officers who have retired, but as discussed below, the number of available cadets has been insufficient to allow CDCR to immediately back-fill in the case of substantial retirements or departures.  (*Id.*) Consequently, if a significant portion of these officers were to retire in lieu of taking the vaccine, the impact to CDCR's operations would be severe.  (*Id.*)

The likely impact of the vaccine-mandate order will come at a time when CDCR's staffing levels have already been significantly impacted by the COVID-19 pandemic.  (*Id.* ¶ 14.)  For example, CDCR's Correctional Officer Academy has been generating fewer cadets during the pandemic than in previous years.  (*Id.*)  Before the pandemic, in fiscal year 2018/19, the Academy graduated 1,608 cadets; in 2019/20, there were 1,316 cadet graduates; and in 2020/21 there were only 892 cadet graduates.  (*Id.*)  So far, only 461 cadets have graduated in fiscal year 2021/22.

22

(*Id.*)  With fewer cadets graduating, it is difficult for CDCR to timely replace officers who quit or retire.  (*Id.*)  Additionally, significant numbers of current cadets in the academy have not been vaccinated, and the vaccine mandate is likely to further reduce the number of graduating cadets who will take positions in CDCR's prisons.  (*Id.*)  Of the cadets graduated on October 22, 2021, only twenty-four percent are currently vaccinated. (*Id.*)

In its September 27 vaccine-mandate order, the Court relied upon the August 19 CDPH public health order requiring vaccination of workers in correctional healthcare settings to argue that a similar mandate should be applied to all correctional staff.  However, the Court's order ignores significant differences between the settings and ability to respond to any staffing impacts caused by a vaccine mandate.  CDPH has entered into contracts with outside healthcare services providers that state agencies—including CDCR—can use to satisfy short term medical staffing needs during the pandemic.  (Decl. Toche Supp. Mot. Stay ¶ 8.)  And CCHCS also has its own contracts with healthcare services providers.  (*Id.*)  Thus, through its own contracts and through the CDPH's contracts, CCHCS has the means to fill vacancies in various healthcare positions that may arise because of people deciding to quit or retire rather than comply with a vaccine mandate. (*Id.*)  Indeed, just in the last 10 months, these contracts have resulted in over 400 clinician deployments to fill vacancies in healthcare positions.  (*Id.*)  But there are no similar contracts for correctional officers, who are now all subject to the Court's vaccine-mandate order.  (Decl. Gipson Supp. Mot. Stay ¶ 16.)  Therefore, there is no simple or quick way to address severe shortages of correctional officers, and it could take months or years to fully recover from a substantial loss of prison staff resulting from the vaccine-mandate order.  (*Id.*)

The irreparable harm that will likely befall CDCR's prisons, the staff who work in the prisons, and the incarcerated people who live in the prisons requires a stay of the vaccine-mandate order pending Defendants' appeal to the Ninth Circuit.

### III.   THE BALANCE OF EQUITIES TIPS IN FAVOR OF A STAY.

The final two factors for considering motions for stays pending appeal—the balance of equities and the public interest—merge where the State is a party.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, the public interest would be best served by a stay of the vaccine-mandate

23

order in order to avoid the serious risk that the order will negatively affect operations at CDCR's prisons that could potentially impact safety, security, and order for both staff and the incarcerated population. A stay would further serve the public interest by helping avoid disruptions to rehabilitative programming for the incarcerated population. And a stay would serve the public interest by helping to ensure sufficient prison staff to provide the incarcerated population with essential and constitutionally mandated services, such as medical care and mental healthcare.

It is indisputable that Defendants have already worked diligently and successfully to reduce the risks of COVID-19 to the incarcerated population through their vaccination programs, which have achieved:

- The vaccination of 78,788 class members with at least one dose (about seventy-nine percent);
- The vaccination of 35,238 prison staff member (about sixty-three percent);
- A drop in active cases from over 10,000 in December 2020 to about 187 cases as of October 24, 2021; and
- A drop from 143 class-member hospitalizations in January 2021 to three class-member hospitalizations as of October 24, 2021. (Decl. Toche Supp. Mot. Stay ¶¶ 3-6.)

These same vaccination policies are also resulting in rising staff vaccination rates. Since August 2021, the rate of staff who have had at least one dose of vaccine has risen from fifty-three percent to sixty-three percent. (*Id.* ¶ 3.)

As a result of CDCR's and CCHCS's many efforts, and without the intervention of this Court, the number of active cases has remained relatively low since March 2021. (*Id.* ¶ 6.) But the world remains in the grip of this devastating pandemic, and there is no way to achieve perfect safety for anyone. Across the country, people continue to contract COVID-19, and the science has confirmed that even vaccinated individuals can contract and spread the virus. Thus, no one is completely safe.

The currently ordered course will cause serious adverse impacts and harms, both to CDCR's ability to safely and effectively operate the prisons, and to the incarcerated people who reside in them. Because CDCR's ongoing efforts have already been successful at greatly curbing

the serious risks associated with the virus, the hardships associated with losing substantial

numbers of mission-critical prison staff tilts the scales in favor of a stay pending appeal.

## CONCLUSION

For the above reasons, Defendants respectfully request that the Court stay the vaccine-

mandate order pending Defendants' appeal.

Dated:  October 25, 2021

HANSON BRIDGETT LLP

/s/ *Paul B. Mello*

PAUL B. MELLO
SAMANTHA D. WOLFF
LAUREL O'CONNOR
DAVID CASARRUBIAS
*Attorneys for Defendants*

Dated:  October 25, 2021

ROB BONTA
Attorney General of California

/S/ *DAMON G. MCCLAIN*

DAMON G. MCCLAIN
Supervising Deputy Attorney General
IRAM HASAN
Deputy Attorney General
*Attorneys for Defendants*

CA2001CS0001
42936471.docx

25