ROB BONTA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN - 209508
Supervising Deputy Attorney General
IRAM HASAN - 320802
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Ryan.Gille@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
LAUREL O'CONNOR - 305478
DAVID CASARRUBIAS - 321994
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER - 83925
STEVEN FAMA - 99641
ALISON HARDY - 135966
SARA NORMAN - 189536
RITA LOMIO - 254501
RANA ANABTAWI - 267073
SOPHIE HART - 321663
LAURA BIXBY - 301148
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., | CASE NO. 01-1351 JST |
| Plaintiffs, | **JOINT CASE MANAGEMENT CONFERENCE STATEMENT** |
| v. | Judge:   Hon. Jon S. Tigar |
| GAVIN NEWSOM, et al., | Date:     December 16, 2021 |
| Defendants. | Time:     2:00 p.m. |
| | Crtrm.:   6, 2nd Floor |

The parties submit the following joint statement in advance of the December 16, 2021 Case Management Conference.

# I.   COVID-19 VACCINE

## A.   Patients

*Plaintiffs' Position:* According to CCHCS Vaccine Registry data as of December 14, 80% of the approximately 100,000 incarcerated in CDCR are fully vaccinated. Another 2% have received a first dose (although it is not clear how many of those intend to receive a second dose).  17% have refused the vaccine, and 1% have not been offered it (the vast majority of the latter are new arrivals).

We believe these vaccination rates could be higher if incentives were offered, particularly at prisons and yards where vaccine acceptance is lower than the overall rate. On November 29, we asked the Receiver and Defendants to design and implement a robust incentive program to encourage vaccination; such programs were established for staff starting eight months ago.  Such incentives could include money, free phone calls, and special food, among other things.  On December 9, we were told, "CCHCS and CDCR continue to evaluate the efficacy of vaccine incentives among the patient population and consider viable options that would encourage vaccinations."  We appreciate an evaluation is ongoing, and believe the Receiver should set a date in the near future for reporting on what has been determined, including whether a patient vaccine incentive program will be recommended.[1]

---

[1]   Defendants imply below that we are inconsistent in asking for patient vaccine incentives because in June and July we expressed doubts about the efficacy of further incentive programs for staff vaccinations.  Defendants overlook that we did not criticize vaccination incentives offered to staff earlier this year, including (1) the establishment in

18090511.3

Separately, the prompt offering of booster vaccine to all eligible patients is imperative.  A booster for eligible CDCR patients is necessary not just because federal guidelines call for it (see below), but because, as the Receiver testified earlier this year, if COVID were designing its ideal home it would build a prison (see ECF No. 3548 at 7:10-12), and because there is currently no vaccine mandate in effect for all CDCR prison staff, who are the primary vectors of COVID outbreaks in the prisons.

As previously reported (see ECF No. 3717 at 2:9-20), CCHCS had previously offered vaccine boosters to the immunocompromised and patients fully vaccinated more than six months ago with Pfizer, consistent with then-existing federal recommendations. Current federal recommendations call for boosters for all who are six months beyond their primary vaccination with Pfizer or Moderna, or two months beyond primary vaccination with J&J's Janssen.

CCHCS now offers a booster to all such patients, and on November 29 stated "efforts are underway to offer all eligible patients a COVID-19 booster by the end of the year."  On December 7, CCHCS elaborated that it was "currently utilizing all available resources to offer boosters to eligible patients by the end of the year without compromising other health care services or clinic resources, including the authorization of overtime, hiring of registry staff, and engaging in patient discussions regarding boosters during routine medical appointments."

According to December 14 CCHCS Vaccine Registry data, approximately 70,000 patients were as of that date eligible for a booster; 73% of those had received one, 18% had refused, and 10% had not yet been offered it.  We appreciate the efforts of the Receiver, CCHCS, and prison staff to offer and provide vaccine, including boosters, to patients.

*Defendants' Position:* CCHCS began offering the Pfizer booster to eligible patients

_____

April of a program, retroactive to January 1, providing for 80 hours of full-pay supplemental sick leave for those who got vaccinated (see ECF No. 3579 at 7:28 – 8:8), and (2) the program instituted in May that provided vaccinated staff with gifts cards and the possibility of other prizes through a kind of lottery.  In contrast, no vaccine incentives have been provided for patients.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

shortly after the United States Food and Drug Administration (FDA) amended its grant of emergency use authorization.  A statewide meeting was held on September 30, 2021 to provide direction to institutions and ensure all eligible patients were given access to the Pfizer booster, and a memorandum was released on October 1.  Similarly, CCHCS began offering Janssen and Moderna boosters to patients the third week of October 2021, not long after the FDA released its emergency use authorization for those vaccines.  CCHCS does not anticipate (and has not experienced) any barriers to procuring adequate supplies of the vaccine boosters.  Additionally, CCHCS has indicated that it is presently using all available resources to offer booster doses to eligible patients by the end of the year, including through the use of overtime, hiring of registry staff, and encouraging the acceptance of boosters during routine medical appointments.

On November 29, 2021, Plaintiffs' counsel emailed CCHCS and advised that they believe the vaccination rate among the incarcerated population would be higher if they "were provided meaningful incentives to get vaccinated."  Plaintiffs' counsel asked that CCHCS "promptly design and implement a robust incentive program that includes special meals or food, money, canteen resources, tablet credits, video calls, and any other meaningful resource to encourage [incarcerated] people to get vaccinated."[2]  Defendants will consider these incentive ideas and continue to do all that they can to encourage vaccine acceptance by incarcerated persons.

