ROB BONTA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
DAMON MCCLAIN - 209508
Supervising Deputy Attorney General
IRAM HASAN - 320802
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-58443
Iram.Hasan@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF - 240280
DAVID CASARRUBIAS - 321994
CARSON NIELLO - 329970
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER - 83925
STEVEN FAMA - 99641
ALISON HARDY - 135966
SARA NORMAN - 189536
RITA LOMIO - 254501
RANA ANABTAWI - 267073
SOPHIE HART - 321663
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Judge:  Hon. Jon S. Tigar<br>Date:    November 7, 2022<br>Time:    2:00 p.m.<br>Crtrm.:  6, 2nd Floor |

The parties submit the following joint statement in advance of the November 7, 2022 Case Management Conference.

## I. COVID-19

*Plaintiffs' Position:*  In recent months, CCHCS and CDCR have relaxed certain COVID risk reduction measures as the number of reported cases among residents, staff, and local communities has fallen to some of the lowest levels since early summer 2021.[1] For example, while face-coverings remain required in all medical settings, they are not required for residents if there is no COVID outbreak in their facility and local county transmission is rated as low.  We generally support these changes.

The lesser number of identified cases among those in the prisons has also resulted in fewer people on quarantine due to exposure to an active case.[2]  As of October 25, CCHCS data shows approximately 2,000 on such quarantine statewide.  CCHCS has undertaken a test-to-program project that, if staffing is available, allows people on exposure quarantine to partake in certain activities, such as visiting, if they test negative.  We support this project.

---

[1]      Serious and sometimes tragic consequences from COVID infection still occur. CCHCS reports 23 hospitalizations for COVID among approximately 13,000 identified cases in the last six months, compared to 30 hospitalizations among approximately 24,000 cases in first four months of this year.  In the last two months, one COVID-infected CDCR resident required multiple weeks in an ICU, intubated, and has now been placed in a long-term acute care hospital.  On October 25, CCHCS reported that the most recent death attributable to COVID occurred in May.  CCHCS a few days later provided notification of a patient death after October 25, for which the preliminary cause was said to be "probable viral pneumonia, secondary to COVID-19."

[2]      We continue to monitor conditions of those in quarantine.  For example, on August 23, we informed CDCR and CCHCS that outdoor exercise was not being offered to those quarantined in High Desert State Prison's administrative segregation Z-unit, meaning they were essentially locked in their cells all day.  After we did so, class members reported that they began to be offered outdoor exercise.  CDCR and CCHCS recently confirmed that for a 10 day period starting in mid-August outdoor exercise was not offered to those on quarantine in Z-unit, due to erroneous direction given by a registered nurse to custody staff.  They said the practice stopped on August 26, that staff received training, and that supervisors now monitor quarantined patients in the unit daily.

19007818.11

1

## A.     Vaccine/Booster

The COVID vaccine bivalent booster, designed to be effective against the original and Omicron variants, was authorized on September 1, and was recommended for, among others, all adults not currently ill with COVID or with a recent (90 day) history of infection.  CCHCS reports it initially focused on residents at highest risk of severe consequences if infected (a COVID Risk Score of 3 or above, which includes all age 65 or older), with the goal of offering the booster to all such persons by October 31.  CCHCS says it is very pleased with its efforts in this regard, as well as the booster acceptance rate, and we are too, based on the reported data.[3]

On October 24, CCHCS's Director told us that there had not been problems with supplies of the bivalent booster, that anyone can ask for it and all will be offered it, but declined to provide a date regarding when the latter will be done.  The Director also said that educational material was provided to the prisons, who were asked to distribute it to those who come to the medical clinics.  The lack of an educational campaign directed to all residents, not just those who happen to come to the medical clinics, involving for example video presentations (on the prisons' closed-circuit TVs), incarcerated  persons' advisory committee outreach, and peer educators, seems to us a major opportunity lost.  The unwillingness to establish a goal for offering the booster to the incarcerated population as a whole is also disappointing.  A deadline was set for those at the highest risk—and it worked.[4]

_____

[3]      As of November 2, the CCHCS COVID-19 Patient Vaccination Registry showed that 93% of the nearly 15,900 with a COVID Risk Score of 3 or above who required the bivalent booster had been offered it, with approximately 69% of those offered accepting it.  Overall, of the approximately 75,500 residents eligible for the bivalent booster, approximately 50% had been offered it; of those offered, 56% accepted.  On October 24, the CCHCS Director said that staff had been directed to offer patients the current influenza vaccination simultaneously with the bivalent booster.

[4]      Defendants below describe our concerns as indicating "distrust" of CCHCS's efforts.  This is not a question of whether we believe CCHCS will do what it has said it will do.  We simply believe additional measures would increase the efficacy of their

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

19007818.11

**B.    Long COVID**

We remain concerned about long COVID.  Recent federal data indicates that approximately 15% of those who have had COVID currently experience long COVID, and 80% of those experience activity limitations because of the disease.[5]

When we discussed long COVID with CCHCS staff on July 25, they agreed to undertake a patient education campaign about the disease, which would include video, posters, and flyers.  We understood the campaign would begin in August.  In response to our query, CCHCS on August 30 provided a draft of a FAQ and a poster for patients about long COVID, and said they anticipated they would be available to CDCR residents in September.  When asked about it on October 24, the CCHCS Director said the materials were being printed and hopefully would be distributed in October.  We are disappointed that the campaign did not begin in August, and with the apparent decision to not directly partner with resident advisory committees and peer educators.

Defendants below report that "CCHCS reports that it has aired long-COVID-related educational videos in the prisons through DRP-TV for more than a year."  We are happy to learn this.

**C.    Ventilation**

We await Defendants' quarterly production of data and information related to preventive maintenance (including filter changes) and repairs of housing unit ventilation systems.  In September CCHCS informed us that it did not recommend installation of portable air filtration units in prison dining halls, including because of the relatively tall ceilings in many of them, or in prison medical clinic patient waiting areas, including because face-coverings are required in those settings and many lack an electrical outlet.

On October 31, Defendants provided third quarter (July through September) data

---

campaign.

[5]  *See* Centers for Disease Control & Prevention, *Long COVID*, https://www.cdc.gov/nchs/covid19/pulse/long-covid.htm (last accessed Oct. 25, 2022) (indicators in drop-down menu of Long COVID data display).

