UNITED STATES DISTRICT COURT    **ORIGINAL**

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| MARCIANO PLATA, et al., | ) | **Further Case Management** |
| | ) | **Conference** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. C 01-01351 JST |
| | ) | |
| GAVIN NEWSOM, et al., | ) | Pages 1 - 54 |
| | ) | |
| Defendants. | ) | Oakland, California |
| _____) | | Tuesday, February 7, 2023 |

<u>**REPORTER'S TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**</u>

**APPEARANCES (VIA ZOOM):**

For Plaintiffs:          PRISON LAW OFFICE
                         1917 Fifth Street
                         Berkeley, California  94710
                    BY:  DONALD H. SPECTER,
                         STEVEN FAMA,
                         SOPHIE HART, ATTORNEYS AT LAW


For Defendants:          HANSON, BRIDGETT LLP
                         425 Market Street, 26th Floor
                         San Francisco, California  94105
                    BY:  PAUL B. MELLO,
                         SAMANTHA D. WOLFF, ATTORNEYS AT LAW

                    (Appearances continued next page)

Reported By:          Raynee H. Mercado, CSR No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

## A P P E A R A N C E S (CONT'D.)

```
For Defendants:          DEPARTMENT OF JUSTICE
                         OFFICE OF THE ATTORNEY GENERAL
                         455 Golden Gate Avenue, Suite 11000
                         San Francisco, California 94102
                  BY:  DAMON G. McCLAIN,
                         DEPUTY ATTORNEY GENERAL


For Intervenor CCPOA:  MESSING ADAM & JASMINE
                         235 Montgomery Street, Suite 828
                         San Francisco, California  94104
                  BY:  GREGG M. ADAM, ATTORNEY AT LAW


For the Receiver:        FUTTERMAN DUPREE DODD CROLEY MAIER LLP
                         601 Montgomery Street, Suite 333
                         San Francisco, California  94111
                  BY:  JAMIE L. DUPREE, ATTORNEY AT LAW


Also Present:            J. CLARK KELSO, RECEIVER
```

--o0o--

```
 1   Tuesday, February 7, 2023                          2:38 p.m.

 2                         P R O C E E D I N G S

 3                           (Zoom Webinar)

 4                             --o0o--

 5

 6            THE CLERK:  Now calling civil case 1-1351, Plata,

 7   et al., versus Newsom, et al.

 8       Will counsel please state your appearances for the record

 9   starting with the plaintiff.

10            MR. SPECTER:  Good afternoon.  Don Specter, Steve

11   Fama, and Sophie Hart for the plaintiffs.

12            MR. MELLO:  Good afternoon.  Paul Mello for

13   defendants.

14            MS. WOLFF:  Good afternoon, Your Honor.  Samantha

15   Wolff for defendants.

16            MR. McCLAIN:  Good afternoon, Your Honor.  Damon

17   McClain for defendants.

18            MS. DUPREE:  Good afternoon, Your Honor.  Jamie

19   Dupree on behalf of the receiver, Clark Kelso.

20            MR. KELSO:  Good afternoon, Your Honor.  Clark Kelso,

21   receiver.

22            MR. ADAM:  And good afternoon, Your Honor.  Gregg

23   Adam for CCPOA.

24            THE COURT:  All right.  Very good.

25       The number of beards on the Zoom screen has jumped
```

1  dramatically since last time we got together.  I'm not going

2  to make that a lengthy item, but I just wanted to note that

3  for the record.

4      Let me just make a couple of observations as I usually do

5  at the beginning of the conference, and then we can turn to

6  the topics set out in the parties' case management statement.

7      The first is I want to say that while there have been some

8  ups and downs in our COVID numbers, for the most part they

9  have remained very low, in the -- in the low 200s.  And even

10  when they have jumped from that number, they have remained

11  below a thousand.

12      And so I think it's worth starting this conference that

13  way for two reasons.  The first is that those numbers

14  obviously used to be much, much, much higher.  And COVID was

15  consuming of the case management of this case.

16      And I hope the parties are taking some satisfaction, as I

17  do, in our renewed ability to address other parts of this case

18  because there are so many other things that need to happen for

19  us to move toward the return of health care from the receiver

20  to the state.  And so that's one thing I think that needs to

21  be said.

22      The other thing is I don't think I can say enough how

23  appreciative I am of the medical staff and custody staff and

24  clerical and administrative staff that have worked around the

25  clock to keep people safe in this pandemic.  And I know that

1    there have been some missteps, and we've talked about those

2    and I'm sure we'll talk about them in the future.

3        But I think of so many things, like the rollout of the

4    original vaccine and the bivalent boosters, and I think about

5    the efforts that have been made, and I also want to thank the

6    prison law office because I think their -- their advocacy has

7    helped bring about some of these things.

8        I want to be grateful for the focus on programming and not

9    losing sight of the fact, for example, that quarantine and

10   programming restrictions have made the time that some of our

11   incarcerated patients have served harder time, and that it was

12   important to strike a balance between making sure that we're

13   doing what we can to keep people safe and also making sure

14   that we can -- that we're doing what we can to make their

15   incarcerated lives more meaningful.

16       So I won't go on at great length.  I just mostly want to

17   say a big thank you to all the hard work that's gone in there

18   and not to lose sight of that.

19       I am tentatively going to visit a prison on March the 7th.

20   As you know, I visited one facility in the pandemic.  I went

21   to North Kern with Tammy Foss, and that was it.  And none of

22   you were there.  And this will be a more traditional visit,

23   and that is that I would expect to be accompanied by, not all

24   of you hopefully, but some number of you.  And as has been my

25   practice, as that date gets a lot closer I'll be specific

1      about where it is.

2          I also want to put on the record an ex-parte contact that

3      I had.  It has been my practice when I took the case over, and

4      then again every time there was a change of secretary for the

5      Department of Corrections and Rehabilitation, to meet very

6      briefly with that person and just put a name to the face and

7      express my wish that CDCR, the court, and the receiver could

8      work collaboratively.

9          I did have a meeting with newly appointed secretary Jeff

10     Macomber last week in my judicial chambers.  That meeting

11     lasted approximately 30 minutes, which is longer than other

12     meetings that I've had.

13         It had been my intention going into that meeting to

14     express to Secretary Macomber how upsetting I found some of

15     the information in the recent status report in the *Armstrong*

16     case, which I know we'll be talking about, and that I hope

17     that CDCR would work on changing the attitudes of some of its

18     staff because, in my view, that is the best way and the only

19     way to keep something like SATF from reoccurring.

20         I did not get the opportunity to raise that topic with him

21     because he raised it first.  That was the first thing he

22     wanted to talk about when he came into my office.  And he

23     affirmed his commitment to educating staff so that nothing

24     like SATF could recur.

25         He also stated how pleased he was with the introduction of

1    some of the Norway prison techniques into CDCR institutions,

2    which as we've seen in some of our prior case management

3    statements, is occurring at a few of the institutions around

4    the state, including SVSP and I want to say also VSP.  I don't

5    have those institutions memorized.  But he told me how pleased

6    he was with the introduction of those techniques.

7        He likes to call it the California model, not the Norway

8    model.  So I'll adopt that vocabulary.  He invited me to go to

9    one of the California model institutions to see those changes

10    for myself.

11        On the subject of the *Plata* case, I wanted to be careful

12    not to mention any specifics.  I did say what I've said many

13    times in these case management conferences and which the

14    secretary, I'm sure, will hear me say again, and that is that

15    this case will end when CDCR develops the capacity to identify

16    and correct its own health care problems on its own without

17    need for inspection by the Prison Law Office or the Office of

18    Inspector General or supervision by this Court.

19        And he listened politely to those comments.

20        And then we closed by talking about how pleased we both

21    were with the successes of the ISUDT program.

22        So I very much enjoyed my meeting with Secretary Macomber.

23    I'm certain that I'll have -- the Court will have its

24    differences -- continue to have its differences with CDCR, but

25    I look forward to working with him.  I hope that I'll see him

1    during a future prison visit or otherwise.

