Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

MARCIANO PLATA, et al.,      )
                             )
          Plaintiffs,        )
                             )
  VS.                        )      NO. C 01-01351 JST
                             )
GAVIN NEWSOM, et al.,        )
                             )
          Defendants.        )
_____)
                             Oakland, California
                             Monday, September 23, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

          PRISON LAW OFFICE
          1917 Fifth Street
          Berkeley, California  94701
     BY:  **DONALD SPECTER, ATTORNEY AT LAW**
          **STEVEN FAMA, ATTORNEY AT LAW**
          **ALISON HARDY, ATTORNEY AT LAW**
          **MACKENZIE L. HALTER, ATTORNEY AT LAW**
          **SOPHIE HART, ATTORNEY AT LAW**

For Defendants:

          HANSON BRIDGETT LLP
          425 Market Street - 26th Floor
          San Francisco, California  94105
     BY:  **PAUL MELLO, ATTORNEY AT LAW**
          **SAMANTHA D. WOLFF, ATTORNEY AT LAW**

          ATTORNEY GENERAL OF CALIFORNIA
          600 West Broadway - Suite 1800
          San Diego, California  92101
     BY:  **CORINNA ARBITER, ATTORNEY AT LAW**
          **DAMON G. MCCLAIN, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                    U.S. District Court - Official Reporter

**APPEARANCES:**   (continued)

For California Correctional Peace Officers Association:

                    MESSING ADAM & JASMINE LLP
                    4330 Redwood Highway - Suite 350
                    San Rafael, California  94903
            BY:  **GREGG M. ADAM, ATTORNEY AT LAW**

Also Appearing:     **CLARK KELSO, RECEIVER**

                    FUTTERMAN DUPREE DODD CROLEY MAIER LLP
                    601 Montgomery Street - Suite 1210
                    San Francisco, California  94111
            BY:  **JAMIE L. DUPREE, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | <u>**Monday - September 23, 2024**</u>                    <u>**10:03 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | **---000---** |
| 4 | **THE CLERK:**  All rise.  The U.S. District Court is now |
| 5 | in session.  The Honorable Jon S. Tigar presiding.  Please be |
| 6 | seated. |
| 7 | (Pause in proceedings.) |
| 8 | **THE CLERK:**  Calling civil case number 01-1351-JST, |
| 9 | Plata, et al. versus Newsom, et al. |
| 10 | Parties, please state your appearances beginning with |
| 11 | Plaintiffs' Counsel.  And if I can have you come up to the |
| 12 | lectern, we have a remote court reporter.  Thank you. |
| 13 | **MS. HART:**  Good morning, Your Honor, Sophie Hart, Don |
| 14 | Specter, Steven Fama, Alison Hardy, Lily Harvey and Mackenzie |
| 15 | Halter from the Prison Law Office for Plaintiffs. |
| 16 | **THE COURT:**  Welcome.  Sorry, Madam court reporter. |
| 17 | There we go. |
| 18 | **MR. MELLO:**  Good morning, Your Honor, Paul Mello and |
| 19 | Samantha Wolff from Hanson Bridgett for Defendants. |
| 20 | **MR. MCCLAIN:**  Good morning, Your Honor, Damon McClain |
| 21 | and Corinna Arbiter for the AG's Office for Defendants. |
| 22 | **THE COURT:**  Good morning. |
| 23 | **MS. DUPREE:**  Good morning, Your Honor, Jamie Dupree on |
| 24 | behalf of receiver Clark Kelso. |
| 25 | **THE COURT:**  Good morning. |

1          **MS. KENT:**  Good morning, Your Honor, Leanne Kent and

2   Greg Adam here for California Correctional Peace Officers

3   Association.

4          **THE COURT:**  Good morning.  Mr. Adam, it has been a

5   while.  Nice to have you back.  Well, good morning, everyone.

6   This is a case management conference in the case we have those

7   about every 90 days.

8          I always have to remind myself that sometimes or that in

9   some ways the purpose of having them is to have them because

10  the presence of the case management conference is -- I think

11  causes a certain amount of work just to occur, and it also

12  allows for the scheduling of the work.

13         And so, just catching up with what's going on even if

14  there are not a lot of disputes is very useful to me.

15         I would say there are not a lot of intense disputes in the

16  case management conference.  I think in some ways that's a sign

17  of the progress of the case, but we have a lot of things to

18  talk about this morning.

19         So, why don't I just go through -- I think this time I

20  will just go through the statement in order.  If I have

21  comments to make, I will make them.  And then if I think that

22  items appear to be informational to me, I'll say that and give

23  the parties a chance to say otherwise.

24         On progress toward resolution, I think mostly both

25  post-receivership plan and delegations to date are meant to be

 1    informational to me.

 2         I would just remind the parties that last time -- I think

 3    I indicated from the bench -- that I had read a preliminary

 4    report that Amend had prepared with some ideas about

 5    post-receivership structure and that I liked it.  I still like

 6    it.  I'm aware that Amend is doing further work to try to put

 7    meat on the bones, and I would expect that that report,

 8    whatever it is, will have an influence on my thinking.

