ROB BONTA
Attorney General of California
DAMON G. MCCLAIN – 209508
Supervising Deputy Attorney General
CORINNA ARBITER - 273074
Deputy Attorneys General
  600 W. Broadway, Suite 1800
  San Diego, CA 92101
  Telephone: (619) 321-5799
  Fax: (619) 645-2061
  E-mail: Corinna.Arbiter@doj.ca.gov

HANSON BRIDGETT LLP
PAUL MELLO – 179755
SAMANTHA D. WOLFF – 240280
DAVID C. CASARRUBIAS – 321994
SAMANTHA M. BACON – 351561
  425 Market Street, 26th Floor
  San Francisco, CA 94105
  Telephone: (415) 777-3200
  Fax: (415) 541-9366
  E-mail: pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER – 83925
STEVEN FAMA – 99641
ALISON HARDY – 135966
RITA LOMIO – 254501
RANA ANABTAWI – 267073
LILY HARVEY – 278947
SOPHIE HART – 321663
MACKENZIE L. HALTER – 333992
  1917 Fifth Street
  Berkeley, CA  94710
  Telephone:  (510) 280-2621
  Fax:  (510) 280-2704
  E-mail:  dspecter@prisonlaw.com

LAW OFFICE OF SARA NORMAN
SARA NORMAN (189536)
  P.O. Box 170462
  San Francisco, CA 94117-0462
  Telephone: (415) 236-3763
  E-mail: sara@saranormanlaw.com

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **MARCIANO PLATA, et al.,**<br><br>                                    Plaintiffs,<br><br>  v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                                    Defendants. | 4:01-cv-01351-JST<br><br>**Joint Case Management Conference Statement**<br><br>Date:            December 16, 2024<br>Time:           10:00 a.m.<br>Courtroom:   6, 2nd Floor<br>Judge:         Hon. Jon S. Tigar<br>Action Filed:  April 5, 2001 |

The parties submit the following joint statement in advance of the December 16, 2024 case management conference.

## I.    PROGRESS TOWARD RESOLUTION

### A.    Post-Receivership Plan

On September 5, 2024, CDCR provided Plaintiffs' counsel with a draft post-Receivership plan in preparation for delegation of all medical care facilities back to CDCR. On September 27, 2024, Plaintiffs' counsel provided a list of areas they believe need to be included or addressed in any post-Receivership plan. The parties met and conferred on October 31, 2024, and at that time CDCR requested that Plaintiffs provide more detailed information on what they believe needs to be included. On November 22, 2024, Plaintiffs requested additional information from CDCR. The meet and confer process continues.

### B.    Delegations to Date

*Defendants' Position:* The parties await the Receiver's decision on delegation of California State Prison, Los Angeles County. The parties will meet and confer with the Receiver through November 2025, to determine if delegation of medical care is appropriate for: (1) Richard J. Donovan Correctional Facility; (2) Substance Abuse Treatment Facility; (3) High Desert State Prison; (4) Salinas Valley State Prison; (5) California State Prison-Sacramento, and (6) California Health Care Facility.

Below are the institutions that have been delegated to date.

|   | Institution | Date of Delegation |
|---|---|---|
| 1 | Folsom State Prison | July 13, 2015 |
| 2 | California Training Facility | March 9, 2016 |
| 3 | Chuckawalla Valley State Prison | May 18, 2016 |
| 4 | California Correctional Institution | June 7, 2016 |
| 5 | Pelican Bay State Prison | June 22, 2016 |
| 6 | California State Prison, Centinela | June 22, 2016 |
| 7 | Sierra Conservation Center | August 25, 2016 |

|   | Institution | Date of Delegation |
|---|---|---|
| 8 | California Institution for Men | October 7, 2016 |
| 9 | Avenal State Prison | October 19, 2016 |
| 10 | San Quentin State Prison | January 25, 2017 |
| 11 | California Institution for Women | March 10, 2017 |
| 12 | Kern Valley State Prison | May 3, 2017 |
| 13 | California City Correctional Facility<br>*Ceased operating as a CDCR prison in March 2024* | May 31, 2017 |
| 14 | Pleasant Valley State Prison | July 31, 2017 |
| 15 | Calipatria State Prison | December 5, 2017 |
| 16 | California Correctional Center<br>*Closed on June 30, 2023* | March 23, 2018 |
| 17 | California Men's Colony | May 31, 2018 |
| 18 | Valley State Prison | July 23, 2018 |
| 19 | California State Prison, Corcoran | October 22, 2018 |
| 20 | Wasco State Prison | October 18, 2022 |
| 21 | Ironwood State Prison | August 2, 2023 |
| 22 | Central California Women's Facility | October 18, 2023 |
| 23 | Mule Creek State Prison | December 8, 2023 |
| 24 | North Kern State Prison | January 12, 2024 |
| 25 | California State Prison – Solano | June 28, 2024 |
| 26 | California Medical Facility | July 25, 2024 |
| 27 | California Rehabilitation Center | September 4, 2024 |

