1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROB BONTA
Attorney General of California
DAMON G. MCCLAIN – 209508
Supervising Deputy Attorney General
CORINNA ARBITER - 273074
Deputy Attorneys General
  600 W. Broadway, Suite 1800
  San Diego, CA 92101
  Telephone: (619) 321-5799
  Fax: (619) 645-2061
  E-mail: Corinna.Arbiter@doj.ca.gov

HANSON BRIDGETT LLP
PAUL MELLO – 179755
SAMANTHA D. WOLFF – 240280
DAVID C. CASARRUBIAS-GONZÁLEZ – 321994
SAMANTHA M. BACON – 351561
  425 Market Street, 26th Floor
  San Francisco, CA  94105
  Telephone:  (415) 777-3200
  Fax:  (415) 541-9366
  E-mail:  pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER – 83925
STEVEN FAMA – 99641
ALISON HARDY – 135966
RITA LOMIO – 254501
RANA ANABTAWI – 267073
LILY HARVEY – 278947
SOPHIE HART – 321663
MACKENZIE L. HALTER – 333992
  1917 Fifth Street
  Berkeley, CA  94710
  Telephone:  (510) 280-2621
  Fax:  (510) 280-2704
  E-mail:  dspecter@prisonlaw.com

LAW OFFICE OF SARA NORMAN
SARA NORMAN (189536)
  P.O. Box 170462
  San Francisco, CA 94117-0462
  Telephone: (415) 236-3763
  E-mail: sara@saranormanlaw.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| **MARCIANO PLATA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 4:01-cv-01351-JST<br><br>**Joint Case Management Conference Statement**<br><br>Date:          March 17, 2025<br>Time:          2:00 p.m.<br>Courtroom:  6, 2nd Floor<br>Judge:         Hon. Jon S. Tigar<br>Action Filed:  April 5, 2001 |

1

The parties submit the following joint statement in advance of the March 17, 2025 Case Management Conference.

## I.    PROGRESS TOWARDS RESOLUTION

### A.    Delegations to Date

*Plaintiffs' Position:* As reported by the Receiver on February 3, authority for medical care has been delegated back to CDCR at 29 prisons, including three that are closed. [1]  That total includes two prisons---California State Prison—Lancaster and Richard J. Donovan Correctional Facility---delegated since the last Case Management Conference. .

Last month, the Receiver considered delegation for the Substance Abuse Training Facility (SATF), which, with more than 5,200 residents, is by far the most populated CDCR prison and, at approximately 153% of design capacity, one of the most crowded. [2]  Plaintiffs opposed delegation for a number of reasons including, first and foremost, dangerously poor care provided to residents.  According to the Receiver's medical expert, during the twelve months between August 2023 and September 2024, clinical care provided by SATF providers to patients with chronic and/or complex medical problems was inadequate, and was a significant contributing factor in multiple deaths.  More specifically, the expert explained that in five of the seven non-overdose deaths during that period, patients experienced diagnostic and/or treatment delays during outpatient care that likely contributed to the lethal outcome.  We also raised concerns about consistent failures by SATF leaders to identify problems. [3]  In response, Defendants said it would be appropriate to defer delegation. On February 19, the Receiver deferred delegation consideration for SATF, stating a new meet-and-confer would be scheduled "likely for approximately February 2026."

We plan to ask the Receiver, CCHCS, and Defendants about plans to address SATF's serious clinical and medical care delivery system problems, including whether additional

---

[1]      See ECF No. 3949 at 7.

[2]      See CDCR, Monthly Report of Population As of Midnight February 28, 2025, at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2025/03/Tpop1d2502.pdf. CCHCS data shows that approximately 21% of SATF residents – nearly 1,100 people -- are designated medical high risk patients.

[3]      The outline of the section headings of our letter to the Receiver regarding SATF, filed herewith as Exhibit A, includes this and the other concerns raised.

1  managerial, supervising, and quality monitoring/improvement staff is necessary given the

2  prison's population.

3       In early January, the Receiver extended Plaintiffs' one-year post-delegation monitoring

4  period for Central California Women's Facility (CCWF) from October 2024 to October 2025 in

5  response to concerns we raised about medical staffing shortages and the prison's emergency

6  response and review process, including as it relates to an incarcerated person's July 2024 death.

7  We will continue to monitor these issues at CCWF.

8       Meet-and-confers regarding possible delegation of High Desert State Prison and Salinas

9  Valley State Prison are scheduled for April and June, respectively.

10      *Defendants' Position:*  Defendants recognize that work remains to be done in order to

11 demonstrate readiness for delegation at SATF and do not disagree with the Receiver's decision to

12 defer delegation to allow CCHCS the opportunity to address any deficiencies.  Although

13 Defendants agree with Plaintiffs that additional improvements are needed before delegation, that

14 is not to suggest that Defendants agreed with Plaintiffs' characterizations of the care delivered at

15 SATF.  Defendants believe Plaintiffs are mistaken as to a number of issues they raised.  Further,

16 SATF's Dashboard demonstrates that it is meeting various metrics, exceeding statewide averages

17 in several key categories, and is consistently performing adequately or better in other areas,

18 including ISUDT and Diabetes, and Asthma care.  Nonetheless, Defendants support the

19 Receiver's decision to defer delegation.

20      Regarding CCWF, while Defendants provided a thorough rebuttal to the issues Plaintiffs

21 raised in their request to extend monitoring of CCWF's medical program, Defendants did not

22 object to the Receiver's decision to extend their monitoring period.

23      Additionally, several institutions—ISP, MCSP, and NKSP—have recently passed the one-

24 year post-delegation mark without challenge from Plaintiffs.  These institutions have

25 demonstrated continued and sustainable proficiency in the delivery of care in the year since

26 delegation, warranting an end to Plaintiffs' monitoring of those institutions.  *See* ECF Nos. 2841

27 at ¶ 4(c), 3028.

28      Finally, the parties continue their discussions related to post-Receivership planning.

## II.    MEDICAL STAFFING

*Plaintiffs' Position:*  We continue to monitor the issue of medical staffing, including with regard to whether the compensation increases provided in summer and fall 2023 are adequate to recruit and retain adequate numbers of staff.  Among other matters, we note that less than one-half of the 40 registered dietician positions statewide are filled.

On February 19, we asked the Receiver to review and report on the extremely unusual and we believe unprecedented hyper-reliance on registry nursing staff at Pelican Bay State Prison, and on the seemingly related circumstances regarding the very low fill rate and astonishingly high turnover rate for supervising nurses at that prison.[4]  With regard to the prison's hyper-reliance on registry nursing staff, Defendants below describe what we consider the standard efforts, done statewide, to recruit civil service staff.  Such efforts do not appear sufficient in the face of the extremely unusual and at this point long-standing shortages of civil service staff at Pelican Bay.  On March 10, the Receiver declined our request, stating he had not identified significant negative impacts on medical care caused by the use of registry nursing staff.  We plan to ask for more information on how that determination was made.

As previously reported,  CCHCS is transitioning to a new system to track employment applications, the Applicant Tracking System (ATS), in part because its prior system contained inaccurate data.  In February, CCHCS responded to our request for information about the ATS.  The response indicates that metrics on timeframes for job postings and applications will be available, but does not say whether the key metric, timeliness of hire (from date of application to date of hire and start date), will be included.  CCHCS indicated the initial data assessment will be completed in March 2025.

In January and February, respectively, CCHCS also provided additional information regarding Staffing Authorization Requests (SARs) for medical staff and dual appointments for primary care providers.  We are considering that information, including whether we have

---

[4]    A copy of our request, which details the underlying data and circumstances, is filed herewith as Exhibit B.

1   sufficient information to determine whether there has been repetitive use of SARs for the same

2   position or for the same category of position. This, in our view, would signal the inappropriate

3   use of SARs, which are not included in the budget authorization process.

4   *Defendants' Position:*  Registered Dieticians continue to be a challenging classification to

5   recruit. While the available candidate pool remains limited, CCHCS Human Resources (HR)

6   implemented a strong awareness campaign designed to educate potential candidates to dietary

7   careers available within the correctional health care system. This is inclusive of targeted emails

8   through industry publications, advertising through professional newsletters, attendance at dietary

9   conferences, and hosting virtual events to educate potential candidates. Additionally, CCHCS is

10  expanding its advertising presence to include college campuses with dedicated dietary curricula.

