ROB BONTA
Attorney General of California
DAMON G. MCCLAIN – 209508
Supervising Deputy Attorney General
CORINNA ARBITER - 273074
Deputy Attorneys General
600 W. Broadway, Suite 1800
San Diego, CA 92101
Telephone: (619) 321-5799
Fax: (619) 645-2061
E-mail: Corinna.Arbiter@doj.ca.gov

HANSON BRIDGETT LLP
PAUL MELLO – 179755
SAMANTHA D. WOLFF – 240280
DAVID C. CASARRUBIAS – 321994
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Fax: (415) 541-9366
E-mail: pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER – 83925
STEVEN FAMA – 99641
ALISON HARDY – 135966
RANA ANABTAWI – 267073
LILY HARVEY – 278947
SOPHIE HART – 321663
MACKENZIE L. HALTER – 333992
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704
E-mail: dspecter@prisonlaw.com

LAW OFFICE OF SARA NORMAN
SARA NORMAN (189536)
P.O. Box 170462
San Francisco, CA 94117-0462
Telephone: (415) 236-3763
E-mail: sara@saranormanlaw.com

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **MARCIANO PLATA, et al.,** Plaintiffs, | 4:01-cv-01351-JST |
| **v.** | **Joint Case Management Conference Statement [Corrected*]** |
| **GAVIN NEWSOM, et al.,** Defendants. | Date: June 16, 2025<br>Time: 1:30 p.m.<br>Courtroom: Via Zoom<br>Judge: Hon. Jon S. Tigar<br>Action Filed: April 5, 2001 |

* An exhibit attached to the Joint Case Management Statement filed on June 9, 2025, contained certain Protected Health Information that has been removed from the attached exhibits. No changes have been made to this Joint Statement.

The parties submit the following joint statement in advance of the June 16, 2025 Case Management Conference.[1]

## I. PROGRESS TOWARDS RESOLUTION

### A. Delegations to Date

*Plaintiffs' Position:* As reported by the Receiver in February, 29 prisons (including three that are now closed) have been delegated.[2] Since the last Case Management Conference, the Receiver held meet-and-confers regarding possible delegation of High Desert State Prison and Salinas Valley State Prison in April and June, respectively. Meet-and-confers regarding the potential delegations of CSP-Sacramento, California Health Care Facility, and California Substance Abuse Treatment Facility and State Prison are scheduled for August 2025, October 2025, and February 2026, respectively.

*Defendants' Position:* Plaintiffs' description of the status of delegations is correct.

### B. Post-Receivership Plan

*Plaintiffs' Position*: As previously reported, the parties have exchanged proposals regarding post-receivership governance,[3] and the parties have met twice to discuss these proposals. At this time, there are fundamental disagreements, and the parties are at an impasse.

We continue to believe robust and meaningful oversight of the prison healthcare system by an independent entity is a necessary element to any post-receivership plan because Defendants are not capable of sustaining the progress made by the Receiver. Two recent decisions in *Coleman v. Newsom* make this clear. The Ninth Circuit affirmed a decision finding Defendants in contempt due to CDCR's failure to provide sufficient mental health staff.[4] The Court noted that "[t]he combination of inadequate mental health care and spiking patient populations has produced predictably grave results: delays in access to life-saving care, inadequate medication

---

[1] Defendants shared their responses to Plaintiffs' portion of the CMC statement with Plaintiffs' counsel on Thursday, June 5th. On the afternoon of June 9th, just several hours before filing, Plaintiffs provided extensive, substantive additions to their sections.

[2] See ECF No. 3949 at 7.

[3] See ECF No. 3940 at 2:5-11.

[4] *See Coleman v. Newsom*, 131 F.4th 948 (9th Cir. 2025).

(continued…)

management, and a heightened risk of deaths by suicide."[5] And because of the State's utter failure to resolve these tragic conditions the district court has announced that it intends to remove control over the mental healthcare system from the State and appoint a receiver.[6]

*Defendants' Position*: Defendants agree that the parties have reached an impasse in their discussions regarding a post-receivership plan. Defendants intend to provide their proposed plan to the Receiver for his consideration and input before filing the plan with the Court.

Plaintiffs' assertion that two recent orders in *Coleman v. Newsom*—a case concerning the provision of mental healthcare to incarcerated patients—demonstrate that Defendants are incapable of maintaining progress made in *Plata* is, at best, far-fetched. This Court is aware of the many differences between the factual and procedural contexts, remedial plans, and remedial statuses of *Plata* and *Coleman*. These are two very different cases. Court orders in *Coleman* concerning a lack of full compliance with certain aspects of the ordered remedy in that case have nothing to do with Defendants' will or ability to maintain achieved compliance in *Plata*. That Plaintiffs resort to referencing events in another case to support their assertion here is telling.

Plaintiffs' assertion also ignores that Defendants have a strong record of maintaining progress achieved in prisons that have already been delegated—no delegations have been revoked. It ignores that Defendants proposed plan provides for meaningful oversight—both internal and external—to help ensure the continued provision of constitutionally adequate healthcare. It ignores that there will be a one-year period of Court oversight after delegation of Headquarters functions or the last institution, whichever is later, during which time Defendants will further demonstrate their will and ability to maintain the progress made. And Plaintiffs' assertion gives short shrift to the infrastructure, systems, processes, and policies that the Receiver and Defendants have developed—with Plaintiffs review and input—to ensure a durable remedy.

---

[5] *Id.* at 952.

[6] *Coleman v. Newsom*, March 19, 2025 Order and Order to Show Cause, ECF No. 8574

(continued…)

## II. MEDICAL STAFFING

*Plaintiffs' Position:* As the Receiver has reported, when civil service, telemedicine, and contract registry primary care providers (PCPs) are counted, all but a handful of prisons have 90% or more of those allocated positions filled, and the statewide fill-rate is approximately 96%.[7] Similarly, nursing staffing fill-rates for allocated positions are at 90% or higher at all prisons, if civil service, registry and overtime are considered.[8] We appreciate the efforts by the Receiver and his staff to accomplish this, particularly in light of CDCR's long-standing challenges with hiring and retaining sufficient mental health clinical staff, which in the *Coleman* case has resulted in CDCR paying more than $100 million in contempt fines.[9]

Nevertheless, as discussed below, there are important unresolved medical staffing concerns related to the sustained use of temporarily approved staff in positions not included in CCHCS's acuity-based staffing model or other formally budgeted positions. Defendants below say the Constitution does not proscribe temporarily approved staff. That is correct – to a point. However, the remedy in this action must be durable and such is not the case when compliance in certain respects is achieved only by extra-budget positions and staffing approved in the context of a federal receivership.

*Defendants' Position*: Plaintiffs' statements regarding the contempt fines in the *Coleman* case are gratuitous and should be disregarded. The staffing levels in *this* case speak for themselves and, as Plaintiffs must admit, demonstrate a durable commitment to achieving and sustaining sufficient medical care providers for the patient class.

Furthermore, and it should go without saying, the Constitution does not proscribe the use of temporarily approved staff for the provision of medical care in CDCR's institutions. The focus should be on maximizing access to care, which CDCR is undoubtedly achieving.

---

[7] The PCP fill-rate includes civil servant on-site, registry, and telemedicine staff. See ECF Nos. 3949 (filed 2/3/25), at 16 and 21 and 3963 (filed 6/2/25) at 17. The nursing rate includes civil service, registry, and overtime full-time equivalent staff.

[8] This based on monthly staffing data provided us by the Receiver, whose recent Triennial Reports have not addressed nursing staffing.

[9] See *Coleman v. Newsom*, *supra*, 131 F.4th 131.

**A. CCHCS must adjust its medical staffing models so as to formally include additional necessary positions at certain prisons, or otherwise permanently establish those positions.**

*Plaintiffs' Position:* CCHCS's medical acuity-based staffing model, based on population levels and patient acuity, determines the number of *direct* patient care positions at each prison. Positions not involved in direct patient care, including management, are separately established, seemingly based upon another staffing model. These staffing models have proven inadequate at certain prisons because they do not provide for the number of staff necessary to provide care actually needed.[10] As a result, some prisons struggle to provide adequate care even with all formally established positions covered, while others, via various methods,[11] regularly use staff in addition to that established by the staffing models. While we support the use of extra staff, its discretionary and temporary nature raises serious concerns about the sustainability of current efforts. The reality of medical staff use in the prisons should be formally and thus permanently reflected in the staffing models, or in otherwise formally budgeted positions.

There are a number of examples that illustrate the need to adjust the acuity-based staffing model and other aspects of medical staffing. In 2023, for example, we told the Receiver the number of established PCP and nurse positions at CCWF, while in accord with CCHCS's staffing model, were insufficient given the actual needs of patients and the actual staffing usage by the prison. In response, the Receiver in October 2023 stated he had directed his staff to "reassess[]" the staffing model, "to ensure that it appropriately reflects the current needs at each institution." He further stated that CCWF may need additional clinical staffing given the size and nature of its population. However, as we understand it, approval of a revised acuity-based medical staffing

---

[10] At some prisons, the demand or need for direct patient care exceeds that capacity of staff allocated via the acuity-based staffing model, and thus additional direct patient care positions (e.g., PCPs or RNs) may be needed. At other prisons (or some of the same), the problem arises because the so-called non-direct patient care staff allocation (e.g. specialty team nurses, medical executive staff) which is largely the same for every prison, is insufficient to meet demand.

[11] The methods include Staffing Authorization Requests (SARs), which temporarily approve additional positions, temporary dual appointments (which permit civil service staff to do additional work via a new pay number), and approved overtime.

(continued…)

model was not sought in either the Fiscal Year (FY) 2024-25 or proposed 2025-26 budgets, and the number of CCWF's formally approved positions (e.g., for PCPs) has not materially changed.

Similarly, in late 2024 and again this year we raised concerns about the use of seven additional staff positions at Richard J. Donovan Correctional Facility (RJD), that while not called for by the staffing model, have been used across multiple budget cycles because they are necessary for the crucial task of specialty services scheduling.[12] When asked when these seven necessary positions will be included in the formal budget, CCHCS last month said they will be "addressed in the next revision of the medical staffing model," without saying when that will occur. The proposed Fiscal Year 2025-26 budget does not appear to include any such revision.

