# EXHIBIT 1

# Analysis of the California Department of Corrections and Rehabilitation Emergency Response System: Critique and Recommendations

## Introduction and qualifications:

The scope of this project is to evaluate the current functioning of the Emergency Response System within the prisons of the California Department of Corrections and Rehabilitation (CDCR), identify weaknesses and problems, and make recommendations as to how it could be improved.

I am a Board-Certified Emergency Physician and a Fellow of the American College of Emergency Physicians (FACEP). I practiced as an emergency physician for 24 years in a busy Level II Trauma Center. My subspecialty was EMS. I served for 25 years as the Medical Director of the City/County Fire Department paramedics. I also served as the Medical Director to numerous rural volunteer ambulance services. I helped found and was the first Medical Director of Air Idaho Rescue, an air ambulance service.

Later, my career took me to correctional medicine, where I have worked for 22 years in both jails and prison systems. I have extensive experience providing direct clinical care to incarcerated patients as well as administrative experience supervising medical operations in jails and prisons.

## Study Objectives

The CDCR Receiver provided me with the following overall goals for my review:

*"Contractor shall provide CDCR with the following services:*

1. *Review all Emergency Medical Response Program (EMRP) policies and procedures to identify and report, in the manner requested by the Receiver or his designee, any improvements that the Contractor recommends for the CDCR correctional setting to address the speed of 9-1-1 activation.*

2. *Review EMRP data for calendar year 2023 and render an opinion, in the manner requested by the Receiver or his designee, regarding how well the program is currently operating and if 9-1-1 activation delays led to bad outcomes.*
3. *Review the last 100 send-outs from California State Prison, Los Angeles County, and Richard J. Donovan Correctional Facility to report, in the manner requested by the Receiver or his designee, on whether diagnostics were ordered in-house and determine whether the send-out was clinically necessary or instead could have been handled safely within the institutional setting.*
4. *Opine, in the manner requested by the Receiver or his designee, on the utility of an emergency medicine consultation service to provide real-time consultation to institutions regarding evaluation and treatment of patients who present to the institution Triage and Treatment Area.*
5. *Review EMRP data for calendar year 2023 and render an opinion, in the manner requested by the Receiver or his designee, regarding how well the program is currently operating.*
6. *Opine whether 9-1-1 activation delays led to bad outcomes."*

I reviewed the following to formulate my opinions:

1. Chart Reviews.
   a. 100 consecutive ambulance transports from May-June, 2024 from the LA County prison (LAC) in Lancaster, California
   b. 100 consecutive ambulance transports from May-June, 2024 from the Richard J. Donovan (RJD) prison in San Diego County.
   c. 402 emergency activation cases chosen at random from 2023 CDCR emergency activations.
   d. 138 additional charts chosen at random from 2023 CDCR emergency transports.
2. Materials reviewed

a. CDCR Health Care Department Operations Manual, Chapter 3 Article 7 Emergency Medical Response.
b. Emergency Medical Response Training Instructor Guide.
c. Emergency Medical Response and Unscheduled Transport Event Checklist.
d. Automation and Integration of clinical Information in Alignment with the Standard of Care: Analysis and Recommendations.
e. Emergency Medical Response Program SBAR: CDCR Peace Officer First Responder Regulations and Training Requirements.
f. HSI Community Adult First Aid/CPR/AED Student Handbook.
g. RN Standardized Procedures (RNSPs) dated 3/2024.
h. RJD materials
    i. RJD Emergency Medical Response Review Committee Minutes.
    ii. RJD Naloxone Cases & Disposition.
    iii. Post Narcan Response Management.
    iv. Interchest Pilot Program.
i. LA Fire Department CDCR (LAC) 911 Utilization.
j. LAC EMRRC Minutes.
k. Post Narcan Response Management Initial Training.
l. Post Narcan Response Management Secondary Training.
m. TTA Narcan Monitoring Guidelines.
n. CDCR Emergency Response Policies and Procedures (P&Ps).
o. NSB Plan for Community Emergency Medical Services Interface with California Prison Health Care Service.
p. Emergency Medical Services (EMS) Interface Project – Statewide Launch Memo.

3. Tours.
    a. I toured the emergency medical operations at LAC prison on March 10-11, 2025.
    b. I toured the emergency medical operations at RJD prison on March 13-14, 2025.

c. Interviews at LAC and RJD:
   i. The CEOs of Health Care Operations.
   ii. The Facility Medical Directors.
   iii. The TTA Medical Directors.
   iv. An LVN and a Psych Tech.
   v. TTA RNs.
   vi. Custody Officers who provide Emergency Training.
   vii. Several Custody Officers at both facilities.
   viii. LA County Fire Department Medical Director, and the Fire Chief and Station Captain of the Station primarily responsible for responding to 911 calls to LAC.
   ix. San Diego County Fire Department Medical Director, and the Fire Chief and Station Captain of the Station primarily responsible for responding to 911 calls to RJD.
   x. Antelope Valley Hospital Emergency personnel.

Limitations:

1. LAC and RJD are large prisons in an urban setting. My analysis of emergency responses and TTA functions at these two prisons may not represent the reality for older or smaller prisons or those in a more rural setting. To be efficient but also cost-effective, EMS systems must be tailored for the population they serve.
2. The charts I reviewed from LAC and RJD were from June and July 2024. The rate of emergency responses at RJD has decreased since June/July 2024, while the rate of emergency responses at LAC has increased since then.




**Standards of Emergency Preparedness and Response.**

I compared the CDCR Emergency Medical Response System with the standard practice of other Emergency Medical Systems (EMS).

**EMS Mission Statement**. The Mission of an Emergency Response System is to deliver life-saving emergency care to patients as soon as possible. EMS systems have two ways to do this.

1. They deliver life-saving care to emergency patients in the field.

   And

2. They transport emergency patients to a medical facility to receive life-saving care there.

Either way, the goal of EMS is to minimize the time it takes to provide patients with life-saving emergency care.

Life-saving emergency medical interventions include:

1. **Automated External Defibrillators (AEDs)**. Each year in the US, AEDs save the lives of hundreds of people who have experienced cardiac arrest, such as ventricular fibrillation. The early availability of an AED more than doubles the chance of survival following cardiac arrest.[1]

[1] https://www.nih.gov/news-events/nih-research-matters/bystanders-save-lives-using-defibrillator-cardiac-arrest



[2]

The sooner the AED is applied and delivers a defibrillating shock, the more effective it is in saving lives. Every minute that of delay in utilizing the AED decreases the success rate by 10%.[3]

2. **Cardiopulmonary Resuscitation (CPR)**. If a patient has had a cardiac arrest, CPR can be life-*saving if it is quickly followed by AED defibrillation*. CPR *by itself* is much less likely to save that life.[4]




3. **Naloxone (Narcan)**. If a patient has had a respiratory arrest due to an overdose of an opiate, such as heroin or fentanyl, Narcan saves lives by immediately reversing the respiratory depressant effect of opiates. The

[2] https://www.sca-aware.org/sites/default/files/downloads/sca-infographic-flyer-letter-2022-web_0.pdf
[3] https://www.nih.gov/news-events/nih-research-matters/bystanders-save-lives-using-defibrillator-cardiac-arrest
[4] https://pubmed.ncbi.nlm.nih.gov/20394876/

sooner an opiate overdose patient receives Narcan, the more likely it is that it will save a life.

4. **Basic Life Support (BLS)**. BLS training teaches First Responders several skills with the potential to save lives, including:
    a. How to rapidly assess emergency patients, including how to take and interpret vital signs. Vital signs are "vital" because they are essential to knowing how sick a particular patient is and how patients are changing over time, i.e., whether they are stable or unstable.
    b. How to secure a patient's airway and how to ventilate a patient who is not breathing.
    c. Trauma training, including how to care for stabbing victims.
    d. Principles of Triage, i.e. deciding which patients need rapid transport to a Trauma or Cardiac center.
    e. Proper techniques of preparing a patient for transport, including c-spine immobilization.

    Each of these skills can be life-saving for many patients.

5. **Advanced Cardiac Life Support (ACLS)**. ACLS teaches several more skills that can save lives. Examples include intravenous (IV) lines, tracheal intubation, surgical cricothyrotomy, transcutaneous heart pacing, and the use of many life-saving drugs. Paramedics and medical practitioners must learn ACLS skills. Many RNs take this training as well.
6. **Medical practitioner examination and evaluation**. Medical practitioners are taught how to perform comprehensive physical examinations, and how to use tests and imaging (e.g., EKGs, laboratory tests and x-rays) to evaluate emergency patients. Practitioners are further taught how to accurately do risk assessments and make definitive diagnoses. Practitioners can determine which patient with abdominal pain needs surgery and which can be treated with medications and sent home. They can use Risk Assessment Algorithms to determine whether a patient with chest pain is having a heart attack, a pulmonary embolism or something benign. They know how to

differentiate a stroke requiring emergency transportation from benign mimics, like Bell's Palsy. Practitioners are also able to definitively treat many urgent problems, such as suturing lacerations, immobilizing fractures and giving therapeutic medications.
*The time to deliver a patient to a medical practitioner is an independent predictor of successful outcome to medical emergencies*.

7. **Some emergencies are definitively treated only at a hospital**. This includes patients who need surgery, cardiac procedures, and stroke care. However, not all hospitals are able to offer these high-level interventions. Transfers between hospitals may need to occur for some emergency patients. The ability of a particular hospital to deliver high-level emergency care may need to be considered when arranging EMS transportation.

EMS is designed to optimize the delivery of life-saving care to patients in the system. The optimal method varies from system to system. A remote rural EMS system may use a community ambulance to provide AEDs and BLS and an EMS helicopter to get early ACLS care to patients. An urban area may use ACLS ambulances exclusively. An airport may position AEDs at several convenient locations and train Custody in BLS skills.

EMS planners must anticipate what type of emergency events they are likely to see, how many are likely to occur and design a system optimize delivery of life-saving care to these patients in a cost-efficient manner. EMS planning for a rodeo will be different than EMS planning for a symphony.

However, all Emergency Medical System organization includes the following.

1. **Policies and Procedures (P&P)**. P&Ps should cover the entire course of the emergency response, including preparedness (equipment and training), initial emergency response activation, the actions of all personnel who respond to the emergency, and final disposition of the patient.

2. **Training**. All personnel who respond to emergency activations must have appropriate training corresponding to their level of certification and activity.
3. **Equipment**. All appropriate equipment necessary to evaluating, treating, and transporting emergency patients must be available at each level of emergency response. There must be a system of checking and restocking equipment so that it is always available.
4. **Staffing**. There must be sufficient staff in place at each level of patient care to respond appropriately to emergency activations. Staffing must take into consideration the population served and have redundancies, if necessary, to be able to respond to more than one emergency at one time.
5. **Communication**. Emergency personnel must be able to communicate with the scene, with other emergency personnel and with receiving institutions.
6. **Practice Drills**. Emergency medical responses should be practiced periodically to ensure competent performance.
7. **Oversight**. Oversight includes
    a. Administration that verifies that P&Ps are in place, training is occurring, all necessary equipment is available, and all necessary staff are in place.
    b. Retrospective reviews and Continuous Quality Improvement (CQI) studies to identify problems, weak areas, and opportunities for improvement.
8. **Relationships**. Emergency Medical Systems should maintain a professional and congenial relationship between each level of emergency responders and with partners in the delivery of emergency care, such as:
    a. The 911 responders, such as the local Fire Department.
    b. BLS ambulance service providers.
    c. The local hospital emergency departments.
    d. The community at large.

9. **Documentation**. Each step of the emergency response must be appropriately documented.

**Description of the Emergency Response System at LAC and RJD**

LAC and RJD prisons each house around 3,100 - 3,400 incarcerated people plus around 1,000 employees for a total of over 4,000 people who could potentially have an emergency need.

LAC and RJD prisons consist of 4 linked autonomous housing areas, each containing around 700-800 incarcerated persons housed in 4-5 buildings. RJD has a fifth freestanding “Echo” housing area approximately 0.6 mile away from the main prison complex. LAC also has one freestanding minimum custody housing unit, which is located approximately ½ mile outside the main prison sally port.

Each housing area has an associated medical clinic, which is staffed by primary medical practitioners (PCPs) and registered nurses (RNs) on 2nd Watch (6:00 AM - 2:00 PM) Monday through Friday (M-F). RNs from the medical clinic respond to emergency activations in their housing area when they are on duty. Emergency patients can be sent to the medical clinic for an evaluation by a PCP during these hours, as well.

Each housing area has several Licensed Vocational Nurses and psychiatric technicians (LVN/PTs) on duty during 2nd and 3rd watches (6:00 AM-10:00 PM) seven days a week, who respond to emergency calls as Health Care First Responders (HCFRs).

Central to the 4-5 main housing areas is the Triage and Treatment Area (TTA), which is the primary emergency response center for each prison. TTA facilities have 4-5 patient examination and observation rooms equipped in a similar manner to those in a community urgent care clinic.

During 1st Watch (10 PM to 6 AM), there are few LVNs or PTs on duty so that an RN from the TTA usually acts as the Health Care First Responder for most emergency activations.

When community ambulances arrive at the prison, they must be admitted through the Sally Port and then proceed to the nearby TTA, where they usually pick up their patient. Rarely, the ambulances proceed all the way to the housing unit.

**Emergency Response Procedure**

If an incarcerated patient communicates that they have an emergency, or if discovered by staff to be having a medical emergency, the following personnel will respond:

**First Responders**. Correctional Officers (COs or Custody) are the first personnel to respond to emergency activations, and are referred to in the Policies and Procedures as "*First Responders*" (CO First Responders). The only times when COs would not be the first personnel to respond is when the emergency activation occurs in a medical clinic. When a CO First Responders identify a medical emergency, they activate the facility Emergency Response Process, which notifies medical personnel to respond. CO First Responders are also empowered to activate 911 at their discretion. Importantly, despite being designated "First Responders" (which implies some level of professional training), CO First Responders are actually considered by the CDCR Emergency Response System to be laymen.

**Health Care First Responders**. Licensed Vocational Nurses/Psychiatric Technicians (LVN/PTs) and Registered Nurses (RNs) are collectively referred to as Health Care First Responders (HCFRs). HCFRs are required to be certified in Basic Life Support (BLS). Most also receive 40 hours of extra Emergency Medical Response Training given by the CCHCS Emergency Medical Response Program. HCFRs respond to emergency activations in two deployments.

During 2nd and 3rd Watch (from 6:00 AM until 10:00 PM) seven days a week, the first HCFRs to respond to an Emergency Activation are the LVNs and PTs working in the housing area where the incident occurred. The LVN/PTs fill out a "First Medical Responder" form documenting their involvement in the emergency response.

Registered Nurses (RNs) usually respond to the emergency activation only if requested by the LVN/PTs. When this happens, an RN can respond from the medical clinic during 2nd Watch, 6 AM to 2:00 PM, M-F. When the clinic is not open, an RN from the TTA responds. The RNs fill out a "Primary and Secondary Assessment" form documenting their actions. During 1st watch, when no LVN/PTs are on duty, TTA RNs act as the 1st HCFRs to respond to emergency activations.

LVN/PTs can activate 9-1-1, but they cannot cancel a 9-1-1 call made by a CO. Only an RN or practitioner can do that. RNs can also cancel the entire emergency activation and send the patient back to their housing unit.

4. **Transport to the Triage and Treatment Area (TTA)**. The next step in most emergency responses is to transport the patient from the scene to a medical facility. When the medical clinic is open, and the HCFR deems it appropriate, the patient can go there. Otherwise, the patient is taken to the TTA facility. Some patients are taken to the TTA in a wheelchair. The other mode of transportation is to transport the patient via a Medical Emergency Response Vehicle (MERV), which can be as sophisticated as an ambulance or as simple as a golf cart with a stretcher attached.

5. **Evaluation in the Triage and Treatment Area (TTA)**. Upon arrival at the TTA, the patient undergoes a medical evaluation, monitoring, and treatment. The TTA RN documents these encounters in a "Emergency Response/TTA RN Summary." During 2nd watch (from 6:00 AM to 2:00 PM), Monday – Friday (i.e. 20% of the time), a medical practitioner is assigned to the TTA, and can assess the patient there. At all other times, there is usually no practitioner present in the TTA and the TTA nurses communicate with an on-call practitioner. The on-call practitioner can respond in person to the TTA after hours but rarely does so.

After patients have been assessed, monitored, and treated in the TTA, the TTA RN may send the patient back to housing without notifying the practitioner on call (POC). If the TTA RN does contact the POC, this TTA practitioner (whether on site or on call) makes the decision to either send the patient back to prison

housing or send the patient to an emergency department at a local hospital, referred to as sending the patient to a Higher Level of Care (HLOC).

It is important to consider how a practitioner makes this decision.

There are two basic reasons to send a patient to an emergency department. First, the practitioner has determined that the patient has—or may have—a true medical emergency. This includes patients who the practitioner suspects may be having a stroke or a heart attack, but also patients who need surgery (e.g. a stabbing victim or a patient with possible appendicitis). There are many other conditions that cannot be diagnosed or treated in a medical clinic like the TTA and require the resources of a hospital emergency department.

A second reason that patients may be sent to HLOC occurs even though a practitioner knows that the patient's problem is not an emergency and could theoretically be taken care of at the TTA. However, the patient is sent to an HLOC anyway due to staffing, training, or equipment issues at the TTA. I will refer to these as "transfers of convenience." Examples include

1. A patient has a simple laceration, but since there is no practitioner on duty, the patient is sent to the emergency department to get sutures.
2. A practitioner does not want to return to the TTA to do a patient examination and so sends the patient to a HLOC to have the examination done.
3. The TTA nurses have trouble starting an IV line so the patient is sent to the ER to get an IV.
4. A patient requires monitoring, but because of short-staffing, there are not enough RNs at the TTA to do the monitoring appropriately.

Such non-emergency patients are typically quickly sent back to the prison after the procedure or monitoring is done at the emergency department.

Once a practitioner has decided to send a patient to the ER, the transfer to a HLOC can occur in one of three ways.

1. Patients can be sent via a prison van, staffed with two COs. No medical personnel accompany the patient when sent in a custody vehicle. Most transfers of convenience can be sent this way.
2. Patients can be sent by a private ambulance. This is often referred to as sending the patient "BLS" (Basic Life Support). Since these are considered "non-emergency" transports, private ambulances respond when it is convenient for them to do so; therefore, BLS transports sometimes entail prolonged waits. The average wait for a BLS ambulance in 2023 was over an hour. In my chart reviews, I encountered several cases where the 9-1-1 ambulance was activated because of the long wait for a BLS ambulance, rather than because of a dramatic change in patient condition.
3. Finally, 9-1-1 can be called and the patient can be sent as quickly as possible in an ALS ambulance. In both LAC and RJD, an ALS ambulance will usually arrive in five to ten minutes. If 9-1-1 was activated by a CO First Responder, the 9-1-1 ambulance sometimes arrives at the TTA before the patient gets there. Even if a physician is on duty in the TTA, the patient may be loaded onto the 9-1-1 ambulance and transferred without the physician on scene ever evaluating them. One of the goals of EMS is to get a patient to a physician as soon as possible, and so this practice delays patient access to a medical practitioner. LA County Fire complained specifically about this scenario when I met with them.

4. The final stage of the emergency response is the evaluation and treatment performed in the hospital emergency department. Once this evaluation and treatment is done, the patient is either admitted to the hospital or sent back to the prison.

**Chart Reviews**:

At the request of the CDCR Receiver, I reviewed three sets of patient charts to answer specific questions regarding the CDCR Emergency Response System.

**Set #1: LAC and RJD Consecutive Send-out Review**

Review Objectives:

1. "*Review 100 consecutive send-outs from California State Prison, Los Angeles County, and Richard J. Donovan Correctional Facility to report, in the manner requested by the Receiver or his designee, on whether diagnostics were ordered in-house and determine whether the send-out was clinically necessary or instead could have been handled safely within the institutional setting*."
2. *"Opine, in the manner requested by the Receiver or his designee, on the utility of an emergency medicine consultation service to provide real-time consultation to institutions regarding evaluation and treatment of patients who present to the institution Triage and Treatment Area."*

The LAC chart review raw data are found in Appendix A.

The RJD chart review raw data are found in Appendix B.

Discussion. In doing this evaluation, I relied on the fact that on call practitioners could theoretically return to the TTA to provide onsite care "as necessary." (Operations Manual 3.7.1-1 (f) (1)). I used my clinical judgement to determine, as well as possible, if the transfer to a HLOC was a transfer of convenience (discussed above) and if the Practitioner On-Call (POC) could reasonably have returned to the TTA to provide the evaluation, monitoring and/or treatment that was instead provided at the HLOC.

Results:

1. Few diagnostics are ordered in the TTA other than EKGs.
2. At LAC, 36 out of 100 cases could reasonably have been taken care of by a practitioner on site.
3. At RJD, 28 out of 100 cases could reasonably have been taken care of by a practitioner on site.

**Discussion:**

A system where patients are seen face-to-face by a practitioner on site provides better medical care and reduces the risk of patient harm compared to a system that delays access to a practitioner evaluation by transporting patients off site.

Since sending patients to a hospital is expensive, these data indicate that staffing the TTA in a way that provides practitioner evaluations in the TTA would also be cost-effective.

An emergency medicine consultation service that provides real-time consultation regarding evaluation and treatment of patients who present to the Triage and Treatment Area would certainly be an improvement to the current system. However, consultation practitioners would still be remote and could not (for example) suture simple lacerations, which would still have to be sent to the ER. However, this may be an efficient and cost-effective way of providing remote on-call emergency consultations during all or part of 1st watch. I discuss this in more detail below.

**Set #2: EMRP EMS Activated Subset.**

*Review a random sample of 138-200 emergency medical response events of the 2023 emergency events where the local Emergency Medical System was activated and determine If 9-1-1 activation delays led to bad outcomes.*

Discussion: The three variables evaluated were:

1. *Was there a bad outcome*? I defined a bad outcome as any case that met at least one of the following:
    a. Death
    b. Required life-saving intervention
    c. Required hospital-based treatment or surgery
2. *Was there a delay in EMS Activation*? An EMS activation delay can occur at any level of emergency response: CO First Responder, HCFR, or in the TTA. To say that a 9-1-1 activation delay occurred requires evidence that a responder should have known from Policy and Procedure and/or training to activate 9-1-but failed to act.

a. CO First Responders. The CDCR Health Care Department Operations Manual, Article 7—Emergency Medical Response (Operations Manual) states 3.7.1-1 (1) (c) states "*the First Responder shall . . . activate 9-1-1 community EMS if indicated*." However, the Operations Manual does not say what those indications are. The HSI Adult First Aid/ CPR AED student manual states: "*If the person is unresponsive, or if you recognize the signs and symptoms of a life-threatening condition in a responsive person (or are just unsure), call 911 to activate EMS . . .* ***or activate your occupational emergency action plan (EAP)***." (my emphasis) (p. 21. See also p. 43) The HSI Adult First Aid/ CPR AED manual does not say when to activate the facility EAP **and also** activate 9-1-1. Since CO First Responders always activate the facility EAP to summon HCFRs and transportation of the patient to a medical clinic, I would fault a CO for not additionally activating 9-1-1 in the event of CPR or an unconscious patient in the setting of trauma, like a stabbing, a beating, or a fall.
The Emergency Medical Response Program has prepared a list of indications for CO First Responders to call 9-1-1, but since this is not part of CO First Responder training, they cannot be held to this standard.
b. Health Care First Responders (HCFRs). HCFRs receive training on recognizing medical emergencies requiring 9-1-1 transport in their Emergency Medical Response Training, as documented below. In my review of these charts, a delay in activation occurred if a HCFR documented any of these conditions, but did not activate 9-1-1.




c. TTA Practitioner. I held TTA Practitioners, whether in the TTA or on call, to the "Reasonable Practitioner" standard. If a reasonable medical practitioner in the community should have known that a patient needed emergency care and yet the TTA practitioner did not activate 9-1-1, I judged that to be a delay in emergency activation.

3. *Was there a delay in EMS response*? The California Correctional Healthcare Services EMS Interface Program has prepared a chart showing the contractual response times for the ACLS EMS units that respond to each CDCR institution (Appendix D). I concluded that there was a significant delay in EMS response if the response time was at least 25% longer than the contractual response time or if the EMS unit was delayed at the Sally Port.

The Emergency Activation Review raw data are found in Appendix C.

Results:

1. There were 12 bad outcomes in this set of 138 charts.
2. There were 3 EMS activation delays. All three EMS activation delays occurred in the TTA.
3. There were no EMS activation delays due to inaction by CO First Responders or HCFRs.

4. 2 of the bad outcome cases had EMS activation delays. Neither of these was contributory to the bad outcome.
5. There were 50 significant EMS response delays out of 119 EMS runs (42%).
6. 9 of the 12 bad outcomes (75%) had an associated EMS response delay. None of these was contributory to the bad outcome.
7. There was one case of unnecessary CPR being done by a CO First Responder.
8. 68 times out of 119 EMS runs (57%), the EMS records were not found in the patient's medical record.
9. An AED was applied five times. One of these resulted in a successful restoration of circulation and a life saved.
10. Narcan was administered 7 times, with a full recovery in 6 of the 7.

Discussion:

Based on this random sample, it does not appear that the CDCR has a significant problem with EMS/9-1-1 activations by First Responders. Instead, delays in getting patients transferred to a Higher Level of Care are mostly due to prolonged response times by both ACLS and BLS ambulances. Longer than expected ACLS EMS responses occurred 42% of the time overall and 75% of the time in bad outcome cases. These data emphasize the importance of the CDCR EMS Interface Project, which provides feedback to EMS systems about poor performance and negotiates commitments for shorter ACLS response times.

**Set #3. Random Sample EMRP Evaluation Emergency Events Data 2023 Review.** *Review EMRP data for calendar year 2023 and render an opinion, in the manner requested by the Receiver or his designee, regarding how well the program is currently operating.*

The Random Sample EMRP Evaluation Emergency Events Data 2023 Review raw data are found in Appendix 4.

Findings:

1. One life was saved by CPR/AED use.
2. There was one potentially preventable death. Patient #1 was seen in the TTA with severe (10/10) back pain. Despite abnormal vital signs, the on-call practitioner ordered a ketorolac shot and the patient was sent back to housing with discharge instructions for a Lumbar Strain and Constipation. About five hours later, the patient returned to the TTA with ongoing severe back pain. This time the POC ordered a transfer to HLOC, but via state vehicle. It took about two hours for this transport to take place. No additional vital signs or monitoring took place in the TTA during these two hours. Upon arrival at the ER, the patient was found to be in critical condition with an epidural abscess, bilateral pneumonias, and sepsis. He expired the next day.
3. Patients #2 and #3 had CPR performed unnecessarily.
4. The overall documentation of Emergency Medical responses is poor.
    a. 37 out of 90 charts of patients sent by ambulance are missing the EMS records.
    b. Many charts show a patient going to TTA or clinic for an evaluation but no documentation of what happened in the TTA. One example is patient #4, who was "sent to SEMS to see MD." The patient was not sent to a HLOC, but there is no note from the MD in the chart.
    c. Several charts document an EKG being done but the EKG is not found in medical records.
    d. Many charts are missing ER/hospital records. One example is patient #5, a "man-down" EMS activation. He died within four hours of arriving at the hospital, but there are no hospital records in his chart.
    e. Several charts show significant miscommunication with the emergency physician, i.e., the reason cited by the TTA practitioner on why the patient needed to be sent to a HLOC was not mentioned or evaluated by the emergency department practitioner. One example is patient #6. The clinic practitioner sent this patient to a HLOC because of a "7-8 cm mass" on her

low back with "weakness in both legs." The PCP wrote "Not sure if the mass is a collection of fluid or tissue swelling. Need immediate imaging" (MRI). However, the ER doctor mentioned no mass on the patient's low back, did not mention leg weakness, did only plain x-rays, and sent the patient back. Another example is patient #7, who was sent to the ER to have atrial flutter evaluated. The ER notes do not mention atrial flutter, and this was never evaluated. Some ER physicians expressed frustration in their notes due to not knowing why a particular patient had been sent to the ER.

5. The current system of staffing the TTA with practitioners only 20% of the time (2nd watch, M-F) delays patient access to ACLS and practitioner evaluations the rest of the time, which increase patient risk.
6. These records corroborate the fact that on-call practitioners frequently send patients to the hospital for minor procedures or observation that could have been done in the TTA, like simple laceration repairs (for example, patients #8 and #9), or observation of patients who could have been monitored in the TTA after fully recovering from an opioid overdose with Narcan (example, patient #10).
7. However, these data also show that such transfers of convenience also occur during 2nd watch on weekdays when there is ostensibly a practitioner assigned to the TTA. For example, patient #11 arrived at the TTA on a Monday at around 12:30 PM for a finger laceration sustained in the kitchen. He was sent to the ER. The ER physician did no sutures. He instead applied tissue adhesive and sent the patient back. (see also patient #12).
8. The overall management of patients complaining of chest pain is inconsistent and often poor. Risk stratification of patient complaints of chest pain is an important clinical process and an essential part of any Emergency Response System.
    a. HCFRs sometimes cancel emergency activations and do not send patients on to the TTA for complaints of chest pain that I would

consider worrisome and needing to be evaluated by a medical practitioner. (Example: patient #13).

b. Similarly, some patients evaluated in the TTA for complaints of chest pain that I would think should have been referred on to a HLOC for a cardiac work up were instead sent back to housing. One example was patient #14, who complained of chest pain and had an EKG in the TTA that read "consider acute ischemia." The TTA clinician diagnosed "epigastric pain" and sent the patient back to housing with a prescription for antacids. Patient #15 was similarly diagnosed with "chest wall pain" and sent back to housing. Later, it was noticed that his EKG showed acute ischemia. The patient was recalled to the TTA and sent to the hospital, where an acute myocardial infarction was confirmed. (see also patients #16 and #17).
c. Patients are being given nitroglycerine "per protocol" and then sent back to housing. (for example, see patient #18) This is poor clinical practice.
d. It appears that an EKG is the only chest pain evaluation tool used at the TTA and often interpreted as if a normal EKG means that the patient with chest pain is "cleared" even without an evaluation by a practitioner. As any emergency physician can tell you, this is not the case. (examples include patients #19 and #20)

**Discussion**:

There are some problems at the level of CO First Responders, including unnecessary CPR, AED delays, and 9-1-1 activation issues. Problems at the level of the HCFRs include inadequate documentation and staffing issues, especially on 1st watch and holidays.

However, the more serious problems with the operations of the CDCR Emergency Response System do not lie primarily at the level of the CO First Responders or the HCFRs, but rather at the level of TTA operations and

emergency transport to HLOC. The way that the TTA is staffed delays patient access to ACLS and to face-to-face practitioner evaluations.

The main cause of delays in getting patients to a hospital emergency department appears to be delays in EMS response, rather than delays in activating 9-1-1.

# Critique and Recommendations

**The Staffing of The Triage and Treatment Area (TTA) Is Inadequate to the TTA's Core Mission.**

The name "Triage and Treatment Area" indicates that the mission of the TTA is to:

1. Triage patients. The word "triage" means rapidly assess incoming patients to decide which patients need to be transferred to a hospital and which can be cared for at the TTA. For those patients who should be transferred to a hospital, triage also includes deciding the most appropriate method of transportation to the hospital.
2. Treatment Area. Patients who can receive definitive therapy on site should be provided with that therapy at the TTA. This would coincide to patients at a community Urgent Care Center who are treated and then sent home. Patients who need to go to a hospital emergency department should also be appropriately stabilized and treated prior to transfer.

The mission of the TTA is similar to that of a community urgent care center, where patients also go to be evaluated, triaged, and treated. However, all community urgent care centers are staffed with a medical practitioner the entire time they are in operation. This is because a practitioner's training and skills are needed to make appropriate Triage decisions and provide medical treatment.

The CDCR Health Care Department Operations Manual, Article 7—Emergency Medical Response says the following about TTA function.

1. "*RN staff, based on their level of licensure, training, and demonstration of competency, shall provide emergency care based upon clinical indications and utilizing patient-specific individual orders or nursing standardized procedures*."
2. "*TTAs and clinical areas shall be properly staffed and equipped*."
3. "Properly staffed" is defined as: One RN on duty 24/7 and one practitioner "*during business hours*." However, since one RN must remain in the TTA at all times, true TTA minimum staffing must be two RNs, one of whom is available to respond to emergencies.
4. "*A provider shall be onsite during business hours*." (i.e., 2nd Watch Monday – Friday, or 20% of the time). The Operations Manual does not say that the provider must be on duty in the TTA, just that a provider must be onsite. P&Ps do not define what the provider should do while on duty these hours or why these hours were chosen.
5. A Provider On Call (POC) must be available after hours, weekends and holidays to answer any calls from the TTA nurse. The POC is to return and provide "onsite care as necessary," but this rarely happens in actual practice.

Ideally, staffing to respond to emergency activations would consider when those emergencies are most likely to occur. Analysis of CDCR emergency activation data shows that the rate of emergency activations is around 45% for both 2nd and 3rd Watch and 8-10% on 3rd watch.



The rate of emergency activations is approximately the same on weekends as weekdays.

| 2023 Number of EMR Events | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Watch | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Total | Percent of Total |
| 1W | 843 | 803 | 829 | 772 | 829 | 851 | 907 | 5,834 | 9% |
| 2W | 3,288 | 4,282 | 4,197 | 4,083 | 4,190 | 4,351 | 3,439 | 27,830 | 45% |
| 3W | 3,840 | 3,946 | 3,997 | 3,891 | 4,045 | 4,285 | 3,978 | 27,982 | 45% |
| No Event Time | 249 | 422 | 470 | 495 | 458 | 453 | 278 | 2,825 | 5% |
| Total | 7,971 | 9,031 | 9,023 | 8,746 | 9,064 | 9,487 | 8,324 | 61,646 | |
| Percent of Total | 13% | 15% | 15% | 14% | 15% | 15% | 14% | | |

Taking this rate of emergency activations into account, staffing to respond to emergencies would be identical on 2nd and 3rd Watch, seven days a week, when 90% of emergency activations occur. Staffing could decrease proportionately on 1st Watch. But that is not how staffing is made at the TTA.

**Practitioner staffing at the TTA is suboptimal.**

A practitioner is scheduled in the TTA during 2nd Watch, Monday-Friday, or 20% of the time. At LAC and most other CDCR facilities, this is the totality of practitioner staffing in the TTA. (RJD offers practitioners the opportunity for optional staffing of the TTA during 3rd Watch for either 4 or 8 hours).

However, business hours are not the ideal time to staff the TTA with a practitioner.

1. This is when medical clinics are scheduled. When I toured LAC, I counted 13 other practitioners on duty in the medical clinics. One of these could respond to the TTA for emergency activations just like the clinic RNs respond to emergency activations.
2. More emergency activations occur on 3rd Watch as on 2nd Watch, on average. In 2024, LAC had an average of 2.3 emergency activations on

2nd Watch and 2.8 on 3rd Watch. Similarly, RJS averages more emergency activations on 3rd Watch as opposed to 2nd Watch. It makes no operational sense to staff TTA with a physician on 2nd Watch but not 3rd Watch.

3. There are just as many emergency activations on the weekend and on holidays as during the week, but the TTA is also unstaffed with a practitioner during weekend and holidays.
4. The CDCR appropriately requires all Health Care Providers to be certified in Advanced Life Support. However, practitioners are only on site for 20% of the time. The other 80% of the time, patients must wait for the arrival of an ACLS ambulance crew to receive ACLS care. The average time required for this ranges from seven minutes to 30 minutes depending on the facility. (See appendix D--EMS Dispatch County Status and 9-1-1 Response Times). ACLS is a life-saving service that should be available on site at least during 2nd and 3rd Watches, when 90% of emergency activations occur.

In the end, if the goal is to provide emergency patients Advanced Cardiac Life Support and the earliest possible access to a practitioner's judgement and skills, it makes no operational sense to do this only 20% of the time. If staffing the TTA with a practitioner is sound medicine on 2nd Watch M-F, then it is sound medicine on 3rd Watch and on the weekends.

**The TTA practitioner call system is suboptimal**

The Operations manual gives little guidance on the responsibilities of the On Call Practitioner (POC). In a community hospital or urgent care center, when a practitioner is "on-call," the expectation is that when called, the practitioner will (almost) always return in person to the site they are covering and provide direct patient care. The Operations Manual states that the POC for the TTA is also supposed to return and provide "*onsite care as necessary*," (3.7.1-1.(f) (6) but this rarely happens in actual practice.

Also, POCs are not required to have access to their work computers while on call. I was told "some take their computers home and use them and some

don't." If an on-call practitioner does not have their work computer, this means, for example, that the TTA RNs cannot send an EKG for review, the practitioner cannot access a patient's old records and the POC cannot document their involvement in a case. None of this is good medical practice and increases patient risk.

When on-call practitioners are unwilling or unable to return to the TTA to evaluate patients, patients are routinely transported to an emergency department simply to obtain a practitioner's examination. In other words, it is more convenient for the POCs to send a patient to the ER for a medical examination than to come back to the TTA and do the examination themselves. Many transfers from the TTA to a HLOC are for the sake of this convenience rather than necessity.

It must be emphasized here that the quality of medical evaluations and decisions made by a remote practitioner are not and cannot be as accurate as if the practitioner were on site directly interacting with the patient. This increases patient risk and inevitably leads to patient harm.

In my opinion, the practice of remote practitioner call is one of the most serious flaws in the CDCR emergency response system. It is also not cost effective. Transfers of convenience are expensive.

- **Recommendations for improving practitioner staffing/call for the TTA.**

1. Staff the TTA with a practitioner on 2nd and 3rd Watch M-F. This can be done in a cost-effective way by moving the practitioner scheduled to staff the TTA from 2nd watch to 3rd watch M-F and having a clinic practitioner respond to emergency activations during 2nd watch. This move alone would double the presence of a practitioner on site.
2. During weekend 2nd and 3rd watches, require the POC to return to the institution to evaluate patients, when called. The CDCR would have to provide nearby housing for this POC. Small rural hospitals that

must provide practitioner coverage for their low-volume emergency departments often buy or rent nearby houses for their emergency practitioners to stay in while on call. The CDCR could staff these shifts either by using their own employee practitioners or by contracting with emergency practitioners to provide coverage. Emergency Medicine Residents and/or experienced emergency mid-level practitioners would be cost-effective resources.

3. Implementing both suggestions would provide ACLS and face-to-face practitioner care for 90% of emergency patients.
4. 1st watch could be covered by an emergency medicine consultation service. Since there are so few emergency activations on 1st watch in each institution, an experienced emergency on-call consultant could cover multiple institutions at night. Other prison systems term such a position a "Nocturnist." This emergency consultant would be expected to be awake and available during the entire 1st watch for emergency calls and questions from TTA nurses at several regional institutions.
5. Many other possibilities exist to improve practitioner coverage and on-call services for CDCR emergency patients. The ideal solution for a large urban facility with many emergency activations, like RJD, may not be ideal for a small rural facility with few emergency activations.

**RN staffing at the TTA Is not optimal for their mission**

TTA RNs are on duty 24/7 and are expected to always respond to emergency activations. However, staffing of the TTA also does not consider any of three important factors:

1. TTA RNs have help on 2nd Watch M-F, when clinic RNs can respond to emergency activations. When this help leaves at the end of 2nd Watch, TTA staffing should increase to maintain the same level of preparedness.

2. Emergency activations occur much more frequently on 2nd Watch and 3rd Watch as opposed to 1st Watch. Minimum TTA staffing should be found on 1st Watch, not on the much busier 2nd and 3rd Watches.
3. Emergency activations occur just as frequently on weekends and holidays. Emergency response preparedness should not be compromised on the weekend and holidays; the rate of emergency activations does not decrease then.
4. The rate of emergency activations varies greatly from prison to prison.




Prisons with a greater population and/or a greater number of emergency activations should have a proportionately higher number of RNs available in the TTA to respond. I was told at LAC that TTA staffing is

standardized and cannot easily be changed. For example, both LAC and FSP staff their TTAs with two RNs 24/7. However, LAC has more than six times as many emergency activations as FSP and should certainly should have proportionately more TTA staffing.
On the other hand, RJD has been able to appropriately increase TTA staffing. RJD staffs its TTA with 3 RNs on 1st watch, 5 RNs on 2nd Watch and 4 RNs on 3rd Watch. I was told that they were allowed to do this because their Echo facility was originally supposed to have its own TTA, which was not built in the end. RJD used this opportunity to more effectively staff their TTA. All facilities should similarly be able to increase their TTA staffing based on their level of emergency activations, with a minimal TTA staffing of two RNs ON 1ST watch.

**TTA RNs are tasked with duties that distract from their core mission.**

TTA RNs are tasked with many other duties that are not related to their core mission of emergency response, triage, and treatment. These include:

- Seeing all patients returning from medical appointments, and hospital/ER visits. There can be many of these patients, who return disproportionately on 3rd watch, when emergency activations are high.
- Supporting the telepsych provider. Telepsych by policy, must have a TTA RN in the room for the entire duration of the visit. This RN is not available to respond to emergency activations nor to actively monitor other emergency patients housed in the TTA.
- Supporting the telemedicine practitioner.
- Seeing clearances after Zoom court.
- Answering the large volume of calls that the TTA receives.
- Giving all medical Infusions, such as antibiotics, iron, hemophilia meds, MS meds, etc.

In addition, on weekends, holidays and after hours, the TTA RNs are also responsible for tasks that otherwise are done in other areas:

- Dressing changes and other treatments that are usually scheduled in the medical clinic.
- 3-day post MAT induction evaluations
- Transfers to and from other institutions
- New arrivals and court returns
- Processing of parolees
- Prep patients for surgery/medical procedures
- Time sensitive labs
- "Hard stick" lab draws
- Processing of sick calls, including:
    - Triage
    - Signing
    - Scanning into EHRS
    - Booking appts for same day or next business day

Once again, even though the amount of non-emergency duties TTA RNs are expected to do increases dramatically on weekends and holidays, their staffing does not increase. Even though the Operations Manual states "*the highest priority for the (TTA) RN shall be emergency care*." (3.7.1-1. (f) (4)), the large amount of non-emergency tasks takes up TTA bedspace and RN time and attention and cannot help but negatively impact emergency operations. For example, at LAC, an estimated 30-40 patients return every weekday from offsite medical appointments and hospital visits. All these patients must be evaluated by the TTA RN. Most of these return evaluations occur during 3rd watch, which has the highest incidence of emergency activations. With just two TTA RNs, this negatively impacts emergency patient care and increases patient risk of harm.

Also, many of these duties, such as the processing of sick calls, are done during business hours by support staff, like secretaries and LVNs. Since the TTA has no support staff, the RNs must do this non-medical work. The TTA should be provided with the support staff they need when they must do extraneous, non-emergency work, after hours, on weekends and on holidays.

**TTAs are often staffed with untrained, inexperienced RNs.**

TTA duty is unpopular among most RNs. Some reasons for this include:

1. TTA duty involves working on weekends and at night.
2. The TTA is understaffed and the work is hard.
3. Like EMS and emergency rooms in the community, TTA duty can be intermittently chaotic and very stressful.
4. Unlike community emergency rooms, the TTA nurses are not reimbursed at a higher rate than nurses working in other, easier jobs.

Because of these factors, experienced RNs, who get to choose their shifts first, do not tend to choose to work in the TTA. Instead, newer inexperienced nurses are disproportionately assigned to the TTA. Even worse, agency nurses, (who the CDCR uses to fill critical gaps in nursing coverage) are also disproportionately assigned to the TTA. Agency nurses, with few exceptions, have not received the Emergency Medical Response training that CDCR HCFRs must have. This results in the TTA being frequently staffed by RNs who are both inexperienced and untrained.

This appears to violate the Operations Manual 3.7.1-1. (f) (1) which states "*Health care staff shall provide emergency care consistent with their licensure or certification, **training, competency**, and legal scope of practice*." In my opinion, agency nurses and new hire/inexperienced nurses do not have the "*training and competency*" to practice in the TTA. It certainly is not the ideal staffing for patients. Staffing the TTA with untrained, inexperienced nurses increases the risk of patient harm. Interacting with TTA nurses "who don't know what they are doing" was one of the complaints that the LA Fire Paramedics made when interviewed about their experience working with LAC.

- **Recommendations to improve TTA RN Staffing**

1. Require Emergency Response Training for all nurses before they can work in the TTA.

2. Increase reimbursement for TTA duty to the point that it becomes a desirable place for experienced RNs to work.
3. Match TTA staffing to the expected occurrence of emergency events. Minimal staffing should occur on 1st watch. Staffing should increase for 2nd and 3rd watches proportional to the occurrence of emergency activations and to the extra, non-emergency work assigned to the TTA.
4. Assign the evaluation of patients returning from medical appointments and hospital/ER visits to RR when RR is open and functioning.
5. Assign support personnel, such as secretaries and LVNs, to the TTA on weekends, holidays, and other times when the TTA is assigned any tasks that are done by support personnel during business hours.

**Transportation of urgent patients by private BLS ambulances and prison vans is suboptimal.**

In 2023 CCHCS EMR events, more patients were transported to a HLOC by private BLS ambulances (4,526) and state vehicles (7,132) than by 9-1-1 ALS ambulances (10,138). However, the length of time for patients deemed "urgent" to be transported by BLS and state vehicles was excessive. The average length of time system wide waiting for a private BLS ambulance was 1 hour and 8 minutes, and the average wait for a state vehicle transport was 2 hours and 3 minutes. Of course, these are the average times; half of the waits were longer, sometimes much longer.

| 2023 CDCR Emergency Activations Data | | |
|---|---|---|
| Average time from EMS activation to patient departure. | | Urgent Priority Level |
| Mode of transport | BLS Ambulance | 1:08 |
| | State Vehicle | 2:03 |

When a patient is deemed urgent, having to wait for over an hour for BLS ambulances and over two hours for state vehicle is excessive and increases

patient risk. The time it takes for a patient to be seen face-to-face by a medical practitioner is an independent factor in successful outcomes.

- **Recommendations to improve early access of urgent patients to practitioner evaluation.**

1. Adopting the changes in TTA staffing and call previously recommended would eliminate the need for most BLS/state vehicle transports.
2. It would be cost-effective for the CDCR to set up its own urgent transport system at urban prisons. One way to do this would be to provide these prisons with a MERV dedicated to urgent HLOC transports and then staff this MERV with on-call paramedics.

**The emergency response to patients complaining of chest pain is suboptimal**

I heard complaints and concerns about how to deal with chest pain patients from many individuals. Correctional Officers at both LAC and RJD expressed confusion and frustration in how they are supposed to act when a patient states that they have chest pain. Both LA Fire and San Diego Fire expressed concerns revolving around the emergency management of chest pain. My review of charts showed many examples of poor clinical management of chest pain patients by RN HCFRs and TTA clinicians.

This confusion is unnecessary. The American College of Cardiology and the American Heart Association have developed an excellent "Guideline for the Evaluation and Diagnosis of Chest Pain"[5] that could easily be adapted into a comprehensive clinical management guideline for chest pain in CDCR prisons.

- **Recommendation for improving care of patients with chest pain.**

[5] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ahajournals.org/doi/pdf/10.1161/cir.0000000000001029

Create a Chest Pain Clinical Management Guideline for use in CDCR facilities. One way to do this would be to assign the task to an ad hoc committee which would include a cardiologist, an emergency physician, representatives from Custody, Nursing, Administration, EMS, and any others deemed appropriate.

**Emergency training for Correctional Officer First Responders is inadequate.**

CO First Responders receive four hours of emergency training every other year. The curriculum is an eight-hour HSI First Aid/CPR AED course designed for laymen in the community. CO First Responders are only allotted four hours to learn the material in this eight-hour course PLUS learn how to administer Narcan. This abbreviated curriculum is seriously inadequate for the critical role that CO First Responders play in the prison Emergency Response System. The HSI First Aid/CPR AED course is designed for a community layman, like a bystander who responds to a medical problem in a grocery store, who likely will never see another medical emergency ever again.

But Correctional Officers are not laymen; they are trained professionals who respond to medical emergencies as part of their professional responsibility. The HSI First Aid/CPR AED training is not designed for professionals like COs and is wholly inadequate for the scope of their professional responsibilities.

*Not giving COs adequate emergency response training results in serious systemic problems in the emergency response system, and increases patient risk of harm*. Not providing appropriate training is also not cost effective.

The Correctional Officers I interviewed felt that they would benefit from more training, simply due to the number of emergencies that they respond to.

I understand that all other Peace Officers in California must receive Basic Life Support (BLS) Training and Certification. "*A course of at least 21 hours in first aid equivalent to the standards of the American Red Cross and healthcare provider level CPR and AED equivalent to the standards of the American Heart Association*" (*Cal. Code Regs. tit. 22 § 100028.01* subsection (f)). I have been told that even though Correctional Officers are Peace Officers, the act does

not require the same training for them as for other Peace Officers, and so Correctional Officers have never been offered this training.

While this might be a *legally* sound argument, it does not make *operational* sense. Correctional Officers respond to emergencies far more than any other category of Peace Officers. In fact, Correctional Officers respond to more emergencies than all other Peace Officers in California *put together*. Operationally, one should give the most training to those who will use it most. To provide BLS training to, say, Probation and Parole Officers who will likely never be an emergency First Responder in their entire career and to deny that training to Correctional Officers who will be an emergency First Responder literally hundreds of times in their career makes no operational sense.

As a rule, an organization should provide the most training to the individuals who will utilize that training the most.

**Inadequate CO First Responder Training Leads to Inappropriate CPR**

Based on the training provided in the HSI Adult First Aid/CPR AED course, COs are not allowed to check a pulse to decide whether a patient needs CPR. This results in COs performing CPR on patients who do not need it. I found three such cases in my chart reviews. Based on this, I wanted to estimate how many other cases of inappropriate CPR are occurring in the CDCR facilities.

Since CPR should always be followed by application of an AED, the number of cases where CPR was performed on patients who did not need it can be estimated by finding the number of times COs began CPR but the HCFR, upon arrival, found a pulse and so did not apply the AED. A search of 2023 emergency activations showed that 1/3 of Custody initiated CPR events were not followed by an AED, for a total of at least 134 cases of unnecessary CPR in 2023.




I need to point out here that CPR is not a benign procedure. Those of us who have done CPR know that CPR frequently results in broken ribs, and occasionally more serious injuries such as liver lacerations and collapsed lungs.

In my opinion, unnecessary CPR should not be happening in the CDCR. The lack of training that leads to unnecessary CPR also appears to violate California Assembly Bill 268 regulatory changes, effective July 1, 2024, which states: "*Adult correctional officers shall be trained that when safe and* ***appropriate to do so****, staff shall begin CPR on a nonresponsive person without obtaining approval from supervisors or medical staff*."[6] (my emphasis)

The solution is simple: teach COs how to check for a pulse before starting CPR. The community HSI First Aid/CPR AED course does not meet the requirements of a group of professional First Responders, like the CDCR Correctional Officers, who do CPR frequently and as part of their required duties.

[6] Title 15, Division 1, Chapter 1, Board of State and Community Corrections, Article 3. Minimum Standards for Training, Section 184 Annual Training Requirements (d)

## Lack of Policy and CO First Responder Training Leads to 9-1-1 Activation Problems

The HSI Adult First Aid/CPR AED course states, "*If the person is unresponsive, or if you recognize the signs and symptoms of a life-threatening condition in a responsive person (or are just unsure), call 911 to activate EMS* ***or*** (my emphasis) *activate your occupational emergency action plan (EAP)*." (p. 21, see also p. 43) The HSI Adult First Aid/CPR AED course does not address when a CO First Responder should activate the EAP **AND** activate 9-1-1.

The CDCR Health Care Operations Manual, 3.7.1-1 (e) defines the duties of COs as First Responders as requesting a health care response and activating 9-1-1 community EMS "*if indicated*." However, the Health Care Operations Manual provides no guidance on what appropriate indications to activate 9-1-1 would be. The words "if indicated" strongly implies that CO First Responders are expected to use their professional judgement to decide when to call 9-1-1 in addition to activating the facility emergency response.

However, the Correctional Officers that I interviewed stated that in practice, they are not allowed to use their judgement in deciding whether to activate 9-1-1. If a patient states that they are having an emergency or if a patient uses a key phrase like "chest pain," activating the facility EAP to summon the HCFR is not enough, they *must* also call 9-1-1. Once 9-1-1 is called, only an RN or medical practitioner can cancel the call. However, 9-1-1 response times at LAC and RJD are so fast that the ambulance often arrives before an RN has an opportunity to cancel the call.

This pattern of over-activation of 9-1-1 has several negative consequences, both systemic and medical. During my visit to LAC, I met with representatives from the LA County Fire Department to discuss their perspective on the emergency system at LAC. These representatives included the Medical Director, Clayton Kazan and the Assistant Medical Director, Saman Kashani. LA Fire was quite critical of the emergency response system at LAC. LA Fire believed that LAC was systematically abusing the 9-1-1 system, thereby diverting resources from the community at large and placing responding

paramedics at risk, since they respond to all calls with lights and sirens. LA Fire presented several statistics in support of this assertion.

1. Since June of 2020, the overall volume of 9-1-1 calls from LAC had increased dramatically, especially in 2024. (insert graph)




2. However, according to LA Fire, this increase in calls was not due to an increase in legitimate medical emergencies. Instead, the main drivers of the increase were "low-acuity" calls. LA Fire defined low acuity calls as any call that was cancelled enroute, any call where the patient was not transported (usually due to a refusal to be transported), or any call that, in their judgement, could have been taken care of by the medical providers at the jail and so did not require transport—what I have defined as transfers of convenience.

# Proportion of low-acuity calls (AMA, BLS, Canceled)




3. LA County Fire was especially concerned about the large increase in refusals to be transported that they labelled "AMA" calls.




4. LA County Fire also felt that they were not being listened to when they tried to discuss their concerns with LAC leadership.
5. Overall, the morale of the LA Fire 9-1-1 paramedics with regard to LAC was poor.

Similarly, my impression from talking to many Correctional Officers at both LAC and RJD Prisons is that their morale is also poor regarding their role in emergency response. I was told by more than one CO, "We're angry." The issues driving this attitude include the perception that their professional judgement is not respected, they are undertrained, and they are not supported by prison administration in their role of emergency response.

This is not good for patients; it increases their risk of harm.

It is my understanding that the situation at LAC is not universal among all of the CDCR facilities. At some other facilities, the CO First Responders are issued cards developed by the CDCR Emergency Response Program that give COs guidance on when to activate 9-1-1:




**CO participation on patient transport is not defined.**

Neither the Operations Manual nor the HSI First Aid/CPR AED training addresses Custody's role in transportation of patients within the facility. For example, COs are taught that they may not transport a patient to the TTA in a wheelchair, even if the wait for a HCFR is prolonged (for example, if there are multiple emergency calls at the same time with only one HCFR on site).

Also, the COs at LAC will not help lift patients into the MERV; not even the CO assigned to drive the MERV will do this. The TTA RN must lift and maneuver the gurney into the MERV alone. Not surprisingly, this has resulted in several RN workplace injuries.

In contrast, the RJD COs will help the RNs lift and load patients into the MERV. It appears to depend on each individual institution's culture of professionalism as to how COs assist in emergency transportation.

**CO First Responders Do Not Use Automatic External Defibrillators (AEDs).**

CO First Responders are taught how to apply the AED in their HSI First Aid/CPR AED training. The Operations Manual states that AEDs are "strategically placed throughout the institution" to allow use by custody (Operations Manual (d)18.). However, the Operations Manual does not mention COs using an AED in the section on their responsibilities as First Responders. CO First Responders do not bring an AED to the scene of emergencies and do not use AEDs. HCFRs bring the AED to the scene up to eight minutes later. This delay increases the risk of patient harm by diminishing the effectiveness of the AED when used on patients in cardiac arrest.

- **Recommendations To Improve CO First Responder Training**

1. The CDCR should stop using the HSI First Aid/CPR AED course. It was designed for community lay people and does not fill the needs of professional COs who are expected to respond to emergencies frequently as part of their professional duties.
2. The Correctional Officers should receive additional emergency training that includes how to check for a pulse before beginning CPR.
3. The CDCR has a department devoted to developing and delivering emergency response training: the California Correctional Health Care Services Emergency Medical Response Program. The CDCR should authorize their own Emergency Medical Response Program to develop a training program specifically for CO First Responders.
4. If COs are not allowed to use their judgement to decide whether 9-1-1 activation is "indicated," the CDCR is obligated to define the indications whereby a correctional officer should call 9-1-1 and provide appropriate training. The CDCR Emergency Response Program has developed training and guidance on when CO First

Responders should activate 9-1-1. This should be incorporated into CO emergency training

5. Four hours every other year is an inadequate amount of time for CO First Responder training. CDCR should consult with the Emergency Medical Response Team as to how much time would be needed for this training.
6. Making this change would be cost-effective by eliminating the money spent for outside consultation and increasing the efficiency of the Emergency Response process.
7. The Operations Manual and training should address when CO First Responders should use an AED themselves rather than waiting for the HCFR.
8. The Operations Manual and training should address CO First Responder roles in the transportation process.

**Prison relationships with EMS partners should be a priority.**

One of the most striking findings of my investigation into the CDCR emergency response system was the level of anger expressed by the LA County Fire Department towards the LAC prison. It was clear that this anger had been building for months if not years. I heard about angry interactions between paramedics and LAC personnel both when I interviewed the LAC RNs and physicians and when I met with LA Fire personnel. This degree of animosity certainly raises the medical risk for patients caught in the middle of such disagreements.

By contrast, the relationship between the San Diego Fire Department and the RJD facility could not have been more cordial. What was striking, though, is that RJD and the San Diego Fire both said that a year ago, their relationship was as full of animus as LAC/LA Fire is now. The difference was a sustained effort to work together as a team. This resulted in San Diego Fire officials touring the RJD facility and attending as active participants the RJD Emergency Medical Response and Review Committee.

This remarkable turnaround was a result of work by the Emergency Medical Response's EMS Interface Project. The goal of this program is to

*"develop a comprehensive statewide plan to improve relationships with community EMS participants, improve the continuity of care provided to our patient-inmate population, standardize future EMS provider contracts where feasible, and become "better neighbors" to our community healthcare provider partners. These goals will be accomplished by the development of open and effective lines of communication and by active participation in local EMS policy development and continuous quality improvement work groups."*

San Diego Fire praised the work done by the EMS Interface project. This is an important project. Improving relationships with EMS partners improves medical care for patients.

The contrast between LA Fire/LAC and San Deigo Fire/RJD is an excellent example of the program's effectiveness.

Another example of the effectiveness of the EMS Interface project has been negotiating for faster response times from ACLS providers.

- **Recommendation to improve relationships with EMS partners**

The CDCR should expand the EMS Interface Project statewide. This would be cost-effective.

**Documentation of Emergency Responses is Not Optimal**.

CO First Responders document their response to emergency activations in the custody record, but this is not available for review in the medical record. Since CO First Responders provide some medical treatments (Narcan, bleeding control, and theoretically AED), their reports should be included in the patient's medical record.

The Operations Manual stipulates that "Patient Care Records (PCR) from community EMS providers involved in treatment or transport (be included) in

the health record." (3.7.(d) (19)) However, in my review of patient charts, EMS records were present less than half of the time.

Patient records also showed the frequent absence of other important emergency response documents, including HCFR reports, TTA RN reports, practitioner reports, and hospital records.

- **Recommendations to improve documentation**

1. CO First Responder emergency reports should be reviewable in the medical record.
2. The Emergency Medical Response and Review Committee should assign someone to make sure that all appropriate documents, such as First Responder records, TTA records, EMS records, and hospital records are incorporated into the medical record.

# EXHIBIT 2

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

Date : May 12, 2025

To : Mackenzie Halter, Prison Law Office

Subject : **PRISON LAW OFFICE NON-PARAGRAPH 7 CONCERN RELATING TO THE APPLICANT TRACKING SYSTEM**

California Correctional Health Care Services (CCHCS) is providing the italicized information below in response to your email inquiry dated April 14, 2025.

1. Has CCHCS completed the initial assessment of the Applicant Tracking System (ATS), and if so, what are the results?

   *CCHCS has completed the initial assessment of the ATS and identified the following reporting options by location, classification, and program:*
   - *Number of applications received*
   - *Number of eligible candidates (passed screening)*
   - *Number of interviews conducted*
   - *Number of offers made:*
     - *Number of contingent offers made*
     - *Number of formal offers made*
   - *Number of candidates who have withdrawn or rescinded who received a contingent or formal offer*

   *Candidate activities will be reported in the month in which they occur. For example, a candidate who submits an application in February will be included in the February reporting period as "application received." If the candidate is interviewed in March, that activity would be reflected in the March report as "interview conducted."*

2. Does the ATS track timeliness of hire (from date of application to date of hire and start date), such that the data can be regularly provided to plaintiffs? If no, please explain.

   *The ATS tracks the number of days between the application date and start date, and this data can be provided upon request.*

Thank you.

cc: Clark Kelso, Receiver
Directors, CCHCS
CCHCS Office of Legal Affairs
Office of Legal Affairs, CDCR
Office of the Attorney General
Hanson Bridgett, LLP

DeAnna Gouldy, Deputy Director, Policy and Risk Management Services, CCHCS
Jasinda Muhammad, Deputy Director, Human Resources, CCHCS
Robin Hart, Associate Director, Risk Management Branch, CCHCS
Regional Executives, Regions I-IV, CCHCS

# EXHIBIT 3

State of California Department of Corrections and Rehabilitation

# Memorandum

Date: June 2, 2025

To: Mackenzie Halter
Prison Law Office

Subject: **PRISON LAW OFFICE FOLLOW-UP TO 2/20/25 CCHCS RESPONSE RE HEAT ISSUES**

The California Department of Corrections and Rehabilitation (CDCR) is providing the italicized information below in response to your email inquiry dated May 2, 2025.

1. With regards to Attachment B, CDCR Housing Unit Cooling Types by Institution, please define all terms used in the columns titled "Asset Description," "Equipment Sub-Type," and "Type of Cooling."

*In Attachment B to the CDCR/CCHCS memorandum, dated February 20, 2025, the "Asset Description" column indicates how the unit (asset) is described in CDCR's Computerized Maintenance Management System (CMMS); the "Equipment Sub-Type" column further describes the assets within the Heating, Ventilation, and Air Conditioning (HVAC) classification in the CMMS; and, the "Type of Cooling" column indicates the type of cooling the asset provides to its respective housing area. There are three types of cooling indicated within this column, and they are:*

*"Ventilation without cooling," which indicates ventilation with no additional cooling component.*
*"Evaporation cooling," which indicates an evaporation component to the ventilation system.*
*"Refrigeration cooling," which indicates a refrigeration component to the ventilation system.*

2. Please provide a revised chart that includes, for each housing unit (i.e., each row):
   - The yard, building number, and unit, as is used in the "Facility Building ID" column of the Institution Bed Audits.
   - Whether the cooling system described is considered air-conditioning for purposes of the temperature taking requirements in "non-air-conditioned units," i.e., whether or not each unit is subject to temperature taking requirements as referenced in your response to Question 4.
   - Whether the system described is central, ductless, or portable.
   - Whether any of the listed cooling systems are permanently inoperable as of the date of this inquiry.

*CDCR's CMMS does not use the housing area designations that appear in the Institution Bed Audits (IBAs). As a result, CMMS is not able to run a report that includes each housing location's yard, building number, and unit, as used in the IBA's "Facility Building ID" column. CDCR's CMMS is not able to run a report that indicates whether the type of cooling in each housing location, statewide, is central, ductless, or portable, or whether each housing area's cooling system is considered permanently inoperable. The report with the requested information does not currently exist and would be burdensome to create.*

*"Ventilation without cooling" and "Evaporation cooling" are the types of cooling treated as "non-air-conditioned units" for the purpose of the 2025 Heat Plan. Housing areas with "refrigeration cooling" are considered air-conditioned.*

Thank you.

cc: Clark Kelso, Receiver
Diana Toche, D.D.S., Undersecretary, Health Care Services, CDCR
Dave Lewis, Director, FPCM, CDCR
Gena Jones, Director, DAI, CDCR
Directors, CCHCS
CCHCS Office of Legal Affairs
Office of the Attorney General
Hanson Bridgett, LLP
DeAnna Gouldy, Deputy Director, Policy and Risk Management Services, CCHCS
Brittany Brizendine, Psy.D., Deputy Director, Institution Operations, CCHCS
Robin Hart, Associate Director, Risk Management Branch, CCHCS

# EXHIBIT 4

Dewi Zarni <[redacted]

# Plata | Non Paragraph 7 re Heat Issues Follow-Up

1 message

**Mackenzie Halter** [redacted] Thu, Apr 17, 2025 at 10:37 AM

To: Clark Kelso [redacted], "Kelso, Clark@CDCR" [redacted], "Toche, Diana@CDCR" [redacted], "John D@CDCR Dovey" [redacted], "Barrow, Roscoe@CDCR" [redacted], "Hartmann, Sarah@CDCR" [redacted], "Yang, Mellonie@CDCR" [redacted], "Burkart, Brianne@CDCR" [redacted], "Saich, Lara@CDCR" [redacted], "Bick, Dr. Joseph@CDCR" [redacted] "Heintz, Lisa@CDCR" [redacted], "Gouldy, DeAnna@CDCR" [redacted], "Hart, Robin@CDCR" [redacted], "Matranga, Amanda@CDCR" [redacted], "Sara@CDCR" [redacted], "Joseph@CDCR Williams" [redacted] CDCR CCHCS Health Care Compliance Support Section [redacted], "Paul B. Mello" [redacted], Samantha Wolff [redacted], David Casarrubias [redacted], Samantha M Bacon [redacted], "Neill, Jennifer@CDCR" [redacted], Rachel [redacted], Damon McClain [redacted], Corinna Arbiter [redacted] CDCR-OLA Plata CAT Mailbox [redacted] "OBrien, Robert@CDCR" [redacted]

Cc: Alison Hardy [redacted], Don Specter [redacted], Steven Fama [redacted] Rana Anabtawi [redacted] Lily Harvey [redacted], Sara Norman [redacted], Dewi Zarni [redacted]

Good morning,

We write to follow-up on the 2/20/25 CCHCS response to our inquiry relating to heat issues.

First, the response to question 2b references training for medical and custodial staff related to identifying and responding to heat-related symptoms. Please provide the 2024 training materials and any updated materials for 2025.

If they will not be included in your response to the training materials request, please provide current mandates to health care staff "clarifying the reporting requirements of heat-related health care incidents," as described in CCHCS's 2/20/25 Non-Paragraph 7 response.

Please provide the following documents, described in the 4/8/24 Heat Plan and Updates memo:

- All CDCR Form 7711-1, Heat Plan Monthly Summary Report, submitted by institutions to Headquarters for the months of January 2024 to December 2024.
- For each prison, all (i) CDCR Form 2031, Inside Temperature Record, (ii) CDCR Form MH-711-2, Heat Incident Log, and (iii) CDCR Form MH-7711-3, Medical Rounds Log (Stage III) gathered and filed with the prison's Heat Plan Coordinator in 2024.
- The 2024 and 2025 Heat Plan Local Operating Procedure for each CDCR prison.

Please also provide the following documents, described in the 8/2/24 Expectations Relative to Institutional Oversight of Heat Plan Operations memo:

- Meeting minutes for all meetings convened by the Warden, CEO, and their executive teams due to a Heat Advisory for all CDCR prisons from January 1 to December 31, 2024.

Thank you,

**Mackenzie Halter**
Staff Attorney
Prison Law Office
(510) 280-2621
[redacted]
Pronouns: she/her

# EXHIBIT 5

**From:** CDCR-OLA Plata CAT Mailbox
**To:** Mackenzie Halter; Clark Kelso; Kelso, Clark@CDCR; Toche, Diana@CDCR; Dovey, John@CDCR; Barrow, Roscoe@CDCR; Hartmann, Sarah@CDCR; Yang, Mellonie@CDCR; Burkart, Brianne@CDCR; Saich, Lara@CDCR; Bick, Dr. Joseph@CDCR; Heintz, Lisa@CDCR; Gouldy, DeAnna@CDCR; Hart, Robin@CDCR; Oltean, Amanda@CDCR; Meier, Sara@CDCR; Williams, Joseph@CDCR; CDCR CCHCS Health Care Compliance Support Section; Paul B. Mello; Samantha Wolff; David Casarrubias; Samantha M Bacon; Neill, Jennifer@CDCR; Napier, Rachel; Damon McClain; Corinna Arbiter; CDCR-OLA Plata CAT Mailbox; OBrien, Robert@CDCR
**Cc:** Alison Hardy; Don Specter; Steven Fama; Rana Anabtawi; Lily Harvey; Sara Norman; Dewi Zarni
**Subject:** RE: Plata | Non Paragraph 7 re Heat Issues Follow-Up
**Date:** Saturday, June 7, 2025 11:00:51 AM

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Good morning,

OLA is still in the process of responding to your request, and appreciate your patience for this delay.

Regarding the LOPs, we are still in the process of gathering the 2025 LOPs and expect to have them in the coming weeks. The 2024 LOPs were not fully available until July of last year, so we expect the 2025 LOPs to be fully available by a similar timeframe.

As for the training materials, we are working towards providing the training materials in the next week an will provide an update by Wednesday, June 11.

Thank you again for your patience.

Respectfully,

Mark A. Johnson
Attorney
Complex Litigation Unit – B
Office of Legal Affairs
California Department of Corrections and Rehabilitation

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Mackenzie Halter [redacted]
**Sent:** Thursday, April 17, 2025 10:38 AM
**To:** Clark Kelso [redacted]; Kelso, Clark@CDCR [redacted]; Toche, Diana@CDCR [redacted]; Dovey, John@CDCR [redacted]; Barrow, Roscoe@CDCR [redacted]; Hartmann, Sarah@CDCR [redacted]; Yang, Mellonie@CDCR [redacted]; Burkart, Brianne@CDCR [redacted]; Saich, Lara@CDCR [redacted]; Bick,

Dr. Joseph@CDCR [redacted]; Heintz, Lisa@CDCR [redacted]; Gouldy, DeAnna@CDCR [redacted]; Hart, Robin@CDCR [redacted]; Oltean, Amanda@CDCR [redacted]; Meier, Sara@CDCR [redacted]; Williams, Joseph@CDCR [redacted]; CDCR CCHCS Health Care Compliance Support Section [redacted]; Paul B. Mello [redacted]; Samantha Wolff [redacted]; David Casarrubias [redacted]; Samantha M Bacon [redacted]; Neill, Jennifer@CDCR [redacted]; Napier, Rachel [redacted]; Damon McClain [redacted]; Corinna Arbiter [redacted]; CDCR-OLA Plata CAT Mailbox [redacted]; OBrien, Robert@CDCR [redacted]
**Cc:** Alison Hardy [redacted]; Don Specter [redacted]; Steven Fama [redacted]; Rana Anabtawi [redacted]; Lily Harvey [redacted]; Sara Norman [redacted]; Dewi Zarni [redacted]
**Subject:** Plata | Non Paragraph 7 re Heat Issues Follow-Up

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning,

We write to follow-up on the 2/20/25 CCHCS response to our inquiry relating to heat issues.

First, the response to question 2b references training for medical and custodial staff related to identifying and responding to heat-related symptoms. Please provide the 2024 training materials and any updated materials for 2025.

If they will not be included in your response to the training materials request, please provide current mandates to health care staff "clarifying the reporting requirements of heat-related health care incidents," as described in CCHCS's 2/20/25 Non-Paragraph 7 response.

Please provide the following documents, described in the 4/8/24 Heat Plan and Updates memo:

- All CDCR Form 7711-1, Heat Plan Monthly Summary Report, submitted by institutions to Headquarters for the months of January 2024 to December 2024.
- For each prison, all (i) CDCR Form 2031, Inside Temperature Record, (ii) CDCR Form MH-711-2, Heat Incident Log, and (iii) CDCR Form MH-7711-3, Medical

Rounds Log (Stage III) gathered and filed with the prison's Heat Plan Coordinator in 2024.

- The 2024 and 2025 Heat Plan Local Operating Procedure for each CDCR prison.

Please also provide the following documents, described in the 8/2/24 Expectations Relative to Institutional Oversight of Heat Plan Operations memo:

- Meeting minutes for all meetings convened by the Warden, CEO, and their executive teams due to a Heat Advisory for all CDCR prisons from January 1 to December 31, 2024.

Thank you,

**Mackenzie Halter**
Staff Attorney
Prison Law Office
(510) 280-2621
[redacted]
Pronouns: she/her

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BERNHARDT TIEDE, II; TEXAS PRISONS COMMUNITY ADVOCATES; BUILD UP, INC. *a/k/a* JUSTICE IMPACTED WOMEN'S ALLIANCE; TEXAS CITIZENS UNITED FOR REHABILITATION OF ERRANTS; and COALITION FOR TEXANS WITH DISABILITIES, | § | |
| Plaintiffs, | § | |
| v. | § | 1:23-CV-1004-RP |
| BRYAN COLLIER, *in his official capacity as Executive Director of Texas Department of Criminal Justice*, | § | |
| Defendant. | § | |

**ORDER**

Before the Court is Plaintiffs Bernhardt Tiede, II ("Tiede"); Prisons Community Advocates ("TPCA"); Build Up, Inc. *a/k/a* Justice Impacted Women's Alliance ("Lioness"); Texas Citizens United for Rehabilitation of Errants ("TX C.U.R.E."); and Coalition for Texans with Disabilities' ("CTD") (collectively, "Plaintiffs") Motion for Preliminary Injunction. (Dkt. 50). Defendant Bryan Collier ("Collier") filed a response in opposition, (Dkt. 69), and Plaintiffs filed a reply, (Dkt. 90). From July 30, 2024 through August 2, 2024, the Court held a hearing on the motion. (*See* Min. Entries, Dkts. 167, 172, 173, 174). After considering the parties' arguments, witnesses, and evidence introduced at the hearing; the parties' pre- and post-hearing briefing; and the relevant law, the Court enters the following order.

## I. BACKGROUND

Tiede originally filed suit on August 24, 2023. (Compl., Dkt. 1). He initially sued Collier, the Texas Department of Criminal Justice, Kenneth Paxton, and the Texas Office of Attorney General (collectively, "Original Defendants"). Tiede is currently incarcerated at the Texas Department of Criminal Justice ("TDCJ") Estelle Unit in Huntsville, Texas. (Am. Compl., Dkt. 57, at 5). Tiede is 65 years old and has multiple health conditions, including diabetes, hypertension, and COPD. (Compl., Dkt. 1, at 7–8; *see also* Am. Compl., Dkt. 57, at 39). In August 2023, he reported that while housed in a cell without air conditioning, he suffered from stroke symptoms that were exacerbated by heat and necessitated transportation by ambulance to an emergency room. (Compl., Dkt. 1, at 1; *see also* Am. Compl., Dkt. 57, at 40). He asserted that fans and periodic deliveries of ice water and cold cloths were insufficient to provide relief from temperatures that exceed 110 degrees Fahrenheit in cells. (Compl., Dkt. 1, at 1). Following his stroke, TDCJ moved Tiede to an air-conditioned cell on August 9, 2023, but returned him to unair-conditioned housing only eight days later. (2d Mot. TRO, Dkt. 7, at 5).

On August 28, 2023, following his return to an unair-conditioned cell, Tiede moved for a temporary restraining order requesting that Original Defendants move him to an airconditioned housing unit. (2d TRO Mot., Dkt. 7). United States Magistrate Judge Mark Lane granted the motion on September 13, 2023. (Dkt. 17). On September 14, 2023, this Court entered an Amended Temporary Restraining Order (the "Amended TRO") ordering the Original Defendants to return Tiede to airconditioned housing for 14 days, (Dkt. 19), which the Court then extended an additional 30 days. (Dkt. 27).

On April 22, 2024, Tiede moved to amend his complaint, (Dkt. 48), and on April 25, 2024, he filed a Motion for Preliminary Injunction, (Dkt. 50), based on the updated facts included in his

proposed amended complaint. The Court granted the motion to amend on May 7, 2024. (Dkt. 56). The first amended complaint removed four of the five Original Defendants (leaving only Collier, the Executive Director of TDCJ)and three of his four legal arguments (leaving only an Eighth Amendment conditions of confinement argument), and added the four Organizational Plaintiffs. (Am. Compl., Dkt. 57). Tiede and the Organizational Plaintiffs bring Section 1983 claims under the Eighth Amendment against Collier in his official capacity, seeking declaratory and injunctive relief on behalf of the entire TDCJ inmate population. (*Id.* at 53–59).

On May 29, 2024, Collier filed an Amended Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Rule 12(b)(1), (Dkt. 76), and an Amended Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Rule 12(b)(6), (Dkt. 77). Plaintiffs filed responses in opposition to the motions to dismiss, (Dkts. 87, 88), and Collier filed replies, (Dkts. 91, 92). On June 14, 2024, the Court denied the two motions to dismiss, (Dkts. 76, 77). (Order, Dkt. 95).

Meanwhile, Collier filed a response in opposition to the motion for preliminary injunction, (Dkt. 52), and Plaintiffs filed a reply, (Dkt. 90). Prior to the preliminary injunction hearing, the Court resolved a number of evidentiary motions. (*See* Orders, Dkts. 83, 96, 100, 108, 109, 117, 118, 131, 132, 133, 147). From July 30, 2024, through August 2, 2024, the Court held a hearing on Plaintiffs' Motion for Preliminary Injunction, (Dkt. 50). (*See* Min. Entries, Dkts. 167, 172, 173, 174). Plaintiffs presented 13 witnesses: (1) Marci Marie Simmons, (2) Dr. Antonella Zanobetti, (3) Plaintiff Bernhardt Tiede, (4) Dr. Julie Skarha, (5) Charlie Malouff, (6) 30(b)(6) deponent David Sweetin via video, (7) Dr. Susi Vassallo, (8) Michele Deitch, (9) Dr. Jhilam Biswas, (10) Dean Williams, (11) Dr. Paul Uribe, (12) Dr. Amite Dominick, and (13) Britany Robertson. (Witness List, Dkt. 175). Collier presented eight witnesses: (1) Bobby Lumpkin, (2) Dr. Jane Leonardson, (3) Timothy Fitzpatrick, (4)

Cody Ginsel, (5) Paul Morales, (6) John Baldwin, (7) Ronald Hudson, and (8) Bryan Collier. (*Id.*). At the hearing, the Court admitted 125 exhibits. (Exhibit List, Dkt. 190).

On August 22, 2024, the parties filed their proposed findings of fact and conclusions of law. (Pls.' Brief, Dkt. 187; Collier's Brief, Dkt. 188). That same day, the parties filed a joint advisory to the Court regarding the outstanding evidentiary disputes. (*See* Dkt. 186). At this time, the Court overrules each outstanding objection.

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

## III. FINDINGS OF FACT

At the outset, the Court notes that the parties are in agreement that air conditioning all TDCJ facilities is necessary as a matter of inmate health and safety. Collier himself testified that his goal is "absolutely" to install air conditioning in all TDCJ facilities and recognized that air conditioning is the best solution to reduce temperatures in TDCJ facilities.[1] He stated that the only reason air conditioning has not been installed in all housing areas throughout TDCJ is because

[1] Final Hearing Tr. (August 2, 2024), at 179:5–9; 254:24–255:20;

the Texas Legislature has not appropriated the funds for TDCJ to do so.[2]

Currently, TDCJ has approximately 46,000 "cool beds," or beds in proximity to partial or full air conditioning, meaning that approximately 95,000 inmates are in unair-conditioned housing.[3] To assess whether individual inmates require a cool bed, TDCJ uses a metric called "heat scores," i.e. a score given to inmates, based on certain criteria, which requires that they be placed in an airconditioned cell. Approximately 12,289 TDCJ inmates have "heat scores" that qualify them for the cool beds;[4] the remaining 33,000 cool beds are available to inmates without heat scores.[5] Some of these beds are given to individuals without a heat score but who have suffered from heat-related illness.[6] 32 of TDCJ's 101 units are fully airconditioned in the housing areas.[7] TDCJ has classified 55 units as partially airconditioned in the housing areas, though a number of these units have fewer than ten cool beds.[8]

**A. The Organizational Plaintiffs' Incarcerated Members and Constituents Face a Substantial Risk of Serious Harm From Extreme Heat.**

1. Lioness: Justice Impacted Women's Alliance ("Lioness")

Lioness is a traditional voluntary organization "made up of formerly incarcerated and currently incarcerated women, girls, [and] gender expansive individuals in Texas."[9] Because the TDCJ currently houses people based on their biological sex, rather than on their gender identity,

---

[2] Pls.' Hearing Ex. 254, Collier's Resp. to Interr. 17.
[3] Final Hearing Tr. (Aug. 1, 2024) at 25:6–8.
[4] *Id.* at 25:3–5.
[5] *Id.* at 25:9–11.
[6] *Id.* at 167:10–168:3.
[7] *Id.* at 14:19–23; 63:23–24.
[8] *Id.* at 63:17–65:2.
[9] Final Hearing Tr. (July 30, 2024) at 26:19–22. Lioness is part of Build Up, Inc., a nonprofit organization formed under the laws of New Jersey. (*See* Final Hearing Tr. (July 30, 2024) at 67:7–10; *see also* Dkt. 90-1, Ex. L, Toon 2d Decl. ¶¶ 1–2; Def.'s Hearing Ex. 30.)

TDCJ currently houses inmates who identify as transgender women with men in its facilities.[10] Lioness's "roughly 700 members" advocate for "appropriate and livable conditions at TDCJ facilities" and work "to get its members and constituents safe from extreme heat."[11] Lioness's board "consists entirely of formerly incarcerated women."[12] More than 400 of Lioness's members are TDCJ inmates, and about 250 of those members are currently housed in unair-conditioned units.[13] Lioness's members all joined the organization voluntarily, support its mission, help guide its priorities, and receive updates about the case.[14] Lioness's incarcerated members also "guide all of [the organization's] work," by letting Lioness know "what's currently going on in their units," and then Lioness "campaign[s] around those issues."[15]

Extreme heat in TDCJ prisons has been of concern to Lioness "from day one."[16] It is a priority for Lioness because of its members' "lived experience," and it remains of paramount importance, because Lioness members have "confirmed" that harm from extreme heat and lack of air conditioning continue each summer.[17] This has happened every year since Lioness was founded. Lioness receives "[a] very large number" of complaints from its incarcerated members "every summer" about the heat in TDCJ prisons, the lack of air conditioning, and TDCJ's inadequate heat-mitigation measures.[18] The volume of those complaints has increased since

---

10 Final Hearing Tr. (July 30, 2024) at 68:18–69:6.
11 Dkt. 90-1, Ex. L, Toon 2d Decl. ¶¶ 2–8; *see also* Final Hearing Tr. (July 30, 2024) at 50:25–51:8; ECF 50-8, Ex. H, Toon Decl. ¶¶ 4–7;
12 Final Hearing Tr. (July 30, 2024) at 52:21–23.
13 Final Hearing Tr. (July 30, 2024) at 51:9–11, 54:7–9; Dkt. 90-1, Ex. L, Toon 2d Decl. ¶¶ 2–8; Pls.' Hearing Ex. 62 (list of Lioness members currently incarcerated in TDCJ facilities).
14 Dkt. 90-1, Ex. L, Toon 2d Decl. ¶¶ 7, 9, 16–23.
15 Final Hearing Tr. (July 30, 2024) at 53:19–22.
16 Final Hearing Tr. (July 30, 2024) at 53:23–54:6.
17 *Id.*
18 *Id.* at 56:18–22.

2022.[19] Lioness has also identified specific members housed in unair-conditioned TDCJ units who "have been harmed or are at risk of harm from the extreme heat in TDCJ facilities."[20] Lioness decided to join this lawsuit because it is "concerned about incarcerated Texans' health and . . . their life," because "the majority of [Lioness's] membership is under the direct authority of [TDCJ]."[21] Lioness's decision to join the lawsuit was "not only a response to the complaints" Lioness received from its members about the extreme heat, but also a result of its formerly incarcerated board members' "lived experience" in the TDCJ system.[22]

2. Texas Citizens United for Rehabilitation of Errants ("TX C.U.R.E.")

TX C.U.R.E. is an Austin-based criminal justice advocacy nonprofit.[23] It was "created to fight systemic and systematic mistreatment of people incarcerated in TDCJ's custody, and to provide those who are incarcerated with resources they need in and out of prison."[24] TX C.U.R.E.'s constituents include all of the approximately 132,600 individuals incarcerated in the TDCJ system—including approximately 89,000 individuals who are currently housed in unair-conditioned living areas.[25] TX C.U.R.E. has constituents in every unit in TDCJ.[26] TX C.U.R.E. advocates for its incarcerated constituents by communicating with them to try to address specific issues, and by testifying in front of the Texas Legislature on heat-related issues.[27] TX C.U.R.E.'s Board of Directors includes individuals formerly incarcerated in the TDCJ system and

---

19 *Id.* at 56:14–57:5.
20 Dkt. 90-1, Ex. L, Toon 2d Decl. ¶¶ 5, 13–23 (identifying members by their initials "because many of our members fear retaliation by TDCJ for providing testimony or participating in a lawsuit against it").
21 Final Hearing Tr. (July 30, 2024) at 57:6–12.
22 *Id.* at 57:13–16.
23 Dkt. 90-1, Ex. M, C. Malouff Decl. (June 4, 2024) ¶ 3.
24 Dkt. 90-1, Ex. M, C. Malouff Decl. ¶ 3.
25 Final Hearing Tr. (July 30, 2024) at 188:10–23; Pls.' Hearing Ex. 128; Dkt. 90-1, Ex. M, C. Malouff Decl. ¶ 4.
26 Final Hearing Tr. (July 30, 2024) at 189:4–6.
27 *Id.* at 190:3–9.

relatives of those who are currently incarcerated.[28]

TX C.U.R.E.'s staff frequently communicates with its incarcerated constituents and their family members, who seek help with addressing poor conditions in TDCJ's prisons.[29] These incarcerated constituents' needs drive the policy goals of the organization, which include seeking relief from the extreme heat in TDCJ's unair-conditioned units.[30] TX C.U.R.E. identified 19 constituents who have written and requested help with excessive heat, a lack of air-conditioned housing, and other related issues.[31] All of these constituents are alleged to have "suffered from exposure to excessive heat" and "are directly affected by TDCJ's lack of temperature control throughout its prisons."[32] TX C.U.R.E. decided to join this lawsuit to serve its constituents by helping address their continued suffering from the extreme heat in unair-conditioned TDCJ facilities.[33]

3. Texas Prisons Community Advocates ("TPCA")

TPCA's mission is to serve incarcerated individuals and their families. TPCA has focused on issues of extreme heat and a lack of air conditioning in TDCJ prisons from its inception.[34] TPCA's constituents include prisoners in the TDCJ population.[35] TPCA advocates for its incarcerated constituents in numerous ways—including by working on bills seeking to require humane temperatures in TDCJ prisons, providing expert testimony about the conditions in TDCJ units before the Texas Legislature, co-authoring research reports about those conditions,

---

28 Dkt. 90-1, Ex. M, C. Malouff Decl. ¶ 5.
29 *Id.* ¶ 6.
30 *Id.* ¶ 9.
31 *Id.*; *see also id.* (attachment to C. Malouff Decl. listing 19 examples of TX C.U.R.E. constituents).
32 Dkt. 90-1, Ex. M, C. Malouff Decl. ¶ 10.
33 Final Hearing Tr. (July 30, 2024) at 192:11–193:1, 194:17–23.
34 Final Hearing Tr. (July 31, 2024) at 341:18–342:2; Dkt. 90-1, Ex. N, A. Dominick Decl. (June 6, 2024) ¶ 5.
35 Final Hearing Tr. (July 31, 2024) at 346:6–12.

conducting advocacy training for criminal justice system-impacted family members, and organizing community events to raise awareness about the conditions within TDCJ units.[36] Most of TPCA's advocacy work focuses on the effects of extreme heat, lack of air conditioning, and inadequate heat mitigation measures in Texas prisons.[37] TPCA's founder and president, Dr. Amite Dominick ("Dr. Dominick"), has also communicated directly with Defendant Collier on behalf of TPCA about extreme heat and the lack of air conditioning in Texas prisons.[38]

TPCA's staff frequently communicates with its incarcerated constituents, and it has approximately 50 volunteer "team members" incarcerated in the TDCJ system whose needs and concerns drive the policy goals of the organization.[39] TPCA communicates with its incarcerated constituents through various means, including by phone, mail, and email.[40] TPCA's Director of Incarcerated Individuals, Brittany Robertson, communicates daily with individuals incarcerated in TDCJ facilities and receives complaints from them about heat in Texas prisons every day.[41] TPCA joined this lawsuit because of the complaints TPCA received from incarcerated volunteers and constituents; and was further driven by the experience of Dr. Dominick's own ex-husband, who has been incarcerated in the TDCJ system since 2015.[42]

4. Coalition of Texans with Disabilities ("CTD")

CTD is a nonprofit corporation whose mission is to ensure that persons with disabilities can work, live, learn, play, and participate fully in the community of their choice.[43] CTD's

---

36 Final Hearing Tr. (July 31, 2024) at 346:22–347:21; Dkt. 90-1, Ex. N, A. Dominick Decl. ¶ 6.
37 Final Hearing Tr. (July 31, 2024) at 347:18–21.
38 *Id.* at 341:6–8.
39 Final Hearing Tr. (July 31, 2024) at 347:22–348:16 (Dr. Dominick); *id.* at 363:12–21 (Robertson); Dkt. 90-1, Ex. N, A. Dominick Decl. ¶ 8; Pls.' Hearing Ex. 147.
40 Final Hearing Tr. (July 31, 2024) at 347:22–348:1; Pls.' Hearing Ex. 146.
41 Final Hearing Tr. (July 31, 2024) at 363:1–364:7.
42 *Id.* at 350:6–17.
43 Dkt. 50-7, Ex. G, C. Bearden Decl. (Apr. 17, 2024) ¶ 3.

constituency includes of all persons with a disability in Texas, including those incarcerated in Texas prisons.[44] Since an estimated 40% of TDCJ inmates have a disability, roughly 52,000 of the 130,000 people incarcerated in Texas prisons are CTD constituents, including every person with a disability incarcerated in every TDCJ facility that lacks air conditioning.[45] CTD joined this lawsuit in its representative capacity on behalf of and to vindicate the rights of TDCJ inmates with disabilities who are being housed in poor conditions and directly harmed by extreme heat.[46] Several courts have held that CTD has associational standing to represent Texans with disabilities.[47]

**B. Plaintiff Bernhard Tiede, II Faces a Substantial Risk of Serious Harm if He is Moved to an Unair-conditioned Cell.**

Tiede is a TDCJ inmate who has been directly affected by Collier's failure to protect inmates from extreme heat. He is 65 years old and has multiple medical conditions that make him especially vulnerable to heat-related illness and death—including diabetes, hypertension, cardiovascular disease, and chronic obstructive pulmonary disease.[48] Despite his age and multiple medical conditions that make him particularly vulnerable to heat, TDCJ housed Tiede in an unair-conditioned cell that regularly reached temperatures above 100° during the summer of 2023.[49] In June 2023, Tiede had a "transient ischemic attack"—a small stroke—from heat exposure that

---

[44] *Id.* ¶ 5.
[45] *Id.*
[46] *Id.* ¶ 7.
[47] *See, e.g., Steward v. Abbott*, 189 F. Supp. 3d 620, 631-32 (W.D. Tex. 2016) (Garcia, J.) (CTD had associational standing to bring suit against State of Texas on behalf of Medicaid beneficiaries with intellectual disabilities); *Richardson v. Tex. Sec'y of State*, No. SA-19-cv-000963-OLG, 2019 WL 10945422, *6 (W.D. Tex. Dec. 23, 2019) (Garcia, J.) (CTD had associational standing to bring claim on behalf of disabled Texas voters); *see also Coalition of Texans with Disabilities v. Smith*, No. 03-99-00064-CV, 1999 WL 816734 (Tex. App.—Austin Oct. 14, 1999) (CTD had associational standing to assert claim on behalf of Texans with mobility impairments prevented from accessing religious buildings).
[48] Dkt. 50-4, Ex. D, Cross 3d Decl. ¶ 7; Final Hearing Tr. (July 30, 2024) at 120:14–121:13; Pls.' Exs. 210, 239.
[49] Dkt. 30-24, Tiede Decl. ¶¶ 3–6; Dkt. 50-4, Ex. D, Cross 3d Decl. ¶¶ 5–7, 18.

resulted in permanent injuries.[50] At the time, he was living in unair-conditioned housing, and (as he testified) it was "really, really hot outside."[51] Yet, after Tiede returned from receiving treatment in the hospital for the transient ischemic attack, TDCJ placed him back in the same unair-conditioned cell, presenting "a severe risk to his life and well-being."[52] Confronted with that risk, Tiede filed suit against TDCJ; TDCJ moved Tiede to an air-conditioned cell after this Court entered a temporary restraining order compelling TDCJ to do so.[53] In April 2024, Tiede was diagnosed with an "[a]cute or subacute infarct of the left thalamus"—i.e., a stroke.[54]

Plaintiffs' medical expert in toxicology, emergency room medicine, and heat medicine, Dr. Susi Vassallo ("Dr. Vassallo") testified, based on credible, published medical studies, that individuals who are 65 and older, and those with diabetes, pulmonary disease, or cardiovascular disease, are especially vulnerable to heat.[55] Dr. Vassallo opined that Tiede is thus particularly vulnerable to heat.[56] In her opinion, placing Tiede in unair-conditioned housing would put him at substantial risk of death or serious harm.[57] Tiede, likewise, testified that his health improves when he is in air conditioning, and that his health declines when he is in extreme heat.[58]

TDCJ and its officials testified that Tiede has been appropriately housed at all times during his custody under TDCJ policy.[59] Despite his various heat-sensitive co-morbidities, TDCJ's "heath

---

50 Dkt. 30-24, Tiede Decl. ¶ 9; Dkt. 50-4, Ex. D, Cross 3d Decl. ¶¶ 7, 12–15; Final Hearing Tr. (July 30, 2024) at 95:22–96:11, 121:20–22.
51 Final Hearing Tr. (July 30, 2024) at 103:18–25.
52 Dkt. 30-24, Tiede Decl. ¶¶ 11–16; Dkt. 50-4, Ex. D, Cross 3d Decl. ¶¶ 7, 12–15.
53 Order, Dkt. 17; Dkt. 30-24, Tiede Decl. ¶ 17.
54 Pls.' Hearing Ex. 210 at 1832.
55 Final Hearing Tr. (July 31, 2024) at 17:25–20:21, 28:5–31:13, 34:7–17; Pls.' Hearing Exs. 6, 13, 15.
56 Final Hearing Tr. (July 31, 2024) at 47:16–49:10; Pls.' Hearing Ex. 13; Pls.' Hearing Ex. 6.
57 Final Hearing Tr. (July 31, 2024) at 49:19–24.
58 Final Hearing Tr. (July 30, 2024) at 128:21–129:1.
59 Final Hearing Tr. (Aug. 1, 2024) at 200:25–201:14; Dkt. 155, TDCJ 30(b)(6) Dep. at 195:20–196:2; 201:5–19.

score algorithm" did not assign Tiede a heat score qualifying him for air-conditioned housing. Thus, under TDCJ's current policy, Tiede's medical conditions did not and still do not require that he be placed in an air-conditioned cell.[60] TDCJ agrees that Tiede may be moved into unair-conditioned housing because he does not have a heat score.[61] On the last day of the preliminary injunction hearing, Collier could not commit to keeping Tiede in an air-conditioned cell for the duration of his sentence.[62] Thus, without a court order, Tiede is at risk of being moved to an unair-conditioned cell at any time.[63]

**C. Temperatures Inside TDCJ's Prisons are Dangerously High Each Summer.**

At the outset, the Court notes that the definition of "summer" is more expansive in Texas and other southern states than it is in more temperate parts of the nation. The Court agrees with TDCJ's definition of summer as running from April 15 through the end of October for purposes of this analysis.[64] Accordingly, the Court refers to these months when it refers to "summer."

1. The health risks of extreme heat are well-established.

According to the National Weather Service ("NWS"), heat "is one of the leading weather-related killers in the United States, resulting in hundreds of fatalities each year."[65] The NWS has

---

[60] Final Hearing Tr. (Aug. 1, 2024) at 200:25–201:14; Dkt. 155, TDCJ 30(b)(6) Dep. at 198:16–24.

[61] Dkt. 155, TDCJ 30(b)(6) Dep. at 205:7–206:7.

[62] Final Hearing Tr. (Aug. 2, 2024) at 252:24–254:9.

[63] Tiede also confirmed that he filed grievances on October 10, 2023, October 22 or 23, 2023, October 31, 2023, and November 15, 2023. (*See* Final Hearing Tr. (July 30, 2024) at 142:1–13.)

[64] Final Hearing Tr. (Aug. 1, 2024) at 14:12–18; *id.* at 16:14–16; *id.* at 26:6–11.

[65] "Heat Safety Tips and Resources," National Weather Service, *available at* https://www.weather.gov/safety/heat. Under Rule 201 of the Federal Rules of Evidence, that Court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201. The Court finds that extreme heat's status as one of the leading weather-related killers in the United States is such a fact, and that the NWS is a source whose accuracy cannot reasonably be questioned.

published a chart that illustrates how exposure to high heat indexes—a function of temperature and humidity—increases the risk of heat-related illnesses[66]:




TDCJ's heat policy references and relies on the heat index.[67] The NWS correlates heat index ranges to risk levels for the general population:

- Caution (light yellow; heat index 80–90º): "Fatigue possible with prolonged exposure and/or physical activity."
- Extreme Caution (mustard yellow; heat index 91–104º): "Sunstroke, muscle cramps, and/or heat exhaustion possible with prolonged exposure and/or physical activity."
- Danger (orange; heat index 105–125º): "Sunstroke, muscle cramps, and/or heat exhaustion likely. Heatstroke possible with prolonged exposure and/or physical activity."
- Extreme Danger (red; heat index >126º): "Heat stroke likely."

Expert testimony and scientific studies presented at the hearing confirm that high temperatures pose a substantial risk of serious harm to anyone, even young, healthy individuals. Dr. Vassallo credibly testified that a heat index of 88º or higher poses a substantial risk of adverse health outcomes in all inmates—even those who are young and healthy.[68] Those risks include heat exhaustion, heat rash,

[66] Final Hearing Tr. (July 31, 2024) at 21:6–23:17; Pls.' Hearing Ex. 24.
[67] Final Hearing Tr. (Aug. 1, 2024) at 262:1–14; Final Hearing Tr. (Aug. 2, 2024) at 172:7–14.
[68] Final Hearing Tr. (July 31, 2024) at 23:2–38:23; Pls.' Hearing Exs. 10, 15, 23, 42, 54, 70.

dehydration, heat cramps, heat syncope, and heat stroke—the last of which carries a "high mortality rate" and can have lasting negative health consequences.[69] Plaintiffs' epidemiology expert, Dr. Julie Skarha ("Dr. Skarha"), confirmed that heat can cause a number of negative health outcomes beyond heat stroke and heat exhaustion, including heart attacks, asthma attacks, kidney failure, and an increase in risk of suicide.[70] Dr. Antonella Zanobetti ("Dr. Zanobetti"), Plaintiffs' environmental epidemiology expert, likewise opined that higher temperatures increase the risks of hospitalization, illness, and mortality.[71] And Collier's own expert in internal medicine, Dr. Jane Leonardson ("Dr. Leonardson"), agreed that people who are exposed to severe environmental heat in the range of 90–105° are at serious risk of illness and death.[72]

Plaintiffs' expert in forensic psychiatry, Dr. Jhilam Biswas ("Dr. Biswas"), testified that high heat exacerbates mental illness; when exposed to high heat, people with mental health disorders exhibit higher rates of suicidality, agitation, and impulsivity, and a slowing of cognitive processing.[73] Heat affects sleep, and people with mental illness have more trouble controlling their conditions if they cannot sleep.[74] Extreme heat can exacerbate mental health episodes requiring hospitalization.[75] And in high heat, suicidality increases "by a significant amount" among inmates.[76]

Further, people with mental illnesses are particularly vulnerable to high heat. Conservative estimates from the  federal Substance Abuse and Mental Health Services

---

69 Final Hearing Tr. (July 31, 2024) at 15:15–17:20, 32:20–37:23; Pls.' Hearing Exs. 15, 275.
70 Final Hearing Tr. (July 30, 2024) at 150:23–151:8.
71 *Id.* at 75:13–23, 79:1–9; Pls.' Hearing Exs. 46, 73, 75.
72 Final Hearing Tr. (Aug. 1, 2024) at 143:12–16.
73 Final Hearing Tr. (July 31, 2024) at 167:24–170:20, 177:17–179:9; Pls.' Hearing Exs. 11, 35, 76, 103.
74 Final Hearing Tr. (July 31, 2024) at 177:11–178:7.
75 Final Hearing Tr. (July 31, 2024) at 180:15–181:15; Pls.' Hearing Ex. 33.
76 Final Hearing Tr. (July 31, 2024) at 178:8–14, 182:6–183:19; Pls.' Hearing Ex. 91.

Administration indicate that 37%—i.e., more than one in three—inmates have a diagnosable mental illness at any given time.[77] When housed in extreme heat, inmates with mental illness are "more likely to die or experience worse morbidity than individuals without mental illness."[78] For example, Dr. Biswas explained that one study showed that people with schizophrenia had a 200% higher risk of death when exposed to extreme heat.[79] People with substance abuse disorders and individuals taking psychotropic medications are also particularly vulnerable to health risks from high heat.[80] Dr. Biswas thus credibly concluded that "exposure to periods of extreme heat cause[s] a substantial risk of serious harm" to TDCJ inmates by increasing the incidence of and exacerbating existing mental health conditions.[81]

2. Texas prisons are hot and getting hotter.

Dr. Linda Mearns ("Dr. Mearns"), a climatologist and researcher at the National Center for Atmospheric Research, has opined via declaration that "increasing temperatures, increasing extreme temperatures, and more frequent heat waves" are among the most certain predictions for future climate trends, including those in Texas.[82] "This most likely will result in an increasing heat index, and [an increased] number of hours per day with extreme heat index values."[83] In other words, "[t]he trend of summer temperatures throughout Texas is certainly towards warmer temperatures [and] increasing heat index."[84] In particular, Texas "is expected to increase in mean annual temperature between 4.5° and 8.5° by the end of the 21st century."[85]

---

77 Final Hearing Tr. (July 31, 2024) at 168:10–23.
78 *Id.* at 177:1–16; Pls.' Hearing Ex. 103 at 13.
79 Final Hearing Tr. (July 31, 2024) at 170:15–20.
80 *Id.* at 181:2–15, 187:9–191:18; Pls.' Hearing Exs 43, 44, 50.
81 Final Hearing Tr. (July 31, 2024) at 185:13–20.
82 Dkt. 50-5, Ex. E, L. Mearns Decl. ¶ 23.
83 *Id.* ¶¶ 12–14, 23.
84 *Id.* ¶ 18.
85 *Id.* ¶ 19.

TDCJ did not provide testimony at the hearing to dispute Dr. Mearns's declaration, and the Court finds Dr. Mearns's opinions to be credible. In addition, TDCJ itself recognizes that its prisons are hot in the summers. TDCJ's Rule 30(b)(6) deponent, David Sweetin ("Sweetin"), agrees that temperatures in every prison in Texas are likely to exceed 85º each summer.[86] Collier also believes that summers are hot in Texas, they have been hot for years, they are likely to continue to be hot, and that it is hot inside Texas prisons without air conditioning.[87] Collier agrees that it "certainly" makes sense to him that the heat index could reach 113º in Texas in August.[88] And, in fact, TDCJ itself reported to the Texas Legislature that the temperatures inside its prisons exceeded 85º on the overwhelming majority of days from May 1, 2023 to September 30, 2023.[89] This testimony is also consistent with TDCJ's own prison temperature logs, which have documented heat indexes outside of its prisons as high as 134º:[90]

[86] Dkt. 155, TDCJ 30(b)(6) Dep. at 214:1–4; 222:17–21.
[87] Final Hearing Tr. (Aug. 2, 2024) at 204:24–205:18.
[88] *Id.* at 217:12–14.
[89] Pls.' Hearing Ex. 102 at 11–20.
[90] Def.'s Hearing Ex. 76 (highlight added).

TEXAS DEPARTMENT OF CRIMINAL JUSTICE
Temperature Log
Unit: Stiles

| Date: 7/10/2022 | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|
| 12:30 a.m. | 84° | 85% | 95° | Hardy |
| 1:30 a.m. | 81° | 90% | 88° | Hardy |
| 2:30 a.m. | 81° | 90% | 88° | Hardy |
| 3:30 a.m. | 81° | 90% | 88° | Hardy |
| 4:30 a.m. | 80° | 91% | 85° | Hardy |
| 5:30 a.m. | 80° | 91% | 85° | Hardy |
| 6:30 a.m. | 80° | 92% | 85° | Hardy |
| 7:30 a.m. | 82° | 90% | 91° | Bordelon |
| 8:30 a.m. | 86° | 86% | 103° | Bordelon |
| 9:30 a.m. | 86° | 89% | 103° | Bordelon |
| 10:30 a.m. | 89° | 76% | 108° | Bordelon |
| 11:30 a.m. | 93° | 73% | 118° | Bordelon |
| 12:30 p.m. | 93° | 70% | 122° | Bordelon |
| 1:30 p.m. | 95° | 66% | 122° | Bordelon |
| 2:30 p.m. | 98° | 66% | 129° | Bordelon |
| 3:30 p.m. | 100° | 68% | 134° | Bordelon |
| 4:30 p.m. | 99° | 64% | 130° | Bordelon |
| 5:30 p.m. | 95° | 76% | 129° | Bordelon |
| 6:30 p.m. | 95° | 76% | 129° | Bordelon |
| 7:30 p.m. | 95° | 76% | 129° | Hardy |
| 8:30 p.m. | 77° | 89% | 78° | Hardy |
| 9:30 p.m. | 78° | 89% | 80° | Hardy |
| 10:30 p.m. | 81° | 89% | 88° | Hardy |
| 11:30 p.m. | 81° | 90% | 88° | Hardy |

* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

Testimony from current TDCJ inmate Tiede and former TDCJ inmates at the hearing further confirmed the existence of these high temperatures. For example, former TDCJ inmate Marci Marie Simmons ("Simmons") testified that, in the summer of 2022, she observed a thermometer in the Dr. Lane Murray Unit, a TDCJ unit for women in Gatesville, that read 136°.[91] Her unit was so hot one day that she and a group of other inmates were able to cook a raw egg on the concrete floor.[92] During his incarceration in the Byrd Unit, a unit for men in Huntsville, former TDCJ inmate Charlie Malouff ("Malouff") observed a digital temperature monitor reading 129° one day, 118° on another, and 114° on another.[93] And scores of TDCJ inmates continue to file

[91] Final Hearing Tr. (July 30, 2024) at 30:2–20.
[92] *Id.* at 28:19–24.
[93] *Id.* at 179:15–23.

grievances about the extreme heat in their unair-conditioned units—last summer alone, inmates filed 450 formal, Step One grievances about heat and heat-related issues.[94] Based on the foregoing, the Court finds that the inmate housing areas in Texas's unair-conditioned prisons are unreasonably dangerous due to the extreme heat during the summer months.

**D. Extreme Heat Poses a Substantial Risk of Serious Harm to TDCJ Inmates.**

1. TDCJ has repeatedly acknowledged the risk that extreme heat poses to TDCJ inmates.

TDCJ has admitted that at least 23 individuals died in TDCJ facilities from heat-related causes between 1998 and 2012, and credible evidence presented at the hearing shows that TDCJ has underestimated this number.[95] Collier admitted he was aware of ten deaths from heat stroke in the summer of 2011 alone.[96] And TDCJ has identified hundreds of other inmates diagnosed with heat-related illnesses since 2011.[97] Collier agrees that heat has caused deaths or contributed to the deaths of TDCJ inmates in the past.[98] Five years ago, Collier testified in Texas federal court that inmates confined in temperatures at or above 95° face a serious health risk.[99]

TDCJ's Rule 30(b)(6) deponent, Sweetin, also testified in his July 2024 deposition that the high temperatures in TDCJ facilities during the summer months place inmates a very real risk of harm and serious injury unless adequate measures are taken to protect them from the excessive heat.[100] He acknowledged that extreme heat poses danger, "has killed inmates, and [has] caused numerous inmates and officers to suffer heat-related illnesses."[101] TDCJ Facilities Director Ron

---

94 Pls.' Hearing Ex. 102 at 4 (reflecting temperature related grievances from May through August).
95 *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *1, *20 (S.D. Tex. July 19, 2017).
96 Final Hearing Tr. (Aug. 2, 2024) at 207:22–208:2.
97 *Cole*, 2017 WL 3049540, at *20.
98 Final Hearing Tr. (Aug. 2, 2024) at 207:9–208:2.
99 Dkt. 50-11, Ex. K-4, *Cole v. Collier*, Sept. 10, 2019 Hearing Tr. at 49:22–25.
100 Dkt. 155, TDCJ 30(b)(6) Dep. at 229:22–230:4; *see also* Final Hearing Tr. (July 31, 2024) at 211:12.
101 Dkt. 155, TDCJ 30(b)(6) Dep. at 131:12–132:8, 161:22–162:5.

Hudson ("Hudson") also agrees that elevated indoor temperatures impact inmates and correctional staff at unair-conditioned facilities.[102]

According to TDCJ's Fiscal Year 2023 report to the Texas Legislature, TDCJ inmates filed 5,202 Step One grievances and 609 Step Two grievances related to the heat in the summer of 2023.[103] TDCJ's Administrative Review and Risk Management Division provides Collier's office a monthly report regarding heat-related grievances filed by TDCJ inmates, and Collier is aware of them.[104] According to Plaintiffs' corrections expert Dean Williams ("Williams"), that volume of grievances further shows extreme heat is a problem that needs to be addressed.[105]

2. Publicly available, peer-reviewed research studies have warned Collier that TDCJ inmates continue to die from extreme heat.

In 2022, Plaintiffs' experts Dr. Zanobetti and Dr. Skarha published an epidemiological study on the association between extreme heat and mortality among inmates in Texas prisons with and without air conditioning.[106] They found an increased risk of mortality in Texas prisons without air conditioning during times of high heat, whereas there was no increase in risk of mortality in Texas prisons with air conditioning during that same period.[107] As compared to days when the heat index is 85°, the risk of dying in a Texas prison without air conditioning increased by 5% when the heat index is 95°, 10% when the heat index is 100°, and 15% when the heat index is 105°.[108] In other words, a one-degree increase above 85° corresponds to a 0.7% increase in the risk of

102 Final Hearing Tr. (Aug. 2, 2024) at 133:18–23; Def.'s Ex. 21.
103 Final Hearing Tr. (Aug. 1, 2024) at 270:14–272:25; Pls.' Hearing Ex. 102 at 4.
104 Final Hearing Tr. (Aug. 1, 2024) at 269:10–270:13.
105 Final Hearing Tr. (July 31, 2024) at 235:17–236:11.
106 Pls.' Hearing Exs. 70 and 75.
107 *Id.*
108 Final Hearing Tr. (July 30, 2024) at 158:18–160:6; Pls.' Hearing Ex. 70 at 5.

mortality.[109]




Dr. Zanobetti and Dr. Skarha concluded there were 271 deaths attributable to extreme heat in Texas prisons without air conditioning from 2001 to 2019—an average of 14 deaths per year.[110] According to Dr. Vassallo, however, this is likely an underestimate, as it does not account for heat's exacerbation of underlying illnesses.[111] The same study concluded that not a single heat-related death occurred in TDCJ's climate-controlled prisons during this period.[112] Based on their research, Dr. Zanobetti and Dr. Skarha expect more TDCJ inmates to die from extreme heat in unair-conditioned cells each summer.[113]

---

[109] Pls.' Hearing Ex. 70 at 5 (explaining that the figure "shows the association between same-day daily maximum heat index above 85 °F and the percentage change in the risk of daily all-cause mortality by AC status").
[110] Final Hearing Tr. (July 30, 2024) at 90:22–91:4 (Dr. Zanobetti); *id.* at 160:7–15 (Dr. Skarha); Pls.' Hearing Ex. 70.
[111] Final Hearing Tr. (July 31, 2024) at 38:3–24.
[112] Pls.' Hearing Ex. 70.
[113] Final Hearing Tr. (July 30, 2024) at 84:21–85:2 (Dr. Zanobetti); *id.* at 163:3–7 (Dr. Skarha).

3. TDCJ admits that multiple TDCJ inmates died from extreme heat in Summer 2023.

After publicly denying that any inmate had died from the extreme heat in Texas prisons since 2011, TDCJ now concedes that there were at least three heat-related custodial deaths in the summer of 2023.[114] Collier admitted "there were three inmate deaths where elevated temperatures were cited in the final autopsies as a possible contributing factor"[115] and reported the following three deaths to the Texas Legislature.[116] Collier also acknowledged that he is briefed on any autopsy that identifies heat as a contributing factor, and that he would "probably" read the autopsy report, as well.[117] The Court briefly recounts the known deaths due to heat during that time period.

a. Elizabeth Hagerty – Died on June 28, 2023

Elizabeth Hagerty was a 37-year-old woman housed in an unair-conditioned cell in the Dr. Lane Murray Unit, a TDCJ unit for women in Gatesville.[118] At 12:10 a.m. on June 30, 2023, after Hagerty failed to respond to an officer conducting the unit count,[119] the officer found Hagerty unresponsive in her cell.[120] Less than forty minutes later, she was pronounced dead.[121] At the time she died, the temperature in her cell was 95.7°.[122] No core body temperature was documented.

Hagerty had a medical history of obesity, hypercholesterolemia, diabetes, asthma, substance abuse, and an unspecified mood disorder.[123] At the time of her death, Hagerty's

---

114 Pls.' Hearing Ex. 102 at 5.
115 Pls.' Hearing Ex. 254, Collier's Resp. to Interr. No. 1.
116 Pls.' Hearing Ex. 102 at 5.
117 Final Hearing Tr. (Aug. 2, 2024) at 211:17–212:2.
118 Pls.' Hearing Ex. 169-A at 2.
119 *Id.*
120 *Id.*
121 *Id.* at 6.
122 *Id.* at 11.
123 Pls.' Hearing Ex. 169-A at 29.

medications included (1) albuterol (a bronchodilator for asthma), (2) atorvastatin (used to treat elevated cholesterol), (3) citalopram (a selective serotonin reuptake inhibitor to treat anxiety and depression), and (4) carbamazepine (used to treat bipolar disorder).[124] A week before she died, Hagerty submitted a sick call complaining about the heat and a heat rash on her entire body.[125] Four days later, she was seen again by medical staff and complained of having abdominal cramps for two days and more than 20 episodes of vomiting.[126] Medical staff advised Hagerty to drink water.[127]

A University of Texas Medical Branch ("UTMB") pathologist performed an autopsy on Hagerty's body five days after her death.[128] Other than a heat rash, the autopsy revealed no significant anatomical findings but found she had hyponatremia (low sodium).[129] The pathologist determined that this was the result of dehydration from her recent gastrointestinal illness, which was likely caused by COVID-19.[130] According to the autopsy report, hyponatremia caused Hagerty's death, although elevated environmental temperatures were noted as a potential contributory factor.[131] At the hearing, Collier admitted that he knew in 2023 that Hagerty died after complaining of heat rash, and that UTMB doctors had concluded that heat may have been a contributing factor in her death.[132]

Plaintiffs' experts Dr. Vassallo and Dr. Uribe gave unrebutted testimony that Hagerty's

---

[124] *Id.* at 27.
[125] Pls.' Hearing Ex. 169 at 6.
[126] *Id.*
[127] Pls.' Hearing Ex. 169 at 6; Pls.' Hearing Ex. 169-A at 24.
[128] Pls.' Hearing Ex. 169 at 4.
[129] *Id.* at 11.
[130] *Id.*
[131] *Id.* at 12.
[132] Final Hearing Tr. (Aug. 2, 2024) at 216:5–9.

death was heat-related.[133] Specifically, Dr. Vassallo opined that the heat exacerbated Hagerty's obesity, diabetes, asthma, and COVID-19 symptoms.[134] Dr. Vassallo and Dr. Uribe credibly testified that Hagerty would not have died if she had been housed in an air-conditioned cell.[135]

b. John Castillo – Died on August 6, 2023

John Castillo was a 33-year-old man housed in an unair-conditioned cell in the Alfred D. Hughes Unit, a TDCJ prison for men in Gatesville.[136] At 10:42 p.m. on August 6, 2023, Castillo's roommate notified a corrections officer that Castillo was sitting on the floor leaning against the bottom bunk with his head tilted backward.[137] He was unresponsive but still breathing.[138] The officer entered the cell and attempted to communicate with Castillo, but he remained unresponsive.[139] The officer noted that Castillo's breathing was shallow, and that his body temperature appeared elevated.[140] Castillo was taken to the medical unit, where a nurse reported he was "hot to the touch."[141] His core body temperature was 107.5º.[142] He was pronounced dead at 11:33 p.m.[143]

The ambient temperature inside the Hughes Unit was 94.4º on the day Castillo died.[144] Fans were on in his unit, and he had access to water.[145] In fact, he was seen on TDCJ surveillance footage going to the water cooler 23 times in the 24 hours before his death.[146] He had a medical history of

---

133 Final Hearing Tr. (July 31, 2024) at 61:3-5 (Dr. Vassallo); *id.* at 302:11–13, 303:1–13 (Dr. Uribe).
134 *Id.* at 61:6–8.
135 *Id.* at 61:9–12 (Dr. Vassallo); *id.* at 303:6–9, 309:7–12 (Dr. Uribe).
136 Pls.' Hearing Ex. 161-B at 2.
137 *Id.* at 2–3.
138 *Id.*
139 *Id.* at 2.
140 *Id.* at 2–3.
141 Pls.' Hearing Ex. 161-B at 27.
142 *Id.* at 64; Pls.' Hearing Ex. 161 at 12.
143 Pls.' Hearing Ex. 161-B at 3.
144 Pls.' Hearing Ex. 102 at 17.
145 Pls.' Hearing Ex. 161 at 12.
146 *Id.*

epilepsy and depression.[147] At the time of his death, his medications included (1) oxybutynin (used to treat bladder control disorders), (2) phenytoin (an antiseizure medication), and (3) sertraline (a selective serotonin reuptake inhibitor (an "SSRI")).[148] According to TDCJ's Administrative Incident Review, Castillo was last seen by medical staff a little over a month before he died, on June 23, 2023, for treatment of depression.[149] The provider did not document any recent seizure activity or complaints of seizures.[150]

A UTMB pathologist performed an autopsy on Castillo's body six days after his death.[151] She could not identify an anatomic cause of death.[152] Bleeding in his tongue, aspiration pneumonitis, and the absence of antiseizure medications in post-mortem toxicology tests suggested that Castillo had a seizure around the time of his death.[153] Based on these findings, the pathologist opined that Castillo's cause of death was seizure disorder, "with high environmental temperature as an important contributory factor."[154] The pathologist's report also stated that, while seizures can result in hyperthermia, "it is well-established that hyperthermia can also induce seizures in susceptible individuals."[155] And she concluded that "[t]he degree of hyperthermia seen in this patient is much greater than would be expected in the setting of seizures alone."[156] At the hearing, Collier admitted to having read the report from the autopsy of Castillo, and to knowing in 2023 that UTMB doctors had concluded that heat was an important

---

147 *Id.*
148 *Id.*
149 Pls.' Hearing Ex. 161-B at 35.
150 *Id.*
151 Pls.' Hearing Ex. 161 at 4.
152 *Id.* at 12.
153 *Id.*
154 Pls.' Hearing Ex. 161 at 12.
155 *Id.*
156 *Id.*

contributory factor in Castillo's death.[157]

Dr. Vassallo and Dr. Uribe agreed that Castillo's death was heat-related.[158] And they credibly testified that Castillo would not have died if he had been in an air-conditioned cell.[159]

c. Patrick Womack – Died on August 21, 2023

Patrick Womack was a 50-year-old man housed in restrictive housing in the unair-conditioned H.H. Coffield Unit, a men's prison in Anderson County.[160] On the night of August 20, 2023, Womack asked a correctional officer for a cooldown shower, but the officer said there were not enough staff and did not give him one.[161] Video surveillance on August 21, 2023, shows Womack passing water bottles under his cell door at 9:19 a.m., but he did not respond to a correctional officer's count at 10:07 a.m.[162] At 11:34 a.m., the commissary manager tried to talk to Womack, but he did not respond.[163] The manager said that Womack appeared to be asleep on his stomach.[164] At 1:33 p.m., officers reported that Womack was face-down in his bunk and unresponsive.[165] At 1:44 p.m., officers noted that he remained unresponsive, and his core body temperature was 106.9º.[166] He was pronounced dead nine minutes later.[167] When corrections officers discovered Womack, the ambient outdoor temperature was 104º and the heat index was 113º.[168] TDCJ reported to the Texas Legislature that the indoor temperature at the Coffield Unit

---

[157] Final Hearing Tr. (Aug. 2, 2024) at 213:11–23, 214:15–215:6.
[158] Final Hearing Tr. (July 31, 2024) at 51:19–52:2 (Dr. Vassallo); *id.* at 316:18–21 (Dr. Uribe).
[159] *Id.* at 56:12-15 (Dr. Vassallo); *id.* at 288:11-15, 309:7-12 (Dr. Uribe).
[160] Pls.' Hearing Ex. 200 at 6; Pls.' Hearing Ex. 200-B at 1.
[161] Pls.' Hearing Ex. 200-B at 3, 8, 42.
[162] *Id.* at 3.
[163] Pls.' Hearing Ex. 200-B at 3.
[164] *Id.*
[165] *Id.* at 2.
[166] Pls.' Hearing Ex. 200 at 6.
[167] *Id.*
[168] *Id.*

was 99.1° at 3:00 p.m. on August 20 and 96.6° at 3:00 p.m. on August 21.[169]

Womack had an extensive history of mental illness, including antisocial behavior, impulse control disorder, and major depressive disorder with suicidal ideation.[170] He had made numerous prior suicide attempts, had had over 70 encounters with Crisis Management, and was on TDCJ's mental health caseload.[171] Womack's medications included (1) benztropine (an anticholinergic); (2) haloperidol (an antipsychotic); and (3) sertraline (an SSRI).[172]

A UTMB pathologist performed an autopsy on Womack's body ten days after his death.[173] His body showed evidence of advanced decomposition.[174] Post-mortem toxicology showed that Womack had potentially toxic serum sertraline levels of 2500 ng/ml, which can cause hyperthermia.[175] The UTMB pathologist stated, "Classic heat stroke caused by elevated environmental temperatures can also occur in combination with drug-induced hyperthermia."[176] She then opined that Womack's cause of death was hyperthermia due to sertraline toxicity with environmental heat as a contributory factor.[177]

Dr. Vassallo and Dr. Uribe offered unrebutted testimony at the hearing that Mr. Womack's death was heat-related,[178] and Dr. Vassallo credibly testified that Womack died of a heat stroke.[179] Dr. Vassallo and Dr. Uribe also opined that absent environmental heat stress,

---

169 Pls.' Hearing Ex. 102 at 17.
170 Pls.' Hearing Ex. 200 at 6.
171 *Id.*
172 *Id.*
173 *Id.* at 4.
174 *Id.* at 6.
175 Pls.' Hearing Ex. 200 at 11.
176 *Id.*
177 *Id.*
178 Final Hearing Tr. (July 31, 2024) at 69: 16-25 (Dr. Vassallo); *id.* at 304:11–13, 305:18–21 (Dr. Uribe).
179 *Id.* at 69:16–25.

sertraline toxicity would not have caused a core body temperature of 106.9°.[180] Dr. Vassallo and Dr. Uribe testified that Womack would not have died if he had been in an air-conditioned cell.[181]

4. At least two more TDCJ inmates died from the heat in summer 2023.

Dr. Vassallo and Dr. Uribe also credibly testified that at least two other TDCJ inmates died from heat-related causes in Summer 2023:

a. John Southards – Died on June 28, 2023

John Southards was a 36-year-old man housed in restrictive housing in an unair-conditioned cell in the Estelle Unit in Huntsville.[182] During security rounds on June 28, 2023, an officer found him laying down in his cell and having trouble breathing.[183] The officer called for assistance at 11:06 p.m.[184] Southards was moved to the infirmary, where resuscitation efforts continued. At the time, staff described him as diaphoretic (sweating heavily) and hot to the touch.[185] Southards was pronounced dead at 11:58 p.m.[186] The UTMB pathologist who performed the autopsy on Southards asked TDCJ for his core body temperature near the time of his death, but none was recorded.[187] The ambient temperature in his cell was 85.7° with a heat index of 96.2° at 3:00 a.m.[188]

Southards had a significant psychiatric history, including depression, anxiety, psychosis,

---

180 *Id.* at 304:16–305:14 (Dr. Uribe testifying that sertraline cannot increase the body temperature to 106.9 degrees); *see id.* at 67:8–69:15 (Dr. Vassallo explaining that a sertraline level of 2500 ng/ml would not necessarily have caused death and not have caused core body temperature to increase to 106.9 degrees).
181 *Id.* at 70:4–7 (Dr. Vassallo); *id.* at 305:15–17, 309:7-12, 332:2–5 (Dr. Uribe).
182 Pls.' Hearing Ex. 192-B at 2.
183 Pls.' Hearing Ex. 192-B at 2.
184 *Id.*
185 Pls.' Hearing Ex. 192-A at 83.
186 *Id.*
187 *Id.* at 19, 83, 88.
188 *Id.* at 88.

and suicidal ideation with multiple suicide attempts.[189] His medical history was only significant for intermittent asthma and gastroesophageal reflux. His medications included (1) haloperidol (an antipsychotic), (2) oxybutynin (used for bladder dysfunction), (3) venlafaxine (an SSRI), and (4) Benadryl (an antihistamine and anticholinergic).[190]

A UTMB pathologist performed an autopsy on Southards's body six days after his death.[191] The findings included heat rash on his upper extremities.[192] Although additional anatomical findings were described, none were considered a contributing factor in Southards's death.[193] The pathologist concluded that diphenhydramine (Benadryl) toxicity caused Southards's death but stated "there is insufficient evidence to support heat-related stress as a contributory cause of death, given the lack of core body temperature data. However, the possibility cannot be excluded."[194] She also noted that there was "no documented information to suggest suicidal intent."[195] On December 8, 2023, TDCJ investigators determined that Southards had died by suicide and closed their investigation.[196]

Dr. Vassallo and Dr. Uribe opined that heat stroke caused Southards's death.[197] Both medical experts testified that Southards could not have died from diphenhydramine toxicity (i.e., a Benadryl overdose), because he was sweating when he was found, and Benadryl inhibits sweating.[198] Dr. Vassallo and Dr. Uribe further concluded that the amount of Benadryl in

---

189 *Id.*
190 *Id.* at 68, 83.
191 *Id.* at 81.
192 *Id.* at 88.
193 *Id.*
194 Pls.' Hearing Ex. 192-A at 88.
195 *Id.*
196 *Id.* at 41.
197 Final Hearing Tr. (July 31, 2024) at 61:18–64:22 (Dr. Vassallo); *id.* at 296:19–21 (Dr. Uribe).
198 *Id.* at 63:15-22 (Dr. Vassallo); *id.* at 297:1–13 (Dr. Uribe).

Southards's system was not lethal.[199] Lastly, Dr. Vassallo and Dr. Uribe both credibly testified that Southards would not have died if he had been in an air-conditioned cell.[200]

b. Armando Gonzales – Died on August 23, 2023

Armando Gonzales was a 42-year-old transgender woman housed in the Alfred D. Hughes Unit, a prison in Gatesville.[201] At 10:00 p.m. on August 21, 2023, Gonzales was found unresponsive but breathing in her cell. After the incident command system was activated, medical staff found Gonzales lying on her left side in a pool of vomit.[202] The autopsy noted that the "air conditioning was out in the unit," and that the ambient temperature in Gonzales's cell at the time she was found was between 97º and 100º.[203] She was taken to the onsite emergency room, where her rectal temperature was documented as 109.4º on repeated measurements.[204] Despite multiple attempts over a 48-hour period, medical providers could not resuscitate her, and she was pronounced dead at 5:32 a.m. on August 23, 2023.[205]

Gonzales had been diagnosed with Hepatitis C and manic depressive disorder with psychosis; she also had a history of substance abuse.[206] She had cirrhosis of the liver,[207] and her medications included: (1) aripiprazole (used to treat bipolar disorder); (2) citalopram (an SSRI); (3) spironolactone (a diuretic to treat fluid retention); (4) estradiol (a hormone); and (5) bupropion (used to treat depression).[208]

---

199 *Id.* at 64:3-19 (Dr. Vassallo); *id.* at 297:15–17 (Dr. Uribe).
200 *Id.* at 64:23–65:1 (Dr. Vassallo); *id.* at 297:23-298:2, 309:7–12 (Dr. Uribe).
201 Pls.' Hearing Ex. 168-A at 2.
202 *Id.* at 8.
203 Pls.' Hearing Ex. 168 at 6, 11.
204 *Id.* at 6.
205 *Id.*
206 *Id.* at 5–6.
207 *Id.*
208 *Id.* at 6.

A UTMB pathologist performed an autopsy on Gonzales's body 13 days after she died.[209] The anatomic examination revealed a lung hemorrhage and pneumonia, reflecting Gonzales's clinical illness.[210] Post-mortem toxicology was positive for midazolam, a sedative hypnotic drug; and fentanyl, an opioid analgesic.[211] The pathologist noted, however, that "the levels of drug may be altered by the long post mortem interval and severe degree of autolysis of tissues seen in this patient."[212] He nevertheless opined that Gonzales's death was caused by multidrug toxicity with opioid overdose and drug-related hyperthermia.[213] Collier received this autopsy report as well.[214]

Dr. Vassallo disagreed with the UTMB pathologist's analysis.[215] She explained that multiple medications (including opioids) are used in the intensive care unit to sedate patients who have suffered medical incidents like heat stroke, which could explain the postmortem toxicology results.[216] Most importantly, it is "unquestionable" that opioids like fentanyl do not cause hyperthermia.[217] Instead, they cause *hypo*thermia—i.e., *decreased* body temperature.[218] Thus, in Dr. Vassallo's credible expert opinion, fentanyl could not have caused Gonzales's hyperthermia; rather, severe environmental heat stroke caused her death.[219] Dr. Uribe agreed that Gonzales's death was heat-related.[220] Dr. Vassallo and Dr. Uribe both credibly testified that Gonzales would

---

209 *Id.* at 4.
210 *Id.*
211 Pls.' Hearing Ex. 168 at 11.
212 *Id.*
213 Pls.' Hearing Ex. 168 at 11.
214 *Id.* at 15.
215 Final Hearing Tr. (July 31, 2024) at 54:15–56:5.
216 *Id.*
217 *Id.* at 54:22–55:13.
218 *Id.* at 54:22–55:3, 55:21–24.
219 *Id.* at 56:3–5.
220 *Id.* at 291:10–292:6.

not have died if she had been in an air-conditioned cell.[221]

Plaintiffs' corrections expert Williams testified that core body temperatures of 106° or 107° would be "cause for alarm across the [state government], . . . not just in the corrections system."[222] If he saw even "one death where [he] knew the core body temperature was in the range of 106 degrees, 107 degrees, . . . [he] would pull the fire alarm for [the] department."[223] As set forth in more detail below, Collier did not do so upon receiving Gonzales's autopsy report.

5. Evidence of two other possibly heat-related inmate deaths was also presented during the preliminary injunction hearing.

Two other inmate deaths were discussed during the hearing—both of which were possibly heat-related.

a. Corey Smith – Died on July 28, 2022

Corey Smith was a 50-year-old transgender woman housed in cell 4-E-2 in the Alfred D. Hughes Unit.[224] During a count on July 28, 2022, at approximately 2:00 a.m., a correctional officer found Smith prostrate on the floor of her cell and in acute medical distress.[225] At that time, her core body temperature was measured at 107.6°.[226] Smith was pronounced dead less than an hour later.[227] Smith's medical history included high cholesterol, asthma, substance abuse, and gender dysphoria disorder.[228] Her medications included (1) Benadryl; (2) estradiol (a hormone); and (3) spironolactone (used to treat high blood pressure and heart failure).[229]

---

[221] *Id.* at 56:6-11 (Dr. Vassallo); *id.* at 292:7–9, 309:7–12 (Dr. Uribe).
[222] *Id.* at 234:1–5.
[223] Final Hearing Tr. (July 31, 2024) at 233:10–18.
[224] Pls.' Hearing Ex. 277 at 2.
[225] *Id.*
[226] *Id.* at 123.
[227] *Id.*; Pls.' Hearing Ex. 277 at 2.
[228] Pls.' Hearing Ex. 277-A at 123.
[229] *Id.* at 24.

A UTMB pathologist performed an autopsy on Smith's body eight days after her death.[230] The autopsy report states that the cause of death was hyperthermia attributed to sertraline toxicity and serotonin syndrome.[231] Smith's postmortem sertraline level was elevated at 1200 ng/ml.[232] While elevated levels of sertraline can increase core body temperature, Dr. Vassallo and Dr. Uribe both testified that a postmortem sertraline level of over twice Smith's level would not have caused someone's core body temperature to rise to 106º.[233] TDCJ's Director of Classification Timothy Fitzpatrick, testified that Hughes 4-E-2 is not air-conditioned.[234] And, according to the temperature logs that TDCJ provided to the Texas Legislature, the indoor temperature at the Hughes unit was 93.6º on the day Smith died in her unair-conditioned cell.[235]

b. Jason Wilson – Died on July 5, 2024

In the weeks before his death, TDCJ inmate Jason Wilson sent TPCA Director Brittany Robertson several emails indicating that there were not enough corrections staff to pass out water, and that the temperatures in his unit were extremely high.[236] Wilson had been a TPCA team member for a year before he died.[237] When Robertson called Wilson's unit to check on him on July 7, 2024, a TDCJ employee told Robertson that Wilson was doing okay, even though he had, in fact, died two days earlier.[238] During the hearing, Collier agreed that TDCJ handled Wilson's

---

230 *Id.* at 126.
231 *Id.* at 123, 126, 133–34.
232 Pls.' Hearing Ex. 277-A at 133.
233 Final Hearing Tr. (July 31, 2024) at 304:16-305:14, 331:10–16 (Dr. Uribe testifying that sertraline cannot increase the body temperature to 106.9º when he discussed Womack's death); *see id.* at 67:1–69:15 (Dr. Vassallo explaining that a sertraline level of 2500 ng/ml would not necessarily have caused death and would not have caused a core body temperature to increase to 106.9º when she discussed Womack's death).
234 Final Hearing Tr. (July 31, 2024) at 218:14–16.
235 Def.'s Hearing Ex. 70 at 2 (noting that the temperatures are taken indoors), 27 (noting the temperature).
236 Final Hearing Tr. (July 31, 2024) at 366:14–370:11, 374:3–375:1; Pls.' Hearing Exs. 137, 264, 152.
237 Final Hearing Tr. (July 31, 2024) at 365:3–12.
238 *Id.* at 372:10–16, 374:3–5; Pls.' Exs. 137, 264, 152.

wellness check in an unprofessional manner, and Collier said he had reached out to his staff to investigate it.[239] Collier also agreed that Wilson's messages to Robertson about not having access to cold water are very concerning.[240] After Wilson's death, another inmate wrote to Robertson that "no officer came and checked on the pod that we were house[d] all night on July 4 til the next morning when they found Jason dead."[241]

6. Heat-related deaths are being undercounted and underreported because of TDCJ's practices.

Based on the available evidence, there is no dispute that high heat has caused or contributed to the deaths of a number of TDCJ inmates in unair-conditioned units, including last summer. In addition, three TDCJ practices have likely led to heat-related deaths of TDCJ inmates being undercounted and unreported.

First, TDCJ does not consistently take the core body temperatures of deceased inmates found in high ambient temperatures, and it has no policy requiring temperatures be taken in those circumstances.[242] According to the medical literature, "[a] rectal temperature should be obtained in *all* patients suspected of heat stroke."[243] According to Dr. Vassallo, a core body temperature is "absolutely fundamental" to determining whether a death is heat-related,[244] and failing to take a core body temperature violates the commonly accepted medical standard of care.[245] In fact, taking a core body temperature is so "fundamental to being a doctor" that the entire point of one oral board examination question is for the examinee to recognize that the temperature is missing

239 Final Hearing Tr. (Aug. 2, 2024) at 238:10–239:8.
240 *Id.* at 241:19–242:2.
241 Pls.' Hearing Ex. 264 at 8.
242 Dkt. 155, TDCJ 30(b)(6) Dep. at 245:17–246:4.
243 Pls.' Hearing Ex. 275 at 5 (emphasis added).
244 Final Hearing Tr. (July 31, 2024) at 52:8–10.
245 *Id.* at 57:21–58:6.

from the data presented.[246]

Dr. Uribe agreed that taking a core body temperature is "essential," because it is a "quick way to establish one or more things that are possibly going wrong" with the body—especially in a "particularly hot or cold environment."[247] He testified that the "documentation of the core body temperature is critically important from a post mortem perspective."[248] "[T]he core body temperature [triggers] the diagnosis of hyperthermia," and the pathologist then has to figure out "why does this person have such an elevated temperature"—for instance, was it "because they were exposed to heat for a prolonged period of time," or "were they . . . on certain drugs or medications?"[249] Dr. Uribe opined that routinely failing to take core body temperatures could lead to heat being underreported as a contributing cause of inmate deaths.[250]

Correctional leaders understand the importance of taking core body temperatures. Plaintiffs' correctional expert, Williams confirmed that a proper death investigation should include measuring the ambient temperature of the cell or the living area where the individual died, the heat index, and the individual's core body temperature.[251] A high core body temperature is "not just a clue," but "strong evidence that people are dying of heat stroke."[252]

Second, TDCJ only considers a death "heat-related" if the autopsy report lists hyperthermia as the sole cause of death.[253] In other words, heat must be the "sole causal factor" of the inmate's

[246] *Id.*
[247] *Id.* at 298:23–299:23.
[248] *Id.* at 299:24–300:18.
[249] *Id.* at 300:3–13.
[250] *Id.* at 300:19–24.
[251] Final Hearing Tr. (July 31, 2024) at 246:7–23, 251:20–24.
[252] *Id.* at 251:2–19.
[253] Dkt. 155, TDCJ 30(b)(6) Dep. at 244:25–245:12.

death for TDCJ to consider it "heat-related."[254] But, according to Dr. Vassallo, there is no medical distinction between identifying heat as a "contributing factor" or a "heat-related death."[255] Dr. Vassallo testified that, "if a death is found to have heat as a contributing cause, [she] as a medical professional [would] consider that to be a heat-related death."[256] Dr. Vassallo concluded that, if you "only considered deaths in which heat was found to be the sole cause and did not consider [deaths] where heat was found to be a contributing factor," you would undercount heat-related deaths.[257] Dr. Uribe agreed that heat-related deaths would be undercounted if TDCJ took the position that a death is not heat-related unless heat is the sole, direct cause of death.[258]

Third, Dr. Uribe also testified that the standard of care for pathologists requires that an autopsy be performed within 48 hours (two days) of an individual's death.[259] The autopsies for the deaths listed above were all performed outside of this window: (i) Elizabeth Hagerty (5 days); (ii) John Castillo (6 days); (iii) Patrick Womack (10 days); (iv) John Southards (6 days); (v) Armando Gonzales (13 days); and (vi) Corey Smith (8 days).[260] Dr. Uribe explained that the timeliness of an autopsy is important because decomposition (autolysis) affects the accuracy of the results, particularly toxicology and laboratory values.[261] Dr. Uribe further opined that a systemic pattern of delayed autopsies would likely result in TDCJ underreporting heat as a cause of death.[262]

---

254 *Id.*
255 Final Hearing Tr. (July 31, 2024) at 71:21–72:19.
256 *Id.* at 72:2–5.
257 *Id.* at 72:6–16.
258 *Id.* at 308:25–309:6.
259 *Id.* at 292:14–293:1.
260 *See* Sections IV.C.–IV.E., *supra*.
261 Final Hearing Tr. (July 31, 2024) at 294:5–295:9.
262 *Id.* at 295:10–19.

7. TDCJ is likely undercounting inmates' heat-related injuries.

In addition to heat-related deaths, Collier knows that TDCJ inmates also continue to develop heat-related injuries. In his interrogatory responses, Collier identified more than a dozen inmates diagnosed with heat exhaustion, heat stroke, or hyperthermia between May 5, 2023, and September 17, 2023.[263] Collier, likewise, reported to the Texas Legislature that 17 TDCJ inmates developed heat-related illnesses in 2023 alone[264]:

| Inmate Heat-Related Illnesses | FY 2023 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Total |
| Heat Cramps | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Heat related Illness, Exhaustion, Dehydration | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 4 | 2 | 8 | 17 |
| Heat Stroke | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **0** | **1** | **0** | **0** | **0** | **0** | **1** | **0** | **1** | **4** | **2** | **8** | **17** |

This number is likely an undercount, since at least one report from UTMB identified 35 TDCJ inmates with heat-related illnesses in a single month (June 2023).[265] Collier acknowledged that he was aware of UTMB's June 2023 heat-related illness report but claimed that the data UTMB reported to TDCJ contained "significant inaccuracies" based on differences in how UTMB and TDCJ categorize heat-related illnesses.[266]

Former TDCJ inmates' firsthand accounts further illustrate the catastrophic consequences of extreme heat. For example, Simmons testified that the summer heat affected her physical and mental health during her ten-year incarceration in unair-conditioned units from 2012 to 2022. She testified that she lost her appetite, could not sleep, and became weaker and more lethargic because of the heat.[267] She saw several other inmates become lethargic, pass out, and

263 Pls.' Hearing Ex. 206, Collier's Response to Plaintiffs' Interr. 8.
264 Pls.' Hearing Ex. 102.
265 Pls.' Hearing Exs. 84 & 85.
266 Final Hearing Tr. (Aug. 2, 2024) at 225:10–228:3.
267 Final Hearing Tr. (July 30, 2024) at 28:25–29:6

suffer heat-induced seizures.[268] She also saw "lots of women that [she] was housed with" require medical attention and be taken away in ambulances "very frequently" during the summer.[269]

According to Simmons, she and her fellow inmates tried to reduce the effects of the heat by dousing themselves in water from the toilets in their cells.[270] Simmons did this "[m]ore times than [she could] count."[271] Other women in Simmons's unit would even "inflict harm" on themselves and "make it look like a suicide attempt" to "get into the air conditioned crisis management center" and "get a break from the heat."[272]

Malouff was also housed in unair-conditioned TDCJ units over multiple summers. He testified that the heat was "horrible"—you felt "dehydrated," and it "literally sucks the oxygen right out of you."[273] He witnessed two inmates go from "sweating profusely" to "no sweat" to "discoloration" to "kind of [] queasiness" to passing out before finally receiving medical attention.[274] To Malouff, it looked like "they were having a heat stroke."[275] Malouff also said that inmates in administrative segregation would "fairly regularly" start fires in their unit, so that the corrections officers would respond by flooding the unit with water and the inmates could lay down on the ground in the pools of water.[276] These accounts suggest there are likely more heat-related injuries than are reported.

8. TDCJ Staff Continue to Suffer Heat-Related Injuries.

In addition to TDCJ inmates, TDCJ staff also suffer from a substantial risk of serious

[268] *Id.* at 33:14–34:9.
[269] *Id.* at 34:10–17.
[270] *Id.* at 31:3–24, 35:15–36:8.
[271] *Id.* at 31:17–24.
[272] *Id.* at 35:17–36:8.
[273] *Id.* at 179:24–180:2.
[274] *Id.* at 181:23–182:9.
[275] *Id.* at 182:7–8.
[276] Final Hearing Tr. (July 30, 2024) at 180:3–19, 182:24–183:2.

harm from the extreme heat in TDCJ facilities. TDCJ's own training documents confirm that heat-related illness is the fifth-leading cause of serious injuries among TDCJ employees.[277] One document specifically recognizes that "[n]o one is immune from suffering a heat-related illness, from the fittest employee to those who may be prone to medical conditions."[278] It warns that "[i]ncreased body temperatures, if left uncontrolled, may lead to delirium, convulsions, seizures, and possibly even death."[279] And the document suggests treating the person by moving them "out of direct sunlight [and] into an air conditioned environment, if possible."[280]

In 2022 and 2023, TDCJ staff filed nearly 80 workers' compensation claims related to the heat.[281] These are some of the employee statements[282]:

- "Overheated, got dizzy, fell down and could not move or respond."
- "I was sitting in my office and started to feel unwell and overheated. I felt liek [*sic*] I could not breath [*sic*]."
- "I was counting the wings at Beto when I became over heated. Reported to Capt. Kimberly Henslee. She then sent me to the chapel where I began to throw up, then Capt. Henslee sent me home."
- "Driving home from work (Torres Unit/Food Service) after being exposed to excessive heat in the food service dept. Had a stroke on the way home."
- "Heat from unit really got to me, extremely overheated causing me to get sick, really dizzy, headache, messing wiht [*sic*] my diabetes."
- "While performing officer duty at the O.M. gate, too much heat."
- "Heat exhaustion, dehydration."
- "Heat exhaustion."
- "It happened because of the heat and I was dehydrated."
- "In C Row top felt light headed, requested water, after drinking three bottles I got dizzy and felt like I was going to pass out, left side of the body went numb."
- "While watching my workers in the bath house, I got overheated, very weak,

---

277 Def.'s Hearing Ex. 13D at 15.

278 *Id.*

279 *Id.*

280 *Id.*

281 Pls.' Hearing Ex. 207, Collier's Resp. to Interr. No. 10.

282 *Id.*

confused and unable to respond. Also, I was dry heaving and felt nauseated, I vomited blood."

- "Was working in high heat when I started to feel dizzy, then later felt chest pain and body aches."

Simmons, likewise, testified that she saw "at least five" corrections officers in her unit pass out in the high heat.[283] Collier acknowledged during the hearing that TDCJ correctional officers continue to develop heat-related illnesses.[284] TDCJ reported 35 instances of heat-related illnesses of TDCJ staff to the Texas Legislature in 2023.[285]

**E. Collier Knows that TDCJ's Heat Mitigation Policies are Inadequate.**

TDCJ circulates a seasonal preparedness directive every year prior to the summer months which discusses TDCJ's heat mitigation measures and Administrative Directive 10.64 ("AD 10.64"), TDCJ's policy regarding excessive and extreme heat temperatures, which provides direction on how to mitigate extreme temperatures during the summer months.[286] TDCJ uses a seasonal preparedness checklist prior to the summer months to ensure the facilities, staff, and inmate population are prepared for extreme heat.[287] The checklists require every unit to respond to 15 checklist items concerning access to heat mitigation measures, whether staff and inmates are trained on heat mitigation and precaution measures, whether equipment is in working condition, and if AD 10.64's requirements are being implemented.[288] TDCJ trains inmates and staff on the effects of heat and how to mitigate these effects.[289] TDCJ also trains individuals in

283 Final Hearing Tr. (July 30, 2024) at 39:16–18.
284 Final Hearing Tr. (Aug. 2, 2024) at 229:4–231:11.
285 Pls.' Hearing Ex. 102.
286 Final Hearing Tr. (Aug. 1, 2024) at 14:3–11; 16:17–17:15; 18:4–20; 19:10–19; Def.'s Hearing Ex. 1; Def.'s Hearing Ex. 53.
287 Final Hearing Tr. (Aug. 1, 2024) at 39:12–40:9; Def.'s Hearing Ex. 9.
288 Def.'s Hearing Ex. 9 at 8–12.
289 Final Hearing Tr. (Aug. 2, 2024) at 167:1–9.

training to become corrections officers ("cadets") in heat preparedness.[290] All TDCJ staff are required to carry a pocket card to help them recognize the signs and symptoms of heat-related illness, and know how to treat and prevent such illness.[291]

TDCJ's heat mitigation policy provides for the provision of respite rooms, cold showers, fans, ice water, and a reusable cup to use to drink from and refill with water.[292] Collier acknowledged that, "despite TDCJ's heat mitigation policies and measures, heat was a factor in at least three [inmates'] death[s] last summer."[293] He admitted that 17 TDCJ inmates suffered heat-related illnesses in summer 2023, despite TDCJ's heat mitigation measures.[294] And he recognized that, despite TDCJ's heat mitigation policies and measures, TDCJ inmates submitted nearly 6,000 heat-related grievances in 2023 alone.[295] TDCJ itself created a "Heat Strike Team" initiative in which groups of TDCJ employees make unannounced visits to individual units to evaluate a unit's compliance with heat-related procedures and heat mitigation protocols by using an audit tool, talking with inmates and staff, visiting all housing and work locations, ensuring the unit has adequate ice and water, looking at respite and how often the inmates get breaks while working, and ensuring all employees are carrying their pocket cards.[296] The Heat Strike Team then drafts a compliance report and can notify TDCJ's executive leadership if it believes a problem is more systematic.[297]

In 2017, Judge Keith Ellison ("Judge Ellison") concluded that "the mitigation measures put

---

290 Final Hearing Tr. (Aug. 1, 2024) at 226:13–229:11.
291 Final Hearing Tr. (Aug. 1, 2024) at 42:19–43:7; 229:12–23; Def.'s Hearing Ex. 12.
292 Final Hearing Tr. (Aug. 1, 2024) at 317:10–11; 30:4–17; Final Hearing Tr. (Aug. 2, 2024) at 169:5–12.
293 Final Hearing Tr. (Aug. 2, 2024) at 221:8–12.
294 Final Hearing Tr. (Aug. 2, 2024) at 222:4–7, 224:10–14; Pls.' Hearing Ex. 102.
295 Final Hearing Tr. (Aug. 2, 2024) at 221:13–222:3; Pls.' Hearing Ex. 102 at 4.
296 Final Hearing Tr. (Aug. 1, 2024) at 262:1–265:19.
297 *Id.* at 265:22–266:13; 268:25–269:2.

in place by TDCJ are insufficient to combat the substantial risk of serious injury or death faced by the inmates at the [Wallace] Pack Unit during the summer months."[298] Judge Ellison explained that, "[s]ince the 12 heat-related deaths in 2011 and 2012, TDCJ has implemented, and attempted to implement, many of the mitigation measures discussed by the Fifth Circuit in *Ball v. LeBlanc*."[299] In Judge Ellison's view, however, these measures did not "reduce the substantial risk of heat-related illness faced by all of the men at the Wallace Pack Unit, and particularly not the men with heat sensitivities."[300] The following year, the Texas House Committee on Corrections reached the same conclusion: "Based on the medical information about human health and heat-related health risks, TDCJ cannot rely only on mitigation measures to ensure the well-being of inmates and corrections personnel."[301]

In July 2022, a study authored by Dr. Carlee Purdum ("Dr. Purdum") and published by Texas A&M ("Dr. Purdum's study" or the "Purdum study") concluded that, "despite [TDCJ's] current heat mitigation policies, nearly every year, there are reports of incarcerated people and staff falling extremely ill and/or dying from complications from extreme heat in Texas prisons."[302] The study warned that "[i]ncreasing annual temperatures and the increase of days over 100 degrees in Texas will continue to exacerbate the degradation of health for both incarcerated people and staff" in the TDCJ system.[303] The study based its conclusions on survey responses from TDCJ inmates which indicated:

- 66% said they did not have access to ice.[304]

---

298 *Cole*, 2017 WL 3049540, at *10.
299 *Id.*; *see also Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015) ("*Ball I*").
300 *Id.*
301 Plaintiffs' Hearing Ex. 34 at 58.
302 Pls.' Hearing Ex. 55 at 3–4.
303 *Id.* at 4.
304 *Id.* at 22.

- 61% said they did not have access to cool-down showers.[305]
- 60% said wellness checks weren't happening regularly.[306]
- 47% reported being denied access to respite areas.[307]
- 29% said that they knew of at least one heat-related death in their own unit or another.[308]
- 11% said they did not receive access to cold water, and the respondents who reported receiving access to cold water described "a pattern or persistent inconsistency."[309]

TDCJ's heat-mitigation policies were in place during the years of Dr. Skarha's study, 2001-2019, as well, yet heat-related deaths continued unabated.[310] According to Dr. Skarha, if mitigation measures were effective in preventing heat-related deaths in Texas prisons without air conditioning, she would have expected to see no effect from heat on mortality in those facilities.[311] But she did see an effect, even while TDCJ's mitigation measures were in place.[312]

Collier also personally acknowledged having received Dr. Purdum's and Dr. Skarha's studies in 2022 and being aware of their findings.[313] He said that he had asked TDCJ's "research director" Barbee to "look at" Dr. Skarha's study,[314] but he did not recall having asked anyone at UTMB or anyone with an epidemiology degree to review that study.[315]

In the face of evidence that 271 people over 19 years likely died from heat in Texas prisons, Collier's Rule 30(b)(6) deponent testified that TDCJ did not give Dr. Purdum's study or Dr. Skarha's study "much credibility," because TDCJ did not "sanction" them and was not

---

305 *Id.* at 27–28.
306 Final Hearing Tr. (Aug. 2, 2024) at 237:16–238:4; Pls.' Hearing Ex. 55 at 14.
307 Pls.' Hearing Ex. 55 at 31–32.
308 Final Hearing Tr. (Aug. 2, 2024) at 235:11–17; Pls.' Hearing Ex. 55 at 18.
309 Final Hearing Tr. (Aug. 2, 2024) at 240:16–241:18; Pls.' Hearing Ex. 55 at 20.
310 Pls' Hearing Exs. 70 & 75.
311 Final Hearing Tr. (July 30, 2024) at 172:24–173:7.
312 *Id.* at 173:9–11.
313 Final Hearing Tr. (Aug. 2, 2024) at 234:8–235:23, 243:10–245:11.
314 *Id.* at 244:6–245:11.
315 *Id.* at 244:21–245:11.

"involved" in them.[316] Collier's deponent called Dr. Skarha's study "nothing more than writing on a piece of paper."[317] Collier's deponent testified that TDCJ did not do anything to investigate the findings of either study.[318] Nor did Collier or anyone else who testified at the hearing on his behalf identify any actions or policy changes made in response to either study.

Plaintiffs' corrections expert Dean Williams testified that, if he received notice of something like the Skarha study, he would not ignore it; instead, it would have raised "high alarms" with him.[319] In Williams's view, not responding to evidence of deaths, staff illnesses, inmate illnesses, and scientific studies puts people's health and safety at risk.[320] Collier's own corrections expert, John Baldwin ("Baldwin"), agreed that if he received a study from a credible source alerting him to dangerous conditions in his prison system, he would review the study.[321] Baldwin acknowledged that, if he received information like what was contained in Dr. Purdum's study, he would investigate it.[322] And Collier's corrections and correctional risk management expert, Paul Morales testified that "any reasonable person in [his] position . . . or in Collier's position" would look into the Purdum study's findings.[323]

Even if he was not moved to action by multiple reputable studies, Collier knew TDCJ's heat mitigation policies were inadequate. He admittedly knew that dozens of TDCJ inmates had died or fallen ill because of extreme heat with those measures in place. Evidence presented at the hearing, which he attended, underscored those inadequacies.

---

316 Dkt. 155, TDCJ 30(b)(6) Dep. at 260:15–261:14.
317 *Id.*, at 262:19–263:1.
318 *Id.*, at 270:21–274:23, 283:18–284:14.
319 Final Hearing Tr. (July 31, 2024) at 240:23–241:24.
320 *Id.* at 242:23–243:2.
321 Final Hearing Tr. (Aug. 2, 2024) at 54:24–55:3.
322 *Id.* at 59:13–60:11.
323 Final Hearing Tr. (Aug. 1, 2024) at 278:16–280:13.

1. TDCJ's heat score system is arbitrary, inadequate, and ineffective.

In 2014, Collier was sued by a group of inmates at one TDCJ prison, the Pack Unit.[324] That case, *Cole v. Collier*, also concerned excessive heat conditions.[325] The case ultimately settled, and as part of the 2018 settlement, TDCJ contracted with an outside medical expert to create a method of determining which inmates most needed air-conditioned housing.[326] A "heat score" is generated using information from the inmate's electronic health record.[327] Inmates are given a preliminary heat score upon intake,[328] and inmates then receive a starting heat score after the 30-day intake process has concluded.[329] If an inmate has a heat score of one or above, an inmate is placed in a cool bed.[330] Heat scores are updated multiple times a day, and TDCJ reviews a report of changes in heat scores and a report of all inmates with heat scores, which are both generated at 10 p.m. every night.[331] Individuals without a heat score but who have suffered from heat-related illness are placed in cool beds.[332] Further, developmentally disabled inmates who are in the "DDP" mental health program are placed in cool beds whether they have a heat score or not.[333] Wardens have discretion to place individuals without heat scores in cool beds if extra cool beds exist.[334]

The testimony during the preliminary injunction hearing revealed that TDCJ's heat score system is, in practice, arbitrary, inadequate, and ineffective. Although all TDCJ inmates face a

[324] *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540 (S.D. Tex. July 19, 2017).
[325] *Id.*
[326] Final Hearing Tr. (Aug. 2, 2024) at 163:3–9.
[327] Final Hearing Tr. (Aug. 1, 2024) at 111:3–9.
[328] *Id.* at 160:6–10.
[329] *Id.* at 160:6–161:19.
[330] *Id.* at 196:12–13.
[331] *Id.* at 170:22–171:6.
[332] *Id.* at 167:10–168:3; 102:15–24; Def.'s Hearing Ex. 72.
[333] Final Hearing Tr. (Aug. 1, 2024) at 187:5–16.
[334] *Id.* at 180:14–181:5.

substantial risk of serious harm from the extreme heat in unair-conditioned facilities,[335] only approximately 12,289 of the 134,500 individuals incarcerated in the TDCJ system (i.e., less than 10%) currently have a heat score.[336] Collier's deponent and Fitzpatrick confirmed that Tiede does not currently have a heat score, even though he is 65 years old and has been diagnosed with a stroke, diabetes, chronic obstructive pulmonary disease, hypertension, and obesity.[337] As Dr. Vassallo testified, if TDCJ's heat score system does not warrant housing Tiede in an air-conditioned cell, she has no confidence in the legitimacy or adequacy of the heat score system.[338] Castillo apparently did not have a heat score, either, despite being diagnosed with epilepsy and taking both an antiseizure medication and an SSRI at the time of his death.[339] Nor did Hagerty (despite being a diabetic, having an unspecified mood disorder, and taking an SSRI at the time of her death),[340] Womack (despite being diagnosed with major depressive disorder, and taking an SSRI and an anticholinergic at the time of his death),[341] or Southards (despite taking an SSRI and an anticholinergic at the time of his death) have a heat score.[342]

Dr. Vassallo testified about conditions and medications that can increase an inmate's risk of heat-related illness or death. Dr. Vassallo stated that "[s]tudies of heat-related deaths during heat waves have indicated that subjects with mental illness had an increased risk of death."[343] She explained that several classes of prescription drugs "impair thermoregulation," including: (1)

335 Final Hearing Tr. (July 31, 2024) at 127:7–11.
336 Final Hearing Tr. (Aug. 1, 2024) at 25:3–5.
337 Dkt. 155, TDCJ 30(b)(6) Dep. at 205:7–206:7; Final Hearing Tr. (Aug. 1, 2024) at 200:25–201:14.
338 Final Hearing Tr. (July 31, 2024) at 124:13–125:5.
339 Pls.' Hearing Ex. 161 at 12.
340 Pls.' Hearing Ex. 169-A at 27.
341 Pls.' Hearing Ex. 200, at 6
342 Pls.' Hearing Ex. 192-A at 65.
343 Dkt. 50-2, Ex. B, S. Vassallo Decl. ¶ 36.

cardiovascular drugs, (2) diuretics, (3) sympathomimetics or vasoconstrictors (such as nasal decongestants like Sudafed), (4) anticholinergics, and (5) SSRIs.[344] She further concluded that "[p]eople over the age of 65 have 10-12 times increased risk of heat-related illness and death than those younger than 65," and that the "mortality from heatstroke in the elderly exceeds 50%."[345] UTMB's own policies identify many of the same conditions and medications that affect heat tolerance—which, by and large, are not incorporated into TDCJ's heat score algorithm.[346]

Indeed, as Dr. Leonardson acknowledged, the following individuals would not receive a heat score under TDCJ's system: (1) a 90-year old with hypertension; (2) an individual with seizure disorder; (3) an individual with diabetes who is under the age of 65; (4) an individual with liver cirrhosis who is under the age of 65 and not taking certain medications; (5) an individual with asthma or pulmonary disease who is under the age of 65; or (6) a 48-year-old inmate with diabetes, peripheral vascular disease, obesity, asthma, and bilateral below-the-knee amputations due to diabetic gangrene.[347]And, Dr. Leonardson is not aware of any policy requiring the TDCJ's health service liaison (who are not medical doctors, but rather, nurses) to follow a doctor's recommendation that an inmate be placed in an air-conditioned cell.[348] Baldwin testified that inmates' medical providers should determine which inmates are vulnerable and need to be housed in air-conditioned cells.[349]

2. Respite areas are inadequate and ineffective.

Respite areas—i.e., designated air-conditioned areas in TDCJ facilities—are also

[344] *Id.* ¶ 37.
[345] Dkt. 50-2, Ex. B, S. Vassallo Decl. ¶ 38.
[346] Final Hearing Tr. (Aug. 1, 2024) at 126:20–127:9, 135:17–136:22; Pls.' Hearing Ex. 274.
[347] Final Hearing Tr. (Aug. 1, 2024) at 114:16–115:6, 135:24–136:2-22, 140:11–24.
[348] *Id.* at 102:25–103:13; 123:16–21.
[349] Final Hearing Tr. (Aug. 2, 2024) at 51:6–10.

inadequate and ineffective at reducing the substantial risk of harm posed by extreme heat.

In practice, evidence presented at the hearing established that inmates do not have sufficient access to respite areas. TDCJ policy states that inmates "may request access to a respite area 24 hours per day, seven days per week."[350] However, corrections staff is required to administer access to respite areas, and as Collier acknowledged, there are staffing shortages throughout TDCJ.[351] He called staffing a "significant problem," and TDCJ itself recognized in a report to the Texas Legislature that staffing is TDCJ's "most significant major issue."[352] Professor Michele Deitch ("Professor Deitch"), an expert in prison policy, testified that TDCJ's widespread understaffing has had an "enormous impact" on TDCJ's ability to implement its heat- mitigation measures.[353] She testified that understaffing prevents TDCJ from effectively managing the respite room system, and that the respite areas do not have enough space to accommodate all of the inmates who would like to use them.[354] This is consistent with what has been publicly reported: TDCJ's respite areas are "crowded and uncomfortable," "packed with inmates," and "almost nonexistent" because of the agency's staffing crisis.[355]

Professor Deitch's testimony is also consistent with testimony from current and former TDCJ inmates. In a video, Tiede confirmed that TDCJ has a "huge" staff shortage because corrections officers "don't want to come to work" in the heat, and that the ratio of corrections officers to inmates is completely "out of proportion" as a result.[356] Tiede said that respite areas are

---

350 Def.'s Hearing Ex. 1 at 24.
351 Final Hearing Tr. (Aug. 2, 2024) at 239:17–19.
352 *Id.* at 254:10–20; Pls.' Hearing Ex. 266 at 303–04.
353 Final Hearing Tr. (July 31, 2024) at 152:6–18.
354 *Id.* at 149:1–24.
355 Dkt. 50-35, Ex. 24.
356 Pls.' Hearing Ex. 243.

"hard to come by" in his unit.[357] Further, Simmons testified that she and other inmates in her unit could not use respite rooms late at night, and they "never had respite available" after midnight.[358] Starting at about 10:00 a.m., women in her unit would start asking to go to a respite room, and sometimes the response from staff would be "respite's not open yet," or that they did not "have anybody [on staff] to open respite yet."[359] Access to respite rooms can also vary depending on an inmate's security level; inmates in restrictive custody face even more difficulties accessing respite. When Simmons was in a higher security level cell, respite was only available once a day around 8:00 or 9:00 p.m.[360]

Simmons further testified that her unit was often short-staffed, and even more so in the summer months, which affected her ability to use respite rooms.[361] There were also significant barriers to using the respite rooms—inmates were required to get fully dressed in their TDCJ uniform and clean their cells, and respite rooms "can only fit so many people," so inmates often had to wait in line, in the heat, to access one.[362] Once in the respite rooms, inmates were sometimes told "to face the wall," "not to talk," or to "sit on the floor."[363] And, although TDCJ policy states that inmates "shall be permitted to stay in the respite area as long as necessary,"[364] Simmons testified that she could only stay in those areas for fifteen minutes to an hour.[365] As a result, the respite rooms were not effective in reducing the physical effects of the heat.[366] If

---

357 Pls.' Hearing Ex. 244.
358 Final Hearing Tr. (July 30, 2024) at 41:1–11.
359 *Id.* at 41:3–7.
360 *Id.* at 41:7–11.
361 *Id.* at 41:18–42:5, 43:6–11.
362 *Id.* at 43:12–44:12.
363 *Id.* at 46:1–10.
364 Def.'s Hearing Ex. 1 at 24.
365 Final Hearing Tr. (July 30, 2024) at 41:15–17.
366 Final Hearing Tr. (July 30, 2024) at 47:23–25.

inmates refused to leave the respite area, they would be physically removed and placed in solitary confinement.[367]

Malouff's access to respite rooms was similarly limited. While he was in the Wallace Pack Unit, the respite room was located in a different building that was a "quarter [or] half mile" away.[368] He had to put in a written request for a TDCJ staff member to escort him, and sometimes it would take a half-hour to an hour for him to be escorted, depending on the number of staff available.[369] There were times when his written request for respite "wasn't responded to at all."[370] And he could spend a "very short" period of time there—"maybe 15 [or] 20 minutes"—before he was brought back to his unair-conditioned dorm.[371] He believes short staffing also affected his ability to use respite rooms.[372] From his perspective, the respite rooms were not effective at reducing the effects of the heat on him because "it was short-term," "it really didn't do anything for you, and as soon as you left, you went right back into that heat."[373]

Not only are respite rooms ineffective as administered by TDCJ, but even when available, they still fail to provide meaningful relief from excessive heat. Even assuming inmates could readily access a respite area, that still puts the onus on them to affirmatively identify that they are exhibiting symptoms of a heat-related illness. The issue with that approach, according to Dr. Vassallo, "is that people don't know they are in trouble" from the heat, so they can "start having cognitive problems from heat illness before they realize they need to go to [a respite room]."[374] In

---

367 *Id.* at 46:17–47:4.
368 *Id.* at 185:8–13.
369 *Id.* at 185:14–186:3.
370 *Id.* at 186:4–6.
371 *Id.* at 186:10–14.
372 *Id.* at 186:7–9.
373 *Id.* at 186:15–21.
374 Dkt. 50-42, Ex. 32 at 135:19–136:15.

other words, "the rapidity, the speed at which heatstroke strikes means that checking people that are walking around, somebody is sleeping in their bed, everything looks fine . . . , and they can still suffer a heatstroke without the correction staff realizing they're in trouble."[375] This is consistent with the medical literature on heat stroke, which notes that patients experiencing heat stroke may only initially complain of "weakness, lethargy, nausea, or dizziness," and "[t]he presentation of older adults with heat stroke may be subtle and nonspecific early in the course of the disease."[376]

Moreover, even if inmates were able to readily access respite areas, these areas are, by definition and design, only a temporary respite from the permanent condition of extreme summer heat in unair-conditioned prisons. As Dr. Vassallo testified in *Cole* case, when inmates are not in air conditioning, "they are subjected to the temperatures . . . which are risky and cause harm, including sickness, morbidity, and mortality."[377] Thus, even if TDCJ inmates get "three or four or five hours" in respite—which does not happen in practice based on the evidence presented at the hearing—"that leaves . . . 19 or 20 hours in these heat conditions."[378] In other words, "it's the total accumulated heat stress for the 20 hours you're in the [extreme] temperatures" that "matters" from a risk perspective.[379] This opinion was supported by a study, which concluded that there were "ten percent more death[s]" among people who simply visited an air-conditioned location, as compared to those who had air conditioning in their homes full-time.[380]

---

375 Dkt. 50-42, Ex. 32 at 135:23–136:5.
376 Pls.' Hearing Ex. 275.
377 Dkt. 50-42, Ex. 32 at 135:25–136:12.
378 *Id.* at 135:16–18.
379 Final Hearing Tr. (July 31, 2024) at 43:1–12.
380 *Id.* at 40:16–41:19; Pls.' Hearing Ex. 13.

3. Cold showers do not guard against the health risks of constant extreme heat.

TDCJ policy says that, at times of high heat, prisons should "[a]llow additional showers for inmates when possible."[381] However, Professor Deitch testified that TDCJ's widespread understaffing issues prevent TDCJ staff from consistently bringing inmates to cold showers.[382] This testimony was supported by that of the former TDCJ inmates at the hearing. Indeed, Simmons testified that cold showers were not available in her unit at all for several hours during count times and overnight from 10:00 p.m. to 7:00 a.m.[383] Even when they were available, her unit had only one cold shower for "80 to 125 women" who "need[ed] to get relief from the heat."[384] And, as discussed, the night before he died, Womack's request for a respite shower was denied.[385] One of Womack's fellow inmates noted that this denial was "nothing unusual for [the] Coffield [Unit]," and that the "excuse is always we are understaffed."[386]

Moreover, even if TDCJ provided inmates with sufficient access to cold showers, the relief provided from showers is, much like that provided by respite areas, temporary in nature. Dr. Vassallo testified that cold showers only work "while you're wet" and while you are experiencing "evaporative cooling."[387] As soon as you are dry, "you are no longer being cooled by that shower."[388] In other words, the shower will only "fix" the problem—i.e., extreme heat—"for about ten minutes" until the inmate "dries off."[389] Dr. Vassallo also discussed a meta-analysis of various heat-mitigation measures, which concluded that increased cold showers or baths did not

---

381 Defs.' Hearing Ex. 1 at 41–42.
382 Final Hearing Tr. (July 31, 2024) at 352:6–12.
383 Final Hearing Tr. (July 30, 2024) at 49:12–14.
384 *Id.* at 49:14–17.
385 Pls.' Hearing Ex. 200-B at 2, 42.
386 *Id.* at 42.
387 Final Hearing Tr. (July 31, 2024) at 113:3–20.
388 *Id.* at 113:19–20.
389 *Id.* at 135:5–21.

lead to a "statistically significant" difference in mortality rates from high heat.[390] In short, Dr. Vassallo believes that "taking frequent [cold] showers doesn't help" address the substantial risk of serious harm posed by extreme heat.[391]

4. Fans are inadequate and can be counter-productive in extreme heat.

According to Dr. Vassallo, fans do not lessen the risk of heat-related illness, either.[392] In fact, when the heat index exceeds 99°, "fans elevate the risk of heat-related illness, increasing the heat load on the body by moving hot air across the skin."[393] In other words, "increased wind speeds of hot air can actually raise the skin temperature and thus produce opposite results by increasing core body temperature."[394] This is consistent with guidance from the United States Environmental Protection Agency, which warns: "[U]sing a portable electric fan alone when heat index temperatures exceed 99°f actually *increases* the heat stress the body must respond to by blowing air that is warmer than the ideal body temperature over the skin surface."[395] Dr. Vassallo has therefore opined that "providing additional fans does nothing to address the health risks of the extreme temperatures."[396]

5. Access to cold water is inconsistent and does not reduce the long-term effects of the heat on TDCJ inmates.

As Professor Deitch testified, TDCJ's widespread understaffing issues prevent TDCJ staff from consistently bringing inmates ice or water.[397] This testimony was supported by the experiences

---

390 Final Hearing Tr. (July 31, 2024) at 42:7–14; Pls.' Hearing Ex. 13 at 5–6.
391 Final Hearing Tr. (July 31, 2024) at 117:18–25.
392 Dkt. 50-2, Ex. B, S. Vassallo Decl., ¶ 41.
393 *Id.* ¶ 41.
394 Pls.' Hearing Ex. 13 at 5–6.
395 Dkt. 50-28, Ex. 17, Excessive Heat Events Guidebook (March 2016), U.S. Environmental Protection Agency, at 37 (emphasis added).
396 Dkt. 50-2, Ex. B, S. Vassallo Decl., ¶ 41.
397 Final Hearing Tr. (July 31, 2024) at 152:6–18.

of former TDCJ inmates, including Simmons, who testified that there was rarely enough ice water to meet the demand of the women in her unit, as they would only receive one cooler for a dorm with 124 women.[398] Malouff testified that, while he was incarcerated, it could take up to eight hours for TDCJ staff to refill the water cooler in his unit.[399] Individuals incarcerated in TDCJ also reported to Robertson that they went "eight to nine hours at a time with no water" in July 2024, and Wilson repeatedly emailed Robertson about the shortage of water—and the fact that inmates in his unit would only receive water once per day—in the weeks before he died.[400]

Dr. Vassallo also opined that "the provision of additional ice [water], on its own, does not mitigate the risk of heat-related illness."[401]

6. Evidence submitted by Collier raises substantial concern about whether TDCJ implements its heat mitigation measures in accordance with TDCJ policy.

According to TDCJ policy, units are only required to provide inmates access to respite areas "during periods of excessive heat," and they are only required to provide inmates other heat mitigation measures—cold showers, fans, and ice water—"where the heat index is above 90°F."[402] So, TDCJ's heat mitigation measures depend on TDCJ staff diligently and accurately monitoring and reporting the heat index at their units.

Evidence presented by Collier at the preliminary injunction hearing cast substantial doubt on TDCJ's own processes and procedures for keeping track of the heat index and, in turn, whether TDCJ is complying with its own heat-mitigation policy. Collier introduced into evidence a manual temperature log reporting the outside air temperature, humidity, and heat index at the

398 Final Hearing Tr. (July 30, 2024) at 48:16–50:9.
399 *Id.* at 187:4–10.
400 Pls.' Hearing Exs. 137 & 264.
401 Dkt. 50-2, Ex. B, S. Vassallo Decl. ¶ 41.
402 Def.'s Hearing Ex. 1 at 41–42.

Mark W. Stiles Unit from July 2022.[403] During the direct examination of Collier, his counsel focused on the outside temperature at the unit on July 12, 2022, which was logged at a consistent 79º from 12:30 a.m. to 4:30 p.m.[404]

After having consulted an authoritative source on the matter during the hearing, this Court took judicial notice that, on July 12, 2022, the temperature actually reached a high of 96º in Beaumont, Texas (where the Stiles Unit is located), despite TDCJ's log indicating that the temperature never exceeded 87°.[405] Additionally, the log recorded the heat index as being *lower* than the ambient temperature, despite 90% humidity.[406] And the temperatures included in the log for that day were noted as being recorded by two different people, despite being in the same handwriting.[407] Because of these discrepancies, the Court expressed concern that the temperature log for July 12, 2022 was fabricated, or at least inaccurate.[408] The logs for several other days in Defendants' Exhibit 76 have similar discrepancies— including July 1 and 2, 2022 ("Wheeler" is in different handwriting, despite purportedly being entered by the same person); July 6, 2022 (similar handwriting for entries purportedly by different people); July 7, 2022 (similar handwriting and pen for entries purportedly by different people); July 13, 2022 (same); and July 14, 2022 (same).[409] The July 12, 2022 temperature log, Defendant's Exhibit 76, is seen below.

---

403 Final Hearing Tr. (Aug. 2, 2024) at 195:12–15, 217:20–219:1 (admitting Def.'s Ex. 76 into evidence).
404 Def.'s Hearing Ex. 76 at 12.
405 Final Hearing Tr. (Aug. 2, 2024) at 276:16–277:10.
406 *Id.* at 277:10–15.
407 *Id.* at 277:16–19.
408 *Id.* at 278:20–279:1.
409 Def.'s Hearing Ex. 76 *passim.*

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**
**Temperature Log**

**UNIT: MARK W. STILES**

| DATE: 7/12/22 | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|
| 12:30 a.m. | 79° | 97% | 70° | Jones |
| 1:30 a.m. | 79° | 97% | 75% | Jones |
| 2:30 a.m. | 79° | 97% | 70% | Jones |
| 3:30 a.m. | 79° | 97% | 75% | Jones |
| 4:30 a.m. | 79° | 97% | 75. | Hardy |
| 5:30 a.m. | 79° | 97% | 75% | Hardy |
| 6:30 a.m. | 79° | 97% | 79% | Hardy |
| 7:30 a.m. | 79° | 97% | 79. | Hardy |
| 8:30 a.m. | 79° | 99% | 80° | Hardy |
| 9:30 a.m. | 79° | 99% | 80° | Jones |
| 10:30 a.m. | 79° | 96% | 80° | Jones |
| 11:30 a.m. | 79° | 99% | 82° | Jones |
| 12:30 p.m. | 79. | 97% | 82° | Jones |
| 1:30 p.m. | 79° | 97% | 83° | Jones |
| 2:30 p.m. | 79° | 97% | 83° | Jones |
| 3:30 p.m. | 79° | 64° | 83° | Jones |
| 4:30 p.m. | 79° | 67% | 83° | Jones |
| 5:30 p.m. | 87° | 71° | 85° | Jones |
| 6:30 p.m. | 87° | 79° | 85° | Jones |
| 7:30 p.m. | 85. | 84° | 89° | Jones |
| 8:30 p.m. | 82° | 84. | 84 | Jones |
| 9:30 p.m. | 80° | 86° | 83° | Jones |
| 10:30 p.m. | 78. | 86° | 83° | Jones |
| 11:30 p.m. | 79° | 86. | 83 | Jones |

* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

Following the hearing, an investigator hired by Collier to investigate the discrepancies in the temperature logs concluded the July 12, 2022, temperature log "is obviously and clearly false."[410] The investigator's report, submitted to the Court by Plaintiffs[411] and unobjected to by Collier,[412] concluded that the temperature log was "not reflective of actual events" and that "the evidence supports periods of carelessness in record creation and/or retention and an attempt by

[410] Dkt. 200-2.
[411] Dkt. 200-3.
[412] *See* Resp., Dkt. 201.

the unit to avoid reporting missing temperature logs."[413] When temperature logs were collected, "staff reported there were logs the unit could not locate or had been defaced (e.g. doodles, stick figure cartoons, etc.) by staff working the duty post."[414] So, "the unit's approach was to 'recreate' these logs," and it is "unlikely [the staff] would have done so without knowledge and/or consent of unit administrators."[415] The investigator observed at least two other logs exhibited the same irregularities as the July 12, 2022 log.[416]

The falseness of Defendant's Exhibit 76 and the discrepancies between the number of heat-related illnesses that UTMB reports to TDCJ and the number TDCJ reports to the Texas Legislature (discussed in Section IV.G., *supra*) raise significant questions about the veracity and reliability of the other documents Collier presented at the hearing regarding TDCJ's compliance with its own heat mitigation policies.[417] As a result, the Court has no confidence in the data that TDCJ generates and uses to implement its heat mitigation measures and record the conditions within its facilities. The Court has no doubt that TDCJ is undercounting heat-related injuries and deaths, keeping unreliable records about temperature conditions, and inadequately providing heat mitigation measures.

### F. Air Conditioning is the Only Effective Protection from Extreme Heat.

#### 1. Reducing temperatures to safe levels is the least restrictive means to address the risks posed by extreme heat.

The parties do not disagree on the central issue in this case: that air conditioning is sorely needed across TDCJ facilities as a matter of inmate health and safety. Even Collier's Rule

---

413 Dkt. 200-3 at 3.
414 *Id.* at 4.
415 *Id.*
416 *Id.*
417 Final Hearing Tr. (Aug. 2, 2024) at 282:20–283:6 ("If what [TDCJ is] saying is they're doing all this good stuff but they're doing it [relying on these temperature logs], that's a problem.").

30(b)(6) deponent agreed that installing air conditioning "is the right thing to do, it is the humane thing to do, and it is something [TDCJ] should have done a long time ago."[418] He testified that it is "the right thing to do because of the increased temperatures that the state is seeing, the increase of medication that . . . inmates are on as opposed to 20 years ago, 30 years ago, 40 years ago," and because "[t]here's a lot of factors that exacerbate the need for wanting to air condition" TDCJ facilities.[419] Collier's Rule 30(b)(6) deponent was not aware of any heat-related illnesses at the Wallace Pack Unit since air conditioning was installed there.[420] And he was not aware of any heat-related illnesses that have occurred in air-conditioned housing areas in the TDCJ system in the last 30 years.[421]

TDCJ's former Director of Facilities, Cody Ginsel, agreed that installing air conditioning in all of TDCJ's facilities would reduce the risk of heat-related injuries among TDCJ staff.[422] And Collier's corrections and correctional risk management expert, Morales, confirmed that air conditioning TDCJ's facilities would "eliminate the risk of injury from the heat."[423] Collier himself acknowledged that he wants air conditioning in all TDCJ facilities and recognized that air conditioning is the best solution to reduce temperatures in TDCJ facilities.[424] He stated that the only reason air conditioning has not been installed in all housing areas throughout TDCJ is because the Texas Legislature has not appropriated the funds for TDCJ to do so.[425]

---

418 Pl.'s Hearing Ex. 255, TDCJ 30(b)(6) Dep. at 304:23–305:4.
419 *Id.* at 38:13–39:11.
420 *Id.*, 99:25–100:3, 161:8–12.
421 *Id.*, 99:25–100:3, 161:13–21.
422 Final Hearing Tr. (Aug. 1, 2024) at 254:19–23.
423 Final Hearing Tr. (Aug. 2, 2024) at 283:8–16.
424 *Id.* at 254:24–255:20.
425 Pls.' Hearing Ex. 254, Collier's Resp. to Interr. 17.

Dr. Vassallo opined that TDCJ inmates are "still dying" from extreme heat despite the mitigation measures, because those measures "do[] not remove the heat."[426] Dr. Vassallo explained that having working air conditioning has been "associated with an 80% reduction in the risk of death due to heat and cardiovascular disease and a 66% reduction in mortality due to cardiovascular disease."[427] "In one study, it was estimated that 50% of the deaths related to a heat wave could have been prevented with a working air conditioner. Lack of air conditioning was reported in 91% of deaths in one report."[428] Dr. Vassallo opined that this data is "directly applicable to the Texas prisons."[429] In her view, "excess morbidity and mortality in TDCJ facilities resulting from the extreme heat of the Texas summers can only be combatted by bringing the temperature in the prisons down."[430] "[P]utting everyone" in the TDCJ system "in air conditioned housing [is] the only way to eliminate the heat risk and the deaths and illnesses."[431] Or, as Dr. Vassallo put it, if "[y]ou remove the heat" through temperature control, then "nobody dies [from the] heat."[432]

According to the Skarha study, the risk of dying in Texas prisons with air-conditioned housing areas actually decreased as the heat index increased.[433] There was no association between an increase in temperature and the risk of death in prisons with air conditioning—which indicates that air conditioning has a protective effect on human health.[434]

Plaintiffs' corrections expert, Williams testified that TDCJ's mitigation measures are not

---

426 Final Hearing Tr. (July 31, 2024) at 39:4–12.
427 Dkt. 50-2, Ex. B, S. Vassallo Decl., ¶ 40.
428 *Id.*
429 *Id.*
430 *Id.*
431 Final Hearing Tr. (July 31, 2024) at 71:11–14.
432 *Id.* at 39:9–12.
433 Pls.' Hearing Ex. 70 at 5.
434 Final Hearing Tr. (July 30, 2024) at 162:22–163:2, 168:16–23; Pls.' Hearing Ex. 70 at 5.

an appropriate solution because they "accept[] the fact that" people "are going to die as a result of" the heat, and that the underlying problem "can't be fixed by other means."[435] In Williams's view, the only solution to the risks posed by extreme heat is air conditioning.[436] Collier's corrections expert, Baldwin, likewise agreed that the solution to the problem of extreme heat is to install air conditioning.[437]

In *Cole v. Collier*, Judge Ellison granted a preliminary injunction in 2017 (before the parties reached a settlement) that, in part, ordered Collier to "lower the temperature in the housing areas of heat-sensitive inmates" in the Wallace Pack Unit.[438] To comply, Collier installed temporary air conditioning in the Wallace Pack Unit.[439] Malouff was in the Wallace Pack Unit when TDCJ installed temporary air conditioning.[440] Malouff testified that he believed that the temporary air conditioning installed in the Wallace Pack Unit was effective at reducing the effects of the heat on him and his fellow inmates, unlike TDCJ's heat mitigation measures.[441] Wallace Pack Unit is air-conditioned today.[442]

2. Air conditioning the entire TDCJ system is feasible—but takes time and resources.

TDCJ's Facilities Director Hudson testified that air conditioning is currently the Facilities Division's number one priority.[443] TDCJ agrees that installing temporary air conditioning is technically feasible, and if ordered by the Court to install air conditioning, it would do so.[444] Collier

435 Final Hearing Tr. (July 31, 2024) at 255:3–19.
436 Final Hearing Tr. (July 31, 2024) at 255:20–256:8.
437 Final Hearing Tr. (Aug. 2, 2024) at 31:16–19.
438 *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *46 (S.D. Tex. July 19, 2017).
439 Final Hearing Tr. (Aug. 2, 2024) at 261:12–19.
440 Final Hearing Tr. (July 30, 2024) at 187:13–17.
441 *Id.* at 187:24–188:5.
442 Final Hearing Tr. (Aug. 1, 2024) at 15:5–7.
443 Final Hearing Tr. (Aug. 2, 2024) at 74:14–16.
444 Dkt. 155, TDCJ 30(b)(6) Dep. at 42:16–43:4, 120:3–10.

also acknowledged that it is feasible to install temporary or permanent air conditioning in every TDCJ facility.[445] Hudson, TDCJ's current Director of the Facilities Division, likewise, agreed that temporary and permanent air conditioning "can be installed i[n] every TDCJ facility."[446]

TDCJ's Facilities Division's engineering department employs a lead engineer, two deputy engineers, seven additional engineers, and two architects internally; they also contract with 18 outside engineering firms to manage roughly 350 projects in design or in construction.[447] Four of the 18 outside engineering firms are contracted to work on the air- conditioning projects to design the HVAC system as well as the backup generators and ensuring the units have enough electrical power.[448] TDCJ has a variety of facility designs, and each unit design requires its own air conditioning plan, which can take a year.[449] Installing air conditioning is an especially intensive process in older units, which need to be retrofitted; the newest TDCJ unit was built in 1997,[450] the oldest unit was built in the mid-1800s, and some units were built in the early 1900s.[451] For example, some TDCJ facilities have open windows that never shut and span entire walls; these windows must be changed before air conditioning can be installed.[452] TDCJ estimates that it will need to purchase 65,000 tons of air conditioning equipment to air condition the whole system.[453] Further, some of the water chillers needed are estimated to take more than a year or two years to arrive after being ordered.[454]

445 Final Hearing Tr. (Aug. 2, 2024) at 258:13–16.
446 *Id.* at 137:5–11.
447 Final Hearing Tr. (Aug. 2, 2024) at 75:3–15.
448 *Id.* at 76:4–11.
449 *Id.* at 97:4–11; 106:10–24; Def.'s Ex. 78; Def.'s Ex. 79.
450 *Id.* at 80:21–22.
451 *Id.* at 93:7–25.
452 *Id.* at 89:4–9.
453 *Id.* at 154:14–17.
454 *Id.* at 154:18–155:11.

Collier also presented credible evidence that any funds and time dedicated to installing temporary air conditioning will impair the time and money allocated to installing permanent air conditioning. TDCJ estimates that the cost to install temporary air conditioning equipment and fuel for generators for the seven summer months would be $700-800 million; the fuel would cost $600 million each year.[455] TDCJ has twice been required to install temporary air conditioning and has done so. Malouff, who was in the Wallace Pack Unit when TDCJ installed temporary air conditioning in response to Judge Ellison's order in the *Cole* case, offered unrebutted testimony that it took TDCJ 60 to 90 days to install it.[456] Since, over $1 million has been spent on upgrades to the Pack Unit HVAC system that were necessary because of the quick installation.[457]

TDCJ also installed temporary air conditioning at three units in response to Governor Abbott's statewide order for undocumented immigrants to be arrested on state criminal charges and incarcerated in TDCJ facilities—which was called "Operation Lone Star."[458] Because these individuals had not been convicted, TDCJ had to comply with the Texas Board of Jail Standards—which, among other things, require that indoor temperatures be between 65° and 85°.[459] To comply with Governor Abbott's order, TDCJ installed temporary air conditioning in the Briscoe, Segovia, and Lopez Units,[460] within approximately three to four months—i.e., from May 2021 to August or September 2021.[461] Those units have all had temporary air conditioning since then.[462] TDCJ did not have to go through a design phase to comply with Governor Abbott's order for

---

455 *Id.* at 91:22–92:3; 86:22–87:14; 90:9–91:6.
456 Final Hearing Tr. (July 30, 2024) at 187:18–23.
457 Final Hearing Tr. (August 2, 2024) at 76:13-17.
458 Final Hearing Tr. (Aug. 2, 2024) at 126:20–127:10.
459 *Id.* at 127:14-21 (Hudson); *id.* at 259:8–260:4 (Collier).
460 *Id.* at 127:22–128:4.
461 *Id.* at 128:5–13.
462 *Id.* at 84:6–12, 128:15–130:15.

Operation Lone Star.[463] The Texas Department of Emergency Management and the Legislature's Operation Lone Star Funding funded the temporary air conditioning for these units.[464]

3. TDCJ's current plan to install air conditioning is inadequate.

It is Collier's goal to air condition the entire TDCJ system.[465] Collier's team presented evidence regarding the amount of funding TDCJ has requested and received from the Texas Legislature in recent years, and how much funding TDCJ has spent on air conditioning. In the 2020–2021 fiscal year, TDCJ spent $13.4 million on air conditioning 3,407 beds.[466] In the 2022–2023 fiscal year, TDCJ spent $15.5 million on air conditioning.[467] In the 2024-2025 fiscal year, the 88th Legislature ear-marked $85.7 million dollars for TDCJ to spend on air conditioning, the first time the Legislature had done so,[468] which occurred after Collier presented a four-phase plan to the Legislature in 2022.[469] However, the Legislature did not appropriate enough funds to TDCJ to enact the plan, which called for $225 million for the first phase alone.[470] Collier plans to request far more than $85 million for air conditioning in the next legislative session.[471]

As of the final day of the hearing, TDCJ had not solicited bids for installing permanent air conditioning throughout the system.[472] According to the Texas Comptroller of Public Accounts' 2024-2025 Certification Revenue Estimate, Texas has an estimated $18.29 billion surplus for this

---

463 *Id.* at 156:15–18.
464 Final Hearing Tr. (August 2, 2024) at 267:19–25; 268:1–8.
465 *Id.* at 17; 5-9.
466 *Id.* at 115:1–7.
467 *Id.* at 115:8–16.
468 *Id.* at 116:12–23.
469 *Id.* at 152:23–153:6.
470 *Id.* at 179:14–180:4.
471 *Id.* at 185:5–9.
472 *Id.* at 124:24–125:1.

upcoming legislative session.[473] And, although TDCJ has a multi-billion-dollar budget,[474] it has allocated only $115.5 million to installing air conditioning in TDCJ units since 2018.[475]

Approximately 96,500 of TDCJ's 142,240 beds remain unair-conditioned.[476] When asked about Defendant's Exhibit 79, Hudson could not provide a month and year by which air conditioning will be installed in any of the facilities highlighted in yellow (air conditioning in design/construction 2024–2025) or gray (air conditioning investigatory for design in 2026–2027) or not highlighted at all (no plans)—a total of 62 facilities.[477] Hudson and Baldwin testified that, at TDCJ's average rate of installing air-conditioned beds since 2018 (1,376 beds per year), it would take 70 years— i.e., until 2094—to install air conditioning throughout TDCJ.[478] Hudson also acknowledged that, even at a rate of 3,100 new air-conditioned beds per year (which is the rate TDCJ averaged in 2023 and 2024), it would take TDCJ 30 years—i.e., until 2054—to install permanent air conditioning throughout the system.[479]

4. Other Prisons Air Condition Their Systems.

Since 1994, state-wide regulations adopted by the Texas Commission on Jail Standards have required all jails in Texas to maintain indoor temperatures between 65° and 85°.[480] Other

---

473 2024-2025 Certification Revenue Estimate, Texas Comptroller of Public Accounts, https://comptroller.texas.gov/transparency/reports/certification-revenue-estimate/2024- 25/docs/cre-2024-25.pdf. Under Rule 201 of the Federal Rules of Evidence, that Court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. The Court finds that the Texas surplus as estimated by the Texas Comptroller of Public Accounts is such a fact, and that the Texas Comptroller of Public Accounts is a source whose accuracy cannot reasonably be questioned.
474 Pls.' Hearing Ex. 266 at 35–39.
475 Def.'s Ex. 17.
476 Pls.' Hearing Ex. 204, Collier's Resp. to Interr. 2.
477 Final Hearing Tr. (Aug. 2, 2024) at 151:4–21; Def.'s Hearing Ex. 79.
478 *Id.* at 34:1-17 (Baldwin); *id.* at 141:6–142:2 (Hudson); Pls.' Hearing Exs. 150, 204.
479 Final Hearing Tr. (Aug. 2, 2024) at 147:12-148:7; Def.'s Hearing Ex. 17.
480 37 Tex. Admin. Code §§ 259.160, 260.154, 261.255.

government buildings in Texas must maintain "comfortable" levels (e.g., between 68° and 78°).[481] North Carolina's administrative code for its jail system requires "heating, ventilation, and air conditioning systems that are capable of maintaining temperatures in confinement units at not less than 68 degrees Fahrenheit during the heating season and not more than 85 degrees Fahrenheit during the cooling season."[482] Tennessee requires that local correctional facilities "have a temperature of not less than sixty-five (65) degrees Fahrenheit and not more than eighty (80) degrees Fahrenheit."[483] And, while there are no temperature requirements under federal law, the Bureau of Prisons operations manual says that target temperatures should be 76° in the summer and 68° in the winter, with the caveat that facilities may be a few degrees higher or lower.[484] TDCJ has nevertheless refused to implement the same (or similar) standards.

## IV. CONCLUSIONS OF LAW

To obtain a preliminary injunction, the party must show (1) a likelihood of success on the merits, (2) irreparable harm, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. at 20. The Court finds that Plaintiffs have clearly met their burden on the first two factors but not on the other two factors.

### A. Likelihood of Success on the Merits

[481] *See* 25 Tex. Admin. Code § 297.8 (a)(1) (providing that "room temperature for a typical occupied office or classroom environment should be kept between 72 to 76 degrees Fahrenheit in the summer and 70 to 75 degrees in Fahrenheit in the winter and controlled within a temperature range of ±2 degrees in Fahrenheit for a given day").
[482] Dkt. 50-1, D. Williams Decl. (Apr. 11, 2024) ¶ 19.
[483] *Id.* ¶ 20.
[484] *Id.* ¶ 16.

At the outset, Collier argues Plaintiffs cannot be likely to succeed on the merits for two reasons: (1) the organizational Plaintiffs lack standing, and (2) Plaintiffs have not exhausted their remedies as required under the PLRA. The Court disagrees.

1. The organizational Plaintiffs have established associational standing.

The Court has already determined that Plaintiffs have standing, and that the Organizational Plaintiffs "meet the requirements of associational standing." (Order, Dkt. 95 at 6–10 (denying Collier's Rule 12(b)(1) motion to dismiss)). With respect to associational standing, the Court specifically determined that "at least one of the Organizational Plaintiffs, Lioness, is a traditional membership organization with hundreds of members who are TDCJ prisoners," and that "the Organizational Plaintiffs' members are not required to participate in this lawsuit individually." *Id.* at 8, 10.

While the Court does not need to revisit these determinations,[485] the evidence at the hearing further confirms that Lioness is a traditional "voluntary membership organization with identifiable members."[486] *SFFA III*, 600 U.S. at 201. The evidence shows that Lioness has hundreds of members who have joined voluntarily, support the organization's mission, and are current TDCJ prisoners assigned to unair-conditioned units.[487] Moreover, Lioness's members would have standing to sue in their own right—members housed in unair-conditioned units in particular face a "substantial risk of serious harm and death" from the extreme heat, that injury is traceable to Collier's deliberate indifference and refusal to take the necessary steps to protect

[485] *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA II*"), 397 F. Supp. 3d 126, 184 (D. Mass. 2019) (relying on earlier associational standing analysis when denying Rule 12(b)(1) as part of the court's post-trial conclusions of law) (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA I*"), 261 F. Supp. 3d 99, 110–11 (D. Mass. 2017)) (cited with approval in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA III*"), 600 U.S. 181, 199 (2023)).
[486] *See* Findings of Fact, Section A.1, *supra.*
[487] *See* Findings of Fact, Section A.1, *supra.*

members from the extreme summer heat, and the injunctive relief sought will redress their injuries. *See Crawford v. Hinds Cty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021) (listing elements for Article III standing). Under *SFFA III*, that is all the evidence that is required to support associational standing. 600 U.S. at 201; *see also VanDerStok v. Garland*, 680 F. Supp. 3d 741, 762 (N.D. Tex. 2023) (relying on affidavits from organizations' leadership describing membership to find that they are traditional membership organizations), *vacated in part on other grounds*, 86 F.4th 179 (5th Cir. 2023); *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, No. 3:23-CV-1471-L, 2024 WL 1349307, at *6 (N.D. Tex. Mar. 29, 2024) (same). "Where, as here, an organization has identified members and represents them in good faith, [the Supreme Court's decisions] do not require further scrutiny into how the organization operates." *SFFA III*, 600 U.S. at 201. In short, Lioness is a traditional voluntary membership organization that has standing to sue on behalf of its members.

The evidence shows that the remaining Organizational Plaintiffs also meet the requirements for associational standing, as they have constituents housed in unair-conditioned units who "were effectively members" of the organization. *Id.* at 199–200 (discussing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 336–44 (1977)). The Court finds that CTD, TCPA, and TX C.U.R.E. each have standing to assert claims on behalf of their constituents, which includes TDCJ prisoners housed in unair-conditioned units, because those prisoners possess sufficient "indicia of membership" in their respective organizations.[488] *Hunt*,

[488] As Lioness is a traditional membership organization, the "indicia of membership" analysis does not need to be addressed. *See SFFA III*, 600 U.S. at 201; *La Unión Del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509, 526 (W.D. Tex. 2022). However, even if Lioness were subject to the "indicia of membership" test for associational standing, it would satisfy the criteria. *See, e.g.*, *AARP v. United States Equal Employment Opportunity Comm'n*, 226 F. Supp. 3d 7, 17 (D.D.C. 2016) (finding that the Court need not address whether AARP was a "traditional membership organization" where it otherwise "satisfies the 'indicia of membership' criteria").

432 U.S. at 344-45.

*Hunt*'s "indicia of membership" test ensures that an organization "represent[s] the individuals it claims as members" and "provide[s] the means by which those individuals express their collective views and protect their collective interest." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012). The test is satisfied when a group serves a "specialized segment" of the community that is "the primary beneficiary of its activities." *Hunt*, 432 U.S. at 344; *see also Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (finding associational standing where constituents—incapacitated criminal defendants—comprised a "specialized segment" of the community that was the primary beneficiary of the group's activities); *AARP*, 226 F. Supp. 3d at 17 (finding associational standing where an organization with a "defined mission" serves a "discrete, stable membership with a definable set of common interests").

CTD, TCPA, and TX C.U.R.E. each have a "defined mission" and serve a "discrete" segment with a "definable set of common interests" in this action.[489] *AARP*, 226 F. Supp. 3d at 17; *see also Am. Leg. Found. v. F.C.C.*, 808 F.2d 84, 90 (D.C. Cir. 1987). Specifically, TPCA and TX C.U.R.E. serve incarcerated Texans and their families, and CTD serves incarcerated Texans with disabilities.[490] The three organizations' constituents also play a role in "guiding [the organization's] activities" and can "participate directly in making and implementing day-to-day decisions."[491] TX C.U.R.E. engages in directly with its constituents, including specific individuals who "have suffered from exposure to excessive heat" in unair-conditioned TDCJ units.[492] TPCA similarly engages regularly with its incarcerated constituents and has "team members" inside TDCJ

[489] *See* Findings of Fact, Sections I.B. through I.D., *supra*.
[490] *See* Findings of Fact, Sections A.2 through A.4, *supra*.
[491] *See* Findings of Fact, Sections A.2 through A.4, *supra*.
[492] *See* Findings of Fact, Section A.2, *supra*.

prisons work directly with the organization.[493] Thus, each of these organizations "is sufficiently identified with and subject to the influence of those it seeks to represent as to have a personal stake in the outcome of the controversy." *Mink*, 322 F.3d at 1111 (quotations omitted). Under *Hunt*'s "indicia of membership" test, CTD, TCPA, and TX C.U.R.E. also have associational standing to represent the interests of their constituents. Therefore, lack of standing does not bar Plaintiffs' likelihood of success on the merits.

2. The Prison Litigation Reform Act's ("PLRA") Exhaustion Requirement Does Not Apply to the Organizational Plaintiffs.

Nor are the Organizational Plaintiffs required to exhaust under the Prison Litigation Reform Act (the "PLRA"). The Organizational Plaintiffs are not persons capable of being incarcerated or detained, so they are not "prisoners" as the term is defined by the PLRA. 42 U.S.C. §§ 1997e(a), (h); *see also Alabama Disabilities Advoc. Pgm. v. Wood*, 584 F. Supp. 2d 1314, 1316 (M.D. Ala. 2008); *Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1176 (M.D. Ala. 2016). The PLRA's exhaustion requirement thus does not apply to the Organizational Plaintiffs. This holding is consistent with those of other courts that have found that those who sue as representatives of prisoners are not "prisoners" under the PLRA and thus are not bound by the exhaustion requirements of the PLRA. *See, e.g., Tretter v. Pennsylvania Dept. of Corrections*, 558 F. App'x 115, 157 (3rd Cir. 2014) (unpublished) (representative of deceased inmate and administratrix of his estate was not a "prisoner" required to exhaust administrative remedies); *Rivera-Rodriguez v. Pereira-Castillo,* No. 04-1389(HL), 2005 WL 290160, *6 (D.P.R. Jan. 31, 2005) (finding that the plain language of the PLRA excludes family members and guardians of incarcerated minors); *see also Wormley v. United States,* 601 F. Supp. 2d 27, 46 (D.D.C. 2009) (finding PLRA applies only to a "prisoner" and does not require exhaustion

---

[493] *See* Findings of Fact, Section A.3, *supra.*

by non-prisoners, even for claims related to their earlier detentions). Therefore, the Organizational Plaintiffs' likelihood of success on the merits is not barred by exhaustion requirements under the PLRA.

3. Plaintiffs are likely to succeed on the merits of their Eight Amendment claims.

The Court now turns to the merits of Plaintiffs' claims. The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." U.S. Const. amend. XII. The Constitution "does not mandate comfortable prisons." *Blackmon v. Garza*, 484 F. App'x 866, 868–69 (5th Cir. 2012) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, (1981)); (*see also* Resp. 12(b)(6) Mot., Dkt. 88, at 1 ("This case is not and has never been about being comfortable.")). However, "prison officials must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Blackmon*, 484 F. App'x at 868–69 (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), & *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)) (internal quotations omitted). What is cruel or unusual is not set in stone, but rather, is based on what is "socially acceptable," *Ball I*, 792 F.3d at 599, or what is consistent with "[a] sufficient national consensus," *Roper v. Simmons*, 543 U.S. 551, 562 (2005). In other words, the extreme deprivation of any "minimal civilized measure of life's necessities" violates the Eighth Amendment. *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (citation omitted).

"It is well-established in [the Fifth Circuit] 'that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures.'" *Yates v. Collier*, 868 F.3d 354, 359 (5th Cir. 2017) (quoting *Hinojosa v. Livingston*, 807 F.3d 657, 669 (5th Cir. 2015)). Indeed, the Fifth Circuit has "repeatedly recognized the serious risk of harm that excessive heat can pose in the prison context absent adequate mitigating measures, and [it

has] consistently found evidence sufficient in these cases to support an Eighth Amendment violation, even when certain mitigating measures were available." *Id.* at 361. The Fifth Circuit has recognized this risk for at least the last twenty years. *See Gates v. Cook*, 376 F.3d 323, 340 (5th Cir. 2004).

In *Gates*, the Fifth Circuit held that inmates in the Mississippi Department of Corrections (the "MDOC") faced a substantial risk of serious harm based on the MDOC's failure to "provide fans, ice water, and daily showers when the heat index is 90 degrees or above." *Gates,* 376 F.3d at 334, 339–40. In *Ball I*, the Fifth Circuit affirmed the district court's finding that the heat within a prison housing area posed a substantial risk of serious harm to inmates, where the heat index ranged from 81.5° to 107.79° and surpassed 100° on five or more days during a roughly two-week period. 792 F.3d at 590–94. The Fifth Circuit did so even though those inmates had continued access to potable water and ice. *Id.* at 590, 592. And in *Cole*, the district court found that extremely hot conditions at TDCJ facilities (a heat advisory warned that the heat index could reach "near or above 108" degrees) constituted a substantial risk of serious harm sufficient to satisfy the Eighth Amendment's objective test. 2017 WL 3049540, at *39 (Ellison, J.). In the two decades since *Gates*, the Fifth Circuit has repeatedly acknowledged the serious risk of harm that excessive heat poses in the prison context. *See Yates*, 868 F.3d at 359; *see also Hinojosa*, 807 F.3d at 669.

Here, to establish an Eighth Amendment violation, Plaintiffs must show (1) the heat poses an unreasonable risk of serious harm, and (2) Collier acted with deliberate indifference to the risk posed. *See e.g., Hinojosa*, 807 F.3d at 665.

a. The Organizational Plaintiffs Are Likely to Show Heat Exposes their Constituents to Unreasonable Risk of Serious Harm

The Organizational Plaintiffs have shown that extreme heat in TDCJ's uncooled prisons constitutes a well-established substantial risk of serious harm that constitutes cruel and unusual

punishment. Approximately 96,500 of TDCJ's 142,240 beds remain unair-conditioned.[494] In the last two summers, TDCJ logs have shown outdoor heat indexes as high as 134°, and indoor temperatures above 85° nearly every day from May 1, 2023 to September 30, 2023.[495] This evidence is consistent with testimony from current and former prisoners, who have observed temperature readings in their units exceeding 110° and 130°.[496] TDCJ agrees that outdoor temperatures at every Texas prison are expected to exceed 85° each summer, and that the temperatures prisoners are exposed to inside unair-conditioned prisons are so high and dangerous that adequate mitigation measures are required.[497] The heat will only get worse with climate change. As Dr. Mearns explains, increasing extreme temperatures and more frequent heat waves are likely to continue, which will result in an increasing heat index, and number of hours per day with extreme heat index values."[498] Collier has offered no evidence to the contrary and, in fact, acknowledged that summers are hot in Texas, have been hot for years, and are likely to continue to be hot.[499]

It is undisputed that heat "is one of the leading weather-related killers in the United States, resulting in hundreds of fatalities each year."[500] As set forth above, a heat index of 88° or higher poses a substantial risk of adverse health outcomes for everyone—even young, healthy people.[501] Those risks include heat exhaustion, heat rash, dehydration, heat cramps, heat syncope, and heat stroke—the last of which carries a "high mortality rate" and can have lasting negative health

---

[494] *See* Findings of Fact, Section F.3, *supra*.
[495] *See* Findings of Fact, Section C.1, *supra*.
[496] *See* Findings of Fact, Section C.1, *supra*.
[497] *See* Findings of Fact, Section C.1, *supra*.
[498] *See* Findings of Fact, Section C.1, *supra*.
[499] *See* Findings of Fact, Section C.1, *supra*.
[500] *See* Findings of Fact, Section C.1, *supra*.
[501] *See* Findings of Fact, Section C.1, *supra*.

consequences for those people who do not die.[502] High heat also exacerbates mental illness.[503] People with mental health disorders exhibit higher rates of suicidality, agitation, impulsivity, and slowing of cognitive processing when exposed to high heat, and mental health episodes requiring hospitalization increase under these conditions.[504] These risks were uncontested by Collier. Indeed, TDCJ's own training documents acknowledge that "[i]ncreased body temperatures, if left uncontrolled, may lead to delirium, convulsions, seizures, and possibly even death."[505] Collier acknowledged through his 30(b)(6) deponent that extreme heat is a dangerous condition in the TDCJ system that "has killed inmates, and [has] caused numerous inmates and officers to suffer heat-related illnesses."[506] And Collier's own internal medicine expert, Dr. Leonardson, agreed that people exposed to severe environmental heat between 90° to 105° Fahrenheit are at serious risk of illness and death.[507]

Plaintiffs need not prove "that death or serious injury has already occurred" to satisfy the Eighth Amendment's objective standard. *Ball I*, 792 F.3d at 593 (citation omitted). Instead, they need only show "a substantial risk of serious harm" from the extreme heat. *Id.* at 594. Even so, Plaintiffs' experts Dr. Skarha and Dr. Zanobetti established that nearly three hundred deaths were attributable to extreme heat in Texas prisons without air conditioning between 2001 to 2019, or an average of 14 deaths per year.[508] Dr. Skarha and Dr. Zanobetti concluded that a one-degree temperature increase above 85° corresponds to a 0.7% increase in the risk of mortality.[509]

---

502 *See* Findings of Fact, Section C.1, *supra*.
503 *See* Findings of Fact, Section C.1, *supra*.
504 *See* Findings of Fact, Section C.1, *supra*.
505 *See* Findings of Fact, Section C.1, *supra*.
506 *See* Findings of Fact, Section C.1, *supra*.
507 *See* Findings of Fact, Section C.1, *supra*.
508 *See* Findings of Fact, Section D.2, *supra*.
509 *See* Findings of Fact, Section D.2, *supra*.

Neither heat-related deaths nor heat-related illnesses have abated since 2019. TDCJ admitted to three heat-related deaths of inmates just last summer alone.[510] That number is almost certainly an undercount, given Plaintiffs' unrebutted evidence of two additional heat-related deaths (neither of which were classified as such by TDCJ), and TDCJ's failure to timely perform autopsies, failure to consistently take core body temperatures, and refusal to classify a death as "heat-related" unless heat was the sole cause of the inmate's death.[511] Plaintiffs, likewise, presented unrebutted testimony from Dr. Zanobetti and Dr. Skarha that inmates in unair-conditioned Texas prisons will continue to die from the heat unless these facilities are air conditioned.[512]

The heat also continues to cause inmates and staff to suffer heat-related illnesses. TDCJ's public reports to the Texas Legislature acknowledged that 17 TDCJ inmates suffered heat-related illnesses in 2023, though Plaintiffs' evidence shows this, too, is likely an undercount, with TDCJ's medical services provider, UTMB, reporting 35 prisoners with heat-related injuries in just June 2023 alone.[513] And according to TDCJ's training documents, heat-related illness is the fifth-leading cause of serious injuries among TDCJ employees.[514] TDCJ also reported 35 heat-related illnesses of staff to the Texas Legislature in 2023, and Plaintiffs presented evidence of nearly 80 heat-related workers' compensation claims filed by corrections staff in 2022 and 2023.[515]

Notably, these deaths and heat-related illnesses and injuries occurred during a summer when, as Collier's witnesses testified and TDCJ documents indicate, the prisons were implementing all of TDCJ's heat mitigation measures, including their heat score system, access to cooled respite areas,

---

510 *See* Findings of Fact, Section D.3, *supra*.
511 *See* Findings of Fact, Section D.4-D.6, *supra*.
512 *See* Findings of Fact, Section D.2, *supra*.
513 *See* Findings of Fact, Section D.6, *supra*.
514 *See* Findings of Fact, Section D.8, *supra*.
515 *See* Findings of Fact, Section D.8, *supra*.

distribution of water and ice, cool showers, and fans.[516] TDCJ's mitigation measures are ineffective because of the temporary nature of the relief.[517] And in some instances, such as using fans when the temperature reaches a certain threshold, the mitigation measures actually increase the risk of heat-related illness, injury, or death.[518] And even if the mitigation measures were effective, inmates have severely limited access to these resources due to understaffing.[519] Based on this evidence, Plaintiffs have shown that every TDCJ inmate in an unair-conditioned cell faces a substantial risk of death or serious bodily injury from the extreme heat, absent the installation of air conditioning.

b. Tiede is Likely to Show the Heat Exposes Him to Unreasonable Risk of Serious Harm

The Court has already determined that Tiede is "substantially likely to prove an Eighth Amendment violation because of his enhanced sensitivity to extreme heat due to his medical conditions," (Order, Dkt. 17 at 4), and finds this remains true. While TDCJ currently houses Tiede in an air-conditioned cell, TDCJ moved him there after the Court entered a temporary restraining order compelling the TDCJ to do so. As for his continued placement in an air-conditioned cell, the Court has also determined that "this voluntary cessation does not moot his request for relief, as it is not 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (Order, Dkt. 95 at 7 (quoting *Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009) (cleaned up), *aff'd*, 563 U.S. 277 (2011))). Despite his undisputed heat-sensitive co-morbidities, Tiede has not been assigned a heat score that would require TDCJ to place him in an air-conditioned cell pursuant to its heat score policy.[520] Further, every TDCJ witness who testified at the hearing, including Collier,

---

516 *See* Findings of Fact, Section E, *supra*.
517 *See* Findings of Fact, Section E.1, *supra*.
518 *See* Findings of Fact, Section E.4, *supra*.
519 *See* Findings of Fact, Section E.1, *supra*.
520 *See* Findings of Fact, Section B, *supra*.

would not commit to keeping Tiede in an air-conditioned cell.[521] Thus, Tiede is at risk of being moved into unair-conditioned housing at any time and therefore being subjected to the dangers of extreme heat detailed above.

The evidence from the hearing also shows that placing Tiede in unair-conditioned housing would be detrimental to his health and put him at a substantial risk of serious harm, including death.[522] Tiede's condition has only worsened since the Court entered its temporary restraining order, as he was diagnosed with a new "acute or subacute" stroke in his thalamus in April 2024.[523] Tiede, 66 years old, also suffers from COPD, diabetes, hypertension, and bleeding on his right retina.[524] He testified that his health improves when he's housed in air conditioning and would decline if placed back in extreme heat.[525] Dr. Vassallo offered unrebutted testimony that Tiede is particularly vulnerable to heat, and that placing Tiede in unair-conditioned housing would put him at a substantial risk of death or serious harm.[526]And again, the evidence at the hearing established that TDCJ's heat mitigation measures are insufficient to protect inmates like Tiede from a substantial risk of death or serious harm.[527]

In sum, TDCJ refuses to guarantee Tiede will remain in an air-conditioned unit, has failed to assign him a heat score that would require such a guarantee, and would provide only woefully inadequate mitigation measures if he is removed from the air conditioning. Accordingly, TDCJ fails to take reasonable measures to guarantee the safety of Tiede, as required by the Eight Amendment.

c. Plaintiffs are substantially likely to show that Collier acted with deliberate indifference.

---

521 *See* Findings of Fact, Section B, *supra*.
522 *See* Findings of Fact, Section B, *supra*.
523 *See* Findings of Fact, Section B, *supra*.
524 *See* Findings of Fact, Section B, *supra*.
525 *See* Findings of Fact, Section B, *supra*.
526 *See* Findings of Fact, Section B, *supra*.
527 *See* Findings of Fact, Section E, *supra*.

To satisfy the Eighth Amendment's subjective standard, Plaintiffs must show that it is substantially likely that Collier "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). This knowledge can be inferred "from circumstantial evidence," and the Court "may conclude that [Collier] knew of a substantial risk of serious harm from the very fact that the risk was obvious." *Gates*, 376 F.3d at 333, 340 (affirming finding of deliberate indifference "based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness"); *see also Ball I*, 792 F.3d at 595 (affirming finding of deliberate indifference based "on the totality of the record evidence" showing prison official's subjective knowledge). This knowledge may also be shown by evidence that the risk is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and "the circumstances suggest that [Collier]" was exposed to that information. *Farmer*, 511 U.S. at 842–43. These standards are met here.

Plaintiffs have shown it likely that Collier knows inmates face serious harm from the extreme heat in Texas's unair-conditioned prisons, and that the risk of harm is obvious, well-documented, longstanding, and pervasive, and has been expressly noted by TDCJ officials in the past.

First, Collier admitted during the hearing that he was aware of the several heat-related deaths, multiple heat-related illnesses of inmates, dozens of workers' compensation claims, dozens of staff-related illnesses, and thousands of heat-related grievances from inmates in the last two summers alone.[528] And Collier knows that this is not a new phenomenon. Indeed, he testified under oath in the *Cole* case during the summer of 2019 that he believed that inmates confined in

[528] *See* Findings of Fact, Section E, *supra.*

temperatures of 95° were at a serious health risk.[529] Collier's Rule 30(b)(6) deponent also acknowledged that the temperatures TDCJ inmates are exposed to during the summer months are so high and potentially dangerous that they are at a very real risk of harm and serious injury unless adequate measures are taken to protect them.[530] And the deponent admitted that extreme heat is a dangerous condition in the system that "has killed inmates, and [has] caused numerous inmates and officers to suffer heat-related illnesses."[531] Thus, Collier is personally aware of the substantial risk of harm faced by TDCJ inmates in unair-conditioned prisons, despite TDCJ's heat mitigation measures.

Second, Collier is well aware of the substantial risk of harm from extreme heat, given the numerous lawsuits that have been filed against him, his predecessors, and TDCJ itself over the last twenty-five years for deaths and serious illnesses caused by extreme heat. TDCJ has previously acknowledged heat-related deaths dating back to 1998. As Judge Ellison found in a case arising out of the death of TDCJ prisoner Larry McCollum:

> It is undisputed that five men died in 1998 from environmentally-caused hyperthermia while incarcerated in TDCJ facilities. Between 1999 and 2010, five more individuals are known to have died from hyperthermia or other heat-related illnesses while incarcerated in Texas prisons. In 2011, Texas experienced an "unprecedented" heat wave, and ten more individuals died from hyperthermia. McCollum was the second individual to die of heat-related illness during the summer of 2011.

*McCollum v. Livingston,* No. 4:14-CV-3253, 2017 WL 608665, at *1 (S.D. Tex. Feb. 3, 2017). As the Fifth Circuit has recognized, "TDCJ officials are, or have been, defendants in numerous other

529 *See* Findings of Fact, Section D.1, *supra*. In that case, Judge Ellison found that Collier was aware that a risk of serious harm existed as a result of the extreme temperatures in the Wallace Pack Unit and, alternatively, that the risk of harm was obvious. *See Cole*, 2017 WL 3049540, *40.
530 *See* Findings of Fact, Section D.1, *supra*.
531 *See* Findings of Fact, Section D.1, *supra*.

cases alleging Eighth Amendment violations based on excessive heat in prison." *Yates*, 868 F.3d at 360 (citing *Hinojosa*, 807 F.3d at 661 (deciding appeal involving TDCJ prisoner who suffered a seizure at night due to high indoor temperatures, "[fell] out of his bed and was convulsing," and died twenty minutes later); *Webb v. Livingston*, 618 F. App'x 201, 204 (5th Cir. 2015) (deciding appeal involving the "heat-related deaths of five prisoners who died while housed in facilities operated by [TDCJ]"); *Valigura v. Mendoza*, 265 F. App'x 232, 233–34 (5th Cir. 2008) (deciding appeal involving prisoner who alleged that "temperatures in the bunk area reached into the nineties and hundreds due to poor ventilation" and that "he was not able to use the restroom or showers without lengthy waits, which caused him severe discomfort"). Collier admitted that he was aware of ten heat-related deaths in the summer of 2011 alone. Thus, these lawsuits not only placed Collier on notice of the substantial risk of serious harm Texas inmates face from extreme heat, but they also established the obviousness of that risk.

Third, multiple studies were sent to Collier personally, warning him and TDCJ that heat-related deaths had occurred in TDCJ prisons. For instance, the study published by Dr. Skarha and Dr. Zanobetti in 2022 concluded that 271 deaths were attributable to extreme heat in Texas prisons without air conditioning from 2001 to 2019—an average of 14 deaths per year.[532] The same study concluded that there was not a single heat-related death in TDCJ's air-conditioned prisons during this period.[533] Likewise, Dr. Purdum's study, published in 2022, revealed that 29% of the TDCJ inmates surveyed said that they knew of at least one heat-related death either in their own unit or at another unit.[534] Dr. Purdum's study also warned that "increasing annual temperatures and the increase of days over 100 degrees in Texas will continue

[532] *See* Findings of Fact, Section D.1, *supra*.
[533] *See* Findings of Fact, Section D.1, *supra*.
[534] *See* Findings of Fact, Section E, *supra*.

to exacerbate the degradation of health for both incarcerated people and staff in the TDCJ system."[535] Collier admitted during the hearing that he had received and reviewed both of these studies.[536]

Lastly, Collier is well aware of the substantial risk of serious harm from extreme heat because of safe-temperature mandates in jails and federal prisons in Texas and in other state prison systems across the country. Since 1994, state-wide regulations adopted by the Texas Commission on Jail Standards have required all jails in Texas to maintain indoor temperatures between 65° and 85°.[537] Notably, this range departs significantly upward from the temperatures required inside other government buildings in Texas to maintain "comfortable" levels (e.g., between 68° and 78°).[538] North Carolina, Tennessee, and the federal Bureau of Prisons have implemented similar standards.[539] TDCJ has nevertheless not done the same.

The "mere presence of remedial measures" is not a defense to an Eighth Amendment violation. *Webb*, 618 F. App'x at 209 n.7; *see also Cole*, 2017 WL 3049540, at *41 (rejecting Collier's argument TDCJ was not deliberately indifferent simply because TDCJ "implemented several mitigating measures since the deaths in 2011 and 2012"). Prison officials cannot "insist[] upon a course of action that has already proven futile." *Lewis v. Cain*, No. CV 15-318-SDD-RLB, 2023 WL 7299130, at *47 (M.D. La. Nov. 6, 2023). Nor can they rely on mitigation measures that have nothing more than a "negligible impact" on the danger posed to inmates from extreme heat. *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002). They are instead required to implement mitigation measures that "adequate[ly] . . . protect inmates from the extreme heat."

535 *See* Findings of Fact, Section E, *supra.*
536 *See* Findings of Fact, Section E, *supra.*
537 *See* Findings of Fact, Section D.4, *supra.*
538 *See* Findings of Fact, Section D.4, *supra.*
539 *See* Findings of Fact, Section D.4, *supra.*

*Webb*, 618 F. App'x at 209 n.7; *see also Cole*, 2017 WL 3049540, at *41 ("[T]he effectiveness of the measures implemented by TDCJ is relevant to the Court's analysis.").

Seven years ago, Judge Ellison held that many of the same mitigation measures Collier relies on in his defense in the instant case—respite rooms, cold showers, access to water and ice, and fans—"do not stop Plaintiffs from experiencing the symptoms of heat-related illnesses and do not reduce the risk of serious injury or death to a socially acceptable level." *Cole*, 2017 WL 3049540, at *40. Judge Ellison explained that those measures were "by and large ineffective at reducing the heat stress placed on Plaintiffs' bodies" and were nothing more than "the bare minimum." *Id.* at *40-42. By implementing such measures, Judge Ellison held, Collier "ignored the risk of harm faced by the population [he] serve[s]" and was thus deliberately indifferent to the substantial risk of serious harm that inmates in the Wallace Pack Unit faced from the extreme heat. *Id.* at *42. The Texas House Corrections Committee reached the same conclusion the following year: "Based on the medical information known about human health and heat-related health risks, TDCJ cannot rely only on mitigation factors to assure the well-being of inmates and corrections personnel."[540]

Despite Judge Ellison's opinion, the Texas Legislature's clear mandate, and the benefit of seven years to adequately address the substantial risk of serious harm (including illness and death) that extreme heat poses to inmates in unair-conditioned cells, Collier has failed to implement the installation of air conditioning in TDCJ facilities. Instead, he largely relies on the same mitigation measures that Judge Ellison found inadequate in the *Cole* case.

Unsurprisingly, the uncontroverted evidence shows that those heat mitigation measures are *still* inadequate, just as Judge Ellison found seven years ago. Even when available, respite is, by its

540 *See* Findings of Fact, Section E, *supra.*

very nature, temporary, and it places the onus on inmates to recognize when they are developing symptoms of a heat-related illness, even though such symptoms can be subtle and can include cognitive impairments that render inmates unable to recognize that they need help.[541] Cold showers, even when available, have no statistically significant impact on heat-related mortality and, at best, provide relief for only a few minutes.[542] Fans are not only ineffective but actually *increase* the risk of heat-related illness at heat indexes over 99°.[543] Even unfettered access to ice and water, which Plaintiffs' evidence demonstrates not consistent in practice, is insufficient.[544] The Court notes again that TDCJ surveillance video captured Castillo visiting the water cooler 23 times in the 24 hours before his heat-related death and that Womack was seen passing water bottles in his cell in the hours before his death.[545] And, as Professor Deitch testified, even if these measures worked in theory, understaffing has had an "enormous impact" on TDCJ's ability to implement these heat mitigation measures.[546]

Nor is TDCJ's "heat score" system—which was implemented as a result of the settlement agreement in the *Cole* case—an adequate manner of remedying the substantial risk of serious harm faced by TDCJ inmates in unair-conditioned facilities. To begin with, although *all* TDCJ inmates (even the young and healthy) face such a risk, only approximately 12,289 of the 134,500 individuals incarcerated in the TDCJ system (i.e., less than 10%) have a heat score.[547] This is reason enough to find the system inadequate. Nor does the system even accomplish its purported goal of protecting especially vulnerable, heat-sensitive inmates. For instance, inmates do not

---

541 *See* Findings of Fact, Section E.1, *supra*.
542 *See* Findings of Fact, Section E.3, *supra*.
543 *See* Findings of Fact, Section E.4, *supra*.
544 *See* Findings of Fact, Section E.5, *supra*.
545 *See* Findings of Fact, Section D.3, *supra*.
546 *See* Findings of Fact, Section E.1, *supra*.
547 *See* Findings of Fact, Section E.1, *supra*.

automatically receive a score for having a mental illness, taking one of the many medications that impair thermoregulation, or being above the age of 65—all of which Plaintiffs' experts identified as making inmates more susceptible to heat.[548] Indeed, many of the medical conditions and medications that UTMB's own policies identify as affecting heat tolerance are not incorporated into the heat score algorithm it designed for TDCJ, either.[549] If Tiede—who is 65 years old and has been diagnosed with a stroke, diabetes, hypertension, pulmonary disease, and obesity—does not have a heat score,[550] then the system is arbitrary and ineffective at accomplishing even its stated, already-underinclusive goal of protecting especially heat-sensitive inmates. Collier thus cannot rely on the heat score system to avoid liability under the Eighth Amendment.

Most troubling to the Court, however, is the fact that none of these measures prevented (1) the several dozen deaths that Drs. Skarha and Dr. Zanobetti attributed to heat even after heat mitigation measures were implemented, (2) the three heat-related deaths that Collier admits occurred last summer, (3) the two additional heat-related deaths that Dr. Uribe and Dr. Vassallo testified occurred last summer, or (4) the 35 heat-related illnesses of TDCJ inmates identified by UTMB that occurred in 2022 and 2023—or the 17 heat-related illnesses that TDCJ itself reported to the Legislature. In short, TDCJ's mitigation measures have "not stop[ped] [TDCJ inmates] from experiencing the symptoms of heat-related illnesses and [did] not reduce the risk of serious injury or death to a socially-acceptable level." *Cole*, 2017 WL 3049540, at *40.

What Collier has *not* done "in the face of the substantial risk of harm is also relevant to the Court's analysis." *Id.* at *42. Despite knowing of the risk extreme heat poses to all inmates and the inadequacy of TDCJ's mitigation measures, Collier has no concrete timeline for installing

548 *See* Findings of Fact, Section E.1, *supra*.
549 *See* Findings of Fact, Sections B and E.1, *supra*.
550 *See* Findings of Fact, Section D.3, *supra*.

permanent or temporary air conditioning in TDCJ inmate living areas.[551] TDCJ has not solicited bids for installing either temporary or permanent air conditioning throughout TDCJ facilities.[552] Although Collier has added 8,940 cool beds since 2018 (a number that includes the 1,436 ordered as part of the Wallace Pack Unit settlement), this averages out to only 1,376 beds per year.[553] At that rate, it would take TDCJ approximately 70 years—i.e., until 2094—to install air conditioning throughout the system.[554] Even crediting the most favorable evidence introduced at the hearing to Collier, at TDCJ's more recent, higher rate of adding cool beds, it will take 25 to 30 years to add air conditioning to all inmate living areas, assuming the Texas Legislature allocates funds to do so.[555] This slow timeline exposes over 95,000 inmates to the substantial risk of serious injury or death from unair-conditioned prisons and, assuming normal rates of inmate turnover, would continue to expose hundreds of thousands of inmates to the substantial risk of injury or death from extreme heat over the next two to three decades. Collier, likewise, did not identify (let alone present any evidence of) a less intrusive alternative to temperature control that would reduce the risk of death and serious bodily injury to a "socially acceptable level." *Ball I*, 792 F.3d at 599.

In sum, the Court finds that, despite a significant risk of harm faced by inmates in unair-conditioned TDCJ prisons, Collier has implemented mitigation measures he knows are inadequate—and which the Court finds are scientifically inadequate—to reduce the substantial risks of serious harm posed by extreme heat. And he has implemented (or has a plan to implement) the only reasonable mitigation measure that he knows is adequate to reduce or eliminate the risk—air conditioning—at a pace that disregards the substantial risk of harm the

---

551 *See* Findings of Fact, Section F.3, *supra*.
552 *See* Findings of Fact, Section F.3, *supra*.
553 *See* Findings of Fact, Section F.3, *supra*.
554 *See* Findings of Fact, Section F.3, *supra*.
555 *See* Findings of Fact, Section F.3, *supra*.

inmates face due to their ongoing exposure to extreme heat. Thus, based on the totality of the evidence, it is substantially likely that Collier has acted with deliberate indifference. Accordingly, Plaintiffs have shown a likelihood of success on the merits of their Eighth Amendment claim.

**B. Irreparable Harm**

"[A] harm is irreparable, in the context of a preliminary injunction, where there is no adequate remedy at law[.]" *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "When an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) (quoted in *Cole*, 2017 WL 3049540, at *43).

Plaintiffs have shown that TDCJ inmates housed in unair-conditioned prisons will experience irreparable harm, absent court intervention. TDCJ's own public reports to the Texas Legislature from 2023 identify that, at minimum, three TDCJ inmates died and 17 more were injured as a result of the extreme heat in their unair-conditioned living areas last summer.[556] Plaintiffs' evidence, including the testimony of Drs. Skarha, Zanobetti, Vassallo, and Uribe, demonstrates that extreme heat has injured and killed even more TDCJ inmates, in addition to those identified by TDCJ itself.[557] And the symptoms inmates suffer—standing alone—are constitutionally significant injuries. *See Blackmon v. Garza*, 484 F. App'x 866, 872 (5th Cir. 2012) (headaches, dizziness, nausea, lightheadedness, difficulty catching breath, and blurred vision, even without medical documentation of the symptoms, are sufficient injuries).[558]

The record evidence shows that exposure to the risks of extreme heat itself is also irreparable injury. *See Ball I*, 792 F.3d at 593-94. Dr. Vassallo testified that exposure to a heat index

[556] *See* Findings of Fact, Sections D.3 and D.7, *supra.*
[557] *See* Findings of Fact, Sections D.4 through D.7, *supra.*
[558] *See* Findings of Fact, Section C.1, *supra.*

of 88° or higher poses a substantial risk of adverse outcomes for everyone and, again, Defendant's witness, Dr. Leonardson, agreed that temperatures at and above 90° expose inmates to a serious risk of heat-related illness and death.[559] While the Court acknowledges that Collier has a goal of installing air conditioning throughout the inmate living areas in all TDCJ prisons, the Court finds that mere goals in the absence of concrete funding and actions do not satisfy the Eighth Amendment. Cumulatively, hundreds of thousands of inmates will be exposed to extremely high temperatures in TDCJ's unair-conditioned prisons in the 25 to 30 years it will take to air-condition all inmate living areas at the most recent rate of installation. TDCJ inmates will continue to suffer scores of heat-related deaths and injuries until air conditioning is installed.

The Court finds there is no adequate remedy at law for these constitutional violations, as they will continue absent permanent air conditioning. Plaintiffs are at "a significant threat of injury from the impending action," this "injury is imminent," and "money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986).

### C. The Balance of the Equities and the Public Interest

The Court now addresses the final point of analysis, which presents an unusual and highly frustrating challenge. When considering a preliminary injunction, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)). Preliminary injunctions are temporary in nature, designed to preserve the status quo and prevent irreparable harm until the

559 *See* Findings of Fact, Section 3.1, *supra.*

court renders a decision on the merits. *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *4 (5th Cir. Feb. 17, 2022) (citing *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)). In this case, the Court is further restrained by the Prison Litigation Reform Act ("PLRA"), which provides that a preliminary injunction issued with respect to prison conditions expires 90 days after its entry. 18 U.S.C. § 3636(a)(2). So, the Court also takes into consideration the temporal limitations of a preliminary injunction now, versus a lasting permanent injunction at the conclusion of this case.

It is usually the case that granting temporary relief will have the effect of benefiting the movant by preserving the status quo while a case is pending. Here, however, the Court is presented with the unsettling paradox that ordering preliminary relief in the form of temporary air conditioning while the case proceeds would be to the detriment to the ultimate goal of permanent air conditioning. Because the installation of temporary air conditioning would involve a different design and construction process than that of a permanent system, the considerable funds necessary to accomplish such temporary relief would be at the expense of the much more elaborate and expensive process of achieving permanent air conditioning. In other words, the temporary solution presented here at the preliminary injunction posture risks altering the status quo to make it *less* feasible to attain a permanent injunction after this case proceeds to a bench trial and final judgment.

Significantly, Plaintiffs and Collier share the goal of installing permanent air conditioning in all TDCJ facilities. When asked if his goal was to have air conditioning in the entire TDCJ system, Collier responded, "Absolutely."[560] This is not a case where the defendant completely opposes remedying a constitutional violation. Rather, while the parties disagree over the necessary timeline and plan, Collier presents evidence that he shares Plaintiffs' ultimate goal of air conditioning the

---

[560] Final Hearing Tr. (August 2, 2024), at 179:5–9.

facilities permanently and agrees that it is attainable. Relatedly, since the hearing on the preliminary injunction, two bills on this issue have been introduced in the Texas Legislature, which is currently in session.[561] The bills, HB2997 and HB1315, both propose requiring TDCJ facilities to be maintained at a temperature between 65 degrees and 85 degrees Fahrenheit. HB2997 also proposes reporting requirements regarding air conditioning.[562] If passed, the bill would require TDCJ to report to the governor and the legislature each incident where the temperature in a TDCJ facility was not maintained in the required range and where an air conditioning system failed, and the steps that were taken to ensure the well-being of inmates and staff during those incidents.[563] Considering these bills and Collier's representations that he moves in good faith towards permanent air conditioning, it remains at the forefront of the Court's mind that Plaintiffs, Collier, and members of the legislature are striving for the same end.

In navigating a path to that end, the Court sees conflict between ordering temporary relief now at the preliminary injunction phase and Plaintiffs' likely permanent injunction at the summary judgment or trial phase. Logistically, temporary and permanent air conditioning are separate technologies and outfitting a unit with either requires different processes.[564] To temporarily air condition a unit, TDCJ rents, at a significant cost, stand-alone air conditioning equipment and a generator to power that equipment.[565] By contrast, to install permanent air-conditioning, TDCJ must employ engineers and architects to investigate the building's structure and design air conditioning to fit the building, and then the building must undergo construction to be permanently outfitted with

---

561 H.R. 2997, 89 Leg., Reg. Sess. (Tex. 2025); H.R. 1315, 89 Leg., Reg. Sess. (Tex. 2025).
562 H.R. 2997, 89 Leg., Reg. Sess. (Tex. 2025); H.R. 1315, 89 Leg., Reg. Sess. (Tex. 2025).
563 H.R. 2997, 89 Leg., Reg. Sess. (Tex. 2025).
564 Final Hearing Tr. (Aug. 2, 2024) at 84:1–89:20.
565 *Id.*

an air-conditioning system.[566] TDCJ's 101 units are of varying sizes and structures, making this an iterative process. These efforts are particularly intensive for older units, which present unique challenges such as large windows that remain open at all times.[567]

At the hearing, Collier explained the cost of installing air conditioning, both temporary and permanent. As previously noted, TDCJ estimates that the cost to install temporary air conditioning equipment and fuel for generators for the seven summer months would be $700-800 million; the fuel would cost $600 million each year.[568] And TDCJ estimates that it will need to purchase 65,000 tons of air conditioning equipment to permanently air condition the whole system.[569] The first phase alone of Collier's plan to air condition the entire system calls for $225 million.[570] If the Court were to order temporary air conditioning placed in all units, vast amounts of funding and resources would be necessary to comply. Collier presented evidence that if ordered to install temporary air conditioning, TDCJ would have to stop efforts towards permanent air conditioning, due to limited staff and resources.[571] This diversion of resources would halt momentum towards installation of permanent air conditioning, Plaintiffs' ultimate desired outcome.

Plaintiffs did present evidence that installing temporary air conditioning in all TDCJ facilities is possible. But, they largely rely on evidence of TDCJ installing temporary air conditioning to comply with the court order in *Cole* and with the Texas Board of Jail Standards during Operation Lone Star. The instant case is of a much larger scale. The preliminary injunction in *Cole* concerned only one unit. *See Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *46 (S.D. Tex. July 19,

---

566 *Id.* at 93:5–98:3.
567 *Id.* at 89:6–11.
568 *Id.* at 91:22–92:3; 86:22–87:14; 90:9–91:6.
569 *Id.* at 154:14–17.
570 *Id.* at 179:14–180:4.
571 Final Hearing Tr. (August 2, 2024), at 92:9–15.

2017). Only three units required temporary air conditioning for Operation Lone Star.[572] This case concerns all TDCJ units, 101 in sum. The Court wholeheartedly agrees with the precedent that "inadequate resources can never be an adequate justification for depriving any person of his constitutional rights." *Smith v. Sullivan,* 553 F.2d 373, 378 (5th Cir. 1977) (internal citation omitted); *see also Rufo v. Inmates of Suffolk Co. Jail*, 502 U.S. 367, 396 (1992) (O'Connor, J., concurring) ("[T]he lack of resources can never excuse a failure to obey constitutional requirements."). But the Court is also mindful that "[p]ublic officials often operate within difficult fiscal constraints; every dollar spent for one purpose is a dollar that cannot be spent for something else." *Rufo*, 502 U.S. at 396 (O'Connor, J., concurring). Regrettably, the Court finds granting temporary relief now undermines the feasibility of installing permanent air conditioning in all 101 units, thereby remedying the constitutional violation with finality.

More, granting temporary relief especially undermines the speed with which TDCJ could install permanent air conditioning. Temporary air conditioning could not be installed instantly. There would still be some delay, which then delays a permanent solution, further undercutting Plaintiffs' goal of not only receiving permanent relief, but receiving it quickly. In *Cole*, it took 60 to 90 days to install temporary air conditioning in one unit,[573] making it conceivable that temporary air conditioning could not be installed in all 101 units in the 90 days before a preliminary injunction would expire under the PLRA. It is a matter of reality and practicality that time and resources would be more judiciously spent securing permanent air conditioning. The Court acknowledges that Plaintiffs experience irreparable harm while Collier works to provide permanent air conditioning. But the Court finds that ordering Collier to expend limited resources on temporary relief does not

---

[572] Final Hearing Tr. (Aug. 2, 2024) at 126:20–127:10.
[573] Final Hearing Tr. (July 30, 2025), at 187:14–23.

serve the public interest nor the ultimate interests of either party. Rather, it is in all parties' best interest, and the public's, to move as quickly as possible to install permanent air conditioning.

Crucially, the Court emphasizes its anticipation that Plaintiffs will ultimately succeed on the merits. The Court warns Collier that it foresees Plaintiffs being entitled to permanent relief in the form of expeditious installation of permanent air conditioning in all TDCJ facilities. Collier is implored take to the necessary steps to be prepared for this result. The Court repeats that TDCJ's current plan to install permanent air conditioning—which on the most generous timeline, would not be complete for another 25 years—is insufficient under the Eight Amendment. While the Court has recognized the obstacles of funding, investigatory work, designing, and other practical considerations in its ruling on the preliminary injunction, the Court does not expect those factors to prevent it from ultimately finding Plaintiffs have a right to an injunction in the form of permanent air conditioning. Should Collier fail to obtain sufficient funding and demonstrate to the Court a plan for achieving the goal of providing sufficient air conditioning for the inmates of TDCJ in a timely manner, the Court reserves its right to revisit its analysis regarding the balance of equities and public interest in this case.

## V. CONCLUSION

This case concerns the plainly unconstitutional treatment of some of the most vulnerable, marginalized members of our society. The Court finds that Plaintiffs have met their burden of establishing a likelihood of success on the merits that Collier is violating the Eighth Amendment's prohibition against cruel and unusual punishment. The Court is of the view that excessive heat is likely serving as a form of unconstitutional punishment. Regrettably, the Court must also acknowledge that it will take hundreds of millions, if not billions, of dollars to install permanent air conditioning in every TDCJ facility, and that ordering temporary air conditioning now would have

the effect of diverting significant limited resources for a process that would neither be adaptable to a permanent solution nor likely even be complete before the Court's preliminary (i.e. temporary) injunction would expire. So, the Court finds it is not in the parties' or the public interest to issue a preliminary injunction at this time.

Accordingly, **IT IS ORDERED** that Plaintiffs' motion for preliminary injunction, (Dkt. 50), is **DENIED**.

The Court expects that this case will proceed along an expedited timeline to a bench trial. Keeping this timeline in mind, **IT IS FURTHER ORDERED** that the parties shall file a joint proposed scheduling order on or before **April 10, 2025.** The parties should consult the website for the U.S. District Court for the Western District of Texas (www.txwd.uscourts.gov), select the "Judges' Info" tab, "Standing Orders," "Austin Division," and file the joint proposed scheduling order utilizing District Judge Robert Pitman's form.

**SIGNED** on March 26, 2025.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

# EXHIBIT 7

# Exhibit B

I, SUSI VASSALLO, declare the following:

1. I make the declaration in support of the plaintiffs in *Tiede v. Texas Department of Criminal Justice*.

2. I received my Bachelor of Science from the University of Texas in 1980.

3. I received a Doctor of Medicine from the University of Texas in 1984.

4. I completed my Emergency Medicine residency at Wayne State University in 1987.

5. I completed my fellowship in Medical Toxicology at the New York University School of Medicine/Bellevue Hospital Center in 1989.

6. I am Board Certified in Emergency Medicine and Medical Toxicology and a certified correctional health professional.

7. I have been on the faculty of the New York University School of Medicine/ Bellevue Hospital Center since 1987 where I work in the Emergency Department. Bellevue Hospital Emergency Department, where I worked for 34 years as an emergency medicine physician, is the primary receiving hospital for the male prisoners housed in New York City jails.

8. My areas of special focus in teaching and writing include thermoregulation and the effects of drugs and illnesses on thermoregulation.

9. My CV is attached as Exhibit 1.

10. I am currently the medical expert for the California Department of Justice investigation into the medical conditions at the Los Angeles Sheriff's Department jails and the Riverside County, California jails. I am the Medical Monitor for the Consent Decree in the Orleans Parish Sherriff's Department Jail and the Sacramento County, California jails. I am the medical expert in the Federal Department of Justice investigation into the Al Cannon Detention Center.

11. I have been qualified as an expert on the effects heat in prisons and jails in federal courts in Louisiana, Mississippi, Texas, and New York.

12. Thermoregulation is the process that maintains the temperature of the human body in response to internal or external stimuli. The safe physiologic range for the body's internal temperature is 98.6° ±0.8° Fahrenheit. Heat transfers in and out of the body via four processes: radiation, convection, conduction, and evaporation. Radiation transfers heat through the emission of particles or waves. Convection transfers heat by moving a liquid or gas. Conduction transfers heat through direct contact between the body and other surfaces. Evaporation transfers heat as water changes from a liquid to a vapor, as when heat is lost through sweating.

13. The body's internal temperature can rise due to exposure to high or prolonged heat, which may result from factors such as high ambient temperature, humidity, radiant heat, and wind. Radiant heat sources include not only the sun but also building walls or cement floors.

14. The heat index is an accepted holistic measure used by the National Weather Service to issue heat advisories and by medical professionals. The heat index is calculated by combining air temperature and humidity, and it is a better gauge of the body's reaction to the external environment than temperature alone. The National Weather Service has developed the environmental heat index measures that correspond to risk for human health, forming four categories of risk as seen in the chart below. These are "caution," "extreme caution," "danger," and "extreme danger," explained in the chart below.



NWS Heat Index — Temperature (°F)

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity

Caution — Extreme Caution — Danger — Extreme Danger

15. The summer of 2023 was the second-hottest summer on record for Texas. Some cities, including El Paso and Austin, went more than 40 days without a single day that did not reach $100^0$F. The risks to health from daytime heat are exacerbated by the following warm nighttime temperatures.

16. Thermoregulation refers to the body's ability to maintain physiologic or normal core body temperature by balancing heat generation with heat loss. Failure to thermoregulate properly results in dysfunction of all bodily systems. Functional impairment includes, but is not limited to, the nervous system, the pulmonary system, the cardiovascular system, the endocrine system, the genitourinary system, and the gastrointestinal system.

17. The body has two primary mechanisms to cool itself — sweating and cutaneous vasodilation (the enlargement of blood vessels close to the skin). These mechanisms are both necessary for effective thermoregulation. Sweating brings water to the skin to evaporate and

allow heat to dissipate from the body. Cutaneous vasodilation brings blood close to the skin, transferring heat from the body's core to the surface. This process requires a healthy heart because when the body needs to release heat, the heart beats faster and harder to pump more blood to the skin.

18. As the external environment gets hotter, the body must work harder to thermoregulate. However, vasodilation is limited by the body's need to maintain blood pressure, so the body will accumulate heat. And as the humidity rises it becomes harder for sweat to evaporate from skin. So, the body cannot cool as effectively, and body temperature rises. Sweating depletes the body of water, which can lead to dehydration. Dehydration can cause light-headedness, low blood pressure, weakness, and increased heart rate. A dehydrated person cannot cool themselves effectively, causing the core body temperature to rise dangerously above normal, known as hyperthermia.

19. Heat causes tissue injury, and cells in the body's organs die, ultimately causing multiple organ systems to fail. The signs and symptoms of heat stroke are caused by tissue death and include death of the cells of the gastrointestinal tract causing vomiting and bloody diarrhea, death of the cells of the kidney causing kidney failure, death of liver cells, loss of coagulation factors further exacerbating bleeding, and catastrophic brain injury.

20. Medical disorders resulting directly from the heat that affect all people, even young, healthy people like many of the inmates in TDCJ facilities, include heat cramps, heat syncope, heat exhaustion, and heat stroke.

21. Heat cramps are painful muscle cramps that result from heat exposure. These cramps occur from dehydration and salt depletion. Heat cramps are painful and can last for hours if untreated with fluid repletion.

22. Heat syncope is loss of consciousness resulting from heat exposure. This occurs when the blood vessels are dilated, or widened, to bring more blood to the skin to cool the body. When the blood vessels are so dilated in the body's attempt to thermoregulate, the blood pressure falls, and there is insufficient blood flowing to the brain to maintain consciousness.

23. Heat exhaustion occurs when heat stress overwhelms the body. The body's cooling mechanisms work maximally, but thermoregulation still fails. A person suffering from heat exhaustion may feel chilled, lightheaded, thirsty, nauseous, weak, faint, dizzy, and/or have muscle aches and headache. The heart beats more rapidly. If the person does not get out of the heat, heat exhaustion can lead to heat stroke. Critically, heat stroke is frequently not preceded by heat exhaustion or the other heat related illnesses described above. There is no continuum of heat illnesses such that heatstroke is predictable.

24. Heat stroke is a severe and potentially fatal medical emergency. In heat stroke, the body's core temperature rises above 105.5° Fahrenheit, resulting in impaired brain function medically known as altered mental status. This may manifest subtly with inappropriate behavior, irritability, confusion, or impaired judgment, or it could include coma, convulsions, and death.

Heat stroke is a serious medical emergency and can be deadly. It carries a significant risk of death or permanent disability, a risk that increases if they do not immediately receive emergency medical treatment. In several studies, the mortality from heat stroke is 30-80%.

25. Importantly, underlying illnesses are exacerbated from exposure to the heat. These include worsening of asthma, cardiovascular disease, and kidney disease.

26. Permanent neurological damage occurs in up to 24% of survivors. This damage may include impaired spontaneous breathing, balance and walking problems, and cognitive issues.

27. Therefore, all people, even young, healthy people, are at substantial risk of suffering serious medical disorders resulting directly from the heat, including heat cramps, heat syncope, heat exhaustion, and heat stroke. This risk is well documented and well established in the medical literature**.**

28. Evidence that young and healthy people die of exercise-induced heatstroke is well proven, in athletes and in the military.

29. Young and presumably healthy people in Texas prisons have undiagnosed conditions. Some of them have asthma, and for most people this condition does not take them out of the young-healthy-people category.

30. The other issue that should be completely clear from this declaration is that people held in these hot conditions with their underlying conditions may develop a condition because of the heat or may manifest a first presentation of pulmonary disease, reactive airway disease. (asthma).

31. Heat-related deaths can be difficult to identify and are underreported. Heat-related deaths report death as a factor contributing to death rather than the underlying cause. When hyperthermia is included as the cause of death, the heat-related deaths increase by 54%. Therefore, the total number of heat-related deaths is significantly undercounted. This means that TDCJ's assertion that no inmates have died from a heat-related cause since 2012 is untrue and medically impossible.

32. According to epidemiological studies of heat waves, young, healthy people without medical problems may tolerate heat stress better than the sick and elderly. Yet the data show that morbidity and mortality in this healthy population still increased with heat stress.

33. Young, people often fail to recognize the symptoms of heat-related disorders, putting them at risk for harm. They may overestimate their fitness or underestimate the risks associated with heat exposure.

34. People with the following risk factor are at the greatest risk for illness and death due to extreme heat: (a) illnesses or medical conditions that impair thermoregulation; b) medical conditions that impair the ability to reason; (c) prescription drugs or medications that impair thermoregulation; and (d) age greater than 65 years old.

35. Asthma, chronic obstructive pulmonary disease, hypertension, cardiovascular disease, kidney disease and impair thermoregulation include hypertension (high blood pressure); respiratory diseases that impair oxygen exchange or ventilation such as asthma, COPD, and inflammatory conditions; seizure disorders; neurologic disease; cardiovascular disease; diabetes; skin disorders; and endocrine disorders.

36. Conditions that impair the ability to reason include dementia; psychiatric disorders including mood disorders such as anxiety and depression. Studies of heat-related deaths during heat waves have indicated that subjects with mental illness had an increased risk of death.

37. Numerous classes of prescription drugs impair thermoregulation. These include cardiovascular drugs, which used to prevent or treat heart disease and hypertension; diuretics, which are used to treat hypertension; sympathomimetics or vasoconstrictors such as nasal decongestants like Sudafed medications, which narrow blood vessels; anticholinergics, which are used to treat a wide variety of diseases, such as depression and seasonal allergies, and inhibit sweating; and SSRIs (selective serotonin reuptake inhibitors) used to treat depression, inferred with the brain's role in thermoregulation.

38. People over the age of 65 have 10-12 times increased risk of heat-related illness and death than those younger than 65. The mortality from heatstroke in the elderly exceeds 50%.

39. Heat-related illness and death are preventable. The risks are well known, and so is the solution. Simple measures such as access to air conditioning are essential to decreased morbidity and mortality. ***Air conditioning is not a luxury but a lifesaver***.

40. Having a working air conditioner was associated with an 80% reduction in the risk of death due to heat and cardiovascular disease and a 66% reduction in mortality due to cardiovascular disease. In one study it was estimated that 50% of the deaths related to a heat wave could have been prevented with a working air conditioner. Lack of air-conditioning was reported in 91% of deaths in one report. In my opinion, these data are directly applicable the Texas prisons. To be sure***, excess morbidity and mortality in TDCJ facilities resulting from the extreme heat of the Texas summers can only be combated by bringing the temperature in the prisons down***. [1]

41. TDCJ's heat mitigation policy falls far short of measures necessary to prevent heat-related illness and death. For example, fans only provide comfort rather than lessening the risk of heat-related illness. Crucially, when the heat index exceeds the body temperature, as has been demonstrated to be the case on death row for extended periods of time, fans elevate the risk of heat-related illness, increasing the heat load on the body by moving hot air across the skin. Therefore providing additional fans does nothing to address the health risks of the extreme temperatures. Similarly, the provision of additional ice, on its own, does not mitigate the risk of heat-related illness.

42. Anyone held in an unairconditioned prison in Texas during the summer months is at substantial risk of serious harm and death.

I declare under penalty of perjury that everything that I have stated in this document is true and correct.

Executed April 15, 2024 in Austin , Texas.

*/s/ Susi Vassallo MD*

Susi Vassallo, MD, MS

# Exhibit 1

# SUSI U. VASSALLO, M.D., M.S.

Curriculum Vitae

---

## PERSONAL DATA

Born: Austin, Texas, January 27, 1959
Citizenship: USA
Address: 6018 Mount Bonnell Cove, Austin Texas 78731
Address: 200 East 36th street, Apt.11J, New York, New York 10016
C: 646-298-4510
Susi.vassallo@nyulangone.org
susivassallo@gmail.com

## EDUCATION

1977 High School Diploma – McCallum High School Austin, TX

1980 Bachelor of Science Biology, Honors – University of Texas, Austin, Texas

1984 Doctor of Medicine – University of Texas, Houston, Texas

## POST DOCTORAL TRAINING

### Residency

1984- 1987 – Emergency Medicine, Wayne State University, Detroit Receiving Hospital, Detroit Michigan

### Fellowship

1987- 1989 – Medical Toxicology Fellowship, New York University School of Medicine / Bellevue Hospital Center, New York City Regional Poison Control Center, 455 First Ave., New York New York

### Masters of Science in Healthcare Management

University of Texas at Dallas School of Business and the University of Texas Southwestern Medical School December 2016

## LICENSURES AND CERTIFICATION

### Licensure

1984 Texas State Medical License, #G9001

1987 New York State Medical License, #170778

2001 California State Medical License, #C50674

### Board Certifications

1984 Federal Licensure Examination

1988 Diplomate, American Board of Emergency Medicine

1989 Diplomate, American Board of Medicine Toxicology

1995 Diplomate, American Board of Emergency Medicine With Subspecialty Certification in Medical Toxicology

2004 Medical Toxicology Subspecialty Recertification

2008 Diplomate Recertification, American Board of Emergency Medicine

2018 Diplomate Recertification, American Board of Emergency Medicine

American Board of Medical Toxicology Diplomate recertification September 2018

### Other Certifications

Basic Life Support

Advanced Cardiac Life Support

Pediatric Advanced Life Support

Certified Correctional Health Professional

## ACADEMIC APPOINTMENTS

May 2015-present Clinical Professor of Emergency Medicine, New York University School of Medicine / Bellevue Hospital Center, NY, NY

2014 -2018 Volunteer Clinical Faculty Emergency Medicine University of Texas Dell Medical School at Austin

September 2012 to 2014 -Clinical Associate Professor UT Southwestern Medical School Dallas, Texas

September 2009 to 2015 - Associate Professor of Emergency Medicine, NYU School of Medicine / Bellevue Hospital Center, New York, New York

1993-2009 – Clinical Assistant Professor of Emergency Medicine, NYU School of Medicine / Bellevue Hospital Center, New York, New York

Consultant NY Regional Poison Control Center 1989 to present

1987-1993- – Instructor in Clinical Medicine (Emergency Medicine), NYU School of Medicine / Bellevue Hospital Center, New York, New York

## APPOINTMENTS

January -2024 Medical Monitor Mays v. County of Sacramento County Case 2:18-cv-02081

2022 to present: Medical Monitor United States District Court Eastern District of Louisiana Lashawn Jones et.al v. Susan Hutson Sheriff Civil Action No. 2:12-cv;00859. Judge Lance M. Africk

California DOJ expert in medical care LASD and Riverside County Jails. 2022 to present.

2016-2018 Department of Homeland Security Civil Rights and Civil Liberties Medical Expert evaluating medical care in detention facilities

1989 to Present – Attending Physician Emergency Medicine Bellevue Hospital Center and Tisch Hospital, NYU School of Medicine, NY, NY

2003 to Present – Attending Physician Emergency Medicine Veterans Administration Hospital , NY, NY

## AWARDS AND HONORS

1991 – Fellow, American College of Emergency Physicians

1997 – Fellow, American College of Medical Toxicology

2003 – Fellow, New York Academy of Medicine

2014 – Fellow, American Academy of Emergency Medicine

## MEMBERSHIPS, OFFICES, AND COMMITTEE ASSIGNMENTS IN PROFESSIONAL SOCIETIES

### Memberships

1989 – American Academy of Clinical Toxicology

1989 – American College of Medical Toxicology

1991 – American College of Emergency Medicine

2003 – Society for Academic Emergency Medicine

2010 – Academy of Correctional Health Professionals

### Offices

1999 – 2002 – Women's Sports Foundation Advisory Board and Research Council

2000-2004 New York State Office of Professional Medical Conduct Consultant

### Committee Assignment

2007 – 2011 American Board of Emergency Medicine, Oral Board Examiner

## EDITORIAL POSITION: REVIEWER

1987 – 1989, American Academy of Clinical Toxicology Updates

1994 – Annals of Emergency Medicine

1995 – Journal of Toxicology / Clinical Toxicology

1999 – Intensive Care Medicine

2011 – American Journal of Public Health

## PRINCIPAL CLINICAL AND HOSPITAL SERVICE RESPONSIBILITIES

### Clinical

2015 Dell School of Medicine Volunteer Faculty.

2012 to 2017 Faculty UT Southwestern Emergency Medicine Residency at Austin, TX

19897- present: Supervise patient care, provide administrative and clinical oversight in the Bellevue Emergency Department and teach medical students and residents from all specialties.

### Hospital Service

1999 to present: Office of Public Affairs, Expert in Emergency Medicine, NYU School of Medicine

1989 to present: Office of Public Relations, Expert in Emergency Medicine, Bellevue Hospital Center

## MAJOR ADMINISTRATIVE RESPONSIBILITIES

1995 - 1996 – Director, Medical Toxicology Fellowship Program, NYU School of Medicine , NYC Regional Poison Control Center, NY, NY

2012- 2022 - Physician Advisor for Case Management Bellevue Hospital Emergency Services

Faculty Council NYU School of Medicine 2012-2016

Faculty Council Secretary NYU School of Medicine July 2014- 2016

## TEACHING EXPERIENCE

### Local

- March 1988 – Bellevue Hospital and New York City Regional Poison Control Center Emergency Medicine Seminar: Non- Opioid Analgesics.
- April 1988 – Bellevue Hospital and New York City Regional Poison Control Center Emergency Medicine Seminar. Lecture: "Mushrooms."
- May 1988 – New York Hospital / Cornell School of Medicine Flight Team. Lecture: "Helicopter Transport of the Poisoned Patient."
- May 1988 – Bellevue Hospital and New York City Regional Poison Control Center Emergency Medicine Seminar. Lecture: "Solvent Toxicity: Has My Patient Been Exposed?"
- June 1988 – New York University Medical Center / Bellevue Hospital, Emergency Medicine Board Review Course. Lecture: "Recent Advances in Hypothermia Management."
- March 1988 to November 1988 – New York University Medical Center / Bellevue Hospital Twenty-Two-Week Emergency Medicine Board Review Course. Lecture: "Environmental Emergencies."
- August 1988 – New York University Medical Center, Department of Internal Medicine Conference Series. Lecture: "Hyperthermia."
- March 1990 – New York City Regional Poison Control Center in conjunction with Bellevue Hospital Emergency Services and St. John's University School of Pharmacy. An Intensive Review in Clinical Toxicology. Lectures on: "Calcium Channel Antagonists," "B-blockers," and "Digoxin."
- October 1988 – New York University Medical Center, Postgraduate Medical School, and Bellevue Hospital, Emergency Services, Fifth Annual Five Day Emergency Medicine Board Review Course. Lecture: "Environmental Emergencies."
- June 1990 – New York University Medical Center, Postgraduate Medical School, 10th Annual Emergency Medicine Seminar. Lectures: "Evaluation of Penetrating Trauma," "Orthopedic Assessment and Casting," "Airway Management," and "Trauma Case Studies."
- March 1991 – New York City Regional Poison Control Center in conjunction with Bellevue Hospital Emergency Services and St. John's University School of Pharmacy, An Intensive Review in Clinical Toxicology. Lectures on: "Chemical Toxins."
- March 1991 to November, 1991 – New York University Medical Center / Bellevue Hospital Twenty-Two-Week Emergency Medicine Board Review Course. Lecture: "Environmental Emergencies."
- August 1991 – Metropolitan Hospital / New York Medical College, Emergency Medicine, Grand Rounds. Lecture: "Hyperthermia."
- October 1991 – New York University Medical Center, Postgraduate Medical School, and Bellevue Hospital, Emergency Services, Sixth Annual Five-Day Emergency Medicine Board Review Course. Lecture: "Environmental Emergencies."
- March 1992 – New York City Regional Poison Control Center in conjunction with Bellevue Hospital Emergency Services and St. John's University School of Pharmacy. An Intensive Review in Clinical Toxicology. Lectures: "Biological Hazards" and "The Patient with an Arrhythmia."
- June 1992 – New York University Medical Center, Postgraduate Medical School, 11th Annual Emergency Medicine Seminar. Lectures: "Resuscitation from Traumatic Arrest," "Heat-related Disorders," and "Orthopedic Assessment and Casting."
- March 1992 – New York University Medical Center, Postgraduate Medical School. Course Director, One-day Seminar. Lecture: "Orthopedic Assessment for the Emergency Physician."

Case 4:01-cv-01510-JS Document 958-1 Filed 06/15/25 Page 135 of 20



- March 1993 – New York City Regional Poison Control Center in conjunction with Bellevue Hospital Emergency Services and St. John's University School of Pharmacy, an Intensive Review in Clinical Toxicology. Lectures: "Drugs of Abuse" and "Toxic Alcohols."
- 1992 to 1994 – New York University Medical Center, Postgraduate Medical School Emergency Medicine Residency Program. Lecture Series: "Procedures in Emergency Medicine."
- March 1994 – New York City Regional Poison Control Center in conjunction with Bellevue Hospital Emergency Services and St. John's University School of Pharmacy, an Intensive Review in Clinical Toxicology. Lecture: "Hydrofluoric Acid."
- June 1994 – New York University Medical Center, Postgraduate Medical School, 14th Annual Emergency Medicine Seminar. Lecturers: "Chest Pain and the Deformed Steering Wheel," "Pediatric Trauma," and "Hand Evaluation: An Intensive Minimodule."
- June 1994 – New York University Medical Center, Bellevue Hospital, Department of Pediatrics and Emergency Services. Pediatric Emergency Medicine Lecture: "Environmental Emergencies."
- September 28 / October 2, 1994 – Essential Topics in Emergency Medicine, presented by ACEP, Washington, D.C. Lectures: "Management of the Overdosed Patient," "Street Drugs," "Analgesic Drug Toxicity," and "Envenomations."
- March 1995 – New York City Regional Poison Control Center in conjunction with Bellevue Hospital Emergency Services and St. John's University School of Pharmacy, an Intensive Review in Clinical Toxicology. Lecture: "Special Concerns in Pediatrics."
- May 1995 – New York University, Bellevue Hospital Center Department of Pediatrics. Pediatric Emergency Medicine Review. Lecture: "Summertime Environmental Dangers."
- 1995 – New York University Medical Center Postgraduate Medical School. 15th Annual Emergency Medicine Seminar. Lectures: "Critical Decisions Regarding the Diagnosis and Management of Hypo- and Hyperthermia" and "Hand Evaluation."
- July 8, 1996 – Grand Rounds: Brooklyn Hospital Center Internal Medicine and Emergency Medicine. "Heat Illness, Pathophysiology and Treatment."
- March 12 to 13, 1998 – New York Regional Poison Control Center, Bellevue Hospital Center. An Intensive Review in Clinical Toxicology. "Natural Toxins."
- June 2 to 4, 1999 – NYU School of Medicine / Bellevue Hospital Department of Emergency Medicine. Contemporary Concepts in Clinical Emergency Medicine: A Literature-based Approach. How are Hypothermic Patients Best Rewarmed?
- March 9, 2000 – Lutheran Medical Center Internal Medicine Grand Rounds, New York, NY. "Sports Toxicology."
- March 9, 2000 – An Intensive Review Course in Clinical Toxicology, New York City Poison Control Center and Bellevue Hospital Center: "Sports Toxicology" and "Snakes and Spiders."
- April 13, 2000 – Lutheran Medical Center Internal Medicine Grand Rounds, New York, NY. Lecture: "Snakes and Arthropods."
- June 2 to 4, 2000 – NYU School of Medicine / Bellevue Hospital Department of Emergency Medicine. Contemporary Concepts in Clinical Emergency Medicine: A Literature-based Approach, Lecture: "Fomepizole: When should it be used?"
- June 7, 2001 –Bellevue Hospital Department of Emergency Medicine 21st Annual Emergency Medicine Seminar. Contemporary Concepts in Clinical Emergency Medicine: A Literature-based Approach. Lecture: "Medical Complications of Marathons."
- March 7 to 8, 2002 – New York Poison Control Center and Bellevue Hospital Center: An Intensive Review Course in Clinical Toxicology. "Sports Toxicology."
- June 5, 2003 – NYU Department of Emergency Medicine 23rd Annual Emergency Medicine Seminar. Contemporary Concepts in Clinical Emergency Medicine: A Literature-based Approach. "The Pain of Prisoners: Health Care Behind Bars."

- March 3, 2005 – American College of Emergency Physicians and the Section on Emergency Medicine. New York Academy of Medicine. Lecture: "Life in Emergency Medicine."
- April 1, 2005 – New York University School of Medicine. Orthopedic Injuries: Clinical Management and Controversies. "Pediatric Fracture Patterns in Child Abuse."
- March 9 to 10, 2006 – New York City Poison Control Center and Bellevue Hospital Center. An Intensive Review Course in Clinical Toxicology. "Sports Toxicology Workshop."
- March 30, 2006 – Office of the Chief Medical Examiner, New York City: "Trauma in the Living."
- April 7, 2006 – NYU School of Medicine: The Orthopedic Manifestations of Child Abuse.
- August 3 to 7, 2006 – NYU School of Medicine Emergency Medicine Review Course: "Environmental Emergencies."
- Advanced Science Seminar, NYU School of Medicine Medical Student Lecture Series August 2008: Sports Toxicology.
- March 8 to 9, 2007 – Bellevue Hospital Center / NY Regional Poison Control Center: An Intensive Review Course in Clinical Toxicology. Lectures: "Hyperthermia Syndromes" and "Sports Toxicology Workshop."
- March 13-14 New York City Poison Control Center and Bellevue Hospital Center An intensive review Course in Clinical Toxicology. Hyperthermic Syndromes.

## National Lectures

- 1994 – ACEP Scientific Assembly, Orlando, Florida. Lectures: "Antidepressant Overdose," "Case Studies in Medical Toxicology," and "Heat Stroke and Heat-related Disorders
- November 1988 – Johns Hopkins Medical Institutes, Department of Emergency Medicine, Baltimore, Maryland. Written Boards in Emergency Medicine, A Comprehensive Review. Lecture: "Environmental Emergencies."
- September 1991 – San Francisco General Hospital / UCSF / Division of Emergency Medicine, Grand Rounds. Lecture: "Penetrating Trauma."
- June 1993 – University of Texas at Houston, Department of Emergency Medicine, Houston, Texas, Grand Rounds. Lecture: "Acute Salicylate Toxicity."
- May 15 to 19 1994 – Essential Topics in Emergency Medicine, Presented by ACEP, New Orleans, Louisiana. Lectures: "Management of the Overdosed Patient: The First Thirty Minutes," "Street Drugs," "Envenomations," and "Analgesic Drug Toxicity."
- March 20 to 24, 1995 – Society for Academic Emergency Medicine, Annual Meeting, San Antonio, Texas. Case Presentation Competition Discussant, Northeast Region.
- September 1995 – 1995 ACEP Scientific Assembly, Washington, D.C. Lectures: "Difficult Issues in Pediatric Trauma: They're Not Just Little Adults," "Case Studies in Medical Toxicology," and "Snake and Arthropod Bites."
- April 1995 – Brooke Army Medical Center Emergency Medicine Department, San Antonio, Texas. Grand Rounds. Lectures: "Iron Poisoning" and "Drugs of Abuse."
- April 15, 1997 – University of Pennsylvania Medical Center Department of Emergency Medicine Grand Rounds: "Hypothermia."
- April 27 – 30, 1999 – Women's Sports Foundation Annual Summit Meeting, Washington, D.C. "Sports Toxicology."
- April 3-5, 2000 – American College of Emergency Physicians: Emergency Medicine Connection 2000, Marriott Marquis, NY, NY 1. Pure Poison 2000 2. Case Studies in Toxicology
- Jan 14, 2000 – Uniformed Services Emergency Medicine Residency Program / Brooke Army Medical Center, Fort Sam Houston, Texas. Grand Rounds. Lecture: "Hypothermia," "Case Studies in Toxicology," and "New Drugs of Abuse."

- September 17, 2000 – North American Congress of Clinical Toxicology 2000, American Academy of Clinical Toxicology. "Metformin."
- December 6th, 2000 – Southwestern Medical School Department of Emergency Medicine, Dallas, TX. Grand Rounds. Lecture: "Hypothermia."
- February 7 to 11, 2004 – Rocky Mountain Winter Conference on Emergency Medicine. Grand Rounds. Lecture: Winners and Losers: The Toxicology of Performance Enhancement. Colorado Chapter, ACEP. Copper Mountain, Colorado.
- February 25, 2004 – Southwestern Medical School Department of Emergency Medicine and Dallas Poison Control Center. Winners and Losers: The Toxicology of Performance Enhancement.
- July 8, 2004 – Wayne State University School of Medicine / Department of Emergency Medicine Keynote Speaker, Detroit, Michigan. "Thermoregulatory Disorders in the Emergency Department."
- March 15-17, 2007 – American College of Medical Toxicology 5th Annual Spring Course, Miami, FL. Lecture: "Out of Bounds: The Science and Toxicology of Testing Athletes."
- April 13–16, 2008 – American College of Occupational and Environmental Medicine. American Occupational Health Conference, New York, NY . Invited Speaker: "The Toxicology of Testing in Sports."
- March 7 – 8th, 2008 – Invited Panelist Fordham Law School, New York City. The Lethal Injection Debate: Law and Science. Physician Participation in Lethal Injection. Co-panelists: Gregory Curfman, M.D., Executive Editor, *New England Journal of Medicine*, Stephen Morrissey, PhD Managing Editor, *New England Journal of Medicine* and Jonathan Groner, M.D. Ohio State University. Lecture: "The Pharmacology of Lethal Injection."
- March 3, 2009 – Fordham Law School Criminal Law Workshop, "Medical Care of Inmates," Invited scholar by Professor Deborah Denno and Arthur A. McGivney, Professor of Law.
- October 25th, 2011: Fordham Law School: Neuroscience and the Law. Ethanol Intoxication, Withdrawal and Tolerance and the Legal Limit
- November 1, 2011 American Public Health Association: Moderator: The FDA and Public Health: Improving Scientific Integrity, Safety, and Quality of Medical Products
- November 2-5, 2011 Children's Hospital of Philadelphia: Pediatric Emergency Medicine in Historic Philadelphia: Pediatric Toxicology
- November 27, 2012 Fordham Law School: Law and Neuroscience Speakers Series 2012. "From the Bellevue Hospital Emergency Department; The Science of Intoxication, Tolerance and Withdrawal".
- February 28-March 2, 2015 Austin, Texas: Annual Scientific Assembly American Academy of Emergency Medicine: "From The Emergency Department to Death Row".
- March 19-20, 2015.Boston, MA: 8th Academic and Health Policy Conference on Correctional Health Care: "Defeating Death from Heat in Prison: A Cool Collaboration."
- March 16,2023 Prisoner Health Care" Lewis Katz School of Medicine at Temple University, Emergency Medicine Residency Program.

## International Lectures

- October 2-25 1997 – 14th Annual Scientific Conference, L'Association des Medecins d'Urgence du Quebec, Quebec City, Quebec. Lecturer. "Street Drug Intoxications," "Cocaine Toxicity," and "Clinical Cases in Toxicology."
- May 22 to 25, 2002 – European Association of Poisons Centres and Clinical Toxicologists XXII International Congress, Lisbon, Portugal. "Toxicologic Effects on Thermoregulation."

- November 18 to 20, 2004 – NYU Department of Emergency Medicine and the Department of Emergency Medicine, Tirgu Mures, Romania. Pediatric Emergency Medicine Course: "Pediatric Toxicology and Pediatric Thermoregulation."
- February 10 to 11, 2007 – Rajavithi Hospital, Bangkok, Thailand. Advanced Training in Emergency Medicine. "The Management of Trauma."
- June 21, 2011: San Miguel de Allende, Mexico: The Symposium on Resusciation. Sociedad Mexicana de Medicine de Emergencia; / International Federation of Emergency Medicine: "Lipid Emulsion Infusion in Acute Overdose"
- 

## TEACHING AWARDS RECEIVED

2002-2003– Clinical Attending Physician of the Year, NYU - Bellevue Emergency Medicine Residency Program

2005-2006 – Clinician of the Year, NYU –Bellevue Emergency Medicine Residency Program

## MAJOR RESEARCH INTERESTS

Thermoregulation: Hyperthermia and Hypothermia
Drugs and Effects on Temperature

Prisoner Health: Access to appropriate health care in prison
Conditions of confinement and temperature
Drug effects on temperature regulation in prisoners

## BIBLIOGRAPHY

### Original Reports

1. Vassallo, SU and Delaney, KA: "Pharmacologic effects on thermoregulation: Mechanisms of drug- related heatstroke," *Clin Toxicol* 1989; 27; 4 199-224.
2. Delaney, KA, Howland, MA, Vassallo, SU and Goldfrank LR: "Assessment of acid-base disturbances in hypothermia and their physiologic consequences," *Ann Emerg Med* 1989;18;72-77.
3. Brown J, Hoffman RS, Aaron CK, Vassallo S: Theophylline toxicity. *Ann Emerg Med* 1989;18:425-426.
4. Vassallo, SU, Khan, A, Howland, MA: "Use of the Rumack-Matthew nomogram in cases of extended-release acetaminophen toxicity." *Ann Intern Med* 1996;125:940.
5. Vassallo S, Delaney K, Hoffman R, Slater W, Goldfrank L: "A prospective evaluation of the electrocardiographic manifestations of hypothermia." *Acad Emerg Med* 1999;6:1121-1126.
6. Vassallo, S, Hartstein, M, Howard, D and Stetz, J.:"Traumatic retrobulbar hemorrhage: emergency decompression by lateral canthotomy and cantholysis," *J Emerg Med* 2002;22: 251-256.
7. Delaney, KA, Vassallo, SU, Larkin, GL, Goldfrank, LR: "Rewarming rates in urban patients with hypothermia: prediction of underlying infection," *Acad Emerg Med* 2006;13:913-921.
8. Halcomb SE, Holubek WJ , Vassallo SU: The clinical approach to coma Eur J Emergency Med. 2006 Dec; 13 (6)364-365.
9. Vassallo, SU: "Thiopental in lethal injection," *Fordham Urban Law Journal,* Vol. 35 p. 957-964, June 2008.
10. Chen BC, Vassallo SU, Nelson LS, Hoffman: Stress Cardiomyopathy induced by Acute Cocaine Toxicity Curr Clin Pharmacol 2012;6:1-11.
11. Buprenorphine: Can it be Deadly in a Dose? Emergency Medicine. 2012 February;44(2):20-22

Case 4:01-23-01-351-JS-RP Document 3953-1 Filed 06/20/25 Page 176 of 209



12. Laskowski Landry Vassallo Hoffman: Ice water submersion for rapid cooling in severe drug-induced hyperthermia. Clinical Toxicology 53; 181-185, 2015.

13. Laskowski LK, Landry A, Vassallo SU Hoffman: Letter in response to "Stimulant -induced hyperthermia and ice-water submersion: practical considerations. Clin Tox9Phila)2016;54(1)

14. Fernandez D, Fara M,, Biary R, Hoffman RS, Vassallo S Balcer l, Torres D:: Clinical Reasoning: A 27 year old man with unsteady gait. Neurology. 2017 Sep 5:89(10).

15. Riggan MAA, Analytically Confirmed Severe Albenzadole Overdose Presenting with alopecia and Pancytopenia. Am J Trop Med Hyg. 2020 Jan; 102(1) 177-179.

## Reviews, Books, and Book Chapters

1. Delaney, KA, Vassallo SU, Goldfrank LR. "Hypothermia and Hyperthermia," In Goldfrank LR, Flomenbaum NE, Lewin NA, et. al. (eds.) *Goldfrank's Toxicologic Emergencies, Fourth Edition*, Appleton-Lange-Crofts, Norwalk, CT 1990.

2. Vassallo SU, "Cocaine " in Tintinalli, Krome and Ruiz, (eds.) " *Emergency Medicine: A Comprehensive Study Guide*, *Third Edition*, McGraw-Hill, 1992.

3. Delaney, KA, Vassallo, SU, Goldfrank LR, "Thermoregulatory Principles," In Goldfrank LR, Flomenbaum NE, Lewin NA, et. al. (eds.) *Goldfrank's Toxicologic Emergencies, Fifth Edition,* Appleton-Lange, Crofts, 1994.

4. Bruno, R and Vassallo, S., "Sedative Hypnotics," *Emergency Toxicology*, 2nd edition, Editor Vicellio, P. Lippincott-Raven, 1998.

5. Vassallo, S and Delaney, K, "Thermoregulatory Principles," In Goldfrank LR, Flomenbaum NE, Lewin NA, et. al. (eds.) *Toxicologic Emergencies*, *6th edition*, Appleton-Lange, Crofts, 1998.

6. Vassallo, S., "Essential Oil Toxicity," *Clinical Toxicology*, Ford, M., Delaney KD, Ling LJ, Erikson, T.(eds.) Saunders, WB, 2001.

7. Vassallo, S: "Sports Toxicology" and "Thermoregulatory Principles," ," In Goldfrank LR, Flomenbaum NE, Lewin NA, et. al. (eds.) *Goldfrank's Toxicologic Emergencies, 7th edition,* Appleton-Lange, Crofts, 2002.

8. Vassallo, S and Delaney, KA, "Thermoregulatory Principles," ," In Goldfrank LR, Flomenbaum NE, Lewin NA, et. al. (eds.) *Goldfrank's Toxicologic Emergencies, 8th Edition* McGraw-Hill, 2006.

9. Vassallo, S, "Athletic Performance Enhancers," ," In Goldfrank LR, Flomenbaum NE, Lewin NA, et. al. (eds.) *Goldfrank's Toxicologic Emergencies*, *8th edition*, LR, McGraw-Hill, 2006.

10. Vassallo, S: Chapter 7: Environmental Emergencies. In Naderi, S., Park R (eds.) *Intensive Review for the Emergency Medicine Written Boards.* McGraw-Hill, 2009

11. **Vassallo,S: Thermoregulatory Principles. In Goldfrank LR et al** *Goldfrank's Toxicologic Emergencies, 8th Edition* McGraw-Hill 2019

12. Vassallo, S, “Athletic Performance Enhancers,” ,” In Goldfrank LR, Flomenbaum NE, Lewin NA, et. al. (eds.) *Goldfrank's Toxicologic Emergencies*, *8th edition*, LR, McGraw-Hill 2019
13. Vassallo, S. Incarceration: “The Intersection of Emergency Medicine and the Criminal Justice System” In *Social Emergency Medicine Principles and Practice*. (eds) Alter HJ, Dealwari P., Doran KM, Raven M. 2021 Springer

## Educationally Relevant Publications

1. Vassallo, S., “Treatment of Methanol Intoxication.” Hospital Pharmacy Hotline, Vol. 1 No 10, 1988.
2. Vassallo S., “Hypothermia,” Audio Digest, Volume 7, Number 5, March 1, 1990.
3. Vassallo, S., “Clinical Challenges in Emergency Medicine: Nausea, Vomiting, Vertigo and Drug Overdose,” Continuing Education Material Sponsored by Albert Einstein College of Medicine and Montefiore Medical Center. December 2001.

## Abstracts

1988 AAPCC/AACT/ABMT/CAPCC Annual Meeting, Baltimore, Maryland.

- Service dichromate poisoning: Survival after hemodialysis. Vassallo, SU and Howland, MA.

1998 American Association of Poison Control Centers Meeting.

- Passion and Poison in the World's Great Opera. Platform presentation September 1998, Orlando FL.

2023ACMT Annual Scientific meeting San Diego. Gluts of GLP-1 Brian G Wiener , Marlis Gnirke, Susi Vassallo, Silas W. Smith Mark K Su

.

## Media

**The Marshall Project: https://www.themarshallproject.org/2017/10/11/cooking-them-to-death-the-lethal-toll-of-hot-prisons. Cooking them to Death October 11, 2017**

**Houston Chronicle Federal judge orders Texas prison system to provide a/c for heat-sensitive inmates at Pack Unit by Gabrielle Banks July 19,2017 https://www.chron.com/news/houston-texas/article/Federal-judge-orders-temporary-air-conditioning-11299434.php**

**https://feminem.org/honors/dr-susi-vassallo/ February 2018**

NBC Channel 4 http://www.nbcnewyork.com/on-air/as-seen-on/Dr_-Susi-Vassallo-on-Heat-Related-Illnesses_New-York-317664951.html July 21, 2015

Texas Monthly: The Heated Battle for Cooled Texas Prisons, Annie Melton, June 2, 2014

**The Brian Lehrer Show WNYC July 22, 2014 http://www.wnyc.org/story/its-getting-hot-here-what-heat-does-you/**

NPR http://www.npr.org/2014/07/24/334049647/do-heat-sensitive-inmates-have-a-right-to-air-conditioning

NPR: January 24, 2013 Bellevue Hospital's Slow Comeback After Superstorm Sandy . www.wnyc.org/npr.../bellevue-hospitals-slow-comeback-after-superst.

WNYC News Monday May 9, 2011: Proposed ER at St. Vincent's Part of Larger Health Care Debate http://www.wnyc.org/articles/wnyc-news/2011/may/09/emergency-room-focal-point-larger-health-care-debate/

MSNBC September 22, 2011 Scores got sick, one died trying to kill bedbugs. Mike Stobbe

New York Times: 19 Have Died from Heat this Summer, City Says. Andy Newman September 1, 2011
Leonard Lopate Show: 93.9 FM,WNYC August 6, 2010. Please explain: Heat Stroke
http://beta.wnyc.org/shows/lopate/2010/aug/06/please-explain-heat-stroke/
http://www.wnyc.org/people/susi-vassallo/

Joan Hamburg show July 6, 2010 WOR 710 radio NY Hour 2: Medications and heat.
http://www.wor710.com/WOR---The-Joan-Hamburg-Show/39827

National Public Radio; Interview on the risks of hypothermia and the landing on the Hudson River by Captain Chesley Sullenberger. Jan 16, 2009

NY Daily News: Icy river next horror after US Airways Flight 1549 crash by Nancy Dillon. Jan. 16, 2009

Crain's Health Pulse: US Airways Jet Lands in Hudson River by Crainsnewyork.com January 15, 2009

Today Show: Toxicology consultant on the Heath Ledger's death due to drug toxicity

Sirius /XM Satellite Radio: Radio Doctor: Pediatric Emergencies / Pediatric Poisoning

New York Times: 8 Aboard Rescued in Another East River Chopper Crash. By Santora and Jess Wisloski. June 18, 2005

Trauma: Life and Death in the ER. Lifetime Television

MSNBC: September 13, 2001. Coverage of 9/11 from Ground Zero, NYC

New York 1 television interviews: Toxicology and Emergency Medicine

New York Times: Patients whose final wishes go unsaid put doctors in a bind. N.R. Kleinfield July 19, 2003

New York Times: Who's Got Job Stress? November 14, 1999

# SUSI VASSALLO, M.D., FACEP, FACMT



Books / Magazine Articles: Consultant / Contributor

Men's Health: How to get out of the Hospital Alive. by Ted Spiker.

AARP magazine: Emergency medicine. by Ted Spiker

The Doctors Book of Home Remedies for Women: Heat Exhaustion. By Prevention Magazine Editors

Ice: The nature, the history, and the uses of an astonishing substance. By Mariana Gosnell

Burned Alive: A Shocking True Story of Betrayal, Kidnapping and Murder by Kieran Crowley

Emergency! True Stories from the Nation's ERs

# EXHIBIT 8

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF OUISIANA**

ALEX A., by and through his guardian, Molly Smith; BRIAN B.[1]; and CHARLES C., by and through his guardian, Kenione Rogers, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS[2], in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,

Defendants.

Civil Action No. 3:22-CV-00573-SDD-RLB

# EXHIBIT 6

[1] On July 14, 2023, pursuant to Rule 25(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs notified the Court of the death of Brian B. Doc. 162. Plaintiffs leave Brian B. as a Plaintiff until the clerk is ordered to change the caption.

[2] On November 18, 2022, Gov. Edwards announced the resignation of Dep. Sec. Sommers and the appointment of Otha "Curtis" Nelson as his replacement. https://gov.louisiana.gov/index.cfm/newsroom/detail/3892 Because Sommers was sued in his official capacity, Nelson is automatically substituted as a Defendant. Fed. R. Civ. P. 25(d). Plaintiff leaves Sommers as a Defendant until the clerk is ordered to change the caption.

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| ALEX A., by and through his guardian, Molly Smith, *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana, *et al.*,<br><br>Defendants. | Civ. Act. No. 3:22-CV-00573-SDD-RLB<br><br>**DECLARATION OF DR. SUSI U. VASSALLO, M.D., M.S., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1
A. Background, Qualifications, and Experience ..... 1
B. Materials Reviewed ..... 3
C. Summary of My Opinions ..... 4
II. THE IMPACT OF EXTREME HEAT ON THE HUMAN BODY ..... 5
A. The Science of Thermoregulation ..... 5
B. Heat-Related Disorders and Heat Stroke ..... 8
C. The Psychological Impact of Persistent Exposure to Extreme Heat ..... 12
D. People With Certain Medical or Psychiatric Conditions or Who Take Certain Medications Are at A Higher Risk of Heat-Related Disorders ..... 13
E. Risks of Persistent Exposure to Heat on Healthy People ..... 18
F. Adverse Medical and Mental Health Outcomes Due to Excessive Heat Exposure Are Entirely Preventable ..... 19
III. CONDITIONS AT THE OJJ ANGOLA UNIT MAGNIFY THE RISK OF SERIOUS HARM DUE TO EXPOSURE TO EXCESSIVE HEAT ..... 21
A. The Physical Plant of the OJJ Angola Unit ..... 21
B. Summer Temperatures and Heat Indexes in Angola, Louisiana ..... 25
C. Angola's Inability to Provide Emergency Medical Care Puts Youth at Risk of Serious Harm ..... 30
IV. CONCLUSION ..... 31

I, Susi U. Vassallo, declare as follows:

# I. INTRODUCTION

## A. Background, Qualifications, and Experience

1. I am a physician licensed to practice medicine in the states of Texas and New York, and am board certified in Emergency Medicine and Medical Toxicology. Since 1987 I have actively practiced and have been on the faculty of the New York University Langone Medical Center Tisch Hospital, and Bellevue Hospital Center. I am a Fellow in the American College of Emergency Physicians, and a Fellow in the American College of Medical Toxicology. I received my Doctor of Medicine medical degree from the University of Texas Health Science Center at Houston, my Masters of Science in Health Care Management at the University of Texas Southwestern Medical School and University of Texas at Dallas School of Business, and my Bachelor of Science with Honors from the University of Texas at Austin. I completed my residency in Emergency Medicine at Wayne State University in Detroit, and a fellowship in Medical Toxicology at New York University School of Medicine. I am active in the teaching, training, and supervision of physicians and medical students training in emergency medicine and medical toxicology. I care for patients with a broad range of medical problems, both chronic and acute. My areas of special focus in teaching and writing include thermoregulation and the effects of drugs and illnesses on thermoregulation. Over the past 30 years, I have cared for many patients with disorders of thermoregulation, mental illness, and toxicity as a result of drugs. I have personally managed many patients who suffered heat exhaustion and heat stroke. I work closely with the New York City Office of the Chief Medical Examiner on toxicology and poisoning issues. A list of my work experience, training, and publications is contained in my curriculum vitae, attached hereto as **Exhibit 1**.

2. Since starting at Bellevue Hospital in 1987, I have treated patients from Rikers Island jails who were taken to Bellevue. The hospital is the primary receiving hospital for the male detainees of New York City's jails. I am a Certified Correctional

Health Professional of the National Commission on Correctional Health Care (NCCHC). I have provided expert reports and testimony on issues relating to heat in prisons and jails for over twenty years in federal courts, as detailed in my CV.

3. As detailed in my CV, I have been qualified as an expert on the effects of heat on prisoners in federal district courts in Louisiana, Mississippi, New York, and Texas, and the Fifth Circuit Court of Appeals, among others.[1] I have consulted for the U.S. Department of Homeland Security (DHS) Division of Civil Rights and Civil Liberties. In this role, I reviewed the delivery of medical care to people in Immigration and Customs Enforcement (ICE) detention centers. I am currently the court-appointed federal monitor for medical care in the Orleans Parish Jails consent decree in the U.S. District Court in the Eastern District of Louisiana. I was a medical expert for plaintiffs about the conditions of confinement (including heat exposure) on the newer Death Row unit at the Louisiana State Penitentiary (LSP)-Angola (*Ball v. LeBlanc*, No. 3:13-cv-00368-BAJ-EWD), as well as an expert on the medical care provided to all incarcerated people in Angola (*Lewis v. Cain*, No. 3:14-CV-318) in litigation before this Court. My role in *Lewis* is principally to evaluate the emergency care and work provided by EMTs at Angola; the Court found my testimony and reports to be credible, and the emergency care provided to people at Angola to be unconstitutional. *See Lewis v. Cain* Opinion, Doc. 594 ¶¶ 23-24, 28, Mar. 31, 2021.

4. I have lectured nationally and internationally about thermoregulation and heat-related disorders. I am frequently asked to assist journalists and reporters writing on heat stroke and the prevention of heat stroke. A list of selected presentations and lectures is contained in my CV.

[1] The Fifth Circuit has recognized and noted my expertise in multiple cases. *See Yates v. Collier*, 868 F.3d 354, 363-64 (5th Cir. 2017) ("Dr. Vassallo is a licensed physician and a recognized expert in the field of thermoregulation and hyperthermia, with over twenty-five years treating heat stroke and heat-related disorders. Dr. Vassallo has previously served as an expert witness in lawsuits challenging prison conditions, and this court has (at least) twice upheld district court findings that relied heavily on Dr. Vassallo's testimony.") (citations omitted).

5. I was retained by Plaintiffs' counsel to provide expert opinions on the impact of prolonged exposure to heat on the children incarcerated at Angola's older Death Row building, now referred to as the "OJJ Angola Unit" or "Bridge City-West Feliciana," who are considered to be the named plaintiffs and class members in *Alex A., et al. v. Edwards, et al.* I have been retained at my standard hourly rate of $400 an hour. The matters set forth herein are my independent opinions, true and correct of my personal and professional knowledge. If called as a witness to testify, I could and would testify competently.

6. The opinions contained in this declaration are based on my training, clinical experience, and familiarity with the extensive body of medical literature on the subjects of thermoregulation; the effects of drugs, illness, and age on thermoregulation; and the mortality and morbidity caused by heat waves and exposure to extreme heat, and literature regarding the same. In this declaration, I provide information on thermoregulation, heat related disorders, the impact of prolonged exposure to high heat indexes on the human body, and the increased risk of heatstroke and heat-related disorders from prolonged exposure to high heat indexes, for people with certain medical conditions or taking certain medications. Equally important is the worsening of medical and mental health conditions when an individual is subjected to high heat and humidity. The lists of medical conditions and medications contained in this declaration are meant to be illustrative, not exhaustive.

**B. Materials Reviewed**

7. For purposes of this declaration, I have reviewed the following:

a. The complaint and other case filings in this case;

b. The declarations of children incarcerated at Angola;

c. Photographs of the Angola unit taken by Plaintiffs' expert Vincent Schiraldi in August 2022 and entered into evidence at September 2022 hearings;

d. U.S. National Weather Service reports on the daily temperature and heat index at Angola from May 1 – July 13, 2023, attached as **Exhibit 1 to the Declaration of Jack Warshal, filed herewith.**

Case 3:22-cv-00573-SDD-RLB Document 164-9 07/17/23 Page 7 of 18

8. I also rely upon my personal knowledge from visiting and touring the Angola prison, and serving as an expert in the *Lewis* and *Ball* litigation.

9. Unfortunately, because discovery has been stayed in this case, I have not been able to request or review the following information, which would be informative:

a. Transcripts of witnesses knowledgeable about temperature regulation and heat management policies at this unit;

b. Any policies, post orders, protocols, or directives for health care or custody staff on heat precautions, the mitigation and management of extreme temperature conditions at the unit, and the provision of medical care for persons with certain heat-sensitive medications or conditions;

c. Temperature and heat index logs maintained by the unit, and all records of indoor and outdoor temperatures and heat indexes at the unit;

d. Medical records for all named plaintiffs and class members;

e. A complete tour of the OJJ Angola Unit, including visiting and taking temperatures in the cells in which youth are confined and live, all medical facilities, indoor and outdoor areas, and any air-conditioned areas, as well as an opportunity to speak freely and confidentially with youth and staff.

10. Despite the inability to obtain this additional useful data and information, all of my opinions and conclusions are rendered to a reasonable degree of medical certainty. I reserve the right to supplement this declaration when and if the stay of discovery is lifted and Plaintiffs' counsel are able to obtain additional information from Defendants or I am able to visit the OJJ Angola Unit.

**C. Summary of My Opinions**

11. The youth at OJJ Angola Unit are at substantial risk of serious physical and psychological harm due to their extensive and continued exposure to high temperatures and heat index during the summer months in Louisiana. This is especially so because of Defendants' alleged practice of confining youth in their unairconditioned cells for up to 72

hours continuously during intake, from approximately 5 pm to 8 am every day, and for additional periods of up to 48 hours as punishment.

12. As detailed in Part II, the science is clear that prolonged exposure to high heat indices places people – including younger and healthier people – at serious risk of death or permanent physical injury. People are also at risk of engaging in acts of self-harm when trapped in these conditions, powerless to cool themselves off.

13. All of the youth detained at OJJ Angola Unit are at substantial risk of serious heat-related disorders due to their prolonged exposure to heat indexes above 88 degrees Fahrenheit. This is especially the case for youth with medical or mental health conditions that make them more susceptible to heat-related injuries, or who are taking certain medications that adversely affect their body's ability to thermoregulate itself.

14. Defendants are extremely lucky that none of the youth– as far as we are able to know – have been injured due to heat exposure or engaged in desperate acts of self harm. The current conditions in which children are living in OJJ Angola during the summer months are dangerous inhumane.

## II. THE IMPACT OF EXTREME HEAT ON THE HUMAN BODY

### A. The Science of Thermoregulation

15. Thermoregulation is the process by which the human body maintains its temperature within a safe physiological range, in response to internal and external thermal stimuli. The body's safe physiologic range is typically a set point of plus or minus 0.8°F range around 98.6 degrees Fahrenheit.

16. Thermoregulation is a major bodily process. Inability to thermoregulate properly impairs the function of multiple bodily systems, including but not limited to the nervous system, pulmonary system, cardiovascular system, gastrointestinal system, and kidney function.

17. Heat transfers in and out of the body at all times through four processes—radiation, convection, conduction, and evaporation. Radiation is heat transfer through

emission of particles or waves, such as sunlight. Convection is heat transfer by moving a liquid or gas, such as hot air blowing over the skin. Conduction is heat transfer through direct contact between the body and other surfaces, such as a hot stove. Evaporation is heat loss when water changes from liquid to a vapor, such as drying sweat.

18. The body's temperature may rise as a result of exposure to high external heat. A number of external factors such as high temperature, humidity, radiant heat, and wind speed may cause a rise in body temperature. Radiant heat sources include not only the sun, but also the walls of buildings, cement or asphalt grounds, or lights. Conductive sources include any hot objects in direct contact with the body.[2]

19. The hypothalamus is the main part of the brain responsible for thermoregulation. Thermoreceptors—for example, nerves in the skin—detect changes in body or blood temperature and send this information back to the brain via the spinal cord. The hypothalamus directs the body's responses to these changes.

20. The body uses two primary mechanisms to cool itself—perspiration (sweating) and cutaneous vasodilation (dilation of blood vessels close to the skin), both of which facilitate heat dissipation. Both of these processes are critical to effective thermoregulation. Sweating requires sweat gland function, a process requiring neurotransmission. Cutaneous vasodilation brings heated blood close to the skin, transferring heat from the body's core to the surface. Vasodilation likewise is dependent on adequate neurotransmission. Adequate cardiac output is essential to the process. When the body needs to emit heat, the heart pumps faster and squeezes harder in order to pump more blood to the skin. Heat dissipates from the body's surface, primarily through evaporation. Evaporation is the process of vaporization of water or sweat and is responsible for large amounts of heat loss from the skin. Perspiration, or sweating, brings water to the skin, where it evaporates and causes heat to dissipate from the body. As described in greater

---

[2] I discuss the unique architectural and physical plant characteristics of prisons and jails that exacerbate radiant heat inside of the facilities below in Part II.E.

detail below in Part II.D, certain medical conditions and pharmaceutical agents may impair these critical processes.

21. When the external environment gets hotter and more humid, the body must work harder to cool itself by increasing vasodilation and perspiration. The need to maintain blood pressure results in a limitation in vasodilation and limits heat loss through this mechanism. The heart also increases its cardiac output. In normal conditions, 5 liters of blood circulate to the skin per minute. In a hotter and more humid environment, 5-20 liters of blood must circulate per minute in order for the body to cool – up to four times as much as normal. The heart pumps faster and harder in order to pump more blood through the body to maintain blood pressure and cooling.

22. The act of sweating depletes the body of water and salt, so without adequate repletion, a person will become dehydrated. Dehydration can cause light-headedness or dizziness, a lack of energy, low blood pressure, weakness, and increased heart rate. Cardiac output is the amount of blood pumped for each squeeze of the heart. It is a product of the amount of blood that the heart can squeeze out to the body and the number of times each minute that the heart squeezes, the heart rate. A person who is dehydrated may be unable to increase cardiac output adequately to meet the demands of the heat stress. If fluids are not replaced, core temperature will rise, and hyperthermia will result. Hyperthermia occurs when the body's natural thermoregulatory processes are insufficient and overwhelmed, and the body begins to accumulate heat.

23. Any medication that decreases the number of times per minute that the heart squeezes or the strength of the squeeze will have profound effects on the ability of the body to cool. Any medication that limits vasodilation or sweat gland function will limit the ability to thermoregulate in the heat.

24. Moreover, evaporation becomes less effective as humidity rises in the external environment. When the external environment has high humidity, the air is already saturated with moisture. High humidity makes it more difficult for the water from sweat to

evaporate from the surface of the skin into the air. Therefore, the body cannot engage in evaporative cooling as efficiently. As a result, the body cannot release as much heat, and body temperature may continue to rise, possibly leading to hyperthermia.

25. Scientists measure air temperature and humidity together using a formula, and the resulting figure is called the heat index. The heat index is a better indication of how the body "feels" heat than air temperature alone.

**B. Heat-Related Disorders and Heat Stroke**

26. The term "heat stress" refers to environmental conditions that cause the body's thermoregulatory systems to engage and enhance heat loss from the body. As discussed above, "hyperthermia" refers to elevated body temperature due to thermoregulation processes that cannot keep up with the amount of heat accumulating in the body. In other words, the body accumulates more heat than it can dissipate.

27. Heat-related disorders occur when the body's temperature control system is overloaded, and the body is unable to adequately dissipate heat. The risk for heat stroke and heat-related disorders increases sharply when the heat index exceeds 88 degrees Fahrenheit. Heat-related disorders include heat syncope (fainting), heat cramps, heat exhaustion, and heat stroke.

28. Heat syncope (fainting) is a brief loss of consciousness that results from heat exposure. It occurs because the blood vessels are maximally dilated in the body's effort to cool itself, thus dropping the blood pressure. The heart is so taxed that it is not able to pump enough blood to generate adequate blood pressure, and provide blood to the brain to maintain consciousness and stay upright. The body can only vasodilate to a point because the need to maintain blood pressure supersedes the thermoregulatory drive to lose heat to the environment through vasodilation.

29. Heat cramps are painful muscle cramps that result from salt and water loss during heat exposure. Heat cramps occur due to dehydration and sodium depletion, most often as a result of exercising or working in a high-heat index environment. Heat cramps

can occur in the legs, and they can be very painful. The cramps can persist for hours, even after a person drinks water and takes rest.

30. Heat exhaustion is a disorder that results when heat stress begins to overwhelm the ability of the body to dissipate heat. The hypothalamus directs the body to maintain a normal body temperature, the heart beats maximally, and the body sweats and blood vessels dilate maximally, but thermoregulation still falls short. The body temperature begins to elevate. A person suffering from heat exhaustion may feel chilled even though it is hot. They can also feel light-headed, thirsty, nauseous, weak, faint, or dizzy, or have unsteady gait. Their heartbeat is rapid, and they may also experience muscle aches (myalgias), headache, or abdominal cramps. A person suffering from heat exhaustion may try to lie down in order to conserve energy and help elevate blood pressure. If the person does not get out of the heat, heat exhaustion can precede heat stroke. Particularly in a setting like the living units and cells that lack air conditioning, symptoms of heat exhaustion must be taken very seriously and evaluated and treated immediately. However, as discussed below, heat disorders are not on a continuum and heat stroke may occur with no warning.

31. There may be overlap in heat-related disorders. Heat exhaustion may include heat cramps and heat syncope, or weakness, fatigue, dizziness, and nausea. Medical providers should always remove people experiencing these problems from the hot environment in order to prevent heat stroke. However, heat stroke may occur rapidly without warning when thermoregulation fails.

32. Heat stroke is a severe medical emergency caused by persistent heat stress and inadequate dissipation of heat from the body. Heat stroke is defined as an elevation of body temperature above 105.5 degrees Fahrenheit, along with an alteration of mental status. Some authors use slightly different temperatures ranging from 104 - 106 degrees Fahrenheit. The altered mental status could be subtle, manifesting as inappropriate behavior or impaired judgment, or it could include confusion, delirium, obtundation, seizures and / or result in coma. It is essential in a carceral setting that all staff are trained

on the symptoms of heat stroke, because the altered mental state can be misinterpreted as misbehavior or a mental health disorder, rather than the physiological response to the excessive heat.

33. Heat stroke can occur whether or not a person is engaged in physical activity. There are two kinds of heat stroke: exertional and classical. Exertional heat stroke occurs when a person is exercising or engaged in physically strenuous activity in a high heat index and hot environment. Classical heat stroke, however, is not associated with exercise and can occur due to exposure to a high-heat index and an inability to leave a hot environment. Classical heat stroke commonly occurs during heat waves, and the victims include persons least able to tolerate heat or escape from heat, such as infants and young children, older adults, individuals with psychiatric disorders, chronically ill persons, and persons with medical conditions or taking medications that interfere with the ability to thermoregulate.

34. Heat stroke comes on rapidly. Heat stroke is not necessarily preceded by other heat-related disorders such as heat cramps or heat exhaustion. The body's temperature rises, and collapse may occur very quickly, with little or no warning. In just ten or twenty minutes, a person suffering from heat stroke may demonstrate life-threatening signs and symptoms.

35. Heat stroke comes on with little warning. Two-thirds of heat stroke victims experience symptoms for less than one day before being hospitalized or being found dead. Some victims go to sleep apparently well and are found the next day critically ill or dead. A person who begins to suffer from heat stroke may be unable to call for help or ask to be taken to a cooler location, because of altered mental status. The person may not be able to report to others – in this case, the corrections officers – that he is feeling badly, because the condition itself impairs the ability to ask for help. The person caught in this Catch-22 is at risk of losing their life. In just ten or twenty minutes, a person suffering from heat stroke will have life-threatening manifestations such as seizure. Heat stroke can occur in persons who have never complained about heat before. The rapid onset of heat stroke has

important implications: even frequent observations of persons at high risk of heat stroke may not give adequate warning of impending collapse.

36. Heat stroke is a true medical emergency. It can cause death or permanent disability if emergency treatment is not provided. When a person begins to suffer from heat stroke, he must immediately receive medical treatment with aggressive cooling, or he is at increased risk of death or serious injury. Survival is possible if cooling measures are properly instituted. The body temperature should be reduced to near normal immediately. This can be accomplished within 20 minutes by complete submersion of the body in ice and ice water. Other treatment, including respiratory support with a respirator, sedation, fluid replacement, and other methods of intensive supportive care may be needed.

37. Heat stroke is deadly. Very high body temperatures in heat stroke can damage the brain and other vital organs. In heat stroke, heat stress causes an inflammatory progression. Heat causes tissue injury, and cells in the body's organs begin to die, ultimately causing multiple organ systems to fail.

38. Heat stroke carries a significant risk of death and permanent disability. Studies have shown heat stroke mortality rates ranging from 30-80%. Survivors of heat stroke may have significant heat-related morbidity, such as permanent inability to walk and talk. Permanent neurological damage occurs in up to 17% of survivors. Permanent neurological damage can include phrenic nerve damage, leading to trouble with spontaneous breathing, and structural damage to the cerebellum, which causes balance and walking problems, or cognitive problems.

39. In addition to death or permanent injuries from heat stroke, there are multiple epidemiological studies that show increased numbers of deaths from underlying medical conditions during heat waves. In terms of pure numbers, this is a much greater threat to the wellbeing of a population. Many more people die each year from heat-induced exacerbations of underlying medical vulnerabilities than die from heat stroke. Persistent exposure to extreme heat also brings on medical events or exacerbates medical conditions

that are not traditionally thought of as "heat-related." For example, in extremely hot environments, people who suffer from cardiovascular disease are more prone to morbidity and mortality. People with diabetes may suffer acute complications such as electrolyte and fluid abnormalities and exacerbation of the coexistent cardiovascular complications that result from diabetes. People with respiratory ailments such as asthma are more prone to suffer from an exacerbation of asthma. These medical events cause pain and suffering, permanent injury, or death, while not directly attributed to heat exposure.

**C. The Psychological Impact of Persistent Exposure to Extreme Heat**

40. In addition to the physical medical effects of heat, studies have shown that there is a relationship between higher temperatures and the rates and number of suicides. One study published in 2007 examined a ten-year period of all deaths in England and Wales, analyzing daily temperature and daily suicide counts and found that above 18° C (65° F), each additional 1° C (1.8° F) in mean temperature was associated with a 3.8% and 5.0% rise in suicide and violent suicide respectively. Similar results were found by Hungarian researchers in a study published two years later, analyzing all deaths by suicide in Budapest over a ten-year period which found that the days with higher numbers of deaths by suicide corresponded to days where the daily maximum temperatures were significantly higher than the average daily temperature. A 2009 Japanese study of deaths by suicide across the country over a 20-year period found a positive association between high daily temperatures and an increase in the number of suicides on the days that there are temperature spikes. And a 2018 study conducted by researchers at Stanford University compared several decades' worth of historical temperature data and suicide data from across thousands of United States counties and Mexican municipalities, and found a strong correlation between excessive temperatures and suicide rates. The study found that this effect was similar in hotter versus cooler regions of the two countries.

41. While these studies do not prove a causal link between excessive temperatures and higher rates of suicide, they show consistency over time and in many

different places. Possible theories as to why mental well-being deteriorates in excessive heat include that when the body is cooling itself, the flow of blood to the brain is altered, and also because high temperatures result in sleep disruption. Inadequate sleep is connected to an array of negative mental health outcomes, including desperate acts of self-harm.

### D. People With Certain Medical or Psychiatric Conditions or Who Take Certain Medications Are at A Higher Risk of Heat-Related Disorders

42. Certain people are at greater risk of heat related disorders. This includes: a) people with chronic illnesses or medical conditions that impair thermoregulation; b) people with psychiatric or mental health disorders; and/or c) people taking drugs or medications that impair thermoregulation. People who fall into more than one of these categories are at even higher risk of injury. In addition, people who are confined or socially isolated are at increased risk of heat related disorders. I discuss each group in turn below.[3]

43. People with chronic illnesses or medical conditions such as heart disease, diabetes, obesity, and respiratory diseases like asthma or chronic obstructive pulmonary disease (COPD) are much more likely to succumb to heat stroke when under heat stress due to their body's inability to fully thermoregulate. Other conditions, such as fatigue associated with a recent deficit in sleep, poor physical conditioning, a recent febrile illness (fever), extensive skin conditions affecting the sweat glands and the blood vessels, including burns, scleroderma or psoriasis, are also precipitating factors for heat stroke.

44. People with heart conditions or heart disease are at increased risk of heat stroke and heat-related complications. Heart disease, or cardiovascular disease, refers to a number of problems related to the heart or blood vessels. Heart conditions can refer to congenital heart defects, or problems that developed later in life. In sum, these are people whose hearts are not able to function maximally when called on to do so.

---

[3] Infants, young children, and persons older than 65 are at higher risk of injury due to heat, but I do not discuss them here given the age range of plaintiffs and class members. However, as detailed in Part II.D, even adolescents, young adults, and healthier people are at risk of serious injury or death due to prolonged exposure to excessive temperatures.

45. In the case of heat stress, the heart is called on to circulate blood, and to circulate more blood and to do it more quickly. All cooling mechanisms depend on having adequate intravascular volume (in blood, plasma, water), and the ability to pump that blood, plasma, and water around the body and particularly to the skin is very important. As noted above, the normal person at rest circulates five (5) liters of blood per minute around the body. With heat stress, that circulation can go up to 20 liters per minute. To respond to heat stress, the heart must beat faster and harder, squeezing out more blood with each pump (which is referred to as stroke volume). During periods of heat stress, persons with heart disease will find it difficult to increase their stroke volume and their cardiac output, which is how much and how quickly their heart can pump out blood to the skin and the body.

46. Many cardiovascular problems reduce cardiac output, including a heart with physical damage or defects, chronic hypertension, blood vessels that are narrowed, and blood vessels that cannot dilate adequately. Reduced cardiac output makes it difficult for the body to cool itself through vasodilation and sweating, and increases the chances of heat stroke and other heat-related disorders.

47. People with diabetes or pre-diabetics are also at increased risk of heat stroke and heat-related disorders. Diabetes is a chronic disease caused by an insulin imbalance. Diabetes causes blood vessels to be unable to dilate adequately and unable to deliver sufficient blood and nutrients to the body. That compromises vasodilation and increases the risk of heat stroke. Diabetes may also impair kidney function, and the kidneys' ability to maintain electrolyte / fluid balance in the body is an important part of the body's response to heat stress.

48. People with hypertension likewise are at greater risk of heatstroke and heat related disorders. Blood pressure is a measure of the force of the blood pushing against the blood vessels. Hypertension, or high blood pressure, is a condition where the heart is being forced to pump harder because of the hardening of the arteries. Persons with hypertension have blood vessels that are not as complaint. The elasticity and the ability of the blood

vessels to open and close are decreased. As a result, the heart must pump much harder, and it will have a more difficult time increasing cardiac output during periods of heat stress.

49. People with respiratory or pulmonary diseases, such as asthma or COPD, are at increased risk of heat stroke and heat related disorder. These people have compromised or limited ability to exchange gases within the lungs, and their ability to oxygenate the body is decreased. Any stressor to the lungs will worsen their underlying conditions, and they will receive less oxygen. In a period of heat stress, when the body must pump more blood, the lungs are called on to oxygenate that blood. But lungs that are diseased will have a harder time doing so, increasing the risk of heat stroke and heat-related disorders.

50. People with psychiatric disease or mental health disorders are at increased risk of heat stroke and heat-related disorders because they may have impaired behavioral responses to heat stress. People with mental illness may not have the ability to reason, take precautions, or help themselves during a period of heat stress. People suffering from heat disorder must be able to express themselves, and have the mental energy and interpersonal skills to ask for help. People who suffer from depression or anxiety – two very common diagnoses among this population of youth involved in the juvenile justice system – may be unable to communicate well with others, or may experience apathy and inability to take on and overcome challenging circumstances, during times of physiologic heat stress. Moreover, many of the symptoms of heat-related problems such as feeling poorly, irritability, anxiety, and confusion can also be seen in a variety of mental illnesses. This often results in people with mental illness – and their treating providers, or the people who live or work around them – not appreciating that they are suffering from heat-related health problems versus a manifestation of their mental illness.

51. Certain medications that impair the body's ability to dissipate heat, circulate blood, or interfere with salt and water balance increase the risk of heat stroke and heat-related disorders. Medications that impair vasodilation and sweating – the primary processes of thermoregulation – will place persons at greater risk of heatstroke and heat

related disorders. Many – if not most, or all, – medications used to treat mental illness increase the risk of heat-related health problems.

52. Drugs that depress cardiac function, or cause dehydration, impair cardiac output and place persons at greater risk of heat stroke and heat-related illness. Common drugs used to prevent or treat cardiovascular disease, known as Beta blockers, calcium channel blockers, and diuretics, all fall into this category. Beta blockers and calcium channel blockers impair the heart's ability to squeeze and reduce the speed at which the heart beats, thereby lowering cardiac output. Diuretics decrease the amount of blood that the heart squeezes out. These drugs are also commonly used to treat hypertension. When cardiac output is reduced during heat stress, there is a greater risk of heat stroke.

53. Diuretics such as hydrochlorothiazide place patients at substantially increased risk of heat stroke. They are commonly prescribed for persons suffering from hypertension. Diuretics remove salt and water from the body in order to decrease blood pressure. In so doing, diuretics reduce the amount of blood volume circulating in the body and impair the ability of the heart to increase cardiac output.

54. Sympathomimetic drugs cause narrowing of the blood vessels, or vasoconstriction. Vasoconstriction results in decreased blood flow to the skin, inhibiting the loss of heat from the body. Examples of sympathomimetic drugs include common nasal decongestants and over the counter cold remedies. Sympathomimetic drugs are associated with heat stroke in numerous reports.

55. Anticholinergic drugs (such as Benadryl) cause sweat gland dysfunction. Sweat glands act through the skin, which is considered an organ, and is the largest organ in the body. Neurotransmission is essential to the proper functioning of sweat glands. Neurotransmitters are the chemicals that communicate messages around the nervous system. Sweat glands work through the neurotransmitter called acetylcholine; Nortriptyline disrupts the operation of the sweat glands by blocking the operation of the neurotransmitter acetylcholine. Many drugs have anticholinergic properties, including drugs used to treat

mental illness, itching, and gastrointestinal disorders. Examples of drugs having an anticholinergic effect include antihistamines, cyclic antidepressants, phenothiazines (*i.e.* Thorazine), and butyrophenones (*i.e*. Haldol). Phenothiazines and butyrophenones are also called neuroleptics or tranquilizers.

56. In addition to their anticholinergic effects, phenothiazines and butyrophenones further impair thermoregulation by interfering with the hypothalamus, the part of the brain that regulates temperature. In other words, the body's thermostat is broken. This results in disruption of signals from the brain, further impairing sweating and vasodilation, as well as other heat loss responses.

57. Antipsychotic medications impair the body's ability to regulate its own temperature. Antipsychotic, antidepressant, and anticholinergic medications all impair the body's ability to perspire, and hence cool itself off. Lithium causes significant fluid loss that can exacerbate heat-related health problems.

58. Selective Serotonin Reuptake Inhibitors (SSRIs) likewise interfere with cooling. SSRIs are antidepressants prescribed for people suffering depression. The hypothalamus requires serotonin, as well as other chemicals, to work properly and direct thermoregulation. The hypothalamus is targeted by SSRIs, and they decrease its ability to respond to and regulate the body's temperature.

59. Finally, a common side effect of many of these medications is sedation. People who are sedated or lethargic may not realize that they are suffering lethargy due to the heat, versus their medication.

60. All of these groups of people are at even higher risk of suffering from heat-related health problems. While heatstroke is commonly thought to be the major consequence of heat, it is the worsening of underlying conditions, including serious injury and death that leads to the large increase in presentations to the hospital when the heat index is above 88° F. Extreme heat is the most common cause of weather-related death in

the U.S., killing more people each year than hurricanes, lightning, tornados, floods, and earthquakes combined.

61. The effect of heat on any one individual is unpredictable. It is unrealistic to believe that security personnel will recognize heat as the cause of a behavioral change in the youth at Angola. Medical staff may attribute an increase in pulse to their young age, or to agitation or anxiety. Body temperature obtained by commonly used methods such as temporal thermometer are poor approximations of core temperature. Body temperature may be normal when it is the heat that is causing the worsening of the underlying medical condition. Body temperature may be normal until the moment of collapse.

62. Underlying medical conditions in young people may first manifest in the heat; for example, heat and the associated poor air quality may precipitate a first asthma attack. Young people may have undiagnosed heart diseases. Electrolyte abnormalities due to dehydration may exacerbate undiagnosed cardiac conduction abnormalities. Cardiac conduction abnormalities, or "cardiac arrest" may result.

63. Paramedics at Angola do not care for children regularly, as this is an adult facility. This is a danger particularly if the vital signs are in the normal range for an adult. There are no practitioners at Angola trained in the assessment and treatment of those under the age of 18. Youth can maintain their blood pressure much longer than adults so the presence of a low blood pressure may not be present in a youth with dehydration, signs of heat exhaustion such as diarrhea, or with impending heat stroke.

**E. Risks of Persistent Exposure to Heat on Healthy People**

64. All people, including young healthy people with no known medical problems, are at risk for heat related disorders during persistent exposure to a heat index above 88° F. Studies have shown that the incidence of heat-related deaths increases sharply starting at temperatures or heat index numbers in the mid to high 80s. Literature including studies of the 1995 Chicago heat wave, the European heat wave of 2003, and many others, have shed greater light on the dangers posed by high heat indexes.

65. Epidemiological studies during heat waves reveal that although some young healthy people with no known medical problems will tolerate heat stress more easily than the sick or elderly, during heat waves, mortality in the general population (and not just the sick or elderly) increases, and the number of illnesses in the general population (and not just the sick or elderly) increases. These studies show that young healthy people are also at risk of heat-related disorders, during periods of prolonged heat stress.

66. Young people who believe they are healthy may in fact be medically vulnerable, because frequently people – including youth – have undiagnosed heart conditions, and as noted above, cardiac disorders increase the risk for heat-related injuries.

### F. Adverse Medical and Mental Health Outcomes Due to Excessive Heat Exposure Are Entirely Preventable

67. Heat stroke and heat-related disorders are preventable, and the risks are well-known. Classical heat stroke is most common among those who have no access to air conditioning during heat waves. Multiple studies and analysis of deaths have shown that access to air conditioning reduces heat-related mortality.

68. Studies of heat waves show that air conditioning is not a luxury but a lifesaver, especially for people at heightened risk for heat-related disorder. Ninety percent of heat stroke victims found dead at their home did not have a working air conditioner. Having a working air conditioner is associated with an 80 percent reduction in the risk of death due to heat and cardiovascular disease, and a two-thirds reduction in mortality due to cardiovascular disease.

69. The U.S. Centers for Disease Control and Prevention (CDC) recommends that people who cannot afford air conditioning in their homes should spend time each day during hot weather in an air-conditioned environment because it will reduce the risk of heat-related disorder. It is now standard policy in most jurisdictions during extreme heat events to open "cooling centers" to the public so that people have a place to go to be in air conditioning. The CDC also recommends frequent cool showers if exposure to heat cannot

be avoided. Electric fans may provide some degree of comfort. However, fans alone do not prevent —and in fact, elevate the risk of— heat stroke when heat and humidity become extreme. The medical science and consensus are clear on this point; in plain language, as stated in the *Excessive Heat Events Guidebook* published by the EPA in 2006 (and updated in 2016), citing the American Medical Association's Council on Scientific Affairs (1997) and the CDC (2004):

> [P]ortable electric fans are not the simple cooling solution they appear to be. Because of the limitations of conduction and convection, using a portable electric fan alone when heat index temperatures exceed 99°F actually increases the heat stress the body must respond to by blowing air that is warmer than the ideal body temperature over the skin surface. In these conditions, portable electric fans provide a cooling effect by evaporating sweat. The increased circulation of hot air and increased sweat evaporation can, however, speed the onset of heat-attributable conditions (e.g., heat exhaustion).
>
> Thus, portable electronic fans need to be used with caution and under specific circumstances during an EHE [excessive heat event], such as exhausting hot air from a room or drawing in cooler air through an open window. Generally, portable electric fans may not be a practical and safe cooling mechanism during an EHE in homes that are already hot and are not air conditioned; their use should be discouraged unless the fans are bringing in significantly cooler air from outside the dwelling. If a resident must stay in these dwellings, and if they are unable to access an air-conditioned environment, safer cooling approaches would include taking frequent cool showers and drinking cool, nonalcoholic fluids (e.g., ice water).

U.S. Environmental Protection Agency, *Excessive Heat Events Guidebook*, at 37-38, at https://www.epa.gov/sites/default/files/2016-03/documents/eheguide_final.pdf.

70. A report released in May 2023 by the public policy research group Center for American Progress estimates that extreme heat will create $1 billion in health care-related costs in the U.S. during Summer 2023, and projects that excessive heat will spur nearly 235,000 emergency department visits and more than 56,000 hospital admissions for conditions related to exposure to excessive heat for each summer in the future. *See* Center for American Progress, *The Health Care Costs of Extreme Heat*, June 27, 2023 at

https://www.americanprogress.org/article/the-health-care-costs-of-extreme-heat/. The report calls on policy makers to "pursue policies that mitigate the effects of extreme heat and the emergencies it creates," again making the point that it is a deliberate choice by Louisiana officials to place these children in the hot un-air conditioned cells at Angola, exposing them to a substantial and unnecessary risk of harm.

## III. CONDITIONS AT THE OJJ ANGOLA UNIT MAGNIFY THE RISK OF SERIOUS HARM DUE TO EXPOSURE TO EXCESSIVE HEAT

### A. The Physical Plant of the OJJ Angola Unit

71. The physical structure and architecture of prisons and the requirements of prison life can make incarcerated people more susceptible to and vulnerable to heat. Prisons are normally built out of heat-retaining materials such as concrete or cement that increase internal prison temperatures. Prison buildings and cells often have few windows (if any) that can open to potentially create a cross-breeze or to circulate air. As a result, it is my experience that the un air-conditioned temperatures inside prisons often exceed the ambient outdoor temperature. For example, a 2014 report by the University of Texas School of Law found that the summer heat index inside Texas Department of Criminal Justice (TDCJ) facilities could exceed 149 degrees Fahrenheit.[4]

72. Any competent medical provider who learns that a patient is living in an extremely hot environment without air conditioning would advise the person to get into an air conditioned or significantly cooler environment for as much time as possible, in order to mitigate the dangers associated with living somewhere with high temperatures or a high heat index. Incarcerated people cannot do this.

73. A person who was free to respond to the stress created by a hot environment would normally be able to take steps to cool their body, for example by leaving their home

---

[4] T. Dart, *Texas Prisons Violate International Human Rights Standards, Report Says*, THE GUARDIAN, Apr. 23, 2014, at https://www.theguardian.com/world/2014/apr/23/teas-prisons-international-human-rights-standard-violations.

and going to a cooling center or other public location with air conditioning. But the youth in Angola cannot access some precautionary measures by virtue of their incarceration. First and foremost, they do not have the ability to sit in air conditioning whenever they need it.

74. Plaintiffs entered into evidence in September 2022 photos of the windowless cells in the former Death Row building where the youth are incarcerated, and how the cells are ventilated. *See* Plaintiffs' Exhibit 20 at 000299-303:







75. Incarcerated people locked in their cells or a dorm setting without air conditioning are trapped and unable to escape the heat. To be in held in poorly ventilated hot cells causes a feeling of suffocation, which in turn causes panic. This compounds the fact that self-harm and suicide increase during hot weather. Mental health conditions are proven to worsen in hot conditions. And mental health medications affect the body's ability to thermoregulate, which creates a spiraling effect of panicked desperation when locked in a claustrophobic cell, unable to obtain any relief.

76. The declarations by the youth assert that they are locked in their unairconditioned cells for 72 hours upon intake to the OJJ Angola Unit, as well as continuously from approximately 5 pm to 8 am, and for up to 48 hours at a time for punishment. They assert that there are fans on the hallways, which often break. As discussed above, fans are insufficient to prevent heat-related injury.

77. As shown in the pictures above, the cells are windowless and the walls are made of concrete blocks. Moreover, the sole source of water while the youth are locked in their cells is the combination toilet/sink in the cells. The youth's declarations also assert

that the water coming out of the cell sink is often foul. If the only water that the youth have available to them is not drinkable, then it is very likely that they are dehydrated.

78. Dehydration is dangerous for many reasons. First, dehydration causes a thickening of the blood from less water to dilute the components of blood. This thickening can cause pulmonary embolism, stroke, and abrupt blockage of any vein or artery. African Americans of any age with sickle cell anemia, or sickle trait, who experience dehydration will suffer greatly and are at high risk. Heat and dehydration increase sickling (deformation into the shape of a sickle) of blood cells, causing pain and blockage of vessels. These sickled cells plug up small blood vessels, causing many life-threatening situations, such as acute chest pain, kidney failure, stroke, and myocardial infarction. As stated above, insufficient water in the blood means insufficient volume of blood for the heart to squeeze, to send blood to the skin to cool the body by evaporation.

79. Second, dehydration also causes abnormal electrolytes. This can include very high sodium or very low sodium. These cause subtle mental status changes . Examples of these subtle alterations include patients brought to the hospital for being less active, sleepier than usual, less cooperative, and apathetic. In the heat, behaviors that seem normal in jail may be manifestations of electrolyte disorders due to heat induced changes. “Drink more water” is an instruction that has caused many patients to arrive with low sodium as they overly dilute the sodium in the body. So “drink more water” is a nonspecific instruction. It can cause serious electrolyte disorders leading to complications such as seizures and cardiac arrest.

80. In my experience consulting with prison and jail systems, they often rely upon fans, ice, and showers as their attempt to address and mitigate heat-related injury. This is what the State of Louisiana relied upon as their heat remediation plan in the new Death Row Unit at Angola. *See Ball v. LeBlanc*, No. 3:13-CV-318, Dkt. 290-1 at ¶¶ 8-22, Feb. 16, 2016.

81. These measures do not sufficiently address the risk of heat-related illness. Fans are insufficient for the reasons detailed above. The provision of ice, on its own, does not mitigate the risk of heat-related illness. The provision of ice to each individual does not achieve brain cooling, does not improve sweating, does not improve evaporative cooling and does not lower core body temperature. Ice as it is provided per individual is not sufficient to decrease the systemic inflammation and coagulopathy that promote life threatening organ dysfunction in heatstroke.

82. The provision of showers is also inadequate, because it is premised on the assumption that the showers can provide water that is cold enough to significantly lower the core body temperature, and that wetting the body will enhance evaporative cooling. But the high humidity and high heat index usually encountered in Angola, especially during the summer, limits the effectiveness of evaporation. If the purpose of the showers is to lower the body temperature, the literature and studies show that the best water temperature to use is 15° Celsius (59° F). In a cooling unit that uses evaporative cooling to treat heatstroke, the cool mist spray is 15°C; in studies using cold water immersion after exercise or for firefighters' body temperatures so that they can return to the fire fight, the temperature of the cold water is ideally around 15°C.

83. The declarations from the youth attest that the fans break often or do not function when the power is out, and are inadequate; that they are offered very short showers once a day, and are only offered access to ice occasionally. This is clearly insufficient and does not address the risk of harm to the youth.

**B. Summer Temperatures and Heat Indexes in Angola, Louisiana**

84. The risk of heat-related illness soars when the heat index exceeds 88° F. However, this risk is on a continuum. I have provided evidence in federal court in Texas that the risk accelerates sharply at heat index of 88°. F.

85. I have reviewed the chart prepared by Plaintiffs' counsel summarizing the the daily temperature, humidity, and heat index for Angola, Louisiana, from May 1, 2023

through July 13, 2023, using publicly-available historic weather data. *See* Declaration of Jack Warshal, ¶ 2, Ex. 1. For all but five days since May 1, the heat index was at or exceeded 88° F; the last day on which the outdoor heat index was below 88° was May 21:

| Date | Max Temp (°F) | Humidity (%) | Heat Index (°F) | Date | Max Temp (°F) | Humidity (%) | Heat Index (°F) |
|---|---|---|---|---|---|---|---|
| 5/1/2023 | 78.2 | 61.1 | 79 | 6/7/2023 | 90.5 | 72.8 | 109 |
| 5/2/2023 | 79.5 | 60.5 | 81 | 6/8/2023 | 92.4 | 70.5 | 114 |
| 5/3/2023 | 82.1 | 58.5 | 84 | 6/9/2023 | 92.2 | 68.5 | 112 |
| 5/4/2023 | 86.7 | 57.7 | 92 | 6/10/2023 | 93.3 | 72.1 | 118 |
| 5/5/2023 | 84.9 | 81.5 | 97 | 6/11/2023 | 91.7 | 71 | 112 |
| 5/6/2023 | 74.5 | 93.4 | 76 | 6/12/2023 | 92.6 | 73.9 | 118 |
| 5/7/2023 | 84.6 | 83.5 | 97 | 6/13/2023 | 94.6 | 72 | 123 |
| 5/8/2023 | 82.7 | 87 | 93 | 6/14/2023 | 94.6 | 71.1 | 122 |
| 5/9/2023 | 80.7 | 90.4 | 88 | 6/15/2023 | 93.9 | 76.3 | 125 |
| 5/10/2023 | 81.1 | 86.5 | 88 | 6/16/2023 | 96.8 | 69.2 | 129 |
| 5/11/2023 | 87.2 | 81.3 | 104 | 6/17/2023 | 96.1 | 75 | 133 |
| 5/12/2023 | 89 | 81.3 | 111 | 6/18/2023 | 96 | 74.5 | 132 |
| 5/13/2023 | 88.7 | 74.7 | 105 | 6/19/2023 | 96.9 | 72.5 | 133 |
| 5/14/2023 | 89.3 | 79.6 | 110 | 6/20/2023 | 96.1 | 77.6 | 136 |
| 5/15/2023 | 88.8 | 83.6 | 112 | 6/21/2023 | 92.4 | 74.2 | 117 |
| 5/16/2023 | 86.5 | 77.9 | 100 | 6/22/2023 | 91.6 | 69.9 | 111 |
| 5/17/2023 | 83.2 | 78 | 91 | 6/23/2023 | 91.8 | 70.5 | 112 |
| 5/18/2023 | 86.7 | 72.3 | 98 | 6/24/2023 | 91.7 | 76.2 | 116 |
| 5/19/2023 | 91.5 | 69.1 | 110 | 6/25/2023 | 94.8 | 77 | 129 |
| 5/20/2023 | 91.7 | 74 | 115 | 6/26/2023 | 90.2 | 81.6 | 115 |
| 5/21/2023 | 81.3 | 73.1 | 86 | 6/27/2023 | 96.1 | 72.3 | 129 |
| 5/22/2023 | 86.5 | 67.6 | 95 | 6/28/2023 | 97 | 70.4 | 131 |
| 5/23/2023 | 89.2 | 64.5 | 100 | 6/29/2023 | 97.9 | 69.7 | 134 |
| 5/24/2023 | 84.8 | 73.3 | 93 | 6/30/2023 | 98.7 | 65.6 | 132 |
| 5/25/2023 | 87.5 | 68.7 | 98 | 7/1/2023 | 98.6 | 66.7 | 133 |
| 5/26/2023 | 87.7 | 60.3 | 95 | 7/2/2023 | 96 | 65 | 121 |
| 5/27/2023 | 87.7 | 66.2 | 97 | 7/3/2023 | 95.7 | 65.4 | 120 |
| 5/28/2023 | 88.7 | 65.7 | 100 | 7/4/2023 | 93.5 | 70.2 | 117 |
| 5/29/2023 | 89.6 | 65 | 102 | 7/5/2023 | 94.7 | 73.5 | 125 |
| 5/30/2023 | 90.6 | 65.9 | 105 | 7/6/2023 | 93.3 | 75.6 | 122 |

| Date | Max Temp (°F) | Humidity (%) | Heat Index (°F) | Date | Max Temp (°F) | Humidity (%) | Heat Index (°F) |
|---|---|---|---|---|---|---|---|
| 5/31/2023 | 90.7 | 64.3 | 104 | 7/7/2023 | 95.6 | 71.1 | 126 |
| 6/1/2023 | 91.2 | 67 | 107 | 7/8/2023 | 92.5 | 70.8 | 115 |
| 6/2/2023 | 92.4 | 63.9 | 109 | 7/9/2023 | 92 | 76.5 | 118 |
| 6/3/2023 | 93.3 | 64.1 | 111 | 7/10/2023 | 92.9 | 74 | 119 |
| 6/4/2023 | 90.8 | 77.1 | 114 | 7/11/2023 | 97.1 | 70.7 | 132 |
| 6/5/2023 | 84.8 | 80.7 | 97 | 7/12/2023 | 96.2 | 68.6 | 126 |
| 6/6/2023 | 87.7 | 75.3 | 102 | 7/13/2023 | 96 | 72.5 | 129 |

86. I have also included a heat chart from the National Weather Service that shows the extreme danger of these conditions, with the likelihood of heat disorders with prolonged exposure or strenuous activity.[5]


National Weather Service
Heat Index Chart

Temperature (°F) / Relative Humidity (%)

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

Likelihood of Heat Disorders with Prolonged Exposure and/or Strenuous Activity
Caution  Extreme Caution  Danger  Extreme Danger

[5] The chart is found at https://www.weather.gov/media/unr/heatindex.pdf.

87. I would not dare to keep my dog in these conditions for fear of my dog dying. Louisiana's cruelty to animals laws would not support keeping a dog confined in this heat in a cage. And Louisiana law requires air conditioning in all juvenile detention centers. La. Admin. C. Tit. 48, Sect. 6945(T). I strongly agree with the federal court in Wisconsin's statement that, "I do not believe that plaintiffs should have to rely on the capriciousness of Mother Nature to determine whether they will make it through the summer alive." *Freeman v. Berge*, Case No: 03-C-21-C, 2003 WL 2327395(W.D. Wis. Dec. 17, 2003).[6] The declaration of one youth dated Tuesday, July 11, 2023, stated that he and other boys had been confined to their cells since the previous Wednesday (July 5, 2023), and only allowed out of their cells for 8 minutes a day for a shower. Declaration of Charles C. ¶ 5. According to the data shown above, the heat indexes for those days ranges from 115° F to 132° F.

88. There is a common myth that people somehow acclimatize to these excessive heat conditions after prolonged exposure. I want to disabuse anyone of the uninformed idea that somehow "the kids are from here, they're used to the heat." Rather, as shown below, Louisiana youth have many visits to ERs each year just for heat related illnesses (and this doesn't include youth presenting due to worsening underlying conditions).[7]

//

//

//

//

//

---

[6] As another court put it in a case related to prisoners' heat exposure, "constitutional rights don't come and go with the weather." *Henderson v. DeRobertis*, 940 F.2d 1055, 1059 (7th Cir. 1991).

[7] Louisiana Dep't of Health: *Heat-Related Illness in Louisiana: Review of Emergency Department and Hospitalization Data from 2010-2020*, Mar. 2023, at 15, at https://ldh.la.gov/assets/docs/lah/HRI_in_Louisiana_from_2010-2020.pdf.




89. It is well established that deaths due to heat alone, due to cardiovascular disease alone, and due to heat and cardiovascular disease combined, increase with the number of cumulative days of heat exposure. Below is an illustrative graph of this phenomenon from the Chicago heatwave of 1995.[8]




[8] Semenza J.C. *et al*, *Heat-related deaths during the July 1995 heat wave in Chicago*. New England J. of Med., 1996:335:84-90

90. In sum, it has been dangerously hot in Angola so far this summer. Confining children for all or most of the day to concrete and cement buildings without air conditioning is foolhardy and perilous.

### C. Angola's Inability to Provide Emergency Medical Care Puts Youth at Risk of Serious Harm

91. As noted above in Paragraph 3, I am one of three experts for Plaintiffs in *Lewis v. Cain*, Case No. 3:15-cv-00318-SDD-RLB (M.D. La.), a case before this Court. In that case, my expert reports found emergency medical care to be sorely lacking, and the Court specifically found emergency medical care to be "constitutionally inadequate." Mar. 31, 2021 Order (Dkt. 594) at ¶¶ 28, 100-116.

92. In the medical experts' April 2022 report[9] following the Court's order, we described two patients at Angola suffering from heat stroke who were provided wholly inadequate emergency care. Ex. 2 at pp. 119-20. In both cases, the emergency medical technicians (EMTs) who work at Angola's Assessment and Treatment Unit (ATU) mistakenly interpreted the symptoms of heat stroke as a drug overdose, even though opiate intoxication does not cause elevated temperatures. These two patients were not provided the appropriate and medically indicated cooling treatment for heat exhaustion or heat stroke. One of the patients died, the other suffered greatly.

93. In Texas, ten incarcerated people died due to heat in the summer of 2011. That does not account for the patients whose cause of death was not listed as heatstroke but was precipitated by the heat. The Texas litigation brought to light that the hogs on the prison farms were in air-conditioned living quarters in the barns, while most incarcerated people in the prisons were not.

94. I am extremely concerned that given the inadequate and unconstitutional medical care provided at Angola to the adults, including those suffering from heat stroke, when and if a youth experiences a heat-related injury, the health care staff will not respond

[9] A true and correct copy of this report is attached as **Exhibit 2**.

appropriately. Addtionally, no health care staff at Angola are trained in pediatric or adolescent medicine. In my opinion, worsening of mental health and medical conditions will occur because of the hot conditions in which these children are confined.

## IV. CONCLUSION

95. It is my opinion that no youth should be housed in an unairconditioned facility at Angola. No youth should be housed in a facility without health care staff trained in the medical care of children, or without health care staff who are competent to treat heat-related illness. Just as it would be unconscionable to allow children to sicken and freeze in the cold by not providing indoor heating, it is equally unconscionable to allow children to suffer, sicken, and possibly die in un-air conditioned conditions. Indeed, Louisiana state law requires that all juvenile detention facilities be air conditioned, for this reason. My personal knowledge of the unconstitutional and inadequate medical care provided to adults at Angola heightens my fear that a child will deteriorate or die at Angola due to the conditions and the poor health care provided at the prison.

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 16, 2023, in New York, NY.

Susi Vassallo M.D.

Susi U. Vassallo, M.D., M.S.

# EXHIBIT 9

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | March 27, 2025 |
| **To:** | All Staff |

**From:**

Signed by: Brittany Brizendine
A0C9F0C2BC7D465...
BRITTANY BRIZENDINE, Psy.D., MBA
Deputy Director, Institution Operations
California Correctional Health Care Services

DocuSigned by: Jennifer Benavidez
4624D27581A4426...
JENNIFER BENAVIDEZ
Deputy Director, Facility Operations
Division of Adult Institutions, CDCR

DocuSigned by: Amar Mehta
46AE21AE5D5B4D3...
AMAR MEHTA, M.D.
Deputy Director, Mental Health
California Correctional Health Care Services

Signed by: Renee Kanan
D65BF861AB2A44B...
RENEE KANAN, M.D.
Deputy Director, Medical Services
California Correctional Health Care Services

DocuSigned by: Debra Amos-Terrell
E7D4D3D26A91442...
DEBRA AMOS-TERRELL
Deputy Director (A), Nursing Services
California Correctional Health Care Services

Signed by: Eaton, Patrick
E0BFCDCCE763457...
JARED LOZANO
Deputy Director, Facility Support
Division of Adult Institutions, CDCR

**Subject:** **2025 ANNUAL HEAT PLAN AND UPDATES**

This annual update of the statewide Heat Plan (HP) memorandum is to remind institutions of major requirements of the HP and provide important updates for heat planning and implementation. When excessive heat warnings are in effect, it is important that the institution Warden and CEO ensure their institution HP procedures are active, and joint collaboration is underway, with respective executive team members taking action as required.

The purpose of this memorandum is to ensure that all staff act in a consistent manner to prevent and respond to serious threats of life and health to all incarcerated persons, including taking specific actions required in the HP applicable to incarcerated persons who are taking medications that can impair the body's ability to regulate temperature. All institutions shall review, revise, and activate institutional policies and procedures, train staff, ensure staff have access to relevant forms, and maintain a tracking system to compile, file, and forward summary documentation to headquarters as outlined in the tracking and reporting section of this memorandum.

**<u>Responsible Owners of the Heat Plan</u>**

The Warden and CEO have overall responsibility of the institution's HP. When an institution's location is expected to reach 100 degrees Fahrenheit or higher, the Warden, CEO, and their respective executive teams shall convene daily to collaborate, address and manage heat-related issues and action plans. If the institution's location is expected to reach 100 degrees Fahrenheit or higher over the weekend/holidays, the team shall meet on the last preceding weekday.

To ensure the well-being of both staff and incarcerated individuals, daily discussions should include, but are not limited to, the following heat-related topics:

- Heat Plan Stage Alerts and routine temperature monitoring (indoor and outdoor)
- Program impacts
- Staff related impacts
- Incarcerated persons related impacts
- Facility related issues (i.e. Plant Operations, chiller, electrical, Central Kitchen functionality, etc).
- Medical Warehouse (i.e. ensure items requiring temperature control are maintained appropriately; if relocation is needed, ensure space and plan for relocation.)
- Pharmacy (i.e. appropriate oversight of all medication refrigerators, contingency plan in case of outage, generator availability, etc.)
- Cooling stations (locations, as well as additional cooling and hydration measures, etc.)
- Daily documentation:
    - Daily verification of the temperature records and all heat logs as required
    - Daily verification of the housing unit logbook upon Stage III Heat Alert
    - Upon Stage III Heat Alert, verification of Medical Rounds and identification of incarcerated persons with symptoms of heat-related illness via EHRS rounding documentation
    - Completion of meeting minutes
- Reasonable accommodations as necessary

The Warden and CEO shall designate the Health Care Access Unit Associate Warden (AW HCAU) and Chief Support Executive (CSE), or designees, to partner as the responsible managers of the HP, to ensure compliance, complete implementation, oversight and documentation. The AW HCAU and CSE, or designees, shall also collaborate to ensure monthly oversight occurs, via the Resource Management Subcommittee (RMS). Specifically, the RMS shall ensure a complete Heat Plan Package is submitted, reviewed and discussed during the monthly RMS Meeting, and reported up to the institution Quality Management Committee (QMC) monthly. A complete Heat Plan Package shall include the following:

- CDCR Form 7711-1, Heat Plan Monthly Summary Report (Attachment A), signed by the Warden and CEO. The AW HCAU and CSE, via RMS, shall ensure prior to routing Form 7711-1 to the Warden and CEO, there is concordance between the 7711-1 and eHCIR submissions.
- CDCR Form 2030, Outside Temperature Record (Attachment B)
- CDCR Form 2031, Inside Temperature Record (Attachment C)
- Electronic Heat Incident Log (extracted from EHRS through a Quality Management electronic report)
- Medical Rounds Log (extracted from EHRS through an electronic report and only applicable during months with a Phase III alert).
- Weekly List of Heat-Risk Incarcerated Persons for the respective month in review

**Seasonal Implementation**

The HP is effective annually from May 1 to October 31 and extends as needed based on temperature conditions.

**Heat Alert Medications List**

Consistent with the HP, the Department shall maintain and distribute annually a list of Heat Alert Medications for the purposes of the HP, pursuant to California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM), Chapter 3, Article 3.5.13, Heat Alert Medications. Heat Alert Medications have the potential to impair thermoregulation, which is the body's ability to regulate temperature. Incarcerated persons prescribed any of the medications found on the current *Heat*

*Alert Medications List* (Attachment D) are at greater risk for heat-related illness as a result of being on any such medication.

**Identification of Heat-Risk Incarcerated Person**

This HP shall apply to all incarcerated persons and includes specific requirements pursuant to the *Coleman* Heat Plan for those incarcerated persons taking Heat Alert Medications. Incarcerated persons taking Heat Alert Medications are referred to as heat-risk incarcerated persons for purposes of the HP.

When the HP is in effect, institutional staff shall generate and distribute **daily** a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. The list shall be generated using the Quality Management Heat Medications – Custody Report list that allows access to the Heat Medication Patient Registry. The Heat Medication Patient Registry can be found at: https://qmtools.accounts.cdcr.ca.gov/Reports/report/QM/NonClinical/HeatMedicationsCustody .

Information on how to request access to the Custody Heat Medication Report can be found at: https://cdcr.sharepoint.com/sites/cchcs_qm_com/Patient%20Registry%20Resource%20Center/Forms/All%20Documents.aspx?id=%2Fsites%2Fcchcs%5Fqm%5Fcom%2FPatient%20Registry%20Resource%20Center%2FHeat%20Med%20Report%20Custody%20%2D%20How%20to%20Access%2Epdf&parent=%2Fsites%2Fcchcs%5Fqm%5Fcom%2FPatient%20Registry%20Resource%20Center%20%2E

To ensure continuity and daily production, the list shall be printed prior to 0600 hours from the institution's Health Care Access Unit every Monday through Friday, and from the Triage & Treatment Area on Saturdays, Sundays, and holidays, and provided to the Watch Commander to ensure distribution to appropriate areas.

**Heat Stress Symptoms**

Upon prescribing a Heat Alert Medication, the provider shall inform each incarcerated person, including those who are not enrolled in the Mental Health Services Delivery System (MHSDS), of heat stress symptoms, which could be a result of taking the medication, as well as any recommended precautions, using Effective Communication. This discussion with the patient shall be documented in the incarcerated person's health care record.

Prompt medical attention shall be provided whenever staff observe, or an incarcerated person reports heat stress symptoms. When an incarcerated person is observed to have, or complains of, one or more of the following heat stress symptoms, staff shall immediately refer the incarcerated person to health care staff for evaluation and/or treatment:

- Flushed or dry feeling
- Red, flushed or mottled (discolored spots or blotches) skin, or skin that is turning bluish
- Cramping of muscles
- Mental confusion, sleepiness, coordination difficulties, or convulsive behavior
- Fainting, dizziness, lightheadedness, giddiness, or severe headaches
- Nausea or vomiting

**Health Care Staff Responsibility for Documenting Suspected Heat Related Illness**

All heat related encounters shall be documented in the health care record.

1. EHRS Form DCT 25.1, First Medical Responder Form, and the associated Primary and Secondary Assessment Forms (25.1) include prompts for recording heat-related illness. Health care staff responding to emergency or urgent heat incidents (for example, in the Triage and Treatment Area) shall use these forms to document heat incident information.

2. Nurses conducting rounds during Stage III heat alerts shall document rounding and perceived symptoms of heat-related illness using the Stage III Heat Med Rounds EHRS form (25.1).

**Routine Monitoring of Temperatures**

1. Routine outdoor temperature monitoring
   a. The Warden or designee shall ensure an accurate thermometer is located in a central, heat-neutral location to monitor outside air temperatures.
   b. Outside air temperatures shall be recorded on the CDCR 2030 Outside Temperature Record, every hour, every day, from May 1 through October 31 of each year, or any other time the outdoor temperature is expected to rise above 90 degrees Fahrenheit.
2. Routine indoor temperature monitoring
   c. The Warden or designee shall also ensure inside air temperatures are measured in all non-air-conditioned living areas housing incarcerated persons and areas that are air conditioned but could exceed 90 degrees Fahrenheit (i.e., kitchen areas, laundry areas, program areas, etc.).
   d. Temperatures shall be taken at the highest physically located temperature sensor, or, in its absence, the highest accessible non-air-conditioned location where incarcerated persons are housed, which could include a temperature taken within an incarcerated person's cell.
   e. Inside air temperatures shall be recorded on the CDCR 2031 Inside Temperature Record, every three hours, daily from May 1 through October 31.
      i. The documented temperature that is highest shall be utilized to activate Stage 2 of the Heat Plan, any time the indoor temperature reaches 90 degrees Fahrenheit or greater.
   f. Any interruption in the functioning of an air-conditioned area shall require immediate temperature monitoring as outlined in the respective heat alert stage criteria below.
   g. The Correctional Plant Manager (CPM) shall ensure testing of all thermometers located within the housing unit(s) and outdoors. Testing shall be conducted in April and July each year to ensure accuracy. This testing requirement shall be generated through the preventive maintenance (PM) work order system for auto scheduling every April and July. Upon completion of the testing, the CPM or designee shall provide a proof of practice memorandum to the institution Heat Plan Coordinator verifying all thermometers have been tested, noting the condition of each thermometer, and confirmation they are of working order. This proof of practice shall also be submitted to the RMS.
      i. The Heat Plan Coordinator shall be designated by the institution Warden in coordination with the CEO.

**Stage I Heat Alert**

A Stage I Heat Alert occurs when the outside temperature rises to 90 degrees Fahrenheit or more. The Warden or designee shall activate and announce the Stage I Heat Plan institution-wide, and heat-risk incarcerated persons shall be called to "Return to Housing." Heat-risk incarcerated persons are not required to return to their housing units when outside temperatures rise to 90 degrees Fahrenheit if cooling measures are initiated or incarcerated persons are working, or otherwise present, in air-conditioned environments that remain below 90 degrees Fahrenheit. All other heat-risk incarcerated persons shall be called back to their housing units. All heat-risk incarcerated persons are restricted to a maximum of 30 minutes outside to perform officially sanctioned activities, such as returning to housing units and receiving medical attention. This time is not to be used for leisure activities.

A Stage I Heat Alert shall be deactivated when the outside temperature has fallen below 90 degrees Fahrenheit for one hour.

**Stage II Heat Alert**

A Stage II Heat Alert occurs when the temperature inside any area occupied by incarcerated persons rises to 90 degrees Fahrenheit or more. The Warden or designee shall activate the Stage II Heat Plan in the affected area. Staff shall initiate cooling and hydration measures, which may include but are not limited to, providing cool drinking water (assess regularly), showers, and/or misting, ensuring areas are equipped with fans, etc. Staff shall also increase observation of incarcerated person for signs of heat-related illness and report any symptoms to health care staff. In addition, staff shall provide patient education to incarcerated persons regarding heat related illness.

A Stage II Heat Alert shall be deactivated when the inside temperature has fallen below 90 degrees Fahrenheit for one hour.

**Stage III Heat Alert**

A Stage III Heat Alert occurs when the temperature inside any area occupied by incarcerated persons rise to 95 degrees Fahrenheit or more. The Warden or designee shall activate the Stage III Heat Plan in the affected area. The Physician on Call (POC) shall be notified, via the Watch Commander or Administrator Officer of the Day (AOD), after normal business hours regarding the activation of the Stage III Heat Alert. The CEO, or the Chief Medical Executive as the CEO's designee shall decide whether the POC may remain off grounds or shall be physically present at the institution.

Nursing staff or other medically trained personnel shall visit the affected areas to observe and assess each heat-risk incarcerated person and perform medical rounds documenting on the "Stage Three Heat Med Round" PowerForm in the Electronic Health Record System (EHRS), at least once every two hours during the period the inside temperature remains at 95 degrees or above and record the incarcerated person's condition.

If any incarcerated person displays signs or symptoms of heat related illness, they shall be provided cooling and hydration measures and sent to the Triage and Treatment Area to receive medically indicated treatment.

A Stage III Heat Alert shall be deactivated when the inside temperature has fallen below 95 degrees Fahrenheit for one hour. Subsequently, the Stage II and I heat alert(s) shall be in effect as warranted by the respective parameters above.

**Tracking and Reporting**

Institutions shall submit a CDCR Form 7711-1, *Heat Plan Monthly Summary Report* (Attachment A), to headquarters each month, signed by the Warden and CEO. Additionally, the following documents are to be gathered at the institution monthly, from May 1 through October 31 of each year, filed for review in an easily accessible manner with the institution's HP Coordinator, and retained consistent with departmental records retention policies and procedures:

1. CDCR Form 2030, *Outside Temperature Record* (Attachment B)
2. CDCR Form 2031, *Inside Temperature Record* (Attachment C)
3. Heat Incident Log (electronic report summarizing EHRS-documented heat incidents for the month)
4. Stage III nursing rounds results (if applicable, via electronic report summarizing EHRS rounding data for the month)
5. Weekly List of Heat-Risk Incarcerated Persons

Copies shall also be included with the monthly submission of the CDCR MH-7711-1. Electronic versions of these forms can also be found on the Mental Health Quality Management (QM) Portal at https://cdcr.sharepoint.com/sites/cchcs_lifeline_mh/SitePages/Mental-Health-Forms(1).aspx

From May through October, institution leaders shall also engage the local Inmate Advisory Council, Patient Advisory Council, and/or Peer Support Specialists in discussions regarding the HP efforts. Institutions can find brochures, flyers, posters, and videos to support local educational campaigns for incarcerated persons at this link: Quality Management - Home, including an order form if institutions would like educational materials printed by headquarters and shipped to the institution.

Health care incident reports are used to identify, evaluate, and address suspected heat related incidents resulting from environmental heat conditions for institutional patient safety efforts. Per HCDOM 1.2.7, *Institution Patient Safety Program,* "All California Department of Corrections and Rehabilitation/California Correctional Health Care Services (CCHCS) staff have a duty to report health care incidents using the centralized electronic Health Care Incident Reporting (eHCIR) system within 24 hours of occurrence or discovery. The eHCIR is available to all staff via Lifeline (http://patientsafety/) and allows health care incidents to be submitted anonymously." The eHCIR includes a checkbox indicating that the incident is a "Heat Medication Related Illness." Please note that all heat related illnesses shall be documented in the EHRS and the eHCIR, whether the patient is taking a heat alert medication or not.

Institution HP Coordinators shall submit a CDCR MH-7711-1, containing the previous month's heat related activities to the Statewide Mental Health Program headquarters by the fifth business day of the following month. The form shall be reviewed and signed by the Warden and CEO, and include the following information in chronological order:

- Temperature Logs: A notation that the Inside and Outside Temperature Records have been collected and are on file and available with the institution's Heat Plan Coordinator.
- Heat Incident Log (electronic report summarizing EHRS-documented heat incidents for the month)
- Stage II Heat Alert Log: Date, hour, and location by housing unit, where inside temperatures of 90 degrees Fahrenheit and above have been recorded, and documentation if hydration and access to cooling measures, were provided to any incarcerated persons. Please indicate "none" if an inside temperature of 90 degrees Fahrenheit was not reached in any housing unit.
- Stage III nursing rounds results (if applicable, via electronic report summarizing EHRS rounding data for the month).

The first CDCR MH-7711-1 for May 2025 is due by June 6, 2025. The form, and associated documents, shall be submitted to the Statewide Heat Plan Coordinator, via email: m_MHProgramHeatPlan@cdcr.ca.gov .

**Reasonable Accommodations**

In an effort to ensure all incarcerated persons are afforded equal access to programs, services, and activities during Heat Alerts, institutions shall devise and include any reasonable accommodations when revising their Local Operating Procedure (LOP). The following are some examples institutions could provide to incarcerated persons as possible forms of reasonable accommodations:

- Modified yard times (i.e. scheduled during cooler periods of the day)
- Additional dayroom/inner wing program opportunities
- Recreation gymnasium programs during summer/warmer months

All reasonable accommodations provided to incarcerated persons during heat alert activation shall be documented in the institution's Daily Activity Report. Institution LOPs shall include what specific reasonable accommodations will be provided in each facility for incarcerated persons who are on the heat alert list and are recalled from outdoor activities.

**Traditional Sweat Lodge**

Conditions in the Traditional Sweat Lodge (high temperature and high humidity) pose very serious health risks for heat-related illness. Participation is not medically recommended for those prescribed Heat Alert Medications, which can impair the body's ability to regulate temperature. However, Incarcerated Persons may still attend the traditional sweat lodge, at their own risk.

Incarcerated persons may consult with their Spiritual Advisors to consider alternatives to the Sweat Lodge Ceremony that do not involve excessive heat or humidity.

**Local Operating Procedure**

In coordination with and in addition to the requirements in the HP, institutions are required to identify and include in their updated HP Joint Local Operating Procedure (LOP), the following information:

- The communication pathway to ensure the following is provided to the staff and incarcerated population:
    - Characteristics that might make a person particularly susceptible to heat-related illness
    - Signs and symptoms of heat-related illness
    - When to seek urgent help
    - The resources and educational materials available to staff and incarcerated people during periods of excessive heat.
- Medical Warehouse (i.e. ensure the items requiring temperature control are maintained appropriately; if relocation is needed, ensure space and plan for relocation is documented.)
- Pharmacy (i.e., appropriate oversight of all medication refrigerators, contingency plan in case of outage, generator availability, etc.)
- Information regarding the institution's cooling stations (locations, as well as additional cooling and hydration measures, etc.)
- Process for documentation verification:
    - Daily verification of the temperature records and all heat incident logs as required.
    - Daily verification of the housing unit logbook upon Stage III Heat Alert.
    - Upon Stage III Heat Alert, daily verification of the Medical Rounds Log.
- Reasonable accommodations as necessary.
- The classification(s) of staff members (such as nursing or other medically trained personnel) who shall be assigned to perform the Stage III rounds/monitoring.
- The local process to ensure maintenance of the mechanical and ventilation systems as needed.
- Space Allocation (contingency plan)
    - Identify adequate space for the most vulnerable incarcerated persons to relocate, if necessary, in accordance with institutional design. Identification of those at increased risk ("most vulnerable") shall be through consultation with health care staff and shall occur as needed through all heat alert stages.
    - Identify additional air-conditioned space for staff to relocate if necessary.

The Warden and CEO shall both sign the Joint LOP, and submit the revised 2025 HP LOP, with any changes identified, to the following email address: m_MHProgramHeatPlan@cdcr.ca.gov by Friday, April 11, 2025.

Wardens and CEOs shall include their respective Associate Directors and Regional Health Care Executives on the Joint LOP Submission.

**Staff Training and Education for Incarcerated Population**

Annual Heat Related Pathologies training (BET code 11053481) on your institution's HP, which includes what to do when heat stress symptoms are identified and/or reported, shall be provided to custodial and clinical staff. Consistent with the California Model, information relative to process and resources available to staff can be found in the Injury Illness Prevention Plan (IIPP) https://cdcr.sharepoint.com/sites/CDCR_IIPPATDBiosafety and the LOPs.

If you have any questions, please contact the Statewide Heat Plan Coordinator, Policy Support, Statewide Mental Health Program, CCHCS, via email: m_MHProgramHeatPlan@cdcr.ca.gov .

Attachments

cc:
Joseph Bick, MD, Director, Health Care Services
Gena Jones, Director, Division of Adult Institutions
Dave Lewis, Director, Facility, Planning and Construction Management
Joseph (Jason) Williams, Director, Corrections Services
Kevin Myers, DDS, Deputy Director, Dental Services
Annette Lambert, Deputy Director, Quality Management
Antronne Scotland, Deputy Director, Corrections Services
Jared Lozano, Deputy Director, Division of Adult Institutions
DeAnna Gouldy, Deputy Director, Policy and Risk Management Services
Michelle Weaver, Deputy Director, Facility, Planning and Construction Management
Regional Health Care Executives
Associate Directors, Division of Adult Institutions
Regional Mental Health Administrators
Regional Chief Psychiatrists
Regional Deputy Medical Executives
Regional Chief Nurse Executives
Regional Pharmacy Services Managers
Regional Dental Directors

# EXHIBIT 10

# Analysis of 2023 California Correctional Health Care Services Mortality Reviews

Kent Imai, MD
Consultant to the California Prison Receivership

3/18/2025

## Table of Contents

I. Introduction ........ 1

II. The California State Prison Population in 2023 ........ 2

III. Mortality Review Purpose and Process ........ 4

IV. 2023 Study Findings ........ 6

A. Causes of Death ........ 6
B. Ages at Death ........ 12
C. Expected and Unexpected Deaths ........ 12
1. *Expected deaths* ........ *12*
2. *Unexpected deaths* ........ *12*
D. Discussion of mortality trends ........ 13
1. *CCHCS mortality rates* ........ *13*
2. *Drug overdose* ........ *15*
3. *Lung cancer* ........ *19*
4. *Cardiovascular disease* ........ *20*
5. *Infectious Disease (Including COVID-19)* ........ *22*
6. *Suicide* ........ *25*
7. *Homicide* ........ *27*
8. *Advanced (end stage) liver disease* ........ *29*
9. *Accidental deaths* ........ *31*
E. Opportunities for Improvement in 2023 ........ 31
1. *Opportunities to improve the application of the "Model of Care" as described in the CCHCS Complete Care Model* ........ *35*
2. *Optimizing care at the end of life* ........ *38*
3. *Opportunities to improve clinical decision making by improved recognition and management of important clinical signs and symptoms* ........ *39*
4. *Opportunities to improve recognition and action in response to abnormal laboratory and other diagnostic test results* ........ *40*
5. *Opportunities to improve adherence to CCHCS Clinical Care Guides for specific diseases, conditions, or risk factors* ........ *41*
6. *Opportunities to improve communication between primary care teams and in care transitions* ........ *44*
7. *Opportunities to improve medical record documentation* ........ *45*
8. *Opportunities to prevent delays in diagnosis or treatment* ........ *46*
9. *Opportunities for improving the practice and documentation of emergency medical responses.* ........ *48*
10. *Miscellaneous* ........ *49*
11. *Potential Quality Issues (PQI)* ........ *49*
12. *Referral from the Mortality Review Discussion Group to quality review committees.* ........ *50*

V. Quality Initiatives and Performance Improvement Tools ........ 50

VI. Conclusions ........ 52

## List of Tables and Figures

Figure 1. California State Prison Population 2006–2023 ....3
Figure 2. Racial/Ethnic Representation in California General Population and CDCR In-Custody Population ....4
Table 1. Causes of Death Among California Incarcerated Persons, 2023 ....6
Table 2. Top Causes of Death Among California Incarcerated Persons, 2006–2023 .... 10
Figure 3. Deaths by Expectation and Category, CCHCS 2023 .... 13
Table 3. Annual Mortality Rates Among California and U.S. State Prisons, 2006–2023 .... 14
Figure 4. Annual Death Rates per 100,000, CCHCS vs all U.S. State Prisons 2006–2023 .... 15
Table 4. Numbers and Rates of Overdose Deaths, CCHCS 2012–2023, and U.S. State Prisons 2012–2019 .... 16
Figure 5. Numbers and Rates of Overdose Deaths, CCHCS 2012–2023, and U.S. State Prisons 2012–2019 .. 17
Table 5. Numbers and Rates of Lung Cancer Deaths, CCHCS 2012–2023 .... 19
Figure 6. Numbers and Rates of Lung Cancer Deaths, CCHCS 2012–2023 .... 20
Table 6. Numbers and Rates of Cardiovascular Deaths, CCHCS 2012–2023 .... 20
Figure 7. Numbers and Rates of Cardiovascular Deaths, CCHCS 2012–2023 .... 21
Figure 8. COVID-19 Deaths and Vaccinations in California State Prisons, CCHCS 2020–2023 .... 22
Figure 9. Numbers and Rates of Non COVID-19 Infectious Disease Deaths, CCHCS 2012–2023 .... 23
Figure 10. Death Rates in Select Causes of Infectious Disease, CCHCS 2012–2023 .... 24
Table 7. Numbers and Rates of Suicide, CCHCS 2012–2023 and U.S. State Prisons 2012–2019 .... 26
Figure 11. Numbers and Rates of Suicide, CCHCS 2012–2023 and U.S. State Prisons 2012–2019.... 26
Table 8. Numbers and Rates of Homicides, CCHCS 2012–2023 and U.S State Prisons 2012–2019 .... 27
Figure 12. Numbers and Rates of Homicides, CCHCS 2012–2023, and U.S State Prisons 2012–2019 .... 28
Table 9. Numbers and Rates of Advanced Liver Disease Deaths, CCHCS 2012–2023 .... 29
Figure 13. Numbers and Rates of Advanced Liver Disease Deaths, CCHCS, 2012–2023 .... 30
Figure 14. Deaths and OFIs, CCHCS 2018–2023.... 32
Table 10. Opportunities for Improvement in Expected and Unexpected Deaths, CCHCS, 2023 .... 33
Table 11. Missed Clinical Signs and Symptoms, and Eventual Diagnoses, CCHCS 2023 .... 40
Table 12. Other Care Guides, Programs and Protocols OFI and related deaths, CCHCS, 2023 .... 43
Figure 15. Example View of CCHCS Health Care Services Dashboard for 2023 .... 51

# I. Introduction

Medical care for persons incarcerated in California Department of Corrections and Rehabilitation (CDCR) facilities was placed under Federal receivership in April 2006, after a ruling that found California in violation of incarcerated persons' rights to constitutionally adequate medical care under the Eighth Amendment to the Constitution. Medical care in the state's prisons was so poor that an estimated average of one incarcerated person each week died as a result of malpractice or neglect.

The work of the Receivership has been transformational. In 2015, after a decade of meaningful reform, the Receivership began delegating institutions from California Correctional Health Care Services (CCHCS) back to CDCR for management of health care with ongoing monitoring by the Receiver. During the COVID-19 pandemic, there were no further delegations, but delegation resumed in 2022. In 2023 the medical care at two additional facilities were delegated to CDCR, for a total delegation of 23 of the 33 California prisons. The CCHCS fact sheet provides a summary of the timeline of the Receivership and a list of delegated institutions.

Also in 2015, the Complete Care Model, based on the industry standard known as the Patient Centered Health Home, was adopted as the standard for the delivery of health care in CCHCS and CDCR.

In 2020, CCHCS and CDCR jointly released a new vision and mission statement with an emphasis on restorative justice, successful community reintegration and public safety.

***Vision***

*We enhance public safety and promote successful community reintegration through education, treatment, and active participation in rehabilitative and restorative justice programs.*

***Mission***

*To facilitate the successful reintegration of the individuals in our care back to their communities equipped with the tools to be drug-free, healthy, and employable members of society by providing education, treatment, rehabilitative, and restorative justice programs, all in a safe and humane environment.*

CDCR describes seven values and seven organizational and programmatic goals which taken together form the basis for The California Model, drawing upon international best practices, including those in Norway and other international systems to change the overall culture within CDCR and CCHCS. Overall, the model seeks to improve working and living conditions for all who live in, work in, and visit state prisons.

This report describes the demographics of the California prison population, summarizes the mortality review process in the prison system, and analyzes the causes of death, and trends in mortality rates. Opportunities for system improvement are categorized and analyzed. Quality improvement initiatives and their effect on specific mortality subsets are discussed and summarized.

This is the 17th consecutive annual report on mortality reviews occurring in CCHCS. All previous annual mortality reviews can be accessed at cchcs.ca.gov/reports/

## II. The California State Prison Population in 2023

**Incarcerated Population:** The Receivership was created in 2006, when the California prison population numbered 171,310. Since then, Federal court mandates, California state propositions, legislative actions, and executive actions have contributed to a sizable reduction in the incarcerated population:

- Assembly Bill 109 (2011), an "Alternate Custody Program," had some felons and parole violators remain in local county jails.
- Proposition 36 (the Three Strikes Reform Act of 2012) decreased the number of individuals at risk for long prison terms by allowing re-sentencing for convicts serving life sentences for felonies that were nonviolent.
- Proposition 47 (2014) converted some theft and drug possession felonies into misdemeanors.
- Proposition 57 (2017) increased good behavior early release opportunities.
- During the COVID-19 pandemic, an Executive Order by the California Governor (2020) suspended the intake of new incarcerated persons from county jails into state prisons.

In 2023, the California quarter-end in-custody populations were:

| | |
|---|---|
| March 31, 2023 | 95,700 |
| June 30, 2023 | 96,033 |
| September 30, 2023 | 95,147 |
| December 31, 2023 | 94,188 |

The 2023 average quarter-end population was 95,267, a 44% reduction from 2006, and the lowest in over 30 years. Figure 1 is an annotated graph of the California prison population from 2006 to 2023.

*Figure 1. California State Prison Population 2006-2023*




| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Population* (in thousands) | 171.3 | 170.8 | 170.0 | 169.5 | 166.7 | 161.8 | 134.9 | 133.3 | 135.2 | 128.8 | 128.7 | 130.8 | 128.9 | 125.3 | 107.3 | 98.1 | 96.3 | 95.3 |

*This annotated run chart shows the significant decrease in prison population, annotated with the timing of related governmental actions.*

**Age:** The average age of the California prison population in December 2023 was 42.5 years. Individuals under 45 represented over three-fifths (61%) of the total prison population.

Incarcerated persons older than 55 comprised 20% of the CDCR in-custody population in December 2023, compared to 13% in Dec 2015 (CDCR Offender Data Points).

**Gender:** In December 2023, 89,431 (94.9%) of the 94,188 people incarcerated were male; 4,154 (4.4%) were female; and 603 (0.6%) were non-binary (Monthly TPOP4 Report for December 2023).

**Race/Ethnicity:** The in-custody population in December 2023 was 27.7% Black, 45.9% Hispanic, 20% White, and 6.4% other races (Offender Data Points, CDCR Public Dashboard).

2023 estimates from the California Department of Finance Demographic Research Unit show the California general adult (18+) population to be 5.9% Black Non-Hispanic, 34.5% Hispanic Any Race, 38.4% White Non-Hispanic, 17% Asian Non-Hispanic, 3.4% Multiracial Non-Hispanic, and 0.8% other single races non-Hispanic (including American Indian and Alaska Native, Native Hawaiian and Other Pacific Islander).

Figure 2 shows the overrepresentation of California's Black and Hispanic populations in its prison system. Black overrepresentation is the most significant, comprising 5.9% of the general population and 27.7% of the prison population. Hispanics are also disproportionately represented, comprising 34.5% of the general population and 45.9% of the prison population.

*Figure 2. Racial/Ethnic Representation in California General Population and CDCR In-Custody Population*




*A stacked horizontal bar chart comparing the racial/ethnic representation described in the narrative above.*

## III. Mortality Review Purpose and Process

The purposes of the Receiver's Mortality Review Unit are to utilize mortality data to mitigate patient harm, and to identify opportunities for improvement (OFIs) as they relate to patient safety, the quality of health care services, and patient outcomes.

Every patient death triggers an initial death report generated by the prison in which the death occurs. This report includes significant clinical events, summarizes the emergency medical response, and gives a provisional immediate cause of death. The initial report is forwarded to the Mortality Review Unit.

The Mortality Review Unit conducts an independent review. This review summarizes the patient's movement history within the California prison system and collects relevant information for the nurse

and medical provider reviewers such as an autopsy report and a toxicology report from the local coroner when available.

A nurse reviewer conducts an extensive review of the patient's clinical record beginning at least six months prior to the date of death (the reviewer may include older records to review pertinent antecedents to the terminal event). The quality of triage and evaluation, timeliness of access to care, the quality of care, adherence to published evidence-based care guides and nationally recognized standards of care, responses to all abnormal laboratory and imaging studies, and the timing and quality of emergency responses are reviewed.

Any history of drug and alcohol abuse is noted, including interactions with the CCHCS substance use program and the patient's experience with medication assisted therapy.

The patient's mental health care is also summarized, including a listing of significant mental illnesses, interactions with the mental health system of care, significant nonadherence problems, and potential for self-harm. The nurse reviewer also identifies any opportunities for improvement in systems or processes related to health care delivery (OFIs).

A medical provider reviewer proposes an immediate cause of death, an underlying cause of death, any significant conditions contributing to but not related to the immediate cause of death, and additional OFIs. The death is assigned to one of four categories: expected or unexpected death, with or without OFIs.

All suicides or possible suicides undergo a separate case review by the Suicide Prevention and Response Focused Improvement Team (SPRFIT).

The Mortality Review is then presented at the Headquarters Mortality Review Discussion Group (MRDG). For each death, the group reaches consensus about the immediate and underlying causes of death, contributing causes of death, and OFIs. The group also identifies Potential Quality Issues (PQI), which are incidents occurring outside the CDCR prison system in one of the Healthcare Provider Networks that contract with the state to provide hospital care or specialist care. Such events have potential quality of care implications.

A final CCHCS Mortality Review is sent to the institution (prison) and regional health care leadership, and findings are entered in the Electronic Health Care Incident Reporting (eHCIR) system. Pertinent OFIs are also referred to the Nursing Professional Practices Committee and other peer review bodies.

# IV. 2023 Study Findings

## A. Causes of Death

In 2023 there were 383 deaths among incarcerated persons. The counts and causes of these deaths are listed in Table 1 below.

*Table 1. Causes of Death Among California Incarcerated Persons, 2023*

| Number of Cases | Category and Causes of Death |
|---|---|
| 86 | Drug Overdose<br>fentanyl (44); unspecified (12); fentanyl, methamphetamine (7); methamphetamine (3); fentanyl, morphine (2); heroin (2); opioid-other (2); amphetamine (1); buprenorphine (1); cocaine (1); fentanyl, clonidine (1); fentanyl, ethyl alcohol (1); fentanyl, morphine, ethyl alcohol (1); fentanyl, other (1); fentanyl, methamphetamine, heroin (1); fentanyl, methamphetamine, morphine (1); fentanyl, fluoxetine (1); fluoro-fentanyl, methamphetamine (1); methamphetamine, opioid-other (1); methanol (1); presumed fluoxetine, clozapine, hydroxyzine (1) |
| 69 | Cancer<br>lung (13); prostate (8); colon (6); pancreas (6); unknown primary (5); cholangial (3); leukemia, acute (3); bladder (2); esophagus (2); melanoma (2); brain glioblastoma (1); brain, meningioma (1); head (squamous cell carcinoma) (1); kidney (1); larynx (1); lymphoma (1); lymphoma B cell (1); lymphoma mantle cell (1); myeloma (1); nasopharynx (1); neuroendocrine GI (1); neuroendocrine of liver (1); oropharynx (1); pancreaticobiliary (1); sarcoma, synovial (1); scalp (1); stomach (1); testis (1); tongue (1) |
| 53 | Cardiovascular Disease<br>sudden cardiac arrest (24) – including the following: 11 with coronary artery disease, five with hypertension, three with possible acute myocardial infarction, one with arrhythmia -prolonged QT interval, one with ventricular tachycardia, one with combined drug toxicity, two with CHF; congestive heart failure (11); acute myocardial infarction (10); abdominal aortic aneurysm dissection (2); abdominal aortic aneurysm repair, hemorrhagic shock (1); abdominal aortic aneurysm rupture (1); arrhythmia atrial fibrillation (1); arrhythmia prolonged QT syndrome (1); cardiomyopathy (1); stroke hemorrhagic, hypertensive (1) |
| 33 | Infectious Disease (including COVID-19)<br>sepsis (21); pneumonia (6); endocarditis infective (2); COVID-19 (1); meningitis (1); spinal epidural abscess (1); tuberculosis, extrapulmonary (1) |
| 30 | Suicide |

| Number of Cases | Category and Causes of Death |
|---|---|
| | asphyxiation (23); drug overdose (3); exsanguination (3); head trauma (1) |
| 22 | Homicide (22) |
| 21 | Advanced Liver Disease, including Hepatocellular Carcinoma<br>hepatocellular carcinoma (10); end stage liver disease (ESLD) hepatitis C positive (8); alcoholic cirrhosis (2); autoimmune hepatitis (1) |
| 15 | Circulatory System<br>pulmonary embolism (10); abdominal aortic aneurysm rupture (2); congestive heart failure post aortic stenosis repair (1); sickle cell disease (1); stroke hemorrhagic (1) |
| 15 | Pulmonary<br>chronic obstructive pulmonary disease (6); interstitial pulmonary fibrosis (5); asphyxiation of foreign body (1); pneumonia (1); pneumonia aspiration, post operative (1); pulmonary hypertension (1) |
| 14 | Cerebrovascular Disease<br>stroke hemorrhagic (6); stroke ischemic (5); stroke embolic (1); subdural hematoma secondary to AV fistula (1); subdural hematoma secondary to trauma (1) |
| 10 | Neurological Disease<br>dementia unspecified (3); dementia Parkinson Disease (3); dementia Alzheimer (2); seizure disorder (2) |
| 4 | Gastrointestinal Disease<br>upper gastrointestinal hemorrhage (3); small bowel perforation (1) |
| 4 | End Stage Renal Disease |
| 3 | Unknown |
| 2 | Auto Immune<br>Multiple sclerosis (1); rheumatoid arthritis with rheumatoid lung (1) |
| 1 | Accidental Injury<br>accidental neck injury – gunshot wound (1) |
| 1 | Endocrine/Metabolic/Nutrition/Immunologic<br>aspiration pneumonia secondary to cachexia (1) |
| **383** | **Total** |

Drug overdose was the leading cause of mortality in 2023, causing 86 deaths. This was a significant increase over all prior years; the previous high being 53 cases in 2022. As in 2022, fentanyl was responsible for a large majority of cases. Of the 86 cases in 2023, 61 (71%) involved fentanyl, either alone (44 cases) or in combination with other drugs (17 cases).

Cancer, with 69 deaths, was the second leading cause of death in 2023. Cancer of the lung, with 13 cases, caused 19% of all cancer deaths.

Cardiovascular diseases caused 53 deaths in 2023. Sudden cardiac death or sudden cardiac arrest (24 cases) represented 44% of these deaths. Sudden cardiac death is caused by a sudden cessation of cardiac activity in patients with underlying structural heart disease and 14 of these patients had underlying coronary artery disease or possible acute myocardial infarction, 5 had hypertension, and two had underlying congestive heart failure. The other cardiovascular deaths were caused by decompensated congestive heart failure (11 cases), acute myocardial infarction (11 cases), aortic aneurysms (4 cases), arrhythmias (2 cases), cardiomyopathy (one case) and intracranial hemorrhage from poorly controlled hypertension (one case).

Infectious diseases, including COVID-19, caused 33 deaths. Sepsis was responsible for 21 of these deaths, followed by pneumonia (6 cases), infective endocarditis (2 cases), and single cases of meningitis, spinal epidural abscess, and extrapulmonary tuberculosis. COVID-19 caused only one death in 2023, continuing the remarkable turnaround from 2020 (141 deaths), 2021 (90 deaths), and 2022 (13 deaths).

Suicide attempts caused 30 deaths, nine more than in 2022.

Homicides accounted for 22 deaths.

Advanced or end stage liver disease (ESLD), including hepatocellular cancer (HCC), caused 21 deaths in 2022. HCC, as a consequence of advanced liver disease, caused ten of these deaths. Eight deaths were caused by hepatitis C positive liver cirrhosis without demonstrable liver cancer. Two deaths were caused by alcoholic cirrhosis, and one by autoimmune hepatitis.

Pulmonary diseases caused 15 deaths, including six from chronic obstructive pulmonary disease and five from interstitial pulmonary fibrosis.

Diseases of the circulatory system caused 15 deaths, including 10 deaths from pulmonary embolism.

Cerebrovascular disease, including six hemorrhagic strokes, five ischemic strokes and two subdural hematomas, caused 14 deaths.

Neurological diseases caused 10 deaths, eight caused by dementia and two by seizure disorders.

Gastrointestinal diseases caused four deaths, three from upper gastrointestinal hemorrhage and one from small bowel perforation.

End stage renal disease caused four deaths in 2023.

There were three deaths of unknown cause, two deaths from autoimmune disease, one metabolic nutritional death from cachexia, and one accidental death caused by custody intervention in an altercation involving incarcerated persons.

Table 2 shows the top causes of death in the California prisons from 2006 through 2023.

*Table 2. Top Causes of Death Among California Incarcerated Persons, 2006–2023*

| YEAR | RANK | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 2023 | Drug Overdose | Cancer | Cardiovascular Disease | Infectious Disease** | Suicide | Homicide | Advanced Liver Disease | (tied) Circulatory, Pulmonary | |
| 2022 | Cancer | Cardiovascular Disease | Drug Overdose | Advanced Liver Disease | Infectious Disease (not COVID-19) | Homicide | Suicide | Neurological Disease | Infectious Disease (COVID-19) |
| 2021 | Infectious Disease - COVID-19 | Cancer | Cardiovascular Disease | (tied) Advanced Liver Disease; Infectious Disease (not COVID-19)** | | Drug Overdose | (tied) Homicide; Suicide | | Pulmonary |
| 2020 | Infectious Disease - COVID-19 | Cancer | Cardiovascular Disease | Infectious Disease (not COVID-19)** | (tied) Advanced Liver Disease; Homicide | | Suicide | Drug Overdose | Neurological Disease |
| 2019 | Cancer | Drug Overdose | Cardiovascular Disease | Advanced Liver Disease* | Suicide | Infectious Disease** | Homicide | Pulmonary | Neurological Disease |
| 2018 | Cancer | Cardiovascular Disease | Drug Overdose | End Stage Liver Disease* | Infectious Disease** | (tied) Suicide, Homicide | | Pulmonary | Circulatory System |
| 2017 | Cancer | Cardiovascular Disease | End Stage Liver Disease* | Drug Overdose | Infectious Disease** | Suicide | Homicide | Cerebrovascular Disease | Pulmonary |
| 2016 | Cancer | Cardiovascular Disease | End Stage Liver Disease* | Infectious Disease** | Drug Overdose | (tied) Suicide, Homicide | | Cerebrovascular Disease | Pulmonary |
| 2015 | Cancer | Cardiovascular Disease | End Stage Liver Disease* | Infectious Disease** | Suicide | Drug Overdose | Homicide | Cerebrovascular Disease | Pulmonary |
| 2014 | Cancer | End Stage Liver Disease* | Cardiovascular Disease | Suicide | Drug Overdose | Pneumonia ** | Homicide | Pulmonary | (tied) Infectious; Stroke-Hemorrhagic |

| YEAR | RANK | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2013 | Cancer | End Stage Liver Disease* | Cardiovascular Disease | Suicide | Drug Overdose | Homicide | Sepsis** | (tied) Pulmonary; Pneumonia** | |
| 2012 | Cancer | End Stage Liver Disease* | Cardiovascular Disease | Suicide | Homicide | Drug Overdose | (tied) Sepsis; Infectious** | | Stroke |
| 2011 | Cancer | End Stage Liver Disease* | Cardiovascular Disease | Suicide | Pneumonia ** | Homicide | Sepsis** | Drug Overdose | Stroke |
| 2010 | Cancer | End Stage Liver Disease* | Cardiovascular Disease | Suicide | (tied) Drug Overdose; Homicide | | Pneumonia** | Congestive Heart Failure | (tied) Coccidioido-mycosis; End Stage Renal Disease; Stroke |
| 2009 | Cancer | End Stage Liver Disease* | Cardiovascular Disease | Suicide | Drug Overdose | Pneumonia** | Congestive Heart Failure | Homicide | |
| 2008 | Cancer | Suicide | End Stage Liver Disease* | Cardiovascular Disease | Drug Overdose | Pneumonia** | HIV/AIDS | Congestive Heart Failure | Sepsis** |
| 2007 | Cancer* | End Stage Liver Disease | Cardiovascular Disease | Suicide | Homicide | HIV/AIDS | Stroke | Drug Overdose | Pneumonia** |
| 2006 | Cancer* | Cardiovascular Disease | End Stage Liver Disease | Suicide | Drug Overdose | Homicide | Pulmonary | End Stage Renal Disease | Stroke |

** Liver Cancer was counted as Cancer in 2006 and 2007; then as Liver Disease from 2008 onward.*

*** Beginning with 2015, Pneumonia and Sepsis were included in Infectious Disease, which also includes HIV/AIDS. COVID-19 was its own category from 2020 through 2022, then combined with Infectious Disease in 2023.*

Drug overdose deaths rose to become the overall leading cause of death in 2023, while cancer and cardiovascular diseases were the number two and three leading causes in 2023. COVID-19, the leading cause of death in 2020 and 2021, was ninth most common in 2022 and, thanks to widespread adoption of the covid vaccine, was only responsible for a single death in 2023. Also significant was the ongoing drop in advanced liver disease deaths, which was the second leading cause of death in the years 2007 and 2009-2014, falling to seventh place in 2023.

## B. Ages at Death

The average age of the 373 male incarcerated persons who died in 2023 was 56 years; the average age of the 10 deceased female incarcerated persons was also 56 years. The youngest death was at age 21; the oldest at age 88. In 2023, drug overdoses, suicides, and homicides caused death at an average age of 42 while the average age of death by all other causes was 67.

## C. Expected and Unexpected Deaths

An Expected Death is defined as a medically anticipated death which is related to the natural course of a patient's illness or underlying condition, whereas an Unexpected Death is not (usually) related to the natural course of a patient's illness or underlying condition.

### 1. Expected deaths

There were 157 expected deaths in 2023. They were the result of chronic disease processes such as cancer, end stage liver disease, infections, and chronic cardiovascular, pulmonary, neurologic and gastrointestinal diseases. Three drug overdose deaths were categorized as expected due to the unusual length of time between overdose and death.

### 2. Unexpected deaths

There were 226 cases of unexpected death in 2023. Suicides, homicides, and all but three drug overdoses together accounted for 135 (58%) of these. Sudden cardiac arrests, acute myocardial infarctions and strokes were mostly unexpected.

Figure 3 compares unexpected and expected deaths in each category.

*Figure 3. Deaths by Expectation and Category, CCHCS 2023*




*A horizontal stacked bar chart showing the breakdown of expected and unexpected deaths for each categoric cause of death.*

## D. Discussion of mortality trends

This section examines mortality trends in key areas. Where referenced, comparative U.S. State Prison data through 2019 are sourced from the U.S. Bureau of Justice Statistics (BJS) , *Mortality in State and Federal Prisons, 2001–2019 – Statistical Tables*, Table 4 (NCJ 255970, December 2021). Sources for more recent statistics are noted where used.

### 1. CCHCS mortality rates

The following table shows the number of deaths and the corresponding mortality rates in California prisons from 2006–2023, compared to mortality rates in all U.S. state prisons.

*Table 3. Annual Mortality Rates Among California and U.S. State Prisons, 2006–2023*

| | | | Death Rate per 100,000 | |
|---|---|---|---|---|
| **YEAR** | **CDCR Number of Deaths** | **CDCR Population** | **CDCR** | **U.S. State Prisons*** |
| 2006 | 424 | 171,310 | 248 | 249 |
| 2007 | 395 | 170,786 | 231 | 258 |
| 2008 | 369 | 170,022 | 217 | 261 |
| 2009 | 393 | 169,459 | 232 | 259 |
| 2010 | 415 | 166,700 | 249 | 246 |
| 2011 | 388 | 161,843 | 240 | 260 |
| 2012 | 362 | 134,929 | 268 | 266 |
| 2013 | 366 | 133,297 | 275 | 274 |
| 2014 | 319 | 135,225 | 236 | 276 |
| 2015 | 355 | 128,824 | 276 | 298 |
| 2016 | 334 | 128,705 | 260 | 304 |
| 2017 | 388 | 130,807 | 297 | 327 |
| 2018 | 452 | 128,875 | 351 | 347 |
| 2019 | 399 | 125,270 | 319 | 330 |
| 2020 | (all) 492<br>(COVID-19) 141<br>(non-COVID-19) 351 | 107,347 | 458<br>131<br>327 | 525 |
| 2021 | (all) 392<br>(COVID-19) 90<br>(non-COVID-19) 302 | 98,077 | 400<br>92<br>308 | 443 |
| 2022 | 389<br>(COVID-19) 13<br>(non-COVID-19) 376 | 96,341 | 404<br>13<br>390 | 422 |
| 2023 | 383<br>(COVID-19) 1<br>(non-COVID-19) 382 | 95,267 | 402<br>1<br>401 | N/A |

*U.S. figures may have been revised by BJS from previously published statistics. Years 2007-2019 from Mortality in State and Federal Prisons, 2001–2019 – Statistical Tables | December 2021; NCJ 300953. Years 2020 and later from Tables 1 and 9, "Prisoners in [2020, 2021, 2022] – Statistical Tables", NCJ 302776, 305125, 307149; U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

*Figure 4. Annual Death Rates per 100,000, CCHCS vs all U.S. State Prisons 2006–2023*




*A line chart illustrating trends in annual death rates, based on the numbers in the table above.*

The 2023 mortality rate of 402 is the highest recorded except for the years 2020-2022, when covid deaths inflated the overall CCHCS mortality rate.

## 2. Drug overdose

There were 89 drug overdose deaths in 2023 (86 accidental overdose deaths and 3 suicides by intentional drug overdose), for an annualized mortality rate of 93/100,000. This was the number one cause of mortality in 2023, and the highest overdose mortality rate in the history of the Receivership, exceeding the record 2022 rate of 56/100,000 by 64%.

*Table 4. Numbers and Rates of Overdose Deaths, CCHCS 2012–2023, and U.S. State Prisons 2012–2019*

| Year | CCHCS Drug Overdoses | CCHCS Rate/100,000 | U.S. State Prison Rate/100,000 |
|---|---|---|---|
| 2012 | 15 | 11 | 3 |
| 2013 | 24 | 18 | 4 |
| 2014 | 19 | 14 | 4 |
| 2015 | 19 | 15 | 7 |
| 2016 | 29 | 23 | 8 |
| 2017 | 40 | 31 | 17 |
| 2018 | 62 | 48 | 21 |
| 2019 | 64 | 51 | 22 |
| 2020 | 23 | 21 | NA |
| 2021 | 24 | 25 | NA |
| 2022 | 53 | 55 | NA |
| 2023 | 89 | 93 | NA |

Table 4, above, and Figure 5, below, show the numbers and mortality rates from drug overdose in CCHCS from 2012-2023 and in all US prisons from 2012 to 2019.

*Figure 5. Numbers and Rates of Overdose Deaths, CCHCS 2012–2023, and U.S. State Prisons 2012–2019*




*A combination chart illustrates the rising trend in drug overdose deaths, despite a significant dip in the years 2020 and 2021.*

Fentanyl was again the most overdosed drug, used in 59 of the 89 deaths from drug overdose in 2023 (alone in 44 cases and in combination with other drugs in 15 cases). Methamphetamine was used alone in 3 cases, and in combination with fentanyl in 7 cases. There was one case in which death was attributed to medications (fluoxetine, hydroxyzine and clozapine) prescribed by a physician to a patient with severe mental illness. One case in which a narcotic used in the MAT program (buprenorphine) was found, two cases in which heroin was the only drug found and two cases in which an unspecified opiate was attributed. In thirteen cases, no specific drug was implicated, but clinical circumstances weighed in favor of death by overdose (drug paraphernalia or other signs of recent drug use). The full list of drugs involved in drug overdose deaths can be found in Table 1.

In 2023, two prisons account for 34% of total overdose deaths; one of which had ten overdose deaths while the other had 20 drug overdose deaths. There were no overdose deaths in nine of the 33 California state prisons. Of the remaining 22 institutions in which overdose deaths occurred, eight institutions had one occurrence each, five institutions had two occurrences, two institutions had three overdoses, while another four sites had four overdoses each. Three prisons had six overdose deaths each.

The dramatic rise in drug overdose deaths has mirrored what is happening in the general population. In CCHCS, this has occurred despite the aggressive promotion of ongoing statewide initiatives as described in the Analysis of 2022 California Correctional Health Care Services Inmate Mortality Reviews. The Integrated Substance Use Disorder Treatment (ISUDT) program, and Medication Assisted Treatment (MAT) availability, are integrated into all prison practices. This multidisciplinary program frames drug addiction as a chronic illness. All patients should be screened using the National Institute on Drug Abuse (NIDA) quick screening questionnaire within days of intake for substance use.  Medical treatment should be offered to all appropriate SUD patients. Cognitive behavioral intervention, supportive housing, monthly newsletters, and transition to community-based programs after release are other key elements. In addition, CDCR and CCHCS are expanding access to naloxone (the narcotic antagonist), making it widely available to healthcare and custody personnel at all institutional locations, and directly to patients as a keep-on-person medication.

The ISUDT program was started in 2019, and the Care Guide for SUD was released in May 2020. According to the Receiver's 55th Triannual Report, there were 16,649 patients receiving MAT by December 2023.

Of the 89 patients with drug overdose deaths, there were the following interactions with elements of the Integrated Substance Use Disorder Treatment (ISUDT) program:

- NIDA screening not done - 4
- NIDA screening declined - 1
- NIDA screening negative - 16
- ISUDT program indicated but patient not referred - 13
- ISUDT program offered but patient refused - 11
- MAT offered but patient refused - 14 patients
- Enrolled in the MAT program - 26 patients
- Nonadherent to MAT treatment - 21 patients

- MAT requested by patient but refused – 1

The third annual ISUDT Overdose Outcomes Report, published in April 2024, contained a detailed description of the drug overdose epidemic in the United States and the effect of synthetic opioids such as fentanyl on the "unprecedented" numbers of overdose deaths. The ISUDT program is described in detail.

Despite the implementation of this state-of-the-art program, overdose deaths are high and rising. The pandemic years of 2020 and 2021, when CCHCS began to treat opioid use disorder using medication assisted treatment, saw a temporary reduction in California prison overdoses, but in 2022, drug overdose mortality reached pre-pandemic levels. By 2023, drug overdoses were the leading cause of California prison deaths, and 67% of these were caused by fentanyl.

## 3. Lung cancer

Lung cancer has been the leading cause of cancer death, both in CCHCS and in the general population. In 2023, nineteen percent (13 of the 69) of cancer deaths were due to cancer of the lung.

Table 5 and Figure 6 show the numbers, rates, and trends of lung cancer deaths from 2012 through 2023.

*Table 5. Numbers and Rates of Lung Cancer Deaths, CCHCS 2012–2023*

| Year | CCHCS Lung Cancer Deaths | Rate/100,000 |
|---|---|---|
| 2012 | 20 | 15 |
| 2013 | 21 | 16 |
| 2014 | 17 | 13 |
| 2015 | 27 | 21 |
| 2016 | 19 | 15 |
| 2017 | 13 | 10 |
| 2018 | 32 | 25 |
| 2019 | 27 | 22 |
| 2020 | 17 | 16 |
| 2021 | 13 | 13 |
| 2022 | 17 | 18 |

| Year | CCHCS Lung Cancer Deaths | Rate/100,000 |
|---|---|---|
| 2023 | 13 | 14 |

*Figure 6. Numbers and Rates of Lung Cancer Deaths, CCHCS 2012–2023*




*This chart illustrates the numbers from the previous table and shows a recent downward trend and relatively flat linear trend over the full period.*

In 2023 the lung cancer mortality rate was 14/100,000. In 2021, CCHCS incorporated the US Preventative Services Task Force recommendation to detect early lung cancer by screening all heavy smokers over age 55 with annual low dose CT scanning.

## 4. Cardiovascular disease

Cardiovascular disease was the third most common cause of death in 2023 with 53 deaths for a mortality rate of 56/100,000. Table 6 and Figure 7 show the numbers, rates, and trends of cardiovascular death from 2012 through 2023.

*Table 6. Numbers and Rates of Cardiovascular Deaths, CCHCS 2012–2023*

| Year | CCHCS Cardiovascular Deaths | Rate/100,000 |
|---|---|---|
| 2012 | 43 | 32 |
| 2013 | 50 | 38 |
| 2014 | 54 | 40 |
| 2015 | 62 | 48 |

| | CCHCS Cardiovascular Deaths | Rate/100,000 |
|---|---|---|
| 2016 | 52 | 40 |
| 2017 | 68 | 52 |
| 2018 | 66 | 51 |
| 2019 | 52 | 42 |
| 2020 | 54 | 50 |
| 2021 | 47 | 48 |
| 2022 | 64 | 66 |
| 2023 | 53 | 56 |

*Figure 7. Numbers and Rates of Cardiovascular Deaths, CCHCS 2012–2023*




*This chart illustrates the numbers from the previous table and shows a slightly increasing linear trend.*

CCHCS Care Guides for chest pain, diabetes, dyslipidemia, and hypertension have stressed the importance of estimating cardiac risk in all patients and the appropriate use of education and medication to manage risk factors for coronary heart disease. There has also been an increased awareness of recognizing and managing red flag symptoms indicative of acute coronary syndromes or exacerbations of congestive heart failure.

## 5. Infectious Disease (Including COVID-19)

In 2023 there was only one death caused by COVID-19. Figure 8 shows how the COVID-19 pandemic has been controlled, attributable initially to the widespread acceptance of covid vaccine by the incarcerated population.

*Figure 8. COVID-19 Deaths and Vaccinations in California State Prisons, CCHCS 2020–2023*




*This chart illustrates a dramatic drop in COVID-19 deaths in Q2 2021 coinciding with a high rate of vaccine acceptance.*

Overall, deaths from COVID-19 dropped by about 69% in the United States, decreasing from roughly 246,000 deaths in 2022 to 76,000 in 2023, according to provisional data released by the US Centers for Disease Control and Prevention (CDC). This shifted COVID-19 from the fourth leading cause of death in 2022 to the tenth, researchers noted in the Morbidity and Mortality Weekly Report. COVID-19 was the underlying cause for 1.6% of all US deaths in 2023 but was responsible for only 0.3% of deaths in CDCR.

In 2023 there were 32 deaths from infectious diseases other than COVID-19. Sepsis (22 deaths) and pneumonia (6 deaths) accounted for 88% of those cases. Infectious endocarditis caused only one death in 2023.

The next figure shows the non-COVID-19 infectious disease mortality rate for the years from 2012 to 2023.

*Figure 9. Numbers and Rates of Non COVID-19 Infectious Disease Deaths, CCHCS 2012–2023*




| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CCHCS Infectious Disease Deaths | 26 | 24 | 21 | 27 | 31 | 32 | 37 | 26 | 47 | 30 | 26 | 32 |
| Rate/100,000 | 19 | 18 | 16 | 21 | 24 | 24 | 29 | 21 | 44 | 31 | 27 | 34 |

*This chart shows an increasing linear trend in non COVID-19 infectious disease deaths, due in part to a spike in 2020.*

Figure 10 shows the sepsis, pneumonia, and infectious endocarditis mortality rates for each of the years from 2012 to 2023.

*Figure 10. Death Rates in Select Causes of Infectious Disease, CCHCS 2012–2023*




| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sepsis | 10 | 9 | 2 | 12 | 11 | 6 | 17 | 6 | 15 | 14 | 16 | 22 |
| Pneumonia | 4 | 7 | 11 | 2 | 7 | 11 | 6 | 9 | 13 | 7 | 4 | 6 |
| Infectious Endocarditis | 3 | 0 | 0 | 1 | 1 | 3 | 2 | 3 | 9 | 4 | 3 | 2 |

*This chart shows an increasing linear trend in sepsis death rates, a flat trend in pneumonia death rates, and a slightly increasing trend in infectious endocarditis deaths.*

Sepsis is a clinical syndrome manifested by a poorly regulated patient response to infection; the failure of multiple organ systems resulting in death. Sepsis mortality rates for 2012 to 2023 ranged from a low of two per hundred thousand in 2014 to a high of 23/100,000 in 2023. Reasons for the rising incidence of sepsis may be related to an evolution in the definition and recognition of sepsis and septic syndromes. One reference cites a fifty percent increase in septic shock hospitalizations in the United States from 2005-2014. (Chest. 2017 (2) 278-285 27452768 PMID.)

The source of systemic infection in the twenty-two cases in 2023 included five cases of sepsis secondary to pneumonia, three cases in patients with recurrent aspiration and debilitating disease, two each in patients with osteomyelitis and urinary tract infections, and single patients with cholecystitis, COVID-19, endocarditis, diverticulitis, peritonitis, and necrotizing fasciitis. Four patients had no obvious underlying source for systemic infection.

Pneumonia mortality rates ranged from two in 2015 to thirteen in 2020. There were six cases of pneumonia in 2023, in addition to the five cases of sepsis arising from pneumonia infected patients.

Infective endocarditis mortality rates range from zero in 2013 and 2014 to nine in 2020. In 2023 there were three cases of death from infectious endocarditis, one of which produced sepsis and therefore is counted in that category.

## 6. Suicide

There were 30 deaths by suicide in 2023, nine more than in 2022, for a suicide mortality rate of 31/100,000.

The most recent estimates of suicide rates in all U.S. state prisons, published by the Bureau of Justice Statistics, are for years 2001 through 2019. The national state prison suicide rate in 2019 was 27 per 100,000 incarcerated individuals. Suicide rates in all state prisons increased from 15/100,000 in 2001-2004 to 22/100,000 in 2015-2019.

Table 7 and Figure 11 list the numbers, rates, and trends of suicide from 2012 through 2023.

*Table 7. Numbers and Rates of Suicide, CCHCS 2012–2023 and U.S. State Prisons 2012–2019*

| Year | CCHCS Suicides | CCHCS Rate/100,000 | U.S. State Prison Rate/100,000 |
|---|---|---|---|
| 2012 | 32 | 24 | 16 |
| 2013 | 30 | 23 | 15 |
| 2014 | 23 | 17 | 20 |
| 2015 | 24 | 19 | 18 |
| 2016 | 26 | 20 | 21 |
| 2017 | 31 | 24 | 21 |
| 2018 | 30 | 23 | 26 |
| 2019 | 38 | 30 | 27 |
| 2020 | 31 | 29 | NA |
| 2021 | 15 | 15 | NA |
| 2022 | 21 | 22 | NA |
| 2023 | 30 | 31 | NA |

*Figure 11. Numbers and Rates of Suicide, CCHCS 2012–2023 and U.S. State Prisons 2012–2019*




*A combination bar and line chart illustrating the information in the preceding table.*

A system to evaluate all CCHCS patients for suicide risk, to treat suicide risk factors and to closely monitor all high-risk patients is in place. All CDCR staff, especially first responders and mental health clinicians, are involved in suicide prevention and response. The recognition and treatment of severe depression and suicidal ideation and liaison between the mental health and medical departments of CCHCS have been systematized.

The 2020 annual report to the California State Legislature on Suicide Prevention and Response in CDCR audited all 2020 suicides and found that 83% (N = 19 of 23) had deficiencies in risk assessment and 87% had poor treatment planning. The report identified the inadequacy of suicide risk assessment. Management of that risk remains an area of concern across the California prison system.

Of the 30 suicide patients in 2023, nineteen were being actively followed by mental health providers. Ten patients were enrolled in the basic Correctional Clinical Case Management System (CCCMS). Eight were followed in the Enhanced Outpatient Program (EOP), the highest level of outpatient mental care in the Mental Health Delivery System. Eleven patients had no mental health interaction, although one had recently requested to be on suicide watch.

The overall suicide rate in CCHCS has been rising since 2012.

## 7. Homicide

There were 22 homicides in CCHCS in 2023 for a homicide rate of 23/100,000.

Table 8 and Figure 12 show the numbers of deaths and mortality rates from homicides in CCHCS from 2012-2023 and in all US prisons from 2012-2019.

*Table 8. Numbers and Rates of Homicides, CCHCS 2012–2023 and U.S State Prisons 2012–2019*

| Year | CCHCS Homicides | CCHCS Rate/100,000 | U.S. State Prison Rate/100,000 |
|---|---|---|---|
| 2012 | 21 | 16 | 7 |
| 2013 | 20 | 15 | 7 |
| 2014 | 9 | 7 | 7 |
| 2015 | 16 | 12 | 7 |
| 2016 | 26 | 20 | 8 |
| 2017 | 19 | 15 | 9 |
| 2018 | 30 | 23 | 10 |

| Year | CCHCS Homicides | CCHCS Rate/100,000 | U.S. State Prison Rate/100,000 |
|---|---|---|---|
| 2019 | 22 | 18 | 12 |
| 2020 | 32 | 30 | NA |
| 2021 | 15 | 15 | NA |
| 2022 | 25 | 26 | NA |
| 2023 | 22 | 23 | |

*Figure 12. Numbers and Rates of Homicides, CCHCS 2012–2023, and U.S State Prisons 2012–2019*




*A combination bar and line chart illustrating the information in the preceding table.*

A 2021 report from the Prison Policy Initiative notes that prison violence is common. Male incarcerated persons have post-traumatic stress disorder at ten times the rate of that in the general population, and imprisonment itself represents another traumatic life experience. Racism and gang culture also contribute.

Through 2021, the California state prison homicide rate was higher and rising faster than the rate for all U.S. prisons.

## 8. Advanced (end stage) liver disease

Advanced liver disease (cirrhosis) and its sequelae, including liver cancer, was the seventh most common cause of death in 2023, with 21 deaths for a mortality rate of 22/100,000. In the prison population, both liver cirrhosis and liver cancer are mainly caused by a high prevalence of chronic hepatitis C virus (HCV) infection, which is primarily associated with intravenous drug use. In 2023, the overall prevalence of hepatitis C antibody in the CCHCS population was 25.1%. Chronic hepatitis C infection was the cause of 18, or 86%, of deaths due to advanced liver cirrhosis. Two deaths were from alcoholic cirrhosis, and one was from autoimmune hepatitis leading to cirrhosis.

Table 9 and Figure 13 show the cases, rates and trends of liver disease deaths seen in the years 2012–2023.

*Table 9. Numbers and Rates of Advanced Liver Disease Deaths, CCHCS 2012–2023*

| YEAR | CCHCS Liver Cancer Deaths | CCHCS Cirrhosis Deaths | CCHCS Total Advanced Liver Disease Deaths | Rate/100,000 |
|---|---|---|---|---|
| 2012 | 25 | 47 | 72 | 53 |
| 2013 | 27 | 43 | 70 | 53 |
| 2014 | 21 | 47 | 68 | 50 |
| 2015 | 19 | 37 | 56 | 44 |
| 2016 | 23 | 18 | 41 | 32 |
| 2017 | 18 | 21 | 39 | 30 |
| 2018 | 28 | 29 | 57 | 44 |
| 2019 | 32 | 13 | 45 | 36 |
| 2020 | 18 | 14 | 32 | 30 |
| 2021 | 24 | 8 | 32 | 33 |
| 2022 | 22 | 19 | 41 | 43 |
| 2023 | 10 | 11 | 21 | 22 |

*Figure 13. Numbers and Rates of Advanced Liver Disease Deaths, CCHCS, 2012–2023*




*A combination bar and line chart illustrating the information in the preceding table and a downward linear trend.*

CCHCS has adopted many initiatives to improve screening and treatment of active HCV infection and to prevent liver cancer and other complications of advanced liver disease. The Care Guide for Hepatitis C includes a comprehensive program for identification and treatment of HCV involving universal screening for HCV antibodies, with confirmatory testing for active infection; monitoring stages of liver injury (fibrosis); and access to safe, effective antiviral treatment for all patients with active HCV.

Education regarding the prevention of HCV is conducted for the entire population at entry and annually thereafter.

In the ISUDT Second Annual Outcome Report (April 2023), patients who were successfully treated for HCV and on medication for opioid use disorder had a 60% reduction in HCV reinfection compared with patients not on medication for opioid use disorder. Another study, "The hepatitis C care cascade in California state prisons: Screening and treatment scale-up and progress toward elimination, 2016–2023," found that the expansion of HCV screening, monitoring and treatment along with the ISUDT program resulted in a nearly 70% decrease in the prevalence of active HCV infection between 2018 and 2023. Although the prevalence of patients with any history of HCV

infection has remained relatively constant at around 25%, the prevalence of active infection has declined dramatically from 14% in 2018 to 4.4% in 2023.

The Care Guide for Liver Cirrhosis advocates staging of liver fibrosis to identify all candidates for biannual abdominal ultrasound screening for liver cancer. It contains routine measures for detecting and treating other potentially fatal complications such as esophageal varices, ascitic fluid collections, and avoiding the use of harmful medications.

Performance dashboards are published in monthly Health Care Services Dashboards for each institution. In 2023, monthly overall performance in HCV care ranged from 87% to 88%, and overall liver cirrhosis care trended upward from 86% in January to 91% in December.

All these initiatives have contributed to large improvements in the care of patients with advanced liver disease, and death rates have trended downward over the past twelve years. The mortality rate from advanced liver disease in 2023 (22/100,000 patients) was the lowest in the history of the Receivership.

### 9. Accidental deaths

There were four accidental deaths in 2023. One patient died as the result of a gunshot wound inflicted by custody while trying to subdue an altercation involving the patient. One patient died from accidental ingestion and aspiration of food. One patient died as a consequence of accidental drug overdose (methanol). And one patient died following an accidental fall in the shower resulting in a closed head injury (subdural hematoma).

## E. Opportunities for Improvement in 2023

Opportunity for Improvement (OFI): An occasion or situation from which it is possible to improve systems or processes related to the delivery of health care.

The Mortality Review Discussion Group (MRDG) identifies OFIs, which are forwarded to the appropriate prison and region for review and further action if indicated.

An OFI in Mortality Review can be relatively minor (documentation time inconsistency) or potentially serious (a specialist recommendation lost during a patient transfer, resulting in a significant delay in the diagnosis of a treatable condition). An OFI is an observation that rendered care might not have been consistent with CCHCS policies and procedures, recommendations in the CCHCS Care guides, or current known evidence-based practice recommendations in the medical literature.

A classification system for OFIs was devised in 2018 for use in this annual analysis and has been refined in each subsequent annual report.

The MRDG recorded 392 OFIs in 2018 and 431 OFIs in 2019. The three subsequent years generated about twice the number of OFIs annually; for example, in 2022, there were 821 OFIs. In 2023, there were 482 total OFIs, of which 281 occurred in unexpected deaths and 201 occurred in expected deaths.

The following chart shows the number of OFI per death by year since 2018.

*Figure 14. Deaths and OFIs, CCHCS 2018–2023*




| | 2018 | 2019 | 2020* | 2021* | 2022*^ | 2023 |
|---|---|---|---|---|---|---|
| Deaths | 452 | 399 | 492 | 392 | 389 | 383 |
| OFI (excl PQI) | 394 | 431 | 925 | 934 | 759 | 482 |
| Avg OFI per death | 0.9 | 1.1 | 1.9 | 2.4 | 2.0 | 1.3 |

**COVID-19 pandemic years*
*^corrected figure; may not match previous report*

*This chart shows a significant rise in average OFIs per death coinciding with the COVID pandemic but currently trending downward to near pre-pandemic levels.*

In 2020 and 2021, the larger number of OFIs were related to findings regarding adherence to new and rapidly changing policies and processes dealing with the COVID-19 pandemic. OFIs per death peaked at 2.4 in 2021, dropping to 2.0 OFIs per death in 2022. In 2023, there were 482 OFIs or 1.3 OFIs/death.

There are nine general categories of OFIs. The following table shows the numbers of OFIs in unexpected and expected deaths and the total number of OFIs in each category.

*Table 10. Opportunities for Improvement in Expected and Unexpected Deaths, CCHCS, 2023*

| Opportunities for Improvement | Unexpected Deaths | Expected Deaths | Total |
|---|---|---|---|
| 1. Opportunities to improve application of the "Model of Care" as described in the CCHCS Complete Care Model | | | |
| a. Access timeframes | | | |
| i. Meeting access timeframes for routine care | 7 | 4 | 11 |
| ii. Meeting access timeframes for urgent or emergency care | 1 | - | 1 |
| b. Applying complex care management for improved coordination or continuity | 6 | 13 | 19 |
| c. Transferring a patient to a more appropriate level of care | 1 | 2 | 3 |
| d. Management of nonadherent or non-compliant patient | 11 | 5 | 16 |
| e. Substance Use Disorder Program referral indicated but not made | 37 | 3 | 40 |
| 2. Optimizing care near the end of life | | | |
| a. Physician's Orders for Life Sustaining treatment (POLST) and Do Not Resuscitate (DNR) orders addressed and documented when indicated or changed when a patient's clinical condition changes | 5 | 11 | 16 |
| b. Honoring POLST and DNR orders | 3 | 11 | 14 |
| c. Improving pain and other symptom management, especially in cancer care | - | 2 | 2 |
| d. Offering hospice care to terminally ill patients | - | 9 | 9 |
| e. Compassionate release request indicated but not made | 1 | 10 | 11 |
| 3. Opportunities to improve clinical decision making by improved recognition and management of important clinical signs and symptoms | 38 | 31 | 69 |
| 4. Opportunities to improve recognition and action in response to abnormal laboratory, imaging and other diagnostic test results | 15 | 14 | 29 |
| 5. Opportunities to improve adherence to policies and procedures, and adherence to Care Guides for specific diseases, conditions, or risk factors | | | |

| Opportunities for Improvement | Unexpected Deaths | Expected Deaths | Total |
|---|---|---|---|
| a. Fall risk (institution-specific protocols and evidence-based practice) | 1 | 5 | 6 |
| b. Chronic Wound Management – prevention/avoidance | 1 | 2 | 3 |
| c. Medication Management (multiple care guides and evidence-based practice) | 11 | 11 | 22 |
| d. Cardiovascular Risk | 2 | 1 | 3 |
| e. Advanced Liver Disease | - | 3 | 3 |
| f. Preventive Services – Lung Cancer Screening | 1 | 3 | 4 |
| g. Other Care Guides, protocols and evidence-based practice | 17 | 4 | 21 |
| 6. Opportunities to improve communication between primary care teams and various care transitions | | | |
| a. Specialty referral | 2 | 3 | 5 |
| b. Hospital | - | 2 | 2 |
| c. Mental Health | 2 | - | 2 |
| d. Custody –Primary Care Physician and Nursing | 2 | - | 2 |
| e. Primary Care Physicians | 2 | - | 2 |
| f. Orders not followed | 3 | 1 | 4 |
| 7. Opportunities to improve medical record documentation | | | |
| a. Inadequate or inaccurate record | 6 | 4 | 10 |
| b. Missing Report | 3 | 9 | 12 |
| c. Missing Provider notes | 4 | - | 4 |
| d. Missing Nurse notes | 2 | 2 | 4 |
| e. Legacy Charting (cloning of medical records) | 5 | 3 | 8 |
| f. Incomplete Problem List | 3 | 2 | 5 |
| g. Electronic Health Record not closed | - | - | - |
| 8. Opportunities to prevent delays in diagnosis and/or treatment | - | 14 | 14 |

| Opportunities for Improvement | Unexpected Deaths | Expected Deaths | Total |
|---|---|---|---|
| 9. Opportunities to improve the practice and documentation of CCHCS Emergency Protocols | | | |
| a. Delay calling 9-1-1 | 26 | 6 | 32 |
| b. Documentation lapse | 35 | 7 | 42 |
| c. Other | 27 | 3 | 30 |
| 10. Miscellaneous | 2 | 1 | 3 |
| **TOTAL CCHCS Opportunities for Improvement** | **281** | **201** | **482** |
| 11. Potential Quality Issue (PQI) referrals | 6 | 8 | 14 |

A detailed discussion of each OFI category follows.

## 1. Opportunities to improve the application of the "Model of Care" as described in the CCHCS Complete Care Model

Since 2015, the Complete Care Model (CCM) has been the foundation for delivery of all care in CCHCS.

The CCM assigns every patient to an Interdisciplinary Care Team. Each Care Team delivers continuous, comprehensive, coordinated, and patient centered care for its panel of assigned patients. A care team follows written standards for access and disease prevention, promotes wellness, provides episodic care as well as chronic disease management, addresses urgent and emergent needs, and provides end-of-life care.

The CCM Care Team uses daily care team huddles, devises panel management strategies, reviews performance dashboards, patient registries and patient problem lists, and makes use of decision support tools such as CCHCS Care Guides for Clinical Support. Evidence-based standards for chronic disease management and for management of common acute disease processes are expected to be followed.

Application of this model should reduce the need for hospitalizations and emergency services, improve health outcomes, and enhance patient and staff satisfaction.

### a) *Meeting access standards for Routine Care or Urgent/Emergency Care.*

*12 total OFIs. (11 for routine care, 1 for urgent or emergency care)*

The standards for access in CCHCS are:

*Nursing triage:* Patient-generated requests for evaluation of medical symptoms are triaged by registered nursing (RN) staff within 24 hours. If an RN triage determines an emergency situation, an immediate arrangement for appropriate care is made; if a situation is urgent but not emergent, same day face-to-face evaluation is arranged; if any other medical symptom needs attention, a next business day evaluation is to be arranged.

*Primary care:* Nursing generates requests for primary care physician evaluation. Urgent: within 1 calendar day; Routine – within 14 days; Post hospital discharge – within 5 days

*Specialty care:* High priority – within 14 days; Medium priority – within 45 days; Routine priority – within 90 days

In 2023, seven of the eleven OFI in routine care access were patient-generated requests for symptom evaluation. In one case, a routine follow-up visit with the primary provider was never done. Another case involved a routine request for mental health referral which was not done because the patient transferred to another facility and the referral was lost. Of more concern was a routine request made by a cardiologist for referral to a pulmonary specialist to evaluate a patient's emphysema that was delayed for seven months. A later section discussing delays in care will summarize this case in more detail.

### b) *Applying complex care management for improved care coordination or continuity*

*19 Total: 6 in cases of unexpected death; 13 in cases of expected death*

Primary care teams are expected to identify their patients who are at high risk for adverse outcomes. These patients often have complex care needs requiring coordination of visits to specialists, appointments for special diagnostic tests or procedures, and other special education and counseling. Candidates for such complex care management include patients with cancer, dementia or chronic degenerative neurological conditions, patients with multiple medical problems and complex medical regimens, patients who require assistance with activities of daily living, patients with serious mental health problems, and patients who have had multiple or prolonged recent hospitalizations or multiple specialists involved in their care. Specific selection for high-risk criteria and for candidates suitable for complex care management are given in the Health Care Department Operations Manual, section 3.1.6.

In 2023, there were nineteen OFI cited in which patients would have benefitted from better care coordination. They included five patients who had cancer. Two patients had severe dementia. One patient had chronic obstructive pulmonary disease with oxygen maintenance therapy. Two patients had seven prison transfers each, one all within one year and the other over three years. Two patients had multiple hospitalizations or repeated transfers to a higher level of care. There was one chronically nonadherent patient whose multiple myeloma care was difficult to coordinate. One patient had four hospitalizations despite a desire to forego aggressive care for advanced liver disease. Another patient who died a sudden cardiac death had multiple cardiac risk factors but was not referred to Cardiology, one court-ordered conservatorship was not pursued, and one elderly patient was not routinely assessed for risk factors associated with advanced age (mental capacity, fall risk, activities of daily living).

### c) *Transferring a patient to a more appropriate level of care.*

*3 Total: 1 in cases of unexpected death; 2 in cases of expected death*

In 2023, examples of patients who might have benefitted from transfer to higher-level care included two patients with dementia requiring increased care for activities of daily living and increasing cognitive decline. One patient with autoimmune hepatitis and melanoma had recurrent and escalating difficulties with an indwelling catheter site.

### d) *Better management of nonadherent or noncompliant patients*

*16 total: 11 in cases of unexpected death; 5 in cases of expected death*

The high frequency of mental illness and substance use disorders in CCHCS contributes to the significant problem of nonadherence or noncompliance in this patient population. Nonadherence is responsible for much redundant effort in the system, with frequent rescheduling and multiple delays leading to poor treatment outcomes. The management of nonadherence/noncompliance was an OFI in 16 cases in 2023.

### e) *Integrated Substance Use Disorder Treatment (ISUDT) Program referral indicated*

*40 Total: 37 in cases of unexpected death; 3 in cases of expected death*

The Integrated Substance Use Disorder Treatment (ISUDT) program was implemented in 2019 and the Care Guide for Substance Use Disorder was issued in 2020. This program uses a variety of evidence-based strategies, including the use of medication assisted treatment (MAT), to help manage drug and alcohol addiction. Referral to the ISUDT program should be offered to any patient with SUD or at high risk for SUD identified by the universal screening test. The 2023 mortality reviews identified 35 patients with indications of drug or alcohol

addiction who might have benefitted from ISUDT program referral. Twenty-four of these patients died of drug overdose.

## 2. Optimizing care at the end of life

The principal of patient autonomy directs physicians to provide a Physician Order for Life Sustaining Treatment (POLST) for patients who are elderly, frail, burdened with serious chronic medical conditions, or have a life expectancy of one year or less. The primary care team is expected to have regular discussions regarding goals of treatment in these situations. Repeat discussions should occur when patients' clinical conditions change. During these discussions, a patient might choose to forego resuscitation in the event of a terminal emergency, generating a "do not resuscitate/do not intubate" (DNR/DNI) order.

### *a) POLST/DNR discussions in appropriate patients were not initiated*

*16 Total: 5 in cases of unexpected death; 11 in cases of expected death*

In 2022, there were 60 total OFIs in this category. As a response to that high number, there was an initiative to improve end-of-life care, including more coordinated care of complex patients, documenting and improving the implementation of appropriate end of life self-directed patient care, and seeking compassionate release when appropriate. These efforts resulted in a significant drop to 16 cases in 2023. These sixteen OFIs involved patients who were appropriate for POLST discussions, but in most cases care teams did not initiate them. In some cases, discussions were conducted but the patient's decision was not documented in the medical record. In some cases, a patient's clinical condition changed but a follow-up discussion was not conducted.

### *b) POLST/ DNR in place but patient decisions were not honored*

*14 Total: 3 in cases of unexpected death; 11 in cases of expected death*

In 2023 there were 14 patients who desired limited life-sustaining treatment but who nevertheless experienced attempted cardiopulmonary resuscitation or were inappropriately sent to emergency rooms and experienced hospitalizations and other life-sustaining measures which they did not desire. This number was lower than in 2022, with 21 OFIs.

### *c) Opportunity for improved management of pain and other symptoms, especially in cancer*

*2 Total: 0 in unexpected deaths; 2 in expected deaths*

The Care Guide for Pain Management emphasizes a comprehensive approach to the diagnosis and management of all types of pain. The importance of chronic pain as a possible symptom of underlying malignancy (a "red flag") is emphasized. The importance of screening for coexisting depression and the judicious use of non-narcotic and narcotic

medications are covered in detail. In 2023 there were two cases in which patients might have experienced better management of pain and other symptoms. One of these died of pancreatic cancer and the other of advanced liver disease. There were eleven such OFIs in 2022.

*d) Opportunity to offer hospice care to eligible patients*

*9 total: 0 in cases of unexpected death; 9 in cases of expected death*

Hospice is a model of care that focuses on providing palliative care to patients with life-limiting illnesses. Hospice care can be provided at every inpatient medical facility, and a special hospice unit is located at the California Medical Facility. In 2023, there were nine OFIs for missed opportunities to offer hospice care to eligible patients. This was the same number of OFIs as in 2022.

*e) Compassionate release parole application indicated*

*11 Total: 1 in cases of unexpected death; 10 in cases of expected death*

In 2022, California state law was changed to make compassionate release for medical reasons easier to obtain. Patients who are on an "end of life trajectory" or who are permanently medically incapacitated are eligible if there is a place in the community where they can go for post parole care.

In 2023, the MRDG identified 11 patients for whom a compassionate release parole application might have been sought. This was significantly fewer than the 32 OFIs in 2022.

### 3. Opportunities to improve clinical decision making by improved recognition and management of important clinical signs and symptoms

*69 Total in 58 patients; 38 in unexpected death cases; 31 in expected death cases*

Previous reviews have discussed "red flag" symptoms or signs as indicators of potential serious diseases. The term "red flag" was originally associated with back pain but lists of red flag symptoms now exist for many other conditions. Examples cited in previous editions of this analysis have included chest pain or shortness of breath as indicators of acute coronary syndrome, unexplained weight loss or prolonged abdominal pain indicative of malignancy, and atypical headache or an alteration in mental status heralding brain tumor or hemorrhagic stroke. Specific red flags such as unilateral leg swelling, jaundice, hematemesis, or palpable tumors are definitely abnormal and should always be quickly investigated. An extensive medical literature on "red flags" is covered in this review article.

In 2023, there were 69 OFI for symptoms or signs that were thought to have been incompletely evaluated or evaluated more slowly than was indicated (many fewer than the 96 OFIs in 2022). These OFI involved 58 patients, many of whom eventually received a significant diagnosis. Table 11 shows many of these OFIs and the eventual diagnoses, if related to the symptom or sign.

*Table 11. Missed Clinical Signs and Symptoms, and Eventual Diagnoses, CCHCS 2023*

| *Clinical Sign or Symptom* | Count of OFIs | Eventual Diagnoses (if related to the clinical symptom or sign) |
|---|---|---|
| weight loss | 17 | cancer (11), drug overdose (2), cirrhosis liver (2), interstitial pulmonary disease, stroke |
| history of drug use | 6 | drug overdose (6) |
| history of suicidal ideation | 5 | suicide (5) |
| abdominal pain | 3 | gastrointestinal hemorrhage (1), cirrhosis (1) |
| leg swelling | 3 | pulmonary embolism (2), melanoma (1) |
| hypertension | 2 | hemorrhagic stroke (1) |
| altered mental status | 2 | dementia (1) |
| back pain | 2 | osteomyelitis (1), metastatic lung cancer (1) |
| hemoptysis | 2 | cancer (2) |
| shortness of breath | 2 | aspiration pneumonia |
| abnormal lung exam | 1 | congestive heart failure |
| brachycardia (slow pulse) | 1 | cardiac arrythmia |
| chest pain | 1 | sudden cardiac death |
| recurrent cough | 1 | cancer of lung |
| skin infection | 1 | drug overdose |
| vomiting, recurrent | 1 | cancer of pancreas |

## 4. Opportunities to improve recognition and action in response to abnormal laboratory and other diagnostic test results

*29 total in 23 patients; 15 in unexpected deaths; 14 in expected deaths*

Any abnormality in a diagnostic test should be treated as an indicator of potentially serious disease. All abnormal test results should be flagged, noted, and explained. Care teams should have processes which identify, track and follow up all abnormal testing results. Results that are

released after hours, during shift changes and in care transitions are especially vulnerable to being lost or not followed up appropriately. In 2023, there were 29 OFI in this category (many fewer than the 54 OFIs in 2022). These included laboratory and radiological tests indicative of underlying malignancy in 8 cases, four patients with positive urine toxicology tests who later died of drug overdose, and abnormal ECGs in two patients who died of sudden cardiac arrest and acute myocardial infarction. Many of the OFI cited in this category were associated with delays in diagnosis or treatment and these will be discussed in a later section.

## 5. Opportunities to improve adherence to CCHCS Clinical Care Guides for specific diseases, conditions, or risk factors

*62 Total: 33 in cases of unexpected death; 29 in cases of expected death*

The Clinical Care Guides are tools created by CCHCS for use by clinicians and care teams in the management of patients. They are reviewed annually and are updated frequently. Each guide contains a summary section, decision support tools, and a section specifically designed for patient education and self-management. These guides are extensively researched, evidence based and well referenced. They can be accessed on the CCHCS website at cchcs.ca.gov/clinical-resources. Similar resources for nursing staff are also in use, including standard nursing procedures and encounter forms for patients with common symptoms or conditions. These include allergic reactions, asthma, chest pain, constipation, dental or ear problems, nosebleed, eye conditions, female genitourinary complaints, headache, hemorrhoids, rashes, alterations in mental status, musculoskeletal complaints, respiratory distress, seizures, wound care and upper respiratory symptoms. The following sections discuss OFI in which recommended practices contained in these guides for providers and nurses were not considered or followed.

### *a) Opportunities to mitigate fall risk*

*6 Total: 1 in cases of unexpected death; 5 in cases of expected death*

Falls can lead to serious injury with potential for hospitalization, increased morbidity, and death. Patients at risk for falls should be identified by their care teams. Patients are screened for ambulatory status, vision and balance, chronic disease/disability, and any medications that might increase fall risk. Any patient who has suffered a fall should be frequently reassessed. Mitigation of fall risk includes adequate room lighting, beds placed in a lower and safer position, call devices available within easy reach, handrails, mobility support, non-slip footwear, and traffic paths free of clutter. The 6 OFI in this category involved 3 patients who had advanced cancer, one patient with chronic obstructive pulmonary disease, one patient with advanced liver disease and hepatocellular carcinoma, and one patient who died of sepsis from a urinary tract infection.

### *b) Pressure Ulcer (Injury) Avoidance*

*3 Total: 1 in cases of unexpected death; 2 in cases of expected death*

Risk factors for pressure injury are immobilization, malnutrition, sensory loss and decreased circulatory perfusion. Patients with stroke, severe arthritis, paralysis or weakness, advanced age, and patients in restraints are at increased risk for developing pressure injury. Any patient with these risk factors or diagnoses should be screened frequently for pressure injury risk and any patient at risk is given a prevention and treatment plan. The development of a pressure injury or ulcer (known as a decubitus ulcer) increases the risk for local and systemic infection which can lead to sepsis and death. Pressure injuries are a major source of morbidity at hospitals and long-term care facilities. Of the three OFI cited for pressure injury in 2023, one was acquired during an inpatient stay at a contracted hospital, generating a Potential Quality Issue (PQI) OFI.

### *c) Medication Management*

*22 Total: 11 in cases of unexpected death; 11 in cases of expected death*

There were 22 OFI in 21 patients for whom the management of prescribed medication could have been improved. Seven patients were prescribed medications contraindicated by their medical condition or by other medications they were receiving. One patient with diabetes mellitus was being poorly managed. Three patients were being prescribed narcotics despite high risk of addiction. Two patients with a cardiac dysrhythmia known as the long QT syndrome were being prescribed medications which were contraindicated or being prescribed at a dose higher than indicated putting the patients at risk for life threatening arrhythmias. The twenty-two OFI in this category were fewer than the thirty OFIs in 2022.

### *d) Management of cardiovascular risk*

*3 total: 2 in cases of unexpected death; 1 in cases of expected death*

Any patient over the age of 18 should undergo a risk assessment for cardiovascular disease, using the American College of Cardiology 10-year risk assessment tool, which incorporates the patient's family history and personal risk factors such as sex, age, race, total cholesterol, HDL-cholesterol, blood pressure, history of diabetes mellitus (DM), and smoking history. Patients at intermediate or high risk should be considered for statin therapy and further noninvasive cardiac evaluation. One patient had no cardiac risk screening at age 41, when he first entered the system, and died of an acute myocardial infarction at age 48. In 2023 there were three OFI cited in this area, whereas there were two such OFIs in 2022.

### e) Hepatitis C and Liver Cirrhosis

*3 total: 0 in cases of unexpected death; 3 in cases of expected death*

The comprehensive care guides for hepatitis C and liver cirrhosis management have been described previously.

In 2023 there were 3 OFIs, all for failure to regularly screen patients with advanced liver disease for hepatocellular cancer. One of these patients subsequently died of advanced liver disease with liver cancer.

### f) Screening for lung cancer

*4 total: 1 in cases of unexpected death; 3 in cases of expected death*

In 2021, CCHCS incorporated the US Preventive Services Task Force recommendation to screen all heavy smokers over age 55 for lung cancer using annual low dose CT scanning.

In 2023 there were 4 OFIs for failure to do so, compared to 8 such OFIs in 2022.

These 4 patients were among the 13 who died of cancer of the lung.

### g) Other Care Guides, Programs, and Protocols

*21 total: 17 in cases of unexpected death; 4 in cases of expected death*

In 2023 there were 21 additional OFI in 17 patients citing nonadherence to recommended practices in other care guides, nursing or custody protocols or other CCHCS programs. The following table shows the Care Guide or program, the number of relevant OFI finding(s) and final cause of death when related to the finding.

*Table 12. Other Care Guides, Programs and Protocols OFI and related deaths, CCHCS, 2023*

| Program or Care Guide | Number of OFIs | Cause of Death |
|---|---|---|
| Suicide risk /suicide watch (RN rounding protocols) | 6 | suicide (5) |
| Custody protocols | 2 | suicide (1), drug overdose (1) |
| Atrial fibrillation management | 2 | stroke, ischemic |
| Urine drug monitor post overdose | 2 | drug overdose (2) |
| Medication Assisted Therapy (MAT) | 1 | drug overdose |
| Prostate cancer surveillance | 1 | prostate cancer |

Single OFIs were noted in four additional patients in the following areas: Foley catheter management, dialysis catheter site monitoring, visitation protocol lapse, abdominal aortic aneurysm monitoring. In these cases, the finding was unrelated to the final cause of death.

### 6. Opportunities to improve communication between primary care teams and in care transitions

*16 Total: 10 in cases of unexpected death; 6 in cases of expected death*

The accurate transfer of clinical information between care teams at transitions of medical care is essential for coordination of patient care. Poor communication between specialists and primary care teams can lead to critical tests being delayed or not done. Information missing or lost when patients are transferred can lead to missed diagnoses or delayed treatment. Within care teams there is also potential for miscommunication. In 2023 there were 16 cautions for poor communication, compared to 40 in 2022.

There were five OFIs for specialist - primary care miscommunication. All these involved specialist recommendations that were not acted upon.

There were two cited miscommunications between the primary care team and the hospital and both involved hospital discharge orders not being followed when the patient returned to the facility.

There were two cited miscommunications between Mental Health and the primary care team. One involved a patient with psychogenic polydipsia in whom the need for fluid restriction was not clarified. A second patient had an altered mental status which was not communicated by the interdisciplinary mental health team (IDST) to primary care.

There were two OFIs due to communication issues between custody and primary care. One involved a patient who lacked decision making capacity who refused to be transferred to hospital after a drug overdose. Custody sided with the patient, refusing to send to a higher level of care. The second case involved an initial refusal by custody to send a possible overdose patient to the Standby Emergency System area as recommended by the on-duty RN after a self-reported ingestion of prescribed medication.

There were four OFIs for physician orders not followed. These included orders for daily weights, a follow-up visit with the PCP, initiation of a suicide watch, and an order to send the patient to a higher level of care.

One OFI involved a communication issue between a local jail and the prison primary care teams. In this case, multiple recommendations made by the patient's primary care providers in the county jail were not acted upon by the prison primary care system when the patient was transferred to CDCR. There were no OFIs for communication problems between primary care teams within the prison system.

The 15 OFIs for miscommunication in 2023 are a significant decrease from the 40 OFIs in the prior year.

## 7. Opportunities to improve medical record documentation

*43 Total: 23 in cases of unexpected death; 20 in cases of expected death*

The Cerner electronic medical record (EMR) installation was completed in 2017. It has resulted in more complete documentation of visits and improved systems for storing and sharing medical information. The 43 OFIs in 2023 are a significant reduction from the 139 documentation lapses cited in 2022. However, there are several areas in which opportunities for improvement remain.

### a) *Inadequate or inaccurate documentation of care which occurs inside CCHCS.*

*10 Total: 6 in cases of unexpected death; 4 in cases of expected death*

### b) *Incomplete or missing documentation of care*

*12 Total: 3 in cases of unexpected death; 9 in cases of expected death*

When care is provided outside of CCHCS, the record of the patient encounter in an emergency room, hospital, or specialist's office may be incomplete, unavailable or missing.

### c) *Missing physician or other provider notes*

*4 Total: 4 in cases of unexpected death; 0 in cases of expected death*

Examples include a medication dose being changed without documentation of a rationale for the change, a missing provider consent form for prescribing a psychiatric medication, and a mental health provider visit not recorded accurately when the patient was hospitalized.

### d) *Missing RN notes*

*4 total: 2 in unexpected death; 2 in expected deaths*

Examples in this category include a missing RN note prior to a patient transfer to a higher level of care, a missing RN note on a suicide watch protocol, and a missing RN documentation of a gastric tube evaluation.

### e) *Legacy charting*

*8 Total: 5 in cases of unexpected death; 3 in cases of expected death*

"Legacy charting" is a term used to describe a workaround by some providers who "cut and paste" sections of previous patient encounter documentation in order to save time. This can result in an inaccurate record if careful editing of the pasted material is not done. This is a practice which should be utilized infrequently, if at all. Legacy charting was seen in many of the COVID-19 protocol OFIs noted in prior years. There were eight OFIs for legacy charting in 2023, a reduction from the 12 OFIs in 2022 and the 34 OFIs in 2021.

### f) *Incomplete problem lists*

*5 total: 3 in cases of unexpected death; 2 in cases of expected death*

The problem list includes all a patient's known medical and psychiatric conditions and should be kept current. Examples of missing entities from problem lists in 2023 included metastatic colon cancer, a congenital bone deformity, treated hepatitis C viremia, a significant 30-year smoking history, and a case missing multiple prior diagnoses. These missing diagnoses have implications for patients' further evaluations and management.

The OFI captured in this category do not include the documentation lapses cited during an Emergency Medical Response, the documentation of POLST and DNI/DNR orders or the documentation lapses cited for the ISUDT program, which are all accounted for in their respective sections.

## 8. Opportunities to prevent delays in diagnosis or treatment

*14 Total: 0 in cases of unexpected death; 14 in cases of expected death*

In 2023, there were 14 OFIs, in 13 deaths, in which delays were noted in the MRDG reports. Table 13 describes the reason for delay, the approximate duration of delay, and the eventual diagnosis in each of these thirteen cases.

Table 13. Delayed Diagnoses, CCHCS 2023

| Abnormality | Length of Delay | Eventual Diagnosis |
|---|---|---|
| *Red flag symptoms or signs* | | |
| hemoptysis | 2 weeks | metastatic sarcoma |
| foot swelling, unilateral | 6 weeks | deep vein thrombosis |
| chest pain | 3 months | lung cancer |
| abdominal pain | 6 months | pancreatocobiliary cancer |
| hemoptysis<br>MRI ordered, not timely obtained | 11 months<br>4 months | laryngeal cancer |
| *Abnormal imaging and laboratory test results* | | |
| abdominal ultrasound | 1 month | pancreatic cancer |
| fecal occult blood test | 2 months | colon cancer |
| rectal biopsy | 9 months | colon cancer |
| gastric biopsy ("metaplasia") | 11 years | gastric cancer |
| prostate biopsy | 2 mo | prophylactic treatment for metastatic prostate cancer |
| *Referral delays* | | |
| Oncology referral to Interventional Radiology | 3 months | hepatocellular cancer |
| *Multiple delays* | | |
| abnormal chest Xray;<br>chemotherapy | 4 years | lung cancer |
| abdominal bloating, recurrent<br>abnormal chest CT<br>referral to Surgery<br>request for abdominal CT<br>Surgery request for endoscopy<br>abnormal chest CT<br>abnormal biopsy | total delay<br>6 years | metastatic cholangiocarcinoma |

A delay in diagnosis can occur when clinical "red flags" are not pursued expeditiously. In 2023, hemoptysis (coughing of blood) was a red flag for metastatic cancer in two cases. Abdominal

pain or bloating was indicative of pancreatic cancer and biliary cancer, respectively. Recurrent chest pain was the first symptom of lung cancer in another patient. Unilateral leg swelling was indicative of underlying deep vein thrombosis in one patient.

Prompt recognition and management of an abnormal laboratory or diagnostic imaging result is dependent on an integrated care team process. In 2023, five cases had delays in responding to abnormal test results in which the final diagnosis was an underlying malignancy. In one case, a delay in responding to a prostate biopsy resulted in delay in prophylaxis for bone metastases in a case of prostate cancer.

One case in which multiple delays contributed to a six-year delay in diagnosing and treating a patient with metastatic gall bladder cancer illustrates the importance of cancer care coordination strategies in all patients with abnormal tests.

## 9. Opportunities for improving the practice and documentation of emergency medical responses.

*104 Total: 88 in cases of unexpected death; 16 in cases of expected death*

The 2018 statewide quality initiative resulted in a redesigned Emergency Medical Response (EMR) Program, intended to eliminate delays in the activation of emergency responses, improve documentation, and standardize subsequent care in clinical emergencies.

Delays in activation of a 9-1-1 call or in first responder arrival to a medical emergency were noted in 32 cases. These delays ranged from three to 57 minutes.

Documentation lapses were noted in 42 cases. The vast majority of these were related to nursing documentation lapses; most of which were referred to the Nursing Professional Practices Committee for followup.

There were 30 miscellaneous emergency medical response OFIs. These included five cases of underuse or inappropriate use of Narcan; the underuse of cervical collars to stabilize the neck in four cases; problems with the electric defibrillator in four cases; oxygen given by nonrebreather mask in two cases; single delays in hemostasis and delay in difficulty in securing intravascular access; inappropriate termination of CPR in one case; and post emesis suction not done in one case. There were four more OFIs in this area in 2023 than in the prior year.

## 10. Miscellaneous

*3 total: 2 in unexpected deaths; 1 in expected deaths*

There were three miscellaneous OFI recorded in 2023; inappropriate use of durable medical equipment in one case, a missing supply of glucagon/dextrose to treat hypoglycemia in another case, and one case of a hospital record found in a custody incident report (a possible HIPAA violation).

## 11. Potential Quality Issues (PQI)

*14 Total: 6 in cases of unexpected death; 8 in cases of expected death*

CCHCS defines a *Potential Quality Issue (PQI)* as "a health care incident, regardless of severity, which occurs during the course of treatment by a Healthcare Provider Network facility or provider and requires submission of a written referral." Mortality reviews may generate a PQI which is then forwarded to the appropriate emergency department, hospital, or specialist for their further review and action.

In 2023, there were 14 PQIs, compared with 22 in 2022, 16 in 2021, 34 in 2020, and 24 in 2019.

One patient was discharged prematurely from the hospital on two separate occasions (generating two PQIs) and was readmitted to a higher level of care within 24 hours. One patient developed a pressure ulcer while hospitalized. There were two PQIs generated for inadequate evaluations of patients - one with abdominal pain which resulted in a significant delay in the diagnosis of pancreatic cancer. Another patient had sepsis but there was an inadequate evaluation as to the cause of the sepsis. Two PQIs were submitted for inadequate evaluation of abnormal lab results - a low potassium level and a high white blood cell count. Two hospitals were cited for not performing a urine drug screen in patients admitted for drug overdose. A patient fall was not followed by a CT scan. A patient with multiple rib fractures and significant difficulty breathing was not considered by a consulting surgeon for a rib stabilizing procedure and the patient later succumbed to pneumonia. Another patient had an abnormal abdominal CT scan which was not recognized as indicative of a bowel perforation. And one hospital was cited for not communicating discharge recommendations to the PCP at the receiving institution.

Although these PQIs may represent significant breaches in quality of care, they are managed by the entity to which the PQI was forwarded, and CCHCS does not necessarily receive any follow-up communication.

### 12. Referral from the Mortality Review Discussion Group to quality review committees.

*a) Referrals to the Nursing Professional Practices Committee*

In 2023 there were 111 referrals to the Nursing Professional Practices Committee (NPPC), which represented 23% of the 481 OFIs. The vast majority of these referrals (80 of 111) were in the areas of emergency medical response protocols (51 referrals); responses to abnormal patient signs and symptoms, including patient requests for services (18 referrals); and potential lapses in Care Guide recommendations (11 referrals).

*b) Referrals to the Health Care Incident Review Committee*

The multidisciplinary Health Care Incident Review Committee (HCIRC) reviews all serious health care incidents (levels 4-6) and makes recommendations regarding potential sentinel events and events worthy of a root cause analysis to protect patient safety and improve the overall health care delivery system. In 2023 there were 12 case referrals to HCIRC generated by mortality case review. They involved four patients who died of drug overdose, two patients who died of advanced liver disease, and single patients who died of congestive heart failure, sudden cardiac death, hemorrhagic stroke, pulmonary embolism, end stage renal disease, and suicide.

## V. Quality Initiatives and Performance Improvement Tools

The 2015 Complete Care Model continues to form the basis of healthcare in CCHCS. Its core principles of comprehensive and continuous patient centered healthcare depend on a well-functioning health information system, supported by additional tools which help staff reach performance targets.

The Health Care Services Dashboard has been in existence since 2012 and is continually refined. Recommendations for good practice that appear in the Care Guides can be monitored. The dashboard allows healthcare leaders and managers to see and trend statewide and individual institutional performance over time for 286 measures organized into 12 domains including Scheduling and Access to Care, Population Health Management, Resource Management, Staffing, and Costs.

*Figure 15. Example View of CCHCS Health Care Services Dashboard for 2023*




| Measures | Jan 23 | Feb 23 | Mar 23 | Apr 23 | May 23 | Jun 23 | Jul 23 | Aug 23 | Sep 23 | Oct 23 | Nov 23 | Dec 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Scheduling & Access to Care** | | | | | | | | | | | | |
| **Access to Medical Services** | | | | | | | | | | | | |
| Care Team Services (All) | 89% | 91% | 90% | 88% | 89% | 89% | 87% | 90% | 89% | 90% | 86% | 88% |
| PCP Urgent Referrals 1 Day | 95% | 95% | 96% | 96% | 95% | 95% | 95% | 96% | 96% | 95% | 96% | 94% |
| PCP Routine Referrals 14 Days | 92% | 92% | 90% | 86% | 87% | 87% | 83% | 87% | 87% | 88% | 83% | 85% |
| **Access to Specialty Services** | | | | | | | | | | | | |
| Specialty Services (All) | 74% | 77% | 79% | 81% | 82% | 81% | 80% | 82% | 82% | 83% | 81% | 81% |
| **Backlog** | | | | | | | | | | | | |
| Medical Backlog (All) per 1,000 | 140.3 | 137.6 | 145.0 | 145.8 | 144.9 | 119.0 | 138.6 | 112.6 | 115.6 | 105.3 | 135.0 | 138.5 |
| **Population Health Management** | | | | | | | | | | | | |
| **Diabetes Care** | | | | | | | | | | | | |
| Diabetes Care (All) | 88% | 88% | 88% | 88% | 89% | 89% | 90% | 90% | 90% | 90% | 89% | 89% |
| **Liver Cirrhosis Care** | | | | | | | | | | | | |
| Liver Cirrhosis Care (All) | 86% | 86% | 86% | 86% | 87% | 87% | 91% | 91% | 91% | 90% | 91% | 91% |
| **HCV Care** | | | | | | | | | | | | |
| HCV Care (All) | 88% | 88% | 88% | 88% | 87% | 87% | 87% | 87% | 87% | 88% | 88% | 88% |
| **Continuity of Clinicians & Services** | | | | | | | | | | | | |
| **Continuity of Care** | | | | | | | | | | | | |
| Primary Care Provider (PCP) | 94% | 94% | 94% | 94% | 94% | 93% | 93% | 93% | 92% | 92% | 93% | 92% |
| **Staffing** | | | | | | | | | | | | |
| **Actual Vacancies** | | | | | | | | | | | | |
| Actual Vacancies (All) | 26% | 26% | 26% | 26% | 25% | 26% | 26% | 26% | 26% | 26% | 25% | 25% |

*A screenshot showing 12-month trends in selected statewide metrics from the California Correctional Health Care Services Dashboard*

Patient registries allow monitoring of performance in areas such as cancer screening, cancer care management, advanced liver disease, diabetes, and hypertension.

Care Guides for specific clinical conditions have been described previously. These point of service guides for clinicians and patients are well referenced and should be useful in the day-to-day management of patients.

Other major quality initiatives in 2023 included the Emergency Medical Response program, the Hepatitis C Treatment program, the Integrated Substance Use Disorder Treatment Program (including Medication Assisted Therapy for narcotic addiction), Cancer Screening Programs (for breast, cervical, colon, liver, and lung), Adult Immunizations for contagious diseases, and the Suicide Prevention and Response Program.

# VI. Conclusions

The overall mortality rate in 2023 was 402, nearly the same as in 2022, when the rate of 404 was the highest since the inception of the receivership in 2006. This was mainly driven by the large increase in drug overdoses, which rose to become the number one cause of death. The COVID-19 mortality rate continued to decrease in 2023, with only a single death signaling an end to the COVID-19 epidemic which had driven record setting mortality rates in 2020 and 2021. Longer term there were upward trends in suicide and deaths from sepsis. Advanced liver disease mortality continued to trend significantly downward, as did cardiovascular mortality.

The process of finding opportunities for systemic improvement continued to evolve, resulting in a further reduction of total OFIs, particularly in areas of red flag symptom evaluation, follow-up of abnormal diagnostic tests, meeting Care Guide recommendations for specific clinical conditions, medical record maintenance, and optimizing care near the end of life, including seeking compassionate release for terminal health conditions. There remain significant opportunities for improvement in coordinated care of complex patients, and in the practice and documentation of CCHCS Emergency Management protocols.

# EXHIBIT 11

ORIGINAL

FILED
MAY 11 1992
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY ______ DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., Plaintiffs, v. PETE WILSON, et al., Defendants. | No. CIV S 90-0520 LKK-JFM<br>ORDER |

INTRODUCTION

On Wednesday, April 29, 1992, counsel for the parties, and various officials of the Department of Corrections, met in a settlement conference on the issues raised in plaintiffs' motion for a preliminary injunction concerning procedures to be utilized by the Department of Corrections during periods of excessive heat (sometimes referenced herein as "heat plans").[1] The parties met in conference for approximately seven hours and reached an

1. Agreement would not have been possible without the attendance of the officials from the Department of Corrections. These officials were able to advise the settlement judge and the attorneys about practical considerations pertinent to various proposals in a concrete fashion which could only have been speculated about in their absence.

232

agreement which obviated the need for a hearing on a preliminary injunction scheduled for April 30, 1992. The agreement is set forth as follows in this Stipulated Order.

NATURE OF THIS ORDER

This order is a stipulated preliminary injunction. As such the provisions of this Order will dissolve upon further order of the court based on either an agreement of the parties or trial of the action.

SCOPE OF THE ORDER

This order applies to that part of plaintiffs' certified class who are at "heat-risk", i.e., those inmates who are currently prescribed, or who will be prescribed, what have been termed "psychotropic drugs" in this litigation.[2] The drugs pertinent to this Order are those, with one exception, identified in the March 24, 1992 Memorandum authored by David Tristan and Nadim Khoury. The drugs are as follows: (a) antipsychotic medication; (b) antimanic medication; (c) anti-Parkinson medication (Trihexyphenidryl or Benztropine); (d) antidepressant medication; Benzodiazepines (Diazepam or Flurazepam).[3]

The Department of Corrections will identify the inmates affected by this Order at each prison institution pertinent to

---

2. The class has been defined by the court previously as: The class of inmates with serious mental disorders confined presently or in the future within the California Department of Corrections (except San Quentin State Prison, the Northern Reception Center at Vacaville and the California Medical Facility-Main at Vacaville). The subclass of inmates termed "heat-risk" in this Order is less than the entire class certified for this action.

3. Furosemide was excepted from the list due to the agreement of the parties that any inmate taking furosemide would also be taking one of the other listed drugs.

this litigation[4] by generating a weekly list at each institution of the inmates prescribed the above listed drugs. Those inmates are referenced throughout this Order as the "heat-risk" inmates. The "responsible person," defined infra, shall ensure that all employees concerned with the implementation of this Order and the attendant heat plans have ready access to the list of heat-risk inmates.

Nothing in this Order would preclude the Department of Corrections from applying the procedures set forth herein to those inmates who are not identified herein as heat-risk. Nothing in this Order would preclude the Department of Corrections from taking positive steps to alleviate heat conditions or heat risks to inmates that are additional to the express procedures of this Order.

This Order is designed to utilize the present structure of a general state-wide heat plan implemented by specific institutional heat plans. The Order is also designed to allow the institutions affected by this Order to implement their plans with the maximum flexibility permissible consistent with the specified universal procedures contained in this Order. However, the substance of the procedures set forth in this Order shall be

4. Those institutions are: all prison facilities under the jurisdiction of the California Department of Corrections except San Quentin State Prison, the Northern Reception Center at Vacaville, and the California Medical Facility-Main at Vacaville. Although the excepted institutions are not bound by this Order, nothing in this Order would preclude application of the procedures set forth herein from being implemented at those excepted institutions.

Inpatient inmates, located at "prison" facilities administered by the Department of Mental Health, sometimes denominated as "CAT I" inmates, are not encompassed by this Order.

present in every heat plan. Moreover, neither the state-wide plan nor institutional plans will contain procedures that are inconsistent with, or violative, of this Order.

EFFECTIVE DATES OF IMPLEMENTATION

All institutional plans for the management of heat-risk inmates shall be finalized in conformance with the state-wide plan and this Order no later than May 15, 1992. In order to accomplish this task, the state-wide and institutional "final draft" plans must be submitted to the court and the plaintiffs no later than May 11, 1992. It is the intention of the court to allow few, if any, changes in the plans, but, of course, this intention is predicated on the belief that the plans will contain, at a minimum, the substance of the general procedures set forth herein. The parties shall be available, with the court's assistance, to resolve any alleged last minute problems in the plans. Unless otherwise expressly stated herein, the procedures set forth in this Order, as reflected ultimately by the state-wide plan and institutional plans, shall be implemented no later than June 1, 1992. Time is of the essence for implementation of the heat plans, and delays, except for extraordinary cause, will not be countenanced. The general press of business or other responsibilities will not constitute extraordinary cause. It is also contemplated that the necessity for emergency heat plan implementation for the present season will cease for most institutions at the end of September, 1992, barring an early Fall heat wave. The record-keeping procedures described herein will in any event cease at every institution at the end of September 1992.

The parties herein contemplate that this Order will be subject to review and possible modification, if the experience over the Summer reflects that modification is advisable.

RESPONSIBLE PERSONS

The Order requires the designation by the Department of Corrections of the state-wide official(s) who is (are) responsible for institutional compliance with the terms of the state-wide plan and this Order. Defendants shall notify the court and plaintiffs' counsel of the person(s) so designated by May 15, 1992. While specific duties may, of course, be delegated, the state-wide responsible person(s) will keep informed about all issues and events related to the implementation of this Order. The state-wide responsible person(s) shall take appropriate supervisory action to ensure the successful implementation of state-wide and institutional plans.

The responsible person at each institution tasked with ensuring the successful implementation of the procedures of the state-wide plan and this Order is the institution's warden. Again, while the warden may delegate specific duties, the warden shall ensure that he/she is informed of the issues and events related to implementation of this Order, and shall take whatever action is appropriate to ensure the continuous implementation of this Order at his/her particular institution.

RECORD KEEPING AND DATA DISSEMINATION

Records will be kept at all institutions encompassed by this Order concerning outside air temperature in excess of 90 degrees, inside air temperatures in excess of 90 degrees, and medical incidents significantly related to heat exposure. The

faithful and accurate recordation of the events described below in this section are procedures adopted in lieu of a mandated, burdensome and onerous (to the Department of Corrections) special monitor process. The plaintiffs have agreed to such record keeping and dissemination based on the assumed good faith of the Department of Corrections to ensure that accurate data is collected. The records will be kept and disseminated as follows.

a. <u>Outside Air Temperature</u>

The responsible person (warden) at each institution will ensure that at a central, heat neutral location, an accurate thermometer records the ambient air temperature at that location. The warden will ensure that the temperature is reviewed each day at periodic intervals. When the temperature first reaches 90 degrees (Fahrenheit), the temperature will be recorded on a log furnished at the central temperature location. A standard "log form" will be provided by the Department of Corrections (Attachment A). Thereafter, the precise temperature will again be recorded at the top of the hour and at two hour intervals thereafter until such time that the temperature has been below 90 degrees for one hour. Logging may then be discontinued until the next period in which the temperature reaches 90 degrees or higher. The logging forms shall be collected by the warden so as to be available for immediate remittance to the state-wide responsible person or his/her designee at the end of the month. The first remittance of the log forms for each institution shall be for the month ending June 1992. The forms shall be sent to the state-wide responsible person or his/her designee so that the

forms can be disseminated to plaintiffs' counsel no later than July 10, 1992. The log forms shall thereafter be sent monthly in the same fashion up to the month ending September 1992.[5]

b. Inside Air Temperature

Inside air temperatures at all housing facilities where persons affected by this order reside shall be logged and disseminated as well. Each warden will ensure that the inside air temperature at each pertinent housing facility can be accurately and faithfully recorded. In the absence of special circumstances, the location of the temperature taking should be at the highest, non-air conditioned location[6] where a heat-risk inmate resides in a pertinent housing facility. When the inside air temperature in a pertinent facility first reaches 90 degrees, that fact will be recorded on a standard form log maintained in the housing facility (Attachment B). Thereafter, the temperature will be recorded on the log at the times (if pertinent) of 12 noon, and at least every three hours thereafter. The recordation ~~of temperatures may be discontinued if the inside air temperature drops below 90 degrees for a one hour period of time.~~

The log forms for all pertinent facilities will be collected and disseminated in the same fashion as the outside air temperature log forms.

///

---

5. ~~The last report would be due, therefore, no later than~~ October 10, 1992.

6. Of course, if the entire housing facility is air conditioned, the temperature should not reach 90 degrees inside the housing facility. Many facilities, however, have partial air conditioning in control booths and other employee locations. This order requires the temperature to be monitored in non-air conditioned living areas.

c. Heat Incident Recordation

The warden will ensure that the medical heat incident recordations are accurately and faithfully made. Whenever, in a clinician's judgment,[7] a heat-risk inmate is suffering from a medical condition that is related to heat exposure, that fact shall be documented on a standard form "heat incident log" (Attachment C) which shall contain the inmate's name, identification number, a short description of the chief medical complaint, and the medications (or change of medications) prescribed.

These logs shall be collected and disseminated in the same manner as the temperature logs. The protective order previously stipulated to by the parties shall apply to any dissemination of these medical logs.

PROCEDURES DURING HEAT EVENTS

Outside Temperature -- 90 Degrees

Whenever the outside air temperature reaches 90 degrees or more, a heat-risk inmate will be afforded the opportunity to return to his housing unit in order to take precautions to mitigate any potential heat related illness. The inmate will have been afforded a ducat in the form of Attachment D so that institution employees are aware of the ability of the inmate to return to his housing facility during such an event.

If a heat risk inmate is classified as a "CAT J" inmate, or if the inmate is awaiting transfer for psychiatric evaluation for "CAT I" or "CAT J", and in the event that these

7. A clinician is a person licensed to provide medical or psychiatric care such as an MTA, RN, or medical doctor including those personnel that specialize in mental health.

inmates are outside of their housing facility for some reason, these inmates shall be ordered to return to their housing facility.

Inside Housing Facility Temperature -- 90 Degrees

Whenever heat-risk inmates are present in their housing facility, and the inside air temperature is 90 degrees or more, heat risk-inmates shall be afforded access to cooling drinks. In addition, such inmates shall have access to showers, and/or water in their cells (sink soakings), and/or mistings. Heat-risk inmates will be the subject of increased custodial observations during this heat event.

If a heat-risk inmate is classified as a "CAT J" inmate, or is awaiting transfer for psychiatric evaluation as a "CAT J" or "CAT I", that inmate shall be encouraged by custodial staff to shower, and/or be misted, and/or take cooling drinks, and/or use water in their cells for drinking and sink soaks. If such an inmate refuses, and in the judgment of a clinician such cooling measures are necessary to prevent death or serious injury, then these measures may be taken involuntarily.

Inside Housing Temperature -- 95 degrees

Whenever heat-risk inmates are present in their housing facility, and the inside temperature reaches 95 degrees or more, the same procedures set forth for 90 degrees will be followed with the additional procedures prescribed here. At the 95 degree trigger level, the Medical Officer of the Day (MOD) will be alerted that said temperature has been recorded in one or more of the pertinent housing units. The individual wardens will decide whether the MOD may remain on call at this time, or will be

required to be physically present on site. A clinician, who has been trained in recognition and treatment of heat related illness, will visit the pertinent housing facilities to observe the heat-risk inmates. The clinician will observe each heat-risk inmate at least once every two hours during the period that the inside temperature remains at 95 degrees or above.

Deactivation

All of the procedures set forth above in this section for the trigger temperatures shall be deactivated at the time when the temperature has fallen below the trigger level for a one hour duration.[8]

NOTICE TO HEAT-RISK INMATES

As previously indicated, each institution will be generating a weekly list of those inmates who are heat-risk. Every heat-risk inmate, who at the time of heat plan implementation (June 1, 1992) has already signed a medications consent form will be asked to sign another form; at that time the inmate will be informed in writing, and, if appropriate, orally, about the risks of heat sickness that are potentially exacerbated by the taking of his medications. At this time, the heat-risk inmate will be given, if appropriate, the "90 degree outside air temperature ducat" referenced above, and the procedures for its use will be given to the inmate.[9]

---

8. For example, if a 95 degree event is in progress, the clinician may cease visiting the affected inmates one hour after the temperature has fallen below 95 degrees.

9. Depending on an institution's policies, "CAT J" inmates or inmates awaiting transfer for psychiatric evaluation as "CAT J" or "CAT I" may not be appropriate candidates for ducats, i.e., they will not be away from their housing area.

For those inmates who become heat-risk after the initial implementation of this order, all of the information described in the preceding paragraph will be given at the time the inmate is first asked to sign the medications consent form.

TRAINING

The responsible persons will be tasked with ensuring that all pertinent employees receive appropriate training, are aware of this Order, and have read their pertinent institutional heat plan(s). This training must take place prior to the June 1 implementation date.

ENFORCEMENT PROCEDURES

Actions to enforce the terms of this Order, including compliance with the institutional heat plans, will be taken according to the following general procedures. All disputes concerning the enforcement of this Order must be the subject of informal meet and confers, preferably in person, but in writing or telephonically if necessary. The court will act expeditiously on any agreed upon stipulations and orders that need to be signed.

In the event a formal resolution is necessary, either party may move the court for an order to shorten time with a motion for an enforcement order. Neither party will seek contempt as an initial enforcement remedy unless substantial proof of bad faith in the implementation of this Order, including

///

///

///

///

the referenced heat plans, exists. Violation of an enforcement order may result in contempt findings.

COUNSEL FOR PLAINTIFFS:

DONALD SPECTER
ALISON HARDY
Prison Law Office

WARREN E. GEORGE
SARAH W. ANDERSON
McCutchen, Doyle, Brown
& Enersen

MICHAEL W. BIEN
ADELA B. KARLINER
Rosen, Bien & Asaro

RICHARD L. GOFF
AMELIA A. CRAIG
Heller, Ehrman, White
& McAuliffe

SIDNEY M. WOLINSKY
LINDA D. KILB
Disability Rights Education
and Defense Fund

Dated: May 6, 1992.

By: DONALD SPECTER

Dated: May ____, 1992.

By: MICHAEL W. BIEN

COUNSEL FOR DEFENDANTS:

DANIEL LUNGREN,
Attorney General of the
State of California
GEORGE WILLIAMSON, Chief
Asst. Attorney General
JAMES CHING,
KARL S. MAYER,
BRUCE M. SLAVIN,
Deputy Attorneys General

Dated: May 6, 1992.

By: KARL S. MAYER

///

///

///

IT IS SO ORDERED.

DATED: May 6, 1992.

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

DATED: May 6, 1992.

JOHN F. MOULDS
U.S. MAGISTRATE JUDGE

DATED: May 7, 1992.

LAWRENCE K. KARLTON
U.S. DISTRICT JUDGE

~~KSM:jy~~
c:\coleman\order

## Attachment A, Outside Temperature Record

From May 15 to September 30, 1992, the **OUTSIDE** air temperature is to be monitored and logged hourly, 24 hours a day.

# OUTSIDE TEMPERATURE RECORD

INSTITUTION: ____________________

Temperature is to be recorded every hour, 24 hours a day, seven days a week from May 15, 1992 through September 30, 1992.

** Immediately notify the Watch Commander at extention ________ when the temperature reaches 90 degrees.

| DATE: | TIME: | TEMP: | PRINTED NAME: |
|---|---|---|---|
| | 0100 | | |
| | 0200 | | |
| | 0300 | | |
| | 0400 | | |
| | 0500 | | |
| | 0600 | | |
| | 0700 | | |
| | 0800 | | |
| | 0900 | | |
| | 1000 | | |
| | 1100 | | |
| | 1200 | | |
| | 1300 | | |
| | 1400 | | |
| | 1500 | | |
| | 1600 | | |
| | 1700 | | |
| | 1800 | | |
| | 1900 | | |
| | 2000 | | |
| | 2100 | | |
| | 2200 | | |
| | 2300 | | |
| | 2400 | | |

Attachment B, Inside Temperature Record

Every day from May 15 to September ~~30, 1992, custody housing staff will be~~ responsible to monitor and log the **INSIDE** temperature **every three hours** on the highest tier a heat-risk inmate is housed.

# INSIDE TEMPERATURE RECORD

INSTITUTION:________________________Housing Unit____________________

Temperature is to be taken every (3) three hours on the highest tier an inmate on the heat risk list is housed, seven days a week from May 15, 1992 through September 30, 1992.

SPECIFIC LOCATION OF TEMP. READING:____________________________
i.e. 1st tier, 2nd tier, 3rd tier...etc.

Immediately notify the Watch Commander at extention________when the temperature reaches 90 degrees and again at 95 degrees.

| DATE: | TIME: | TEMP: | PRINTED NAME: |
|---|---|---|---|
| | 0300 | | |
| | 0600 | | |
| | 0900 | | |
| | 1200 | | |
| | 1500 | | |
| | 1800 | | |
| | 2100 | | |
| | 2400 | | |

## Attachment C, Heat Incident Log

The Heat Incident Log is to be completed when, in the clinician's judgment, a heat-risk inmate is observed to be suffering from a medical condition which is related to heat exposure. Information to be documented includes the inmate's name, CDC number, and a short description of the chief medical complaint and the medication (or change of medication) prescribed.

FROM: VEATA GRANT A TO: 9??-CCS-SF MAY 5, 1992 3:37PM #286 P.03

# HEAT INCIDENT LOG

Institution: ______________________________

Date: ______________ Time: ______________

Inmate Name: ______________ CDC Number: ______________

Chief Medical Complaint: ______________________________

______________________________

Medication(s): ______________ ______________

______________ ______________

Clinician's Name: ______________________________

=========================================================

# HEAT INCIDENT LOG

Institution: ______________________________

Date: ______________ Time: ______________

Inmate Name: ______________ CDC Number: ______________

Chief Medical Complaint: ______________________________

______________________________

Medication(s): ______________ ______________

______________ ______________

Clinician's Name: ______________________________

=========================================================

# HEAT INCIDENT LOG

Institution: ______________________________

Date: ______________ Time: ______________

Inmate Name: ______________ CDC Number: ______________

Chief Medical Complaint: ______________________________

______________________________

Medication(s): ______________ ______________

______________ ______________

Clinician's Name: ______________________________

**Attachment D, Inmate Pass**

A heat-risk inmate's pass and Notice to Inmate of steps to take to keep cool during hot weather, is to be provided to inmates prescribed a psychotropic medication. The Inmate Pass is to be provided by May 15, 1992 to inmates presently on the heat-risk list. Those prescribed psychotropic medication after May 15, 1992, shall be provided an inmate pass at the time the medication consent form is signed.

## INMATE PASS

Inmate ____________________ CDC #: ________________

has the option to return to his/her Housing Unit from outside areas at the time the Institution's Heat Plan is activated.

The holder of this pass will be allowed into his/her Housing Unit once the Institution's Heat Plan is activated.

______________________
Chief Medical Officer

______________
Date

## THINGS TO DO WHEN IT IS HOT 90 DEGREES & ABOVE

1) Take your prescribed medications unless told not to by the Doctor.
2) Don't take aspirin, Tylenol, Motrin, Excedrin or bufferin.
3) Drink more liquids (water, juice).
4) Don't drink coffee, tea or colas.
5) Don't do hard exercises.
6) Stay out of the sun.
7) Shower or wash from sink often.
8) Stay in contact with others.
9) If you are in the sun, wear loose, light-weight clothing and protect your head.
10) Stay away from areas with poor air flow.

## Attachment E, Housing Log

A log will be maintained by the designated clinician of the date and time each housing unit was observed during activation of the heat plan when temperatures exceed 95 degrees. Clinician is to visually observe each identified heat-risk inmate in the unit and document times in and out of the unit.

HOUSING LOG*
HEAT-RISK INMATES

Institution: ______________________ Date: ____________

Clinician's Name: ______________________

Unit: ______________________

Time In: ____________
Time Out: ____________

Unit: ______________________

Time In: ____________
Time Out: ____________

Unit: ______________________

Time In: ____________
Time Out: ____________

Unit: ______________________

Time In: ____________
Time Out: ____________

Unit: ______________________

Time In: ____________
Time Out: ____________

~~Unit:~~ ______________________

Time In: ____________
Time Out: ____________

Unit: ______________________

Time In: ____________
Time Out: ____________

Unit: ______________________

Time In: ____________
Time Out: ____________

Unit: ______________________

Time In: ____________
Time Out: ____________

* Clinical observation of heat-risk inmates to be made every 2 hours when inside temperature reaches 90

Attachment F, Addendum to Medication Consent Form.

A medication consent form is to be provided to every inmate listed on a heat-risk list.

If the inmate has been prescribed the medication prior to May 15, 1992, the inmate will be informed both in writing and orally about the risks of heat sickness as a result of taking his/her medication.

An inmate prescribed a psychotropic medication after the initial implementation will be provided the Notice at the time he/she is asked to sign the medication consent form.

SAMPLE

## V SIDE EFFECTS; GENERAL

When properly used these medications are relatively safe and effective. Not all side effects possible can be predicted, not have they been listed here. You may experience few, if any, side effects. YOU WILL NOT EXPERIENCE ALL SIDE EFFECTS LISTED. Side effects may vary according to the dose taken, length of time taken, your physical condition, your mental condition, and other drugs you may be taking. For these reasons, it is important that you tell your doctor about other drugs, including alcohol and street drugs, that you may be taking.

If you experience any of the side effects listed below, or any other unusual effects, it is important that you report them to your doctor.

Common

Blurred vision
Constipation
Rapid pulse
Problems in urinating
Dizziness

Dry mouth
Headache
Increased appetite
Nausea
Tiredness or weakness

Less Common

Eye Pain
Fainting
Seeing, hearing, or feeling things that are not there
Shakiness
Unusually slow pulse
Vomiting

Diarrhea
Excessive sweating
Heartburn
Increased sensitivity to sunlight
Sleeping difficulty

Rare

Seizures
Skin rash and itching

Sore throat and fever
Yellowing of eyes and skin

## VI. HEAT WARNING

Sheet listing heat related symptoms and precautions was discussed and received by patient.

## STATEMENT OF INFORMED CONSENT

______________________ Inmate Name

______________________ CDC Number

______________________ met with me and discussed my mental problems. The doctor told me of medications which are know to be of help in treating mental problems such as mine. The doctor told me of any division of opinion as to whether the medication will be helpful, why and how it works and its side effects. The doctor also discussed with me the likelihood of my improving or not improving without such medication(s). We discussed the reasonable treatment alternatives to medication and I understand that I may take the medication(s) and still be involved in other forms of treatment.

I understand that I may withdraw consent at any time by informing any member of the treatment staff.

☐ I do ☐ I do not consent to taking this medication as part of my treatment.

Name of drug, dosage, frequency and anticipated duration: ______________________

Patient's Signature ______________________ Date ______________

Witness to Patient's Signature ______________________ Date ______________

☐ I have discussed this medication with the patient and it is my opinion that he/she has the capacity to understand that he is mentally ill, that the medication may help with his/her illness, and that there are possible side effects.

☐ I have discussed this medication with the patient and it is my opinion that he/she lacks the capacity to understand based upon the following evidence: ______________________

Physician's Signature ______________________ Date ______________



# TO ALL INMATES

*(Post in inmates areas)*

**This is about heat. Some medications can hurt the body's response to heat.**

***If you have questions, ask.***

THINGS YOU SHOULD DO WHEN IT'S HOT:

1. Take your medications prescribed by your doctor unless told otherwise. Don't take Tylenol, aspirin, Motrin, Excedrin or bufferin.
2. ~~Drink more liquids (water, juice,~~ Kool-Aid, etc). Do not drink tea, colas, or coffee. (Caffine is bad for you in hot weather.)
3. Shower or wash from a sink often.
4. Don't play basketball, run, lift weights or do other hard exercises.
5. Stay out of the sun. If you are in the sun, wear light-weight, loose clothing, and protect your head.
6. Stay in contact with others.
7. Stay away from areas with poor air flow.

TELL STAFF AT ONCE IF YOU HAVE:

1. ~~Blurring of vision or spots before your eyes.~~
2. Muscle cramps, stomach cramps or weakness.
3. Nausea or vomiting.
4. Shortness of breath, chest pain.
5. ~~Lack of coordination or balance.~~
6. Any headache, dizziness, spinning of the room, or light-headedness.
7. Feelings like "burning up" with hot skin and little or no sweating.
8. Sleepiness or confusion.
9. Very bad thirst even after drinking.

Rev. 3-23-92