UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | | |
|---|---|---|
| MARCIANO PLATA, ET AL., | ) | C-01-01351 JST |
| PLAINTIFFS, | ) | OAKLAND, CALIFORNIA |
| VS. | ) | JUNE 16, 2025 |
| GAVIN NEWSOM, ET AL., | ) | PAGES 1-53 |
| DEFENDANTS. | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JON S. TIGAR
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFFS: PRISON LAW OFFICE
BY: MACKENZIE L. HALTER
STEVEN FAMA
LILY HARVEY
DANIEL GREENFIELD
1917 FIFTH STREET
BERKELEY, CALIFORNIA 94710

FOR DEFENDANTS: HANSON, BRIDGETT LLP
BY: PAUL B. MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS-GONZALEZ
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

APPEARANCES CONTINUED ON THE NEXT PAGE

OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

APPEARANCES (CONTINUED)

| | |
|---|---|
| FOR DEFENDANTS: | DEPARTMENT OF JUSTICE<br>OFFICE OF THE ATTORNEY GENERAL<br>BY: DAMON G. MCCLAIN<br>455 GOLDEN GATE AVENUE, SUITE 11000<br>SAN FRANCISCO, CALIFORNIA 94102 |
| | CALIFORNIA DEPARTMENT OF JUSTICE<br>OFFICE OF THE ATTORNEY GENERAL<br>BY: CORINNA ARBITER<br>600 WEST BROADWAY<br>SAN DIEGO, CALIFORNIA 92101 |
| FOR INTERVENOR CCPOA: | MESSING ADAM & JASMINE<br>BY: GREGG M. ADAM<br>235 MONTGOMERY STREET, SUITE 828<br>SAN FRANCISCO, CALIFORNIA 94104 |
| FOR THE RECEIVER: | FUTTERMAN DUPRESS DODD CROLEY MAIER LLP<br>BY: JAIME L. DUPREE<br>601 MONTGOMERY STREET, SUITE 333<br>SAN FRANCISCO, CALIFORNIA 94111 |
| ALSO PRESENT: | CLARK KELSO |

OAKLAND, CALIFORNIA JUNE 16, 2025

P R O C E E D I N G S

(ZOOM PROCEEDINGS CONVENED AT 1:30 P.M.)

THE CLERK: GOOD AFTERNOON, YOUR HONOR.

CALLING --

THE COURT: COUNSEL -- LET ME TURN ON MY SELFIE FOR A SECOND TO MAKE SURE I KNOW WHAT I LOOK LIKE.

OKAY. THAT SEEMS ALL RIGHT.

LET ME ASK YOU TO CALL THE CASE.

THE CLERK: CALLING CIVIL CASE NUMBER 01-CV-1351-JST, PLATA, ET AL. VERSUS NEWSOM, ET AL.

PARTIES, PLEASE STATE YOUR APPEARANCES, BEGINNING WITH THE PLAINTIFF.

MS. HALTER: GOOD AFTERNOON.

FOR PLAINTIFFS, THIS IS MACKENZIE HALTER, AND WE HAVE STEVEN FAMA, LILY HARVEY, AND DANIEL GREENFIELD.

THE COURT: WELCOME.

MR. MELLO: GOOD AFTERNOON, YOUR HONOR.

PAUL MELLO FOR DEFENDANTS. I'M JOINED BY SAMANTHA WOLFF, DAVID CASARRUBIAS-GONZALEZ, DAMON MCCLAIN, AND CORINNA ARBITER.

THE COURT: THANK YOU. WELCOME.

MS. DUPREE: GOOD AFTERNOON, YOUR HONOR.

JAMIE DUPREE ON BEHALF OF RECEIVER CLARK KELSO.

THE COURT: WELCOME.

MR. KELSO: AND RECEIVER CLARK KELSO.

THE COURT: OKAY.

I THINK MR. ADAMS WAS WAITING HIS TURN.

MR. ADAM: I AM.

GREGG ADAM FOR CCPOA, YOUR HONOR.

THE COURT: WELCOME.

ALL RIGHT. THANK YOU ALL FOR ACCOMMODATING ME AND ALLOWING ME TO PROCEED VIRTUALLY. THAT MAY ACTUALLY BE SOME OF YOUR PREFERENCE. I DON'T KNOW. I'VE NEVER TAKEN A POLL.

I LIKE TO HAVE OUR CONFERENCES IN PERSON.

I WOULDN'T DESCRIBE MYSELF AS HAVING A TERRIFIC GRASP OF THE RUMOR MILL IN THE SACRAMENTO AREA, BUT WORD DID GET TO ME THAT SOME OF YOU THOUGHT I WAS PROCEEDING VIRTUALLY BECAUSE OF A CLOSURE OF PART OF HIGHWAY 80 IN THE SACRAMENTO AREA TODAY AND THAT I DID IT TO MAKE THINGS MORE CONVENIENT FOR THOSE PERSONS.

I LOVE SO MUCH THE FACT THAT SOMEONE THINKS THAT I HAVE THAT LEVEL OF KNOWLEDGE ABOUT THE HIGHWAY SYSTEM IN THE SACRAMENTO METROPOLITAN AREA, AND THAT THEY THINK THAT I'M A PERSON OF SUCH GOODWILL THAT I WOULD, ON MY OWN, RECONFIGURE THE CASE MANAGEMENT CONFERENCE TO ACCOMMODATE OTHER PEOPLE'S TRAFFIC NEEDS.

SO WHOEVER STARTED THAT RUMOR, I THANK YOU.

IT ISN'T TRUE. I'M WORKING REMOTELY THIS WEEK, SO THERE WAS NO WAY FOR ME TO PROCEED IN THE COURTROOM.

WE HAVE QUITE A LONG CASE MANAGEMENT STATEMENT FILED IN

CONNECTION WITH THIS CONFERENCE -- IT'S 41 PAGES LONG -- AND THEN THERE ARE A COUPLE HUNDRED PAGES OF ATTACHMENTS. THAT'S A LITTLE LONGER THAN USUAL.

SO I'M GOING TO DEPART FROM MY USUAL ROUTINE -- I DO HAVE A COUPLE OF PRELIMINARY THINGS TO TELL YOU IN A SECOND, BUT ONCE I'VE DONE THAT, INSTEAD OF PROCEEDING IN ORDER THROUGH THE STATEMENT AND CALLING OUT THE VARIOUS ROMAN NUMBERED TOPICS OR SUBTOPICS, I'M JUST GOING TO START BY ASKING YOU IN A MINUTE WHICH TOPICS YOU WERE HOPING TO DISCUSS TODAY.

I'M SURE NO ONE WILL SAY ALL OF THEM, BECAUSE THEN -- WELL, ANYWAY, I'M -- I'M PREDICTING THAT NO ONE WILL SAY ALL OF THEM. I DON'T WANT YOU TO SAY THAT. I DON'T THINK THAT WOULD BE PRODUCTIVE.

SO I'LL FIND OUT WHAT YOU WANT TO TALK ABOUT, AND THEN THAT'S WHAT WE'LL TALK ABOUT. THERE'S A CHANCE THAT I HAVE SOMETHING TO SAY ABOUT A TOPIC THAT'S NOT ON YOUR LIST, ALTHOUGH I THINK THE CHANCES OF THAT ARE FAIRLY LOW.

SO IN TERMS OF JUST THINGS TO TELL YOU ABOUT WHAT I'VE BEEN UP TO SINCE WE LAST GOT TOGETHER, I TOLD YOU THAT I WOULD MEET WITH THE NUTRITION TEAM AT THE SAN QUENTIN REHABILITATION CENTER AND LOOK AT THEIR PEER SUPPORT PROGRAM.

I DID THAT, I DON'T KNOW, ABOUT A MONTH AGO. I MET WITH WARREN CLARK, WHO IS THE CORRECTIONAL FOOD MANAGER AT SAN QUENTIN; AND ALSO JANET VIGO (PHONETIC) -- I THINK IT'S JANET -- WHO IS THE DIETICIAN THERE. VERY INTERESTING FOR ME

TO LEARN ABOUT THE CHALLENGES OF PROVIDING GOOD NUTRITION FOR INCARCERATED PEOPLE ON A TIGHT BUDGET AND AT SCALE, WHICH IS WHAT THEY DO.

THEY -- THEY HAVE SOME WONDERFUL TRICKS UP THEIR SLEEVE, AND THEY'RE VERY FOCUSSED ON MAKING SURE THAT INCARCERATED PEOPLE DO GET A NUTRITIOUS DIET.

IT'S NOT SOMETHING THAT WE'VE WORKED ON DIRECTLY IN THE CASE, BUT THERE'S NO QUESTION THAT GOOD NUTRITION AND EXERCISE, WHILE WE'RE ON THE SUBJECT, ARE COMPONENTS OF A HEALTHY LIFE, AND IF YOU HAVE A HEALTHIER -- IF YOU HAVE A HEALTHY POPULATION, YOU NEED LESS MEDICAL CARE.

SO THE THINGS ARE RELATED, EVEN THOUGH THEY DON'T WORK ON THEM DIRECTLY, AND I APPRECIATED SAN QUENTIN'S MAKING THOSE FOLKS AVAILABLE FOR ABOUT AN HOUR.

THEN I SPENT MORE THAN AN HOUR AT THE PEER SUPPORT PROGRAM. I MET WITH DR. ALISON PACHYNSKI, AND ALSO ELENA TOOTELL, AND ALL OF THE TRAINED INCARCERATED PERSON PEER SUPPORT COUNSELORS. ALL OF THE COUNSELORS WERE IN THE MEETING IN ONE BIG GROUP.

THAT MEETING, FRANKLY, I WISH ALL OF YOU COULD HAVE BEEN THERE. IT WAS VERY -- IT WAS VERY UPLIFTING TO HEAR FROM INCARCERATED MEN WHO THEMSELVES, UNIFORMLY, TO A MAN, WERE GREAT VICTIMS OF TRAUMA, DESCRIBE HOW THEY HAD BEEN TRAINED TO HELP OTHER INMATES, HOW MUCH SATISFACTION THEY GOT FROM DOING THAT, AND IT'S CLEAR THAT THE PEER SUPPORT PROGRAM IS A REAL

SUCCESS BOTH FOR THE COUNSELORS AND FOR THE INCARCERATED PEOPLE THEY'RE HELPING.

AND I WOULD SAY THERE ALSO APPEARS TO BE SOME BENEFIT TO CORRECTIONAL STAFF, BECAUSE NOW INMATES ARE ABLE TO HELP EACH OTHER DEAL WITH CHALLENGING EMOTIONS AND CHALLENGING SITUATIONS IN A WAY THAT'S, I'M SURE, GOOD FOR INSTITUTIONAL SAFETY AND SECURITY AND THE ORDERLY RUNNING OF THE PRISON.

SO I JUST SEE IT AS A WIN-WIN-WIN, AND I HOPE THAT THERE WON'T BE ANY DIFFICULTY IN THEIR -- IN GETTING THEIR FUNDING RENEWED AND SUPPORTING THE PROGRAM AT OTHER INSTITUTIONS. IT REALLY WAS A GREAT MEETING.

ON THE SUBJECT OF VISITING SAN QUENTIN, I KNOW THAT THERE ARE CDCR AND CCHCS EMPLOYEES WHO WATCH THESE CASE MANAGEMENT CONFERENCES. I WELCOME THAT. THIS CASE OBVIOUSLY HAS AN IMPACT ON YOUR LIFE, AND I'M GLAD YOU GET TO SEE HOW WE'RE DOING OUR WORK.

I ALSO KNOW THAT THERE ARE FOLKS AT OTHER INSTITUTIONS THAT MIGHT SAY, "HEY, HOW COME YOU WENT TO SAN QUENTIN? WE'RE DOING GREAT WORK HERE. HOW COME YOU'RE NOT SEEING OUR GREAT WORK?"

THE SHORT ANSWER IS I WISH I COULD. I LOVE VISITING INSTITUTIONS. A COUPLE TIMES A YEAR I AM ABLE TO ACTUALLY GET INTO INSTITUTIONS UP AND DOWN THE STATE. I HAVEN'T BEEN TO QUITE ALL OF THEM YET, BUT I'VE BEEN TO VERY MANY.

I ACTUALLY HAVE HUNDREDS OF OTHER CASES. I'M NOT JUST

ABLE TO WORK ONLY ON PLATA, AND THAT REALLY KEEPS ME AT MY DESK MORE THAN I WOULD LIKE.

I JUST WENT TO SAN QUENTIN BECAUSE I REALLY NEEDED TO SEE THESE THINGS AND IT'S JUST THE CLOSEST INSTITUTION TO THE COURT. I CAN GET THERE IN UNDER AN HOUR WITHOUT ANY TRAFFIC.

BUT IF YOU'RE IN THE CATEGORY OF HOPING THAT THE COURT WILL COME TO YOUR INSTITUTION TO SEE YOUR WORK, WHAT I WOULD SAY TO YOU IS, ME, TOO. AND AS I SAY, I DO GO OUT TO THE INSTITUTIONS AND I HOPE -- I LOOK FORWARD TO GETTING INTO ANOTHER INSTITUTION SOON.

