ROB BONTA
Attorney General of California
DAMON G. MCCLAIN – 209508
Supervising Deputy Attorney General
CORINNA ARBITER - 273074
Deputy Attorneys General
  600 W. Broadway, Suite 1800
  San Diego, CA 92101
  Telephone: (619) 321-5799
  Fax: (619) 645-2061
  E-mail: Corinna.Arbiter@doj.ca.gov

HANSON BRIDGETT LLP
PAUL MELLO – 179755
SAMANTHA D. WOLFF – 240280
DAVID C. CASARRUBIAS-GONZÁLEZ – 321994
  425 Market Street, 26th Floor
  San Francisco, CA  94105
  Telephone:  (415) 777-3200
  Fax:  (415) 541-9366
  E-mail:  pmello@hansonbridgett.com

PRISON LAW OFFICE
DONALD SPECTER – 83925
STEVEN FAMA – 99641
ALISON HARDY – 135966
RANA ANABTAWI – 267073
LILY HARVEY – 278947
SOPHIE HART – 321663
MACKENZIE L. HALTER – 333992
  1917 Fifth Street
  Berkeley, CA  94710
  Telephone:  (510) 280-2621
  Fax:  (510) 280-2704
  E-mail:  dspecter@prisonlaw.com

LAW OFFICE OF SARA NORMAN
SARA NORMAN (189536)
  P.O. Box 170462
  San Francisco, CA 94117-0462
  Telephone: (415) 236-3763
  E-mail: sara@saranormanlaw.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **MARCIANO PLATA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 4:01-cv-01351-JST<br><br>**Joint Case Management Conference Statement**<br><br>Date:          September 15, 2025<br>Time:          2:00 p.m.<br>Courtroom:  6, 2nd Floor<br>Judge:         Hon. Jon S. Tigar<br>Action Filed:  April 5, 2001 |

1

The parties submit the following joint statement in advance of the September 15, 2025, Case Management Conference.

## I.   PROGRESS TOWARDS RESOLUTION – DELEGATIONS TO DATE

*Plaintiffs' Position:*  Since the last Case Management Conference, the Receiver delegated authority for medical care at High Desert State Prison (HDSP).  In doing so, the Receiver recognized the "extra challenges" HDSP providers face in providing care to "complex, high risk patients [] because of HDSP's remoteness to tertiary care."[1]  The Receiver directed HDSP to reduce the population of medical high-risk patients to approximately 100 patients, to immediately transfer 10-15 patients out of HDSP, and to immediately stop non-essential transfers of certain patients to HSDP.[2]  We asked CCHCS for more information on the Receiver's directives, which we consider necessary to protect patients from an undue risk of harm.[3]

On September 8, CCHCS provided a list of 17 patients who were transferred or are in the process of transferring from HDSP based on their medical risk status.  CCHCS also stated that the Population Management Unit, which manages institutional transfers, is not approving intake of certain high-risk patients ("high risk 1" or "HR1" patients) into HDSP without the approval of the Regional Health Care Executive.  CCHCS also stated it does not anticipate incorporating the halt of non-essential HR1 transfers into policy.  We will continue to monitor the issue, including as it relates to HDSP's ability to provide care to the 100 or so HR1 patients who will remain at HDSP.

A meet-and-confer regarding the potential delegation of CSP-Sacramento was held in August 2025, and meet and confers regarding California Health Care Facility and California Substance Abuse Treatment Facility and State Prison are scheduled for November 2025 and February 2026, respectively.

*Defendants' Position:*  Plaintiffs' Non-Paragraph 7 request is under review.  High Desert State Prison (HDSP) has already acted based on the Receiver's instruction of July 24, 2025.  The Chief Physician & Surgeon (CP&S) at HDSP reviewed all High-Risk patients residing at HDSP

---

[1]     Exhibit A, Letter from Receiver J. Clark Kelso to CDCR Secretary Jeff Macomber (July 24, 2025).
[2]     *Id.*
[3]     *See* Exhibit B, Email from Mackenzie Halter, "Non Para 7 Query re HDSP HR1 Transfers" (Aug. 6, 2025).

2

to determine which of them had needs that could not be easily met in a rural setting. The CP&S then determined which patients had specialty appointments on calendar that would be difficult to reschedule quickly and excluded them from consideration at the time. From that list, the CP&S identified 17 patients who could be transferred within the very near future. Nine have been transferred, and eight are pending transfer. Another cohort of High-Risk Patients will be transferred out over time in compliance with the Receiver's instruction. Answers to Plaintiffs' questions, above, were provided to Plaintiffs on September 8, 2025.

## II.    MEDICAL STAFFING MODELS

*Plaintiffs' Position:* We continue to ask about the need for and efforts to establish formal budget authority for "extra" medical staff positions used at many prisons. This staffing is necessary for adequate medical care.

On July 23, CCHCS informed us that in May 2025 a Budget Change Proposal (BCP) was submitted to remedy a staffing shortfall related to reproductive and breast health services at Central California Women's Facility (CCWF) and California Institution for Women (CIW). CCHCS reported that it sought permanent position authority for an additional primary care provider for Obstetrics and Gynecology and radiologic technologists for mammography services at CCWF and CIW and additional Registered Nurses (RNs) at CCWF, the latter based on the demand for RN services.[4] Defendants below confirm the request was approved by the Legislature and Governor and was effective on July 1, and link to a document showing the number of approved positions but nothing more. We have asked for a copy of the BCP, so we can better understand and consider how CCHCS's medical staffing model was adjusted.

All these staffing increases are important, and the additional RNs at CCWF are especially critical because that prison—in stark contrast to the other 30 institutions—has for several months, and much of the last year, reported very poor compliance with the bedrock requirement that patients be seen, face-to-face, by an RN within one business day of the prison receiving a written request reporting medical symptoms. In July, for example, only 63% of those appointments occurred timely at CCWF, while the statewide average for timely such appointments was 94%, no

---

[4]    *See* Exhibit C, CCHCS Memorandum (July 23, 2025).

