# Exhibit A

July 24, 2025

Secretary Jeff Macomber
California Department of Corrections and Rehabilitation
Elk Grove, CA 95758

Dear Secretary Macomber:

**Subject:  Delegation of Authority – High Desert State Prison**

Under the authority conferred on me by United States District Court for the Northern District of California, Case No. 4:01-cv-01351-JST, *Plata v. Newsom*, under the Order Appointing Receiver dated February 14, 2006, as modified by the order dated January 23, 2008, and in compliance with the order dated October 29, 2021 , I have considered whether the medical care program at High Desert State Prison ("HDSP") is suitable for return to California Department of Corrections and Rehabilitation control.

In making this determination, I have considered the Assessment of Medical Care Report at High Desert State Prison (January 2025); Dr. Dewsnup's report (January 2025); the Readiness for Delegation: Nursing Services Review for HDSP (December 2024); the Cycle 7 report of the Office of the Inspector General; data from the Healthcare Services Dashboard and other internal monitoring tools; and letters submitted by the Prison Law Office and the State. Dr. Dewsnup concluded that "within the care capacity at HDSP, provider care was effective and appropriate." His concern regarding "care capacity" related to the large number of complex, high risk patients who, because of HDSP's remoteness to tertiary care, presented HDSP's providers with extra challenges in providing care to that population.



I have directed HDSP to take steps to reduce the population of Medical High Risk (HR1) patients to approximately 100 patients and to stabilize the HR1 census at that level. This will include the immediate transfer of approximately 10-15 HR1 patients and a halt on non-essential HR1 transfers to HDSP effective immediately. Overall, I have determined HDSP has made sufficient progress, and has sustained that progress this year, so that it is appropriate to delegate its management to the State. I hereby issue this revocable delegation of authority to you, effective immediately, to take over management of medical care at HDSP, subject to the conditions and requirements in the October 29, 2021 Court order.

Sincerely,

J. Clark Kelso, Receiver

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

# Exhibit B



**Dewi Zarni**

## Plata | Non Para 7 Query re HDSP HR1 Transfers
1 message



**Mackenzie Halter**                                                          Wed, Aug 6, 2025 at 12:35 PM
To: Clark Kelso
Kelso, Clark@CDCR"                                          "Toche, Diana@CDCR"
."John D@CDCR Dovey"                                     "Hartmann, Sarah@CDCR"
"Yang, Mellonie@CDCR"                                    "Burkart, Brianne@CDCR"
"Saich, Lara@CDCR"                                          "Bick, Dr. Joseph@CDCR"
"Heintz, Lisa@CDCR"                                        "Gouldy, DeAnna@CDCR"
"Hart, Robin@CDCR"                                         Matranga, Amanda@CDCR"
Sara@CDCR"                                                  "Joseph@CDCR Williams"
CDCR CCHCS Health Care Compliance Support Section
"Paul B. Mello"                                              . Samantha
David Casarrubias                                          Samantha M Bacon
"Neill, Jennifer@CDCR"                                    Rachel
Damon McClain                                              Corinna Arbiter
CDCR-OLA Plata CAT Mailbox                            "OBrien, Robert@CDCR"
"CDCR Health Care Regulations and Policy Section@CDCR."
Cc: Alison Hardy                    Don Specter                          Steven Fama
                Rana Anabtawi                        Lily Harvey              Sara Norman
                Dewi Zarni

Good afternoon,

We write regarding the Receiver's July 24, 2025, letter regarding Delegation of Authority at High Desert State Prison (attached). The letter includes that the Receiver "directed HDSP to take steps to reduce the population of Medical High Risk (HR1) patients to approximately 100 patients and to stabilize the HR1 census at that level. This will include the immediate transfer of approximately 10-15 HR1 patients and a halt on non-essential HR1 transfers to HDSP effective immediately."

Please provide a list of the 10-15 HR1 patients who were "immediate[ly] transfer[red] from HDSP.

Please define "non-essential HR1 transfers" and, conversely,  "essential" HR1 transfer. What factors will be considered, who will make the decision as to whether a transfer is essential or non-essential, and when will those decisions be made in relation to when a patient is considered or endorsed for transfer?

Finally, how will the Receiver's plan as described in the HDSP Delegation Letter with regard to the halt on non-essential HR1 transfers to HDSP be operationalized? For instance, will it be included in the HCDOM, a statewide memorandum or directive, a HDSP Local Operating Procedure, or something else? Please also provide the time-frame for formal adoption of a written policy regarding the halt on non-essential HR1 transfers to HDSP.

Thank you,

**Mackenzie Halter**
Staff Attorney
Prison Law Office
(510) 280-2621

Pronouns: she/her

---

 **25.07.24 Delegation of Authority - HDSP.pdf**
128K

# Exhibit C

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

Date        :        July 23, 2025

To          :        Rana Anabtawi, Prison Law Office

Subject    :        **PRISON LAW OFFICE NON-PARAGRAPH 7 CONCERN RELATING TO CHANGES TO MEDICAL STAFFING ALLOCATIONS**

California Correctional Health Care Services (CCHCS) is providing the italicized information below in response to your email inquiry dated May 21, 2025.

1.  Are we correct that the acuity-based staffing model is only applicable to direct patient care positions? Please provide a list of all positions which are tied to this ratio-based staffing.

    *The acuity-based staffing model is applicable only to direct patient care positions. Refer to Attachment A for a list of all acuity-based staffing model positions.*

    Our understanding is that positions such as the Specialty UM, offsite and onsite RN, etc., are *not* adjusted based on the patient population – but their titles were not included in the non-direct patient care list provided as part of the attached 5/6/25 non-paragraph 7 response. Are those specialty positions (UM, Offsite/onsite/telehealth RN, etc.) direct patient care positions or not?

    *The Utilization Management (UM) and offsite/onsite/telehealth RN positions are direct patient care positions and included in the Registered Nurse (RN) allocations; however, these positions are based on a per institution complement, not volume of appointments or population.*

2.  For positions subject to the acuity-based staffing model, how are adjustments made to healthcare positions annually? For these positions, we understand certain factors – including the number of patients and their identifying characteristics such as their medical and mental health classifications – determine how many healthcare positions will be allocated in any given fiscal year and that these adjustments are made annually. Is that correct?

    *Adjustments to the positions listed in Attachment A are made twice a year (Spring and Fall).*

    Are any adjustments to these staff positions done without the need for a formal BCP to be submitted and approved? If a BCP is required, are they automatically approved? For example, were all proposed staff changes based on the acuity-based staffing model approved for the last fiscal year? Please let us know if any were not approved and the reasons why.

    *Acuity-based staffing model methodology was established and approved by the Legislature. The established methodologies are recalculated every year through the Fall Population and May Revise adjustments based on updated population numbers and population acuity levels. If CCHCS needs to update a methodology in the staffing model, a Budget Change Proposal would need to be submitted for consideration and is not automatically approved by the Department of Finance. There have been no acuity-based staffing adjustments or proposals denied by the Legislature since 2023.*

# MEMORANDUM

Re: Changes to Medical Staffing Allocations

3. Since 2023, have any changes been made to the formula which dictates the acuity-based staffing ratios? What reassessment was completed related to nursing and PCP allocations at CCWF and what were the findings of that reassessment? Have any changes been made or are anticipated to be made to CCWF direct-patient care staffing positions as a result of the reassessment? If so, what and when? We did not identify any BCP submitted to adjust CCWF staffing numbers from this year.

*A staffing reassessment was completed for our women's facilities, Central California Women's Facility (CCWF) and California Institution for Women (CIW), and identified a staffing shortfall for female needs based on volume of services. CCHCS submitted a BCP during May Revise to obtain permanent position authority for an additional primary care provider (PCP) for Obstetrics and Gynecology and radiologic technologists for mammography services at CCWF and CIW and, additional RNs at CCWF for episodic care and case management. If approved by the Legislature, this position authority will be included in the July 2025 staffing allocations for CCWF and CIW.*

Was this reassessment related only to CCWF or was the assessment related to whether changes needed to be made about the acuity-based staffing model/ratio that would factor in additional information when determining staffing needs?

*This particular staffing reassessment was related to the female institutions only (CCWF and CIW).*

What, if any, staffing needs were identified and submitted via a BCP in 2025? Was it approved? If not, why not? Is the Receiver able to bypass the BCP process and provide those allocated positions regardless of the BCP determination?

*A BCP was submitted with the May Revise because of the identified staffing shortfall at the female institutions. This BCP was approved in the Budget Act 2025 and is effective July 1, 2025. The Receiver may authorize CCHCS Fiscal Management Section (FMS) and Human Resources (HR) to proceed with allocating and hiring positions while the BCP is under review; however, these positions would remain unfunded until a final BCP determination is made.*

4. We want to understand how adjustments may be made to healthcare positions that are *not* subject to the acuity-based staffing model. Could you explain what appears to be a contradiction between the response received on 5/6/25 and that received on 5/8/25: specifically, will the referenced RJD positions become part of the allocated staffing budget part of the acuity-based staffing model or not? In this regard, it appears that in the context of the 5/6/25 non-paragraph 7 response, the members of the Specialty services team are *not* subject to acuity-based staffing.

