| | |
|---|---|
| ROB BONTA<br>Attorney General of California<br>DAMON G. MCCLAIN – 209508<br>Supervising Deputy Attorney General<br>CORINNA ARBITER - 273074<br>Deputy Attorneys General<br>  600 W. Broadway, Suite 1800<br>  San Diego, CA 92101<br>  Telephone: (619) 321-5799<br>  Fax: (619) 645-2061<br>  E-mail: Corinna.Arbiter@doj.ca.gov<br><br>HANSON BRIDGETT LLP<br>PAUL MELLO – 179755<br>SAMANTHA D. WOLFF – 240280<br>DAVID C. CASARRUBIAS-GONZÁLEZ – 321994<br>  425 Market Street, 26th Floor<br>  San Francisco, CA  94105<br>  Telephone: (415) 777-3200<br>  Fax: (415) 541-9366<br>  E-mail:  pmello@hansonbridgett.com<br><br>*Attorneys for Defendants* | PRISON LAW OFFICE<br>DONALD SPECTER – 83925<br>STEVEN FAMA – 99641<br>ALISON HARDY – 135966<br>RANA ANABTAWI – 267073<br>LILY HARVEY – 278947<br>SOPHIE HART – 321663<br>MACKENZIE L. HALTER – 333992<br>  1917 Fifth Street<br>  Berkeley, CA  94710<br>  Telephone: (510) 280-2621<br>  Fax: (510) 280-2704<br>  E-mail:  dspecter@prisonlaw.com<br><br>LAW OFFICE OF SARA NORMAN<br>SARA NORMAN (189536)<br>  P.O. Box 170462<br>  San Francisco, CA 94117-0462<br>  Telephone: (415) 236-3763<br>  E-mail: sara@saranormanlaw.com<br><br>*Attorneys for Plaintiffs* |

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>                               Plaintiffs,<br><br>     v.<br><br>GAVIN NEWSOM, et al.,<br><br>                               Defendants. | 4:01-cv-01351-JST<br><br>**Joint Case Management Conference Statement**<br><br>Date:        January 26, 2026<br>Time:        2:00 p.m.<br>Courtroom:   6, 2nd Floor<br>Judge:       Hon. Jon S. Tigar<br>Action Filed: April 5, 2001 |

The parties submit the following joint statement in advance of the January 26, 2026 case management conference.

## I. PROGRESS TOWARDS RESOLUTION – DELEGATIONS TO DATE

*Plaintiffs' Position:* The Receiver has not delegated any prisons since the last Case Management Conference. Meet-and-confers regarding the potential delegation of California Health Care Facility were held in November and December 2025, and a meet-and-confer regarding Substance Abuse Treatment Facility and State Prison is scheduled for February 2026.

*Defendants' Position:* There are 31 adult institutions presently operating under the California Department of Corrections and Rehabilitation (CDCR). As of this writing, the Receiver has delegated authority of medical care services for 27 of those institutions back to the CDCR Secretary. In 2025, Plaintiffs' counsel's one-year post-delegation monitoring period for North Kern State Prison, CSP-Solano, California Medical Facility, and CSP-Los Angeles County have ended. Four institutions remain to be delegated with CSP-Sacramento, Salinas Valley State Prison (SVPS) and California Health Care Facility already under submission.

## II. MEDICAL STAFFING

*Plaintiffs' Position:* We continue to correspond with the Receiver and CCHCS regarding efforts to ensure adequate medical staffing. As previously discussed, CCHCS in July confirmed that its medical staffing model allocates staff on a per-prison (not volume-of-care) basis for specialty services-related positions and Treatment and Triage Area (TTA) RN positions. As we have pointed out, the workload for these positions varies greatly among the prisons, with some having up to four times as many patient encounters.[1]

In September, CCHCS informed us that statewide, 32 nursing staff work in specialty services and 19 RNs work in TTAs in addition to those called for by the medical staffing model.[2] We believe this additional staffing is essential for adequate care and credit the Receiver's leadership with the temporary positions' existence. CCHCS also said that adjusting the model would require submitting a Budget Change Proposal (BCP). In November, we asked whether

---

[1] *See* ECF No. 3984 at 4:3-16.
[2] *See* Exhibit 1, CCHCS Memorandum 2-3 (Sept. 17, 2025).

