ROB BONTA
Attorney General of California
DAMON G. MCCLAIN – 209508
Supervising Deputy Attorney General
CORINNA ARBITER - 273074
Deputy Attorneys General
  600 W. Broadway, Suite 1800
  San Diego, CA 92101
  Telephone: (619) 321-5799
  Fax: (619) 645-2061
  E-mail: Corinna.Arbiter@doj.ca.gov

HANSON BRIDGETT LLP
PAUL MELLO – 179755
SAMANTHA D. WOLFF – 240280
DAVID C. CASARRUBIAS-GONZÁLEZ – 321994
  425 Market Street, 26th Floor
  San Francisco, CA  94105
  Telephone: (415) 777-3200
  Fax: (415) 541-9366
  E-mail:  pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER – 83925
STEVEN FAMA – 99641
ALISON HARDY – 135966
RANA ANABTAWI – 267073
LILY HARVEY – 278947
SOPHIE HART – 321663
MACKENZIE L. HALTER – 333992
  1917 Fifth Street
  Berkeley, CA  94710
  Telephone: (510) 280-2621
  Fax: (510) 280-2704
  E-mail:  dspecter@prisonlaw.com

LAW OFFICE OF SARA NORMAN
SARA NORMAN (189536)
  P.O. Box 170462
  San Francisco, CA 94117-0462
  Telephone: (415) 236-3763
  E-mail: sara@saranormanlaw.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **MARCIANO PLATA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 4:01-cv-01351-JST<br><br>**Joint Case Management Conference Statement**<br><br>Date:         June 1, 2026<br>Time:         2:00 p.m.<br>Courtroom:   6, 2nd Floor<br>Judge:        Hon. Jon S. Tigar<br>Action Filed: April 5, 2001 |

1

The parties submit the following joint statement in advance of the June 1, 2026, Case Management Conference.

## I.   PROGRESS TOWARDS RESOLUTION – DELEGATIONS TO DATE

*Plaintiffs' Position:*  Since the last Case Management Conference, the Receiver declined to delegate authority for medical care for California State Prison, Sacramento (SAC) in February. While the Receiver did not cite his reasons for this decision, we opposed the delegation of SAC for several reasons, including nursing care deficiencies, custody interference with medical care, failure to provide timely access to primary care, and issues with medical management of complex mental health patients.

Also, the Receiver delegated authority for medical care at California Health Care Facility (CHCF) in March, although he recognized that opportunities for improvement remain at the prison, including with nursing care, timeliness of specialty appointments, and better coordination of care for patients who have both serious medical and mental health conditions. The Receiver described the latter as a system-wide problem; we discuss this below (see Part V.A). We will continue to monitor these issues, among others.

A meet-and-confer regarding delegation for Substance Abuse Treatment Facility and State Prison was held in February 2026. We believe delegation is not appropriate at the present time, including because patients continue to die and suffer harm because of inadequate care. A meet-and-confer regarding delegation for Salinas Valley State Prison (SVSP) is scheduled for February 2027.

*Defendants' Position:*  As Plaintiffs note above, since the last Case Management Conference, the Receiver delegated authority over medical care at CHCF to the State and declined to delegate CSP-SAC.  With regard to CHCF and the issues Plaintiffs reference above, the Receiver found that CCHCS's standard for high priority specialty care services "is stricter than the free-world standard," and that the specialty care backlog has been a systemwide issue for several years.  The Receiver also found that while there remain opportunities for improvement in coordination between medical and mental health care providers, the best solution is a systemic one involving the mental health program's adoption of the Complete Care Model and that this "is

not something that a single institution, by itself, can successfully address." Notably, the Receiver found that "CHCF is to be commended for trying to design a system for multi-disciplinary consideration of patients requiring careful medical and mental health management notwithstanding the barriers that exist."

The significant EOP population at the remaining institutions may be a barrier to the completion of the remedy in this case. Indeed, the Receiver has noted that "it is an issue that has an impact on medical care at institutions with significant EOP populations." On April 23, 2026, CDCR's Secretary wrote to the *Coleman* Receiver requesting "immediate prioritization of the 'EOP review process'" which, if done, should result in a significant decrease in the size of that population, as happened the last time such a review was conducted. (*See* Ex. A., Macomber Letter.)

Finally, while the parties await the Receiver's delegation determination with respect to SATF, Defendants note that Plaintiffs have never once conceded that care at an institution is constitutionally adequate, notwithstanding the Receiver's subsequent findings that 31 institutions have been appropriate for delegation.

## II.    MEDICAL STAFFING

*Plaintiffs' Position:* In November 2025, we asked whether CCHCS would submit a Budget Change Proposal (BCP) or take other steps to adjust its hiring authorization model to include volume-based nursing staffing for specialty services and TTA positions. In late December, CCHCS said it continued to evaluate whether a BCP would be submitted, stating such could happen either in relation to a Governor's proposed budget (issued in January each year) or the May Revise of the proposed budget. CCHCS also explained that staffing model adjustments can and have resulted from a "full" BCP (which are publicly posted) or a "premise" BCP (which are not so posted) and that it works with the Department of Finance to determine which type of BCP is appropriate when the staffing model must be adjusted.[1]

The proposed Fiscal Year (FY) 2026-27 Governor's Budget released in January did not include a BCP regarding CCHCS's hiring authorization model, including with regard to volume-

---

[1]    *See* ECF Nos. 4003 at 2:15-3:9 and 3984 at 4:3-16.

3

based nursing staffing for specialty services and TTA positions. However, such was included the "May Revise" proposed FY 26-27; a copy of the BCP, released on May 14, is attached as Exhibit B. If enacted and implemented, it appears these changes will address the concern that CCHCS's medical staffing model does not include volume-based measures for essential specialty services and TTA nurse positions.

