ROB BONTA
Attorney General of California
DAMON G. MCCLAIN – 209508
Supervising Deputy Attorney General
CORINNA ARBITER - 273074
Deputy Attorneys General
600 W. Broadway, Suite 1800
San Diego, CA 92101
Telephone: (619) 321-5799
Fax: (619) 645-2061
E-mail: Corinna.Arbiter@doj.ca.gov

HANSON BRIDGETT LLP
PAUL MELLO – 179755
SAMANTHA D. WOLFF – 240280
DAVID C. CASARRUBIAS-GONZÁLEZ – 321994
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Fax: (415) 541-9366
E-mail: pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER – 83925
STEVEN FAMA – 99641
RANA ANABTAWI – 267073
LILY HARVEY – 278947
SOPHIE HART – 321663
MACKENZIE L. HALTER – 333992
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704
E-mail: dspecter@prisonlaw.com

LAW OFFICE OF SARA NORMAN
SARA NORMAN (189536)
P.O. Box 170462
San Francisco, CA 94117-0462
Telephone: (415) 236-3763
E-mail: sara@saranormanlaw.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **MARCIANO PLATA, et al.,**<br>Plaintiffs,<br>**v.**<br>**GAVIN NEWSOM, et al.,**<br>Defendants. | 4:01-cv-01351-JST<br>**Joint Case Management Conference Statement**<br>Date: September 14, 2026<br>Time: 2:00 p.m.<br>Courtroom: 6, 2nd Floor<br>Judge: Hon. Jon S. Tigar<br>Action Filed: April 5, 2001 |

The parties submit the following joint statement in advance of the September 14, 2026, Case Management Conference.

## I. Progress Towards Resolution – Delegations to Date

To date, the Receiver has delegated authority for medical care at 28 institutions, with three remaining under the Receiver's authority: Salinas Valley State Prison (SVSP), California State Prison, Sacramento (CSP-SAC), and Substance Abuse Treatment Facility (SATF). The Receiver has not delegated authority for medical care at any prisons since the last Case Management Conference. A meet-and-confer regarding potential delegation of SVSP is scheduled for February 2027. The parties' understanding is that the Receiver may again consider delegation of CSP-SAC and SATF in 2027, but the dates for the meet-and-confers have not been announced.

## II. Medical Staffing

*Plaintiffs' Position:* As previously reported, we last year asked CCHS about adopting volume-based staffing for prisons' TTA and specialty services, and CCHCS in June reported a Budget Change Proposal for such had been submitted.[1] In August, CCHCS confirmed that the proposed changes were enacted, resulting in establishment of approximately 60 additional nursing positions statewide.[2] We will continue to monitor this matter.

*Defendants' Position:* Defendants support CCHCS's efforts to ensure sufficient medical staffing is available to appropriately address the needs of the patient population. The positions referenced above by Plaintiffs were provided to the institutions in late July 2026 and are approved for Triage & Treatment Areas, Reception Centers, Offsite/Onsite Specialty Services, and Central California Women's Facility's Skilled Nursing Facility.

## III. Access to Specialty Care Services

*Plaintiffs' Position:* Based on information requested and received from CCHCS, we regularly provide and address data regarding backlogged specialty service orders, the rates at which appointments resulting from such orders are timely provided, and efforts to reduce the

---

[1] *See* May 26, 2026, Joint Case Management Statement 3:17-4:5, ECF. 4013; January 20, 2026, Joint Case Management Statement 2:15-3:9, ECF 4003; and September 8, 2025, Joint Case Management Statement 4:3-16, ECF 3984.

[2] *See* Ex. 1, CCHCS Memorandum (Aug. 5, 2026).

backlog and improve timeliness of appointments. We do so again immediately below, then address two other matters related to specialty services.[3]

CCHCS-provided data shows that as of August 3, there was a backlog of 2,155 specialty service orders statewide. That data also shows there have been between 1,600 and 2,300 backlogged orders reported each week for the last approximately 18 months.

Dashboard data for July 2026 shows relatively high (86%) overall rate of timely specialty services appointments. However, the data for that month shows a poor rate of timely high priority specialty service appointments (we have always been most concerned about these more urgent appointments): 65% statewide, with the flagship California Health Care Facility at 45%, the California Medical Facility at 20%, and approximately 10 other prisons reporting rates of about 65% or less. The poor rate of high priority appointments reported for July appears especially notable because it is the first month for which CCHCS, per the Dashboard, measured compliance using the newly adopted 21-day time period for those appointments, an increase of one-third from the previous, long-established 14-day time-frame. Yet the rate of timely high priority appointments in July (64%) was about the same as all other recent months, when the 14-day time period was used.

On August 25, CCHCS at our request provided information about efforts to improve the timeliness of high priority specialty service appointments at five prisons, all of which have persistently reported, including in July, poor rates of providing such appointments timely. We appreciate the described efforts,[4] but all appear very similar to previously described efforts, which have not materially reduced the backlog or improved timeliness of appointments. We will continue to monitor this situation.

Further, on August 24, via a draft of this Statement provided by Defendants, we learned that the current CCHCS contract with HealthNet, the entity that for approximately a decade has had, as we understand it, the primary role in obtaining or securing specialty (and hospital) services for

---

[3] *See, e.g.*, May 26, 2026, Joint Case Management Statement 4:14-5:12, ECF 4013; Jan. 20, 2026, Joint Case Management Statement 4:4-23, ECF 4003.

[4] Ex. 2, CCHCS Memorandum 1-3 (Aug. 25, 2026) (responses to Questions 3 and 4).

CDCR residents statewide will soon expire. As discussed by Defendants below, CCHCS has issued a Request for Proposal (RFP) and apparently soon will choose a new entity to do this essential medical care-related work.[5]

As Defendants state below, the new entity is anticipated to begin a six-month transition period with HealthNet starting January 1, 2027. Among other things, an RFP addendum states that, once selected by CCHCS, the new entity will be provided a list of HealthNet's current specialty service (and hospital) providers.[6] It appears the new entity will only then be able to contact each of those providers, should it choose to do so, to attempt reach an agreement regarding the future provision of services. We hope for smooth transition, but it appears that the replacement of HealthNet necessarily results in an element of uncertainty regarding a key CCCHS function (the timely providing of specialty services), that may not be fully resolved until after July 2027.

*Defendants' Position:* The demand for specialty-care services has continued to increase over the past quarter. As of August 17, 2026, the total number of open specialty-care orders was 67,131—a significant number. Of those open specialty-care orders, 2,144 (3.19%) were backlogged, and about 79% of those backlogged open orders were already scheduled.

Above, Plaintiffs raise a particular concern regarding the high-priority specialty-care backlog and provide percentages of backlogged high-priority orders. To provide some additional context to that discussion, according to CCHCS, as of August 31, 2026, the entire statewide backlog for high-priority orders totaled 129 orders, nearly 20% of which were for physical therapy. And about 74.5% of these backlogged orders were scheduled to occur within three weeks of their compliance dates.

Plaintiffs found it notable that the rate of backlogged high-priority orders was substantially unchanged in July 2026, because the newly adopted 21-day measure for high-priority orders was

---

[5] As stated in the first paragraph of the publicly available documents regarding the RFP, it was issued using the alternative-to-state-contracting-provisions authorized by this Court in this action. The first three pages of the RFP documents, obtained from the website cited by Defendants below, are filed herewith as Exhibit 3. In total, those documents number more than 1,000 pages, plus addenda.

[6] *See* Ex. 4, RFP Addendum 3 (Question 2).

implemented in July. But this is not surprising. The 21-day measure is captured on the dashboard as of July 13, and only applied to new orders. It does not retroactively change existing high-priority orders or their compliance deadlines. The impact of the new measure on the high-priority backlog will only become apparent after more time has passed. Defendants note, however, that this change was implemented to bring CCHCS in line with community standards, not for the purpose of reducing the high-priority specialty-care backlog.