**B.    Staff**

*Plaintiffs' Position:* Mandating vaccination for staff, the primary vector of COVID

---

[2] Notably, Plaintiffs have previously doubted the efficacy of incentive programs in the context of staff vaccination.  *See*, *e.g.*, ECF No. 3605 (June 25, 2021 Joint Case Management Conference Statement) at 5:5-7 ("Further incentive programs will not substantially increase staff vaccination rates, based on recent experience and studies of vaccine incentives in similar contexts."); *see also* ECF No. 3623 (July 27, 2021 Joint Case Management Conference Statement) at 5:6-8 (*id.*).  Indeed, Plaintiffs advised both the Receiver and this Court that "[t]he low efficacy of incentives to date is not unexpected. Medical researchers believe that '[i]ncentives alone are unlikely to deliver the population immunity that will end the pandemic.'"  ECF No. 3605-1 at 5.

18090511.3

1  infections in the prisons, is necessary to reduce the substantial risk of harm the virus poses

2  to incarcerated people.  Unfortunately, on November 26, the Ninth Circuit Court of

3  Appeals granted Defendants' request for a stay of this Court's September 27 and October

4  27 orders requiring implementation of a vaccine mandate for all CDCR prison staff who

5  work in the prisons.

6  Vaccination thus remains voluntary for all prison staff except for, according to

7  CCHCS data, approximately 20,000 (of approximately 56,000 who work in the prisons)

8  who are subject to the August 19 California Department of Public Health (CDPH) order

9  that mandates their vaccination unless granted a medical or religious exemption. CDCR

10  and CCHCS implemented that mandate via an August 23 Memorandum, and staff were

11  required to be fully vaccinated or have requested an exemption by either October 14 or, if

12  a member of Bargaining Unit 6, by November 24.

13  Even though it applies to only approximately one-third of those who work in

14  CDCR, the CDPH mandate has worked to substantially increase vaccination rates among

15  that staff, and thus also the overall rate among staff statewide. The efficacy of the mandate

16  is perhaps best shown by the staff vaccination rates at California Health Care Facility

17  (CHCF) and California Medical Facility (CMF), the two prisons for which the CDPH

18  order required all staff be vaccinated (or exempted) due to the heightened vulnerabilities of

19  the people incarcerated in those prisons.  In mid-July, approximately one month before the

20  CDPH order, the overall staff vaccination rates at CHCF and CMF, per CCHCS data, were

21  64% and 62%, respectively, with custody staff rates of 50% and 57%, respectively.  As of

22  December 3, the overall vaccinate rates at those two prisons were 82% and 76%,

23  respectively, with custody staff rates of 79% and 87%, respectively.[3]   As for the overall

24  statewide prison staff vaccination rate, CCHCS data as of August 20, just before the

---

[3]   It is unfortunate that Defendants question the efficacy of the CDPH staff vaccine mandate just weeks after having vigorously defended it from challenge by the very staff whose safety it in part is designed to protect.  *See* Order Denying Plaintiff's Request for Preliminary Injunction, Nov. 5, 2021, *Robert Davis, Jr., et al. v. California Department of Public Health, et al.*, No. BCV-21-102318 (Kern County Sup. Ct.).

18090511.3

1    mandate was implemented, showed that 54% of CDCR prison staff had received at least

2    one dose of vaccine.  As of December 3, CCHCS reports that 67% had received a dose.

3         Having required vaccination for certain staff, CDCR and CCHCS must take prompt

4    disciplinary action against those who fail to comply and have neither an exemption request

5    pending nor granted.  Frustratingly, we cannot say whether that is being done. As

6    explained by Defendants below, data about who is not vaccinated or exempt is apparently

7    inaccurate.  Further, and partly related to the data problem, we have yet to receive

8    complete and reliable information about how many total staff at each prison are required to

9    be vaccinated, the number of those currently unvaccinated who have neither a granted or

10   pending exemption request, and the disciplinary action, if any, initiated against those staff.

11        Further complicating our understanding is the lack of information to date regarding

12   contractor staff, who must comply with the CDPH mandate but, as we understand it,

13   cannot be disciplined for failing to comply by either CDCR or CCHCS.  Contractors

14   constitute a substantial percentage of staff who work in the prisons.  At CHCF and CMF,

15   the two prisons at which the CDPH mandate applies to all staff, contractors constitute 17%

16   and 26% of staff, respectively.  Those contractors also have relatively low rates of

17   vaccination, according to CCHCS data: 61% at CHCF and 27% at CMF.

18        CCHCS and CDCR must promptly provide full and accurate reporting of staff

19   vaccination data, including in particular as it relates to those subject to the CDPH mandate,

20   and full and accurate reporting regarding efforts to progressively discipline or otherwise

21   take action regarding those to whom the mandate applies who remain unvaccinated and

22   have neither an exemption granted or a such a request pending, including contractor staff.