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

regarding: (1) completion of necessary filter changes for housing units Air Handling Units; and (2) housing unit ventilation system repair and maintenance work orders. *See* Ex. A. On November 1, Defendants' counsel provided additional and clarifying information regarding the data. With regard to the filter changes, counsel explained that while the filter change data shows eight prisons with very poor compliance, due to late data entry or subsequent action, five are not in fact concerning. We intend to follow up with Defendants about the remaining three prisons reporting only 46-68% of filters were changed. With regard to the work orders, counsel emphasized that orders opened at the very end of the quarter will appear as "issued" but not "completed," even though the due date for completion has not yet been reached. Nevertheless, we intend to follow up with Defendants about several data points, including the very poor completion rate reported for Priority 1 work orders at California State Prison, Los Angeles County (LAC) (14 issued, only 2 completed).

### D.     The Near Future

It is not known whether or to what degree there will be a cold-weather or other surge of the current dominant COVID variant, or of some other variant, and to what degree current vaccine and boosters, or previous infection, will protect against serious illness and death. CCHCS says it is tracking these matters, and will be ready to revise and recommend revising risk reduction measures if necessary. We agree this is necessary.

### E.     Directives to the Prisons[6]

During its discussion in August regarding the challenges CCHCS experienced having the prisons follow its directives regarding the COVID prophylaxis, the Court indicated an interest in how Headquarters could improve communication and compliance when issuing directives to the 34 prisons. *See* ECF No. 3825 at 29:25-31:20. We agree this is an important issue. When asked about this on October 24, CCHCS's Director said his view was that directives were often received from many different units and that instead

---

[6]     While this issue arises from a COVID-related matter (and is thus discussed here), it applies to all care-related directives.

1  they should (and will in the future) all come from the office of the CCHCS executive in

2  charge of operations.

3       We thought that was a good idea.  On November 1, we were informed that CCHCS

4  would no longer have an executive in charge of operations.  We do not know what this

5  means for CCHCS's plan to address this concern.

6       *Defendants' Position*:

7  **I.     COVID-19**

8       Defendants are pleased that Plaintiffs support the decision by CDCR and CCHCS to

9  relax certain COVID-risk-reduction measures, which has benefited both the incarcerated

10 population and staff at the prisons.  And Defendants join Plaintiffs in supporting CCHCS's

11 test-to-program project.

12      Defendants agree that COVID continues to have tragic consequences.  As of

13 October 26, 2022, the New York Times reported that California has a COVID-

14 hospitalization rate of 5 per 100,000 residents and an average daily COVID-death rate of

15 about 33 residents.  By comparison, on the same date, CDCR had only one COVID-related

16 hospitalization.  And as of the date of this filing, CDCR has had one possible COVID-

17 related patient death in the past five months.  CDCR will accordingly continue to balance

18 an appropriate level of COVID mitigation measures with the need to reduce unnecessary

19 restrictive measures to further the safety and wellbeing of its residents and staff.

20      **A.     Vaccine/Booster**

21      Defendants disagree with Plaintiffs that CCHCS's roll out of the COVID vaccine

22 bivalent booster has been somehow deficient or disappointing.  CCHCS has appropriately

23 focused its initial booster efforts on the portion of the population that is most at risk from a

24 COVID infection with great success and has represented that it will continue its

25 vaccination efforts until everyone has been offered the booster.  Significantly, CCHCS

26 recently reported in a briefing with the parties that patients are factoring their medical risk

27 into their decision to accept a booster dose of the vaccine, indicating to CCHCS that efforts

28

to educate the population on the risks of COVID and the benefits of the vaccine have been successful.  Given CCHCS's outstanding vaccination achievements throughout the pandemic—including achieving a higher vaccinaction rate within the institutions than among California residents—Plaintiffs' distrust of its current efforts is surprising and unwarranted.

### B.    Long COVID

Defendants also disagree with Plaintiffs contention that CCHCS's efforts to educate the incarcerated population about long COVID are inadequate and disappointing based on a two-month delay in the preparation of updated education materials.  Plaintiffs appear to disregard CCHCS and CDCR's impressive efforts to educate patients on COVID safety measures and the risks of contracting the virus since the start of the pandemic.  (*See*, e.g., CMC Statement, April 20, 2020, ECF No. 3294 at 4:6-8.)  Moreover, CCHCS reports that it has aired long-COVID-related educational videos in the prisons through DRP-TV for more than a year including the following: Post-COVID Syndrome: Heart and Lungs (Osmosis); Lessons from Long Haul Lyme & Long Haul COVID I (Johns Hopkins Rheumatology); and Covid-19 Long Haulers: What to Expect From Post COVID Symptoms (Houston Methodist).  CCHCS has reported that its efforts to provide COVID education—including providing updated information regarding long COVID—are ongoing.  And it is noteworthy that Plaintiffs make no allegation that there is a lack of appropriate treatment for patients suffering from long COVID.

### C.    Ventilation

Defendants have provided Plaintiffs with ventilation-maintenance and air-filter-replacement data for last quarter.  The data show that a great deal of ventilation-related maintenance is taking place at the prisons on an ongoing basis.

Importantly, the third-quarter data show that Priority 1 and 3 work orders, which concern actual needed repairs and maintenance for the functioning of equipment, are being prioritized over Priority 2 work orders, which concern preventative maintenance.  All

Priority 1 and 3 work orders are addressed, even if the work must be carried over into the next quarter. They are not closed until the Priority 1 or 3 issue has been resolved. Completion of some of these projects depends on the delivery of needed parts and the schedules of outside contractors, but every one of them will be fully addressed.

The third-quarter data also show that, out of the Priority 2 work orders, the prisons have prioritized completing filter replacements for air-handling units. Overall completion of all Priority 2 orders has risen. Thus, the rate of completion of Priority 2 orders increased significantly from the second to the third quarter across most prisons. And CDCR intends to continue prioritizing ventilation-related maintenance in the coming months.

### D. The Near Future

Defendants agree that it is important for CDCR and CCHCS to closely track infection rates and COVID-related developments through the fall and winter months. CDCR is prepared to change course on COVID-risk-reduction measures if warranted.

### E. Directives to the Prisons

CDCR and CCHCS have established chains of command for communication with the prisons. And CCHCS's recent decision to explore routing communications through a particular division show that it is open to identifying ways to improve communication. Defendants support and are in favor of efforts to evaluate and further streamline CCHCS's communications and directives to the prisons.

## II. MEDICAL APPOINTMENT BACKLOGS

*Plaintiffs' Position:* On October 3, in his 51st Tri-Annual Report, the Receiver stated that preliminary analysis in early August showed that as much as 43% of the provider appointment backlog and 14% of the specialty services backlog was comprised of orders already completed or which otherwise should have been closed (such as for being duplicates). ECF No. 3827 at 10. The Receiver described these orders as "noise" in the system and reported that "focused" efforts were underway to eliminate them. *Id.* We

19007818.11

agree that eliminating—and preventing future build-up of—such "noise" is necessary so that staff can better schedule timely appointments for patients who actually need care.