2        I will also say this.  Of course there's going to be

3    fighting, it's litigation.  But as I look around the country

4    at other reform efforts, or even as I look around other

5    federal courts, I think that this court and CDCR have had and

6    continue to have a good relationship, and I look forward to

7    that continuing.

8        So that's my summary of -- those are my introductory

9    remarks.

10       Let's turn to the case management statement.

11       Oh, thank you all for waiting.  I meant to start with

12    that.  Normally I give you your own day and you don't have to

13    wait for other case management conferences, but I'm in trial

14    right now, and I just didn't have the space.  So thanks for

15    waiting.

16       Okay.  Turning to the case management statement.

17                    (Pause in the proceedings.)

18            **THE COURT:**  The first topic the parties identify is

19    called CDCR updates.  There's a discussion of Secretary

20    Macomber's appointment, and there's a discussion of the

21    closure of some prisons and also individual facilities within

22    prisons.  I think all that's informational to the court only,

23    unless there's something someone wants to say now.

24       Mr. Specter or Mr. Mello?  No?

25       Okay.  Everyone is shaking their head.

1          The next item has to do with SATF.  And the report that

2    was recently generated by -- is Mr. Swanson called the court

3    expert?  Yes -- by the court expert in that case and the

4    investigation performed by him and his law firm.

5          I just have a couple things to say about that, and then

6    the parties can say what they like.

7          First, it's very important for me to start by noting that

8    the report was generated in the *Armstrong* case, which is a

9    separate federal case.  It's presided over by Judge Claudia

10   Wilken.  And it's not my place to manage or to be seen to be

11   managing that case, and I'm not going to do that.

12         I do have a really terrific working relationship with

13   Judge Wilken.  And we try historically to keep each other

14   up-to-date on the developments within our two cases.

15         I feel confident that I will be meeting with Judge Wilken

16   once all the briefing and responses and so forth are in.  It

17   is possible that Mr. Swanson and Mr. Kelso will be invited to

18   that meeting.  I think I need to let Judge Wilken take the

19   lead on who's at the meeting.  But I intend to stay up-to-date

20   on what is happening at SATF and CDCR and CCHS's responses to

21   what happened there.

22         In part because our cases are related but also in part

23   because many of the things that are discussed in that report

24   relate directly to the general provision of medical care which

25   is at the heart of the *Plata* case, and I don't think it's

1    possible to draw a neat line between what's discussed in that

2    report and the mission of the *Plata* case.

3        I would also say that there are many recommendations

4    listed at the end of the report?  The state is in the process

5    of responding to those recommendations and to the report

6    generally.

7        I am aware of -- I am generally aware of the responses

8    that the receiver has made in terms of implementing changes on

9    the ground.  I am encouraged by those.  I think I can say that

10   Mr. Kelso takes the report seriously.  I won't say he was as

11   upset as I am because I don't know if anybody could be as

12   upset as I was when I read that report.  But he was unhappy to

13   read the facts stated in the report and the conclusions in

14   that report, as I also was.

15       I sometimes -- I sometimes become emotional at these

16   conferences.  I wish I didn't.  I have some doubts about

17   whether it's professional as a demeanor, but I don't have any

18   control over it.

19       I think one of the reasons that I become emotional is

20   because I take so seriously the obligation of every state

21   actor in this case, federal or state, to caretake the needs of

22   a very vulnerable population insofar as it concerns medical

23   care.  And by that I mean every single incarcerated person,

24   all of them.

25       And it is upsetting to me when I think that there is more

1    that could be done to provide basic medical care and it's not

2    being done.  And it is particularly upsetting to me when care

3    is not provided or it is provided poorly intentionally.

4        So the parties have had to see me become emotional at

5    times where I thought that was happening.

6        It is hard to conceive of someone who is more in need of

7    that kind of caretaking and protection than a disabled,

8    incontinent, incarcerated patient, just to take one example

9    from the report.

10       So the report was upsetting to me.  And I won't belabor

11   the point, but I wanted to make it so the parties could

12   understand that I hope this is some kind of floor that we

13   won't see anymore, that we will never see this, one.

14       Second, to reiterate the point that Secretary Macomber

15   made to me, which is you don't get out of this, you don't

16   escape the likelihood of this recurring without changing

17   attitudes.

18       Thirdly, not everyone in CDCR has these attitudes, or

19   CCHCS.  Not everyone is a bad actor.  There are plenty of

20   staff out there who come to work every day at a hard job and

21   try to do the right thing.  And I thank those people and I

22   don't want them to think I'm lumping them in with everybody

23   else because I'm not.

24       I don't want to address the specifics of any of the

25   report or the recommendations or the findings in the report.

1    I don't think I need to do that right now.

2         But I will say this:  In their portion of the case

3    management statement, the defendants take issue with the

4    conclusion of the SATF report that there aren't sufficient

5    mechanisms for identifying problems with the delivery of

6    health care at SATF and the other prisons.

7         And what they say, this is a quote, "It is also not true

8    that CCHCS and CDCR lack mechanisms for identifying problems

9    with the delivery of health care at SATF and the other

10   prisons."

11        I don't agree with that statement.  I think the statement

12   is not true.  I think there are not sufficient mechanisms.  I

13   think this is a case of what in the law we call *res ipsa*

14   *loquitur*, which means the thing speaks for itself.  If there

15   were such mechanisms, they would have worked in this case.

16   And if someone thinks I'm being unfair, they should identify

17   what the mechanisms are.

18        But I -- well, I think I've spoken at enough length.  I

19   look forward to our developing such mechanisms together so...

20        Mr. Specter, would the plaintiffs like to say anything

21   further about SATF?

22             **MR. SPECTER:**  Yes, Your Honor.  I'll start off and

23   then I'll turn it over to Ms. Hart to see if she has anything

24   to add.

25        You've said a lot of -- which are consistent with our

 1    views.  In many ways the report is very disappointing and

 2    disheartening.  But in our view, it's not surprising given the

 3    amount of attention that our office has paid to this prison

 4    over the last several years and the amount of times that we

 5    have informed the defendants about the exact problems that

 6    Mr. Swanson identified and the failure of the defendants to

 7    take reasonable action in order to resolve some of those

 8    problems, even when they have been identified.

 9        I think at the root of it, not only us, but the grievances

10    that they receive from the incarcerated population and our

11    advocacy were more than enough to give a reasonable

12    administrator the ideas that they needed some significant

13    change.

14        And the fact that those pleas were essentially ignored for

15    several years and that it took a report by a court official in

16    order to get the attention of the state and, to certain

17    extent, CCHCS is very disappointing and it's extremely far

18    from where they have demonstrated their ability to identify

19    and resolve problems.

20        Unfortunately, we do not believe that the problems that

21    Mr. Swanson and our office have identified at SATF are

22    confined to that prison alone.  In our experience, many other

23    prisons suffer from the same -- same culture certainly and the

24    same practices and the same inability to identify their own

25    issues and to resolve them.

 1          We think that the response of the state to Mr. Swanson's
 2     report, not to mention the numerous letters and phone calls
 3     that we have made, is deeply disappointing.  They -- it
 4     doesn't seem like the state recognizes the gravity of the
 5     problems.  And we will be filing our response to this court
 6     expert's report later today which will detail in some degree
 7     why we -- why we believe that it's true.

 8          We also believe, and I think it's consistent with the
 9     views you just expressed, that -- and hopefully that
10     Mr. Macomber expressed to you, that there needs to be what's
11     commonly called a culture change.  I refer to it more as a
12     behavior change, that they will treat the people who are in
13     their custody with dignity and humanity that the Constitution
14     requires.  And that because of that, there needs to be a
15     fairly fundamental shift in how these issues are resolved.

16          They are not going to be resolved by writing a memo.
17     They're not going to be resolved by having a few hours of
18     training the staff.  This is a fundamental culture shift which
19     has to take place in SATF and other prisons in order to avoid
20     a recurrence of the problems we see that have been identified
21     in the Court's and the special master's report -- I mean in
22     the Court expert's report.