 9         So, I just commend that to the parties as they prepare

10    their own ideas.

11         Anything more to be said about progress towards

12    resolution?

13              **MS. HART:**  Nothing further from Plaintiffs.

14              **THE COURT:**  Widespread shaking of heads, okay.

15         Roman II, access to specialty care services, this item

16    keeps popping up on case management statements.  So, I called

17    Mr. Kelso and said, "Mr. Kelso, this item keeps popping up on

18    case management statements," and I invited him to give an

19    update to the parties.  So, I will do that now.

20              **MR. KELSO:**  Thank you, Your Honor.  Clark Kelso,

21    Receiver.  Well, two things that I think are worth mentioning

22    by way of update.  The first is the Plaintiffs, I think, are

23    correct; we have stalled in terms of reducing the backlog.

24    That's just factually where we are at this point and have been

25    for the last couple of months.

1    Actually, I'm going to have three things to say.

2    The second comment is we are very actively monitoring and

3  managing the appointments that are in the backlog.  So, we are

4  making sure that those appointments get handled as promptly as

5  they can be.

6    So, for example, of the 2,100 or so that are in the

7  backlog right at the moment, about 75 percent of them are no

8  more than 30 days late.  That gets reflected, of course, in the

9  timeliness measure; and we are trying to make sure -- I can --

10  I have more data about how late various appointments are, but

11  we are trying to make sure that we aren't simply missing

12  appointments in the backlog; that we are getting to the ones

13  that are important and we are getting to them as quickly as

14  possible.

15    A third comment, we are -- we have a fair number of

16  appointments, maybe 125 in the backlog, 130, that relate to

17  transgender treatment.  And, frankly, we need to -- and are in

18  the process of trying to figure out how to handle those

19  differently because we oftentimes are scheduling several years

20  out because transgender treatment requires that much -- that

21  much effort; and many of those appointments, given the way we

22  have to schedule them at the moment, show up on the backlog

23  list even though almost very few of them are actually current.

24    So, we have got some technical issues to work out with the

25  way we count what constitutes part of the backlog.

1    And I'm going to add a fourth.  No question we need to do

2  more to reduce the backlog.  So, we are cognizant that having a

3  steady stubborn backlog is not where we want to be; and I'm

4  confident Dr. Bick and his team and our folks who work with

5  Health Net will be doing everything they can to reduce that

6  backlog so that we can get back on a downward trajectory.

7  Thank you, Your Honor.

8    **THE COURT:**  Thank you.  Are you -- I'm going to ask

9  you a question that will reflect back on something we have

10  talked about.  Are you confident that the dashboard accurately

11  reflects the percentage of -- measures the delay measured as a

12  percentage of services delivered?

13    **MR. KELSO:**  Yes, I am.

14    **THE COURT:**  Oh.

15    **MR. KELSO:**  We -- what I have been looking at -- and

16  getting a better understanding from my own staff -- is the

17  differences between the timeliness measure and what's in the

18  backlog.

19    And it turns out that the -- it's a very complicated

20  relationship between those two things, but I'm confident that

21  both measures are accurately reporting the numbers that we see.

22    **THE COURT:**  Okay.  Further comment from anybody?

23    **MS. HART:**  Good morning, Your Honor, we appreciate the

24  update --

25    **OFFICIAL COURT REPORTER:**  I'm sorry.  This is the

1    court reporter.  Can you state your name again, please.

2         MS. HART:  Sophie Hart, Counsel for Plaintiffs.  We

3    appreciate the update and CCHCS's focused attention to this

4    issue and hearing about new attention to this issue as well.

5         I -- just rereading the statement this morning, I wanted

6    to note that we focus on the timeliness of high priority and

7    medium priority appointments because those are the ones where a

8    clinician has determined it needs to happen on an expedited

9    timeframe.  And so when there are significant delays reported

10   on the dashboard for those measures, we are particularly

11   concerned about the risk of harm to patients.

12        So, we will continue to focus on those going forward and

13   continue to monitor this.  Thank you.

14        THE COURT:  Thanks.  And it is a structural issue;

15   right.  This is not about care at one facility.  So, I think

16   that's worth bearing in mind as we now begin to think we can

17   see the end horizon.  Mr. Mello, further comments about this?

18        MR. MELLO:  Mr. Mello for Defendants.  Nothing further

19   than what the Receiver just reported.  Thank you.

20        THE COURT:  Okay, thanks.

21        I don't have anything to say about notification of offsite

22   specialty care appointments.  I think tablets are going to be a

23   game changer, and I think we are all just waiting on tablets.

24   So, that's all I have there.  Ms. Hart, anything further?

25                        (No response.)

1          **THE COURT:**  Okay.  Madam reporter, she says nothing

2   further.  Mr. Mello anything further?

3                          (No response.)

4          **THE COURT:**  Mr. Mello says nothing further.

5       Okay, use of the black box restraint system.  So, I got an

6   update from Mr. Kelso at 5:04 a.m. this morning.  I did not

7   read it until 5:53 a.m., which is -- it was on my e-mail.