*Plaintiffs' Position:* Since the last Case Management Conference, the Receiver held a meet-and-confer regarding the potential delegation of California State Prison – Los Angeles County.

**C.    Construction**

*Defendants' Position:* Health Care Facility Improvement Projects (HCFIP) that are

3

1  currently planned across all CDCR institutions remain on track for completion by December
2  2025.

3    *Plaintiffs' Position:* We continue to monitor HCFIP-related construction.

4  **II.   NAMED PLAINTIFFS**

5    Pursuant to the parties' stipulation and this Court's order, M. Dean (WE4314), William M.
6  Edwards Jr. (BP7270), Howard Forbes (AN6308), and Jamel Walker (D92260) have been added
7  as named plaintiffs in this action.[1]  Leslie Rhoades (C42491) remains a named plaintiff.

8  **III.   MEDICAL STAFFING**

9    *Plaintiffs' Position:*  We continue to monitor the issue of medical staffing, including to
10  determine whether staffing is adequate or compensation established in late-2023 collective
11  bargaining agreements should be adjusted.

12    The question of policy-based medical staff ratios primarily raises concerns related to the
13  sustainability and durability of the remedy in this action.  That said, to fully consider those issues
14  and to adequately monitor current efforts, we need certain information related to patient care and
15  staffing at the prisons.  We are provided detailed monthly staffing information regarding
16  established positions and fill rates, but certain other information is not regularly reported, such as
17  whether dual appointments are approved and used and whether additional temporary positions,
18  not reflected in monthly data, have been approved via Staffing Authorization Requests (SARs). In
19  response to a recent query, CCHCS last month explained that prisons use SARs to request staff in
20  a variety of circumstances including: (1) to hire into a position that is not currently established,
21  and (2) to hire into an established position subject to a hiring restriction.[2]

22    SARs that request and are approved for medical staff in addition to established positions are
23  of special interest, both with regard to current compliance efforts and sustainability.  For example,
24  at a site visit earlier this month at Richard J. Donovan Correctional Facility, we were told that a
25  dozen staff positions – mostly nurses, along with office technicians – in addition to those already
26  established have been necessary for months to timely review and process requests for, then

---

27    [1]    ECF No. 3937.
28    [2]    Our understanding is that currently CCHCS is restricted from hiring into any
   position if the classification with a greater than 90% fill rate.

schedule and provide, the very large numbers of specialty appointments ordered and done for patients. We were told these positions were above budgeted authority, and provided information showing that some nurses related to specialty care delivery were obtained via SARs both in 2023 and 2024.

*Defendants' Position:* Continuity of clinicians and services, specifically with respect to primary care providers, remained strong for the past six months, with the dashboard showing an 89% compliance rate as of November 25, 2024. Similarly, the six-month trend for all appointments seen as scheduled remains at 81%. These statistics reflect that staffing levels remain appropriate for the needs of CDCR patients.

The use of a SAR to fill a position is not an impediment to constitutionally adequate medical care. An institution submits a SAR to request temporary civil service or registry coverage while the civil service recruitment process is conducted. An institution submits a SAR to fill a vacant health care position that is part of its staffing allocation if the position is subject to a CCHCS hiring restriction or if the position is temporarily vacant due to a current health employee being on extended leave. An approved SAR has an expiration date, usually up to six months, but potentially longer depending on the position being filled. If the SAR is approved, the position may be filled either by a civil servant or registry staff.

SARs request temporary resources for interim solutions until a permanent solution is identified. Permanent solutions require a Budget Change Proposal. Regarding Richard J. Donovan Correctional Facility (RJD), it has not submitted a SAR directly related to specialty backlog since July 2023, and there are currently no SARs for OT Schedulers.[3] There are no hiring restrictions for OT Schedulers and RJD's fifteen OT Scheduler positions are completely full.

Defendants responded to Plaintiffs' request for information concerning the SAR process on November 21, 2024. CCHCS continues to provide staffing reports to Plaintiffs through the non-Paragraph 7 process if they are not available through the Dashboard.