11  CCHCS maintains a steady presence on social media, sharing accomplishments within the

12  program and connecting its efforts to the broader dietary field.  Finally, CCHCS Medical Services

13  has reorganized dietary resources to provide tele-consultation services, and the majority of the

14  institutions do not have backlogs.  As reflected on the Medical Services Dashboard for December

15  2024, statewide patients are receiving timely access to tele-consultation services. Statewide

16  timely access is greater than 90 percent, with just six institutions with timely access less than 85

17  percent. Medical Services continues to provide dietary support service coverage utilizing

18  headquarters and regional dietary staff.

19      Over the last two years, Pelican Bay State Prison has experienced turnover in the

20  Supervising Registered Nurse II (SRN II) positions. The recruitment and filling of the SRN II

21  classification is not historically a difficult classification to fill. Since January 2024, there have

22  been five SRN IIs that have separated from state service and one SRN II transferred to another

23  institution. Since that time, however, CCHCS HR has made five SRN II hires and has one SRN II

24  scheduled to start on March 17, 2025, and will continue to recruit for the remaining 2.5 vacancies.

25      CCHCS HR has established a broad advertising presence to attract prospective candidates

26  and build future candidate pipelines. This recruitment strategy includes digital advertising,

27  participation in in-person and virtual career events, and partnerships with educational programs.

28  By targeting candidates actively seeking new opportunities and introducing correctional health

5

1   care as a career option to passive candidates, CCHCS expands its reach. Additionally, through

2   targeted educational outreach, CCHCS connects with students preparing to enter the nursing

3   profession, strengthening its future workforce.

4          CCHCS utilizes various digital advertising platforms, including those tailored for nursing

5   classifications and registered dietitian recruitment, as well as career pages that highlight job

6   opportunities. CCHCS collaborates with nursing statewide to participate in career fairs at

7   traditional and community colleges to provide direct interaction with prospective nursing

8   candidates, including recent graduates and alumni. CCHCS also collaborates with educational

9   institutions statewide to offer lectures by subject matter experts and, when possible, facility tours

10  to give students insight into careers in correctional health care.

11         CCHCS HR continues to evaluate the Applicant Tracking System (ATS) data to develop

12  metrics, CCHCS time to hire metrics will include the hiring process from job advertisement

13  through candidate start date. The initial assessment remains on track for March 2025.

14         CCHCS Fiscal Management Services reviews these Staffing Authorization Requests (SAR)

15  for medical staff and dual appointments to ensure there is a vacancy or a justifiable need for the

16  request. The medical staff and dual appointment SAR reviews are consistent with other Primary

17  Care Provider (PCP) SAR requests and ensures there is appropriate tracking of the utilization of

18  these appointments.

19  **III.   ACCESS TO SPECIALTY CARE SERVICES**

20         **A.    Specialty Services Appointment Delays and Backlogs**

21         *Plaintiffs' Position:*  The timeliness of specialty appointments continues to be an issue of

22  concern.  In December, we reported that the specialty care backlog decreased slightly to 2,034 as

23  of November 1, 2024.[5]  According to CCHCS data, the statewide specialty care backlog was

24  2,191 as of January 31, 2025—a 7.4% increase from the November backlog total.  CCHCS's

25  monthly health services dashboard for January shows that 68% of high priority, 66% of medium

26  priority, and 81% of routine priority appointments that occurred that month were timely.

27

28         [5]      ECF No. 3940 at 6:5-6.

1    Some prisons had far worse percentages for timely specialty services in January,

2  particularly for such services ordered high and medium priority.  At Salinas Valley State Prison,

3  for example, only 37% and 47% of such appointments, respectively, were timely.

4    At the flagship California Health Care Facility—which houses more than 1,000 medical

5  inpatients and hundreds of others with serious medical conditions—only 58% of January high

6  priority and 62% of medium priority specialty services appointments were timely.  These poor

7  compliance percentages for the most promptly needed appointments were consistent with those

8  reported across the two previous calendar years.  In 2024, only 43% of high priority and 63% of

9  medium priority specialty services appointments, which totaled approximately 2,200. were timely

10  provided.[6]  In 2023, only 47% of high priority and 62% of medium priority specialty service

11  appointments, which together totaled approximately 2,800, were timely done.[7]

12    In July, we asked the Receiver to consider actions to increase the supply of specialty

13  services for CHCF patients, including by increasing rates offered for those services, partnering with

14  the local hospital to establish a coordinated program that attracts additional specialists via increased

15  compensation and other benefits, or by having CCHCS/CHCF employ its own specialists.  In January,

16  we asked for an update on these matters.   The response, included here as Exhibit C, does not

17  include information about specific efforts to increase the supply of specialty providers.  The other

18  measures mentioned, including efforts to decrease the number of ordered high and medium

19  priority appointments, and decrease patient refusals due to the lack of advance notification of

20  appointments, do not appear likely to substantially improve compliance rates at CHCF, because

21  the prison has already implemented such changes.[8]

22  _____

23    [6]    Per CCHCS Dashboard data, there were 468 high priority specialty service
appointments, and 1,798 medium priority specialty service appointments. completed at CHCF in
2024.

24    [7]    Per CCHCS Dashboard data, there were 770 high priority specialty service
appointments, and 2,023 medium priority specialty service appointments, completed at CHCF in
25  2023.

26    [8]    As seen in the data in the footnotes immediately above, CHCF in 2024
substantially reduced, by  approximately 20%, the number of high and medium appointment
27  specialty service appointments compared to 2023.  With regard to patient notification, CHCF for
several months has provided verbal advance notification to patients, and in February said that
28  such has decreased the refusal rate for off-site specialty appointments.

(continued…)

In December, Defendants reported that they anticipated implementation of CCHCS's offsite specialty appointment scheduling tracking and reporting system would begin in early 2025.[9]  In response to our request for an update, CCHCS told us in February that it was on track to begin implementation of the system on or before April 30, 2025.  We anticipate requesting additional information regarding the system once it is implemented.

*Defendants' Position:*  To provide relative context regarding specialty ordering over the last couple years, it is significant to note that the overall number of specialty orders, which tie to appointments, have increased about 21% since February 2023, and just in the last three months have increased nearly 3%.  Despite the continued steady increase of orders over the last two years, the specialty backlog has decreased from 8% to approximately 3% on March 5, 2025, with a 1% decrease just since December 4, 2024.  On February 27, 2023, about 65% of the backlog was scheduled and on March 5, 2025, 81% of the backlog is scheduled; viewed differently, as of March 5, 2025, less than 0.60% (390) of our total volume (65,470) of orders are backlogged and not scheduled. Despite the nearly 21% increase in orders, the backlog has consistently decreased. The progress made in ensuring continued patient access to specialty care is both commendable and worthy of recognition.

According to CCHCS, the slight increase in specialty backlog from November 2024 through January 2025 is generally typical of this time of the year.  Though it is noteworthy and warrants attention it is not cause for concern.  During this period, there were five major holidays. Many specialists in the community take time off around the holiday season contributing to the impact on operations and resulting in the increased backlogs, which are beyond CDCR's control. The backlog has already been decreased from the holiday surge of 3,138 (out of 64,677 orders, per the specialty registry) on January 6, 2025, to 2,099 (out of 65,470 orders) on March 5, 2025, showing a dramatic reduction of about 33%.

Within the last 12 months, there have been approximately 128,000 Request for Services (RFS).  When comparing the top five institutions with the highest backlog (ranging from 127 to 303 open orders), four of those institutions are also in the top five institutions with the highest

---

[9]    ECF No. 3940 at 7:7-10.

RFSs  (ranging from 6,096 per year to 10,666 per year).  While it is true that some institutions have a higher backlog, particularly for High and Medium priority appointments, these institutions often face a larger number of RFSs than their counterparts or have a higher rate of ordering those priority levels.  The Regional Health Care Executives and their assigned institutions are decisively implementing targeted measures to resolve backlog, with progress subjected to rigorous, continuous oversight to ensure accountability and timely access to specialty care.  Over the past 12 months, the California Health Care Facility (CHCF) successfully managed 8,698 RFSs; as of February 26, 2025, there were 6,983 open orders, with a backlog of 196, leaving only 31 unscheduled—a testament to the team's efficiency and dedication.  While some specific specialties have fewer providers available, this is equally observable in the community.