In addition, earlier this year we informed the Receiver that the California Substance Abuse Treatment Facility and State Prison (SATF) was using large numbers of staff above that authorized by the staffing model or otherwise formally budgeted. These positions included a second Chief Physician and Surgeon, a handful of additional PCPs, and more than a dozen registered nurse positions.[13] We urged that these positions be formally included in the prison's budgeted medical staff allocation. To date, this appears not to have been done, and we are not aware of a plan to do so.

Defendants below do not foreclose adding these (or other) necessary positions to the budget, but don't promise such will be done. Further, they assert that access to care at the three prisons mentioned above remains robust. This misses the mark, including because at some prisons the access to care performance scores are due in part, sometimes in large part, to the use of extra staff above the prisons budgeted allocations; the many such positions at RJD necessary

[12] These specialty scheduling positions have been repeatedly temporarily approved via Staffing Authorization Requests. Although they are essential for adequate care, specialty scheduling positions are not considered direct care positions, and thus are not including in the acuity-based staffing model. This means that RJD, even though it provides far more specialty services than many other prisons, receives the same allocation of staff to process and schedule such orders as the others.

[13] Because of the additional PCP appointment demands, the prison in 2024, per data it provided, used its additional PCPs to run hundreds of extra "lines," meaning sets of patient appointments, and thus remain at goal with regard to timely care. SATF also is using additional temporarily-approved medical staff in other positions because the 'one-size fits all' so-called non-direct patient care allocation is inadequate. That SATF, with the largest number of residents statewide – in some cases twice as many as other prisons - receives the same allocation of these positions as prisons housing thousands fewer residents is puzzling, to say the least.

for processing and scheduling specialty services orders are an example of that. Also, the Dashboard metrics seemingly referenced address timeliness of care which, while important, is not the only component of adequacy; the care provided must be adequate too. For instance, Defendants state that concerns about staffing have not translated into diminished care at SATF although a number of people in recent months died because of inadequate care, and Defendants agreed the prison, which had green zone access to care scores, was not ready for delegation.

*Defendants' Position*: CCHCS continues to evaluate additional staffing needs including updates to its methodology. If there is a need for an adjustment outside of the approved acuity-based staffing model methodology, California Department of Corrections and Rehabilitation (CDCR) will evaluate the need to submit a budget change through the Budget Change Proposal process.

The latest statewide comparison data as of March 2025 for CCWF, RJD, and SATF strongly supports the conclusion that access to care remains robust across these institutions, despite concerns raised about staffing levels. Across a broad range of key performance indicators—including primary care, specialty services, allied health, and inpatient access—the facilities consistently demonstrate high performance. For example, all three institutions reported compliance rates above 87% for overall care team services, with CCWF at 87%, RJD at 98%, and SATF at 92%. Timely triage by RNs, urgent referrals, routine referrals, and chronic care follow-up also show excellent outcomes, particularly at RJD, which achieved 100% compliance for urgent PCP referrals and nearly perfect scores across the board.

Inpatient access and inpatient rounds metrics further reinforce the adequacy of staffing and care delivery. Medical inpatient access is at or above 95% for all three institutions, and timely initial history and physicals are being completed 100% of the time in medical beds at both RJD and SATF. These high-performing metrics, grounded in statewide data, demonstrate that patient access to care is not being compromised, and that concerns about staffing have not translated into diminished care delivery at CCWF, RJD, or SATF.

**B. Exceptionally High Usage of Registry Nursing Staff at Pelican Bay State Prison (PBSP)**

*Plaintiffs' Position:* As previously reported, PBSP nursing care is hyper-reliant on registry staff, which it uses in far greater percentages than any other CDCR prison, and which raises concerns about patient care.[14] In April, CCHCS confirmed that the Receiver has asked headquarters staff to review nursing at the prison, further stating that the review's timeframe was not known and that the Receiver will determine what information is shared. We look forward to hearing more about this matter. Defendants' miss the mark below when asserting that registry staff does not affect patient care. As detailed in the recently provided analysis, by the Receiver's expert, of CCHCS emergency medical response care, the prisons' Treatment and Triage Areas (TTAs) are staffed by large numbers of registry nurses (called "agency nurses" therein) who have not received the CCHCS emergency response training, and that is one factor that "results in the TTA being frequently staffed by RNs who are both inexperienced and untrained," increasing the risk of patient harm.[15]

*Defendants' Position*: Due to the high rate of civil service vacancies at Pelican Bay State Prison (PBSP), CCHCS utilizes registry nursing staff to fill positions, but that does not affect patient care. PBSP, located in Crescent City, is one of CDCR's more remote locations statewide and the candidate pool is limited as CDCR competes for the same small pool of candidates in the community. However, CCHCS is actively recruiting for PBSP supported by the Workforce Development Unit that is responsible for the design, organization, and implementation of a marketing and recruiting program for CCHCS. CCHCS Human Resources (HR) uses digital ads targeting nursing roles, maintains job-specific career pages, and attends virtual and in-person career events. HR also partners with colleges for career fairs, guest lectures, and hosts facility tours to engage students entering the nursing field. These efforts aim to reach both active and

---

[14] *See* ECF No. 3952 at 4:6-9 and Exhibit B thereto. There are also substantial vacancies and very high turn-over among supervising nurses at the prison. *Id.*

[15] *See* "Analysis of the California Department of Corrections and Rehabilitation Emergency Response System: Critique and Recommendations," filed herewith as Exhibit 1, at 33. This analysis is further discussed at Part V.E, below.

passive candidates and build a future workforce pipeline. Seven of the 9.5 Supervising Registered Nurse positions are filled and through the efforts discuss above, HR continues to actively recruit to fill the vacancies. The results of headquarters staff's review of nursing at PBSP were provided to the Receiver and CCHCS on May 16, 2025, and it is under review.

**C. Hiring Process Delays – Applicant Tracking System**

*Plaintiffs' Position:* In April 2023, we raised concerns about hiring delays for medical staff, based on information showing that it sometimes, after an employment offer is made (and the applicant presumably has indicated continued interest), it took months for the final hiring paperwork to be completed even though CCHCS procedures called for it to be done in less than two weeks.[16] In May 2023, the Receiver indicated that CCHCS would improve its HR platform to better capture and provide data that would, among other things, detail hiring process delays.[17] CCHCS last month informed us that it has implemented an Applicant Tracking System, and described its basic functions; it further indicated that data on hiring process timeframes will be available on request.[18] We believe the Receiver and CCHCS should make hiring process timeframe data publicly available, such as by a Dashboard metric, and that such data should include the timeliness of completion of post-offer paperwork necessary for a new hire to start work. Public transparency regarding any hiring process timeframes will allow informed advocacy regarding any delays, and increase incentives for Defendants to have an efficient process.

*Defendants' Position:* CCHCS completed its initial assessment of the hiring platform in March 2025. As a result of the evaluation, CCHCS HR is in the progress of migrating hiring event information into the Applicant Tracking System. The Applicant Tracking System will include time-to-hire metrics, from date of application to start date. CCHCS HR is still evaluating the system and report capabilities and anticipates the first reports will be available in August 2025. There are no plans to make this information public and it is unnecessary for purposes of ensuring adequate delivery of medical care.

---

[16] *See* ECF No. 3852 at 22:22-23:8.
[17] *See* Reporter's Transcript, May 5, 2023, at 20:23-24:10.
[18] *See* CCHCS Memorandum, May 12, 2025, filed herewith as Exhibit 2.

## III. ACCESS TO SPECIALTY CARE SERVICES

### A. Specialty Services Appointment Backlogs and Delays

*Plaintiffs' Position:* The statewide specialty services appointments backlog decreased by approximately 25% between the end of January and May 1, per CCHCS data, [19] and, consistent with that reduction, the statewide rates of timely specialty service appointments were higher in April (the last full month for which data is available) compared to January.[20] We appreciate this improvement.

However, there remain prisons, including those that house large numbers of high-risk medical patients, that have decidedly substandard rates for timely high and medium priority specialty services appointments, which comprise the most urgent cases. We have in this regard previously discussed our particular concern that action be taken to improve the long-standing poor rates of timely high and medium priority specialty services at the flagship California Health Care Facility, where in 2023 and 2024, only approximately 45% of high priority and approximately 63% of medium priority specialty services were timely provided.[21] Through the first four months of this year, those rates have marginally improved, but remain sub-par especially given that the prison houses more than 1,600 high risk patients. Last month, CCHCS told us that a project, the details of which were not shared, that could possibly increase the number of available specialty service providers for CHCF patients is "in the preliminary stages," stating "coordination across the organization is necessary before entering into any trilateral (HealthNet, Provider, CCHCS) contractual agreements." This project should proceed as expeditiously as possible, including because it may either directly help or serve as a model to increase the availability of specialty service providers at other prisons with large numbers of high-risk patients that also have low rates for timely high and medium priority specialty services. These prisons include California Medical Facility, where only 32% of high priority and 59% of

[19] As of May 1, there were 1,653 backlogged (i.e., overdue) specialty service appointments, compared to 2,191 on January 31.

[20] In April, the percentage of timely specialty appointments overall (which includes high, medium and routine initial appointments, follow-up appointments, and appointments for services such as physical therapy and optometry which CCHCS terms "consult") was 89%, compared to 83% in January. There were similar increases in the listed sub-categories.

[21] *See* ECF No. 3952 at 7:4-21.

medium priority specialty services were timely provided in the six months between November 2024 and April 2025, and Salinas Valley State Prison, where those rates for that period were 49% and 60%, respectively.

*Defendants' Position:* Demand for specialty services within CCHCS continues to outpace provider supply, but CCHCS is addressing the challenge both statewide and at the individual institutions referenced above by Plaintiffs. The six-month trend report as of May 30, 2025, reflects that California Medical Facility (CMF) and Salinas Valley State Prison (SVSP) dramatically improved their specialty backlogs. In December, CMF's high-priority specialty compliance was 23%, and by the end of May, it increased to 55%. Similarly, the medium-priority compliance was 43% in December and increased to 73% by the end of May. In the same timeframe, SVSP's high priority compliance jumped from 37% to 69% and the medium-priority compliance jumped from 48% to 74%. California Health Care Facility's (CHCF) high-priority compliance jumped from 31% to 50% and CHCF improved its compliance for medium-priority specialty from 61% to 75%. That improvement places CHCF in the near goal territory (yellow as opposed to red) since April.