SOMETHING BRIEF, I DON'T WANT TO MAKE TOO BIG A DEAL OUT OF IT, BUT THERE WERE A COUPLE OF REFERENCES TO THE COLEMAN CASE IN OUR STATEMENT, AND THOSE KIND OF TAKE THE FORM -- WELL, I THINK -- I'M THINKING OF THE PLAINTIFFS' REFERENCE TO THAT CASE IN THE STATEMENT.

I DON'T THINK THOSE REFERENCES ARE HELPFUL. THE KIND OF NATURAL EFFECT OF THE REFERENCES IS TO MAKE THE STATE FEEL THAT THEY'RE REQUIRED TO RESPOND AND EXPLAIN WHY THINGS ARE GOING BETTER IN COLEMAN THAN THE PLAINTIFFS ARE MAKING OUT, OR WHY THE SITUATION IN COLEMAN IS DIFFERENT THAN IT IS HERE.

I JUST DON'T THINK THAT'S HELPFUL. IT JUST SEEMS LIKE A BIG DISTRACTION. SO UNLESS I'M MISSING SOMETHING, I DON'T THINK WE NEED TO BE DESCRIBING THE CONTEMPT PROCEEDINGS AND ALL THAT. IT JUST DOESN'T HELP ME DO MY JOB.

COORDINATION IS DIFFERENT. COORDINATION IS REALLY

IMPORTANT, AND WHERE THERE ARE AREAS WHERE THE PLATA AND COLEMAN COURTS NEED TO COORDINATE, I WELCOME THOSE DISCUSSIONS.

SO THAT'S JUST AN ASIDE.

OKAY. SO WHO WANTS TO SPEAK FOR THE PLAINTIFFS TO IDENTIFY THE TOPICS THAT WE SHOULD DISCUSS TODAY?

MS. HALTER: I CAN GO AHEAD AND DO THAT, YOUR HONOR.

THIS IS MACKENZIE HALTER.

THE COURT: ALL RIGHT. MS. HALTER, WHAT ARE WE GOING TO DO?

MS. HALTER: I THINK SOME OF THESE WILL BE BRIEF, BUT JUST GOING DOWN THE LIST, WE'LL TALK ABOUT MEDICAL STAFFING; EXTREME HEAT; NON-TRADITIONAL HOUSING AT SALINAS VALLEY STATE PRISON; END-OF-LIFE MEDICAL CARE; EMERGENCY MEDICAL RESPONSE.

THE COURT: HOLD ON JUST A SECOND. I'M A LITTLE BEHIND YOU.

MS. HALTER: YEAH.

THE COURT: EMERGENCY RESPONSE, OKAY, YEAH.

MS. HALTER: AND MEDICAL STAFF'S ROLE IN THE DISCIPLINARY PROCESS.

THE COURT: MR. MELLO, WHO WOULD LIKE TO IDENTIFY TOPICS ON THE STATE SIDE?

MR. MELLO: I CAN SPEAK, YOUR HONOR.

AND, FIRST OF ALL, DEFENDANTS APPRECIATE THE COURT'S COMMENTS ON THE COLEMAN CASE. THERE'S NO WAY TO ADDRESS -- TO SORT OF ERODE TRUST AND GOODWILL WHEN DISCUSSING ANOTHER CASE

IN THIS CASE.
WE CAN SPEAK ABOUT ALL THOSE TOPICS THAT THE COURT HAS MENTIONED.
AS THIS COURT PROBABLY UNDERSTANDS, DEFENDANTS' STATEMENTS WERE VETTED BY THEIR CLIENTS AND THOSE ARE DEFENDANTS' STATEMENTS.
SO I CAN TRY TO ANSWER QUESTIONS, BUT I WILL TELL YOU I DON'T HAVE A LOT TO ADD, YOUR HONOR.
BUT I'M GLAD TO ANSWER ANY QUESTIONS ON THE TOPICS THAT PLAINTIFFS IDENTIFIED AND DISCUSS THOSE ISSUES.
THANK YOU.
THE COURT: OKAY. IT SOUNDS LIKE YOU DON'T HAVE ANYTHING TO ADD TO THAT LIST.
MR. MELLO: CORRECT.
THE COURT: OKAY, GREAT.
ALL RIGHT. WELL, I WILL APOLOGIZE FOR THESE LITTLE PAUSES. I HAVE TO CLICK BACK AND FORTH. I WANT TO MAKE SURE THAT MY NOTES ARE IN FRONT OF ME WHEN WE'RE TALKING ABOUT A PARTICULAR TOPIC. BUT I THINK I'M THERE.
SO, MS. HALTER, WHO WANTS TO TALK ABOUT MEDICAL STAFFING?
MS. HALTER: THAT WOULD BE MR. FAMA.
THE COURT: MR. FAMA.
MR. FAMA: GOOD AFTERNOON. EXCUSE ME, YOUR HONOR. GOOD AFTERNOON.
JUST VERY BRIEFLY ON MEDICAL STAFFING, AND THEN A

SUPPLEMENTAL POINT BASED UPON WHAT YOU TALKED ABOUT, WHAT YOU DID AT SAN QUENTIN.

ON MEDICAL STAFFING, IT'S REALLY ONLY PART A THAT WE WANT TO BRIEFLY COMMENT ON, WHICH IS THE MEDICAL STAFFING MODEL. WE THINK WE ARE, WE'RE -- WE WERE CORRECT THAT THERE NEEDS TO BE, OR SHOULD BE, ADJUSTMENTS TO THE MODEL.

WE THINK THIS IS IN THE BAILIWICK, SO TO SAY, OF THE RECEIVER. AND WE DO, OF COURSE, GIVE MR. KELSO THE ROOM TO BEST DETERMINE THE BIGGER PICTURE WITHIN HOW IT ALL WORKS AND WHEN TO BEST ADJUST, AS HE DETERMINES AS NECESSARY, THE MEDICAL STAFFING MODEL.

I SUPPOSE IT'S -- DEFENDANTS CAN'T COMMIT TO DOING WHATEVER MR. KELSO RECOMMENDS, PARTICULARLY WHEN HE HASN'T ACTED ON IT YET.

BUT WE DO STRONGLY BELIEVE THAT THE STATE WILL NEED TO ADJUST ITS MODEL AS MR. KELSO AND HIS STAFF DETERMINE IS NEEDED, AND THAT'S REALLY THE ONLY POINT OF EMPHASIS THAT WE'D LIKE TO MAKE THIS AFTERNOON ON THAT.

THE COURT: OKAY. I BELIEVE YOU ALSO INDICATED THAT THERE WAS WHAT YOU CALL A SUPPLEMENTAL POINT THAT YOU WANTED TO MAKE.

MR. FAMA: YEAH, JUST THE COURT MENTIONED OBSERVING -- OR EXCUSE ME -- ATTENDING A MEETING REGARDING THE PEER SUPPORT PROGRAM AT SAN QUENTIN, AND WE AGREE IT'S A TREMENDOUS PROGRAM.

WE HAVE ALSO TALKED WITH THE PEER SUPPORT SPECIALIST, AND CCHCS PROVIDED US THE TRAINING MATERIALS THAT THEY WERE USING TO TRAIN THEM, AND IT'S A GREAT PROGRAM.

JUST FOR THE COURT'S KNOWLEDGE, NUMBER ONE, THERE MAY BE A COURT COORDINATION ISSUE ON THIS. WE UNDERSTAND THAT SOME OF THE MONITORS IN THE COLEMAN CASE RAISED QUESTIONS -- OR ASKED QUESTIONS, I SHOULD SAY -- ABOUT THE CONSENT OF PATIENTS IN ADVANCE TO HAVE A PEER EDUCATOR SPECIALIST -- EXCUSE ME -- APPROACH THEM AND ASK THEM ABOUT MEDICAL CARE.

AND WE, TOO, HAVE HEARD FROM SOME OF THE PATIENTS --

THE COURT: LET ME INTERRUPT YOU HERE.

MR. FAMA: YEAH.

THE COURT: I'M NOT SURE I KNOW WHAT YOU'RE TALKING ABOUT.

MR. FAMA: WELL, PART OF THE PEER SPECIALIST PROGRAM, AS WE UNDERSTAND IT, IS THAT PEOPLE WILL BE GIVEN A LIST OF -- AND WE DON'T KNOW THE FULL PARAMETERS, WE'VE ASKED, BUT IT MAY BE -- WE BELIEVE THAT PEOPLE -- THAT SPECIALISTS, EXCUSE ME, GET LISTS OF PATIENTS WHO HAVE UPCOMING MEDICAL APPOINTMENTS, FOR EXAMPLE, AN OFFSITE SPECIALTY APPOINTMENT, AND WILL APPROACH AND SAY, "HEY, I UNDERSTAND YOU HAVE AN APPOINTMENT."

THEY MAY NOT KNOW WHAT KIND OF APPOINTMENT, BUT FOR PATIENTS, SOME PATIENTS ARE, ARE STARTLED, TO SAY THE LEAST, AT BEING APPROACHED IN THAT WAY BY A FELLOW RESIDENT, NOT FULLY UNDERSTANDING.

AT SOME PRISONS IT MAY BE THAT THE INFORMATION PROVIDED IS ALSO CONCERNING THAT THEY HAVE MISSED MEDICATIONS, WHICH ALSO, AS I UNDERSTAND IT -- AS WE UNDERSTAND IT IS WHAT THE COLEMAN MONITORS HAVE ASKED ABOUT.

SO WE HAVE -- THIS IS SIMPLY TO ALERT YOUR HONOR THAT WE HAVE ASKED WHAT SORT OF PROTOCOLS THE PROGRAM SHOULD BE USING AND WHETHER ADVANCED CONSENT SHOULD BE OBTAINED FROM THE PATIENTS TO BE APPROACHED BY A PEER SPECIALIST.

WE THINK THAT WOULD PROBABLY BE A GOOD IDEA AND IT WOULDN'T BE HARD TO DO.

BUT IN ANY EVENT, IT'S A -- THAT SAID, WE AGAIN SAY IT'S A WONDERFUL PROGRAM THAT HAS A LOT OF OPPORTUNITIES TO BOTH IMPROVE CARE AND IMPROVE THE MEDICAL CULTURE AT THE PRISONS.

THE COURT: GREAT.

THE OTHER MATTERS THAT YOU MENTIONED, I'M HEARING THOSE FOR THE FIRST TIME, SO I DON'T HAVE ANYTHING TO SAY ABOUT THAT. BUT I APPRECIATE YOUR TELLING ME THAT THAT'S AN ISSUE.

MR. FAMA: THANK YOU.

THE COURT: MR. MELLO, ANY COMMENT ON THAT TOPIC FROM THE STATE SIDE?

MR. MELLO: JUST THAT CCHCS AND CDCR ADDRESS STAFFING, SUCCESSFULLY IT APPEARS, AT A TIME WHEN THESE POSITIONS ARE SCARCE IN THE NATION.

AND ON THIS LAST ISSUE, ON PEER SUPPORT, THIS IS A GREAT PROGRAM, AND I KNOW THAT THIS IS TOP OF MIND FOR CCHCS AND CDCR

TO MAKE SURE THAT IT WORKS.

BUT I CAN'T SPEAK TO WHAT SOMEBODY'S COUSIN'S FRIEND SAID ABOUT IT OR IS WORRIED ABOUT IT BECAUSE IT SEEMS LIKE IT'S A GREAT PROGRAM, AND I DON'T THINK WE NEED TO BE FOCUSSING IN ON POSSIBLE CONCERNS THAT AREN'T FULLY BAKED AT THIS POINT.

BUT I KNOW THAT CCHCS IS WORKING ON THIS PROGRAM.

THE COURT: I THINK THAT'S IT FOR MEDICAL STAFFING.

LET ME JUST SAY A COUPLE THINGS BEFORE WE MOVE ON TO THE NEXT TOPIC.

FIRST OF ALL, IN THE CASE MANAGEMENT STATEMENT, AS THEY'VE SAID BEFORE, THE PLAINTIFFS HAVE SAID THEY REALLY -- WELL, BEFORE I GET TO THAT, LET ME JUST SAY, TO EXPAND A LITTLE BIT ON WHAT MR. MELLO SAID, HUGE STRIDES HAVE BEEN MADE IN THIS AREA BY CCHCS AND CDCR. ALL THE PARTIES ACKNOWLEDGE THAT. THAT'S IN WRITING IN THE CASE MANAGEMENT STATEMENT.

WHEN, AS IT'S REPORTED IN THIS STATEMENT, WHEN CIVIL SERVICE, TELEMEDICINE, AND CONTRACT REGISTRY PRIMARY CARE PROVIDERS ARE COUNTED, ALL BUT A HANDFUL OF PRISONS HAVE 90 PERCENT OR MORE OF THOSE ALLOCATED POSITIONS FILLED. THE STATE-WIDE FILL RATE IS APPROXIMATELY 96 PERCENT.

THAT IS NOT WHERE WE USED TO BE. I REALLY WANT TO THANK AND CONGRATULATE EVERYONE AT CCHCS, CDCR, AND ELSEWHERE IN THE STATE GOVERNMENT WHO HELPED OUT TO GET US TO THAT POINT.

OBVIOUSLY THERE'S MORE TO BE DONE, BUT I THINK YOU HAVE TO -- IT'S IMPORTANT TO CELEBRATE YOUR SUCCESSES WHEN YOU HAVE

THEM, AND THERE'S A LOT OF SUCCESS THERE.