3

1  other prison reported less than 91%, and approximately 20 prisons reported that 98% or more

2  were timely.[5]

3       CCHCS in July also informed us that its acuity-based medical staffing model calls for the

4  same level of specialty services-related RN staffing (e.g., nurses who review orders or requests

5  for such services, and those who schedule those appointments) at every prison.  We have asked

6  about this one-size-fits-all allocation: some prisons, because of their size and patient acuity, have

7  three or four times the number of specialty appointments compared to other prisons, amounting

8  over the course of a year to many thousands more orders to be reviewed and appointments to be

9  scheduled.[6]  Some of those prisons have had to rely on temporarily approved and redirected staff

10  to provide adequate care; for example, and as previously reported, RJD across multiple budget

11  cycles has augmented its formally allocated specialty services team with seven additional staff.[7]

12       CCHCS similarly informed us that its acuity-based staffing model provides for the same

13  Treatment and Triage Area (TTA) RN staffing for every prison, regardless of the number of

14  patients seen.  We have also asked about this, given that the number of patients seen in the TTA

15  varies greatly between the prisons, with some having twice or even four times the number of such

16  encounters compared to others.

17       *Defendants' Position:*  CCHCS received approval for additional resources at the female

18  institutions effective July 1, 2025, and information about the approved positions is available in

19  the Enacted Budget Galley at https://ebudget.ca.gov/2025-

20  /pdf/Enacted/GovernorsBudget/5210.pdf, pp. CR 4, 24, under "Female Factor Premise."

21       Central California Women's Facility (CCWF) hired three Registered Nurses (RN) who

22  began working in April and July, respectively. Two other RNs have pending start dates. The

23  remaining RN posts have been activated since July 1, 2025, CCWF has filled them with overtime

24

---

25  [5]      All data is from CCHCS Dashboards.  In the 12-month period ending in July, only
71% of these RN appointments were timely at CCWF while 95% were timely statewide.  CCWF
26  may need even more RN positions atop the additional July 1 formally-approved positions: in
August, per the Dashboard, only 63% of face-to-face triage RN appointments were timely.
27  [6]      For example, CCHCS data shows that in the six months from February through
July 2025, California Correctional Institution had 1,814 specialty appointments, while Richard J.
Donovan Correctional Institution (RJD) had 9,211.
28  [7]      *See* ECF No. 3968 at 6:3-6.

4

1   or registry staff until a permanent resource is hired.  As these positions are for episodic care and

2   case management, CCHCS expects that the hires will facilitate CCWF's ability to provide face-

3   to-face encounters within one business day for symptomatic patients who submit sick call slips.

4        Staffing for specialty care scheduling and TTAs is based upon a "per institution" allocation

5   and not based on number of patients or patient acuity.  CCHCS is evaluating the medical

6   classification model as well as reviewing the Receiver-commissioned report entitled "CCHCS

7   Analysis of the California Department of Corrections and Rehabilitation Emergency Response

8   System: Critique and Recommendations."

9   **III.   ACCESS TO SPECIALTY CARE SERVICES**

10       *Plaintiffs' Position:*  Backlogs and the timeliness of specialty appointments continues to be

11  an issue statewide. In the last Case Management Statement, we reported a significant decrease in

12  the specialty care backlog; as of May 1, the backlog was 1,653, which was approximately 25%

13  less than the backlog as of January 1.[8]  However, according to CCHCS data, the backlog as of

14  August 1 was 2,145—nearly the same as it was at the beginning of the year.  CCHCS's monthly

15  health care services dashboard for July shows that 70% of high priority, 74% of medium priority,

16  and 87% of routine priority specialty appointments occurred on time.

17       We agree, as Defendants discuss below, that progress regarding timely specialty care has

18  occurred since 2022.  However, CCHCS's estimate—stated in October 2022—that within one

19  year to eighteen months of that date it would eliminate all specialty service backlogs and

20  consistently schedule patients well within allotted timeframes[9]—did and still has not come to

21  pass. Further, we remain concerned about the very low percentages of timely high and medium

22  priority specialty services at a substantial number of prisons, including several which house large

23  numbers of high-risk patients.  On July 15, we wrote to the Receiver and CCHCS about this,

24  discussing among other things that at five prisons, including California Health Care Facility, only

25  50% to 65% of high priority specialty service appointments were timely between July 2024 and

26

27       [8]      ECF No. 3968 at 10:3-4.
            [9]      See ECF No. 3830 at 9.
28

                                                                                (continued…)

1    June 2025.[10]  It is true, as Defendants write below, that these prisons have more orders for such

2    services than other prisons; this is to be expected given the large numbers of medically high risk

3    patients these prisons house.  That fact, however, does not excuse the poor rates of timely

4    specialty services—especially when patients at other prisons receive such appointments timely at

5    much higher rates.

6        In its August 28 response to our query, CCHCS listed and described nearly 30 statewide or

7    prison-specific measures being taken to improve the timeliness of high and medium priority

8    specialty services.[11]  Many of the measures aim to reduce the number of such appointments

9    ordered or approved, and many of the measures have been tried before, sometimes for years.

10   Only a few of the described actions involve increasing the availability of specialty services, and

11   the primary such measure—"CCHCS continues to work with HealthNet to expand its specialty

12   network, with continued focus on specialties with the most backlog or a higher proportion of

13   medium and high-risk appointments at risk for non-compliance"[12]—is vague. Defendants

14   below—in information provided for the first time on the date this Statement was filed—report

15   that since March more than 100 specialty providers have been added to HealthNet.  This is good

16   to know, but the full significance of that statistic cannot be evaluated without information

17   regarding the number of providers who have left the network or regarding how current numbers

18   compare to those in the past.

19       Ultimately, CCHCS said it could not say when the prisons we asked about will be closer to

20   goal for timely high and medium priority specialty service appointments.[13]  To be clear, we do

21   not expect perfection, but do believe compliance rates of between 50% and 65% for critical

22   specialty services, for arguably the state's sickest prison residents, is inadequate and creates a risk

23   of harm.

24       *Defendants' Position:*  As the Court and Plaintiffs are aware from previous statements, the

25   demand for specialty services at the institutions continues to outpace provider supply.  This

26   ───────────────

        [10]    See email, July 14, 2025, attached hereto (with email addresses and most
        recipients redacted) as Exhibit D.

27      [11]    See CCHCS Memorandum, August 28, 2025, attached hereto as Exhibit E.
        [12]    *Id*. at 2.