*Staffing Authorization Requests (SAR) provide limited-term position allocation approval but do not provide permanent position authority as part of the acuity-based staffing model. A BCP must be submitted and approved by the Legislature for permanent position authority and funding.*

*Although it appears in the context of the response dated May 6, 2025, that members of the specialty services team are not subject to acuity-based staffing, Specialty RNs are a part of the acuity-based staffing model. However, Specialty RNs are not allocated based on patient populations; instead, each institution is allocated 1.0 RN for onsite specialty services and 1.0 RN for offsite specialty services.*

# MEMORANDUM

Re: Changes to Medical Staffing Allocations

According to the 5/6/25 non-paragraph 7 response, in order to have the number of non-direct patient care positions adjusted to become part of the permanent staffing allocations, a BCP is required – can

you explain if this process differs from how the adjustments are done for direct patient care positions? For instance, are the latter positions automatically done for all prisons based on patient data without the need for justification and the former is done individually for each prison with necessary justification needed?

*As noted in response to questions 3 and 4 above, the methodology for the positions listed in Attachment A have been approved by the DOF and the Legislature. Position adjustments based upon the approved methodology are submitted to the DOF twice each year. Any deviations from the approved methodology requires a BCP to be submitted and approved by the Legislature. Staffing adjustments for non-clinical positions also require approval by the Legislature through the BCP process.*

Since 2023, were any BCPs submitted for positions that would otherwise not be included in the acuity-based staffing formula? If so, please list those positions, including whether they were approved.

*As noted in response to question 5, a BCP has been submitted for the following:*

- o *Female Factor (pending legislative vote)*
  - *2.0 Primary Care Providers*
  - *4.8 Registered Nurses Episodic Care*
  - *4.8 Registered Nurses Case Management*
  - *1.0 Radiologic Technician*

What authority, if any, does the Receiver have to change a prison's non-direct patient care healthcare allocations without a formal BCP? If the Receiver has authority to do so, has he exercised this authority since 2023? Please provide relevant data.

*The Receiver may authorize CCHCS FMS and HR to proceed with allocating and hiring positions while a BCP is under review; however, these positions would remain unfunded until a final BCP determination is made by the Legislature. The Receiver has not exercised this authority since 2023.*

5. We were informed via a 11/21/24 non-Paragraph 7 response regarding SAR positions, "SARs are intended as temporary resources and can be used as interim solutions until a permanent solution is identified. Permanent resource requests require a Budget Change Proposal." Our understanding is that this applies to both SAR positions for direct and non-direct patient care positions that exceed the pre-established staffing allocations – is that correct? If so, have any BCPs related to making a SAR position permanent been submitted since 2023? Please provide such BCPs, including whether they were approved.

*SARs are required for both direct and non-direct patient care positions that exceed established staffing allocations. To receive permanent funding for SAR positions, CCHCS has submitted the Female Factor Budget Change Proposal. This BCP is pending inclusion in the Budget Act to be released July 1, 2025.*

Could you please explain why a SAR would be approved for more than one year but then not be included in a BCP to make the position permanent?

# MEMORANDUM

Re:  Changes to Medical Staffing Allocations

*A SAR could be approved for more than one year but not included in a BCP for many reasons. For example, if a permanent employee leaves CCHCS and accepts a limited term position with another department, CCHCS holds a position in the event the employee returns to CCHCS. In the event the permanent employee returns, CCHCS will have to let the temporary employee go. BCPs are generally used when statewide needs are identified. Ideally, SARs are temporary until an adjustment can be made via an existing model methodology.*

For instance, SATF has been utilizing a second CP&S as a temporary position for more than a year – has a BCP been submitted to make this position permanent?

*SATF was allocated a second permanent Chief Physician & Surgeon (CP&S) position in the 2025-26 Fall Population Distribution based on the 1:15 PCP methodology. This adjustment was based on population and currently, there are no plans to adjust the CP&S model methodology.*

If so, was it approved? If not, why was it not submitted?

*Once again, this position is outside the approved model methodology and no BCP has been submitted to adjust the 1:15 ratio.*

Thank you.

cc:    Clark Kelso, Receiver
       Diana Toche, D.D.S., Undersecretary, Health Care Services, CDCR
       Directors, CCHCS
       CCHCS Office of Legal Affairs
       Office of Legal Affairs, CDCR
       Office of the Attorney General
       Hanson Bridgett, LLP
       DeAnna Gouldy, Deputy Director, Policy and Risk Management Services, CCHCS
       Brittany Brizendine, Psy.D., Deputy Director, Institution Operations, CCHCS
       Robin Hart, Associate Director, Risk Management Branch, CCHCS
       Regional Executives, Regions I-IV, CCHCS

**ATTACHMENT A**

Below is the list of positions tied to ratio based staffing with the included main driver of need in parenthesis:

- Primary Care Physician (population)
- Health Records Technician (population)
- Health Information Management Office Assistant (population)
- Laboratory Assistant (population)
- Pharmacist (population)
- Pharmacist Technician (population)
- Food Administrator (licensed beds)
- Clinical Dietician (licensed beds)
- Correctional Supervising Cook (licensed beds)
- Supervising Correctional Cook (licensed beds)
- Registered Nurses
  - Leads (beds)
  - Correctional Treatment Center (licensed beds)
  - Mental Health Crisis Bed (licensed beds)
  - Skilled Nursing Facility (licensed beds)
  - Hospice (beds)
  - Psychiatric Inpatient Program (licensed beds)
  - Outpatient Housing Unit (beds)
  - Treatment and Triage Area (per institution)
  - Specialty – Onsite (per institution)
  - Specialty – Offsite (per institution)
  - Utilization Management (per institution)
  - Telemedicine (per institution)
  - Infection Control (per institution)
  - Public Health Nurse (per institution)
  - Nurse Instructor (per institution)
  - MH Nurse Educator (per institution)
  - Reception Center (per reception center)
  - Receiving and Release (per institution)
  - Mental Health Group RN (per Enhanced Outpatient Building)
  - Mental Health Case Management (per Enhanced Outpatient Building)
  - Episodic Care (per clinic)
  - Case Management (per clinic)
  - Health Care Appeals (number of appeals)
  - Employee Health Program (per institution)
  - Substance Use Disorder Treatment (per institution)
- Licensed Vocational Nurses
  - Correctional Treatment Center (licensed beds)
  - Outpatient Housing Unit (beds)
  - Skilled Nursing Facility (licensed beds)
  - Psychiatric Inpatient Program (licensed beds)

- o   Medication Management (medications passed)
- o   Case management (per clinic)
- Psychiatric Technician
  - o   Enhanced Outpatient Program (population)
  - o   Reception Center (per reception center)
  - o   Psychiatric Inpatient Program (licensed beds)
  - o   Correctional Clinical Case Management System Restricted Housing Unit (per building)
  - o   Non-Disciplinary Segregation (per building)
  - o   General Population Restricted Housing Unit (per building)
  - o   Enhanced Outpatient Program Restricted Housing Unit (population)
  - o   Mental Health Crisis Bed (licensed beds)
- Unit Supervisor (per Enhanced Outpatient Program institution)

# Exhibit D



---

## Plata non-Para 7: improving rates of timely high and medium priority specialty service appointments at certain prisons
1 message

---

**Steven Fama**                                                                 Mon. Jul 14, 2025 at 1:51 PM
To: Clark Kelso

---

Dear Mr. Kelso and all,

We write regarding CCHCS's efforts to improve rates of timely high and medium priority specialty services at certain prisons.

As shown in the attached excerpt from the June 2025 12-month Statewide Comparison Dashboard, thirteen prisons had red-zone scores for rates of timely high priority specialty service appointments  in that period; in addition, almost all also having red zone rates for medium priority specialty service appointments.   Our concern is that at those prisons patients who needed high or medium specialty services too often did not timely receive them.

Five of the thirteen prisons each had at least 250 high priority specialty service appointments due over that 12-month period, with four having more than 335 and one having nearly 500.  Those prisons, with the total number of high priority specialty service appointments and the percentage that timely provided in that period, were:

| Prison Provided | # of High Priority Appointments | % Timely |
|---|---|---|
| CHCF | 490 | |
| 50% | | |

SVSP                      343
49%

SATF                      337
64%

MCSP                      335
61%

RJD                       251
65%

We also note that CMF, which has the second highest percentage (56%) among the prisons of residents designated medical high risk, had the lowest rate of timely high priority specialty service appointments (44%) during the 12-month period.