CCHCS would submit a BCP or take other steps to adjust its hiring authorization model to include volume-based nursing staffing for specialty services and TTA positions. In late December, CCHCS said it continued to evaluate whether a BCP would be submitted, stating such could happen either in relation to a Governor's proposed budget (issued in January each year) or the May Revise of the proposed budget. CCHCS also explained that staffing model adjustments can and have resulted from a "full" BCP (which are publicly posted) or a "premise" BCP (which are not so posted) and that it works with the Department of Finance to determine which type of BCP is appropriate when the staffing model must be adjusted. We will continue to monitor this issue.

*Defendants' Position:* Defendants continue to work collaboratively with the Receiver and CCHCS to ensure that medical staffing across the state prison system remains robust and responsive to patient needs. The current medical staffing model, which allocates specialty services and TTA Registered Nurse (RN) positions on a per-institution basis, is designed to provide consistent and equitable coverage throughout all facilities.

While Plaintiffs have suggested that workload varies among institutions, CCHCS has proactively addressed these differences by deploying additional nursing staff where needed. As of September 17, 2025, CCHCS has assigned 32 nursing staff to specialty services and 19 RNs to TTAs statewide, supplementing the positions provided by the staffing model. This demonstrates CCHCS's ongoing commitment to adapting resources to meet operational demands.

Adjustments to the staffing model, including consideration of volume-based formulas, are subject to established budgetary processes. CCHCS regularly evaluates statewide staffing needs and, when appropriate, pursues adjustments through the Governor's Budget or May Revision. The process for submitting a Budget Change Proposal (BCP) or premise adjustment is governed by collaboration with the Department of Finance and is designed to ensure that any changes are supported by the data, adequately consider institutional needs, and are fiscally responsible.

Defendants maintain that the current staffing approach is effective and flexible, allowing for targeted resource allocation without compromising care. CCHCS will continue to monitor staffing levels and evaluate its methodologies and may submit a Spring proposal that would be

released in May 2026, or a Fall proposal in January 2027, consistent with statutory and budgetary requirements.

**III.   ACCESS TO SPECIALTY CARE SERVICES**

*Plaintiffs' Position:* We continue to monitor the provision of specialty care, including the number of backlogged specialty appointments and the rates by which such appointments are timely provided.

In early January, in accord with the Court's suggestion at the last case management conference,[3] the Receiver provided a very detailed presentation, impressively prepared by the CCHCS Quality Management unit, focusing on the timeliness of specialty services ordered high priority (i.e., to occur within 14 days).

While the Receiver is in the best position to describe the presentation's conclusions, we understand that CCHCS believes that its provision of specialty services is generally in accord with community standards, even if those standards, because of how they are measured and reported, cannot be exactly compared with care in CDCR prisons. CCHCS said it is considering extending the high priority specialty service time-frame to 21 calendar days, to more closely align with what it considers community standards, among other policy adjustments.

We continue to consider the information and possible actions presented by CCHCS. However, it appears based on the data presented earlier this month that even if the high priority time-frame is extended to 21 days, some prisons would still have problematic rates of untimely high priority specialty service appointments. These include the California Health Care Facility, California Medical Facility, and Salinas Valley State Prison. We thus continue to encourage and support efforts by the Receiver and CCHCS to expand the pool of special service providers available both statewide and for patients at those prisons.

*Defendants' Position:*  As the Court noted at the last Case Management Conference, the issue of timely specialty appointments for high priority care should be considered in the context of similar services in community healthcare markets.[4]  The California Department of Managed

---

[4] September 16, 2025 Tr. 18:9-19:5, ECF 3993.