*Defendants' Position:*  As reflected in the May 14, 2026 BCP titled "Medical Classification Model Adjustment," the State has advanced a BCP through the May Revision process that addresses CCHCS's hiring authorization model, including the incorporation of volume-based nursing staffing for specialty services and TTA functions. While a BCP was not included in the January Governor's Budget, the State has since submitted a comprehensive May Revision BCP that not only contemplates but concretely implements volume-based staffing methodologies for the TTA and specialty services, among other areas.

## III.   ACCESS TO SPECIALTY CARE SERVICES

*Plaintiffs' Position:* CCHCS provided data shows that as of May 8, there were nearly 1,900 overdue (backlogged) specialty service orders, with that number ranging from approximately 1,600 to 2,300 each week over the last 12 months.

As previously stated, some prisons—including California Health Care Facility (CHCF, which houses large numbers of high risk and medically complex patients) and Salinas Valley State Prison (SVSP)—would continue to have problems providing timely specialty services even if CCHCS's current time-frame standards for specialty services were lengthened.  Using current metrics, these prisons continue to be among those most challenged with regard to providing timely specialty services. In April, for example, CHCF was able to provide timely high priority services in only about 40% of the cases, and had the highest rate of backlogged specialty service appointments among the prisons.

In response to our query, CCHCS on May 22 provided information about efforts at these problematic prisons to increase the timeliness of specialty services. For example, numerous initiatives were described at CHCF; some, such as working with a local hospital so that its specialists might come to the prison to see patients, appear to be new or more specific than those

4

previously stated efforts, while others, such as "coordinating with HQ to expand specialist availability," seem to re-state what we have been told for years has been occurring, and has not yet materially improved overall timeliness of high priority specialty services at the prison. We will continue to monitor this matter.

*Defendants' Position:*  The demand for specialty care at CCHCS continues to increase because of, among other things, CDCR's aging patient population. Yet CCHCS continues to improve patient access to specialty care. As evidence of CCHCS's progress, between January 5, 2026, and May 6, 2026, total statewide open specialty orders increased from 62,884 to 66,997 (an increase of 6.54%) while the overall backlog decreased from 2,579 open orders to 1,972 open orders. For the 1,972 open backlogged orders on May 6, 2026, 1,537 were already scheduled. That CCHCS managed to decrease the backlog in the face of rising orders is a direct result of improved specialty care processing.

For CHCF, CMF, and SVSP, institutions that Plaintiffs have identified in a non-Paragraph 7 (attached as Exhibit C) as struggling to provide specialty appointments, each decreased their specialty backlogs significantly between January 5, 2026, and May 6, 2026. CHCF decreased its specialty backlog by 24.39%; CMF decreased its specialty backlog by 52.41%; and SVSP decreased its backlog by 20.74%.  These institutions are at or near goal for overall timely compliance with specialty care, with CHCF at 81%, CMF at 91%, and SVSP at 76%. CHCF, CMF, and SVSP achieved this by developing measures that targeted some of the causes of the backlogs at those institutions.

As was discussed in the January 2026 Case Management Statement, CCHCS has held the institutions to more stringent requirements than the community with respect to timely specialty care.[2] CCHCS presently rates an institution as providing timely access to high priority specialty appointments if 85% or more of such appointments are scheduled within 14 calendar days and if 85% of medium priority appointments are scheduled within 45 days. The California Department of Managed Health Care rates California health care plan providers as providing timely access to specialty care if just 70% of the first available specialty appointments are scheduled within 15

---

[2]    *See* 1/20/2026 CMC Statement, 4:24-5:23, ECF No. 4003

business days. CCHCS's Statewide Quality Management Committee members recently voted that "High Priority" referral time frame should be extended to 21 calendar days to align with community standards.

CCHCS recognizes room for continued improvement in ordering and scheduling practices and continues to work with Health Net to bring on specialty providers who can support the incarcerated population.

## IV. EXTREME HEAT

*Plaintiffs' Position:* Extreme heat poses a serious risk to the health of the California prison population. As previously reported, information provided by CDCR indicates that two-thirds of housing units statewide do not have refrigeration-based air conditioning, including at many prisons that exceed 90°F (and some that reach 100°F) during the summer months.[3] Indeed, CCHCS data shows that several such prisons had Stage III heat alerts (meaning the temperature *inside* housing units reached 95°F) on multiple days in 2025: California Rehabilitation Center (17 days with Stage III heat alerts), Folsom State Prison (15 days), Sierra Conservation Center (15 days), and Central California Women's Facility (3 days). We continue to believe that air conditioning is the only certain protection from extreme heat for those who live in CDCR prisons.

As previously described, CDCR's current—and in Plaintiffs' view, inadequate—approach to addressing the medical risk posed by excessive heat to all residents is outlined in its Heat Plan.[4] A central requirement of CDCR's Heat Plan is that CDCR staff take and document temperatures in housing units during the heat season.[5] However, both the Office of the Inspector General and this Court have recognized CDCR's failure to reliably take accurate indoor temperature measurements in housing units.[6] Defendants previously reported that wireless temperature-

---

[3]    *See* ECF No. 3984 at 10:8-11.
[4]    *See* ECF No. 3966 at 17; *id.* at 260 (CDCR's 2025 Heat Plan, filed as Exhibit 9 to the June 9, 2025 CMC Statement); *see also* Exhibit J (CDCR's 2026 Heat Plan).
[5]    *Id.* at 264-65.
[6]    *See* Office of the Inspector General, *Audit of the California Department of Corrections and Rehabilitation's Management of Temperature Conditions Within California's Prisons* at 15 (Sept. 2025), ("OIG Report") (filed as Exhibit L to Sept. 8, 2025 CMC Statement at ECF No. 3985) (documenting "multiple days in which custody staff failed to perform and document temperature readings in several housing units"); Reporter's Transcript, September 15, 2025, at 26:5-9 ("[O]ne thing that needs to happen immediately [] is that CDCR staff need to record institutional temperature data … That has not been happening.")