As mentioned above by Plaintiffs, CCHCS's contract with HealthNet for specialty-care services terminates at the end of September 2027. CCHCS is soliciting proposals from qualified entities to provide specialty-care services and anticipates a transition period of at least six months, possibly commencing as early as January 2027.[7]

## IV. EXTREME HEAT

*Plaintiffs' Position:* Extreme heat continues to pose a serious risk to the health of the California prison population. In August, external temperatures met or exceeded 100 degrees more days than not in Madera County (CCWF, Valley State) (18 days), Fresno County (Pleasant Valley) (20 days), and Kings County (SATF, Corcoran, Avenal) (20 days).[8] The vast majority of housing units in prisons in those areas lack mechanical air conditioning.

On May 1, *Plata* and *Coleman* counsel wrote to CDCR and the Receivers in both cases detailing our concerns with CDCR's existing plan to protect residents from harm during periods of extreme heat, including that the temperature thresholds are too high, temperature measurement practices are inadequate, and CDCR staff are not properly trained on requirements.[9] We requested CDCR install air conditioning statewide.[10] Recognizing that air conditioning cannot be installed before the upcoming heat season even if CDCR adopts an urgent timeline for statewide installation, we also requested several interim measures, including installing sensors that measure heat index in areas within housing units where people are exposed to the highest heat index.[11]

---

[7] *See* Request for Proposal at https://caleprocure.ca.gov/event/5225/0000039664.

[8] *See* Nat'l Oceanic and Atmospheric Administration, National Weather Service, https://www.weather.gov/wrh/climate (NOWData for the Fresno, Madera, and Hanford Areas).

[9] May 26, 2026, Joint Case Management Statement Ex. E at 28-48, ECF 4013-1.

[10] *Id.* at 44.

[11] *Id.* at 45-47.

On July 21, CDCR responded to our May 1 letter. Regarding installation of air conditioning statewide, CDCR again reported that it is conducting a pilot project "to determine the most efficient and effective means of better insulating" each housing unit. However, as we have previously stated, results from the project are not expected until the 2028-29 fiscal year, and, the pilot is, by definition, preliminary and provides no guarantee of future action based on the results.

Regarding heat sensors, CDCR has reported that when it is 88.2°F in a dayroom, it may be 109.1°F in a cell,[12] yet CDCR does not monitor the temperature or heat index in people's cells. CDCR previously reported it installed wireless temperature recording devices at two prisons. We wrote to CDCR and CCHCS in February to ask whether heat sensors would be installed at other prisons, whether the sensors would measure heat index (as opposed to temperature alone), and where in each prison the sensors would be installed.[13] We reiterated these concerns in our May 1 letter.[14] In June, CCHCS and CDCR told us that CDCR anticipated the heat sensors would be installed at all prisons and was in the process of procuring devices that measure both humidity and temperature. On July 21, CDCR informed us that CCHCS/CDCR had not yet decided where the sensors will be placed. We are concerned that nearly halfway through the 2026 heat season, a decision about placement had not been made. On August 6, we asked CDCR and CCHCS for an update on the status of this project. We have not yet received a response.

Finally, CDCR's July 21 response also noted CCHCS has contracted with Johns Hopkins University to assess the effect of extreme heat on health outcomes for patients in CDCR. In late June, CCHCS provided us with details regarding that study. We are evaluating the research proposal and will follow up with CCHCS with any questions and concerns.

*Defendants' Position:* CDCR's position on the issue of extreme heat has remained consistent since Plaintiffs first raised this issue in this case in August 2024. *See* ECF No. 3925 at 16 (Joint Case Management Statement). Many of the issues that Plaintiffs have raised related to extreme heat—including a demand to install air conditioning throughout all housing units in all institutions statewide—extend beyond the delivery of medical care to class members.

---

[12] *Id.* at 36.
[13] *Id.* at 23-26.
[14] *Id.* at 46.

Notwithstanding, CDCR responded to Plaintiffs' May 1 letter and provided a detailed and thoughtful response describing the State's efforts to address heat-related concerns, including those extending beyond the *Plata* and *Coleman* cases, as a courtesy. Ex. 5 (July 21, 2026 letter).

Defendants also reiterated why Plaintiffs' continued reliance on the Texas District Court's findings in *Tiede v. Collier*, 796 F. Supp. 3d 275 (W.D. TX Mar. 26, 2025), in support of their one-size-fits-all demand for the installation of air conditioning statewide is inappropriate and unpersuasive. *See* Ex. 5 at 2. Such a sweeping expenditure would result in the unnecessary waste of taxpayer funds given that CDCR institutions are dispersed throughout the State in varying climates, including in places where extreme heat is not a concern. *Id.* And in hotter climates, the State is proactively addressing extreme heat, including through its Air Cooling Pilot Program (though it bears repeating that refrigeration cooling exists in all housing units at CDCR's three hottest institutions located in the desert region—Ironwood State Prison, Centinela State Prison, and Calipatria State Prison). *Id.* Moreover, mitigation measures within CDCR, unlike in Texas, appear effective in preventing serious adverse outcomes or sentinel events attributable to heat within CDCR facilities. Ex. 5 at 2.

Regarding Plaintiffs' interim requests, CDCR responded that the State was already in the process of implementing many of Plaintiffs' suggestions. *See* Ex. 5 at 6-8 (noting CDCR is in the process of procuring heat sensors that will record heat index; CCHCS identifies patients considered to be at higher risk for overall adverse health outcomes; CDCR, in consultation with CCHCS, plans for the initiation of cooling and hydration measures; CDCR is looking into the installation of additional shade structures and misting systems; Local Operating Procedures are already in place to address localized staffing shortages; and CDCR and CCHCS already provide extensive training and patient information).

Additionally, earlier this month, CCHCS issued a Heat Illness Care Guide, which provides further information and education relating to the risk of heat illness, identification and treatment, and prevention. Ex. 5.

## V. OTHER MEDICAL CARE MATTERS

### A. Management of Complex Care Patients

*Plaintiffs' Position*: As previously reported, CCHCS is working to improve the care provided to its complex patients via the Complex Care Management Initiative, through which it has identified three categories of complex patients who need better management: (i) decompensating patients, (ii) patients who are participating in their care and have no behavioral issues but are clinically challenging, and (iii) patients with complex healthcare and behavioral health needs.[15] With respect to the latter category, the Court recognized the need for coordination between medical and mental health staff in June and asked the Receiver for a proposal about how such coordination would happen.[16] On July 9, we asked CCHCS for an update on these matters, including the Complex Care Model,[17] which, as of April 2026, CCHCS planned to test at CHCF, CMF, and SAC.

On September 3, CCHCS informed us that the draft proposal requested by the Court is "under review by key stakeholders, including experts from other class action litigation."[18] Presumably, this review includes the Mental Health Receiver's experts; we, as Plaintiffs' counsel, have not yet been given an opportunity to review or provide feedback.

CCHCS also told us that it has developed a prototype for the Complex Care Management Registry, but that the Registry will not go into production until the complex care coordination system is finalized and approved.[19] We appreciate the work CCHCS has done thus far to improve care for its complex patients, including its efforts to coordinate with others on the draft proposal. It is unclear whether other aspects of the Complex Care Initiative, including the three-prison Complex Care Model pilot or other projects designed to improve care for those complex patients who may not require coordination between medical and mental staff, will proceed alongside these coordination efforts, or whether all aspects of the Complex Care Initiative are dependent on the coordination system proposal.

---

15 *See* May 26, 2026, Joint Case Management Statement 14-16, ECF 4013.
16 June 1, 2026, Tr. 19:23-20:7, ECF 4020.
17 *See* May 26, 2026, Joint Case Management Statement 15:11-13, ECF 4013.
18 Ex. 6, CCHCS Memorandum (Sep. 3, 2026).
19 *Id.*

*Defendants' Position*: As was discussed with Plaintiffs in April 2026, the Performance Improvement Plan for Complex Care Management is a long-term effort. The project team has worked to establish a complex care registry that will be used to identify candidates for complex care and track complex care services provided. There is no timeline for statewide release.