23        *Defendants' Position:*  Defendants first reported in the Supplemental Declaration of

24   Connie Gipson in Support of Defendants' Reply for Motion to Stay Order Re: Mandatory

25   COVID-19 Vaccinations that her staff "at CHCF and CMF have discovered that CCHCS's

26   vaccine registry showed some correctional officers as noncompliant even though they had

27   actually been vaccinated."  ECF No. 3741-1 at 2:20-22.  After her staff meticulously

28

-6-                                                        Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

combed through the list of allegedly noncompliant staff at those institutions, the percentage of noncompliant staff dropped from 10.14% to 2% at CMF and from 8.26% to 5.2% at CHCF.  *Id.* at 2:22-27.    Thus, the extent to which the CDPH order increased the staff vaccination rate at these two institutions is still being assessed.  But to the extent that the CDPH order is succeeding in increasing staff vaccination rates, it would further confirm that Defendants' targeted efforts are working.

CDCR has continued to investigate the issue and believes there is a potentially serious issue with the source data for the vaccine registry that may be inflating the denominator and the purported number of unvaccinated staff for at least some prisons.  For instance, it appears that staff who do not work at a particular prison are sometimes being counted in the denominator for that prison, certain unvaccinated staff are counted multiple times, and some vaccinated staff are showing up in the registry as unvaccinated.  Officials have also discovered that in some cases, visitors who were tested months ago at a particular prison are included in the staff denominator for the prison they visited, even though they are not employed at the prison.  Indeed, when CMF and CHCF dedicated staff to look into this issue, they discovered that many letters of instruction were mistakenly issued to vaccinated staff.  For example, 143 Letters of Instruction (LOIs) were issued at CHCF on or about October 15, 2021 to healthcare staff who presented as unvaccinated and out of compliance with the October 14, 2021 deadline set forth by the August 19, 2021 CDPH order.  After receiving letters of instruction, numerous staff provided proof of vaccination that had not previously been captured by Employee Health and Safety, others obtained a religious or medical exemption, and a number of other staff were determined to be out on long-term leave and thus not currently subject to the mandate.  As a result, approximately 69 of the 143 letters of instruction were rescinded.  Similarly, an initial list from CCHCS showed 207 custody staff were noncompliant at CHCF.  But when corrections to the data were made, including accounting for staff who had been vaccinated, had obtained an exemption, or left the institution, the list dwindled to only 15

18090511.3

1   noncompliant staff, which means that only 15 staff were unvaccinated and had not

2   requested a medical or religious exemption.  Letters of instruction were issued to 3 staff

3   members; 3 additional staff are mid-compliance (meaning, they have had one of two shots[4]

4   and are awaiting their third); and 9 letters are pending service (these staff members work

5   an irregular schedule (3-7 times per month) and will be served when they are onsite).[5]  At

6   CMF, the same analysis was performed for custody staff and CDCR discovered that, in

7   fact, all staff who had not left that institution had either been vaccinated or obtained an

8   exemption and thus were compliant.  It is unclear how long CCHCS's reports have been

9   understating the number of vaccinated staff and whether the problems extend back to

10   August 2021 or even before.

11       CDCR is working with CCHCS on an expedited basis to determine the cause of the

12   data errors, the extent of the errors (including whether it is system-wide and to what

13   degree), and what can be done to correct the errors.  All parties have an interest in

14   resolving this issue as soon as possible.  Defense counsel met and conferred with

15   Plaintiffs' counsel on December 6, 2021 to apprise them of this development.

16       Plaintiffs demand that they immediately be provided with a "full and accurate

17   reporting" of staff vaccination data and the number of those subject to discipline appears to

18   be based on a misunderstanding of what the data reflects.  This information is not a static

19   data point, as Plaintiffs seem to believe.  Aside from staff who are, on an ongoing basis,

20   transferred into and out of certain positions and institutions that are subject to the CDPH

21   order, staff also continue to provide evidence of vaccination or have a pending request for

22   religious accommodation or medical exemption.  Moreover, Plaintiffs' suggestion that they

23   have not received data on these subjects is misleading.  For instance, on December 9,

24   2021, Plaintiffs received information pertaining to their request for the number of staff

25

26   [4] One staff member recently transferred to CHCF and two others recently returned from
     long-term sick leave.

27   [5] These numbers are intended as a point-in-time illustration; compliance numbers fluctuate

28   as staff are transferred into and out of institutions.

statewide, and at each institution, who are subject to the CDPH order; how many are vaccinated or unvaccinated; of the unvaccinated, how many (statewide and at each institution) requested a religious or medical exemption, and how many of those exemptions have been granted, denied or are pending.  CCHCS's December 9, 2021 response to Plaintiffs also advised that "the California Department of Corrections and Rehabilitation (CDCR) and CCHCS are beginning a process to perform manual review of vaccination data at each institution to improve the accuracy of the vaccination data (e.g., excluding inactive staff in reports), ensuring vaccination records are correctly incorporated for vaccinated staff."

## II.    STAFF TESTING AND MASKING REQUIREMENTS

*Plaintiffs' Position:* While mandatory vaccination for all prison staff is necessary to reduce the substantial risk of harm to incarcerated people from COVID, the granting of a stay of the order requiring such vaccinations underscores the importance of other measures adopted by Defendants to reduce the risk of harm.  In particular, requiring unvaccinated staff to COVID test twice-weekly and wear a N95 mask while at work are crucial measures to stop the spread of COVID-19.  Indeed, Defendants have insisted that these are reasonable measures that obviate the need for mandated vaccinations for staff.  *See, e.g.*, ECF No. 3715-1 at 15:9-10 ("Workers who cannot show proof of vaccination must be tested for COVID-19 twice per week").