During a briefing on October 24, CCHCS reported progress in addressing statewide medical appointment backlogs.[7]  CCHCS reported that the backlog of overdue primary care provider (PCP) appointments had decreased from 5,117 appointments overdue as of September 9 to 2,360 as of October 21, and that the backlog of overdue laboratory orders had decreased from 8,347 to 2,871 during that time.  Data provided by CCHCS on October 19 further shows that the total specialty care backlog has also reduced -- from 8,025 appointments overdue as of July 6 to 5,974 appointments as of October 17.

Regarding specialty care, particular progress was made in addressing the significant backlogs for optometry and physical therapy appointments.  According to data provided by CCHCS, the optometry backlog decreased from 2,116 appointments as of July 6 to 1,486 as of October 17, and the physical therapy backlog decreased from 1,096 to 573 during that time.  This progress was achieved in part[8] by increasing the pay rate for registry optometrists and physical therapists in, respectively, late July and early August, which increased the number of such staff in the prisons.[9]  We appreciate CCHCS's attention to this issue and efforts to date to reduce these backlogs.

_____

[7]     We assume a good amount of this progress stems from the focused efforts the Receiver reported were being taken to eliminate already completed duplicate, and otherwise unnecessary orders.

[8]     We agree with Defendants' statement below that there were other causes of the optometry appointment backlog, including the fact that providers ordered a significant number of people to see an optometrist, even though new glasses should have been obtained without an optometry consult, as these patients had current, valid prescriptions.  It is unfortunate this was not done in the first place, and further unfortunate that these cases were not identified until the backlog was investigated—months after the unnecessary appointments were ordered.

[9]     The lack of adequate pay for optometrists compromised patient care for months at some prisons, particularly CHCF, which had no optometrist, we believe because of a lack of competitive pay, from approximately March 1 to a date in August.  Patients who were ordered to see an optometrist in February, March, and April, including for corrective lenses, have only in recent weeks had those appointments.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  Still, significant backlogs remain.  In particular, according to CCHCS data, there

2  has been little progress in addressing the backlogs for orthopedic surgery,[10] transgender

3  care,[11] and neurosurgery.[12]  Anecdotally, we also see that prisons are sometimes unable to

4  timely schedule specialty services done via telemedicine, mainly because the headquarters

5  staff that coordinates telemedicine appointments cannot provide timely appointment dates.

6  There has also been little progress in addressing the overdue ultrasounds for patients

7  with end-stage liver disease: as of July 6, there were 699 overdue; as of October 17, there

8  were 628.  During the October 24 briefing, CCHCS reported it recently determined its

9  vendors have additional capacity, that this had been communicated to the prisons, and that

10 staff have been encouraged to run weekend and/or evening clinics if necessary to address

11 the backlog of overdue ultrasound exams.  We do not know whether there is sufficient

12 custodial staff to support these extra clinics.

13 CCHCS estimated it would take approximately one year to 18 months to work

14 through all backlogs and consistently schedule patients well within required timeframes.

15 We will continue to monitor this issue.

16 *Defendants' Position*: Defendants agree with Plaintiffs that CCHCS has made, and

17 continues to make, significant efforts to reduce the statewide medical appointment

18 backlogs.  As CCHCS reported on October 24, and as reflected in data provided to

19 Plaintiffs on October 17, considerable progress has been made in addressing the following

20 medical appointment backlogs: primary care provider (PCP) appointments, overdue

21 laboratory orders, and specialty care appointments.  From September 9 to October 21, the

22 PCP appointment backlog decreased from 5,117 to 2,360, while the overdue laboratory

23 orders decreased from 8,347 to 2,871.  And from July 6 to October 17, the total specialty

---

24 [10]  According to CCHCS data, there was a backlog of 254 orthopedic surgery
25 appointments overdue as of July 6, and 263 such appointments overdue as of October 17.
   [11]  According to CCHCS data, there was a backlog of 135 appointments for
26 transgender care overdue as of July 6, and 185 such appointments overdue as of October
   17.
27 [12]  According to CCHCS data, there was a backlog of 187 appointments for
28 neurosurgery overdue as of July 6, and 171 such appointments overdue as of October 17.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   care appointment backlog was reduced from 8,025 to 5,974.

2       Defendants agree with Plaintiffs that a portion of the reduction in medical

3   appointment backlogs can be attributed to duplicates or redundancies that remained in the

4   system, on which the Receiver reported in his 51st Tri-Annual Report—e.g., patients that

5   were not checked out following their appointment, appointments that were not bundled, or

6   appointments that remained open after patients were moved to another institution.  But

7   notably, irrespective of the steps taken to reduce duplicate or otherwise unnecessary

8   appointments, a considerable fraction of the reduction in backlogs resulted from the

9   focused, continued efforts by CCHCS staff to see more patients.

10      Defendants also agree with Plaintiffs that particular progress was made in

11  addressing the backlogs for optometry and physical therapy appointments.  From July 6 to

12  October 17, the optometry appointment backlog decreased from 2,116 to 1,486, while the

13  physical therapy appointment backlog decreased from 1,096 to 573.

14      Moreover, the registry rates for optometrists were increased on July 25, 2022,

15  effective across all institutions statewide.  Accounting for committed registry optometrists,

16  Defendants are only one optometrist short of their authorized positions and have on-site

17  optometrists at all 34 institutions.  Defendants continue to work aggressively to ensure

18  sufficient optometry coverage at every institution.

19      Separate and apart from those efforts, Plaintiffs' assertion ignores several other

20  causes of the optometry appointment backlog, including a significant number of

21  appointments that were not appropriate for an optometry visit in the first place.  For

22  example, CCHCS identified a substantial number of patients who were seen by

23  optometrists for new eyeglass frames, even if they had received a pair in the last year and a

24  half, and broken eyeglasses—both of which do not require an optometry appointment.

25      To date, CCHCS has not made the same degree of progress with respect to

26  appointment backlogs for ultrasound end stage liver disease when compared to other

27  backlogs discussed above.  Notwithstanding this, however, CCHCS is actively pursuing

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  additional approaches to address the backlog of ultrasound exams.  As reported to

2  Plaintiffs on October 24, CCHCS has identified that its vendors have additional supply and

3  communicated this information to the institutions.  Further, CCHCS has confirmed with

4  staff that additional time should be committed to addressing the backlog of ultrasound

5  exams, including operating weekend and/or evening clinics as necessary to eliminate the

6  backlog.  CDCR is working collaboratively with CCHCS to reduce the specialty backlog,

7  including by redirecting staff or approving overtime to support the scheduling of additional

8  onsite clincis.