23          And we also recognize that there's quite a bit of overlap
24     between the *Armstrong* case and this case.  And we're very
25     gratified that you and Judge Wilken will be meeting about

1    that.  We've a had a little difficulty figuring out ourselves

2    who's responsible for what and, you know, in terms of the

3    remedies, who should be responsible for what.  But so we look

4    forward to the guidance from you and Judge Wilken about those

5    issues.

6         **THE COURT:**  Well, I think in addition to my having a

7    very good working relationship with Judge Wilken and a

8    tremendous amount of respect for her abilities as a judge,

9    Mr. Kelso and Mr. Swanson also have a very good -- an easy

10   working relationship and partnership around these issues.  So

11   I would not expect there to be any problem in determining

12   what -- who's responsible for what and that sort of thing.

13       As long as I can -- but I need to return to the principle

14   that this is a report that she asked for and it was issued in

15   her case.  So I -- while I'm confident that these kind of

16   small "j" jurisdictional issues will not present a problem, I

17   really need to take my lead from the judge who's -- who asked

18   for the report, which is her.

19       I also want to say that I -- as is reported in the case

20   management statement, I think it's actually something that the

21   plaintiffs put in, that they raised these culture change

22   issues with the receiver and the receiver is committed to

23   working with the defendants on this issue.

24       And I don't think I'm telling tales out of school to say

25   Mr. Kelso also thinks these issues are very important, and I

1    think he is committed to working on those.

2        They're hard issues.  They're hard issues.  I don't think

3    culture change is always the word -- the exactly right word,

4    but it's the word I'm going to use for the moment.  They're

5    hard issues.  I think, as it says in the report, we have some

6    staff burnout, particularly after the last few years of

7    dealing with COVID, which is not an excuse for the conduct,

8    but it's also not unrelated.  And so I think -- before I go

9    much further, it's a very big issue and I hope that we're

10   going to be able to make some progress in addressing it.

11       Ms. Hart, did you want to add anything?

12           **MS. HART:**  I think Mr. Specter covered a lot of it.

13       I just would like to add, one thing that was so

14   frustrating about the report was it identified problems with

15   very basic access to medical care systems at SATF, the ability

16   to submit a sick -- sick call slip, for example.  And that's

17   very concerning.

18       And because of that and because of other findings and

19   investigations that our office has done, we think the problems

20   with the medical care delivery system at SATF extend beyond

21   the four corners of the court expert's report, and we hope

22   that Mr. Kelso and CCHCS are looking sort of extensively, not

23   only at the issues that the Court expert identified, but with

24   the medical care delivery system as a whole.

25           **THE COURT:**  Very good.

 1    Mr. Mello, would you like to comment on this issue?

 2         **MR. MELLO:**  I would turn it over to Mr. McClain.

 3         **THE COURT:**  Mr. McClain.

 4         **MR. McCLAIN:**  Good afternoon, Your Honor.

 5    Okay, there's a lot to address here.  The first thing I

 6    would like to talk about is the, I guess, disappointment that

 7    the Court expressed about defendant's lack of acknowledgment

 8    of a problem with identification of issues at SATF.

 9    And I drafted that part of the CMC statement.  That was

10    not what I intended to say.  I don't think that that's what my

11    colleagues believed we were saying in that portion of the

12    statement.  I don't think that's what defendants believed we

13    were saying.

14    My concern that I was trying to address there was that I

15    believe someone could -- could have read plaintiff's portion

16    of the statement and walked away thinking that plaintiffs were

17    saying that defendants and CDCR have no mechanisms in place to

18    identify problems or issues.  And lest anybody get that

19    impression from the statement, I wanted to make it clear that

20    that is not the case.  There are mechanisms in place.

21    However, defendants did not -- did not dispute, object to

22    any part of the expert's report in the *Armstrong* case.  They

23    acknowledged those findings, one of which was that there was

24    some sort of a breakdown or a problem with the identification

25    of issues at SATF.

 1     Defendants have not taken a position that -- that that

 2 isn't true.  And CDCR and CCHCS are taking a hard look at that

 3 and why that happened there and what can be done to prevent it

 4 from happening elsewhere.

 5     So I hope that's clear.  If that wasn't clear in our

 6 statement, I apologize.

 7     So with respect to culture or attitude or behavior of

 8 staff at -- at SATF, it's been discussed before, but I think

 9 it's worth repeating here that we have new leadership at SATF,

10 a new warden and a new CEO, and there are some other newly

11 implemented positions there that have been filled.

12     I think a primary way to impact things like attitude and

13 behavior at a prison is leadership, and that has changed at

14 SATF.

15     I also -- it sounds as though Secretary Macomber has at

16 least started to show you what kind of a leader he will be

17 when it comes to issues and the situation that arose at SATF.

18     As I mentioned, defendants and CCHCS are taking a hard

19 look at SATF.  They've already implemented a number of

20 measures to address the issues that were identified in the

21 *Armstrong* expert's report.  Additional steps have been taken

22 to address issues that plaintiffs have raised at SATF, and

23 more measures are contemplated, and I'm sure there will be

24 more to report on those at future case management conferences.

25     And I think that's all I have to say on SATF right now,

1    Your Honor, unless you have any questions.

2            **THE COURT:** I don't.  Thank you.  I appreciate your

3    clarification and your comments, and those of your comments

4    that were directed to the Court.

5        As you know, when I can find the time, which is not

6    usually when I'm in trial as I am now, I sometimes make

7    efforts to educate myself about all the mini nonlegal things

8    that I think go into being a decent presiding judge in a case

9    involving prison medical care.  So I will schedule meetings

10   with people which then I report to the case management

11   conference so you'll know who I'm talking to.

12       Some of those persons have become members of my advisory

13   board.  Sometimes those contacts lead to other contacts

14   because someone will say that there's someone else they think

15   I need to talk to, that kind of thing.

16       I think it's likely that when I get some additional time,

17   I will start to reach out to academics, former prison

18   officials, and other persons that I think might have useful

19   thoughts about culture change.

20       I think in -- and I'd offer those two categories, but I'm

21   sure that's not an exhaustive list.  I'm not quite -- I want

22   to continue this discussion with the parties.  This is my one

23   chance of having all of you in the same place.  This is going

24   to sound a little disconnected for a court hearing.  But I

25   want your suggestions, and I'm not quite sure how to get

 1  those.  I know that we don't have an ex-parte rule in this

 2  case, but still I don't think I want you to send me emails and

 3  things about whatever your ideas are.

 4      On the other hand, I don't think that this -- that it

 5  would be constructive -- we can't litigate the issue of

 6  culture change.  So I'm not -- I'm not quite sure what I'm

 7  asking for except to say I want every idea I can get my hands

 8  on.

 9      I've been presiding over this case now for more than five

10  years and talking about culture change inside and outside of

11  these case management conferences probably at least for the

12  last four and a half years, and it's time for some new

13  thinking on my part and bigger thinking.

14      So perhaps you could, if you have suggestions, you could

15  share those with Mr. Kelso and he can make sure that they get

16  to me.

17      Mr. Adam, do you want to say anything about this issue?

18  And that is either SATF or culture change or any of those

19  issues?

20          **MR. ADAM:**  No.  I noted in the status report that I

21  think the focus is on -- on medical staff.  I -- I did relate

22  to your comments about staff being worn down and the

23  challenges of the pandemic.  And people who work in public

24  safety medical were not given some of same comforts those of

25  us with white collars were during it.  And I know there's a

 1   lot of burnout in a lot of areas that I'm involved in, police,

 2   fire, corrections.  And so it's -- I think it is good to keep

 3   that focus.  Changed leadership can also always be good

 4   because it brings in new ideas.

 5       But I didn't see anything specifically focused on -- on

 6   CCPOA, but certainly we're keeping an eye on things like

 7   staffing retention issues because while it may be most

 8   challenging at the moment with medical staff, I know that some

 9   other areas such as law enforcement are not far behind.

10           **THE COURT:**  Thank you.