8       So, I will tell you after I read the case management

9   statement, I had sort of written down some notes about what I

10  might say.  And what I was going to say is that the we, I think,

11  are in the very fortunate position in this case, which I have

12  now been presiding over for 7 years -- or at least 7 years --

13  of managing the healthcare of this enormous institution by

14  coming to agreements and allowing prison officials to make

15  promises.

16      It's extraordinary actually.  We are so incredibly lucky.

17  I issue very few orders, and I'm asked to issue very few

18  orders.  And for that to work, the officials obviously have to

19  keep the promises; and that's what I was going to say because I

20  wasn't that happy with the black box part of this.  And, as you

21  know, I do think that they inflict a lot of unnecessary

22  suffering; and we know that there are inmates who are not

23  getting medical care they need because of the black box.

24      But then I got an update at 5:00 o'clock in the morning --

25  and I don't know if that has been shared with the State or

1  anybody?

2                        (No response.)

3        **THE COURT:**  Okay, no.  Everyone is shaking their head.

4  I'm usually not the one that gets to put the news on the record

5  but I guess today I am.

6        Mr. Kelso, I'm just going to read this if that's all

7  right.  It appears that 27 -- and I'm just reading from an

8  e-mail that I received from Mr. Kelso.  (As read:) "It appears

9  that 27 institutions have now fully acquired and trained their

10  transportation staff on proper use of new equipment."

11        "All 27 are now operating under the February memo that

12  restricted use of the black box to instances approved by the

13  warden for his or her designee."

14        "There are three institutions -- SCC, SVSP and VSP -- that

15  have not received the new cuffs/change from their supplier.

16  CMC had already been using better security equipment, and they

17  don't use the black box.  So they are not in the three but they

18  are not also not in the black box group."

19        And it was also Mr. Kelso's wish, expressed in this

20  e-mail, that the State have provided its lawyers with this

21  information; but I'm happy to serve that role.

22        So, that's the information.  I will just say a couple of

23  things first.  I'm sure Mr. Kelso would be happy to provide

24  this information to you after the hearing in a form that you

25  can keep it or record it or whatever you do.  So, I would

1   expect that he will follow up on that.

2        And then also, I just want to say to the Prison Law

3   Office, this strikes me as one of the things where you are in

4   contact with your clients, sometimes it takes a little while

5   for practice to line up with policy.  And if you discover that

6   practice has not lined up with policy, I'm sure you will bring

7   that to the Court's attention.

8        So, Mr. Mello, it looks like you wanted to speak.

9            **MR. MELLO:**  Yes.  So, I just want the record to be

10  clear that I didn't know exactly what information you had, so I

11  didn't want to presuppose.  I did have that information.  So, I

12  apologize for making Your Honor have to report it to the Court,

13  so --

14           **THE COURT:**  As I'm sure you-all have discerned over

15  seven years of working with me, talking is not effortful for

16  me.  So, that was fine.

17           **MR. MELLO:**  I think it takes one to know one.

18           **THE COURT:**  Thank you.  Okay.  So, that is good news.

19       Civil servant vacancies and use of registry staff, I think

20  that's for the Court's information only.  I will say labor

21  market is starting to loosen up.  Whether that will affect

22  these particular positions, I don't know.

23       As far as I can tell, CCHCS is doing every single thing it

24  can think of to work on this problem; and I look forward to

25  continuing updates.

1      Development of a model staffing policy, I'll give you my

2   tentative thought about this; and then I'm happy to take

3   argument or discussion.

4      I don't think staffing ratios need to be in the DOM, and

5   my reasoning for saying that is -- not that we don't need

6   staffing ratios.  We do need them and we have them -- it's

7   that -- it is that putting them in the DOM could take away some

8   of the flexibility that I think has been a component of CCHCS's

9   effectiveness.

10      And my guess -- and I will hear from PLO in a second.  My

11   guess is that the PLO is looking down the road to the time when

12   I'm not doing this job, Mr. Kelso is not doing this job, and

13   wanting to set a floor of some kind.  And if I'm right about

14   that, I'm sympathetic to that goal; but I'm not sure from a

15   healthcare delivery standpoint that this is the best way of

16   achieving that goal.

17      So, I'm happy to hear argument about why I'm wrong or my

18   assumptions are wrong; but when I read the case management

19   statement, that's the first thing that I thought.  Ms. Hart.

20      **MS. HART:**  Thank you, Your Honor.  Again, this is

21   Sophie Hart, Counsel for Plaintiffs.

22      CCHCS agrees with you.  So, we received a response after

23   filing the statement that said essentially the policy wouldn't

24   be revised to address those concerns.

25      But you are right.  Our concerns come primarily from a

 1  sustainability and durability of the remedy question.  And so,

 2  we anticipate that this -- if it won't be solved in this policy

 3  will be addressed in the plan for post receivership governance

 4  or at least it is our position that it would need to be.