---

[3] Although this information appears to conflict with the information Plaintiffs obtained during their visit to RJD, Defendants believe it is correct. Defendants will attempt to confirm its accuracy before the case management conference.

5

**IV.    SPECIALTY SERVICES**

    **A.    Specialty Services Appointment Delays and Backlogs**

*Plaintiffs' Position:*  The timeliness of specialty appointments has long been an issue.  In the last Case Management Statement, we reported the specialty care backlog increased slightly to 2,360 as of August 16. According to CCHCS data, the statewide specialty care backlog was 2,034 as of November 1.  This represents a 14% decrease from the backlog as of August—the backlog is approximately the same as it was in May 2024.[4]  CCHCS's monthly health care services dashboard for October shows that 72% of high priority, 80% of medium priority, and 88% of routine priority appointments occurred on time.

    In the September 2024 CMC Statement, Defendants indicated CCHCS identified the need for improved tracking and reporting of offsite specialty appointment scheduling, and stated that a system is being developed that "will allow CCHCS to track efforts in the scheduling process and identify "potential barriers" and "best practices," among other things.[5]  We asked CCHCS for an update on this system, and we were told that CCHCS anticipates the process will be implemented in early 2025.  We will continue to monitor this issue.

*Defendants' Position:*  The issue of timeliness of specialty appointments remains a top priority that CCHCS and CDCR are working to ameliorate. As Plaintiffs acknowledged in the March 2024 Case Management Statement, a challenge in addressing this backlog is that as appointments are removed from the list, other appointments move onto the list.[6] The cyclical nature of this backlog can lead to improvement numbers appearing less significant than they actually are. There are approximately 26 overdue orders that remain from June 2024. The data from May to October shows that the backlog is trending downward. The six-month data (from June 2024 through November 27, 2024) shows that overall access to specialty services remains at 86%. Indeed, in November, overall access to specialty care rose to 87%. Further, in November 2024, Routine Specialty 90 days is at 88%, Follow-Up Specialty Services as Ordered is at 88%, and Consult Specialty Services as Ordered is at 89%. All of these indicators have been

---

[4]   As previously reported, the backlog was 2,085 as of May 10.  ECF No. 3925 at 4.
[5]   ECF No. 3925 at 5:18-23.
[6]   ECF No. 3895 at 5:23-26.

1    consistently "green" on the Dashboard for the last nine months, meaning that performance for the

2    metric is in substantial compliance with goal.

3         CDCR and CCHCS continue to work to investigate and address the reasons for

4    appointments becoming overdue, and to reduce the overall number of overdue appointments.

5    CDCR and CCHCS continue to collaborate to optimize scheduling and ensure timely referrals,

6    and also to review the specialty provider network to address region-specific and statewide needs.

7    As identified in the September Case Management Statement, CCHCS is continuing to build an

8    improved tracking and reporting system related to scheduling offsite specialty appointments. This

9    tracking system is currently in the development and testing phase. Once completed, CCHCS

10   anticipates statewide training and subsequent implementation to start in early 2025.

11        **B.    Notification of Offsite Specialty Care Appointments**

12        *Plaintiffs' Position:*  As we have previously stated, advance patient notification of specialty

13   appointments is an important aspect of patient-centered care and may significantly reduce refusals

14   of such appointments. In October, CCHCS responded to our request for information and data on

15   two CCHCS initiatives related to advance patient notifications of such appointments.  We were

16   told that CCHCS hopes to roll out a paper-based notification process statewide by the end of this

17   year. We were also told a tablet-based notification process was piloted at one prison, and that

18   patient refusals went down 43%. We will continue to monitor this issue and anticipate receiving

19   further information on these programs in early 2025.

20        *Defendants' Position:*  As discussed in the June 2024 Case Management Statement and in

21   the September 2024 Case Management Statement, notification through the tablet is in process, but

22   the expected release date is unknown at this time. CCHCS is rolling out a printed Patient

23   Notification Letter in the interim.[7] CCHCS is on track to roll out the written notification letters at

24   all institutions within a few months.

25   **V.    OTHER MEDICAL CARE MATTERS**

26        **A.    Substance Use Disorder (SUD) Care**

27        *Plaintiffs' Position:* We emphasize again that the Integrated Substance Use Disorder

---

[7]    *See* ECF No. 3925 at 6:7-22.