As indicated by Plaintiffs, implementation of recent changes to the Consolidated Patient Provider Calendar ("CPPC") will include information related to CCHCS's offsite specialty appointment scheduling and is on track to be fully implemented by the end of April 2025. Defendants aim to optimize the quality and effectiveness of a statewide standard, real-time tracking application capturing access to care efforts.  In addition, this system update will identify trends in response time and identify potential needs for additional specialty providers or staff.

**B.    Black Box Restraints**

*Plaintiffs' Position*:  A year ago, CDCR directed all prisons to procure hinged handcuffs, train staff on their use, and use the hinged handcuffs for offsite medical transports as the default security device, unless specific security factors warranted using the Black Box.

Defendants have now provided information demonstrating that they have implemented the directive.  Specifically, on February 7 they confirmed that all of the prisons have obtained the hinged cuffs and completed the necessary training (except California Men's Colony, which uses a different alternative security device). In response to our request for data regarding Black Box usage during one week in October, Defendants stated that for the 1,872 scheduled offsite medical transports during that week from the 31 prisons, the Black Box was used for 112 of the trips, or roughly 6% of the time.

1    One prison, CSP-Lancaster, accounted for three quarters of the cases statewide in which the

2    Black Box was used, having used it in 84 of 86 cases for that week. Defendants acknowledged

3    that LAC's usage appeared high, and performed additional training at the prison. Defendants

4    provided additional data showing that, during a more recent four-week period, LAC sent people

5    to 247 scheduled offsite medical appointments, and used the Black Box only seven times, i.e., in

6    less than 3% of the cases.

7    *Defendants' Position:* As Plaintiffs acknowledge, the directive to procure, train staff on use

8    of, and use hinged handcuffs for offsite medical transports as the default security device has been

9    implemented at all CDCR institutions, except for California Men's Colony.[10]

10   **IV.   EXTREME HEAT**

11   *Plaintiffs' Position:*  Extreme heat poses a serious risk to the health and safety of all people

12   who live and work in prisons. Heat kills more people in the United States than any other type of

13   extreme weather, and heat-related deaths are on the rise nationwide.[11]  The potential impacts of

14   extreme heat on health are well known, as are the groups who are most at risk for heat related

15   illness. Heat increases the risk of hospitalization for heart disease, heat exhaustion and heat

16   stroke, worsened asthma and COPD, and dehydration and kidney injury, and it impacts behavior

17   and mental health.[12]  People over the age of 65 and those with chronic conditions or disabilities

18   are at increased risk for heat-related illness.[13] The National Commission on Correctional

19   Healthcare recently released a position statement regarding extreme temperatures in correctional

20   facilities, stating that "[e]xtreme indoor and outdoor temperatures adversely affect the health of

21   people residing and working in carceral settings" and calling upon "[e]very carceral facility [to]

---

[10] California Men's Colony has an approved exemption from defaulting to hinge cuffs and instead utilizes the BOA Peerless Security Restraints with barrel locks

[11] *See* Austyn Gaffney, *Heat Deaths Have Doubled in the U.S. in Recent Decades, Study Finds*, NY TIMES (Aug. 28, 2024), https://www.nytimes.com/2024/08/27/climate/heat-deaths.html.

[12] *Climate and Health Outlook: Extreme Heat*,  DEP'T OF HEALTH AND HUMAN SERV. OFF. OF CLIMATE CHANGE AND HEALTH EQUITY (July 2024), https://ghhin.org/wp-content/uploads/july-2024-climate-health-outlook.pdf (on file with Plaintiffs).

[13] *People at Increased Risk for Heat-Related Illness*, U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION (Feb. 20, 2024) https://www.cdc.gov/extreme-heat/risk-factors/index.html; *Who Is Most At Risk to Extreme Heat?*, NAT'L INTEGRATED HEAT HEALTH INFO.SYS., https://www.heat.gov/pages/who-is-at-risk-to-extreme-heat (last visited Feb. 6, 2025).

(continued…)

21588244.9

1  implement standards to minimize extreme temperature exposure indoors and outdoors and adopt

2  steps for prevention and mitigation."[14] We maintain that air-conditioning of resident living-areas

3  (cells and dorms) is necessary to protect CDCR resident's health and safety as the climate

4  continues to warm.

5      We have asked CCHCS and CDCR for information on how it protects the incarcerated

6  population from the dangers of extreme heat, including on November 4, 2024, when we wrote to

7  CCHCS to request specific information on its approach to addressing heat issues in California

8  prisons. The November inquiry asked, among other things, the question posed by the Court in

9  September 2024: Is there an indoor temperature above which CDCR agrees it would not be

10  healthy for an incarcerated person to stay for an extended period of time?[15]

11      CCHCS/CDCR responded to some of our requests in February 2025.[16]  However, the

12  question of an all-residents heat plan remains: In the December 2024 Case Management

13  Conference statement, Defendants stated they "anticipate[d] having an update at the next CMC

14  hearing."[17]  We understood this update would center on an all-residents heat plan, based in part

15  on CCHCS's October 2024 statement to us that they were "developing a heat plan," seemingly in

16  addition to the existing *Coleman* plan (applicable to those on heat sensitive medications).[18]  We

17  have not received any such update.  Defendants characterization, below, of an August 2024

18  memorandum regarding heat as the all-residents heat plan does not take into account the

19  subsequent October 2024 statement that "the Receiver, in collaboration with custody partners, is

20  committed to developing a heat plan."[19]

21

22      [14] *Climate Control for Extreme Temperatures for Corrections,* Nat'l Comm'n on
Correctional Healthcare, (Aug. 2024), https://www.ncchc.org/wp-content/uploads/Climate-
23  Control-for-Extreme-Temperatures-in-Corrections-2024.pdf.
    [15] Reporter's Transcript, ECF No. 3932, Sept. 23, 2024, at 21:17-20; ECF No. 3925 at
24  21:3-22; ECF No. 3940 at 11:19-12:7.
    [16] Plaintiffs' November 2024 request and CCHCS's February 2025 response are attached
25  as Exhibits D and E, respectively. PLO anticipates follow up to CCHCS/CDCR's February 20th
2025 response to clarify certain answers and re-request responsive information not provided by
26  CDCR/CCHCS.
    [17] ECF No. 3940 at 12:8-9.
27      [18] CCHCS's October 2024 response is included as Exhibit F.
    [19] Ex. F at 2.
28                                     (continued…)

In January 2025, CDCR submitted a budget request to the California Legislature for an "Air Cooling Pilot Program."[20]  The purpose of the pilot is to "evaluate and determine the effectiveness" of three air cooling alternatives in specific housing units at four prisons.[21]

The proposed Air Cooling Pilot Program similarly does not indicate adequate processes will be in place to prevent an unreasonable risk of serious heat-related harm to all CDCR residents when such risks begin on approximately May 1.  What is needed now is an all-residents plan, with appropriate training that includes, among other things:

- **An indoor temperature threshold applicable to <u>all</u> CDCR residents, not just those who receive medications that create a heightened risk of heat-related symptoms, that, if reached, would trigger mitigation measures identified in the plan.** In their February response, CCHCS/CDCR state there is "no specific indoor temperature . . . determined by CDCR/CCHCS to pose a substantial risk of serious illness or injury to the population of CDCR."[22] As such, there currently is no temperature, no matter how high, that requires any response by medical or other prison staff to mitigate risk of harm, unless the affected residents are ordered heat-risk medications (for those patients, specified actions are required if outdoor air temperatures are 90 degrees or above, or indoor air temperatures reach 90 and 95 degrees).  Relatedly, for residents other than those taking medications known to heighten risks from heat, there currently are no required steps to be taken to mitigate risk of harm from heat, regardless of temperature.

- **Clear, specific directives and related training for medical staff to adequately understand, address and report adverse, heat-related health impacts among CDCR residents.** These directives must clearly capture what constitutes a heat-related medical incident, including but not limited to heat stress, heat syncope, heat cramps, heat

---

[20] *See* Exhibit G.