As was discussed with Plaintiffs at the CHCF site visit in February, Region II—which includes SVSP and CMF—continues to conduct outreach with surrounding health care organizations to find specialists in the immediate geographic area willing to contract with CCHCS and provide specialty services for incarcerated persons. Plaintiffs seem to have misunderstood the discussion with the Region II health care executive held during the site visit at CHCF. The executive advised that outreach was continuing to locate specialty providers in the region. This outreach is typical of the work being done by all Regions to bring on specialty providers to address patient care needs that cannot be provided on site.

As an update to the Court regarding the Consolidated Patient Provider Calendar that was modified to track specialty appointment scheduling (discussed in the March 2025 Joint Case Management Conference Statement), as of June 9, 2025, the documentation process is complete. Anyone scheduling a specialty appointment will have access to the calendar, and if an attempt to schedule an offsite specialty appointment is made, but cannot be completed, that information will

be entered. CCHCS expects to have data related to provider response times, among other things, in several months. However, this is aggregate data and not patient specific and will need to be coupled with other sources for actionable data.

**B. Patient Notification of Specialty Care Appointments**

*Plaintiffs' Position*: In December, Defendants reported that CCHCS was on track to roll out written notification letters at all prisons "within a few months."[22] Following the last Case Management Conference, we wrote to CCHCS to clarify the status of both the paper and tablet-based notification projects. On April 25, CCHCS told us it expected to expand its pilot paper notification process statewide in the second quarter of 2025. With regard to the tablet notification process, CCHCS told us "the timeline for tablet notifications is unknown, as it requires completion of onsite infrastructure replacements and deployment of new tablets to the population." Per CCHCS, this process is to "occur in a phased roll out which is anticipated to begin in approximately six to nine months."

On May 8, we received notification of the rollout of the Automated Specialty Services Patient Notification Letter, along with a May 7 policy memorandum regarding the notification letter and example of the patient notification letters. This is an excellent development, because notification to patients regarding specialty services is a key aspect of patient-centered care. We have provided feedback about the language used in the patient letters, which in our view could be improved to reduce the risk of patient confusion, and plan to monitor how the new notification practice works. We also look forward to receiving further information about the tablet-based notification project.

*Defendants' Position*: During the first week of May 2025, all institutions rolled out a paper notification process for specialty care and appointment reminders. Given the relatively recent roll-out, CCHCS has not been able to collect enough data to appropriately evaluate whether these notices impact patient access to care. Plaintiffs' request for revisions to the written notification letters is being considered and a response will be provided through the Non-Paragraph 7 process.

---

[22] ECF No. 3940 at 7:23-24.

As stated in several past joint Case Management Conference statements, the tablet notification initiative will require a system-wide change and CDCR has contracted with a vendor to perform that work. The automated patient letter is part of that initiative. The vendor has advised Defendants that statewide implementation might occur later this year or in early 2026.

## IV. EXTREME HEAT

*Plaintiffs' Position:* Extreme heat is dangerous for the entire incarcerated population and the dangers of extreme heat will grow in both severity and urgency each year. As previously noted by the Court extreme heat is a medical care issue, and therefore a *Plata* issue.[23] In our view, including after talking with experts in the field, air conditioning is the only certain protection from extreme heat for those who live (and work) in CDCR's prisons. CDCR's current approach to addressing harmful heat exposure in its prisons is insufficient.

Below, Defendants assert there have been few sentinel events caused by extreme heat and claim the placement of some California prisons in "temperate" climate zones render air conditioning unnecessary statewide. However, Defendants have failed to provide information that would support these contentions, such as heat incident logs, training materials, and temperature logs. As the Court noted in March, "we need to have good data."[24] Whether the data exists, whether it is complete and reliable, and what it specifically tells us about the scope of the problem is unknown because Defendants have to date been unable or unwilling to share it.

As previously reported, we asked CDCR for a list of housing units in prisons statewide, and whether they are equipped with air-cooling technology.[25] CDCR produced a chart that includes multiple rows for each building where incarcerated people are housed without explaining what areas within the building the information corresponds to, and at some prisons, certain buildings on the chart are not referenced using the commonly-used terms for buildings at the prison.[26] We asked CDCR to update the chart to include commonly used names for yards, buildings, and

---

[23] "There's not a shred of doubt in my mind that this is a medical care issue, but it is obviously not only a medical care issue." Reporter's Transcript, 12/16/24 at 19:6-8.

[24] Reporter's Transcript, 3/17/25 at 13:4-8.

[25] ECF No. 3952-1 at 13.

[26] ECF No. 3952-1 at 38-79.

(continued…)

housing information, such that we could meaningfully engage with the document. CDCR told us it would be too burdensome. CDCR also told us it would be too burdensome to tell us what type of cooling the systems utilize and whether the air-cooling systems are operable.[27]

On April 17, we asked for information previously gathered per the Heat Plan and submitted to Headquarters in 2024. This request included indoor temperature records, heat incident logs, heat plan medical round logs, and documentation of prison heat responses when outdoor temperatures reached or exceeded 100° F, as well as CDCR/CCHCS training materials related to identifying and responding to heat-related medical symptoms.[28] As of June 9, Defendants have not provided this information. The failure to produce reliable, complete information documenting CDCR's response to extreme heat should not be mistaken for an absence of current or future harm.

Because the data described above is essential to an evaluation of the effect that extreme heat is having on the plaintiff class, Plaintiffs will initiate a meet and confer with Defendants in an attempt to resolve this issue. If the disputes are not resolved, Plaintiffs will file a discovery motion.

### A. Air conditioning is necessary to protect the incarcerated population from the dangers of extreme heat.

A recent federal court order regarding Texas prisons supports our view that air conditioning is necessary.[29] The case presents the claim that exposing incarcerated people to excessively warm indoor air temperatures in prison without air conditioning constitutes cruel and

---

[27] *See* CCHCS/CDCR 6/3/25 Non-Paragraph 7 follow up response, attached here as Exhibit 3.

[28] *See* PLO 4/17/25 Non-Paragraph 7 follow up inquiry, attached here as Exhibit 4. On June 7, 2025, CDCR responded noting that the 2025 local heat plans – which were required to be submitted with Warden and CEO approval to headquarters per the Heat Plan on April 11, 2025 – are not "fully available" but may become so by July. They also noted that they will provide an update on training materials by June 11th. For neither request did they offer explanation as to why they have not produced the requested data from 2024. Nor did they explain why they are unable to provide local heat plans for 2025 that were due to headquarters, per the 2025 Heat Plan, or why it will take them until June 11th to update Plaintiffs on training presumably provided in advance of the 2025 heat season, which began in May. CDCR 6/7/25 Non-Paragraph 7 follow up response, attached here as Exhibit 5.

[29] Order Denying Preliminary Injunction at 56, ECF No. 202, *Tiede v. Collier*, No. 1:23-cv-01004-RP (W.D. Tex. Mar. 26, 2025)., attached here as Exhibit 6.

(continued…)

unusual punishment. The federal district judge held a four-day evidentiary hearing at which the parties presented 23 witnesses, including numerous epidemiologists, climatologists, correctional experts, and medical doctors.[30]

After the hearing, the district court found that the plaintiffs successfully demonstrated that extreme heat conditions in Texas prisons likely violate the Eighth Amendment and foresaw plaintiffs "being entitled to permanent relief in the form of expeditious installation of permanent air conditioning in all [Texas prison] facilities."[31] In a 91-page order, the district court credited expert and scientific studies testimony in finding that there is a "substantial risk of serious harm" posed by confining anyone, "even those who are young and healthy" in unairconditioned Texas facilities with a "heat index of 88° or higher."[32]

The district court also made numerous findings regarding the scope of medical harm resulting from extreme heat exposure. These findings include that such exposure can cause:

- "heat exhaustion, heat rash, dehydration, heat cramps, heat syncope, and heat stroke—the last of which carries a 'high mortality rate' and can have lasting negative health consequences" for survivors;[33]
- "[n]egative health outcomes beyond heat stroke and heat exhaustion, including heart attacks, asthma attacks, [and] kidney failure;"[34]
- "exacerbat[ion of] mental illness," including significant increases in suicidality, elevated rates of agitation, impulsivity, and slowed cognitive processing, and "exacerbat[ion] of mental health episodes requiring hospitalization;"[35]

---

[30] *Id.* at 3.

[31] *Id.* at 90.

[32] *Id.* at 12-13. The heat index is the well-established measure of the impact of heat on the human body. Vassallo Dec. ¶ 14, Dkt. No. 50-2, *Tiede v. Collier*, No. 1:23-cv-01004-RP (W.D. Tex.), attached here as Exhibit 7. As a medical expert on the health impacts of extreme heat explained: "Scientists measure air temperature and humidity together using a formula, and the resulting figure is called the heat index. The heat index is a better indication of how the body 'feels' heat than air temperature alone." Vassallo Dec. ¶ 25, Dkt. No. 164-9, *Alex A. v. Edwards*, No. 3:22-CV-00573-SDD-RLB (M.D. La. July 17, 2023), attached here as Exhibit 8.

[33] *Tiede* at 13-14.

[34] *Tiede* at 14.

[35] *Id.*

(continued…)

- People with schizophrenia were 200% more likely to die when exposed to extreme heat, and those with substance abuse disorders or on psychotropic medications were also additionally vulnerable heat-related health risks.[36]

The district court additionally found that the Texas prisons' heat mitigation policies, which "provide[] for the provision of respite rooms, cold showers, fans, ice water, and a reusable cup to use to drink from and refill with water" are "inadequate."[37] In evaluating the various mitigation measures, the court concluded that: "[r]espite areas are inadequate and ineffective," "[c]old showers do not guard against the health risks of constant extreme heat," and "[a]ccess to cold water is inconsistent and does not reduce the long-term effects of the heat on . . . inmates."[38] Ultimately, the court concluded, "air conditioning is the only effective protection from extreme heat."[39]

Despite Defendants efforts to distance the present case from *Tiede*, they do not dispute any of the scientific findings in *Tiede* that clearly describe the scope of the harm in question. The expert testimony as reflected in the *Tiede* order clearly demonstrates that extreme heat is a crisis in the prison context and the risk of harm to incarcerated people exposed to extreme heat is dire.