I LIKE HIRING PEOPLE PERMANENTLY. THIS IS SOMETHING THAT THE PLAINTIFFS WANT. THEY WANT CCHCS TO HAVE PERMANENT EMPLOYEES AND NOT RELY ON REGISTRY SO MUCH, OR OTHER TEMPORARY ARRANGEMENTS.

THE MANAGER IN ME LIKES PERMANENT EMPLOYEES. THEY'RE CHEAPER, THERE'S A DIRECT REPORT RELATIONSHIP THAT I THINK IS HEALTHY, THERE'S AN INSTITUTIONAL BUY-IN ON THE PART OF THE EMPLOYEE THAT I THINK IS HEALTHY.

SO FROM THAT PERSPECTIVE, THAT SEEMS BETTER.

I WOULD IMAGINE MR. KELSO FEELS THE SAME WAY. HE'S A MANAGER AT HEART.

BUT I HAVEN'T SEEN ANYTHING HERE THAT SAYS THERE'S AN EFFECT ON CARE. THAT'S MY FIRST COMMENT. IF SOMEONE WANTS TO BRING HARD EVIDENCE TO ME THAT THE CARE IS WORSE, THEN I WOULD WANT TO DO SOMETHING ABOUT THAT.

AND THE OTHER THING I WOULD SAY IS THERE'S KIND OF AN OPPORTUNITY COST OF TIME AND EFFORT AND TREASURE WHEN WE THINK ABOUT WHAT REFORMS WE WANT TO MOVE NEXT ON. AND WITHOUT GETTING INTO THE PARTICULARS OF HOW THIS CASE INTERACTS WITH THE CALIFORNIA BUDGETING PROCESS, WE DO, YOU KNOW -- THERE IS MORE LATITUDE AND THERE ARE MORE RESOURCES AVAILABLE UNDER A RECEIVERSHIP THAN THERE WOULD BE WITHOUT ONE, BUT NONETHELESS, YOU'VE GOT TO PICK YOUR BATTLES.

SO FOR THAT ADDITIONAL REASON, I DON'T KNOW THE PLAINTIFFS

HAVE GOTTEN ME ON PERMANENT AS OPPOSED TO TEMPORARY STAFFING TO THE PLACE THAT THEY ARE HOPING TO GET ME.

SO THAT'S WHERE I'LL LEAVE THAT.

I THINK ACCESS TO SPECIALTIES -- LET ME GO BACK TO THE LIST.

OH, WE'RE ALREADY AT EXTREME HEAT, AND I THINK WE'LL BE HERE FOR A LITTLE WHILE.

MS. HALTER, WHO WOULD LIKE TO ADDRESS THAT TOPIC FROM THE PLAINTIFFS' SIDE?

MS. HALTER: I THINK YOU'RE RIGHT, YOUR HONOR, AND THIS WILL BE MS. HARVEY AND MR. GREENFIELD.

THE COURT: MS. HARVEY, OR MR. GREENFIELD, I'M NOT SURE WHO WANTS TO LEAD OFF.

MS. HARVEY: IT'LL BE LILY HARVEY, YOUR HONOR.

THE COURT: MS. HARVEY, YOU HAVE THE FLOOR.

MS. HARVEY: THANK YOU VERY MUCH.

THE SCIENCE OF HOW HEAT HARMS PEOPLE IS WELL ESTABLISHED. IT HARMS PEOPLE ON CERTAIN MEDICATIONS AND WITH UNDERLYING CONDITIONS, BUT ULTIMATELY IT CAN HARM ANYONE.

THIS IS THE SAME SCIENCE HERE IN CALIFORNIA AS IT IS IN TEXAS, OR ANYWHERE ELSE IN THE WORLD, AS IS THE SCIENCE BEHIND WHAT PREVENTS HARM FLOWING FROM EXTREME HEAT EXPOSURE.

THIS IS A PLATA ISSUE, AS THE COURT HAS NOTED, AND WE NEED AIR CONDITIONING THROUGHOUT THE CDCR TO ADDRESS THIS KNOWN THREAT TO THE HEALTH OF PEOPLE INCARCERATED IN CALIFORNIA'S

PRISONS.

MOREOVER, WE NEED IT SWIFTLY. ANYTHING SHORT OF A PLAN TO MOVE FORWARD EFFICIENTLY AND URGENTLY TO ROLL OUT AIR CONDITIONING IN CALIFORNIA'S PRISONS IS INAPPROPRIATE.

WE'VE REQUESTED DATA RELATED TO THE MEDICAL IDENTIFICATION, RESPONSE, TREATMENT, AND REPORTING OF THE HEALTH IMPACTS OF EXTREME HEAT EXPOSURE IN THE CDCR, AS WELL AS INFORMATION ON WHICH HOUSING UNITS IN THE DEPARTMENT HAVE COOLING SYSTEMS, WHAT KIND OF COOLING THEY USE, AND WHETHER THEY'RE FUNCTIONAL.

SCIENCE AND PUBLICLY AVAILABLE DATA ALREADY TELLS US THAT MEDICAL HARM IS AND WILL CONTINUE TO OCCUR AS A RESULT OF EXTREME HEAT EXPOSURE IN CDCR.

THIS DATA WILL SHOW US THE SCOPE OF THE HARM, WHETHER MEDICAL STAFF ARE CONNECTING THE DOTS BETWEEN MEDICAL HARM AND HEAT, HOW MEDICAL STAFF ARE RESPONDING AND DOCUMENTING THE FULL RANGE OF HEAT-RELATED HARMS EXPERIENCED BY CDCR PATIENTS, AND WHERE AIR CONDITIONING MUST BE INSTALLED FIRST.

ON FRIDAY WE BECAME AWARE OF A REPORT JUST PUBLISHED BY CDCR REGARDING ITS RESPONSE TO CLIMATE ISSUES. THE REPORT BEGINS WITH ACKNOWLEDGING THAT MOST CDCR INSTITUTIONS STRUGGLE TO ADDRESS INDOOR HEAT CONDITIONS, AND THAT THIS STRUGGLE IMPACTS THE DEPARTMENT'S ABILITY TO OPERATE WITHIN MODERN ACCEPTABLE STANDARDS FOR INDOOR TEMPERATURES.

IT ALSO ACKNOWLEDGES THAT MANY CALIFORNIA PRISONS ARE IN

AREAS WHERE THE IMPACTS OF CLIMATE CHANGE ARE GOING TO BE PARTICULARLY EXTREME.

NOTHING IN THE REPORT SUGGESTS THAT AIR CONDITIONING ISN'T NEEDED QUICKLY TO PREVENT SERIOUS HARM IN CDCR'S PRISONS.

THE REPORT DEMONSTRATES THAT CDCR IS UNABLE TO ADEQUATELY RESPOND TO THE THREAT OF EXTREME HEAT IN ITS PRISONS. IT DEMONSTRATES THAT THE PROBLEM IS WELL KNOWN BY CDCR, THAT THE PROBLEM IS A BIG CHALLENGE, AND THAT DESPITE THIS, THERE'S NO PLAN TO URGENTLY MOVE FORWARD WITH AIR CONDITIONING.

THE APPROACHES THEY LISTED IN THE REPORT ARE BASELINE PIECEMEAL, REFLECT OUTDATED SCIENCE, AND ARE TOO SMALL IN SCOPE, PARTICULARLY IN THE FACE OF THE FAILING OR NON-EXISTENT COOLING SYSTEMS THAT CDCR ITSELF DESCRIBES.

WE BELIEVE THAT THE RECEIVER IS VERY WELL POSITIONED TO ROLL OUT A PLAN TO INSTALL OR UPGRADE AIR CONDITIONING THROUGHOUT CDCR WITH HASTE, BY UTILIZING THE EXPERTISE ON HIS TEAM TO ACCESS AND ANALYZE NECESSARY DATA AND GAPS IN THAT DATA, EMBRACE SCIENTIFIC AND MEDICAL REALITIES, AND START INSTALLATION IN AREAS WHERE PEOPLE ARE MOST LIKELY TO EXPERIENCE SIGNIFICANT HARM.

THE COURT: MS. HARVEY, HAVE YOU CONCLUDED YOUR REMARKS?

MS. HARVEY: I HAVE. I'M HAPPY TO TAKE QUESTIONS.

THE COURT: WELL, I WAS TOLD THAT MR. GREENFIELD ALSO WANTED TO ADDRESS THIS TOPIC, SO LET ME ASK HIM TO SPEAK FIRST.

MR. GREENFIELD: GOOD AFTERNOON, YOUR HONOR. I APPRECIATE THE OPPORTUNITY TO SPEAK TO THE COURT.

AS YOU KNOW, IN TIEDE V. COLLIER, A FEDERAL DISTRICT COURT, WE SIMPLY FOUND THAT AIR CONDITIONING IS THE ONLY EFFECTIVE PROTECTION FROM EXTREME HEAT IN PRISON FACILITIES, AND EXPLAINED THAT NOTWITHSTANDING THE ANTICIPATED COST, IT WAS LIKELY TO ORDER ITS EXPEDITIOUS STATE-WIDE INSTALLATION BECAUSE INADEQUATE RESOURCES WAS NOT A DEFENSE TO AN EIGHTH AMENDMENT VIOLATION.

AS IN TEXAS, MANY CALIFORNIA PRISONS ROUTINELY EXPERIENCE EXTREME HEAT. AT CCWF, FOR EXAMPLE, AVERAGE MONTHLY TEMPERATURES DURING JULY AND AUGUST RANGE FROM 97 TO 98 FARENHEIT. AT SATF, THE RANGE IS 97 TO 99. AND AT PVSP, IT IS 98 TO 100.

RECENT SUMMERS HAVE BEEN EVEN HOTTER. INDEED, AS THE MEMO MY COLLEAGUE REFERENCED EXPLAINS, THE INTERIOR WALLS OF SOME CELLS MAY CURRENTLY REACH 109 DEGREES FARENHEIT.

AS WE KNOW FROM THE CONSENSUS SCIENCE, RECOUNTED BY THE TIEDE COURT, THESE TEMPERATURES ARE FAR IN EXCESS OF THOSE THAT POSE A SUBSTANTIAL RISK OF SERIOUS HARM TO ANYONE, EVEN YOUNG HEALTHY INDIVIDUALS. ADVERSE HEALTH OUTCOMES FROM PROLONGED EXPOSURE TO HEAT INCLUDE HEAT STROKE, WHICH HAS A 30 TO 80 PERCENT MORTALITY RATE AND LEAVES 20 PERCENT OF SURVIVORS WITH PERMANENT NEUROLOGICAL DAMAGE.

BUT IT ALSO INCLUDES EXACERBATION OF UNDERLYING HEALTH

CONDITIONS RESULTING, FOR EXAMPLE, IN INCREASED INCIDENTS OF HEART ATTACKS, ASTHMA ATTACKS, SUICIDE, AND KIDNEY FAILURE.

CALIFORNIA, LIKE TEXAS, HAS A MENU OF MITIGATION OPTIONS, INCLUDING COLD SHOWERS, COLD WATER, RESPITE AREAS, AND FANS.

BUT THE TIEDE COURT FOUND, BASED ON SOUND SCIENCE, THAT THESE OPTIONS WERE INEFFECTIVE AND, IN THE CASE OF FANS, HARMFUL. CRITICALLY, THE TIEDE COURT FOUND THAT SUCH MEASURES WOULD BE INEFFECTIVE EVEN IF THEY WERE IMPLEMENTED CONSISTENTLY AND CORRECTLY.

NOTABLY, THOUGH THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE INITIALLY ASSERTED THAT IT HAD NOT EXPERIENCED ANY HEAT-RELATED DEATHS SINCE IMPLEMENTING THESE MITIGATION MEASURES, THE TIEDE COURT FOUND THAT ASSERTION LACKING IN CREDIBILITY AND EXPLAINED THAT EVEN OUTSIDE STUDIES IDENTIFIED AN AVERAGE OF 14 DEATHS PER YEAR IN THE -- HEAT-RELATED DEATHS PER YEAR, EXCUSE ME -- IN THE TDCJ, LIKELY UNDERSTATED THE DEGREE OF HARM BECAUSE THEY DID NOT ACCOUNT FOR HEAT'S IMPACT ON UNDERLYING HEALTH CONDITIONS.

CONSIDERING THE EXTREME TEMPERATURES EXPERIENCED IN THE AREAS WHERE MANY UN-AIR CONDITIONING CDCR FACILITIES ARE LOCATED, THERE IS LITTLE REASON TO ASSUME THAT INCARCERATED PEOPLE IN CALIFORNIA ARE NOT SUFFERING SIMILARLY.

AND IT --

(TECHNICAL DIFFICULTIES.)

THE COURT: WHOOPS. MR. GREENFIELD --

MR. GREENFIELD: THE EIGHTH AMENDMENT VIOLATIONS DON'T TURN ON COMPARATIVE DEATH OR INJURY.

DID YOU LOSE ME?

THE COURT: FOR A MOMENT, BUT I'M FAMILIAR WITH THE TIEDE CASE AND I READ THE CASE MANAGEMENT STATEMENT, SO --

MR. GREENFIELD: AM I BACK?