28      [13]    *Id*. at 4.

situation is not unique to CCHCS as the wait times for specialty appointments nationally continue to increase due to rising patient demand, provider retirements or departures, and fewer available physicians in the market.

In March 2022, Plaintiffs raised concerns about the timeliness of all specialty appointments (CMC Statement, 25:4-10, ECF No. 3796) and have continued to raise this issue in every CMC Statement since.  At that time, only 59% of the specialty appointments were scheduled within the time allotted.  Since then, CCHCS has made significant progress in improving the timeliness of specialty appointments, by, among other things, adding categories to the Dashboard to break out types of specialty appointments for better understanding barriers, reducing the "noise" in the backlog data by correcting duplicate appointments, promoting e-consults when appropriate, ensuring specialty referrals and associated priority designations are medically necessary, implementing on-site and tele-specialty services at the institutions where possible, and actively working with Health Net to add new specialty providers. CCHCS has dedicated thousands of hours of staff time to reducing the backlog for specialty appointments. CCHCS continues to assist the institutions and work collaboratively with Health Net to expand the specialty network.  Some of the focused efforts include, expanding outreach and training opportunities for institution scheduling staff to obtain access and efficiently utilize the Health Net directory; improved processes for institutions to request recruitment for specific specialty services; improved communication to the field of new providers added to the network; and monitoring institution usage of the directory.  As a result of CCHCS's and Health Net's recruitment efforts, over 100 new specialty services/providers have been added to the Provider Network since March of 2025.  This includes, but is not limited to, 15 Orthopedic Surgeons, seven Neurologists, seven Cardiologists, seven Gastroenterologists, and six General Surgeons.

Three years and five months later, the dashboard reflects that 88% of all specialty appointments statewide are timely scheduled.  This statistic is not an anomaly—for the last year and five months, CCHCS scheduled at least 85% of all specialty appointments statewide within the time allotted.  This is no small achievement considering that as of August 20, 2025, there were 65,571 active orders, with only 1,991 specialty appointments in the backlog.  Of the 65,571

orders, 22,757 have appointments scheduled within the next 30 days. Further, and as reported previously, most specialty appointments that have not been timely scheduled are less than 30 days outside the compliance window. For example, on August 20, 2025, of the 1,991 backlogged specialty appointments, 1,437 (72.2%) were backlogged 30 days or less, and 378 (19%) were backlogged 31 to 60 days.

Plaintiffs' July 14, 2025, Non-Paragraph 7 request—titled "improving rates of timely high and medium priority specialty service appointments"—seeks information about CCHCS's efforts to improve the backlog at the institutions with either the greatest number of backlogged specialty appointments or the greatest rate of unscheduled appointments. CCHCS's response to this query is no different than has been previously stated in Non-Paragraph 7 responses, in discussions with Plaintiffs, and to the Court in CMC statements. The backlog is monitored at the local, regional, and headquarters level. CHCF and CMF, which bear the brunt of the backlog, are complex care missions and house the highest percentage by population of high-risk patients in the state. As of August 19, 2025, CHCF's population is 69% high risk and CMF's is 55%.

Clinically high-risk patients experience the highest disease burden, and it stands to reason their care is generally more complex and would result in higher numbers of appointments, both chronic care and specialty. While CMF and CHCF are both intermediate institutions, they share local resources with several other co-located institutions.

Finally, it bears reminding that while CCHCS works to maintain high compliance for timely access, some number of appointments will always be backlogged given that a number of factors are outside agency control, including provider availability and willingness to accept incarcerated patients. Perfection is not possible nor sustainable or required by the Constitution.

## IV.   EXTREME HEAT

*Plaintiffs' Position:* This Court has stated: "I want to say this very clearly. [Heat] is a medical care issue."[14] Extreme heat poses a serious risk to the health of the California prison population, and we continue to believe that air conditioning is the only certain protection from extreme heat for those who live in CDCR prisons.

---

[14]     ECF. 3980 at 26:4 (June 16, 2025, Reporter's Transcript).

Below, Defendants argue this issue is beyond the scope of *Plata*, in part because heat was not discussed in the Amended Complaint or Stipulation for Injunctive Relief. It cannot be disputed that extreme heat is an environmental condition that causes medical harm that is preventable. Extreme heat is an environmental health determinant that can and does have significant impacts on health, similar to other such determinants that have been addressed in this case, like coccidioidomycosis (Valley Fever) or legionella bacteria, despite not being mentioned specifically in the Amended Complaint or Stipulation for Injunctive Relief. Similarly, the Covid-19 pandemic was not anticipated at the time of the Amended Complaint or Stipulation for Injunctive Relief, but was still addressed through *Plata* nearly 20 years after the case began. As with new and emerging infections, changes in the environment due to climate change lead to medical harm that must be addressed.

Defendants also argue that the issue of extreme heat is beyond the scope of *Plata* because Plaintiffs have not identified any sentinel events among patients with serious medical conditions. As an initial matter, the Eighth Amendment does not require a showing of actual harm, but only a risk of harm.[15] However, using the information currently available to us, we are investigating incidents of what we believe to be serious and sometimes irreparable medical harm caused by extreme heat. We will present these incidents to Defendants, and if necessary the Court, at the appropriate time.

As previously discussed, we asked CDCR and CCHCS for information that will allow us to evaluate the effect heat is having on the Plaintiff class as well as Defendants' response to those impacts.[16] Pursuant to this Court's order, on July 24, 2025, the parties filed a Joint Stipulation Regarding Production Schedule for Response to Non-Paragraph 7 Request Relating to Extreme Heat.[17] Defendants agreed to complete their production of responsive documents by August 15 and to describe of any categories of documents that were not produced. Defendants made eight productions of documents, including some Local Operating Procedures, training materials

---

[15] *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 35 (1993).
[16] *See* ECF No. 3968 at 13:19-14:15.
[17] ECF No. 3981.