*Please describe all current and planned near future efforts to improve the rates of timely high and medium priority specialty service appointments, including in particular at the 13 prisons which, per the June 2025 12-Month Statewide Comparison Dashboard, had red-zone compliance rates for timely high priority specialty service appointments over the preceding 12 months.*

*What other particular efforts, if any, are being undertaken, or will be in the near future, to increase the percentages of timely high and medium priority specialty service appointments at, respectively, CHCF, SVSP, SATF, MCSP, RJD, and CMF?*

*When does CCHCS anticipate these prisons reaching consistent yellow and green zone percentages for timely high and medium priority specialty service appointments?*

Thanks in advance for your anticipated prompt response.

Sincerely,

Steven Fama

Staff Attorney

Prison Law Office

---

**Pages from 25.06 SW 12-Month Comparison.pdf**
921K



# DASHBOARD STATEWIDE COMPARISON
## All Institutions
*June 2025*

| Report Range: | *Twelve Month Average* |
| Selected Domain(s): | *All* |

Dashboard Scorecard | Institution Dashboard | Statewide Comparison | Trended View | Subcommittee View | Dashboard Glossary

| Scheduling & Access to Care | SW | ASP | CAL | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | FSP | HDSP | ISP | KVSP | LAC | MCSP | NKSP | PBSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Care Team Services (All)** | **93%** | **99%** | **95%** | **95%** | **83%** | **93%** | **93%** | **98%** | **89%** | **94%** | **97%** | **88%** | **97%** | **99%** | **99%** | **86%** | **99%** | **84%** | **98%** | **92%** | **97%** | **88%** |
| RN FTF Triage 1 Day | 96% | 100% | 99% | 97% | 74% | 99% | 99% | 99% | 96% | 93% | 98% | 99% | 97% | 100% | 98% | 96% | 99% | 96% | 98% | 96% | 98% | 97% |
| PCP Urgent Referrals 1 Day | 94% | 98% | 85% | 94% | 76% | 92% | 91% | 96% | 88% | 95% | 99% | 87% | 95% | 86% | 94% | 86% | 90% | 92% | 98% | 98% | 93% | 34% |
| PCP Routine Referrals 14 Days | 93% | 99% | 97% | 98% | 94% | 87% | 93% | 97% | 67% | 96% | 97% | 84% | 97% | 100% | 99% | 83% | 98% | 84% | 97% | 92% | 97% | 91% |
| Episodic Care Follow-Up as Ordered | 94% | 99% | 95% | 97% | 93% | 86% | 91% | 97% | 83% | 96% | 97% | 85% | 97% | 100% | 100% | 81% | 99% | 84% | 98% | 89% | 98% | 92% |
| Chronic Care as Ordered | 92% | 99% | 91% | 98% | 90% | 88% | 87% | 99% | 81% | 93% | 96% | 82% | 97% | 100% | 99% | 80% | 98% | 80% | 98% | 89% | 94% | 70% |
| Return from HLOC 5 Days | 92% | 99% | 97% | 98% | 91% | 99% | 91% | 96% | 93% | 89% | 91% | 79% | 97% | 99% | 98% | 85% | 99% | 87% | 96% | 90% | 95% | 86% |
| RC Screening 5 Days | 96% | - | - | - | 90% | - | - | - | - | - | - | 100% | - | - | - | - | - | - | - | - | 99% | - |
| Transfers Seen Timely: Medium/Low Risk with Chronic Conditions | 87% | 97% | 91% | 76% | 80% | 87% | 99% | 97% | 96% | 90% | 92% | 77% | 96% | 95% | 97% | 87% | 95% | 64% | 90% | 79% | 87% | 82% |
| Transfers Seen Timely: High Risk/Complex Care | 73% | 80% | 83% | 56% | 67% | 81% | 88% | 97% | 85% | 86% | 87% | 57% | 93% | 87% | 89% | 66% | 93% | 56% | 72% | 58% | 63% | 71% |
| **Specialty Services (All)** | **87%** | **87%** | **94%** | **94%** | **90%** | **92%** | **83%** | **96%** | **88%** | **82%** | **89%** | **90%** | **95%** | **82%** | **89%** | **74%** | **94%** | **85%** | **91%** | **87%** | **95%** | **73%** |
| High Priority Specialty 14 Days | 70% | 88% | 90% | 90% | 72% | 86% | 50% | 84% | 65% | 73% | 44% | 78% | 84% | 90% | 80% | 85% | 82% | 77% | 80% | 61% | 80% | 46% |
| Medium Priority Specialty 45 Days | 74% | 77% | 86% | 84% | 81% | 88% | 67% | 86% | 77% | 71% | 63% | 84% | 89% | 81% | 79% | 72% | 82% | 75% | 73% | 72% | 93% | 44% |
| Routine Specialty 90 Days | 86% | 89% | 94% | 95% | 85% | 94% | 81% | 91% | 91% | 81% | 79% | 91% | 96% | 88% | 87% | 87% | 93% | 82% | 91% | 89% | 97% | 73% |
| Follow-Up Specialty Services as Ordered | 87% | 92% | 92% | 93% | 87% | 92% | 86% | 96% | 89% | 85% | 92% | 91% | 95% | 83% | 89% | 80% | 95% | 81% | 90% | 85% | 86% | 81% |
| Consult Specialty Services as Ordered | 89% | 76% | 98% | 96% | 96% | 92% | 85% | 100% | 88% | 81% | 95% | 90% | 98% | 72% | 95% | 52% | 92% | 96% | 97% | 97% | 98% | 68% |
| **Allied Health (All)** | **90%** | **97%** | **98%** | **95%** | **98%** | **76%** | **89%** | **95%** | **82%** | **99%** | **88%** | **92%** | **96%** | **96%** | **96%** | **90%** | **99%** | **91%** | **92%** | **86%** | **83%** | **79%** |
| Laboratory Services as Ordered | 89% | 97% | 97% | 94% | 98% | 72% | 86% | 94% | 80% | 99% | 87% | 92% | 96% | 96% | 89% | 89% | 99% | 90% | 90% | 85% | 83% | 78% |
| Radiology Services as Ordered | 96% | 96% | 99% | 99% | 96% | 99% | 98% | 99% | 93% | 100% | 91% | 96% | 98% | 99% | 94% | 96% | 97% | 98% | 98% | 99% | 98% | 93% |
| Dietary Services as Ordered | 94% | 86% | 88% | 78% | 96% | 98% | 98% | 99% | 98% | 96% | 98% | 55% | 86% | 87% | 90% | 85% | 94% | 99% | 99% | 89% | 85% | 68% |

\* Rate Per 1,000 Inmates

Questions or Feedback? Email *QMstaff@cdcr.ca.gov*

Report run: 7/14/2025 8:11:07 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions
### June 2025

| Report Range: | Twelve Month Average |
|---|---|
| Selected Domain(s): | All |

| Dashboard Scorecard | Institution Dashboard | Statewide Comparison | Trended View | Subcommittee View | Dashboard Glossary |
|---|---|---|---|---|---|

| Scheduling & Access to Care | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|
| **Care Team Services (All)** | **97%** | **99%** | **86%** | **91%** | **96%** | **92%** | **98%** | **90%** | **97%** | **95%** |
| RN FTF Triage 1 Day | 99% | 100% | 97% | 95% | 99% | 94% | 98% | 99% | 96% | 97% |
| PCP Urgent Referrals 1 Day | 84% | 88% | 82% | 95% | 88% | 79% | 98% | 84% | 61% | 90% |
| PCP Routine Referrals 14 Days | 95% | 99% | 89% | 89% | 98% | 92% | 98% | 89% | 98% | 93% |
| Episodic Care Follow-Up as Ordered | 96% | 99% | 89% | 91% | 96% | 92% | 97% | 90% | 98% | 95% |
| Chronic Care as Ordered | 97% | 99% | 79% | 88% | 93% | 88% | 97% | 85% | 98% | 95% |
| Return from HLOC 5 Days | 93% | 98% | 82% | 90% | 92% | 86% | 95% | 83% | 97% | 88% |
| RC Screening 5 Days | - | - | - | - | - | - | - | - | - | 95% |
| Transfers Seen Timely: Medium/Low Risk with Chronic Conditions | 92% | 88% | 83% | 79% | 96% | 88% | 85% | 62% | 91% | 94% |
| Transfers Seen Timely: High Risk/Complex Care | 88% | 81% | 58% | 78% | 93% | 86% | 89% | 43% | 88% | 58% |
| **Specialty Services (All)** | **91%** | **91%** | **80%** | **77%** | **93%** | **84%** | **83%** | **74%** | **89%** | **93%** |
| High Priority Specialty 14 Days | 81% | 65% | 58% | 64% | 96% | 82% | 69% | 49% | 63% | 77% |
| Medium Priority Specialty 45 Days | 89% | 71% | 60% | 61% | 89% | 86% | 68% | 65% | 69% | 87% |
| Routine Specialty 90 Days | 94% | 91% | 81% | 78% | 96% | 80% | 79% | 80% | 86% | 94% |
| Follow-Up Specialty Services as Ordered | 95% | 90% | 84% | 77% | 89% | 84% | 85% | 73% | 87% | 91% |
| Consult Specialty Services as Ordered | 85% | 98% | 79% | 80% | 97% | 86% | 85% | 80% | 97% | 96% |
| **Allied Health (All)** | **92%** | **91%** | **92%** | **96%** | **94%** | **92%** | **89%** | **92%** | **93%** | **85%** |
| Laboratory Services as Ordered | 92% | 90% | 91% | 97% | 94% | 91% | 88% | 93% | 94% | 85% |
| Radiology Services as Ordered | 98% | 97% | 95% | 90% | 100% | 96% | 97% | 90% | 93% | 99% |
| Dietary Services as Ordered | 91% | 98% | 99% | 82% | 89% | 95% | 100% | 96% | 95% | 90% |