4

Health Care (DMHC), which works to ensure health-plan members have access to equitable, high-quality, timely, and affordable healthcare, analyzes data concerning the community's access to specialty healthcare through surveys of various healthcare plans in California. (*See,* Timely Access Compliance and Annual Network Reporting.) Like CCHCS, DHMC has compliance standards against which it measures the performance of the healthcare plans it monitors. (*Id.*)

CCHCS prepared a comparison of its compliance rates for specialty appointments with the compliance rates regulated by DHMC.[5] CCHCS appears to have more stringent requirements than DHMC for assessing the provision of specialty services, for example:

- CCHCS measures the interval between the specialty order date and the completed appointment date,[6] whereas DMHC measures the interval between the date of the plans' response to DMHC's survey and the next available appointment—not the date by which the appointment is completed;[7]
- CCHCS measures all specialty orders completed in the reporting period[8] while DMHC only measures a sample of the health plan's network providers;
- CCHCS expects that at least 85% of high priority specialty appointments will be completed within 14 *calendar* days while DMHC considers healthcare plans to be performing adequately if at least 70% of non-urgent specialty appointments are completed within 15 *business* days.[9] Urgent appointments would roughly equate to patients at CCHCS who needed care at the TTA or to be sent to a higher level of care.

In short, there is no straight comparison to be made between community wait times for access to specialty care and similar CCHCS wait times. However, it appears that compared to community health plans in California, CCHCS/CDCR timely provide high-priority specialty-care services within a shorter timeframe for the specialties tracked by DMHC. Nonetheless, CCHCS recognizes room for improvement in certain specialties at specific institutions and continues to work with Health Net to bring on specialty providers who can support the incarcerated population.

---

[5] Exhibit 2, Timely Access to Specialty Care December 2025|Quality Management Analysis
[6] *See* CCHCS Performance Dashboard Definition High Priority Specialty 14 Days.
[7] *See,* Cal. Code Regs. Tit. 28, § 1300.67.2.2(b)(2) for definition of DHMC measurements.
[8] *See,* CCHCS Performance Dashboard Definition for High Priority Specialty 14 Days.
[9] Cal. Code Regs. Tit. 28, § 1300.67.2.2(c)(5)(D) for DHMC benchmark methodology.

**IV.     EXTREME HEAT**

*Plaintiffs' Position:* Extreme heat poses a serious risk to the health of the California prison population, and we continue to believe that air conditioning is the only certain protection from extreme heat for those who live in CDCR prisons. On December 5, 2025, the parties submitted a joint discovery letter brief regarding Plaintiffs' request for documents related to Defendants' air-cooling infrastructure needs at institutions statewide.[10] This information is essential to understanding CDCR's response to the medical risk posed by excessive heat.

As previously described, CDCR's current—and in Plaintiffs' view, inadequate—approach to addressing the medical risk posed by excessive heat to all residents is outlined in its "2025 Heat Plan."[11] At the core of the Plan is a requirement that CDCR staff take and document temperatures in housing units during the heat season.[12] However, both the Office of the Inspector General and this Court recently recognized CDCR fails to take consistent, reliable indoor temperature measurements in housing units.[13]

In its September 2025 Audit, the OIG made four recommendations regarding temperature readings in its report, including recommendations to "ensure temperature readings are taken in or at consistent locations in housing units," and "consider taking temperature readings in cells to determine whether the temperatures in cells, where incarcerated people spend a significant amount of their time, are more extreme than the temperatures in other living areas."[14] But in CDCR's 60-Day Corrective Action Plan ("CAP"), attached as **Exhibit 3**, CDCR stated for all four of the OIG's recommendations: "[t]he Department will not be implementing this recommendation, and considers this matter closed."[15] The additional information provided by

---

[10] ECF No. 4000.
[11] *See* ECF No. 3966 at 17; *id.* at 260 (CDCR's 2025 Heat Plan, filed as Exhibit 9 to the June 9, 2025 CMC Statement).
[12] *Id.* at 264-65.
[13] *See* Office of the Inspector General, *Audit of the California Department of Corrections and Rehabilitation's Management of Temperature Conditions Within California's Prisons* at 15 (Sept. 2025), ("OIG Report") (filed as Exhibit L to Sept. 8, 2025 CMC Statement at ECF No. 3985) (documenting "multiple days in which custody staff failed to perform and document temperature readings in several housing units"); Reporter's Transcript, September 15, 2025, at 26:5-9 ("[O]ne thing that needs to happen immediately [] is that CDCR staff need to record institutional temperature data … That has not been happening.")
[14] OIG Report at 17.
[15] Exhibit 3, CAP at 1-2.