recording devices had been installed and were being tested at two prisons (Mule Creek State Prison and Calipatria State Prison), but stated that no decision had been made as to whether these devices would be installed statewide.[7]

We appreciate that automatic heat sensors may improve CDCR's temperature management practices, and support this effort. However, for the sensors to accurately measure the temperatures—and risk of heat related harm—that incarcerated people are exposed to, the sensors must (1) record heat index (as opposed to temperature alone) and (2) be installed in locations that capture the highest heat index people are exposed to in housing units. Installing sensors in dayrooms that only measure temperature will dramatically and dangerously underestimate the risk of medical harm that incarcerated people are exposed to. We also appreciate the new process of electronically logging temperatures taken by CDCR staff, described by Defendants below and in the 2026 Heat Plan, may improve the issue of staff failing to take temperatures at all.  However, electronically logging temperatures taken manually does not address our concerns regarding the reliability of the temperatures being taken, described below. On February 12, we asked CDCR and CCHCS whether and when heat sensors would be installed at other prisons, whether the sensors would measure heat index, and where in each prison the sensors would be installed.[8] As of May 26, 2026, we have not received a response to our February 12 letter.

On May 1, *Plata* and *Coleman* counsel wrote to CDCR and the Receivers in both cases detailing our concerns with the existing Heat Plan,[9] including that the temperature thresholds are too high, temperature measurement practices are inadequate, and CDCR staff are not properly trained on the Heat Plan requirements. We requested CDCR install air conditioning statewide. Recognizing that air conditioning cannot be installed before the upcoming heat season even if CDCR adopts an urgent timeline for statewide installation, we also requested several interim measures, including installing sensors that measure heat index in areas within housing units

---

[7] ECF No. 4003 at 8:7-11.
[8] *See* Exhibit D, Ltr. from S. Hart to CDCR and CCHCS re: Installation of Heat Sensors in CDCR (Feb. 12, 2026).
[9] *See* Exhibit E, Ltr. from T. Nolan and S. Hart to CDCR and Receivers Kelso and Peters re: Protection of *Coleman* and *Plata* Class Members from Extreme Heat (May 1, 2026) (attachments omitted and identifying patient information redacted).

7

where people are exposed to the highest heat index, identifying patients at the highest risk for heat related medical harm and offering to move those patients to air conditioned housing units, and ensuring all incarcerated people have reliable access to cooling centers during the heat season, among others. As of May 26, 2026, we have not received a response to the May 1 letter.

Finally, as the Court is aware, in December 2025, the parties submitted a joint discovery letter brief regarding Plaintiffs' request for documents related to Defendants' air-cooling infrastructure needs at institutions statewide—information that is essential to our understanding of CDCR's response to the medical risk posed by excessive heat.[10] Below, Defendants restate their position that Plaintiffs are required to demonstrate not only that extreme heat poses a serious risk to health, that CDCR prisons experience very high temperatures, and that patients have recently been sent to the hospital due to heat-related illness, but that heat is killing people or causing "sentinel medical events" in CDCR before we are entitled to information about CDCR's response to the medical risk of extreme heat. As Plaintiffs outlined in the joint discovery letter brief, this is wrong. The Eighth Amendment does not require awaiting tragic outcomes before seeking relief, let alone discovery.[11]

On May 18, 2026, CDCR released a 20-year Infrastructure Master Plan that provides "a high-level, comprehensive assessment of the current institutional infrastructure" and "long-term strategy for the Department's infrastructure and operational needs."[12] The Plan reports on a broad array of infrastructure needs, including, for example, improvements to electrical, sewer/irrigations, and HVAC systems, as well as installation of electric vehicle charging stations and lethal electrified fencing.[13] The Plan and related documents purport to report on the condition of each prison's existing air cooling technology (failing, poor, fair, good, plus)[14] and outlines

---

[10]    ECF No. 4000. We are also informed that the Receiver is commissioning a study examining the relationship between health outcomes and environmental temperature data. The timeline for the study's results is unclear.

[11]    *See Helling v. McKinney*, 509 U.S. 25, 33-34 (1993); *see also* ECF No. 4000 at 2-3.

[12]    Exhibit F CDCR Infrastructure Master Plan at 2 (May 2026).

[13]    *Id.*; *see also* Exhibit G, CDCR Infrastructure Master Plan Appendix 3 – 20 Year Infrastructure Needs.

[14]    Exhibit H, CDCR Infrastructure Master Plan Appendix 2 – Condition Assessment.

8

"replacement cost estimate(s)" for HVAC systems at each prison.[15] However, the Plan provides no assurance that air conditioning will be installed at any prison—CDCR acknowledges that the projects identified the Plan are "subject to the standard budget review and approval process, including review and consideration by the Department of Finance and the Legislature" and that "[i]nclusion in the Plan does not constitute project approval or funding authorization."[16] Further, the Plan provides no timeline for when the installation of air conditioning would be completed, even if the plan were fully funded. As of the date of filing, we are still reviewing and considering the Infrastructure Master Plan and related information, including as it relates to the pending discovery dispute. We hope to provide the Court with further information regarding our position at the Case Management Conference.