**B. Medical Staff Role in the Disciplinary Process**

*Plaintiffs' Position:* The issue of whether, and under what circumstances, healthcare staff initiate Rule Violation Reports (RVRs) has significant implications for patient care and the delivery of medical care in the prisons, including as it relates to the relationship between healthcare staff and the patient. In our most recent update to the Court on this issue, we reported that CCHCS told us it was considering our request to incorporate the its January 2025 policy memorandum "Limiting Licensed Health Care Staff Access to Rules Violation Reports" into the Heath Care Department Operations Manual.[20] However, on June 22, 2026, CCHCS informed us it was rescinding the January 2025 memo, and that "operational procedures [would] return to the procedures that were in place before the memo was issued."

On August 20, we met with CCHCS, CDCR, the Receiver, and others, to discuss CCHCS's decision to rescind the memo. We were informed by CCHCS leadership that, in lieu of a policy, healthcare staff will be trained on de-escalation and methods to manage situations that might lead to a possible rule violation. While healthcare staff will not be able to directly issue RVRs because they will not have access to SOMS, healthcare staff are permitted to report conduct to custody staff to initiate an RVR. We were informed that there are no current plans to provide training to custody staff on the expectations regarding healthcare initiated RVRs. We believe such training is necessary.

We were also told that CDCR is exploring the possibility of amending its electronic RVR form to include whether the RVR was issued on behalf of another classification, such that reports could be generated showing whether healthcare staff reported the conduct underlying RVRs. We

[20] *See* Jan. 20, 2026, Joint Case Management Statement 15:3-5, ECF 4003.

appreciate that this feature, if established, would allow for better tracking of healthcare initiated RVRs.

Finally, we were informed that while healthcare staff will be trained on issues related to RVRs, CCHCS does not intend to adopt policies related to healthcare staff's role in discipline. We are concerned that without such a policy, there is no way to ensure staff act in a manner consistent with their training. Discussions with CCHCS on these issues are ongoing, and we intend to request further information, including about the potential RVR form update and training for both medical and custody staff.

*Defendants' Position:* On June 22, 2026, the Receiver's Office notified all parties that CDCR and CCHCS jointly determined that the January 8, 2025 memorandum ("Limiting Licensed Health Care Staff Access to Rules Violation Reports") would be rescinded.

This means that if health care staff believe a patient has committed an infraction, they may notify custody staff. If a Rules Violation Report is warranted a custody officer will enter the RVR into CDCR's Strategic Oversight Management System. Health care staff have no RVR writing access in CDCR's Strategic Oversight Management System (SOMS). On August 20, 2026, CCHCS held a meeting with all counsel to explain the decision to rescind the memorandum and to discuss the plan moving forward.

Returning decision-making for Rules Violation Reports to custody allows health care staff to focus on developing clinical relationships with patients, delivering medical care, and applying de-escalation techniques in difficult situations. CCHCS expressed that it is committed to training health care staff on de-escalation techniques.

**C. Housing Incarcerated People in Non-Traditional Housing at SVSP**

*Plaintiffs' Position:* In early 2025, it was discovered Salinas Valley State Prison residents were and had been placed in nontraditional housing, including holding cells without running water or a toilet. The facts were "shocking and upsetting" to the Court,[21] which subsequently indicated the importance of an investigation regarding what happened because, among other

[21] *See* Reporter's Transcript, March 17, 2025, at 26:2-8.

things, such was relevant to the question of whether state officials can find and fix problems on their own.[22]

In late June, CCHCS, in response to our request, said that no health care staff were the subject of any current internal affairs investigations relating to the inappropriate housing of SVSP residents, that there had been health care executives who were the subject of an investigation regarding that matter, and that those investigations were closed with no findings of misconduct.[23] We have asked for a copy of the investigations and findings of no misconduct.

*Defendants' Position:* On August 10, 2026, Plaintiffs submitted a non-Paragraph 7 request for a copy of the investigation relating to health care executives and inappropriate housing of individuals at SVSP. Plaintiffs' request is currently pending with CCHCS.

**D. Notable Pending Non-Paragraph 7 Inquiries**

*Plaintiffs' Position:* As the Court is aware, Plaintiffs raise concerns and request information from Defendants and CCHCS through the Non-Paragraph 7 process. In addition to the issues mentioned above and others not mentioned here, we recently requested information on (i) nurse call station systems that CDCR has determined are in poor or failing condition and the plan to repair/replace those systems and (ii) sepsis deaths among the CDCR population and CCHCS's efforts to reduce such deaths. We will provide updates to the Court on these topics as needed depending on CCHCS/CDCR's responses.

*Defendants' Position:* Plaintiffs' July 23 and July 28, 2026 non-Paragraph 7 requests are still under review and the responses will be provided once complete.

[22] *See* Reporter's Transcript, June 16, 2025 at 38:24-39:12.
[23] *See* Ex. 7, CCHCS Memorandum (June 29, 2026).

Dated: September 4, 2026

Respectfully submitted,
HANSON BRIDGETT LLP

*/s/ Samantha D. Wolf*
PAUL MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS-GONZÁLEZ

*Attorneys for Defendants*

Dated: September 4, 2026

ROB BONTA
Attorney General of California
DAMON G. MCCLAIN
Supervising Deputy Attorney General

*/s/ Corinna Arbiter*
CORINNA ARBITER
Deputy Attorney General
*Attorneys for Defendants*

Dated: September 4, 2026

PRISON LAW OFFICE

*/s/ Mackenzie Halter*
DON SPECTER
STEVEN FAMA
RANA ANABTAWI
SOPHIE HART
MACKENZIE L. HALTER

*Attorneys for Plaintiffs*

EXHIBIT 1

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

Date : August 5, 2026

To : Steven Fama, Prison Law Office

Subject : **PRISON LAW OFFICE NON-PARAGRAPH 7 CONCERN RELATING TO ENACTMENT OF PROPOSED MEDICAL CLASSIFICATION MODEL ADJUSTMENT (VOLUME-BASED STAFFING RATIOS FOR SPECIALTY SERVICES AND TRIAGE & TREATMENT AREAS)**

California Correctional Health Care Services (CCHCS) is providing the italicized information below in response to your email inquiry dated July 8, 2026.

> Can you please let us know whether the recently enacted Fiscal Year Budget (and presumed accompanying / trailing legislation) fully enacted the requested adjustments (please see the attached Budget Change Proposal) in the medical classification model (volume-based staffing ratios for specialty services and TTAs)? If no, please explain. If yes, when will those positions be established and provided to the prisons, and can you please provide a list of which prisons are receiving additional positions, specifying for each the number for specialty services and, separately, TTA staffing?
>
> *Yes, the positions were provided to the institutions in late July 2026. Refer to Attachment A for a list of the additional institution positions approved for Triage & Treatment Areas, Reception Centers, Offsite/Onsite Specialty Services, and Central California Women's Facility's Skilled Nursing Facility staffing update via the 2026-27 Medical Classification Model Adjustment Budget Change Proposal.*

Thank you.

cc: Clark Kelso, Receiver
Diana Toche, Undersecretary, Health Care Services, CDCR
Directors, CCHCS
CCHCS Office of Legal Affairs
Office of Legal Affairs, CDCR
Office of the Attorney General
Hanson Bridgett, LLP
DeAnna Gouldy, Deputy Director, Policy and Risk Management Services, CCHCS
Rainbow Brockenborough, Deputy Director, Institution Operations, CCHCS
Duane Reeder, Deputy Director, Fiscal Management, CCHCS
Robin Hart, Associate Director, Risk Management Branch, CCHCS
Regional Executives, Regions I-IV, CCHCS

# ATTACHMENT A

| TTA RNs | |
|---|---|
| CCWF | 8.9 |
| COR | 3.5 |
| SVSP | 7.1 |
| **Total** | **19.5** |

| Reception Center RNs | |
|---|---|
| NKSP | 3.6 |
| WSP | 3.6 |
| **Total** | **7.2** |

| Reception Center LVNs | |
|---|---|
| NKSP | 3.6 |
| WSP | 3.6 |
| **Total** | **7.2** |

| Offsite LVNs | |
|---|---|
| CCWF | 1.2 |
| CIM | 2.4 |
| CIW | 1.2 |
| CMF | 1.2 |
| COR | 1.2 |
| CTF | 2.4 |
| KVSP | 1.2 |
| LAC | 1.2 |
| MCSP | 1.2 |
| RJD | 3.6 |
| SAC | 1.2 |
| SATF | 2.4 |
| SQ | 2.4 |
| SVSP | 1.2 |
| VSP | 1.2 |
| **Total** | **25.2** |

| Onsite LVNs | |
|---|---|
| SQ | 1.2 |
| **Total** | **1.2** |

| CCWF Skilled Nursing Facility Update | |
|---|---|
| RN | -3.4 |
| LVN | -10.5 |
| CNA | 14.2 |
| **Total** | **0.3** |

# EXHIBIT 2

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

Date : August 25, 2026

To : Mackenzie Halter, Prison Law Office

Subject : **PRISON LAW OFFICE NON-PARAGRAPH 7 CONCERN RELATING TO SPECIALTY BACKLOG DATA AND APPOINTMENT TIMELINESS**

California Correctional Health Care Services (CCHCS) is providing the italicized information below in response to your email inquiry dated July 8, 2026.