However, information recently provided by CDCR shows that large percentages of staff required to be tested twice weekly are not doing so, and that most of those workers face no consequences.  Attached hereto as Exhibit A is a document provided on November 30, showing, per the document's title and column headings, the percentage of CDCR custody and nursing staff who were compliant with COVID testing requirements statewide and at each prison in recent weeks.  The number of these staff who are required to test twice-weekly is approximately 10,000.  Statewide, the compliance rates were 69% (week ending October 24), 68% (week ending October 31, 77% (week ending November 7), and

61% (week ending November 14, the most recent week reported).  In other words, the data indicates that statewide in recent weeks approximately 20% to 40% of staff who were supposed to COVID test twice did not do so.  Further, the rates at some prisons were substantially below the statewide averages, indicating that even larger percentages of staff did not comply with the testing requirement at those prisons.  In sum, the table indicates that each week between approximately 2,000 to 4,000 staff statewide were required to but did not comply with twice-weekly COVID testing.

However, although thousands did not COVID test as required, CDCR between October 28 and November 24 issued progressive discipline against fewer than 20 staff members for failing to test.  *See* CDCR Non-Compliance Tracking Log – 10/28/2021 to 11/24/2021, attached hereto as Exhibit B.  The lack of enforcement of the COVID testing requirement via progressive discipline is deeply concerning, as it puts incarcerated persons at risk of infection from unvaccinated staff who may be COVID positive.  Defendants must promptly establish means to identify staff required to COVID test twice weekly, and couple that with a process that immediately identifies those who do not comply, disciplines them for that non-compliance, and bars them from prison grounds until they do.

*Defendants' Position:*  Defendants agree that adherence to masking and testing policies is an important part of a multilayered response to the COVID-19 pandemic. Defendants continue to enforce a mask mandate for all staff, and require unvaccinated workers to wear N95 masks and submit to twice-weekly testing[6]—twice the frequency required by the July 26, 2021 CDPH directive.  *See* Office Gov. Gavin Newsom, *California Implements First-in-the-Nation Measures to Encourage State Employees and Health Care Workers to Get Vaccinated* (Jul. 26, 2021) https://www.gov.ca.gov/2021/07/26/california-implements-first-in-the-nation-measures-to-

---

[6] CDCR and CCHCS must certify their vaccination status with their supervisors so that the supervisors will know what type of mask each person should be wearing.  Supervisors are tasked with ensuring all unvaccinated staff wear N95 masks, and wear them properly throughout their shifts.

18090511.3

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  encourage-state-employees-and-health-care-workers-to-get-vaccinated/ (requiring weekly
2  COVID-19 testing).

3  However, Plaintiffs mischaracterize Defendants' position by suggesting they
4  "insist" any single measure "obviates" the need for a staff mandate.  Defendants'
5  consistent position has been that their comprehensive COVID-19 response far exceeds the
6  requirements of the Eighth Amendment, and therefore a court-ordered staff vaccination
7  mandate would run afoul of the Prison Litigation Reform Act's (PLRA) restrictions on
8  prospective relief.  *See, e.g.*, ECF Nos. 3660 & 3673.  Defendants continue to encourage
9  staff and the incarcerated population to accept the vaccine in the largest possible numbers.
10 *Id*.

11 Based on the data discrepancy discussed in the COVID-19 Vaccine section above,
12 the data illustrating who is subject to twice-weekly testing is likely unreliable, partly
13 because fully-vaccinated staff who are not subject to the testing requirement may show as
14 noncompliant with testing.  As discussed above, CDCR and CCHCS are working together
15 to address this issue on an urgent basis.  CDCR intends to verify staff testing and discipline
16 data after resolving issues identified with vaccination data.

17 **III.    VENTILATION**

18 *Plaintiffs' Position:* Those who live and work in CDCR housing units face
19 significant risk of airborne transmission of COVID-19.  *See* ECF No. 3717 at 7:20 – 8:13.
20 In an effort to mitigate this risk, Defendants installed MERV-13 filters in housing unit Air
21 Handling Units (AHUs), where possible.  They also inspected and evaluated AHUs and
22 ventilation systems, the results of which showed a substantial need for repair or
23 replacement in many prisons.  *Id*. at 8:14 – 9:20. At the October 28 Case Management
24 Conference, Defendants agreed that housing unit ventilation improvements are an
25 important component of COVID-19 mitigation measures, and the Court expressed its
26 desire that they present a clear schedule for determining the heating and air conditioning
27 systems that are not properly functioning and repairing those that are not.

28

18090511.3

1    With regard to installation of MERV-13 filters, Defendants report below that all

2    AHUs which can accommodate such filters have had them installed.

3    With regard to a schedule for repairs, Defendants report below that two rounds of

4    re-inspections and possibly repairs (no specifics are provided) resulted in a reduction of

5    AHUs not performing below 90% of design specifications from nearly 500 (in August) to,

6    150, spread across ten prisons, as of December 6 (*see* Exhibit C).  We only learned of this

7    great reduction in the number of AHUs in need of repair on December 11, when

8    Defendants provided a draft of this Statement which included that information, and we

9    plan to ask for further information.  For example, documents previously provided by

10   CDCR indicated that AHUs in nearly three dozen large housing units at Avenal State

11   Prison had "outlived their lifespan" and that staff are "constantly making repairs and

12   tweaks to these units in any attempt to squeeze every minute of operation possible."  But

13   now, CDCR says no AHUs at that prison need replacement or repair.