9  **III.    MEDICAL STAFFING**

10    *Plaintiffs' Position:* The Receiver in May informed the parties of a major hiring and

11  retention problem among the approximately 3,000 medical support and ancillary staff

12  statewide.  When this was discussed at the June 1 Case Management Conference the Court

13  stated it wanted more information:

14    I do want Mr. Kelso to figure out what issues are causing us to have recruiting and
     retention problems, whether there is an impact on quality of care, share his findings
15    with you, and report back, hopefully at the next CMC, on what he thinks.

16  ECF No. 3815 at 22:18-22.  The Receiver agreed to prepare a report and

17  recommendations.  *Id.* at 24:18-19.

18    On July 12, in response to our request for an update, CCHCS stated a report was in

19  process and would be shared when completed.  On August 5, CCHCS stated the Receiver

20  may provide a verbal update at the August 15 Case Management Conference.  No update

21  was provided at that time.

22    On September 6, we asked if the report could now be shared, and if appropriate for

23  a meeting to discuss it, on a schedule that would allow us to include substantive

24  information in the upcoming Joint Case Management Conference Statement.

25    On October 13, CCHCS responded that they had compiled a detailed report on

26  medical staffing recruitment and retention, containing "comprehensive medical staffing

27  and compensation information, including vacancy and fill rates, annual salary analyses

28

findings and applicable recommendations to the California Department of Human Resources . . . to address CCHCS's medical staffing needs." CCHCS further indicated that the recommendations and subsequent negotiations regarding civil service salaries and compensation are confidential, involving collective bargaining and legislation, and thus stated that CCHCS will not share its medical staffing recruitment and retention report.[13] *See* October 13, 2022 CCHCS Memorandum, attached hereto as Exhibit B. Defendants below similarly state the report cannot be disclosed because it contains "confidential information that is protected from disclosure by federal and state law," and because "Plaintiffs do not demonstrate a need for this information at this time." We disagree.

The newly-asserted position that the staffing report cannot be shared suggests that resolution of current staffing shortages may now be enmeshed in control agency and executive branch review and negotiation processes, with the Receiver and Defendants apparently deciding that it cannot be shared for that reason. This seems wrong given that it is the Plaintiff class who needs the staffing problem resolved, yet Plaintiffs, through their counsel, are the only party not privy to the information. The decision not to share the report also appears to be contrary to the direction provided by the Court on June 1.

Adequate staffing is essential to providing adequate medical care in the prisons, and thus central to this case. We should see the data and information relied on to address the staffing problem, so we can assess the scope of the problem and whether sufficient measures are being timely implemented to resolve the current significant hiring problem, including not just with licensed staff such as doctors but the 3,000 medical support and ancillary positions which the Receiver spoke about in May, which we understood gave rise to the need for a report. *See* ECF No. 3819 at 27:19-23.

---

[13] Until these staffing matters are resolved, CCHCS stated that they will continue to contract for "temporary help/relief registry providers" to cover certain vacancies. But we understand there are some positions for which CCHCS has not been able to obtain adequate staff via contracts. We assume the staffing report discusses this.

1   We should also be told of the plan and timeframe for implementation of the

2   measures that apparently have been chosen, so we can determine if measures will be

3   implemented expeditiously – within weeks or a couple months for example, as opposed to

4   July 1, 2023, when the Fiscal Year 2023-24 budget is expected to become effective.  We

5   would like to determine whether and to what degree state laws and/or inaction are

6   impeding the solution to this matter, and whether we should advocate for the Receiver to

7   seek waivers of state law so as to more quickly do what is needed.

8   There is a protective order in place governing the disclosure of confidential material

9   in this case; there is no reason this staffing information cannot be shared under a similar

10   protective order.  We are reviewing our options, including whether to file a discovery

11   dispute.

12   *Defendants' Position:* Defendants continue to have conversations with the Receiver,

13   legislature, and employee stakeholders about appropriate levels of compensation for

14   different positions, including medical staff positions.

15   As of August 29, 2022, 41 percent of institutions (14 institutions) have achieved the

16   goal of filling 90 percent or higher of their civil service provider positions; 24 percent (8

17   institutions) have filled between 75 and 89 percent of their civil service provider positions;

18   and 35 percent (12 institutions) have filled less than 75 percent of their civil service

19   provider positions.  However, when on-site civil service, telemedicine, and contract

20   registry providers are utilized to deliver care statewide, coverage at 23 institutions is at or

21   above 90 percent.  Notably, the Telemedicine Program remains strong at 90 percent filled,

22   with 5.6 vacant positions and a sufficient number of candidates in the interview process to

23   cover the vacant positions.

24   CCHCS continues to explore creative ways to recruit medical staff.  For example,

25   CCHCS was present at the National Commission on Correctional Health Care's 2022

26   National Conference in October. CCHCS will also engage attendees at other conferences

27   in Orlando, Florida and San Antonio, Texas through advertisements and virtual attendance

28

19007818.11
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   when possible.  Other recruitment efforts include the expansion of social media

2   recruitment, and a strategic partnership with Doximity—an online social network site used

3   by 80 percent of all physicians for both job searches and workflow tools. CCHCS's hiring

4   events continue a pattern of success with over 1,500 attendees since its launch in January

5   2022.  Upcoming events are planned to support hiring needs for California City

6   Correctional Facility (CAC); California Correctional Institution (CCI); Chuckawalla

7   Valley State Prison (CVSP); Ironwood State Prison (ISP); Kern Valley State Prison

8   (KVSP); California State Prison, Los Angeles (LAC); North Kern State Prison (NKSP);

9   Richard J. Donovan Correctional Facility (RJD); and Wasco State Prison (WSP).

10       Further, since the last case management conference, CCHCS has been authorized to

11   raise registry pay rates for physical therapists and pay rates for optometrists.  CCHCS is

12   working aggressively to fill optometrist positions, though challenges remain in some of the

13   more remote locations.  However, there is currently an optometrist at each of the 34

14   prisons, and offsite services for optometry at Avenal State Prison (ASP), Pleasant Valley

15   State Prison (PVSP), and California Men's Colony (CMC).  If committed registry

16   optometrists are considered, CCHCS is only one optometrist short of what is expected

17   statewide.