11       So let's turn to the other areas of the case management

12   statement.  The next one in order is COVID-19.  And that's

13   broken up into a couple of different sections, the first of

14   which is recent outbreaks and changes to risk reduction

15   measures.

16       This section appears to be informational to the Court.

17       I echo the comments made I think by plaintiff's counsel

18   that they appreciate CCHCS's efforts to offer the COVID

19   primary vaccine series and bivalent booster to residents and

20   CDCR's continuing efforts to timely maintain and repair

21   housing unit ventilation systems.

22       Boy, we spent a heck of a lot of time on ventilation

23   systems.  And so I'm glad to see that that's paying off.  And

24   as I said, I appreciate staff's hard work.

25       Anything anybody wants to say on this subtopic?

1      Mr. Specter?

2          **MR. SPECTER:**  No, thank you.

3          **THE COURT:**  Mr. Mello?

4          **MR. MELLO:**  No, Your Honor.

5          **THE COURT:**  The next subtopic is the impact of the

6  COVID-19 pandemic and related public health measures on credit

7  earning.  Just to summarize for anyone who might be listening

8  to the hearing and wonder what that means, there is a

9  discussion about a prior program CDCR had for awarding credits

10  to incarcerated persons to offset a loss of credits from the

11  loss of programming.

12      That program has expired.  And now plaintiffs wish that

13  CDCR would resume that program or start another program that

14  would have the effect of awarding credits to incarcerated

15  people who are locked out of programming so that their

16  sentences could come down.  I think that section is largely

17  informational to the Court.

18      I generally agree with the perspective expressed by

19  plaintiffs personally, but the awarding of credits is outside

20  of my mandate as the *Plata* judge.  It's just not something

21  that's in my inbox, so I don't know that I have anything

22  further to say about that.

23      Mr. Specter, further comment on that subtopic?

24          **MR. SPECTER:**  No, thank you, Your Honor.  We

25  understand your position.

 1          **THE COURT:**  Mr. Mello.

 2          **MR. KELSO:**  Nothing further, Your Honor.

 3          **THE COURT:**  Okay.  The next topic is medical

 4     appointment backlogs.  And there are some continuing

 5     challenges, but there's also a lot of good news there.

 6          CCHCS is doing a very good job of bringing down primary

 7     care provider backlogs.  And I applaud everyone who's involved

 8     in those efforts.

 9          Optometry is doing a lot better than it used to.  And I

10     don't know if the data have changed, but the data regarding

11     cancer screening ultrasounds for end-stage liver disease

12     patients actually show that a greater percentage of those

13     patients are getting timely screenings than was previously

14     reported.

15          As I said, I don't know if the data has changed, but our

16     way of looking at the data has changed.  So that's all very

17     much to the good.

18          Delayed specialty services is still a big challenge.

19     Those numbers are going down.  Three months ago they were at

20     5,974.  Now it's down to 5,615.  I'm not the best

21     mathematician.  I think that's about a 6 percent decline.  So

22     if you could annualize that, it would be at the rate of about

23     24 or 25 percent a year.

24          I think CCHCS would like to be obviously doing as well as

25     it could.  I don't know what more I have to say about that.

1          Mr. Specter, further comment on this subtopic?

2                **MR. MELLO:**  I'll send it over to Ms. Hart.

3                **THE COURT:**  Ms. Hart?

4          **MS. HART:**  Thank you.

5      As you said, the data that we've received shows that

6  significant backlogs remain, in particular for certain

7  specialties, and we think in particular for telemedicine,

8  specialty appointments or at least particular telemedicine

9  specialty appointments.

10     And we understand really from the CMC statement that CCHCS

11 and CDCR are dedicated to efforts to address those backlogs,

12 but we don't have a lot of information about what those

13 efforts are or what the barriers are that are preventing, you

14 know, particular special progress in particular specialties.

15 So we intend to follow up with CCHCS unless perhaps Mr. Kelso

16 has anything further to report today.

17               **THE COURT:**  I'll ask him that in just a second.

18     Mr. Mello, any further comment on this topic?

19          **MR. MELLO:**  I mean we of course will continue to work

20 with CCHCS.  I know that they have dedicated resources

21 addressing these issues and trying to deal with these very

22 complicated issues.

23     Health care in general and specialty services are strained

24 throughout the country in the free world, in the incarcerated

25 world.  Getting specialists both to appear via telemedicine as

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    well as to get people to telemedicine appointments, those are

2    not issues that are limited to CDCR and CCHCS.

3        But we will continue to work with them.  I know that this

4    is a large focus of CCHCS and Dr. Bick and Mr. Kelso, as it

5    should be.

6        With that, I have nothing more.

7            **THE COURT:**  I will ask Mr. Kelso in just a second to

8    say something.

9        I would also say that, as you know, I from time to time

10   have conversations with Mr. Kelso where I receive emails

11   including emails with substantive attachments so that I can

12   stay apprized regarding the progress of the many, many things

13   that CCHCS is working on at any given time.

14       It's fairly rare that at a case management conference I

15   will say out loud, "This really bother me, this particular

16   thing really bothers me and I want Mr. Kelso to work on it."

17       I am pretty confident based on my past experience that

18   Mr. Kelso also notices that that's a rare event and that he

19   pays particular attention when I call out a particular issue.

20       I have called out this issue because it seems fundamental

21   to me in the way we provide medical care that it has to be

22   provided in a timely way.

23       And I'll let Mr. Kelso speak for himself, but it's my

24   understanding that market conditions make it harder to catch

25   up with certain backlogs than others.  And I have no doubt

1    that if someone wanted to hire a health care economist to

2    challenge Mr. Kelso, that probably wouldn't bother him.  So my

3    belief is he's out in the market doing what he can.

4        But I'll let Mr. Kelso address this for himself if he

5    wants to.

6            MR. KELSO:  Well, thank you, Your Honor.

7        First I'll look forward to and my staff will look forward

8    to receiving from the -- from Ms. Hart the deeper inquiries

9    that I'm sure they will ask us, particular types of specialty

10   care, and helping -- helping us then explore the truly

11   manifold reasons for the problem.  Some of them are

12   market-related, in particular specialties, but it is not

13   entirely a market problem.

14       We know that we have -- we can increase utilization of

15   telemedicine for a number of the specialty type of

16   appointments.  And there are obstacles that, as we dig into

17   this ourselves, we discover -- or I should say there are

18   opportunities at individual institutions to expand the

19   telemedicine.

20       There is some unused space at institutions where the

21   institution needed to be reminded to look around a little more

22   and get some help from headquarters about how they can, with

23   some headquarters assistance, actually free up space, clinic

24   space, where you can conduct specialty appointments by

25   telemedicine.

```
1            There are scheduling issues that are -- can be problematic
2    here with many specialty appointments being canceled late in
3    the process by our outside providers.  And we are working with
4    our statewide network contractor to try to address those
5    better.
6        We do have still some compensation issues that for some of
7    the specialty care are being worked on by the state.
8        So it's not only we're having trouble finding people.
9    It's a range of issues.
10       One of the things I heard this morning frankly from our
11   conference with the warden and CEO at SATF was heartening
12   about their approach to the backlog that I suspect will
13   resonate, Your Honor, with the Court.  And that is the CEO is
14   trying to make sure that they stay focused on let's get
15   today's work done and a little bit more than today's work
16   because that's how you get the trajectory of a backlog moving
17   in the right direction.
18       Sometimes if you change your focus off of get today's work
19   done to, oh, we have to attack a backlog, you actually can
20   find yourself treading water.  Where you put too much focus
21   here and then it turns out that, well, some of your work you
22   need to do today just gets added to the backlog.
23       And I know in at least my experience with case management
24   with courts that get too big a backlog of cases, that's one of
25   the strategies that works.  You do get a slower reduction in
```

1    the backlog numbers, but you get a steady reduction.

2        And that's what we, in part, I think have to make sure

3    happens, that what we don't do is plateau at, you know,

4    whatever the number, 5,000.  We've got to keep efforts until

5    we can work through the backlog so that we really have caught

6    up and can do today's work today.