 5          **THE COURT:**  Yeah, let me leave you with the thought

 6  that who is making these decisions and how much accountability

 7  they have and how much sovereignty they have and how much

 8  agency they have is what's important.  And if you are not -- if

 9  you have not created a system that is successful on those

10  metrics, fiddling with the DOM will not get you there.

11          **MS. HART:**  Thank you.

12          **THE COURT:**  Mr. Mello.

13                      (No response.)

14          **THE COURT:**  All right.  Moving right along, ISDUT, IV,

15  there is sort of an intro section before you get to subpart A,

16  and the intro section essentially invites a moment of

17  celebration about the success of Naloxone and I accept the

18  invitation.

19      I just think it's fantastic.  I think it is progressive.

20  I want to give a huge thanks to the Secretary.  I want to give

21  huge thanks to the Secretary's predecessor.  I want to give

22  huge thanks to CCPOA.  I want to give a huge thanks to the

23  custody liaison staff who liaises with medical.

24      All of these people have to be in alignment for this to

25  work.  And fentanyl continues to be a

1    scourge -- excuse me -- and so we need every tool we can get at

2    our disposal.  So, I was happy to see that note in there.

3       Subpart A, SUD care licensed clinical social worker

4    appointments.

5                  (Pause in proceedings.)

6       **THE COURT:**  At any given time we have half a dozen

7    things cooking along that are not like a single conference

8    issue, things that just keep coming up.  And I know that CCHCS

9    is making progress on this issue, but it also has a quality of

10    persistence that I think invites attention.

11       So, I'm happy to hear from the parties.  I would like

12    to -- I would like the Receiver to meet with the PLO and the

13    State and come to some understanding about the actual effect

14    this is having as an impediment to participation in ISUDT.

15       See if we can't figure out the -- re-measure this effect

16    because it keeps showing up.  I would just like to know -- part

17    of what we do in here -- "we," I mean all of us together -- is

18    figure out what should be at the top of the list and what

19    should be next and what should be next.

20       It keeps appearing.  Now I would like to know how harmful

21    is it.  So, Mr. Kelso, thoughts about that?

22       **MR. KELSO:**  No, Your Honor, other than be happy to

23    have a meeting to further discuss the problem.

24       **THE COURT:**  Yeah.  Ms. Hart?

25                (No response.)

1          THE COURT:  Mr. Fama.

2          MR. FAMA:  Thank you, Your Honor, Steven Fama,

3    Plaintiffs.  First, Plaintiffs will join the celebration if we

4    can.

5          THE COURT:  That party is still happening.

6          MR. FAMA:  This is a very important program, the

7    ISDUT.  It is necessary treatment.  And the work that is being

8    done in the prisons to help the people who have enrolled in the

9    program is lifesaving.

10         And since we last met, the progress has been -- well, it's

11   a milestone to get the Naloxone to the residents of CDCR.  And

12   a lot of great work has been done to reduce the number of

13   people who are waiting to see primary care providers for an

14   initial appointment and still, though, more work needs to be

15   done with that.

16         But with regard to the social work aspect of it, we do

17   think it's important.  There are seemingly thousands of people

18   waiting to be screened, and we believe that there are many who

19   need to see social workers after they are enrolled in the

20   program and receiving medication assisted treatment to discuss

21   issues that relate to, for example, the risk of relapse.

22         And then there is another component to the program in

23   which the social workers are to meet with people who are

24   released or are releasing both to parole and community

25   supervision, and we believe there is a couple of hundred, at

1    least, of those a month to help with the transition; and those

2    appointments -- unfortunately, despite the work that's being

3    done by the current core of social workers -- isn't being done

4    for a goodly percentage of the patients who paroled.

5        As we have said in the statement, it appears that there is

6    a shortage of social workers resulting from vacant positions

7    and that additional work needs to be done to fill those

8    positions so that the program -- which, again is very

9    important -- can more adequately treat these patients.

10        **THE COURT:**  Thanks.

11        **MR. MELLO:**  Defense Counsel and Defendants would be

12    glad to meet with the Receiver to talk about this issue.  I

13    think the case management statement speaks to many of the

14    issues here.  It talks about other classifications that are

15    going to help with this process.

16        There may also be some misunderstanding as to the actual

17    numbers.  There are various pathways that people can get into

18    the program.  It is not necessarily -- and I know that the care

19    guide as well as policies are being updated, but we are happy

20    and look forward to meeting with the Receiver and talking about

21    this issue more.

22        **THE COURT:**  I very much appreciate this point; that

23    there are different pathways into the program, and that's

24    actually one of the reasons for my setting the meeting.

25        I want everybody to get on the same page if it is possible

1    about what are the relevant numbers.  You know, are we

2    measuring -- if what we care most about is access followed by

3    complete treatment, are we measuring the right gateways?  So, I

4    have in mind what you just said.

5        All of this sort of orthogonally reminds me to update you

6    about ex parte contacts.  I told you last time it was my

7    intention to go to CMF to participate in something called

8    "Inside Circle," and I did it.