28

7

1   Treatment program, including Medication Assisted Treatment (MAT) for those with Opioid Use

2   Disorder (OUD), continues to save and change lives.  As of December 6, approximately 18,700

3   residents were receiving MAT statewide.[8]

4          In October, CCHCS shared new workflows and training directing RNs to see patients who

5   submit requests related to SUD within one business day; it also circulated a formal revised policy

6   it intends to adopt that includes that requirement.  The workflows further indicated that SUD

7   patients seen by RNs may be, as appropriate, immediately discussed with or referred to a provider

8   for possible initiation of Medication Assisted Treatment (MAT).   CCHCS subsequently stated

9   that as of November 26, 75% of RNs had received training on this, and that further training

10  regarding MAT rapid induction is planned for January.

11         We hope this newly formalized RN-pathway-to-MAT will result in patients who need

12  medication receiving it more promptly, and eliminate cases in which patients who likely would

13  have been ordered MAT do not timely receive it.  The RN pathway is especially necessary

14  because the previously established and still-used CCHCS process for a patient to be considered

15  for MAT, involving a SUD assessment by a Licensed Clinical Social Worker (LCSW), remains

16  problematic, with a large backlog of such appointments.[9]

17         CCHCS also said in October it is finalizing implementation of plans to establish Marriage

18  & Family Therapist and Clinical Counselor civil service positions to expand the pool of qualified

19  individuals who can provide ISUDT-related care, in addition to LCSWs.  We hope this will

20  increase the ability to provide timely necessary SUD assessments and other care to patients.[10]

21         Encouragingly, CCHCS data in mid-November showed relatively small backlogs of and

---

[8]     This data was obtained on the referenced date from the publicly available CCHCS interactive ISUDT Dashboard, the home page of which is denominated "ISUDT Program Overview;" there, the number of patients for whom MAT is provided is listed along with other information.  *See*  https://cchcs.ca.gov/isudt/dashboard/.

[9]     As of December, CCHCS data showed 946 overdue LCSW initial SUD assessment appointments statewide; it also showed that only 37% of such appointments in November were done timely.  This data, and that in the three footnotes that follow, was taken from CCHCS's recently revised, non-public ISUDT Dashboard.  It is not clear why important metrics such as the number of backlogged and percentage of timely addiction medicine-related appointments – are only available within the organization.

[10]    For example, CCHCS data as of December 6 showed that there were 1,475 overdue follow-up LCSW appointments, and that only 7% of such appointments in November were done timely.

improved statewide rates for timely Primary Care Provider (PCP) initial and follow-up addiction medicine appointments.[11]  However, the rates of such appointments done timely by Headquarters PCPs -- who see patients, some of whom are the most complex, via telemedicine -- were poor.[12]

*Defendants' Position:* Plaintiffs requested further information regarding the steps CCHCS is taking to address these issues on October 7, 2024, through the non-paragraph 7 process. CCHCS is still evaluating the request and preparing a response.

On September 11, 2024, the issues raised by Plaintiffs at the September 2024 hearing, which are similar to the issues raised above, were addressed in a meeting coordinated by the Receiver. CCHCS explained that the statewide shortage of LCSWs is not a barrier to patients obtaining MAT because an SUD assessment is not a condition precedent for initiating treatment. Additionally, if a patient returns from a higher level of care resulting from an overdose, they will be seen by a PCP within five days. The revised policy for scheduling and access to care will be posted soon and includes direction pertaining to RNs seeing patients during a face-to-face encounter who submit requests related to SUD.

According to the November 2024 dashboard, the statewide percentage of initial addiction medicine orders that were seen timely by PCPs was 84%. Similarly, for timely addiction medicine orders, PCPs reached 91%.

The total number of patients in the backlog for initial assessments has been reduced. Of the 931 patients currently in the backlog, 16 % have been assessed previously but are on a new term and are being re-assessed; and 14% have refused at least one time. The remaining 653 represents an all-time low number of patients who have never been assessed or offered a SUD assessment.

While CCHCS has significantly reduced the backlog for both initial and follow-up addiction medicine appointments, and patients referred for initial evaluation are often scheduled the same day they are referred, the rates of timeliness for Headquarters Addiction Medicine

---

[11]    As of December 6, CCHCS data showed 49 overdue initial PCP addiction medicine appointments, and that 75% of such appointments in November were timely.  The data also showed 668 overdue follow-up PCP addiction medicine appointments as of December 6, and that 86% of such appointments in November were timely completed

[12]    CCHCS data as of December 6 showed that in November the rates of timely "Central Team" PCP initial and follow-up addiction medicine appointments were 42% and 63%, respectively, with the rates for October reported as, respectively, 36% and 58%.