[21] The prisons involved in the pilot are CCWF, CMF, KVSP, and LAC. Ex. G at 3. The cooling alternatives to be tested in the pilot are thermal insulation only, air cooling only, and thermal insulation and air cooling. *Id.*

[22] Exhibit E at 1. In addition to the numerous temperature standards referenced by the Court during the September 2024 CMC, which take into account the unique nature of carceral spaces, the FY2023-2024 California Department of Housing and Community Development (HCD) Recommended Maximum Safe Indoor Air Temperature guidance for residential settings, which sets a general maximum temperature of 82 degrees, may be instructive.

1    exhaustion, and heat stroke, as well as underlying conditions exacerbated by heat, and

2    should include but not be limited to harms experienced by Coleman class members. The

3    directives must also contain specific reporting requirements for heat-related diagnoses,

4    which in turn must be made available for monitoring and oversight. In the February 20th

5    response, CCHCS stated it "anticipates issuing mandates to health care staff, which will

6    include clarifying the reporting requirements of heat-related incidents."[23] The response did

7    not provide a timeline to issue such directives, or specify what they would be.

8         While the proposed Air Cooling Pilot Program may allow CDCR to better understand the

9    performance of some types of cooling methods, it would, if enacted, mitigate the risks of extreme

10   heat for only a small percentage of residents and will at best require approximately four years to

11   complete.  More specifically, the program appears to involve only 20 housing units out of

12   approximately 1500 statewide and is estimated to be complete in 2028-29.[24]  Moreover, the Pilot

13   is, by definition, preliminary and provides no guarantee of future action based on the results.

14   More fundamentally, the pilot program, does not supplant today's need for a statewide heat plan

15   to avoid unreasonable risk to all current CDCR residents.

16        Below, Defendants assert the "one size fits all approach" of a "single temperature

17   threshold indoor temperatures for all incarcerated person[s] is not appropriate."  We do not assert

18   that an indoor temperature threshold will necessarily be, on its own, sufficient to

19   prevent *all* incarcerated persons from experiencing adverse health effects from extreme

20   heat.  Some individuals or populations may need additional mitigation measures to ensure health

21   and safety.  But an indoor temperature threshold is not a "one size fits all" approach; it is a vital

22   step in creating an environment that will keep incarcerated people safe from the dangers of

23   extreme heat.  Further, indoor temperature thresholds are not uncommon in correctional settings,

24   as recognized by the Court in the September 2024 CMC[25] and in the *Coleman* Heat

25   Plan.  Defendants further assert that we have not explained why training provided to CDCR and

26   CCHCS staff about heat-related pathologies is not sufficient.  We plan to ask CCHCS for

---

[23] Exhibit E at 2.
[24] Ex. G at 4.
[25] *See* footnote 15, supra.

1    additional information to evaluate the training's sufficiency, particularly as it relates to medical

2    staff's ability to identify, treat, and report health incidents caused or exacerbated by heat.

3        *Defendants' Position:*  Plaintiffs note above the risks of extreme heat, stating that "[h]eat

4    kills more people in the United States than any other type of extreme weather, and heat-related

5    deaths are on the rise nationwide."  Yet, there have been very few sentinel events among CDCR's

6    patient population in the last year directly related to extreme heat, and Plaintiffs present no

7    evidence that heat-related sentinel events in California exceed those in other jurisdictions.  While

8    it is undeniable that heat planning is critical—which CDCR and CCHCS are actively engaged in,

9    and that all incarcerated persons must have access to heat mitigation measures during high heat

10   periods—which they currently do, Plaintiffs inaccurately portray CDCR's and CCHCS's efforts

11   as insufficient, particularly in light of patient outcomes.

12       In their statement above, Plaintiffs assert that the recent Non-Paragraph 7 response detailing

13   CDCR and CCHCS's efforts and the Air Cooling Pilot Program are both insufficient to address

14   the issue of heat.  As an initial matter, Defendants' Non-Paragraph 7 response was intended to

15   respond directly to Plaintiffs' specific questions, not to detail the entirety of the State's plans to

16   address heat.  Nonetheless, Plaintiffs advocate for: (1) an indoor temperature threshold applicable

17   to all CDCR residents (not just incarcerated persons receiving heat-sensitive medications) that

18   would trigger mitigation measures, and (2) clear directives and training for staff to adequately

19   understand and address heat impacts to residents.

20       As it relates to their first request, Plaintiffs appear to be confusing the issue related to a

21   threshold indoor temperature.  Plaintiffs' Non-Paragraph 7 request asked whether there was an

22   indoor temperature above which it would not be healthy for an incarcerated person to stay for an

23   extended period of time.  In response, CDCR/CCHCS stated, "a 'one size fits all' approach  is not

24   appropriate for addressing the heat tolerance and responses of patients and institutions statewide."

25   (Exhibit E [2/20/25 Non-P7 Response] at 1.)  Now Plaintiffs appear to be advocating for a

26   threshold temperature that would trigger mitigation measures.  These are different asks, and there

27   is a difference between a threshold that is unhealthy and a threshold that triggers the activation of

28   heat mitigation measures.  As to the former, there is no one-size fits all approach given

14

1  individuals' varying heat tolerances and the variety of environments statewide. There is also no

2  evidence that CDCR's housing units are so hot that they are unhealthy such that they are

3  triggering a significant number of heat-related sentinel events. Nor do Plaintiffs address this

4  assertion. As to the latter, the Heat Plan does address when heat mitigation measures need to be

5  activated, and not simply for incarcerated persons on heat-sensitive medications, as explained

6  below.

7  CDCR and CCHCS issue a joint memorandum each year "prompting institutions to plan

8  and implement specific operational responses to high-heat conditions." (Exhibit H [8/2/2024

9  Memorandum].) This joint memorandum "highlights the major requirements of the Heat Plan,

10 including, among other things, that the institution activate heat alerts" when the outside air

11 temperature reaches 90 degrees Fahrenheit, and directs the Warden, CEO, and their executive

12 teams to convene daily meetings during weekdays for the duration of any Heat Advisory (defined

13 as an expected heat index of 100 degrees Fahrenheit or higher) to discuss a number of heat-

14 related topics including cooling stations, reasonable accommodations, and facility-related issues.

15 (*Id.* at 1-2.) This joint memorandum is applicable to *all* incarcerated persons—not just those on

16 heat-sensitive medications. (*See* Exhibit H [8/2/2024 Memorandum].)

17 Plaintiffs also fail to explain, with respect to their second request, why the annual training

18 that both custodial and clinical staff receive regarding heat-related pathologies, "which include

19 the signs of heat stress and on how to respond," is insufficient. (*Id.*) The training also specifies

20 some heat responses that are triggered at specific heat alert stages including, among other things:

21 custodial staff observing incarcerated persons for signs of heat stress, logging inside temperatures

22 at regular intervals, reporting any suspected cases of heat stress to medical staff, providing

23 incarcerated persons access to cool water, showers or misting, notifying watch commanders when

24 the outside temperature reaches 90°F (Stage 1) and between 90-95°F indoors (Stage 2/3), and

25 logging all heat-related incidents in the Heat Incident Log.

26 Further, while Plaintiffs contend that the Air Cooling Pilot Program is insufficient and

27 provides no future guarantees, they fail to note that any effort by the State to modify facilities

28 statewide must be thoughtful, deliberative, and effective. The Pilot is a necessary first step in this

15

1    regard.  Moreover, it bears noting that not all CDCR facilities face the same heat-related concerns

2    given the varied geographic locations across the state in which institutions are located.

3        Finally, CDCR and CCHCS leadership continue to work together to determine how best to

4    prepare for and address extreme heat events.  These efforts are ongoing and are not limited to the

5    medical care context as the issue of extreme heat is not specific to *Plata* class members.  Indeed,

6    the issue of heat planning has long been addressed in the *Coleman* Court, which approved the

7    parties' stipulated injunction regarding heat plans on May 11, 1992.  *Coleman v. Newsom*, No.