**B. California's proposed "Air Cooling Pilot Program" is an inadequate "first step" to addressing extreme heat in the CDCR.**

We have previously discussed California's proposed Air Cooling Pilot Program and its inadequacies, including that it would bring air conditioning to only a few housing units at four prisons.[40] Recently, the Governor proposed cuts to the proposed program, decreasing the number of prisons in the program to three, and reducing funding by approximately $31.5 million. Setting aside questions regarding the sufficiency of the engineering study underpinning the program, as a first step towards a long-term solution it is too slow, too uncertain, and provides too little impact to be the state's sole long-term approach to addressing extreme heat. Four years for completion

---

36 *Id.* at 15.
37 *Id.* at 39, 43.
38 *Id.* at 46-53.
39 *Id.* at 56 (alterations omitted).
40 *See* ECF 3952 at 12:1-6, 13:8-13.

(continued…)

of installation – plus an additional, unknown number of years for evaluation, reporting, and beginning to "develop a future statewide plan to address . . . indoor temperatures"[41] – is simply too long for people at risk of heat-related harm in CDCR prisons to wait. Because of the significant risk of harm, we think that a more thorough and expeditious response from the Receiver or the state is necessary.

### C. CDCR's 2025 Heat Plan is insufficient to protect the incarcerated population from the dangers of extreme heat.

As an initial matter, the 2025 Heat Plan[42] – issued on March 27 – is insufficient because it does not provide a plan to ensure air conditioning throughout CDCR.

But even if that fundamental problem is disregarded, the Plan is insufficient. It largely repeats the long-standing three-stage heat plan for people on heat-risk medications (often referred to as the "*Coleman* heat plan"), but expands portions of the plan's Stage II and Stage III heat alert processes (i.e., those applicable when indoor housing unit temperatures are, respectively, 90 and 95 degrees or higher) to all people in CDCR custody. Key areas of insufficiency include:

Temperature thresholds are insufficient: Thresholds set at 90-95°F air temperature to trigger heat alerts are too high to adequately protect people from the dangerous impacts of extreme heat exposure. As the district court in Texas found, scientific studies and expert testimony prove that high heat poses "substantial risk of adverse health outcomes in all inmates – even those who are young and healthy" at a heat index of 88° F.[43] CDCR's Plan, providing for short-term mitigation measures (and inadequate ones at that) only once indoor temperatures reach 90° F, means that it may be too late for even the best mitigation measures, provided correctly, to

---

41 ECF No. 3952-1 at 88.

42 A copy of the plan is filed herewith as Exhibit 9.

43 Ex. 9 at 13. By way of additional context, temperature thresholds are typically identified to create a ceiling for indoor temperatures to prevent medical harm. California's Department of Housing and Community Development recommends a statewide maximum safe indoor air temperature of 82°F. Policy Recommendations: Recommended Maximum Safe Indoor Air Temperature. State correctional facilities across the country, as the Court noted in September of last year, have managed to identify indoor temperature requirements, typically falling in the range of 65-85°F, though the Federal Bureau of Prisons' range was lower at 68-76°F. *See* Reporter's Transcript, ECF No. 3932, Sept. 23, 2024, at 18:20–20:9.

(continued…)

prevent harm.[44]

Mitigation requirements and measures are vague and unsound: The Plan contains no specific requirements for mitigation measures during Stages II and III heat alerts. During those stages, it merely requires staff to initiate some type of mitigation, and provides a non-exhaustive list of possible options.[45] The Plan provides no guidance on which mitigation measures might be most appropriate or effective, the duration or frequency needed for the mitigation measures to make a medically significant impact, or any other instruction that could offer a medically sound response to prolonged extreme indoor temperatures. This lack of guidance puts people in CDCR's custody in very real danger of harm. And, as discussed by the District Court in *Tiede*, the very same mitigation measures that CDCR relies upon are either ineffective (ice water, respite rooms, cooling showers) or potentially dangerous (fans).[46]

Required training for medical staff regarding heat issues may not be adequate: Medical staff must be adequately trained to identify, treat, track, and document health impacts caused or exacerbated by heat. As noted previously, we requested heat-related training materials and clarification on reporting requirements for heat-related health care incidents on April 17, 2025, but have not received them. Thus, we do not know if the training is adequate. Without adequate training, medical staff cannot properly identify, treat, track, and document health impacts caused or exacerbated by heat.

*Defendants' Position:* Plaintiffs' attempt to expand this medical-care class action to encompass weather-related, conditions of confinement issues is inappropriate. Rather, Plaintiffs must follow proper procedure and file a new lawsuit, if they believe one is warranted, and

---

[44] Defendants' attempts to differentiate conditions in Texas and California in an effort to diminish the impact of *Tiede* on the present case are unpersuasive. Without reliable, available, data providing heat index measurements inside California's prison housing units, it is impossible to know how many days and how many people in CDCR custody may be at similar risk of significant harm. As CDCR noted in their Pilot Program Budget Change Proposal, "many Housing Units . . . were originally equipped with only air handling units or evaporative cooling systems; neither of which are sufficient to provide adequate relief from excessive heat. . . . [and] a significant number . . . require air cooling upgrades or other alternatives to address rising indoor temperatures." ECF No. 3952-1 at 87.

[45] *See* Ex. 9 at 13 [Heat Plan] at 5.

[46] *See, e.g.*, Ex. 6 [*Tiede* Order at 46-53]; Ex. 8 [Vassallo Dec. ¶¶ 69, 80-83, Dkt. No. 164-9, *Alex A. v. Edwards*, No. 3:22-CV-00573-SDD-RLB (M.D. La. July 17, 2023])..,  .

complete all associated requirements—including necessary screening under the PLRA, discovery, and all other procedural hurdles—before they may skip ahead to implementation of a remedy.

### A. Plaintiffs' Criticisms of Defendants' Heat Plan Fall Short.

Plaintiffs contend that Defendants' Heat Plan is inadequate simply by virtue of the fact that it does not mandate the installation of air conditioning in all housing units throughout CDCR. While air conditioning *may* be required in Texas prisons—an order that has yet to issue—California is not Texas, and the Constitution does not mandate air-conditioned prisons without regard to any other considerations. Neither the facts nor the issues in this case resemble those present in *Tiede*, *et al.*, *v. Collier*, and Plaintiffs' efforts to draw a connection fail. No. 1:23-cv-1004-RP (W.D. TX March 26, 2025) at ECF No. 202.

The Defendants in *Tiede* conceded that air conditioning all Texas prisons is necessary as a matter of inmate health and safety, but *Plata* Defendants do not share that belief here, where there are a number of distinguishing factors. For instance, a number of California's prisons are located in more temperate climates, whereas the Texas Department of Criminal Justice (TDCJ) reported to the Texas Legislature that temperatures inside its prisons exceeded 85 degrees Fahrenheit most days from May 1, 2023, to September 30, 2023 (and also documented heat indexes outside of its prisons as high as 134 degrees). *Tiede*, ECF No. 202 at *16. And while some California prisons are located in areas within the state that reach high temperatures in summer months, others are located along the coast or in the northern reaches of the state, where temperatures remain more moderate. Thus, the blanket approach advocated for by Plaintiffs, mandating the installation of air conditioning system-wide, is not narrowly tailored to California's more diverse climate.

Moreover, California's implementation of its Heat Plan has been met with greater success. Whereas TDCJ admitted to at least 23 deaths from heat-related causes from 1998-2012 (and Tiede's expert concluded 271 deaths were attributable to extreme heat from 2001-2019), CDCR's population has experienced very few sentinel events among its patient population directly related to extreme heat. This fact alone is a significant distinguishing factor, given that the court in *Tiede* concluded that TDCJ's mitigation measures were insufficient because those measures had already proven futile. *See Tiede*, ECF No. 202 at *79. The same has not been, and cannot be, established

here. Indeed, many of the *Tiede* Court's criticisms of the mitigation measures—some of which are also employed by CDCR—related to the fact that they were inconsistently implemented by TDCJ in violation of policy.

While Plaintiffs argue above that they cannot address these distinguishing factors without data, and that "Defendants have failed to provide information that would support these contentions," Plaintiffs fail to realize that as the moving parties in this litigation, it is not incumbent upon Defendants to prove a negative, particularly where it is Plaintiffs who are seeking to expand the scope of this medical class action case to encompass weather-related conditions of confinement. Plaintiffs are not entitled to endless discovery on unrelated topics simply by virtue of their status as litigants in this case; rather, to obtain the information they desire, they must file a new lawsuit and complete all necessary procedural prerequisites before they are entitled to such information. Further, as it relates to Plaintiffs' April 17, 2025 Non-Paragraph 7 request, as Defendants indicated to Plaintiffs on June 7, 2025, they are "still in the process of responding to [their] request" and are working to provide much of the requested information in the coming weeks. Plaintiffs' statement above that Defendants have "failed" to provide this information as of today's date ignores the volume of requested information as well as Defendants' statement from two days ago that they are working on it.

Plaintiffs also assert that the Heat Plan is inadequate because it does not mandate specific steps at specific temperature thresholds. But this flexible approach is consistent with the May 7, 1992 *Coleman* Stipulated Order, which "created the foundational framework for what is described today as the Heat Plan and Updates Memorandum." (*Coleman v. Newsom*, U.S. Dist. Court for the Eastern Dist. of California, Case No. 2:90-cv-0520-KJM-SCR, *Coleman* Special Master's Thirty-First Round Focused Heat Plan Monitoring Report, Feb. 28, 2025, ECF No. 8558 at 7.) The 1992 *Coleman* Stipulated Order specifically states that it is "designed to allow the institutions affected by this Order to implement their plans with the maximum flexibility permissible." (*Coleman v. Newsom*, U.S. Dist. Court for the Eastern Dist. of California, Case No. 2:90-cv-0520-KJM-SCR, May 7, 1992 Order at 3:17-19, 3:21-4:1 (courtesy copy attached as Exhibit 11).) The Heat Plan is consistent with this mandate, noting that the "Warden and CEO [at each affected

institution] have overall responsibility of the institution's [Heat Plan]." (Exhibit 9, March 27, 2025 Annual Heat Plan and Updates.)

Finally, it bears noting that the contours of CDCR's Heat Plan—which requires institutions to record outside and inside air temperatures in all non-air-conditioned living areas housing incarcerated persons from May 1 through October 31 of each year, and medical incidents suspected to be related to heat exposure; establishes requirements for three stages of Heat Alerts; and mandates annual training for staff[47]—are perfectly consistent with the mandates set forth in the May 7, 1992 *Coleman* Stipulated Order, which requires implementation of each of these measures. This approach has been deemed constitutionally adequate since at least 1992.