THE COURT: YOU'RE BACK.

MR. GREENFIELD: OKAY. I'M BACK.

IF I MIGHT JUST WRAP UP, I WANTED TO SAY THE EIGHTH AMENDMENT VIOLATIONS DON'T TURN ON COMPETITIVE -- COMPARATIVE DEATH OR INJURY.

WHETHER CALIFORNIA HAS EXPERIENCED AS MANY HEAT-RELATED DEATHS AND INJURIES AS TEXAS HAS NO BEARING ON THE QUESTION OF WHETHER MEDICAL HARM FROM UN-AIR CONDITIONED CDCR PRISONS COMPLIES WITH THE EIGHTH AMENDMENT.

BUT EVEN IF WE WERE TO ASSUME FOR PURPOSES OF ARGUMENT THAT INCARCERATED PEOPLE IN THE CDCR ARE NOT YET SUFFERING, EIGHTH AMENDMENT CONCERNS WOULD REMAIN. THE OBJECTIVE PRONG OF THE EIGHTH AMENDMENT DOES NOT REQUIRE CONSUMMATED MEDICAL HARM.

INSTEAD, THE (TECHNICAL DIFFICULTIES) HARM IS ENOUGH TO COMPEL PRISON OFFICIALS TO ALLEVIATE THAT RISK, AND THAT OBLIGATION IS NOT SATISFIED BY TAKING INEFFECTUAL STEPS, SUCH AS RELYING ON INEFFECTIVE MITIGATION MEASURES TO REDUCE THE RISK OF MEDICAL HARM THAT IS BOTH OBVIOUS AND ACCEPTED BY THE SCIENTIFIC CONSENSUS.

AND WHILE THAT COURT IN TEXAS RECOGNIZED OBSTACLES TO THE INSTALLATION OF AIR CONDITIONING, SUCH AS FUNDING, INVESTIGATORY WORK, AND DESIGN, IT EMPHASIZED THAT IT DID NOT EXPECT THOSE FACTORS TO PREVENT IT FROM ULTIMATELY FINDING THAT PLAINTIFFS HAVE A RIGHT TO AN INJUNCTION IN THE FORM OF PERMANENT AIR CONDITIONING AND ITS EXPEDITIOUS INSTALLATION.

THANK YOU, YOUR HONOR.

THE COURT: THANK YOU.

MR. MELLO, OR HIS DESIGNEE?

MR. MELLO: THANK YOU, YOUR HONOR.

I'M HERE TO TALK ABOUT THE PLATA CASE. DEFENDANTS -- I MEAN, WE QUITE CLEARLY STATE DEFENDANTS' POSITION ON THIS ISSUE IN THE JOINT CASE MANAGEMENT CONFERENCE STATEMENT. IF PLAINTIFFS BELIEVE THAT THERE'S AN EIGHTH AMENDMENT VIOLATION, THEY CAN FILE A CONDITIONS OF CONFINEMENT CASE AND THEY CAN SEEK A REMEDY.

THEY CAN'T SEEK A REMEDY IN THIS CASE.

TO THE EXTENT IT TOUCHES ON HEALTH CARE, YES, A COUPLE OF POINTS TO MAKE, BECAUSE APPARENTLY WE ARE REPEATING OURSELVES OF WHAT WE WRITE IN CMC STATEMENTS.

NUMBER ONE, THIS IS NOT TEXAS. WE HAVE A VASTLY DIFFERENT HISTORY, VASTLY DIFFERENT FACTS, AND THERE WOULD BE VASTLY DIFFERENT FINDINGS.

THE POINT OF THE TIEDE CASE -- WHICH, AGAIN, I'M NOT HERE TO DO OPENING ARGUMENTS OR CLOSING STATEMENTS -- THE POINT OF

THE <u>TIEDE</u> CASE WAS THAT THERE WAS EVIDENCE THAT THERE WERE DEATHS BETWEEN -- WHAT WAS IT? -- 18 AND 271.

THERE'S NO SUCH EVIDENCE OF SENTINEL EVENTS IN CALIFORNIA. THERE'S NO SUCH EVIDENCE.

IN ADDITION, THE MITIGATION MEASURES THAT WERE NOT APPLIED IN TEXAS APPARENTLY ARE WORKING IN CALIFORNIA FOR THOSE VERY REASONS, AS EVIDENCED BY THE LACK OF SENTINEL EVENTS.

AND, THIRD, CDCR HAS A PILOT PROGRAM IN PLACE TO INFORM FUTURE CAPITAL OUTLAY REQUESTS, PRIORITIZE -- BECAUSE ALL THE SYSTEMS, ALL THE FACILITIES ARE NOT THE SAME. THEY'RE NOT IN THE SAME LOCATION. SOME MEASURES MAY WORK.

THE IDEA THAT YOU HAVE TO INSTALL A/C IN EVERY INSTITUTION IN THE SYSTEM IS JUST WRONG.

WHAT YOU NEED TO DO IS YOU NEED TO EVALUATE AND DETERMINE WHETHER OR NOT YOU NEED TO INSTALL; WHETHER OR NOT FACILITIES CAN HANDLE A/C SYSTEMS; WHETHER OR NOT INSULATION WILL SUFFICE; WHETHER OR NOT AN INSTITUTION, LIKE PELICAN BAY, NEEDS AIR CONDITIONING LIKE A FACILITY LIKE SALINAS VALLEY.

BUT, AGAIN, I'M NOT HERE TO ARGUE THIS. IF PLAINTIFFS BELIEVE THAT THEY WANT TO BRING A CONDITIONS OF CONFINEMENT CASE, THEY CAN.

WE WILL, OF COURSE, DO WHAT HAS BEEN DONE, AND IS CONTINUING TO BE DONE, WHICH IS TO CONSIDER THE MEDICAL IMPACTS OF HEAT, ADDRESS THOSE ISSUES, AND CONTINUE TO FOCUS ON THIS IMPORTANT ISSUE.

BUT TEXAS IS NOT CALIFORNIA.

AND OH, BY THE WAY, TEXAS DOES NOT HAVE AN ORDER CURRENTLY THAT THEY HAVE TO PUT AIR CONDITIONING IN EVERY FACILITY, AND THE REMEDY IN THIS CASE CANNOT BE BLOATED WITHOUT FINDINGS LIKE HAPPENS IN OTHER INSTANCES.

AND I'M HAPPY TO ANSWER QUESTIONS. AGAIN, I'M NOT HERE FOR AN OPENING ARGUMENT OR CLOSING STATEMENT AFTER TRIAL, YOUR HONOR. I'M HERE FOR A CASE MANAGEMENT CONFERENCE.

THE COURT: THANK YOU, MR. MELLO.

I DO THINK THERE WAS A LITTLE BIT IN BOTH PARTIES' PRESENTATIONS OF TRYING TO REACH AN AUDIENCE OTHER THAN THE COURT. THAT'S FINE. I UNDERSTAND THESE ARE SOMETIMES -- THESE CASE MANAGEMENT CONFERENCES HAVE AUDIENCES THAT ARE RELEVANT TO THE LAWYERS.

I THINK THEY SAID WHAT THEY WANTED TO SAY IN THEIR STATEMENT.

THE TIEDE CASE -- MADAM REPORTER, T-I-E-D-E -- REALLY HAS SOMETHING GOOD FOR EVERYONE, WHICH WE CAN TALK ABOUT IN A SECOND.

I JUST WOULD SAY A FEW THINGS ABOUT HEAT. FIRST, WE'RE NOT GOING TO SOLVE THIS ISSUE IN A FEW CASE MANAGEMENT CONFERENCES OR ONE HEARING OR WHAT HAVE YOU. THIS IS A HUGE ISSUE, A HUGE ISSUE, AND IF THE PARTIES ARE GOING TO MAKE ANY PROGRESS, THEY'RE GOING TO HAVE TO FIGURE OUT A STRUCTURE OF TALKING ABOUT IT THAT GOES BEYOND WHAT I WOULD CALL POSITIONAL

BARGAINING IN THEIR PORTION OF THE CASE MANAGEMENT STATEMENT.

AND WHETHER THEY DO THAT OR NOT, THE ISSUE IS GOING TO BE THERE. THIS IS A BIG ISSUE THAT'S ONLY GOING TO GET BIGGER WITH THE PASSAGE OF TIME.

AS ONE OF YOU NOTED, THE CDCR JUST RELEASED A DOCUMENT ON FRIDAY. IT'S CALLED "CLIMATE AND THE IMPACT ON CDCR." IT'S A MEMORANDUM THAT WAS PREPARED BY CDCR.

I THINK ON THE ONE HAND, THAT SHOWS THAT CDCR IS IN FACT THINKING SERIOUSLY ABOUT THIS PROBLEM. I DON'T THINK IT'S ACCURATE TO SAY THAT CDCR DOESN'T CARE ABOUT THIS.

I ALSO THINK, HOWEVER, THAT IT SHOWS THAT THEY DON'T THINK THE CURRENT MEASURES ARE ADEQUATE. IF THEY THOUGHT THAT, THEY WOULDN'T HAVE RELEASED THE MEMO.

SO I'M NOT SURE THAT THE CHARACTERIZATIONS ON EITHER SIDE OF HOW CDCR FEELS ABOUT THIS ISSUE ARE ACCURATE.

I CAN'T GO ANY FURTHER WITHOUT JUST ACKNOWLEDGING THAT THERE IS ACTIVITY ON HEAT IN THE COLEMAN CASE, AND WE NEED TO COORDINATE WITH THEM. I'M NOT EVEN SURE THAT I AM UP TO SPEED ON EVERYTHING THAT'S HAPPENING THERE.

BUT I JUST WANT TO MAKE THE POINT TO THE PARTIES THAT THEY GOT TO THAT ISSUE A WHILE AGO, AND SO WHATEVER HAPPENS IN THIS CASE, WE'RE GOING TO NEED TO COORDINATE WITH THEM.

I WOULD MAKE THE ADDITIONAL POINT THAT THE FACT THAT IT IS AN ISSUE IN COLEMAN DOES TELL ME SOMETHING ABOUT WHETHER HEAT IS REALLY SO SEPARATE OF AN ISSUE. THAT SEEMS TO BE WELL

ESTABLISHED AS PART OF THE COLEMAN CASE.

I DON'T KNOW WHY THAT WOULDN'T BE TRUE HERE.

I CAN'T REALLY TELL HOW MUCH THE STATE WANTS TO HAVE THIS FIGHT RIGHT NOW. BUT I WANT TO SAY THIS VERY CLEARLY. THIS IS A MEDICAL CARE ISSUE. IT IS. YES, IT'S NOT TEXAS. CALIFORNIA IS NOT TEXAS. THAT'S TRUE.

BUT IF THE QUESTION IS, DOES EXCESSIVE HEAT, WITHOUT MITIGATION, NEGATIVELY IMPACT THE HEALTH OF CONGREGATE POPULATIONS, I CAN'T IMAGINE THAT THE ANSWER TO THAT IS NOT YES.

NOW, PERHAPS I'M WRONG. I'M NOT A DOCTOR. I'M NOT A PUBLIC HEALTH PROFESSIONAL.

BUT I WILL JUST BE VERY, VERY SURPRISED IF WE HAVE FOUR DAYS OF EVIDENTIARY HEARINGS, AS THEY DID IN THE TIEDE CASE, AND WE DIDN'T COME AT LEAST TO THE CONCLUSION -- PUTTING REMEDY TO ONE SIDE -- AT LEAST TO THE CONCLUSION THAT EXCESSIVE HEAT IS A MEDICAL CARE ISSUE.

THE STATE IS TAKING A VERY STRONG POSITION TO THE CONTRARY IN THE CASE MANAGEMENT STATEMENT.

I THINK I'M USUALLY PRETTY CAPABLE OF READING THE STATE'S TONE, WHICH DOES CHANGE FROM ISSUE TO ISSUE. I GET THE SENSE THAT THIS ISSUE IS VERY IMPORTANT TO THEM.

IF THEIR -- I THINK WE'RE ALL GOING TO GET TIRED PRETTY QUICKLY IF THE POINT IS TO TRY TO SCARE THE PLATA CASE OFF OF THIS ISSUE.

AND SO IF WHAT'S NECESSARY IS TO JUST HAVE SOME EVIDENTIARY HEARINGS, THEN I THINK PLAINTIFFS' COUNSEL AND DEFENDANTS' COUNSEL SHOULD TALK ABOUT THAT AND LET'S JUST HAVE THEM. I ACTUALLY DON'T THINK THAT'S WHERE THE MEAT OF THE -- OF -- I THINK WE HAVE A LOT OF WORK TO DO TOGETHER. I DON'T KNOW THAT THAT'S WHERE THE CORE OF THAT WORK IS.

BUT IF THE STATE'S POSITION ON THAT ISSUE IS GOING TO STOP US FROM DOING THAT WORK, THEN LET'S JUST FIND OUT. LET'S HAVE A HEARING AND GET A RULING AND DO WHATEVER WE NEED TO DO.

TURNING TO THE QUESTION OF REMEDY, I THINK THE STATE -- I'LL TALK ABOUT THE SHORT TERM AND I'LL TALK ABOUT THE LONG TERM.