(continued…)

9

1  regarding heat, and some heat incident reports. Defendants did not produce indoor heat

2  temperature logs. We are in the process of reviewing the documents and, if necessary, we will

3  raise further concerns with the production.[18]

4       Further, as previously reported, we have asked CDCR which housing units statewide have

5  air conditioning, and they produced a chart that has limited practical use, as explained in the June

6  2023 case statement.[19] Whether a housing unit has air conditioning is a key factor in determining

7  how and to what extent extreme heat is currently impacting the health and safety of and assessing

8  the threat of serious medical harm to individuals in CDCR custody. That said, based on the

9  limited information provided by CDCR, approximately *two-thirds of housing units do not have*

10 *refrigeration-based air conditioning*,[20] some of which are at prisons in the hottest parts of

11 California. In August, CDCR told us again that it would be too burdensome to produce the

12 information using the commonly-used names for buildings, instead referring us to maps produced

13 in *Coleman* in connection with the Covid-19 pandemic for us to use in translating the building

14 names ourselves. Using the *Coleman* maps, we believe we were able to determine which housing

15 units are air conditioned at many prisons, excepting SAC and SCC. We subsequently asked

16 Defendants' to provide information that would allow us to determine which housing units at those

17 two prisons have air conditioning.

18      Relatedly, in June 2025, a document was posted on the CDCR website estimating "the cost

19 of a statewide implementation of effective air cooling mechanism" was approximately $6

20 billion.[21] The document also indicated that "[b]oth long and short-term capital investment

21 measures will need to be taken to address heat in CDCR institutions." On July 11, we requested

22 documents relating to the cost estimate and the capital investments CDCR is considering. On

23 August 18, CDCR declined to provide the requested information, stating the information

24

25      [18]    Below, Defendants state they provided over 30,000 pages in response to our April
       query regarding heat issues. It should be noted, however, that Defendants produced more than
26     5,000 pages that were *not* requested and are readily available to Plaintiffs' counsel on CCHCS's
       QM server (Heat Medication Patient Registry for each prison).

27      [19]    *See* ECF No. 3968 at 13:19-14:2.
        [20]    As compared to evaporative cooling or ventilation without cooling.
28      [21]    *See* Exhibit F, "Climate and the Impact on CDCR: Air Cooling
       Infrastructure/Needs at Institutions Statewide" (June 2025).

1    "exceed[s] the scope of this class action related to the constitutional delivery of medical care to

2    incarcerated persons with serious medical needs."

3         On September 2, 2025, the parties met and conferred regarding temperature logs,

4    documentation of current air cooling technology in housing units, and documents relating to the

5    cost of implementing effective air cooling mechanisms statewide.  Although Defendants take the

6    opportunity below to argue the merits of their obligation to produce heat related information,

7    Plaintiffs will determine whether to pursue a discovery order  after we receive and evaluate the

8    documents Defendants agreed to produce.

9         *Defendants' Position:*  This case concerns the delivery of medical care to incarcerated

10   persons with serious medical needs—not whether heat constitutes an unconstitutional condition of

11   confinement.  (*See* ECF Nos. 1, 20, 24; *see also Brown v. Plata*, 563 U.S. 493, 507 (2011)

12   ("*Plata v. Brown* [ ] involves the class of state prisoners with serious medical conditions").)

13   CCHCS has a robust health care practice at each institution and can address any health care

14   matters that patients may experience from high temperatures.  Plaintiffs have not shown that

15   expansion of this case (to include mandatory installation of air conditioning, for instance) is

16   necessary or appropriate.

17        Plaintiffs have raised the issue of extreme heat and increasing temperatures in five Case

18   Management Conference statements spanning eleven months (ECF Nos. 3925, 3940, 3952,

19   3968), but in all this time, have failed to tether increasing outdoor temperatures to adverse

20   medical or sentinel events among patients with serious medical conditions.  Instead, Plaintiffs

21   argue that the risk of harm is sufficient to demonstrate an Eighth Amendment violation.  But more

22   than a mere suggestion of future harm is required.  Rather, Plaintiffs must prove "a substantial

23   risk of serious harm" that presents an "excessive risk to inmate health or safety" such that the

24   "objectively intolerable risk of harm" is "sure or very likely to cause serious illness and needless

25   suffering."  *Norbert v. City and County of San Francisco*, 10 F. 4th 918, 934 (9th Cir. 2021),

26   *quoting Farmer v. Brennan*, 511 U.S. 825, 834, 837, 846 (1994), *Baze v. Rees*, 553 U.S. 35, 50

27   (2008), *and Helling v. McKinney*, 509 U.S. 25, 33 (1993) (citation modified).  There is also no

28   injury—and therefore, no claim—where the risk of future harm fails to materialize.  *Edwards v.*

1    *Hutchings*, No. 22-16738, 2025 WL 1132828 at *1 (9th Cir. April 17, 2025).  Plaintiffs have

2    shown neither a an objectively intolerable risk nor actual harm, and thus, should not be permitted

3    to unnecessarily and improperly expand the scope of this case at this late hour.

4         Further, Plaintiffs do not dispute that there is no mention of this issue, or any issue closely

5    resembling extreme heat, in the Amended Complaint or the parties' Stipulation for Injunctive

6    Relief.  (*See* ECF Nos. 20, 24.)  Plaintiffs should not be permitted to expand the scope of this

7    lawsuit at this late stage in the litigation, now 24 years since the filing of the original complaint,

8    which also did not mention the issue of extreme heat.  The Federal Rules of Civil Procedure do

9    not allow it, and Defendants' due process rights forbid it.  (*See Califano v. Yamasaki*, 442 U.S.

10   682, 702 (1979) (observing that the scope of injunctive relief in a class action "is dictated by the

11   extent of the violation *established*") (emphasis added).)

12        Nonetheless, Plaintiffs assert that it is appropriate to expand this case to encompass heat

13   and equate it to other environmental health determinants that have been addressed in this case,

14   such as COVID-19 or Valley Fever.  Plaintiffs' comparison of heat to Valley Fever and COVID-

15   19—both of which infectious diseases undeniably caused myriad sentinel events among class

16   members, including death—is a stretch.  Valley Fever was a contributing factor in 34 deaths from

17   2006-2011 and Defendants did not dispute that it presented a serious risk of harm.  (ECF No.