*\* Rate Per 1,000 Inmates*

Questions or Feedback? Email *QMstaff@cdcr.ca.gov*

Report run: 7/14/2025 8:11:07 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions
### June 2025

| Report Range: | Twelve Month Average |
|---|---|
| Selected Domain(s): | All |

| Dashboard Scorecard | Institution Dashboard | Statewide Comparison | Trended View | Subcommittee View | Dashboard Glossary |
|---|---|---|---|---|---|

| Scheduling & Access to Care | SW | ASP | CAL | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | FSP | HDSP | ISP | KVSP | LAC | MCSP | NKSP | PBSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Care Team Services (All)** | 93% | 99% | 95% | 95% | 83% | 93% | 93% | 98% | 89% | 94% | 97% | 88% | 97% | 99% | 99% | 86% | 99% | 84% | 98% | 92% | 97% | 88% |
| RN FTF Triage 1 Day | 96% | 100% | 99% | 97% | 74% | 99% | 99% | 99% | 96% | 93% | 98% | 99% | 97% | 100% | 98% | 96% | 99% | 96% | 98% | 96% | 98% | 97% |
| PCP Urgent Referrals 1 Day | 94% | 98% | 85% | 94% | 76% | 92% | 91% | 96% | 88% | 95% | 99% | 87% | 95% | 86% | 94% | 86% | 90% | 92% | 98% | 98% | 93% | 34% |
| PCP Routine Referrals 14 Days | 93% | 99% | 97% | 98% | 94% | 87% | 93% | 97% | 67% | 96% | 97% | 84% | 97% | 100% | 99% | 83% | 98% | 84% | 97% | 92% | 94% | 91% |
| Episodic Care Follow-Up as Ordered | 94% | 99% | 95% | 97% | 93% | 86% | 91% | 97% | 83% | 96% | 97% | 85% | 97% | 100% | 100% | 81% | 99% | 84% | 98% | 93% | 98% | 92% |
| Chronic Care as Ordered | 92% | 99% | 91% | 98% | 90% | 88% | 87% | 99% | 81% | 93% | 96% | 82% | 97% | 100% | 99% | 80% | 98% | 80% | 98% | 89% | 94% | 70% |
| Return from HLOC 5 Days | 92% | 99% | 97% | 98% | 91% | 99% | 91% | 96% | 93% | 89% | 91% | 79% | 97% | 99% | 98% | 85% | 99% | 87% | 96% | 90% | 95% | 86% |
| RC Screening 5 Days | 96% | - | - | - | 90% | - | - | - | - | - | - | 100% | - | - | - | - | - | - | - | - | 99% | - |
| Transfers Seen Timely: Medium/Low Risk with Chronic Conditions | 87% | 97% | 91% | 76% | 80% | 87% | 99% | 97% | 96% | 90% | 92% | 77% | 96% | 95% | 97% | 87% | 95% | 64% | 90% | 79% | 87% | 82% |
| Transfers Seen Timely: High Risk/Complex Care | 73% | 80% | 83% | 56% | 67% | 81% | 88% | 97% | 85% | 86% | 87% | 57% | 93% | 87% | 89% | 66% | 93% | 56% | 72% | 58% | 63% | 71% |
| **Specialty Services (All)** | 87% | 87% | 94% | 94% | 90% | 92% | 83% | 96% | 88% | 82% | 89% | 90% | 95% | 82% | 89% | 74% | 94% | 85% | 91% | 87% | 95% | 73% |
| High Priority Specialty 14 Days | 70% | 88% | 90% | 90% | 72% | 86% | 50% | 84% | 65% | 73% | 44% | 78% | 84% | 90% | 80% | 85% | 82% | 77% | 80% | 61% | 80% | 46% |
| Medium Priority Specialty 45 Days | 74% | 77% | 86% | 84% | 81% | 88% | 67% | 86% | 77% | 71% | 63% | 84% | 89% | 81% | 79% | 72% | 82% | 75% | 73% | 72% | 93% | 44% |
| Routine Specialty 90 Days | 86% | 89% | 94% | 95% | 85% | 94% | 81% | 91% | 91% | 81% | 79% | 91% | 91% | 88% | 87% | 87% | 93% | 82% | 91% | 89% | 97% | 73% |
| Follow-Up Specialty Services as Ordered | 87% | 92% | 94% | 93% | 87% | 92% | 86% | 96% | 89% | 85% | 92% | 91% | 95% | 83% | 89% | 80% | 95% | 81% | 90% | 85% | 86% | 81% |
| Consult Specialty Services as Ordered | 89% | 76% | 98% | 96% | 96% | 92% | 85% | 100% | 88% | 81% | 95% | 90% | 98% | 72% | 95% | 52% | 92% | 96% | 97% | 97% | 98% | 68% |
| **Allied Health (All)** | 90% | 97% | 98% | 95% | 98% | 76% | 89% | 95% | 82% | 99% | 88% | 92% | 96% | 96% | 96% | 90% | 99% | 91% | 92% | 86% | 83% | 79% |
| Laboratory Services as Ordered | 89% | 97% | 97% | 94% | 98% | 72% | 86% | 94% | 80% | 99% | 87% | 92% | 96% | 96% | 86% | 89% | 99% | 90% | 90% | 85% | 83% | 78% |
| Radiology Services as Ordered | 96% | 96% | 99% | 99% | 96% | 99% | 98% | 96% | 93% | 100% | 91% | 96% | 96% | 99% | 94% | 96% | 97% | 98% | 98% | 95% | 95% | 93% |
| Dietary Services as Ordered | 94% | 86% | 88% | 78% | 96% | 98% | 94% | 99% | 98% | 96% | 98% | 55% | 86% | 87% | 90% | 85% | 94% | 99% | 99% | 89% | 85% | 68% |

\* Rate Per 1,000 Inmates

Questions or Feedback? Email QMstaff@cdcr.ca.gov

Report run: 7/14/2025 8:11:07 AM



# DASHBOARD STATEWIDE COMPARISON
## All Institutions
### *June 2025*

| Report Range: | *Twelve Month Average* |
|---|---|
| Selected Domain(s): | *All* |

| Dashboard Scorecard | Institution Dashboard | Statewide Comparison | Trended View | Subcommittee View | Dashboard Glossary |
|---|---|---|---|---|---|

| Scheduling & Access to Care | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |
|---|---|---|---|---|---|---|---|---|---|---|
| **Care Team Services (All)** | **97%** | **99%** | **86%** | **91%** | **96%** | **92%** | **98%** | **90%** | **97%** | **95%** |
| RN FTF Triage 1 Day | 99% | 100% | 97% | 95% | 99% | 94% | 98% | 99% | 96% | 97% |
| PCP Urgent Referrals 1 Day | 84% | 88% | 82% | 95% | 88% | 79% | 98% | 84% | 61% | 90% |
| PCP Routine Referrals 14 Days | 95% | 99% | 89% | 89% | 98% | 92% | 98% | 89% | 98% | 93% |
| Episodic Care Follow-Up as Ordered | 96% | 99% | 89% | 91% | 96% | 92% | 97% | 90% | 98% | 95% |
| Chronic Care as Ordered | 97% | 99% | 79% | 88% | 93% | 88% | 97% | 85% | 98% | 95% |
| Return from HLOC 5 Days | 93% | 98% | 82% | 90% | 92% | 86% | 95% | 83% | 97% | 88% |
| RC Screening 5 Days | - | - | - | - | - | - | - | - | - | 95% |
| Transfers Seen Timely: Medium/Low Risk with Chronic Conditions | 92% | 88% | 83% | 79% | 96% | 88% | 85% | 62% | 91% | 94% |
| Transfers Seen Timely: High Risk/Complex Care | 88% | 81% | 58% | 78% | 93% | 86% | 89% | 43% | 88% | 58% |
| **Specialty Services (All)** | **91%** | **91%** | **80%** | **77%** | **93%** | **84%** | **83%** | **74%** | **89%** | **93%** |
| High Priority Specialty 14 Days | 81% | 65% | 58% | 64% | 96% | 82% | 69% | 49% | 63% | 77% |
| Medium Priority Specialty 45 Days | 89% | 71% | 60% | 61% | 89% | 86% | 68% | 65% | 69% | 87% |
| Routine Specialty 90 Days | 94% | 91% | 81% | 78% | 96% | 80% | 79% | 80% | 86% | 94% |
| Follow-Up Specialty Services as Ordered | 95% | 90% | 84% | 77% | 89% | 84% | 85% | 73% | 87% | 91% |
| Consult Specialty Services as Ordered | 85% | 98% | 79% | 80% | 97% | 86% | 85% | 80% | 97% | 96% |
| **Allied Health (All)** | **92%** | **91%** | **92%** | **96%** | **94%** | **92%** | **89%** | **92%** | **93%** | **85%** |
| Laboratory Services as Ordered | 92% | 90% | 91% | 97% | 94% | 91% | 88% | 93% | 94% | 85% |
| Radiology Services as Ordered | 98% | 97% | 95% | 90% | 100% | 96% | 97% | 90% | 93% | 99% |
| Dietary Services as Ordered | 91% | 98% | 99% | 82% | 89% | 95% | 100% | 96% | 95% | 90% |