CDCR regarding these declined recommendations in the "Comments/Proof of Practice" column largely point to the existing, inadequate policies and practices regarding temperature readings. And while the OIG Report and the October 2025 *Armstrong-Coleman-Plata* Coordination Meeting minutes indicated CDCR was installing and testing wireless temperature-recording devices at certain prisons,[16] the November 2025 Coordination Meeting minutes indicate the project may be stalled due to cost.[17]

*Defendants' Position:* As previously stated in Defendants' portion of the joint discovery letter brief, filed December 5, 2025, CDCR's response to climate change, including extreme heat, is not at issue in this case. Questions pertaining to HVAC-related infrastructure and capital expenditure estimates are extraordinarily far afield of the singular issue central to this case: the constitutional delivery of medical care to incarcerated persons with serious medical needs. CDCR's response to climate change is a conditions-of-confinement issue and as such, Plaintiffs' discovery requests and repeated efforts to raise this issue in this case should be disregarded.

Notwithstanding the above relevance concerns, Defendants respond to several issues to provide clarification. First, the September 2025 OIG Audit made eight—not four— recommendations, some of which appear to be unrelated to the issue of extreme heat.[18] While CDCR's 60-Day Corrective Action Plan ("CAP") response indicates that five of the recommendations will not be implemented, it also provides additional context. For instance, with respect to the first recommendation—to establish guidelines to track temperatures year-round in living areas—the CAP states that indoor and outdoor temperature monitoring already occurs May through October each year, and that additional monitoring occurs when the outdoor temperature is projected to exceed 90 degrees Fahrenheit. Thus, this recommendation appears aimed at tracking temperatures during winter months since CDCR is already monitoring temperatures

---

[16] OIG Report at 17; Coordination Meeting Minutes 2-4 (Oct. 8, 2025). Thirty-one sensors capable of measuring temperature and relative humidity were recently installed in throughout Florida's Dade Correctional Institution. *See* Second Decl. of Stefano Schiavon, Ph.D., at ¶¶ 47– 52, *Wilson v. Dixon,* No. 1:24-cv-24253 (S.D. Fla Nov. 2, 2025), ECF No. 82-2. Three sensors were installed in cells. *Id.* at ¶ 51.
[17] Coordination Meeting Minutes (Nov. 13, 2025).
[18] The OIG's Audit was not limited to its review of CDCR's response to extreme heat; rather, the OIG reviewed CDCR's "preparedness for extremely hot *and cold* temperatures at three prisons." (ECF No. 3985 at Ex. L, p. 3 (OIG Report) (emphasis added).

during periods of extreme heat. The last recommendation (Item #8)—to provide the incarcerated persons with thicker jackets—is also unrelated to extreme heat. The other three remaining recommendations are either no longer applicable (due to changes in the 2025 Heat Plan),[19] are occurring in a related fashion,[20] or are partially implemented.[21] CDCR and CCHCS are also beginning discussions regarding the 2026 Heat Plan, and it is possible that the OIG's report and recommendations will be further discussed at that time.

With respect to wireless temperature-recording devices, such devices have been installed in two institutions (Mule Creek State Prison and Calipatria State Prison) as a trial program and the devices are currently operating. While there are funding concerns for further rollout,[22] the project team met to consider heat sensor vendors but no firm decision has yet been made regarding statewide implementation.

## V. OTHER MEDICAL CARE MATTERS

### A. Housing Incarcerated People in Non-Traditional Housing at SVSP

*Plaintiffs' Position*: Last January, the *Coleman* Special Master Team found 11 people housed in holding cells at Salinas Valley State Prison (SVSP). Since then, we have sought a full accounting of how these individuals, along with dozens of others we determined to be similarly housed in the months before that, came to be placed in non-traditional housing, including holding cells without plumbing, unstaffed decommissioned buildings, and medical exam rooms.[23] A robust investigation and thorough corrective action are necessary to ensure that this situation does not happen again. However, we have yet to receive an adequate response.