*Defendants' Position:*  Notwithstanding Plaintiffs' citations to various heat studies, National Weather Service heat safety tips, and testimony provided in an unrelated case where incarcerated persons are housed in a state that experiences significantly more extreme weather conditions than California, Plaintiffs are not able to point to any serious adverse outcomes or sentinel events attributable to heat *within CDCR*. Plaintiffs' continued reliance on *Tiede v. Collier* is unavailing as there are no points of comparison either in terms of climate or its impact among the incarcerated population. Indeed, a plaintiffs'-side expert in *Tiede* testified that "if mitigation measures were effective in preventing heat-related deaths in Texas prisons without air conditioning, she would have expected to see no effect from heat on mortality in those facilities." *Tiede v. Collier*, 796 F. Supp. 3d 275, 307 (W.D. Tex. 2025). But TDCJ acknowledged at least 23 individuals died from heat-related causes in TDCJ facilities between 1998 and 2012, and experts estimated that number to be 271 deaths from 2001 to 2019. *Tiede*, 796 F. Supp. 3d at 292, 293. By comparison, the most recent mortality review by CCHCS did not reference heat as an underlying cause of death in any of the in-custody deaths that occurred in 2024.

---

[15]    *See* Exhibit G. It appears likely these figures represent the cost of installing and/or replacing mechanical A/C systems at each prison, but that is not clear. It is also unclear whether the figures include installation of A/C in every building at each prison, or in some subset of buildings.

[16]    CDCR Infrastructure Master Plan, https://www.cdcr.ca.gov/fpcm/cdcr-infrastructure-master-plan/ (last visited May 19, 2026).

9

While the statewide installation of air conditioning in Texas facilities may offer the "only certain protection from extreme heat," as Plaintiffs posit above, no such determination has been made here, nor could one reasonably be made based on California's more moderate climate and the State's successful efforts to prevent serious heat-related outcomes among the incarcerated population. In fact, CDCR's three institutions located in the desert region—Ironwood State Prison, Centinela State Prison, and Calipatria State Prison, each of which experienced Stage 1 temperatures at least half of the days during Heat Plan months in 2025—have refrigeration cooling in all housing units. So too does CHCF, which provides medical care and mental health care to those with the most severe and long-term needs.

Plaintiffs' references to emergency room send-outs and visits to an institution's Treatment and Triage Area do not support their position here, and instead demonstrates that care is being provided to those who need it. Emergency-room visits or hospitalization alone do not denote a sentinel medical event or demonstrate serious risk of harm.[17] And certainly, 45 emergency room send-outs in one year (2024), 7 of which occurred while incarcerated persons were fighting fires or training at fire camps, is not evidence of a systemic issue considering that CDCR housed, on average, over 90,000 incarcerated persons that same year – equating to approximately .05% of the population. In short, California is not Texas and Plaintiffs' incompatible comparison here is unpersuasive.

Yet Plaintiffs somehow infer from the above facts that it is Defendants' position that Plaintiffs must "demonstrate that heat is killing people or causing 'sentinel events' in CDCR" before they are entitled to information on this subject. That is clearly not Defendants' position. Rather, it is Defendants' position that legal standards—which require Plaintiffs to show an objectively intolerable risk or actual harm—must apply to this case. *See*, *e.g.*, *Norbert v. City and County of San Francisco*, 10 F.4th 918, 934 (9th Cir. 2021); *Farmer v. Brennan*, 511 U.S. 825, 834, 837, 846 (1994); *Baze v. Rees*, 553 U.S. 35, 50 (2008) (the risk must be "'*sure or very likely*

_____

[17] *See* Joint Commission, Sentinel Events at https://www.jointcommission.org/en-us/knowledge-library/sentinel-events (sentinel event defined as death, permanent harm, or severe temporary harm); *see also* CDCR Health Care Department Operations Manual, Definitions, at https://www.cdcr.ca.gov/hcdom/dom/health-care-definitions/health-care-definitions/health-care-definitions-2/ (same).

to cause serious illness and needless suffering," emphasis in original, citing to *Helling v. McKinney*, 509 U.S. 25, 33, 34-35 (1993)); *Rhodes v. Chapman*, 452 U.S. 337, 367 (1981) (Brennan, J., concurring) (stating that "a court is under the obligation to examine the actual effect of challenged conditions upon the well-being of the prisoners."). Plaintiffs have made no such showing to date. Nor can it reasonably be said that Plaintiffs are not receiving adequate information on this topic, given the extensive access to information Plaintiffs enjoy in this case.

Moreover, as Defendants have repeatedly stated, *Plata* is not a conditions-of-confinement case. *See*, *e.g.*, ECF Nos. 4003 at 7:7-13; 4000 at 4-5; 3984 at 11. Nonetheless, Defendants have kept Plaintiffs (and this Court) informed of the steps the State is taking to mitigate the effects of climate change, which it takes very seriously and is aggressively working to address. Those efforts include the Air Cooling Pilot Program, the Heat-Related Illness Initiative within CDCR/CCHCS's 2026-2028 Performance Improvement Plan, the installation and testing of automated temperature sensors, and the updated 2026 *Coleman* Heat Plan, and CDCR's 20-year Infrastructure Master Plan. While Defendants provide an update on each of these measures below as a courtesy, this collateral issue is not properly before the Court. Plaintiffs have not—and cannot—demonstrate that Defendants' myriad heat mitigation efforts amount to deliberate indifference to a serious medical need. Nonetheless, Defendants provide the following comprehensive update to resolve any concerns regarding the State's response to heat—an issue that should not be litigated via the back-and-forth exchange of Joint CMC Statements in a case about the delivery of medical care that is close to resolution.