1. I write to request updated data regarding backlogs of specialty services, ultrasound exams for advanced liver disease patients, and PCP appointments, in the formats you've previously provided, as of a specified date on or after 8/1/26.

   *The requested data is available on the Secure File Transfer Protocol (SFTP) server.*

2. Can you also please provide an updated chart showing statewide monthly totals of e-consults generated, the proportion of providers who generated one or more consult, and the proportion of e-consult responses that met the needs of the requesting provider, for the months of May, June, and July 2026?

   *The requested data is available on the SFTP server.*

3. Lastly, please describe the actions CCHCS has taken (or plans to take) to improve timely access to high and medium priority specialty services at CCWF and SATF in recent months?

   *CCHCS has taken multiple steps to improve timely access to specialty services at Central California Women's Facility (CCWF) and Substance Abuse Treatment Facility (SATF).*

   *At CCWF, staff receive regular training on using the Health Net directory to identify new specialists. Off-site appointments are scheduled to meet compliance dates, and an additional off-site nurse was assigned to support increased specialty appointment volume. If potential transportation issues are identified, custody and health care staff collaborate to resolve those issues. Routine meetings with Region II staff and weekly reviews with leadership and the Headquarters (HQ) Nurse Consultant Program Review (NCPR) address appointment barriers. A project improvement workgroup was established in August 2026 to streamline pre-diagnostic tests, ensuring timely completion and compliance. A specialty refusal workgroup is active, recommending policy updates, providing training, and transferring responsibility for refusal forms and education to clinic care teams. Collaboration with custody staff ensures prompt communication regarding patient refusals.*



P.O. Box 588500
Elk Grove, CA 95758

*SATF has initiated several measures to improve compliance and expedite access to specialty services. In November 2025, a High/Medium Priority Workgroup was formed to improve timely access to specialty care by addressing operational delays and barriers. Meeting monthly, the workgroup reviewed compliance dashboards, discussed submitted orders, assessed noncompliant orders, and identified obstacles to specialty service delivery. Implemented interventions include enhancements to specialty scheduling and staffing, identification and correction of discrepancies between master pass lists and scheduled offsite appointments, increased transportation resources, and immediate escalation protocols for any issues with staffing transports and adherence to scheduled times. Currently SATF holds weekly onsite specialty huddles for real-time monitoring and resolution of access concerns, and collaborates quarterly with Adventist Health to address barriers, staffing issues, new provider availability, and unmet service needs in line with the July 10, 2026 Request for Specialty Priority Update memorandum (Attachment A hereto), which, effective July 15, 2026, eliminates medium priority in the Electronic Health Records System and expands high priority compliance to 21 days while adjusting routine priority to a 22 to 90-day timeframe. The changes to the scheduling compliance timeframes for high priority referrals align with statewide access standards to improve overall timeliness of care. These efforts collectively promote improved coordination and timely access to specialty care.*

*In addition to institutional-level efforts, the coordination between both CCWF and SATF with their respective regional scheduling teams has significantly strengthened real-time management of specialty scheduling challenges. To improve communication surrounding barriers, challenges, and emerging opportunities, Region II has implemented bi-weekly meetings with institutional and regional leadership, the Region II Scheduling and Access to Care Team, and the Specialty Needs and Access Program (SNAP) team, while the Region III Regional Scheduling Support Unit has established enhanced communication strategies to connect all Region III specialty schedulers. These strengthened communication channels enable swift information sharing and collaborative problem-solving, allowing issues to be addressed as they arise and optimize the scheduling process for specialty care across both regions. This structure supports the July 10, 2026, Request for Services Priority Update memorandum.*

4. Please also describe any updates regarding the improvement efforts described in CCHCS's 5/22/26 non-paragraph 7 response regarding CHCF, SVSP, and CMF.

*California Health Care Facility (CHCF) continues to focus on the strategies set out in CCHCS's memorandum dated May 22, 2026. Overtime was approved for the month of July 2026 for schedulers to allow for uninterrupted time to prepare scheduling packets. Supplemental offsite specialty scheduling support is being provided by a Region II Office Technician. A Region II NCPR is onsite to meet with the CHCF scheduling team to review opportunities for improvement. Additionally, CHCF onsite schedulers assist with offsite scheduling as time permits. Continued collaboration with hospital coordinators, institutional leadership, the Region II Scheduling and Access to Care Team, and HQ SNAP has supported expanded specialty availability and improved scheduling and responsiveness to emerging specialty care needs across the institution. In addition to these efforts, recent outreach has included site visits to Madera Community Hospital, as well as discussions regarding specialty care availability at Dameron Hospital. These engagements focused on current specialty care needs, opportunities to expand services, and the feasibility of securing on-site specialists. In addition, a*

*regional provider supports CHCF running its on-site procedure clinic and the Region II Deputy Medical Executive continues exploring opportunities to engage with additional hospitals. CHCF has also been authorized to schedule in-network specialty providers beyond a 120-mile radius and has increased use of the Health Net directory, supporting optimized provider selection.*

*Salinas Valley State Prison (SVSP) continues to implement targeted interventions to ensure the timely specialty care. These efforts include thorough review of Requests for Services (RFS) to confirm accuracy, daily leadership huddles with onsite and offsite scheduling teams and custody staff to identify and address potential delays and transportation issues, and daily review of high and medium priority specialty appointments to ensure accurate prioritization and follow-up. The Specialty Scheduling team maintains communication with contracted specialists to secure the earliest available appointment dates, documents all scheduling activity, and identifies newly added specialists using the monthly Health Net Provider Network Additions List. Additionally, the Region II Scheduling Team provides ongoing support for SVSP's onsite and offsite specialty scheduling and holds bi-weekly specialty backlog meetings, contributing to measurable progress and operational improvements. Due to SVSP's rural location and limited resources, patients are often scheduled outside the region to meet compliance requirements.*

*California Medical Facility (CMF) continues to advance specialty services through targeted operational enhancements. In June 2026, CMF delivered a refresher course on the Health Net directory for all offsite specialty nursing staff, ensuring streamlined access to provider information and improving coordination. On July 3, 2026, CMF introduced a revised Letter of Authorization process, streamlining the process for staff to obtain permissions and improving efficiency of offsite specialty referrals. CMF launched a shared mailbox for the offsite specialty team, which has been distributed to relevant external partners to facilitate organized and timely responses. CMF also implemented a local tracker for high-priority specialty cases, monitoring each step from RFS approval to appointment scheduling. Any issues are elevated to CMF's SNAP and San Joaquin General Hospital teams and addressed collaboratively in monthly meetings to ensure prompt resolution. Additionally, the Region II Scheduling Team holds bi-weekly specialty backlog meetings with CMF that enhance process efficiency, communication, and stakeholder coordination on mitigation strategies.*

Thank you.

cc: Clark Kelso, Receiver
Directors, CCHCS
CCHCS Office of Legal Affairs
Office of Legal Affairs, CDCR
Office of the Attorney General
Hanson Bridgett, LLP
Rainbow Brockenborough, Deputy Director, Institution Operations, CCHCS
DeAnna Gouldy, Deputy Director, Policy and Risk Management Services, CCHCS
Renee Kanan, M.D., Deputy Director, Medical Services, CCHCS
Annette Lambert, Deputy Director, Quality Management, CCHCS
Robin Hart, Associate Director, Risk Management Branch, CCHCS
Regional Executives, Regions I-IV, CCHCS