14   Defendants on December 6 also provided a repair schedule (*see* Exhibit C) for the

15   AHUs that need repairs, with "estimated" completion dates between January and April

16   2022.  Obviously, repairs will not be done at these ten prisons before winter, a crucial

17   misstep given the role of AHUs in recirculating housing unit air in cold weather months.

18   *See* ECF No. 3717 at 7:26 – 8:1.

19   Further, while improved filtration and repaired AHUs are important, housing unit

20   ventilation systems have other components which also must work adequately.  *See* ECF

21   No. 3717 at 8:4-14 (describing March 2021 CalPROTECT report citing among other

22   things inoperative exhausts and unintended pressurizations leading to potential infection

23   scenarios).  In that regard, we understand that CDCR's ventilation system inspections this

24   past summer  identified many problems with components other than AHUs, such as ducts

25   and exhaust fans.  Defendants must address these problems as well.

26   In addition, we look forward to CalPROTECT's report, said to be coming at the end

27   of this year, of its inspection of 11 other prisons earlier this year, which we hope will

28

18090511.3

provide further information on the risk of harm from COVID resulting from ventilation systems.  Finally, we continue to believe that CDCR must not only repair its ventilation systems, but assess whether residents are safe from airborne spread of COVID-19 at current population levels (and, if not, what population each housing unit could safely support), so that it can be better prepared in the event of a vaccine-evading variant or emergence of a similar airborne disease.  *See* ECF Nos. 3717 at 10:6-10 and 3592 at 15-17.

*Defendants' Position:*

In addition to the previously reported air-filtration upgrades throughout the prison system, CDCR has made significant progress on repairs to housing-ventilation units and now provides a schedule for the completion of that work.

In the last Case Management Statement, Defendants reported that 29 housing units were still awaiting replacement MERV-13 filters.  It was later determined that one of those housing units does not recirculate air and therefore does not need a MERV-13 filter, and another of those housing units is unable to use a MERV-13 filter.  The filter replacement for the remaining 27 housing units is complete.

As of late August 2021, CDCR had identified 490 air-handling units that were performing below 90% of design specifications.  As identified in the last Case Management Conference Statement, the Facility Planning, Construction, and Management Division began performing prison site visits in September 2021 to review the procedures followed by plant-operations staff in performing the original airflow measurements and to review repair procedures and priorities.  As a result of those site visits and additional actions by plant-operations staff, 94 air-handling units that had previously measured below 90% of design specifications were repaired and are now operating at 90% or better of design specifications.

On November 12, 2021, the prisons with the remaining 396 air-handling units performing below 90% of design specifications were directed to perform another round of inspection, part replacement (as needed), and repairs, and then to re-measure the airflow.

1  This round of inspections and repairs was completed on December 6, 2021, and now only

2  150 air-handling units at ten institutions are performing below 90% of design

3  specifications.  These ten prisons have developed schedules for additional repair or

4  replacement activities, with expected completion dates ranging from January through April

5  2022.

6  Attached as Exhibit C is a chart listing for each prison the air-handling units now

7  performing at 90% or better of design specifications, the air-handling units performing

8  below 90% of design specifications, and a schedule for completion of the outstanding

9  maintenance and repairs.

10 **IV.   IMPACT OF COVID-19 ON MEDICAL CARE SERVICES**

11 *Plaintiffs' Position:* Unfortunately, COVID continues to adversely impact medical

12 services.  For example, there continue to be delays in specialty services for many patients;

13 there were as of October 27 more than 8,500 overdue specialty service appointments,

14 according to CCHCS-provided data.  This total is essentially the same as reported in July,

15 and only approximately 500 fewer than reported in May.  *See* ECF No. 3623 at 13:12-13.

16 Further, CCHCS data shows that as of October 27, there were 913 backlogged

17 (overdue) ultrasound exams for end stage liver disease patients.  This total is greater than

18 the number overdue reported in July, and not materially different than the backlogged total

19 report in May.  *Id*. at 13:16-17.  As previously explained, these exams are a key cancer

20 screening procedure, and the failure to timely provide them has been identified as a key

21 factor in a number of possibly preventable deaths.  *See* ECF No. 3605 at 13, n. 5.

22 CCHCS has also recently said that COVID has had a significant impact on the

23 providing of group counseling to patients diagnosed with substance use disorder who are a

24 part of the Integrated Substance Use Disorder Treatment (ISUDT) Program (this program

25 is discussed in more detail below).  CCHCS says the virus has required reducing the size

26 of groups, limited the mixing of patients from different housing units, and limited the

27 ability to obtain the counselors who facilitate the group – all of which contributes to the

28

1  fact that most ISUDT patients are not yet even offered groups.  It also said on December 1

2  that nearly 10% of those who are assigned to groups cannot attend because of COVID

3  quarantine restrictions.