18       Finally, Plaintiffs' counsel was not granted access to the staffing report referenced

19   above for the reasons set forth in CCHCS' memorandum to Plaintiffs' counsel, dated

20   October 13, 2022, attached hereto as Exhibit B.  It is Defendants' understanding that the

21   recommendations and reports contain confidential information relative to negotiations

22   regarding civil service salaries and compensation, including collective bargaining and

23   legislation, and other confidential information that is protected from disclosure by federal

24   and state law.  *See* 5 U.S.C. § 7114(b)(4)(C); Cal. Gov't Code, §§ 6254(k) & 6254(p).

25   More importantly, however, Plaintiffs do not demonstrate a need for this information at

26   this time.  State processes must be allowed to run their normal course without intrusion.

27   Plaintiffs' desire to inject themselves in a State process at this early stage is not

28

19007818.11    JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  appropriate, not supported by the law, and will likely chill important and ordinary

2  government processes and decision-making.

3  **IV.  INTEGRATED SUBSTANCE USE DISORDER TREATMENT PROGRAM**

4  **(ISUDT)**

5  *Plaintiffs' Position:*

6  **A.  Growth of ISUDT Program**

7  CCHCS reports that it has now screened more than 90,000 people for substance use

8  disorder, that the number of people receiving Medication Assisted Treatment has risen by

9  about 5% since early August, from approximately 14,200 to over 15,000, and that the

10 percentage of those patients now participating in a Cognitive Behavioral Intervention

11 program has increased from 55% to 68%.[14]

12 Growth of the program has included staffing increases.  As we wrote in the last

13 CMC Statement, CCHCS reported that all requested Fiscal Year 2022-23 additional

14 ISUDT program funds, including for 309.6 new staff positions, were fully enacted, and

15 that it was in the process of determining where the new positions would be allocated.  *See*

16 ECF No. 3819 at 31:11-15.  Since then, CCHCS provided us with a chart showing that the

17 positions, which include physicians, clinical social workers, pharmacists, nurses and data

18 specialists, have been distributed to all 34 prisons as well as regional offices and

19 headquarters. We applaud these additional resources, but have concerns about the ability to

20 recruit and retain staff for these additional positions given the above-mentioned medical

21 staffing challenges CCHCS has experienced statewide.  We will continue to monitor this

22 matter.

23 Although delayed by the COVID pandemic, further development of the ISUDT

24 program includes the creation of supportive housing spaces for "recovery-focused"

26 [14]  Data as of November 3; *see* Cal. Corr. Health Care Servs., *ISUDT Program*
27 *Overview*, https://cchcs.ca.gov/isudt/dashboard (last accessed Nov. 3, 2022); *see also* ECF
No. 3819 at 31 (reporting August data).

living.[15]  CCHCS says prisons were directed to identify supportive housing spaces for ISUDT patients by October 18, 2022 and that staff working in these spaces will receive training on Substance Use Disorder.  CCHCS also said that in November it intends to release a revised Substance Use Disorder Care Guide and to add to the ISUDT Dashboard the percentage of Medication Assisted Treatment patients successfully linked to a community provider upon release.  We strongly support and will continue to monitor these activities.

### B.    Privacy Concerns

As CCHCS reported in April 2022, "[t]he ISUDT Program incorporates the most current best practices in addiction science and manages SUD *as a chronic illness*."[16] Using the medical model to treat this condition has been extremely effective.  "The success of the ISUDT Program, two years into implementation, is extraordinary: already, the program is saving lives, reducing morbidity and other adverse outcomes for California prison residents that exceeds all projections."[17]

We strongly support the expansion of this life-saving program for a disabling illness and believe that many more people in the CDCR can benefit from it.  Accordingly, we are highly concerned about unnecessary barriers to participation.  In the last two months, people who participate in the ISUDT Program have written our office about the disclosure of their personal health information regarding treatment for their substance use disorder to non-medical CDCR personnel.  Specifically, these patients object to CCHCS's practice of releasing ISUDT medical information to the CDCR's Board of Parole Hearings (BPH), without their consent and possibly without notice, in advance of and for consideration during their parole hearings.  This raises obvious concerns that patients will be deterred

---

[15]    *See* Cal. Corr. Health Care Servs., *Integrated Substance Use Disorder Treatment*, https://cchcs.ca.gov/isudt (last accessed Oct. 25, 2022).
[16]    *See Transforming Substance Use Disorder Treatment in California's Prison System* at 23 (April 2022), *available at* https://cchcs.ca.gov/wp-content/uploads/sites/60/ISUDT/Impacts-ISUDT-Program2019-22.pdf (emphasis added).
[17]    *Id*. at 9.

1  from seeking treatment knowing that the information that they share with their doctor and

2  treatment team will be disclosed to and may be used by the Board to deny them parole.

3       We raised these issues with the Receiver in August 2022. CCHCS's October 7,

4  2022 response stated that Health Information Portability and Accountability Act (HIPAA)

5  and the California Confidentiality of Medical Information Act (CMIA) permit disclosure

6  of personal health information "when required by law," and that the CMIA requires

7  disclosure of medical information when compelled "by a board, commission or

8  administrative agency" for a lawful adjudication.  California Civil Code Section

9  56.10(b)(2).  CCHCS maintains that

10        Under CCR, Title 15, Sections 2240 and 2281 and California Penal Code
          Sections 2962 and 3055, "BPH is required to consider all relevant and
11        reliable information in evaluating whether an inmate presents a threat to
          public safety, including pertinent medical and mental health care factors as
12        part of a comprehensive risk assessment when determining an inmate's
          suitability for parole.
13

14  *See* October 7, 2022 CCHCS Memorandum, attached hereto as Exhibit C.

15       This response raises questions about what information has been provided to patients

16  who are enrolling in treatment regarding their lack of privacy if they participate in this

17  program.  Letters we have received from class members strongly suggest that they were

18  not aware that their health records would be disclosed to BPH.  Accordingly, we have

19  asked the Receiver what patients are told before enrolling in the program and whether they

20  are specifically told who does and does not have access to their health record (including

21  BPH), including their record regarding treatment for SUD and test results, and where/how

22  this is documented in the patients' records.  We expect to receive a response in early

23  November.

24       Whether or not the practice of disclosure to the BPH is consistent with current

25  privacy laws and regulations, its impact on people who may be considering whether to

26  pursue treatment for their Substance Use Disorder must be considered. Specifically, we

27  believe that, as people serving indeterminate terms learn that accepting medical treatment

28

19007818.11

1    could ultimately result in extended incarceration based on the course of their chronic

2    condition, people with substance use disorder will choose not to receive vital, potentially

3    life-saving treatment.  Forcing patients to make this choice is highly problematic.