7            **THE COURT:**  Well, I appreciate your opening this to

8    your discussions with Ms. -- the future discussions with

9    Ms. Hart.  And I have a, sounds sort of like an

10   all-of-the-above strategy.  So I'm assuming that if Ms. Hart

11   has a good idea, you're apt to implement it.

12       Good.  Well, you know, overall the progress here is not

13   perfect, but there's a lot of good and hopefully we'll see

14   more progress over these specialty services next time because

15   these other categories are in pretty good shape.

16       The next category in the statement is medical staffing.

17       Sorry, I just need a second to click through the document.

18       And that looks informational to me.  I don't have any

19   comments about that.

20       Mr. Specter, anybody from the PLO want to comment on that

21   topic?

22           **MR. SPECTER:**  No.  I think it was just to inform you

23   of what -- we had a dispute last time at the last conference

24   and we were able to resolve it so...

25           **THE COURT:**  I was pleased to see that.

1          Mr. Mello, any comment from the state?

2          **MR. MELLO:**  Nothing further, Your Honor.

3          **THE COURT:**  Okay.

4      And just for those of you who are listening, you think,

5  well, what's the point of -- the Judge keeps saying this is

6  just informational, then you skip over it.

7      These lawyers work so hard to give me updates about the

8  case, and it really -- these informational sections are

9  actually incredibly useful to me.  So even if we don't talk

10 about them at the conference, I'm glad they are in the

11 statement.

12     The next is integrated substance use disorder treatment,

13 which we call ISUDT, program and related issues.  The first

14 two subtopics are the program itself and privacy concerns.

15 Those sections just seemed informational to the Court.

16     Does anybody want to comment on those.

17     Mr. Specter?

18         **MR. SPECTER:**  Well, I -- I think I'll let Mr. Fama

19 comment on -- yeah, Mr. Fama comment on the privacy issue

20 because I think, Judge, that it has a negative effect on the

21 effectiveness of an overall very effective program.  Nobody

22 kind of disputes that.  But --

23         **THE COURT:**  Isn't the argument that's made in the

24 case management statement that the practice -- that there's --

25 CDCR's practices were not good up until this point, but

1   they're changing those practices and the PLO is unhappy that

2   it took that long?  Or is it something other than that?

3         **MR. SPECTER:**  I think it's something other than that.

4   It's not quite clear what CCH is going to do.  So I'll let

5   Mr. Fama explain the details, if you don't mind.

6         **THE COURT:**  All right.  Sure.  Mr. Fama.

7         **MR. FAMA:**  Good afternoon, Your Honor.

8      Not too much detail to explain here because we're just

9   waiting on how the department and CCHCS will inform patients

10   of what's going on with their private information so that

11   people can be informed and -- and know in advance.

12      We get letters from people who have no idea that this is

13   happening until it happens to them.  And it's just not -- it's

14   not fair and it's not right, and so we're hoping that that

15   happens soon.

16         **THE COURT:**  Would it be an unfair -- and I'm just

17   doing this from memory so please correct me if I'm wrong.

18   Would it be an unfair characterization on the status of this

19   issue that while it may be lawful for CDCR to share this

20   information with the parole board, it is not therapeutically

21   advantageous because once inmates -- once -- excuse me -- once

22   incarcerated persons learn that the information will be or may

23   be shared with parole, word will get out and they're less

24   likely to participate in ISUDT.

25      Is what I just said accurate?

1      **MR. FAMA:**  Yes.

2      **THE COURT:**  So it's not unlawful what CDCR is doing,

3   but it may not be a good idea.

4      **MR. FAMA:**  It may not be unlawful, and it's not a

5   good idea.  And it also damages the therapeutic relationship

6   for people who, as they see it, I think rightly, sign papers

7   when they enroll that they believe one thing about what's

8   happening with this information, but then learn subsequently

9   that it's different.

10     **THE COURT:**  Is the paperwork you're referring to,

11  which I have never seen, does that paperwork make

12  representations about the confidentiality of the information

13  learned from the incarcerated patient in the ISUDT program?

14     **MR. FAMA:**  I think it addresses how it goes to

15  custody staff, Your Honor.

16     **THE COURT:**  I see.

17     **MR. FAMA:**  That it won't go to custody.  The Board is

18  of course a separate entity, so the state says and maintains.

19  And so there's -- there's, I think, something of a disconnect

20  there.

21     **THE COURT:**  Well --

22     **MR. FAMA:**  And patients are trained to tell their

23  providers -- they're not trained, they're asked and many

24  patients embrace the notion of being transparent with their

25  provider about their addiction struggles if they have them.

1    And it -- they -- we think people just need to know what the

2    score is when they sign up.

3         **MR. SPECTER:**  And we also --

4                   (Simultaneous colloquy.)

5         **MR. SPECTER:**  I'm sorry, Judge.  And we also -- go

6    ahead.  Sorry.

7         **THE COURT:**  No, I just keep saying go ahead.  So --

8         **MR. SPECTER:**  Oh, okay.

9         **THE COURT:**  So if I say that, I'm good.  Go ahead.

10        **MR. SPECTER:**  And I also think it will have a

11   negative -- an adverse effect on people's willingness to

12   engage in the program.

13        And I also think it's something that probably should be

14   discussed with the Board itself.  Because they have a -- they

15   have a different view and a view of what information they need

16   to make the decisions that they're charged with.  And I just

17   wonder if there's some middle ground where all the interests

18   can be resolved.

19        Mr. Kelso is kind of in the middle of it, I think.  It's

20   really a dispute between us and the Board.

21        **THE COURT:**  Hmm.  Mr. Mello, would you like to

22   comment on it?

23        **MR. MELLO:**  Yeah.  So there was a discussion in

24   the -- and it wasn't informational.  We were trying to convey,

25   you know, the situation as it stood.  As the Court started at

```
1    the beginning of the discussion, it appeared that additional
2    information is going to be provided to the participants of
3    this program.  And somehow we got -- we got lost on bigger
4    pictures.
5        I'm not an expert on whether it's -- it has a detrimental
6    impact on participation in the program or -- or communication,
7    but what I do I know is that this issue is being addressed by
8    CCHCS and that I do understand that a newsletter is going to
9    the incarcerated population that is going to explain these
10   issues and explain who gets the information.
11       And we will continue to communicate with plaintiff's
12   counsel on these issues.  But I think Your Honor had it right
13   at the very beginning that this issue appears to be getting
14   addressed.
15       And with that, I don't have anything more, Your Honor.
16           THE COURT:  Okay.  Mr. Kelso, you don't have to say
17   anything, but your name came up a couple times so if there's
18   something you want to add, you can.
19           MR. KELSO:  I don't think I have anything to add,
20   Your Honor.
21           THE COURT:  Well, you know, the board of parole
22   hearings is outside of my jurisdiction.  And I think that's a
23   hard job.  I think being a parole officer is a hard job.  I've
24   listened to some recordings of parole hearings.  I'm not well
25   versed in the information that they require or are entitled to
```

1    make their decisions.  And I -- in this forum, I don't think I

2    have any comment about that.

3        I'll say this.  I think this ISUDT program is saving

4    lives.

5        That's core.  We don't think about lifesaving too much.

6    The receiver was put in place in this case because people were

7    dying pretty frequently from not getting good medical care, or

8    not receiving it at all.  And then that stopped happening.

9        So we have a lot of things we need to fix, but mostly

10   people are not just dying because they're not getting medical

11   care.  But with ISUDT, we're stopping people from dying.  So

12   fewer people are waking [sic] up dead in their cell from

13   fentanyl or heroin or other things.

14       That's amazing.  That's amazing.  We had an endemic

15   problem in all of our prisons, and we massively reduced it

16   because Clark Kelso had a white paper on ISUDT sitting in his

17   desk.  So when the judge asked him "Could we please do

18   something about this?" he was ready.

19       So I like anything that builds enthusiasm for

20   participation in ISUDT.  And I'm unenthusiastic about anything

21   that diminishes enthusiasm for ISUDT.