9        And I will just say for the record one more time -- I

10   won't repeat it -- but I'm going to go back probably on a

11   semi-regular basis.  I can't tell you anything that was said

12   because one of the agreements you make to participate in Inside

13   Circle is that what is said there stays there.

14       But structurally, it is a therapeutic circle of men and

15   there is a volunteer facilitator -- there is a volunteer from

16   the community, and then there is someone who is therapeutically

17   trained, who is part of Inside Circle, who is also from the

18   free world; and everyone else in the circle, except for me, is

19   an incarcerated person at CMF.  So, I'm going to keep doing

20   that.

21       So, the next thing in the statement is SUD-care PCP MAT

22   appointments.  I don't have anything to say about this on the

23   merits.

24       I have something brief to say with regards to Defendant's

25   position, and we can talk more about it if someone wants to;

1    but what the Defendants say is that because the parties are

2    engaged in the non-paragraph 7 process, it is premature to

3    discuss the issues via the statement.

4        And what I want to say is:  I don't know -- I have never

5    told anybody what to put in the statement.  So, I don't know

6    that I have anything to say about that; but I think the

7    function of the conference is for me to know what the parties

8    are talking about.

9        And the fact that they haven't come to a resolution or

10   that there is a certain structure to their conversations, to my

11   eyes and ears doesn't sound like a reason for me not to know

12   that they are talking about it.  If they are talking about it,

13   they must think it's important.  That's how the opportunity

14   cost of time works.

15       So, I don't know if anything more needs to be said about

16   that; but unless someone wants to correct me, I just see those

17   processes as being related but not one acting as a break on the

18   other.  Anything more to be said about that?

19            **MR. MELLO:**  For Defendants, we hear you, Your Honor.

20            **THE COURT:**  Okay very good.  Other medical care

21   matters.  Extreme heat -- wow, okay, now I think we are at

22   something that could bear some discussion.  I just want to put

23   some information on the record that I found on the internet.

24       Article 5(1)(b) of the 1977 Additional Protocol II to the

25   1949 Geneva Convention relative to the treatment of prisoners

of war says (as read:) "A person's whose liberty has been
restricted shall be provided with food and drinking water and
be afforded safeguards as regards health and hygiene and
protection against the rigors of the climate."

2008 United States Manual On Detainee Operations and its
chapter on Planning For Detainee Operations states (as read:)
"To the extent feasible, the facilities will be protected from
dampness; adequately heated and cooled and appropriately"
eliminated -- excuse me -- "illuminated."

I think to the extent feasible means you might be in a
desert somewhere with no electricity, that kind of thing.  I
don't think it refers to out-of-pocket expense.

Since 1984 statewide regulations adopted by the Texas
Commission on Jail Standards have required all jails in Texas
to maintain indoor temperatures between 65 degrees and
85 degrees.

Other government buildings in Texas must maintain, quote,
"comfortable levels;" e.g., between 68 and 78 degrees.

North Carolina's Administrative Code for its jail system
requires heating, ventilation and air-conditioning systems that
are capable of maintaining temperatures in confinement units at
not less than 68 degrees Fahrenheit during the heating season
and not more than 85 degrees Fahrenheit during the cooling
season.

Tennessee requires that local correctional facilities have

a temperature of not less than 65 degrees Fahrenheit and not more than 80 degrees Fahrenheit.

While there are no requirements under federal law, the Bureau of Prisons' Operations Manual says that target temperatures should be 76 degrees in the summer and 68 degrees in the winter with the caveat that facilities may be a few degrees higher or lower.

In case anyone was wondering whether I'm competitive with other states, I am.

On the question of whether this is related to medical care, I read an article.  It came out earlier this year.  It was produced by KFF Health News, which publishes California Healthline, an editorially independent service of the California Healthcare Foundation.  The article was reprinted, among other places, on the NPR website.  So, I regard it as reliable and having come from an authoritative source.

And it reports that seven workers died in California from indoor heat between 2010 and 2017, and that heat stress can lead to heat exhaustion, heat stroke, cardiac arrest and kidney failure.

In 2021 the Centers For Disease Control and Prevention reported 1,600 heat-related deaths occurred nationally, which is probably an undercount because healthcare providers are not required to report them.

If someone wants a copy of the article, it's called *Newsom*

1    *Offers A Compromise To Protect Indoor Workers From Heat*.  It's

2    on the KFF Health News.org website.  It's about what happened

3    earlier this year with regards to regulations -- workplace

4    regulations actually.

5        So, in just a moment I will ask Mr. Adam or Ms. Kent if

6    they want to weigh in on this topic because it affects their

7    membership.

8        So, anyway, I think it is a big problem and it's going to

9    get worse; and both of those things are not arguable.  A, it is

10   a big problem.  And, B, it is going to get worse.  It might not

11   get worse every year, but on balance -- on average it is

12   definitely going to get worse.

13       So, I don't have any definitive to say about it.  I just

14   wanted to signal to the parties that I think it's important and

15   give them a few metrics that they can work with.

16       I will ask the question today whether or not there is an

17   answer.  Is there a temperature above which CDCR agrees it

18   would not be healthy for an incarcerated person or an employee

19   to stay for an extended period of time?  That's one question I

20   have.  Is there a number?  What's the number?