1   Central Team continues to lag due limited numbers of central team positions and to challenges

2   with clinic space availability.  However, most of the appointments are scheduled within a few

3   days of the compliance date.

4       **B.    Medically Necessary Gender Affirming Care**

5       *Plaintiffs' Position:* On November 7, we sent a letter to CCHCS detailing our thorough

6   review of gender affirming surgeries. Our letter identified several issues, including concerning

7   surgical outcomes and deficiencies in patient education and pre- and post-operative care. These

8   findings were based on review of medical records and interviews with patients who received such

9   care. The letter included recommendations for improving the provision of medically necessary

10  gender affirming care. We requested a meet and confer process with, followed by a written

11  response from, CCHCS.

12      *Defendants' Positions:* CCHCS's team of skilled and knowledgeable medical professionals

13  consistently review, assess, and improve their care of patients requesting gender affirming

14  medical treatment, consistent with the requirements of Title 15.

15      Plaintiffs' assessment of the care CCHCS provides to patients receiving gender affirming

16  medical care is contained in a 25-page letter with 70 footnotes and 59 pages of appendices that

17  was received just 32 days ago as of December 9, 2024. CCHCS is closely reviewing Plaintiffs'

18  request and will respond to the medical concerns raised in the request through the *Plata* non-

19  paragraph 7 process. CCHCS is not prepared to address this matter in full in this statement given

20  the scope of the request and because it is still being reviewed.

21      **C.    Medical Staff's Role in the Disciplinary Process**

22      *Plaintiffs' Position*:  We understand that CCHCS is finalizing a memorandum to staff, titled

23  "Limiting Licensed Health Care Staff Access to Rules Violations Report," and related training

24  materials. We also understand that CCHCS in *Armstrong* has agreed to work with the *Armstrong*

25  Court Expert to "identify information sufficient to allow Armstrong Plaintiffs' Counsel to review

26  the adequacy of CCHCS's policy as to Armstrong class members at SATF. The identified

27  information will then be produced to the Armstrong Court Expert who may, at his discretion,

28

provide the information to the Armstrong Plaintiffs' counsel."[13]  We asked CCHCS to provide a copy of the memorandum once it is signed and issued to the field and the related training materials, once finalized.  We will continue to monitor the issue, including determining if we will need additional information to determine if medical staff inappropriately discipline patients.

*Defendants' Position*: Plaintiffs' counsel has a copy of the draft policy. (*See, Armstrong v. Newsom*, ECF No. 3631-1.) CCHCS issued the draft policy to the field and is in the process of training staff and developing a tracking system to monitor the adequacy of the policy for the *Armstrong* class members at Substance Abuse Treatment Facility. (*Id.*) Plaintiffs' counsel will receive the finalized, dated, and signed copy when it is produced to Plaintiffs' counsel for *Armstrong*, as well as through Plaintiffs' non-Paragraph 7 request, but this has no bearing on the implementation of the policy itself, which is already underway.

### D.    Emergency Medical Response Activation

*Plaintiffs' position*: As previously explained, we believe it important that CCHCS regularly report the number of emergency medical responses statewide and at each prison, and the number/percentage of such activations determined to have been delayed, and CCHCS said it is aiming to establish such a process by year's end.[14]  On November 21, CCHCS reiterated that it hopes to have a process to share by year's end.

## VI.    EXTREME HEAT

*Plaintiffs' Position:*  As previously reported, we wrote to CCHCS and CDCR outlining concerns related to extreme heat in August 2024, including requesting processes that would apply to all residents not just those who take heat-risk medications.[15] On October 28, CCHCS responded, stating in part that the Receiver "is committed to developing a heat plan which will involve long-term and sustainable processes to mitigate high temperatures and address health care conditions through heat planning, management, and oversight." On November 4, we again wrote to CCHCS to request information on its approach to addressing heat issues. Among other things,

---

[13] Joint Status Statement re Compliance with the Ct.'s Dec. 7, 2023 Order at 152, *Armstrong v. Newsom*, No. 4:94-cv-02307 (N.D. Cal. Oct. 16, 2024), ECF No. 3630.
[14] See ECF No. 3925 at 21:3-22.
[15] See ECF No. 3925 at 16.