8    2:90-cv-00520 KJM SCR (PC), ECF No. 232 (E.D. Cal. May 11, 1992).  The stipulated order for

9    preliminary injunctive relief provided the framework for the current *Coleman* Heat Plan and

10   Updates Memorandum, which is annually updated.  *See id.* at ECF No. 8558 at 6-7.

11       Heat planning has also been the subject of discussion at a recent Court Coordination

12   meeting, including as it relates to *Armstrong* and *Coleman* class members as well as *Plata* class

13   members.  (*See* Dec. 6, 2024 Coordination Meeting Minutes.)  And the *Coleman* Special Master

14   recently filed his Thirty-First Round Focused Heat Plan Monitoring Report, which conducts a

15   "focused review of defendants' heat plan implementation based on the excessive heat impacting

16   the State of California during the 2024 heat seasons" and other concerns related to Enhanced

17   Outpatient Population programs.  *Coleman v. Newsom*, No. 2:90-cv-00520 KJM SCR (PC), ECF

18   No. 8558 at 4 (E.D. Cal. Feb. 28, 2025).  The Special Master's monitoring focused on "heat alert

19   activation data, heat-related illness, staff knowledge of heat plan policy and procedure,

20   completion of temperature logs, in-cell temperatures, cooling measures and reasonable

21   accommodations, heat pathologies training, and institution-specific operating procedures."  *Id.* at

22   6.  The Special Master's report also details the joint memorandum issued by CDCR and CCHCS

23   at the beginning of each heat season and describes expectations and obligations.  *Id.* at 10-11. The

24   Special Master's report notes that daily heat advisory meetings were observed at six institutions,

25   and that the meetings "reflected collaboration and effective communication to address both small

26   and large concerns across each yard, including plant operation issues, heat illnesses, heat

27   mitigation strategies, program impacts, and activation of any stages of the heat plan," and

28

21588244.9

1  indicated that heat issues and patient concerns "were addressed by custody staff in an effective

2  way," though there were concerns regarding communication with mental health staff.  *Id.* at 11.

3      Thus, while Defendants understand and appreciate Plaintiffs' concerns relating to heat, this

4  issue is best addressed holistically—*i.e.*, not just in the medical care context—and in coordination

5  with all stakeholders.

6  **V.    OTHER MEDICAL CARE MATTERS**

7      **A.    Substance Use Disorder (SUD): Care and Harm Prevention**

8      *Plaintiffs' Position:* The Integrated Substance Use Disorder Treatment program, including

9  Medication Assisted Treatment (MAT) for those with Opioid Use Disorder (OUD), continues to

10  save and change lives.  As of March 8, approximately 19,130 residents were receiving MAT

11  statewide.[26]  We continue to monitor the program and as necessary advocate for changes so that

12  patients who may or do benefit from this care have timely access to it.

13      CCHCS has implemented new workflows, training, and policy to enable at-risk patients to

14  be "rapidly inducted" into MAT via a same or next business day appointment with a registered

15  nurse (RN), who can refer the patient to a provider who can order medication.[27]   That said, large

16  numbers of patients are considered for MAT via CCHCS's long-established process that starts

17  with a Licensed Clinical Social Worker (LCSW) assessment appointment.  The backlogs and

18  timeliness of those appointments continue to improve.[28]   Backlogged and untimely follow-up

19

---

20  [26]    This data was obtained on the referenced date from the publicly available CCHCS
interactive ISUDT Dashboard, the home page of which is denominated "ISUDT Program

21  Overview;" there, the number of patients for whom MAT is provided is listed along with other
information.  *See*  https://cchcs.ca.gov/isudt/dashboard/.

22  [27]    The policy provisions requiring a same or next business day appointment with a
RN were adopted on December 16, 2024.  *See* Heath Care Department Operations Manual 3.1.5,

23  at https://www.cdcr.ca.gov/hcdom/dom/chapter-3-health-care-operations/article-1-complete-care-
model/3-1-5-scheduling-and-access-to-care/ .  We had in July 2023 asked for such policy

24  provisions to be adopted.
[28]    As of February, CCHCS data showed 218 overdue LCSW initial SUD assessment

25  appointments statewide, a decrease of approximately 700 compared to November 2024.  The data
also showed that 64% and 76% of the initial LCSW appointments in, respectively, January and

26  February, were timely, compared to 37% in November.  This data, and that in the three footnotes
that follow, was taken from CCHCS's recently revised, non-public ISUDT Dashboard.  It is not

27  clear why important metrics such as the number of backlogged and percentage of timely addiction
medicine-related appointments – are only available within the organization.

28                                                                                    (continued…)

1    LCSW SUD appointments, while also improved, remain substantial problems.[29]

2        The backlogs of initial and follow-up Primary Care Provider (PCP) addiction medicine

3    appointments statewide continue to decrease and, correspondingly, the rate of such appointments

4    that are timely continues to increase.[30]  Within those, the percentages  of timely initial and follow-

5    up addiction medicine appointments done by Headquarters PCPs via telemedicine have also

6    improved, but remain sub-par.[31]

7        *Defendants' Position:*  Plaintiffs' narrow focus on particular statistics obscures the progress

8    CCHCS continues to make to ensure patients receive life-saving care.

9        The backlog of LCSW substance use disorder (SUD) appointments has greatly diminished

10   over the last few months.  The dashboard reflects that there are 2.1 Initial SUD Assessments in

11   the backlog per 1,000 patients (compared to 10.4 in November 2024).  Similarly, the Follow-Up

12   SUD Assessment Backlog is down to 3.7 per 1,000 patients (compared to 16.5 in November

13   2024).

14       In terms of appointment volume, as of March 7, 2025, there are 5,604 backlogged

15   assessments. There are 186 appointments in the backlog for initial assessments, 325 for follow-

16   ups, and 5,093 for pre-release assessments.  By comparison, in November 2024, there were 9,631

17   backlogged assessments (956 initials, 1,518 follow-ups, 7,157 pre-release).

18       The Headquarters Addition Medicine Central Team (Central Team) operates from CCHCS

19   Headquarters to support to incarcerated persons throughout the State more complex cases

20   including those on Sublocade and those who have recently overdosed.  A patient who has

21   overdosed will see a provider on the Central Team within five days of the overdose and quickly

22

23   [29]    CCHCS data for  February showed 423 overdue follow-up LCSW appointments, compared to approximately  1,500 in November 2024, and that 24% and 37% of such appointments were timely done in, respectively, January and February,  compared to 7% in November.

25   [30]    For February, CCHCS data showed 15 overdue initial and 146 overdue follow-up PCP addiction medicine appointments; in November those numbers were 49 and 665, respectively.  That same data showed that statewide in February 80% of initial and 91% of follow-up PCP addiction medicine appointments were timely completed; in November the rates were 75% and 86%, respectively.

27   [31]    CCHCS data for February showed the rates of timely "Central Team" PCP initial and follow-up addiction medicine appointments were 56% and 82%, respectively, compared to 42% and 62%, respectively, in November.

1    be offered medication assisted treatment (MAT).

2         CCHCS quality management recently performed an analysis of the Central Team backlog.

3    As a result of the analysis, HCDOM 3.1.5 Scheduling & Access to Care was revised in December

4    2024, including revision of the timeframe for ISUDT Behavioral Health assessments from 14

5    days to 30 days, but most of the current orders are using the 14-day compliance timeframe.

6    Changes in the Electronic Health Record System to reflect the new compliance timeframe are

7    scheduled to be completed by end of February 2025.  This modification will provide the Central

8    Team with the flexibility to prioritize patients based on medical need.  The extension of the

9    compliance date for an additional 16 days will not deprive patients of necessary medical care

10   given the safeguards in place, e.g., seeing overdose patients within five days and offering them

11   MAT quickly, as well as seeing patients who request an appointment with a Health Care Services

12   Request Form.

13        Plaintiffs' concern that CCHCS has not yet made the ISUDT dashboard public is already

14   being addressed by Defendants.  (*See,* footnote 21.)  CCHCS recently overhauled the dashboard,

15   but the public-facing dashboard does not yet reflect those changes (which were reviewed and

16   discussed with Plaintiffs' counsel in advance).  Quality Management is planning to update the

17   public dashboard to align with the internal dashboard in Spring 2025.

18        Lastly, 14 institutions have received self-service naloxone dispensers  that will be installed

19   at centrally located areas such as housing units, corridors, or rotundas for use by the incarcerated

20   population, as well as adjacent to entry gates for use by staff.  Delivery of the naloxone dispensers

21   to the remaining institutions is scheduled to take place through Spring 2025.

22        **B.    Medically Necessary Gender-Affirming Care**

23        *Plaintiffs' Position:*  As previously reported,[32] in November 2024 we wrote to CCHCS

24   regarding concerns about gender affirming surgical outcomes and pre- and post-operative care.