**B. CDCR's Air Cooling Pilot Program is an Appropriate and Measured First Step.**

Notwithstanding the fact that Plaintiffs argue above that CDCR's current approach to addressing harmful heat exposure in its prisons is insufficient, they have criticized CDCR's efforts to study effective air-cooling techniques and options as an inadequate first step. Plaintiffs argue the Air Cooling Pilot Program is inadequate and unnecessary because it would bring air conditioning to only a few housing units at four prisons. Plaintiffs ignore the purpose and benefits of pilot programs, which are typically designed to test new ideas or technology on a smaller scale before full-scale implementation. Pilot programs allow organizations to evaluate the feasibility of implementation and identify problems before rolling out a program system-wide. This measured approach to systemic change is particularly prudent here, given the extraordinary taxpayer funds that would be needed to expand and implement this project across the state. And, notwithstanding Plaintiffs' criticisms that this is not the right first step, they fail to acknowledge that CDCR is making extensive efforts and planning has to start somewhere.

Plaintiffs note their frustration with the anticipated timeline of four years for installation plus additional time to monitor effectiveness and then subsequent roll-out and implementation, but this type of extensive facility improvement cannot happen overnight. While the court in *Tiede*

[47] Plaintiffs state above that Defendants' training for staff "may not be adequate" but acknowledge they have not yet received or reviewed the training materials. Defendants reserve comment on Plaintiffs' anticipatory concerns but note that CCHCS provides an annual training on identifying and treating heat-related conditions and Plaintiffs have not identified any evidence that medical staff are failing to identify and treat such conditions.

found that TDCJ's plan to install permanent air conditioning in all Texas prison housing units over the course of the next 25 years was insufficient under the Eighth Amendment, the court also "recognized the obstacles of funding, investigatory work, designing, and other practical considerations." *Tiede*, ECF No. 202 at *90. Given the significant public funds that would be needed to implement permanent cooling measures across the state, Defendants' pilot approach to evaluating the most cost-effective and practical options is responsible and prudent.

## V. OTHER MEDICAL CARE MATTERS

### A. Housing Incarcerated People in Non-Traditional Housing at Salinas Valley State Prison

*Plaintiffs' Position*: As discussed during the March 17, 2025 Case Management Conference, the Coleman Special Master team, while conducting a monitoring visit in mid-January, found nine incarcerated people who were housed in an area of Salinas Valley State Prison apart from where all others were housed. Some of these cells had no water or toilet. The Special Master team stated that these cells were not adequately monitored by custody staff and that medical staff may have been unaware that incarcerated people were being housed in this location. As this Court observed, these facts were "shocking and upsetting," and the "[f]acility leadership fell down all the way."[48] Of particular concern to the Court was that "correctional staff and maybe medical staff at any one of our institutions could permit these circumstances to occur for more than a few hours before they were reported up the chain and corrected. And it was more than a few hours."[49]

<u>Plaintiffs' Investigation</u>

We share the Court's concern, but do not yet have a full accounting of what happened or why, and whether medical leadership tried, including by raising the issue to regional and headquarters staff, to stop the practice, particularly when the aberrant patient housing was interfering with the delivery of healthcare. But a few things are clear. First, the number of SVSP residents who were improperly housed is far larger than the limited list of patient names CDCR

48 ECF No. 3958 at 26 (March 17, 2025 Transcript).
49 *Id.*

provided us. In addition, our review of available evidence demonstrates that the use of inappropriate housing was known to the prison's medical leaders for months. Finally, after we reported these facts to CCHCS, our access to the data from which we learned of them, which we have had for years either via specific request and production, or more recently via an electronic database, was abruptly stopped.

More specifically, CCHCS on April 28 acknowledged that SVSP's Warden authorized placing some people in the non-traditional housing units, implying that the practice may have begun in November, and that until mid-January people were housed in holding cells in the Board of Parole Hearings area, Receiving and Release, the Triage and Treatment Area, medical clinic exam rooms, and in a deactivated (*i.e.*, unstaffed) housing unit. However, CCHCS declined as "unreasonably burdensome" our request for a list of SVSP residents so housed during the last year, their housing location, and the length of time spent there. In response to our questions about whether steps were taken to track or monitor people housed in the non-traditional housing, we were provided no information, and simply told "[t]his matter is currently under review."

Also on April 28, in response to our questions about how and when SVSP's medical leadership learned of the non-traditional housing placements, and what they did to ensure medical care access, CCHCS indicated that the medical leadership had not been aware that people found by the *Coleman* monitors would be so housed prior to placement. CCHCS admitted that "[s]ince there are no policies or standards for the delivery of medical care in BPH cells, medical services were delivered on an *ad hoc* basis, and unfortunately, it was not managed in a consistent or systematic manner."

In preparation for our May pre-delegation consideration site visit at SVSP, we requested production of "[a]ll documentation, logs and communications, dated from July 1, 2024 to the present, related to the decision to house and/or the housing of incarcerated people in non-traditional housing at SVSP, including any communications between custody and medical staff." Defendants refused to produce the documents, stating "[t]here is an ongoing investigation and CDCR/CCHCS are working on this through root cause analysis." Upon receiving this, we requested specifics about the type of investigation being performed, including the entity

conducting and tracking it, and date by which Defendants anticipate completing the investigation. We also requested a list of the people who were placed in non-traditional housing at SVSP. In response, we received a list of 13 patients who were housed in non-traditional housing on the day of the *Coleman* monitors' visit on January 15, 2025 (the monitors had found nine of these).

Although Defendants and CCHCS refused to produce the above-described documents and information, they did per standard processes produce prior to our May site visits the minutes from recent months' meetings of various medical care-related committees at the prison, many of which were attended by medical and custody leadership. Those documents demonstrate that SVSP's medical managers and leaders were aware that people were housed in non-traditional housing and that it was impeding access to health care. On November 1, for example, at a meeting that included the Chief Nursing Executive, the Director of Nursing and the Health Care Access Captain, staff discussed placement of a patient on suicide watch in the specialty clinic room, causing the cancellation of specialty appointments. Similarly, minutes from the November 21, 2024 Quality Management Committee meeting (QMC), which was attended by SVSP medical executives including the Chief Executive Officer, the Chief Medical Officer, and the Chief Nursing Executive, as well as the Associate Warden for Health Care, show that concerns were raised about housing people in "inappropriate housing," and indicated "ASU overflow is spread throughout the prison." The following month, the December 19, 2024 QMC meeting minutes indicate that 19 patients were transferred into a housing unit that was "closed" (*i.e.*, unstaffed), causing "issues with scheduling, med pass and MH scheduling." According to the minutes, "[t]his is impacting patient care, it is a patient safety issue, not getting medications, and not able to see providers…. This has been an ongoing issue for the past several months."

During our May site visit, we were informed that SVSP staff would not answer any questions related to the placement of patients in non-traditional housing, thus limiting our ability to gather additional information. The reports of patients we spoke with who had been placed in non-traditional housing were alarming. One person was placed in a BPH holding cell typically used for contraband watch that smelled of urine and feces and had a non-functioning toilet. He remained there for days and, even after going man-down and reporting to the TTA for symptoms

of nausea due to the odor in his cell, he was given anti-nausea medication and returned to the same holding cell. Shortly after this experience, he experienced anxiety and depression so severe he was placed in a mental health crisis bed.

In order to gather more information, we reviewed CCHCS's Health Care Incident Report (HCIR) registry for SVSP. The HCIR registry includes information about potential healthcare deficiencies reported anonymously by staff who submitted health care incident reports. CCHCS has since at least 2019 provided us lists of HCIRs, or the registry either upon request or, in recent years, via unfettered access to the registry online. Based on our review of the SVSP HCIR registry, we provided CDCR and CCHCS with the names of 54 people who, in addition to the 13 people CCHCS had said were wrongly housed on the date of the *Coleman* monitors January site visit, may have been previously housed in non-traditional housing at the prison, beginning as early as October 9, 2024. These names were included in entries made into the HCIR registry by healthcare staff who reported that the non-traditional housing placement impacted the ability of medical staff to provide medications, schedule healthcare appointments, labs, or radiology encounters, or at times, to even run clinic lines because patients were sleeping or housed in clinic exam room spaces.

On May 12, we asked CDCR and CCHCS, as part of any investigation or analysis of this matter, to interview these patients, and that attempts be made to identify any additional patients impacted. We believe these steps are necessary to fully understand the reasons patients were placed in non-traditional housing, the conditions of their placement, and the impact on medical services.

We did not receive a response to our inquiry but, within two days of our request, we were no longer able to access to the HCIR registry. When we asked CCHCS counsel, that day, about our access, we were told the issue was being looked in to. On June 4, we were told for the first time that Defendants believed we should not have received access to the registry. On June 5, we received Defendants' draft CMC statement asserting that the HCIR registry is protected from disclosure under a March 2020 stipulated order[50] regarding access to Root Cause Analysis (RCA)

[50] ECF No. 3204.

documents and information. As set forth below, we strongly object to what appears to be an effort to curtail our access to information that will allow us to do our job as plaintiffs' counsel and identify the scope of CDCR's and CCHCS's failures with regard to health care.

Plaintiffs consider it essential to determine how and why SVSP's custody and medical leadership for months allowed people to be housed in areas where there was no established way for providing them with reliable and timely medical care access. A comprehensive understanding of what happened is critical so that measures can be implemented to prevent recurrence in the future. We look forward to the results of the Defendants' RCA, when they are available. In the meantime, we will continue to investigate this issue and report to the Court on our efforts.

Health Care Incident Reports are Necessary for Adequate Monitoring

We have a duty in this action to monitor medical care. The Stipulated Injunction provides that we "shall have reasonable access to the institutions, staff, inmates and documents necessary to properly evaluate the adequacy of the medical care delivery system."[51] As long ago agreed, that includes access to the minutes and reports of the Quality Management Committee (QMC).[52] The health incident reporting system is part of the Quality Management program.[53] Furthermore, the substance of the HCIRs are or should be reviewed in almost every QMC meeting to determine whether any trend or issue warrants further review or other action, such as a work-group. The matters consider include such matters as patient falls in the CTC, barriers resulting in missed medication, or cancelled healthcare appointments. Defendants below assert health care incident reports cannot be produced because they constitute "RCA documentation," and are thus subject to the above-referenced March 2020 Stipulated Order[54], regarding access to such documentation. This assertion is not tenable.