FIRST OF ALL, I DON'T REMEMBER THE WORD "EXPEDITIOUSLY," BUT MAYBE IT WAS IN THERE. MR. GREENFIELD USED THAT WORD A COUPLE OF TIMES.

THIS IS A LITTLE BIT OFF-THE-CUFF, BUT MY READ OF THOSE SECTIONS OF THE TIEDE CASE IS THE COURT SAID, FIRST OF ALL, "I'M NOT GOING TO ORDER ANY RELIEF RIGHT AWAY BECAUSE IT'S GOING TO BE INCREDIBLY EXPENSIVE AND I DON'T WANT YOU ACTUALLY TO SPEND MONEY ON RELIEF NOW THAT WILL DETRACT FROM YOUR ABILITY TO IMPLEMENT A LARGER REMEDY."

SECONDLY, I THINK WHAT THE STATE TOLD THE JUDGE IN TIEDE WAS THAT IT WOULD TAKE 25 YEARS TO INSTALL AIR CONDITIONING IN ALL THE UNITS, AND HE SAID THAT'S TOO LONG, AND HE'S WAITING FOR A PLAN.

BUT ALL WE KNOW ABOUT HOW EXPEDITIOUSLY THE TEXAS COURT WANTS THAT RELIEF IS THAT IT HAS TO BE FASTER THAN 25 YEARS.

SO THAT BRINGS ME TO MY NEXT POINT. I DON'T KNOW HOW MANY BILLIONS OF DOLLARS IT WOULD COST TO GET AIR CONDITIONING IN ALL OF THE CALIFORNIA INSTITUTIONS.

AND I'M NOT SAYING THAT'S NOT THE RIGHT REMEDY. MAYBE IT IS. MAYBE IT'S THE RIGHT REMEDY TO ORDER AIR CONDITIONING IN ALL OF THE UNITS.

BUT LET'S JUST SAY THAT WOULD COST $7 BILLION. THAT MAKES IT A COMPLICATED PROBLEM.

I DON'T HAVE MORE TO SAY ABOUT THAT, EXCEPT TO SAY I'M SURE IT'S VERY COMPLICATED AND THERE'S MORE SORT OF LEGAL WORK THAT WOULD HAVE TO BE DONE BEFORE WE COULD GET TO A PLACE WHERE THAT REMEDY -- WHERE WE WERE HAVING A DISCUSSION ABOUT THAT REMEDY.

IN THE NEAR TERM, I THINK THE STATE IS LOOKING AT WHAT IT NEEDS TO DO. I WILL SAY THIS: I THINK THE STATE DOES NEED TO FIGURE OUT WHAT CAN YOU DO, OR WHAT DO YOU NEED TO DO IMMEDIATELY?

SO IT'S JUNE 16TH. THE STATE'S WARMING UP. WE'VE GOT SOME INSTITUTIONS THAT ARE PARTICULARLY AT RISK FOR EXCESSIVE HEALTH. WITHIN THOSE INSTITUTIONS, PRESUMABLY THERE ARE PERSONS WHO THEMSELVES, ON AN INDIVIDUAL BASIS, ARE AT GREATER RISK OF NEGATIVE EFFECTS OF HEAT EXPOSURE.

IF THERE'S A WAY OF IDENTIFYING THOSE PEOPLE AND DOING

SOMETHING FOR THEM, THAT'S A DIFFERENT QUESTION THAN INSTALLING AIR CONDITIONING AT THE FACILITY. LET'S DO THOSE THINGS, WHATEVER THEY ARE.

I KNOW THESE COMMENTS ARE A LITTLE DISORGANIZED, BUT I THINK THE ISSUE IS IN ITS INFANCY, AND THAT MIGHT BE WHY.

AND THEN THE LAST THING I WOULD SAY IS PUTTING ASIDE WHAT FORMAL LEGAL FIGHTS MIGHT HAPPEN, IF ANY, I WONDER IF THERE IS -- AND I'M NOT SUGGESTING THIS AFFIRMATIVELY, I'M JUST WONDERING OUT LOUD -- WHETHER THIS ISSUE HAS ENOUGH IMPORTANCE THAT THERE'S ANYTHING IN ADDITION TO HAVING THE ISSUE AS PART OF THE PARTIES' REGULAR DISCUSSIONS -- I'M NOT A BIG WORKING GROUP PERSON USUALLY, BUT WHETHER SOMETHING LIKE THAT WOULD BE OF USE.

SO I TALKED FOR A LONG ENOUGH TIME THAT I THOUGHT PERHAPS, MS. HARVEY, I SHOULD GIVE YOU A CHANCE TO MAKE ANY COMMENTS YOU WANT TO MAKE, AND THEN I WILL GIVE MR. MELLO THE SAME OPPORTUNITY.

MS. HARVEY: THANK YOU, YOUR HONOR. WE APPRECIATE THE COURT'S COMMENTS.

I THINK, AS THE COURT SAYS, THIS IS A VERY COMPLICATED ISSUE, AND YOU'VE TOUCHED ON MULTIPLE REASONS WHY THAT IS THE CASE.

AND THAT'S WHY WE'VE REQUESTED THE INFORMATION THAT WE HAVE, AND WE VERY MUCH BELIEVE THAT IT'S NECESSARY TO INFORM THE KIND OF QUICK DECISION MAKING THAT YOU DESCRIBED.

THE COURT: IS IT THE HCIR'S? IS THIS THE HCIR'S OR SOMETHING ELSE?

MS. HARVEY: I'M SORRY, IS THIS WHAT? HCIR'S?

THE COURT: IN YOUR STATEMENT, THE PLAINTIFFS SAY, "WE USED TO GET HCIR'S AND NOW WE'RE NOT GETTING THEM, AND COULD YOU PLEASE MAKE THEM GIVE IT TO US?"

AND MY QUESTION IS, NOW YOU'RE SAYING THAT YOU WANT THEM TO GIVE YOU INFORMATION YOU'RE NOT GETTING, AND MY QUESTION IS, IS THAT THE HCIR'S, OR IS IT SOMETHING ELSE?

MS. HARVEY: NO, THEY'RE SEPARATE.

THE INFORMATION THAT WE REQUESTED SPECIFICALLY IN AN ATTEMPT TO MAKE IT MORE LIMITED AND HOPEFULLY EASIER TO -- NOT TOO BURDENSOME REQUEST WERE THE 2024 DOCUMENTS THAT WERE SUBMITTED TO HEADQUARTERS LAST YEAR, INCLUDING HEAT-RELATED INCIDENTS.

THERE WERE OTHER REQUESTS AS WELL THAT WOULD SORT OF HELP US BETTER UNDERSTAND THE CONTOURS OF WHAT IS BEING DOCUMENTED, HOW PEOPLE ARE BEING TREATED, WHETHER THERE ARE GAPS THAT NEED TO BE IDENTIFIED IN THE DOCUMENTATION, THINGS LIKE THAT.

BUT WE DO VERY MUCH AGREE THAT THIS IS A COMPLEX ISSUE, AND FOR EXACTLY THAT REASON, WE BELIEVE THE RECEIVER IS VERY WELL POSITIONED TO LEAD A PLAN TO REVIEW ALL OF THIS INFORMATION, TO HAVE, YOU KNOW, A TEAM THAT INCLUDES EXPERTS LIKE EPIDEMIOLOGISTS, THE PEOPLE WHO ARE REALLY NEEDED TO HELP MOVE FORWARD THOUGHTFULLY WITH THE DATA BOTH IN TERMS OF WHAT

IS AND ISN'T HAPPENING MEDICALLY, AND ALSO THE IMPACTS MEDICALLY ON THE INFRASTRUCTURE ISSUES THAT YOU RAISED.

THE COURT: MR. MELLO?

MR. MELLO: I JUST WANT TO MAKE CLEAR THAT DEFENDANTS ARE TAKING STEPS TO MITIGATE THESE RISKS, AND TAKING IT VERY SERIOUSLY, AND ARE DOING THE PILOT PROGRAM THAT THEY MENTIONED.

THEY'RE IMPLEMENTING THE HEAT PLAN, AND THEY'RE ALSO DOING ADDITIONAL CAPITAL EXPENSES THAT ARE IN THAT DOCUMENT THAT THE COURT'S REFERENCED THAT CAME OUT LAST FRIDAY, THAT MEMO THAT TALKS ABOUT THE OTHER WORK AT OTHER INSTITUTIONS.

SO I DON'T WANT THAT -- THIS ISN'T A SCENARIO WHERE NO MITIGATION MEASURES ARE OCCURRING, NUMBER ONE.

AND, NUMBER TWO, WITH RESPECT TO THE REQUEST FOR INFORMATION, IT'S MY UNDERSTANDING THAT IS THE SINGLE LARGEST, MOST ONEROUS NON-PARAGRAPH 7 REQUEST THAT'S EVER BEEN DONE IN THE CASE IN TERMS OF THE DOCUMENTATION BEING REQUESTED.

BUT, I MEAN, WE CONTINUE TO TALK TO PLAINTIFFS' COUNSEL ON THESE ISSUES, AND WE'LL CONTINUE TO DO SO.

AND I THINK OUR POSITION IS CLEAR THAT THE IMPACTS OF HEAT AND THE DELIVERY OF HEALTH CARE ARE DEFINITELY, YOU KNOW, PART OF THIS CASE.

BUT I DON'T THINK THE MANDATE TO INSTALL A/C AT EVERY INSTITUTION, WHICH HASN'T BEEN PROVEN UP TO BE NECESSARY, IS PART OF THIS CASE.

BUT, AGAIN, I APPRECIATE THE COURT'S WORDS AND THE COURT

UNDERSTANDS ITS AUDIENCE IN THESE PROCEEDINGS.

SO THANK YOU.

THE COURT: THANK YOU, MR. MELLO. I APPRECIATE BOTH YOUR CLARIFICATION AND YOUR ACKNOWLEDGMENT A MOMENT AGO REALLY.

ON THE QUESTION OF DISCOVERY, I WOULD SAY, FIRST OF ALL, I'M -- I AM, I THINK, THE LUCKIEST JUDGE IN AMERICA WHEN I THINK ABOUT THE LACK OF DISCOVERY MOTIONS IN THIS CASE THAT I HAVE TO DECIDE.

BUT THERE'S -- BUT, OF COURSE, WE'RE STANDING BY TO DECIDE THEM WHEN THEY'RE NECESSARY, AND I WONDER IF WHAT MIGHT BE HELPFUL HERE IS JUST TO SET A DEADLINE, AND IF THE PARTIES ARE NOT ABLE TO WORK OUT SOMETHING THAT EVERYBODY CAN LIVE WITH BY THAT DEADLINE, THE PARTIES COULD JUST FILE A JOINT DISCOVERY LETTER BRIEF.

MR. MELLO, WHAT DO YOU THINK A SENSIBLE DEADLINE FOR THAT WOULD BE?

MR. MELLO: I WOULD LOOK, IN THE COURTROOM, AT MY TEAM AND TRY TO GET A BETTER SENSE OF PEOPLE'S PLANS AND EVERYTHING.

THE COURT: YEAH.

MR. MELLO: A MONTH, SO THAT WE COULD MEET AND CONFER? I DON'T -- YOU KNOW, AGAIN, I'M DOING THIS BLIND -- "BLINDER" IS NOT A WORD, BUT I FEEL LIKE IT'S APPROPRIATE HERE WITHOUT BEING ABLE TO CONSULT WITH MY TEAM AND MY CLIENTS AS TO THE INFORMATION REQUESTED.

IT SEEMS LIKE A MONTH SEEMS LIKE A REASONABLE PERIOD OF TIME, YOUR HONOR.

THE COURT: MS. HARVEY, LET'S MAKE IT FOUR WEEKS, WHICH WOULD BE JULY 14. CAN YOU LIVE WITH JULY 14, OR DO YOU WANT TO MAKE A COUNTER?

MS. HARVEY: I'M EXPERIENCING THE SAME STRUGGLE OF NOT BEING ABLE TO --

THE COURT: LET'S DO THIS. LET'S -- WE'RE NOT -- THIS IS A -- THAT'S A -- WE HAVE A LOT OF UNSOLVABLE PROBLEMS TODAY. THAT ONE IS SOLVABLE.

SO WHAT WE'LL DO IS AFTER TODAY'S CONFERENCE CALL, OR CONFERENCE ZOOM HAS ENDED, WHY DON'T YOU JUST GET ON THE PHONE WITH MR. MELLO AFTER EACH OF YOU HAVE TALKED TO YOUR TEAMS AND THE TWO OF YOU CAN WORK OUT A DEADLINE THAT YOU BOTH LIKE, AND THEN YOU CAN JUST SUBMIT IT AS A STIPULATION.

MS. HARVEY: THANK YOU.

THE COURT: AND I WON'T EVEN SET A DEADLINE FOR THE FILING OF THAT. YOU'LL JUST -- BECAUSE IT -- YOU KNOW, YOU HAVE AN INTEREST IN GETTING IT DONE, SO I DON'T THINK I NEED TO DO THAT. I'LL JUST WAIT FOR YOUR STIPULATION.

OKAY.

MR. GREENFIELD: YOUR HONOR, MIGHT I JUST OFFER TWO POINTS OF CLARIFICATION?