18   2580-1 at 46-8; ECF No. 2661 at 9:1-4, 17:21-23.)  Nor did Defendants dispute that COVID-19

19   presented a serious public health risk, including of severe illness and death.  (ECF No. 3235 at

20   15:6-10.)  But heat is not an infectious disease and does not present such a clear and undeniable

21   risk of serious harm.  Heat also existed at the time the original complaint was filed, as did

22   concepts of climate change and global warming, yet issues pertaining to the medical impacts of

23   heat were not included in this lawsuit.  And unlike Valley Fever and COVID-19, there is no

24   evidence to suggest that heat in CDCR housing units is causing sentinel medical events among

25   class members.

26        Notwithstanding the above, Plaintiffs seek limitless discovery on the issue of heat to  enable

27   them to establish this purported connection—a tacit concession that heat was never an established

28   part of this case.  But this assertion is flawed for two reasons.  First, to the extent Plaintiffs are

attempting to expand the scope of this case (or obtain information to bring a new lawsuit), it is not Defendants' burden to assist in that effort.  Defendants do not need to prove a negative—that heat is not causing adverse medical outcomes to patients with serious medical conditions.  Rather, it is Plaintiffs' burden to attempt to establish that connection.  Second, and relatedly, given Plaintiffs' extraordinary access to information in this case and others, as explained below, and state laws granting broad public access to public agency information, Plaintiffs' assertion that they need further information to evaluate the impact of heat on the patient population falls flat.[22]

Plaintiffs' ongoing access to information in this case is extraordinarily vast.  They receive monthly productions, have extensive access to all CDCR patients' electronic health records on CCHCS's electronic health records system (eHRS), may submit an unlimited number of patient-specific medical inquiries (pursuant to the Paragraph 7 process), and may also submit limitless inquiries pertaining to systemic issues and institutional compliance issues requiring headquarters attention and intervention (Non-Paragraph 7 inquiries).[23]  Indeed, since the last Case Management Conference statement was filed on June 10, 2025, Plaintiffs have submitted 25 such Non-Paragraph 7 inquiries on the following issues:

| Date | Non-Paragraph 7 Subject Line |
|------|------------------------------|
| 6/13/2025 | CHCF PCP Allegation Regarding Patient Letters and Orders Being Entered In his Name, Without his Knowledge |
| 6/23/2025 | Query re Hair Removal in CDCR |
| 6/27/2025 | New CDCR Form 7225 |
| 6/27/2025 | Peer Support Specialist Program – Follow-Up Questions and Requests |
| 7/2/2025 | Query re RVR Issued |

---

[22]    Every month CCHCS produces 16 categories of documents to Plaintiffs as follows: Monthly Health Care Grievance Report, Patient Health Care Inquiry Dashboard, Mortality Review Report, Mortality Review Current Case Status Report, Mortality Review Summaries, Professional Practice Evaluation Summary Report, Investigation and Discipline Audit Report, Telemedicine Activity Report, HR Recruitment and Retention Report, Telemedicine PCPs – Registry Providers and Turnover Rate, Telemedicine PCPs – Statewide Total and Vacant, Hepatitis C Virus Report, Medical Scheduling Registry Report, Root Cause Analysis Report, MAT Population Changes Report, ISUDT Insider.

[23]    Since the beginning of 2025, Plaintiffs have submitted 87 or more Non-Paragraph 7 inquiries, and 87 or more Paragraph 7 inquiries (including follow-ups).  Further, Plaintiffs receive voluminous productions in advance of site visits, and have access to various CCHCS intranet sites containing information about health care.

| Date | Non-Paragraph 7 Subject Line |
|------|------------------------------|
| 7/7/2025 | CMF Follow-up SAR Questions |
| 7/11/2025 | Heat Mitigation |
| 7/11/2025 | Status of Autopsy and Mortality Review |
| 7/11/2025 | Further Info re Peer Support Specialist Program |
| 7/14/2025 | Review of Pelican Bay State Prison (PBSP) Nursing Services |
| 7/14/2025 | Request for Specialty Services Backlog and Related Data |
| 7/14/2025 | Improving Rates of Timely High and Medium Priority Specialty Service appointments at Certain Prisons |
| 7/14/2025 | Receiver-Commissioned Expert Report on CCHCS Emergency Medical Responses |
| 7/15/2025 | Further Follow-Up Query re SVSP Non-Traditional Housing and Any Upcoming Investigations |
| 7/15/2025 | Follow-Up Regarding Efforts to Improve Coordinated Care of Complex Patients |
| 7/17/2025 | False Positive Urinalysis Results – follow up questions |
| 7/16/2025 | RVR Issued Contrary to 1/8/25 CCHCS/CDCR Policy Memorandum – Request to Rescind (and related requests) |
| 8/1/2025 | Additional Inquiry re Medical Staff's Role in the RVR Process |
| 8/5/2025 | Follow-up to 2/20/25 CCHCS Response re Heat Issues |
| 8/6/2025 | Query re HDSP HR1 Transfers |
| 8/11/2025 | Further RVR Issued Contrary to 1/8/25 Process |
| 8/12/2025 | Info/Data from Applicant Tracking System |
| 8/12/2025 | Changes to Acuity Based Staffing Model and the recent BCP |
| 8/15/2025 | Additional Inquiry re June 9, 2025 response, medical staff's role in the RVR process |
| 8/22/2025 | SATF Offsite Appointment Cancellations |
| 9/5/2025 | Documentation of Heat-Related Medical Encounters |

Moreover, Defendants agreed to produce documents requested in Plaintiffs' April 17, 2025, follow-up Non-Paragraph 7 request relating to heat issues, notwithstanding Defendants' consistent objection that the issue of heat being an unconstitutional condition of confinement exceeds the scope of this case. Defendants produced over 30,000 pages of documents in response to this request. Defendants also agreed, at the conclusion of the rolling production, to identify

14

1    each category of requested information and state whether any categories of documents were

2    determined to be beyond the scope of this lawsuit and therefore irrelevant to either party's claims

3    or defenses, despite the fact that the Non-Paragraph 7 process contemplates no such obligation.