*\* Rate Per 1,000 Inmates*

Questions or Feedback? Email **QMstaff@cdcr.ca.gov**

Report run: 7/14/2025 8:11:07 AM

# Exhibit E

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

Date : August 28, 2025

To : Steven Fama, Prison Law Office

Subject : **PRISON LAW OFFICE NON-PARAGRAPH 7 CONCERN RELATING TO IMPROVING RATES OF TIMELY HIGH AND MEDIUM PRIORITY SPECIALTY SERVICE APPOINTMENTS AT CERTAIN PRISONS**

California Correctional Health Care Services (CCHCS) is providing the italicized information below in response to your email inquiry dated July 14, 2025.

1. Please describe all current and planned near future efforts to improve the rates of timely high and medium priority specialty service appointments, including in particular at the 13 prisons which, per the June 2025 12-Month Statewide Comparison Dashboard, had red-zone compliance rates for timely high priority specialty service appointments over the preceding 12 months.

   *CCHCS efforts to improve rates of timely high and medium priority specialty services appointments include:*

   - *In March 2025, CCHCS Medical Services enabled Physician Managers to change the priority level of a Request for Service (RFS) before final approval, allowing the priority level to be adjusted up or down based upon clinical indication, as appropriate, for timely access to care. Regional leadership engages with Physician Mangers regularly regarding RFS' best practices.*
   - *As of April 2025, reinforcement of best practices is being provided to all Physician Managers in reviewing medium and high priority RFS orders for medical necessity, priority appropriateness and those that do not meet InterQual criteria. Ensuring requested services are medically necessary and meet InterQual criteria helps optimize limited specialty care resources. By also confirming that medically necessary services are ordered within clinically appropriate timeframes, we can prioritize patients with high or medium priority needs and reduce scheduling bottlenecks. Physician Managers and PCPs are expected to provide data-driven oversight and monitoring using management tools to track and improve specialty service delivery.*
   - *In April 2025, Utilization Management (UM) worked with a contracted E-Consult vendor to implement an improved E-Consult platform for users. Multiple statewide training sessions have been conducted on the use of the new platform. E-Consults with qualified specialists expand available services which help minimize referrals for offsite specialty appointments, reducing backlog and ensuring timelier access to medically necessary care.*
   - *In the second quarter of 2025, UM expanded institutional access to Virtual Physical Therapy which promotes the use of conservative interventions before patients are referred for certain orthopedic procedures. By utilizing less invasive and easier to schedule conservative options,*

# MEMORANDUM

Re: Improving Rates of Timely High and Medium Priority Specialty Service Appointments at Certain Prisons

---

*patients receive appropriate treatment and avoid unnecessary specialty procedure appointments.*

- *Total Joint Replacement procedures now require headquarters-level review via the Statewide Medical Authorization Review Team (SMART). The additional level of review will ensure that conservative treatment options have been attempted prior to determining whether it is medically necessary to order a specialty appointment.*

- *In the second quarter of 2025, CCHCS released the automated Advanced Specialty Patient Notification Letter that provides patients with paper notifications of upcoming specialty appointments. By keeping patients informed and giving them time to prepare for offsite appointments, CCHCS expects to see a reduction in refusals.*

- *CCHCS continues to work with HealthNet to expand its specialty network, with continued focus on specialties with the most backlog or a higher proportion of medium and high-risk appointments at risk for non-compliance.*

- *UM staff will continue to provide institution-specific training on topics ranging from E-Consult use, proper RFS priority designation, conservative treatment options, onsite procedures, and data-driven tools and dashboards.*

- *CCHCS's leadership has reinforced the expectation for medical holds for high priority referrals to be placed no later than the end of the next business day from when the RFS is ordered. Primary care providers (PCP) are responsible for determining the necessity of the continued need or removal of medical holds.*

2. What other particular efforts, if any, are being undertaken, or will be in the near future, to increase the percentages of timely high and medium priority specialty service appointments at, respectively, CHCF, SVSP, SATF, MCSP, RJD, and CMF?

*These institution specific efforts are as follows:*

### California Health Care Facility (CHCF)
- *The Quality Management team continues to work with Specialty Services to review and research the dashboard metric to understand and resolve any issues that delay scheduling appointments within the compliance date. Telemedicine orders are reviewed and scheduled by headquarters.*

### California Medical Facility (CMF)
- *The CMF Specialty Team and leadership meet weekly to review pending appointments, availability of providers, and barriers to obtaining appointments.*
- *CMF leadership continues to meet with San Joaquin General Hospital monthly to discuss any issues and obtain updates on new/pending specialty providers/services.*

### Salinas Valley State Prison (SVSP)
- *Daily meetings are conducted to discuss scheduled specialty appointments and backlogs.*
- *The leadership team will contact headquarters for assistance in securing additional providers to support the submitted orders.*
- *Specialty onsite and offsite nurses have been cross-trained to provide back-up and to further assist with the timely scheduling of appointments.*

# MEMORANDUM

Re: Improving Rates of Timely High and Medium Priority Specialty Service Appointments at Certain Prisons

### Substance Abuse Treatment Facility (SATF)
- *A specialty backlog workgroup was formed in which key stakeholders discuss possible barriers preventing compliance and brainstorm interventions.*
- *Offsite team members discuss current backlogs and scheduling issues and review individual cases with the Chief Physician and Surgeon (CP&S) during the offsite huddle.*
- *A second RN has been designated to the offsite specialty department to provide additional support.*
- *The Health Care Access Unit was allocated eight additional custody positions to assist with transporting patients to specialty appointments.*
- *As of August 15, 2025, two additional vehicles were placed into service to assist with transporting patients to specialty appointments.*
- *Telehealth options have expanded and a third specialty telemedicine line has been added.*

### Mule Creek State Prison (MCSP)
*Please note that for the month of June 2025, 30 of 560 high and medium priority appointments were not timely, which is 95% timely rate.*
- *MCSP schedulers follow up on all medium priority requests two times weekly until an appointment is obtained. For high priority requests, schedulers initiate appointment requests with two providers and follow up daily until an appointment is obtained. RFS demand is being reviewed weekly.*
- *MCSP leadership meets with the specialty scheduling team bi-weekly to review all pending, unscheduled orders. Difficult to obtain appointments are reviewed and the leadership team will contact headquarters for assistance in securing additional providers to support the submitted orders.*
- *Opportunities are being explored to bring additional services onsite. As of June 2025, electrolysis is provided onsite. In addition, a second telehealth line has been added to provide additional onsite services.*

### Richard J. Donovan Correctional Facility (RJD)
- *High priority and medium priority non-compliance dashboard measures are captured for all cancelled orders (e.g., refusals) and orders past compliance dates. Over the last six months, the majority of deficiencies at RJD are due to specialist availability, patient refusals, and facility transfers. Please note that RJD is ordering fewer high priority and medium priority services compared to other similar institutions, which RJD attributes to provider training.*
- *A process to notify patients about preparation and what to expect at specific specialist appointments has been implemented.*
- *Efforts continue with the Warden's Ducat Project to ensure patients are released timely to attend scheduled ducated appointments.*
- *Canvassing continues with local specialist provider networks, such as Paradise Valley Hospital and Tri-City, to expand their network and reduce deficiencies due to specialist availability.*
- *A process has been implemented in which initial scheduling outreach occurs within 8 business hours of receipt of high priority RFS and within 3 business days of receipt of medium and routine RFS.*

# MEMORANDUM

Re: Improving Rates of Timely High and Medium Priority Specialty Service Appointments at
Certain Prisons

3.  When does CCHCS anticipate these prisons reaching consistent yellow and green zone percentages for
    timely high and medium priority specialty service appointments?