---

[19] Exhibit 3, CAP at Item 7.
[20] Exhibit 3, CAP at Items 2, 3, 4, & 6.
[21] Exhibit 3, CAP at Item 5.
[22] Plaintiffs advocate above for further rollout of wireless temperature-recording devices statewide and note in footnote 19 that similar sensors "were recently installed in throughout [sic] Florida's Dade Correctional Institution." But those sensors appear to only have been installed temporarily at one Florida institution. The cell sensors were installed for 72 hours (fn. 19 at ¶ 51) and the remaining sensors were installed for five months (*id.* at ¶ 50).
[23] We found that people in these locations sometimes had to sleep on concrete floors and exam tables, and that some missed medical appointments and medications. *See* ECF No. 3968 at 25:8-16. We provided these facts to CDCR and CCHCS in May 2025 and requested that, as part of their investigation, Defendants interview all people who were housed in non-traditional or deactivated housing.

1    In July, we questioned the narrow scope of a Root Cause Analysis (RCA) that Defendants and CCHCS initiated about the housing, including because it referenced only the 11 residents identified by the *Coleman* Special Master in January. In response, Defendants asserted the matter had been thoroughly and credibly considered, indicating no changes would be made.[24]

We also requested the Plan of Action (PoA) implemented as a result of the RCA. On November 13, we received the PoA, which reinforced our concerns about the RCA's limited scope. On December 8, we provided CCHCS and Defendants a detailed list of facts and concerns that were not included in the PoA provided to us, including that medical and custody staff were, for months, aware that people were housed improperly with impaired access to health care, yet this issue was apparently not raised with the chain of command. We requested that a new or supplemental RCA be initiated to address our concerns. Below, Defendants state the RCA *summary* comprised more than 100 pages, whereas the PoA we received is less than 10 pages. The question now is whether the Receiver, who presumably has access to the entire RCA, shares our concerns.

*Defendants' Position*: A Root Cause Analysis (RCA) was undertaken in response to the inappropriate housing at Salinas Valley State Prison (SVSP) to analyze what happened, why it happened, and how to prevent it from happening again. Similar questions were also asked by this Court at the June 15, 2025 Case Management Conference.[25]

RCAs are conducted pursuant to a standardized process that follows a series of steps to conduct a comprehensive review, incorporating criteria for thorough and credible risk mitigation in alignment with national Joint Commission standards. In the course of an RCA, the RCA Team identifies a subset of contributing factors that embody the core reasons the incident occurred (typically two to four in total per RCA). The CCHCS RCA procedure includes detailed criteria to assist RCA Teams in identifying root causes. For example, a root cause will have a clear cause-and-effect relationship, and that cause-and-effect will be specific and accurate, not vague or

---

[24] Defendants' counsel in May, and again at the September Case Management Conference indicated that other, unspecified on-going investigations were being done, which they deem confidential. We assume these may concern staff misconduct, and that we will be informed when concluded and provided the results.

[25] June 16, 2025 Tr., 39:4-12, ECF No. 3980.

speculative, with an emphasis on system design and environmental factors that increase organizational risk. The root causes identified by the RCA Team become the focus of the Plan of Action (PoA).

Per CCHCS procedure, the PoA must provide detailed interventions to address identified root causes and performance measures that will allow oversight entities to assess whether risks have been successfully prevented and/or mitigated. For RCAs assigned by CCHCS's Patient Safety Program, the headquarters-based Health Care Incident Review Committee monitors the implementation and impact of the PoA for at least four months; during this time, as institutions evaluate the impact of interventions, they may submit modifications to the PoA for review and approval.

The CCHCS RCA procedure dictates that data is collected beginning at least six months prior to the incident and that a significant scope of information is reviewed, including associated data systems, physical document, communications between staff, organizational directives (via email, policy, procedure, rules, regulations, memoranda, and other methods of communication), observation of physical space, equipment, supplies, and materials, and research into the most current expert opinions and evidence-based best practices.