Air Cooling Pilot Program

CDCR is currently performing an Exterior Insulation and Finishing System installation at CSP-Los Angeles County, and will be starting projects at Kern Valley State Prison and Central California Women's Facility this month. CDCR believes the installation process will be mostly complete at CSP-Los Angeles County in September 2026, at Kern Valley State Prison in February 2027, and at Central California Women's Facility around June 2027. CDCR plans to use the information gathered from this pilot program to determine the most efficient and effective means of better insulating each of the various designed housing units throughout the State.

Heat Related Illness Initiative

CDCR and CCHCS also developed a Statewide Performance Improvement Plan (Statewide Plan), revised March 2026, which "serves as the framework for improvement initiatives over subsequent years."[18] The Statewide Plan includes the issue of heat related illnesses as one of ten statewide priorities. For priorities highlighted in the Statewide Plan, CDCR and CCHCS develop performance goals, launch statewide improvement initiatives, and measure performance through the Dashboard or similar performance report. *Id.* at 1. The Statewide Plan notes a number of strategies that will be included in its heat-related illness initiative, including implementing a clinical change-package for heat-related illness detection, management, prevention and reporting; leveraging technologies for temperature monitoring; and exploring facility improvements to help manage internal temperatures. *Id.* at 4.

Significant progress has been made in terms of implementing the Statewide Plan's heat-related illness initiative. The clinical change-package currently includes a care guide for heat-related illness that has been drafted and is going through the vetting process before being adopted. CCHCS is also developing continuing medical education in this area. Quality Management (QM) tools to help track and report on patients with heat-related illnesses are also planned, but development is dependent on heat-related illness information being entered into the Electronic Health Record System (EHRS). Both the care guide and continuing medical education will provide guidance to health care staff on how to document heat-related illnesses in EHRS. CCHCS is also evaluating the possible procurement of additional equipment specifically designed to help treat severe presentations of heat-related illnesses.

Automated Temperature Sensors

Additionally, as previously reported and noted by Plaintiffs above, Defendants installed two types of temperature-recording devices at Mule Creek and Calipatria State Prisons. ECF No. 4003 at 8:7-11. Following an analysis of the data and information learned from the installation of these devices, CDCR leadership will decide on which device to procure.

---

[18] Exhibit I, CDCR and CCHCS Performance Improvement Plan 2026-2028 (rev. March 2026).

Updated 2026 *Coleman* Heat Plan

Plaintiffs reference the 2025 Heat Plan above and state that it is inadequate to address the medical risk posed by excessive heat. Defendants note that the 2026 Annual Heat Plan offers significant improvements over its 2025 predecessor as it relates to the collection and availability of temperature data, and it is unclear why Plaintiffs omit reference to those updates. Under the 2026 Annual Heat Plan, officers no longer record temperatures on paper forms, and instead, CDCR and CCHCS developed a "new web-based Electronic Temperature Log . . . to assist all institutions in meeting the requirements outlined in the annual [Heat Plan] for recording indoor and outdoor temperatures."[19] Custody supervisors must monitor the electronic temperature logs to ensure that staff are timely entering temperature data in accordance with the 2026 Annual Heat Plan.[20]

20-Year Infrastructure Master Plan

On May 18, 2026, CDCR released an Infrastructure Master Plan (Plan) which includes its analysis and recommendations to update department infrastructure and align it with modern correctional standards.[21] As relevant to this discussion, the Plan notes that infrastructure is aging and indoor heating and cooling standards have developed and evolved since the institutions were first constructed. *Id.* at 2. The Plan sets forth several objectives for the next 20 years; Objective 1 includes modernization of fundamental utility systems to ensure that heating, ventilation and air conditioning systems meet contemporary community standards, demonstrating this is a priority for CDCR. *Id.* at 18-19. The Plan focuses on improvements at five institutions over the next five years (CMF, CCWF, SCC, COR, and CIM) and notes that in addition to focused infrastructure improvements at those facilities, CDCR will "continue to pursue targeted investments in repairs at other CDCR prisons" related to ADA accessibility, indoor heat conditions, and fire and life safety systems. *Id.* at 21-22.

---

[19]   Exhibit J, 2026 Annual Heat Plan and Updates (March 25, 2026) at 4.
[20]   Exhibit K, Electronic Temperature Log Memorandum (March 30, 2026) at 2.
[21]   CDCR's Infrastructure Master Plan, at 1, https://www.cdcr.ca.gov/fpcm/cdcr-infrastructure-master-plan/ (last visited May 26, 2026).

13

## V.   OTHER MEDICAL CARE MATTERS

### A.   Management of Complex Care Patients

*Plaintiffs' Position*: As previously reported, in April 2025, CCHCS published its annual analysis of mortality reviews, which reviewed patient deaths in 2023. The analysis concluded that "[t]here remain significant opportunities for improvement in coordinated care of complex patients."[22] Opportunities to improve care of complex patients continue be identified following patient deaths.  According to CCHCS, such opportunities were found in seven deaths that occurred in 2024[23], and, by our count, there were at least nine patient deaths in 2025 in which the CCHCS mortality review identified opportunities for improvement related to complex care management or the need for interdisciplinary coordination.[24] Among those nine was the tragic death last May of a patient from severe malnutrition after approximately seven months in CDCR custody across four prisons, which per the Receiver's physician expert was "highly likely to have been a preventable death" in which there were "multiple missed opportunities for intervention."

In December, CCHCS reported that it had created prototypes for a Complex Care Management Registry and a multidisciplinary complex care assessment plan of care tool.[25] In March, CCHCS informed us that it had adopted a Performance Improvement Plan for 2026-2028 that includes "Complex Care Management" as a statewide improvement priority. The plan states that such patients are "characterized by complex healthcare and behavioral needs" and provides data showing that, while comprising approximately 1,200 patients statewide (i.e., about one percent of CDCR residents), the group accounts for more than 25% of urgent/emergent encounters in prisons Treatment and Triage Areas (TTAs) and nearly 25% of all hospital send-outs.[26]

---

[22]   *See* ECF No. 3968 at 36:9–11 and Exhibit 10 thereto (2023 Annual Analysis) at 52; ECF No. 4003 at 11:22–12:7.