Chief Executive Officers, CCWF, SATF, CHCF, SVSP, CMF



P.O. Box 588500
Elk Grove, CA 95758

# ATTACHMENT A

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | July 10, 2026 |
| **To:** | Chief Executive Officers<br>Chief Support Executives<br>Chief Medical Executives<br>Chief Nurse Executives<br>Chief Physician & Surgeons |
| **From:** | Renee Kanan, MD, MPH Deputy Director, Medical Services (DocuSigned by: Dr. Renee Kanan, D65BF861AB2A44B...)<br>Rainbow Brockenborough, Deputy Director, Institution Operations (Signed by: Rainbow Brockenborough MBA, 45E33710A2B546F...)<br>Barbara Barney-Knox, Deputy Director, Nursing Services (DocuSigned by: Barbara Barney Knox, 4A779D358DA14E1...) |
| **Subject:** | **REQUEST FOR SERVICE PRIORITY UPDATE** |

This memorandum is to announce changes related to the Request for Services (RFS) orders within the Cerner Electronic Health Record System (EHRS). Effective July 15, 2026, Medium Priority will be removed as an option from all RFS orders. New Extended Priority RFS and Extended Priority Imaging orders have been created for select conditions and circumstances that are not urgent and not expected to result in clinical deterioration or adverse outcomes as determined by the licensed provider and allow orders for these services to be placed for longer timeframes than routine priority would permit. Specialty services that fall within the scope of Extended Priority can be found on *Attachment A: Extended Priority RFS* and are subject to change. For Extended Priority orders, the provider will be required to determine and enter the Requested End Date/Time. The Requested End Date/Time should not be less than the 90-day compliance period for Routine Priority orders. A subset of procedures being given the Extended Priority option that do not require an RFS are highlighted in the list within the noted attachment. Each procedure highlighted will have its own order and will not be included in the new Extended Priority RFS order.

As a result of these changes, compliance timeframes for the priorities will change. High Priority will extend from a 14-day compliance to 21 days to align with the California Department of Managed Health Care standards and Routine Priority will now have a 22- to 90-day compliance range.

To ensure a smooth transition, existing Medium Priority referrals entered prior to implementation will remain available for completion during the transition period of the EHRS updates. A temporary interruption to the RFS referral process will occur from 1400 on July 14, 2026, to 0800 on July 15, 2026, while system changes are deployed. During this time, we ask that Chief Medical Executives and Chief Physician and Surgeons refrain from approving/denying any RFS orders. If an emergent referral is needed during this downtime, please follow the current RFS process and work with your UM Nurses to ensure that the appropriate referral order is placed as the system may not automatically place the appropriate referral order during the maintenance timeframe. Users may still see orders with Medium Priority

available as an option throughout the day of July 15th as the EHRS Team completes removal from all orders, this is expected and will be completely removed from the system by close of business on July 15th.

These changes will be reflected in the soon to be released Health Care Department Operation Manual revision impacting sections 3.1.5, 3.1.8, 3.1.11, 3.1.13, and 3.4.1. Current data tools will be revised to reflect the new priorities.

Please ensure all staff with a need to know are informed about these changes before July 14, 2026. If you have questions or need support, please contact: UM@cdcr.ca.gov.

**Attachment:**
Attachment A: Extended Priority RFS

**cc:** Clark Kelso, Receiver
Diana Toche, Undersecretary
Brittany Brizendine, Psy.D, Director, Health Care Services
Lara Saich, Director, Health Care Policy and Administration
DeAnna Gouldy, Deputy Director, Health Care Policy and Administration
Annette Lambert, Deputy Director, Quality Management
Kevin Myers, Director, Dental Services
Regional and Headquarters Medical Executives
Regional and Headquarters Chief Nurse Executives
Regional Health Care Executives
Kashyap Kanani, Chief, Medical Imaging Services


P.O. Box 588500
Elk Grove, CA 95758

## Attachment A: Extended Priority RFS

### Request for Extended Priority:




### List of Approved Procedures for Extended Priority:

- Colonoscopy
- EGD
- Facial Feminization Surgery
- Facial Masculinization Surgery
- Feminizing Bottom Surgery
- Feminizing Breast Augmentation
- Hair Transplant
- Masculinizing Body Contouring
- Masculinizing Bottom Surgery
- Masculinizing Mastectomy Surgery
- Transgender Unlisted
- CT Chest W/O Con Low Dose Lung Cancer Screening*
- MG Mammogram Bilat Screening Dig*
- US Liver HCC Screening*

****Do not require an RFS. Individual order can be placed.***

### Procedure List Dropdown:



# EXHIBIT 3

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

# 1. RFP Overview

This RFP is not subject to provisions of the Public Contract Code (PCC) pertaining to bidding and awarding of contracts but rather uses substitute procedures authorized by the United States District Court for the Northern District of California, in *Plata v. Schwarzenegger*, Case Number C01-1351 TEH (*Plata* Court).

No protest of the award of the contract resulting from this RFP is available. Proposers are solely responsible for understanding the scope of work and all requirements, terms, conditions, evaluation criteria, etc. before submitting a proposal. If the language is unclear or ambiguous, or if clarification of the RFP is necessary, it is the Proposer's responsibility to request clarification or assistance from the Project Manager before submitting a proposal.

If the RFP is modified prior to the final proposal submission date, the State shall post an addendum at Cal eProcure. By virtue of submitting a proposal, the Proposer accepts the terms and conditions expressed as stated in this RFP and as required by law. Costs incurred for developing proposals in anticipation of award of an Agreement are the responsibility of the Proposer and shall not be charged to the State.

CDCR/CCHCS reserves the right to modify or cancel, in whole or in part, this RFP at any time prior to contract award. Any RFP modification(s) and/or cancellation will be made via an addendum. CDCR/CCHCS reserves the right to negotiate services and related costs deemed necessary to meet the needs of the project. CDCR/CCHCS at its sole discretion reserves the right to reject any or all proposals received in response to this RFP.

# 2. Background

The CDCR/CCHCS is currently responsible for healthcare services to approximately 90,000 incarcerated persons in thirty (30) institutions and thirteen (13) Reentry Programs (REPS) facilities throughout the state. The scope of the healthcare mission includes primary, urgent, acute, emergency, and long-term care, as well as preventative care, and chronic care management. Cases requiring specialty medical consultation, treatment, or complex specialty management are seen remotely by telemedicine, onsite, or referred to community based medical service providers. Some community hospitals have secured wings within the facility dedicated to CDCR/CCHCS incarcerated persons. The wings range in size from ten (10) to forty-two (42) beds.

In 2014, CDCR/CCHCS contracted with a Health Care Provider Network (HCPN) to develop and implement a network of community-based healthcare providers to provide services to incarcerated persons within CDCR/CCHCS and REPS that are not available in the CDCR/CCHCS institutions or REPS facilities. The network consists of hospitals, onsite and offsite specialty care, and a full scope of ancillary services.

In 2009, CDCR/CCHCS contracted with a Third-Party Administrator (TPA) to process claims and to implement an efficient business model for adjudicating claims. The TPA currently provides a web-based portal for both vendors and CDCR/CCHCS to view status of claims and generate reports. The Contractor shall be required to use CDCR/CCHCS' designated TPA as its sole claims processing administrator. Contractor will require providers to send healthcare claims electronically through the TPA.

CDCR/CCHCS uses a manual authorization request for medical services, which does not validate authorization at time of claims payment. Therefore, a new prior authorization component is necessary to assure the claims paid match the services authorized and provided. CDCR/CCHCS is requesting the option for an electronic prior authorization component to be built into this contract after the first year period. CDCR/CCHCS will have the right not to exercise this option, based on organizational directives, needs and fiscal climate.

In order to ensure the State is receiving these services, CDCR/CCHCS seeks to continue contracting for the HCPN using best practices and standards in the industry applicable to the correctional environment. The objective is to contract with a qualified firm to continue the HCPN for the following period: Five (5) initial years with Five (5) optional - One (1) year extensions.