4        *Defendants' Position:* Defendants will continue to work with the Receiver and

5  CCHCS to ensure the delivery of medical care services to patients to the full extent

6  possible during the COVID pandemic.  More recent data provided by CCHCS indicates

7  that quarantines are preventing less than 10% of patients from attending ISUDT groups.  In

8  fact, a December 3 report from CCHCS indicates that quarantines only prevented about

9  2.7% of patients from attending those groups.

10 **V.      INTEGRATED SUBSTANCE USE DISORDER TREATMENT (ISUDT)**

11       *Plaintiffs' Position*: We continue to appreciate CCHCS's and CDCR's efforts to

12 increase the number of ISUDT patients, including those receiving Medication Assisted

13 Treatment (MAT).  As of December 14, there were approximately 13,800 patients

14 receiving MAT, per the CCHCS public ISUDT Dashboard.[7]  Another approximately 3,200

15 are likely to be added to that total by July 2022, given the number currently pending initial

16 appointments and the rate at which such patients are being seen, as indicated in monthly

17 data provided by CCHCS.  In addition, approximately 40,000 incarcerated people await

18 screening to determine if ISUDT services are necessary; it is anticipated a quarter to one-

19 third will need those services.

20       Almost all CCHCS primary care providers (PCPs) have the federal "x-waiver"

21 necessary to prescribe MAT, though only approximately 50% are currently actively

22 managing such patients.  In addition to increasing the number of PCPs who manage MAT

23 patients, CCHCS is working to increase nursing staff so that it can adequately provide

24 MAT.  It is also working to increase resources so that more patients can receive necessary

25 cognitive behavioral intervention (only about 40% of patients currently receive group

26 counseling, an integral part of the program).  We are hopeful the Governor and Legislature

27

28 ───────────────
   [7]   See https://cchcs.ca.gov/isudt/dashboard/.

18090511.3          JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   will provide additional funding so that so that necessary care can be adequately provided to

2   all substance use disorder patients who need it.

3         We also followed up with CCHCS about the information in the Receiver's most

4   recent Triennial Report indicating that in recent months approximately 40% of MAT-

5   prescribed patients were not been linked to a community-based medication source upon

6   release (*see* ECF Nos. 3668 at 12 and 3717 at 16:5-12).  CCHCS staff said the Receiver's

7   reported data was incorrect due to documentation errors, and that only 12% of released

8   patients were not linked to a community provider.  CCHCS said it was training staff to

9   correctly document this information, and making efforts to further increase the percentage

10   of patients linked to community services.  We will continue to monitor these efforts.

11   Again, we appreciate the work being done to provide incarcerated people with necessary

12   ISUDT.  It saves lives, and changes many for the better.

13         *Defendants' Position:*  Defendants join Plaintiffs in applauding the success and

14   importance of the ISUDT and MAT programs, and agree with Plaintiffs' above summary

15   of a December 1, 2021 meeting with ISUDT staff.  Defendants look forward to continued

16   collaboration with their CCHCS partners to expand its reach and effectiveness within the

17   incarcerated population.

18   **VI.     INDIVIDUAL PRISON CONCERNS**

19         **A.     California State Prison, Los Angeles County (LAC)**

20   *Plaintiffs' Position:* We recently asked CCHCS about three matters related to medical

21   services at LAC.  First, the prison has a huge backlog of overdue Primary Care Provider

22   (PCP) appointments.  The number of overdue PCP appointments at LAC, and the rate of

23   such appointments per 100 patients, have grown substantially in recent months.  In June,

24   according to CCHCS data, there were 475 backlogged PCP appointments at the prison, and

25   the number has been rising ever since.  The most recent data provided by CCHCS shows

26   1,997 overdue PCP appointments as of October 15 at LAC, with 1,300 of those overdue

27   for more than 30 days.  These are by far the largest such numbers among the prisons.

28

1  LAC's reported rate of 71.0 overdue PCP appointments per 100 patients is nearly 15 times

2  higher than the statewide average, and its number of overdue appointments older than 30

3  days is greater than that number at all other prisons combined.

4  When asked in September about overdue provider appointments at the prison,

5  CCHCS in October said LAC had experienced a significant shortage of providers.

6  CCHCS data for the last six months, however, shows that LAC always reported that at

7  least 90% of its established staff PCP positions were filled when telemedicine and registry

8  staff were taken into account, and CCHCS, in its color-coded reports, has for each such

9  month indicated that the provider fill rate at the prison was adequate (in the green

10  zone).  Given this, on November 16, we asked further about the shortage and the

11  appointments backlog.

12  We also on November 16 asked about the lack of stable medical clinic managers at

13  LAC, a problem that has persisted for years.  Between mid-2017 and January, 2019, LAC

14  had six different Chief Medical Executives (CMEs), including those acting in that position,

15  and had experienced a similar turn-over among Chief Physicians.  In the most recent

16  approximately two and one-half years, the prison has not had a permanent (CME); the

17  position has been vacant, sometimes for months at a time, or filled by a person in an acting

18  capacity.