4          *Defendants' Position:*  Defendants understand Plaintiffs' concern that the disclosure

5    of ISUDT participants' information to BPH could impact patient decisions whether to

6    pursue treatment, though there is no indication that this is a widespread concern among the

7    patient population.  As CCHCS previously informed Plaintiffs' counsel, privacy laws and

8    California Code of Regulations, Title 15, Section 3370 authorize the disclosure of personal

9    health information to BPH, and BPH is required to consider all relevant and reliable

10   information in evaluating whether an incarcerated person presents a threat to public safety,

11   including pertinent medical and mental health care factors as part of a comprehensive risk

12   assessment when determining their suitability for parole.  It is Defendants' understanding

13   that this issue is under review by CCCHS.

14   **V.     EMERGENCY MEDICAL RESPONSE PROGRAM (EMRP)**

15         *Plaintiffs' Position:* Seven months ago, we updated the Court regarding the status of

16   CCHCS's vitally necessary Emergency Medical Response Program (EMRP), designed to

17   improve the care and documentation of emergency responses at each prison via a multi-

18   month training and certification process.  *See* ECF No. 3796 at 26:13-27:9.  The EMRP

19   began in 2017 and was originally scheduled to be completed by October 2020, but was

20   delayed due to the COVID pandemic such that in March 2022, only six prisons had

21   completed the program and 11 had not yet started training, the program's first step.  *Id.*  At

22   that time, CCHCS said it was continuing its efforts at the prisons that had started the

23   EMPR, and scheduled the prisons that had not yet started to begin, at regular intervals,

24   through June 2023.  *Id.*

25         CCHCS at our request recently provided an EMRP status update.  As of September

26   14, 2022, eight prisons had completed the program, work continued at 20 prisons,

27   including some almost done, and five had not yet started it.  The start dates for the five

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  prisons that have not begun the EMRP are now scheduled at regular intervals through

2  almost the end of 2023, except for CHCF, which is scheduled to start in January 2024.

3  CCHCS's goal is to have a prison complete the EMRP within 12 months of training.  We

4  will continue to monitor this essential improvement project.

5          We continue to be concerned about the adequacy of emergency responses, including

6  staff delays when initiating 9-1-1.  As the Court may recall, on April 30, 2021, CCHCS

7  and CDCR issued a joint memorandum clarifying and reiterating staff's responsibility to

8  activate 9-1-1, thus suggesting that the challenges regarding this are even more

9  fundamental than the matters addressed by the EMRP.  *See* April 30, 2021 CCHCS/CDCR

10 Memorandum, attached hereto as Exhibit D.  The memorandum was issued because

11 "recent suicide and death reviews . . . identified multiple instances [of] significant delays

12 in activating" 9-1-1.  The memorandum required each prison to update Local Operating

13 Procedures (LOPs) and post orders, provide on the job training to all custody staff, and

14 provide proof of doing those things (proof of practice) to Associate Directors within 30

15 days.

16         On September 28, 2022 we asked CCHCS and CDCR about the prisons'

17 compliance with the April 2021 memorandum's requirements.  We did so after reporting

18 that eight recent mortality or suicide reviews of deaths that occurred between December

19 2021 and June 2022 -- months after the April 2021 memorandum's requirements --

20 identified untimely 9-1-1 activation as a significant opportunity for improvement.  All but

21 one of these cases involved unconscious or unresponsive patients, with the reviews

22 indicating 9-1-1 should have been initiated immediately.  Instead, staff -- medical, custody,

23 or both -- waited from three to twenty minutes.  We also asked for statewide data regarding

24 9-1-1 activation delays.  We have not yet received a response.

25         *Defendants' Position:*  Defendants support the EMRP and all efforts to improve

26 medical response times across the State.  The EMRP requires hours of extensive training

27 for staff, and Defendants remain hopeful that full implementation will address the concerns

28

-20-

Plaintiffs raise above.  Additionally, CCHCS rolled out an Emergency Medical Response Review Committee dashboard, which tracks emergency responses and outcomes at each institution.  The dashboard is used by each institution's Emergency Medical Response Review Committee and CCHCS Regional offices to review incidents and identify opportunities for improvement.  Statewide metrics are still being developed by CCHCS.

## VI.    MEDICAL CARE IN THE PIPS

*Plaintiffs' Position:*  As we previously reported, CCHCS recently conducted onsite assessments of health care spaces within the PIP units at California Medical Facility (CMF) and Salinas Valley State Prison (SVSP).  CCHCS said they anticipated completing short-term plans to address current medical space issues in those units in August.  CCHCS also said that once short-term solutions were identified, long-term plans would be developed to address space issues, and that once plans for these two prisons had been developed, the remaining PIPs would be reviewed.  We requested an update on these matters on September 26.  We have not yet received a substantive response.

## VII.    PRISON-SPECIFIC ISSUES

### A.    Substance Abuse Treatment Facility and State Prison, Corcoran (SATF)

*Plaintiffs' Position:* We have recently identified and requested information and action regarding several problems related to the medical care delivery system at SATF, which we believe harm and result in an unreasonable risk of harm to patients.  First, as described in the previous Case Management Conference Statement, in June we wrote to CDCR and CCHCS regarding problems with processing sick call requests and scheduling nursing appointments at the prison.  *See* ECF No. 3818 at 29-30.  In August, CCHCS acknowledged that SATF had problems processing, scheduling, and documenting nursing appointments, and that corrective action was being taken, including by regional staff.  In mid-September, we again reviewed SATF patients' medical records, focusing on the first two weeks of that month, and again identified what appear to be substantial and continuing problems with scheduling and processing sick call requests.  We sent our concerns to

19007818.11

1   CCHCS on September 23 and are awaiting a response.

2          Separately, on August 5 we wrote to CCHCS to request information about offsite

3   medical appointments being cancelled or postponed at SATF due to what multiple

4   patients' records said were "transportation" issues.  On October 4, CCHCS responded that

5   SATF in May identified a shortage of transportation staff as a cause of canceled specialty

6   appointments, and that nearly 75 such appointments were cancelled between June 1 and

7   August 8 for that reason.  However, the response did not clearly state what action, if any,

8   CCHCS or CDCR had taken, and when that action was taken, to address this shortage.  On

9   October 5 we requested further information and are awaiting a response.

10          In addition, in response to multiple individual patient cases we have recently

11   brought to their attention, CCHCS has acknowledged the need to correct serious medical

12   care delivery system deficiencies at SATF.  The corrective actions include:

13          -   Training providers on policies and procedures for completing requests for

14              medical procedures requiring Headquarters approval, and establishing tracking

15              logs to ensure such requests are timely submitted and then timely acted on by

16              prison staff once approved or denied;

17          -   Providing additional help to the offsite appointments scheduler after multiple

18              requests to schedule a patient's surgery were not acted on;

19          -   Training staff and supervisors on policies and procedures for ensuring continuity

20              of care when a patient transfers from another prison;[18]

21          -   Training staff on procedures for ensuring appropriate follow-up when a patient's

22   _____

[18]        Unfortunately, it appears this problem persists, despite the corrective action taken.
23   In August we wrote to CCHCS regarding a patient who was ordered to have an MRI of his
     brain before he transferred to SATF.  SATF staff failed to reschedule the procedure after
24   his transfer.  We were told on September 7, 2022 that "[t]he reconciliation process was
     reviewed and discussed with the responsible staff and supervisors to prevent similar
25   oversights from occurring in the future."  Yet we subsequently identified a patient who
     transferred into SATF less than a week later, on September 12, 2022, who had a number of
26   specialty appointments ordered and approved at his previous prison, none of which SATF
     staff rescheduled after his transfer to that prison.  We are awaiting a response from
27   CCHCS regarding this patient's care.

28

1    offsite appointment is cancelled; and

2    -    Training staff on providing an interpreter when necessary for a medical

3         encounter.

4         In addition, two recent internal audit reports have identified serious problems at

5    SATF related to medical care.  The October 14, 2022 CCHCS Health Care Access Unit

6    (HCAU) Operations Monitoring Audit identified several critical issues, including: (1) staff

7    failing to deliver ducats to patients prior to their scheduled health care appointments (and

8    in some housing units, inappropriately relying on incarcerated workers to complete this

9    task);[19] (2) failing to document collection of sick call requests in units on lockdown or

10   modified program;[20] and (3) failing to ensure that patients moved to SATF's restricted

11   housing unit were provided their keep-on-person (KOP) medications, durable medical

12   equipment (DME), and other medical supplies.[21]  The HCAU recommended the findings

13   be referred to the Associate Director, Division of Adult Institutions and the Regional

14   Health Care Executive, Health Care Operations, for further review.

15

16   [19]    Defendants below criticize the finding that health care ducats were not properly
17   distributed, noting that the auditors "did not verify the delivery of ducats" in certain
     housing units.  But that does not signal a methodological problem with the audit; rather, as
18   the report explains, the auditors were unable to verify the delivery of ducats in those units
     because staff failed to document the delivery of ducats in those units, as is required by
19   policy.  In any event, Defendants do not assert that ducats were being properly delivered at
20   SATF.
     [20]    This finding is particularly concerning, as we have been raising the problem of
21   collection of sick call slips in units on lockdown or modified program at SATF since June
22   2020, and we have been repeatedly assured corrective action was taken to address the
     issue.  When we raised this issue most recently, CCHCS informed us on July 8, 2022 that
23   "SATF staff is handling the process effectively."
24   [21]    Defendants below criticize the finding that DME supplies and KOP medications
     were not properly provided to patients in restrictive housing units because "the audit report
25   states that the compliance rating was determined by observing six patients."  That is
     correct as to the audit of the provision of DME, but not KOP medications.  Auditors
26   reviewed ten patients in restrictive housing; of the ten, four had not been given their KOP
27   medications.  More fundamentally, Defendants do not assert that patients in restrictive
     housing units were properly provided their DME and KOP medications.
28

Most troublingly, CCHCS's August 2022 Healthcare Facilities Maintenance (HFM) Assessment identified "an abnormally large quantity of deficiencies" at the prison.  The assessment evaluated environmental housekeeping services performed in medical care locations, reporting compliance in seven areas.[22]  SATF was found to be "severely out of compliance" in all areas, a highly unusual and we believe unprecedented set of findings.[23]

In addition to widespread infection control problems, the review documented appalling conditions in several patient care spaces. The auditors described "severe neglect" of one medical clinic (H Yard Clinic), noting that the holding cells that were actively being used for patients "were completely unsanitary," with trash on the floor and a "build-up of various colors of splatter on the metal cell walls."  One holding cell "appeared to have a pool of dried urine on the floor."  The auditors discovered that, during their review, the "Daily Inspection Checklist" for this clinic "had been falsified" to document that a full cleaning was provided.

The review also documented disturbing problems in the Correctional Treatment Center (CTC), which houses some of SATF's most medically vulnerable patients, and concluded that the unit was "atrociously out of compliance."  The auditors wrote:

> The inpatient cells in the CTC Side C exhibited a foul odor, and appeared visually unsanitary. Additionally, the walls were soiled with unidentifiable splatter, the floors in several inpatient cells were black with grime and sticky on the shoes. Patient shower drains were nearly clogged with soap scum, hair, food particles, and debris. The toilet and sink areas exhibited mildew, lime-scale build-up, food particles, and offensive odors (Figure 3). Patient medical beds appeared neglected, as they were excessively dirty with dust, dirt, and grime. Additionally, both live and dead insects were found within inpatient cells throughout the CTC.

The auditors highlighted the indifference displayed by both medical and custody

---

[22]    Those areas are: Cleaning Schedule; Cleaning Supplies and Equipment; Work Orders, Audits and Corrective Action; Training and Certification; Infection Control; Housekeeping; and Staffing.

[23]    CCHCS began conducting HFM Assessments and issuing reports in 2020.  Its stated goal is to review each prison at least once every 12 to 18 months.  The current round began in May.

staff towards the patients in the CTC, noting "[i]t is alarming that staff members from multiple classifications were entering and exiting the patient cells without calling attention to the unsanitary environment in which the patients were housed."  Due to the scope and severity of the problems, the report states staff from Health Care Facility Support will be conducting monthly inspections at SATF.

We also await the *Armstrong* Court Expert's report regarding allegations of mistreatment of *Armstrong* class members at SATF, which we hope will begin to address, in part, longstanding problems with the culture of staff at SATF.  *See Armstrong v. Newsom*, Case No. 94-cv-2307-CW, ECF No. 3338 (N.D. Cal. Nov. 8, 2021).  This is a critical investigation, but we believe the matters reported on above indicate not only a culture of indifference among staff at that prison, but a medical care delivery system that in certain respects is seriously dysfunctional.