22       And I hope that to the extent that the various agencies

23   and persons who are involved at any stage of the correctional

24   or post correctional process that our incarcerated patients go

25   through could act in a way that fosters rather than dampens

1    enthusiasm for ISUDT, I'd appreciate it.  That's all I have to

2    say about that.

3        Let's talk about naloxone.  And what I want to say is for

4    the most part when I'm in a case management conference or I'm

5    preparing for a case management conference, I don't learn new

6    things about CCHCS or CDCR as it pertains -- at a programmatic

7    level as it pertains to medical care.  The things that I tend

8    to learn as I'm getting ready are more granular than that.

9        But I did not know until I read this statement that

10    incarcerated persons now receive naloxone when they leave CDCR

11    custody so they can resuscitate friends who have overdosed or

12    be revived themselves.  I did not know that.  I think that's

13    great.  I think it's great.

14        I think that one frontier of this case that we are now

15    able to explore, and which this is a great example of, this

16    continuity of care, that most of the people in our prisons are

17    coming back into the community and so the idea that we're

18    going to take these principles of ISUDT and we're going to

19    allow people to bring some of those principles into the

20    community is terrific.  And I thank everybody who made that

21    happen.

22        It's -- it's proactive and it's going to keep incarcerated

23    people and people in their community safe.

24        So there is a discussion in the statement about the

25    circumstances under which naloxone is made or should be made

1    available within the prison facilities.

2        I can't tell exactly, but it looks to me as though

3    naloxone is part of -- oh, sorry, I'm clicking around on my

4    screen -- like naloxone is provided to custody.  And my guess

5    is it's available within each housing unit or maybe each

6    floor, and that you've got to be in custody and you got to

7    have a key to get to it.  And for now, that's what CDCR wants

8    to do.  And the PLO wishes that it would be provided directly

9    to incarcerated people in some way.

10        So that's the way I read that part of the statement.  And

11    I don't know if anybody wants to comment further.

12        Mr. Specter?

13            **MR. SPECTER:**  I'm kicking this to Mr. Fama.

14            **THE COURT:**  Mr. Fama.

15            **MR. FAMA:**  Good afternoon again.

16        I -- I probably didn't explain it well, Your Honor.  Our

17    understanding is that the naloxone is available with the

18    medical staff who responds in emergencies.  It's available to

19    certain custody staff, I believe the sergeants on first watch.

20            **THE COURT:**  Okay.

21            **MR. FAMA:**  And that we had asked that it be made

22    available to residents if they want it, as it is at some of

23    the -- well, the San Diego and Los Angeles jails.

24        In response we learned by the drafting of this statement

25    from counsel for defendants that there is a plan to put

1    naloxone in the housing units.  But that's all we know.  We

2    don't know what that means, whether it means it's available to

3    custody under lock and key, or whether that means that there's

4    going to be a box of it available to anyone in a housing unit.

5        And we're very curious about that and of course hopeful

6    that it will be more widely available to residents as it is in

7    some of the jails.

8            THE COURT:  Mr. Mello, do you want to weigh in on

9    this?

10           MR. MELLO:  So first of all, I would check the facts

11   on the availability in Los Angeles County Jail, number one.

12       But more importantly, I don't have anything to add other

13   than what we put in the statement on Friday as to this issue.

14   We don't have any additional information that can be shared.

15       We stated the position that it is being discussed with the

16   unions, and that's where it stands.  I don't have anything

17   more that I can share with the Court at this moment on that

18   particular issue.

19           THE COURT:  I don't think the Court has anything

20   either.  I can understand on a kind of gut instinct basis why

21   it is that CDCR or CCHCS, or whoever's making the call, might

22   want to put the naloxone under the control of custody.  And I

23   could probably be persuaded to feel otherwise, but I don't

24   feel otherwise as I sit here now.

25       And so I think I'll let this issue play out.  It sounds

1    like naloxone is not available in individual custody units

2    yet.  And that's going to happen.  And when that happens, I'm

3    assuming defendants will share more information with

4    plaintiffs about how that's happening.

5        I'm glad it's happening, I'll say that.  I think having --

6    putting aside the issue of whether it's only available to

7    custody to give to incarcerated people or whether they have

8    direct access, putting that issue to one side, having naloxone

9    ubiquitously available seems like an excellent idea.  So if

10   that's where the state's going, I applaud that.

11       Who's entitled to immediate control of it?  I don't think

12   I have an opinion about that yet.  So I'll look forward to

13   hearing more from the parties as that issue unfolds.

14       We're getting down toward the end of the statement.

15       Next issue is Emergency Medical Response Program.  And I

16   take it from the case management statement that the parties

17   are in active discussion about that -- those issues.  And I

18   inferred that the parties just wanted me to be aware of those

19   discussions.

20       Mr. Specter.

21        **MR. SPECTER:**  Unless Mr. Fama contradicts me, I think

22   that's correct.

23        **THE COURT:**  Mr. Fama?

24        **MR. FAMA:**  My contradiction.  Just to update Your

25   Honor, Mr. Kelso's office, CCHCS, did yesterday provide us the

1  data that the parties discussed, the -- I think it's on

2  page 29 -- about the numbers and percentages of untimely

3  activations of 911.

4          THE COURT:  Okay.

5          MR. FAMA:  So perhaps I'll -- I'll wait for another

6  occasion to -- to delve into those details.  But they're --

7  but they're in part reassuring and in part very concerning.

8          THE COURT:  Hmm.  Describes my last five and a half

9  years managing this case.  Okay.

10     I usually regret making a joke in a case management

11  statement, and I think I regret having made that one.

12     So I'll -- so it sounds like I should just be standing by

13  and that those discussions will continue and you'll digest

14  this data, and if you think there's more that the state needs

15  to be doing, you'll tell them that.  Am I right about that?

16          MR. FAMA:  Yeah.  Your Honor, if you'll permit me,

17  though, I would like to represent that the data shows that

18  defendant's statement that there's about a -- a two and a half

19  percent noncompliance rate with timely initialing 911 is

20  correct.

21     And -- however that's an average.  Or it -- it takes into

22  account all the prisons.  And what the data shows --

23          THE COURT:  I see.

24          MR. FAMA:  And what the data shows and what we looked

25  at, it is that, you know, about half the prisons have

1    essentially no problem whatsoever with dozens or even hundreds

2    of emergency responses.  And that there are some, and four in

3    particular, where in 10 percent or more of the cases, there's

4    a problem.

5        And, you know, we all have the data and -- and, you know,

6    it's unfortunate but not surprising to us that one of those

7    four prisons and the one with twice as many problems as any

8    other prisons is the Substance Abuse Training Facility which

9    we call S-A-T-F for SATF.

10        **THE COURT:**  Um-hmm.  Well, they're doing a lot of

11    work at SATF so maybe they can fold this in.  When stuff like

12    this happens, and this is probably consistent with all of your

13    experience also, very often there's a resources problem or a

14    training problem.  And you can usually figure out which one it

15    is.  And you can apply the resources or you can apply the

16    training.  And then if that doesn't work, you can try to

17    figure out, you know, what the other problem is.

18        But as I'm listening -- first of all, it's very

19    interesting what you're saying.  You have some institutions

20    that are essentially perfect.

21        And my guess is -- and of course I don't have the base of

22    knowledge that all of you have or that certainly Mr. Kelso

23    has.  My guess is that if you scratch the surface at those

24    institutions, you would see a very well established training

25    program so that whoever is involved in making those 911 calls

1   knows exactly what to do when it happens, they're not

2   flummoxed by the -- you know, they're not -- they're not

3   wondering what to do.  They know exactly what to do and then

4   they're just doing it out of habit.  But the habit kind of

5   came from good training.

6       But I would imagine that, putting my educated guesses to

7   one side, you'll be asking the state, now that you have this

8   data, what do they think explains these differences between

9   institutions, and you'll be satisfied with the answer or not.

10      So I think that takes us back to let's wait and see how

11  they respond to you when you point these things out.