21       Are there measurements of cell temperatures?  Are we -- do

22   we even know what we are imposing on people?  Are there

23   other -- are there measurements elsewhere in the facilities.

24       So, to the extent that we are in -- we have a housing

25   unit, for example, and we have custody staff in charge of that

 1  housing unit -- we have all been in prisons many, many times --

 2  there is generally sort of a common -- what I would call a

 3  common area where custody are, and then they can kind of rotate

 4  out into the housing unit as they need to.  Do we know what the

 5  temperature in those hallways is?  Do we know what the

 6  temperature at the desk is?

 7      These are places that our patients are going to go.  They

 8  are also patients that custody and medical staff are going to

 9  go.

10      Do we have statistics about the treatment of heat-related

11  conditions in our own facilities?

12      There is a single anecdotal example of a 42-year-old woman

13  who may have died because of heat-related issues.  That's in

14  footnote 24.

15      I just wonder, do we know anything at a higher level of

16  generality about what's happening medically because of heat?

17  So, that's just some place-setting information.  Ms. Hart.

18      **MS. HART:**  Thank you, Your Honor.  We share those

19  questions.  Would like answers to them as well.  I don't, of

20  course, have the answer particularly to the first one.

21      I do know in regards to whether temperatures are taken in

22  cells or in common areas, my understanding is the policy is to

23  take them in common areas only and not in cells.

24      And anecdotally, we have heard from many of our clients

25  that the temperatures are much higher in their cells.  That has

1    been a persistent question, whether policy can be revised to

2    require temperatures be taken where people live.

3        **THE COURT:**  High Desert hasn't been delegated yet, has

4    it?

5        **MS. HART:**  No.

6        **THE COURT:**  Oak Creek hasn't been delegated, has it?

7    Oh, it has actually.

8        **MS. HART:**  Yeah.

9        **THE COURT:**  You know, I have been not visiting prisons

10   in August and September for these reasons and maybe I should.

11   That horse has left the barn for 2024.  But, anyway, go ahead.

12       **MS. HART:**  I was just going to say that we haven't yet

13   received a response to our August 19th inquiry, but we hope to

14   do so soon and to continue these discussions with CDCR and

15   CCHCS.

16       **THE COURT:**  Thanks.  Mr. Mello.

17       **MR. MELLO:**  Your Honor, I don't have answers to your

18   questions, but I suspect we will have answers to your questions

19   for the next case management conference.  And Ms. Hart is

20   correct; that there is an outstanding non-paragraph 7 letter,

21   which is not a reason not to discuss it at a case management

22   conference.

23       **THE COURT:**  So, I just think this is the beginning

24   of -- you know, this is the beginning of a discussion.  The

25   issue hasn't come up in a case management statement that I'm

1  aware of before, and everyone is probably still getting their

2  sea legs in terms of what their positions are going to be and

3  the discussions and so forth.

4      My only goal was to signal to the parties that it seems

5  very important to me and that there -- and that we cannot

6  responsibly address this issue without good data, which is

7  generally true, what we are doing around here.

8      And I have to say if we don't have -- we have a lot of

9  incarcerated people, a significant number who are in their

10 cells 23 hours a day.  And the majority of incarcerated

11 people -- even if they are not in that group -- are in their

12 cells the majority of the day.  We have to know what the

13 temperatures are in -- in their cells.

14     And to the point that maybe this is not a medical care

15 issue, I don't agree with that.  This is a public health issue.

16     If we had a bunch of tarantulas running around inside of a

17 housing unit, we wouldn't say "Well, that is a spider issue."

18 We would be worried that the tarantulas would go into the cells

19 of people and sting them and poison them.

20     We have heat running around in these cells, and we already

21 know from the statistics it is very dangerous to people if

22 there is too much heat.  So, I think it would be good for us to

23 try to get some data.  But, to be continued.

24     Mr. Adam, would you or Ms. Kent like to weigh in on this

25 issue because, as I said earlier, it initially came to my

1  attention because I remember when this event happened last

2  April and these facilities were exempt, so....

3       **MR. ADAM:**  Your Honor, Greg Adam for CCPOA.  Thank

4  you, Your Honor.  You remind me of a couple of events.  One is

5  I remember being in an arbitration near Blythe to prepare, and

6  it was 6:00 p.m. or something and it was 111 degrees.

7       I also remember in early in the *Madrid* cases under your

8  predecessor, Judge Henderson -- this is about 20 years ago --

9  Special Master Hagar having some comments about CCPOA; and

10 there was a large public crowd at that particular hearing and

11 some cheering.

12      And Judge -- and Special Master Hagar said, "Well, hold

13 off because as bad as the conditions may be for the inmates,

14 the correctional officers are right there with them."

15      And so, we are certainly interested in continuing to

16 engage on this issue.  Our members try to follow all of the

17 heat protocols.

18      One of our challenges we have run into throughout time is

19 that a number of laws that apply generally in the State have

20 been adjudged to not apply to public employees.