1    we asked whether CCHCS specifically tracks treatment of heat-related conditions, for specific

2    information on how prisons are expected to monitor indoor temperatures within housing units,

3    and what, if any, cooling technology (such as air conditioning or evaporative cooling) is used in

4    every housing unit in each CDCR prison.  We also asked the question posed by the Court at the

5    September 2024 CMC: is there an indoor temperature above which CDCR agrees it would not be

6    healthy for an incarcerated person to stay for an extended period of time?[16] As of December 9, we

7    have not received a response.

8        *Defendants' Position:* CDCR/CCHCS are assessing  concerns about indoor temperatures in

9    the institutions and anticipate having an update at the next CMC hearing. CDCR currently tracks

10   and monitors indoor temperatures in housing units and other areas in its facilities consistent with

11   the *Coleman* Heat Plan, which includes mandates that apply to patients on heat-sensitive

12   medications.

13   **VII.  BLACK BOX**

14       *Plaintiffs' Position:*  CDCR's February 1, 2024 Memorandum directed all prisons to

15   procure hinged handcuffs, to train staff on their use, and to use the hinged handcuffs for offsite

16   medical transports except when (1) a person presents a known risk to the security of the

17   transporting staff and incarcerated person(s); (2) "such risk and all supporting factors are

18   documented within the incarcerated person's" file; and (3) the Hiring Authority or designee

19   approves the use of different restraints, including the Black Box.

20       At the September 23, 2024 Case Management Conference, Defendants represented that all

21   prisons but four had obtained the hinged cuffs and trained their transportation staff on their use.[17]

22   We continue to have concerns about Defendants' full implementation of the Black Box directive.

23   In the last three months, we have visited three prisons that had obtained and implemented the

24   hinged cuffs for offsite medical visits. At two of the prisons, Mule Creek State Prison (housing

25   approximately 4,000 people, including close to 1,000 classified as level IV) and R.J. Donovan

26

27   _____

        [16] Reporter's Transcript, Sept. 23, 2024, at 21:17-20.
        [17]     As of September 25, 2024, the four prisons that had not obtained the hinged cuffs
     were Salinas Valley State Prison, Sierra Conservation Center, Valley State Prison and California
28   Men's Colony.

Correctional Facility (housing approximately 3,000 people, mostly classified as Level II and III, although until just a few months ago its population including approximately 750 residents classified as Level IV), the security staff told us they have found it unnecessary to use the Black Box in virtually every case.[18]  That was not the case, however, at California State Prison-Los Angeles (LAC), where we learned that the Black Box was used on 17 of 20 patients who were medically transported the day before our visit.  We also interviewed several people about their recent offsite medical trips from LAC. Among them was a frail 70-year-old patient with metastatic renal cell carcinoma who is  housed in a medical inpatient bed and has been unable to move back to the general population because he is prone to falling.  He is taken offsite at least weekly for chemotherapy, radiation and other specialty visits, and said he is always required to wear the Black Box, which has resulted in him defecating and urinating on himself. He also stated that he has no history of violence against staff. On October 14, we requested further documentation to monitor whether LAC's security staff had used the Black Box only when the individual being transported presented a known risk to the security of the transporting staff and incarcerated person(s), and whether the risks and supporting factors were documented.  As of December 9, the documentation has not been produced. On October 24, we also requested information and documentation regarding the use of the Black Box at eight other prisons that we have not visited in recent months. As of December 9, we have not received a response.

Continued use of the Black Box is inexcusable, absent a genuine security risk. Plaintiffs will continue to monitor and report on the use of Black Box and other restraints on patients who are transported offsite for medical care, until Defendants demonstrate that they have fully implemented and are accurately verifying compliance with the February 1 directive.

*Defendants' Position:*  CDCR's selection and use of security restraint systems for offsite transports of patients is a correctional function. Pursuant to the February 2024 directive to all

---

[18]    Defendants assert below that MCSP staff have not observed a reduction in refusals since the initiation in September of the hinged handcuffs for offsite medical appointments. Defendants have shared no data regarding refusal rates at MCSP since September, and we will request that data. Fundamentally, however, we reject Defendants' premise that it is acceptable to use an inherently painful and dehumanizing security device when an alternative device exists that is effective but does not inflict pain.

institutions, the black-box device is no longer the default for all offsite transports. Thus, custody's decision to use the black box on patients during offsite transport based on the specific safety risks they pose is an individualized determination and does not represent a systemic issue.