25   Our letter was supported by a detailed appendix regarding patients who received such surgery

26

27   _____

28        [32]    *See* ECF No. 3940 at 10:5-11.

                                                                                    (continued…)

1    between 2017 and 2024.  We asked to meet and confer regarding our concerns and proffered

2    recommendations—approximately two dozen, some with multiple parts.[33]

3         Our letter was based on substantial research and investigation.[34]  It included details of and

4    conclusions regarding surgical outcomes for the two most common gender-affirming surgeries

5    that CCHCS provides: feminizing bottom surgery (vaginoplasty) and masculinizing chest surgery

6    (double mastectomy).  We found that nearly every patient who had gender-affirming surgery

7    CDCR through May 2024 had undergone surgical revision or medical procedures to address

8    complications, had been recommended for such procedures, or had reported serious

9    complications.  Specifically, 66 out of 68 patients (97.1%) who underwent either masculinizing

10    chest surgery or feminizing bottom surgery and remained in CDCR at least 12 months after

11    surgery reported significant complications.[35]

---

12    [33]    A list of the recommendations included with our letter is attached hereto as Exhibit
13    I.  Our overarching recommendations are that: (1) CCHCS track surgical outcomes to determine
      whether those outcomes are comparable to community outcomes, whether data indicate negative
14    trends with particular providers and/or prisons, and what, if any, remedial actions may be
      necessary; (2) provide more detailed and accessible informational resources, more robust face-to-
15    face patient education for patients seeking gender-affirming surgery, and more substantive
      training for CCHCS staff who work with these patients, so patients and their care teams can
16    engage in informed consent and shared decision making at every stage in the process; (3) update
      its Health Care Department Operations Manual (HC-DOM), Transgender Care Guide, Durable
17    Medical Equipment and Medical Supply Formulary, Comprehensive Accommodation Formulary
      Guidelines, Drug Formulary, and training to address the specific issues with pre- and post-
18    operative care identified in this letter; and (4) conduct quality assessments to ensure surgeons'
      cultural competency and professionalism.  Our more detailed recommendations elaborate on these
19    matters.
20    [34]    We reviewed patients' medical records, conducted over 100 interviews of those
      who had undergone surgery, and surveyed over 100 patients who had requested gender-affirming
21    surgery.  We also contracted with an expert, who is on the Board of the World Professional
      Association of Transgender Health and a leader in the treatment of trans and gender diverse
22    populations, to review our findings.
23    [35]    Of these 68 patients, 45 patients (66.1%) have required surgical revision and/or
      medical procedures to address complications.  An additional 10 patients (14.7%) have been
24    recommended for surgical revision or procedures to address complications, and 11 patients
      (16.1%) have reported symptoms indicating that such procedures may be necessary, and of those,
25    many are pending determinations for necessary follow-up care or have been released.  Our expert
      opined that the rates of surgical revisions, medical procedures, and complications for patients in
26    CCHCS's care were significantly higher than in peer-reviewed studies.
27        Among the concerns identified, we found that 22 out of 28 patients (78.6% of patients)
      who had vaginoplasty had either medical or custodial issues (e.g., CCHCS not providing dilation
28    supplies or space, or CDCR custody staff seized dilation supplies) that resulted in significant or

                                                             (continued…)

---

In its January 22 response, CCHCS said care is adequate under Title 15 standards, that it would be too burdensome to meet and confer, and that our recommendations have been or will be considered—without saying whether any have been or will not be implemented. CCHCS also reported that to "improve compliance" it had implemented a new process in which headquarters staff monitors and coordinates certain aspects of gender affirming surgery requests, including those related to post-surgery care. In our view, the new headquarters-driven process, if successfully implemented, may reduce problems arising from untimely orders, or those not entered in accord with proper sequencing of care

However, concerns remain even with this new process, including because, for example, it provides no changes with regard to patient education, tracking outcomes, staff training, or policies to support staff in providing, and patients in accessing, adequate pre- and post-operative care. On January 31, we requested that CCHCS detail which of our recommendations it has or will consider and implement, and what other efforts it is undertaking to improve gender-affirming surgery outcomes. We also requested that CCHCS prioritize its responses to our recommendations and patient examples regarding post-operative care. Lastly, we again requested a meet-and-confer to discuss post-operative care with a small team to further our shared goals of improving outcomes for transgender patients. We believe prompt implementation of our recommendations would substantially improve patient outcomes and CCHCS processes that provide and oversee gender affirming surgery, and thus reduce the risk of harm to patients.[36]

There are substantial disagreements between the parties regarding the adequacy of GAS post-operative care. Defendants below take issue with some of the data and conclusions in our November 2024 letter regarding surgery outcomes for GAS patients; these specific concerns,

---

total loss of depth, and that 23 patients (82.18%) experienced significant issues with wound healing, urinary symptoms, vaginal prolapse, and/or discharge. We also found that 28 out of 40 patients (70.0% of patients) who underwent masculinsizing top surgery experienced significant complications with nipple grafts (including one or both nipple grafts failing) and that 32 patients (80.0%) experienced significant complications with wound healing, scarring, infections, and/or hematomas or seromas requiring evacuation. The issues we identified are not exclusive to gender-affirming care issues, but rather, seem to be part of a broader set of issues with wound-care and post-operative care generally that were exacerbated in these contexts.

[36]    In this regard, we reported to CCHCS that our expert agreed that our recommendations, in addition to other remedial steps, would likely improve surgical outcomes.

(continued...)

including about methodology, aesthetics, and lack of clarity regarding dilation issues, were not included in CCHCS's January response to the letter. [37]  Defendants also state CCHCS will soon provide a response regarding implementing any of our recommendations for improving care, and indicate again that meeting about these matters is not necessary.

*Defendants' Position:*  Defendants appreciate Plaintiffs' concerns regarding gender-affirming care and also note care for patients with gender dysphoria often involves complex and extensive treatment plans that may include multiple medical and surgical treatments, that may require pre- and post-operative care over extended periods.  CCHCS's team of skilled and knowledgeable licensed health care professionals consistently reviews, assesses, and finds ways to improve care of patients receiving gender affirming medical treatment.  And there is no dispute that CCHCS is providing medically necessary gender affirming care to patients in accordance with Title 15.

In 2023, CCHCS launched the Integrated Gender Affirming Healthcare Program (IGAHP) which provides a robust model of coordinated care for transgender and gender-diverse (TGD) patients.  IGAHP is used in conjunction with existing CCHCS mechanisms and resources to review and respond to patient and provider matters.  IGAHP has already accomplished many significant milestones including securing headquarters staff with TGD care expertise, leveraging expanded resources for TGD care, developing an extensive library of TGD resources for providers, conducting regular trainings regarding TGD patient care, and providing ongoing support to the field in the form of consultation, chart review, and patient contact.  IGAHP is

---

[37] We do not believe Defendants' concerns about methodology undercut our recommendations: we reviewed all patients who had gender affirming surgery, and explained which patients we included, and why.  With regard to the concern that certain post-surgical outcomes are merely "aesthetic" issues, we believe many patients had both functional and aesthetic issues, and that for some further surgery was needed seemingly because of inadequate or incorrect post-operative wound care at the prison, which CCHCS should take steps to improve.  Defendants also assert that we did not define "dilation issues."  However, we described at least five examples of patient dilation-related issues, including staff taking people's dilators and dilation supplies, staff failing to provide adequate dilators and dilation supplies per the surgeon's instructions, staff failing to replace or provide lost or taken dilators and dilation supplies, and patients receiving rule violation reports for covering their genitals from view while they dilated.  In addition, some patients reported that they did not receive adequate pre- or post-operative patient education about dilation practices and that their providers failed to give them instructions.

currently implementing a new case management initiative to improve timely and safe access and delivery of gender affirming care, which includes post-operative care. Additionally, CCHCS is evaluating the possibility of placing patients with more medically complex situations to a few select institutions that are best able to manage specialized gender-affirming post-surgical needs.

Gender affirming surgeries are highly specialized and complex procedures completed by highly skilled surgeons in this field. CCHCS is committed to contracting with expert surgeons who are agreeable to providing services for CCHCS patients. All surgeons must be licensed medical professionals by the State of California, in good standing, and appropriately privileged and credentialed via the CCHCS contracting process. These surgeons are required to provide care consistent with Title 15. CCHCS trains its leadership to identify, among other things, pre and post-operative concerns and professional competencies, and encourages medical professionals at CCHCS to report any problematic indicators to HealthNet.