First, based on the HCIR lists and registries that we have received and had access to since 2019, we know that hundreds, if not thousands, of Health Care Incident Reports are submitted every month. In contrast, at any given time, there are, per CCHCS-provided information, only

[51] ECF No. 68, Stipulated Injunction at ¶ 9.
[52] ECF No. 127, Stipulation and Order re Production and Access to Documents, at 2.
[53] *See* HCDOM § 1.2.3.
[54] ECF No. 3204.

approximately two dozen or fewer active RCAs. In other words, the overwhelming majority of HCIRs listed in the registry *will never result in, be involved in, or otherwise implicate an RCA.* It thus is disingenuous to characterize HCIRs as "RCA documentation." If Defendants maintain that the HCIRs related to a particular RCA are protected, they can redact those HCIR entries from the Registries they provide us – although we ultimately receive information related to pending and completed RCAs.

Defendants also claim below that Plaintiffs should not have access to HCIR registries because Defendants have always "attempted to maintain the confidentiality" of those materials. That is incorrect. Defendants regularly produce confidential documents to Plaintiffs for monitoring purposes, and those documents are covered by the Stipulated Protective Order.[55] Production of the registry under the Protective Order does not compromise confidentiality.

Defendants' assertions that we received access to the HCIR registry "inadvertently" and that they only "recently discovered" that Plaintiffs had access to it do not square with the facts. As stated above, we have been provided us with HCIR lists and the registry *since at least 2019.* Before these registries became available online in the last two years, we regularly requested these documents when we planned our pre and post delegation site visits, and routinely were sent them.[56] Tellingly, all documents we request, before being produced, are reviewed by the

[55] ECF No. 3201.

[56] *See, e.g.,* 12/21/18 Document request for SVSP site visit ("All Health Care Incident Reports regarding medical care matters … since January 1, 2018;" Defendants produced HCIR Report listing 1635 incidents with incident specifics); 3/19/19 Document request for CMC site visit ("All Health Care Incident Reports regarding medical care matters … since May 2018;" Defendants produced HCIR Report listing 774 incidents with incident specifics); 5/10/19 Document request for VSP site visit ("All Health Care Incident Reports regarding medical care matters … since May 1, 2018;" Defendants produced HCIR Report listing 279 incidents with incident specifics); 9/20/19 Document request for CCWF site visit ("All Health Care Incident Reports regarding medical care matters…. Since 6/1/19;" Defendants produced HCIR Report listing 494 incidents with incident specifics); 2/14/22 Document request for RJD site visit ("All Health Care Incident Reports regarding medical care matters … since July 1, 2021;" Defendants produced HCIR Report listing 774 incidents with incident specifics); 4/18/22 Document request for WSP site visit ("All Health Care Incident Reports regarding medical care matters … since July 1, 2021;" Defendants produced HCIR Report listing 685 incidents with incident specifics); 9/16/22 Document request for SOL site visit ("All Health Care Incident Reports regarding medical care matters … since January 1, 2022; Defendants produced HCIR Report listing 449 incidents with incident specifics).

(continued…)

CCHCS Office of Legal Affairs, which fedacts information related to dental and mental health care, and RCAs– but the HCIR lists or registries were always produced unredacted.

Moreover, CCHCS and Defendants have long been aware that we reviewed the HCIR lists, reports, and registry because we have mentioned or cited to HCIRs in various communications to them, such as in our "Paragraph 7" advocacy letters.[57] We also refer to the HCIR matters in our letters, sent to the Receiver and Defendants, regarding prisons being considered for delegation. For example, in May 2022, we opposed delegation of California Rehabilitation Center in part because medical staff had failed to document problems in their HCIR registry. Similarly, in September 2023, we opposed delegation of Central California Women's Facility based in part on our review of the more serious HCIRs. Further, our February 2025 letter opposing delegation of the Substance Abuse and Treatment Facility at Corcoran, referenced our review of the HCIR registry. In fact, our access, review, and use of HCIR information was open and known.

Access to the HCIR registry has been and continues to be critical to our ability to monitor medical care in the prisons, and we are unable to resolve this dispute, we will file a discovery motion.

*Defendants' Position*: The placement of incarcerated persons in non-traditional housing at SVSP was unacceptable and the practice was discontinued by January 16, 2025. After learning this had occurred at SVSP, on January 15, 2025, CDCR headquarters held a statewide call with all Wardens, Regional Health Care Executives, and Associate Directors, and instructed the Wardens, Chief Executive Officers, and Health Care Access Associate Wardens to inspect their institutions, determine if such practices were taking place, and take immediate action to place any person so housed in appropriate housing. Following that call, CDCR confirmed that no other institutions were housing incarcerated persons in non-traditional housing.

---

[57] *See, e.g.*¸7/31/23 Advocacy letter from Rana Anabtawi regarding late filing of an HCIR, as reflected in eHCIR registry.

### 1. Under a Stipulated Court Order, Information Within the Scope of a Root Cause Analysis Investigation Is Protected from Disclosure.

CDCR and CCHCS opened a Root Cause Analysis (RCA) concerning the placement of incarcerated persons in non-traditional housing at SVSP (Incident). The RCA Incident Date is January 15, 2025, and the Assignment Date is March 3, 2025. Multiple Health Care Incident Reports (HCIRs) were submitted concerning the incident and resulted in the initiation of this RCA. HCIRs are authored and submitted to an electronic database—the HCIR registry—by healthcare staff.

Protecting the confidentiality of such information is essential to encouraging a culture in the institutions where healthcare staff report problems because they know the information reported will be handled and addressed confidentially. Plaintiffs' access to documentation and all other sources of information concerning RCAs was the subject of extended negotiations between the Receiver, Plaintiffs, and Defendants and culminated in the Stipulation and Order Regarding Root Cause Analysis Documentation and Information referenced above, ECF No. 3204. The Stipulation and Order requires Defendants to provide identifying information about health care RCAs, summarize what happened, and when a Plan of Action is approved in response to an RCA, to provide that plan to Plaintiffs. (ECF No. 3204 at ¶ 4.) The Order further requires that, notwithstanding Plaintiffs' counsel's access to this specified information, Plaintiffs' counsel "shall not seek information from Defendants' or Receiver's staff regarding the particulars of any RCA." (ECF No. 3204 at 3:23-26.) Plaintiffs' counsel may request any individual RCA report, once completed, and if good cause be shown, the Receiver will grant the request. (*Id.*)

Defendants acknowledge Plaintiffs' counsel's desire to learn as much information about the Incident as possible. But Plaintiffs' requests must be balanced against the need for CCHCS and CDCR to maintain the confidentiality of the HCIR registry, to complete the RCA investigation without interference, and to identify and address the causes of the Incident. (Order, 2:11-16, ECF No. 3180.) Protecting the confidentiality of this process is essential to encouraging a culture where healthcare staff are comfortable reporting perceived problems.

**2. Plaintiffs' Counsel Were Unintentionally Given Access to a Confidential Registry Containing Health Care Incident Reports.**

CCHCS recently discovered that Plaintiffs' and Defendants' counsel were inadvertently given access to the HCIR registry. On May 12, 2025, Plaintiffs sent to CCHCS and Defendants an unconfirmed list of incarcerated persons who Plaintiffs' counsel believes may have been placed in inappropriate housing at SVSP that they compiled through the "use of resources available on the QM server". While the May 12, 2025 communication did not explicitly identify the HCIR registry, Plaintiffs' subsequent communication on May 14, 2025, explicitly identified the registry in question as the HCIR registry.

CCHCS has always attempted to maintain the confidentiality of this information and has not produced this type of information when requested. Access to this registry requires approval by internal stakeholders. Members of the HCIR Committee sign confidentiality agreements in which they acknowledge the confidentiality of these reports and their use as bases for initiating RCAs. Because CCHCS has always sought to protect HCIRs and the RCA process, once CCHCS learned of this unauthorized access, CCHCS immediately revoked access for anyone who was not approved through the proper channels, including Plaintiffs' counsel and Defense counsel.

**3. CCHCS and CDCR Informed Plaintiffs of the RCA Concerning the Incident and the Confidential Nature of Information Plaintiffs Requested.**

Plaintiffs scheduled the SVSP pre-delegation site visit for May 5 through May 7, 2025, and in advance of the visit requested: "all documentation, logs and communications, dated from July 1, 2024 to the present, related to the decision to house and/or the housing of incarcerated people in non-traditional housing at SVSP…." When Plaintiffs made this request, they did not know about the RCA. So, on April 25, 2025, Defense counsel advised Plaintiffs' counsel that CDCR and CCHCS were jointly addressing the Incident through an RCA and would not be producing those documents. Defendants did, however, provide Plaintiffs with the Incident date of the RCA, and the date it was assigned, in accordance with the March 3, 2020 Stipulation and Order.

On April 29, 2025, despite knowing about the RCA and without regard to the March 3, 2020 Stipulation and Order, Plaintiffs' agenda for the SVSP site visit included an entire section

dedicated to the Incident. On May 2, 2025, Defendants reiterated that the Incident was the subject of an RCA and that SVSP leadership would not address any topics related to that RCA. However, as a courtesy, CDCR and CCHCS provided the names of thirteen individuals they verified were housed in non-traditional cells on January 15, 2025. Plaintiffs were also granted access to the non-traditional housing cells where the individuals had been placed during the pre-delegation site visit. CDCR and CCHCS also responded to Plaintiffs' Non-Paragraph 7 requests concerning the Incident.

As Defendants explained to Plaintiffs' counsel, there is no practical or efficient means for CDCR and CCHCS to accurately confirm every person placed in non-traditional housing because there was no tracking mechanism at SVSP for such placements. There are no automated reports that could be generated that would indicate which individuals were housed in non-traditional locations for a specified duration. Rather, to obtain the information Plaintiffs request, CDCR would have to manually cross-reference multiple sources of data to attempt to to determine whether an incarcerated person was not in their assigned cell because they were located elsewhere for a legitimate purpose. This would be a tremendous undertaking and, even so, is unlikely to result in a complete and accurate record of each individual housed in a non-traditional space given all of the variables and sources of information that would need to be reviewed manually. Nor is a complete and accurate list necessary for the completion of the RCA, to understand why or how this happened, or to implement measures to prevent it from occurring again in the future.