ONE, YOU'RE ABSOLUTELY CORRECT THAT THE TEXAS DISTRICT COURT DID NOT SET A FIRM DEADLINE FOR INSTALLATION OF AIR

CONDITIONING AND EXPLAINED THAT 25 YEARS WAS TOO SHORT (SIC).

IT DID, HOWEVER, CALL FOR EXPEDITIOUS INSTALLATION. THAT WAS THE COURT'S WORD, NOT MINE, WHICH IS WHY I ASSUMED THAT IT MEANT SOMETHING SIGNIFICANTLY SHORTLY THAN 25 YEARS.

BUT REASONABLE MINDS CAN DISAGREE, OF COURSE.

AND THE OTHER THING IS TO MR. MELLO'S POINT. I WANTED TO NOTE, ON THE QUESTION OF MITIGATION, THAT THE TEXAS COURT DID FIND THAT MITIGATION, EVEN UNDER PERFECT CIRCUMSTANCES, WAS INEFFECTIVE BECAUSE IT DIDN'T RELIABLY REDUCE THE IMPACT OF HEAT FOR MORE THAN A SHORT PERIOD OF TIME.

I JUST WANTED TO OFFER THOSE TWO POINTS OF CLARIFICATION.

THE COURT: THANK YOU.

NON-TRADITIONAL HOUSING AT SVSP I THINK IS NEXT ON THE LIST.

MS. HALTER: YES, YOUR HONOR, AND THAT WILL BE MR. FAMA.

THE COURT: MR. FAMA.

MR. FAMA: GOOD AFTERNOON ONCE AGAIN, YOUR HONOR.

YOU ALREADY MENTIONED THE HEALTH CARE INCIDENT REPORTS, AND THAT'S REALLY THE CENTRAL POINT HERE BEYOND, OF COURSE, THE DEEPLY UNFORTUNATE CIRCUMSTANCES AT SALINAS VALLEY WITH THE HOUSING OF PEOPLE IN THE NON-TRADITIONAL HOUSING.

THE COURT: MR. FAMA.

MR. FAMA: YES.

THE COURT: AS A LATE BREAKING DEVELOPMENT, I'VE

SPOKEN WITH MR. KELSO AND HE HAS SAID THAT ON FURTHER REFLECTION, HE'S GOING TO PROVIDE HCIR'S TO THE PLAINTIFFS.

MR. FAMA: THANK YOU, YOUR HONOR. WE APPRECIATE HEARING THAT NEWS, AND I THINK WE CAN MOVE TO THE NEXT AGENDA ITEM.

THE COURT: WELL, MY -- THERE'S SOMETHING IN THE STATEMENT THAT I WANTED TO MENTION.

MR. FAMA: YES.

THE COURT: AND THAT IS -- FIRST OF ALL, I STILL DON'T FEEL LIKE I KNOW EXACTLY WHAT HAPPENED DOWN THERE, AND I WOULD LIKE TO. THAT'S THING ONE.

I HAVE BECOME ACCUSTOMED TO THE TONE THAT EACH SIDE TAKES ON A WIDE VARIETY OF ISSUES, AND IT IS AN OBSERVATION AND NOT INTENDED AS A CRITICISM TO SAY THAT EACH SIDE HAS A HANDFUL OF STYLES IT RESORTS TO DEPENDING ON THE TOPIC. BUT THE STYLES THEMSELVES HAVE BECOME FAMILIAR TO THE COURT.

EVERY NOW AND THEN THERE IS SOMETHING THAT IS SO BAD, IT CRIES OUT FOR A DIFFERENT VOCABULARY. THIS THING THAT HAPPENED AT SVSP, BASED ON WHAT I KNOW -- AND MY INFORMATION IS ADMITTEDLY INCOMPLETE -- IS IN THAT CATEGORY.

AND SO THAT'S -- IT WOULD JUST BE HOPEFULLY HELPFUL FOR THE PARTIES TO UNDERSTAND WHERE I POSITION THAT ISSUE AMONG ALL THE OTHER THINGS WE'RE TALKING ABOUT.

I SAW A SENTENCE IN THE CASE MANAGEMENT STATEMENT THAT SAID THIS: "AS DEFENDANTS EXPLAINED TO PLAINTIFFS' COUNSEL,

THERE IS NO PRACTICAL OR EFFICIENT MEANS FOR CDCR AND CCHCS TO ACCURATELY CONFIRM EVERY PERSON PLACED IN NON-TRADITIONAL HOUSING BECAUSE THERE WAS NO TRACKING MECHANISM AT SVSP FOR SUCH PLACEMENTS."

AND I THOUGHT, I MUST BE READING THAT SENTENCE -- I MUST BE TAKING FROM THAT SENTENCE A VERY DIFFERENT MEANING THAN THE PERSON WHO WROTE IT INTENDED, BECAUSE I SIMPLY CAN'T IMAGINE A STATE PRISON WHERE YOU DON'T KNOW WHERE SOMEBODY IS. I JUST GO TO -- I JUST CAN'T -- I DON'T UNDERSTAND HOW THAT COULD BE. WHAT HAPPENS WHEN IT'S COUNT? YOU SAY, "WELL, INMATE JOHNSON OR INMATE GARCIA, CAN'T HELP YOU, DON'T REALLY KNOW WHERE THEY ARE"?

OR MAYBE WHAT'S MEANT THERE IS THAT IT'S NOT WRITTEN DOWN. HOW CAN THAT BE? PEOPLE ARE DOING IT FROM MEMORY? ISN'T THIS A LEVEL 4? YOU HAVE PEOPLE DOING THE LAST 10 YEARS ON 25 YEARS TO LIFE.

SO THAT STATEMENT TOOK ME BACK.

ALSO, I'M NOT SURE WHAT INFORMATION THE PLAINTIFFS HAVE REQUESTED THAT THEY'RE NOT GETTING, BUT I HOPE THAT WE CAN SET A DEADLINE FOR THE RESOLUTION OF THAT DISCOVERY DISPUTE ALSO IF THERE IS ONE.

THOSE ARE MY COMMENTS ABOUT THAT TOPIC.

MR. MELLO?

MR. MELLO: I HAVE NOTHING TO ADD, YOUR HONOR. I MEAN, DEFENDANTS MAKE CLEAR HOW IMPORTANT THIS ISSUE WAS. THEY

TOOK IMMEDIATE ACTION. WE SURVEYED THE ISSUE. THERE ARE ONGOING INVESTIGATIONS OCCURRING.

I THINK THE POINT OF THAT STATEMENT WAS THAT THEY KNEW ON THE PARTICULAR DATE IN QUESTION, AND RECONSTRUCTING BACK FOR THE PERIOD OF A YEAR THAT PLAINTIFFS ASK ABOUT, WAS THE DIFFICULT, ONEROUS PART.

THE COURT: I SEE.

MR. MELLO: GOING BACKWARDS WAS THE PART THAT THEY MADE CRYSTAL CLEAR THAT THEY KNEW THE NUMBER ON THAT DATE, IT WAS IMMEDIATELY STOPPED, THERE WAS STATE-WIDE CALLS, ALL INSTITUTIONS WERE SURVEYED, AND IT WAS RESOLVED.

AND THAT'S NOT THE END OF IT, BECAUSE THEY'RE INVESTIGATING IT AND THOSE INVESTIGATIONS ARE ONGOING.

THE COURT: BUT LET'S SAY -- I MEAN, I HAVE A FAIR NUMBER OF PRISONER CIVIL RIGHTS CASES ON MY DOCKET, LIKE ALL THE FEDERAL JUDGES HAVE, AND LET'S SAY SOMEONE FILES A COMPLAINT, IT'S BARELY WITHIN THE STATUTE OF LIMITATIONS, YOU KNOW, SO IT'S -- LET'S SAY IT WAS A ONE YEAR STATUTE OF LIMITATIONS. THEY FILE IT AT 363 DAYS AFTER THE ALLEGED EVENT TOOK PLACE.

THERE'S A MOTION TO DISMISS, IT SURVIVES THE MOTION, THERE'S DISCOVERY FINALLY.

AND SO NOW LET'S SAY IT'S 18 MONTHS LATER, AND LET'S SAY THAT THE CASE IS ABOUT AN ATTACK BY ONE INMATE ON ANOTHER AND THEY SAY THAT THE CORRECTIONAL OFFICERS WEREN'T PAYING ENOUGH

ATTENTION, OR MAYBE THEY GOADED THE OTHER INMATE OR WHATEVER IT IS. SO ANYWAY, THAT'S THE CLAIM, AND IT'S IMPORTANT THAT YOU KNOW, FOR PURPOSES OF DECIDING THE CASE AT SUMMARY JUDGMENT OR TRIAL, WHERE EVERYBODY WAS HOUSED.

YOU CAN'T GO BACK AND -- YOU DON'T KNOW THAT? YOU WOULD SAY, "WELL, I DON'T KNOW"?

THAT JUST SURPRISES ME. THAT'S ALL I'M SAYING.

MR. MELLO: SO IF WE KNOW THE INMATE'S NAME, IT IS ACTUALLY, I UNDERSTAND, PRETTY EASY TO GO BACK AND FIGURE OUT WHERE THEY WERE. THIS IS A SITUATION WHERE THERE'S AN ABSENCE OF INFORMATION AT THE TIME.

BUT, AGAIN, I DON'T WANT TO BURROW INTO IT AND LOSE THE FACT THAT DEFENDANTS ARE TAKING IT SERIOUSLY, THEY STOPPED THE PRACTICE, THEY'RE INVESTIGATING.

BUT IN YOUR HYPOTHETICAL, YOUR HONOR, I BELIEVE IF WE HAVE AN INMATE NAME AND AN INMATE -- OR AN INCARCERATED PERSON'S NAME AND NUMBER, I THINK WE CAN PROBABLY TRACE BACK.

THAT'S A VERY DIFFERENT CIRCUMSTANCE THAN THE REQUEST THAT'S IN FRONT OF US.

AND, AGAIN, IN A CASE THAT'S ABOUT PROSPECTIVE RELIEF, YOU KNOW, DETERMINING WHAT'S GOING ON AND HOW IT CAN BE FIXED AND THAT TYPE OF ISSUE IS THE ISSUE AT HAND.

BUT I CAN'T SPEAK TO YOUR QUESTION.

THE COURT: YEAH, FOR ME -- THIS IS NOT A PROSPECTIVE RELIEF ISSUE FOR ME. I ASSUME THAT THIS IS NOT HAPPENING

ANYMORE. I MEAN, I -- YOU KNOW, BOY, WE WOULD BE IN A VERY DIFFERENT WORLD IF I FOUND OUT THAT THIS HAD HAPPENED AGAIN OR WAS ONGOING. SO I DON'T THINK THAT.

THIS IS AN ISSUE FOR ME REALLY BECAUSE THIS IS -- BECAUSE AS YOU ALL KNOW, WE'VE TALKED ABOUT THIS BEFORE, I'M LOOKING AT TO WHAT EXTENT IS THE STATE CAPABLE OF FINDING ITS OWN PROBLEMS AND FIXING THEM ON THEIR OWN?

SO WE'RE PAST THE FINDING PART.

BUT, YOU KNOW, HOW THOROUGH WAS THE INVESTIGATION? WHAT DOES THE INVESTIGATION TURN UP? WHAT CHANGES, IF ANY, ARE MADE BECAUSE OF THAT INVESTIGATION? THAT KIND OF THING. THAT'S REALLY WHY I'M INTERESTED.

MR. FAMA, I THINK YOU LED OFF ON THIS TOPIC. BEFORE I GO TO THE NEXT ITEM, IS THERE ANYTHING YOU WANT TO ADD?

MR. FAMA: NO, YOUR HONOR. THANK YOU FOR YOUR COMMENTS, THOUGH, AND IT'S BECAUSE -- I GUESS I AM ADDING SOMETHING.

IT'S BECAUSE OF THE CONCERNS THAT YOU RAISED ABOUT THE, THE -- I'LL USE THE TERM MAGNITUDE OF THIS PROBLEM THAT WE DID WHAT WE DID IN TERMS OF TRYING TO IDENTIFY, TO BE A LITTLE CHEAP ABOUT IT, WHO KNEW WHAT WHEN AND HOW MANY PEOPLE WERE SUBJECTED TO THIS KIND OF HOUSING.

WE THINK IT'S IMPORTANT FOR ALL THAT TO BE CONSIDERED IN DETERMINING HOW TO PREVENT IT FROM HAPPENING AGAIN.

THE COURT: OKAY. PERHAPS WE CAN MOVE TO END-OF-LIFE

MEDICAL CARE.

MS. HALTER: YES, AND YOUR HONOR, AND THAT WOULD BE ME.

THIS IS MACKENZIE HALTER.

YOUR HONOR, END-OF-LIFE MEDICAL CARE IS A NECESSARY COMPONENT OF AN ADEQUATE HEALTH CARE DELIVERY SYSTEM.

IDENTIFYING ISSUES WITH END-OF-LIFE MEDICAL CARE, WHICH CCHCS DOES THROUGH THE MORTALITY REVIEW PROCESS, IS AN IMPORTANT FIRST STEP, BUT IT'S NOT SUFFICIENT.