4        On August 15, 2025, Defendants provided Plaintiffs with their eighth and final production

5    of documents and advised Plaintiffs that all documents that were requested were provided except

6    for inside temperature records.  As Defendants explained, "[t]emperature logs do not indicate, for

7    instance, whether medical care should have been delivered, whether medical care was actually

8    administered, or the quality of any such medical care."  (August 15, 2025 Email from Corinna

9    Arbiter to Plaintiffs' Counsel, attached as Exhibit G.)  Plaintiffs responded, asserting that

10    temperature logs are relevant because they indicate when Stage III under the Heat Plan has been

11    triggered such that medical rounds are required.  However, that information—including how

12    many times a Stage III heat alert was triggered in a given month (CDCR Form 7711-1), as well as

13    corresponding medical rounding logs (CDCR Form 7711-3)—was already included in

14    Defendants' production.

15        The parties met and conferred on September 2, 2025.  On the issue of temperature logs,

16    Defendants reaffirmed their objection to the request on the basis of relevance, but agreed as a

17    courtesy to produce certain logs that had been previously produced outside of this case in

18    response to a Public Records Act request.  The parties also discussed Plaintiffs' access to

19    information to enable them to determine which buildings at SAC and SCC are air conditioned and

20    agreed, again as a courtesy, to provide information notwithstanding Defendants' relevance

21    concerns.[24]  Defendants provided information to Plaintiffs the following day relating to SCC but

22    have not yet heard whether this resolves their concerns.  Defendants agreed to provide similar

23    information for SAC.  Regarding Plaintiffs' request for information on the estimated cost of

24    implementing effective air cooling mechanisms statewide, Defendants pointed to information that

25    was publicly available relating to Defendants' air cooling pilot program.

---

26    [24]        Plaintiffs had previously requested similar information for all other institutions,
     and Defendants informed Plaintiffs that much of that information was available to them through
27    prior *Coleman* filings.  (*See* ECF No. 3201 (Stipulation and Order Superseding the Stipulated
     Protective Order Filed April 3, 2003, permitting the sharing of confidential information between
28    the two cases).)

1   While Defendants have worked with Plaintiffs to provide certain information as a courtesy,

2   concepts of relevance and burden still apply here.  Defendants are also not obligated to create

3   evidence, including charts and reports specifying the status of air handling units statewide, that

4   does not otherwise exist. *Rogers v. Giurbino*, 288 F.R.D. 469, 485 (S.D. Cal. 2012) ("A party,

5   however, is not required to create a document where none exists."), *citing  Goolsby v. Carrasco*,

6   2011 WL 2636099, at *7–8, 2011 U.S. Dist. LEXIS 71627, at *20–21 (finding that a document

7   request that would require the defendant to create a roster of all employees who supervised the

8   prison cage yard is not a proper request under Federal Rule of Civil Procedure 34(a)); *Robinson v.

9   Adams*, No. 1:08–cv–01380–AWI–SMS PC, 2011 WL 2118753, at *20, 2011 U.S. Dist. LEXIS

10  60370, at *53 (E.D. Cal. May 27, 2011) (ruling that defendant is not required to create a

11  document in response to a request for production).

12   Finally, Defendants requested that Plaintiffs join in a stipulation to formally close discovery

13  in this case.  As Defendants explained, this request is intended to address an apparent oversight:

14  discovery was reopened in 2013 to allow Plaintiffs to prepare for a possible termination motion

15  by Defendants.  (*See* ECF Nos. 2534; 2542; 2546 at 3:12-14; 2685 at 2:21-23; and 2727 at 2:7-

16  9.)  But Defendants never filed any such motion, and as this Court observed in 2019, it does not

17  appear that discovery has since been closed.  (ECF No. 3155 at fn. 3.)  Given that this case is long

18  past the discovery stage of litigation, Defendants believe it is time to formally address this

19  oversight.  At the September 2, 2025 meet and confer, Plaintiffs stated they would not so stipulate

20  because they could foresee a need for information (outside of their extensive and ongoing access)

21  in the future.  Such is not a legally valid or appropriate basis to keep discovery open in case long-

22  since past the discovery phase, and accordingly, Defendants intend to file a noticed motion to

23  address this issue formally with the Court.[25]

24

25

26

27

28

---

[25]   Alternatively, if the Court prefers, Defendants can work with Plaintiffs to submit a joint discovery letter brief to this Court.

## V.    OTHER MEDICAL CARE MATTERS

### A.    Housing Incarcerated People in Non-Traditional Housing at SVSP

*Plaintiffs' Position*:  Plaintiffs continue to seek a full accounting of how dozens of people came to be housed in non-traditional housing at Salinas Valley State Prison (SVSP) in late 2024 and early 2025.  Defendants have advised that this matter is the subject of a CCHCS Root Cause Analysis (RCA).  We are monitoring the status of that review.

In July, an updated RCA status report provided by CCHCS indicated the focus of the review appears quite narrow, referencing eleven residents housed inappropriately in January as discovered by *Coleman* Special Master, and not the more than 50 other people who may have been inappropriately housed previously in January and for months before that we identified.[26] Without consideration of all facts, any RCA findings are likely to be limited and the remedies inadequate.

We also asked Defendants, on April 25 and again on July 15, 2025, if, in addition to the RCA, they would also be conducting a formal internal affairs investigation related to the staff misconduct both in housing people in shockingly inhumane locations and—for health care staff— not immediately elevating concerns about the inability to provide adequate care.  We requested the date any such investigation was approved and the tracking number.  To date, we have not received a response to these requests (the fact of an administrative internal affairs investigation is not confidential, as we understand it).[27]

*Defendants' Position*:  Plaintiffs mischaracterize the scope of the Root Cause Analysis (RCA)[28] and seem to want CCHCS and CDCR to focus more on identifying the possible number

---

[26]    *See* ECF No. 3968 at 25:8-16.  We provided these facts to CDCR and CCHCS in May 2025 and requested that, as part of their investigation, Defendants interview all people who were housed in non-traditional or deactivated housing.

[27]    CDCR on May 2, 2025, referenced the possibility of other formal investigations, mentioning "ongoing investigations including but not limited to the RCA" but has never said a formal investigation is taking place.