    *CCHCS will evaluate the effectiveness of recently implemented changes and determine the appropriate
    next steps based on the findings. CCHCS does not have an anticipated timeframe for when these
    institutions will be closer to timeliness goals and timeframes will likely differ for each institution.*

Thank you.

cc:     Clark Kelso, Receiver
        Diana Toche, Undersecretary, Health Care Services, CDCR
        Directors, CCHCS
        CCHCS Office of Legal Affairs
        Office of Legal Affairs, CDCR
        Office of the Attorney General
        Hanson Bridgett, LLP
        DeAnna Gouldy, Deputy Director, Policy and Risk Management Services, CCHCS
        Michael Whittaker, Deputy Director (A), Institution Operations, CCHCS
        Renee Kanan M.D., Deputy Director, Medical Services, CCHCS
        Robin Hart, Associate Director, Risk Management Branch, CCHCS
        Regional Executives, Regions I-IV, CCHCS

# Exhibit F

JUNE 2025

# ❄ CLIMATE
## AND THE IMPACT ON CDCR
### AIR COOLING INFRASTRUCTURE/NEEDS AT INSTITUTIONS STATEWIDE

## THE CDCR CLIMATE CHALLENGE

Most California Department of Corrections and Rehabilitation (CDCR) institutions struggle to address indoor heat conditions based on the original design. This has an impact on the ability of CDCR to operate in a warming climate that is increasingly at odds with modern standards for indoor temperatures and CDCR's efforts for a more humanistic approach to incarceration.

## CDCR COOLING CAPACITY

- Most CDCR institutions were built before 2000, with an average age of 51 years, when the comfort level of the incarcerated population and staff was not a consideration or priority.

- CDCR's construction standards at the time required indoor temperatures to be no more than 89°F. This temperature standard reduced the complexity of construction and the need for additional electrical infrastructure, but also reduced the Department's ability to respond to extreme heat events.

- Many institutions have turned to solutions such as floor and wall-mounted fans to provide some supplementary relief from high indoor temperatures.

- Over time, the cooling infrastructure at CDCR institutions has degraded and become less effective with climate change further exacerbating this challenge. Even CDCR institutions with air conditioning will need extensive upgrades to existing cooling and insulation to meet modern standards of efficiency and cooling.

- The lack of insulation means that even in institutions with refrigerant cooling (i.e. air conditioning) it can be difficult to meet and maintain targeted temperatures of 89°F or less on the hottest days of the year.



**Wall-mounted Fan**



**Floor Fan**



**Central California Women's Facility Corroded Evaporative Cooling**



**Core Sample of Uninsulated Concrete**



## HEAT ACTIVATION STAGES

**Heat Activations occur when the following temperatures are reached (May-October) requiring mitigation efforts such as:**

- **STAGE I** *(Outside Temperatures Reach 90°F or more):*
  - Return to housing units for heat risk incarcerated persons.

- **STAGE II** *(Inside Temperatures Reach 90°F or more):*
  - Initiate cooling and hydration measures.
  - Increased observation of heat-risk incarcerated persons for signs of heat-related illness.

- **STAGE III** *(Inside Temperatures Reach 95°F or more):*
  - Medically-trained personnel must perform medical rounds to observe each heat-risk incarcerated person at least once every two hours.
  - Provide additional cooling measures or send to the Triage and Treatment Area all individuals displaying signs of heat-related illness.

Additional information is available at www.cdcr.ca.gov/family-resources/2022/09/02/cdcr-and-cchcs-extreme-heat-prevention-and-response-efforts/

| CDCR HEAT ACTIVATIONS STATEWIDE | | | |
|---|---|---|---|
| **YEAR** | **2023** | **2024** | **TOTAL** |
| **STAGE 1** | 166 | 182 | **348** |
| **STAGE 2** | 59 | 86 | **145** |
| **STAGE 3** | 20 | 46 | **66** |

**Figures represent the number of days in the year that a CDCR heat activation occurred. For example, one day could represent 20 institutions on heat activation or only one institution on heat activation.**

# CLIMATE CHANGE IMPACT ON TEMPERATURE

- Due to climate change, the average temperature in California is projected to increase by 5.6°F by the end of the century.

- Many CDCR institutions are built in locations that are likely to experience more extreme impacts from climate change. These locations are projected to see temperature increases of 8.5°F by the end of the century.

# INFRASTRUCTURE IMPACT ON TEMPERATURE

**TEMPERATURE TRANSMISSION:**
Many CDCR institutions are concrete construction and the lack of insulation means that there is little barrier to the transmission of both heat and cold from the walls directly into cells. Radiant heat from the sun is directly transferred through the walls.

**TEMPERATURE RETENTION:**
The thermal mass of the concrete will retain heat during night cooling and continue to radiate heat into cells even when outside temperatures are cooling.

**HEAT ISLAND EFFECT:**
The lack of shading and other groundcover in CDCR institutions can result in increased temperatures as well as limit relief from the sun's solar impact and the hot, dry winds that cause moisture loss.



Lack of Shade and Groundcover

Concrete Wall Thickness

| Space Type | Space Temperature - No Insulation | Space Temperature - w/Insulation | Degree Reduction |
|---|---|---|---|
| Dayroom | 88.2 ° F | 80.5 ° F | 7.7 ° F |
| Cell- North Wall | 98.0 ° F | 88.0 ° F | 10.0 ° F |
| Cell- South Wall | 106.7 ° F | 88.5 ° F | 18.2 ° F |
| Cell- West Wall | 109.1 ° F | 88.2 ° F | 20.9 ° F |



## TYPES OF COOLING AT CDCR INSTITUTIONS

**CDCR uses four primary means of cooling to mitigate heat within housing units:**

- Air Conditioning/Mechanical (i.e. refrigerant cooling)

- Evaporative Cooling (i.e. non-refrigerant cooling, effectiveness dependent on outside air temp and humidity)

- Mixed Air Conditioning and Evaporative Cooling

- Ventilation/Air Handlers



**Air Cooling Infrastructure at Housing Units Statewide**

- Evaporative Cooling
- Mechanical Cooling
- Air Handlers Only
- Fans Only



Mechanical Cooling Using Chilled Water

Evaporative Cooling Diagram

---

## CDCR HAS IMPLEMENTED PROCEDURES TO ADDRESS HEAT

- CDCR has implemented various processes to mitigate the impacts of heat, including specific policies for heat-risk incarcerated individuals who are on certain medications and face health risks in high-heat conditions.

- In response to the Coleman court's concern for incarcerated individuals on specific medications, CDCR was mandated to establish and adhere to a Prevention Plan for Heated Pathologies: Extreme Heat Prevention and Response.

- CDCR performed an engineering study in 2024 of typical housing units to determine how to provide system replacement recommendations capable of maintaining a maximum temperature of 78°F. This study provided



Portable Evaporative Cooling Solution



Automated Temperature Monitoring

information necessary to inform CDCR's Air-Cooling Pilot Program.

- The Department has also initiated a trial program at two institutions in support of the Department's

statewide Heat Plan, which will automate temperature readings and replace the current manual process. If the trial is successful, the automated temperature process will go statewide.

# FUTURE ACTIONS TO ADDRESS HEAT

- Both long and short-term capital investment measures will need to be taken to address heat in CDCR institutions. This will be driven by regulatory action related to heat standards.

- This Air-Cooling Pilot Program taking place at Central California Women's Facility, Kern Valley State Prison, and California State Prison, Los Angeles County, will allow CDCR to develop a future statewide plan to address indoor temperatures within the Department's buildings and is included in the Governor's 2025 Budget. The results of the pilot are anticipated in FY 28/29.

- Pending further information from the pilot, current estimates indicate the cost of a statewide implementation of effective air cooling mechanisms to be approximately $6 billion.

- In 2024, the Department of Industrial Relations (DIR) adopted a new indoor heat standard specific to all indoor work areas where the temperature is 82°F or greater and employees are present. In addition to several new definitions such as "clothing that restricts heat removal" and "preventative cool-down rest", the new regulations included a requirement for indoor or outdoor "cool down areas." State and local detention facilities were excluded from those regulations though the understanding is that future regulations will be proposed for those facilities. CDCR is awaiting DIR indoor heat standards for staff in correctional facilities.

- There are approximately $246 million of CDCR projects currently underway to address cooling at five institutions. These projects include housing units at Calipatria State Prison, Central California Women's Facility, California Institution for Men, Ironwood State Prison, and Substance Abuse Treatment Facility. The Ironwood State Prison project was completed in March 2024 at a cost of $192 million and mitigates heat using a chilled water-cooling system.



**Central California Women's Facility Hybrid Cooling Solution**



**California Institution for Men: A Yard Cooling Project**

## IN CLOSING

### NEXT STEPS

In closing, CDCR will be closely monitoring and evaluating the pilot cooling programs previously mentioned. The pilot institutions will inform future capital outlay requests for upgrades, prioritizing those institutions with the greatest need. It is also crucial to ensure a good roof condition before installing a new HVAC system, as commercial roofs often need to support heavy HVAC units and are exposed to significant weather elements, making a compromised roof a potential issue for both the HVAC system and the building itself. Ensuring that CDCR facilities have adequate infrastructure is critical to the health and safety of the incarcerated while also providing a proper work environment for CDCR's valuable staff.