RCAs identify root causes that are within the institution's authority and ability to address. When appropriate, the statewide Patient Safety Program will assist the institution in elevating the need for additional action at regional or headquarters levels. Typically, that step occurs after the bulk of the RCA analysis is complete, when detailed information about contributing factors and root causes is available to inform regional and statewide actions.

The SVSP RCA Team followed procedures as set forth above. The SVSP RCA aims to identify the root causes leading to the inappropriate housing of incarcerated persons at SVSP, and to develop a detailed PoA to prevent similar events from occurring in the future. RCAs are conducted pursuant to a standardized process that follows a series of steps to conduct a comprehensive review, incorporating criteria for thorough and credible risk mitigation in alignment with national Joint Commission standards.

The SVSP RCA was conducted by a multidisciplinary team of sixteen individuals with RCA training and substantial experience and expertise in the processes and disciplines involved in the incident. The team included representatives from nursing, medical, mental health, custody, and patient safety disciplines with a thorough understanding of institution culture, day-to-day operations, human resource factors, physical environment, and state and local policies impacting appropriate placement at SVSP.

SVSP Team's review was expansive. It involved data collection which encompassed hundreds of pages of staff correspondence, interview notes, electronic health records, information from CDCR databases involved in housing, local operating procedures, statewide policies and memoranda, and special reports and correspondence produced by both internal and external stakeholders. Team members visited and photographed the locations used for housing. The Team reviewed health care incident reports of similar incidents beyond the 11 patient placements that were identified at the *Coleman* site visit in January 2025. The RCA brainstorming session incorporated themes and findings from data collection, considered all risk categories required by CCHCS, and looked beyond obvious contributing factors into deeper systemic issues. The Team identified 41 factors that contributed to inappropriate housing placements at SVSP. The summarized information alone was more than 100 pages of text.

In its RCA, the SVSP Team distilled the factors to four specific root causes. To prevent this from happening again at SVSP, those root causes are addressed in the PoA. The SVSP PoA is still in the monitoring phase.

### B. Analysis of 2023 Mortality Review

*Plaintiffs' Position:* As previously reported, CCHCS in April released its most recent annual analysis of mortality reviews, covering deaths in 2023. The analysis' ultimate conclusion included that "[t]here remain significant opportunities for improvement in coordinated care of complex patients." In response to our inquiry about its actions to address this finding, CCHCS in August said it was evaluating responsive measures as part of what it called a "complex care

initiative."[26] On November 14, 2025, we asked for an update, referencing not only the 2023 annual analysis conclusion but findings in several mortality reviews of those who died in 2024 and 2025 that identified additional opportunities for improvement related to complex care. We also asked about a mortality review's findings regarding a complex care patient who, tragically, died last May of severe malnutrition after approximately seven months in CDCR custody across four prisons. The Receiver's physician expert concluded this it was "highly likely to have been a preventable death," stating there were "multiple missed opportunities for intervention."

In late December 2025, CCHCS told us it began discussing the Complex Care Management Initiative in early 2025, and that as a part of the initiative CCHCS has created prototypes for a Complex Care Management Registry and a multidisciplinary complex care assessment plan of care tool. According to CCHCS, it will begin testing these tools in the first half of 2026 before a statewide rollout. We appreciate CCHCS's work to improve care for complex patients going forward, and we will continue to monitor this issue, including as it relates to potentially preventable deaths.

*Defendants' Position:* CCHCS is investigating and preparing responses to Plaintiffs' requests regarding the individual deaths in 2024 and 2025. As it relates to the care of complex patients, CCHCS began discussing a Complex Care Management initiative in early 2025. A Headquarters steering committee comprised of leadership from Medical, Nursing, Mental Health, Dental, Clinical Operations, Quality Management, and Division of Adult Institutions was established in October 2025. The initiative involves clinical and non-clinical staff at all levels of the organization. Areas for improvement identified by leadership include:

- Identifying appropriate forums to discuss complex care patients in interdisciplinary team meetings, huddles, population management meetings, and care team enhanced conferences;
- Creating interdisciplinary communication templates to improve coordination between clinical and custody disciplines;
- Developing a multidisciplinary complex care assessment and plan of care tool;
- Enhancing documentation and notices in the Electronic Health Record System;

---

[26] *See* ECF No. 3968 at 36:9-11 and Exhibit 10 thereto [the Annual Analysis] at 52, and ECF No. 3984 at 19:4-20.