[23]   *See* Analysis of 2024 California Correctional Health Care Services Mortality Reviews, at https://cchcs.ca.gov/wp-content/uploads/sites/60/Analysis-of-2024-CCHCS-Mortality-Reviews.pdf.

[24]   The most recent CCHCS documents provided to us, dated April 8, 2026, showed there were four pending reviews of 2025 CDCR resident deaths.

[25]   *See* ECF No. 4003 at 11:21–12:24.

[26]   *See* Exhibit I at 2, California Department of Corrections and California Correctional Health Care Services Performance Improvement Plan 2026-2028 (Revised March 2026).

14

At our request, CCHCS on April 10, 2026 provided a briefing regarding the Complex Care Management Initiative. CCHCS staff acknowledged that coordinated management of the complex patients, which they recognize are at increased risk of harm, is fundamental, stating that its Complete Care Model is not complete until there is Complex Care Management. We agree.

At the April meeting, headquarters staff described three groups of complex patients that need better management: high utilizer patients with significant behavioral issues, decompensating patients, and patients who are participating in their care and have no behavioral issues but are clinically challenging.[27] In addition to creating processes that facilitate coordinated care for these patients, CCHCS reported its Complex Care infrastructure will include data analytics (such as a Complex Care Registry), updates to the electronic health record system, and systems to limit transfers of these patients to enhance continuity of care. CCHCS indicated that it is preparing to test the Complex Care Model at CHCF, CMF, and SAC and hopes to start testing in the next few months.

Importantly, CCHCS in April also indicated that improving medical care for complex patients will require CDCR's mental health program to implement the complete care model; Mr. Kelso said this directly when delegating CHCF in March. This will require cooperation and coordination between the *Plata* and *Coleman* Receivers. Notably, representatives of the *Coleman* Receiver attended the April briefing regarding CCHCS's new initiative.

CCHCS at the April meeting indicated it was still considering matters and finalizing methodologies related to its complex care patient management project. CCHCS therefore was not able to provide specific time-frames or dates for completion or implementation of its new model, or provide specifics about how healthcare staff functions or patient encounters would differ once the program is implemented. Nevertheless, we appreciate the substantial work done to date on the necessary project to improve care for complex patients.

---

[27] Data provided by CCHCS in April showed they believe CHCF, SAC, and SVSP each house more than 100 "high utilizer" patients, with CCWF, LAC, CMF, SATF and Mule Creek, holding lesser numbers, but more than 75 each. The data also showed such patients, in varying numbers, at other prisons, with some housing relatively few.

15

*Defendants' Position*:  Since at least 2018, CCHCS has been tracking the number of deaths where patients would have benefited from improved care coordination. CCHCS's annual publication, Analysis of Inmate Deaths, reflects that CCHCS is successfully tackling this issue. Deaths for this cohort have significantly declined from 21 in 2018 (pre-COVID) to 10[28] in 2024.

| | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 |
|---|---|---|---|---|---|---|---|
| Number of deaths with Opportunities for Improvement relating to care coordination or continuity | **10** | 19 | 23 | 18 | 36 | 20 | 21 |

Defendants applaud CCHCS's initiative to improve complex patient care management and will continue to support the effort.

As was discussed with Plaintiffs in April, the Performance Improvement Plan for Complex Care Management is a long-term effort. Among other things, the project team has created prototypes of a registry and a multidisciplinary complex care assessment plan of care tool. They are developing roles and responsibilities for care team members and reviewing the Health Care Department Operations Manual to identify necessary revisions. The plan requires numerous decision points, for which many stakeholders must provide input. CCHCS anticipates it will take at least two years to properly develop and implement the infrastructure to support this effort. Notwithstanding, CCHCS has already implemented improved initiatives for patients in this category, including weight management and monitoring.

### B.    Emergency Medical Response

*Plaintiffs' Position:* As previously stated, in early June 2025 the Receiver provided the expert report (by Dr. Keller) he commissioned on the prisons' emergency medical responses; the report's approximately 20 recommendations were reviewed and considered by the Receiver, CCHCS, and CDCR through the end of 2025. In mid-January, CCHCS informed us they and CDCR were finalizing their response, which was anticipated to be complete in Spring. CCHCS also said it is addressing or identifying alternative solutions for some problems Dr. Keller identified, though CCHCS did not specify which problems were being addressed or what the

---

[28]    According to CCHCS there were ten deaths in 2024 for this category due to a difference in categorization by the prior Chair of the Death Review Committee.

16

possible solutions were.[29] On May 21, we received CCHCS and CDCR's response to Dr. Keller's report.[30] We appreciate that some of the expert's recommendations have been adopted wholly or in part. However, most recommendations have been rejected, explicitly or implicitly.

We are particularly concerned that CCHCS rejected the expert's related recommendations for increased training and compensation for Treatment and Triage Area (TTA) registered nurses (RNs).[31] With regard to the increased training, the expert recommended more focused training about care in the TTA; in its response, CCHCS states that it agrees with the recommendation, but only references the training currently provided to TTA RNs, instead of describing any additional training that would be provided.[32] CCHCS rejected the recommendation to increase compensation for TTA RNs because doing that is "outside [its] authority" because another state agency (the Department of Human Resources) sets pay rates.[33] However, CCHCS does not explain why it could not request a rate increase; more fundamentally, the Receiver could provide the recommended additional reimbursement, seeking a waiver of state law if necessary.