If requested by the State, Contractor agrees to negotiate in good faith with the State, including State departments other than CDCR/CCHCS, to provide goods,

services and pricing substantially similar to that set forth in this Agreement, to those departments delivering healthcare services to CDCR/CCHCS incarcerated persons. Those goods and services may be provided via written amendment to this Agreement or by separate agreement with the other State department.

The Parties agree and acknowledge that if any provision of this Agreement is determined by a final judgment of a court of competent jurisdiction to be illegal or unenforceable, such determination shall not affect the balance of this Agreement, which shall remain in full force and effect, and such invalid provision shall be deemed severable.

# EXHIBIT 4

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# ADDENDUM 3

**Request for Proposal (RFP) SD25-00019**
**Health Care Provider Network and Prior Authorization services**
**Questions and Responses**

Below are the responses provided by CDCR/CCHCS to the questions submitted for this RFP.

**Question 1:** Could you please provide detail on the current telemedicine offering? Are these services delivered by the same contracted providers delivering in person care? Are telehealth only vendors also part of your network?

**Response 1:** Onsite telemedicine services are delivered by civil service providers, while off-site telemedicine is conducted by contracted providers either within their offices or designated facility hubs. While we have some telehealth providers that offer telehealth services only, it is the expectation of CDCR/CCHCS that our telehealth providers be able to see patients in-person for follow up care if necessary.

**Question 2:** Is there a specific date that CDCR will commit to providing the complete list of network providers to the winning bidder? Could the date be prior to the contract start date? For example, when the winning bidder is notified.

**Response 2:** CDCR/CCHCS anticipates sharing a complete list of network providers upon execution of the contract. A more precise timeline will be provided after the selection of the winning proposer.

**Question 3:** Will you please provide additional details regarding the format of the provider network information that will be shared with the winning bidder?

**Response 3:** CDCR/CCHCS will determine the format for this information upon contract award and in collaboration with the winning proposer.

**Question 4:** When do you anticipate releasing your response to the request for the due date extension?

**Response 4:** Please refer to Addendum 2 for additional information.


P.O. Box 588500
Elk Grove, CA 95758

**Question 5:** Will you please list the specific claim and provider data fields that will be shared with the winning bidder?

**Response 5:** Please refer to the following table for additional information.

FY 24/25 July 1, 2024, through June 30, 2025

| Provider Type | Number of Distinct Providers | Number of Claims |
|---|---|---|
| Hospital | 98 | 71,110 |
| Ambulance | 36 | 18,832 |
| Laboratory | 7 | 590,085 |
| Surgery Centers | 35 | 2,686 |
| Radiology | 660 | 141,146 |
| Physicians | 4,449 | 180,525 |
| **Totals:** | **5,285** | **1,004,384** |

# EXHIBIT 5

**SAMANTHA D. WOLFF**
PARTNER
DIRECT DIAL (415) 995-5020
E-MAIL swolff@hansonbridgett.com

HansonBridgett

July 21, 2026

VIA E-MAIL

Tom Nolan
Rosen Bien Galvan & Grunfeld LLP
Tnolan@rbgg.com

Sophie Hart
Prison Law Office
Sophieh@prisonlaw.com

Re: Class Counsel's May 1, 2026 Letter re Protection of *Coleman* and *Plata* Class Members from Extreme Heat

Dear Counsel:

We write on behalf of the California Department of Corrections and Rehabilitation in response to your May 1, 2026 letter regarding extreme heat. While this letter was addressed to both the *Plata* and *Coleman* Receivers, as well as to CDCR's Office of Legal Affairs, we respond only on behalf of CDCR. CDCR has, however, shared this response with the *Plata* and *Coleman* Receivers who have reviewed it and provided their input.

CDCR has consistently stated that issues of extreme heat that extend beyond the delivery of medical and mental health care, including those related to infrastructure and HVAC, exceed the scope of the *Plata* and *Coleman* cases. Plaintiffs may not attempt to expand the scope of these matters at this late stage in the litigation—through their advocacy letters, CMC position statements, or otherwise—to include conditions-of-confinement issues. To the extent extreme heat impacts the delivery of medical and mental health care, including class members who are prescribed heat-sensitive medications, CDCR has carefully worked to address those concerns.

CDCR continues to thoughtfully address the impact of extreme heat on the incarcerated population, including outside of the confines of the *Plata* and *Coleman* litigation. CDCR writes below to reiterate its position and, as a courtesy, describe its efforts to address heat-related concerns beyond these class action matters.

**Class Counsel's Demands Are Misplaced**

Class Counsel's May 1 letter asserts that "the only effective long-term solution to addressing extreme heat is the installation of air-conditioning in housing units statewide,"

and cites to the Texas District Court's decision in *Tiede v. Collier*, 796 F. Supp. 3d 275 (W.D. TX Mar. 26, 2025). According to the plaintiffs' expert in *Tiede*, Dr. Vassallo, TDCJ inmates were dying from extreme heat despite the mitigation measures in place in Texas facilities. *Id.* at 317. The parties in *Tiede* agreed that air conditioning was needed in all TDCJ facilities "as a matter of inmate health and safety" and that air conditioned housing was the only way to eliminate the risk of death and illness attributable to heat in Texas facilities. *Tiede*, 796 F. Supp. 3d at 282. But as CDCR has asserted repeatedly, California is not Texas and *Tiede*'s findings are not persuasive here, where Plaintiffs are not able to point to any serious adverse outcomes or sentinel events attributable to heat within CDCR facilities. As Dr. Vassallo testified in *Tiede*, if mitigation measures were effective in Texas, she "would have expected to see no effect from heat on mortality in those facilities." *Id.* at 307. But Texas prisons experienced at least 23 heat-related deaths from 1998 to 2012, and experts estimate 271 deaths from 2001 to 2019 (*id.* at 292-293); by contrast, CCHCS' most recent mortality review did not reference heat as an underlying cause of death in any of the in-custody deaths in 2024. And Class Counsel's reference to 45 emergency room send-outs in one year (2024), 7 of which occurred while incarcerated persons were fighting fires or at fire training camps, in a system housing over 90,000 persons on average that same year (*i.e.* ~0.05%), is not evidence of a systemic issue. Accordingly, it can be inferred that mitigation measures in California are working.

Further, Class Counsel's citation to various heat studies and National Weather Service Heat Safety Tips is not persuasive in reaching the same conclusion as in Texas—that air conditioning is the only answer to this problem. While that may be true in a state like Texas, which experiences significantly more extreme weather conditions than California, it does not hold true here. This one-size-fits-all approach to extreme heat is overly simplistic and does not account for this State's varying climates. Indeed, institutions located along the coastal region and in the northern area of the state (including San Quentin, High Desert State Prison, California Men's Colony, Richard J. Donovan Correctional Facility, and Pelican Bay State Prison) experience far cooler temperatures in the summer than other institutions, with approximately less than 5% of days during Heat Plan months[1] reaching 90 degrees.[2] It also bears noting that CDCR's three hottest institutions located in the desert region—Ironwood State Prison, Centinela State Prison, and Calipatria State Prison, each of which experienced Stage 1 temperatures at least 85% of the days during Heat Plan months from 2022 to 2025—have refrigeration cooling in all housing units. CHCF, which provides medical care and mental health care to those with some of the most severe and long-term needs, also has refrigeration cooling in all housing units. So while only 24% of CDCR's housing units may have mechanical air conditioning, as Plaintiffs' note, that fact alone does not tell the full story and it is important

[1] "Heat Plan months" refers to the timeframe each year during which the Heat Plan is in effect – from May 1 through October 31.

[2] The temperature at Pelican Bay State Prison did not reach 90 degrees on *any* Heat Plan days from 2022-2025.

to acknowledge that incarcerated persons living in the hottest locations, and many of those with the most severe medical and mental health care needs, are housed in air conditioned units.