19  On December 2, we asked CCCHS about the persistent problem of untimely

20  responses by LAC to patients' healthcare grievances. We first asked about this in April,

21  based on data showing that only 43% of such grievances were timely answered in

22  February.  In May, CCHCS said the prison "anticipates the backlog will be resolved within

23  two months."  However, the rate of timely responses has not markedly improved, with the

24  most recent data provided, covering the months of September and October, showing that

25  barely one-half of grievances were timely answered.  LAC is the only prison in the state

26  with such persistently poor performance regarding timely responses to healthcare

27  grievances.

28

1    *Defendants' Position:*  Defendants will continue to collaborate with the Receiver

2   and CCHCS as they work to address the backlogs of PCP appointments and responses to

3   healthcare grievances at LAC.

4       **B.      Substance Abuse Treatment Facility and State Prison, Corcoran (SATF)**

5       *Plaintiffs' Position:*  Defendants accurately describe below the recent actions of the

6   *Armstrong* court, that court's expert, and other matters related to staff misconduct at

7   SATF, which we discussed in the October 26 Case Management Conference Statement

8   (*see* ECF No. 3717 at 17:25 – 19:18).  While we appreciate that upon further review,

9   twenty of the sixty-one Rule Violation Reports (RVRs) issued by medical staff were

10  voided, we are concerned that these RVRs were approved by both the regular RVR review

11  process at SATF, as well as the SATF CEO's review done in response to concerns we

12  raised after our August 2021 site visit.  (*See* ECF No. 3717 at 19:21-21 ("The SATF CEO

13  reviewed the 61 RVR's referenced by Plaintiffs and determined that all were appropriate

14  and none should be rescinded.").)  The voiding of these RVRs happened only after

15  inquiries made by Plaintiffs' counsel in both *Armstrong* and *Plata*, and only after the

16  involvement of the court expert in *Armstrong*.  We believe the issuing of RVRs by medical

17  staff represents a larger issue at SATF of a staff culture of disrespect towards patients.

18  While the work in *Armstrong* on this matter is critical, and we will continue to coordinate

19  with our *Armstrong* colleagues to address these problems, the problems with medical staff

20  at SATF must also be addressed in *Plata*.  We plan to continue our discussions with the

21  Receiver and CCHCS regarding how to implement reforms going forward.

22      *Defendants' Position:* On November 8, 2021, the *Armstrong* court issued an order

23  citing the parties' last Joint Case Management Conference Statement filed on October 26,

24  2021 in this case and referencing the parties' statements regarding RVRs issued at SATF.

25  *Armstrong v. Newsom*, U.S. Dist. Court for the Northern Dist. of California, Case No. 94-

26  cv-2307 CW, ECF No. 3338 (Nov. 8, 2021).  The *Armstrong* court's November 8, 2021

27  order requires the *Armstrong* "Court Expert to investigate and report to the Court on the

28  issues raised by Plaintiffs' counsel in the above-referenced case management statements."

18090511.3

1  *Id.* at 3:14-16.  The order permits the *Armstrong* Court Expert to interview staff and

2  request "whatever information he deems necessary."  *Id.* at 3:16-19.  The order requires

3  coordination with the Receiver in this case and the *Coleman* Special Master.  *Id.* at 3:22-

4  25.  At the conclusion of his investigation, the Court Expert will file a written report with

5  the *Armstrong* court with any appropriate recommendations.  *Id.* at 3:26-27.  Defendants

6  defer further discussion of this topic pending conclusion of the *Armstrong* Court Expert's

7  investigation.  However, Defendants did recently inform Plaintiffs that twenty of the sixty-

8  one RVRs were voided in the interest of justice following a recent meeting between health

9  care and custody leadership at SATF.

10          **C.        California Health Care Facility (CHCF)**

11          *Plaintiffs' Position*: Defendants recently informed the Court that due to a "new

12  approach" by the Federal Centers for Medicare & Medicaid Services, the CDCR's medical

13  parole process is now restricted to people on ventilators.  *See* ECF Nos. 3704-1 at 7-8 and

14  3747-2 at 5-6.  Defendants further indicated that people previously granted medical parole

15  and placed in community skilled nursing facilities, are expected to be returned to CDCR

16  prisons unless they are on a ventilator.  *See* ECF No. 3747-2 at 5-6.  On November 9, the

17  Receiver's counsel told us the Receiver had concluded that 70 medical parolees will soon

18  be forced to return to CDCR prisons.  That same date, we asked for further information

19  about this, including the names of the patients who will be returned to prison, and we are

20  awaiting a response.  Among other things, we are concerned about the potential impact on

21  medical and particularly nursing services in the prisons if dozens of patients who require

22  substantial and in some cases total care, including with activities of daily living, are

23  returned to prison.  In this regard, we believe CHCF, the prison primary site of CDCR

24  Correctional Treatment Center (CTC) beds, will be most impacted.

25          *Defendants' Position:*  As Plaintiffs note, Defendants recently advised the Court

26  and the parties of a change in federal regulations affecting CDCR's medical parole

27  process.  *See* ECF No. 3747, Ex. B at 5-6 & Attachment A.  Defendants will continue to

28

1   apprise the Court and parties of updates regarding the program in the regular Three Judge

2   Panel status reports.

3      **D.      Wasco State Prison (WSP)**

4      *Plaintiffs' Position:*  In the October 26 Case Management Statement, we explained

5   that on October 13 we told Defendants that WSP was showering people with disabilities

6   and not known to have or to have been exposed to COVID in units housing people with

7   active COVID or are on quarantine because they possibly had COVID.[8]  *See* ECF No.