We have been raising serious concerns about this prison for more than a year, *see, e.g.*, ECF No. 3717 at 17-19, but corrective actions taken to date have not addressed the dangerous conditions at this prison.  We are alarmed stronger action has not been taken by CCHCS and CDCR in light of the continued threat of harm to patients at this prison.  We believe more effective corrective action needs to be taken, including looking at whether leadership at the prison needs to change, whether somebody from Headquarters should be imbedded at the prison to ensure things are done correctly, whether the composition of the population needs to be adjusted or reduced, whether there needs to be new policies and procedures in effect, and whether and what direct, real-time monitoring should be implemented.

Defendants below describe a number of measures which they state have been taken to address the situation at SATF.  We appreciate these, but many of them have been in place for months or years—including the implementation of a new warden (November 2020) and ADA coordinator (July 2022), the warden's practice of conducting walking

tours (since at least June 2021), and the Field Training Sergeant program (August 2021).[24] These measures failed to equip staff at the prison to identify, let alone correct, recent major problems, including the shocking findings of the HFM report.  We continue to believe more extensive corrective action is necessary.

*Defendants' Position:* As an initial matter, SATF has gone through significant management changes that have made substantial differences.  CCHCS replaced the CEO, who is greatly improving collaboration with custody.  A new ADA Coordinator started in July 2022, and has a proven ability to positively interact with both staff and the population. SATF staff have already received – and will continue to receive – training on positive interactions with the incarcerated populations.  The ADA Coordinator, facility manager, and supervisors have established tours to monitor and interact with staff and the population.  The warden and CEO have implemented tours as well.  At a higher level, bi-monthly meetings with the Assistant Director, warden, and CEO have been implemented to discuss current issues and establish plans to effect positive change.  And the Assistant Director's office monitors serious incidents, unusual occurrences, and any resulting adverse actions involving staff members at SATF.  Additionally, DAI has implemented a Field Training Sergeant program, which will focus on positive interactions with class members and will provide training to other staff members.

With respect to Plaintiffs' statements regarding transportation, CDCR established an Incident Command Post to help address the issues with offsite specialty appointments, resulting in a significant reduction in SATF's backlog.  This has been a collaborative effort between custody staff and medical leadership.  The Assistant Director reviews and monitors this and is in regular communication with SATF's warden, CEO and regional health care executive.

Additionally, a corrective action plan (CAP) is being generated to address the issues

---

[24]   This Field Training Sergeant program was implemented pursuant to an *Armstrong* Court Order.  *See Armstrong v. Newsom*, Case No. 94-cv-2307-CW, ECF No. 3275 at 6 (N.D. Cal. June 1, 2021).

set forth in the October 14, 2022 CCHCS Health Care Access Unit Operations Monitoring Audit (OMA).  The CAP will be reviewed and discussed on a bi-monthly basis with the Assistant Director and management team at SATF.  In the interim, Health Care Access (HCA) Managers are utilizing training, tours, and meetings with stakeholders to address the issues identified at the exit meeting with OMA auditors.  Area managers were also instructed to monitor their housing units closely and ensure custody staff are following policy with regard to ducats.

Further, leadership has provided clarification to staff regarding the expectations for Keep On Person (KOP) medications, Durable Medical Equipment (DME) and supplies in restricted housing units, and spot audits are being conducted to monitor compliance – though it bears noting that the audit report states that the compliance rating was determined by observing six patients, five of whom had their DME and medical supplies in their possession upon placement, and only one was missing his shoes/orthotics.  The newly-assigned CEO and warden are having regular meetings to collaborate on compliance and identify any barriers.  These discussions have improved the working relationship between custody staff and medical staff at the institution.

Defendants take very seriously the findings of CCHCS's August 2022 Healthcare Facilities Maintenance (HFM) Assessment, which identified failures at multiple levels with HFM-PIA, healthcare, and custody.  The following action items were implemented immediately: (1) training regarding responsibilities and how to report unsatisfactory conditions was provided to all custody staff assigned to healthcare posts; (2) HCA Managers are conducting weekly meetings nad touring with HFM-PIA staff, creating more collaboration and a sense of ownership among stakeholders; (3) HCA supervisors provided additional expectations on monitoring cleanliness during daily tours with notifications to be made on observations; and (4) the warden and CEO executive unit rounding will include monitoring for cleanliness and asking staff about obstacles and barriers.

Finally, with respect to delivering ducats, it bears noting that the audit team only

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  reviewed one day – September 14, 2022 – and did not verify the delivery of ducats at two

2  entire facilities (A and B) and three housing units within two other facilities (F3, G1, and

3  G3).  (2022 HCAU OMA Report, p. 17.)

4  **VIII.  DELEGATIONS**

5  　　　On October 17, the Receiver issued a revocable delegation of authority to CDCR

6  over the delivery of medical care at Wasco State Prison.  There are now a total of twenty

7  delegated institutions.  The Receiver also held meet and confers with the parties regarding

8  possible delegation of such authority at Richard J. Donovan Correctional Facility in

9  September.  Meet and confers regarding the possible delegation of such authority at

10  California State Prison-Solano are scheduled for November.

11

12  DATED:  November 3, 2022　　　　　　HANSON BRIDGETT LLP

13

14

15　　　　　　　　　　　　　　　　By:  */s/ Samantha Wolff*

16　　　　　　　　　　　　　　　　　　PAUL B. MELLO
　　　　　　　　　　　　　　　　　　SAMANTHA D. WOLFF
17　　　　　　　　　　　　　　　　　　LAUREL O'CONNOR
　　　　　　　　　　　　　　　　　　DAVID C. CASARRUBIAS
18　　　　　　　　　　　　　　　　　　Attorneys for Defendants

19  DATED:  November 3, 2022　　　　　　ROB BONTA
　　　　　　　　　　　　　　　　　　Attorney General of California
20

21

22　　　　　　　　　　　　　　　　By:  */s/ Damon McClain*

23　　　　　　　　　　　　　　　　　　DAMON MCCLAIN
　　　　　　　　　　　　　　　　　　Supervising Deputy Attorney General
24　　　　　　　　　　　　　　　　　　IRAM HASAN
　　　　　　　　　　　　　　　　　　Deputy Attorney General
25　　　　　　　　　　　　　　　　　　Attorneys for Defendants

26

27

28

19007818.11　　JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1    DATED:  November 3, 2022                    PRISON LAW OFFICE

2

3                                        By:  */s/ Steven Fama*
                                              _____
4                                             DONALD SPECTER
                                              STEVEN FAMA
5                                             ALISON HARDY
                                              SARA NORMAN
6                                             RANA ANABTAWI
                                              SOPHIE HART
7                                             Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19007818.11    JOINT CASE MANAGEMENT CONFERENCE STATEMENT