12      Mr. Mello, do you want to say anything on this topic?

13          **MR. MELLO:**  I feel like Mr. Fama and I just can't

14  help myself, I have to say something.

15      I think it's important to understand the numbers here.

16  We're talking about 180 untimely activation delays out of

17  6900.  That's what we're talking about systemwide.

18      And of course we will provide additional information.

19  CCHCS provided additional information and drill-down data and

20  we can speak to those issues.  But I don't want the

21  denominator to be lost.

22      These are terribly important issues.  There are so many

23  checks and balances that identify these delays.  But since we

24  had a long discussion, I thought we might want to circle back

25  to the actual numbers for the listening audience, I guess.

1      Thank you, Your Honor.

2           THE COURT:  Thanks.  Okay.

3      To be continued.

4      And then we have the topic called other medical care

5  matters.  The first is medical care related to weight

6  management.  This topic also seems informational to the Court.

7      I do want to say, first of all, it's important.  It's

8  important.  You've all been on tours with me.  We have a lot

9  of elderly incarcerated patients.  We have a lot of overweight

10  incarcerated patients.  And excess weight does bear on other

11  health care issues.  So I'm glad the issue is -- is being

12  discussed.

13      I also think it's partially wrapped up in nutrition and

14  exercise which I think are squarely within the mandate of the

15  *Plata* court.  And so there may come a time when we start

16  discussing those two related issues in these case management

17  conferences.

18      I don't think I have much more on that issue.

19  Mr. Specter?

20           MR. SPECTER:  Nothing further.

21           THE COURT:  Mr. Mello?

22           MR. MELLO:  No, Your Honor.

23           THE COURT:  Next subpart is inpatient medical

24  provider appointments.

25      That topic is under active discussion among the parties,

 1   and I look forward to getting further information from the

 2   parties as those discussions continue.  I'll hear from the

 3   parties if they want to add anything in a second.

 4       I think it's tucked into this section that California will

 5   become the first state in the nation to offer a set of

 6   Medicaid services to youth and adults in state prisons, county

 7   jails, and youth correctional facilities for up to 90 days

 8   before they're released from custody.  And that is another

 9   continuity of care item that I just loved reading about.

10       And so whoever thought of that, whoever organized it, I

11   know that with these agency-to-agency partnership issues, you

12   cannot get anywhere without a lot of discussion and paperwork.

13   So someone had to work hard to make that happen.

14       And as with the naloxone discussion we had, it's a really

15   important piece of continuity of care and I was glad to read

16   it.

17       So is there anything anyone else would like to say on this

18   topic of inpatient medical provider appointments, whatever is

19   contained in that part of the statement?

20       Mr. Specter?

21          **MR. SPECTER:**  No (Shakes head.)

22          **THE COURT:**  Mr. Mello?

23          **MR. SPECTER:**  No.

24          **MR. MELLO:**  No, Your Honor.

25          **THE COURT:**  Then that brings us to delegations.  That

1    item seems largely informational to the Court.

2        I will say that process is slowing down a little bit

3    compared to what was reported in prior case management

4    statements.  But that is simply because it looks to me from

5    the statement like Mr. Kelso wants to do a thorough job of

6    assuring himself that the institutions are really ready before

7    they're delegated.

8        So maybe I'm supposed to be unhappy that it's slowing

9    down, but I'm actually -- I think it's good to see that

10   Mr. Kelso really wants to be sure that an institution is ready

11   before he delegates it.  And hopefully in the future the pace

12   will pick up.

13       Anything further on any topic before we set our next date?

14       Mr. Specter?

15           MR. SPECTER:  No, thank you, Judge.  I think we've

16   covered a lot of ground in the last hour, almost two hours.

17           THE COURT:  Mr. Mello, anything further?

18           MR. MELLO:  Two comments.

19       Number one, has the Court given any additional thought to

20   making these in person again?  Number one.

21       And if you want to speak to that, I'll wait and say number

22   two.

23           THE COURT:  No, I'll -- I'll answer number one, but

24   now I want to know what number two is.

25           MR. MELLO:  Okay.  So number two is at the beginning

1    of this conference, this Court thanked medical providers and

2    persons who've provided care, custody, leaders, et cetera.

3    And I just want to say that's not lost on our clients and they

4    do listen and they do get reports of these status conferences.

5        And I know in many cases and even today, there is this

6    attack, sometimes it feels like an attack on people who have

7    chosen to again to work in the most difficult settings, to

8    provide care to most vulnerable populations, and sometimes

9    they get lumped into groups.  And I just -- I know that my

10   clients appreciated those words.

11       Sometimes it's lost on other participants and other

12   jurisdictions how hard people are working.  And I just, you

13   know, I think it's important that those people do get "atta

14   boys" and "atta girls" occasionally because we run the risk of

15   burnout and losing people who are working in the most

16   difficult settings, and really talented people who've chosen

17   to work in these settings.

18       And so I appreciate it and my clients appreciate those

19   words, and they appreciate not everybody being lumped in

20   together.

21       And with that, I have nothing further, Your Honor.  And I

22   appreciate you allowing me to say that for my clients who've

23   mostly --

24            **THE COURT:**  I enjoyed listening to it.

25                    (Simultaneous colloquy.)

1          **THE COURT:**  I enjoyed listening to it and it's

2     available -- more of that is available whenever you want it.

3          And I'll just say a word to the staff of any stripe,

4     custody, administrative, medical, who might be listening to

5     this conference.  And I want to pick up on what I said earlier

6     in the conference about my feelings for incarcerated people.

7          And what I want to say is that I feel the same respect and

8     affection, and I use that word advisedly, for the staff who

9     get up in the morning or in the middle of the night, because

10    there are many shifts, and go into our prisons every day.

11         And I think you have hard jobs.  I respect you.  I think

12    we're all walking on the same carpet in these prisons.  We all

13    are.  Okay, correctional officers, medical staff, incarcerated

14    patients.  And I want your lives to be satisfying also.  And I

15    want your -- the conditions of your work to be satisfying

16    also.

17         And I respect your work and you.  And I recognize that

18    some of the things that I say in these case management

19    conferences and some of the things that I do when I'm visiting

20    an institution are -- are unorthodox.  And I don't apologize

21    for that.

22         This is a political and social event and problem that's

23    sitting on a judge's docket.  And so it takes the form of a

24    case.  And so we have to use the tools of a litigation case

25    for the -- in order for the case to progress.

 1        But those tools are inadequate.  They're necessary but

 2    they're also inadequate to the task.  And hopefully this is

 3    not too informal, I guess, is the best word I can come up

 4    with.

 5        But I was in a prison, it was North Kern actually, and I

 6    was speaking to one of the two inmate advisory councils there.

 7    They have two.  And I asked the men in the room who had been

 8    vaccinated.  There were about eight men in the room.  Only two

 9    of them raised their hands.  There might have been ten, eight

10    to ten.  Only two of them raised their hands.

11        And I asked how come more people had not been vaccinated

12    and they gave me their reasons.  And they just had different

13    information available to them than what I had.  And I

14    didn't -- I didn't believe their information about what

15    problems there were with the vaccine, but that's neither here

16    nor there.  They believed it and so they had chosen not to

17    take the vaccine.

18        And after the meeting was over but before I had left the

19    room, I took one of the members of the IACSI who seemed to

20    have a particular standing with other incarcerated people, and

21    I took a risk.  I put my arm around his shoulder and I said:

22    I have to tell you something.  I come into these institutions

23    because incarcerated people are so important to me.  And so I

24    actually love you.  Okay?  Not in some weird way, but in the

25    way people use that word in religion or spirituality or

1    family.  And I cannot stand the idea that this will be the

2    thing that kills you.  I can't.  Because it's preventable.

3        And I wonder -- and -- and the guy's letting me do this,

4    okay.  I mean I had my arm around him.  I've taken him off to

5    the side.  He's listening closely.

6        I said:  I'm wondering what can I do to convince you?  And

7    if you say nothing, I'll leave the room, okay?  I'm not going

8    to pressure you.