21      And two of my great lesses are trying to get meal breaks

22 for our members, 15, 20 years ago.  And more recently, the

23 California Supreme Court said the minimum wage standards do not

24 apply to our members.  They apply to everybody else in

25 California partly but not CCPOA members.

1      So, we are interested.  It's obviously an important issue.

2  We know there are extremes of climate in our State.  And, as I

3  said, anything that -- further discussion on that issue, we

4  want our members to be fully attuned to perform all of their

5  functions.  And when they are working an 8-hour shift in

6  midsummer with all their safety equipment on, that can be

7  challenging.

8      **THE COURT:**  Thank you.  The next item in the case

9  management statement is the triage of and response to patient

10 sick call slips.  I don't think I have anything to say there.

11 Ms. Hart, anything?

12                        (No response.)

13     **THE COURT:**  Mr. Mello?

14                        (No response.)

15     **THE COURT:**  All right.  Medical staff's role in

16 disciplinary process.  This issue has come up with a few times

17 before.  I'm happy to hear from the parties.  I have to say

18 this issue is being resolved in the *Armstrong* case, which is

19 where it first came up.

20     And so, first, they are working it out I think.  Secondly,

21 Mr. Swanson and Mr. Kelso already engaged on issues of common

22 interest all the time in their coordination efforts, and I know

23 they are working closely together on this issue.

24     And I have a tremendous amount of confidence in the court

25 expert, who is called Edward Swanson; and I have a tremendous

1  amount of confidence in my colleague, Judge Wilken.

2      So, given those ingredients, my instincts tell me to

3  simply let the *Armstrong* process play out; and when it's done,

4  see if there is any reason why that process shouldn't simply be

5  replicated across the healthcare system, but I'm happy to take

6  further comment.  Ms. Hart.

7      **MS. HART:**  Thank you, Your Honor.  I have a lot of

8  comments, but I am being permitted to share them at Armstrong.

9  So, I think that approach makes sense.  Thank you.

10     **THE COURT:**  Well, that was an interesting pivot.  That

11 sentence started going in one direction and -- yeah, Mr. Mello?

12                  (No response.)

13     **THE COURT:**  Very good.  Okay.  Emergency medical

14 response activation, this is something else that I talked about

15 with Mr. Kelso again because it's an issue that has arisen more

16 than once.  So, let me let him provide an update to you similar

17 to the one he provided to me.  Mr. Kelso.

18     **MR. KELSO:**  Yes, Your Honor, the -- and I believe we

19 shared Friday or Thursday -- we did.  We had shared with

20 counsel a copy of the contract -- consultant contract that we

21 entered into with an expert in June.

22     And I believe when you reviewed the scope of the work in

23 that contract, it is where we are taking a broad approach to

24 gathering a fair amount of information so that the expert

25 consultant can give us guidance about whether and if so to what

1   extent we have a problem with significant systemic delays in

2   emergency response time.

3       Anecdotally, there will always be cases where there are

4   delays.  We have something, like, 64,000 plus call-outs

5   annually.  And it does vary very much by institution as to how

6   quickly an emergency response vehicle shows up versus

7   healthcare and custody staff in the institution.

8       As an example, I was -- it was suggested to me earlier

9   this week that at least at RJD, there seemed to be emergency

10   response vehicles simply lined up at the institution because

11   they have that many call-outs, so --

12           **THE COURT:**  Like cabs at the airport.

13           **MR. KELSO:**  Cabs at the airport, apparently.

14           **THE COURT:**  That was a dated example, but anyway.

15           **MR. KELSO:**  And I don't know for sure, but it wouldn't

16   surprise me if there is a similar situation in Stockton simply

17   because of the very large number of trips that are taken there.

18       I don't have handy an estimate of when this consultant

19   will finish the report, but I will find out from staff this

20   week if we have an estimated completion time and communicate

21   that with the parties.

22           **THE COURT:**  Thanks.  Yeah, what I wrote in my notes

23   before I talked to Mr. Kelso was we have to have data, you

24   know, for accountability purposes and transparency purposes.

25   We just have to have that, but Mr. Kelso is a step ahead of me.

He has hired someone to go get the data, and then we can figure

out what needs to be done.  So, that all sounds very good to

me.  Ms. Hart, anything from the PLO?

        **MR. FAMA:**  Good morning again, Your Honor, Steve Fama.

We did receive a copy of the contract, and the scope of work is

intriguing in a good way; that the CCHCS and the Receiver have

contracted to look not only at numbers of delays and potential

harm from that but other aspects of emergency response

including even whether some sort of -- seemingly remote

consultant would be helpful to the prisons in realtime to

provide emergency care, make appropriate decisions.  So, we

appreciate that that's being done.

        To be clear, we understand that there will, of course,

always be delays in activating 911 in a system this large.  We

are concerned about at most what are the obvious examples that

we have seen -- sometimes unfortunately repeated over the

years -- the case where there is a non-responsive patient and

it takes X amount of minutes before 911 is activated or maybe

most tragically where a resident has attempted to or maybe even

successfully completed suicide; and there is not the activation

of it by those first on the scene but instead it's futile until

some subsequent event.