CDCR advised Plaintiffs and the Court that in February 2024, all prisons were instructed to procure hinged restraints, or an approved alternative, and to use them as the default restraint mechanism. (3/2024 CMC Statement at 13:19-28, ECF No. 3895.) CDCR has also advised Plaintiffs in their responses to inquiries through the non-Paragraph 7 process that orders for the hinged restraints were backlogged, and some prisons did not receive the hinged restraints until later in the year. (*See* Ex. A, 7/23/2024 CDCR Memorandum.) California State Prison – Los Angeles County (LAC) was one of those prisons identified. (*Id.*) LAC obtained the hinged restraints in August 2024, and implemented their use as the default restraint system in September 2024. Even so, custody's assessment of risk necessitated continued use of the black-box device for patient transports even after LAC received the hinged restraints.

Plaintiffs' criticism of LAC's continued use of the black box for patient transports seems to be based on an assumption that the use of the black-box device for offsite transports was neither necessary nor reasonable. In fact, LAC's use of the black-box device for those medical transports followed protocol. The transportation sergeant assessed the risk of for each patient pertaining to a propensity for violence or escape and obtained appropriate authorization for each use of the black-box device. Plaintiffs' criticism also presumes that LAC's use of the black box impacts patients attending their offsite medical appointments to a degree that warrants the Court's attention. However, Plaintiffs present no facts that support this presumption.

While Plaintiffs allege that LAC—a level IV prison—used the black box on 17 of 20 patients during their transports to offsite medical appointments, Plaintiffs' do not indicate whether any of those patients' offsite specialty appointments were terminated because of the black box. In the case of the patient that Plaintiffs discussed above, his age and medical condition did not prevent his participation in unlawful activities and violence.[19] Moreover, LAC provided

---

[19]    The patient Plaintiffs discussed above experienced significant medical issues in November 2023. But he also received multiple Rules Violation Reports since 2021 for, among other things,

(continued…)

1  information indicating that Plaintiffs' claim that use of the Black Box resulted in this patient

2  defecating and urinating on himself is not accurate.

3      Notably, at a recent site visit at Mule Creek State Prison—a level III prison—custody staff

4  advised that they rarely use the black box for patient transports. But staff have not observed a

5  concurrent reduction in patient refusals for offsite medical appointments.

6      Given the risk inherent in transporting incarcerated persons off-site, the ultimate decision

7  on the type of restraints to be used is a security issue. Custody must be able to use their

8  professional judgment to ensure the safest and most secure way to transport a patient to protect

9  other patients, staff, and the safety and security of the public in general.

10  Dated:  December 9, 2024                    Respectfully submitted,

11

12                                             HANSON BRIDGETT LLP

13                                             /s/ Paul Mello

14                                             PAUL MELLO
                                               SAMANTHA D. WOLFF
15                                             DAVID C. CASARRUBIAS- GONZÁLEZ
                                               SAMANTHA BACON
16                                             Attorneys for Defendants

17

18  Dated:  December 9, 2024                    ROB BONTA
                                               Attorney General of California
19                                             MONICA ANDERSON
                                               Senior Assistant Attorney General

20

21                                             /s/ Damon McClain

22                                             DAMON MCCLAIN
                                               Supervising Deputy Attorney General
23                                             Attorneys for Defendants

24

25

26  ───────────────────
    fighting, unauthorized possession of drug paraphernalia, and distribution of controlled substances,
27  and was facing new charges in Los Angeles County Superior Court for possession of controlled
    substances while in prison. LAC's decision to use the black box was appropriate given this
28  patient's security risk.
    .

1
2
Dated:  December 9, 2024                               PRISON LAW OFFICE

3
                                                       /s/ Steven Fama

4
                                                       DON SPECTER
                                                       STEVEN FAMA
5
                                                       ALISON HARDY
                                                       RANA ANABTAWI
6
                                                       LILY HARVEY
                                                       SOPHIE HART
7
                                                       MACKENZIE L. HALTER

8
                                                       Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date:    July 23, 2024

To:    Alison Hardy
       Prison Law Office

Subject:    **SECURITY DEVICES/ALTERNATIVES TO BLACK BOX**

CDCR's selection and use of certain security restraint systems are correctional functions that are outside the scope of the constitutional provision of medical care. The black box supplemental restraint device is no longer CDCR's default security restraint system for patient transports, and Plaintiffs have not demonstrated that the issue of security restraints has any bearing on the constitutional adequacy of the medical care provided to Plaintiff class. CDCR is providing the italicized information below in response to your email inquiry dated May 16, 2024, as a courtesy in the interest of transparency.

1.  A list of the Hiring Authorities that have submitted Proofs of Practice memos to their Associate Directors regarding procurement of the hinged cuffs.