Plaintiffs' counsel assert that they reviewed the charts of all patients who received gender affirming surgeries and then gave their work to an undisclosed expert to review. Plaintiffs have not provided any explanation regarding the scientific, technical, or other specialized knowledge by which the review was performed; whether the opinions are based on sufficient facts or data; whether the opinions are the product of reliable principles and methods; and whether they reliably applied the principles and methods to the facts of the reviewed cases.[38, 39]

Plaintiffs appear to have both overstated and not clearly defined or classified post-surgical "complications" experienced by TGD patients by including medically necessary revisions that were completed to modify unsatisfactory aesthetics that result in ongoing gender dysphoria. However, such changes would not be termed a "complications," which is defined as "any deviation from the ideal postoperative course that is not inherent to the procedure, and does not

---

[38] *See* Fed. R. Ev. 702.

[39] A brief review of Plaintiffs' work raises some concerns. Their Non-Paragraph 7 request discusses 33 patients who had top surgery, and excludes five from the analysis because they were discharged or had surgery within the year. But Plaintiffs reported 45 patients who had top surgery, and 33 patients who had bottom surgery. And by Plaintiffs' own assumptions, it seems that seven of the bottom surgery patients should have been excluded, not five, because they were discharged or had surgery within the year.

(continued…)

1  comprise failure to cure" according to the Clavien-Dindo classification.[40]  Revisions or surgical

2  procedures performed post-operatively to correct aesthetics that deviate from what would be

3  expected as a normal anatomic representation for that person's gender identity may not be

4  considered a complication.  Rather, this would be a revision to further reduce gender dysphoria

5  symptoms.

6         For example, most of the patients who reported issues for masculinizing top surgery

7  reported aesthetic discontent, scarring, and problems with nipple grafts which may negatively

8  impact symptoms of gender dysphoria distress.  According to University of California San

9  Francisco, these issues are expected outcomes of such surgeries and surgeons do their best to

10  correct them after the healing process through minor procedures.[41]  Such aesthetic issues do not

11  constitute surgical complications.

12         Similarly, according to Plaintiffs' review, patients who reported concerns with their

13  feminizing bottom surgery mostly reported problems concerning aesthetics, vaginal depth, and

14  dilation issues.  Plaintiffs do not expound on what they mean by "dilation issues" but if patients

15  do not adhere to post-operative recommendations, the surgical outcome may be affected.  Further,

16  for concerns related to vaginal depth, Plaintiffs do not report the type of vaginoplasty performed,

17  pre-operative considerations, post-operative compliance, final vaginal depth, and whether final

18  vaginal depth compared unfavorably to average outcomes.[42]  Consequently, Plaintiffs' reporting

19  on this issue sheds little light on the quality of the provided medical services.

20         CCHCS and CDCR are preparing a response to Plaintiffs' follow-up inquiry that will be

21  issued soon.  CCHCS declined Plaintiffs' request to meet in January 2025, because of the

22  significant burden it would place on CCHCS staff to ensure meaningful discussion in a relatively

23         [40] (See, Surgical Complications and Its Grading: A Literature Review - PMC,
    https://pmc.ncbi.nlm.nih.gov/articles/PMC9187255/#REF7).

24         [41] See Postoperative care and common issues after masculinizing chest surgery UCSF
    Transgender Care, Gender Affirming Health Program,

25  (https://transcare.ucsf.edu/guidelines/chest-surgery -masculinizing) (Associated early and late
    complications related to nipple healing include decreased nipple sensitivity, numbness, or

26  paresthesia's are expected outcomes for both methods….Nipple reconstruction and revision
    procedures may be required to restore the appearance of the nipple. Usually these are minor

27  procedures than can be accommodated once the initial healing phase is complete.)

       [42] Primary Sigmoid Vaginoplasty in Transwomen: Technique and Outcomes - PMC,

28  https://pmc.ncbi.nlm.nih.gov/articles/PMC5971241/

short timeframe.  CDCR and CCHCS declined to meet in March 2025 because the pending response will provide the information currently available.

### C.    Emergency Medical Response Activation

*Plaintiffs' Position:*  As previously explained, we believe it important that CCHCS regularly report the number of emergency medical responses, including 9-1-1 activations, statewide and at each prison, and the number/percentage of such activations determined to have been delayed.   CCHCS previously said it aimed to establish such a process by the end of 2024. On February 28, it said, consistent with Defendants' statement below, that it was not feasible to provide such data.  We are now considering whether there are other means to systemically monitor and decrease 9-1-1 activation delays, about which we remain concerned, including because they continue to be identified in mortality reviews, occur at relatively high rates at some of the (relatively few) prisons for which we can receive relevant data.

The Receiver previously informed the Court that a physician-expert was retained to review CCHCS emergency response policies and practices.  CCHCS in January informed us that a completion date cannot yet be determined, including because the expert will conduct prison site visits in the early spring.

*Defendants' Position:*  CCHCS began evaluating its ability to capture and report on information about Emergency Medical Response activations several years ago.

While the underlying data for 9-1-1 activations is reported in EHRS, assessments of the timeliness of 9-1-1 activations are not.  Medical professionals at the institutional level evaluate each 9-1-1 activation and assess whether any delay caused a bad medical outcome.  The results of these assessments are not tied to any electronic system, so that information cannot be included in automated reports.  (September 2024 Joint CMC Statement 21:24-22:4, ECF No. 3925.)

Following Plaintiffs' inquiry in 2024, CCHCS investigated if there was an automated process to capture the number of delayed activations that led to poor outcomes.  There is not, and CCHCS does not have the resources available to establish and sustain a manual process. Accordingly, that information will continue to be accessible only at the institutional level.

The Receiver notified the parties on September 20, 2024, that CCHCS planned to contract with Jeffrey E. Keller, M.D. to, among other things: (1) evaluate policies and procedures to identify and report among other things improvement for the speed of 9-1-1 activations; and (2) review Emergency Medical Response Provider data for 2023 and render an opinion on how well the program is currently operating and if 9-1-1 activation delays led to bad outcomes.

On January 15, 2025, Plaintiffs requested Dr. Keller's reports and opinions. Plaintiffs' request was premature. On January 25, 2025, CCHCS advised that "a complete and thorough analysis is essential for an accurate and meaningful report" and that the analysis would "include approximately 800 chart reviews and several institutions visits that will occur in early spring." Defendants are informed that CCHCS will provide Dr. Keller's reports and opinions to Plaintiffs when they are in final form.

### D.    False Positive Urinalysis Results

*Plaintiffs' Position:*  As part of the Integrated Substance Use Disorder Treatment program, participants are regularly ordered urine drug screening tests. Clinical staff may not share clinical urine drug screening results with custody staff. However, as we have discussed previously, these results are available to the Board of Parole Hearings (BPH) to determine whether to grant parole to individuals.[43]

During recent site visits at Central California Women's Facility (CCWF) and Mule Creek State Prison (MCSP), we received a number of complaints about the accuracy of the urine drug tests from staff and incarcerated people.  Specifically, at CCWF, we heard from a provider that a number of his patients had received positive urine test results that he believed to be false.  At MCSP, we heard from several people who learned  only during their BPH parole consideration hearings  that they had tested positive for opiates, and insisted that the results were wrong.[44] During that site visit, we also learned that Quest Labs, the laboratory that performs all urine drug screens for CCHCS, had notified CCHCS that it had been using a reagent[45] that was associated

---

[43]      Reporter's Transcript, ECF No. 3844, Feb. 7, 2023, at 29:12-35:2.
[44]      In each case, the BPH either denied or deferred their parole based at least in part on their allegedly positive UA results.
[45]      A reagent is a chemical compound designed to react with specific drugs. It detects
(continued…)

with false positive opiate tests, and had subsequently discontinued use of that reagent for urinalyses.

Based on this information, we requested additional information from CDCR and CCHCS, including regarding the information that had been provided to the patients, the providers and the Board of Parole Hearings regarding the possibility that some people may have received false positive drug screen results.  On January 29, 2025, CCHCS responded that Quest Labs had used the reagent that produced possibly unreliable results from mid-April to the end of July 2024, that CCHCS had generated a list of patients that received a positive result during the relevant time period, and that in October, a clinical team had provided a training to the BPH on the use of clinical urine drug screening that included information about the period during which the problematic reagent was used.