**B. End-of-Life Medical Care**

*Plaintiffs' Position*: Decisions about end-of-life care are deeply personal and give seriously ill patients a critical degree of control over their care. Further, end-of-life medical care, including documenting, updating, and *following* instructions regarding patients' goals of care, is a vital element of adequate medical care.

CCHCS has had problems with such care, as pointed out by us[58] and as recognized by its own annual analyses of mortality reviews, particularly those concerning 2022 and 2023 deaths. CCHCS has taken steps to improving end-of-life medical care, including through its Palliative

[58] *See, e.g.*, ECF No. 3925 at 2:13-16.

Care Initiative. These improvements were recognized in CCHCS's 2023 Mortality Review Analysis, which reported that there were a reduced number of end-of-life care problems identified in 2023 compared to 2022. However, the 2023 analysis described continuing issues with end-of-life medical care, and the mortality reviews to date for deaths occurring in 2024 and 2025 show opportunities for improvement with end-of-life care in a concerning number of cases.

In January, we wrote to CCHCS about a number of recurring problems with end-of-life care, based upon mortality reviews from recent years, including 2024. These mortality reviews identified patients with Physician Orders for Life-Sustaining Treatment (POLST)[59] indicating do not resuscitate (DNR)/comfort-measures who underwent resuscitative efforts and patients who did not have a POLST or were not engaged in goals of care discussions despite serious diagnoses or medical decline.

Further, through continued review of CCHCS mortality reviews, we became aware of a CHCF patient who died in late 2024, whose DNR was discovered only after several rounds of CPR were performed and an external defibrillator and intraosseous line were placed. The patient's medical records indicate that at least three RNs, an SRN II, and a physician were present for or participated in the resuscitative efforts. We also discovered an RJD patient who died in late 2024. This patient signed a POLST indicating DNR approximately seven years before his death, and then he submitted a sick-call slip a few months later asking to change his status from DNR to Attempt Resuscitation. The patient was seen by an RN for this request, and the RN entered an order in the health record, but the patient was not asked to sign a new POLST. When he was found unresponsive in 2024, staff began resuscitative efforts but these efforts were stopped when they found the operative POLST indicating DNR.[60]

We wrote to CCHCS regarding these patients in March and April, respectively. In March, we asked whether all inpatient unit residents' POLST should be reviewed by all medical staff at the start of each shift. In April, we asked whether CCHCS would adopt a policy requiring

[59] "Physician Orders for Life Sustaining Care (POLST) is a legally recognized mechanism by which patients can provide specific instructions for their end-of-life care, including requests regarding resuscitation." HCDOM § 2.4.2(d)(1).

[60] Through Mortality Review OFIs, we have identified at least three patients whose POLST or Advance Directive was not scanned into EHRS.

patients with POLSTs indicating DNR be asked if their POLSTs accurately reflect their at least once per year. In response to the March inquiry, CCHCS told us that "[n]urses and physicians are expected to review and verify their assigned patients' code status at the beginning of each shift." To our knowledge, this expectation is not in CCHCS policy. In response to our April inquiry, CCHCS responded that "POLSTs should be reviewed when clinically indicated." However, the same response indicates why this vague directive, as opposed to policy a policy mandate, is insufficient: because of the patient's "multiple hospital admissions and declining medical condition, a review of his POLST should have occurred based on clinical judgement."

Our findings, based on CCHCS's own identified opportunities for improvement, demonstrate its existing end-of-life care policies are not sufficient to ensure patients are engaged in goals of care discussions at clinically appropriate times or that the wishes of those patients who have had the opportunity to make their wishes known are respected.[61] While CCHCS has identified problems with end-of-life medical care through the mortality review process, unless it takes meaningful and systemic actions to address the issues, there is nothing to stop their recurrence, resulting in further patient harm. CCHCS policy should require medical staff to engage in goals of care discussions with seriously ill, elderly, or frail patients at regular intervals and following a decline in medical condition and engage all patients in these discussions following a diagnosis of a serious medical condition. CCHCS must also codify a requirement that medical staff review and verify patients' code statuses at regular intervals, including at the start of each shift for patients in inpatient medical beds. Finally, CCHCS must engage all medical staff who provide patient care with regular, robust training on issues related to end-of-life medical care.

*Defendants' Position*: CCHCS has a robust practice in place to identify opportunities for improvement in medical care, including mortality reviews at every institution. While Plaintiffs

[61] CCHCS policies describe healthcare staff's "professional obligation" to discuss end-of-life decision-making and goals of care at when "clinically appropriate." HCDOM §§ 2.4.2(e)(1)(B), 2.4.1(d)(2), 2.4.1(e)(B). CCHCS policy encourages healthcare providers to consider obtaining POLSTs "for patients that are elderly, frail, have serious medical or surgical conditions, or who have less than six months life expectancy" and "directs the review goals of care (including POLSTs) when a patient's "clinical situation changes." HCDOM §§ 2.4.2(d)(1), 2.4.1(e)(D).

assert that they identified issues related to compliance with Physician Orders for Life Sustaining Treatment (POLST) for certain patients, those issues had already been identified and reported by CCHCS consistent with its practice.

Having recognized opportunities for improvement concerning POLSTs and honoring patient wishes, CCHCS released an updated Palliative Care Guide in April 2025.[62] This revised guide provides expectations regarding review and verification of patient code status. Consistent with recently passed Senate Bill 1139 and Assembly Bills 2288 and 2338, CCHCS also revised its policy regarding Advance Care Directive for Health Care and is revising the Palliative Care Policy to provide staff with decision support and expectations regarding end-of-life care, including goals of care discussions.

CCHCS has automated reports in place relative to advance directives, POLSTs, and code status, including the Specialized Medical Bed Huddle Report. CCHCS has and will continue to provide trainings on issues related to end-of-life care at specific institutions and statewide. CCHCS also provides day-to-day support to the field through the Palliative Care and referrals to interdisciplinary care team educational conferences.

### C. False Positive Urinalysis Results

*Plaintiffs' Position*: As previously reported, CCHCS earlier this year acknowledged that Quest Labs, the laboratory it uses to process urine drug screen tests, used a reagent associated with false positive results from April through July 2024.[63] CCHCS provided a list of the approximately 6,000 participants in the Integrated Substance Use Disorder Treatment program who received positive drug screen results that were not reliable during the four-month period. Because these positive test results can and have resulted in parole denials and deferrals, we asked that CCHCS notify all people in writing that the positive test results that they received may be inaccurate.

On April 15, CCHCS agreed to notify all patients who received a positive urine drug screening test during the relevant period with a standardized patient letter. In addition, a copy of

[62] *See* https://cchcs.ca.gov/wp-content/uploads/sites/60/Palliative-Care-Guide.pdf).
[63] See ECF No. 3952 at 27:3-11.

the letter will be scanned into each impacted person's health record, with the date corresponding to the urine drug test's collection date. The patient letter states that their results may have been falsely positive, and that CCHCS was reviewing "additional steps [they] might take to confirm results of presumptive positive urine drug tests to ensure that results are as accurate as possible."

In response to our request for additional information about the current process for confirming test results, CCHCS on June 4 stated that they will update their urine screening process to provide for reflex (automatic) confirmatory tests when an opiate screen is positive. We have asked for additional information about when this will be implemented.

*Defendants' Position*: On March 5, 2025, Defendants notified Plaintiffs that all incarcerated persons tested in the relevant period would receive a letter notifying them about the potential for false-positive results. Plaintiffs submitted a follow-up non-Paragraph 7 request on May 7, 2025, requesting to know if CCHCS has a confirmatory process it follows when a urinalysis screen is positive, and what steps/processes is CCHCS considering implementing to facilitate testing accuracy. CCHCS contracts with Quest Labs for urinalysis testing. CCHCS advises that there is a confirmatory process in place based on the provider's discretion. CCHCS will be modifying the current process so that all presumptive positive tests for opiates will automatically undergo confirmatory testing. The Board of Parole Hearings has advised that it is reviewing decisions that might have been impacted by testing results from the relevant period and will schedule new hearings as necessary to ensure the validity and fairness of its decisions.

### D. Analysis of 2023 Mortality Review

*Plaintiffs' Position*: CCHCS since 2006 has commissioned and publicly posted an annual analysis of its mortality reviews.[64] These analyses, which both compile and report data on causes of death and identified opportunities for improvement, are an essential element of self-monitoring and quality improvement. In addition to providing a basis for change, they also provide data from

[64] The analyses are available at https://cchcs.ca.gov/reports/ under the "Death in Custody Reporting" tab. Because the analysis is based on CCHCS's mortality reviews for all deaths in each calendar year, and because it can sometimes take months after a death for a mortality review to be completed (usually because of pending autopsy results), there is generally a substantial lag between the end of a particular year and the completion of the analysis of the mortality reviews of the deaths that occurred in that year.

which the effectiveness of care initiatives designed to reduce mortality can be evaluated. For these reasons, we on April 30 asked CCHCS to include a requirement for annual mortality review analysis, and its public posting, in formal policy, regulation, or to work to embody such into law. Defendants do not address this matter below; in May, CCHCS told us it and CDCR "will take this matter into consideration for possible future action." We appreciate that consideration, and reiterate our view that a regulatory or statutory mandate for these annual independent analyses or mortality review is necessary for an adequate and transparent mortality review and quality improvement processes.

CCHCS's most recent annual analysis, the "Analysis of 2023 Mortality Reviews," is dated March 18, 2025 and was publicly posted on April 30.[65] The Analysis concludes, "There remain significant opportunities for improvement in coordinated care of complex patients . . . ."[66] Given that finding, we have asked CCHCS what actions have, is, or will it undertake to improve coordinated care of complex patients.

The Analysis also reports that overdose, and primarily opioid-related overdose – was in 2023, for the first time, the leading cause of death among CDCR residents, with the number and rate of such deaths far exceeding those in previous years.[67] The analysis said the dramatic increase in overdose deaths in the prisons "mirrored" the increase in such deaths in society at large, and occurred despite "aggressive promotion" of Integrated Substance Use Disorder Treatment (ISUDT) by CCHCS.[68] We agree with those observations, and add, as we have previously stated, that the number of overdose deaths would have been much higher but for the ISUDT program given CCHCS's finding that 80% of overdose deaths in CDCR occur among residents with Opioid Use Disorder who were not on medication assisted treatment (MAT).[69] We further believe deaths have been prevented by making naloxone widely available to residents, including in housing units.