OUR REQUESTS TO CCHCS, WHICH ARE SUMMARIZED IN THE STATEMENT, ARE DESIGNED TO PREVENT THE RECURRENCE OF THE ISSUES THAT HAVE BEEN IDENTIFIED, SOMETIMES REPEATEDLY, THROUGH THE MORTALITY REVIEW PROCESS.

AND, AGAIN, WE APPRECIATE THE WORK OF THE PALLIATIVE CARE TEAM, AND WE DON'T DISPUTE THE VALUE OF THE PALLIATIVE CARE GUIDE AS A RESOURCE FOR CCHCS PHYSICIANS. HOWEVER, THE PALLIATIVE CARE INITIATIVE LAUNCHED IN JANUARY OF 2022 AND CCHCS MORTALITY REVIEWS CONTINUE TO IDENTIFY ISSUES WITH END-OF-LIFE MEDICAL CARE FOR DEATHS OCCURRING IN 2025.

THE COURT: LET ME ASK YOU THIS: TO WHAT EXTENT -- I SAW IN THE STATEMENT THAT THERE WAS AN UPDATED PALLIATIVE CARE GUIDE ISSUED IN APRIL. TO WHAT EXTENT DOES THAT NOT SOLVE YOUR CONCERNS?

MS. HALTER: THE REQUESTS THAT WE HAVE FOR HAVING, FOR INSTANCE, PATIENTS WHO HAVE -- WHO ARE IN IN-PATIENT

MEDICAL UNITS, HAVING MEDICAL STAFF REVIEW THEIR CODE STATUS AT THE START OF EACH SHIFT, THAT IS NOT FOUND IN THE PALLIATIVE CARE UNIT.

THE PALLIATIVE CARE GUIDE IS A VERY -- IT'S AN OVERARCHING GUIDE FOR PALLIATIVE CARE GENERALLY, WHICH IS FOR ALL PATIENTS WHO HAVE OPTED NOT TO PROCEED WITH CURATIVE TREATMENT, AND THE -- SO PULSES OR CODE STATUS, THAT IS RELEVANT TO ALL PATIENTS WHO ARE SERIOUSLY ILL, INCLUDING THOSE WHO ARE CONTINUING WITH CURATIVE CARE.

SO THE PALLIATIVE CARE GUIDE DOES NOT FULLY -- IT DOES NOT COVER THE FULL PATIENT POPULATION THAT END-OF-LIFE MEDICAL CARE NEEDS TO SERVE.

AND FURTHER, YES, THE SPECIFIC REQUESTS THAT WE HAVE MADE ABOUT INCLUDING REQUIREMENTS IN POLICY, TO MY UNDERSTANDING AND MY READ OF THE PALLIATIVE CARE GUIDE, ARE NOT PRESENT.

AND THE LAST THING I WILL SAY ABOUT THAT IS THE PALLIATIVE CARE GUIDE, AND ALL CARE GUIDES, ARE NOT DIRECTIVES. THEY'RE NOT REQUIREMENTS. THEY'RE NOT POLICY. THEY ARE GUIDELINES.

WHEREAS THE HCDOM, FOR INSTANCE, WHICH IS WHERE WE WOULD WANT THESE, THESE REQUIREMENTS TO BE CODIFIED, THAT MUST BE FOLLOWED.

THE COURT: OKAY. I REMEMBER FROM THE STATEMENT THE REQUEST THAT CAREGIVERS REVIEW DIRECTIVES AT THE BEGINNING OF EVERY SHIFT. IF THAT -- AND I THINK I REMEMBER THE PLAINTIFFS SAYING -- MR. KELSO SAID THEY'RE SUPPOSED TO DO THAT, AND THE

PLAINTIFFS SAID, "WELL, OKAY, BUT IT'S NOT WRITTEN DOWN."

FIRST OF ALL, AM I ACCURATELY SUMMARIZING THAT ISSUE?

MS. HALTER: YES, THE CCHCS STATEMENT WAS THAT PROVIDERS ARE EXPECTED TO REVIEW AT THE START OF EACH SHIFT.

THE COURT: OKAY. AND IF THAT WERE TO HAPPEN, LET'S SAY -- LET'S SAY THAT THAT WERE OCCURRING. I MEAN, ACTUALLY, LET'S -- YEAH, LET'S SAY THAT WERE OCCURRING.

WHAT ELSE, IF ANYTHING, IN YOUR VIEW WOULD BE NECESSARY TO -- I MEAN, UNFORTUNATELY, THERE'S GOING TO BE SOME HUMAN ERROR NO MATTER WHAT YOU DO. BUT WHAT ELSE WOULD NEED TO BE DONE TO MINIMIZE HUMAN ERROR IN THIS AREA, OR WOULD JUST HAVING EVERYONE REVIEW THESE DIRECTIVES AT THE BEGINNING OF EVERY SHIFT SOLVE THIS?

MS. HALTER: GREAT QUESTIONS, YOUR HONOR.

THAT WOULD CERTAINLY SOLVE ONE OF THE PROBLEMS.

ANOTHER OF THE PROBLEMS THAT WE HAVE SEEN IS THAT PEOPLE WHO HAVE, LIKE, COMFORT CARE OR DO NOT RESUSCITATE POLST'S MAYBE CHANGE THEIR MIND AND THEN THEY AREN'T RE-ENGAGED IN GOALS OF CARE DISCUSSIONS LATER.

SO, FOR INSTANCE, THIS IS -- ONE OF THE CASES IN THIS STATEMENT, FOR INSTANCE, THAT WE DISCUSSED WAS A PATIENT WHO HAD CHANGED THEIR MIND AND TOLD MEDICAL CARE STAFF, BUT THEN THAT WASN'T IN THE RECORDS. SO NOT ONLY IS IT PHYSICIANS AND ALL MEDICAL STAFF REVIEWING TO MAKE SURE THAT THEY KNOW WHAT A PATIENT'S POLST STATUS IS --

THE COURT: WELL, LET ME ASK YOU A QUESTION, BECAUSE I REMEMBER THAT EXAMPLE FROM THE STATEMENT.

THAT'S ONE OF TWO THINGS. ONE POSSIBILITY IS THAT WE DON'T HAVE A BUILT-IN MECHANISM TO ENSURE THAT ALTERED -- OR NOT ALTERED, THAT'S THE WRONG WORD -- THAT WHEN SOMEONE CHANGES THEIR MIND AND THEIR DIRECTIVE DIRECTS A DIFFERENT OUTCOME, THAT THAT DIRECTIVE BECOMES PART OF THEIR RECORD, OR BECOMES PART OF THEIR RECORD IN A WAY THAT'S EASILY REVIEWABLE. THAT'S ONE POSSIBILITY.

ANOTHER POSSIBILITY IS WE DO HAVE THAT, BUT THERE IS HUMAN ERROR. SOMEONE FORGOT TO PUT THE CHANGED DIRECTIVE INTO THE RECORD.

AND IN YOUR EXAMPLE, DO YOU KNOW WHICH ONE IT WAS?

MS. HALTER: YES. IN THAT CASE, IT WAS THE PATIENT SPOKE TO A NURSE WHO ENTERED WHAT'S CALLED THE COMMUNICATION ORDER IN THE RECORD.

BUT A POLST IS A SIGNED FORM, AND THE NURSE DID NOT HAVE THE PATIENT SIGN A FORM. SO EVEN THOUGH THERE WAS AN ORDER IN THE MEDICAL RECORD, IT WAS NOT THE OPERATIVE FORM.

THE COURT: SO THAT -- WOULD YOU -- AM I CORRECT IN THINKING THAT THAT'S A TRAINING ERROR, THAT THE NURSE SHOULD HAVE DONE SOMETHING DIFFERENTLY WHEN SHE BECAME AWARE OF THAT INFORMATION?

MS. HALTER: YES.

THE COURT: AND DO WE KNOW -- THERE WAS A

CONVERSATION -- THAT WAS NEVER GOING TO BE A GOOD SENTENCE. LET ME START OVER.

SO THERE WAS A CONVERSATION BETWEEN A CAREGIVER, WHICH WAS THIS NURSE, AND A PATIENT IN WHICH THE PATIENT SAID, "YOU HAVE A RECORD OF A DIRECTIVE THAT SAYS ONE THING, I NOW HAVE A DIRECTIVE THAT SAYS A DIFFERENT THING."

DO WE KNOW IF HE HAD A COPY OF THE DIRECTIVE WITH HIM?

MS. HALTER: NO.

THE COURT: DO YOU KNOW --

MS. HALTER: SORRY. WHEN YOU SAY "HE," THE NURSE OR THE PATIENT?

THE COURT: THE PATIENT. DO WE KNOW IF THE PATIENT HAD A COPY OF THE DIRECTIVE WITH HIM?

MS. HALTER: NO.

THE COURT: WOULD YOU AGREE WITH ME THAT IT -- BEFORE YOU WERE TO CHANGE THE DIRECTIVE IN THE SYSTEM, YOU WOULD WANT A WRITTEN COPY BEFORE YOU ARE COUNTERMANDING -- YOU WOULD WANT A WRITTEN COPY OF A CHANGE DOCUMENT BEFORE YOU COUNTERMANDED THE ORIGINAL DOCUMENT?

MS. HALTER: YES.

THE COURT: IT MIGHT ALSO BE POSSIBLE THAT, COMING BACK TO THIS EXAMPLE AGAIN, I ASKED THAT QUESTION IN SUCH A LEADING WAY -- AND OF COURSE I'M WEARING A ROBE, EVEN THOUGH I'M WORKING REMOTELY, AND PERHAPS YOU WERE RESPONDING TO ALL OF THAT -- IT OCCURS TO ME THAT'S NOT THE ONLY POSSIBILITY. YOU

MIGHT WANT, WHEN A PATIENT SAYS, "I'VE CHANGED MY MIND AND I HAVE A DIFFERENT DIRECTIVE," IT COULD BE THAT THE APPROPRIATE RESPONSE -- THAT GOOD MEDICINE WOULD DICTATE THAT THE APPROPRIATE RESPONSE IS, "OKAY, DO YOU HAVE A WRITTEN COPY? IF YOU DON'T HAVE A WRITTEN COPY, WHERE CAN WE GET A WRITTEN COPY?" AND SO ON.

IN OTHER WORDS, THAT A DIALOGUE THEN BEGIN WITH THE PATIENT, WITH AN UNDERSTANDING THAT THAT DIALOGUE NEEDS TO BE COMPLETED IN THE NEAR FUTURE TO DETERMINE WHETHER A PHYSICAL COPY EXISTS, WHETHER THE PHYSICAL COPY CAN BE OBTAINED, IF THERE'S NOT A PHYSICAL COPY, WHAT TO DO.

I'M SURE THERE'S SOME GUIDANCE ABOUT THAT OUT THERE SOMEWHERE. MAYBE NOW YOU WOULD SIT DOWN WITH THE PATIENT AND SAY, "YOU TOLD ME THAT THIS IS WHAT YOU WANTED, BUT THERE'S NO PAPER." MAYBE YOU HELP THEM CREATE THE PAPER. MAYBE YOU ACTUALLY HAVE A DUTY NOT TO CREATE THE PAPER. I DON'T KNOW.

THE MORE I TALK ABOUT THIS, THE MORE THIS IS WHAT I THINK: THE PARTIES SHOULD KEEP TALKING ABOUT THIS ISSUE. THAT'S WHAT I THINK.

MS. HALTER: I WHOLEHEARTEDLY AGREE, AND THAT IS CERTAINLY OUR PLAN.

YOUR HONOR, AS ALWAYS, OUR GOAL IS TO IMPROVE HEALTH CARE FOR THE CLASS, AND THIS IS SIMPLY ONE OF THOSE -- AGAIN, THIS IS ONE OF THOSE TIMES. AND, YES, WE BELIEVE THAT MORE CAN BE DONE TO ENSURE PATIENT'S GOALS OF CARE ARE FOLLOWED

RESPECTFULLY, AND WE'LL CONTINUE TO WORK TOWARDS THAT, INCLUDING BY SPEAKING WITH DEFENDANTS.

THE COURT: VERY GOOD.

MR. MELLO, THE PARTIES ARE GOING TO KEEP TALKING ABOUT THIS ISSUE. ANYTHING TO ADD FROM DEFENDANTS' STANDPOINT?

MR. MELLO: NO, JUST THAT IT'S GOOD TO ALWAYS WANT TO IMPROVE AND DO MORE.

BUT THERE ARE REAL OPPORTUNITY COSTS OF DOING EVERYTHING. IF YOU DO EVERYTHING, YOU DO NOTHING. AND WE DO HAVE TO DEFER TO THE MEDICAL EXPERTS, ACTUAL EXPERTS ON SOME OF THESE ISSUES AND THE WAY THAT CCHCS IS DOING THESE ISSUES AND TRAINING ON THESE ISSUES.

AND NOT EVERYTHING CAN BE THE MOST IMPORTANT ISSUE BECAUSE THERE ARE IMPACTS AND CONSEQUENCES OF THAT.

BUT, OF COURSE, WE WILL CONTINUE TO LISTEN TO THE CONVERSATIONS WITH CCHCS ON THIS ISSUE.

THE COURT: YOU AND I SHARE A LOVE OF THE CONCEPT OF OPPORTUNITY COST, MR. MELLO.