[28]    There is a minimum data set that a team must collect for a "thorough and credible" RCA. The RCA team looks at many information points to answer questions about the scope of the problem including how the problem was created and who was involved, how widespread was the problem, why it happened, and how it can be prevented from re-occurring. (*See,* "Framework for Root Cause Analysis and Corrective Actions," available at: https://digitalassets.jointcommission.org/api/public/content/3559a1e9d41842348122ca1f2c627e9
(continued...)

of improperly housed persons rather than on the cause(s) of the problem itself.  That even one incarcerated person was improperly housed is unacceptable.  But Defendants continue to believe that the proper focus of the investigation is identifying what led to the improper housing decision(s) at SVSP and what critical steps must be taken to ensure that it does not happen again.  It appears the parties share in their goal of ensuring incarcerated persons are not improperly housed, as they were at SVSP, ever again though they disagree on how best to achieve that goal.  Nonetheless, it remains Defendants' right and responsibility to conduct this investigation as best they see fit to achieve this goal.

The RCA findings may not be disclosed in the public record in this action without written permission from all parties.[29]  However, CCHCS provided the RCA findings to Plaintiffs in accordance with the Stipulation and Order and Protective Orders for the case.  Defendants have reviewed the findings and are confident that they are broad enough so that the scope of the action plan will prevent this type of situation from occurring in the future.

Defendants advised Plaintiffs about ongoing investigations on May 2, 2025. These investigations are ongoing and confidential and as such, Defendants cannot disclose further information about them, including the information requested by Plaintiffs.

**B.    False Positive Urinalysis Results**

*Plaintiffs' Position*:  In the last CMC statement, we reported that we asked CCHCS when it would implement the urine screening process to provide for reflex (automatic) confirmatory tests following a positive opiate screen.  On August 8, CCHCS told us that this process was implemented on July 1, 2025.  We appreciate this newly required process, and we will monitor whether it resolves the problem of patients being at risk of unwarranted parole denials based on inaccurate, unreliable urinalysis results.

---

6?v=291853c9; *see also* "Root Cause Analysis and Medical Error Prevention," available at https://www.ncbi.nlm.nih.gov/books/NBK570638/.)

[29]    March 3, 2020, Stipulation and Order re: RCA Documentation and Information, ECF No. 3204; February 14, 2020, Plata/Coleman Protective Order, ECF No. 3201, ¶ 6.

1      *Defendants' Position*: CCHCS implemented the reflex confirmatory urine screening

2      process on July 1, 2025.   Defendants support CCHCS's work to ensure the process functions

3      effectively and helps reduce the risk of inaccurate urinalysis results.

4          **C.    Analysis of 2023 Mortality Review**

5          *Plaintiffs' Position:*  As previously reported, CCHCS in April released its most recent

6      annual analysis of its mortality reviews, which concluded that "[t]here remain significant

7      opportunities for improvement in coordinated care of complex patients . . . ."[30]  In response to our

8      query asking what actions have been or will be taken in response to that conclusion, CCHCS in

9      June described how complex patients were currently managed and general efforts and initiatives

10     to improve patient care.[31]  In July, we asked about initiatives specific to improving coordinated

11     care of complex patients, suggesting possible actions including using the long-established

12     medical clinic morning huddles and the bi-weekly or monthly population management meetings

13     held by medical clinic care teams.

14         On August 15, CCHCS responded, stating "Health care leadership is in the process of

15     evaluating areas of improvements for complex care management including identifying

16     appropriate forums for discussions of these patients in interdisciplinary team meetings, huddles,

17     population management meetings, care team enhanced conferences, and with individual

18     clinicians. This is part of the complex care initiative which is an active project involving ongoing

19     discussions and planning."  We appreciate that this initiative and project is active and will

20     continue to monitor these matters.

21         *Defendants' Position:*  Defendants continue to support CCHCS's ongoing efforts to

22     strengthen complex care management in response to the Analysis of 2023 Mortality Reviews.

23     These efforts include evaluating and identifying appropriate forums—such as interdisciplinary

24     team meetings, huddles, and population management meetings—for discussing the care of

25     complex patients.

26

27

28
_____

[30]      *See* ECF No. 3968 at 36:9-11 and Exhibit 10 thereto at 52.
[31]      *See* Exhibit H, CCHCS Memorandum (June 19, 2025).

19

1    **D.    Emergency Medical Response**

2    *Plaintiffs' Position:*  As the Court knows, in early June the Receiver provided the expert

3    report he commissioned on prisons' emergency medical response, and that overall, we found the

4    report's critiques and recommendations well-considered.[32]  In mid-July, we asked what the next

5    steps would be, including what has been determined regarding the expert's recommendations.

6    As of September 9, we have not received a response.  Defendants below indicate the report is still

7    being reviewed.  Given the deficiencies in emergency medical response care identified in the

8    report, and which we have observed in the prisons, we believe prompt and effective

9    implementation of the report's recommendations is necessary.

10    *Defendants' Position:* Dr. Jeffrey Keller, retained by the Receiver to evaluate the current

11    functioning of CDCR's Emergency Response System and provide his recommendations, issued a

12    report that was provided to the parties earlier this year. CCHCS and CDCR's Division of Adult

13    Institutions are thoroughly reviewing the report.  CCHCS is appreciative of Dr. Keller's

14    recommendations and will continue to review for areas of improvement.

15    **E.    Medical Staff's Role in the Disciplinary Process**

16    *Plaintiffs' Position*:  In January, CCHCS and CDCR issued a joint memorandum that

17    governs and limits health care staff involvement in the Rule Violation Report (RVR) process,

18    mandated staff training on the new process, and required implementation of a tracking system for

19    all RVRs "generated and uploaded on behalf of healthcare staff."[33]

20    The issue of whether, and under what circumstances, CDCR health care staff initiate RVRs

21    has significant implications for patient care and the delivery of medical services in the prisons.

22    The new process set forth in the January memorandum, if implemented and followed, may

23    adequately limit when and how medical staff participate in the discipline of patients.

24    On August 1, we asked for information regarding the percentages of medical staff who have

25    to date received the required training on the new process, whether and when the January

26    memorandum's requirements will be included as formal policy in the Health Care Department

---

[32]    *See* ECF No. 3968 at 38:8-15 and Exhibit 1 thereto.
[33]    *See* Exhibit I, CCHCS Memorandum, "Limiting Licensed Health Care Staff
Access to Rules Violation Reports" (Jan. 8, 2025).