# Exhibit G

| | |
|---|---|
| **From:** | Corinna Arbiter |
| **To:** | ahardy@prisonlaw.com; mhalter@prisonlaw.com; sfama@prisonlaw.com; lharvey@prisonlaw.com; rana@prisonlaw.com |
| **Cc:** | v_Damon.McClain@doj.ca.gov; Samantha Wolff; Paul B. Mello; David C. Casarrubias-González; Mollie H. Levy; Mark Griffin; Janell E. Gehrke; Caitlin N. Rabiyan |
| **Subject:** | [EXTERNAL] Plata - April 17, 2025 Non-Paragraph 7 re Heat/ 8th Production |
| **Date:** | Friday, August 15, 2025 4:18:36 PM |

**EXTERNAL:** Use caution when opening attachments, links or responding to this e-mail.

---

Dear Counsel,

At the link, please find the production of documents bates stamped CDCR022974 - 30017. The documents are marked Confidential pursuant to the 2020 Protective Order.

This production constitutes Defendants' eighth and final production and final response to Plaintiffs' April 17, 2025 request, subject line "Plata | Non Paragraph 7: Follow-up to 2/20/25 CCHCS Response re Heat Issues", wherein Plaintiffs' counsel requested production of documents relating to heat. Consistent with Defendants' July 24, 2025 email proposal, Defendants identify each category of requested information and state whether any categories of documents that Plaintiffs requested were determined to be beyond the scope of this lawsuit and therefore irrelevant to either party's claims or defenses:

1. Please provide the 2024 training materials and any updated materials for 2025.

<u>Response:</u> These documents have been provided.


2. If they will not be included in your response to the training materials request, please provide current mandates to health care staff "clarifying the reporting requirements of heat-related health care incidents," as described in CCHCS's 2/20/25 Non-Paragraph 7        response.


<u>Response:</u> These documents have been provided.

3. All CDCR Form 7711-1, Heat Plan Monthly Summary Report, submitted by institutions to Headquarters for the months of January 2024 to December 2024.

<u>Response:</u> These documents have been provided.

4. For each prison, all

   a. CDCR Form 2031, Inside Temperature Record,


                            <u>Response:</u> These documents were not produced. Records of temperature logs are irrelevant to the delivery of medical care to incarcerated persons with serious medical needs and do not pertain to the claims or defenses of either party. Temperature logs do not indicate, for instance, whether medical care should have been delivered, whether medical care was actually administered, or the quality of any such medical care. These documents are also grossly voluminous, and it would be overly burdensome to gather, review, and produce these documents, particularly given that they are not relevant to the claims at issue in this case.

   b. CDCR Form MH-7711-2, Heat Incident Log, and

<u>Response:</u> These documents have been provided to the extent they were required to be generated under the Coleman Heat Plan.

c. CDCR Form MH-7711-3, Medical Rounds Log (Stage III) gathered and filed with the prison's Heat Plan Coordinator in 2024.

<u>Response</u>: These documents have been provided to the extent they were required to be generated under the Coleman Heat Plan. Not all institutions will have completed these forms if the temperature didn't reach the requisite threshold.

5. The 2024 and 2025 Heat Plan Local Operating Procedure for each CDCR prison.

<u>Response</u>: These documents have been provided.

6. Meeting minutes for all meetings convened by the Warden, CEO, and their executive teams due to a Heat Advisory for all CDCR prisons from January 1 to December 31, 2024.

<u>Response:</u> These documents have been provided to the extent they were required to be generated under the August 2, 2024 memorandum, titled "Expectations Relative to Institutional Oversight of Heat Plan Operations." Not all institutions will have prepared        meeting minutes if the temperature didn't reach the requisite threshold.

Additionally, Defendants produced Heat Medication Patient Registry for each institution.

Finally, regarding the parties' communications on Plaintiffs' follow-up to the February 20, 2025 Non-Paragraph 7 response related to heat issues, Defendants would appreciate a response to their request that Plaintiffs join them in stipulating to formally close discovery in Plata. As we stated in our August 11, 2025 email on this subject, discovery was only reopened in 2013 to allow Plaintiffs to prepare for a potential termination motion, which was never filed. It seems to have been an oversight that discovery was never closed again, and so we ask that Plaintiffs join in correcting this oversight.

Thank you,

Corinna Arbiter

The following files have been sent using FileXchange and can be downloaded by using the link below:

| Filename | Size | Checksum (SHA256) |
|---|---|---|
| 02.14.2020 ECF 3201 Protective Order.pdf | 143 KB | 33334b3d5b32fc39ff36fca23a130dacc844ace1246bb5695f0af15e2c5b4a1d |
| 8th Production.zip | 1.17 GB | 7ae0a0a1d70be467835346085931df13922587ae802750d78c6243c2fe67e976 |

Please click on the following link to download the attachments:

https://FX.doj.ca.gov/message/Jhduk2fkdUbCCFo7EGEkcc

This email or download link can not be forwarded to anyone else.

The attachments are available until: **Friday, 22 August.**

Message ID:

Jhduk2fkdUbCCFo7EGEkcc



**https://FX.doj.ca.gov**



CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Exhibit H

  **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

Date        :        June 19, 2025

To          :        Steven Fama, Prison Law Office

Subject     :        **PRISON LAW OFFICE NON-PARAGRAPH 7 CONCERN RELATING TO CERTAIN FINDINGS IN THE ANALYSIS OF 2023 MORTALITY REVIEWS**

California Correctional Health Care Services (CCHCS) is providing the italicized information below in response to your email inquiry dated May 5, 2025.

"We write to ask about certain findings in the Analysis of 2023 CCHCS Mortality Reviews, completed in March. The Analysis concludes, 'There remain significant opportunities for improvement in coordinated care of complex patients, and in the practice and documentation of CCHCS Emergency Management protocols.'"

1. Given the Analysis' findings on the matter, what actions has, is, or will CCHCS undertake to improve coordinated care of complex patients?

   *The Analysis of 2023 California Correctional Health Care Services Mortality Reviews report, dated March 18, 2025, reviewed patient deaths from 2023, and identified trends in mortality rates and categories from 2023, and reviewed and compared opportunities for improvements by year. Ongoing efforts to improve patient care are informed by the mortality review process among other aspects of the system that inform improvements.*

   *Complex patients are managed by multidisciplinary care teams and through the institutional oversight process. Patient care management involves clinical assessments using patient registries and care guides with supportive tools and trainings as indicated. Other resources include clinical Headquarters support. CCHCS leadership regularly engages in efforts and initiatives to improve patient care and reduce adverse patient outcomes.*

2. With regard to emergency medical care, we know – and appreciate – that the Receiver has contracted with Dr. Keller to analyze and report on the matter.  Can the Receiver please provide an update on the status of that report (in early January you kindly told us that chart reviews and prison site visits would occur in early spring)?

   *CCHCS' Office of Legal Affairs emailed Dr. Keller's report to plaintiffs on June 5, 2025.*

3. Is CCHCS undertaking or planning in the near future any further initiatives to ensure that all who might benefit from the ISUDT program and treatment are timely offered it? Please explain.

   *CCHCS has made significant progress in offering substance use disorder assessment and treatment to patients who may benefit. A major focus now will be on higher-risk patients who have refused assessment and treatment, discontinued treatment, or continue to engage in risky behaviors. Strategies to engage these higher-risk patients include leveraging peer support specialists, creating more*

# MEMORANDUM

Re: Certain Findings in the Analysis of 2023 Mortality Reviews

*therapeutic environments that are conducive to recovery, and establishing contingency management systems to reward patients committed to recovery and rehabilitation.*

Thank you.

cc:     Clark Kelso, Receiver
        Diana Toche, D.D.S., Undersecretary, Health Care Services, CDCR
        Directors, CCHCS
        CCHCS Office of Legal Affairs
        Office of Legal Affairs, CDCR
        Office of the Attorney General
        Hanson Bridgett, LLP
        DeAnna Gouldy, Deputy Director, Policy and Risk Management Services, CCHCS
        Brittany Brizendine, Psy.D., Deputy Director, Institution Operations, CCHCS
        Renee Kanan, Deputy Director, Medical Services, CCHCS
        Robin Hart, Associate Director, Risk Management Branch, CCHCS
        Regional Executives, Regions I-IV, CCHCS

# Exhibit I



# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES



# MEMORANDUM

| | |
|---|---|
| **Date:** | January 8, 2025 |
| **To:** | Associate Directors, Division of Adult Institutions |
| | Regional Health Care Executives |
| | Wardens |
| | Chief Executive Officers |
| | Chief Support Executives |

**From:**

DocuSigned by:
*Gena Jones*
—27FE10BEF45A48E...
GENA JONES
Director
Division of Adult Institutions

DocuSigned by:
*Joseph Bick*
—347167202A8A404
JOSEPH BICK, M.D.
Director
Health Care Operations

DocuSigned by:
*JOSEPH J WILLIAMS*
—6DD85FF0281341A...
JOSEPH (JASON) WILLIAMS
Director
Corrections Services

**Subject:**  **LIMITING LICENSED HEALTH CARE STAFF ACCESS TO RULES VIOLATION REPORTS**

The California Correctional Health Care Services (CCHCS) and California Department of Corrections and Rehabilitation (CDCR) leadership have identified instances in which institutional health care staff have written Rules Violation Reports (RVRs) when alternate behavioral interventions may have been more appropriate. In an effort to reduce unnecessary RVRs and to allow health care staff to focus on health care related duties, Strategic Offender Management System (SOMS) RVR writing access will now be limited to the Chief Executive Officer (CEO), the Chief Support Executive (CSE), and the CEO's designee.