- Developing Quality Management tools, such as a complex care registry;
- Leveraging Peer Support Specialists;
- Creating workflow designs and functions;
- Adopting best practices informed by institutions and outside health care organizations; and
- Defining staff roles and responsibilities.

CCHCS has a robust practice involving the review of patient deaths. These efforts include CCHCS evaluating and identifying appropriate forums—such as interdisciplinary team meetings, huddles, and population management meetings—for discussing the care of complex patients. Defendants will continue to support these efforts.

### C. Emergency Medical Response

*Plaintiffs' Position:* As previously reported, in early June the Receiver provided the expert report (by Dr. Keller) he commissioned on the prisons' emergency medical responses, and that as of mid-September the report and its recommendations were being reviewed.[27] On November 21, we asked for an update, including whether any of the report's approximately 20 recommendations could be implemented now. On January 13, CCHCS stated that its review of the report was completed, and that a response is being reviewed and edited with an anticipated completion date of Spring 2026.[28] CCHCS also said it is addressing or identifying alternative solutions for some problems identifying by the expert, though specific problems and solutions were not shared.[29]

*Defendants' Position:* As reported in the last Case Management Conference Statement, the report recommendations were thoroughly reviewed and discussed. Of approximately nineteen recommendations, CCHCS and the Division of Adult Institutions agreed with four recommendations, disagreed with ten, and five are still under consideration. CCHCS is appreciative of Dr. Keller's recommendations and will continue to review its processes for areas of improvement.

---

[27] *See* ECF No. 3968 at 38:8-15 and Exhibit 1 thereto and ECF No. 3984 at 20:2-9. In addition to this expert's report, the Analysis of 2023 CCHCS Mortality Reviews, released in April 2025, concluded, "There remain significant opportunities for improvement . . . in the practice and documentation of CCHCS Emergency Management protocols." *See* ECF No. 3968 at Exhibit 10 [the Annual Analysis] at 52.
[28] *See* CCHCS Memorandum, January 13, 2026, attached hereto as Exhibit 4.
[29] *Id.*

### D.  Medical Staff's Role in the Disciplinary Process

*Plaintiffs' Position*: Since the last Case Management Conference, we identified additional instances of what appeared to have been Rules Violation Reports (RVRs) issued in violation of the policy set forth in CCHCS and CDCR's January 2025 Joint Memorandum, which circumscribes health care staff's involvement in the RVR process.[30] Specifically, it appeared that custody staff initiated RVRs at the request of individual medical staff, without the request being considered by supervisors and approved by the CEO, as required by CCHCS policy. At our request, CCHCS and CDCR have voided two of these RVRs.[31] We have also learned that reviews by CDCR internal auditors resulted in the voiding of other RVRs that we believe violated the January CCHCS policy.

Below, Defendants state that the January 2025 policy "does not mandate RVRs authored by custody be rescinded simply because health care staff notified custody of the incarcerated person's misconduct." This is an apparent misunderstanding of our concerns. We requested that such RVRs be rescinded not simply because custody staff issued the RVRs after being notified of alleged misconduct, but because the process outlined in the January 2025 policy for the issuance of such RVRs was plainly not followed.

These violations—and possibly others—did not appear in the tracking log required by the policy itself, as that log reflects only RVRs issued in accord with the policy—those entered into SOMS by each institution's CEO or designee on behalf of licensed health care staff. As a result, the log does not capture RVRs entered by custody staff at the request of health care staff.[32]

The voided RVRs referenced above were issued at CHCF. On December 1, we asked CDCR and CCHCS to void four more RVRs at CHCF. We also asked whether CHCF healthcare staff will receive further training on the January 2025 policy, and whether CHCF custody staff,

---

[30] *See* Exhibit 5, CCHCS Memorandum, "Limiting Licensed Health Care Staff Access to Rules Violation Reports" (Jan. 8, 2025).
[31] At our request, CCHCS and CDCR also voided the four RVRs referenced in the September 2025 Case Management statement (*see* ECF No. 3984 at 21:4–6), which were issued at CHCF, RJD, and SATF.
[32] There is no requirement that custody staff be trained on the January 2025 policy.