We are also concerned about CCHCS's rejection of the recommendation to formally staff TTAs with medical providers on second or third watch (or either).[34] The expert was quite clear that the current process, with providers available by phone with no requirement to even access medical records, "increases patient risk and inevitably leads to patient harm;" overall, the expert opined that "the practice of remote practitioner call is one of the most serious flaws in the CDCR emergency response system."[35] CCHCS's rejection of a recommendation to establish medical provider coverage in TTAs seems at odds with the fact that some prisons, as we understand it, currently require a provider staff the TTA on second watch, or, if there is a medical inpatient unit in the same building, have the inpatient provider cover urgent/emergent patients, because it reduces the risk of harm to patients. We believe CCHCS, should, at the least acknowledge this

---

[29]   *See* ECF No. 4003 at 13:10-18. Dr. Keller's report is attached as Exhibit L.
[30]   A copy of the response is attached as Exhibit M.
[31]   Exhibit M at 3.
[32]   Exhibit L at 11 and 33; Exhibit M at 3.
[33]   Exhibit M at 3.
[34]   *Id.* at 1.
[35]   *See* Exhibit L at 27.

current practice consider whether other prisons, with similar TTA utilization rates, should also formally post providers to cover TTAs.

*Defendants' Position:* After a thorough analysis of Dr. Keller's recommendations, CCHCS agreed with about half. For those recommendations with which CCHCS partially agreed or disagreed, CCHCS provided a justification of its position.

Dr. Keller's recommendation for RN training was based on the TTA being understaffed and positions being filled with less experienced RNs and agency RNs. (*See* Exhibit XX, Keller Report, p. 33.) His specific recommendation for training was: "Require Emergency Response Training for all nurses before they can work in the TTA." (*Id.*) CCHCS already has such training in place.

Regarding Plaintiffs' concern that CCHCS did not agree to Dr. Keller's recommendation for increased reimbursement for RNs on TTA duty, Defendants agree that the request is outside the scope of CCHCS's authority. Defendants respect the Receiver's right to seek a waiver of state law to request a pay increase for these positions if he believes that is necessary. The Receiver's response indicates that time is not now.

CCHCS is constrained by its budget. The fall version of the Acuity Based Staffing Model includes 34 TTA providers. Some institutions with more high-risk patients and potential emergency room send outs will assign a provider to the full shift at the TTA, while other institutions with less TTA volume will have the providers split their time between their patient panel and the TTA.

## C.    Urinalysis Toxicology Testing for MAT Patients

*Plaintiffs' Position:* As the Court will recall, in early 2025 CCHCS acknowledged that approximately 6,000 substance use disorder patients received unreliable positive drug screen results during a four-month period in 2024 due to the use of a reagent associated with false-positive results by the contracted-for laboratory.[36] When it notified the impacted patients of this fact, CCCHS said it was considering "additional steps . . . to confirm results of presumptive

---

[36]    *See* ECF No. 3968 at 34:16-24.

18

positive urine drug tests to ensure that results are as accurate as possible."[37]

When asked about those "additional steps," CCHCS said its patient drug test urine screening process would be updated to provide for reflex (automatic) confirmatory tests when an opiate screen is positive.[38] It subsequently said the updated process was implemented effective July 1, 2025,[39] and provided copies of memoranda sent to medical executives and managers stating the previous urinalysis test was "retired" and "no[] longer available for use." The memos also detailed how the new test with automatic confirmatory testing on presumptive positive opiate and fentanyl screens would be ordered, and provided the six-digit test code (used in Primary Care Providers' (PCPS) lab orders) for both the "retired"/"no[] longer available for use" and new tests.[40] We understood this change was made because the "retired" test, which only reported presumptive positive results, is not considered definitive, even by the lab that provided them.[41] We appreciated CCHCS making this change to require confirmatory testing of presumptive positive results.[42]

On April 13, we again asked CCHCS about MAT patient urinalysis testing, after hearing from an octogenarian patient who was told he tested positive for opiates and fentanyl in February 2026 and who said the positive test was referenced by the Board of Parole Hearings (BPH) in March when it found him unsuitable for release. Our review of the patient's medical records indicated the positive test resulted from an order for the unreliable "retired"/ "no[] longer available" urinalysis test; it was, in other words, only a presumptive positive result. Almost immediately after those unreliable results were received, the patient, who denied he had used any nonprescribed substance, was ordered the "new" test with automatic confirmatory testing – i.e.,

---

[37] *Id*. at 35:2-4.
[38] *Id*. at 35:5-7.
[39] *See* ECF No. 3984 at 18:17-23.
[40] *See* CCHCS Memorandum, June 9, 2025, and CCHCS Memorandum, June 26, 2025, filed herewith as Exhibits N and O, respectively.
[41] *See* Quest Diagnostics, "Presumptive and definitive testing: make the right choice by understanding the differences" (2021) at https://www.questdiagnostics.com/healthcare-professionals/diagnostic-insights/articles/2021/presumptive-definitive-testing-understand-differences ["False positives cannot be distinguished from true positive results in the presumptive test," [ . . . ] and the test cannot provide definitive identification of which drugs or drug metabolites are present"].
[42] *See* ECF No. 3984 at 18:21-23.

19

the test PCPs had been directed to use since July 1, 2025 – with those results <u>negative</u> for any illicit substances. Of further concern, our review of other records, including CCHCS's MAT Registry and Lab Results Report, indicated that many other patients had been and were still being ordered the "retired"/ "no[] longer available" urinalysis test.[43] We asked CCHCS whether this information was correct, how it happened, and whether they would inform BPH about the continued use of the "retired" test providing only presumptive positive results with no confirmatory testing.