**The State Is Actively Addressing Issues Related to Heat**

The State acknowledges that climate change, and the corresponding concern of extreme heat, is an important issue particularly as it relates to the housing of incarcerated individuals in warm climates. It has taken, and continues to take, a thoughtful and measured approach to this issue, as explained further below and in numerous *Plata* Case Management Conference statements. Notwithstanding the State's unwavering position that the issue of extreme heat is largely a conditions-of-confinement issue, and thus outside the scope of the *Plata* and *Coleman* matters, we provide the following update as a courtesy and because much, if not all of the information in this letter, is publicly available.

Air Cooling Pilot Program

As you are aware, CDCR is performing an Exterior Insulation and Finishing System installation at CSP-Los Angeles County, Kern Valley State Prison, and Central California Women's Facility. Installation is ongoing at LAC, and has been completed in one "270"-style housing unit. Installation work has also commenced at KVSP, and preparations for installation have commenced at CCWF. CDCR believes the installation process will be mostly complete at CSP-Los Angeles County in September 2026, at Kern Valley State Prison in February 2027, and at Central California Women's Facility around June 2027. CDCR plans to use the information gathered from this pilot program to determine the most efficient and effective means of better insulating each of the various designed housing units throughout the State. As noted above, a one-size-fits-all approach to indoor cooling is not a particularly effective or efficient means of addressing the issue of extreme heat, and so the results of this pilot program will be critical in informing the State of how to effectively address this issue.

Heat Related Illness Initiative

CDCR and CCHCS also developed a Statewide Performance Improvement Plan (Statewide Plan), revised March 2026, which "serves as the framework for improvement initiatives over subsequent years."[3] The Statewide Plan includes the issue of heat related illnesses as one of ten statewide priorities. For priorities highlighted in the Statewide Plan, CDCR and CCHCS develop performance goals, launch statewide improvement initiatives, and measure performance through the Dashboard or similar performance reports. *Id*. at 1. The Statewide Plan notes a number of strategies that will be included in its heat-related illness initiative, including implementing a clinical change-package for

[3] CDCR and CCHCS Performance Improvement Plan 2026-2028 (rev. March 2026).

heat-related illness detection, management, prevention and reporting; leveraging technologies for temperature monitoring; and exploring facility improvements to help manage internal temperatures. *Id.* at 4.

Significant progress has been made in terms of implementing the Statewide Plan's heat-related illness initiative. The clinical change-package currently includes a care guide for heat-related illness that has been drafted and is going through the vetting process before being adopted. Additionally, CCHCS delivered continuing medical education on this topic on June 17, 2026. Quality Management (QM) tools to help track and report on patients with heat-related illnesses are also planned, but development is dependent on heat-related illness information being entered into the Electronic Health Record System (EHRS). The care guide will provide guidance to health care staff on what codes to enter into the EHRS to improve the tracking and reporting of heat-related illnesses.

20-Year Infrastructure Master Plan

CDCR released an Infrastructure Master Plan (Plan) on May 18, 2026, which includes its analysis and recommendations to update department infrastructure and align it with modern correctional standards.[4] As relevant to this discussion, the Plan notes that infrastructure is aging and indoor heating and cooling standards have developed and evolved since the institutions were first constructed. *Id.* at 2. The Plan sets forth several objectives for the next 20 years: Objective 1 includes modernization of fundamental utility systems to ensure that heating, ventilation and air conditioning systems meet contemporary community standards, demonstrating this is a priority for CDCR. *Id.* at 18-19. The Plan focuses on improvements at five institutions over the next five years (CMF, CCWF, SCC, COR, and CIM) and notes that in addition to focused infrastructure improvements at those facilities, CDCR will "continue to pursue targeted investments in repairs at other CDCR prisons" related to ADA accessibility, indoor heat conditions, and fire and life safety systems. *Id.* at 21-22.

Updated 2026 *Coleman* Heat Plan

Class Counsel's May 1 Letter states that CDCR's existing Heat Plan is flawed and inadequate to address the medical risk posed by excessive heat. Class Counsel claim that CDCR does not collect accurate and reliable temperature readings, consistently implement heat alerts, provide patient education, or adequately train staff. As an initial matter, the 2026 Annual Heat Plan offers significant enhancements over its 2025 predecessor, including as it relates to the collection and availability of temperature data. Under the 2026 Annual Heat Plan, correctional officers will no longer record temperatures on paper forms, and instead, CDCR and CCHCS are developing a "new web-based Electronic Temperature Log . . . to assist all institutions in meeting the requirements

---

[4] CDCR's Infrastructure Master Plan, at 1, https://www.cdcr.ca.gov/fpcm/cdcr-infrastructure-master-plan/.

outlined in the annual [Heat Plan] for recording indoor and outdoor temperatures."[5] Custody supervisors must monitor the electronic temperature logs to ensure that staff are timely entering temperature data in accordance with the 2026 Annual Heat Plan.[6] This improvement should address Class Counsel's concerns related to temperature data collection.

The May 1 letter also asserts that CDCR is incapable of properly implementing the Heat Plan. The May 1 letter claims that CDCR often fails to implement heat alerts, and Plaintiffs rely upon a handful of anecdotes from class members who claim they had not heard a heat alert reported "all summer" and that there is no procedure in place to "prevent or discourage heat risk individuals from going out to yard and staying out on the yard during heat waves." May 1, 2026 LTR at 13. The letter also references an incarcerated individual at CCWF who reported that "although heat alerts are announced over the loudspeaker, people prefer to stay outside because of the lack of yard time in general." *Id.* While these vague anecdotes are not evidence of a systemic problem, it also bears noting that CDCR, in partnership with CCHCS, provides education to individuals on heat risk medication. That said, incarcerated persons enjoy autonomy over their own health-related decisions. They may opt to stay outside on hot days notwithstanding the potential risk. CDCR cannot, and should not, prevent individuals from doing so, as long as they are educated and understand the risks.

Class Counsel also assert that CDCR is not providing alternative accommodations to yard activities for those on heat-sensitive medications. While this issue strays from the issue of addressing extreme heat, and notwithstanding that incarcerated persons on heat-sensitive medications may decide to access yard time despite known risks, Defendants note that access to alternative activities during heat alerts is monitored during the *Coleman* Receiver team's Continuous Quality Improvement (CQI) tours. Of the eight institutions audited by CQI to date, five institutions had heat alerts during the review period and four of those showed high levels of compliance of offering access to alternative activities during heat alerts (88% at CCWF, 90% at CIW, 97% at FSP, and 100% at PVSP).

<u>Heat Sensor Installation</u>

As previously reported, CDCR installed two types of automated temperature sensors at Mule Creek and Calipatria State Prisons. ECF No. 4003 at 8:7-11. In a June 4, 2026 Non-Paragraph 7 Response, CCHCS indicated that CDCR is in the process of procuring heat sensors that will record heat index—meaning, both temperature and humidity. Although CDCR is working to procure devices that measure heat index, CDCR disagrees with Class Counsel's statement in the May 1 Letter that "**the appropriate metric to measure risk of harm from heat is *heat index***, not temperature." May 1 Ltr. at 6

[5] 2026 Annual Heat Plan and Updates (March 25, 2026) at 4.
[6] Electronic Temperature Log Memorandum (March 30, 2026) at 2.

(emphasis in original). Humidity is an important factor in determining what the temperature actually feels like to the human body when combined with air temperature, but heat index is generally not a helpful metric in dry climates. When relative humidity is low, as it typically is in California's desert region and inland valleys, the apparent temperature can actually be lower than the air temperature.[7] Similarly, in areas where there are hot temperatures in the summer months but low relative humidity values, "it [is] somewhat unusual to see dangerous heat index values" there. *Id.* Thus, while CDCR disagrees that heat index is the only appropriate metric by which to measure temperature, CDCR is actively working to procure sensors that measure heat index.

Johns Hopkins Heat Study

CCHCS has contracted with Johns Hopkins to assess the effect of extreme heat on health outcomes. It is anticipated that the results of this study will help CCHCS and CDCR develop protective strategies and identify the most vulnerable populations.