8   3717 at 12:15 – 13:5.  Defendants below report that training was done and a procedure

9   issued that are designed to stop that practice.  Those actions were necessary.  It is telling

10  that this practice, which violated fundamental public health COVID prevention tenets, was

11  neither identified nor corrected until we brought it to Defendants' attention.

12     *Defendants' Position:*  On October 26, 2021, Defendants reported remedial

13  measures implemented at WSP to ensure that wheelchair-using patients not on quarantine

14  or isolation have access to wheelchair-accessible showers in housing units not used for

15  quarantine or isolation.  ECF No. 3717 at 13:6-15:3. [9]  Further to that update, all Facility B

16  and Receiving and Release staff were provided on-the-job training regarding the procedure

17  described in the previous statement.  *Id.*  That procedure has been formalized in a

18  memorandum WSP issued to all staff on November 2, 2021.

19  / / /

20

21  _____

   [8]     We thank Ben Bien-Kahn of Rosen, Bien, Galvan and Grunfeld, L.L.P. for

22  promptly bringing this dangerous practice at WSP to our attention after he was told about

   it during interviews of incarcerated people done as class counsel in *Armstrong, et al. v.*

23  *Newsom, et al* (N.D. Cal. No. 94-cv-02307 CW).

   [9] As previously reported in the October 26, 2021 case management conference statement,

24  WSP issued direction that all newly-arriving intermittent wheelchair users (DPO) and

   permanent wheelchair users (DPW) are to be housed in a housing unit with ADA-

25  accessible showers not being used for quarantine or isolation.  These patients remain in

   this housing unit for the duration of the fourteen-day post-intake precautionary quarantine

26  period.  After this fourteen-day period, dorm-eligible patients are moved to dorms, and

   patients who are not dorm-eligible and require a wheelchair-accessible cell remain in that

27  housing unit pending transfer.

28

## VII.   DELEGATIONS

The Receiver has previously delegated authority for medical care back to Defendants at 19 prisons.  On October 29, the Court issued an Amended Receivership Transition Order, and in an accompanying order stated that the Receiver is developing a new model for evaluating when it is appropriate to delegate medical care at an individual prison, and had strengthened the internal expertise of CCHCS to assist with the evaluation process. The Court also stated the Receiver's evaluations need not be tied to the release of an Office of Inspector General report on a particular prison.  *See* ECF Nos. 3278 and 3279.

On November 29, the Receiver informed the parties he was scheduling a meet-and-confer in late January regarding the delegation of medical care at the California Rehabilitation Center (CRC), and provided his draft assessment of medical care at that prison.   On December 7, 2021, the Receiver scheduled these meet-and-confers as follows: CRC, January 25, 2022; Richard J. Donovan Correctional Facility (RJD), February 24, 2022; Wasco State Prison (WSP), March 29, 2022; and California State Prison – Solano (SOL), April 26, 2022.

*Plaintiffs' position*:  The Receiver's draft assessment of care at CRC appears to reflect the new model for evaluating the appropriateness of care the Court mentioned in its October Order.  On December 2, we asked the Receiver questions about the assessment so that we can adequately understand the new model and the resulting conclusions regarding care.  These questions, among other things, concerned the "qualified, independent physician" who conducted approximately 20 qualitative chart reviews used in the assessment, the identities of the patients whose care was reviewed, whether a nursing expert was used, and why care related to a number of major medical delivery system components was not reviewed after April 2021.  On December 6, the Receiver's counsel provided answers to some of the questions, and indicated that responses to the others would be forthcoming.  We appreciate the Receiver's help, so that we can adequately consider the assessment and understand the new evaluation process. We will provide the

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   Receiver any relevant information regarding CRC before or at the meet-and-confer.

2       *Defendants' Position:*  The receivership last delegated authority over medical care

3   services to CDCR at California State Prison – Corcoran in October 2018.  Defendants look

4   forward to resuming the delegation meet-and-confer process.

5

6

7   DATED:  December 14, 2021                HANSON BRIDGETT LLP

8

9

                                     By:  */s/ Samantha Wolff*
10                                        _____
                                          PAUL B. MELLO
11                                        SAMANTHA D. WOLFF
                                          LAUREL O'CONNOR
12                                        DAVID C. CASARRUBIAS
                                          Attorneys for Defendants
13

14  DATED:  December 14, 2021                ROB BONTA
                                             Attorney General of California
15

16

17                                   By:  */s/ Damon McClain*
                                          _____
18                                        DAMON MCCLAIN
                                          Supervising Deputy Attorney General
19                                        IRAM HASAN
                                          Deputy Attorneys General
20                                        Attorneys for Defendants

21

22

23

24

25

26

27

28

18090511.3      JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1

DATED:  December 14, 2021                    PRISON LAW OFFICE

2

3
                                        By:  */s/ Steven Fama*
4                                            DONALD SPECTER
                                             STEVEN FAMA
5                                            ALISON HARDY
                                             SARA NORMAN
6                                            RITA LOMIO
                                             RANA ANABTAWI
7                                            SOPHIE HART
                                             LAURA BIXBY
8                                            Attorneys for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18090511.3

JOINT CASE MANAGEMENT CONFERENCE STATEMENT