9        And he said:  Well, they offered me the vaccine -- I asked

10   for the vaccine before, but they didn't have it.  Which I knew

11   was false because at that time, I got information pretty much

12   every week from Mr. Kelso about where the vaccines were and

13   all that.  So it was a face-saving move on his part.

14       And I said:  Well, okay.  I'm really glad you asked for

15   it.  And hopefully someone will offer it to you at some point.

16       And you -- as I'm sure you guessed by now, as soon as I

17   was on the other side of the door, I told medical leadership

18   that inmate is to be offered this vaccine today.  And if he

19   doesn't take it, that's fine.  Just walk away.  But if he says

20   yes, someone puts -- gives him that vaccine within the hour.

21       Okay.  He took it.

22       Why do I tell you this story after Mr. Mello just talked

23   to me about staff?  Because later that day I had exactly the

24   same conversation using exactly the same body language and

25   exactly the same words with a line CO.  And I'll never know if

1    it had an effect.

2        And I want to say also that I think the CO was

3    uncomfortable a little bit in a way that I don't think the

4    incarcerated person was.  But I was careful to take him to one

5    side so that he would not have to engage in a conversation

6    about the vaccine with one of his colleagues.  Because I did

7    not want him to be in a position where he felt that anything

8    that he said could be the subject of peer pressure or whatever

9    it was.

10       He listened respectfully to what I said.  But I felt the

11   same way about him.  And that is, I had so much respect and

12   affection for him, and the idea that this is what would come

13   for him and take his life was intolerable to me.

14       And without having any idea of the probability that what I

15   told him would be successful, because he was not surrounded by

16   any colleagues, I just felt that I had the opportunity.

17       So to all the staff I would say, I don't utter [sic] you.

18   I don't privilege incarcerated people over you.  I think this

19   case is about the needs of incarcerated people, explicitly

20   about that, and I'm committed to helping them in every way I

21   can.  But I see you on the staff side, and I think we're all

22   in this together.

23       Let's set another date.

24       Oh, I got so carried away, I forgot to answer Mr. Mello's

25   first question.

```
1          Before I say what I think about that -- well, what I think
2     is not a hard no.  So I would be curious to know what the
3     parties think about that.  And I'll -- I'll hear from anybody
4     who wants to raise their hand so I know who to call on.
5          You're a quiet bunch today, uncharacteristically.
6     Mr. Mello raised his hand.  So did Mr. Fama.  Okay.  I saw
7     Mr. Mello first.
8          Mr. Mello, you can go first.
9          MR. MELLO:  I'm very competitive so I'm glad I get to
10    go first.
11         I broached it because I think we're interested in it.  I
12    think Your Honor's talked about people seeing each other in
13    the halls and sometimes that helps, and that's the reason we
14    broached it.
15         Of course we will do what Your Honor -- we have to do what
16    you will say, but I think we prefer to go back in person, Your
17    Honor.
18              THE COURT:  Mr. Fama, what do you think?
19         MR. FAMA:  Well, we talked about it a bit over here,
20    Your Honor, and we appreciate the ability of the public and
21    others to -- to hear and observe these case management
22    conferences.
23         It's a slightly different format today, but my
24    understanding is that anyone from the public can join in.
25    I -- I don't know that we can tote it up, but in the past I
```

1    know upwards of 150 people, including a number who -- who work

2    in the prison and -- and some who have family in the prisons

3    were able to observe it.

4        And I think for that reason, we appreciate the ability of

5    the public and others to listen in.

6            THE COURT:  Two completely great, mutually exclusive

7    reasons.

8        I agree with both of you.

9        Mr. Fama, your number today is 117, which is not bad.

10   It's not 150, but it's a good number.  So I'm a fan of us

11   doing all of our work in a transparent way.

12       I do think about the families of incarcerated people also.

13   I do think about the staff around the state that work in these

14   institutions who are curious about the case, have the

15   opportunity to listen in.  And so that's, I think, a very

16   legitimate concern.

17       I think Mr. Mello is right, not just about the benefits of

18   having everybody be in the same room, because it does I think

19   lead to more agreement and a better litigation culture, but

20   also I think -- I've been doing Zoom now since the beginning

21   of the pandemic, you run up against the limits of speech.  And

22   we are all able to communicate so much more information to

23   each other when we're in the same physical space because we

24   are -- we are -- certain things are intangible, certain things

25   are communicated by body language, et cetera.

```
 1        So I think what I'd like to do is I'd like to have -- I
 2   wish I could do both things, you know, each time, but I can't.
 3   I think I would like to have some in person and some by Zoom.
 4   I think the time has come -- I don't -- I am not -- most of my
 5   case management conferences are on Zoom, and that's going to
 6   be true for a long time.
 7        But I think in particular cases, and I put this case in
 8   that category, there are advantages to having them in person.
 9        You're all good lawyers.  I like your advocacy.  And I
10   think the advocacy is more effective in person also, honestly.
11        So let's do the next meeting in person.  Let's see how
12   that feels.  It's possible I'm going to make you all mask up.
13   I'll have to think about that.  I'm making my jurors and
14   witnesses and lawyers do it in my jury trials.
15        So we might be wearing masks.  I know that's, you know,
16   getting to be kind of retro, but I might do it anyway.  And
17   let's pick a date.
18                    (Pause in the proceedings.)
19             THE COURT:  How about the afternoon of May 3rd, which
20   is about a week less than three months from now.
21             MR. MELLO:  That works for me personally.
22             THE COURT:  Mr. Specter, what say you for the --
23             MR. SPECTER:  I think that -- that seems fine, Your
24   Honor.
25             THE COURT:  All right.
```

1        And Ms. Dupree, Mr. Kelso, and Mr. Adam, you available on

2    that date?

3            **MR. ADAM:**  Yes, Your Honor.  And if my wife has her

4    way, it will be without beard.

5            **THE COURT:**  Well, we frequently make reference to

6    things I don't have any jurisdiction over, and I think you

7    just added another one.

8            **MS. DUPREE:**  I will come without a beard.  I hope.

9            **THE COURT:**  Yeah.

10       Okay.  So let's set a conference May 3rd at 2:00 o'clock

11   in the afternoon.  Well, I think we could put that at 1:30.

12   I've got a trial on calendar.  But I think -- I'm not

13   confident I'm going to be in trial that day.  Let's do it at

14   1:30 so folks can get back on the road a little earlier.  If I

15   have to bump it back to 2:00 o'clock, I will.  But let's say

16   1:30.

17       In terms of when a statement is due, Monday at noon is

18   fine.  It gives me -- even if I am in trial, it gives me time

19   to read it.  But we could also make it due on Friday and then

20   no one has to work over the weekend.  So that would be my

21   suggestion is let's just make it due on Friday at 5:00, and

22   then --

23       Oh, I'm seeing so much nodding.  Okay.

24            **MR. MELLO:**  Yes.  My team is very much in favor of

25   Friday.

1     **THE COURT:**  I can't remember the last time I --

2           (Simultaneous colloquy.)

3     **THE COURT:**  -- had that much agreement in a case

4  management conference.

5     So the statement will be due Friday, April 28th, at

6  5:00 p.m.

7     Further matters for the Court's attention, Mr. Specter?

8     **MR. SPECTER:**  No, thank you, Judge.

9     **THE COURT:**  Mr. Mello?

10    **MR. MELLO:**  No, thank you, Your Honor.

11    **THE COURT:**  Mr. Adam?

12    **MR. ADAM:**  No, thank you.

13    **MR. MELLO:**  All right.  Thank you all very much.

14         (Proceedings were concluded at 4:05 P.M.)

15                    --o0o--

16            **CERTIFICATE OF REPORTER**

17     I certify that the foregoing is a correct transcript

18  from the record of proceedings in the above-entitled matter.

19  I further certify that I am neither counsel for, related to,

20  nor employed by any of the parties to the action in which this

21  hearing was taken, and further that I am not financially nor

22  otherwise interested in the outcome of the action.

23  _____

24     Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

25              Friday, February 10, 2023

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**