        It seems to be getting better now that attention is being

paid but we agree with you and with the contract, that that is

essential; and we look forward to receiving it as well as the

 1   report of the consultant.

 2        THE COURT:  Thanks, Mr. Fama.  Mr. Mello, anything

 3   else on this topic?

 4        MR. MELLO:  Thank you, Your Honor.  Just that there

 5   has been a great deal of focus on emergency response.  It has

 6   been reported on in various case management statements.  I

 7   can't speak to anecdotal or opaque examples that were just

 8   raised now.  We very much look forward to receiving the data

 9   and information from the consultant that the Receiver has

10   retained.  Thank you.

11        THE COURT:  One of the things that I think is true as

12   a general matter about CCHCS and the receivership -- and as is

13   true in this specific instance -- is that there is this focus

14   on quality improvement.  And Mr. Kelso gets some credit for

15   that.  Dr. Bick gets a lot of credit for that.  Renee Kanan and

16   the data team get a lot of credit for that.

17        The reason I'm going on about this a little bit is I hope

18   whatever the governance structure is that is offered to the

19   Court in terms of post receivership there is a component that

20   can continue to achieve that as an institutional goal.

21        Because, you know, it seems to me likely that -- I

22   shouldn't say "likely."  I don't have any views about

23   likelihood.  I don't know what the remedies are that are going

24   to be offered to the Court.  It is possible that there won't be

25   a PLO.  I have said this before.  I mean, the PLO will still be

1  there, but they won't be performing the role that they perform

2  now.

3      So, there has to be -- there has to be some formal

4  mechanism.  It can't just be a cultural expectation.  There has

5  to be a formal mechanism inside the institution that runs

6  around looking for problems and figures out how to fix them and

7  prioritizes the problems.  And so, just wanted to make that

8  additional point.

9      We zoomed through the conference.  It's -- we haven't even

10  taken an hour.  I feel like maybe I haven't been doing my job.

11  I don't know.

12      Is -- we will set a date in just a second.  It feels like

13  regularizing quarterly case management conferences is about the

14  right rhythm.  I'm happy to hear from the parties to hear what

15  they think and also anything else they were hoping to talk

16  about today.  Ms. Hart?

17                          (No response.)

18          **THE COURT:**  Madam reporter, she said "nothing

19  further."  Mr. Mello?

20          **MR. MELLO:**  (Inaudible).

21          **OFFICIAL COURT REPORTER:**  I'm sorry.  This is the

22  court reporter.  I cannot hear Mr. Mello.

23          **MR. MELLO:**  I apologize.  I think there was a

24  reference to a resident spending 23 hours a day, and I'm not

25  sure that's the case anymore at CDCR.

1        But on the regular nature of the CMCs, I think that's a

2    really good idea; and I think quarterly makes a lot of sense

3    and it prompts the discussion that Your Honor and the parties

4    and the Receiver had today.

5        **THE COURT:**  Thanks, Mr. Mello.  It could certainly be

6    that the Court's information is outdated, and I would be happy

7    to be corrected on the point that anybody is spending up to

8    23 hours a day in their cell.

9        Good, well, 90 days or a -- exactly quarterly would put us

10    at December 23rd, which is, I guess, no one's nomination for a

11    good date.

12        So, I might suggest December 16th, which is the Monday

13    before.  Otherwise, you have to jump past the holidays; and you

14    really are not achieving your 90-day goal; but I'm also happy

15    to go into January.  So, I could do the afternoon -- I also

16    don't like to set any deadlines between Christmas Day and New

17    Year's Day.  I just don't, internally or externally.

18        So, maybe I should just stop there and see if

19    December 16th works for everybody because it works for the

20    Court.  Ms. Hart.

21        **MS. HART:**  December 16th works for us.

22        **THE COURT:**  Mr. Mello, does that work for your team?

23        **MR. MELLO:**  It does thank you, Your Honor.

24        **THE COURT:**  Great.  Okay.  So, we will set this for

25    further case management on December 16th.  Morning or

1  afternoon?  Doesn't matter to me.  Do the parties have a

2  preference?

3          **MR. MELLO:**  No.

4          **THE COURT:**  Rush hour traffic might be an issue for

5  some of you.  I don't know.

6          **MR. MELLO:**  Mornings are great but Mr. Kelso comes

7  from Sacramento.

8          **THE COURT:**  Mr. Kelso, does it make a difference to

9  you?

10                    (No response.)

11         **THE COURT:**  I like 10:00.  This felt good.  I could go

12  over my notes in detail before I took the bench.  And so, let's

13  have this next conference Monday, December 16 at 10:00 a.m.

14  with a case management statement due on the 9th.  Thank you all

15  very much.  That concludes the hearing.

16                  (Proceedings adjourned at 10:54 a.m.)

17                         ---oOo---

18

19

20

21

22

23

24

25

1        **CERTIFICATE OF REPORTER**

2            I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4

5    DATE:    September 26, 2024

6

7

8

9    _____

10       Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
     United States District Court - Official Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25