    *As of July 17, 2024, the following institutions submitted Proof of Practice memos regarding their procurement of hinged cuffs:*
    *Avenal State Prison (ASP), Calipatria State Prison (CAL), California Correctional Institution (CCI), California Institution for Men (CIM), California State Prison, Corcoran (COR), California Rehabilitation Center (CRC), Correctional Training Facility (CTF), High Desert State Prison (HDSP), Ironwood State Prison (ISP), Kern Valley State Prison (KVSP), Mule Creek State Prison (MCSP), North Kern State Prison (NKSP), Pelican Bay State Prison (PBSP), Richard J. Donovan Correctional Facility (RJD), California State Prison, Solano (SOL), Valley State Prison (VSP), and Wasco State Prison (WSP).*
    *Additionally, the following institutions indicated they had sufficient hinged cuffs in their inventories and did not require further procurement:*
    *Central California Women's Facility (CCWF), Centinela State Prison (CEN), California Men's Colony (CMC), Chuckawalla Valley State Prison (CVSP), and Folsom State Prison (FSP).*

2.  A list of the Hiring Authorities that have shared with their respective Associate Directors that they have had delays in procurement.

    *As of July 17, 2024, the following institutions shared with their respective Associate Directors there are delays in their procurement of hinged cuffs:*
    *California Health Care Facility (CHCF), Institution for Women (CIW), California Medical Facility (CMF), California State Prison, Los Angeles County (LAC), MCSP, NKSP, Pleasant Valley State Prison (PVSP), California State Prison, Sacramento (SAC), California Substance Abuse Treatment Facility*

Hardy
Security Devices/Alternatives to Black Box
Page 2

*(SATF), Sierra Conservation Center (SCC), San Quentin State Prison (SQ), Salinas Valley State Prison (SVSP), VSP, and WSP.*

3. A list of the prisons that have initiated on-the-job training for custody officers regarding transportation restraints.

   *All institutions have initiated on-the-job training for custody officers regarding the restraints used during transportation to offsite medical appointments.*

4. A list of any prisons that have completed on-the-job training for their staff regarding the restraints.

   *As of July 17, 2024, the following institutions completed on-the-job training for their custody officers regarding the restraints used during transportation to offsite medical appointments: ASP, CMC, FSP, RJD, and SQ.*

5. Please provide an update on the plan to fully implement Director Broomfield's February 1, 2024 memo.

   *CDCR's Division of Adult Institutions (DAI) continues to solicit updates from the institutions to monitor compliance with DAI's memorandum, dated February 1, 2024, regarding updated expectations for the use of transportation restraints, and to assist with procurement issues when appropriate.*

6. In addition, Defendants stated in the 6/17/24 CMC Statement that CDCR and CCPOA had recently completed negotiations pertaining to the use of restraints, including hinged cuffs, for offsite transports, and reached an agreement regarding their use and implementation. Could you please provide a copy of that agreement?

   *As previously stated in our November 29, 2023 memorandum on this topic, CDCR's policy pertaining to the use of restraints, including for transportation offsite, fall under the Restricted Department Operations Manual (R-DOM), which is maintained as a confidential document for the safety and security of inmates, CDCR/CCHCS staff, and the general public. The recent agreement between CCPOA and CDCR describes implementation of the R-DOM section at issue here relating to the use of transportation equipment restraints. Accordingly, the agreement cannot be shared.*

Thank you.

cc:    Clark Kelso, Receiver
       Ronald Broomfield, Director, Division of Adult Institutions, CDCR

Hardy
Security Devices/Alternatives to Black Box
Page 3


Directors, CCHCS
Deputy Directors, Division of Adult Institutions, CDCR
Associate Directors, Division of Adult Institutions, CDCR
CCHCS Office of Legal Affairs
Office of Legal Affairs, CDCR
Office of the Attorney General
Hanson Bridgett, LLP
DeAnna Gouldy, Deputy Director, Policy and Risk Management Services, CCHCS
Robin Hart, Associate Director, Risk Management Branch, CCHCS

# CERTIFICATE OF SERVICE

Case Name:   **Plata, et al. v. Newsom, et al.**        No.    **4:01-cv-01351-JST**

I hereby certify that on <u>December 9, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **JOINT CASE MANAGEMENT CONFERENCE STATEMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>December 9, 2024</u>, at Los Angeles, California.

|  |  |
|---|---|
| J. Sissov | */s/ J. Sissov* |
| Declarant | Signature |

CA2001CS0001
67279903.docx