We also asked CCHCS to provide written notification to all impacted patients of the discontinuation of the reagent and the possibility that their positive test result(s) may have been unreliable.  In response, CCHCS said that it would provide providers with a list of their assigned patients who had received a positive urine drug screening result during the relevant period, and that the provider could exercise their judgment as to how or whether to address the results with the patient.

Because positive test results can and have resulted in parole denials and deferrals, we believe that people who tested positive must be informed that these possibly unreliable results are part of their medical record. Thus, on January 30, 2025, we explained our concerns and again requested that CCHCS notify, in writing, all people who received positive UA test results for opioids during the relevant period that their test results may be inaccurate.  On March 5, CCHCS responded that it plans to notify patients who had a positive UA tests results during the relevant time period that the test results may have been inaccurate and the details of the notification are being finalized.  On March 10, CCHCS confirmed the notification would be in writing.

_____

the presence of a specific drug/drugs by causing a visible color change when mixed with the urine sample.

*Defendants' Position:* CCHCS maintains that communicating the list of potentially impacted patients to the primary care providers is optimal because it allows the providers to interpret the results in context of the patient's entire clinical picture (e.g. positive opiate results before or after the period during which the alternate reagent was in use by Quest Diagnostics), and addend any interpretive documentation related to the test results within the medical record.

In addition, CCHCS plans to notify patients who received positive urinalysis drug screen results from April through July 2024, that their test results may not have been accurate.  The details of the notification process are still being finalized, as indicated in CCHCS's Response to Plaintiffs' above referenced January 30, 2025 communication. CCHCS will also have further communications with the Board of Parole Hearings to educate the Board that when considering patients' treatment and recovery for substance use disorder, attention should be on the provider's documentation and interpretation of the urine drug screening results, rather than on the urine drug screen results alone. Such tests results in CERNER always carry the following disclaimer:

> This drug testing is for medical treatment only. Analysis was performed as non-forensic testing and these results should be used only by healthcare providers to render diagnosis or treatment, or to monitor progress of medical conditions.

### E. Housing Incarcerated People in Non-traditional Housing at Salinas Valley State Prison

*Plaintiffs' Position:* In mid-January, during a monitoring visit at Salinas Valley State Prison, the Coleman Special Master team found nine incarcerated people who were housed in holding cells (i.e., cells that were not approved or staffed for overnight housing) in an area of the prison apart from where all others were housed. Some of these cells were "dry," meaning that had no water or toilet.  The Special Master team stated that these cells were not adequately monitored by custody staff and that medical staff may have been unaware that incarcerated people were being housed in this location.

On January 17, 2025, we asked defendants and CCHCS for more information about this situation, including how long SVSP had been housing people in such cells or locations similar to them, who had authorized this, and whether medical leadership had been apprised of the housing assignments. We have not yet received a response to this inquiry.

*Defendants' Position*: Upon learning on January 15, 2025, that incarcerated persons were housed in non-traditional cells at SVSP, CDCR leadership took immediate action to ensure that those individuals were properly housed, and to ensure this issue was not occurring at any other institution.  The individuals housed in the non-traditional cells at SVSP were rehoused within the institution by the next day, and  patients were assessed by health care staff as needed.  Additionally, on the morning of January 16, 2025, the Deputy Director of the Division of Adult Institutions and the CCHCS Deputy Director of Institution Operations directed every CDCR warden, Healthcare Access Associate Warden, and Chief Executive Officer to tour all housing units at all institutions by 4:00 p.m. that day and required each institution to report back and describe their findings, if any, regarding incarcerated persons housed in non-traditional cells or dry cells.  The statewide review confirmed that no other incarcerated persons were housed in non-traditional or dry cells.  Executive staff reiterated expectations that non-traditional cells may not be used to house inmates. SVSP is now under the leadership of a new Warden.

Defendants continue reviewing the matter, gathering facts, and working on the response to Plaintiffs' January 17, 2025 request for more information regarding the situation.

### F.    Transition of California Health Care Facility Correctional Treatment Center Beds

*Plaintiffs' Position:* The Governor's Proposed Fiscal Year 2025-2026 Budget, released in January, includes an "operational reduction[]" of $7.4 million General Fund in 2025-26, and $15.3 million General Fund in 2026-27 and on-going, from transitioning 180 Correctional Treatment Center (CTC) beds at California Health Care Facility (CHCF) to "Long Term Care." [46]

As a general matter, CTC beds house the CDCR residents with the most complex medical needs and have the highest level of medical staffing. [47]  The 180 beds to be transitioned represent

---

[46]    *See* Governor's Budget Summary – 2025-26, Criminal Justice and Judicial Branch at 64 [PDF page 6], https://ebudget.ca.gov/2025-26/pdf/BudgetSummary/CriminalJusticeandJudicialBranch.pdf.

[47]    *See generally*, California Department of Corrections Health Care Department Operations Manual at 3.1.10 ("Specialized Health Care Housing") and Title 15, California Code of Regulations, sections 79516 et seq. (defining Correctional Treatment Centers as facilities "designated to provide health care to that portion of the inmate population who do not require general acute care level of services but are in need of professionally supervised health care beyond that normally provided in the community on an outpatient basis" and specifying medical staffing and other requirements for those units).

1    one-half of such beds at CHCF, or three of the current six CTC units at the prison.  CCHCS

2    currently has no "Long Term Care" level of care or housing unit.  We assume that the substantial

3    post-transition spending reductions indicated in the proposed budget would be attained by

4    reducing the number of medical staff in the newly-purposed units compared to the current CTC

5    units and that substantial planning had occurred such that precise cost-savings could be

6    announced by the Governor.

7         During a site visit at CHCF on February 11 and 12, medical executives said headquarters

8    staff were that week assessing CTC patients in relation to the planned new housing and indicated

9    they expected the transition to be phased. They were unable, however, to explain the criteria for

10   removal of patients from the CTC or for placement in "Long Term Care."  On February 14, we

11   asked the Receiver and CCHCS for information regarding this matter, and also that, before any

12   transition takes place, CCHCS adopt a formal Health Care Department Operations Manual policy

13   setting forth the criteria and other operational requirements for the new "Long Term Care" level

14   of care.

15        *Defendants' Position:* There have been many level-of-care assessments for the populations

16   residing in Correctional Treatment Center (CTC) beds and Outpatient Housing Unit (OHU) beds

17   at California Health Care Facility (CHCF) that have consistently shown that the majority of

18   patients in CTC beds have similar needs as patients in OHU beds. These needs are primarily for

19   long-term assisted living support in a residential environment rather than skilled nursing inpatient

20   services.

21        CCHCS is in the process of transitioning CHCF's CTC beds in D4, D5, and D6 to become

22   part of CHCF's OHU beds. This transition is expected to take 18 months.  CHCF is assessing

23   each patient's level of care and placing each patient at the appropriate level, consistent with

24   current processes.

25

26

27

28

1

2    Dated:  March 10, 2025                          Respectfully submitted,
                                                     HANSON BRIDGETT LLP

3

4                                                    /s/ Samantha D. Wolff
                                                     PAUL MELLO
5                                                    SAMANTHA D. WOLFF
                                                     DAVID C. CASARRUBIAS- GONZÁLEZ
6                                                    SAMANTHA M. BACON

7                                                    Attorneys for Defendants

8

      Dated:  March 10, 2025                         ROB BONTA
9                                                    Attorney General of California

10

11                                                   /s/ Damon G. McClain
                                                     DAMON G. MCCLAIN
12                                                   Supervising Deputy Attorney General
                                                     CORINNA ARBITER
13                                                   Deputy Attorney General
                                                     Attorneys for Defendants
14

15

      Dated:  March 10, 2025                         PRISON LAW OFFICE
16

17                                                   /s/ Mackenzie L. Halter
18                                                   DON SPECTER
                                                     STEVEN FAMA
19                                                   ALISON HARDY
                                                     RANA ANABTAWI
20                                                   LILY HARVEY
                                                     SOPHIE HART
21                                                   MACKENZIE L. HALTER

22                                                   Attorneys for Plaintiffs

23

24

25

26

27

28