---

[65] A copy of the Analysis of 2023 Mortality Reviews is filed herewith as Exhibit 10.
[66] *Id* at 52.
[67] *Id*. at 6-8, 10-12, and 15-19.
[68] Id. at 18.
[69] *See* ISUDT 3rd Annual Outcomes Report, April 2024, at 6 (available at https://cchcs.ca.gov/wp-content/uploads/sites/60/ISUDT-Annual-Outcomes-Report-2024.pdf).

The Analysis reports that a number of opportunities for improvement were identified in 2023 mortality reviews regarding untimely appointments to screen or offer care for substance use disorder (SUD). We previously raised these issues with CCHCS, and CCHCS, we believe at least in part in response to our requests, has acted including in recent months to reduce SUD-related appointment delays. In that regard, CCHCS internal Dashboard data from April and May show 90% or better rates of timely initial and follow-up Licensed Clinical Social Worker SUD screening appointments, and similar if slightly lower percentages of timely and follow-up PCP SUD appointments. This all represents a marked improvement from rates of timely SUD-related appointments in late 2024 and even early 2025. As of June 9, there were per CCHCS data approximately 19,500 CDCR residents provided MAT.[70]

We very much appreciate the policy and other changes made to increase timely access to SUD care, and the past and continuing efforts to provide that care. Nevertheless, given the now formally recognized huge increase in SUD-related mortality, we have asked CCHCS if any further initiatives are being undertaken or planned.

*Defendants' Position*: As Plaintiffs note above, the number one cause of mortality among CDCR's incarcerated population in 2023 was drug overdose. To that end, CCHCS has made significant progress in offering SUD assessment and treatment to patients who may benefit from these services. CCHCS will focus their efforts on higher risk patients who have refused assessment and treatment, have stopped treatment, or who continue to engage in risky behaviors. Strategies include engaging these patients through outreach, creating environments that are conducive to recovery, and establishing contingency management systems for patients who demonstrate commitment to recovery and rehabilitation.

It also bears noting that the Analysis of 2023 CCHCS Mortality Reviews indicated that the COVID-19 mortality rate "continued to decrease in 2023, with only a single death signaling an end to the COVID-19 epidemic which had driven record setting mortality rates in 2020 and 2021." (Analysis of 2023 CCHCS Mortality Reviews at 52.)

---

70 See CCHCS ISUDT Program Overview, at https://cchcs.ca.gov/isudt/dashboard/ .

**E. Emergency Medical Response**

*Plaintiffs' Position:* The Receiver previously informed the Court that a physician-expert has been retained to review CCHCS emergency medical response policies and practices; earlier this year we were told the expert would conduct prison visits in early spring and a completion date for the review could not then be determined. This is a very important project given the very large number of emergency medical responses in the prisons and the number of opportunities for improvement that are identified in relation to them.[71]

On June 5, the Receiver provided the expert's report.[72] The report causes us to re-think certain advocacy we have previously undertaken, including regarding delayed 9-1-1 activations (it finds CCCHS does not have a significant problem in that regard). However, in a number of other respects the report confirms what we in recent years have reported to CCHCS and the Receiver regarding problems with medical emergency responses, including for example with regard to problems with RN staffing in the prisons' Treatment and Triage Areas and documentation. Overall, we find the report's critiques and recommendations well-considered. We look forward to hearing whether and to what extent the Receiver will act on them, and when.

*Defendants' Position:* We are advised by CCHCS that the evaluation of Emergency Medical Response is ongoing. The Receiver's expert's report is currently under consideration by the Receiver and was provided to Plaintiffs on June 5, 2025. The report states that based on the reviewer's random sample "it does not appear that CDCR has a significant problem with EMS/9-1-1 activations by First Responders" and that delays are mostly due to prolonged response times by ambulances.

**F. Medical Staff's Role in the Disciplinary Process**

*Plaintiffs' Position*: As discussed in the December 9, 2024 Case Management Statement, we requested information regarding the adequacy of CCHCS's policy regarding the role of

---

[71] The CCHCS-commissioned March 2025 "Analysis of 2023 Mortality Reviews," for example, concludes that "[t]here remain significant opportunities for improvement . . . in the practice and documentation of CCHCS Emergency Management protocols". See Exhibit 10 at 52.

[72] The report, titled "Analysis of the California Department of Corrections and Rehabilitation Emergency Response System: Critique and Recommendations," is filed herewith as Exhibit 1.

medical staff in the disciplinary process. Responding to our October 29, 2024 request, CCHCS on January 14, 2025, shared with our office a memorandum titled "Limiting Licensed Health Care Staff Access to Rules Violation Reports" describing the new policy for medical staff's limited role in the Rules Violation Report (RVR) process.

The policy requires staff training and dictates that "[a] tracking system will be developed for all RVRs generated and uploaded on behalf of health care staff." On April 18th, our office requested information on the tracking system outlined in the new policy through a non-Paragraph 7. We followed up on this request on May 22, 2025. On June 9, CDCR informed us that the tracking system is live but access will not be provided to Plaintiffs' counsel.[73]

*Defendants' Position*: The status of the tracking system that will monitor health care professionals' role in the Rules Violation Report process and Plaintiffs access to that information is being responded to through the Non-Paragraph 7 process.

**G. Medically Necessary Gender Affirming Care**

*Plaintiffs' Position*: As previously reported,[74] in November 2024 we wrote to CCHCS regarding concerns about gender affirming surgical outcomes and pre- and post-operative care, and made a number of recommendations to improve that care. In March, the court encouraged the parties to meet and confer on this issue. On May 9, 2025, our expert met for an hour with CCHCS clinicians, including the Director of Health Care Services; the Receiver also attended along with attorneys for the parties who participated as observers.

The meeting in our view was not as productive as it could have been. Despite our explanation in advance of the scope of our expert's review, our expert was asked about matters outside of the scope of his review, concerns that were not the subject of our November 2024 letter, and methodological or related questions that were described in that letter or which only we

[73] In his 59th Tri-Annual Report, the Receiver noted that CDCR's Office of Research is monitoring and tracking RVRs authored by health care staff, and during the reporting period (January 1 – April 30, 2025), health care staff did not author any RVRs. ECF No. 3963 at 9. While the report that no RVRs have been *issued* by health care staff is welcome news, it does not fully address whether the RVR policy is being followed. Specifically, it does not address whether RVRs are being generated and uploaded on behalf of health care staff only after following the process outlined in the policy.

[74] ECF No. 3940 at 10:5-11; ECF No. 2952 at 19:22-25:2.

(continued…)

could answer.[75] As a result, only a relatively short part of the meeting addressed matters related to patient education and surgical outcomes.[76] Also, only one of the CCHCS attendees asked questions or made comments.

Nevertheless, a few key points of agreement appeared to emerge. First, all agree California is at the forefront of providing gender-affirming care in locked settings, and yet, California's care is far from perfect and should be improved. Second, CCHCS said the four overarching recommendations in our November 2024 letter were sound and generally agreed with them.[77]

We intend to continue advocating regarding and monitoring matters related to gender affirming surgery and care and intend to request additional meetings, as necessary.

*Defendants' Position*: CCHCS always seeks to improve the medical care provided to its patients and Defendants appreciate Plaintiffs' acknowledgment that CCHCS is at the forefront in providing gender-affirming medical care in the prison setting. Indeed, in 2023, CCHCS assembled a team of skilled and knowledgeable licensed health care professionals who form the Integrated Gender Affirming Health Care Program (IGAHP). IGAHP will continue to review, assesses, and find ways to improve care of patients receiving gender affirming medical treatment, including incorporation of Plaintiffs' counsels' suggestions when appropriate.[78]

---

[75] Below, Defendants continue to raise questions regarding methodology. Our letter detailed the specific methodology used, for instance explaining "[a]mong other things, we sent surveys to over 180 individuals who had requested gender-affirming surgery (GAS), over 100 of whom responded. We also conducted over 100 interviews of transgender, gender diverse, and intersex (TGI) patients, including nearly every individual who had surgery and many who were pending surgery, and reviewed those patients' medical records." The letter also included a 33-page appendix detailing specific information from each individual patient's CCHCS medical record that we relied upon.

[77] Although many of our important November 2024 subordinate recommendations were not discussed, we note that in April CCHCS changed the duration for use of post-gender affirming surgery topical silicone scar gel from 6 months to 12 months. One of our recommendations was to do essentially that.

[78] As of May 15, 2025, Durable Medical Equipment formulary at CCHCS now includes some post-surgical equipment discussed in Plaintiffs' Non-Paragraph 7 request for those undergoing or having undergone gender affirming procedures and surgeries.

(continued…)

Defendants were, however, surprised to learn through the course of Plaintiffs' expert's meeting with CCHCS gender-affirming care experts, that Plaintiffs' expert was not involved in Plaintiffs' counsel's collection of data for their November 2024 letter, nor was he aware if a data collection tool was used and if so, whether it was validated. He did not participate in the study performed by Plaintiffs' counsel and did not have access to medical records. Nor did he review the CCHCS education materials (which he recommended improving).[79] Instead, he was brought in to discuss Plaintiffs' counsel's recommendations that were included in the letter. While CCHCS advised that the meeting with Plaintiffs' expert was informative and helped the IGAHP better understand Plaintiffs' counsel's concerns set forth in their November 2024 report, CCHCS sees no need for additional meetings with Plaintiffs' expert.

Dated: June 10, 2025

Respectfully submitted,
HANSON BRIDGETT LLP

*/s/ Samantha D. Wolff*
PAUL MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS- GONZÁLEZ

*Attorneys for Defendants*

Dated: June 10, 2025

ROB BONTA
Attorney General of California
DAMON G. MCCLAIN
Supervising Deputy Attorney General

*/s/ Corinna S. Arbiter*
CORINNA ARBITER
Deputy Attorney General
*Attorneys for Defendants*

[79] Plaintiffs stated to Defense Counsel that their expert was provided access to "relevant excerpts from the Patient Education section of CCHCS's Transgender Care Guide relating to GAS," but notably, their expert stated during his call with CCHCS that he had not seen them.

Dated: June 10, 2025

PRISON LAW OFFICE

*/s/ Mackenzie Halter*
DON SPECTER
STEVEN FAMA
ALISON HARDY
RANA ANABTAWI
LILY HARVEY
SOPHIE HART
MACKENZIE L. HALTER

*Attorneys for Plaintiffs*