EMERGENCY RESPONSE, THAT WAS VERY INTERESTING. SO WE HAD ALL THESE CONFERENCES ABOUT 911, 911, 911, AND THEN IT TURNS OUT 911 IS OKAY. I MEAN, ACTIVATION TIME IS OKAY.

BUT THEN THERE ARE SOME OTHER THINGS THAT THE EXPERT SAID WE NEED TO BE DOING DIFFERENTLY.

SO MS. HALTER, WHO WILL BE SPEAKING ABOUT THIS ISSUE FROM THE PLAINTIFFS' POINT OF VIEW?

MS. HALTER: MR. FAMA.

THE COURT: MR. FAMA.

MR. FAMA: YES, IT IS INTERESTING. I DON'T THINK WE SEE IT QUITE AS BLACK AND WHITE AS 911 AND NO 911 AS AN ISSUE.

BUT THE MAIN POINT YOU ARE ABSOLUTELY CORRECT ON, YOUR HONOR. THE EXPERT -- THE RECEIVER'S EXPERT IDENTIFIED A NUMBER OF OTHER ISSUES THAT HE CALLED CRITIQUES FOR WHICH HE PAIRED RECOMMENDATIONS.

AND WE WANTED TO TALK ABOUT THIS TODAY SIMPLY TO EMPHASIZE THAT THIS REPORT IS THERE, AND THAT WE LOOK FORWARD TO MR. KELSO'S CONSIDERATION OF THIS REPORT AND A DETERMINATION AS TO WHAT'S NECESSARY AS THE NEXT STEPS.

AS WE MENTIONED IN THE STATEMENT, SOME OF THE EXPERT'S FINDINGS MIRROR, TO A DEGREE, THINGS THAT WE HAD SAID ABOUT, FOR EXAMPLE, STAFFING IN THE TREATMENT AND TRIAGE AREAS.

AND OTHERS, WE WILL JUST MENTION, WE THOUGHT WERE, WERE THINGS THAT WERE WELL CONSIDERED AS WE SAID IN THE STATEMENT.

JUST AS AN EXAMPLE, THAT TTA HAS MULTIPLE ADMISSIONS, AND AT LEAST AT THE TTA -- THAT'S THE TREATMENT AND TRIAGE AREAS THAT ARE VERY BUSY -- THOSE MULTIPLE ADMISSIONS CAN COMPLICATE CARE.

AND AS WE SAID, IT'S NOW, I THINK, ON MR. KELSO'S DESK, HE AND HIS STAFF, TO CONSIDER WHAT TO DO.

THE COURT: OKAY.

MR. MELLO, ANYTHING TO ADD THERE?

MR. MELLO: YES, IT'S ON HIS DESK AND CDCR AND CCHCS ARE EVALUATING IT.

THE COURT: WELL, WE'LL JUST HAVE TO WAIT TO SEE WHAT IS PRODUCED BY THAT EVALUATION.

LET'S TALK ABOUT MEDICAL STAFF'S ROLE IN THE DISCIPLINARY PROCESS.

MS. HALTER: THAT WOULD BE MS. HARVEY.

THE COURT: MS. HARVEY.

MS. HARVEY: THANK YOU, YOUR HONOR. I'LL BE VERY BRIEF. WE MOSTLY SPELL IT OUT WHERE WE ARE IN THE CONVERSATION IN OUR STATEMENT.

BUT WE DO WANT TO NOTE THAT WE WERE RECENTLY INFORMED THAT WE WILL NOT BE GETTING ACCESS TO THE TRACKING SYSTEM FOR -- THAT WOULD HELP US EVALUATE WHETHER THE POLICY INVOLVING HEALTH CARE STAFF'S ROLE IN RVR'S IS BEING FOLLOWED.

THE POLICY ITSELF IS VERY MUCH A PROCESS, AND SO THE INABILITY TO KNOW WHAT'S HAPPENING WITH IT, EITHER THROUGH THE TRACKING SYSTEM OR ANY OTHER WAY, IS GOING TO PRESENT A CHALLENGE -- CHALLENGES FOR US TO EVALUATE WHETHER THE PROCESS IS WORKING AND THE POLICY IS WORKING AS INTENDED, AND WE WERE GIVEN NO EXPLANATION FOR DENYING ACCESS.

SO THIS IS GOING TO CONTINUE TO BE AN ISSUE, AND I WANTED TO JUST FLAG THAT.

THE COURT: ALL RIGHT. WELL, WE'RE STANDING BY. I DON'T HAVE AN OPINION ABOUT IT AS I SIT HERE. SO I GUESS THE

FIGHT WILL EITHER RESOLVE ITSELF OR IT WILL COME TO ME IN THE FORM OF A MOTION AT SOME POINT.

THE PLAINTIFFS DISCOVERED THAT STAFF WERE, IN THEIR VIEW, INAPPROPRIATELY WRITING PEOPLE UP BEFORE -- THEY BECAME AWARE OF THAT IN SOME WAY WITHOUT THIS INFORMATION FLOW YOU'RE DESCRIBING. HOW DID THEY BECOME AWARE OF IT?

MS. HARVEY: WE OFTEN GET REPORTS FROM PEOPLE, FROM CLASS MEMBERS, WHO RAISE ISSUES AND ASK FOR OUR HELP. SO IT IS OFTEN THE CASE THAT WE ARE ALERTED TO ISSUES IN THAT WAY.

BUT, OF COURSE, IT IS HARD TO LOOK AT A SYSTEMIC POLICY BASED ON THOSE KINDS OF RESPONSES.

SO, AGAIN, WITH THIS PARTICULAR POLICY AND THIS PARTICULAR ISSUE, IT ISN'T JUST WHETHER THE CEO ULTIMATELY IS ISSUING RVR'S, BUT IT'S THE PROCESS OF HOW THAT IS AND ISN'T HAPPENING AND THE PROCESS OF HOW AND WHEN CUSTODY IS INVOLVED.

THE COURT: GOT IT.

MR. MELLO, ANYTHING TO ADD THERE?

MR. MELLO: I THINK THIS MAY HAVE COME UP IN THE ARMSTRONG CASE, AND MAYBE THAT'S THE WAY THAT THE INFORMATION CAME UP.

BUT I DON'T HAVE ANYTHING TO ADD, OTHER THAN THAT THIS WAS MORE OF A SORT OF LATE BREAKING SITUATION.

I KNOW WE USED THE HORRIBLE NON-PARAGRAPH 7, NOT BECAUSE WE DON'T WANT TO DISCUSS IT, BUT BECAUSE MAYBE, MAYBE IT'S AN ARMSTRONG ISSUE, OR MAYBE IT'S SOMETHING THAT'S NOT -- WASN'T

READY FOR US TO HAVE A POSITION ON AT THIS POINT IN THE CMC PROCESS, YOUR HONOR. IT WASN'T TO GET YOUR IRE.

I DO -- I DID HAVE ONE THOUGHT. WHEN SOMEBODY WAS SPEAKING EARLIER, SOMEBODY COMMENDED YOU FOR HAVING A GOOD QUESTION.

30 YEARS INTO THE PRACTICE OF LAW, I WANT AN ATTORNEY TO SAY TO A JUDGE, "THAT'S A REALLY BAD QUESTION." I WANT THAT TO HAPPEN. I MIGHT SEE IT AT SOME POINT, BUT SO FAR NOT AT ALMOST 30 YEARS.

BUT I THINK THIS WAS, AGAIN, A NON-PARAGRAPH 7 ISSUE WHERE I DON'T THINK WE WERE TRYING TO PUT YOU OFF OR PLAINTIFFS OFF. I JUST DON'T THINK IT WAS READY, YOUR HONOR.

THE COURT: I SEE. YEAH, I DON'T -- AS I SAID EARLIER, I DON'T HAVE A VIEW ACTUALLY. I'M NOT, AS THEY SAY, WELL VERSED IN THE PARTICULARS.

AND EVEN IF I WERE, I DON'T THINK I WOULD HAVE AN OPINION YET. IT JUST -- AND I DON'T THINK THE PLAINTIFFS ARE TRYING TO GET ME TO HAVE ONE. I THINK THEY JUST WANT ME TO KNOW THAT THIS IS INFORMATION THAT THEY WANT AND THIS IS JUST ONE OF THE DISPUTES BETWEEN THE PARTIES.

MR. MELLO IS REMINDING ME, THIS IS SOMETHING THAT ARMSTRONG IS WORKING ON, AND MR. KELSO AND MR. MCNAMARA DO WORK CLOSELY TOGETHER WHEN IT'S APPROPRIATE, AND THEY HAVE A VERY GOOD WORKING RELATIONSHIP.

BUT WHETHER THERE'S -- I DON'T KNOW WHETHER THERE'S

ANYTHING MORE TO BE DONE IN THIS CASE ABOUT THAT. I'LL JUST WAIT TO HEAR FROM THE PARTIES.

TO YOUR POINT ABOUT WHETHER ANYONE WOULD EVER TELL A JUDGE THAT HE OR SHE ASKED A BAD QUESTION, YOU KNOW, I TELL THE PARTIES -- I TELL THE LAWYERS, RATHER, AT THE BEGINNING OF A TRIAL, I DON'T ASK VERY MANY QUESTIONS IN A JURY TRIAL. I DON'T LIKE TO DO THAT. I LIKE TO STAY OUT OF THE LAWYERS' WAY. I USUALLY WIND UP ASKING A COUPLE.

IN A BENCH TRIAL, I'LL ASK LOTS OF QUESTIONS.

IN EITHER EVENT, I TELL THE LAWYERS AT THE BEGINNING OF THE TRIAL, "YOU HAVE THE RIGHT TO OBJECT TO THE JUDGE'S QUESTION, JUST LIKE ANY OTHER QUESTION. AND I CAN ASK A BAD QUESTION."

I'VE BEEN A JUDGE FOR 23 YEARS. SOMEONE OBJECTED TO ONE OF MY QUESTIONS ONCE. A LOT OF CREDIT TO THAT LAWYER FOR OBJECTING. I THINK I SUSTAINED IT, TOO, JUST BECAUSE I FELT LIKE I NEEDED TO -- AT THIS POINT, YOU KNOW, I HAVE TO SHOW THEM I'M GOOD, THAT I'M A MAN OF MY WORD, I GUESS.

WELL, I THINK WE WENT THROUGH THE LIST. I'LL SAY IT'S BEEN A LITTLE WHILE SINCE I WENT INTO AN INSTITUTION FOR A VISIT. AT THE BEGINNING OF THE YEAR I DID IT. THAT SEEMS LIKE IT'S BEEN A WHILE.

SO YOU SHOULDN'T BE SURPRISED IF I TRY TO FIND A DATE TO GO INTO ANOTHER INSTITUTION. I'LL LET YOU KNOW THAT IF I HAVE IT.

I MAY HAVE MENTIONED TO YOU BEFORE, I SOMETIMES GO TO THE INSIDE CIRCLE AT CMF IN VACAVILLE. I'M GOING TO DO THAT ON THURSDAY, JUST SO YOU KNOW.

I THINK 90 DAYS CONTINUES TO FEEL LIKE ABOUT THE RIGHT PACE. EVEN IF WE DON'T WIND UP DISCUSSING SOMETHING THAT'S IN A CASE MANAGEMENT STATEMENT, THEY'RE HELPFUL FOR ME TO READ, AND SO I APPRECIATE THAT ASPECT OF THESE CONFERENCES AS MUCH AS I DO THE IN-PERSON COMPONENT.

HOW ABOUT MONDAY, SEPTEMBER 15TH, AT 2:00 O'CLOCK? THAT'S MORE OR LESS EXACTLY QUARTERLY AWAY FROM TODAY.

MS. HALTER: THAT LOOKS GOOD FOR PLAINTIFFS.

MR. MELLO: I HAVEN'T HAD ANY SCREAMING TEXTS, SO I THINK THAT WORKS FOR DEFENDANTS AS WELL.

DO YOU BELIEVE IT'LL BE IN PERSON?

THE COURT: I DO.

MR. MELLO: OKAY.

THE COURT: AUDIENCES --

MR. MELLO: YOU'RE NOT PROTECTING US FROM HIGHWAY 80, OR INTERSTATE 80.

THE COURT: NOW THAT I KNOW IT'S A THING, MAYBE I'LL LOOK FOR ANOTHER OPPORTUNITY. I DIDN'T KNOW THIS TIME.

MR. MELLO: THANK YOU.

THE COURT: BUT, NO, I WOULD EXPECT IT WOULD BE IN PERSON. I THINK WE GET MORE DONE IN PERSON, FRANKLY.

AND I THINK -- I THINK THAT -- WELL, I'LL LEAVE IT WITH

THAT. I THINK THERE ARE MANY DIFFERENT WAYS OF MEASURING HOW MUCH YOU GET DONE, AND UNDERSTANDING THAT, WE GET MORE DONE. SO I BELIEVE IT'LL BE IN PERSON.

THANK YOU ALL VERY MUCH.

MS. HALTER: THANK YOU.

MR. MELLO: THANK YOU, YOUR HONOR.

THE CLERK: COURT IS IN RECESS.

(THE PROCEEDINGS WERE CONCLUDED AT 2:45 P.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 1301 CLAY STREET, OAKLAND, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF ZOOM PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.



LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED: JUNE 27, 2025