Operations Manual (HC-DOM), and CCHCS's plan to self-audit compliance, including processes for identifying and reviewing RVRs issued in ways that do not comply with the new process. As of September 4, have not received a response to this request. We are especially interested in the CCHCS's plan to identify RVRs issued contrary to the policy. Via class member correspondence, we have so far identified four RVRs issued after the January memorandum that did not comply with the new process. To date, CDCR has, at our request voided two such RVRs and has not yet responded to our request to void the other two. Below, Defendants assert that four RVRs do not indicate the policy is not being followed. We disagree. That we have been alerted to multiple policy violations through class member correspondence alone raises serious concerns as to how the policy is being implemented.

We also asked for access to the tracking system for healthcare generated RVRs that is required by the January memorandum. Access to the tracking system, given our duties to the class, is necessary to adequately monitor compliance with the January memorandum's directives. In June, CDCR without explanation stated there were no plans to grant us access. We renewed our request on August 1.[34] Below, Defendants state that we have access to a monthly report containing the number of RVRs authored by health care staff through our role in *Armstrong*. As an initial matter, the *Armstrong* Court Expert has indicated this is no longer an *Armstrong* issue and stated that all ongoing monitoring of the policy regarding health care staff's role in the RVR process is an issue for *Plata*.[35] Further, Plaintiffs' counsel in *Armstrong* have only received one such report, dated May 31, 2025, sent to them by the Court Expert's team. That report was wholly inadequate to monitor compliance, as the number of RVRs issued by healthcare staff alone says nothing about whether the process was followed. Indeed, the May 31, 2025, report says zero RVRs were generated by healthcare staff, but one of the four RVRs we identified via class member correspondence as violating CCHCS's policy, discussed above, was issued on May 23.

*Defendants' Position*: Since January 14, 2025, when CCHCS provided Plaintiffs with the January 8, 2025, memorandum to wardens, chief executive officers, and regional executives,

---

[34] Despite Defendants' implication below, we have not asked for access to SOMS.
[35] Exhibit J, Email from Ed Swanson, "Monitoring Health Care RVRs" (July 24, 2025).

regarding "Limiting Licensed Health Care Staff Access to Rules Violation Reports," Plaintiffs' counsel have identified to Defendants only three patients who received RVRs, which they contend did not comply with the January 8, 2025, memorandum.  Two RVRs that Plaintiffs contend did not comply with the new process were issued about six and 12 weeks after roll-out and before all health care staff were fully trained.  At Plaintiffs' request, those RVRs for those patients were voided.  Two other RVRs—which were issued to a single verbally and sexually assaultive patient on different dates—were brought to CCHCS's attention on July 25, 2025, and August 11, 2025, and are under review through the Non-Paragraph 7 process.  These four RVRs—out of 16,246 RVRs written between January 8, 2025, and August 26, 2025—hardly demonstrate a systemic compliance problem with the January 8, 2025 memorandum or cause for alarm.

As of August 18, 2025, approximately 84% of all required health care staff have completed the training, titled "Health Care Providers Role in the Rules Violation Report (RVR) Process." Others are in the process of being trained.  Custody does not require training on the new process for health care staff.

Plaintiffs seek access to the tracking system discussed in the January 8, 2025 memorandum, though they already receive a report every month containing the number of RVRs authored by licensed health care staff through their role in *Armstrong v. Newsom*, 4:94-cv-02307-CW. CCHCS uses this monthly report as the tracking mechanism.  So, they already have access to the tracking system.

If the CEO or their designee author an RVR, they enter the information into the Strategic Oversight Management System (SOMS), a secure web-based system that consolidates and centralizes data about incarcerated persons and contains sensitive information about every incarcerated person.  To the extent Plaintiffs seek access to this system to further track RVRs, as they request above, Plaintiffs will not be given access rights to the SOMS database. They are not entitled to the overwhelming majority of the information in the database.

## VI.  PEER SUPPORT SPECIALIST PROGRAM

*Plaintiffs' Position*:  CDCR and CCHCS have trained and hired hundreds of peer support specialists in the prisons and plans to have such specialists at every prison very soon.  The Peer Support Specialist Program is an excellent one, and we credit CDCR and CCHCS for implementing it.  After we raised concerns about patient privacy and asked about the need for advance consent before medical-related information about residents is provided to the peer support specialists, CCHCS on July 28 suspended its practice of providing of such information to the specialists.[36]  We were subsequently told that an advance consent process was anticipated to be implemented in or shortly after the first quarter of 2026.

We appreciate and agree with these actions, as well as CCHCS's statement that peer support specialists can continue general outreach work and that residents can self-initiate contact with them regarding medical care matters.[37]  These efforts, in our view, will allow this important program to continue helping many with medical care-related concerns while the necessary consent process is developed and implemented.

*Defendants' Position*: Defendants continue to believe the Peer Support Specialist Program (PSSP) is an important initiative.  CCHCS suspended the practice of providing medical-related information to PSSP workers as of July 28, 2025, and similarly paused the practice of having PSSP workers perform healthcare-related tasks.  CCHCS is developing an advance consent process with the goal of resuming the performance of healthcare-related tasks by PSSP workers in early 2026.

---

[36]    *See* Exhibit K, CCHCS Memorandum, "Peer Support Specialist Program Tasks Suspended for Peer Support Specialist Workers" (July 28. 2025).
[37]    *Id.*

1

2                                          Respectfully submitted,

3    Dated:  September 8, 2025             HANSON BRIDGETT LLP

4

5                                          /s/ Samantha D. Wolff
                                           PAUL MELLO
6                                          SAMANTHA D. WOLFF
                                           DAVID C. CASARRUBIAS- GONZÁLEZ
7
                                           Attorneys for Defendants
8

9      Dated:  September 8, 2025           ROB BONTA
                                           Attorney General of California
10                                         DAMON G. MCCLAIN
                                           Supervising Deputy Attorney General
11

12

13                                         /s/ Corinna Arbiter
                                           CORINNA ARBITER
14                                         Deputy Attorney General
                                           Attorneys for Defendants
15

16
     Dated:  September 8, 2025             PRISON LAW OFFICE
17

18
                                           /s/ Mackenzie L. Halter
19                                         DON SPECTER
                                           STEVEN FAMA
20                                         ALISON HARDY
                                           RANA ANABTAWI
21                                         LILY HARVEY
                                           MACKENZIE L. HALTER
22
                                           Attorneys for Plaintiffs
23

24

25

26

27

28

                                  24