If a health care staff is the victim of or a witness to, an incarcerated person's misconduct of a serious nature necessitating an incident report (e.g., use of force, indecent exposure, assault, battery, threat of serious/great bodily injury) the health care staff shall complete an incident report (via SOMS Incident Report or CDCR Form 837-C Crime/Incident Report Part C Staff Report) within established timeframes as outlined in the Department Operations Manual (DOM), Section 51020.17.6, Health Care Staff Use of Force - Reporting Requirements, and DOM, Chapter 5, Article 3 – Incident Report.

The completed incident report shall be submitted to the Incident Commander for review, and if necessary, a custody supervisor will generate an RVR in SOMS. The CEO review of the incident report or the associated RVR is not required in these circumstances.

If a health care staff is the victim of or a witness to an incarcerated person's misconduct of a serious nature, that does not involve the use of force, indecent exposure, assault, battery, threat of serious/great bodily injury) the health care staff shall document and route their concerns to

Docusign Envelope ID: B138CDF5-E865-46AB-9E9C-4F455B646581

# MEMORANDUM

the immediate health care supervisor for review. After reviewing the concerns of health care staff and the circumstances for appropriateness, the immediate health care supervisor shall consult with the area custody supervisor to ensure the circumstances documented are not a reportable incident. The immediate health care supervisor will then, if deemed necessary, implement alternative behavioral interventions. If after implementing alternate behavioral interventions the incarcerated person's misconduct of a serious nature continues, the health care supervisor will elevate the matter to the CEO for review.  The CEO may determine that additional or alternate behavioral interventions are indicated. If the CEO determines an RVR is necessary, the CEO will work with the health care SOMS designee to create the RVR in SOMS within three business days.  If the CEO, CSE, or designee, should have any questions regarding the RVR or the RVR process, they should consult the Health Care Access Lieutenant.  Health care supervisors will work with custody to meet all required timeframes.  A tracking system will be developed for all RVRs generated and uploaded on behalf of health care staff. The CEO or designee shall track these RVRs.

An eLearning course titled *Health Care Providers Role in the Rules Violation Report (RVR) Process* (Course Code 11063442) has been developed for institution healthcare staff in the classifications identified in Attachment A to complete. Registry and contractor staff in the identified classifications are required to take the training.

Current staff must complete this course once within 90 days of the release of this memorandum, and new staff must complete it once within 90 days of hire.

Staff required to complete this training will be automatically enrolled in the course via the Learning Management System (LMS). Within two business days, staff will receive an email notification from the LMS of their enrollment.  The eLearning course may be accessed via the LMS at https://cchcstraining.com.

Please direct all LMS-related questions to the Staff Development Unit (SDU) LMS Administration team by submitting a ticket using the Submit an LMS Request form through the ServiceNow Portal.

Thank you in advance for your cooperation. Please contact Joseph Edwards, Correctional Administrator, via email at Joseph.K.Edwards@cdcr.ca.gov regarding any questions or concerns.

Attachment

cc:  Christopher Mauldin, EIS Captain
     Maria Rocha, Chief, SDU
     Chessnia Maharaj, Program Manager, SDU
     Tunji Akilo, Staff Services Manager I, SDU
     Meghann Matthews, Staff Services Manager I, SDU
     Divya Diven, Staff Services Manager I, SDU

# Exhibit J

**Megha Ram**

| | |
|---|---|
| **From:** | Ed Swanson                              on behalf of Ed Swanson |
| **Sent:** | Thursday, July 24, 2025 3:57 PM |
| **To:** | Jacob Hutt; Sean Lodholz |
| **Cc:** | Williams, Joseph@CDCR; Brianne                              Chor.Thac |
| | Scotland, Antronne@CDCR; Audrey Barron; Megha Ram; Davis, Tamiya@CDCR; Olena |
| | Likhachova; Armstrong Team; Sophie Hart |
| **Subject:** | Re: Monitoring Health Care RVRs |

All –

I'm writing in response to an issue presented in plaintiffs' and defendant's letters to the Court Coordination Committee regarding the policy involving health care staff and RVRs. In the court expert's opinion, the issue of health care staff issuing RVRs that arose in connection with the SATF litigation has been resolved for purposes of the *Armstrong* case. I understand I will continue to receive reports from CCHCS on RVRs issued by CEOs or their designees, and I intend to pass those onto *Armstrong* counsel. Beyond that, it is my opinion that any further monitoring of health care staff's compliance with the policy is not properly located in *Armstrong*, and we defer to the Receiver and the *Plata* court on that issue.

Please let me know if you have any questions.

Ed

# Exhibit K



# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| **Date:** | 7/28/2025 |
| **To:** | Chief Executive Officers |
| **From:** | Signed by: *Brittany Brizendine* A0C9F0C2BC7D465... BRITTANY BRIZENDINE, Psy.D., MBA Director (A), Health Care Operations California Correctional Health Care Services |
| **Subject:** | **PEER SUPPORT SPECIALIST PROGRAM TASKS SUSPENDED FOR PEER SUPPORT SPECIALIST WORKERS** |

The purpose of this memorandum is to inform California Correctional Health Care Services (CCHCS) staff that the Peer Support Specialist Program (PSSP) Workers will no longer initiate individual engagement with peers for healthcare-related tasks until a formal consent process is established and implemented.

Effective immediately, the following PSSP Tasks are suspended and will no longer be reflected on the **Peer Support Specialist – Potential Contacts Report**:

1. Recent High Stress Experience
2. Returned from Higher Level of Care
3. Returned from Specialty Last 7 days
4. Healthcare-related Refusals (medication, appointments, screenings, vaccinations)
5. Any Medication Management
6. Any laboratory testing or results
7. Durable Medical Equipment (DME) Orders - No Receipt and Overdue
8. High Priority Recovery Contact
9. Hunger Strike
10. Other People Who May Benefit from One-on-One or Group Recovery Services
11. Comprehensive Dental Exam Not Requested
12. Upcoming Onsite or Telemed Specialty/Radiology Appointment Next 14 days
13. Upcoming Offsite Specialty/Radiology Appointment
14. Due for Screenings Soon

The following PSSP Tasks will remain on the Peer Support Specialist – Potential Contacts Report:

1. Outpatient Housing Unit & Skilled Nursing Facility
2. Education/Vocational Program Non-Participation
3. Upcoming Parole Hearing in the Next 90 Days

# MEMORANDUM

4. New to the Institution within the Last 30 Days
5. New to the Facility/Yard within the Last 30 Days
6. Releasing in the Next 30 Days, 31 – 90 Days, 91 – 180 Days

PSSP Workers may continue to participate in general outreach campaigns as needed to provide education, connect individuals with staff or programs, and assist with advocacy and systems navigation to support their peers in meeting their personal goals.

> *For example, when healthcare staff identify a low cancer screening uptake within a housing unit or facility, PSSP Workers may be utilized to conduct general outreach and promote cancer screening awareness. PSSP Workers may coordinate with staff to set up informational booths and peer led groups in designated areas, provide education to the population, and distribute educational materials (Attachment 1). PSSP Workers can also assist individuals with completing and submitting the Health Care Services Request Form CDCR 7362 to request cancer screening services or indicate their intent to decline screening.*

On-the-Job resources for general outreach campaign are available on the PSSP SharePoint site - **Peer Support Specialist Program (PSSP)**.

Additionally, incarcerated individuals may continue to seek and initiate individual support from the PSSP Workers as appropriate.

All institutions are expected to communicate this directive to their respective PSSP Coordinators and PSSP Workers promptly to ensure compliance.

Thank you for your attention to this matter and continued commitment to our mission.

For any questions regarding this memorandum, please contact CDCR CCHCS Peer Support Specialist Program at **PSSP@cdcr.ca.gov**.

**Attachment 1:** Sample Educational Resource for Cancer Screening

CC:    Debra Amos-Terrell, Deputy Director (A), Nursing Services
       Lisa Heintz, Director, Legislation and Special Projects
       Gena Jones, Director, California Department of Corrections & Rehabilitation
       Affie Tamuno-Koko, Chief Nurse Executive, Nursing Services
       Jennifer Neil, Assistant Secretary Legal Affairs/Chief Counsel
       Sarah Hartmann, Chief Counsel, CCHCS Office of Legal Affairs
       Annette Lambert, Deputy Director, Quality Management
       Amar Mehta, Deputy Director, Statewide Mental Health Program
       Deanna Gouldy, Deputy Director, Policy and Risk Management Services
       Regional Health Care Executives
       CDCR DAI Associate Directors
       Chief Nurse Executives