14

who have repeatedly issued RVRs at the request of individual healthcare staff in violation of the January policy, should receive training on it.

Separately, we have asked that CCHCS include the January 2025 policy in its Health Care Department Operations Manual (HC-DOM). On November 17, 2025, we were informed that our request is being considered. We will continue to monitor this issue.

*Defendants' Position*: During the September Case Management Conference, the Court requested that Defendants determine if the guidance set forth in the January 8, 2025 memorandum, "Limiting Licensed Health Care Staff Access to Rules Violation Reports[33]" (January 2025 Memo) was being followed. The issuance of the January 2025 Memo followed the Prison Law Offices' (PLO) advocacy in *Armstrong v. Newsom, et al.,* 4:94-cv-02307 (N.D. Cal.), relating to concerns at the Substance Abuse Treatment Facility (SATF). This memo was issued statewide to establish best practices, reduce unnecessary RVRs, and to allow health care staff to focus on health care related duties.

The January 2025 Memo reiterates that RVRs are a custody function and provides that health care staff who are the victim of or who witness a serious incident that requires an incident report (e.g., for use of force, indecent exposure, assault, battery, threat of serious or great bodily injury) must complete an incident report and submit it to custody for review. Custody staff then determine whether to generate an RVR. If the incarcerated person's misconduct did not involve the use of force, indecent exposure, assault, battery or the threat of serious or great bodily injury, then health care staff are to document their concerns and share them with their immediate health care supervisor. After reviewing the concerns of health care staff and the circumstances for appropriateness, immediate health care supervisor shall consult with the area custody supervisor to ensure circumstances documented are not a reportable incident. The immediate health care supervisor will then, if deemed necessary, implement alternative behavioral interventions. If, after implementing alternate behavioral interventions the incarcerated person's misconduct of a serious nature continues, the health care supervisor will elevate the matter to the CEO for review. If the

---

[33] *See* Ex. 5, CCHCS Memorandum, "Limiting Licensed Health Care Staff Access to Rules Violation Reports" (Jan. 8, 2025).

CEO agrees an RVR is appropriate, the CEO or their designee, or the Chief Support Executive, may create an RVR in the Strategic Oversight Management System (SOMS). To date, no CEO or designee has entered an RVR for patient behavior reported by health care staff.

Thus, under the Memo, there are circumstances under which it is appropriate for health care staff to raise their concerns regarding an incarcerated person's misconduct directly with custody staff, and for custody staff to issue an RVR. Simply because serious misconduct may occur outside the presence of custody staff (but in the presence of health care staff) does not render such conduct unworthy of accountability. In the small handful of examples raised by Plaintiffs, it appears that healthcare staff did not follow the specific process set forth in the Memo. These were isolated incidents and do not necessitate statewide retraining of staff. Four of those RVRs have since been voided and the others are under consideration through the Non-Paragraph 7 review process even though the Memo does not mandate that RVRs authored by custody be rescinded simply because health care staff notified custody of the incarcerated person's misconduct.

Respectfully submitted,

Dated:  January 20, 2026

HANSON BRIDGETT LLP

*/s/ Samantha Wolff*
PAUL MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS- GONZÁLEZ

*Attorneys for Defendants*

Dated:  January 20, 2026

ROB BONTA
Attorney General of California
DAMON G. MCCLAIN
Supervising Deputy Attorney General

*/s/ Corinna Arbiter*
CORINNA ARBITER
Deputy Attorney General
*Attorneys for Defendants*

| | | |
|---|---|---|
| 1 | Dated:  January 20, 2026 | PRISON LAW OFFICE |
| 2 | | |
| 3 | | |
| 4 | | */s/ Mackenzie L. Halter*<br>DON SPECTER |
| 5 | | STEVEN FAMA<br>RANA ANABTAWI |
| 6 | | LILY HARVEY<br>MACKENZIE L. HALTER |
| 7 | | *Attorneys for Plaintiffs* |