On May 11, CCHCS responded. It acknowledged that the "retired" /"no[] longer available" urinalysis test, lacking automatic confirmatory testing, had been ordered approximately 10,400 times since the June 2025 memoranda stating it was "retired"/ "no[] longer available". CCHCS reported this amounted to approximately 7.5% of the tests ordered after June 2025.[44] CCHCS attributed these inappropriate orders to PCPs who continued to order the "retired" test using "saved" or "favorite" orders, where it remained available despite its removal from the main order menu.[45] CCHCS indicated it had as of April 15 fully stopped the ability of PCPs to order the discontinued test.[46] It also said it did not need to inform BPH about this matter because "they previously have been made aware that they should not be relying on the test results but rather the interpretation by the medical provider."

We do not know when, by whom, or how BPH was "made aware" that it should rely not on urinalysis results but rather the provider's interpretation, or what more precisely was conveyed

[43]    The patient discussed above, for example, had been ordered the "retired" test multiple times since June 2025.

[44]    *See* CCHCS Memorandum, May 8, 2026, copy filed herewith as Exhibit P.  We have redacted patient-identifying information. The memorandum states that approximately 4,300 of the wrongly ordered tests had been completed, with the remainder discontinued or cancelled; it did not say how many of the orders were discontinued or cancelled after we pointed out that providers were continuing to order "retired" test.

[45]    CCHCS characterized these thousands of orders as "inadvertent[]." These orders, however, were purposefully entered by PCPs. In any event, even if "advertent" is an appropriate characterization, that it happened repeatedly for more than nine months without, apparently, anyone noticing or taking action to stop it, indicates a more concerning problem, as discussed below.

[46]    CCHCS also said or implied that one of the presumptive positive tests for the patient discussed above was in fact positive because there appeared to be no alternative explanation for the result. This seems to wrongly ignore the possibility of lab error and, more fundamentally, is contrary to the June 2025 decision to require confirmatory testing for all presumptive positive urinalysis results.

regarding the need to rely on providers' "interpretation."[47] We also do not know whether CCHCS has audited its records to determine if or what providers document regarding interpretation of positive results, particularly regarding such results on tests done without automatic confirmatory testing after such testing was "retired." We have asked CCHCS for more specific information, and asked that they provide BPH with its memorandums changing the testing order protocol and a list showing which patients, and when, were ordered the "retired" test, without automatic confirmatory testing.

*Defendants' Position:*  Changing systems in large institutions is inherently complex, especially when technology is involved. In response to Plaintiffs' non-Paragraph 7 request in April on this subject, CCHCS discovered some providers continued to access the order for the old test. Between July 1, 2025, and March 31, 2026 7.5% of all UTOX monitoring tests ordered were ordered for the old test. As CCHCS told Plaintiffs, of those orders, 4,291 were already completed when the issue was discovered. CCHCS took immediate action to remove providers' ability to access the old test from the electronic Health Record System and re-enter the remaining orders using the panel for the reflexive test.

CCHCS's May 8, 2026 response to Plaintiffs' non-Paragraph 7 request is set forth below, for ease of reference:

> *Following implementation of the updated Urine Toxicology (UTOX) Monitoring 383403, UTOX Monitoring 374595 remained active **to allow completion of existing orders and minimize potential disruption to patient care during the transition period**. During the transition, UTOX Monitoring 374595 was inadvertently ordered, as some primary care providers (PCP) continued accessing it through saved or "favorite" orders, despite its removal from the order menu.*
>
> *…There were **10,372 UTOX Monitoring 374595** tests ordered statewide from July 1, 2025, to March 31, 2026, or 7.5% of all UTOX Monitoring tests ordered during that period. **Of the 10,372 orders, 4,291 <u>were completed</u>**; the rest were cancelled or discontinued.* (Emphasis added.)

The "potential disruption" discussed by CCHCS was due to the fact that tens of thousands of orders were already placed using the old order panel and as such, did not include an automatic

---

[47]   CCHCS previously provided us its October 2022 PowerPoint presentation to the Board of Parole Hearings regarding the MAT program, which does not appear to address relying not on test results but rather on provider interpretation of such results.

retest for positive results. Had CCHCS immediately removed the order screen for the old test in June 2025, significant staff resources would have had to be dedicated to reentering those orders for the reflexive test and taken time away from patient care.

Defendants understand that CCHCS has further educated BPH about the ISUDT program and drug screening tools, including how a provider might use UTOX screening results to adjust treatment, the detection time of various substances in urine, and compounds and substances that may lead to false positives. Further, CCHCS communicated to BPH that health care UTOX testing is for clinical purposes and use of the results without clinical interpretation and confirmatory testing should be avoided. Plaintiffs discuss that they have asked for additional information. CCHCS received the most recent non-Paragraph 7 requests on May 15, 2026, and May 20, 2026. Defendants do not have any additional information to share because CCHCS is still analyzing the requests.

Dated: May 26, 2026

Respectfully submitted,
HANSON BRIDGETT LLP

/s/ Samantha D. Wolff
PAUL MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS-GONZÁLEZ

*Attorneys for Defendants*

Dated: May 26, 2026

ROB BONTA
Attorney General of California
DAMON G. MCCLAIN
Supervising Deputy Attorney General

/s/ Corinna Arbiter
CORINNA ARBITER
Deputy Attorney General
*Attorneys for Defendants*

22

Dated: May 26, 2026                              PRISON LAW OFFICE


                                                 */s/ Mackenzie L. Halter*
                                                 DON SPECTER
                                                 STEVEN FAMA
                                                 ALISON HARDY
                                                 RANA ANABTAWI
                                                 LILY HARVEY
                                                 MACKENZIE L. HALTER

                                                 *Attorneys for Plaintiffs*

23

23118564.1