**CDCR's Response to Class Counsel's Request for Interim Measures**

Class Counsel requests that CDCR and/or CCHCS, in consultation with Receiver Peters and Receiver Kelso, undertake the following interim measures: (1) install in-cell heat sensors; (2) focus efforts on the highest risk patients; (3) ensure access to cooling centers for all incarcerated persons; (4) install shade and mist structures outdoors; (5) provide access to ice water, cool showers, and personal fans; (6) prioritize staffing so as not to interfere with the completion of Heat Plan mitigation measures; and (7) develop and implement staff and patient education campaigns. We respond to each of these requests below.

1. Heat Sensors

As discussed above, CDCR installed two types of automated temperature sensors at Mule Creek and Calipatria State Prisons and is in the process of procuring heat sensors that will record heat index. Workgroup discussions are ongoing and no decision has yet been made as to the location of the sensors' placement.

2. High Risk Patients

Identifying the patients at highest risk for significant harm due to heat illness is complex, involving environmental and behavioral factors in addition to personal health factors.

CCHCS provides relevant information to CDCR via the Automated Clinical Risk System, which identifies patients who CCHCS considers to be at higher risk for overall adverse health outcomes. CCHCS also provides relevant information through the Heat

---

[7] See, National Weather service, "What is the heat index?" at https://preview.weather.gov/ama/heatindex.

Medication Registry, which identifies patients who are prescribed a medication that increases their risk for heat illness. The 2026 Heat Plan and Emergency Medical Response policy and procedures provide mechanisms to minimize heat illnesses and respond appropriately to mitigate significant harm due to heat illness when it does occur.

3. Cooling Centers

CDCR and CCHCS leadership remain committed to proactive planning for high-heat months and extended heat waves. In accordance with the Heat Plan, with the activation of Stage II Heat Alert, staff shall initiate cooling and hydration measures, which may include but are not limited to, providing cool drinking water, showers, misting, or ensuring areas are equipped with fans. Staff are also expected to increase observation of incarcerated persons for signs of heat-related illness and report any symptoms to health care staff. In addition, staff provide education to incarcerated persons regarding heat-related illness.

4. Outdoor Structures

CDCR has begun the process of exploring the installation of shade structures and/or misting systems. This is being completed in a manner in which security of the institution and the safety of persons are prioritized, as well as the fiscal impact considered. CDCR currently has shade structures and/or misting systems in place at several facilities that were able to safely accommodate installation.

5. Access to Cooling Measures

As stated above, with the activation of Stage II Heat Alert, staff shall initiate cooling and hydration measures, which may include but are not limited to, providing cool drinking water, showers, misting, or ensuring areas are equipped with fans. Staff are also expected to increase observation of incarcerated persons for signs of heat-related illness and report any symptoms to health care staff.

6. Staffing Prioritization

Plaintiffs ask that CDCR use mandatory overtime and other emergency staffing measures in order to enforce the heat plan. Local Operational Procedures are already in place to address localized staffing shortages. They include involuntary overtime when necessary.

7. Staff and Patient Education

Extensive resources already exist for staff training and patient information. CCHCS is also in the process of developing additional resources. Training and education are already implemented, as noted in the 2026 Annual Heat Plan Memo. Staff complete annual training on heat-related pathologies where they are trained specifically on CDCR and CCHCS's expectations on the annual heat plan and updates as well as signs and

symptoms staff must be aware of during times of extreme heat. Moreover, institution leadership are expected to engage in regular discussions with representatives of the incarcerated population regarding their concerns related to heat. This will continue to promote institution leadership’s monitoring of heat-related impacts on the incarcerated population. Additionally, the annual Heat Plan memorandum details staff expectations on specific protocol they must follow when certain temperatures are reached regarding monitoring, tracking and cooling efforts to mitigate the elevated temperatures.

Very truly yours,

Samantha D. Wolff
Partner

cc: Receiver Colette Peters
Receiver Clark Kelso
Kathleen Toomey, Deputy Receiver
William Lothrop, Deputy Receiver
Dr. Darci Delgado
Dr. Brittany Brizendine
Gary Ninman
Sarah Hartmann
Sarah Brattin
Nick Weber
Rachel Napier
Sundeep Thind
*Plata* & *Coleman* Co-Counsel

# EXHIBIT 6

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

| | | |
|---|---|---|
| Date | : | September 3, 2026 |
| To | : | Steve Fama, Prison Law Office |
| Subject | : | **PRISON LAW OFFICE NON-PARAGRAPH 7 CONCERNING COMPLEX CARE MODEL UPDATE** |

California Correctional Health Care Services (CCHCS) is providing the italicized information below in response to your email inquiry dated July 9, 2026.

1. Can you please provide updates on these matters, including describing any relevant changes to CDCR databased (sic) or information infrastructure, and provide copies of any written information provided to the prisons (including CHCF, CMF, and SAC)? If changes or initiatives related to the Complex Care Model are scheduled for the future, please describe, including time-frames for implementation.

   *At the June 1, 2026, Plata Case Management Conference, the Honorable Jon S. Tigar requested that CCHCS submit a proposal to him outlining a system for coordinating care for patients with complex health care needs. The draft is under review by key stakeholders, including experts from other class action litigation. Quality Management has developed a Complex Care Management Registry prototype, the purpose of which will be to identify complex care candidates and track complex care services provided. Please note, subject to evaluation and program stakeholders' review, the specific complex care services that will be included in the Registry, along with the final methodology for identifying complex care candidates, is not finalized. The Registry will go into production once the complex care coordination system proposal is finalized and approved.*

Thank you.

cc: Clark Kelso, Receiver
Diana Toche, Undersecretary, Health Care Services, CDCR
Directors, CCHCS
CCHCS Office of Legal Affairs
Office of Legal Affairs, CDCR
Office of the Attorney General
Hanson Bridgett, LLP
DeAnna Gouldy, Deputy Director, Policy and Risk Management Services, CCHCS
Rainbow Brockenborough, Deputy Director, Institution Operations, CCHCS
Renee Kanan, M.D., Deputy Director, Medical Services, CCHCS
Robin Hart, Associate Director, Risk Management Branch, CCHCS
Regional Executives, Region II, CCHCS

# EXHIBIT 7

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

Date : June 29, 2026

To : Rana Anabtawi, Prison Law Office

Subject : **PRISON LAW OFFICE NON-PARAGRAPH 7 CONCERN RELATING TO INTERNAL AFFAIRS INVESTIGATION ON INAPPROPRIATE SVSP HOUSING**

California Correctional Health Care Services (CCHCS) and California Department of Corrections and Rehabilitation (CDCR) are providing the italicized information below in response to your email inquiry dated April 9, 2026.

1. Can you please confirm that no healthcare staff, including executing leadership, are the subject of any internal affairs investigation as it relates to the inappropriate housing of individuals at SVSP and the failure to provide consistent healthcare, in late 2024 and early 2025? If so, please explain how the decision was made that healthcare staff would not be a subject of any investigation.

   *No health care staff are currently the subject of any internal affairs investigations as it relates to this matter. There were health care executives who were the subject of an investigation, but those investigations were closed with no findings of misconduct.*

2. If an internal affairs investigation is being completed that also includes healthcare staff, we request an update on the status of the investigation.

   *Please refer to the response to question #1.*

Thank you.

cc: Clark Kelso, Receiver
Diana Toche, Undersecretary, Health Care Services, CDCR
Directors, CCHCS
CCHCS Office of Legal Affairs
Office of Legal Affairs, CDCR
Office of the Attorney General
Hanson Bridgett, LLP
DeAnna Gouldy, Deputy Director, Policy and Risk Management Services, CCHCS
Rainbow Brockenborough, Deputy Director, Institution Operations, CCHCS
Renee Kanan, M.D., Deputy Director, Medical Services, CCHCS
Robin Hart, Associate Director, Risk Management Branch, CCHCS
Regional Executives, Region II, CCHCS

# CERTIFICATE OF SERVICE

Case Name: **Plata, et al. v. Newsom, et al.** No. **4:01-cv-01351-JST**

I hereby certify that on September 4, 2026, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**JOINT CASE MANAGEMENT CONFERENCE STATEMENT; AND EXHIBITS 1-7**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on September 4, 2026, at San Diego, California.

| A. Rangel | A. Rangel |
|---|---|
| Declarant | Signature |

CA2001CS0001
85897411